UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:09-MD-02036-JLK

_____
                                                          )
IN RE: CHECKING ACCOUNT                                   )
OVERDRAFT LITIGATION                                      )
                                                          )
MDL No. 2036                                              )
_____)


_____
                                                          )
THIS DOCUMENT RELATES TO:                                 )
                                                          )
*Luquetta, et al. v. JP Morgan Chase Bank, N.A.*          )
S.D. Fla. Case No. 09-_____-JLK                     )
C.D. Cal. Case No. 2:09-cv-06967-GHK-FFM                  )
_____)


### FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff ANDREA LUQUETTA ("Plaintiff"), on behalf of herself and all similarly situated California residents, alleges the following based on personal knowledge as to allegations regarding the Plaintiff and on information and belief as to other allegations.

### INTRODUCTION

1.      This is a civil action seeking monetary damages, restitution, and injunctive relief from Defendant JP Morgan Chase Bank, N.A., ("Chase" or "the Bank") arising out of its unfair, deceptive, and unconscionable assessment and collection of excessive overdraft fees.

2.      "The Banks," as used in this Complaint, refers to both Chase and Washington Mutual Bank ("Washington Mutual"), which Chase acquired on September 25, 2008. As part of the acquisition, Chase assumed the liabilities of Washington Mutual and is therefore liable for the misconduct of Washington Mutual described herein in addition to its own substantially similar misconduct.

3.      In the era of electronic banking and the ubiquitous use of debit card[1] transactions, the assessment of overdraft fees has become a major profit center for many United States banks, including Chase.  For years, banks covered customers who occasionally bounced checks and even did so for a time for customers using debit cards, without charging their customers.  Since the early 1990's, however, banks have devised methods to provide overdraft "protection" for customers and charge them in each instance.  A recent FDIC report estimated that overdraft fees represent 74 percent of the total service charges that are imposed on deposit accounts in the United States.  A 2008 FDIC study reports that overdraft fees for debit cards can carry an effective annualized interest rate that *exceeds 3,500 percent*.  Nevertheless, the Consumer Federation of America reports that five of the ten largest banks raised their overdraft fees in the last year.

4.      In 2007, banks collected more than $17 billion in overdraft fees.  That number nearly doubled in 2008, as more and more consumers struggled to maintain positive checking account balances.  *In 2009, banks are estimated to bring in between $27 billion to $38.5 billion in overdraft charges alone*.  Chase is among the largest beneficiaries of these staggering charges.

5.      Almost by definition, these fees disproportionately affect the poor, who are most likely to maintain low balances.  Moebs Services, a research company that has conducted studies for the government as well as banks, estimates that 90 percent of overdraft fees are paid by the poorest 10 percent of banks' customer base.  Moreover, these fees have the tendency to create a domino effect, because the imposition of a service charge on an account

---

[1] The term debit card as used in this complaint includes ATM cards as well as "hybrid" check cards.  Hybrid check cards operate as ATM cards but bear the Visa or MasterCard logo and are accepted by merchants who accept credit cards but would not otherwise accept ATM cards. Plaintiff Luquetta's card was a Washington Mutual branded hybrid card with a MasterCard logo. Plaintiff has the ability to use her card for point of sale purchases like a debit or credit card and as an ATM debit card.

with a negative balance will make it less likely that the account holder's balance will reach positive territory, resulting in more fees.

6.     Before debit cards existed, banks occasionally extended the courtesy of honoring paper checks written on overdrafted or otherwise deficient accounts for customers who were typically in good standing.  Banks extended this courtesy largely because the third party involved in a sales transaction allowed the customer to purchase goods or services with a check with an expectation that funds would be available and that the check would clear.  For example, if a customer used a check to purchase groceries, the grocery store would only know if the check cleared *after* the groceries had been purchased.

7.     The same considerations are not present when customers use debit cards. Banks could simply decline to honor debit or point of sale transactions made where accounts lack sufficient funds to execute the transaction.  Retail and service transactions could still be executed if customers presented an alternative form of payment.  ATM transactions could still proceed if banks provided a warning that an overdraft fee would be incurred, and consumers chose to proceed nevertheless.  In fact, until a few years ago, most banks simply declined debit transactions that would overdraw an account.

8.     Instead of simply declining debit transactions when there are insufficient funds or warning its customers that an overdraft fee will be assessed if they proceed with the transaction, Chase routinely processes such transactions and then charges its customers an overdraft fee of $25 to $35—even when the transaction is for only a few dollars.  Washington Mutual also engaged in this practice.  This automatic, fee-based overdraft scheme is intentionally designed to maximize overdraft fee revenue for the Banks.  Additionally, as part of their inequitable motive to generate obscene profits gained through the imposition of unconscionable overdraft fees, the Banks either refused to allow their customers to opt out of overdraft protection, or failed to adequately disclose to their customers that they may do so.

9.     In many instances, these overdraft fees cost the Banks' account holders hundreds of dollars in a matter of days, or even hours, when they may be overdrawn by only a

few dollars. Even more egregious, customer accounts may not actually be overdrawn at the time the overdraft fees are charged, or at the time of the debit transaction.

10.     Thus, it is through manipulation and alteration of customers' transaction records that the Banks maximize overdraft penalties imposed on customers.

11.     Although it is possible to do so, the Banks do not or did not alert their debit card customers at the time of a POS transaction or ATM withdrawal that the transaction will overdraft their account and cause them to incur fees.

## JURISDICTION AND VENUE

12.     The Central District of California has original jurisdiction of this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), since Plaintiff is a citizen of a State different from Chase, and the combined claims of proposed class members exceed $5,000,000 exclusive of interest and costs.

13.     Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b)(2) because Chase conducts business in the district, is subject to personal jurisdiction in the district, and a substantial part of the events giving rise to the claims occurred in the district.

## PARTIES

14.     Plaintiff Andrea Luquetta is, and at all relevant times hereto has been, a resident of Los Angeles, California. Ms. Luquetta is a customer of the Bank who was charged improper overdraft fees in connection with the use of her Chase checking account.

15.     JP Morgan Chase Bank, N.A. maintains its principal place of business in Columbus, Ohio. Chase regularly and systematically conducts business throughout the State of California, including in the Central District. Among other things, Chase is engaged in the business of providing retail banking services to millions of consumers, including Plaintiff and members of the putative Classes, which include the issuance of debit cards for use by its customers in conjunction with their checking accounts.

16.     Chase is a national bank subject to the National Bank Act, 12 U.S.C. § 1, *et seq.*, and OCC regulations.

## CLASS ALLEGATIONS

17.     Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Fed. R. Civ. P. 23.   This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

18.     The proposed class is defined as:

> All Chase and/or Washington Mutual customers in the State of California who, from September 24, 2005 to the date of class certification, incurred an overdraft fee as a result of Chase or Washington Mutual's practice of re-sequencing debit card transactions from highest to lowest (the "Class").

19.     Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

20.     Excluded from the Class are Chase, its parents, subsidiaries, affiliates, officers and directors, any entity in which Chase has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.   Also excluded are any former officers or directors of Washington Mutual.

21.     The members of the Class are so numerous that joinder is impractical. The Class consists of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to the Banks' records.

22.     The claims of the representative Plaintiff are typical of the claims of the Class in that the representative Plaintiff, like all Class members, was charged overdraft fees by Chase and/or Washington Mutual as a result of their practice of re-sequencing debit card transactions from highest to lowest.   The representative Plaintiff, like all Class members, has been damaged by Chase and/or Washington Mutual's misconduct in that she incurred and/or will continue to incur unfair and unconscionable overdraft charges.   Furthermore, the factual basis of

Washington Mutual and Chase's misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Class.

