# EXHIBIT A

# DEPOSIT AGREEMENT AND DISCLOSURES FOR PERSONAL ACCOUNTS

EFFECTIVE OCTOBER 1, 2008



**WACHOVIA**

WACH 001745

## INTRODUCTION

Welcome to Wachovia. Thank you for banking with us. This Deposit Agreement ("Agreement") contains the following important sections:

I. DEPOSIT AGREEMENT AND DISCLOSURES

II. WIRE TRANSFER SPECIAL TERMS AND CONDITIONS

III. PRIVACY STATEMENT

IV. ELECTRONIC FUNDS TRANSFER DISCLOSURE AND SPECIAL TERMS AND CONDITIONS

Please READ and RETAIN this Agreement so that you can refer to it whenever you have questions about your account. If you have any questions after reading this Agreement, we would be happy to answer them. You may obtain an additional copy at any Wachovia Financial Center or by calling 800-WACHOVIA (800-922-4684).

## TABLE OF CONTENTS

I. DEPOSIT AGREEMENT AND DISCLOSURES ........ 3
   A. LEGAL EFFECT OF AGREEMENT ................... 3
   B. ACCOUNT DISCLOSURES ............................... 3
     1. Interest Calculations ........................................ 3
     2. Average Balance ............................................. 3
     3. Withdrawal Limits on Interest-bearing Accounts ........................................................ 3
     4. Banking Packages ........................................... 3
     5. Internal Accounting of Balances ...................... 3
     6. Time Deposits ................................................. 3
     7. Fixed Rate CD Accounts ................................. 4
     8. Convertible CD Accounts ................................. 4
     9. Callable CD Accounts ..................................... 4
     10. Step Rate CD Accounts ................................. 4
     11. Systematic Saver CD Accounts .................... 4
     12. Liquid CD Accounts ...................................... 4
     13. Passbook Savings (where offered) ............... 5
     14. Passbook Savings Limitations ...................... 5
     15. Holiday Club Savings (where offered) .......... 5
     16. PayAccess/My Direct Pay Accounts ............ 5
     17. Crown Select Banking .................................. 5
     18. Employee Accounts ...................................... 5
   C. OWNERSHIP OF ACCOUNTS .......................... 5
     1. Signature Card Designation ............................ 5
     2. Individual Accounts ......................................... 5
     3. Joint Accounts ................................................ 6
     4. Payable on Death (POD), "In Trust For" Accounts and "As Trustee For" Accounts ........... 6
     5. Transfers to Minors ......................................... 6
     6. Trust Agreement Accounts ............................. 6
     7. Power of Attorney Accounts ........................... 6
     8. Agency and Fiduciary Accounts ..................... 6
     9. Withholding and Reporting of Interest ............. 6
   D. GENERAL RULES GOVERNING DEPOSIT ACCOUNTS .........................................................
     1. Deposits .......................................................... 7
     2. Authorized Signatures .................................... 7
     3. Facsimile Signatures ...................................... 7
     4. Placement of Endorsements .......................... 7
     5. Collection of Items ........................................... 8
     6. Automated Processing of Items ..................... 8
     7. Fraud Detection/Deterrence and Safeguarding Your Account .............................. 8
     8. Statements ...................................................... 9
     9. Review of Account Statements ...................... 9
     10. Check Safekeeping and Check Image ........ 9
     11. Check Copies ................................................ 9
     12. Payment of Checks and Other Withdrawals ........ 9
     13. Insufficient Funds/Overdrafts ...................... 10
     14. Overdraft Protection ................................... 10
     15. Stale, Time-Dated and Post-Dated Items .......... 10
     16. Stop Payments ............................................ 11
     17. Service Fees ............................................... 11
     18. Sharing Information Regarding Your Wachovia Relationships ................................. 11
     19. Accuracy and Verification ........................... 11
     20. Wachovia Banking Cards ........................... 11
     21. Telephone Access ....................................... 11
     22. Automated Clearing House ......................... 11
     23. Transfer of Accounts .................................. 12
     24. Abandoned/Dormant Accounts .................. 12
     25. Arbitration of Disputes/Waiver of Jury Trial and Participation in Class Actions ............. 12
     26. Conflicts/Disputes Involving the Account ......... 12
     27. Legal Process Affecting Accounts .............. 12
     28. Indemnification of Bank .............................. 13
     29. Costs and Attorney's Fees ......................... 13
     30. Setoff of Debts and Security Interest ......... 13
     31. Changing this Agreement ........................... 13
     32. Terminating this Agreement ....................... 13
     33. Notices ........................................................ 13
     34. Applicable Law ........................................... 13
     35. Customer's Waiver of Notice ...................... 13
     36. Information Reported to Consumer Reporting Agencies ......................................... 13
     37. Force Majeure ............................................ 14
     38. Invalidity of Contract Provisions ................. 14
     39. Signatures Received Via Facsimile (Fax) ........ 14
     40. Telephone Communication Monitoring ............ 14
     41. Entire Agreement ....................................... 14
   E. SUBSTITUTE CHECKS AND YOUR RIGHTS .. 14
     1. What is a Substitute Check? ......................... 14
     2. What are My Rights Regarding Substitute Checks? ........................................ 14
     3. How Do I Make a Claim for a Refund? ......... 14
II. WIRE TRANSFER SPECIAL TERMS AND CONDITIONS ............................................................ 14
     1. Authorization and Security Procedure .......... 14
     2. Execution of Payment Orders ...................... 14
     3. Cut-Off Times ................................................ 15
     4. Advice of Funds Transfer ............................. 15
     5. Limitation of Liability and Indemnification ........ 15
     6. Use of Identifying Numbers ......................... 15
     7. Interest Compensation ................................. 15
     8. International Payments ................................ 15
III. PRIVACY STATEMENT ........................................ 15
IV. ELECTRONIC FUNDS TRANSFER DISCLOSURE AND SPECIAL TERMS AND CONDITIONS .......... 17
     1. Types of Electronic Funds Transfers Available ........................................................ 17
     2. Right to Receive Documentation of Electronic Funds Transfers ............................ 18
     3. Right to Stop Payment of Pre-Authorized Transfers ................................ 18
     4. Liability for Failure to Stop Payments of Automated Debits .......................................... 18
     5. Notice of Varying Amounts .......................... 18
     6. Liability for Unauthorized Transfers from Your Account ........................................ 18
     7. Unauthorized Transfers from Your Account .................................................. 18
     8. Liability for Failure to Make Transfers ......... 18
     9. Business Day ............................................... 18
     10. Disclosure of Account Information ............. 18
     11. In Case of Errors or Questions .................. 18
     12. Bank Contacts ............................................ 18

## I. DEPOSIT AGREEMENT AND DISCLOSURES

### A. LEGAL EFFECT OF AGREEMENT

This Agreement governs all personal deposit accounts established with any Wachovia Bank, National Association, and supersedes any previous deposit agreement. The words "you", "your", and "yours" as used in this Agreement refer to the person(s) who maintain one or more personal deposit accounts with us, including, but not limited to, all owners and signers on the account. The words "we", "us", "our" and "Bank" refer to the Wachovia Bank ("Wachovia") in the state where we maintain your account. By opening, using and/or maintaining an account with us, you agree to the terms and conditions of this Agreement, including the fees and charges listed in the applicable Schedule of Fees and Funds Availability for Personal Accounts, Rate Disclosures and the other account opening materials, which are incorporated herein by reference. This Agreement, the Schedule of Fees and Funds Availability and Rate Disclosures and the Signature Card are part of our legally binding contract with you. For purposes of this Agreement, "Signature Card" refers to the Customer Access Agreement and/or the Deposit Account Application or any other account opening documents that you completed when you established your account. Our deposit relationship with you is that of debtor and creditor and you agree and acknowledge that we are not in any way acting as a fiduciary for you or for your benefit. Depending on the context in which it is used, the term "Item" means a check, draft or other written order or instruction for the payment of money or a point-of-sale authorization request, ATM withdrawal, ACH entry or other electronic transaction.

### B. ACCOUNT DISCLOSURES

1. **Interest Calculation on Interest-bearing Checking Accounts, Money Market Accounts and Savings Accounts.** Interest begins to accrue on your account no later than the business day we receive credit for the deposit of non-cash items deposited to your account. We will receive credit for checks drawn on other financial institutions based on the general availability schedule established either by the Federal Reserve Bank or its appropriate branch for the district in which we are located. We may not pay interest on funds deposited by a check, which is returned unpaid. You may not receive interest when your balance falls below certain levels. Interest is compounded at the frequency indicated on the Rate Disclosure provided and credited each monthly statement period for interest-bearing checking accounts, money market accounts and savings accounts (savings if in a combined statement relationship). If savings are not in a combined statement relationship, interest is credited each calendar month. If you close your account before interest is credited, you may not receive the accrued interest (for savings accounts in Connecticut, interest is paid from date of deposit to date of withdrawal). Interest rates and Annual Percentage Yields ("APYs") vary from time to time and are subject to change at any time at our discretion. The current interest rates are available in our financial centers. We use the daily-balance method to calculate interest on your account. This method applies a daily periodic rate to the collected principal balance in your account (the collected principal balance is that portion of the balance for which we have received credit). The daily rate is 1/365 (or 1/366 in a leap year) of the interest rate.

2. **Average Balance.** As referred to in the Schedule of Fees and Funds Availability for Personal Accounts, the average balance in your account during the statement period is calculated by adding the balance in the account for each day of the period, and dividing that figure by the number of days in the period.

3. **Withdrawal Limits on Interest-bearing Accounts.** We are required by federal regulation to retain the right to ask for seven (7) days' written notice before you may withdraw money from interest-bearing checking, savings and money market accounts. Other withdrawal limits include:

   A. **Money Market Accounts.** You may make unlimited withdrawals or transfers to other Wachovia accounts in person or at an Automated Teller Machine (ATM) from your money market account. However, federal regulations limit third party transactions or pre-authorized transfers from your account (including overdraft transfers) or transfers made by personal computer (including online banking or bill payment services) or telephone (including facsimile or data transmission) to six per month, no more than three of which may be by check, draft, or debit card. If this limitation is exceeded on a regular basis, we are required to convert your account to another account that permits unlimited check writing privileges.

   B. **Savings Accounts.** You may make unlimited withdrawals or transfers to another Wachovia account in person or at an ATM from your savings account. However, federal regulations limit third party transactions or pre-authorized transfers (including overdraft transfers) or transfers made by personal computer (including online banking or bill payment services) or telephone (including facsimile or data transmission) from your account to six per month, no more than three of which may be by draft or debit card. If this limitation is exceeded on a regular basis, we are required to close your account and to open another account that permits unlimited check writing privileges.

   Charges may apply when transfer limits are exceeded.

4. **Banking Packages.** We offer certain banking packages that require you to open and maintain the applicable checking account. You may also elect to use additional accounts to meet qualifying minimum or average balances for your selected banking package. Additional deposit accounts in the program will be subject to maintenance fees and other service charges if the balance requirements are not met unless such additional accounts are specifically listed as having a no-charge feature. Please refer to your Schedule of Fees for more information about your particular banking package.

5. **Internal Accounting of Balances – No Effect on Your Account.** For regulatory and accounting purposes, your checking account will consist of two "sub-accounts" on our books: (1) either a non interest-bearing (demand deposit) sub-account or an interest-bearing (NOW) sub-account and (2) a money market sub-account. These sub-accounts are treated as a single account for statements and daily use of your account. Interest is not earned on either sub-account for non interest-bearing checking accounts. On interest-bearing checking accounts, the same interest rate may be paid on both sub-accounts, and your periodic statement will reflect a single blended Annual Percentage Yield (APY) earned.

   Whenever your checking sub-account balance exceeds a threshold amount (which we may set and change at our discretion), we may transfer funds above that amount to the money market sub-account.

   As these funds are needed to pay items presented against your checking account, we will transfer funds from the money market sub-account to the checking sub-account, up to six times per statement period. If a sixth transfer is needed, the entire balance in the money market sub-account will be transferred into the checking sub-account. This process may be repeated each statement period.

   This balance accounting has no effect on the daily use of your account, on how checks are paid, or on how your account activity appears on your monthly statement.

6. **Time Deposits.** At the Bank's option, time deposits may be issued in the form of a Certificate of Deposit (no longer issued), a passbook, or a time deposit for which no certificate is issued. On the initial or any subsequent maturity date, you may present your properly endorsed Certificate (for accounts where Certificates were issued), your passbook, or sign a receipt form (for accounts with no certificate issued) at any financial center and you will be paid the amount due. The certificate will serve as evidence of your account. If a time deposit certificate is lost or destroyed, we must be notified immediately in writing. Upon receipt of satisfactory indemnity and an affidavit to the effect that the certificate has been lost or destroyed and has not been pledged or assigned, we will close the account and reissue a Time Deposit Receipt. To the extent required to begin the running of the applicable statute of limitations, you will be deemed to have demanded payment of any time deposit that does not automatically renew for another term on the 31st day after its last maturity date. A minimum of $1,000 or more is required to open an account.

   A. **Redemption.** We may redeem the Time Deposit on the initial or any subsequent maturity date, and may accelerate maturity if you default in the payment of money owed to us, applying the redemption proceeds against such obligations.

   B. **Interest Calculation.** We use the daily balance method to calculate interest on your account. This method applies a daily periodic rate to the ledger balance in your account each day and to any interest you've earned that has not been credited to your account. The daily rate is 1/365 (or 1/366 in a leap year) of the interest rate. Interest is compounded at the frequency indicated on the Rate Disclosure provided from the opening date. Interest is paid from the date of deposit through the day prior to the maturity date, and begins to accrue on the business day you deposit non-cash items. The APY assumes that interest will remain on deposit for the term of the account. A withdrawal of interest will reduce earnings. Interest is credited in accordance with the terms of the Time Deposit Receipt provided to the customer.

