# EXHIBIT D



# Overdraft
# Protection
# A Guide for
# Bankers

## Table of Contents

A Guide for Bankers                                                                    7

How Formalized Overdraft Protection Programs Work                                     10

Why Are More Bankers Considering Formalized Overdraft Protection?                     12

Common Concerns                                                                        13

Addressing the Regulatory Concerns                                                     16

Recommended Best Practice "Do's and Don'ts"                                            18

Concluding Remarks                                                                     21

Appendix                                                                               22

# OVERDRAFT PROTECTION
# A GUIDE FOR BANKERS

Opinions abound about overdraft services – those formalized systems handling Non Sufficient Funds (NSFs) presented on a customer's account. Nessa Feddis, Senior Federal Counsel of the ABA, offers her insights in a recent article stating "the basics of bounce protection are sound."[1]  At the same time, the Consumer Federation of America asserts that financial organizations are deliberately enticing consumers to write bad checks.[2]  Vendors of overdraft programs extol their "customer-oriented" virtues, while the news media present overdraft users as pictures of despair.  CEOs of some financial organizations tout the benefits to their customers, while others disparage the practice.  Some banking organizations sign deals with vendors to endorse the programs, while a few publish negative opinions about them.

With this wide range of opinions, it is no wonder that many, inside the industry and out, question the practice and/or the methods of overdraft services.  As a financial executive, how are you to approach overdraft services in order to best serve your customers, shareholders, and the public welfare?

Offering an overdraft protection program is a decision unique to each executive and organization.  However, sometimes lost in the heat of the debate is the clarity created from a common set of facts.  Concerns and fears grow in the absence of facts.  Legitimate questions exist about overdraft services, and they deserve an analytical answer.  Why has the overdraft issue arisen so fervently now and not 20 years ago?  What are the benefits or reasons for a formalized overdraft program at your financial institution?  What are the regulatory compliance components?  What are recommended best practices, and what practices should be more cautiously considered or even avoided?  Furthermore, concerns of the media and consumer groups alike have made it clear that there are definitely potential risks associated with overdraft programs, in the event the bank makes a mistake or "over-reaches" in the implementation.

Before making a decision, each bank should review any program being considered with a critical eye towards what is "right" for the customer and the bank. We hope that this guide will equip you with the background and knowledge you need to make the right decision for your bank.

[1] Nessa Eileen Feddis. "Will We Kill a Useful Service?" ABA Banking Journal. April 2003, 42.
[2] Consumer Federation of America and National Consumer Law Center. "Bounce Protection: How Banks Turn Rubber into Gold by Enticing Consumers to Write Bad Checks." 27 Jan. 2003. <http://www.consumerfed.org/bounceappendix012803.pdf> (17 September 2003), Section 6.

# The Origins of the "Late Payment" Choice

Overall, consumer perceptions about debt and late payments are changing. A few years ago, some consumers counted on "float" to carry them through times when they might have been low on funds between paychecks. Over the past few years, float has been considerably decreased due to improved automation of processing systems, the increased usage of Internet banking, and the requirements of the Expedited Funds Availability Act. The increased time to clear a check that so many counted on before is no longer there.

Currently, on most of the bills that consumers pay on a monthly basis, the recipient is given the opportunity to pay the bill on time for one amount and late for a different (higher) amount. Consumers who choose to utilize the late payment option are aware of the late fee they will pay for this service. While one could certainly argue that this is financially imprudent, it is a choice that many make on a monthly basis.

Utility companies such as phone, gas, water, cable, and electric providers made this adjustment towards late payments in their policies in the 1990s. Prior to their change in approach, these industries often faced customer and public policy embarrassments when they discontinued service due to lack of payment. In order to meet customers' payment needs, they changed their approach, finding ways to serve customers who happened to be strapped for cash between paychecks. Below is a sample disclosure statement from a utility company that allows customers to pay their bills at a later date for an additional charge.

---

### Sample Water Utility Policy Statement

**Payments:**
Utility payments are due by the 15th of the month.
Utility payments can be deposited in the drop slot located in the door of the City Office.

