## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 1:09-MD-02036-JLK

_____
)
IN RE: CHECKING ACCOUNT                         )
OVERDRAFT LITIGATION                            )
                                                )
MDL No. 2036                                    )
_____)


_____
                                                )
THIS DOCUMENT RELATES TO:                       )
                                                )
*Larsen v. Union Bank, N.A.*                    )
S.D. Fla. Case No. 1:09-cv-23235-JLK            )
N.D. Cal. Case No. 4:09-cv-03250-PJH            )
_____)


### FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Cynthia Larsen, through undersigned counsel, on behalf of herself and all persons similarly situated, alleges the following based on personal knowledge as to allegations regarding the Plaintiff and on information and belief as to other allegations.

### INTRODUCTION

1.      This is a civil action seeking monetary damages, restitution, and injunctive relief from Defendant Union Bank, N.A. ("Union Bank," or the "Bank"), arising out of its unfair and unconscionable assessment and collection of excessive overdraft fees.

2.      In the era of electronic banking and the ubiquitous use of debit card transactions, the assessment of overdraft fees has become a major profit center for many United States banks, including Union Bank. For years, banks covered customers who occasionally bounced checks and even did so for a time for customers using debit cards, without charging their customers. Since the early 1990's, however, banks have devised methods to provide overdraft "protection" for customers and charge them in each instance. A recent FDIC report

estimated that overdraft fees represent 74 percent of the total service charges that are imposed on deposit accounts in the United States.  A 2008 FDIC study reports that overdraft fees for debit cards can carry an effective annualized interest rate that *exceeds 3,500 percent*.  Nevertheless, the Consumer Federation of America reports that five of the ten largest banks raised their overdraft fees in the last year.

3.      In 2007, banks collected more than $17 billion in overdraft fees.  That number nearly doubled in 2008, as more and more consumers struggled to maintain positive checking account balances.  *In 2009, banks are estimated to bring in between $27 billion to $38.5 billion in overdraft charges alone.*  Union Bank is a beneficiary of these staggering charges.

4.      Almost by definition, these fees disproportionately affect the poor, who are most likely to maintain low balances.  Moebs Services, a research company that has conducted studies for the government as well as banks, estimates that 90 percent of overdraft fees are paid by the poorest 10 percent of banks' customer base.  Moreover, these fees have the tendency to create a domino effect, because the imposition of a service charge on an account with a negative balance will make it less likely that the account holder's balance will reach positive territory, resulting in more fees.

5.      Before debit cards existed, banks occasionally extended the courtesy of honoring paper checks written on overdrafted or otherwise deficient accounts for customers who were typically in good standing.  Banks extended this courtesy largely because the third party involved in a sales transaction allowed the customer to purchase goods or services with a check with an expectation that funds would be available and that the check would clear.  For example, if a customer used a check to purchase groceries, the grocery store would only know if the check cleared *after* the groceries had been purchased.

6.      The same considerations are not present when customers use debit cards.  Banks could simply decline to honor debit or point of sale transactions made where accounts lack sufficient funds to execute the transaction.  Retail and service transactions could still be

executed if customers presented an alternative form of payment.  ATM transactions could still proceed if banks provided a warning that an overdraft fee would be incurred, and consumers chose to proceed nevertheless.  In fact, until a few years ago, most banks simply declined debit transactions that would overdraw an account.

7.     Instead of simply declining debit transactions when there are insufficient funds or warning its customers that an overdraft fee will be assessed if they proceed with the transaction. Union Bank routinely processes such transactions and then charges its customers an overdraft fee of $35—even when the transaction is for only a few dollars.  This automatic, fee-based overdraft scheme is intentionally designed to maximize overdraft fee revenue for Union Bank. Additionally, as part of its inequitable motive to generate obscene profits gained through the imposition of unconscionable overdraft fees, Union Bank fails to adequately disclose to its customers that they may elect to opt out of overdraft protection.

8.     In many instances, these overdraft fees cost Union Bank account holders hundreds of dollars in a matter of days, or even hours, when they may be overdrawn by only a few dollars.  Even more egregious, customer accounts may not actually be overdrawn at the time the overdraft fees are charged, or at the time of the debit transaction.

9.     Thus, it is through manipulation and alteration of customers' transaction records that Union Bank maximizes overdraft penalties imposed on customers.

10.    Although it is possible to do so, Union Bank does not alert its check card customers at the time a POS transaction or ATM withdrawal is made that the transaction will overdraft their account and cause them to incur fees.

## JURISDICTION AND VENUE

11.    The Northern District of California has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), the Court has original jurisdiction because the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, and the proposed class contains members who are residents of a different state than Union Bank.

12.     Venue is proper in the Northern District of California pursuant to 20 U.S.C. § 1391(b)(2) because Union Bank conducts business in the district and a substantial part of the events giving rise to the claims occurred in the district.

13.     Under the Northern District of California Civil Local Rules 3-2(c) and (d), intradistrict assignment to the San Francisco/Oakland Division is proper because a substantial part of the events giving rise to the claims asserted occurred in San Francisco.

## PARTIES

14.     Plaintiff Larsen is, and at all relevant times hereto has been, a resident of Riverside, California.   Ms. Larsen is a customer of the Bank who was charged improper overdraft fees in connection with the use of his Union Bank check card.

15.     Union Bank, N.A. is headquartered in San Francisco, California.   As of June 30, 2009, Union Bank operated 335 branches and 566 ATMs in California and several other states. The Bank has a retail customer base of approximately 1 million households.

16.     Among other things, Union Bank is engaged in the business of providing retail banking services to consumers, including Plaintiff and members of the putative Class, which include the issuance of debit cards for use by its customers in conjunction with their checking accounts.

17.     Union Bank is a national bank subject to the National Bank Act, 12 U.S.C. § 1, *et seq*., and OCC regulations.

## CLASS ALLEGATIONS

18.     Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Fed. R. Civ. P. 23.   This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

19.     The proposed class is defined as:

> All Union Bank customers in the United States who, within the
> applicable statute of limitations preceding the filing of this action
> to the date of class certification, incurred an overdraft fee as a

result of Union Bank's practice of re-sequencing debit card transactions from highest to lowest (the "National Class").

