**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 1:09-MD-02036-JLK**

IN RE:  CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

# OMNIBUS MOTION TO DISMISS AND/OR FOR JUDGMENT ON THE PLEADINGS AND INCORPORATED MEMORANDUM OF LAW

**THIS DOCUMENT RELATES TO:**

*Tornes, et al. v. Bank of America, N.A.*
S.D. Fla. Case No. 1:08-cv-23323-JLK

*Yourke, et al. v. Bank of America, N.A.*
S.D. Fla. Case No. 1:09-cv-21963-JKL
N.D. Cal. Case No. 3:09-cv-2186

*Amrhein v. Citibank, N.A.*
S.D. Fla. Case No. 1:09-cv-21681-JLK
N.D. Cal. Case No. 4:08-cv-05101-SBA

*Lopez, et al. v. JPMorgan Chase Bank, N.A.*
S.D. Fla. Case No. 1:09-cv-23127-JLK

*Luquetta v. JPMorgan Chase Bank, N.A.*
S.D. Fla. Case No. 1:09-cv-23432-JLK
C.D. Cal. Case No. CV09-6967-GHK

*Speers v. U.S. Bank, N.A.*
S.D. Fla. Case No. 1:09-23126-JLK

*Waters, et al. v. U.S. Bank, N.A.*
S.D. Fla. Case No. 1:09-23034-JLK
N.D. Cal. Case No. 3:09-cv-2071

*Larsen v. Union Bank, N.A.*
S.D. Fla. Case No. 1:09-cv-23235-JLK
N.D. Cal. Case No. 4:09-cv-3250

*Garcia, et al. v. Wachovia Bank, N.A.*
S.D. Fla. Case No. 1:08-cv-22463-JLK

*Spears-Haymond v. Wachovia Bank, N.A.*
S.D. Fla. Case No. 1:09-cv-21680-JLK
N.D. Cal. Case No. 3:08-cv-4610

*Dolores Gutierrez v. Wells Fargo Bank, N.A.*
S.D. Fla. Case No. 1:09-cv-23685-JLK
D. Or. Case No. 3:09-cv-01239-ST

*Martinez v. Wells Fargo Bank, N.A.*
S.D. Fla. Case No. 1:09-cv-_____
D.N.M. Case No. 6:09-cv-01072-GBW-ACT

*Zankich, et al. v. Wells Fargo Bank, N.A.*
S.D. Fla. Case No. 1:09-cv-23186-JLK
W.D. Wash. Case No. C-08-1476-RSM

TABLE OF CONTENTS

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

II.     STATEMENT OF THE CASE......................................................................................... 5

        A.      Procedural Background................................................................................... 6

        B.      The Parties ...................................................................................................... 8

        C.      The Challenged Banking Practice................................................................... 8

        D.      Other General Allegations of the Complaints............................................... 12

        E.      The Banks' Contracts with Their Customers................................................. 13

        F.      Statutory and Regulatory Background............................................................ 13

                1.      The Uniform Commercial Code ........................................................ 14

                2.      Federal Regulation of National Banks.............................................. 15

III.    ARGUMENT.................................................................................................................. 18

        A.      Because They Seek to Invoke State Law to Limit the Terms on Which
                National Banks May Conduct the Business of Banking, Plaintiffs' Claims
                Are Preempted by Federal Law. ...................................................................... 19

                1.      Practices Relating to the Calculation of Fees, Including Posting
                        Order, Fall Within the Scope of a National Bank's Federally
                        Authorized "Powers." ....................................................................... 20

                2.      Any Application of State Law to the Practices Addressed by
                        Plaintiffs' Claims Is Preempted by the NBA and the OCC's
                        Regulations. ...................................................................................... 24

                3.      Plaintiffs' State-Law Claims Fall Squarely Within Expressly
                        Preempted Subject Matter and Would More than Incidentally
                        Affect Banks' Exercise of Their Federal Powers. ................................ 27

                4.      An Extensive Body of Case Law Confirms That State-Law Claims
                        Such as Plaintiffs' Are Preempted. ................................................... 30

        B.      If and to the Extent State Law Applies Here at All, the Claims of Each
                Plaintiff Are Governed by the Law of the State of His or Her Residence........... 34

                1.      In All But Two of the Cases, Contractual Choice-of-Law
                        Provisions Dictate the Law Applicable to Plaintiffs' Claims. ................. 35

2.      Even Absent a Contractual Selection of Applicable Law, Choice of Law Rules Dictate That the Laws Applicable to Plaintiffs' Claims Are Those of Their Home States. ............................................................ 38

C.   Plaintiffs' Breach of Contract Claims Fail to State a Claim on Which Relief May Be Granted. ............................................................................ 40

1.      Each Bank's Contract Specifically Authorizes Debits to Be Posted from Highest Amount to Lowest. ............................................................ 41

2.      The Common Law Implied Covenant of Good Faith and Fair Dealing Does Not Preclude High-To-Low Posting as Authorized by the Contracts. ................................................................................ 42

a)      The Common Law Implied Covenant Is Inapplicable to Account Agreements Governed by Texas Law. ........................... 43

b)      The Implied Common Law Covenant of Good Faith and Fair Dealing Cannot Vary Actual Contract Terms Authorizing High-To-Low Posting. ............................................... 43

c)      The Implied Covenant Cannot Prohibit a Practice That State Laws and Federal Regulatory Pronouncements Specifically Permit. ....................................................................... 46

d)      Courts Have Consistently Held that High-to-Low Posting Does Not Violate The Implied Covenant of Good Faith and Fair Dealing. ................................................................................ 49

D.   Plaintiffs' Common Law Unconscionability Claims Fail as a Matter of Law. ................................................................................................................ 55

1.      Unconscionability Is Not an Affirmative Cause of Action. ...................... 56

2.      The Challenged Practices Are Not Unconscionable. ................................ 57

E.   Plaintiffs' Conversion Claims Fail on Multiple Grounds. .................................... 61

1.      The Defendant Banks Did Not Convert Any Property Owned by Plaintiffs When Assessing Fees on Plaintiffs' Accounts. ......................... 62

2.      Plaintiffs Cannot Show a "Wrongful" Taking of Property. ...................... 64

F.   Plaintiffs' Unjust Enrichment Causes of Action Fail to State a Claim. ................ 65

G.   All of Plaintiffs' Statutory Claims Fail for Multiple Reasons. ............................. 67

1.     No Plaintiff May Bring a Claim Under the Law of Any State in Which That Plaintiff Does Not Reside or Maintain His or Her Account. ................................................................... 68

     a)    State Laws Presumptively Do Not Apply Extraterritorially. ........ 69

     b)    The Statutes Themselves Limit Their Application to Transactions Occurring in the State or Affecting State Residents. ................................................................... 69

     c)    Choice of Law Principles Bar Application of "Non-Resident" Laws. ........................................................... 71

2.     Plaintiffs' Complaints Fail to State a Claim Under Any of the Statutes They Assert. ..................................................... 72

     a)    The Statutes Do Not Provide a Cause of Action to Challenge Conduct that State and Federal Law Specifically Permits. ........................................................ 73

     b)    The Posting Practice and Fees at Issue Here Are Not Within the Categories of Conduct Covered by Most of the Statutes Plaintiffs Seek to Invoke. ................................. 74

          (1)    Plaintiffs Have Not Pled Misrepresentations or Other Deceptive Acts as Required Under Many of the Statutes. ..................................................... 74

          (2)    Plaintiffs Have Failed Adequately to Allege Violation of the State Statutes That Extend to "Unfair" Practices. ........................................... 77

          (3)    Plaintiffs Have Failed to State a Claim Under Those Statutes That Permit Challenges to Allegedly "Unconscionable" Business Practices. .............................. 81

     c)    Plaintiffs Cannot Assert Claims Under Statutes That Exempt Banking Transactions or Transactions Involving Only "Money." ................................................... 82

     d)    Plaintiffs Have Failed to Comply with Pre-Lawsuit Notification Requirements of Certain Statutes. ....................... 84

     e)    Plaintiffs Cannot Maintain Claims for Class Relief Under the Montana Statute. ............................................. 85

    f) Plaintiffs Have Failed Adequately to Plead Claims Under Statutes That Require a Showing of One or More Specifically Enumerated Predicate Violations............................. 86

  H. Plaintiffs Have Failed to State a Claim for Relief Based on Any Business Practice Other Than Posting Order and Associated Fees. ................................... 87

    1. To State a "Plausible" Claim for Relief Based on a Business Practice Other Than Posting Order, Plaintiffs Must Sufficiently Allege Injury and Causation. .................................................................. 90

    2. Plaintiffs Have Not Stated a Plausible Entitlement to Relief Based on Business Practices Other than Posting Order...................................... 92

IV. CONCLUSION................................................................................................ 96

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*Abel v. KeyBank USA, N.A.*,
   313 F. Supp. 2d 720 (N.D. Ohio 2004)...................................................................................25

*Abogados v. AT&T, Inc.*,
   223 F.3d 932 (9th Cir. 2000) ..................................................................................................39

*Aguayo v. U.S. Bank*,
   __ F. Supp. 2d __, 2009 WL 3149607 (S.D. Cal. Sept. 24, 2009) ..........................................28

*Alan's of Atlanta, Inc. v. Minolta Corp.*,
   903 F.2d 1414 (11th Cir. 1990) ..............................................................................................42

*Allstate Ins. Co. v. Hague*,
   449 U.S. 302 (1981)..................................................................................................................38

*Am. Casual Dining, L.P. v. Moe's Sw. Grill, L.L.C.*,
   426 F. Supp. 2d 1356 (N.D. Ga. 2006) ...................................................................................66

*Am. Gen. Life & Accident Ins. Co. v. Ward*,
   509 F. Supp. 2d 1324 (N.D. Ga. 2007) ...................................................................................65

*Anderson v. Dist. Bd. of Trs. of Cent. Fla. Comty. Coll.*,
   77 F.3d 364 (11th Cir. 1996) ..................................................................................................95

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009)...................................................................................................... passim

*Auer v. Robbins*,
   519 U.S. 452 (1997)............................................................................................................23, 32

*Bank of Am. v. City & County of San Francisco*,
   309 F.3d 551 (9th Cir. 2002) ........................................................................................... passim

*Bank of Am., N.A. v. Sorrell*,
   248 F. Supp. 2d 1196 (N.D. Ga. 2002) ...................................................................................21

*Bank One, Utah v. Guttau*,
   190 F.3d 844 (8th Cir. 1999) ..................................................................................................33

*Barnett Bank of Marion County, N.A. v. Nelson*,
   517 U.S. 25 (1996)........................................................................................................2, 21, 24

i

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)................................................................87, 91, 96

*Bennett v. Behring Corp.*,
    466 F. Supp. 689 (S.D. Fla. 1979) ......................................................56, 58

*Berry v. Budget Rent A Car Sys., Inc.*,
    497 F. Supp. 2d 1361 (S.D. Fla. 2007) ................................................66, 84

*Bildstein v. MasterCard Int'l Inc.*,
    329 F. Supp. 2d 410 (S.D.N.Y. 2004).................................................74, 76

*Blum v. Yaretsky*,
    457 U.S. 991 (1982).................................................................................70

*BMW of N. Am. v. Gore*,
    517 U.S. 559 (1996).................................................................................69

*Bristol Tech. v. Microsoft*,
    42 F. Supp. 2d 153 (D. Conn. 1998) ......................................................79

*Brown v. Fla. Bar*,
    2009 WL 1513999 (M.D. Fla. May 29, 2009).........................................91

*Burger King Corp. v. C.R. Weaver & M-W-M, Inc.*,
    798 F. Supp. 684 (S.D. Fla. 1992) ......................................................71, 72

*Burger King Corp. v. C.R. Weaver; M-W-M, Inc.*,
    169 F.3d 1310 (11th Cir. 1999) ...................................................42, 44, 46

*Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp. ITT*,
    139 F. 3d 1396 (11th Cir. 1998) .............................................................70

*Carl Kelley Constr. LLC v. Danco Techs.*,
    __F. Supp. 2d __, 2009 WL 2950790 (D.N.M. Aug. 7, 2009) ................40

*Cattie v. Wal-Mart Stores, Inc.*,
    504 F. Supp. 2d 939 (S.D. Cal. 2007)....................................................85

*Chipman v. Lollar*,
    304 F. Supp. 440 (N.D. Miss. 1969).......................................................64

*City of N.Y. v. FCC*,
    486 U.S. 57 (1988)..................................................................................26

*Clark v. Am.'s Favorite Chicken Co.*,
    110 F.3d 295 (5th Cir. 1997) ............................................................44, 46

*Cowin Equip. Co., Inc. v. Gen. Motors Corp.*,
   734 F.2d 1581 (11th Cir. 1984) ...................................................................56

*Cumis Ins. Soc'y v. Peters*,
   983 F. Supp. 787 (N.D. Ill. 1997) ................................................................63

*Daniels v. Equitable Life Assurance Soc'y of the United States*,
   35 F.3d 210 (5th Cir. 1994) ..........................................................................65

*Davis v. Gen. Motors Acceptance Corp.*,
   406 F. Supp. 2d 698 (N.D. Miss. 2005)........................................................66

*DiMaio v. Democratic Nat'l Comm.*,
   520 F.3d 1299 (11th Cir. 2008) ....................................................................90

*Dorsey v. Ga. Dept. of State Rd. & Tollway Authority SRTA*,
   2009 WL 2477565 (N.D. Ga. Aug. 10, 2009) .........................................19

*Easton v. Iowa*,
   188 U.S. 220 (1903)......................................................................................21

*Elliott Indus. LP v. BP Am. Prod. Co.*,
   407 F.3d 1091 (10th Cir. 2005) .............................................................65, 66

*Estate of Duckett v. Cable News Network LLLP (CNN)*,
   2008 WL 2959753 (M.D. Fla. July 31, 2008) ..............................................38

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
   458 U.S. 141 (1982)................................................................................26, 34

*First Nat'l Bank of E. Ark. v. Taylor*,
   907 F.2d 775 (8th Cir. 1990) ........................................................................21

*First Nat'l Bank of San Jose v. Cal.*,
   262 U.S. 366 (1923)......................................................................................21

*Forzley v. AVCO Corp. Elecs. Div.*,
   826 F.2d 974 (11th Cir. 1987) ................................................................34, 36

*Franklin Nat'l Bank v. N.Y.*,
   347 U.S. 373 (1954)................................................................................21, 24

*Frye v. Am. Gen. Fin., Inc.*,
   307 F. Supp. 2d 836 (S.D. Miss. 2004)........................................................56

*Garcia v. Pub. Health Trust of Dade County*,
   841 F.2d 1062 (11th Cir. 1988) ....................................................................38

*Garcia v. Santa Maria Resort, Inc.*,
  528 F. Supp. 2d 1283 (S.D. Fla. 2007) ...................................................................91

*Gotlin v. Lederman*,
  616 F. Supp. 2d 376 (E.D.N.Y. 2009) ...................................................................70

*Griffin v. Dugger*,
  823 F.2d 1476 (11th Cir. 1987) ...........................................................................71

*Guidance Endodontics LLC v. Dentsply Int'l, Inc.*,
  2009 WL 3672452 (D.N.M. Oct. 2, 2009)........................................................37, 40

*Gutierrez v. Wells Fargo & Co.*,
  622 F. Supp. 2d 946 (N.D. Cal. 2009) ........................................................... passim

*Gutierrez v. Wells Fargo Bank, N.A.*,
  2008 WL 4279550 (N.D. Cal. Sept. 11, 2008) ............................................... passim

*Harper v. LG Elecs. USA, Inc.*,
  595 F. Supp. 2d 486 (D.N.J. 2009) .......................................................................75

*Harris v. Evans*,
  20 F.3d 1118 (11th Cir. 1994) .............................................................................90

*Harris v. Ivax Corp.*,
  182 F.3d 799 (11th Cir. 1999) .............................................................................19

*Hassler v. Sovereign Bank*,
  644 F. Supp. 2d 509 (D.N.J. 2009) ................................................................ passim

*Hawthorne v. Mac Adjustment, Inc.*,
  140 F.3d 1367 (11th Cir. 1998) ...........................................................................19

*Healy v. Beer Inst.*,
  491 U.S. 324 (1989)............................................................................................69

*Horsely v. Feldt*,
  304 F.3d 1125 (11th Cir. 2002) ...........................................................................19

*In re Late Fee & Over-Limit Fee Litig.*,
  528 F. Supp. 2d 953 (N.D. Cal. 2007) .............................................................75, 78

*In re Oxford Mktg., Ltd.*,
  444 F. Supp. 399 (N.D. Ill. 1978) ........................................................................62

*In re Salett*,
  53 B.R. 925 (Bankr. D. Mass. 1985) ....................................................................65

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
580 F. Supp. 2d 896 (N.D. Cal. 2008) ...................................................................85

*In re Wash. Mut. Overdraft Prot. Litig.*,
539 F. Supp. 2d 1136 (C.D. Cal. 2008) ................................................................28

*Jaffe v. Bank of Am., N.A.*,
__ F. Supp. 2d __, 2009 WL 2567488 (S.D. Fla. Aug. 28, 2009) ..........................67

*Jefferson v. Chase Home Fin.*,
2008 WL 1883484 (N.D. Cal. April 29, 2008).....................................................29

*Jenkins v. First Am. Cash Advance of Ga., LLC*,
400 F.3d 868 (11th Cir. 2005) ........................................................................57, 58

*Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*,
129 S. Ct. 865 (2009)...........................................................................................23

*Keys Jeep Eagle v. Chrysler Corp.*,
897 F. Supp. 1437 (S.D. Fla. 1995) ................................................................42, 44

*Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*,
908 F.2d 1351 (7th Cir. 1990) .............................................................................44

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
313 U.S. 487 (1941)........................................................................................34, 38

*Laster v. T-Mobile USA, Inc.*,
407 F. Supp. 2d 1181 (2005) ...............................................................................85

*Lee v. Am. Nat'l Life Ins. Co.*,
260 F.3d 997 (9th Cir. 2001) ...............................................................................90

*Lowden v. T-Mobile USA, Inc.*,
2009 WL 537787 (W.D. Wash. Feb. 18, 2009).................................................42, 78

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)..............................................................................................90

*Lyon v. Caterpillar, Inc.*,
194 F.R.D. 206 (E.D. Pa. 2000)............................................................................70

*Madison River Mgmt Co. v. Bus. Mgmt Software Corp.*,
351 F. Supp. 2d 436 (M.D.N.C. 2005) .................................................................66

*Magluta v. Samples*,
256 F.3d 1282 (11th Cir. 2001) ...........................................................................95

*Marathon Resort & Marina, Ltd. v. Promus Hotels, Inc.*,
   No. 02-cv-10085 (S.D. Fla. Dec. 9, 2002) ............................................................44

*Marple v. Kurzweg*,
   902 F.2d 397 (5th Cir. 1990) ...............................................................................66

*Martinez v. Wells Fargo Bank, N.A.*,
   2007 WL 963965 (N.D. Cal. Mar. 30, 2007).........................................................30

*Martinez v. Wells Fargo Bank*,
   2007 WL 2213216 (N.D. Cal. Jul 31, 2007)..........................................................25

*McCalley v. Samsung Elecs. Am., Inc.*,
   2008 WL 878402 (D.N.J. Mar. 31, 2008)...............................................................87

*McCulloch v. PNC Bank, Inc.*,
   298 F.3d 1217 (11th Cir. 2002) ............................................................................18

*McGarvey v. Penske Auto. Group*,
   639 F. Supp. 2d 450 (D.N.J. 2009) .......................................................................87

*Merrill Lynch Bus. Fin. Servs. v. Performance Mach. Sys. U.S.A.*,
   2005 WL 975773 (S.D. Fla. Mar. 4, 2005).............................................................87

*Metrobank, N.A. v. Foster*,
   193 F. Supp. 2d 1156 (S.D. Iowa 2002) ................................................................25

*Misabec Mercantile, Inc. De Panama v. Donaldson, Lufkin & Jenrette ACLI Futures,
   Inc.*,
   853 F.2d 834 (11th Cir. 1988) ..............................................................................64

*Mitchell v. Ford Motor Credit Co.*,
   68 F. Supp. 2d 1315 (N.D. Ga. 1998)....................................................................56

*MJ & Partners Restaurant LP v. Zadikoff*,
   995 F. Supp. 929 (N.D. Ill. 1998) .........................................................................45

*Monroe Retail v. RBS Citizens, N.A.*,
   2009 WL 4749352 (6th Cir. Dec. 14, 2009) ......................................................20, 22, 23, 24

*Montgomery v. Bank of Am. Corp.*,
   515 F. Supp. 2d 1106 (C.D. Cal. 2007) .............................................................25, 30

*Montgomery v. Sprint Spectrum, L.P.*,
   2007 WL 3274833 (D. Kan. 2007) ........................................................................70

*Morrone Co. v. Barbour*,
   241 F. Supp. 2d 683 (S.D. Miss. 2002)..................................................................65

*Murphy v. F.D.I.C.*,
  208 F.3d 959 (11th Cir. 2000) ..................................................................34

*Murray v. Abt Assocs., Inc.*,
  18 F.3d 1376 (7th Cir. 1994) ...................................................................66

*Nat'l Bank v. Dearing*,
  91 U.S. 29 (1875)....................................................................................20

*NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*,
  513 U.S. 251 (1995).....................................................................15, 21, 24

*NNDJ, Inc. v. Nat'l City Bank*,
  540 F. Supp. 2d 851 (E.D. Mich. 2008)...................................................25

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*,
  96 F.3d 1151 (9th Cir. 1996) ...................................................................66

*Parker v. Scrap Metal Processors, Inc.*,
  386 F.3d 993 (11th Cir. 2004) .................................................................90

*Perez-Acevedo v. Rivero-Cubano*,
  520 F.3d 26 (1st Cir. 2008)......................................................................19

*Perry v. Tri-State Chrysler Jeep, LLC*,
  2008 WL 1780938 (S.D. W. Va., April 16, 2008)...................................85

*Rando v. Gov't Employees Ins. Co.*,
  556 F.3d 1173 (11th Cir. 2009) ...............................................................39

*Reese v. JPMorgan Chase & Co.*,
  __ F. Supp. 2d __, 2009 WL 3346783 (S.D. Fla. Oct. 15, 2009) ..........66, 67, 91, 92

*Refco, Inc. v. Troika Inv. Ltd.*,
  702 F. Supp. 684 (N.D. Ill. 1988) ...........................................................70

*Rizzuto v. Joy Mfg. Co.*,
  834 F.2d 7 (1st Cir. 1987)........................................................................80

*Rose v. Chase Bank USA, N.A.*,
  513 F.3d 1032 (9th Cir. 2008) ............................................................25, 30

*Sandberg v. McDonald*,
  248 U.S. 185 (1918)..................................................................................69

*Scholes Elec. & Commc'ns, Inc. v. Fraser*,
  2006 WL 1644920 (D.N.J. June 14, 2006)...............................................62

*Silvas v. E\*Trade Mortgage Corp.*,
514 F.3d 1001 (9th Cir. 2008) ..................................................................23, 28, 32

*Silver v. Nelson*,
610 F. Supp. 505 (E.D. La. 1985) .........................................................................65

*Simon v. E. Ky. Welfare Rights Org.*,
426 U.S. 26 (1976).................................................................................................71

*Sinaltrainal v. Coca-Cola Co.*,
578 F.3d 1252 (11th Cir. 2009) .......................................................19, 80, 90, 92

*Smith v. Orkin Exterminating Co.*,
791 F. Supp. 1137 (S.D. Miss. 1990)...................................................................64

*Song v. PIL, LLC*,
640 F. Supp. 2d 1011 (N.D. Ill. 2009) .................................................................65

*Sonnenreich v. Philip Morris Inc.*,
929 F. Supp. 416 (S.D. Fla. 1996) .......................................................................25

*Stubbs v. McDonald's Corp.*,
224 F.R.D. 668 (D. Kan. 2004)............................................................................89

*Suburban Transfer Serv., Inc. v. Beech Holdings, Inc.*,
716 F.2d 220 (3d Cir. 1983).................................................................................66

*Sunoptic Techs., LLC v. Integra Luxtec, Inc.*,
2009 WL 722320 (M.D. Fla. Mar. 18, 2009) ......................................................87

*Superior Leasing, LLC v. Kaman Aerospace Corp.*,
2006 WL 3756950 (D. Or. Dec. 19, 2006) ..........................................................40

*Synergy Fin., L.L.C. v. Zarro*,
329 F. Supp. 2d 701 (W.D.N.C. 2004) ................................................................64

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)..............................................................................................19

*Texas Pac. Railway v. Pottorff*,
291 U.S. 245 (1934)..............................................................................................62

*Tiffany v. Nat'l Bank of Mo.*,
85 U.S. (18 Wall.) 409 (1874) ..............................................................................20

*Torres v. Wells Fargo*,
2008 WL 2397460 (N.D. Cal. Jun. 11, 2008)................................................49, 53

*Trans-Spec Truck Serv., Inc. v. Caterpillar, Inc.*,
   524 F.3d 315 (1st Cir. 2008) .......................................................57

*Truitt v. DirecTV, Inc.*,
   2008 WL 5054570 (E.D. La. Nov. 21, 2008) ........................................57

*U.S. for Use & Benefit of Walton Tech., Inc. v. Weststar Eng'g, Inc.*,
   290 F.3d 1199 (9th Cir. 2002) ....................................................66

*United Techs. Corp. v. Mazer*,
   556 F.3d 1260 (11th Cir. 2009) ..................................................19

*Util. Audit, Inc. v. Horace Mann Serv. Corp.*,
   383 F.3d 683 (7th Cir. 2004) .....................................................66

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ...................................................75

*Von Grabe v. Sprint PCS*,
   312 F. Supp. 2d 1285 (2003) .....................................................85

*Wagner v. First Horizon Pharm. Corp.*,
   464 F.3d 1273 (11th Cir. 2006) ...............................................91, 95

*Watters v. Wachovia Bank, N.A.*,
   550 U.S. 1 (2007).......................................................20, 21, 24, 29

*Weiss v. Wells Fargo Bank, N.A.*,
   2008 WL 2620886 (W.D. Mo. July 1, 2008).........................................25

*Wells Fargo Bank of Tex. N.A. v. James*,
   321 F.3d 488 (5th Cir. 2003) ..................................................25, 33

*WESI, LLC v. Compass Envtl., Inc.*,
   509 F. Supp. 2d 1353 (N.D. Ga. 2007) ............................................64

*White v. Wachovia Bank, N.A.*,
   563 F. Supp. 2d 1358 (N.D. Ga. 2008) ...................................... passim

*Ziemba v. Cascade Int'l, Inc.*,
   256 F.3d 1194 (11th Cir. 2001) ..................................................91

## STATE CASES

*Advanced Enters. Recycling, Inc. v. Bercaw*,
   869 A.2d 468 (N.J. Super. Ct. 2005) ..............................................63

*Aron v. U-Haul Co. of Cal.*,
    143 Cal. App. 4th 796 (2006) ........................................................................81, 82

*Automatic Sprinkler Corp. of Am. v. Anderson*,
    243 Ga. 867 (1979) ....................................................................................45

*Badgett v. Security State Bank*,
    116 Wash. 2d 563 (1991)............................................................................44

*Bd. of Comm'rs, San Miguel County v. People's Bank & Trust Co.*,
    279 P. 60 (N.M. 1929) ..............................................................................63

*Belford Trucking Co. v. Zagar*,
    243 So. 2d 646 (Fla. Ct. App. 1970)..................................................63, 64, 65

*Berry v. Am. Express Publ'g, Inc.*,
    147 Cal. App. 4th 224 (2007) ......................................................................83

*Best v. United States Nat'l Bank of Oregon*,
    714 P.2d 1049 (Or. Ct. App. 1986), *aff'd*, 303 Or. 557 (1987) .........................56, 58

*BMW Fin. Servs., N.A., Inc. v. Smoke Rise Corp.*,
    486 S.E.2d 629 (Ga. Ct. App. 1997)..............................................................58

*Bomhoff v. Nelnet Loan Services, Inc.*,
    279 Kan. 415 (2005) ..................................................................................73

*Boswell v. Zephyr Lines, Inc.*,
    606 N.E.2d 1336 (Mass. 1993) ....................................................................66

*Brown v. Wells Fargo Bank, N.A.*,
    168 Cal. App. 4th 938 (2008) ......................................................................57

*Buckland v. Threshold Enters., Ltd.*,
    155 Cal. App. 4th 798 (2007) ......................................................................76

*Bus. Cabling, Inc. v. Yokeley*,
    643 S.E. 2d 63 (N.C. App. 2007), *rev. denied*, 650 S.E.2d 599 (2007).................77

*Cal. Grocers Ass'n, Inc. v. Bank of Am., Nat'l Trust & Sav. Ass'n*,
    22 Cal. App. 4th 205 (1994) ..................................................................57, 58

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
    20 Cal. 4th 163 (1999) ..........................................................................73, 84

*Cheshire Mortg. Serv. v. Montes*,
    612 A.2d 1130 (Conn. 1992) ......................................................................79

*Chesnut v. Progressive Cas. Ins. Co.,*
  850 N.E.2d 751 (Ohio Ct. App. 2006) ...................................................................70

*Chicago Title Ins. Co. v. Ellis,*
  978 A.2d 281 (N.J. Super. Ct. 2009) ....................................................................64

*Cirrincione v. Johnson,*
  703 N.E.2d 67 (Ill. 1998) .....................................................................................61

*Citizens First Bank v. Intercontinental Express, Inc.,*
  713 P.2d 1097 (Or. App. 1986)............................................................................40

*Collums ex rel. Collums v. Union Planters Bank, N.A.,*
  832 So. 2d 572 (Miss. Ct. App. 2002) .................................................................63

*Cordova v. World Fin. Corp. of New Mexico,*
  208 P.3d 901 (N.M. 2009) ...................................................................................57

*Corp. Comm'n of N.C. v. Merchs. Bank & Trust Co.,*
  138 S.E. 22 (N.C. 1927).................................................................................62, 63

*Daniels v. PNC Bank, N.A.,*
  738 N.E.2d 447 (Ohio App. 2000)..........................................................49, 51, 60

*Daugherty v. Am. Honda Motor Co., Inc.,*
  144 Cal. App. 4th 824 (2006) ..............................................................................84

*Dep't of Motor Vehicles v. Mercedes-Benz of N. Am., Inc.,*
  408 So. 2d 627 (Fla. App. 1981)..........................................................................36

*Deposit Guar. Nat'l Bank v. B.N. Simrall & Son Inc.,*
  524 So. 2d 295 (Miss. 1988)................................................................................62

*Eller v. NationsBank of Tex., N.A.,*
  975 S.W.2d 803 (Tex. Ct. App. 1998) .................................................................43

*Erwin v. Cotter Health Ctrs.,*
  167 P.3d 1112 (Wash. 2007)..........................................................................37, 40

*Farmers Ins. Exch. v. Zerin,*
  53 Cal. App. 4th 445 (1997) ................................................................................64

*Feitler v. The Animation Celection, Inc.,*
  170 Or. App. 702 (2000).......................................................................................74

*Fetter v. Wells Fargo Bank Tex., N.A.,*
  110 S.W.3d 683 (Tex. App. 2003)............................................................... passim

*Fortune Prod. Co. v. Conoco, Inc.*,
    52 S.W.3d 671 (Tex. 2000)................................................................66

*Fuller v. XTO Energy, Inc.*,
    989 So. 2d 298 (La. Ct. App. 2008)....................................................64

*Gossels v. Fleet Nat'l Bank*,
    902 N.E.2d 370 (Mass. 2009)............................................................63

*Graham v. State Farm Mut. Auto. Ins. Co.*,
    565 A.2d 908 (Del. 1989)..................................................................46

*Gray v. N.C. Ins. Underwriting Ass'n*,
    529 S.E.2d 676 (N.C. 2000)..............................................................79

*Green Prop. Corp. v. O'Callaghan, Saunders & Stumm, P.C.*,
    340 S.E.2d 652 (Ga. Ct. App. 1986)..................................................63

*Gregory v. Albertson's, Inc.*,
    104 Cal. App. 4th 845 (2002)............................................................79

*Haeger v. Johnson*,
    25 Or. App. 131 (1976).....................................................................84

*Hernandez v. Wells Fargo Bank New Mexico, N.A.*,
    139 N.M. 68 (2005)....................................................................60, 82

