# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 1:09-MD-02036-JLK

---

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

---

### PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' OMNIBUS MOTION TO DISMISS AND/OR FOR JUDGMENT ON THE PLEADINGS

---

**THIS DOCUMENT RELATES TO:**

*Tornes, et al. v. Bank of America, N.A.*
S.D. Fla. Case No. 1:08-cv-23323-JLK

*Yourke, et al. v. Bank of America, N.A.*
S.D. Fla. Case No. 1:09-cv-21963-JLK
N.D. Cal. Case No. 3:09-2186

*Amrhein v. Citibank, N.A.*
S.D. Fla. Case No. 1:09-cv-21681-JLK
N.D. Cal. Case No. 4:08-cv-05101-SBA

*Lopez, et al. v. JPMorgan Chase Bank, N.A.*
S.D. Fla. Case No. 1:09-cv-23127-JLK

*Luquetta v. JPMorgan Chase Bank, N.A.*
S.D. Fla. Case No. 1:09-cv-23432-JLK
C.D. Cal. Case No. CV09-6967-GHK

*Speers v. U.S. Bank, N.A.*
S.D. Fla. Case No. 1:09-23126-JLK

*Waters, et al. v. U.S. Bank, N.A.*
S.D. Fla Case No. 1:09-23034-JLK
N.D. Cal. Case No. 3:09-cv-2071

*Larsen v. Union Bank, N.A.*
S.D. Fla. Case No. 1:09-cv-23235-JLK
N.D. Cal. Case No. 4:09-cv-3250

*Garcia, et al. v. Wachovia Bank, N.A.*
S.D. Fla. Case No. 1:08-cv-22463-JLK

*Spears-Haymond v. Wachovia Bank, N.A.*
S.D. Fla. Case No. 1:09-cv-21680-JLK
N.D. Cal. Case No. 3:-cv-08-4610

*Dolores Gutierrez v. Wells Fargo Bank, N.A.*
S.D. Fla. Case No. 1:09-cv-23685-JLK
D. Or. Case No. 3:09-cv-01239-ST

*Martinez v. Wells Fargo Bank, N.A.*
S.D. Fla. Case No. 1:09-cv-_____
D.N.M. Case No. 6:09-cv-01072-GBW-ACT

*Zankich, et al. v. Wells Fargo Bank, N.A.*
S.D. Fla. Case No. 1:09-cv-23186-JLK
W.D. Wash. Case No. C-08-1476-RSM

*Buffington, et al. v. SunTrust Banks, Inc.*
S.D. Fla. Case No. 1:09-cv-23632-JLK
N.D. Ga. Case No. 1:09-cv-01558

*Michelle Gulley v. Huntington Bancshares*
S.D. Fla. Case No. 1:09-cv-23514-JLK
W.D. Mich. Case No. 1:09-cv-00880

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   INTRODUCTION ......................................................................... 1

II.  STATEMENT OF THE CASE AND FACTS ................................................ 2

   A.   Procedural Background.......................................................... 2

   B.   The Banks' Customers .......................................................... 3

   C.   The Banks' Wrongful Overdraft Fee Scheme ....................................... 4

   D.   The Banks' Overdraft Practices Caused Plaintiffs to Sustain Damages.............. 10

   E.   The Banks' Unconscionable Agreements, Policies and Practices .................... 10

III. ARGUMENT ........................................................................... 12

   A.   Plaintiffs' Claims Are Not Preempted ........................................... 13

        1.   No Express Preemption.................................................... 14

        2.   No Field Preemption ..................................................... 15

        3.   No Conflict Preemption ................................................... 16

             a.   Plaintiffs Assert Claims Under Laws of General
                  Application That Do Not Conflict With the NBA ...................... 17

             b.   The Laws of General Application in the Complaints Affect
                  the Banks' Powers No More Than Incidentally......................... 22

             c.   Federal Regulations and Advisory Materials Militate
                  Against Conflict Preemption......................................... 23

             d.   The Banks Were on Notice of Their Violations and Their
                  Exposure to State Law .............................................. 30

        4.   Congress Did Not Intend for Claims of This Nature to Be
             Preempted ................................................................ 32

   B.   No Choice-Of-Law Analysis Is Appropriate at This Juncture............................ 33

   C.   Plaintiffs State Valid Claims for Breach of Contract.............................. 34

        1.   The Banks' Discretion Is Constrained by the Covenant of Good
             Faith and Fair Dealing ................................................... 35

             a.   The Covenant Is Recognized in Virtually All States ................. 35

             b.   The Covenant Limits the Discretion Conferred by the
                  Agreements ......................................................... 37

             c.   The Court Should Follow the Decisions Recognizing That
                  the Banks' Abusive Overdraft Fee Scheme Breaches the
                  Covenant ........................................................... 41

        2.   The Bank Deposit Agreements Are Contracts of Adhesion
             Containing Discretionary Terms That Have Been Breached.................. 43

# TABLE OF CONTENTS
(continued)

Page

a.    Given the Unequal Bargaining Position of the Parties, There Is a Compelling Interest in Applying the Covenant of Good Faith and Fair Dealing .................................................... 43

b.    The Deposit Agreements Contain Discretionary Terms That Impose an Obligation of Good Faith on the Banks ..................... 44

3.    Decisions and Regulations Involving Paper Check Transactions Are Inapposite ................................................................ 51

a.    Check Transactions Are Fundamentally Different From Debit Transactions ............................................................ 51

b.    U.C.C. section 4-303(b) Does Not Apply to Debit Card Transactions ............................................................... 56

c.    The Other Two Decisions Relied on by the Banks Are Not Controlling ................................................................. 58

D.    Plaintiffs State Valid Claims for Unconscionability ............................................ 59

1.    The Court Should Declare the Challenged Contractual Terms Unconscionable ................................................................ 60

2.    This Court Has Discretion to Fashion Proper Relief if It Declares the Challenged Terms Unconscionable .................................... 61

3.    The Banks' Practices Are Unconscionable ............................................. 62

a.    Procedural Unconscionability .................................................... 62

b.    Substantive Unconscionability .................................................. 63

4.    The Unconscionability Analysis Is Heavily Fact Dependent ................. 65

E.    Plaintiffs State Viable Claims for Conversion .................................................. 65

1.    By Taking Funds From Plaintiffs' Accounts, the Banks Converted Property Plaintiffs Owned or Had a Right to Possess ............................. 66

a.    Ownership ....................................................................... 67

b.    Right to Possession .............................................................. 69

2.    The Banks' Conduct Was Wrongful Because They Improperly Imposed Overdraft Fees and Took Account Funds ................................ 71

3.    The Money in the Accounts Is Property Which Can Be Converted ........ 71

4.    In Analogous Cases, Courts Have Sustained Conversion Claims ........... 72

F.    Plaintiffs' Alternative Claims for Unjust Enrichment Are Proper ...................... 73

G.    Plaintiffs State Valid Claims Under State Consumer Protection Statutes ........... 74

# TABLE OF CONTENTS
(continued)

Page

1. Claims Under a Given State's Consumer Protection Statute Should Not Be Dismissed Simply Because There Is No Class Representative From That State at This Juncture ................................... 74

   a. Plaintiffs Were Injured by the Banks' Conduct and Therefore Have Standing To Assert Statutory Claims on Behalf of Other Customers Injured by the Same Conduct .......... 75

   b. The Statutes Are Substantially Similar to Each Other and Can Be Applied on a Classwide Basis ......................................... 76

   c. If the Court Finds Plaintiffs Lack Standing to Assert Claims Under the Laws of States Where They Do Not Reside, the Court Should Grant Leave to Add Additional Plaintiffs ................................................................................ 77

2. Plaintiffs Have Stated Viable Claims Under State Consumer Protection Statutes ................................................................... 78

   a. The Abusive Practices at Issue Are Not Permitted by Law ......... 78

   b. The Conduct Alleged Is the Type Prohibited by State Consumer Protection Statutes ...................................... 80

   c. The Banks' Overdraft Payments Are a Service ........................... 93

   d. Plaintiffs Complied with Pre-Lawsuit Notification Requirements .................................................................. 95

IV. CONCLUSION ............................................................................ 98

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

CASES

*300 DeHaro St. Investors v. Dep't of Hous. & Cmty. Dev.*,
  75 Cal. Rptr. 3d 98 (Cal. Ct. App. 2008)................................................. 41
*Abels v. JP Morgan Chase Bank, N.A.*,
  2009 WL 5342768 (S.D. Fla. Nov. 23, 2009)................................................. passim
*Adams v. First Nat'l Bank of Commerce*,
  644 So.2d 219 (La. Ct. App. 1994) ................................................. 39
*Aguayo v. U.S. Bank*,
  -- F. Supp. 2d --, 2009 WL 3149607 (S.D. Cal. Sept. 24, 2009) ................................................. 21
*Alexander Mfg., Inc. Employee Stock Ownership & Trust v. Ill. Union Ins. Co.*,
  2009 U.S. Dist. LEXIS 95897 (D. Or. Oct. 15, 2009) ................................................. 38
*Allen v. Gordon*,
  429 So.2d 369 (Fla. Dist. Ct. App. 1983) ................................................. 72
*Allworth v. Howard Univ.*,
  890 A.2d 194 (D.C. 2006) ................................................. 36
*Altria Group, Inc. v. Good*,
  -- U.S. --, 129 S. Ct. 538 (2008) ................................................. 16
*Am. Deposit Corp. v. Schacht*,
  887 F. Supp. 1066 (N.D. Ill. 1995) ................................................. 29
*Amoco Oil Co. v. Ervin*,
  908 P.2d 493 (Colo. 1995) ................................................. 38
*Amoco Prod. Co. v. Heimann*,
  904 F.2d 1405 (10th Cir.), *cert. denied*, 498 U.S. 942 (1990) ................................................. 38
*Anderson Nat'l Bank v. Luckett*,
  321 U.S. 233 (1944) ................................................. 15, 22, 25
*Aragon v. Gen. Elec. Credit Corp.*,
  557 P.2d 572 (N.M. Ct. App. 1976) ................................................. 66
*Ark. Valley Town & Land Co. v. Atchison, T. & S. F. Ry.*,
  151 P. 1028 (Okla. 1915) ................................................. 39
*Armendariz v. Found. Health Psychcare Servs., Inc.*,
  6 P.3d 669 (Cal. 2000) ................................................. 63
*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009) ................................................. 12
*Atlas Truck Leasing, Inc. v. First NH Banks, Inc.*,
  808 F.2d 902 (1st Cir. 1987) ................................................. 37
*Automatic Sprinkler Corp. of America v. Anderson*,
  257 S.E.2d 283 (Ga. 1979) ................................................. 50
*BA Mortg. & Int'l Realty Corp. v. Am. Nat'l Bank & Trust Co. of Chicago*,
  706 F. Supp. 1364 (N.D. Ill. 1989) ................................................. 39
*Badie v. Bank of Am.*,
  79 Cal. Rptr. 2d 273 (Cal. Ct. App. 1998) ................................................. 41

## TABLE OF AUTHORITIES

(continued)

**Page**

*Baldanzi v. WFC Holdings Corp.*,
  2008 WL 4924987 (S.D.N.Y. Nov. 14, 2008) ............................................................ 17, 18, 23
*Baltimore & Ohio R.R. v. Equitable Bank*,
  550 A.2d 407 (Md. Ct. Spec. App. 1988) .................................................................... 66
*Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*,
  2000 WL 174955 (S.D.N.Y. Feb. 15, 2000) ................................................................ 69
*Bank of America v. City and County of San Francisco*,
  309 F.3d 551 (9th Cir. 2002) ....................................................................................... 21
*Bank One, Utah v. Guttau*,
  190 F.3d 844 (8th Cir. 1999) ....................................................................................... 21
*BankWest, Inc. v. Baker*,
  411 F.3d 1289 (11th Cir. 2005), *vacated on other grounds as moot*,
  446 F.3d 1358 (11th Cir. 2006) ................................................................................... 29
*Barnett Bank of Marion County, N.A. v. Nelson*,
  517 U.S. 25 (1996) ....................................................................................................... 14
*Bear Hollow, L.L.C. v. Moberk, L.L.C.*,
  2006 WL 1642126 (W.D.N.C. June 5, 2006) .............................................................. 37
*Beaverhead Bar Supply, Inc. v. Harrington*,
  805 P.2d 560 (Mont. 1991) .......................................................................................... 37
*Bike Fashion Corp. v. Kramer*,
  46 P.3d 431 (Ariz. Ct. App. 2002) .............................................................................. 38
*Birmingham Steel Corporation v. Tennessee Valley Authority*,
  353 F.3d 1331 (11th Cir. 2003) ................................................................................... 78
*Blankenship v. Ethicon, Inc.*,
  656 S.E.2d 451 (W. Va. 2007) ..................................................................................... 97
*Blue Cross Blue Shield of Ala. v. Rigas*,
  923 So.2d 1077 (Ala. 2005) ......................................................................................... 64
*Blum v. Yaretsky*,
  457 U.S. 991 (1982) ............................................................................................... 75, 76
*Bodin v. Gulf Oil Corp.*,
  707 F. Supp. 875 (E.D. Tex. 1988) ............................................................................. 66
*Bowler v. Hawke*,
  320 F.3d 59 (1st Cir. 2003) ......................................................................................... 29
*Brack v. Brownlee*,
  273 S.E.2d 390 (Ga. 1980) .......................................................................................... 36
*Brill v. Catfish Shaks of Am., Inc.*,
  727 F. Supp. 1035 (E.D. La. 1989) ............................................................................. 37
*Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assoc.*,
  864 A.2d 387 (N.J. 2005) ............................................................................................. 37
*Burch v. Second Jud. Dist. Ct. of State ex rel. County of Washoe*,
  49 P.3d 647 (Nev. 2002) .............................................................................................. 62
*Burkhardt v. City Nat'l Bank of Detroit*,
  226 N.W.2d 678 (Mich. Ct. App. 1975) ...................................................................... 39

**TABLE OF AUTHORITIES**

(continued)

**Page**

*Burns ex rel Office of Public Guardian v. Hale and Dorr LLP*,
   445 F. Supp. 2d 94 (D. Mass. 2006) ................................................................. 97

*Bybee Farms L.L.C. v. Snake River Sugar Co.*,
   2008 WL 4454054 (E.D. Wash. Sept. 29, 2008) ............................................... 38

*California Lettuce Growers v. Union Sugar Co.*,
   289 P.2d 785 (Cal. 1955) ................................................................................... 38

*Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*,
   826 P.2d 710 (Cal. 1992) ................................................................................... 36

*Carmichael v. Adirondack Bottled Gas Corp.*,
   635 A.2d 1211 (Vt. 1993) ............................................................................. 37, 39

*Carney v. Gebhardt*,
   1988 Kan. LEXIS 224 (Kan. Dec. 9, 1988) ...................................................... 65

*Celentano v. Oaks-Condominium Ass'n.*,
   830 A.2d 164 (Conn. 2003) ............................................................................... 38

*Cenac v. Murry*,
   609 So.2d 1257 (Miss. 1992) ............................................................................ 37

*Channelbind Intl' Corp. v. Esselte Corp.*,
   2009 WL 3617611 (D.S.C. Oct. 29, 2009) ....................................................... 66

*Chem. Bank v. Miller Yacht Sales*,
   413 A.2d 619 (N.J. Super. Ct. App. Div. 1980) ............................................... 70

*Cirrincione v. Johnson*,
   703 N.E.2d 67 (Ill. 1998) .................................................................................. 65

*City Nat'l Bank v. Goodwin*,
   783 S.W.2d 335 (Ark. 1990) ............................................................................. 65

*City of Gillette v. Hladky Constr., Inc.*,
   196 P.3d 184 (Wyo. 2008) ................................................................................ 37

*City of Golden v. Parker*,
   138 P.3d 285 (Colo. 2006) ................................................................................ 36

*Clancy v. King*,
   954 A.2d 1092 (Md. 2008) ................................................................................ 37

*Cleveland v. Policy Mgmt. Sys. Corp.*,
   526 U.S. 795 (1999) .......................................................................................... 73

*Cliff v. Payco Gen. Am. Credits, Inc.*,
   363 F.3d 1113 (11th Cir. 2004) ........................................................ 13, 14, 15, 16

*Cole v. Control Data Corp.*,
   1990 U.S. Dist. LEXIS 19454 (E.D. Mo. Apr. 11, 1990) ................................ 66

*Commercial Credit Corp. v. Nelson Motors, Inc.*,
   147 S.E.2d 481 (S.C. 1966) .............................................................................. 37

*Cook v. Zions First Nat'l Bank*,
   919 P.2d 56 (Utah Ct. App. 1996) .................................................................... 39

*Cordova v. World Fin. Corp. of NM*,
   208 P.3d 901 (N.M. 2009) ................................................................................ 62

## TABLE OF AUTHORITIES
(continued)

**Page**

*Cox v. CSX Intermodal, Inc.,*
  732 So.2d 1092 (Fla. Dist. Ct. App. 1999) ............................................................................ 39

*Craig v. Pillsbury Non-Qualified Pension Plan,*
  458 F.3d 748 (8th Cir. 2006) ................................................................................................ 39

*Cruthis v. Firstar Bank, N.A.,*
  822 N.E.2d 454 (Ill. App. Ct. 2004) ............................................................................... 70, 72

*Cullen v. Inv. Strategies, Inc.,*
  911 P.2d 936 (Or. Ct. App. 1996), *rev. denied*, 918 P.2d 846 (Or. 1996) ......................... 92

*Cuomo v. Clearing House Ass'n, L.L.C.,*
  -- U.S. --, 129 S.Ct. 2710 (2009) ................................................................................... passim

*Dairy Dep't of N.D. v. Harvey Cheese, Inc.,*
  278 N.W.2d 137 (N.D. 1979) ................................................................................................ 66

*Davis v. Chase Bank U.S.A., N.A.,*
  650 F. Supp. 2d 1073 (C.D. Cal. 2009) .......................................................................... 18, 22

*Decatur Auto Ctr. v. Wachovia Bank, N.A.,*
  583 S.E.2d 6 (Ga. 2003) ........................................................................................................ 72

*deCiutiis v. NYNEX Corp.,*
  1996 WL 512150 (S.D.N.Y. Sept. 9, 1996) .......................................................................... 39

*Denson v. Ron Tonkin Gran Turismo, Inc.,*
  586 P.2d 1177 (Or. 1977) ...................................................................................................... 82

*Devitt v. Manulik,*
  410 A.2d 465 (Conn. 1979) ................................................................................................... 65

*Dorocon, Inc. v. Burke,*
  2004 U.S. Dist. LEXIS 29052 (D.D.C. Sept. 27, 2004) ....................................................... 38

*Dougovito v. First Trade Union Bank,*
  2009 WL 2449855 (Mass. Super. Ct. July 31, 2009) ........................................................... 37

*E. Ford, Inc. v. Taylor,*
  826 So.2d 709 (Miss. 2002) .................................................................................................. 62

*Elijah Mount v. Executors of W.W. Cubberly, Dec.,*
  19 N.J.L. 124 (1842) ....................................................................................................... 66, 70

*Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.,*
  407 F.3d 1091 (10th Cir. 2005) ............................................................................................ 36

*Elliott v. Elliott,*
  149 S.W.3d 77 (Tenn. Ct. App. 2004) .................................................................................. 37

*Empiregas, Inc. v. Geary,*
  431 So.2d 1258 (Ala. 1983) .................................................................................................. 65

*Enomoto v. Space Adventures, Ltd.,*
  624 F. Supp. 2d 443 (E.D. Va. 2009) .............................................................................. 37, 39

*Europlast, Ltd. v. Oak Switch Sys., Inc.,*
  10 F.3d 1266 (7th Cir. 1993) ................................................................................................ 36

*Eva v. Midwest Nat'l Mortg. Bank, Inc.,*
  143 F. Supp. 2d 862 (N.D. Ohio 2001) .......................................................................... 60, 61

## TABLE OF AUTHORITIES

(continued)

Page

*Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*,
   4 F.3d 90 (1st Cir. 1993)........................................................................................ 66
*Facciolo Constr. Co. v. Bank of Del.*,
   514 A.2d 413 (Del. 1986) ....................................................................................... 65
*FDIC v. Perry Bros., Inc.*,
   854 F. Supp. 1248 (E.D. Tex. 1994)........................................................................ 37
*Ferguson v. City of Orofino*,
   953 P.2d 630 (Idaho Ct. App. 1998)........................................................................ 38
*Fibro Trust, Inc. v. Brahman Fin., Inc.*,
   974 P.2d 288 (Utah 1999)........................................................................................ 66
*First Nat'l Bank of Bay City v. Fellows ex rel. Union Trust Co.*,
   244 U.S. 416 (1917)................................................................................................. 32
*First Nat'l Bank v. Commonwealth of Kentucky*,
   76 U.S. 353 (1869)............................................................................................. 15, 25
*First Nat'l Bank of Colo. Springs v. Wilbur*,
   26 P. 777 (Colo. 1891)............................................................................................ 65
*First Nat'l Bank of Eastern Arkansas v. Taylor*,
   907 F.2d 775 (8th Cir. 1990) .................................................................................. 21
*First Union Nat'l Bank of Ga. v. Davies-Elliott, Inc.*,
   452 S.E.2d 132 (Ga. Ct. App. 1994)................................................................. 71, 72
*Fisher v. Ciba Specialty Chems. Corp.*,
   238 F.R.D. 273 (S.D. Ala. 2006).............................................................................. 13
*Fla. Lime & Avocado Growers, Inc. v. Paul*,
   373 U.S. 132 (1963)................................................................................................. 14
*Frank Coluccio Constr. Co. v. King County*,
   150 P.3d 1147 (Wash. Ct. App. 2007)..................................................................... 36
*Franklin National Bank v. New York*,
   347 U.S. 373 (1954)................................................................................................. 21
*Fusion, Inc. v. Neb. Aluminum Castings, Inc.*,
   1997 WL 51227 (D. Kan. Jan. 23, 1997)................................................................. 39
*G. F. Kelly Trucking, Inc. v. U.S. Xpress Enters., Inc.*,
   2007 WL 3227390 (M.D. Ala. Oct. 30, 2007).......................................................... 38
*Garrett v. BankWest, Inc.*,
   459 N.W.2d 833 (S.D. 1990) ................................................................................... 37
*Gilbane Bldg. Co. v. Fed. Res. Bank*,
   80 F.3d 895 (4th Cir. 1996) .................................................................................... 86
*Gilbert v. Rafael*,
   352 S.E.2d 641 (Ga. Ct. App. 1987)........................................................................ 65
*Gillette of Kingston, Inc. v. Bank R.I.*,
   2006 WL 1314259 (R.I. Super. Ct. May 5, 2006)............................................... 37, 39
*Gilson v. Rainin Instrument, L.L.C.*,
   2005 WL 1899471 (W.D. Wis. Aug. 9, 2005).......................................................... 39

## TABLE OF AUTHORITIES

(continued)

**Page**

*Goldman v. Simon Prop. Group, Inc.*,
  869 N.Y.S.2d 125 (N.Y. App. Div. 2d Dep't 2008) ................................................................ 93
*Goodrich v. E. F. Hutton Group, Inc.*,
  542 A.2d 1200 (Del. Ch. 1988)....................................................................................... 36
*Griffin v. Dugger*,
  823 F.2d 1476 (11th Cir. 1987) ....................................................................................... 75
*Griswold v. Heat Inc.*,
  229 A.2d 183 (N.H. 1967) ............................................................................................... 39
*Gunter v. Chase Bank U.S.A., N.A.*,
  2008 WL 3211293 (S.D. Ala. 2008)................................................................................ 20
*Gutierrez v. Wells Fargo Bank, N.A.*,
  2008 WL 4279550 (N.D. Cal. Sept. 11, 2008). ....................................................... passim
*Hagans, Brown & Gibbs v. First Nat'l Bank of Anchorage*,
  783 P.2d 1164 (Alaska 1989)........................................................................................... 36
*Hammond v. United of Oakland, Inc.*,
  483 N.W.2d 652 (Mich. Ct. App. 1992) .......................................................................... 37
*Harper v. Lawrence County, Ala.*,
  -- F.3d --, 2010 WL 21179 (11th Cir. 2010)................................................................... 12
*Hassler v. Sovereign Bank*,
  644 F. Supp. 2d 509 (D.N.J. 2009) ................................................................... 58, 90, 91
*Haw. Leasing v. Klein*,
  698 P.2d 309 (Haw. Ct. App. 1985) ................................................................................ 38
*Hernandez v. Medows*,
  209 F.R.D. 665 (S.D. Fla. 2002)...................................................................................... 77
*Herring v. Knab*,
  458 F. Supp. 359 (D. Ohio 1978)..................................................................................... 90
*Hilco Capital, LP v. Fed. Ins. Co.*,
  978 A.2d 174 (Del. 2009) ................................................................................................ 38
*Hinds v. Paul's Auto Werkstatt, Inc.*,
  810 P.2d 874 (Or. Ct. App. 1991), *rev. denied*, 815 P.2d 1273 (Or. 1991)............................ 92
*Hoffmaster v. Guiffrida*,
  630 F. Supp. 1289 (S.D. W. Va. 1986).......................................................................... 37, 39
*Hooters of Am., Inc. v. Phillips*,
  173 F.3d 933 (4th Cir. 1999) ........................................................................................... 39
*Hopper v. Bills*,
  232 So.2d 296 (La. 1970) ................................................................................................ 66
*Hughes v. Atty. Gen. of Fla.*,
  377 F.3d 1258 (11th Cir. 2004) ....................................................................................... 28
*Hunter v. Wilshire Credit Corp.*,
  927 So.2d 810 (Ala. 2005) ............................................................................................... 36
*Hunting Aircraft, Inc. v. Peachtree City Airport Auth.*,
  636 S.E.2d 139 (Ga. Ct. App. 2006)................................................................................ 38

## TABLE OF AUTHORITIES

(continued)

**Page**

*Iadanza v. Mather,*
  820 F. Supp. 1371 (D. Utah 1993) ............................................................. 37

*In re Chase Bank USA, N.A. "Check Loan" Contract Litigation,*
  2009 WL 4063349 (N.D. Cal. Nov. 20, 2009) ...................................... 20, 22

*In re ConAgra Peanut Butter Prods. Liab. Litig.,*
  2008 WL 2132233 (N.D. Ga. May 21, 2008 ............................................ 34

*In re Enron Corp. Sec., Deriv. & "ERISA" Litig.,*
  540 F. Supp. 2d 800 (S.D. Tex. 2007) ...................................................... 90

*In re Hennepin County 1986 Recycling Bond Litig.,*
  540 N.W.2d 494 (Minn. 1995) .................................................................. 37

*In re Marriage of Langham & Kolde,*
  106 P.3d 212 (Wash. 2005) ....................................................................... 69

*In re Marriage of Langham,*
  106 P.3d 212 (Wash. 2005) ....................................................................... 66

*In re Mattel, Inc.,*
  588 F. Supp. 2d 1111 (C.D. Cal. 2008) .................................................... 96

*In re Pharm. Indus. Average Wholesale Price Litig.,*
  252 F.R.D. 83 (D. Mass. 2008) ........................................................... 76, 81

*In re Watts,*
  298 F.3d 1077 (9th Cir. 2002) .................................................................. 97

*In re: Creekstone Apartments Assocs. L.P.,*
  1995 WL 588904 (M.D. Tenn. Sept. 18, 1995) ....................................... 66

*ITT Indus. Credit Co. v. L-P Gas Equip., Inc.,*
  453 F. Supp. 671 (W.D. Okla. 1978) ........................................................ 66

*Jacques v. First Nat'l Bank of Maryland,*
  515 A.2d 756, 763 (Md. 1986) ................................................................. 44

*Jaffe v. Bank of America, N.A.,*
  2009 WL 2567488 (S.D. Fla. Aug. 18, 2009) .......................................... 74

*Jefferson v. Chase Home Fin.,*
  2008 WL 1883484 (N.D. Cal. Apr. 29, 2008) ............................... 19, 23, 29

*Kansas Baptist Convention v. Mesa Operating Ltd. P'ship,*
  864 P.2d 204 (Kan. 1993) ......................................................................... 36

*Katz v. Belmont Nat'l Bank of Chicago,*
  491 N.E.2d 1157 (Ill. 1986) ...................................................................... 70

*Kronemeyer v. U.S. Bank National Association,*
  857 N.E.2d 686 (Ill. App. Ct. 2006) ........................................................ 21

*L&N P'ship v. Lakeside Forest Ass'n,*
  916 N.E.2d 500 (Ohio Ct. App. 2009) ..................................................... 66

*Laster v. AT&T Mobility LLC,*
  584 F.3d 849 (9th Cir. 2009) .................................................................... 63

*Laube v. Campbell,*
  333 F. Supp. 2d 1234 (M.D. Ala. 2004) ................................................... 29

## TABLE OF AUTHORITIES

(continued)

**Page**

*Levitansky v. FIA Card Servs., N.A.*,
  492 F. Supp. 2d 758 (N.D. Ohio 2007)............................................................................ 20, 23

*Lewis v. Wells Fargo & Co.*,
  2009 WL 1033823 (N.D. Cal. Apr. 16, 2009) .......................................................................... 13

*Lipcon v. Sprint Corp.*,
  962 F. Supp. 1490 (S.D. Fla. 1997) ........................................................................ 14, 17, 19

*Littlejohn v. Parrish*,
  839 N.E.2d 49 (Ohio Ct. App. 2005)................................................................................ 37, 39

*Lonner v. Simon Prop. Group, Inc.*,
  866 N.Y.S.2d 239 (N.Y. App. Div. 2008) ................................................................................ 61

*Manicini Enters., Inc. v. Am. Express Co.*,
  236 F.R.D. 695 (S.D. Fla. 2006)............................................................................................ 73

*Mann v. TD Bank, N.A.*,
  2009 WL 3818128 (D.N.J. Nov. 12, 2009) ................................................................ 19, 22, 30

*Marsh v. Butler County, Ala.*,
  268 F.3d 1014 (11th Cir. 2001) ...................................................................................... 12, 28

*Martin v. Prier Brass Mfg. Co.*,
  710 S.W.2d 466 (Mo. Ct. App. 1986).............................................................................. 37, 39

*Master Lease Corp. v. Manhattan Limousine, Ltd.*,
  177 A.D.2d 85 (N.Y. App. Div. 1992) .................................................................................... 61

*Matsuda v. Wada*,
  101 F. Supp. 2d 1315 (D. Haw. 1999) .................................................................................. 65

*Maxwell v. Fid. Fin. Servs., Inc.*,
  907 P.2d 51 (Ariz. 1995)........................................................................................................ 64

*McClellan v. Chipman*,
  164 U.S. 347 (1896)................................................................................................................ 32

*McDonald's Corp. v. Barnes*,
  1991 U.S. Dist. LEXIS 6971 (D. Alaska May 8, 1991) ......................................................... 38

*McKibben v. Mohawk Oil Co.*,
  667 P.2d 1223 (Alaska 1983)................................................................................................ 65

*Metro. Ventures, L.L.C. v. GEA Assocs.*,
  717 N.W.2d 58 (Wis. 2006).................................................................................................... 37

*Metrobank v. Foster*,
  193 F. Supp. 2d 1156 (S.D. Iowa 2002) ............................................................................... 21

