UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 09-MD-02036-JLK

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION,

MDL No. 2036

_____/

## ORDER RULING ON OMNIBUS MOTION TO DISMISS

The Defendant Banks[1] moved for dismissal or judgment on the pleadings of each

of the fifteen Complaints pending in this multi-district litigation proceeding, pursuant to

Fed.R.Civ.P. 12(b)(6) and 12(c), on December 22, 2009. Coordinated oral argument on

all Motions to Dismiss were held February 25, 2010 (Oral Arg. Tr. pp. 1-167).

### I. BACKGROUND

On June 10, 2009 the United States Judicial Panel on Multidistrict Litigation

transferred five actions to this Court for coordinated pre-trial proceedings, establishing

this multi-district litigation proceeding known as *In re Checking Account Overdraft*

*Litigation*, MDL No. 2036. Actions against SunTrust Bank and Huntington National

---

[1] Bank of America, N.A. ("Bank of America"), Citibank, N.A. ("Citibank"), JPMorgan Chase Bank, N.A. ("Chase"), Union Bank, N.A. ("Union"), U.S. Bank, N.A. ("U.S. Bank"), Wachovia Bank, N.A. ("Wachovia"), and Wells Fargo Bank, N A. ("Wells Fargo") filed an Omnibus Motion to Dismiss and/or for Judgment on the Pleadings (DE # 217). Defendants SunTrust Banks, Inc. ("SunTrust") and the Huntington National Bank ("Huntington Bank") joined in this Motion (DE # 253, 254) on January 14, 2010 and January 19, 2010, respectively. Plaintiffs Responded (DE # 265) on February 5, 2010 and on February 19, 2010 Defendants Replied (DE # 291). Defendant Chase also filed Supplemental Motions to Dismiss the *Luquetta* and *Lopez* Complaints (D.E. #222, 225) on December 22, 2009 and Citibank filed a Renewed Independent Motion to Dismiss (D.E. #228) on the same date.

Bank were subsequently transferred to this Court and made part of this Multidistrict litigation proceeding. New actions continue to be filed against these, and other, Banks alleging basically the same cause of action. The transfer and consolidation of those actions to this Court by the Multidistrict Panel is anticipated.

Amended Complaints against Bank of America, Citibank, Chase, Union Bank, U.S. Bank, Wachovia and Wells Fargo were filed in October and November 2009.[2] Plaintiffs, are current or former checking account customers of the Defendant federally chartered banks who seek to recover (for themselves and all other customers similarly situated) alleged excessive overdraft fees for charges made to their accounts on debit card transactions. The alleged common nucleus of specific facts pled assert a common practice by Defendants, to enter charges debiting Plaintiffs' accounts from the "largest to the smallest" thus maximizing the overdraft fee revenue for themselves. In addition to the allegations about posting order, the Complaints set forth a number of other alleged agreements, policies and practices, contended by Plaintiffs to unlawfully damage them. Plaintiffs' asserted claims rely upon the legal theories of breach of contract and breach of a covenant of good faith and fair dealing, unconscionability, conversion, unjust enrichment, and violation of the consumer protection statutes of various states.

The Banks rely, as the legal basis for their omnibus motion to dismiss all claims: (1) the doctrine of federal preemption barring state regulation of the activities of national

---

[2] Plaintiffs did not amend (*Yourke, et al. v. Bank of America, N.A.* and *Zankich, et al. v. Wells Fargo Bank, N.A.*).

bank pursuant to the National Bank Act; (2) the contracts with the banks explicitly authorizing Defendants to post from "high to low" and overdraft fee assessment; (3) the legal argument that common law unconscionability claims are defenses only, not subject to affirmative causes of action for injury; (4) that conversion will not lie since the depositor does not have title to the money deposited; (5) that an adequate remedy at law exists for unjust enrichment; and (6) that state consumer protection laws are inapplicable.

Each of the fifteen Complaints in these lawsuits is filed against a single bank. Five of the fifteen Complaints were filed by California Plaintiffs seeking to represent classes of California customers.[3] Eight Complaints were filed by non-California Plaintiffs seeking to represent nationwide classes excluding California customers, but with (in some cases) subclasses limited to residents of particular states.[4] Finally, *Larsen v. Union Bank, N.A.*, No. 1:09-cv-23235-JLK ("*Larsen*") was filed by a California Plaintiff seeking to represent a nationwide class that includes California customers; and *Zankich v. Wells Fargo Bank, N.A.*, No. 1:09-cv-23186-JLK ("*Zankich*") was filed by Washington

---

[3] *Amrhein v. Citibank, N.A.*, No. 1:09-cv-21681-JLK ("*Amrhein*"); *Luquetta v. JPMorgan Chase Bank, N.A.*, No. 1:09-cv-23432-JLK ("*Luquetta*"); *Spears-Haymond v. Wachovia Bank, N.A.*, No. 1:09-cv-21680-JLK ("*Spears-Haymond*"); *Waters v. U.S. Bank, N.A.*, No. 1:09-cv-23034-JLK ("*Waters*"); and *Yourke v. Bank of America, N.A.*, No. 1:09-cv-21963-JKL ("*Yourke*").

[4] *Garcia v. Wachovia Bank, N.A.*, No. 1:08-cv-22463-JLK ("*Garcia*"); *Lopez v. JPMorgan Chase Bank, N.A.*, No. 1:09-cv-23127-JLK ("*Lopez*"); *Speers v. U.S. Bank, N.A.*, No. 1:09-23126-JLK ("*Speers*"); *Tornes v. Bank of America, N.A.*, No. 1:08-cv-23323-JLK ("*Tornes*"); *Dolores Gutierrez v. Wells Fargo Bank, N.A.*, No. 1:09-cv-23685-JLK ("*Dolores Gutierrez*"); *Martinez v. Wells Fargo Bank, N.A.*, 09-cv-23834-JLK ("*Martinez*"); *Gully v. Huntington Bancshares Inc.*, 09-cv-23514-JLK ("*Gully*"); and *Buffington v SunTrust Banks, Inc.*, 09-cv-23632-JLK ("*Buffington*").

Plaintiffs seeking to represent a Washington class.

The operative Complaints in these cases vary somewhat in the causes of action asserted, but all of the Complaints allege causes of action for breach of contract and/or breach of an implied covenant of good faith and fair dealing. Most cases also assert the common law causes of action for conversion, unconscionability, and/or unjust enrichment. Finally, each Complaint asserts one or more causes of action under the consumer protection laws of various states. Collectively, the Complaints involve individual Plaintiffs from fourteen states asserting claims under the law of twenty-one states.

## II. STANDARD OF REVIEW OF MOTIONS TO DISMISS UNDER FED.R.CIV.P. 12(b) & (c)

"For the purposes of a motion to dismiss, the court must view the allegations of the Complaint in the light most favorable to plaintiff, consider the allegations of the Complaint as true, and accept all reasonable inferences therefrom." *Omar ex rel. Cannon v. Lindsey*, 334 F.3d 1246, 1247 (11th Cir. 2003). *See also Zinnia Chen v. Lester*, 2010 U.S. App. LEXIS 2203 (11th Cir. Feb. 1, 2010) ("The complaint is viewed in the light most favorable to the plaintiffs, and all of the plaintiffs' well-pleaded facts are accepted as true."). The complaint may be dismissed if the facts as pled do not state a claim to relief that is plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). More simply, dismissal is appropriate if the plaintiff has not "nudged [its] claims across the line from conceivable to plausible." *Id.* Despite these admonitions, however,

-4-

all parties have appeared to argue this motion as if it were one for summary judgment,

asking this Court to rule on their claims as a matter of law. At this stage, the Court must

accept all well-plead facts as true and only rule on the legal sufficiency of the

Complaints. That is, the Court is only determining whether the Complaints adequately

state a cause of action, not whether those causes of action will ultimately succeed.

### III. DISCUSSION

Applying this standard to a consideration of the well-pled allegations made by

Plaintiffs in the filed Complaints subject to the omnibus motion to dismiss, the Court

finds Plaintiffs make the following assertions:

Over the past decade, Defendant Banks provided many of their checking account

customers with debit cards, check cards or ATM cards. Through the use of debit cards,

customers engage in transactions using funds from their accounts by engaging in "debit"

or "point of sale" ("POS") transactions, or by withdrawing money from their accounts at

automated teller machines ("ATMs"). Regardless of whether a debit card is used to

execute POS transactions or to withdraw cash from ATM machines, the transaction is

processed electronically, and the Banks are notified instantaneously when the card is

physically passed ("swiped") through a receiving machine.

When a customer swipes a debit card, the bank is able to determine immediately

whether there are sufficient funds in the customer's account to cover the attempted POS

or ATM transaction. The Banks have the option to accept or decline the transaction at

that time. They have the technological capability to decline debit card transactions (which

-5-

they do if a pending transaction would exceed a pre-determined, overdraft tolerance limit for an account), or to notify customers that the particular transaction will result in an overdraft. Rather than routinely declining debit card transactions or warning their customers that completing the transaction would result in an overdraft fee, the Banks have adopted and implemented automatic, fee-based overdraft programs, processing debit card transactions and then charging their customers overdraft fees. The overdraft fee is typically $35 per overdraft. Defendant Banks do not give customers the option to decline to complete the debit transactions or provide other forms of payment. In addition, the Banks fail to adequately disclose to their customers that they can opt out of this overdraft policy, thereby avoiding all overdrafts and overdraft fees.

