UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:09-MD-02036-JLK

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

THIS DOCUMENT RELATES TO:

*Yourke, et al. v. Bank of America, N.A.*
S.D. Fla. Case No. 1:09-cv-21963-JLK
N.D. Cal. Case No. 3:09-2186

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs, through undersigned counsel, on behalf of themselves and all persons similarly situated, allege the following based on personal knowledge as to allegations regarding the Plaintiffs and on information and belief as to all other allegations.

## INTRODUCTION

1.       This is a civil action seeking declaratory relief, monetary damages and restitution from Defendant Bank of America, N.A. (the "Banks," "Bank of America" or "Defendant") arising out of its unfair, deceptive and unconscionable assessment and collection of excessive overdraft fees.

2.       The Bank provides debit cards and/or ATM cards (collectively herein "debit cards") to its checking account customers.  Through those debit cards, customers may engage in transactions using funds directly from their accounts or may withdraw money from their accounts at automatic teller machines.  These are called "point of sale" ("POS") or "debit" transactions.

3.      If, according to the Bank's accounting practices detailed below, a customer does not have sufficient funds in his or her account the transaction is considered an "overdraft." The Bank may honor or allow an overdraft to go through despite the lack of funds in the account. If the Bank allows such a POS or debit transaction to proceed, the Bank charges its customer's account $35 for each separate overdraft, after an initial rate of $25 for the first occurrence. These fees are known as "overdraft fees."

4.      Before debit cards existed, banks occasionally extended the courtesy of honoring paper checks written on overdrafted or otherwise deficient accounts for customers who were typically in good standing. Banks extended this courtesy largely because the third party involved in a sales transaction allowed the customer to purchase goods or services with a check with an expectation that funds would be available and that the check would clear. For example, if a customer used a check to purchase groceries, the grocery store would only know if the check cleared *after* the groceries had been purchased.

5.      The same considerations are not present when the transaction is one with a debit card. The bank could simply decline to honor debit or POS transactions made with debit cards where there are insufficient funds in the account. Retail and service transactions would simply not take place if the consumer were unable to present an alternative form of payment. ATM transactions could proceed if the Bank provided a warning that an overdraft fee would be incurred and the consumer chose to proceed nevertheless. In fact, until a few years ago, most banks simply declined debit and/or POS transactions that would overdraw an account.

6.      Instead of declining debit and/or POS transactions when there are insufficient funds, or warning the customer that an overdraft fee will be assessed if he or she proceeds with the transaction, Bank of America routinely processes such transactions in order to charge its customers an overdraft fee of $25 or $35, even when the transaction is for only a few dollars. This automatic fee-based overdraft scheme is designed and intended solely to increase overdraft fee revenue.

7.      Although it is possible to do so, the Bank does not alert its debit card customers at the time a POS transaction or ATM withdrawal is made that the transaction will overdraft their account and cause them to incur fees.

8.      Because the Bank's debit card customers are not notified of the potential overdraft and not given the option to decline the debit card transaction or provide another form of payment, the customers incur monetary damages in the form of overdraft fees.

9.      According to rules proposed by the Board of Governors of the Federal Reserve System, the Office of Thrift Supervision, Treasury, and the National Credit Union Administration (the "Agencies"): "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . . This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee."  73 F.R. 28904-01, 28929 (May 19, 2008).

10.     The Bank's overdraft policies make it difficult for a customer to avoid injury even if a customer carefully tracks the balance in his or her account.  In fact, the Agencies have stated that "Injury" resulting from such policies, "is not reasonably avoidable" by the consumer.  73 F.R. 28904-01, 28929.  ("It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available.")

11.     The Bank seeks to maximize the number of overdraft fees it charges debit card customers because overdraft fees are a primary source of revenue for the Bank.

12.     The Bank's overdraft fees can cost the account holders hundreds of dollars in a matter of days, or even hours, when they may be overdrawn only by a few dollars.  Even more

egregious, a customer's account may not actually be overdrawn at the time the overdraft fee is charged or at the time of the POS transaction.

13.     The Bank has not followed the list of "best practices" with respect to overdraft programs set forth in the "Joint Guidance on Overdraft Protection Programs" (the "Joint Guidance"), issued by the United States Department of the Treasury, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation and the National Credit Union Administration. These "best practices" include:  "Provide election or opt-out of service.  Obtain affirmative consent of consumers to receive overdraft protection.  Alternatively, where overdraft protection is automatically provided, permit consumers to 'opt out' of the overdraft program and provide a clear consumer disclosure of this option."  70 F.R. 9127-01, 9132.  A copy of the Joint Guidance is attached as Exhibit A.

14.     The "best practices" listed in the Joint Guidance also advise banks to: "Alert customers before a transaction triggers any fees.  When consumers attempt to withdraw or transfer funds made available through an overdraft protection program, provide a specific consumer notice, where feasible, that completing the withdrawal may trigger the overdraft fees." 70 F.R. 9127, 9132.   It goes on to advise that: "This notice should be presented in a manner that permits consumers to cancel the attempted withdrawal or transfer after receiving the notice."  *Id.*

15.     The list of "best practices" set forth in the "Overdraft Protection: A Guide For Bankers" issued by the American Bankers Association includes offering customers the option of "opting out" of any overdraft programs, and informing customers, before they access funds, that a particular point of sale or ATM transaction will cause them to incur overdraft fees.  A copy of "Overdraft Protection:  A Guide for Bankers" is attached as Exhibit B.  (*See* Exhibit B, at 18, 20).

16.     The Bank does not disclose or does not reasonably disclose to its customers that they have the right to opt out of the Bank's overdraft scheme.  The Bank also fails to notify

consumers when use of a debit card, such as an ATM or POS transaction, will cause an overdraft fee.

17.     The Bank's lack of disclosure regarding the ability to opt out of the overdraft scheme and its failure to notify customers when the use of a debit card, such as an ATM or POS transaction, will cause an overdraft fee, is a violation of California's consumer protection laws and the implied covenant of good faith and fair dealing in the Bank's Deposit Agreement governing its checking accounts.

