**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 1:09-MD-02036-JLK**

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

THIS DOCUMENT RELATES TO:

*Amrhein v. Citibank, N.A.*
S.D. Fla. Case No. 1:09-cv-21681-JLK
N.D. Cal. Case No. 4:08-cv-05101-SBA

## THIRD AMENDED CLASS ACTION COMPLAINT

Plaintiff, through undersigned counsel, on behalf of himself and all persons similarly situated, alleges the following based on personal knowledge as to allegations regarding the Plaintiff and on information and belief as to other allegations.

## INTRODUCTION

1.     This is a civil action seeking monetary damages, restitution and declaratory relief from Defendant Citibank, N.A. ("Citibank" or the "Bank"), arising from its unfair and unconscionable assessment and collection of excessive overdraft fees.

2.     In the era of electronic banking and the ubiquitous use of debit card transactions, the assessment of overdraft fees has become a major profit center for many United States banks, including Citibank.  For years, banks covered customers who occasionally bounced checks and even did so for a time for customers using debit cards, without charging their customers.  Since the early 1990's, however, banks have devised methods to provide overdraft "protection" for

customers and charge them in each instance.  A recent FDIC report estimated that overdraft fees represent 74 percent of the total service charges that are imposed on deposit accounts in the United States.  A 2008 FDIC study reports that overdraft fees for debit cards can carry an effective annualized interest rate that *exceeds 3,500 percent*.  Nonetheless, the Consumer Federation of America reports that five of the ten largest banks raised their overdraft fees in the last year.

3.      In 2007, banks collected more than $17 billion in overdraft fees.  That number nearly doubled in 2008, as more and more consumers struggled to maintain positive checking account balances.  *In 2009, banks are estimated to bring in between $27 billion to $38.5 billion in overdraft charges alone.*  As the one of the largest retail banks in the country, Citibank is among the largest beneficiaries of these staggering charges.

4.      Almost by definition, these fees disproportionately affect the poor, who are most likely to maintain low balances.  Moebs Services, a research company that has conducted studies for the government as well as banks, estimates that 90 percent of overdraft fees are paid by the poorest 10 percent of banks' customer base.  Moreover, these fees have the tendency to create a domino effect, because the imposition of a service charge on an account with a negative balance will make it less likely that the account holder's balance will reach positive territory, resulting in more fees.

5.      Before debit cards existed, banks occasionally extended the courtesy of honoring paper checks written on overdrawn or otherwise deficient accounts for customers who were typically in good standing.  Banks extended this courtesy largely because the third party involved in a sales transaction allowed the customer to pay by check, expecting the funds to be available and the check to clear.  For example, if a customer wrote a check to purchase groceries, the

grocery store would only know whether the check cleared *after* the groceries had been purchased.

6.      The same considerations are not present when customers use debit cards.  Banks could simply decline to honor debit or point of sale transactions where accounts lack sufficient funds to execute the transactions.  Retail and service transactions could still be executed if consumers presented an alternative form of payment.  ATM transactions could still proceed if banks provided a warning that an overdraft fee would be incurred, and customers chose to proceed nevertheless.   In fact, until a few years ago, most banks simply declined debit transactions that would overdraw an account.

7.      Instead of simply declining debit transactions when there are insufficient funds, or warning its customers that an overdraft fee will be assessed if they proceed with the transaction, Citibank routinely processes such transactions and then charges its customers an overdraft fee of $34—even when the transaction is for only a few dollars.  This automatic, fee-based overdraft scheme is intentionally designed to maximize overdraft fee revenue for Citibank.  Additionally, as part of its inequitable motive to generate obscene profits gained through the imposition of unconscionable overdraft fees, Citibank fails to adequately disclose to its customers that they may elect to opt out of overdraft protection.

8.      In many instances, these overdraft fees cost Citibank account holders hundreds of dollars in a matter of days, or even hours, when they may be overdrawn by only a few dollars.  Even more egregious, customer accounts may not actually be overdrawn at the time the overdraft fees are charged, or at the time of the debit transaction.

9.      Thus, it is through manipulation and alteration of customers' transaction records that Citibank maximizes overdraft penalties imposed on customers.

## JURISDICTION AND VENUE

10.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, and Plaintiff is a resident of a different state than Citibank.

11.     Venue is proper in the Northern District of California, the district in which this complaint was originally filed, pursuant to 28 U.S.C. § 1391(b) and California Code of Civil Procedure § 395.  Venue is proper in the Northern District of California because Class members live in San Francisco County, because the Bank has numerous branches and ATMs in San Francisco County, and because the Bank has imposed substantial overdraft fees on consumers who hold accounts in San Francisco County.

## THE PARTIES

12.     Plaintiff Mike Amrhein is a citizen of the State of California.

13.     Citibank, N.A. is a national bank which maintains its principal place of business in Las Vegas, Nevada.  Citibank regularly and systematically conducts business throughout the United States, including in the Northern District of California.  Among other things, Citibank is engaged in the business of providing retail banking services to millions of consumers, including Plaintiff and members of the putative Class, which include the issuance of debit cards for use by its customers in conjunction with their checking accounts.

