**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 1:09-MD-02036-JLK**

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

**MDL No. 2036**

---

**THIS DOCUMENT RELATES TO:**

*Luquetta, et al. v. JPMorgan Chase Bank, N.A.*
S.D. Fla 1:09-cv-23432-JLK
C.D. Cal. Case No. CV09-6967-GHK

**SECOND AMENDED CLASS ACTION COMPLAINT**

Plaintiffs through undersigned counsel, on behalf of themselves and all similarly situated California residents, alleges the following based on personal knowledge as to allegations regarding the Plaintiffs and on information and belief as to other allegations.

**INTRODUCTION**

1.     This is a civil action seeking monetary damages, restitution, and declaratory relief from Defendant JPMorgan Chase Bank, N.A., ("Chase" or the "Bank") arising out of its unfair, deceptive, and unconscionable assessment and collection of excessive overdraft fees.

2.     In the era of electronic banking and the ubiquitous use of debit card transactions, the assessment of overdraft fees has become a major profit center for many United States banks, including Chase.  For years, banks covered customers who occasionally bounced checks and even did so for a time for customers using debit cards, without charging their customers.  Since the early 1990's, however, banks have devised methods to provide overdraft

"protection" for customers and charge them in each instance.  A recent FDIC report estimated that overdraft fees represent 74 percent of the total service charges that are imposed on deposit accounts in the United States.  A 2008 FDIC study reports that overdraft fees for debit cards can carry an effective annualized interest rate that *exceeds 3,500 percent*.  Nevertheless, the Consumer Federation of America reports that five of the ten largest banks raised their overdraft fees in the last year.

3.      In 2007, banks collected more than $17 billion in overdraft fees.  That number nearly doubled in 2008, as more and more consumers struggled to maintain positive checking account balances.  *In 2009, banks are estimated to have brought  in between $27 billion to $38.5 billion in overdraft charges alone*.  Chase is among the largest beneficiaries of these staggering charges.

4.      Almost by definition, these fees disproportionately affect the poor, who are most likely to maintain low balances.  Moebs Services, a research company that has conducted studies for the government as well as banks, estimates that 90 percent of overdraft fees are paid by the poorest 10 percent of banks' customer base.  Moreover, these fees have the tendency to create a domino effect, because the imposition of a service charge on an account with a negative balance will make it less likely that the account holder's balance will reach positive territory, resulting in more fees.

5.      Before debit cards existed, banks occasionally extended the courtesy of honoring paper checks written on overdrafted or otherwise deficient accounts for customers who were typically in good standing.  Banks extended this courtesy largely because the third party involved in a sales transaction allowed the customer to purchase goods or services with a check with an expectation that funds would be available and that the check would clear.  For example, if a customer used a check to purchase groceries, the grocery store would only know if the check cleared *after* the groceries had been purchased.

6.      The same considerations are not present when customers use debit cards. Banks could simply decline to honor debit or point of sale transactions made where accounts

lack sufficient funds to execute the transaction.  Retail and service transactions could still be executed if customers presented an alternative form of payment.  ATM transactions could still proceed if banks provided a warning that an overdraft fee would be incurred, and consumers chose to proceed nevertheless.  In fact, until a few years ago, most banks simply declined debit transactions that would overdraw an account.

7.      Instead of simply declining debit transactions when there are insufficient funds or warning its customers that an overdraft fee will be assessed if they proceed with the transaction, Chase routinely processes such transactions and then charges its customers an overdraft fee of $25 to $35—even when the transaction is for only a few dollars.  This automatic, fee-based overdraft scheme is intentionally designed to maximize overdraft fee revenue for the Bank.  Additionally, as part of its inequitable motive to generate obscene profits gained through the imposition of unconscionable overdraft fees, the Bank either refused to allow its customers to opt out of overdraft protection, or failed to adequately disclose to its customers that they may do so.

8.      In many instances, these overdraft fees cost Chase account holders hundreds of dollars in a matter of days, or even hours, when they may be overdrawn by only a few dollars.  Even more egregious, customer accounts may not actually be overdrawn at the time the overdraft fees are charged, or at the time of the debit transaction.

9.      Thus, it is through manipulation and alteration of customers' transaction records that Chase maximizes overdraft penalties imposed on customers.

10.      Although it is possible to do so, Chase does not or did not alert its debit card customers at the time of a POS transaction or ATM withdrawal that the transaction will overdraft their account and cause them to incur fees.

## JURISDICTION AND VENUE

11.      This Court has jurisdiction of this action pursuant to the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. § 1332(d), this Court has original jurisdiction

because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, and at least one Plaintiff is a resident of a different state than Chase.

12.     Venue is proper in the Central District of California, the district where this action was originally filed, pursuant to 28 U.S.C. § 1391 because Chase is subject to personal jurisdiction and regularly conducts business in that district, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred and continue to occur in that district.

## PARTIES

13.     Plaintiff Andrea Luquetta is, and at all relevant times hereto has been, a resident of Los Angeles, California.  Ms. Luquetta is a customer of the Bank who was charged improper overdraft fees in connection with the use of her Chase checking account.

14.     Plaintiff Valerie Williams is a resident of the State of California. Ms. Williams is a customer of the Bank who was charged improper overdraft fees in connection with the use of her Chase checking account.

15.     Plaintiff Megan Biss is a resident of the State of California.  Ms. Biss is a customer of the Bank who was charged improper overdraft fees in connection with the use of her Chase checking account.

16.     Plaintiffs Billy Martin Ruiz and Deborah Ruiz are residents of the State of California.   Mr. and Mrs. Ruiz were customers of the Bank who were charged improper overdraft fees in connection with the use of their Chase checking account.

17.     Plaintiff John D. Kirkland is a resident of the State of California. Mr. Kirkland is a customer of the Bank who was charged improper overdraft fees in connection with the use of his Chase checking account.

18.     Plaintiff Jacqueline Miller is a resident of the State of California.  Mrs. Miller is a customer of the Bank who was charged improper overdraft fees in connection with the use of her Chase checking account.

19.     JPMorgan Chase Bank, N.A. maintains its principal place of business in Columbus, Ohio.  Chase regularly and systematically conducts business throughout the State of California.  Among other things, Chase is engaged in the business of providing retail banking services to millions of consumers, including Plaintiffs and members of the putative Classes, which include the issuance of debit cards for use by its customers in conjunction with their checking accounts.

20.     Chase is a national bank subject to the National Bank Act, 12 U.S.C. § 1, *et seq.*, and OCC regulations.

## CLASS ALLEGATIONS

21.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

22.     The proposed Class is defined as:

> All Chase customers in the State of California who, from September 24, 2005 to the date of class certification, incurred an overdraft fee as a result of Chase's practice of re-sequencing debit card transactions from highest to lowest (the "Class").

23.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

24.     Excluded from the Class are Chase, its parents, subsidiaries, affiliates, officers and directors, any entity in which Chase has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

25.     The members of the Class are so numerous that joinder is impractical. The Class consists of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to the Bank's records.

26.     The claims of the representative Plaintiffs are typical of the claims of the Class in that the representative Plaintiffs, like all Class members, were charged overdraft fees by

Chase as a result of its practice of re-sequencing debit card transactions from highest to lowest. The representative Plaintiffs, like all Class members, have been damaged by Chase's misconduct in that they incurred and/or will continue to incur unfair and unconscionable overdraft charges. Furthermore, the factual basis of Chase's misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Class.

