# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 1:09-MD-02036-JLK

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

THIS DOCUMENT RELATES TO:

*Martinez v. Wells Fargo Bank, N.A.*
S.D. Fla. Case No. 1:09-cv-23834
D.N.M. Case No. 6:09-cv-01072-GBW-ACT

### SECOND AMENDED CLASS ACTION COMPLAINT[1]

Plaintiffs, through undersigned counsel, on behalf of themselves and all persons similarly situated, alleges the following based on personal knowledge as to allegations regarding the Plaintiffs, and on information and belief as to other allegations:

### INTRODUCTION

1.      This is a civil action seeking monetary damages, restitution, and declaratory relief from Defendant Wells Fargo Bank, N.A. ("Wells Fargo," the "Bank," or "Defendant") arising from its unfair and unconscionable assessment and collection of excessive overdraft fees.

2.      In the era of electronic banking and the ubiquitous use of debit card transactions, the assessment of overdraft fees has become a major profit center for many United States banks, including Wells Fargo.  For years, banks covered customers who occasionally bounced checks

---

[1] This Second Amended Class Action Complaint is filed with the consent of Defendant.

and even did so for a time for customers using debit cards, without charging their customers. Since the early 1990's, however, banks have devised methods to provide overdraft "protection" for customers and charge them in each instance.

3.     In November 2008, the Federal Deposit Insurance Corporation ("FDIC") issued a report detailing the abusive practices employed by various banks in implementing overdraft programs. *See* FDIC Study of Bank Overdraft Programs, November 2008 ("FDIC Study"), *available at* http://www.fdic.govlbanklanalytical/overdraftl.atll.   The FDIC reviewed 22.6 million non-sufficient fund ("NSF") transactions.  While Wells Fargo was not one of the banks studied by the FDIC, Wells Fargo employs several overdraft fee practices that the FDIC's report highlighted as the most abusive.

4.     The FDIC Study estimated that overdraft fees represent 74 percent of the total service charges that are imposed on deposit accounts in the United States.  The FDIC Study further reports that overdraft fees for debit cards can carry an effective annualized interest rate that *exceeds 3,500 percent*.  Nonetheless, the Consumer Federation of America reports that five of the ten largest banks raised their overdraft fees in the last year.  The FDIC Study found that the vast majority of NSF transactions, accounting for most fees, involved "automated" overdraft programs that are "non-promoted."  Automated programs are computerized programs by which the bank honors a charge when there are not sufficient funds in the account to cover the charge using standardized procedures or a matrix to determine whether the NSF occurrence qualifies for overdraft coverage.  The FDIC Study reports that 22.5 million of the 22.6 million NSF transactions analyzed (more than 99%) were reported by banks that operate automated overdraft programs.  "Promoted" overdraft programs are those in which the customers are informed of the

existence of the program, while "non-promoted" overdraft programs are those in which customers are not informed of the existence of the overdraft program.

5.      In 2007, banks collected more than $17 billion in overdraft fees.  That number nearly doubled in 2008, as more and more consumers struggled to maintain positive checking account balances.  *In 2009, banks are estimated to bring in between $27 billion to $38.5 billion in overdraft charges alone.*  As the one of the largest retail banks in the country, Wells Fargo is among the largest beneficiaries of these staggering charges.

6.      Almost by definition, these fees disproportionately affect the poor, who are most likely to maintain low balances.  Moebs Services, a research company that has conducted studies for the government as well as banks, estimates that 90 percent of overdraft fees are paid by the poorest 10 percent of banks' customer base.  The FDIC Study found that more than 38 percent of accounts held by customers in lower-income areas are assessed overdraft charges.  Moreover, these fees have the tendency to create a domino effect, because the imposition of a service charge on an account with a negative balance will make it less likely that the account holder's balance will reach positive territory, resulting in more fees.

7.      Before debit cards existed, banks occasionally extended the courtesy of honoring paper checks written on overdrawn or otherwise deficient accounts for customers who were typically in good standing.  Banks extended this courtesy largely because the third party involved in a sales transaction allowed the customer to pay by check, expecting the funds to be available and the check to clear.  For example, if a customer wrote a check to purchase groceries, the grocery store would only know whether the check cleared *after* the groceries had been purchased.

8.     The same considerations are not present when customers use debit cards.  Banks could simply decline to honor debit or point of sale transactions where accounts lack sufficient funds to execute the transactions.  Retail and service transactions could still be executed if consumers presented an alternative form of payment.  ATM transactions could still proceed if banks provided a warning that an overdraft fee would be assessed, and customers chose to proceed nevertheless.  In fact, until a few years ago, most banks simply declined debit transactions that would overdraw an account.

9.     Instead of simply declining debit transactions when there are insufficient funds, or warning its customers that an overdraft fee will be assessed if they proceed with the transaction, Wells Fargo routinely processes such transactions and then charges its customers an overdraft fee of $35--even when the transaction is for only a few dollars. This automatic, fee-based overdraft scheme is intentionally designed to maximize overdraft fee revenue for Wells Fargo. Additionally, as part of its inequitable motive to generate obscene profits gained through the imposition of unconscionable overdraft fees, Wells Fargo refuses to allow its customers to opt out of overdraft protection.

10.     Consistent with the FDIC's findings, Wells Fargo maximizes the number of transactions on which it is able to exact fees from its customers by reordering the sequence of transactions that are posted in a given day from highest dollar amount to lowest dollar amount so as to increase the number of transactions that can be deemed to carry overdraft fees.

11.     In many instances, these overdraft fees cost Wells Fargo account holders hundreds of dollars in a matter of days, or even hours, when they may be overdrawn by only a few dollars.  Even more egregious, customer accounts may not actually be overdrawn at the time the overdraft fees are charged, or at the time of the debit transaction.

4

12.     Thus, it is through manipulation and alteration of customers' transaction records that Wells Fargo maximizes overdraft penalties imposed on customers.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, and at least one Plaintiff is a resident of a different state than Wells Fargo.

14.     Venue is proper in the District of New Mexico, the district in which this action was originally filed, pursuant to 28 U.S.C. § 1391, because Wells Fargo is subject to personal jurisdiction and regularly conducts business in the State of New Mexico, and because a substantial part of the events giving rise to the claims occurred in that judicial district.

## THE PARTIES

15.     Plaintiff Marc Martinez resides in Albuquerque, New Mexico, and maintains a checking account with Wells Fargo.

16.     Plaintiff Ivy Graham resides in Albuquerque, New Mexico, and maintains a checking account with Wells Fargo.

17.     Defendant Wells Fargo Bank, N.A., is a national banking association chartered in Sioux Falls, South Dakota, and headquartered in San Francisco, CA.  Wells Fargo conducts business throughout the United States.

18.     Wells Fargo regularly and systematically conducts business throughout the United States.  Among other things, Wells Fargo is engaged in the business of providing retail banking services to millions of consumers throughout the United States, including Plaintiffs and members of the putative classes, which include the issuance of debit cards for use by its customers in conjunction with their checking accounts.

