# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 1:09-MD-02036-JLK

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

---

THIS DOCUMENT RELATES TO:

*Waters, et al. v. U.S. Bank, N.A.*
S.D. Fla. Case No. 09-23034-JLK
N.D. Cal. Case No. 09-2071

---

## FOURTH AMENDED CLASS ACTION COMPLAINT[1]

Plaintiffs, through undersigned counsel, on behalf of themselves and all persons similarly situated, allege the following based on personal knowledge as to allegations regarding the Plaintiffs and on information and belief as to other allegations.

## INTRODUCTION

1.      This is a civil action seeking monetary damages, restitution and declaratory relief from Defendant U.S. Bank, N.A. ("U.S. Bank" or the "Bank"), arising from its unfair and unconscionable assessment and collection of excessive overdraft fees.

2.      In the era of electronic banking and the ubiquitous use of debit card transactions, the assessment of overdraft fees has become a major profit center for many United States banks, including U.S. Bank.  For years, banks covered customers who occasionally bounced checks and even did so for a time for customers using debit cards, without charging their customers.  Since

---

[1] This Fourth Amended Class Action Complaint is filed with the consent of Defendant.

the early 1990's, however, banks have devised methods to provide overdraft "protection" for customers and charge them in each instance. A recent FDIC report estimated that overdraft fees represent 74 percent of the total service charges that are imposed on deposit accounts in the United States. A 2008 FDIC study reports that overdraft fees for debit cards can carry an effective annualized interest rate that *exceeds 3,500 percent*. Nonetheless, the Consumer Federation of America reports that five of the ten largest banks raised their overdraft fees in the last year.

3.      In 2007, banks collected more than $17 billion in overdraft fees. That number nearly doubled in 2008, as more and more consumers struggled to maintain positive checking account balances. *In 2009, banks are estimated to bring in between $27 billion to $38.5 billion in overdrafts charges alone.* As the one of the largest retail banks in the country, U.S. Bank is among the largest beneficiaries of these staggering charges.

4.      Almost by definition, these fees disproportionately affect the poor, who are most likely to maintain low balances. Moebs Services, a research company that has conducted studies for the government as well as banks, estimates that 90 percent of overdraft fees are paid by the poorest 10 percent of banks' customer base. Moreover, these fees have the tendency to create a domino effect, because the imposition of a service charge on an account with a negative balance will make it less likely that the account holder's balance will reach positive territory, resulting in more fees.

5.      Before debit cards existed, banks occasionally extended the courtesy of honoring paper checks written on overdrawn or otherwise deficient accounts for customers who were typically in good standing. Banks extended this courtesy largely because the third party involved in a sales transaction allowed the customer to pay by check, expecting the funds to be available

and the check to clear.  For example, if a customer wrote a check to purchase groceries, the grocery store would only know whether the check cleared *after* the groceries had been purchased.

6.     The same considerations are not present when customers use debit cards.  Banks could simply decline to honor debit or point of sale transactions where accounts lack sufficient funds to execute the transactions.  Retail and service transactions could still be executed if consumers presented an alternative form of payment.  ATM transactions could still proceed if banks provided a warning that an overdraft fee would be incurred, and customers chose to proceed nevertheless.  In fact, until a few years ago, most banks simply declined debit transactions that would overdraw an account.

7.     Instead of simply declining debit transactions when there are insufficient funds, or warning its customers that an overdraft fee will be assessed if they proceed with the transaction, U.S. Bank routinely processes such transactions and then charges its customers an overdraft fee of $19, $35, or $37.50—even when the transaction is for only a few dollars.  This automatic, fee-based overdraft scheme is intentionally designed to maximize overdraft fee revenue for U.S. Bank.  Additionally, as part of its inequitable motive to generate obscene profits gained through the imposition of unconscionable overdraft fees, U.S. Bank fails to adequately disclose to its customers that they may elect to opt out of overdraft protection.

8.     In many instances, these overdraft fees cost U.S. Bank account holders hundreds of dollars in a matter of days, or even hours, when they may be overdrawn by only a few dollars.  Even more egregious, customer accounts may not actually be overdrawn at the time the overdraft fees are charged, or at the time of the debit transaction.

9.     Thus, it is through manipulation and alteration of customers' transaction records that U.S. Bank maximizes overdraft penalties imposed on customers.

## JURISDICTION AND VENUE

10.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, and at least one of the Plaintiffs is a resident of a different state than U.S. Bank.

11.     Venue is proper in the Northern District of California, the district in which this action was originally filed, pursuant to 28 U.S.C. § 1391(b), because the Bank has numerous branches and ATMs in San Francisco County and imposed substantial overdraft fees on consumers who hold accounts in San Francisco County.

## THE PARTIES

12.     Plaintiffs Willyum Waters and Frank Smith are residents of the State of California.

13.     Plaintiffs Shane Parkins and Kara Parkins are residents of the State of California

14.     Plaintiffs Steven Barnes and Carolyn Barnes are residents of the State of California.

15.     Plaintiff Glenda Lawrence is a resident of the State of California.

16.     Plaintiff Susan Ledbetter is a resident of the State of California.

17.     Plaintiff Donald Kimenker was, at all times relevant to this complaint, a resident of the State of California.  He is currently a resident of the State of New Jersey.

18.     U.S. Bank, N.A. maintains its principal place of business in Cincinnati, Ohio. U.S. Bank regularly and systematically conducts business throughout the State of California.

Among other things, U.S. Bank is engaged in the business of providing retail banking services to millions of consumers, including Plaintiffs and members of the putative class, which include the issuance of debit cards for use by its customers in conjunction with their checking accounts.

19.     U.S. Bank is a national bank, subject to the National Bank Act, 12 U.S.C. § 1, *et seq.*, and regulations promulgated by the Office of the Comptroller of the Currency.

## CLASS ALLEGATIONS

20.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

21.     The proposed class is defined as:

> All U.S. Bank customers in California who, from May 12, 2005, to the date of class certification, incurred overdraft fees on debit card transactions as a result of U.S. Bank's practice of re-sequencing transactions from highest to lowest (the "Class").

22.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

23.     Excluded from the Class are U.S. Bank, its parents, subsidiaries, affiliates, officers and directors, any entity in which U.S. Bank has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

24.     The members of the Class are so numerous that joinder is impractical.  The Class consists of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to U.S. Bank's records.

25.     The claims of the representative Plaintiffs are typical of the claims of the Class in that the representative Plaintiffs, like all Class members, were charged overdraft fees by U.S.

Bank as a result of its practice of re-sequencing debit card transactions from highest to lowest. The representative Plaintiffs, like all Class members, have been damaged by U.S. Bank's misconduct in that they incurred and/or will continue to incur unfair and unconscionable overdraft charges. Furthermore, the factual basis of U.S. Bank's misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Class.

