**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 1:09-MD-02036-JLK**

| |
|---|
| **IN RE: CHECKING ACCOUNT OVERDRAFT LITIGATION**<br><br>**MDL No. 2036** |

| |
|---|
| **THIS DOCUMENT RELATES TO:**<br><br>*Casayuran, et al v. PNC Bank, National Association.*<br>S.D. FL. Case No. 10-cv-20496-JLK |

## AMENDED CLASS ACTION COMPLAINT

Plaintiff, through undersigned counsel, on behalf of himself and all similarly situated New Jersey residents, alleges the following based on personal knowledge as to allegations regarding the Plaintiff and on information and belief as to other allegations.

## INTRODUCTION

1.      This is a civil action seeking monetary damages, restitution and declaratory relief from Defendant PNC Bank, N.A. ("PNC" or the "Bank"), arising from its unfair and unconscionable assessment and collection of excessive overdraft fees.

2.      Upon information and belief, PNC Bank acquired National City Corporation via stock purchase transaction before the end of 2008 and PNC is responsible for the liabilities of National City Corporation that are alleged in this Amended Class Action Complaint.  Complete conversion of all branches has not yet been accomplished.  As used herein, PNC or the Bank includes National City Corporation.

3.      In the era of electronic banking and the ubiquitous use of debit card transactions, the assessment of overdraft fees has become a major profit center for many United States banks, including the Bank.  For years, banks covered customers who occasionally bounced checks and even did so for a time for customers using debit cards, without charging their customers.  Since the early 1990's, however, banks have devised methods to provide overdraft "protection" for customers and charge them in each instance.  A recent FDIC report estimated that overdraft fees represent 74 percent of the total service charges that are imposed on deposit accounts in the United States.  A 2008 FDIC study reports that overdraft fees for debit cards can carry an effective annualized interest rate that *exceeds 3,500 percent*.  Nonetheless, the Consumer Federation of America reports that five of the ten largest banks raised their overdraft fees in the last year.

4.      In 2007, banks collected more than $17 billion in overdraft fees.  That number nearly doubled in 2008, as more and more consumers struggled to maintain positive checking account balances.  *In 2009, banks are estimated to have brought in between $27 billion to $38.5 billion in overdraft charges alone.*  As one of the largest retail banks in the country, PNC is among the largest beneficiaries of these staggering charges.

5.      Almost by definition, these fees disproportionately affect the poor, who are most likely to maintain low balances.  Moebs Services, a research company that has conducted studies for the government as well as banks, estimates that 90 percent of overdraft fees are paid by the poorest 10 percent of banks' customer base.  Moreover, these fees have the tendency to create a domino effect, because the imposition of a service charge on an account with a negative balance will make it less likely that the account holder's balance will reach positive territory, resulting in more fees.

6.      Before debit cards existed, banks occasionally extended the courtesy of honoring paper checks written on overdrawn or otherwise deficient accounts for customers who were typically in good standing.  Banks extended this courtesy largely because the third party involved in a sales transaction allowed the customer to pay by check, expecting the funds to be available and the check to clear.  For example, if a customer wrote a check to purchase groceries, the grocery store would only know whether the check cleared *after* the groceries had been purchased.

7.      The same considerations are not present when customers use debit cards.  Banks could simply decline to honor debit or point of sale transactions where accounts lack sufficient funds to execute the transactions.  Retail and service transactions could still be executed if consumers presented an alternative form of payment.  ATM transactions could still proceed if banks provided a warning that an overdraft fee would be incurred, and customers chose to proceed nevertheless.  In fact, until a few years ago, most banks simply declined debit transactions that would overdraw an account.

8.      Instead of simply declining debit transactions when there are insufficient funds, or warning its customers that an overdraft fee will be assessed if they proceed with the transaction, PNC routinely processes such transactions and then charges its customers an overdraft fee of $31 (for the first three occurrences), $34 (for the fourth through sixth occurrences), or $36 (for each additional occurrence) (based on the number of insufficient/unavailable items during the current and previous eleven service charge cycles)—even when the transaction is for only a few dollars. This automatic, fee-based overdraft scheme is intentionally designed to maximize overdraft fee revenue for the Bank.  Additionally, in furtherance of its motive to generate obscene profits through the imposition of unconscionable overdraft fees, the Bank fails to adequately disclose to its customers that they may elect to opt out of overdraft protection.

9.      PNC's method of assessing overdraft fees can cost its account holders hundreds of dollars in a matter of days, or even hours, even though they may be overdrawn by only a few dollars.  Even more egregious, customer accounts may not actually be overdrawn at the time the Banks charges the overdraft fees, or at the time of the debit transaction.

10.     Thus, it is through manipulation and alteration of customers' transaction records that PNC maximizes overdraft penalties imposed on customers.

## JURISDICTION AND VENUE

11.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, and at least one Plaintiff is a resident of a different state than PNC.

12.     Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391 because PNC is subject to personal jurisdiction there and regularly conducts business in the District of New Jersey, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred and continue to occur in that District.

## THE PARTIES

13.     Plaintiff Virgilio S. Casayuran, Jr. is a resident of the state of New Jersey.

14.     PNC maintains its headquarters and principal place of business in Pittsburgh, PA. PNC conducts business throughout the State of New Jersey.  Among other things, PNC is engaged in the business of providing retail banking services to millions of consumers, including Plaintiff and members of the putative Class, which include the issuance of debit cards for use by its customers in conjunction with their checking accounts.

