## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 1:09-MD-02036-JLK

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

THIS DOCUMENT RELATES TO:

*Casayuran, et al v. PNC Bank, National
Association.*
S.D. FL. Case No. 10-cv-20496-JLK

*Cowen, et al. v. PNC Bank, National
Association.*
S.D. FL. Case No. 10-cv-21869-JLK

*Hernandez, et al. v. PNC Bank, N.A.*
S.D. FL. Case No. 10-cv-21868-JLK

*Matos v. National City Bank*
S.D. FL. Case No. 10-cv-21771-JLK

### CONSOLIDATED AMENDED CLASS ACTION COMPLAINT[1]

Plaintiffs, through undersigned counsel, on behalf of themselves and all persons similarly

situated, allege the following based on personal knowledge as to allegations regarding the

Plaintiffs and on information and belief as to other allegations.

---

[1] By filing this Consolidated Amended Complaint, Plaintiffs consolidate all previously-filed
Complaints that have been transferred to this Court in connection with *In Re: Checking Account
Overdraft Litigation*, MDL No. 2036 for all purposes, including trial.  "[A]n amended complaint
asserting venue in the transferee district" filed in the MDL court gives the transferee court the
authority "to resolve the multidistrict litigation through trial while remaining faithful to the
*Lexecon* limitations."  *See* Manual for Complex Litig. Fourth § 20.132 at 224-25 (*citing Lexecon,
Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 118 S.Ct. 956, 140 L.Ed.2d 62
(1998)).

## INTRODUCTION

1.      This is a civil action seeking monetary damages, restitution and declaratory relief from Defendants PNC Bank, N.A. ("PNC") and National City Corporation ("National City") (collectively "the Banks"), arising from their unfair and unconscionable assessment and collection of excessive overdraft fees.

2.      PNC acquired National City via a stock purchase transaction on or about October 24, 2008.  Beginning on the date of the transaction and continuing through June of 2010, PNC integrated National City's customers into its PNC customer base.  As of the current time, all former National City customers (whose accounts have not been closed) are now customers of PNC.  PNC assumed the liabilities of National City associated with the claims asserted herein that occurred prior to the acquisition, in addition to its own independent liability for the claims asserted herein by customers who (i) became PNC customers as a result of the transaction with National City and/or (ii) were not previously National City customers.

3.      In the era of electronic banking and the ubiquitous use of debit card transactions, the assessment of overdraft fees has become a major profit center for many United States banks, including the Banks.  For years, banks covered customers who occasionally bounced checks and even did so for a time for customers using debit cards, without charging their customers.  Since the early 1990's, however, banks have devised methods to provide overdraft "protection" for customers and charge them in each instance.  A recent FDIC report estimated that overdraft fees represent 74 percent of the total service charges that are imposed on deposit accounts in the United States.  A 2008 FDIC study reports that overdraft fees for debit cards can carry an effective annualized interest rate that *exceeds 3,500 percent*.  Nonetheless, the Consumer Federation of America reports that five of the ten largest banks raised their overdraft fees in the last year.

2

4.      In 2007, banks collected more than $17 billion in overdraft fees.  That number nearly doubled in 2008, as more and more consumers struggled to maintain positive checking account balances.  *In 2009, banks are estimated to have brought in between $27 billion to $38.5 billion in overdraft charges alone.*  As one of the largest retail banks in the country, PNC and National City are and/or were among the largest beneficiaries of these staggering charges.

5.      Almost by definition, these fees disproportionately affect the poor, who are most likely to maintain low balances.  Moebs Services, a research company that has conducted studies for the government as well as banks, estimates that 90 percent of overdraft fees are paid by the poorest 10 percent of banks' customer base.  Moreover, these fees have the tendency to create a domino effect, because the imposition of a service charge on an account with a negative balance will make it less likely that the account holder's balance will reach positive territory, resulting in more fees.

6.      Before debit cards existed, banks occasionally extended the courtesy of honoring paper checks written on overdrawn or otherwise deficient accounts for customers who were typically in good standing.  Banks extended this courtesy largely because the third party involved in a sales transaction allowed the customer to pay by check, expecting the funds to be available and the check to clear.  For example, if a customer wrote a check to purchase groceries, the grocery store would only know whether the check cleared *after* the groceries had been purchased.

7.      The same considerations are not present when customers use debit cards.  Banks could simply decline to honor debit or point of sale transactions where accounts lack sufficient funds to execute the transactions.  Retail and service transactions could still be executed if consumers presented an alternative form of payment.  ATM transactions could still proceed if

banks provided a warning that an overdraft fee would be incurred, and customers chose to proceed nevertheless.   In fact, until a few years ago, most banks simply declined debit transactions that would overdraw an account.

8.      Prior to the effective date of Regulation E, instead of simply declining debit transactions when there are insufficient funds, or warning its customers that an overdraft fee will be assessed if they proceed with the transaction, the Banks routinely processed such transactions and then charged their customers an overdraft fee.   PNC, for example, assessed overdraft fees of $31 (for the first three occurrences), $34 (for the fourth through sixth occurrences), or $36 (for each additional occurrence) (based on the number of insufficient/unavailable items during the current and previous eleven service charge cycles)—even when the transaction was for only a few dollars. National City, in comparison, charged $36 for each overdraft occurrence.   These automatic, fee-based overdraft schemes were intentionally designed to maximize overdraft fee revenue for the Banks.   Additionally, in furtherance of their motives to generate obscene profits through the imposition of unconscionable overdraft fees, the Banks failed to adequately disclose to customers that they could elect to opt out of overdraft protection.

9.      The Banks' method of assessing overdraft fees cost account holders hundreds of dollars in a matter of days, or even hours, even though they may have been overdrawn by only a few dollars.   Even more egregious, customer accounts may not actually have been overdrawn at the time the Banks charged the overdraft fees, or at the time of the debit transactions.

10.     Thus, it is through manipulation and alteration of customers' transaction records that PNC and National City maximized overdraft penalties imposed on customers.

## JURISDICTION AND VENUE

11.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.   Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction

because the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, and at least one Plaintiff is a resident of a different state than PNC and National City.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1407(a).  Venue was proper in the districts where these actions were originally filed because PNC and National City were subject to personal jurisdiction there and regularly conducted business in the original districts, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in these districts.

## THE PARTIES

13.     Plaintiff Virgilio S. Casayuran, Jr. is a resident of the state of New Jersey.

14.     Plaintiffs Michael D. and Nicole Cowen are residents of the Commonwealth of Pennsylvania.

15.     Plaintiffs Eric and Monica DeRosia are residents of the State of Michigan.

16.     Plaintiffs Michael and April (Edelman) Dorney are residents of the Commonwealth of Pennsylvania.

17.     Plaintiff Fernando Hernandez is a resident of the State of Illinois.

18.     Plaintiff Raymond A. Langford is a resident of the State of Ohio.

19.     Plaintiff Robert A. Matos is a resident of the State of Illinois.

20.     PNC maintains its headquarters and principal place of business in Pittsburgh, PA. PNC conducts business throughout the State of Florida, including in this district.  Among other things, PNC is engaged in the business of providing retail banking services to millions of consumers, including Plaintiffs and members of the putative Classes, which include the issuance of debit cards for use by its customers in conjunction with their checking accounts.

21.     National City was headquartered in Pittsburgh, Pennsylvania.   National City regularly and systematically conducted business within the State of Florida, including in this district.   Among other things, National City engaged in the business of providing retail banking services to millions of consumers, including Plaintiffs and members of the putative Classes, which include the issuance of debit cards for use by its customers in conjunction with their checking accounts.   As alleged above, National City was recently acquired by PNC.   In connection with that transaction, all National City customers who did not close their accounts or otherwise cease doing business with National City following the acquisition have been converted to PNC customers.

