## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 1:09-02036-JLK

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

THIS DOCUMENT RELATES TO:

*Blahut v. Harris Bank, N.A.*
N.D. IL Case No. 1:10-2543
S.D. FL Case No. 1:10-cv-21821-JLK

### AMENDED CLASS ACTION COMPLAINT

Plaintiff, Stephanie Blahut, through undersigned counsel, on behalf of herself and all persons similarly situated, alleges the following based on personal knowledge as to allegations regarding the Plaintiff and on information and belief as to other allegations.

### INTRODUCTION

1.       This is a civil action seeking monetary damages, restitution, and declaratory relief from Defendant, Harris Bank, N.A. ("Harris Bank" or the "Bank"), arising from its unfair and unconscionable assessment and collection of excessive overdraft fees.

2.       In the era of electronic banking and the ubiquitous use of debit card transactions, the assessment of overdraft fees has become a major profit center for many United States banks, including Harris Bank. For years, banks covered customers who occasionally bounced checks and even did so for a time for customers using debit cards, without charging their customers. Since the early 1990's, however, banks have devised methods to provide

overdraft "protection" for customers and charge them in each instance.  A recent FDIC report estimated that overdraft fees represent 74 percent of the total service charges that are imposed on deposit accounts in the United States.  A 2008 FDIC study reports that overdraft fees for debit cards can carry an effective annualized interest rate that *exceeds 3,500 percent*.  Nevertheless, the Consumer Federation of America reports that five of the ten largest banks raised their overdraft fees in the last year.

3.      In 2007, banks collected more than $17 billion in overdraft fees.  That number nearly doubled in 2008, as more and more consumers struggled to maintain positive checking account balances.  *In 2009, banks brought in $37.1 billion in overdraft charges alone.*  As one of the largest Chicago-area banks and serving more than 1.2 million customers throughout Illinois, Wisconsin and Indiana, Harris Bank benefits greatly from these staggering charges.

4.      Almost by definition, these fees disproportionately affect the poor, who are most likely to maintain low balances.  Moebs Services, a research company that has conducted studies for the government as well as banks, estimates that 90 percent of overdraft fees are paid by the poorest 10 percent of banks' customer base.  Moreover, these fees have the tendency to create a domino effect, because the imposition of a service charge on an account with a negative balance will make it less likely that the account holder's balance will reach positive territory, resulting in more fees.

5.      Before debit cards existed, banks occasionally extended the courtesy of honoring paper checks written on overdrawn or otherwise deficient accounts for customers who were typically in good standing.  Banks extended this courtesy largely because the third party involved in a sales transaction allowed the customer to pay by check, expecting the funds to be available and the check to clear.  For example, if a customer wrote a check to purchase groceries,

the grocery store would only know whether the check cleared *after* the groceries had been purchased.

6.        The same considerations are not present when customers use debit cards. Banks could simply decline to honor debit or point of sale transactions where accounts lack sufficient funds to execute the transactions.   Retail and service transactions could still be executed if consumers presented an alternative form of payment.  ATM transactions could still proceed if banks provided a warning that an overdraft fee would be assessed, and customers chose to proceed nevertheless.  In fact, until a few years ago, most banks simply declined debit transactions that would overdraw an account.

7.        Instead of simply declining debit transactions when there are insufficient funds, or warning its customers that an overdraft fee will be assessed if they proceed with the transaction, Harris Bank routinely processes such transactions and then charges its customers an overdraft fee of $32 – even when the transaction is for only a few dollars.  This automatic, fee-based overdraft scheme is intentionally designed to maximize overdraft fee revenue for Harris Bank.  Additionally, as part of its inequitable motive to generate obscene profits gained through the imposition of unconscionable overdraft fees, Harris Bank failed to adequately disclose to its customers that they could elect to opt out of overdraft protection.

8.        In many instances, these overdraft fees cost Harris Bank account holders hundreds of dollars in a matter of days, or even hours, when they may be overdrawn by only a few dollars.  Even more egregious, customer accounts may not actually be overdrawn at the time the overdraft fees are charged, or at the time of the debit transaction.

9.        Thus, it is through manipulation and alteration of customers' transaction records that Harris Bank maximizes overdraft penalties imposed on customers.

## JURISDICTION AND VENUE

10.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed classes is a resident of a different state than Harris Bank.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1407(a).  Venue was proper in the Northern District of Illinois, the district in which Plaintiff's action was originally filed, pursuant to 28 U.S.C. § 1391 because Harris Bank is subject to personal jurisdiction there and regularly conducts business in that district, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred and continue to occur in that district.

## THE PARTIES

12.     Plaintiff, Stephanie Blahut, is a resident of the State of Illinois.

13.     Harris Bank is a national bank incorporated in the State of Delaware and maintains its principal place of business in Chicago, Illinois.  Among other things, Harris Bank is engaged in the business of providing retail banking services to millions of consumers, including Plaintiff and members of the putative Classes, which include the issuance of debit cards for use by its customers in conjunction with their checking accounts.  According to its website, Harris Bank operates 280 branches in Illinois, Indiana, and Wisconsin.

14.     Harris Bank is a national bank, subject to the National Bank Act, 12 U.S.C. § 1, *et seq.*, and regulations promulgated by the Office of the Comptroller of the Currency.

## CLASS ALLEGATIONS

15.      Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Fed. R. Civ. P. 23.   This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

16.      The proposed classes are defined as:

> All Harris Bank customers in the United States who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, incurred an overdraft fee as a result of Harris Bank's practice of re-sequencing debit card transactions from highest to lowest (the "National Class").

> All Harris Bank customers having accounts at branches in the state of Illinois for the purpose of asserting claims under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq*. (the "Illinois State Subclass") (*see* Fifth Claim for Relief, *infra*).

> The National Class and the Illinois State Subclass are collectively referred to as the "Classes."

17.      Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

18.      Excluded from the Classes are Harris Bank, its parents, subsidiaries, affiliates, officers and directors, any entity in which Harris Bank has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

19.      The members of the Classes are so numerous that joinder is impractical.  The Classes consist of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to Harris Bank's records.

