# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 1:09-02036-JLK

---

**IN RE: CHECKING ACCOUNT OVERDRAFT LITIGATION**

**MDL No. 2036**

---

**THIS DOCUMENT RELATES TO:**

*McKinley v. Great Western Bank*
W.D. MO Case No. 4:10-595
S.D. FL Case No. 1:10-cv-22770-JLK

---

## AMENDED CLASS ACTION COMPLAINT

Plaintiff, Michael McKinley, through undersigned counsel, on behalf of himself and all persons similarly situated, alleges the following based on personal knowledge as to allegations regarding the Plaintiff and on information and belief as to other allegations.

## INTRODUCTION

1.        This is a civil action seeking monetary damages, restitution, and declaratory relief from Defendant, Great Western Bank ("Great Western" or the "Bank"), arising from its unfair and unconscionable assessment and collection of excessive overdraft fees.

2.        In the era of electronic banking and the ubiquitous use of debit card transactions, the assessment of overdraft fees has become a major profit center for many United States banks, including Great Western.  For years, banks covered customers who occasionally bounced checks and even did so for a time for customers using debit cards, without charging

their customers.  Since the early 1990's, however, banks have devised methods to provide overdraft "protection" for customers and charge them in each instance.  A recent FDIC report estimated that overdraft fees represent 74 percent of the total service charges that are imposed on deposit accounts in the United States.  A 2008 FDIC study reports that overdraft fees for debit cards can carry an effective annualized interest rate that *exceeds 3,500 percent*.  Nevertheless, the Consumer Federation of America reports that five of the ten largest banks raised their overdraft fees in the last year.

3.      In 2007, banks collected more than $17 billion in overdraft fees.  That number nearly doubled in 2008, as more and more consumers struggled to maintain positive checking account balances.  *In 2009, banks brought in $37.1 billion in overdraft charges alone.*  Operating more than 200 banking locations, Great Western benefits greatly from these staggering charges.

4.      Almost by definition, these fees disproportionately affect the poor, who are most likely to maintain low balances.  Moebs Services, a research company that has conducted studies for the government as well as banks, estimates that 90 percent of overdraft fees are paid by the poorest 10 percent of banks' customer base.  Moreover, these fees have the tendency to create a domino effect, because the imposition of a service charge on an account with a negative balance will make it less likely that the account holder's balance will reach positive territory, resulting in more fees.

5.      Before debit cards existed, banks occasionally extended the courtesy of honoring paper checks written on overdrawn or otherwise deficient accounts for customers who were typically in good standing.  Banks extended this courtesy largely because the third party involved in a sales transaction allowed the customer to pay by check, expecting the funds to be available and the check to clear.  For example, if a customer wrote a check to purchase groceries,

the grocery store would only know whether the check cleared *after* the groceries had been purchased.

6.      The same considerations are not present when customers use debit cards. Banks could simply decline to honor debit or point of sale transactions where accounts lack sufficient funds to execute the transactions.   Retail and service transactions could still be executed if consumers presented an alternative form of payment.  ATM transactions could still proceed if banks provided a warning that an overdraft fee would be assessed, and customers chose to proceed nevertheless.  In fact, until a few years ago, most banks simply declined debit transactions that would overdraw an account.

7.      Instead of simply declining debit transactions when there are insufficient funds, or warning its customers that an overdraft fee will be assessed if they proceed with the transaction, Great Western routinely processes such transactions and then charges its customers an overdraft fee of $33 – even when the transaction is for only a few dollars.  This automatic, fee-based overdraft scheme is intentionally designed to maximize overdraft fee revenue for Great Western.   Additionally, as part of its inequitable motive to generate obscene profits gained through the imposition of unconscionable overdraft fees, Great Western failed to adequately disclose to its customers that they could elect to opt out of overdraft protection.

8.      In many instances, these overdraft fees cost Great Western account holders hundreds of dollars in a matter of days, or even hours, when they may be overdrawn by only a few dollars.  Even more egregious, customer accounts may not actually be overdrawn at the time the overdraft fees are charged, or at the time of the debit transactions.

9.      Thus, it is through manipulation and alteration of customers' transaction records that Great Western maximizes overdraft penalties imposed on customers.

## JURISDICTION AND VENUE

10.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed classes is a resident of a different state than Great Western.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1407(a).  Venue was proper in the Western District of Missouri, the district in which Plaintiff's action was originally filed, pursuant to 28 U.S.C. § 1391 because Great Western Bank is subject to personal jurisdiction there and regularly conducts business in that district, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred and continue to occur in that district.

## THE PARTIES

12.     Plaintiff, Michael McKinley, is a resident of the state of Arizona.

13.     Great Western is a community bank incorporated in the state of South Dakota and maintains its principal place of business in Sioux Falls, South Dakota.  Among other things, Great Western is engaged in the business of providing retail banking services to tens of thousands of consumers, including Plaintiff and members of the putative Classes, which include the issuance of debit cards for use by its customers in conjunction with their checking accounts. According to its website, Great Western has assets in excess of $6 billion and operates over 200 banking locations in Arizona, Colorado, Iowa, Kansas, Missouri, Nebraska, and South Dakota.

## CLASS ALLEGATIONS

14.     Plaintiff brings this action on behalf of himself and all others similarly situated pursuant to Fed. R. Civ. P. 23.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

15.     The proposed classes are defined as:

> All Great Western customers in the United States who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, incurred an overdraft fee as a result of Great Western's practice of re-sequencing debit card transactions from highest to lowest dollar amount (the "National Class").

> All Great Western customers having accounts at branches in the state of Arizona for the purpose of asserting claims under Arizona's consumer protection statute, A.R.S. § 44-1521, *et seq.* (the "Arizona State Subclass") (*see* Fifth Claim for Relief, *infra*).

> The National Class and the Arizona State Subclass are collectively referred to as the "Classes."

16.     Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

17.     Excluded from the Classes are Great Western, its parents, subsidiaries, affiliates, officers and directors, any entity in which Great Western has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

18.     The members of the Classes are so numerous that joinder is impractical.  The Classes consist of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to Great Western's records.

