## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 1:09-MD-02036-JLK

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

THIS DOCUMENT RELATES TO:

*Larsen v. Union Bank, N.A.*
S.D. Fla. Case No. 1:09-cv-23235-JLK
N.D. Cal. Case No. 4:09-cv-3250

### THIRD AMENDED CLASS ACTION COMPLAINT[1]

Plaintiffs, through undersigned counsel, on behalf of themselves and all persons similarly situated, make the allegations herein regarding the Plaintiffs on personal knowledge and on information and belief regarding all other allegations. Plaintiffs bring this Third Amended Class Action Complaint in order to bring an additional claim under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), arising out of Defendant Union Bank, N.A.'s association with CAST Management Consultants, Inc. for the deliberate purpose of engaging in an enterprise to assess and collect excessive and unconscionable overdraft fees.

### INTRODUCTION

1.      This is a civil action seeking monetary damages, restitution, and injunctive relief from Defendant Union Bank, N.A. ("Union Bank," or the "Bank"), arising out of its unfair and unconscionable assessment and collection of excessive overdraft fees.

---

[1] This complaint is filed pursuant to the Order Granting Plaintiffs' Motion for Leave to File Third Amended Class Action Complaint **[DE # 1316]**, and the agreement announced on the record during the hearing held on March 15, 2011 (Tr. pp. 46-48).

2.      In the era of electronic banking and the ubiquitous use of debit card transactions, the assessment of overdraft fees has become a major profit center for many United States banks, including Union Bank.  For years, banks covered customers who occasionally bounced checks and even did so for a time for customers using debit cards, without charging their customers. Since the early 1990's, however, banks have devised methods to provide overdraft "protection" for customers and charge them in each instance.  A recent FDIC report estimated that overdraft fees represent 74 percent of the total service charges that are imposed on deposit accounts in the United States.  A 2008 FDIC study reports that overdraft fees for debit cards can carry an effective annualized interest rate that *exceeds 3,500 percent*.  Nevertheless, the Consumer Federation of America reports that five of the ten largest banks raised their overdraft fees in the last year.

3.      In 2007, banks collected more than $17 billion in overdraft fees.  That number nearly doubled in 2008, as more and more consumers struggled to maintain positive checking account balances.  *In 2009, banks are estimated to bring in between $27 billion to $38.5 billion in overdraft charges alone*.  Union Bank is a beneficiary of these staggering charges.

4.      Almost by definition, these fees disproportionately affect the poor, who are most likely to maintain low balances.  Moebs Services, a research company that has conducted studies for the government as well as banks, estimates that 90 percent of overdraft fees are paid by the poorest 10 percent of banks' customer base.  Moreover, these fees have the tendency to create a domino effect, because the imposition of a service charge on an account with a negative balance will make it less likely that the account holder's balance will reach positive territory, resulting in more fees.

5.      Before debit cards existed, banks occasionally extended the courtesy of honoring paper checks written on overdrafted or otherwise deficient accounts for customers who were typically in good standing.  Banks extended this courtesy largely because the third party involved in a sales transaction allowed the customer to purchase goods or services with a check with an expectation that funds would be available and that the check would clear.  For example, if a

customer used a check to purchase groceries, the grocery store would only know if the check cleared *after* the groceries had been purchased.

6.     The same considerations are not present when customers use debit cards. Banks could simply decline to honor debit or point of sale transactions made where accounts lack sufficient funds to execute the transaction. Retail and service transactions could still be executed if customers presented an alternative form of payment. ATM transactions could still proceed if banks provided a warning that an overdraft fee would be incurred, and consumers chose to proceed nevertheless. In fact, until a few years ago, most banks simply declined debit transactions that would overdraw an account.

7.     Instead of simply declining debit transactions when there are insufficient funds or warning its customers that an overdraft fee will be assessed if they proceed with the transaction. Union Bank routinely processes such transactions and then charges its customers an overdraft fee of $35—even when the transaction is for only a few dollars. This automatic, fee-based overdraft scheme is intentionally designed to maximize overdraft fee revenue for Union Bank. Additionally, as part of its inequitable motive to generate obscene profits gained through the imposition of unconscionable overdraft fees, Union Bank fails to adequately disclose to its customers that they may elect to opt out of overdraft protection.

