UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:09-MD-02036-JLK

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

THIS DOCUMENT RELATES TO:
FIRST TRANCHE ACTIONS

*Tornes, et al. v. Bank of America, N.A.*
S.D. Fla. Case No. 1:08-cv-23323-JLK

*Yourke, et al. v. Bank of America, N.A.*
S.D. Fla. Case No. 1:09-cv-21963-JLK
N.D. Cal. Case No. 3:09-2186

PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS
SETTLEMENT AND FOR CERTIFICATION OF SETTLEMENT CLASS
AND INCORPORATED MEMORANDUM OF LAW

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF FACTS ................................................................................. 4

        A.    Factual Background ................................................................................ 4

              1.    Procedural History ...................................................................... 4

              2.    Plaintiffs' Investigation ............................................................... 7

              3.    The Related *Gutierrez v. Wells Fargo* Action ............................... 8

              4.    The Closson Appeal ..................................................................... 9

        B.    Summary of the Settlement Terms ....................................................... 10

              1.    The Settlement Class.................................................................. 10

              2.    Monetary Relief for the Class .................................................... 10

              3.    Cy Pres Distributions ................................................................ 12

              4.    Class Release ............................................................................. 13

              5.    The Notice Program ................................................................... 13

                    (a)    The Mailed Notice Program.............................................. 15

                    (b)    The Published Notice Program ......................................... 16

                    (c)    The Settlement Website, Web Advertising and the
                           Toll-Free Settlement Line ................................................. 17

              6.    Settlement Administration ......................................................... 17

              7.    Settlement Termination.............................................................. 19

              8.    Class Representative Service Awards.......................................... 19

              9.    Attorneys' Fees and Costs .......................................................... 20

III.    ARGUMENT AND AUTHORITY .................................................................. 20

        A.    The Legal Standard for Preliminary Approval ..................................... 20

        B.    This Settlement Satisfies The Criteria For Preliminary Settlement
              Approval. ............................................................................................. 22

              1.    This Settlement Is The Product Of Good Faith, Informed
                    and Arm's Length Negotiations.................................................. 23

              2.    The Facts Support a Preliminary Determination that the
                    Settlement is Fair, Adequate and Reasonable............................ 24

                    (a)    Likelihood of Success at Trial ......................................... 24

## TABLE OF CONTENTS
(continued)

**Page**

(b)    Range of Possible Recovery and The Point on or Below the Range of Recovery at Which a Settlement is Fair ................................................................. 25

(c)    Complexity, Expense and Duration of Litigation ............ 27

(d)    Stage of the Proceedings ................................................. 27

C.    Certification Of The Settlement Class Is Appropriate. ............................ 28

D.    The Court Should Approve The Proposed Notice Program, Because It Is Constitutionally Sound. ...................................................... 31

E.    The Court Should Schedule A Final Approval Hearing. ........................ 32

IV.    CONCLUSION ................................................................................................ 33

I.    **INTRODUCTION**

Plaintiffs respectfully move for preliminary approval of the Settlement Agreement and Release ("Settlement" or "Agreement", attached hereto as Exhibit A), which would resolve Plaintiffs' claims against Bank of America, N.A. ("BofA" or "the Bank") in the above-captioned actions (collectively, the "Action").[1]  The Court should grant preliminary approval because the $410 million Settlement provides substantial monetary relief to the Settlement Class, and because the terms of the Settlement are within the range of reasonableness, consistent with applicable case law.  The Settlement is an excellent result for the class of BofA account holders defined in paragraph 51 of the Settlement Agreement (the "Settlement Class).  Accordingly, Plaintiffs respectfully request that the Court approve the Settlement's Notice Program and the form and content of the Notices attached to the Agreement as Exhibits 1-5; certify a Settlement Class under Rule 23 of the Federal Rules of Civil Procedure; and schedule a final approval hearing.  The Settlement satisfies all Eleventh Circuit criteria for preliminary settlement approval.  For the Court's convenience, Plaintiffs attach a proposed Order that grants preliminary approval and approves the Notice Program, certifies the Settlement Class, and schedules a final approval hearing.

Plaintiffs sued on behalf of themselves and all others similarly situated who incurred overdraft fees as a result of BofA's practice of re-sequencing debit card transactions from highest dollar amount to lowest dollar amount ("Debit Re-sequencing").  Plaintiffs allege that BofA systemically re-sequenced Settlement Class Members' debit transactions to maximize the Bank's overdraft fee revenue.  According to Plaintiffs, BofA's practices violate the Bank's contractual

---

[1] "Action" and all other capitalized defined terms used throughout this memorandum have the same meanings ascribed in Section II of the Agreement.

and good faith duties to the Settlement Class, are substantively and procedurally unconscionable, violate state unfair trade practices laws, and result in conversion and unjust enrichment.

One of the keystones of this Settlement is that identifiable Settlement Class Members automatically -- without having to do anything at all -- will receive their *pro rata* share of the $410 million Settlement Fund.  There are no claims forms to fill out, and Settlement Class Members will not be asked to prove that they were damaged as a result of the Bank's Debit Re-sequencing.  Instead, Settlement Class Counsel (as defined in paragraph 42 of the Agreement) and their experts will use available BofA data to determine which BofA checking, savings and demand deposit account holders ("Account holders") were affected by Debit Re-sequencing, and will apply a formula (described below and detailed in paragraph 79 of the Agreement) to calculate each identifiable Settlement Class Member's *pro rata* share of the Settlement Fund. For those Settlement Class Members from the 2001-2003 period who cannot be identified because BofA does not have data sufficient to permit Settlement Class Counsel to perform the analysis to identify them (Agreement ¶78), their share of the Settlement Fund will be distributed *cy pres* to nonprofit organizations, to benefit consumer financial literacy education and to educate and assist consumers with financial services issues through advisory and related services.  Agreement ¶91.

Another testament to the reasonableness and fairness of the Settlement is the magnitude of the Settlement Fund.  Settlement Class Counsel negotiated a $410 million cash payment, which is remarkable given that in its 2008 settlement of *Closson, et al. v. Bank of America, N.A., et al.* ("*Closson*"), BofA agreed to pay only $35 million in exchange for a release of nearly all of the claims that Plaintiffs assert in this Action.[2]  Without a settlement of this Action, if the

---

[2] The *Closson* settlement currently is on appeal in the California Court of Appeal, First Appellate District, Case No. A125963.

*Closson* settlement release became effective after appeal, approximately 80% of Plaintiffs' and the Settlement Class Members' damages in this Action could have been released. In the face of that risk, Plaintiffs' $410 million recovery in this Settlement is outstanding, and merits preliminary (and ultimately, final) approval.

This Action involves sharply opposed positions on several fundamental legal questions, including whether the National Bank Act ("NBA") preempts Plaintiffs' claims, and whether BofA violated its duty of good faith and fair dealing to its customers when it re-sequenced their debit transactions. BofA consistently has argued that Plaintiffs' claims are preempted, and that relevant account agreements expressly authorize its re-sequencing practices. This Court denied an omnibus motion to dismiss on both issues, but indicated that facts developed through discovery could be relevant to both points.[3] The legal risks posed by these issues further supports Settlement approval.

Plaintiffs have litigated this Action for nearly 2 1/2 years, first in state and federal courts around the country, and then as a coordinated multidistrict litigation in the Southern District of Florida. As the Court knows, the litigation has been hard-fought: the Parties engaged in significant motion practice and extensive formal discovery, including multiple depositions and the production of more than one million of pages of documents.

Settlement discussions began in late 2010, punctuated by three full days of lengthy, in-person, mediation sessions led by Professor Eric Green, one of the leading mediators in the United States. With this motion, Plaintiffs seek preliminary approval so that they can notify the Settlement Class Members of the Settlement terms, and provide them an opportunity to opt-out of or object to the Settlement.

