## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 1:09-MDL-02036-JLK

Sealed

---

IN RE:  CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

---

THIS DOCUMENT RELATES TO:

*Larsen v. Union Bank, N.A.*
S.D. Fla. Case No. 1:09-cv-23235-JLK
N.D. Cal. Case No. 4:09-cv-3250

---

FILED by __ATS__ D.C.

JUN 09 2011

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

---

## UNION BANK'S RESPONSE TO PLAINTIFFS' PROPOSED TRIAL PLAN

### I.   INTRODUCTION

As plaintiffs point out in their Proposed Trial Plan ("PTP"), p. 1, n. 1, an increasing

number of courts, including the Eleventh Circuit, consider the plaintiffs' proposed trial plan a

critical tool in determining whether or not class certification is appropriate.  Trial courts use

these plans to determine the universe of evidence which will be submitted on each claim and

affirmative defense, whether such evidence will be class-wide or individual in nature, and

whether the case would be manageable if certified as a class action.  *Vega v. T-Mobile USA, Inc.,*

564 F.3d 1256, 1279, n. 20 (11th Circuit 2009); *compare with Abercrombie v. Lum's Inc.*, 345

F.Supp. 387, 390 (S.D. Fla. 1972) (King, J.) ("an analysis of the issues and the nature of proof

which will be required at trial is directly relevant to a determination of whether the matters in

dispute are principally individual in nature or are susceptible of proof equally applicable to all class members") (citations omitted).

Unfortunately, plaintiffs' PTP is of little utility to the Court for this purpose. Plaintiffs do not clearly identify the elements which would have to be established to recover on each of their causes of action, nor do they comprehensively describe all of the evidence to be introduced at trial on each claim. Instead, plaintiffs' PTP merely repeats the allegations of their complaint and cites snippets of emails and documents which they characterize as class-wide evidence. Union Bank responds to that plan by identifying the essential elements of each claim, describing the various types of evidence which will be introduced at trial and explaining why the need to introduce such evidence will cause individual issues to predominate and render this case unmanageable as a class action.

## II.    THE ESSENTIAL ELEMENTS FOR RECOVERY ON PLAINTIFFS' CLAIMS

Set forth below are the essential elements which must be established at trial in order for plaintiffs and members of the proposed class to prevail on each of their claims.

### Count One, Violation of RICO:

To state a RICO claim under 18 U.S.C. § 1962(c), a plaintiff must prove "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1282 (11th Cir. 2006). To prove "racketeering activity" based on mail and wire fraud (as alleged here) he must also prove: "(1) that defendants knowingly devised or participated in a scheme to defraud plaintiffs; (2) that they did so willingly with the intent to defraud; and (3) that the defendants used the U.S. mails or the interstate wires for the purpose of executing the scheme." *Anderson v. Smithfield Foods,* 209 F.Supp. 2d 1270, 1272 (M.D. Fla. 2002) (internal quotations and citations omitted). The complaint must also plead "(4) that the plaintiff relied on a misrepresentation made in furtherance of the fraudulent scheme, (5) that such

misrepresentation would have been relied upon by a reasonable person, (6) that the plaintiff suffered injury as a result of such reliance, and (7) that the plaintiff incurred a specifiable amount of damages." *Sikes v. Teleline, Inc.,* 281 F.3d 1350, 1360 (11th Cir. 2002); *see also Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354, 1359 (11th Cir. 2004). Finally, a civil RICO plaintiff must prove injury to "business or property""by reason" of the substantive RICO violation. *Williams,* 465 F. 3d at 1282-83; 18 U.S.C. § 1964(c).

**Count Two, Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing:**

To prove breach of contract, a plaintiff must prove, at minimum, a contract, plaintiff's performance, defendant's breach, and resultant damages. *Durell v. Sharp Healthcare*, 183 Cal.App.4th 1350, 1367 (2010) ("A cause of action for damages for breach of contract is comprised of the following elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff."). *Nw. Indep. Forest Mfrs. v. Dep't of Labor and Indus.*, 78 Wash.App. 707, 712 (1995) ("A breach of contract is actionable only if the contract imposes a duty, the duty is breached, and the breach proximately causes damage to the claimant.") *MEI, LLC v. Integral Applied Tech., Inc.*, 2009 WL 2871125, at *3 (D. Or. Sept. 1, 2009) ("Specifically, the claim must include the following elements: (1) whether the contract is oral or written; (2) when the contract was made; (3) the terms of the contract; (4) what action was taken to breach the contract; and (5) damages.") (citations omitted).

