## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## CASE NO. 09-MD-02036-JLK

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION,

MDL No. 2036
_____/

THIS DOCUMENT RELATES TO:

*Eivet v. IBERIABANK,*
S.D. Fla. Case No. 1:10-CV-23790-JLK
_____/

### DEFENDANT IBERIABANK'S OPPOSITION TO THE PEC'S VERIFIED MOTION TO ENJOIN "COPYCAT" CASE UNDER THE ALL WRITS ACT

IBERIABANK files this Response in Opposition to the Verified Motion to Enjoin Copycat Case under the All Writs Act (the "PEC's Motion"), filed on June 14, 2011 by the MDL Plaintiffs' Co-Lead Counsel, MDL Plaintiffs' Coordinating Counsel, and MDL Plaintiffs' Executive Committee (collectively, the "PEC") [MDL DE 1608].

### INTRODUCTION

The PEC's Motion requests this Court to invoke the All Writs Act (12 U.S.C. § 1651) to enjoin a bona fide, arm's-length settlement that IBERIABANK has reached, after a lengthy mediation conference before a highly respected professional in that field, in an overlapping class action presently pending in the United States District Court for the Eastern District of Arkansas. In that case, *Sachar, et al. v. IBERIABANK Corporation, et al.,* Case No. 4:11-CV-0266BSM (the "*Sachar* Action"), IBERIABANK and the *Sachar* Action Plaintiffs have filed a joint motion for preliminary approval of the class action settlement before United States District Judge Brian Miller. In deference to this Court and to the Judicial Panel on Multidistrict Litigation (the "JPML"), both IBERIABANK and the *Sachar* Action Plaintiffs have requested that Judge Miller defer ruling thereon until after this Court or the JPML resolves certain pending issues with respect to IBERIABANK, including the present motion.

With regard to this motion, IBERIABANK points out that the JPML has already permitted several other overdraft class actions to be administered in the districts in which they

settled, and is very likely to do so in the *Sachar* Action; that any suggestion that the settlement reached is in any way unfair to the class—something that the PEC implies but wisely does not attempt to support—must completely disregard the actual economic settlement agreed to, which bank-for-bank even exceeds the payout amount in the Bank of America settlement which this Court recently approved; that the standards for injunctive relief are not even marginally satisfied by the PEC; and that in any event the *Sachar* Action in the Eastern District of Arkansas is plainly the first-filed case against IBERIABANK, because of an obvious defect in this *Eivet* complaint affecting standing, jurisdiction, and venue, which the PEC has chosen not to correct despite IBERIABANK's invitation to do so.

## ARGUMENT

The *Sachar* Action is subject to an opposed Conditional Transfer Order entered by the JPML, which will determine whether to transfer the *Sachar* Action to MDL 2036 on its July 28, 2011 non-argument docket. [JPML DE 536][1]. In addition to this All Writs Act motion in this district, on June 14, 2011 the PEC also filed in the JPML docket a response (the "PEC's JPML Filing") in opposition to the *Sachar* Plaintiffs' motion to vacate the Conditional Transfer Order. IBERIABANK conditionally joined in the *Sachar* Plaintiffs' motion to vacate after a lengthy mediation and resulting settlement, and pending approval of the settlement agreement in the Eastern District of Arkansas.[2]

The PEC's Motion under the All Writs Act is devoid of merit and IBERIABANK expects that the JPML will follow its own precedent of declining to transfer overdraft cases that have reached settlement in a different federal district to MDL 2036. Nonetheless, in light of the PEC's Motion and related filings, IBERIABANK has requested that Judge Miller of the Eastern District of Arkansas refrain from taking any action on the Motion for Preliminary Approval of Settlement (or the Sachar Plaintiffs' Motion to File a Second Amended Complaint) until the JPML or this Court have resolved the issues raised in the PEC's June 14, 2011 filings. [ARK DE 35]. The *Sachar* Action Plaintiffs have joined in that request. [ARK DE 36].

---

[1] A copy of the JPML's Notice of Hearing Session is attached hereto as Exhibit A.

[2] As the PEC's Motion has put the status of proceedings before the JPML at issue, in an effort to present this Court with an accurate record of those JPML proceedings, a copy of the *Sachar* Plaintiffs' Reply Brief in Response to Objections by Plaintiffs' Counsel in MDL 2036 to Vacating CTO-34 is attached as Exhibit B. While IBERIABANK supports the relief sought by and generally agrees with the legal arguments presented in the *Sachar* Plaintiffs' reply, IBERIABANK does not rely on anything contained therein for purposes of this opposition.

### PLAINTIFF GISELA EIVET'S
### RELATIONSHIP WITH IBERIABANK

The PEC relies on the fact that the instant case—the *Eivet* Action—is already in MDL 2036 as the fundamental reason for enjoining settlement of the *Sachar* Action. However, there is substantial doubt as to whether the *Eivet* Action—a dispute between one Texas banking customer and her Texas bank over six overdraft charges incurred in Texas during a two-week period in October, 2010—should even be in MDL 2036 in the first place.

Ms. Eivet resides in Texas. On August 9, 2010, she opened a checking account at the Deer Park, Texas branch of IBERIABANK*fsb*, located in Harris County, Texas. When she opened her account Ms. Eivet specifically declined to opt in to IBERIABANK*fsb*'s overdraft protection service. This service protected IBERIABANK*fsb* customers from having check, debit card, and ATM transactions refused for insufficient funds for a previously disclosed fee.

In the first two months of her banking relationship with IBERIABANK*fsb*, Ms. Eivet overdrew her account several times. Because she was not enrolled in Bounce Protection, those overdrafts resulted in non-payment to Ms. Eivet's creditors. According to IBERIABANK*fsb*'s records, on or about October 6, 2010, Ms. Eivet spoke with the branch manager at her bank and discussed Bounce Protection. On October 6, 2010, Ms. Eivet enrolled in IBERIABANK*fsb*'s Bounce Protection program. In the two weeks that followed, she again overdrew her account several times. However, because she had enrolled in the Bounce program, those overdrafts were covered by the bank. Rather than bouncing payments to various merchants and retailers, and being liable for any resulting fees imposed by them, Ms. Eivet was contractually responsible to pay IBERIABANK*fsb* an overdraft fee of $35.00 for each overdraft that IBERIABANK*fsb* covered. Ms. Eivet expressly agreed to these conditions.

