# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# MIAMI DIVISION

### CASE NO. 09-MD-02036-JLK

---

**IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION**

**MDL No. 2036**

---

**THIS DOCUMENT RELATES TO:
FIRST TRANCHE ACTIONS**

*Tornes, et al. v. Bank of America, N.A.*
S.D. Fla. Case No. 1:08-cv-23323-JLK

*Yourke, et al. v. Bank of America, N.A.*
S.D. Fla. Case No. 1:09-cv-21963-JLK
N.D. Cal. Case No. 3:09-2186

---

## PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT, APPLICATION FOR SERVICE AWARDS, CLASS COUNSEL'S APPLICATION FOR ATTORNEYS' FEES, AND INCORPORATED MEMORANDUM OF LAW

# TABLE OF CONTENTS

**Page**

I.       INTRODUCTION ........................................................................................... 1

II.      MOTION FOR FINAL SETTLEMENT APPROVAL ........................................ 3

     A.      Factual and Procedural Background. ...................................................... 3

          1.      The Course of Proceedings. ...................................................... 4

          2.      The *Closson* Settlement. ....................................................... 11

          3.      Settlement Negotiations in the MDL. ....................................... 13

     B.      Summary of the Settlement Terms. ...................................................... 15

          1.      The Settlement Class ................................................................ 15

          2.      Monetary Relief for the Benefit of the Settlement Class. ........... 15

          3.      *Cy Pres* Distributions to Promote Consumer Financial
                 Literacy. ................................................................................ 17

          4.      Class Release. ......................................................................... 18

          5.      Service Awards, Class Counsel's Fees and Expenses. ................ 18

     C.      The Proposed Settlement With BofA Should Be Approved ................... 19

          1.      The Court Has Personal Jurisdiction Over the Settlement
                 Class Because the Class Received Adequate Notice and an
                 Opportunity to Be Heard ........................................................ 20

               a.      The Best Notice Practicable Was Provided to the
                      Class. ............................................................................ 20

               b.      The Notice Was Reasonably Calculated to Inform
                      Class Members of Their Rights. ...................................... 21

          2.      The Settlement Should Be Approved Because It Is Fair,
                 Adequate and Reasonable. ....................................................... 21

               a.      There Was No Fraud or Collusion. ................................... 22

               b.      The Settlement Will Avert Years of Highly
                      Complex and Expensive Litigation. ................................. 23

               c.      The Factual Record is Sufficiently Developed to
                      Enable Plaintiffs and Class Counsel to Make a
                      Reasoned Judgment Concerning the Settlement. .............. 24

               d.      Plaintiffs Would Have Faced Significant Obstacles
                      to Obtaining Relief. ........................................................ 25

**TABLE OF CONTENTS**
(continued)

Page

e. The Benefits Provided by the Settlement Are Fair, Adequate and Reasonable When Compared to the Range of Possible Recovery. ............................................. 26

f. The Opinions of Settlement Class Counsel, Class Representatives, and Absent Class Members Strongly Favor Approval of the Settlement. .................... 27

3. The Court Should Certify the BofA Settlement Class. ............... 28

4. The *Cy Pres* Program Is Reasonable and Should Be Approved. .................................................................................. 29

III. APPLICATION FOR SERVICE AWARDS TO THE CLASS REPRESENTATIVES ........................................................................... 30

IV. CLASS COUNSEL'S APPLICATION FOR ATTORNEYS' FEES ................. 31

A. The Law Awards Class Counsel Fees From the Common Fund Created Through Their Efforts. ................................................ 32

B. The *Camden I* Factors Support Class Counsel's Requested Fee. ............ 34

1. The Claims Against BofA Required Substantial Time and Labor. ................................................................................. 35

2. The Issues Involved Were Novel and Difficult and Required the Exceptional Skill of a Highly Talented Group of Attorneys. ........................................................................ 38

3. The Claims Against BofA Entailed Considerable Risk. .............. 40

4. Class Counsel Assumed Substantial Risk to Pursue This Action on a Pure Contingency Basis, and Were Precluded From Other Employment as a Result. ......................................... 44

5. Class Counsel Achieved an Excellent Result. ............................. 45

6. The Requested Fee Comports with Customary Fees Awarded in Similar Cases. .......................................................... 46

7. The Remaining *Camden I* Factors Also Favor Approving Class Counsel's Fee Request. ...................................................... 49

V. CONCLUSION .................................................................................... 50

## I.   INTRODUCTION

After more than two years of hard-fought litigation, Class Counsel successfully negotiated the Settlement with Bank of America, N.A. ("BofA" or the "Bank"), memorialized in the Settlement Agreement and Release of May 6, 2011 ("Agreement"), under which BofA will pay $410 million in cash to the Settlement Class.[1]  The proceeds of the Settlement, less the costs of settlement administration, attorneys' fees, expenses and service awards (the "Net Settlement Fund"), will be distributed *pro rata* to Settlement Class Members based on the harm that each individual sustained.  This result is nothing short of extraordinary.  In the face of serious litigation obstacles and legal risks, Settlement Class Members will receive immediate and substantial relief.

One of the hallmarks of the Settlement is that identifiable Settlement Class Members will automatically receive their *pro rata* share of the Net Settlement Fund without needing to do anything at all.  There are no claim forms to fill out.  Settlement Class Members will not be asked to prove that they were damaged as a result of BofA's practice of re-sequencing debit card transactions from highest-to-lowest dollar amount ("Debit Re-sequencing").  Instead, Settlement Class Counsel and their experts used BofA's actual data to determine which BofA Accounts were harmed by BofA's Debit Re-sequencing, and will apply a formula (detailed in paragraph 79 of the Agreement) to calculate each identifiable Settlement Class Member's *pro rata* share of the Net Settlement Fund.[2]

---

[1] All capitalized terms have the same meaning as defined in the Agreement attached as Exhibit A.  Any capitalized terms not defined there are defined herein.

[2] For a small portion of the Settlement Class who incurred overdraft charges from 2001 through 2003, and who cannot be identified because BofA does not have data sufficient to permit Class Counsel's experts to perform the analysis to identify them (Agreement ¶ 78), their share of the Net Settlement Fund will be distributed *cy pres* to nonprofit organizations to benefit consumer financial literacy education and to educate and assist consumers with financial services issues through advisory and related services.  (Agreement ¶ 91).

Plaintiffs now move for Final Approval of the Settlement on behalf of the Settlement Class. Based on the controlling legal standards and supporting facts, Final Approval of this Settlement is not only warranted, but beyond legitimate dispute. In addition, Class Counsel request that the Court award service awards to the Plaintiffs, whose willingness to represent the Settlement Class and active participation in the Action have made this result possible. Finally, Class Counsel respectfully request that the Court award attorneys' fees and reimbursement of expenses to compensate us for our work in achieving this excellent result for the benefit of the Settlement Class.

For the reasons detailed below, Plaintiffs and Class Counsel ask that the Court: (1) approve the Settlement; (2) certify for settlement purposes the Settlement Class pursuant to Federal Rules of Civil Procedure 23(a), (b)(3) and (e); (3) appoint Plaintiffs Richard Blair; David Brull; Jonathan Bylin; Marco Chelo; Robert Conroy; Joshua DiFrances; Carolyn Gipson; David Hanny; Haneef Haqq; Joi Holloway; Stephen and Esther James; John and Anya Kopp; Deborah and Therese Marshall; Jason Molitor; Laura Morland; Bruce and Maria Mosley; Nelson Norman; Ronald and Dawyn Palmer; William Powell; Kristin Richards; Alvin Richardson; Caroline Sherman; Ralph Tornes; Elona Wagner; Kelly Weatherspoon; William Werking; and Steve Yourke as class representatives for this Settlement ("Settlement Class Representatives"); (4) appoint as Class Counsel and Settlement Class Counsel the attorneys and law firms listed in paragraphs 15 and 42 of the Agreement, respectively; (5) award service awards to the Settlement Class Representatives; (6) award Class Counsel attorneys' fees; and (7) enter Final Judgment dismissing the Action with prejudice.[3]

---

[3] *See* Agreement ¶¶ 14, 72(d).

## II.     MOTION FOR FINAL SETTLEMENT APPROVAL

### A.     Factual and Procedural Background.

The Action involved sharply opposed positions on several fundamental legal and factual issues.  The ultimate success of the litigation required Plaintiffs to prevail, in whole or in part, on *all* of these issues.  Conversely, BofA's success on any one of these issues could have spelled defeat for Plaintiffs and the Settlement Class.

Plaintiffs alleged that BofA systemically re-sequenced Settlement Class Members' debit transactions for the sole purpose of maximizing its overdraft fee revenue.  According to the operative complaints, BofA's practices violated the bank's contractual and good faith duties owed to its customers; BofA's acts resulted in unlawful conversion of depositor property; BofA's contractual provisions and practices were substantively and procedurally unconscionable; and BofA's conduct violated certain state unfair trade practices statutes, and resulted in it being unjustly enriched.

BofA, on the other hand, consistently argued, *inter alia*, that Plaintiffs' claims were preempted by the National Bank Act ("NBA"); that its account agreements expressly authorized the very re-sequencing practice Plaintiffs challenged; that it fully disclosed its practices to its customers; that no unconscionability cause of action exists for damages; that no plausible conversion claim existed because Plaintiffs did not own the funds in their accounts; that Plaintiffs could not maintain unjust enrichment claims because of the existence of an express agreement; that the consumer protection claims were defective; and that, moreover, the vast majority of the claims brought against it were extinguished based on a nationwide settlement of a class-action suit in California state court.

The Settlement represents a compromise of competing interests which resolves the claims with finality now – thereby avoiding years of continued litigation in the trial and appellate courts.

A thorough review of the facts and history of the litigation is necessary to appreciate why this Settlement merits Final Approval.

>       **1.       The Course of Proceedings.**

Plaintiffs brought these cases seeking monetary damages, restitution and declaratory relief, arising from the BofA's alleged Debit Re-sequencing, that Plaintiffs contend was devised to increase the number of overdraft fees its customers incurred.  *See generally Tornes* Third Amended Consolidated Class Action Complaint ("TAC") [**DE # 344**]; *Yourke* Amended Class Action Complaint [**DE # 345**].  Plaintiffs allege that because BofA manipulated the order in which customers' debit transactions were posted, customers' funds were allegedly depleted more rapidly than they should have been, and Plaintiffs and Settlement Class Members allegedly paid more overdraft fees than they should have paid.

BofA denies all of Plaintiffs' allegations.  The Bank consistently defended its conduct by, *inter alia*, highlighting language in the relevant account agreements that it contends expressly advises customers of and permits the re-sequencing practices at issue.  *See* Joint Declaration of Robert C. Gilbert and Michael W. Sobol, ¶ 6 (hereafter "Joint Decl. ¶___.") attached as Exhibit B.  BofA also asserts that Plaintiffs' claims are entirely preempted by the NBA.  Furthermore, the Bank advanced a medley of other defenses, including that the federal Office of the Comptroller of the Currency ("OCC") endorses the Debit Re-sequencing at issue, that Plaintiffs cannot maintain common law unconscionability, conversion or unjust enrichment claims, and that Plaintiffs' state statutory claims fail as a matter of law.  Joint Decl. ¶ 6.

On December 1, 2008, Plaintiff Ralph Tornes filed a complaint against BofA in this Court.  *See Tornes v. Bank of America, N.A.*, S.D. Fla. Case No. 08-23323.  On December 23, 2008, Tornes filed an amended complaint.  BofA responded by moving for a stay [**DE # 17 in Case No. 08-cv-23323**] based on the pending final approval of the settlement in *Closson v. Bank*

- 4 -

*of America, N.A.*, a case pending in California state court (discussed in detail below), and to compel individual arbitration [**DE # 23** in Case No. 08-cv-23323].  On April 9, 2009, Plaintiffs Steve Yourke and Kristin Richards filed a complaint against BofA in San Francisco County Superior Court, which was removed to the United States District Court for the Northern District of California.  *See Yourke v. Bank of America, N.A.*, N.D. Cal. Case No. 09-cv-02186.  Both the *Tornes* and *Yourke* complaints asserted claims against BofA based on its alleged unfair assessment and collection of overdraft fees.

