# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## Case No. 1:09-MD-02036-JLK

| | |
|---|---|
| IN RE:  CHECKING ACCOUNT OVERDRAFT LITIGATION | ) ) ) ) |
| MDL No. 2036 | ) ) |
| THIS DOCUMENT RELATES TO: FIRST TRANCHE ACTIONS | ) ) ) ) |
| *Tornes, et al. v. Bank of America, N.A.* S.D. Fla. Case No. 1:08-cv-23323-JLK | ) ) ) |
| *Yourke, et al. v. Bank of America, N.A.* S.D. Fla. Case No. 1:09-cv-21963-JLK N.D. Cal. Case No. 3:09-2186 | ) ) ) ) |

## OBJECTIONS OF RICHARD HASTINGS AND JANEL BUYCKS TO FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND CLASS COUNSEL'S APPLICATION FOR ATTORNEYS' FEES

I.        **INTRODUCTION AND SUMMARY OF ARGUMENT**

The proposed $410 million settlement with Bank of America, while large in the abstract, is only 9% of the over $4.5 billion in damages sustained by the class as a result of Bank of America's practice of "debit re-sequencing."  Unfortunately, no one who received and read the class notice would gain any understanding of this fundamental fact.  Instead of being told that they will receive a refund of less than one illegitimate overdraft charge for every ten they paid, class members were told —*falsely*—that the amount of their anticipated refund "cannot be determined at this time."  In fact, Plaintiffs' expert was able to determine the identities of the class members (*i.e.*, those who suffered damages due to debit re-sequencing), to whom the class notice was sent, only by *also* determining the amount to which each of them would be entitled under the proposed settlement—an average of only $29.71 (before deduction of attorneys' fees and costs) — less than the amount of a single overdraft charge.  The relative absence of objections is a result of the deficient—indeed, misleading—class notice.

Objectors' counsel—formerly a member of the Plaintiffs' Executive Committee—is no stranger to this litigation, and led the preparation and presentation of the damages case in the companion case of *Gutierrez v. Wells Fargo*, tried to a $203 million judgment last year.  Prior to trial—and Objectors' counsel's involvement—Judge Alsup publicly ridiculed a proposed settlement for 8% of the damages estimated by plaintiffs' expert, and strongly indicated on the record that he would accept nothing less than fifty cents on the dollar, given the strength of plaintiffs' case.

The Plaintiffs' Executive Committee has itself formally objected to two separate settlements of overlapping claims—one with Fifth Third Bank, for 10% of class members' estimated damages, and another with National City Bank, for between 10% and 26% of class members' estimated damages—as grossly insufficient.  Yet Class Counsel ask *this* Court to approve a *lesser* settlement, for a mere 9% of class members' damages, as "fair, reasonable and adequate."

Class Counsel attempt to transform an inadequate, 9% settlement into a respectable 45%, arguing that the overlapping *Closson* settlement, if upheld, would eliminate 80% of the class' damages.  Class Counsel provide no explanation of how they calculated this "*Closson* discount," but even if accurate, it cannot be used to discount the claims of class members who are not also members of the *Closson* class because they did not open their Bank of America checking accounts until *after* the end of the *Closson* class period, December 31, 2007.  Apparently, this constitutes approximately 20% of the 13.8 million member settlement class.

Class Counsel overstate the remaining obstacles to securing a class judgment against BofA.  With respect to class certification, nothing of consequence distinguishes the two *Bank of America* cases from the *Union Bank* case, which the Court has already certified for trial.  Class Counsel argue that *Concepcion* and its progeny, *Cruz*, may be used to force class members into individual arbitrations, but neglect to mention that BofA affirmatively *waived* arbitration of all consumer disputes over two years ago.  Plaintiffs also fear the resurrection of the banks' preemption arguments, which have already died a thousand deaths.

The completion of a damages analysis specific to each class member, endorsed by Bank of America itself, removes the greatest remaining obstacle to a class trial, in which the class will likely recoup damages of over $4.5 billion, if they recoup anything at all.  That trial will be to the Court, without a jury, as provided for in BofA's account agreements, and, with respect to *Yourke*, as required by California law.  The proposed settlement should be disapproved, and BofA put to the choice of paying fair compensation, or facing a class trial.

## II.   OBJECTORS AND THEIR COUNSEL

### A.   Richard Hastings

Richard Hastings is an 80-year old resident of Sarasota, Florida.[1]  Mr. Hastings opened checking account number xxxx-xxxx-5467 at a Bank of America branch in Sarasota, Florida in

---

[1] Paragraph 62 of the Settlement Agreement purports to require Objectors to state their "full name, address and telephone number."  However, Section 6A of the Court's CM/ECF Administrative Procedures requires, *inter alia*, that "the personal identifiers noted below must be redacted to show **only** the following:  . . . **home address**: city and state only," while Section 6B

October 2006.  Mr. Hastings was charged a total of $19 in overdraft fees on debit card charges in 2006, and approximately $840 in 2007, $735 in 2008, $980 in 2009, and $840 in 2010, for a total of approximately $3,414.  A number of these overdraft fees were the result of BofA's practice of Debit Re-sequencing (as defined in paragraph 21 of the Settlement Agreement).  (*See, e.g*., Exh. A.)  Accordingly, Mr. Hastings is a member of the Settlement Class.[2]

### B. Janel Buycks

Janel Buycks is a resident of Los Angeles, California.  Ms. Buycks received a postcard notice of the settlement.  (*See* Exh. B.).  Accordingly, Ms. Buycks is a member of the Settlement Class.[3]

Ms. Buycks opened checking account number xxxxx-x7338 at a Bank of America branch in El Segundo, California in April 2008.  (*See* Exh. C.)  Ms. Buycks opened checking account number xxxxx-x2284 at the same branch in February 2009.  On these accounts, Ms. Buycks was charged a total of approximately $735 in overdraft fees on debit card charges in 2008, $1,155 in 2009, and $210 in 2010, for a total of approximately $2,100.

