**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

**CASE NO. 1:09-MD-02036-JLK**

---

**IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION**

**MDL No. 2036**

---

**THIS DOCUMENT RELATES TO:
FIFTH TRANCHE ACTION**

*Case v. Bank of Oklahoma, N.A.*
W.D. OK Case No. 5:10-00901-L
S.D. FL Case No. 1:11-cv-20815-JLK

---

**AMENDED CLASS ACTION COMPLAINT**

Plaintiff, through undersigned counsel, on behalf of himself and all persons similarly situated, alleges the following based on personal knowledge as to allegations regarding the Plaintiff and on information and belief as to other allegations.

**INTRODUCTION**

1.        This is a civil action seeking monetary damages, restitution and declaratory relief from Defendant, BOKF, N.A. f/k/a Bank of Oklahoma, N.A. ("BOKF" or the "Bank"), arising from its unfair and unconscionable assessment and collection of excessive overdraft fees.

2.        In the era of electronic banking and the ubiquitous use of debit card transactions, the assessment of overdraft fees has become a major profit center for many United States banks, including BOKF. For years, banks covered customers who occasionally bounced checks and even did so for a time for customers using debit cards, without charging their customers. Since the early 1990's, however, banks have devised methods to provide overdraft

"protection" for customers and charge them in each instance.  A recent FDIC report estimated that overdraft fees represent 74 percent of the total service charges that are imposed on deposit accounts in the United States.  A 2008 FDIC study reports that overdraft fees for debit cards can carry an effective annualized interest rate that *exceeds 3,500 percent*.  Nevertheless, the Consumer Federation of America reports that five of the ten largest banks raised their overdraft fees in the last year.

3.      In 2007, banks collected more than $17 billion in overdraft fees.  That number nearly doubled in 2008, as more and more consumers struggled to maintain positive checking account balances.  *In 2009, banks brought in $37.1 billion in overdraft charges alone.*  Operating 188 banking locations across nine states, BOKF benefits greatly from these staggering charges.

4.      Almost by definition, these fees disproportionately affect the poor, who are most likely to maintain low balances.  Moebs Services, a research company that has conducted studies for the government as well as banks, estimates that 90 percent of overdraft fees are paid by the poorest 10 percent of banks' customer base.  Moreover, these fees have the tendency to create a domino effect, because the imposition of a service charge on an account with a negative balance will make it less likely that the account holder's balance will reach positive territory, resulting in more fees.

5.      Before debit cards existed, banks occasionally extended the courtesy of honoring paper checks written on overdrawn or otherwise deficient accounts for customers who were typically in good standing.  Banks extended this courtesy largely because the third party involved in a sales transaction allowed the customer to pay by check, expecting the funds to be available and the check to clear.  For example, if a customer wrote a check to purchase groceries,

the grocery store would only know whether the check cleared *after* the groceries had been purchased.

6.          The same considerations are not present when customers use debit cards. Banks could simply decline to honor debit or point of sale transactions where accounts lack sufficient funds to execute the transactions.   Retail and service transactions could still be executed if consumers presented an alternative form of payment.   ATM transactions could still proceed if banks provided a warning that an overdraft fee would be assessed, and customers chose to proceed nevertheless.   In fact, until a few years ago, most banks simply declined debit transactions that would overdraw an account.

7.          Instead of simply declining debit transactions when there are insufficient funds, or warning its customers that an overdraft fee will be assessed if they proceed with the transaction, BOKF routinely processes such transactions and then charges its customers an overdraft fee of $28.95[1] for each charge – even when the transaction is for only a few dollars. This automatic, fee-based overdraft scheme is intentionally designed to maximize overdraft fee revenue for BOKF.   Additionally, as part of its inequitable motive to generate obscene profits gained through the imposition of unconscionable overdraft fees, BOKF failed to adequately disclose to its customers that they could elect to opt out of overdraft protection.

8.          In many instances, these overdraft fees cost BOKF account holders hundreds of dollars in a matter of days, or even hours, when they may be overdrawn by only a few dollars. Even more egregious, customer accounts may not actually be overdrawn at the time the overdraft fees are charged, or at the time of the debit transaction.

---

[1] The overdraft fee amount charged by each of the divisions (specified below) of BOKF may differ slightly and may have changed throughout the periods of time attributable to each class.

9.      Thus, it is through manipulation and alteration of customers' transaction records that BOKF maximizes overdraft penalties imposed on customers.

## JURISDICTION AND VENUE

10.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed Classes is a resident of a different state than BOKF.

11.     Venue is proper in this district under 28 U.S.C. § 1407(a).  Venue is proper in the Western District of Oklahoma, the district in which this action was originally filed, pursuant to 28 U.S.C. § 1391 because BOKF is subject to personal jurisdiction there and regularly conducts business in that district, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred and continue to occur in that district.

## THE PARTIES

12.     Plaintiff, Terry Case, is a resident of the State of Oklahoma.

13.     Defendant, BOKF, is a commercial bank which maintains its principal place of business in Tulsa, Oklahoma.  On January 1, 2011, Bank of Oklahoma, N.A., changed its name to BOKF, N.A.  Contemporaneously with the name change, BOKF, N.A., acquired Bank of Arkansas, N.A., Bank of Albuquerque, N.A., Bank of Arizona, N.A., Bank of Kansas City, N.A., Bank of Texas, N.A., and Colorado State Bank and Trust, N.A.  As a result of the above acquisitions, in addition to the existing customers of Bank of Oklahoma, N.A, all customers of Bank of Arkansas, N.A., Bank of Albuquerque, N.A., Bank of Arizona, N.A., Bank of Kansas City, N.A., Bank of Texas, N.A., and Colorado State Bank and Trust, N.A., are now also customers of BOKF and are potential class members covered by the claims herein.   According

- 4 -

to its website, BOKF operates the aforementioned entities as seven banking divisions, such that

BOKF is the real party in interest and the proper defendant in this lawsuit.[2]  Among other things,

BOKF is engaged in the business of providing retail banking services to consumers, including

Plaintiff and members of the putative Classes, which include the issuance of debit cards for use

by its customers in conjunction with their checking accounts.   BOKF has over $24 billion in

assets and operates 188 banking locations in Arizona, Arkansas, Colorado, Kansas, Maryland,

Missouri, New Mexico, Oklahoma, and Texas.