23.     There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual Class members.

24.     Among the questions of law and fact common to the Class are whether Chase, and Washington Mutual before the merger,

a.     Do or did not clearly disclose and/or refuses to allow their customers to opt out of their overdraft protection program;

b.     Do or did not obtain affirmative consent from their customers prior to processing transactions that will result in overdraft fees;

c.     Do or did not alert their customers that a debit card transaction will trigger an overdraft fee, and does not or did not provide their customers with an opportunity to cancel such transactions;

d.     Manipulate and reorder or manipulated or reordered transactions so that they can increase the number of overdraft fees they impose;

e.     Manipulate and reorder or manipulated or reordered debits from highest to lowest in order to maximize the number of overdrafts and, consequently, the amount of overdraft fees;

f.     Impose or imposed overdrafts and overdraft fees when, but for reordering transactions, there would otherwise be sufficient funds in the account;

g.     Fail or failed to provide customers with accurate balance information;

h.     Delay or delayed posting of transactions by customers using debit cards so that customers are charged overdraft fees on transactions, even though the customers had sufficient funds in their accounts to cover the transactions upon execution;

i.      Charge or charged exorbitant overdraft fees that bear no relationship to the actual costs and risks of covering insufficient funds transactions;

j.      Breach or breached the covenant of good faith and fair dealing with Plaintiff and the other members of the Class through its overdraft policies and practices;

k.      Convert or converted moneys belonging to Plaintiff and the other members of the Class through overdraft policies and practices;

l.      Require or required their customers to enter into standardized account agreements which include unconscionable provisions;

m.      Were unjustly enriched through overdraft policies and practices; and

n.      With respect to Chase, continues to commit wrongdoing through its overdraft policies and practices.

25.     Other questions of law and fact common to the Class include:

a.      The proper method or methods by which to measure damages, and

b.      The injunctive relief to which the Class is entitled.

26.     Plaintiff's claims are typical of the claims of other Class members, in that they arise out of the same wrongful overdraft policies and practices and the same or substantially similar unconscionable provisions of the Banks' account agreements and other related documents.  Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other Class member.

27.     Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions.  Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

28.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of

Chase, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses and Chase's misconduct will proceed without remedy.

29.     Even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

## COMMON FACTUAL ALLEGATIONS

### A.     Chase and Washington Mutual

30.     Chase is one of the largest banks in the United States, with over two trillion dollars in assets. Chase has over 5,100 branches and 15,000 ATMs nationwide.

31.     In 2007, Washington Mutual was the seventh largest bank in the United States, according to a 10-K Form filed with the Securities and Exchange Commission by its parent, Washington Mutual, Inc., on February 29, 2008. At that time, Washington Mutual employed over 43,000 individuals and maintained over 2,200 branch offices in 15 states. Washington Mutual operated 4,932 ATMs and held $188.3 billion in deposits.

32.     On September 21, 2008, Chase acquired all deposits and assets of Washington Mutual for $1.9 billion. According to a press release issued by Chase, the acquisition created the largest depository institution in the country, with over $900 billion in customer deposits. The acquisition also created the second-largest network of bank branches and gave Chase control over 24.5 million checking accounts.

33.     Since the acquisition, Chase has owned and operated Washington Mutual's consumer banking operations, and upon information and belief it has finished converting those operations to the Chase brand.

34.     Pursuant to its acquisition agreement with Washington Mutual, Chase assumed the liabilities of Washington Mutual to its depositors.  Therefore, Chase is liable for the harm caused by the practices described herein, and is obligated by law to compensate Plaintiff and Class members who were injured by Washington Mutual's overdraft fee practices.

35.     Chase is, and Washington Mutual was, in the business of providing customers with a variety of banking services.  One of the services provided by the Banks for customers who open a checking account is a debit card, also known as a check card or ATM card.  Through those debit cards, customers can engage in transactions using funds directly from their accounts by engaging in "debit" or "point of sale" ("POS") transactions, or may withdraw money from their accounts at automated teller machines ("ATMs").  Whether the card is used to execute POS transactions or to withdraw cash from ATM machines, the transaction is processed electronically.  As a result, the Banks are notified instantaneously when the card is swiped, and have the option to accept or decline transactions at such time.

36.     The Banks employ sophisticated software to automate their overdraft system.  This program maximizes the number of overdrafts, and thus, the amount of overdraft fees charged per customer.

37.     As a result of the Banks' manipulation and alteration of customers' transactions records, funds in a customer's account are depleted more rapidly and more overdraft fees are likely to be charged for multiple smaller transactions.  Indeed, overdraft charges are likely to occur at times when, but for the manipulation and alteration, there would be funds in the account and no overdraft would occur.  For example, if a customer, whose account has a $50 balance at the time the Banks processed several transactions, made four transactions of $10 and one subsequent transaction of $100 on the same day, the Banks would reorder the debits from largest to smallest, imposing four overdraft fees on the customer.  Conversely, if the $100

transaction were debited last—consistent with the actual order of transactions—only one overdraft fee would be assessed. *See* FDIC Study of Bank Overdraft Programs, November 2008, *available at*: http://www.fdic.gov/bank/analytical/overdraft/, at 11, n. 12.

38.     Alternatively, a customer may have $100 in their account and spend $50 on Saturday, $50 on Sunday, and $101 on Monday. Instead of being charged one overdraft for their $101 transaction on Monday, the Banks can and do reorder the transactions from Saturday through Monday such that the Monday transaction is processed before the Saturday and Sunday transactions.  As like with the previous example, the end result is the customer being charged more overdraft fees than had the Banks processed the transactions chronologically.

**B.     The Banks' Relevant Customer Documents Regarding Overdrafts**

39.     Plaintiff and all members of the Class maintain or maintained a checking account with Chase and/or Washington Mutual.

40.     The terms of Chase's checking accounts are contained in standardized account holder agreements, presented to its customers on a "take it or leave it" basis, drafted and imposed by Chase, which was the party of vastly superior bargaining strength, and thus constitute contracts of adhesion.  A representative copy of the "Account Rules and Regulations" (the "Deposit Agreement"), covering all Chase accounts, which is 31 pages long, single-spaced and in small print, is attached as Exhibit A.

41.     The Deposit Agreement states:

**Insufficient Funds**:  If you don't have enough funds available in your account to cover your checks or any other withdrawals, one of these two things will happen depending on your specific account:

•     We pay the check or other withdrawal and charge an Insufficient Funds fee to the account.

•     We return the check or withdrawal unpaid and charge a Returned Item fee to the account.

Ex. A, p. 4.

42.     The Deposit Agreement also states that "[g]enerally, deposits will be credited to your account first and then we'll pay your items (e.g. checks, debit card transactions, ATM transactions and other debits to your account) from highest to lowest dollar amount each business day.  Certain transactions such as wire transfers may post before others." *Id.*

43.     In addition, the Deposit Agreement states:

> We have no obligation to pay or honor any item or withdrawal request unless it is drawn or requested against available funds credited to your Account at the opening of business on the day the item is presented for payment or the request is received, even if we paid an item or honored a withdrawal request drawn or requested against insufficient funds in the past.  If we pay an item or honor your request that overdraws your Account, a deposited item has been returned unpaid, or for any other reason your Account has become overdrawn, you agree to pay the amount of the overdraft together with any fee and accrued interest identified in this Agreement immediately, whether or not you signed or requested the withdrawal or participated in the transaction creating the overdraft.