WACH 001747

C. **Interest Rates.** The interest rate for your deposit is established based upon the amount of deposit, the type of product, and the term you select. Except for Step Rate CDs and Systematic Saver CDs, the interest rate is fixed for the term of the account.

D. **Premium Interest Rates.** Time deposits, which are part of certain banking programs, may earn premium interest rates as long as you maintain your membership in the applicable banking program. The premium interest rate and APY, which may vary from time to time, are effective at the time the account is opened and upon renewal of existing related time deposit accounts, and are subject to change at any time at the Bank's discretion. The premium interest rate is effective until the maturity date.

E. **Receiving Interest.** If you request at the time of purchase, earned interest may be withdrawn at intervals (specified by Wachovia) during the term of the Time Deposit without penalty. Methods of interest payments may be limited.

F. **Automatically Renewable Time Deposits.** If "Automatically Renewable" is indicated on your account opening documents, the following terms apply:

   (1) **Grace Period.** For accounts with a maturity of 7 through 31 days, you have one calendar day after the maturity date to withdraw funds without penalty. For all other accounts, you have 7 days after the maturity date to withdraw funds without penalty. This time period is known as a grace period.

   (2) **Automatic Renewal.** Unless your account is closed on the initial or any subsequent maturity date or within the grace period, this time deposit account will automatically be extended for a time period equal to the initial term beginning at the initial maturity date or at each subsequent maturity date. The interest rate for each renewal term will be the currently offered rate in effect on the maturity date for the term just ended.

G. **Withdrawal of Principal.** Interest will not be paid for the days in the grace period if any of the principal is withdrawn and not reinvested at Wachovia. However, if the principal is withdrawn within the grace period and is reinvested in any Wachovia account, interest will be paid for the days in the grace period up to the date the principal is withdrawn. The interest rate in effect during the grace period is the interest rate in effect the day after the maturity date.

H. **Withdrawal of Interest.** As long as the principal is not reduced, interest earned during the initial or subsequent term may be withdrawn without penalty.

I. **Additional Deposits.** Additional deposits are not permitted during the term of your account (except for Systematic Saver and Liquid CDs).

J. **Interest Added to Principal.** If the interest earned during the initial or subsequent term is not withdrawn or credited to another account on the maturity date or within the grace period after the term when earned, it will be added to and made part of the principal amount.

K. **Partial Withdrawals.** You are permitted to make partial withdrawals of your principal, $500 minimum, during the initial or any subsequent renewal term of your account, as long as the minimum amount required to open an account of that type remains on deposit. The partial withdrawal will be subject to early withdrawal penalties.

L. **Early Withdrawal Penalties.** If you make withdrawals from or close your time deposit account before the maturity date, you may be subject to a penalty as outlined below:

   (1) If any of the deposit is withdrawn before the initial or any subsequent maturity date, a penalty as shown below will be imposed on the amount withdrawn:

| Maturity Term | Early Withdrawal Penalty |
|---|---|
| 7 days through 90 days | All interest that would be earned during the term of the CD. |
| 91 days through 364 days | Amount equal to 90 days' simple interest. |
| 365 days and greater | Amount equal to 180 days' simple interest. |

   (2) Withdrawals from time deposit accounts will be permitted before maturity without an interest penalty as outlined in the previous paragraph (1) in the following circumstances: (i) when requested, upon the death of any account owner; or (ii) when requested, when the account owner is determined to be legally incompetent by a court or other administrative body of competent jurisdiction; (iii) when a bank pays that portion of the account on which federal deposit insurance has been lost as the result of a merger of two or more federally insured banks in which the depositor previously maintained separate time deposit accounts, for a period of 1 year after the date of the merger; or (iv) when a Crown Classic customer incurs a health-related emergency, an early withdrawal up to $25,000 per year is allowed. Health-related emergencies include confinement in a medical facility or in a nursing care or retirement facility.

7. **Fixed Rate CD Accounts.** The minimum opening deposit for terms of 7-90 days is $2,500. The minimum opening deposit for terms of 91 days – 60 months is $1,000.

8. **Convertible CD Accounts.** Additional terms apply to Convertible CD accounts. A minimum of $1,000 is required to open the account. Twelve (12) Month Convertible CD accounts may be converted, after a 90-day waiting period, to a Wachovia CD with a term of 12 months or longer. Thirty-Six (36) Month Convertible CD accounts may be converted, after a one-year waiting period, to a Wachovia CD with a term of 36 months or longer. The interest rate and Annual Percentage Yield (APY) on the new CD, if converted, is the current interest rate and APY in effect for the selected product.

9. **Callable CD Accounts.** The following additional terms apply to Callable CD accounts. A minimum of $10,000 is required to open the account. Callable CD accounts pay a premium rate of interest in return for our right to "call" the CD account at any time after one year from the date of deposit. If the account is not called, the initial interest rate and APY apply for the initial term. If the account is called, you may choose from the following three options:

   - Funds may be reinvested in any other Wachovia deposit account at the current interest rate and APY in effect at the time.
   - Funds may remain in the CD for the remainder of the term and earn no less than the floor interest rate and APY disclosed at account opening. (The floor rate is the lowest rate that can be paid on the CD.)
   - Funds may be withdrawn without penalty.

   If the CD is called, a notice indicating the call date is mailed to you. You have 10 calendar days from the call date to reinvest or withdraw the funds without penalty. If no action is taken, the funds remain in the account for the remainder of the term, earning interest at a rate that is no less than the floor rate disclosed at the time the account was opened. At its maturity, the Callable CD automatically renews as a standard CD with the same term.

10. **Step Rate CD Accounts.** The following additional terms apply to Step Rate CD accounts. A minimum deposit of $1,000 is required to open the account. The interest rate in effect when the account is opened is increased at the following intervals: 183 days, 366 days and 548 days from the issue date as shown on your Rate Disclosure form. You are permitted to make penalty free withdrawals of your principal on the days the interest rate increases, as long as the minimum amount required to open a Step Rate CD account remains on deposit. If the interest rate increase falls on a non-business day, the withdrawal will be allowed on the next business day. After the 548th day, the interest rate remains fixed until maturity. Step Rate CD accounts mature 24 months after account opening. At maturity, Step Rate CD accounts automatically renew as a standard, automatically renewing 24-month CD.

11. **Systematic Saver CD Accounts.** The following additional terms apply to Systematic Saver CD accounts. A minimum deposit of $50 is required to open the account. The Systematic Saver CD is a variable-rate account. The interest rate and APY may change on the first day of each month. The interest rate and APY will be no less than the 12-month fixed CD rate for $1,000 in effect on the last business day of the previous month.

By opening a Systematic Saver CD, you authorize Wachovia to make automatic deposits to the CD from a checking or savings account designated by you on a monthly or semi-monthly basis for 12 months. At maturity, the account automatically renews for an additional 12-month term as a Systematic Saver CD and you authorize automatic deposits to continue.

If total deposits made to a Systematic Saver CD account are less than $500 (including the initial deposit) during the one-year term, a maintenance fee of $30 is deducted from the account on the maturity date. If the balance in this CD is $5,000 or more on the maturity date, the maintenance fee is waived (regardless of the amount deposited during the year).

The lowest interest rate earned during the term is used to calculate early withdrawal penalties.

If an automatic deposit date falls on a weekend or holiday, or on a date that does not occur in a particular month (e.g. the 29th, 30th or 31st of the month), the deposit is made on the next banking day.

If an automatic transfer must be returned due to insufficient or uncollected funds, you are notified. Future automatic transfers are terminated and you are responsible for any fees charged by the payer and/or payee bank for the item returned. If a deposit to a Systematic Saver CD cannot be completed due to inaccurate information provided by you, you will be notified. Future automatic deposits will be processed after accurate information is provided.

12. **Liquid CD Accounts** The following additional terms apply to Liquid CD accounts. A minimum opening deposit of $5,000 is required. These accounts also have a required minimum balance of $5,000. The maximum account balance allowed is $250,000. Funds can be deposited or withdrawn in amounts of $500 or more as long as the balance remains above the required minimum. Deposits do not extend the term of the account. Automated Clearing House (ACH) deposits- for example, direct deposits-are not permitted. Withdrawals of funds within 7 calendar days of their deposit or within 7 calendar days of any prior withdrawal are subject to a penalty of 7 days' interest on the amount withdrawn. Also, when a withdrawal brings the account below the required minimum balance, the account will be closed and a penalty as described in Section L. above will apply on required minimum balance.

13. **Passbook Savings (where offered).** The passbook issued by us will serve as evidence of your account and record of account activity. We will update your passbook record upon request and will include the amount of interest you earned. You agree to examine the activity on your passbook record and give us prompt written notice of any error or discrepancy. We will mail annual statements to you for Premium Passbook accounts and monthly or quarterly statements (depending on account activity) for Hi-Yield Passbook and Passbook Savings.. If there are differences between the entries in your passbook and our records, you agree that our records will control. If a passbook is lost or destroyed, we must be notified immediately.

14. **Passbook Savings Limitations.** This account will not be linked to an ATM card or debit card. Pre-authorized electronic transfers to the account are permissible (i.e. direct deposit) and you may confirm receipt of a pre-authorized deposit by calling the appropriate number listed under "Bank Contacts" at the end of this publication. Should pre-authorized electronic debits from non-Wachovia affiliates occur, your savings passbook might be transferred to a statement savings account.

15. **Holiday Club Savings (where offered).** The Holiday Club is a one-year savings plan which allows you to begin saving in October for holiday purchases the following year. You may open this account with a deposit of any amount, and subsequent deposits can be made at any time in any amount. Your account matures in early October. We pay your balance on the first business day after your account matures. All Holiday Club accounts automatically renew for the following year. You must arrange to set up automatic transfers to your Holiday Club from your Wachovia checking account. Partial withdrawals are not permitted, and you must close your account to withdraw money before maturity. Interest is credited on the account after the close of business on the maturity date. If you close the Holiday Club account before the maturity date, you may receive interest earned to the closing date.

16. **PayAccess/My Direct Pay Accounts.** PayAccess/My Direct Pay Accounts are accounts established to accept direct payroll or other electronic deposits. No other deposits or check writing privileges are peritted on this type of account.

17. **Crown Select Banking.** The Crown Select Banking package consists of two different accounts: an interest-earning checking account ("Crown Select Checking") and a higher-rate tiered interest earning sweep account ("Crown Select Sweep"). Interest rates on both deposit accounts are variable and may change after account opening.

    The Crown Select Banking sweep function will automatically transfer funds that are collected (this is the portion of the account balance for which we have received credit) and available for withdrawal above a fixed, preset amount ("Sweep Target Balance") from your Crown Select Checking account to your Crown Select Sweep account. As checks or debits cause your Crown Select Checking account balance to go below the Sweep Target Balance, funds are automatically transferred from your Crown Select Sweep account back to your Crown Select Checking account to meet the established Sweep Target Balance. All transfers will be made as of the close of Wachovia's business on each business day. The Sweep Target Balance is determined by the Bank and will be shown on your Rate Disclosure Form when the account is opened and on your periodic account statement.

    The Crown Select Checking and Crown Select Sweep accounts are not available individually, and both must remain open to take advantage of the Crown Select Banking package of features and services.

    A. **Account Deposits and Withdrawals.** All deposits and withdrawals must be made using the Crown Select Checking account and will not be permitted on the Crown Select Sweep account. You agree not to provide the Crown Select Sweep account number or other information to any third party for the purpose of creating transactions to or from this account.

    B. **Account Access.** The Crown Select Checking account will have full access to Wachovia's Online Banking, Online Bill Pay and Banking Card options. The Crown Select Sweep account will be limited to balance and transaction inquiry only for Online Banking and will not be accessible via Online Bill Pay or a Banking Card.

18. **Employee Accounts.** If you have established an employee account as an employee of any Wachovia company and your employment ends, the charges applicable to your account as described in the Schedule of Fees and Funds Availability for Personal Accounts will be imposed.

## OWNERSHIP OF ACCOUNTS

1. **Signature Card Designation.** The classification of your account as a personal account and the form of ownership for your account are designated on the Signature Card when you open the account. We may rely on those designations for all purposes relating to your account, unless state-specific special ownership and passage upon death rules ("State-Specific Rules") are applicable to your account and are disclosed in the Signature Card or in this Agreement. Those State-Specific Rules supplement the provisions of this Agreement and, in the event of any conflict or inconsistency between those special rules and this Agreement, those State-Specific Rules control, but only to the extent of the conflict or inconsistency.

2. **Individual Accounts.** By opening an individual account, you are considered by us to be the sole owner of the account, regardless of whether any other person is designated as a POD payee, ITF payee or ATF payee (as defined below). You maydesignate another person to write checks on the account by

granting them a limited power of attorney on a form acceptable to the Bank (or, where offered, by establishing a convenience account or personal agency account pursuant to applicable law), without granting them any ownership interest in your account. Otherwise, you will be the only person authorized to use the account.