**Late Payments:**
Payments received after the 15th of the month are considered late.
A late charge of $25.00 will be added to any bill not paid by the 15th.

**Disconnect:**
Utilities will be disconnected if payment is not received by the last day of the month.

Reconnect fee is $25.00.

---

To address customer needs, vendors today supply what is now well recognized by consumers: an invoice, similar to the one above, which offers one payment if paid by a certain date, and a higher amount if paid by a later date. In defining why customers paid late fees, one utility study found that a significant segment did so even though they have sufficient financial resources.[3]

Bankers may want to consider the way they communicate with their customers regarding overdrawn accounts. Compare the sample utility bill referenced above with the method financial institutions commonly use to communicate with their customers. Non-bank companies typically inform the consumer of their methods of handling their account in the event the consumer does not meet their obligations on time, and they communicate the fee associated with this. They do not actively entice customers to pay their bills late, but they communicate how the account will be handled should the consumer pay late. Contrast this with the communication sent out by the bank. When an item is presented to an account with insufficient funds to pay the check, the bank generally sends out a terse notice indicating that the customer did not have the funds in their account to cover the check. The communication usually indicates that, although the bank may have paid the check, the practice of falling below the minimum balance in the account is not something the bank encourages.

## The New Dynamics of Checking Accounts and Customer Communication

As new payment options have flourished over the past several years, the methods and means in which consumers use checking accounts have also changed. Rather than having only checks flow through their checking account, consumers now have many ways to access their funds, such as Internet access, ATM access, etc.

A by-product of having multiple delivery channels is that consumers now need better, more specific communication from financial institutions regarding use of these accounts. Financial institutions should be aware that in regard to consumers' attitudes toward late payments, the environment is changing. Banks need to be able to clearly articulate polices so that consumers can make

---

[3] Roger D. Colton, "Determining the Cost Effectiveness of Utility Late Payment Charges," July 1994, http://www.fsconline.com/downloads/LATE-FEE.pdf (17 September 2003).

informed decisions as well as understand the bank's policy regarding NSF fees when a customer mistakenly overdraws.

## The Dilemma

Many bankers believe that a response that discourages overdrafts is the accepted course of action. They believe that overdrafting a checking account is simply "wrong." They believe that banks should actively discourage overdrafts and they view NSF fees as "punitive" fees that are designed to discourage the activity.

Other bankers believe that most of their customers are good customers that will ultimately clear up their accounts, and that paying an insufficient item is better for the customer than returning it. While not encouraging overdrafts, these bankers believe that they are actually helping their customers avoid other fees and providing them a valuable service when they pay overdrawn items.

### Which view is appropriate? Or more precisely, which view is appropriate for your bank?

In many cases, these two views are not mutually exclusive. Bankers do not want to actively encourage overdrafts, but they do want to provide good customer service whenever and wherever prudent.

## HOW FORMALIZED OVERDRAFT PROTECTION PROGRAMS WORK

The first question you might ask is, "How do these programs work?" An example may help illustrate the programs' underlying concepts.

*John Smith is a customer at ABC Bank. John sits down to pay his bills on the 9th of the month. He gets to his credit card bill and he notices that the payment is due on the 15th, or he can wait and pay it on the 1st of the following month, in which case he will be charged a $36 late fee. He decides to wait and pay the credit card bill late because he has an unexpected emergency expense that he needs to pay immediately. John understands "the deal" with the credit card company – they have communicated this to him with every bill. John*

understands that he will incur the late fee, but in spite of this, he makes the decision to defer the payment.

John isn't sure how ABC Bank would generally handle it if he were to present an NSF check. In the past he has presented checks that were paid when funds were not available, but he has also presented some that were returned. The bank's communication in both cases was very short and did not inform John how they made their decision. As a result, John has no comfort at all as to how the bank might handle the next check he presents.

ABC Bank decides to begin offering a formal overdraft program. Through a variety of techniques, the bank communicates clearly with John and generally makes him aware of their decision-making process. When John is next faced with making the decision of whether or not to pay the credit card bill, he now considers his options. He can continue to pay the bill late as he has on occasion in the past, or he can go ahead and write the check to the credit card company today and have some comfort that the bank will probably pay it. He would pay the bank $20 (their NSF fee) vs. paying the credit card company $36.