All Union Bank customers having accounts at branches in the State of California, for the purpose of asserting claims under California's Unfair Competition Law and Consumer Legal Remedies Act (the "California Subclass") (*see* Fifth and Sixth Claims for Relief, *infra*).

The National Class and the California Subclass are collectively referred to as the "Classes."

20.     Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

21.     Excluded from the Classes are Union Bank, its parents, subsidiaries, affiliates, officers and directors, any entity in which Union Bank has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

22.     The members of the Classes are so numerous that joinder is impractical. The Class consists of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to Union Bank's records.

23.     The claims of the representative Plaintiff are typical of the claims of the Classes in that the representative Plaintiff, like all Class members, was charged overdraft fees by Union Bank as a result of its practice of re-sequencing debit card transactions from highest to lowest. The representative Plaintiff, like all Class members, has been damaged by Union Bank's misconduct in that she incurred and/or will continue to incur unfair and unconscionable overdraft charges. Furthermore, the factual basis of Union Bank's misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.

24.     There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual Class members.

25.     Among the questions of law and fact common to the Classes are whether Union Bank:

a.     Does not clearly disclose and/or refuses to allow its customers to opt out of its overdraft protection program;

b.     Does not obtain affirmative consent from its customers prior to processing transactions that will result in overdraft fees;

c.     Does not alert its customers that a debit card transaction will trigger an overdraft fee, and does not provide its customers with an opportunity to cancel such transactions;

d.     Manipulates and reorders transactions so that it can increase the number of overdraft fees it imposes;

e.     Manipulates and reorders debits from highest to lowest in order to maximize the number of overdrafts and, consequently, the amount of overdraft fees;

f.     Imposes overdrafts and overdraft fees when, but for reordering transactions, there would otherwise be sufficient funds in the account;

g.     Fails to provide customers with accurate balance information;

h.     Delays posting of transactions by customers using debit cards so that customers are charged overdraft fees on transactions, even though the customers had sufficient funds in their accounts to cover the transactions upon execution;

i.     Charges exorbitant overdraft fees that bear no relationship to the actual costs and risks of covering insufficient funds transactions;

j.     Breaches its covenant of good faith and fair dealing with Plaintiff and the other members of the Classes through its overdraft policies and practices;

k.     Converts moneys belonging to Plaintiff and the other members of the Classes through its overdraft policies and practices;

l.     Requires its customers to enter into standardized account agreements which include unconscionable provisions;

m.     Is unjustly enriched through its overdraft policies and practices; and

n.     Continues to commit wrongdoing through its overdraft policies and practices.

26.     Other questions of law and fact common to the Classes include:

a.     The proper method or methods by which to measure damages, and

b.     The injunctive relief to which the Classes are entitled.

27.     Plaintiff's claims are typical of the claims of other Class members, in that they arise out of the same wrongful overdraft policies and practices and the same or substantially similar unconscionable provisions of Union Bank's account agreements.  Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other Class member.

28.     Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions.  Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes.

29.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Union Bank, no Class member could afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, the Class members will continue to suffer losses and Union Bank's misconduct will proceed without remedy.

30.     Even if Class members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual

lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

## COMMON FACTUAL ALLEGATIONS

### A.   Union Bank

31.   Union Bank conducts substantial business in the State of California. Union Bank maintains 337 branch offices in California, Oregon, Washington, and Texas. Individual customer accounts are maintained at these branch offices. The headquarters of Union Bank, which is located in San Francisco, is, upon information and belief, responsible for bank accounts held by customers all over California.

32.   Union Bank is owned by Defendant UnionBanCal Corporation, which is incorporated in Delaware and located in San Francisco, California. Defendant UnionBanCal Corporation is the holding company for The Bank of Tokyo-Mitsubishi UFJ, LTD., a Japanese corporation with a U.S. headquarter in California. Both Defendant UnionBanCal Corporation and The Bank of Tokyo-Mitsubishi UFJ, LTD. provide diversified financial services, including banking, insurance, investments, mortgage banking and consumer finance to individuals, businesses and institutions. UnionBanCal is the second largest commercial bank holding company headquartered in California, and the 16th largest commercial bank holding company in the United States, based on assets on June 30, 2009.

33.   Union Bank is a consumer banking company servicing thousands of individual and business customers in California. One of the services provided by Union Bank for customers who open a checking account is a check/debit/ATM card. This card allows customers to access their checking account funds by using the card to conduct transactions. Whether it is transactions with vendors or using the card to withdraw cash from an ATM machine, the card is processed electronically so that Union Bank is aware of the use of the card and has the option to accept or decline transactions at the point of sale.

34.     Union Bank is in the business of providing customers with a variety of banking services.  One of the services provided by the Bank for customers who open a checking account is a debit card, also known as a check card or ATM card.  Through those debit cards, customers can engage in transactions using funds directly from their accounts by engaging in "debit" or "point of sale" ("POS") transactions, or may withdraw money from their accounts at automated teller machines ("ATMs").  Whether the card is used to execute POS transactions or to withdraw cash from ATM machines, the transaction is processed electronically.  As a result, the Bank is notified instantaneously when the card is swiped, and have the option to accept or decline transactions at such time.

35.     Union Bank employs sophisticated software to automate its overdraft system.  This program maximizes the number of overdrafts, and thus, the amount of overdraft fees charged per customer.

36.     As a result of Union Bank's manipulation and alteration of customers' transactions records, funds in a customer's account are depleted more rapidly and more overdraft fees are likely to be charged for multiple smaller transactions.  Indeed, overdraft charges are likely to occur at times when, but for the manipulation and alteration, there would be funds in the account and no overdraft would occur.  For example, if a customer, whose account has a $50 balance at the time Union Bank processed several transactions, made four transactions of $10 and one subsequent transaction of $100 on the same day, the Banks would reorder the debits from largest to smallest, imposing four overdraft fees on the customer.  Conversely, if the $100 transaction were debited last—consistent with the actual order of transactions—only one overdraft fee would be assessed.  *See* FDIC Study of Bank Overdraft Programs, November 2008, *available at*: http://www.fdic.gov/bank/analytical/overdraft/, at 11, n. 12.