*Hill v. St. Paul Fed. Bank for Sav.*,
    768 N.E.2d 322 (Ill. App. 2002) ........................................49, 50, 74, 80

*Hills v. Snell*,
    104 Mass. 173, 1870 WL 6822 (Mass. 1870)....................................64

*Houston Nat'l Bank v. Biber*,
    613 S.W.2d 771 (Tex. Ct. App. 1981)..........................................62, 64

*Hunt v. First Nat'l Bank of Halfway*,
    202 P. 564 (Or. 1921).......................................................................64

*In re Halliburton Co.*,
    80 S.W.3d 566 (Tex. 2002)...............................................................57

*In re Liquidation of Canal Bank & Trust Co.*,
    160 So. 609 (La. 1935).....................................................................62

*In re Thebus*,
    483 N.E.2d 1258 (Ill. 1985)..............................................................63

*In re Title U.S.A. Ins. Corp.*,
    36 Cal. App. 4th 363 (1995) ...................................................................39

*In re Wittenbrink*,
    849 So. 2d 18 (La. 2003) ........................................................................63

*Internal Med. Alliance, LLC v. Budell*,
    659 S.E.2d 668 (Ga. Ct. App. 2008) ......................................................64

*Island Mortgages of N.J. v. 3M*,
    860 A.2d 1013 (N.J. Sup. Ct. Law Div. 2004) .......................................82

*Johnson v. Barton*,
    83 So. 722 (Fla. 1920)..............................................................................62

*Kaskin v. John Lynch Chevrolet-Pontiac Sales, Inc.*,
    767 N.W.2d 394 (Wis. 2009) ..................................................................78

*Katz v. Belmont Nat'l Bank of Chicago*,
    491 N.E.2d 1157 (Ill. 1986) ....................................................................62

*Ken Hood Constr. v. Pac. Coast Constr., Inc.*,
    120 P.3d 6 (Or. Ct. App. 2005)................................................................66

*Krause v. GE Capital Mtg. Servs.*,
    731 N.E.2d 302 (Ill. App. 2000) .............................................................78

*Kronemeyer v. U.S. Bank Nat'l Ass'n*,
    857 N.E. 2d 686 (Ill. App. 2006) .......................................................25, 33

*La. State Bar Ass'n v. Hinrichs*,
    486 So. 2d 116 (La. 1986) .......................................................................61

*Laighton v. Brookline Trust Co.*,
    114 N.E. 671 (Mass. 1917) ......................................................................62

*Lamm v. AMFAC Mortgage Corp.*,
    44 Or. App. 203 (1980)............................................................................84

*LaPlace v. Briere*,
    962 A.2d 1139 (N.J. Super. Ct. 2009) .....................................................61

*Lawrence v. Bank of Am.*,
    163 Cal. App. 2d 431 (1985) ...................................................................63

*Lazar v. Hertz Corp.*,
    69 Cal. App. 4th 1494 (1999) ..................................................................73

*Lee Tung v. Burkhart*,
    116 P. 1066 (Or. 1911) ..................................................................................61

*Lohman v. Daimler-Chrysler Corp.*,
    142 N.M. 437 (N.M. Ct. App. 2007) .........................................................77

*Madden v. Kaiser Found. Hosps.*,
    17 Cal. 3d 699 (1976) ................................................................................78

*Maurello v. Broadway Bank & Trust Co.*,
    176 A. 391 (N.J. 1935) ..............................................................................62

*McFoy v. Amerigas*,
    295 S.E.2d 16 (W. Va. 1982) ....................................................................75

*McGregor v. Battle*,
    58 S.E. 28 (Ga. 1907).................................................................................62

*McInerney v. Pinehurst Area Realty, Inc.*,
    162 N.C. App. 285 (2004) ..........................................................................78

*Metro. Life Ins. Co. v. S.F. Bank*,
    58 Cal. App. 2d 528 (1943) .......................................................................62

*Miller v. Bank of Am., N.T. & S.A.*,
    46 Cal. 4th 630 (2009) ..............................................................................18

*Mine Supply, Inc. v. Elayer Co. Inc.*,
    411 P.2d 354 (N.M. 1966) ...................................................................61, 64

*Muhammad v. County Bank of Rehoboth Beach, Del.*,
    189 N.J. 1 (2006) .......................................................................................57

*N. Houston Int'l, L.L.C. v. PW Real Estate Invs., Inc.*,
    2003 WL 22453796 (Tex. Ct. App. Oct. 30, 2003) ..................................64

*Nat'l Fin. Servs., LLC v. Mahan*,
    19 So. 3d ...................................................................................................57

*Novell v. Migliaccio*,
    309 Wis. 2d 132 (2008) .............................................................................77

*Pac. First Bank v. New Morgan Park Corp.*,
    319 Or. 342 (1994)....................................................................................44

*Parker v. E.I. DuPont de Nemours & Co., Inc.*,
    121 N.M. 120 (N.M. Ct. App. 1995) .........................................................77

*Parks v. Ricciardi*,
   2005 Mass. App. Div. 107 (2005) ..................................................................................85

*PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro LLP*,
   150 Cal. App. 4th 384 (2007) .....................................................................................61

*Peed v. Burleson's Inc.*,
   94 S.E.2d 351 (N.C. 1956) ..........................................................................................61

*PMP Assoc., Inc. v. Globe Newspaper Co.*,
   321 N.E.2d 915 (Mass. 1975) .....................................................................................79

*Race v. Chandler*,
   15 Ill. App. 532, 1884 WL 10189 (1884) ..................................................................64

*Ramirez v. Health Net of Ne., Inc.*,
   938 A.2d 576 (Conn. 2008) .........................................................................................78

*Razor v. Hyundai Motor Am.*,
   222 Ill. 2d 75 (2006) ...................................................................................................57

*Reinisch v. Consol. Nat'l Bank*,
   45 Pa. Super. 236, 1911 WL 4366 (Mar. 3, 1911) ....................................................47

*Riddle v. Star Bank*,
   No. 98-CI-4098 (Ky. Cir. Ct. Mar. 19, 1999) ...........................................................49

*Robinson v. Toyota Motor Credit Corp.*,
   775 N.E.2d 951 .............................................................................................................78

*Rohrer v. Knudson*,
   203 P.3d 759 (Mont. 2009) ..........................................................................................79

*Sanders v. Colonial Bank of Alabama*,
   551 So. 2d 1045 (Ala. 1989) .......................................................................................56

*Sands v. Ticketmaster-N.Y., Inc.*,
   207 A.D. 2d 687 (N.Y. Sup. Ct. 1994) ......................................................................75

*Saunders v. Mich. Ave. Nat'l Bank*,
   662 N.E.2d 602 (Ill. App. 1996) .......................................................................... passim

*Schnall v. Hertz Corp.*,
   78 Cal. App. 4th 1144 (2000) ......................................................................................79

*Searcy v. Bend Garage Co.*,
   286 Or. 11 (1979) ........................................................................................................74

*Senfeld v. Bank of Nova Scotia Trust Co. (Cayman) Ltd.*,
    450 So. 2d 1157 (Fla. Ct. App. 1984) ....................................................................61

*Sepe v. City of Safety Harbor*,
    761 So. 2d 1182 (Fla. Ct. App. 2000) ...................................................................45

*Smith v. First Union Nat'l Bank*,
    958 S.W.2d 113 (Tenn. Ct. App. 1997) ....................................................49, 51, 73

*Smoot v. Physicians Life Ins. Co.*,
    135 N.M. 265 (2003) .............................................................................................76

*Sprague v. Quality Rests. Nw., Inc.*,
    162 P.3d 331 (Or. Ct. App. 2007) ........................................................................57

*Spring v. Geriatric Auth. of Holyoke*,
    475 N.E.2d 727 (Mass. 1985) ..............................................................................84

*State Farm Mut. Auto. Ins. Co. v. Roach*,
    945 So. 2d 1160 (Fla. 2006) .................................................................................39

*State of Kan. ex rel. Stovall v. DVM Enter.*,
    275 Kan. 243 (2003) ........................................................................................81, 82

*State Sur. Co. v. Lensing*,
    249 N.W. 2d 608 (Iowa 1977) .............................................................................69

*State v. Tauscher*,
    360 P.2d 764 (Or. 1961) .......................................................................................62

*Stephens v. PNC Bank of Ky., Inc.*,
    No. 98-CI-04051 (Ky. Cir. Ct. Oct. 20, 1998) ....................................................50

*Stevenson v. Louis Dreyfus Corp.*,
    112 N.M. 97 (1991) ..............................................................................................77

*Struna v. Convenient Food Mart*,
    160 Ohio App. 3d 655 (2005) ..............................................................................78

*Subaru v. David McDavid Nissan, Inc.*,
    84 S.W.3d 212 (Tex. 2002) ..................................................................................43

*Sunwest Bank of Albuquerque v. Colucci*,
    872 P.2d 346 (N.M. 1994) ....................................................................................62

*Super Glue Corp. v. Avis Rent A Car Sys., Inc.*,
    159 A.D.2d 68 (N.Y. App. 1990) .........................................................................74

*Swanson v. Bankers Life Co.*,
   450 N.E.2d 577 (Mass. App. Ct. 1983) ................................................................78

*Sweeney v. DeLuca*,
   2006 WL 936688 (Mass. Super. Ct. Mar. 16, 2006) ..........................................61, 64

*Textron Fin. Corp. v. Nat'l Union Fire Ins. Co.*,
   118 Cal. App. 4th 1061 (2004) ............................................................................79

*Third Story Music, Inc. v. Waits*,
   41 Cal. App. 4th 798 (Cal. Ct. App. 1995) ..........................................................44

*Tillman v. Commercial Credit Loans, Inc.*,
   362 N.C. 93 (2008) ..............................................................................................57

*Tolbert v. First Nat'l Bank*,
   312 Or. 485 (1991) ..........................................................................................45, 46

*Transamerica Ins. Co. v. United States Nat'l Bank*,
   558 P.2d 328 (Or. 1976) ......................................................................................63

*Unified Servs., Inc. v. Home Ins. Co.*,
   460 S.E.2d 545 (Ga. Ct. App. 1995) ....................................................................61

*Upper Valley Aviation, Inc. v. Mercantile Nat'l Bank*,
   656 S.W.2d 952 (Tex. Ct. App. 1983) ..................................................................63

*Vannoy v. Capital Lincoln-Mercury Sales*,
   88 Ohio App. 3d 138 (1993) ................................................................................83

*Victor G. Reiling Assocs. & Design Innov., Inc. v. Fisher Price, Inc.*,
   406 F. Supp. 2d 175 (N.D. Conn. 2005) ..............................................................70

*Waisath v. Lack's Stores, Inc.*,
   474 S.W.2d 444 (Tex. 1971) ................................................................................61

*Walker v. Brown*,
   501 So. 2d 358 (Miss. 1987) ................................................................................61

*Wash. Mut. Bank, FA v. Super. Court of Orange County*,
   24 Cal. 4th 906 (2001) ........................................................................................36

*West v. West*,
   891 So. 2d 203 (Miss. 2004) ................................................................................57

*Whitfield v. Gilchrist*,
   497 S.E.2d 412 (N.C. 1998) ................................................................................66

*Whitney Nat'l Bank v. Reliable Mailing & Printing Servs., Inc.,*
    694 So. 2d 479 (La. Ct. App. 1997)......................................................49

*Wil-Roye Invest. Co. II v. Wash. Mut. Bank, F.A.,*
    142 S.W.3d 393 (Tex. Ct. App. 2004) ..................................................43

*Winslow v. Corp. Express, Inc.,*
    834 A.2d 1037 (N.J. Super. Ct. 2003) .................................................65

*Wood Indus. Corp. v. Rose,*
    530 P.2d 1245 (Or. 1975) ......................................................................64

*Young v. Mobil Oil Corp.,*
    735 P.2d 654 (Or. App. 1987)...............................................................37

## STATUTES

12 U.S.C. § 21 *et seq.*...........................................................................15, 19, 83

12 U.S.C. § 24(Seventh) ............................................................... passim

12 U.S.C. § 93a .......................................................................................21

13 Pa. Cons. Stat. § 4303 .......................................................................47

15 U.S.C. § 1693 *et seq.*......................................................................16, 48

15 U.S.C. § 4301 *et seq.*............................................................................16

15 U.S.C. §§ 45(a)(2), 57a .....................................................................16

810 Ill. Comp. Stat. Ann. 5/4-303........................................................47, 48

815 Ill. Comp. Stat. Ann. 505/10b(1) ..................................................73

Ala. Code § 7-4-303................................................................................47

Alaska Stat. § 45.04.303 .........................................................................47

Ariz. Rev. Stat. Ann. § 47-4303.............................................................47

Ark. Code Ann. § 4-4-303 ......................................................................47

Cal. Bus. & Prof. Code § 17200 ............................................................84

Cal. Civ. Code § 1670.5..........................................................................55, 57

Cal. Civ. Code § 1782 ................................................................................................................84

Cal. Com. Code § 4303 ..................................................................................................47, 48, 54

Colo. Rev. Stat. Ann. § 4-4-403 ..................................................................................................47

Conn. Gen. Stat. Ann. § 42-110a(4) ............................................................................................70

Conn. Gen. Stat. Ann. § 42-110b .................................................................................................70

Conn. Gen. Stat. Ann. § 42-110c(a) .............................................................................................73

Conn. Gen. Stat. Ann. § 42-110g .................................................................................................70

Conn. Gen. Stat. Ann. § 42a-4-303 ..............................................................................................47

D.C. Code § 28:4-303 ...................................................................................................................47

Del. Code Ann. tit. 6, § 4-303 ......................................................................................................47

Fla. Stat. Ann. § 647.303 .......................................................................................................47, 48

Ga. Code Ann. § 11-4-303 .....................................................................................................47, 48

Haw. Rev. Stat. Ann. § 490:4-303 ...............................................................................................47

Idaho Code Ann. § 28-4-303 ........................................................................................................47

Ind. Code Ann. § 26-1-4-303 .......................................................................................................47

Iowa Code Ann. § 554.4303 .........................................................................................................47

Kan Stat. Ann. § 84-4-303 ...........................................................................................................47

Kan. Stat. Ann. §§ 50-623 *et seq* ..............................................................................................70

Ky. Rev. Stat. Ann. § 355.4-303 ..................................................................................................47

La. Rev. Stat. Ann. § 10:4-303 ...............................................................................................47, 48

Mass. Gen. Laws Ann. ch. 106, § 4-303 ................................................................................47, 48

Mass. Gen. Laws Ann. ch. 93A, § 3 .............................................................................................73

Mass. Gen. Laws Ann. ch. 93A, § 9(3) ........................................................................................84

Md. Code Ann. Com. Law § 4-303 ..............................................................................................47

Me. Rev. Stat. Ann. 11 § 4-303 ....................................................................................................47

Mich. Comp. Laws Ann. § 440.4303 ..................................................................47

Minn. Stat. Ann. § 336.4-303 ..........................................................................47

Minn. Stat. Ann. § 8.31 ..............................................................................74, 86

Miss. Code Ann. § 75-4-303 .........................................................................47, 48

Mo. Rev. Stat. § 400.4-303 ............................................................................47

Mont. Code Ann. § 30-14-101 ..........................................................................85

Mont. Code Ann. § 30-14-133(1) ......................................................................85

Mont. Code Ann. § 30-4-303 ............................................................................47

Mont. Code Ann. §§ 30-14-201, *et seq.* ..............................................................86

N.C. Gen. Stat. Ann. § 25-4-303 ....................................................................47, 48

N.D. Cent. Code § 41-04-31 ............................................................................47

N.H. Rev. Stat. Ann. § 382-A:4-303 ..................................................................47

N.J. Stat. Ann. § 12A:4-303 .........................................................................47, 48

N.M. Stat. Ann. § 57-12-2 .......................................................................81, 82, 86

N.M. Stat. Ann. § 57-12-7 ..............................................................................73

N.M. Stat. Ann. § 55-4-303 .........................................................................47, 48

N.Y. Gen. Bus. Law § 349 ..................................................................70, 73, 74, 75

N.Y. U.C.C. Law § 4-303 ...............................................................................47

Neb. Rev. Stat. Ann. § 4-303 ...........................................................................47

Nev. Rev. Stat. § 104.4303 .............................................................................47

Ohio Rev. Code Ann. § 1304.29 .........................................................................47

Ohio Rev. Code Ann. § 1345.01(A) .....................................................................83

Ohio Rev. Code Ann. § 1345.03(B) .....................................................................81

Ohio Rev. Code Ann. § 1345.04 .........................................................................70

Ohio Rev. Code Ann. § 1345.12(A) .....................................................................73

Okla. Stat. Ann. 12A § 4-303 ................................................................47

Or. Rev. Stat. Ann § 646.608 ..............................................................86

Or. Rev. Stat. Ann. § 646.638 ........................................................74, 86

Or. Rev. Stat. Ann. § 74.3030 ......................................................47, 48

R.I. Gen. Laws § 6A-4-303 ..................................................................47

S.C. Code Ann. § 36-4-303 ..................................................................47

S.D. Codified Laws § 57A-4-303 ........................................................47

Tenn. Code Ann. § 47-4-303 ................................................................47

Tex. Bus. & Com. Code Ann. § 1.304 ..................................................43

Tex. Bus. & Com. Code Ann. § 4-303 ............................................47, 48

UCC § 4-103(a) ......................................................................................47, 54

UCC § 4-303 ................................................................................ passim

UCC § 4A-108 ......................................................................................48

UCC § 4A-504(a) ..............................................................................14, 48

UCC Art. 3 ............................................................................................48

Utah Code Ann. § 70A-4-303 ..............................................................47

Va. Code Ann. § 8.4-303 ......................................................................47

Vt. Stat. Ann. 9A, § 4-303 ....................................................................47

W. Va. Code Ann. § 46-4-303 ..............................................................47

W. Va. Code Ann. § 46A-1-104 ............................................................70

W. Va. Code Ann. § 46A-6-102 ......................................................74, 86

W. Va. Code Ann. § 46A-6-106(a)-(b) ..................................................84

Wash. Rev. Code Ann. § 62A.4-303 ................................................47, 48

Wash. Rev. Code Ann. § 19.86.170 ......................................................73

Wis. Stat. Ann. § 100.20(5) ............................................................77, 86

Wis. Stat. Ann. § 404.303 ...................................................................................47

Wis. Stat. Ann. § 93.01(1m) ................................................................................83

Wyo. Stat. Ann. § 34.1-4-303 ..............................................................................47


**OTHER AUTHORITIES**

1 Arthur L. Corbin, Corbin on Contracts § 1.20 ..................................................65

12 C.F.R. § 560.2 ..................................................................................................28

12 C.F.R. § 7.4002 ........................................................................................ passim

12 C.F.R. § 7.4007 ........................................................................................ passim

12 C.F.R. § 7.4008 ................................................................................................28

12 C.F.R. §7.4009 .................................................................................20, 26, 27

12 C.F.R. pt. 230.4(b)(4) ......................................................................................17

12 C.F.R. pt. 230, Supplement .............................................................................17

23 Williston on Contracts § 63:22 (4th ed.) .........................................................44

34 Fed. Reg. 2002 (Jul. 1, 1969) ..........................................................................16

66 Am. Jur. 2d § 24 ..............................................................................................65

67 Fed. Reg. 72,618 (Dec. 6, 2002) .....................................................................16

68 Fed. Reg. 16,185 (Apr. 3, 2003) ......................................................................16

69 Fed. Reg. 1904 (Jan. 13, 2004) ........................................................................27

69 Fed. Reg. 31,760 (Jun. 7, 2004) .......................................................................16

70 Fed. Reg. 29,582 (May 24, 2005) ...............................................................16, 17

70 Fed. Reg. 9127 (Feb. 24, 2005) ...................................................................16, 17

73 Fed. Reg. 28,904 (May 19, 2008) .............................................................9, 16, 17

74 Fed. Reg. 5212 (Jan. 29, 2009) ........................................................................16

74 Fed. Reg. 5498 (Jan. 29, 2009) .......................................................10, 16, 17, 48

74 Fed. Reg. 5584 (Jan. 29, 2009) ...........................................................................16

74 Fed. Reg. 59,033 (Nov. 17, 2009)........................................................................17

Fed. R. Civ. P. 8 ............................................................................................... passim

Fed. R. Civ. P. 9(b) ...................................................................................75, 91

Fed. R. Civ. P. 12(b)(1)...........................................................................90

Fed. R. Civ. P. 12(b)(6)..................................................................................... passim

Fed. R. Civ. P. 12(c) ...............................................................................1, 6, 18, 19

Fed. R. Civ. P. 12(f) ...................................................................................89, 96

OCC Interp. Ltr. 464, 1989 WL 451287 (Dec. 14, 1988)...........................................63

OCC Interp. Ltr. 916, 2001 WL 1285359 (May 22, 2001)..........................................22

OCC Interp. Ltr. 997, 2002 WL 32639293 (April 15, 2002).................................. passim

OCC Interp. Ltr. 1082, 2007 WL 3341502 (May 17, 2007)........................................23

Restatement (First) of Restitution § 107 .....................................................................65

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

Bank of America, N.A. ("Bank of America"), Citibank, N.A. ("Citibank"), JPMorgan Chase Bank, N.A. ("Chase"), Union Bank, N.A. ("Union"), U.S. Bank, N.A. ("U.S. Bank"), Wachovia Bank, N.A. ("Wachovia"), and Wells Fargo Bank, N.A. ("Wells Fargo") hereby move, pursuant to Fed. R. Civ. P. 12(b)(6) and 12(c), for dismissal or judgment on the pleadings on each of the thirteen actions against these defendants in this Multidistrict Litigation ("MDL") proceeding.

In their complaints in these cases, plaintiffs seek to challenge the order in which each of the defendant banks posts transactions to its customers' checking accounts, alleging that the practice improperly increases the fees customers are charged when they overdraft their accounts. The "high to low" posting practice that plaintiffs seek to challenge here is not new – either to the banking industry or to the laws that regulate it. Indeed, the discretion of banks to post transactions in the manner they do has been explicitly recognized for years under both federal and state law. Moreover, each defendant bank explicitly addresses the issue by contract in its account agreements with its customers.

As demonstrated in this Motion, each of the complaints against these defendants fails in its entirety, on multiple grounds.

First, all of plaintiffs' claims are barred by federal preemption. (*See* pp. 19-34 below.) These seven defendants are all national banks, chartered by the federal government pursuant to the National Bank Act. And it is black-letter law that the activities of national banks in conducting the "business of banking" are subject to *exclusive* federal regulation. State law may not be applied to regulate, limit, or condemn such activities. Indeed, the Supreme Court has repeatedly identified regulation of national banks as one of the few areas in which preemption of

1

state law is *presumed*.  *See, e.g.*, *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 32 (1996).

All of plaintiffs' claims are brought under state law; no federal causes of action are asserted.  Plaintiffs' claims are accordingly barred in their entirety by federal preemption.

This is not an issue of first impression.  In multiple opinions issued over the past century (including as recently as 2007), the Supreme Court has repeatedly confirmed the broad scope of federal preemption to shield the banking activities of national banks from the application of state law.  Moreover, the Office of the Comptroller of the Currency ("OCC"), as the regulatory agency charged with implementing the National Bank Act, has promulgated a binding regulation confirming that the federally authorized "powers" of national banks include the calculation and assessment of non-interest fees such as overdraft fees.  The OCC's authoritative interpretations of that regulation have explicitly addressed a national bank's selection of a high-to-low posting order and the impact of that practice on overdraft fees, confirming that those activities fall squarely within the national banking powers that are protected from state regulation.  The application of federal preemption to the activities at issue here is further confirmed in the OCC's preemption regulations.

Based upon these principles, numerous courts have applied preemption to dismiss claims similar to those asserted here.  This Court should do the same.

Wholly apart from the preemption bar, plaintiffs' state-law claims fail as a matter of state law.  Plaintiffs' first claim in each complaint is for breach of contract – a paradoxical choice in light of the fact that every single one of plaintiffs' contracts with their banks explicitly authorizes the bank to post from highest amount to lowest and provides for the assessment of fees for overdrafts.  (*See* pp. 40-42.)  Plaintiffs do not – and cannot – claim that defendants' conduct is inconsistent with those provisions.  Rather, plaintiffs appear to be asserting that the

contracts do not mean what they say, that they should be interpreted as imposing an obligation on the banks to follow rules that are *different* from what the contracts provide, and that defendants are in breach of those imaginary rules.  The law of contract recognizes no such contorted claim.

Plaintiffs base their contract theory on the implied covenant of good faith and fair dealing, asserting that it should be applied to preclude defendants from using a high-to-low posting order.  But the common law covenant of good faith and fair dealing cannot be asserted to vary an express term of a contract.  It is a tool used to interpret the terms of a contract, not an instrument for creating brand-new terms in direct conflict with what the contract actually says. (*See* pp. 42-46.)

Nor may the implied covenant be invoked to preclude a party from doing that which the law explicitly authorizes.  Here, the Uniform Commercial Code authorizes all banks (and not just national banks like these defendants) to post debit transactions in any order, recognizing high-to-low as a permissible posting order.  Federal regulators, sharing the understanding of the UCC drafters that there is no posting order that is inherently preferable in all circumstances, have similarly recognized the validity of high-to-low posting.  Under these circumstances, a court may not properly intercede to insert into these contracts a limitation that is contrary to both the letter of the contracts and the underlying law.  (*See* pp. 46-49.)

These plaintiffs are not the first to claim that overdraft fees, or the methods through which they are calculated (including posting order), violate the covenant of good faith and fair dealing.  Such a claim has been made time and again.  And courts all over the country have rejected those efforts, time and again.  (*See* pp. 49-55.)

Most of the complaints also assert claims for unconscionability, for conversion, and for unjust enrichment.  As past courts have held in similar cases, those claims fail for the

same reasons as plaintiffs' contract claims:  the challenged practices are explicitly authorized in the parties' contracts, by the UCC, and by federal regulatory authorities.  Plaintiffs' "unconscionability" claims fail for the further reason that there is no such cause of action recognized under any state law; unconscionability is, rather, only a *defense* to a claim of breach of contract.  (*See* pp. 55-61.)  Plaintiffs' conversion claims fail for the additional reason that they have not pled (and cannot plead) the necessary elements of a conversion claim.  It is black-letter law, for example, that a depositor does not have title to money deposited in a bank account and may therefore not state a claim for conversion of account funds used to cover bank fees.  (*See* pp. 61-65.)  A claim for unjust enrichment may be asserted only where there is no contract governing the parties' relationship.  (*See* pp. 65-67.)

Plaintiffs' claims under various state consumer protection statutes also fail as a matter of law.  To begin with, plaintiffs' efforts to assert the laws of states in which no named plaintiff resides (and in which none of the purported wrongs are alleged to have occurred) fail at the threshold.  Such extraterritorial application of laws with no meaningful connection to the plaintiffs' alleged injuries is barred by the Constitution, by the statutes themselves, and by the parties' contracts.  (*See* pp. 68-72.)

As to substance, all of plaintiffs' statutory claims fail for the same fundamental reason as their common law claims:  the statutes of every state (as well as federal law) expressly *authorize* banks to post transactions in an order convenient to them.  Other statutes of those same states cannot reasonably be interpreted as condemning that same conduct.  Plaintiffs' statutory claims also fail for multiple other reasons that vary from state to state.  For example, several statutes apply only to misrepresentations and other deceptive conduct, which plaintiffs have not alleged.  Those statutes that do apply to conduct that is instead alleged to be "unfair" or "unconscionable" would not condemn the conduct at issue here.  Several statutes explicitly

exclude banking transactions or transactions involving only payments of money.  Others have pre-lawsuit notice requirements with which plaintiffs failed to comply or other statutory requirements that they have ignored.  (*See* pp. 72-87.)

Finally, insofar as plaintiffs rest their complaints on shotgun pleading – throwing out a wide variety of conclusory allegations about supposed practices of these banks that have nothing to do with the actual alleged injuries of the plaintiffs themselves – the Court should reject that effort out of hand.  (*See* pp. 87-96.)  Even if these plaintiffs had standing to complain about alleged abstract wrongs committed by these defendants that had no impact on them – which, as a constitutional matter, they do not – the conclusory allegations of the complaints on these subjects would fall far short of those required to plead a cause of action under any rubric.

In sum, each and every one of the claims in these thirteen complaints fails as a matter of law for multiple independent reasons.  All thirteen complaints should be dismissed in their entirety or judgment granted on the pleadings.

## II.     STATEMENT OF THE CASE

The seven banks on whose behalf this Motion is filed are defendants in thirteen lawsuits that are being coordinated in this MDL proceeding.  Each of the complaints in these lawsuits is filed against only one of the seven banks.

Collectively, the complaints at issue here involve plaintiffs from fourteen states who purport to assert claims under the laws of twenty-one states.[1]  (None of the complaints asserts claims arising under any federal law.)  The claims purportedly arise under state common law and under statutes of various states.  There are no causes of action that are asserted against

---

[1] As originally filed, the complaints implicated the laws of twenty-two states.  However, plaintiffs have now voluntarily dismissed (from the *Lopez* case) the sole Indiana plaintiff in any of the cases.  This Motion accordingly does not address Indiana law, which none of the complaints otherwise purports to invoke.

all seven of these defendants under the laws of any single state.  Notwithstanding this immense

diversity of claims, counsel for these seven defendant banks have coordinated their arguments

under Fed. R. Civ. P. 12(b)(6) and 12(c) as to all thirteen complaints so as to present them to the

Court in consolidated briefing.[2]

### A.      Procedural Background

The thirteen lawsuits addressed in this omnibus motion were originally filed in

multiple jurisdictions across the country.  The cases not originally filed in this District have been

transferred here pursuant to orders of the Judicial Panel on Multidistrict Litigation ("JPML").

Five of the thirteen complaints were filed by California plaintiffs seeking to

represent classes of California customers.  These are:

- *Amrhein v. Citibank, N.A.*, No. 1:09-cv-21681-JLK ("*Amrhein*");[3]

- *Luquetta v. JPMorgan Chase Bank, N.A.*, No. 1:09-cv-23432-JLK ("*Luquetta*");

- *Spears-Haymond v. Wachovia Bank, N.A.*, No. 1:09-cv-21680-JLK ("*Spears-Haymond*");

- *Waters v. U.S. Bank, N.A.*, No. 1:09-cv-23034-JLK ("*Waters*"); and

- *Yourke v. Bank of America, N.A.*, No. 1:09-cv-21963-JKL ("*Yourke*").

Six complaints were filed by non-California plaintiffs seeking to represent

nationwide classes that exclude California customers, together with (in some cases) subclasses

limited to residents of particular states:

- *Garcia v. Wachovia Bank, N.A.*, No. 1:08-cv-22463-JLK ("*Garcia*");

---

[2] There is considerable diversity in the actual practices of the defendant banks with respect to the matters addressed in the complaints.  However, those differences are not germane to the common legal issues addressed in this Motion, and the plaintiffs have largely ignored them in formulating their complaints.  There are a few individualized issues, such as arbitration rights, that certain individual banks will be presenting to the Court in separate motions.

[3] In this motion, each operative complaint is cited with the last name of the lead plaintiff, followed by "C" (or "AC," "SAC," etc. for amended complaints), and the pertinent paragraph or exhibit numbers.

- *Lopez v. JPMorgan Chase Bank, N.A.*, No. 1:09-cv-23127-JLK ("*Lopez*");

- *Speers v. U.S. Bank*, *N.A.*, No. 1:09-23126-JLK ("*Speers*");

- *Tornes v. Bank of America, N.A.*, No. 1:08-cv-23323-JLK ("*Tornes*");

- *Dolores Gutierrez v. Wells Fargo Bank, N.A.*, No. 1:09-cv-23685-JLK ("*Dolores Gutierrez*");[4] and

- *Martinez v. Wells Fargo Bank, N.A.*, No. _____ ("*Martinez*").[5]

In addition, one case, *Larsen v. Union Bank, N.A.*, No. 1:09-cv-23235-JLK ("*Larsen*"), was filed by a California plaintiff seeking to represent a nationwide class that *includes* California customers.  Another, *Zankich v. Wells Fargo Bank, N.A.*, No. 1:09-cv-23186-JLK ("*Zankich*"), was filed by Washington plaintiffs seeking to represent a Washington class.

Each of the complaints asserts claims against only one bank defendant.  None of the complaints suggests that any bank has liability for the challenged practices of any other bank. The cases are in that sense entirely distinct.