*Midwest Mgmt. Corp. v. Stephens*,
  291 N.W.2d 896 (Iowa 1980) ................................................................................................ 39

*Miller v. Guimaraes*,
  829 A.2d 422 (Conn. App. Ct. 2003)..................................................................................... 36

*Miller v. Merchants Bank*,
  415 A.2d 196 (Vt. 1980) ........................................................................................................ 66

*MJ & Partners Restaurant LP v. Zadikoff*,
  995 F. Supp. 929 (N.D. Ill. 1998) ......................................................................................... 50

**TABLE OF AUTHORITIES**

(continued)

**Page**

*Mobil Oil Corp. v. Dade County Esoil Mgmt. Co., Inc.*,
 982 F. Supp. 873 (S.D. Fla. 1997) ........................................................ 74

*Monroe Retail, Inc. v. RBS Citizens, N.A.*,
 589 F.3d 274 (6th Cir. 2009) ................................................................ 26

*Montgomery v. Bank of America Corporation*,
 515 F. Supp. 2d 1106 (C.D. Cal. 2007) ................................................ 28

*Montoya v. Countrywide Bank, FSB*,
 2009 WL 1813973 (N.D. Cal. June 25, 2009) ....................................... 65

*Morgan Stanley Mortg. Capital Holdings, L.L.C. v. Realty Mortg. Corp.*,
 2008 WL 4279585 (S.D. Miss. Sept. 11, 2008) .................................... 39

*Morgan v. AT & T Wireless Serv., Inc.*,
 177 Cal. App. 4th 1235 (Cal. Ct. App. 2009) ....................................... 96

*Morris v. Bank of Am. Nev.*,
 886 P.2d 454 (Nev. 1994) ..................................................................... 37

*Murray v. Auslander*,
 244 F.3d 807 (11th Cir. 2001) .............................................................. 77

*Mwantembe v. TD Bank, N.A.*,
 2009 WL 3818745 (E.D. Pa. Nov. 19, 2009) ........................ 16, 18, 22, 29

*Newman v. Hinky Dinky Omaha-Lincoln, Inc.*,
 427 N.W.2d 50 (Neb. 1988) ............................................................ 37, 39

*NNDJ, Inc. v. National City Bank*,
 540 F. Supp. 2d 851 (E.D. Mich. 2008) ............................................... 21

*Normand Josef Enters., Inc. v. Conn. Nat'l Bank*,
 646 A.2d 1289 (Conn. 1994) ................................................................ 86

*Okmyansky v. Herbalife Int'l of Am., Inc.*,
 415 F.3d 154 (1st Cir. 2005) ........................................................... 39, 40

*Olson v. Moorhead Country Club*,
 568 N.W.2d 871 (Minn. Ct. App. 1997) ............................................... 66

*Pac. & Atl. Shippers v. Schier*,
 258 A.2d 351 (N.H. Oct. 31, 1969) ...................................................... 66

*Pacific First Bank v. New Morgan Park Corp.*,
 876 P.2d 761 (Or. 1994) ....................................................................... 50

*Pasteur Health Plan, Inc. v. Salazar*,
 658 So.2d 543 (Fla. Dist. Ct. App. 1995) ............................................. 63

*Patterson v. Regions Bank*,
 2006 WL 3407852 (S.D. Ill. Nov. 27, 2006) ........................................ 19

*Payday Advance Plus, Inc. v. Findwhat.com, Inc.*,
 478 F. Supp. 2d 496 (S.D.N.Y. 2007) ................................................... 37

*Perdue v. Crocker National Bank*,
 702 P.2d 503 (Cal. 1985) ................................................ 37, 38, 63, 65

*Peterson v. BMI Refractories*,
 132 F.3d 1405 (11th Cir. 1998) ............................................................ 27

# TABLE OF AUTHORITIES
(continued)

**Page**

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985).................................................................................................. 76

*Pierpoint v. Doing Business under the Firm Name of Prince & Whitely*,
   182 N.E. 235 (N.Y. 1932)......................................................................................... 66

*Plaza National Bank v. Walker*,
   767 S.W.2d 276 (Tex. Ct. App. 1989) ..................................................................... 37

*Poskin v. TD BankNorth, N.A.*,
   2009 WL 2981963 (W.D. Pa. Sept. 11, 2009) ......................................................... 19

*Premier Digital Access, Inc. v. Cent. Tel. Co.*,
   360 F. Supp. 2d 1161 (D. Nev. 2005) ...................................................................... 60

*Premier Wine & Spirits of S. Dakota, Inc. v. E. & J. Gallo Winery*,
   644 F. Supp. 1431 (E.D. Cal. 1986).......................................................................... 60

*Prod. Credit Ass'n of Chippewa Falls v. Equity Coop Livestock Sales Ass'n*,
   261 N.W.2d 127 (Wis. 1978)..................................................................................... 66

*Purity Supreme, Inc. v. Attorney Gen.*,
   407 N.E.2d 297 (Mass. 1980) ................................................................................... 86

*Questar Builders, Inc. v. CB Flooring, L.L.C.*,
   978 A.2d 651 (Md. 2009) .......................................................................................... 39

*RAM Eng'g & Constr., Inc. v. Univ. of Louisville*,
   127 S.W.3d 579 (Ky. 2003) ...................................................................................... 39

*Ranier v. Mount Sterling Nat'l Bank*,
   812 S.W.2d 154 (Ky. 1991) ...................................................................................... 36

*Rao v. Rao*,
   718 F.2d 219 (7th Cir. 1983) .................................................................................... 36

*Rawlings v. Apodaca*,
   726 P.2d 565 (Ariz. 1986).......................................................................................... 36

*Razor v. Hyundai Motor Am.*,
   854 N.E.2d 607 (Ill. 2006)......................................................................................... 62

*Relativity Travel, Ltd. v. JP Morgan Chase Bank*,
   831 N.Y.S.2d 349 (N.Y. Sup. Ct. 2006) .................................................................. 93

*Robinson v. Toyota Motor Credit Corp.*,
   775 N.E.2d 951 (Ill. 2002)............................................................................. 81, 82, 83

*Rose v. Chase Bank USA, N.A.*,
   513 F.3d 1032 (9th Cir. 2008) .................................................................................. 21

*Ross v. Wells Fargo Bank, N.A.*,
   2009 WL 357921 (S.D. W. Va. Feb. 12, 2009) ....................................................... 60

*Santos v. Crown Equip. Corp.*,
   2009 WL 1066946 (S.D. Fla. Apr. 21, 2009) .......................................................... 27

*Saunders v. Michigan Ave. Nat'l Bank*,
   662 N.E.2d 602 (Ill. App. 1996)..................................................................... 82, 83, 86

*Scaffidi v. United Nissan*,
   425 F. Supp. 2d 1159 (D. Nev. 2005)....................................................................... 66

## TABLE OF AUTHORITIES
(continued)

**Page**

*Scherer Constr., L.L.C. v. Hedquist Constr., Inc.*,
  18 P.3d 645 (Wyo. 2001) ........................................................................ 39
*Scholes Electric & Communications, Inc. v. Fraser*,
  2006 WL 1644920 (D.N.J. 2006) ............................................................ 69
*Schubach v. Household Fin. Corp.*,
  376 N.E.2d 140 (Mass. 1978) ................................................................. 80
*Scranton Times, L.P. v. Wilkes-Barre Publ'g Co.*,
  2009 WL 3100963 (M.D. Pa. Sept. 23, 2009) ........................................ 66
*Seal v. Riverside Fed. Sav. Bank.*,
  825 F. Supp. 686 (E.D. Pa. 1993) ........................................................... 37
*Sears Consumer Fin. Corp. v. Thunderbird Prods.*,
  802 P.2d 1032 (Ariz. Ct. App. 1990) ...................................................... 65
*Seibel v. Soc'y Lease, Inc.*,
  969 F. Supp. 713 (M.D. Fla. 1997) ......................................................... 71
*Seidenberg v. Summit Bank*,
  791 A.2d 1068 (N.J. Super. Ct. App. Div. 2002) .................................... 39
*Servpro Indus., Inc. v. Pizzillo*,
  2001 WL 120731 (Tenn. Ct. App. Feb. 14, 2001) .................................. 39
*Shin v. Cobb County Bd. of Educ.*,
  248 F.3d 1061 (11th Cir. 2001) .............................................................. 13
*Skyline Steel Corp. v. A.J. Dupuis Co.*,
  648 F. Supp. 360 (E.D. Mich. 1986) ...................................................... 66
*Smith v. First Union National Bank*,
  958 S.W.2d 113 (Tenn. Ct. App. 1997) .................................................. 57
*Sprayfoam, Inc. v. Durant's Rental Ctrs., Inc.*,
  39 Conn. Supp. 78 (Conn. Super. Ct. 1983) .......................................... 82
*Star Fruit Co. v. Eagle Lake Growers, Inc.*,
  33 So.2d 858 (Fla. 1948) ................................................................. 65, 69
*Stark v. Circle K Corp.*,
  751 P.2d 162 (Mont. 1988) ..................................................................... 39
*State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.*,
  461 S.E.2d 516 (W. Va. 1995) .......................................................... 82, 93
*State of Kansas ex rel. Stovall v. DVM Enter.*,
  62 P.3d 653 (Kan. 2003) ......................................................................... 87
*Steinberg v. A Analyst Ltd.*,
  2009 WL 806780 (S.D. Fla. Mar. 26, 2009) ........................................... 34
*Steiner v. Ziegler-Tamura Ltd., Co.*,
  61 P.3d 595 (Idaho 2002) ....................................................................... 36
*Tahir v. Avis Budget Group, Inc.*,
  2009 WL 4911941 (D.N.J. Dec. 14, 2009) ............................................. 13
*Tarpey v. Crescent Ridge Dairy, Inc.*,
  713 N.E.2d 975 (Mass. App. Ct. 1999) .................................................. 97

## TABLE OF AUTHORITIES

(continued)

**Page**

*TCBY Sys., Inc. v. RSP Co., Inc.*,
   33 F.3d 925 (8th Cir. 1994) ...................................................................... 36

*Team Gordon, Inc. v. Fruit of the Loom, Inc.*,
   2009 WL 426555 (W.D.N.C. Feb. 19, 2009) ............................................. 39

*Texas & Pacific Railway Company v. Pottorff*,
   291 U.S. 245 (1934) .................................................................................. 68

*The Best Place, Inc. v. Penn Am. Ins. Co.*,
   920 P.2d 334 (Haw. 1996) ........................................................................ 36

*Third Story Music, Inc. v. Waits*,
   48 Cal. Rptr. 2d 747 (Cal. Ct. App. 1995) ............................................... 40

*Thompson Dev. Inc. v. Kroger Co.*,
   413 S.E.2d 137 (W. Va. 1991) .................................................................. 66

*Tolbert v. First National Bank of Oregon*,
   823 P.2d 965 (Or. 1991) ........................................................................... 50

*Torres v. Wells Fargo*,
   2008 WL 2397460 (N.D. Cal. June 11, 2008) ................................... 58, 59

*TSM Assocs., L.L.C. v. Tractor Supply Co.*,
   2008 WL 4826276 (N.D. Okla. Oct. 29, 2008) ........................................ 37

*U.S. Small Bus. Admin. v. Progress Bank*,
   2004 WL 2980412 (E.D. Pa. Dec. 22, 2004) ........................................... 39

*Vander Kley v. Acstar Ins. Co.*,
   2009 U.S. Dist. LEXIS 3293 (D. Or. Jan. 15, 2009 .................................. 36

*Video Trax, Inc. v. NationsBank, N.A.*,
   33 F. Supp. 2d 1041 (S.D. Fla. 1998) ................................................ 13, 25

*W. Idaho Prod. Credit Ass'n*,
   678 P.2d 52 (Idaho 1984) .......................................................................... 65

*Waite v. Dowley*,
   94 U.S. 527 (1876) .................................................................................... 15

*Weiss v. Marcus*,
   124 Cal. Rptr. 297 (Cal. Ct. App. 1975) .................................................. 72

*Weiss v. Wells Fargo Bank, N.A.*,
   2008 WL 2620886 (W.D. Mo. July 1, 2008) ...................................... 28, 29

*Welke v. Davenport*,
   309 N.W.2d 450 (Iowa 1981) .................................................................... 65

*Wells Fargo Bank of Texas NA v. James*,
   321 F.3d 488 (5th Cir. 2003) .................................................................... 21

*White v. Wachovia Bank, N.A.*,
   563 F. Supp. 2d 1358 (N.D. Ga. 2008) .............................................. passim

*Williams v. First Gov't Mortg. & Inv. Corp.*,
   225 F.3d 738 (D.C. Cir. 2000) .................................................................. 60

*Wis. Auto Title Loans, Inc. v. Jones*,
   714 N.W.2d 155 (Wis. 2006) ..................................................................... 63

**TABLE OF AUTHORITIES**

(continued)

**Page**

*Withers v. Hackett*,
    714 A.2d 798 (Me. 1998)................................................................. 66

*Wolpin v. Philip Morris, Inc.*,
    974 F. Supp. 1465 (S.D. Fla. 1997) .................................................. 19, 26, 33

*Wright v. Kia Motors Am. Inc.*,
    2007 U.S. Dist. LEXIS 7431 (D. Or. Jan. 29, 2007) ....................... 92

*Wyeth v. Levine*,
    -- U.S. --, 129 S. Ct. 1187 (2009) .................................................... 16, 32, 33

*York v. Sullivan*,
    338 N.E.2d 341 (Mass. 1975) ........................................................... 97

*Young v. Wells Fargo & Co.*,
    -- F. Supp. 2d --, 2009 WL 3450988 (S.D. Iowa Oct. 27, 2009) ..... passim

*Zimmerman v. FirsTier Bank, N.A.*,
    585 N.W.2d 445 (Neb. 1998).............................................................. 66

### STATUTES

11 U.S.C. § 101..................................................................................... 69
12 U.S.C. § 1, *et seq*............................................................................ 13
12 U.S.C. § 24....................................................................................... 25
12 U.S.C. § 36(f)(1)(C).......................................................................... 33
12 U.S.C. § 43........................................................................................ 29, 32
12 U.S.C. § 90....................................................................................... 69
12 U.S.C. § 92a...................................................................................... 69
25 U.S.C. § 156...................................................................................... 69
25 U.S.C. § 162...................................................................................... 69
25 U.S.C. § 162a.................................................................................... 69
12 U.S.C. § 192...................................................................................... 69
31 U.S.C. § 771...................................................................................... 69
48 U.S.C. § 780...................................................................................... 69
California Civil Code § 1670.5.............................................................. 60
California Civil Code § 1770(a)(19)...................................................... 95
California Civil Code § 1782................................................................. 96
California Civil Code § 1782(a)............................................................ 96
Mass. Gen. Laws Ch. 93A, § 9(3)........................................................ 97
Mont. Code Ann. § 30-14-101, *et seq*................................................. 74
N.M. Stat. Ann. § 57-12-2(E)(1)........................................................... 88
N.Y. Gen. Bus. Law § 349.................................................................... 93
Ohio Rev. Code Ann. § 1345.01(A)..................................................... 74
Or. Rev. Stat. § 646.607........................................................................ 92
Or. Rev. Stat. § 646.608(1)(u) .............................................................. 92
U.C.C. § 3-101, *et seq.* (2009)............................................................. 57
U.C.C. § 4-101...................................................................................... 57

# TABLE OF AUTHORITIES
### (continued)

**Page**

U.C.C. § 4-303(a)................................................................................................... 57
U.C.C. § 4-303(b) (2009)........................................................................... 52, 56, 57
U.C.C. § 4-303(b) cmt. 7 ...................................................................................... 52
W. Va. Code § 46A-6-101, *et seq.* ....................................................................... 93
Wash. Rev. Code § 19.86.920............................................................................... 82
Wis. Stat. § 100.20, *et seq.* ................................................................................. 74

## REGULATIONS

12 C.F.R. § 7.4002............................................................................................ 25, 26
12 C.F.R. § 7.4002(a)........................................................................................... 24
12 C.F.R. § 7.4002(b)(2)....................................................................................... 25
12 C.F.R. § 7.4002(b)(2)(iv)................................................................................. 25
12 C.F.R. § 7.4007(b) ........................................................................................... 24
12 C.F.R. § 7.4007(c)............................................................................................ 22
12 C.F.R. § 7.4009(c)(2)........................................................................................ 22
Electronic Fund Transfers, 74 Fed. Reg. 59,033, 59,035
   (Nov. 17, 2009) (to be codified at 12 C.F.R. pt. 205)................................ 53, 55
Final Joint Guidance on Overdraft Protection Programs,
   70 Fed. Reg. 9127, 9128 (Feb. 24, 2005) ........................................................ 54

## RULES

Federal Rules of Civil Procedure
   Rule 8 ........................................................................................................... 12, 73
   Rule 8(a)(2)....................................................................................................... 12
   Rule 8(d) ........................................................................................................... 73
   Rule 12 ............................................................................................................. 12
   Rule 23 ............................................................................................................. 78

## TREATISES

1 *Newberg on Class Actions* (4th ed. 2002)
   § 3:29 ............................................................................................................... 77
   § 3:19 ............................................................................................................... 77
3 *Newberg on Class Actions* (4th ed. 2002) § 7.47........................................... 77
*Manual for Complex Litigation* (4th ed. 2004)
   § 21.3................................................................................................................ 78
   § 22.634............................................................................................................ 76
*Prosser and Keeton on the Law of Torts* § 15 (5th ed. 1984)........................... 66
RESTATEMENT (SECOND) OF CONTRACTS (1981)
   § 205................................................................................................................. 36
RESTATEMENT (SECOND) OF TORTS
   § 243, cmt. b (2009) ....................................................................................... 69

**TABLE OF AUTHORITIES**
(continued)

**Page**

OTHER AUTHORITIES

140 Cong. Rec. S4819, 1994 WL 151478 (1994) ........................................................ 33
143 Cong. Rec. S5638, 1997 WL 314303 (1997) ...................................................... 33
Center for Responsible Lending, *Consumers Want Informed Choice on Overdraft Fees
and Banking Options* (2008) .................................................................................. 55
Consumer Union of U.S., *Financial Regulation Poll* (2009) ...................................... 55
FDIC Study of Bank Overdraft Programs (Nov. 2008) ......................................... 8, 55
H.R. Rep. No. 103-651, 1994 WL 405911 ........................................................... 32, 33
James J. White, *NSF Fees*,
68 Ohio St. L.J. 185 (2007) ............................................................................. 51, 55
OCC Interp. Letter AL 2002-3 ................................................................................. 30
OCC Interp. Letter No. 1082, 2007 WL 3341502 (May 17, 2007) ........................... 27
OCC Interp. Letter No. 464, 1988 WL 284846 (Dec. 14, 1988) .............................. 68
OCC Interp. Letter No. 914 (Sept. 2001) ................................................................. 31
OCC Interp. Letter No. 916, 2001 WL 1285359 (May 22, 2001) .................. 27, 28, 52
OCC Interp. Letter No. 997, 2002 WL 32639293 (Apr. 15, 2002) ...................... 27, 28
OCC Statement of Jan. 13, 2004, 2004 WL 50763, 69 F.R. 1904-01 ......................... 23
*Transcript of the Consumer Advisory Council Meeting,
Thursday, March 13, 2003* (2003) .................................................................. 51, 54, 56
Vincent Di Lorenzo, *Federalism, Consumer Protection and Regulatory Preemption:
A Case for Heightened Judicial Review*,
10 U. Pa. J. Bus. & Emp. L. 273 (2008) ............................................................... 24

## I.      INTRODUCTION

Over the past decade, through the use of sophisticated software and modern technology, many banks implemented automated overdraft fee schemes.  In 2009, banks were estimated to earn between $27 billion and $38.5 billion in overdraft fees alone.  Those fees now represent approximately 74 percent of the total service charges imposed on deposit accounts in the United States.

Through these specially designed software programs, banks abuse the discretion afforded under their customer agreements as part of a systemic scheme designed to generate the greatest possible number of overdrafts and, consequently, to maximize overdraft fee revenue for themselves.  To carry out this scheme, banks manipulate customer transactions records, causing funds in customer accounts to be depleted more rapidly, resulting in more overdrafts and, hence, more overdraft fees for multiple transactions.  In fact, overdraft charges are likely to occur at times when, but for the banks' manipulation, there would be sufficient funds in customer accounts and many of these overdrafts would not occur.

Manipulating and reordering debit transactions from largest to smallest results in more overdrafts than if the transactions were processed chronologically.  The banks, in turn, earn substantially more overdraft fee revenue.  For example, if a customer, whose account has a $50 balance, made four transactions of $10 and one subsequent transaction of $100 on the same day, the bank would reorder the debits from largest to smallest, imposing five overdraft fees on the customer.  Conversely, if the $100 transaction were debited last – consistent with the actual order of the transactions – only one overdraft fee would be assessed.

Plaintiffs in this multi-district litigation – all customers of the Banks – seek to recover, for themselves and all other customers similarly situated, excess overdraft fees generated and

-1-

retained through the Banks' unlawful practices.[1]   Based on a common nucleus of factual allegations, plaintiffs assert claims against the Banks for breach of contract and breach of the covenant of good faith and fair dealing, unconscionability, conversion, unjust enrichment, and for violations of various states' consumer protection statutes.

The Banks seek dismissal and/or judgment on the pleadings as to all claims based on six arguments: (1) preemption; (2) the Banks' contracts permit them to engage in their unfair practices; (3) damages are not recoverable for common law unconscionability; (4) conversion is not cognizable; (5) unjust enrichment does not lie because plaintiffs have adequate remedies at law; and (6) state consumer protection statutes do not apply.

As we demonstrate below, the Banks' arguments are without merit.   Their omnibus motion should be denied.

## II.   STATEMENT OF THE CASE AND FACTS

### A.   Procedural Background

In June 2009, the United States Judicial Panel on Multidistrict Litigation transferred five actions to this Court for coordinated pre-trial proceedings, establishing this multi-district litigation proceeding known as *In re Checking Account Overdraft Litigation*, MDL No. 2036.  A number of additional actions were subsequently transferred to and/or filed before this Court and made part of this MDL proceeding.  New actions continue to be filed against the Banks which are already part of this MDL proceeding, as well other banks, and transfer of those actions to this Court is inevitable.

In October and November 2009, pursuant to this Court's orders, plaintiffs filed new or amended complaints against Bank of America, Citibank, JPMorgan Chase Bank, Union Bank,

---

[1]  We use "Banks" to include all defendants for purposes of this response to the Banks' omnibus motion to dismiss and/or for judgment on the pleadings.

U.S. Bank, Wachovia Bank and Wells Fargo Bank.[2]  Plaintiffs also chose not to amend existing complaints brought against certain of these banks.[3]  Actions against SunTrust Bank and Huntington National Bank were subsequently transferred to this Court and made part of this MDL proceeding.[4]

On December 22, 2009, Bank of America, Citibank, Chase, Union Bank, U.S. Bank, Wachovia and Wells Fargo filed their omnibus motion to dismiss and/or for judgment on the pleadings. [DE 217].  SunTrust and Huntington subsequently joined in the omnibus motion.  [DE 253, 254].

Plaintiffs' fifteen operative complaints include detailed factual allegations supporting their claims for relief.  We provide an overview below of those common factual allegations for purposes of responding to the issues raised in the omnibus motion, and incorporate by reference all the allegations in plaintiffs' respective complaints.

### B.    The Banks' Customers

Plaintiffs are residents of various states who all maintain or maintained personal checking accounts with one of the Banks.  In nine of the actions, plaintiffs bring common law claims for themselves and on behalf of all U.S. customers who incurred overdraft fees as a result of the Banks' practice of reordering debit card transactions.  *Tornes*, SAC ¶ 29; *Lopez*, C ¶ 21; *Larsen*, FAC ¶ 19; *Speers*, C ¶ 16; *Garcia*, AC ¶ 22; *Dolores Gutierrez*, FAC ¶ 23; *Martinez*, C ¶ 22; *Buffington*, C ¶ 16; and *Gulley*, C ¶ 15.  Since many of these customers reside in states where

---

[2] For ease of reference, we identify each of the actions and the operative pleadings using the same terminology used in the Banks' omnibus motion, namely, *Tornes*, SAC; *Amrhein*, TAC; *Lopez*, C; *Luquetta*, FAC; *Larsen*, FAC; *Speers*, C; *Waters*, SAC; *Garcia*, AC; *Spears-Haymond*, SAC; *Dolores Gutierrez*, FAC; and *Martinez*, C.  Omnibus Mot. at 6-7.

[3] *Yourke*, C; *Zankich*, C.

[4] We refer to these actions and their operative pleadings consistent with the terminology used in the omnibus motion, namely, *Buffington*, C; and *Gulley*, C.

consumer protection statutes provide relief (in addition to common law relief) against the Banks' unlawful practices, plaintiffs in these actions also bring claims under certain states' consumer protection statutes on behalf of those states' customers. *Id.*

In five other actions, California residents assert common law and statutory consumer protection claims for themselves and on behalf of all customers in California who incurred overdraft fees as a result of some of the Banks' practice of reordering debit card transactions. *Yourke*, C ¶ 40; *Luquetta*, FAC ¶ 18; *Amrhein*, TAC ¶ 17; *Waters*, AC ¶ 19; *Spears-Haymond*, SAC ¶ 17. In one action, Washington residents assert common law and statutory consumer protection claims for themselves and on behalf of all customers in Washington who incurred overdraft fees as a result of Wells Fargo's practice of reordering debit card transactions. *Zankich*, C ¶ 30.

As is commonplace in the early stages of complex, multi-district litigation of this nature, plaintiffs allege preliminary class definitions in each of the operative complaints, but specifically reserve the right to modify or amend the definitions of the proposed classes before the Court determines whether certification is appropriate. *See*, *e.g.*, *Tornes*, SAC ¶¶ 29-30; *Garcia*, AC ¶¶ 22-23; *Speers*, C ¶¶ 16-17; *Dolores Gutierrez*, C ¶¶ 23-24; *Martinez*, C ¶¶ 22-23.

### C.   The Banks' Wrongful Overdraft Fee Scheme

Over the past decade, the Banks provided many of their checking account customers with debit cards, also known as check cards or ATM cards. *See*, *e.g.*, *Tornes*, SAC ¶ 42.[5] Through the use of debit cards, customers engage in transactions using funds from their accounts by engaging in "debit" or "point of sale" ("POS") transactions, or by withdrawing money from their accounts at automated teller machines ("ATMs"). Regardless of whether a debit card is used to

---

[5] Consistent with the Banks' presentation, where particular facts are alleged consistently by plaintiffs, we provide citations to one or two of the complaints. Omnibus Mot. at 9 n.7.

execute POS transactions or to withdraw cash from ATM machines, the transaction is processed electronically, and the Banks are notified instantaneously when the card is swiped.  They have the option to accept or decline the transaction at that time.  *Tornes*, SAC ¶ 42.

Before the widespread use of debit cards, the Banks occasionally honored paper checks written on overdrawn or otherwise deficient accounts by customers in good standing.  *Tornes*, SAC ¶¶ 2, 5.  The Banks provided this service largely because merchants allowed customers to pay by check, expecting the funds to be available when the check was later presented for payment.  *Tornes*, SAC ¶ 5.  For example, if a customer wrote a check to purchase groceries, the grocery store would not know whether the check had cleared until *after* the groceries had been purchased and taken home.  *Tornes*, SAC ¶ 5.

The same considerations do not exist when customers use debit cards.  These transactions are processed electronically and instantaneously.  *Tornes*, SAC ¶¶ 6, 53.  When a customer swipes a debit card, the bank is able to determine immediately whether there are sufficient funds in the customer's account to cover the attempted POS or ATM transaction.  *Tornes*, SAC ¶¶ 53, 64.  The Banks have the technological capability to decline debit card transactions (which they do if a pending transaction would exceed a pre-determined, overdraft tolerance limit for an account), or to notify customers that the particular transaction will result in an overdraft.  *Tornes*, SAC ¶ 64.  If the Banks were to decline to honor debit or POS transactions when accounts lack sufficient funds, merchant transactions could still proceed if consumers presented an alternative form of payment.  *Tornes*, SAC ¶ 6.  Likewise, ATM transactions could still proceed if the Banks provided a warning that an overdraft fee would be incurred, and customers nevertheless chose to withdraw funds.  *Tornes*, SAC ¶ 6.

Rather than routinely declining debit card transactions or warning their customers that completing the transaction would result in an overdraft fee, the Banks, aided by specialized software, adopted and implemented automatic, fee-based programs *intentionally* designed to maximize their overdraft fee revenues. *Tornes*, SAC ¶ 7. The Banks began routinely processing debit card transactions and then charging their customers overdraft fees – typically $35 – even when the transaction and/or the overdraft was only for a few dollars. *Tornes*, SAC ¶ 7.

Despite their technological capabilities and actual knowledge, the Banks fail to provide notice to their customers that particular debit card transactions will cause overdrafts and, hence, result in overdraft fees. *Tornes*, SAC ¶ 65. The Banks do not give customers the option to decline to complete the debit transactions or provide other forms of payment because the Banks seek to maximize the amount of fees generated through overdrafts. *Tornes*, SAC ¶ 64. In addition, as part of their inequitable motive to generate profits through the imposition of unconscionable fees, the Banks fail to adequately disclose to their customers that they can opt out of overdraft "protection" altogether, thereby avoiding any overdrafts at all. *Tornes*, SAC ¶¶ 7, 66. A recent report found that it is "standard procedure" for the Banks "to automatically enroll checking account customers in their most expensive overdraft loan program," and that debit card transactions account for more overdraft fees than traditional checks or any other type of transaction – even though "debit card transactions and ATM withdrawals . . . could easily be denied for no fee." *Tornes*, SAC ¶ 72, Ex. F.

As a result of the Banks' scheme, overdraft fees now represent approximately 74 percent of the total service charges imposed on deposit accounts in the United States. *Tornes*, SAC ¶ 2. These fees carry an effective annualized interest rate that *exceeds 3,500 percent*. *Tornes*, SAC ¶ 2. In many instances, these overdraft fees cost customers hundreds of dollars in a matter of days,

or even hours, when their accounts may be overdrawn by only a few dollars.  *Tornes*, SAC ¶ 8. Often, customer accounts may not actually be overdrawn at the time the overdraft fees are charged, or at the time of the debit transaction.  *Tornes*, SAC ¶ 8.  These overdraft fees disproportionately affect the poor; studies have found that 90 percent of overdraft fees are paid by the poorest 10 percent of the Banks' customer base.  *Tornes*, SAC ¶ 4.

To accomplish their goal, the Banks deploy advanced software specifically designed to automate their overdraft systems to *maximize* the number of overdrafts and, thus, the amount of overdraft fees charged per customer.  *Tornes*, SAC ¶ 43.  These automated overdraft programs are designed to manipulate and alter customers' transaction records to deplete the funds in a customer's account as rapidly as possible, resulting in more overdraft fees charged for multiple, smaller transactions.  *Tornes*, SAC ¶¶ 9, 44.  Overdrafts are likely to occur at times when, but for the Banks' manipulation and alteration, there would be sufficient funds in the account and many of these overdrafts would not occur at all.  *Tornes*, SAC ¶ 44.