The Complaints further allege that Defendant Banks deploy advanced software to automate their overdraft systems to maximize the number of overdrafts and, thus, the amount of overdraft fees charged per customer. These automated overdraft programs manipulate and alter customers' transaction records to deplete the funds in a customer's account as rapidly as possible, resulting in more overdraft fees charged for multiple, smaller transactions. Overdrafts are likely to occur at times when, but for the Banks' manipulation and alteration, there would be sufficient funds in the account and many of these overdrafts would not occur at all.

Plaintiffs further state the most common way in which the Banks manipulate and alter customer accounts is by reordering debit transactions on a single day, or over multiple days, from largest to smallest amount, regardless of the actual chronological

-6-

sequence in which the customer engaged in these transactions. Almost without exception, reordering debit transactions from highest to lowest results in more overdrafts than if the transactions were processed chronologically. For example, if a customer, whose account has a $50 balance at the time a bank processed several transactions, made four transactions of $10 and one subsequent transaction of $100 on the same day, the bank would reorder the debits from largest to smallest, imposing four overdraft fees on the customer. Conversely, if the $100 transaction were debited last – consistent with the chronological order of the transactions, and with consumers' reasonable expectations – only one overdraft fee would be assessed. By holding charges rather than posting them immediately to an account, the Banks are able to amass a number of charges on the account. Subsequently, the Banks post all of the amassed charges on a single date, in order of largest to smallest, rather than in the order in which they were received or charged. This delayed posting results in multiple overdraft fees that would not otherwise be imposed.

The delayed posting also prevents customers from determining accurate account balances. In certain cases, customers are informed that they have a positive balance when, in reality, they have a negative balance, despite the Banks' actual knowledge of outstanding debits and transactions. Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account. For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a

-7-

returned purchase will be made available. Even when the Banks have knowledge of outstanding transactions that have already created a negative balance in a customer's account, they approve, rather than decline, subsequent debit card purchases and other electronic transactions. Further, the Banks assess overdraft fees at times when the actual funds in customer accounts are sufficient to cover all debits that have been submitted for payment. The Banks do this by placing a "hold" on actual funds in customer accounts.

Specifically, Plaintiffs allege that they were personally injured by Defendant bank's practices. Defendant banks charged each of the Plaintiffs multiple overdraft fees. Plaintiffs contend they were forced to pay overdraft fees as a consequence of the Banks' wrongful overdraft policies and practices, depriving them of significant funds, and causing them ascertainable monetary losses and damages. Plaintiffs assert claims against the Banks for breach of contract and breach of the covenant of good faith and fair dealing, unconscionability, conversion, unjust enrichment, and for violations of various states' consumer protection statutes.

On December 22, 2009, Bank of America, Citibank, Chase, Union Bank, U.S. Bank, Wachovia and Wells Fargo filed their omnibus motion to dismiss and/or for judgment on the pleadings. Chase also filed two Supplemental Motions to Dismiss and Citibank filed a Renewed, Independent Motion to Dismiss on the same day. SunTrust and Huntington subsequently joined in the omnibus motion. In this Order, the Court addresses whether: (A) all of Plaintiffs' claims are barred by federal preemption; (B) Plaintiffs' state common law claims fail as a matter of law; and (c) Plaintiffs' claims

under various state consumer protection statutes also fail as a matter of law. The Court
addresses each allegation in turn. For the following reasons, the Court finds Defendants'
arguments on preemption and the common law claims, at this procedural state of the case,
unpersuasive and would have denied the motion to dismiss on these grounds. Had this
been the only basis for the bank's motion to dismiss, denial of these asserted grounds for
dismissal would have had the procedural result of the case proceeding on the Complaints
as presently filed. There would have been no need for the filing of further amended
complaints by Plaintiffs. However, the Court's findings, in the following portions of this
opinion regarding the state's statutory claims will require the filing of amended
complaints to correct the deficiencies in the existing Complaints. Regarding the state
statutory claims, the Court finds some, but not all, of Defendants' arguments persuasive
and therefore grants in part the Motion. Finally, the Court grants in part Defendant
Chase's Supplemental Motions to Dismiss the *Luquetta* and *Lopez* Complaints and denies
Defendant Citibank's Renewed, Independent Motion to Dismiss.

## A.     Federal Preemption

As the Eleventh Circuit explained in *Rine v. Imagitas, Inc.*, "[u]nder the
Supremacy Clause, any state law that conflicts with federal law is preempted." 590 F.3d
1215,1224 (11th Cir. 2009) (quoting *Gibbons v. Ogden*, 22 U.S. 1 (1824)). Defendants
assert that the activities of national banks in conducting the "business of banking" are
subject to exclusive federal regulation and any state law which attempts to regulate, limit,
or condemn such activities is preempted. Defendants primarily rely on OCC Regulations

-9-

§7.4002 and §7.4007 and OCC Interpretative Letter 997. All of Plaintiffs' allegations in this action rely upon state law claims. Defendants argue these allegations are preempted because they are in direct conflict with the Office of the Comptroller of the Currency's regulations and attempt to regulate the business of banking.

Plaintiffs respond that they are not trying to prevent banks from engaging in the business of banking, they are merely asking the banks to do so in good faith. Specifically, Plaintiffs claim they are not challenging the bank's right to charge overdraft fees. Instead, they are challenging the banks' practice of manipulating the overdraft fees "in order to maximize a benefit to them and to the great detriment of the parties who are their account holders." (Oral Arg. Tr. at 33.) Plaintiffs explain that the banks are not federally authorized to manipulate the transactions as alleged and therefore their claims are not preempted by federal law. *Id.* at 38. The Court agrees.

As Defendants point out, regulation of national banks is one of the few areas in which preemption of state law is presumed. *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 32 (1996). National banks are chartered by the federal government pursuant to the National Bank Act ("NBA") and the NBA grants national banks "all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24 (Seventh) (2006). To insure that national banks can carry out the business of banking without the impairment of inconsistent or intrusive state laws, courts have "repeatedly made clear that federal control shields national banking from unduly burdensome and duplicative state regulation." *Watters v. Wachovia Bank*, 550 U.S. 1, 11 (2006).

-10-

The United States Supreme Court has upheld the doctrine of federal preemption to shield the banking activities of national banks from the application of state law. *See e.g., Barnett Bank of Marion County,* 517 U.S. 25; *Franklin Nat. Bank of Franklin Square v. New York,* 347 U.S. 373 (1953). In *Barnett Bank* the Supreme Court determined that a federal law allowing national banks to "act as the agent for any fire, life, or other insurance company" preempted a state law outlawing financial institutions from engaging in insurance agency activities. 517 U.S. at 26. The *Barnett Bank* Court explained that to determine preemption the Court must look at whether the federal and state statutes are in *irreconcilable conflict. Id.* at 32. In other words, whether compliance with both statutes is a physical impossibility, or whether the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *Id.* Similarly, the Court in *Franklin National Bank* held that federal statutes which authorize national banks to receive savings deposits conflicted with New York state legislation that prohibited national banks from using the word 'saving' or 'savings' in their advertising or business. 347 U.S. at 376-79. The Court found the statutes incompatible; finding that since advertising is a natural part of the business of banking, the government cannot allow the banks to receive savings deposits without allowing them to advertise the same. *Id.*

Further, the Court in *Watters* held that an operating subsidy of a national bank cannot be subject to state mortgage lending requirements such as registration, inspection and enforcement regimes. 550 U.S. 1. The Court explained that "[s]tates are permitted to regulate the activities of national banks where doing so does not prevent or significantly

-11-

interfere with the national bank's or the national bank regulator's exercise of its powers. But when state prescriptions significantly impair the exercise of authority, enumerated or incidental under the NBA, the State's regulations must give way." *Id.* at 12.

Nevertheless, as Plaintiffs argue, the aforementioned cases all address state laws specifically targeted at national banks. State laws of general applicability, however, have been found not to be preempted. *See e.g. Baldanzi v. WFC Holdings Corp.*, 2008 WL 4924987 (S.D.N.Y. 2008) ("In contrast to findings of federal preemption in cases involving specific state regulations that conflict with the NBA, causes of action sounding in contract, consumer protection statutes and tort have repeatedly been found by federal courts not to be preempted."). In fact, the Supreme Court held in *Watters* that "federally chartered banks are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or general purpose of the NBA." *Watters*, 550 U.S. at 12.

Looking specifically at whether federal law preempts general state law claims addressing overdraft fees, the court in *Gutierrez v. Wells Fargo Bank N.A.* found that the state law claims were not preempted. 622 F. Supp. 2d 946 (N.D. Cal. 2009). Explaining that "preemption would likely apply if a customer were challenging a bank's fundamental right to employ an overdraft fee at all," the court held that there was no preemption in *Gutierrez* because "the issue is whether Wells Fargo has been manipulating - indeed downright altering - customers' transaction records so as to maximize overdraft penalties imposed on customers." *Id.* at 950. Addressing the same issue in *White v. Wachovia*

-12-

*Bank, N.A.*, the court held that "while the lawsuit may incidentally implicate Wachovia's largest-to-smallest transaction posting policy, it, more importantly, claims that Wachovia's policy allows the routine imposition of an overdraft fee for transactions that do not result in an actual overdraft. This allegation which forms the basis for all of its claims is not of a regulatory nature that would subject it to federal preemption." 563 F.Supp.2d 1358, 1367 (N.D. Ga. 2008).