18.     In an effort to cause as many overdrafts as possible, the Bank also manipulates and reorders debits from highest to lowest during the course of a day.

19.     Bank of America has a computer automated overdraft system programmed to maximize the number of overdrafts and, thus, the amount of fees charged per customer.

20.     As a result of the Bank's manipulation and alteration of customers' transactions records, funds in a customer's account are depleted more rapidly and more overdraft fees are likely to be charged for multiple smaller transactions.  Indeed, overdraft charges are likely to occur at times when, but for the manipulation and alteration, there would be funds in the account and no overdraft would occur.  For example, if a customer has an account with a $50 balance and makes four transactions of $10 and one later transaction of $100 the same day, the Bank debits the transactions from the account highest to lowest, thus subjecting the customer to four overdraft fees.  Conversely, if the $100 transaction were debited last (in the order it was made), the customer would only be subject to one overdraft fee.  *See* FDIC Study of Bank Overdraft Programs, November 2008, http://www.fdic.gov/bank/analytical/overdraft/, at 11, n.12.

21.     Thus, it is through manipulation and alteration of customers' transactions records that the Bank maximizes overdraft penalties imposed on customers.

22.     The Bank reorders transactions for no reason other than to increase the number of exorbitant overdraft fees it can charge.  This practice is a violation of California's consumer protection laws and the implied covenant of good faith and fair dealing in the Bank's Deposit Agreement.

23.     In addition, the Bank misleads its customers regarding its reordering practices. Instead of unequivocally telling its customers that it will reorder debits from highest to lowest, the Bank instead states in its contract that: "We *may* determine in our discretion the order of processing and posting deposits, fees, charges, check, debits and other items to your account. We *may* credit, accept, pay, certify or return deposits, fees, charges, checks, debits and other items arriving to your account on the same day in any order at our option." This statement is deceptive because it is, in fact, the practice of the Bank to *always* reorder debit from highest to lowest. This statement thus violates California's consumer protection laws and the implied covenant of good faith and fair dealing in the Bank's Deposit Agreement.

24.     The Bank's policies have a disproportionate impact on low-income customers. Almost by definition, these fees disproportionately affect the poor, who are most likely to maintain low balances. Moebs Services, a research company that has conducted studies for the government as well as banks, estimates that 90 percent of overdraft fees are paid by the poorest 10 percent of banks' customer base. Moreover, these fees have the tendency to create a domino effect, because the imposition of a service charge on an account with a negative balance will make it less likely that the account holder's balance will reach positive territory, resulting in more fees.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, and at least one of the Plaintiffs is a resident of a different state than Bank of America.

26.     Venue is proper in the Northern District of California, the district where this action was originally commenced, pursuant to 28 U.S.C. § 1391 because Bank of America is subject to personal jurisdiction there and regularly conducts business in that district, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred and continue to occur in that district.

## THE PARTIES

27.     Plaintiff Steve Yourke is a resident of San Francisco, California.  Mr. Yourke is a former customer of the Bank who was wrongfully charged multiple overdraft fees in connection with use of his Bank of America debit card.

28.     Plaintiff Kristin Richards is a resident of Citrus Heights, California.  Ms. Richards is a current customer of the Bank who was wrongfully charged multiple overdraft fees in connection with use of her Bank of America debit card.

29.      Plaintiff David Brull is a resident of Laguna Hills, California.  Mr. Brull is a current customer of the Bank who was wrongfully charged multiple overdraft fees in connection with use of his Bank of America debit card.

30.     Plaintiff Laura Morland is a resident of Berkeley, California.  Ms. Morland is a current customer of the Bank who was wrongfully charged multiple overdraft fees in connection with use of her Bank of America debit card.

31.     Bank of America is a national bank incorporated in the State of Delaware which maintains its principal place of business in Charlotte, North Carolina.  Bank of America regularly and systematically conducts business throughout the State of California.  Among other things, Bank of America is engaged in the business of providing retail banking services to millions of consumers, including Plaintiffs and members of the putative Class, which include the issuance of debit cards for use by its customers in conjunction with their checking accounts.  Bank of America boasts the country's most extensive branch network, with more than 1,000 branches in California alone.

32.     Bank of America is a national bank, subject to the National Bank Act, 12 U.S.C. § 1, *et seq.*, and regulations promulgated by the Office of the Comptroller of the Currency.

## CLASS ALLEGATIONS

33.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

34.    The proposed Class is defined as:

All Bank of America customers having accounts at branches in the State of California who, within four (4) years preceding the commencement of this action through the date of class certification, incurred an overdraft fee as a result of Bank of America's practice of re-sequencing debit card transactions from highest to lowest (the "Class").

35.    Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

36.    Excluded from the Class are Bank of America, its parents, subsidiaries, affiliates, officers and directors, any entity in which Bank of America has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

37.    The members of the Class are so numerous that joinder is impractical.  The Class consists of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to Bank of America's records.

38.    The claims of the representative Plaintiffs are typical of the claims of the Class in that the representative Plaintiffs, like all Class members, were charged overdraft fees by Bank of America as a result of its practice of re-sequencing debit card transactions from highest to lowest.  The representative Plaintiffs, like all Class members, have been damaged by Bank of America's misconduct in that they incurred and/or will continue to incur unfair and unconscionable overdraft charges.   Furthermore, the factual basis of Bank of America's misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Class.