14.     Citibank is a national bank, subject to the National Bank Act, 12 U.S.C. § 1, *et seq.*, and regulations promulgated by the Office of the Comptroller of the Currency.

## CLASS ALLEGATIONS

15.     Plaintiff brings this action on behalf of himself and all others similarly situated

pursuant to Fed. R. Civ. P. 23.   This action satisfies the numerosity, commonality, typicality,

adequacy, predominance and superiority requirements of Rule 23.

16.     The proposed classes are defined as:

All Citibank customers in the United States who, from November 7, 2004, to the
date of class certification, incurred overdraft fees on debit card transactions as a
result of Citibank's practice of re-sequencing transactions from highest to lowest
(the "National Class").

All Citibank customers in California who, from November 7, 2004, to the date of
class certification, incurred overdraft fees on debit card transactions as a result of
Citibank's practice of re-sequencing transactions from highest to lowest (the
"California Subclass").

The National Class and the California Subclass are collectively referred to as the "Class."

17.     Plaintiff reserves the right to modify or amend the definition of the proposed

Class before the Court determines whether certification is appropriate.

18.     Excluded from the Class are Citibank, its parents, subsidiaries, affiliates, officers

and directors, any entity in which Citibank has a controlling interest, all customers who make a

timely election to be excluded, governmental entities, and all judges assigned to hear any aspect

of this litigation, as well as their immediate family members.

19.     The members of the Class are so numerous that joinder is impractical.  The Class

consists of thousands of members, the identity of whom is within the knowledge of and can be

ascertained only by resort to Citibank's records.

20.     The claims of the representative Plaintiff are typical of the claims of the Class in

that the representative Plaintiff, like all Class members, was charged overdraft fees by Citibank

as a result of its practice of re-sequencing debit card transactions from highest to lowest.  The

representative Plaintiff, like all Class members, has been damaged by Citibank's misconduct in

that they incurred and/or will continue to incur unfair and unconscionable overdraft charges. Furthermore, the factual basis of Citibank's misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Class.

21.     There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual Class members.

22.     Among the questions of law and fact common to the Class are whether Citibank:

a.     Does not clearly disclose and/or refuses to allow its customers to opt out of its overdraft protection program;

b.     Does not obtain affirmative consent from its customers prior to processing transactions that will result in overdraft fees;

c.     Does not alert its customers that a debit card transaction will trigger an overdraft fee, and does not provide its customers with an opportunity to cancel such transactions;

d.     Manipulates and reorders transactions so that it can increase the number of overdraft fees it imposes;

e.     Manipulates and reorders debits from highest to lowest in order to maximize the number of overdrafts and, consequently, the amount of overdraft fees;

f.     Imposes overdrafts and overdraft fees when, but for reordering transactions, there would otherwise be sufficient funds in the account;

g.     Fails to provide customers with accurate balance information;

h.     Delays posting of transactions by customers using debit cards so that customers are charged overdraft fees on transactions, even though the customers had sufficient funds in their accounts to cover the transactions upon execution;

i.      Charges exorbitant overdraft fees that bear no relationship to the actual costs and risks of covering insufficient funds transactions;

j.      Breaches its covenant of good faith and fair dealing with Plaintiff and the other members of the Class through its overdraft policies and practices;

k.      Requires its customers to enter into standardized account agreements which include unconscionable provisions;

l.      Converts moneys belonging to Plaintiff and the other members of the Class through its overdraft policies and practices;

m.      Is unjustly enriched through its overdraft policies and practices; and

n.      Violates the consumer protection acts of California through its overdraft policies and practices.

23.     Other questions of law and fact common to the Class include:

a.      The proper method or methods by which to measure damages, and

b.      The declaratory relief to which the Class is entitled.

24.     Plaintiff's claims are typical of the claims of other Class members, in that they arise out of the same wrongful overdraft policies and practices and the same or substantially similar unconscionable provisions of Citibank's account agreements and other related documents.  Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other Class member.

25.     Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions.  Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

26.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Citibank, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses and Citibank's misconduct will proceed without remedy.

27.     Even if Class members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

## COMMON FACTUAL ALLEGATIONS

### A.    Citibank

28.     According to its website, Citibank is one of the largest full service banks in the world.  Citibank maintains ATMs in every state, totaling approximately 3,200 in number, as well as over 1,000 bank branches across the country.  In addition, Citibank's online services are among the largest in the banking industry, boasting more than 15 million users.

29.     Citibank is in the business of providing its customers with a variety of banking services.  One of the services provided by Citibank for customers who open a checking account is a debit card, also known as a debit card or ATM card.  Through those debit cards, customers can engage in transactions using funds directly from their accounts by engaging in "debit" or

"point of sale" ("POS") transactions, or may withdraw money from their accounts at automated teller machines ("ATMs").  Whether the card is used to execute POS transactions or to withdraw cash from ATM machines, the transaction is processed electronically.  As a result, Citibank is notified instantaneously when the card is swiped, and has the option to accept or decline transactions at such time.

30.     Citibank employs sophisticated software to automate its overdraft system.  This program maximizes the number of overdrafts, and thus, the amount of overdraft fees charged per customer.