27.     There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual Class members.

28.     Among the questions of law and fact common to the Class are whether Chase:

a.     Does not clearly disclose and/or refuses to allow its customers to opt out of its overdraft protection program;

b.     Does not obtain affirmative consent from its customers prior to processing transactions that will result in overdraft fees;

c.     Does not alert its customers that a debit card transaction will trigger an overdraft fee, and does not provide its customers with an opportunity to cancel such transactions;

d.     Manipulates and reorders transactions so that it can increase the number of overdraft fees it imposes;

e.     Manipulates and reorders debits from highest to lowest in order to maximize the number of overdrafts and, consequently, the amount of overdraft fees;

f.     Imposes overdrafts and overdraft fees when, but for reordering transactions, there would otherwise be sufficient funds in the account;

g.     Fails to provide customers with accurate balance information;

h.      Delays posting of transactions by customers using debit cards so that customers are charged overdraft fees on transactions, even though the customers had sufficient funds in their accounts to cover the transactions upon execution;

i.      Charges exorbitant overdraft fees that bear no relationship to the actual costs and risks of covering insufficient funds transactions;

j.      Breaches the covenant of good faith and fair dealing with Plaintiffs and the other members of the Class through its overdraft policies and practices;

k.      Requires its customers to enter into standardized account agreements which include unconscionable provisions;

l.      Converts moneys belonging to Plaintiffs and the other members of the Class through overdraft policies and practices;

m.      Is unjustly enriched through its overdraft policies and practices; and

n.      Violates the consumer protection laws of California through its overdraft policies and practices.

29.      Other questions of law and fact common to the Class include:

a.      The proper method or methods by which to measure damages, and

b.      The declaratory relief to which the Class is entitled.

30.      Plaintiffs' claims are typical of the claims of other Class members, in that they arise out of the same wrongful overdraft policies and practices and the same or substantially similar unconscionable provisions of Chase's account agreements and other related documents. Plaintiffs have suffered the harm alleged and have no interests antagonistic to the interests of any other Class member.

31.      Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions.  Accordingly,

Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Class.

32.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Chase, no Class member could afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, Class members will continue to suffer losses and Chase's misconduct will proceed without remedy.

33.     Even if Class members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

## COMMON FACTUAL ALLEGATIONS

### A.      Chase

34.     Chase is one of the largest banks in the United States, with over two trillion dollars in assets.  Chase has over 5,100 branches and 15,000 ATMs nationwide. Following its September 2008 acquisition of all deposits and assets of Washington Mutual, Chase became the largest depository institution in the country, with over $900 billion in customer deposits.  The acquisition also created the second-largest network of bank branches and gave Chase control over 24.5 million checking accounts.  Since the acquisition, Chase has integrated Washington Mutual's customers and consumer banking operations into the Chase brand.

35.     Chase is in the business of providing customers with a variety of banking services.  One of the services provided by the Bank for customers who open a checking account is a debit card, also known as a check card or ATM card.  Through those debit cards, customers can engage in transactions using funds directly from their accounts by engaging in "debit" or "point of sale" ("POS") transactions, or may withdraw money from their accounts at automated teller machines ("ATMs").  Whether the card is used to execute POS transactions or to withdraw cash from ATM machines, the transaction is processed electronically.  As a result, the Bank is notified instantaneously when the card is swiped, and has the option to accept or decline transactions at such time.

36.     The Bank employs sophisticated software to automate its overdraft system.  This program maximizes the number of overdrafts, and thus, the amount of overdraft fees charged per customer.

37.     As a result of the Bank's manipulation and alteration of customers' transactions records, funds in a customer's account are depleted more rapidly and more overdraft fees are likely to be charged for multiple smaller transactions.  Indeed, overdraft charges are likely to occur at times when, but for the manipulation and alteration, there would be funds in the account and no overdraft would occur.  For example, if a customer, whose account has a $50 balance at the time the Bank processed several transactions, made four transactions of $10 and one subsequent transaction of $100 on the same day, the Bank would reorder the debits from largest to smallest, imposing four overdraft fees on the customer.  Conversely, if the $100 transaction were debited last—consistent with the actual order of transactions—only one overdraft fee would be assessed.  *See* FDIC Study of Bank Overdraft Programs, November 2008, *available at*: http://www.fdic.gov/bank/analytical/overdraft/, at 11, n. 12.

38.     Alternatively, a customer may have $100 in their account and spend $50 on Saturday, $50 on Sunday, and $101 on Monday. Instead of being charged one overdraft for their $101 transaction on Monday, the Bank can and does reorder the transactions from Saturday through Monday such that the Monday transaction is processed before the Saturday and Sunday

transactions.  As with the previous example, the end result is the customer being charged more overdraft fees than had the Bank processed the transactions chronologically.

     **B.**        **<u>The Bank's Relevant Customer Documents Regarding Overdrafts</u>**

        39.     Plaintiffs and all members of the Class maintain or maintained a checking account with Chase.

        40.     The terms of Chase's checking accounts are contained in standardized account holder agreements, presented to its customers on a "take it or leave it" basis, drafted and imposed by Chase, which was the party of vastly superior bargaining strength, and thus constitute contracts of adhesion.  A representative copy of the "Account Rules and Regulations" (the "Deposit Agreement"), covering all Chase accounts, which is 31 pages long, single-spaced and in small print, is attached as Exhibit A.

        41.     The Deposit Agreement states:

> **Insufficient Funds**:  If you don't have enough funds available in your account to cover your checks or any other withdrawals, one of these two things will happen depending on your specific account:
>
> -     We pay the check or other withdrawal and charge an Insufficient Funds fee to the account.
>
> -     We return the check or withdrawal unpaid and charge a Returned Item fee to the account.

Ex. A, p. 4.

        42.     The Deposit Agreement also states that "[g]enerally, deposits will be credited to your account first and then we'll pay your items (e.g. checks, debit card transactions, ATM transactions and other debits to your account) from highest to lowest dollar amount each business day.  Certain transactions such as wire transfers may post before others." *Id.*

        43.     In addition, the Deposit Agreement states:

> We have no obligation to pay or honor any item or withdrawal request unless it is drawn or requested against available funds credited to your Account at the opening of business on the day the

item is presented for payment or the request is received, even if we paid an item or honored a withdrawal request drawn or requested against insufficient funds in the past.  If we pay an item or honor your request that overdraws your Account, a deposited item has been returned unpaid, or for any other reason your Account has become overdrawn, you agree to pay the amount of the overdraft together with any fee and accrued interest identified in this Agreement immediately, whether or not you signed or requested the withdrawal or participated in the transaction creating the overdraft.

You hereby authorize us to apply any subsequent deposit to the Account against the amount of any overdraft and resulting fees or charges, including any federal or state benefit payments that you choose to deposit in any Account (including direct deposit of Social Security). …

Items will be posted to your Account in highest to lowest dollar amount each business day (Monday through Friday, federal holidays not included).  However, certain transactions like wire transfers may be posted before others.  We reserve the right to change this posting order without notice.  We may assess a fee for any item or withdrawal request, such as a check, in person withdrawal, ATM withdrawal, or other electronic means, when there are insufficient funds in your Account based upon the posting method identified above, whether or not the item is paid or the request honored, or whether or not an overdraft to your account has occurred.  We may assess an Extended Overdraft fee for overdraft balances that are not promptly repaid and/or charge interest for any overdraft on your Account.  You agree to pay all costs and expenses, including attorney's fees, incurred by us in the collection of any overdraft.