5

19.     Wells Fargo is a national bank, subject to the National Bank Act, 12 U.S.C. § 1, *et seq.*, and regulations promulgated by the Office of the Comptroller of the Currency.

## CLASS ALLEGATIONS

20.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23.   This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

21.     The proposed classes are defined as:

> All Wells Fargo customers in the United States (except for customers with accounts maintained at Wells Fargo branches located in California) who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, incurred an overdraft fee as a result of Wells Fargo's practice of re-sequencing debit card transactions from highest to lowest (the "National Class").

> All Wells Fargo customers having accounts maintained at branches in the State of New Mexico, for the purpose of asserting claims under the New Mexico Unfair Practices Act (the "New Mexico Subclass") (*see* Fifth Claim for Relief, *infra*).

> The National Class and the New Mexico Subclass are collectively referred to as the "Classes."

22.     Plaintiffs reserve the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

23.     Excluded from the Classes are Wells Fargo, its parents, subsidiaries, affiliates, officers and directors, any entity in which Wells Fargo has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

24.     The members of the Classes are so numerous that joinder is impractical.   The Classes consist of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to Wells Fargo's records.

25.     The claims of the representative Plaintiffs are typical of the claims of the Classes in that the representative Plaintiffs, like all Class members, were charged overdraft fees by Wells Fargo as a result of its practice of re-sequencing debit card transactions from highest to lowest. The representative Plaintiffs, like all Class members, have been damaged by Wells Fargo's misconduct in that they were assessed and/or will continue to be assessed unfair and unconscionable overdraft charges.  Furthermore, the factual basis of Wells Fargo' misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.

26.     There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual Class members.

27.     Among the questions of law and fact common to the Classes are whether Wells Fargo:

a.     Refuses to allow customers to opt out of its overdraft protection programs;

b.     Does not obtain affirmative consent from customers prior to processing transactions that will result in overdraft fees;

c.     Does not alert customers that a debit card transaction will trigger an overdraft fee, and do not provide customers with an opportunity to cancel such transactions;

d.     Manipulates and reorders transactions so that it can increase the number of overdraft fees;

e.     Manipulates and reorders debits from highest to lowest in order to maximize the number of overdrafts and, consequently, the amount of overdraft fees;

f.     Imposes overdrafts and overdraft fees when, but for reordering transactions, there would otherwise be sufficient funds in the account;

g.      Fails to provide customers with accurate balance information;

h.      Delays posting of transactions by customers using debit cards so that customers are charged overdraft fees on transactions, even though the customers had sufficient funds in their accounts to cover the transactions upon execution;

i.      Charges exorbitant overdraft fees that bear no relationship to the actual costs and risks of covering insufficient funds transactions;

j.      Breaches its covenant of good faith and fair dealing with Plaintiffs and the other members of the Classes through its overdraft policies and practices;

k.      Requires its customers to enter into standardized account agreements which include unconscionable provisions;

l.      Converts moneys belonging to Plaintiffs and the other members of the Classes through its overdraft policies and practices;

m.      Is unjustly enriched through its overdraft policies and practices;

n.      Violates New Mexico's consumer protection statutes through its overdraft policies and practices; and

o.      Continues to commit wrongdoing through its overdraft policies and practices.

28.      Other questions of law and fact common to the Classes include:

a.      The proper method or methods by which to measure damages, and

b.      The declaratory relief to which the Classes are entitled.

29.      Plaintiffs' claims are typical of the claims of other Class members, in that they arise out of the same wrongful overdraft policies and practices and the same or substantially similar unconscionable provisions of Wells Fargo's account agreements and other related

8

documents.  Plaintiffs have suffered the harm alleged and have no interests antagonistic to the interests of any other Class member.

30.     Plaintiffs are committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions.  Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interest of the Classes.

31.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Wells Fargo, no Class member could afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, the Class members will continue to suffer losses and Wells Fargo's misconduct will proceed without remedy.

32.     Even if Class members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

## COMMON FACTUAL ALLEGATIONS

### A.     Wells Fargo

33.     According to its website, Wells Fargo is one of the largest commercial banks in the United States, holding approximately $13 trillion in assets as of June 30, 2009.  In addition to

its online banking services, Wells Fargo operates in most states, with 10,587 retail banking outlets and 12,353 ATMs.

34.     Wells Fargo is in the business of providing its customers with a variety of banking services.  One of the services provided by Wells Fargo for customers who open a checking account is a debit card, also known as a check card or ATM card.  Through those debit cards, customers can engage in transactions using funds directly from their accounts by engaging in "debit" or "point of sale" ("POS") transactions, or may withdraw money from their account, at automated teller machines ("ATMs").  Whether the card is used to execute POS transactions or to withdraw cash from ATM machines, the transaction is processed electronically.  As a result, Wells Fargo is notified instantaneously when the card is swiped, and has the option to accept or decline transactions at such time.

35.     Wells Fargo employs sophisticated software to automate its overdraft system. This program maximizes the number of overdrafts, and thus, the amount of overdraft fees charged per customer.

36.     As a result of Wells Fargo's manipulation and alteration of customers' transactions records, funds in a customer's account are depleted more rapidly and more overdraft fees are likely to be charged for multiple smaller transactions.  Indeed, overdraft charges are likely to occur at times when, but for the manipulation and alteration, there would be funds in the account and no overdraft would occur.  For example, if a customer, whose account had a $50 balance at the time Wells Fargo processed several transactions, made four transactions of $10 and one subsequent transaction of $100 on the same day, Wells Fargo would reorder the debits from largest to smallest, imposing four overdraft fees on the customer.  Conversely, if the $100

transaction were debited last--consistent with the actual order of transactions -- only one overdraft fee would be assessed.  *See* FDIC Study at n. 12.

**B.**     **Wells Fargo's Relevant Customer Documents Regarding Overdrafts**

37.     Plaintiffs and all members of the Classes maintain or maintained a checking account with Wells Fargo.  The terms of Wells Fargo's checking accounts are contained in standardized account holder agreements, presented to its customers on a "take it or leave it" basis, drafted and imposed by Wells Fargo, which was the party of vastly superior bargaining strength, and thus constitute contracts of adhesion.  While there has been some variation over time in the precise wording used in the agreement, on information and belief, the pertinent provisions discussed below have remained substantially the same at all material times.  A representative copy of the "Consumer Account Agreement," covering all deposit accounts, is attached as Exhibit A.

38.     Wells Fargo's customers have no opportunity to negotiate or change the terms of the Consumer Account Agreement before opening their accounts or becoming joint owners of previously opened accounts, and they also lack the bargaining power to do so.

39.     In the Consumer Account Agreement imposed by Wells Fargo on customers, Wells Fargo broadly defines the term "Item" to include "electronic items" such as debit card transactions and other electronic transactions.

40.     The Consumer Account Agreement defines an "overdraft" as "any event that results in a negative balance in your Account," and states that an "overdraft" occurs "if the Bank *receives* an Item drawn against your Account and there *are* insufficient available funds in your Account to cover the Item" and the bank pays or covers the Item.  Consumer Account Agreement, at 3, 26 (emphasis added).