26.     There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual Class members.

27.     Among the questions of law and fact common to the Class are whether U.S. Bank:

a.      Does not clearly disclose and/or refuses to allow its customers to opt out of its overdraft protection program;

b.      Does not obtain affirmative consent from its customers prior to processing transactions that will result in overdraft fees;

c.      Does not alert its customers that a debit card transaction will trigger an overdraft fee, and does not provide its customers with an opportunity to cancel such transactions;

d.      Manipulates and reorders transactions so that it can increase the number of overdraft fees it imposes;

e.      Manipulates and reorders debits from highest to lowest in order to maximize the number of overdrafts and, consequently, the amount of overdraft fees;

f.      Imposes overdrafts and overdraft fees when, but for reordering transactions, there would otherwise be sufficient funds in the account;

g.      Fails to provide customers with accurate balance information;

        h.     Delays posting of transactions by customers using debit cards so that customers are charged overdraft fees on transactions, even though the customers had sufficient funds in their accounts to cover the transactions upon execution;

        i.     Charges exorbitant overdraft fees that bear no relationship to the actual costs and risks of covering insufficient funds transactions;

        j.     Breaches its covenant of good faith and fair dealing with Plaintiffs and the other members of the Class through its overdraft policies and practices;

        k.     Requires its customers to enter into standardized account agreements which include unconscionable provisions;

        l.     Converts moneys belonging to Plaintiffs and the other members of the Class through its overdraft policies and practices;

        m.     Is unjustly enriched through its overdraft policies and practices; and

        n.     Violates the consumer protection laws of California through its overdraft policies and practices.

28.     Other questions of law and fact common to the Class include:

        a.     The proper method or methods by which to measure damages, and

        b.     The declaratory relief to which the Class is entitled.

29.     Plaintiffs' claims are typical of the claims of other Class members, in that they arise out of the same wrongful overdraft policies and practices and the same or substantially similar unconscionable provisions of U.S. Bank's account agreements and other related documents. Plaintiffs have suffered the harm alleged and have no interests antagonistic to the interests of any other Class member.

30.     Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions.  Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Class.

31.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of U.S. Bank, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses and U.S. Bank's misconduct will proceed without remedy.

32.     Even if Class members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

## COMMON FACTUAL ALLEGATIONS

### A.     U.S. Bank

33.     According to its website, U.S. Bank is the sixth largest commercial bank in the United States, holding $226 billion in assets.  In addition to its online banking services, U.S. Bank operates in 24 states with approximately 2,850 branch offices and 5,173 ATMs.

34.     U.S. Bank is in the business of providing its customers with a variety of banking services.  One of the services provided by U.S. Bank for customers who open a checking account is a debit card, also known as a check card or ATM card.  Through those debit cards, customers can engage in transactions using funds directly from their accounts by engaging in "debit" or "point of sale" ("POS") transactions, or may withdraw money from their accounts at automated teller machines ("ATMs").  Whether the card is used to execute POS transactions or to withdraw cash from ATM machines, the transaction is processed electronically.  As a result, U.S. Bank is notified instantaneously when the card is swiped, and has the option to accept or decline transactions at such time.

35.     U.S. Bank employs sophisticated software to automate its overdraft system.  This program maximizes the number of overdrafts, and thus, the amount of overdraft fees charged per customer.

36.     As a result of U.S. Bank's manipulation and alteration of customers' transactions records, funds in a customer's account are depleted more rapidly and more overdraft fees are likely to be charged for multiple smaller transactions.  Indeed, overdraft charges are likely to occur at times when, but for the manipulation and alteration, there would be funds in the account and no overdraft would occur.  For example, if a customer, whose account had a $50 balance at the time the Bank processed several transactions, made four transactions of $10 and one subsequent transaction of $100 on the same day, the Bank would reorder the debits from largest to smallest, imposing four overdraft fees on the customer.  Conversely, if the $100 transaction were debited last—consistent with the actual order of transactions—only one overdraft fee would be assessed.  *See* FDIC Study of Bank Overdraft Programs, November 2008, *available at*: http://www.fdic.gov/bank/analytical/overdraft/, at 11, n. 12.

**B.    U.S. Bank's Relevant Customer Documents Regarding Overdrafts**

37.    Plaintiffs and all members of the Class maintain or maintained a checking account with U.S. Bank.  The terms of U.S. Bank's checking accounts are contained in standardized account holder agreements, presented to its customers on a "take it or leave it" basis, drafted and imposed by U.S. Bank, which was the party of vastly superior bargaining strength, and thus constitute agreements of adhesion.  A representative copy of the "Deposit Account Agreement" effective June 1, 2009 (the "Deposit Agreement"), covering "all deposit accounts," which is 34 pages long, single-spaced and in small print, is attached as Exhibit A.

38.    The Deposit Agreement states:

> **Our Options**: You do not have the right to withdraw funds that exceed the available balance on your account.  When an item of yours overdraws an account, we can either pay or return the item.  You have no right to choose which items we pay or return.
>
> If we get a **batch, or multiple batches**, of such items in a day (for example, checks, ATM purchase transactions, and check card purchase transactions typically come in batches), and if one, some or all of them would overdraw the account if paid, we the right [sic] to decide the order of the items we will pay and which items will be returned (if any).  This means, for example, we can process items beginning with the largest item (regardless of the type of item), even though it will have the effect of reducing your available balance more quickly.
>
> We have all these options each time you might overdraw an account. What we do one time does not make that a rule you can rely on for the future (pp. 10-11).

39.    The Deposit Agreement also states that U.S. Bank will "charge an insufficient funds fee for each withdrawal (e.g., in-person, ATM, automatic payment, or other paper or electronic withdrawal transaction) we return because it exceeds your available balance on a given day.  An overdraft fee is assessed for each item or transaction we pay that causes the available balance to become negative or occurs while the available balance is negative on the checking account. . . . If you have an overdraft, you must deposit enough money into your

account to pay the overdraft and the fees we charge, and you must do so immediately. . . . **You have the option to direct us to return overdraft items, but you may still be charged an insufficient funds fee for returned items**." *Id*. at 11.

40.     The Deposit Agreement further states that "if we make funds available to you for withdrawal ahead of schedule, that does not mean we have to do it again," and that "if we pay a check that is more than your account balance, that does not mean we have to do it again." *Id*. at 4.

41.     A representative copy of an earlier "Deposit Account Agreement," effective March 15, 2007, covering "all deposit accounts," which is 26 pages long, single-spaced and in small font, is attached as Exhibit B.

42.     Exhibit B states:

> **Our Options**: When an item of yours overdraws an account, we can either pay or refuse to pay the item.
>
> If we get a **batch** of such items in a day (checks typically come in batches), and if one, some or all of them would overdraw the account if paid, we can pay or refuse to pay them, in any order, or no order.  For example, if one large check and six small checks are offered to us for payment, and the one large check would empty the account, we can:
>
> (1)     pay the one large check and refuse to pay the six small checks;
>
> (2)     pay the small checks and refuse to pay the large check;
>
> (3)     pay all of them, creating an overdraft; or
>
> (4)     pay some and reject others.
>
> We have all these options each time you might overdraw an account. What we do one time does not make that a rule you can rely on for the future (p. 10).

43.     Neither Exhibit A nor Exhibit B (together, the "Deposit Agreements") sets forth the dollar amount of fees that will be charged for purported overdrafts.