15.     PNC is a national bank, subject to the National Bank Act, 12 U.S.C. § 1, *et seq.*, and regulations promulgated by the Office of the Comptroller of the Currency.

## CLASS ALLEGATIONS

16.     Plaintiff brings this action on behalf of himself and all others New Jersey residents similarly situated pursuant to Fed. R. Civ. P. 23.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

17.     The proposed class is defined as:

> All PNC customers having accounts at branches in the State of New Jersey who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, incurred an overdraft fee as a result of PNC's practice of re-sequencing debit card transactions from highest to lowest (the "Class").

18.     Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

19.     Excluded from the Class are PNC, its parents, subsidiaries, affiliates, officers and directors, any entity in which PNC has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

20.     The members of the Class are so numerous that joinder is impractical.  The Class consists of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to PNC's records.

21.     The claims of the representative Plaintiff are typical of the claims of the Class in that the representative Plaintiff, like all Class members, was charged overdraft fees by the Bank as a result of its practice of re-sequencing debit card transactions from highest to lowest.  The representative Plaintiff, like all Class members, has been damaged by the Bank's misconduct in that he incurred and/or will continue to incur unfair and unconscionable overdraft charges. Furthermore, the factual basis of the Bank's misconduct is common to all Class members, and

represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Class.

22.     There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual Class members.

23.     Among the questions of law and fact common to the Class are whether the Bank:

a.     Does not clearly disclose and/or refuses to allow customers to opt out of its overdraft protection programs;

b.     Does not obtain affirmative consent from customers prior to processing transactions that will result in overdraft fees;

c.     Does not alert customers that a debit card transaction will trigger an overdraft fee, and does not provide customers with an opportunity to cancel such transactions;

d.     Manipulates and reorders transactions so that it can increase the number of overdraft fees;

e.     Manipulates and reorders debits from highest to lowest in order to maximize the number of overdrafts and, consequently, the amount of overdraft fees;

f.     Imposes overdrafts and overdraft fees when, but for reordering transactions, there would otherwise be sufficient funds in the account;

g.     Fails to provide customers with accurate balance information;

h.     Delays posting of transactions by customers using debit cards so that customers are charged overdraft fees on transactions, even though the customers had sufficient funds in their accounts to cover the transactions upon execution;

i.     Charges exorbitant overdraft fees that bear no relationship to the actual costs and risks of covering insufficient funds transactions;

j.        Breaches its covenant of good faith and fair dealing with Plaintiff and the other members of the Class through its overdraft policies and practices;

k.        Requires its customers to enter into standardized account agreements which include unconscionable provisions;

l.        Converts moneys belonging to Plaintiff and the other members of the Class through its overdraft policies and practices;

m.        Is unjustly enriched through its overdraft policies and practices; and

n.        Violates the consumer protection act of the State of New Jersey through its overdraft policies and practices.

24.        Other questions of law and fact common to the Class include:

a.        The proper method or methods by which to measure damages, and

b.        The declaratory relief to which the Class are entitled.

25.        Plaintiff's claims are typical of the claims of other Class members, in that they arise out of the same wrongful overdraft policies and practices and the same or substantially similar unconscionable provisions of the Bank's account agreements and other related documents.  Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other Class member.

26.        Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions.  Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

27.        A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of PNC, no

Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, Class members will continue to suffer losses and PNC's misconduct will proceed without remedy.

28.    Even if Class members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

## COMMON FACTUAL ALLEGATIONS

### A.    PNC Bank

29.    According to its website, PNC provides banking services to more than five million customers through 2500 branches and 6400 ATM machines across 15 states and the District of Columbia.

30.    One of the services provided by the Bank for customers who open a checking account is a debit card, also known as a check card or ATM card.  Through those debit cards, customers can engage in transactions using funds directly from their accounts by engaging in "debit" or "point of sale" ("POS") transactions, or may withdraw money from their accounts at automated teller machines ("ATMs").  Whether the card is used to execute POS transactions or to withdraw cash from ATM machines, the transaction is processed electronically.  As a result, the Bank is notified instantaneously when the card is swiped, and has the option to accept or decline transactions at such time.

31.     The Bank employs sophisticated software to automate its overdraft systems.  This program maximizes the number of overdrafts, and thus, the amount of overdraft fees charged per customer.

32.     As a result of PNC's manipulation and alteration of customers' transactions records, funds in a customer's account are depleted more rapidly and more overdraft fees are likely to be charged for multiple smaller transactions.  Indeed, overdraft charges are likely to occur at times when, but for the manipulation and alteration, there would be funds in the account and no overdraft would occur.  For example, if a customer, whose account had a $50 balance at the time PNC processed several transactions, made four transactions of $10 and one subsequent transaction of $100 on the same day, PNC would reorder the debits from largest to smallest, imposing four overdraft fees on the customer.  Conversely, if the $100 transaction were debited last—consistent with the actual order of transactions—only one overdraft fee would be assessed. *See* FDIC Study of Bank Overdraft Programs, November 2008, *available at*: http://www.fdic.gov/bank/analytical/overdraft/, at 11, n. 12.