22.     PNC is a national bank, subject to the National Bank Act, 12 U.S.C. § 1, *et seq.*, and regulations promulgated by the Office of the Comptroller of the Currency.

## CLASS ALLEGATIONS

23.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23.   This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

24.     The proposed classes are defined as:

> All customers in the United States who were not National City customers prior to the PNC/National City transaction and who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, incurred an overdraft fee as a result of PNC's practice of re-sequencing debit card transactions from highest to lowest dollar amount (the "PNC National Class") (*see* First through Fourth Claims for Relief, *infra*).

All customers having accounts at branches in the Commonwealth of Pennsylvania, the State of Illinois and the State of New Jersey who were not National City customers at the time of the PNC/National City transaction and who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, incurred an overdraft fee as a result of PNC's practice of re-sequencing debit card transactions from highest to lowest dollar amount (the "PNC State Subclasses") (*see* Fifth Claim for Relief, *infra*).

All customers in the United States who were National City customers prior to the PNC/National City transaction and who, within the applicable statute of limitations preceding the filing of this action to the date liability for their accounts was assumed by PNC, incurred an overdraft fee as a result of National City's practice of re-sequencing debit card transactions from highest to lowest dollar amount (the "National City National Class") (*see* First through Fourth Claims for Relief, *infra*).

All customers having accounts at branches in the state of Illinois who were National City customers prior to the PNC/National City transaction and who, within the applicable statute of limitations preceding the filing of this action to the date liability for their accounts was assumed by PNC, incurred an overdraft fee as a result of National City's practice of re-sequencing debit card transactions from highest to lowest dollar amount (the "National City State Subclass") (*see* Fifth Claim for Relief, *infra*).

The National Classes for PNC and National City and the State Subclasses for the respective banks are collectively referred to as the "Classes."

25.     Plaintiffs reserve the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

26.     Excluded from the Classes are PNC and/or National City, their parents, subsidiaries, affiliates, officers and directors, any entity in which PNC and/or National City has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

27.     The members of the Classes are so numerous that joinder is impractical.  The Classes consists of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to the Banks' records.

28.     The claims of the representative Plaintiffs are typical of the claims of the Classes in that the representative Plaintiffs, like all Class members, were charged overdraft fees by the Banks as a result of their practice of re-sequencing debit card transactions from highest to lowest. The representative Plaintiffs, like all Class members, have been damaged by the Banks' misconduct in that they incurred and/or will continue to incur unfair and unconscionable overdraft charges.  Furthermore, the factual basis of the Banks' misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.

29.     There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual Class members.

30.     Among the questions of law and fact common to the Classes are whether the Banks:

a.     Did not clearly disclose and/or refused to allow customers to opt out of their overdraft protection programs;

b.     Did not obtain affirmative consent from customers prior to processing transactions that resulted in overdraft fees;

c.     Did not alert customers that a debit card transaction would trigger an overdraft fee, and did not provide customers with an opportunity to cancel such transactions;

d.     Manipulated and reordered transactions so that it increased the number of overdraft fees;

e.     Manipulated and reordered debits from highest to lowest in order to maximize the number of overdrafts and, consequently, the amount of overdraft fees;

      f.      Imposed overdrafts and overdraft fees when, but for reordering transactions, there would otherwise be sufficient funds in the accounts;

      g.      Failed to provide customers with accurate balance information;

      h.      Delayed posting of transactions by customers using debit cards so that customers were charged overdraft fees on transactions, even though the customers had sufficient funds in their accounts to cover the transactions upon execution;

      i.      Charged exorbitant overdraft fees that bore no relationship to the actual costs and risks of covering insufficient funds transactions;

      j.      Breached their covenant of good faith and fair dealing with Plaintiffs and the other members of the Classes through their overdraft policies and practices;

      k.      Required their customers to enter into standardized account agreements which included unconscionable provisions;

      l.      Converted moneys belonging to Plaintiffs and the other members of the Classes through their overdraft policies and practices;

      m.      Were unjustly enriched through their overdraft policies and practices; and

      n.      Violated the consumer protection acts of certain states through their overdraft policies and practices.

31.      Other questions of law and fact common to the Classes include:

      a.      The proper method or methods by which to measure damages, and

      b.      The declaratory relief to which the Classes are entitled.

32.      Plaintiffs' claims are typical of the claims of other Class members, in that they arise out of the same wrongful overdraft policies and practices and the same or substantially similar unconscionable provisions of the Banks' account agreements and other related

documents.  Plaintiffs suffered the harm alleged and have no interests antagonistic to the interests of any other Class member.

33.     Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions.  Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Classes.

34.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of PNC and/or National City, no Class member could afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, the Banks' misconduct alleged herein will not be remedied.

35.     Even if Class members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court.  Individualized litigation would also create the potential for inconsistent or contradictory rulings.  By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

## COMMON FACTUAL ALLEGATIONS

### A.      PNC Bank

36.      According to its website, PNC provides banking services to more than five million customers through 2500 branches and 6400 ATM machines across 15 states and the District of Columbia.

37.      One of the services provided by the PNC for customers who open a checking account is a debit card, also known as a check card or ATM card.  Through those debit cards, customers can engage in transactions using funds directly from their accounts by engaging in "debit" or "point of sale" ("POS") transactions, or may withdraw money from their accounts at automated teller machines ("ATMs").  Whether the card is used to execute POS transactions or to withdraw cash from ATM machines, the transaction is processed electronically.  As a result, PNC is notified instantaneously when the card is swiped, and has the option to accept or decline transactions at such time.

38.      PNC employs sophisticated software to automate its overdraft systems.  This program maximizes the number of overdrafts, and thus, the amount of overdraft fees charged per customer.

39.      As a result of PNC's manipulation and alteration of customers' transactions records, funds in a customer's account are depleted more rapidly and more overdraft fees are likely to be charged for multiple smaller transactions.  Indeed, overdraft charges are likely to occur at times when, but for the manipulation and alteration, there would be funds in the account and no overdraft would occur.  For example, if a customer, whose account had a $50 balance at the time PNC processed several transactions, made four transactions of $10 and one subsequent transaction of $100 on the same day, PNC would reorder the debits from largest to smallest, imposing five overdraft fees on the customer.  Conversely, if the $100 transaction were debited

last—consistent with the actual order of transactions—only one overdraft fee would be assessed. *See* FDIC Study of Bank Overdraft Programs, November 2008, *available at*: http://www.fdic.gov/bank/analytical/overdraft/, at 11, n. 12.

**B.     PNC's Relevant Customer Documents Regarding Overdrafts**

40.     The terms of PNC's checking accounts are contained in standardized account holder agreements, presented to its customers on a "take it or leave it" basis, drafted and imposed by PNC, which was the party of vastly superior bargaining strength, and thus constitute agreements of adhesion.   A representative copy of the "Account Agreement for Personal Checking, Savings and Money Market Accounts" (the "PNC Account Agreement") is attached as Exhibit A.

41.     The PNC Account Agreement consists of twenty-seven, single-spaced pages, and directs customers to seven documents they should refer to, most of which are not contained within the PNC Account Agreement itself. PNC purports to bind customers to the terms of the PNC Account Agreement, regardless of whether or not they have been given an opportunity to review the document:  "…By signing the signature card and/or Account Registration, by using the account, by requesting or later adding products and/or services connected to the account…"[2]

42.     In small, non-emphasized print that appears five paragraphs under the subheading "Withdrawals," the PNC Account Agreement, at page 4, states that PNC will exercise its discretion as to the order in which it will pay debits and whether it will pay overdrafts on customer accounts:

> … If there are sufficient funds to cover some but not all of your withdrawal orders, we [PNC] will exercise our discretion (i) in paying some but not all of the items, and (ii) to pay the items in any order. In exercising that discretion to pay in any order, we do not necessarily process items in the

---

[2] Exhibit A at 1.