20.      The claims of the representative Plaintiff are typical of the claims of the Classes in that the representative Plaintiff, like all Class members, was charged overdraft fees by Harris Bank as a result of its practice of re-sequencing debit card transactions from highest to

lowest.  The representative Plaintiff, like all Class members, has been damaged by Harris Bank's misconduct in that she has been assessed and/or will continue to be assessed unfair and unconscionable overdraft charges.  Furthermore, the factual basis of Harris Bank's misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.

21.     There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual Class members.

22.     Among the questions of law and fact common to the Classes are whether Harris Bank:

a.     Did not clearly disclose and/or refused to allow its customers to opt out of its overdraft protection program;

b.     Did not obtain affirmative consent from its customers prior to processing transactions that would result in overdraft fees;

c.     Does not alert its customers that a debit card transaction will trigger an overdraft fee, and does not provide its customers with an opportunity to cancel such transactions;

d.     Manipulates and reorders transactions so that it can increase the number of overdraft fees it imposes;

e.     Manipulates and reorders debits from highest to lowest in order to maximize the number of overdrafts and, consequently, the amount of overdraft fees;

f.     Imposes overdrafts and overdraft fees when, but for reordering transactions, there would otherwise be sufficient funds in the account;

g.        Fails to provide customers with accurate balance information;

h.        Delays posting of transactions by customers using debit cards so that customers are charged overdraft fees on transactions, even though the customers had sufficient funds in their accounts to cover the transactions upon execution;

i.        Charges exorbitant overdraft fees that bear no relationship to the actual costs and risks of covering insufficient funds transactions;

j.        Breaches its covenant of good faith and fair dealing with Plaintiff and other members of the Classes through its overdraft policies and practices;

k.        Requires its customers to enter into standardized account agreements which include unconscionable provisions;

l.        Converts money belonging to Plaintiff and other members of the Classes through its overdraft policies and practices;

m.        Is unjustly enriched through its overdraft policies and practices; and

n.        Violates the consumer protection acts of certain states through its overdraft policies and practices.

23.        Other questions of law and fact common to the Classes include:

a.        The proper method or methods by which to measure damages, and

b.        The declaratory relief to which the Classes are entitled.

24.        Plaintiff's claims are typical of the claims of other Class members, in that they arise out of the same wrongful overdraft policies and practices and the same or substantially similar unconscionable provisions of Harris Bank's account agreements and other related

documents. Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other Class member.

25.     Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes.

26.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Harris Bank, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses and Harris Bank's misconduct will proceed without remedy.

27.     Even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

## COMMON FACTUAL ALLEGATIONS

A.      **Harris Bank**

28.      According to its website, Harris Bank has over $40 billion in assets, and serves its 1.2 million customers with 280 branches and 634 ATMs in Illinois, Indiana, and Wisconsin.

29.      Harris Bank is in the business of providing its customers with a variety of banking services.  One of the services provided by Harris Bank for customers who open a checking account is a debit card, also known as a check card or ATM card.  Through those debit cards, customers can engage in transactions using funds directly from their accounts by engaging in "debit" or "point of sale" ("POS") transactions, or may withdraw money from their accounts at automated teller machines ("ATMs").  Whether the card is used to execute POS transactions or to withdraw cash from ATMs, the transaction is processed electronically.  As a result, Harris Bank is notified instantaneously when the card is swiped, and has the option to accept or decline transactions at such time.

30.      Harris Bank employs sophisticated software to automate its overdraft system. This program maximizes the number of overdrafts, and thus, the amount of overdraft fees charged per customer.

31.      As a result of Harris Bank's manipulation and alteration of customers' transactions records, funds in a customer's account are depleted more rapidly and more overdraft fees are likely to be charged for multiple smaller transactions.  Indeed, overdraft charges are likely to occur at times when, but for the manipulation and alteration, there would be funds in the account and no overdraft would occur.  For example, if a customer, whose account has a $50 balance at the time Harris Bank processed several transactions, made four transactions of $10 and one subsequent transaction of $100 on the same day, the Bank would reorder the debits from

largest to smallest, imposing five overdraft fees on the customer.   Conversely, if the $100 transaction was debited last – consistent with the actual order of transactions – only one overdraft fee would be assessed.  *See* FDIC Study of Bank Overdraft Programs, November 2008, *available at*: http://www.fdic.gov/bank/analytical/overdraft/, at 11, n. 12.

B.      <u>**Harris Bank's Relevant Customer Documents Regarding Overdrafts**</u>

32.      Plaintiff and all members of the Classes maintain or maintained a checking account with Harris Bank.   The terms of Harris Bank's checking accounts are contained in standardized account holder agreements, presented to its customers on a "take it or leave it" basis, drafted and imposed by Harris Bank, which was the party of vastly superior bargaining strength, and thus constitute agreements of adhesion.   A representative copy of the "Harris Handbook for Personal and Business Deposit Accounts" (the "Deposit Agreement"), covering customers maintaining accounts in Indiana, Wisconsin, and Illinois, which is over 30 pages long, is attached as Exhibit A.

33.      The Deposit Agreement states "[w]e *may* pay Items presented against your account in any order we choose, unless a particular order is either required or prohibited by Applicable law."  *Id.* at 2 (emphasis added).

34.      The Deposit Agreement also states "[w]e may change the order of posting Items to your account at any time without notice to you."  *Id.*

35.      The Deposit Agreement also states that Harris Bank "may charge an overdraft fee if any transfer, withdrawal, service fee or other debit of any type exceeds your available balance."  *Id.*   Further, the Deposit Agreement states that "[i]f paying an Item will cause an overdraft, then we reserve the right to return the Item or pay the Item, at our sole discretion, and we may charge the overdraft fee in either case."  *Id.*

36.      The Deposit Agreement also directs customers to refer to:

*YOUR GUIDE TO DEPOSIT SERVICES AT HARRIS* AND ANY SPECIAL SUPPLEMENT APPLICABLE TO YOUR ACCOUNT (COLLECTIVELY, THE *"SERVICES GUIDE"*) WHICH INCLUDE THE SERVICE FEE SCHEDULE AND IMPORTANT ACCOUNT DISCLOSURES

*Id*. at iii.

37.     The Deposit Agreement and, upon information and belief, related documents, including the Services Guide and Service Fee Schedule ("Fee Schedule"), failed to disclose to customers that they had the option to "opt out" from the Bank's overdraft scheme, although it was possible for them to opt out upon request.