19.     The claims of the representative Plaintiff are typical of the claims of the Classes in that the representative Plaintiff, like all Class members, was charged overdraft fees by Great Western as a result of its practice of re-sequencing debit card transactions from highest to

lowest. The representative Plaintiff, like all Class members, has been damaged by Great Western's misconduct in that he has been assessed and/or will continue to be assessed unfair and unconscionable overdraft charges. Furthermore, the factual basis of Great Western's misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.

20.     There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual Class members.

21.     Among the questions of law and fact common to the Classes are whether Great Western:

a.      Did not clearly disclose and/or refused to allow its customers to opt out of its overdraft protection program;

b.      Did not obtain affirmative consent from its customers prior to processing transactions that would result in overdraft fees;

c.      Does not alert its customers that a debit card transaction will trigger an overdraft fee, and does not provide its customers with an opportunity to cancel such transactions;

d.      Manipulates and reorders transactions so that it can increase the number of overdraft fees it imposes;

e.      Manipulates and reorders debits from highest to lowest in order to maximize the number of overdrafts and, consequently, the amount of overdraft fees;

f.      Imposes overdrafts and overdraft fees when, but for reordering transactions, there would otherwise be sufficient funds in the accounts;

       g.       Fails to provide customers with accurate balance information;

       h.       Delays posting of transactions by customers using debit cards so that customers are charged overdraft fees on transactions, even though the customers had sufficient funds in their accounts to cover the transactions upon execution;

       i.       Charges exorbitant overdraft fees that bear no relationship to the actual costs and risks of covering insufficient funds transactions;

       j.       Breaches its covenant of good faith and fair dealing with Plaintiff and other members of the Classes through its overdraft policies and practices;

       k.       Requires its customers to enter into standardized account agreements which include unconscionable provisions;

       l.       Converts money belonging to Plaintiff and other members of the Classes through its overdraft policies and practices;

       m.       Is unjustly enriched through its overdraft policies and practices; and

       n.       Violates the consumer protection acts of certain states through its overdraft policies and practices.

22.       Other questions of law and fact common to the Classes include:

       a.       The proper method or methods by which to measure damages, and

       b.       The declaratory relief to which the Classes are entitled.

23.       Plaintiff's claims are typical of the claims of other Class members, in that they arise out of the same wrongful overdraft policies and practices and the same or substantially similar unconscionable provisions of Great Western's account agreements and other related

documents.  Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other Class member.

24.     Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions.  Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes.

25.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Great Western, no Class member could afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, the Class members will continue to suffer losses and Great Western's misconduct will proceed without remedy.

26.     Even if Class members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

## COMMON FACTUAL ALLEGATIONS

A.     **Great Western**

27.     According to its website, Great Western operates over 200 banking locations in Arizona, Colorado, Iowa, Kansas, Missouri, Nebraska, and South Dakota.

- 8 -

28.       Great Western is in the business of providing its customers with a variety of banking services.  One of the services provided by Great Western for customers who open a checking account is a debit card, also known as a check card or ATM card.  Through those debit cards, customers can engage in transactions using funds directly from their accounts by engaging in "debit" or "point of sale" ("POS") transactions, or may withdraw money from their accounts at automated teller machines ("ATMs").  Whether the card is used to execute POS transactions or to withdraw cash from ATMs, the transaction is processed electronically.  As a result, Great Western is notified instantaneously when the card is swiped, and has the option to accept or decline transactions at such time.

29.       Great Western employs sophisticated software to automate its overdraft system.  This program maximizes the number of overdrafts, and thus, the amount of overdraft fees charged per customer.

30.       As a result of Great Western's manipulation and alteration of customers' transactions records, funds in a customer's account are depleted more rapidly and more overdraft fees are likely to be charged for multiple smaller transactions.  Indeed, overdraft charges are likely to occur at times when, but for the manipulation and alteration, there would be funds in the account and no overdraft would occur.  For example, if a customer, whose account has a $50 balance at the time Great Western processed several transactions, made four transactions of $10 and one subsequent transaction of $100 on the same day, the Bank would reorder the debits from largest to smallest, imposing five overdraft fees on the customer.  Conversely, if the $100 transaction was debited last – consistent with the actual order of transactions – only one overdraft fee would be assessed.  *See* FDIC Study of Bank Overdraft Programs, November 2008, *available at*: http://www.fdic.gov/bank/analytical/overdraft/, at 11, n. 12.

B.        **Great Western's Relevant Customer Documents Regarding Overdrafts**

31.        Plaintiff and all members of the Classes maintain or maintained a checking account with Great Western.  The terms of Great Western's checking accounts are contained in standardized account holder agreements, presented to its customers on a "take it or leave it" basis, drafted and imposed by Great Western, which was the party of vastly superior bargaining strength, and thus constitute agreements of adhesion.  Upon request, the Bank provided Plaintiff with a copy of a document that is believed to be the Deposit Agreement, which is entitled "Terms and Conditions of Your Account" (the "Deposit Agreement"), dated April 4, 2001, and is attached as Exhibit A.

32.        The Deposit Agreement states:

> The law permits us to pay items (such as checks or drafts) drawn on your account in any order.  To assist you in handling your account with us, we are providing you with the following information regarding how we process the items that you write.  When processing items drawn on your account, or [sic] policy is to pay them according to the dollar amount. We pay the largest items first. The order in which items are paid is important if there is not enough money in your account to pay all of the items that are presented. Our payment policy will cause your largest, and perhaps more important, items to be paid first (such as your rent or mortgage payment), but may increase the overdraft or NSF fees you have to pay if funds are not available to pay all of them. If an item is presented without sufficient funds in your account to pay it, we may, at our discretion, pay the item (creating an overdraft) or return the item (NSF).

*Id*. at 2.

33.        The Deposit Agreement only refers to items *drawn* on customers' accounts, "such as checks or drafts" and fails to state that the Bank will re-order *debit transactions* from highest to lowest dollar value.

34.        In addition, the Deposit Agreement states "[w]e encourage you to make careful records and practice good account management. This will help you to avoid writing checks or drafts without funds and incurring the resulting fees."  *Id.*

- 10 -

35.     Great Western also publishes a document entitled "Schedule of Fees" (the "Fee Schedule"), which is available for customers in each state in which the Bank conducts business.  A representative copy of the Fee Schedule is attached as Exhibit B.

36.     The Deposit Agreement and related documents, including the Fee Schedule, failed to disclose to customers that they had the option to "opt out" from the Bank's overdraft scheme, although it was possible for them to opt out upon request.