8.     In many instances, these overdraft fees cost Union Bank account holders hundreds of dollars in a matter of days, or even hours, when they may be overdrawn by only a few dollars. Even more egregious, customer accounts may not actually be overdrawn at the time the overdraft fees are charged, or at the time of the debit transaction.

9.     Thus, it is through manipulation and alteration of customers' transaction records that Union Bank maximizes overdraft penalties imposed on customers.

10.    Although it is possible to do so, Union Bank does not alert its check card customers at the time a POS transaction or ATM withdrawal is made that the transaction will overdraft their account and cause them to incur fees.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), the Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, and the proposed class contains members who are residents of a different state than Union Bank.  This Court also has original federal question jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) ("RICO").

12.     Venue is proper in the Northern District of California, the district where this action was originally filed, pursuant to 20 U.S.C. § 1391(b)(2) because Union Bank conducts business in the district and a substantial part of the events giving rise to the claims occurred in the district.

## PARTIES

13.     Plaintiff Cynthia Larsen is a resident of the State of California.  Ms. Larsen is a customer of the Bank who, on multiple occasions, was charged improper overdraft fees in connection with the use of her Union Bank check card.

14.     Plaintiff Cheryl Brown is a resident of the State of California.  Ms. Brown is a customer of the Bank who, on multiple occasions, was charged improper overdraft fees in connection with the use of her Union Bank check card.

15.     Plaintiff Kristian Logan is a resident of the State of California.  Ms. Logan is a customer of the Bank who, on multiple occasions, was charged improper overdraft fees in connection with the use of her Union Bank check card.

16.     Plaintiff Josh Naehu-Reyes is a resident of the State of California.  Mr. Naehu-Reyes is a current checking customer of the Bank who, on multiple occasions, was charged improper overdraft fees in connection with the use of his Union Bank check card.

17.     Union Bank, N.A. is headquartered in San Francisco, California.  As of June 30, 2009, Union Bank operated 335 branches and 566 ATMs in California and several other states. The Bank has a retail customer base of approximately 1 million households.

18.     Among other things, Union Bank is engaged in the business of providing retail banking services to consumers, including Plaintiff and members of the putative Class, which include the issuance of debit cards for use by its customers in conjunction with their checking accounts.

19.     Union Bank is a national bank subject to the National Bank Act, 12 U.S.C. § 1, *et seq.*, and OCC regulations.

## CLASS ALLEGATIONS

20.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

21.     The proposed Class are defined as:

> All Union Bank customers in the United States who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, incurred an overdraft fee as a result of Union Bank's practice of re-sequencing debit card transactions from highest to lowest (the "National Class").

> All Union Bank customers having accounts at branches in the State of California, for the purpose of asserting claims under California's Unfair Competition Law (the "California Subclass") (*see* Fifth Claim for Relief, *infra*).

> The National Class and the California Subclass are collectively referred to as the "Class."

22.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

23.     Excluded from the Class are Union Bank, its parents, subsidiaries, affiliates, officers and directors, any entity in which Union Bank has a controlling interest, all customers

who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

24.     The members of the Class are so numerous that joinder is impractical.  The Class consists of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to Union Bank's records.

25.     The claims of the representative Plaintiffs are typical of the claims of the Class in that the representative Plaintiffs, like all Class members, were charged overdraft fees by Union Bank as a result of its practice of re-sequencing debit card transactions from highest to lowest. The representative Plaintiffs, like all Class members, have been damaged by Union Bank's misconduct in that they incurred and/or will continue to incur unfair and unconscionable overdraft charges.  Furthermore, the factual basis of Union Bank's misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Class.