---

[3] As discussed in greater detail below, the Court also granted in part the motion to dismiss.

For all of these reasons, and those detailed below, Plaintiffs respectfully request that the Court take the following initial steps in the settlement approval process: (1) preliminarily approve the Settlement; (2) certify for settlement purposes the proposed Settlement Class, pursuant to Rule 23(b)(3) and (e) of the Federal Rules of Civil Procedure and appoint Richard Blair; David Brull; Jonathan Bylin; Marco Chelo; Robert Conroy; Joshua DiFrances; Carolyn Gipson; David Hanny; Haneef Haqq; Joi Holloway; Stephen and Esther James; John and Anya Kopp; Deborah and Therese Marshall; Jason Molitor; Laura Morland; Bruce and Maria Mosley; Nelson Norman; Ronald and Dawyn Palmer; William Powell; Kristin Richards; Alvin Richardson; Caroline Sherman; Ralph Tornes; Elona Wagner; Kelly Weatherspoon; William Werking; and Steve Yourke as Class Representatives; (3) approve the Notice Program set forth in the Agreement and approve the form and content of the Notices, attached to the Agreement as Exhibits 1, 2, 3, 4 and 5; (4) approve and order the opt-out and objection procedures set forth in the Agreement; (5) stay the Action against BofA pending final approval of the Settlement; (6) appoint as Class Counsel and Settlement Class Counsel the attorneys and law firms listed in paragraphs 15 and 42 of the Agreement, respectively; and (7) schedule a fairness hearing on final settlement approval to occur in early November 2011.

## II.    STATEMENT OF FACTS

### A.    Factual Background

The Court is familiar with the facts giving rise to Plaintiffs' claims and BofA's defenses. Plaintiffs reference such facts below only to the extent pertinent to the issues raised in this unopposed motion.

#### 1.    Procedural History

Plaintiffs brought this case seeking monetary damages, restitution and declaratory relief from BofA, arising from the Bank's alleged re-sequencing practices that Plaintiffs contend were

designed to increase the number of overdraft fees its customers incurred.  *See generally Tornes*

Third Amended Consolidated Class Action Complaint (Dkt. 344); *Yourke* Amended Class

Action Complaint (Dkt. 345).  As a result of BofA's manipulation of the order in which

customers' debit transactions were posted, customers' funds were depleted more rapidly than

they should have been, and Plaintiffs and Class Members paid more overdraft fees than they

should have paid.  Dkt. 344 ¶ 53.

     BofA denies all of Plaintiffs' allegations.  The Bank consistently has defended its conduct

by, *inter alia*, highlighting language in the relevant account agreements that it contends expressly

advises customers of and permits the re-sequencing practices at issue.  Joint Declaration of

Robert C. Gilbert and Michael W. Sobol ("Joint Decl.") ¶ 5, attached hereto as Exhibit B.  BofA

also asserts that Plaintiffs' claims are entirely preempted by the NBA.  Furthermore, the Bank

has advanced a medley of other defenses, including that the UCC endorses the re-sequencing

practices at issue, that Plaintiffs cannot maintain common law unconscionability, conversion or

unjust enrichment claims, and that Plaintiffs' state statutory claims fail.  Joint Decl. ¶ 6.

     On December 1, 2008, Plaintiff Ralph Tornes filed a complaint against BofA in this

Court.  On April 9, 2009, Plaintiffs Steve Yourke and Kristin Richards filed a complaint against

BofA in San Francisco County Superior Court.  Both complaints assert claims against BofA

based on its alleged unfair assessment and collection of overdraft fees.  Thereafter, a number of

other complaints were also filed against BofA alleging similar claims, and were transferred to

this MDL proceeding.

     On June 10, 2009, the Judicial Panel for Multi-District Litigation ("JPML") transferred

all of the cases against BofA – as well as cases against other banks – involving allegations of

unfair assessment and collection of overdraft fees to this Court for coordinated pre-trial proceedings under MDL No. 2036. *See* Dkt. 1.

On March 11, 2010, this Court ruled on an omnibus motion to dismiss submitted by BofA and the other defendant banks. *See In re Checking Account Overdraft Litigation*, 694 F. Supp. 2d 1302 (S.D. Fla. 2010) (Dkt. 305). In a thorough opinion that addressed multiple complicated legal questions, the Court: (1) considered and rejected the banks' federal preemption defense; (2) disagreed with the banks' assertion that the terms of customer account agreements allowed them to engage in the challenged re-sequencing conduct notwithstanding the covenant of good faith and fair dealing, and reserved the ultimate question of whether the banks acted in good faith for a later stage, after discovery;[4] (3) rejected the banks' contention that the UCC endorsement of high-to-low posting of checks should also apply to debit card transactions; (4) concluded that Plaintiffs sufficiently pled procedural and substantive unconscionability, citing the disparity in bargaining power, inconspicuous and boilerplate contractual language regarding overdrafts, and the fact that the fees resulting from the banks' reordering practice bear no reasonable commercial relationship to the costs or risks associated with providing the overdraft service; (5) maintained the unjust enrichment claim as an alternative ground for relief; (6) refused to dismiss the conversion claim, noting Plaintiffs' right to possess the funds in their accounts; (7) dismissed without prejudice the state statutory claims that were not supported by a named plaintiff living in the relevant state; (8) maintained certain state statutory claims alleging deceptive, unfair, and unconscionable practices; (9) dismissed state statutory claims with pre-suit notice requirements; and (10) dismissed state statutory claims where Plaintiffs failed to plead predicate acts. *Id.* at 1310-28.

---

[4] The Court granted the motion to dismiss the covenant of good faith claim under Texas law. *See In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d at 1317.

On April 12, 2010, Plaintiff Tornes filed a Third Amended Consolidated Class Action Complaint, and Plaintiffs Yourke and Richards filed an Amended Class Action Complaint. Dkts. 344-45. After the Parties entered into a Stipulated Protective Order relating to the production of documents and information, BofA produced over one million pages of documents and a collection of large Excel spreadsheet files. Joint Decl. ¶ 8.

Settlement negotiations began in late 2010. Joint Decl. ¶ 10. In December 2010 and January 2011, the Parties participated in three days of mediation under the auspices of Professor Green. Joint Decl. ¶ 10. During the mediation, the parties discussed their relative views of the law and facts, and potential relief for the proposed Class. Joint Decl. ¶ 10. Counsel exchanged a series of counter-proposals on key aspects of the Settlement. Joint Decl. ¶ 10. At all times the negotiations were adversarial, non-collusive, and at arm's length. Joint Decl. ¶ 10. On January 27, 2011, the Parties signed a Memorandum of Understanding ("MOU") that memorialized the Parties' agreement that Plaintiffs' claims against BofA would be released in exchange for the Bank's agreement to pay $410 million into a Settlement Fund. Joint Decl. ¶ 11. Several months of intense negotiations regarding the specific terms of the Settlement Agreement followed. Joint Decl. ¶ 11. The Settlement Agreement was signed on May 6-11, 2011. Joint Decl. ¶ 11.

### 2. **Plaintiffs' Investigation**

Plaintiffs' counsel spent hundreds of hours investigating the claims of many dozens of potential plaintiffs against the defendants in this MDL. Joint Decl. ¶ 12. For BofA alone, Plaintiffs' counsel interviewed at least 100 customers and potential plaintiffs to gather information about the Bank's conduct and its impact upon consumers. Joint Decl. ¶ 12. This information was essential to counsel's ability to understand the nature of BofA's conduct, the language of the account agreements at issue, and potential remedies. Joint Decl. ¶ 12.

Plaintiffs also expended significant resources researching and developing the legal claims at issue, particularly in opposition to the omnibus motion to dismiss. Joint Decl. ¶ 13. Mindful of the Court's emphasis on the development of the factual record in its denial of most points raised in the omnibus motion, Plaintiffs crafted document requests and interrogatories with an eye toward class certification, summary judgment, and trial. Joint Decl. ¶ 13.