To establish a claim for breach of the implied covenant of good faith and dealing, a plaintiff must prove that plaintiffs entered into a contract; that plaintiff did all, or substantially all of the significant things that the contract required or that he was excused from having to do those

things; that all conditions required for defendant's performance had occurred; that defendant unfairly interfered with plaintiff's right to receive the benefits of the contract; and that plaintiff was harmed by defendant's conduct.  Judicial Council Of California Civil Jury Instruction 325.

**Count Three, Unconscionability:**

Unconscionability constitutes a generally applicable defense to enforcement of contracts, but is not a basis for affirmative relief.  California: *Brown v. Wells Fargo Bank, NA*, 168 Cal. App. 4th 938, 955, (Cal. Ct. App. 2008) (citing Civ.Code, § 1670.5); Oregon: *Best v. U.S. Nat. Bank of Oregon*, 78 Or. App. 1, 13 (Or. Ct. App. 1986), *aff'd*, 303 Or. 557, 739 P.2d 554 (1987) ("Because the doctrine of unconscionability is not a basis for affirmative relief, the trial court was correct in granting the bank's motion for summary judgment against the unconscionability claim."); Washington: *Satomi Owners Ass'n v. Satomi, LLC*, 167 Wash. 2d 781, 813, 225 P.3d 213, 231 (2009) (recognizing unconscionability as one of the generally applicable contract defenses).

**Count Five, Unjust Enrichment:**

California: [Two Elements] "A person is enriched if [1] he receives a benefit [2] at another's expense.  The term benefit denotes any form of advantage.  Thus, a benefit is conferred not only when one adds to the property of another, but also when one saves the other from expense or loss." *Ghirardo v. Antonioli*, 14 Cal. 4th 39, 51-52 (1996) (internal quotations and citations omitted).

Oregon: [Three Elements] "Those three elements are [1] 'a benefit conferred, [2] awareness by the recipient that a benefit has been received and, [3] under the circumstances, it would be unjust to allow retention of the benefit without requiring the recipient to pay for it." *Edward D. Jones & Co. v. Mishler*, 983 P.2d 1086, 1101 (Or. Ct. App. 1999).

Washington: [Three Elements] "To establish unjust enrichment, the claimant must meet three elements: (1) one party must have conferred a benefit to the other; (2) the party receiving the benefit must have knowledge of the benefit; and (3) the party receiving the benefit must accept or retain the benefit under the circumstances that make it inequitable for the receiving party to retain the benefit without paying its value." *Cox v. O'Brien*, 206 P.3d 682, 688 (Wash. Ct. App. 2009).

### Count Six, Violations of California Business & Professions Code § 17200

Plaintiffs must establish that Union Bank's conduct constituted unlawful, unfair or fraudulent business act or practice. (Cal. Bus. & Prof. Code, § 17200.) Addtionally, plaintiffs must each establish that they suffered "injury in fact" and lost money as a result of the alleged act of unfair competition. (Cal. Bus. & Prof. Code, § 17204.) And, for each class member, they must prove that Union Bank wrongfully acquired money from that class member as the result of the alleged unfair competition. *Korea Supply Company. Lockheed Martin Corporation*, 29 Cal.4th 1134, 1149 (2003)

## III.  THE COMMON AND INDIVIDUAL PROOF WHICH WILL BE INTRODUCED AT TRIAL ON PLAINTIFFS' CLAIMS

Plaintiffs compare this case to others which involve claims arising out of "uniform form contracts," and repeatedly state that customers entered into the same or similar contracts (account agreements) because variations were not permitted.  As explained in Union Bank's opposition memorandum, however, plaintiffs' lawsuit is not based upon a simple, uniform claim that Union Bank's posting order violated its agreement with all class members.[1]  Instead, they allege that

---

[1] To the contrary, the account agreement specifically reserved to Union Bank the right to post transactions in any manner it wished, and disclosed that the Bank would generally pay larger items first—which is precisely what plaintiffs say that Union Bank did.