### TEXAS RESIDENT EIVET SUES IBERIABANK FOR
### CONDUCT THAT SHE CLAIMS OCCURRED IN BROWARD COUNTY, FLORIDA

As set forth in the affidavit of IBERIABANK's counsel, Thomas Meeks, sworn to on June 27, 2011, and submitted in support of this opposition (the "Meeks Aff."),[3] on October 20, 2010, Ms. Eivet, who opened her banking account at an IBERIABANK*fsb* branch in Harris County, Texas and incurred all of her overdraft fees there, sued IBERIABANK (an entity distinct from IBERIABANK*fsb* and with whom Ms. Eivet did not have a banking relationship) in the

---

[3] The Meeks Aff. is attached hereto as Exhibit C.

Southern District of Florida.  The case was initially assigned Case Number 10-cv-23970, and the signed civil cover sheet filed with the complaint states that Ms. Eivet's claims arose in Broward County, Florida.  The civil cover sheet in this action also indicates that the *Eivet* Action was a related case to 09-MDL-2036 ("*In re: Checking Account Overdraft Litigation*"), and two days after the case was filed, the Clerk of the Court reassigned the case to MDL 2036 by operation of Rule 7.2(a) of the Panel Rules of the JPML.

<div align="center">

**IBERIABANK'S COUNSEL CONFERS WITH THE PEC
REGARDING THE APPROPRIATE TRANCHE FOR THE *EIVET* ACTION**

</div>

As further set forth in the Meeks Affidavit,  IBERIABANK learned about the *Eivet* Action on October 23, 2010.  On October 26, 2010, IBERIABANK's counsel conferred with Robert Gilbert (MDL Plaintiffs' Coordinating Counsel) and discussed, *inter alia*, the propriety of the *Eivet* Action being assigned to the Fourth Tranche of cases in MDL 2036, because of issues that were specific to that defendant.  IBERIABANK's counsel told Mr. Gilbert that they required additional information to evaluate IBERIABANK's potential defenses, and, in particular needed to time to determine whether the claims against IBERIABANK might be subject to arbitration. IBERIABANK's counsel noted that their review of Ms. Eivet's claims against IBERIABANK and potential defenses was hampered because Ms. Eivet's complaint contained no "plaintiff specific" exhibits, such as her account agreement, and IBERIABANK was in the process of locating those documents so they could be reviewed.

During the telephone conversation of October 26, 2011, IBERIABANK's counsel indicated that it appeared that Ms. Eivet had a problem with respect to the party defendant in the case.  Ms. Eivet's banking relationship was with IBERIABANK*fsb*, a federally chartered thrift that was headquartered in Little Rock, Arkansas, with branches in Arkansas, Texas, and other states not including Florida, and not IBERIABANK, a Louisiana state chartered bank, headquartered in Lafayette, Louisiana that maintained operations in Florida, Louisiana, and other states, and which, at the time Ms. Eivet filed her complaint, was a separate legal entity from IBERIABANK*fsb*.  IBERIABANK's counsel suggested that plaintiffs look into this matter, which Mr. Gilbert agreed he would do with Wayne Schwartz, counsel of record for Ms. Eivet.

On November 1, 2010, the PEC and certain other Defendants filed a Joint Motion for Entry of a Scheduling Order with respect to the Fourth Tranche.  [MDL DE 862].  Also on November 1, 2010, the Plaintiffs' Lead Counsel and Defendants (through Defendants' Liaison

Counsel) submitted a Joint Status Report in accordance with the Court's Order Setting Status Conference for November 4, 2010.  [MDL DE 864].  This submission indicated that "other defendants that do not agree with the interim scheduling order, including … IBERIABANK, plan to attend the November 4, 2010 Status Conference and will be prepared to address their positions with respect to entry of interim scheduling order covering the transfer actions pending against it."  *See* [MDL DE 64 at ¶ 3].   The notation that IBERIABANK "disagrees" with the placement of the *Eivet* Action in the Fourth Tranche demonstrates that the PEC's position was that IBERIABANK should be placed in the Fourth Tranche.  After the November 4, 2010 Status Conference, the Court entered an interim Scheduling Order with respect to several cases assigning them to what is now called the Fourth Tranche.  The Court did *not* put IBERIABANK in the Fourth Tranche.  Accordingly, the unfortunate suggestion by the PEC that IBERIABANK somehow duped counsel into putting its case in a later tranche does not hold water.

On November 15, 2010, IBERIABANK filed an unopposed motion for extension of time to respond to the *Eivet* Complaint for a period of fourteen (14) days, through November 29, 2010.  [MDL DE 914].  Mr. Gilbert indicated that he agreed to this extension, and the Court granted the motion.  *Id.*   On November 16th, IBERIABANK's counsel conferred with Mr. Gilbert regarding the *Eivet* Action and suggested that Ms. Eivet correct her pleading problem with respect to the proper party defendant by amending her Complaint, in lieu of extensive motion practice to achieve the same result.

IBERIABANK's  counsel also confirmed to Mr. Gilbert that IBERIABANK did not have an arbitration clause in its agreement with Ms. Eivet and thus would not be raising an arbitration defense.   IBERIABANK's counsel represented that because the arbitration issue had been resolved, IBERIABANK was amenable to becoming part of the Fourth Tranche, which had been organized approximately two weeks prior.  Mr. Gilbert indicated that he did not think adding IBERIABANK to the Fourth Tranche was feasible at that time.  Mr. Gilbert indicated that IBERIABANK would therefore be placed into the Fifth Tranche and that he anticipated the Scheduling Order for the Fifth Tranche to be entered by the end of the year (2010) or shortly into the new year (2011).  Mr. Gilbert believed that this would give Ms. Eivet adequate time to resolve any problems with her pleading.

On or about November 29, 2010, IBERIABANK's counsel contacted Mr. Gilbert to discuss an additional enlargement of time for IBERIABANK to respond to the *Eivet* Complaint.

During this time, Mr. Gilbert correctly informed defense counsel that he had neglected to mention that Scheduling Order No. 1 [MDL DE 59], which had been entered on September 14, 2009, stated that all existing deadlines for newly transferred actions were automatically suspended and stayed upon transfer pending the entry of an applicable Scheduling Order by this Court.  *See id.* at p. 2-3.  Scheduling Order No. 1 provides that Plaintiffs' Lead Counsel should provide a copy of that order and any other orders entered in the MDL to each newly added defendant.  Accordingly, no extensions to plead to the *Eivet* Complaint had been necessary.