*Tornes* sought monetary and injunctive relief on behalf of a putative class of "all persons similarly situated that suffered injuries as a result of" what it termed BofA's "fee maximizing batch processing scheme."  *Tornes* Compl. ¶ 21.  *Tornes* asserted claims for breach of contract, abuse of rights, unconscionability, trover and conversion, unjust enrichment, and usury.  *Id.* ¶¶ 29–62.  *Tornes* described the challenged BofA practices as follows:

> The Bank commonly structures its customer processing so that a number of transactions are held back in a batch of transactions and debits, not all of which would create an overdraft in a particular customer's account.  These "held back transactions" are not always reflected in customers' available balance, thereby giving the customer a false impression that there is more money in his or her account that there actually is, and encouraging the customer to continue making transactions.  After holding these transactions, the Bank takes the batch and re-orders it so that the largest individual transaction amount processes first, and creates an overdraft and overdraft fee.  The Bank then continues to manipulate the remaining debits in the batch and processes each one to create additional overdrafts and escalating overdraft fees.  Commonly, these later processed debits would not have created an overdraft had they been processed the batch with the smallest amounts being sent through first.  Instead the bank purposely puts the largest transactions through first to create its fee maximizing scheme and result.

*Id.* ¶ 11.

The *Yourke* complaint brought claims on behalf of a putative California class of BofA customers.  Yourke Compl. ¶ 40.  The *Yourke* complaint asserted claims based on violations of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*; the Unfair Competition Law,

California Business and Professions Code § 17200, *et seq.*; and the common law doctrines of conversion, breach of the implied covenant of good faith and fair dealing, unjust enrichment and restitution.  Yourke Compl. ¶¶ 88–126.  The *Yourke* complaint alleged, among other things, that

> [i]nstead of declining debit and/or POS transactions when there are insufficient funds . . . or warning the customer than an overdraft fee will be assessed if he or she proceeds with the transaction, Bank of America routinely processes such transactions in order to charge its customers an overdraft fee of $25 or $35, even when the transaction is for only a few dollars.  This automatic fee-based overdraft scheme is designed and intended solely to increase overdraft fee revenue. . . . The Bank's overdraft policies make it difficult for a customer to avoid injury even if a customer carefully tracks the balance in his or her account. . . . For example, if a customer has an account with a $50 balance and makes four transactions of $10 and one later transaction of $100 the same day, the Bank debits the transactions from the account largest-to-smallest, thus subjecting the customer to four overdraft fees.  Conversely, if the $100 transaction were debited last (in the order it was made), the customer would only be subject to one overdraft fee.

*Id.* ¶¶ 6, 10, 20.

On June 10, 2009, the Judicial Panel for Multidistrict Litigation ("JPML") transferred the *Tornes* and *Yourke* actions – as well as similar cases pending against several other banks – involving allegations of unfair assessment and collection of overdraft fees to this Court for coordinated pre-trial proceedings under MDL No. 2036.  [**DE # 1**].  Additional tag-along actions asserting similar claims against BofA were filed across the country and later transferred by the JPML to this Court.

Following transfer and centralization, Class Counsel interviewed over 100 BofA customers and potential plaintiffs to gather information about BofA's conduct and its impact upon consumers.  Joint Decl. ¶ 11.  This information was essential to Class Counsel's ability to understand the nature of BofA's conduct, the language of the account agreements at issue, and potential remedies.  *Id.*  Class Counsel also expended significant resources researching and developing the legal claims at issue.  *Id.*  Some of the named plaintiffs in tag-along actions

transferred by the JPML to this Court were added to the *Tornes* Second Amended Complaint filed on November 10, 2009.  *See* S.D. Case No. 1:08-cv-23323-JLK, DE # 58.  Plaintiffs elected not to amend the *Yourke* complaint.

Soon after the filing of these complaints, BofA, joined by the other First Tranche defendants (Citibank, N.A.; JPMorgan Chase Bank, N.A.; Union Bank, N.A.; U.S. Bank, N.A.; Wachovia Bank, N.A.; and Wells Fargo Bank, N.A.) filed a 96-page Omnibus Motion to Dismiss and/or for Judgment on the Pleadings (the "Omnibus Motion").  [**DE # 217**].  Two of BofA's primary arguments focused on federal preemption and the language in its account agreement.

First, BofA argued that Plaintiffs' state-law claims conflict with the NBA and its implementing regulations.  It insisted that the ordering of debits falls within the bank's federally-authorized deposit-taking powers and, as such, cannot be regulated under state law.  Further, it added, the federal agency responsible for regulating national banks specifically indicated that various methods of posting and ordering debits are permissible under federal law.  Therefore, BofA argued that any attempt to use state laws to reach account posting would not only interfere with core banking operations, but would also pose a clear conflict with federal law.  *Id.* at 19-34.

Second, BofA pointed to its deposit account agreement, which informs customers, among other things, that the bank "do[es] not process and post transactions in the order in which they occurred."  *Tornes* TAC, Ex. A at 18.  The agreement also states that the bank "may" post debits in any order it chooses.  *Id*.  Based on these provisions, BofA advanced the position that there can be no contractual breach, including a breach of an implied contractual duty of good faith, when the contract at issue expressly permits the complained-of practice and includes as a material term the very possibility of high-to-low posting.  Thus, BofA claimed that it adequately disclosed its debit re-sequencing practices and that it could not be held liable for Plaintiffs'

decision to maintain BofA checking accounts under a contract authorizing such practices.  [**DE # 217 at 40-55**].

After extensive research and drafting, Plaintiffs filed a 98-page brief in opposition.  [**DE # 265**].  At the banks' urging, the Court stayed discovery in the First Tranche actions pending resolution of the Omnibus Motion.  An all-day argument on the Omnibus Motion took place before this Court on February 25, 2010.  [**DE # 294**].

On March 11, 2010, this Court issued its Order Ruling on Omnibus Motion to Dismiss.  [**DE # 305**].  *See In re Checking Account Overdraft Litigation*, 694 F. Supp. 2d 1302 (S.D. Fla. 2010).  In a thorough opinion that addressed several complex legal questions, the Court: (1) considered and rejected the banks' federal preemption defense in the Rule 12 posture; (2) disagreed with the banks' assertion that the terms of customer account agreements allowed them to engage in the challenged Debit Re-sequencing conduct notwithstanding the covenant of good faith and fair dealing, and reserved the ultimate question of whether the banks acted in good faith for a later stage, after discovery; (3) rejected the banks' contention that the OCC's conclusion that high-to-low posting of checks falls within the banks' authority should also apply to debit card transactions; (4) concluded that Plaintiffs sufficiently pled procedural and substantive unconscionability, citing the disparity in bargaining power, inconspicuous and boilerplate contractual language regarding overdrafts, and the fact that the fees resulting from the banks' Debit Re-sequencing bear no reasonable commercial relationship to the costs or risks associated with providing the overdraft service; (5) preserved the unjust enrichment claim as an alternative ground for relief; (6) refused to dismiss the conversion claim, noting Plaintiffs' right to possess the funds in their accounts; (7) dismissed without prejudice the state statutory claims where no named plaintiff resided in the relevant states; (8) maintained certain state statutory claims

alleging deceptive, unfair, and unconscionable practices; (9) dismissed state statutory claims with pre-suit notice requirements; and (10) dismissed state statutory claims where Plaintiffs failed to plead required predicate acts. *Id.* at 1310-28.

On April 12, 2010, Plaintiff Tornes and Plaintiffs Blair, Bylin, Chelo, Conroy, Di Frances, Gipson, Hanny, Haqq, Holloway, James, Kopp, Marshall, Molitor, Mosley, Norman, Richardson, Palmer, Powell, Sherman, Wagner, Weatherspoon, and Werking filed the Third Amended Consolidated Class Action Complaint, and Plaintiffs Yourke and Richards and Plaintiffs Brull and Morland filed an Amended Class Action Complaint. [**DE # 344, 345**]. BofA answered the complaints on May 21, 2010, asserting 37 affirmative defenses in each answer. [**DE # 496, 497**]. BofA's defenses included "Federal Preemption Under the National Bank Act and Implementing Regulations" (Second Affirmative Defense), "Absence of Reliance" (Twenty-First Affirmative Defense), "Absence of Causation" (Twenty-Second Affirmative Defense), "Contractual Terms" (Thirty-Second Affirmative Defense), and "Arbitration" (Thirty-Fourth Affirmative Defense). *Id.* Additionally, BofA asserted that the claims brought in the operative complaints were released, in whole or in part, by virtue of the class action settlement entered into and approved in *Closson*, the prior California state court action (discussed below). *Id.* ¶¶ 181, 182.

Class Counsel and counsel for BofA (along with counsel for other First Tranche banks) engaged in extensive discussions and negotiations regarding a proposed pretrial discovery plan and schedule. On May 13, 2010, after the parties were unable to reach agreement, the Court lifted the stay of discovery and entered a comprehensive Order Establishing a Schedule for the Discovery, Motion Practice, Final Pretrial Conference, and Trial for Selected Cases. [**DE # 463**]. That same day, Plaintiffs served identical written discovery requests on the First Tranche banks,

including BofA, seeking substantial documents and information in their possession, custody and control which are probative of and relevant to the claims and defenses in these actions.  Mindful of the Court's emphasis on the development of the factual record in its denial of most points raised in the Omnibus Motion, Plaintiffs crafted document requests and interrogatories with an eye toward class certification, summary judgment, and trial.  Joint Decl. ¶ 18.

After the Parties negotiated and entered into a Stipulated Protective Order relating to the production of documents and information [**DE # 688**], BofA produced over one million pages of documents.  Joint Decl. ¶ 19.  BofA also asserted extensive objections to Plaintiffs' discovery requests.  Class Counsel engaged in lengthy conferences and meetings with counsel for BofA (and other First Tranche banks) in an effort to resolve discovery objections, issues pertaining to Rule 30(b)(6) deposition topics, and other discovery-related issues.  *Id.*  On July 16, 2010, Plaintiffs moved to compel discovery from BofA.  [**DE # 691**].

Class Counsel established a large document review team, consisting of dozens of attorneys whose task was to review, sort and code the one million pages of documents produced by BofA.  Joint Decl. ¶ 20.  To make the review and subsequent litigation more efficient, Class Counsel established uniform coding procedures for electronic review of the documents produced, and team members remained in constant contact with each other to ensure that all counsel became aware of significant emerging evidence in real time.  *Id.*

On July 19, 2010, the Eleventh Circuit issued *Cappuccitti v. DirecTV, Inc.*, 611 F.3d 1252 (11th Cir. 2010), instantly placing the viability of these claims in doubt.  *Cappuccitti* created delay and uncertainty in this action for months.  The panel decision held that, under the Class Action Fairness Act of 2005, a court lacks jurisdiction over a claim originally filed in federal court unless at least one of the plaintiffs alleges an amount in controversy exceeding

$75,000.  On September 8, 2010, this Court temporarily stayed all further proceedings in this multidistrict litigation pending the outcome of *en banc* proceedings in *Cappuccitti*.  [**DE # 790**].  On October 15, 2010, the panel vacated its original  decision in *Cappuccitti* and issued a new opinion, allowing this Court to lift the stay so that this litigation could proceed.  *Cappuccitti v. DirecTV, Inc*., 623 F.3d 1118 (11th Cir. 2010).

During the Summer and Fall of 2010, Class Counsel also prepared objections and responses to BofA's extensive discovery requests to Plaintiffs, including requests for production of documents and interrogatories, Joint Decl. ¶ 23, and successfully defended against BofA's motion to compel discovery.  [**DE # 902, 939, 1016**].  Class Counsel also began the process of scheduling depositions of BofA personnel.

2.      **The *Closson* Settlement.**

After the *Tornes* and *Yourke* actions were filed, Class Counsel learned that a proposed nationwide class action settlement in a similar case brought against BofA –*Closson v. Bank of America*, San Francisco Superior Court, No. CGC-04-436877– threatened to bar the claims asserted by Plaintiffs and Settlement Class Members in these actions based on extremely broad release language.  In an effort to preserve such claims, Class Counsel undertook significant efforts to object to, and then to appeal, the California trial court's approval of the *Closson* settlement.  *See Jan L. Petrus, et al. v. Rhonda J. Closson, et al. & Bank of America, N.A.*, California Court of Appeal Nos. A125963, A126230, A126606, A126608.  Class Counsel's decision to challenge approval of the *Closson* settlement, and our sustained efforts in pursuit of this objective, proved critical to the excellent relief achieved for the Settlement Class in this Action.

*Closson* was filed in 2004 on behalf of a class of BofA customers.  Like Plaintiffs here, the plaintiffs in *Closson* originally alleged claims for unfair business practices in connection with

BofA's overdraft fee policies and practices. Plaintiffs here allege that, after the trial court judge indicated that such claims might be preempted by federal law, the plaintiffs in *Closson* limited their claims to those involving alleged false advertising by BofA, and did not challenge the legality of Debit Re-sequencing. Lacking significant discovery into BofA's overdraft practices, the parties in *Closson* reached a $35 million settlement in July 2008. Under its terms, *Closson* class members were required to submit claims to participate in the recovery, and each class member's recovery was capped at $78.