### C. Objectors' Counsel

Objector's counsel, Barry Himmelstein, was appointed by the Court to the Plaintiffs' Executive Committee at the initial status conference in this multidistrict litigation proceeding.[4]  (*See* Transcript of Aug. 26, 2009 Status Conference (Dkt. No. 169) at 43:4-44:12.)  In that capacity, Mr. Himmelstein drafted the Committee's objections, on behalf of plaintiffs with overlapping cases ("MDL Objectors"), to the preliminary approval of a proposed class action

---

cautions that "[i]t is the **sole responsibility of counsel and the parties** to ensure the redaction of personal identifiers."  (Emphasis in original.)  Objectors respectfully decline to place their home telephone numbers in the public, internet-accessible record.

[2] (*See* Affidavit of Joel Botzet With Respect to the Notice Program (Dkt. No. 1885-4), Exh. B ("Class Notice"), § 6 ("You are a member of the Settlement Class if you: . . . were charged one or more overdraft fees as a result of Bank of America's practice of posting debit card transactions from highest to lowest dollar amount.").)

[3] (*See id*., ¶¶ 6-8 ("A Settlement Class Member List was generated by Class Counsel's expert, using data maintained by Bank of America and applying the formula and calculation specified in the Settlement Agreement."); Class Notice, § 5 ("If you received notice of the Settlement by a postcard addressed to you, then you are a Settlement Class Member").)

[4] Mr. Himmelstein was admitted *pro hac vice* on Dec. 7, 2009.  (*See* Dkt. No. 187, at 5.)

settlement of nearly identical "overdraft" claims asserted against Fifth Third Bank in *Schulte v. Fifth Third Bank*, Case No. 1:09-CV-06655 (N.D. Ill.) ("*Fifth Third*"). The principal objections made by MDL Objectors in *Fifth Third* are equally applicable to the settlement proffered here.

Specifically, in June 2010, MDL Objectors complained that:

> The Court cannot determine whether the proposed settlement is adequate, because the parties have not presented any estimate of class member damages. The proposed plan of allocation is inequitable and unfair, in that it would give many class members a windfall while leaving others undercompensated. The settlement was negotiated with insufficient discovery to enable Plaintiffs' counsel to determine the settlement value of the class' claims. For all these reasons, the proposed settlement is not deserving of preliminary approval, which should be denied.

(Objections of Michelle Keyes, Amanda Ratliff, and Verdel Ratliff to Plaintiff's Motion for Preliminary Approval of Proposed Class Action Settlement (Exh. D), at 1.)

In September 2010, the Court granted the motion for preliminary approval, but cautioned the parties that:

> The "most important factor relevant to the fairness of a class action settlement" is the "strength of plaintiff's case on the merits balanced against the amount offered in the settlement." *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006). In conducting this analysis, the district court should begin by "quantify[ing] the net expected value of continued litigation to the class." *Reynolds*, 288 F.3d at 284-85. . . . In essence, a court must weigh the value of the proposed settlement against the total amount that the class could recover, discounted by the weaknesses and risks inherent in the class' claims.

> . . . [T]he Objectors correctly observe that the parties have not provided the Court with information regarding the likely "return to the class of continued litigation." *Sutton*, 2002 WL at 1794048, *1. . . . *The Court cautions the parties that it cannot grant final approval unless the parties present evidence that would enable the Court to determine the potential value of Class Members' claims.*

Opinion and Order of Preliminary Approval (Exh. E) (citing *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277 (7th Cir. 2002), and *Sutton v. Bernard*, 2002 WL 1794048 (N.D. Ill. Aug. 5, 2002)) (other citations omitted, emphasis added).

On February 23, 2011, MDL Objectors reiterated their objections—this time in opposition to *final* approval of the *Fifth Third* settlement—arguing that "[t]he inadequacy of the proposed settlement has become even clearer . . . since the Court ruled on preliminary approval," citing the intervening "agreement in principle" to settle similar claims against Bank of America

for $410 million, which MDL Objectors assured the Court would "dwarf the $9.5 million settlement amount proposed here (even after accounting for differences between the banks' relative sizes) . . . ."  (Objections of Michelle Keyes, Amanda Ratliff and Verdel Ratliff to Final Approval of Class Action Settlement (Exh. G), at 2-3.)[5]

MDL Objectors joined Judge Alsup in ridiculing a proposed settlement of similar claims for a mere 8% of class members' estimated damages, endorsing his view that nothing less than "fifty cents on the dollar" was sufficient to merit approval:

> Even before Judge Alsup issued the $203 million restitution award in *Gutierrez*, . . . Judge Alsup refused to grant preliminary approval of a proposed settlement of $16 million for Wells Fargo's California account holders, finding that "16 million is very low for a case where your expert said the damages were 200 million;" that plaintiffs had "a strong claim, not a weak claim;" that the proposed settlement was not "in the ballpark and even close to a reasonable settlement," calling it "a nonstarter in my judgment;" and strongly indicating that he would not consider approving any settlement that provided class members with a recovery of less than fifty cents on the dollar.

(*Id.* at 5-6.)