14.        BOKF is a national bank, subject to the National Bank Act, 12 U.S.C. § 1, *et
seq.*, and regulations promulgated by the Office of the Comptroller of the Currency.

## CLASS ALLEGATIONS

15.        Plaintiff brings this action on behalf of himself and all others similarly

situated pursuant to Fed. R. Civ. P. 23.   This action satisfies the numerosity, commonality,

typicality, adequacy, predominance and superiority requirements of Rule 23.

16.        The proposed classes are defined as:

All BOKF customers in the United States who, within the applicable statute of
limitations preceding the filing of this action to the date of class certification,
incurred an overdraft fee as a result of BOKF's practice of re-sequencing debit
card transactions from highest to lowest (the "National Class").

All BOKF customers having accounts at branches in the State of Oklahoma, for
the purpose of asserting claims under Oklahoma's Consumer Protection Act, O.S.
§ 15-53, *et seq.* (the "Oklahoma State Subclass") (*see* Fifth Claim for Relief,
*infra*).

The National Class and the Oklahoma State Subclass are collectively referred to as the

"Classes."

---

[2] *See* http://investor.bokf.com/CorporateProfile.aspx?iid=100003 (last visited Oct. 18, 2011).

17.     Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

18.     Excluded from the Classes are BOKF, its parents, subsidiaries, affiliates, officers and directors, any entity in which BOKF has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

19.     The members of the Classes are so numerous that joinder is impractical.  The Classes consist of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to BOKF's records.

20.     The claims of the representative Plaintiff are typical of the claims of the Classes in that the representative Plaintiff, like all Class members, was charged overdraft fees by BOKF as a result of its practice of re-sequencing debit card transactions from highest to lowest. The representative Plaintiff, like all Class members, has been damaged by BOKF's misconduct in that they have been assessed and/or will continue to be assessed unfair and unconscionable overdraft charges.  Furthermore, the factual basis of BOKF's misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.

21.     There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual Class members.

22.     Among the questions of law and fact common to the Classes are whether BOKF:

a.      Did not clearly disclose and/or refused to allow its customers to opt out of its overdraft protection program;

b.      Did not obtain affirmative consent from its customers prior to processing transactions that would result in overdraft fees;

c.      Does not alert its customers that a debit card transaction will trigger an overdraft fee, and does not provide its customers with an opportunity to cancel such transactions;

d.      Manipulates and reorders transactions so that it can increase the number of overdraft fees it imposes;

e.      Manipulates and reorders debits from highest to lowest in order to maximize the number of overdrafts and, consequently, the amount of overdraft fees;

f.      Imposes overdrafts and overdraft fees when, but for reordering transactions, there would otherwise be sufficient funds in the account;

g.      Fails to provide customers with accurate balance information;

h.      Delays posting of transactions by customers using debit cards so that customers are charged overdraft fees on transactions, even though the customers had sufficient funds in their accounts to cover the transactions upon execution;

i.      Charges exorbitant overdraft fees that bear no relationship to the actual costs and risks of covering insufficient funds transactions;

j.      Breaches its covenant of good faith and fair dealing with Plaintiff and other members of the Classes through its overdraft policies and practices;

k.      Requires its customers to enter into standardized account agreements which include unconscionable provisions;

- 7 -

l.      Converts moneys belonging to Plaintiff and other members of the Classes through its overdraft policies and practices;

m.      Is unjustly enriched through its overdraft policies and practices; and

n.      Violates the consumer protection acts of certain states through its overdraft policies and practices.

23.     Other questions of law and fact common to the Classes include:

a.      The proper method or methods by which to measure damages, and

b.      The declaratory relief to which the Classes are entitled.

24.     Plaintiff's claims are typical of the claims of other Class members, in that they arise out of the same wrongful overdraft policies and practices and the same or substantially similar unconscionable provisions of BOKF's account agreements and other related documents. Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other Class member.

25.     Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions.  Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes.

26.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of BOKF, no Class member could afford to seek legal redress individually for the claims alleged herein.

Therefore, absent a class action, the Class members will continue to suffer losses and BOKF's misconduct will proceed without remedy.

27.    Even if Class members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

## COMMON FACTUAL ALLEGATIONS

**A.**    **BOKF**

28.    BOKF has over $24 billion in assets and operates 188 banking locations in Arizona, Arkansas, Colorado, Kansas, Maryland, Missouri, New Mexico, Oklahoma, and Texas.

29.    BOKF is in the business of providing its customers with a variety of banking services.  One of the services provided by BOKF for customers who open a checking account is a debit card, also known as a check card or ATM card.  Through those debit cards, customers can engage in transactions using funds directly from their accounts by engaging in "debit" or "point of sale" ("POS") transactions, or may withdraw money from their accounts at automated teller machines ("ATMs").  Whether the card is used to execute POS transactions or to withdraw cash from ATMs, the transaction is processed electronically.   As a result, BOKF is notified instantaneously when the card is swiped, and has the option to accept or decline transactions at such time.

30.      BOKF employs sophisticated software to automate its overdraft system.  This program maximizes the number of overdrafts, and thus, the amount of overdraft fees charged per customer.