> You hereby authorize us to apply any subsequent deposit to the Account against the amount of any overdraft and resulting fees or charges, including any federal or state benefit payments that you choose to deposit in any Account (including direct deposit of Social Security). …

> Items will be posted to your Account in highest to lowest dollar amount each business day (Monday through Friday, federal holidays not included).  However, certain transactions like wire transfers may be posted before others.  We reserve the right to change this posting order without notice.  We may assess a fee for any item or withdrawal request, such as a check, in person withdrawal, ATM withdrawal, or other electronic means, when there are insufficient funds in your Account based upon the posting method identified above, whether or not the item is paid or the request honored, or whether or not an overdraft to your account has occurred.  We may assess an Extended Overdraft fee for overdraft balances that are not promptly repaid and/or charge interest for any overdraft on your Account.   You agree to pay all costs and expenses, including attorney's fees, incurred by us in the collection of any overdraft.

*Id.* at 10-11.

44.     The Deposit Agreement also states that "Insufficient Funds and Returned Item based on the number of 'Occurrences' in the previous twelve (12) months plus the current month.   An Occurrence happens any business day that at least one item is presented or withdrawal request is made against an account with insufficient funds, whether or not we honor any or all of the items or withdrawal requests.  In general, the more Occurrences you have on the account, higher fees will be charged on each item.  For example, on your second Occurrence e you may pay a higher per item fee than you paid on the first Occurrence." *Id.* at 11.

45.     The Deposit Agreement does not set forth the dollar amount of fees that will be charged for purported overdrafts.

46.     Instead, a separate document, the "Account Rules and Regulations - Important Notices"), lists the dollar amount of fees that will be charged for purported overdrafts, in a chart entitled "Insufficient Funds, Returned Items, and Stop Payments."  The Important Notices, a representative copy of which is attached as Exhibit B, states in small print, as follows:

Insufficient Funds and Returned Item Fees

| | |
|---|---|
| -accounts opened in FL, GA, ID, OR, WA | $ 34.00/item or withdrawal request |
| -all other accounts:<br>    First occurrence during the current month and preceding 12 months | $ 25.00/item or withdrawal request |
|     Second through fourth occurrences during the current month and preceding 12 months | $ 32.00/item or withdrawal request |
|     Fifth and subsequent occurrences during the current month and preceding 12 months | $ 35.00/item or withdrawal request |

An "occurrence" is a day with at least one insufficient funds or returned item/withdrawal request.

*   *   *

Extended Overdraft Fee (If account balance remains negative for five consecutive business days):

| | |
|---|---|
| -accounts opened in CT, FL, GA, ID, NJ, NY, OR, WA | no fee |
| -accounts opened in AZ, LA, OK, TX, WV | $12.50/incident |
| -accounts opened in MI | $25.00/incident |
| -all other accounts | $15.00/incident |

47.     The Deposit Agreement and related documents, including the Important Notices, fail to disclose to customers that they have the option to "opt out" from the Bank's overdraft scheme, although it is possible for them to opt out upon request.

48.     The terms of Washington Mutual's checking accounts were also contained in standardized account holder agreements, presented to its customers on a "take it or leave it" basis, drafted and imposed by Washington Mutual, which was the party of vastly superior bargaining strength, and thus constitute agreements of adhesion.   Washington Mutual's contractual provisions and fee schedule concerning overdraft fee practices, in fact, are substantially similar to the corresponding documents that Chase imposes on consumers.   A representative copy of the "Account Disclosures and Regulations" covering Washington Mutual "deposit accounts," which is 92 pages long, single-spaced and in small print, is attached as Exhibit C.

49.     Exhibit C states:

**Non-Sufficient      Funds/Uncollected      Funds/Overdrafts**
If a check you write or any other transfer or withdrawal request is presented for payment, or if we otherwise receive notice of such check, transfer, or withdrawal request, and sufficient funds are not available in your account (due to non-sufficient funds, uncollected items, or otherwise), the Bank shall have the authority to process same in any order, at its option, and if such is not otherwise required to be paid in accordance with an overdraft line of credit or overdraft transfer service agreement with us, Bank may, in its sole discretion, either (1) make payment in accordance with such check, transfer or withdrawal request or (2) return the check, transfer or other withdrawal unpaid, and, in either case, we will not be liable to you for doing so. …

[I]f the Bank chooses to pay the check, transfer or withdrawal and the Bank is not reimbursed by an automatic advance from your line of credit or transfer authorization, we will impose an Overdraft Charge for each item, transfer or withdrawal in the amount disclosed in the *Statement of Fees* applicable to your account.  You agree that you will, WITHOUT DEMAND OR NOTICE FROM US, immediately deposit or otherwise pay Bank sufficient good funds to eliminate any overdraft and to pay the Overdraft Charge. … If the Bank chooses not to pay the check, transfer or

withdrawal, the Bank will assess a Non-Sufficient Funds Charge for each item or transaction in the amount disclosed in the Statement of Fees applicable to your account.  We may also close your account without notice, unless notice is required by law. Should we allow an overdraft, we will not be obligated to continue the practice at a later time, nor will we be obligated to notify you of such discontinuance.  You are responsible for immediately reimbursing the Bank for all overdrafts and returned items, regardless of when or why returned, and for all Overdraft Charges and Non-Sufficient Funds Charges. …

The Bank may, at its option, pay checks, transfers and withdrawals, including, without limit, electronic transactions such as ATM, debit card, electronic check, automated and electronic bill payments and other automated transactions presented for payment against your account, despite insufficiency of good finds in the account, up to the amount of the Overdraft Limit it has established, but has no obligation to do so.  Fees will be assessed as set forth above for overdrafts created in any manner including, without limit, by transaction types described above (pp. 30-31).

50.     Exhibit C also states that "[t]he Bank determines the order of posting deposits, checks, debits and other charges to your account unless otherwise required by law. Deposits/credits, checks, debits and other charges arriving to your account on the same day may be credited/paid/returned in any order at the Bank's option.  We may give preference to any checks, debits or charges payable to the Bank or any affiliate of the Bank." *Id.* at 32.

51.     Exhibit C further states:

| **Balance** | **Calculation/Definitions** |
We calculate the balance in your account differently for different purposes.

*Available Balance*.  Your Available Balance is the balance at any time that is available for withdrawal in accordance with our Funds Availability Policy. …

*Collected Balance*.  Your Collected Balance is the balance in your account including deposits which we are deemed to have collected in accordance with the Balance Calculation/Determining Collected Balance section below. …

> *Ledger Balance (sometimes referred to as "Current Balance").*
> Your Ledger Balance is the balance at the time of the inquiry,
> which includes all deposits we deem received. …

*Id*. at 46.

52.     In addition, Exhibit C states that "[t]he Bank reserves the right to change its fees from time to time without notice, except as may be required by law," and that "[t]he Bank may elect to waive any of these Rules, but any such waiver will only apply on that occasion." *Id.* at 55-56, 70.

53.     Exhibit C does not set forth the dollar amount of fees that will be charged for purported overdrafts.

54.     Instead, a separate document, the "Statement of Fees," a representative copy of which is attached as Exhibit D, lists the dollar amount of fees that will be charged for purported overdrafts, in a chart entitled "Account & Other Service Fees."  In small print, the chart states:

> Overdraft Charge (if paid) and Non-Sufficient
>        Funds Charge (if returned) . . . . . . . . . . . . . . . .$30.00/item
>                       Maximum of               $150.00 per day

55.     Neither Exhibit A nor Exhibit C (together, the "Deposit Agreements"), nor any related documents, including the Important Notices or Statement of Fees, inform customers that they have the option to "opt out" from the Banks' overdraft schemes, if Washington Mutual allowed its customers to do so.

**A.     The Banks' Re-Ordering of Checking Account Transactions**

56.     In an effort to maximize overdraft revenue, Chase manipulates and reorders debits from highest to lowest each business day and also reorders transactions from different days.  Chase reorders transactions for no reason other than to increase the number of exorbitant overdraft fees it can charge.  This practice violates numerous consumer protection laws and the covenant of good faith and fair dealing in the Bank's Deposit Agreement.