3. **Joint Accounts.** If your account is in two or more names (without a fiduciary, beneficiary or other designation), it is a joint account and, unless State-Specific Rules are applicable to your account and are disclosed in the Signature Card or in this Agreement, we will presume it is a joint account with right of survivorship.If such a presumption is contrary to applicable state law and you desire the joint account to pass by right of survivorship, you may elect right of survivorship on the Signature Card. Each joint owner appoints the other as his or heragent to deposit funds, withdraw and transfer funds, instruct us to stop payment on any item drawn on the account, add additional joint owners to the account, obtain any and all information about the account, and conduct any and all other business on the joint account without limit including, but not limited to, pledging, encumbering, or closing the account. Any joint owner or owners may appoint an attorney-in-fact for the account, but we reserve the right to require the consent of all joint owners. Acting as an agent, any joint owner can endorse a check, draft or other payment order made out to any other joint owner for deposit into the joint account. You agree that any money in a joint account may be paid to any one or more of the joint owners, and that payment may be made on the order or instructions of any of the joint owners, whether or not we have notice that the other owner or owners are deceased at the time of payment.
One joint owner is not authorized to remove another joint owner from the title of the account without the other joint owner's written consent, but may, however, withdraw all of the funds from the account or close the account. If you have requested that the names on your account be connected with the word "and", you agree that we may treat the account like any other joint account, we may rely on the instructions/signature of any one authorized signer, and the rules in this Agreement will apply. Unless State-Specific Rules are applicable to your account and are disclosed in the Signature Card or in this Agreement, upon the death of a joint owner, the account balance is owned by the surviving owner(s), subject to our right to reimbursement from the account and our right of setoff and security interest in the account, and the estate of the deceased joint owner has no interest in the account. If more than one joint owner survives, unless State-Specific Rules are applicable to your account and are disclosed in the Signature Card or in this Agreement, they will
own the account as joint tenants with right of survivorship and not as tenants in common. If you have a joint account with your spouse at Wachovia, you agree that we may treat your account as owned by joint tenants and not as a tenancy by the entireties. For Texas accounts, the parties to a multiple-party account own the account in proportion to the parties' net contributions to the account. The Bank may pay any sum in the account to a party or the personal representative of a party's estate at any time. On the death of a party, unless the deceased party elected a right of survivorship account by so designating and signing a Signature Card, the party's ownership of the account passes as part of the party's estate under the party's will or by intestacy.

4. **Payable on Death (POD), "In Trust For" Accounts and "As Trustee For" Accounts.**
Subject to any State-Specific Rules that may be applicable to your account and are disclosed in the Signature Card or in this Agreement, you may, without a trust document, designate an account to be payable on your death to a designated beneficiary or beneficiaries. Such accounts are generally known as payable on death ("POD"), in trust for ("ITF") accounts and as trustee for ("ATF") accounts. POD, ITF and ATF accounts are governed by applicable state laws and regulations. You are solely responsible for meeting the terms of applicable state law in establishing such accounts, including without limitation any titling requirements. We make no representations as to whether the use of a POD, ITF and ATF designation is appropriate for the person(s) establishing such an account. Any such designation should be made only after consulting with an attorney or other qualified estate planning professional. POD, ITF and ATF accounts belong to you during your lifetime and, until your death, the beneficiary(ies) has no interest in the account and may not access the account. Upon your death, or if there is more than one joint owner, upon the death of the last surviving co-owner, all the funds in the account shall be owned in equal shares by the person(s) then living who are named as beneficiary(ies). At our option, we may pay the funds in the account in equal shares to the person(s) then living who are named as beneficiary(ies) or pay the funds by issuing a check in the name of all living beneficiaries and giving the check to any one beneficiary, subject to our right of setoff and security interest. The money in the account will not be inherited by your heirs or controlled by your will. Certain state law restrictions may apply. The Bank has no obligation to notify any beneficiary of the existence of any account or the vesting of any interest in any account.

5. **Transfers to Minors.** You may make a gift of money to a minor under state law by opening an account in the name of the minor with you listed as Custodian, pursuant to the Uniform Transfers to Minors Act (UTMA), Uniform Gifts to Minors Act (UGMA), or corresponding law in the state where the account is opened and maintained. Only you are authorized to act on the account. The law of the state where the account is maintained determines when the minor reaches the age of majority. As Custodian, you will abide by the applicable law by notifying us in writing immediately upon the death of the minor or at the time the minor reaches the age of majority. After notifying us of either of these events, your authority over these accounts continues only to the extent allowed by law. Before we receive such notice and have a reasonable opportunity to act on it, we may honor any checks or drafts written on the account without incurring any liability to the minor or to any third party. You will be liable to us for any loss or expense (including attorneys' reasonable fees and cost of litigation) we incur because of your failure to give us prompt written notice or otherwise abide by the law.

6. **Trust Agreement Accounts.** If you have established a trust for someone else under a will or written trust agreement and if you die or are replaced as trustee, we will not release any funds until all required legal documents have been delivered to us and all other legal requirements for such release have been met.

7. **Power of Attorney Accounts.** We may require you to complete our power of attorney form applicable to add an attorney-in-fact to your account. Generally, we also accept the applicable state statutory form. To the extent permissible by applicable law, we may reject a power of attorney from you that is not the original or is not on a Wachovia Power of Attorney form or, if applicable, the statutory form. If a power of attorney is accepted by us, any action taken by us in reliance on your attorney-in-fact will be binding on you if we take action before we receive (1) a signed written revocation of the power of attorney (2) a certified copy of your death certificate; or (3) a certified copy of a court order declaring you incapacitated or appointing a guardian for your person or property. You authorize and direct us to receive, accept, pay and/or apply, without any duty of inquiry, without limit as to amount, and without regard to the application of the proceeds, any check, draft, or other instrument for the payment of money drawn by your attorney-in-fact on or payable from your accounts including, but not limited to, those indorsed to the order of your attorney-in-fact or otherwise for the personal credit of your attorney-in-fact. We are not liable for the misapplication of funds from your account by the attorney-in-fact.

8. **Agency and Fiduciary Accounts.** Any individual acting as an agent, guardian, personal representative, trustee, custodian, conservator, representative payee, or in some other fiduciary capacity (collectively "Agent") must be designated as such on the Signature Card. Otherwise, it will be assumed that the account is owned in an individual capacity. We are authorized to follow the directions of the Agent regarding the account until we receive written notice that the agency has been terminated and we have a reasonable time to act upon the notice. We are not liable for the misapplication of funds from your account by the Agent. Unless we have been provided with a complete copy of the agreement, court order or other document under which the account is opened, we are authorized to follow the instructions of your Agent without determining if those instructions are contrary to or prohibited by such document.

9. **Withholding and Reporting of Interest.** If you fail to provide us with your correct taxpayer identification number ("TIN"), we are required by law to withhold a specified percentage of taxable interest, dividend and certain other payments we make to you. This is commonly referred to as "backup withholding".

You must provide us with your TIN number even if you don't have to file a tax return and you must also certify that you are not subject to backup withholding. These certifications must be given under penalty of perjury. For an individual account, the applicable TIN is the Social Security Number ("SSN") of the sole account owner. For a joint account, it is the SSN of the joint owner listed first on the account. For a POD, ITF or ATF account, it is the SSN of the owner (or the first one listed if there is more than one). For a UTMA or UGMA account, it is the SSN of the minor. We are not required to open (and may close) an account for you if you do not provide and certify your TIN, even if you are exempt from backup withholding and information reporting. We are required to report certain dividend, interest and other payments we make to you to the Internal Revenue Service ("IRS"). We include your TIN in those reports. Non-resident aliens who are not subject to information reporting must certify to us that they are exempt from withholding status by completing a Certification of Foreign Status (W-8). Each non-resident alien joint owner of a joint account will be required to submit the appropriate W-8 Certification Form. We reserve the right to open an account only in the name of non-resident alien owner(s) who have signed and submitted W-8 Certification Forms at the time the account is opened and to expand the title or Signature Card to include the names of additional non-resident alien owners at the time we receive a signed and dated W-8 Certification Form from such non-resident alien owner(s). You may be subject to civil and criminal penalties if you fail to provide us with a correct TIN or falsify withholding information. For additional information on interest reporting and withholding, contact your tax advisor or the IRS.

## D. GENERAL RULES GOVERNING DEPOSIT ACCOUNTS

1. **Deposits.** You can make deposits to your account in person at any Wachovia Financial Center, by mail or by any other method we make available, such as at any Wachovia Automated Teller Machines ("ATM") and at certain non-Wachovia ATMs. You are encouraged to use your personalized deposit slips in order to help us credit deposits to your account as soon as possible and to minimize errors. If you do not use your personalized deposit slips, you agree that we will not be liable to you for any errors resulting from your use of a counter deposit slip, whether completed by you or one of our employees. We are not responsible for deposits made by mail, night depository or other outside depository until we actually record the receipt of those deposits in our books and records. We have the right, but are not obligated, to endorse any non-cash item submitted for deposit into your account and deposit them into your account and the right to not accept items that contain multiple, missing, or improper endorsements. We also have the right to limit, refuse, hold, or return any deposit. You agree that you shall not deposit, without our prior express written consent, unsigned demand drafts or other paper or electronic replacements for the original item, including without limitation substitute checks as defined by federal law that have not been previously endorsed by a bank. You agree to be liable for and to reimburse us for any loss or expense (including without limitation, attorneys reasonable fees and costs of litigation) we may incur because you deposit any such items listed above, you fail to endorse an item exactly as drawn, you deposit an item with a missing endorsement, or resulting from or arising out of any return of or claim with respect to any deposited item for any reason whatsoever. You agree that we can automatically charge your deposit account for such losses and expenses without prior notice to you. If we receive an item on a weekend, holiday or after our cut-off hour on a business day, the item is deemed to have been received on our next business day. You agree that our count of the coins and currency in your deposit shall be conclusive as to the amount. We will make any necessary adjustments to your account for any discrepancies with which we agree and notify you. Our business days and cut-off hours are posted at our financial centers and ATM cut-off hours are displayed on the ATM deposit screen, and are subject to change from time to time at our discretion. We reserve the right to make adjustments to your account, in our sole discretion, for computation or other errors to your account.

2. **Authorized Signatures.** The authorized signatures for an account are those reflected on the Signature Card, any resolution or other separate written authorization relating to the account received by us. For the payment of funds and for other purposes relating to any account you have with us, we are authorized to recognize those signatures, but we will not be liable to you for refusing to honor a check or other signed instructions if we believe, in good faith, that the signature appearing on such checks or instructions is not genuine. If the Signature Card is not returned, you agree that we will not be liable to you for honoring checks or other signed instructions if we believe in good faith that the signature appearing on such checks or instructions is authorized. When your account is established, you may indicate your desire for more than one authorized signature on a check or other item drawn against the account by designating a specific number of desired signatures on the Signature Card, a resolution or in a separate written authorization that is received by us. However, we do not offer accounts that require two or more signatures. Any such designation is solely for your convenience and internal control purposes and not binding on us. As a result, you agree that we may pay checks against your account without regard to the number of desired signatures. You may also give another person authority over your account by your conduct or failure to act and, although we may recognize such authorization, we may refuse to do so without liability to you. For example, if you voluntarily give information about your account (such as our routing and transit numbers and/or your account number) to a party who is seeking to sell you goods or services, and you do not physically deliver a check to that party, any item presented against your account by the party to whom you gave the information is deemed to have been authorized by you. Moreover, you guarantee and warrant that any unsigned draft that you deposit into your account is authorized.

3. **Facsimile Signatures.** We are not liable for and reserve the right to reject any item drawn against any personal account that bears or appears to bear a signature or endorsement made by use of a facsimile signature stamp, machine or any method other than an original handwritten signature or endorsement, whether or not genuine. If you use, place or make a facsimile signature or endorsement on any item, you bear the risk of any unauthorized use of your facsimile method or the use of fake facsimiles and you agree that we may pay and charge your account for such item, regardless of by whom or by what means the actual or purported facsimile signature or endorsement may have been affixed (whether or not authorized) and regardless of by whom or by what means the item was created (whether or not authorized). As a result, you should maintain close control over your facsimile signature or endorsement device and promptly review your statement(s) and its contents for unauthorized use of the device.

4. **Placement of Endorsements.** If you issue a check that contains a carbon band, printing, endorsements or other material on the back of the check outside the area extending 1½ inches from the trailing edge of the check, that material could also interfere with endorsements by banks and cause delays in returning the check. Similarly, if you or a prior endorser signs, stamps or affixes an endorsement to a check for deposit which is outside of the area extending 1½ inches from the trailing edge of a check, that material could also interfere with endorsements by banks and cause delays in returning the check. Therefore, you agree that (1) we shall not be liable to you for and (2) you will indemnify and hold us harmless from any and all claims, loss, costs and expenses (including without limitation reasonable attorneys' fees and the costs of litigation) that we or you may incur as a result of the

late return of a check caused by carbon band, printing, endorsements or other material on the back of any check drawn on or deposited to your account that extend outside the area extending 1½ inches from the trailing edge of the check. The trailing edge is defined as the left side of the check when viewing it from the front.