## The Informed Consumer Effect

By communicating with customers, banks that offer formalized overdraft protection programs achieve the "Informed Consumer Effect," helping participants to make an informed decision on how to utilize this service, should the need arise. Because John is given some comfort on how his check will be handled, he shifts a fee from the credit card company to the bank and pays less in fees.

Just how does a bank communicate with a customer? This is an area where bankers should proceed with caution. A non-recommended method of communicating with customers is to market the service aggressively. A few banks put up billboards, take out radio ads, and do regular monthly statement stuffers. But as the Office of the Comptroller of the Currency pointed out in Interpretive Letter 914 (IL914), this could have the appearance that the bank is attempting to entice customers to overdraw their accounts, an activity that at best is "frowned upon" by consumer groups, and at worst could be considered an unsafe practice. At a typical bank, 60% to 70% of the customer base never (or rarely) present an insufficient item, and marketing to them is wasteful.

However, an efficient, fair, and consistent process could also be considered an opportunity for clear communication to customers – a way to enhance a customer relationship. Customers are often confused by the NSF decision-making process in those banks that do not have a formalized program, since there is often inconsistency in payment of NSF items. Banks that offer a formalized overdraft program have the opportunity to establish consistent guidelines for paying NSF items and to inform and educate customers who use the service.

## WHY ARE MORE BANKERS CONSIDERING FORMALIZED OVERDRAFT PROTECTION?

As of January 2003, the Consumer Federation of America estimated that more than 1,000 banks in the United States use formalized overdraft protection programs, and that number is steadily growing.[*] Why are more bankers considering these programs?

### 1. A New Definition of Customer Service
One of the most common complaints by consumer groups about overdraft protection services is that banks with these programs are providing "bad" customer service. Some consumer groups equate the paying of overdrafts with "payday" lending. They believe that paying an overdraft item is equivalent to taking advantage of an uninformed customer.

However, this seems to be an oversimplification of a much broader issue. Think about it from the perspective of your customers – would they consider it better customer service if the bank paid their check or returned it?

Bank employees also benefit from a consistent overdraft program that offers them guidance on how and when to cover overdraft items. Since they can now define their overdraft policy and explain it to the customer, they can offer better customer service. Defined overdraft program guidelines eliminate banker and customer confusion and lead to improved customer service.

### 2. A Way to Avoid Discriminatory Practices
Organized overdraft protection programs formalize a process that has been han-

---

[*] Consumer Federation of America. "Bounce Protection." Section 2.

dled informally and in a discretionary manner in the past, making it more equitable and consistent.  In general, banks have historically paid items for some customers and not paid them for others, based mostly on a variety of factors, including account history and the relationships the customer has with the personal bankers or CSRs working in the branch.  By using overdraft protection software and more efficient automation, the banks that implement these programs state that they are attempting to treat all customers more fairly.

### 3.  Increased Opportunity

When banks formalize their programs and disclose them, they learn that some customers find this to be a valuable service.  These customers choose to write a check a few days before a deposit and pay the NSF fee rather than pay a late fee to the check recipient.  They choose the bank option because the costs are generally lower than those imposed by the merchant or other payee, and it presents less of a hassle.  Financial institutions that formalize their process and disclose it to customers allow their customers to make informed decisions for themselves.

## COMMON CONCERNS

Bankers need to address a number of concerns before they decide to implement such a formal overdraft program.  Questions raised by the media and consumers groups alike have spawned a variety of concerns.

### Perceptions of "Abusing" the Customer

Media and consumer groups have voiced concerns that some overdraft protection programs are by nature deceptive and designed to take advantage of consumers.  Other media reports discuss cases in which banks have allowed customers to overdraw with their ATM or debit card, at either the ATM or the point of sale, without notification that they were overdrawing the account or that they would be charged a fee. (Reg DD requires fee disclosure at account opening and on periodic statements.)