**B.     Union Bank's Relevant Customer Documents Regarding Overdrafts**

37.     Plaintiff and all members of the Class maintain or maintained a checking account with Union Bank.

38.     The terms of Union Bank's checking accounts are contained in standardized account holder agreements, presented to its customers on a "take it or leave it" basis, drafted and imposed by Union Bank, which was the party of vastly superior bargaining strength, and thus constitute agreements of adhesion.  A representative copy of the "All About Personal Accounts & Services Disclosure Agreement," effective January 1, 2009 (the "Deposit Agreement"), covering all Union Bank accounts, which is 113 pages long, single-spaced and in small print, is attached as Exhibit A.

39.     The Deposit Agreement states:

*Order of Processing Checks and Other Items* — You agree that we may pay or certify your checks and other items in any order we choose, and that we may establish different processing priorities and categories for checks and other items.  Within each priority or category, we may process checks and other items in the order in which we receive them, in check number order, or in the dollar amount order, and we may change these priorities, categories, and orders at any time without notice to you.  We will generally pay larger checks and transactions first.  However, we are not obligated to do so.  When there are not sufficient available funds in an account to cover all of the checks and other items presented on a given day, some of the priorities, categories, and orders may result in more nonsufficient available funds fees than others.

Ex. A, at 43.

40.     The Deposit Agreement further state:

**NONSUFFICIENT FUNDS (NSF)**

**All   Checking   and   Savings   Accounts—All   Withdrawal, Transfer,   and   Payment   Transactions:     Checks,   ATM Withdrawals,   ATM   Transfers,   Electronic   Fund   Transfers, Point-of-Sale   (POS)   Purchases,   Telephone   Transfers, Automatic Transfers, Pre-Authorized Debits, Wire Transfers**

If you do not have sufficient funds on deposit in your checking or savings account at the time a check is presented for payment or any other transaction is posted to your account or received by us (for example, automatic payments or electronic fund transfers), we may return the check unpaid or reject the transaction.  However, in our sole discretion, we may choose to pay the check or process the transaction in spite of nonsufficient funds.

We may also assess a Nonsufficient Funds (NSF) charge whether we pay or return checks or other items drawn against nonsufficient funds.  We may also assess a Nonsufficient Funds (NSF) charge whether we process or reject ATM withdrawals and transfers, electronic fund transfers, point-of-sale (POS) purchases, telephone transfers, automatic transfers, pre-authorized debits, wire transfers, or any other types of withdrawal, transfer, or payment transactions presented to us when the amount of a transaction exceeds the balance of funds in your account.  This charge will appear on your periodic statement as an "NSF Fee."

In a 12-month period, if your checks or other items are returned or pad, or other transactions are rejected or processed, when your account has nonsufficient funds, the following NSF Fees will apply:

| Charges for each item up to a maximum of 5 items per day: | Returned/ Rejected Items | Paid Against Nonsufficient Funds/ Processed Items |
|---|---|---|
| 12-month period If 1-2 occurrences .............$ | per item 22.00 | per item 24.00 |
| If 3-5 occurrences .............$ | 30.00 | 32.00 |
| If 6+ occurrences ..............$ | 34.00 | 34.00 |

Daily maximum of 5 items: The daily maximum of 5 items applies to the total number of both NSF occurrences, described above, and "Held Funds" occurrences, described below under the heading "**NONSUFFICIENT AVAILABLE FUNDS (HELD FUNDS)**." This means that no more than 5 items will be subject to an NSF Fee or a Held Funds Fee (described below in this Agreement) during a single day, even if the combined total of NSF occurrences and Held Funds occurrences on that day is 6 or more. In addition, no single transaction will both an NSF Fee and a Held Funds Fee.

**Note**: An NSF occurrence is a day in which items are presented for payment against nonsufficient funds.  NSF occurrences are counted using the most recent 12-month history .for your account.

**Continued Overdraft Fee**

If you overdraw your account (that is, let the ledger balance become less than zero), and you do not deposit sufficient available funds to cover the overdraft by the fourth calendar day that your account has been continuously overdrawn (counting the day the overdraft first occurs as the first calendar day), there is a $6 per-business-day fee for up to I0 business days thereafter that the

overdraft continues, up to a maximum of $60 each time your account becomes overdrawn. (You may have one or two additional calendar clays to cover an overdraft under sonic circumstances. For example, if an overdraft occurs on Wednesday and is not promptly covered, the daily I Continued Overdraft Fee will not begin until the following Monday, unless Monday is a Bank holiday, in which case the fee will begin the following Tuesday.) In all cases, if you make a deposit of available funds sufficient to cover the overdraft on a business day at one of our banking offices or ATMs before the posted cutoff time, no fee is charged for that business day.

*Continued Overdraft Fee: $6 per business day, starting on the fourth calendar day ($60 maximum)*

**Note**:  An overdraft occurrence is a day in which items are presented for payment against insufficient funds.  Overdraft occurrences are counted using the most recent 12-month history for your account.

41.    The Deposit Agreement fails to offer customers the option to "opt out" from the Bank's overdraft scheme, and/or fails to disclose that option.

**A.    Union Bank's Re-Ordering of Checking Account Transactions**

42.    In an effort to maximize overdraft revenue, Union Bank manipulates and reorders debits from highest to lowest during given periods of time.  Union Bank reorders transactions for no reason other than to increase the number of exorbitant overdraft fees it can charge.  This practice violates numerous consumer protection laws and the covenant of good faith and fair dealing in the Bank's Deposit Agreement.

43.    Transactions involving debit cards used by Union Bank customers, including the withdrawal of cash from ATM machines and POS transactions with vendors, are processed electronically.   As a result, Union Bank is notified instantaneously when the customer's debit card is swiped, and has the option to accept or decline these transactions.