The operative complaints in these cases vary somewhat in the causes of action asserted, but all of the complaints allege causes of action for breach of contract and/or for breach of an implied covenant of good faith and fair dealing.  Most also assert causes of action for conversion, unconscionability, and/or unjust enrichment.  Finally, each complaint asserts one or more causes of action under the consumer protection laws of various states.  The specific statutes asserted vary from complaint to complaint, with no clear pattern.  In some instances, the statutes asserted are those of states in which named plaintiffs reside; but some complaints purport to present claims under statutes of states of which no plaintiff in that case is a resident.

---

[4] *Dolores Gutierrez* is referred to herein by both the first and last names of the plaintiff, to distinguish it from a different case brought by an unrelated plaintiff, *Gutierrez v. Wells Fargo Bank, N.A.*, No. CV-07-5923 WHA (N.D. Cal.), which is discussed below.

[5] The transfer of the *Martinez* case to this Court only recently became final, and it has not yet been assigned a Southern District of Florida case number.

Attached as an exhibit to this Motion is a table (Table A) that sets out, for each of the thirteen cases, each claim asserted in that case under each applicable state law.  Additional tables are provided in subsequent exhibits to assist the Court in reconciling the details of specific arguments to the individual complaints to which they pertain.

### B.    The Parties

Each of the defendants is a national bank, chartered by the federal government pursuant to the National Bank Act.[6]  Each of the named plaintiffs claims to be a current or former checking account customer of one of the seven defendant banks.  Each such plaintiff seeks to represent a nationwide and/or state class of customers who incurred allegedly excessive overdraft fees as a result of the order in which that bank posts transactions to its customers' accounts.  Thus, members of the proposed classes are typically defined as customers of a given bank who "incurred an overdraft fee as a result of [the bank's] practice of re-sequencing debit card transactions from highest to lowest."  *See, e.g.*, *Garcia* AC ¶ 22; *Amrhein* TAC ¶ 17; *Larsen* FAC ¶ 19; *Lopez* C ¶ 21; *Martinez* C ¶ 22; *Tornes* SAC ¶ 29; *Waters* SAC ¶ 19.

### C.    The Challenged Banking Practice

Plaintiffs assert that the posting order used by each defendant bank caused its customers to pay allegedly excessive overdraft fees for transactions made with debit cards.  The class definitions in these complaints, as well as the specific facts pled as to each named plaintiff, focus on defendants' practice of ordering certain transactions from highest amount to lowest when posting those transactions to a customer's account and the impact that this practice has on the overdraft fees the customer may be assessed on debit card transactions.

---

[6] The complaints explicitly allege that defendants are "national banks."  *See, e.g.*, *Tornes* SAC ¶ 27 (Bank of America); *Amrhein* TAC ¶ 15 (Citibank); *Lopez* C ¶ 19 (Chase); *Larsen* FAC ¶ 17 (Union); *Speers* C ¶ 14 (U.S. Bank); *Garcia* AC ¶ 20 (Wachovia); *Martinez* C ¶ 20 (Wells Fargo).

A debit card (sometimes referred to as a "check card" or an "ATM card") permits a bank customer to withdraw funds from his checking account at an ATM or to make purchases from a merchant.  *See, e.g*., *Tornes* SAC ¶ 42.[7]  Although debit cards often bear a "Visa" or "MasterCard" logo, they are not credit cards.  The customer is not sent a monthly bill to pay for purchases made with a debit card; rather, the purchase amount is deducted directly from the customer's checking account once the merchant presents the transaction to the bank for payment.[8]

An "overdraft" is created when the holder of a checking account spends more money than he has deposited in the account and the bank covers the difference.  For example, if a check is presented against insufficient funds and the bank exercises its discretion to pay the check instead of rejecting it, an overdraft is created.[9]  Similarly, if a customer uses his debit card for a purchase and there are insufficient funds in the account when the merchant presents the transaction to the bank for payment, the payment will result in an overdraft.  The defendant banks, like virtually all banks, charge fees for overdrafts.  Overdraft fees are typically assessed on a "per item" basis – that is, a separate fee is charged for each separate transaction that is paid against insufficient funds.  *See, e.g.*, *Tornes* SAC Ex. B at 9.  Each bank also charges fees –

---

[7] Where particular facts discussed here are alleged consistently by plaintiffs, citations are provided only to one or two sample complaints.

[8] *See Lopez* C Ex. A at 6; *Larsen* FAC Ex. A2 at 63; *Martinez* C Ex. A at 54.  Most (but not all) debit card transactions are "authorized" through an electronic query to the bank at the time of purchase.  *See, e.g.*, *Tornes* SAC ¶ 42.  However, the actual settlement and payment of the transaction is a separate step that occurs later (often days later), depending on when the merchant submits the transaction for payment.  *See Larsen* FAC Ex. A2 at 65; *Martinez* C Ex. A at 53; *see generally* 73 Fed. Reg. 28,904, 28,931 (May 19, 2008) ("[S]ettlement for signature-based transactions may take up to three days following authorization.").

[9] *See, e.g.*, *Lopez* C Ex. A at 4.  Banks exercise their discretion to pay items for which there are insufficient account funds as a service to customers.  However, customers have an obligation to keep track of the credits and debits to their accounts so as to avoid overdrafts.  *See, e.g.*, *id*. Ex. A at 2; *Martinez* C Ex. A at 10, 26.

typically in the same per-item amounts as overdraft fees – when checks are rejected for payment due to insufficient funds instead of paid into overdraft. *Id.* Such "returned item" fees are not at issue in these cases.[10]

Checks, debit card purchases, and most other transactions are not received by the bank for payment until sometime – often several days – after customers initiate them, and those transactions typically do not arrive for settlement in any particular coherent order. A bank must therefore adopt a set of standardized rules to sort the transactions that arrive for settlement each day and to post them to customers' accounts.[11] Plaintiffs here claim that the defendant banks have adopted ordering algorithms for the posting of debit card transactions to customers' accounts that result in more separate overdraft items – and hence more separate overdraft fees – than are appropriate. Specifically, plaintiffs challenge the common industry practice of ordering debit transactions submitted for payment on a given day from highest amount to lowest when posting them to a customer's account; this order, plaintiffs assert, can on some occasions cause a customer to be assessed more overdraft fees than would have been assessed had a different order been used. *E.g.*, *Tornes* SAC ¶¶ 51, 81-162; *Waters* SAC ¶¶ 72-90.

The connection between posting order and overdraft fees is neither immediate nor inevitable. Posting order cannot, by definition, cause an account to go into overdraft; rather, it can only – in certain specific circumstances – affect the number of separate items that are paid into overdraft. The allegedly "excess" fees that are the subject of plaintiffs' complaints can occur if the following chain of circumstances exists:

---

[10] Overdraft and/or returned item fees are sometimes referred to as "insufficient funds" or "NSF" fees.

[11] *See generally* 74 Fed. Reg. 5498, 5548 (Jan. 29, 2009) (discussing the complexity of payment processing and the need for financial institutions to adopt and apply posting rules).

- On a single business day, multiple debits (checks, debit card purchases, ATM withdrawals, etc.) are presented to the bank for payment from a particular account;

- The total dollar amount of the debits to be posted that day is more than the total available in the account, including any deposits that are also posted that day;

- The bank posts the debits, or some group of them, in order from highest amount to lowest;

- Two or more debit card transactions presented for payment that day post against insufficient funds and *might* result in overdraft fees;

- If the debits had instead been posted in a different order, fewer debit card transactions would have occasioned potential overdraft fees; and

- The "additional" overdraft fees potentially occasioned by the posting order were not subject to special rules exempting certain types of overdrafts from fees or to the bank's ceiling on overdraft fees.[12]

Notably, although all plaintiffs challenge the order in which their banks post transactions, they do not allege any "natural" ordering that banks must use in posting transactions to an account. Indeed, there is considerable variation among the complaints as to the alternative posting order that plaintiffs imply should be used for comparison purposes. In *Amrhein*, for example, the plaintiff alleges that Citibank charged him more overdraft fees on a given day when his transactions were posted from highest dollar amount to lowest than he would have been charged had those same transactions been posted from lowest amount to highest. *Amrhein* TAC ¶¶ 66-68. In *Larsen*, in contrast, the plaintiff implies that Union Bank should have posted his transactions in some form of "chronological" order based on when she initiated

---

[12] Even when all of these conditions exist, a customer will still not pay overdraft fees if there is a late deposit that the bank treats as retroactively "covering" overdrafts, if the bank subsequently reverses or waives the overdraft fees incurred, or if the customer is enrolled in the bank's overdraft protection program. The defendants encourage their customers to enroll in such programs, which cover overdrafts using other funding sources, such as a savings account or credit card. *See, e.g.*, *Tornes* SAC Ex. A at 20-21; *Lopez* C Ex. A at 4, 27.

the transactions.  *Larsen* FAC ¶ 70; *see also Zankich* C ¶ 29.[13]  The *Tornes* complaint against

Bank of America offers both "low to high" and "chronological" scenarios without offering any

basis for concluding that one is inherently superior to the other.  *See Tornes* SAC ¶¶ 81-162; *see*

*also Speers* C ¶¶ 69-72; *Lopez*  C ¶¶ 120-23.  The *Luquetta* complaint against Chase offers no

challenge to the order in which Chase posted the customer's debit card transactions, but instead

focuses on the treatment given a transaction that did not even involve a debit card.  *Luquetta*

FAC ¶¶ 94-95.  None of the complaints cites any statute, regulation, or contractual provision

stating that debit transactions must be posted in any particular order.

> **D.     Other General Allegations of the Complaints**

> In addition to the allegations about posting order, plaintiffs' complaints also recite

a laundry list of other alleged practices by the defendant banks that they consider to be

inappropriate.  *See, e.g.*, *Tornes* SAC ¶ 35; *Waters* SAC ¶ 25.  However, the class definitions

focus only on posting order as the challenged practice.  *See, e.g., Tornes* SAC ¶ 29; *Waters* SAC

¶ 19.  Moreover, the complaints do not allege that any of the named plaintiffs suffered any

identifiable harm from any other practice.[14]

> For example, plaintiffs assert, in conclusory fashion, that the defendants provide

inaccurate information to customers about their account balances.  *E.g.*, *Tornes* SAC ¶¶ 35(g),

60-61.  But none of the plaintiffs claims to have received such inaccurate balance information or

---

[13] It is unclear what these or other plaintiffs mean by "chronological" ordering, however.  They
do not appear to assert, for example, that a check should be included in the "chronology" as of
the date it was written by the customer rather than the date it is presented to the bank for
payment.  And the plaintiff in *Luquetta* appears to assert that a transaction she made using
Chase's bill-pay service should *not* have been posted to her account based on the date when she
initiated the transaction.  *See Luquetta* FAC ¶¶ 94-95.

[14] Most complaints assert that the dollar amounts of defendants' overdraft fees are excessive.
*E.g.*, *Tornes* SAC ¶ 35(i).  However, this appears to be an element of plaintiffs' challenge to the
total fee amounts that allegedly result from defendants' posting practices.

to have relied upon it to his or her detriment.  The concrete *factual* allegations offered in the complaints about specific bank practices that are alleged to have had an actual impact on the named plaintiffs focus instead on posting order.  *Compare, e.g.*, *id.* ¶ 35 *with id.* ¶¶ 80-162.

### E.       The Banks' Contracts with Their Customers

Each of the defendant banks has an account agreement that sets out the terms and conditions applicable to its customers' accounts.  Copies of the account agreements for these seven banks are attached as exhibits to the complaints, and plaintiffs do not dispute that these are binding contracts governing their accounts.[15]

Among the subjects addressed in each agreement is the bank's discretion to approve and pay transactions into overdraft and to assess associated fees.  Each account agreement explicitly addresses posting of transactions from highest amount to lowest.  *See Tornes* SAC Ex. A at 18-20, B at 9; *Amrhein* TAC Ex. A at 32; *Lopez* C Ex. A at 10-11; *Larsen* FAC Ex. A1 at 43; *Speers* C Ex. A at 11; *Garcia* AC Ex. A at 10; *Martinez* C Ex. A at 22, 26. Each agreement also discusses how overdrafts are created and the fees charged for overdraft items.  *See Tornes* SAC Exs. A at 19-20, B at 9; *Amrhein* TAC Ex. A at 32; *Lopez* C Ex. A at 10-11; *Larsen* FAC Ex. A1 at 43; *Speers* C Ex. A at 11; *Garcia* AC Ex. A at 10; *Martinez* C Ex. A at 26.[16]

### F.       Statutory and Regulatory Background

The banking practices at issue here have an extensive regulatory history. Overdraft fee policies in general, and posting practices in particular, have been the subject of

---

[15] *See Tornes* SAC Exs. A-C (Bank of America); *Amrhein* TAC Ex. A (Citibank); *Lopez* C Exs. A, B (Chase); *Larsen* FAC Ex. A1-2 (Union); *Waters* SAC Exs. A, B (U.S. Bank); *Garcia* AC Exs. A, B (Wachovia);  *Martinez* C Ex. A (Wells Fargo).

[16] In most cases, customers are also explicitly warned that high-to-low posting can result in higher overdraft fees than might result from other posting orders.  *See, e.g.*, *Martinez* C Ex. A at 22; *Tornes* SAC Ex. A at 18, 20.

extensive consideration and regulatory action over the years – action that is inconsistent with plaintiffs' claims here.[17]

### 1.      The Uniform Commercial Code

It has long been understood that all banks (and not just national banks like defendants) have wide discretion in determining the order in which they will post transactions to customers' accounts.  This subject is explicitly addressed in the Uniform Commercial Code ("UCC").

Since at least 1963, Article 4 of the UCC has provided that, in the absence of contrary contractual arrangements, a bank has discretion to post checks in any order it chooses.  The language currently appearing in the statutes of nearly every state provides that "items may be accepted, paid, certified, or charged to the indicated account of [the bank's] customer in any order."  UCC § 4-303(b).[18]  The official comment to this provision explains that there is no *a priori* rule that is preferable, that the account-holder bears responsibility for imposing conflicting demands on the bank to pay out more money than the account contains, and that the account-holder has no legitimate basis for complaint when the bank chooses a posting order – including one that serves its own interests – to deal with such conflicting payment orders:

> As between one item and another no priority rule is stated. This is
> justified because of the impossibility of stating a rule that would be
> fair in all cases, having in mind the almost infinite number of
> combinations of large and small checks in relation to the available
> balance on hand in the drawer's account; the possible methods of
> receipt; and other variables.  Further, the drawer has drawn all the

---

[17] This discussion provides a general overview of the pertinent regulatory environment and history.  Certain points discussed in this section, such as federal preemption under the National Bank Act and related regulations, as well as the Uniform Commercial Code provisions on posting order, are discussed in greater detail in the Argument below.

[18] Although section 4-303(b) specifically pertains to checks, the same principles apply to other debits as well.  *See, e.g.*, UCC § 4A-504(a).  These UCC provisions are discussed in greater detail at pp. 46-48 below.

checks, the drawer should have funds available to meet all of them
and has no basis for urging one should be paid before another….

UCC § 4-303, cmt. 7.

### 2.      Federal Regulation of National Banks

National banks are created by the federal government pursuant to the National

Bank Act, 12 U.S.C. § 21 *et seq.*  They are chartered and supervised exclusively by the OCC, a

division of the Treasury Department.  The OCC is responsible for interpreting and implementing

the National Bank Act, for supervising national banks, and for enforcing the statutory and

regulatory requirements to which those institutions are subject.  *NationsBank of N.C., N.A. v.*

*Variable Annuity Life Ins. Co*., 513 U.S. 251, 256 (1995) (citing 12 U.S.C. §§ 1, 26-27, 481).

The National Bank Act grants national banks extensive powers to conduct the

"business of banking," subject only to restrictions imposed by federal statute and the federal

bank regulatory agencies – and precluding regulation under state law.  12 U.S.C. § 24.

Implementing this statute, the OCC has adopted regulations governing the exercise by national

banks of their federal banking powers.  These regulations address, *inter alia*, the establishment

and implementation by a national bank of "non-interest fees," such as overdraft fees.  *See* 12

C.F.R. § 7.4002.

The OCC has explicitly recognized on more than one occasion that a national

bank's operational decisions in posting transactions to customers' accounts (including the chosen

order of posting), the creation of overdrafts, and the assessment of overdraft fees, are all within

the scope of the bank's federal powers.  For example, in its Interpretive Letter No. 997 (issued

April 15, 2002), the OCC stated that "the Banks are authorized, pursuant to section 24(Seventh)

of the National Bank Act and [the OCC's fee regulation], to charge [insufficient funds] fees that

result from the high-to-low order of check posting."  2002 WL 32639293, at *3 (Apr. 15, 2002);

*see also* 12 C.F.R. § 7.4007(b) (addressing federal preemption of state law in areas including, *inter alia*, "checking accounts").

The Federal Reserve Board ("Federal Reserve" or "Board") does not supervise national banks, but it has authority to promulgate regulations applicable to all financial institutions to implement certain federal consumer protection statutes.[19]  Over the past forty years, the Board has frequently addressed overdraft charges, consistently confirming that paying for overdrafts "is a long-established customer service provided by depository institutions."  70 Fed. Reg. 29,582 (May 24, 2005).[20]

Plaintiffs' complaints discuss certain "best practices" set out in a Joint Guidance on Overdraft Protection Programs ("Joint Guidance") issued in February 2005 by the Federal Reserve, OCC, and other bank regulatory agencies.  70 Fed. Reg. 9127 (Feb. 24, 2005); *see, e.g.*, *Tornes* SAC ¶ 67.  The Joint Guidance (which offered only recommendations, not binding regulatory requirements) focused primarily on matters not at issue here:  the affirmative promotion of overdraft services and the inclusion of potential overdraft amounts in calculating "available" account balances communicated to customers.  *See* 70 Fed. Reg. at 9128 (stating that the best practices recommendations were "intended to assist insured depository institutions in the responsible disclosure and administration of overdraft protection services, particularly those that are marketed to consumers").  On posting order, the Joint Guidance merely recommended that banks "[c]learly explain to consumers that transactions may not be processed in the order in

---

[19] Statutes implemented by the Federal Reserve include, among others, the Truth in Savings Act, 15 U.S.C. § 4301 *et seq*., the Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq*., and certain provisions of the Federal Trade Commission Act, *see* 15 U.S.C. §§ 45(a)(2), 57a.  Enforcement of the Federal Reserve's regulations against national banks is the responsibility of the OCC.

[20] *See also* 34 Fed. Reg. 2002, 2004 (Jul. 1, 1969); 67 Fed. Reg. 72,618, 72,620 (Dec. 6, 2002); 68 Fed. Reg. 16,185, 16,185 (Apr. 3, 2003); 69 Fed. Reg. 31,760, 31,761 (Jun. 7, 2004); 73 Fed. Reg. at 28,910; 28,927-33; 74 Fed. Reg. 5212, 5213 (Jan. 29, 2009); 74 Fed. Reg. 5584 (Jan. 29, 2009); 74 Fed. Reg. at 5547-48.

which they occurred, and that the order in which transactions are received by the institution and processed can affect the total amount of overdraft fees incurred by the consumer." *Id*. at 9132. It did not recommend any particular posting order; nor did it suggest that the use of any particular order would be unfair or inappropriate.[21]

Three years later, in May 2008, the Board and other federal banking agencies sought comment on possible new regulations requiring banks to give customers the ability to opt out of certain automatic overdraft protection services. 73 Fed. Reg. at 28,947-48.[22]  The agencies also solicited public comment on whether regulations should be promulgated to address posting-order practices.  Comment was specifically sought "on the impact of requiring institutions to pay smaller dollar items before larger dollar items when received on the same day for purposes of assessing overdraft fees on a consumer's account." *Id*. at 28,933.

In January 2009, after receiving comments and conducting further analysis, the agencies decided *against* requiring the use of any particular posting order.  Instead, the agencies elected to retain the traditional rule that banks have complete discretion with respect to the order of posting debits.  *See* 74 Fed. Reg. at 5547-48.  In so doing, the agencies noted that UCC § 4-303, which has been adopted by every state, allows banks to post debits "in any order."  *Id*. at 5547 n.183.  As the agencies observed:  "[t]he commentary to [UCC] § 4-303 states that any

---

[21] At around the same time, the Board issued a regulation requiring banks to disclose the conditions under which an overdraft fee may be charged.  *See* 70 Fed. Reg. 29,582 (2005).  The regulation required disclosure of "[t]he amount of any [overdraft] fee that may be imposed … and the conditions under which the [overdraft] fee may be imposed."  12 C.F.R. pt. 230.4(b)(4). Under that regulation, "[i]t is sufficient for an institution to state that the fee applies to overdrafts 'created by check, in-person withdrawal, ATM withdrawal, or other electronic means,' as applicable."  Official Staff Interpretations, 12 C.F.R. pt. 230, Supplement I.  Plaintiffs do not (and cannot) claim that any defendant fails to comply with this requirement.

[22] In November 2009, the Board adopted a final rule of *prospective* application (as of July 2010) implementing such an opt-out requirement.  74 Fed. Reg. 59,033 (Nov. 17, 2009).  That regulation does not purport to restrict, even prospectively, banks' decisions on posting order.

posting order is permitted because (1) it is impossible to state a rule that would be fair in all

circumstances, and (2) a drawer should have sufficient funds on deposit at all times, he or she

should thus be indifferent as to posting order."  *Id*.  The agencies also cited an OCC Interpretive

Letter confirming that national banks may use their discretion to post transactions in any order.

*See id*. at 5547 n.184.

Having considered all these factors, the agencies explained their decision not to

dictate any particular transaction processing order:

> The Agencies believe that it would be difficult to set forth a bright-
> line rule that would clearly result in the best outcome for all or
> most consumers.  For example, requiring institutions to pay
> smaller dollar items first may cause an institution to return unpaid
> a large dollar nondiscretionary item, such as a mortgage payment,
> if there is an insufficient amount of overdraft coverage remaining
> to cover the large dollar item after the smaller items have been paid.
> The Agencies also acknowledge the inherent complexity of
> payments processing and recognize that mandating a particular
> posting order could create complications for institutions seeking to
> move toward real-time transaction processing.

*Id.* at 5548.[23]

## III.   ARGUMENT

Pursuant to Rule 12, a complaint should be dismissed (or judgment granted on the

pleadings) if, on the facts alleged, the plaintiff has failed as a matter of law to state a claim upon

which relief may be granted.  Fed. R. Civ. P. 12(b)(6), 12(c); *McCulloch v. PNC Bank, Inc.*, 298

F.3d 1217, 1226 (11th Cir. 2002).

---

[23]  The potential negative implications for customers of a system that fails to maximize the
likelihood of payment of important, large-dollar items has been recognized by others as well.
*See, e.g.*, *Miller v. Bank of Am., N.T. & S.A.*, 46 Cal. 4th 630, 634 (2009) (observing that "an
overdraft may be the result of the bank honoring, rather than bouncing, a rent or utility payment
….  Requiring banks to dishonor checks can harm the customer's credit rating, result in the
customer's incurring fees, and affect the customer's relationship with merchants").

In considering a motion to dismiss, the Court must treat the plaintiffs' factual allegations as true, but those allegations cannot support the asserted claims unless they "raise a right to relief above the speculative level." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1270 (11th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  A complaint cannot survive a motion to dismiss based on "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  Unless the complaint pleads sufficient factual allegations to cross the line "from [the] conceivable to [the] plausible," it must be dismissed.  *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009).[24]

A motion for judgment on the pleadings under Rule 12(c) is governed by the same legal standards as a Rule 12(b)(6) motion to dismiss for failure to state a claim.  *Perez-Acevedo v. Rivero-Cubano*, 520 F.3d 26, 29 (1st Cir. 2008); *Dorsey v. Ga. Dept. of State Rd. & Tollway Authority SRTA*, 2009 WL 2477565, at *5 n.6 (N.D. Ga. Aug. 10, 2009); *see also Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1370 (11th Cir. 1998) (describing Rule 12(c) standard).

A.     **Because They Seek to Invoke State Law to Limit the Terms on Which National Banks May Conduct the Business of Banking, Plaintiffs' Claims Are Preempted by Federal Law.**

National banks are specialized institutions, chartered by the federal government pursuant to authority established more than 100 years ago in the National Bank Act, 12 U.S.C. § 21 *et seq.* ("NBA").  Although they are privately owned entities, national banks are chartered to effectuate specific federal policies as embodied in the NBA.  Among those policies is

---

[24]  The Court may properly consider both the allegations of the complaint and the content of any contracts or other documents attached to it.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (when ruling on a motion to dismiss, "courts must consider the complaint in its entirety, as well as ... documents incorporated into the complaint by reference"); *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999) (Rule 12(b)(6) motions); *Horsely v. Feldt*, 304 F.3d 1125, 1134-35 (11th Cir. 2002) (Rule 12(c) motions).

protecting national banks' exercise of federally authorized powers from "the hazard of unfriendly legislation by the States." *Tiffany v. Nat'l Bank of Mo.*, 85 U.S. (18 Wall.) 409, 413 (1874). Where the banking powers of national banks are concerned, "the States can exercise no control over them, nor in any wise affect their operation, except in so far as Congress may see proper to permit." *Farmers' & Mechs.' Nat'l Bank v. Dearing*, 91 U.S. 29, 34 (1875). Thus, when a national bank conducts the "business of banking" pursuant to its federally granted authority, its activities are immune from state statutes or common law. *See, e.g.*, *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11-12 (2007); *Monroe Retail v. RBS Citizens, N.A.*, 2009 WL 4749352, at *4 (6th Cir. Dec. 14, 2009) ("In the context of national banking … the general presumption against preemption does not apply.").

Plaintiffs' claims seek to present state-law challenges to core banking practices of national banks that are authorized by the NBA and the implementing regulations of the OCC. Plaintiffs' theories would invoke state law to change the terms on which national banks provide banking services to their customers and manage checking accounts. But these core banking activities, while subject to extensive federal regulation and oversight, simply cannot be challenged in a suit brought under state law. Plaintiffs' claims therefore fail at the threshold, because such challenges are barred by well-established principles of federal preemption in the banking context.

> ### 1. Practices Relating to the Calculation of Fees, Including Posting Order, Fall Within the Scope of a National Bank's Federally Authorized "Powers."

As national banks, chartered under the NBA, defendants conduct the "business of banking" subject to regulation exclusively by federal law, including the NBA and regulations of the OCC and other federal banking agencies. *See* 12 U.S.C. § 24(Seventh); 12 C.F.R. §§ 7.4002, 7.4007, 7.4009. The NBA grants national banks both enumerated powers and all "incidental

powers" needed to carry on the "business of banking."  12 U.S.C. § 24(Seventh).  As the Supreme Court has recognized, the history of applying national bank legislation "is one of interpreting grants of both enumerated and incidental 'powers' to national banks as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law." *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 32 (1996).  Thus, when a national bank conducts the "business of banking" pursuant to its federal authority, its activities are *presumptively* immune from regulation or challenge under state law. *See, e.g.*, *Watters*, 550 U.S. at 11-12.[25]

There can be no serious question that the activities plaintiffs challenge here fall within the scope of the defendant banks' federally granted banking "powers" under the NBA. The NBA expressly grants to national banks the power "to take deposits" and all other powers "incidental … to … the business of banking."  12 U.S.C. § 24(Seventh).  The term "business of banking," as used in the statute, is broadly construed. *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 258 n.2 (1995).  The "incidental powers" granted to carry out that business are similarly expansive:  they are "not limited to activities that are deemed essential to the exercise of express powers" but also include activities that are merely "useful in carrying out the business of banking." *First Nat'l Bank of E. Ark. v. Taylor*, 907 F.2d 775, 778 (8th Cir. 1990); *see also Bank of Am. v. City & County of San Francisco*, 309 F.3d 551, 562 (9th Cir. 2002).

Congress has delegated to the OCC authority to determine the scope of national banks' incidental powers under Section 24(Seventh). *See* 12 U.S.C. § 93a; *NationsBank of N.C.*, 513 U.S. at 256-57, 258 & n.2; *Bank of Am., N.A. v. Sorrell*, 248 F. Supp. 2d 1196, 1199 (N.D.

---

[25] *See also Franklin Nat'l Bank v. N.Y.*, 347 U.S. 373, 375 (1954); *First Nat'l Bank of San Jose v. Cal.*, 262 U.S. 366, 368-69 (1923); *Easton v. Iowa*, 188 U.S. 220, 229 (1903).

Ga. 2002).  In an exercise of this responsibility, the OCC has determined, by regulation, that the

incidental powers of a national bank include the power to "charge its customers non-interest

charges and fees."  12 C.F.R. § 7.4002(a).  The regulation provides that "[the] establishment of

non-interest charges and fees, their amounts, *and the method of calculating them* are business

decisions to be made by each bank, in its discretion, according to sound banking judgment and

safe and sound banking principles."  12 C.F.R. §7.4002(b)(2) (emphasis added).  The OCC has

explicitly delineated the factors a bank must consider in pricing such fees.  *See* 12 C.F.R.

§ 7.4002(b)(2).  Those factors do not include the content of state law.[26]

      In its authoritative interpretations of Section 7.4002, the OCC has confirmed that

operational choices affecting the pricing of overdraft fees, including specifically the order of

posting transactions to customers' accounts, constitute exercise of the bank's federal powers.

*See* OCC Interp. Ltr. 997, 2002 WL 32639293 (April 15, 2002) ("OCC Posting Opinion"); *see*

*also* Interp. Ltr. 916, 2001 WL 1285359 (May 22, 2001); *Monroe Retail*, 2009 WL 4749352, at

\*7 ("The OCC has consistently interpreted § 7.4002(a) as including the authorization to

determine the order in which banks may post fees to an account.").  To calculate when overdraft

fees are triggered, and in what quantity, a bank must post debits to a customer's account, and

must determine the order in which to post them.  Recognizing this, the OCC has specifically

determined that the power granted to national banks by Section 7.4002 includes the authority to

use, at their discretion in accordance with safe and sound banking principles, a "high-to-low"

order of posting debits to a customer's account.  OCC Posting Opinion, 2002 WL 32639293, at

---

[26]  The regulation directs banks to consider (i) the bank's cost of providing the service, (ii) "[t]he
deterrence of misuse by customers of bank services," (iii) the bank's "competitive position," and
(iv) "[t]he maintenance of the safety and soundness of the institution."  *Id.*

*3.[27]  The OCC Posting Opinion thus confirms what is already self-evident:  that in determining

how to post transactions to a customer's deposit account, a national bank is fully engaged in the

"business of banking" and is thus exercising its federally granted powers to conduct that business.

As the OCC's official interpretation of its own duly promulgated regulation,

Section 7.4002, the OCC Posting Opinion is controlling unless plainly erroneous or inconsistent

with the regulation.  *See Auer v. Robbins*, 519 U.S. 452, 461 (1997); *see also Kennedy v. Plan*

*Adm'r for DuPont Sav. & Inv. Plan*, 129 S. Ct. 865, 872 (2009); *Silvas v. E*Trade Mortgage*

*Corp.*, 514 F.3d 1001, 1005 n.1 (9th Cir. 2008) (recognizing that an interpretation of federal

banking regulations by the agency that promulgated the regulations "must be given controlling

weight under *Auer v. Robbins*").  Indeed, just this month the Sixth Circuit confirmed that the

OCC Posting Opinion is a reasonable interpretation of Section 7.4002.  As the Sixth Circuit

found, Section 7.4002, as interpreted by the OCC Posting Opinion, preempts any requirement

that "mandates the order in which … [national] banks carry out their daily account-balancing and

account-management functions."  *Monroe Retail*, 2009 WL 4749352, at *7-8 (relying on the

OCC Posting Opinion to dismiss state-law claims that would interfere with national banks'

"ability to collect and set their service fees" and "to complete other transactions and balance their

accounts").  Thus, plaintiffs' claims are in direct conflict with the OCC's legally binding

regulations as properly interpreted by the agency that wrote them.

---

[27]  The OCC has also reconfirmed in a recent interpretive letter that clearing overdrafts and
assessing the associated fees are activities that "have long been considered as associated with (as
well as necessary to) the administration of deposit accounts."  *See* OCC Interp. Ltr. 1082, 2007
WL 3341502, at *2 n.8 (May 17, 2007) (citation omitted)

2.      **Any Application of State Law to the Practices Addressed by Plaintiffs' Claims Is Preempted by the NBA and the OCC's Regulations.**

A national bank's exercise of its federal grant of authority to conduct the "business of banking" is not subject to limitation by, or conditioned on compliance with, state law.  *See, e.g.*, *Barnett Bank*, 517 U.S. at 32; *Watters*, 550 U.S. at 11-12; *Bank of Am. v. City & County of S.F.*, 309 F.3d 551, 561 (9th Cir. 2002).