The most common way in which the Banks manipulate and alter customer accounts is by reordering debit transactions on a single day, or over multiple days, from largest to smallest amount, regardless of the actual chronological sequence in which the customer engaged in these transactions.  Almost without exception, reordering debit transactions from highest to lowest results in more overdrafts than if the transactions were processed chronologically.  *Tornes*, SAC ¶ 44.  The Banks, in turn, earn substantially more overdraft fee revenue.  *Tornes*, SAC ¶ 44.  For example, if a customer, whose account has a $50 balance at the time a bank processed several transactions, made four transactions of $10 and one subsequent transaction of $100 on the same day, the bank would reorder the debits from largest to smallest, imposing four overdraft fees on the customer.  Conversely, if the $100 transaction were debited last – consistent with the

chronological order of the transactions, and with consumers' reasonable expectations – only one overdraft fee would be assessed.  *See* FDIC Study of Bank Overdraft Programs (Nov. 2008), *available at*: http://www.fdic.gov/bank/analytical/overdraft/, at 11 n.12.  *Tornes*, SAC ¶ 44.

Even though electronic debit card transactions are instantaneous, the Banks intentionally set up their systems not to post charges in the order in which they are incurred or received, sometimes for multiple business days.  *Tornes*, SAC ¶¶ 54, 56.  Instead, the Banks employ a common practice whereby account charges and debits are posted to customers' accounts out of chronological order for the *sole purpose* of maximizing the number of overdraft transactions and the amount of overdraft fees charged to their customers.  *Tornes*, SAC ¶¶ 54, 57, 58.  By holding charges rather than posting them immediately to an account, the Banks are able to amass a number of charges on the account.  *Tornes*, SAC ¶ 56.  Subsequently, the Banks post all of the amassed charges on a single date, in order of largest to smallest, rather than in the order in which they were received or charged.  *Tornes,* SAC ¶ 56.  This delayed posting results in multiple overdraft fees that would not otherwise be imposed.  *Tornes*, SAC ¶ 56.

The delayed posting also prevents customers from determining accurate account balances.  *Tornes*, SAC ¶ 56.  In fact, although the Banks actively promote the convenience of debit cards and other electronic debiting, they provide *inaccurate* balance information to customers through their electronic networks.  *Tornes*, SAC ¶ 60.  In certain cases, customers are informed that they have a positive balance when, in reality, they have a negative balance, despite the Banks' actual knowledge of outstanding debits and transactions.  *Tornes*, SAC ¶ 61.  Even when the Banks have knowledge of outstanding transactions that have already created a negative balance in a customer's account, they encourage customers to incur more overdraft charges by

approving – rather than declining – subsequent debit card purchases and other electronic transactions.  *Tornes*, SAC ¶ 62.

Further, the Banks assess overdraft fees at times when the actual funds in customer accounts are sufficient to cover all debits that have been submitted for payment.  *Tornes*, SAC ¶ 63.  The Banks do this by placing a "hold" on actual funds in customer accounts.  *Tornes*, SAC ¶ 63.  In doing so, the Banks charge overdraft fees where they face no risk, because the cash balance in a customer's account has not dropped below zero.  *Tornes*, SAC ¶ 63.

In pursuing these anti-consumer overdraft practices, the Banks failed to follow the list of "best practices" for overdraft programs set forth in the "Joint Guidance on Overdraft Protection Programs" ("Joint Guidance") issued by the United States Department of the Treasury, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the National Credit Union Administration (collectively, the "Agencies").  *Tornes*, SAC ¶ 67, Ex. D.

The Banks' overdraft practices make it difficult for customers to avoid injury, even if they carefully track the balance in their accounts.  *Tornes*, SAC ¶ 71.  In fact, the Agencies have stated that "Injury" resulting from such practices "is not reasonably avoidable" by consumers. 73 F.R. 28904-01, 28929.

> It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available.

*Tornes,* SAC ¶ 71.  The Agencies concluded:

> Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . . This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically

be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee.

*Tornes,* SAC ¶ 68; 73 F.R. 28904-01, 28929 (May 19, 2008).

### D.      The Banks' Overdraft Practices Caused Plaintiffs to Sustain Damages

The Banks charged each of the plaintiffs multiple overdraft fees.  *Tornes,* SAC ¶ 81.  Had the Banks not manipulated and reordered account transactions, plaintiffs would not have incurred as many overdraft fees.  *Tornes*, SAC ¶¶ 82, 88, 94, 100, 106, 112, 117, 123, 129, 135, 141, 147, 154, 160.  As the Agencies found, "injury" resulting from the Banks' unfair overdraft practices "is not reasonably avoidable" for many customers even if they keep close track of the balance in their accounts.  *Tornes,* SAC ¶ 165.  Plaintiffs were forced to pay overdraft fees as a consequence of the Banks' wrongful overdraft policies and practices, depriving them of significant funds, and causing them ascertainable monetary losses and damages.  *Tornes*, SAC ¶¶ 167-169, 185-191.

### E.      The Banks' Unconscionable Agreements, Policies and Practices

The Banks attempt to justify their scheme by relying on the terms of their standardized deposit account agreements and related documents.   These account agreements and related documents are unconscionable contracts of adhesion.  They are standardized forms, drafted and imposed by the Banks – parties of vastly superior bargaining strength – that relegate to customers the decision either to adhere to the agreements or reject them in their entirety.  *Tornes*, SAC ¶¶ 45, 74, 179.   Representative copies of the Banks' agreements are attached to the operative complaints.  *Tornes*, SAC ¶ 45, Exs. A, B & C.[6]

---

[6] Plaintiffs generally refer to these deposit account agreements in this memorandum to demonstrate the discretion granted to the Banks in all of them.  During the writing of this memorandum, the Banks finally began to produce various iterations of their deposit agreements and related documents – as ordered by this Court on November 13, 2009 [DE 148] – used over

The Banks' overdraft policies and practices are equally unconscionable.  *Tornes*, SAC ¶¶ 74, 179.  The Banks do *not*: (i) disclose or reasonably disclose to customers that they have the option to "opt out" of the Banks' overdraft scheme; (ii) alert customers that a debit card transaction will trigger an overdraft and provide an opportunity to cancel the transaction before incurring an overdraft fee; or (iii) obtain affirmative consent from customers prior to processing transactions that will overdraw their accounts and result in overdraft fees.  *Tornes*, SAC ¶¶ 74, 179.  The account agreements are also ineffective, ambiguous, unfair and deceptive, because they do not unambiguously state that the Banks *always* reorder debits from high to low – even though Banks do *always* reorder transactions in this manner to maximize overdrafts and overdraft fee revenues for themselves at consumers' expense.  *Tornes*, SAC ¶¶ 74, 179.

Moreover, the amount of an overdraft fee is disclosed in an ineffective, ambiguous, unfair and deceptive manner, since it is not contained in the actual account agreements, but in separate documents which are typically not signed by customers.  *Tornes*, SAC ¶¶ 74, 179.  The imposition of overdraft charges which exceed the amount overdrawn (*e.g.*, the imposition of a $35 charge on an overdraft of less than $35) is itself unconscionable.  *Tornes*, SAC ¶ 181.  Such charges are not reasonably related to the Banks' cost of covering the overdraft and/or the risk of nonpayment (where the Banks pay the overdrafts), or to the Banks' cost of returning the item unpaid (where the Banks do not pay the overdrafts).  *Tornes*, SAC ¶ 181.

All of these provisions are unconscionable and unenforceable given the comparative business acumen and experience of the parties, the great disparity in their relative bargaining

the last five years.  The myriad versions of these agreements – which have discretionary language addressing the issues at the heart of this litigation – have changed over time.  To the extent the Banks rely on actual contractual text, the omnibus motion must be denied as premature because plaintiffs have not been permitted to conduct any discovery concerning these documents.

power, the inconspicuousness (and incomprehensibility) of the contract language at issue, the

commercial unreasonableness and oppressiveness of the contract terms, their intended purpose

and effect, the allocation of the risk between the parties, and public policy concerns. *Tornes*,

SAC ¶ 180.

## III.   ARGUMENT

Under Federal Rule of Civil Procedure 12, the allegations of a complaint must be

accepted as true, and all reasonable inferences resolved in plaintiffs' favor, on a motion to

dismiss. *Harper v. Lawrence County, Ala.*, -- F.3d --, 2010 WL 21179 (11th Cir. 2010).  Federal

Rule of Civil Procedure 8(a)(2) requires a "short and plain statement of the claim showing that

the pleader is entitled to relief."  The Supreme Court has clarified that Rule 8 "does not require

detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-

harmed-me accusation."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotation

marks and citation omitted).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter,
> accepted as true, to state a claim to relief that is plausible on its face.  A claim has
> facial plausibility when the plaintiff pleads factual content that allows the court to
> draw the reasonable inference that the defendant is liable for the misconduct
> alleged.

*Id.* (internal quotation marks and citation omitted).  This standard requires "more than a sheer

possibility that a defendant has acted unlawfully."  *Id*. (citation omitted).  The allegations here

are more than sufficient to state claims that the Banks have acted unlawfully.

Seeking to limit plaintiffs' allegations to reordering, the Banks rely heavily on the

preliminary class definitions proposed in the complaints.  Nevertheless, a motion to dismiss must

be decided in view of all the facts pleaded, not a subset.  *See Marsh v. Butler County, Ala.*, 268

F.3d 1014, 1055 (11th Cir. 2001) (court must not consider any portion of the complaint "in

-12-

isolation," but must "accept all alleged facts as true and then draw from those facts as many inferences favorable to the plaintiff as possible").

The Banks' excessive focus on the proposed class definitions is particularly inappropriate considering that "class definitions may undergo modification, possibly several times, during the course of a class action." *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1133 (11th Cir. 2004). Indeed, "a class definition requires ongoing refinement and give-and-take." *Fisher v. Ciba Specialty Chems. Corp.*, 238 F.R.D. 273, 300 (S.D. Ala. 2006). A district court has broad discretion "at any time" to "consider redefined or more narrowly tailored classes or subclasses." *Shin v. Cobb County Bd. of Educ.*, 248 F.3d 1061, 1065 (11th Cir. 2001).

In consequence, the preliminary class definitions proposed in the complaints provide no basis for deciding this motion. *See, e.g.*, *Tahir v. Avis Budget Group, Inc.*, 2009 WL 4911941, at *8 (D.N.J. Dec. 14, 2009) (the "proposed class definition" relates "to the matter of certification . . . not to the question of whether the factual allegations of the Complaint, taken as true, plausibly state a claim for relief"); *Lewis v. Wells Fargo & Co.*, 2009 WL 1033823, at *2 (N.D. Cal. Apr. 16, 2009) (finding "no cases supporting the assertion that this case should be dismissed on the pleadings because the class is not narrowly defined.").

### A.     Plaintiffs' Claims Are Not Preempted

There are three types of preemption: express, field and conflict. *Cliff*, 363 F.3d at 1122. The Banks nowhere specify which type of preemption they claim applies here, and they fail to establish that any of the three types apply to plaintiffs' state-law claims. It is well settled that the party seeking to establish preemption by the National Bank Act, 12 U.S.C. § 1, *et seq.* ("NBA"), bears the burden of proof. *Video Trax, Inc. v. NationsBank, N.A.*, 33 F. Supp. 2d 1041, 1048 (S.D. Fla. 1998); *Gutierrez v. Wells Fargo Bank, N.A.*, 2008 WL 4279550, at *10 n.4 (N.D. Cal. Sept. 11, 2008).

-13-

As the Supreme Court has long held, national banks are subject to state laws of general application, the very laws under which plaintiffs assert their claims. Indeed, the Court recently reaffirmed this rule in a decision which is conspicuously absent from the Banks' omnibus motion. *See Cuomo v. Clearing House Ass'n, L.L.C.*, -- U.S. --, 129 S.Ct. 2710 (2009).

The Banks wrongly claim that national bank regulation is "one of the few areas in which preemption of state law is *presumed*." Omnibus Mot. at 1-2, 21 (emphasis in original). In fact, "there is no presumption that the NBA preempts state law." *Young v. Wells Fargo & Co.*, -- F. Supp. 2d --, 2009 WL 3450988, at *9 (S.D. Iowa Oct. 27, 2009). The case cited by the Banks says only that the NBA "ordinarily pre-empt[s] *contrary* state law." *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 32 (1996) (emphasis added).

The Eleventh Circuit recognizes "a presumption against finding implied preemption" of state laws that protect consumers from unfair business conduct, because "consumer protection is a field traditionally regulated by the states[.]" *Cliff*, 363 F.3d at 1124-25. In addition, "the historic police powers of the states are not superseded by federal law unless preemption is the clear and manifest purpose of Congress." *Id.* at 1122. Laws intended to deter businesses from taking advantage of consumers fall squarely within the states' historic police powers. *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 146 (1963). Because the Banks fail to demonstrate clear and manifest Congressional intent to preempt these claims, they are not preempted. *See Lipcon v. Sprint Corp.*, 962 F. Supp. 1490, 1492 (S.D. Fla. 1997) (King, J.) (preemption question is determined "by examining Congress' purpose in enacting the particular law at issue.").

### 1.     No Express Preemption

There is no express preemption unless "Congress has manifested its intent to preempt state law explicitly in the language of the statute." *Cliff*, 363 F.3d at 1122. The Banks do not,

and cannot, point to anything in the text or legislative history of the NBA suggesting that the claims at issue here are preempted.  To the contrary, in 1869, shortly after the NBA was enacted, the Supreme Court declared that national banks:

> are subject to the laws of the State, and are governed in their daily course of business far more by the laws of the State than of the nation.  All their contracts are governed and construed by State laws. . . .  It is only when the State law incapacitates the banks from discharging their duties to the government that it becomes unconstitutional.

*First Nat'l Bank v. Commonwealth of Kentucky*, 76 U.S. 353, 362 (1869); *see also Waite v. Dowley*, 94 U.S. 527, 533 (1876) (holding that "the national banks organized under the acts of Congress are subject to State legislation").  Thus, the NBA does not expressly preempt state law.

## 2.    No Field Preemption

Field preemption occurs only "when federal regulation in a legislative field is so pervasive that we can reasonably infer that Congress left no room for the states to supplement it[.]"  *Cliff*, 363 F.3d at 1122.  This is manifestly not the case in the field of banking.  The Supreme Court has made it clear that, far from leaving no room for state regulation of national banks, Congress intended that national banks be "subject to state laws, unless those laws infringe the national banking laws or impose an undue burden on the performance of the banks' functions."  *Anderson Nat'l Bank v. Luckett*, 321 U.S. 233, 248 (1944).

The Banks omit any mention of the Supreme Court's most recent decision reaffirming the concurrent state and federal jurisdiction over national banks.  In *Cuomo*, the Court struck down an OCC regulation and held that federal law did *not* preempt the New York Attorney General from filing suit against national banks under state fair-lending laws.  The NBA's preemptive scope is strictly limited, the Court found.  States "have always enforced their general laws against national banks – and have enforced their banking-related laws against national banks for

at least 85 years[.]"  *Cuomo*, 129 S. Ct. at 2720-21 (citing cases).  The banking system, the Court explained:

> echoes many other mixed state/federal regimes in which the Federal Government exercises general oversight while leaving state substantive law in place. . . . [S]tates retain some power to regulate national banks in areas such as *contracts*, debt collection, acquisition and transfer of property, and taxation, zoning, criminal, and *tort law*.  Application of these laws to national banks and their implementation by state authorities *typically does not affect the content or extent of the Federally-authorized business of banking* . . . but rather establishes the legal infrastructure that surrounds and supports the ability of national banks . . . to do business.

*Id.* at 2718-19 (citations omitted) (emphasis added).  The analysis in *Cuomo* "caused a sea change in the perception of the preemptive effect of the NBA and the OCC regulations," by "dispel[ling] the popular notion that all state laws that affect national banks in any way or to any degree are preempted."  *Mwantembe v. TD Bank, N.A.*, 2009 WL 3818745, at *3 (E.D. Pa. Nov. 19, 2009).  As *Cuomo* demonstrates, the NBA does not occupy the field; thus, there is no field preemption.[7]

### 3.    No Conflict Preemption

Conflict preemption does not exist unless "it is impossible to comply with both federal and state law and when state law stands as an obstacle to achieving the objectives of the federal law."  *Cliff*, 363 F.3d at 1122.  Neither circumstance is present here.  First, the Banks could have complied with both the NBA and the state laws at issue had they refrained from engaging in the abusive and unconscionable conduct alleged in the complaints.  Second, the state laws are laws of general application that do not vitiate the purposes of the NBA.

---

[7] *Cuomo* is part of a trend *against* preemption in the Supreme Court's recent jurisprudence.  *See*, *e.g.*, *Wyeth v. Levine*, -- U.S. --, 129 S. Ct. 1187 (2009) (neither federal Food, Drug, and Cosmetic Act, nor Food and Drug Administration regulations and procedures, preempted failure-to-warn claim under Vermont tort law); *Altria Group, Inc. v. Good*, -- U.S. --, 129 S. Ct. 538 (2008) (neither federal statute concerning cigarette labeling, nor Federal Trade Commission enforcement policy, preempted consumer protection claim under Maine law).

No federal regulation or OCC advisory letter suggests that claims under state laws based on abusive overdraft fee practices conflict with the NBA. *See, e.g.*, *White v. Wachovia Bank, N.A.*, 563 F. Supp. 2d 1358, 1367 (N.D. Ga. 2008) ("state law claims of improper overdraft fees and an improperly implemented posting policy present no conflict").

In fact, the applicable regulations and advisory materials put the Banks on notice that they can and will be held liable under state law for the very practices alleged in the complaints.

       **a.**      **Plaintiffs Assert Claims Under Laws of General Application That Do Not Conflict With the NBA**

While state laws specifically directed at national banks may, in some cases, be preempted, it is virtually impossible for a state law that is *not* specifically directed at national banks to be preempted, because there can be no conflict of law in the absence of substantive overlap between the duties imposed by the state law at issue and those imposed by the NBA or its enforcement regulations. *See Cuomo*, 129 S. Ct. at 2720 (states "have always enforced their general laws against national banks"); *Lipcon*, 962 F. Supp. at 1494 (King, J.) (claims not preempted where "plaintiffs seek to hold defendant to the same standards as they would any other business").

Plaintiffs assert claims under the common law of most states prohibiting breach of the contractual covenant of good faith and fair dealing, unconscionable business conduct, conversion and unjust enrichment, as well as a number of state consumer protection statutes. Each and every one of these laws is a law of general application. Each applies to all businesses, not just to banks. Therefore, none conflicts with the NBA and the Banks' preemption argument fails.

Courts routinely hold that the NBA does *not* preempt state laws of general application. For example, in *Baldanzi v. WFC Holdings Corp.*, 2008 WL 4924987 (S.D.N.Y. Nov. 14, 2008), the court rejected a preemption challenge to state-law breach of contract, consumer protection

and unjust enrichment claims against a national bank.  The plaintiffs alleged that the bank unlawfully charged interest after the principal balance on loans had been repaid.  The court found that, "[i]n contrast to findings of federal preemption in cases involving specific state regulations that conflict with the NBA, causes of action sounding in contract, consumer protection statutes and tort have repeatedly been found by federal courts not to be preempted."  *Id*. at *2.

In *Davis v. Chase Bank U.S.A., N.A*., 650 F. Supp. 2d 1073 (C.D. Cal. 2009), the court observed, similarly, that courts have "tended to distinguish between those claims that arise from generally-applicable duties such as contractual obligations and the duty to refrain from deceptive acts and those claims that rest on alleged violations of statutes specifically aimed at NBA duties. In the former case, courts have found no preemption[.]"  *Id*. at 1084 (citations omitted). Accordingly, because the plaintiffs' state-law claims for unconscionability and breach of the covenant of good faith and fair dealing were "part of a general rule of contract law," they presented no conflict with the NBA and could proceed.  *Id*. at 1086.

In *Mwantembe*, the district court rejected a preemption argument for the same reason. The plaintiffs asserted state-law claims, including breach of contract and under a consumer protection statute, based on the bank's alleged failure to disclose the deduction of dormancy and replacement fees from gift cards prior to their expiration dates.  The court noted that the consumer protection statute "is not directed at the authorized activity of a national bank" and "does not target or regulate banks or the 'business of banking.'  The statute prohibits fraudulent and deceptive conduct and practices in all consumer transactions" and, consequently, was not preempted by the NBA.  *Mwantembe*, 2009 WL 3818745, at *7.

Nor *could* the NBA preempt state laws that "merely require all businesses, including banks," to refrain from unlawful behavior – such as the laws at issue here.  *Young*, 2009 WL

3450988; *see Mann v. TD Bank, N.A*, 2009 WL 3818128, at *5 (D.N.J. Nov. 12, 2009) (NBA cannot preempt state laws "not aimed at or specific to the banking industry" which "simply require all actors to conform to a generally applicable code of conduct regardless of the nature of their business.").[8]

The scheme alleged in *Young* is analogous to the scheme alleged here.  In both cases, a national bank or banks allegedly manipulated a computer program to maximize profits and hit consumers with unconscionably high fees.  The plaintiffs in *Young* brought state-law claims, including consumer protection and unjust enrichment claims, based on allegations that Wells Fargo programmed its computer system to automatically charge as many property inspection fees as possible, irrespective of reasonableness.  *Young*, 2009 WL 3450988, at *1; *compare* Dolores *Gutierrez*, C ¶ 37 ("Wells Fargo employs sophisticated software to automate its overdraft system.  This program maximizes the number of overdrafts, and thus, the amount of overdraft fees charged per customer.").

In *Young*, the district court stated that the "central inquiry" of conflict preemption "is whether the legal duty that is the predicate of the common-law damages action directly conflicts with the governing federal law."  *Id.* at *9 (citing *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 524 (1992)); *accord*, *Wolpin v. Philip Morris, Inc.*, 974 F. Supp. 1465, 1467 (S.D. Fla. 1997) (King, J.).  The court found no such conflict with the NBA – and no preemption – where the

---

[8] *See also Lipcon*, 962 F. Supp. at 1494 (claims not preempted by Communications Act where "plaintiffs seek to hold defendant to the same standards as they would any other business"); *Poskin v. TD BankNorth, N.A*., 2009 WL 2981963, at *21 (W.D. Pa. Sept. 11, 2009) (no NBA preemption because plaintiffs asserted state-law claim against national bank under "a law of general applicability, and not targeted directly at banking"); *Jefferson v. Chase Home Fin*., 2008 WL 1883484, at *10-15 (N.D. Cal. Apr. 29, 2008) (no NBA preemption because state laws in question were "laws of general application" that "merely require all business (including banks) to refrain from misrepresentations and abide by contracts"); *Patterson v. Regions Bank*, 2006 WL 3407852, at *5 (S.D. Ill. Nov. 27, 2006) (no NBA preemption where claims against national bank "amount to nothing more than state law causes of action").

claims under laws of general application were "premised on the theory that Wells Fargo had a legal duty not to employ procedures designed to defraud borrowers by charging unreasonable fees," and "the basis of the alleged excessiveness [was] that Wells Fargo charged fees when they should not[.]" *Young*, 2009 WL 3450988, at *9.

Together with *Young*, the recent decision in *In re Chase Bank USA, N.A. "Check Loan" Contract Litigation*, 2009 WL 4063349 (N.D. Cal. Nov. 20, 2009), is especially instructive. In refusing to dismiss the plaintiffs' claim for breach of the covenant of good faith and fair dealing on NBA preemption grounds, the court stated it could find "*no authority* providing that if a national bank enters into a contract and subsequently breaches an *implied* term of such contract, the customer lacks the ability to seek a remedy under state contract law." *Id*. at *9 (emphasis added).

In legions of other recent cases, including cases within the Eleventh Circuit where plaintiffs alleged national banks charged excessive fees, federal courts have consistently *rejected* preemption arguments based on the NBA, and have allowed claims to proceed under state laws of general application. *See*, *e.g.*, *White*, 563 F. Supp. 2d at 1361 (NBA did not preempt state-law claims on allegations that national bank "delays, reorders, or otherwise manipulates posting transactions to an account"); *Gutierrez*, 2008 WL 4279550, at *5-12 (same); *Gunter v. Chase Bank U.S.A., N.A.*, 2008 WL 3211293, at *4 (S.D. Ala. 2008) (where plaintiffs alleged national bank assessed improper fees in administering housing loans, state-law claim not preempted by NBA); *Levitansky v. FIA Card Servs., N.A.*, 492 F. Supp. 2d 758, 762 (N.D. Ohio 2007) (allegations of improper fees for cash advances and balance transfers involved "only . . . breach of contract claims" that were not preempted by NBA). Significantly, almost all of the cases

discussed above were decided before *Cuomo*, 129 S. Ct. 2710, which further buttresses their holdings.

In contrast, the cases on which the Banks base their argument involved state laws that *specifically targeted* banks and, as a result, were preempted:

- *Franklin National Bank v. New York*, 347 U.S. 373 (1954), Omnibus Mot. at 21, 24 (statute prohibited national banks from using the word "savings" or its variants);

- *Rose v. Chase Bank USA, N.A.*, 513 F.3d 1032 (9th Cir. 2008), Omnibus Mot. at 25 (statute imposed disclosure requirements on national credit card issuers in California);

- *Wells Fargo Bank of Texas NA v. James*, 321 F.3d 488 (5th Cir. 2003), Omnibus Mot. at 25, 33 (statute barred national banks from charging non-account holders a fee for cashing checks in Texas);

- *Bank of America v. City and County of San Francisco*, 309 F.3d 551 (9th Cir. 2002), Omnibus Mot. at 21, 24, 25, 33 (municipal ordinance barred national banks from charging ATM fees to non-depositors in San Francisco);

- *Bank One, Utah v. Guttau*, 190 F.3d 844 (8th Cir. 1999), Omnibus Mot. at 33, (statute restricted national banks' placement and operation of, and advertising on, ATMs in Iowa);

- *NNDJ, Inc. v. National City Bank*, 540 F. Supp. 2d 851 (E.D. Mich. 2008), Omnibus Mot. at 25 (statutes prohibited national banks from issuing official checks and then charging non-account holders a fee to cash them in Michigan);

- *Aguayo v. U.S. Bank*, -- F. Supp. 2d --, 2009 WL 3149607 (S.D. Cal. Sept. 24, 2009), Omnibus Mot. at 28 (statute required national banks in California to comply with notice procedures after repossessing motor vehicles); and

- *Metrobank v. Foster*, 193 F. Supp. 2d 1156 (S.D. Iowa 2002), Omnibus Mot. at 25-26 (statute prohibited national banks from charging ATM fees to non-account holders in Iowa).[9]

---

[9] Similarly, *First Nat'l Bank of Eastern Arkansas v. Taylor*, 907 F.2d 775 (8th Cir. 1990), Omnibus Mot. at 21, did not involve a law of general application, but rather the state insurance commissioner's notice to a national bank that its debt cancellation contracts amounted to credit life insurance policies and therefore were subject to state insurance laws.  And in *Kronemeyer v. U.S. Bank National Association*, 857 N.E.2d 686 (Ill. App. Ct. 2006), Omnibus Mot. at 25, 33, the court did not reach the question of whether the NBA preempted a law targeting banks, because the plaintiffs lacked standing.

Not a single law identified in plaintiffs' complaints is directed *specifically* at national banks in this manner.  Because plaintiffs assert claims solely under laws of general application, their claims are not preempted.

> **b.**     **The Laws of General Application in the Complaints Affect the Banks' Powers No More Than Incidentally**

Federal regulations codified at 12 C.F.R. §§ 7.4007(c) and 7.4009(c)(2) provide that federal law does *not* preempt state contract, tort and other laws "to the extent that they only incidentally affect the exercise of national bank powers," including "deposit-taking powers." Under these regulations, state laws do *not* affect the exercise of national bank powers more than "incidentally," except if they "prevent or significantly interfere with the national bank's or the national bank regulator's exercise of its powers." *Gutierrez*, 2008 WL 4279550, at *5-6 (citation omitted).  National banks are "subject to state laws, unless those laws infringe the national banking laws or impose an undue burden on the performance of the banks' functions." *Anderson Nat. Bank*, 321 U.S. at 248.  The laws under which plaintiffs assert their claims do neither.

The Banks contend that the state contract, tort and other laws of general application pled in plaintiffs' complaints affect the exercise of national bank powers more than "incidentally." Omnibus Mot. at 28.  They are wrong.  *Cuomo* and the other cases discussed above hold that state laws such as the ones at issue here – which apply to *all* business, not just to banks – "only incidentally affect" the exercise of national bank powers and, consequently, are not preempted. *See*, *e.g.*, *Chase Bank*, 2009 WL 4063349, at *8-9 (state laws of general application "only incidentally affect" national bank powers); *Mwantembe*, 2009 WL 3818745, at *7; *Davis*, 650 F. Supp. 2d at 1086; *Mann*, 2009 WL 3818128, at *8; *Young*, 2009 WL 3450988, at *10; *Poskin*, 2009 WL 2981963, at *21; *White*, 563 F. Supp. 2d at 1367; *Gutierrez*, 2008 WL 4279550, at *9;

*Baldanzi*, 2008 WL 4924987, at *3; *Jefferson*, 2008 WL 1883484, at *13; *Levitansky*, 492 F. Supp. 2d at 762.

The OCC's explanatory comments published in the *Federal Register* when it issued Section 7.4007 reinforce these holdings.  Taking note of "the Supreme Court's observation that national banks 'are governed in their daily course of business far more by the laws of the state than of the nation,'" the OCC drew the same distinction between state laws that regulate national banks in particular – which are preempted – and state laws of general application, which are *not* preempted.  OCC Statement of Jan. 13, 2004, 2004 WL 50763, 69 F.R. 1904-01, at 1913 (quoting *First Nat. Bank*, 76 U.S. at 362).  In the OCC's view, "state laws that, as a general matter, are not preempted . . . include state laws concerning contract, rights to collect debt, tort, zoning, and property transfers" – *i.e.*, laws of general application.  *Id.* at 1912.  By contrast, "[t]ypes of state laws that are generally preempted under § 7.4007 include state requirements concerning abandoned and dormant accounts, checking accounts, disclosure requirements, funds availability, savings account orders of withdrawal, state licensing or registration requirements, and special purpose savings services" – *i.e.*, laws targeting banks.  *Id.*  The laws at issue here are general state contract, tort and consumer protection laws, not "state requirements concerning . . . checking accounts."  *Id.*  Accordingly, they are not preempted.

           **c.**      **Federal Regulations and Advisory Materials Militate Against Conflict Preemption**

The Banks are unable to point to any authority suggesting that challenges to their unconscionable overdraft fee practices are preempted.  Nor could they – because no such authority exists.

The Banks argue that the OCC regulation providing that "state laws that obstruct, impair, or condition"[10] a national bank's "deposit-taking powers" are preempted, 12 C.F.R. § 7.4007(b) – and the regulation authorizing national banks to charge "non-interest charges," 12 C.F.R. § 7.4002(a) – preempt the state laws of general application in these complaints.  Omnibus Mot. at 21-22, 26-27.  This argument is without merit.