In their oral argument, Defendants relied heavily on the Sixth Circuit case, *Monroe Retail Inc. v. RBS Citizens*, 589 F.3d 274 (6th Cir. 2009). In *Monroe Retail*, the court found that the NBA's grant of authority to charge fees includes the authority to determine service fees for the garnishment process. The court found that Ohio's state conversion claim which would require the bank to freeze accounts immediately upon receipt of a garnishment order was preempted. Notably, the court agreed with the aforementioned cases and found that state laws of general applicability that do not target banks are "exempted from preemption 'to the extent that they only incidentally affect the exercise of national banks' deposit taking powers." *Id.* at 282. The court then went on to find that "'when state laws significantly impair the exercise of authority, enumerated or incidental under the NBA', the state laws 'must give way.'" *Id.* at 283 (quoting *Watters*, 550 U.S. at 12).

Here, the federally authorized powers have been enumerated by the Office of the Comptroller of the Currency ("OCC"). The OCC, the regulatory agency charged with implementing the NBA, has promulgated a binding regulation confirming that the

-13-

federally authorized "powers" of national banks include the power to impose non-interest

fees such as overdraft fees.  12 C.F.R. § 7.4002(a) ("Authority to impose charges and

fees. A national bank may charge its customers non-interest charges and fees, including

deposit account service charges.").  Further, the OCC sets out the factors a national bank

is supposed to use to establish those fees, their amounts and the method of calculating

them.  12 C.F.R. § 7.4002(b)(2). Namely, a national bank should establish non-interest

fees, "in its discretion, according to sound banking judgment and safe and sound banking

principles." *Id.*  Further, when asked if the process followed by the Banks in deciding to

use a high-to-low order of check posting is consistent with the safety and soundness

considerations of 12 C.F.R. §7.4002(b) the OCC held, in Interpretive Letter No. 997, that

"we agree that the Banks' decision to set fees based on a given order of check posting

falls within the Banks' authority to set fees pursuant to section 4 (Seventh) and section

7.4002. We further agree that the process the Banks used in deciding to adopt the order of

check posting described in your submissions is consistent with section 7.4002." 70 FR

9127-01.

The OCC also addresses federal preemption of regulations on deposit-taking

activities.  In Section 7.4007(b)(2) the OCC states "[a] national bank may exercise its

deposit-taking powers without regard to state law limitations concerning: . . . ii) Checking

accounts; iii) Disclosure requirements; iv) Funds Availability . . ." 12 C.F.R. §

7.4007(b)(2). The OCC goes on to clarify "state laws that are not preempted" in Section

(c): "State laws on the following subjects are not inconsistent with the deposit-taking

-14-

powers of national banks and apply to national banks to the extent that they only incidentally affect the exercise of national banks' deposit-taking powers: 1) Contracts; 2) Torts; 3) Criminal History . . ." 12 C.F.R. § 7.4007(c).

The state law claims before this Court are contracts and tort claims; thus this Court's inquiry is limited to whether Plaintiffs' claims, as alleged, more than "incidentally affect the exercise of national banks' deposit taking powers." The Court finds that they do not and are therefore not preempted.

Defendants assert that the language of the OCC expressly preempts any state law regulations on overdraft fees, but this is not the case. Section 7.4002 gives Defendant banks the right to charge overdraft fees, but it does not authorize banks to ignore general contract or tort law. Further, the OCC's interpretative letter does not authorize debit card postings in a high to low order to increase fees, it merely states that doing so does not *violate* the OCC's requirement that banks set fees using sound banking judgment. A bank could follow both the requirements of sound banking judgment outlined in Section 7.4007 and good faith; these principals are not in irreconcilable conflict. In fact, as cited by the *Gutierrez* court, the OCC itself advised a California bank that it must act in good faith when reordering checks for overdraft fees. *Gutierrez*, 622 F. Supp. 2d at 952 ("The only restraint on the discretion given to the payor under subsection (b) is that the bank act in good faith."). Thus, the OCC did not expressly manifest its intent to preempt these state law claims in the language of the regulation.

Similarly, federal regulation in this field is not so pervasive that we can reasonably

-15-

infer that Congress left no room for the states to supplement it. "States . . . have always enforced their general laws against national banks - and have enforced their banking - related laws against national banks for at least 85 years . . ." *Cuomo v. Clearing House Ass'n,* 129 S. Ct. 2710, 2720 (2009). Moreover, Section 7.4007(c) explicitly reserves general areas of law to the states such as contracts, torts, criminal law and rights to collect debts, if the laws only incidentally affect the exercise of a national bank's deposit taking power.

Finally, these are state laws of general application that do not vitiate the purposes of the NBA, and banks could comply with both the NBA, OCC regulations and state laws if they refrained from engaging in the criticized posting procedures. Again, the Court's only inquiry at this stage is whether the state law claims, as alleged, more than incidentally affect the exercise of the banks' deposit taking power. The Plaintiffs alleged claims are *not* that banks lack the right to charge overdraft fees as part of their deposit-taking powers. Instead, Plaintiffs attack the allegedly unlawful manner in which the banks operate their overdraft programs to maximize fees at the expense of consumers. At this stage, these allegations do no more than incidentally affect the banks' exercise of their deposit taking power and are therefore not preempted.

**B.    Common Law Claims**

In this section, the Court will turn to Plaintiffs' common law claims. Specifically, the Court will address (i) choice of law, (ii) breach of contract, (iii) unconscionability, (iv) unjust enrichment, and (v) conversion.

-16-

### i. Choice of Law

Before addressing the common law claims, it is necessary for the Court to briefly address the issue of choice of law. The Plaintiffs in the fifteen Complaints that are the subject of this motion to dismiss reside in several different states. The common law claims asserted are, of course, claims that are defined and construed by the courts of the several states. The Court realizes that it may be necessary in the future to apply a particular state's law to a particular Plaintiff. Without conducting an extensive choice of law analysis, it appears that, for purposes of this motion, there are no relevant differences in how each state interprets these various causes of action. Indeed, Defendants do not argue that particular Plaintiffs should be dismissed because the courts of that Plaintiff's state impose additional requirements that are not satisfied here.[5] Rather, Defendants generally acknowledge that the elements of the common law claims asserted are the same in every state. There is, therefore, no need for the Court to analyze the common law issues on a plaintiff-by-plaintiff or state-by-state basis at this early procedural (Motion to Dismiss) stage of the proceedings. The case authorities from various states cited by the Court are merely demonstrative of what the common law appears to be in each state involved in this action.[6] Any arguments regarding specific Plaintiffs or specific states

---

[5] The one exception to this is that Defendants argue that Texas law imposes additional requirements to assert a claim for breach of the implied covenant of good faith and fair dealing.

[6] This paragraph applies only to choice of law with respect to the common law claims. Choice of law issues regarding statutory claims will be addressed in a later section.

may be raised at a later stage upon Court consideration of class certification, summary judgment, or trial.

## ii. Breach of Contract based on the Implied Covenant of Good Faith and Fair Dealing

The Defendant banks make two arguments for the dismissal of the breach of contract claims, based on the implied covenants of good faith and fair dealing.[7] First, Defendants argue that the conduct complained of is in accord with the express terms of the agreements between the bank and the Plaintiff customer and that the implied covenant of good faith and fair dealing cannot vary express contractual terms. "As a general principle, there can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract." 23 Williston on Contracts § 63:22 (4th ed.); *see, e.g., Burger King Corp. v. C.R. Weaver,* 169 F.3d 1310, 1316 (11th Cir. 1999) ("[T]he implied obligation of good faith cannot be used to vary the terms of an express contract") (citations omitted); *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1357(7th Cir. 1990) ("Good faith is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting"); *Tolbert v. First Nat'l Bank,*

---

[7] In Huntington's Joinder Motion to Dismiss, Huntington also asserts that neither Ohio nor Michigan law permit an independent claim for breach of the duty of good faith and fair dealing. The Court however finds that Michigan and Ohio law both expressly support a claim for breach of the implied covenant, as part of a claim for breach of contract. The fact that the *Gulley* Complaint enumerates the claim as a separate cause of action is not a basis for dismissal.

312 Or. 485, 495 (1991) (holding that as a matter of law there is no breach of the implied covenant of good faith and fair dealing where the contract provides for unilateral exercise of discretion and that discretion is exercised in accordance with the express terms of the contract).

Plaintiffs counter, and the Court agrees, that they do not seek to vary the language of the contract, but rather to have the express contractual terms carried out in good faith. Plaintiffs do not ask the Court to tell the banks *how* to order transactions, but simply that the ordering must be carried out as contemplated by the covenant of good faith and fair dealing. There are a number of cases supporting the proposition that when one party is given discretion to act under a contract, said discretion must be exercised in good faith. *See Alexander Mfg., Inc. Employee Stock Ownership & Trust v. Ill. Union Ins. Co.,* 2009 U.S. Dist. LEXIS 95897, at *48 (D. Or. Oct. 15, 2009) ("Good faith requires that each party perform its obligations under the contract, including exercising any discretion that the contract provides, in a way that will effectuate the objectively reasonable contractual expectations of the parties"); *Amoco Prod. Co. v. Heimann*, 904 F.2d 1405, 1411-12 (10th Cir. 1990) (where discretion exists in one of two parties to a contract, that discretion must be exercised in good faith); *Bybee Farms L.L.C. v. Snake River Sugar Co.*, 2008 WL 4454054, at *12 (E.D. Wash. Sept. 29, 2008) (finding that an agreement which confers discretion means that there is "an implied duty to exercise its authority in good faith"). Therefore, the Court will not dismiss the breach of contract claim on this basis.