39.    There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual Class members.

40.    Among the questions of law and fact common to the Class are whether Bank of America:

a.    Does not clearly disclose and/or refuses to allow its customers to opt out of its overdraft protection program;

8

b.      Does not obtain affirmative consent from its customers prior to processing transactions that will result in overdraft fees;

c.      Does not alert its customers that a debit card transaction will trigger an overdraft fee, and does not provide its customers with an opportunity to cancel such transactions;

d.      Manipulates and reorders transactions so that it can increase the number of overdraft fees it imposes;

e.      Manipulates and reorders debits from highest to lowest in order to maximize the number of overdrafts and, consequently, the amount of overdraft fees;

f.      Imposes overdrafts and overdraft fees when, but for reordering transactions, there would otherwise be sufficient funds in the account;

g.      Fails to provide customers with accurate balance information;

h.      Delays posting of transactions by customers using debit cards so that customers are charged overdraft fees on transactions, even though the customers had sufficient funds in their accounts to cover the transactions upon execution;

i.      Charges exorbitant overdraft fees that bear no relationship to the actual costs and risks of covering insufficient funds transactions;

j.      Breaches its covenant of good faith and fair dealing with Plaintiffs and other members of the Class through its overdraft policies and practices;

k.      Requires its customers to enter into standardized account agreements which include unconscionable provisions;

l.      Converts moneys belonging to Plaintiffs and other members of the Class through its overdraft policies and practices;

m.      Is unjustly enriched through its overdraft policies and practices; and

n.      Violates California's consumer protection laws, including California Business & Professions Code § 17200, *et seq.*, through its overdraft policies and practices.

41.    Other questions of law and fact common to the Class include:

a.      The proper method or methods by which to measure damages, and

b.      The declaratory relief to which the Class is entitled.

42.    Plaintiffs' claims are typical of the claims of other Class members, in that they arise out of the same wrongful overdraft policies and practices and the same or substantially similar unconscionable provisions of Bank of America's account agreements and other related documents.  Plaintiffs have suffered the harm alleged and have no interests antagonistic to the interests of any other Class member.

43.    Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions.  Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Class.

44.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Bank of America, no Class member could afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, the Class members will continue to suffer losses and Bank of America's misconduct will proceed without remedy.

45.    Even if Class members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court.

Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

## COMMON FACTUAL ALLEGATIONS

### A.      Bank of America

46.      According to its website, Bank of America is one of the world's largest financial institutions, with more than 59 million consumer and small business relationships, more than 6,100 retail banking offices, in excess of 18,000 ATMs, and online banking with nearly 24 million active users.

47.      Bank of America is in the business of providing its customers with a variety of banking services.  One of the services provided by Bank of America for customers who open a checking account is a debit card, also known as a check card or ATM card.  Through those debit cards, customers can engage in transactions using funds directly from their accounts by engaging in "debit" or "point of sale" ("POS") transactions, or may withdraw money from their accounts at automated teller machines ("ATMs").  Whether the card is used to execute POS transactions or to withdraw cash from ATM machines, the transaction is processed electronically.  As a result, Bank of America is notified instantaneously when the card is swiped, and has the option to accept or decline transactions at such time.

48.      Bank of America employs sophisticated software to automate its overdraft system.  This program maximizes the number of overdrafts, and thus, the amount of overdraft fees charged per customer.

49.      As a result of Bank of America's manipulation and alteration of customers' transactions records, funds in a customer's account are depleted more rapidly and more overdraft fees are likely to be charged for multiple smaller transactions.  Indeed, overdraft charges are

likely to occur at times when, but for the manipulation and alteration, there would be funds in the account and no overdraft would occur.  For example, if a customer, whose account has a $50 balance at the time Bank of America processed several transactions, made four transactions of $10 and one subsequent transaction of $100 on the same day, the Bank would reorder the debits from largest to smallest, imposing four overdraft fees on the customer.  Conversely, if the $100 transaction were debited last—consistent with the actual order of transactions—only one overdraft fee would be assessed.  *See* FDIC Study of Bank Overdraft Programs, November 2008, *available at*: http://www.fdic.gov/bank/analytical/overdraft/, at 11, n. 12.

### B. Bank of America's Relevant Customer Documents Regarding Overdrafts

50.    Plaintiffs and all members of the Class maintain or maintained a checking account with Bank of America.  The terms of the Bank's checking accounts are contained in a written standard account holder agreement.  The "Deposit Agreement and Disclosures" effective February 1, 2008, is attached as Exhibit C.  The Deposit Agreement is a 41-page, single-spaced document written in small font.

51.    The Bank's Deposit Agreement states that "[i]n *most* states we process and post items within each category from the highest to lowest dollar amount" (p. 19, emphasis added).  The Deposit Agreement does not describe the states to which this applies.  It further states that the "the high-to-low posting order *may* result in more insufficient funds items and more fees," even though it *will almost always* result in more fees (*Id.*, emphasis added; *see also* pp. 20-21).

52.    The Deposit Agreement also states that the Bank "may charge you a fee for each insufficient funds item whether we pay, permit, return, decline or reject the item." (*Id.* at 20).

53.    The Bank publishes a pamphlet that, upon information and belief, is available to customers at the Bank branches, titled a "Personal Schedule of Fees."  The Personal Schedule of Fees for California (the "Fee Schedule") is attached as Exhibit D.  The Fee Schedule provides "Overdraft Item Fee and NSF: Returned Item Fee — For the first day your account has an occurrence, fee for each overdraft item and for each returned item" is "$25.00 each item."  The Fee Schedule further provides:  "For the second and subsequent days your account has an

occurrence, fee for each overdraft item and for each returned item" is "$35.00 each item." Fee Schedule at p.9. An "occurrence" is defined as "a day with at least one overdraft item or one returned item." *Id.*

54.     The Bank also publishes "Important Information About Your Card Agreement and Disclosure" (the "Card Agreement") a copy of which is attached as Exhibit E. The Card Agreement "supplements the Deposit Agreement and Disclosures and related Personal Schedule of Fees (collectively, the "Deposit Agreement") that apply to each Bank of America deposit account that you link to your card." Card Agreement at p.1.

55.     The Deposit Agreement and related documents, including the Fee Schedule and Card Agreement, fail to disclose to depositors that they have the option to "opt out" from the Bank's overdraft scheme. However, it is possible for customers to opt out of the scheme upon request. For instance, after several requests, Plaintiff Yourke was permitted to opt out of the scheme.

56.     At the time the Bank's debit card is used, for example at a POS or at an ATM, the Bank is able to determine almost instantaneously whether there are sufficient funds in a customer's account to cover that particular transaction. The Bank has the technological capability to decline transactions or notify customers at that very moment that the particular debit card transaction would result in an overdraft. The Bank could give customers the option to decline the transaction to avoid incurring the overdraft fee, but it does not do this because it seeks to maximize its overdraft fees.