31.     As a result of Citibank's manipulation and alteration of customers' transactions records, funds in a customer's account are depleted more rapidly and more overdraft fees are likely to be charged for multiple smaller transactions.  Indeed, overdraft charges are likely to occur at times when, but for the manipulation and alteration, there would be funds in the account and no overdraft would occur.  For example, if a customer, whose account had a $50 balance at the time the Bank processed several transactions, made four transactions of $10 and one subsequent transaction of $100 on the same day, the Bank would reorder the debits from largest to smallest, imposing four overdraft fees on the customer.  Conversely, if the $100 transaction were debited last—consistent with the actual order of transactions—only one overdraft fee would be assessed.  *See* FDIC Study of Bank Overdraft Programs, November 2008, *available at*: http://www.fdic.gov/bank/analytical/overdraft/, at 11, n. 12.

### B.     Citibank's Relevant Customer Documents Regarding Overdrafts

32.     Plaintiff and all members of the Class maintain or maintained a checking account with Citibank.  The terms of Citibank's checking accounts are contained in standardized account holder agreements, presented to its customers on a "take it or leave it" basis, drafted and imposed by Citibank, which was the party of vastly superior bargaining strength, and thus constitute

agreements of adhesion.   A representative copy of the "Client Manual" (the "Deposit Agreement"), a contract binding all customers who maintain accounts in "U.S. Markets," which is over 40 pages long, single-spaced and in small print, is attached as Exhibit A.

33.    The Deposit Agreement states:

> **Overdrawing Your Account**.  In the event the available balance in your account is insufficient to cover your day's transactions, we generally will utilize the following payment hierarchy:
>
> We pay all electronic debits (ATM withdrawals, ACH debits, online bill payments, and POS transactions) first.  We then process all debits for purchasing of securities through Smith Barney.  If available funds remain after processing these transactions, we pay your checks in the order of largest to smallest dollar amount. . . .
>
> In the event of insufficient funds to pay your checks, we may return your checks and charge you a fee.  At our sole discretion we may create an overdraft by paying the check or permitting the transaction.  Either way, there will be a service charge (p. 32).

34.    The Deposit Agreement does not set forth the dollar amount of fees that will be charged for purported overdrafts.

35.    Instead, a separate document, the "Marketplace Addendum" (attached as Exhibit B), lists the dollar amount of fees that will be charged for purported overdrafts in a chart entitled "Service Fees and Charges for All Accounts."  Using smaller print than the Deposit Agreement, the chart states:

| Service | Regular Fees | Citigold Account Fees |
|---|---|---|
| Check/Item Returned/Paid Against Insufficient/Unavailable Funds (overdraft)[3] (An insufficient funds item may be created by check, in-person withdrawal, ATM withdrawal or other electronic means.) | $34.00 | $34.00 |

The footnote appears in extremely small print:  "[3]Fee will not be assessed more than 4 times per account per day.  The fee may be charged whenever any fee or charge is deducted from your

account and either causes your account to be overdrawn or increases the amount by which your account is overdrawn." Exhibit B, p. 44.

36.     The Deposit Agreement and related documents, including the Marketplace Addendum, fail to disclose to customers that they have the option to "opt out" from the Bank's overdraft scheme, although it is possible for them to opt out upon request.

### C.     Citibank's Re-Ordering of Checking Account Transactions

37.     In an effort to maximize overdraft revenue, Citibank manipulates and reorders debits from highest to lowest during given periods of time.  Citibank reorders transactions for no reason other than to increase the number of exorbitant overdraft fees it can charge.  This practice violates numerous consumer protection laws and the covenant of good faith and fair dealing in the Bank's Deposit Agreement.

38.     In addition, Citibank misleads its customers regarding its reordering practices. The Bank does not unequivocally tell its customers that it will reorder debits from highest to lowest.  This omission is deceptive and/or unfair because it is, in fact, the Bank's practice to *always* reorder debits from highest to lowest, and because the Bank groups together POS transactions that occurred on subsequent days with POS transactions that occurred on earlier days, and reorders them so that higher debits that occurred on subsequent days are posted to its customers' accounts before lower debits that occurred on earlier days, contrary to the terms of the Bank's Deposit Agreement and its customers' reasonable expectations.  The Bank's practices thus violate the covenant of good faith and fair dealing implied in the Deposit Agreement as well as the consumer protection laws of California.

39.     Transactions involving debit cards used by Citibank customers, including the withdrawal of cash from ATM machines and POS transactions with vendors, are processed

electronically.  As a result, Citibank is notified instantaneously when the customer's debit card is swiped, and has the option to accept or decline these transactions.

40.    Notwithstanding the instantaneous nature of these electronic debit card transactions, under Citibank's posting system, it fails to post charges in the order in which they are incurred or received.  Citibank developed a policy and employs a practice whereby account charges and debits are posted to its customers' accounts out of chronological order for the sole purpose of maximizing the number of overdraft transactions and, therefore, the amount of overdraft fees charged to its customers.

41.    Instead of processing such transactions in chronological order, Citibank processes them starting with the largest debit and ending with the smallest debit, so as to generate the largest possible number of overdrafts and the greatest possible amount of overdraft fees.