*Id*. at 10-11.

44.     The Deposit Agreement also states that "Insufficient Funds and Returned Item based on the number of 'Occurrences' in the previous twelve (12) months plus the current month.  An Occurrence happens any business day that at least one item is presented or withdrawal request is made against an account with insufficient funds, whether or not we honor any or all of the items or withdrawal requests.  In general, the more Occurrences you have on the account, higher fees will be charged on each item.  For example, on your second Occurrence you may pay a higher per item fee than you paid on the first Occurrence."  *Id*. at 11.

45.     The Deposit Agreement does not set forth the dollar amount of fees that will be charged for purported overdrafts.

46.     Instead, a separate document, the "Account Rules and Regulations – Important Notices" ("Important Notices"), lists the dollar amount of fees that will be charged for purported overdrafts, in a chart entitled "Insufficient Funds, Returned Items, and Stop Payments."   The Important Notices, a representative copy of which is attached as Exhibit B, states in small print, as follows:

Insufficient Funds and Returned Item Fees

| | |
|---|---|
| -accounts opened in FL, GA, ID, OR, WA | $ 34.00/item or withdrawal request |
| -all other accounts: | $ 25.00/item or withdrawal request |
|     First occurrence during the current month and preceding 12 months | |
|     Second through fourth occurrences during the current month and preceding 12 months | $ 32.00/item or withdrawal request |
|     Fifth and subsequent occurrences during the current month and preceding 12 months | $ 35.00/item or withdrawal request |

An "occurrence" is a day with at least one insufficient funds or returned item/withdrawal request.

\*   \*   \*

Extended Overdraft Fee (If account balance remains negative for five consecutive business days):

| | |
|---|---|
|     -accounts opened in CT, FL, GA, ID, NJ, NY, OR, WA | no fee |
|     -accounts opened in AZ, LA, OK, TX, WV | $12.50/incident |
|     -accounts opened in MI | $25.00/incident |
|     -all other accounts | $15.00/incident |

47.     The Deposit Agreement and related documents, including the Important Notices, fail to disclose to customers that they have the option to "opt out" from the Bank's overdraft scheme, although it is possible for them to opt out upon request.

48.     Neither the Deposit Agreement, nor any related documents, including the Important Notices or Statement of Fees, inform customers that they have the option to "opt out" from the Bank's overdraft schemes.

A.      **Chase's Re-Ordering of Checking Account Transactions**

49.     In an effort to maximize overdraft revenue, Chase manipulates and reorders debits from highest to lowest each business day and also reorders transactions from different days.  Chase reorders transactions for no reason other than to increase the number of exorbitant overdraft fees it can charge.  This practice violates numerous consumer protection laws and the covenant of good faith and fair dealing in the Bank's Deposit Agreement.

50.     Transactions involving debit cards used by Chase customers, including the withdrawal of cash from ATM machines and POS transactions with vendors, are processed electronically.  As a result, Chase is notified instantaneously when the customer's debit card is swiped, and has the option to accept or decline these transactions.

51.     Notwithstanding the instantaneous nature of these electronic debit card transactions, under Chase's posting system, it fails to post charges in the order in which they are incurred or received.  Chase developed a policy and employs a practice whereby account charges and debits are posted to its customers' accounts out of chronological order for the sole purpose of maximizing the number of overdraft transactions and, therefore, the amount of overdraft fees charged to its customers.

52.     Instead of processing such transactions in chronological order, Chase processes them starting with the largest debit and ending with the smallest debit, so as to generate the largest possible number of overdrafts and the greatest possible amount of overdraft fees.

53.     Chase refrains from immediately posting charges to a customer's account as it receives them – sometimes for multiple business days.  By holding charges rather than posting them immediately to an account, Chase is able to amass a number of charges on the account.  Subsequently, Chase posts all of the amassed charges on a single date.  When the group of charges is eventually posted to the customer's account, Chase posts them in order of largest to smallest – not in the order in which they were received or in the order in which they were charged.  This delayed posting results in the imposition of multiple overdraft fees that would not

otherwise be imposed.  The delayed posting also prevents customers from ascertaining the accurate balances in their accounts.

54.     Chase's policy and practice of posting charges from largest to smallest, rather than chronologically, or from smallest to largest, is specifically designed to maximize the generation of overdraft fees by triggering overdraft fees for account charges that would not otherwise result in such fees.

55.     Chase enforces an unconscionable policy whereby charges incurred are posted to customers' accounts in a non-chronological order, from highest to lowest, and are held for multiple days and then batched together, to maximize the number of overdraft transactions and fees.  Chase's processing practices substantially increase the likelihood that customers' smaller charges will result in multiple overdraft fees.  The practices provide Chase with substantially higher service fee revenues than it would otherwise achieve absent these practices.

56.     As a result, Plaintiff and members of the Class have been assessed overdraft fees for transactions which occurred when they actually had sufficient funds in their accounts to cover those transactions.

57.     In addition, Chase misleads its customers regarding its reordering practices.  The statements in the Deposit Agreement are deceptive and unconscionable.  While Chase encourages its customers to use debit cards, informing consumers that the cards are a "convenient way to access your money," "are accepted at millions of locations worldwide," "are safer than using cash," and "can be used for everyday purchases including gas, groceries, dining out, shopping online and paying bills," Chase fails to disclose its wrongful practices relating to its imposition of overdraft fees from debit card purchases.  Chase states that "*[g]enerally*, deposits will be credited to your account first and then we'll pay your items (e.g. checks, debit card transactions, ATM transactions and other debits to your account) from highest to lowest dollar amount *each business day*."  However, Chase fails to disclose that it maximizes its overdraft fees, at consumer expense, by grouping together POS transactions that occurred on *subsequent* days with POS transactions that occurred on *earlier* days, and reordering them so that

- 14 -

higher debits that occurred on subsequent days are posted to its customers' accounts before lower debits that occurred on earlier days, contrary to the terms of the Bank's Deposit Agreement and its customers' reasonable expectations.  Chase's practices violate the covenant of good faith and fair dealing implied in the Deposit Agreement as well as the consumer protection laws of California.

     C.     **Chase's Cloaking of Accurate Balance Information**

     58.     Chase actively promotes the convenience of its debit cards and other electronic debiting, but fails to provide customers with accurate balance information.  When customers execute account transactions, they generally do not have access to an accurate balance register or balance information.

     59.     Chase provides inaccurate balance information to its customers through its electronic network.  In certain cases, Chase informs its customers that they have a positive balance when, in reality, they have a negative balance, despite its actual knowledge of outstanding debits and transactions.

     60.     Even when Chase has actual knowledge of outstanding transactions which have already created a negative balance in a customers' account, it encourages the customer to incur more overdraft charges by approving—rather than prudently declining—subsequent debit card purchases and other electronic transactions.