11

41.    An "overdraft" thus occurs as a result of an electronic debt transaction when Wells Fargo receives the Item related to the transaction and there are insufficient funds in the account when the Item is received, and Wells Fargo pays or covers the Item.  Consumer Account Agreement, at 26-27.

42.    The Consumer Account Agreement does not set forth the amount that will be charged for purported overdrafts.

43.    The Consumer Account Agreement does not offer customers the option to "opt out" from Wells Fargo's overdraft scheme.

44.    Similarly, Wells Fargo's website defines an Overdraft as "a term used to indicate when an Item such as a check, Check Card purchase, or other transaction presented for payment is paid even though the available balance in your deposit account is less than the amount of the Item, thereby creating an Overdraft (or negative balance) in your account."[2]

### C.    Wells Fargo's Re-Ordering of Checking Account Transactions

45.    In an effort to maximize overdraft revenue, Wells Fargo manipulates and reorders debits from highest to lowest during given periods of time. Wells Fargo reorders transactions for no reason other than to increase the number of exorbitant overdraft fees it can charge. Wells Fargo's uniform and systematic daily practice of re-sequencing electronic debits from highest to lowest dollar amount puts customers' accounts into a negative balance as quickly as possible and artificially increases the number of overdraft fees that Wells Fargo imposes on its customers. This practice violates numerous consumer protection laws and the covenant of good faith and fair dealing in Wells Fargo's Consumer Account Agreement.

---

[2] Wells Fargo, https://www.wellsfargo.com/help/faqs/fees_faqs.

46.     Contrary to the terms of Wells Fargo's Consumer Account Agreement, the descriptions on its website and promotional materials, and its customers' reasonable expectations, Wells Fargo always reorders debits from highest to lowest by grouping together POS transactions that occurred on subsequent days with POS transactions that occurred on earlier days and reordering them so that higher debits that occurred on subsequent days are posted to its customers' accounts before lower debits that occurred on earlier days. Wells Fargo's practices thus violate the covenant of good faith and fair dealing implied in the Consumer Account Agreement as well as the consumer protection laws of numerous States.

47.     Transactions involving debit cards used by Wells Fargo customers, including the withdrawal of cash from ATM machines and POS transactions with vendors, are processed electronically. As a result, Wells Fargo is notified instantaneously when the customer's debit card is swiped, and has the option to accept or decline these transactions.

48.     Notwithstanding the instantaneous nature of these electronic debit card transactions, under Wells Fargo's posting system, it fails to post charges in the order in which they are incurred or received. Wells Fargo developed a policy and employs a practice whereby account charges and debits are posted to its customers' accounts out of chronological order for the sole purpose of maximizing the number of overdraft transactions and, therefore, the amount of overdraft fees charged to its customers.

49.     Instead of processing such transactions in chronological order, Wells Fargo processes them starting with the largest debit and ending with the smallest debit, so as to generate the largest possible number of overdrafts and the greatest possible amount of overdraft fees.  Thus, by resequencing transactions, Wells Fargo treats a transaction as an overdraft even

when there were sufficient funds in the account to cover the transaction at the time Wells Fargo received the item.

50.    Wells Fargo refrains from immediately posting charges to a customer's account as it receives them-sometimes for multiple business days. By holding charges rather than posting them immediately to an account, Wells Fargo is able to amass a number of charges on the account.  Subsequently, Wells Fargo posts all of the amassed charges on a single date. When the group of charges is eventually posted to the customer's account, Wells Fargo posts them in order of largest to smallest—not in the order in which they were received or in the order in which they were charged. This delayed posting results in the imposition of multiple overdraft fees that would not otherwise be imposed. The delayed posting also prevents customers from ascertaining the accurate balances in their accounts.

51.    Wells Fargo's policy and practice of posting charges from largest to smallest, rather than chronologically, is specifically designed to maximize the generation of overdraft fees by triggering overdraft fees for account charges that would not otherwise result in such fees.

52.    Wells Fargo enforces an unconscionable policy whereby charges incurred are posted to customers' accounts in a non-chronological order, from highest to lowest, and are held for multiple days and then batched together, to maximize the number of overdraft transactions and fees.  Wells Fargo's processing practices substantially increase the likelihood that customers' smaller charges will result in multiple overdraft fees.  The practices provide Wells Fargo with substantially higher service fee revenues than it would otherwise achieve absent these practices.

53.     As a result, Plaintiffs and members of the Classes have been assessed overdraft fees for transactions which occurred when they actually had sufficient funds in their accounts to cover those transactions.

### D.     Wells Fargo's Cloaking of Accurate Balance Information

54.     Wells Fargo actively promotes the convenience of its debit cards and other electronic debiting, but fails to provide customers with accurate balance information. When customers execute account transactions, they generally do not have access to an accurate balance register or balance information.

55.     Wells Fargo advertises to customers that its online website provides the "most current information regarding the funds you have available for withdrawal, ATM, or check card purchases or writing checks."   It claims that the account history it shows through its online banking service shows up-to-date transactions listed in the order transacted, starting with the most recent.

56.     Wells Fargo's website explains to customers what they can expect when using Wells Fargo check cards, online banking, and electronic bill pay features.  Wells Fargo does not, however, clearly inform customers of its practice of re-sequencing transactions from highest to lowest dollar amount and is silent regarding this practice even when describing the reasons it may charge overdraft fees.

57.     In its online section entitled "Overdraft Protection Questions," Wells Fargo states that enrollment in Overdraft Protection is free and describes in detail the fee schedule for overdrafts under its program, which accounts may be linked, and how overdraft protection will work.  Wells Fargo completely omits the fact that when a customer chooses not to enroll in the overdraft protection program detailed, that the customer will be automatically enrolled in Wells

Fargo's automated overdraft protection program.  Wells Fargo omits any similar description of the processes and fees of the automated overdraft protection program.

58.     Wells Fargo provides inaccurate balance information to its customers through its electronic network.  In certain cases, Wells Fargo informs its customers that they have a positive balance when, in reality, they have a negative balance, despite Wells Fargo's actual knowledge of outstanding debits and transactions.

59.     Wells Fargo further misrepresents the accuracy and reliability of this published "account balance" information in its marketing materials and customer contractual agreements that encourage customers to rely upon balance information in making purchase decisions.

60.     Wells Fargo has failed to provide notice to customers that the published available balance information it promotes, markets, encourages, and advertises can be inaccurate and result in overdraft charges for transactions that are within the amount of the stated available balance published by Wells Fargo.

61.     Even when Wells Fargo has actual knowledge of outstanding transactions which have already created a negative balance in a customers' account, it encourages the customer to incur more overdraft charges by approving—rather than prudently declining—subsequent debit card purchases and other electronic transactions.

62.     Wells Fargo also assesses overdraft fees at times when actual funds in the customer account are sufficient to cover all debits that have been submitted to Wells Fargo for payment.  It does this by placing a "hold" on actual funds in the customer's account.  In doing so, Wells Fargo charges overdraft fees where it faces no risk, because the cash balance in the customer's account has not dropped below zero.