44.     Instead, a separate document—a pamphlet entitled "Consumer Pricing Information" (attached as Exhibit C)—lists the dollar amount of fees that will be charged for purported overdrafts, in a chart entitled "Miscellaneous Checking, Savings or Money Market Fees."  Using small print, the chart states:

| Overdraft Item Paid[3] | |
|---|---|
| 1 occasion | $19.00 per item |
| 2-4 occasions | $35.00 per item |
| 5 or more occasions | $37.50 per item |
| Overdraft Item Returned (NSF)[3] | |
| 1 occasion | $19.00 per item |
| 2-4 occasions | $35.00 per item |
| 5 or more occasions | $37.50 per item |

The footnote appears in extremely small print:  "[3]An 'occasion' is a day in which your account has insufficient funds to cover an item as defined in *Your Deposit Account Agreement.*  To determine the appropriate fees for a particular overdraft item paid and/or overdraft item returned, we count the number of occasions in a 12 month period.  Fees are subject to a daily maximum of 6 overdraft items paid and 6 overdraft items requested, a maximum total of 12 per day."  Exhibit C.

45.     The Deposit Agreements and related documents, including the Consumer Pricing Information pamphlet, fail to disclose to customers that they have the option to "opt out" from the Bank's overdraft scheme, although it is possible for them to opt out upon request.

**C.     U.S. Bank's Re-Ordering of Checking Account Transactions**

46.     In an effort to maximize overdraft revenue, U.S. Bank manipulates and reorders debits from highest to lowest during given periods of time.  U.S. Bank reorders transactions for

no reason other than to increase the number of exorbitant overdraft fees it can charge. This practice violates numerous consumer protection laws and the covenant of good faith and fair dealing in the Bank's Deposit Agreements.

47.     In addition, U.S. Bank misleads its customers regarding its reordering practices. Instead of unequivocally telling its customers that it will reorder debits from highest to lowest, the Bank states in its contract that "we the right [sic] to decide the order of the items we will pay and which items will be returned (if any). This means, for example, we *can* process items beginning with the largest item[.]" This statement is deceptive and/or unfair because it is, in fact, the Bank's practice to *always* reorder debits from highest to lowest, and because the Bank groups together POS transactions that occurred on subsequent days with POS transactions that occurred on earlier days, and reorders them so that higher debits that occurred on subsequent days are posted to its customers' accounts before lower debits that occurred on earlier days, contrary to the terms of the Bank's Deposit Agreements and its customers' reasonable expectations. Further, the Deposit Agreement effective March 15, 2007 (Exhibit B) is affirmatively misleading because, by stating that "checks typically come in batches" and presenting examples of different ways of processing checks only, it suggests that debit card transactions are not processed in batches and are not subject to overcharge fees. The Bank's practices thus violate the covenant of good faith and fair dealing implied in the Deposit Agreements as well as the consumer protection laws of California.

48.     Transactions involving debit cards used by U.S. Bank customers, including the withdrawal of cash from ATM machines and POS transactions with vendors, are processed electronically. As a result, U.S. Bank is notified instantaneously when the customer's debit card is swiped, and has the option to accept or decline these transactions.

49.     Notwithstanding the instantaneous nature of these electronic debit card transactions, under U.S. Bank's posting system, it fails to post charges in the order in which they are incurred or received.  U.S. Bank developed a policy and employs a practice whereby account charges and debits are posted to its customers' accounts out of chronological order for the sole purpose of maximizing the number of overdraft transactions and, therefore, the amount of overdraft fees charged to its customers.

50.     Instead of processing such transactions in chronological order, U.S. Bank processes them starting with the largest debit and ending with the smallest debit, so as to generate the largest possible number of overdrafts and the greatest possible amount of overdraft fees.

51.     U.S. Bank refrains from immediately posting charges to a customer's account as it receives them—sometimes for multiple business days.  By holding charges rather than posting them immediately to an account, U.S. Bank is able to amass a number of charges on the account. Subsequently, U.S. Bank posts all of the amassed charges on a single date.  When the group of charges is eventually posted to the customer's account, U.S. Bank posts them in order of largest to smallest—not in the order in which they were received or in the order in which they were charged.  This delayed posting results in the imposition of multiple overdraft fees that would not otherwise be imposed.   The delayed posting also prevents customers from ascertaining the accurate balances in their accounts.

52.     U.S. Bank's policy and practice of posting charges from largest to smallest, rather than chronologically, is specifically designed to maximize the generation of overdraft fees by triggering overdraft fees for account charges that would not otherwise result in such fees.

53.     U.S. Bank enforces an unconscionable policy whereby charges incurred are posted to customers' accounts in a non-chronological order, from highest to lowest, and are held for multiple days and then batched together, to maximize the number of overdraft transactions and fees.  U.S. Bank's processing practices substantially increase the likelihood that customers' smaller charges will result in multiple overdraft fees.  The practices provide U.S. Bank with substantially higher service fee revenues than it would otherwise achieve absent these practices.

54.     As a result, Plaintiffs and members of the Class have been assessed overdraft fees for transactions which occurred when they actually had sufficient funds in their accounts to cover those transactions.

### D.     U.S. Bank's Cloaking of Accurate Balance Information

55.     U.S. Bank actively promotes the convenience of its debit cards and other electronic debiting, but fails to provide customers with accurate balance information.  When customers execute account transactions, they generally do not have access to an accurate balance register or balance information.

56.     U.S. Bank provides inaccurate balance information to its customers through its electronic network.  In certain cases, U.S. Bank informs its customers that they have a positive balance when, in reality, they have a negative balance, despite U.S. Bank's actual knowledge of outstanding debits and transactions.

57.     Even when U.S. Bank has actual knowledge of outstanding transactions which have already created a negative balance in a customers' account, it encourages the customer to incur more overdraft charges by approving—rather than prudently declining—subsequent debit card purchases and other electronic transactions.

58.     U.S. Bank also assesses overdraft fees at times when actual funds in the customer account are sufficient to cover all debits that have been submitted to the Bank for payment.  It

does this by placing a "hold" on actual funds in the customer's account.  In doing so, U.S. Bank charges overdraft fees where it faces no risk, because the cash balance in the customer's account has not dropped below zero.

**E.      U.S. Bank's Failure to Notify Customers of Overdrafts or Advise Customers of Their Right to Opt Out**

59.     At the time its debit cards are used in POS transactions or at ATMs, U.S. Bank is able to determine, almost instantaneously, whether there are sufficient funds in a customer's account to cover that particular transaction.  The Bank has the technological capability to decline transactions (which it does when a pending transaction would exceed a pre-determined, overdraft tolerance limit for the account), or notify customers at that very moment that the particular debit card transaction would result in an overdraft.  U.S. Bank could give customers the option to decline the transaction to avoid incurring the overdraft fee, but it does not do so because it seeks to maximize the amount of revenue generated through its assessment of overdraft fees.

60.     Notwithstanding its technological capabilities and actual knowledge, U.S. Bank fails to provide notice to Plaintiffs and the Class that a particular debit card transaction will result in an overdraft and, hence, an overdraft fee.  Because U.S. Bank's customers are not notified of the potential overdraft, and are not given the option of declining the debit card transaction or providing another form of payment, the customers incur monetary damages in the form of overdraft fees.

61.     U.S. Bank fails to make Plaintiffs and Class members aware that they can opt out of its overdraft scheme upon request, thereby avoiding any overdraft fees from being incurred.