### B.     PNC's Relevant Customer Documents Regarding Overdrafts

33.     Plaintiff and members of the Class maintain or maintained a checking account with PNC.  The terms of PNC's checking accounts are contained in standardized account holder agreements, presented to its customers on a "take it or leave it" basis, drafted and imposed by PNC, which was the party of vastly superior bargaining strength, and thus constitute agreements of adhesion.  A representative copy of the "Account Agreement for Personal Checking, Savings and Money Market Accounts" (the "Account Agreement"), covering all PNC accounts, is attached as Exhibit A.

34.     The Account Agreement consists of twenty-seven single-spaced pages, and directs PNC Customers to seven documents they should refer to, most of which are not contained

within the Account Agreement itself. PNC purports to bind Customers to the terms of its Account Agreement whether or not they have been given an opportunity to review the document: "…By signing the signature card and/or Account Registration, by using the account, by requesting or later adding products and/or services connected to the account…"[1]

35.    In small, non-emphasized print that appears five paragraphs under the subheading "Withdrawals," the Account Agreement, at page 4, states that PNC will exercise its discretion as to the order in which it will pay debits and whether it will pay overdrafts on customer accounts:

> … If there are sufficient funds to cover some but not all of your withdrawal orders, we [PNC] will exercise our discretion (i) in paying some but not all of the items, and (ii) to pay the items in any order. In exercising that discretion to pay in any order, we do not necessarily process items in the order in which we receive them. Our general practice is to post withdrawals from your account in order of the largest-to-smallest dollar item; in other words, beginning with the largest dollar item, then the next-largest dollar item, and so on until we reach the last, smallest-dollar item. The order in which we process these withdrawals may affect the total amount of overdraft fees charged to your Account. If, in our sole discretion, we choose to allow withdrawals for which there are not sufficient available funds, you agree to repay us immediately the amount of the funds advanced to you.

36.    Neither the Account Agreement, nor any related documents, disclose to customers that they have they have any ability to stop PNC from paying overdrafts.

37.    Instead, the Account Agreement confusingly references and incorporates separate documents, notably, a "Funds Availability Policy" and a "Consumer Schedule of Services Charges and Fees." [2]

38.    PNC compounds the confusion by including in the Account Agreement the policy relating to overdrafts for an optional service, "Overdraft Protection Agreement," that Plaintiff

---

[1] Exhibit A at 1.

[2] Exhibit A at 1, 10 ("All charges and other fees mentioned in this Agreement or otherwise applicable to your Account are detailed in our Consumer Schedule of Service Charges and Fees, a copy of which has been given to you, and which is a part of this Agreement.").

and many other Customers do not have. Customers who opt for "Overdraft Protection" are subject to the same debit ordering policy and overdraft fee schedule once they exceed their protection limit.

        **C.**      **PNC's Re-Ordering of Checking Account Transactions**

        39.      In an effort to maximize overdraft revenue, PNC manipulates and reorders debits from highest to lowest during given periods of time.  PNC reorders transactions for no reason other than to increase the number of exorbitant overdraft fees it can charge.  This practice violates New Jersey consumer protection laws and the covenant of good faith and fair dealing in the Bank's Account Agreement.

        40.      In addition, PNC misleads its customers regarding its reordering practices. Instead of unequivocally telling its customers that it will reorder debits from highest to lowest, the Bank states while its general practice is to post withdrawals in largest-to-smallest order, "we will exercise our discretion … to pay the items in any order.  In exercising that discretion to pay in any order, we do not necessarily process items in the order we receive them."  Moreover, in that same section of the Account Agreement, PNC indicates that "in determining whether you have sufficient funds in your account to cover a withdrawal, PNC Bank will consider: (1) the deposits and withdrawals posted that day to your account, and (2) all pending electronic transactions for which PNC has received notice…"  These statements are deceptive and/or unfair because it is, in fact, the Bank's practice to *always* reorder debits from highest to lowest, and because the Bank groups together POS transactions that occurred on subsequent days with POS transactions that occurred on earlier days, and reorders them so that higher debits that occurred on subsequent days are posted to its customers' accounts before lower debits that occurred on earlier days, contrary to the terms of the Account Agreement and its customers' reasonable

expectations.  The Bank's practices thus violate the covenant of good faith and fair dealing implied in PNC's Account Agreement as well as the consumer protection laws of New Jersey.

41.     Transactions involving debit cards used by PNC customers, including the withdrawal of cash from ATM machines and POS transactions with vendors, are processed electronically.  As a result, PNC is notified instantaneously when the customer's debit card is swiped, and has the option to accept or decline these transactions.

42.     Notwithstanding the instantaneous nature of these electronic debit card transactions, under PNC's posting system, it fails to post charges in the order in which they are assessed or received.  PNC developed a policy and employs a practice whereby account charges and debits are posted to its customers' accounts out of chronological order for the sole purpose of maximizing the number of overdraft transactions and, therefore, the amount of overdraft fees charged to its customers.

43.     Instead of processing such transactions in chronological order, PNC processes them starting with the largest debit and ending with the smallest debit, so as to generate the largest possible number of overdrafts and the greatest possible amount of overdraft fees.