12

order in which we receive them. Our general practice is to post withdrawals from your account in order of the largest-to-smallest dollar item; in other words, beginning with the largest dollar item, then the next-largest dollar item, and so on until we reach the last, smallest-dollar item. The order in which we process these withdrawals may affect the total amount of overdraft fees charged to your Account. If, in our sole discretion, we choose to allow withdrawals for which there are not sufficient available funds, you agree to repay us immediately the amount of the funds advanced to you.

43.     Neither the PNC Account Agreement, nor any related documents, disclosed to customers that they had any ability to opt out of this program or otherwise stop PNC from paying overdrafts.

44.     Instead, the PNC Account Agreement confusingly references and incorporates separate documents, notably, a "Funds Availability Policy" and a "Consumer Schedule of Services Charges and Fees."[3]

45.     PNC compounds the confusion by including in the PNC Account Agreement the policy relating to overdrafts for an optional service, "Overdraft Protection Agreement," that Plaintiffs and many other customers did not have. Customers who opted for "Overdraft Protection" were subject to the same debit ordering policy and overdraft fee schedule once they exceed their protection limit.

C.     **PNC's Re-Ordering of Checking Account Transactions**

46.     In an effort to maximize overdraft revenue, PNC manipulates and reorders debits from highest to lowest during given periods of time.  PNC reorders transactions for no reason other than to increase the number of exorbitant overdraft fees it can charge.  This practice violates consumer protection laws and the covenant of good faith and fair dealing in the PNC Account Agreement.

---

[3] Exhibit A at 1, 10 ("All charges and other fees mentioned in this Agreement or otherwise applicable to your Account are detailed in our Consumer Schedule of Service Charges and Fees, a copy of which has been given to you, and which is a part of this Agreement.").

47.     In addition, PNC misleads its customers regarding its reordering practices. Instead of unequivocally telling its customers that it will reorder debits from highest to lowest, the Bank states that while its general practice was to post withdrawals in largest-to-smallest order, "we will exercise our discretion … to pay the items in any order.  In exercising that discretion to pay in any order, we do not necessarily process items in the order we receive them." Moreover, in that same section of the PNC Account Agreement, PNC indicates that "in determining whether you have sufficient funds in your account to cover a withdrawal, PNC Bank will consider: (1) the deposits and withdrawals posted that day to your account, and (2) all pending electronic transactions for which PNC has received notice…"  These statements are deceptive and/or unfair because it was, in fact, the Bank's practice to *always* reorder debits from highest to lowest, and because the Bank grouped together POS transactions that occurred on subsequent days with POS transactions that occurred on earlier days, and reordered them so that higher debits that occurred on subsequent days were posted to its customers' accounts before lower debits that occurred on earlier days, contrary to the terms of the PNC Account Agreement and its customers' reasonable expectations.  PNC's practices thus violate the covenant of good faith and fair dealing implied in PNC's Account Agreement as well as consumer protection laws.

48.     Transactions involving debit cards used by PNC customers, including the withdrawal of cash from ATM machines and POS transactions with vendors, are processed electronically.  As a result, PNC is notified instantaneously when the customer's debit card is swiped, and has the option to accept or decline these transactions.

49.     Notwithstanding the instantaneous nature of these electronic debit card transactions, under PNC's posting system, it fails to post charges in the order in which they were assessed or received.  PNC developed a policy and employs a practice whereby account charges

and debits were posted to its customers' accounts out of chronological order for the sole purpose of maximizing the number of overdraft transactions and, therefore, the amount of overdraft fees charged to its customers.

50.     Instead of processing such transactions in chronological order, PNC processes them starting with the largest debit and ending with the smallest debit, so as to generate the largest possible number of overdrafts and the greatest possible amount of overdraft fees.

51.     PNC refrains from immediately posting charges to a customer's account as it received them—sometimes for multiple business days.  By holding charges rather than posting them immediately to an account, PNC is able to amass a number of charges on the account. Subsequently, PNC posted all of the amassed charges on a single date.  When the group of charges was eventually posted to the customer's account, PNC posts them in order of largest to smallest—not in the order in which they were received or in the order in which they were charged.  This delayed posting results in the imposition of multiple overdraft fees that would not otherwise have been imposed.  The delayed posting also prevents customers from ascertaining the accurate balances for their accounts.

52.     PNC's policy and practice of posting charges from largest to smallest, rather than chronologically, or from smallest to largest, is and/or was specifically designed to maximize the generation of overdraft fees by triggering overdraft fees for account charges that would not have otherwise resulted in such fees.

53.     PNC enforces an unconscionable policy whereby charges assessed were posted to customers' accounts in a non-chronological order, from highest to lowest, and were held for multiple days and then batched together, to maximize the number of overdraft transactions and fees.  PNC's processing practices substantially increase the likelihood that customers' smaller

charges would result in multiple overdraft fees.  The practices provide PNC with substantially higher service fee revenues than it would otherwise achieved absent these practices.

54.     As a result, Plaintiffs and members of the Classes are or were assessed overdraft fees for transactions which occurred when they actually had sufficient funds in their accounts to cover those transactions.

### D.     PNC's Cloaking of Accurate Balance Information

55.     PNC actively promotes the convenience of its debit cards and other electronic debiting, but fails to provide customers with accurate balance information.  When customers execute account transactions, they generally did not have access to an accurate balance register or balance information.

56.     PNC provides inaccurate balance information to its customers through its electronic network.  In certain cases, PNC informs its customers that they have a positive balance when, in reality, they have a negative balance, despite PNC's actual knowledge of outstanding debits and transactions.

57.     Even when PNC has actual knowledge of outstanding transactions which have already created a negative balance in a customers' account, it encourages the customer to incur more overdraft charges by approving—rather than prudently declining—subsequent debit card purchases and other electronic transactions.

58.     PNC also assesses overdraft fees at times when actual funds in the customer account are or were sufficient to cover all debits that had been submitted to the Bank for payment.  It does this by placing a "hold" on actual funds in the customer's account.  In doing so, PNC charges overdraft fees where it faced no risk, because the cash balance in the customer's account has not dropped below zero.

**E.**     **PNC's Failure to Notify Customers of Overdrafts or Advise Customers of Their Right to Opt Out**

59.     At the time its debit cards were used in POS transactions or at ATMs, PNC was able to determine, almost instantaneously, whether there were sufficient funds in a customer's account to cover that particular transaction.  PNC had the technological capability to decline transactions (which it did when a pending transaction would exceed a pre-determined, overdraft tolerance limit for the account), or notify customers at that very moment that the particular debit card transaction would result in an overdraft.  Prior to the effective date of the opt in/opt out requirements of Regulation E (the "Effective Date"), PNC could have given customers the option to decline the transaction in order to avoid incurring the overdraft fee, but it did not do so because it sought to maximize the amount of revenue generated through its assessment of overdraft fees.

60.     Notwithstanding its technological capabilities and actual knowledge, PNC failed to provide notice to Plaintiffs and the PNC Classes that a particular debit card transaction would result in an overdraft and, hence, an overdraft fee.  Because PNC's customers were not notified of the potential overdraft, and were not given the option of declining the debit card transaction or providing another form of payment, the customers incurred damages in the form of overdraft fees.

61.     Prior to the Effective Date, PNC failed to give Plaintiffs and the PNC Class members the choice of opting out of its overdraft scheme, thereby avoiding any overdraft fees from being incurred.

**F.**     **National City**

62.     Prior to being acquired by PNC, National City was a financial institution with principle markets in the Eastern and Midwestern United States.