C.     **Harris Bank's Re-Ordering of Checking Account Transactions**

38.     In an effort to maximize overdraft revenue, Harris Bank manipulates and reorders debits from highest to lowest during given periods of time.  Harris Bank reorders transactions for no reason other than to increase the number of exorbitant overdraft fees it can charge.  This practice violates the consumer protection laws of certain states and the covenant of good faith and fair dealing in the Bank's Deposit Agreement.

39.     In addition, Harris Bank misleads its customers regarding its reordering practices.  Instead of unequivocally telling its customers that it will reorder debits from highest to lowest, the Bank states in its Deposit Agreement that the Bank states in its contract that "[w]e *may* pay Items presented against your account in any order we choose, unless a particular order is either required or prohibited by Applicable law."  This statement is deceptive and/or unfair because it is, in fact, the Bank's practice to *always* reorder debits from highest to lowest, and because the Bank groups together POS transactions that occurred on subsequent days with POS transactions that occurred on earlier days, and reorders them so that higher debits that occurred on subsequent days are posted to its customers' accounts before lower debits that occurred on earlier days, contrary to the terms of the Bank's Deposit Agreement and its customers'

- 11 -

reasonable expectations.  The Bank's practices thus violate the covenant of good faith and fair dealing implied in the Bank Deposit Agreement as well as the consumer protection laws of numerous states.

40.        Harris Bank's website is littered with deceptive representations.  Harris Bank claims that online banking "makes it easy to view your account balances and details."  Harris Bank also claims that with online banking "[y]ou can view your current checking . . . balance[]" and that "[t]ransactions will be listed chronologically with your most recent ones listed first." Contrary to Harris Bank's advertisements and representations, the online account features are not a means by which consumers can gain control of their finances or effectively manage their accounts.  While Harris Bank's online banking service may list customers' transactions in chronological order, the Bank re-sequences the transactions from highest to lowest when they are posted to and deducted from customers' accounts.  Thus, the inaccurate and unreliable information displayed in the online account information on the Bank's website dupes consumers into generating overdraft fees for Harris Bank.

41.        Transactions involving debit cards used by Harris Bank customers, including the withdrawal of cash from ATMs and POS transactions with vendors, are processed electronically.  As a result, Harris Bank is notified instantaneously when the customer's debit card is swiped, and has the option to accept or decline these transactions.

42.        Notwithstanding the instantaneous nature of these electronic debit card transactions, under Harris Bank's posting system, it fails to post charges in the order in which they are assessed or received.  Harris Bank developed a policy and employs a practice whereby account charges and debits are posted to its customers' accounts out of chronological order for

the sole purpose of maximizing the number of overdraft transactions and, therefore, the amount of overdraft fees charged to its customers.

43.     Instead of processing such transactions in chronological order, Harris Bank processes them starting with the largest debit and ending with the smallest debit, so as to generate the largest possible number of overdrafts and the greatest possible amount of overdraft fees.

44.     Harris Bank refrains from immediately posting charges to a customer's account as it receives them – sometimes for multiple business days.  By holding charges rather than posting them immediately to an account, Harris Bank is able to amass a number of charges on the account.  Subsequently, Harris Bank posts all of the amassed charges on a single date. When the group of charges is eventually posted to the customer's account, Harris Bank posts them in order of largest to smallest – not in the order in which they were received or in the order in which they were charged.  This delayed posting results in the imposition of multiple overdraft fees that would not otherwise be imposed.  The delayed posting also prevents customers from ascertaining the accurate balances in their accounts.

45.     Harris Bank's policy and practice of posting charges from largest to smallest, rather than chronologically, or from smallest to largest, is specifically designed to maximize the generation of overdraft fees by triggering overdraft fees for account charges that would not otherwise result in such fees.

46.     Harris Bank enforces an unconscionable policy whereby charges assessed are posted to customers' accounts in a non-chronological order, from highest to lowest, and are held for multiple days and then batched together, to maximize the number of overdraft transactions and fees.  Harris Bank's processing practices substantially increase the likelihood that customers'

smaller charges will result in multiple overdraft fees.  The practices provide Harris Bank with substantially higher service fee revenues than it would otherwise achieve absent these practices.

47.       Harris Bank also assesses overdraft fees at times when actual funds in the customer's account are sufficient to cover all debits that have been submitted to the Bank for payment.  It does this by placing a "hold" on actual funds in the customer's account.  In doing so, Harris Bank charges overdraft fees where it faces no risk, because the cash balance in the customer's account has not dropped below zero.

48.       A debit card can be used to make a purchase in two ways:  (1) an Automated Clearing House ("ACH") transaction in which a customer enters his/her PIN number at the point of sale; or (2) an "offline signature" transaction, in which the debit card is treated like a credit card and the customer usually is required to sign a receipt.  In the former, the money is debited from the account instantaneously.  In the latter, the "offline signature" transaction occurs in two parts: first, authorization for the purchase amount is obtained by the merchant.  Second, the transaction is not actually "settled" (that is, money between the bank and the merchant does not change hands) until the merchant submits the transaction to the bank sometime after the customer's purchase.  Before settlement, "authorization holds" are placed on the customer's account, preventing access to money so held.  For some transactions, the authorization hold is for an amount larger than the purchase actually made by the customer.  Harris Bank charges an overdraft fee when the authorization hold amount—not the purchase price—pushes an account balance into negative territory.

49.       Such "authorization hold" policies, and the extent to which they are used by Harris Bank to charge overdraft fees, are inconsistent with Harris Bank's Deposit Agreement.

50.     The terms of the Deposit Agreement fail to alert customers that they must often keep a large cushion of funds in their account in order to guard against an overdraft fee even when customers do not spend more than the funds in their account, and are materially deceptive.  Accordingly, Harris Bank charges customers overdraft fees even when there are sufficient funds in customers' accounts to cover transactions.

51.     Charging an overdraft fee when in fact an account has never been over-drafted is materially deceptive.  By charging overdraft fees when in fact the customer's account has not been over-drafted, Harris Bank breached its contract with Plaintiff.

52.     As a result, Plaintiff and members of the Classes have been assessed overdraft fees for transactions which occurred when they actually had sufficient funds in their accounts to cover those transactions.