C.     **Great Western's Re-Ordering of Checking Account Transactions**

37.     In an effort to maximize overdraft revenue, Great Western manipulates and reorders debits from highest to lowest during given periods of time.  Great Western reorders transactions for no reason other than to increase the number of exorbitant overdraft fees it can charge.  This practice violates the consumer protection laws of certain states and the covenant of good faith and fair dealing in the Bank's Deposit Agreement.

38.     In addition, Great Western misleads its customers regarding its reordering practices.  The Deposit Agreement fails to state that the Bank will re-order debit transactions from highest to lowest dollar value.  In addition, the Deposit Agreement fails to state that the Bank groups together POS transactions that occurred on subsequent days with POS transactions that occurred on earlier days, and reorders them so that higher debits that occurred on subsequent days are posted to its customers' accounts before lower debits that occurred on earlier days.  In addition, the Deposit Agreement fails to give the period of time in which the Bank processes and reorders batches of transactions.  The Bank's practices thus violate the covenant of good faith and fair dealing implied in the Bank Deposit Agreement as well as the consumer protection laws of numerous states.

39.     Great Western claims that its Internet Banking service "helps you streamline your financial information, giving you greater control of your finances."  Great Western also

- 11 -

claims that with Internet Banking "you have quick and easy access to all your account balance information."  Contrary to Great Western's representations, the online account features are not a means by which consumers can gain control of their finances or effectively manage their accounts.  In fact, the inaccurate and unreliable information displayed in the online account information on the Bank's website dupes consumers into generating overdraft fees for Great Western.

40.     As a result, it is impossible for customers to keep accurate records and any attempt to "practice good account management" will be frustrated by the Bank's reordering scheme.

41.     Transactions involving debit cards used by Great Western customers, including the withdrawal of cash from ATMs and POS transactions with vendors, are processed electronically.  As a result, Great Western is notified instantaneously when the customer's debit card is swiped, and has the option to accept or decline these transactions.

42.     Notwithstanding the instantaneous nature of these electronic debit card transactions, under Great Western's posting system, it fails to post charges in the order in which they are assessed or received.  Great Western developed a policy and employs a practice whereby account charges and debits are posted to its customers' accounts out of chronological order for the sole purpose of maximizing the number of overdraft transactions and, therefore, the amount of overdraft fees charged to its customers.

43.     Instead of processing such transactions in chronological order, Great Western processes them starting with the largest debit and ending with the smallest debit, so as to generate the largest possible number of overdrafts and the greatest possible amount of overdraft fees.

44.      Great Western refrains from immediately posting charges to a customer's account as it receives them – sometimes for multiple business days.  By holding charges rather than posting them immediately to an account, Great Western is able to amass a number of charges on the account.  Subsequently, Great Western posts all of the amassed charges on a single date.  When the group of charges is eventually posted to the customer's account, Great Western posts them in order of largest to smallest – not in the order in which they were received or in the order in which they were charged.  This delayed posting results in the imposition of multiple overdraft fees that would not otherwise be imposed.  The delayed posting also prevents customers from ascertaining the accurate balances in their accounts.

45.      Great Western's policy and practice of posting charges from largest to smallest, rather than chronologically, or from smallest to largest, is specifically designed to maximize the generation of overdraft fees by triggering overdraft fees for account charges that would not otherwise result in such fees.

46.      Great Western enforces an unconscionable policy whereby charges assessed are posted to customers' accounts in a non-chronological order, from highest to lowest, and are held for multiple days and then batched together, to maximize the number of overdraft transactions and fees.  Great Western's processing practices substantially increase the likelihood that customers' smaller charges will result in multiple overdraft fees.  The practices provide Great Western with substantially higher service fee revenues than it would otherwise achieve absent these practices.

47.      As a result, Plaintiff and members of the Classes have been assessed overdraft fees for transactions which occurred when they actually had sufficient funds in their accounts to cover those transactions.

D.         **Great Western's Cloaking of Accurate Balance Information**

48.        Great Western actively promotes the convenience of its debit cards and other electronic debiting, but fails to provide customers with accurate balance information.  When customers execute account transactions, they generally do not have access to an accurate balance register or balance information.

49.        Great Western's computers are set up not to process transactions in the order received, but in order from highest to lowest dollar amount so as to ensure that the maximum number of overdraft charges are imposed on customers' accounts.

50.        Great Western provides inaccurate balance information to its customers through its electronic network.  Great Western informs its customers that they have a positive balance when, in reality, they have a negative balance, despite the Bank's actual knowledge of outstanding debits and transactions.

51.        Even when Great Western has actual knowledge of outstanding transactions which have already created a negative balance in a customer's account, it encourages the customer to incur more overdraft charges by approving – rather than prudently declining – subsequent debit card purchases and other electronic transactions.

52.        Great Western also assesses overdraft fees at times when actual funds in the customer's account are sufficient to cover all debits that have been submitted to the Bank for payment.  It does this by placing a "hold" on actual funds in the customer's account.  In doing so, Great Western charges overdraft fees where it faces no risk, because the cash balance in the customer's account has not dropped below zero.

53.        A debit card can be used to make a purchase in two ways:  (1) an Automated Clearing House ("ACH") transaction in which a customer enters his/her PIN number at the point of sale; or (2) an "offline signature" transaction, in which the debit card is treated like a credit

card and the customer usually is required to sign a receipt.  In the former, the money is debited from the account instantaneously.  In the latter, the "offline signature" transaction occurs in two parts: first, authorization for the purchase amount is obtained by the merchant.  Second, the transaction is not actually "settled" (that is, money between the bank and the merchant does not change hands) until the merchant submits the transaction to the bank sometime after the customer's purchase.  Before settlement, "authorization holds" are placed on the customer's account, preventing access to money so held.  For some transactions, the authorization hold is for an amount larger than the purchase actually made by the customer.  Great Western charges an overdraft fee when the authorization hold amount—not the purchase price—pushes an account balance into negative territory.

54.     Such "authorization hold" policies, and the extent to which they are used by Great Western to charge overdraft fees, are inconsistent with Great Western's Deposit Agreement.