26.     There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual Class members.

27.     Among the questions of law and fact common to the Class are whether Union Bank:

a.     Does not clearly disclose and/or refuses to allow its customers to opt out of its overdraft protection program;

b.     Does not obtain affirmative consent from its customers prior to processing transactions that will result in overdraft fees;

c.     Does not alert its customers that a debit card transaction will trigger an overdraft fee, and does not provide its customers with an opportunity to cancel such transactions;

d.     Manipulates and reorders transactions so that it can increase the number of overdraft fees it imposes;

e.     Manipulates and reorders debits from highest to lowest in order to maximize the number of overdrafts and, consequently, the amount of overdraft fees;

f.      Imposes overdrafts and overdraft fees when, but for reordering transactions, there would otherwise be sufficient funds in the account;

g.      Fails to provide customers with accurate balance information;

h.      Delays posting of transactions by customers using debit cards so that customers are charged overdraft fees on transactions, even though the customers had sufficient funds in their accounts to cover the transactions upon execution;

i.      Charges exorbitant overdraft fees that bear no relationship to the actual costs and risks of covering insufficient funds transactions;

j.      Breaches its covenant of good faith and fair dealing with Plaintiffs and the other members of the Class through its overdraft policies and practices;

k.      Engaged in an unlawful enterprise that included a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).

l.      Requires its customers to enter into standardized account agreements which include unconscionable provisions;

m.      Converts moneys belonging to Plaintiffs and the other members of the Class through its overdraft policies and practices;

n.      Is unjustly enriched through its overdraft policies and practices; and

o.      Continues to commit wrongdoing through its overdraft policies and practices.

28.    Other questions of law and fact common to the Class include:

a.      The proper method or methods by which to measure damages, and

b.      The declaratory relief to which the Class are entitled.

29.    Plaintiffs' claims are typical of the claims of other Class members, in that they arise out of the same wrongful overdraft policies and practices and the same or substantially

similar unconscionable provisions of Union Bank's account agreements.  Plaintiffs have suffered the harm alleged and have no interests antagonistic to the interests of any other Class member.

30.    Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions.  Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Class.

31.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Union Bank, no Class member could afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, the Class members will continue to suffer losses and Union Bank's misconduct will proceed without remedy.

32.    Even if Class members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court.  Individualized litigation would also create the potential for inconsistent or contradictory rulings.  By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

## COMMON FACTUAL ALLEGATIONS

### A.    Union Bank

33.    Union Bank maintains approximately 337 branch offices in California, Oregon, Washington and Texas.  Individual customer accounts are established and maintained at these branch offices.  Union Bank's headquarters is located in San Francisco and, upon information

and belief, is responsible for establishing overdraft fee policies and practices applicable to the bank accounts held by all customers.

34.     Union Bank is owned by UnionBanCal Corporation, which is incorporated in Delaware and located in San Francisco, California.  UnionBanCal Corporation is the holding company for The Bank of Tokyo-Mitsubishi UFJ, LTD., a Japanese corporation with its U.S. headquarters in California.  UnionBanCal Corporation and The Bank of Tokyo-Mitsubishi UFJ, LTD. provide diversified financial services, including banking, insurance, investments, mortgage banking and consumer finance to individuals, businesses and institutions.  UnionBanCal is the second largest commercial bank holding company headquartered in California, and the 16th largest commercial bank holding company in the United States.

35.     Union Bank is a consumer banking company servicing millions of individual customers.  One of the services provided by Union Bank for customers who open a checking account is a check/debit/ATM card.  This card allows customers to access their checking account funds by using the card to conduct transactions.  Whether it is transactions with vendors or using the card to withdraw cash from an ATM machine, the card is processed electronically so that Union Bank is aware of the use of the card and has the option to accept or decline transactions at the point of sale.

36.     Union Bank is in the business of providing customers with a variety of banking services.  One of the services provided by the Bank for customers who open a checking account is a debit card, also known as a check card or ATM card.  Through those debit cards, customers can engage in transactions using funds directly from their accounts by engaging in "debit" or "point of sale" ("POS") transactions, or may withdraw money from their accounts at automated teller machines ("ATMs").  Whether the card is used to execute POS transactions or to withdraw cash from ATM machines, the transaction is processed electronically.  As a result, the Bank is notified instantaneously when the card is swiped, and have the option to accept or decline transactions at such time.