In response to those discovery requests, BofA produced more than one million pages of documents. Joint Decl. ¶ 14. Plaintiffs created a large document review team whose task was to review the produced documents. Joint Decl. ¶ 14. To make the review and subsequent litigation more efficient, Settlement Class Counsel established coding procedures for electronic review of the documents produced, and team members remained in constant contact with each other to ensure that all counsel became aware of significant emerging evidence in real time. Joint Decl. ¶ 14. Plaintiffs also took depositions, and expended significant effort to prepare responses to the Bank's requests for documents maintained by Plaintiffs. Joint Decl. ¶ 14.

After the Parties executed the Memorandum of Understanding in connection with the Settlement, Plaintiffs engaged in extensive settlement-related investigation, to determine -- among other things -- an appropriate plan for allocation of the Settlement funds. Joint Decl. ¶ 15. That investigation required Settlement Class Counsel to retain experts to analyze the relevant transactional data related to overdraft fees imposed upon Settlement Class members, and to help determine the fairest and most appropriate distribution formula in light of the data that BofA possessed. Joint Decl. ¶ 15.

### 3.    The Related *Gutierrez v. Wells Fargo* Action

Plaintiffs' counsel have a thorough understanding of the practical and legal issues they face in connection with potential ongoing litigation of their claims against BofA, in part because they successfully pursued similar claims against Wells Fargo Bank, N.A. through class

certification, summary judgment, and a two-week trial that resulted in a $203 million plaintiffs' verdict. That case, *Gutierrez v. Wells Fargo Bank, N.A.*, No. 07-cv-5923 (N.D. Cal), was filed in the Northern District of California in 2007 on behalf of a class of California Wells Fargo customers. As this Court is aware, the *Gutierrez* plaintiffs challenged high-to-low posting practices almost identical to those challenged in this case. Joint Decl. ¶ 36. The JPML excluded *Gutierrez* from this MDL because *Gutierrez* was virtually trial ready at the time this MDL was created. Joint Decl. ¶ 36.

### 4. The *Closson* Appeal

In reaching the Settlement in this case, the Parties were forced to consider the impact of an already-settled case brought in 2004 on behalf of Rhonda Closson and others against BofA in California Superior Court ("*Closson*"). Though the final approval of the *Closson* settlement is now being challenged on appeal, the very broad release in that settlement arguably releases Plaintiffs' and Settlement Class Members' claims over a time period that significantly overlaps with the claims in this Action.

Like Plaintiffs here, the *Closson* plaintiffs originally alleged claims for unfair business practices in connection with the Bank's overdraft fee policies and practices. After the *Closson* court indicated that such claims might be preempted by the NBA, Plaintiffs here contend the *Closson* claims were thereafter limited to those involving false advertising that arose from alleged misrepresentations the Bank made about its overdraft practices. As Plaintiffs here argue in the *Closson* appeal, the *Closson* plaintiffs did not challenge the legality of the re-sequencing practices themselves. Without significant discovery of the Bank's overdraft practices, the parties in *Closson* entered into a settlement agreement that gave the Bank a very broad all-encompassing release, not only of the false advertising claims, but of all claims that relate in any manner to its overdraft practices, including the lawfulness of the practices themselves. The $35 million

settlement required class members to submit claims to participate in the settlement, and each class member's damages were capped at $78.

Certain Settlement Class Counsel in this MDL filed objections to the proposed *Closson* settlement on behalf of class members aggrieved by BofA's allegedly unlawful debit re-sequencing practices. The California Superior Court overruled those objections, as well as those of other objectors, and granted final approval to the *Closson* settlement. Several objectors appealed the *Closson* settlement final approval to the California Court of Appeal, First Appellate District, where the appeal is still pending. Based on a review of the *Closson* settlement release and an analysis of the data made available by BofA, Plaintiffs in this case estimate that if it were enforceable, the *Closson* settlement release could potentially release as much as 80% of the value of Plaintiffs' and Settlement Class Members' claims in this Action.

**B.    Summary of the Settlement Terms**

The Settlement's terms are detailed in the Agreement, attached Exhibit A.  The following is a summary of the material terms of the Settlement.

**1.    The Settlement Class**

The Settlement Class is an opt-out class under Rule 23(b)(3) of the Federal Rule of Civil Procedure.  The Settlement Class is defined as:

> All holders of a BofA Account who, from January 1, 2001 through Preliminary Approval, incurred one or more Overdraft Fees as a result of Debit Re-sequencing.  Excluded from the Class are all current BofA employees, officers and directors, and the judge presiding over this Action.

Agreement ¶ 51.

**2.    Monetary Relief for the Class**

The Settlement requires BofA to deposit $410 million into an Escrow Account within 14 calendar days of this Court's preliminary approval of the Settlement.  Agreement ¶ 47.  That

deposit will create the Settlement Fund, which will be used to pay all distributions, fees, costs and expenses in the Settlement, including but not limited to distribution of money to the Settlement Class; distribution of the *Cy Pres* Distribution Amount; all costs of Settlement Notice; all costs of Settlement Administration; and all attorneys' fees, costs and expenses of Class Counsel.  Agreement ¶¶ 47, 50.

Settlement Class Members do not have to submit claims or take any other affirmative step to receive relief under the Settlement.  Instead, within 30 days of the Effective Date of the Settlement (Agreement ¶ 22), BofA and the Settlement Administrator will distribute the Net Settlement Fund to all identifiable Settlement Class members who do not opt out of the Settlement, and to the recipients of the *Cy Pres* Distribution Amount.  Agreement ¶¶ 83, 91.

All identifiable Settlement Class members who experienced a "Positive Differential Overdraft Fee" will receive a *pro rata* distribution of the Net Settlement Fund minus the *Cy Pres* Distribution Amount.  Agreement ¶¶ 79, 83-85.  The Positive Differential Overdraft Fee analysis determines, among other things, which BofA Account holders were assessed additional overdraft fees that would not have been assessed if the Bank had used a posting sequence or method for Debit Card Transactions (Agreement ¶20) other than ordering them from highest to lowest dollar amount, and how much in additional overdraft fees those Account holders paid.  The calculation involves a complex multi-step process that is described in detail in the Agreement.  Agreement ¶79.

The Net Settlement Fund – which will be distributed *pro rata* among identifiable Settlement Class Members – is equal to the Settlement Fund, plus interest earned, less (among other things) the *Cy Pres* Distribution Amount, Settlement Notice and Settlement Administration

costs, attorneys' fees and costs, and Court-awarded Service Awards for the Plaintiffs. Agreement ¶ 82.

Payments to Settlement Class Member current account holders will be made by the Bank crediting such Settlement Class Members' accounts, and notifying the Settlement Class members of the credit.  Agreement ¶ 87.  BofA will then be entitled to a reimbursement for any such credits from the Settlement Fund.  Agreement ¶ 88.  Former account holders (and current account holders whose accounts cannot feasibly be credited) will receive payment from the Settlement Fund by checks mailed by the Settlement Administrator.  Agreement ¶¶ 87, 89.

Any uncashed or returned checks will remain in the Settlement Fund for one year from the date the first distribution check is mailed by the Settlement Administrator, during which time the Settlement Administrator will make reasonable efforts to effectuate delivery of the Settlement Class Member Payments.  Agreement ¶ 90.