Union Bank engaged in a variety of related practices which breach the implied covenant of good faith and fair dealing, were unconscionable, resulted in unjust enrichment, etc.

Accordingly, Union Bank sets forth below the common and individual evidence which will be introduced at trial on plaintiffs' claims.

## A.    Evidence Regarding Supposedly Misleading Disclosures in the Union Bank Account Agreement.

Plaintiffs allege that Union Bank misleads its customers about its posting practices by providing deceptive statements in its deposit agreement about those practices. Third Amended Complaint ("TAC"), ¶¶ 68, 84(e)-(f). This allegation is incorporated into each of the five claims for which plaintiffs seek class certification. *Id.* ¶¶ 120, 130 (failure to describe posting practices "in an unambiguous manner" constitutes a RICO violation), 135, 142, 143(e) and (f) (Union Bank's overdraft practices are unconscionable because the disclosure of them in the deposit agreement is ambiguous, deceptive and misleading), 159, 168. Plaintiffs say in their PTP that they will show by common evidence that customers were harmed by the "vague and misleading disclosures" in the account agreement. See PTP, p. 4.

At trial, however, Union Bank will introduce individual evidence which disproves plaintiffs' claim that all putative class members were misled by this agreement.

First, while plaintiffs acknowledge that Union Bank customers are required to enter into a deposit agreement when opening an account (PTP, pp. 3-4), three of the four named plaintiffs (Larsen, Logan and Brown) did not remember receiving the Account Agreement and did not believe they ever read it before suing.[2] The fourth plaintiff (Naehu-Reyes) remembers reading

---

[2]    Larsen Depo., 22:15-22, 42:8-15; Logan Depo., 31:11-33:8, 39:22-40:15, 106:20-107:5; Brown Depo., 25:17-26:13, 30:6-31:6.

the agreement only briefly, and formed his understanding of Union Bank's ordering practices based upon communications with friends and family members.

Accordingly, these plaintiffs could not have been misled or otherwise harmed by any "vague or misleading" disclosures in the account agreement.  For example, while plaintiffs contend that the class can recover under RICO based upon the Bank's dissemination of this agreement through the mails and wires (PTP, p. 12), class members who do not remember receiving or reading it, were not confused by it and cannot show they relied upon anything said in this agreement plainly cannot recover for a RICO violation based upon the contents of the agreement.

Moreover, when two of the plaintiffs re-read the portion of the account agreement dealing with order of processing, they understood it to mean exactly what is said.  Namely, that Union Bank would "generally pay larger checks and transactions first."[3] Union Bank will also introduce evidence that other class members did read the deposit agreement, including the disclosures regarding Union Bank's ability to post items in any order it wished, and understood that it would generally post items in high to low order.

B.    **Evidence of Other Supposedly Misleading Disclosures.**

Plaintiffs allege that Union Bank provided other disclosures to customers which were misleading and caused customers to incur the overdraft fees plaintiffs seek to recover. According to plaintiffs, these included bank statements, marketing materials and other disclosures.  Union Bank will introduce common evidence showing that it took affirmative steps

---

[3]    Brown Depo., 83:5-84:24; Naehu-Reyes Depo., 97:15-98:12.

7

to explain the change to its posting practices in April of 2004,[4] and that it sent individual overdraft notices to customers identifying each transaction which had resulted in an overdraft fee. Union Bank will also introduce individualized evidence showing that two of the named plaintiffs who were customers at the time do not remember receiving this disclosure, whereas other customers read and understood the disclosure and took steps to avoid overdraft fees.

### C.       Evidence of Supposedly Misleading Balance Information Provided to Customers.

Plaintiffs also claim that Union Bank caused them to overdraft their accounts and incur overdraft fees by providing them with inaccurate balance information, which they relied upon. For example, they contend that Union Bank told customers they had positive balances when, in reality, they had negative balances. TAC, ¶¶ 70, 71, 128. Plainitffs rely upon this allegation to support each of their causes of action. *Id.,* ¶¶ 120, 135, 142, 159 and 168.