### IBERIABANK's COUNSEL PROMPTLY ADVISED THE PEC ABOUT THE REMOVAL AND EVENTUAL SETTLEMENT OF THE *SACHAR* ACTION

IBERIABANK's counsel called Mr. Gilbert on March 22, 2011 to advise him that IBERIABANK would be removing the *Sachar* Action from the state court in Pulaski County, Arkansas to the Eastern District of Arkansas, and that it would be filing a notice of tag along to MDL 2036.  IBERIABANK believed it was appropriate to alert Mr. Gilbert that this overdraft class action against IBERIABANK would be entering the federal system.

Approximately three months after the *Sachar* Action was filed, IBERIABANK and the *Sachar* Action Plaintiffs reached a settlement that includes monetary consideration of $2,500,000 and injunctive relief to resolve the litigation.  On June 3, 2011, IBERIABANK's counsel advised Mr. Gilbert that IBERIABANK and the Plaintiffs in the *Sachar* Action had reached a settlement and were filing a motion for its preliminary approval.  Counsel believed it was appropriate to promptly alert Mr. Gilbert of this development.  The settlement was the product of, informed, non-"collusive" negotiations.  It was negotiated and agreed to by the parties and counsel with the aid of an experienced mediator, Gary McGowan of McGowan Dispute Resolution in Houston, Texas.  Before and during the mediation, the *Sachar* Action Plaintiffs' counsel reviewed documentary evidence concerning IBERIABANK's relevant overdraft fee policies, the changes to those policies, and the revenue IBERIABANK derived from them.

As a result, counsel for IBERIABANK and the *Sachar* Action Plaintiffs were able to assess the strengths and weaknesses of the case and determine with a reasonable degree of certainty the amount of damages the class might plausibly claim in the event that they were successful at trial.  Counsel for IBERIABANK and the *Sachar* Action Plaintiffs vigorously advocated their clients' positions in mediation and throughout the two weeks of subsequent negotiations culminating in the execution of the settlement agreement.  Accordingly, the

settlement between IBERIABANK and the *Sachar* Action Plaintiffs should be "presumed to be fair and reasonable." *In re Checking Account Overdraft Litig.*, No. 1:09-MD-02036-JLK, --- F. Supp. 2d ----, 2011 WL 2258458, *1 (S.D. Fla. May 24, 2011) (granting approval of settlement negotiated between Bank of America and the PEC with the aid of a mediator) [MDL DE 1520].

When compared to settlements in other national overdraft class actions that have been preliminarily or finally approved, the monetary consideration of the settlement agreement represents a greater ratio to IBERIABANK's assets than the monetary consideration provided by either Fifth Third Bank, Webster Bank, or Bank of America to their respective settlement class members.[4]  Additionally, the settlement provides for two components of injunctive relief.

The PEC conclusively argues, without support, that IBERIABANK's settlement with the *Sachar* Action Plaintiffs is "grossly inadequate."   [MDL DE 1608 at p. 6].   However, the settlement has no obvious defects.  It is not contingent upon approval of attorneys' fees or any incentive award to the proposed class representatives, and the attorneys' fees that the Sachars' counsel plan to request represents a smaller percentage of the settlement fund, 25%, than the 30% attorneys' fees to be requested by plaintiffs' counsel pursuant to the preliminarily approved Bank of America settlement.   [MDL DE 1520].   Whichever court ultimately reviews the settlement will separately and independently determine the appropriate amount of fees to award to proposed class counsel and the appropriate amount of any award to the proposed class representatives.   Similarly, the *Sachar* settlement is not contingent upon approval of the proposed plan of allocation, which also must be approved by the court.   Accordingly, the settlement treats all members of the proposed settlement class equally and fairly, and there are no apparent deficiencies which would prevent preliminary approval.

### THE PEC IS USING ITS OBJECTIONS TO THE *SACHAR*  SETTLEMENT TO GAIN POWER TO CONTROL ALL OVERDRAFT SETTLEMENTS THROUGHOUT THE COUNTRY

The theme of the PEC's Motion is that no bank should be permitted to reach a settlement of any overdraft case outside of the MDL.  While the PEC has opposed prior settlements that have been reached outside the MDL, the proposition that no banks can settle overdraft cases outside of the MDL is inconsistent with decisions from the JPML, specifically declining to

---

[4] A chart comparing settlements in related overdraft litigation is attached hereto as Exhibit D.

transfer four separate overdraft cases against three separate banks to this MDL where settlements had been reached in federal district courts outside of the MDL.  [JPML DE 233, 289, 459].[5]

IBERIABANK is improperly being caught up in the PEC's attempt to modify the administrative rules of MDL 2036.  The instant dispute should be between Ms. Eivet, on one hand, and IBERIABANK, on the other.  In that regard, Ms. Eivet has a clear remedy to object to the settlement under Fed. R. Civ. P. 23.  However, rather than making the instant dispute between Ms. Eivet and IBERIABANK, the PEC has taken the unusual step of filing a motion on its own behalf—as the movants are Plaintiffs' Co-Lead Counsel, Plaintiffs' Coordinating Counsel, and Plaintiffs' Executive Committee, not Ms. Eivet.  This is telling; in essence, the PEC is using the *Eivet* Action as a stalking horse to seek additional authority under the various scheduling orders and orders appointing the PEC entered in MDL 2036.  Specifically, the PEC is seeking exclusive authority to negotiate and enter into settlements on behalf of any defendants in any banking overdraft case in the country or at least in the federal court system—a proposition that the JPML has thrice rejected.[6]

IBERIABANK urges the Court to take a case-specific look at this controversy and confine its consideration to whether IBERIABANK's settlement of the *Sachar* Action in the Eastern District of Arkansas, achieved in mediation, should be enjoined or Judge Miller should remain free to conduct a preliminary approval hearing to evaluate that settlement.  As set forth above, in light of the PEC's Motion and related filing in the JPML, IBERIABANK has asked Judge Miller to refrain from taking any action on the Motion for Preliminary Approval of Settlement (or the *Sachar* Plaintiffs' Motion to File a Second Amended Complaint) until the JPML or this Court have resolved the issues raised in the PEC's June 14, 2011 filings.