Despite the scope of the plaintiffs' claims in *Closson*, the parties agreed to a very broad, all-encompassing release, not only of the claims at issue in *Closson*, but of all claims relating in any manner to BofA's overdraft practices, including the illegality of the practices themselves. Indeed, in its Motion to Stay the original *Tornes* matter [Case No. 08-cv-23323], BofA asserted that "the nationwide class action settlement in *Closson*, which has already been preliminarily approved by the state court, will have the effect of resolving and releasing all or most of the purported claims asserted in this action. . . ." **[DE # 17 in Case No. 08-cv-23323]**. Based on a review of the *Closson* settlement release and an analysis of the data made available by BofA, Settlement Class Counsel estimate that if it were enforceable, the *Closson* settlement would release up to *80 percent* of the value of Settlement Class Members' claims in the Action.

In an effort to prevent the *Closson* settlement from releasing the claims at issue here, Ralph Tornes – plaintiff in the *Tornes* action – and Jessica Grinstead – a BofA customer – filed objections to the *Closson* settlement challenging, among other things, its overly-broad release. In June 2009, while those objections were pending, and before the California trial court ruled on final approval in *Closson*, the JPML created this MDL and transferred the *Tornes* and *Yourke* actions to this Court.

Recognizing that the release in *Closson*, if enforceable, threatened to prevent customers from recovering all or most of their damages resulting from Debit Re-sequencing, Class Counsel diligently pursued the objections on behalf of Mr. Tornes and Ms. Grinstead, and for the benefit of all Settlement Class Members.  After the California trial court overruled their objections and granted final approval of the *Closson* settlement in August 2009, Mr. Tornes and Ms. Grinstead pursued a coordinated appeal in *Closson*.  The pursuit of that appeal, involving exhaustive research and full appellate briefing on a host of complex legal and factual issues, had a major impact on the eventual Settlement reached in this Action.

### 3.        Settlement Negotiations in the MDL.

Settlement Class Counsel and counsel for BofA first began preliminary settlement discussions in mid-October 2010.  Joint Decl. ¶ 31.  In mid-November 2010, BofA indicated that it wished to participate in formal mediation proceedings, and proposed that Professor Eric Green, a nationally prominent mediator, preside over the mediation proceedings.  *Id.*  Settlement Class Counsel agreed to participate in mediation and to Professor Green's selection as the mediator. *Id.*

The first mediation session was held in Boston on December 17, 2010.  During the first session, the parties discussed their relative views of the law and facts, and potential relief for the proposed Class.  The Parties also made initial settlement demands and offers.  Joint Decl. ¶ 32. The first mediation session ended without any agreement, and the Parties agreed to resume mediation in late January 2011.  *Id.*

The second and third mediation sessions were held on January 26 and 27, 2011, in Charlotte.   Joint Decl. ¶ 33.   Professor Green continued to preside over the mediation proceedings.  *Id.*  During the second session, the Parties exchanged a series of counter-proposals on key aspects of the Settlement.  *Id.*  At times during the second day of mediation, it appeared

that the Parties were nearing an impasse.  *Id.*  Nevertheless, on January 27, 2011, during the third day of mediation, the Parties reached agreement on all material terms of the Settlement and executed a Memorandum of Understanding ("MOU") that memorialized their agreement.  *Id.*  At all times, the negotiations were adversarial, non-collusive and at arm's length.  Joint Decl. ¶ 34.

The MOU provided, in relevant part that BoA would pay $410 million to create a common fund for the benefit of the Settlement Class, would receive in exchange a full release of all claims, and that the parties would seek the dismissal of the appeal in Closson once the Settlement received final approval.   Joint Decl. ¶ 33.   The MOU also provided that the Settlement was contingent on the Parties' drafting and execution of a comprehensive settlement agreement.  *Id.*

Several months of painstaking negotiations regarding the specific terms of the Agreement followed.  Joint Decl. ¶ 36.  During the same time, Settlement Class Counsel and their experts performed the detailed work necessary to determine the exact amount of each Settlement Class Member's damages based on the high-to-low Debit Re-sequencing, and the proposed plan of allocation of the Net Settlement Fund. *Id.*  The negotiations with BofA's counsel also included the plan of allocation.  *Id.*  The Settlement Agreement was executed between May 6 and May 11, 2011.  Joint Decl. ¶ 37.

On May 13, 2011, Plaintiffs filed their Motion for Preliminary Approval of the Settlement.  **[DE # 1471]**.  A preliminary approval hearing was held on May 23, 2011 [**DE # 1517**], at which time the Court announced its intention to grant preliminary approval, commenting that the Settlement Class and the Settlement were among the largest ever presented to this Court.  On May 24, 2011, the Court entered the Order Granting Preliminary Approval [**DE # 1520**] which, *inter alia*, preliminary approved the Settlement, finding that the Settlement

Class met the requirements of Fed. R. Civ. P. 23; that the Settlement was "the result of informed, good-faith, arms'-length negotiation between the parties and their capable and experienced counsel" and was "not the result of collusion,"; that the Settlement is "within the range of reasonableness" and that it should be approved.  [**DE # 1520 at 2**].

Pursuant to the Preliminary Approval Order, notice of the Settlement was mailed to over 13 million members of the Settlement Class.  *See* Decl. of Joel Botzet (Ex. C) at 4. In addition, notice of the Settlement was published in a number of national consumer magazines, including People, Sports Illustrated, and TV Guide, and was also distributed through the Internet on sites including Facebook, Yahoo, and the Microsoft Media Network.  *See* Decl. of Katherine Kinsella (Ex. D) at 5-7.  A special Settlement website was also established which enable Settlement Class members to obtain additional information about the Settlement. *See id.* at 7-8.

**B.      Summary of the Settlement Terms.**

The terms of the Settlement are detailed in the Agreement attached as Exhibit A.   We provide a brief summary of the material terms of the Settlement.

**1.      The Settlement Class.**

The Settlement Class is an opt-out class under Rule 23(b)(3) of the Federal Rule of Civil Procedure.  The Settlement Class is defined as:

> All holders of a BofA Account who, from January 1, 2001 through Preliminary Approval, incurred one or more Overdraft Fees as a result of Debit Re-sequencing.  Excluded from the Class are all current BofA employees, officers and directors, and the judge presiding over this Action.

Agreement ¶ 51.

**2.      Monetary Relief for the Benefit of the Settlement Class.**

As required by the Settlement, on June 7, 2011, BofA deposited the sum of $410 million into an Escrow Account.  Joint Decl. ¶ 40.  That deposit created the Settlement Fund, which will

be used to pay all distributions, fees, costs and expenses of the Settlement, including but not limited to distribution of funds to the Settlement Class; distribution of the *Cy Pres* Distribution Amount; all costs of Settlement Notice; all costs of Settlement Administration; all Service Awards; and all attorneys' fees, costs and expenses of Class Counsel.  Agreement ¶¶ 47, 50.

Settlement Class Members do not have to submit claims or take any other affirmative step to receive relief under the Settlement.  Joint Decl. ¶ 40.  Instead, within 30 days of the Effective Date of the Settlement (Agreement ¶ 22), BofA and the Settlement Administrator will distribute the Net Settlement Fund to all identifiable Settlement Class Members who do not opt out of the Settlement, and to the recipients of the *Cy Pres* Distribution Amount.  Agreement ¶¶ 83, 91.

All identifiable Settlement Class Members who experienced a "Positive Differential Overdraft Fee" will receive a *pro rata* distribution of the Net Settlement Fund, minus the *Cy Pres* Distribution Amount.  Agreement ¶¶ 79, 83–85.  The Positive Differential Overdraft Fee analysis determines, among other things, which BofA Account holders were assessed additional overdraft fees that would not have been assessed if the Bank had used a posting sequence or method for Debit Card Transactions (Agreement ¶ 20) other than ordering them from highest-to-lowest dollar amount, and how much in additional overdraft fees those Account holders paid. The calculation involves a complex, multi-step process described in the Agreement.  Agreement ¶ 79.

The Net Settlement Fund – which will be distributed *pro rata* among identifiable Settlement Class Members – is equal to the Settlement Fund, plus interest earned (if any), less (among other things) the *Cy Pres* Distribution Amount, costs and expenses of Settlement Notice

and Settlement Administration, Court-awarded Service Awards for the Plaintiffs, and Class Counsel's attorneys' fees and costs.  Agreement ¶ 82.

Payments to Settlement Class Members who are current BofA account holders will be made by the Bank directly crediting such Settlement Class Members' accounts, and notifying the Settlement Class members of the credit.   Agreement ¶ 87.  BofA will then be entitled to a reimbursement for such credits from the Settlement Fund.  Agreement ¶ 88.  Former account holders (and current account holders whose accounts cannot feasibly be credited) will receive payment from the Settlement Fund by checks mailed by the Settlement Administrator. Agreement ¶¶ 87, 89.

Any uncashed or returned checks will remain in the Settlement Fund for one year from the date the first distribution check is mailed by the Settlement Administrator, during which time the Settlement Administrator will make reasonable efforts to effectuate delivery of the Settlement Class Member Payments.  Agreement ¶ 90.

> 3.       *Cy Pres* **Distributions to Promote Consumer Financial Literacy.**

Settlement Class Members have been identified based on a complex analysis of BofA data.  Data for the period January 1, 2004 through Preliminary Approval is sufficiently complete to permit the Parties to identify all Settlement Class Members who had Accounts during that period, and to calculate the amount of the distribution from the Settlement Fund to which each is entitled under the Settlement.  Unfortunately, however, BofA lacks certain relevant data for the earliest part of the Class Period.  Specifically, for the period January 1, 2001 through September 30, 2003, BofA lacks data that would enable Settlement Class Counsel and their experts to identify any of the Bank customers who were affected by BofA's Debit Re-sequencing during that period.  Along similar lines, for the period October 1, 2003 through December 31, 2003, BofA lacks data that would permit Settlement Class Counsel and their experts to identify certain

segments of BofA's customers affected by the Bank's Debit Re-sequencing during that period. Agreement ¶ 78.

Settlement Class Counsel and their experts determined – based on a review of the available data – that roughly 12.5% of all Settlement Class Members' damages occurred during the periods for which data is unavailable. *See* Decl. of Arthur Olsen (Ex. E) at 2. Because Settlement Class Members for those periods cannot reasonably be identified and, therefore, cannot be paid directly, 12.5% of the Net Settlement Fund will be allotted to a *cy pres* program that is intended to benefit consumer financial literacy education, and to educate and assist consumers with financial services issues through advisory and related services (excluding litigation). Agreement ¶¶ 82, 91. The Settlement Administrator will disburse the *Cy Pres* Distribution Amount within 30 days of the Effective Date. *Id.* The *cy pres* recipients will be agreed upon by the Bank and Settlement Class Counsel, and submitted to this Court for approval. *Id.*

### 4. Class Release.

In exchange for the benefits conferred by the Settlement, all Settlement Class Members who do not opt out will be deemed to have released BofA from claims related to the subject matter of the Actions. The detailed release language can be found in Section XV of the Agreement.

### 5. Service Awards, Class Counsel's Fees and Expenses.

The Settlement provides that Class Counsel will apply for service awards to each Class Representative (or married couple representing the Class) amounting to $5,000. Agreement ¶ 106. The Settlement also provides that Class Counsel will seek up to 30 percent of the Settlement Fund for attorneys' fees, as well as reasonable expenses, after deducting certain Settlement-related administration expenses. Agreement ¶¶ 82, 102.

**C.       The Proposed Settlement With BofA Should Be Approved.**

Court approval is required for settlement of a class action.  Fed. R. Civ. P. 23(e).  Federal courts have long recognized a strong policy and presumption in favor of class action settlements. The Rule 23(e) analysis should be "informed by the strong judicial policy favoring settlements as well as the realization that compromise is the essence of settlement."   *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. Unit B 1982).  In evaluating a proposed class action settlement, the court "will not substitute its business judgment for that of the parties; 'the only question . . . is whether the settlement, taken as a whole, is so unfair on its face as to preclude judicial approval.'"  *Rankin v. Rots*, 2006 WL 1876538, at *3 (E.D. Mich. June 27, 2006) (quoting *Zerkle v. Cleveland-Cliffs Iron Co.*, 52 F.R.D. 151, 159 (S.D.N.Y. 1971)). Indeed, "[s]ettlement agreements are highly favored in the law and will be upheld whenever possible because they are a means of amicably resolving doubts and uncertainties and preventing lawsuits."  *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1105 (5th Cir. 1977).  Class settlements minimize the litigation expenses of the parties and reduce the strain that litigation imposes upon already scarce judicial resources.  Therefore, "federal courts naturally favor the settlement of class action litigation." *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996).

The Settlement here is more than sufficient under the standard of Rule 23(e).  Not only does it secure a large, $410 million fund for the benefit of the Settlement Class, but each Settlement Class Member will receive his or her recovery as a matter of course, *without needing to do anything at all*, based on an analysis of information in BofA's possession.  As set forth below, Final Approval of this Settlement is clearly warranted.