*Fifth Third* class counsel did not obtain the data necessary to make a reliable estimate of class members' damages until "confirmatory discovery," *i.e.*, *after* they had already agreed to release class members' claims for $9.5 million.  (*See* Representative Plaintiffs' Motion for, and Memorandum In Support of, Final Approval of Class Action Settlement (Exh. H), at at 7.)  MDL Objectors excoriated this practice:

> [C]lass counsel failed to . . . perform any reliable, independent analysis of the potential class damages in this case.  In fact, there is no evidence that any analysis was performed prior to entering into the settlement.  Under these circumstances, the Court cannot sufficiently evaluate the adequacy of the proposed settlement, and final approval is not appropriate.  *See Reynolds v. Beneficial Nat'l Bank*, 238 F.3d 277, 280-285 (7th Cir. 2002) (Seventh Circuit criticized approval of class settlement where reliable damages estimate was lacking and warning of "the practice whereby the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with in the hope that the district court will approve a weak settlement that will preclude other claims against the

---

[5] In August 2010, MDL Objectors submitted a copy of Judge Alsup's Findings of Fact and Conclusions of Law in *Gutierrez v. Wells Fargo Bank*, Case No. C07-05923 WHA (N.D. Cal.) in further support of their objections.  (*See* Notice of Recent Development Supporting Objections of Michelle Keyes, Amanda Ratliff, and Verdel Ratliff to Plaintiff's Motion for Preliminary Approval of Proposed Class Action Settlement (Exh. F).)

defendant."); *Reynolds v. Beneficial Nat'l Bank*, 260 F. Supp. 2d 680 (N.D. Ill. 2003) (declining to approve settlement on remand and disqualifying class counsel because they attempted to settle case without first undertaking sufficient discovery to estimate class damages); *In re Microsoft Antitrust Litig.*, 185 F. Supp. 2d 519, 526-527 (D. Md. 2002) (declining to grant preliminary approval to proposed class action settlement where the record contained insufficient "information by which to . . . reach a conclusion as to a reasonable range of value").

(*Id*. at 3-4.)

Responding to these objections,[6] *Fifth Third* class counsel disclosed that their expert "estimates that during the Class Period, Fifth Third charged approximately $97.7 million in overdraft fee charges as a result of its re-sequencing of Fifth Third Debit Card Transactions." (Exh. H, at 8.)  (*See also* Memorandum Opinion and Order (Exh. K), at 9.)  In support of final approval, defendant Fifth Third Bank submitted its own damage calculation, $95.3 million.  (*Id*. at 12-13.)

The Court approved the settlement, noting that it "represents approximately 10% of the $96.5 million that is the class's maximum potential recovery" (*i.e.*, the midpoint of the two damage estimates), and that single-digit percentage recoveries were not unprecedented.  (*Id*. at 33-34.)  MDL Objectors have appealed from the *Fifth Third* Court's judgment and order approving the settlement.  (*See* Notice of Appeal (Ex. L).)

Objectors' counsel, Freidin Dobrinsky, have not objected to any class action settlement within the last five years.

## III.    THE PROPOSED *BANK OF AMERICA* SETTLEMENT

On January 27, 2011, Class Counsel executed a Memorandum of Understanding providing for a "complete release of all claims brought against Bank of America in this

---

[6] Shortly after filing their objections, MDL Objectors were served by *Fifth Third* class counsel with deposition notices and subpoenas *duces tecum*.  MDL Objectors moved for a protective order on the grounds that such discovery "would serve only to oppress and harass the Objectors and clutter the record with irrelevant material."  (Joint Motion by Settlement Class Members Laura Kannapel, Michelle Keyes, Amanda Ratliff, and Verdel Ratliff for Protective Order Precluding Depositions and Production of Subpoenaed Documents (Exh. I), at 8.)  The Court issued the protective order.  (*See* Protective Order Precluding Depositions and Production of Subpoenaed Documents By Settlement Class Members Laura Kannapel, Michelle Keyes, Amanda Ratliff, and Verdel Ratliff (Exh. J).)  Hopefully, the Executive Committee will resist the temptation to engage in similar shenanigans in this case.

multidistrict litigation" for $410 million.  (*See* Notice of Settlement (Dkt. No. 1135).)  Class Counsel did not begin obtaining the transactional data from Bank of America necessary for their expert, Arthur Olsen, to calculate class members' damages until February 2011—*after* the settlement was negotiated and announced.  (*See* Declaration of Arthur Olsen in Support of Final Approval of Class Action Settlement With Bank of America, N.A. (Dkt. No. 1885-6), ¶ 20 ("During the time period of February 2011, through March 2011, BOA employees began pulling the data that was eventually utilized in order to perform the final analysis.")  This exercise was not complete until, at the earliest, June 2011.  (*See id.*, ¶ 21 (data analysis took place "[f]rom April 2011 through June 2011").)

In contrast to his detailed report in *Gutierrez*,[7] Mr. Olsen's report in support of the proposed settlement contains *no estimate whatsoever of class members' damages*, and provides only a single useful figure:  "I identified 13.8 million accounts demonstrating the 'harm' resulting from BOA's debit card re-sequencing."  (*Id.*, ¶ 35.)  If the settlement is approved, class members will receive an average of $29.71 each[8] ($20.79 minus costs of settlement administration, if the requested 30% attorneys' fees are awarded), *less than the amount of a single $35 overdraft charge.*  This supposed "home run" does not even make it to first base.