31.      As a result of BOKF's manipulation and alteration of customers' transactions records, funds in a customer's account are depleted more rapidly and more overdraft fees are likely to be charged for multiple smaller transactions.  Indeed, overdraft charges are likely to occur at times when, but for the manipulation and alteration, there would be funds in the account and no overdraft would occur.  For example, if a customer, whose account has a $50 balance at the time BOKF processed several transactions, made four transactions of $10 and one subsequent transaction of $100 on the same day, the Bank would reorder the debits from largest to smallest, imposing five overdraft fees on the customer.  Conversely, if the $100 transaction was debited last—consistent with the actual order of transactions—only one overdraft fee would be assessed. *See* FDIC Study of Bank Overdraft Programs, November 2008, *available at*: http://www.fdic.gov/bank/analytical/overdraft/, at 11, n. 12.

**B.       BOKF's Relevant Customer Documents Regarding Overdrafts**

32.      Plaintiff and all members of the Classes maintain or maintained a checking account with BOKF.  The terms of BOKF's checking accounts are contained in standardized account holder agreements, presented to its customers on a "take it or leave it" basis, drafted and imposed by BOKF, which was the party of vastly superior bargaining strength, and thus constitute agreements of adhesion.   A representative copy of Bank of Oklahoma, N.A.'s "Agreements and Disclosures" (the "Deposit Agreement") is attached hereto as Exhibit A.[3]

---

[3] Upon information and belief, the material terms of Bank of Oklahoma, N.A.'s Deposit Agreement, including language relating to overdraft fees and the processing of transactions, is substantially identical to that of the other divisions of BOKF.

33.     The Deposit Agreement states that "[i]f multiple items have been presented against the Account and there are insufficient funds to pay all the items presented, we *may* pay the items in any order we select and *may* charge a processing fee with respect to each item paid or returned."  *Id.* at 6 (emphasis added).

34.     In addition, the Deposit Agreement states that "[w]e *may* refuse to pay an item drawn on the Account because of insufficient funds, without giving you prior notice, and charge a processing fee at the rate set in the Summary of Fees brochure, as amended from time to time." *Id.*  (emphasis added).

35.     BOKF also published other documents that are available to customers at its branches that list a schedule of fees and other important information about its customers' accounts.  Plaintiff is not in possession of these documents and upon information and belief said documents are in the possession of the Bank.

36.     For all times material hereto, the Deposit Agreement and related documents, fail to disclose to customers that they have the option to "opt out" from the Bank's overdraft scheme, although it is possible for them to opt out upon request.

37.     The Deposit Agreement and related documents failed to disclose to customers that they had the option to "opt out" from the Bank's overdraft scheme, although it was possible for them to opt out upon request.

**C.     BOKF's Re-Ordering of Checking Account Transactions**

38.     In an effort to maximize overdraft revenue, BOKF manipulates and reorders debits from highest to lowest during given periods of time.  BOKF reorders transactions for no reason other than to increase the number of exorbitant overdraft fees it can charge.  This practice violates the consumer protection laws of certain states and the covenant of good faith and fair dealing in the Bank's Deposit Agreement.

39.      In addition, BOKF misleads its customers regarding its reordering practices because it fails to disclose to customers that the Bank will reorder debit card transactions from highest to lowest dollar value.  The Bank's failure to include language regarding its reordering scheme is deceptive and/or unfair because it is, in fact, the Bank's practice to *always* reorder debits from highest to lowest, and because the Bank groups together POS transactions that occurred on subsequent days with POS transactions that occurred on earlier days, and reorders them so that higher debits that occurred on subsequent days are posted to its customers' accounts before lower debits that occurred on earlier days, contrary to the terms of the Bank Deposit Agreement and its customers' reasonable expectations.  The Bank's practices thus violate the covenant of good faith and fair dealing implied in the Bank Deposit Agreement as well as the consumer protection laws of numerous states.

40.      Transactions involving debit cards used by BOKF customers, including the withdrawal of cash from ATM machines and POS transactions with vendors, are processed electronically.  As a result, BOKF is notified instantaneously when the customer's debit card is swiped, and has the option to accept or decline these transactions.

41.      Notwithstanding the instantaneous nature of these electronic debit card transactions, under BOKF's posting system, it fails to post charges in the order in which they are assessed or received.  BOKF developed a policy and employs a practice whereby account charges and debits are posted to its customers' accounts out of chronological order for the sole purpose of maximizing the number of overdraft transactions and, therefore, the amount of overdraft fees charged to its customers.

42.      Instead of processing such transactions in chronological order, BOKF processes them starting with the largest debit and ending with the smallest debit, so as to

generate the largest possible number of overdrafts and the greatest possible amount of overdraft fees.

43.     BOKF refrains from immediately posting charges to a customer's account as it receives them—sometimes for multiple business days.  By holding charges rather than posting them immediately to an account, BOKF is able to amass a number of charges on the account. Subsequently, BOKF posts all of the amassed charges on a single date.  When the group of charges is eventually posted to the customer's account, BOKF posts them in order of largest to smallest—not in the order in which they were received or in the order in which they were charged.  This delayed posting results in the imposition of multiple overdraft fees that would not otherwise be imposed.  The delayed posting also prevents customers from ascertaining the accurate balances in their accounts.

44.     BOKF's policy and practice of posting charges from largest to smallest, rather than chronologically, or from smallest to largest, is specifically designed to maximize the generation of overdraft fees by triggering overdraft fees for account charges that would not otherwise result in such fees.

45.     BOKF enforces an unconscionable policy whereby charges assessed are posted to customers' accounts in a non-chronological order, from highest to lowest, and are held for multiple days and then batched together, to maximize the number of overdraft transactions and fees.  BOKF's processing practices substantially increase the likelihood that customers' smaller charges will result in multiple overdraft fees.  The practices provide BOKF with substantially higher service fee revenues than it would otherwise achieve absent these practices.