57.     Transactions involving debit cards used by Chase customers, including the withdrawal of cash from ATM machines and POS transactions with vendors, are processed electronically.  As a result, Chase is notified instantaneously when the customer's debit card is swiped, and has the option to accept or decline these transactions.

58.     Notwithstanding the instantaneous nature of these electronic debit card transactions, under Chase's posting system, it fails to post charges in the order in which they are incurred or received.  Chase developed a policy and employs a practice whereby account charges and debits are posted to its customers' accounts out of chronological order for the sole purpose of maximizing the number of overdraft transactions and, therefore, the amount of overdraft fees charged to its customers.

59.     Instead of processing such transactions in chronological order, Chase processes them starting with the largest debit and ending with the smallest debit, so as to generate the largest possible number of overdrafts and the greatest possible amount of overdraft fees.

60.     Chase refrains from immediately posting charges to a customer's account as it receives them—sometimes for multiple business days.  By holding charges rather than posting them immediately to an account, Chase is able to amass a number of charges on the account.  Subsequently, Chase posts all of the amassed charges on a single date.  When the group of charges is eventually posted to the customer's account, Chase posts them in order of largest to smallest—not in the order in which they were received or in the order in which they were charged.  This delayed posting results in the imposition of multiple overdraft fees that would not otherwise be imposed.  The delayed posting also prevents customers from ascertaining the accurate balances in their accounts.

61.     Chase's policy and practice of posting charges from largest to smallest, rather than chronologically, or from smallest to largest, is specifically designed to maximize the generation of overdraft fees by triggering overdraft fees for account charges that would not otherwise result in such fees.

62.     Chase enforces an unconscionable policy whereby charges incurred are posted to customers' accounts in a non-chronological order, from highest to lowest, and are held for multiple days and then batched together, to maximize the number of overdraft transactions and fees.   Chase's processing practices substantially increase the likelihood that customers' smaller charges will result in multiple overdraft fees.   The practices provide Chase with substantially higher service fee revenues than it would otherwise achieve absent these practices.

63.     As a result, Plaintiff and members of the Class have been assessed overdraft fees for transactions which occurred when they actually had sufficient funds in their accounts to cover those transactions.

64.     In addition, Chase misleads its customers regarding its reordering practices.   The statements in the Deposit Agreement are deceptive and unconscionable.   While Chase encourages its customers to use debit cards-informing consumers that the cards are a "convenient way to access your money," "are accepted at millions of locations worldwide," "are safer than using cash," and "can be used for everyday purchases including gas, groceries, dining out, shopping online and paying bills"—Chase fails to disclose its wrongful practices relating to its imposition of overdraft fees from debit card purchases.   Chase states that "*[g]enerally,* deposits will be credited to your account first and then we'll pay your items (e.g. checks, debit card transactions, ATM transactions and other debits to your account) from highest to lowest dollar amount *each business day.*"   However, Chase fails to disclose that it maximizes its overdraft fees, at consumer expense, by grouping together POS transactions that occurred on *subsequent* days with POS transactions that occurred on *earlier* days, and reordering them so that higher debits that occurred on subsequent days are posted to its customers' accounts before lower debits that occurred on earlier days, contrary to the terms of the Bank's Deposit Agreement and its customers' reasonable expectations.   Chase's practices violate the covenant of good faith and fair dealing implied in the Deposit Agreement as well as the consumer protection laws of California.

65.     Washington Mutual's checking account agreement fails to inform consumers that Washington Mutual's standard practice was to reorder account transactions from highest to lowest to maximize the number of individual $30 overdraft fees, to consumer detriment.  In addition, Washington Mutual's checking account agreement contains numerous deceptive and unconscionable provisions.

66.     Before it was acquired by Chase, Washington Mutual engaged in substantially similar practices concerning the reordering of checking account transactions and the imposition of overdraft fees on consumers.

C.     **The Banks' Cloaking of Accurate Balance Information**

67.     Chase actively promotes the convenience of its debit cards and other electronic debiting, but fails to provide customers with accurate balance information.  When customers execute account transactions, they generally do not have access to an accurate balance register or balance information.

68.     Chase provides inaccurate balance information to its customers through its electronic network.  In certain cases, Chase informs its customers that they have a positive balance when, in reality, they have a negative balance, despite its actual knowledge of outstanding debits and transactions.

69.     Even when Chase has actual knowledge of outstanding transactions which have already created a negative balance in a customers' account, it encourages the customer to incur more overdraft charges by approving—rather than prudently declining—subsequent debit card purchases and other electronic transactions.

70.     Chase also assesses overdraft fees at times when actual funds in the customer account are sufficient to cover all debits that have been submitted to the Bank for payment.  It does this by placing a "hold" on actual funds in the customer's account.  In doing so, Chase charges overdraft fees where it faces no risk, because the cash balance in the customer's account has not dropped below zero.

71.     The Banks tout the purported benefits of its checking account and debit cards in advertisements aimed at luring new customers and retaining current ones, as convenient online banking features have become an industry standard.  Below are examples of the Banks' advertisements regarding the purported benefits of their checking accounts and debit cards from the Chase and Washington Mutual websites:

a.      "Use your card to pay for your purchases—groceries, gas, bills or even a cup of coffee.  The money will be deducted directly from your checking account."

b.      "Purchases are automatically subtracted from your checking account and recorded on your monthly statement."

c.       "If asked 'debit or credit,' always select 'credit' and sign for the purchase.  The money for your purchases is always deducted from your checking account when you use your debit card, even if you select 'credit.'  When paying bills (e.g., utilities, cable television, telephone) with your debit card, always select 'credit card' if prompted or ask the biller to process your debit card as a credit transaction; do not provide your PIN.  The money for your bill payment will still be deducted from your checking account."

d.      "With our Online, On Time Guarantee, you never need to worry about late payments."

e.      "You can schedule exactly when you need your payments sent. You can even choose whether to make a one-time or a repeating payment."

f.      "Our free online bill pay service with a WaMu checking account lets you control who, when and how much to pay.  There are no stamps to buy, envelopes to lick or multiple sites to log in to.  Just schedule the payment and it's done.  And online bill pay transactions are guaranteed to arrive on the scheduled date."

72.     The advertisements above each create the expectation that account funds are debited immediately by the amount of the purchase at the time of purchase.  They also include the expectation that transactions will be processed in the order that they are incurred and not reordered with transactions from different days.  As demonstrated by the Banks' actions

alleged herein, these expectations are not met, as funds are not depleted immediately by the amount of the purchase at the time of purchase and the Banks will reorder transactions from different days for its own benefit.

73. The advertisements above are misleading or deceptive because they create the expectation that these transactions will be processed in the order that they are incurred or are scheduled to be incurred. As demonstrated by the Banks' actions alleged herein, these expectations are not met, as the Banks will reorder transactions from different days for its own benefit.

74. Before it was acquired by Chase, Washington Mutual engaged in substantially similar practices concerning the cloaking of balance information.

**D.    The Banks' Failure to Notify Customers of Overdrafts or Advise Customers of Their Right to Opt Out**

75. At the time its debit cards are used in POS transactions or at ATMs, Chase is able to determine, almost instantaneously, whether there are sufficient funds in a customer's account to cover that particular transaction. Chase has the technological capability to decline transactions (which it does when a pending transaction would exceed a pre-determined, overdraft tolerance limit for the account), or notify customers at that very moment that the particular debit card transaction would result in an overdraft. Chase could give customers the option to decline the transaction to avoid incurring the overdraft fee, but it does not do so because it seeks to maximize the amount of revenue generated through its assessment of overdraft fees.