5. **Collection of Items.** In receiving items for deposit or collection, we act as your collection agent and assume no responsibility beyond the exercise of ordinary care. Special instructions for handling an item are effective only if made in writing and given to us along with the item in question. We will not be liable for default or negligence of our correspondent banks or for loss in transit, and each correspondent bank will only be liable for its own negligence. You are responsible for reconstruction and proof of loss of any items, including checks and other negotiable instruments, included in deposits which are lost or stolen in transit before we have received and accepted the deposit. Further, you agree to fully cooperate and assist in the reconstruction and proof of loss of any items, including checks and other negotiable instruments, included in deposits that are lost or stolen in transit after we have received and accepted the deposit. Items and their proceeds may be handled in accordance with applicable Federal Reserve regulations and operating circulars, Clearing House Association or Funds Transfer System rules, and contractual arrangements with other financial institutions. All deposited items (including those drawn on another account at the Bank) are credited subject to final payment and our receipt of proceeds. If you deposit foreign currency or items that are denominated in a foreign currency into your account, the final credit to your account will be based on the exchange rate in effect at the time we receive final payment for that item in United States currency. Without prior notice to you, we may charge back any item at any time before final payment, whether returned or not, and we may also charge back any item drawn on us if the item cannot be honored against the drawer's account. If you have insufficient funds in your account to cover a returned item, we may overdraw your account in accordance with this Agreement. We are authorized to pursue collection of previously dishonored items, and in so doing we may permit the payor bank, to hold an item beyond the midnight deadline. At our discretion, you authorize us to convert any checks that you deposit into your account and that are returned for uncollected or insufficient funds to an electronic transaction.
If any check or other item deposited in your account is returned to us by the bank on which it was drawn through the Federal Reserve, a clearing house or other normal check return channels, we may accept that return and charge the check or other item back against your account without regard to whether the bank on which the check was drawn returned the check before its midnight deadline. Furthermore, if, after a check or other item deposited into your account is finally paid, it is returned to us by the bank on which it is drawn because someone has made a claim that the check or other item was altered, forged, unauthorized, or should not have been paid for some other reason, we may debit your account for the amount of the item. If you have insufficient funds in your account to cover a returned item, we may overdraw your account in accordance with this Agreement in an amount equal to such check or other item. You agree to reimburse us for any cost or expenses we incur in connection with any such claim (including, without limitation, attorneys' reasonable fees and court costs) and agree that we may impose service fees against your account for processing any such claim as reflected in our Schedule of Fees and Funds Availability for Personal Accounts from time to time.

6. **Automated Processing of Items.** Checks you write may be automatically processed and/or converted into electronic images (truncated) during the check collection and return process. If you elect to have your bank documents printed by a vendor that has not been approved by the Bank or you use check stock or features (e.g., security features) that cause critical data to disappear or be obscured upon truncation or you make your check out in such way (e.g. using a lightly colored ink) that causes critical data to disappear upon truncation, you will be doing so at your own risk. We shall not be liable for processing errors or delays, losses or our failure to process any such item due to printing inaccuracies, faulty magnetic ink, encoding of critical data, or the failure of critical data printed or written on the item to survive truncation. We have adopted automated collection and payment procedures so that we can process the greatest volume of items at the lowest possible cost to all customers. These automated procedures involve high-speed automated check processing machines that read information encoded onto each item in magnetic ink. In recognition of this fact, you agree that in paying or taking an item for collection, we may disregard all information on the item other than any information encoded onto the item in magnetic ink according to general banking standards, whether or not that information is consistent with other information on the item. For example, we may rely on the amount of an item as encoded in magnetic ink, even if that encoded amount differs from the face amount of the item or exceeds the maximum amount for which the item is valid as stated in a legend on the item (even if we are aware of it). You agree to reimburse us for any loss or expense (including without limitation, attorneys' reasonable fees and the cost of litigation) we incur because you issue or deposit an item (1) containing extra information such as, but not limited to, maximum amount limitations, date limitations, two signature requirements, etc.; or (2) containing features or ink that cannot be properly imaged. You also agree that we have exercised ordinary care in paying an item even though our procedures do not provide for the sight examination of items with a face amount below an amount we specify from time to time.

7. **Fraud Detection/Deterrence and Safeguarding Your Account.** There are several precautions that you can and should take to decrease the risk of unauthorized transactions from your account(s). Such precautions include, but are not limited to:

    - Safeguarding and not disclosing to third parties information about your account, such as your account number(s);
    - Safeguarding materials and information which can be used to access your account including, but not limited to, your checkbook, blank or unused checks, electronic access devices including ATM cards, personal identification numbers and any passwords or other access-related information, to prevent them from being misused by an unauthorized party;
    - Calling us immediately at 800-WACHOVIA (800-922-4684) if you suspect any problem with your account or unauthorized activity, or your checkbook or unused checks are lost, stolen or misplaced;
    - Reviewing carefully your checkbook and unused checks for unauthorized activity if you suspect that any of these items may have been stolen or tampered with or if you are the victim of theft or your property is burglarized;
    - Promptly and carefully reviewing your statement each month for unauthorized activity or missing deposits;
    - Closing your account immediately upon discovery of any known or suspected unauthorized activity. When you report missing, stolen, or unauthorized checks, we may recommend that any account(s) that has been compromised by unauthorized or fraudulent activity be closed. If you decline this recommendation and elect to leave your account open, Wachovia shall not be liable to you for subsequent losses on the account due to unauthorized activity and we may require you to indemnify us for any losses we incur as well;
    - Limiting your telephone transactions with us to landline telephones. Cordless or cellular phone conversations can be intercepted without your knowledge or authorization;
    - Safeguarding your facsimile signature devices, if any.
    - Issuing any checks with care to avoid alterations or forgeries. Precautions include without limitation using a dark colored permanent ink to write out your checks, making sure the numeric and written amounts match and are readable, and making sure there are no blank or open spaces in the body of the instrument where words or figures are to be inserted.

In addition, from time to time we may make certain products and services that are designed to detect and/or deter check fraud available to you. While no product or service will be completely effective, we believe that the products and services we may offer will reduce the likelihood that certain types of fraudulent items will be paid against your account. You agree that if you fail to implement any of these products or services, or you fail to follow these and other precautions reasonable for your particular circumstances, you will be precluded from asserting any claims against us for paying any unauthorized, altered, counterfeit or other fraudulent item that such product, service, or precaution was designed to detect or deter, and we will not be required to re-credit your account or otherwise have any liability for paying such items.

8. **Statements.** Your statement will be mailed or will be made available to you electronically monthly, quarterly or annually, depending on the type of account and the services you have with us and, if applicable, will include the amount of interest earned for the statement period. If you are a My Direct Pay Card customer, your statement will not be mailed to you unless you request it; you must access your monthly account statement at Wachovia ATMs. We will mail your statements to the address we have for you in our records. If you elect to have statements mailed to a third party address, you are still responsible for careful and prompt examination of the statement and the timely reporting of any problems or unauthorized transactions as outlined below. You agree to notify us if you change your address and/or any contact telephone information. You also agree that if the U.S. Postal Service or one of its agents notifies us of a change in address for you, we may change your address based on this information. We will have no liability to you for changing your address based on such information, even if the information provided by the U.S. Postal Service or one of its agents is in error. If any statement is returned to us because of an incorrect address, we may stop sending statements to you until a valid address is provided to us, but for all purposes it shall be considered as if we made your statement of account available to you as of the statement date that was or would have been printed on your statement.

If you had previously requested us to hold rather than mail your statements (a service we no longer offer), you must call for them promptly. You will be responsible for the same care in reviewing these statements as if they were mailed. We will destroy statements being held after 90 days. Your statement will deemed to be received by you five (5) calendar days after its date. You are responsible for notifying us promptly if you do not receive your statement(s). If you do not receive your statement contents (or you receive copies or substitute checks with an illegible image), the canceled checks or legible copies will be provided to you within a reasonable time after your written request that sufficiently identifies the checks requested. You agree to pay the applicable service charge for retrieving and copying the requested checks.

9. **Review of Account Statements.** You are in the best position to discover a forged, unauthorized or missing signature or endorsement, a material alteration, a missing or diverted deposit, illegible image or any other error or discrepancy relating to a check, deposit or other credit or debit entry to your account. Therefore, you agree to promptly and carefully examine your statement(s) and its contents when you, or a party designated by you, receive them. If you think that an unauthorized person has withdrawn funds from your account, that one or more deposits is not reflected on your statements, or that there is any other type of error or discrepancy in your statements, you should notify us immediately. The statement is considered correct unless you notify us promptly after receipt of the statement, its contents, or the checks themselves, or after any error is discovered or reasonably could have been discovered, whichever occurs first.

If you do not discover and report a forged, unauthorized or missing signature, illegible image or an alteration promptly after we have sent or otherwise made your statement(s) and/or its contents available to you, you agree not to assert against us (a) any forged, unauthorized or missing signature or alteration, if we suffered a loss because of your failure to discover and report the problem, and (b) any forged, unauthorized or missing signature or alteration by the same wrongdoer on items we paid after you have had a reasonable period of time (not to exceed thirty (30) days) to examine the statement containing or reflecting the first forged, unauthorized or missing signature or alteration but before we received notice of the problem from you. If the previous sentence applies, but you are able to prove that we failed to exercise ordinary care in paying the item in question and that our failure substantially contributed to the loss, then the loss will be allocated between us based on the extent to which our respective failures to exercise ordinary care contributed to the loss. In that regard, and as disclosed elsewhere in this Agreement, we process checks and other items by automated means and do not visually examine all checks or other items.

You agree that we do not fail to exercise ordinary care because we use these automated procedures. You also agree that we do not fail to exercise ordinary care if the items were forged or altered so cleverly (as by unauthorized use of a facsimile machine, photocopy machine, computer equipment or otherwise) that a reasonable person would not detect the forgery or alteration.

If you have not discovered and reported a forged, unauthorized or missing signature or endorsement, a material alteration, a missing or diverted deposit, illegible image or any other error or discrepancy relating to a check, deposit or other credit or debit entry to your account within forty (40) days of the date on which the first statement containing or reflecting (or that should have contained or reflected) those items was mailed to you or otherwise made available to you, you agree not to assert that problem against us. This forty (40) day limitation takes priority over the provisions in the previous paragraph and applies regardless of whether or not you or we exercised ordinary care with respect to the item in question (or its payment), the examination of the statement on which it was reflected (or should have been reflected) or otherwise.

**IF YOU FAIL TO DISCOVER AND REPORT THESE OR ANY OTHER ERRORS OR DISCREPANCIES WITHIN THE FORTY (40) DAY PERIOD, YOU LOSE ANY AND ALL RIGHTS YOU MAY HAVE TO ASSERT THE ERROR OR DISCREPANCY AGAINST US.**

10. **Check Safekeeping and Check Image.** If you select an account with check safekeeping, you authorize us to retain and copy at our expense all checks, drafts, debit or credit advices for the accounts indicated on the Signature Card. After the original documents have been copied, they will be destroyed. The copies will generally be available for seven years. Items are deemed to be made available to you when your statement is made available. You may cancel your authorization for check safekeeping at any time in writing, except for those accounts that require check safekeeping. If you select Check Image, reduced-sized copies of canceled checks will appear on the last page(s) of your statement.

11. **Check Copies.** You may request a copy of up to three (3) checks per statement cycle at no charge by calling the Customer Service number listed on your account statement. We will provide copies required by the Internal Revenue Service or any state or local taxing authority without additional charge to you. If we cannot provide a copy of the check as agreed, and as a result you sustain a monetary loss, we may reimburse you for any direct loss up to the amount of the check. We shall not be liable to you for any special or consequential damages of any kind. You agree to provide any information we may require concerning the missing check prior to payment of your claim, and if you fail to substantiate your claim, we may decline to pay it.

12. **Payment of Checks and Other Withdrawals.** Checks and other items are sometimes lost or truncated (i.e., converted into electronic images) during the collection process. Items that have been truncated may also be reconverted into substitute checks

or other replacement documents. Under federal law, the Bank is required to accept substitute checks with warranties as the legal equivalent of the original and the Bank will pay and charge against your account such substitute checks. Moreover, you agree that the Bank may at its discretion pay and charge against your account photocopies, image replacement documents, electronic check or other paper or electronic replacements of the original item that do not constitute substitute checks, if they are legitimate replacements for properly drawn and authorized items. You agree to allow any imaged document or copy to serve as the original for all purposes, including charging your account or determining validity of signature, etc. We may refuse to pay or may impose a special fee for any check or other item drawn against your account or used to withdraw funds from your account if it is not on a form we have approved. We also reserve the right to refuse to pay or impose a special fee for any check or other item drawn against your account or used to withdraw funds from your account if the transaction is made in a manner not specifically authorized for your account, if made more frequently or in a greater number than specifically permitted for your account, or if made in an amount less than the minimum withdrawal or transfer specifically permitted for your account. If you buy checks from a third party vendor and not through us or if you print your own checks, you must be sure that you do not issue more than one check with the same serial number. If you issue such duplicate checks, we are not responsible for any loss, cost or expense that you incur as a result. We reserve the right to limit the amount of funds that may be withdrawn from your account in cash for various reasons including, without limitation, the amount of currency that is available at a particular financial center. This limitation is in addition to those set forth in other sections of this Agreement. Withdrawals are generally made first from finally collected funds and, unless prohibited by law or by our written funds availability policy, we reserve the right to refuse to pay any check or other item drawn against uncollected funds, impose a special fee for each such item, or both. We may pay checks or other items drawn upon your account (including those payable to us or on which we may be liable) in any order determined by us, even if (1) paying a particular check or item results in an insufficient balance in your account to pay one or more other checks or other items that otherwise could have been paid out of your account; or (2) using a particular order results in the payment of fewer checks or other items or the imposition of additional fees. Although we generally pay larger items first, we are not obligated to do so and, without prior notice to you, we may change the order in which we generally pay items.

From time to time, a person who is not our customer may attempt to cash a check that you have written on your account with us. Cashing an item for a non-customer exposes us to certain risks that are not present if the item is deposited at another financial institution and presented to us through the check collection system. As a result, you agree that we may charge a non-customer a fee to cash an item (including a payroll check) that is drawn on your account with us unless prohibited by applicable law. This fee may be imposed without prior notice to you and may be applied to items that are drawn on your account or that we have issued at your request. You also agree that we may impose various additional identification, security and other requirements on a non-customer seeking to cash an item drawn at one of our financial centers. These requirements may include, without limitation, submitting one or more forms of identification, providing thumbprints or other identifiers, and using specified teller lines that may only be available at specially designated locations. You agree that we will not be liable for wrongful dishonor for refusing to cash the item if payee refuses or fails to pay the fee or comply with such reasonable security measures.