It is interesting to note that in most overdraft discussions the media and consumer groups often gloss over individual consumer responsibility.  Banks only charge these fees to consumers that present NSF items.  Overdrawing is a dis-

cretionary activity and is completely avoidable, much like the decision to use a foreign ATM. In both cases, the service provided is merely responding to customer need and behavior.

Although the ultimate responsibility lies with the consumer, situations may arise in which a customer becomes overextended and is unable to pay back the overdrawn amount and subsequent fees. As customer service organizations, banks should be aware of these situations and work with the customer to resolve the issue. Any program allowing chronic overdrafts that put the customer in difficult financial circumstances may seem to take advantage of a customer and, of course, should be avoided. Banks should communicate clearly and frequently with their customers regarding the status of their account balance. The bank may then offer the overextended customer a repayment plan, perhaps at a low interest rate, or reduced NSF fees to help the customer recover from the situation. The checking account could be left open and available, as long as the customer meets their repayment obligations.

## Appearance of Violating Credit Laws

One recent article charged that banks are "skirting" credit laws when they pay overdrafts. The reasoning applied was that an overdraft is a short-term loan and the NSF fee imposed is interest. Some consumer advocates have stated that overdrafts amount to loans with very high interest rates, sometimes exceeding 1,000%.

These allegations ignore the fact that many banks charge the same fee whether the item is paid or returned, and there is no differential for overdrawing the account. More specifically, at most banks customers do not pay any additional fee for overdrawing their accounts – they are only charged a fee for presenting an insufficient item and the bank subsequently handling the item.

Credit laws apply when a bank extends credit to a consumer. According to the Truth in Lending Act, 15 USC 1601 et seq. (TILA) and its implementing Federal Reserve Regulation Z, 12 CFR Part 226, "Credit means the right to defer payment of a debt or to incur debt and defer its payment." The bank does not grant a "right" to overdraw; it is a discretionary activity on the part of

the bank. Credit laws have not applied to bank overdraft fees in the past, and it is unlikely that they will in the future.

As stated in the American Bankers Association letter from ABA Chairman-Elect Ken Fergeson, dated March 21, 2003, "Overdraft protection has been around for a long time, but has evolved over the years. Under automated bounce protection systems that are now gaining in popularity, banks disclose that they may pay overdrafts up to a limit—usually between $100 and $500, depending on the customer. The feature is typically available to all those eligible to open an account. There is no creditworthiness test as there is for an overdraft line of credit. A flat fee is charged for the overdraft, regardless of the amount."

Several bankers have shown hesitancy toward overdraft protection programs because of potential changes to Regulation Z (Truth in Lending), which would cause an overdraft to be considered a loan and related charges to be interest for APR purposes. For decades, under the terms of Regulation Z, regulators have not generally considered overdraft fees to be a loan when the item is paid. Prior history with other regulations has shown that the Federal Reserve changes them only after careful consideration.

Moreover, any change in regulation would likely impact the payment of all NSF items, not just those items at banks with formal overdraft programs. It would be a very detrimental change to consumers for the regulators to alter regulations in such a manner that banks could effectively no longer pay any overdrafts.

### Incurring Too Much Risk

It may appear upon initial review that paying overdrafts would increase the overall risk levels of a bank. After all, the customer is typically not required to complete any type of application for the service. Most banks do not subject customers to a formal underwriting process prior to allowing the customer to overdraw their account. The bank typically does not obtain credit scores.

Prudent bankers must approach an overdraft program as they would any other new product or service offering. Analysis of the particular program must be performed with the bank's overall risk tolerance in mind. Acceptable levels of risk must be determined prior to entering any program and monitored after implementation.

Most bankers who have implemented a formal overdraft program indicate that charge-offs do, in fact, increase. However, they also indicate that the overall level of charge-offs is within acceptable levels of risk and the benefits of the overdraft program outweigh the increase in charge-offs.