44.    Notwithstanding the instantaneous nature of these electronic debit card transactions, under Union Bank's posting system, it fails to post charges in the order in which they are incurred or received.  Union Bank developed a policy and employs a practice whereby

account charges and debits are posted to its customers' accounts out of chronological order for the sole purpose of maximizing the number of overdraft transactions and, therefore, the amount of overdraft fees charged to its customers.

45.     Instead of processing such transactions in chronological order, Union Bank processes them starting with the largest debit and ending with the smallest debit, so as to generate the largest possible number of overdrafts and the greatest possible amount of overdraft fees.

46.     Union Bank refrains from immediately posting charges to a customer's account as it receives them—sometimes for multiple business days.  By holding charges rather than posting them immediately to an account, Union Bank is able to amass a number of charges on the account.  Subsequently, Union Bank posts all of the amassed charges on a single date. When the group of charges is eventually posted to the customer's account, Union Bank posts them in order of largest to smallest—not in the order in which they were received or in the order in which they were charged.  This delayed posting results in the imposition of multiple overdraft fees that would not otherwise be imposed.  The delayed posting also prevents customers from ascertaining the accurate balances in their accounts.

47.     Union Banks' policy and practice of posting charges from largest to smallest, rather than chronologically, or from smallest to largest, is specifically designed to maximize the generation of overdraft fees by triggering overdraft fees for account charges that would not otherwise result in such fees.

48.     Union Bank enforces an unconscionable policy whereby charges incurred are posted to customers' accounts in a non-chronological order, from highest to lowest, and are held for multiple days and then batched together, to maximize the number of overdraft transactions and fees.  Union Bank's processing practices substantially increase the likelihood that customers' smaller charges will result in multiple overdraft fees.  The practices provide Union Bank with substantially higher service fee revenues than it would otherwise achieve absent these practices.

49.     As a result, Plaintiff and members of the Classes have been assessed overdraft fees for transactions which occurred when they actually had sufficient funds in their accounts to cover those transactions.

50.     In addition, Union Bank misleads its customers regarding its reordering practices.  The statements in the Deposit Agreement are deceptive and unconscionable.  Union Bank fails to disclose that it maximizes its overdraft fees, at consumer expense, by grouping together POS transactions that occurred on *subsequent* days with POS transactions that occurred on *earlier* days, and reordering them so that higher debits that occurred on subsequent days are posted to its customers' accounts before lower debits that occurred on earlier days, contrary to the terms of the Bank's Deposit Agreement and its customers' reasonable expectations.  Union Bank's practices violate the covenant of good faith and fair dealing implied in the Deposit Agreement as well as the consumer protection laws of California.

51.     In an effort to maximize overdraft revenue, Union Bank manipulates and reorders debits from highest to lowest during given periods of time.  Union Bank reorders transactions for no reason other than to increase the number of exorbitant overdraft fees it can charge.  This practice violates numerous consumer protection laws and the covenant of good faith and fair dealing in the Bank's Deposit Agreement.

C.      **Union Bank's Cloaking of Accurate Balance Information**

52.     Union Bank actively promotes the convenience of its debit cards and other electronic debiting, but fails to provide customers with accurate balance information.  When customers execute account transactions, they generally do not have access to an accurate balance register or balance information.

53.     Union Bank provides inaccurate balance information to its customers through its electronic network.  In certain cases, Union Bank informs its customers that they have a positive balance when, in reality, they have a negative balance, despite the Bank's actual knowledge of outstanding debits and transactions.

54.     Even when Union Bank has actual knowledge of outstanding transactions which have already created a negative balance in a customers' account, it encourages the customer to incur more overdraft charges by approving—rather than prudently declining—subsequent debit card purchases and other electronic transactions.

55.     Union Bank also assesses overdraft fees at times when actual funds in the customer account are sufficient to cover all debits that have been submitted to the Bank for payment. It does this by placing a "hold" on actual funds in the customer's account. In doing so, Union Bank charges overdraft fees where it faces no risk, because the cash balance in the customer's account has not dropped below zero.

**D.      Union Bank's Failure to Notify Customers of Overdrafts or Allow Customers to Opt Out**

56.     At the time its debit cards are used in POS transactions or at ATMs, Union Bank is able to determine, almost instantaneously, whether there are sufficient funds in a customer's account to cover that particular transaction.   The Bank has the technological capability to decline transactions (which it does when a pending transaction would exceed a pre-determined, overdraft tolerance limit for the account), or notify customers at that very moment that the particular debit card transaction would result in an overdraft.  Union Bank could give customers the option to decline the transaction to avoid incurring the overdraft fee, but it does not do so because it seeks to maximize the amount of revenue generated through its assessment of overdraft fees.

57.     Notwithstanding its technological capabilities and actual knowledge, Union Bank fails to provide notice to Plaintiff and the Classes that a particular debit card transaction will result in an overdraft and, hence, an overdraft fee.  Because Union Bank's customers are not notified of the potential overdraft, and are not given the option of declining the debit card transaction or providing another form of payment, the customers incur monetary damages in the form of overdraft fees.

58.     Union Bank fails to allow Class members to opt out of its overdraft scheme upon request and/or fails to inform Class members of that option.

**E.     Union Bank's Overdraft Policies and Practices Are Contrary to Best Practices.**

59.     By engaging in the conduct described herein, Union Bank has failed to follow the list of "best practices" for overdraft programs set forth in the "Joint Guidance on Overdraft Protection Programs" ("Joint Guidance") issued by the United States Department of the Treasury, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the National Credit Union Administration (collectively, the "Agencies"). A copy of the Joint Guidance is attached as Exhibit B. These "best practice" recommendations include: "Provide election or opt-out of service. Obtain affirmative consent of consumers to receive overdraft protection. Alternatively, where overdraft protection is automatically provided, permit consumers to 'opt-out' of the overdraft program and provide a clear consumer disclosure of this option." 70 F.R. 9127-01, 9132.

60.     According to rules proposed by the Agencies: "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. … This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee." 73 F.R. 28904-01, 28929 (May 19, 2008).