*Franklin National Bank* illustrates this principle.  In that case, New York law, in furtherance of a public policy seeking to distinguish between depositor-owned "savings" institutions and commercial banks, prohibited banks from using the terms "saving" or "savings" in their advertising or business.  The Supreme Court held that national banks have the "incidental power" to advertise and to use the word "savings" in that advertising, and that state laws that conditioned or impaired that power were preempted.  *Franklin Nat'l Bank*, 347 U.S. at 377-79.

Here, plaintiffs' claims seek to apply state law to challenge and regulate the banking practices of national banks and are thus squarely preempted by the NBA and the OCC's regulations.  It is difficult to imagine any activities of a national bank that are more central to the "business of banking" than the bank's procedures for posting transactions to accounts, determining bank balances, and assessing fees for account services.  Although the "incidental powers" of a national bank are interpreted expansively – "the level of interference that gives rise to preemption under the NBA is not very high," *Monroe Retail*, 2009 WL 4749352, at *6 (internal quotation omitted) – no such expansive interpretation is required here to conclude that plaintiffs' claims are attempting to apply state law to regulate some of the core functions that make a national bank a bank.  Just as a national bank's decision to use the word "savings," *see Franklin Nat'l Bank*, 347 U.S. at 378, to sell annuities, *see NationsBank of N.C.*, 513 U.S. at 264, or to sell insurance, *see Barnett Bank*, 517 U.S. at 27-28, cannot be regulated under state law, a

24

national bank's management of bank accounts must similarly be exempt from state-law regulation.

Federal preemption bars, not just direct assertion of state law by a state agency to regulate the exercise of national banking powers, but also the assertion of state-law causes of action by private plaintiffs who seek to challenge as unfair business practices a national bank's banking practices and related disclosures. *See, e.g.*, *Rose v. Chase Bank USA, N.A.*, 513 F.3d 1032, 1038 (9th Cir. 2008); *Weiss v. Wells Fargo Bank, N.A.*, 2008 WL 2620886, at *1-2 (W.D. Mo. July 1, 2008); *Martinez v. Wells Fargo Bank*, 2007 WL 2213216, at *3-6 (N.D. Cal. Jul 31, 2007); *Montgomery v. Bank of Am. Corp.*, 515 F. Supp. 2d 1106, 1113-14 (C.D. Cal. 2007); *Abel v. KeyBank USA, N.A.*, 313 F. Supp. 2d 720, 723-26 (N.D. Ohio 2004); *cf. Sonnenreich v. Philip Morris Inc.*, 929 F. Supp. 416, 419 (S.D. Fla. 1996) (state-law claim against tobacco manufacturer preempted under Cigarette Labeling and Advertising Act). Plaintiffs here seek to assert claims that strike at the core of defendants' conduct of "the business of banking." 12 U.S.C. § 24(Seventh). Those claims are therefore preempted.

Numerous courts have confirmed that the NBA preempts state-law claims seeking to challenge the ability of national banks to charge fees or the manner or amounts in which such fees are charged. For example, in *Wells Fargo Bank of Tex. N.A. v. James*, 321 F.3d 488, 495 (5th Cir. 2003), the court, relying on Section 7.4002, held to be preempted a state law prohibiting national banks from charging non-account holders a fee for check-cashing services.[28] In *City & County of San Francisco*, the court held that Section 7.4002 preempted municipal ordinances prohibiting banks from charging ATM fees to nondepositors. 309 F.3d at 563-64; *see also Metrobank, N.A. v. Foster*, 193 F. Supp. 2d 1156, 1161 (S.D. Iowa 2002) (holding state law

---

[28] *See also NNDJ, Inc. v. Nat'l City Bank*, 540 F. Supp. 2d 851, 854 (E.D. Mich. 2008) (same); *Kronemeyer v. U.S. Bank Nat'l Ass'n*, 857 N.E. 2d 686, 690 (Ill. App. 2006) (same).

prohibiting national banks from charging ATM fees to non-accountholders was "an obstacle to the rights given … by [Section 7.4002]" and therefore preempted).

The OCC has also confirmed, by regulation, that preemption precludes the application of state law to the fees and related activities of national banks.  Pursuant to its rulemaking authority under the NBA, the OCC has promulgated regulations specifically addressing the scope of federal preemption in these and other areas affecting the activities of national banks.  *See, e.g.*, 12 C.F.R. §§ 7.4007, 7.4009.  These rules have the force of law as "Laws of the United States" that preempt state law pursuant to the Supremacy Clause.  *See City of N.Y. v. FCC*, 486 U.S. 57, 63 (1988).  They accordingly have the same preemptive effect as federal statutes.  *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) (regulation of the Federal Home Loan Bank Board permitting federal savings and loan associations to include due-on-sale clauses in mortgage contracts preempted a state law prohibiting such clauses).

The OCC's regulations addressing preemption confirm that preemption bars plaintiffs' state-law challenges to the banking activities at issue in these cases.  The OCC's preemption regulation pertaining to "deposit-taking" expressly provides that "state laws that obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized deposit-taking powers are not applicable to national banks."  12 C.F.R. § 7.4007(b)(1).  As discussed above, the OCC has determined that these "Federally authorized deposit-taking powers" include the power to assess non-interest fees and to calculate those fees – including through the use of transaction posting order.  12 C.F.R. § 7.4002; OCC Posting Opinion, 2002 WL 32639293, at *3.

The OCC's preemption regulation does not stop there.  It goes on to provide explicitly that the NBA preempts state law limitations on "[c]hecking accounts," "[d]isclosure

requirements," and "[f]unds availability."  12 C.F.R. § 7.4007(b)(2).  A separate provision,

Section 7.4009, recognizes preemption of any state law that impedes a national bank's

"operations."  12 C.F.R. § 7.4009(b).  In promulgating these and other preemption regulations,

the OCC stressed the importance of *national* standards and warned that state-by-state regulation

negatively affects safety and soundness – a key issue of concern for the national banking system.

*See* 69 Fed. Reg. 1904, 1908 (Jan. 13, 2004).

Any application of state law to control the manner in which national banks post

transactions to customers' accounts, or to restrict the methods and amounts of national bank fees

for banking services, could not intrude more centrally upon national banks' powers to provide

and administer "[c]hecking accounts" and to determine "[f]unds availability."  12 C.F.R.

§ 7.4007(b)(2).  Similarly, the determination of account balances and overdrafts is intrinsic to the

administration of funds in a deposit account and the monitoring and implementation of "funds

availability."  And insofar as plaintiffs are challenging the adequacy of the defendant banks'

disclosures about these practices, such claims clearly relate to "disclosures."

In short, plaintiffs' claims would impose state-law limitations on the very

activities specified in Section 7.4007 and would restrict the "operations" of national banks

addressed in Section 7.4009(b).  Because the manner in which banks post transactions, calculate

balances and overdraft fees, and disclose these practices may not be subject to limitation by, or

conditioned on compliance with, state law, plaintiffs' claims are barred by federal preemption.

**3.     Plaintiffs' State-Law Claims Fall Squarely Within Expressly Preempted Subject Matter and Would More than Incidentally Affect Banks' Exercise of Their Federal Powers.**

Plaintiffs may seek to rely upon a provision of the OCC's preemption regulation

recognizing that national banks remain subject to state criminal, contract, and tort laws in areas

that do not involve any of the specific categories of banking activity enumerated in the regulation

and that otherwise do "no more than incidentally" affect a bank's exercise of its federal powers. 12 C.F.R. § 7.4007(c).  Any such reliance would be misguided, as (1) the exception recognized in section 7.4007(c) does not apply to claims directed at conduct falling within one of the specific categories set out in section 7.4007(b), and (2) the application of state law that plaintiffs seek here would "more than incidentally affect" defendants' exercise of their federal powers.

The first of these points was expressly addressed in *Aguayo v. U.S. Bank*, __ F. Supp. 2d __, 2009 WL 3149607 (S.D. Cal. Sept. 24, 2009).  There, a borrower brought a putative class action against a national bank, claiming that the bank violated state-law post-repossession notice requirements.  *Id.* at *1.  The district court dismissed the case on preemption grounds.  *Id*. at *3-7.  At issue was 12 C.F.R. § 7.4008, an OCC regulation that parallels 12 C.F.R. § 7.4007 in addressing preemption in the area of national banks' non-real estate lending activities.  In both regulations, paragraph (a) sets out the scope of federal authority; paragraph (b) lists topics that may not be made subject to state-law limitations; and paragraph (c), the savings clause, identifies areas in which state law may apply to a national bank if that law has no more than an "incidental" effect on exercise of the bank's federal powers.  As explained by the *Aguayo* court, "the savings clause provides no sanctuary for laws already preempted by the express language of the OCC" in paragraph (b) of the regulation.  2009 WL 3149607, at *7.  The *Aguayo* court was guided by the "strikingly similar" regulation for federal thrifts, 12 C.F.R. § 560.2, under which the Office of Thrift Supervision ("OTS") "first considers whether the state law is covered by the list of expressly preempted areas," and "[i]f the state law fits in the list of laws preempted, then the analysis is over.  Courts need not consider whether the state law also fits under the areas listed in the savings clause."  2009 WL 314609, at *7; *see Silvas*, 514 F.3d at 1006 (applying same analysis to parallel OTS regulation); *see also In re Wash. Mut. Overdraft Prot. Litig.*, 539 F. Supp. 2d 1136 (C.D. Cal. 2008).

Similarly, here, because plaintiffs' claims challenge the methods by which national banks post transactions to checking accounts, determine funds available to cover debits to those accounts, and disclose such matters to their checking account customers – all areas that are specifically identified as preempted subject matter under Section 7.4007(b) – the preemption analysis ends there, and plaintiffs' claims are barred.

Even apart from the fact that plaintiffs' claims fall squarely within section 7.4007(b), it cannot reasonably be disputed that the application of state law that plaintiffs seek would have a much more than incidental effect on defendants' exercise of their federal powers. This is not a situation in which a plaintiff seeks to invoke state law to pursue a claim that is peripheral to a national bank's exercise of its federal banking powers. *Compare Jefferson v. Chase Home Fin.*, 2008 WL 1883484, at *12 (N.D. Cal. April 29, 2008) (finding no preemption of claims challenging alleged affirmative misrepresentations about loan repayment terms, but noting that claims challenging the loan repayment terms themselves would likely be preempted). Rather, plaintiffs' claims here seek squarely to apply state law to regulate core banking functions.

The OCC's preemption regulations are very clear in stating that even in areas in which state tort and consumer protection laws are not categorically preempted, preemption nonetheless extends to *any* state laws that more than "incidentally affect" the exercise of national banks' banking powers. 12 C.F.R. § 7.4007(c). *Cf. Watters*, 550 U.S. at 12 (state laws of general applicability may apply to national banks only "where doing so does not prevent or significantly interfere with the national bank's … exercise of its powers…. [W]hen state prescriptions significantly impair the exercise of authority, enumerated or incidental under the [National Bank Act], the State's regulations must give way").

Here, plaintiffs seek to impose state-law limitations on the defendant banks that necessarily would more than "incidentally affect" the banks' ability to exercise their federal

powers in conducting the business of banking.  Indeed, what plaintiffs are really claiming here is

that the very exercise of those powers in managing their accounts violates state law.  Any such

claim is preempted under Section 7.4007(c) as well as under Section 7.4007(b).

> **4.      An Extensive Body of Case Law Confirms That State-Law Claims
> Such as Plaintiffs' Are Preempted.**

Courts have routinely applied the foregoing preemption principles in rejecting

state-law challenges to conduct falling within the federal banking powers of a national bank.  *See,*

*e.g.*, *Rose*, 513 F.3d at 1037-38 (state-law unfair competition claims on disclosures and fees);

*Montgomery*, 515 F. Supp. 2d at 1113-14 (state-law claims on disclosures and fees); *Martinez v.*

*Wells Fargo Bank, N.A.*, 2007 WL 963965, at *8 (N.D. Cal. Mar. 30, 2007) (same).

For example, in *Montgomery*, the plaintiffs asserted that a national bank's

overdraft fee policies, as well as its disclosures about those policies, violated state law.

The court found that "plaintiff's state law claims, which are all based on the amount of and

means of disclosure of NSF/OD fees assessed by defendants," were expressly preempted under

the OCC's regulations, which provide that "[a] national bank may exercise its deposit-taking

powers *without regard to state law limitations* concerning … disclosure requirements."

515 F. Supp. 2d at 1113-14 (quoting 12 C.F.R. § 7.4007(b)(2)(iii); emphasis added by court).

Similarly, in *Martinez*, the plaintiffs sued a national bank for violations of state unfair

competition law based on the bank's setting, charging, and disclosing of certain mortgage-related

fees.  2007 WL 963965, at *2.  The court found the claims to be "premised primarily" on

challenges to conduct falling within the bank's federal authority under the NBA; those claims

were therefore preempted.  *Id.* at *8.

Like the plaintiffs in *Montgomery* and *Martinez*, plaintiffs here seek to impose

state-law liability upon national banks in connection with the substantive terms of the banks'

exercise of federally granted banking powers.  By express directive of federal law, state law may not be used to achieve any such result.

In opposing this motion, plaintiffs are likely to rely on two district court decisions that rejected the application of federal preemption to claims relating to overdraft fees:  *White v. Wachovia Bank, N.A.*, 563 F. Supp. 2d 1358 (N.D. Ga. 2008), and *Gutierrez v. Wells Fargo Bank, N.A.*, 2008 WL 4279550 (N.D. Cal. Sept. 11, 2008).  Neither of these cases supports plaintiffs' position.  One (*White*) actually supports preemption here.  The other (*Gutierrez*) failed to afford the NBA and the OCC's regulations their full preemptive force as required by clearly established Supreme Court authority.

In *White*, the plaintiffs alleged that the bank manipulated the posting of transactions to a customer's account and charged overdraft fees "even where the account contain[ed] sufficient funds to pay a draft."  563 F. Supp. 2d at 1361.  As the court observed: "While the lawsuit may incidentally implicate Wachovia's largest-to-smallest transaction posting policy, it more importantly claims that Wachovia's policy allows the routine imposition of an overdraft fee for transactions that do not result in an actual overdraft.  This allegation, which forms the basis for all of its claims, is not of a regulatory nature that would subject it to federal preemption."  *Id.* at 1368 (footnote and citations omitted).

Plaintiffs' claims here, in contrast to those in *White*, focus on defendants' alleged sequencing of debits from highest to lowest.[29]  The *White* court recognized that, had such a challenge been presented in that case, federal preemption would have applied:  "This court

---

[29] Some of plaintiffs' complaints include conclusory allegations that appear to be designed to imply claims paralleling those asserted in *White*.  However, the specific allegations relating to the named plaintiffs support no such claims; instead, those allegations simply challenge defendants' posting order practices.  (*See* pp. 92-94 below.)

clearly understands that it has no role in deciding for any bank the order in which to post transactions in a checking account on a given day."  *Id.* at 1368 n.13.[30]

In *Gutierrez*, the court failed to apply the principles of federal preemption required by the NBA as interpreted by the Supreme Court and set out in the OCC's regulations. For example, although the *Gutierrez* court acknowledged that Section 7.4002 authorizes national banks to impose fees and charges on customer accounts, it stated that "nowhere does [the regulation] remotely suggest that the specific practices described herein are authorized."  2008 WL 4279550, at *9.  This statement failed to recognize that section 7.4002, as interpreted by the OCC in its Interpretive Letter, expressly grants a national bank discretion to administer deposit accounts, including by selecting the methods to handle overdrafts and to establish and collect associated fees.  As the OCC recognized, Section 7.4002 does not need to refer expressly to specific practices to provide such authorization, which is implicit in the broad authority recognized in the regulation.  *See* OCC Posting Opinion, 2002 WL 32639293, at *2 ("[A] bank's authorization to establish fees pursuant to 12 C.F.R. § 7.4002(a) necessarily includes the authorization to determine the amount and method by which they are computed.").  The *Gutierrez* court therefore erred when it failed to afford deference to the OCC's interpretation of its own regulation, which is controlling unless plainly erroneous or inconsistent with the regulation itself.  *See Auer v. Robbins*, 519 U.S. at 461; *Silvas*, 514 F.3d at 1005 n.1.[31]

In stark contrast to *Gutierrez*, other courts have routinely deferred to the OCC's interpretations in applying the preemption principles of the NBA and its implementing

---

[30] The *White* court further acknowledged that, "[t]o the extent Plaintiffs assert that Wachovia does not adequately disclose its check-posting policy, those claims may well be preempted."  *Id.* at 1369 n.15 (citing *Montgomery*, 515 F. Supp. 2d at 1112).

[31] The *Gutierrez* court did not purport to find that the OCC's interpretation was clearly erroneous or inconsistent with the plain language of the regulation.  Instead it merely applied its own interpretation.

regulations.  *See, e.g.*, *Bank One, Utah v. Guttau*, 190 F.3d 844, 850 (8th Cir. 1999) (relying on an OCC Interpretive Letter finding that 12 U.S.C. § 24(Seventh) preempted the application to national banks of certain Iowa restrictions on the placement of bank names on ATMs, even though the federal statute said nothing about the subject); *James*, 321 F.3d at 490, 494-95 (relying on OCC opinion letters finding that an OCC regulation that permitted national banks to charge "customers" non-interest fees authorized the banks to charge such fees to non-accountholders, even though the regulation made no mention of non-accountholders); *Kronemeyer*, 857 N.E.2d at 690 (same, notwithstanding conflicting state-law definition of "customer"); *see also City & County of S.F.*, 309 F.3d at 563 (affording "great weight" to interpretation provided by OCC in Interpretive Letters and amicus brief).  The *Gutierrez* court erred in not applying similar deference.

The *Gutierrez* court also misapplied the OCC's preemption regulation on deposit-taking.  Rather than looking to the effect of state posting-order restrictions on the deposit-taking powers of a national bank (specifically, powers relating to checking accounts, disclosures, and funds availability), the court stated that "[o]n its face, 12 C.F.R. 7.4007 only relates to a bank's deposit-taking powers" and "[n]one of the exclusions cited by Wells Fargo relate to a bank's ability to … reorder transactions in order to maximize overdraft fees…."  *Gutierrez*, 2008 WL 4279550, at *12.  This statement does not square with the plain language of the regulation.  Restrictions on a national bank's posting-order practices *are* restrictions relating to "checking accounts" and "funds availability."  If plaintiffs' claims are not within the scope of these categories, it is difficult to imagine what would be.[32]

---

[32] The *Gutierrez* court also improperly relied upon the choice-of-law provision in the bank's account agreement as overriding federal preemption.  Asserting that the agreement provided that Wells Fargo's posting-order practices were subject to "'the laws governing [the customer's] Account,'" the court found that there could be no preemption of state law because "[t]he (continued…)

Because federal preemption bars all of plaintiffs' state-law causes of action, each of the complaints should be dismissed in its entirety.

**B.      If and to the Extent State Law Applies Here at All, the Claims of Each Plaintiff Are Governed by the Law of the State of His or Her Residence.**

For the reasons set out above, the Court should dismiss plaintiffs' complaints in their entirety without even considering the content of any state law.

If, however, the Court considers matters beyond federal preemption, it must begin by determining which states' laws would apply to the accounts of each of the named plaintiffs.[33] In these cases, to the extent state law applies at all, the claims of each plaintiff are governed by the laws of his or her state of residence.

When considering choice of law, a court sitting in diversity must look to the laws of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Forzley v. AVCO Corp. Elecs. Div.*, 826 F.2d 974, 978 (11th Cir. 1987). In multidistrict litigation, the forum state is that in which the transferor district court sits. *Murphy v. F.D.I.C.*, 208 F.3d 959, 965 (11th Cir. 2000). The complaints here were filed in Florida, California, Oregon, New Mexico, and Washington. Accordingly, this Court must apply those states' choice-of-law principles. Specifically, the Court must apply Florida choice-of-law rules in *Garcia*, *Lopez*,

---

governing law on bank deposits is normally state law...." *Id.* at *10. Even apart from its misquotation of the contract (*see* p. 42 below), this conclusion was wrong as a matter of law. As the Supreme Court has held, a "governing law" provision in a financial agreement is properly understood "not to elevate state law over federal law, but to provide a uniform choice-of-law provision to be used when *interstate* disputes arose regarding the interpretation of [the agreement]." *de la Cuesta*, 458 U.S. at 158 n.12 (emphasis added). A contractual choice-of-law provision cannot "choose" a designated state's laws over preemptive federal law, because "'the Constitution, laws and treaties of the United States are as much a part of the law of every State as its own local laws and Constitution.'" *Id.* at 157 (citation omitted).

[33] There is no occasion at this juncture to consider absent putative class members, or what state's law might apply to any such person. If the named plaintiffs have no viable claims of their own, their complaints must be dismissed.

*Tornes*, and *Speers*.  California choice-of-law rules apply in *Spears-Haymond*, *Larsen*, *Luquetta*,

*Amrhein*, *Yourke*, and *Waters*.  Oregon, Washington, and New Mexico choice-of-law rules apply

in *Dolores Gutierrez*, *Zankich*, and *Martinez*, respectively.

### 1.    In All But Two of the Cases, Contractual Choice-of-Law Provisions Dictate the Law Applicable to Plaintiffs' Claims.

With few exceptions, each of plaintiffs' deposit agreements contains a choice-of-

law provision that identifies the applicable state law, to the extent that state law applies at all.[34]

Those provisions select the laws of the state in which the customer's account was either opened

or maintained.

The applicable choice of law provisions state, in pertinent part:

- **Bank of America**:  "This Agreement, and your and our rights and obligations under this Agreement, are governed by and interpreted according to federal law and the law of the state in which the Banking Center that maintains your account is located.  We generally maintain your account at the Banking Center where we open your account." (*Tornes* SAC Ex. A at 2; *see also Yourke* C Ex. C at 2 (choosing California law for California accounts).)

- **Chase**:  "Your Account is governed by all rules and regulations of applicable federal law and the laws of your State (to the extent they are not considered to have been preempted by federal law)…."  (*Lopez* C Ex. A at 18.)  "Your State" is defined in that Agreement as "the U.S. state where you opened your account, or the state where you reside if you opened your Account by mail, internet, or other remote means and you reside in a state where we have branch offices." (*Id*. at 8.)

- **Wachovia Bank**:  "To the extent state law applies to our deposit relationship, the applicable law is the law of the state where your account was opened as reflected in our records." (*Garcia* AC Ex. A at 13.)

- **Citibank**:  "Accounts and services through Citibank are governed by Federal law and regulations.  To the extent that such laws and regulations do not apply, these accounts and services shall be governed by and be construed in accordance with the laws of the state in which the Financial Center for your account is located."  (*Amrhein* TAC Ex. A at 6.)

---

[34] U.S. Bank's deposit agreement does not include a choice of law provision.

- **Union Bank**:  "Your account relationships are governed by the law of the state in which your account is located and by applicable federal law."  (*Larsen* FAC Ex. A2 at 93.)

- **Wells Fargo**:  "Your Account is governed by the laws and regulations of the United States and, to the extent applicable, the laws of the state in which the office of the Bank that maintains your Account is located…."  (*Martinez* C Ex. A at 36.)

Regardless of which state's choice of law rules are applied, each of these contractual choice-of-law provisions is enforceable to require plaintiffs' claims to be governed by the laws of their home states.

Under Florida law, "when the parties to a contract have indicated their intention as to the law which is to govern, it will be governed by such law in accordance with the intent of the parties."  *Dep't of Motor Vehicles v. Mercedes-Benz of N. Am., Inc.*, 408 So. 2d 627 (Fla. App. 1981); *Forzley*, 826 F.2d at 978-79 (same).  The parties' contractually specified choice of law "will be applied so long as there is a reasonable relationship between the contract and the state whose law is selected and the selected law does not conflict with Florida law…."  *Forzley*, 826 F.2d at 979.

Similarly, California's choice of law rules reflect "strong policy considerations favoring the enforcement" of contractual choice of law clauses.  *Wash. Mut. Bank, FA v. Super. Court of Orange County*, 24 Cal. 4th 906, 917-18 (2001) (quoting *Nedlloyd Lines B.V. v. Super. Court*, 3 Cal. 4th 459, 462 (1992)).  California has adopted the approach of the Restatement (Second) of Conflict of Laws § 187(2):  If the state selected by the contractual choice of law provision "has a substantial relationship to the parties or their transaction . . . the parties' choice generally will be enforced" unless the party resisting application of that law "establish[es] both that the chosen law is contrary to a fundamental policy of California and that California has a materially greater interest in the determination of the particular issue."  *Wash. Mut. Bank*, 24 Cal. 4th at 917.

36

Oregon and Washington also follow the Restatement (Second) approach in enforcing contractual choice of law provisions.  *Young v. Mobil Oil Corp.*, 735 P.2d 654, 656 (Or. App. 1987); *Erwin v. Cotter Health Ctrs.*, 167 P.3d 1112, 1120-21 (Wash. 2007).  New Mexico extends similar deference to the law selected by contracting parties and will only decline to enforce a choice of law provision where it "offends New Mexico public policy" or "violate[s] some fundamental principle of justice."  *Guidance Endodontics LLC v. Dentsply Int'l, Inc.*, 2009 WL 3672452, at *5 (D.N.M. Oct. 2, 2009).

Here, there can be no question that the choice of law provisions specified in the deposit agreements are valid and enforceable.  Each plaintiff has agreed to be governed by the laws of the states in which his or her account was opened or is maintained.  Plainly, those states are more than "reasonably related" to the deposit agreements and the transactions between the parties.  Indeed, there is no state with which a plaintiff has a stronger relationship than the state in which he or she resides.  That is where plaintiffs interact with their banks at local branches, where they maintain their accounts, and where they receive their account statements and other communications from the banks.[35]

Nor is there any conflict of "fundamental public policy" between the laws of the states selected in the deposit agreements and any other state whose laws plaintiffs plausibly could invoke.  Even if such a conflict existed, no state has a "materially greater interest" in the

---

[35] The complaints typically do not allege specifically where plaintiffs actually opened and maintained their accounts, but it is reasonable to infer that the pertinent state in each case is the plaintiff's state of residence, which is alleged in each case.  The only exception is that two plaintiffs recently added in the First Amended Complaint in the *Dolores Gutierrez* case assert that they opened their accounts in Oregon but now live in California.  (*Dolores Gutierrez* FAC ¶ 18.)  That complaint offers no allegations about where these plaintiffs' account was maintained during the pertinent time or where they lived when the challenged transactions occurred.  However, that complaint invokes Oregon (and not California) law, so for purposes of this Motion defendants treat those plaintiffs' claims as governed by Oregon law.

issues addressed in these actions than do the states where plaintiffs reside and where the banks did business with plaintiffs through branches in those states.  Accordingly, plaintiffs here are bound by their agreements to be governed by the laws of their home states.

> **2.**     **Even Absent a Contractual Selection of Applicable Law, Choice of Law Rules Dictate That the Laws Applicable to Plaintiffs' Claims Are Those of Their Home States.**

Where the parties have not selected the applicable law by contract, as in the cases brought by customers of U.S. Bank (*Speers* and *Waters*), the choice of law rules of the states where the plaintiffs filed their actions also require that those plaintiffs' claims be governed by the laws of their home states.

"[F]or a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair."  *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13 (1981).  To determine what state law applies in the absence of a contractual election of governing law, courts also employ the choice of law principles of the forum state.  *Klaxon Co.*, 313 U.S. at 496.

Florida (the forum of *Speers*) applies the "most significant relationship" test of the Restatement (Second) of Conflict of Laws to determine the law applicable to tort claims.  *Garcia v. Pub. Health Trust of Dade County*, 841 F.2d 1062, 1064 (11th Cir. 1988).  The factors considered are:  "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."  *Id.* (quotation omitted); *see also Estate of Duckett v. Cable News Network LLLP (CNN)*, 2008 WL 2959753, at *3 (M.D. Fla. July 31, 2008) ("The place of injury still determines which state's law applies, unless some other state has a more significant relationship to the

38

issues.") (quotations omitted).  For contract claims, Florida follows the "*lex loci contractus*"
choice-of-law rule, which selects the law of the jurisdiction where the contract was executed.
*Rando v. Gov't Employees Ins. Co.*, 556 F.3d 1173, 1176 & n.5 (11th Cir. 2009); *State Farm Mut.
Auto. Ins. Co. v. Roach*, 945 So. 2d 1160, 1164 (Fla. 2006).

   California (the forum of *Waters*) applies a three-step "governmental interest"
analysis in determining choice of law questions:  (1) "the court examines the substantive law of
each jurisdiction to determine whether the laws differ as applied to the relevant transaction," (2)
"if the laws do differ, the court must determine whether a 'true conflict' exists in that each of the
relevant jurisdictions has an interest in having its law applied," and (3) "if more than one
jurisdiction has a legitimate interest … the court [must] identify and apply the law of the state
whose interest would be more impaired if its law were not applied."  *Abogados v. AT&T, Inc.*,
223 F.3d 932, 934 (9th Cir. 2000) (internal citations omitted).  Under that approach, however,
"[w]hen one of two states related to a case has a legitimate interest in the application of its law
and policy and the other has none, there is no real problem; clearly the law of the interested state
should be applied."  *In re Title U.S.A. Ins. Corp.*, 36 Cal. App. 4th 363, 372 (1995).

   The *Speers* and *Waters* plaintiffs do not specifically allege where any of the
operative facts took place.  Presumably, however, most or all of the overdraft transactions and
resulting fees occurred in their states of residence, and that is also where their accounts were
opened and maintained.  Plaintiffs do not allege that any other state bears any relationship to the
underlying facts, let alone the "most significant" relationship required to justify the application
of that state's law.  Nor do they allege that any other state has a "legitimate" interest, stronger
than that of their home states, in the application of its laws to the banking transactions of non-

residents.  Accordingly, the claims of the *Speers* and *Waters* plaintiffs are also governed by the laws of their states of residence.[36]

### C.     Plaintiffs' Breach of Contract Claims Fail to State a Claim on Which Relief May Be Granted.

Plaintiffs' principal claim in each case is for common law breach of contract. (*See* Table A.)  Each bank account is governed by a detailed written contract.  Plaintiffs contend that each bank breached that contract by posting debits in high-to-low order, which can, in certain circumstances, result in increased fees if the customer has caused multiple overdrafts. Plaintiffs do not contend that the actual terms of the written contracts required a different posting order; in fact, every one of the contracts specifically authorizes the bank to post in high-to-low order.  But plaintiffs claim that the common law implies in each contract an obligation of good faith and fair dealing that prohibits this posting order.  According to plaintiffs' theory, a bank's *adherence to the actual contractual terms* should therefore, paradoxically, be deemed *a breach of the contract.*

Plaintiffs' claims fail as a matter of law, for multiple reasons:

- The conduct complained of was in accord with the express contract terms.  Plaintiffs do not plead any actual contract term that any defendant has breached.

- Even in states recognizing a general implied covenant of good faith and fair dealing that could apply to bank accounts (and not all do), such a term cannot be implied to invalidate conduct that is expressly authorized by the contract.

---

[36]  The same result would apply in the other cases as well (including those filed in Oregon, New Mexico, and Washington), even in the absence of contractual choice of law clauses.  *See Carl Kelley Constr. LLC v. Danco Techs.*, __F. Supp. 2d __, 2009 WL 2950790, at *11 (D.N.M. Aug. 7, 2009) ("place of the wrong" test for New Mexico tort claims); *Guidance Endodontics, LLC*, 2009 WL 3672452, at *5 (New Mexico follows *lex loci contractus* doctrine in contract claims); *Superior Leasing, LLC v. Kaman Aerospace Corp.*, 2006 WL 3756950, at *9 (D. Or. Dec. 19, 2006) ("most significant relationship" test governs Oregon tort claims); *Citizens First Bank v. Intercontinental Express, Inc.*, 713 P.2d 1097, 1098-99 (Or. App. 1986) (same test governs contract actions in Oregon); *Erwin*, 167 P.3d at 693 & n.17 ("most significant relationship" test governs Washington tort and contract claims).