Plaintiffs do *not* assert that the Banks lack the right to charge overdraft fees as part of their deposit-taking powers.  Plaintiffs also do *not* challenge the existence of overdraft fees. Instead, they challenge the unlawful manner in which the Banks operate their overdraft programs to maximize fees at the expense of consumers, especially low-income consumers, while concealing their true motive in bad faith.  *See Tornes*, SAC ¶¶ 4, 7 (identifying Banks' "inequitable motive to generate obscene profits" and noting that "90 percent of overdraft fees are paid by the poorest 10 percent of banks' customer base.").  On this point, the reasoning of *Gutierrez* is instructive: "Preemption would likely apply if a customer were challenging a bank's fundamental right to employ an overdraft fee at all.  But here, the issue is whether Wells Fargo has been manipulating – indeed downright altering – customers' transaction records so as to maximize overdraft penalties imposed on customers."  *Gutierrez*, 2008 WL 4279550, at *7.  The identical issue is present here.

Further, in seeking redress under state laws of general application, plaintiffs' claims will *not* obstruct, impair, or condition the Banks' deposit-taking powers given that the violations detailed in the complaints depart from the recommendations of the federal government itself. Holding the Banks liable for past violations when they have failed to comply with the guidelines

---

[10] This OCC language has come under attack as insufficiently grounded in Supreme Court precedent.  *See* Vincent Di Lorenzo, *Federalism, Consumer Protection and Regulatory Preemption: A Case for Heightened Judicial Review*, 10 U. PA. J. BUS. & EMP. L. 273, 282-88 (2008).

of all the major national bank regulators, by definition, cannot "significantly interfere with . . . the national bank regulator's exercise of its federal powers." *Gutierrez*, 2008 WL 4279550, at *5 (citation omitted).  There can be no "undue burden on the performance of the banks' functions," *Anderson Nat. Bank*, 321 U.S. at 248, and no "incapacitat[ing]" effect on their "discharging their duties to the government," *First Nat'l Bank*, 76 U.S. at 362, when the deficiencies complained of are the very ones that prompted substantial federal government concern.  Indeed, had the Banks brought their overdraft fee practices in line with the federal government's view of the proper limits of bank powers, plaintiffs would never have been injured.

The Banks rely on 12 C.F.R. § 7.4002, which directs national banks to set non-interest charges and fees "according to sound banking judgment and safe and sound banking principles." Omnibus Mot. at 22.  Plaintiffs, however, allege that the Banks' overdraft fee practices depart egregiously from "safe and sound banking principles" and undermine "the safety and soundness of the institution[s]."  *Id.* § 7.4002(b)(2), (b)(2)(iv); *Tornes*, SAC ¶¶ 67-73.  The Banks have failed to abide by the OCC's own guidelines for safe and sound overdraft fee programs.  *See* Section A.3.d, *infra*.

Moreover, as Judge Gold found, the notion that section 7.4002, or the reference in 12 U.S.C. § 24 to "receiving deposits," preempts allegations of unreasonable overdraft fees under state law is "palpably erroneous" and "simply untenable":

> Neither the Bank Act nor any other federal statute considers whether the provisions in contracts between banks and their customers may exact unreasonable or unconscionable fees. . . . The explicit language of the Bank Act does not speak to charges for processing checks presented against overdrawn accounts.  The legislative history reveals no evidence of congressional intent to displace state law regarding charges or payments other than for interest.

*Video Trax*, 33 F. Supp. 2d at 1049, 1057-58 (dismissing usury claim on summary judgment based on finding that overdraft fees for bounced checks did not constitute interest under Florida

law); *compare Wolpin*, 974 F. Supp. at 1468-69 (King, J.) (stating that it is "unfair to deny [a] segment of society the benefit of state law protection when the federal government neither intended to nor in fact afforded that class of people protection," and when "the Act was never intended to address the problem" identified in the complaint).

In *Gutierrez*, the court rejected Wells Fargo's preemption argument based on section 7.4002 because "nowhere does [that regulation] remotely suggest that the specific [overdraft fee] practices described herein are authorized."[11]  *Gutierrez*, 2008 WL 4279550, at *9.  The Banks struggle to distinguish the *Gutierrez* decision, which came on summary judgment.  Omnibus Mot. at 32-34.  Here, at a much earlier stage of the litigation, the same outcome is warranted.

The OCC advisory letters cited by the Banks do not suggest otherwise.  The letters advise that, with regard to checks that clear on a single day, a bank may post them to customers' accounts in whatever order it chooses provided it does so in good faith.  Omnibus Mot. at 22. For several reasons, the Banks' reliance on these letters is unavailing.

First, far from giving the Banks *carte blanche* to reorder the posting of checks, the OCC advisory letters, drawing upon state law, counsel that such reordering is permissible only if the Banks "act in good faith."  OCC Interp. Letter No. 997, 2002 WL 32639293, at *2 (Apr. 15,

---

[11] *Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274 (6th Cir. 2009), Omnibus Mot. at 20, 22, 23, is not to the contrary.  *Monroe* did not involve bad faith practices surrounding overdraft fees as in *Gutierrez*, but rather certain banks' practice of charging debtors service fees before releasing the funds in the debtors' accounts to creditors who sought to garnish the accounts.  The practice allegedly harmed the plaintiff-creditors because the debtors sometimes had insufficient funds to cover both the banks' fees and the amounts owed to the creditors.  The creditors argued that the banks' practice violated an Ohio garnishment statute that, the court found, imposed a "requirement that banks freeze accounts immediately upon receipt of a garnishment order[.]"  *Id.* at 284.  Over a dissent, the court held the Ohio statute was preempted.  The majority found that the statute conflicted with section 7.4002 to the extent it "mandate[d] the order" of "account-balancing and account-management functions."  *Id.*  This finding, even if correct, is irrelevant to the instant cases.  Plaintiffs do not contend that the state laws under which they assert their claims affirmatively *mandate* a particular order in which the Banks can process transactions, only that they *prohibit* conduct that unreasonably harms consumers.

2002).  For example, "a procedure designed to maximize the number of returned checks solely to increase returned check fees charged to customers would not be appropriate."  *Id.* (citing Texas guidelines); *see also* OCC Interp. Letter No. 1082, 2007 WL 3341502, at *2 (May 17, 2007) (advising national banks to act "consistent with safe and sound banking practices.").  A bank must "act in good faith," and "could not properly follow an established practice of maximizing the number of returned checks for the sole purpose of increasing the amount of returned check fees charged to the customer."  OCC Interp. Letter No. 916, 2001 WL 1285359 (May 22, 2001) (citing California guidelines).  Plaintiffs allege precisely such a bad faith scheme.  *See Tornes*, SAC ¶ 57 (scheme "is specifically designed to maximize the generation of overdraft fees by triggering overdraft fees for account charges that would not otherwise result in such fees.").

Second, the OCC advisory letters do not *require* national banks to reorder the posting of checks.  As Judge Fay noted, where claims invoke a "nonnegotiable state right" and call for a "purely factual inquiry" uncontrolled by any federal statute or regulation, a finding of preemption is not appropriate.  *Peterson v. BMI Refractories*, 132 F.3d 1405, 1413 (11th Cir. 1998).  Thus, federal statutes, regulations, or advisory materials that "neither prohibit nor require" a course of conduct cannot preempt state-law claims.  *Santos v. Crown Equip. Corp.*, 2009 WL 1066946, at *5 (S.D. Fla. Apr. 21, 2009).

Third, the OCC advisory letters are inapposite because they address the order of posting of checks – not debit card transactions.  With debit card transactions, unlike with checks, banks have precise contemporaneous information concerning when an account holder attempts to execute each transaction.  The Banks "are able to determine, almost instantaneously, whether there are sufficient funds in a customer's account to cover that particular transaction," and therefore are capable of "notify[ing] customers at that very moment that the particular debit card

transaction would result in an overdraft." *Tornes*, SAC ¶ 64; *see also id*. ¶ 53.  As a result, the considerations present with bounced checks "are not present when customers use debit cards." *Id*. ¶ 6; *see*, *e.g*., *Hughes v. Atty. Gen. of Fla.*, 377 F.3d 1258, 1268-69 (11th Cir. 2004) (finding that opinion of administrative agency was entitled to little weight because it concerned a different factual context).

Fourth, while the OCC advisory letters address reordering of checks "that are presented on the same day," plaintiffs allege a different, unconscionable reordering scheme in which debit transactions "are held for multiple days and then batched together[.]"  *Compare* Letter No. 997, 2002 WL 32639293, at *2, *and* Letter No. 916, 2001 WL 1285359, *with Tornes*, SAC ¶¶ 56, 58.

Fifth, the Banks' argument rests on an impermissibly cramped reading of plaintiffs' complaints.  *See Marsh*, 268 F.3d at 1055.  The OCC advisory letters, as noted, provide guidance only on reordering the posting of checks on a given day, but even a cursory review of plaintiffs' complaints will show that their allegations are not limited to the Banks' reordering practices. *See*, *e.g*., *Tornes*, SAC ¶ 59 ("Plaintiffs and members of the Classes have been assessed overdraft fees for transactions which occurred when they actually had sufficient funds in their accounts to cover those transactions."); ¶ 66 ("Bank of America fails to make Plaintiffs and Class members aware that they can opt out of its overdraft scheme upon request"); ¶ 74(b) ("The Bank does not obtain affirmative consent from checking account customers prior to processing a transaction that will overdraw the account and result in an overdraft fee").[12]

---

[12] Because plaintiffs allege much more than inadequate disclosures, the statement in dicta in *White* that claims based solely on inadequate disclosures "may" be preempted is irrelevant, let alone a basis for preemption here.  563 F. Supp. 2d at 1369 n.15.  The same is true of the dismissal of claims that were "all based on the amount of and means of disclosure" in *Montgomery v. Bank of America Corporation*, 515 F. Supp. 2d 1106, 1113 (C.D. Cal. 2007), Omnibus Mot. at 25, 30.  Likewise, the decision in *Weiss v. Wells Fargo Bank, N.A*., 2008 WL 2620886 (W.D. Mo. July 1, 2008), Omnibus Mot. at 25, concerned preemption only under

Sixth, the OCC advisory letters are not binding on this Court.  An OCC letter is advisory only.  It "does not have the full force of law.  It is merely interpretive rather than legislative." *Gutierrez*, 2008 WL 4279550, at *7.  In the Eleventh Circuit, the OCC's "factual findings are not legally entitled to deference."  *Laube v. Campbell*, 333 F. Supp. 2d 1234, 1240 (M.D. Ala. 2004) (citation omitted).  The Eleventh Circuit has stated that "'a preemption determination involves matters . . . more within the expertise of the courts than within the expertise of' an administrative agency."  *BankWest, Inc. v. Baker*, 411 F.3d 1289, 1301 (11th Cir. 2005) (citation omitted), *vacated on other grounds as moot*, 446 F.3d 1358 (11th Cir. 2006).  Therefore, "we do not defer to agency positions, whether formal or informal, on preemption issues."  411 F.3d at 1300.  Even if this Court nevertheless were to grant some deference to an OCC letter, it "would have to stop short of giving it controlling weight."  *Am. Deposit Corp. v. Schacht*, 887 F. Supp. 1066, 1076 (N.D. Ill. 1995); *see also Bowler v. Hawke*, 320 F.3d 59, 62-63 (1st Cir. 2003) (holding that an OCC advisory letter contains "no more than informal agency guidance to banks and other interested parties . . . not carrying the force or effect of law").

Last, the OCC made the "decision not to take the next step to give its guidance regulatory status."  *Mwantembe*, 2009 WL 3818745, at *7.  This "evidences its intent that states are free to regulate" abusive overdraft fee practices.  *Id.* (citing *Sprietsma v. Mercury Marine*, 537 U.S. 51, 65 (2002)).  Had the OCC intended for state regulation in this area to be preempted, it would have had to initiate, undertake and complete the notice-and-comment procedures set forth at 12 U.S.C. § 43.  *See Jefferson*, 2008 WL 1883484, at *8.  This has not happened.

---

"regulations expressly provid[ing] that bank advertising and disclosures are not subject to state law."  *Id*. at *2.

       **d.**    **The Banks Were on Notice of Their Violations and Their Exposure to State Law**

The Banks cannot complain about these state-law claims proceeding when they have had ample warning not only that committing wrongful acts will subject them to state law, but also that the specific wrongful acts alleged in the complaints are illegal.

Attached to plaintiffs' complaints is the Joint Guidance, issued by the Agencies in 2005. The Banks depart from many of the sound banking practices specified in the Joint Guidance. *See Tornes*, SAC ¶¶ 67-69.  For example, they do not inform their customers of their right to opt out of overdraft protection, or alert them at the point of sale before a transaction triggers an overdraft fee. *See id*. ¶¶ 66, 74; *compare* 70 F.R. 9127, 9132.

The Joint Guidance explicitly contemplates that state laws are available to redress injuries resulting from overdraft fee programs administered by national banks: "*State laws also may be applicable*, including . . . laws on unfair or deceptive acts or practices.  It is important that institutions have their overdraft protection programs reviewed by counsel for compliance with *all* applicable laws prior to implementation."  *Id*. at 9130 (emphasis added).

In like vein, an OCC advisory letter issued in 2002 put all national banks on notice that engaging in unfair business conduct will subject them to state law:

> A number of state laws prohibit unfair or deceptive acts or practices, and such laws may be applicable to insured depository institutions. . . . Whether particular conduct constitutes an unfair act or practice would depend on the particular facts and circumstances presented, but generally would involve acts or practices that are unscrupulous, unconscionable, or contrary to public policy, and that harm consumers.

OCC Interp. Letter AL 2002-3, at 1 & 3 n.2, *available at*: www.occ.treas.gov/ftp/advisory/2002-3.doc; *see Mann*, 2009 WL 3818128, at *7 (rejecting preemption argument under NBA, finding "it significant that OCC appears to envision that certain state laws against unfair or deceptive practices will remain enforceable against national banks").

Apart from the Joint Guidance, the OCC has issued multiple letters that put the Banks on notice that key aspects of their overdraft fee programs are unlawful.  In 2001, the OCC indicated its strong disapproval of overdraft fee programs, like the ones alleged in the complaints, which "in essence, attempt to entice their customers to write NSF checks more frequently and on purpose in order to generate fee income."  OCC Interp. Letter No. 914, at 8 (Sept. 2001), *available at*: www.occ.treas.gov/interp/sep01/int914.pdf.  The letter criticized the Banks for "send[ing] a mixed message" about their commitment to paying overdrafts, and for making "no effort" (1) "to identify customers who are writing overdraft checks regularly as a means of meeting regular obligations in order to attempt serve their needs through more economical alternatives," (2) to "explain to customers the costs and advantages of various alternatives to the program," or (3) to "identify for customers the risks and problems in relying on this product and the consequences of abuse."  *Id*. at 3, 6.  In addition, the OCC expressed concern that the "*use of the Program could promote poor fiscal responsibility on the part of some customers*."  *Id*. at 5 (emphasis in original).

In 2007, a California bank asked the OCC to clarify whether an official commentary on California law accorded with federal law.  The commentary stated that, in reordering the posting of checks on a given day, a bank is obligated to "act in good faith.  For example, the bank could not properly follow an established practice of maximizing the number of returned checks for the sole purpose of increasing the amount of returned check fees charged to the customer."  *Gutierrez*, 2008 WL 4279550, at *11; *compare Tornes*, SAC ¶¶ 57-58.  The OCC's letter informed the bank that this state commentary was entirely "consistent" with federal standards.  *Id*.  As the court in *Gutierrez* concluded, "[i]mplicit in this analysis was the OCC's effort to reconcile the activity proposed by the bank with the relevant state law.  Nowhere in the letter did

-31-

the OCC state that the California law could be ignored or not complied with because it would be preempted." *Id.*[13]

### 4.    Congress Did Not Intend for Claims of This Nature to Be Preempted

The Supreme Court reaffirmed last year that "[t]he case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them." *Wyeth*, 129 S. Ct. at 1200 (citation omitted).  The Court has long recognized that the plain "terms" of the federal banking statutes make "controversies concerning national banks cognizable in state courts because of their intimate relation to many state laws and regulations[.]"  *First Nat'l Bank of Bay City v. Fellows ex rel. Union Trust Co*., 244 U.S. 416, 428 (1917).  There can be no doubt that "the purpose and object of congress [sic] in enacting the national bank law was to leave such banks, as to their contracts in general, under the operation of the state law[.]"  *McClellan v. Chipman*, 164 U.S. 347, 359 (1896).   The banking system is a "mixed state/federal regime[]" that reflects "Congress's decision not to pre-empt substantive state law." *Cuomo*, 129 S. Ct. at 2718.

In 1994, Congress enacted the Riegle-Neal Amendments to the NBA, thereby establishing the notice-and-comment procedures for NBA preemption regulations, *see* 12 U.S.C. § 43 – "[i]n view of the Congressional concern regarding preemption of State law regarding . . . consumer protection[.]"  H.R. REP. NO. 103-651, 1994 WL 405911, at *54.  The intent behind the new requirements was "to help ensure that an agency only makes a preemption determination

---

[13] The decisions in *Gutierrez* and *White* also placed the Banks on notice that they can and will be held accountable under state laws of general application for their wrongful overdraft fee practices.  As the court found in *Gutierrez*, the fact that a bank's own account agreement provides it is subject to state law undermines the Banks' preemption claim. *See Gutierrez*, 2008 WL 4279550, at *10.

-32-

when the legal basis is compelling and the Federal policy interest is clear."   *Id*. at *55.

According to the conference report:

> States have a legitimate interest in protecting the rights of their consumers, businesses, and communities. . . . Under well-established judicial principles, national banks are subject to State law in many significant respects. . . . Congress does not intend [to] alter this balance and thereby weaken States' authority to protect the interests of their consumers, businesses, or communities.

*Id*. at *53-54.  In floor debates, Senator Bob Graham stated that his "concern" was:

> a significant loss of authority for the States.  Currently through their banking laws and their bank holding company statutes, States are able to require all banks to conform with a wide variety of State laws.  States have applied laws in the areas of consumer protection . . . We need to look at the financial system from the eyes of the users of the services, the consumers.

140 CONG. REC. S4819, 1994 WL 151478 (1994).

Congressional concern about overly aggressive OCC preemption of state law again found its way into a statutory mandate in 1997.  The amendments to the Riegle-Neal Act imposed a requirement that the OCC conduct an annual review of its preemption determinations and provide the reasons for each one in its annual report to Congress.  *See* 12 U.S.C. § 36(f)(1)(C). The floor debates on this legislation make it clear that Congress viewed the requirement as necessary because "the Comptroller has undertaken preemptive actions which were unnecessarily expansive."  143 CONG. REC. S5638, 1997 WL 314303 (1997).

Thus, Congress "has indicated its awareness" – indeed, its approval – "of the operation of state law" on the business of banking.  *Wyeth*, 129 S. Ct. at 1200 (citation omitted). Congressional purpose, the "ultimate touchstone" of a preemption analysis, *Wolpin*, 974 F. Supp. at 1468 (King, J.), dictates that plaintiffs' claims are not preempted.

### B.       No Choice-Of-Law Analysis Is Appropriate at This Juncture

The Banks' choice-of-law argument – that plaintiffs' accounts are governed by the law of the state in which the accounts were opened or maintained – contradicts their argument that

plaintiffs' claims, all of which relate to the account agreements, are preempted by federal law rather than governed by state law.  Plaintiffs do not dispute that the contractual choice-of-law provisions are generally controlling, but submit that it is neither necessary nor appropriate for the Court to conduct any choice-of-law analysis at this juncture.  *See*, *e.g.*, *Steinberg v. A Analyst Ltd.*, 2009 WL 806780, at *7 (S.D. Fla. Mar. 26, 2009) ("it is premature to undertake a choice of law analysis at the motion to dismiss stage of the proceedings") (citation omitted); *In re ConAgra Peanut Butter Prods. Liab. Litig.*, 2008 WL 2132233, at *1 (N.D. Ga. May 21, 2008) ("it is premature to conduct a rigorous choice of law analysis at [the motion to dismiss] stage.").

As demonstrated below, plaintiffs' claims are based on universally recognized common law doctrines.  To the extent there are differences in how the courts of various states have applied these doctrines, such differences are *de minimis* rather than material.  Moreover, any minor differences have no bearing on whether plaintiffs' well-pled allegations state a claim under the common laws of every state.  Nor is a choice-of-law analysis necessary with regard to the consumer protection claims.  Plaintiffs have already done the analysis and have specified which consumer protection laws apply.

The Banks would have this Court add an unwarranted layer of complexity to its analysis of the omnibus motion.  The Court should decline the invitation.

### C.    Plaintiffs State Valid Claims for Breach of Contract

The Banks' motion to dismiss the breach of contract claims is predicated on the overly simplistic assertion that their deposit agreements contain express terms permitting the reordering of debits.  According to the Banks, since their agreements permit the high-to-low posting of debits, they can post high-to-low irrespective of the methods they employ or their rationale for doing so.  Omnibus Mot. at 40-55.  The Banks' assertion is flawed.  It fails to recognize that:

- In *all* of the agreements, the reordering of debits is *discretionary* and, as such, imposes upon the Banks the obligation to act in good faith. Case law uniformly holds that where, as here, contract provisions give discretion to one party, that discretion must be exercised in good faith;

- *Nothing* in their agreements permits the Banks to manipulate the reordering of debits *solely* to create overdrafts that would not otherwise exist, to charge overdraft fees when there are sufficient funds in the account, or to reorder the posting of debits over a period of days irrespective of when the transaction occurred; and

- There are fundamental differences between checks and debit transactions, which make earlier decisions and the OCC pronouncements concerning checks inapplicable.

These factors prompted the holding in *White v. Wachovia Bank*:

> The court cannot find as a matter of law that the Deposit Agreement's statement that Wachovia "may" post items "in any order" . . . expressly gives Wachovia the right to manipulate transactions, delay posting indefinitely, and maximize overdraft fees in the ways the Complaint alleges.

*White,* 563 F. Supp. 2d at 1364.

Contrary to the Banks' claims, plaintiffs are *not* trying to vary the explicit contract language or eliminate all high-to-low ordering, but instead seek only to enforce good faith performance under the discretionary terms of the agreements. The detailed allegations in their complaints are more than sufficient to state plausible contract claims.

### 1. The Banks' Discretion Is Constrained by the Covenant of Good Faith and Fair Dealing

#### a. The Covenant Is Recognized in Virtually All States

Courts throughout the United States recognize an implied covenant of good faith and fair dealing in the performance of contracts. As this Court recently held, "as long as the implied covenant does not vary the express terms of the contract, the failure to perform a discretionary act in good faith may be a breach of the implied covenant of good faith and fair dealing." *Abels v. JP Morgan Chase Bank, N.A.*, 2009 WL 5342768, at *4 (S.D. Fla. Nov. 23, 2009) (King, J.) (*citing Cox v. CSX Intermodal, Inc.*, 732 So.2d 1092 (Fla. Dist. Ct. App. 1999)).

"*Every* contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."   RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981) (emphasis added).   "Good faith" here means "consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness."  *Id*. cmt. a. As for "fair dealing," it "may require more than honesty."  *Id*. cmt. d.

In addition to Florida, there is nearly universal acceptance of the covenant of good faith and fair dealing.  The Banks identify Florida, California, Oregon, New Mexico and Washington in their choice of law analysis.  Omnibus Mot. at 34.  All of these states recognize the covenant of good faith and fair dealing.  *See*, *e.g.*, *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 826 P.2d 710, 726 (Cal. 1992); *Vander Kley v. Acstar Ins. Co.*, 2009 U.S. Dist. LEXIS 3293, at *13 (D. Or. Jan. 15, 2009); *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1114 (10th Cir. 2005); *Frank Coluccio Constr. Co. v. King County*, 150 P.3d 1147, 1154 (Wash. Ct. App. 2007).  Numerous other states not identified by the Banks also recognize this implied covenant in every contract.[14]  As these decisions show, nearly all states accept the covenant of good faith and fair dealing.[15]

---

[14] *See*, *e.g.*, **Alabama**, *Hunter v. Wilshire Credit Corp*., 927 So.2d 810, 813 (Ala. 2005); **Alaska**, *Hagans, Brown & Gibbs v. First Nat'l Bank of Anchorage*, 783 P.2d 1164, 1167 n.4 (Alaska 1989); **Arizona**, *Rawlings v. Apodaca*, 726 P.2d 565, 569 (Ariz. 1986); **Arkansas**, *TCBY Sys., Inc. v. RSP Co., Inc.*, 33 F.3d 925, 928-929 (8th Cir. 1994); **Colorado**, *City of Golden v. Parker*, 138 P.3d 285, 292 (Colo. 2006); **Connecticut**, *Miller v. Guimaraes*, 829 A.2d 422, 433 (Conn. App. Ct. 2003); **Delaware**, *Goodrich v. E. F. Hutton Group, Inc.*, 542 A.2d 1200, 1203 (Del. Ch. 1988); **District of Columbia**, *Allworth v. Howard Univ*., 890 A.2d 194, 201 (D.C. 2006); **Georgia**, *Brack v. Brownlee*, 273 S.E.2d 390, 392 (Ga. 1980); **Hawaii**, *The Best Place, Inc. v. Penn Am. Ins. Co.*, 920 P.2d 334, 337-338 (Haw. 1996); **Idaho**, *Steiner v. Ziegler-Tamura Ltd., Co.*, 61 P.3d 595, 599 (Idaho 2002); **Illinois**, *Europlast, Ltd. v. Oak Switch Sys., Inc.*, 10 F.3d 1266, 1275 n.5 (7th Cir. 1993); **Iowa**, *Rao v. Rao*, 718 F.2d 219, 222 (7th Cir. 1983); **Kansas**, *Kansas Baptist Convention v. Mesa Operating Ltd. P'ship*, 864 P.2d 204, 210-211 (Kan. 1993); **Kentucky**, *Ranier v. Mount Sterling Nat'l Bank*, 812 S.W.2d 154, 156 (Ky. 1991); **Louisiana**,

### b. The Covenant Limits the Discretion Conferred by the Agreements

The Banks concede that nearly every state recognizes a duty of good faith and fair dealing where a contract vests discretion in one of the parties. Omnibus Mot. at 44. For example, in *Perdue v. Crocker National Bank*, 702 P.2d 503 (Cal. 1985), a case that challenged a bank's discretionary authority to impose charges for insufficient funds, the court found that a contract authorizing the bank to impose such charges was "subject to the bank's duty of good

---

*Brill v. Catfish Shaks of Am., Inc.*, 727 F. Supp. 1035, 1039 (E.D. La. 1989); **Maryland**, *Clancy v. King*, 954 A.2d 1092, 1106 (Md. 2008); **Massachusetts**, *Dougovito v. First Trade Union Bank*, 2009 WL 2449855 (Mass. Super. Ct. July 31, 2009); **Michigan**, *Hammond v. United of Oakland, Inc.*, 483 N.W.2d 652, 655 (Mich. Ct. App. 1992); **Minnesota**, *In re Hennepin County 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995); **Mississippi**, *Cenac v. Murry*, 609 So.2d 1257, 1272 (Miss. 1992); **Missouri**, *Martin v. Prier Brass Mfg. Co.*, 710 S.W.2d 466, 473 (Mo. Ct. App. 1986); **Montana**, *Beaverhead Bar Supply, Inc. v. Harrington*, 805 P.2d 560, 564 (Mont. 1991); **Nebraska**, *Newman v. Hinky Dinky Omaha-Lincoln, Inc.*, 427 N.W.2d 50, 54 (Neb. 1988); **Nevada,** *Morris v. Bank of Am. Nev.*, 886 P.2d 454, 457 (Nev. 1994); **New Hampshire**, *Atlas Truck Leasing, Inc. v. First NH Banks, Inc.*, 808 F.2d 902, 904 (1st Cir. 1987); **New Jersey**, *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assoc.*, 864 A.2d 387, 395 (N.J. 2005); **New York**, *Payday Advance Plus, Inc. v. Findwhat.com, Inc.*, 478 F. Supp. 2d 496, 503 (S.D.N.Y. 2007); **North Carolina**, *Bear Hollow, L.L.C. v. Moberk, L.L.C.*, 2006 WL 1642126, at *11 (W.D.N.C. June 5, 2006); **Ohio**, *Littlejohn v. Parrish*, 839 N.E.2d 49, 53-54 (Ohio Ct. App. 2005); **Oklahoma**, *TSM Assocs., L.L.C. v. Tractor Supply Co.*, 2008 WL 4826276, at *4 (N.D. Okla. Oct. 29, 2008); **Pennsylvania**, *Seal v. Riverside Fed. Sav. Bank.*, 825 F. Supp. 686, 698 (E.D. Pa. 1993); **Rhode Island**, *Gillette of Kingston, Inc. v. Bank R.I.*, 2006 WL 1314259, at *5 (R.I. Super. Ct. May 5, 2006); **South Carolina**, *Commercial Credit Corp. v. Nelson Motors, Inc.*, 147 S.E.2d 481, 484 (S.C. 1966); **South Dakota**, *Garrett v. BankWest, Inc.*, 459 N.W.2d 833, 841 (S.D. 1990); **Tennessee**, *Elliott v. Elliott*, 149 S.W.3d 77, 84-85 (Tenn. Ct. App. 2004); **Utah**, *Iadanza v. Mather*, 820 F. Supp. 1371, 1387 (D. Utah 1993); **Vermont**, *Carmichael v. Adirondack Bottled Gas Corp.*, 635 A.2d 1211, 1216-17 (Vt. 1993); **Virginia**, *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 450 (E.D. Va. 2009); **West Virginia**, *Hoffmaster v. Guiffrida*, 630 F. Supp. 1289, 1290-91 (S.D. W. Va. 1986); **Wisconsin**, *Metro. Ventures, L.L.C. v. GEA Assocs.*, 717 N.W.2d 58, 69 (Wis. 2006); **Wyoming**, *City of Gillette v. Hladky Constr., Inc.*, 196 P.3d 184, 196-97 (Wyo. 2008).

[15] The Banks identify Texas as a jurisdiction that does not recognize the covenant of good faith and fair dealing. Omnibus Mot. at 43. Although the law in Texas is generally unfavorable to a claim for breach of the covenant of good faith and fair dealing, Texas courts have found a duty of good faith and fair dealing to exist between a bank and its customer in *FDIC v. Perry Bros., Inc.*, 854 F. Supp. 1248, 1259-1260 (E.D. Tex. 1994), and *Plaza National Bank v. Walker*, 767 S.W.2d 276, 277-78 (Tex. Ct. App. 1989).

faith and fair dealing in setting or varying such charges." *Id.* at 510. *Perdue* summarized an

earlier decision, *California Lettuce Growers v. Union Sugar Co.*, 289 P.2d 785, 791 (Cal. 1955),

where the court found that a contract permitting a defendant to set prices did not confer *arbitrary*

power because "where a contract confers on one party a discretionary power affecting the rights

of the other, a duty is imposed to exercise that discretion in good faith and in accordance with

fair dealing." *Perdue*, 702 P.2d at 510 (internal quotation marks and citations omitted).

Similarly, courts in the other states identified by the Banks recognize that discretion in a

contract necessarily gives rise to a good faith obligation. *See Alexander Mfg., Inc. Employee

Stock Ownership & Trust v. Ill. Union Ins. Co.*, 2009 U.S. Dist. LEXIS 95897, at *48 (D. Or.