-19-

Second, Defendants argue that the practice of posting high-to-low is permitted by the applicable law. The Uniform Commercial Code (UCC) generally endorses high-to-low posting of checks in UCC Section 4-303(b).[8] Defendants suggest the Court should read that general endorsement of high-to-low posting as applicable to debit card transactions. While conceding that the relevant UCC provisions upon which they rely do not apply to debit card transactions (only to checks) Defendants argue that the principles underlying the UCC's reasoning apply to electronic transfers as well as to the check transactions.[9] According to Defendants, if the UCC, as a matter of legislative determination holds that banks have discretion to order transactions from high-to-low, it cannot therefore be bad faith or a violation of the common law to do so. Defendants contend this is a reasonable interpretation because of the impossibility of stating a rule that would be fair in all cases, bearing in mind the infinite number of combinations of large and small checks and debit purchases, in relation to the available balance on hand.

In support of their position, Defendants cite several cases which have found in favor of a bank's discretion to post transactions high-to-low. *See e.g., Hassler v. Sovereign Bank*, 644 F. Supp. 2d 509 (D.N.J. 2009) (the court rejected a claim that the implied covenant required banks to post customers' debit transactions in the order in

---

[8] "(b) Subject to subsection (a), *items* may be accepted, paid certified, or charged to the indicated *account* of its *customer* in any order."

[9] The banks rely on 4-303(b) of the UCC to support their position that high-to-low posting does not violate the covenant of good faith and fair dealing. The UCC drafters however did not include transactions initiated by means of a credit card or debit cards in its endorsement of high-to-low posting.

-20-

which the transactions occurred); *Hill v. St. Paul Fed. Bank for Sav.*, 768 N.E. 2d 322 (Ill. App. 2002) (holding that there can be no lack of good faith in acting as authorized by the UCC); *Fetter v. Wells Fargo Bank Tex., N.A.*, 110 S.W. 3d 683 (Tex. App. 2003) (adopting the holding in *Hill*, the court recognized that the legislature authorized Wells Fargo's practice of high to low posting); *Daniels v. PNC Bank, N.A.*, 738 N.E. 2d 447 (Ohio App. 2000) (holding that the plaintiff had the insurmountable task of persuading the court that a statutorily authorized procedure constitutes an act of bad faith and unfair dealing); *Smith v. First Union Nat'l Bank*, 958 S.W.2d 113 (Tenn. Ct. App. 1997) (holding that in light of the UCC, the bank had discretion to pay items in a manner convenient to it and the court could not substitute its judgment for the bank's because doing so would be undermining the fundamental purposes of the statute).

Plaintiffs respond that decisions involving paper check transactions are inapposite. They argue that there is a fundamental difference between check and electronic transactions, and that the UCC's endorsement of high-to-low posting for checks should not be extended to cover debit card transactions. Plaintiffs submit that the instantaneous nature of debit card transactions, carries with it much less risk to the merchant than the risk involved when accepting a check, where there is usually a few days gap in between when the check is issued and when the check is presented to the bank for payment. With the faster debit card transaction, the risk to the merchant is much less significant since the bank can choose to decline the purchase before the buyer leaves the store with the goods.

Defendants' suggested analysis of applying the UCC's endorsement of high-to-low posting in check transactions to debit card transactions does not logically follow. If they were the same, there would be one body of law addressing both. The UCC's generally accepted principles when dealing with checks cannot be broadly applied to debit card transactions. To do so would be to ignore the fundamental differences between the two.

The Court notes that two cases have found the system employed by the banks, to reorder debit card transactions to impose excessive overdraft fees, was an abuse of the bank's discretion. *See Gutierrez*, 622 F. Supp 2d 946; *White*, 563 F. Supp. 2d 1358. In *Gutierrez*, the court held that Wells Fargo abused its discretion in adopting a policy of maximizing the number of returned checks for the sole purpose of maximizing overdraft charges. *Id*. at 954. The court in *Gutierrez* further held that even if the contract confers discretion on the bank to determine the sequence of honoring presentments, the bank must exercise that discretion fairly and cannot exercise it to enrich itself by gouging the consumer. *Id.*

Moreover, in *White v. Wachovia*, the court found that good faith was a question of fact to be developed on discovery. 563 F. Supp. 2d at 1364. The court held that, although discovery may make clear that Wachovia complied with its duties fairly, plaintiffs sufficiently alleged otherwise. *Id.* The court declined to find that the Deposit Agreements' statement that Wachovia "may" post items "in any order" expressly gives Wachovia the right to manipulate transactions, delay posting indefinitely, or maximize overdraft fees in the ways the Complaint alleges. *Id.* Based upon the pleadings before it,

-22-

the court found that plaintiffs alleged sufficient facts to show a lack of good faith in Wachovia's exercise of its discretion in charging six overdraft fees for six transactions over a period during which, even if the six transactions were posted in order from largest to smallest, at most three overdraft fees should have been imposed. *Id.*

Thus, if there is any question about the facts, or how the banks operate, these are matters to be developed through discovery. Factual issues must not be resolved on Motion to Dismiss by the simple expedient of selecting facts asserted by one side over the other as true. After carefully considering the pleadings, reviewing the case law and listening to all parties at extensive oral argument, the Court finds that it cannot resolve this issue at this procedural stage in the litigation. Although discovery may make clear that the banks complied with its obligations in good faith, Plaintiffs have sufficiently alleged otherwise. The Court takes all well pled facts as true. Plaintiffs' allegations state a plausible claim for breach of contract, based on the implied covenant of good faith. At this stage in the proceedings the Court determines that whether the banks are acting in good faith is a question of fact which should be deferred until discovery is taken and the facts before the Court further developed. Therefore, the Court must deny Defendants' Motion to Dismiss on this issue.

However, the Court reaches a different conclusion on the breach of the implied covenant based on Texas law. Defendants argue that the implied covenant only exists in exceptional circumstances under Texas law. *See Subaru v. David McDavid Nissan, Inc.*, 84 S.W. 3d 212, 225 (Tex. 2002) ("A common-law duty of good faith and fair dealing ...

-23-

arises only when a contract creates or governs a special relationship between the parties.").

In response, Plaintiffs concede that the law in Texas is generally unfavorable to a claim for breach of the implied covenant, but Texas courts have found a duty of good faith and fair dealing based on the special relationship between a bank and its customers. *Plaza National Bank v. Walker*, 767 S.W. 2d 276, 277-78 (Tex. Ct. App. 1989). In *Plaza*, the court found that a special relationship existed between a bank and its depositors and therefore the implied covenant applied. *Id.* Plaintiffs also rely on *FDIC v. Perry Bros., Inc.*, which held that the imposition of the duty of good faith and fair dealing may arise by: (1) agreement; (2) a long- standing special relationship of confidence; or (3) when an imbalance of bargaining power exists, at least when defendant has been the cause of the imbalance. 854 F. Supp. 1248, 1259-60 (E.D. Tex. 1994).

The Court finds *Wil-Roye Invest. Co. II v. Wash. Mut. Bank, F.A.*, 142 S.W. 3d 393, 410 n.4 (Tex. Ct. App. 2004) to be particularly instructive. In *Wil-Roye*, the court declined to follow the court's ruling in *Plaza*, finding that the court did not engage in an analysis as to why a special relationship exists between a bank and a depositor. The *Wil-Roye* court held that in order to find a special relationship exists, there must be evidence that the customers had substantial deposits in the bank and that the customers were shareholders who sought the bank's advice on various matters. *Id.* at 410. Here, the Court finds that while in certain instances Texas law supports a claim for breach of contract based on the implied covenant, the facts before the Court do not satisfy the

-24-

additional requirements imposed by Texas law to raise a claim based on the implied covenant. Therefore, Defendants' Motion to Dismiss Plaintiffs' breach of the implied covenant claims based on Texas law only, is granted without prejudice to amend.

### iii.    Unconscionability

All Complaints include a count for Unconscionability. That is, Plaintiffs seek a declaration that certain terms of Plaintiffs' contracts with Defendants (and Defendants' performance of those terms) are unconscionable, and damages that have resulted from Defendants' enforcement of the allegedly unconscionable terms. Those terms and practices include: (1) Re-ordering the debit postings in bad faith so as to maximize the number of overdrafts incurred by Plaintiffs, (2) charging excessive overdraft fees that do not reasonably relate to the costs or risks associated with providing overdraft protection, (3) failing to disclose that customers have the option to opt out of the overdraft protection, and (4) failing to obtain Plaintiffs' consent before overdrawing their accounts.