57.     The Deposit Agreement also contains an arbitration agreement and a class action waiver which states "YOU AND WE ARE BOTH GIVING UP THE RIGHT TO TRIAL BY JURY," AND "THIS SECTION PRECLUDES YOU AND US FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION OR JOINING OR CONSOLIDATING THE CLAIMS OF OTHER PERSONS (HEREINAFTER REFERRED TO AS THE 'CLASS ACTION WAIVER.')." Deposit Agreement at p.40.

58.     Under California Civil Code § 1670.5, the Arbitration and Waiver of Jury & Class Action Provision of the Deposit Agreement are unconscionable in that the Deposit Agreement and related documents, to the extent they may be deemed contracts at all, are contracts of adhesion because, among other reasons, they are standardized forms, imposed and drafted by the Bank, which is a party of vastly superior bargaining strength, and relegate to the depositor only the opportunity to adhere to them or reject them and because they lead to overly harsh results for consumers.

C.      **Bank of America's Re-Ordering of Checking Account Transactions**

59.     In an effort to maximize overdraft revenue, Bank of America manipulates and reorders debits from highest to lowest during given periods of time.  Bank of America reorders transactions for no reason other than to increase the number of exorbitant overdraft fees it can charge.  This practice violates numerous consumer protection laws and the covenant of good faith and fair dealing in the Bank's Deposit Agreement.

60.     In addition, Bank of America misleads its customers regarding its reordering practices.  Instead of unequivocally telling its customers that it will reorder debits from highest to lowest, the Bank states in its contract that "[w]e *may* determine in our discretion the order of processing and posting deposits, fees, charges, checks, debits and other items to your account. We *may* credit, accept, pay, certify or return deposits, fees, charges, checks, debits and other items arriving to your account on the *same day* in any order at our option."  This statement is deceptive and/or unfair because it is, in fact, the Bank's practice to *always* reorder debits from highest to lowest, and because the Bank groups together POS transactions that occurred on subsequent days with POS transactions that occurred on earlier days, and reorders them so that higher debits that occurred on subsequent days are posted to its customers' accounts before lower debits that occurred on earlier days, contrary to the terms of the Bank Deposit Agreement and its customers' reasonable expectations.  The Bank's practices thus violate the covenant of good faith and fair dealing implied in the Bank Deposit Agreement as well as the consumer protection laws of California.

14

61.     Transactions involving debit cards used by Bank of America customers, including the withdrawal of cash from ATM machines and POS transactions with vendors, are processed electronically.  As a result, Bank of America is notified instantaneously when the customer's debit card is swiped, and has the option to accept or decline these transactions.

62.     Notwithstanding the instantaneous nature of these electronic debit card transactions, under Bank of America's posting system, it fails to post charges in the order in which they are incurred or received.  Bank of America developed a policy and employs a practice whereby account charges and debits are posted to its customers' accounts out of chronological order for the sole purpose of maximizing the number of overdraft transactions and, therefore, the amount of overdraft fees charged to its customers.

63.     Instead of processing such transactions in chronological order, Bank of America processes them starting with the largest debit and ending with the smallest debit, so as to generate the largest possible number of overdrafts and the greatest possible amount of overdraft fees.

64.     Bank of America refrains from immediately posting charges to a customer's account as it receives them—sometimes for multiple business days.  By holding charges rather than posting them immediately to an account, Bank of America is able to amass a number of charges on the account.  Subsequently, Bank of America posts all of the amassed charges on a single date.  When the group of charges is eventually posted to the customer's account, Bank of America posts them in order of largest to smallest—not in the order in which they were received or in the order in which they were charged.  This delayed posting results in the imposition of multiple overdraft fees that would not otherwise be imposed.  The delayed posting also prevents customers from ascertaining the accurate balances in their accounts.

65.     Bank of America's policy and practice of posting charges from largest to smallest, rather than chronologically, or from smallest to largest, is specifically designed to maximize the generation of overdraft fees by triggering overdraft fees for account charges that would not otherwise result in such fees.

66.     Bank of America enforces an unconscionable policy whereby charges incurred are posted to customers' accounts in a non-chronological order, from highest to lowest, and are held for multiple days and then batched together, to maximize the number of overdraft transactions and fees.   Bank of America's processing practices substantially increase the likelihood that customers' smaller charges will result in multiple overdraft fees.  The practices provide Bank of America with substantially higher service fee revenues than it would otherwise achieve absent these practices.

67.     As a result, Plaintiffs and members of the Class have been assessed overdraft fees for transactions which occurred when they actually had sufficient funds in their accounts to cover those transactions.

### D.       Bank of America's Cloaking of Accurate Balance Information

68.     Bank of America actively promotes the convenience of its debit cards and other electronic debiting, but fails to provide customers with accurate balance information.  When customers execute account transactions, they generally do not have access to an accurate balance register or balance information.

69.     Bank of America provides inaccurate balance information to its customers through its electronic network.  In certain cases, Bank of America informs its customers that they have a positive balance when, in reality, they have a negative balance, despite the Bank's actual knowledge of outstanding debits and transactions.

70.     Even when Bank of America has actual knowledge of outstanding transactions which have already created a negative balance in a customers' account, it encourages the customer to incur more overdraft charges by approving—rather than prudently declining— subsequent debit card purchases and other electronic transactions.

71.     Bank of America also assesses overdraft fees at times when actual funds in the customer account are sufficient to cover all debits that have been submitted to the Bank for payment.  It does this by placing a "hold" on actual funds in the customer's account.  In doing so,

Bank of America charges overdraft fees where it faces no risk, because the cash balance in the customer's account has not dropped below zero.