42.    Citibank refrains from immediately posting charges to a customer's account as it receives them—sometimes for multiple business days.  By holding charges rather than posting them immediately to an account, Citibank is able to amass a number of charges on the account. Subsequently, Citibank posts all of the amassed charges on a single date.  When the group of charges is eventually posted to the customer's account, Citibank posts them in order of largest to smallest—not in the order in which they were received or in the order in which they were charged.  This delayed posting results in the imposition of multiple overdraft fees that would not otherwise be imposed.   The delayed posting also prevents customers from ascertaining the accurate balances in their accounts.

43.    Citibank's policy and practice of posting charges from largest to smallest, rather than chronologically, is specifically designed to maximize the generation of overdraft fees by triggering overdraft fees for account charges that would not otherwise result in such fees.

44.     Citibank enforces an unconscionable policy whereby charges incurred are posted to customers' accounts in a non-chronological order, from highest to lowest, and are held for multiple days and then batched together, to maximize the number of overdraft transactions and fees.   Citibank's processing practices substantially increase the likelihood that customers' smaller charges will result in multiple overdraft fees.   The practices provide Citibank with substantially higher service fee revenues than it would otherwise achieve absent these practices.

45.     As a result, Plaintiff and members of the Class have been assessed overdraft fees for transactions which occurred when they actually had sufficient funds in their accounts to cover those transactions.

**D.     Citibank's Cloaking of Accurate Balance Information**

46.     Citibank actively promotes the convenience of its debit cards and other electronic debiting, but fails to provide customers with accurate balance information.   When customers execute account transactions, they generally do not have access to an accurate balance register or balance information.

47.     Citibank provides inaccurate balance information to its customers through its electronic network.   In certain cases, Citibank informs its customers that they have a positive balance when, in reality, they have a negative balance, despite Citibank's actual knowledge of outstanding debits and transactions.

48.     Even when Citibank has actual knowledge of outstanding transactions which have already created a negative balance in a customers' account, it encourages the customer to incur more overdraft charges by approving—rather than prudently declining—subsequent debit card purchases and other electronic transactions.

**E.      Citibank's Failure to Notify Customers of Overdrafts or Advise Customers of Their Right to Opt Out**

49.      At the time its debit cards are used in POS transactions or at ATMs, Citibank is able to determine, almost instantaneously, whether there are sufficient funds in a customer's account to cover that particular transaction.  The Bank has the technological capability to decline transactions (which it does when a pending transaction would exceed a pre-determined, overdraft tolerance limit for the account), or notify customers at that very moment that the particular debit card transaction would result in an overdraft,.  Citibank could give customers the option to decline the transaction to avoid incurring the overdraft fee, but it does not do so because it seeks to maximize the amount of revenue generated through its assessment of overdraft fees.

50.      Notwithstanding its technological capabilities and actual knowledge, Citibank fails to provide notice to Plaintiff and the Class that a particular debit card transaction will result in an overdraft and, hence, an overdraft fee.  Because Citibank's customers are not notified of the potential overdraft, and are not given the option of declining the debit card transaction or providing another form of payment, the customers incur monetary damages in the form of overdraft fees.

51.      Citibank fails to make Plaintiff and Class members aware that they can opt out of its overdraft scheme upon request, thereby avoiding any overdraft fees from being incurred.

**F.      Citibank's Overdraft Policies and Practices are Contrary to Best Practices**

52.      By engaging in the conduct described herein, Citibank has failed to follow the list of "best practices" for overdraft programs set forth in the "Joint Guidance on Overdraft Protection Programs" ("Joint Guidance") issued by the United States Department of the Treasury, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the National Credit Union

Administration (collectively, the "Agencies").  A copy of the Joint Guidance is attached as Exhibit C.  These "best practice" recommendations include: "Provide election or opt-out of service.  Obtain affirmative consent of consumers to receive overdraft protection.  Alternatively, where overdraft protection is automatically provided, permit consumers to 'opt-out' of the overdraft program and provide a clear consumer disclosure of this option."  70 F.R. 9127-01, 9132.

53.     According to rules proposed by the Agencies: "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . .  This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee."  73 F.R. 28904-01, 28929 (May 19, 2008).

54.     The Joint Guidance also advises banks to "[a]lert customers before a transaction triggers any fees.  When consumers attempt to withdraw or transfer funds made available through an overdraft protection program, provide a specific consumer notice, where feasible, that completing the withdrawal may trigger the overdraft fees."  70 F.R. 9127, 9132.  The Joint Guidance further advises that "[t]his notice should be presented in a manner that permits consumers to cancel the attempted withdrawal or transfer after receiving the notice."  *Id*.

55.     Similarly, the list of "best practices" recommended in "Overdraft Protection: A Guide for Bankers," issued by the American Bankers Association, includes offering customers the option of "opting out" of any overdraft programs, and informing customers, before they access funds, that a particular point of sale or ATM transaction will cause them to incur an overdraft fee.  A copy of "Overdraft Protection: A Guide for Bankers" is attached as Exhibit D.

56.     Citibank's overdraft policies make it difficult for customers to avoid injury even if they carefully track the balance in their account.  In fact, the Agencies have stated that "Injury" resulting from such policies "is not reasonably avoidable" by the consumer.  73 F.R. 28904-01, 28929.  "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available."