     61.     Chase also assesses overdraft fees at times when actual funds in the customer account are sufficient to cover all debits that have been submitted to the Bank for payment.  It does this by placing a "hold" on actual funds in the customer's account.  In doing so, Chase charges overdraft fees where it faces no risk, because the cash balance in the customer's account has not dropped below zero.

     62.     The Bank touts the purported benefits of its checking account and debit cards in advertisements aimed at luring new customers and retaining current ones, as convenient online banking features have become an industry standard.  Below are examples of the Bank's

advertisements regarding the purported benefits of their checking accounts and debit cards from the Chase website:

a. "Use your card to pay for your purchases—groceries, gas, bills or even a cup of coffee.  The money will be deducted directly from your checking account;"

b. "Purchases are automatically subtracted from your checking account and recorded on your monthly statement;"

c. "If asked 'debit or credit,' always select 'credit' and sign for the purchase.  The money for your purchases is always deducted from your checking account when you use your debit card, even if you select 'credit.' When paying bills (e.g., utilities, cable television, telephone) with your debit card, always select 'credit card' if prompted or ask the biller to process your debit card as a credit transaction; do not provide your PIN.  The money for your bill payment will still be deducted from your checking account;"

d. "With our Online, On Time Guarantee, you never need to worry about late payments;" and

e. "You can schedule exactly when you need your payments sent. You can even choose whether to make a one-time or a repeating payment."

63. The advertisements above each create the expectation that account funds are debited immediately by the amount of the purchase at the time of purchase.  They also include the expectation that transactions will be processed in the order that they are incurred and not reordered with transactions from different days.  As demonstrated by the Bank's actions alleged herein, these expectations are not met, as funds are not depleted immediately by the amount of the purchase at the time of purchase and the Bank will reorder transactions from different days for its own benefit.

64. The advertisements above are misleading or deceptive because they create the expectation that these transactions will be processed in the order that they are incurred or are scheduled to be incurred.  As demonstrated by the Bank's actions alleged herein, these

- 16 -

expectations are not met, as the Bank will reorder transactions from different days for its own benefit.

**D.**   **Chase's Failure to Notify Customers of Overdrafts or Advise Customers of Their Right to Opt Out**

65.     At the time its debit cards are used in POS transactions or at ATMs, Chase is able to determine, almost instantaneously, whether there are sufficient funds in a customer's account to cover that particular transaction.   Chase has the technological capability to decline transactions (which it does when a pending transaction would exceed a pre-determined, overdraft tolerance limit for the account), or notify customers at that very moment that the particular debit card transaction would result in an overdraft.   Chase could give customers the option to decline the transaction to avoid incurring the overdraft fee, but it does not do so because it seeks to maximize the amount of revenue generated through its assessment of overdraft fees.

66.     Notwithstanding its technological capabilities and actual knowledge, Chase fails to provide notice to Plaintiffs and the Class that a particular debit card transaction will result in an overdraft and, hence, an overdraft fee.   Because Chase's customers are not notified of the potential overdraft, and are not given the option of declining the debit card transaction or providing another form of payment, the customers incur monetary damages in the form of overdraft fees.

67.     At relevant times, Chase failed to make Plaintiffs and Class members aware that they can opt out of its overdraft scheme upon request, thereby avoiding any overdraft fees from being incurred.

**E.**   **Chase's Overdraft Policies and Practices Are Contrary to Best Practices**

68.     By engaging in the conduct described herein, Chase has failed to follow the list of "best practices" for overdraft programs set forth in the "Joint Guidance on Overdraft Protection Programs" ("Joint Guidance") issued by the United States Department of the Treasury, the Office of the Comptroller of the Currency, the Board of Governors of the Federal

Reserve System, the Federal Deposit Insurance Corporation, and the National Credit Union Administration (collectively, the "Agencies").  A copy of the Joint Guidance is attached as Exhibit C.  These "best practice" recommendations include: "Provide election or opt-out of service.  Obtain affirmative consent of consumers to receive overdraft protection.  Alternatively, where overdraft protection is automatically provided, permit consumers to 'opt-out' of the overdraft program and provide a clear consumer disclosure of this option."  70 F.R. 9127-01, 9132.

69.    According to rules proposed by the Agencies: "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . .  This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee."  73 F.R. 28904-01, 28929 (May 19, 2008).

70.    The Joint Guidance also advises banks to "[a]lert customers before a transaction triggers any fees.  When consumers attempt to withdraw or transfer funds made available through an overdraft protection program, provide a specific consumer notice, where feasible, that completing the withdrawal may trigger the overdraft fees."  70 F.R.D. 9127, 9132.  The Joint Guidance further advises that "[t]his notice should be presented in a manner that permits consumers to cancel the attempted withdrawal or transfer after receiving the notice."  *Id.*

71.    Similarly, the list of "best practices" recommended in "Overdraft Protection: A Guide for Bankers," issued by the American Bankers Association, includes offering customers the option of "opting out" of any overdraft programs, and informing customers, before they access funds, that a particular point of sale or ATM transaction will cause them to incur an overdraft fee.  A copy of "Overdraft Protection: A Guide for Bankers" is attached as Exhibit D.

72.    Chase's overdraft policies make it difficult for customers to avoid injury even if they carefully track the balance in their account.  In fact, the Agencies have stated that "Injury" resulting from such policies, "is not reasonably avoidable" by the consumer.  73 F.R.

28904-01, 28929.  "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available."

73.     On October 6, 2009, the Center for Responsible Lending issued a report entitled "Overdraft Explosion:  Bank Fees for Overdrafts Increase 35% in Two Years."  The report, attached hereto as Exhibit E, finds that it is now "standard procedure to automatically enroll checking account customers in their most expensive overdraft loan program."  The report finds that debit card transactions account for more overdraft fees than traditional checks or any other type of transaction, even though "debit card transactions and ATM withdrawals . . . could easily be denied for no fee."  The report also finds that overdraft fees increased 35 percent from 2006 to 2008, and that over 50 million Americans overdrew their accounts in a 12 month period, with 27 million accounts incurring five or more overdraft fees.

74.     A chart from the research company Moebs Services shows that, in every year since 1992, banks have gained increased revenues from overdraft fees:



**F.**    **Chase's Unconscionable Provisions and Policies**

75.    The Bank's overdraft policies and practices are unconscionable in the following respects, among others:

a.    The Bank does not or did not disclose or reasonably disclose to customers that they have the option to "opt out" of its overdraft scheme;

b.    The Bank does not or did not obtain affirmative consent from checking account customers prior to processing a transaction that will overdraw the account and result in an overdraft fee;

c.    The Bank does not or did not alert customers that a debit card transaction will trigger an overdraft, and does not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

        d.     The Deposit Agreement and related documents are contracts of adhesion in that they are standardized forms, imposed and drafted by the Bank, which has vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement in its entirety;

        e.     The amount of overdraft fees is disclosed in an ineffective, ambiguous, misleading, and unfair manner, in a document not signed by the depositor; and

        f.     The Bank's Deposit Agreement provided to customers is ineffective, ambiguous, deceptive, unfair, and misleading in that it does not unambiguously state that the Bank always reorders debits from high to low over separate days, even though the Bank reorders transactions in this way for customers in order to maximize overdrafts and overdraft fee revenues.

        g.     Chase's Deposit Agreement also contains an arbitration clause and a class action waiver which states:

> ANY DISPUTE MUST BE RESOLVED BY BINDING ARBITRATION. . . . YOU WILL NOT BE ABLE TO BRING A CLASS ACTION OR OTHER REPRESENTATIVE ACTION IN COURT, NOR WILL YOU BE ABLE TO BRING ANY CLAIM IN ARBITRATION AS A CLASS ACTION OR OTHER REPRESENTATIVE ACTION. YOU WILL NOT BE ABLE TO BE PART OF ANY CLASS ACTION OR OTHER REPRESENTATIVE ACTION BROUGHT BY ANYONE ELSE, OR TO BE REPRESENTED IN A CLASS ACTION OR OTHER REPRESENTATIVE ACTION.
>
> . . .
>
> If you or the Bank elects to arbitrate a Claim, the arbitration will be conducted as an individual action. Neither you nor the Bank consents or agrees to any arbitration on a class or representative basis, and the arbitrator shall have no authority to proceed with any arbitration on a class or representative basis. This arbitration provision applies to and includes any Claims made and remedies sought as part of any class action, private attorney general or other representative action, which Claims hereby are made subject to arbitration on an individual (non-class, non-representative) basis. This means that even if a class action lawsuit or other

representative action, such as that in the form of a private attorney general action, is filed, any Claim between you and the Bank related to this Agreement raised in such lawsuits will be subject to an individual arbitration Claim if either you or the Bank so elects.

Deposit Agreement, p. 19.

h.    Such arbitration agreements are procedurally and substantively unconscionable and unenforceable in that, inter alia, the Deposit Agreement, to the extent it may be deemed a contract at all, is a contract of adhesion because, among other reasons, it is a standardized form, imposed and drafted by Chase, which is a party of vastly superior bargaining strength, and relegates to the depositor only the opportunity to adhere to it or reject it, and because it leads to overly harsh results for consumers and prevents consumers from having a meaningful opportunity to redress their grievances.

76.    In July 2009, Chase publicly announced that it will no longer seek to enforce the arbitration provisions in its Deposit Agreement, and it is equitably estopped from reneging on this commitment.

**G.    Recently Announced Changes in Chase's Overdraft Policies and Practices Do Not Offer Any Remedial Benefits to Customers**

77.    On September 22, 2009, Chase announced plans to overhaul its overdraft policies on a going-forward basis.  The changes do nothing to remedy the past wrongs to Plaintiffs and the Class.  They do not retroactively reverse the charges wrongly debited from their accounts, nor do they prevent Chase from continuing its unfair and unconscionable methods of business.

**H.    Chase's Overdraft Practices Harmed Plaintiffs**

78.    Plaintiff Luquetta held a checking account with Chase.

79.    Ms. Luquetta was issued a debit card by the Bank in connection with her account.  As described above, a debit card allows customers to access their checking account

funds by using the card to execute a transaction. The charge is processed electronically, and the Bank has the option to accept or decline the transaction at the point of sale.

80.    Chase wrongfully charged Ms. Luquetta overdraft fees on multiple occasions. By way of illustration, between August 13, 2009 and August 16, 2009, Plaintiff Luquetta made seven debit card purchases with her debit card totaling $457.32. At the time these purchases were made, there were sufficient funds in Plaintiff Luquetta's account to cover all of her transactions.

81.    Plaintiff Luquetta in late July 2009 set up an automatic bill pay for $1,725.00 to be processed on August 22, 2009.

82.    Chase, instead of processing the automatic bill pay for $1,725.00 on August 22, 2009, processed the payment on August 17, 2009. Chase also chose to process the automatic bill payment before processing six of the seven charges made between August 13, 2009 and August 16, 2009. Through this re-sequencing of transactions, Plaintiff Luquetta was charged seven overdraft fees totaling $231 on August 18, 2009.

83.    The following table illustrates the transactions explained above as *Chase processed them*:

| | | Debits (-) | Credits (+) | Running Balance |
|---|---|---|---|---|
| | **Beginning Balance on <u>August 14, 2009</u>:** | | | **$1180.03** |
| **Date Posted** | **Debit Description** | | | |
| 8/17/2009 | Debit made between 8/15/2009 and 8/16/2009 | 28.52 | | 1,151.51 |
| 8/17/2009 | Bill Pay Scheduled For 8/22/2009 | 1,725.00 | | -573.49 |
| 8/17/2009 | Debit made on 8/15/2009 or 8/16/2009 | 107.50 | | -680.99 |
| 8/17/2009 | Debit made on 8/15/2009 | 87.46 | | -768.45 |
| 8/17/2009 | Debit made on 8/15/2009 or 8/16/2009 | 32.92 | | -801.37 |
| 8/17/2009 | Debit made on 8/15/2009 | 100.00 | | -901.37 |
| 8/17/2009 | Debit made between 8/13/2009 and 8/16/2009 | 10.92 | | -912.29 |
| 8/17/2009 | Debit made between 8/13/2009 and 8/16/2009 | 90.00 | | -1,002.29 |
| | | | | |
| | | | | **Total Fees: $ 231.00** |

84.    The following table illustrates the transactions explained above as Chase *should have* processed them:

|  |  | Debits (-) | Credits (+) | Running Balance |
|---|---|---|---|---|
|  | **Beginning Balance on August 14, 2009:** |  |  | **$1180.03** |
| **Date Posted** | **Debit Description** |  |  |  |
| 8/17/2009 | Debit made between 8/13/2009 and 8/16/2009 | 90.00 |  | 1,090.03 |
| 8/17/2009 | Debit made between 8/13/2009 and 8/16/2009 | 10.92 |  | 1,079.11 |
| 8/17/2009 | Debit made on 8/15/2009 | 100.00 |  | 979.11 |
| 8/17/2009 | Debit made on 8/15/2009 | 87.46 |  | 891.65 |
| 8/17/2009 | Debit made on 8/15/2009 or 8/16/2009 | 107.50 |  | 784.15 |
| 8/17/2009 | Debit made on 8/15/2009 or 8/16/2009 | 32.92 |  | 751.23 |
| 8/17/2009 | Debit made on 8/15/2009 or 8/16/2009 | 28.52 |  | 722.71 |
| 8/17/2009 | Bill pay scheduled for 8/22/2009 | 1,725.00 |  | -1,002.29 |
|  |  |  |  |  |
|  | Total Fees: $ 33.00[1] |  |  |  |

85.     As the tables above reflect, because Chase posted her 8/17/2009 bill pay transaction *ahead* of her 8/13/2009 - 8/16/2009 debit card transactions, *i.e.*, out of chronological order, Plaintiff Luquetta was charged *seven* overdraft fees, instead of only *one* overdraft fee.

86.     Since opening her account in September 2003, Ms. Luquetta has been charged over $2,900 in overdraft fees.  Since the beginning of 2009 alone, Ms. Luquetta was charged at least $2,673 in overdraft fees.

87.     The Bank generally did not notify Plaintiff Luquetta at the time she made check card transactions, including POS transactions, that her checking account was overdrawn or that she would be charged an overdraft fee as a result of the transaction.

88.     Generally, the Bank has paid Plaintiff Luquetta's check card charges, even when the account was overdrawn, and charged Plaintiff overdraft fees.