E.     **Wells Fargo's Failure to Notify Customers of Overdrafts or Allow Customers to Opt Out**

63.     At the time its debit cards are used in POS transactions or at ATMs, Wells Fargo is able to determine, almost instantaneously, whether there are sufficient funds in a customer's account to cover that particular transaction.  Wells Fargo has the technological capability to decline transactions (which it does when a pending transaction would exceed a pre-determined, overdraft tolerance limit for the account), or notify customers at that very moment that the particular debit card transaction would result in an overdraft. Wells Fargo could give customers the option to decline the transaction to avoid incurring the overdraft fee, but it does not do so because it seeks to maximize the amount of revenue generated through its assessment of overdraft fees.

64.     Notwithstanding its technological capabilities and actual knowledge, Wells Fargo fails to provide notice to Plaintiffs and the Classes that a particular debit card transaction will result in an overdraft and, hence, an overdraft fee. Because Wells Fargo's customers are not notified of the potential overdraft, and are not given the option of declining the debit card transaction or providing another form of payment, the customers incur monetary damages in the form of overdraft fees.

65.     Wells Fargo fails to allow Plaintiffs and Class members to opt out of its overdraft scheme upon request.

F.     **Wells Fargo's Overdraft Policies and Practices are Contrary to Best Practices**

66.     By engaging in the conduct described herein, Wells Fargo has failed to follow the list of "best practices" for overdraft programs set forth in the "Joint Guidance on Overdraft Protection Programs" ("Joint Guidance") issued by the United States Department of the Treasury, the Office of the Comptroller of the Currency, the Board of Governors of the Federal

17

Reserve System, the Federal Deposit Insurance Corporation, and the National Credit Union Administration (collectively, the "Agencies"). A copy of the Joint Guidance is attached as Exhibit B. These "best practice" recommendations include: "Provide election or opt-out of service. Obtain affirmative consent of consumers to receive overdraft protection. Alternatively, where overdraft protection is automatically provided, permit consumers to 'opt-out' of the overdraft program and provide a clear consumer disclosure of this option." 70 F.R. 9127-01, 9132.

67.     According to rules proposed by the Agencies: "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . . This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee." 73 F.R. 28904-01, 28929 (May 19, 2008).

68.     The Joint Guidance also advises banks to "[a]lert customers before a transaction triggers any fees. When consumers attempt to withdraw or transfer funds made available through an overdraft protection program, provide a specific consumer notice, where feasible, that completing the withdrawal may trigger the overdraft fees." 70 F.R. 9127, 9132. The Joint Guidance further advises that "[t]his notice should be presented in a manner that permits consumers to cancel the attempted withdrawal or transfer after receiving the notice. ' *Id.*

69.     Similarly, the list of "best practices" recommended in "Overdraft Protection: A Guide for Bankers," issued by the American Bankers Association, includes offering customers the option of "opting out" of any overdraft programs, and informing customers, before they access funds, that a particular point of sale or ATM transaction will cause them to incur an overdraft fee.  A copy of "Overdraft Protection: A Guide for Bankers" is attached as Exhibit C.

70.     Wells Fargo's overdraft policies make it difficult for customers to avoid injury even if they carefully track the balance in their account.  In fact, the Agencies have stated that "Injury" resulting from such policies "is not reasonably avoidable" by the consumer. 73 F R. 28904-01, 28929.  "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available."

71.     On October 6, 2009, the Center for Responsible Lending issued a report entitled "Overdraft Explosion: Bank Fees for Overdrafts Increase 35% in Two Years." A copy of this report is attached as Exhibit D.  The report finds that it is now "standard procedure to automatically enroll checking account customers in their most expensive overdraft loan program."  The report finds that debit card transactions account for more overdraft fees than traditional checks or any other type of transaction, even though "debit card transactions and ATM withdrawals ... could easily be denied for no fee."  The report also finds hat overdraft fees increased 35 percent from 2006 to 2008, and that over 50 million Americans overdrew their accounts in a 12 month period, with 27 million accounts incurring five or more overdraft fees.

72.     A chart from the research company Moebs Services shows that, in every year since 1992, banks have gained increased revenues from overdraft fees:



**G.     Wells Fargo's' Unconscionable Provisions and Policies**

73.     Wells Fargo's overdraft policies and practices are unconscionable in the following respects, among others:

a.     Wells Fargo does not allow customers to "opt out" of its overdraft scheme;

b.     Wells Fargo does not obtain affirmative consent from checking account customers prior to processing a transaction that will overdraw the account and result in an overdraft fee;

c. Wells Fargo does not alert its customers that a debit card transaction will trigger an overdraft, and does not provide the customer the opportunity to cancel the transaction, before assessing an overdraft fee;

d. The Consumer Account Agreement and related documents are contracts of adhesion in that they are standardized forms, imposed and drafted by Wells Fargo, which is a party of vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement in its entirety;

e. The amount of overdraft fees is disclosed in an ineffective, ambiguous, misleading, and unfair manner, since it is not contained in the Deposit Agreement, but rather in a separate document, the Consumer Pricing Information pamphlet, which is not signed by the depositor; and

f. The Consumer Account Agreement provided to customers is ineffective, ambiguous, deceptive, unfair, and misleading in that it does not unambiguously state that Wells Fargo always reorders debits from high to low, even though Wells Fargo always reorders transactions in this way for customers in order to maximize overdrafts and overdraft fee revenues for Wells Fargo.

74. The Consumer Account Agreement also contains an arbitration clause and class action waiver which state:

> If you have a dispute with the Bank, and you are not able to resolve the dispute informally, you and the Bank agree that any dispute between you and the Bank, regardless of when it arose, shall be resolved by the following arbitration process. . . .
>
> Neither you nor the Bank shall be entitled to join or consolidate disputes by or against others in arbitration, or to include in any arbitration any dispute as a representative or member of a class, or to act in any arbitration in the interest of the general public or in a private attorney general capacity.…

Consumer Account Agreement, at 4, 5.

75.     The above cited provisions are unconscionable because the Consumer Account Agreement and related documents, to the extent they are deemed contracts, are unenforceable contracts of adhesion and the arbitration provision itself is substantively unconscionable.

### H.     Wells Fargo's Overdraft Practices Harmed Plaintiffs

#### a.     Marc Martinez

76.     Plaintiff Marc Martinez opened a checking account with Wells Fargo and entered into a bank account relationship with Wells Fargo in 2007 in New Mexico.  Mr. Martinez had no opportunity to review Wells Fargo's Consumer Account Agreement before he opened the account.

77.     In connection with his account, Wells Fargo issued a debit card to Mr. Martinez. A debit card allows customers to access their checking account funds by using the card to execute a transaction.  The charge is processed electronically, and Wells Fargo has the option to accept or decline the transaction at the point of sale.

78.     According to Mr. Martinez's statement reflecting checking account activity between November 27, 2008 – December 23, 2008 ("December Statement"), certain debit transactions occurring on November 27, 28, 29, and 30 posted to this account on December 1.