**F.      U.S. Bank's Overdraft Policies and Practices Are Contrary to Best Practices**

62.     By engaging in the conduct described herein, U.S. Bank has failed to follow the list of "best practices" for overdraft programs set forth in the "Joint Guidance on Overdraft

Protection Programs" ("Joint Guidance") issued by the United States Department of the Treasury, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the National Credit Union Administration (collectively, the "Agencies").   A copy of the Joint Guidance is attached as Exhibit D.   These "best practice" recommendations include: "Provide election or opt-out of service.   Obtain affirmative consent of consumers to receive overdraft protection.   Alternatively, where overdraft protection is automatically provided, permit consumers to 'opt-out' of the overdraft program and provide a clear consumer disclosure of this option."   70 F.R. 9127-01, 9132.

63.     According to rules proposed by the Agencies: "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . .   This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee."   73 F.R. 28904-01, 28929 (May 19, 2008).

64.     The Joint Guidance also advises banks to "[a]lert customers before a transaction triggers any fees.   When consumers attempt to withdraw or transfer funds made available through an overdraft protection program, provide a specific consumer notice, where feasible, that completing the withdrawal may trigger the overdraft fees."   70 F.R. 9127, 9132.   The Joint Guidance further advises that "[t]his notice should be presented in a manner that permits consumers to cancel the attempted withdrawal or transfer after receiving the notice."   *Id.*

65.     Similarly, the list of "best practices" recommended in "Overdraft Protection: A Guide for Bankers," issued by the American Bankers Association, includes offering customers the option of "opting out" of any overdraft programs, and informing customers, before they

access funds, that a particular point of sale or ATM transaction will cause them to incur an overdraft fee.  A copy of "Overdraft Protection: A Guide for Bankers" is attached as Exhibit E.

66.     U.S. Bank's overdraft policies make it difficult for customers to avoid injury even if they carefully track the balance in their account.  In fact, the Agencies have stated that "Injury" resulting from such policies "is not reasonably avoidable" by the consumer.  73 F.R. 28904-01, 28929.  "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available."

67.     On October 6, 2009, the Center for Responsible Lending issued a report entitled "Overdraft Explosion:  Bank Fees for Overdrafts Increase 35% in Two Years."  A copy of this report is attached as Exhibit F.  The report finds that it is now "standard procedure to automatically enroll checking account customers in their most expensive overdraft loan program."  The report finds that debit card transactions account for more overdraft fees than traditional checks or any other type of transaction, even though "debit card transactions and ATM withdrawals . . . could easily be denied for no fee."  The report also finds that overdraft fees increased 35 percent from 2006 to 2008, and that over 50 million Americans overdrew their accounts in a 12 month period, with 27 million accounts incurring five or more overdraft fees.

68.     A chart from the research company Moebs Services shows that, in every year since 1992, banks have gained increased revenues from overdraft fees:



**G.     U.S. Bank's Unconscionable Provisions and Policies**

69.     U.S. Bank's overdraft policies and practices are unconscionable in the following respects, among others:

a.      The Bank does not disclose or reasonably disclose to customers that they have the option to "opt out" of the Bank's overdraft scheme;

b. The Bank does not obtain affirmative consent from checking account customers prior to processing a transaction that will overdraw the account and result in an overdraft fee;

c. The Bank does not alert its customers that a debit card transaction will trigger an overdraft, and does not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

d. The Deposit Agreements and related documents are contracts of adhesion in that they are standardized forms, imposed and drafted by the Bank, which is a party of vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement in its entirety; and

e. The amount of overdraft fees is disclosed in an ineffective, ambiguous, misleading, and unfair manner, since it is not contained in the Deposit Agreements, but rather in a different and separate document, the Consumer Pricing Information pamphlet, which is not signed by the depositor.

70. The Deposit Agreements provided to customers are ineffective, ambiguous, deceptive, unfair, and misleading in that they do not unambiguously state that the Bank always reorders debits from high to low, even though U.S. Bank *always* reorders transactions in this way for customers in order to maximize overdrafts and overdraft fee revenues for the Bank.

71. The Deposit Agreement effective March 15, 2007 (Exhibit B) is specifically deceptive and misleading because it led consumers to believe that *only checks* were processed in batches, and that they would not be assessed any overdraft fees as a result of the processing of debit card transactions in batches, or the processing of checks together with debit card transactions in batches.

72.     The Deposit Agreements contain an identical arbitration clause and a class action waiver which states:

> **If any provision of this section is ruled invalid or unenforceable, this section shall be rendered null and void in its entirety.**
>
> **Arbitration Rules:  If you or we elect to arbitrate a dispute concerning your account, the dispute will be decided by arbitration under the Commercial Arbitration Rules of the American Arbitration Association. . . .**
>
> **Effects of Arbitration:  If either of us chooses arbitration, neither of use [sic] will have the right to litigate the dispute in court or have a jury trial.  In addition, you will not have the right to participate as a representative or member of any class of claimants pertaining to any dispute subject to arbitration.**

Exhibit A, pp. 33-34; Exhibit B, p. 26.

73.     The above cited provisions are unconscionable because the Deposit Agreements and related documents, to the extent they are deemed contracts, are unenforceable contracts of adhesion and the arbitration provision itself is substantively unconscionable.

### H.     Recently Announced Changes in U.S. Bank's Overdraft Policies and Practices Do Not Offer Any Remedial Benefits to Customers

74.     On September 24, 2009, U.S. Bank announced plans to overhaul its overdraft policies on a going-forward basis.  The changes do nothing to remedy the past wrongs to the Plaintiffs and the Class.  They do not retroactively reverse the charges wrongly debited from their accounts, nor do they prevent U.S. Bank from continuing its unfair and unconscionable methods of business.

### I.     U.S. Bank's Overdraft Practices Harmed Plaintiffs

75.     Plaintiffs Willyum Waters and Frank Smith are current checking account customers of U.S. Bank.

76.     In connection with their joint account, Messrs. Waters and Smith were issued debit cards by the Bank.  A debit card allows customers to access their checking account funds by using the card to execute a transaction.  The charge is processed electronically, and the Bank has the option to accept or decline the transaction at the point of sale.

77.     U.S. Bank wrongfully charged Messrs. Waters and Smith overdraft fees on multiple occasions.   By way of illustration, Plaintiffs were charged four overdraft fees on September 29, 2008, in the amount of $37.50 each, for a total of $150.00.  Based on information and belief, the overdraft fees were based on the following ordering of transactions:

| | | Debits | Balance |
|---|---|---|---|
| | Beginning Balance on September 26, 2008: | | $ 78.00 |
| Date Posted | Debit Description | | |
| 9/26/2008 | Electronic Withdrawal | -90.00 | -12.00 |
| 9/26/2008 | Purchase Made with Pin (Safeway) | -12.15 | -24.15 |
| 9/26/2008 | Visa Purchase (Subway) | -10.39 | -34.54 |
| 9/26/2008 | Visa Purchase (Borders Books) | -8.61 | -43.15 |
| | | | |
| | Total Fees: $ 150 .00 | | |

78.     If U.S. Bank had not manipulated and reordered Messrs. Waters and Smith's transactions from highest to lowest, Plaintiffs would have incurred only one overdraft fee instead of four overdraft fees.