44.     PNC refrains from immediately posting charges to a customer's account as it receives them—sometimes for multiple business days.  By holding charges rather than posting them immediately to an account, PNC is able to amass a number of charges on the account. Subsequently, PNC posts all of the amassed charges on a single date.  When the group of charges is eventually posted to the customer's account, PNC posts them in order of largest to smallest—not in the order in which they were received or in the order in which they were charged.  This delayed posting results in the imposition of multiple overdraft fees that would not otherwise be imposed.  The delayed posting also prevents customers from ascertaining the accurate balances for their accounts.

45.     PNC's policy and practice of posting charges from largest to smallest, rather than chronologically, or from smallest to largest, is specifically designed to maximize the generation of overdraft fees by triggering overdraft fees for account charges that would not otherwise result in such fees.

46.     PNC enforces an unconscionable policy whereby charges assessed are posted to customers' accounts in a non-chronological order, from highest to lowest, and are held for multiple days and then batched together, to maximize the number of overdraft transactions and fees.  PNC's processing practices substantially increase the likelihood that customers' smaller charges will result in multiple overdraft fees.  The practices provide PNC with substantially higher service fee revenues than it would otherwise achieve absent these practices.

47.     As a result, Plaintiff and members of the Class have been assessed overdraft fees for transactions which occurred when they actually had sufficient funds in their accounts to cover those transactions.

**D.     PNC's Cloaking of Accurate Balance Information**

48.     PNC actively promotes the convenience of its debit cards and other electronic debiting, but fails to provide customers with accurate balance information.  When customers execute account transactions, they generally do not have access to an accurate balance register or balance information.

49.     PNC provides inaccurate balance information to its customers through its electronic network.  In certain cases, PNC informs its customers that they have a positive balance when, in reality, they have a negative balance, despite PNC's actual knowledge of outstanding debits and transactions.

50.     Even when PNC has actual knowledge of outstanding transactions which have already created a negative balance in a customers' account, it encourages the customer to incur

more overdraft charges by approving—rather than prudently declining—subsequent debit card purchases and other electronic transactions.

51.     PNC also assesses overdraft fees at times when actual funds in the customer account are sufficient to cover all debits that have been submitted to the Bank for payment.  It does this by placing a "hold" on actual funds in the customer's account.  In doing so, PNC charges overdraft fees where it faces no risk, because the cash balance in the customer's account has not dropped below zero.

### E.     PNC's Failure to Notify Customers of Overdrafts or Advise Customers of Their Right to Opt Out

52.     At the time its debit cards are used in POS transactions or at ATMs, PNC is able to determine, almost instantaneously, whether there are sufficient funds in a customer's account to cover that particular transaction.  PNC has the technological capability to decline transactions (which it does when a pending transaction would exceed a pre-determined, overdraft tolerance limit for the account), or notify customers at that very moment that the particular debit card transaction would result in an overdraft.  PNC could give customers the option to decline the transaction to avoid incurring the overdraft fee, but it does not do so because it seeks to maximize the amount of revenue generated through its assessment of overdraft fees.

53.     Notwithstanding its technological capabilities and actual knowledge, PNC fails to provide notice to Plaintiff and the Class that a particular debit card transaction will result in an overdraft and, hence, an overdraft fee.  Because PNC's customers are not notified of the potential overdraft, and are not given the option of declining the debit card transaction or providing another form of payment, the customers incur monetary damages in the form of overdraft fees.

54.     PNC fails to give Plaintiff and Class members the choice of opting out of its overdraft scheme, thereby avoiding any overdraft fees from being incurred.

F.     **PNC's Overdraft Policies and Practices Are Contrary to Best Practices**

55.     By engaging in the conduct described herein, the Bank failed to follow the list of "best practices" for overdraft programs set forth in the "Joint Guidance on Overdraft Protection Programs" ("Joint Guidance") issued by the United States Department of the Treasury, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the National Credit Union Administration (collectively, the "Agencies").   A copy of the Joint Guidance is attached as Exhibit B.   These "best practice" recommendations include: "Provide election or opt-out of service.   Obtain affirmative consent of consumers to receive overdraft protection.   Alternatively, where overdraft protection is automatically provided, permit consumers to 'opt-out' of the overdraft program and provide a clear consumer disclosure of this option."   70 F.R. 9127-01, 9132.

56.     According to rules proposed by the Agencies: "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . .   This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee."   73 F.R. 28904-01, 28929 (May 19, 2008).

57.     The Joint Guidance also advises banks to "[a]lert customers before a transaction triggers any fees.   When consumers attempt to withdraw or transfer funds made available through an overdraft protection program, provide a specific consumer notice, where feasible, that completing the withdrawal may trigger the overdraft fees."   70 F.R. 9127, 9132.   The Joint Guidance further advises that "[t]his notice should be presented in a manner that permits consumers to cancel the attempted withdrawal or transfer after receiving the notice."   *Id.*

58.     Similarly, the list of "best practices" recommended in "Overdraft Protection: A Guide for Bankers," issued by the American Bankers Association, includes offering customers the option of "opting out" of any overdraft programs, and informing customers, before they access funds, that a particular point of sale or ATM transaction will cause them to incur an overdraft fee.  A copy of "Overdraft Protection: A Guide for Bankers" is attached as Exhibit C.