63.     National City was in the business of providing its customers with a variety of banking services.  One of the services provided by National City for customers who opened a checking account is a debit card, also known as a check card or ATM card.  Through those debit cards, customers could engage in transactions using funds directly from their accounts by engaging in "debit" or "point of sale" ("POS") transactions, or could withdraw money from their accounts at automated teller machines ("ATMs").  Whether the card was used to execute POS transactions or to withdraw cash from ATMs, the transaction were processed electronically.  As a result, National City was notified instantaneously when the card was swiped, and had the option to accept or decline transactions at such time.

64.     National City employed sophisticated software to automate its overdraft system.  This program maximized the number of overdrafts, and thus, the amount of overdraft fees charged per customer.

65.     As a result of National City's manipulation and alteration of customers' transactions records, funds in a customer's account were depleted more rapidly and more overdraft fees were likely to be charged for multiple smaller transactions.  Indeed, overdraft charges were likely to occur at times when, but for the manipulation and alteration, there would have been funds in the account and no overdraft would occur.  For example, if a customer, whose account had a $50 balance at the time National City posted several transactions, made four transactions of $10 and one subsequent transaction of $100, the Bank reordered the debits from largest to smallest, imposing five overdraft fees.  Conversely, if the $100 transaction were debited last – consistent with the actual order of transactions – only one overdraft fee would have been assessed.  *See* FDIC Study of Bank Overdraft Programs, November 2008, *available at*: http://www.fdic.gov/bank/analytical/overdraft/, at 11, n. 12.

### G.   National City's Relevant Customer Documents Regarding Overdrafts

66.     The terms of National City's checking accounts were contained in standardized account holder agreements, presented to its customers on a "take it or leave it" basis, drafted and imposed by National City, which was the party of vastly superior bargaining strength, and thus constitute agreements of adhesion.  A representative copy of the "Personal Account Agreement" (the "National City Account Agreement"), covering customers maintaining accounts like Plaintiffs was over 30 pages long, and is attached as Exhibit B.

67.     The National City Account Agreement stated that National City "reserves the right to pay items and Entries in any order."

68.     The National City Account Agreement also stated that "although Bank has no obligation to permit an overdraft, Bank may do so."

69.     The National City Account Agreement and related documents failed to provide customers the ability to "opt out" from National City's overdraft scheme.

### H.   National City's Reordering of Checking Account Transactions

70.     In an effort to maximize overdraft revenue, National City manipulated and reordered debits from highest to lowest amount during given periods of time.  National City reordered debit card transactions for no reason other than to increase the number of exorbitant overdraft fees it could charge.  This practice violated numerous consumer protection laws and the covenant of good faith and fair dealing as applied to the National City Account Agreement.

71.     In addition, National City misled its customers regarding its reordering practices. Instead of unequivocally telling its customers that it would reorder debits from highest to lowest, National City stated that it "reserves the right to pay items and Entries in any order."  This statement was deceptive and/or unfair because it was, in fact, National City's practice to *always* reorder debits from highest to lowest, and because National City grouped together POS

transactions that occurred on subsequent days with POS transactions that occurred on earlier days, and reordered them so that higher debits that occurred on subsequent days were posted to its customers' accounts before lower debits that occurred on earlier days, contrary to the terms of the National City Account Agreement and its customers' reasonable expectations.   National City's practices thus violated the National City Account Agreement as modified by the covenant of good faith and fair dealing as well as the consumer protection laws.

72.   Transactions involving debit cards used by National City customers, including the withdrawal of cash from ATMs and POS transactions with vendors, were processed electronically.  As a result, National City was notified instantaneously when the customer's debit card was swiped, and had the option to accept or decline these transactions.

73.   Notwithstanding the instantaneous nature of these electronic debit card transactions, under National City's posting system, it failed to post charges in the order in which they were assessed or received.  National City developed a policy and employs a practice whereby account charges and debits were posted to its customers' accounts out of chronological order for the sole purpose of maximizing the number of overdraft transactions and, therefore, the amount of overdraft fees charged to its customers.

74.   Instead of processing such transactions in chronological order, National City processed them starting with the largest debit and ending with the smallest debit, so as to generate the largest possible number of overdrafts and the greatest possible amount of overdraft fees.

75.   National City refrained from immediately posting charges to a customer's account as it receives them – sometimes for multiple business days.  By holding charges rather than posting them immediately to an account, National City was able to amass a number of charges

on the account.  Subsequently, National City posted all of the amassed charges on a single date. When the group of charges is eventually posted to the customer's account, National City posted them in order of largest to smallest – not in the order in which they were received or in the order in which they were charged.  This delayed posting resulted in the imposition of multiple overdraft fees that would not otherwise be imposed.  The delayed posting also prevented customers from ascertaining the accurate balances in their accounts.

76.     National City's policy and practice of posting charges from largest to smallest, rather than chronologically, or from smallest to largest, was specifically designed to maximize the generation of overdraft fees by triggering overdraft fees for account charges that would not otherwise result in such fees.

77.     National City enforced an unconscionable policy whereby charges assessed were posted to customers' accounts in a non-chronological order, from highest to lowest, and were held for multiple days and then batched together, to maximize the number of overdraft transactions and fees.  National City's processing practices substantially increased the likelihood that customers' smaller charges would result in multiple overdraft fees.  The practices provided National City with substantially higher service fee revenues than it would have otherwise achieved absent these practices.

78.     As a result, Plaintiffs and members of the National City Classes were assessed overdraft fees for transactions which occurred when they actually had sufficient funds in their accounts to cover those transactions.

I.     **National City's Cloaking of Accurate Balance Information**

79.     National City actively promoted the convenience of its debit cards and other electronic debiting, but failed to provide customers with accurate balance information.  When

customers executed account transactions, they generally did not have access to an accurate balance register or balance information.

80.     National City provided inaccurate balance information to its customers through its electronic network.   In certain cases, National City informed its customers that they had a positive available balance when, in reality, they had a negative available balance, despite National City's actual knowledge of outstanding debits and transactions.

81.     Even when National City had actual knowledge of outstanding transactions which had already created a negative available balance in a customers' account, it encouraged the customer to incur more overdraft charges by approving – rather than prudently declining – subsequent debit card purchases and other electronic transactions.

82.     National City also assessed overdraft fees at times when actual funds in the customer account were sufficient to cover all debits that have been submitted to the bank for payment.   In doing so, National City charged overdraft fees where it faced no risk, because the cash balance in the customer's account had not dropped below zero.

**J.     National City's Failure to Notify Customers of Overdrafts or Allow Customers to Opt Out**

83.     At the time its debit cards are used in POS transactions or at ATMs, National City was able to determine, almost instantaneously, whether there were sufficient funds in a customer's account to cover that particular transaction.   National City had the technological capability to decline transactions (which it does when a pending transaction would exceed a pre-determined, overdraft tolerance limit for the account), or notify customers at that very moment that the particular debit card transaction would result in an overdraft.   National City could have given customers the option to decline the transaction to avoid incurring the overdraft fee, but it

did not do so because it sought to maximize the amount of revenue generated through its assessment of overdraft fees.

84.     Notwithstanding its technological capabilities and actual knowledge, National City failed to provide notice to Plaintiffs and the National City Classes that a particular debit card transaction would result in an overdraft and, hence, an overdraft fee.  Because National City's customers were not notified of the potential overdraft, and were not given the option of declining the debit card transaction or providing another form of payment, the customers were assessed monetary damages in the form of overdraft fees.

85.     National City failed to provide Plaintiffs and the National City Class members the ability to opt out of its overdraft scheme upon request, thereby avoiding any overdraft fees from being charged.