### D.     Harris Bank's Cloaking of Accurate Balance Information

53.     Harris Bank actively promotes the convenience of its debit cards and other electronic debiting, but fails to provide customers with accurate balance information.  When customers execute account transactions, they generally do not have access to an accurate balance register or balance information.

54.     Online advertisements claim that "[t]ransactions will be listed chronologically with your most recent ones listed first," thereby allowing customers to "view your current checking . . . balance."  But in reality, Harris Bank's computers are set up not to process transactions in the order received, but in order from highest to lowest dollar amount so as to ensure that the maximum number of overdraft charges are imposed on customers' accounts.

55.     Harris Bank provides inaccurate balance information to its customers through its electronic network.  Harris Bank informs its customers that they have a positive balance

when, in reality, they have a negative balance, despite the Bank's actual knowledge of outstanding debits and transactions.

56.     Even when Harris Bank has actual knowledge of outstanding transactions which have already created a negative balance in a customer's account, it encourages the customer to incur more overdraft charges by approving – rather than prudently declining – subsequent debit card purchases and other electronic transactions.

**E.     Harris Bank's Failure to Notify Customers of Overdrafts or Advise Customers of Their Right to Opt Out**

57.     At the time its debit cards are used in POS transactions or at ATMs, Harris Bank is able to determine, almost instantaneously, whether there are sufficient funds in a customer's account to cover that particular transaction.  The Bank has the technological capability to decline transactions (which it does when a pending transaction would exceed a pre-determined, overdraft tolerance limit for the account), or notify customers at that very moment that the particular debit card transaction would result in an overdraft.  Prior to the effective date of the opt in/opt out requirements of Regulation E (the "Effective Date"), Harris Bank could have given customers the option to decline the transaction to avoid incurring overdraft fees, but it did not do so because it sought to maximize the amount of revenue generated through its assessment of overdraft fees.

58.     Notwithstanding its technological capabilities and actual knowledge, Harris Bank failed to provide notice to Plaintiff and the Classes that a particular debit card transaction would result in an overdraft and, hence, an overdraft fee.  Because Harris Bank's customers were not notified of the potential overdraft, and were not given the option of declining the debit card transaction or providing another form of payment, the customers were assessed monetary damages in the form of overdraft fees.

59.     Prior to the Effective Date, Harris Bank failed to make Plaintiff and Class members aware that they could opt out of its overdraft scheme upon request, thereby avoiding any overdraft fees from being charged.

**F.      Harris Bank's Overdraft Policies and Practices Are Contrary to Best Practices**

60.     By engaging in the conduct described herein, Harris Bank has failed to follow the list of "best practices" for overdraft programs set forth in the "Joint Guidance on Overdraft Protection Programs" ("Joint Guidance") issued by the United States Department of the Treasury, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the National Credit Union Administration (collectively, the "Agencies").   A copy of the Joint Guidance is attached as Exhibit B.   These "best practice" recommendations include: "Provide election or opt-out of service.   Obtain affirmative consent of consumers to receive overdraft protection.   Alternatively, where overdraft protection is automatically provided, permit consumers to 'opt-out' of the overdraft program and provide a clear consumer disclosure of this option."   70 F.R. 9127-01, 9132.

61.     According to rules proposed by the Agencies: "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . .   This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee."   73 F.R. 28904-01, 28929 (May 19, 2008).

62.     The Joint Guidance also advises banks to "[a]lert customers before a transaction triggers any fees.   When consumers attempt to withdraw or transfer funds made available through an overdraft protection program, provide a specific consumer notice, where

feasible, that completing the withdrawal may trigger the overdraft fees."  70 F.R.D. 9127, 9132. The Joint Guidance further advises that "[t]his notice should be presented in a manner that permits consumers to cancel the attempted withdrawal or transfer after receiving the notice."  *Id.*

63.      Similarly, the list of "best practices" recommended in "Overdraft Protection: A Guide for Bankers," issued by the American Bankers Association, includes offering customers the option of "opting out" of any overdraft programs, and informing customers, before they access funds, that a particular point of sale or ATM transaction will cause them to incur an overdraft fee.  A copy of "Overdraft Protection: A Guide for Bankers" is attached as Exhibit C.

64.      Harris Bank's overdraft policies make it difficult for customers to avoid injury even if they carefully track the balance in their account.  In fact, the Agencies have stated that "Injury" resulting from such policies, "is not reasonably avoidable" by the consumer.  73 F.R. 28904-01, 28929.  "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available."

65.      On October 6, 2009, the Center for Responsible Lending issued a report entitled "Overdraft Explosion:  Bank Fees for Overdrafts Increase 35% in Two Years."  The report, attached hereto as Exhibit D, finds that it is now "standard procedure to automatically enroll checking account customers in their most expensive overdraft loan program."  The report finds that debit card transactions account for more overdraft fees than traditional checks or any other type of transaction, even though "debit card transactions and ATM withdrawals . . . could

easily be denied for no fee." The report also finds that overdraft fees increased 35 percent from 2006 to 2008, and that over 50 million Americans overdrew their accounts in a 12 month period, with 27 million accounts incurring five or more overdraft fees.

66.     A chart from the research company Moebs Services shows that, in every year since 1992, banks have gained increased revenues from overdraft fees:



### G.     Harris Bank's Unconscionable Provisions and Policies

67.     Harris Bank's overdraft policies and practices are or were unconscionable in the following respects, among others:

a.      Prior to the Effective Date, the Bank did not disclose or reasonably disclose to customers that they had the option to "opt out" of the Bank's overdraft scheme;

b.      Prior to the Effective Date, the Bank did not obtain affirmative consent from checking account customers prior to processing a transaction that would overdraw the account and result in an overdraft fee;

c.      The Bank does not alert its customers that a debit card transaction will trigger an overdraft, and does not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

d.      The Deposit Agreement and related documents, including the Fee Schedule, are contracts of adhesion in that they are standardized forms, imposed and drafted by the Bank, which is a party of vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement in its entirety;

e.      The amount of overdraft fees is disclosed in an ineffective, ambiguous, misleading, and unfair manner, since it is not contained in the Deposit Agreement, but rather in a different and separate document, the Fee Schedule, which is not signed by the depositor; and

f.      The Deposit Agreement provided to customers is ineffective, ambiguous, deceptive, unfair, and misleading in that it does not unambiguously state that the Bank always reorders debits from high to low, even though Harris Bank *always* reorders transactions in this way for customers in order to maximize overdrafts and overdraft fee revenues for the Bank.