55.     The terms of the Deposit Agreement fail to alert customers that they must often keep a large cushion of funds in their account in order to guard against an overdraft fee even when customers do not spend more than the funds in their account, and are materially deceptive.  Accordingly, Great Western charges customers overdraft fees even when there are sufficient funds in customers' accounts to cover transactions.

56.     Charging an overdraft fee when in fact an account has never been over-drafted is materially deceptive.  By charging overdraft fees when in fact the customer's account has not been over-drafted, Great Western breached its contract with Plaintiff.

**E.**      <u>Great Western's Failure to Notify Customers of Overdrafts or Advise Customers of Their Right to Opt Out</u>

57.      At the time its debit cards are used in POS transactions or at ATMs, Great Western is able to determine, almost instantaneously, whether there are sufficient funds in a customer's account to cover that particular transaction. The Bank has the technological capability to decline transactions (which it does when a pending transaction would exceed a pre-determined, overdraft tolerance limit for the account), or notify customers at that very moment that the particular debit card transaction would result in an overdraft. Prior to the effective date of the opt in/opt out requirements of Regulation E (the "Effective Date"), Great Western could have given customers the option to decline the transaction to avoid incurring the overdraft fee, but it did not do so because it sought to maximize the amount of revenue generated through its assessment of overdraft fees.

58.      Notwithstanding its capabilities and actual knowledge, Great Western failed to provide notice to Plaintiff and the Classes that a particular debit card transaction would result in an overdraft and, hence, an overdraft fee. Because Great Western's customers were not notified of the potential overdraft, and were not given the option of declining the debit card transaction or providing another form of payment, the customers were assessed monetary damages in the form of overdraft fees.

59.      Prior to the Effective Date, Great Western failed to make Plaintiff and Class members aware that they could opt out of its overdraft scheme upon request, thereby avoiding any overdraft fees from being charged.

**F.**      <u>Great Western's Overdraft Policies and Practices Are Contrary to Best Practices</u>

60.      By engaging in the conduct described herein, Great Western has failed to follow the list of "best practices" for overdraft programs set forth in the "Joint Guidance on

Overdraft Protection Programs" ("Joint Guidance") issued by the United States Department of the Treasury, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the National Credit Union Administration (collectively, the "Agencies").  A copy of the Joint Guidance is attached as Exhibit C.  These "best practice" recommendations include: "Provide election or opt-out of service.  Obtain affirmative consent of consumers to receive overdraft protection.  Alternatively, where overdraft protection is automatically provided, permit consumers to 'opt-out' of the overdraft program and provide a clear consumer disclosure of this option."  70 F.R. 9127-01, 9132.

61.     According to rules proposed by the Agencies: "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . .  This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee."  73 F.R. 28904-01, 28929 (May 19, 2008).

62.     The Joint Guidance also advises banks to "[a]lert customers before a transaction triggers any fees.  When consumers attempt to withdraw or transfer funds made available through an overdraft protection program, provide a specific consumer notice, where feasible, that completing the withdrawal may trigger the overdraft fees."  70 F.R.D. 9127, 9132.  The Joint Guidance further advises that "[t]his notice should be presented in a manner that permits consumers to cancel the attempted withdrawal or transfer after receiving the notice."  *Id*.

63.     Similarly, the list of "best practices" recommended in "Overdraft Protection: A Guide for Bankers," issued by the American Bankers Association, includes offering customers the option of "opting out" of any overdraft programs, and informing customers, before they

access funds, that a particular point of sale or ATM transaction will cause them to incur an overdraft fee.  A copy of "Overdraft Protection: A Guide for Bankers" is attached as Exhibit D.

64.     Great Western's overdraft policies make it difficult for customers to avoid injury even if they carefully track the balance in their account.  In fact, the Agencies have stated that "Injury" resulting from such policies, "is not reasonably avoidable" by the consumer. 73 F.R. 28904-01, 28929.  "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available."

65.     On October 6, 2009, the Center for Responsible Lending issued a report entitled "Overdraft Explosion:  Bank Fees for Overdrafts Increase 35% in Two Years."  The report, attached hereto as Exhibit E, found that it is now "standard procedure to automatically enroll checking account customers in their most expensive overdraft loan program."  The report found that debit card transactions account for more overdraft fees than traditional checks or any other type of transaction, even though "debit card transactions and ATM withdrawals . . . could easily be denied for no fee."  The report also found that overdraft fees increased 35 percent from 2006 to 2008, and that over 50 million Americans overdrew their accounts in a 12 month period, with 27 million accounts incurring five or more overdraft fees.

66.     A chart from the research company Moebs Services shows that, in every year since 1992, banks gained increased revenues from overdraft fees:



**G.    Great Western's Unconscionable Provisions and Policies**

67.    Great Western's overdraft policies and practices are or were unconscionable in the following respects, among others:

a.    Prior to the Effective Date, the Bank did not disclose or reasonably disclose to customers that they had the option to "opt out" of the Bank's overdraft scheme;

b.    Prior to the Effective Date, the Bank did not obtain affirmative consent from checking account customers prior to processing a transaction that would overdraw the account and result in an overdraft fee;

- 19 -

c.      The Bank does not alert its customers that a debit card transaction will trigger an overdraft, and does not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

d.      The Deposit Agreement and related documents, including the Fee Schedule, are contracts of adhesion in that they are standardized forms, imposed and drafted by the Bank, which is a party of vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement in its entirety;

e.      The amount of overdraft fees is disclosed in an ineffective, ambiguous, misleading, and unfair manner, since it is not contained in the Deposit Agreement, but rather in a different and separate document, the Fee Schedule, which is not signed by the depositor; and

f.      The Deposit Agreement provided to customers is ineffective, ambiguous, deceptive, unfair, and misleading in that it does not state that the Bank reorders debit transactions from highest to lowest dollar value, even though Great Western *always* reorders transactions in this way for customers in order to maximize overdrafts and overdraft fee revenues for the Bank.

**H.      <u>Great Western's Overdraft Practices Harmed Plaintiff</u>**

68.      Great Western's wrongful overdraft policies and practices described above harmed Plaintiff and members of the Classes.  The following allegations regarding the named Plaintiff are made for purposes of illustrating the harm and damage sustained by Plaintiff and members of the Classes as a result of Great Western's wrongful overdraft policies and practices.