B.   **Union Bank's Scheme to Assess and Collect Excessive and Unconscionable Overdraft Fees.**

37.   Union Bank employs sophisticated software to automate its overdraft system. This program maximizes the number of overdrafts, and thus, the amount of overdraft fees charged per customer.

38.   Beginning in or about 2002 or 2003, Union Bank collaborated with CAST Management Consultants, Inc. of Los Angeles, California (hereinafter, "CAST Management") for the purpose of assessing and implementing practices designed to increase Union Bank's generation of overdraft fee income.

39.   CAST Management provides consulting services to the financial industry and claims as its clients Union Bank, Wachovia, Wells Fargo, Bank of America, U.S. Bank, Bank of the West, BB&T Bank, M&T Bank, Sun Trust Bank, Fifth Third Bank, and others.   See http://www.castconsultants.com/clients.aspx?q=10024&c=3 (accessed January 1, 2011).

40.   CAST Management purports to specialize in "Fee Revenue Optimization" services.   CAST Management describes this service as addressing the "persistent challenge within the financial service industry [of] the continued need to create top line revenue growth." *See* http://www.castconsultants.com/services.aspx?q=10054&c=10025 (accessed January 1, 2011).   CAST Management claims to provide services to identify "Fee opportunity areas," to implement fee revenue optimization projects via policies, procedures, and systems, and then to monitor and refine the performance of the fee revenue optimization plan.  *Id.*

41.   CAST Management represents that it is well-qualified to provide "Fee Revenue Enhancement" services in part owing to its "In-depth revenue knowledge" regarding the "Retail banking" industry.  *Id.*

42.   CAST Management promises a "Collaborative/team approach" and represents that it has "Collaborated with client[s] to implement agreed upon recommendations" for fee revenue   enhancement.      *See*      *Id.*;      http://www.castconsultants.com/upload/Non-

Earning%20Asset%20Review%20and%20Revenue%20Enhancement%20-%20Banking%20-%202.pdf (accessed January 1, 2011).

43.     In and around 2001 and 2002, CAST Management performed consulting services for the purpose of enhancing Union Bank's overdraft revenue by means of overdraft fee re-pricing and "continuing overdraft fee" practices (*i.e.*, assessing successive overdraft fees when customers fail to bring their accounts to a positive balance).

44.     In or about January 2003, Union Bank further sought consultation services from CAST Management for "any ideas that have the potential to improve the Bank's bottom line," such that Union Bank would "leave no stone unturned, particularly in the fee income area (charging, collecting pricing, etc. etc.)."  *See* Exhibit E, attached hereto.

45.     Thereafter, CAST Management actively solicited its retention by Union Bank for consultation services specifically for the purpose of recommending that Union Bank adopt a high-to-low posting order for debit transactions in order to maximize revenues by increasing overdraft fees.  *See* Exhibit F, attached hereto.  Union Bank retained CAST Management for that purpose and CAST Management began to perform such services including conducting a diagnostic analysis of the projected increased fee revenue that would be generated by adopting a high-to-low posting order.

46.     The purpose of Union Bank's consideration of switching to high-to-low posting of debit transactions was to increase overdraft occurrences in order to generate more overdraft fees.  As stated in an October 2003 Union Bank action plan, entitled "Union Bank of California High to Low," the bank would:  "Post customer generated debits in the order of descending amount, regardless of trancode type. *The objective is to charge fees on more items*."  *See* Exhibit G, attached hereto.

47.     In mid-2003, Union Bank and CAST Management established a joint "High to Low Implementation Team," consisting of employees and managers from both Union Bank and CAST Management, in furtherance of a so-called "High to Low Initiative," an effort to assess the bank's capabilities of ordering transactions high-to-low and to estimate the potential revenue that