### 3.    *Cy Pres* **Distributions**

Settlement Class Members are going to be identified through a complex analysis of certain types of BofA data.  BofA data for the period January 1, 2004 through Preliminary Approval is sufficiently complete to permit the Parties to identify all Settlement Class Members who had Accounts during that period, and to calculate the amount of the distribution from the Settlement Fund to which each is entitled under the Settlement.  Unfortunately, BofA lacks certain relevant data for the earliest part of the class period.  For example, for the period January 1, 2001 through September 30, 2003, BofA lacks data that would permit Settlement Class Counsel and their experts to identify any of the Bank customers who were affected by its Debit Re-sequencing practices during that period.  Along the same lines, for the period October 1, 2003 through December 31, 2003, BofA lacks the data that would permit Settlement Class Counsel

- 12 -

and their experts to identify certain segments of Bank customers that were affected by the Bank's

Debit Re-sequencing practices during that period.  Agreement ¶78.

Settlement Class Counsel estimate – based on a review of the available data – that

between 5% and 14% of Settlement Class Members' damages occurred during the periods for

which data is unavailable.  Because Settlement Class Members for those periods cannot be

identified and, therefore, cannot be paid directly to them, between 5% and 14% of the Net

Settlement Fund will be allotted to a *cy pres* program that is intended to benefit consumer

financial literacy education, and to educate and assist consumers with financial services issues

through advisory and related services (excluding litigation).  Agreement ¶¶ 82, 91.  The

Settlement Administrator will disburse the *Cy Pres* Distribution Amount within 30 days of the

Effective Date.  *Id*.  The *cy pres* recipients will be agreed upon by the Bank and Settlement Class

Counsel, and approved by the Court.  *Id.*

### 4.   Class Release

In exchange for the benefits conferred by the Settlement, all Settlement Class Members

who do not opt out will be deemed to have released BofA from claims related to the subject

matter of the Action.  The detailed release language can be found in Section XV of the

Agreement.

### 5.   The Notice Program

Settlement Class Counsel have retained one of the leading class action notice experts in

the country to serve as the Notice Administrator for this Settlement.  Kinsella Media and its

founder, Kathy Kinsella ("Kinsella"), have developed and directed some of the largest and most

complex national notification programs in the country.  Kinsella Declaration ¶ 4, attached as Ex.

C.  The Notice Program in this Settlement (Agreement Section VIII) is designed to be the best

notice practicable, and it is tailored to take advantage of the information BofA has available

about the Settlement Class Members.  *Id.* ¶¶ 9-13.  The Settlement Fund will pay all Notice Program costs.  The Notice Program is reasonably calculated under the circumstances to apprise the Settlement Class of the pendency of the Action, class certification, the terms of the Settlement, Class Counsel's Fee Application and request for Service Awards for Plaintiffs, and their rights to opt-out of the Settlement Class and object to the Settlement, Class Counsel's Fee Application, and/or the request for Service Awards for Plaintiffs.  The Notice and Notice Program constitute sufficient notice to all persons entitled to notice.  The Notice and Notice Program satisfy all applicable requirements of law, including, but not limited to, Federal Rule of Civil Procedure 23 and the Constitutional requirement of due process.

The Notice Program is comprised of five parts:  (1) direct mail postcard notice ("Mailed Notice") to all identifiable Settlement Class Members; (2) publication notice ("Published Notice") designed to reach those Settlement Class Members for whom direct mail notice is not possible; (3) a "Long Form" notice with more detail than the direct mail or publication notices, that will be available on the Settlement Web Site (www.bofaoverdraftsettlement.com) and via mail upon request; (4) Web Advertising, which consists of "banner ads" being placed on certain popular internet web sites; and (5) sponsored keyword search advertising on the Google and Bing search engines, designed to direct internet searches related to this Settlement to the Settlement Web Site.  Agreement, Section VIII; Kinsella Declaration ¶¶ 16-37.

All forms of Notice to the Settlement Class will include, among other information: a description of the material terms of the Settlement; a date by which Settlement Class members may exclude themselves from or "opt out" of the Settlement Class; a date by which Settlement Class members may object to the Settlement; the date upon which the Final Approval Hearing

will occur; and the address of the Settlement Website at which Settlement Class members may access the Agreement and other related documents and information.  Agreement ¶ 60, Exs. 1-5.

In addition to the information described above, the Long-Form notice will also describe the procedure Settlement Class Members must use to opt out of the Settlement or to object to the Settlement, and/or to Class Counsel's application for attorneys' fees.  *See* Ex. 3 to Agreement. All opt-outs must be received by counsel before the opt-out deadline, and any objections must be received by counsel for the Parties by the objection deadline.  For an objection to be valid, it must include: the name of the Action; the objector's name, address, and telephone number; an explanation of how the objector is a member of the Settlement Class; the basis for the objection; a description of the number of times the objector or the objector's counsel has objected to a class settlement in the last five years, the names of any such cases, and any relevant orders issued in response to such past objections; a statement confirming whether the objector will appear at the final approval hearing and a description of counsel or witnesses who will appear on behalf of the objector at the final approval hearing; and the objector's signature.  Agreement ¶ 62.

### (a)    The Mailed Notice Program

The Settlement Administrator will administer the Mailed Notice Program.  Within 28 days from the date that the Settlement Administrator receives from Settlement Class Counsel and BofA the data files that identify the names and last known addresses of the identifiable Settlement Class Members, as set forth in paragraphs 65 and 78 of the Settlement, the Settlement Administrator will run such addresses through the National Change of Address Database, and will mail to all such Settlement Class Members postcards that contain the Mailed Notice (the "Initial Mailed Notice").  To coordinate the Mailed Notice Program with the Published Notice Program, within one business day of its receipt of the data files described above, the Settlement Administrator will inform the Notice Administrator by email that it has received such data files.

- 15 -

The Settlement Administrator will perform reasonable address traces for all Initial Mailed Notice postcards that are returned as undeliverable. No later than 35 days from the Initial Mailed Notice date, the Settlement Administrator will complete the re-mailing of Mailed Notice postcards to those Settlement Class Members whose new addresses were identified as of that time through address traces (the "Notice Re-mailing Process").

The Mailed Notice Program (both the Initial Mailed Notice and the Notice Re-mailing Process) will be completed by no later than September 2, 2011. Within seven days after the date the Settlement Administrator completes the Notice Re-mailing Process, the Settlement Administrator will provide Settlement Class Counsel and BofA's counsel an affidavit that confirms that the Mailed Notice Program was completed in a timely manner. Settlement Class Counsel will file such affidavit with the Court in conjunction with Plaintiffs' motion for final approval of the Settlement.

All costs associated with the Mailed Notice Program will be paid solely out of the Settlement Fund, as set forth in the Agreement.

### (b)      The Published Notice Program

The Published Notice Program, for which Kinsella is responsible, is comprised of the following components: one full-page advertisement in People magazine, one full-page advertisement in Sports Illustrated magazine, and one full-page advertisement in TV Guide; web advertising on Facebook.com, Microsoft Media Network, Yahoo! Network, and 24/7 Network ("Web Advertising"); and sponsored keyword search advertisements on the internet. The Published Notice Program will be completed no later than September 2, 2011. All costs associated with the Published Notice Program will be paid solely out of the Settlement Fund, as set forth in the Agreement.

Within seven days after the date the Notice Administrator completes the Published Notice Program, the Notice Administrator will provide Settlement Class Counsel and counsel for BofA with one or more affidavits that confirm that Published Notice was given in accordance with the Published Notice Program.  Settlement Class Counsel will promptly file such affidavit(s) with the Court.

**(c)      The Settlement Website, Web Advertising and the Toll-Free Settlement Line**

The Settlement Administrator will establish a Settlement Website as a means for Settlement Class Members to obtain notice of, and information about, the Settlement.  The Settlement Website will be established as soon as practicable following Preliminary Approval, but no later than before commencement of the Notice Program.  The Settlement Website will include hyperlinks to the Settlement, the Long-Form Notice, the Preliminary Approval Order, and such other documents as Settlement Class Counsel and counsel for BofA agree to post or that the Court orders posted on the Settlement Website.  These documents will remain on the Settlement Website at least until Final Approval.