In their proposed trial plan, plaintiffs say they will establish by class-wide proof that Union Bank "provided unclear balance information to **all** Class members." PTP, p. 5 (emphasis added). Yet, they never explain how they will do this. The only evidence they cite are snippets from a few emails (culled from the hundreds of thousands of documents produced by the Bank) which suggest that, at least in some instances, customers may have been confused about their balances. *See* PTP, p. 5, n. 6; *see also* p. 12, n. 30 (5 calls received from customers who were concerned or confused). Such anecdotal "evidence" will not suffice to prove, on a class-wide basis, that all class members checked their balances, were confused or misled, and relied to their

---

[4]      This Notice of Change in Terms was sent to all existing customers in February of 2004. It not only explained the change to its posting order practices, but urged customers to take steps to avoid overdraft charges—and it specifically recommended two different overdraft protection plans offered by the Bank.

detriment. *See also* PTP, p. 6, which talks of "widespread consumer confusion" but provides the Court with no plan on how they will prove **classwide** confusion at trial.

The individual evidence which Union Bank will introduce at trial will disprove this claim. Union Bank will show that, for individual transactions entered into by plaintiffs and other class members, the available balance information provided by Union Bank was accurate. It will show that the balance maintained by the Bank included all transactions of which the Bank was aware at the time the customer initiated the transaction. Union Bank will also submit evidence demonstrating that some plaintiffs' claim that they "routinely" checked their available balance, or did so every other day, or only entered into transactions after they had checked their available balance to make sure that they had sufficient funds, is contradicted by their own testimony and other evidence. This evidence will include plaintiffs' admissions that they were not aware of any inaccurate balance information provided them by the Bank, and that they could not identify any overdraft fee they incurred as the result of relying on any inaccurate balance information.

Union Bank will submit individual evidence showing that plaintiffs and other customers checked their balances infrequently. It will also show that they entered into transactions when the balance available from Union Bank, and their own knowledge of the transactions they had previously entered into, provided ample warning that there were insufficient funds to cover an intended transaction, and that an overdraft fee would result.

### D.   Evidence Regarding Holds of Funds in Customer Accounts.

Plaintiffs allege that Union Bank's practice of placing a hold on funds in the customer's account results in the unfair assessment of overdraft fees at a time when the customer had sufficient funds in the account to cover the transaction. TAC, ¶ 73; PTP, p. 4. Union Bank will rely upon both class-wide and individual evidence to defeat that claim.

The common evidence will include the terms of Union Bank's account agreement and the disclosures it provided customers. These provisions explained the Bank's hold policy in detail, including the fact that the use of a debit card may result in an immediate hold and may make funds unavailable to pay subsequent transactions.

Union Bank will also rely upon individual evidence of customers' understanding of its hold policy. That evidence will show that, while the named plaintiffs cannot recall receiving these disclosures, they knew or assumed (based upon "common sense") that a hold would result from the use of a debit card and that an overdraft could result. Union Bank will also introduce individual evidence that other customers both read these disclosures and understood the policy. Accordingly, the Bank's hold policy cannot be a basis for imposing liability on the Bank, under any of plaintiffs' theories.

E.      **Evidence of Union Bank's Supposed "Delay" in Posting Items.**

Plaintiffs also claim that Union Bank delays posting charges to a customer's account, "sometimes" for multiple business days, and that this delay causes multiple overdraft charges. TAC, ¶64; *see also id.*, ¶¶ 68, 127, 130; PTP, p. 4. As plaintiffs allege that this occurs only "sometimes," not "always," they implicitly concede this is an individual rather than a classwide issue.

Union Bank will present common evidence that it does not "delay" posting charges to a customer's account, but posts them whenever they are submitted for settlement—which is different from (and often later than) the date on which the transaction is initiated. Union Bank will further show that this practice did not result in the imposition of overdraft fees which would otherwise not have occurred.

In addition, the Bank will present evidence of individual transactions on customers' accounts. This evidence is necessary to show that the amount of time between initiation of the transaction by the customer and posting by Union Bank varies from transaction to transaction, such that there can be no classwide liability based upon this claim. Further, this individual evidence will show that this delay is the result of the actions of the merchant in a particular transaction, not any intentional delay on the part of the Bank to increase overdraft fees.