### THIS COURT HAS PREVIOUSLY REJECTED A REQUEST TO STAY A SECOND-FILED ACTION PENDING IN MDL 2036

The PEC also argues that the *Sachar* Action should be stayed based on the federal "first-to-file-rule."  *See* PEC Motion at pp. 9-11.  This argument does not specifically rely on the All

---

[5] Copies of the JPML's Orders vacating conditional transfer orders of cases settled in federal courts outside of the MDL are attached as Composite Exhibit E.

[6] "[A] district court may not expand the decree or impose obligations that are not unambiguously mandated by the decree itself.  In other words, the court may not frame relief that was beyond the contemplation of the original order."  *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, n.24 (11th Cir. 2005) (internal citations omitted).

Writs Act as grounds for imposing a stay. Rather, the PEC relies on a line of cases supporting the proposition "that the court in which an action is first filed is the appropriate court to determine whether subsequently filed cases involving similar issues should proceed." *Id.* at 10.

As an initial matter, the PEC presents—as uncontroverted—the proposition that the "first-filed" forum is the only proper forum to decide whether to stay the second-filed action. The PEC relies on a line of cases going back to *Mann Mfg. Inc. v. Hortex, Inc.*, 439 F.2d 403, 408 (5th Cir. 1971) in support of their contention that the court first filed in should stay a second-filed action—as opposed to the second-filed action's court. While *Mann Mfg.* predates *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir.,1981) (en banc)—and thus is binding precedent—district court cases in the Eleventh Circuit, while not specifically purporting to depart from this aspect of *Mann Mfg.*, have at least implicitly suggested that the second-filed district should weigh in on the issue. *See e.g., Global Innovation Tech. Holdings, LLC v. Acer Am. Corp.,* 634 F. Supp. 2d 1346 (S.D. Fla. 2009); *Parsons & Whittemore, Enters. Corp. v. Cello Energy*, LLC, No. 07-0743-CG-B, 2008 WL 227952, at *23 (S.D. Ala. Jan. 25, 2008) (stating that there is an "absence of binding precedent on the issue").

Regardless of whether this Court has the jurisdictional authority as the claimed[7] first-filed court to stay the second-filed case under the first-to-file rule, pursuant to precedent established by this Court in MDL 2036, a stay should not be imposed. In support of this argument, IBERIABANK specifically refers to the motion to stay filed by Defendant Fifth Third Bank in a case styled as *Keyes v. Fifth Third Bank*, (MDL 2036 - S.D. Fla. Case No. 10-CV-21283-JLK) where Fifth Third Bank moved to stay an action pending in MDL 2036 (the "*Keyes* Action") based on a settlement of an overlapping overdraft case pending in another federal court and in which the JPML had denied transfer to MDL 2036.[8] One of the arguments that Fifth Third Bank advanced was that the *Keyes* Action—the case in MDL 2036—was a second-filed action, and on the basis of the first-filed rule alone should have been stayed. *See* [MDL DE 863 at pp. 10-11]. Directly contradicting its present position, the PEC in *Keyes* disagreed with the proposition that the federal first-to-file rule was sufficient grounds for a stay. *See id.* at 13. The Court agreed

---

[7] As discussed herein, since the *Eivet* Action was not properly filed in the Southern District of Florida, this Court is not really the "first-filed" court. *Infra* at pp.18-21.

[8] IBERIABANK's undersigned counsel is co-counsel to Fifth Third Bank in the *Keyes* Action.

with the PEC, rejected Fifth Third Bank's argument, and declined to stay the second-filed action. *See* [MDL DE 894].  Now the PEC seeks to have this Court rule precisely the opposite.

## THE PEC IS NOT ENTITLED TO AN INJUNCTION UNDER THE ALL WRITS ACT

The PEC argues that an injunction is necessary to protect this Court's jurisdiction over the MDL proceeding and to fairly and efficiently manage this complex litigation.  However, the cases in which a federal court enjoined concurrent federal court proceedings are factually distinguishable, either because settlement was imminent or conditionally approved, because the court was protecting existing rulings such as on discovery, or because the party to be enjoined was clearly trying to evade existing rulings.  *See In re Managed Care Litig.*, 236 F. Supp. 2d 1336 (S.D. Fla. 2002) ("The motion [for preliminary approval in the enjoined action] did not reveal to the Judge the fact that the requested class encompassed a class previously certified by this Court, the pendency of the Injunction Motion, or the imminent injunction hearing (scheduled [one week after the parties in the enjoined action filed their settlement agreement and motion for preliminary approval]).")

There are two prerequisites to the issuance of a writ under the All Writs Act: "(1) that the petitioners have no other adequate means to attain the [desired] relief, and (2) that the petitioner meet its burden of showing that its right to the writ is clear and indisputable."  *In re School Asbestos Litig.*, 921 F.2d 1310, 1314 (3d Cir. 1991) (citing *Kerr v. U.S. Dist. Court*, 426 U.S. 394, 403 (1976) and denying request for writ) (internal quotations omitted).   "A court may not rely on the [All Writs] Act to enjoin conduct that is 'not shown to be detrimental to the court's jurisdiction,' instead, any order under the [All Writs] Act must be 'directed at conduct which, left unchecked, would have had the practical effect of diminishing the court's power to bring the litigation to its natural conclusion.'"  *In re Managed Care Litig.*, 236 F. Supp. 2d at 1339-40 (citing *ITT Community Dev. Corp. v. Barton*, 569 F.2d 1351, 1359 (5th Cir. 1978)).  Although "an MDL court entertaining complex issues has the authority to be particularly vigilant and protective of its jurisdiction," MDL courts only issue injunctions in instances where it is necessary "to protect the integrity of their rulings," or where defendants are attempting "to reach an inadequate or collusive settlement."  *Id.*; *In re Lease Oil Antitrust Litig.*, 48 F. Supp. 2d 699 (S.D. Tex. 1998) (inadequate settlement)).   "[T]his Court must operate on the basis of the assumption that all federal judges follow the law and protect the right of class members in

accordance with Rule 23 of the Federal Rules of Civil Procedure." *In re Managed Care Litig.*, 236 F. Supp. 2d at 1342-43.