1.      **The Court Has Personal Jurisdiction Over the Settlement Class Because the Class Received Adequate Notice and an Opportunity to Be Heard.**

In addition to having personal jurisdiction over the named Plaintiffs, who are parties to this litigation and agreed to serve as Class Representatives, the Court also has personal jurisdiction over all members of the Settlement Class because they have received the requisite notice and due process required by the United States Supreme Court.  As stated by the Supreme Court, for a court to exercise jurisdiction over the claims of absent class members:

> [I]t must provide minimal procedural due process protection.  The plaintiff must receive notice plus an opportunity to be heard and participate in the litigation, whether in person or through counsel.  The notice must be the best practicable, 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'

*Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 811-12 (1985) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950)); *see also In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 306 (3d Cir. 1998) ("[T]he district court obtains personal jurisdiction over the absentee class members by providing proper notice of the impending class action and providing the absentees with the opportunity to be heard or the opportunity to exclude themselves from the class.").  These due process protections were provided with respect to the Settlement.

a.      **The Best Notice Practicable Was Provided to the Class.**

As noted above, notice of the Settlement was mailed to over 13 million members of the Settlement Class.  *See* Decl. of Joel Botzet (Ex. C) at 4. In addition, notice of the Settlement was published in a number of national consumer magazines, including People, Sports Illustrated, and TV Guide, and was also distributed through the Internet on sites including Facebook, Yahoo, and the Microsoft Media Network.  *See* Decl. of Katherine Kinsella (Ex. D) at 5-7.  A special

Settlement website was also established which enable Settlement Class members to obtain additional information about the Settlement.  *See id.* at 7-8.

> **b.    The Notice Was Reasonably Calculated to Inform Class Members of Their Rights.**

The Court-approved notice provided to the Settlement Class members was sufficient to satisfy the requirements of due process because it described "the substantive claims . . . [and] contained information reasonably necessary to make a decision to remain a class member and be bound by the final judgment."  *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104-05 (5th Cir. 1977).

This notice, among other things, defined the Settlement Class, described the release as well as the amount and proposed distribution of the Settlement proceeds, and informed Settlement Class Members of their right to opt-out and object, the procedures for doing so, and the time and place of the Final Approval Hearing.  It also notified Settlement Class Members that a class judgment would bind them unless they opted out, and told them where they could obtain more information, such as access to a full copy of the Agreement.  Further, the notice described in summary form the fact that Class Counsel would be seeking attorneys' fees of up to 30 percent of the Settlement.

In short, Settlement Class Members were provided with the best practicable notice "reasonably calculated, under [the] circumstances, to apprise them of the pendency of the action and afford them an opportunity to present their objections."  *Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950).

> **2.    The Settlement Should Be Approved Because It Is Fair, Adequate and Reasonable.**

In determining whether to approve the Settlement, the Court considers whether it is "fair, adequate, reasonable, and not the product of collusion."  *Leverso v. SouthTrust Bank of Al., N.A.,*

18 F.3d 1527, 1530 (11th Cir. 1994); *see also Bennett v. Behring Corp.,* 737 F.2d 982, 986 (11th Cir. 1984).  A settlement is fair, reasonable and adequate when "the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued."  *In re Lorazepam & Clorazepate Antitrust Litig.*, MDL No. 1290, 2003 WL 22037741, at *2 (D.D.C. June 16, 2003) (quoting *Manual for Complex Litigation* (Third) § 30.42 (1995)).  Importantly, the Court is "not called upon to determine whether the settlement reached by the parties is the best possible deal, nor whether class members will receive as much from a settlement as they might have recovered from victory at trial."  *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1014 (N.D. Ill. 2000) (citations omitted).

The Eleventh Circuit has identified six factors to be considered in analyzing the fairness, reasonableness and adequacy of a class action settlement under Rule 23(e):

(1)    the existence of fraud or collusion behind the settlement;

(2)    the complexity, expense, and likely duration of the litigation;

(3)    the stage of the proceedings and the amount of discovery completed;

(4)    the probability of the plaintiffs' success on the merits;

(5)    the range of possible recovery; and

(6)    the opinions of the class counsel, class representatives, and the substance and amount of opposition to the settlement.

*Leverso*, 18 F.3d at 1530 n.6; *see also Bennett,* 737 F.2d at 986.  As set forth below, an analysis of these factors shows the Settlement to be fair, adequate and reasonable.

### a.    There Was No Fraud or Collusion.

The Court is well aware of the vigor with which the Parties litigated prior to reaching the Settlement.  Plaintiffs continue to litigate these cases against other defendant banks, and the sharply contested nature of the proceedings in this case readily demonstrates the lack of fraud or

collusion behind the Settlement.  *See, e.g., In re Sunbeam Sec. Litig.,* 176 F. Supp. 2d 1323, 1329 n.3 (S.D. Fla. 2001); *Ingram v. Coca-Cola Co.,* 200 F.R.D. 685, 693 (N.D. Ga. 2001) (court had "no doubt that this case has been adversarial, featuring a high level of contention between the parties"); *In re Motorsports Merchandise Antitrust Litig.,* 112 F. Supp. 2d 1329, 1338 (N.D. Ga. 2000) ("[t]his was not a quick settlement, and there is no suggestion of collusion"); *Warren v. City of Tampa,* 693 F. Supp. 1051, 1055 (M.D. Fla. 1988) (record showed no evidence of collusion, but to the contrary showed "that the parties conducted discovery and negotiated the terms of settlement for an extended period of time"), *aff'd,* 893 F.2d 347 (11th Cir. 1989).

Settlement Class Counsel negotiated the Settlement with similar vigor.  Plaintiffs were represented by experienced counsel at these arms-length negotiations.  These lawyers and law firms are among the most experienced in complex commercial and class action litigation in the country.

> **b.     The Settlement Will Avert Years of Highly Complex and Expensive Litigation.**

This case involves millions of Settlement Class Members and alleged wrongful overdraft fees in the billions of dollars.  The claims and defenses are complex; litigating them is difficult and time consuming.  Although the Actions have been pending for more than two years, recovery by any means other than settlement would require additional years of litigation in this Court and appellate courts.  *See United States v. Glens Falls Newspapers, Inc.,* 160 F. 3d 853, 856 (2d Cir. 1998) (noting that "a principal function of a trial judge is to foster an atmosphere of open discussion among the parties' attorneys and representatives so that litigation may be settled promptly and fairly so as to avoid the uncertainty, expense and delay inherent in a trial."); *In re Domestic Air Transp. Antitrust Litig.,* 148 F.R.D. 297, 317, 325-26 & n.32 (N.D. Ga. 1993) ("adjudication of the claims of two million claimants could last half a millennium").

In contrast, the Settlement provides immediate and substantial benefits to millions of BofA customers.  As stated in *In re Shell Oil Refinery*, 155 F.R.D. 552 (E.D. La. 1993):

> The Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation.  In this respect, '[i]t has been held proper to take the bird in the hand instead of a prospective flock in the bush.'

*Id*. at 560 (alterations in original) (quoting *Oppenlander v. Standard Oil Co*., 64 F.R.D. 597, 624 (D. Colo. 1974)); *see also In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) (noting that complex litigation "can occupy a court's docket for years on end, depleting the resources of the parties and taxpayers while rendering meaningful relief increasingly elusive").  Especially because the "demand for time on the existing judicial system must be evaluated in determining the reasonableness of the settlement," *Ressler v. Jacobson*, 822 F. Supp. 1551, 1554 (M.D. Fla. 1992) (citation omitted), there can be no reasonable doubt as to the adequacy of this Settlement, which provides an immediate, tangible, and significant benefit to the Class.

      **c.**      **The Factual Record is Sufficiently Developed to Enable Plaintiffs and Class Counsel to Make a Reasoned Judgment Concerning the Settlement.**

Courts also consider "the degree of case development that class counsel have accomplished prior to settlement" to ensure that "counsel had an adequate appreciation of the merits of the case before negotiating."  *In re General Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 813 (3d Cir. 1995).  At the same time, "[t]he law is clear that early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations."  *Ressler*, 822 F. Supp. at 1555.

Significant discovery occurred in this case prior to the Settlement.  Joint Decl. ¶ 60.  While that discovery was not complete, it nonetheless afforded Settlement Class Counsel insight into the strengths and weaknesses of their claims against BofA.  *Id.*  Before settling, we had

already developed ample information and performed extensive analyses from which "to determine the probability of their success on the merits, the possible range of recovery, and the likely expense and duration of the litigation." *Mashburn v. Nat'l Healthcare, Inc.,* 684 F. Supp. 660, 669 (M.D. Ala. 1988); Joint Decl. ¶ 60.

> ### d.      Plaintiffs Would Have Faced Significant Obstacles to Obtaining Relief.

Further, "the likelihood and extent of any recovery from the defendants absent . . . settlement" constitutes an important factor in assessing the reasonableness of a settlement. *In re Domestic Air Transp.,* 148 F.R.D. at 314 (N.D. Ga. 1993); *see also Ressler*, 822 F. Supp. at 1555 ("A Court is to consider the likelihood of the plaintiff's success on the merits of his claims against the amount and form of relief offered in the settlement before judging the fairness of the compromise.").

Plaintiffs and Settlement Class Counsel believe we have a compelling case against BofA. Even so, BofA advanced significant defenses that Plaintiffs would be required to overcome in any contested proceeding.   In fact, this litigation involved several major risks.   *See* Section IV.B.3, *infra* (discussing four major litigation risks, relating to (1) the *Closson* settlement release, (2) federal preemption, (3) the BofA account agreement, and (4) arbitration).   Class Counsel and Plaintiffs thus appreciate that, absent a settlement, it would take years of additional litigation – and overcoming vigorous legal and factual defenses – to bring the Action to finality.   Even then, the outcome would still be uncertain.

Given the myriad risks attending these claims, the Settlement cannot be seen as anything except a fair compromise. *See, e.g.*, *Bennett v. Behring Corp.*, 96 F.R.D. 343, 349-50 (S.D. Fla. 1982) (plaintiffs faced a "myriad of factual and legal problems" that led to "great uncertainty as to the fact and amount of damage," which made it "unwise [for plaintiffs] to risk the substantial

benefits which the settlement confers . . . to the vagaries of a trial"), *aff'd*, 737 F.2d 982 (11th Cir. 1984); *Enter. Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 248 (S.D. Ohio 1991) (citing the "very real potential that the [c]lass could come away from a long expensive trial with nothing," the court rejected the argument "that the Class should get more").

> ### e.   The Benefits Provided by the Settlement Are Fair, Adequate and Reasonable When Compared to the Range of Possible Recovery.

In determining whether a settlement is fair in light of the potential range of recovery, this Court should by guided by the "important maxim[]" it once articulated – namely, "the fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate." *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988), *aff'd*, 899 F.2d 21 (11th Cir. 1990).  Indeed, "[a] settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery." *Id.* This is because a settlement must be evaluated "in light of the attendant risks with litigation." *Thompson v. Metropolitan Life Ins. Co.*, 216 F.R.D. 55, 64 (S.D.N.Y. 2003); *see Bennett*, 737 F.2d at 986 ("[C]ompromise is the essence of settlement."); *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("[T]he very essence of a settlement is . . . a yielding of absolutes and an abandoning of highest hopes.") (internal quotation omitted).  Thus, courts regularly find settlements to be fair where "[p]laintiffs have not received the optimal relief." *Warren,* 693 F. Supp. at 1059; *see, e.g., Great Neck Capital Appreciation Investment P'ship, L.P. v. PriceWaterhouseCoopers, L.L.P.,* 212 F.R.D. 400, 409-410 (E.D. Wis. 2002) ("The mere possibility that the class might receive more if the case were fully litigated is not a good reason for disapproving the settlement.").

The Settlement provides substantial value to the Settlement Class.  Such value is well within the range of reasonableness.  Under the Settlement, Plaintiffs and the Settlement Class

have recovered $410 million, which represents between forty-five percent (45%) and nine percent (9%) of their anticipated total recovery, depending on how the *Closson* appeal was resolved as well as the future course of this litigation.  *See* Joint Decl. ¶ 68; Decl. of Prof. Samuel Issacharoff (Ex. F) at 9 ("The assessment of the value to the class here must include the harm avoided if the *Closson* settlement had been affirmed on appeal, thereby foreclosing most of the class claims."); Decl. of Roberto Martinez (Ex. G) at 10 (noting that settlement representing a portion of alleged loss "is not only reasonable and adequate, but outstanding…").