Counsel for Objectors have carefully scoured Plaintiffs' motions for preliminary approval (Dkt. No. 1471) and final approval (Dkt. No. 1885), and each of the supporting papers, searching

---

[7] After Judge Alsup found the original damages study proferred by class counsel in *Gutierrez* inadequate, Objector's counsel was placed in charge of working with Mr. Olsen to prepare a proper damages study, a copy of which is attached as Exhibit M.  Objector's counsel led that effort from start to finish; defended Mr. Olsen's deposition; took the depositions of Wells Fargo's opposing experts; drafted, argued, and prevailed on the related *Daubert* motions; presented Mr. Olsen's testimony at trial; and cross-examined Wells Fargo's opposing experts. *See Gutierrez v. Wells Fargo & Co.*, No. C 07-05923 WHA, 2009 WL 1247040, *1-*6 (N.D. Cal. May 5, 2009) (threatening to decertify class due to inadequate class damages study); *Gutierrez v. Wells Fargo & Co.*, No. C 07-05923 WHA, 2010 WL 1233810, *1 (N.D. Cal. Mar. 26, 2010) (rejecting Wells Fargo's challenges to new damages study; prior order "found plaintiffs' damages study underlying the class-wide claims to be woefully inadequate"); *Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080, 1138 (N.D. Cal. Aug. 10, 2010) ("after much work and time--this order finds that Expert Olsen has done a professional and careful job in laying out the impacts of various alternative posting protocols").
[8] $410 million divided by 13.8 million equals $29.71.

for an estimate of the total excess overdraft charges imposed on these 13.8 million class member accounts. It is nowhere to be found, but Plaintiffs provide sufficient information to "reverse engineer" an approximate damages calculation:

> Based on a review of the *Closson* settlement release and an analysis of the data made available by BofA, Settlement Class Counsel estimate that if it were enforceable, the *Closson* settlement would release up to *80 percent* of the value of Settlement Class Members' claims in the Action.
>
> * * *
>
> Under the Settlement, Plaintiffs and the Settlement Class have recovered $410 million, which represents between forty-five percent (45%) and nine percent (9%) of their anticipated total recovery, depending on how the *Closson* appeal was resolved . . . .

(Plaintiffs' Motion for Final Approval of Settlement (Dkt. No. 1885) at 12, 26-27 (emphasis in original).)

No computation or explanation is provided for either the "*80 percent*" or 9% figures (the 45% figure being merely a product of the other two). The above quotations are simply repeated verbatim at paragraphs 28 and 68 of the Joint Declaration of Robert C. Gilbert and Michael W. Sobol in Support of Plaintiffs' Motion for Final Approval of Settlement (Dkt. No. 1885-3). Neither figure appears anywhere in Mr. Olsen's report, although his finding of a 20% "upward trend in damage totals from year to year" (Dkt. No. 1885-6, ¶ 5) may well bear on the accuracy and reliability of Class Counsel's "back-of-the-envelope," 80% calculation.

As Class Counsel have not put the actual damages calculated by their expert before the Court, Objectors proffer their own, "back-of-the-envelope" calculation: if 9% of the total damages = $410 million, then the total damages = $410 million/.09, which equals *$4.55 billion*.

## IV. THE CLASS NOTICE IS MISLEADING, AND WITHHOLDS FROM CLASS MEMBERS THE MOST IMPORTANT INFORMATION CONCERNING THE PROPOSED SETTLEMENT

To absent class members, the most important part of any class notice is the part that tells them how much they will receive if the settlement is approved. Without that information, they are unable to make an intelligent decision among the several options presented: remain in the class, exclude themselves, or object to the proposed settlement. (*See* Class Notice, at 1

(highlighting options).)  Providing each class member with the information necessary to make this informed decision is no mere procedural nicety; it is the primary purpose of *any* class notice.

Class Counsel report that the parties have "identif[ied] all Settlement Class Members who had Accounts during [the class] period, and . . . calculate[d] the amount of the distribution from the Settlement Fund to which each is entitled under the Settlement."  (Joint Declaration, ¶ 18.)  This work was completed *before* the class notice was distributed.  Indeed, the 13.8 million Settlement Class Members to whom the notice was mailed were identified by having Plaintiffs' expert quantify their individual damages.  (*See id*., ¶ 24; Declaration of Arthur Olsen, ¶ 35.)

Rather than informing Settlement Class Members of "the amount of the distribution from the Settlement Fund to which each is entitled under the Settlement," which had *already been calculated*, the class notice gives them only the following, *false* information:

> **What does the Settlement provide?**
> Bank of America has agreed to establish a Settlement Fund of $410 million from which identifiable Settlement Class Members may receive payments or account credits.  *The amount of such payments or account credits cannot be determined at this time.*  However, it will be based on the number of people in the Settlement Class and the amount of additional overdraft fees each Settlement Class Member paid as a result of Bank of America's posting order.

(Class Notice, § 7) (italics added).

There are undoubtedly cases where individual class member recoveries cannot be determined in advance—chiefly, where there is a claims process, and neither the number or value of claims are yet known.  In such cases, one variable in the equation—the amount paid by the settling defendant—is known, but the other two variables—the total value of all claims, and the value of each class member's claim in relation to that total—are not.[9]  This is the antithesis of such a case.[10]

---

[9] (*See* Settlement Agreement, ¶¶ 84-85 (individual payout equals "the total amount of all Settlement Class Members' Positive Differential Overdraft Fees," divided by "the total amount of the Net Settlement Fund," multiplied by "each Settlement Class Member's total Positive Differential Overdraft Fees.").)  This is a typical formula for the division of a common fund among successful claimants in proportion to their relative damages.
[10] Indeed, Class Counsel trumpet the *absence* of a claims process as one of the principal virtues of the proposed settlement.  (*See* Motion for Final Approval, at 27.)

There is simply no excuse for leading Class Members down the garden path, and pointing obliquely to a $410 million pot, while withholding from them their individual shares which have already been calculated, and which will average a mere $29.71 (before attorneys' fees and settlement costs) — less than a single, $35 overdraft charge.  To tell them instead that these amounts, which have already been calculated, "cannot be determined at this time," is utterly indefensible.

Ironically, one of the members of the Plaintiffs' Executive Committee recently objected to a $67 million settlement with Bank of America entered into by twenty State Attorneys General, on the grounds that the proposed notice to class members:

> made no mention of the size of the underlying municipal bond market or whether the "restitution" offered through this settlement constituted what the state Attorneys General and/or BofA view as full restitution, or if it is not, *how partial the settlement amount is.  The . . . notice remains inadequate.*

(Oakland Plaintiffs' Reply Memo. Concerning Notice of State Attorneys General Settlement With Bank of America (Exh. N), at 2 (emphasis added).)