46.     BOKF also assesses overdraft fees at times when actual funds in the customer's account are sufficient to cover all debits that have been submitted to the Bank for

payment.  It does this by placing a "hold" on actual funds in the customer's account.  In doing so, BOKF charges overdraft fees where it faces no risk, because the cash balance in the customer's account has not dropped below zero.

47.     A debit card can be used to make a purchase in two ways:  (1) an Automated Clearing House ("ACH") transaction in which a customer enters his/her PIN number at the point of sale; or (2) an "offline signature" transaction, in which the debit card is treated like a credit card and the customer usually is required to sign a receipt.  In the former, the money is debited from the account instantaneously.  In the latter, the "offline signature" transaction occurs in two parts: first, authorization for the purchase amount is obtained by the merchant.  Second, the transaction is not actually "settled" (that is, money between the bank and the merchant does not change hands) until the merchant submits the transaction to the bank sometime after the customer's purchase.  Before settlement, "authorization holds" are placed on the customer's account, preventing access to money so held.  For some transactions, the authorization hold is for an amount larger than the purchase actually made by the customer.  BOKF charges an overdraft fee when the authorization hold amount—not the purchase price—pushes an account balance into negative territory.

48.     Such "authorization hold" policies, and the extent to which they are used by BOKF to charge overdraft fees, are inconsistent with BOKF's Deposit Agreement.

49.     The terms of the Deposit Agreement fail to alert customers that they must often keep a large cushion of funds in their account in order to guard against an overdraft fee even when customers do not spend more than the funds in their account, and are materially deceptive.  Accordingly, BOKF charges customers overdraft fees even when there are sufficient funds in customers' accounts to cover transactions.

50.     Charging an overdraft fee when in fact an account has never been over-drafted is materially deceptive.  By charging overdraft fees when in fact the customer's account has not been over-drafted, BOKF breached its contract with Plaintiff.

51.     As a result, Plaintiff and members of the Classes have been assessed overdraft fees for transactions which occurred when they actually had sufficient funds in their accounts to cover those transactions.

### D.     BOKF's Cloaking of Accurate Balance Information

52.     BOKF actively promotes the convenience of its debit cards and other electronic debiting, but fails to provide customers with accurate balance information.  When customers execute account transactions, they generally do not have access to an accurate balance register or balance information.

53.     BOKF provides inaccurate balance information to its customers through its electronic network.  In certain cases, BOKF informs its customers that they have a positive balance when, in reality, they have a negative balance, despite the Bank's actual knowledge of outstanding debits and transactions.

54.     Even when BOKF has actual knowledge of outstanding transactions which have already created a negative balance in a customer's account, it encourages the customer to incur more overdraft charges by approving—rather than prudently declining—subsequent debit card purchases and other electronic transactions.

### E.     BOKF's Failure to Notify Customers of Overdrafts or Advise Customers of Their Right to Opt Out

55.     At the time its debit cards are used in POS transactions or at ATMs, BOKF is able to determine, almost instantaneously, whether there are sufficient funds in a customer's account to cover that particular transaction.  The Bank has the technological capability to decline

transactions (which it does when a pending transaction would exceed a pre-determined, overdraft tolerance limit for the account), or notify customers at that very moment that the particular debit card transaction would result in an overdraft. BOKF could give customers the option to decline the transaction to avoid incurring the overdraft fee, but it does not do so because it seeks to maximize the amount of revenue generated through its assessment of overdraft fees.

56.     Notwithstanding its technological capabilities and actual knowledge, BOKF fails to provide notice to Plaintiff and the Classes that a particular debit card transaction will result in an overdraft and, hence, an overdraft fee. Because BOKF's customers are not notified of the potential overdraft, and are not given the option of declining the debit card transaction or providing another form of payment, the customers are assessed monetary damages in the form of overdraft fees.

57.     BOKF failed to make Plaintiff and Class members aware that they could opt out of its overdraft scheme upon request, thereby avoiding any overdraft fees from being charged.

**F.      BOKF's Overdraft Policies and Practices Are Contrary to Best Practices**

58.     By engaging in the conduct described herein, BOKF has failed to follow the list of "best practices" for overdraft programs set forth in the "Joint Guidance on Overdraft Protection Programs" ("Joint Guidance") issued by the United States Department of the Treasury, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the National Credit Union Administration (collectively, the "Agencies"). A copy of the Joint Guidance is attached as Exhibit B. These "best practice" recommendations include: "Provide election or opt-out of service. Obtain affirmative consent of consumers to receive overdraft protection. Alternatively, where overdraft protection is automatically provided, permit consumers to 'opt-out' of the

overdraft program and provide a clear consumer disclosure of this option."  70 F.R. 9127-01, 9132.

59.     According to rules proposed by the Agencies: "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . .  This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee."  73 F.R. 28904-01, 28929 (May 19, 2008).

60.     The Joint Guidance also advises banks to "[a]lert customers before a transaction triggers any fees.  When consumers attempt to withdraw or transfer funds made available through an overdraft protection program, provide a specific consumer notice, where feasible, that completing the withdrawal may trigger the overdraft fees."  70 F.R.D. 9127, 9132. The Joint Guidance further advises that "[t]his notice should be presented in a manner that permits consumers to cancel the attempted withdrawal or transfer after receiving the notice."  *Id.*

61.     Similarly, the list of "best practices" recommended in "Overdraft Protection: A Guide for Bankers," issued by the American Bankers Association, includes offering customers the option of "opting out" of any overdraft programs, and informing customers, before they access funds, that a particular point of sale or ATM transaction will cause them to incur an overdraft fee.  A copy of "Overdraft Protection: A Guide for Bankers" is attached as Exhibit C.