76. Notwithstanding its technological capabilities and actual knowledge, Chase fails to provide notice to Plaintiff and the Class that a particular debit card transaction will result in an overdraft and, hence, an overdraft fee. Because Chase's customers are not notified of the potential overdraft, and are not given the option of declining the debit card transaction or providing another form of payment, the customers incur monetary damages in the form of overdraft fees.

77.     At relevant time, Chase failed to make Plaintiff and Class members aware that they can opt out of its overdraft scheme upon request, thereby avoiding any overdraft fees from being incurred.

78.     Before it was acquired by Chase, Washington Mutual engaged in similar practices.  Specifically, it was also able to determine whether an overdraft would occur, but failed to inform its customers or give them the opportunity to opt out, if it allowed its customers to do so.

**E.**     **The Banks' Overdraft Policies and Practices Are Contrary to Best Practices**

79.     By engaging in the conduct described herein, Chase and Washington Mutual have failed to follow the list of "best practices" for overdraft programs set forth in the "Joint Guidance on Overdraft Protection Programs" ("Joint Guidance") issued by the United States Department of the Treasury, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the National Credit Union Administration (collectively, the "Agencies").  A copy of the Joint Guidance is attached as Exhibit E.  These "best practice" recommendations include: "Provide election or opt-out of service.  Obtain affirmative consent of consumers to receive overdraft protection.  Alternatively, where overdraft protection is automatically provided, permit consumers to 'opt-out' of the overdraft program and provide a clear consumer disclosure of this option." 70 F.R. 9127-01, 9132.

80.     According to rules proposed by the Agencies: "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . .  This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee." 73 F.R. 28904-01, 28929 (May 19, 2008).

81.     The Joint Guidance also advises banks to "[a]lert customers before a transaction triggers any fees.  When consumers attempt to withdraw or transfer funds made

available through an overdraft protection program, provide a specific consumer notice, where feasible, that completing the withdrawal may trigger the overdraft fees." 70 F.R.D. 9127, 9132. The Joint Guidance further advises that "[t]his notice should be presented in a manner that permits consumers to cancel the attempted withdrawal or transfer after receiving the notice." *Id.*

82.     Similarly, the list of "best practices" recommended in "Overdraft Protection: A Guide for Bankers," issued by the American Bankers Association, includes offering customers the option of "opting out" of any overdraft programs, and informing customers, before they access funds, that a particular point of sale or ATM transaction will cause them to incur an overdraft fee.  A copy of "Overdraft Protection: A Guide for Bankers" is attached as Exhibit F.

83.     Chase and Washington Mutual's overdraft policies make it difficult for customers to avoid injury even if they carefully track the balance in their account.  In fact, the Agencies have stated that "Injury" resulting from such policies, "is not reasonably avoidable" by the consumer.  73 F.R. 28904-01, 28929.  "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available."

84.     On October 6, 2009, the Center for Responsible Lending issued a report entitled "Overdraft Explosion:  Bank Fees for Overdrafts Increase 35% in Two Years."  The report, attached hereto as Exhibit G, finds that it is now "standard procedure to automatically enroll checking account customers in their most expensive overdraft loan program."  The report finds that debit card transactions account for more overdraft fees than traditional checks or any other type of transaction, even though "debit card transactions and ATM withdrawals . . . could easily be denied for no fee."  The report also finds that overdraft fees increased 35 percent from

2006 to 2008, and that over 50 million Americans overdrew their accounts in a 12 month period, with 27 million accounts incurring five or more overdraft fees.

85.     A chart from the research company Moebs Services shows that, in every year since 1992, banks have gained increased revenues from overdraft fees:



F.      **The Banks' Unconscionable Provisions and Policies**

86.     The Banks' overdraft policies and practices are unconscionable in the following respects, among others:

a.      The Banks do not or did not disclose or reasonably disclose to customers that they have the option to "opt out" of its overdraft scheme (if Washington Mutual even allowed its customers to do so);

- 23 -

b.      The Banks do not or did not obtain affirmative consent from checking account customers prior to processing a transaction that will overdraw the account and result in an overdraft fee;

c.      The Banks do not or did not alert customers that a debit card transaction will trigger an overdraft, and do not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

d.      The Deposit Agreements and related documents are contracts of adhesion in that they are standardized forms, imposed and drafted by the Banks, which have vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement in its entirety;

e.      The amount of overdraft fees is disclosed in an ineffective, ambiguous, misleading, and unfair manner, in a document not signed by the depositor; and

f.      The Banks' Deposit Agreements provided to customers are ineffective, ambiguous, deceptive, unfair, and misleading in that they do not unambiguously state that the Banks always reorder debits from high to low over separate days, even though the Banks reorder transactions in this way for customers in order to maximize overdrafts and overdraft fee revenues.

g.      Chase's Deposit Agreement also contains an arbitration clause and a class action waiver which states:

> ANY DISPUTE MUST BE RESOLVED BY BINDING
> ARBITRATION. . . . YOU WILL NOT BE ABLE TO BRING A
> CLASS ACTION OR OTHER REPRESENTATIVE ACTION IN
> COURT, NOR WILL YOU BE ABLE TO BRING ANY CLAIM
> IN ARBITRATION AS A CLASS ACTION OR OTHER
> REPRESENTATIVE ACTION.  YOU WILL NOT BE ABLE TO
> BE PART OF ANY CLASS ACTION OR OTHER
> REPRESENTATIVE ACTION BROUGHT BY ANYONE ELSE,
> OR TO BE REPRESENTED IN A CLASS ACTION OR OTHER
> REPRESENTATIVE ACTION.
>
> . . .

> If you or the Bank elects to arbitrate a Claim, the arbitration will be conducted as an individual action. Neither you nor the Bank consents or agrees to any arbitration on a class or representative basis, and the arbitrator shall have no authority to proceed with any arbitration on a class or representative basis. This arbitration provision applies to and includes any Claims made and remedies sought as part of any class action, private attorney general or other representative action, which Claims hereby are made subject to arbitration on an individual (non-class, non-representative) basis. This means that even if a class action lawsuit or other representative action, such as that in the form of a private attorney general action, is filed, any Claim between you and the Bank related to this Agreement raised in such lawsuits will be subject to an individual arbitration Claim if either you or the Bank so elects.

Deposit Agreement, p. 19.

        h.    Such arbitration agreements are procedurally and substantively unconscionable and unenforceable under in that, inter alia, the Deposit Agreement, to the extent it may be deemed a contract at all, is a contract of adhesion because, among other reasons, it is a standardized form, imposed and drafted by Chase, which is a party of vastly superior bargaining strength, and relegates to the depositor only the opportunity to adhere to it or reject it, and because it leads to overly harsh results for consumers and prevents consumers from having a meaningful opportunity to redress their grievances.

        87.    In July 2009, Chase publicly announced that it will no longer seek to enforce the arbitration provisions in its Deposit Agreement, and it is equitably estopped from reneging on this commitment.

        **G.**    **Recently Announced Changes in Chase's Overdraft Policies and Practices Do Not Offer Any Remedial Benefits to Customers**

        88.    On September 22, 2009, Chase announced plans to overhaul its overdraft policies on a going-forward basis. The changes do nothing to remedy the past wrongs to Plaintiff and the Classes. They do not retroactively reverse the charges wrongly debited from their accounts, nor do they prevent Chase from continuing its unfair and unconscionable methods of business.

**H.**     **The Banks' Overdraft Practices Harmed Plaintiff**

89.     Plaintiff Luquetta held a checking account with Chase.

90.     Ms. Luquetta was issued a debit card by the Bank in connection with her account. As described above, a debit card allows customers to access their checking account funds by using the card to execute a transaction. The charge is processed electronically, and the Bank has the option to accept or decline the transaction at the point of sale.