13. **Insufficient Funds/Overdrafts.** We may determine whether or not your account contains sufficient funds to pay a check or other item, authorize a point-of-sale transaction, in person withdrawal, ATM withdrawal, or process any other electronic transaction at any time between the time we receive the check or other item, point-of-sale transaction authorization request, in person withdrawal, ATM withdrawal, or other electronic transaction and our return deadline, and only one determination of the account balance is required. If that determination reveals insufficient available funds to pay the check or other item, or in person withdrawal, authorize the point-of-sale transaction, or process the ATM withdrawal, or other electronic transaction you agree to pay a service charge, and we are not required to honor the check or other item, or in person withdrawal, authorize the point-of-sale transaction, or ATM withdrawal, or process the other electronic transaction and may return and/or decline it. Alternatively, we may honor the check, other item, or in person withdrawal, authorize the point-of-sale transaction, or ATM withdrawal, or process the other electronic transaction and create an overdraft and impose a service charge for paying the overdraft. You are responsible for the full amount of any overdraft and the related service charges. We can enforce overdraft liability in the joint account against any joint owner individually (and each joint account owner agrees to be liable for all overdraft liability in the joint account), even if the joint owner did not sign the item or authorize the point-of-sale or other electronic transaction creating the overdraft or receive any benefits from its proceeds. You agree to deposit sufficient funds to cover the overdraft and the related service charge immediately upon notice of the overdraft and to reimburse us for any costs we incur in collecting the overdraft from you including, without limitation, reasonable attorneys' fees and the costs of litigation to the extent permitted by law. However, the honoring of one or more overdrafts does not obligate us to honor any future overdrafts, and you should not rely on us to honor an overdraft even if we have done so in the past. Moreover, we are not required to send you prior notice on checks returned for insufficient funds.

14. **Overdraft Protection.** If overdraft protection is available, and if you have elected that option, we will automatically transfer funds, sufficient to cover the amount of any overdraft and service charge, to your primary checking account from any other eligible secondary deposit account (checking, savings, money market) or credit account (credit card or line of credit) you selected. One transfer will be made at the end of the business day in which an overdraft occurs, as follows:

    (1) **Overdraft transfers made from a deposit account.** Funds will be transferred in amounts in the next largest full dollar amount. This is not an extension of credit and no transfer may be made if sufficient funds are not available in your secondary deposit account to cover the overdraft. If your secondary deposit account is a savings or money market account, transfers from such accounts are pre-authorized transfers and limited by federal regulation to 6 pre-authorized transfers (including telephone and automatic transfers) each statement period.

    (2) **Overdraft transfers made from a credit account.** Funds will be transferred in amounts rounded up to the next $100 increment, subject to your available credit limit. An overdraft transfer from a credit account is treated as a cash advance and is subject to the terms of the credit agreement, including any applicable transaction fee or other fee.

    If a check, ATM or Check Card transaction is involved and is not paid because there are not sufficient funds in your account or through overdraft protection, you will be charged the applicable insufficient funds fee.

15. **Stale, Time-Dated and Post-Dated Items.** We maintain the option either to pay or to dishonor any stale check (i.e., a check that is more than six months old) upon presentation to us.

    Our check processing equipment is unable to detect time-dated checks (i.e., checks stating that they are not valid after a certain date or beyond a certain period of time). As a result, you agree that we will not be liable to you for charging your account after the date or period stated on an otherwise properly payable time-dated check (even if we are aware of it) and you further agree that we are not bound by any time limitation or restriction you may place on any item presented for payment against your account.

    Similarly, our check processing equipment cannot detect a post-dated check (i.e., a check bearing a date later than the actual date it is written). Therefore, it is not recommended that you issue post-dated checks as a means of withdrawal.

    To stop us from paying stale, time-dated or post-dated items, you must ask us to stop payment on such items in accordance with the Stop Payment provision below.

16. **Stop Payments.** You may ask us to stop payment on checks drawn on your account that we have not paid. You must tell us the exact amount of the check, check number, date of check, payee and the full account number on which it is drawn for us to be able to enter a stop payment. If the information you give us is not correct or if you do not give us other reasonable information requested about the check, we will not be responsible if we are not able to affect the stop payment. We also cannot be responsible if we are not able to identify the proper check because you have issued more than one check with the same serial number. If you generate your checks by computer or in any other manner which does not produce a MICR-encoded check number on the check, we will be unable to guarantee that your stop payment will be honored. You therefore agree to hold us harmless should we be unable to honor a stop payment order which you have timely and correctly placed on your check with no MICR-encoded check number. We are entitled to a reasonable period of time within which to notify our employees after you give us a stop payment order. A "reasonable time" means until the end of the business day following the day on which the stop payment order was placed. Moreover, we are not obligated to re-credit your account if we pay a check over a valid and timely stop order unless you are able to demonstrate that you would not have otherwise been obligated to pay the check. In that regard, you should be aware that a stop order does not relieve you of your obligation on a check that has been negotiated to a holder in due course. If we re-credit your account after paying a check over a valid and timely stop payment order, you agree to transfer to us all of your rights against the payee or other holder of the check, and to assist us in any legal action taken against that person. Any person who is authorized to draw checks against the account may give a release or cancellation of a stop payment order. Stop payment orders on cashier's checks, official checks, or money orders are not permitted. If such an item has been lost, stolen or destroyed, you may provide a declaration of loss and affidavit and request the item be re-issued. The Bank may require that you wait 90 days (or provide a bond where permitted by law) before honoring your claim and will not be liable to you if such check is cashed prior to the 90 days (or receipt of bond, if applicable). Stop payment orders (both oral and written) are valid for six months from their dates unless renewed by you for an additional six months. The fee for stopping payment is contained in the Schedule of Fees and Funds Availability for Personal Accounts. You may renew a stop payment order by calling or writing us prior to the expiration of the existing stop payment order. If you place or renew a stop payment order, you agree to pay our stop payment fee and to hold us harmless from all costs and expenses incurred by us, including our attorney's fees, due to our refusal to pay the check stopped.

17. **Service Fees.** You agree to pay any service fees that apply to your account or the services described in or incorporated into this Agreement. Service fees may include but are not limited to charges for check printing, check writing, stop payment orders, notices of post-dated items, cashier's checks, overdrafts, Automated Clearing House (ACH) entries, wire transfers, investigation, research and insufficient funds checks, other items, point-of-sale transaction authorization requests and other electronic transactions. Any fees may be deducted from your account without prior notice to you. We will not be liable for dishonoring checks or other withdrawal orders because of insufficient funds resulting from proper deduction of fees. Our current Schedule of Fees and Funds Availability for Personal Accounts is given to you when you open an account and is available at any of our financial centers. Service fees are subject to change from time to time at our discretion. Notice of any changes will be sent to you at the address shown on our records, and a reasonable period of time will be given before any changes become effective. You further agree to reimburse us for any actual expenses we incur to execute, cancel or amend any wire transfer payment order or ACH entry, or perform any related act at your request.

18. **Sharing Information Regarding Your Wachovia Relationships.** We have the right to report information about your account to any credit reporting agency or to anyone to whom you give us as a reference. Wachovia shares customer transaction and experience information with affiliates within Wachovia Corporation (e.g. Wachovia Bank, N.A., Wachovia Securities, Inc., Wachovia Mortgage Corporation, etc.) through a central information system.

Wachovia will now be allowed by the Fair Credit Reporting Act to share any other customer information among Wachovia affiliates. Wachovia will never share this "other information" with any non-affiliated third party for any reason other than those already stated in this Agreement.

Sharing of "other information" among Wachovia affiliates can be used to improve our services to you. However, you may opt out of such sharing between Wachovia affiliates. In order to do so send your name, address (as it appears on your account statement), social security number, telephone number, and account type and number to:

Wachovia<br>
P.O. Box 11726<br>
Roanoke, VA 24022-1726

(Your request must be mailed in a separate envelope and should not be included in any other bank correspondence.) You may also call us at 1-866-203-5722, visit a Wachovia Financial Center, or visit us on the web at www.wachovia.com to discuss your options, inform us of a preference, or provide us with feedback. Please note that each customer has the right to direct Wachovia not to share information other than transaction or experience information about them with its affiliates. If you and another customer jointly obtain a Wachovia account or service ("joint customers"), we will treat your preference not to share your non-transactional information with any of the affiliates in the Wachovia family as applying only to you individually – unless you specify that you are acting on behalf of the other joint customers for that account and that the preference not to share should apply to the other joint customers. We will process any request received as quickly as possible. You authorize us to tell payees of items drawn against your account whether sufficient funds are then available.

19. **Accuracy and Verification.** You acknowledge and agree that any information you have supplied or will supply in the future to Wachovia is complete and correct. You agree that we may request reports from credit bureaus and consumer reporting agencies to investigate or reinvestigate any information provided by you in connection with your application for any account. We may also verify your employment, salary, assets, debts and references.

20. **Wachovia Banking Cards.** If you have requested us to issue a Wachovia ATM card, PayAccess or Check Card, you agree to the terms and conditions of the Wachovia Card Agreement and Disclosure Statement ("Card Agreement"). If you have requested us to issue a Wachovia My Direct Pay Card, you agree to the terms and conditions of the Wachovia My Direct Pay Card Agreement.

    If you have opened a PayAccess/My Direct Pay Account, with direct deposit of your pay or benefits, a PayAccess ATM card/My Direct Paycard will be issued to you. The terms and conditions of the respective Card Agreement will govern the use of your Card. You will not have check writing privileges on a PayAccess/My Direct Pay Account.

21. **Telephone Access.** You may access your accounts and perform many banking services using a touch-tone telephone and personalized access codes. Services may include balance and transaction information, transfers, stop payments, interest information and other matters (where available).

22. **Automated Clearing House.** From time to time, you may be a party to an Automated Clearing House (ACH) entry, which may be credited or charged to your account. You agree to be bound by the National Clearing House Association (NACHA) operating rules then in effect for any ACH transactions. You agree that we may rely on the representations and warranties of the originator of the ACH transaction set forth in the NACHA operating rules in debiting or crediting your account. We will notify you of the receipt of any ACH entry only in your account statement, and you may confirm receipt by calling the telephone number listed in the "Bank Contacts" section of this Agreement. You agree that payment of ACH entries will be processed on the basis of the identifying number, even if the identifying number identifies a person or entity different from the named party in the transaction. If you receive an unauthorized transaction posted to your account, you have fifteen (15) days to notify us to return

WACH 001755

the item as unauthorized. We will not be able to return the item after that time without the cooperation and agreement of the originating bank and the originating company. Any other action must be conducted between you and the originator of the transaction.

Please note that the ACH system may not be used to process transactions in violation of Office of Foreign Assets Control ("OFAC") sanctions. At a minimum, illicit transactions will be blocked or rejected and originators of such ACH transactions may face penalties.

From time to time, you may authorize a merchant or service provider to use one of your checks as a source of account information in order to initiate an electronic withdrawal from your account. If you authorize such a transaction, the merchant or service provider will use certain information from your check, along with other information concerning the transaction (such as the amount) to initiate a ACH debit transaction against your account. The merchant or service provider only uses the check as a source document to send the transaction through the ACH system electronically. The funds will be debited from your account and deposited into the merchant or service provider's account. A description of the transaction containing the serial number of the check used to initiate it will appear on your monthly statement. However, because the merchant or service provider did not forward the check to us, it will not be included with your statement. If you authorize a merchant or service provider to use one of your checks to initiate this type of transaction, the transfer is governed by the Electronic Funds Transfer Act and is subject to the Electronic Funds Transfer Disclosure and Special Terms and Conditions that appear later in this Agreement. It is not subject to the rules for normal check transactions described in this part of the Agreement.

If we return a check you give a merchant because of insufficient or uncollected funds, the merchant may also re-present the check to us electronically. In order to do this, the merchant must give you a notice (before accepting your check) that your check may be collected electronically if it is returned. A description of the transaction containing the serial number of the check will appear on your monthly statement from us. However, because the merchant re-presents the check to us electronically, it will not be included with your statement. If a merchant re-presents a check electronically, the transaction is not covered by the Electronic Funds Transfer Act. However, if the merchant charges you a fee as a result of the returned check and you authorize the merchant to electronically debit the fee from your account, that transfer is covered by the Electronic Funds Transfer Act and is subject to the Electronic Funds Transfer Disclosure and Special Terms and Conditions that appear later in this Agreement.

23. **Transfer of Accounts.** No accounts are transferable. Personal savings accounts and time deposits are assignable only with our prior written consent and we may, in our sole and absolute discretion, withhold such consent. No assignment will become effective until we have recorded it in our records.

24. **Abandoned/Dormant Accounts.** If you fail to notify us in writing of any change to your current mailing address or you fail to utilize your account, your account and deposits may be presumed dormant or even abandoned after a certain period of time. Dormant accounts may be subject to reasonable service charges (similar to those imposed on active accounts), and service charges may also be imposed on accounts presumed to be abandoned. Accounts that are presumed to be abandoned will be escheated to the state of your last known address in which your account is maintained in accordance with applicable law.

25. **Arbitration of Disputes/Waiver of Jury Trial and Participation in Class Actions.** If either you or we request, any dispute or claim concerning your account or your relationship to us will be decided by binding arbitration under the expedited procedures of the Commercial Financial Disputes Arbitration Rules of the American Arbitration Association (AAA), and Title 9 of the US Code. Arbitration hearings will be held in the city where the dispute occurred or where mutually agreed. A single arbitrator will be appointed by agreement of the parties, or, if the parties are unable to agree, by the AAA and will be a retired judge or attorney with experience or knowledge in banking transactions. Each party will pay its own costs and attorney's fees. A court may enter a judgment on the award. Any statute of repose or limitations period which would provide a defense to a claim brought in a lawsuit in state or federal court will also apply with equal force and effect to any arbitration brought pursuant to this section.