## ADDRESSING THE REGULATORY CONCERNS

Regulators have expressed concerns when reviewing overdraft protection programs, and all bankers considering this service should take care to address them. Some of the main issues are delineated in OCC Interpretive Letter 914 and further defined in the ABA letter dated March 21, 2003, from Ken Fergeson, ABA Chairman-Elect. IL914 outlines three types of regulatory concerns with respect to one particular overdraft protection program. They include: 1) Compliance Issues, 2) Supervisory Concerns, and 3) Policy Issues. We recommend studying IL914 in depth and reviewing the concerns of the OCC with legal counsel. However, there are basic steps bankers can take to be proactive in addressing these regulatory concerns.

### Define the Process Specifically.

For many years banks have paid checks on an inconsistent basis, often times lacking universal guidelines that employees could follow. Often, banks did not have a formal policy in place to guide bankers on how and when to cover an overdraft. Defining the process specifically will help to alleviate compliance concerns. Due to simple human nature, when paying or returning an overdraft using only personal discretion as a guide, inconsistencies will result. By applying consistent criteria across the board, the entire process should become consistently implemented with all customers.

### Use Detailed Reporting and Tracking.

As part of the bank's formal process, the bank should use detailed reporting and tracking of accounts in the overdraft protection program. This will ensure that all levels of management remain apprised of the program, and that potential abusers of the service can be spotted and addressed appropriately, including being removed from the program.

### Avoid Statements that Seem Like Commitments.

In all written communication to customers, be certain to stay away from statements that sound like absolute commitments to pay overdrafts (e.g., "never incur a merchant charge again"). The Office of the Comptroller of the Currency in its Interpretive Letter 914 (IL914) points out that the Federal Trade Commission Act prohibits deceptive acts or practices, including representations or omissions that are likely to mislead reasonable consumers. Carefully word all the bank's customer communications to explain the overdraft process clearly and directly. Be sure to acknowledge that the process to pay NSFs is completely discretionary and that all overdrafts will not be paid automatically.

### Avoid "Enticing" Customers to Begin Presenting NSFs.

Studies have shown that most customers do not overdraw their accounts, nor do they want to. In 2002, Raddon Financial Group estimated that nearly 60% of customers have little or no interest in NSF services. Heavy marketing of an overdraft protection program could give the appearance that the bank is attempting to entice customers who currently do not overdraw accounts to begin overdrawing them. Aggressive marketing can potentially backfire, even though the intent may simply be to inform the customer of a helpful, new service that is now available. Instead, establish sound, customer-service response-oriented policies for customers who overdraw their accounts. Above all, do not state that overdrawing is an acceptable practice; offer alternatives. The bank should also provide appropriate disclosures at the ATM and teller window if customers are allowed to overdraw their accounts at those channels.

### Use the Same Fee for Both Paying and Returning.

One of the "tests" offered in IL914 for determining if an overdraft fee is a finance charge or not, as stated under Regulation Z, is whether an NSF fee is the same regardless of whether a check is paid or returned. By charging the same fee in both instances, the fee is unlikely to be considered a "finance charge."

**Utilize Effective Risk Management Techniques.**
Banks that monitor customer behavior can contact those customers who exhibit excessive or abusive usage and inform them of bank programs that can help them manage their account balances. This practice should identify customers who show a serious lack of account management so that bank management can make decisions on the customer's continued involvement in the bank's over-draft program.

## RECOMMENDED BEST PRACTICE "DO'S AND DON'TS"

In addition to taking proactive steps to address regulatory concerns, adhering to certain "best practices" will help ensure that an overdraft protection program takes the right approach. The main best practices that all bankers should know include:

### Best Practice "Do's"

**1. Do inform customers that the bank has other ways to handle over-drafts, such as lines of credit and automatic transfers.** Clear communication will give customers all the information they need to make an informed decision. Let your customers know that the bank has other, potentially less expensive ways to handle overdrafts.

**2. Do proactively offer an "opt-out" giving the customers a choice.** Some customers may not want to have their items paid, and they should be given this choice. By sending each qualified customer a letter with an opt-out clause *before the program is implemented,* bankers are ensuring that all customers are duly informed and are aware of their alternatives.

**3. Do monitor customer activity, and don't let customers abuse the service.** Utilize software tools to generate detailed reports that will allow the bank to track customers who may be abusing the privilege. Consider contacting and notifying frequent overdrafters of the cost of these services, and suggest a meeting with bank officers to consider other alternatives to overdrafting.