61.     The Joint Guidance also advises banks to "[a]lert customers before a transaction triggers any fees. When consumers attempt to withdraw or transfer funds made available through an overdraft protection program, provide a specific consumer notice, where feasible, that completing the withdrawal may trigger the overdraft fees." 70 F.R.D. 9127, 9132.

The Joint Guidance further advises that "[t]his notice should be presented in a manner that permits consumers to cancel the attempted withdrawal or transfer after receiving the notice." *Id.*

62.     Similarly, the list of "best practices" recommended in "Overdraft Protection: A Guide for Bankers," issued by the American Bankers Association, includes offering customers the option of "opting out" of any overdraft programs, and informing customers, before they access funds, that a particular point of sale or ATM transaction will cause them to incur an overdraft fee.  A copy of  "Overdraft Protection: A Guide for Bankers" is attached as Exhibit C.

63.     Union Bank's overdraft policies make it difficult for customers to avoid injury even if they carefully track the balance in their account.  In fact, the Agencies have stated that "Injury" resulting from such policies, "is not reasonably avoidable" by the consumer. 73 F.R. 28904-01, 28929.  "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase Bank will be made available."

64.     On October 6, 2009, the Center for Responsible Lending issued a report entitled "Overdraft Explosion:  Bank Fees for Overdrafts Increase 35% in Two Years."  The report, attached hereto as Exhibit D, finds that it is now "standard procedure to automatically enroll checking account customers in their most expensive overdraft loan program."  The report finds that debit card transactions account for more overdraft fees than traditional checks or any other type of transaction, even though "debit card transactions and ATM withdrawals . . . could easily be denied for no fee."  The report also finds that overdraft fees increased 35 percent from 2006 to 2008, and that over 50 million Americans overdrew their accounts in a 12 month period, with 27 million accounts incurring five or more overdraft fees.

65.    A chart from the research company Moebs Services shows that, in every year since 1992, banks have gained increased revenues from overdraft fees:



**F.    Union Bank's Unconscionable Provisions and Policies**

66.    Union Bank's overdraft policies and practices are unconscionable in the following respects, among others:

a.    Union Bank does not allow its customers to "opt out" of its overdraft scheme, and/or fails to reasonably disclose to its customers that they have that option;

b.    Union Bank does not obtain affirmative consent from checking account customers prior to processing a transaction that will overdraw the account and result in an overdraft fee;

c.      Union Bank does not alert its customers that a debit card transaction will trigger an overdraft, and does not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

d.      The Deposit Agreement is a contract of adhesion in that it is a standardized form, imposed and drafted by the Bank, which is a party of vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement in its entirety;

e.      The amount of overdraft fees is disclosed in an ineffective, ambiguous, misleading, and unfair manner, in a document not signed by the depositor; and

f.      The Deposit Agreement provided to customers is ineffective, ambiguous, deceptive, unfair, and misleading in that it does not unambiguously state that the Bank always reorders debits from high to low, even though Union Bank always reorders transactions in this way for customers in order to maximize overdrafts and overdraft fee revenues for the Bank.

### G.      Union Bank's Overdraft Practices Harmed Plaintiff

67.      Plaintiff Larsen is a current checking account customer of the Bank.  She opened her checking account with the Bank in approximately 1998.  She was issued a check card sometime after she opened her account.

68.      During this time as a checking account customer of the Bank, Ms. Larsen has been charged with numerous overdraft fees.  Some months, she has been charged with hundreds of dollars in overdraft charges.  In all, the Bank has charged Ms. Larsen approximately $2,500.00 in overdraft fees.

69.      Numerous times, Ms. Larsen has been charged overdraft fees for transactions when there were sufficient funds in her account to cover the transaction at issue at the time of the transaction at issue.  In these instances, she would not have incurred overdraft fees but for the Bank's reordering of her debit transactions from highest to lowest.

70.     For example, Ms. Larsen was charged three overdraft charges, of $32 each, which were posted on March 10, 2009 for three debit card transactions that were posted on March 9, 2009.  Based on information and belief, as well as the fact that Ms. Larsen frequently checks her account balance online, at the time of all three transactions, Ms. Larsen had a positive balance in her account.  Based on information and belief, Union Bank expressly electronically approved these transactions before the transactions were completed, and never provided Plaintiff an option to decline transactions that would overdraft her account.  In addition, the Banks reordered Ms. Larsen's debits during this time period, causing her to be charged more overdraft fees than she would have been charged had her debits been posted in the order in which the transactions occurred.  Ms. Larsen was charged these overdraft fees even though her available balance information showed that at all times, she had enough funds in her account to cover these transactions before they were entered into.  Therefore, Ms. Larsen was damaged in the amount of $64, based on the two overdraft fees improperly assessed when she had sufficient funds in her account at the time she made the transactions, as a result of Union Bank's practice of reordering transactions from the order they occurred to highest to lowest for the purpose of assessing additional overdraft fees.

71.     The Bank did not notify Ms. Larsen that she could opt out of the overdraft program.

72.     The Bank never notified Ms. Larsen at the time she made check card transactions, including POS transactions, that her checking account was overdrawn or that it would charge her an overdraft fee as a result of the transaction.

73.     The Bank never declined to pay any of Ms. Larsen's check card charges, even when her account was overdrawn.  Rather, the Bank has always paid such charges and charged Ms. Larsen overdraft fees.

74.     Union Bank failed to notify Ms. Larsen that she could incur overdraft fees on transactions even though there were sufficient funds in the checking account to cover the transaction at the time the transaction was executed.  In addition, Union Bank never notified

Ms. Larsen, at the time she executed the purported insufficient funds transactions described above, that her checking account was overdrawn or that she would be charged an overdraft fee as a result of the transactions. Furthermore, Union Bank paid, rather than returned, all of the debit card charges described above, even though Ms. Larsen's account purportedly lacked sufficient funds to cover the transactions.