- Any contention that the challenged posting method is forbidden by an implied good faith and fair dealing obligation is precluded by the fact that state and federal law expressly allow posting of transactions in any order – a fact recognized in numerous court decisions.

    1.    **Each Bank's Contract Specifically Authorizes Debits to Be Posted from Highest Amount to Lowest.**

Plaintiffs concede that each of their accounts is controlled by a detailed written contract; their claim is for breach of that contract. Each bank's contract expressly authorizes the bank to post debits in high-to-low order:

- **Bank of America**: "We may determine in our discretion the order of processing and posting deposits, fees, charges, checks, debits and other items to your account …. We do not process and post transactions in the order in which they occurred.  In most states we process and post items within each category from the highest to lowest dollar amount."  *Tornes* SAC Ex. A at 18; *Yourke* C Ex. C at 19.

- **Citibank**: "We pay all electronic debits ... first.  We then process all debits for purchasing of securities through Smith Barney.  If available funds remain after processing these transactions, we pay your checks in the order of largest to smallest dollar amount.  For accounts maintained with a Financial Center located in the state of Texas, we will pay your checks in order of the smallest to the largest dollar amount." *Amrhein* TAC Ex. A at 32.

- **Chase**: "Items will be posted to your Account in highest to lowest dollar amount each business day …. We reserve the right to change this posting order …."  *Lopez* C Ex. A at 10-11.[37]

- **Union Bank**: "You agree that we may pay or certify your checks and other items in any order we choose …. We will generally pay larger checks and transactions first." *Larsen* FAC Ex. A1 at 43.

- **U.S. Bank**: "If we get a **batch**, or **multiple batches** of such items in a day (for example, checks, ATM purchase transactions, and check card purchases typically come in batches), and if one, some or all of them would overdraw the account if paid, we [sic] the right to decide the order of the items we will pay and which items will be returned (if any).  This means, for example, we can process items beginning with the largest items … even though it will have the effect of reducing your available balance more quickly." *Speers* SAC Ex. A at 11.

---

[37]  *See also Lopez* C Ex. C at 32 (Washington Mutual Bank contract:  "The Bank determines the order of posting deposits, checks, debits and other charges to your account unless otherwise required by law.  Deposits/credits, checks, debits and other charges arriving to your account on the same day may be credited/paid/returned in any order at the Bank's option.")

- **Wachovia**: "We may pay checks or other items drawn upon your account … in any order determined by us …. Although we generally pay larger items first, we are not obligated to do so ...." *Garcia* AC Ex. A at 10.

- **Wells Fargo**: "The Bank may post *Items* presented against the Account in any order the Bank chooses, unless the laws governing your Account either requires or prohibits a particular order.  For example, the Bank may, if it chooses, post *Items* in the order of the highest dollar amount to the lowest dollar amount." *Martinez* C Ex. A at 22.

Insofar as plaintiffs are purporting to assert a straightforward breach-of-contract claim, any such claim fails at the threshold, as plaintiffs do not, and could not, contend that posting high-to-low is contractually impermissible under their actual contract terms.  In none of the complaints do plaintiffs identify any obligation provided in the contracts that any bank has breached.  Such an allegation is a requirement for any action for breach, and its absence is ground for dismissal.  *See, e.g.*, *Burger King Corp. v. C.R. Weaver; M-W-M, Inc.*, 169 F.3d 1310, 1318 (11th Cir. 1999) (claim for breach of the implied covenant failed as a matter of law because the plaintiff cited no contract provision that had been breached); *Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1429 (11th Cir. 1990) (same); *cf. Keys Jeep Eagle v. Chrysler Corp.*, 897 F. Supp. 1437, 1443 (S.D. Fla. 1995) (dismissing breach of contract claims on summary judgment where "Plaintiffs do not identify a single contract term or provision that [defendant] allegedly breached"); *Lowden v. T-Mobile USA, Inc.*, 2009 WL 537787, at *3 (W.D. Wash. Feb. 18, 2009) (no claim for breach of contract where the contract authorized the challenged practice).

2.      **The Common Law Implied Covenant of Good Faith and Fair Dealing Does Not Preclude High-To-Low Posting as Authorized by the Contracts.**

The real thrust of plaintiffs' claims is not that the banks have breached their contracts, but rather that the common law doctrine of implying a covenant of good faith and fair dealing should prohibit any high-to-low posting order, notwithstanding the fact that the contracts specifically provide for it.  That theory fails on multiple levels.  Not all states even recognize the

42

existence of any covenant of good faith and fair dealing in a case like this.  And none of those that do recognize such a covenant would find it breached on the facts alleged here.

### a)   The Common Law Implied Covenant Is Inapplicable to Account Agreements Governed by Texas Law.

In Texas, the implied covenant does not apply at common law, and for that reason alone the claims arising in that state (*see* Table A) should be dismissed.[38]  Texas courts have held that a common law covenant of good faith and fair dealing is implied only in exceptional circumstances, such as where the parties have a fiduciary relationship.  *See Subaru v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 225 (Tex. 2002) ("A common-law duty of good faith and fair dealing … arises only when a contract creates or governs a special relationship between the parties.").  Ordinary depositor relationships, such as those involved here, are not the sort of "special" relationships that give rise to a duty beyond any specified in the contract.  *See Wil-Roye Invest. Co. II v. Wash. Mut. Bank, F.A.*, 142 S.W.3d 393, 410 & n.4 (Tex. Ct. App. 2004) (relationship between a bank and its customer did not create a special or fiduciary relationship); *Eller v. NationsBank of Tex., N.A.*, 975 S.W.2d 803, 809 (Tex. Ct. App. 1998) (same).

### b)   The Implied Common Law Covenant of Good Faith and Fair Dealing Cannot Vary Actual Contract Terms Authorizing High-To-Low Posting.

In those states in which an implied common law covenant of good faith and fair dealing is recognized, "[a]s a general principle, there can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract."  23

---

[38]  Texas does impose a *statutory* duty of good faith on transactions governed by the UCC.  *See* Tex. Bus. & Com. Code § 1.304.  However, plaintiffs do not allege a violation of the UCC. Indeed, as discussed below, courts in Texas and other jurisdictions have held that the UCC expressly *authorizes* the posting practice challenged here.

Williston on Contracts § 63:22 (4th ed.); *see, e.g.*, *Weaver*, 169 F.3d at 1316 ("the implied obligation of good faith cannot be used to vary the terms of an express contract") (citation and quotation marks omitted).  As this Court stated in a recent case, "*Weaver* held that a cause of action for breach of the implied covenant of good faith cannot be maintained in derogation of the express terms of the underlying contract or in the absence of breach of an express term of the underlying agreement."  *Marathon Resort & Marina, Ltd. v. Promus Hotels, Inc.*, No. 02-cv-10085 (S.D. Fla. Dec. 9, 2002).[39]  This is so because the implied covenant is simply a tool to effectuate the parties' actual bargain – not to change it.  *See Kham & Nate's Shoes*, 908 F.2d at 1357 ("'[g]ood faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting*"); cf. Keys Jeep Eagle*, 897 F. Supp. at 1444 (claim failed as a matter of law where the parties' contract "specifically authorized all of [defendant's] actions").

Although courts may sometimes imply a duty of good faith when a party is given generalized discretion without specifying the particular action that the party has discretion to adopt, this occurs only where the parties' intent is unclear or where the covenant is necessary to prevent an agreement from being deemed illusory and unenforceable.  *See, e.g.*, *Third Story Music, Inc. v. Waits*, 41 Cal. App. 4th 798, 808 (Cal. Ct. App. 1995).  Thus, courts generally will not imply a duty of good faith and fair dealing where a contractual provision expressly grants a party absolute discretion.  *See, e.g.*, *Pac. First Bank v. New Morgan Park Corp.*, 319 Or. 342,

---

[39] *Accord Clark v. Am.'s Favorite Chicken Co*., 110 F.3d 295, 297 (5th Cir. 1997) ("the implied obligation to execute a contract in good faith usually modifies the express terms of the contract and should not be used to override or contradict them") (citation and quotation marks omitted); *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990) (principles of good faith should be used only to fill gaps in contracts, not to "block use of terms that actually appear in the contract"); *Badgett v. Security State Bank*, 116 Wash. 2d 563, 569 (1991) (duty of good faith does not inject substantive terms into the contract and "requires only that the parties perform in good faith the obligations imposed by their agreement").

354 (1994); *Tolbert v. First Nat'l Bank*, 312 Or. 485, 495 (1991) (holding that as a matter of law there is no breach of the implied covenant of good faith and fair dealing where the contract provides for unilateral exercise of discretion and that discretion is exercised in accordance with the express terms of the contract); *Automatic Sprinkler Corp. of Am. v. Anderson*, 243 Ga. 867, 869 (1979) (holding that employer was not bound by good faith where it had absolute discretion to determine incentive compensation under an employment contract).  Nor may the implied covenant be invoked to limit a party's discretion to follow a course specifically envisioned by the contract's terms.  *See, e.g.*, *Tolbert*, 312 Or. at 494 (in an insufficient funds fee case, "only the objectively reasonable expectations of parties ... will be examined in determining whether the obligation of good faith has been met"); *see also MJ & Partners Restaurant LP v. Zadikoff*, 995 F. Supp. 929, 933 (N.D. Ill. 1998) (covenant of good faith and fair dealing "is not an independent source of duties for parties to a contract, but rather is simply a guide to the construction of the explicit terms of the agreement"); *Sepe v. City of Safety Harbor*, 761 So. 2d 1182, 1185 (Fla. Ct. App. 2000) (implied covenant is designed to protect the parties' reasonable expectations, so its force "varies with the context in which it arises").

In light of this well-settled rule, the implied covenant cannot be applied to prohibit high-to-low posting.  Each of the written contracts between the parties specifically addresses posting order.  In no instance does any contract require a posting order different from high-to-low; on the contrary, every contract *explicitly authorizes* the bank to post debits in that order.  Precisely this reasoning has been applied to reject similar claims in other cases:

> We find that the contract clearly and unambiguously provides that the Bank will charge $20 per day for overdrafts…. The bank charged the overdraft fee within the parameters of the parties' agreement.  Thus Saunders' awareness of the Bank's right to charge the overdraft fee negates any inference that the Bank's actions were so far outside the parties' reasonable expectations as to constitute a breach of good faith.

*Saunders v. Mich. Ave. Nat'l Bank*, 662 N.E.2d 602, 610 (Ill. App. 1996); *see also Tolbert*, 312 Or. at 494 (same).

Plaintiffs may now believe that contracting for a specific posting order different from the one used by their banks would, in retrospect, have been more favorable to them in some circumstances.  But in the face of the actual, specific language of the contracts explicitly saying that high-to-low posting is authorized and proper, no plaintiff can claim that he or she had any basis to believe that he or she had actually contracted for something different.

> **c)** **The Implied Covenant Cannot Prohibit a Practice That State Laws and Federal Regulatory Pronouncements Specifically Permit.**

At bottom, plaintiffs' "contract" theory is not a breach of contract theory at all; it is instead an assertion that even when a bank's contracts with its customers authorize the bank to post debits in high-to-low order, the law should still prohibit the bank from posting in that order. But the implied covenant of good faith and fair dealing has never been recognized as a regulatory whip, to be administered ad hoc by courts to overrule what the parties' contract actually provides. *See Weaver*, 169 F.3d at 1316; *Clark*, 110 F.3d at 297.  On the contrary, it is for the legislature and the banking supervisors to decide when substantive regulation is to be imposed on banking operations and, if so, what the nature of such regulation shall be.  Here, state legislators and federal regulators have spoken, and their judgment is exactly contrary to plaintiffs' position.  The Court may not properly interpose a different judgment under the rubric of the implied covenant of good faith and fair dealing.  *Cf. Graham v. State Farm Mut. Auto. Ins. Co.*, 565 A.2d 908, 913 (Del. 1989) ("[I]t would be highly inappropriate if this Court were to find a contract unconscionable because it adheres to the declared public policy of this State.").

Article 4 of the UCC, the state law that generally governs check transactions (to the extent state law applies at all), provides that "items may be accepted, paid, certified, or

charged to the indicated account of [the bank's] customer in any order" suiting the bank.  UCC § 4-303(b).[40]  The UCC also specifically provides that the bank and the account-holder may adopt a particular standard by contract, but the § 4-303(b) rule of bank discretion applies in the absence of a contract providing otherwise.  *See* UCC § 4-103(a).[41]

        The legislative rationale for banks' discretion to post items to customers' accounts "in any order" is explained in an official UCC comment, which has also been adopted by every state pertinent to this case.  The UCC drafters recognized that it is often preferable for consumers that larger payments be processed first, lest their most important payments (*e.g.*, rent, mortgage, or car payment) be returned unpaid with potentially severe consequences.  For this and other reasons, there is no single "best" posting order from the customer's point of view.  UCC § 4-303, Official cmt 7.  Moreover, the account-holder bears responsibility for imposing conflicting payment demands on the bank to pay out more money than the account-holder has on deposit;

---

[40]  UCC § 4-303(b) has been adopted, sometimes with slight variations to the accompanying commentary, in all fifty states and the District of Columbia.  Ala. Code § 7-4-303; Alaska Stat. § 45.04.303; Ariz. Rev. Stat. Ann. § 47-4303; Ark. Code Ann. § 4-4-303; Cal. Com. Code § 4303; Colo. Rev. Stat. Ann. § 4-4-303; Conn. Gen. Stat. Ann. § 42a-4-303; Del. Code Ann. tit. 6, § 4-303; D.C. Code § 28:4-303; Fla. Stat. Ann. § 647.303; Ga. Code Ann. § 11-4-303; Haw. Rev. Stat. Ann. § 490:4-303; Idaho Code Ann. § 28-4-303; 810 Ill. Comp. Stat. Ann. 5/4-303; Ind. Code Ann. § 26-1-4-303; Iowa Code Ann. § 554.4303; Kan Stat. Ann. § 84-4-303; Ky. Rev. Stat. Ann. § 355.4-303; La. Rev. Stat. Ann. § 10:4-303; Me. Rev. Stat. Ann. 11 § 4-303; Md. Code Ann. Com. Law § 4-303; Mass. Gen. Laws Ann. ch. 106, § 4-303; Mich. Comp. Laws Ann. § 440.4303; Minn. Stat. Ann. § 336.4-303; Miss. Code Ann. § 75-4-303; Mo. Rev. Stat. § 400.4-303; Mont. Code Ann. § 30-4-303; Neb. Rev. Stat. Ann. § 4-303; Nev. Rev. Stat. § 104.4303; N.H. Rev. Stat. Ann. § 382-A:4-303; N.J. Stat. Ann. § 12A:4-303; N.M. Stat. Ann. § 55-4-303; N.Y. U.C.C. Law § 4-303; N.C. Gen. Stat. Ann. § 25-4-303; N.D. Cent. Code § 41-04-31; Ohio Rev. Code Ann. § 1304.29; Okla. Stat. Ann. 12A § 4-303; Or. Rev. Stat. Ann. § 74.3030; 13 Pa. Cons. Stat. § 4303; R.I. Gen. Laws § 6A-4-303; S.C. Code Ann. § 36-4-303; S.D. Codified Laws § 57A-4-303; Tenn. Code Ann. § 47-4-303; Tex. Bus. & Com. Code Ann. § 4.303; Utah Code Ann. § 70A-4-303; Vt. Stat. Ann. 9A, § 4-303; Va. Code Ann. § 8.4-303; Wash. Rev. Code Ann. § 62A.4-303; W. Va. Code Ann. § 46-4-303; Wis. Stat. Ann. § 404.303; Wyo. Stat. Ann. § 34.1-4-303.

[41]  The UCC approach is consistent with pre-Code precedent.  *See, e.g.*, *Reinisch v. Consol. Nat'l Bank*, 45 Pa. Super. 236, 1911 WL 4366, at *4 (Mar. 3, 1911) (holding that a bank that had been presented with 17 checks drawn from one customer's account, the total of which exceeded the available balance, could determine for itself the posting order).

and if there is no specific contractual term dictating otherwise, the account-holder has no

legitimate basis for criticizing the bank's choice of a payment order that serves its own interests:

> This is justified because of the impossibility of stating a rule that
> would be fair in all cases, having in mind the almost infinite
> number of combinations of large and small checks in relation to
> the available balance on hand in the drawer's account; the possible
> methods of receipt; and other variables.  Further, the drawer has
> drawn all the checks, the drawer should have funds available to
> meet all of them and has no basis for urging one should be paid
> before another ….

*Id.*[42]  Applying the same principles, the UCC's parallel provision pertaining to commercial

"payment orders" gives banks the same degree of discretion.  *See* UCC § 4A-504(a).

This same reasoning also applies to debit card transactions, although the UCC

does not, by its technical terms, govern them.[43]  Debit card transactions are governed by the

Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. §§ 1693 *et seq.*, which is implemented

through regulations issued by the Federal Reserve Board.  As discussed above (at pp. 17-18), the

Board has explicitly declined to adopt any limitation on banks' discretion as to posting order for

debit card transactions.  *See* 74 Fed. Reg. 5498, 5547-48 (Jan. 29, 2009) (observing that "it

would be difficult to set forth a bright-line rule that would clearly result in the best outcome for

all or most consumers").  The official judgments of the OCC similarly confirm that high-to-low

---

[42]  *See also* Cal. Com. Code § 4303, UCC cmt. 7; Fla. Stat. Ann. § 674.303, cmt. 7; Ga. Code
Ann. § 11-4-303, cmt. 7; 810 Ill. Comp. Stat. Ann. 5/4-303, cmt. 7; La. Rev. Stat. Ann. § 10:4-
303, cmt. 7; Mass. Gen. Laws Ann. ch. 106, § 4-303, cmt. 7; Miss. Code Ann. § 75-4-303, cmt.
7; N.J. Stat. Ann. § 12A:4-303, cmt. 7; N.M. Stat. Ann. § 55-4-303, cmt. 7;  N.C. Gen. Stat. Ann.
§ 25-4-303, cmt. 7; Or. Rev. Stat. Ann. § 74.3030, cmt. 7; Tex. Bus. & Com. Code Ann. § 4.303,
cmt. 7; Wash. Rev. Code Ann. § 62A.4-303, cmt. 7.

[43]  This exclusion results, not from a belief by the UCC drafters that debit card transactions
should be subject to a different rule, but rather because the drafters believed that debit cards were
governed by preemptive federal law.  *See* Transcript of Proceedings, National Conference of
Commissioners on Uniform State Laws, UCC Arts. 3, 4, & 4A, at 141:16-142:11 (1987).  The
official comment to UCC § 4A-108 expressly counsels that "in the absence of any law to govern
the part of the funds transfer that is not subject to [federal law], a court might apply appropriate
principles from [the UCC] by analogy."

posting is an appropriate banking protocol.  Thus, in the OCC Posting Opinion interpreting the

agency's fee regulation, the OCC concluded that "the Banks are authorized, pursuant to section

24(Seventh) of the National Bank Act and section 7.4002, to charge NSF fees that result from the

high-to-low order of check posting."  OCC Posting Opinion, 2002 WL 32639293, at *3.  The

OCC, like others, noted that "high-to-low order of posting will help ensure that a customer's

most important bills (such as mortgage payments) are paid first."  *Id.*

      These sources of authority require rejection of plaintiffs' theory that the defendant

banks' high-to-low posting violates any implied covenant of good faith and fair dealing in their

contracts.  Where the parties' contract establishes the terms of their commercial relationship, and

those terms are the same as the approach that applicable substantive law authorizes *even in the*

*absence of a contract*, there is no basis for a legal contention that such terms violate the implied

covenant.  *See, e.g.*, *Whitney Nat'l Bank v. Reliable Mailing & Printing Servs., Inc.*, 694 So. 2d

479, 481 (La. Ct. App. 1997) ("[t]he bank cannot be in bad faith for doing that which it was

legally allowed to do").

      **d)**     **Courts Have Consistently Held that High-to-Low Posting Does**
      **Not Violate The Implied Covenant of Good Faith and Fair**
      **Dealing.**

      For the reasons discussed above, courts have repeatedly dismissed as a matter of

law claims for breach of contract, based on the implied covenant, in cases challenging high-to-

low posting.  *See, e.g.*, *Hassler v. Sovereign Bank*, 644 F. Supp. 2d 509 (D.N.J. 2009); *Hill v. St.*

*Paul Fed. Bank for Sav.*, 768 N.E.2d 322 (Ill. App. 2002); *Fetter v. Wells Fargo Bank Tex., N.A.*,

110 S.W.3d 683 (Tex. App. 2003); *Daniels v. PNC Bank, N.A.*, 738 N.E.2d 447 (Ohio App.

2000); *Smith v. First Union Nat'l Bank*, 958 S.W.2d 113 (Tenn. Ct. App. 1997); *Torres v. Wells*

*Fargo*, 2008 WL 2397460 (N.D. Cal. Jun. 11, 2008); *Riddle v. Star Bank*, No. 98-CI-4098 (Ky.

Cir. Ct. Mar. 19, 1999); *Stephens v. PNC Bank of Ky., Inc.*, No. 98-CI-04051 (Ky. Cir. Ct. Oct. 20, 1998).

In *Hassler*, for example, the court rejected a claim that the implied covenant required posting "customers' debit transactions in the order in which the transactions occur." 644 F. Supp 2d at 511.  The court held that "it does not satisfy the improper motive element of a good faith performance claim for a plaintiff to allege merely that its contractual partner exercised the discretion expressly afforded to it under the agreement to serve its own financial interests or to maximize its profits."  *Id.* at 519 (internal quotation marks and citations omitted).

In *Hill*, the plaintiffs claimed "that defendants violated their duty of good faith and fair dealing in choosing a posting method that potentially results in more overdraft fees than other methods."  768 N.E.2d at 325.  Rejecting the claim, the court explained that "[t]here can be no lack of good faith in acting as authorized by the UCC," and concluded that the high-to-low posting method was authorized by the UCC regardless of the defendants' intent in choosing it. *Id.* at 326-27.  The court also observed that the implied covenant "is essentially used as a construction aid in determining the intent of the parties where an instrument is susceptible of two conflicting constructions," and held that "[n]o construction problem exists in this case," even though the "account agreements do not specify the posting order that [the bank] will use," but merely said that the bank could charge a fee for overdrafts.  *Id.* at 325.

In *Fetter*, a Texas court expressly adopted the analysis of *Hill* in recognizing that "[u]nder the plain language of [the UCC] the legislature has authorized Wells Fargo's practice of posting from high to low."  110 S.W.3d at 687.  Indeed, in *Fetter* (as in this case), the bank's position was "even stronger than … in *Hill* because Wells Fargo has language in its Account Agreement specifically permitting high to low posting in addition to the authorization provided in UCC section 4.303(b)."  *Id.* at 691 n.8.  As the *Fetter* court observed:

50

> the UCC "duty of good faith and fair dealing is aimed at making effective the agreement's promises." …. Moreover, if the factfinder may write into a contract other terms it believes are fair under the circumstances, any contract is subject to being rewritten to better suit the court's or the jury's view of what the parties should in "good faith" have included in the agreement, regardless of what the parties actually did or did not provide.

*Id.* at 689 (internal citations omitted).

In *Daniels*, an Ohio court reached the same conclusion, observing that, in light of UCC § 4-303, the plaintiff "has the insurmountable task of persuading us that a statutorily authorized procedure constitutes an act of bad faith and unfair dealing." 738 N.E.2d at 449. Moreover, the court found that contract provisions for posting "in any order convenient to us" unambiguously allowed the bank's process even though the contract did not specifically refer to high-to-low ordering.  *Id.* at 449.

A Tennessee court similarly rejected, on the same grounds, claims virtually identical to those made here.  *Smith*, 758 S.W.2d at 116.  As that court explained, in light of the UCC,

> the bank had the discretion to pay items in a manner convenient to it and we cannot substitute our judgment for that of the Bank.  To do so would undermine the fundamental purposes of the statute.

*Id.*  Accordingly, the court concluded, "there is, as a matter of law, no breach of either the common law duty of good faith in the performance of the contracts or a violation of statutory requirements of good faith."  *Id.* at 117.

A federal district court, applying Georgia law, similarly relied on the UCC in rejecting as a matter of law the contention that high-to-low processing is unconscionable.  *White v. Wachovia Bank*, 563 F. Supp. 2d 1358, 1370-71 (N.D. Ga. 2008).  That court also recognized that, because the UCC affords a bank discretion to adopt high-to-low posting, a contract provision so providing cannot be regarded as unconscionable:

> [T]here can be no substantive unconscionability because the text of the provision is consistent with a Georgia statute.  O.C.G.A. § 11-4-303(b) ("[I]tems may be accepted, paid, certified, or charged to the indicated account of its customer in any order."); *see also Zepp v. Mayor & Council of Athens*, 180 Ga. App. 72, 78, 348 S.E.2d 673, 678 (1986) ("[T]hat which the law itself specifically permits cannot be 'unconscionable'").

*Id.* at 1370-71.

In the same opinion, the *White* court declined to dismiss a good faith and fair dealing claim because of unique contentions presented in that case.  The *White* plaintiffs claimed that the bank had actually delayed posting debits for days after they were presented for payment and had improperly charged overdraft fees on days when the account was not actually overdrawn; these claims, the court found, presented a potential issue of good faith and fair dealing.  *Id.* at 1363-66.  But the *White* court found nothing in the doctrine of good faith and fair dealing that would render account terms unenforceable if they provided for high-to-low posting; nor did it disagree with the authorities discussed above.  Indeed, in discussing the UCC and case law, the *White* court merely found those authorities inapplicable because the *White* plaintiffs had alleged different conduct, such as the imposition of fees when no overdraft existed.  *See id.* at 1370 n.16.  By contrast, the plaintiffs here all concede that their accounts were in fact overdrawn, and none has identified any instance in which a defendant bank failed to timely post a debit once it was presented to the bank for payment.[44]  Accordingly, the decision of the *White* court was not inconsistent with any of the foregoing authorities in any respect pertinent to this case.

---

[44] A bank cannot, of course, control when a merchant or other payee will present a check, debit card transaction, or other debit for payment.  Some debits are "authorized" earlier, but posting a debit to an account at the time of authorization, rather than when presented for payment, is problematic because debits are often abandoned and never presented, or may be presented in amounts different from the initial authorization.  *See, e.g.*, *Gutierrez v. Wells Fargo Bank, N.A.*, 2008 WL 4279550, at *9 (N.D. Cal. 2008) (noting that "the bank has no way of knowing the extent of unpresented checks and the extent of debit transactions that will turn out to be more than what was initially authorized").

Finally, the unpublished decision in *Torres*, 2008 WL 2397460, is also in accord with the authorities above.  The plaintiffs contended that the bank's high-to-low debit posting order violated consumer protection statutes in California.  The court rejected the claims, concluding that the contract expressly disclosed the high-to-low posting method and the UCC authorized the bank to "determine freely the order in which items are accepted."  *Id.* at *2.

Defendants acknowledge that a different judge of the Northern District of California has reached a different conclusion from *Torres* in interpreting UCC § 4-303(b).  *Gutierrez v. Wells Fargo & Co.*, 622 F. Supp. 2d 946 (N.D. Cal. 2009).  *Gutierrez* did not involve a common law claim of contractual breach; rather, the plaintiffs had alleged that high-to-low posting violated a California unfair business practices statute.[45]  The *Gutierrez* court denied the bank's motion for summary judgment on that claim, basing its ruling on a unique approach to section 4-303.  The court relied on two lines of argument.  First, the *Gutierrez* court took the view that section 4-303 had nothing to do with the relationship between a bank and its account-holders and instead related only to the relationship between the bank and payees on checks they are presenting for payment.  Unfortunately, however, the court did not carefully review the statutory language of section 4-303(b), which by its plain terms *is* about the relationship between the bank and its account-holders.  (This contrasts, for example, with UCC § 4-303(a), which addresses the relationship between the bank and a payee to whom the bank has already given funds or an assurance of payment.)  The *Gutierrez* court reached its view on this point without citing any supporting authority and without any apparent consideration of the official

---

[45] As discussed below (at p. 79) this California statute permits a finding of liability if a defendant has violated a "legislative policy" associated with another law.  The *Gutierrez* court looked at the UCC in assessing this issue.  *Id.* at 954.

commentary on the provision, which provides an explicit rationale speaking directly to the bank/account-holder relationship.  (*See* pp. 47-48 above.)

Second, the *Gutierrez* court took note of a special comment attached to the adoption of UCC § 4-303 in California, which it interpreted as imposing a special duty of good faith on the bank in choosing a posting order notwithstanding the discretion explicitly provided in the statute itself.  *Id.* at 952.[46]  In reaching this conclusion, the *Gutierrez* court failed to acknowledge, much less grapple with, the contrary holding of every other high-to-low posting case on record – including that of *Fetter*, which rejected a similar argument.  *See Fetter*, 110 S.W.3d at 688-89.

Moreover, the *Gutierrez* court made a fundamental error in overlooking the *independent* source of authority for the bank's posting order provided in UCC § 4-103(a), which gives priority to any applicable provision of the parties' contract.  The discretion to post "in any order" under section 4-303(b) – and any limitation on that discretion imposed by the unlegislated California comment – becomes pertinent only *in the absence of a contract*.  Here, contracts do exist, and they uniformly provide for high-to-low posting.[47]

With due respect, the *Gutierrez* court's reasoning on this point was palpably incorrect as a reading of the statutory language and is contrary to the overwhelming weight of case authority.  This Court should instead follow the overwhelming majority conclusion that the UCC, far from supporting an implied "covenant" by the banks to post debit transactions in a

---

[46] This California comment states that banks "could not properly follow an established practice of maximizing the number of returned checks for the sole purpose of increasing the amount of returned check fees…."  Cal. Com. Code § 4303, Cal. cmt. 7.

[47] Moreover, even if the California comment had some relevance here, it only addresses a bank's choice of posting order adopted for the "sole purpose" of "maximizing" fees.  Plaintiffs here have not alleged that the defendant banks have selected a posting order that maximizes fees, much less that this was the sole purpose of their ordering choice.

different order, both affirmatively recognizes the enforceability of the parties' contracts authorizing the posting order used here and, in the absence of such a contract, affords banks discretion to post debits in any order they choose.

**D.      Plaintiffs' Common Law Unconscionability Claims Fail as a Matter of Law.**

In all but one of the thirteen complaints, plaintiffs also assert a cause of action for unconscionability.[48]  In each of the "non-California" cases, the claim is advanced as a common law claim.  In the cases brought under California law, plaintiffs assert this claim as a statutory one under California Civil Code § 1670.5.  All of these unconscionability claims are vaguely pleaded, but it is clear that plaintiffs are not contending that overdraft fees are inherently unconscionable, or that the defendant banks' fees are unconscionable in all respects.  Rather, they contend that the specific contract terms providing for high-to-low posting are unconscionable, with a few also adding that the dollar amount of the overdraft fees they received is itself unconscionable when the fee exceeds the amount of the overdraft itself.

Neither the common law nor California Civil Code § 1670.5 establishes an affirmative right of action for damages on grounds of unconscionability.  Unconscionability is only recognized as a *defense* to the enforcement of an unconscionable contract.  Moreover, the terms at issue here are not unconscionable.  As plaintiffs' own complaints make clear, the banks' terms are spelled out in detailed contracts, and the complaints do not allege that anything prevented plaintiffs from reviewing those contracts or taking their business elsewhere.  The challenged terms are broadly accepted in the marketplace and are in accordance with applicable statutory and regulatory prescriptions.

---

[48] *See* Table A.  No such cause of action is asserted in *Zankich* or *Yourke*.

### 1.     Unconscionability Is Not an Affirmative Cause of Action.

The common law of every pertinent state recognizes unconscionability only as a defense to enforcement of a contract, and not as an independent cause of action or source of affirmative relief.  As the Eleventh Circuit has stated:

> [T]he equitable theory of unconscionability has never been utilized to allow for the affirmative recovery of money damages. …
> [N]either the common law of Florida, *nor that of any other state*, empowers a court addressing allegations of unconscionability to do more than refuse *enforcement* of the unconscionable section or sections of the contract so as to avoid an unconscionable result.