Oct. 15, 2009) ("good faith requires that each party perform its obligations under the contract,

including exercising any discretion that the contract provides, in a way that will effectuate the

objectively reasonable contractual expectations of the parties.") (internal quotation marks and

citation omitted); *Amoco Prod. Co. v. Heimann*, 904 F.2d 1405, 1411-12 (10th Cir.), *cert.

denied*, 498 U.S. 942 (1990) (where discretion exists in one of two parties to a contract, that

discretion must be exercised in good faith); *Bybee Farms L.L.C. v. Snake River Sugar Co.*, 2008

WL 4454054, at *12 (E.D. Wash. Sept. 29, 2008) (fact that agreement confers discretion means

that there is "an implied duty to exercise its authority in good faith").[16]

---

[16] There are legions of cases holding that contractual discretion imposes a duty of good faith and
fair dealing: **Alabama**, *G. F. Kelly Trucking, Inc. v. U.S. Xpress Enters., Inc.*, 2007 WL
3227390, at *6-7 (M.D. Ala. Oct. 30, 2007); **Alaska**, *McDonald's Corp. v. Barnes*, 1991 U.S.
Dist. LEXIS 6971, at *5 (D. Alaska May 8, 1991); **Arizona**, *Bike Fashion Corp. v. Kramer*, 46
P.3d 431, 435 (Ariz. Ct. App. 2002); **Colorado**, *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498-99
(Colo. 1995); **Connecticut**, *Celentano v. Oaks-Condominium Ass'n.*, 830 A.2d 164, 188 (Conn.
2003); **Delaware**, *Hilco Capital, LP v. Fed. Ins. Co.*, 978 A.2d 174, 178 (Del. 2009); **District of
Columbia**, *Dorocon, Inc. v. Burke*, 2004 U.S. Dist. LEXIS 29052, at *95 (D.D.C. Sept. 27,
2004); **Georgia**, *Hunting Aircraft, Inc. v. Peachtree City Airport Auth.*, 636 S.E.2d 139, 141 (Ga.
Ct. App. 2006); **Hawaii**, *Haw. Leasing v. Klein*, 698 P.2d 309, 313 (Haw. Ct. App. 1985);
**Idaho**, *Ferguson v. City of Orofino*, 953 P.2d 630, 634-35 (Idaho Ct. App. 1998); **Illinois**, *BA

In *Cox v. CSX Intermodal, Inc.*, cited by this Court in *Abels*, Florida's First District Court of Appeal discussed the applicability of the covenant of good faith and fair dealing where a contract provides for discretion:

> In considering the application of the implied duty of good faith to the instant action, we find persuasive the reasoning of Justice Souter who, while on the New Hampshire Supreme Court, explained the implied duty, as follows:
>
> > Under an agreement that appears by word or silence to invest one party with a degree of discretion in performance sufficient to deprive another party of a substantial proportion of the agreement's value, the parties' intent to be bound by an enforceable contract raises an implied obligation of good faith to

---

*Mortg. & Int'l Realty Corp. v. Am. Nat'l Bank & Trust Co. of Chicago*, 706 F. Supp. 1364, 1373 (N.D. Ill. 1989); **Iowa**, *Midwest Mgmt. Corp. v. Stephens*, 291 N.W.2d 896 (Iowa 1980); **Kansas**, *Fusion, Inc. v. Neb. Aluminum Castings, Inc.*, 1997 WL 51227, at *17 (D. Kan. Jan. 23, 1997); **Kentucky**, *RAM Eng'g & Constr., Inc. v. Univ. of Louisville*, 127 S.W.3d 579, 585 (Ky. 2003); **Louisiana**, *Adams v. First Nat'l Bank of Commerce*, 644 So.2d 219, 222 (La. Ct. App. 1994); **Maryland**, *Questar Builders, Inc. v. CB Flooring, L.L.C.*, 978 A.2d 651, 670 (Md. 2009); **Massachusetts**, *Okmyansky v. Herbalife Int'l of Am., Inc.*, 415 F.3d 154, 158 (1st Cir. 2005); **Michigan**, *Burkhardt v. City Nat'l Bank of Detroit*, 226 N.W.2d 678, 680 (Mich. Ct. App. 1975); **Minnesota**, *Craig v. Pillsbury Non-Qualified Pension Plan*, 458 F.3d 748, 752 (8th Cir. 2006); **Mississippi**, *Morgan Stanley Mortg. Capital Holdings, L.L.C. v. Realty Mortg. Corp.*, 2008 WL 4279585, at *5 (S.D. Miss. Sept. 11, 2008); **Missouri**, *Martin v. Prier Brass Mfg. Co.*, 710 S.W.2d 466, 473 (Mo. Ct. App. 1986); **Montana**, *Stark v. Circle K Corp.*, 751 P.2d 162, 167 (Mont. 1988); **Nebraska**, *Newman v. Hinky Dinky Omaha-Lincoln, Inc.*, 427 N.W.2d 50, 54 (Neb. 1988); **New Hampshire**, *Griswold v. Heat Inc.*, 229 A.2d 183, 187 (N.H. 1967); **New Jersey**, *Seidenberg v. Summit Bank*, 791 A.2d 1068, 1078-79 (N.J. Super. Ct. App. Div. 2002); **New York**, *deCiutiis v. NYNEX Corp.*, 1996 WL 512150, at *3 (S.D.N.Y. Sept. 9, 1996); **North Carolina**, *Team Gordon, Inc. v. Fruit of the Loom, Inc.*, 2009 WL 426555, at *7 (W.D.N.C. Feb. 19, 2009); **Ohio**, *Littlejohn v. Parrish*, 839 N.E.2d 49, 54 (Ohio Ct. App. 2005); **Oklahoma**, *Ark. Valley Town & Land Co. v. Atchison, T. & S. F. Ry.*, 151 P. 1028, 1032 (Okla. 1915); **Pennsylvania**, *U.S. Small Bus. Admin. v. Progress Bank*, 2004 WL 2980412, at *4 (E.D. Pa. Dec. 22, 2004); **Rhode Island**, *Gillette of Kingston, Inc. v. Bank of R.I.*, 2006 WL 1314259, at *6 (R.I. Super. Ct. May 5, 2006); **South Carolina**, *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 940 (4th Cir. 1999); **Tennessee**, *Servpro Indus., Inc. v. Pizzillo*, 2001 WL 120731, at *4 (Tenn. Ct. App. Feb. 14, 2001); **Utah**, *Cook v. Zions First Nat'l Bank*, 919 P.2d 56, 60 (Utah Ct. App. 1996); **Vermont**, *Carmichael v. Adirondack Bottled Gas Corp. of Vt.*, 635 A.2d 1211, 1216-17 (Vt. 1993); **Virginia**, *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 450 (E.D. Va. 2009); **West Virginia**, *Hoffmaster v. Guiffrida*, 630 F. Supp. 1289, 1290-91 (S.D. W. Va. 1986); **Wisconsin**, *Gilson v. Rainin Instrument, L.L.C.*, 2005 WL 1899471, at *2 (W.D. Wis. Aug. 9, 2005); **Wyoming**, *Scherer Constr., L.L.C. v. Hedquist Constr., Inc.*, 18 P.3d 645, 653-54 (Wyo. 2001).

> observe reasonable limits in exercising that discretion, consistent
> with the parties' purpose or purposes in contracting.

*Centronics v. Genicom Corp.*, 562 A.2d 187, 193 (N.H. 1989).  Thus, where the terms of the contract afford a party substantial discretion to promote that party's self-interest, the duty to act in good faith nevertheless limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

*Cox*, 732 So.2d at 1097-98.  In like vein, the First Circuit stated:

> Ceding discretion in a contract is not tantamount to subjecting oneself to legalized tyranny.  Every contract contains an implied covenant of good faith and fair dealing.  Consequently, not even the reservation of absolute discretion can clear the way for a totally arbitrary and unprincipled exercise of a contracting party's power.

*Okmyansky v. Herbalife Int'l of Am., Inc.*, 415 F.3d 154, 157 n.3 (1st Cir. 2005) (internal citations omitted).

The Banks erroneously claim that courts only imply a duty to act in good faith and deal fairly where generalized discretion is present and "the parties' intent is unclear or where the covenant is necessary to prevent an agreement from being deemed illusory and unenforceable." Omnibus Mot. at 44.  In support of this garbled claim, they point to *Third Story Music, Inc. v. Waits*, 48 Cal. Rptr. 2d 747 (Cal. Ct. App. 1995).  Omnibus Mot. at 44.  There, the court held that the covenant of good faith and fair dealing cannot be used to obliterate a contractual right, but nowhere did the court suggest that the covenant cannot limit discretion.  *Third Story Music*, 48 Cal. Rptr. 2d at 808.  As discussed above, numerous decisions teach that discretion in a contract is limited by the covenant of good faith and fair dealing.  Indeed, the obligation to act in good faith, and to deal fairly with the other party to the contract, attaches to all contractual provisions conferring discretion.   Another California decision, ignored by the Banks, emphasized:

> the *importance* of the duty imposed on one having the discretionary power to affect the rights of the other party to exercise that power in a manner consistent

-40-

with the covenant of good faith and fair dealing. *Abuse of the power to specify terms* is one of the judicially recognized types of bad faith. (Rest.2d, Contracts (1981) § 205, com. d, pp. 100-101.) While *Perdue* indicated that the bank's increase in NSF check fees was to be evaluated under the ". . . duty of good faith and fair dealing in setting or varying such charges," other cases make it clear that the exercise of discretionary powers conferred on a party by contract *must also* be evaluated under the implied covenant to assure that the promises of the contract are effective and in accordance with *the parties' legitimate expectations*.

*Badie v. Bank of Am.*, 79 Cal. Rptr. 2d 273, 283-84 (Cal. Ct. App. 1998) (emphasis added) (citations omitted).

### c.    The Court Should Follow the Decisions Recognizing That the Banks' Abusive Overdraft Fee Scheme Breaches the Covenant

Courts have found claims similar to those pled by plaintiffs to be valid, and have found acts similar to those alleged against the Banks to violate the duty of good faith and fair dealing. For example, the plaintiffs in *White* alleged that Wachovia "delays, reorders, or otherwise manipulates posting transactions to an account and imposes overdraft fees even where the account contains sufficient funds to pay a draft," and "routinely enforces a policy whereby charges incurred are posted to consumers' accounts in order of largest to smallest amounts, even where larger charges are received days after smaller charges." 563 F. Supp. 2d at 1361. These same allegations are asserted here.[17] In *White*, Wachovia moved to dismiss the contract claim. Echoing the Banks' arguments here, Wachovia argued that the covenant of good faith and fair dealing did not apply because the provisions of the contract expressly permitted Wachovia to reorder and impose overdraft fees. *Id*. at 1363. Judge Martin rejected the argument:

> Plaintiffs' allegations state a plausible claim for breach of the implied covenant of good faith . . . The court cannot find as a matter of law that the Deposit Agreement's statement that Wachovia "may" post items "in any order" (Deposit Agreement ¶ I.D.12) expressly gives Wachovia the right to manipulate transactions, delay posting indefinitely, and maximize overdraft fees in the ways the Complaint alleges.

---

[17] *See Tornes*, SAC ¶¶ 8, 35(e), 58; *Garcia*, AC ¶¶ 8, 28(e), 53; *Luquetta*, FAC ¶¶ 9, 24(e), 62.

*Id.* at 1364.  In addition, the court found that the language of the Wachovia deposit agreement did not confer *absolute* discretion given the covenant and the fact that the deposit agreement vested the bank with discretion, by stating that "Wachovia 'may' post transactions in any order."[18]  *Id.* at 1365.

In *Gutierrez v. Wells Fargo & Co.*, 622 F. Supp. 2d 946 (N.D. Cal. 2009), the plaintiffs brought claims similar to those asserted here concerning the improper manipulation of debit transactions.  Denying summary judgment to Wells Fargo, U.S. District Judge William Alsup stated:

> One of the leading decisions is *Perdue v. Crocker Nat'l Bank*, 38 Cal. 3d 913, 923 (1985), which makes this point clear.  Among other rules concerning bank accounts, *Perdue* held that "where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise the discretion in good faith and in accordance with fair dealing."  38 Cal. 3d at 923.  Applying that rule here, even if the bank-depositor contract confers discretion on the bank as to the sequence of honoring  presentments, the bank must exercise its discretion in accordance with fair dealing and cannot exercise its discretion to enrich itself by gouging the consumer.  Put differently, even if the bank-depositor contract purports to allow the bank to post in any order it wishes, such discretion remains subject to the bank's duty of good faith and fair dealing.  There is a duty of good faith and fair dealing to honor checks in such a way as to be fair to the consumer and that discretionary power cannot be exercised so as to pile on ever greater penalties on the depositor, which is exactly what Wells Fargo seems to be doing, or so a reasonable jury could conclude.

*Id.* at 952-53.

This Court should follow the sound reasoning of *White* and *Gutierrez* to find that the allegations detailing the Banks' abusive overdraft fee scheme are more than sufficient to state a claim for breach of the covenant of good faith and fair dealing.  The panoply of anti-consumer practices demonstrates bad faith, not good faith.  At the very minimum, consumers have the

---

[18] As to discretion, the Wachovia deposit agreement is virtually identical to the agreements of all the other Banks, which also use the term "may" or similar words conferring discretion.

reasonable expectation that the Banks will not intentionally manipulate their account records to impose the most fees possible (which quickly add up).

> 2.     **The Bank Deposit Agreements Are Contracts of Adhesion Containing Discretionary Terms That Have Been Breached**

>> a.     **Given the Unequal Bargaining Position of the Parties, There Is a Compelling Interest in Applying the Covenant of Good Faith and Fair Dealing**

The Banks repeatedly claim that their customers are informed of their practice of reordering debits from high-to-low. Omnibus Mot. at 2, 46. In truth, the Banks stick discretionary language on reordering and the imposition of overdraft fees deep within their lengthy customer agreements. The Banks' deposit agreements are not designed to be read and understood by their customers – this much is clear from their sheer length, small font and complex, sleep-inducing language. Examples of such language include:

> If more than one *Item* is presented to the Bank for payment on a day the Bank determines there are sufficient funds to pay one or more but not all of the *Items*, the number of *Items* paid and the *Overdraft* and returned *Item* fees assessed may be affected by the order that the Bank chooses to pay those *Items*.

*Martinez*, C Ex. A, at 22 (emphasis added).

> We may determine whether or not your account contains sufficient funds to pay a check or other item, authorize a point-of-sale transaction, in person withdrawal, ATM withdrawal, or process any other electronic transaction at any time between the time we receive the check or other item, point-of-sale transaction authorization request, in person withdrawal, ATM withdrawal, or other electronic transaction and our return deadline, and only one determination of the account balance is required.

*Garcia*, AC, ¶ 39, Ex. A, at 10.

The Banks fail to acknowledge that their agreements are non-negotiable contracts of adhesion. Moreover, because the agreements all contain similar language, customers lack the ability to shop around for more favorable terms. The Banks' agreements do not even advise

customers of their right to opt-out of the overdraft procedures.  Some of the Banks do not offer any opt-out procedures at all.[19]

"The banking business is affected with the public interest.  Traditionally banks and their officers have been held to a high degree of integrity and responsiveness to their public calling." *Jacques v. First Nat'l Bank of Maryland*, 515 A.2d 756, 763 (Md. 1986).  The Banks' agreements fall well short of those principles.

   **b.**  **The Deposit Agreements Contain Discretionary Terms That Impose an Obligation of Good Faith on the Banks**

The Banks contend, incorrectly, that plaintiffs failed to identify any obligations in the agreements which have been breached.  Omnibus Mot. at 42.  The Banks overlook that if there were an obligation to show an express provision was breached, there would be no reason for an implied covenant of good faith and fair dealing because a breach of contract claim would lie.  As the Eleventh Circuit explained, breach of the implied covenant "is a doctrine that modifies the meaning of all explicit terms in a contract, preventing a breach of those explicit terms *de facto* when performance is maintained *de jure*."  *Alan's of Atlanta, Inc.*, 903 F.2d at 1429.

The terms of the deposit agreements breached by the Banks – those relating to the reordering of the accounts and the overdraft fees incurred as a result – were referenced in the operative complaints, with representative terms set forth in sections entitled "[The Bank's] Relevant Customer Documents Regarding Overdrafts."

The Banks do not accurately describe the material provisions of the operative agreements.  Instead, through the use of ellipses and selective quotes, the Banks create a false impression.  For example, they use no fewer than nine ellipses in their presentation of the

---

[19] Such opt-out procedures are required to be implemented pursuant to Regulation E, which the Federal Reserve Board of Governors has issued but which has yet to take effect.

purportedly relevant text.  Omnibus Mot. at 41-42.  In fact, the full scope of the relevant language is much broader than the out-of-context selections that the Banks excerpt.  Plaintiffs set forth these terms below to demonstrate the discretion they confer on the Banks.

> Bank of America's 41 page deposit agreement provides that:
>
> We *may* determine in our discretion the order of processing and posting deposits, fees, charges, checks, debits and other items to your account.  We *may* credit, accept, pay, certify or return deposits, fees, charges, checks, debits and other items arriving to your account *on the same day* in any order at our option.
>
> \*   \*   \*
>
> When you do not have enough available funds in your account to cover all of the items presented *that day*, some posting orders *may* result in more insufficient funds items and more fees than other orders.
>
> \*   \*   \*
>
> Even if we provisionally post deposits, fees, charges, checks, debits or other items to your account during the day, we *may* treat them as if we received all of them at the *end of the day* and post them in any order *we choose*.  We do not process and post transactions in the order in which they occurred.
>
> *In most states* we process and post items within each category from the highest to lowest dollar amount.  If you do not have enough available funds to cover all of your transactions *on any given day*, the high-to-low posting order *may* result in more insufficient funds items and more fees than *may* have resulted if we had used another posting order.

*Tornes*, SAC ¶¶ 46, 52, Ex. A, at 25 (emphasis added).

This language not only grants Bank of America discretion to reorder items, but it also suggests that the reordering will only occur at the end of a single day.  In reliance on the agreement, a customer would reasonably expect to calculate his available funds following his "transactions on any given day."  The agreement does not inform the customer that the reordering scheme can cause overdraft fees to be charged even when his account has sufficient funds to cover transactions.

The terms of Citibank's checking accounts are contained in a 44 page, single-spaced, small font "Client Manual."  Amrhein, TAC Ex. A.  The omnibus motion quotes misleadingly from the portion of the Citibank agreement which says items "will" be posted in highest-to-lowest dollar amount.  Omnibus Mot. at 41.  An accurate quotation, however, shows that the ordering is discretionary – what Citibank highlights is only the practice it "generally will utilize":

> **Overdrawing Your Account**.  In the event the available balance in your account is insufficient to cover *your day's transactions*, we *generally* will utilize the following payment hierarchy:
>
> We pay all electronic debits (ATM withdrawals, ACH debits, online bill payments, and point-of-sale transactions) first. We then process all debits for purchasing of securities through Smith Barney. If available funds remain after processing these transactions, we pay your checks in the order of largest to smallest dollar amount. . . .
>
> In the event of insufficient funds to pay your checks, we may return your checks and charge you a fee.  At *our sole discretion* we *may* create an overdraft by paying the check or permitting the transaction. Either way, there will be a service charge.

*Amrhein*, TAC ¶ 34, Ex. A, at 32 (emphasis added).  Citibank's reordering is clearly discretionary, and the discretion extends no further than to the reordering of transactions occurring on a single day.

While Chase's deposit agreement provides for discretion, the summary of its provisions in the omnibus motion camouflages this discretion with some artful deletion.  Omnibus Mot. at 41.  On page 4 of its "Account Rules and Regulations," at paragraph 2, Chase advises its customers:

> Posting Order:  *Generally*, deposits will be credited to your account first and then we'll pay your items (e.g. checks, debit card transactions, ATM transactions and other debits to your account) from highest to lowest dollar amount *each business day*.  Certain transactions such as wire transfers may post before others.

*Lopez*, C ¶ 45, Ex. A, at 4 (emphasis added).  This language contemplates both discretion and reordering on a single day.  Section II of the Chase agreement likewise confers discretion:

> Items will be posted to your Account in highest to lowest dollar amount each business day (Monday through Friday, federal holidays not included).  However, certain transactions like wire transfers *may* be posted before others.  We reserve the right to change this posting order *without notice*.  We *may* assess a fee for any item or withdrawal request, such as a check, in person withdrawal, ATM withdrawal, or other electronic means, when there are insufficient funds in your Account based upon the posting method identified above, whether or not the item is paid or the request honored, or whether or not an overdraft to your account has occurred.  We *may* assess an Extended Overdraft fee for overdraft balances that are not promptly repaid and/or charge interest for any overdraft on your Account.  You agree to pay all costs and expenses, including attorney's fees, incurred by us in the collection of any overdraft.

*Lopez*, C ¶ 47, Ex. A, at 10-11 (emphasis added).  The first sentence is inconsistent with the previously cited provision.  At all events, there can be no doubt that the provision stating that Chase "may assess" certain fees confers discretion on the Bank.[20]  Moreover, the deposit account agreement defines "items" to include "checks and funds transfers."  *Lopez*, C Ex. A, at 8.  Thus, this section is *not even applicable* to the reordering of debit charges.

Union Bank uses a document entitled "All About Personal Accounts & Services Disclosure and Agreement," which is single-spaced and over 100 pages long.  *Larsen*, FAC Ex. A.  Discretion is evident from the language of the reordering provisions:

> You agree that we *may* pay or certify your checks and other items in any order we choose, and that we *may* establish different processing priorities and categories for checks and other items.  Within each priority or category, we *may* process checks and other items in the order in which we receive them, in check number order, or in the dollar amount order, and we *may* change these priorities, categories, and orders at any time without notice to you.  We will *generally* pay larger checks and transactions first.  However, we are not obligated to do so.  When there are not sufficient available funds in an account to cover all of the checks and other items *presented on a given day*, some of the priorities,

---

[20] Washington Mutual, whose liabilities were assumed by Chase, also used discretionary language in its deposit agreement: "The Bank determines the order of posting deposits, checks, debits and other charges to your account unless otherwise required by law.  Deposits/credits, checks, debits and other charges arriving to your account on the same day *may* be credited/paid/returned in any order at the Bank's option.  We *may* give preference to any checks, debits or charges payable to the Bank or any affiliate of the Bank."  *Lopez*, C ¶ 54, Ex. C, at 32 (emphasis added).

categories, and orders *may* result in more nonsufficient available funds fees than others.

*Larsen*, FAC ¶ 39, Ex. A, at 43 (emphasis added).   As with the other deposit agreements, discretion is apparent and nothing permits the reordering to occur over multiple days.

U.S. Bank uses a 34 page, single-spaced, small print deposit account agreement that confers discretionary authority to reorder transactions occurring on a single day.  *Speers*, C Ex. A.  It provides:

> If we get a **batch**, or **multiple** batches, of such items *in a day* (for example, checks, ATM purchase transactions, and check card purchase transactions typically come in batches), and if one, some or all of them would overdraw the account if paid, we [sic] the right to decide the order of the items we will pay and which items will be returned (if any).  This means, for example, we *can* process items beginning with the largest item (regardless of the type of item), even though it will have the effect of reducing your available balance more quickly.
>
> We have *all these options* each time you might overdraw an account.  *What we do one time does not make that a rule you can rely on for the future.*

*Speers*, C ¶ 33, Ex. A, at 11 (emphasis added).

Wachovia uses an 18 page, single-spaced, small print deposit agreement that states:

> We *may* pay checks or other items drawn upon your account (including those payable to us or on which we may be liable) in any order determined by us, even if (1) paying a particular check or item results in an insufficient balance in your account to pay one or more other checks or other items that otherwise could have been paid out of your account; or (2) using a particular order results in the payment of fewer checks or other items or the imposition of additional fees.  Although we *generally* pay larger items first, we are not obligated to do so and, without prior notice to you, we *may* change the order in which we generally pay items.

*Garcia*, AC ¶ 40, Ex. A, at 10 (emphasis added).  Moreover, Wachovia's deposit agreement establishes the time for determining whether an overcharge exists for a POS transaction at authorization and for an ATM withdrawal at withdrawal:

> If that determination [of whether there is sufficient funds] reveals insufficient available funds to pay the check or other item, or in person withdrawal, *authorize the point-of-sale transaction, or process the ATM withdrawal*, or other electronic

-48-

> transaction you agree to pay a service charge, and we are not required to honor the check or other item, or in person withdrawal, authorize the point-of-sale transaction, or ATM withdrawal, or process the other electronic transaction and may return and/or decline it.  Alternatively, we *may* honor the check, other item, or in person withdrawal, *authorize the point-of-sale transaction, or ATM withdrawal, or process the other electronic transaction* and create an overdraft and impose a service charge for paying the overdraft.

*Garcia*, AC ¶ 39, Ex. A, at 10 (emphasis added).  Wachovia's deposit agreement, therefore, similarly provides for discretion as well as a determination of whether an overcharge would occur at the time of the transaction with regard to debit and ATM transactions.

Wells Fargo's "Consumer Account Agreement" is 80 pages long, single-spaced and in small print.  *Martinez*, C Ex. A.  It grants Wells Fargo discretion to reorder "Items" from a single day:

> The Bank *may* post *Items* presented against the Account in any order the Bank chooses, unless the laws governing our Account either requires or prohibits a particular order.  For example, the Bank *may, if it chooses*, post *Items* in the order of the highest dollar amount to the lowest dollar amount.  The Bank *may change* the order of posting *Items* to the Account at any time without notice.  If more than one *Item* is presented to the Bank for payment *on a day* the Bank determines there are sufficient funds to pay one or more but not all of the *Items*, the number of *Items* paid and the *Overdraft* and returned *Item* fees assessed *may* be affected by the order that the Bank *chooses* to pay those *Items*.  For example, if the Bank pays *Items* in the order of highest to lowest dollar amount, the total number of *Overdraft* and returned *Item* fees you are charged may be larger than if the bank were to pay the *Items* in the order of lowest to highest dollar amount.

*Martinez*, C Ex. A, at 22 (emphasis added).

All of these agreements vest discretion in the Banks.  Indeed, the quoted excerpts are replete with discretionary terms such as "may" or "generally."  Further, while the Banks' agreements address the reordering of charges on a day, they do not provide for reordering over multiple days.

The agreements amply demonstrate that the discretion given to the Banks is not absolute, despite their claims to the contrary.  Omnibus Mot. at 44.  In consequence, the cases on which

-49-

they rely are easily distinguishable.  For example, *Pacific First Bank v. New Morgan Park Corp.*, 876 P.2d 761 (Or. 1994), involved a commercial lease which provided that the landlord could arbitrarily withhold consent.  The lease used unconditional words such as "shall" and was enforced by the court, although even in that context the court held that a duty of good faith applies to lease agreements as with other contracts.  *Id*. at 763, 768.  Similarly, the contract in *Automatic Sprinkler Corp. of America v. Anderson*, 257 S.E.2d 283 (Ga. 1979), stated that the payment "will rest completely in the absolute and final discretion" of the employer, among other conclusive terms.  *Id*. at 285.

In contrast, it is readily apparent from the language used in the Banks' agreements that they do *not* have absolute and unfettered discretion.  Instead, their agreements use the language of discretion.  *See, e.g.*, *White*, 563 F. Supp. at 1365.

Contrary to the Banks' assertion, *Tolbert v. First National Bank of Oregon*, 823 P.2d 965 (Or. 1991), did not find that absolute discretion extinguished the covenant of good faith and fair dealing.  Instead, that decision held:

> The contract in this case is not unusual in that it explicitly granted one party the right to exercise its discretion regarding one aspect of the performance and enforcement of the contract.  In changing the amount of the NSF fees, Bank enforced a right specifically granted to it under the contract.  Because the exercise of that right was pursuant to Bank's unilateral discretion, the good faith obligation discussed in *Best* applies.

*Id*. at 970.

Also contrary to the Banks' assertion, plaintiffs are not seeking to override or contradict the express terms of these agreements.  Omnibus Mot. at 44-45.  Indeed, as the Banks themselves recognize by citing *MJ & Partners Restaurant LP v. Zadikoff*, 995 F. Supp. 929, 933 (N.D. Ill. 1998), the covenant of good faith and fair dealing is "a guide to the construction of the explicit terms of the agreement."  Omnibus Mot. at 45.

In sum, the discretionary terms of the Banks' adhesion contracts, when viewed through the prism of good faith and fair dealing, simply do not permit overdraft fees to be charged where no overdrafts actually occurred.  Nor do the discretionary terms somehow immunize the manipulation of posting solely to gouge customers, or the delaying of posting over days. Plaintiffs do not contend that the Banks could never post high-to-low – only that they could not implement their scheme as they did, in breach of their duty to act in good faith and deal fairly with plaintiffs.

### 3.    Decisions and Regulations Involving Paper Check Transactions Are Inapposite

The Banks claim their conduct is explicitly permitted by state laws and federal regulations.  Omnibus Mot. at 46-55.  Yet, they ignore the basic differences between check transactions and debit transactions that render inapposite the authorities on which they rely.  The OCC has *not* issued regulations in connection with debit overdrafts, and almost all of the cases cited by the Banks involved paper check transactions.  Of the two cases cited by the Banks involving debit overdrafts, one lacks precedential value and cannot even be cited in its own jurisdiction; the other is on appeal.  Moreover, both of these decisions are distinguishable and, in any event, the decisions marked by careful, sound reasoning support plaintiffs' position.

### a.    Check Transactions Are Fundamentally Different From Debit Transactions

Under the traditional approach to overdraft coverage, checks drawn on insufficient funds were more likely to be returned than paid by banks.  *See* James J. White, *NSF Fees*, 68 Ohio St. L.J. 185, 185-86 (2007).  Before debit cards were created, banks would occasionally extend the courtesy of honoring checks written on accounts with insufficient funds for particular customers, typically "first-name basis" customers who were in good standing.  *See Transcript of the Consumer Advisory Council Meeting, Thursday, March 13, 2003*, at 3 (2003).  One reason banks

extended this courtesy was that merchants who presented checks for payment had already sold goods or services to the customers, expecting the checks to clear.  By covering the customer's overdraft, the bank provided a service to merchants as well as to customers.

As banks drifted toward paying overdrafts, questions arose concerning whether the consistent use of this practice was lawful.  The Uniform Commercial Code addressed the reordering of checks written on accounts with insufficient funds.   Recognizing that the presentment of checks by the payee is *always delayed*, often for days, and that checks are often presented in a different order than the order in which they were written by the customer, U.C.C. section 4-303(b) provides that checks (*not* debit transactions) can be paid in any order.  U.C.C. § 4-303(b) (2009).  The U.C.C. commentary explained that the drafters decided not to recommend a priority rule because of "the possible methods of receipt . . . and other variables," and that a bank may post items in any order under the U.C.C. because "of the impossibility of stating a rule that would be fair in all cases."  U.C.C. § 4-303(b) cmt. 7.  The Banks, however, lobbied for and implemented a highest-to-lowest posting order for checks.  For justification, they asserted that such a posting order "will have the consequence of the customer's most important bills (such as mortgage payments) being paid first."  OCC Interp. Letter No. 916, 2001 WL 1285359 (May 22, 2001).  The Banks further claimed that their preferred payment order for checks was "aligned with the majority of its customers' priorities and preferences."  *Id.*

Paper checks are separate and distinct from debit card transactions.  The different considerations attending debit card transactions render the high-to-low posting of debit card transactions, as alleged here, devoid of any legitimate justification.  Therefore, legal authorities involving checks are distinguishable.