Defendants make two arguments attacking Plaintiffs' unconscionability count in this Motion. First, Defendants argue that unconscionability is not an affirmative cause of action, but merely a defense to the enforcement of a contract. *See Cowin Equip. Co., Inc. v. Gen. Motors Corp.*, 734 F.2d 1581, 1582 (11th Cir. 1984) ("[T]he equitable theory of unconscionability has never been utilized to allow for the affirmative recovery of money damages. The Court finds that neither the common law of Florida, nor that of any other state, empowers a court addressing allegations of unconscionability to do more than refuse enforcement of the unconscionable section or sections of the contract so as to

-25-

avoid an unconscionable result."). Plaintiffs respond by asserting that the Court can utilize its equitable powers to issue a declaratory decree that the contractual terms and practices are unconscionable. "As a general proposition, most matters of defense can be raised affirmatively in a declaratory judgment action, so long as there is an actual controversy between the parties." *Eva v. Midwest Nat'l Mortg. Banc, Inc*., 143 F. Supp. 2d 862, 895 (N.D. Ohio 2001). Moreover, Plaintiffs argue that, if the Court finds the terms or practices to be unconscionable, the Court has the power to award damages for the banks' past enforcement of the terms. *Id.* at 896 ("Under either scenario, once the plaintiff obtains either a declaration that the contract or some of its terms are invalid, or has the contract reformed to eliminate the unconscionable terms, the plaintiff can further request damages to the extent that the unconscionable terms have been enforced in the past.").

The Court finds Plaintiffs' argument more persuasive. If the overdraft fee provisions are found to be unconscionable, the Court retains the authority and discretion to fashion appropriate equitable relief. Moreover, a declaration of unconscionability may affect the legal status of the contractual terms that Defendants seek to enforce, which may, in turn, affect the analysis of the other causes of action that Plaintiffs assert. Finally, Defendants appear to be correct in their assertion that, ordinarily, unconscionability is properly asserted as a defense to a contract rather than an affirmative cause of action. But this is not the ordinary case. An ordinary case in this factual context would be one in which the customer allegedly overdraws his or her account, the bank

-26-

provides the overdraft service, and then the bank demands payment of the overdraft fee from the customer. Then, when the customer refuses to pay, the bank sues the customer for breach of contract, and the customer at that time can raise an unconscionability defense to the enforcement of the contract. In the instant case, however, the bank is never required to file suit because it is already in possession of the customer's money, and simply collects the fee by debiting the customer's account. Thus, the customer never has the opportunity to raise unconscionability as a defense for nonpayment. The only opportunity to do so is through a lawsuit filed by the customer, after payment has been made. Hence, the facts of the instant case weigh in favor of permitting Plaintiffs to pursue an unconscionability claim.

Defendants' second argument asserts that the challenged contractual terms and practices are not unconscionable. Unconscionability has two aspects: procedural and substantive. The Court will address procedural unconscionability first.

"Procedural unconscionability relates to the manner in which a contract is made and involves consideration of issues such as the bargaining power of the parties and their ability to know and understand the disputed contract terms. Substantive unconscionability, on the other hand, requires an assessment of whether the contract terms are so outrageously unfair as to shock the judicial conscience." *Bland v. Health Care & Ret. Corp. of Am.*, 927 So. 2d 252, 256 (Fla. 2d DCA 2006) (quotations and citations omitted). Regarding the procedural aspect, Defendants argue that, although the contractual terms were part of boilerplate language contained in a multi-page contract,

-27-

Plaintiffs were not forced to sign the agreements, they were not tricked into signing the agreement, and the terms were not hidden from them. *See Best v. United States Nat'l Bank*, 739 P.2d 554, 556 (Or. 1987) (bank's overdraft fees not procedurally unconscionable, even though they were in a "take it or leave it" contract, where customers could close their accounts at any time and for any reason, customers were of ordinary intelligence and experience, and there was no evidence that the bank obtained the contract through deception or any other improper means); *Saunders v. Michigan Ave. Nat'l Bank*, 662 N.E.2d 602, 611 (Ill. App. Ct. 1st Dist. 1996) (bank's overdraft fees not unconscionable where bank disclosed fees, plaintiff was not intimidated or coerced into accepting the terms, and plaintiff could have chosen another bank). Plaintiffs respond by pointing out the tremendous disparity in sophistication and bargaining power between Plaintiffs and Defendants. They also argue that these were contracts of adhesion–that is, they were presented with no option to negotiate the terms and those terms were set out in voluminous boilerplate language. Plaintiffs further claim that they were denied any meaningful opportunity to opt out of the overdraft protection program. *See Perdue v. Crocker Nat'l Bank*, 702 P.2d 503, 514 (Cal. 1985) (procedural unconscionability present where contract terms laying out the bank's overdraft policies were presented on a "take it or leave it" basis in one-sided boilerplate terms); *Powertel, Inc. v. Bexley*, 743 So. 2d 570, 575 (Fla. 1st DCA 1999) (arbitration clause procedurally unconscionable because parties had no meaningful choice in accepting or rejecting the contract).

The Court finds that Plaintiffs have sufficiently pled procedural unconscionability.

-28-

Although Plaintiffs do not allege they were coerced into accepting the overdraft

protection terms, the disparity in sophistication and bargaining power between Plaintiffs

and Defendants is obvious. The terms at issue were contained in voluminous boilerplate

language drafted by the bank. If Plaintiffs did disagree with the terms, there was no

meaningful opportunity to negotiate with the bank; rather, the bank would simply refuse

to open an account for the customer as Defendants' counsel orally argued: ("That's why

these terms are nonnegotiable, because it's automated."). (*See* Oral Arg. Trans. 76:14-

15.) Moreover, Plaintiffs have alleged that they were not notified they had the option to

decline the overdraft protection service (in which case the bank would simply decline to

pay the merchant who presented the item for payment, rather that paying and charging the

customer an overdraft fee), when in fact they did have that option. Thus, the Court

concludes the Plaintiffs have sufficiently alleged procedural unconscionability.

The standard for substantive unconscionability has been articulated in slightly

different ways, but one representative formulation is the following: A term is

substantively unconscionable if it is so "outrageously unfair as to shock the judicial

conscience," or it is one that "no man in his senses and not under delusion would make

on the one hand, and as no honest and fair man would accept on the other." *Bland*, 927

So. 2d at 256 (quotations and citations omitted). To make that determination, courts

should consider "the commercial reasonableness of the contract terms, the purpose and

effect of the terms, the allocation of the risks between the parties, and similar public

policy concerns." *Jenkins v. First Am. Cash Advance of Ga., LLC*, 400 F.3d 868, 876

(11th Cir. 2005) (quotations and citations omitted). Defendants argue that the high-to-low posting practice cannot be substantively unconscionable because it is a standard industry practice that is expressly endorsed by the UCC. *See White*, 563 F. Supp. 2d at 1370 (high to low posting practice not substantively unconscionable because the practice is consistent with the UCC); *Daniels v. PNC Bank, N.A.*, 738 N.E.2d 447, 451 (Ohio App. 2000) ("[B]ecause the practice of high-low posting is allowed by [the UCC], it cannot be said to be itself unconscionable."). In response, Plaintiffs argue that no reasonable person would have agreed to allow the banks to post debits in a manner designed solely to maximize the number of overdraft fees. They also argue that the amount of overdraft fees is unconscionably excessive because the fees are not reasonably related to the costs or risks associated with providing overdraft protection. *See Maxwell v. Fidelity Fin. Servs.*, 907 P.2d 51, 58 (Ariz. 1995) ("Indicative of substantive unconscionability are contract terms so one-sided as to oppress or unfairly surprise an innocent party, an overall imbalance in the obligations and rights imposed by the bargain, and significant cost-price disparity."). Finally, Plaintiffs argue that this analysis is highly fact dependent and cannot be resolved on a motion to dismiss.

The Court finds that Plaintiffs have sufficiently pled substantive unconscionability. The Complaints state that deposit agreements contained contractual terms regarding overdraft protection that had the purpose and effect of allowing Defendants to re-order the posting of debit transactions to maximize the number and amount of overdraft fees charged to Plaintiffs, and that the fees bear no reasonable commercial relationship to the

costs or risks associated with providing the overdraft service  Moreover, Defendants are not entirely correct when they state that high-to-low posting is expressly condoned by the UCC. As discussed in the above section, the provision they rely on, section 4-303(b), applies only to paper checks, not the electronic debits that are the subject of this lawsuit. Although the Court recognizes that the UCC commentary suggests that courts may apply the UCC provisions by analogy, this is the exact set of circumstances in which the analogy breaks down. With paper checks, the customer gives a check to the merchant and leaves with the merchandise. The merchant then, at some unspecified time in the future, takes the check to his or her bank, which then presents the check to the customer's bank for payment. This guaranteed time lapse increases the risk to the bank, the merchant, and the customer that, in the intervening time period, there will not be sufficient funds in the account to cover the check. Thus, banks are far more justified in adopting a specific check posting order, providing overdraft services, and charging the customer an overdraft fee to account for the risk of insufficient funds. With electronic debit cards, however, the banks can know, at least in many circumstances, instantly whether there are sufficient funds and can decline the transaction immediately, decreasing the risk to all parties and obviating the need to "hold" the debit transactions for a period of time and then post them in a specific order. Thus, Defendants' reliance on UCC section 4-303(b) to defeat substantive unconscionability is misplaced.