**E.      Bank of America's Failure to Notify Customers of Overdrafts or Advise Customers of Their Right to Opt Out**

72.      At the time its debit cards are used in POS transactions or at ATMs, Bank of America is able to determine, almost instantaneously, whether there are sufficient funds in a customer's account to cover that particular transaction.  The Bank has the technological capability to decline transactions (which it does when a pending transaction would exceed a pre-determined, overdraft tolerance limit for the account), or notify customers at that very moment that the particular debit card transaction would result in an overdraft.  Bank of America could give customers the option to decline the transaction to avoid incurring the overdraft fee, but it does not do so because it seeks to maximize the amount of revenue generated through its assessment of overdraft fees.

73.      Notwithstanding its technological capabilities and actual knowledge, Bank of America fails to provide notice to Plaintiffs and the Class that a particular debit card transaction will result in an overdraft and, hence, an overdraft fee.  Because Bank of America's customers are not notified of the potential overdraft, and are not given the option of declining the debit card transaction or providing another form of payment, the customers incur monetary damages in the form of overdraft fees.

74.      Bank of America fails to make Plaintiffs and Class members aware that they can opt out of its overdraft scheme upon request, thereby avoiding any overdraft fees from being incurred.

**F.      Bank of America's Overdraft Policies and Practices Are Contrary to Best Practices**

75.      By engaging in the conduct described herein, Bank of America has failed to follow the list of "best practices" for overdraft programs set forth in the Joint Guidance issued by the United States Department of the Treasury, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation,

and the National Credit Union Administration (collectively, the "Agencies").  *See* Exhibit A. These "best practice" recommendations include: "Provide election or opt-out of service.  Obtain affirmative consent of consumers to receive overdraft protection.  Alternatively, where overdraft protection is automatically provided, permit consumers to 'opt-out' of the overdraft program and provide a clear consumer disclosure of this option."  70 F.R. 9127-01, 9132.

76.     According to rules proposed by the Agencies: "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . .  This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee."  73 F.R. 28904-01, 28929 (May 19, 2008).

77.     The Joint Guidance also advises banks to "[a]lert customers before a transaction triggers any fees.  When consumers attempt to withdraw or transfer funds made available through an overdraft protection program, provide a specific consumer notice, where feasible, that completing the withdrawal may trigger the overdraft fees."  70 F.R.D. 9127, 9132.  The Joint Guidance further advises that "[t]his notice should be presented in a manner that permits consumers to cancel the attempted withdrawal or transfer after receiving the notice."  *Id.*

78.     Similarly, the list of "best practices" recommended in "Overdraft Protection: A Guide for Bankers," issued by the American Bankers Association, includes offering customers the option of "opting out" of any overdraft programs, and informing customers, before they access funds, that a particular point of sale or ATM transaction will cause them to incur an overdraft fee.  *See* Exhibit B.

79.     Bank of America's overdraft policies make it difficult for customers to avoid injury even if they carefully track the balance in their account.  In fact, the Agencies have stated that "Injury" resulting from such policies, "is not reasonably avoidable" by the consumer. 73 F.R. 28904-01, 28929.  "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although consumers can reduce the risk of overdrawing their accounts by carefully

tracking their credits and debits, consumers often lack sufficient information about key aspects of their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available."

80.  On October 6, 2009, the Center for Responsible Lending issued a report entitled "Overdraft Explosion:  Bank Fees for Overdrafts Increase 35% in Two Years."  The report, attached hereto as Exhibit F, finds that it is now "standard procedure to automatically enroll checking account customers in their most expensive overdraft loan program."  The report finds that debit card transactions account for more overdraft fees than traditional checks or any other type of transaction, even though "debit card transactions and ATM withdrawals . . . could easily be denied for no fee."  The report also finds that overdraft fees increased 35 percent from 2006 to 2008, and that over 50 million Americans overdrew their accounts in a 12 month period, with 27 million accounts incurring five or more overdraft fees.

81.  A chart from the research company Moebs Services shows that, in every year since 1992, banks have gained increased revenues from overdraft fees:



### G.   The Bank's Overdraft Policies Are Unconscionable.

82.     Under California Civil Code § 1670.5, the Bank's overdraft policies are unconscionable in the following respects, among others:

(a)     The Bank does not disclose or reasonably disclose to customers that they have the option to "opt out" of the Bank's overdraft scheme;

(b)     The Bank does not obtain affirmative consent from checking account customers prior to processing a transaction that would overdraw the account and result in an overdraft fee;

(c)     The Bank does not alert its customers that a debit card transaction will trigger an overdraft fee and does not provide the customer the opportunity to cancel that transaction;

(d)     The Deposit Agreement and related documents, including the Fee Schedule and Card Agreement, to the extent they may be deemed contracts, are contracts of adhesion in that they are standardized forms, imposed and drafted by the Bank, which is a party of vastly superior bargaining strength, and relegates to the depositor only the opportunity to adhere to them or reject them;

(e)     The amount of overdraft fees are disclosed in an ineffective, ambiguous, misleading and deceptive manner, since they are not contained in the Deposit Agreement, but rather in a different and separate document, the Fee Schedule, which is not signed by the depositor; and

(f)     The Deposit Agreement provided to California customers is ineffective, ambiguous, deceptive and misleading in that it does not unambiguously state that it always reorders debits from high to low, even though the Bank always reorders transactions in this way for California customers so as to maximize overdrafts and revenue for the Bank.

### H.    Plaintiff Steve Yourke's Account History

83.    Plaintiff Steve Yourke is a former checking account customer of Bank of America. He opened his account with the Bank in or about April 2002.  The Bank issued Mr. Yourke a debit card when he opened his account.

84.    The Bank wrongfully charged Mr. Yourke with overdraft fees on multiple occasions.  For example, on December 4, 2007, the Bank sent Mr. Yourke a notice that, as of December 3, 2007, the Bank had received notice of five transactions, for $32.83, $4.35, $4.35, $6.05 and $39.46, that his account had become overdrawn for each of these transactions and that the Bank had charged $35 fee for each such transaction, for a total of $175.  If the Bank had not manipulated and reordered the transactions from highest to lowest, Mr. Yourke would have incurred only two overdraft fees instead of five overdraft fees.