57.     On October 6, 2009, the Center for Responsible Lending issued a report entitled "Overdraft Explosion:  Bank Fees for Overdrafts Increase 35% In Two Years."  The report, attached hereto as Exhibit E, finds that it is now "standard procedure to automatically enroll checking account customers in their most expensive overdraft loan program."  The report finds that debit card transactions account for more overdraft fees than traditional checks or any other type of transaction, even though "debit card transactions and ATM withdrawals . . . could easily be denied for no fee."  The report also finds that overdraft fees increased 35 percent from 2006 to 2008, and that over 50 million Americans overdrew their accounts in a 12 month period, with 27 million accounts incurring five or more overdraft fees.

58.     A chart from the research company Moebs Services shows that, in every year since 1992, banks have gained increased revenues from overdraft fees:



### G.    Citibank's Unconscionable Provisions and Policies

59.    Citibank's overdraft policies and practices are unconscionable in the following respects, among others:

a.    The Bank does not disclose or reasonably disclose to customers that they have the option to "opt out" of the Bank's overdraft scheme;

b.    The Bank does not obtain affirmative consent from checking account customers prior to processing a transaction that will overdraw the account and result in an overdraft fee;

c.      The Bank does not alert its customers that a debit card transaction will trigger an overdraft, and does not provide the customer the opportunity to cancel that transaction, before incurring an overdraft fee;

d.      The Deposit Agreement and related documents are contracts of adhesion in that they are standardized forms, imposed and drafted by the Bank, which is a party of vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement in its entirety; and

e.      The amount of overdraft fees are disclosed in an ineffective, ambiguous, misleading, and unfair manner, since they are not contained in the Deposit Agreement, but rather in a separate document, the Marketplace Addendum, which is not signed by the depositor; and

60.     The Deposit Agreement provided to customers is ineffective, ambiguous, deceptive, unfair, and misleading in that it does not unambiguously state that the Bank always reorders debits from high to low, even though Citibank *always* reorders transactions in this way for customers in order to maximize overdrafts and overdraft fee revenues for the Bank.

61.     The Deposit Agreement also contains an arbitration clause and a class action waiver which states:

> EITHER YOU OR WE CAN REQUIRE THAT ANY DISPUTES BE RESOLVED BY BINDING ARBITRATION.  ARBITRATION REPLACES THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING. . . . .
>
> **Agreement to Arbitrate Disputes**.  Either you or we may elect, without the other's consent, to require that any dispute between us . . . except [individual disputes in small claims court] be resolved by binding arbitration. . . .
>
> **No Class Action or Joinder of Parties**.  You and we agree that no class action, private attorney general or other representative claims may be pursued in arbitration, nor may such action be pursued in court if either you or we elect arbitration. . . .

**Severability, Survival**. . . . If any portion of this arbitration provision is deemed invalid or unenforceable, the entire arbitration provision shall not remain in force.  No provision of this arbitration provision may be amended, severed or waived absent a written agreement between you and us.

Deposit Agreement, pp. 39, 41.

62.     The above cited provisions are unconscionable because the Deposit Agreement and related documents, to the extent they are deemed contracts, are unenforceable contracts of adhesion and the arbitration provision itself is substantively unconscionable.

**H.     Citibank's Overdraft Practices Harmed Plaintiff**

63.     Plaintiff Mike Amrhein is a current checking account customer of Citibank.

64.     In connection with his account, the Bank issued a debit card to Mr. Amrhein.  A debit card allows customers to access their checking account funds by using the card to execute a transaction.  The charge is processed electronically, and the Bank has the option to accept or decline the transaction at the point of sale.

65.     Citibank wrongfully charged Mr. Amrhein overdraft fees on multiple occasions. By way of illustration, Plaintiff was charged two overdraft fees on September 27, 2008, in the amount of $30.00 each, for a total of $60.00.  Based on information and belief, the overdraft fees were based on the following ordering of transactions:

| | | Debits | Balance |
|---|---|---|---|
| | **Beginning Balance on February 26, 2008:** | | **$ 23.58** |
| **Date Posted** | **Debit Description** | | |
| 2/26/2008 | Debit Card Purchase (Sam's Gas Station) | -20.06 | 3.52 |
| 2/26/2008 | Debit Card Purchase (Valero) | -15.01 | **-11.49** |
| 2/26/2008 | Debit Card Purchase (Gas Up) | -5.03 | **-16.52** |
| | | | |
| | **Total Fees: $ 60.00** | | |

66.    If Citibank had not manipulated and reordered Mr. Amrhein's transactions from highest to lowest, he would have incurred only one overdraft fee instead of two overdraft fees.