89.     Plaintiff Williams held a checking account with Chase.

90.     Ms. Williams was issued a debit card by the Bank in connection with her account.  As described above, a debit card allows customers to access their checking account

---

[1] Note: Plaintiff Luquetta's August statement reflects a $33 overdraft refund which "posted" on August 17, 2009.  However that refund was requested by the Plaintiff on August 19, 2009 and was later back-posted by Chase, making it irrelevant to the sequencing above.

funds by using the card to execute a transaction.  The charge is processed electronically, and the Bank has the option to accept or decline the transaction at the point of sale.

91.    Chase has also wrongfully charged Ms. Williams overdraft fees.  Ms. Williams was charged six overdraft fees on January 11, 2010, in the amount of $33.00 each.

92.    Through the re-sequencing of transactions, Plaintiff Williams was charged six overdraft fees totaling $198.00 on January 11, 2010.

93.    Based on information and belief, the overdraft fees were based on the following ordering of transactions:

| | | Debits (-) | Credits (+) | Running Balance |
|---|---|---|---|---|
| | **Beginning Balance on January 11, 20010:** | | | **$197.30** |
| **Date Posted** | **Debit Description** | | | |
| 1/11/2010 | Check #1155 | 96.00 | | 101.30 |
| 1/11/2010 | Chevron | 35.39 | | 65.91 |
| 1/11/2010 | Trader Joe's | 21.06 | | 44.85 |
| 1/11/2010 | Aveda Institute | 19.00 | | 25.85 |
| 1/11/2010 | Fred 62 | 10.60 | | 15.25 |
| 1/11/2010 | Gateway Cleaners 2 | 6.95 | | 8.30 |
| 1/11/2010 | Delilah Bakery | 6.28 | | 2.02 |
| 1/11/2010 | Old Pasadena Parking | 6.00 | | -3.98 |
| 1/11/2010 | Pinkberry-Vermont | 3.95 | | -7.93 |
| 1/11/2010 | In-N-Out Burger | 3.27 | | -11.20 |
| 1/11/2010 | Apl*Itunes | 2.28 | | -13.48 |
| 1/11/2010 | LA City Metered Park | 1.75 | | -15.23 |
| 1/11/2010 | LA City Metered Park | .50 | | -15.73 |
| 1/11/2010 | Insufficient Funds Fee | 33.00 | | -48.73 |
| 1/11/2010 | Insufficient Funds Fee | 33.00 | | -81.73 |
| 1/11/2010 | Insufficient Funds Fee | 33.00 | | -114.73 |
| 1/11/2010 | Insufficient Funds Fee | 33.00 | | -147.73 |
| 1/11/2010 | Insufficient Funds Fee | 33.00 | | -180.73 |
| 1/11/2010 | Insufficient Funds Fee | 33.00 | | -213.73 |
| | | | **Total Fees: $ 198.00**[2] | |

94.    If Chase had not manipulated and reordered Ms. Williams' transactions from highest to lowest, she would not have incurred six overdraft fees.

---

[2] One overdraft fee was subsequently refunded on January 12, 2010.

95.     For instance, if Chase had posted the transactions from lowest to highest,

Ms. Williams would have incurred only one overdraft fee instead of six:

|  |  | Debits (-) | Credits (+) | Running Balance |
|---|---|---|---|---|
|  | Beginning Balance on January 11, 20010: |  |  | $197.30 |
| Date Posted | Debit Description |  |  |  |
| 1/11/2010 | LA City Metered Park | .50 |  | 196.80 |
| 1/11/2010 | LA City Metered Park | 1.75 |  | 195.05 |
| 1/11/2010 | Apl*Itunes | 2.28 |  | 192.77 |
| 1/11/2010 | In-N-Out Burger | 3.27 |  | 189.50 |
| 1/11/2010 | Pinkberry-Vermont | 3.95 |  | 185.55 |
| 1/11/2010 | Old Pasadena Parking | 6.00 |  | 179.55 |
| 1/11/2010 | Delilah Bakery | 6.28 |  | 173.27 |
| 1/11/2010 | Gateway Cleaners 2 | 6.95 |  | 166.32 |
| 1/11/2010 | Fred 62 | 10.60 |  | 155.72 |
| 1/11/2010 | Aveda Institute | 19.00 |  | 136.72 |
| 1/11/2010 | Trader Joe's | 21.06 |  | 115.66 |
| 1/11/2010 | Chevron | 35.39 |  | 80.27 |
| 1/11/2010 | Check #1155 | 96.00 |  | -15.73 |
| 1/11/2010 | Insufficient Funds Fee | 33.00 |  | -48.73 |
|  |  |  |  |  |
|  |  |  | Total Fees: $ 33.00 |  |

96.     Likewise, if Chase had posted the transactions in chronological order, Ms.

Williams would have incurred only one overdraft fee instead of six:

|  |  | Debits (-) | Credits (+) | Running Balance |
|---|---|---|---|---|
|  | Beginning Balance on January 11, 20010: |  |  | $197.30 |
| Date Posted | Debit Description |  |  |  |
| 1/07/2010 | Old Pasadena Parking | 6.00 |  | 191.30 |
| 1/08/2010 | Chevron | 35.39 |  | 155.91 |
| 1/08/2010 | Aveda Institute | 19.00 |  | 136.91 |
| 1/08/2010 | Gateway Cleaners 2 | 6.95 |  | 129.96 |
| 1/08/2010 | In-N-Out Burger | 3.27 |  | 126.69 |
| 1/08/2010 | LA City Metered Park | 1.75 |  | 124.94 |
| 1/08/2010 | LA City Metered Park | .50 |  | 124.44 |
| 1/09/2010 | Fred 62 | 10.60 |  | 113.84 |
| 1/09/2010 | Apl*Itunes | 2.28 |  | 111.56 |
| 1/10/2010 | Trader Joe's | 21.06 |  | 90.50 |
| 1/10/2010 | Pinkberry-Vermont | 3.95 |  | 86.55 |
| 1/10/2010 | Delilah Bakery | 6.28 |  | 80.27 |
| 1/11/2010 | Check #1155 | 96.00 |  | -15.73 |
| 1/11/2010 | Insufficient Funds Fee | 33.00 |  | -48.73 |
|  |  |  | Total Fees: $ 33.00 |  |

97.     Plaintiffs Megan Biss, Billy and Deborah Ruiz, John D. Kirkland and Jacqueline Miller are also current and/or former checking account customers of Chase.

98.     In connection with their accounts, the Bank issued debit cards to Ms. Biss, Mr. and Mrs. Ruiz, Mr. Kirkland, and Mrs. Miller.

99.     Chase also wrongfully charged Ms. Biss, Mr. and Mrs. Ruiz, Mr. Kirkland and Mrs. Miller overdraft fees on multiple occasions.  These wrongful overdraft fees occurred as a result of the Bank's manipulation and re-ordering of these Plaintiffs' debit card transactions.

100.    Chase failed to notify any of these Plaintiffs that they could incur overdraft fees on transactions even though there were sufficient funds in the checking account to cover the transaction at the time the transaction was executed.  In addition, Chase never notified these Plaintiffs, at the time they executed the purported insufficient funds transactions described above, that their checking accounts were overdrawn or that they would be charged overdraft fees as a result of the transactions.  Furthermore, Chase paid, rather than returned, all of the debit card charges described above, even though Plaintiffs' accounts purportedly lacked sufficient funds to cover the transactions.