79.     Between November 27 and November 29, Mr. Martinez made a series of small purchases, all totaling less than $100.  On November 27, Mr. Martinez made a $1.07 purchase from Redbox DVD.  On November 28, he purchased groceries from Smith's Food & Drug for $13.15.   Mr. Martinez transacted two additional electronic debits from Redbox DVD on November 29 for $4.27 and $1.07.   He also made a $40.39 transaction at Hobby Lobby on November 29.

80.     On November 30, Mr. Martinez spent $98.24 at Wal-Mart, $18.26 at Smith's Food & Drug, $10.66 at Gamestop, and 3 debits from Redbox DVD for $1.07.

81.     Because Mr. Martinez' purchase at Wal-Mart on November 30 was the largest, Wells Fargo deducted this transaction first and caused Mr. Martinez' account to almost immediately reach a negative balance much sooner than if the debits had been deducted chronologically.

82.     The following chart depicts the debit transactions in the order Wells Fargo deducted them from Mr. Martinez' account:

| | | |
|---|---|---|
| Balance after deposits and fees beginning on December 1, 2008 | + **$110.26** | |
| Wal-Mart November 30 | -98.24 | |
| Hobby Lobby November 29 | -40.39 | $35.00 Overdraft Fee Assessed |
| Smith's Food & Drug November 30 | -18.26 | $35.00 Overdraft Fee Assessed |
| Smith's Food & Drug November 28 | -13.15 | $35.00 Overdraft Fee Assessed |
| Gamestop November 30 | -10.66 | $35.00 Overdraft Fee Assessed |
| Redbox DVD November 29 | -4.27 | $35.00 Overdraft Fee Assessed |
| Redbox DVD November 30 | -1.07 | $35.00 Overdraft Fee Assessed |
| Redbox DVD November 30 | -1.07 | $35.00 Overdraft Fee Assessed |
| Redbox DVD November 30 | -1.07 | $35.00 Overdraft Fee Assessed |
| Redbox DVD November 29 | -1.07 | $35.00 Overdraft Fee Assessed |
| Redbox DVD November 27 | -1.07 | $35.00 Overdraft Fee Assessed |
| Balance ending on December 1, 2008 | **-80.06** | |

83.     The following chart depicts how the debit transactions would have impacted Mr.

Martinez' available balance if ordered consistent with the time transacted rather than amount:

| Balance after deposits and fees beginning on December 1, 2008 | + **$110.26** | |
|---|---|---|
| **November 27 Charges** | | |
| Redbox DVD | -1.07 | |
| **November 28 Charges** | | |
| Smith's Food & Drug | -13.15 | |
| **November 29 Charges** | | |
| Hobby Lobby | -40.39 | |
| Redbox DVD | -4.27 | |
| Redbox DVD | -1.07 | |
| **November 30 Charges** | | |
| Wal-Mart | -98.24 | $35.00 Overdraft Fee Assessed |
| Smith's Food & Drug | -18.26 | $35.00 Overdraft Fee Assessed |
| Gamestop | -10.66 | $35.00 Overdraft Fee Assessed |
| Redbox DVD | -1.07 | $35.00 Overdraft Fee Assessed |
| Redbox DVD | -1.07 | $35.00 Overdraft Fee Assessed |
| Redbox DVD | -1.07 | $35.00 Overdraft Fee Assessed |
| Balance ending on December 1, 2008 | **-80.06** | |

84.     The electronic debits posted to Mr. Martinez' account on December 1 total less

than $200.  But because of Wells Fargo's manipulation of Mr. Martinez' transactions, he was

required to pay ten overdraft fees totaling $350.  Wells Fargo extracted at least $140 more in

overdraft fees than Mr. Martinez would have been assessed had Wells Fargo deducted

transactions in the order they occurred.

85.     On at least one occasion when Mr. Martinez used his debit card, an authorization query that included the information Wells Fargo needed to approve or deny the transaction was transmitted to Wells Fargo, and Wells Fargo approved the transaction despite knowing that Mr. Martinez' account did not have adequate funds to satisfy the amount requested by the merchant.  Wells Fargo approved the transaction without providing any notice to Mr. Martinez that proceeding with the transaction would result in a $35 overdraft fee.  Had Mr. Martinez been informed that authorization of his request to debit funds from his account would result in an additional $35 fee, he could have chosen to pay his debit through another means or he could have chosen to discontinue the transaction and not incur the overdraft fee.

86.     When Mr. Martinez used his debit card on November 30, for example, an authorization query was sent from each merchant.  This query included the number of Mr. Martinez' debit card and the amount of the transaction.  Upon receiving the authorization query, Wells Fargo conducted a series of verification steps to determine whether sufficient funds were available.  Although Mr. Martinez did not have adequate funds to pay for the transaction, Wells Fargo sent an authorization back to the merchant with no indication that these transactions would carry a charge that was 3-35 times the value of the transaction itself.

87.     Wells Fargo failed to notify Plaintiff that he could incur overdraft fees on transactions even though there were sufficient funds in his checking accounts to cover the transaction at the time the transactions were executed.  In addition, Wells Fargo never notified Plaintiff, at the time he executed the purported insufficient funds transactions described above, that his checking accounts was overdrawn or that he would be charged an overdraft fee as a result of the transactions.  Furthermore, Wells Fargo paid, rather than returned, all of the debit

card charges described above, even though Plaintiff's accounts purportedly lacked sufficient funds to cover the transactions.

88.     Wells Fargo's approval of transactions without notice to Plaintiff that his accounts was in, or about to be in, a negative balance caused him to suffer harm in the amount of the overdraft fees that he could have avoided if given timely notice.

### b.     Ivy Graham

89.     Plaintiff Ivy Graham opened a personal checking account with Wells Fargo and entered into a bank account relationship with Wells Fargo in 2006 in New Mexico.  Ms. Graham had no opportunity to review Wells Fargo's consumer Account Agreement before she opened the account.

90.     In connection with this account, Wells Fargo issued a debit card to Ms. Graham. A debit card allows customers to access their checking account funds by using the card to execute a transaction.  The charge is processed electronically, and Wells Fargo has the option to accept or decline the transaction at the point of sale.