79.     For instance, if U.S. Bank had posted the transactions from lowest to highest, Messrs. Waters and Smith would have only incurred one overdraft fee ($37.50) instead of four overdraft fees ($150.00):

| | | Debits | Balance |
|---|---|---|---|
| | **Beginning Balance on <u>September 26, 2008</u>:** | | **$ 78.00** |
| <u>Date Posted</u> | <u>Debit Description</u> | | |
| 9/26/2008 | Visa Purchase (Borders Books) | -8.61 | 69.39 |
| 9/26/2008 | Visa Purchase (Subway) | -10.39 | 59.00 |
| 9/26/2008 | Purchase Made with Pin (Safeway) | -12.15 | 46.85 |
| 9/26/2008 | Electronic Withdrawal | -90.00 | **-43.15** |
| | | | |
| | **Total Fees: $ 37.50** | | |

80.     Likewise, if U.S. Bank had posted the transactions in chronological order, Messrs. Waters and Smith would have only incurred one overdraft fee ($37.50) instead of four overdraft fees ($150.00):[2]

| | | Debits | Balance |
|---|---|---|---|
| | Beginning Balance on <u>September 26, 2008</u>: | | $ 78.00 |
| <u>Date of Transaction</u> | <u>Debit Description</u> | | |
| 9/24/2008 | Visa Purchase (Borders Books) | -8.61 | 69.39 |
| 9/24/2008 | Visa Purchase (Subway) | -10.39 | 59.00 |
| 9/25/2008 | Purchase Made with Pin (Safeway) | -12.15 | 46.85 |
| 9/26/2008 | Electronic Withdrawal | -90.00 | **-43.15** |
| | | | |
| **Total Fees: $ 37.50** | | | |

81.     Since opening their account in March 2007, Messrs. Waters and Smith have incurred at least $2,475.00 in overdraft fees.

82.     Plaintiffs Shane Parkins and Kara Parkins are also current checking account customers of U.S. Bank.  In connection with their joint account, Mr. and Mrs. Parkins were issued debit cards by the Bank.

83.     U.S. Bank wrongfully charged Mr. and Mrs. Parkins overdraft fees on multiple occasions.  By way of illustration, Plaintiffs were charged six overdraft fees on September 26, 2008, in the amount of $34.00 each, for a total of $204.00.  Based on information and belief, the overdraft fees were based on the following ordering of transactions:

---

[2] For each chart that lists the transactions in chronological order, the transactions are shown as listed in the Bank's statements, re-sorted only by date.  Because the statements do not indicate the hour and minute of each transaction, Plaintiffs have listed the transactions for each particular day in the same order in which they are listed in the statements, sorting only from earlier dates to later dates.  Thus, if the Bank's statements list transactions that occurred on one particular day in some order other than chronological—sorting from highest to lowest transaction, for example— Plaintiffs have not changed that order.  As a result, the chronological charts in this Complaint may reflect even more overdraft fees than Plaintiffs would have incurred had the Bank posted the transactions in strict chronological order.

| | | Debits | Balance |
|---|---|---|---|
| | Beginning Balance on <u>December 24, 2008</u>: | | $ 864.60 |
| <u>Date Posted</u> | <u>Debit Description</u> | | |
| 12/24/2008 | Electronic Withdrawal (Auto Finance) | -398.84 | 465.76 |
| 12/24/2008 | Electronic Withdrawal (Auto Finance) | -398.84 | 66.92 |
| 12/24/2008 | Card 6244 Visa Purchase (Non-PIN) | -51.64 | 15.28 |
| 12/24/2008 | Card 6244 Visa Purchase (Made with PIN) | -24.77 | **-9.49** |
| 12/24/2008 | Card 6244 Visa Purchase (Made with PIN) | -19.02 | **-28.51** |
| 12/24/2008 | Card 6244 Visa Purchase (Non-PIN) | -16.15 | **-44.66** |
| 12/24/2008 | Card 7866 Visa Purchase (Non-PIN) | -11.01 | **-55.67** |
| 12/24/2008 | Card 6244 Visa Purchase (Non-PIN) | -8.51 | **-64.18** |
| 12/24/2008 | Card 6244 Visa Purchase (Non-PIN) | -8.24 | **-72.42** |
| 12/24/2008 | Card 6244 Visa Purchase (Made with PIN) | -7.04 | **-79.46** |
| 12/24/2008 | Card 7866 Visa Purchase (Non-PIN) | -5.37 | **-84.83** |
| 12/24/2008 | Card 6244 Visa Purchase (Made with PIN) | -4.77 | **-89.60** |
| 12/24/2008 | Card 6244 Visa Purchase (Made with PIN) | -1.99 | **-91.59** |
| | | | |
| | **Total Fees (6): $ 204.00** | | |

84.     If U.S. Bank had not manipulated and reordered the Parkins's transactions from highest to lowest, they would have incurred only one overdraft fee instead of six overdraft fees.

85.     For instance, if U.S. Bank had posted the transactions from lowest to highest, Mr. and Mrs. Parkins would have only incurred one overdraft fee ($34.00) instead of six overdraft fees ($204.00):

| | | Debits | Balance |
|---|---|---|---|
| | **Beginning Balance on <u>December 24, 2008</u>:** | | **$ 864.60** |
| <u>Date Posted</u> | <u>Debit Description</u> | | |
| 12/24/2008 | Card 6244 Visa Purchase (Made with PIN) | -1.99 | 862.61 |
| 12/24/2008 | Card 6244 Visa Purchase (Made with PIN) | -4.77 | 857.84 |
| 12/24/2008 | Card 7866 Visa Purchase (Non-PIN) | -5.37 | 852.47 |
| 12/24/2008 | Card 6244 Visa Purchase (Made with PIN) | -7.04 | 845.43 |
| 12/24/2008 | Card 6244 Visa Purchase (Non-PIN) | -8.24 | 837.19 |
| 12/24/2008 | Card 6244 Visa Purchase (Non-PIN) | -8.51 | 828.68 |
| 12/24/2008 | Card 7866 Visa Purchase (Non-PIN) | -11.01 | 817.67 |
| 12/24/2008 | Card 6244 Visa Purchase (Non-PIN) | -16.15 | 801.52 |
| 12/24/2008 | Card 6244 Visa Purchase (Made with PIN) | -19.02 | 782.50 |
| 12/24/2008 | Card 6244 Visa Purchase (Made with PIN) | -24.77 | 757.73 |
| 12/24/2008 | Card 6244 Visa Purchase (Non-PIN) | -51.64 | 706.09 |
| 12/24/2008 | Electronic Withdrawal (Auto Finance) | -398.84 | 307.25 |
| 12/24/2008 | Electronic Withdrawal (Auto Finance) | -398.84 | **-91.59** |
| | | | |
| | **Total Fees (1): $ 34.00** | | |