59.     PNC's overdraft policies make it difficult for customers to avoid injury even if they carefully track the balance in their account.  In fact, the Agencies have stated that "Injury" resulting from such policies "is not reasonably avoidable" by the consumer.  73 F.R. 28904-01, 28929.  "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available."

60.     On October 6, 2009, the Center for Responsible Lending issued a report entitled "Overdraft Explosion:  Bank Fees for Overdrafts Increase 35% in Two Years."  The report, attached as Exhibit D, finds that it is now "standard procedure to automatically enroll checking account customers in their most expensive overdraft loan program."  The report finds that debit card transactions account for more overdraft fees than traditional checks or any other type of transaction, even though "debit card transactions and ATM withdrawals . . . could easily be denied for no fee."  The report also finds that overdraft fees increased 35 percent from 2006 to 2008, and that over 50 million Americans overdrew their accounts in a 12 month period, with 27 million accounts incurring five or more overdraft fees.

61.    A chart from the research company Moebs Services shows that, in every year since 1992, banks have gained increased revenues from overdraft fees:



G.    **PNC's Unconscionable Provisions and Policies**

62.    The Bank's overdraft policies and practices are unconscionable in the following respects, among others:

a.    The Bank does not permit customers to or does not reasonably disclose to customers that they have the option to "opt out" of the Bank's overdraft scheme;

b.       The Bank does not obtain affirmative consent from checking account customers prior to processing a debit card transaction that will overdraw the account and result in an overdraft fee;

c.       The Bank does not alert customers that a debit card transaction will trigger an overdraft, and does not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

d.       The Account Agreement and related documents are contracts of adhesion in that they are standardized forms, imposed and drafted by the Bank, the party of vastly superior bargaining strength, and only relegate to the customer the opportunity to adhere to them or reject the agreements in their entirety;

e.       The amount of overdraft fees is disclosed in an ineffective, ambiguous, misleading and unfair manner, since it is not contained in the Account Agreement but, rather, in different and separate documents which are not signed by the depositor; and

f.       The Account Agreement and related documents provided to customers are ineffective, ambiguous, deceptive, unfair, and misleading.

H.       **Recently Announced Changes in PNC's Overdraft Policies and Practices Do Not Offer Any Remedial Benefits to Customers**

63.     PNC has announced plans to overhaul its overdraft policies as of August 15, 2010.  The changes do nothing to remedy the past wrongs to Plaintiff and the Class.  They do not retroactively reverse the charges wrongly debited from their accounts, nor do they prevent PNC from continuing its unfair and unconscionable methods of business.

I.       **PNC's Overdraft Practices Harmed Plaintiff**

64.     Plaintiff Virgilio S. Casayuran, Jr. is an account holder and customer of PNC.

- 18 -

65.     In connection with his account, PNC issued a debit card or cards to Mr. Casayuran.  A debit card allows customers to access their checking account funds by using the card to execute a transaction.  The charge is processed electronically, and the Bank has the option to accept or decline the transaction at the point of sale.

66.     Over the course of his banking relationship with PNC, the Bank wrongfully charged Mr. Casayuran multiple overdraft fees.  By way of illustration, PNC charged Mr. Casayuran with three $36 overdraft charges on December 2, 2008 and an additional $36 overdraft charge on December 3 for a total of $144.00.  Based on information and belief, the overdraft fees were based on the following ordering of transactions:

**Balance Sheet per PNC Reordering Scheme**
**(Debits Processed from Highest to Lowest)**

| | | Debits (-) | Credits (+) | Running Balance |
|---|---|---|---|---|
| | **Beginning Balance on December 2, 2008 (excluding a $60.00 cash deposit of December 1, 2008):** | | | **$55.59** |
| **Date Posted** | **Debit Description** | | | |
| 12/02/08 | EZ-Pass Electronic Debit | 70.00 | | -14.41 |
| | Debit Card Purchase | 27.20 | | -41.61 |
| | Debit Card Purchase | 5.85 | | -47.46 |
| | Debit Card Purchase | 2.12 | | -49.58 |
| | Insufficient Funds Fee | 36.00 | | -85.58 |
| | Insufficient Funds Fee | 36.00 | | -121.58 |
| | Insufficient Funds Fee | 36.00 | | -157.58 |
| 12/03/08 | Insufficient Funds Fee | 36.00 | | -193.58 |
| | | | | |
| | | | **Total Fees: $ 144.00** | |

67.     If PNC had not manipulated and reordered Mr. Casayuran's transactions from highest to lowest, he would not have incurred four overdraft fees.

68.     For instance, if PNC had posted the transactions from lowest to highest, Mr. Casayuran would have incurred only one overdraft fee instead of four:

**Balance Sheet if Debits Were Processed from Lowest to Highest**

|  |  | Debits (-) | Credits (+) | Running Balance |
|---|---|---|---|---|
|  | Beginning Balance on <u>December 2, 2008</u> (excluding a $60.00 cash deposit of December 1, 2008): |  |  | $55.59 |
| **Date Posted** | **Debit Description** |  |  |  |
| 12/02/08 | Debit Card Purchase | 2.12 |  | 53.47 |
| 12/02/08 | Debit Card Purchase | 5.85 |  | 47.62 |
| 12/02/08 | Debit Card Purchase | 27.20 |  | 20.42 |
| 12/02/08 | EZ-Pass Electronic Debit | 70.00 |  | -49.58 |
| 12/02/08 | Insufficient Funds Fee | 36.00 |  | -85.58 |
|  |  |  |  |  |
|  | **Total Fees: $ 36.00** |  |  |  |