### K.     The Overdraft Policies and Practices Were Contrary to Best Practices

86.     By engaging in the conduct described herein, PNC and National City fail and/or failed to follow the list of "best practices" for overdraft programs set forth in the "Joint Guidance on Overdraft Protection Programs" ("Joint Guidance") issued by the United States Department of the Treasury, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the National Credit Union Administration (collectively, the "Agencies").  A copy of the Joint Guidance is attached as Exhibit C.  These "best practice" recommendations include: "Provide election or opt-out of service.  Obtain affirmative consent of consumers to receive overdraft protection.  Alternatively, where overdraft protection is automatically provided, permit consumers to 'opt-out' of the overdraft program and provide a clear consumer disclosure of this option."  70 F.R. 9127-01, 9132.

87.     According to rules proposed by the Agencies: "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . .  This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee."  73 F.R. 28904-01, 28929 (May 19, 2008).

88.     The Joint Guidance also advises banks to "[a]lert customers before a transaction triggers any fees.  When consumers attempt to withdraw or transfer funds made available through an overdraft protection program, provide a specific consumer notice, where feasible, that completing the withdrawal may trigger the overdraft fees."  70 F.R. 9127, 9132.  The Joint Guidance further advises that "[t]his notice should be presented in a manner that permits consumers to cancel the attempted withdrawal or transfer after receiving the notice." *Id*.

89.     Similarly, the list of "best practices" recommended in "Overdraft Protection: A Guide for Bankers," issued by the American Bankers Association, includes offering customers the option of "opting out" of any overdraft programs, and informing customers, before they access funds, that a particular point of sale or ATM transaction will cause them to incur an overdraft fee.  A copy of "Overdraft Protection: A Guide for Bankers" is attached as Exhibit D.

90.     The overdraft policies of PNC and National City made it difficult for customers to avoid injury even if they carefully tracked the balance in their account.  In fact, the Agencies stated that "Injury" resulting from such policies "is not reasonably avoidable" by the consumer. 73 F.R. 28904-01, 28929.  "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of

their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available."

91.     On October 6, 2009, the Center for Responsible Lending issued a report entitled "Overdraft Explosion:  Bank Fees for Overdrafts Increase 35% in Two Years."  The report, attached as Exhibit E, found that it is now "standard procedure to automatically enroll checking account customers in their most expensive overdraft loan program."  The report found that debit card transactions account for more overdraft fees than traditional checks or any other type of transaction, even though "debit card transactions and ATM withdrawals . . . could easily be denied for no fee."  The report also found that overdraft fees increased 35 percent from 2006 to 2008, and that over 50 million Americans overdrew their accounts in a 12 month period, with 27 million accounts incurring five or more overdraft fees.

92.     A chart from the research company Moebs Services shows that, in every year since 1992, banks gained increased revenues from overdraft fees:



**L.     The Unconscionable Provisions and Policies**

93.     The overdraft policies and practices of PNC and National City are or were unconscionable in the following respects, among others:

        a.     Prior to the Effective Date, the Banks did not disclose or reasonably disclose to customers that they had the option to "opt out" of the overdraft schemes;

        b.     Prior to the Effective Date, the Banks did not obtain affirmative consent from checking account customers prior to processing a transaction that would overdraw the account and result in overdraft fees;

c.      The Banks do not alert customers that a debit card transaction would trigger an overdraft, and do not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

d.      The respective Account Agreements for PNC and National City and related documents are contracts of adhesion in that they are standardized forms, imposed and drafted by the Banks, the party of vastly superior bargaining strength, and only relegate to the customer the opportunity to adhere to them or reject the agreements in their entirety;

e.      The amount of overdraft fees is disclosed in an ineffective, ambiguous, misleading and unfair manner, since it is not contained in the Account Agreements but, rather, in different and separate documents which are not signed by the depositor; and

f.      The respective Account Agreements for PNC and National City and related documents provided to customers are ineffective, ambiguous, deceptive, unfair, and misleading.

**M.    PNC's Overdraft Practices Harmed Plaintiffs**

94.    Plaintiff Virgilio S. Casayuran, Jr. is an account holder and customer of PNC.

95.    In connection with his account, PNC issued a debit card or cards to Mr. Casayuran.  A debit card allows customers to access their checking account funds by using the card to execute a transaction.  The charge is processed electronically, and PNC has the option to accept or decline the transaction at the point of sale.

96.    Over the course of his banking relationship with PNC, PNC wrongfully charged Mr. Casayuran multiple overdraft fees.  By way of illustration, PNC charged Mr. Casayuran with three $36 overdraft charges on December 2, 2008 and an additional $36 overdraft charge on December 3 for a total of $144.00.  Based on information and belief, the overdraft fees were based on the following ordering of transactions:

27

### Balance Sheet per PNC Reordering Scheme
### (Debits Processed from Highest to Lowest)

| | | Debits (-) | Credits (+) | Running Balance |
|---|---|---|---|---|
| | **Beginning Balance on December 2, 2008 (excluding a $60.00 cash deposit of December 1, 2008):** | | | **$55.59** |
| **Date Posted** | **Debit Description** | | | |
| 12/02/08 | EZ-Pass Electronic Debit | 70.00 | | -14.41 |
| | Debit Card Purchase | 27.20 | | -41.61 |
| | Debit Card Purchase | 5.85 | | -47.46 |
| | Debit Card Purchase | 2.12 | | -49.58 |
| | Insufficient Funds Fee | 36.00 | | -85.58 |
| | Insufficient Funds Fee | 36.00 | | -121.58 |
| | Insufficient Funds Fee | 36.00 | | -157.58 |
| 12/03/08 | Insufficient Funds Fee | 36.00 | | -193.58 |
| | | | | |

97.    If PNC had not manipulated and reordered Mr. Casayuran's transactions from highest to lowest, he would not have incurred four overdraft fees.

98.    For instance, if PNC had posted the transactions from lowest to highest, Mr. Casayuran would have incurred only one overdraft fee instead of four:

### Balance Sheet if Debits Were Processed from Lowest to Highest

| | | Debits (-) | Credits (+) | Running Balance |
|---|---|---|---|---|
| | **Beginning Balance on December 2, 2008 (excluding a $60.00 cash deposit of December 1, 2008):** | | | **$55.59** |
| **Date Posted** | **Debit Description** | | | |
| 12/02/08 | Debit Card Purchase | 2.12 | | 53.47 |
| 12/02/08 | Debit Card Purchase | 5.85 | | 47.62 |
| 12/02/08 | Debit Card Purchase | 27.20 | | 20.42 |
| 12/02/08 | EZ-Pass Electronic Debit | 70.00 | | -49.58 |
| 12/02/08 | Insufficient Funds Fee | 36.00 | | -85.58 |
| | | | | |
| | | | **Total Fees: $ 36.00** | |

28

99.     Likewise, if PNC had posted the transactions in chronological order, Mr. Casayuran would have incurred only one overdraft fee instead of four:

### Balance Sheet if Debits Were Processed in Chronological Order

| | | Debits (-) | Credits (+) | Running Balance |
|---|---|---|---|---|
| | Beginning Balance on December 2, 2008 (excluding the $60.00 cash deposit of December 1, 2008): | | | $55.59 |
| Date Transacted | Debit Description | | | |
| 11/28/08 | Debit Card Purchase | 2.12 | | 53.47 |
| 11/28/08 | Debit Card Purchase | 5.85 | | 47.62 |
| 11/28/08 | Debit Card Purchase | 27.20 | | 20.42 |
| 11/30/08 | EZ-Pass Electronic Debit | 70.00 | | -49.58 |
| 12/02/08 | Insufficient Funds Fee | 36.00 | | -85.58 |
| | | | | |
| | | Total Fees: $ 36.00 | | |

100.    Moreover, on December 1, 2008, after viewing his account balance online and noting the sum of the *pending* debits, Mr. Casayuran made a cash teller deposit of $60.00.  Thus, this deposit was made prior to the posting of all the outstanding debits.