**H.      <u>Harris Bank's Overdraft Practices Harmed Plaintiff</u>**

68.      Harris Bank's wrongful overdraft policies and practices described above harmed Plaintiff and members of the Classes.   The following allegations regarding the named

Plaintiff are made for purposes of illustrating the harm and damage sustained by Plaintiff and members of the Classes as a result of Harris Bank's wrongful overdraft policies and practices.

69.     Plaintiff, Stephanie Blahut, is a current checking account customer of Harris Bank.

70.     In connection with her account, the Bank issued a debit card to Ms. Blahut.  A debit card allows customers to access their checking account funds by using the card to execute a transaction.  The charge is processed electronically, and the Bank has the option to accept or decline the transaction at the point of sale.

71.     Harris Bank charged Ms. Blahut multiple overdraft fees on numerous occasions.  For example, Ms. Blahut was charged six overdraft fees on July 28, 2009, and one overdraft fee on July 29, 2009, in the amount of $32.00 each, for a total of $224.00.  Based on information and belief, the overdraft fees were based on the following ordering of transactions:

**Balance Sheet per Harris Bank Reordering Scheme**
**(Debits Processed from Highest to Lowest)**

| | | Debits | Fees | Balance |
|---|---|---|---|---|
| | **Beginning Balance on 7/24/2009:**[1] | | | **$96.21** |
| **Date Posted** | **Debit Description**[2] | | | |
| 7/27/2009 | ATM DB-522 W ROOSEVELT ROAD | 20.00 | | 76.21 |
| 7/27/2009 | ATM DB-522 W ROOSEVELT ROAD | 20.00 | | 56.21 |

---

[1] The statements in Plaintiff's possession do not detail the beginning account balance for each given period or the subsequent balance after each transaction occurrence.  Given Plaintiff incurred six overdraft fees out of a total of fifteen transactions made, one can infer that Plaintiff's beginning balance on 7/24/2009 was at least $96.21 – the amount equal to the total aggregate sum of the first nine transactions on the above balance sheet (the transactions for which overdraft fees were not incurred).  Further, one can infer that at the most, Plaintiff's beginning balance on 7/24/2009 was $98.83 – the amount equal to the total aggregate sum of the first ten transactions on the above balance sheet, less one cent, given that the tenth transaction ($2.63) resulted in an overdraft fee.  For the purpose of the calculations contained herein, Plaintiff has therefore assumed a beginning balance on 7/24/2009 of $96.21 – the lowest possible balance within the aforesaid possible range that Plaintiff's account could have had on 7/24/2009.

[2] From the limited statements in Plaintiff's possession, it appears that Harris Bank posts checks to customer accounts after all POS and ATM transactions are posted.  Thus, Plaintiff has followed that same method in each of the calculations contained herein.

| 7/27/2009 | POS WHOLEFDS SLP 10171 | 18.00 | | 38.21 |
| 7/27/2009 | POS STEAK N SHAKE 0644 Q | 9.06 | | 29.15 |
| 7/27/2009 | POS JEWEL 3776 | 8.37 | | 20.78 |
| 7/27/2009 | POS SPEEDWAY 07427 720 Q | 6.28 | | 14.50 |
| 7/27/2009 | POS JEWEL 3776 | 5.23 | | 9.27 |
| 7/27/2009 | POS STARBUCKS USA 00002Q | 4.81 | | 4.46 |
| 7/27/2009 | POS SPEEDWAY 07612 721 Q | 4.46 | | 0 |
| 7/27/2009 | POS WHOLEFDS SLP 10171 | 2.63 | | -2.63 |
| 7/27/2009 | POS HOLLYWOOD VIDEO | 2.19 | | -4.82 |
| 7/27/2009 | POS HOLLYWOOD VIDEO | 1.97 | | -6.79 |
| 7/27/2009 | POS STEAK N SHAKE 0644 Q | 1.92 | | -8.71 |
| 7/27/2009 | POS REDBOX DVD RENTAL | 1.00 | | -9.71 |
| 7/27/2009 | CHECK # 2104 | 50.00 | | -59.71 |
| 7/28/2009 | OVERDRAFT / INSUFFICIENT FUNDS | | 32.00 | -91.71 |
| 7/28/2009 | OVERDRAFT / INSUFFICIENT FUNDS | | 32.00 | -123.71 |
| 7/28/2009 | OVERDRAFT / INSUFFICIENT FUNDS | | 32.00 | -155.71 |
| 7/28/2009 | OVERDRAFT / INSUFFICIENT FUNDS | | 32.00 | -187.71 |
| 7/28/2009 | OVERDRAFT / INSUFFICIENT FUNDS | | 32.00 | -219.71 |
| 7/28/2009 | OVERDRAFT / INSUFFICIENT FUNDS | | 32.00 | -251.71 |
| 7/28/2009 | POS STARBUCKS USA 00141Q | 7.00 | | -258.71 |
| 7/29/2009 | OVERDRAFT / INSUFFICIENT FUNDS | | 32.00 | -290.71 |
| | | **Total Fees:** | **$224.00** | |

72.     If Harris Bank had not manipulated and reordered Ms. Blahut's transactions from highest to lowest, she would not have incurred seven overdraft fees.

73.     For instance, if Harris Bank had posted the transactions from lowest to highest, Ms. Blahut would have incurred only three overdraft fee instead of seven:

**Balance Sheet if Debits Were Processed from Lowest to Highest**

| | | **Debits** | **Fees** | **Balance** |
| --- | --- | --- | --- | --- |
| | Beginning Balance on 7/24/2009: | | | **$96.21** |
| **Date Posted** | **Debit Description** | | | |
| 7/27/2009 | POS REDBOX DVD RENTAL | 1.00 | | 95.21 |
| 7/27/2009 | POS STEAK N SHAKE 0644 Q | 1.92 | | 93.29 |
| 7/27/2009 | POS HOLLYWOOD VIDEO | 1.97 | | 91.32 |
| 7/27/2009 | POS HOLLYWOOD VIDEO | 2.19 | | 89.13 |
| 7/27/2009 | POS WHOLEFDS SLP 10171 | 2.63 | | 86.50 |
| 7/27/2009 | POS SPEEDWAY 07612 721 Q | 4.46 | | 82.04 |
| 7/27/2009 | POS STARBUCKS USA 00002Q | 4.81 | | 77.23 |
| 7/27/2009 | POS JEWEL 3776 | 5.23 | | 72.00 |
| 7/27/2009 | POS SPEEDWAY 07427 720 Q | 6.28 | | 65.72 |
| 7/27/2009 | POS JEWEL 3776 | 8.37 | | 57.35 |
| 7/27/2009 | POS STEAK N SHAKE 0644 Q | 9.06 | | 48.29 |
| 7/27/2009 | POS WHOLEFDS SLP 10171 | 18.00 | | 30.29 |
| 7/27/2009 | ATM DB-522 W ROOSEVELT ROAD | 20.00 | | 10.29 |
| 7/27/2009 | ATM DB-522 W ROOSEVELT ROAD | 20.00 | | -9.71 |
| 7/27/2009 | CHECK # 2104 | 50.00 | | -59.71 |
| 7/28/2009 | OVERDRAFT / INSUFFICIENT FUNDS | | 32.00 | -91.71 |

| 7/28/2009 | OVERDRAFT / INSUFFICIENT FUNDS | | 32.00 | -123.71 |
|---|---|---|---|---|
| 7/28/2009 | POS STARBUCKS USA 00141Q | 7.00 | | -130.71 |
| 7/29/2009 | OVERDRAFT / INSUFFICIENT FUNDS | | 32.00 | -162.71 |
| | | Total Fees: | $96.00 | |

74.     Likewise, if Harris Bank had posted the transactions in chronological order,

Ms. Blahut would have been assessed only three overdraft fees instead of seven:

**Balance Sheet if Debits Were Processed in Chronological Order**[3]

| | | Debits | Fees | Balance |
|---|---|---|---|---|
| | Beginning Balance on 7/24/2009: | | | $96.21 |
| Date Posted | Debit Description | | | |
| 7/24/2009 | POS WHOLEFDS SLP 10171 | 2.63 | | 93.58 |
| 7/24/2009 | POS STARBUCKS USA 00002Q | 4.81 | | 88.77 |
| 7/24/2009 | POS WHOLEFDS SLP 10171 | 18.00 | | 70.77 |
| 7/24/2009 | POS REDBOX DVD RENTAL | 1.00 | | 69.77 |
| 7/24/2009 | POS HOLLYWOOD VIDEO | 1.97 | | 67.80 |
| 7/24/2009 | POS HOLLYWOOD VIDEO | 2.19 | | 65.61 |
| 7/25/2009 | POS JEWEL 3776 | 8.37 | | 57.24 |
| 7/25/2009 | POS STEAK N SHAKE 0644 Q | 1.92 | | 55.32 |
| 7/26/2009 | POS STARBUCKS USA 00141Q | 7.00 | | 48.32 |
| 7/26/2009 | POS SPEEDWAY 07427 720 Q | 6.28 | | 42.04 |
| 7/26/2009 | POS SPEEDWAY 07612 721 Q | 4.46 | | 37.58 |
| 7/26/2009 | POS JEWEL 3776 | 5.23 | | 32.35 |
| 7/26/2009 | POS STEAK N SHAKE 0644 Q | 9.06 | | 23.29 |
| 7/27/2009 | CHECK # 2104 | 50.00 | | -26.71 |
| 7/27/2009 | ATM DB-522 W ROOSEVELT ROAD | 20.00 | | -46.71 |
| 7/27/2009 | ATM DB-522 W ROOSEVELT ROAD | 20.00 | | -66.71 |
| 7/28/2009 | OVERDRAFT / INSUFFICIENT FUNDS | | 32.00 | -98.71 |
| 7/28/2009 | OVERDRAFT / INSUFFICIENT FUNDS | | 32.00 | -130.71 |
| 7/28/2009 | OVERDRAFT / INSUFFICIENT FUNDS | | 32.00 | -162.71 |
| | | Total Fees: | $96.00 | |

75.     Harris Bank failed to notify Plaintiff that she could be assessed overdraft fees

on transactions even though there were sufficient funds in the checking account to cover the

transaction at the time the transaction was executed.  In addition, Harris Bank never notified

Plaintiff at the time she executed the purported insufficient funds transactions described above,

that her checking account was overdrawn or that she would be charged an overdraft fee as a

result of the transactions.  Furthermore, Harris Bank paid, rather than returned, all of the debit

---

[3] The transactions are shown in the order in which they were incurred based on Plaintiff's receipts, which show the date, hour and minute of each transaction.

card charges described above, even though Plaintiff's accounts purportedly lacked sufficient funds to cover the transactions.

76.     Based on information and belief, the overdraft charges assessed Plaintiff are representative of millions of dollars of overdraft fees that Harris Bank wrongfully assessed and deducted from its customers' accounts.   These wrongful takings are especially egregious considering the fact that the Bank approved each transaction and knew at the time of approval whether there were sufficient funds in the account to cover the transaction.

## I.        The Damages Sustained by Plaintiff and the Classes

77.     As shown by this example, Harris Bank's overdraft policies make it difficult for a customer to avoid injury even if the customer keeps close track of the balance in his or her account.   In fact, the Agencies have stated that "injury" resulting from such policies "is not reasonably avoidable" by consumers.   73 F.R. 28904-01, 28929.   "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.   Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account.   For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available." *Id*.

78.     According to rules proposed by the Agencies: "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . . This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee."   73 F.R. 28904-01, 28929 (May 19, 2008).

79.     Thus, as a consequence of Harris Bank's overdraft policies and practices, Plaintiff and the Classes have been wrongfully forced to pay overdraft fees.  Harris Bank has improperly deprived Plaintiff and the Classes of significant funds, causing ascertainable monetary losses and damages.

80.     As a consequence of Harris Bank's improper overdraft fees, Harris Bank has wrongfully deprived Plaintiff and the Classes of funds to which it had no legitimate claim.

81.     Plaintiff and the Classes had sufficient funds to cover at least some of the transactions for which she and the Classes were charged overdraft fees.  Plaintiff and members of the Classes either had adequate funds to cover the transactions posted to their accounts, or the accounts were allowed to become overdrawn, even by *de minimis* margins, exclusively so that Harris Bank could impose these wrongful charges.   In many instances, Harris Bank's manipulation of the process for imposing overdraft fees triggered a cascade of charges that exponentially added to the charges it collected from Plaintiff and Class members.