69.      Plaintiff, Michael McKinley, is a former checking account customer of Great Western.

- 20 -

70.     In connection with his account, the Bank issued a debit card to Mr. McKinley. A debit card allows customers to access their checking account funds by using the card to execute a transaction. The charge is processed electronically, and the Bank has the option to accept or decline the transaction at the point of sale.

71.     Great Western wrongfully charged Mr. McKinley multiple overdraft fees on numerous occasions. For example, Mr. McKinley was charged seventeen overdraft fees on May 17, 2010, in the amount of $33.00 each, for a total of $561.00. Based on information and belief, the overdraft fees were based on the following ordering of transactions:

### Balance Sheet per Great Western Reordering Scheme
### (Debits Processed from Highest to Lowest)

| | | Debits | Fees | Balance |
|---|---|---|---|---|
| | Beginning Balance on 5/17/2010: | | | $1,210.46 |
| Date Posted | Debit Description | | | |
| 05/17/2010 | COLLECTION ACC 619-295-1200 | 925.00 | | 285.46 |
| 05/17/2010 | WEB DISB ISLLC | 225.00 | | 60.46 |
| 05/17/2010 | DDA B/P 1927 05/14/10 61449863 | 135.00 | | -74.54 |
| 05/17/2010 | ATM W/D 1124 05/16/10 00001741 | 100.00 | | -174.54 |
| 05/17/2010 | POS DEB 1944 05/15/10 12817280 | 48.06 | | -222.60 |
| 05/17/2010 | POS DEB 1338 05/15/10 98238906 | 45.01 | | -267.61 |
| 05/17/2010 | POS DEB 1857 05/14/10 00285160 | 40.20 | | -307.81 |
| 05/17/2010 | POS DEB 1820 05/16/10 92638453 | 29.48 | | -337.29 |
| 05/17/2010 | POS DEB 2024 05/15/10 00172407 | 29.08 | | -366.37 |
| 05/17/2010 | POS DEB 2135 05/14/10 00009318 | 22.09 | | -388.46 |
| 05/17/2010 | DBT CRD 2026 05/16/10 00040200 | 20.00 | | -408.46 |
| 05/17/2010 | DBT CRD 1541 05/14/10 00007920 | 9.64 | | -418.10 |
| 05/17/2010 | DBT CRD 1544 05/15/10 00049992 | 9.18 | | -427.28 |
| 05/17/2010 | POS DEB 1714 05/15/10 00427129 | 7.47 | | -434.75 |
| 05/17/2010 | DBT CRD 0051 05/17/10 00058071 | 7.03 | | -441.78 |
| 05/17/2010 | POS DEB 2040 05/15/10 00011732 | 4.11 | | -445.89 |
| 05/17/2010 | POS DEB 2117 05/14/10 00025921 | 4.05 | | -449.94 |
| 05/17/2010 | DBT CRD 1612 05/15/10 00000005 | 3.45 | | -453.39 |
| 05/17/2010 | POS DEB 2254 05/15/10 00027486 | 2.40 | | -455.79 |
| 05/17/2010 | OVERDRAFT ITEM FEE | | 33.00 | -488.79 |
| 05/17/2010 | OVERDRAFT ITEM FEE | | 33.00 | -521.79 |
| 05/17/2010 | OVERDRAFT ITEM FEE | | 33.00 | -554.79 |
| 05/17/2010 | OVERDRAFT ITEM FEE | | 33.00 | -587.79 |
| 05/17/2010 | OVERDRAFT ITEM FEE | | 33.00 | -620.79 |
| 05/17/2010 | OVERDRAFT ITEM FEE | | 33.00 | -653.79 |
| 05/17/2010 | OVERDRAFT ITEM FEE | | 33.00 | -686.79 |
| 05/17/2010 | OVERDRAFT ITEM FEE | | 33.00 | -719.79 |
| 05/17/2010 | OVERDRAFT ITEM FEE | | 33.00 | -752.79 |
| 05/17/2010 | OVERDRAFT ITEM FEE | | 33.00 | -785.79 |

| 05/17/2010 | OVERDRAFT ITEM FEE | | 33.00 | -818.79 |
|---|---|---|---|---|
| 05/17/2010 | OVERDRAFT ITEM FEE | | 33.00 | -851.79 |
| 05/17/2010 | OVERDRAFT ITEM FEE | | 33.00 | -884.79 |
| 05/17/2010 | OVERDRAFT ITEM FEE | | 33.00 | -917.79 |
| 05/17/2010 | OVERDRAFT ITEM FEE | | 33.00 | -950.79 |
| 05/17/2010 | OVERDRAFT ITEM FEE | | 33.00 | -983.79 |
| 05/17/2010 | OVERDRAFT ITEM FEE | | 33.00 | -1016.79 |
| | | **Total Fees:** | **$561.00** | |

72.     If Great Western had not manipulated and reordered Mr. McKinley's transactions from highest to lowest, he would not have incurred seventeen overdraft fees.

73.     For instance, if Great Western had posted the transactions from lowest to highest, Mr. McKinley would have incurred only one overdraft fee instead of seventeen:

### Balance Sheet if Debits Were Processed from Lowest to Highest

| | | **Debits** | **Fees** | **Balance** |
|---|---|---|---|---|
| | **Beginning Balance on 5/17/2010:** | | | **$1,210.46** |
| **Date Posted** | **Debit Description** | | | |
| 05/17/2010 | POS DEB 2254 05/15/10 00027486 | 2.40 | | 1,208.06 |
| 05/17/2010 | DBT CRD 1612 05/15/10 00000005 | 3.45 | | 1,204.61 |
| 05/17/2010 | POS DEB 2117 05/14/10 00025921 | 4.05 | | 1,200.56 |
| 05/17/2010 | POS DEB 2040 05/15/10 00011732 | 4.11 | | 1,196.45 |
| 05/17/2010 | DBT CRD 0051 05/17/10 00058071 | 7.03 | | 1,189.42 |
| 05/17/2010 | POS DEB 1714 05/15/10 00427129 | 7.47 | | 1,181.95 |
| 05/17/2010 | DBT CRD 1544 05/15/10 00049992 | 9.18 | | 1,172.77 |
| 05/17/2010 | DBT CRD 1541 05/14/10 00007920 | 9.64 | | 1,163.13 |
| 05/17/2010 | DBT CRD 2026 05/16/10 00040200 | 20.00 | | 1,143.13 |
| 05/17/2010 | POS DEB 2135 05/14/10 00009318 | 22.09 | | 1,121.04 |
| 05/17/2010 | POS DEB 2024 05/15/10 00172407 | 29.08 | | 1,091.96 |
| 05/17/2010 | POS DEB 1820 05/16/10 92638453 | 29.48 | | 1,062.48 |
| 05/17/2010 | POS DEB 1857 05/14/10 00285160 | 40.20 | | 1,022.28 |
| 05/17/2010 | POS DEB 1338 05/15/10 98238906 | 45.01 | | 977.27 |
| 05/17/2010 | POS DEB 1944 05/15/10 12817280 | 48.06 | | 929.21 |
| 05/17/2010 | ATM W/D 1124 05/16/10 00001741 | 100.00 | | 829.21 |
| 05/17/2010 | DDA B/P 1927 05/14/10 61449863 | 135.00 | | 694.21 |
| 05/17/2010 | WEB DISB ISLLC | 225.00 | | 469.21 |
| 05/17/2010 | COLLECTION ACC 619-295-1200 | 925.00 | | -455.79 |
| 05/17/2010 | OVERDRAFT ITEM FEE | | 33.00 | -488.79 |
| | | **Total Fees:** | **$33.00** | |

74.     Likewise, if Great Western had posted the transactions in chronological order, Mr. McKinley would have been assessed only three overdraft fees instead of seventeen:

## Balance Sheet if Debits Were Processed in Chronological Order[1]

| | | Debits | Fees | Balance |
|---|---|---|---|---|
| | Beginning Balance on 5/17/2010: | | | $1,210.46 |
| Date Posted | Debit Description | | | |
| 05/17/2010 | DDA B/P 1927 05/14/10 61449863 | 135.00 | | 1075.46 |
| 05/17/2010 | POS DEB 1857 05/14/10 00285160 | 40.20 | | 1035.26 |
| 05/17/2010 | POS DEB 2135 05/14/10 00009318 | 22.09 | | 1013.17 |
| 05/17/2010 | DBT CRD 1541 05/14/10 00007920 | 9.64 | | 1003.53 |
| 05/17/2010 | POS DEB 2117 05/14/10 00025921 | 4.05 | | 999.48 |
| 05/17/2010 | POS DEB 1944 05/15/10 12817280 | 48.06 | | 951.42 |
| 05/17/2010 | POS DEB 1338 05/15/10 98238906 | 45.01 | | 906.41 |
| 05/17/2010 | POS DEB 2024 05/15/10 00172407 | 29.08 | | 877.33 |
| 05/17/2010 | DBT CRD 1544 05/15/10 00049992 | 9.18 | | 868.15 |
| 05/17/2010 | POS DEB 1714 05/15/10 00427129 | 7.47 | | 860.68 |
| 05/17/2010 | POS DEB 2040 05/15/10 00011732 | 4.11 | | 856.57 |
| 05/17/2010 | DBT CRD 1612 05/15/10 00000005 | 3.45 | | 853.12 |
| 05/17/2010 | POS DEB 2254 05/15/10 00027486 | 2.40 | | 850.72 |
| 05/17/2010 | ATM W/D 1124 05/16/10 00001741 | 100.00 | | 750.72 |
| 05/17/2010 | POS DEB 1820 05/16/10 92638453 | 29.48 | | 721.24 |
| 05/17/2010 | DBT CRD 2026 05/16/10 00040200 | 20.00 | | 701.24 |
| 05/17/2010 | COLLECTION ACC 619-295-1200 | 925.00 | | -223.76 |
| 05/17/2010 | WEB DISB ISLLC | 225.00 | | -448.76 |
| 05/17/2010 | DBT CRD 0051 05/17/10 00058071 | 7.03 | | -455.79 |
| 05/17/2010 | OVERDRAFT ITEM FEE | | 33.00 | -488.79 |
| 05/17/2010 | OVERDRAFT ITEM FEE | | 33.00 | -521.79 |
| 05/17/2010 | OVERDRAFT ITEM FEE | | 33.00 | -554.79 |
| | | Total Fees: | $99.00 | |

75.     Great Western failed to notify Plaintiff that he could be assessed overdraft fees on transactions even though there were sufficient funds in the checking account to cover the transaction at the time the transaction was executed.  In addition, Great Western never notified Plaintiff at the time he executed the purported insufficient funds transactions described above, that his checking account was or would be overdrawn or that he would be charged an overdraft fee as a result of the transactions.  Furthermore, Great Western paid, rather than returned, all the

---

[1] Because the statements do not indicate the hour and minute of each transaction, Plaintiff has listed the transactions for each particular day in the same order in which they are listed in the statements, sorting only from earlier dates to later dates.  Thus, if the Bank's statements list transactions that occurred on one particular day in some order other than chronological – sorting from highest to lowest transaction, for example – Plaintiff has not changed that order.  As a result, this chart may reflect even more overdraft fees than Plaintiff would have been assessed had the Bank posted the transactions in strict chronological order.

debit card charges described above, even though Plaintiff's accounts purportedly lacked sufficient funds to cover the transactions.

76.     Based on information and belief, the overdraft charges incurred by Plaintiff are representative of millions of dollars of overdraft fees that Great Western wrongfully assessed and deducted from its customers' accounts.  These wrongful takings are especially egregious considering the fact that the Bank approved each transaction and knew at the time of approval whether there were sufficient funds in the account to cover the transaction.

## I.        The Damages Sustained by Plaintiff and the Classes

77.     As shown by this example, Great Western's overdraft policies make it difficult for a customer to avoid injury even if the customer keeps close track of the balance in his or his account.  In fact, the Agencies stated that "injury" resulting from such policies "is not reasonably avoidable" by consumers.  73 F.R. 28904-01, 28929.  "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available."  *Id*.

78.     According to rules proposed by the Agencies: "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . . This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee."  73 F.R. 28904-01, 28929 (May 19, 2008).

79.     Thus, as a consequence of Great Western's overdraft policies and practices, Plaintiff and the Classes have been wrongfully forced to pay overdraft fees. Great Western has improperly deprived Plaintiff and the Classes of significant funds, causing ascertainable monetary losses and damages.