The Settlement Administrator will establish and maintain an automated toll-free telephone line for Settlement Class Members to call with Settlement-related inquiries, and answer the questions of Settlement Class Members who call with or otherwise communicate such inquiries.

**6.      Settlement Administration**

The Settlement Administrator is Rust Consulting ("Rust"), one of the leading class action settlement administrators in the United States.  As mentioned above, Rust's responsibilities include the following:

a.      Obtaining from BofA and Settlement Class Counsel Settlement Class Member name and address information (to the extent it is available), and verifying and updating the addresses received through the National Change of Address database, for the purpose of mailing the Mailed Notice, and later mailing distribution checks to Settlement Class Members;

b.      Establishing and maintaining a Post Office box for requests for exclusion from the Settlement Class;

c.      Establishing and maintaining the Settlement Website, which will serve as a means for Settlement Class Members to obtain notice of and information about the Settlement, including through hyperlinked access to the Agreement, the Long Form Notice, the order preliminarily approving the Settlement, and such other documents as Settlement Class Counsel and counsel for BofA agree to post or that the Court orders posted on the website (Agreement ¶ 45);

d.      Establishing and maintaining an automated toll-free telephone line for Settlement Class Members to call with Settlement-related inquiries, and answering the questions of Settlement Class Members who call with or otherwise communicate such inquiries;

e.      Responding to any mailed Settlement Class Member inquiries;

f.      Processing all requests for exclusion from the Settlement Class;

g.      Providing weekly reports and, no later than five days after the end of the Opt-Out Period, a final report to Settlement Class Counsel and counsel for BofA that summarize the number of requests for exclusion received that week, the total number of exclusion requests received to date, and other pertinent information;

h.      Interfacing with the Tax Administrator;

i.      At Settlement Class Counsel's request in advance of the Final Approval Hearing, preparing an affidavit to submit to the Court that identifies each Settlement Class Member who timely and properly requested exclusion from the Settlement Class;

j.      Processing and transmitting distributions to Settlement Class Members from the Settlement Fund;

k.      Paying invoices, expenses and costs upon approval by Settlement Class Counsel and counsel for BofA, as provided in the Agreement; and

l.      Performing the duties of Escrow Agent as described in the Agreement, and any other Settlement-administration-related function at the instruction of Settlement Class Counsel and counsel for BofA.  Agreement ¶¶ 57-58.

All fees and charges related to Settlement Administration will be paid from the Settlement Fund.  Agreement ¶57.

### 7.    **Settlement Termination**

Either Party may terminate the Settlement if the Settlement is rejected or materially modified by the Court or an appellate court.  Agreement ¶ 108.  BofA also has the right to terminate the Settlement if the number of Settlement Class Members who timely opt out of the Settlement Class equals or exceeds the number or percentage specified in the separate letter agreement executed concurrently with the Agreement by BofA's counsel and Settlement Class Counsel.  The number or percentage will be confidential except to the Court, who upon request will be provided a copy of the letter agreement for *in camera* review.  Agreement ¶109.

### 8.    **Class Representative Service Awards**

Class Counsel will seek and BofA will not oppose Service Awards of $5,000 per named Plaintiff, or $2,500 per Plaintiff for married couples when both spouses are Plaintiffs. Agreement ¶ 106.  If the Court approves them, the Service Awards will be paid from the

Settlement Fund, and will be in addition to the relief the Class Representatives will be entitled to under the terms of the Settlement. *Id.* These awards will compensate the representatives for their time and effort in the Action, and for the risk they undertook in prosecuting the case against BofA.

9.   **Attorneys' Fees and Costs**

BofA will not oppose Class Counsel's request for attorneys' fees of up to 30% of the Settlement Fund, net of Settlement-related costs and expenses, plus reimbursement of litigation costs and expenses. Agreement ¶ 102. The Parties negotiated and reached agreement regarding attorneys' fees and costs only after reaching agreement on all other material terms of this Settlement. Agreement ¶ 103; Joint Decl. ¶ 33.

III.   **ARGUMENT AND AUTHORITY**

A.   **The Legal Standard for Preliminary Approval**

Rule 23(e) of the Federal Rules of Civil Procedure requires judicial approval for the compromise of claims brought on a class basis. "Although class action settlements require court approval, such approval is committed to the sound discretion of the district court." *In re U.S. Oil and Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992). In exercising that discretion, courts are mindful of the "strong judicial policy favoring settlement as well as by the realization that compromise is the essence of settlement." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984). The policy favoring settlement is especially relevant in class actions and other complex matters, where the inherent costs, delays and risks of continued litigation might otherwise overwhelm any potential benefit the class could hope to obtain. *See, e.g., Ass'n for Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 466 (S.D. Fla. 2002) ("There is an overriding public interest in favor of settlement, particularly in class actions that have the well-

deserved reputation as being most complex.") (citing *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)); *see also* 4 Newberg on Class Actions § 11.41 (4th ed. 2002) (citing cases).

The purpose of preliminary evaluation of proposed class action settlements is to determine whether the settlement is within the "range of reasonableness." 4 Newberg § 11.26. "Preliminary approval is appropriate where the proposed settlement is the result of the parties' good faith negotiations, there are no obvious deficiencies and the settlement falls within the range of reason." *Smith v. Wm. Wrigley Jr. Co.*, No. 09-cv-60646, 2010 WL 2401149, at *2 (S.D. Fla. June 15, 2010). Settlement negotiations that involve arm's length, informed bargaining with the aid of experienced counsel support a preliminary finding of fairness. *See Manual for Complex Litigation,* Third, § 30.42 (West 1995) ("A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.") (internal quotation marks omitted).

When determining whether a settlement is ultimately fair, adequate and reasonable, courts in this circuit have looked to six factors: "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of the proceedings at which the settlement was achieved." *Bennett*, 737 F.2d at 986. Courts have, at times, engaged in a "preliminary evaluation" of these factors to determine whether the settlement falls within the range of reason at the preliminary approval stage. *See, e.g., Smith*, 2010 WL 2401149 at *2.[5]

---

[5] Plaintiffs do not address the fifth factor related to objections to the Settlement in the context of this motion, because at this preliminary stage, Settlement Notice has not yet been distributed.

The Court's grant of preliminary approval will allow all Settlement Class members to receive notice of the proposed Settlement's terms, and of the date and time of the Final Approval Hearing at which Settlement Class Members may be heard, and at which further evidence and argument concerning the fairness, adequacy, and reasonableness of the Settlement may be presented by the Parties. *See Manual for Compl. Lit.*, at §§ 13.14, § 21.632. Neither formal notice nor a hearing is required at the preliminary approval stage; the Court may grant such relief upon an informal application by the settling parties, and may conduct any necessary hearing in court or in chambers, at the Court's discretion. *Id.* at § 13.14.

**B.**    **This Settlement Satisfies The Criteria For Preliminary Settlement Approval.**

Each of the relevant factors weighs in favor of approval of this Settlement. First, the Settlement was reached in the absence of collusion, and is instead the product of good-faith, informed and arm's length negotiations by competent counsel, in conjunction with an experienced mediator. Furthermore, a preliminary review of the factors related to the fairness, adequacy and reasonableness of the Settlement demonstrates that the Settlement fits well within the range of reasonableness, such that preliminary approval is appropriate.

Any settlement requires the parties to balance the merits of the claims and defenses asserted against the attendant risks of continued litigation and delay. Plaintiffs maintain that the claims asserted are meritorious, that any motion for class certification would prove successful, and that Plaintiffs would prevail if this matter proceeded to trial. BofA maintains that Plaintiffs' claims are unfounded and cannot be maintained as a class action, denies any potential liability, and has shown a willingness to litigate those claims vigorously.