**F.      Evidence Regarding Union Bank's Decision to Change Its Posting Order, The Effect on Customers and Its Customers' Preferences.**

Plaintiffs claim that Union Bank's "entire purpose" in changing its posting practices was to generate additional revenue. PTP, p. 5. This is untrue, as Union Bank will show at trial. It will put on evidence that it conducted an internal analysis for more than a year before changing its posting order so that larger dollar items are generally paid first. It will show that it studied the practices of other banks and changed its practices to be aligned with those banks, thus preserving Union Bank's competitive position, as specifically permitted by OCC regulations regarding the assessment of bank fees.

Union Bank will further show that it considered not only the increased revenue which would result from changing its posting practices, but the impact that higher overdraft fees would have on customers who incurred multiple overdraft fees and whose risky behavior Union Bank wanted to curtail.[5] Union Bank will also prove that it conducted two different customer surveys about this change to its overdraft practice—one before it implemented the change and one six

---

[5]      The validity of the Bank's concern will be confirmed by evidence concerning the individual plaintiffs' circumstances. Two of the four named plaintiffs incurred so many overdrafts that Union Bank closed their accounts. The Bank suffered a loss as the result of plaintiffs' refusal to repay the Bank for amounts it advanced to merchants on their behalf. This evidence will disprove plaintiffs' claim that the overdraft fees were not "reasonably related to the costs or risks associated with providing overdraft protection." PTP, p. 6

months after, to see how Union Bank customers were responding to the change; both of these studies confirmed that Bank customers were satisfied with the Bank paying larger dollar items before smaller ones.

While much of this evidence is common, Union Bank will also introduce individual evidence showing that many of its customers affirmatively want Union Bank to pay larger dollar items first, even if more overdraft fees may be incurred as a result. (This was confirmed in the customer studies performed by the Bank as well.) Some customers benefit from high-to-low posting order. Larger items, such as checks for important purchases or other obligations (such as rent or mortgage payments) are debited first, assuring they will be paid, even if lower-sum debit card transactions are declined as a result of a large overdraft. [6] In the federal regulators' words, "payment of the check or ACH overdraft may allow the consumer to avoid a second fee assessed by the merchant for a returned item as well as possible negative reporting consequences." 73 Fed. Reg. 28904-01, 28929 (May 19, 2008).

Plaintiffs hope to convince the trier of fact that the Bank "uniformly re-sequenced transactions . . . from highest to lowest" (PTP, p. 4), and that chronological posting would be more beneficial for every customer in the putative class. However, Union Bank will introduce evidence showing that not all transactions were posted from highest to lowest dollar amount. More importantly, it will show that the chronological posting advocated by plaintiffs would *not* benefit the customer in every instance but, in fact, would create additional overdraft fees in some cases. To prove this, Union Bank will introduce individual evidence of transactions on class

---

[6]     Brown Depo., 168:10-16 (When asked how plaintiff felt about Union Bank paying a rent check when she did not have sufficient funds to cover it, she replied "[t]hat they paid it, fine. And that if they charged me an overdraft fee for it, fine."); 167:17-24; 216:1-8 (Plaintiff never had a rent check bounce with Union Bank; however, several were paid against nonsufficient funds.)

member accounts, including some involving the named plaintiffs' accounts, which show that chronological posting would have harmed customers in some instances. This *evidence* will stand in stark contrast to plaintiffs' *allegation* that no reasonable person would have agreed to the posting practices of the Bank. PTP, p. 6.

While plaintiffs claim that they and other class members were tricked or deceived into incurring multiple overdraft fees, Union Bank will submit individual evidence showing that this is not true. This evidence will show that individual class members read and understood the description of the Bank's posting order in their account agreement; received account statements informing them that they had incurred overdraft fees; and received and reviewed individual overdraft notices identifying the transaction which had resulted in an overdraft fee and identifying any hold on funds which might have reduced the available balance on the account.

The evidence to be introduced at trial will also show that many of those customers who incurred multiple overdraft fees on numerous occasions (*i.e.*, "chronic" overdrafters) did *not* do so because they were confused or unaware that multiple overdraft fees would result. Instead, they did not want to take the time to track their transactions or their account balances, or they wanted to obtain the good or service even though they had insufficient funds and an overdraft fee would result.

Plaintiffs Brown, Logan, Larsen, and Naehu-Reyes apparently intend to dispute this, even though they incurred overdraft fees totaling some $2,600, $2,500, $2,200 and $500, respectively. However, Union Bank will submit evidence showing that the named plaintiffs were aware of the multiple overdraft fees which would result if they did not manage their bank account prudently— and that they eventually changed their behavior and monitored their own transactions such that they were able to completely eliminate overdrafts.