The PEC argues that the decision in *In re Managed Care Litig.* "is highly instructive in applying the All Writs Act to stop settlement activities outside of the MDL for a case that belongs in the MDL." [MDL DE 1608 at 7]. However, the PEC omits key facts that Judge Moreno relied on in deciding to issue an injunction, specifically:

- "CIGNA [was] in violation of MDL Rule 7.5(e) … [because it] did not inform the MDL Panel of the pendency of the tag-along action it created in the Illinois federal court until December 6, 2002—after it had already received preliminary approval of the settlement and a full ten days after the removal was effectuated."

  ➢ *In contrast, IBERIABANK notified the JPML of the pendency of tag-along action less than three hours after the Sachar Action was removed to federal court.*

- At the time it filed its settlement agreement and moved for preliminary approval in the non-MDL action, "CIGNA did not inform that judge of the pendency of the injunction motion or of the imminent hearing on that motion" or "of the proceedings in [the MDL] case."

  ➢ *In contrast, IBERIABANK notified Judge Miller of the PEC's filings in the JPML and this Court—specifically filing copies of the PEC's submissions by way of notice of filing to Judge Miller.*

- "The motion [for preliminary approval] did not reveal to the Judge the fact that the requested class encompassed a class previously certified by [the MDL] Court."

  ➢ *In contrast, no class has been certified by this Court with respect to IBERIABANK— or in fact with respect to any other bank in a contested case in this MDL.*

- "CIGNA [] consented to an order [in the non-MDL action] which directly conflicted with the relief sought in the injunction motion" leaving the Court "no doubt … that CIGNA deliberately went before another court to create conflicting court orders so that it could claim inability to comply with any order this Court might enter on the injunction motion."

  ➢ *In contrast, the PEC cannot point to any orders that IBERIABANK is seeking in the Eastern District of Arkansas that directly conflict with orders entered by this Court. IBERIABANK's time to respond to the Eivet Action is stayed.*

*See In re Managed Care Litig.*, 236 F. Supp. 2d 1336, generally. Judge Moreno's ruling simply does not support the relief they now ask this Court to grant.

The PEC also relies on *In re Lease Oil Antitrust Litig.*, 48 F. Supp. 2d 699, *In re Viatron Computer Sys. Corp. Sec. Litig.*, 462 F. Supp. 382 (J.P.M.L. 1978), and *In re Armored Car Antitrust Litig.*, 462 F. Supp. 394 (J.P.M.L. 1978), for the proposition that transfer to the MDL is appropriate even given the pendency of a settlement agreement. However, *In re Lease Oil Antitrust Litig.* is distinguishable from the present case because the claims being settled in the state court case were weaker than the overlapping claims in the MDL action, "render[ing] the state court case prone to an inadequate, or possibly even collusive, settlement:"

> [S]ince the plaintiffs in Alabama state court are in a relatively weak bargaining position, those plaintiffs might be motivated to accept a settlement which reflects only the value of their lesser claims, rather than the value of the exclusive federal claims. Moreover, the state court litigants might be motivated to settle the exclusive federal claims at the same time and possibly for a bargain price since the exclusive federal claims are worthless to the state court plaintiffs, except for purposes of settlement. In these circumstances, the self-interest of the state court litigants themselves might drive the case towards an inadequate settlement which even the most fastidious court might feel itself bound to approve when both parties are insisting that it is a fair resolution.

*In re Lease Oil Antitrust Litig.*, 48 F. Supp. 2d at 702-03 (internal citation omitted).

In *In re Viatron*, at least one of the defendants in a New York action stayed pending transfer to the MDL "had reached agreement in principle with the plaintiff in this action and the plaintiffs in the already consolidated actions to settle and dismiss the claims against the underwriter in these litigations." 462 F. Supp. at 384. However, the JPML ultimately based its decision to transfer the New York action to the MDL because the judge presiding over the New York action had "recently resigned from the bench" and it would be inefficient to require a new judge to become familiar with the New York action and the MDL proceedings. *Id.*

In *In re Armored Car*, the MDL parties reached a settlement agreement settling fifteen of the sixteen actions pending in the MDL and moved for preliminary approval. 462 F. Supp. at 395. At the preliminary approval hearing the court determined that it needed additional information in order to be in a position to evaluate the settlement, and scheduled a second preliminary approval hearing. *Id.* Between the initial preliminary approval hearing and the continued preliminary approval hearing, a related action was filed in the District of Maryland. *Id.* Based on the shared questions of fact with the previously transferred actions, the District of Maryland action was transferred to the MDL. *Id.* at 396.

"When the [All Writs] Act has been used to *block* settlement efforts in another court, it is typically because a party was deliberately using that forum to circumvent a pending settlement agreement in the enjoining court.  This was the case in both *In re Lease Oil Antitrust Litigation* ... and *In re Managed Care Litigation*."  *See Grider v. Keystone Health Plan Cent., Inc.*, 500 F.3d 322, 330-31 (3d Cir. 2007) ("Indeed, the lack of cases in which the All Writs Act has been used to enjoin settlement efforts in another federal court is telling.  It is clear that the Act is generally used to prohibit activities in another court that threaten to undermine a pending settlement in the enjoining court.").  Although in *Grider* the non-MDL movants were seeking to enjoin a settlement agreement in the MDL and the parties were in agreement that the *Grider* action and MDL actions were overlapping but not identical, the Court's reasoning in refusing to issue the injunction is instructive.  *Id.*  In *Grider*, "unlike in *In re Lease Oil Antitrust Litigation* and *In re Managed Care Litigation*, there [was] no evidence of any collusion or wrongdoing by the *Grider* Defendants."  *Id.* at 332.  The parties reached a settlement after court-ordered mediation.  *Id.*  The court also held that the right to object to the settlement pursuant to Fed. R. Civ. P. 23 provided the movants an adequate remedy at law precluding the issuance of an injunction.  *Id.* (citing *Alabama*, 424 F.3d at 1132; *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1100-01 (11th Cir. 2004)).  Here, the PEC has not—and cannot—claim that Rule 23(e) is not an adequate remedy at law.