The absence of a claims-made process here also speaks volumes about the propriety of settlement approval.  *See* Decl. of Prof. Samuel Issacharoff (Ex. F) at 14 (noting the significant benefit of the proposed direct distribution to Class members "is designed to optimize the class recovery."); Decl. of Prof. Geoffrey Miller (Ex. H) at 7 ("The automatic nature of the individual payments is an important benefit . . .").  Settlement Class Members will receive the benefit *automatically*, without needing to fill out *any* claim form or indeed to take any action whatsoever.  *Cf. Sylvester v. CIGNA Corp.*, 369 F. Supp. 2d 34, 52 (D. Me. 2005) (finding that "'claims made' settlements regularly yield response rates of 10 percent or less."); *Acosta v. Trans Union*, LLC, 243 F.R.D. 377, 391 (C.D. Cal. 2007) ("[M]uch of what is attainable will go unpaid as a result of the claims-made process.").  In stark contrast to the pro-consumer, automatic distribution of the Net Settlement Fund under this Settlement, the *Closson* settlement, as well as two more recent settlements of overdraft fee cases, all required potential settlement class members to submit claims forms themselves in order to receive benefits.

        **f.**      **The Opinions of Settlement Class Counsel, Class Representatives, and Absent Class Members Strongly Favor Approval of the Settlement.**

The Court should also give "great weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation."  *Warren,* 693 F. Supp. at

1060; *see also Mashburn*, 684 F. Supp. at 669 ("If plaintiffs' counsel did not believe these factors all pointed substantially in favor of this settlement as presently structured, this Court is certain that they would not have signed their names to the settlement agreement."); *In re Domestic Air Transp.*, 148 F.R.D. at 312-13 ("In determining whether to approve a proposed settlement, the Court is entitled to rely upon the judgment of the parties' experienced counsel. '[T]he trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel.'" (citations omitted)).

Settlement Class Counsel believe that this Settlement is extraordinary and deserving of Final Approval. Joint Decl. at 23. Moreover, opposition to the Settlement has been *de minimis*. To date, Settlement Class Counsel have received only 15 *pro se* objections, and the number of opt-outs received to date is 169, representing less than .0013 percent of the Settlement Class. *Id.* As many courts have noted: "[A] small number of objectors from a plaintiff class of many thousands is strong evidence of a settlement's fairness and reasonableness." *Assn. for Disabled Americans. v. Amoco Oil Co.,* 211 F.R.D. 457, 467 (S.D. Fla. 2002); *accord Mangone*, 206 F.R.D. at 227 ("In evaluating the fairness of a class action settlement, such overwhelming support by class members is strong circumstantial evidence supporting the fairness of the Settlement."); *Austin v. Pennsylvania Dept. of Corrections*, 876 F. Supp. 1437, 1458 (E.D. Pa. 1995) ("Because class members are presumed to know what is in their best interest, the reaction of the class to the Settlement Agreement is an important factor for the court to consider.").

### 3.    The Court Should Certify the BofA Settlement Class.

This Court has previously found the requirements of Rule 23(a) and 23(b)(3) to be satisfied in the Action. *See In re Checking Account Overdraft Litig.*, -- F.R.D. --, 2011 WL 2258458, at *2-3 (S.D. Fla. May 24, 2011) (analyzing Rule 23 class certification factors in granting preliminary approval) [**DE # 1520**]; *see also In re Checking Account Overdraft Litig.*, --

F.R.D. --, 2011 WL 3158998 (S.D. Fla. 2011) (granting class certification for purposes of trial in parallel MDL action).  The Court should make the same class certification findings in granting Final Approval.  *See also* Decl. of Prof. Samuel Issacharoff (Ex. F) at 6 ("From the documents I have reviewed, this appears to be a classic case for class treatment.").

> **4.      The *Cy Pres* Program Is Reasonable and Should Be Approved.**

The Settlement provides for a *cy pres* program for (i) funds due Settlement Class members who cannot reasonably be identified, and therefore cannot be paid directly, Agreement ¶¶ 82, 91; and (ii) any undistributed funds that remain after distribution of Settlement Class member payouts.  *Id.* ¶ 93.  The *cy pres* doctrine permits courts to distribute unclaimed settlement amounts to worthy charities, especially to charities whose purposes harmonize with the underlying lawsuit, as here.  *See, e.g.*, *In re Motorsports Merchandise Antitrust Litig.*, 160 F. Supp. 2d 1392, 1394 (N.D. Ga. 2001) (approving *cy pres* distributions of settlement residue, stating that "[w]here settlement funds remain after distribution to class members, courts have approved charitable donations to organizations geared toward combating harms similar to those that injured the class members.  Such a donation may serve the cy pres principle of indirectly benefitting all class members.") (internal quotation marks and citation omitted); *In re Infant Formula Multidistrict Litig.*, 2005 WL 2211312 (N.D. Fla. Sept. 8, 2005) (approving *cy pres* distribution to victims of Hurricane Katrina).

The proposal here comports with the law of *cy pres* and should be approved.  The American Law Institute recommends *cy pres* distributions "only when direct distributions to class members are not feasible—either because class members cannot be reasonably identified or because distribution would involve such small amounts that, because of the administrative costs involved, such distribution would not be economically viable."  American Law Institute, *Principles of the Law: Aggregate Litigation* § 3.07, cmt. b (2010).  In this case, it is not feasible

to identify certain BofA customers who incurred overdraft fees between January 1, 2001 and December 31, 2003. Particularly because the claims being settled involve allegations of unfair treatment of customers by a large financial institution, it is reasonable to direct these funds to respected organizations that promote financial literacy.

Accordingly, for all the above reasons, the Settlement is fair, adequate and reasonable, and deserving of Final Approval.

## III. APPLICATION FOR SERVICE AWARDS TO THE CLASS REPRESENTATIVES

Service awards "compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1218 (S.D. Fla. 2006). "[T]here is ample precedent for awarding incentive compensation to class representatives at the conclusion of a successful class action." *David v. American Suzuki Motor Corp.*, 2010 WL 1628362, at *6 (S.D. Fla. Apr. 15, 2010). Courts have consistently found service awards to be an efficient and productive way to encourage members of a class to become class representatives. *See*, *e.g.*, *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 694 (N.D. Ga. 2001) (awarding class representatives $300,000 each, explaining that "the magnitude of the relief the Class Representatives obtained on behalf of the class warrants a substantial incentive award."); *Spicer v. Chi. Bd. Options Exchange, Inc.*, 844 F. Supp. 1226, 1267-68 (N.D. Ill. 1993) (collecting cases approving service awards ranging from $5,000 to $100,000, and awarding $10,000 to each named plaintiff).

The factors for determining a service award include: (1) the actions the class representatives took to protect the interests of the class; (2) the degree to which the class benefited from those actions; and (3) the amount of time and effort the class representatives

expended in pursuing the litigation.  *See, e.g.*, *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998).

The above factors, as applied to this case, demonstrate the reasonableness of a service award of $5,000 to each Class Representative, or $2,500 to each Class Representative for married couples where both spouses are Class Representatives.  Among other things, each Class Representative took numerous actions and provided substantial assistance to Class Counsel by locating and forwarding responsive documents and information – including monthly account statements and account agreements – and by engaging in conferences with Class Counsel.  In so doing, the Class Representatives were integral to forming the theory of this case.  The Class Representatives not only devoted time and effort to this long-running litigation, but the end result of their efforts, and those of counsel, was a substantial benefit to the Class.  The Class Representatives should be rewarded for their service.

If each of the Class Representatives are awarded $5,000, the total service awards will be $135,000.  This is only .03 percent of the Settlement Fund of $410 million, a ratio that is well within the range of reasonable service awards.  *See, e.g.*, *Enter. Energy Corp. v. Columbia Gas Transmission*, 137 F.R.D. 240, 251 (S.D. Ohio 1991) (approving service awards totaling $300,000, or 0.56 percent of the $56.6 million settlement fund).  The requested service awards of $5,000 are reasonable and should be approved.

## IV.    CLASS COUNSEL'S APPLICATION FOR ATTORNEYS' FEES

As indicated in the Court-approved Notice disseminated to the Settlement Class, and consistent with standard class action practice and procedure, Class Counsel request a fee amounting to 30 percent of the $410 million common fund created through our efforts in reaching this Settlement, net of the expenses listed in ¶ 82 of the Agreement.  Agreement ¶¶ 82,

102.[4]  This fee request is well within the guidelines set forth by the Eleventh Circuit in *Camden I*

*Condominium Assn. v. Dunkle*, 946 F.2d 768 (11th Cir. 1991).[5]  For the reasons set forth below,

the requested attorney fee award is appropriate, fair and reasonable, and should be approved.

**A.      The Law Awards Class Counsel Fees From the Common Fund Created Through Their Efforts.**

It is well established that when a representative party has conferred a substantial benefit

upon a class, counsel is entitled to an allowance of attorneys' fees based upon the benefit

obtained.  *Camden I Condominium Assn. v. Dunkle,* 946 F.2d 768, 771 (11th Cir. 1991); *Boeing*

*Co. v. Van Gemert,* 444 U.S. 472, 478 (1980).  The common benefit doctrine is an exception to

the general rule that each party must bear its own litigation costs.  The doctrine serves the "twin

goals of removing a potential financial obstacle to a plaintiff's pursuit of a claim on behalf of a

class and of equitably distributing the fees and costs of successful litigation among all who

gained from the named plaintiff's efforts."  *In re Gould Sec. Litig.,* 727 F. Supp. 1201, 1202

(N.D. Ill. 1989) (citation omitted); *see also Ramey*, 508 F.2d at 1195.  The common benefit

doctrine is based on the premise that those who receive the benefit of a lawsuit without

contributing to its costs are "unjustly enriched" at the expense of the successful litigant.  *Boeing,*

444 U.S. at 478; *Mills,* 396 U.S. at 392.  Thus, the Supreme Court, the Eleventh Circuit, and

courts in this District have all noted that "[a] litigant or a lawyer who recovers a common fund

for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee

from the fund as whole."  *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1333 (S.D. Fla. 2001)

(citing *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980)); *see also Camden I*, 946 F.2d at 771

---

[4]  The amount of expenses listed in ¶ 82 of the Agreement are set forth are set forth in the Declaration of Joel Botzet, attached as Exhibit L.

[5]  While the Settlement entitles Class Counsel to also seek reimbursement of litigation costs and expenses, we are not seeking separate reimbursement of such expenses even though our expenses incurred to date in connection with the Action.

("Attorneys in a class action in which a common fund is created are entitled to compensation for their services from the common fund, but the amount is subject to court approval.").

Courts also have recognized that appropriate awards of attorneys' fees in cases such as this encourage redress for wrongs caused to entire classes of persons, as well as discourage future misconduct of a similar nature:

> [C]ourts . . . have acknowledged the economic reality that in order to encourage 'private attorney general' class actions brought to enforce . . . laws on behalf of persons with small individual losses, a financial incentive is necessary to entice capable attorneys, who otherwise could be paid regularly by hourly-rate clients, to devote their time to complex, time-consuming cases for which they may never be paid.

*Mashburn v. National Healthcare, Inc.*, 684 F. Supp. 679, 687 (M.D. Ala. 1988); *see also Deposit Guar. Nat'l Bank v. Rope*, 445 U.S. 326, 338-39 (1980). Adequate compensation promotes the availability of counsel for plaintiffs:

> If the plaintiffs' bar is not adequately compensated for its risk, responsibility, and effort when it is successful, then effective representation for plaintiffs in these cases will disappear . . . . We as members of the judiciary must be ever watchful to avoid being isolated from the experience of those who are actively engaged in the practice of law. It is difficult to evaluate the effort it takes to successfully and ethically prosecute a large plaintiffs' class action suit. It is an experience in which few of us have participated. The dimensions of the undertaking are awesome.

*Muehler v. Land O'Lakes, Inc.*, 617 F. Supp. 1370, 1375-76 (D. Minn. 1985).

In the Eleventh Circuit, class counsel are awarded a percentage of the funds generated through a class action settlement. In *Camden I* – the controlling authority in this Circuit dealing with the issue of attorneys' fees in common-fund class-action cases – the Eleventh Circuit held that "the percentage of the fund approach [as opposed to the lodestar approach] is the better reasoned in a common fund case. Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." *Camden I*, 946 F.2d at 774.

- 33 -

This Court has substantial discretion in determining the appropriate fee percentage awarded to counsel.  "There is no hard and fast rule mandating a certain percentage of a common fund which may be awarded as a fee because the amount of any fee must be determined upon the facts of each case." *In re Sunbeam,* 176 F. Supp. 2d at 1333 (quoting *Camden I*, 946 F.2d at 774).  Nevertheless,  "[t]he majority of common fund fee awards fall between 20 percent to 30 percent of the fund," although "an upper limit of 50 percent of the fund may be stated as a general rule."  *Id.* (quoting *Camden I,* 946 F.2d at 774-75); *see also Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291 (11th Cir. 1999) (approving fee award where the district court determined that the benchmark should be 30 percent and then adjusted the fee award higher based on the circumstances of the case).  Our fee request falls comfortably within this range.