Far from giving Class Members the information necessary to intelligently weigh their options, the Class Notice *conceals* from them the very existence of that information.  The Class Notice is fatally defective.

## V.  THE PROPOSED SETTLEMENT IS NOT FAIR, REASONABLE, AND ADEQUATE

In order to grant final approval, the Court must find that the proposed settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  In making this determination, the Court should consider "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved."  *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984).

Plaintiffs do their best to divert attention from the "800-pound gorilla," front-loading instead the factors "absence of collusion" and "duration of the litigation," then laying out

"significant obstacles to recovery" before presenting their offer of nine cents on the dollar, barely pausing to acknowledge this numerical fulcrum upon which any finding of fairness must ultimately rise or fall.

### A.    This Case Is Worth More Than Nine Cents on the Dollar

Having joined Judge Alsup in publicly ridiculing a proposed settlement of nearly identical claims for *8%* of the estimated damages as "not 'even close to a reasonable settlement'" (Exh. G, at 4-5); and having formally objected to two settlements of nearly identical claims, one for *10%* of class members' estimated damages (*see id.*, Exh. L), and another for *between 10% and 26%* of class members' estimated damages (discussed *infra*), Plaintiffs propose to settle "almost identical" claims (Dkt. No. 1471, at 9) against BofA for a mere *9%* of Settlement Class Members' actual damages, as calculated by BofA itself. Plaintiffs characterize this result as "nothing short of extraordinary." (Motion for Final Approval, at 1.) It is extraordinarily *low*, by Class Counsel's own measure.

While problem-plagued cases with little chance of ultimate success may merit such single-digit recoveries, this is not such a case. Plaintiffs have survived every legal challenge the banks defendants, including BofA, have thrown at them. *See In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d 1302 (S.D. Fla. 2010). The identical posting practice has already been declared an "unfair business practice" under California law, which governs the *Yourke* case. (*See* Motion for Final Approval, at 5-6.) There are no obvious impediments to class certification, and the Court has already certified nearly identical claims against Union Bank. *See In re Checking Account Overdraft Litig.*, -- F.R.D. --, 2011 WL 3158998 (S.D. Fla. July 25, 2011). Finally, the only case to be tried to date has resulted in an award of full restitution. *See Gutierrez*, 730 F. Supp. 2d at 1137-39.

The proposed $410 million nationwide settlement may seem large in relation to the $203 million judgment against Wells Fargo, until one considers that: (1) the Wells Fargo judgment was for a single state, not the entire country; and (2) the Wells Fargo judgment covered less than four years of overdraft activity (from November 2004 to June 2008)—slightly more than a *third*

of the time period covered by the proposed settlement (from January 2001 to May 2011).  *See id.*, at 3.  As a consequence, it is not surprising—except to Settlement Class Members, who have not been told—that the total damages here, calculated by Bank of America itself, are over $4.5 billion.  "Let the punishment fit the crime."  Cicero, *De Legibus*, Bk. III. 20.

In addition to objecting to the *Fifth Third* settlement as insufficient, Class Counsel objected to approval of a proposed settlement of overlapping claims asserted against National City Bank in a case pending in the District of Columbia.[11]  At the preliminary approval stage, the Court summarized and ruled on Class Counsel's principle objections as follows:

Objector argues that the Court cannot sufficiently evaluate the adequacy of the proposed settlement, because plaintiffs have not conducted an independent analysis of the merits of their case and adequately explained the basis for a $12 million dollar settlement.  Objector contends that plaintiffs and National City Bank have not reached a settlement that falls within the range of possible approval.

* * *

The Court cautions the parties that they must offer evidence that enables the Court to calculate the potential trial recovery in this case in order to obtain final approval of the settlement. . . . At the Final Fairness Hearing, the parties should provide the Court with an independent analysis for reaching the agreed settlement amount and explain and defend their methodology to demonstrate that it is a fair, adequate, and reasonable settlement.

At the preliminary approval stage, however, the proposed settlement of $12 million, which allegedly represents 17% to 24% of the potential recovery at trial, is within the "range of possible approval" based on other approved class action settlements.  Although there are not such doubts or deficiencies as to cause this Court to decline to grant preliminary approval based on the settlement amount, the Court will continue to give close scrutiny to the proposed settlement amount in the final fairness assessment.

*Trombley v. National City Bank*, 759 F. Supp. 2d 20, *23-*26 (D.D.C. 2011) (citations omitted).

At the final approval stage, Class Counsel amplified their objections to the proposed settlement for—according to plaintiffs' expert—"'a recovery of between 10% and 26% of the[]

---

[11] The members of the Plaintiffs' Executive Committee have objected to at least seven class action settlements, in addition to *Fifth Third* and *National City Bank*, within the last five years. (*See* Exh. G, at 15-16.)  *See, e.g., Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1309 (S.D. Fla. 2005) (objectors "vigorously opposed the proposed preliminary approval of the settlement because they maintained Plaintiffs and Class Counsel were agreeing to inadequate consideration for the release of their claims").

two [alternative] damages calculations," complaining that "[t]he report submitted by Plaintiffs' expert fails . . . to demonstrate that the proposed settlement is fair, adequate and reasonable, because it does not compare the settlement terms to the proposed recovery of the settlement class . . . ." (Objections to Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement (Exh. O), at 9-10.)[12]  As set forth above, the report of Plaintiffs' expert in this case, Mr. Olsen, suffers from the same glaring omission.