62.     BOKF's overdraft policies make it difficult for customers to avoid injury even if they carefully track the balance in their account.  In fact, the Agencies have stated that "Injury" resulting from such policies, "is not reasonably avoidable" by the consumer.  73 F.R. 28904-01, 28929.  "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although

consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available."

63.     On October 6, 2009, the Center for Responsible Lending issued a report entitled "Overdraft Explosion:  Bank Fees for Overdrafts Increase 35% in Two Years."  The report, attached hereto as Exhibit D finds that it is now "standard procedure to automatically enroll checking account customers in their most expensive overdraft loan program."  The report finds that debit card transactions account for more overdraft fees than traditional checks or any other type of transaction, even though "debit card transactions and ATM withdrawals . . . could easily be denied for no fee."  The report also finds that overdraft fees increased 35 percent from 2006 to 2008, and that over 50 million Americans overdrew their accounts in a 12 month period, with 27 million accounts incurring five or more overdraft fees.

64.     A chart from the research company Moebs Services shows that, in every year since 1992, banks have gained increased revenues from overdraft fees:



**G.**      **BOKF's Unconscionable Provisions and Policies**

65.      BOKF's overdraft policies and practices are or were unconscionable in the following respects, among others:

a.      The Bank did not disclose or reasonably disclose to customers that they had the option to "opt out" of the Bank's overdraft scheme;

b.      The Bank did not obtain affirmative consent from checking account customers prior to processing a transaction that would overdraw the account and result in an overdraft fee;

c.      The Bank does not alert its customers that a debit card transaction will trigger an overdraft, and does not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

d.      The Deposit Agreement and related documents are contracts of adhesion in that they are standardized forms, imposed and drafted by the Bank, which is a party of vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement in its entirety;

e.      The amount of overdraft fees is disclosed in an ineffective, ambiguous, misleading, and unfair manner, since it is not contained in the Deposit Agreement, but rather in a different and separate document, which is not signed by the depositor; and

f.      The Deposit Agreement provided to customers is ineffective, ambiguous, deceptive, unfair, and misleading in that it does not unambiguously state that the Bank always reorders debits from high to low, even though BOKF *always* reorders transactions in this way for customers in order to maximize overdrafts and overdraft fee revenues for the Bank.

**H.      BOKF's Overdraft Practices Harmed Plaintiff**

66.      BOKF's wrongful overdraft policies and practices described above harmed Plaintiff and members of the Classes.  The following allegations regarding the named Plaintiff is made for purposes of illustrating the harm and damage sustained by Plaintiff and members of the Classes as a result of BOKF's wrongful overdraft policies and practices.

67.      Plaintiff, Terry Case, is a current checking account customer of BOKF, having opened his account at Bank of Oklahoma, N.A.

68.      In connection with his account, BOKF issued a debit card or cards to Mr. Case.  A debit card allows customers to access their checking account funds by using the card to execute a transaction.  The charge is processed electronically, and the Bank has the option to accept or decline the transaction at the point of sale.

69.      BOKF wrongfully charged Mr. Case multiple overdraft fees.  For example, based on information and belief, Mr. Case was charged ten overdraft fees on May 3, 2010, in the amount of $28.95 each, for a total of $289.50.  Based on information and belief, the overdraft fees were based on the following ordering of transactions:

**Balance Sheet per BOKF Reordering Scheme**
**(Debits Processed from Highest to Lowest)[4]**

| | | Debits | Credit | Fees | Balance |
|---|---|---|---|---|---|
| | Beginning Balance on 5/03/2010: | | | | $264.04 |
| Date Posted | Debit Description | | | | |
| 05/03/2010 | DEPOSIT | | 400.00 | | 664.04 |
| 05/03/2010 | CASHED CHECK | 565.46 | | | 98.58 |
| 05/03/2010 | OD CHARGE | | | 28.95 | 69.63 |
| 05/03/2010 | WU AMERICREDIT WU | 139.00 | | | -69.37 |
| 05/03/2010 | OD CHARGE | | | 28.95 | -98.32 |
| 05/03/2010 | DOC'S COUNTRY MART | 99.28 | | | -197.60 |
| 05/03/2010 | OD CHARGE | | | 28.95 | -226.55 |
| 05/03/2010 | PAYPAL ECHECK | 44.45 | | | -271.00 |
| 05/03/2010 | OD CHARGE | | | 28.95 | -299.95 |
| 05/03/2010 | PAYPAL ECHECK | 43.31 | | | -343.26 |
| 05/03/2010 | OD CHARGE | | | 28.95 | -372.21 |
| 05/03/2010 | PAYPAL ECHECK | 40.49 | | | -412.70 |
| 05/03/2010 | OD CHARGE | | | 28.95 | -441.65 |
| 05/03/2010 | QT 51 0100 CHK CARD | 15.00 | | | -456.65 |
| 05/03/2010 | OD CHARGE | | | 28.95 | -485.60 |
| 05/03/2010 | PAYPAL ECHECK | 14.55 | | | -500.15 |
| 05/03/2010 | OD CHARGE | | | 28.95 | -529.10 |
| 05/03/2010 | PAYPAL ECHECK | 12.99 | | | -542.09 |
| 05/03/2010 | OD CHARGE | | | 28.95 | -571.04 |
| 05/03/2010 | PAYPAL ECHECK | 12.95 | | | -583.99 |
| 05/03/2010 | OD CHARGE | | | 28.95 | -612.94 |
| | | Total Fees: | | $289.50 | |

70.      If BOKF had not manipulated and reordered Mr. Case's transactions from highest to lowest, he would not have been assessed ten overdraft fees.

71.      For instance, if BOKF had posted the transactions from lowest to highest, Mr. Case would have been assessed only one overdraft fee instead of ten:

---

[4] Surprisingly, Plaintiff incurred an overdraft fee for the $565.46 cashed check, despite Plaintiff still having a positive balance of $98.58 after the transaction posted to his account.