91.     Chase charged Ms. Luquetta multiple overdraft fees. For example, between August 15, 2009 and August 17, 2009, Plaintiff Luquetta made seven debit card purchases with her debit card totaling $457.32. Her account balance on August 14, 2009 was $1,180.03. Between the time the purchases were made on August 15, 2009 and August 17, 2009, there were sufficient funds in the Plaintiff Luquetta's account to cover all of her transactions.

92.     Plaintiff Luquetta in late July 2009 set up an automatic bill pay for $1,725.00 to be processed on August 22, 2009.

93.     Chase, instead of processing the automatic bill pay for $1,725.00 on August 22, 2009, processed the payment on August 17, 2009. Chase also chose to process the automatic bill payment before processing six of the seven charges made between August 15, 2009 and August 17, 2009. Through this re-sequencing of transactions, Plaintiff Luquetta was charged seven overdraft fees totaling $231 on August 18, 2009. Plaintiff Luquetta's account went from what should have been a positive $755.71 to a negative $1,233.29.

94.     The following table illustrates the transactions explained above as *Chase processed them*:

| | | Debits (-) | Credits (+) | Running Balance |
|---|---|---|---|---|
| | Beginning Balance on August 14, 2009: | | | $1180.03 |
| Date Posted | Debit Description | | | |
| 8/17/2009 | Debit made between 8/15/2009 and 8/17/2009 | -28.52 | | $1,151.51 |
| 8/17/2009 | Bill Pay Scheduled For 8/22/2009 | -1,725.00 | | **-573.49** |
| 8/17/2009 | Debit made between 8/15/2009 and 8/17/2009 | -107.50 | | **-680.99** |
| 8/17/2009 | Debit made between 8/15/2009 and 8/17/2009 | -87.46 | | **-768.45** |

- 26 -

| 8/17/2009 | Debit made between 8/15/2009 and 8/17/2009 | -32.92 | | **-801.37** |
| 8/17/2009 | Debit made between 8/15/2009 and 8/17/2009 | -100.00 | | **-901.37** |
| 8/17/2009 | Debit made between 8/15/2009 and 8/17/2009 | -10.92 | | **-912.29** |
| 8/17/2009 | Debit made between 8/15/2009 and 8/17/2009 | -90.00 | | **-1,002.29** |
| | | | | |
| | | | **Total Fees: $ 231.00[2]** | |

95. The following table illustrates the transactions explained above as Chase *should have* processed them:

| | | Debits (-) | Credits (+) | Running Balance |
|---|---|---|---|---|
| | **Beginning Balance on <u>August 14, 2009</u>:** | | | **$1180.03** |
| **Date Posted** | **Debit Description** | | | |
| 8/17/2009 | Debit made between 8/15/2009 and 8/17/2009 | -28.52 | | $1,151.51 |
| 8/17/2009 | Debit made between 8/15/2009 and 8/17/2009 | -107.50 | | $1,077.01 |
| 8/17/2009 | Debit made between 8/15/2009 and 8/17/2009 | -87.46 | | $989.55 |
| 8/17/2009 | Debit made between 8/15/2009 and 8/17/2009 | -32.92 | | $956.63 |
| 8/17/2009 | Debit made between 8/15/2009 and 8/17/2009 | -100.00 | | $856.63 |
| 8/17/2009 | Debit made between 8/15/2009 and 8/17/2009 | -10.92 | | $845.71 |
| 8/17/2009 | Debit made between 8/15/2009 and 8/17/2009 | -90.00 | | $755.71 |
| 8/22/2009 | Bill Pay Scheduled For 8/22/2009 | -1,725.00 | | **-969.29** |
| | | | | |
| | | | **Total Fees: $ 33.00** | |

96. Hypothetically, even if it was proper for Chase to deduct the $1,725.00 on August 17th, that transaction should not have been processed until all of Plaintiff Luquetta's transactions from August 15th and August 16th were processed. As the table above reflects,

---

[2] Note: Plaintiff Luquetta's August statement reflects a $33 overdraft refund on 8/17/2009, that was not processed until 8/19/2009.

Plaintiff Luquetta should have had a balance of $755.71 and therefore should only, at most, been assessed one overdraft charge.

97.     Since opening her account in September 2003, Ms. Luquetta has been charged over $2,900 in overdraft fees.  Since the beginning of 2009 alone, Ms. Luquetta was charged at least $2,673 in overdraft fees.

98.     The Banks generally did not notify Plaintiff at the time she made check card transactions, including POS transactions, that her checking account was overdrawn or that she would be charged an overdraft fee as a result of the transaction.

99.     Generally, the Banks have paid Plaintiff's check card charges, even when the account was overdrawn, and charged Plaintiff overdraft fees.

100.    The Banks failed to notify Plaintiff that she could incur overdraft fees on transactions even though there were sufficient funds in her checking account to cover the transactions at the time transactions were executed.  In addition, the Banks generally did not notify Plaintiff, at the time she executed the purported insufficient funds transactions described above, that her checking account was overdrawn or that she would be charged an overdraft fee as a result of the transactions.  Furthermore, the Banks paid, rather than returned, all of the debit card charges described above, even though Plaintiff's account purportedly lacked sufficient funds to cover the transactions.

101.    Based on information and belief, the overdraft charges incurred by Plaintiff are representative of hundreds of millions of dollars of overdraft fees that Chase and/or Washington Mutual wrongfully assessed and deducted from customers' accounts.  These wrongful takings are especially egregious considering the fact that the Banks approved each transaction and knew at the time of approval whether there were sufficient funds in the account to cover the transaction.

I.     **The Damages Sustained by Plaintiff and the Class**

102.   As shown by these examples, the Banks' overdraft policies make it difficult for a customer to avoid injury even if the customer keeps close track of the balance in his or her account.  In fact, the Agencies have stated that "injury" resulting from such policies "is not reasonably avoidable" by consumers.  73 F.R. 28904-01, 28929.  "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available."  *Id.*

103.   According to rules proposed by the Agencies, "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . .  This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee."  73 F.R. 28904-01, 28929 (May 19, 2008).

104.   Thus, as a consequence of the Banks' overdraft policies and practices, Plaintiff and the Class have been wrongfully forced to pay overdraft fees.  The Banks have improperly deprived Plaintiff and the Class of significant funds, causing ascertainable monetary losses and damages.

105.   As a consequence of the Banks' improper overdraft fees, the Banks have wrongfully deprived Plaintiff and the Class of funds to which they had no legitimate claim.

106.   Plaintiff had sufficient funds to cover at least some of the transactions for which she and the Class were charged overdraft fees.  Plaintiff and members of the Class either had adequate funds to cover the transactions posted to their accounts, or the accounts were allowed to become overdrawn, even by *de minimis* margins, exclusively so that the Banks could impose these wrongful charges.  In many instances, the Banks' manipulation of the process for

imposing overdraft fees triggered a cascade of charges that exponentially added to the charges it collected from Plaintiff and Class members.

107.   All conditions precedent to the relief sought herein have either occurred or have been performed or waived.

## FIRST CLAIM FOR RELIEF

### Breach of Contract

108.   Plaintiff repeats paragraphs 1 through 107 above.

109.   Plaintiff, on the one hand, and Chase and/or Washington Mutual on the other, have contracted in California for bank account deposit, checking, ATM and debit card services, as embodied in the Deposit Agreements and related documentation.

110.   Under California law, good faith is an element of every contract pertaining to the assessment of overdraft fees. Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

111.   Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

112.   Chase and Washington Mutual have breached the covenant of good faith and fair dealing in the Deposit Agreements through their overdraft policies and practices as alleged herein.