To the extent permitted by law, if any dispute or claim results in a lawsuit, and neither you nor we have elected or requested arbitration, you and we knowingly and voluntarily agree that a judge, without a jury, will decide the case. The arbitration or trial will be brought individually and not as part of a class action. If it is brought as a class action, it must proceed on an individual (non-class, non-representative) basis. YOU UNDERSTAND AND KNOWINGLY AND VOLUNTARILY AGREE THAT YOU AND WE ARE WAIVING THE RIGHT TO A TRIAL BY JURY AND THE RIGHT TO PARTICIPATE OR BE REPRESENTED IN ANY CLASS ACTION LAWSUIT.

26. **Conflicts/Disputes Involving the Account.** If we receive a actual or potential claim from a third party regarding your account, any deposit, transfer, credit or other transaction involving your account, or conflicting instructions or claims from authorized signers, you hereby grant to us full discretion to freeze your account and not honor any further transactions until the claim is resolved, or we may, at our discretion, choose to rely on the current account documentation, honor the competing claim if we receive evidence supporting the claim, or refuse to pay out any money from your account until we receive consistent instructions from all parties or a court order, all without any liability to you. We may also without liability to you close the account and issue a check made payable to you, to you and each authorized signer, or you and each claimant, as we deem necessary, or interplead the funds into court. You agree to reimburse us for any loss, costs or expenses, including without limitation, reasonable attorneys' fees and the costs of litigation to the extent permitted by law, that we incur as a result of any dispute involving your account, and you authorize us to deduct such loss, costs, and expenses from your account(s) with us without prior notice to you. This obligation includes disputes between us involving account and situations where we become involved in disputes between you and an authorized signer, another joint owner, or a third party claiming an interest in the account. It also includes situations where you, an authorized signer, joint owner, or third party takes any action with respect to the account that causes us, in good faith, to seek the advice of counsel, whether or not we actually become involved in a dispute. This obligation also includes costs associated with investigation and research we initiate internally.

27. **Legal Process Affecting Accounts.** If legal action such as an attachment, garnishment, levy or other state or federal legal process ("legal process") is brought against your account, we may refuse to permit (or may limit) withdrawals or transfers from your account until the legal process is satisfied or dismissed. If we receive any document that appears or is purported to be legal process issued out of any court or governmental agency, you hereby authorize us to accept and comply with it, no matter how it was received by us. You hereby direct us not to contest on your behalf any such document or legal process and that we may take action to comply with such process as we determine to be appropriate in the circumstances without liability of us to you, even if the legal process or document purports to affect the interest of only one owner of a joint account and even if any funds we may be required to pay out leaves insufficient funds to pay a check you have written. If we incur any expenses, including without limitation, attorneys' reasonable fees, in connection with any such document or legal process, you are liable to us in such amount and we may charge any expenses and fees to your account or any other account you may have with us without prior notice to you, or we may bill you directly for such expenses and fees. Any garnishment, attachment or other levy against your account is subject to our right of setoff and security interest. You agree that because we have financial centers or offices in numerous jurisdictions and states other than where your account was opened, if we are served with any process or receive any document as referenced above in or from any jurisdiction or state, you hereby direct us to recognize and honor such service of process.

WACH 001756

28. **Indemnification of Bank.** You agree to indemnify and hold us, our officers, employees and agents harmless from any and all losses, claims, and expenses (including attorneys fees and costs of litigation) of any kind (collectively "losses, claims and expenses") arising in connection with the services provided under this Agreement, except losses, claims, and expenses arising out of our negligence or willful misconduct of our employees. You further agree to hold us and our employees, officers, employees and agents harmless from any and all claims and expenses arising out of actions taken or omitted in good faith by us in reliance upon instructions from you. We shall not be responsible or liable to any other entity's (not under our direct control) acts or omissions, including without limitation, any Federal Reserve Bank, Clearing House, correspondent bank, or transmission or communication facility, and we shall not be responsible or liable to you for failure or delay in our performance under this Agreement or for any losses, claims, and expenses due to causes or conditions, including, without limitation, delays and/or interruptions of business due to acts of God, natural disasters, fire, acts of government authority, acts of terrorists, public enemy or war, riots, civil disturbances, insurrections, labor difficulties, power failure, telecommunications failure, severe adverse weather conditions or other circumstances beyond our reasonable control. Even if liability is established for actual damages, IN NO EVENT SHALL WE OR YOU BE LIABLE TO ONE ANOTHER FOR SPECIAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH THE FURNISHING, PERFORMANCE OR USE OF THE SERVICES PROVIDED FOR UNDER THIS AGREEMENT, EVEN IF YOU OR WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES UNLESS REQUIRED BY APPLICABLE LAW. The limitations and exclusions in this paragraph shall apply to all claims of every kind, nature, and description whether arising from breach of contract, breach of warranty, negligence or other tort, and shall survive the termination of this Agreement.

29. **Costs and Attorney's Fees.** You agree to reimburse us for our costs and expenses (including attorney's fees) incurred in any action that we bring against you concerning your account and in any lawsuit instituted by you against us where we are the prevailing party. You further agree to reimburse us for any actual expenses we incur to execute, cancel or amend any wire transfer payment order, or perform any related act at your request, including, without limitation, costs associated with investigations and research we initiate internally. We may charge any account of yours for such costs and expenses without prior notice to you.

30. **Setoff of Debts and Security Interest.** Any pledge or assignment of time deposits and other deposit accounts for security purposes remains subject to our right of setoff and security interest. If you ever owe us or any of our affiliates money as a borrower, guarantor, judgment debtor or otherwise, including any obligation owed to a financial institution acquired by us, and it becomes due, we have the right under the law (called "setoff") and under is Agreement, by which you grant us a security interest in your certificates of deposit and other deposit accounts, to use the money from your account(s) maintained with us or our affiliates to pay the debt. We may use the money to pay the debt even if the withdrawal results in a loss of interest, the imposition of a penalty or the dishonor of checks. In the case of a joint account, each joint owner agrees that we may use the money in their joint accounts to satisfy any one of their individual obligations. We may use the money if: (1) you are a joint owner of the account and (2) you are indebted to us or (3) the debt is owed to us by another joint owner. This right exists irrespective of who contributed funds to the joint account. Similarly, each joint owner agrees that we may use the money in their individual accounts to satisfy obligations in their joint account(s). The security interest granted by this Agreement is consensual and is in addition to our right of setoff. However, our right of setoff and security interest may not apply to your account if: (a) it is an IRA or a tax-deferred Keogh Retirement Account; (b) the debt is created by a consumer credit transaction under a credit card plan (unless that debt is subject to a court judgment in our favor); or (c) the debtor's right of withdrawal arises only in a representative capacity. To the extent any of the funds to be setoff are entitled to any exemption from execution, levy, attachment, garnishment, seizure or other legal or equitable process (including, without limitation, any Social Security, Supplemental Security Income, Veterans or other federal or state benefits), then to the maximum extent allowed by law you hereby knowingly, affirmatively and unequivocally waive such exemption and consent to our setoff against such funds as contemplated by this Agreement.

31. **Changing this Agreement.** We have the right to change the terms of this Agreement and the fees, charges and other terms and conditions described in other documents incorporated by reference. We will notify you in writing at least thirty calendar days before the change will take effect if the change is not in your favor. Any such notification will be effective if mailed to the address of the account in our records. If any such notice is returned to us as undeliverable, the changes described in that notice are still binding on you. Therefore, it is very important for you to notify us right away if your mailing address changes. This Agreement may not be amended or modified orally. We reserve the right to waive the enforcement of any of the terms of this Agreement with respect to any transaction or series of transactions. Any such waiver will not affect our right to enforce any of our rights with respect to other customers, or to enforce any of our rights with respect to later transactions with you. Whether we enforce or waive our rights does not obligate us to enforce or waive similar rights in the future, nor will such waiver modify this Agreement.

32. **Terminating this Agreement.** You can terminate this Agreement at any time by notifying us in writing and by no longer using your account. We can also terminate this Agreement and close your account at any time by giving you notice a reasonable time before the effective date of such termination and closure. Notwithstanding the foregoing, you agree that we may close your account without advance notice under certain circumstances such as, for example, we believe in good faith that your account is being used to facilitate a fraud or other crime. Whether you terminate this Agreement and close your account or we do, the account closing will not affect your obligations under this Agreement, even if we allow any transactions to be completed after this Agreement has been terminated. You will remain responsible for any fees you incur on your account and any outstanding items and overdrafts. If you close your account during a statement period, you may not receive interest that has accrued but has not been credited.

33. **Notices.** Any notice we send you will be considered effective when it is deposited into the United States mail to the address for the account in our records or is otherwise provided to you. If you elect to have statements mailed to a third party address, any notice we send will be considered effective when it is deposited into the United States mail to the third party mailing address you elected. Unless otherwise provided in this Agreement, notice from you must be in writing and will be effective upon receipt provided we have a reasonable opportunity to act upon it. If your account is a joint account, we can notify any one of you and the notice will be effective for all of you. Any one of you may notify us and we will consider it to be notice from all of you.

34. **Applicable Law.** Our deposit relationship with you is governed primarily by this Agreement. However, it is also governed by the laws of The United States of America; the rules and regulations of the Board of Governors of the Federal Reserve System and various Federal Reserve Banks; and the rules and regulations of other proper bank supervisory authorities and other governmental agencies. To the extent state law applies to our deposit relationship, the applicable law is the law of the state where your account was opened as reflected in our records. If there is any conflict between this Agreement and applicable federal or state law, this Agreement will be considered changed to the extent necessary to comply with the law. If any provision in this Agreement is declared to be invalid, unenforceable or illegal, that part will not affect the validity of other provisions.

35. **Customer's Waiver of Notice.** By signing the Signature Card, or using your account, you waive any notice of non-payment, dishonor or protest regarding any items credited to or charged against your deposit account. For example, if a check, which you deposited, is dishonored and returned to us, we are not required to notify you of the dishonor.

36. **Information Reported to Consumer Reporting Agencies.** Under the Fair Credit Reporting Act you have the right to notify us if you believe we have reported inaccurate information about your account to any Consumer Reporting Agency. Such notices should be sent in writing and include your complete name, current address, social security number, telephone number, account number, type of account, specific item of dispute and the reason why you believe the information reported is in error. Send your notice to:

    Wachovia
    P.O. Box 3117
    Winston-Salem, NC 27102

37. **Force Majeure.** You agree we shall have no responsibility or liability to you or any third party for failure or delay in our performance under this Agreement or for any losses due to causes or conditions including, without limitation, delays and/or interruptions of business due to any act of God, natural disasters, fire, act of government authority, act of public enemy or war, riot, civil disturbance, insurrection, labor difficulty, power failure, telecommunications failure, severe adverse weather condition or other causes beyond our reasonable control. The time, if any, required for such performance under this Agreement shall be automatically extended during the period of such delay or interruption.

38. **Invalidity of Contract Provisions.** In the event any one or more of the provisions of this Agreement shall for any reason, including under any applicable statue or rule of law, be held to be invalid, illegal or unenforceable, the remaining provisions of this Agreement shall remain in full force and effect.

39. **Signatures Received Via Facsimile (Fax).** If you fax any document to us signed, you agree that it was your intention that: (i) your fax signature is an electronic signature under applicable federal and state law, (ii) the fax be an original document, (iii) you intend on conducting business with us by electronic records and electronic signatures, (iv) your consent under (iii) to be electronically given under applicable federal and state law.

40. **Telephone Communication Monitoring.** You agree that your telephone communications with us may be monitored and recorded, by our employees or agents, to improve customer service and security.

41. **Entire Agreement.** This Agreement and the documents to which it refers constitute your and our entire agreement and understanding and supercede all prior agreements and understandings. This Agreement may not be changed orally. This Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.

E. **SUBSTITUTE CHECKS AND YOUR RIGHTS.**

1. **What is a substitute check?**

   To make check processing faster, federal law permits banks to replace original checks with "substitute checks." These checks are similar in size to original checks with a slightly reduced image of the front and back of the original check. The front of a substitute check states: "This is a legal copy of your check. You can use it the same way you would use the original check." You may use a substitute check as proof of payment just like the original check.

   Some or all of the checks that you receive back from us may be substitute checks. This notice describes rights you have when you receive substitute checks from us. The rights in this notice do not apply to original checks or to electronic debits to your account or if you do not receive substitute checks from us. However, you have rights under other law with respect to those transactions.

2. **What are my rights regarding substitute checks?**

   In certain cases, federal law provides a special procedure that allows you to request a refund for losses you suffer related to a substitute check that you receive that was posted to your account (for example, if you think that we withdrew the wrong amount from your account or that we withdrew money from your account more than once for the same check). The losses you may attempt to recover under this procedure may include the amount that was withdrawn from your account and fees that were charged as a result of the withdrawal (for example, bounced check fees).

   The amount of your refund under this procedure is limited to the amount of your loss or the amount of the substitute check, whichever is less. You also are entitled to interest on the amount of your refund if your account is an interest-bearing account. If your loss exceeds the amount of the substitute check, you may be able to recover additional amounts under other law.

   If you use this procedure, you may receive up to $2,500 of your refund plus interest if your account earns interest within 10 business days after we received your claim and the remainder of your refund (plus interest if your account earns interest) not later than 45 calendar days after we received your claim.

   We may reverse the refund (including any interest on the refund) if we later are able to demonstrate that the substitute check was correctly posted to your account.