**4. Do apply good risk management techniques, using software to monitor usage.** IL914 notes that overdraft protection programs could increase a bank's credit risk profile (e.g., higher delinquency and loss rates) by extending credit to borrowers who may not have normally qualified for payment of overdrafts or overdraft protection. By utilizing software tools with robust reporting capabilities, you should be able to minimize this risk and manage it accordingly.

**5. Do communicate with customers often, using multiple channels (i.e., letters, phone calls, email).** It is imperative that bankers notify customers as overdrafts are presented and then continue to communicate with the customer while they are overdrawn. As ABA Senior Federal Counsel Nessa Feddis states in an April 2003 *ABA Banking Journal* article, "A consumer understanding of bank practices in this matter is *absolutely critical* to avoid charges of unfair play."[5] Communication and education of customers will help to dispel the mystery of the process and enhance the overall customer relationship as well.

## Best Practice "Don'ts"

**1. Don't use aggressive marketing.** One of the biggest red flags for regulators and consumer groups alike is a program that tries to achieve increased revenue through aggressive marketing techniques. This kind of customer communication also makes it seem as if the bank is attempting to encourage customers who have not presented NSFs to begin presenting them.

**2. Don't step over the line from a compliance perspective.** Regulators may question programs that give the wrong impression about the scope of protection offered by the program and in turn oversell its benefits. When communicating with customers, it is important to use clear, precise, and accurate language that does not attempt to oversell the customer. Keep in mind that this service is discretionary, and therefore avoid promises or words that sound like commitments to customers. Claims of "no more charges from retailers for insufficient checks," "make a mistake – you're covered," and "write a check or use an ATM for more than you have in the bank – you're covered" are overly broad statements, given the limitations of these programs.

---

Feddis, 40.

**3. Don't allow customers the opportunity to access funds that will put their account into a negative balance at the ATM, through POS, or teller window without customer knowledge.** Banks should communicate clearly with their customers and disclose all fees and charges associated with transactions that will result in an overdraft status on the account. If bankers make the decision to allow customers to overdraw their account balance at the ATM, through POS, or teller window, if technically feasible the bank should inform the customer at the time of the transaction that they will incur an additional fee for overdrawing under the circumstances. If this is not technically feasible, the bank should place notices at the ATM or have a policy in place that does not allow the customer to overdraw the account at the ATM.

Banks should not mislead their customers as to the actual balance in their account and they should clearly present balances to their customers in a format that is easy to understand. For example, if the overdraft limit is included in an "available balance," the text on the ATM screen and receipt should specifically state that the balance includes the overdraft limit. Mistakes are easily made if this information is not communicated to the customer clearly at the time of the transaction. Additionally, banks should consider waiving any initial NSF fees for customers who inadvertently overdrew their checking account due to any type of confusion at electronic channels.

**4. Don't leave out effective risk management.** Given the loss history of bank overdraft programs, bank management should develop reasonable loss recognition guidelines and establish loan loss reserve methodologies to ensure timely loss recognition and estimated loss coverage. This is imperative. Strict loss-recognition programs and tracking are recommended.

## CONCLUDING REMARKS

With the wide range of opinions and heartfelt emotions concerning overdraft programs, it is no wonder that many inside and outside the industry question either the practice or the methods of overdraft services.  In sorting through the facts and opinions, history can be an excellent guide.  In the May 20, 1961, issue of *Business Week*, the headline read, "With the Fed showing no signs of easing its regulations, banks are doubting the wisdom of offering certificates of deposit."[6]  Believe it or not, this statement was made concerning negotiable CDs!

Even the most pedestrian of bank products today, certificates of deposit, were once the subject of much debate and concern.  Consumer needs often are ahead of regulatory management and public policy.  Such may be the case with formalized overdraft programs.  Bankers, however, must carefully consider all sides of the formalized overdraft option to make the best decision for their banks.

[6] "Some Second Thoughts on CDs," *Business Week*, 20 May 1961, 138.