75.     Based on information and belief, the overdraft charges incurred by Ms. Larsen are representative of millions of dollars of overdraft fees that Union Bank wrongfully assessed and deducted from its customers' accounts. These wrongful takings are especially egregious considering the fact that the Bank approved each transaction and knew at the time of approval whether there were sufficient funds in the account to cover the transaction.

**H.     The Damages Sustained by Plaintiff and the Class**

76.     As shown by these examples, Union Bank's overdraft policies make it difficult for a customer to avoid injury even if the customer keeps close track of the balance in his or her account. In fact, the Agencies have stated that "injury" resulting from such policies "is not reasonably avoidable" by consumers. 73 F.R. 28904-01, 28929. "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out. Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account. For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase by Union Bank will be made available." *Id.*

77.     According to rules proposed by the Agencies, "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. … This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee." 73 F.R. 28904-01, 28929 (May 19, 2008).

78.     Thus, as a consequence of Union Bank's overdraft policies and practices, Plaintiff and the Class have been wrongfully forced to pay overdraft fees.  Union Bank has improperly deprived Plaintiff and the Classes of significant funds, causing ascertainable monetary losses and damages.

79.     As a consequence of Union Bank's improper overdraft fees, Union Bank has wrongfully deprived Plaintiff and the Classes of funds to which it had no legitimate claim.

80.     Plaintiff had sufficient funds to cover at least some of the transactions for which they and the Classes were charged overdraft fees.  Plaintiff and members of the Classes either had adequate funds to cover the transactions posted to their accounts, or the accounts were allowed to become overdrawn, even by *de minimis* margins, exclusively so that Union Bank could impose these wrongful charges.  In many instances, Union Bank's manipulation of the process for imposing overdraft fees triggered a cascade of charges that exponentially added to the charges it collected from Plaintiff and Class members.

81.     All conditions precedent to the relief sought herein have either occurred or have been performed or waived.

## FIRST CLAIM FOR RELIEF

### Breach of Contract

**(On Behalf of the National Class)**

82.     Plaintiff repeats paragraphs 1 through 81 above.

83.     Plaintiff and Union Bank have contracted for bank account deposit, checking, ATM and debit card services, as embodied in Union Bank's Deposit Agreement and related documentation.

84.     Good faith is an element of every contract pertaining to the assessment of overdraft fees. Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Put differently, the parties to a

contract are mutually obligated to comply with the substance of their contract in addition to its form.   Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

85.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.   Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.   Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

86.    Union Bank has breached the covenant of good faith and fair dealing in the Deposit Agreement through its overdraft policies and practices as alleged herein.

87.    Plaintiff and the Class have performed all, or substantially all, of the obligations imposed on them under the Deposit Agreement.

88.    Plaintiff and members of the Class have sustained damages as a result of Union Bank's breach of the covenant of good faith and fair dealing.

## SECOND CLAIM FOR RELIEF

### Unconscionability in Violation of Cal. Civ. Code § 1670.5

### (On Behalf of the National Class)

89.    Plaintiff repeats paragraphs 1 through 81 above.

90.    Union Bank's overdraft policies and practices are substantively and procedurally unconscionable, in violation of Section 1670.5 of the California Civil Code and the common law, in the following respects, among others:

a.    Union Bank does not allow its to "opt out" of the Bank's overdraft scheme, and/or fails to reasonably disclose to its customers that they have that option;

b.    Union Bank does not obtain affirmative consent from checking account customers prior to processing a transaction that will overdraw the account and result in an overdraft fee;

c.     Union Bank does not alert its customers that a debit card transaction will trigger an overdraft, and does not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

d.     The Deposit Agreement is a contract of adhesion in that they are standardized forms, imposed and drafted by Union Bank, which is a party of vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement in its entirety;

e.     The amount of overdraft fees is disclosed in an ineffective, ambiguous, misleading, and unfair manner, since it is contained in the Deposit Agreement, which is not signed by the depositor; and

f.     The Deposit Agreement provided to customers is ineffective, ambiguous, deceptive, unfair, and misleading in that it does not unambiguously state that the Bank always reorders debits from high to low, even though Union Bank always reorders transactions in this way for customers in order to maximize overdrafts and overdraft fee revenues for Union Bank.

91.     Considering the great business acumen and experience of Union Bank in relation to Plaintiff and the Class, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law.

92.     The imposition of overdraft charges which exceed the amount overdrawn (e.g., the imposition of a $35 charge on an overdraft of less than $35) is itself unconscionable. Such charges are not reasonably related to Union Bank's cost of covering the overdraft and/or its risk of nonpayment (where the Bank pays the overdraft), or to Union Bank's cost of returning the item unpaid (where Union Bank does not pay the overdraft).

93.     Plaintiff and members of the Class have sustained damages as a result of Union Bank's unconscionable policies and practices as alleged herein.

## THIRD CLAIM FOR RELIEF

### Conversion

### (On Behalf of the National Class)

94.     Plaintiff repeats paragraphs 1 through 81 above.

95.     Union Bank had and continues to have a duty to maintain and preserve its customers' checking accounts and to prevent their diminishment through its own wrongful acts.

96.     Union Bank has wrongfully collected overdraft fees from Plaintiff and the members of the Class, and has taken specific and readily identifiable funds from their accounts in payment of these fees in order to satisfy them.

97.     Union Bank has, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiff and the members of the Class, without legal justification.

98.     Union Bank continues to retain these funds unlawfully without the consent of Plaintiff or members of the Class.

99.     Union Bank intends to permanently deprive Plaintiff and the members of the Class of these funds.

100.     These funds are properly owned by Plaintiff and the members of the Class, not Union Bank, which now claims that it is entitled to their ownership, contrary to the rights of Plaintiff and the members of the Class.

101.     Plaintiff and the members of the Class are entitled to the immediate possession of these funds.

102.     Union Bank has wrongfully converted these specific and readily identifiable funds in violation of California law.

103.     Union Bank's wrongful conduct is continuing.

104.    As a direct and proximate result of this wrongful conversion, Plaintiff and the members of the Class have suffered and continue to suffer damages.

105.    By reason of the foregoing, Plaintiff and the members of the Class are entitled to recover from Union Bank all damages and costs permitted by law, including all amounts that Union Bank has wrongfully converted.