*Cowin Equip. Co., Inc. v. Gen. Motors Corp.*, 734 F.2d 1581, 1582 (11th Cir. 1984) (first emphasis added; quoting *Bennett v. Behring Corp.*, 466 F. Supp. 689, 700 (S.D. Fla. 1979)).[49]

In *Sanders v. Colonial Bank of Alabama*, 551 So. 2d 1045 (Ala. 1989), this principle was applied to dismiss a claim for "unconscionability" substantially similar to that asserted here.  There, the plaintiff sued a bank "for injunctive relief and damages based on alleged unconscionability … in the Bank's assessing a $15 service charge for each check honored by the Bank when funds in [the plaintiff's] account were insufficient to cover the issued check."  *Id.* at 1045.  The court rejected the claim because no affirmative cause of action for unconscionability exists.  *Id.* at 1045-46 (citing cases in Eleventh Circuit and elsewhere).  This universal common law principle applies with equal force here.

---

[49] *See also, e.g.*, *Frye v. Am. Gen. Fin., Inc.*, 307 F. Supp. 2d 836, 844 (S.D. Miss. 2004) ("The doctrine of unconscionability is a defense to the enforcement of a contract, not a private cause of action that can be brought by a party seeking damages."); *Mitchell v. Ford Motor Credit Co.*, 68 F. Supp. 2d 1315, 1318 (N.D. Ga. 1998) (dismissing plaintiff's claim for damages for unconscionability under the UCC, which only "codifies the common law defense of unconscionability to the enforcement of a contract"); *Bennett*, 466 F. Supp. at 700 (rejecting claim for restitution based on unconscionability); *Best v. United States Nat'l Bank of Oregon*, 714 P.2d 1049, 1056 (Or. Ct. App. 1986), *aff'd*, 303 Or. 557 (1987) (same)

The law is the same under Section 1670.5 of the California Civil Code.[50]  Section 1670.5 – like the common law principles that it codifies – does not give rise to an affirmative cause of action.  *See Cal. Grocers Ass'n, Inc. v. Bank of Am., Nat'l Trust & Sav. Ass'n*, 22 Cal. App. 4th 205, 217 (1994).

Because they do not assert a recognized cause of action upon which relief may be granted, all of plaintiffs' claims for "unconscionability" should be dismissed.

## 2.      The Challenged Practices Are Not Unconscionable.

Even if an affirmative cause of action for unconscionability existed, plaintiffs' claims would be subject to dismissal because, as a matter of law, there was no unconscionability. Under the laws of the relevant states, unconscionability involves procedural and substantive elements, both of which must be present for a finding of unconscionability to be made.[51]  Neither element is present here.

*Procedural* unconscionability focuses on whether the conditions of contract formation involve oppression or unfair surprise.  *See, e.g.*, *Sprague*, 162 P.3d at 333-34.  Nothing

---

[50] Section 1670.5 provides, in pertinent part:

> If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

[51] **California:** *Brown v. Wells Fargo Bank, N.A.*, 168 Cal. App. 4th 938, 955 (2008); **Florida:** *Nat'l Fin. Servs., LLC v. Mahan*, 19 So. 3d 1134, 1136 (Fla. Ct. App. 2009); **Georgia:** *Jenkins v. First Am. Cash Advance of Ga., LLC*, 400 F.3d 868, 875-76 (11th Cir. 2005); **Illinois:** *Razor v. Hyundai Motor Am.*, 222 Ill. 2d 75, 99-100 (2006); **Louisiana:** *Truitt v. DirecTV, Inc.*, 2008 WL 5054570, at *2 (E.D. La. Nov. 21, 2008); **Massachusetts:** *Trans-Spec Truck Serv., Inc. v. Caterpillar, Inc.*, 524 F.3d 315, 329 (1st Cir. 2008); **Mississippi**: *West v. West*, 891 So. 2d 203, 213 (Miss. 2004); **New Jersey:** *Muhammad v. County Bank of Rehoboth Beach, Del.*, 189 N.J. 1, 15-16 (2006); **New Mexico:** *Cordova v. World Fin. Corp. of New Mexico*, 208 P.3d 901, 907-08 (N.M. 2009); **North Carolina:** *Tillman v. Commercial Credit Loans, Inc.*, 362 N.C. 93, 102 (2008); **Oregon:** *Sprague v. Quality Rests. Nw., Inc.*, 162 P.3d 331, 333 (Or. Ct. App. 2007); **Texas:** *In re Halliburton Co.*, 80 S.W.3d 566, 571 (Tex. 2002).

of the sort is alleged here:  plaintiffs do not claim that they were compelled to enter into the account relationships or accept the posting terms, as a result of duress, subterfuge, or other improper behavior by the banks.  *See, e.g.*, *Best*, 303 Or. at 561 (overdraft fees were not unconscionable where depositors could close their accounts at any time, and there was no evidence that the depositors were not of ordinary sophistication or that the bank obtained the deposit agreements through deception or improper means); *Saunders v. Mich. Ave. Nat'l Bank*, 662 N.E.2d 602, 611 (Ill. App. 1996) (overdraft fees were not unconscionable where the bank disclosed the fees, plaintiff was not intimidated or coerced into accepting the terms, and plaintiff could have chosen another bank).  Nor do plaintiffs allege that the contracts are disorganized, or that the posting terms were hidden.  To be sure, the contracts are detailed, form documents.  But it is wholly appropriate to use form documents to set out the terms of accounts whose computerized treatment must necessarily be uniform.  And it is an inescapable fact that a modern deposit account, attended by many features and subject to many required disclosures, inherently calls for detailed documentation.  Such disclosures cannot be deemed unconscionable.

*Substantive* unconscionability concerns the agreement's allocation of risks and burdens between parties.  *See, e.g.*, *Jenkins*, 400 F.3d at 876.  A contract is not unconscionable in the eyes of the law merely because the bargain works out, in retrospect, to be more costly than a party expected – especially when that cost is due to the party's own conduct (in this case overdrawing the account).  *See Bennett*, 466 F. Supp. at 699.  Rather, the legal question is whether the terms were so shockingly improper, at the time they were entered into, that no court can enforce the contract even though the parties agreed to it.  The classic standard is whether the contractual term "shocks the conscience" because it is "one which no sane man not acting under a delusion would make."  *See, e.g.*, *Cal. Grocers Ass'n*, 22 Cal. App. 4th at 214-15; *BMW Fin.*

58

*Servs., N.A., Inc. v. Smoke Rise Corp.*, 486 S.E.2d 629, 630 (Ga. Ct. App. 1997); *Saunders*, 662 N.E.2d at 610.

The high-to-low posting terms challenged here are hardly "shocking" or exceptional; rather, they authorize routine banking practices. Plaintiffs' own complaints assert that these terms are commonplace in the industry and – far from being restricted to the delusional – are widely accepted, after disclosure, by millions of ordinary banking customers across the country. Perhaps more significantly, as discussed above, both the UCC and statements of federal bank regulatory agencies accept the authority of banks to post in high-to-low order, recognizing the significant arguments in favor of the practice and concluding that there is no single approach that is *a priori* preferable. (*See* pp. 14-18, 46-49 above.) In light of this approval, the practice cannot be deemed unconscionable. *See, e.g.*, *White v. Wachovia*, 563 F. Supp. 2d 1358, 1370 (N.D. Ga. 2008) (dismissing unconscionability claim directed at posting practice, observing that "there can be no substantive unconscionability because the text of the provision [allowing such posting] is consistent with [the UCC]"); *Daniels v. PNC Bank, N.A.*, 738 N.E.2d 447, 451 (Ohio App. 2000) ("because the practice of high-low posting is allowed by [the UCC], it cannot be said to be itself unconscionable").

Finally, the account-holder, who can avoid any possible disadvantage by simply not overdrawing his or her account, is not in a position to complain. *See* UCC § 4-303, cmt. 7. Overdrafts occur because the customer initiates payment orders that exceed the account balance. Plaintiffs do not, and cannot, allege that the bank's posting order actually caused their accounts to be overdrafted; they assert only that posting order affects the total number of fees incurred. But account-holders may avoid *all* fees simply by monitoring their spending habits and maintaining sufficient funds in their accounts. In light of this control, there is no possible claim of unconscionability: "[A] person who chronically writes bad checks does not have clean hands

to seek equitable relief from the resulting fees, since such a person is engaged in bad banking practices and is merely experiencing the intended deterrent effect of those fees." *Daniels*, 738 N.E.2d at 451. *See also Saunders*, 662 N.E.2d at 611 (plaintiff's challenge to an allegedly excessive overdraft charge "ignores [plaintiff's] own role in establishing the [overdraft] charge").

To the extent some plaintiffs seek to allege that "[t]he imposition of overdraft charges which exceed the amount overdrawn … is itself unconscionable," such claims plainly lack merit as a matter of law.[52]  Plaintiffs do not challenge the flat per-item overdraft fee across the board; rather, they simply assert that, when that amount is charged for overdrafts of small transactions, it is disproportionate to the bank's risks and costs for those particular transactions. But it has never been the law that flat per-transaction pricing – which is accepted everywhere in the economy – is unconscionable or that companies must calibrate their pricing to match the specific costs associated with each transaction.  Nor does the law of unconscionability dictate that a provider of services may never charge substantially more than its marginal costs for individual transactions.  The price of a hotel room is not unenforceable for unconscionability because the hotel is already built and staffed, and the hotel owner's marginal cost for one more night's stay is much smaller than the rate charged; nor is the price of software unconscionable because it costs next to nothing to produce another marginal copy.  *See Hernandez v. Wells Fargo Bank New Mexico, N.A.*, 139 N.M. 68 (N.M. 2005) (rejecting claim that overdraft fee rates were unconscionable when imposed for small overdrafts).

---

[52] *See Lopez* C ¶ 143; *see also Amrhein* TAC ¶ 88; *Garcia* AC ¶ 128; *Larsen* FAC ¶ 9; *Martinez* C ¶ 110; *Tornes* SAC ¶ 181; *Waters* SAC ¶ 110.  Plaintiffs' sole basis for this claim is that "[s]uch charges are not reasonably related to the Bank's cost of covering the overdraft and/or its risk of nonpayment (where the Bank pays the overdraft), or to the Bank's cost of returning the item unpaid (where the Bank does not pay the overdraft)."  *See, e.g.*, *Lopez* C ¶ 143.

Moreover, OCC regulations explicitly *require* national banks, in establishing fees (including overdraft fees), to take into account not just "[t]he cost incurred by the bank in providing the service," 12 C.F.R. § 7.4002(b)(2)(i), but also other factors, including "[t]he deterrence of misuse by customers of banking services." *Id.* at § 7.4002(b)(2)(ii).  It is not unreasonable, much less unconscionable, for a bank to contract with its customers for flat per-transaction overdraft charges in part to discourage repetitive overdraft behavior.

### E.    Plaintiffs' Conversion Claims Fail on Multiple Grounds.

In twelve of the thirteen complaints, plaintiffs allege that charging their accounts for overdraft fees resulting from high-to-low posting constitutes "conversion."[53]  These causes of action are also fatally flawed.  While the common law is not uniform throughout the thirteen states at issue here, plaintiffs uniformly fail to plead essential elements of conversion that are universally required:  (1) ownership of, and a right to possess, specific, identifiable property; and (2) defendants' wrongful interference with and unauthorized assumption of control, dominion, or ownership over the property.[54]  As explained below, plaintiffs have not satisfied – and cannot satisfy – these elements; their claims for conversion therefore fail as a matter of law.

---

[53] *See* Table A.  Again, no such cause of action is asserted in *Zankich*.

[54] **California:**  *PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro LLP*, 150 Cal. App. 4th 384, 394-96 (2007); **Florida:**  *Senfeld v. Bank of Nova Scotia Trust Co. (Cayman) Ltd.*, 450 So. 2d 1157, 1161 (Fla. Ct. App. 1984); **Georgia:**  *Unified Servs., Inc. v. Home Ins. Co.*, 460 S.E.2d 545, 549 (Ga. Ct. App. 1995); **Illinois:**  *Cirrincione v. Johnson*, 703 N.E.2d 67, 70 (Ill. 1998); **Louisiana:**  *La. State Bar Ass'n v. Hinrichs*, 486 So. 2d 116, 120-21 (La. 1986); **Massachusetts:**  *Sweeney v. DeLuca*, 2006 WL 936688, at *8 (Mass. Super. Ct. Mar. 16, 2006); **Mississippi:**  *Walker v. Brown*, 501 So. 2d 358, 361 (Miss. 1987); **New Jersey:**  *LaPlace v. Briere*, 962 A.2d 1139, 1145-46 (N.J. Super. Ct. 2009); **New Mexico:**  *Mine Supply, Inc. v. Elayer Co. Inc.*, 411 P.2d 354, 355 (N.M. 1966); **North Carolina:**  *Peed v. Burleson's Inc.*, 94 S.E.2d 351, 353 (N.C. 1956); **Oregon:**  *Lee Tung v. Burkhart*, 116 P. 1066, 1067 (Or. 1911); **Texas:**  *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 446-47 (Tex. 1971).

### 1. The Defendant Banks Did Not Convert Any Property Owned by Plaintiffs When Assessing Fees on Plaintiffs' Accounts.

To state a claim for conversion, the property allegedly converted must have belonged to the plaintiff.  *See, e.g.*, *Scholes Elec. & Commc'ns, Inc. v. Fraser*, 2006 WL 1644920, at *5 (D.N.J. June 14, 2006).  Plaintiffs do not, and cannot, claim that the defendant banks' assessment of fees against their accounts constituted an assumption of control by the bank over property as to which they had personal ownership.  On the contrary, it is well settled that when funds are deposited with a bank, the depositor cedes ownership over those funds and becomes instead a general creditor of the bank pursuant to the deposit contract.  *See, e.g.*, *In re Liquidation of Canal Bank & Trust Co.*, 160 So. 609, 611 (La. 1935) ("[T]here is no principle of the law of banking more firmly established than that relating to the title of money deposited generally in a bank.  Such a deposit passes title to the banker immediately…."); *Maurello v. Broadway Bank & Trust Co.*, 176 A. 391, 394 (N.J. 1935) ("[W]here a general deposit is made, the title to the moneys passes from the depositor to the bank.").[55]

Indeed, under the National Bank Act, national banks *may not* treat funds in deposit accounts as the property of the depositor.  In *Texas Pacific Railway v. Pottorff*, 291 U.S. 245, 255-56 (1934), the Supreme Court held that a national bank may not even pledge assets to guarantee a depositor the repayment of deposited funds, and that any purported contract to do so would be *ultra vires* and unenforceable.  Relying on *Pottorff*, the OCC has concluded that

_____

[55] *Accord* **California:**  *Metro. Life Ins. Co. v. S.F. Bank*, 58 Cal. App. 2d 528, 534 (1943); **Florida:**  *Johnson v. Barton*, 83 So. 722, 725 (Fla. 1920); **Georgia:**  *McGregor v. Battle*, 58 S.E. 28, 29-30 (Ga. 1907); **Illinois:**  *In re Oxford Mktg., Ltd.*, 444 F. Supp. 399, 404 (N.D. Ill. 1978); *Katz v. Belmont Nat'l Bank of Chicago*, 491 N.E.2d 1157, 1159 (Ill. 1986); **Massachusetts:** *Laighton v. Brookline Trust Co.*, 114 N.E. 671, 672 (Mass. 1917); **Mississippi:**  *Deposit Guar. Nat'l Bank v. B.N. Simrall & Son Inc.*, 524 So. 2d 295, 299 (Miss. 1988); **New Mexico:**  *Sunwest Bank of Albuquerque v. Colucci,* 872 P.2d 346, 348 (N.M. 1994); **North Carolina:**  *Corp. Comm'n of N.C. v. Merchs. Bank & Trust Co.*, 138 S.E. 22, 24 (N.C. 1927); **Oregon:**  *State v. Tauscher*, 360 P.2d 764, 768 (Or. 1961); **Texas:**  *Houston Nat'l Bank v. Biber*, 613 S.W.2d 771, 774 (Tex. Ct. App. 1981).

allowing individual depositor claims on deposits "would be inconsistent with many provisions of the National Bank Act which are designed to insure, in case of disaster, … a ratable distribution of assets."  OCC Interp. Ltr. 464, 1989 WL 451287, at *2 (Dec. 14, 1988) (quoting *Pottorff*, 291 U.S. at 253).

Plaintiffs do not allege that defendants were bailees of some kind who had an obligation to keep intact a particular bundle of currency for return to the depositor.  Rather, plaintiffs allege only that they had ordinary checking accounts.  Moreover, at the time plaintiffs accrued the overdraft fees about which they complain, they by definition had no funds in their accounts.  It is therefore particularly difficult to envision what specific property belonging to the plaintiffs the banks could have converted.

Because they did not have title to the funds they claim were "converted," plaintiffs' conversion claims fail as a matter of law.  *See, e.g.*, *Lawrence v. Bank of Am.*, 163 Cal. App. 2d 431, 437 n.2 (1985) ("It is well settled … that money on deposit with a bank may not be the subject of conversion.") (citation omitted); *Transamerica Ins. Co. v. United States Nat'l Bank*, 558 P.2d 328, 335 n.11 (Or. 1976) (conversion is not a tenable theory where plaintiff is seeking to enforce its right as a creditor to repayment of its deposits by the bank); *Upper Valley Aviation, Inc. v. Mercantile Nat'l Bank*, 656 S.W.2d 952, 955 (Tex. Ct. App. 1983) (holding that a "depositor may not sue in conversion to recover his deposit").[56]

---

[56] *Accord* **Florida:**  *Belford Trucking Co. v. Zagar*, 243 So. 2d 646, 648 (Fla. Ct. App. 1970); **Georgia:**  *Green Prop. Corp. v. O'Callaghan, Saunders & Stumm*, *P.C.*, 340 S.E.2d 652, 654 (Ga. Ct. App. 1986); **Illinois:**  *Cumis Ins. Soc'y v. Peters*, 983 F. Supp. 787, 793 (N.D. Ill. 1997); *In re Thebus*, 483 N.E.2d 1258, 1260 (Ill. 1985); **Louisiana:**  *In re Wittenbrink*, 849 So. 2d 18, 22 (La. 2003); **Massachusetts:**  *Gossels v. Fleet Nat'l Bank*, 902 N.E.2d 370, 378 (Mass. 2009); **Mississippi:** *Collums ex rel. Collums v. Union Planters Bank, N.A.*, 832 So. 2d 572, 576 (Miss. Ct. App. 2002); **New Jersey:**  *Advanced Enters. Recycling, Inc. v. Bercaw*, 869 A.2d 468, 472-73 (N.J. Super. Ct. 2005); **New Mexico:**  *Bd. of Comm'rs, San Miguel County v. People's Bank & Trust Co.*, 279 P. 60, 62 (N.M. 1929); **North Carolina:**  *Corp. Comm'n*, 138 S.E. at 24.

This principle was recognized even in *Gutierrez v. Wells Fargo & Co.*, 622 F. Supp. 2d 946 (N.D. Cal. 2009), a decision on which plaintiffs will likely seek to rely on other issues. That court correctly rejected a conversion claim identical to plaintiffs' claims here, stating that the plaintiffs had "not demonstrated their ownership or right to possession of the property. The relationship between a bank and its depositor arising out of a general deposit is that of a debtor and creditor. A bank may not be sued for conversion of funds deposited with the bank." *Id.* at 956.[57]

### 2.    Plaintiffs Cannot Show a "Wrongful" Taking of Property.

It is well settled under the law of every relevant state that "[t]he crux of conversion is *wrongful* exercise of dominion or control over property of another without authorization and to the exclusion of the owner's rights in that property." *Chicago Title Ins. Co. v. Ellis*, 978 A.2d 281, 288 (N.J. Super. Ct. 2009) (emphasis added).[58]  Even if plaintiffs had pled actual ownership of their account funds, they could not as a matter of law demonstrate a

---

[57] Furthermore, to state a claim for conversion of money, most states require a plaintiff to claim ownership, not just of some particular *amount* of money, but rather of specific identifiable currency, just as on a claim for conversion of other specific tangible property. *See Wood Indus. Corp. v. Rose*, 530 P.2d 1245, 1247 (Or. 1975) (holding that there can be no conversion of money unless party was under an obligation to return the specific money to the party claiming it); *accord Belford*, 243 So. 2d at 648; *Sweeney v. DeLuca*, 2006 WL 936688, at *8 (Mass. Super. Ct. Mar. 16, 2006); *Houston Nat'l Bank v. Biber*, 613 S.W.2d 771, 774-75 (Tex. Ct. App. 1981); *Internal Med. Alliance, LLC v. Budell*, 659 S.E.2d 668, 675 (Ga. Ct. App. 2008). Such a claim would be impossible here, and plaintiffs do not even attempt it.

[58] *Accord* **California:** *Farmers Ins. Exch. v. Zerin*, 53 Cal. App. 4th 445, 452 (1997); **Florida:** *Misabec Mercantile, Inc. De Panama v. Donaldson, Lufkin & Jenrette ACLI Futures, Inc.*, 853 F.2d 834, 838 (11th Cir. 1988) (applying Florida law); **Georgia:** *WESI, LLC v. Compass Envtl., Inc.*, 509 F. Supp. 2d at 1353, 1361 (N.D. Ga. 2007); **Illinois:** *Race v. Chandler*, 15 Ill. App. 532, 1884 WL 10189, at *5 (1884); **Louisiana**: *Fuller v. XTO Energy, Inc.*, 989 So. 2d 298, 302 (La. Ct. App. 2008); **Massachusetts:** *Hills v. Snell*, 104 Mass. 173, 177-78, 1870 WL 6822, at *4 (Mass. 1870); **Mississippi:** *Smith v. Orkin Exterminating Co.*, 791 F. Supp. 1137, 1143 (S.D. Miss. 1990); *Chipman v. Lollar*, 304 F. Supp. 440, 444 (N.D. Miss. 1969); **New Mexico:** *Mine Supply, Inc. v. Elayer Co.*, 411 P.2d 354, 355 (N.M. 1966); **North Carolina:** *Synergy Fin., L.L.C. v. Zarro*, 329 F. Supp. 2d 701, 708 (W.D.N.C. 2004); **Oregon:** *Hunt v. First Nat'l Bank of Halfway*, 202 P. 564, 565-66 (Or. 1921); **Texas:** *N. Houston Int'l, L.L.C. v. PW Real Estate Invs., Inc.*, 2003 WL 22453796, at *7 (Tex. Ct. App. Oct. 30, 2003).

wrongful taking of that property, because defendants' actions in assessing the challenged overdraft fees were authorized under the deposit agreements.[59] Plaintiffs' conversion claims fail for this additional reason also.

### F.    Plaintiffs' Unjust Enrichment Causes of Action Fail to State a Claim.

In twelve of the thirteen complaints (again excluding *Zankich*), plaintiffs allege that the defendants' collection of overdraft fees resulting from high-to-low posting constitutes "unjust enrichment."  (*See* Table A.)  These claims fail for at least two reasons.

*First*, plaintiffs themselves allege, in each case, that their accounts, and the conduct and fees at issue, are specifically controlled by written contracts.  This defeats a common law claim for unjust enrichment.  Unjust enrichment is the modern term for the doctrine of quasi-contract or contract implied in law, and it is hornbook law that "an action for unjust enrichment cannot lie in the face of an express contract."[60]  This Court recently held as much in a

---

[59] What plaintiffs are really asserting here is that they were charged too much for their overdrafts. But it is well settled that such a claim for an alleged overcharge does not provide a basis for a cause of action in conversion.  **California:** *Gutierrez*, 622 F. Supp. 2d at 956 (citing *McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457, 1492 (2006) ("Plaintiffs cite no authority for the proposition that a cause of action for conversion may be based on an overcharge.")); **Florida:** *Belford*, 243 So. 2d at 648-49 (Fla. Ct. App. 1970); **Georgia:** *Am. Gen. Life & Accident Ins. Co. v. Ward*, 509 F. Supp. 2d 1324, 1330 (N.D. Ga. 2007); **Illinois:** *Song v. PIL, LLC*, 640 F. Supp. 2d 1011, 1017 (N.D. Ill. 2009) (citing *In re Thebus*, 483 N.E.2d 1258, 1260 (Ill. 1985)); **Louisiana:** *Silver v. Nelson*, 610 F. Supp. 505, 514 n.10 (E.D. La. 1985); **Massachusetts:** *In re Salett*, 53 B.R. 925, 930 (Bankr. D. Mass. 1985); **Mississippi:** *Morrone Co. v. Barbour*, 241 F. Supp. 2d 683, 689 (S.D. Miss. 2002); **New Jersey:** *Winslow v. Corp. Express, Inc.*, 834 A.2d 1037, 1046 (N.J. Super. Ct. 2003); **New Mexico:** *Elliott Indus. LP v. BP Am. Prod. Co.*, 407 F.3d 1091, 1115-16 (10th Cir. 2005); **Texas:** *Daniels v. Equitable Life Assurance Soc'y of the United States*, 35 F.3d 210, 215 (5th Cir. 1994).

[60] 66 Am. Jur. 2d *Restitution and Implied Contracts* § 24; *see also id.* ("[A]n express contract precludes the existence of a contract implied by law or a quasi contract.") (citations omitted); *id.* § 8 (citing cases); *id.* § 9 ("Unjust enrichment describes a recovery for the value of the benefit retained *when there is no contractual relationship*, but when, on the grounds of fairness and justice, the law compels the performance of a legal and moral duty to pay.") (emphasis added) (citations omitted); Restatement (First) of Restitution § 107; 1 Arthur L. Corbin, Corbin on Contracts § 1.20 ("Where, however, there is an enforceable express or implied in fact contract (continued…)

case applying Florida law.  *Reese v. JPMorgan Chase & Co.*, __ F. Supp. 2d __, 2009 WL

3346783, at \*14 (S.D. Fla. Oct. 15, 2009) (dismissing unjust enrichment claim where plaintiff's

claim arose out of a contractual relationship with the defendant).  All states whose laws apply to

plaintiffs' claims bar recovery for unjust enrichment on this same ground.[61]

   At least two federal courts have dismissed similar "overdraft fee" unjust

enrichment claims for precisely this reason.  In *White v. Wachovia Bank, N.A.*, which allowed

certain other claims to proceed on distinguishable grounds (*see* p. 52 above), the court

nonetheless rejected the plaintiffs' unjust enrichment claim under Georgia law, stating:

> The Deposit Agreement covers [Defendant]'s posting of
> transactions and imposition of overdraft fees.  Plaintiffs allege that
> the same behavior underlying their unjust enrichment
> claim underlies their breach of contract claim.  Effectively, Plaintiffs
> claim that there was a contract and that [Defendant] was unjustly
> enriched within a single count.  This is not permissible, and the
> court must dismiss the unjust enrichment claim.

563 F. Supp. 2d 1358, 1371-72 (N.D. Ga. 2008).  Similarly, in *Hassler v. Sovereign Bank*, 644 F.

Supp. 2d 509 (D.N.J. 2009), the court applied New Jersey law to dismiss the plaintiffs' claim

_____

that regulates the relations of the party or that part of their relations about which issues have
arisen, there is no room for quasi contract." (citations omitted)).

[61] **California:**  *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1167 (9th Cir.
1996); **Florida:**  *Reese*, 2009 WL 3346783, at \*14; *Berry v. Budget Rent A Car Sys., Inc.*, 497 F.
Supp. 2d 1361, 1369 (S.D. Fla. 2007); **Georgia:** *Am. Casual Dining, L.P. v. Moe's Sw. Grill,
L.L.C.*, 426 F. Supp. 2d 1356, 1372 (N.D. Ga. 2006); **Illinois:**  *Util. Audit, Inc. v. Horace Mann
Serv. Corp.*, 383 F.3d 683, 688-89 (7th Cir. 2004); *Murray v. Abt Assocs., Inc.*, 18 F.3d 1376,
1379 (7th Cir. 1994); **Louisiana:**  *Marple v. Kurzweg*, 902 F.2d 397, 401 (5th Cir. 1990) (citing
*Miller v. Housing Auth. of New Orleans*, 190 So. 2d 75, 81 (La. 1966); **Massachusetts:**  *Boswell
v. Zephyr Lines, Inc.*, 606 N.E.2d 1336, 1342 (Mass. 1993); **Mississippi:**  *Davis v. Gen. Motors
Acceptance Corp.*, 406 F. Supp. 2d 698, 702 (N.D. Miss. 2005); **New Jersey:**  *Suburban
Transfer Serv., Inc. v. Beech Holdings, Inc.*, 716 F.2d 220, 226 -27 (3d Cir. 1983); **New Mexico:**
*Elliott Indus. LP v. BP Am. Prod. Co.*, 407 F.3d 1091, 1117 (10th Cir.  2005); **North Carolina:**
*Whitfield v. Gilchrist*, 497 S.E.2d 412, 414-15 (N.C. 1998); *Madison River Mgmt Co. v. Bus.
Mgmt Software Corp.*, 351 F. Supp. 2d 436, 446 (M.D.N.C. 2005); **Oregon:**  *Ken Hood Constr.
v. Pac. Coast Constr., Inc.*, 120 P.3d 6, 13 n.7 (Or. Ct. App. 2005); **Texas:**  *Fortune Prod. Co. v.
Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000); **Washington:**  *U.S. for Use & Benefit of Walton
Tech., Inc. v. Weststar Eng'g, Inc.*, 290 F.3d 1199, 1204 (9th Cir. 2002).

that charging overdraft fees constituted unjust enrichment, explaining that "the enrichment of one party at the expense of the other is not unjust where it is permissible under the terms of an express contract." *Id.* at 519 (citations omitted).  The same rationale applies here.

   *Second*, even if the unjust enrichment claims could coexist with the express contracts, they would nevertheless fail because plaintiffs do not allege grounds on which defendants' overdraft fees could lawfully be deemed unjust.  As discussed above, the fees were specifically provided for under the parties' contracts and were in accord with both the UCC and the applicable regulations and interpretations issued by federal regulators.  As this Court has recently observed, "[t]he essential elements of an action for unjust enrichment are a benefit conferred upon the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance and retention of such benefit by the defendant under such circumstances that it would be inequitable for him to retain it without paying the value thereof."  *Jaffe v. Bank of Am., N.A.*, __ F. Supp. 2d __, 2009 WL 2567488, at *20 (S.D. Fla. Aug. 28, 2009) (dismissing claim for unjust enrichment where it was not inequitable for defendant to retain benefit of payment).

  **G.**  **All of Plaintiffs' Statutory Claims Fail for Multiple Reasons.**

   Each of plaintiffs' complaints asserts causes of action under the consumer protection or deceptive business practices statutes of one or more states.  These claims fail for multiple, independent reasons.[62]

   *First*, plaintiffs cannot assert claims for violation of the statutes of states other than their own.  The Constitution restricts the extraterritorial application of state law, and those limitations are reinforced by the plain terms of the statutes themselves and by the choice-of-law

---

[62] The full citations to the state statutes asserted in each complaint are set out in Table C, along with a complete listing of the grounds for dismissal of each claim in each case.  The state statutes that have been invoked in each case are summarized in Table A, and the specific grounds on which claims asserted under each statute should be dismissed are summarized in Table B.

provisions of the parties' contracts.  Plaintiffs' non-resident statutory claims should thus be dismissed for this threshold reason.

        *Second*, plaintiffs have failed to plead facts sufficient to state a claim under *any* of the state statutes they seek to invoke.  These claims fail for a variety of reasons, including that: (a) high-to-low posting is specifically permitted by federal and state law; (b) plaintiffs have failed to allege a "deceptive," "unfair," or "unconscionable" practice as variously required by these statutes; (c) certain of the statutes do not apply to "banking" transactions or to transactions involving the provision of "money" – such as overdraft coverage; (d) plaintiffs failed to comply with the pre-lawsuit notice requirements of certain statutes; (e) the express terms of one statute precludes the maintenance of a class action; and (f) plaintiffs have failed to plead other predicate requirements of certain statutes.  For these additional reasons, as set forth in greater detail below, all of plaintiffs' statutory claims should be dismissed.

### 1.    No Plaintiff May Bring a Claim Under the Law of Any State in Which That Plaintiff Does Not Reside or Maintain His or Her Account.