### i.      Debit Card Transactions Are Instantaneous

The instantaneous nature of debit card transactions make them fundamentally different from transactions involving paper checks.  As evidenced by the Banks' account agreements, the Banks receive notice of an attempted debit card transaction the instant a customer attempts to make a purchase or withdrawal with a debit card.  The Banks are capable of determining whether the account contains sufficient funds instantaneously, and of declining or approving any debit card transaction before the purchase or withdrawal goes through.[21]   Because the Banks receive debit transactions simultaneously with the customer's purchase or withdrawal, posting transactions in chronological order is a practical option.

This is not the case with paper check transactions, in which the presentment of checks by the payee is always delayed.  This accounts for the U.C.C. drafters' concern about possible methods of receipt and other variables with regard to paper checks, and their conclusion that it was impossible to state a "fair" rule governing the order for posting checks.

### ii.      Debit Cards Are Not Used for Important Bills

One reason cited by the Banks for high-to-low posting is that it ensures the payment of mortgages and other "important" bills first.  Omnibus Mot. at 49.  This rationale is completely inapplicable to debit card transactions.  No "important" bills – such as the mortgage – are ever paid with debit cards or ATM transactions.  *See* Electronic Fund Transfers, 74 Fed. Reg. 59,033, 59,035 (Nov. 17, 2009) (to be codified at 12 C.F.R. pt. 205) (stating the Federal Reserve Board's

---

[21]   According to their own account agreements, the Banks have the ability to decline and authorize a POS transaction or ATM withdrawal.  For example, Wachovia's "Deposit Agreement and Disclosures for Personal Accounts" states that if it determines there are insufficient funds in the account to pay the "point-of-sale transaction, or process the ATM withdrawal, or other electronic transaction," Wachovia "may return and/or *decline*" the transaction."  Garcia, AC ¶ 39, Ex. A, at 10 (emphasis added).

conclusion, based on comments received, consumer testing, and its own analysis, that ATM withdrawals and debit card transactions "tend to be more discretionary in nature" as opposed to important bills that are paid by check, and that, as a result, "many participants would prefer to have ATM withdrawals and debit card transactions declined if they had insufficient funds, rather than incur an overdraft fee").  Because technology permits the Banks to segregate checks from debit transactions, debit transactions can be posted in any order without affecting the payment of important bills.  Indeed, the Banks implicitly acknowledge this in their deposit agreements.[22]

### iii.    Debit Cards Are Automatic, Computer-Programmed Payments

A world apart from the *ad hoc* decision-making with paper checks, the computer software designed and implemented by the Banks systematically and automatically covers overdrafts.  *See Final Joint Guidance on Overdraft Protection Programs, 70 Fed. Reg. 9127, 9128 (Feb. 24, 2005)* (stating that "over the years, [payment of overdrafts by banks] has become automated by many institutions" and is now "automatic for consumers" rather than being an *ad hoc* decision); *see also Transcript of the Consumer Advisory Council Meeting of the Federal Reserve Board, Thursday, March 13, 2003* (2003).  The software allows the Banks to instantaneously process overdrafts resulting from debit card transactions, thereby providing a tremendous profit center.[23]

---

[22] For example, Bank of America's "Deposit Agreement and Disclosures" states that the Bank can treat checks and debits differently, and reserves the right to "establish categories for fees, charges, checks, debits and other items and designate a posting priority for each category." *Tornes*, SAC Ex. A, at 18.  More specifically, Bank of America states that it may create one category which includes ATM withdrawals and loan payments, and another category which includes only checks, and then treat those categories differently by posting the ATM withdrawals and loan payments before the checks.  *Id.*  Similarly, Citibank's "Client Manual Consumer Accounts" states that checks and debits are already segregated and treated differently.  *Amrhein*, TAC ¶ 34, Ex. A, at 32.

[23] While banks rarely used to pay overdrafts, the practice has become routine.  "In the past century, overdrafts have gone from the banker's scourge to the banker's profit center as bankers have learned that there is much to be made on these short term loans and breathtaking interest

### iv.    Debit Card Transactions Resulting in Overdraft Fees Are Not Desired by Customers

Contrary to the Banks' argument that customers want their overdrafts to be paid, Omnibus Mot. at 47, many studies and surveys show customers would much rather have debit card transactions declined than pay overdraft fees.  Significantly, the Federal Reserve Board concluded last year that consumers would "prefer to have ATM withdrawals and debit card transactions declined if they had insufficient funds, rather than incur an overdraft fee."  *See* Electronic Fund Transfers, 74 Fed. Reg. 59,033, 59,035 (Nov. 17, 2009) (to be codified at 12 C.F.R. pt. 205).  Likewise, in a survey conducted last year by the Consumer Union National Research Center, a large majority of consumers said that "banks should deny a debit card or ATM transaction outright if it would overdraw the account."  Consumer Union of U.S., *Financial Regulation Poll*, at 4, 9 (2009).  A 2008 survey conducted by the Center for Responsible Lending showed that the "vast majority (80%) reported that they would prefer that the bank simply decline the transaction" rather than approve the transaction and charge an overdraft fee.  Center for Responsible Lending, *Consumers Want Informed Choice on Overdraft Fees and Banking Options*, at 3 (2008).  The consumer preference is hardly surprising: as detailed in the complaints, an overdraft of a few dollars can result in a fee of approximately $25 to $35 (depending upon the bank's fees). *Tornes*, SAC ¶ 7.

### v.    The Risk to Merchants Is Not a Factor With Debit Card Transactions

The greater the amount of a check returned for insufficient funds, the greater the loss to the merchant.  Thus, in transactions involving paper checks, high-to-low ordering provided

---

rates."  James J. White, *NSF Fees*, 68 Ohio St. L.J. 185, 185-86 (2007).  This realization has led to a rapid increase in overdraft coverage by banks over the past several years; 70 percent of banks have initiated overdraft programs since 2001.  *See FDIC Study of Bank Overdraft Programs* (Nov. 2008), *available at*: http://www.fdic.gov/bank/analytical/overdraft/.

greater protection for merchants who incurred the greatest loss caused by checks returned for insufficient funds. *Tornes*, SAC ¶ 5. In debit card transactions, however, the interests of merchants in minimizing their risk of loss are *not* implicated because such a transaction will either be covered or declined. If the transaction is covered, that means the merchant is paid. If the transaction is declined, the sale is not completed unless the consumer presents a viable alternate form of payment. Either way, the merchant cannot be injured.

### vi.      There Are No Merchant Return Fees to Pay

The avoidance of merchant returned item fees is often cited by banks as a reason to liberally apply overdraft coverage to checks written upon accounts with insufficient funds. *See Transcript of the Consumer Advisory Council Meeting, Thursday, March 13, 2003*, at 4 (2003). This rationale for allowing overdrafts in connection with checks does not exist in connection with debit card transactions because, as noted, merchants are either paid if debit transactions are approved, or suffer no loss if debits transactions are declined. *See* Electronic Fund Transfers, 74 Fed. Reg. 59,033, 59,035 (Nov. 17, 2009) (to be codified at 12 C.F.R. pt. 205) (finding that with ATM and debit card transactions, "if the transaction is declined because the consumer's account contains insufficient funds, the consumer would not incur any merchant returned item fees").

### b.      U.C.C. section 4-303(b) Does Not Apply to Debit Card Transactions

The Banks rely heavily on section 4-303(b) of the Uniform Commercial Code to support their argument that high-to-low posting of debit card transactions does not violate the covenant of good faith and fair dealing. Omnibus Mot. at 46-48. Their reliance is misplaced. By its express terms, section 4-303(b) does *not* apply to the posting of debit transactions. Section 4-303(b) states that, "[s]ubject to subsection (a), items may be accepted, paid, certified, or charged to the indicated account of its customer in any order." In section 4-101, "item" is defined as "an

instrument or a promise or order to pay money handled by a bank for collection or payment." U.C.C. § 4-101. However, the "term does *not* include a payment order governed by Article 4A or a credit or debit card slip." *Id.* (emphasis added). There is no ambiguity in the U.C.C.'s language. Debit card transactions are *excluded* from its purview. *See, e.g.*, *Gutierrez*, 622 F. Supp. 2d at 951-52 (Section 4-303 does *not* apply to debit card transactions).[24]

Even the Banks concede that the U.C.C. does *not* apply to debit card transactions; they stated that "the UCC does not, by its technical terms, govern [debit card transactions]." Omnibus Mot. at 48. Despite this admission, the Banks continue their fruitless effort to compare "apples to oranges." In fact, six of the eight cases they cite in support of their high-to-low posting argument involve paper check transactions. Omnibus Mot. at 49-55. These paper check cases relied heavily, if not exclusively, on the U.C.C. to reach their outcomes. For example, in *Smith v. First Union National Bank*, 958 S.W.2d 113 (Tenn. Ct. App. 1997), the court stated that the U.C.C. provision was "pivotal" to its determination of the issue presented. *Id.* at 115.

In the face of the U.C.C.'s express *exclusion* of debit cards and their own admissions, the Banks nevertheless ask this Court to extend the reach of the U.C.C. to include what it expressly excludes. Omnibus Mot. at 48-49. U.C.C. section 4-303(b), however, cannot be expanded to

---

[24] In *Gutierrez*, Judge Alsup concluded that U.C.C. section 4-303(b) is *inapplicable* in part because that section governs the relationship between the bank and the payee or presenter of items, rather than the relationship between the bank and the depositor. While the Banks argue that the court erred in *Gutierrez*, Omnibus Mot. at 53, they ignore the fact that, as Judge Alsup recognized, Section 4-303(b) is included in part 3 of section 4 of the U.C.C., entitled "COLLECTION OF ITEMS: PAYOR BANKS." U.C.C. § 3-101, *et seq.* (2009). Significantly, there is no similar language in part 4 of section 4, entitled "RELATIONSHIP BETWEEN PAYOR BANK AND ITS CUSTOMER." *See* U.C.C. § 4-101, *et seq.* (2009). In addition, section 4-303(a) – the paragraph that immediately precedes section 4-303(b) – plainly applies to the relationship between the bank and a payee or presenter, not between the bank and the depositor. *See* U.C.C. § 4-303(a). The Banks concede as much. Omnibus Mot. at 53. It is clear from the paragraph's placement that it was *solely* intended to govern the relationship between banks and presenters, not banks and depositors.

include debit card transactions.  Apart from the clear intent of the drafters to exclude debit card transactions, the basic distinctions discussed above preclude such an unwarranted expansion.

### c.      The Other Two Decisions Relied on by the Banks Are Not Controlling

The Banks rely on two additional decisions, neither of which is controlling.  In *Hassler v. Sovereign Bank*, 644 F. Supp. 2d 509 (D.N.J. 2009), the court rejected a challenge to Sovereign Bank's electronic debit transactions.  Omnibus Mot. at 49.  The court dismissed the complaint, which included a claim for breach of contract, finding, among other things, that Sovereign's particular deposit agreement was not misleading.  *Hassler*, 644 F. Supp. 2d at 518.  The court in *Hassler* did *not* discuss the validity of a claim of good faith and fair dealing where a bank allegedly imposed overcharges despite there being sufficient funds in the account.  So too, the court did not address good faith and fair dealing in the context of reordering occurring over multiple days.  Both these allegations were found to be significant by the court in *White*, when it denied Wachovia's motion to dismiss.  Moreover, the *Hassler* court's finding that Sovereign Bank's agreement contained "transparent" terms and "unmistakably plain" language – quite unlike the agreements here – affected its view of the claim.  *Hassler*, 644 F. Supp. 2d at 516, 517.  *Compare White*, 563 F. Supp. 2d at 1361, *with Hassler*, 644 F. Supp. 2d at 512.  The Banks fail to point out that *Hassler* is currently on appeal to the Third Circuit.

The other decision on which the Banks rely, *Torres v. Wells Fargo*, 2008 WL 2397460 (N.D. Cal. June 11, 2008), was *improperly* cited.  The decision specifically states that "[t]his disposition is not designated for publication and may not be cited."  *Id*. at *1 n.1.  The case was brought by a *pro se* litigant.  *Id*. at *1.  Based on the cursory opinion, the plaintiff apparently relied solely upon reordering, without the other elements of wrongdoing alleged here.  *Id*.

Apparently, no breach of contract claim was alleged. *Id*. at *1-3. The Banks' reliance on this decision demonstrates the lack of merit to their arguments.

Plaintiffs' principal cases, *White* and *Gutierrez*, constitute far more compelling authority. The Banks' attempt to distinguish *White*, 563 F. Supp. 2d 1358, consists of nothing more than a bare, incorrect claim that the allegations in *White* differ from those asserted here. Omnibus Mot. at 52. In *Gutierrez*, plaintiffs have survived repeated summary judgment motions and the case is scheduled for trial in May 2010. *See Gutierrez*, 622 F. Supp. 2d 946; *Gutierrez*, 2008 WL 4279550.

Last, the Banks' reliance on an OCC advisory letter from 2002 is completely misplaced. Omnibus Mot. at 49 (citing OCC Interp. Letter No. 997, 2002 WL 32639293, at *2 (Apr. 15, 2002)). The advisory letter refers *only* to the posting of checks. Thus, the letter is clearly distinguishable for the reasons discussed above, including the fact that debit cards, unlike checks, are not used to pay "important" bills (*i.e.*, the mortgage) and that reordering does not, therefore, help the customer. Further, as noted in *Gutierrez*, an OCC advisory letter "does not have the full force of law" but "is merely interpretive rather than legislative." 2008 WL 4279550, at *7. Moreover, this letter does not address the wrongful conduct alleged here.

### D.    Plaintiffs State Valid Claims for Unconscionability

Plaintiffs seek a declaration that the terms of the Banks' account agreements relating to the imposition of overdraft fees are unenforceable because they are procedurally and/or substantively unconscionable. Plaintiffs allege that the manner in which these terms were imposed on customers, and the Banks' manipulation of customer transactions which results in overdraft fees being charged even when customers have sufficient funds in their accounts – combined with the disproportionate relationship between the amount of any given overdraft and the uniform fee collected – render these terms unconscionable. Plaintiffs further allege that the

unfettered discretion claimed by the Banks to manipulate transactions in such a way that plaintiffs cannot reasonably avoid or limit the total amount of overdraft fees charged – and the resulting multi-*billion* dollar windfall to the Banks – are outrageous and unconscionable.  *See*, *e.g.*, *Tornes*, SAC ¶¶ 7, 44, 51-63, 179-182.  Contrary to the Banks' position, these allegations are more than sufficient to maintain a claim for unconscionability.

### 1.    The Court Should Declare the Challenged Contractual Terms Unconscionable

The Banks' primary argument on the unconscionability claims is that "the common law of every pertinent state recognizes unconscionability as a defense to enforcement of a contract, and not as an independent cause of action or source of relief."  Omnibus Mot. at 56.  This is *not* a correct statement of the law.

In fact, numerous courts have sustained claims, like the ones here, seeking affirmative declaratory relief that the terms of a contract are unconscionable.  *See*, *e.g.*, *Williams v. First Gov't Mortg. & Inv. Corp.*, 225 F.3d 738, 748-49 (D.C. Cir. 2000); *Ross v. Wells Fargo Bank, N.A.*, 2009 WL 357921, at *2 (S.D. W. Va. Feb. 12, 2009); *Premier Digital Access, Inc. v. Cent. Tel. Co.*, 360 F. Supp. 2d 1161, 1168 (D. Nev. 2005); *Eva v. Midwest Nat'l Mortg. Banc, Inc.*, 143 F. Supp. 2d 862, 895 (N.D. Ohio 2001) ("Upon review of the arguments made by the parties in addition to the cases cited therein, this Court fails to see why a plaintiff cannot file suit for at least declaratory relief raising the issue of unconscionability.  As a general proposition, most matters of defense can be raised affirmatively in a declaratory judgment action, so long as there is an actual controversy between the parties.").[25]  Indeed, consistent with these decisions, this

---

[25] The same is true with regard to the claims under California Civil Code section 1670.5.  *See Premier Wine & Spirits of S. Dakota, Inc. v. E. & J. Gallo Winery*, 644 F. Supp. 1431, 1440-41 (E.D. Cal. 1986) (considering the merits of a claim for declaratory relief under section 1670.5, but determining the contract terms were not unconscionable).

Court recently denied a motion to dismiss directed against a claim for unconscionability seeking affirmative relief.  *Abels*, 2009 WL 5342768, at \*4 (King, J.).  As a matter of law, it is indisputable that plaintiffs can affirmatively seek a declaration that the challenged terms in the Banks' agreements are unconscionable.  This procedural right and the detailed supporting allegations militate against the Banks' argument for dismissal.

### 2. This Court Has Discretion to Fashion Proper Relief if It Declares the Challenged Terms Unconscionable

If this Court concludes that the challenged overdraft fee provisions are unconscionable, then it has the unquestionable authority to fashion appropriate relief – including ordering the Banks to return all fees collected pursuant to any terms declared unconscionable:

> [O]nce the plaintiff obtains . . . a declaration that the contract or some of its terms are invalid, . . . *the plaintiff can further request damages to the extent that the unconscionable terms have been enforced in the past*.

*Eva*, 143 F. Supp. 2d at 896 (emphasis added); *see also Lonner v. Simon Prop. Group, Inc.*, 866 N.Y.S.2d 239, 245 (N.Y. App. Div. 2008) (holding that a declaration that terms are unconscionable can give rise to a breach of contract action); *Master Lease Corp. v. Manhattan Limousine, Ltd.*, 177 A.D.2d 85, 86 (N.Y. App. Div. 1992) ("If the disclaimer of warranties provision in the subject lease were to be held unconscionable by the court, as a matter of law, then the defendants' counterclaim against Master which seeks damages for breach of warranty, would be a viable one").

Whether as an extension of this Court's authority to grant "such other relief as the Court deems proper," *Tornes*, SAC Prayer for Relief ¶ 8 – or in conjunction with Plaintiffs' separately pled breach of contract claim – the foregoing authorities demonstrate the Banks are wrong to insist that a declaration that contract terms are unconscionable cannot provide the basis for a subsequent monetary remedy.  The Banks overlook that if this Court declares the relevant terms

unconscionable, they will be unable to rely on those terms in defending against plaintiffs' contract claims.

### 3.     The Banks' Practices Are Unconscionable

Plaintiffs' allegations of unconscionability are more than sufficient to survive a motion to dismiss.  There are two aspects to unconscionability – procedural and substantive.  The Banks misstate the applicable law by arguing that all states require a showing of *both* procedural and substantive unconscionability in order to declare contract terms void.  In reality, many states only require a showing of one or the other.  In any event, plaintiffs have sufficiently alleged the existence of both.

### a.     Procedural Unconscionability

Procedural unconscionability "relates to the manner in which a contract is made and involves consideration of issues such as the bargaining power of the parties and their ability to know and understand the disputed contract terms."  *Abels*, 2009 WL 5342768, at *4 (quoting *Bland, ex rel. Coker v. Health Care & Ret. Corp. of Am.*, 927 So.2d 252, 256 (Fla. Dist. Ct. App. 2006)); *see also Razor v. Hyundai Motor Am.*, 854 N.E.2d 607, 622 (Ill. 2006) (procedural unconscionability, in addition to considering the disparity of bargaining power between the parties, involves a term that "is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it").

The agreements here are between major national banks and individual customers. Accordingly, the sophistication and bargaining power of the Banks dwarf that of the plaintiffs. Courts routinely consider these factors in determining whether procedural unconscionability exists.  *See*, *e.g.*, *Cordova v. World Fin. Corp. of NM*, 208 P.3d 901, 907-08 (N.M. 2009); *E. Ford, Inc. v. Taylor*, 826 So.2d 709, 714 (Miss. 2002); *Burch v. Second Jud. Dist. Ct. of State ex rel. County of Washoe*, 49 P.3d 647, 650 (Nev. 2002).  Indeed, as this Court recently held, the

presence of these factors *alone* is sufficient to satisfy the procedural unconscionability requirement.  *See Abels*, 2009 WL 5342768, at \*4 ("Procedural unconscionability is satisfied here because of the disparity in bargaining power between Plaintiffs and Defendant.").

The Banks' agreements, drafted and offered on a take-it-or-leave-it basis, are voluminous boilerplate contracts, printed in small type over dozens of pages.  Furthermore, plaintiffs were denied any opportunity to opt out of overdraft protection because the Banks viewed it as a vehicle to generate billions of dollars in revenue.  *See, e.g., Tornes*, SAC, at ¶¶ 64-66.  In consequence, these are contracts of adhesion.  *See, e.g., Laster v. AT&T Mobility LLC*, 584 F.3d 849, 853 (9th Cir. 2009) (a contract of adhesion is "a contract drafted by the party of superior bargaining strength and imposed on the other, without the opportunity to negotiate the terms"); *Pasteur Health Plan, Inc. v. Salazar*, 658 So.2d 543, 544 (Fla. Dist. Ct. App. 1995) (adhesion contract means "a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to *adhere* to the contract or *reject* it") (emphasis in original) (alterations omitted).  Whether a contract is adhesive is a crucial factor in whether it is procedurally unconscionable.  *See, e.g., Perdue*, 702 P.2d at 511; *Armendariz v. Found. Health Psychcare Servs., Inc.*, 6 P.3d 669, 766-67 (Cal. 2000); *Wis. Auto Title Loans, Inc. v. Jones*, 714 N.W.2d 155, 159-60 (Wis. 2006).

Here, plaintiffs were presented with adhesive contracts, offered by parties of vastly superior bargaining power, with the overdraft provisions buried in dozens of pages of terms.  Faced with an virtually identical situation, the court in *Perdue* held that such provisions are procedurally unconscionable.  *See Perdue*, 702 P.2d at 511.

### b.    Substantive Unconscionability

As for substantive unconscionability, it depends on the substantive contract terms themselves and whether those terms are unreasonably favorable to the more powerful party.

Examples of substantively unconscionable terms are those which impair the integrity of the bargaining process or otherwise contravene public policy; terms (usually of an adhesive or boilerplate nature) which impermissibly attempt to alter fundamental duties required by law; fine-print terms which operate to negate the reasonable expectations of the non-drafting party; or unreasonably or unexpectedly harsh terms relating to price or other central aspects of the transaction. *Abels*, 2009 WL 5342768, at *4; *Blue Cross Blue Shield of Ala. v. Rigas*, 923 So.2d 1077, 1086-7 (Ala. 2005); *Maxwell v. Fid. Fin. Servs., Inc.*, 907 P.2d 51, 58 (Ariz. 1995) ("Indicative of substantive unconscionability are contract terms so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity.").

The overdraft fee provisions in the agreements are unreasonably favorable to the Banks, and the purpose and effect of those provisions are to negate the reasonable expectations of the customers.  While the Banks seek to cast the plaintiffs' claims as relating only to the reordering of transactions, that is only one element of the Banks' abusive scheme to impose overdraft fees "not reasonably avoidable" by consumers.  73 F.R. 28904-01, 28929.  As discussed above, the Banks rely on the unconscionable overdraft terms to manipulate transactions so as to wrongfully multiply fees – excessively large fees that customers *cannot* reasonably avoid, even when exercising due diligence to monitor their account balances and to maintain sufficient funds.  No reasonable person would ever have agreed to grant the Banks the unfettered power to manipulate checking account transactions for the sole purpose of maximizing their profits at consumer expense.

And there is still another aspect to the substantive unconscionability of the challenged contractual terms: the disparity between the cost and the value of the service rendered on one

hand, and, on the other, its price.  As plaintiffs allege, the Banks generally impose uniform $35 overdraft fees on transactions in which a customer has overdrawn his account – even if the overdraft is for a $1 cup of coffee.  Yet, the cost to the Banks to provide this "service" has *no reasonable relation* to the amount of the overdraft, nor to the actual cost of paying it.  *See*, *e.g.*, *Tornes*, SAC ¶ 181; *Garcia*, AC ¶ 7.  This fact alone dictates the unconscionability claim is plausible and should be sustained.  *See*, *e.g.*, *Perdue*, 702 P.2d at 512-13 (allegations of overdraft fees of $6 deemed sufficient to maintain unconscionability claim).

### 4.    The Unconscionability Analysis Is Heavily Fact Dependent

Most important for purposes of this motion, the substantive unconscionability inquiry is a factual one that cannot support dismissal at this stage.  *Abels*, 2009 WL 5342768, at *4 (King, J.) ("Whether or not a reasonable person would have actually agreed to it is a factual question that cannot be decided on a motion to dismiss.  Therefore, the unconscionability count should not be dismissed at this point.").

### E.    Plaintiffs State Viable Claims for Conversion

To state a claim for conversion, a plaintiff must plausibly show: (i) his ownership of *or* right to possess the property at issue, and (ii) a wrongful interference with that right.[26]   *See*

---

[26] Courts recognizing ownership or possession include: **Alabama**, *Empiregas, Inc. v. Geary*, 431 So.2d 1258, 1260-61 (Ala. 1983); **Alaska**, *McKibben v. Mohawk Oil Co.*, 667 P.2d 1223, 1228-29 (Alaska 1983); **Arizona**, *Sears Consumer Fin. Corp. v. Thunderbird Prods.*, 802 P.2d 1032, 1034 (Ariz. Ct. App. 1990); **Arkansas**, *City Nat'l Bank v. Goodwin*, 783 S.W.2d 335, 337 (Ark. 1990); **California**, *Montoya v. Countrywide Bank, FSB*, 2009 WL 1813973, at *8 (N.D. Cal. June 25, 2009); **Colorado**, *First Nat'l Bank of Colo. Springs v. Wilbur*, 26 P. 777, 778 (Colo. 1891); **Connecticut**, *Devitt v. Manulik*, 410 A.2d 465, 467 (Conn. 1979); **Delaware**, *Facciolo Constr. Co. v. Bank of Del.*, 514 A.2d 413, 413 (Del. 1986); **Florida**, *Star Fruit Co. v. Eagle Lake Growers, Inc.*, 33 So.2d 858, 860 (Fla. 1948); **Georgia**, *Gilbert v. Rafael*, 352 S.E.2d 641, 641 (Ga. Ct. App. 1987); **Hawaii**, *Matsuda v. Wada*, 101 F. Supp. 2d 1315, 1321 (D. Haw. 1999); **Idaho**, *W. Idaho Prod. Credit Ass'n*, 678 P.2d 52, 54 (Idaho 1984); **Illinois**, *Cirrincione v. Johnson*, 703 N.E.2d 67, 70 (Ill. 1998); **Iowa**, *Welke v. Davenport*, 309 N.W.2d 450, 452 (Iowa 1981); **Kansas**, *Carney v. Gebhardt*, 1988 Kan. LEXIS 224, at *11 (Kan. Dec. 9, 1988);

generally Prosser and Keeton on the Law of Torts § 15 (5th ed. 1984).  The allegations in

plaintiffs' complaints are more than sufficient to satisfy these elements.  First, plaintiffs hold the

requisite possessory or ownership rights to the funds in their accounts, as case law and the

deposit agreements themselves establish.  Second, by alleging that the Banks assessed overdraft

fees to checking accounts that contained sufficient funds on deposit to cover the debits, plaintiffs

have alleged sufficient facts to show the Banks' wrongful interference.

    **1.    By Taking Funds From Plaintiffs' Accounts, the Banks Converted Property Plaintiffs Owned or Had a Right to Possess**

    To establish a claim for conversion, plaintiffs must show that they either owned *or* had a

right to possess the property at issue.  Both are true here.

---

**Louisiana**, *Hopper v. Bills*, 232 So.2d 296, 300 (La. 1970); **Maine**, *Withers v. Hackett*, 714 A.2d 798, 800 (Me. 1998); **Maryland**, *Baltimore & Ohio R.R. v. Equitable Bank*, 550 A.2d 407, 410 (Md. Ct. Spec. App. 1988); **Massachusetts**, *Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 95 (1st Cir. 1993); **Michigan**, *Skyline Steel Corp. v. A.J. Dupuis Co.*, 648 F. Supp. 360, 375 (E.D. Mich. 1986); **Minnesota**, *Olson v. Moorhead Country Club*, 568 N.W.2d 871, 872 (Minn. Ct. App. 1997); **Missouri**, *Cole v. Control Data Corp.*, 1990 U.S. Dist. LEXIS 19454, at *21-22 (E.D. Mo. Apr. 11, 1990); **Nebraska**, *Zimmerman v. FirsTier Bank, N.A.*, 585 N.W.2d 445, 451-52 (Neb. 1998); **Nevada,** *Scaffidi v. United Nissan*, 425 F. Supp. 2d 1159, 1168 (D. Nev. 2005); **New Hampshire**, *Pac. & Atl. Shippers v. Schier*, 258 A.2d 351, 353 (N.H. Oct. 31, 1969); **New Jersey**, *Elijah Mount v. Executors of W.W. Cubberly, Dec.*, 19 N.J.L. 124, 124-25 (1842); **New Mexico**, *Aragon v. Gen. Elec. Credit Corp.*, 557 P.2d 572, 574 (N.M. Ct. App. 1976); **New York**, *Pierpoint v. Doing Business under the Firm Name of Prince & Whitely*, 182 N.E. 235, 236 (N.Y. 1932); **North Dakota**, *Dairy Dep't of N.D. v. Harvey Cheese, Inc.*, 278 N.W.2d 137, 144 (N.D. 1979); **Ohio**, *L&N P'ship v. Lakeside Forest Ass'n*, 916 N.E.2d 500, 506 (Ohio Ct. App. 2009); **Oklahoma**, *ITT Indus. Credit Co. v. L-P Gas Equip., Inc.*, 453 F. Supp. 671, 676 (W.D. Okla. 1978); **Pennsylvania**, *Scranton Times, L.P. v. Wilkes-Barre Publ'g Co.*, 2009 WL 3100963, at *8 (M.D. Pa. Sept. 23, 2009); **South Carolina**, *Channelbind Intl' Corp. v. Esselte Corp.*, 2009 WL 3617611, at *7 (D.S.C. Oct. 29, 2009); **Tennessee**, *In re: Creekstone Apartments Assocs. L.P.*, 1995 WL 588904, at *7-8 (M.D. Tenn. Sept. 18, 1995); **Texas**, *Bodin v. Gulf Oil Corp.*, 707 F. Supp. 875, 878 (E.D. Tex. 1988); **Utah**, *Fibro Trust, Inc. v. Brahman Fin., Inc.*, 974 P.2d 288, 296 (Utah 1999); **Vermont**, *Miller v. Merchants Bank*, 415 A.2d 196, 199 (Vt. 1980); **Washington**, *In re Marriage of Langham*, 106 P.3d 212, 218 (Wash. 2005); **West Virginia**, *Thompson Dev. Inc. v. Kroger Co.*, 413 S.E.2d 137, 142 (W. Va. 1991); **Wisconsin**, *Prod. Credit Ass'n of Chippewa Falls v. Equity Coop Livestock Sales Ass'n*, 261 N.W.2d 127, 129 (Wis. 1978).

a.      **Ownership**

The Banks assert that plaintiffs lack the requisite ownership to assert a conversion claim. Omnibus Mot. at 62-63.  This assertion is contradicted by the Banks' own agreements (which they drafted).  Without exception, all of the Banks' deposit agreements identify the customer as the owner of the account.