Therefore, having found that Plaintiffs have sufficiently alleged both the procedural and substantive aspects, the Court concludes that Plaintiffs have stated a claim

for unconscionability.[10]

### iv.    Unjust Enrichment

Thirteen of the fifteen Complaints contain a count for unjust enrichment, and

Defendants make two arguments for the dismissal of this count. The first argument is that

there can be no claim for unjust enrichment when an express contract exists. That is,

Defendants contend that, because the practices that are the subject of Plaintiffs'

Complaints are governed by a written contract, Plaintiffs may only bring a claim under

the contract and are barred from seeking relief on an unjust enrichment theory. *See*

*White*, 563 F.Supp.2d at 1372 (applying Georgia law and dismissing an unjust enrichment

claim); *Hassler*, 644 F. Supp. 2d at 519 ("[T]he enrichment of one party at the expense of

the other is not unjust where it is permissible under the terms of an express contract.")

(quotations and citations omitted). In response, Plaintiffs concede that they will not be

permitted to recover damages under both claims, but argue that dismissal of the unjust

enrichment claim would be premature at this stage.

The Court agrees with Plaintiffs' position. Federal Rule of Civil Procedure 8(d)

allows pleading in the alternative, even if the theories are inconsistent. Defendants have

not conceded that Plaintiffs are entitled to recovery under the contract, and it is possible

that if their contractual claim fails, Plaintiffs may still be entitled to recovery under an

---

[10] To be clear, the Court has not concluded that the challenged terms and practices are unconscionable. The Court has merely found that Plaintiffs have alleged sufficient facts to proceed with this claim.

unjust enrichment theory. *See Tracfone Wireless, Inc. v. Access Telecom, Inc.*, 2009 WL

2207818, *8 (S.D. Fla. 2009) ("Although plaintiff has alleged a breach of contract claim

which I have concluded can proceed, it would be premature to dismiss plaintiff's count

for unjust enrichment in this case."); *Manicini Enters. v. Am. Express Co.*, 236 F.R.D.

695, 699 (S.D. Fla. 2006) ("[T]he court finds that plaintiff should be permitted to plead

alternative equitable claims for relief as the existence of express contracts between the

Parties has yet to be proven."); *Mobil Oil Corp. v. Dade County Esoil Mgmt. Co.*, 982 F.

Supp. 873, 880 (S.D. Fla. 1997) ("Until an express contract is proven, a motion to dismiss

a claim for promissory estoppel or unjust enrichment on these grounds is premature.").

Hence, while the law does not permit a party to simultaneously prevail on an unjust

enrichment theory and a contractual theory, it does not require the dismissal (at the

motion to dismiss stage) of an unjust enrichment claim merely because an express

contract exists that arguably governs the conduct complained of.  That argument may be

properly raised at a later stage in this litigation, such as summary judgment.

Defendants' second argument is that Plaintiffs fail to allege circumstances under

which it would be unjust for Defendants to retain the benefit that they have allegedly

received, chiefly because the overdraft fees are specifically provided for in the contracts.

The Court disagrees.  Plaintiffs have alleged sufficient facts—that, among other things,

Defendants manipulated the posting order of debit transactions in bad faith so as to

maximize the number of overdraft fees incurred—which could lead a reasonable fact-

finder to conclude that it would be unjust to retain the benefit of those fees.  Thus, the

Court cannot dismiss the unjust enrichment count on this ground.

### v. Conversion

Thirteen of the fifteen Complaints contain a count for Conversion, and Defendants make two arguments for the dismissal of this claim. First, Defendants argue that the tort of Conversion requires Plaintiffs to plead ownership of some specific property, and that Plaintiffs have not and cannot do so as matter of law. That is, Defendants contend that Plaintiffs do not "own" the funds in their accounts–they merely own a contractual right to demand those funds from the bank, and any failure to comply by the bank gives rise to a contractual claim, not a tort. *See Gutierrez*, 622 F. Supp. 2d at 956 ("A bank may not be sued for conversion of funds deposited with the bank."); *Maurello v. Broadway Bank & Trust Co.*, 176 A. 391, 394 (N.J. 1935) ("[W]here a general deposit is made, the title to the moneys passes from the depositor to the bank."); *Lawrence v. Bank of Am.*, 163 Cal. App. 3d 431, 437 (Cal. App. 1st Dist. 1985) (stating in dictum that "[i]t is well settled, however, that money on deposit with a bank may not be the subject of conversion.").

In response, Plaintiffs argue that this element of conversion can be met by pleading a right to possession, rather than ownership, and that, even if title to the funds passes to the banks when the funds are deposited, Plaintiffs still retain a right to possess those funds at any time. *See Bank Brussels Lambert v. Credit Lyonnais,* 2000 WL 174955, at *6 (S.D.N.Y. 2000) ("[P]laintiffs, to sustain a conversion claim, need not establish legal ownership of the funds in question: it is sufficient if they establish an immediate right of possession."); *Pierpoint v. Hoyt*, 260 N.Y. 26, 29 (1932) ("It is

elementary that the law of conversion is concerned with possession, not with title."); *Star Fruit Co. v. Eagle Lake Growers, Inc.*, 33 So. 2d 858, 868 (Fla. 1948) ("A conversion consists of an act in derogation of the plaintiff's possessory rights, and any wrongful exercise or assumption of authority over another's goods, depriving him of the possession, permanently or for an indefinite time, is a conversion."); *In re Marriage of Langham*, 106 P.3d 212, 219 (Wash. 2005) ("We hold that some property interest in the allegedly converted goods is all that is needed to support an action in conversion."); *Cruthis v. Firstar Bank, N.A.*, 822 N.E.2d 454, 463-64 (Ill. App. Ct. 5th Dist. 2004) ("Conversion is an unauthorized act that deprives a person of his property permanently or for an indefinite time. . . . The plaintiffs had a right to the funds in their bank account, had the absolute and unconditional right to the immediate possession of the funds in their account, and made a demand for possession, and the defendant wrongfully and without authorization assumed control, dominion, or ownership over the plaintiffs' property. . . .The evidence supported the plaintiffs' conversion cause of action against the defendant, thereby establishing an independent tort for which punitive damages may be awarded."); *Seibel v. Society Lease*, 969 F. Supp. 713, 718-19 (M.D. Fla. 1997) ("Conversion has been defined as: An act of willful interference with the personal property of another which is inconsistent with the rights of the person entitled to the use, possession or ownership of the property.") (quotations and citations omitted); *Decatur Auto Ctr., Inc. v. Wachovia Bank, N.A.*, 276 Ga. 817, 821 (Ga. 2003) ("Conversion is also available for . . . overdrafts charged by a bank on existing accounts."); *First Union Nat'l Bank v. Davies-Elliott, Inc.*,

-35-

452 S.E.2d 132, 140 (Ga. Ct. App. 1994) (upholding a jury verdict finding that the wrongful imposition of an overdraft fee constituted conversion).

After consideration of all the relevant cases, the Court agrees with Plaintiffs' position. Although the caselaw is not particularly clear in delineating whether conversion requires interference with ownership or merely a right to possession, it is clear that it requires interference with a property interest. Here, Plaintiffs unquestionably had the right to possess the funds in their bank accounts upon demand to the bank, and they have alleged that Defendants wrongfully took funds from their accounts so that Plaintiffs were unable to possess and use those funds. This interference with Plaintiffs' property interest in the funds in their accounts constitutes a cause of action for conversion. Moreover, as the above cases demonstrate, a conversion action is available for a bank's wrongful debiting of funds from a customer's account. *See, e.g., White*, 563 F. Supp. 2d at 1371.

Defendants' second argument is that, assuming Plaintiffs have a sufficient property interest in the funds that were taken, Plaintiffs have failed to plead that the taking was wrongful because the overdraft fees were authorized by the deposit agreements. This argument fails for several reasons. First, if the terms of the deposit agreement are subsequently declared to be unconscionable, Defendants may be barred from relying on them. Second, Plaintiffs have pled enough facts to show that, even if the deposit agreements gave Defendants discretion to re-order the debit postings, Defendants exercised that discretion in bad faith by intentionally causing Plaintiffs to incur overdrafts that they would not have otherwise incurred. These allegations could lead a reasonable

-36-

factfinder to conclude that Defendants acted wrongfully in charging some of the overdraft

fees, thereby converting Plaintiffs' funds. Thus, the Court cannot dismiss Plaintiffs'

claim for conversion.