85.    On May 2, 2008, the Bank sent Mr. Yourke a notice that, as of May 1, 2008, two transactions, for $60 and $21.39, had caused his account to be overdrawn and that the Bank had charged him a fee of $35 for each such charge.  If the Bank had not manipulated and reordered the transactions from highest to lowest, Mr. Yourke would have incurred one overdraft fee instead of two overdraft fees.

86.    In addition to the fees that Mr. Yourke was charged for overdrafts as a result of reordering of transactions in December 2007 and May 2008, there were many other overdraft fees he was charged as a result of the Bank's manipulation and reordering of transactions from at least February 2005 until the present.

87.    On multiple occasions, the Bank charged Mr. Yourke overdraft fees based solely on the fact that he did not have sufficient funds in his account to cover prior overdraft fees charged by the Bank.  For instance, in or about November or December 2005, he was charged multiple overdraft fees based on the fact that he incurred overdraft fees without sufficient funds in the account to cover them.

88.     The Bank never notified Mr. Yourke at the time he made the debit card transactions, including the POS transactions described above, that his checking account was overdrawn or that it would charge him an overdraft fee as a result of the transaction.

89.     The Bank never declined to pay any of Mr. Yourke's debit card charges, even when his account was overdrawn.

90.     In the past four years, the Bank has wrongfully charged Mr. Yourke at least $4,000 in overdraft fees.

**I.      Plaintiff Kristin Richards' Account History**

91.     Plaintiff Kristin Richards is a current checking account customer with Bank of America.  She opened her account on or about September 30, 2008.  At that time, the Bank issued Ms. Richards a debit card.

92.     The Bank account Ms. Richards opened online was advertised as a "free" checking account.  At the time she opened her account, the Bank did not inform her about overdraft fees or provide her with the ability to opt out of the overdraft scheme.  Instead, the Bank asked Ms. Richards to "accept" the terms and conditions associated with her account even though the full disclosure was not available online.  The Bank mailed the agreements that pertain to her account to Ms. Richards after she had opened her account and "accepted" the terms.

93.     The Bank wrongfully charged Ms. Richards for overdraft fees incurred when she made withdrawals from a Bank of America ATM on or about October 6, 2008.  The Bank did not warn Ms. Richards that the withdrawals would cause her to overdraft her account.

94.     The Bank wrongfully charged Ms. Richards an unwarranted $25 overdraft fee on October 27, 2008, even though there was approximately $219.07 in her account at the time the overdraft fee was imposed.

95.     Many of the transactions for which Ms. Richards was charged overdraft fees were related to use of her debit card, including POS transactions, even though there were sufficient funds in her account to cover them.

96.     Between October 27 and October 28, 2008, the Bank wrongfully charged Ms. Richards two overdraft fees of $35 each and one overdraft fee of $25.  If the Bank had not manipulated the timing of her transactions by reordering them from highest to lowest, Ms. Richards would only have incurred one overdraft fee instead of three fees on those dates.

97.     In one day, on November 18, 2008, the Bank wrongfully charged Ms. Richards five overdraft fees of $35, for a total of $175.  According to her bank records, there was approximately $150.39 in her account at the time the Bank imposed the first overdraft fee, enough to cover that first transaction.

98.     As a result of these five improper overdraft fees, totaling $175, Ms. Richards' account overdrafted.  Because her account was already negative due to the improper overdraft fees, her account became even more negative when three additional debits were posted to Ms. Richards' account on November 18, 2008.  Accordingly, on November 19, 2008, the Bank charged Ms. Richards three more overdraft fees of $35 each, for a total of $105.

99.     If the Bank had not manipulated Ms. Richards' transactions by reordering them from highest to lowest, Ms. Richards would only have incurred one overdraft fee instead of eight overdraft fees between November 18, 2008 and November 19, 2008.

100.    Bank of America charged Ms. Richards a $25 or $35 fee for each overdraft, regardless of whether there were sufficient funds in her account and regardless of the size of the POS transaction that could have led to an overdraft.

101.    Ms. Richards protested the fees by calling Bank of America's customer service line, by visiting a Bank of America branch office in Roseville, California, and by contacting Bank of America through its website.

102.    In response to one of Ms. Richards' email inquiries, Bank of America stated that it "implemented a change to the way Check Card transactions are processed on March 4, 2008." It further stated that Ms. Richards was sent notice of this change on her June 2007 statement and then on her March 2008 statement, despite the fact that Ms. Richards did not even open her Bank of America account until September 2008.

103.    Finally, in response to Ms. Richards' repeated and insistent protests, the Bank ultimately refunded $108 to her account, which is approximately equal to three $35 overdraft fees.

104.    As a result of the improper overdraft fees that Ms. Richards was charged, her so-called "free" checking account was not "free."

105.    In addition to the circumstances described above, there are many other occasions when Bank of America improperly charged Ms. Richards overdraft fees.

106.    The Bank never notified Ms. Richards at the time she made the debit card transactions, including the POS transactions described above, that her checking account was overdrawn or that it would charge her an overdraft fee as a result of the transaction.

107.    As a result of these improper overdraft fees, Ms. Richards has suffered monetary damages.

**J.      Plaintiff David Brull's Account History**

108.    Plaintiff David Brull is a current checking account customer with Bank of America.  He opened his account on or about 1988.  The Bank issued Mr. Brull a debit card.

109.    Bank of America wrongfully charged Mr. Brull overdraft fees on multiple occasions.  By way of illustration, Mr. Brull was charged two overdraft fees on January 19, 2010, in the amount of $35.00 each, for a total of $70.00.

110.    If Bank of America had not manipulated and reordered Mr. Brull's transactions, he would have incurred only one overdraft fee instead of two overdraft fees.

111.    Since opening his account in 1988, Mr. Brull has been wrongfully charged approximately $2,000 in overdraft fees.

112.    Bank of America failed to notify Mr. Brull that he could incur overdraft fees on transactions even though there were sufficient funds in the checking account to cover the transaction at the time the transaction was executed.  In addition, Bank of America never notified Mr. Brull at the time he made the check card transactions that his checking account was overdrawn or that he would be charged an overdraft fee as a result of the transaction.