67.    For instance, if Citibank had posted the transactions from lowest to highest, Mr. Amrhein would have only incurred one overdraft fee instead of two overdraft fees:

| | | **Debits** | **Balance** |
|---|---|---|---|
| | **Beginning Balance on <u>February 26, 2008</u>:** | | $ 23.58 |
| <u>Date Posted</u> | <u>Debit Description</u> | | |
| 2/26/2008 | Debit Card Purchase (Gas Up) | -5.03 | 18.55 |
| 2/26/2008 | Debit Card Purchase (Valero) | -15.01 | 3.54 |
| 2/26/2008 | Debit Card Purchase (Sams Gas Station) | -20.06 | **-16.52** |
| | | | |
| **Total Fees: $ 30.00** | | | |

68.    Citibank failed to notify Mr. Amrhein that he could incur overdraft fees on transactions even though there were sufficient funds in the checking account to cover the transaction at the time the transaction was executed.  In addition, Citibank never notified Mr. Amrhein at the time he made the debit card transactions that his checking account was overdrawn or that he would be charged an overdraft fee as a result of the transaction. Furthermore, Citibank never declined to pay any of Mr. Amrhein's debit card charges even though his account was overdrawn or he had insufficient funds in his account to cover the transaction.

69.    Since opening his account in July 2005, Mr. Amrhein has incurred at least $90.00 in overdraft fees.

70.    Based on information and belief, the overdraft charges incurred by Plaintiff are representative of hundreds of millions of dollars of overdraft fees that the Bank wrongfully assessed and deducted from Citibank customer accounts.  These wrongful takings are especially

egregious considering the fact that the Bank approved each transaction and knew at the time of approval whether there were sufficient funds in the account to cover the transaction.

**I.**     **The Damages Sustained by Plaintiff and the Class**

71.     As shown by these examples, Citibank's overdraft policies make it difficult for a customer to avoid injury even if the customer keeps close track of the balance in his or her account.  In fact, the Agencies have stated that "injury" resulting from such policies "is not reasonably avoidable" by consumers.  73 F.R. 28904-01, 28929.  "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available." *Id*.

72.     According to rules proposed by the Agencies, "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . . This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee."  73 F.R. 28904-01, 28929 (May 19, 2008).

73.     Thus, as a consequence of Citibank's overdraft policies and practices, Plaintiff and the Class have been wrongfully forced to pay overdraft fees.  Citibank has improperly deprived Plaintiff and the Class of significant funds, causing ascertainable monetary losses and damages.

74.     As a consequence of Citibank's improper overdraft fees, Citibank has wrongfully deprived Plaintiff and the Class of funds to which it had no legitimate claim.

75.     Plaintiff had sufficient funds to cover at least some of the transactions for which he and the Class were charged overdraft fees.  Plaintiff and members of the Class either had adequate funds to cover the transactions posted to their accounts, or the accounts were allowed to become overdrawn, even by *de minimis* margins, exclusively so that Citibank could impose these wrongful charges.  In many instances, Citibank's manipulation of the process for imposing overdraft fees triggered a cascade of charges that exponentially added to the charges it collected from Plaintiff and Class members.

76.     All conditions precedent to the relief sought herein have either occurred or have been performed or waived.

## FIRST CLAIM FOR RELIEF

### Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing[1]
### (On Behalf of the National Class and California Subclass)

77.     Plaintiff repeats paragraphs 1 through 76 above.

78.     Plaintiff and Citibank have contracted for bank account deposit, checking, ATM and debit card services, as embodied in Citibank's Deposit Agreement and related documentation.

79.     Good faith is an element of every contract pertaining to the assessment of overdraft fees.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Put differently, the parties to a

---

[1] Florida and certain other states recognize a claim for breach of the covenant of good faith and fair dealing as a separate and independent claim from breach of contract.  Other states treat breach of the covenant of good faith and fair dealing as a species of breach of contract.  For the sake of convenience in this multi-district litigation, the Complaint pleads these two types of claims, which are substantively identical, in a single count.

contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

80.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

81.     Since at least November 7, 2004, Citibank has breached the covenant of good faith and fair dealing in the Deposit Agreement through its overdraft policies and practices as alleged herein.

82.     Plaintiff and the Class have performed all, or substantially all, of the obligations imposed on them under the Deposit Agreement.

83.     Plaintiff and members of the Class have sustained damages as a result of Citibank's breach of the covenant of good faith and fair dealing.

## SECOND CLAIM FOR RELIEF

### Unconscionability
**(On Behalf of the National Class and California Subclass)**

84.     Plaintiff repeats paragraphs 1 through 76 above.

85.     Citibank's overdraft policies and practices are substantively and procedurally unconscionable in the following respects, among others:

a.      The Bank does not disclose or reasonably disclose to customers that they have the option to "opt out" of the Bank's overdraft scheme;

b.      The Bank does not obtain affirmative consent from checking account customers prior to processing a transaction that will overdraw the account and result in an overdraft fee;

c.      The Bank does not alert its customers that a debit card transaction will trigger an overdraft, and does not provide the customer the opportunity to cancel that transaction, before incurring an overdraft fee;

d.      The Deposit Agreement and related documents, including the Marketplace Addendum, are contracts of adhesion in that they are standardized forms, imposed and drafted by the Bank, which is a party of vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement in its entirety; and

e.      The amount of overdraft fees are disclosed in an ineffective, ambiguous, misleading, and unfair manner, since they are not contained in the Deposit Agreement, but rather in a separate document, the Marketplace Addendum, which is not signed by the depositor; and

f.      The Deposit Agreement provided to customers is ineffective, ambiguous, deceptive, unfair, and misleading in that it does not unambiguously state that the Bank always reorders debits from high to low, even though Citibank *always* reorders transactions in this way for customers in order to maximize overdrafts and overdraft fee revenues for the Bank.