101.    Based on information and belief, the overdraft charges incurred by Plaintiffs are representative of hundreds of millions of dollars of overdraft fees that Chase wrongfully assessed and deducted from its customers' accounts.  These wrongful takings are especially egregious considering the fact that the Bank approved each transaction and knew at the time of approval whether there were sufficient funds in the account to cover the transaction.

## I.     The Damages Sustained by Plaintiffs and the Class

102.    As shown by these examples, the Bank's overdraft policies make it difficult for a customer to avoid injury even if the customer keeps close track of the balance in his or her account.  In fact, the Agencies have stated that "injury" resulting from such policies "is not reasonably avoidable" by consumers.  73 F.R. 28904-01, 28929.  "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft

service without having an opportunity to opt out.  Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available."  *Id.*

103.    According to rules proposed by the Agencies, "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . .  This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee."  73 F.R. 28904-01, 28929 (May 19, 2008).

104.    Thus, as a consequence of the Bank's overdraft policies and practices, Plaintiffs and the Class have been wrongfully forced to pay overdraft fees.  The Bank has improperly deprived Plaintiffs and the Class of significant funds, causing ascertainable monetary losses and damages.

105.    As a consequence of the Bank's improper overdraft fees, the Bank has wrongfully deprived Plaintiffs and the Class of funds to which they had no legitimate claim.

106.    Plaintiffs had sufficient funds to cover at least some of the transactions for which they and the Class were charged overdraft fees.  Plaintiffs and members of the Class either had adequate funds to cover the transactions posted to their accounts, or the accounts were allowed to become overdrawn, even by *de minimis* margins, exclusively so that the Bank could impose these wrongful charges.  In many instances, the Bank's manipulation of the process for imposing overdraft fees triggered a cascade of charges that exponentially added to the charges it collected from Plaintiffs and Class members.

107.    All conditions precedent to the relief sought herein have either occurred or have been performed or waived.

## FIRST CLAIM FOR RELIEF

### Breach of Contract

108.     Plaintiffs repeat paragraphs 1 through 107 above.

109.     Plaintiffs, on the one hand, and Chase on the other, have contracted in California for bank account deposit, checking, ATM and debit card services, as embodied in the Deposit Agreement and related documentation.

110.     Under California law, good faith is an element of every contract pertaining to the assessment of overdraft fees.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

111.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

112.     Chase breached the covenant of good faith and fair dealing in the Deposit Agreements through its overdraft policies and practices as alleged herein.

113.     Plaintiffs and the Class have performed all, or substantially all, of the obligations imposed on them under the Deposit Agreement.

114.     Plaintiffs and members of the Class have sustained damages as a result of the Bank's breach of the covenant of good faith and fair dealing.

## SECOND CLAIM FOR RELIEF

### Unconscionability in Violation of Cal. Civ. Code § 1670.5

115.   Plaintiffs repeat paragraphs 1 through 107 above.

116.   The Bank's overdraft policies and practices are substantively and procedurally unconscionable, in violation of Section 1670.5 of the California Civil Code, in the following respects, among others:

a.   The Bank does not and did not disclose or reasonably disclose to customers that they have the option to "opt out" of the Bank's overdraft scheme;

b.   The Bank does not and did not obtain affirmative consent from checking account customers prior to processing a transaction that will overdraw the account and result in an overdraft fee;

c.   The Bank does not and did not alert its customers that a debit card transaction will trigger an overdraft, and do not or did not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

d.   The Deposit Agreement and related documents are contracts of adhesion in that they are standardized forms, imposed and drafted by the Bank, which has vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement in its entirety;

e.   The amount of overdraft fees is disclosed in an ineffective, ambiguous, misleading, and unfair manner, since it is not contained in the Deposit Agreement, but rather in a separate document, which is not signed by the depositor; and

f.   The Deposit Agreement provided to customers is or was ineffective, ambiguous, deceptive, unfair, and misleading in that it does not unambiguously state that the Bank always reorders debits from high to low over separate days, even though the Bank reorders transactions in this way for customers in order to maximize overdrafts and overdraft fee revenues.

117.    Considering the great business acumen and experience of the Bank in relation to Plaintiffs and the Class, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law.

118.    The imposition of overdraft charges which exceed the amount overdrawn (e.g., the imposition of a $35 charge on an overdraft of less than $35) is itself unconscionable. Such charges are not reasonably related to the Bank's cost of covering the overdraft and/or its risk of nonpayment (where the Bank pays the overdraft), or to the Bank's cost of returning the item unpaid (where the Bank does not or did not pay the overdraft).

119.    Plaintiffs and members of the Class have sustained damages as a result of the Bank's unconscionable policies and practices as alleged herein.

### THIRD CLAIM FOR RELIEF

### Conversion

120.    Plaintiffs repeat paragraphs 1 through 107 above.

121.    The Bank has or had a duty to maintain and preserve its customers' checking accounts and to prevent their diminishment through the Bank's own wrongful acts.

122.    The Bank has wrongfully collected overdraft fees from Plaintiffs and the members of the Class, and took specific and readily identifiable funds from their accounts in payment of these fees in order to satisfy it.

123.    The Bank has, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiffs and the members of the Class, without legal justification.

124.    The Bank continues to retain these funds unlawfully without the consent of Plaintiffs or members of the Class.

125. The Bank intends or intended to permanently deprive Plaintiffs and the members of the Class of these funds.

126. These funds are properly owned by Plaintiffs and the members of the Class, not the Bank, which claim that it is entitled to their ownership, contrary to the rights of Plaintiffs and the members of the Class.

127. Plaintiffs and the members of the Class are entitled to the immediate possession of these funds.

128. The Bank has wrongfully converted these specific and readily identifiable funds in violation of California law.

129. The Bank's wrongful conduct is continuing.

130. As a direct and proximate result of this wrongful conversion, Plaintiffs and the members of the Class have suffered and continue to suffer damages.

131. By reason of the foregoing, Plaintiffs and the members of the Class are entitled to recover from Chase all damages and costs permitted by law, including all amounts that the Bank has wrongfully converted.

## FOURTH CLAIM FOR RELIEF

### Unjust Enrichment

132. Plaintiffs repeat paragraphs 1 through 107 above.

133. Plaintiffs, on behalf of themselves and the Class, assert a claim for unjust enrichment under the common law of California.

134. By means of the Bank's wrongful conduct alleged herein, the Bank knowingly provides or provided banking services to Plaintiffs and members of the Class that are unfair, unconscionable, and oppressive.

135. The Bank knowingly received and retained wrongful benefits and funds from Plaintiffs and members of the Class. In so doing, the Bank acted with conscious disregard for the rights of Plaintiffs and members of the Class.

136.    As a result of the Bank's wrongful conduct as alleged herein, Chase has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Class.

137.    Chase's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

138.    Under the common law doctrine of unjust enrichment, it is inequitable for Chase to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of overdraft fees on Plaintiffs and members of the Class in an unfair, unconscionable and oppressive manner. Chase's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

139.    The financial benefits derived by Chase rightfully belong to Plaintiffs and members of the Class. Chase should be compelled to disgorge in a common fund for the benefit of Plaintiffs and members of the Class all wrongful or inequitable proceeds received by them. A constructive trust should be imposed upon all wrongful or inequitable sums received by Chase traceable to Plaintiffs and the members of the Class.