91.     Ms. Graham has incurred excessive overdraft fees as a result of Wells Fargo's unfair practice of re-sequencing electronic transactions from largest to smallest.  For example, in March 2009 Ms. Graham made a series of small purchases between March 20 and March 22 totaling less than $120.  Rather than deducting these electronic debits in the order in which they were transacted, Wells Fargo re-sequenced Ms. Graham's debits from largest to smallest.  This in turn caused her balance to become negative sooner and caused her to incur two $35 overdraft fees.  Had Wells Fargo not re-sequenced Ms. Graham's transactions she would not have incurred at least one of the $35 overdraft fees.  The following chart depicts the debit transactions in the order Wells Fargo deducted them from Ms. Graham's account in March 2009:

| | | |
|---|---|---|
| Balance beginning on March 23, 2009 | + **$104.98** | |
| American<br>March 21 | -45.00 | |
| Park It Place<br>March 20 | -40.57 | |
| Wendy's<br>March 22 | -16.67 | |
| Paradies<br>March 21 | -9.59 | $35.00 Overdraft Fee Incurred |
| Urban Taco<br>March 21 | -6.50 | $35.00 Overdraft Fee Incurred |
| Savings Overdraft Fee | -10 | |
| State Sales Tax | -0.79 | |
| Deposit | +100 | |
| Overdraft Transfer | +4.15 | |
| Balance ending on March 23, 2009 | **+$79.92** | |

92.     The following chart depicts how the debit transactions would have impacted Ms.

Graham's balance if ordered consistent with the time transacted rather than the amount:

| | | |
|---|---|---|
| Balance beginning on March 23, 2009 | + **$104.98** | |
| **March 20 Charges** | | |
| Park It Place<br>March 20 | -40.57 | |
| **March 21 Charges** | | |
| American<br>March 21 | -45.00 | |
| Paradies<br>March 21 | -9.59 | |
| Urban Taco<br>March 21 | -6.50 | |
| **March 22 Charges** | | |
| Wendy's<br>March 22 | -16.67 | $35.00 Overdraft Fee Incurred |
| **March 23 Transactions** | | |

| | | |
|---|---|---|
| Savings Overdraft Fee | -10 | |
| State Sales Tax | -0.79 | |
| Deposit | +100 | |
| Overdraft Transfer | +4.15 | |
| Balance ending on March 23, 2009 | **+$79.92** | |

93.     On March 21 Ms. Graham made a purchase for $6.50 at Urban Taco. When Ms. Graham's debit card was "swiped" or used for payment Ms. Graham had sufficient funds in her account to pay for the $6.50 purchase. Yet subsequent to the transaction Wells Fargo re-sequenced the transactions to their own benefit and unfairly charged Ms. Graham as if she had insufficient funds to pay for her purchase.

94.     When Ms. Graham used her debit card on March 21, an authorization query was sent from each merchant. This query included the number of Ms. Graham's debit card and the amount of the transaction. Upon receiving the authorization query, Wells Fargo conducted a series of verification steps to determine whether sufficient funds were available and whether to approve the transaction. Wells Fargo sent an authorization back to the merchant with no indication that these transactions could carry a charge that was several times the value of the transaction itself.

95.     Wells Fargo failed to notify Plaintiff that she could incur overdraft fees on transactions even though there were sufficient funds in her checking accounts to cover the transaction at the time the transactions were executed.

96.     The overdraft charges assessed against Plaintiffs are representative of hundreds of millions of dollars in overdraft fees that Wells Fargo wrongfully assessed and deducted from its

customers' accounts.  These wrongful takings are especially egregious considering the fact that Wells Fargo approved each transaction and knew at the time of approval whether there were sufficient funds in the account to cover the transaction.

**I.       The Damages Sustained by Plaintiffs and the Classes**

97.    As shown by these examples, Wells Fargo's overdraft policies make it difficult for a customer to avoid injury even if the customer keeps close track of the balance in his or her account.  In fact, the Agencies have stated that "injury" resulting from such policies "is not reasonably avoidable" by consumers.  73 F.R. 28904-01, 28929.  "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available." *Id.*

98.    According to rules proposed by the Agencies, "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . . This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee."  73 F.R. 28904-01, 28929 (May 19, 2008).

99.    Thus, as a consequence of Wells Fargo's overdraft policies and practices, Plaintiffs and the Classes have been wrongfully forced to pay overdraft fees.  Wells Fargo has improperly deprived Plaintiffs and the Classes of significant funds, causing ascertainable monetary losses and damages.

100.   As a consequence of Wells Fargo's improper overdraft fees, Wells Fargo has wrongfully deprived Plaintiffs and the Classes of funds to which it had no legitimate claim.

101.   Plaintiffs and members of the Classes had sufficient funds in their accounts to cover at least some of the transactions for which they were charged overdraft fees.  Plaintiffs had sufficient funds to cover at least some of the transactions for which he and the Classes were charged overdraft fees. Plaintiffs and members of the Classes either had adequate funds to cover the transactions posted to their accounts, or the accounts were allowed to become overdrawn, even by *de minimis* margins, exclusively so that Wells Fargo could impose these wrongful charges.  In many instances, Wells Fargo's manipulation of the process for imposing overdraft fees triggered a cascade of charges that exponentially added to the charges it collected from Plaintiffs and Class members.

102.   All conditions precedent to the relief sought herein have either occurred or have been performed or waived.

## FIRST CLAIM FOR RELIEF

### Breach of Contract/Breach of the Covenant of Good Faith and Fair Dealing[3]

### (On Behalf of the National Class)

103.   Plaintiffs repeat paragraphs 1 through 102 above.

104.   Plaintiffs and Wells Fargo have contracted for bank account deposit, checking, ATM and debit card services, as embodied in Wells Fargo's Consumer Account Agreement and related documentation.

---

[3] Certain states recognize a claim for breach of the covenant of good faith and fair dealing as a separate and independent claim from breach of contract.  Other states treat breach of the covenant of good faith and fair dealing as a species of breach of contract.  For the sake of convenience, the Complaint pleads these two types of claims, which are substantively identical, in a single count.

105.    The Consumer Account Agreement defines an "overdraft" as an event that occurs when an electronic debit transaction "***results*** in a negative balance" in a customer's account, and it states that an "overdraft" occurs if "the Bank ***receives*** an Item against your Account and there ***are*** insufficient available funds in your Account to cover the Item" and the bank pays or covers the Item.  Consumer Account Agreement, at 3, 26 (emphasis added).

106.    Under this contract provision, which was drafted by and is binding on Wells Fargo, when sufficient funds are in a customer's account to cover an electronic debit transaction at the time the bank receives the Item, no overdraft has occurred.

107.    Good faith is an element of every contract pertaining to the assessment of overdraft fees.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

108.    Under the Consumer Account Agreement, Wells Fargo impliedly promises to administer these contract obligations in accordance with principles of good faith and fair dealing.

109.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

31

110.    Since at least 2003, Wells Fargo has breached the covenant of good faith and fair dealing in the Consumer Account Agreement through its overdraft policies and practices as alleged herein.

111.    Plaintiffs and members of the National Class have performed all, or substantially all, of the obligations imposed on them under the Deposit Agreement.

112.    Plaintiffs and members of the National Class have sustained damages as a result of Wells Fargo's breach of the covenant of good faith and fair dealing.

## SECOND CLAIM FOR RELIEF

### Unconscionability

**(On Behalf of the National Class)**

113.    Plaintiffs repeat paragraphs 1 through 102 above.

114.    Wells Fargo's overdraft policies and practices are substantively and procedurally unconscionable in the following respects, among others:

a.      Wells Fargo does not allow customers to "opt out" of Wells Fargo's overdraft scheme;

b.      Wells Fargo does not obtain affirmative consent from checking account customers prior to processing a transaction that will overdraw the account and result in an overdraft fee;

c.      Wells Fargo does not alert its customers that a debit card transaction will trigger an overdraft, and does not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

d.      The Consumer Account Agreement and related documents, are contracts of adhesion in that they are standardized forms, imposed and drafted by Wells Fargo, which is a

party of vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement in its entirety;

e.     The amount of overdraft fees is disclosed in an ineffective, ambiguous, misleading, and unfair manner, since it is not contained in the Consumer Account Agreement; and

f.     The Consumer Account Agreement provided to customers is ineffective, ambiguous, deceptive, unfair, and misleading in that it does not unambiguously state that Wells Fargo always reorders debits from high to low, even though Wells Fargo always reorders transactions in this way for customers in order to maximize overdrafts and overdraft fee revenues for Wells Fargo.