86.     Likewise, if U.S. Bank had posted the transactions in chronological order, Plaintiffs would have only incurred one overdraft fee ($34.00) instead of six overdraft fees ($204.00):

|  |  | Debits | Balance |
|---|---|---|---|
|  | Beginning Balance on December 24, 2008: |  | $ 864.60 |
| Date of Transaction | Debit Description |  |  |
| 12/21/2008 | Card 7866 Visa Purchase (Non-PIN) | -5.37 | 859.23 |
| 12/21/2008 | Card 6244 Visa Purchase (Made with PIN) | -7.04 | 852.19 |
| 12/21/2008 | Card 6244 Visa Purchase (Non-PIN) | -8.51 | 843.68 |
| 12/21/2008 | Card 7866 Visa Purchase (Non-PIN) | -11.01 | 832.67 |
| 12/22/2008 | Card 6244 Visa Purchase (Non-PIN) | -8.24 | 824.43 |
| 12/22/2008 | Card 6244 Visa Purchase (Non-PIN) | -16.15 | 808.28 |
| 12/22/2008 | Card 6244 Visa Purchase (Made with PIN) | -19.02 | 789.26 |
| 12/22/2008 | Card 6244 Visa Purchase (Non-PIN) | -51.64 | 737.62 |
| 12/23/2008 | Card 6244 Visa Purchase (Made with PIN) | -1.99 | 735.63 |
| 12/23/2008 | Card 6244 Visa Purchase (Made with PIN) | -4.77 | 730.86 |
| 12/23/2008 | Card 6244 Visa Purchase (Made with PIN) | -24.77 | 706.09 |
| 12/24/2008 | Electronic Withdrawal (Auto Finance) | -398.84 | 307.25 |
| 12/24/2008 | Electronic Withdrawal (Auto Finance) | -398.84 | -91.59 |
|  |  |  |  |
| **Total Fees (1): $ 34.00** | | | |

87.     Since opening his account in 2005, Mr. Parkins estimates that he has incurred at least $2,000 in overdraft fees.[3]

88.     Plaintiffs Steven Barnes and Carolyn Barnes are current checking account customers of U.S. Bank.  In connection with their joint account, Mr. and Mrs. Barnes were issued debit cards by the Bank.

89.     U.S. Bank wrongfully charged Mr. and Mrs. Barnes overdraft fees on multiple occasions.  By way of illustration, Plaintiffs were charged three overdraft fees on January 29, 2008, in the amount of $34.00 each, for a total of $102.00.  Based on information and belief, the overdraft fees were based on the following ordering of transactions:

---

[3] Mrs. Parkins was added to the account in approximately 2008.

|  |  | Debits | Deposit | Balance |
|---|---|---|---|---|
|  | **Beginning Balance on <u>January 28, 2008</u>:** |  |  | **$ 291.01** |
| **Date Posted** | **Description** |  |  |  |
| 1/28/2008 | Check No. 4208 | -210.00 |  | 81.01 |
| 1/28/2008 | Visa Purchase (Non-PIN) | -99.95 |  | **-18.94** |
| 1/28/2008 | Visa Purchase (Non-PIN) | -44.52 |  | **-63.46** |
| 1/28/2008 | Visa Purchase (Non-PIN) | -7.46 |  | **-70.92** |
| 1/28/2008 | Automatic Advance |  | +9.29 | -61.63 |
|  |  |  |  |  |
|  | **Total Fees (3): $ 102.00** |  |  |  |

90.     If U.S. Bank had not manipulated and reordered the Barnes's transactions from highest to lowest, they would have incurred only one overdraft fee instead of six overdraft fees.

91.     For instance, if U.S. Bank had posted the transactions from lowest to highest, Mr. and Mrs. Barnes would have only incurred one overdraft fee ($34.00) instead of three overdraft fees ($102.00):

|  |  | Debits | Deposit | Balance |
|---|---|---|---|---|
|  | **Beginning Balance on <u>January 28, 2008</u>:** |  |  | **$ 291.01** |
| **Date Posted** | **Description** |  |  |  |
| 1/28/2008 | Automatic Advance |  | +9.29 | 300.03 |
| 1/28/2008 | Visa Purchase (Non-PIN) | -7.46 |  | 292.84 |
| 1/28/2008 | Visa Purchase (Non-PIN) | -44.52 |  | 248.32 |
| 1/28/2008 | Visa Purchase (Non-PIN) | -99.95 |  | 148.37 |
| 1/28/2008 | Check No. 4208 | -210.00 |  | **-61.63** |
|  |  |  |  |  |
|  | **Total Fees (1): $ 34.00** |  |  |  |

92.     Likewise, if U.S. Bank had posted the transactions in chronological order, Mr. and Mrs. Barnes would have only incurred one overdraft fee ($34.00) instead of three overdraft fees ($102.00):

| | | **Debits** | **Deposit** | **Balance** |
|---|---|---|---|---|
| | **Beginning Balance on <u>January 28, 2008</u>:** | | | **$ 291.01** |
| **Date of Transaction** | **Description** | | | |
| 1/25/2008 | Visa Purchase (Non-PIN) | -99.95 | | 191.06 |
| 1/24/2008 | Visa Purchase (Non-PIN) | -44.52 | | 146.54 |
| 1/26/2008 | Visa Purchase (Non-PIN) | -7.46 | | 139.08 |
| 1/28/2008 | Automatic Advance | | +9.29 | 148.37 |
| 1/28/2008 | Check No. 4208 | -210.00 | | **-61.63** |
| | | | | |
| | **Total Fees (1): $ 34.00** | | | |

93.     Since becoming U.S. Bank customers in approximately 2002, Mr. and Mrs. Barnes have incurred at least $7,300 in overdraft fees.

94.     Plaintiffs Glenda Lawrence and Susan Ledbetter are also current checking account customers of U.S. Bank.

95.     In connection with their accounts, the Bank issued debit cards to Ms. Lawrence and Ms. Ledbetter.

96.     U.S. Bank also wrongfully charged Ms. Lawrence and Ms. Ledbetter overdraft fees on multiple occasions.  These wrongful overdraft fees occurred as a result of the Bank's manipulation and re-ordering of their debit card transactions.

97.     Plaintiff Donald Kimenker is a former checking account customer of U.S. Bank, who opened and maintained his account with U.S. Bank while residing in the State of California.

98.     In connection with his account, the Bank issued a debit card to Mr. Kimenker.

99.    U.S. Bank also wrongfully charged Mr. Kimenker overdraft fees on multiple occasions.  These wrongful overdraft fees occurred as a result of the Bank's manipulation and re-ordering of his debit card transactions.

100.    U.S. Bank failed to notify Plaintiffs that they could incur overdraft fees on transactions even though there were sufficient funds in the checking account to cover the transaction at the time the transaction was executed.  In addition, U.S. Bank never notified Plaintiffs at the time they made the check card transactions that their checking account was overdrawn or that they would be charged an overdraft fee as a result of the transaction. Furthermore, U.S. Bank never declined to pay any of Plaintiffs' check card charges even though their account was overdrawn or they had insufficient funds in the account to cover the transaction.

101.    Based on information and belief, the overdraft charges incurred by Plaintiffs are representative of hundreds of millions of dollars of overdraft fees that the Bank wrongfully assessed and deducted from U.S. Bank customer accounts.   These wrongful takings are especially egregious considering the fact that the Bank approved each transaction and knew at the time of approval whether there were sufficient funds in the account to cover the transaction.