69.     Likewise, if PNC had posted the transactions in chronological order, Mr.
Casayuran would have incurred only one overdraft fee instead of four:

**Balance Sheet if Debits Were Processed in Chronological Order**

|  |  | Debits (-) | Credits (+) | Running Balance |
|---|---|---|---|---|
|  | Beginning Balance on <u>December 2, 2008</u> (excluding the $60.00 cash deposit of December 1, 2008): |  |  | $55.59 |
| **Date Transacted** | **Debit Description** |  |  |  |
| 11/28/08 | Debit Card Purchase | 2.12 |  | 53.47 |
| 11/28/08 | Debit Card Purchase | 5.85 |  | 47.62 |
| 11/28/08 | Debit Card Purchase | 27.20 |  | 20.42 |
| 11/30/08 | EZ-Pass Electronic Debit | 70.00 |  | -49.58 |
| 12/02/08 | Insufficient Funds Fee | 36.00 |  | -85.58 |
|  |  |  |  |  |
|  | **Total Fees: $ 36.00** |  |  |  |

70.     Moreover, on December 1, 2008, after viewing his account balance online and
noting the sum of the *pending* debits, Mr. Casayuran made a cash teller deposit of $60.00.  Thus,
this deposit was made prior to the posting of all the outstanding debits.

71.     Had PNC posted the cash deposit on the day it was deposited, or even on the next
business day prior to the debits, no overdraft fees would have been incurred, even under the
Bank's reordering scheme:

**Balance Sheet under PNC Reordering Scheme
if Credit was Processed Prior to Debits**

| | | Debits (-) | Credits (+) | Running Balance |
|---|---|---|---|---|
| | **Beginning Balance on December 2, 2008:** | | | **$55.59** |
| **Date Posted** | **Debit Description** | | | |
| 12/02/08 | Deposit | | 60.00 | 115.59 |
| 12/02/08 | EZ-Pass Electronic Debit | 70.00 | | 45.59 |
| 12/02/08 | Debit Card Purchase | 27.20 | | 18.39 |
| 12/02/08 | Debit Card Purchase | 5.85 | | 12.54 |
| 12/02/08 | Debit Card Purchase | 2.12 | | 10.42 |
| | | | | |
| | | | **Total Fees: $ 0.00** | |

72.     PNC Bank failed to notify Plaintiff that he could be assessed overdraft fees on transactions even though there were sufficient funds in his checking account to cover the transaction at the time the transaction was executed.  In addition, PNC Bank never notified Plaintiff, at the time he executed the purported insufficient funds transactions described above, that his checking accounts were overdrawn or that he would be charged an overdraft fee as a result of the transactions.  Furthermore, PNC Bank paid, rather than returned, all of the debit card charges described above, even though Plaintiff's account purportedly lacked sufficient funds to cover the transactions.

73.     The overdraft charges assessed by Plaintiff are representative of hundreds of millions of dollars of overdraft fees that PNC Bank wrongfully assessed and deducted from its customers' accounts.  These wrongful takings are especially egregious considering the fact that the Bank approved each transaction and knew at the time of approval whether there were sufficient funds in the account to cover the transaction.

**J.      The Damages Sustained by Plaintiff and the Class**

74.     As shown by these examples, PNC's overdraft policies make it difficult for a customer to avoid injury even if the customer keeps close track of the balance in his or her account.  In fact, the Agencies have stated that "injury" resulting from such policies "is not

reasonably avoidable" by consumers.  73 F.R. 28904-01, 28929.  "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available." *Id.*

75.     According to rules proposed by the Agencies, "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . . This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee."  73 F.R. 28904-01, 28929 (May 19, 2008).

76.     Thus, as a consequence of the Bank's overdraft policies and practices, Plaintiff and the Class have been wrongfully forced to pay overdraft fees.  The Bank has improperly deprived Plaintiff and the Class of significant funds, causing ascertainable monetary losses and damages.

77.     As a consequence of the Bank's improper overdraft fees, the Bank has wrongfully deprived Plaintiff and the Class of funds to which the Bank had no legitimate claim.

78.     Plaintiff and members of the Class had sufficient funds in their accounts to cover at least some of the transactions for which they were charged overdraft fees.  Plaintiff and members of the Class either had adequate funds to cover the transactions posted to their accounts, or the accounts were allowed to become overdrawn, even by *de minimis* margins, exclusively so that the Bank could impose these wrongful charges.  In many instances, the

Bank's manipulation of the process for imposing overdraft fees triggered a cascade of charges that exponentially added to the charges it collected from Plaintiff and Class members.

79.     All conditions precedent to the relief sought herein have either occurred or have been performed or waived.

## FIRST CLAIM FOR RELIEF

### Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing[3]

80.     Plaintiff repeats paragraphs 1 through 79 above.

81.     Plaintiff and PNC have contracted for bank account deposit, checking, ATM and debit card services, as embodied in PNC's Account Agreement and related documentation.