101.    Had PNC posted the cash deposit on the day it was deposited, or even on the next business day prior to the debits, no overdraft fees would have been incurred, even under the Bank's reordering scheme:

### Balance Sheet under PNC Reordering Scheme if Credit was Processed Prior to Debits

| | | Debits (-) | Credits (+) | Running Balance |
|---|---|---|---|---|
| | Beginning Balance on December 2, 2008: | | | $55.59 |
| Date Posted | Debit Description | | | |
| 12/02/08 | Deposit | | 60.00 | 115.59 |
| 12/02/08 | EZ-Pass Electronic Debit | 70.00 | | 45.59 |
| 12/02/08 | Debit Card Purchase | 27.20 | | 18.39 |
| 12/02/08 | Debit Card Purchase | 5.85 | | 12.54 |
| 12/02/08 | Debit Card Purchase | 2.12 | | 10.42 |
| | | | | |
| | | Total Fees: $ 0.00 | | |

102.     PNC failed to notify Mr. Casayuran that he could be assessed overdraft fees on transactions even though there were sufficient funds in his checking account to cover the transaction at the time the transaction was executed.   In addition, PNC never notified Mr. Casayuran, at the time he executed the purported insufficient funds transactions described above, that his checking accounts were overdrawn or that he would be charged an overdraft fee as a result of the transactions.   Furthermore, PNC paid, rather than returned, all of the debit card charges described above, even though Mr. Casayuran's account purportedly lacked sufficient funds to cover the transactions.

103.     Plaintiffs Michael and Nicole Cowen ("the Cowens") were joint account holders and former customers of PNC.

104.     In connection with this account, PNC issued a debit card or cards to the Cowens.  A debit card allows customers to access their checking account funds by using the card to execute a transaction. The charge is processed electronically, and PNC has the option to accept or decline the transaction at the point of sale.

105.     Over the course of their banking relationship with PNC, PNC wrongfully charged the Cowens multiple overdraft fees.  By way of illustration, PNC charged the Cowens with three $31 overdraft charges on January 27, 2006 and three overdraft charges for $33 each on February 9, 2006.  In each instance, but for PNC's re-ordering, only one overdraft would have been incurred.

106.     Had PNC deducted the Cowens' debit purchases from their balance when it received notice of them and in the chronological order that they were made, they would not have overdrawn their account until PNC posted the last of each of these transactions in both of these instances.  Other similar instances to that alleged above occurred in 2006, 2008 and 2009.

107.     Instead of using its discretion to post the debits in a chronological manner or otherwise act in good faith toward the Cowens, PNC followed and applied its consistent Debit Ordering Practice and reordered the transactions, some of which took place over a three day period, into highest-to-lowest order. By manipulating the order of the transactions so that the highest transaction was deducted first, PNC managed to charge the Cowens more overdraft fees than it would have if it had posted transactions in a chronological manner.

108.     In other instances, the Cowens incurred overdraft fees on transactions even though there were sufficient funds in their checking account to cover the transactions at the time they were executed. PNC failed to notify the Cowens that this could occur.  In addition, PNC never notified the Cowens, at the time they executed the purported insufficient funds transactions described above, that their checking accounts were overdrawn or that they would be charged an overdraft fee as a result of the transactions.  Furthermore, PNC paid, rather than returned, all debit card charges described above, even though the Cowens' accounts purportedly lacked sufficient funds to cover the transactions.

109.     Plaintiffs Michael and April (Edelman) Dorney, are joint account holders and customers of PNC.

110.     In connection with their account, PNC issued a debit card or cards to the Dorneys.  A debit card allows customers to access their checking account funds by using the card to execute a transaction. The charge is processed electronically, and PNC has the option to accept or decline the transaction at the point of sale.

111.     Over the course of their banking relationship with PNC, PNC wrongfully charged the Dorneys multiple overdraft fees.

112.     The overdraft charges assessed by Plaintiffs are representative of hundreds of millions of dollars of overdraft fees that PNC wrongfully assessed and deducted from its customers' accounts.  These wrongful takings are especially egregious considering the fact that PNC approved each transaction and knew at the time of approval whether there were sufficient funds in the account to cover the transaction.

### N.     National City's Overdraft Practices Harmed Plaintiffs

113.     National City's wrongful overdraft policies and practices described above harmed Plaintiffs and members of the National City Classes.  The following allegations regarding the named Plaintiffs are made for purposes of illustrating the harm and damage sustained by Plaintiffs and members of the National City Classes as a result of National City's wrongful overdraft policies and practices.

114.     Plaintiff Robert Matos was a former checking account customer of National City who closed his account following the conversion to PNC.

115.     In connection with his account, National City issued a debit card to Mr. Matos.  A debit card allows customers to access their checking account funds by using the card to execute a transaction.  The charge is processed electronically, and National City had the option to accept or decline the transaction at the point of sale.

116.     National City wrongfully charged Mr. Matos overdraft fees on multiple occasions.  By way of illustration, Mr. Matos was charged five overdraft and/or non-sufficient funds fees on October 20, 2008.

117.     On Friday, October 17, 2008, Mr. Matos used his debit card to authorize five transactions.  He authorized a $40.00 charge to replenish his "I-Pass" prepaid toll road account, a $24.60 authorization at Sweet Tomatoes Restaurant, a $6.95 authorization at Cedar Grill, a $6.15 authorization at Subway, and a $1.84 authorization at Caribou Coffee.

118.     On Sunday, October 19, 2008, Mr. Matos used his debit card to authorize a charge or $49.95 at BP Oil.

119.     Subsequently on Monday, October 20, 2008, Mr. Matos used his debit card to make a $60.00 cash withdrawal from a National City ATM machine.

120.     Rather than process these transactions in the order that Mr. Matos made them, National City manipulated and reordered these transactions from highest to lowest, which resulted in Mr. Matos paying more overdraft fees than had National City processed these transactions in another fashion.

121.     For instance, upon information and belief, if National City had posted the transactions from lowest to highest, Mr. Matos would have been assessed only one overdraft fee.

122.     Likewise, if National City had posted the transactions in chronological order, Mr. Matos would have been assessed fewer overdraft fees.

123.     Similarly, on June 9, 2009, Mr. Matos used his debit card to authorize two transactions.  That morning, he used his debit card at Caribou Coffee to authorize an expenditure of $1.84.  Later that day, he authorized a transaction at Portillo's restaurant for $19.79.  Even though there were sufficient funds to pay the $1.84 charge from Caribou Coffee at the time the transaction was authorized, when National City processed these transactions later that night by rearranging them from highest to lowest, it withdrew the $19.79 from Mr. Matos' account first, which overdrew his account and resulted in the assessment of an overdraft fee.  In addition, National City then ran the Caribou Coffee transaction through, resulting in an additional fee.

124.     National City failed to notify Mr. Matos that he could be assessed overdraft fees on transactions even though there were sufficient funds in the checking account to cover the transaction at the time the transaction was executed.  In addition, National City never notified

Mr. Matos at the time he executed the purported insufficient funds transactions described above, that his checking account was or would be overdrawn or that he would be charged an overdraft fee as a result of the transactions.  Furthermore, National City paid, rather than returned, all the debit card charges described above, even though Mr. Matos' accounts purportedly lacked sufficient funds to cover the transactions.

125.    The overdraft charges assessed Mr. Matos are representative of millions of dollars of overdraft fees that National City wrongfully assessed and deducted from its customers' accounts.  These wrongful takings are especially egregious considering the fact that National City approved each transaction and knew at the time of approval whether there were sufficient funds in the account to cover the transaction.