82.     All conditions precedent to the relief sought herein have either occurred or have been performed or waived.

### FIRST CLAIM FOR RELIEF
### Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing[4]
### (On Behalf of the National Class)

83.     Plaintiff repeats paragraphs 1 through 82 above.

---

[4]  Illinois and certain other states recognize a claim for breach of the covenant of good faith and fair dealing as a separate and independent claim from breach of contract.  Other states treat breach of the covenant of good faith and fair dealing as a species of breach of contract.  For the sake of convenience in this multi-district litigation, the Complaint pleads these two types of claims, which are substantively identical, in a single count.

84.     Plaintiff and Harris Bank have contracted for bank account deposit, checking, ATM, and debit card services, as embodied in Harris Bank's Deposit Agreement and related documentation.

85.     Under the laws of the states where Harris Bank does business, good faith is an element of every contract pertaining to the assessment of overdraft fees.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

86.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

87.     Harris Bank has breached the covenant of good faith and fair dealing in the Deposit Agreement through its overdraft policies and practices as alleged herein.

88.     Plaintiff and the National Class have performed all, or substantially all, of the obligations imposed on them under the Deposit Agreement.

89.     Plaintiff and members of the National Class have sustained damages as a result of Harris Bank's breach of the covenant of good faith and fair dealing.

## SECOND CLAIM FOR RELIEF
### Unconscionability
**(On Behalf of the National Class)**

90.        Plaintiff repeats paragraphs 1 through 82 above.

91.        Harris Bank's overdraft policies and practices are or were substantively and procedurally unconscionable in the following respects, among others:

a.        Prior to the Effective Date, the Bank did not disclose or reasonably disclose to customers that they had the option to "opt out" of the Bank's overdraft scheme;

b.        Prior to the Effective Date, the Bank did not obtain affirmative consent from checking account customers prior to processing a transaction that would overdraw the account and result in an overdraft fee;

c.        The Bank does not alert its customers that a debit card transaction will trigger an overdraft, and does not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

d.        The Deposit Agreement and related documents, including the Fee Schedule, are contracts of adhesion in that they are standardized forms, imposed and drafted by the Bank, which is a party of vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement in its entirety;

e.        The amount of overdraft fees is disclosed in an ineffective, ambiguous, misleading, and unfair manner, since it is not contained in the Deposit Agreement, but rather in a different and separate document, the Fee Schedule, which is not signed by the depositor; and

f.        The Deposit Agreement provided to customers is ineffective, ambiguous, deceptive, unfair, and misleading in that it does not unambiguously state that the Bank always reorders debits from high to low, even though Harris Bank *always* reorders

transactions in this way for customers in order to maximize overdrafts and overdraft fee revenues for the Bank.

92.     Considering the great business acumen and experience of Harris Bank in relation to Plaintiff and the National Class, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law.

93.     The imposition of overdraft charges which exceed the amount overdrawn (e.g., the imposition of a $32 charge on an overdraft of less than $32) is itself unconscionable. Such charges are not reasonably related to the Bank's cost of covering the overdraft and/or its risk of nonpayment (where the Bank pays the overdraft), or to the Bank's cost of returning the item unpaid (where the Bank does not pay the overdraft).

94.     Plaintiff and members of the National Class have sustained damages as a result of Harris Bank's unconscionable policies and practices as alleged herein.

### THIRD CLAIM FOR RELIEF
### Conversion
### (On Behalf of the National Class)

95.     Plaintiff repeats paragraphs 1 through 82 above.

96.     Harris Bank had and continues to have a duty to maintain and preserve its customers' checking accounts and to prevent their diminishment through its own wrongful acts.

97.     Harris Bank has wrongfully collected overdraft fees from Plaintiff and the members of the National Class, and has taken specific and readily identifiable funds from their accounts in payment of these fees in order to satisfy them.

- 28 -

98.     Harris Bank has, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiff and the members of the National Class, without legal justification.

99.     Harris Bank continues to retain these funds unlawfully without the consent of Plaintiff or members of the National Class.

100.    Harris Bank intends to permanently deprive Plaintiff and the members of the National Class of these funds.

101.    These funds are properly owned by Plaintiff and the members of the National Class, not Harris Bank, which now claims that it is entitled to their ownership, contrary to the rights of Plaintiff and the members of the National Class.

102.    Plaintiff and the members of the National Class are entitled to the immediate possession of these funds.

103.    Harris Bank has wrongfully converted these specific and readily identifiable funds.

104.    Harris Bank's wrongful conduct is continuing.

105.    As a direct and proximate result of this wrongful conversion, Plaintiff and the members of the National Class have suffered and continue to suffer damages.

106.    By reason of the foregoing, Plaintiff and the members of the National Class are entitled to recover from Harris Bank all damages and costs permitted by law, including all amounts that Harris Bank has wrongfully converted.

### FOURTH CLAIM FOR RELIEF
### Unjust Enrichment
### (On Behalf of the National Class)

107.    Plaintiff repeats paragraphs 1 through 82 above.

108.    Plaintiff, on behalf of herself and the National Class, assert a common law claim for unjust enrichment.

109.    By means of Harris Bank's wrongful conduct alleged herein, Harris Bank knowingly provides banking services to Plaintiff and members of the National Class that are unfair, unconscionable, and oppressive.

110.    Harris Bank knowingly received and retained wrongful benefits and funds from Plaintiff and members of the National Class.  In so doing, Harris Bank acted with conscious disregard for the rights of Plaintiff and members of the National Class.

111.    As a result of Harris Bank's wrongful conduct as alleged herein, Harris Bank has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the National Class.

112.    Harris Bank's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

113.    Under the common law doctrine of unjust enrichment, it is inequitable for Harris Bank to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of overdraft fees on Plaintiff and members of the National Class in an unfair, unconscionable, and oppressive manner.  Harris Bank's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

114.    The financial benefits derived by Harris Bank rightfully belong to Plaintiff and members of the National Class.  Harris Bank should be compelled to disgorge in a common fund for the benefit of Plaintiff and members of the National Class all wrongful or inequitable proceeds received by them.  A constructive trust should be imposed upon all wrongful or

inequitable sums received by Harris Bank traceable to Plaintiff and the members of the National Class.