80.     As a consequence of Great Western's improper overdraft fees, Great Western has wrongfully deprived Plaintiff and the Classes of funds to which it had no legitimate claim.

81.     Plaintiff and the Classes had sufficient funds to cover at least some of the transactions for which he and the Classes were charged overdraft fees. Plaintiff and members of the Classes either had adequate funds to cover the transactions posted to their accounts, or the accounts were allowed to become overdrawn, even by *de minimis* margins, exclusively so that Great Western could impose these wrongful charges. In many instances, Great Western's manipulation of the process for imposing overdraft fees triggered a cascade of charges that exponentially added to the charges it collected from Plaintiff and Class members.

82.     All conditions precedent to the relief sought herein have either occurred or have been performed or waived.

### FIRST CLAIM FOR RELIEF
### Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing[2]
### (On Behalf of the National Class)

83.     Plaintiff repeats paragraphs 1 through 82 above.

---

[2]   Arizona and certain other states recognize a claim for breach of the covenant of good faith and fair dealing as a separate and independent claim from breach of contract. Other states treat breach of the covenant of good faith and fair dealing as a species of breach of contract. For the sake of convenience in this multi-district litigation, the Complaint pleads these two types of claims, which are substantively identical, in a single count.

- 25 -

84.     Plaintiff and Great Western have contracted for bank account deposit, checking, ATM, and debit card services, as embodied in Great Western's Deposit Agreement and related documentation.

85.     Under the laws of the states where Great Western does business, good faith is an element of every contract pertaining to the assessment of overdraft fees.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

86.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

87.     Great Western has breached the covenant of good faith and fair dealing in the Deposit Agreement through its overdraft policies and practices as alleged herein.

88.     Plaintiff and the National Class have performed all, or substantially all, of the obligations imposed on them under the Deposit Agreement.

89.     Plaintiff and members of the National Class have sustained damages as a result of Great Western's breach of the covenant of good faith and fair dealing.

## SECOND CLAIM FOR RELIEF
### Unconscionability
### (On Behalf of the National Class)

90.         Plaintiff repeats paragraphs 1 through 82 above.

91.         Great Western's overdraft policies and practices are or were substantively and procedurally unconscionable in the following respects, among others:

a.          Prior to the Effective Date, the Bank did not disclose or reasonably disclose to customers that they had the option to "opt out" of the Bank's overdraft scheme;

b.          Prior to the Effective Date, the Bank did not obtain affirmative consent from checking account customers prior to processing a transaction that would overdraw the account and result in an overdraft fee;

c.          The Bank does not alert its customers that a debit card transaction will trigger an overdraft, and does not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

d.          The Deposit Agreement and related documents, including the Fee Schedule, are contracts of adhesion in that they are standardized forms, imposed and drafted by the Bank, which is a party of vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement in its entirety;

e.          The amount of overdraft fees is disclosed in an ineffective, ambiguous, misleading, and unfair manner, since it is not contained in the Deposit Agreement but, rather, in a different and separate document, the Fee Schedule, which is not signed by the depositor; and

f.          The Deposit Agreement provided to customers is ineffective, ambiguous, deceptive, unfair, and misleading in that it does not unambiguously state that the Bank always reorders debits from high to low, even though Great Western *always* reorders

- 27 -

transactions in this way for customers in order to maximize overdrafts and overdraft fee revenues for the Bank.

92.       Considering the great business acumen and experience of Great Western in relation to Plaintiff and the National Class, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law.

93.       The imposition of overdraft charges which exceed the amount overdrawn (*e.g.*, the imposition of a $33 charge on an overdraft of less than $33) is itself unconscionable. Such charges are not reasonably related to the Bank's cost of covering the overdraft and/or its risk of nonpayment (where the Bank pays the overdraft), or to the Bank's cost of returning the item unpaid (where the Bank does not pay the overdraft).

94.       Plaintiff and members of the National Class have sustained damages as a result of Great Western's unconscionable policies and practices alleged herein.

### THIRD CLAIM FOR RELIEF
### Conversion
### (On Behalf of the National Class)

95.       Plaintiff repeats paragraphs 1 through 82 above.

96.       Great Western had and continues to have a duty to maintain and preserve its customers' checking accounts and to prevent their diminishment through its  own wrongful acts.

97.       Great Western has wrongfully collected overdraft fees from Plaintiff and the members of the National Class, and has taken specific and readily identifiable funds from their accounts in payment of these fees in order to satisfy them.

98.     Great Western has, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiff and the members of the National Class, without legal justification.

99.     Great Western continues to retain these funds unlawfully without the consent of Plaintiff or members of the National Class.

100.    Great Western intends to permanently deprive Plaintiff and the members of the National Class of these funds.

101.    These funds are properly owned by Plaintiff and the members of the National Class, not Great Western, which claims that it is entitled to their ownership, contrary to the rights of Plaintiff and the members of the National Class.

102.    Plaintiff and the members of the National Class are entitled to the immediate possession of these funds.

103.    Great Western has wrongfully converted these specific and readily identifiable funds.

104.    Great Western's wrongful conduct is continuing.

105.    As a direct and proximate result of this wrongful conversion, Plaintiff and the members of the National Class have suffered and continue to suffer damages.

106.    Plaintiff and the members of the National Class are entitled to recover from Great Western all damages and costs permitted by law, including all amounts that Great Western has wrongfully converted.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On Behalf of the National Class)**

107.    Plaintiff repeats paragraphs 1 through 82 above.

- 29 -

108.     Plaintiff, on behalf of himself and the National Class, assert a common law claim for unjust enrichment.

109.     By means of Great Western's wrongful conduct alleged herein, Great Western knowingly provides banking services to Plaintiff and members of the National Class that are and/or were unfair, unconscionable, and oppressive.

110.     Great Western knowingly received and retained wrongful benefits and funds from Plaintiff and members of the National Class.  In so doing, Great Western acted with conscious disregard for the rights of Plaintiff and members of the National Class.

111.     As a result of Great Western's wrongful conduct as alleged herein, Great Western has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the National Class.