---

Plaintiffs address the remaining factors here, but reserve a more thorough discussion of each factor for the motion for final approval of the Settlement.

The parties have concluded that the benefits of settlement in this case outweigh the risks attendant to litigation, which include, but are not limited to, the time and expenses associated with proceeding to trial, the time and expenses associated with appellate review, and the countless uncertainties of litigation, particularly in the context of a large and complex multi-district litigation.

## 1.    **This Settlement Is The Product Of Good Faith, Informed and Arm's Length Negotiations.**

A class action settlement should be approved so long as a district court finds that "the settlement is fair, adequate and reasonable and is not the product of collusion between the parties." *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977); *see also Lipuma v. American Express Co.*, 406 F. Supp. 2d 1298, 318-19 (S.D. Fla. 2005) (approving class settlement where the "benefits conferred upon the Class are substantial, and are the result of informed, arms-length negotiations by experienced Class Counsel").

The Settlement in this case is the result of intensive, arm's-length negotiations between experienced attorneys who are familiar with class action litigation and with the legal and factual issues of this case. The parties engaged in extensive and contested mediation before an experienced and respected mediator, Professor Eric Green. These negotiations were arm's-length and extensive. Joint Decl. ¶ 10; *see also Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1384 (S.D. Fla. 2007) (concluding that class settlement was not collusive in part because it was overseen by "an experienced and well-respected mediator").

Furthermore, counsel for both sides are particularly experienced in the litigation, certification, trial, and settlement of nationwide class action cases. Joint Decl. ¶ 34. Counsel zealously represented their clients in litigating the motion to dismiss and through the discovery process.

In negotiating this Settlement in particular, Plaintiffs' counsel had the benefit of years of experience and a familiarity with the facts of this case as well as with other cases involving similar claims. As detailed above, Plaintiffs' counsel conducted a thorough investigation and analysis of Plaintiffs' claims and engaged in extensive formal discovery with BofA. Counsel's review of that extensive discovery enabled them to gain an understanding of the evidence related to central questions in the case, and prepared counsel for well-informed settlement negotiations. Joint Decl. ¶¶ 8-9; *see also Francisco v. Numismatic Guaranty Corp. of America*, 2008 WL 649124, *11 (S.D. Fla. Jan. 31, 2008) (stating that "Class Counsel had sufficient information to adequately evaluate the merits of the case and weigh the benefits against further litigation" where counsel conducted two 30(b)(6) depositions and obtained "thousands" of pages of documentary discovery).

Plaintiffs' counsel were also well-positioned to evaluate the strengths and weaknesses of Plaintiffs' claims, as well as the appropriate basis upon which to settle them, as a result of their participation in a full bench trial of similar claims in federal court in California. Joint Decl. ¶ 37.

### 2. <u>The Facts Support a Preliminary Determination that the Settlement is Fair, Adequate and Reasonable.</u>

As noted, this Court may conduct a preliminary review of the *Bennett* factors to determine whether the Settlement falls within the "range of reason" such that notice and a final hearing as to the fairness, adequacy, and reasonableness of the Settlement is warranted.

### (a) <u>Likelihood of Success at Trial</u>

Plaintiffs and Class Counsel are confident in the strength of their case, but are also pragmatic in their awareness of the various defenses available to BofA, and the risks inherent to litigation. As noted above, Plaintiffs faced the risk of dismissal on various theories advanced at the motion to dismiss stage, including federal preemption and a legal challenge to the duty of

good faith claim.  The success of Plaintiffs' claims in future litigation turns on these and other questions that are certain to arise in the context of motions for summary judgment and at trial, as they did in the *Gutierrez* case in California.  Joint Decl. ¶ 38.  Though the *Gutierrez* plaintiffs were successful at trial, protracted litigation carries inherent risks that would necessarily have delayed and endangered Class members' monetary recovery.  Under the circumstances, Plaintiffs and Class Counsel appropriately determined that the settlement reached with BofA outweighs the gamble of continued litigation.

The broad release language of the *Closson* settlement posed a very serious risk for Plaintiffs and the Class Members at trial.  Among other things, BofA likely would have argued that the *Closson* release bars the claims of a significant percentage of the Settlement Class Members, which could have had an adverse effect on Plaintiffs' ultimate result.

Even if Plaintiffs did prevail at trial, any recovery could be delayed for years by an appeal.  *Lipuma*, 406 F. Supp. 2d at 1322 (likelihood that appellate proceedings could delay class recovery "strongly favor[s]" approval of a settlement).  This Settlement provides substantial relief to Settlement Class Members without further delay.

### (b)   Range of Possible Recovery and The Point on or Below the Range of Recovery at Which a Settlement is Fair

When evaluating "the terms of the compromise in relation to the likely benefits of a successful trial . . . the trial court is entitled to rely upon the judgment of experienced counsel for the parties."  *Cotton*, 559 F.2d at 1330.  "Indeed, the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel."  *Id.*

Courts have determined that settlements may be reasonable even where Plaintiffs recover only part of their actual losses.  *See Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988) ("[T]he fact that a proposed settlement amounts to only a fraction of the

potential recovery does not mean the settlement is unfair or inadequate"). "The existence of strong defenses to the claims presented makes the possibility of a low recovery quite reasonable." *Lipuma*, 406 F. Supp. 2d at 1323.

In this case, Plaintiffs faced a serious challenge to their potential damages claims: the *Closson* settlement. As described above, BofA obtained a release in the *Closson* settlement that, if affirmed on appeal, could have reduced Plaintiffs' and Settlement Class Members' damages in this Action by approximately 80%. Even putting aside the existential risk that *Closson* posed, Plaintiffs' $410 million recovery is excellent, given the complexity of the litigation and the significant barriers that stood between now and final judgment: class certification; interlocutory Rule 23(f) appeal of class certification; motions for summary judgment; trial; and appeals after a Plaintiffs' verdict. Taking into account that the *Closson* settlement threatened to almost eliminate Plaintiffs' and the Class Members' damages claims, the $410 million recovery is outstanding.

Class Counsel estimate that if the *Closson* settlement were affirmed on appeal, Class Members' maximum recoverable damages through litigation would have been approximately $660 million. Under this analysis, Plaintiffs and the Settlement Class Members recovered 62% of their maximum damages. That is a significant achievement, given the obstacles that Plaintiffs faced in the litigation. Moreover, even if one were to ascribe only a conservative 30% chance to the *Closson* settlement being affirmed on appeal, Plaintiffs and the Settlement Class Members will still recover a risk-discounted 35% of their maximum damages, which is a significant recovery given the litigation risks -- in addition to *Closson* -- identified above. In any event, this $410 million Settlement is a fair and reasonable recovery for the Class in light of the Bank's

defenses, and the challenging and unpredictable path of litigation Plaintiffs would have faced

absent a settlement.

### (c)   Complexity, Expense and Duration of Litigation

The traditional means for handling claims like those at issue here would unduly tax the

court system, require a massive expenditure of public and private resources, and given the

relatively small value of the claims of the individual class members, would be impracticable.

Thus, the proposed Settlement is the best vehicle for Settlement Class Members to receive the

relief to which they are entitled in a prompt and efficient manner.

One of the most expensive aspects of ongoing litigation of this case -- to which Class

Counsel can attest after the *Gutierrez* trial -- would involve the retention of experts to perform

data analyses and to present those analyses in expert reports, at depositions, and at trial.  Joint

Decl. ¶ 45.   Experts in the fields of marketing, economics and the credit card industry may also

be necessary.  Joint Decl. ¶ 45.  These, and other considerations noted above, militate heavily in

favor of the Settlement.  *See Behrens*, 118 F.R.D. at 542 (noting likely "battle of experts" at trial

regarding damages, which would pose "great difficulty" for plaintiffs).