13

Plaintiffs apparently hope to convince the trier of fact that all class members were "poor but honest" based upon a single email using that phrase. PTP, p. 8. However, Union Bank will introduce evidence showing that customers overdrafted their accounts for a wide variety of reasons. Many customers were simply inattentive or careless, failing to check their balances or note expenditures they had made which would reduce their available balance once those charges were posted to their account. These included both "poor" and wealthy customers, and those in between. Some overdrafts (including several on plaintiff Larsen's account) were caused by the return of checks which Union Bank customers had deposited into their accounts but which had been written against insufficient funds. Some customers knowingly purchased more goods and services than they could afford, and consciously used overdrafts to bridge this gap. As the Eleventh Circuit has held, such widely varying individual circumstances must be considered in determining plaintiffs' unjust enrichment claim, rendering this claim particularly "inappropriate for class action treatment." *Vega*, 564 F.3d at 1274. Plaintiffs' other causes of action are similarly not amenable to class action treatment.

## G.     Evidence Regarding Customers' Ability to Avoid Overdrafts.

Finally, plaintiffs claim that each class member was denied any "meaningful opportunity" to opt out of Union Bank's overdraft protection program (PTP, p. 6) or to avoid overdrafts by changing their conduct. The issue is significant because, under plaintiffs' claim for violation of California's Unfair Competition Law (Count VI), a consumer's ability to avoid the alleged harm is a key factor in determining whether the defendant's actions were "unfair" and whether the consumer is entitled to recover. This same issue will impact the affirmative defenses which Union Bank is likely to assert once the pleadings are settled, such as consent, waiver and failure to mitigate damages.

Union Bank's evidence at trial will show that it offered customers various products which would allow them to avoid overdraft fees altogether. These include its savings overdraft protection program ("SOPP") and its cash reserve account, both of which are offered on the face of the account agreement which the customer signs to open the account. At least one of the named plaintiffs (Naehu-Reyes) signed up for the SOPP with Union Bank. Others, like Logan and Larsen, declined these offers but later changed their practices in checking their account balances such that they were able to avoid overdraft fees altogether. This evidence, which is of course individual in nature, will be introduced at trial in response to plaintiffs' claims.

## IV.   AFFIRMATIVE DEFENSES

Plaintiffs' PTP contains no plan for how Union Bank's affirmative defenses would be tried in the event that this case were certified as a class action. This alone renders the plan ineffective as a "roadmap" for class certification and trial, since trial courts are obligated to consider how affirmative defenses will impact the requirements for class certification, including the predominance and superiority elements under Rule 23(d)(3). *Rutstein v. Avis Rent–A–Car Sys.*, 211 F.3d 1228, 1234 (11th Cir. 2000) (citing 5th Circuit for proposition that "[g]oing beyond the pleadings is necessary, as a court must understand the claims, *defenses,* relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues") (citation omitted) (emphasis added).

Because the pleadings are not settled, Union Bank has not asserted its affirmative defenses to whichever of plaintiffs' claims may survive the pending motion to dismiss. Which affirmative defenses will remain for trial will depend upon which of plaintiffs' claims survive the pending motion to dismiss. However, Union Bank currently anticipates that it will assert a number of affirmative defenses which will require the introduction of individual evidence at trial. These affirmative defenses are likely to include consent, waiver, ratification, estoppel, and

voluntary payment, each of which may be applicable as to some plaintiffs and not others. Moreover, if and when it answers, Union Bank will seek to recover—through offsets and counterclaims—amounts that are due from Larsen, Brown, and others, as a result of the fact that they closed their accounts with negative balances.   Adjudicating these counterclaims and calculating these offsets in a manner that is fair to the entire putative class will require individual proof as to the amounts owed.

## V.   INDIVIDUAL ISSUES PREDOMINATE

The evidence described above will establish that plaintiffs cannot recover on their various claims against Union Bank, because they will be unable to establish one or more of the essential elements for recovery under the particular cause of action.  Union Bank will be entitled to present this evidence at trial in order to defend itself from plaintiffs' claims.