In *In re RC2 Corp. Toy Lead Paint Prods. Liab. Litig.*, No. 07 C 7184, 2008 WL 548772 (N.D. Ill. Feb. 20, 2008), MDL plaintiffs moved to preliminarily enjoin a state court settlement agreement pursuant to the All Writs Act, arguing that the settlement was inadequate and that the injunction was "necessary to protect th[e] Court's jurisdiction over the MDL proceeding and fairly and efficiently manage th[e] complex litigation."  *Id.* at *1, 3.  In response, the defendants moved to stay the federal proceedings pending approval of their settlement.  *Id.* at *1.

The *RC2* MDL proceedings were "not far advanced."  *Id.* at *4.[9]  There had been some exchange of discovery and briefing on a motion to dismiss.  *Id.*  Although the MDL plaintiffs

---

[9] While an injunction under the All Writs Act may be appropriate "where the federal court ha[s] spent so much time on a case that the lengthy litigation has become the virtual equivalent of a res," the *Eivet* Action—which has been stayed since it was filed more than 8 eight months ago— does not meet this requirement.  *See Peters v. Brants Grocery*, 990 F. Supp. 1337, 1342 (M.D. Ala. 1998) (recommending denial of motion to extend injunction).  In *Peters*, the case had been pending before the district court for approximately 18 months, and stayed for 7 of those 18

were engaged in settlement negotiations with the defendants at the time the defendants were engaged in mediation with the state court plaintiffs, the Court did not find any collusive intent on the defendants' part to avoid settling with the MDL plaintiffs. *Id.* The court found that an injunction was not necessary in aid of its jurisdiction, but granted the defendants' motion to stay the MDL proceedings because the putative class and claims in the state court action overlapped with the plaintiffs' claims in the MDL. *Id.* at *5. Here, the PEC now seeks to have this Court enjoin another federal district court under circumstances similar to those in *RC2* , where another federal court refused to enjoin an overlapping *state court* action, and instead issued a stay of the pending federal proceedings.

## AN INJUNCTION UNDER THE ALL WRITS ACT IS SUBJECT TO THE REQUIREMENTS OF RULE 65

Pursuant to precedent that is binding on district courts in the Eleventh Circuit, an injunction under the All Writs Act *must* satisfy the requirements of Rule 65. *Florida Med. Ass'n v. U.S. Dep't of Health, Educ. & Welfare*, 601 F.2d 199, 202 (5th Cir. 1979) ("[T]he All Writs Act does not free a district court from the restraints of Rule 65."); *Alabama*, 424 F.3d at 1132 (11th Cir. 2005) ("An injunction under the All Writs Act invokes the equitable power of the court; thus, as is similarly the case for traditional injunctions, a court may not issue an injunction under the All Writs Act if adequate remedies at law are available."); *Scardelletti v. Debarr*, 265 F.3d 195, 211-12 (4th Cir. 2001) ("We must determine, therefore, whether Rule 65 applies to an All Writs Act injunction issued in aid of the district court's jurisdiction. We conclude that it does.") *rev'd on other grounds in Devlin v. Scardelletti*, 536 U.S. 1 (2002).[10]

The Eleventh Circuit has made clear that a district court may grant a preliminary injunction only if the movant establishes all of the following: (1) a substantial likelihood of success on the merits of the underlying case; (2) the movant will suffer irreparable harm in the absence of an injunction; (3) the harm suffered by movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued; and (4) an injunction

---

months. *Id.* "Although the defendants ha[d] filed a large number of motions, the case [was] still in its infancy" and the grounds for issuance of an injunction were resultantly lacking. *Id.* at 1342-43.

[10] *But see Klay*, 376 F.3d at 1100 ("The requirements for a traditional injunction do not apply to injunctions under the All Writs Act."). However, under the prior precedent rule, *Florida Med. Ass'n, Inc.* remains binding precedent "unless and until it is overruled by [the Eleventh Circuit] *en banc* or by the Supreme Court." *See U.S. v. Brown*, 342 F.3d 1245, 1246 (11th Cir. 2003).

would not disserve the public interest. *North Am. Med. Corp. v. Axiom Worldwide Inc.*, 522 F.3d 1211, 1217 (11th Cir. 2008). "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to the four requisites." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). Thus, the PEC's failure to establish *any* of these prongs is sufficient to defeat the PEC's Motion.[11]

### THE PEC CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS BEFORE THE JPML

Although the PEC argues that "it is likely the JPML will deny the Motion to Vacate CTO-34," based on the JPML's past practice quite the opposite appears to be the case, and the PEC cannot establish a substantial likelihood of success. As explained above, in each instance that the JPML has ruled on the propriety of transferring an action settled before transfer to the MDL, the JPML has vacated the conditional transfer order. *See, e.g.,* Order Vacating Conditional Transfer Order in *Mathena v. Webster Bank* [JPML DE 459] (stating that "[w]ith respect to *Mathena*, the moving parties have informed the Panel that they have reached a settlement that the District of Connecticut court has preliminarily approved. Consistent with our past practice in this docket, we conclude that transfer of *Mathena* to the MDL is not presently warranted."). This is the procedural posture of the *Sachar* Action, and there is no reason to expect the JPML to disregard and break with its past practice.

### RULE 23 ESTABLISHES AN ADEQUATE REMEDY AT LAW FOR CLASS MEMBERS, AND THERE IS NO RISK OF IRREPARABLE HARM

It is uncontroversial that "equitable relief is available only in the absence of an adequate remedy at law" and based on a finding that irreparable injury will result if an injunction is not issued. *Papadopoulos v. Sidi*, 547 F. Supp. 2d 1262, 1268 (S.D. Fla. 2008). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm. … [P]rospective harm, by itself, clearly does not meet the test of imminence." *Id.* (citing *SME*

---

[11] Additionally, pursuant to Rule 65(c), a bond is required for the issuance of an injunction under the All Writs Act. *See John Nuveen & Co. Inc. v. New York Hous. Dev. Corp.*, Nos. 86 C 2583, 86 C 2817, 1986 WL 5780, *7 (N.D. Ill. May 9, 1986) ("[T]his court regards use of the All Writs Act to avoid the bond requirement of Rule 65(c) as unjustifiable"); *Pinto v. Doskocil*, No. 91 CIV. 1518 (RWS), 1992 WL 111344, *3 (S.D.N.Y. May 8, 1992) (requiring plaintiff to post bond for injunction granted under All Writs Act).