## B.      The *Camden I* Factors Support Class Counsel's Requested Fee.

The Eleventh Circuit has provided a set of factors the Court should use to determine a reasonable percentage to award class-action counsel.  These factors are:

    (1)    the time and labor required;

    (2)    the novelty and difficulty of the questions involved;

    (3)    the skill requisite to perform the legal service properly;

    (4)    the preclusion of other employment by the attorney due to acceptance of the case;

    (5)    the customary fee;

    (6)    whether the fee is fixed or contingent;

    (7)    time limitations imposed by the client or the circumstances;

    (8)    the amount involved and the results obtained;

    (9)    the experience, reputation, and ability of the attorneys;

    (10)    the "undesirability" of the case;

    (11)    the nature and the length of the professional relationship with the client;

- 34 -

(12)    awards in similar cases.

*Camden I*, 946 F.2d at 772 n.3 (citing factors originally set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)).

These twelve factors are not exclusive.  "Other pertinent factors are the time required to reach a settlement, whether there are any substantial objections by class members or other parties to the settlement terms or the fees requested by counsel, any non-monetary benefits conferred upon the class by the settlement, and the economics involved in prosecuting a class action."  *In re Sunbeam,* 176 F. Supp. 2d at 1333 (quoting *Camden I*, 946 F.2d at 775).  These factors are merely guidelines, and the Eleventh Circuit has "encouraged the lower courts to consider additional factors unique to the particular case."  *Id.* (quoting *Walco Inv., Inc. v. Thenen*, 975 F. Supp. 1468, 1472 (S.D. Fla. 1997)).  As applied here, the *Camden I* factors demonstrate that the Court should award Class Counsel the requested fee.

### 1.    The Claims Against BofA Required Substantial Time and Labor.

Prosecuting and settling the claims in the Action demanded considerable time and labor, making this fee request reasonable.  Moreover, had Class Counsel not mounted a vigorous challenge to the *Closson* settlement, BofA's exposure in the Action would have been drastically reduced, if not eliminated altogether.  As Professor Issacharoff noted, "[w]hat is critical here is that the efforts of class counsel realized through this settlement voided the potential loss of hundreds of millions of dollars in claims through the operation of the *Closson* settlement."  Decl. of Prof. Samuel Issacharoff (Ex. F) at 9.

Throughout the pendency of the Action, the internal organization of Class Counsel, including assignments of work, weekly conference calls, and oversight of task-oriented subcommittees, ensured that Class Counsel were engaged in coordinated, productive work

efforts to maximize efficiency and minimize duplication of effort.  To the same ends, in-person meetings of Class Counsel were also held at various times during the course of the litigation.

Class Counsel spent hundreds of hours investigating the claims of many dozens of potential plaintiffs against BofA in this MDL.  Joint Decl. ¶ 85.  Class Counsel interviewed more than 100 BofA customers and potential plaintiffs to gather information about BofA's conduct and its impact upon consumers.  *Id.*  This information was essential to Class Counsel's ability to understand the nature of BofA's conduct, the language of the account agreements at issue, and potential remedies.  *Id.*

Class Counsel obtained, reviewed, sorted, and analyzed dozens of BofA deposit account agreements.  Joint Decl. ¶ 85.  Class Counsel also expended significant resources researching and developing the legal claims at issue.  For example, state-by-state legal surveys were necessary to determine which state common law doctrines and consumer protection statutes provided Plaintiffs with viable claims.  Joint Decl. ¶ 86.

Following the research, drafting and filing of the *Tornes* complaint, Class Counsel soon faced a significant hurdle with the filing of the Omnibus Motion, as to which BofA was one of the moving parties.  [**DE # 217**].  Substantial additional legal research was necessary to oppose the Omnibus Motion, as well as a considerable briefing effort that ultimately resulted in Plaintiffs' 98-page Opposition Brief.  Joint Decl. ¶ 87. [**DE # 265**].  Class Counsel also convened in advance of oral argument on the Omnibus Motion to prepare for the day-long argument held on February 25, 2010.  Joint Decl. ¶ 87.  [**DE # 294**].

Discovery in the First Tranche actions was stayed – at the banks' request – pending resolution of the Omnibus Motion.  [**DE # 148**].  On May 13, 2010, approximately two months after the Court allowed the claims to proceed, the Court lifted the stay of discovery and entered a

comprehensive Scheduling Order.  [**DE # 463**].  The very same day, Plaintiffs served identical written discovery requests on each of the Defendants, seeking relevant and probative documents and information in their possession.  Joint Decl. ¶ 88.  The process of developing, refining and finalizing such discovery requests – with an eye toward class certification, summary judgment, and trial – required considerable effort by Class Counsel.  *Id.*

BofA produced over one million pages of documents in response to Plaintiffs' discovery requests.  Joint Decl. ¶ 89.  It also asserted layers of blanket, boilerplate objections to Plaintiffs' discovery requests.  *Id.*  On July 16, 2010, Plaintiffs moved to compel discovery from BofA.  [**DE # 691**].

Class Counsel established a large document review team consisting of dozens of attorneys whose task was to review, sort, and code the produced documents.  Joint Decl. ¶ 90.  To make the review and subsequent litigation more efficient, Class Counsel established uniform coding procedures for electronic review of the documents produced, and team members remained in constant contact with each other to ensure that all counsel became aware of significant emerging evidence in real time.  *Id.*  Such document review efforts and coordination were essential – and account for a large proportion of the attorney hours expended in this action.

During the Summer and Fall of 2010, Class Counsel began the process of negotiating with BofA's counsel (as well as counsel for other First Tranche Banks) regarding Rule 30(b)(6) deposition topics.  Joint Decl. ¶ 91.  In addition, Class Counsel expended significant time and effort to prepare responses to BofA's interrogatories and requests for production of documents directed to the Plaintiffs, and to successfully defend against BofA's motion to compel discovery.  *Id.*  [**DE # 902, 939, 1016**].

Beginning in mid-October 2010, Settlement Class Counsel began preliminary settlement discussions with BofA's counsel.  Joint Decl. ¶ 92.   In December 2010 and again in January 2011, Settlement Class Counsel prepared for and participated in three separate days of mediation in various locations in an attempt to settle this action. *Id.*

After the Parties executed the MOU in connection with the Settlement, Settlement Class Counsel engaged in extensive discussions over the terms of the Settlement Agreement as well as settlement-related analysis to determine – among other things – an appropriate plan for allocation of the Settlement funds.  Joint Decl. ¶ 93.  That process required Settlement Class Counsel and their experts to analyze transactional data concerning overdraft fees imposed upon Settlement Class members, and to determine the most appropriate distribution formula in light of BofA's data.  *Id.*  In addition, Settlement Class Counsel directed and oversaw Class Counsel's post-MOU confirmatory discovery, including ongoing document review and coding as well as regular conference calls, pending final approval of the Settlement.  *Id.*

All told, Class Counsel's steadfast and coordinated work paid great dividends for the Settlement Class.  Each of the above-described efforts was essential to achieving the Settlement currently before the Court.  Joint Decl. ¶ 94.  Taken together, the time and resources Class Counsel devoted to prosecuting and settling this Action of nationwide importance more than justify the fee sought.

### 2.    The Issues Involved Were Novel and Difficult and Required the Exceptional Skill of a Highly Talented Group of Attorneys.

This Court regularly witnessed and commented upon the high quality of Class Counsel's legal work, which has conferred a significant benefit on the Class in the face of daunting litigation obstacles.  As the Court is aware, it is extremely challenging to identify, and establish liability based upon, the Debit Re-sequencing that lies at the heart of the Action.  Even from the

face of Plaintiffs' bank statements, the proof is not self-evident.  Joint Decl. ¶ 95.  Instead, it requires the acquisition and analysis of a monumental amount of bank data – and the efforts of a highly skilled expert.  Moreover, the management of this very large MDL, including the individual cases against BofA, among other banks, presents challenges which many law firms are simply not able to meet.  *Id.*  Indeed, litigation of a case like this requires counsel highly trained in class action law and procedure as well as the specialized issues these cases present. Joint Decl. ¶ 96.  All of the lawyers representing Plaintiffs possess these attributes, and their participation as Class Counsel added significant value to the representation of this unusually large Settlement Class consisting of millions of individuals.  The record before the Court establishes that the Action involved a wide array of complex and novel challenges, which Class Counsel met at every juncture.  *Id.*

In any given case, the skill of legal counsel should be commensurate with the novelty and complexity of the issues, as well as the skill of the opposing counsel.  *See Walco*, 975 F. Supp. at 1472 (explaining that "[g]iven the quality of defense counsel from prominent national law firms, the Court is not confident that attorneys of lesser aptitude could have achieved similar results"). Class Counsel have extensive experience in complex and class action litigation.  *See* Joint Decl. ¶ 96.

In assessing the quality of representation by Class Counsel, the Court also should consider the quality of their opposing counsel.  *See, e.g.*, *Camden I*, 946 F.2d at 772 n.3; *Johnson,* 488 F.2d at 718; *Ressler v. Jacobson,* 149 F.R.D. 651, 654 (M.D. Fla. 1992).  BofA is represented by extremely able and diligent attorneys.  These were worthy, highly competent adversaries.

### 3. The Claims Against BofA Entailed Considerable Risk.

BofA mounted vigorous defenses to these claims, denying any and all liability in the Actions.  The time and expense demands on Class Counsel were daunting, to say the least, and obviated their ability to work on numerous other matters.  Joint Decl. ¶ 98.  Success under these circumstances represents a genuine milestone.

"A court's consideration of this factor recognizes that counsel should be rewarded for taking on a case from which other law firms shrunk.  Such aversion could be due to any number of things, including social opprobrium surrounding the parties, thorny factual circumstances, or the possible financial outcome of a case.  All of this and more is enveloped by the term 'undesirable.'"  *In re Sunbeam*, 176 F. Supp. 2d at 1336.  In addition, "[t]he point at which plaintiffs settle with defendants . . . is simply not relevant to determining the risks incurred by their counsel in agreeing to represent them." *Skelton v. General Motor Corp.*, 860 F.2d 250, 258 (7th Cir. 1988), *cert. denied*, 493 U.S. 810 (1989).  "Undesirability" and relevant risks must be evaluated from the standpoint of plaintiffs' counsel as of the time they commenced the suit – not retroactively, with the benefit of hindsight.  *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 112 (3d Cir. 1976); *Walco*, 975 F. Supp. at 1473.

Prosecuting the Action was risky from the outset.  Joint Decl. ¶ 99.  While several risks existed, Class Counsel here limit their discussion to four of the most serious risks.

*First*, the possibility that the pending appeal in *Closson* would not succeed presented a massive risk to the Settlement Class.  Indeed, a decision by the California Court of Appeal upholding the *Closson* settlement would likely have erased an estimated *80 percent (or more)* of the value of the Settlement Class Members' claims.  Those claims would have been instantly extinguished.  *See Matsushita Electrical Industrial Co., Ltd. v. Epstein*, 516 U.S. 367 (1996) (settlement release approved in state court action precluded claims in federal court arising from

same factual predicate).  Here, if the California Court of Appeal upheld the trial court's approval

of the *Closson* settlement and its all-encompassing release provision, Plaintiffs' only chance for

preserving this huge portion of the Settlement Class Members' claims would likely be through a

collateral attack on the judgment in *Closson*.   That would be an extremely challenging

undertaking.  *See Grider v. Keystone Health Plan Cent., Inc*., 500 F.3d 322, 329, 330 (3d Cir.

2007) ("[A]n injunction under the All Writs Act is appropriate only when the state court action

threatens to frustrate proceedings and disrupt the orderly resolution of the federal litigation.  That

is, the state action must not simply threaten to reach judgment first, it must interfere with the

federal court's own path to judgment.") (internal quotation marks and citations omitted).  Class

Counsel's diligent pursuit of this Action avoided an inferior result for the Class.

> As Professor Fitzpatrick explains:

> If the [*Closson*] settlement had been affirmed on appeal (the appeal was dropped
> as part of this settlement), all of the members of the proposed class here who
> incurred debit-card overdraft fees before December 31, 2007, would likely have
> had no remaining claims in this lawsuit against Bank of America. Class counsel
> estimate that these claims constitute approximately 80% of all of the damages
> incurred by the settlement class members here. *See* Plaintiffs' Unopposed Motion
> for Preliminary Approval of Class Settlement and for Certification of Settlement
> Class and Incorporated Memorandum of Law in *Tornes* and *Yourke* at 10. In other
> words, the class action attorneys in *Closson* had already settled 80% of these
> cases for $35 million. Thus, not only did class counsel here manage to persuade
> Bank of America that this previous settlement might not withstand appeal, but
> they managed to persuade Bank of America to *resettle* the dispute for nearly *ten
> times* what it had been willing to pay only three years ago in *Closson*. . . . I have
> never seen such a remarkable transformation of a case. In short, there is little
> doubt that the attorneys for the plaintiffs have added great value to the plaintiffs'
> claims.