### B.      *Closson* Does Not Justify The Proposed Settlement

Class Counsel attempt to transform an insufficient 9% settlement into a respectable 45% settlement by "presuming [the *Closson* settlement] would affect 80% of the aggregate value of the litigation." (Joint Declaration, ¶ 68.)  As set forth above, Class Counsel provide nothing in support of this pivotal assumption except their own say-so.  The Court should require more. Even assuming, *arguendo*, that Class Counsel's calculation is correct, *Closson* does not justify the proposed settlement.

If upheld on appeal, *Closson* would release only claims belonging to members of the *Closson* settlement class.  That class is expressly limited to persons "who, at any time between December 6, 2000 and *December 31, 2007*, resided in the United States and had an account at Bank of America accessible through a Bank of America debit card . . . ."  Order Finally Approving Class Action Settlement (Exh. P), ¶ 6 (emphasis added).

Ms. Buycks did not open her Bank of America checking account until *April 2008*.  She— and the millions like her who opened their accounts *after* December 31, 2007—are not members of the *Closson* settlement class, and are unaffected by the *Closson* release.  *Closson* simply provides no basis for discounting the value of these class members' claims, who Class Counsel estimate constitute 20% of the 13.8 million member Settlement Class.  The larger the "*Closson* discount," the more unfair the settlement is to Ms. Buycks and other unaffected Settlement Class

---

[12] A hearing on final approval of the proposed *National City Bank* settlement was held on July 14, 2011.  (*See* Minute Entry, *Trombley v. National City Bank*, D.D.C. Case No. 1:10-CV-00232-JDB (Jul. 14, 2011).)  The matter remains under submission.  (*Id.*)

Members, whose claims Class Counsel propose to sacrifice for a corresponding fraction of their true settlement value.  Class Counsel objected to the proposed settlement with National City Bank on the grounds that it divides the settlement pot between those with viable claims and those without them, and that "the burden of this largesse falls squarely on the injured class members . . . ." (Exh. O, at 7.)  The Court should not place its *imprimatur* on Class Counsel's proposal to do the same here.

In making their "back-of-the-envelope," 80% calculation, Class Counsel assume that "as Professor Patrick explains: 'If the *Closson* settlement had been affirmed on appeal . . . , all of the members of the proposed class here who incurred debit-card overdraft fees before December 31, 2007, would likely have had no remaining claims in this lawsuit . . . .'" (Motion for Final Approval, at 41, quoting Declaration of Prof. Brian T. Fitzpatrick (Dkt. No. 1885-11), at 11.) Neither Class Counsel nor Professor Patrick perform any legal analysis, or cite any authority, in support of this conclusion, which is far from certain.

If the *Closson* settlement is upheld, *this* Court, not the California Court of Appeal, will determine the preclusive effect of that judgment in this action.  As the Ninth Circuit held with respect to successive class actions:

> A claim arising after the date of an earlier judgment is not barred, even if it arises out of a continuing course of conduct that provided the basis for the earlier claim. Because the judgment in [the previous class action] was entered in 1979, . . . it cannot preclude claims based on events occurring after that date.

*Frank v. United Airlines, Inc*., 216 F.3d 845, 851 (9th Cir. 2000) (citations omitted).

If this principle were applied to the case at hand, *Closson* would only extinguish the claims of overlapping class members that accrued on or before December 31, 2007. Accordingly, even if the proposed settlement was fair to the class "on average," it would be *unfair* to class members like Mr. Hastings, whose overdraft charges due to BofA's practice of "Debit Re-sequencing" (*see* Settlement Agreement, ¶ 21) occurred primarily *after* 2007, as well as class members like Ms. Buycks, whose excess overdraft charges occurred *exclusively* after 2007.

14

C.     **Class Counsel Negotiated the Proposed Settlement With No Reliable Estimate of Class Members' Damages**

As set forth above, Class Counsel negotiated the settlement of this case *before* gaining

access to the data necessary to make a reasonably accurate estimate of class members' damages.

On this point, Objectors need do no more than quote Class Counsel's own objections to the *Fifth*

*Third* settlement.  (*See* Part II-C, *supra*.)  Class Counsel's objections to the proposed settlement

with National City Bank are even more on point:

> [I]dentifying the proper claimants . . . and calculating the amount of overdraft fees incurred as a result of re-ordering would undoubtedly have added time, expense and complexity to a simple, quickly consummated settlement.
>                                          * * *
> [W]hile Plaintiffs have supported the motion for final approval with a more detailed discussion of post-settlement confirmatory discovery, that is not sufficient.  *See, e.g., Moore v. Halliburton Co.*, No. 03-CV-1152-M, 2004 WL 2092019, at *7 (N.D. Tex. Sept. 9, 2004) ("Confirmatory discovery, by its nature, is not adversarial.  In contrast pretrial negotiations and discovery must be sufficiently adversarial so that they are not designed to justify a settlement [but are] an aggressive effort to ferret out facts helpful to prosecution of the suit.") (citing *Martens v. Smith Barney, Inc.*, 181 F.R.D. 243, 263 (S.D.N.Y. 1998)).  Plaintiffs' counsel's declaration makes clear that, before the settlement was agreed to, Plaintiffs' counsel had obtained no information about the amount of overdraft fees imposed on PNC Bank's customers as a result of reordering.  Lacking that critical information, Plaintiffs were in no position to bargain away the class members' rights against PNC Bank.[13]

(Exh. O, at 8, 13-14.)  Class Counsel's criticisms are equally applicable here.

D.     **The Obstacles to Relief Are Overstated**

1.     ***Concepcion* and *Cruz* are Irrelevant**

Plaintiffs argue that the Supreme Court's decision in *AT&T Mobility v. Concepcion*, 131

S. Ct. 1740 (2011) "might have afforded BofA a similar opportunity to seek individual

arbitrations," and that "[t]he risk in this regard was reinforced as a result of the Eleventh

Circuit's holding in *Cruz v. Cingular Wireless, LLC*, -- F.3d --, 2011 WL 350516 (11th Cir. Aug.