**Balance Sheet if Debits Were Processed from Lowest to Highest**

|  |  | Debits | Credit | Fees | Balance |
|---|---|---|---|---|---|
|  | Beginning Balance on 5/03/2010: |  |  |  | $264.04 |
| Date Posted | Debit Description |  |  |  |  |
| 05/03/2010 | DEPOSIT |  | 400.00 |  | 664.04 |
| 05/03/2010 | PAYPAL ECHECK | 12.95 |  |  | 651.09 |
| 05/03/2010 | PAYPAL ECHECK | 12.99 |  |  | 638.10 |
| 05/03/2010 | PAYPAL ECHECK | 14.55 |  |  | 623.55 |
| 05/03/2010 | QT 51 0100 CHK CARD | 15.00 |  |  | 608.55 |
| 05/03/2010 | PAYPAL ECHECK | 40.49 |  |  | 568.06 |
| 05/03/2010 | PAYPAL ECHECK | 43.31 |  |  | 524.75 |
| 05/03/2010 | PAYPAL ECHECK | 44.45 |  |  | 480.30 |
| 05/03/2010 | DOC'S COUNTRY MART | 99.28 |  |  | 381.02 |
| 05/03/2010 | WU AMERICREDIT WU | 139.00 |  |  | 242.02 |
| 05/03/2010 | CASHED CHECK | 565.46 |  |  | -323.44 |
| 05/03/2010 | OD CHARGE |  |  | 28.95 | -352.39 |
|  |  | Total Fees: |  | $28.95 |  |

72.     The wrongful overdraft fees assessed occurred as a result of the Bank's manipulation and re-ordering of Plaintiff's debit card transactions.

73.     BOKF failed to notify Plaintiff that he could be assessed overdraft fees on transactions even though there were sufficient funds in the checking accounts to cover the transaction at the time the transaction was executed.  In addition, BOKF never notified Plaintiff, at the time he executed the purported insufficient funds transactions described above, that his checking account was overdrawn or that he would be charged an overdraft fee as a result of the transactions.  Furthermore, BOKF paid, rather than returned, all of the debit card charges described above, even though Plaintiff's account purportedly lacked sufficient funds to cover the transactions.

74.     Based on information and belief, the overdraft charges assessed to Plaintiff are representative of millions of dollars of overdraft fees that BOKF wrongfully assessed and deducted from its customers' accounts.  These wrongful takings are especially egregious considering the fact that the Bank approved each transaction and knew at the time of approval whether there were sufficient funds in the account to cover the transaction.

I.        <u>**The Damages Sustained by Plaintiff and the Classes**</u>

75.       As shown by these examples, BOKF's overdraft policies make it difficult for a customer to avoid injury even if the customer keeps close track of the balance in his or her account.  In fact, the Agencies have stated that "injury" resulting from such policies "is not reasonably avoidable" by consumers.  73 F.R. 28904-01, 28929.  "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available." *Id*.

76.       According to rules proposed by the Agencies, "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . . This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee."  73 F.R. 28904-01, 28929 (May 19, 2008).

77.       Thus, as a consequence of BOKF's overdraft policies and practices, Plaintiff and the Classes have been wrongfully forced to pay overdraft fees.  BOKF has improperly deprived Plaintiff and the Classes of significant funds, causing ascertainable monetary losses and damages.

78.       As a consequence of BOKF's improper overdraft fees, BOKF has wrongfully deprived Plaintiff and the Classes of funds to which it had no legitimate claim.

79.       Plaintiff and the Classes had sufficient funds to cover at least some of the transactions for which they and the Classes were charged overdraft fees.  Plaintiff and members

of the Classes either had adequate funds to cover the transactions posted to their accounts, or the accounts were allowed to become overdrawn, even by *de minimis* margins, exclusively so that BOKF could impose these wrongful charges.  In many instances, BOKF's manipulation of the process for imposing overdraft fees triggered a cascade of charges that exponentially added to the charges it collected from Plaintiff and Class members.

80.     All conditions precedent to the relief sought herein have either occurred or have been performed or waived.

### FIRST CLAIM FOR RELIEF
### Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing[5]
### (On Behalf of the National Class)

81.     Plaintiff repeats paragraphs 1 through 80 above.

82.     This claim is brought by Plaintiff, on behalf of himself and the National Class, except that this claim expressly does not implicate BOKF customers who are members of the National Class, but whose claims are governed by the laws of the State of Texas.

83.     Plaintiff and BOKF have contracted for bank account deposit, checking, ATM and debit card services, as embodied in BOKF's Deposit Agreement and related documentation.

84.     Under the laws of the states where BOKF does business, good faith is an element of every contract pertaining to the assessment of overdraft fees.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of

---

[5]  Certain states recognize a claim for breach of the covenant of good faith and fair dealing as a separate and independent claim from breach of contract.  Other states treat breach of the covenant of good faith and fair dealing as a species of breach of contract.  For the sake of convenience in this multi-district litigation, the Complaint pleads these two types of claims, which are substantively identical, in a single count.

the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

85.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

86.     BOKF has breached the covenant of good faith and fair dealing in the Deposit Agreement through its overdraft policies and practices as alleged herein.

87.     Plaintiff and the National Class have performed all, or substantially all, of the obligations imposed on them under the Deposit Agreement.

88.     Plaintiff and members of the National Class have sustained damages as a result of BOKF's breach of the covenant of good faith and fair dealing.