113.    Plaintiff and the Class have performed all, or substantially all, of the obligations imposed on them under the Deposit Agreements.

114.    Plaintiff and members of the Class have sustained damages as a result of the Banks' breach of the covenant of good faith and fair dealing.

### SECOND CLAIM FOR RELIEF

### Unconscionability in Violation of Cal. Civ. Code § 1670.5

115.    Plaintiff repeats paragraphs 1 through 107 above.

116.    The Bank's overdraft policies and practices are substantively and procedurally unconscionable, in violation of Section 1670.5 of the California Civil Code, in the following respects, among others:

a.    The Banks do not and did not disclose or reasonably disclose to customers that they have the option to "opt out" of the Banks' overdraft scheme, or, in the case of Washington Mutual, do not permit customers to opt out;

b.    The Banks do not and did not obtain affirmative consent from checking account customers prior to processing a transaction that will overdraw the account and result in an overdraft fee;

c.    The Banks do not and did not alert their customers that a debit card transaction will trigger an overdraft, and do not or did not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

d.    The Deposit Agreements and related documents are contracts of adhesion in that they are standardized forms, imposed and drafted by the Banks, which have vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement in its entirety;

e.    The amount of overdraft fees is disclosed in an ineffective, ambiguous, misleading, and unfair manner, since it is not contained in the Deposit Agreements, but rather in a separate document, which is not signed by the depositor; and

f.      The Deposit Agreements provided to customers are or were ineffective, ambiguous, deceptive, unfair, and misleading in that it does not unambiguously state that the Banks always reorders debits from high to low over separate days, even though the Banks reorder transactions in this way for customers in order to maximize overdrafts and overdraft fee revenues.

117.    Considering the great business acumen and experience of the Banks in relation to Plaintiff and the Class, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law.

118.    The imposition of overdraft charges which exceed the amount overdrawn (e.g., the imposition of a $35 charge on an overdraft of less than $35) is itself unconscionable. Such charges are not reasonably related to the Banks' cost of covering the overdraft and/or its risk of nonpayment (where the Banks pay the overdraft), or to the Banks' cost of returning the item unpaid (where the Banks do not or did not pay the overdraft).

119.    Plaintiff and members of the Class have sustained damages as a result of the Banks' unconscionable policies and practices as alleged herein.

### THIRD CLAIM FOR RELIEF

### Conversion

120.    Plaintiff repeats paragraphs 1 through 107 above.

121.    The Banks have or had a duty to maintain and preserve their customers' checking accounts and to prevent their diminishment through their own wrongful acts.

122.    The Banks have wrongfully collected overdraft fees from Plaintiff and the members of the Class, and took specific and readily identifiable funds from their accounts in payment of these fees in order to satisfy them.

- 32 -

123. The Banks have, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiff and the members of the Class, without legal justification.

124. The Banks continue to retain these funds unlawfully without the consent of Plaintiff or members of the Class.

125. The Banks intend or intended to permanently deprive Plaintiff and the members of the Class of these funds.

126. These funds are properly owned by Plaintiff and the members of the Class, not the Banks, which claim that they are entitled to their ownership, contrary to the rights of Plaintiff and the members of the Class.

127. Plaintiff and the members of the Class are entitled to the immediate possession of these funds.

128. The Banks have wrongfully converted these specific and readily identifiable funds in violation of California law.

129. The Banks' wrongful conduct is continuing.

130. As a direct and proximate result of this wrongful conversion, Plaintiff and the members of the Class have suffered and continue to suffer damages.

131. By reason of the foregoing, Plaintiff and the members of the Class are entitled to recover from Chase all damages and costs permitted by law, including all amounts that the Banks have wrongfully converted.

## FOURTH CLAIM FOR RELIEF

### Unjust Enrichment

132. Plaintiff repeats paragraphs 1 through 107 above. This claim is plead in the alternative to the contract claim pled in ¶¶ 108-114 above.

133. Plaintiff, on behalf of herself and the Class, asserts a claim for unjust enrichment under the common law of California.

134.    By means of the Banks' wrongful conduct alleged herein, the Banks knowingly provide or provided banking services to Plaintiff and members of the Class that are unfair, unconscionable, and oppressive.

135.    The Banks knowingly received and retained wrongful benefits and funds from Plaintiff and members of the Class.  In so doing, the Banks acted with conscious disregard for the rights of Plaintiff and members of the Class.

136.    As a result of the Banks' wrongful conduct as alleged herein, Chase has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Class.

137.    Chase's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

138.    Under the common law doctrine of unjust enrichment, it is inequitable for Chase to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of overdraft fees on Plaintiff and members of the Class in an unfair, unconscionable, and oppressive manner. Chase's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

139.    The financial benefits derived by Chase rightfully belong to Plaintiff and members of the Class. Chase should be compelled to disgorge in a common fund for the benefit of Plaintiff and members of the Class all wrongful or inequitable proceeds received by them. A constructive trust should be imposed upon all wrongful or inequitable sums received by Chase traceable to Plaintiff and the members of the Class.

140.    Plaintiff and members of the Class have no adequate remedy at law.

## FIFTH CLAIM FOR RELIEF

### (Violations of California Business & Profession Code § 17200, *et seq.*)

141.    Plaintiff repeats paragraphs 1 through 107 above.

142.    The Banks' conduct described herein violates the Unfair Competition Law (the "UCL"), codified at California Business and Professions Code section 17200, in the following respects, among others:

a.    The Banks' practices relating to the imposition of overdraft fees are unconscionable, in violation of California Civil Code section 1770(a)(19), and, as a result, constitute an unlawful business act or practice within the meaning of the UCL;

b.    The Banks' practices relating to the imposition of overdraft fees violate California Civil Code sections 1770(a)(5), (14) and (19), and, as a result, constitute unlawful business acts or practices within the meaning of the UCL; and

c.    The Banks' practices relating to the imposition of overdraft fees constitute unfair business acts or practices within the meaning of the UCL.

143.    The harm to Plaintiff and the Class arising from the Banks' unlawful and unfair practices relating to the imposition of overdraft fees outweighs the utility, if any, of those practices.

144.    The Banks' unlawful and unfair business practices relating to the imposition of overdraft fees are immoral, unethical, oppressive, unscrupulous, unconscionable and/or substantially injurious to Plaintiff and members of the Class.

145.    As a result of the Banks' violations of the UCL, Plaintiff and members of the Class have paid, and/or will continue to pay, unreasonably excessive amounts of money for banking services and thereby suffered and will continue to suffer actual damages.

146.    Pursuant to California Business and Professions Code section 17203, Plaintiff and the Class are therefore entitled to:

a.    an Order requiring Chase to cease the unlawful and unfair acts alleged herein;

b.    an Order enjoining Chase from continuing to collect overdraft fees from California consumers on cheek-card transactions, including POS and ATM transactions, unless the consumer is notified at the time of the transaction that an overdraft fee will be charged

and unless the consumer is given the option of declining the transaction without incurring an overdraft fee;

c.       full restitution of all overdraft fees paid to Chase and Washington Mutual on check card transactions, including POS and ATM transactions, pursuant to California Code of Civil Procedure section 384;

d.       pre-judgment interest at the highest rate allowable by law; and

e.       payment of their attorneys' fees and costs pursuant to, *inter alia*, California Code of Civil Procedure section 1021.5.

## SIXTH CLAIM FOR RELIEF

### Violations of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*

147.    Plaintiff repeats paragraphs 1 through 107 above.

148.    This claim for relief is brought pursuant to the California Consumer Legal Remedies Act (the "CLRA"), codified at California Civil Code section 1750, *et seq.*

149.    The Banks provide or provided "services" within the meaning of California Civil Code sections 1761(b) and 1770(a).