3. **How do I make a claim for a refund?**

   If you believe that you have suffered a loss relating to a substitute check that you received and that was posted to your account, please contact us by calling 800-WACHOVIA (800-922-4684) or by writing to Wachovia Bank, N.A., Attn: Correspondence Team NC-8502, P.O. Box 563966, Charlotte, NC 28256-3966. You must contact us within 40 calendar days of the date that we mailed (delivered by a means to which you agreed) the substitute check in question or the account statement showing that the substitute check was posted to your account, whichever is later. We will extend this time period if you were not able to make a timely claim because of extraordinary circumstances. We may require that you submit your claim in writing. If we require you to submit your claim in writing, we will notify you of the written claim requirement at the time you submit a claim orally. Your claim will still be timely, if we receive your oral claim within the 40 calendar day time period outlined above and receive your written claim no later than the 10th business day after you submitted your oral claim.

   Your claim must include —

   - A description of why you have suffered a loss (for example, you think the amount withdrawn was incorrect);
   - An estimate of the amount of your loss;
   - An explanation of why the substitute check you received is insufficient to confirm that you suffered a loss; and
   - A copy of the substitute check and/or the following information to help us identify the substitute check: the check number, the name of the person to whom you wrote the check, date the check was written and the amount of the check.

II. **WIRE TRANSFER SPECIAL TERMS AND CONDITIONS**

If you wish to use our wire transfer service, the following terms and conditions shall govern all transactions for our acceptance and processing of your payment orders, credits and related requests. If a discrepancy were determined to exist between these Terms and Conditions and other provisions of this Agreement, then these Terms and Conditions shall control but only to the extent necessary to address the discrepancy. Unless otherwise defined below, the terms used in this Section II of this Agreement shall have the same meaning as set forth in Article 4A of the Uniform Commercial Code of the state in which your account or relationship is maintained.

1. **AUTHORIZATION AND SECURITY PROCEDURE.** We have established operating rules and security procedures for you to initiate and receive wire transfer of funds to or from your account(s),which rules and procedures include a requirement for you to sign a "Wire Transfer of Funds - Standard Set Up," or such other document as we may require, the terms of which are incorporated by reference and made part of this Agreement. Such Wire Transfer of Funds Setup contains the rules and procedures ("Security Procedures") which you and we will use to process payment orders initiated by you. Additional call back procedures may be utilized by you as described in the Security Procedures. You agree that the Security Procedures are commercially reasonable in light of your circumstances and the type, value and frequency of the payment orders you will request. You also agree to keep the Security Procedures confidential and not to disclose the Security Procedures to anyone except the persons whom you have authorized to make transfer requests on your behalf ("Authorized Persons"). If you or any of your Authorized Persons have reason to believe that a Security Procedure may have been learned by an unauthorized person, you agree to notify us immediately at the telephone number indicated in the Wire Transfer of Funds Setup. If we receive a payment order (or related request) in accordance with your Security Procedure, it shall be conclusively deemed authentic and we shall be entitled to rely thereon. You are responsible for the accuracy of the initial communication of the payment order as well as the accuracy of any documentation or callback of the payment order made by us. You, for yourself and each of your Authorized Persons, agree that we, in our sole discretion, may record any telephone conversation between you or any Authorized Persons and us.

2. **EXECUTION OF PAYMENT ORDERS.** If we receive a payment order that has been verified according to Security Procedures,

you authorize and direct us to debit your account(s) as listed on the Wire Transfer of Funds Setup and transfer the funds. We are also authorized to implement any instructions, including amendments or cancellations of prior payment orders, upon verification of such instructions. We are authorized to rely on any payment order believed by us in good faith to have been given by an Authorized Person. We may handle payment orders received from you and other customers in any order selected by us and, unless otherwise instructed by you, we may use any means, intermediaries or funds transfer systems which may have operating rules governing the execution of payment orders to effect the transfer as we, in our sole discretion, shall determine.

3.  **CUT-OFF TIMES.** We must receive all payment orders before the cut-off time for funds transfers on a business day established by us from time to time. Any payment orders or related requests received after such deadlines, or on weekends, holidays for us or the bank or institution to receive the transfer, or the funds transfer system to be used, will be treated as received on our next funds transfer business day. We will make reasonable efforts to execute all payment orders received prior to the deadline.

4.  **ADVICE OF FUNDS TRANSFERS.** Unless otherwise agreed in writing, we will not provide a next-day wire transfer summary statement or confirmation. Instead, we will notify you of a receipt or payment by wire transfer in any periodic statement provided to you. You agree to examine each of your periodic statements promptly upon receipt and to notify us immediately of any discrepancies between the periodic statement and your records. We shall not be liable for interest compensation unless we are notified of the discrepancy within thirty (30) days after the date of your statement indicating the debit for the payment order in question. You agree that your right to assert a claim against us with respect to any transaction reasonably identified on a statement shall expire one (1) year after the date of the transaction which becomes the basis for such a claim.

5.  **LIMITATION OF LIABILITY AND INDEMNIFICATION.** You expressly agree that we shall be liable to you only for our erroneous execution of a payment order. We shall not be liable for any errors or delay on the part of any third party including, without limitation, third parties used by us in executing a payment order or performing a related act and no such third party shall be deemed to be our agent. We shall not be liable for our refusal to honor any request if we, in good faith, are unable to determine to our satisfaction that such request is valid, based upon our adherence to the Security Procedures. **IN NO EVENT SHALL WE BE LIABLE FOR SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES EVEN IF WE SHALL HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE.** Except as may be limited by applicable law, you agree to indemnify us and hold us harmless (including the payment of attorneys' reasonable fees) against all liability to third parties arising out of or in connection with the terms and conditions of this Agreement and the services provided hereunder or otherwise pursuant to your instructions.

6.  **USE OF IDENTIFYING NUMBERS.** In the event a payment or payment order identifies a beneficiary, beneficiary's bank or intermediary bank inconsistently by name and an identifying number (such as an account number, S.W.I.F.T. address or universal identification number), payment may be made by the intermediary or beneficiary bank on the basis of the identifying number, even if the identifying number identifies a person or entity different from the named beneficiary in your payment order and your obligation to pay the payment order shall not be excused by your error. We will rely on the identifying number as proper identification of a beneficiary.

7.  **INTEREST COMPENSATION.** In the event that we shall be liable to you for interest compensation under this Agreement or by applicable law, interest shall be calculated on the basis of the average Federal Funds rate for the period involved. You agree that we may, at our sole option, pay interest compensation as follows: (1) by lump sum payment of cash, or (2) by providing a credit to your account with us.

8.  **INTERNATIONAL PAYMENTS.** Payment orders for the transfer of U.S. Dollars shall be paid in U.S. Dollars if the funds shall be transferred to a beneficiary account located in the United States or its protectorates or territories. If a payment order requires U.S. Dollars to be transferred to a beneficiary account located outside of the United States or its protectorates or territories, we or the beneficiary's bank may elect to pay the beneficiary in non-U.S. Dollar currency at our or the beneficiary bank's buying rate of currency exchange for wire transfers. It is your responsibility to advise the beneficiary of this possibility. We may send any message relative to an international payment order in explicit language, code or cipher. International transfer payment orders are final when delivered to us. However, pursuant to the request of the originator, and only if we may determine it to be possible, we may cancel or amend the originator's payment order before the wire transfer of funds shall be effected. We shall not incur any liability if we are unable, for any reason, to cancel or amend any payment order. Refunds of U.S. Dollar payment orders shall be in U.S. Dollars in the amount of U.S. Dollars that we shall receive from the bank that shall be returning the transferred funds to us at such bank's rate of currency exchange, less any fees therefor. Refunds of non-U.S. Dollar currency payment orders shall be in the amount of U.S. Dollars that can be bought by us for the applicable non-U.S. Dollar currency amount at our then current rate of currency exchange. The originator bears all risk of loss due to fluctuation in the rate of currency exchange. No wire transfer fee shall be refunded.

### III. PRIVACY STATEMENT

#### Privacy At A Glance

Wachovia[1] is dedicated to protecting your privacy and providing you with the highest level of service. We want you to understand how we gather and may share customer information at Wachovia, the choices you have, and how we protect that information in everything we do.

#### You Have Choices

You may direct us not to contact you for marketing purposes by:

- Telephone
- Direct mail
- E-mail

You may direct us not to allow Wachovia companies to share or use information about you in two ways:

- Do not share, with other Wachovia companies, credit information about you that we receive from you or others; and
- Limit Wachovia companies from marketing their products and services to you based on credit or transaction information about you that they receive from other Wachovia companies (this option is available beginning October 1, 2008, and is fully described in the section below titled "*Your Choice to Limit Use of Information for Marketing*").

[1] Wachovia Corporation (or Wachovia), includes multiple companies, such as Wachovia Bank, N.A., Wachovia Mortgage, Wachovia Insurance Services, Inc., and Wachovia Securities, LLC. This Privacy Statement applies to all Wachovia companies unless a Wachovia company provides notice that a separate privacy statement applies to that company. This Privacy Statement describes how we handle and protect customer information and replaces any Privacy Statements previously provided. The Privacy Statement applies only to consumers who are customers or former customers of Wachovia and have or had established relationships with Wachovia in the United States. The policies and practices described in this Privacy Statement are subject to change, but we will notify you if there are significant changes. This Privacy Statement is issued as of January 2008.

#### How to Reach Us to Exercise Your Choices

- Visit a Wachovia Financial Center.
- Call us at 1-866-203-5722 to speak to a representative (Command Asset Program, IRA, Brokerage and Insurance customers should call 1-877-358-1114).
- Complete our *Consumer Privacy Preferences Form* at wachovia.com/privacy.

#### How We Protect Customer Information

Keeping financial information secure is our responsibility and our commitment to you.

- We protect customer information through physical, electronic, contractual, and procedural measures that comply with or exceed applicable laws and standards.
- We train our employees to protect customer information and only authorize access for employees whom we believe have a business need for that information. Employees are held accountable by Wachovia's Code of Conduct and Ethics to properly protect customer information.
- We maintain policies and procedures that provide for the proper physical security of workspaces and records.

- We require contractors and other companies that provide services on our behalf to protect information, and we prohibit those companies from using it for any other purpose. We only provide them with information that we believe is necessary to fulfill their responsibilities or to provide a financial service to you.
- Protecting information about our customers online is an essential part of our service to you. For more information on our Internet Security and Privacy practices, please visit wachovia.com/privacy.

If you believe you are a victim of fraud or identity theft, please contact us at 1-888-647-3648 for assistance, which may include placing holds on your accounts.

**The section above is a summary. It is important that you read the rest of this Privacy Statement for a more detailed explanation of our privacy practices.**

### How We Gather Customer Information

The information we gather about you helps us to better understand your financial needs and to provide more personalized, efficient service to you. For example, this information may prompt us to suggest overdraft protection for your checking account, or recommend an investment product.

The information we gather comes from a variety of sources, including:

- Information you provide to us (such as name, address and telephone number).
- Information about your transactions with Wachovia (such as account balance and payment history).
- Information we receive from credit reporting agencies and other companies and agencies (such as your credit history).

### Sharing Customer Information Within Wachovia Corporation

Wachovia Corporation includes several related companies. These companies operate in a variety of business lines, such as banking, credit cards, consumer loans, insurance, securities and others. We may share customer information about you among the companies that make up Wachovia Corporation, including:

- Information based on your transactions with us (for example, information that we would collect about your loan amounts and deposits with us in order to offer you a rate based on total balances) and contact information (such as your name and address).
- Credit information received from you or others (such as information from your credit application or your employment or credit history) to evaluate your eligibility for various financial services (for example, a home equity loan at a special rate).

You may tell us not to share credit information with other Wachovia companies.* For more information, see the section below entitled, *Your Privacy Choices at Wachovia*.

### Sharing Customer Information Outside of Wachovia Corporation

We do not provide customer information to companies outside of Wachovia Corporation, except as outlined below. You do not need to request this confidentiality - it is our standard practice.

In order to serve your needs, we may provide all of the information we gather to:

- Companies that perform business operations for us (such as check printing).
- Companies that act on our behalf to market our services, or financial institutions with whom we have entered into a joint marketing agreement in order to provide you with valuable financial products and services.*
- Others as permitted or required by law (such as to protect against fraud or in response to a subpoena).

Our policies for sharing customer information, both within and outside of Wachovia as described above, also apply to all of the information we have gathered about former customers of Wachovia.

### How We Use Customer Information

The customer information we gather helps us to better understand your financial needs and to provide you with superior service by offering the right services at the right time. We may use the information among Wachovia companies and other authorized entities, for the following purposes, among others:

- To protect your accounts from unauthorized access or fraud.
- To provide you with the products and services you requested.
- To service your accounts.
- To inform you about financial products and services that may be of interest to you.

### Your Privacy Choices at Wachovia

Because we recognize that you may wish to limit the ways in which we contact you for marketing purposes, we offer the following options. You can choose not to be contacted for marketing purposes by:

1. Telephone
2. Direct Mail
3. E-mail

You also have choices about how information about you is shared or used within Wachovia. You may choose the following options:

4. Do not share among Wachovia companies credit information about me that you receive from me or others.
5. Limit Wachovia companies from marketing their products or services to you based on credit or transaction information about you that they receive from other Wachovia companies. (*This option is available beginning October 1, 2008 and is fully described in the section below titled "Your Choice to Limit Use of Information for Marketing".*)

**If you are comfortable with the ways in which we contact you currently, there is no need to indicate your preferences. To discuss your options, inform us of a preference, or provide us with feedback, call us at 1-866-203-5722 (Command Asset Program, IRA, Brokerage and Insurance customers should call 1-877-358-1114), visit a Wachovia Financial Center or visit us on the web at wachovia.com/privacy.**

Whatever your preferences, we will honor your wishes and respect your privacy. Your preferences will remain in effect until you tell us otherwise. You do not need to notify us if you have already indicated your preferences to us. If you contact us, we will assume your preferences apply to you only - unless you tell us that they also apply to other individuals listed on your accounts.