Overdraft Protection A Guide for Bankers

## APPENDIX
### Letter to Bank CEOs from the ABA Chairman-Elect.

Date: March 21, 2003
To: Bank CEOs
From: Ken Fergeson, ABA Chairman-Elect

Hundreds of banks are offering automated bounce protection on checking accounts, a new version of bankers' traditional practice of paying overdrafts. Many other banks are considering it. That's why I'm writing. As ABA's Chairman-Elect and a community banker, I'm hearing a lot of concern about this product and the consequences of offering and promoting it.

All bankers want a fair return. But bankers also have a responsibility to treat customers fairly and provide them with clear, conspicuous disclosures. One misleading phrase or questionable ad can destroy your customers' trust in a heartbeat, an awfully high price to pay. As one compliance officer wrote about paying interest on investable balances, "It's cute. It's legal. Don't do it!" When put under a spotlight, that practice led Congress to enact the Truth-in-Savings Act and the Fed to issue Reg DD. That example could be a preview of coming attractions if bankers don't look carefully before they leap into this.

Consumers like overdraft protection. It can save them returned-check fees from creditors or merchants and avoid tarnishing their credit rating in credit bureaus and databases. But some of these products have drawn fire from the regulators and in the media—and litigation won't be far behind, as customers start complaining about unfair treatment.

Overdraft protection has been around for a long time, but has evolved over the years. Under automated bounce protection systems that are now gaining in popularity, banks disclose that they may pay overdrafts up to a limit—usually between $100 and $500, depending on the customer. The feature is typically available to all those eligible to open an account. There is no creditworthiness test as there is for an overdraft line of credit. A flat fee is charged for the overdraft, regardless of the amount.

Before you offer a bounce protection product, decide if you'd want to defend the one you're considering in your local newspaper or to your regulator.  To protect yourself and your institution's reputation, you should, at a minimum:

- Disclose, disclose, disclose.  Disclose costs and terms in the agreement fully and conspicuously, including treatment of debit card overdrafts.  And disclose charges prominently in statements.

- Make clear that the bank is not promising to pay checks, even if the consumer meets the criteria for paying an overdraft.

- Do not encourage overdrafts in your marketing materials, advertising or communications.  Some customers have bounced checks because, on balance inquiries, their bank adds the amount of their overdraft protection to their true balance, leading them to believe they have more than they do.  Some bank messages encourage them to use the product anytime.

- Monitor the account for frequent use of the service.  Customers may not understand how to use it appropriately.

All of these efforts may still not be enough.  Done carefully, automated bounce protection programs can be good for your customers and for the banks.  But without understanding how your program will be seen and judged in your community, in the agencies and in court, it could become your worst nightmare.  If you offer one, proceed with caution and make sure you do it right.

If you have any questions or concerns, please contact ABA Regulatory Director Jim McLaughlin, at 1-800-BANKERS.

# BIBLIOGRAPHY

Berensen, Alex. "Some Banks Encourage Overdrafts, Reaping Profit." *New York Times*, 22 January 2003, A1.

Board of Governors of the Federal Reserve System. *Annual Report to the Congress on Retail Fees and Services of Depository Institutions.* June 2002.

Consumer Federation of America and National Consumer Law Center. "Bounce Protection: How Banks Turn Rubber into Gold by Enticing Consumers to Write Bad Checks." 27 Jan. 2003, http://www.consumerfed.org/bounceappendix012803.pdf, 17 September 2003.

Colton, Roger D. "Determining the Cost Effectiveness of Utility Late Payment Charges." July 1994, http://www.fsconline.com/downloads/LATE-FEE.pdf, 17 September 2003.

Feddis, Nessa Eileen. "Will We Kill a Useful Service?" *ABA Banking Journal*, April 2003, 38-42.

Fergeson, Ken. Letter to Bank CEOs from the ABA Chairman-Elect. 21 March 2003.

Office of the Comptroller of the Currency. *Interpretive Letter #914.* 15 USC 1691, 12 CFR 215, 12 CFR 226, SBJ CONS, September 2001.

Raddon Financial Group. "Consumer Trends in Checking Accounts." Spring 2002.

"Some Second Thoughts on CDs." *Business Week*, 20 May 1961, 138.