### FOURTH CLAIM FOR RELIEF

#### Unjust Enrichment

#### (On Behalf of the National Class)

106.    Plaintiff repeats paragraphs 1 through 81 above.

107.    Plaintiff, on behalf of herself and the Class, asserts a claim for unjust enrichment under the common law.

108.    By means of Union Bank's wrongful conduct alleged herein, Union Bank knowingly provides banking services to Plaintiff and members of the Class that are unfair, unconscionable, and oppressive.

109.    Union Bank knowingly received and retained wrongful benefits and funds from Plaintiff and members of the Class.  In so doing, Union Bank acted with conscious disregard for the rights of Plaintiff and members of the Class.

110.    As a result of Union Bank's wrongful conduct as alleged herein, Union Bank has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Class.

111.    Union Bank's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

112.    Under the common law doctrine of unjust enrichment, it is inequitable for Union Bank to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of overdraft fees on Plaintiff and members of the Class in an unfair, unconscionable, and oppressive manner. Union Bank's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

113.     The financial benefits derived by Union Bank rightfully belong to Plaintiff and members of the Class. Union Bank should be compelled to disgorge in a common fund for the benefit of Plaintiff and members of the Class all wrongful or inequitable proceeds received by them. A constructive trust should be imposed upon all wrongful or inequitable sums received by Union Bank traceable to Plaintiff and the members of the Class.

114.     Plaintiff and members of the Class have no adequate remedy at law.

## FIFTH CLAIM FOR RELIEF

### Violations of California Business & Profession Code § 17200, *et seq*.

### (On Behalf of the California Subclass)

115.     Plaintiff repeats paragraphs 1 through 81 above.

116.     Union Bank's conduct described herein violates the Unfair Competition Law (the "UCL"), codified at California Business and Professions Code section 17200, in the following respects, among others:

a.     Union Bank's practices relating to the imposition of overdraft fees are unconscionable, in violation of California Civil Code section 1770(a)(19), and, as a result, constitute an unlawful business act or practice within the meaning of the UCL;

b.     Union Bank's practices relating to the imposition of overdraft fees violate California Civil Code sections 1770(a)(5), (14) and (19), and, as a result, constitute unlawful business acts or practices within the meaning of the UCL; and

c.     Union Bank's practices relating to the imposition of overdraft fees constitute unfair business acts or practices within the meaning oft UCL.

117.     The harm to Plaintiff and the Class arising from Union Bank's unlawful and unfair practices relating to the imposition of overdraft fees outweighs the utility, if any, of those practices.

118.     Union Bank's unlawful and unfair business practices relating to the imposition of overdraft fees are immoral, unethical, oppressive, unscrupulous, unconscionable and/or substantially injurious to Plaintiff and members of the Class.

119. As a result of Union Bank's violations of the UCL, Plaintiff and members of the Class have paid, and/or will continue to pay, unreasonably excessive amounts of money for banking services and thereby suffered and will continue to suffer actual damages.

120. Pursuant to California Business and Professions Code section 17203, Plaintiff and the Class are therefore entitled to:

   a.    an Order requiring Union Bank to cease the unlawful and unfair acts alleged herein;

   b.    an Order enjoining Union Bank from continuing to collect overdraft fees from California consumers on check-card transactions, including POS and ATM transactions, unless the consumer is notified at the time of the transaction that an overdraft fee will be charged and unless the consumer is given the option of declining the transaction without incurring an overdraft fee;

   c.    full restitution of all overdraft fees paid to Union Bank on check card transactions, including POS and ATM transactions, pursuant to California Code of Civil Procedure section 384;

   d.    pre-judgment interest at the highest rate allowable by law; and

   e.    payment of their attorneys' fees and costs pursuant to, *inter alia*, California Code of Civil Procedure section 1021.5.

## SIXTH CLAIM FOR RELIEF

### Violations of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*.

### (On Behalf of the California Subclass)

121. Plaintiff repeats paragraphs 1 through 81 above.

122. This claim for relief is brought pursuant to the California Consumer Legal Remedies Act (the "CLRA"), codified at California Civil Code section 1750, et seq.

123. Union Bank provides "services" within the meaning of California Civil Code sections 1761(b) and 1770(a).

124.    Union Bank is a "person" within the meaning of California Civil Code sections 1761(c) and 1770(a).

125.    Users of Union Bank's account services, including Plaintiff and members of the Class, are "consumers" within the meaning of California Civil Code sections 1761(d) and 1770(a).

126.    Every use of Union Bank's account services by Plaintiff and the Class constitutes a "transaction" within the meaning of California Civil Code sections 1761(e) and 1770.

127.    Union Bank's practices relating to the imposition of overdraft fees violated, and continue to violate, the CLRA in the following respects, among others:

a.    Union Bank makes deceptive representations in connection with its services, in violation of California Civil Code sections 1770(a)(5) and (14);

b.    Union Bank represents that its services have characteristics, uses, or benefits which they do not have, in violation of California Civil Code sections 1770(a)(5); and

c.    Union Bank's Deposit Agreement includes unconscionable provisions, in violation of California Civil Code section 1770(a)(19).

128.    Union Bank has intentionally engaged in willful, unreasonable, and oppressive conduct relating to the imposition of overdraft fees, in conscious disregard of the rights of Plaintiff and the Class.

129.    As a result of Union Bank's violations of the CLRA, Plaintiff and the other Class members have incurred damages in the form of overdraft fees.

130.    Plaintiff and the other Class members will continue to suffer irreparable damage unless Union Bank is enjoined from continuing its ongoing wrongful practices relating to the imposition of overdraft fees.

131.    Pursuant to California Civil Code section I780(a)(2), Plaintiff seek an order enjoining the wrongful practices of Union Bank described herein, including, but not limited to, an order: (1) enjoining Union Bank from continuing to collect unconscionable

overdraft fees; (2) requiring Union Bank to allow its customers to opt out of the Bank's overdraft scheme, and requiring Union Bank to inform its customers of that option; (3) requiring Union Bank to provide its customers with a reasonable process for opting out; and (4) requiring Union Bank to notify its customers when a POS and/or ATM transaction will result in an overdraft charge and, in such a situation, to permit the customer to make the affirmative decision of whether or not to proceed.