        Some complaints assert claims invoking only the laws of the plaintiffs' home states.  Others, however, purport also to assert claims under statutes of other states.  Thus, for example, the *Garcia* plaintiffs purport to assert claims under the statutes, not just of states in which plaintiffs in that case reside, but also of five other states of which no plaintiff in that case is a resident.  Similar "extraterritorial" statutory claims are asserted in *Tornes*, *Lopez*, and *Speers*. (*See* Table A.)   These claims all fail at the threshold, as none of the plaintiffs has standing, under either the Constitution or the statutes themselves, to assert them.[63]

---

[63] In a few instances, the plaintiffs in one case purport to assert claims under the statute of a state in which there is a resident plaintiff in a *different* case against a *different* defendant.  Thus, for example, the Washington Consumer Protection Act is invoked in *Zankich*, *Tornes*, *Lopez*, and *Speers*.  The *Zankich* plaintiffs reside in Washington, but all plaintiffs in the other three cases (continued…)

a)       **State Laws Presumptively Do Not Apply Extraterritorially.**

There is a heavy presumption that a state's laws do not apply extraterritorially to transactions that do not occur within that state's borders and do not affect its residents.  *Sandberg v. McDonald*, 248 U.S. 185, 195 (1918) (state laws are "presumptively territorial and confined to limits over which the law-making power has jurisdiction").  The Commerce and Due Process Clauses of the Constitution severely restrict any attempt to apply state laws to extraterritorial conduct.  *See BMW of N. Am. v. Gore*, 517 U.S. 559, 571-72 (1996); *Healy v. Beer Inst.*, 491 U.S. 324, 335-37 (1989).  Accordingly, courts routinely decline to apply state laws to out-of-state transactions that do not involve a resident of the state.  *See, e.g.*, *State Sur. Co. v. Lensing*, 249 N.W. 2d 608, 612 (Iowa 1977) (refusing to extend Iowa statute to transactions that took place in Arizona, citing "the general rule that a state's statutes are presumed not to have extraterritorial effect").

Here, the plaintiffs in several cases seek to bring claims under the statutes of states in which they do not reside and in which none of the relevant transactions are alleged to have occurred.  Plaintiffs fail to allege *any* contact between these non-resident states and the challenged practices, much less the significant aggregation of contacts the Constitution requires.  As a result, the extraterritorial application of those laws to these plaintiffs is inappropriate.

b)       **The Statutes Themselves Limit Their Application to Transactions Occurring in the State or Affecting State Residents.**

Even apart from the constitutional presumption against extraterritorial application of state statutes, most consumer protection statutes make clear on their face that they are not

---

reside elsewhere, and they obviously cannot rely on the *Zankich* plaintiffs' residence in suing different defendants in different cases.

intended to have extraterritorial application.[64]  And case law applying such statutes confirms that "[s]tate consumer fraud acts are designed to either protect state residents or protect consumers engaged in transactions within the state."  *Lyon v. Caterpillar, Inc.*, 194 F.R.D. 206, 215 (E.D. Pa. 2000).  Accordingly, where the plaintiff does not reside in a state and the transaction is not alleged to have occurred in that state, that state's statute does not apply.  *See, e.g.*, *Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp. ITT*, 139 F.3d 1396, 1410 (11th Cir. 1998) (affirming summary judgment as to Massachusetts statutory claims where the acts did not take place in Massachusetts); *Gotlin v. Lederman*, 616 F. Supp. 2d 376, 392 (E.D.N.Y. 2009) (New York statute only applies where deception occurred in New York).[65]

That plaintiffs purport to maintain some of these actions as nationwide class actions does not give them free rein to assert statutes of states for which there are no resident plaintiffs.  No named plaintiff has standing to assert claims under the laws of states where that plaintiff does not reside and where none of the events that caused his or her injury is alleged to have occurred.  *See generally Blum v. Yaretsky*, 457 U.S. 991, 999 (1982) ("It is not enough that

---

[64] *See*, *e.g.*, W. Va. Code Ann. § 46A-1-104 (applying to "a consumer, *who is a resident of this state*," regarding goods, services, or proceeds delivered "*in this state*" and where payment is "*from this state*") (emphasis added); Conn. Gen. Stat. Ann. §§ 42-110a(4), 42-110b, 42-110g (regulating "trade" or "commerce," which is defined as that occurring "*in this state*") (emphasis added); Kans. Stat. Ann. §§ 50-623 *et seq.* (applying to consumer transactions "*within this state*") (emphasis added); N.Y. Gen. Bus. Law § 349(a) (applies to "business, trade or commerce" or "service[s]" "*in this state*") (emphasis added); Ohio Rev. Code Ann. § 1345.04 (limited to "any supplier with respect to any act or practice *in this state*") (emphasis added).

[65] *See also Montgomery v. Sprint Spectrum, L.P.*, 2007 WL 3274833, at *6 (D. Kan. 2007) ("the KCPA applies to consumer transactions which occur 'within this state.'"); *Victor G. Reiling Assocs.& Design Innov., Inc. v. Fisher Price, Inc.*, 406 F. Supp. 2d 175, 200-01 (N.D. Conn. 2005) (Connecticut statute did not apply to Connecticut-based plaintiff where alleged practices were not "intimately associated" with Connecticut – alleged practices took place in New York and product was marketed nationwide); *Chesnut v. Progressive Cas. Ins. Co.*, 850 N.E.2d 751, 755-56 (Ohio Ct. App. 2006) (statute only applicable "if the offending conduct took place within the territorial borders of the State of Ohio"); *Refco, Inc. v. Troika Inv. Ltd.*, 702 F. Supp. 684, 690 n.19 (N.D. Ill. 1988) (under Illinois statute – which limits "trade or commerce" to that "directly or indirectly affecting the people of this State" – the "relevant question is … whether [the claimant] is within the scope of the intended coverage").

the conduct of which the plaintiff complains will injure *someone*.  The complaining party must also show that he is within the class of persons who will be concretely affected."); *Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987) ("[A] claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim.").[66] Plaintiffs thus cannot invoke the hypothetical claims of absent class members to overcome the bar to the extraterritorial application of state law.

### c)   Choice of Law Principles Bar Application of "Non-Resident" Laws.

Plaintiffs' efforts to invoke the statutes of states other than those in which they reside also fail under basic choice-of-law principles.  As discussed above (at pp. 35-38), most of the plaintiffs here are bound by contractual choice-of-law clauses that specify the state laws that apply to their accounts. Those provisions do not permit the application of the laws of *other* states to those same accounts.[67]

The decision in *Burger King Corp. v. C.R. Weaver & M-W-M, Inc.*, 798 F. Supp. 684, 687 (S.D. Fla. 1992), *aff'd*, 169 F.3d 1310 (11th Cir. 1999), illustrates the application of a statutory choice-of-law provision to bar the assertion of claims under a statute of a state other than the one whose law is chosen.  In *Weaver*, the parties entered a franchise agreement for the operation of a Burger King restaurant in Montana.  The agreement provided that it would be governed and construed in accordance with Florida law.  798 F. Supp. at 687.  When the

---

[66] As the Supreme Court has repeatedly held, "[t]hat a suit may be a class action … adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 & n.20 (1976) (quoting *Warth v. Seldin*, 422 U.S. 490, 522 (1975)).

[67] Nor do plaintiffs allege facts to show any other nexus to these other states sufficient to support application of these states' laws under basic choice-of-law principles.  (*See* pp. 39-40 above.)

71

franchisee subsequently brought a claim against Burger King for violation of Montana's Unfair Trade Practices Act ("MUTPA"), the court rejected its application, reasoning that the "MUTPA … is inapplicable to a lawsuit construed in accordance with the laws of the State of Florida."  *Id.* at 690.  The court dismissed the MUTPA claims as a result.  *Id.*

Plaintiffs here are bound by their agreements to be governed either by the laws of the states in which their accounts are maintained or by the laws of the states in which their accounts were opened.  They may not now invoke the laws of different states – particularly states that have nothing to do with them or their claims in any event.

> **2.      Plaintiffs' Complaints Fail to State a Claim Under Any of the Statutes They Assert.**

All of plaintiffs' statutory claims fail to state a claim as a matter of law for multiple reasons.  The grounds for dismissal of each claim vary from state to state (*see* Table B), but they include the following:

- Conduct cannot be condemned under the asserted consumer protection statutes when it is specifically authorized under both federal law and the law of those same states.

- Plaintiffs have failed to allege a "deceptive" practice, as required by many statutes.

- Plaintiffs cannot maintain a claim for "unfair" practices under statutes that extend to such conduct because the deposit agreements authorize high-to-low posting and plaintiffs have not – and cannot – allege that the practice violates a legislatively or constitutionally declared policy.

- Because the deposit agreements disclose, and federal and state law authorize, the challenged practice, it cannot be deemed "unconscionable" within the meaning of statutes barring unconscionable conduct.

- Some of the asserted statutes expressly exempt banking transactions, while others do not apply to transactions involving the provision of "money" – such as overdraft coverage.

- Plaintiffs failed to comply with certain statutes' pre-lawsuit notice requirements.

- The express terms of the Montana statute bars plaintiffs from maintaining a class action, and no individual plaintiff has a claim under that statute.

- Plaintiffs have failed to plead other predicate requirements of certain statutes.

Each of these defects, and the statutory claims to which they apply, are addressed below.  Table B provides a summary listing of the particular defects in the claims asserted under each state statute.

> **a)**      **The Statutes Do Not Provide a Cause of Action to Challenge Conduct that State and Federal Law Specifically Permits.**

As explained above (at pp. 14-15, 46-48), the law of every state in the United States expressly permits banks to post transactions from highest amount to lowest.  Federal law also expressly recognizes and authorizes this practice.  (*See* pp. 15-18, 48-49 above.)   A practice that is expressly authorized by both federal law and the law of the very state at issue cannot at the same time violate that same state's consumer protection laws.

Several of the statutes at issue expressly exempt from liability conduct that is otherwise authorized by law.[68]  Other states have recognized this safe harbor through decisional law.[69]  All recognize the self-evident principle that statutes are not to be interpreted as barring that which the law already specifically permits.  *See Smith v. First Union Nat'l Bank*, 958 S.W.2d 113, 116-17 (Tenn. Ct. App. 1997) (affirming dismissal of suit claiming that a high-to-low posting order violated the Tennessee Consumer Protection Act, reasoning that the UCC as

---

[68] **Connecticut**:  Conn. Gen. Stat. Ann. § 42-110c(a); **Illinois**:  815 Ill. Comp. Stat. Ann. 505/10b(1); **Massachusetts**:  Mass. Gen. Laws Ann. 93A, § 3; **New Mexico**:  N.M. Stat. Ann. § 57-12-7; **New York**:  N.Y. Gen. Bus. Law § 349(d); **Ohio**:  Ohio Rev. Code Ann. § 1345.12(A); **Washington**:  Wash. Rev. Code Ann. § 19.86.170.

[69] **California**:  *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 182 (1999) ("If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination.  When specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor."); *Lazar v. Hertz Corp.*, 69 Cal. App. 4th 1494, 1505-06 (1999) (dismissing unfair competition claim challenging surcharge expressly authorized by California law, reasoning that "[a] business practice cannot be unfair if it is permitted by law"); **Kansas**:  *Bomhoff v. Nelnet Loan Services, Inc.*, 279 Kan. 415, 421-22 (2005) (dismissing claim that lender's practice of applying loan pre-payment amounts first to interest was deceptive or unconscionable because lender complied with federal regulation which provided that "lender *may* credit the entire payment amount first to any late charges accrued or collection costs and then to any outstanding interest and then to outstanding principal") (emphasis added).

adopted by Tennessee authorized the posting order); *Hill v. St. Paul Fed. Bank for Sav.*, 768 N.E.2d 322, 328-29 (Ill. App. Ct. 2002) (affirming dismissal of a suit claiming that a high-to-low posting order violated the Illinois Consumer Fraud Act).

For this reason alone, plaintiffs' statutory causes of action all fail to state a claim.

> **b)    The Posting Practice and Fees at Issue Here Are Not Within the Categories of Conduct Covered by Most of the Statutes Plaintiffs Seek to Invoke.**

Most of plaintiffs' statutory claims seek to invoke statutes that address only very specific types of conduct. Several of these statutes extend only to conduct that is "deceptive." Others apply also to certain types of "unfair" or "unconscionable" conduct, but those categories are not open-ended and do not extend to cover the kind of practices at issue here.

> **(1)    Plaintiffs Have Not Pled Misrepresentations or Other Deceptive Acts as Required Under Many of the Statutes.**

Several of the statutes plaintiffs assert (those of Minnesota, New York, Oregon, and West Virginia) apply only to conduct involving some form of misrepresentation or deception. (*See also* n.72 below.) For those statutes, it is not enough to claim that a practice is somehow "unfair" or "unconscionable"; rather, to state a claim, plaintiffs must allege facts showing that they were injured by conduct that affirmatively *misled* or *deceived* them.[70]

This is, simply put, not a "deceptive practices" case. Plaintiffs' claims here relate to the practice of posting transactions in order from highest amount to lowest and charging

---

[70] **Minnesota**: Minn. Stat. Ann. § 8.31 (authorizing suit for alleged violation of certain other statutes; only statutes potentially applicable here address "deceptive" or "fraudulent" acts); **New York**: N.Y. Gen. Bus. Law § 349(a); *Super Glue Corp. v. Avis Rent A Car Sys., Inc.*, 159 A.D.2d 68, 71 (N.Y. App. 1990); *Bildstein v. MasterCard Int'l Inc.*, 329 F. Supp. 2d 410, 414 (S.D.N.Y. 2004) (to be actionable, an act or practice must be materially misleading); **Oregon**: Or. Rev. Stat. §§ 646.638; 646.608(1) (allowing private right of action for deceptive or misleading representations and certain specific unfair conduct not at issue here); *Feitler v. The Animation Celection, Inc.*, 170 Or. App. 702, 708 (2000); *Searcy v. Bend Garage Co.*, 286 Or. 11, 14 (1979); **West Virginia**: W. Va. Code § 46A-6-102 (describing categories of actionable misrepresentations and deceptive conduct).

allegedly excessive fees as a result.  Plaintiffs have not alleged that any of the defendant banks

engaged in any materially misleading conduct in connection with high-to-low posting.  Any such

allegation would be subject to the heightened pleading standards of Rule 9(b).  *See, e.g.*, *Vess v.

Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003); *Harper v. LG Elecs. USA, Inc.*,

595 F. Supp. 2d 486, 491 (D.N.J. 2009).  (*See also* n.83 below.)  Here, plaintiffs have not only

failed to satisfy Rule 9(b); they have not alleged any actual *misrepresentations* made to them at

all.

Even if the requirements of Rule 9(b) did not exist, the facts presented in these

complaints could not possibly support a claim of deceptive conduct in violation of these statutes.

As a matter of law, a business practice cannot be deemed to be "deceptive" or "misleading" if it

complies with the terms of a contract between the parties.  *Hassler*, 644 F. Supp. 2d at 520-21.[71]

In *Hassler*, for example, the plaintiff alleged that a bank had violated New Jersey's Consumer

Fraud Act by failing to disclose adequately that it would order transactions from highest to

lowest, a practice the plaintiff contended resulted in a greater likelihood of depleting account

funds and a corresponding increase in overdraft fees.  *Id.* at 513-15.  The account agreement

indicated that the bank "generally" posted transactions from largest to smallest, but the bank

reserved the right to pay transactions "in any order."  *Id.* at 515.  The district court dismissed the

claims because the terms of the deposit agreement made clear that the bank reserved the right to

---

[71] *See also McFoy v. Amerigas*, 295 S.E.2d 16, 20 (W. Va. 1982) (where a defendant has "made
known to its customers the terms and conditions [at issue] through any reasonable oral or written
means," action consistent with those terms "could not possibly be characterized as 'deceptive'");
*Sands v. Ticketmaster-N.Y., Inc.*, 207 A.D. 2d 687 (N.Y. Sup. Ct. 1994) (challenged fees were
not deceptive under New York General Business Law § 349 where fees were fully disclosed); *In
re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 966 (N.D. Cal. 2007) (dismissing
UCL claim because challenged conduct permitted by federal law and because "actions consistent
with the 'fully-disclosed terms of the contract . . . cannot plausibly be labeled a deception'")
(citation omitted).

process debit transactions in precisely the manner about which the plaintiff complained. *Id*. Reasoning that "it would be difficult for [the bank] to have disclosed its 'practice of posting charges in a non-chronological manner' in clearer or more understandable terms," the court concluded that the bank's practices were "not misleading or deceptive in any way." *Id*.

Plaintiffs here do not (and could not) allege that the banks' high-to-low posting order was contrary to or in any way inconsistent with the deposit agreements. As in *Hassler*, the bank defendants' contracts authorize the very practice about which plaintiffs complain. None states that the banks will post transactions in chronological order, from lowest amount to highest, or in any other order plaintiffs may prefer.

No plaintiff alleges that he or she was actually misled by any statement or conduct of any defendant. Nor does any plaintiff contend that he or she would have acted any differently had the banks disclosed the practice differently. *See Bildstein*, 329 F. Supp. 2d at 414 (dismissing claim for failure to disclose credit card fee in card agreement because the plaintiffs failed to allege that information about the fee would have affected their choice of credit cards). Plaintiffs also fail to allege that any deceptive conduct by defendants – or any failure to disclose a material fact – actually injured them. *See, e.g.*, *Hassler*, 644 F. Supp. 2d at 514 (New Jersey statute requires "a causal relationship between the unlawful conduct and the ascertainable loss.").

For the foregoing reasons, plaintiffs' claims under the consumer protection statutes of Minnesota, New York, Oregon, and West Virginia all fail as a matter of law.

Similarly deficient are any efforts plaintiffs may be making to assert claims under the "misrepresentation" or "deceptive practices" prong of any other consumer protection statute. *See, e.g.*, *Buckland v. Threshold Enters.*, *Ltd.*, 155 Cal. App. 4th 798, 809 (2007) ("plaintiffs in a California CLRA action [must] show not only that a defendant's conduct was deceptive but that the deception caused them harm") (citations omitted); *Smoot v. Physicians Life Ins. Co.*, 135

N.M. 265, 270 (2003) (New Mexico statute requires proof of a "causal link" between challenged

misrepresentation and plaintiff's alleged loss); *Bus. Cabling, Inc. v. Yokeley*, 643 S.E. 2d 63, 69

(N.C. App. 2007) (plaintiff must show he or she "detrimentally relied upon a statement or

misrepresentation and he or she suffered actual injury as a proximate result of defendant's

deceptive statement or misrepresentation"), *rev. denied*, 650 S.E.2d 599 (2007); *Novell v.*

*Migliaccio*, 309 Wis. 2d 132, 151-52 (2008) (challenged misrepresentation must materially cause

pecuniary loss to the plaintiff).

### (2) Plaintiffs Have Failed Adequately to Allege Violation of the State Statutes That Extend to "Unfair" Practices.

Some state statutes (those of California, Connecticut, Illinois, Massachusetts,

Montana, North Carolina, Ohio, and Washington) do recognize a cause of action for conduct that

is "unfair" even where there is no allegation of deception.[72]  However, plaintiffs' claims under

those statutes still fail as a matter of law, for several reasons.

*First*, the challenged conduct cannot be deemed "unfair," because it was fully

disclosed and expressly authorized in the parties' contracts.  A practice may not be challenged as

"unfair" under any of these statutes where, as here, it complies with the terms of a contract

---

[72] As discussed above, the statutes of Minnesota, New York, Oregon, and West Virginia do *not* recognize a claim for an "unfair" practice that is not also deceptive.  The statutes of Kansas and New Jersey also do not recognize such a claim, although, as discussed below, they do recognize a claim for unconscionability.  Although the New Mexico statute refers to "unfair or deceptive" practices, it has been interpreted by the New Mexico courts as requiring a showing of a deceptive or misleading representation or omission to make out a claim.  *See Stevenson v. Louis Dreyfus Corp.*, 112 N.M. 97, 100-01 (1991); *see also Lohman v. Daimler-Chrysler Corp.*, 142 N.M. 437, 439 (N.M. Ct. App. 2007) ("The gravamen of an unfair trade practice is a misleading, false, or deceptive statement made knowingly in connection with the sale of goods or services."); *Parker v. E.I. DuPont de Nemours & Co., Inc.*, 121 N.M. 120, 132 (N.M. Ct. App. 1995) ("[T]he Unfair Practices Act is intended to provide a private remedy for individuals who suffer pecuniary harm for conduct involving either misleading identification of a business or goods, or false or deceptive advertising.").  The Wisconsin statute only permits a private cause of action for conduct that the state's Department of Agriculture, Trade, and Consumer Protection has first declared to be unfair.  Wis. Stat. Ann. § 100.20(5).  Plaintiffs do not allege that such a declaration has been made.

between the parties or was otherwise plainly disclosed.[73]  As explained in detail at pp. 41-42

above, each defendant bank's deposit agreement expressly authorizes the banks' high-to-low

posting practice.  The mere implementation of these terms of the deposit agreements cannot

transform defendants' actions into an "unfair" practice.

   Moreover, no plaintiff alleges that he or she was precluded from simply taking his

or her business elsewhere and opening a checking account at another institution.  The absence of

such an allegation is especially relevant where the plaintiff was not locked in to the defendant's

service, but rather had alternatives in the marketplace.  *See, e.g.*, *Saunders*, 662 N.E.2d at 608-09

(explaining that customer could have gone to another bank if she believed overdraft terms were

unfair); *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 961-62 (Ill. 2002) (rejecting

---

[73] **California**: *In re Late Fee & Over-Limit Litig.*, 528 F. Supp. 2d at 965-66 ("[U]nder the substantive terms of the [California unfair competition law], the defendant banks could not properly be deemed to have engaged in unfair or deceptive practices … by acting consistently with … the express disclosures of their contracts concerning late and over-limit fees."); *Madden v. Kaiser Found. Hosps.*, 17 Cal. 3d 699, 710 (1976); **Connecticut**: *Ramirez v. Health Net of Ne., Inc.*, 938 A.2d 576, 591 (Conn. 2008) (claims failed as a matter of law where plaintiffs alleged "nothing more than that … the defendant[s] … availed [themselves] of the rights afforded under the plain and unambiguous terms of the agreement[s]"); **Illinois**: *Saunders v. Mich. Ave. Nat'l Bank*, 662 N.E.2d 602, 608 (Ill. App. 1996) (rejecting bank customer's claim that bank's overdraft policy establishing a high overdraft fee constituted an unfair practice because of "a total absence of the type of oppressiveness and lack of meaningful choice necessary to establish unfairness" where "[t]he Bank provided [plaintiff] with all the information necessary to make a meaningful choice in selecting banks"); *Krause v. GE Capital Mtg. Servs.*, 731 N.E.2d 302, 312 (Ill. App. 2000) (fees did not constitute unfair practices where the fees were disclosed and not hidden); **Massachusetts**: *Swanson v. Bankers Life Co.*, 450 N.E.2d 577, 580 (Mass. App. Ct. 1983) ("[A] plaintiff's conduct, his knowledge, and what he reasonably should have known may be factors in determining whether an act or practice is unfair."); **North Carolina:** *McInerney v. Pinehurst Area Realty, Inc.*, 162 N.C. App. 285, 291 (2004) (conduct specifically authorized by contract is not "unfair" under North Carolina statute); **Ohio**: *Struna v. Convenient Food Mart*, 160 Ohio App. 3d 655, 661 (2005) (challenged conduct concerning sale of lottery tickets not "unfair, deceptive, and unconscionable" under Ohio statutes because terms were disclosed in lottery agreement); **Washington**: *Lowden v. T-Mobile*, 2009 WL 537787, at *3 (W.D. Wash. Feb 18, 2009) (disclosure of challenged billing practice was fully disclosed and therefore not "unfair" under Washington statute); **Wisconsin**: *Kaskin v. John Lynch Chevrolet-Pontiac Sales, Inc.*, 767 N.W.2d 394, 400 (Wis. 2009) (Wisconsin requirement of disclosures and "informed consent" from customers prior to starting repairs ensures that "consumers have the power to choose whether to have the [work] performed, in the manner and price suggested by the [supplier], or seek other options").

vehicle lessees' claim that default penalties provided for in automobile lease were an unfair practice under Illinois Consumer Fraud Act because plaintiffs did not allege they were coerced into signing the leases or lacked reasonable alternatives in the marketplace).

*Second*, plaintiffs' claims for "unfair" practices in violation of California's Unfair Competition Law and the asserted statutes from Connecticut, Illinois, Massachusetts, Montana, Illinois, and North Carolina must be dismissed for the additional reason that plaintiffs have not – and cannot – allege that high-to-low posting violates a legislatively declared policy or is contrary to the spirit of a separate law, as each of those statutes requires.[74]

Plaintiffs have not linked their challenge to any specific constitutional, statutory or other recognized policy that the banks have breached in connection with the conduct that caused plaintiffs' alleged injury.  Nor can they do so.  The defendant banks have done exactly what the UCC and federal regulations authorize them to do.  (*See* pp. 14-18, 46-49 above.)  Far from representing a violation of legislative policy, therefore, the challenged conduct is affirmatively authorized by such policy.  It therefore cannot be "unfair."

---

[74] This is a mandatory requirement of the law in California and Montana.  In Connecticut, Illinois, Massachusetts, and North Carolina, unfairness may be demonstrated in the absence of a separate violation of public policy only in extreme circumstances, which plaintiffs have not pled here. **California UCL**:  *Gregory v. Albertson's, Inc.*, 104 Cal. App. 4th 845, 854 (2002) (claim of "unfairness" must be "'tethered' to specific constitutional, statutory or regulatory provisions"); *Schnall v. Hertz Corp.*, 78 Cal. App. 4th 1144, 1166 (2000); *Textron Fin. Corp. v. Nat'l Union Fire Ins. Co.*, 118 Cal. App. 4th 1061, 1072 (2004); *see also Gutierrez*, 622 F. Supp. 2d at 956-57 (N.D. Cal. 2009); **Montana:**  *Rohrer v. Knudson*, 203 P.3d 759, 764 (Mont. 2009) ("[A]n unfair act or practice is one which offends established public policy and which is either immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."); **Connecticut**: *Cheshire Mortg. Serv. v. Montes*, 612 A.2d 1130, 1143 (Conn. 1992); *Bristol Tech. v. Microsoft*, 42 F. Supp. 2d 153, 173-74 (D. Conn. 1998) (standard met where practice is "an incipient violation" or "contrary to the spirit of" some law); **Illinois:**  *Saunders*, 662 N.E.2d at 608 (finding that unfairness requires that "the defendant's conduct must violate public policy"); **Massachusetts**:  *PMP Assoc., Inc. v. Globe Newspaper Co.*, 321 N.E.2d 915, 917-18 (Mass. 1975); **North Carolina**:  *Gray v. N.C. Ins. Underwriting Ass'n*,  529 S.E.2d 676, 681 (N.C. 2000).

*Finally*, even if "unfairness" under these statutes were not tied to violations of common law or statutory notions of unfairness, plaintiffs' claims would still fail. Because high-to-low posting is permissible under statutory and regulatory provisions, it would be improper for this Court to judicially legislate a standard that is not only not contemplated by legislative policy, but actually conflicts with it. *See, e.g.*, *Rizzuto v. Joy Mfg. Co.*, 834 F.2d 7, 8 (1st Cir. 1987) (declining to extend the scope of Massachusetts Chapter 93A because plaintiff's cause of action was "no more than an ingenious attempt to circumvent the [applicable] laws of Massachusetts and the principle established by the legislature and interpreted by the courts").[75]

Moreover, although plaintiffs allege in boilerplate fashion that the harm of overdraft fees outweighs their utility and that high-to-low posting is immoral and oppressive (*e.g.*, *Waters* SAC ¶ 135), their complaints are devoid of facts to support those naked conclusions. Such conclusory allegations are insufficient, standing alone, to support any such claims. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1954 (2009); *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009). Plaintiffs' claims under the statutes that permit challenges to "unfair" conduct therefore fail as a matter of law.

---

[75] *Gutierrez v. Wells Fargo & Co.*, 622 F. Supp. 2d 946 (N.D. Cal. 2009) does not support a different conclusion. In *Gutierrez*, the court properly found that the plaintiffs could assert a cause of action under the California statute only if they could identify a legislative policy that had been violated, but then concluded that the plaintiffs could base such a claim on a legislative comment unique to California's version of the UCC. *Id.* at 953-54. As explained in detail at pp. 53-54 above, the *Gutierrez* court's interpretation of the California UCC and its comment was erroneous. *See Fetter v. Wells Fargo Bank Texas, N.A.*, 110 S.W.3d 683, 688 (Tex. Ct. App. 2003) (reaching conclusion contrary to *Gutierrez* and rejecting claim because posting order was authorized by both the UCC and the bank's deposit agreement); *Hill*, 768 N.E.2d at 326-27 (concluding that high-to-low posting did not breach implied covenant of good faith and fair dealing because "[t]here can be no lack of good faith in acting as authorized by the UCC").

**(3)      Plaintiffs Have Failed to State a Claim Under Those Statutes That Permit Challenges to Allegedly "Unconscionable" Business Practices.**

A handful of state statutes (those of California, Kansas, New Jersey, New Mexico, and Ohio) recognize a cause of action for practices found to be "unconscionable."[76]  Plaintiffs' claims under these statutes also fail, as plaintiffs have not pled facts sufficient to demonstrate an act that "shocks the conscience," involves any deceptive bargaining conduct, or takes advantage of a customer's lack of knowledge to a "grossly unfair" degree.

For example, to state a claim under the Kansas Consumer Protection Act for an unconscionable act or practice, "there must be some element of deceptive bargaining conduct present as well as unequal bargaining power to render the contract between the parties unconscionable."  *See State of Kan. ex rel. Stovall v. DVM Enter.*, 275 Kan. 243, 251 (2003) (citation omitted).  Unequal bargaining power alone is insufficient to state a claim of unconscionability.  *Id.* at 251.  Similarly, to state a claim for an "unconscionable trade practice" under the Ohio or New Mexico statutes, a plaintiff must allege that the practice takes advantage of the physical or mental infirmities, ignorance, or other incapacity of the plaintiff to a grossly unfair degree or results in a gross disparity between the value received by the plaintiff and the price paid in comparison to that otherwise available in the marketplace.  *See* Ohio Rev. Code Ann. § 1345.03(B); N.M. Stat. § 57-12-2(E); *see also Aron v. U-Haul Co. of Cal.*, 143 Cal. App. 4th 796, 809 (2006) (holding that there is no unconscionability under the California CLRA where "the customer has meaningful choices," including the option to obtain the services from another source, and the terms, albeit arguably "unreasonable," do not "shock the conscience").

---

[76] As discussed above, such a claim is not recognized by the statutes of Connecticut, Illinois, Massachusetts, Minnesota, Montana, New York, North Carolina, Oregon, Washington, West Virginia, and Wisconsin.

As discussed above (at pp. 59-61), unconscionability cannot be shown here, because the practice of posting transactions from highest amount to lowest is authorized by both state and federal law.  The practice thus can hardly be said to "shock the conscience," to involve any deceptive bargaining conduct, or to take advantage of a customer's lack of knowledge.  *Aron*, 143 Cal. App. 4th at 809; *DVM Enter.*, 275 Kan. at 251; N.M. Stat. § 57-12-2(E).  Nor does the fully disclosed practice have the "capacity to mislead" that lies at the "heart" of all New Jersey unconscionability claims.  *Island Mortgages of N.J. v. 3M*, 860 A.2d 1013, 1016 (N.J. Sup. Ct. Law Div. 2004).

Nor have plaintiffs sufficiently alleged facts to support a conclusion, such as that required under New Mexico's UPA, that there was a gross disparity between the value received by plaintiffs from the act of covering the overdraft and the fee paid.  As a New Mexico court recently observed, the mere fact that an overdraft fee may be substantially greater than the amount of the overdraft does not render it "unconscionable."  *Hernandez v. Wells Fargo Bank New Mexico, N.A.*, 139 N.M. 68, 71 (2005).  As that court explained, "overdraft fees are fees for the processing of Plaintiff's debit transactions made on insufficient funds.  They are not interest or compensation for the use of money, transactions for which there is a direct relationship between the amount extended and the amount charged," thus, "the amount of the overdraft is not the focus of the overdraft fee."  *Id.* at 71.

c)    **Plaintiffs Cannot Assert Claims Under Statutes That Exempt Banking Transactions or Transactions Involving Only "Money."**

In addition to the fatal flaws discussed above, plaintiffs are precluded from asserting claims under the statutes they purport to invoke from Ohio and Wisconsin because

those statutes explicitly exempt banking transactions from their scope.[77]   Plaintiffs' claims under these statutes must be dismissed in their entirety for this independent reason.

Similar exclusions exist under California's CLRA and Oregon's UTPA, which apply only to transactions involving "goods or services."  As those statutes have been interpreted by the courts, the transactions and practices at issue here fall outside the scope of that phrase.