Bank of America's "Deposit Agreement and Disclosures" states under the heading "Account Ownership": "When you open an account, you may choose one of several types of ownership."  *Tornes*, SAC Ex. A, at 5.  The bank may "either treat the account as being owned solely by the persons who have signed the appropriate account opening documentation or treat the account as being owned by all persons in whose names the account was opened."  *Id.*  Under "Joint Accounts," the agreement states that "[i]f more than one person's name appears in the title of an account . . . then the account is a joint account and all persons whose names appear on a joint account are co-owners of the account."  *Id.*

Chase's deposit agreement provides: "Where only one individual is designated or appears on a signature card as the owner of such account, then we may treat the Account as a solely owned account."  *Lopez*, C Ex. A, at 15.  The agreement also provides for joint ownership where two or more individuals wish to share a checking account.  *Id.*

Citibank's "Account Ownership" portion of its deposit agreement, entitled "Client Manual Consumer Accounts," states that – for joint accounts – "[a]ll money on deposit will be owned jointly," and "[i]f a joint account owner dies, full ownership and control of the balance of the account passes to the surviving account owner(s)."  *Amrhein*, TAC Ex. A, at 8-9.

Union Bank defines "you" and "your" as "owners of an account," as opposed to "we," "our," "us," and "the Bank" (referring to Union Bank).  *Larsen*, FAC Ex. A, at 3.  The agreement defines "owners" in its deposit agreement as "individuals, joint tenants, tenants in common, both

spouses on a community property account . . ." *Larsen*, FAC Ex. A, at 3.  For accounts held by individuals, Union Bank considers the depositor to be the sole owner.  *Larsen*, FAC Ex. A, at 90.

U.S. Bank's "Deposit Account Agreement," under the heading "Individual Account," states that "[t]he holder of such an account is presumed to be the owner."  *Id*. at 13.  And under the heading "Withdrawal Rights, Ownership of Account, and Beneficiary Designation," the agreement states: "By ownership we generally mean who owns the funds in the account." *Speers*, C Ex. A, at 12.

According to Wachovia's "Deposit Agreement and Disclosure for Personal Accounts," "[b]y opening an individual account, you are considered by us to be the sole owner of the account."  *Garcia*, AC Ex. A, at 5.

Wells Fargo's "Consumer Account Agreement" provides that "[t]he Bank may presume that any person named in addition to you in its records for your Account owns the funds in your Account with you as a co-owner unless the Bank's records indicate that the person is an *Authorized Signer* or has some other relationship to the Account."  *Martinez*, C Ex. A, at 32.

Given the Banks' vastly superior bargaining power and their position as drafters of the deposit agreements, they should not be permitted to claim now that *they* own the accounts and funds, directly contradicting the express terms of the agreements.

Despite the express language in their deposit agreements, the Banks argue that, pursuant to the NBA and Supreme Court precedent, they may not treat funds in deposit accounts as the property of the depositor.  Omnibus Mot. at 62.  None of the authorities cited states such a prohibition.  In *Texas & Pacific Railway Company v. Pottorff*, 291 U.S. 245 (1934), a railroad sought to enforce a pledge written by the bank to secure funds the railroad had deposited.  OCC Interpretive Letter No. 464, 1988 WL 284846 (Dec. 14, 1988), dealt with an inquiry by a

national bank seeking to make a similar pledge.  In fact, the NBA has been expanded to allow

national banks to make a pledge in certain circumstances.  *See*, *e.g.*, 12 U.S.C. § 90; 25 U.S.C.

§§ 156, 162, 162a; 12 U.S.C. § 192; 48 U.S.C. § 780; 31 U.S.C. § 771; 12 U.S.C. § 92a; 11

U.S.C. § 101.  Plaintiffs are not seeking to enforce a pledge by the Banks.  Consequently, *Texas*

*Pacific Railway* and OCC Interpretive Letter No. 464 are inapposite.

### b.        Right to Possession

While ownership is sufficient to satisfy the first element of conversion, it is not

necessary.  To the contrary, conversion can lie where a plaintiff holds a right to possession.  "It is

elementary that the law of conversion is concerned with possession, not with title."  *Bank*

*Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 2000 WL 174955, at *6 (S.D.N.Y. Feb. 15,

2000) (citation omitted) (rejecting the defendant bank's argument that a conversion claim failed

as a consequence of the plaintiff's lack of ownership of the funds in dispute, because, even if this

were true, plaintiffs need not establish legal ownership of funds to pursue a conversion claim).

As the Florida Supreme Court held:

> The gist of a conversion has been declared to be not the acquisition of the
> property . . . but the wrongful deprivation of a person of property to the
> possession of which he is entitled.

*Star Fruit Co. v. Eagle Lake Growers, Inc.*, 33 So.2d 858, 860 (Fla. 1948).  Indeed, any property

interest, including a future possessory interest, has been held to be sufficient.  *See*, *e.g.*, *In re*

*Marriage of Langham & Kolde*, 106 P.3d 212, 219 (Wash. 2005) (holding that "some property

interest in the allegedly converted goods is all that is needed to support an action in conversion");

*see generally* RESTATEMENT (SECOND) OF TORTS § 243, cmt. b (2009).

Attempting to limit conversion to cases where ownership was shown, the Banks ignore

the well settled law that the right to possession is sufficient under the tort.  They rely on *Scholes*

*Electric & Communications, Inc. v. Fraser*, 2006 WL 1644920 (D.N.J. 2006), for the proposition

that ownership on the part of the plaintiff is required for a claim of conversion to lie.  Omnibus
Mot. at 62.    Nevertheless, the Banks' description of the law of conversion New Jersey is
incomplete.  New Jersey requires only the mere right to possession and *not* the more onerous
requirement of ownership.  *See*, *e.g.*, *Elijah Mount v. Ex'rs of W.W. Cubberly*, 19 N.J.L. 124,
124-25 (N.J. 1842); *Chem. Bank v. Miller Yacht Sales*, 413 A.2d 619, 623 (N.J. Super. Ct. App.
Div. 1980).  In fact, the Banks universally ignore this distinction, which is fundamental to the
conversion tort.  Other cases they cite come from states that, similarly, do *not* require ownership
but find possession sufficient.  Omnibus Mot. at 61 n.54, 62 n.55.

Plaintiffs have an absolute right to possession of the funds on deposit in their bank
accounts.  When a customer deposits his or her paycheck into a personal account, the customer
retains, at a minimum, the right to possess those funds.  Thus, courts recognize that a depositor
has an "absolute and unconditional right to immediate possession of the property" in his
checking account.  *Cruthis v. Firstar Bank, N.A.*, 822 N.E.2d 454, 463-64 (Ill. App. Ct. 2004)
(affirming a jury finding of a bank's conversion in the form of its wrongful withdrawals of
money from the plaintiff's general checking account); *see also Katz v. Belmont Nat'l Bank of
Chicago*, 491 N.E.2d 1157, 1159 (Ill. 1986) (stating that a bank could be held liable for
conversion for taking funds from a depositor's account, despite the debtor-creditor relationship,
because the depositor has the "absolute and unconditional" right to "the immediate possession"
of the funds on deposit in his account).

As these decisions show, it defies common sense to say that depositors have no right to
possess their own money once it has been deposited into their personal bank accounts –
especially since depositors have instantaneous access to these funds at ATMs and in POS
transactions as well as online.

### 2.    The Banks' Conduct Was Wrongful Because They Improperly Imposed Overdraft Fees and Took Account Funds

Plaintiffs have alleged a more than adequate nucleus of fact to satisfy the wrongful act requirement of a conversion claim.  The "essence of the tort" is:

> not the acquisition of the property; rather it is the wrongful deprivation.  *National Union Fire Ins. Co. of Penn. v. Carib Aviation, Inc.*, 759 F.2d 873, 878 (11th Cir. 1985) (applying Florida law) (citing *Star Fruit Co. v. Eagle Lake Growers, Inc.*, 160 Fla. 130 (Fla. 1948)).   An act of willful interference with the personal property of another which is inconsistent with the rights of the person entitled to the use, possession or ownership of the property    . . . Good faith is not a defense to a claim of conversion.  *Dairy Farm Leasing Co. v. Haas Livestock Selling Agency,  Inc.*, 458 N.W.2d 417, 419 (Minn. Ct. App. 1990).

*Seibel v. Soc'y Lease, Inc.*, 969 F. Supp. 713, 718-19 (M.D. Fla. 1997).

Plaintiffs allege the Banks' wrongful conduct in considerable detail.  As discussed above, the Banks' scheme included reordering transactions to impose the greatest possible number of overdraft fees – even when there are sufficient funds in the account – and batching transactions over multiple days.  Where the original assessment of an overdraft is improper, the resultant overdraft fee is also improper.   This common sense statement, in fact, derives from a case directly on point.   In *White*, the court refused to dismiss the plaintiffs' conversion claim, rejecting Wachovia's reliance on its deposit agreement.  563 F. Supp. 2d at 1371.  In finding that the elements of conversion had been satisfied, including the wrongful act element, the court pointed to Wachovia's practice of "impos[ing] Overdraft Fees when there was in fact no overdraft." *Id*. at 1371; *accord*, *First Union Nat'l Bank of Ga. v. Davies-Elliott, Inc.*, 452 S.E.2d 132, 140 (Ga. Ct. App. 1994) (holding that where the bank's improper actions lead to overdrafts, the overdraft fees are also improper and can support a viable claim for conversion).

### 3.    The Money in the Accounts Is Property Which Can Be Converted

The Banks assert that the money in the plaintiffs' bank accounts cannot be the subject of conversion.  Omnibus Mot. at 64 n.57.  As case law demonstrates, however, "[c]onversion is . . .

available for specific amount of money placed on deposit with a bank . . . *and for overdrafts charged by a bank on existing accounts.*"  *Decatur Auto Ctr. v. Wachovia Bank, N.A.*, 583 S.E.2d 6, 9 (Ga. 2003) (emphasis added); *see also White*, 563 F. Supp. 2d at 1371; *Allen v. Gordon*, 429 So.2d 369, 371 (Fla. Dist. Ct. App. 1983) (withdrawals from accounts constituted conversion); *Davies-Elliott, Inc.*, 452 S.E.2d at 140; *Weiss v. Marcus*, 124 Cal. Rptr. 297, 303 (Cal. Ct. App. 1975); *Cruthis v. Firstar Bank, N.A.*, 822 N.E.2d 454, 463-64 (Ill. App. Ct. 2004).

### 4.       In Analogous Cases, Courts Have Sustained Conversion Claims

Analogous case law demonstrates why the Banks' improper taking of money from plaintiffs' accounts constitutes conversion.  In *White*, the court refused to dismiss a conversion claim brought against Wachovia for conduct *identical* to the conduct alleged here.  The plaintiffs alleged conversion on the basis of Wachovia's delaying, reordering and otherwise manipulating the posting of transactions to accounts, and imposing overdraft fees even when the account contained sufficient funds to pay a draft.  563 F. Supp. 2d at 1361.  The court held that plaintiffs satisfied the elements for a conversion claim, including showing "title to the property or the right of possession."  *Id*. at 1371.  Significantly, the plaintiffs in *White* alleged that the property converted by Wachovia's wrongful imposition of overdraft fees were funds on deposit in a general account.  *Id*.

Other courts facing similar facts have found conversion to be a valid claim.  In *Davies-Elliott*, the court held that the trial court properly denied the bank's post-trial motion on a conversion claim brought by a depositor based on overdraft charges improperly assessed to the depositor's checking account.  452 S.E.2d at 140.  Similarly, in *Cruthis v. Firstar Bank, N.A.*, 822 N.E.2d 454 (Ill. App. Ct. 2004), the court affirmed a jury verdict of conversion in favor of the depositor where the bank removed funds on deposit in the depositor's general account.  *See id*. at 463-64.

**F.      Plaintiffs' Alternative Claims for Unjust Enrichment Are Proper**

Rule 8(d) permits plaintiffs to plead alternative claims, even if the alternative claims are inconsistent. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805 (1999) ("Our ordinary Rules recognize that a person may not be sure in advance upon which legal theory she will succeed, and so permit parties to 'set forth 2 or more statements of a claim or defense alternatively or hypothetically,' and to 'state as many separate claims or defenses as the party has regardless of consistency.'") (quoting Fed. R. Civ. P. 8).  Plaintiffs have pled claims for unjust enrichment in the alternative and, as a result, have properly exercised their pleading rights under Rule 8(d).  *Cleveland*, 526 U.S. at 805.

The Banks argue that the existence of written agreements mandates dismissal of the unjust enrichment claims.  Omnibus Mot. at 65-67.  This Court recently rejected the *identical* argument in *Abels*, a case involving one of the Banks here:

> Federal Rule of Civil Procedure 8(d) allows pleading in the alternative, even if the theories are inconsistent.  Defendant is correct in that Plaintiffs will not be permitted to recover on both theories, but at this point it would be premature to dismiss the unjust enrichment count simply because an express contract exists. Defendant has not conceded that Plaintiffs are entitled to recovery under the contract, and it is possible that if their contractual claim fails, Plaintiffs may still be entitled to recovery under the unjust enrichment count. *See Tracfone Wireless, Inc. v. Access Telecom, Inc*., 2009 WL 2207818, *8 (S.D. Fla. 2009) ("Although Plaintiff has alleged a breach of contract claim which I have concluded can proceed, it would be premature to dismiss Plaintiff's count for unjust enrichment in this case."). Therefore, the unjust enrichment count should not be dismissed at this point.

*Abels*, 2009 WL 5342768, at *4 (King, J.); *see also Manicini Enters., Inc. v. Am. Express Co*., 236 F.R.D. 695, 699 (S.D. Fla. 2006) ("Plaintiff should be permitted to plead alternative equitable claims for relief as the existence of express contracts between the Parties has yet to be proven"); *Mobil Oil Corp. v. Dade County Esoil Mgmt. Co., Inc.*, 982 F. Supp. 873, 880 (S.D.

Fla. 1997) ("Until an express contract is proven, a motion to dismiss a claim for . . . unjust enrichment . . . is premature.").

The Banks rely on *White*, but there the plaintiffs "[e]ffectively claim[ed] that there was a contract and that Wachovia was unjustly enriched within a single count," 563 F. Supp. 2d at 1371-72, not in alternative counts as pled here and in *Abels*. Equally unpersuasive is the Banks' reliance on *Jaffe v. Bank of America, N.A.*, 2009 WL 2567488 (S.D. Fla. Aug. 18, 2009), in which this Court found, *after a bench trial*, that the plaintiffs could not prevail on their unjust enrichment claim. Unlike *Jaffe*, where the unjust enrichment claim was dismissed following trial, this case is at the pleadings stage. As this Court held in *Abels*, it would be premature to dismiss the unjust enrichment count simply because an express contract exists where plaintiffs may be entitled to recovery under their unjust enrichment claim if their contractual claim were to fail.

**G.    Plaintiffs State Valid Claims Under State Consumer Protection Statutes**

**1.    Claims Under a Given State's Consumer Protection Statute Should Not Be Dismissed Simply Because There Is No Class Representative From That State at This Juncture**

Plaintiffs are bank customers injured by the Banks' conduct. They assert claims under various states' consumer protection statutes on behalf of absent class members who reside in those states.[27] Plaintiffs have standing to act in a representative capacity for those who reside in

---

[27] The Banks argue that several of the state statutes do not permit the claims plaintiffs have alleged. Specifically, they argue that the Montana Unfair Trade and Practices Act, Mont. Code Ann. § 30-14-101, *et seq.*, does not permit consumer class actions. Omnibus Mot. at 85-86. Plaintiffs agree. The Banks also seek dismissal of claims brought under the Ohio CSPA, Ohio Rev. Code Ann. § 1345.01(A), and the Wisconsin Unfair Trade Practices Act, Wis. Stat. § 100.20, *et seq.*, because claims against national banks are not permitted under these statutes. Plaintiffs concede these points.

other states because they suffered the same injuries, resulting from the same policies and practices, as those unnamed class members from other states.[28]

> a.  **Plaintiffs Were Injured by the Banks' Conduct and Therefore Have Standing To Assert Statutory Claims on Behalf of Other Customers Injured by the Same Conduct**

The Banks contend that plaintiffs do not have standing to assert statutory consumer protection claims of states where they do not reside.  The cases cited by the Banks are distinguishable from the situation here, as the plaintiffs in those cases had not suffered the injury upon which they sought to represent a class.  Here, on the other hand, plaintiffs suffered the same injury as the classes they seek to represent.  Therefore, they have standing.

In *Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987), Omnibus Mot. at 71, the court held that the named plaintiff in a Title VII case could bring claims for discipline and promotion actions by the defendant because he was subjected to discipline and was not promoted.  He did not, however, have standing to bring claims on behalf of a class under Title VII based on the allegedly discriminatory educational and testing requirements for hiring because he was not subjected to or injured by those requirements.  823 F.2d at 1483.  Similarly, in *Blum v. Yaretsky*, 457 U.S. 991 (1982), Omnibus Mot. at 70, the Supreme Court held that recipients of Medicaid assistance in nursing homes could not raise a claim based on a threatened increase in the level of care because there was no immediate threat of harm.  457 U.S. at 1001.

Here, in contrast, the named plaintiffs have each been subjected to the Banks' conduct that is the basis of the claims, and they have each been injured as a result.  Accordingly, even

---

[28] Contrary to the Banks' assertion, plaintiffs do *not* seek extraterritorial application of any state's consumer protection statute.  Instead, they seek separate subclasses based on various states' consumer protection statutes, a sound approach for case management whereby a particular state statute would apply only to the residents of that state.  Given what plaintiffs are requesting, the fact that the statutory language of the West Virginia, Connecticut, Kansas, New York and Illinois statutes prohibit extraterritorial application is of no consequence.  Omnibus Mot. at 70 nn.64-65.

under decisions such as *Griffin* and *Blum*, the named plaintiffs have been "concretely affected" by the Banks' conduct, and have standing to bring claims on behalf of others injured as a result of the same conduct. *Blum*, 457 U.S. at 1001.

> **b.      The Statutes Are Substantially Similar to Each Other and Can Be Applied on a Classwide Basis**

Not only have the named plaintiffs been subjected to the same conduct as the absent class members (regardless of whether they reside in the same state), but the consumer protection claims pled in the complaints are substantially similar.  Because the laws protecting each state's consumers are substantially similar, and because plaintiffs and the absent class members have been subjected to the exact same conduct by the Banks, a class representative from one state can properly represent class members from other states.  *See Manual for Complex Litigation* § 22.634 (4th ed. 2004) ("*Manual 4th*") ("If the choice-of-law and subsequent analysis show little relevant difference in the governing law, or that the law of only a few jurisdictions applies, the court might address these differences by creating subclasses or by other appropriate grouping of claims."); *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 104 (D. Mass. 2008) ("In a multi-state class, the caselaw does not create a *per se* rule that the Court must appoint a separate representative for each state or even each group.  There is no substantial conflict of interest between the three state groupings which would necessitate a class representative from each group.") (citations omitted); *see generally Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985).

Moreover, standing, the adequacy of the class representatives, and whether a class can be certified under multiple states' laws, are issues that are manifestly *not* appropriate for the Court to address at this juncture; these issues are typically addressed at the class certification stage. *See Hernandez v. Medows*, 209 F.R.D. 665, 667 (S.D. Fla. 2002) ("It is well-established that

'prior to certification of a class, and technically speaking before undertaking any formal typicality or commonality review, the district court must determine that at least one named representative has Article III standing to raise each class claim.'") (quoting *Prado-Steiman  ex rel. Prado v. Bush*, 221 F.3d 1266, 1279-80 (11th Cir. 2000), and *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987)).[29]  In short, these issues do not warrant dismissal of any state statutory claims at this juncture.

c.  **If the Court Finds Plaintiffs Lack Standing to Assert Claims Under the Laws of States Where They Do Not Reside, the Court Should Grant Leave to Add Additional Plaintiffs**

If the Court were to conclude that any of the plaintiffs lack standing to represent the classes pled, plaintiffs should be permitted additional time, until they move for class certification, to locate additional class representatives who can adequately represent the proposed classes in connection with the statutory claims at issue.

It is well "settled that the named plaintiff need not demonstrate a probability of success on the merits or show in advance that he or she suffered damages in order to serve as the class representative."  1 *Newberg on Class Actions* § 3:29 (4th ed. 2002).  Indeed, *Newberg* notes that if a class representative is found to lack standing to represent a proposed class – even after certification of that class – courts should, and often do, permit additional class representatives to be added to cure the defect.  3 *Newberg* § 7.47; *see also* 1 *Newberg* § 3:19 ("an alternative representative may be appointed for the issues on which the plaintiff lacks standing.").  In like vein, the *Manual 4th* observes that "courts generally allow class counsel time to make reasonable

---

[29] Although the issue of typicality is not presently before the Court, the typicality requirement will be easily satisfied because the plaintiffs' and class members' claims are sufficiently co-extensive and there is no antagonism between the class members and named plaintiffs.  *See Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001) ("A class representative must possess the same interest and suffer the same injury as the class members in order to be typical under Rule 23(a)(3).").

efforts to recruit and identify a new representative who meets the Rule 23(a) requirements." *Manual 4th* § 21.36.  Further, "[t]he court may permit intervention by a new representative or may simply designate that person as a representative in the order granting class certification." *Id.*  Thus, a finding at this point that plaintiffs lack standing to represent each proposed class does not justify dismissal.  *See Hernandez*, 209 F.R.D. at 667.

On this point, *Birmingham Steel Corporation v. Tennessee Valley Authority*, 353 F.3d 1331 (11th Cir. 2003), is instructive.  There, the Eleventh Circuit reversed and remanded the district court's decertification of a class of plaintiffs where the named plaintiff had lost standing by filing for bankruptcy – the class definition specifically excluded bankrupt entities.  *Id.*  The court found that "while a loss of standing might justify dismissal of the named plaintiff as a representative, it did not necessarily call for the simultaneous dismissal of the class action. Rather . . . under the circumstances before it, the district court erred in dismissing the case without first giving an opportunity for intervention of a newly named plaintiff who would have standing to pursue the action."  *Id.* (citing *Lynch v. Baxley*, 651 F.2d 387 (5th Cir. Unit B 1981)).

Under the reasoning of *Birmingham Steel*, and in light of the overwhelming weight of authority on this issue, the proper approach is to permit the current proposed class representatives to continue represent the proposed classes at *this* juncture, and, only if it proves necessary to satisfy the Rule 23 requirements at a *later* point, to allow amendments to the complaints that add class representatives, or to order their intervention.

### 2.    Plaintiffs Have Stated Viable Claims Under State Consumer Protection Statutes

#### a.    The Abusive Practices at Issue Are Not Permitted by Law

The Banks argue that the conduct that is the subject of this litigation is authorized by law, and that claims brought under various state consumer protection statutes should, therefore, be

dismissed.  Omnibus Mot. at 73.  Specifically, they argue that the consumer protection statutes of California, Connecticut, Illinois, Kansas, Massachusetts, New Mexico, New York, Ohio and Washington do not permit claims based on conduct that is otherwise authorized by law.  The Banks are wrong.

The Banks' argument presumes there is authorization, either under federal or state law, for the practices that form the basis of plaintiffs' complaints.  This argument is essentially one of preemption.  As previously discussed, the Banks' argument that there is any authorization for the alleged practices is simply incorrect.  The practices complained of here have been found to violate the duty of good faith and fair dealing.  *Gutierrez*, 622 F. Supp. 2d at 952-53 ("even if the bank-depositor contract purports to allow the bank to post in any order it wishes, such discretion remains subject to the bank's duty of good faith and fair dealing.  There is a duty of good faith and fair dealing to honor checks in such a way as to be fair to the consumer and that discretionary power cannot be exercised so as to pile on ever greater penalties on the depositor, which is exactly what Wells Fargo seems to be doing, or so a reasonable jury could conclude.").

Further, as the Banks concede, the Massachusetts Supreme Court has explicitly rejected their assertion that otherwise lawful conduct cannot form the basis of a claim under the Massachusetts consumer protection act.  Specifically, the court stated: "We reject the argument that an act or practice which is authorized by statute can never be an unfair or deceptive act or practice . . . The circumstances of each case must be analyzed, and unfairness is to be measured not simply by determining whether particular conduct is lawful . . . but also by analyzing the effect of the conduct on the public."  *Schubach v. Household Fin. Corp.*, 376 N.E.2d 140, 142 (Mass. 1978).  The Banks' argument fails under Massachusetts law.

**b.      The Conduct Alleged Is the Type Prohibited by State Consumer Protection Statutes**

The Banks contend, incorrectly, that the conduct alleged in this litigation is not prohibited by state statutes that protect against unfair, unconscionable, and deceptive conduct.[30]  In fact, the complaints state plausible claims under all the consumer protection statutes identified.

**i.      Plaintiffs' Allegations of Unfair Conduct Are Actionable**

**A.      The Banks' Conduct Was Neither Disclosed Nor Authorized**

The Banks argue that plaintiffs cannot sustain a claim under those consumer protection statues that prohibit unfair conduct because their conduct complied with the terms of their respective contracts and/or was fully disclosed to plaintiffs and, thus, is *per se* fair.  As noted, however, plaintiffs have pled that the Banks' practices did *not* comply with the terms of the agreements and that the true import of the Banks' scheme was not fully disclosed.  It is no stretch to say that the Banks failed to adequately disclose to their customers, before those customers entrusted their money to them, that the Banks would manipulate the customers' transactions for the Banks' own exclusive benefit, so that the Banks could take hefty overdraft fees – sometimes hundreds of dollars a day – from customers.  The Banks also failed to disclose that they (and their adroit computer programs) were so skilled at manipulating accounts that there could be no reasonable way for customers to avoid such fees, because it would be impossible, under the Banks' scheme, for the customers to know with certainly what their balance was at any given time.  Certainly, these practices were not authorized by the customers.  Moreover, the inadequate disclosures that may have been made to customers were provided in take-it-or-leave-it terms, in tiny, ambiguous language, in long contracts of adhesion.  Whether their practices were "fully

---

[30]  A chart illustrating the statutory models of the relevant consumer protection statutes is attached to our response as Exhibit A.

disclosed" or "expressly authorized" – as the Banks argue – are issues of fact that are inappropriate for resolution on a motion to dismiss.

> ### B.    The Court Should Not Dismiss Plaintiffs' Claims on the Ground That They Were Not Forced to Open or Maintain Accounts

The Banks' argument that plaintiffs' claims of unfair competition should be dismissed because they were not forced to enter into agreements with the Banks is likewise absurd. Omnibus Mot. at 78-79. As the Banks well know, plaintiffs are not required to allege that they were precluded from taking their business elsewhere in order to plead unfairness.[31] If this were a defense to a statutory unfair business practices act, virtually no consumer could ever bring a colorable claim alleging an unfair business practice unless that consumer was somehow forced to conduct business with the defendant. Moreover, it is the application of those terms that is at issue here. Under the Banks' reading of the law, all consumer protection statutes would be stripped of effect. This was manifestly not the intent of the legislatures that enacted the laws, and the Banks fail to cite any cases that support their position. In truth, consumer protection statutes are generally enacted to give *broad* protection to consumers in recognition of the fact that consumers typically have unequal bargaining power. *See*, *e.g.*, *Robinson*, 775 N.E.2d at

---

[31] Factors to consider in measuring unfairness include "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers." *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 961 (Ill. 2002) (observing that the Consumer Fraud Act mandates that consideration be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act); *see also Pharm. Indus.*, 252 F.R.D. at 95 (finding that Alabama, Alaska, Arizona, Connecticut, Florida, Georgia, Idaho, Illinois, Louisiana, Maine, Maryland, Massachusetts, Montana, New Hampshire, New Mexico, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Utah, Vermont, Washington, and West Virginia "'statutorily or judicially recognize a federal deference obligation' to Federal Trade Commission and federal court interpretations of the FTCA."). "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Robinson*, 775 N.E.2d at 961 (citation omitted).

960-61 ("The Consumer Fraud Act is a regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices.  It is to be liberally construed to effectuate its purpose."); *Denson v. Ron Tonkin Gran Turismo, Inc.*, 586 P.2d 1177, 1179 (Or. 1977) ("the legislative history of the Oregon Unlawful Trade Practices Act supports the view that it is to be interpreted liberally as a protection to consumers."); Wash. Rev. Code § 19.86.920 ("The legislature hereby declares that the purpose of this act is to complement the body of federal law governing . . . unfair competition and unfair, deceptive, and fraudulent acts or practices in order to protect the public . . . To this end this act shall be liberally construed that its beneficial purposes may be served."); *Sprayfoam, Inc. v. Durant's Rental Ctrs., Inc.*, 39 Conn. Supp. 78, 79 (Conn. Super. Ct. 1983) ("CUTPA is a consumer protection statute intended to provide an individual with an action more flexible and a remedy more complete than does the common law. The act is remedial in nature and is to be liberally construed."); *Scott Runyan Pontiac-Buick*, 461 S.E.2d at 523 (purpose of the CCPA "is to protect consumers from unfair, illegal, and deceptive acts or practices by providing an avenue of relief for consumers who would otherwise have difficulty proving their case under a more traditional cause of action.").

Not surprisingly, the Banks cite only two Illinois cases to support their argument – *Saunders v. Michigan Ave. Nat'l Bank*, 662 N.E.2d 602 (Ill. App. 1996), and *Robinson*, 775 N.E.2d at 961-62 – neither of which is persuasive.  In *Saunders*, the Illinois Supreme Court rejected a bank customer's claim that the bank's overdraft policy establishing an unconscionably high fee constituted an unfair practice because of "a total absence of the type of oppressiveness and lack of meaningful choice necessary to establish unfairness."  This analysis, however, appears to have been overruled.  *See Robinson*, 775 N.E.2d at 961 ("Although the holding in

-82-

Saunders seems to suggest that all three prongs of the *Sperry* test must be met, that is not an accurate statement of plaintiffs' burden."). Moreover, the court in *Saunders* based its holding on the facts that the plaintiff had control over whether she would be assessed an overdraft fee and that plaintiff was free to select another bank. *Saunders*, 662 N.E.2d at 608-09.

In *Robinson*, plaintiffs alleged that penalties in an auto lease were unfair because the lease required both an excess mileage penalty and payment for excess wear and tear, including scratches and dents. 775 N.E.2d at 962. The Illinois Supreme Court agreed with the appellate court's findings that "there was a total absence of the type of oppressiveness and lack of meaningful choice necessary to establish unfairness . . . [P]laintiffs could have gone elsewhere to lease a car . . . [and] the assessment of a $0.10-per-mile penalty for every mile exceeding 15,000 annual miles, coupled with a requirement that plaintiffs pay for excess wear and tear, was not so oppressive as to constitute unfairness." *Id*. at 962.