## C.   State Statutory Claims

Defendants assert that the state consumer protection statutes invoked should be

dismissed. Defendants argue that Plaintiffs do not have standing to bring claims under

state laws in which no Plaintiffs reside and where none of the wrongs were alleged to

have occurred. Defendants further argue that Plaintiffs' state statutory claims fail as a

matter of law because: (a) Defendants' conduct is specifically permitted under state

and/or federal law; (b) Plaintiffs fail to allege "deceptive conduct"; (c) Plaintiffs fail to

allege "unfair conduct"; (d) Plaintiffs fail to allege "unconscionable conduct"; (e)

Defendants' alleged conduct does not involve goods or services; (f) Plaintiffs failed to

comply with pre-lawsuit notice requirements; and (g) Plaintiffs failed to allege

Defendants violated one or more of the specifically enumerated predicate violations.[11]

### i.   Whether Plaintiffs Have Standing to Assert Statutory Claims

Defendants argue that Plaintiffs do not have standing to invoke a claim under the

statute of a state in which no Plaintiff resides. That is, the fifteen Complaints that are the

---

[11] Defendants also claim that the express terms of the Montana Unfair Trade Practices and Consumer Protection Act ("MUTPA") bar Plaintiffs from maintaining a class action and that the Ohio Consumer Sales Practices Act ("CSPA") and Wisconsin statute §100.20 exempt banking transactions or transactions involving only money. Plaintiffs concede these points and the claims based on those three statutes are therefore dismissed.

subject of this motion involve multiple plaintiffs from different states and assert violations of consumer protection statutes in a number of different states. In certain instances a plaintiff from one state asserts a consumer protection statute from another state; in which that plaintiff does not reside. Defendants contend that any statutory claim should be dismissed if no named plaintiff in that Complaint resides in that state.[12] Plaintiffs argue that the Court should defer ruling on these issues until class certification, when the makeup of each class and their representatives will be known.

The Court agrees with Defendants' argument. The issue of Article III standing must be resolved for each named plaintiff before issues of class certification and representation are contemplated. "Thus, the threshold question is whether the named plaintiffs have individual standing, in the constitutional sense, to raise certain issues. . . . Only after the court determines the issues for which the named plaintiffs have standing should it address the question whether the named plaintiffs have representative capacity, as defined by Rule 23(a), to assert the rights of others." *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987). The court in *Griffin* explained that in a class action, this means that each named plaintiff must have standing for his or herself, and not merely assert that the plaintiff will represent a future class member who will have standing. *Id.* at 1483 ("Thus, a plaintiff cannot include class action allegations in a complaint and expect to be relieved of personally meeting the requirements of constitutional standing,

---

[12] The Court will assume for purposes of this motion that the applicable law is the law of the state in which each Plaintiff resides.

'even if the persons described in the class definition would have standing themselves to sue.' A named plaintiff in a class action who cannot establish the requisite case or controversy between himself and the defendants simply cannot seek relief for anyone -- not for himself, and not for any other member of the class." (citations omitted)). Moreover, the standing requirement must be met for every claim asserted in the Complaint. *Id.* ("[E]ach claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim."). Thus, *Griffin* appears to squarely control this issue.

Plaintiffs attempt to distinguish *Griffin* by arguing that its holding only applies to situations in which the named plaintiff did not suffer from the factual circumstances that would be required to assert a particular claim. Plaintiffs note that, in the instant case, the individual plaintiffs all suffered the same harm, only their *legal* claims are different. This argument is unpersuasive, as it does nothing to rebut the assertion that there must be a named plaintiff with constitutional standing to assert each particular claim. Moreover, this argument has been considered and rejected in nearly identical circumstances. *In re Terazosin Hydrochloride Antitrust Litigation*, 160 F. Supp. 2d 1365, 1371-72 (S.D. Fla. 2001). In *Terazosin*, the plaintiffs asserted that they all suffered the same harm (paying more for certain prescription drugs), but attempted to assert claims from states in which they did not reside. *Id.* They argued that they had standing to assert these claims in a representative capacity even though they did not personally have standing. *Id.* Judge Seitz, following *Griffin*, rejected this argument, holding that each claim must be

-39-

supported by a named plaintiff with standing to assert that claim. *Id.*

Thus, the Court finds that Plaintiffs may only assert a state statutory claim if a named plaintiff resides in that state.[13] The Court notes that this does not resolve the issue of class certification or representation; whether Plaintiffs have named proper class representatives will be considered at a later date. For now, the Court merely announces the same rule that applies in every case: each claim must have a named plaintiff with constitutional standing to assert it. Therefore, all state statutory claims where no named plaintiff resides in the state from which the claim is asserted are hereby dismissed without prejudice.

### ii.     Whether Plaintiffs Properly Alleged the State Statutory Claims

#### a.     Whether Defendants' Conduct is Specifically Permitted Under State and/or Federal Law

Defendants assert that the conduct that Plaintiffs complain of is authorized by state and federal law and that the consumer protection statutes of California, Connecticut, Illinois, Kansas, Massachusetts, New Mexico, New York, Ohio, and Washington do not permit claims that are otherwise authorized by law. Because this Court has already determined that neither federal nor state law expressly permit the bank's alleged practices, the Court cannot dismiss the statutory claims on this basis.

---

[13] Moreover, this requirement must be met *for each Complaint*. That is, it is insufficient for Plaintiffs to assert that a certain state statutory claim in one Complaint should remain because a named plaintiff in another Complaint resides in that state.

### b.     Statutes that Require Deceptive Practices

Defendants assert that the statutes of Minnesota, New York, Oregon and West

Virginia require a "deceptive practice" to succeed on a claim for unfair practices.

Defendants claim that Plaintiffs do not sufficiently allege any deceptive or fraudulent acts

as required by Rule 9(b)'s heightened pleading standard. Further, Defendants claim that

even if Plaintiffs did adequately plead misrepresentations, those misrepresentations could

not be deceptive or misleading because they complied with the terms of the contract.

As discussed above, at the motion to dismiss stage the Court must accept all of

Plaintiffs' allegations as true. Plaintiffs are alleging that the actions of Defendant banks,

in manipulating and reordering Plaintiffs' debit transactions, are deceptive and do *not*

comply with the terms of the contract. Plaintiffs therefore sufficiently allege a "deceptive

practice."

### c.     Statutes that Require Unfair Acts

Defendants next assert that even in those states that do not require a deceptive act,

(California, Connecticut, Illinois, Massachusetts, Montana, North Carolina, Ohio, and

Washington), Plaintiffs' claims fail because they require unfair acts. First, Defendants

reiterate that because the challenged conduct was fully disclosed and expressly authorized

in the parties' contracts, it cannot be deemed unfair. Defendants also claim that, if

Plaintiffs found the terms of the contract unfair, they could have opened a checking

account with a different institution. Finally, Defendants claim that Plaintiffs have not, as

required by the statutes of Connecticut, Illinois, Massachusetts, Montana, and North

-41-

Carolina, alleged that high-to-low posting violates a legislatively declared policy or is contrary to the spirit of a separate law.

The Court has already held that Defendants' alleged conduct was not expressly authorized by the contract. At this stage, the Court must take as true Plaintiffs' allegations that the Defendants' *application* of the contract was unfair. Since Plaintiffs could not have known that the terms of the contract would be applied unfairly at the time they opened a checking account, they would have been unaware of the need to reject the contract and take their business elsewhere.

Plaintiffs have also adequately alleged Defendants' practices to be contrary to the spirit of separate state laws. Namely, Plaintiffs have alleged Defendants breached their duty of good faith and fair dealing and violated the doctrine of unconscionability. In sum, Plaintiffs sufficiently allege unfair acts.

#### d.    Statutes that Require Unconscionable Acts

California, Kansas, New Jersey, New Mexico, and Ohio all recognize a cause of action for practices found to be unconscionable. Defendants allege Plaintiffs have not pled facts sufficient to demonstrate that Defendants engaged in acts that shock the conscience, involve deceptive bargaining conduct, or take advantage of a customer's lack of knowledge to a grossly unfair degree.

Plaintiffs do, however, allege that Defendants engaged in unconscionable practices. These allegations are sufficient to state a cause of action at this time.

e.    **Statutes that Require Transactions Involving Goods or Services**

Defendants contend that the California CLRA and Oregon statute relied upon by Plaintiffs only create a cause of action (for a plaintiff) on transactions involving *goods and services*. These transactions involve money. Therefore, Plaintiffs' reliance on the California CLRA and Oregon statute are misplaced and these claims should be dismissed. Defendants rely on *Berry v. Am. Express Publ'g, Inc.*, 147 Cal. App. 4th 224 (2007), a California appellate court decision which held that the California CLRA does not cover activities pertaining solely to the provision of money and credit. The *Berry* court explained that while early drafts of the Act included the terms "money" and "credit" under the definition of what the statute applied to, the Legislature removed those references before the Act was enacted. *Id.* at 230. The court found that a statute should not be construed as encompassing a provision that the legislature affirmatively chose to reject and held that "neither the express text of the California CLRA nor its legislative history supports the notion that credit transactions separate and apart from any sale or lease of goods or services are covered under the act." *Id.* at 233. Relying on *Berry*, the court in *Gutierrez* found that overdrafts and overdraft fees do not fall within the California CLRA's definition of a "good" or "service". *Gutierrez*, 622 F. Supp. 2d at 957. The court held that while "plaintiffs likely bought goods and services in many instances with the money extended because of overdrafts" the overdrafts themselves were not goods or services covered by the California CLRA. *Id.*

Plaintiffs respond that Defendants themselves refer to their payment of overdrafts

-43-

as "overdraft services" and that the Banks cannot on the one hand charge for a service, and on the other hand escape statutory liability by claiming that they are not providing a service. Plaintiffs fail to provide the Court with any case law to support this contention. The Court rejects Plaintiffs' characterization of a bank's decision to extend funds to cover a client's overdraft as a service. Therefore, Plaintiffs cannot file suit under California's CLRA or Oregon's OUTPA and Defendants' Motion to Dismiss these specific claims is granted.