Furthermore, Bank of America never declined to pay any of Mr. Brull's check card charges even though his account was overdrawn or had insufficient funds in the account to cover the transaction.

### K.   Plaintiff Laura Morland's Account History

113.   Plaintiff Laura Morland is a current checking account customer with Bank of America.  She opened her account on or about 1992.  The Bank issued Ms. Morland a debit card.

114.   Bank of America wrongfully charged Ms. Morland overdraft fees on multiple occasions.  By way of illustration, Ms. Morland was charged four overdraft fees on November 16, 2009, in the amount of $35.00 each, for a total of $140.00.[1]

115.   If Bank of America had not manipulated and reordered Ms. Morland's transactions, she would have incurred three overdraft fees instead of four overdraft fees.

116.   Since opening her account in 1992, Ms. Morland has been wrongfully charged approximately $750 in overdraft fees.

117.   Bank of America failed to notify Ms. Morland that she could incur overdraft fees on transactions even though there were sufficient funds in the checking account to cover the transaction at the time the transaction was executed.  In addition, Bank of America never notified Ms. Morland at the time she made the check card transactions that her checking account was overdrawn or that she would be charged an overdraft fee as a result of the transaction.  Furthermore, Bank of America never declined to pay any of Ms. Morland's check card charges even though her account was overdrawn or had insufficient funds in the account to cover the transaction.

118.   The overdraft fees charged to Mr. Yourke, Ms. Richard, Mr. Brull and Ms. Morland are representative of hundreds of millions of dollars in overdraft fees that Bank of America wrongfully assessed and deducted from the bank accounts of Class members.  These

---

[1] On September 21, 2009, Bank of America announced that, in the future, it would limit the number of overdraft fees charged to a single customer to four in a given 24 hour period.  *See* http://www.nytimes.com/2009/09/23/your-money/credit-and-debit-cards/23credit.html?_r=1&hp.

wrongful takings are especially egregious considering the fact that the Bank approved each transaction and knew at the time of approval whether there were sufficient funds in the accounts to cover the transactions.

119.    All conditions precedent to the relief sought herein have been performed, occurred or been waived.

## FIRST CLAIM FOR RELIEF

### (Breach of Implied Covenant of Good Faith and Fair Dealing)

120.    Plaintiffs repeat paragraphs 1 through 119 above.

121.    Under California common law, a covenant of good faith and fair dealing is implied into every contract.

122.    The Bank breached the covenant of good faith and fair dealing in the Deposit Agreement between it and Plaintiffs and the Class by charging Plaintiffs and the Class unconscionable overdraft fees and disclosing the mechanism for assessing these fees in a deceptive and misleading manner.

123.    Plaintiffs and members of the Class performed all, or substantially all, of the duties required of them under the Deposit Agreement, Fee Agreement and Card Agreement.

124.    The conditions required for the Bank's performance under the Deposit Agreement, Fee Agreement and Card Agreement had occurred.

125.    The Bank unfairly interfered with the right of Plaintiffs and Class members to receive the benefits under the Agreement.

126.    Plaintiffs and the Class have been, and will continue to be, damaged by the Bank's breach of the implied covenant of good faith, and the resulting overdraft fees in an amount that is capable of identification through the Bank's records.

## SECOND CLAIM FOR RELIEF

### (Conversion)

127.    Plaintiffs repeat paragraphs 1 through 119 above.

26

128.    Plaintiffs and Class members own and have the right to possess the money in their checking accounts.

129.    The Bank interfered, and continues to interfere, with Plaintiffs' and Class members' possession of this money by assessing unwarranted and unlawful overdraft fees as the result of debit card transactions, including POS and ATM transactions, despite the fact that Plaintiffs and the Class members had and/or have sufficient funds in their accounts to cover these transactions at the time they were and/or are made.

130.    Plaintiffs and Class members never affirmatively consented to the Bank's direct debit of overdraft fees from their checking accounts as a result of debit card transactions, including POS and ATM transactions, that occurred at a time when there were sufficient funds in their accounts to cover these transactions.

131.    Plaintiffs and Class members have been, and will continue to be, damaged by the Bank's wrongful assessment of overdraft fees in an amount that is capable of identification through the Bank's records.

132.    Plaintiffs are entitled to punitive damages because the Bank engaged in fraud, malice or oppression.

## THIRD CLAIM FOR RELIEF

### (Unjust Enrichment and Restitution)

133.    Plaintiffs repeat paragraphs 1 through 119 above.

134.    By charging excessive overdraft fees pursuant to unconscionable contract terms, in violation of the Cal. Civ. Code §§ 1770(a)(5), (14)(19), and in violation of the Cal. Bus. Prof. Code. § 17000, the Bank unjustly received a benefit at the expense of Plaintiffs and Class members.

135.    It is unjust to allow the Bank to retain the profits from its charging of unlawful and unconscionable overdraft fees without providing compensation to Plaintiffs and the Class.

136.    The Bank acted with conscious disregard for the rights of Plaintiffs and Class members.

137.    Plaintiffs and Class members are entitled to restitution.

**FOURTH CLAIM FOR RELIEF**

**(Violations of California Business & Profession Code § 17200, *et seq.*)**

138.    Plaintiffs repeat paragraphs 1 through 119 above.

139.    The Bank's conduct described herein violates Business and Professions Code § 17200 (The Unfair Competition Law, or "UCL") in the following respects:

(a)    The Bank's conduct in charging overdraft fees is unconscionable, a violation of California Civil Code § 1770(a)(19) and, consequently, constitutes an unlawful business act or practice within the meaning of the UCL;

(b)    The Bank's practices, as described herein, violate California Civil Code §§ 1770(a)(5), (14) and (19), and consequently, constitute unlawful business acts or practices within the meaning of the UCL;

(c)    The Bank's policies and practices regarding overdraft fees constitute unfair business acts or practices within the meaning of the UCL; and

(d)    The Bank's policies and practices regarding overdraft fees are likely to mislead the general public and, consequently, constitute fraudulent business acts or practices within the meaning of the UCL.