86.     Considering the great business acumen and experience of Citibank in relation to Plaintiff and the Class, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law.

87.     The imposition of overdraft charges which exceed the amount overdrawn (*e.g.*, the imposition of a $34 charge on an overdraft of less than $34) is itself unconscionable.  Such charges are not reasonably related to the Bank's cost of covering the overdraft and/or its risk of nonpayment (where the Bank pays the overdraft), or to the Bank's cost of returning the item unpaid (where the Bank does not pay the overdraft).

88.     Plaintiff and members of the Class have sustained damages as a result of Citibank's unconscionable policies and practices as alleged herein.

### THIRD CLAIM FOR RELIEF

#### Conversion
#### (On Behalf of the National Class and California Subclass)

89.     Plaintiff repeats paragraphs 1 through 76 above.

90.     Citibank had and continues to have a duty to maintain and preserve its customers' checking accounts and to prevent their diminishment through its own wrongful acts.

91.     Citibank has wrongfully collected overdraft fees from Plaintiff and the members of the Class, and has taken specific and readily identifiable funds from their accounts in payment of these fees in order to satisfy them.

92.     Citibank has, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiff and the members of the Class, without legal justification.

93.     Citibank continues to retain these funds unlawfully without the consent of Plaintiff or members of the Class.

94.     Citibank intends to permanently deprive Plaintiff and the members of the Class of these funds.

95.     These funds are properly owned by Plaintiff and the members of the Class, not Citibank, which now claims that it is entitled to their ownership, contrary to the rights of Plaintiff and the members of the Class.

96.     Plaintiff and the members of the Class are entitled to the immediate possession of these funds.

97.     Citibank has wrongfully converted these specific and readily identifiable funds in violation of California law.

98.     Citibank's wrongful conduct is continuing.

99.     As a direct and proximate result of this wrongful conversion, Plaintiff and the members of the Class have suffered and continue to suffer damages.

100.    By reason of the foregoing, Plaintiff and the members of the Class are entitled to recover from Citibank all damages and costs permitted by law, including all amounts that Citibank has wrongfully converted.

### FOURTH CLAIM FOR RELIEF

### Unjust Enrichment
### (On Behalf of the National Class and California Subclass)

101.    Plaintiff repeats paragraphs 1 through 76 above.

102.    Plaintiff, on behalf of himself and the Class, asserts a claim for unjust enrichment.

103.    By means of Citibank's wrongful conduct alleged herein, Citibank knowingly provides banking services to Plaintiff and members of the Class that are unfair, unconscionable, and oppressive.

104.    Citibank knowingly received and retained wrongful benefits and funds from Plaintiff and members of the Class.  In so doing, Citibank acted with conscious disregard for the rights of Plaintiff and members of the Class.

105.    As a result of Citibank's wrongful conduct as alleged herein, Citibank has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Class.

106.    Citibank's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

107.    Under the common law doctrine of unjust enrichment, it is inequitable for Citibank to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of overdraft fees on Plaintiff and members of the Class in an unfair, unconscionable, and oppressive manner.   Citibank's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

108.    The financial benefits derived by Citibank rightfully belong to Plaintiff and members of the Class.   Citibank should be compelled to disgorge in a common fund for the benefit of Plaintiff and members of the Class all wrongful or inequitable proceeds received by them.   A constructive trust should be imposed upon all wrongful or inequitable sums received by Citibank traceable to Plaintiff and the members of the Class.

109.    Plaintiff and members of the Class have no adequate remedy at law.

**FIFTH CLAIM FOR RELIEF**

**Violations of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200**
**(On Behalf of the California Subclass)**

110.    Plaintiff repeats paragraphs 1 through 76 above.

111.    Citibank's conduct described herein violates the Unfair Competition Law (the "UCL"), codified at California Business and Professions Code section 17200, in the following respects, among others:

       a.     Citibank's practices relating to the imposition of overdraft fees are unconscionable, in violation of California Civil Code section 1770(a)(19), and, as a result, constitute an unlawful business act or practice within the meaning of the UCL;

       b.     Citibank's practices relating to the imposition of overdraft fees violate California Civil Code sections 1770(a)(5), (14) and (19), and, as a result, constitute unlawful business acts or practices within the meaning of the UCL; and

       c.     Citibank's practices relating to the imposition of overdraft fees constitute unfair business acts or practices within the meaning of the UCL.

112.    The harm to Plaintiff and the California Subclass arising from Citibank's unlawful and unfair practices relating to the imposition of overdraft fees outweighs the utility, if any, of those practices.

113.    Citibank's unlawful and unfair business practices relating to the imposition of overdraft fees are immoral, unethical, oppressive, unscrupulous, unconscionable and/or substantially injurious to Plaintiff and members of the California Subclass.

114.    As a result of Citibank's violations of the UCL, Plaintiff and members of the California Subclass have paid, and/or will continue to pay, unreasonably excessive amounts of money for banking services and thereby suffered and will continue to suffer actual damages.