140.    Plaintiffs and members of the Class have no adequate remedy at law.

## FIFTH CLAIM FOR RELIEF

### (Violations of California Business & Profession Code § 17200, *et seq*.)

141.    Plaintiffs repeat paragraphs 1 through 107 above.

142.    The Bank's conduct described herein violates the Unfair Competition Law (the "UCL"), codified at California Business and Professions Code section 17200, in the following respects, among others:

a.    The Bank's practices relating to the imposition of overdraft fees is unconscionable, in violation of California Civil Code section 1770(a)(19), and, as a result, constitutes an unlawful business act or practice within the meaning of the UCL;

b.      The Bank's practices relating to the imposition of overdraft fees violate California Civil Code sections 1770(a)(5), (14) and (19), and, as a result, constitute unlawful business acts or practices within the meaning of the UCL; and

c.      The Bank's practices relating to the imposition of overdraft fees constitute unfair business acts or practices within the meaning of the UCL.

143.    The harm to Plaintiffs and the Class arising from the Bank's unlawful and unfair practices relating to the imposition of overdraft fees outweighs the utility, if any, of those practices.

144.    The Bank's unlawful and unfair business practices relating to the imposition of overdraft fees are immoral, unethical, oppressive, unscrupulous, unconscionable and/or substantially injurious to Plaintiffs and members of the Class.

145.    As a result of the Bank's violations of the UCL, Plaintiffs and members of the Class have paid, and/or will continue to pay, unreasonably excessive amounts of money for banking services and thereby suffered and will continue to suffer actual damages.

146.    Pursuant to California Business and Professions Code section 17203, Plaintiffs and the Class are therefore entitled to *inter alia*:

a.      an order requiring Chase to cease the unlawful and unfair acts alleged herein;

b.      full restitution of all overdraft fees paid to Chase on check card transactions, including POS and ATM transactions, pursuant to California Code of Civil Procedure section 384;

c.      pre-judgment interest at the highest rate allowable by law; and

d.      payment of their attorneys' fees and costs pursuant to, *inter alia*, California Code of Civil Procedure section 1021.5.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class demand a jury trial and judgment as follows:

1.      Declaring Chase's overdraft fee policies and practices to be wrongful, unfair and unconscionable.

2.      Restitution of all overdraft fees paid to the Bank by Plaintiffs and the Class on check card transactions, including POS and ATM transactions, within the applicable statutes of limitations, in an amount to be determined at trial;

3.      Disgorgement of the ill-gotten gains derived from the Bank's misconduct;

4.      Actual damages in an amount according to proof;

5.      Punitive and exemplary damages;

6.      Pre-judgment interest at the highest rate permitted by law;

7.      The costs and disbursements incurred by Plaintiffs in connection with this action, including reasonable attorneys' fees pursuant to California Code of Civil Procedure § 1021.5 and California Civil Code § 1780; and

8.      Such other and further relief as the Court deems just and proper.

Dated:      April 12, 2010.

/s/ Bruce S. Rogow
Bruce S. Rogow, Esquire
Florida Bar No. 067999
bruce@abbrclaw.com
Robert C. Gilbert, Esquire
Florida Bar No. 561861
bobby@abbrclaw.com
ALTERS BOLDT BROWN
 RASH & CULMO, P.A.
4141 N.E. 2nd Avenue
Miami, Florida 33137
Tel:  (305) 571-8550
Fax:  (305) 571-8558

*Lead Counsel for Plaintiff*

/s/ Ruben Honik
Ruben Honik, Esquire
Pennsylvania Bar No. 33109
rhonik@golombhonik.com
GOLUMB & HONIK, P.C.
1515 Market Street
Suite 1100
Philadelphia, PA 19102
Tel: 215-985-9177
Fax: 215-985-4169

/s/ Barry R. Himmelstein
Barry R. Himmelstein, Esquire
California Bar No. 157736
bhimmelstein@lchb.com
Michael W. Sobol, Esquire
California Bar No. 194857
msobol@lchb.com
Jordan Elias, Esquire
California Bar No. 228731
jelias@lchb.com
Mikaela Bernstein, Esquire
California Bar No. 261301
mbernstein@lchb.com
LIEFF CABRASER HEIMANN &
    BERNSTEIN LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Tel: 415-956-1000
Fax: 415-956-1008

/s/ Robert C. Josefsberg
Robert C. Josefsberg, Esquire
Florida Bar No. 40856
rjosefsberg@podhurst.com
Victor M. Diaz, Jr., Esquire
Florida Bar No. 503800
vdiaz@podhurst.com
John Gravante, III, Esquire
Florida Bar No. 617113
jgravante@podhurst.com
PODHURST ORSECK, P. A.
City National Bank Building
25 W Flagler Street
Suite 800
Miami, FL 33130-1780
Tel: 305-358-2800
Fax: 305-358-2382

/s/ Ted E. Trief
Ted E. Trief, Esquire
New York Bar No. 1476662
ttrief@triefandolk.com
Barbara E. Olk, Esquire
New  York Bar No. 1459643
bolk@triefandolk.com
TRIEF & OLK
150 East 58th street
34th Floor
New York, NY 10155
Tel: 212-486-6060
Fax: 212-317-2946

/s/ Edward Adam Webb
Edward Adam Webb, Esquire
Georgia Bar No. 743910
Adam@WebbLLC.com
G. Franklin Lemond, Jr., Esquire
Georgia Bar No. 141315
FLemond@WebbLLC.com
WEBB, KLASE & LEMOND, L.L.C.
1900 The Exchange SE, Suite 480
Atlanta, GA 30339
Tel: 770-444-9325
Fax: 770-444-0271

/s/ Russell W. Budd
Russell W. Budd, Esquire
Texas Bar No. 03312400
rbudd@baronbudd.com
/s/ Bruce W. Steckler
Bruce W. Steckler, Esquire
Texas Bar No. 00785039
bsteckler@baronbudd.com
/s/ Melissa K. Hutts
Melissa K. Hutts, Esquire
Texas Bar No.  0188015
mhutts@baronbudd.com
/s/ Renee M. Melancon
Renee M. Melancon, Esquire
Texas Bar No. 2403573
rmelancon@baronbudd.com
BARON & BUDD, P.C.
3102 Oak Lawn Avenue
Suite 1100
Dallas, TX 75219
Tel: 214-521-3605
Fax: 214-520-1181

*Plaintiffs' Executive Committee*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 1:09-MD-02036-JLK**

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

**CERTIFICATE OF SERVICE**

I hereby certify that on April 12, 2010, I electronically filed the foregoing document with

the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served

this day on all counsel of record or pro se parties identified on the attached Service List in the

manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF

or in some other authorized manner for those counsel or parties who are not authorized to receive

electronically Notices of Electronic Filing.

/s/ Robert C. Gilbert
Robert C. Gilbert, Esquire
Florida Bar No. 561861
ALTERS BOLDT BROWN
RASH & CULMO, P.A.
4141 N.E. 2nd Avenue, Suite 201
Miami, Florida 33137
bobby@abbrclaw.com