115.    Considering the great business acumen and experience of Wells Fargo in relation to Plaintiffs and the National Class, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law.

116.    The imposition of overdraft charges which exceed the amount overdrawn (*e.g.*, the imposition of a $35 charge on an overdraft of less than $35) is itself unconscionable.  Such charges are not reasonably related to Wells Fargo's cost of covering the overdraft and/or its risk of nonpayment (where Wells Fargo pays the overdraft), or to Wells Fargo's cost of returning the item unpaid (where Wells Fargo does not pay the overdraft).

117.    Plaintiffs and members of the National Class have sustained damages as a result of Wells Fargo's unconscionable policies and practices as alleged herein.

## THIRD CLAIM FOR RELIEF

### Conversion

### (On Behalf of the National Class)

118.    Plaintiffs repeat paragraphs 1 through 102 above.

119.    Wells Fargo had and continues to have a duty to maintain and preserve its customers' checking accounts and to prevent their diminishment through its own wrongful acts.

120.    Wells Fargo has wrongfully collected overdraft fees from Plaintiffs and the members of the National Class, and has taken specific and readily identifiable funds from their accounts in payment of these fees in order to satisfy them.

121.    Wells Fargo has, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiffs and the members of the National Class, without legal justification.

122.    Wells Fargo continues to retain these funds unlawfully without the consent of Plaintiffs or members of the National Class.

123.    Wells Fargo intends to permanently deprive Plaintiffs and the members of the National Class of these funds.

124.    These funds are properly owned by Plaintiffs and the members of the National Class, not Wells Fargo, which now claims that it is entitled to their ownership, contrary to the rights of Plaintiffs and the members of the National Class.

125.    Plaintiffs and the members of the National Class are entitled to the immediate possession of these funds.

126.    Wells Fargo has wrongfully converted these specific and readily identifiable funds in violation of law.

127.    Wells Fargo's wrongful conduct is continuing.

128.    As a direct and proximate result of this wrongful conversion, Plaintiffs and the members of the National Class have suffered and continue to suffer damages.

129.    By reason of the foregoing, Plaintiffs and the members of the National Class are entitled to recover from Wells Fargo all damages and costs permitted by law, including all amounts that Wells Fargo has wrongfully converted.

## FOURTH CLAIM FOR RELIEF

### Unjust Enrichment

### (On Behalf of the National Class)

130.    Plaintiffs repeat paragraphs 1 through 102 above.

131.    Plaintiffs, on behalf of themselves and the National Class, assert a common law claim for unjust enrichment.

132.    By means of Wells Fargo's wrongful conduct alleged herein, Wells Fargo knowingly provides banking services to Plaintiffs and members of the National Class that are unfair, unconscionable, and oppressive.

133.    Wells Fargo knowingly received and retained wrongful benefits and funds from Plaintiffs and members of the National Class.  In so doing, Wells Fargo acted with conscious disregard for the rights of Plaintiffs and members of the National Class.

134.    As a result of Wells Fargo's wrongful conduct as alleged herein, Wells Fargo has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the National Class.

135.    Wells Fargo's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

136.    Under the common law doctrine of unjust enrichment, it is inequitable for Wells Fargo to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of overdraft fees on Plaintiffs and members of the National Class in an unfair, unconscionable, and oppressive manner.  Wells Fargo's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

137.    The financial benefits derived by Wells Fargo rightfully belong to Plaintiffs and members of the National Class.  Wells Fargo should be compelled to disgorge in a common fund for the benefit of Plaintiffs and members of the National Class all wrongful or inequitable proceeds received by them.   A constructive trust should be imposed upon all wrongful or inequitable sums received by Wells Fargo traceable to Plaintiffs and the members of the National Class.

138.    Plaintiffs and members of the National Class have no adequate remedy at law.

## FIFTH CLAIM FOR RELIEF

### Violations of New Mexico Unfair Practices Act

#### (On Behalf of the New Mexico Subclass)

139.    Plaintiffs repeat paragraphs 1 through 102 above.  This claim is asserted on behalf of the members of the New Mexico Subclass for violations of New Mexico's Unfair Practices Act ("UPA").

140.    Wells Fargo provides checking account, ATM or debit card, and "overdraft protection" services to Plaintiffs and the members of the New Mexico Subclass.  This conduct constitutes "trade" or "commerce" within the meaning of N.M. Stat. § 57-12-2(C).

141.    Wells Fargo is a "person" within the meaning of N. M. Stat. § 57-12-2(A).

142.    Wells Fargo has engaged in an "unfair or deceptive trade practice" as set forth in N.M. Stat. § 57-12-2(D) because it knowingly made false or misleading statements in connection

36

with the sale, lease, rental or loan of services in the regular course of trade or commerce that tended to deceive or mislead, and these acts included the following specific violations of the UPA:

a.      Wells Fargo represented that the services offered by it had characteristics, uses, or benefits that they do not have, in that Wells Fargo claims that monies used to fund electronic debit card transactions are "automatically" or "immediately" withdrawn from the account-holder's funds or that using an electronic debit card is like using cash when, in fact, Wells Fargo subsequently re-sequences the electronic debits after the transactions occur to its benefit. *See* N. M. Stat. § 57-12-2(D)(5).

b.      Wells Fargo makes false or misleading statements of fact concerning the price of goods or services in that Plaintiffs and the New Mexico Subclass reasonably believe they will be charged a single overdraft fee when there are insufficient funds in their account to cover a transaction at the time of purchase, but, in fact, Wells Fargo re-sequences transactions to its own benefit resulting in Plaintiffs and the New Mexico Subclass paying several overdraft fees as a result of a single transaction. *See* N. M. Stat. § 57-12-2(d)(11).

c.      Wells Fargo uses innuendo and ambiguity as to a material fact or fails to state a material fact in that it does not specifically disclose or inform Plaintiffs and the New Mexico Subclass that transactions will be posted from largest to smallest, thereby resulting in repetitive overdraft fees based on transactions already made. *See* N. M. Stat. § 57-12-2(D)(14).

d.      Wells Fargo states that a transaction involves rights, remedies, or obligations that it does not involve, in that Wells Fargo claims transactions with electronic debit cards are "automatic" or "immediate," as if the individual is using cash when, in fact, the transactions are subsequently rearranged and withdrawn in the method most beneficial to Wells

37

Fargo and, in fact, using electronic debit cards are quite different than using cash.  *See* N. M. Stat. § 57-12-2(D)(15).

   e. Wells Fargo engages in an "unconscionable trade practice" as set forth in N. M. Stat. § 57-12-2(E) because Wells Fargo engages in a practice in connection with the sale, lease, rental, or loan of a service and in collection of debts to Plaintiffs' and the New Mexico Subclass members' detriment.  Wells Fargo's practice of re-sequencing transactions from largest to smallest takes advantage of Plaintiffs' and New Mexico Subclass members' lack of knowledge, ability, experience or capacity and is grossly unfair.  *See* N. M. Stat. § 57-12-2(E)(1). Additionally, Wells Fargo's practice of re-sequencing results in a gross disparity between the value received by a person and the price paid in that Wells Fargo claims to offer overdraft "protection" and customers believe they will be charged only one overdraft fee when they conduct a transaction but do not have sufficient funds in their account to fund the transaction at the time of purchase but, instead, Wells Fargo re-sequences transactions and is able to charge customers multiple overdraft fees, resulting in excessive fees that surpass the value Plaintiffs and New Mexico Subclass members receive through Wells Fargo's purported overdraft protection. *See* N. M. Stat. § 57-12-2(E)(2).