**J.**    **The Damages Sustained by Plaintiffs and the Class**

102.    As shown by these examples, U.S. Bank's overdraft policies make it difficult for a customer to avoid injury even if the customer keeps close track of the balance in his or her account.  In fact, the Agencies have stated that "injury" resulting from such policies "is not reasonably avoidable" by consumers.  73 F.R. 28904-01, 28929.  "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack

sufficient information about key aspects of their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available." *Id*.

103.    According to rules proposed by the Agencies, "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . . This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee."  73 F.R. 28904-01, 28929 (May 19, 2008).

104.    Thus, as a consequence of U.S. Bank's overdraft policies and practices, Plaintiffs and the Class have been wrongfully forced to pay overdraft fees.  U.S. Bank has improperly deprived Plaintiffs and the Class of significant funds, causing ascertainable monetary losses and damages.

105.    As a consequence of U.S. Bank's improper overdraft fees, U.S. Bank has wrongfully deprived Plaintiffs and the Class of funds to which it had no legitimate claim.

106.    Plaintiffs had sufficient funds to cover at least some of the transactions for which they and the Class were charged overdraft fees.  Plaintiffs and members of the Class either had adequate funds to cover the transactions posted to their accounts, or the accounts were allowed to become overdrawn, even by *de minimis* margins, exclusively so that U.S. Bank could impose these wrongful charges.  In many instances, U.S. Bank's manipulation of the process for imposing overdraft fees triggered a cascade of charges that exponentially added to the charges it collected from Plaintiffs and Class members.

107.    All conditions precedent to the relief sought herein have either occurred or have been performed or waived.

## FIRST CLAIM FOR RELIEF

### Breach of Contract

108.    Plaintiffs repeat paragraphs 1 through 107 above.

109.    Plaintiffs and U.S. Bank have contracted in California for bank account deposit, checking, ATM and debit card services, as embodied in U.S. Bank's Deposit Agreements and related documentation.

110.    Under California law, good faith is an element of every contract pertaining to the assessment of overdraft fees.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

111.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

112.    Since at least May 12, 2005, U.S. Bank has breached the covenant of good faith and fair dealing in the Deposit Agreements through its overdraft policies and practices as alleged herein.

113.    Plaintiffs and the Class have performed all, or substantially all, of the obligations imposed on them under the Deposit Agreements.

114.    Plaintiffs and members of the Class have sustained damages as a result of U.S. Bank's breach of the covenant of good faith and fair dealing.

## SECOND CLAIM FOR RELIEF

### Unconscionability in Violation of Cal. Civ. Code § 1670.5

115.    Plaintiffs repeat paragraphs 1 through 107 above.

116.    U.S. Bank's overdraft policies and practices are substantively and procedurally unconscionable, in violation of Section 1670.5 of the California Civil Code, in the following respects, among others:

      a.    The Bank does not disclose or reasonably disclose to customers that they have the option to "opt out" of the Bank's overdraft scheme;

      b.    The Bank does not obtain affirmative consent from checking account customers prior to processing a transaction that will overdraw the account and result in an overdraft fee;

      c.    The Bank does not alert its customers that a debit card transaction will trigger an overdraft, and does not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

      d.    The Deposit Agreements and related documents, including the Consumer Pricing Information pamphlet, are contracts of adhesion in that they are standardized forms, imposed and drafted by the Bank, which is a party of vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement in its entirety;

      e.    The amount of overdraft fees is disclosed in an ineffective, ambiguous, misleading, and unfair manner, since it is not contained in the Deposit Agreements, but rather in

a different and separate document, the Consumer Pricing Information pamphlet, which is not signed by the depositor; and

   f.  The Deposit Agreements provided to customers are ineffective, ambiguous, deceptive, unfair, and misleading in that they do not unambiguously state that the Bank always reorders debits from high to low, even though U.S. Bank *always* reorders transactions in this way for customers in order to maximize overdrafts and overdraft fee revenues for the Bank.

   g.  The Deposit Agreement effective March 15, 2007 (Exhibit B) is specifically deceptive and misleading because it induced consumers to believe that *only checks* were processed in batches, and that they would not be assessed any overdraft fees as a result of the processing of debit card transactions in batches or the mixed processing of checks and debit card transactions in batches.

  117. Considering the great business acumen and experience of U.S. Bank in relation to Plaintiffs and the Class, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law.

  118. The imposition of overdraft charges which exceed the amount overdrawn (*e.g.*, the imposition of a $35 charge on an overdraft of less than $35) is itself unconscionable. Such charges are not reasonably related to the Bank's cost of covering the overdraft and/or its risk of nonpayment (where the Bank pays the overdraft), or to the Bank's cost of returning the item unpaid (where the Bank does not pay the overdraft).

119.    Plaintiffs and members of the Class have sustained damages as a result of U.S. Bank's unconscionable policies and practices as alleged herein.

### THIRD CLAIM FOR RELIEF

#### Conversion

120.    Plaintiffs repeat paragraphs 1 through 107 above.

121.    U.S. Bank had and continues to have a duty to maintain and preserve its customers' checking accounts and to prevent their diminishment through its own wrongful acts.

122.    U.S. Bank has wrongfully collected overdraft fees from Plaintiffs and the members of the Class, and has taken specific and readily identifiable funds from their accounts in payment of these fees in order to satisfy them.

123.    U.S. Bank has, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiffs and the members of the Class, without legal justification.

124.    U.S. Bank continues to retain these funds unlawfully without the consent of Plaintiffs or members of the Class.

125.    U.S. Bank intends to permanently deprive Plaintiffs and the members of the Class of these funds.

126.    These funds are properly owned by Plaintiffs and the members of the Class, not U.S. Bank, which now claims that it is entitled to their ownership, contrary to the rights of Plaintiffs and the members of the Class.

127.    Plaintiffs and the members of the Class are entitled to the immediate possession of these funds.

128.    U.S. Bank has wrongfully converted these specific and readily identifiable funds in violation of California law.

129.   U.S. Bank's wrongful conduct is continuing.

130.   As a direct and proximate result of this wrongful conversion, Plaintiffs and the members of the Class have suffered and continue to suffer damages.

131.   By reason of the foregoing, Plaintiffs and the members of the Class are entitled to recover from U.S. Bank all damages and costs permitted by law, including all amounts that U.S. Bank has wrongfully converted.

## FOURTH CLAIM FOR RELIEF

### Unjust Enrichment

132.   Plaintiffs repeat paragraphs 1 through 107 above.

133.   Plaintiffs, on behalf of themselves and the Class, assert a claim for unjust enrichment under the common law of California.

134.   By means of U.S. Bank's wrongful conduct alleged herein, U.S. Bank knowingly provides banking services to Plaintiffs and members of the Class that are unfair, unconscionable, and oppressive.

135.   U.S. Bank knowingly received and retained wrongful benefits and funds from Plaintiffs and members of the Class.  In so doing, U.S. Bank acted with conscious disregard for the rights of Plaintiffs and members of the Class.

136.   As a result of U.S. Bank's wrongful conduct as alleged herein, U.S. Bank has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Class.