82.     Good faith is an element of every contract pertaining to the assessment of overdraft fees.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

83.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of

---

[3] Certain states recognize a claim for breach of the covenant of good faith and fair dealing as a separate and independent claim from breach of contract.  Other states treat breach of the covenant of good faith and fair dealing as a species of breach of contract.  For the sake of convenience in this multi-district litigation, the Complaint pleads these two types of claims, which are substantively identical, in a single count.

the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

84. Since at least 2003, PNC has breached the covenant of good faith and fair dealing in the Account Agreement through its overdraft policies and practices as alleged herein.

85. Plaintiff and members of the Class have performed all, or substantially all, of the obligations imposed on them under the Account Agreement.

86. Plaintiff and members of the Class have sustained damages as a result of PNC's breach of the covenant of good faith and fair dealing.

## SECOND CLAIM FOR RELIEF

### Unconscionability

87. Plaintiff repeats paragraphs 1 through 79 above.

88. PNC's overdraft policies and practices are substantively and procedurally unconscionable in the following respects, among others:

a. The Bank does not permit customers to or reasonably disclose to customers that they can "opt out" of the Bank's overdraft scheme;

b. The Bank does not obtain affirmative consent from checking account customers prior to processing a transaction that will overdraw the account and result in an overdraft fee;

c. The Bank does not alert its customers that a debit card transaction will trigger an overdraft, and does not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

d. The Account Agreement and related documents, including the "Funds Availability Policy" and the "Consumer Schedule of Services Charges and Fees," are contracts of adhesion in that they are standardized forms, imposed and drafted by the Bank, which is a

party of vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement in its entirety;

> e.     The amount of overdraft fees is disclosed in an ineffective, ambiguous, misleading, and unfair manner, since it is not contained in the Account Agreement, but rather in a separate document which is not signed by the depositor; and

> f.     The Account Agreement and the related documents provided to customers are ineffective, ambiguous, deceptive, unfair, and misleading in that they do not unambiguously state that the Bank always reorders debits from high to low, even though PNC always reorders transactions in this way for customers in order to maximize overdrafts and overdraft fee revenues for the Bank.

89.     Considering the great business acumen and experience of PNC in relation to Plaintiff and the Class, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law.

90.     The imposition of overdraft charges which exceed the amount overdrawn (*e.g.*, the imposition of a $36 charge on an overdraft of less than $36) is itself unconscionable.  Such charges are not reasonably related to the Bank's cost of covering the overdraft and/or its risk of nonpayment (where the Bank pays the overdraft), or to the Bank's cost of returning the item unpaid (where the Bank does not pay the overdraft).

91.     Plaintiff and members of the Class have sustained damages as a result of PNC's unconscionable policies and practices as alleged herein.

## THIRD CLAIM FOR RELIEF

### Conversion

92.     Plaintiff repeats paragraphs 1 through 79 above.

93.     PNC had and continues to have a duty to maintain and preserve its customers' checking accounts and to prevent their diminishment through PNC's own wrongful acts.

94.     PNC has wrongfully collected overdraft fees from Plaintiff and the members of the Class, and has taken specific and readily identifiable funds from their accounts in payment of these fees in order to satisfy them.

95.     PNC has, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiff and the members of the Class, without legal justification.

96.     PNC continues to retain these funds unlawfully without the consent of Plaintiff or members of the Class.

97.     PNC intends to permanently deprive Plaintiff and the members of the Class of these funds.

98.     These funds are properly owned by Plaintiff and the members of the Class, not PNC, which now claims that it is entitled to their ownership, contrary to the rights of Plaintiff and the members of the Class.

99.     Plaintiff and the members of the Class are entitled to the immediate possession of these funds.

100.    PNC has wrongfully converted these specific and readily identifiable funds in violation of law.

101.    PNC's wrongful conduct is continuing.

102.    As a direct and proximate result of this wrongful conversion, Plaintiff and the members of the Class have suffered and continue to suffer damages.

103.    By reason of the foregoing, Plaintiff and the members of the Class are entitled to recover from PNC all damages and costs permitted by law, including all amounts that PNC has wrongfully converted.

## FOURTH CLAIM FOR RELIEF

### Unjust Enrichment

104.    Plaintiff repeats paragraphs 1 through 79 above.

105.    Plaintiff, on behalf of himself and the Class, asserts a common law claim for unjust enrichment.

106.    By means of PNC's wrongful conduct alleged herein, PNC knowingly provides banking services to Plaintiff and members of the Class that are unfair, unconscionable, and oppressive.

107.    PNC knowingly received and retained wrongful benefits and funds from Plaintiff and members of the Class.  In so doing, PNC acted with conscious disregard for the rights of Plaintiff and members of the Class.

108.    As a result of PNC's wrongful conduct as alleged herein, PNC has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Class.

109.    PNC's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

110.    Under the common law doctrine of unjust enrichment, it is inequitable for PNC to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of overdraft fees on Plaintiff and members of the Class in an unfair, unconscionable,

and oppressive manner.   PNC's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

111.   The financial benefits derived by PNC rightfully belong to Plaintiff and members of the Class.  PNC should be compelled to disgorge in a common fund for the benefit of Plaintiff and members of the Class all wrongful or inequitable proceeds received by the Bank.   A constructive trust should be imposed upon all wrongful or inequitable sums received by PNC traceable to Plaintiff and the members of the Class.