126.    Plaintiffs Fernando Hernandez, Raymond A. Langford, and Eric and Monica DeRosia are all current and/or former checking account customers of National City, who became PNC customers as a result of the PNC/National City transaction.

127.    In connection with their accounts, National City issued debit cards to Mr. Hernandez, Mr. Langford, and Mr. and Ms. DeRosia.

128.    National City wrongfully charged Mr. Hernandez, Mr. Langford, and Mr. and Ms. DeRosia overdraft fees on multiple occasions. These wrongful overdraft fees occurred as a result of the National City's manipulation and re-ordering of these Plaintiffs' debit card transactions.

129.    The overdraft charges assessed by Plaintiffs are representative of hundreds of millions of dollars of overdraft fees that National City wrongfully assessed and deducted from its customers' accounts.  These wrongful takings are especially egregious considering the fact that

National City approved each transaction and knew at the time of approval whether there were sufficient funds in the account to cover the transaction.

### O.    The Damages Sustained by Plaintiffs and the Classes

130.    As shown by these examples, the overdraft policies of PNC and National City made it difficult for a customer to avoid injury even if the customer keeps close track of the balance in his or her account.  In fact, the Agencies stated that "injury" resulting from such policies "is not reasonably avoidable" by consumers.  73 F.R. 28904-01, 28929.  "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available."  *Id.*

131.    According to rules proposed by the Agencies, "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . . This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee."  73 F.R. 28904-01, 28929 (May 19, 2008).

132.    Thus, as a consequence of the Banks' overdraft policies and practices, Plaintiffs and the Classes were wrongfully charged overdraft fees.  The Banks improperly deprived Plaintiffs and the Classes of significant funds, causing ascertainable monetary losses and damages.

133.    As a consequence of the Banks' improper overdraft fees, the Banks wrongfully deprived Plaintiffs and the Classes of funds to which the Banks had no legitimate claim.

134.    Plaintiffs and members of the Classes had sufficient funds in their accounts to cover at least some of the transactions for which they were charged overdraft fees.  Plaintiffs and members of the Classes either had adequate funds to cover the transactions posted to their accounts, or the accounts were allowed to become overdrawn, even by *de minimis* margins, exclusively so that the Banks could impose these wrongful charges.  In many instances, the Banks' manipulation of the process for imposing overdraft fees triggered a cascade of charges that exponentially added to the charges it collected from Plaintiffs and Class members.

135.    All conditions precedent to the relief sought herein have either occurred or have been performed or waived.

### FIRST CLAIM FOR RELIEF
### Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing[4]
### (On Behalf of the National Classes for PNC and National City)

136.    Plaintiffs repeat paragraphs 1 through 135 above.

137.    Plaintiffs and the Banks contracted for bank account deposit, checking, ATM and debit card services, as embodied in the respective Account Agreement for PNC and National City and related account documentation for each Bank.

138.    Good faith is an element of every contract pertaining to the assessment of overdraft fees.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Put differently, the parties to a

---

[4] Certain states recognize a claim for breach of the covenant of good faith and fair dealing as a separate and independent claim from breach of contract.  Other states treat breach of the covenant of good faith and fair dealing as a species of breach of contract.  For the sake of convenience in this multi-district litigation, the Complaint pleads these two types of claims, which are substantively identical, in a single count.

contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

139.   Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

140.   Since at least 2003, PNC and National City breached the covenant of good faith and fair dealing in their respective Account Agreements through their overdraft policies and practices as alleged herein.

141.   Plaintiffs and members of the PNC National Class performed all, or substantially all, of the obligations imposed on them under the PNC Account Agreement.

142.   Plaintiffs and members of the National City National Class performed all, or substantially all, of the obligations imposed on them under the National City Account Agreement.

143.   Plaintiffs and members of the PNC and National City National Classes sustained damages as a result of PNC's and National City's breaches of the covenant of good faith and fair dealing.

**SECOND CLAIM FOR RELIEF**
**Unconscionability**
**(On Behalf of the National Classes for PNC and National City)**

144.   Plaintiffs repeat paragraphs 1 through 135 above.

145.    The Banks' overdraft policies and practices were and/or are substantively and procedurally unconscionable in the following respects, among others:

a.    Prior to the Effective Date, the Banks did not disclose or reasonably disclose to customers that they had the option to "opt out" of the overdraft scheme;

b.    Prior to the Effective Date, the Banks did not obtain affirmative consent from checking account customers prior to processing a transaction that would overdraw the account and result in an overdraft fee;

c.    The Banks did not alert its customers that a debit card transaction will trigger an overdraft, and did not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

d.    The respective PNC and National City Account Agreements and related documents, including the "Funds Availability Policy" and the "Consumer Schedule of Services Charges and Fees," are contracts of adhesion in that they are standardized forms, imposed and drafted by the Banks, which are/were parties of vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement in its entirety;

e.    The amount of overdraft fees is disclosed in an ineffective, ambiguous, misleading, and unfair manner, since it is not contained in the respective PNC and National City Account Agreements but, rather, in a separate document which is not signed by the depositor; and

f.    The respective PNC and National City Account Agreements and the related documents provided to customers are ineffective, ambiguous, deceptive, unfair, and misleading in that they do not unambiguously state that the Banks always reorder debits from

high to low, even though PNC and National City always reorder transactions in this way for customers in order to maximize overdrafts and overdraft fee revenues.

146.    Considering the great business acumen and experience of PNC and National City in relation to Plaintiffs and the National Classes, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law.

147.    The imposition of overdraft charges which exceed the amount overdrawn (*e.g.*, the imposition of a $36 charge on an overdraft of less than $36) is itself unconscionable.  Such charges are not reasonably related to the cost of covering the overdraft and/or its risk of nonpayment (where the Banks paid the overdraft), or to the cost of returning the item unpaid (where the Banks did not pay the overdraft).

148.    Plaintiffs and members of the National Classes sustained damages as a result of PNC's and National City's unconscionable policies and practices alleged herein.

### THIRD CLAIM FOR RELIEF
#### Conversion
**(On Behalf of the National Classes for PNC and National City)**

149.    Plaintiffs repeat paragraphs 1 through 135 above.

150.    PNC and National City had a duty to maintain and preserve their customers' checking accounts and to prevent their diminishment through the Banks' own wrongful acts.

151.   PNC and National City wrongfully collected overdraft fees from Plaintiffs and the members of the National Classes, and took specific and readily identifiable funds from their accounts in payment of these fees in order to satisfy them.

152.   PNC and National City, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiffs and the members of the National Classes, without legal justification.

153.   PNC and National City retained these funds unlawfully without the consent of Plaintiffs or members of the National Classes.

154.   PNC and National City intended to permanently deprive Plaintiffs and the members of the National Classes of these funds.

155.   These funds were properly owned by Plaintiffs and the members of the National Classes, not PNC or National City, which claimed entitlement to their ownership, contrary to the rights of Plaintiffs and the members of the National Classes.

156.   Plaintiffs and the members of the National Classes are entitled to the immediate possession of these funds.

157.   PNC and National City wrongfully converted these specific and readily identifiable funds in violation of law.

158.   As a direct and proximate result of this wrongful conversion, Plaintiffs and the members of the National Classes suffered damages.

159.   Plaintiffs and the members of the National Classes are entitled to recover from PNC and/or National City all damages and costs permitted by law, including all amounts wrongfully converted.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On Behalf of the National Classes for PNC and National City)**

160.    Plaintiffs repeat paragraphs 1 through 135 above.

161.    Plaintiffs, on behalf of themselves and the National Classes, assert a common law claim for unjust enrichment.

162.    By means of the Banks' wrongful conduct alleged herein, PNC and National City knowingly provide or provided banking services to Plaintiffs and members of the National Classed that are and/or were unfair, unconscionable and oppressive.