115.     Plaintiff and members of the National Class have no adequate remedy at law.

**FIFTH CLAIM FOR RELIEF**
**Violations of Illinois' Consumer Fraud and Deceptive Business Practices Act**
**(On Behalf of the Illinois State Subclass)**

116.     Plaintiff repeats paragraphs 1 through 82 above.

117.     This claim is asserted on behalf of the members of the Illinois State Subclass under Illinois' consumer protection statute.

118.     Harris Bank engages in unfair business practices relating to the imposition of overdraft fees on consumers, in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq*.

119.     Illinois' Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*, prohibits "unfair or deceptive acts or practices" including the use of any "misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact."

120.     Harris Bank violated 815 ILCS 505/2 by the conduct alleged above including, but not limited to, employing an unfair and deceptive policy and practice of re-sequencing debit purchases from largest to smallest, and misrepresenting and failing to disclose its policy and practice of re-sequencing debit purchases from largest to smallest in its Deposit Agreement and related documents.  Harris Bank misrepresented, concealed, suppressed, or otherwise omitted such material fact with intent that its customers rely upon their concealment, suppression, or omission.

121.     As redress for Harris Bank's repeated and ongoing violations of this consumer

protection statute, Plaintiff and the Illinois State Subclass are entitled to, *inter alia*, damages and

declaratory relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Classes demand a jury trial on all claims so triable and

judgment as follows:

1.     Declaring Harris Bank's overdraft fee policies and practices to be wrongful,

unfair and unconscionable;

2.     Restitution of all overdraft fees paid to Harris Bank by Plaintiff and the

Classes, as a result of the wrongs alleged herein in an amount to be determined at trial;

3.     Disgorgement of the ill-gotten gains derived by Harris Bank from its

misconduct;

4.     Actual damages in an amount according to proof;

5.     Punitive and exemplary damages;

6.     Pre-judgment interest at the maximum rate permitted by applicable law;

7.     Costs and disbursements assessed by Plaintiff in connection with this action,

including reasonable attorneys' fees pursuant to applicable law; and

8.     Such other relief as this Court deems just and proper.

Dated:   December 6, 2010.

/s/ Bruce S. Rogow
Bruce S. Rogow, Esquire
Florida Bar No. 067999
brogow@rogowlaw.com
Robert C. Gilbert, Esquire
Florida Bar No. 561861
bobby@alterslaw.com
ALTERS LAW FIRM, P.A.
4141 N.E. 2nd Avenue
Miami, Florida 33137
Tel:  (305) 571-8550
Fax:  (305) 571-8558

*Plaintiffs' Lead Counsel*

/s/ Robert C. Josefsberg
Robert C. Josefsberg, Esquire
Florida Bar No. 40856
rjosefsberg@podhurst.com
Victor M. Diaz, Jr., Esquire
Florida Bar No. 503800
vdiaz@podhurst.com
Peter Prieto, Esquire
Florida Bar No. 501492
pprieto@podhurst.com
John Gravante, III, Esquire
Florida Bar No. 617113
jgravante@podhurst.com
PODHURST ORSECK, P. A.
City National Bank Building
25 W Flagler Street - Suite 800
Miami, FL 33130-1780
Tel: 305-358-2800
Fax: 305-358-2382

/s/ Michael W. Sobol
Michael W. Sobol, Esquire
California Bar No. 194857
msobol@lchb.com
David S. Stellings, Esquire
New York Bar No. 2635282
dstellings@lchb.com
Roger N. Heller
California Bar No. 215348
rheller@lchb.com
Jordan Elias, Esquire
California Bar No. 228731
jelias@lchb.com
LIEFF CABRASER HEIMANN &
  BERNSTEIN LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Tel: 415-956-1000
Fax: 415-956-1008

/s/ Edward Adam Webb
Edward Adam Webb, Esquire
Georgia Bar No. 743910
Adam@WebbLLC.com
G. Franklin Lemond, Jr., Esquire
Georgia Bar No. 141315
FLemond@WebbLLC.com
WEBB, KLASE & LEMOND, L.L.C.
1900 The Exchange SE, Suite 480
Atlanta, GA 30339
Tel: 770-444-9325
Fax: 770-444-0271

/s/ Ted E. Trief
Ted E. Trief, Esquire
New York Bar No. 1476662
ttrief@triefandolk.com
Barbara E. Olk, Esquire
New  York Bar No. 1459643
bolk@triefandolk.com
TRIEF & OLK
150 East 58th street - 34th Floor
New York, NY 10155
Tel: 212-486-6060
Fax: 212-317-2946

/s/ Russell W. Budd
Russell W. Budd, Esquire
Texas Bar No. 03312400
rbudd@baronbudd.com
Bruce W. Steckler, Esquire
Texas Bar No. 00785039
bsteckler@baronbudd.com
Melissa K. Hutts, Esquire
Texas Bar No. 0188015
mhutts@baronbudd.com
BARON & BUDD, P.C.
3102 Oak Lawn Avenue
Suite 1100
Dallas, TX 75219
Tel: 214-521-3605
Fax: 214-520-1181

/s/ Ruben Honik
Ruben Honik, Esquire
Pennsylvania Bar No. 33109
rhonik@golombhonik.com
Kenneth J. Grunfeld
Pennsylvania Bar No. 84121
kgrunfeld@golombhonik.com
GOLOMB & HONIK, P.C.
1515 Market Street
Suite 1100
Philadelphia, PA 19102
Tel: 215-985-9177
Fax: 215-985-4169

*Plaintiffs' Executive Committee*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 1:09-MD-02036-JLK**

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 6, 2010, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document

is being served this day on all counsel of record or pro se parties identified on the attached

Service List in the manner specified, either via transmission of Notices of Electronic Filing

generated by CM/ECF or in some other authorized manner for those counsel or parties who are

not authorized to receive electronically Notices of Electronic Filing.


/s/ Robert C. Gilbert
Robert C. Gilbert, Esquire
Florida Bar No. 561861
ALTERS LAW FIRM, P.A.
4141 N.E. 2nd Avenue, Suite 201
Miami, Florida 33137
bobby@alterslaw.com

- 35 -