112.     Great Western's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

113.     Under the common law doctrine of unjust enrichment, it is inequitable for Great Western to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of overdraft fees on Plaintiff and members of the National Class in an unfair, unconscionable, and oppressive manner.  Great Western's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

114.     The financial benefits derived by Great Western rightfully belong to Plaintiff and members of the National Class.  Great Western should be compelled to disgorge in a common fund for the benefit of Plaintiff and members of the National Class all wrongful or inequitable proceeds received by the Bank.  A constructive trust should be imposed upon all

wrongful or inequitable sums received by Great Western traceable to Plaintiff and the members of the National Class.

115.     Plaintiff and members of the National Class have no adequate remedy at law.

### FIFTH CLAIM FOR RELIEF
### Violations of A.R.S. § 44-1521, *et seq*.
### (On Behalf of the Arizona State Subclass)

116.     Plaintiff repeats paragraphs 1 through 82 above.

117.     This claim is asserted on behalf of the members of the Arizona State Subclass under Arizona's consumer protection statute.

118.     Great Western engages in unfair business practices relating to the imposition of overdraft fees on consumers, in violation of Arizona's Consumer Protection Statute, A.R.S. § 44-1521.

119.     A.R.S. § 44-1521, *et seq*., prohibits the use of any "deceptive act or practice . . . misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission."

120.     Great Western violated A.R.S. § 44-1522 by the conduct alleged above including, but not limited to, employing an unfair and deceptive policy and practice of resequencing debit purchases from largest to smallest, and misrepresenting and failing to disclose its policy and practice of re-sequencing debit purchases from largest to smallest in its Deposit Agreement and related documents.   Great Western misrepresented, concealed, suppressed, or otherwise omitted such material facts with intent that its customers rely upon their concealment, suppression, or omission.

121.     As redress for Great Western's repeated and/or ongoing violations of the A.R.S. § 44-1521, *et seq.*, Plaintiff and the Arizona State Subclass are entitled to, *inter alia*, damages and declaratory relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Classes demand a jury trial on all claims so triable and judgment as follows:

1.      Declaring Great Western's overdraft fee policies and practices to be wrongful, unfair and unconscionable;

2.      Restitution of all overdraft fees paid to Great Western by Plaintiff and the Classes, as a result of the wrongs alleged herein in an amount to be determined at trial;

3.      Disgorgement of the ill-gotten gains derived by Great Western from its misconduct;

4.      Actual damages in an amount according to proof;

5.      Punitive and exemplary damages;

6.      Pre-judgment interest at the maximum rate permitted by applicable law;

7.      Costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

8.      Such other relief as this Court deems just and proper.

Dated:      December 6, 2010.

/s/ Bruce S. Rogow
Bruce S. Rogow, Esquire
Florida Bar No. 067999
brogow@rogowlaw.com
Robert C. Gilbert, Esquire
Florida Bar No. 561861
bobby@alterslaw.com
ALTERS LAW FIRM, P.A.
4141 N.E. 2nd Avenue
Miami, Florida 33137
Tel:  (305) 571-8550
Fax:  (305) 571-8558

*Plaintiffs' Lead Counsel*

/s/ Robert C. Josefsberg
Robert C. Josefsberg, Esquire
Florida Bar No. 40856
rjosefsberg@podhurst.com
Victor M. Diaz, Jr., Esquire
Florida Bar No. 503800
vdiaz@podhurst.com
Peter Prieto, Esquire
Florida Bar No. 501492
pprieto@podhurst.com
John Gravante, III, Esquire
Florida Bar No. 617113
jgravante@podhurst.com
PODHURST ORSECK, P. A.
City National Bank Building
25 W Flagler Street
Suite 800
Miami, FL 33130-1780
Tel: 305-358-2800
Fax: 305-358-2382

/s/ Michael W. Sobol
Michael W. Sobol, Esquire
California Bar No. 194857
msobol@lchb.com
David S. Stellings, Esquire
New York Bar No. 2635282
dstellings@lchb.com
Roger N. Heller, Esquire
California Bar No. 215348
rheller@lchb.com
Jordan Elias, Esquire
California Bar No. 228731
jelias@lchb.com
LIEFF CABRASER HEIMANN &
  BERNSTEIN LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Tel: 415-956-1000
Fax: 415-956-1008

/s/ Edward Adam Webb
Edward Adam Webb, Esquire
Georgia Bar No. 743910
Adam@WebbLLC.com
G. Franklin Lemond, Jr., Esquire
Georgia Bar No. 141315
Flemond@WebbLLC.com
WEBB, KLASE & LEMOND, L.L.C.
1900 The Exchange SE, Suite 480
Atlanta, GA 30339
Tel: 770-444-9325
Fax: 770-444-0271

/s/ Ted E. Trief
Ted E. Trief, Esquire
New York Bar No. 1476662
ttrief@triefandolk.com
Barbara E. Olk, Esquire
New York Bar No. 1459643
bolk@triefandolk.com
TRIEF & OLK
150 E 58th Street, 34th Floor
New York, NY 10155
Tel: 212-486-6060
Fax: 212-317-2946

/s/ Russell W. Budd
Russell W. Budd, Esquire
Texas Bar No. 03312400
rbudd@baronbudd.com
Bruce W. Steckler, Esquire
Texas Bar No. 00785039
bsteckler@baronbudd.com
Melissa K. Hutts, Esquire
Texas Bar No. 0188015
mhutts@baronbudd.com
BARON & BUDD, P.C.
3102 Oak Lawn Avenue
Suite 1100
Dallas, TX 75219
Tel: 214-521-3605
Fax: 214-520-1181

/s/ Ruben Honik
Ruben Honik, Esquire
Pennsylvania Bar No. 33109
rhonik@golombhonik.com
Kenneth J. Grunfeld
Pennsylvania Bar No. 84121
kgrunfeld@golombhonik.com
GOLOMB & HONIK, P.C.
1515 Market Street
Suite 1100
Philadelphia, PA 19102
Tel: 215-985-9177
Fax: 215-985-4169

*Plaintiffs' Executive Committee*

- 34 -

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 1:09-MD-02036-JLK**

**IN RE: CHECKING ACCOUNT**
**OVERDRAFT LITIGATION**

**MDL No. 2036**

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 6, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Robert C. Gilbert
Robert C. Gilbert, Esquire
Florida Bar No. 561861
ALTERS LAW FIRM, P.A.
4141 N.E. 2nd Avenue, Suite 201
Miami, Florida 33137
bobby@alterslaw.com

- 35 -