### (d)   Stage of the Proceedings

Courts consider the stage of proceedings at which settlement is achieved "to ensure that

Plaintiffs had access to sufficient information to adequately evaluate the merits of the case and

weigh the benefits of settlement against further litigation." *Lipuma*, 406 F. Supp. 2d at 1324.

Plaintiffs settled this Action with the benefit of at least one million pages produced by

BofA.  As noted, review of those documents positioned Settlement Class Counsel to evaluate

with confidence the strengths and weaknesses of Plaintiffs' claims and prospects for success at

class certification, summary judgment and trial.  Joint Dec ¶ 46; *see also Numismatic Guaranty*

*Corp.*, 2008 WL 649124 at *11.  Even in the absence of such discovery, Settlement Class

Counsel are familiar with the practices and likely defenses of banks on these issues through their experience litigating the *Gutierrez* case, and "[i]nformation obtained from other cases may be used to assist in evaluating the merits of a proposed settlement of a different case." *Lipuma*, 406 F. Supp. 2d at 1325.

### C.   Certification Of The Settlement Class Is Appropriate.

For settlement purposes, Plaintiffs respectfully request that the Court certify the Settlement Class defined above, and in paragraph 51 of the Agreement. "A class may be certified solely for purposes of settlement [if] a settlement is reached before a litigated determination of the class certification issue." *Borcea v. Carnival Corp.*, 238 F.R.D. 664, 671 (S.D. Fla. 2006) (internal quotation marks omitted). "Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

Certification of a nationwide class for settlement purposes permits notice of the proposed Settlement to issue to the class to inform class members of the existence and terms of the proposed Settlement, of their right to be heard on its fairness, of their right to opt out, and of the date, time and place of the formal fairness hearing. *See Manual for Compl. Lit.*, at §§ 21.632, 21.633. For purposes of this Settlement only, BofA does not oppose class certification. For the reasons set forth below, certification is appropriate under Rule 23(a) and (b)(3).

Certification under Rule 23(a) of the Federal Rules of Civil Procedure requires that (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Under Rule 23(b)(3), certification is appropriate if

- 28 -

the questions of law or fact common to the members of the class predominate over individual issues of law or fact and if a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

The numerosity requirement of Rule 23(a) is satisfied because the Settlement Class consists of millions of people throughout the United States, and joinder of all such persons is impracticable.  Joint Decl. ¶ 48; *see also* Fed. R. Civ. P. 23(a)(1); *Kilgo v. Bowman Trans.*, 789 F.2d 859, 878 (11th Cir. 1986) (numerosity satisfied where plaintiffs identified at least 31 class members "from a wide geographical area").

"[C]ommonality requires that there be at least one issue whose resolution will affect all or a significant number of the putative class members." *Williams v. Mohawk Industries, Inc.*, 568 F.3d 1350, 1355 (11th Cir. 2009) (internal quotation marks omitted); *see also Fabricant v. Sears Roebuck*, 202 F.R.D. 310, 313 (S.D. Fla. 2001) (same). Here, the commonality requirement is satisfied because there are many questions of law and fact common to the Settlement Class that center on BofA's practice of systemically re-sequencing account transactions, as alleged in the operative complaints.  *See* Fed. R. Civ. P. 23(a)(2).  U.S. District Judge William Alsup of the Northern District of California relied upon almost identical common questions in finding that commonality was satisfied in *Gutierrez*.  *See Gutierrez*, 2008 WL 4279550, at \*17 ("[I]ndividual variations will not predominate over the pervasive commonality of the highest-to-lowest method and its adverse impact on hundreds of thousands of depositors.").

For similar reasons, Plaintiffs' claims are reasonably coextensive with those of the absent class members, such that the Rule 23(a)(3) typicality requirement is satisfied.  *See Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984) (typicality satisfied where claims "arise from the same event or pattern or practice and are based on the same legal theory");

*Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001) (named plaintiffs are typical of the class where they "possess the same interest and suffer the same injury as the class members"). Plaintiffs are typical of absent Settlement Class Members because they were subjected to the same BofA practices and claim to have suffered from the same injuries, and because they will equally benefit from the relief provided by the Settlement.

Plaintiffs also satisfy the adequacy of representation requirement. Adequacy under Rule 23(a)(4) relates to (1) whether the proposed class representatives have interests antagonistic to the class; and (2) whether the proposed class counsel has the competence to undertake this litigation. *Fabricant*, 202 F.R.D. at 314. The determinative factor "is the forthrightness and vigor with which the representative party can be expected to assert and defend the interests of the members of the class." *Lyons v. Georgia-Pacific Corp. Salaried Employees Ret. Plan*, 221 F.3d 1235, 1253 (11th Cir. 2000) (internal quotation marks omitted). Plaintiffs' interests are coextensive with, not antagonistic to, the interests of the Settlement Class, because Plaintiffs and absent Settlement Class Members have an equally great interest in the relief offered by the Settlement, and absent Settlement Class Members have no diverging interests. Further, Plaintiffs are represented by qualified and competent counsel who have extensive experience and expertise prosecuting complex class actions, including consumer actions similar to the instant case. *See* Joint Decl. ¶¶ 34, 52. Plaintiffs' counsel have devoted substantial time and resources to vigorous litigation of this case through the defeat of the motion to dismiss, discovery and settlement. Joint Decl. ¶ 52.

The predominance requirement of Rule 23(b)(3) requires that "[c]ommon issues of fact and law ... ha[ve] a direct impact on every class member's effort to establish liability that is more substantial than the impact of individualized issues in resolving the claim or claims of each class

member." *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1170 (11th Cir. 2010) (internal quotation marks omitted).  Plaintiffs satisfy the predominance requirement because liability questions common to all Settlement Class Members substantially outweigh any possible issues that are individual to each Settlement Class Member.  For example, each Settlement Class Member's relationship with BofA arises from an account agreement that is the same or substantially similar in all relevant respects to other Settlement Class Members' account agreements.  *See Sacred Heart Health Sys.*, 601 F.3d at 1171 ("It is the form contract, executed under like conditions by all class members, that best facilitates class treatment.").

Furthermore, resolution of thousands of claims in one action is far superior to individual lawsuits, because it promotes consistency and efficiency of adjudication.  *See* Fed. R. Civ. P. 23(b)(3).  For these reasons, the Court should certify the Settlement Class.

**D.     The Court Should Approve The Proposed Notice Program, Because It Is Constitutionally Sound.**

"Rule 23(e)(1)(B) requires the court to direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise regardless of whether the class was certified under Rule 23(b)(1), (b)(2), or (b)(3)."  Manual for Compl. Lit., *supra*, at § 21.312 (internal quotation marks omitted).  The best practicable notice is that which is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  To satisfy this standard, "[n]ot only must the substantive claims be adequately described but the notice must also contain information reasonably necessary to make a decision to remain a class member and be bound by the final judgment or opt out of the action."  *Twigg v. Sears, Roebuck & Co.*, 153 F.3d 1222,

1227 (11th Cir. 1998) (internal quotation marks omitted); *see also* Manual for Compl. Lit., supra, at § 21.312 (listing relevant information).

The proposed Notice Program satisfies all of these criteria.  As recited in the proposed Settlement and above, Notice will inform Settlement Class members of the substantive terms of the Settlement, will advise Settlement Class members of their options for opting-out or objecting to the Settlement, and how to obtain additional information about the Settlement.  Moreover, the Notice Program was designed and is being implemented by one of the most respected Notice experts in the country, Kathy Kinsella of Kinsella Media.

In her declaration, attached as Exhibit C, Kinsella provides detailed information about the design and scope of the Notice Program, which Kinsella Media will administer.  As Kinsella states, the program is the best practicable notice under the circumstances.  Kinsella Decl. ¶13.  Among other things, it is designed to reach a high percentage of Settlement Class Members (including many by direct mail, the best possible form of notice), and it exceeds the requirements of constitutional due process.  Kinsella Decl. ¶¶ 15, 31-34.  Therefore, the Court should approve the Notice Program and the form and content of the Notices attached to the Agreement as Exhibits 1-5.