As shown above, introduction of this evidence will require individual testimony not only from the four named plaintiffs, but from other members of the putative class who read and understood Union Bank's account agreement and disclosures; understood the Bank's posting practices; preferred that the Bank pay higher dollar items first; benefitted from the practices under attack; successfully avoided overdrafts, etc.

Certainly, there will be common, class-wide evidence regarding the terms of the account agreements (which are essentially uniform) and the various factors which Union Bank analyzed in changing its posting practices in April of 2004.  However, the individual evidence described above will plainly predominate, in terms of the trial time required.

It would not be possible for this case to be tried in nine days, as plaintiffs suggest, and their analogy to the trial in the *Gutierrez v. Wells Fargo* case is inapt.  That case involved a single state class and only a single cause of action; plaintiffs dismissed their other claims before trial, including claims which they are seeking to certify here. *Gutierrez* was tried to a judge, not

16

a jury. And the nine day trial in *Gutierrez* resolved only the issue of liability under plaintiffs' single statutory claim; damages and other issues were addressed in subsequent proceedings which consumed substantially more time than plaintiffs suggest.

This case, by comparison, involves a multi-state class. It includes five different causes of action, each of which has numerous elements. The elements vary from state to state, as do Union Bank's probable defenses. This case will be tried to a jury, unlike *Gutierrez*. The trial of this case would thus require jury instructions and special verdict forms, including instructions on the elements for recovery under each of plaintiffs' claims, and instructions on how those elements vary from state to state. Union Bank estimates that the trial of this case would take a minimum of 20 trial days—perhaps substantially longer.

Trial of this case in 9 days could only be accomplished if Union Bank were prohibited from calling plaintiffs and other class members as witnesses, putting on evidence of individual accounts and transactions, and presenting the sort of detailed evidence which will be necessary to disprove the allegations which plaintiffs make in their complaint. Union Bank cannot be barred from presenting this evidence or hamstrung in its defense of this case simply because denial of class certification would be the inevitable result if Union Bank were allowed to properly defend itself from plaintiffs' claims. Simply put, the rules do not change just because plaintiffs have elected to plead their case as a class action. As courts have explained,

> Class actions are provided only as a means to enforce substantive law. Altering the substantive law to accommodate procedure would be to confuse the means with the ends—to sacrifice the goal for the going.

*City of San Jose v. Superior Court*, 12 Cal.3d 447, 462 (1974); *see also Granberry v. Islay Inv.*, 9 Cal.4th 738, 749 (1995) ("It is inappropriate to deprive [class action] defendants of their

substantive rights [there, the right to a setoff] merely because those rights are inconvenient in light of the litigation posture plaintiffs have chosen").

Because such individual issues predominate, class certification will not be the superior means of adjudicating these claims given the difficulties in managing these claims as a class action. Any trial of this case would require the presentation of a substantial amount of evidence specific to each of an unknown number of class members. As the *Vega* court has acknowledged, "[t]his reality poses serious challenges to the efficiency and manageability of a class action proceeding." *Vega*, 564 F.3d at 1278. Absent a concrete plan from plaintiffs for how to feasibly address these difficulties, it is clear that a class action is *not* superior to other available methods of adjudicating the controversy. *Id.* at 1278-79.

## VI.   PLAINTIFFS' PROPOSED TRIAL PLAN IS DEFECTIVE FOR OTHER REASONS

Plaintiffs' PTP suffers from other flaws as well, which Union Bank briefly recaps here.

Plaintiffs' proposed treatment of Count Three for "unconscionability" is illustrative of the problems with their plan. As an initial matter, Union Bank reasserts its position that unconscionability is only a defense to enforcement of a contract and does not give rise to an affirmative cause of action. *California Grocers Assn. v. Bank of America*, 22 Cal.App.4[th] 205 (Cal. App. 1994); see page 4 above.

The Bank acknowledges the Court's previous finding that, while the above rule is ordinarily true, this case may be the sort of extraordinary case in which unconscionability can give rise to an affirmative claim. See March 11, 2010 Order Ruling on Omnibus Motion to Dismiss, DE #305.. But the Court specifically found that this doctrine might allow *the Court* to exercise its *equitable* powers to fashion relief for customers. *Id.* Plaintiffs conceded as much in connection with the motion to dismiss, *ibid*, and they again note in their proposed trial plan that

uncionscionability is determined by the Court as a matter of law. PTP, Ex. C. Yet they propose trying this claim to a jury when they plainly have no right to a jury trial of this purely equitable claim (or defense).