*Racks, Inc. v. Sistemas Mecanicos Para, Electronica, S.A.*, 243 Fed. Appx. 502, 504 (11th Cir. 2007)).  This includes the opportunity to object to the proposed settlement in the *Sachar* Action pursuant to Rule 23.  *See Grider*, 500 F.3d at 332; *Alabama*, 424 F.3d at 1132 ("[g]enerally, if a party will have opportunity to raise its claims in the concurrent federal proceeding sought to be enjoined, that concurrent proceeding is deemed to provide an adequate remedy at law"); *Weaver v. Florida Power & Light Co.*, 172 F.3d 771, 773-74 (11th Cir. 1999) (reversing grant of injunction based on adequate remedy at law, where movant could raise arguments in support of injunction in arbitration proceedings sought to be enjoined and stating "[i]f FPL were attempting to enjoin an action by Weaver (or her representative) in another court, the adequacy—indeed, the necessity—of the remedy at law would be clear").  "The simple fact that litigation involving the same issues is occurring concurrently in another forum does not sufficiently threaten the court's jurisdiction as to warrant an injunction under [the All Writs Act]."  *Alabama*, 424 F.3d at 1132 (citing *Klay*, 376 F.3d at 1102-03).

Further, there is no risk of irreparable harm, and an injunction is not appropriate, where money damages are both measurable and can be satisfied by the defendant.  *Id*. at 1127; *Women's Emergency Network v. Bush*, 191 F. Supp. 1356, 1361 (S.D. Fla. 2002).  Here, Ms. Eivet complains of six overdraft related charges of $35 within a period of less than one month. As such, she would be entitled to compensation for each allegedly improper overdraft imposed against her under the terms of the settlement in the *Sachar* Action.  Even if the Court finds that the Rule 65 standards do not apply to the issuance of an injunction under the All Writs Act, as explained above, an injunction under the All Writs Act is still "[un]available to provide alternatives to other, adequate remedies at law."  *See Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1229 (11th Cir. 2005) (denying request for injunction pursuant to All Writs Act and citing *Klay*, 376 F.3d at 1100).

### AN INJUNCTION WOULD DISSERVE THE INTERESTS OF PUTATIVE CLASS MEMBERS

The public interest does not support an injunction.  At best, enjoining the settlement agreement and requiring IBERIABANK to litigate the claims in the *Eivet* Action would delay potential class members' recovery for overdraft charges imposed against them.  At worst, an injunction would jeopardize any recovery by potential class members from IBERIABANK to the extent IBERIABANK is successful in defending itself on the merits of Ms. Eivet's claims.

16

### STANDING IS A JURISDICTIONAL ISSUE WHICH MUST BE DETERMINED BASED ON THE FACTS AS THEY EXISTED WHEN THE ORIGINAL COMPLAINT WAS FILED

The United States Supreme Court—and numerous other federal courts—have confirmed the uncontroversial proposition that standing "depends on the facts as they exist when the complaint is filed." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 569 n.4 (1992); *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1275 (11th Cir. 2003) ("Article III standing must be determined as of the time at which the plaintiff's complaint is filed")). District courts throughout Florida have consistently followed this rule. *See, e.g.*, *Fusilamp, LLC v. Littelfuse, Inc.*, No. 10-20528-CIV, 2010 WL 2277545, at *3 (S.D. Fla. June 7, 2010); *Moyer v. Walt Disney World Co.*, 146 F. Supp. 2d 1249, 1253 (M.D. Fla. 2000) ("The existence of standing is determined as of the date suit is filed."); *Resnick v. Magical Cruise Co., Ltd.*, 148 F. Supp. 2d 1298, 1301 (M.D. Fla. 2001) ("The determination of whether a plaintiff has standing to bring suit is made as of the date the lawsuit is commenced.")

"[T]he 'case or controversy' limitation of Art[icle] III [] requires that a federal court act only to redress injury that fairly can be traced to the challenged action of a defendant, and not injury that results from the independent action of some third party not before the court. *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1975) (holding that certain respondents lacked standing to allege denial of service by hospital, where hospital was not a defendant before the Court). "The party invoking the jurisdiction of the court cannot rely on events that unfolded after the filing of the complaint to establish its standing." *In re Ditropan XL Antitrust Litig.*, No. M:06-CV-01761-JSW, 2007 WL 2978329, at *2 (N.D. Cal. Oct. 11, 2007) (citing *Wilbur v. Locke*, 423 F.3d 1101, 1107 (9th Cir. 2005)); *see also Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, n.3 (11th Cir. 2005) (citing *Focus on the Family* and stating "[s]tanding is to be determined as of the time the plaintiff's complaint is filed, and is not altered by events unfolding during litigation." (internal citation omitted)).

At the time Ms. Eivet filed her Complaint in the Southern District of Florida, she had no standing to sue IBERIABANK—either in this Court or anywhere else. Had she attached her contract with her bank, IBERIABANK*fsb*, this would have been apparent from her pleading. As it stands, on the date Ms. Eivet's Complaint was filed in this Court, her alleged damages were the result of the independent actions of IBERIABANK*fsb*, a third party not before this Court—and a party that was not subject to jurisdiction of the courts of the State of Florida.

Ms. Eivet's pleading mistake is important because it was only because of this hopefully unintentional error that Ms. Eivet's Complaint was transferred directly from the "regular" Southern District docket to MDL 2036, without having to be evaluated by the JPML.  As with standing, the propriety of venue is an issue that is to be evaluated based on the facts existing at the time a complaint is filed.  *See, e.g.*, *Flowers Indus., Inc. v. F.T.C.*, 835 F.2d 775, 777 n.1 ("venue must be determined based on the facts at the time of filing"); *S.L. Sakansky & Assocs., Inc. v. Allied Am. Adjusting Co. of Fla., LLC*, No. 3:05-cv-708-J-32-MMH, 2006 WL 948055, at *4 (M.D. Fla. Apr. 12, 2006) (same, citing *Flowers Indus.*).

At the time Ms. Eivet filed her Complaint, she could not have established venue in this district against IBERIABANK*fsb*, the party that allegedly committed the actions for which she seeks relief.  Specifically, pursuant to 28 U.S.C § 1391(a), when an action is based on diversity, such as this case is, venue may be laid "in (1) a judicial district where any defendant resides . . ., (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred . . ., or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought."  28 U.S.C. §1391(a).