Decl. of Prof. Brian T. Fitzpatrick (Ex. J) at 11.  This point is echoed by Judge Scott:  "Being

able to secure a settlement in this case for almost twelve times as much as the prior *Closson*

Settlement was no easy feat because class action settlements are difficult to overturn."  Decl. of

Thomas E. Scott (Ex. I) at 6.

- 41 -

*Second*, BofA would have raised its federal preemption argument at all stages of the litigation. Indeed, this Court emphasized that its preemption ruling in connection with the Omnibus Motion applied only "[a]t this stage . . ." 694 F. Supp. 2d at 1313; *see also White v. Wachovia Bank, N.A.*, 563 F. Supp. 2d 1358, 1369 (N.D. Ga. 2008) ("At least at this stage, this court is unprepared to hold that the state laws under which Plaintiffs assert their claims are contrary to federal banking law."). The centrality of the preemption issue to BofA's defense is further illustrated by the fact that (1) Union Bank raised NBA preemption in two of its three main arguments in its recent petition to the Eleventh Circuit challenging this Court's class certification order under Federal Rule of Civil Procedure 23(f), *see* Eleventh Circuit Case No. 11-90012; and (2) Wells Fargo emphasized the NBA preemption issue in appealing the *Gutierrez* verdict (*Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080 (N.D. Cal. 2010)) to the Ninth Circuit – devoting more pages to that issue than to any other in both its opening and reply briefs, *see* Ninth Circuit Case Nos. 10-16959, 10-17468 & 10-17689. Had this litigation proceeded, BofA undoubtedly would have argued that the NBA preempts these claims on the grounds that they "significantly interfere" with its federally-authorized banking powers. *Barnett Bank of Marion City, N.A. v. Nelson*, 517 U.S. 25, 33 (1996). In further support of its argument that the claims conflict with federal law, BofA would have pointed to commentary by a federal banking agency, the OCC, suggesting that national banks have discretion to order debits as they see fit and that this decision falls within their federally-granted powers. While Class Counsel believe that these specific claims – brought under state laws of general applicability, and based on allegations of bad-faith conduct – are not preempted, no one doubts that the preemption issue involves complex issues of law and fact, and presented an ongoing, major risk to Plaintiffs' claims against BofA.

- 42 -

*Third*, BofA would have continued to assert that language in its deposit account agreement shields it from liability for the claims asserted in the Actions.  The agreement states: "We may determine in our discretion the order of processing and posting deposits, fees, charges, checks, debits and other items to your account . . . . We do not process and post transactions in the order in which they occurred.  In most states we process and post items within each category from the highest to lowest dollar amount."  *Tornes* TAC, Ex. A at 18.  Such language, BofA believes, expressly authorized it to engage in the challenged Debit Re-sequencing and, as a material term in the account agreements, foreclosed any finding of breach of the covenant of good faith and fair dealing.  Thus, BofA stated in its Omnibus Motion that "there can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract."  **DE # 217**, at 43-44 (citing 23 Williston on Contracts § 63:22 (4th ed.)).  Nor, BofA added, "may the implied covenant be invoked to limit a party's discretion to follow a course specifically envisioned by the contract's terms."  [**DE # 217**, at 45].  The Court rejected this argument, explaining that Plaintiffs seek only to have the bank exercise its contractual discretion in good faith.  694 F. Supp. 2d at 1315.  However, BofA's contractual language would have allowed it to make the argument to the fact-finder that it told Plaintiffs exactly what it was going to do, and that it cannot be held responsible for Plaintiffs' decision to maintain BofA checking accounts under these terms.

*Fourth*, just as other First Tranche banks seized on the Supreme Court's decision in *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011), to move to compel arbitration, even though they did not initially seek arbitration in this MDL (*e.g.*, **DE # 1384**), that development might have afforded BofA a similar opportunity to seek individual arbitrations, and thereby

avoid a class-wide finding of liability.  The risk in this regard was reinforced as a result of the Eleventh Circuit's holding in *Cruz v. Cingular Wireless, LLC*, -- F.3d --, 2011 WL 3505016 (11th Cir. Aug. 11, 2011).  *Cf.* Tornes TAC ¶ 84 (BofA's account agreement contains an arbitration clause purporting to "PRECLUDE YOU AND US FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION OR JOINING OR CONSOLIDATING THE CLAIMS OF OTHER PERSONS (HEREINAFTER REFERRED TO AS THE 'CLASS ACTION WAIVER').").

Each of these four risks, standing alone, could have impeded Plaintiffs' successful prosecution of these claims at trial (and in any appeal).  Joint Decl. ¶ 104.  Together, they overwhelmingly demonstrate that Plaintiffs' claims against BofA were far from a "slam dunk" and that, in light of all the circumstances, the Settlement achieves an excellent class-wide result. *Id.*

### 4. Class Counsel Assumed Substantial Risk to Pursue This Action on a Pure Contingency Basis, and Were Precluded From Other Employment as a Result.

Class Counsel prosecuted the Action entirely on a contingent fee basis.  Joint Decl. ¶ 105. In undertaking to prosecute this complex action on that basis, Class Counsel assumed a significant risk of nonpayment or underpayment.  *Id.*  That risk warrants the requested fee.

Numerous cases recognize that the contingent fee risk is an important factor in determining the fee award.  "A contingency fee arrangement often justifies an increase in the award of attorney's fees."  *In re Sunbeam,* 176 F. Supp. 2d at 1335 (quoting *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 548 (S.D. Fla. 1988), *aff'd,* 899 F.2d 21 (11th Cir. 1990)); *see also In re Continental Ill. Sec. Litig.,* 962 F.2d 566 (7th Cir. 1992) (holding that when a common fund case has been prosecuted on a contingent basis, plaintiffs' counsel must be compensated adequately for the risk of non-payment); *Ressler*, 149 F.R.D. at 656 ("Numerous cases recognize

- 44 -

that the attorney's contingent fee risk is an important factor in determining the fee award.");

*Walters v. Atlanta,* 652 F. Supp. 755, 759 (N.D. Ga. 1985), *modified,* 803 F.2d 1135 (11th Cir.);

*York v. Alabama State Bd. of Education,* 631 F. Supp. 78, 86 (M.D. Ala. 1986).

Public policy concerns – especially ensuring the continued availability of experienced and capable counsel to represent classes of injured plaintiffs whose individual claims would defy vindication – further justify such a fee award. As this Court observed:

> Generally, the contingency retainment must be promoted to assure representation when a person could not otherwise afford the services of a lawyer. . . . A contingency fee arrangement often justifies an increase in the award of attorney's fees. This rule helps assure that the contingency fee arrangement endures. If this "bonus" methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, *especially in light of the risks of recovering nothing.*

*Behrens,* 118 F.R.D. at 548 (emphasis added).

The progress of the Action to date readily demonstrates the inherent risk that counsel faced in taking these cases on a contingency fee basis. Despite Class Counsel's enormous and ongoing effort in litigating before this Court for two years, Class Counsel remains completely uncompensated for the millions of dollars of time invested. Joint Decl. ¶ 107. Uncompensated expenditures of this magnitude can severely damage or even destroy law firms. There can be no reasonable dispute that the Action entailed substantial risk of nonpayment and resulting financial catastrophe.

Furthermore, the time spent on the Action was time that could not be spent on other matters. Joint Decl. ¶ 108. This factor thus strongly militates in favor of the requested fee.

**5.      Class Counsel Achieved an Excellent Result.**

The Settlement is outstanding. Instead of facing additional years of costly and uncertain litigation, millions of Settlement Class Members will receive an immediate benefit from a large

settlement fund of $410 million.  The Settlement represents an exceptional achievement by any

measure.  As Professor Silver puts it:

> Yet, instead of performing as expected, class counsel over-achieved.  They took a novel
> case with difficult legal merits of a type that other lawyers had previously settled for
> moderate amounts and turned it into a landmark recovery.

Decl. of Prof. Charles Silver (Ex. K) at 3.

### 6.    The Requested Fee Comports with Customary Fees Awarded in Similar Cases.

The fee requested here matches the fee typically awarded in similar cases.  As legions of

decisions have recognized, a fee award of 30 percent of a common fund is well within the range

of a customary fee.  *See, e.g.*, *In re Sunbeam*, 176 F. Supp. 2d at 1333-34.  Numerous recent

decisions within this Circuit have awarded attorneys' fees up to (and at times in excess of) 30

percent, which confirms the fairness and reasonableness of the fee requested here.  As another

member of this Court observed, "federal district courts across the country have, in the class

action settlement context, routinely awarded class counsel fees in excess of the 25 percent

'benchmark,' even in so-called 'mega-fund' cases."[6]  *Allapattah Servs., Inc. v. Exxon Corp.*, 454

F. Supp. 2d 1185, 1210 (S.D. Fla. 2006) (awarding fees equaling 31⅓ percent of settlement of

over  $1 billion including interest; citing *inter alia*, *In re Relafen Antitrust Litig.*, No. 01-12239-

WGY (D. Mass. Apr. 9, 2004) (33⅓ percent); *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403

(S.D. Tex. 1999) (35.1 percent)); *see also Gaskill v. Gordon*, 942 F. Supp. 382, 387-88 (N.D. Ill.

1996), *aff'd*, 160 F.3d 361 (7th Cir. 1998) (finding that 33 percent is the norm, but awarding 38

percent of the settlement fund); *In re Combustion, Inc.*, 968 F. Supp. 1116 (W.D. La. 1997) (36

---

[6] *See* 1 *Court Awarded Attorney Fees*, ¶ 2.06[3], at 2-88 (Matthew Bender 2010) (noting that, "when appropriate circumstances have been identified, a court may award a percentage significantly higher" than 25 percent); 4 *Newberg on Class Actions*, § 14:6, at 551 (4th ed. 2002) ("Empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in class actions average around one-third of the recovery.").

percent); *In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320, 326 (E.D.N.Y. 1993) (33.8 percent); *In re Ampicillin Antitrust Litig.*, 526 F. Supp. 494, 498 (D.D.C. 1981) (45 percent); *Beech Cinema, Inc. v. Twentieth-Century Fox Film Corp.*, 480 F. Supp. 1195, 1199 (S.D.N.Y. 1979), *aff'd*, 622 F.2d 1106 (2d Cir. 1980) (approximately 53 percent); *Zinman v. Avemco Corp.*, 1978 WL 5686 (E.D. Pa. Jan. 18, 1978) (Higginbotham, J.) (50 percent)).

Class Counsel's fee request falls at the low end of the average in the private marketplace, where contingency fee arrangements often approach or equal 40 percent of any recovery. *See* Decl. of Prof. Charles Silver (Ex. K) at 20 ("contingent percentage fees of 33-40 percent are common in mass action and . . . higher fees often prevail"); Decl. of Thomas E. Scott (Ex. I) at 7 ("In contingency cases such as this one, the fees agreed between client and counsel normally range between twenty-five (25%) and forty (40%) percent."); *see, e.g.*, *In re Continental Illinois Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992) ("The object in awarding a reasonable attorneys' fee . . . is to simulate the market."); *RJR Nabisco, Inc. Sec. Litig.*, Fed. Sec. L. Rep. (CCH) ¶ 94,268 (S.D.N.Y. 1992) ("what should govern [fee] awards is . . . what the market pays in similar cases . . . ."); *see also Kirchoff v. Flynn,* 786 F.2d 320, 325 (7th Cir. 1986) ("When the 'prevailing' method of compensating lawyers for 'similar services' is the contingent fee, then the contingent fee is the 'market rate.'") (emphasis in original)  And, "[i]n tort suits, an attorney might receive one-third of whatever amount the Plaintiff recovers.  In those cases, therefore, the fee is directly proportional to the recovery." *Blum v. Stenson*, 465 U.S. 886, 904 (1984) (Brennan, J., concurring); *see also Kirchoff*, 786 F.2d at 323, 325 n.5 (observing that "40 percent is the customary fee in tort litigation"); *In re Public Service Co. of New Mexico*, 1992 WL 278452, at *7 (S.D. Cal. July 28, 1992) ("If this were a non-representative litigation, the

customary fee arrangement would be contingent, on a percentage basis, and in the range of 30%

to 40% of the recovery.").[7]

The record here establishes that Class Counsel's fee request is justified and comports

with those in similar cases.  As Professor Samuel Issacharoff notes:

> [T]his is an extraordinary recovery for the class.  Settlements in excess of $100
> million are generally categorized as megafund cases, and there have been
> relatively few of these.  The proposed settlement of $410 million makes this
> among the 25 largest class action settlements and certainly one of the top handful
> for consumer cases.