11, 2011)."  (Motion for Final Approval, at 43-44.)  These decisions are irrelevant, and pose no

new obstacles to class adjudication.

---

[13] PNC Bank was merged into by National City Bank.  (*See* Exh. O, at 3 n.1.)

On August 13, 2009, Bank of America formally *waived* the right to force its consumer banking customers into individual arbitrations, stating that:

> Bank of America's Consumer businesses will no longer enforce mandatory arbitration in new banking disputes with individual customers. . . . [A] customer with a . . . deposit account who has a new dispute with Bank of America will no longer be subject to mandatory arbitration. . . . Our approach will be reflected in future Bank of America customer agreements, as we update those agreements beginning later this year.

(Letter from Bank of America to Chmn. of House Comm. On Oversight and Govt. Reform) (Exh. P).)

True to its word, BofA's current Deposit Agreements and Disclosures contain *no* arbitration clause pertaining to consumer accounts, and expressly provide that "all Claims relating to a personal account will be resolved in court by a judge without a jury." (Exh. Q, at 43; Exh. R, at 43.) The only arbitration provision contained in the agreements is specifically limited to "business accounts." (Exh. Q, at 44; Exh. R, at 44.) Accordingly, the *Concepcion* decision, which holds only that "California's *Discover Bank* rule [invalidating class action waivers] is preempted by the FAA" (Federal Arbitration Act) (131 S. Ct. at 1753), and *Cruz*, which applies that holding, *do not even come into play*, let alone pose a risk to class adjudication.[14] Indeed, BofA's revised account agreements *no longer contain a class action waiver* as to personal accounts. (*See* Exh. Q, at 43-45; Exh. R, at 43-45.)

> **2.    The Banks' Preemption Arguments Have Been Rejected By Multiple Jurists at Every Stage of the Litigation**

Plaintiffs argue that "the preemption issue . . . presented an ongoing, major risk to Plaintiffs' claims against BofA." (Motion for Final Approval, at 42.) The banks' preemption arguments have been consistently rejected, not only by this Court on a motion to dismiss, but by the only judge to try an "overdraft" case, on a full and complete record.[15]

---

[14] *See* Order Denying Renewed Motions to Compel Arbitration (Dkt. No. 1853), at 6 ("Thus, after *Concepcion* and *Cruz*, courts may not invalidate arbitration agreements simply because they contain class action waivers") (citation omitted).

[15] *See In re Checking Account Overdraft Litig.*, 2011 WL 2746171, -- F. Supp. 2d -- (S.D. Fla. July 13, 2011) (rejecting preemption); *Gutierrez*, 730 F. Supp. 2d. at 1129 ("Wells Fargo argues that the National Bank Act and the implementing regulations of the Office of the Comptroller of

### 3.    The Deposit Agreement Does Not Shield BofA From Liability

Finally, Plaintiffs point out that "BofA would have continued to assert that language in its deposit agreement shields it from liability for the claims asserted in the Actions."  (Motion for Final Approval, at 43.)  Plaintiffs acknowledge that "[t]he Court rejected this argument, explaining that Plaintiffs seek only to have the bank exercise its contractual discretion in good faith," but caution that "the fact-finder" might decide the issue differently.  (*Id.*)  With respect to BofA, the fact-finder has already spoken.

The claims asserted in *Yourke* for violation of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.*) are the same claims tried to the Court in *Gutierrez.*  (*See Yourke* Amended Class Action Complaint (Dkt. No. 345), at 28-29.)  These claims are triable *only* by a court, not by a jury.  *Hodge v. Superior Court*, 51 Cal. Rptr. 3d 519, 524, 145 Cal. App. 4th 278, 284-85 (2006).  That remains true even if the claim is tried in federal court.  *Okura & Co. (America), Inc. v. Careau Group*, 783 F. Supp. 482, 491 (C.D. Cal. 1991).

Moreover, the operative BofA account agreements expressly provide that *all* claims not submitted to arbitration "will be decided by a judge without a jury."[16]  As BofA has waived arbitration (*see* Part V.D.1, *supra*), *all* of the claims asserted in *Tornes* and *Yourke* will be decided by the Court, as also provided in BofA's current account agreement.  (*See* (Exh. Q, § XXIV(B) (all consumer claims "will be resolved by a court by a judge without a jury").)  Accordingly, the Court *is* the fact-finder on all claims asserted against BofA in this proceeding. Class Counsel should be encouraged, not deterred, by the Court's prior ruling.

---

the Currency (OCC) preempts all of the foregoing.  The undersigned rejected this argument on two prior occasions.  Based on a full trial record, this order again rejects it.") (citations omitted); *Gutierrez v. Wells Fargo & Co.*, No. C 07-05923 WHA, 2010 WL 1233885, *1 (N.D. Cal. Mar. 26, 2010), *1 ("the unfair competition claim remaining in this litigation is not preempted by the National Banking Act or OCC regulations").

[16] (Deposit Agreement and Disclosures (*Tornes* Third Amended Consolidated Class Action Complaint, Exh. A (Dkt. No. 344-1)), at 41; Deposit Agreement and Disclosures (*Yourke* Amended Class Action Complaint (Dkt. No. 345-4), at 41).)

### E.     This Case Can Be Brought to Trial Relatively Quickly

Class Counsel report that discovery, while "not complete," is well advanced, with "over one million pages of documents" produced by BofA, and reviewed by Plaintiffs' counsel. (*See* Motion for Final Approval, at 9-11, 24, 36-38.) Having now performed a full damages analysis endorsed by BofA itself, this case can be brought to trial relatively quickly.