**SECOND CLAIM FOR RELIEF**
**Unconscionability**
**(On Behalf of the National Class)**

89.     Plaintiff repeats paragraphs 1 through 80 above.

90.     BOKF's overdraft policies and practices are or were substantively and procedurally unconscionable in the following respects, among others:

a.     The Bank did not disclose or reasonably disclose to customers that they had the option to "opt out" of the Bank's overdraft scheme;

b.     The Bank did not obtain affirmative consent from checking account customers prior to processing a transaction that would overdraw the account and result in an overdraft fee;

       c.       The Bank does not alert its customers that a debit card transaction will trigger an overdraft, and does not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

       d.       The Deposit Agreement and related documents are contracts of adhesion in that they are standardized forms, imposed and drafted by the Bank, which is a party of vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement in its entirety;

       e.       The amount of overdraft fees is disclosed in an ineffective, ambiguous, misleading, and unfair manner, since it is not contained in the Deposit Agreement, but rather in a different and separate document, which is not signed by the depositor; and

       f.       The Deposit Agreement provided to customers is ineffective, ambiguous, deceptive, unfair, and misleading in that it does not unambiguously state that the Bank always reorders debits from high to low, even though BOKF *always* reorders transactions in this way for customers in order to maximize overdrafts and overdraft fee revenues for the Bank.

91.       Considering the great business acumen and experience of BOKF in relation to Plaintiff and the National Class, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law.

92.       The imposition of overdraft charges which exceed the amount overdrawn (*e.g.*, the imposition of a $28.95 charge on an overdraft of less than $28.95) is itself

unconscionable.  Such charges are not reasonably related to the Bank's cost of covering the overdraft and/or its risk of nonpayment (where the Bank pays the overdraft), or to the Bank's cost of returning the item unpaid (where the Bank does not pay the overdraft).

93.       Plaintiff and members of the National Class have sustained damages as a result of BOKF's unconscionable policies and practices as alleged herein.

### THIRD CLAIM FOR RELIEF
#### Conversion
#### (On Behalf of the National Class)

94.       Plaintiff repeats paragraphs 1 through 80 above.

95.       BOKF had and continues to have a duty to maintain and preserve its customers' checking accounts and to prevent their diminishment through its own wrongful acts.

96.       BOKF has wrongfully collected overdraft fees from Plaintiff and the members of the National Class, and has taken specific and readily identifiable funds from their accounts in payment of these fees in order to satisfy them.

97.       BOKF has, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiff and the members of the National Class, without legal justification.

98.       BOKF continues to retain these funds unlawfully without the consent of Plaintiff or members of the National Class.

99.       BOKF intends to permanently deprive Plaintiff and the members of the National Class of these funds.

100.       These funds are properly owned by Plaintiff and the members of the National Class, not BOKF, which now claims that it is entitled to their ownership, contrary to the rights of Plaintiff and the members of the National Class.

101.     Plaintiff and the members of the National Class are entitled to the immediate possession of these funds.

102.     BOKF has wrongfully converted these specific and readily identifiable funds.

103.     BOKF's wrongful conduct is continuing.

104.     As a direct and proximate result of this wrongful conversion, Plaintiff and the members of the National Class have suffered and continue to suffer damages.

105.     By reason of the foregoing, Plaintiff and the members of the National Class are entitled to recover from BOKF all damages and costs permitted by law, including all amounts that BOKF has wrongfully converted.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On Behalf of the National Class)**

106.     Plaintiff repeats paragraphs 1 through 80 above.

107.     Plaintiff, on behalf of himself and the National Class, asserts a common law claim for unjust enrichment.

108.     By means of BOKF's wrongful conduct alleged herein, BOKF knowingly provides banking services to Plaintiff and members of the National Class that are unfair, unconscionable, and oppressive.

109.     BOKF knowingly received and retained wrongful benefits and funds from Plaintiff and members of the National Class.  In so doing, BOKF acted with conscious disregard for the rights of Plaintiff and members of the National Class.

110.     As a result of BOKF's wrongful conduct as alleged herein, BOKF has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the National Class.

111.    BOKF's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

112.    Under the common law doctrine of unjust enrichment, it is inequitable for BOKF to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of overdraft fees on Plaintiff and members of the National Class in an unfair, unconscionable, and oppressive manner.  BOKF's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

113.    The financial benefits derived by BOKF rightfully belong to Plaintiff and members of the National Class.  BOKF should be compelled to disgorge in a common fund for the benefit of Plaintiff and members of the National Class all wrongful or inequitable proceeds received by them.  A constructive trust should be imposed upon all wrongful or inequitable sums received by BOKF traceable to Plaintiff and the members of the National Class.

114.    Plaintiff and members of the National Class have no adequate remedy at law.

### FIFTH CLAIM FOR RELIEF
### Violations of Oklahoma's Consumer Protection Act, O.S. § 15-753, *et seq.*
### (On Behalf of the Oklahoma State Subclass)

115.    Plaintiff repeats paragraphs 1 through 80 above.

116.    This claim is asserted on behalf of the members of the Oklahoma State Subclass under Oklahoma's consumer protection statute.

117.    Oklahoma's Consumer Protection Act, O.S. § 15-753(20), prohibits the use of a "deceptive trade practice", which is defined as a "misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person."  O.S. § 15-752(11).

118.     In addition, O.S. § 15-753(20), prohibits the use of an "unfair trade practice", which is defined as any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." O.S. § 15-752(12).

119.     BOKF violated O.S. § 15-753(20) by, *inter alia*, employing an unfair and deceptive policy and practice of re-sequencing debit purchases from largest to smallest, and misrepresenting and failing to disclose its policy and practice of re-sequencing debit purchases from largest to smallest in its Deposit Agreement and related documents.

120.     Plaintiff and the Oklahoma State Subclass have been actually injured by BOKF's unlawful, unfair, and deceptive business acts and practices, as described above.