150.    The Banks are or were each a "person" within the meaning of California Civil Code sections 1761(c) and 1770(a).

151.    Users of the Banks' account services, including Plaintiff and members of the Class, are "consumers" within the meaning of California Civil Code sections 1761(d) and 1770(a).

152.    Every use of the Banks' account services by Plaintiff and the Class constitutes a "transaction" within the meaning of California Civil Code sections 1761(e) and 1770.

153.    The Banks' practices relating to the imposition of overdraft fees violated, and continue to violate, the CLRA in the following respects, among others:

a.       The Banks make or made deceptive representations in connection with its services, in violation of California Civil Code sections 1770(a)(5) and (14);

b.     The Banks represent or represented that their services have characteristics, uses, or benefits which they do not have, in violation of California Civil Code sections 1770(a)(5); and

c.     The Banks' Deposit Agreements include unconscionable provisions, in violation of California Civil Code section 1770(a)(19).

154.   The Banks have intentionally engaged in willful, unreasonable, and oppressive conduct relating to the imposition of overdraft fees, in conscious disregard of the rights of Plaintiff and the Class.

155.   As a result of the Banks' violations of the CLRA, Plaintiff and the other Class members have incurred damages in the form of overdraft fees.

156.   Plaintiff and the other Class members will continue to suffer irreparable damage unless Chase is enjoined from continuing its ongoing wrongful practices relating to the imposition of overdraft fees.

157.   Pursuant to California Civil Code section 1780(a)(2), Plaintiff seeks an order enjoining the wrongful practices of Chase described herein, including, but not limited to, an order: (1) enjoining Chase from continuing to collect unconscionable overdraft fees; (2) requiring Chase to disclose to its customers that they have the right to opt out of the Bank's overdraft scheme; (3) requiring Chase to provide its customers with a reasonable process for opting out; and (4) requiring Chase to notify its customers when a POS and/or ATM transaction will result in an overdraft charge and, in such a situation, to permit the customer to make the affirmative decision of whether or not to proceed.

158.   Plaintiff and the Class have no adequate remedy at law.

159.   Venue is proper pursuant to California Civil Code section 1780(d) because Chase does business in the Central District of California.

160.   On or about November 9, 2009, Plaintiff sent a CLRA notice letter to Chase.  If Chase fails to provide appropriate relief for its violations of California Civil Code sections 1770(a)(5), (14) and (19) within 30 days of receipt of Plaintiff's notification, in

accordance with Section 1782(b), Plaintiff is entitled to the following relief under Section 1780 for the Bank's violations of Sections 1770(a)(5), (14) and (19):

        a.      actual damages under Section 1780(a)(1);

        b.      restitution of property under Section 1780(a)(2);

        c.      punitive damages under Section 1780(a)(4) and because the Bank has engaged in malice or oppression;

        d.      attorneys' fees and costs under Section 1780(d); and

        e.      any other relief the Court deems proper under Section 1780(a)(5).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the members of the Class she seeks to represent, demands a jury trial and judgment as follows:

1.      Preliminary and permanent injunctive relief enjoining Chase from charging overdraft fees under its current policies and from engaging in the acts of unfair competition alleged herein.

2.      Restitution of all overdraft fees paid to the Banks by Plaintiff and the Class in the past four years on check card transactions, in an amount to be determined at trial;

3.      Disgorgement of the ill-gotten gains derived from the Banks' misconduct;

4.      Actual damages in an amount according to proof;

5.      Punitive and exemplary damages;

6.      Pre-judgment interest at the highest rate permitted by law;

7.      The costs and disbursements incurred by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to California Code of Civil Procedure § 1021.5 and California Civil Code § 1780; and

8.      Such other and further relief as the Court deems just and proper.

Dated:      November 9, 2009

/s/ Bruce S. Rogow
Bruce S. Rogow, Esquire
Florida Bar No. 067999
bruce@abbrclaw.com
Robert C. Gilbert, Esquire
Florida Bar No. 561861
bobby@abbrclaw.com
ALTERS BOLDT BROWN
  RASH & CULMO, P.A.
4141 N.E. 2nd Avenue
Miami, Florida 33137
Tel:  (305) 571-8550
Fax:  (305) 571-8558

*Lead Counsel for Plaintiff*

/s/ Ruben Honik
Ruben Honik, Esquire
Pennsylvania Bar No. 33109
rhonik@golombhonik.com
GOLUMB & HONIK, P.C.
1515 Market Street
Suite 1100
Philadelphia, PA 19102
Tel: 215-985-9177
Fax: 215-985-4169

/s/ Barry R. Himmelstein
Barry R. Himmelstein, Esquire
California Bar No. 157736
bhimmelstein@lchb.com
Michael W. Sobol, Esquire
California Bar No. 194857
msobol@lchb.com
Jordan Elias, Esquire
California Bar No. 228731
jelias@lchb.com
Mikaela Bernstein, Esquire
California Bar No. 261301
mbernstein@lchb.com
LIEFF CABRASER HEIMANN &
  BERNSTEIN LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Tel: 415-956-1000
Fax: 415-956-1008

/s/ Robert C. Josefsberg
Robert C. Josefsberg, Esquire
Florida Bar No. 40856
rjosefsberg@podhurst.com
Victor M. Diaz, Jr., Esquire
Florida Bar No. 503800
vdiaz@podhurst.com
John Gravante, III, Esquire
Florida Bar No. 617113
jgravante@podhurst.com
PODHURST ORSECK, P. A.
City National Bank Building
25 W Flagler Street
Suite 800
Miami, FL 33130-1780
Tel: 305-358-2800
Fax: 305-358-2382

/s/ Ted E. Trief
Ted E. Trief, Esquire
New York Bar No. 1476662
ttrief@triefandolk.com
Barbara E. Olk, Esquire
New York Bar No. 1459643
bolk@triefandolk.com
TRIEF & OLK
150 East 58th street
34th Floor
New York, NY 10155
Tel: 212-486-6060
Fax: 212-317-2946

/s/ Edward Adam Webb
Edward Adam Webb, Esquire
Georgia Bar No. 743910
Adam@WebbLLC.com
G. Franklin Lemond, Jr., Esquire
Georgia Bar No. 141315
FLemond@WebbLLC.com
WEBB, KLASE & LEMOND, L.L.C.
1900 The Exchange SE, Suite 480
Atlanta, GA 30339
Tel: 770-444-9325
Fax: 770-444-0271

/s/ Russell W. Budd
Russell W. Budd, Esquire
Texas Bar No. 03312400
rbudd@baronbudd.com
/s/ Bruce W. Stecker
Bruce W. Steckler, Esquire
Texas Bar No. 00785039
bsteckler@baronbudd.com
/s/ Melissa K. Hutts
Melissa K. Hutts, Esquire
Texas Bar No. 0188015
mhutts@baronbudd.com
/s/ Renee M. Melancon
Renee M. Melancon, Esquire
Texas Bar No. 2403573
rmelancon@baronbudd.com
BARON & BUDD, P.C.
3102 Oak Lawn Avenue
Suite 1100
Dallas, TX 75219
Tel: 214-521-3605
Fax: 214-520-1181

*Plaintiffs' Executive Committee*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 09-MD-02036-JLK

_____
                                                )
IN RE: CHECKING ACCOUNT                         )
OVERDRAFT LITIGATION                            )
                                                )
MDL No. 2036                                    )
_____)

### CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of November, 2009, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Robert C. Gilbert
Florida Bar No. 561861
ALTERS BOLDT BROWN
RASH & CULMO, P.A.
4141 N.E. 2nd Avenue, Suite 201
Miami, Florida 33137
bobby@abbrclaw.com