Please note that we are committed to providing you with superior service. We may contact you to resolve a problem or to service your accounts even if you have asked us not to contact you for marketing purposes. For example, if we notice unusual activity on your credit card, we may contact you to verify your purchases and confirm you authorized them. If you choose not to be contacted by direct mail for marketing purposes, you will continue to receive the marketing information that accompanies our usual account mailings and statements. You may also be contacted by your designated account representative or Relationship Manager.

### How to Protect Yourself

At Wachovia, we're committed to customer protection, which includes protecting personal information about you as well as providing you with ways to protect yourself. We recommend that you follow these security measures to protect and help prevent potential misuse of personal information about you:

- Protect and properly dispose of your account records.
- Do not share account information, passwords, user IDs, PINs, code words or other confidential information with others.
- Do not provide confidential information by telephone to unknown callers.
- Do not provide confidential information online unless you initiated the contact, know the party with whom you are dealing, and provide the information through a secure channel.
- When conducting business over the Internet, always use a secure browser, exit online applications as soon as you finish using them, and make sure you have virus protection and a firewall and update them regularly.
- Monitor your credit report for accuracy. By law, you are entitled to receive one free credit file disclosure every 12 months from each of the nationwide consumer credit reporting companies. To learn more or request a copy of your credit report, visit annualcreditreport.com or call 1-877-322-8228.
- For additional information, please visit wachovia.com/securityplus or call us at 1-888-647-3648.

### If You Believe You May Be a Victim of Fraud or Identity Theft

Contact us at 1-888-647-3648 to place holds on your accounts, obtain a free copy of Wachovia's Customer Fraud Assistance Package or for other assistance.

### How to Limit Direct Marketing from Other Companies

To reduce the marketing materials you receive from companies other than Wachovia:

1. Contact the credit reporting industry's pre-screening opt out number (1-888-567-8688 or visit optoutprescreen.com). This should remove your name from credit reporting industry databases used for making pre-approved credit solicitations.
2. Add your telephone number to the National Do Not Call Registry. You may either call 1-888-382-1222 or register online at donotcall.gov. While this will stop many calls, you may still receive calls from businesses where you are a customer.

### Maintaining Accurate Information

It is important to keep information about your accounts accurate and up to date. If you ever believe that our records contain inaccurate or incomplete information about you, please let us know immediately by contacting us at 800-WACHOVIA (800-922-4684). We are committed to resolving any inaccuracies as quickly as possible.

### Credit Reporting Agencies

If you believe we have reported inaccurate information about your account to any credit reporting agency, please let us know in writing. Be sure to include your complete name, current address, Social Security Number, telephone number, account number, type of account, specific item of dispute and the reason you believe the information is wrong. Send your notice to: Wachovia Bank, N.A., P.O. Box 3117, Winston-Salem, NC 27102. We will investigate your concern and correct any inaccuracies we find. We will inform you of any actions we take.

### If You Have Questions, Contact Us

We welcome the opportunity to answer any questions you may have about this statement or how we safeguard and protect the confidentiality of information about our customers. Please visit our web site at wachovia.com/privacy, visit a Wachovia Financial Center, or call us at 1-866-203-5722 (Command Asset Program, IRA, Brokerage and Insurance customers should call 1-877-358-1114) to speak to a representative.

### *Other Applicable Laws

The practices described above are in accordance with federal law. You may have other protections under applicable state laws, such as those in Vermont, California and Nevada. To the extent these state laws apply, we will comply with them when we share information about you. For example, Vermont law places additional limits on sharing information about Vermont residents. As long as he or she remains a resident of Vermont, we will not share information we collect about a Vermont resident to companies outside of Wachovia, except:

- To companies that perform marketing or other services on our behalf;
- Contact information (like name and address), and transaction information (such as your payment history) to other financial institutions with which we have joint marketing agreements;
- With the authorization or consent of the Vermont resident; or
- As permitted or required by law.

We also will not share within Wachovia companies credit information about a Vermont resident received by another Wachovia company except with the authorization or consent of the Vermont resident.

<u>Do Not Call Policy:</u> This Privacy Statement constitutes Wachovia's Do Not Call Policy under the Telephone Consumer Protection Act for all consumers.

<u>For Nevada residents:</u> At any time, you may request to be placed on Wachovia's internal do not call list by following the instructions in the "Your Privacy Choices at Wachovia" section above. Nevada law also requires that we provide you with the following contact information:

| | |
|---|---|
| Wachovia Corporation<br>Attention: VA7282<br>PO Box 13327<br>Roanoke, VA 24040 | Bureau of Consumer Protection<br>Office of the Nevada Attorney General<br>555 E. Washington Street, Suite 3900<br>Las Vegas, NV 89101<br>Phone: (702) 486-3132<br>Email: BCPINFO@ag.state.nv.us |

### Your Choice to Limit Use of Information for Marketing

Wachovia[1] is providing this notice.

You may limit Wachovia companies, such as the Wachovia banking, insurance and securities affiliates, Evergreen companies, American Mortgage Network, Inc. doing business as Vertice, GE Capital Administrative Services, Inc., GE Capital Management Corp., GE Capital Warranty Corp., Heritage Indemnity Company, Heritage Mechanical Breakdown Corp., J.L. Kaplan Associates, LLC, Metropolitan West Capital Management, LLC, Tattersall Advisory Group, Inc., Westlake Group Ltd., and Westlake Insurance Company, Ltd., from marketing their products or services to you based on credit or transaction information about you that they receive from other Wachovia companies. This information includes your account balance, payment history, and your credit history. Your choice to limit such marketing offers from Wachovia companies will apply until you tell us to change your choice.

If you have already made a choice to limit such marketing offers from Wachovia companies, you do not need to act again.

To limit such marketing offers, contact us:

- By telephone: 1-866-203-5722 (Command Asset Program, IRA, Brokerage and Insurance customers should call 1-877-358-1114);
- On the Web: wachovia.com/privacy; or
- Visit a Wachovia Financial Center.

However, when you choose this option to limit the use of this information by other Wachovia companies to market their products and services to you, your choice does not apply to any Wachovia company that has an existing business relationship with you or where the use is otherwise permitted by law, including the use of information made available to that Wachovia company prior to October 1, 2008.

## IV. ELECTRONIC FUNDS TRANSFER DISCLOSURE AND SPECIAL TERMS AND CONDITIONS

You may arrange for direct deposits to be made to, automated payments and checks to be paid from, and funds to be transferred between your savings or transaction account(s) with us. If your account was established primarily for personal, family, or household purposes, the transfers are governed by Regulation E and the following special provisions and disclosures apply.

We use the terms "automated credits" or "direct deposits" to indicate deposits made directly to your account by electronic means; the terms "automated debits", "automated payments" or "automated checks" to indicate payments authorized in writing to be made from your account(s) by electronic means; and the term "telephone transfers" to indicate movement of funds between your Wachovia authorized accounts by use of a touch-tone telephone and personalized access codes. Your acceptance of direct deposits, authorization of automated payments/debits/checks, or telephone transfers to or from your accounts, is your agreement to the terms and conditions of this Agreement. The applicable terms and conditions set forth in the General Rules Governing Deposit Accounts in the Deposit Account Agreement section above also apply and are incorporated herein to the extent they are not inconsistent with Regulation E or the special provisions and disclosures below.

You also agree to pay any service fees that apply to your account for making electronic fund transfers, including the possibility of insufficient available funds or overdraft fees for point-of-sale transaction authorization requests and other electronic transactions. Applicable fees and charges for electronic funds transfers are listed in the Schedule of Fees and Funds Availability for Personal Accounts.

1. **Types of Electronic Funds Transfers Available.**

    (1) You may arrange with another party, such as your employer or a government agency, to electronically transfer deposits directly to your checking or savings account at Wachovia on a regular basis.

    (2) You may authorize another party, such as an insurance company or mortgage company, to have payments transferred from your checking or savings account at Wachovia and sent directly to them on a regular basis.

    (3) You may also direct funds be transferred from one of your deposit or credit accounts to another account, by use of a touch-tone telephone and personalized access codes (where available), ATM or Check Card at an ATM or other permissible terminal, and by means of the Internet. A funds transfer from a designated credit account (credit card or line of credit) is treated as a cash advance, and is subject to the

WACH 001761

terms of the credit agreement, including any applicable transaction fee or other fee.

(4) You may also participate in an automated check transaction with another party, such as a merchant, or other payee, in which you authorize a one-time electronic payment from your checking account using information from your check to pay for purchases and pay bills or, in which one of your checks is converted to an automated debit transaction via ACH including but not limited to a Re-presented Check Entry (RCK), an Accounts Receivable Entry (ARC), a Point-of- Purchase Entry (POP), an Automated Teller Machine Entry (ATM) or a Point-of-Sale Entry (POS), against your Wachovia Account.

(5) You may also use your Check Card at point-of-sale to make purchases for goods and/or services, which will result in funds being transferred from your deposit account to another party, such as a merchant, for the amount of the purchase.

2. **Right to Receive Documentation of Electronic Funds Transfers.**

    (1) **Automated Credits.** If you have arranged to have direct deposits made to your account at least once every 60 days from the same company or person, you can call us to find out whether or not the deposit has been made, using the applicable telephone number listed in the "Bank Contacts" section.

    (2) **Statements.** If you have a statement savings account linked with another account, you will receive a monthly account statement showing all of your automated transactions. If you have only a statement savings account, you will receive a statement at least quarterly. If the statement savings account has electronic activity you will receive a monthly statement. Inactive accounts may receive an annual statement.

3. **Right to Stop Payment of Pre-authorized Transfers and Procedure for Doing So.** If you have told us in advance to make regular automated payments out of your account, you can stop any of these payments by calling us at the applicable telephone number listed in the "Bank Contacts" section, or by writing to us at the applicable address listed in the "Bank Contacts" section, in time for us to receive your request 3 business days or more before the payment is scheduled to be made. If you call, we may require you to put your request in writing and get it to us within 14 days after you call.

4. **Liability for Failure to Stop Payments of Automated Debits.** If you order us to stop any of these automated payments 3 business days or more before the transfer is scheduled, and we do not do so, we will be liable for your actual losses or damages.

5. **Notice of Varying Amounts.** If regular automated payments may vary in amount, the person you are going to pay will tell you, 10 days before each payment, when it will be made and how much it will be.

6. **Liability for Unauthorized Transfers from Your Account.** If your statement or passbook record shows transfers that you did not make, including those made by card, code or other means, tell us at once. If you do not tell us within 60 days after the statement was mailed to you, you may not get back any money you lost after the 60 days if we can prove that we could have stopped someone from taking the money if you had told us in time. If a good reason (such as a hospital stay or a long trip) kept you from telling us, we will extend the time period.

7. **Unauthorized Transfers from Your Account.** If you believe that someone has transferred or may transfer money from your account without your permission, including using information from your check without permission, CALL US IMMEDIATELY at the toll-free number listed in the "Bank Contacts" section. If you cannot reach us by telephone, write to us at the address listed in the "Bank Contacts" section.

8. **Liability for Failure to Make Transfers.** If we do not complete a transfer to or from your account(s) on time or in the correct amount according to our Agreement with you, we will be liable for your actual losses or damages. These are some exceptions to our liability, such as:

    (1) If, through no fault of ours, you do not have enough money in your account to make the transfer;

    (2) If the transfer would exceed the credit limit available for your account(s);

    (3) If circumstances beyond our control (such as fire or flood) prevent the transfer, despite reasonable precautions that we have taken;

    (4) Other exceptions stated in our Agreement with you.

9. **Business Day.** Our business days are Monday through Friday. Weekends and bank holidays are not included.

10. **Disclosure of Account Information.** We will not disclose information about your account or the transfers you make, except:

    (1) As necessary to complete transfers;

    (2) To verify the existence and standing of your account with us at the request of a third party, such as a credit bureau;

    (3) If you give us your written permission;

    (4) To comply with government agency or court orders.

11. **In Case of Errors or Questions About Your Automated Debits/Credits, or Automated Check Transactions.**

    Telephone us at the number listed in the "Bank Contacts" section as soon as you can, if you think your statement is wrong or if you need more information about a transfer listed on the statement. We must hear from you no later than 60 days after we send you the FIRST statement on which the problem or error appeared, or after we record a passbook entry.

    (1) Tell us your name and account number.

    (2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.

    (3) Tell us the date and dollar amount of the suspected error. If you tell us verbally, we may require that you send us your complaint or question in writing within 10 business days.

    We will tell you the result of our investigation within 10 business days after we hear from you and will correct any error promptly. If we need more time, however, we may take up to 45 days to investigate your complaint or question. If we decide to do this, we will re-credit your account within 10 business days for the amount you think is in error, so that you will have the use of the money for the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we are not required to re-credit your account. For errors involving new accounts, point-of-sale or foreign-initiated transactions, we may take up to 90 days to investigate your complaint or question. For new accounts, we may take up to 20 days to credit your account for the amount you think is in error. If we decide that there was no error, we will send you a written explanation within 3 business days after we finish our investigation. You may ask for copies of the documents we used in our investigation.

12. **Bank Contacts.** If you need to call or write us about your account, use the following telephone number or address:

    **800-WACHOVIA (800-922-4684)**

    Wachovia
    Attn: Correspondence Team
    P.O. Box 563966
    Charlotte, NC 28256-3966


EQUAL HOUSING LENDER

©2008 Wachovia Corporation;
Wachovia Bank, National Association;
Wachovia Bank of Delaware, National Association, Members FDIC.
Wachovia is a registered trademark of Wachovia Corporation.