   132. Plaintiff and the Class have no adequate remedy at law.

   133. Venue is proper pursuant to California Civil Code section 1780(d) because Union Bank does business in the Northern District of California.

   134. On or about November 9, 2009, Plaintiff sent a CLRA notice letter to Union Bank. If Union Bank fails to provide appropriate relief for its violations of California Civil Code sections 1770(a)(5), (14) and (19) within 30 days of receipt of Plaintiff's notification, in accordance with Section 1782(b), Plaintiff is entitled to the following relief under Section 1780 for the Bank's violations of Sections 1770(a)(5), (14) and (19):

    a. actual damages under Section 1780(a)(1);

    b. restitution of property under Section 1780(a)(2);

    c. punitive damages under Section 1780(a)(4) and because the Bank has engaged in malice or oppression;

    d. attorneys' fees and costs under Section 1780(d); and

    e. any other relief the Court deems proper under Section 1780(a)(5).

### **PRAYER FOR RELIEF**

   WHEREFORE, Plaintiff, on behalf of herself and the members of the Class she seeks to represent, demands a jury trial and judgment as follows:

   1. Preliminary and permanent injunctive relief enjoining Union Bank from charging overdraft fees under its current policies and from engaging in the acts of unfair competition alleged herein.

2.      Restitution of all overdraft fees paid to Union Bank by Plaintiff and the Class in the past four years in an amount to be determined at trial;

3.      Disgorgement of the ill-gotten gains derived from Union Bank's misconduct;

4.      Actual damages in an amount according to proof;

5.      Punitive and exemplary damages;

6.      Pre-judgment interest at the highest rate permitted by law;

7.      The costs and disbursements incurred by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to California Code of Civil Procedure § 1021.5 and California Civil Code § 1780; and

8.      Such other and further relief as the Court deems just and proper.

Dated:      November 9, 2009

/s/ Bruce S. Rogow
Bruce S. Rogow, Esquire
Florida Bar No. 067999
bruce@abbrclaw.com
Robert C. Gilbert, Esquire
Florida Bar No. 561861
bobby@abbrclaw.com
ALTERS BOLDT BROWN
 RASH & CULMO, P.A.
4141 N.E. 2nd Avenue
Miami, Florida 33137
Tel: (305) 571-8550
Fax: (305) 571-8558

*Lead Counsel for Plaintiff*

/s/ Ruben Honik
Ruben Honik, Esquire
Pennsylvania Bar No. 33109
rhonik@golombhonik.com
GOLUMB & HONIK, P.C.
1515 Market Street
Suite 1100
Philadelphia, PA 19102
Tel: 215-985-9177
Fax: 215-985-4169

/s/ Barry R. Himmelstein
Barry R. Himmelstein, Esquire
California Bar No. 157736
bhimmelstein@lchb.com
Michael W. Sobol, Esquire
California Bar No. 194857
msobol@lchb.com
Jordan Elias, Esquire
California Bar No. 228731
jelias@lchb.com
Mikaela Bernstein, Esquire
California Bar No. 261301
mbernstein@lchb.com
LIEFF CABRASER HEIMANN &
  BERNSTEIN LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Tel: 415-956-1000
Fax: 415-956-1008

/s/ Robert C. Josefsberg
Robert C. Josefsberg, Esquire
Florida Bar No. 40856
rjosefsberg@podhurst.com
Victor M. Diaz, Jr., Esquire
Florida Bar No. 503800
vdiaz@podhurst.com
John Gravante, III, Esquire
Florida Bar No. 617113
jgravante@podhurst.com
PODHURST ORSECK, P. A.
City National Bank Building
25 W Flagler Street
Suite 800
Miami, FL 33130-1780
Tel: 305-358-2800
Fax: 305-358-2382

/s/ Ted E. Trief
Ted E. Trief, Esquire
New York Bar No. 1476662
ttrief@triefandolk.com
Barbara E. Olk, Esquire
New York Bar No. 1459643
bolk@triefandolk.com
TRIEF & OLK
150 East 58th street
34th Floor
New York, NY 10155
Tel: 212-486-6060
Fax: 212-317-2946

/s/ Edward Adam Webb
Edward Adam Webb, Esquire
Georgia Bar No. 743910
adam@webllc.com
G. Franklin Lemond, Jr., Esquire
Georgia Bar No. 141315
flemond@webbllc.com
WEBB, KLASE & LEMOND, L.L.C.
1900 The Exchange SE, Suite 480
Atlanta, GA 30339
Tel: 770-444-9325
Fax: 770-444-0271

/s/ Russell W. Budd
Russell W. Budd, Esquire
Texas Bar No. 03312400
rbudd@baronbudd.com
/s/ Bruce W. Stecker
Bruce W. Steckler, Esquire
Texas Bar No. 00785039
bsteckler@baronbudd.com
/s/ Melissa K. Hutts
Melissa K. Hutts, Esquire
Texas Bar No. 0188015
mhutts@baronbudd.com
/s/ Renee M. Melancon
Renee M. Melancon, Esquire
Texas Bar No. 2403573
rmelancon@baronbudd.com
BARON & BUDD, P.C.
3102 Oak Lawn Avenue
Suite 1100
Dallas, TX 75219
Tel: 214-521-3605
Fax: 214-520-1181

*Plaintiffs' Executive Committee*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 09-MD-02036-JLK

_____
                                        )
IN RE: CHECKING ACCOUNT                 )
OVERDRAFT LITIGATION                    )
                                        )
MDL No. 2036                            )
_____)

### CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of November, 2009, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Robert C. Gilbert
Florida Bar No. 561861
ALTERS BOLDT BROWN
RASH & CULMO, P.A.
4141 N.E. 2nd Avenue, Suite 201
Miami, Florida 33137
bobby@abbrclaw.com