In *Berry v. Am. Express Publ'g, Inc.*, 147 Cal. App. 4th 224 (2007), a California court held that the CLRA did not extend to activities relating solely to the provision of credit. Examining the legislative history of the statute, the court observed that early drafts had defined "Consumer" as "an individual who seeks or acquires, by purchase or lease, any goods, services, *money, or credit* for personal, family or household purposes."  *Id.* at 230 (quoting Assem. Bill No. 292, as introduced Jan. 21, 1970).  However, the references to "money" and "credit" were eliminated from the statutory language as enacted.  Following the well-settled maxim that a statute should not be construed as encompassing a provision that the Legislature affirmatively chose to reject, the court concluded that the CLRA does not cover activities pertaining solely to the provision of "money" and "credit."  *Id.*

Although a bank does not extend "credit" when it covers an overdraft, it does furnish "money" to cover the depositor's transaction, and does so "separate and apart from any sale or lease of goods or services."  *Id*. at 233.  Thus, overdraft services and the fees charged for them are similarly not "goods or services" within the meaning of the CLRA.  *See Gutierrez*, 622

---

[77] **Ohio:**  Ohio Rev. Code Ann. § 1345.01(A) ("'Consumer transaction' does not include transactions between persons, defined in section[] … 5725.01 of the Revised Code [financial institutions, including national banks organized under the National Bank Act, 12 U.S.C. § 21] and their customers"); *Vannoy v. Capital Lincoln-Mercury Sales*, 88 Ohio App. 3d 138, 145-46 (1993) ("consumer transactions under the CSPA do not include transactions between financial institutions and their customers"); **Wisconsin:** Wis. Stat. Ann. § 93.01(1m) (as used in chapters 93-100, "'[b]usiness' includes any business, *except that of banks*, *savings banks*, credit unions, savings and loan associations, and insurance companies") (emphasis added).

F. Supp. 2d at 956-57 (applying *Berry* and dismissing CLRA claim challenging posting order and overdraft fees, reasoning that "[m]uch like credit cards provide an extension of credit, an overdraft provides an extension of money" and does not constitute "goods or services").[78]

It is also well established that a loan or extension of credit does not fall within the scope of "goods and services" covered by Oregon's UTPA.  *See Lamm v. AMFAC Mortgage Corp.*, 44 Or. App. 203, 204 (1980); *see also Haeger v. Johnson*, 25 Or. App. 131, 134-35 (1976).  Thus, plaintiffs similarly cannot state a claim for relief under the UTPA for overdraft fees allegedly incurred as a result of the defendant banks' posting practices.

Accordingly, plaintiffs' claims under California's CLRA and Oregon's UTPA fail as a matter of law.

### d)    Plaintiffs Have Failed to Comply with Pre-Lawsuit Notification Requirements of Certain Statutes.

Plaintiffs' claim under the Massachusetts and West Virginia statutes and (in some instances) the California CLRA must be dismissed for the separate and independent reason that plaintiffs failed to comply with those statutes' notice prerequisites.[79]  Failure to allege such compliance compels the dismissal of claims under those statutes.  *See Spring v. Geriatric Auth.*

---

[78] This factor also defeats plaintiffs' claim of an "unlawful" practice under the California UCL, Cal. Bus. & Prof. Code § 17200.  The UCL can serve as a borrowing statute, allowing a plaintiff to rest on the violation of another law.  *Cel-Tech*, 20 Cal. 4th at 180.  But where a plaintiff cannot state a claim under the "borrowed" law, any corresponding UCL claim fails as well. *Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 837 (2006).  Here, plaintiffs allege that the challenged practice is "unlawful" under the UCL because it violates the CLRA. (*See, e.g.*, *Waters* SAC ¶ 134a-b.)  Because plaintiffs cannot state a claim under the CLRA, their UCL claims for "unlawful" business practices are also fatally deficient.

[79] **Massachusetts:**  Mass. Gen. Laws 93A, § 9(3) ("At least thirty days prior to the filing of any … action …, a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be mailed or delivered to any prospective respondent."); **West Virginia:**  W. Va. Code Ann. § 46A-6-106(a)-(b) ("no action may be brought … until the consumer has informed the seller or lessor in writing and by certified mail of the alleged violation" and provided 20 days for a cure offer); **California:**  Cal. Civ. Code § 1782 (requiring 30 days notice before instituting any suit for damages under CLRA).

*of Holyoke*, 286-89, 475 N.E.2d 727 (Mass. 1985) ("A demand letter listing the specific deceptive practices claimed is a prerequisite to [a chapter 93A] suit and as a special element must be alleged and proved."); *Parks v. Ricciardi*, 2005 Mass. App. Div. 107, 108 (2005) ("As no demand letter was attached to, or referenced in, the plaintiffs' amended complaint, and no evidence was introduced at trial that such a letter was ever sent …, Count II was properly dismissed as a matter of law."); *Perry v. Tri-State Chrysler Jeep, LLC*, 2008 WL 1780938, at *4 (S.D. W. Va., April 16, 2008) (dismissing CCPA claim against defendant to whom notice not provided); *Cattie v. Wal-Mart Stores, Inc.*, 504 F. Supp. 2d 939, 949-50 (S.D. Cal. 2007) (dismissing CLRA damages claim); *Laster v. T-Mobile USA, Inc.*, 407 F. Supp. 2d 1181, 1195-96 (2005) (same); *Von Grabe v. Sprint PCS*, 312 F. Supp. 2d 1285, 1304 (2003) (same).

Here, the plaintiffs who seek to invoke the Massachusetts and West Virginia statutes have failed to allege that they provided the required statutory notice. This presents an independent ground for dismissal of those claims. The plaintiffs who assert the California CLRA do allege that notice was provided; however, the plaintiffs in three of those cases (*Luquetta*, *Yourke*, and *Larsen*) filed suit before the statutorily required 30 days had elapsed. This requirement is strictly applied and requires dismissal of those plaintiffs' damages claims as well. *See, e.g.*, *Cattie*, 504 F. Supp. 2d at 949-50.

### e)    Plaintiffs Cannot Maintain Claims for Class Relief Under the Montana Statute.

Plaintiffs' claims under the Montana Unfair Trade and Practice Act, Mont. Code Ann. § 30-14-101 ("MUTPA"), fail for the additional reason that the statute does not allow private consumer protection claims to be brought as a class action. Mont. Code Ann. § 30-14-133(1) ("A consumer … may bring an individual but not a class action."); *see, e.g.*, *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 908 (N.D. Cal. 2008)

(dismissing Montana claim because, among other things, Montana does not allow private consumer protection claims to be brought as class actions).[80]

> **f)**  **Plaintiffs Have Failed Adequately to Plead Claims Under Statutes That Require a Showing of One or More Specifically Enumerated Predicate Violations.**

Many state consumer protection statutes provide lists of specific predicate conduct that may form the basis of a statutory claim.  To demonstrate a violation of such a statute based upon such a provision, plaintiffs must plead the specific predicate conduct that they claim a defendant has committed.  None of the plaintiffs here has identified any such predicate conduct; rather, plaintiffs have pled their statutory claims in completely conclusory fashion.  *See, e.g.*, *Tornes* SAC ¶¶ 205-18.  Particularly for those statutes that recognize causes of action *only* for acts fitting within certain specific categories of conduct enumerated in the statute, this failure of pleading alone compels dismissal of plaintiffs' claims.

For example, the Minnesota statute, Minn. Stat. Ann. § 8.31, allows recovery only for violation of a predicate statute.  To plead a cause of action, plaintiffs must at least identify one or more predicate statutes that they allege have been violated, together with facts demonstrating the existence of such a violation.  *See also* Or. Rev. Stat. Ann. § 646.638 (predicating civil recovery for violation of Oregon consumer protection statute on showing that challenged "unlawful practice" appears on list in section 646.608); Mont. Code Ann. §§ 30-14-201, *et seq*. (identifying specific actionable acts); W. Va. Code Ann. § 46A-6-102 (listing specific types of misrepresentations and other deceptive acts made unlawful by statute); N.M. Stat. Ann. § 57-12-2 (same); Wis. Stat. Ann. § 100.20(5) (permitting private suit only for acts state agency has officially declared to be unfair).

---

[80] An individual Montana resident would not be barred under this provision from pursuing a claim under this statute, but there are no Montana plaintiffs in any of the cases.

As the Supreme Court explained, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). Plaintiffs' failure to allege the elements of the statutes under which they seek relief, or facts demonstrating how those elements are met, is fatal to their claims. *See Merrill Lynch Bus. Fin. Servs. v. Performance Mach. Sys. U.S.A.*, 2005 WL 975773, at *9-10 (S.D. Fla. Mar. 4, 2005) (dismissing claims under Florida's consumer protection statute where plaintiffs failed to allege facts demonstrating the elements of the claim and, instead, "merely recite conclusory allegations"); *Sunoptic Techs., LLC v. Integra Luxtec, Inc.*, 2009 WL 722320, at *5 (M.D. Fla. Mar. 18, 2009) (same); *McCalley v. Samsung Elecs. Am., Inc.*, 2008 WL 878402, at *9 (D.N.J. Mar. 31, 2008) (dismissing claims where plaintiff alleged violations of the unfair and deceptive acts and practices statutes of forty-four states, but "fail[ed] to allege even the elements of the various statutes, or facts permitting this Court to draw inferences that the elements exist"); *McGarvey v. Penske Auto. Group*, 639 F. Supp. 2d 450, 465 (D.N.J. 2009) ("the mere listing of state consumer fraud statutes … is insufficient to state a claim").

### H. Plaintiffs Have Failed to State a Claim for Relief Based on Any Business Practice Other Than Posting Order and Associated Fees.

In the preceding sections, defendants have demonstrated that each of plaintiffs' claims is barred by federal preemption and that each purported cause of action fails independently to state a claim upon which relief can be granted under state law.

The discussion above has focused primarily on plaintiffs' challenge to the high-to-low posting practice and associated fees, which is the only conduct of defendants that any plaintiff alleges caused him or her any actual harm. Plaintiffs' class definitions similarly focus exclusively on high-to-low posting order. Thus, the complaint in *Tornes*, for example, defines the putative nationwide class as: "All … customers … who … incurred an overdraft fee as a

result of Bank of America's practice of re-sequencing debit card transactions from highest to lowest…." *Tornes* SAC ¶ 29.  The class definitions in the other cases are substantially the same. *See, e.g.*, *Amrhein* TAC ¶ 17; *Garcia* AC ¶ 22; *Larsen* FAC ¶ 19; *Lopez* C ¶ 21; *Waters* SAC ¶ 19; *Martinez* C ¶ 22.

        Accordingly, if the Court agrees, as it should, that plaintiffs' challenge to the defendant banks' posting practice fails to state a claim upon which relief may be granted, it should dismiss the complaints in their entirety.

        Defendants acknowledge that there are passages in the complaints accusing them in general terms of other conduct plaintiffs consider inappropriate.  But none of those accusations is advanced as a violation of any identified legal obligation; nor does any plaintiff identify any compensable injury he or she has personally suffered as a result of any such conduct. Rather, these cursory allegations appear to have been introduced into the complaints simply to paint defendants in a negative light.  For example, in nearly identical conclusory language, several complaints allege that each defendant bank:

- "Does not obtain affirmative consent from … customers prior to processing transactions that will result in overdraft fees."  *E.g.*, *Tornes* SAC ¶ 35(b); *Garcia* AC ¶ 28(b); *Larsen* FAC ¶ 25(b); *Lopez* C ¶ 27(b); *Waters* SAC ¶ 25(b); *Amrhein* TAC ¶ 23(b); *Martinez* C ¶ 28(b);

- "Does not alert its customers that a debit card transaction will trigger an overdraft fee." *E.g.*, *Tornes* SAC ¶ 35(c); *Garcia* AC ¶ 28(c); *Larsen* FAC ¶ 25(c); *Lopez* C ¶ 27(c); *Waters* SAC ¶ 25(c); *Amrhein* TAC ¶ 23(c); *Martinez* C ¶ 28(c);

- "Fails to provide customers with accurate balance information." *E.g.*, *Tornes* SAC ¶ 35(g); *Garcia* AC ¶ 28(g); *Larsen* FAC ¶ 25(g); *Lopez* C ¶ 27(g); *Waters* SAC ¶ 25(g); *Amrhein* TAC ¶ 23(g); *Martinez* C ¶ 28(g); and

- "[A]ssesses overdraft fees at times when actual funds in [a] customer ['s] account are sufficient to cover all debits that have been submitted to the [b]ank … by placing a 'hold' on … [the] funds in the customer's account." *Tornes* SAC ¶ 63; *Garcia* AC ¶ 58; *Larsen* FAC ¶ 55; *Lopez* C ¶ 76; *Waters* SAC ¶ 56; *Martinez* C ¶ 63.

No complaint alleges that any of the named plaintiffs himself or herself suffered any injury as a result of any such conduct.[81]  These are, at most, unfocused and extraneous allegations designed to confuse the issues and (should the complaints survive) expand discovery.

Defendants raise this point now because they anticipate that plaintiffs may contend, in opposition to this Motion, that something in these vague and conclusory allegations might justify proceeding with this litigation even if the Court dismisses their challenge to defendants' posting practice.  Any such argument would be plainly without merit.  If plaintiffs wish to present genuine claims relating to any such alleged conduct, they must comply with the basic pleading requirements of Rule 8 and allege facts demonstrating a "plausible" claim of actual injury caused by it.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009).  As plaintiffs have failed to do so, these allegations cannot support their complaints.  Even if the high-to-low posting claims were themselves viable, these extraneous allegations should properly be stricken as "immaterial" and "impertinent" matter.  *See* Fed. R. Civ. P. 12(f); *Stubbs v. McDonald's Corp.*, 224 F.R.D. 668, 676-77 (D. Kan. 2004) (striking allegations from complaint as "serv[ing] no purpose other than to incite unfair prejudice against Defendant").

---

[81] The complaints also assert that the dollar amounts of defendants' overdraft fees are excessive, but this appears to be an element of plaintiffs' challenge to the total fee amounts that allegedly result from the posting practices.  As discussed at p. 60 above, it would be frivolous for plaintiffs to challenge the per-item amounts of plaintiffs' overdraft fees merely because, as applied to overdrafts for transactions of small amounts, they would exceed defendants' costs associated with those particular transactions.  Plaintiffs do not dispute that these fees are fully disclosed and authorized in their consumer account agreements.  Moreover, any frontal challenge to the amounts of these fees would clearly be barred by federal preemption.  *See, e.g.*, *Bank of Am. v. City and County of S.F.*, 309 F.3d 551, 563-64 (9th Cir. 2002) (barring on preemption grounds application of state laws purporting to restrict bank fees).  (*See generally* pp. 21-22, 25-26 above.)

1.   **To State a "Plausible" Claim for Relief Based on a Business Practice Other Than Posting Order, Plaintiffs Must Sufficiently Allege Injury and Causation.**

Injury and causation are fundamental elements of the claims for relief alleged by plaintiffs in their various complaints.  Even more fundamentally, injury and causation are required for plaintiffs to have Article III standing to assert any of their claims.  *E.g.*, *DiMaio v. Democratic Nat'l Comm.*, 520 F.3d 1299, 1302 (11th Cir. 2008).  Standing is, in effect, an irreducible requirement of every claim for relief.  *See Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1002 (11th Cir. 2004) ("[S]tanding must exist with respect to each claim.").  The purpose of standing is to guarantee "that the plaintiff has alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends."  *Harris v. Evans*, 20 F.3d 1118, 1121 (11th Cir. 1994).  Consequently, to establish Article III standing at the pleading stage, a plaintiff must allege both a "concrete and particularized" injury-in-fact and a "causal" or "trace[able]" connection between that alleged injury and the challenged conduct.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

In sum, both injury and causation must be present for plaintiffs' claims to proceed, and thus, both must be sufficiently pled in each and every one of plaintiffs' complaints for each intended claim.  *See Lee v. Am. Nat'l Life Ins. Co.*, 260 F.3d 997, 1001-02 (9th Cir. 2001) (plaintiff who failed to allege actual injury could not proceed on that claim because he did not satisfy the Article III standing requirement).[82]

---

[82] In the Eleventh Circuit, a complaint that fails properly to plead standing can be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of jurisdiction.  *See DiMaio*, 520 F.3d at 1301.  Nevertheless, a motion to dismiss under Rule 12(b)(1) for lack of jurisdiction, including lack of standing, is assessed under the same pleading standards as a motion to dismiss under Rule 12(b)(6) for failure to state a claim.  *See Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009).

To establish standing to assert their claims, plaintiffs must, at a minimum, comply with the pleading requirements of Rule 8.[83]  To satisfy Rule 8, a plaintiff must sufficiently allege all material elements of each cause of action and must allege a "plausible claim for relief."  *Iqbal*, 129 S. Ct. at 1950; *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Reese v. JP Morgan Chase & Co.*, __ F. Supp. 2d __, 2009 WL 3346783, at *2 (S.D. Fla. Oct. 15, 2009).  In practical terms, this is a "two-pronged approach."  *See Iqbal*, 129 S. Ct. at 1950; *Brown v. Fla. Bar*, 2009 WL 1513999, at *1 (M.D. Fla. May 29, 2009).  First, each plaintiff must set forth sufficient *factual*, non-conclusory allegations as to all material elements of his or her claims, including injury and causation.  *Iqbal*, 129 S. Ct. at 1949-50.  Second, the allegations concerning these elements must be enough to show that the plaintiff does not merely have a possible claim, but that the allegations "plausibly give rise to an entitlement to relief."  *Id.* at 1950.  In light of the substantial discovery costs and time that must be invested in a claim that survives the pleading stage, it is only through satisfaction of this "plausibility" standard that the interests of the parties and the Court can be protected.  *See id.*

Accordingly, a complaint that merely "offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action' will not do."  *Id.* (quoting *Twombly*, 550 U.S. at 555).  Such "naked" complaints, devoid of any "factual enhancements" as to the required elements of a plaintiff's claims, lead to the undesired result of "unlock[ing] the doors of

---

[83] Moreover, to the extent any challenge to these other practices sounds in fraud – i.e., to the extent plaintiffs purport to allege fraudulent or deceptive conduct by a defendant – their complaints must satisfy the heightened pleading standard of Rule 9(b), which requires a plaintiff to plead with "particularity," setting out, *inter alia*, the precise details and circumstances of the statements that allegedly deceived the plaintiff.  *See Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001); *Garcia v. Santa Maria Resort, Inc.*, 528 F. Supp. 2d 1283, 1294 (S.D. Fla. 2007).  Many of the "other practices" alleged in the complaints purportedly involve such deceptive conduct; hence any claims relating to such alleged practices would be subject to this even more stringent standard.  In light of the fact that plaintiffs have not satisfied Rule 8 as to any such claims, they can hardly be found to have satisfied Rule 9(b).  *See Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1280 (11th Cir. 2006).

discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 1949-50.  As the Eleventh Circuit has explained, the plaintiff's allegations as to the fundamental predicates of his or her claims for relief must permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Sinaltrainal*, 578 F.3d at 1261; *see also Reese*, 2009 WL 3346783, at *2-17 (dismissing various causes of action).

### 2. Plaintiffs Have Not Stated a Plausible Entitlement to Relief Based on Business Practices Other than Posting Order.

Applying the Rule 8 pleading standards here, plaintiffs have not stated a "plausible" – or any – "entitlement to relief" with respect to any business practices other than posting order, because their complaints do not contain specific *factual* averments demonstrating that they suffered injury as a result of such practices.  Plaintiffs' failure to plead any facts showing injury and causation in relation to any other business practices is manifest from a simple comparison between the explicit detail with which causation and harm are alleged with respect to high-to-low posting, and the absence of such factual allegations in the context of any other business practices.

For example, the *Garcia* Amended Complaint includes, for each named plaintiff, both the specific allegation that each plaintiff was "charged … multiple overdraft fees" and a series of charts showing exactly how the bank's high-to-low posting practice allegedly led to increased overdraft fees.  *Garcia* AC ¶¶ 76, 81, 86, 91, 96, 101, 106.  That complaint also alleges, for each named plaintiff, that "[i]f [the bank] had not manipulated and reordered [named plaintiff's] transactions from highest to lowest, [he or] she would not have incurred [as many] overdraft fees" and then includes, for each plaintiff, charts showing how a lesser number of fees allegedly would have been incurred if the bank had posted in low-to-high or "chronological" order instead.  *Id.* ¶¶ 77-79, 82-84, 87-89, 92-94, 97-99, 102-04, 107-09.  Similar specific *factual* allegations about posting order and its specific alleged impact on the named plaintiffs are found

in the other complaints as well.[84]  Plaintiffs clearly understand the need to allege both injury and causation to state a plausible claim for relief based on high-to-low posting, and they knew exactly how to formulate allegations of causation and harm in relation to each plaintiff when they wanted to do so.

In marked contrast, the operative complaints are devoid of similar factual allegations showing that plaintiffs suffered harm as a result of the other business practices, which are instead merely discussed in conclusory terms.

For example, the complaints contain only the most cursory allegations mentioning defendants' allegedly improper practice of "[f]ail[ing] to provide customers with accurate balance information."  *See Tornes* SAC ¶ 35(g); *Garcia* AC ¶ 28(g); *Larsen* FAC ¶ 25(g); *Lopez* C ¶ 27(g); *Waters* SAC ¶ 25(g); *Amrhein* TAC ¶ 23(g); *Martinez* C ¶ 28(g).  In the *Tornes* case, for example, almost the totality of the allegations with respect to the supposed practice of providing "inaccurate balance information" consists of the following:

> [Bank] provides inaccurate balance information to its customers through its electronic network.  In certain cases, [Bank] informs its customers that they have a positive balance when, in reality, they have a negative balance, despite the Bank's actual knowledge of outstanding debits and transactions.

*Tornes* SAC ¶ 61; *see also Garcia* AC ¶ 56; *Lopez* C ¶ 74; *Waters* SAC ¶ 54; *Amrhein* TAC ¶ 48; *Martinez* C ¶ 59; *Larsen* FAC ¶ 53.  Plaintiffs do not allege that any named plaintiff actually received inaccurate balance information, relied on allegedly inaccurate balance information in conducting a debit card transaction that he or she would otherwise have foregone, or was harmed as a result of inaccurate balance information.  Absent these key missing allegations, a claim relating to alleged inaccurate balance information cannot be stated.

---

[84] *See, e.g.*, *Tornes* SAC ¶¶ 81-162; *Lopez* C ¶¶ 95-121; *Waters* SAC ¶¶ 75, 81, 87; *Amrhein* TAC ¶¶ 66-68; *Martinez* C ¶¶ 83-85; *Larsen* FAC ¶¶ 69-70.

Plaintiffs similarly fail to establish a plausible entitlement to relief based on the alleged practice of placing a "hold" on a customer's funds in order to increase the number of potential overdrafts.  *See, e.g.*, *Tornes* SAC ¶ 63.  In this instance, again, no plaintiff alleges any injury as a result of this purported practice.  Indeed, none of the complaints offers a single factual allegation that a named plaintiff actually had a "hold" placed on his or her funds or that, as a result of such a hold, he or she incurred an overdraft fee that would not have been assessed but for the hold.  Instead, as exemplified by the *Larsen* FAC, plaintiffs simply allege, in conclusory terms:

> Union Bank also assesses overdraft fees at times when actual funds in the customer account are sufficient to cover all debits that have been submitted to the Bank for payment.  It does this by placing a "hold" on actual funds in the customer's account.  In doing so, Union Bank charges overdraft fees where it faces no risk, because the cash balance in the customer's account has not dropped below zero.

*Larsen* FAC ¶ 55; *see also, e.g.*, *Tornes* SAC ¶ 56; *Garcia* AC ¶ 58; *Lopez* C ¶ 76; *Waters* SAC ¶ 56; *Martinez* C ¶ 63.  This allegation offers nothing to demonstrate actual injury to any plaintiff caused by this alleged practice.  Consequently, as to this supposed practice also, plaintiffs have completely failed to plead a plausible claim or entitlement to relief in compliance with Rule 8 and *Iqbal*.

Plaintiffs similarly fail to allege facts sufficient to state a claim based on the allegedly improper practice of "not alert[ing] customers [at the point of sale] that a debit card transaction will trigger an overdraft fee."  *See, e.g.*, *Garcia* AC ¶ 28(c).  For example, in *Garcia*, plaintiffs allege that, as a general practice, Wachovia does not "warn[] its customers that an overdraft fee will be assessed if they proceed with the transaction."  *Id.* ¶ 7.  That complaint also alleges that:

> Wachovia never notified these [named] Plaintiffs, at the time they executed the purported insufficient funds transactions described

94

> above, that their checking account[s] were overdrawn or that they
> would be charged an overdraft fee as a result of the transaction.

*Id.* at ¶ 110.  But plaintiffs offer no factual allegations showing they were actually harmed as a result of any lack of notice.  They present no allegation, for example, that any plaintiff would have elected not to complete a particular transaction and would thereby have avoided a fee had additional notice been provided.[85]  Without such factual allegations, there is no indication that any named plaintiffs suffered harm because of this alleged practice.

The problem is identical with respect to each of the business practices mentioned in the complaint other than posting order and associated overdraft fees.  The supposed practices are mentioned and cursorily described, but no factual and plausible allegations are made that any such practices actually resulted in harm to any plaintiffs.

"Shotgun" complaints – which offer a variety of conclusory allegations about supposed wrongful conduct without tying them concretely to the plaintiffs' alleged injuries – are highly disfavored in this Circuit.  *See Wagner*, 464 F.3d at 1279; *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001).  Such pleadings "wreak havoc on the judicial system," by "divert[ing] already stretched judicial resources into disputes that are not structurally prepared to use those resources efficiently."  *Wagner*, 464 F.3d at 1279 (internal quotation omitted).  In the absence of allegations linking their assertions about other business practices to their alleged injuries, plaintiffs leave defendants and the Court to guess which of these practices – if any – plaintiffs genuinely intend to incorporate into which causes of action.  *See id.* at 1280; *see also Anderson v. Dist. Bd. of Trs. of Cent. Fla. Comty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996) (plaintiff's shotgun complaint made it "virtually impossible to know which allegations of fact

---

[85] Nor have plaintiffs identified any specific instance in which a defendant bank had the actual ability to provide such notice to any particular plaintiff but failed to do so.

[were] intended to support which claim(s) for relief"). Such pleading cannot be found to satisfy Rule 8, particularly in light of the Supreme Court's recent pronouncements in *Iqbal* and *Twombly*.

Accordingly, plaintiffs' allegations concerning these other business practices cannot save their complaint from dismissal. Even if the Court determines that plaintiffs' challenge to the banks' posting order survives, it should at a minimum strike allegations concerning such other business practices from the complaints as immaterial and impertinent matter. Fed. R. Civ. P. 12(f). Such action is appropriate at this juncture to narrow the issues to those that have been properly raised in the pleadings and to deter the overly broad and unnecessary discovery that would almost certainly flow from these extraneous averments.

## IV. CONCLUSION

For the foregoing reasons, the Court should dismiss these thirteen complaints in their entirety. Attached hereto in Table C is a listing that identifies the specific grounds on which each cause of action in each complaint should be dismissed.

Dated:  December 22, 2009

Respectfully submitted,

/s/ Sonya D. Winner
SONYA D. WINNER
(*pro hac vice*)
SWinner@cov.com
DAVID M. JOLLEY
(*pro hac vice*)
DJolley@cov.com
COVINGTON & BURLING LLP
One Front Street
San Francisco, California  94111
Tel:  (415) 591-6000
Fax:  (415) 591-6091

EMILY JOHNSON HENN
(*pro hac vice*)
EHenn@cov.com

COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, D.C.  20004-2401
Tel:  (202) 662-6000
Fax:  (202) 662-6291

AMY S. RUBIN
Florida Bar No. 476048
amy.rubin@ruden.com
DORI K. STIBOLT
Florida Bar No. 183611
dori.stibolt@ruden.com
RUDEN, McCLOSKY, SMITH,
SCHUSTER & RUSSELL, P.A.
222 Lakeview Avenue, Suite 800
West Palm Beach, Florida  33401
Tel:  (561) 838-4500
Fax:  (561) 514-3447

Attorneys for Defendant
WELLS FARGO BANK, N.A.


/s/ Barry R. Davidson
BARRY R. DAVIDSON
Florida Bar No. 107678
bdavidson@hunton.com
JAMIE ZYSK ISANI
Florida Bar No. 728861
jisani@hunton.com
HUNTON & WILLIAMS LLP
1111 Brickell Avenue, Suite 2500
Miami, Florida  33131
Tel:  (305) 810-2500
Fax:  (305) 810-2460

Attorneys for Defendant
WACHOVIA BANK, NATIONAL
ASSOCIATION


/s/ James R. McGuire
JAMES R. McGUIRE
(*pro hac vice*)
jmcguire@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105

97

Tel:  (415) 268-7013
Fax:  (415) 268-7255

SYLVIA RIVERA
(*pro hac vice*)
srivera@mofo.com
MORRISON & FOERSTER LLP
555 West Fifth Street, Suite 3500
Los Angeles, California 90013-1024
Tel:  (213) 892-5200
Fax:  (213) 892-5454

Attorneys for Defendants
U.S. BANK, N.A. and
WACHOVIA BANK, NATIONAL
ASSOCIATION


/s/ John B. Sullivan
JOHN B. SULLIVAN
(*pro hac vice*)
jbs@severson.com
JAN T. CHILTON
(*pro hac vice*)
jtc@severson.com
MARK D. LONERGAN
(*pro hac vice*)
mdl@severson.com
PETER H. BALES
(*pro hac vice*)
phb@severson.com
SEVERSON & WERSON
One Embarcadero Center, Suite 2600
San Francisco, California  94111
Tel:  (415) 398-3344
Fax:  (415) 956-0439

Attorneys for Defendant
UNION BANK, N.A.


/s/ Christopher R. Lipsett
CHRISTOPHER R. LIPSETT
(*pro hac vice*)
chris.lipsett@wilmerhale.com
DAVID S. LESSER
(*pro hac vice*)
david.lesser@wilmerhale.com

98

ALAN E. SCHOENFELD
(*pro hac vice*)
alan.schoenfeld@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
399 Park Avenue
New York, New York  10022
Tel:  (212) 230-8851
Fax:  (212) 230-8888

A. STEPHEN HUT, JR.
(*pro hac vice*)
stephen.hut@wilmerhale.com
MICHELLE OGNIBENE
(*pro hac vice*)
michelle.ognibebe@wilmerhale.com
WILMER CUTLER PICKERING HALE
AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C.  20006
Tel:  (202) 663-6000
Fax:  (212) 663-6363

Attorneys for Defendant
JPMORGAN CHASE BANK, N.A.


/s/ Rebecca J. Williams
REBECCA J. WILLIAMS
Florida Bar No. 403733
rwilliams@strook.com
STROOCK & STROOCK & LAVIN LLP
200 South Biscayne Boulevard, Suite 3100
Miami, Florida  33131
Tel:  (305) 358-9900
Fax:  (305) 789-9302

JULIA B. STRICKLAND
(*pro hac vice*)
jstrickland@strook.com
LISA M. SIMONETTI
(*pro hac vice*)
lsimonetti@strook.com
A.R. KACHADOORIAN
(*pro hac vice*)
akachadoorian@stroock.com
STROOCK & STROOCK & LAVIN LLP
2029 Century Park East, Suite 1800

99

Los Angeles, California  90067-3086
Tel:  (310) 556-5800
Fax:  (310) 556-5959

Attorneys for Defendant
CITIBANK, N.A., for itself and as successor to
CITIBANK (WEST), FSB, and CITIBANK
F.S.B.


/s/ Laurence J. Hutt
LAURENCE J. HUTT
(*pro hac vice*)
Laurence.Hutt@aporter.com
CHRISTOPHER S. TARBELL
(*pro hac vice*)
Christopher.Tarbell@aporter.com
ARNOLD & PORTER LLP
777 S. Figueroa Street, 44th Floor
Los Angeles, California  90017-5844
Tel:  (213) 243-4000
Fax:  (213) 243-4199

J. RANDOLPH LIEBLER
Florida Bar No. 0507954
jrl@lgplaw.com
LIEBLER GONZALEZ &
PORTUANDO, P.A.
2500 Courthouse Tower
44 West Flagler Street
Miami, Florida 33130
Tel:  (305) 379-0400
Fax:  (305) 379-9626

Attorneys for Defendant
BANK OF AMERICA, N.A.