Unlike the plaintiffs in *Saunders* and *Robinson*, these plaintiffs do not have *any* kind of meaningful choice to select another bank that does not engage in similar unfair conduct. Indeed, this MDL proceeding is coordinating similar lawsuits against many of the country's largest banks. Given that these Banks make up most of the banking market share in the United States, and that many of the smaller banks not yet part of the MDL engage in similar activities, the banking choices available to plaintiffs are hardly meaningful when it comes to avoiding abusive overdraft fee practices.

With regard to the control exercised by plaintiffs over their own accounts, it is clear from the account histories of the named plaintiffs that the Banks have mastered the art of deception in account balances, making it impossible for a customer to determine his real balance with certainty. To compound that problem, as alleged, the Banks do not alert their customers when a

debit card transaction will trigger an overdraft – even when the Banks automatically know an overdraft has occurred and that it has triggered a fee.  Nor do the Banks provide their customers with the opportunity to cancel a transaction before incurring an overdraft fee, even though they could easily do so.  *See, e.g.*, *Tornes*, SAC ¶ 35(c); *Speers*, C ¶ 22(c); *Lopez*, C ¶ 27(c).

Here, unlike *Saunders* and *Robinson*, plaintiffs have adequately alleged unfairness, largely because the Banks' practices are offensive to public policy.  For example, an estimated 90 percent of overdraft fees are paid by the poorest 10 percent of Banks' customer base. Furthermore, the Banks' overdraft policies and practices are contrary to the "best practices" for overdraft programs set forth in the Joint Guidance.  *See, e.g.*, *Tornes*, SAC ¶ 67; *Speers*, C ¶ 55; *Lopez*, C ¶ 82.   So too, the Banks' overdraft policies are contrary to the express recommendations of the American Bankers Association.  *See, e.g.*, *Tornes*, SAC ¶ 70; *Speers*, C ¶ 58; *Lopez*, C ¶ 85.  In addition, a report by the Center for Responsible Lending found that overdraft fees increased 35 percent from 2006 to 2008, and that over 50 million Americans overdrew their accounts in a 12 month period, with 27 million accounts incurring five or more overdraft fees.  *See, e.g.*, *Tornes*, SAC ¶ 72; *Speers*, C ¶ 60; *Lopez*, C ¶ 87.  Plaintiffs also allege that the Banks' practices are immoral, unethical, oppressive, or unscrupulous because, for example, as a consequence of the Banks' improper overdraft fees, they have wrongfully deprived plaintiffs and the classes of funds to which the Banks had no legitimate claim.  *See, e.g.*, *Tornes*, SAC ¶ 168; *Speers*, C ¶ 78; *Lopez*, C ¶ 129.  And the Banks employ sophisticated software to manipulate and alter customer transactions in an effort to maximize the number of overdrafts and overdraft charges for individual customers.  *See, e.g.*, *Tornes*, SAC ¶¶ 43-44; *Speers*, C ¶¶ 30-31; *Lopez*, C ¶¶ 40-41.  Last, plaintiffs adequately allege that the Banks' practices caused substantial injury to consumers because consumers like plaintiffs have incurred hundreds of millions of

dollars of overdraft fees that were wrongfully assessed and deducted from their accounts by the Banks.  *Tornes*, SAC ¶ 164; *Speers*, C ¶ 74; *Lopez* C ¶ 125.

**C.      The Banks' Conduct Is Contrary to Law**

The Banks claim that plaintiffs' allegations of unfair business practices must fail in a number of states, including California (under UCL), Connecticut, Illinois, Massachusetts, Montana and North Carolina because their conduct does not violate the letter or spirit of any states' law.  Omnibus Mot. at 79.  Again, their argument fails.

First, the Court should not consider the question of whether the Banks have violated the law on a motion to dismiss.  Plaintiffs have more than sufficiently pled plausible violations of the laws under which they have brought claims, and they should be permitted to pursue those claims.

Second, with regard to violations of California law, the district court in *Gutierrez* has already found that the very practices complained of here may violate the duty of good faith and fair dealing.  *Gutierrez*, 622 F. Supp. 2d at 953 ("There is a duty of good faith and fair dealing to honor checks in such a way as to be fair to the consumer and that discretionary power cannot be exercised so as to pile on ever greater penalties on the depositor, which is exactly what Wells Fargo seems to be doing, or so a reasonable jury could conclude.").  As the court in *Gutierrez* specifically found, "[w]here a bank has discretion under its agreement and that discretion is used to gouge consumers in violation of the covenant of good faith and fair dealing, then the unfair prong of Section 17200 applies."  *Id.*

Third, the practices complained of violate the letter and spirit of each state's common law governing contracts and unconscionability, as alleged in the complaints and discussed above.

The Banks argue that under the Connecticut, Illinois, Massachusetts and North Carolina statutes, plaintiffs must show that the defendants' conduct violates public policy in order to be considered unfair.  Omnibus Mot. at 79 & n.74.  First, even if this were true, it would not

-85-

constitute grounds for dismissing plaintiffs' claims under *any* law – plaintiffs *have* alleged that the Banks' conduct violates public policy. Second, this is a misstatement of the law. Under each of these states' statutes, a violation of public policy may be a consideration in determining unfairness, but it is not a requirement. *See Purity Supreme, Inc. v. Attorney Gen.*, 407 N.E.2d 297, 306-08 (Mass. 1980); *Saunders*, 662 N.E.2d at 608 (same under Illinois law); *Gilbane Bldg. Co. v. Fed. Res. Bank*, 80 F.3d 895, 902 (4th Cir. 1996) (under North Carolina's Unfair and Deceptive Trade Practices Act, conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious can be considered unfair); *Normand Josef Enters., Inc. v. Conn. Nat'l Bank,* 646 A.2d 1289, 1307 (Conn. 1994) (to determine whether an act or practice is "unfair" within the meaning of the Connecticut consumer protection statute, the court must consider: (1) whether the practice offends public policy as established in statutes or common law – whether, in other words, "it is within at least the penumbra of some common law, statutory or other established concept of unfairness"; (2) whether it is "immoral, unethical, oppressive or unscrupulous;" and (3) whether it causes substantial injury to consumers, competitors or others engaged in business. All three criteria need not be satisfied for there to be a violation.).

### ii.    Plaintiffs Have Adequately Pled Claims Under Statutes Prohibiting "Unconscionable" Business Practices

The Banks next argue that the claims under those state statutes prohibiting "unconscionable" practices fail because plaintiffs have not pled facts sufficient to constitute unconscionability. Omnibus Mot. at 81. As discussed above, however, plaintiffs' claims of unconscionability are well-pled. They are based on, among other acts, the Banks' misrepresentations concerning their ordering practices, their concealment of account balances, their failure to disclose to a consumer at the point of sale that there are insufficient funds in the

account, their failure to permit customers to opt out of the overdraft scheme, and the imposition of oppressive contracts of adhesion on customers.  *See generally* Section D, *supra*.

Nevertheless, the Banks argue that claims under the Kansas Consumer Protection Act cannot be maintained because the plaintiffs must establish (1) "deceptive bargaining conduct" and (2) unequal bargaining power that renders the contract unconscionable.  Omnibus Mot. at 81 (citing *State of Kansas ex rel. Stovall v. DVM Enter.*, 62 P.3d 653, 658 (Kan. 2003)).  They also contend that, under New Jersey law, their representations must have the capacity to mislead in order to be found unconscionable.  Omnibus Mot. at 82.

The *Stovall* decision relied on by the Banks, in fact, does not limit unconscionability claims to these two factors.  Rather, that decision speaks of unconscionability as a "nebulous" concept, one that is difficult to define and that turns on many different factors and the facts of each case.  *Stovall*, 62 P.3d at 657-59.  Indeed, unconscionability can be based on "evidence of deceptive or oppressive practices, overreaching, intentional misstatements, misused superior bargaining power, or concealment of facts."  *Id*. at 654.

Further, even if proof of deceptive conduct and unequal bargaining power were required to establish unconscionability, the account agreements that are the basis of these actions are deceptive in that, among other things, they do not clearly inform customers that the Banks will *always* reorder their transactions from highest to lowest.  Moreover, there is no question that the nation's largest banks and their customers have "unequal bargaining power."  As plaintiffs allege, the terms of the Banks' checking accounts are contained in standardized account holder agreements, presented to customers on a "take it or leave it" basis, drafted and imposed by the Banks (the party of vastly superior bargaining strength), and thus constitute contracts of

adhesion.  *See, e.g., Tornes*, SAC ¶ 45; *Speers*, ¶ 32.  Accordingly, even under the requirements for a claim under the KCPA as stated by the Banks, plaintiffs' claims must stand.

The Banks also misstate the New Mexico statute's requirement for establishing unconscionability.  The statute does not require that the defendant take advantage of some incapacity.  Instead, it defines an "unconscionable trade practice" as a one that "takes advantage of the lack of knowledge . . . of a person to a grossly unfair degree."  N.M. Stat. Ann. § 57-12-2(E)(1).  Here, plaintiffs lacked knowledge of the Banks' practice of reordering and their other business practices intended to maximize fees.  *See, e.g., Tornes*, SAC ¶ 163.  The statute also provides that unconscionable practices include those which "result[] in a gross disparity between the value received by a person and the price paid."  Plaintiffs specifically allege such a disparity.  *Tornes*, SAC ¶ 181.  For these reasons, violations of the statute have been adequately pled and should not be dismissed.[32]

### iii.    Plaintiffs Allege Misrepresentation and Deception, in Addition to Unfair and Unconscionable Acts and Practices

The Banks also contend that plaintiffs cannot state claims under the consumer protection statutes of Minnesota, New York, Oregon and West Virginia because those statutes only prohibit conduct that involves misrepresentation or deception, and do not apply to conduct that is only "unfair" or "unconscionable."  First, this argument fails because plaintiffs have clearly and specifically alleged misrepresentation and deception on the part of the Banks.  Second, certain of these states' consumer protection statutes, including Oregon, New York and West Virginia, prohibit far more conduct that the Banks argue, including the conduct detailed in the complaints.

### A.    Plaintiffs Have Adequately Alleged Deceptive Practices

---

[32] New Mexico law prohibits unfair and deceptive trade practices in addition to unconscionable practices.  *See* Exhibit A to this brief.

Even under those statutes which only prohibit deceptive conduct or misrepresentations, the Banks' argument is premised on a faulty assumption – that this is not a "deceptive practices" case.   To the contrary, plaintiffs' claims are based on multiple deceptive acts and/or misrepresentations by the Banks.  For example, plaintiffs allege that the Banks do not clearly state in their operative agreements that it is their practice to *always* reorder transactions from largest to smallest.  Indeed, in *Speers*, plaintiffs allege:

> In addition, U.S. Bank *misleads its customers* regarding its reordering practice. Instead of unequivocally telling its customers that it will reorder debits from highest to lowest, the Bank states in its contract that 'we the right [sic] to decide the order of the items we will pay and which will be returned (if any).  This means, for example, we can process items beginning with the largest item[.]' This statement is *deceptive* and/or unfair because it is, in fact, the Bank's practice to *always* reorder debits from highest to lowest . . . [in violation of the] consumer protection laws of numerous states.

*Speers*, C ¶ 40 (emphasis added).  Similar allegations are made in each complaint.  *See*, *e.g.*, *Tornes*, SAC ¶ 52; *Luquetta*, AC ¶ 64; *Amrhein*, TAC ¶ 39; *Lopez*, C ¶ 61.  The Banks' argument that these allegations are not present in plaintiffs' complaints is simply wrong.

Plaintiffs also allege that the Banks' posting practices prevent consumers from calculating the true balance in their accounts, thereby deceiving them into engaging in transactions that will overdraw their account.  For instance, in *Speers*, plaintiffs allege that "U.S. Bank . . . fails to provide customers with accurate balance information."  *Speers*, C ¶ 48.  Similar allegations are made in each complaint.  *Tornes*, SAC ¶ 61; *Luquetta*, AC ¶ 68; *Amrhein*, TAC ¶ 48; *Lopez*, C ¶ 74.

Plaintiffs further allege that the Banks act deceptively when they permit debit card transactions to go forward at the point of sale even when the transaction will result in an overdraft.  When Banks authorize such insufficient funds transactions without providing notice, the Banks represent to customers that their account balances are sufficient to cover the

-89-

transactions whether this is true or not.    At a minimum, customers' reliance on such representations is reasonable.    Moreover, a misleading act is the equivalent of a deceptive statement, *In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 540 F. Supp. 2d 800, 810 (S.D. Tex. 2007), and the failure to represent a material fact is the equivalent of an affirmative misrepresentation, *Herring v. Knab*, 458 F. Supp. 359, 362 (D. Ohio 1978).   Thus, in *Speers,* plaintiffs allege that: "Even when U.S. Bank has actual knowledge of outstanding transactions which have already created a negative balance in a customers' account, it encourages the customer to incur more overdraft charges by approving – rather than prudently declining – subsequent debit card purchases and other electronic transactions."   *Speers*, C ¶ 15; *see also Tornes*, *SAC* ¶ 62; *Luquetta*, AC ¶ 69; *Amrhein*, TAC ¶ 49; *Lopez*, C ¶ 75.

The Banks contend that the abusive scheme described in the complaints complies with the terms of their agreements and, thus, cannot be deceptive or misleading as a matter of law. Omnibus Mot. at 75-76 (citing *Hassler*, 644 F. Supp. 2d at 520-21).   With regard to *Hassler*, it was strictly limited to a claim based on the reordering of electronic debit transactions from highest to lowest.   644 F. Supp. 2d at 515.   The claims alleged here are much broader – they are based on, among other misleading practices, the Banks' cloaking of accurate balance information, their failure to notify customers of overdrafts or advise customers of their right to opt out of overdraft protection, and their unconscionable provisions and policies.   Furthermore, in *Hassler*, the court found that the operative agreement of Sovereign Bank specifically disclosed that high to low posting was the bank's policy.   *Id.*   Indeed, the language in Sovereign Bank's agreement is far more specific than the language in the deposit agreements of the Banks, stating, among other things, that the bank "post[s] your payment transactions each business day in descending order, starting with the largest payment order that is presented for payment," and

providing a "clear and concise example of how this policy plays out" through a real-life scenario of a $900 mortgage payment being paid before a $100 supermarket charge.  *Id.* at 515 & n.5.

Last, the Banks argue that, even if plaintiffs alleged that the Banks engaged in deceptive practices or misrepresentations, under some state consumer protection statutes they would be required to show either reliance or causation, but have pled neither.  Omnibus Mot. at 76-77.  Specifically, the Banks contend that California (in the Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.* ("CLRA")), New Jersey, New Mexico and North Carolina require a causal link between the subject misrepresentation and harm to plaintiffs.

Again, the argument that allegations of causation and reliance are not made in the complaints is untrue.  For example, in *Speers*, plaintiffs allege: "Because U.S. Bank's customers are not notified of the potential overdraft, and are not given the option of declining the debit card transaction or providing another form of payment, the customers incur monetary damages in the form of overdraft fees."  *Speers*, C ¶ 53.  As for causation, plaintiffs in each case allege that they incurred overdraft fees as a result of the Banks' practices.  *See*, *e.g.*, *Speers*, C ¶ 71 ("If U.S. Bank had posted the transactions from lowest to highest, Ms. Speers would have only incurred one overdraft fee instead of six.").  Similar allegations are made in the other complaints.  *See*, *e.g.*, *Tornes*, SAC ¶ 141 ("If Bank of America had not manipulated and reordered the Palmers' transactions from highest to lowest, they would not have incurred two overdraft fees."); *Waters*, SAC ¶ 82 ("If U.S. Bank had not manipulated and reordered . . . transactions from highest to lowest, they would have incurred only one overdraft fee instead of six overdraft fees.").

In sum, the complaints plausibly allege deceptive and misleading practices.

### B.     The Statutory Prohibitions in Oregon, New York and West Virginia Are Not Limited to Deceptive Conduct Only

The prohibitions in the Oregon consumer protection statute are not limited to "deceptive" conduct.   Under Oregon Revised Statute section 646.607, an unlawful business practice is defined, in part, as when a person "[e]mploys an unconscionable tactic in connection with the sale, rental or other disposition of real estate, goods or services, or collection of enforcement of an obligation."   In addition, under Oregon Revised Statute section 646.608(1)(u) "[a] person engages in an unlawful practice when in the course of the person's business, vocation or occupation the person does any of the following: . . . (u) Engages in any other unfair or deceptive conduct in trade or commerce."   The policy behind the act "is to discourage deceptive trade practices and to provide a viable remedy for consumers who are damaged by such conduct." *Wright v. Kia Motors Am. Inc.*, 2007 U.S. Dist. LEXIS 7431 (D. Or. Jan. 29, 2007) (citing *Raudebaugh v. Action Pest Control, Inc.*, 59 Or. App. 166, 171 (Or. Ct. App. 1982)).   The "UTPA is to be construed consistently with its consumer protective purposes[.]" *Cullen v. Inv. Strategies, Inc.*, 911 P.2d 936, 941 (Or. Ct. App. 1996), *rev. denied*, 918 P.2d 846 (Or. 1996); *see also Hinds v. Paul's Auto Werkstatt, Inc.*, 810 P.2d 874, 875 (Or. Ct. App. 1991), *rev. denied*, 815 P.2d 1273 (Or. 1991) (UTPA is intended to provide "broad remedial" consumer protection). Accordingly, based on the specific language of the statute and the policy underlying the statute, claims under the Oregon act are not limited to deceptive conduct only.

The New York statute is not as narrow as the Banks assert, and prohibits conduct other than deceptive statements.   Indeed, New York courts have found that "[a]llegations of a bank's [or card issuer's] unilateral imposition of illegal and/or unwarranted fees upon its customers states a valid claim of consumer fraud" in violation of General Business Law section 349.

*Goldman v. Simon Prop. Group, Inc*., 869 N.Y.S.2d 125, 130 (N.Y. App. Div. 2d Dep't 2008) (complaint alleged that that type size used by defendant was impermissibly small, that defendant failed to disclose the terms of the fee clearly and conspicuously; such conduct, combined with deceptive marketing, damaged the plaintiff sufficiently for a claim to stand under section 349); *see also Relativity Travel, Ltd. v. JP Morgan Chase Bank*, 831 N.Y.S.2d 349, at *3 (N.Y. Sup. Ct. 2006) (plaintiff adequately alleged that an account agreement was deceptive even where the surcharge at issue was disclosed in that agreement – "[t]he issue is not simply whether the Deposit Account Agreement was deceptive, but whether Chase's overall business practices in connection with the charge were deceptive.").

Likewise, the West Virginia Consumer Credit and Protection Act ("CCPA"), W. Va. Code § 46A-6-101, *et seq.*, has been interpreted broadly as establishing a cause of action for consumers who are injured as the result of any unconscionable business practice. *Orlando v. Fin. One of W. Va., Inc.*, 369 S.E.2d 882 (W. Va. 1988). As the West Virginia courts have recognized, the purpose of the CCPA "is to protect consumers from unfair, illegal, and deceptive acts or practices by providing an avenue of relief for consumers who would otherwise have difficulty proving their case under a more traditional cause of action." *State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.*, 461 S.E.2d 516, 523 (W. Va. 1995). Thus, the West Virginia CCPA is not limited to only deceptive acts.

### c.    The Banks' Overdraft Payments Are a Service

The Banks argue that plaintiffs cannot bring claims under California's CLRA or Oregon's UTAP because those statutes only provide causes of action based on transactions involving "goods or services," whereas the Banks are furnishing "money." Tellingly, in their omnibus motion, the Banks actually refer to their services as "overdraft services" but, in the very same sentence, claim they are not "services." Omnibus Mot. at 83 ("Thus, overdraft services and

the fees charged for them are similarly not 'goods or services' within the meaning of the CLRA.").  Indeed, in their various deposit agreements, the Banks admit over and over again that they provide a *service* to their customers when the Banks pay overdrafts:

- "You agree to pay us for our *services* in accordance with the fees that apply to your account and your deposit relationship with us."  *Tornes,* SAC Ex. A, at 10 (emphasis added);

- "The fees for many of our *products and services* may vary from state to state or between regions within a state."  *Id*. at 10 (emphasis added);

- "[W]e do not set our fees based only or primarily on the direct or overall costs and expenses associated with providing the particular *account or service* involved."  *Id*. at 11 (emphasis added);

- "At Citibank, we are committed to giving our clients superior *service* and value."  *Amrhein,* TAC Ex. A, at 8 (emphasis added);

- "In the event of insufficient funds to pay your checks, we may return your checks and charge you a fee.  At our sole discretion, we may create an overdraft by paying the check and permitting the transaction.  Either way, there will be a *service* charge."  *Id*. at 32 (emphasis added); and

- "*Service* Fees: You agree to pay any *service* fees that apply to your account or the services described in or incorporated into this Agreement.  *Service* fees may include but are not limited to charges for . . . overdrafts, . . . research and insufficient funds checks, other items, point-of-sale transaction authorization requests and other electronic transactions."  *Id*. at 11 (emphasis added); *see also Spears-Haymond*, SAC Ex. B (Schedule of Fees and Funds Availability listing "Insufficient Funds/Unavailable Funds/Overdrafts" under the title "Other *Services*/Fees").

The Banks cannot, on one hand, charge for a "service," and on the other hand escape liability under these statutes by claiming they are not providing a service.  This is hypocritical, at best.

The Banks cite to *Gutierrez*, where the court rejected plaintiffs' claims based on overdraft practices under the California CLRA on the grounds that Wells Fargo was not providing a service when covering overdraft transactions.  Plaintiffs disagree with this aspect of the holding *Gutierrez*, which incorrectly relied on the principle that the "CLRA does not apply to the extension of *lines of credit through credit cards*, separate and apart from the sale of goods or

services." *Gutierrez,* 622 F. Supp. 2d at 956-57 (emphasis added).  However, that principle has

no application here.  There, Wells Fargo conceded that covering an overdraft was not technically

a "credit," but nevertheless asserted that the funds extended to cover the overdraft were "separate

and apart from any sale or lease of goods or services."  *Id.* at 957 ("much like credit cards

provide an extension of credit, an overdraft provides an extension of money.").  Respectfully, the

*Gutierrez* court failed to acknowledge that the Banks' overdraft services include the assessment

of an overdraft fee which is separate and apart from the extension of funds to honor the overdraft

item.  Indeed, the former may exist without the latter.

Here, the Banks have conceded both in their briefing and in their deposit agreements that

they provide a *service* to their customers when they pay overdrafts.  Moreover, if the Banks'

overdraft practices were indeed credit transactions, they would constitute involuntary lines of

credit at illegal interest rates.  *See, e.g.*, *Amrhein*, TAC  ¶¶ 50-52 (Citibank's Failure to Notify

Customers of Overdrafts or Advise Customers of Their Right to Opt-Out); *Amrhein*, TAC  ¶ 2

("A 2008 FDIC study reports that overdraft fees for debit cards can carry an effective annualized

interest rate that *exceeds 3,500 percent*.").

Further, "[i]nserting an unconscionable provision in the contract" is itself illegal under

the CLRA.  Cal. Civ. Code § 1770(a)(19).  The unconscionable provisions in the Banks' account

agreements, as discussed above, provide an independent basis for their CLRA liability.

### d.      Plaintiffs Complied with Pre-Lawsuit Notification Requirements

The Banks state that plaintiffs' claims under the consumer protection statutes of

California, Massachusetts and West Virginia must be dismissed based on plaintiffs' alleged

failure to send the required pre-lawsuit notice under the statutes.  Omnibus Mot. at 84-85.  All

three of these states' laws are in substantial agreement: to the extent notice is required at all to

proceed in one or more of these cases, courts uniformly grant plaintiffs leeway to cure any defect in such notice by amending the operative pleading – and dismissal is neither required nor called for here.

**i.      California**

Under California's CLRA, only an action *for damages* requires notice to the defendant 30 days before filing suit.   Cal. Civ. Code § 1782(a).   Restitution and disgorgement are not "damages" for purposes of triggering the statutory notice requirement.  *In re Mattel, Inc.,* 588 F. Supp. 2d 1111, 1119-20 (C.D. Cal. 2008).

Here, the operative pleadings include prayers for both restitutionary and disgorgement damages under the CLRA.  Accordingly, these claims are not affected by any failure to provide pre-filing notice.

Even assuming the CLRA required notice in this case for the "actual damages" sought in the operative pleadings (or any other class of damages or relief other than the above), plaintiffs sent such notices.  *See*, *e.g.*, *Yourke*, TAC ¶ 102.  The Banks do *not* dispute that the content of such notices, and the manner of transmittal, satisfied the statutory requirements – they claim only that they were untimely.   Omnibus Mot. at 85.   However, the California Court of Appeals recently held that failure to send the required notice 30 days before filing a complaint for damages does *not* require dismissal under Civil Code 1782.  *Morgan v. AT & T Wireless Serv., Inc.*, 177 Cal. App. 4th 1235, 1260-61 (Cal. Ct. App. 2009).   The purpose of the notice requirement is satisfied by dismissing that portion of the damages claim subject to the notice requirement *without prejudice* "until 30 days or more after the plaintiff complies with the notice requirements," and with leave to plaintiff to amend the complaint at that time.  *Id.*  Where, as here, a plaintiff has already filed an amended complaint more than 30 days after the date of

-96-

notice (*see Luquetta*, AC ¶ 160), there is no need to dismiss at all (without prejudice or otherwise) – the "defect" has been cured.

The Banks' contrary federal authority, Omnibus Mot. at 85, pre-dates *Morgan*, and the California Court of Appeals' construction of a California statute takes precedence. *See In re Watts*, 298 F.3d 1077, 1082 (9th Cir. 2002). In short, the CLRA does not require dismissal on the ground asserted here.

### ii.  Massachusetts

Massachusetts likewise allows a plaintiff to cure untimely service of the notice and demand required by Massachusetts General Laws chapter 93A, section 9(3), by serving such notice before the defendant's answer, and amending the complaint accordingly. *Burns ex rel Office of Public Guardian v. Hale and Dorr LLP*, 445 F. Supp. 2d 94, 96-97 (D. Mass. 2006); *Tarpey v. Crescent Ridge Dairy, Inc.*, 713 N.E.2d 975, 983 (Mass. App. Ct. 1999). The Massachusetts Supreme Judicial Court has held that any dismissal for failure to timely serve pre-filing notice should *not* be on the merits or with prejudice, so as to allow plaintiff to amend or re-file 30 days after compliance. *York v. Sullivan*, 338 N.E.2d 341, 346-47 (Mass. 1975).

### iii.  West Virginia

There appears to be no published authority directly on point concerning this issue in West Virginia, but a West Virginia court suggested that it would follow California and Massachusetts on this issue. *See Blankenship v. Ethicon, Inc.*, 656 S.E.2d 451, 459 (W. Va. 2007) (where plaintiffs failed to comply with notice requirement "the [lower] court should have afforded [plaintiffs] additional time to meet the filing [notice] requirements . . . as opposed to granting the harsh sanction of dismissal."). Therefore, any failure here to comply with the West Virginia notice statute should not result in dismissal, consistent with the law in both Massachusetts and California.

## IV.    CONCLUSION

For all of the reasons set forth above, the Banks' omnibus motion to dismiss and/or

judgment on the pleadings should be denied.  Should the Court determine that any of plaintiffs'

claims are subject to dismissal, plaintiffs respectfully request leave to replead such claims

pursuant to Rule 15.

Dated:  February 5, 2010

/s/ Robert C. Josefsberg                                     *Lead Counsel for Plaintiffs*
Robert C. Josefsberg, Esquire
Florida Bar No. 40856                                        /s/ Bruce S. Rogow
rjosefsberg@podhurst.com                                     Bruce S. Rogow, Esquire
Victor M. Diaz, Jr., Esquire                                 Florida Bar No. 067999
Florida Bar No. 503800                                       bruce@abbrclaw.com
vdiaz@podhurst.com                                           Robert C. Gilbert, Esquire
John Gravante, III, Esquire                                  Florida Bar No. 561861
Florida Bar No. 617113                                       bobby@abbrclaw.com
jgravante@podhurst.com                                       ALTERS BOLDT BROWN
PODHURST ORSECK, P.A.                                        RASH & CULMO, P.A.
City National Bank Building                                  4141 N.E. 2nd Avenue
25 West Flagler Street – Suite 800                           Miami, Florida  33137
Miami, Florida  33130-1780                                   Tel:  (305) 571-8550/ Fax:  (305) 571-8558
Tel:  (305) 358-2800 /Fax: (305)358-2382

/s/ Edward Adam Webb
Edward Adam Webb, Esquire
Georgia Bar No. 743910
Adam@WebbLLC.com
G. Franklin Lemond, Jr., Esquire
Georgia Bar No. 141315
FLemond@WebbLLC.com
WEBB, KLASE & LEMOND, L.L.C.
1900 The Exchange SE, Suite 480
Atlanta, GA 30339
Tel: 770-444-9325/Fax: 770-444-0271

/s/ Russell W. Budd
Russell W. Budd, Esquire
Texas Bar No. 03312400
rbudd@baronbudd.com
Bruce W. Steckler, Esquire
Texas Bar No. 00785039
bsteckler@baronbudd.com
Melissa K. Hutts, Esquire
Texas Bar No. 0188015
mhutts@baronbudd.com
Renee M. Melancon, Esquire
Texas Bar No. 2403573
rmelancon@baronbudd.com
BARON & BUDD, P.C.
3102 Oak Lawn Ave. – Suite 1100
Dallas, TX 75219
Tel: 214-521-3605/ Fax: 214-520-1181

/s/ Ruben Honik
Ruben Honik, Esquire
Pennsylvania Bar No. 33109
rhonik@golombhonik.com
GOLUMB & HONIK, P.C.
1515 Market Street - Suite 1100
Philadelphia, PA 19102
Tel: 215-985-9177/Fax: 215-985-4169

/s/ Ted E. Trief
Ted E. Trief, Esquire
New York Bar No. 1476662
ttrief@triefandolk.com
Barbara E. Olk, Esquire
New York Bar No. 1459643
bolk@triefandolk.com
TRIEF & OLK
150 E 58th Street – 34th Floor
New York, NY  10115
Tel: 212-486-6060/Fax: 212-317-2946

/s/ Barry R. Himmelstein
Barry R. Himmelstein, Esquire
California Bar No. 157736
bhimmelstein@lchb.com
Michael W. Sobol, Esquire
California Bar No. 194857
msobol@lchb.com
Jordan Elias, Esquire
California Bar No. 228731
jelias@lchb.com
Mikaela Bernstein, Esquire
California Bar No. 261301
mbernstein@lchb.com
LIEFF CABRASER HEIMANN &
 BERNSTEIN LLP
Embarcadero Center West
275 Battery St. – 30th Floor
San Francisco, CA 94111-3339
Tel: 415-956-1000/ Fax: 415-956-1008


*Plaintiffs' Executive Committee*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 09-MD-02036-JLK

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

## CERTIFICATE OF SERVICE

I hereby certify that on February 5, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Robert C. Gilbert
Robert C. Gilbert, Esquire
Florida Bar No. 561861
ALTERS BOLDT BROWN
RASH & CULMO, P.A.
4141 N.E. 2nd Avenue, Suite 201
Miami, Florida 33137
bobby@abbrclaw.com