### f.      Statutes that Have Pre-Lawsuit Notice Requirements

Defendants assert that Plaintiffs failed to comply with the Massachusetts, West Virginia and California CLRA notice prerequisites.[14] Defendants contend that failure to allege compliance with these prerequisites compels the dismissal of claims under those statutes. Plaintiffs counter that, to the extent notice is required in one or more of the cases, courts have usually granted plaintiffs the right to cure any defects by amending the operative Complaint. As such, dismissal should neither be required, nor called for.

The only Complaint that alleges a claim based on Massachusetts law is *Tornes*. Careful review of the *Tornes* Complaint shows that Plaintiffs did not allege *any* statement indicating compliance with the Massachusetts Regulation of Business Practices for

---

[14] This Court has found that Plaintiffs lack Article III standing to bring claims under the state consumer protection laws of West Virginia and that overdraft protection and fees does not qualify as a "good or service" under the California CLRA. Therefore, the Court will not address whether Plaintiffs complied with the West Virginia or California CLRA's pre-suit notice requirements.

Consumers Protection Act ("RBPCPA") pre-suit notice requirements. *See* M.G.L.A. 93A §19(3). Plaintiffs' response regurgitates Massachusetts law, but it does not contain an affirmative statement that Plaintiffs have in fact complied with any notification requirements.

Thus, Plaintiffs cannot rely upon the Massachusetts RBPCPA as a claim for relief. Defendants' Motion to Dismiss these specific claims is granted.

### g.      Statutes that Require a Showing of One or More Specifically Enumerated Predicate Violations

Defendants assert Plaintiffs have pled only conclusory allegations and do not adequately identify the specific predicate conduct required to prove the violation of a statute. Defendants contend this is particularly problematic for those causes of action pled under Minnesota, Oregon, Montana, West Virginia, and Wisconsin law, which require allegations of an enumerated predicate act.[15] Defendants assert that the failure to allege all elements of the statutes is fatal to Plaintiffs' claims. Plaintiffs have not responded to this defense.

New Mexico's Unfair Practices Act ("UPA") specifically enumerates what conduct qualifies as "unfair or deceptive trade practice" under Section 57-12-3. *See* N.

---

[15] This Court has found that Plaintiffs lack Article III standing to bring claims under the state consumer protection laws of Minnesota, Montana, Wisconsin and West Virginia. The Court also found that overdraft fees are not covered under the Oregon OUTPA. The Court therefore only addresses Plaintiffs' claims under New Mexico state law. Moreover, the Court does not address the state statutory claims under New Mexico law in *Torres* because Plaintiffs do not have standing to assert New Mexico state law claims.

M. S. A. § 57-12-2 (2009). Yet, Plaintiff's claim under New Mexico's UPA in *Martinez* does not allege which enumerated deceptive or unfair practice Defendants are in violation of. Instead, in paragraph 136 of the Complaint, Plaintiff claims Defendant employed "unfair or deceptive practices" by engaging in a laundry list of alleged bad acts not outlined in Section 57-12-2(D). (*Martinez* Compl. at 34.) Accordingly, Defendant's motion to dismiss *Martinez*'s claim under New Mexico's UPA is granted and the claim is dismissed without prejudice.

**D.     Additional Motions to Dismiss**

Lastly, the Court addresses (i) Defendant Chase's Supplemental Motions to Dismiss the *Luquetta* and *Lopez* Complaints; and (ii) Defendant Citibank's Renewed, Independent Motion to Dismiss the *Amrhein* Complaint.

**i.     Chase's Supplemental Motions to Dismiss the *Luquetta* and *Lopez* Complaints**

Plaintiffs in the *Luquetta* and *Lopez* Complaints were account holders at Washington Mutual Bank, FA ("WaMu") before the bank failed. After WaMu's failure, the bank was placed in receivership by federal banking regulators and Chase purchased its banking operations from the FDIC. The new entity was opened for business as a Chase bank on September 26, 2008. In this Motion, Chase asserts that the Court should dismiss all of Plaintiffs' claims against Chase regarding conduct done by WaMu.

Defendant correctly argues that the Complaints do not allege that WaMu specifically engaged in any improper conduct or the times and place of any such acts. All

-46-

of the re-ordering and ensuing overdraft fees specifically alleged were done by Chase

when Plaintiffs were Chase (not WaMu) customers.  Plaintiffs allege that WaMu engaged

in wrongdoing in general conclusory terms.  For example, Plaintiffs specifically allege

that Chase reordered the debit transactions "to generate the largest possible number of

overdrafts and the greatest possible amount of overdraft fees" and laid out the specific

transactions and overdraft fees that ensued, but Plaintiffs made no similarly specific

allegations against WaMu.  (*Luquetta* Am. Compl. at 5.)  Instead, Plaintiffs state that

"plaintiff . . . has been damaged by Chase and/or Washington Mutual's misconduct in

that she incurred and/or will continue to incur unfair and unconscionable overdraft

charges."  *Id.*  It is unclear from the Complaints which, if any, overdraft fees were

charged by WaMu.  Plaintiffs' claims against Chase regarding conduct by WaMu are not

pled with the requisite specificity and they are therefore dismissed without prejudice to

amend.

Defendant Chase also asks the Court to dismiss Plaintiffs' claims against Chase

regarding conduct by Chase.  Defendant's grounds for dismissal on Chase's conduct are

fact oriented.  Defendant's request is therefore denied without prejudice to reassert at

summary judgment.

### ii.     Citibank's Renewed, Independent Motion to Dismiss

Defendant Citibank asks this Court to dismiss the *Amrhein* Complaint for lack of

standing.  Defendant contends that Plaintiff's alleged harm, the imposition of overdraft

fees in connection with three gasoline purchases, was caused by third-party gasoline

merchants, not Citibank. Specifically, Citibank claims that the third-party gasoline merchants first charged Amrhein $1.00 hold amounts and only later charged him for the full amounts of the transactions. Defendant asserts that it was these holds, and not any action by Citibank, that caused the overdrafts and ensuing fees.

These are not, however, valid grounds for dismissal at this stage in the proceeding. Whether Plaintiff's damages are attributable to Citibank or to a third-party is a factual dispute that cannot be decided on a motion to dismiss. Defendant Citibank's Renewed, Independent Motion to Dismiss is therefore denied without prejudice to renew at a later date in the case.

## IV. CONCLUSION

After careful consideration and being fully advised by the briefs, memoranda and oral argument of counsel, it is

**ORDERED, ADJUDGED, and DECREED** that the Omnibus Motion (D.E. # 217, 253, 254) filed by Defendants to Dismiss the pending fifteen (15) Complaints in their entirety, and/or parts of various claims for relief relied upon by Plaintiffs in their respective Complaints, be, and the same is hereby **GRANTED in part and DENIED in part**, as follows:

1.  The portion of the Omnibus Motion to Dismiss directed to all statutory claims relying upon the laws of individual states in which none of the Plaintiffs are alleged to reside is **GRANTED, WITHOUT PREJUDICE**

to the right of the parties to file amended complaints directed to this issue.

2.      The portion of the Omnibus Motion to Dismiss directed to any claim based

upon the Massachusetts (RBPCPA) or New Mexico (UPA) be, and the

same is hereby **GRANTED, WITHOUT PREJUDICE** to the right of the

parties to file amended complaints directed to this issue.

3.      The portion of the Omnibus Motion to Dismiss directed to any claim based

upon the California (CLRA), Oregon (OUTPA), Montana (MUTPA), Ohio

(CSPA), or Wisconsin Statute § 100.20, *et seq.*, be, and the same is hereby

**GRANTED, WITH PREJUDICE.**

4.      The portion of the Omnibus Motion to Dismiss directed to claims for

breach of the implied covenant of good faith and fair dealing based upon

the law of Texas is hereby **GRANTED, WITHOUT PREJUDICE** to the

right of the parties to file amended complaints directed to this issue.

5.      The portion of the Omnibus Motion to Dismiss directed to all other portions

of the respective Complaints or portions or claims asserted therein and

addressed by the briefs, memoranda and oral argument of counsel for the

defense be, and the same are hereby **DENIED, WITHOUT PREJUDICE**

(where noted in the foregoing opinion) for Defendants to reassert at the

conclusion of all discovery, on motions for summary judgment, or at trial.

It is **FURTHER ORDERED** that the Supplemental Motions to Dismiss filed by

J.P. Morgan Chase Bank directed to those portions of the *Lopez* and *Luquetta* Complaints (D.E. # 222 & 225), insofar as they seek to dismiss any acts allegedly committed by Washington Mutual be, and they are hereby **GRANTED, WITHOUT PREJUDICE** to the right of the parties to amend those portions of the Complaints directed to this issue.

It is **FURTHER ORDERED** that the Independent Motion to Dismiss filed by Citibank (D.E. # 228) be, and the same is hereby **DENIED, WITHOUT PREJUDICE** to reassert at the conclusion of discovery or at other appropriate time during the future pendency of these proceedings.

It is **FURTHER ORDERED** that Plaintiffs shall within thirty (30) days hereof, consistent with the rulings set forth in this Order, file such amended complaints as they may be advised.

**DONE AND ORDERED** in chambers at the James Lawrence King Federal Justice Building and United States Courthouse, Miami, Florida, this 11th day of March, 2010.

JAMES LAWRENCE KING
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF FLORIDA

cc:    All Counsel of Record