140.    The harm to Plaintiffs and the Class arising from the Bank's unlawful, unfair and fraudulent practices outweighs the utility, if any, of those practices.

141.    The unlawful, unfair and fraudulent business practices of the Bank are immoral, unethical, oppressive, unscrupulous, unconscionable and/or substantially injurious to Plaintiffs and members of the Class.

142.    As a result of the Bank's violation of the UCL, Plaintiffs and members of the Class have paid, and/or will continue to pay, excessive amounts of money for banking services and thereby suffered and will continue to suffer actual damages.

143.    Pursuant to California Business and Professions Code § 17203, Plaintiffs and the Class are therefore entitled to *inter alia*;

(a)    an order requiring the Bank to cease the acts of unfair competition alleged herein;

(b)    full restitution of all overdraft fees paid to the Bank on debit card transactions, including POS and ATM transactions, pursuant to California Code of Civil Procedure § 384;

(c)    pre-judgment interest at the highest rate allowable by law; and

(d)    payment of their attorneys' fees and costs pursuant to, *inter alia*, Cal. Code Civ. Proc. § 1021.5.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class demand trial by jury and judgment as follows:

1.    Declaring Bank of America's overdraft fee policies and practices to be wrongful, unfair, deceptive and unconscionable;

2.    Restitution of all overdraft fees paid to the Bank by Plaintiffs and the Class in an amount to be determined at trial;

3.    Disgorgement of the ill-gotten gains derived from the Bank's misconduct;

4.    Actual damages in an amount according to proof;

5.    Punitive and exemplary damages;

6.    Pre-judgment interest at the highest rate permitted by law;

7.    Costs and disbursements incurred by Plaintiffs in connection with this action, including reasonable attorneys' fees pursuant to California Code of Civil Procedure § 1021.5 and California Civil Code § 1780; and

8.    Such other and further relief as the Court deems just and proper.

Dated:       April 12, 2010.

/s/ Bruce S. Rogow
Bruce S. Rogow, Esquire
Florida Bar No. 067999
bruce@abbrclaw.com
Robert C. Gilbert, Esquire
Florida Bar No. 561861
bobby@abbrclaw.com
ALTERS BOLDT BROWN
  RASH & CULMO, P.A.
4141 N.E. 2nd Avenue
Miami, Florida 33137
Tel:  (305) 571-8550
Fax:  (305) 571-8558

*Lead Counsel for Plaintiffs*

/s/ Russell W. Budd
Russell W. Budd, Esquire
Texas Bar No. 03312400
rbudd@baronbudd.com
Bruce W. Steckler, Esquire
Texas Bar No. 00785039
bsteckler@baronbudd.com
Melissa K. Hutts, Esquire
Texas Bar No.  0188015
mhutts@baronbudd.com
Renee M. Melancon, Esquire
Texas Bar No. 2403573
rmelancon@baronbudd.com
BARON & BUDD, P.C.
3102 Oak Lawn Ave. – Suite 1100
Dallas, TX 75219
Tel: 214-521-3605/ Fax: 214-520-1181

/s/ Barry R. Himmelstein
Barry R. Himmelstein, Esquire
California Bar No. 157736
bhimmelstein@lchb.com
Michael W. Sobol, Esquire
California Bar No. 194857
msobol@lchb.com
Jordan S. Elias, Esquire
California Bar No. 228731
jelias@lchb.com
Mikaela Bernstein, Esquire
California Bar No. 261301
mbernstein@lchb.com
LIEFF CABRASER HEIMANN &
  BERNSTEIN LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Tel: 415-956-1000 / Fax: 415-956-1008

/s/ Robert C. Josefsberg
Robert C. Josefsberg, Esquire
Florida Bar No. 40856
rjosefsberg@podhurst.com
Victor M. Diaz, Jr., Esquire
Florida Bar No. 503800
vdiaz@podhurst.com
John Gravante, III, Esquire
Florida Bar No. 617113
jgravante@podhurst.com
PODHURST ORSECK, P. A.
City National Bank Building
25 W Flagler Street - Suite 800
Miami, FL 33130-1780
Tel: 305-358-2800 / Fax: 305-358-2382

/s/ Ted E. Trief
Ted E. Trief, Esquire
New York Bar No. 1476662
ttrief@triefandolk.com
Barbara E. Olk, Esquire
New York Bar No. 1459643
bolk@triefandolk.com
TRIEF & OLK
150 East 58th Street
34th Floor
New York, NY 10155
Tel: 212-486-6060
Fax: 212-317-2946

/s/ Edward Adam Webb
Edward Adam Webb, Esquire
Georgia Bar No. 743910
adam@webllc.com
G. Franklin Lemond, Jr., Esquire
Georgia Bar No. 141315
flemond@webbllc.com
WEBB, KLASE & LEMOND, L.L.C.
1900 The Exchange SE, Suite 480
Atlanta, GA 30339
Tel: 770-444-9325
Fax: 770-444-0271

/s/ Ruben Honik
Ruben Honik, Esquire
Pennsylvania Bar No. 33109
rhonik@golombhonik.com
GOLUMB & HONIK, P.C.
1515 Market Street
Suite 1100
Philadelphia, PA 19102
Tel: 215-985-9177
Fax: 215-985-4169

*Plaintiffs' Executive Committee*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 1:09-MD-02036-JLK**

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on April 12, 2010, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document

is being served this day on all counsel of record or pro se parties identified on the attached

Service List in the manner specified, either via transmission of Notices of Electronic Filing

generated by CM/ECF or in some other authorized manner for those counsel or parties who are

not authorized to receive electronically Notices of Electronic Filing.

/s/ Robert C. Gilbert
Robert C. Gilbert, Esquire
Florida Bar No. 561861
ALTERS BOLDT BROWN
RASH & CULMO, P.A.
4141 N.E. 2nd Avenue
Suite 201
Miami, Florida 33137
bobby@abbrclaw.com