115.    Pursuant to California Business and Professions Code section 17203, Plaintiff and the California Subclass are entitled to *inter alia*:

       a.     an order requiring Citibank to cease the unlawful and unfair acts alleged herein;

       b.     full restitution of all overdraft fees paid to Citibank on debit card transactions, including POS and ATM transactions, pursuant to California Code of Civil Procedure section 384;

       c.     pre-judgment interest at the highest rate allowable by law; and

       d.     payment of their attorneys' fees and costs pursuant to, *inter alia*, California Code of Civil Procedure section 1021.5.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class demand a jury trial on all claims so triable and judgment as follows:

1.     Declaring Citibank's overdraft fee policies and practices to be wrongful, unfair and unconscionable;

2.     Restitution of all overdraft fees paid to Citibank by Plaintiff and the Class, as a result of the wrongs alleged herein, within the applicable statutes of limitations, in an amount to be determined at trial;

3.     Disgorgement of the ill-gotten gains derived by Citibank from its misconduct;

4.     Actual damages in an amount according to proof;

5.     Punitive and exemplary damages;

6.     Pre-judgment interest at the maximum rate permitted by applicable law;

7.     Costs and disbursements incurred by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

8.     Such other relief as this Court deems just and proper.

Dated: April 12, 2010.

/s/ Bruce S. Rogow
Bruce S. Rogow, Esquire
Florida Bar No. 067999
bruce@abbrclaw.com
Robert C. Gilbert, Esquire
Florida Bar No. 561861
bobby@abbrclaw.com
ALTERS BOLDT BROWN
  RASH & CULMO, P.A.
4141 N.E. 2nd Avenue
Miami, Florida 33137
Tel:  (305) 571-8550
Fax:  (305) 571-8558

*Lead Counsel for Plaintiff*

/s/ Russell W. Budd
Russell W. Budd, Esquire
Texas Bar No. 03312400
rbudd@baronbudd.com
Bruce W. Steckler, Esquire
Texas Bar No. 00785039
bsteckler@baronbudd.com
Melissa K. Hutts, Esquire
Texas Bar No.  0188015
mhutts@baronbudd.com
Renee M. Melancon, Esquire
Texas Bar No. 2403573
rmelancon@baronbudd.com
BARON & BUDD, P.C.
3102 Oak Lawn Ave. – Suite 1100
Dallas, TX 75219
Tel: 214-521-3605
Fax: 214-520-1181

/s/ Barry R. Himmelstein
Barry R. Himmelstein, Esquire
California Bar No. 157736
bhimmelstein@lchb.com
Michael W. Sobol, Esquire
California Bar No. 194857
msobol@lchb.com
Jordan Elias, Esquire
California Bar No. 228731
jelias@lchb.com
Mikaela Bernstein, Esquire
California Bar No. 261301
mbernstein@lchb.com
LIEFF CABRASER HEIMANN &
  BERNSTEIN LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Tel: 415-956-1000
Fax: 415-956-1008

/s/ Robert C. Josefsberg
Robert C. Josefsberg, Esquire
Florida Bar No. 40856
rjosefsberg@podhurst.com
Victor M. Diaz, Jr., Esquire
Florida Bar No. 503800
vdiaz@podhurst.com
John Gravante, III, Esquire
Florida Bar No. 617113
jgravante@podhurst.com
PODHURST ORSECK, P. A.
City National Bank Building
25 W Flagler Street
Suite 800
Miami, FL 33130-1780
Tel: 305-358-2800
Fax: 305-358-2382

/s/ Ted E. Trief
Ted E. Trief, Esquire
New York Bar No. 1476662
ttrief@triefandolk.com
Barbara E. Olk, Esquire
New York Bar No. 1459643
bolk@triefandolk.com
TRIEF & OLK
150 E 58th street
34th Floor
New york, NY 10155
Tel: 212-486-6060
Fax: 212-317-2946

/s/ Edward Adam Webb
Edward Adam Webb, Esquire
Georgia Bar No. 743910
adam@webllc.com
G. Franklin Lemond, Jr., Esquire
Georgia Bar No. 141315
flemond@webbllc.com
WEBB, KLASE & LEMOND, L.L.C.
1900 The Exchange SE, Suite 480
Atlanta, GA 30339
Tel: 770-444-9325
Fax: 770-444-0271

/s/ Ruben Honik
Ruben Honik, Esquire
Pennsylvania Bar No. 33109
rhonik@golombhonik.com
GOLUMB & HONIK, P.C.
1515 Market Street
Suite 1100
Philadelphia, PA 19102
Tel: 215-985-9177
Fax: 215-985-4169

*Plaintiffs' Executive Committee*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

**CASE NO. 1:09-MD-02036-JLK**

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

**CERTIFICATE OF SERVICE**

I hereby certify that on April 12, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Robert C. Gilbert
Robert C. Gilbert, Esquire
Florida Bar No. 561861
ALTERS BOLDT BROWN
RASH & CULMO, P.A.
4141 N.E. 2nd Avenue
Suite 201
Miami, Florida 33137
bobby@abbrclaw.com