  143. As described above, Wells Fargo employs "unfair or deceptive trade practices" in connection with the imposition of overdraft fees, in violation of N. M. Stat. § 57-12-3, by making false or misleading statements and/or representations in connection with its services, the extension of credit, and/or the collection of debts; including making false or misleading statements of fact concerning the price of its services; representing that its services have characteristics or benefits they do not have; using exaggeration, innuendo or ambiguity as to a material fact; and/or or failing to state a material fact.

144.     As described above, Wells Fargo employs "unconscionable trade practices" in connection with the imposition of overdraft fees, in violation of N. M. Stat. § 57-12-3, by taking advantage of consumers' lack of knowledge, ability, experience, or capacity to a grossly unfair degree, and/or providing a gross disparity between the value received by consumers and the price paid.

145.     Wells Fargo's violations of the UPA were willful.

146.     As a result of Wells Fargo's unlawful trade practices, Plaintiffs and the members of the New Mexico Subclass have each been assessed an ascertainable loss, and are entitled to recover the greater of three times their actual damages or $300, pursuant to N.M. Stat. § 57-12-10(B).

147.     Plaintiffs and the members of the New Mexico Subclass seek punitive damages in an amount to be determined by the jury.

148.     Plaintiffs and the members of the New Mexico Subclass are entitled to recover their reasonable attorneys' fees, pursuant to N. M. Stat. § 57-12-10(C).

149.     Pursuant to N.M. Stat. § 57-12-10(A), Plaintiffs and the members of the New Mexico Subclass seek an order enjoining Wells Fargo from engaging in the unlawful practices described above.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Classes demand a jury trial on all claims so triable and judgment as follows:

1.     Declaring Wells Fargo's overdraft fee policies and practices to be wrongful, unfair and unconscionable;

2.     Restitution of all overdraft fees paid to Wells Fargo by Plaintiffs and the Classes, as a result of the wrongs alleged herein in an amount to be determined at trial;

3. Disgorgement of the ill-gotten gains derived by Wells Fargo from its misconduct;

4. Actual damages in an amount according to proof;

5. Punitive and exemplary damages;

6. Pre-judgment interest at the maximum rate permitted by applicable law;

7. Costs and disbursements assessed by Plaintiffs in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

8. Such other relief as this Court deems just and proper.

Dated: May 5, 2010.

/s/ Bruce S. Rogow
Bruce S. Rogow, Esquire
Florida Bar No. 067999
bruce@abbrclaw.com
Robert C. Gilbert, Esquire
Florida Bar No. 561861
bobby@abbrclaw.com
ALTERS BOLDT BROWN
 RASH & CULMO, P.A.
4141 N.E. 2nd Avenue
Miami, Florida 33137
Tel:  (305) 571-8550
Fax:  (305) 571-8558

*Plaintiffs' Lead Counsel*

/s/ Ruben Honik
Ruben Honik, Esquire
Pennsylvania Bar No. 33109
rhonik@golombhonik.com
GOLUMB & HONIK, P.C.
1515 Market Street
Suite 1100
Philadelphia, PA 19102
Tel: 215-985-9177
Fax: 215-985-4169

/s/ Barry R. Himmelstein
Barry R. Himmelstein, Esquire
California Bar No. 157736
bhimmelstein@lchb.com
Michael W. Sobol, Esquire
California Bar No. 194857
msobol@lchb.com
Jordan Elias, Esquire
California Bar No. 228731
jelias@lchb.com
Mikaela Bernstein, Esquire
California Bar No. 261301
mbernstein@lchb.com
LIEFF CABRASER HEIMANN &
  BERNSTEIN LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Tel: 415-956-1000
Fax: 415-956-1008

/s/ Robert C. Josefsberg
Robert C. Josefsberg, Esquire
Florida Bar No. 40856
rjosefsberg@podhurst.com
Victor M. Diaz, Jr., Esquire
Florida Bar No. 503800
vdiaz@podhurst.com
John Gravante, III, Esquire
Florida Bar No. 617113
jgravante@podhurst.com
PODHURST ORSECK, P. A.
City National Bank Building
25 W Flagler Street
Suite 800
Miami, FL 33130-1780
Tel: 305-358-2800
Fax: 305-358-2382

/s/ Ted E. Trief
Ted E. Trief, Esquire
New York Bar No. 1476662
ttrief@triefandolk.com
Barbara E. Olk, Esquire
New  York Bar No. 1459643
bolk@triefandolk.com
TRIEF & OLK
150 East 58th street
34th Floor
New York, NY 10155
Tel: 212-486-6060
Fax: 212-317-2946

/s/ Edward Adam Webb
Edward Adam Webb, Esquire
Georgia Bar No. 743910
Adam@WebbLLC.com
G. Franklin Lemond, Jr., Esquire
Georgia Bar No. 141315
FLemond@WebbLLC.com
WEBB, KLASE & LEMOND, L.L.C.
1900 The Exchange SE, Suite 480
Atlanta, GA 30339
Tel: 770-444-9325
Fax: 770-444-0271

/s/ Russell W. Budd
Russell W. Budd, Esquire
Texas Bar No. 03312400
rbudd@baronbudd.com
/s/ Bruce W. Steckler
Bruce W. Steckler, Esquire
Texas Bar No. 00785039
bsteckler@baronbudd.com
/s/ Melissa K. Hutts
Melissa K. Hutts, Esquire
Texas Bar No.  0188015
mhutts@baronbudd.com
BARON & BUDD, P.C.
3102 Oak Lawn Avenue
Suite 1100
Dallas, TX 75219
Tel: 214-521-3605
Fax: 214-520-1181

*Plaintiffs' Executive Committee*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

**CASE NO. 1:09-MD-02036-JLK**

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 5, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

<u>/s/ Robert C. Gilbert</u>
Robert C. Gilbert, Esquire
Florida Bar No. 561861
ALTERS BOLDT BROWN
RASH & CULMO, P.A.
4141 N.E. 2nd Avenue, Suite 201
Miami, Florida 33137
bobby@abbrclaw.com