137.   U.S. Bank's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

138.     Under the common law doctrine of unjust enrichment, it is inequitable for U.S. Bank to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of overdraft fees on Plaintiffs and members of the Class in an unfair, unconscionable, and oppressive manner.   U.S. Bank's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

139.     The financial benefits derived by U.S. Bank rightfully belong to Plaintiffs and members of the Class.   U.S. Bank should be compelled to disgorge in a common fund for the benefit of Plaintiffs and members of the Class all wrongful or inequitable proceeds received by them.   A constructive trust should be imposed upon all wrongful or inequitable sums received by U.S. Bank traceable to Plaintiffs and the members of the Class.

140.     Plaintiffs and members of the Class have no adequate remedy at law.

### FIFTH CLAIM FOR RELIEF

### Violations of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200

141.     Plaintiffs repeat paragraphs 1 through 107 above.

142.     U.S. Bank's conduct described herein violates the Unfair Competition Law (the "UCL"), codified at California Business and Professions Code section 17200, in the following respects, among others:

a.     U.S. Bank's practices relating to the imposition of overdraft fees are unconscionable, in violation of California Civil Code section 1770(a)(19), and, as a result, constitute an unlawful business act or practice within the meaning of the UCL;

b.     U.S. Bank's practices relating to the imposition of overdraft fees violate California Civil Code sections 1770(a)(5), (14) and (19), and, as a result, constitute unlawful business acts or practices within the meaning of the UCL; and

c.      U.S. Bank's practices relating to the imposition of overdraft fees constitute unfair business acts or practices within the meaning of the UCL.

143.    The harm to Plaintiffs and the Class arising from U.S. Bank's unlawful and unfair practices relating to the imposition of overdraft fees outweighs the utility, if any, of those practices.

144.    U.S. Bank's unlawful and unfair business practices relating to the imposition of overdraft fees are immoral, unethical, oppressive, unscrupulous, unconscionable and/or substantially injurious to Plaintiffs and members of the Class.

145.    As a result of U.S. Bank's violations of the UCL, Plaintiffs and members of the Class have paid, and/or will continue to pay, unreasonably excessive amounts of money for banking services and thereby suffered and will continue to suffer actual damages.

146.    Pursuant to California Business and Professions Code section 17203, Plaintiffs and the Class are therefore entitled to:

a.      an order requiring U.S. Bank to cease the unlawful and unfair acts alleged herein;

b.      full restitution of all overdraft fees paid to U.S. Bank on check card transactions, including POS and ATM transactions, pursuant to California Code of Civil Procedure section 384;

c.      pre-judgment interest at the highest rate allowable by law; and

d.      payment of their attorneys' fees and costs pursuant to, *inter alia*, California Code of Civil Procedure section 1021.5.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class demand a jury trial on all issues so triable and judgment as follows:

1.      Declaring U.S. Bank's overdraft fee policies and practices to be wrongful, unfair and unconscionable;

2.      Restitution of all overdraft fees paid to U.S. Bank by Plaintiffs and the Class, as a result of the wrongs alleged herein, in an amount to be determined at trial;

3.      Disgorgement of the ill-gotten gains derived by U.S. Bank from its misconduct;

4.      Actual damages in an amount according to proof;

5.      Punitive and exemplary damages;

6.      Pre-judgment interest at the maximum rate permitted by applicable law;

7.      Costs and disbursements incurred by Plaintiffs in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

8.      Such other relief as this Court deems just and proper.

Dated:     May 13, 2010.

/s/ Bruce S. Rogow
Bruce S. Rogow, Esquire
Florida Bar No. 067999
bruce@abbrclaw.com
Robert C. Gilbert, Esquire
Florida Bar No. 561861
bobby@abbrclaw.com
ALTERS BOLDT BROWN
 RASH & CULMO, P.A.
4141 N.E. 2nd Avenue
Miami, Florida 33137
Tel:  (305) 571-8550
Fax:  (305) 571-8558

*Plaintiffs' Lead Counsel*

/s/ Ruben Honik
Ruben Honik, Esquire
Pennsylvania Bar No. 33109
rhonik@golombhonik.com
Kenneth J. Grunfeld, Esquire
Pennsylvania Bar No. 84121
kgrunfeld@golombhonik.com
GOLOMB & HONIK, P.C.
1515 Market Street
Suite 1100
Philadelphia, PA 19102
Tel: 215-985-9177
Fax: 215-985-4169

/s/ Barry R. Himmelstein
Barry R. Himmelstein, Esquire
California Bar No. 157736
bhimmelstein@lchb.com
Michael W. Sobol, Esquire
California Bar No. 194857
msobol@lchb.com
Jordan Elias, Esquire
California Bar No. 228731
jelias@lchb.com
Mikaela Bernstein, Esquire
California Bar No. 261301
mbernstein@lchb.com
LIEFF CABRASER HEIMANN &
  BERNSTEIN LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Tel: 415-956-1000
Fax: 415-956-1008

/s/ Robert C. Josefsberg
Robert C. Josefsberg, Esquire
Florida Bar No. 40856
rjosefsberg@podhurst.com
Victor M. Diaz, Jr., Esquire
Florida Bar No. 503800
vdiaz@podhurst.com
John Gravante, III, Esquire
Florida Bar No. 617113
jgravante@podhurst.com
PODHURST ORSECK, P. A.
City National Bank Building
25 W Flagler Street
Suite 800
Miami, FL 33130-1780
Tel: 305-358-2800
Fax: 305-358-2382

/s/ Ted E. Trief
Ted E. Trief, Esquire
New York Bar No. 1476662
ttrief@triefandolk.com
Barbara E. Olk, Esquire
New York Bar No. 1459643
bolk@triefandolk.com
TRIEF & OLK
150 E 58th street
34th Floor
New york, NY 10155
Tel: 212-486-6060
Fax: 212-317-2946

/s/ Edward Adam Webb
Edward Adam Webb, Esquire
Georgia Bar No. 743910
adam@webllc.com
G. Franklin Lemond, Jr., Esquire
Georgia Bar No. 141315
flemond@webbllc.com
WEBB, KLASE & LEMOND, L.L.C.
1900 The Exchange SE, Suite 480
Atlanta, GA 30339
Tel: 770-444-9325
Fax: 770-444-0271

/s/ Russell W. Budd
Russell W. Budd, Esquire
Texas Bar No. 03312400
rbudd@baronbudd.com
/s/ Bruce W. Steckler
Bruce W. Steckler, Esquire
Texas Bar No. 00785039
bsteckler@baronbudd.com
/s/ Melissa K. Hutts
Melissa K. Hutts, Esquire
Texas Bar No.  0188015
mhutts@baronbudd.com
BARON & BUDD, P.C.
3102 Oak Lawn Avenue
Suite 1100
Dallas, TX 75219
Tel: 214-521-3605
Fax: 214-520-1181

*Plaintiffs' Executive Committee*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:09-MD-02036-JLK

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

CERTIFICATE OF SERVICE

I hereby certify that on this May 13, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Robert C. Gilbert
Robert C. Gilbert, Esquire
Florida Bar No. 561861
ALTERS BOLDT BROWN
RASH & CULMO, P.A.
4141 N.E. 2nd Avenue, Suite 201
Miami, Florida 33137
bobby@abbrclaw.com