112.   Plaintiff and members of the Class have no adequate remedy at law.

## FIFTH CLAIM FOR RELIEF

## Violations of New Jersey Consumer Fraud Act

113.   Plaintiff repeats paragraphs 1 through 79 above.

114.   PNC engages in unfair business practices relating to the imposition of overdraft fees on consumers in violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-2, *et seq*.

115.   As redress for PNC's repeated and ongoing violations of these consumer protection statutes, Plaintiff and the Class are entitled to, *inter alia*, damages and declaratory relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class demand a jury trial on all claims so triable, and judgment as follows:

1.   Declaring PNC's overdraft fee policies wrongful, unfair and unconscionable;

2.   Restitution of all overdraft fees paid to PNC by Plaintiff and the Class, as a result of the wrongs alleged herein, within the applicable statutes of limitations, in an amount to be determined at trial;

3.   Disgorgement of the ill-gotten gains derived by PNC from its misconduct;

4.       Actual damages in an amount according to proof;

5.       Punitive and exemplary damages;

6.       Pre-judgment interest at the maximum rate permitted by applicable law;

7.       Costs and disbursements incurred by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

8.       Such other relief as this Court deems just and proper.


Dated:      June 7, 2010.


/s/ Bruce S. Rogow
Bruce S. Rogow, Esquire
Florida Bar No. 067999
bruce@abbrclaw.com
Robert C. Gilbert, Esquire
Florida Bar No. 561861
bobby@abbrclaw.com
ALTERS BOLDT BROWN
  RASH & CULMO, P.A.
4141 N.E. 2nd Avenue
Miami, Florida 33137
Tel:  (305) 571-8550
Fax:  (305) 571-8558

*Plaintiffs Lead Counsel*

/s/ Robert C. Josefsberg
Robert C. Josefsberg, Esquire
Florida Bar No. 40856
rjosefsberg@podhurst.com
Victor M. Diaz, Jr., Esquire
Florida Bar No. 503800
vdiaz@podhurst.com
John Gravante, III, Esquire
Florida Bar No. 617113
jgravante@podhurst.com
PODHURST ORSECK, P. A.
City National Bank Building
25 W Flagler Street
Suite 800
Miami, FL 33130-1780
Tel: 305-358-2800
Fax: 305-358-2382

/s/ Barry R. Himmelstein
Barry R. Himmelstein, Esquire
California Bar No. 157736
bhimmelstein@lchb.com
Michael W. Sobol, Esquire
California Bar No. 194857
msobol@lchb.com
Jordan Elias, Esquire
California Bar No. 228731
jelias@lchb.com
Mikaela Bernstein, Esquire
California Bar No. 261301
mbernstein@lchb.com
LIEFF CABRASER HEIMANN &
  BERNSTEIN LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Tel: 415-956-1000 / Fax: 415-956-1008

/s/ Ruben Honik
Ruben Honik, Esquire
Pennsylvania Bar No. 33109
rhonik@golombhonik.com
Kenneth J. Grunfeld
Pennsylvania Bar No. 84121
kgrunfeld@golombhonik.com
GOLOMB & HONIK, P.C.
1515 Market Street - Suite 1100
Philadelphia, PA 19102
Tel: 215-985-9177 / Fax: 215-985-4169

/s/ Ted E. Trief
Ted E. Trief, Esquire
New York Bar No. 1476662
ttrief@triefandolk.com
Barbara E. Olk, Esquire
New  York Bar No. 1459643
bolk@triefandolk.com
TRIEF & OLK
150 E 58th street - 34th Floor
New york, NY 10155
Tel: 212-486-6060 / Fax: 212-317-2946

/s/ Edward Adam Webb
Edward Adam Webb, Esquire
Georgia Bar No. 743910
adam@webllc.com
G. Franklin Lemond, Jr., Esquire
Georgia Bar No. 141315
flemond@webbllc.com
WEBB, KLASE & LEMOND, L.L.C.
1900 The Exchange SE, Suite 480
Atlanta, GA 30339
Tel: 770-444-9325
Fax: 770-444-0271

/s/ Russell W. Budd
Russell W. Budd, Esquire
Texas Bar No. 03312400
rbudd@baronbudd.com
Bruce W. Steckler, Esquire
Texas Bar No. 00785039
bsteckler@baronbudd.com
Melissa K. Hutts, Esquire
Texas Bar No.  0188015
mhutts@baronbudd.com
BARON & BUDD, P.C.
3102 Oak Lawn Ave. – Suite 1100
Dallas, TX 75219
Tel: 214-521-3605/ Fax: 214-520-1181

*Plaintiffs' Executive Committee*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 1:09-MD-02036-JLK**

**IN RE: CHECKING ACCOUNT**
**OVERDRAFT LITIGATION**

**MDL No. 2036**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 7, 2010, I electronically filed the foregoing document with

the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served

this day on all counsel of record or pro se parties identified on the attached Service List in the

manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF

or in some other authorized manner for those counsel or parties who are not authorized to receive

electronically Notices of Electronic Filing.

<u>/s/ Robert C. Gilbert</u>
Robert C. Gilbert, Esquire
Florida Bar No. 561861
ALTERS BOLDT BROWN
RASH & CULMO, P.A.
4141 N.E. 2nd Avenue, Suite 201
Miami, Florida 33137
bobby@abbrclaw.com