163.    The Banks knowingly received and retained wrongful benefits and funds from Plaintiffs and members of the National Classes.  In so doing, PNC and National City acted with conscious disregard for the rights of Plaintiffs and members of the National Classes.

164.    As a result of their wrongful conduct as alleged herein, PNC and National City were unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the National Classes.

165.    The unjust enrichment of PNC and/or National City is traceable to, and resulted directly and proximately from, the conduct alleged herein.

166.    Under the common law doctrine of unjust enrichment, it is inequitable for PNC and/or National City to retain the benefits it received without justification from the imposition of overdraft fees on Plaintiffs and members of the National Classes in an unfair, unconscionable, and oppressive manner.  The Banks' retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

167.    The financial benefits derived by PNC and/or National City rightfully belong to Plaintiffs and members of the National Classes.  PNC and National City should be compelled to

disgorge in a common fund for the benefit of Plaintiffs and members of the National Classes all wrongful or inequitable proceeds they received.  A constructive trust should be imposed upon all wrongful or inequitable sums received by PNC and National City traceable to Plaintiffs and the members of the National Classes.

168.    Plaintiffs and members of the National Classes have no adequate remedy at law.

### FIFTH CLAIM FOR RELIEF
### Violations of State Unfair Trade Practice Laws
### (On Behalf of the PNC State Subclasses)

169.    Plaintiffs repeat paragraphs 1 through 135 above.

170.    This claim is asserted on behalf of the members of each PNC State Subclass under their respective consumer protection statutes.

171.    PNC engages in unfair business practices relating to the imposition of overdraft fees on consumers, in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1 *et seq.*  In particular, the wrongful conduct described herein violated 73 P.S. § 201-2(4)(v) (representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have), § 201-2(4)(xiv) (failing to comply with the terms of any written guarantee or warranty given to a buyer), and § 201-2(4)(xxi) (engaging in any other deceptive conduct which creates a likelihood of confusion or misunderstanding).

172.    PNC engaged in unfair business practices relating to the imposition of overdraft fees on consumers in violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-2, *et seq.*

173.    As redress for PNC's repeated and ongoing violations of these consumer protection statutes, Plaintiffs and the PNC State Subclasses are entitled to, *inter alia*, damages and declaratory relief.

**SIXTH CLAIM FOR RELIEF**
**Violations of State Unfair Trade Practice Laws**
**(On Behalf of the National City State Subclasses)**

174.     Plaintiffs repeat paragraphs 1 through 135 above.

175.     This claim is asserted on behalf of the members of each National City State Subclass under their respective consumer protection statute.

176.     National City engaged in unfair business practices relating to the imposition of overdraft fees on consumers, in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. § 505/1, et seq.

177.     As redress for National City's repeated and ongoing violations of these consumer protection statutes, Plaintiffs and the National City State Subclass are entitled to, *inter alia*, damages and declaratory relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Classes demand a jury trial on all claims so triable, and judgment as follows:

1.     Declaring PNC's and National City's overdraft fee policies wrongful, unfair and unconscionable;

2.     Restitution of all overdraft fees paid to PNC and National City by Plaintiffs and the Classes, as a result of the wrongs alleged herein, within the applicable statutes of limitations, in an amount to be determined at trial;

3.     Disgorgement of the ill-gotten gains derived by PNC and National City from their misconduct;

4.     Actual damages in an amount according to proof;

5.     Punitive and exemplary damages;

6.     Pre-judgment interest at the maximum rate permitted by applicable law;

7.      Costs and disbursements incurred by Plaintiffs in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

8.      Such other relief as this Court deems just and proper.

Dated:   December 6, 2010.

/s/ Bruce S. Rogow
Bruce S. Rogow, Esquire
Florida Bar No. 067999
brogow@rogowlaw.com
Robert C. Gilbert, Esquire
Florida Bar No. 561861
bobby@alterslaw.com
ALTERS LAW FIRM, P.A.
4141 N.E. 2nd Avenue
Miami, Florida 33137
Tel:  (305) 571-8550
Fax:  (305) 571-8558

*Plaintiffs' Lead Counsel*

/s/ Robert C. Josefsberg
Robert C. Josefsberg, Esquire
Florida Bar No. 40856
rjosefsberg@podhurst.com
Victor M. Diaz, Jr., Esquire
Florida Bar No. 503800
vdiaz@podhurst.com
Peter Prieto, Esquire
Florida Bar No. 501492
pprieto@podhurst.com
John Gravante, III, Esquire
Florida Bar No. 617113
jgravante@podhurst.com
PODHURST ORSECK, P. A.
City National Bank Building
25 W Flagler Street - Suite 800
Miami, FL 33130-1780
Tel: 305-358-2800
Fax: 305-358-2382

/s/ Michael W. Sobol
Michael W. Sobol, Esquire
California Bar No. 194857
msobol@lchb.com
David S. Stellings, Esquire
New York Bar No. 2635282
dstellings@lchb.com
Roger N. Heller
California Bar No. 215348
rheller@lchb.com
Jordan Elias, Esquire
California Bar No. 228731
jelias@lchb.com
LIEFF CABRASER HEIMANN &
  BERNSTEIN LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Tel: 415-956-1000
Fax: 415-956-1008

/s/ Edward Adam Webb
Edward Adam Webb, Esquire
Georgia Bar No. 743910
Adam@WebbLLC.com
G. Franklin Lemond, Jr., Esquire
Georgia Bar No. 141315
FLemond@WebbLLC.com
WEBB, KLASE & LEMOND, L.L.C.
1900 The Exchange SE, Suite 480
Atlanta, GA 30339
Tel: 770-444-9325
Fax: 770-444-0271

/s/ Ted E. Trief
Ted E. Trief, Esquire
New York Bar No. 1476662
ttrief@triefandolk.com
Barbara E. Olk, Esquire
New York Bar No. 1459643
bolk@triefandolk.com
TRIEF & OLK
150 East 58th street - 34th Floor
New York, NY 10155
Tel: 212-486-6060
Fax: 212-317-2946

/s/ Russell W. Budd
Russell W. Budd, Esquire
Texas Bar No. 03312400
rbudd@baronbudd.com
Bruce W. Steckler, Esquire
Texas Bar No. 00785039
bsteckler@baronbudd.com
Melissa K. Hutts, Esquire
Texas Bar No. 0188015
mhutts@baronbudd.com
BARON & BUDD, P.C.
3102 Oak Lawn Avenue
Suite 1100
Dallas, TX 75219
Tel: 214-521-3605
Fax: 214-520-1181

/s/ Ruben Honik
Ruben Honik, Esquire
Pennsylvania Bar No. 33109
rhonik@golombhonik.com
Kenneth J. Grunfeld
Pennsylvania Bar No. 84121
kgrunfeld@golombhonik.com
GOLOMB & HONIK, P.C.
1515 Market Street
Suite 1100
Philadelphia, PA 19102
Tel: 215-985-9177
Fax: 215-985-4169

*Plaintiffs' Executive Committee*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 1:09-MD-02036-JLK**

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 6, 2010, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document

is being served this day on all counsel of record or pro se parties identified on the attached

Service List in the manner specified, either via transmission of Notices of Electronic Filing

generated by CM/ECF or in some other authorized manner for those counsel or parties who are

not authorized to receive electronically Notices of Electronic Filing.

/s/ Robert C. Gilbert
Robert C. Gilbert, Esquire
Florida Bar No. 561861
ALTERS LAW FIRM, P.A.
4141 N.E. 2nd Avenue, Suite 201
Miami, Florida 33137
bobby@alterslaw.com