**E.**     **The Court Should Schedule A Final Approval Hearing.**

The last step in the Settlement approval process is a Final Approval Hearing, at which the Court will hear all evidence and argument necessary to make its final evaluation of the Settlement.  Proponents of the Settlement may explain the terms and conditions of the Settlement, and offer argument in support of final approval.  The Court will determine at or after the Final Approval Hearing whether the Settlement should be approved; whether to enter a final order and judgment under Rule 23(e); and whether to approve Class Counsel's application for attorneys' fees and reimbursement of costs and expenses.  Plaintiffs request that the Court

schedule the Final Approval Hearing for a full day during the week of November 7, 2011, if that

is convenient for the Court.  Plaintiffs will file their motion for final approval of the Settlement,

and Class Counsel will file their Fee Application and request for Service Awards for Plaintiffs,

no later than 45 days prior to the Final Approval Hearing.

## IV.    CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that the Court (1) grant preliminary

to the Settlement; (2) certify the proposed Settlement Class pursuant to Federal Rule of Civil

Procedure 23(b)(3) and (e) for settlement purposes only, and appoint Richard Blair; David Brull;

Jonathan Bylin; Marco Chelo; Robert Conroy; Joshua DiFrances; Carolyn Gipson; David Hanny;

Haneef Haqq; Joi Holloway; Stephen and Esther James; John and Anya Kopp; Deborah and

Therese Marshall; Jason Molitor; Laura Morland; Bruce and Maria Mosley; Nelson Norman;

Ronald and Dawyn Palmer; William Powell; Kristin Richards; Alvin Richardson; Caroline

Sherman; Ralph Tornes; Elona Wagner; Kelly Weatherspoon; William Werking; and Steve

Yourke as Class Representatives; (3) approve the Notice Program set forth in the Agreement,

and approve the form and content of the Notices as set forth in the forms attached to the

Agreement as Exhibits 1, 2, 3, 4 and 5; (4) approve and order the opt-out and objection

procedures set forth in the Agreement; (5) stay the Action against BofA pending final approval

of the Settlement; (6) appoint as Class Counsel the law firms listed in paragraph 15 of the

Agreement; (7) appoint as Settlement Class Counsel the attorneys and law firms listed in

paragraph 42 of the Agreement; and (8) schedule a final approval hearing during the week of

November 7, 2011, subject to the Court's availability and convenience.  For the Court's

convenience, Plaintiffs have attached as Exhibit D hereto a [Proposed] Order Preliminarily

Approving Class Settlement and Certifying Settlement Class.

Dated: May 13, 2011.

Respectfully submitted,

/s/ Aaron S. Podhurst
Aaron S. Podhurst, Esquire
Florida Bar No. 063606
apodhurst@podhurst.com
Robert C. Josefsberg, Esquire
Florida Bar No. 40856
rjosefsberg@podhurst.com
Peter Prieto, Esquire
Florida Bar No. 501492
pprieto@podhurst.com
Stephen F. Rosenthal, Esquire
Florida Bar No. 0131458
srosenthal@podhurst.com
John Gravante, III, Esquire
Florida Bar No. 617113
jgravante@podhurst.com
PODHURST ORSECK, P.A.
City National Bank Building
25 W. Flagler Street, Suite 800
Miami, FL 33130-1780
Tel: 305-358-2800
Fax: 305-358-2382

/s/ Bruce S. Rogow
Bruce S. Rogow, Esquire
Florida Bar No. 067999
brogow@rogowlaw.com
Jeremy W. Alters, Esquire
Florida Bar No. 0111790
jeremy@alterslaw.com
ALTERS LAW FIRM, P.A.
4141 N.E. 2nd Avenue
Suite 201
Miami, FL 33137
Tel: 305-571-8550
Fax: 305-571-8558

*Co-Lead Counsel for Plaintiffs*

/s/ Robert C. Gilbert
Robert C. Gilbert, Esquire
Florida Bar No. 561861
rcg@grossmanroth.com
Stuart Z. Grossman, Esquire
Florida Bar No. 156113
szg@grossmanroth.com
David Buckner, Esquire
Florida Bar No. 60550
dbu@grossmanroth.com
Seth E. Miles, Esquire
Florida Bar No. 3855830
sem@grossmanroth.com
GROSSMAN ROTH, P.A.
2525 Ponce de Leon Boulevard
Eleventh Floor
Coral Gables, FL 33134
Tel: 305-442-8666
Fax: 305-779-9596

*Coordinating Counsel for Plaintiffs*

/s/ E. Adam Webb
E. Adam Webb, Esquire
Georgia Bar No. 743910
Adam@WebbLLC.com
Matthew C. Klase, Esquire
Georgia Bar No. 141903
Matt@WebbLLC.com
G. Franklin Lemond, Jr., Esquire
Georgia Bar No. 141315
FLemond@WebbLLC.com
WEBB, KLASE & LEMOND, L.L.C.
1900 The Exchange, S.E.
Suite 480
Atlanta, GA 30339
Tel: 770-444-9325
Fax: 770-444-0271

/s/ Michael W. Sobol
Michael W. Sobol, Esquire
California Bar No. 194857
msobol@lchb.com
Roger N. Heller, Esquire
California Bar No. 215348
rheller@lchb.com
Jordan Elias, Esquire
California Bar No. 228731
jelias@lchb.com
LIEFF CABRASER HEIMANN &
   BERNSTEIN L.L.P.
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
Tel: 415-956-1000
Fax: 415-956-1008

/s/ David S. Stellings
David S. Stellings, Esquire
New York Bar No. 2635282
dstellings@lchb.com
LIEFF CABRASER HEIMANN &
   BERNSTEIN L.L.P.
250 Hudson Street, 8th Floor
New York, NY  10013
Tel:  212-355-9500
Fax:  212-355-9592

/s/ Russell W. Budd
Russell W. Budd, Esquire
Texas Bar No. 03312400
rbudd@baronbudd.com
Bruce W. Steckler, Esquire
Texas Bar No. 00785039
bsteckler@baronbudd.com
Mazin A. Sbaiti, Esquire
Texas Bar No. 24058096
msbaiti@baronbudd.com
BARON & BUDD, P.C.
3102 Oak Lawn Avenue
Suite 1100
Dallas, TX 75219
Tel: 214-521-3605
Fax: 214-520-1181

/s/ Ted E. Trief
Ted E. Trief, Esquire
New York Bar No. 1476662
ttrief@triefandolk.com
Barbara E. Olk, Esquire
New  York Bar No. 1459643
bolk@triefandolk.com
TRIEF & OLK
150 E. 58th Street
34th Floor
New York, NY 10155
Tel: 212-486-6060
Fax: 212-317-2946

<u>/s/ Ruben Honik</u>
Ruben Honik, Esquire
Pennsylvania Bar No. 33109
<u>rhonik@golombhonik.com</u>
Kenneth J. Grunfeld, Esquire
Pennsylvania Bar No. 84121
<u>kgrunfeld@golombhonik.com</u>
GOLOMB & HONIK, P.C.
1515 Market Street
Suite 1100
Philadelphia, PA 19102
Tel: 215-985-9177
Fax: 215-985-4169

*Plaintiffs' Executive Committee*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 09-MD-02036-JLK

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

### CERTIFICATE OF SERVICE

I hereby certify that on May 13, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Robert C. Gilbert
Robert C. Gilbert, Esquire
Florida Bar No. 561861
GROSSMAN ROTH, P.A.
2525 Ponce de Leon Boulevard
Eleventh Floor
Coral Gables, FL 33134
Tel: 305-442-8666
Fax: 305-779-9596