Plaintiffs would have the jury make a finding on whether the "overdraft provisions" are unconscionable, without specifying which provisions they seek to invalidate.[7] Then, they envision that the jury will decide whether the Court "may declare [Union Bank's] contractual provisions to be unconscionable." PTP, Proposed Special Verdict Form. This approach mixes up the proper roles of judge and jury. It is the role of the trial court, sitting in equity, to determine whether a particular provision should not be enforced because it is unconscionable.

Next, plaintiffs would have the jury make a finding on the amount of the "monetary relief" which should be awarded based upon Union Bank's insertion of supposedly unconscionable "overdraft provisions" in the account agreement. However, they cite no authority for this notion that monetary relief can be awarded based upon a finding that a contractual provision is unconscionable. As previously explained, the proper remedy is that the trial court may strike or refuse to enforce the offending provision, and it is the trial court which would decide what further equitable relief may be warranted.

Similarly, plaintiffs propose that their fifth and sixth causes of action, for unjust enrichment and violation of California's unfair competition law, be tried to a jury. They are wrong here as well. Both are equitable claims which will be tried to the court. *Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry,* 494 U.S. 558, 570, 110 S.Ct. 1339, 108 L.Ed.2d

---

[7]     There are numerous provisions throughout the Union Bank account agreement dealing with overdrafts. It is unclear whether plaintiffs seek to invalidate that portion allowing the Bank to post in any order or "generally" high to low, or those provisions which allow the Bank to pay items into overdraft, or some other provision(s).

519 (1990); *Okura & Co. (America), Inc. v. Careau Group,* 783 F.Supp. 482, 490 (C.D. Cal. 1991); *Beasley v. Wells Fargo Bank*, 235 Cal.App.3d 1383, 1392 (Cal. App. 1991).

Plaintiffs' proposed trial plan also ignores essential elements for recovery under certain of their claims, and misstates other elements. For example, their proposed special verdict form for their RICO claim omits entirely the element of reliance, which must be established in order for any plaintiff or class member to recover. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658-59 (2008); *Braswell Wood Co., Inc. v. Waste Away Group, Inc.*, 2010 WL 3168125, at *3 n. 1 (M.D. Ala. 2010); *In re Managed Care Litig.*, 2009 WL 812257, at *8 (S.D. Fla. 2009); *see* Reply Memo. re Motion to Dismiss 3d Amended Compl. (DE #1505), pp. 13-18. Finally, their proposed special verdict form includes no findings on Union Bank's affirmative defenses, and is plainly inadequate for that reason as well.

## VII.   CONCLUSION

For all the foregoing reasons, the Court should find that Plaintiffs' Trial Plan is inadequate.

Dated: June 9, 2011

Respectfully submitted,

*Alan G. Greer*

Alan G. Greer, Esq.
Florida Bar No. 0123294
agreer@richmangreer.com
John M. Brumbaugh, Esq.
Florida Bar No. 0126350
jbrumbaugh@richmangreer.com
RICHMAN GREER, P.A.
Miami Center – Suite 1000
201 South Biscayne Boulevard
Miami, Florida 33131-2305
Telephone: (305) 373-4000
Facsimile: (305) 373-4099

John B. Sullivan
jbs@severson.com
Jan T. Chilton
jtc@severson.com
Mark D. Lonergan
mdl@severson.com
Peter H. Bales
phb@severson.com
Severson & Werson
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Tel: 415-677-5603
Fax: 415-956-0439

Attorneys for Defendant
UNION BANK, N.A.

## CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2011, I served the foregoing document with the Clerk.  I also certify that the forgoing document is being served this day, via Hand Delivery, on Robert C. Gilbert, Esq, Grossman Roth, P.A., 525 Ponce de Leon Blvd. Suite 1150, Coral Gables, Florida 33134; and Michael W. Sobol, Esq., Lieff Cabraser Heimann & Bernstein LLP, Embarcadero Center West, 275 Battery Street, 30th Floor, San Francisco, CA 94111.

Alan G. Greer