At the time the Complaint was filed, the controversy between Ms. Eivet and her bank (IBERIABANK*fsb*) did not meet any of those three categories.  Specifically, at the time the Complaint was filed IBERIABANK*fsb* was a resident of Arkansas—its state of incorporation and the location of its principal place of business, Little Rock.  Little Rock is within the geographical boundaries of the Eastern District of Arkansas.  As IBERIABANK*fsb* was the only proper party to have been sued as of the date the Complaint was filed, under the venue statute it also "resided" in three additional federal district where it had branches—Southern District of Texas  (where Ms. Eivet banked with IBERIABANK*fsb*), as well as the Western District of Tennessee and the Western District of Arkansas.  Additionally, certain administrative functions related to the operations of IBERIABANK*fsb* were conducted in Lafayette, Louisiana, which is in the geographical boundaries of the Eastern District of Louisiana.

As of the date Ms. Eivet's Complaint was filed, IBERIABANK*fsb* had no branches in Florida and did not conduct any operations in Florida.  Rather, only IBERIABANK—which, at the time Ms. Eivet's complaint was filed, was a separate banking institution, operating under a separate charter—had branches in Florida, including certain branches within the geographical

boundaries of the Southern District of Florida.  Next, while she claims that the events giving rise to her claims occurred in Florida, all of the events giving rise to Ms. Eivet's claims occurred in the Houston, Texas area, within the geographical boundaries of the Southern District of Texas. Specifically, all six of Ms. Eivet's complained of overdraft charges were imposed in Texas for transactions initiated there.  Alternatively, to the extent that Ms. Eivet seeks to establish venue based on the location of her bank's activities with respect to processing her overdrafts, all of those events occurred either in the geographical boundaries of federal courts outside of Florida.

This lack of standing at the time Ms. Eivet filed her Complaint, and the lack of personal jurisdiction over the proper defendant in this matter, who as a result would not have been subject to venue in this forum, is fatal to the PEC's request for a stay pursuant to the first-filed rule. Under the first-filed rule, the order of filing is determined at the time jurisdiction *properly* attaches.  *See Keymer v. Management Recruiters Int'l, Inc.*, 169 F.3d 501, n.2 (8th Cir. 1999) ("In cases of concurrent jurisdiction, the first court in which jurisdiction attaches has priority to consider the case as a matter of federal comity.").  As jurisdiction never *properly* attached in the Southern District of Florida, the *Sachar* Action is first-filed, and any resulting injunction should be issued against the re-filing of Ms. Eivet's Complaint in the proper jurisdiction.

Additionally, although the PEC implies that IBERIABANK has violated the spirit of the JPML's Rules, it is Ms. Eivet's failure to file in the proper venue, and instead take advantage of a loophole in the JPML Rules, that has imposed a "burden [on] this court." *See In re Prempro Prods. Liab. Litig.*, No. 4:08CV00377, 2008 WL 1970244, at *1 (E.D. Ark. May 7, 2008) ("By filing directly in [the] MDL Transferee Court, rather than in what would otherwise be a more appropriate venue, Plaintiffs not only bypass the multidistrict litigation statute providing for transfer and later remand, but also threaten to burden this court with unnecessary transfer decisions under § 1404(a).").

In *National Union Fire Ins. Co. of Pittsburgh, PA v. Beta Constr. LLC*, No. 8:10-cv-1541-T-26TBM, 2010 WL 3789042 (M.D. Fla. Sept. 24, 2010), the defendant in an allegedly second-filed federal action, who was also the plaintiff in the allegedly first-filed action, moved to dismiss the second-filed action, or in the alternative, to stay or transfer the action to the Eastern District of Louisiana, the venue of the first-filed action and the MDL encompassing the claims in both actions.  *Id.* at *1.   The defendant in the Louisiana action moved "to dismiss the Louisiana action for improper venue based on lack of personal jurisdiction and the fact that a substantial

part of the events did not occur in Louisiana." *Id*. at *2.  The plaintiff in the Louisiana action, and the movant in the Middle District of Florida, was a citizen of Texas and a trustee of a Delaware trust, with "no connection" to Louisiana. *Id*. at *4.  Additionally, "none of the alleged injuries ar[o]se out of or occurred in Louisiana." *Id*. at *2.  Since the movant, as plaintiff in the Louisiana action, "ha[d] no connection to his chosen forum," the court denied his motion to dismiss, stay, or transfer.  Like the plaintiff's complaint in the Louisiana action in *National Union*, Ms. Eivet's Complaint was automatically transferred to the MDL.  Also like the plaintiff in the Louisiana action, Ms. Eivet has no connection with her chosen forum and the claims she asserts did not arise out of the district in which she filed, and personal jurisdiction and venue are resultantly lacking.  Therefore, as in *National Union*, Ms. Eivet's selection of forum is not entitled to deference, and the PEC's Motion should be denied.

## CONCLUSION

Based on the arguments and authorities cited herein, Defendant IBERIABANK respectfully requests that the Court deny the PEC's request for an injunction under the All Writs Act and request for a stay under the first-filed rule.


Dated:  June 27, 2011

<div style="margin-left: 40%;">

*s/ Thomas J. Meeks*
Thomas J. Meeks (314323)
e-mail: tmeeks@carltonfields.com
Aaron Weiss (48813)
e-mail: aweiss@carltonfields.com
**CARLTON FIELDS, P.A.**
100 S.E. Second Street, Suite 4200
Miami, FL 33131
Tel:   (305) 530-0050
Fax:   (305) 530-0055

*Attorneys for Defendant, IberiaBank*

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.


*s/ Thomas Meeks*
Thomas Meeks

## SERVICE LIST

Wayne H. Schwartz, Esq.
e-mail: Schwartz@leeamlaw.com
Lee & Amitzis, P.L.
5550 Glades Road, Suite 401
Boca Raton, FL 33431
Tel: 561-981-9988
Fax: 561-981-9980
*(via electronic filing)*

Robert Cecil Gilbert
Email: rcg@grossmanroth.com
Grossman Roth, P.A.
2525 Ponce de Leon Boulevard, Suite 1150
Miami, FL 33134
Telephone: (888) 296-1681
Facsimile:  (305) 285-1668
*Coordinating Counsel for Plaintiff in MDL 2036*
*(via electronic filing)*