Decl. of Prof. Samuel Issacharoff (Ex. F) at 4.  Professor Miller observes, "A fee award of 30%

is consistent with the results of several studies that provide information about fee awards as

percentages of the recovery in class action cases."  Decl. of Prof. Geoffrey Miller (Ex. H) at 16;

*see also id.* at 16-23 (citing studies).  Similarly, Professor Fitzpatrick observes that of the 35

class actions in district courts in the Eleventh Circuit in which fees were awarded in 2006 and

2007, "[t]he average fee awarded in these cases was 28.1% and the median fee awarded was

30%. . . These numbers are obviously very much in line with the award requested here."  Decl.

of Prof. Brian T. Fitzpatrick (Ex. J) at 14.

The requested fee falls squarely within the range of awards made in numerous cases

brought in this Circuit and District.  *See, e.g.*, *Waters v. Int'l Precious Metals Corp.*, 190 F.3d

1291 (11th Cir. 1999), *cert. denied*, 530 U.S. 1289 (2000) (affirming fee award of 33⅓ percent

on settlement of $40 million even though most of the fund ultimately reverted to the defendant);

*In re Managed Care Litig. v. Aetna*, MDL No. 1334, 2003 WL 22850070 (S.D. Fla. Oct. 24,

2003) (35.5 percent including costs on settlement of $100 million); *Gutter v. E.I. Dupont De*

---

[7] National Economic Research Associates, an economic consulting firm that has conducted a
survey of fee awards in class actions, has found that "[r]egardless of the case size, fees average
approximately 32 percent of the settlement."  Denise N. Martin, *et al.*, *Recent Trends IV: What
Explains Filings and Settlements in Shareholder Class Actions?* at 12-13 (NERA Nov. 1996).

*Nemours & Co.*, 95-2152-CIV-Gold (S.D. Fla. May 30, 2003) (33⅓ percent on settlement of

$77.5 million); *In re Terazosin Hydrochloride Antitrust Litig.*, 99-1317-MDL-Seitz (S.D. Fla.

Apr. 19, 2005) (33⅓ percent on settlement of over $30 million); *Sands Point Partners, LP v.*

*Pediatrix Med. Group, Inc.*, 2002 U.S. Dist. Lexis 25721 (S.D. Fla. 2002) (30 percent on

settlement of $12 million); *In re CHS Elecs., Inc. Sec. Litig.*, 99-8186-CIV-Gold (S.D. Fla. 2002)

(30 percent on settlement of over $11 million); *Ehrenreich v. Sensormatic Elecs. Corp.*, 95-

6637-CIV-Zloch (S.D. Fla. 1998) (30 percent on settlement of over $44 million); *Tapken v.*

*Brown*, 90-0691-CIV-Marcus (S.D. Fla. 1995) (33 percent on settlement of $10 million).[8]

### 7.    The Remaining *Camden I* Factors Also Favor Approving Class Counsel's Fee Request.

The remaining *Camden I* factors likewise support granting our fee request.  As noted, the

burdens of this litigation have precluded our pursuit of other cases.  Joint Decl. ¶ 108.  The

relatively small size of most of the firms representing Plaintiffs, and the major commitment

involved in accepting this representation, prevented our firms from working on other matters and

accepting other representations.  Joint Decl. ¶ 111.  In addition, our fee request is firmly rooted

in "the economics involved in prosecuting a class action."  *See In re Sunbeam*, 176 F. Supp. 2d at

---

[8] *See also In re Friedman's, Inc. Sec. Litig.*, No. 1:03-cv-3475-WSD, 2009 WL 1456698 (N.D. Ga. May 22, 2009) (30 percent); *Francisco v. Numismatic Guar. Corp. of Am.*, No. 06-61677-CIV-Martinez, 2008 WL 649124 (S.D. Fla. 2008) (30 percent); *Pinto v. Princess Cruise Lines, Ltd.*, 513 F. Supp. 2d 1334 (S.D. Fla. 2007) (30 percent); *In re BellSouth Corp. Sec. Litig.*, Civil Action No. 1:02-cv-2142-WSD (N.D. Ga. Apr. 9, 2007) (30 percent); *In re Cryolife, Inc. Sec. Litig.*, Civil Action No. 1:02-cv-1868-BBM (N.D. Ga. Nov. 9, 2005) (Martin, J.) (30 percent); *In re Profit Recovery Group Int'l, Inc. Sec. Litig.*, Civil Action No. 1:00-cv-1416-CC (N.D. Ga. May 26, 2005) (33⅓ percent plus interest and expenses); *In re Clarus Corp. Sec. Litig.*, Civil Action No. 1:00-CV-2841-CAP (N.D. Ga. Jan. 6, 2005) (33⅓ percent); *In re Pediatric Servs. of Am., Inc. Sec. Litig.*, Civil Action No. 1:99-CV-0670-RLV (N.D. Ga. Mar. 15, 2002) (33⅓ percent); *In re Int'l Recovery Corp. Sec. Litig.*, Case No. 92-1474-CIV (S.D. Fla. 1994) (30 percent); *In re Sound Advice, Inc. Sec. Litig.*, Case No. 92-6457 (S.D. Fla. 1994) (30 percent); *In re Belmac Corp. Sec. Litig.*, Case No. 92-1814-CIV-T-23-(C) (M.D. Fla. 1994) (31 percent); *Holloway v. Chapnick*, Consol. Case No. 89-6572-CIV-Paine (S.D. Fla. 1994) (30 percent); *Kaser v. Swann*, Case No. 90-607-CIV-Orl-3A18 (M.D. Fla. 1993) (30 percent); *Ressler v. Jacobson*, 149 F.R.D. 651 (M.D. Fla. 1992) (30 percent); *In re Home Shopping Network Sec. Litig.*, Case No. 87-428-T-13(A) (M.D. Fla. 1991) (33 percent).

1333.  Without adequate compensation and financial reward, cases such as this simply could not be pursued.

## IV.    CONCLUSION

The Settlement securing $410 million in immediate compensation for the Settlement Class constitutes an outstanding result by any measure.   The Settlement easily satisfies the fairness and reasonableness standard embodied in Rule 23(e), as well as the class certification requirements of Rules 23(a) and (b)(3).  Further, Class Counsel's fee request is reasonable under the circumstances of this case.   The request satisfies the guidelines of *Camden I* given the outstanding result, the considerable risks of litigation, the extremely complicated nature of the factual and legal issues, and the time, effort and skill required to litigate claims of this nature to a satisfactory conclusion.

Accordingly, Plaintiffs and Class Counsel respectfully request that this Court (1) approve the Settlement; (2) certify for settlement purposes the Settlement Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(3), and 23(e); (3) appoint as Plaintiffs Richard Blair; David Brull; Jonathan Bylin; Marco Chelo; Robert Conroy; Joshua DiFrances; Carolyn Gipson; David Hanny; Haneef Haqq; Joi Holloway; Stephen and Esther James; John and Anya Kopp; Deborah and Therese Marshall; Jason Molitor; Laura Morland; Bruce and Maria Mosley; Nelson Norman; Ronald and Dawyn Palmer; William Powell; Kristin Richards; Alvin Richardson; Caroline Sherman; Ralph Tornes; Elona Wagner; Kelly Weatherspoon; William Werking; and Steve Yourke as Class Representatives; (4) appoint as Class Counsel and Settlement Class Counsel the attorneys and law firms listed in paragraphs 15 and 42 of the Agreement, respectively; (5) approve the requested service awards to the Class Representatives; (6) award Class Counsel attorneys' fees; and (7) enter Final Judgment dismissing the Action with prejudice.

Dated: September 16, 2011.

Respectfully submitted,

/s/ Aaron S. Podhurst
Aaron S. Podhurst, Esquire
Florida Bar No. 063606
apodhurst@podhurst.com
Robert C. Josefsberg, Esquire
Florida Bar No. 40856
rjosefsberg@podhurst.com
Peter Prieto, Esquire
Florida Bar No. 501492
pprieto@podhurst.com
Stephen F. Rosenthal, Esquire
Florida Bar No. 0131458
srosenthal@podhurst.com
John Gravante, III, Esquire
Florida Bar No. 617113
jgravante@podhurst.com
PODHURST ORSECK, P.A.
City National Bank Building
25 W. Flagler Street, Suite 800
Miami, FL 33130-1780
Tel: 305-358-2800
Fax: 305-358-2382

/s/ Bruce S. Rogow
Bruce S. Rogow, Esquire
Florida Bar No. 067999
brogow@rogowlaw.com
Jeremy W. Alters, Esquire
Florida Bar No. 0111790
jeremy@alterslaw.com
ALTERS LAW FIRM, P.A.
4141 N.E. 2nd Avenue
Suite 201
Miami, FL 33137
Tel: 305-571-8550
Fax: 305-571-8558

*Co-Lead Counsel for Plaintiffs*

/s/ Robert C. Gilbert
Robert C. Gilbert, Esquire
Florida Bar No. 561861
rcg@grossmanroth.com
Stuart Z. Grossman, Esquire
Florida Bar No. 156113
szg@grossmanroth.com
David Buckner, Esquire
Florida Bar No. 60550
dbu@grossmanroth.com
Seth E. Miles, Esquire
Florida Bar No. 385530
sem@grossmanroth.com
GROSSMAN ROTH, P.A.
2525 Ponce de Leon Boulevard
Eleventh Floor
Coral Gables, FL 33134
Tel: 305-442-8666
Fax: 305-779-9596

*Coordinating Counsel for Plaintiffs*

- 51 -

/s/ E. Adam Webb
E. Adam Webb, Esquire
Georgia Bar No. 743910
Adam@WebbLLC.com
Matthew C. Klase, Esquire
Georgia Bar No. 141903
Matt@WebbLLC.com
G. Franklin Lemond, Jr., Esquire
Georgia Bar No. 141315
FLemond@WebbLLC.com
WEBB, KLASE & LEMOND, L.L.C.
1900 The Exchange, S.E.
Suite 480
Atlanta, GA 30339
Tel: 770-444-9325
Fax: 770-444-0271

/s/ Michael W. Sobol
Michael W. Sobol, Esquire
California Bar No. 194857
msobol@lchb.com
Roger N. Heller, Esquire
California Bar No. 215348
rheller@lchb.com
Jordan Elias, Esquire
California Bar No. 228731
jelias@lchb.com
LIEFF CABRASER HEIMANN &
  BERNSTEIN L.L.P.
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
Tel: 415-956-1000
Fax: 415-956-1008

/s/ Russell W. Budd
Russell W. Budd, Esquire
Texas Bar No. 03312400
rbudd@baronbudd.com
Bruce W. Steckler, Esquire
Texas Bar No. 00785039
bsteckler@baronbudd.com
Mazin A. Sbaiti, Esquire
Texas Bar No. 24058096
msbaiti@baronbudd.com
BARON & BUDD, P.C.
3102 Oak Lawn Avenue
Suite 1100
Dallas, TX 75219
Tel: 214-521-3605
Fax: 214-520-1181

/s/ David S. Stellings
David S. Stellings, Esquire
New York Bar No. 2635282
dstellings@lchb.com
LIEFF CABRASER HEIMANN &
  BERNSTEIN L.L.P.
250 Hudson Street
8th Floor
New York, NY  10013
Tel: 212-355-9500
Fax: 212-355-9592

/s/ Ruben Honik
Ruben Honik, Esquire
Pennsylvania Bar No. 33109
rhonik@golombhonik.com
Kenneth J. Grunfeld, Esquire
Pennsylvania Bar No. 84121
kgrunfeld@golombhonik.com
GOLOMB & HONIK, P.C.
1515 Market Street
Suite 1100
Philadelphia, PA 19102
Tel: 215-985-9177
Fax: 215-985-4169

/s/ Ted E. Trief
Ted E. Trief, Esquire
New York Bar No. 1476662
ttrief@triefandolk.com
Barbara E. Olk, Esquire
New  York Bar No. 1459643
bolk@triefandolk.com
TRIEF & OLK
150 E. 58th Street
34th Floor
New York, NY 10155
Tel: 212-486-6060
Fax: 212-317-2946

*Plaintiffs' Executive Committee*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 09-MD-02036-JLK

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Robert C. Gilbert
Robert C. Gilbert, Esquire
Florida Bar No. 561861
GROSSMAN ROTH, P.A.
2525 Ponce de Leon Boulevard
Eleventh Floor
Coral Gables, FL 33134
Tel: 305-442-8666
Fax: 305-779-9596

- 54 -