Plaintiffs hold in their hands (or their hard drives) a completed damages study, using the same methodology rigorously tested by Wells Fargo and closely examined by a respected federal judge who had previously expressed dissatisfaction. BofA's endorsement of the methodology—contained in the Settlement Agreement itself[17]—should obviate any serious challenges to the result, which was calculated by BofA itself,[18] shaving six months to a year off of pre-trial preparation.[19] Accordingly, this case can be brought to trial relatively quickly.

### F.     The Absence of Objections Is A Function of the Inadequate Class Notice

Class Counsel argue that the fact they have "only 15 *pro se* objections" and 169 requests for exclusion reflects "*de minimis*" opposition to the settlement. (Motion for Final Approval, at 28.) An average person reading the Class Notice would have no way of knowing that the proposed $410 million settlement will reimburse them for less than one in ten illegitimate overdraft charges imposed on them by BofA, as the notice discloses neither the total amount of class members' damages or the number of Settlement Class Members. Instead, an average

---

[17] (*See* Settlement Agreement, ¶ 79.)

[18] (*See* Olsen Declaration (Dkt. No. 1885-6), ¶ 21 ("the full analysis was performed on-site at the BOF facility in Charlotte, North Carolina").

[19] In May 2009, Judge Alsup threatened to decertify the *Gutierrez* class because class counsel—who did yet include counsel for Objectors—had only estimated the class' damages by analyzing a small sample of account data and extrapolating the result, rather than calculating the actual sum of individual class members' damages. *See Gutierrez*, 2009 WL 1247040, *1-*6. Mounting a "full court press," class counsel—led by Objector's counsel—and their expert Arthur Olsen—the same expert who performed the damages analysis here—completed the task and submitted Mr. Olsen's report to Wells Fargo in November, 2009. The ensuing months were consumed exclusively by the preparation of Wells Fargo's opposing expert reports, expert depositions, *Daubert* motions, and further data analysis ordered by the Court (discovery having been otherwise completed). These activities were completed in April 2010, and trial commenced the same month. *See Gutierrez*, 2010 WL 1233810, *2-*3 (reviewing procedural history); 730 F. Supp. 2d at 1082-83 (same).

person—without a PACER logon and hours of time to devote to the matter—would naturally assume that $410 million was enough to return to them most, if not all, of the amounts unfairly taken from them.  The average person would be wrong.  The absence of objections is merely a function of the inadequate and uninformative Class Notice.

## VI.  CLASS COUNSEL DO NOT DESERVE A $123 MILLION FEE FOR NEGOTIATING A 9% SETTLEMENT WITH INSUFFICIENT INFORMATION

Assuming, *arguendo*, that the Court finds the proposed settlement for 9% of class members' damages fair, reasonable, and adequate, this single-digit result does not merit the requested triple-digit, $123 million fee.  Especially in this Circuit, where counsel's lodestar—the traditional measure of effort expended—is made irrelevant by *Camden I Condominium Assn. v. Dunkle*, 946 F.2d 768 (11th Cir. 1991), the Court should look primarily to the result achieved to determine an appropriate fee award.

Class Counsel's expert on attorneys' fees, Prof. Fitzpatrick, states that "[i]n the Eleventh Circuit, courts use 25% as the '"bench mark" percentage fee award' and then adjust it upward or downward 'in accordance with the individual circumstances of each case.'"  (Fitzpatrick Declaration, ¶ 12 (quoting *Camden I*, 946 F.2d at 775).)  Objectors respectfully submit that Class Counsel do not deserve a "supersized" fee for delivering an underweight settlement.

## PERSONS CALLED TO TESTIFY

Objectors intend to call Plaintiffs' damages expert, Arthur Olsen, to testify at the fairness hearing in support of their objections.

Dated:  October 3, 2011

Respectfully submitted,

**s/Barry Himmelstein**
Barry Himmelstein (Cal. Bar No. 157736)
(*pro hac vice*)
barry@himmellaw.com
HIMMELSTEIN LAW NETWORK
2000 Powell St., Suite 1605
Emeryville, CA 94608-1861
Telephone:  (510) 450-0782
Facsimile:  (510) 380-6147


**s/Philip Freidin**
Philip Freidin (Florida Bar Number 118519)
pfreidin@fdlaw.net
FREIDIN DOBRINSKY
One Biscayne Tower
2 South Biscayne Blvd., Suite 3100
Miami, FL 33131
Telephone:  (305) 371-3666
Facsimile:  (305) 371-6725

*Attorneys for Class Members and Objectors
Richard Hastings and Janel Buycks*

## **CLASS MEMBER SIGNATURES**

I object to final approval of the proposed class action settlement and class counsel's application for attorneys' fees on the grounds stated herein.  I have not objected to any class action settlement within the last five years.  I will appear by my counsel, Barry Himmelstein, at the fairness hearing.

Respectfully submitted,

**s/Richard Hastings**_____
Richard Hastings

I object to final approval of the proposed class action settlement and class counsel's application for attorneys' fees on the grounds stated herein.  Within the last five years, I objected to a class action settlement of *Fairchild v. AOL, LLC*, Case No. CV 09-03568 CAS (PLAx) (C.D. Cal.).  I will appear by my counsel, Barry Himmelstein, at the fairness hearing.

Respectfully submitted,

**s/Janel Buycks**_____
Janel Buycks

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing was served by CM/ECF on

October 3, 2011 on all counsel or parties of record in this proceeding.

**s/Philip Freidin**
Philip Freidin (Florida Bar No. 118519)
pfreidin@fdlaw.net
FREIDIN DOBRINSKY
One Biscayne Tower
2 South Biscayne Blvd., Suite 3100
Miami, FL 33131
Telephone:  (305) 371-3666
Facsimile:  (305) 371-6725