121.     As redress for BOKF's repeated and ongoing violations of these consumer protection statutes, Plaintiff and the State Subclass are entitled to, *inter alia*, damages and declaratory relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Classes demand a jury trial on all claims so triable and judgment as follows:

1.     Declaring BOKF's overdraft fee policies and practices to be wrongful, unfair and unconscionable;

2.     Restitution of all overdraft fees paid to BOKF by Plaintiff and the Classes, as a result of the wrongs alleged herein in an amount to be determined at trial;

3.     Disgorgement of the ill-gotten gains derived by BOKF from its misconduct;

4.     Actual damages in an amount according to proof;

5.     Punitive and exemplary damages;

6.      Pre-judgment interest at the maximum rate permitted by applicable law;

7.      Costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

8.      Such other relief as this Court deems just and proper.

Dated: October 19, 2011.

Respectfully submitted,

/s/ Aaron S. Podhurst
Aaron S. Podhurst, Esquire
Florida Bar No. 063606
apodhurst@podhurst.com
Robert C. Josefsberg, Esquire
Florida Bar No. 40856
rjosefsberg@podhurst.com
Steven C. Marks, Esquire
Florida Bar No.  516414
smarks@podhurst.com
Peter Prieto, Esquire
Florida Bar No. 501492
pprieto@podhurst.com
Stephen F. Rosenthal, Esquire
Florida Bar No. 0131458
srosenthal@podhurst.com
John Gravante, III, Esquire
Florida Bar No. 617113
jgravante@podhurst.com
PODHURST ORSECK, P.A.
City National Bank Building
25 W. Flagler Street, Suite 800
Miami, FL 33130-1780
Tel: 305-358-2800
Fax: 305-358-2382

/s/ Bruce S. Rogow
Bruce S. Rogow, Esquire
Florida Bar No. 067999
brogow@rogowlaw.com
Bruce S. Rogow, P.A.
Broward Financial Center
500 East Broward Boulevard
Suite 1930
Fort Lauderdale, FL  33394
Tel: 954-767-8909
Fax: 954-764-1530

*Co-Lead Counsel for Plaintiff*

- 31 -

/s/ Robert C. Gilbert
Robert C. Gilbert, Esquire
Florida Bar No. 561861
rcg@grossmanroth.com
Stuart Z. Grossman, Esquire
Florida Bar No. 156113
szg@grossmanroth.com
David Buckner, Esquire
Florida Bar No. 60550
dbu@grossmanroth.com
Seth E. Miles, Esquire
Florida Bar No. 385530
sem@grossmanroth.com
GROSSMAN ROTH, P.A.
2525 Ponce de Leon Boulevard
Eleventh Floor
Coral Gables, FL 33134
Tel: 305-442-8666
Fax: 305-779-9596

*Coordinating Counsel for Plaintiffs*


/s/ E. Adam Webb
E. Adam Webb, Esquire
Georgia Bar No. 743910
Adam@WebbLLC.com
Matthew C. Klase, Esquire
Georgia Bar No. 141903
Matt@WebbLLC.com
G. Franklin Lemond, Jr., Esquire
Georgia Bar No. 141315
FLemond@WebbLLC.com
WEBB, KLASE & LEMOND, L.L.C.
1900 The Exchange, S.E.
Suite 480
Atlanta, GA 30339
Tel: 770-444-9325
Fax: 770-444-0271

/s/ Michael W. Sobol
Michael W. Sobol, Esquire
California Bar No. 194857
msobol@lchb.com
Roger N. Heller, Esquire
California Bar No. 215348
rheller@lchb.com
Jordan Elias, Esquire
California Bar No. 228731
jelias@lchb.com
LIEFF CABRASER HEIMANN &
  BERNSTEIN L.L.P.
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
Tel: 415-956-1000
Fax: 415-956-1008

/s/ Russell W. Budd
Russell W. Budd, Esquire
Texas Bar No. 03312400
rbudd@baronbudd.com
Bruce W. Steckler, Esquire
Texas Bar No. 00785039
bsteckler@baronbudd.com
Mazin A. Sbaiti, Esquire
Texas Bar No. 24058096
msbaiti@baronbudd.com
BARON & BUDD, P.C.
3102 Oak Lawn Avenue
Suite 1100
Dallas, TX 75219
Tel: 214-521-3605
Fax: 214-520-1181


/s/ Ruben Honik
Ruben Honik, Esquire
Pennsylvania Bar No. 33109
rhonik@golombhonik.com
Kenneth J. Grunfeld, Esquire
Pennsylvania Bar No. 84121
kgrunfeld@golombhonik.com
GOLOMB & HONIK, P.C.
1515 Market Street
Suite 1100
Philadelphia, PA 19102
Tel: 215-985-9177
Fax: 215-985-4169

/s/ David S. Stellings
David S. Stellings, Esquire
New York Bar No. 2635282
dstellings@lchb.com
LIEFF CABRASER HEIMANN &
  BERNSTEIN L.L.P.
250 Hudson Street
8th Floor
New York, NY  10013
Tel: 212-355-9500
Fax: 212-355-9592


/s/ Ted E. Trief
Ted E. Trief, Esquire
New York Bar No. 1476662
ttrief@triefandolk.com
Barbara E. Olk, Esquire
New  York Bar No. 1459643
bolk@triefandolk.com
TRIEF & OLK
150 E. 58th Street
34th Floor
New York, NY 10155
Tel: 212-486-6060
Fax: 212-317-2946

*Plaintiffs' Executive Committee*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 09-MD-02036-JLK**

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

**CERTIFICATE OF SERVICE**

I hereby certify that on October 19, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Robert C. Gilbert
Robert C. Gilbert, Esquire
Florida Bar No. 561861
GROSSMAN ROTH, P.A.
2525 Ponce de Leon Boulevard
Eleventh Floor
Coral Gables, FL 33134
Tel: 305-442-8666
Fax: 305-779-9596