**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 09-MD-02036-JLK**

---

**IN RE: CHECKING ACCOUNT**
**OVERDRAFT LITIGATION**

**MDL No. 2036**

---

**THIS DOCUMENT RELATES TO:**
**FIRST TRANCHE ACTIONS**

*Tornes, et al. v. Bank of America, N.A.*
S.D. Fla. Case No. 1:08-cv-23323-JLK

*Yourke, et al. v. Bank of America, N.A.*
S.D. Fla. Case No. 1:09-cv-21963-JLK
N.D. Cal. Case No. 3:09-2186

---

**PLAINTIFFS' RESPONSE TO OBJECTIONS TO MOTION FOR FINAL**
**APPROVAL OF SETTLEMENT AND CLASS COUNSEL'S APPLICATION**
**FOR SERVICE AWARDS AND ATTORNEYS' FEES**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................. 1

II.     THE OBJECTIONS TO THE SETTLEMENT SHOULD BE
        OVERRULED. ................................................................................................ 3

        A.      None of the Objections Has Merit. .......................................................... 3

                1.      Objections to the Size of the Recovery Overestimate
                        Damages and Underestimate the Risks Plaintiffs Face................. 3

                2.      The Court-Approved Notice Was Exemplary and
                        Objections to It Are Unfounded.................................................... 8

                3.      Plaintiffs' Expert Performed a Full Damages Analysis............... 11

                4.      Class Members Properly Release Their Claims in Exchange
                        for Valuable Consideration. ........................................................ 12

                5.      Subdividing the Settlement Class Is Unnecessary and
                        Inappropriate, Due to the Bank's Uniform Conduct and the
                        Overriding Common Risks That All Settlement Class
                        Members Faced............................................................................ 13

                6.      The *Cy Pres* Provisions Are Appropriate and Are
                        Frequently Included and Approved in Class Action
                        Settlements. ................................................................................. 16

                7.      Injunctive Relief Is Unnecessary Because Regulation E
                        Already Prohibits BofA From Placing Debit Card Users
                        Into Overdraft Status Absent Their Prior Consent...................... 19

III.    MANY OBJECTORS ARE REPRESENTED BY EXTORTIONIST
        PROFESSIONAL OBJECTOR COUNSEL, AND OTHERS ARE
        REPRESENTED BY COUNSEL WITH QUESTIONABLE MOTIVES. ......... 19

IV.     THE OBJECTIONS TO THE ATTORNEYS' FEE AND SERVICE
        AWARD APPLICATIONS SHOULD BE OVERRULED. ............................... 23

        A.      A Fee of 30 Percent of the Common Fund Is Reasonable........................ 23

        B.      Under the Controlling *Camden* Decision, the Court Should Not
                Undertake a Lodestar Analysis. ............................................................. 27

        C.      The Service Awards Are Reasonable. ..................................................... 29

V.      CONCLUSION................................................................................................ 29

## I.    INTRODUCTION

This Settlement is outstanding:  it will put hundreds of millions of dollars into the hands of more than 13 million people.[1]  It will do so automatically, without the need for any Settlement Class Member to do anything.  No one needs to submit a claim form, provide evidence of damage, or even sign a statement.  Nearly all of those 13 million Settlement Class Members received direct mail notice of the Settlement.  The Notice approved by the Court used plain language to inform Settlement Class Members about the choices available to them under the Settlement:  exclude themselves; object to the Settlement; or participate in the Settlement proceeds by taking no action.

Of the approximately 13 million Settlement Class Members, only 49 timely filed objections – 0.0004 percent.[2]  Botzet Supp. Aff. at 3.  The tiny number of objections is telling.  It evidences overwhelming support for Plaintiffs' Motion for Final Approval of the Settlement, and Class Counsel's Application for Service Awards, and Attorneys' Fees.  This extraordinarily "low percentage of objections points to the reasonableness of a proposed settlement and supports its approval."[3]  *Lipuma v. American Express Co.*, 406 F. Supp. 2d 1298, 1324 (S.D. Fla. 2005).

As discussed more fully below, the objections on file lack merit.  The short responses to the most commonly voiced complaints are as follows:

- The Settlement provides Settlement Class Members with between 45 and 9 percent of the maximum potential value of their claims.  To achieve any recovery without a settlement, Plaintiffs have to overcome every litigation risk, proceed to trial, obtain a favorable verdict, persuade an appellate court to affirm the

---

[1] All capitalized terms have the same meaning as defined in the Agreement, attached as Exhibit A to **DE # 1885**.

[2] An additional 8 objections were filed after the deadline of October 3, 2011.

[3] The average number of objections to settlements of consumer class actions is 233.  In a settlement of this magnitude, the Court should expect to receive around 2,000 objections (extrapolating from the average of 4.7 objectors per $1 million in consumer recovery).  *See* Theodore Eisenberg & Geoffrey Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues*, 57 VAND. L. REV. 1529 (2004); Supplemental Declaration of Professor Geoffrey Miller, attached as Exhibit A, ¶ 9.

judgment, and then collect it. The $410 million secured for the Class through the Settlement is an extremely fair and reasonable recovery, given the multitude of serious risks faced by Plaintiffs. *See* pp. 3–8, *infra*.

- The Court-approved Notice is sufficient. It used plain language to apprise the Settlement Class of the litigation, the Settlement terms, and their rights. *See* pp. 9–11, *infra*.

- Subclassing based on membership in the *Closson* settlement class makes no logical sense, because approval of that settlement was uncertain, and because all Settlement Class Members here are similarly situated with respect to BofA's conduct and the litigation risks they would face if these claims were to proceed through trial and appeal. *See* pp. 13–17, *infra*.

- The Court will approve, supervise and control all *cy pres* distributions; the *cy pres* program to benefit consumer financial literacy is an appropriate proxy for distributing Settlement proceeds to those Settlement Class Members who cannot be identified. *See* pp. 17–19, *infra*.

- Class Counsel's application for fees is reasonable and consistent with Eleventh Circuit precedent, which adopted percentage of the fund fee awards as the exclusive method for awarding fees in common fund class actions and expressly repudiated the cumbersome lodestar method of calculating attorneys' fees. *See* pp. 27–30, *infra*.

Apart from the inadequate substance of the objections, a number of Objectors are represented by lawyers who have made a career of objecting to class action settlements to extort money from class counsel and settling defendants ("professional objectors"). An additional group of Objectors are represented by a lawyer who previously served on the Plaintiffs' Executive Committee ("PEC") in this MDL proceeding and who was terminated from, and is presently litigating against, his former law firm, one of the PEC law firms. The objections raised

by these lawyers (identified in Section III, *infra*) should be accorded little weight due to the questionable motives underlying their filing.

Plaintiffs respectfully request that the Court overrule all of the objections, grant Final Approval, award Service Awards to the Class Representatives, and award Class Counsel fees for their services in successfully litigating and resolving the Actions.

## II.    THE OBJECTIONS TO THE SETTLEMENT SHOULD BE OVERRULED.

The Objectors' filed papers are riddled with errors and do nothing to affect the conclusion that this Settlement is fair and reasonable.  Not a single Objector submitted an expert affidavit or provided any evidence that undermines the conclusion reached by all of Plaintiffs' experts that the Settlement achieves an exceptional result for the Settlement Class.  *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir. 1998) (affirming final approval of nationwide class action settlement where "[t]he objectors presented no evidence" to support their arguments).  Here, the evidence Plaintiffs presented in support of the fairness of the Settlement and the reasonableness of the attorneys' fee request is unrebutted.  The Settlement should be finally approved.

### A.    None of the Objections Has Merit.

#### 1.    Objections to the Size of the Recovery Overestimate Damages and Underestimate the Risks Plaintiffs Face.

A theme across many objections is that $410 million is not enough to adequately compensate the Settlement Class.  However, as Class Counsel previously informed the Court, the $410 million paid into escrow by BofA represents between 45 percent and 9 percent of the total potential damages.  [**DE # 1885** at 27].  This range of recovery derives from Class Counsel's analysis of the broad spectrum of risks present in this action.  The nine percent figure at the bottom end of this range, which is based on BofA's *maximum possible* liability exposure, assumes that a fact-finder would have calculated damages by comparing the total overdraft fees BofA assessed using its high-to-low posting order with the total overdraft fees it would have assessed using the inverse method, *i.e.*, posting debits from lowest to highest dollar amount.

Of course, a fact-finder might not have used such a low-to-high comparator to calculate damages, but instead might have calculated damages by comparing the fees actually assessed with the fees that would have been assessed under a chronological posting order. *See Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080, 1138-39 (N.D. Cal. 2010) (calculating damages based on the finding that chronological posting of debits "would have tracked the ordinary and reasonable expectations of depositors."). Such a chronological comparison, as opposed to a low-to-high comparison, significantly reduces BofA's total liability and, in turn, significantly increases the percentage of recovery that $410 million represents.

Nine percent or higher constitutes a fair settlement even absent the risks associated with prosecuting these claims. *See Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988) (King, C. J.) ("A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery."); *In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d 568, 581 (E.D. Pa. 2003); *see also In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1105 (5th Cir. 1977) (holding that "[s]ettlement agreements are highly favored in the law and will be upheld whenever possible because they are a means of amicably resolving doubts and uncertainties and preventing lawsuits.").

Objectors' argument is premised on hindsight bias and an unduly sanguine view of Plaintiffs' litigation risks. A settlement fairness analysis must consider such risks at the time the settlement was reached, not after settlement. *See, e.g.*, *In re CIGNA Corp.*, 2007 WL 2071898, at *3 (E.D. Pa. July 13, 2007). The combined risks here were real and potentially catastrophic for the Class. As Professor Miller stated: "This is among the riskiest class action cases I have encountered in more than twenty years of involvement in the field of class action and complex litigation." Declaration of Professor Geoffrey Miller [**DE # 1885** at Ex. H], ¶ 22. Plaintiffs faced a number of serious risks, several of which could have abruptly ended the litigation and resulted in the Class receiving nothing. That the Objectors seek to undo the Settlement and expose the Class once more to these risks is indicative of the extent to which the Objectors have

elevated their own personal interests over those of the Class, and of why they are ill-suited to speak for the Class.

*First*, whether Plaintiffs' claims are preempted by the National Bank Act ("NBA") remains an open question. No federal appeals court has yet reached the NBA preemption issue in this specific context. Courts have taken different approaches to the complex federal preemption analysis (*see, e.g.*, *Baptista v. JPMorgan Chase Bank, N.A.*, 640 F.3d 1194 (11th Cir. 2011)), and such analysis in this case requires interpretation of a web of competing federal and state authorities and interests. Moreover, the preemption defense "was a 'light switch' which, if successfully turned 'on' by BOA, would have led to dismissal of the entire case, which was predicated entirely on state law." Expert Report of Professor Charles Silver [**DE # 1885** at Ex. K], at 15; *cf. Enterprise Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 248 (S.D. Ohio 1991) (rejecting the argument "that the Class should get more" because of the "very real potential that the Class could come away from a long expensive trial with nothing."). While Class Counsel continue to believe the claims here are not preempted, there is no guarantee this view will ultimately prevail in this Court or on appeal.

*Second*, high-to-low reordering is "by no means clearly unlawful." Declaration of Professor Samuel Issacharoff in Support of Settlement [**DE # 1885** at Ex. F], ¶ 17. The account agreements disclose that BofA may process debits out of order, and the Uniform Commercial Code expressly permits the reordering of checks. *See* UCC § 4-303(b) & cmt. 7. Plaintiffs include serial overdrafters who could be portrayed at trial as irresponsible or profligate, or as simply having spent more money than they had. Although Class Counsel believe they can overcome such defenses at trial, the risk of defeat remained significant.

*Third*, while Objectors treat class certification as a foregone conclusion, it is anything but that. This Court had not certified any class in MDL 2036 when this Settlement was negotiated in mediation, nor had it done so before the Settlement Agreement was signed. BofA would have undoubtedly opposed class certification on multiple grounds; for example, manageability arguments not available to Union Bank (sued under the laws of three states) would have been

available to BofA.  Had BofA defeated class certification, the value of this case would have decreased to near zero.

*Fourth*, the Class faced a large roadblock to recovery in the *Closson* settlement.  Its release subsumed *all* BofA customers who incurred overdrafts between 2001 and 2007, as well as large numbers of BofA customers who incurred overdrafts *after* 2007.  *See* Section II.A.5, *infra*.  As a result, "the *Closson* settlement loomed like a Sword of Damocles . . . ."  Declaration of Professor Geoffrey Miller [**DE # 1885** at Ex. H], ¶ 38.  Yet Settlement Class Counsel "successfully navigated around the *Closson* Settlement and obtained an outstanding settlement for the class."  Declaration of Roberto Martinez [**DE # 1885** at Ex. G], ¶ 32.  Indeed, "not only did class counsel here manage to persuade Bank of America that this previous settlement might not withstand appeal, but they managed to persuade Bank of America to *resettle* the dispute for nearly ten times what it had been willing to pay only three years ago."  Declaration of Brian T. Fitzpatrick [**DE # 1885** at Ex. J], ¶ 14.

*Fifth*, Objectors downplay the risk that BofA would have joined other First Tranche Banks in seeking arbitration based on the Supreme Court's recent decision in *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011).  [*E.g.*, **DE # 1384**].  Objector Hastings relies on BofA's public statement of August 13, <u>2009</u> that it "will no longer enforce mandatory arbitration in *new* banking disputes with *individual* customers."  **[DE # 1916** at 16 (emphases added)].  In addition to being non-binding and potentially reversible, however, this announcement by its terms did *not* extend to class action suits or disputes already on file at the time.  *Tornes* and *Yourke* are both class actions that, at the time of BofA's 2009 announcement, had already been filed and centralized here.  Also, in its Answer, BofA raised arbitration as a defense, purporting to reserve the right to enforce the arbitration provision in the governing (not the current) BofA account agreement.  *See* BofA Answer in *Tornes* [**DE # 496**], ¶ 268; *cf. Chavez v. Bank of Am., N.A.*, 2011 WL 4712204 (N.D. Cal. Oct. 7, 2011) (enforcing arbitration provision in BofA consumer contract against two plaintiffs).  Had BofA succeeded in enforcing its arbitration provision, the value of this case would have dropped to near zero.

- 6 -

*Sixth*, just as the risk of BofA's insolvency factored into Settlement Class Counsel's analysis, so, too, this risk informs the Court's own analysis.  The 2008 financial crisis culminated in large bank bailouts; BofA's market capitalization has since plummeted; and the new Dodd-Frank law prohibits the federal government from bailing out any national bank that fails.  *See* Pub. L. 111-203, 124 Stat. 1376, Sec. 214 (July 21, 2010) ("No taxpayer funds shall be used to prevent the liquidation of any financial company").  Since the Settlement Agreement was signed in May 2011, BofA's stock price has dropped 47 percent, from $12.31 at market closing on May 6, 2011, to $6.47 at market closing on October 20, 2011.  If, as several Objectors suggest, a court were to materially modify the terms of the Settlement Agreement and thereby give BofA the right to terminate the Settlement pursuant to paragraphs 94 and 108, BofA might then choose not to settle but, rather, to terminate the Settlement and automatically and immediately recover the balance of the $410 million (less administrative expenses incurred to date) now safely held in escrow to bolster its capital reserves against the enormous potential litigation liabilities it now faces on multiple fronts.[4]

Last but not least, the Court should bear in mind that Class Counsel confronted not merely a single large bank, but "the combined forces of a substantial portion of the entire American banking industry, and with them a large contingent of some of the largest and most sophisticated law firms in the country."  Declaration of Professor Geoffrey Miller [**DE # 1885** at Ex. H], ¶ 49.  The record of proceedings here, like the record in *Bennett v. Behring Corp.*, 737 F.2d 982, 988 (11th Cir. 1984), will demonstrate "great patience and diligence" on the part of "counsel and the court in resolving a massive and difficult case."

It is easy enough for Objectors to claim in hindsight that Settlement Class Counsel could or should have obtained more.[5]  It is quite another thing to accomplish that result in the face of

---

[4] *See, e.g.*, http://money.cnn.com/2011/09/12/news/companies/bank_of_america_job_cuts/index.htm (CNN news report of Sept. 12, 2011 headlined "Bank of America Cutting 30,000 Jobs");   M. Chadbourn & J. Stempel, *Mortgage Suits May Cost Banks Billions*, MIAMI TIMES, Sept. 7, 2011, at 7D; K. Pittman, *BofA Shares Slide 8% as Feds File Suit*, CHARLOTTE OBSERVER, Sept. 3, 2011, at section B.

[5] "I could of [sic] take on this bank on my own and win this case and get back my money," a
*Footnote continued on next page*

all these risks, combined. "Successful outcomes often make risks seem less risky in hindsight than they were at the time," and, even though "inherent in compromise is a yielding of absolutes and an abandoning of highest hopes," final settlement approval orders "almost always override the wishes of some class members for a bigger slice of the pie." *In re Abrams & Abrams, P.A.*, 605 F.3d 238, 248 (4th Cir. 2010); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) (citation omitted); *Curtis-Wright Corp. v. Helfand*, 687 F.2d 171, 175 (7th Cir. 1982).

In negotiating this Settlement Agreement, Settlement Class Counsel drew upon knowledge of this case and experience in negotiating other major settlements to make the reasonable judgment that $410 million constitutes a fair and reasonable result, against *all* the risks, added together. Further, Settlement Class Counsel negotiated tenaciously to ensure that the money will go directly to Settlement Class Members, preventing a claims process that would have drastically reduced the number of compensated individuals. *See* Declaration of Professor Geoffrey Miller [**DE # 1885** at Ex. H], ¶ 20 ("[I]t is quite uncommon for consumer class actions to provide automatic relief"); Declaration of Professor Samuel Issacharoff [**DE # 1885** at Ex. F], ¶ 27 (noting the claims rate in *Closson* was only 2.8 percent).[6] This Settlement – one of the largest consumer recoveries in American history – clearly merits Final Approval.

## 2.   The Court-Approved Notice Was Exemplary and Objections to It Are Unfounded.

Several Objectors contend the Class Notice was insufficient.[7] The Court should reject these contentions. The Notice fully complied with Rule 23(e) and due process, providing the

---

*Footnote continued from previous page*

typically unrealistic Objector wrote. [Objection of S. Pereira]. Another wrote: "I feel I am entitled to get all of this money back, not to mention the late fees . . . ." [Objection of B. Harrison].

[6] One Objector's excessive focus on the PEC's objections to renegade, non-MDL settlements fails to acknowledge the primary basis for those objections; that members of those proposed settlement classes were required to fill out and submit claim forms as a condition to receiving payment. Additionally, class counsel in those settlements, unlike Settlement Class Counsel here, negotiated with no reliable damages estimates – not even extrapolations from total overdraft revenues. [**DE # 1916**]. *See also* Section II.A.3, *infra*.

[7] Objectors finding fault with the Notice include Hastings [**DE # 1916**], Repa [**DE # 1935**], Carapia [**DE # 1936**], and Finn. For example, Hastings claims the notice "falsely" informed

*Footnote continued on next page*

best notice practicable. This Court previously approved the Notice and found that it satisfies Rule 23. *In re Checking Account Overdraft Litig.*, --- F.R.D. ----, 2011 WL 2258458 (S.D. Fla. 2011) (finding "the proposed Notice Program and proposed forms of Notice satisfy Federal Rule of Civil Procedure 23 and Constitutional Due Process requirements, and are reasonably calculated under the circumstances . . .").

The Court need only review a brief set of statistics to confirm the reach of the Notice and the overwhelmingly positive reaction of the Class:

- 13,280,225 notices were mailed;

- 268,775 Settlement Class Members called the Settlement hotline on or before October 15, 2011, meaning they had a question about the Settlement and sought further information about it;

- there were approximately 281,413 unique visitors to the Settlement website as of October 15, 2011;

- 102,304 Settlement Class Members went so far as to contact the Settlement Administrator to request a mailed copy of the long-form notice;

- the Notice prominently included the names and telephone numbers of Settlement Class Counsel, who fielded hundreds of phone calls and e-mails from Settlement Class Members seeking additional information;

- there were only 346 timely exclusion requests (0.0027 percent), and

- only 49 objections (0.0004 percent).[8]

---

*Footnote continued from previous page*

Settlement Class Members that Class Counsel could not determine how much money each Settlement Class Member would receive. [**DE # 1916** at 1]. But that is a true statement. It would have been "false" to provide each Settlement Class Member with a particular damage figure when that figure necessarily depended on such unknowns as the number of opt-outs and the outcome of the application for attorneys' fees.

[8] The objection rate is much lower than the mean in consumer class actions. *See* footnote 2, *supra.* The Affidavit of Joel Botzet of Rust Consulting [**DE # 1885** at Ex. C], and the Supplemental Affidavit of Joel Botzet of Rust Consulting, attached as Exhibit B, set forth the above-referenced statistics concerning Settlement administration.

These statistics establish that the Settlement was widely known and appreciated, and that any Settlement Class Member who wished to express comments or objections had ample opportunity and means to do so.  The near "unanimous approval of the proposed settlements by the class members is entitled to nearly dispositive weight in this court's evaluation of the proposed settlements."  *In re Art Materials Antitrust Litig.*, MDL No. 436, 100 F.R.D. 367, 372 (N.D. Ohio 1983); *see also Lipuma*, 406 F. Supp. 2d at 1324.

Contrary to what Objectors suggest, the law does not require that notice be given of the amount an individual class member will recover, either as a lump sum or as a range or percentage of potential recovery.  A class action settlement notice "need not be so detailed that an individual class member can calculate the amount of his or her actual recovery under the settlement."  *In re WorldCom, Inc.*, 347 B.R. 123, 140 (Bankr. S.D.N.Y. 2006) (citation, quotation marks, and alteration omitted); *see Mangone v. First USA Bank*, 206 F.R.D. 222, 231-34 (S.D. Ill. 2001) (overruling objection that class settlement notice did not state "the value of damages, the merits of the claims, . . . the maximum potential recovery for the Class, and the methodology for determining and calculating damages"; holding that "none of the items complained of are required by the notice requirements set out in F.R.C.P. 23 or due process.").

The extremely low objection rate prompts the conclusion that most Settlement Class Members are pleased to be receiving money back.  Conversely, disclosure in the Notice of all the risks and corresponding percentages would have required describing a series of risks that depended on legal assumptions and guesswork, and this easily could have led to a garbled or misleading Notice.  There was no meaningful way to disclose all these details briefly, to non-lawyers, without provoking confusion.

Nor was there any requirement to make such an extensive disclosure in the Notice. "Class members are not expected to rely upon the notices as a complete source of settlement information."  *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 122 (8th Cir.), *cert. denied*, 423 U.S. 864 (1975).  This Notice was adequate because it informed the Settlement Class Members of the Settlement terms, their rights under the Settlement, and where they could find more

information.  The website contains links to the Settlement Agreement, operative complaints, Motion for Final Approval, and many other documents relevant to the Settlement and the litigation posture of the Actions.  Class Counsel included the estimated 45% – 9% recovery range in their Motion for Final Approval; some Objectors included this information in their objections.  In short, all the information that was offered to the Court is and has been available to every Settlement Class Member.

### 3. Plaintiffs' Expert Performed a Full Damages Analysis.

Certain Objectors imply that Settlement Class Counsel entered into the Settlement without knowing BofA's total liability exposure.  [*E.g.*, **DE # 1916**].  That is flat-out wrong. Settlement Class Counsel participated in three days of mediation, overseen by nationally recognized mediator Professor Eric Green, with several damages estimates in hand based on information provided by BofA.  Before entering mediation and reaching the Settlement, Settlement Class Counsel also reviewed and analyzed a substantial number of BofA internal documents that showed BofA's own calculations of how much extra revenue the debit re-sequencing generated.  Moreover, as part of the ongoing settlement process, Plaintiffs' expert Art Olsen performed the detailed work necessary to determine the exact amount of each Settlement Class Member's damages based on high to low Debit Re-sequencing, and the proposed plan of allocation.  *See* Joint Declaration of Robert C. Gilbert and Michael W. Sobol [**DE # 1885** at Ex. B ("Joint Decl.")], ¶ 36.

Binding law sets the bar for settlement negotiations such that "[i]t is enough if representation of the class during the negotiations was adequate and that the settlement itself is fair."  *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 237 (5th Cir. Unit B 1982) (citations, quotation marks, and alterations omitted)).  Here, Settlement Class Counsel possessed all the information needed to deliver a stunning result, which received widespread approval, despite a few isolated instances of Objector confusion.[9]  Both the representation of Class

---

[9] The Objectors offer no evidence, only misinformed and misguided argument.  Erroneous statements that "the class members shall only receive reimbursement for approximately one

*Footnote continued on next page*

Counsel and the results obtained far exceed that minimum standard.  These Objectors complaints are misplaced.

### 4.      Class Members Properly Release Their Claims in Exchange for Valuable Consideration.

Notwithstanding some Objectors' arguments, the release in this Settlement is clear and satisfactory, as well as typical of class action settlement releases.[10]  The release extinguishes any and all claims arising from the operative facts, which include BofA's debit re-sequencing practice, its failure to notify or obtain advance approval of overdrafts, and its failure to allow account holders to opt-out of overdrafts.  *See* Agreement ¶ 98.  The release permissibly protects BofA from any such follow-on claims, but *not* from new or unrelated claims arising from separate events or transactions.  The release withstands scrutiny because this litigation concerned all the released issues and BofA is providing extremely valuable consideration in exchange for the release.  *See, e.g.*, *In Re Managed Care Litig.*, 2010 WL 6532985, at *11 (S.D. Fla. Aug. 15, 2010) (holding similar release language – precluding "any and all causes of action . . . that are, were or *could have been* asserted . . . by reason of, arising out of, or in any way related to any of the facts, acts, events, transactions, [or] occurrences" – "*only* applies to claims that relate to the course of conduct" at issue in the underlying settled multidistrict litigation) (emphasis added).

---

*Footnote continued from previous page*

overdraft," or that the Settlement provides "a mere 2.28%" of the total harm (or "$450,000"), severely underestimate the total recovery and fail to comprehend that Expert Olsen calculated damages for each of the 13 million individuals, one by one, based on their own account histories, using the formula detailed at paragraph 79 of the Settlement Agreement.  [**DE # 1933** at 2–3; **DE # 1903** at 9; Objection of C. Cushman].  Objector Judith Brown misunderstands the mechanics of fund distribution.  [Objection of J. Brown].  BofA will receive disbursements from the Settlement Fund to cover the credits it will provide to Settlement Class Members.  No amounts from the fund will revert to BofA.  Another deficient objection protests BofA's ability under a Settlement provision to seek uncollectibles and sums in closed accounts.  [**DE # 1935** at 9].  That negotiated provision reasonably safeguards BofA's ability to do what it is already permitted to do.

[10] *E.g.*, Jenkins [**DE # 1920**] and Sarro [**DE # 1933**].  Class action defendants invariably and predictably seek a global release that will eliminate their risk of future exposure under any legal theory that could arise from the operative facts.  *See* Joseph M. McLaughlin, *McLaughlin on Class Actions: Law and Practice* § 6:28, at 141 (5th ed. 2009) (noting that "a settlement is ordinarily impractical unless it covers all claims, actual and potential, state and federal, arising out of the transaction or conduct at issue.").

5.   **Subdividing the Settlement Class Is Unnecessary and Inappropriate, Due to the Bank's Uniform Conduct and the Overriding Common Risks That All Settlement Class Members Faced.**

A few Objectors argue for subclassing based on certain Settlement Class Members' participation in the settlement in *Closson v. Bank of America, N.A.*, the California class action settled with a nationwide release that Settlement Class Counsel contested and appealed to protect the Class Members' claims in this MDL litigation.[11]  But the plan of allocation treating all Settlement Class Members equally should not be disturbed.  All Settlement Class Members were harmed by the same BofA practices and in the same manner, and all were subject to the same overriding (and existential) risks of federal NBA preemption, arbitration, and defenses grounded in BofA's account agreements.  Balkanizing the unified Settlement Class into subgroups cannot be justified, and is potentially inconsistent with the fiduciary obligations of Class Counsel, demonstrating yet again why the Objectors are in no position to speak for the Class.

A material intra-class conflict requiring subclassing does *not* exist "if: (1) the general interests of all class members are amenable to unified representation, and (2) no specific feature of the settlement sacrificed the interests of some class members to those of others."  *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 237 (5th Cir. Unit B 1982).  This is exactly the situation here.  "There are no conflicts in the representation of class members who all were subject to the exact same procedures by Bank of America.  The relief afforded to class members is precisely proportionate to the charges they suffered as a result of the contested overdraft policy."  Declaration of Professor Samuel Issacharoff in Support of Settlement [**DE # 1885** at Ex. F], ¶ 40.

The *Closson* settlement, while relevant as a risk factor, does not affect the structural integrity of this Settlement Class.  When this Settlement was being negotiated, nobody knew whether *Closson* would be affirmed or overturned on appeal.  *See In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981) (analysis of a potential intra-class conflict

---

[11] Objectors who raise the *Closson* subclassing argument include Hastings [**DE # 1916**], Locke [**DE # 1922**], and Clayton [**DE # 1945**].

looks to "whether . . . interests conflicted at the point of settlement negotiation").  The uncertainty and risk presented by *Closson* falls well short of the material variations in class member rights and interests that required subclassing in Objectors' case authorities at the time of settlement.  *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999)[12] (disparities among asbestos claimants centered on their eligibility for the insurance policies financing a limited settlement fund, in a mandatory, non-opt-out class settlement); *In re Literary Works in Elec. Databases Copyright Litig.*, -- F.3d --, 2011 WL 3606725 (2d Cir. Aug. 17, 2011)[13] (class members who registered copyrights had qualitatively different and more valuable rights, including eligibility for statutory damages and attorneys' fees, than those who had not).

Objectors fail to see that those cases involved stark disparities in class member rights that are not present here, and then they compound the error by distorting and misconstruing the *Closson* release.  When this Settlement was reached, *Closson* threatened to extinguish claims of *all* BofA account holders who incurred even a single overdraft fee between 2001 and 2007, not merely overdraft fees that resulted from debit re-sequencing.  Therefore, many *Closson* class members (*i.e.*, those who incurred at least one overdraft fee but did not incur any excess overdraft fee resulting from debit re-sequencing) are not even members of this Settlement Class.  On the other hand, a BofA account holder who incurred a re-sequencing related fee between 2008 and 2011, *and* who incurred *any* fee between 2001 and 2007 (whether related to re-sequencing or not), would belong to both the *Closson* class and this Settlement Class.  It is precisely such complexities that would make it administratively difficult to untangle the two groups; a 2007 subclass cut-off date would be neither accurate nor workable.[14]

---

[12] Cited by Objectors Clayton [**DE # 1945**] and Locke [**DE # 1922**].

[13] Cited by Objector Locke [**DE # 1922**].

[14] Further complexities would result from the fact that many people change their names when they get married, making it difficult to identify claimants who held BofA checking accounts under maiden names during and before 2007 and during that time incurred at least one overdraft fee, and who subsequently married, opened a new or joint account with a different account number, and then incurred at least one excessive overdraft fee.  Likewise, claimants who opened and closed accounts, or who held multiple BofA checking accounts, would pose administrative

*Footnote continued on next page*

A variant on this objection complains that the relatively small number of BofA account holders who may belong to both settlement classes will receive a double recovery. [**DE # 1945**]. There are two responses to this argument. First, any overlapping recovery is minimal and negligible in the context of this Settlement. Class members in *Closson* filed only 110,000 total claims, and that limited group stands to receive approximately $8 million, less than two percent of the amount secured by this Settlement. *See* Declaration of Samuel Issacharoff [**DE # 1885** at Ex. F], ¶ 27. Second, even if a minimal degree of overlapping recovery exists here, it would be structurally justified because the two settlements separately compensate individuals for distinct alleged violations. In *Closson*, BofA settled claims based on allegations of false advertising, and agreed to pay account holders who had incurred even a single overdraft charge. Here, BofA is settling claims based on allegations of breach of the implied covenant of good faith and fair dealing and unfair business practices (*i.e.*, the practice of reordering debits), and has agreed to pay account holders who incurred two or more overdrafts on a single day as a result of the reordering. Any limited overlap between the two groups does not create a conflict or adequacy of representation issue, because the settled claims involve separate alleged and recompensed wrongs.

Objectors further overlook that account holders in the later part of this Settlement class period might actually be seen as having weaker claims, to the extent they could be attacked or portrayed as being on notice of the relevant BofA practices from the filing of overdraft fee cases and the increasing media coverage of bank overdraft fee abuses.[15]  Such Settlement Class

---

*Footnote continued from previous page*

difficulties under Objectors' subclassing scenarios because the only reasonable way to track damages is by account number.

[15] Objector Clayton asserts that claims from the earlier time period are barred by the statute of limitations. [**DE # 1945**]. This ignores the tolling doctrines available to Plaintiffs as a result of the deliberate "inconspicuousness and incomprehensibility of the contract language at issue . . . ." Tornes Compl. ¶ 192; *see also id.* ¶¶ 61, 69–71, 80, 83(a)–(c); *Madura v. Countrywide Home Loans, Inc*., 2008 WL 2856813, at *9 & n.23 (M.D. Fla. July 23, 2008) (finding claims not time-barred under equitable tolling, fraudulent concealment, and delayed discovery rules). Additionally, Objector Hastings' legal argument that *Closson* would not have precluded overlapping MDL claims cannot be reconciled with *Monahan v. New York City Department of Corrections*, 214 F.3d 275, 289-90 (2d Cir. 2000), which held that if "challenges are to aspects

*Footnote continued on next page*

- 15 -

Members might well be considered *less*, rather than more, entitled to recover, even though their claims may not fit within the *Closson* release. *See* BofA Answer in *Tornes* [**DE # 496**], ¶¶ 247–52 (asserting defenses of voluntary payment, voluntary conduct, estoppel, consent, ratification, and disclosure). At a minimum, the Settlement fund could not be allocated between hypothetical settlement subgroups (assuming they could even be identified) except on the basis of unwarranted and speculative assumptions going to the merits of the parties' claims and defenses.

The subclassing argument also has no logical stopping-point. One could just as easily argue for subclasses based on variations in state law,[16] or in BofA's deposit account agreements, which varied over time and between states and regions. But such minor distinctions, like membership in *Closson*, do not rise to the level of a material intra-class conflict. The present Settlement correctly treats all account holders the same, as BofA subjected all its consumer accounts to the same re-sequencing and all Settlement Class Members confronted several major litigation risks, each of which could have eliminated the claims of each and every Settlement Class Member in their entirety: preemption; arbitration; and unfavorable contract interpretation.

### 6.    The *Cy Pres* Provisions Are Appropriate and Are Frequently Included and Approved in Class Action Settlements.

Some Objectors challenge the distribution of sums attributable to unidentifiable Settlement Class Members and left-over sums to worthy organizations that benefit consumer financial education and literacy.[17] These Objectors miss the point that the Settlement Agreement does not itself select the organizations or distribute such residual funds. Instead, the Court in due course will review proposals by Settlement Class Counsel and BofA for such distributions, and

---

*Footnote continued from previous page*

of the policy which survive the earlier litigation, then the claim itself was subsumed by the earlier litigation" and is therefore barred by the prior final judgment. [**DE # 1916**].

[16] No state-by-state subclassing is warranted, in view of the shared common law claims and factual predicate. [**DE # 1945**]. Where "deceptive practices occurred nationwide . . . fairness counsels that plaintiffs similarly injured by the same course of deceptive conduct should receive similar results with respect to liability and damages." *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 290 (3d Cir.), *cert. denied*, 525 U.S. 1114 (1999).

[17] Objectors focusing on *cy pres* include Jenkins [**DE # 1920**], Carapia [**DE # 1936**], Fletcher [**DE # 1903**], and Finn.

will make all the final decisions.[18]  Thus, the Court will ensure the integrity and suitability of the *cy pres* awards.

The Court has the discretion to approve *cy pres* provisions of the Settlement (a) in the interests of "facilitating a settlement in a hard-fought, complex class action," and (b) to "serve[] the goals of civil damages by ensuring [the defendant] fairly pays for the class's alleged losses."[19]  *In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 35-36 (1st Cir. 2009); *see Cotton v. Hinton*, 559 F.2d 1326, 1329 (5th Cir. 1977) (reviewing court will evaluate whether District Judge "clearly abused his discretion" in approving settlement as a whole).[20]  Since there is a reasonable basis for *cy pres* distributions here – it is not feasible to determine the damages sustained by BofA account holders from 2001 to 2003 – approving the relevant provisions, which are narrowly tailored to the purpose of the underlying action, cannot be a clear abuse of discretion.  *See In re Rasbury*, 24 F.3d 159, 168 (11th Cir. 1994) (reciting Eleventh Circuit "range of choice" approach to highly deferential abuse-of-discretion standard of review).

Indeed, the Settlement Agreement's *cy pres* provisions are fully consistent with the law of *cy pres*, under which courts have approved settlements awarding class members *nothing* and allocating the entire fund to charities whose missions harmonize with the purposes of the suit. *Shepherd Park Citizens Ass'n v. Gen. Cinema Beverages of Wash., D.C., Inc.*, 584 A.2d 20, 25 (D.C. 1990).[21]  What would be legally unjustified here is for unclaimed funds to revert to BofA.

---

[18] Federal courts regularly award attorneys' fees out of *cy pres* settlement funds.  *E.g.*, *Francisco v. Numismatic Guar. Corp. of Am.*, 2008 WL 649124 (S.D. Fla. Jan. 31, 2008).

[19] As one of Plaintiffs' experts opined, "in small-stakes cases, the most important function of the class action device is not compensation of class members but deterrence of wrongdoing . . . [and] if defendants did not pay someone—even third parties like *cy pres* charities—for such harms, then defendants would have every incentive to cause such harms in the future. . . . Thus, in such [small-stakes] cases, the most important thing is that the defendant pays for the wrongs it has perpetrated—it is less important *who* the defendant pays."  Supplemental Declaration of Brian T. Fitzpatrick, attached as Exhibit C, ¶¶ 6, 9.

[20] *Accord*, *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984) ("Determining the fairness of the settlement is left to the sound discretion of the trial court and we will not overturn the court's decision absent a clear showing of abuse of that discretion.").

[21] *See also New York by Vacco v. Reebok Int'l*, 903 F. Supp. 532 (S.D.N.Y. 1995), *aff'd*, 96 F.3d 44 (2d Cir. 1996) (settlement distributed to state athletic activities and facilities); *In re Toys R Us Antitrust Litig.*, 191 F.R.D. 347 (E.D.N.Y. 2000) (settlement distributed $37 million in new toys

*Footnote continued on next page*

- 17 -

That will not happen.  *See* ALI, *Principles of the Law: Aggregate Litigation* § 3.07, cmt. b (2010) (noting that "reversion to the defendant  . . . would undermine the deterrence function of class actions and . . . reward[] the alleged wrongdoer simply because distribution to the class would not be viable.").

Objectors contesting these *cy pres* provisions may also rely on the Fifth Circuit's recent decision in *Klier v. Elf Atochem N. Am., Inc*., -- F.3d --, 2011 WL 4436528 (5th Cir. 2011).  But *Klier* is inapposite, because the settlement agreement in that case "required the court to reallocate the funds among the subclasses of the class that generated the settlement fund," *id.* at *8, and the court specifically tied its holding to this contractual requirement, *id*. at *1 ("We hold that the district court abused its discretion by ordering a *cy pres* distribution in the teeth of the bargained-for terms of the settlement agreement, which required residual funds to be distributed within the class.").  Also, the *Klier* decision by its terms only "treat[ed] a distinct category of such cases, in which funds have gone unused by a particular subclass." *Id*. at *7.  In contrast, there are no subclasses here, let alone unused money allocated to a subclass, and the Settlement Agreement explicitly and appropriately provides for *cy pres* distributions in light of the infeasibility of determining recipients.

The *cy pres* plan of this Settlement recognizes that the "next best thing" for BofA account holders charged unfair overdraft fees between 2001 and 2003 (the group who cannot be identified and whose damages cannot be determined) is to give their aggregate share of damages – 12.5 percent of the Net Settlement Fund – to organizations devoted to educating consumers and protecting them from unsavory bank practices.  Such payments will furnish some indirect benefit to the 2001-2003 group.  Allocating their recovery to the 2004-2011 group, however, will not demonstrably benefit the 2001-2003 group, and likely will provide the 2004-2011 group with a recovery based on fees they did not pay.  The latter outcome would undoubtedly have prompted

*Footnote continued from previous page*
through the Toys for Tots program and established a $20 million fund to buy books and computers for schools); *In re Vitamins Cases*, 107 Cal. App. 4th 820 (Cal. Ct. App. 2003) (affirming *cy pres* award of an entire settlement).

a separate set of objections, which were *not* made as a consequence of the existing *cy pres* program.

Because Settlement Class Members from the 2001-2003 period cannot be identified and their damages cannot be determined, it is reasonable to entrust the money they otherwise might have recovered to worthy organizations, consistent with this Court's approval of such organizations and the law of *cy pres*. *See* Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11:20 (4th ed. 2002).

> **7.    Injunctive Relief Is Unnecessary Because Regulation E Already Prohibits BofA From Placing Debit Card Users Into Overdraft Status Absent Their Prior Consent.**

Objectors who lament the absence of injunctive relief operate under the misimpression that it is still possible for BofA to carry out its alleged debit re-sequencing scheme.[22]  It is not. On September 21, 2009 (after the filing and centralization of these cases), BofA announced that henceforth it would no longer approve attempted debit transactions when consumer checking accounts lacked sufficient funds to cover them.  Tornes Compl. [**DE # 344**], ¶ 87.  And BofA could not restart its alleged unfair and deceptive overdraft-fee scheme even it wanted to. Regulation E, which took effect on August 15, 2010, prohibits banks from assessing overdraft fees on debit transactions unless consumers affirmatively consent to this practice.  *See* 12 C.F.R. § 205.17.  Therefore, injunctive relief would be superfluous.

**III.    MANY OBJECTORS ARE REPRESENTED BY EXTORTIONIST PROFESSIONAL OBJECTOR COUNSEL, AND OTHERS ARE REPRESENTED BY COUNSEL WITH QUESTIONABLE MOTIVES.**

The Court-approved Notice requirement that Objectors and their lawyers list their prior recent objections – designed to deter and ferret out frivolous objections – seems to have struck a nerve.  The drawn-out protestations in some Objector papers indicate they have something to hide – and they do.  [*E.g.*, **DE # 1922, 1933, 1936**].  Several of the Objectors here are

---

[22] Such Objectors include Repa [**DE # 1935**], Carapia [**DE # 1936**], Fletcher [**DE # 1903**], and Jordan.

represented by members of a small but active group of lawyers, often acting in concert, who have made a cottage industry out of challenging class action settlements, not to benefit the class, but to leverage a fee.

Baseless rote allegations (such as those before the Court) that class counsel deliberately undervalued the claims, and boilerplate objections (again, like those before the Court) to fees, notice, or the settlement release, provide strong evidence that objections stem from professional objectors' counsel.  Such lawyers – who employ objections, and subsequent meritless appeals, as extortion – interfere with the system and "often delay and unnecessarily complicate class proceedings." *Newberg on Class Actions* § 15:37.  The Federal Judicial Center therefore advises courts to "[w]atch out . . . for canned objections from professional objectors who seek out class actions to extract a fee by lodging generic, unhelpful protests."   Federal Judicial Center, *Managing Class Action Litigation: A Pocket Guide for Judges*, at 15 (2d ed. 2009).

Federal courts have condemned professional objectors, including some of the ones who objected to this Settlement:

> Repeat objectors to class action settlements can make a living simply by filing frivolous appeals and thereby slowing down the execution of settlements. . . . [P]rofessional objectors can levy what is effectively a tax on class action settlements, *a tax that has no benefit to anyone other than to the objectors.  Literally nothing is gained* from the cost: Settlements are not restructured and the class, on whose benefit the appeal is purportedly raised, gains nothing.

*Barnes v. Fleet Boston Fin. Corp*., 2006 U.S. Dist. LEXIS 71072, at *3-4 (D. Mass. Aug. 22, 2006) (emphasis added).

Federal courts "are increasingly weary of professional objectors," who "are a pariah to the functionality of class action lawsuits, as they maraud proposed settlements – not to assess their merits on some principled basis – but in order to extort the parties, and particularly the settling defendants, into ransoming a settlement that could otherwise be undermined by a time-consuming appeals process."  *O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 295 n.26 (E.D. Pa. 2003); *Snell v. Allianz Life Ins. Co. of N. Am*., 2000 WL 1336640, at *9 (D. Minn.

Sept. 8, 2000); *see also Shaw v. Toshiba Am. Info. Sys., Inc*., 91 F. Supp. 2d 942, 975 (E.D. Tex. 2000). Another District Court Judge memorably compared professional objectors to ocean parasites:

> The remoras are loose again. . . . These objectors have contributed nothing. . . . Objectors' request and their motion ill-befit attorneys admitted to the bar.

*In re UnitedHealth Group PSLRA Litig*., 643 F. Supp. 2d 1107, 1108-09 (D. Minn. 2009).

Rather than allowing these same "remoras" to further bog down the system, the Court should accord diminished weight and credibility to the arguments put forth by lawyers with a proven pattern of improper behavior.[23] The lawyers who have been identified as professional objectors representing Objectors in this action are: John W. Davis[24] [**DE # 1933**]; Ernest J.

---

[23] Plaintiffs' experts correctly foresaw this Settlement would attract such hold-up artists. Professor Issacharoff explained that "[t]he unfortunate game is to lodge *pro forma* objections at the trial stage, then negotiate a private resolution in order to drop the invariable notice of appeal. Once the case has progressed beyond the trial court, there is no longer any accountability for side payments to objectors' counsel, and the game is on." Declaration of Professor Samuel Issacharoff [**DE # 1885** at Ex. F], ¶ 33. Professor Fitzpatrick also discussed the unfortunate trend of "objector blackmail," and observed that courts have fought back by sanctioning professional objectors and requiring hefty appeal bonds. Supplemental Declaration of Brian T. Fitzpatrick, ¶¶ 11–13.

[24] After reciting a defendant's contention that John W. Davis "has a history of compromising the interests of unnamed parties to benefit himself and his counsel" – including by "demanding personal payments and attorney's fees without passing any monetary benefit to the general public" – the California Court of Appeal found that "Davis engaged in questionable conduct in the prior class actions" and that his professional reputation has been "compromised by his past objectionable conduct[.]" *Davis v. Apple Computer, Inc*., 2005 WL 1926621 (Cal. Ct. App. 2005). In like vein, Florida's Third District Court of Appeal rejected Davis' appeal of final settlement approval in *Barnhill v. Fla. Microsoft Antitrust Litig*., 905 So.2d 195 (Fla. Dist. Ct. App. 2005). Davis also lodged unsuccessful objections to class action settlements and/or attorney fee awards in *Wal-Mart Stores, Inc. v. Buholzer*, 156 Fed. Appx. 346, 348 (2d Cir. 2005) (holding that Davis' arguments in appeal of attorney fee award were "unavailing and, indeed, border on being frivolous."); *Chavez v. Netflix, Inc.*, 162 Cal. App. 4th 43, 63 (Cal. Ct. App. 2008) (finding that the alternative "Davis would apparently prefer" to the approved settlement "seems highly unfair and impractical by comparison"); *White v. CellCo P'ship*, 2008 WL 5262009 (Cal. Super Ct. Oct. 21, 2008) (finding Davis' objection "reflect[ed] a lack of understanding" and stating "Davis will no doubt be familiar to the Court. Mr. Davis previously objected to *both* the Verizon and Sprint locking settlements . . . and appealed when his objections were overruled.").

Browne, Jr.[25] [**DE # 1922**]; J. Scott Kessinger[26] [**DE # 1935**]; John C. Kress[27] [**DE # 1935**]; Jonathan Fortman[28] [**DE # 1935**]; and Patrick Sweeney[29] [**DE # 1936**].

The objections interposed by another lawyer, Barry R. Himmelstein, also stem from questionable motives and should be discounted accordingly.  [**DE # 1916**].  Mr. Himmelstein formerly served on the PEC while a partner with the PEC law firm Lieff Cabraser Heimann & Bernstein, L.L.P.  On March 5, 2011, Mr. Himmelstein was expelled from the partnership of Lieff Cabraser Heimann & Bernstein, L.L.P., and is currently involved in litigation against his former firm.  Under these circumstances, Mr. Himmelstein comes before this Court with

---

[25] Judge Scheindlin, a U.S. District Court Judge for the Southern District of New York, concluded that Ernest Browne, Jr. – together with other serial objectors – had "engaged in bad faith and vexatious conduct" in contesting a class action settlement to extort a fee.  *In re Initial Pub. Offering Sec. Litig.*, 728 F. Supp. 2d 289, 295 (S.D.N.Y. 2010).  Browne and other objectors' "goal was, and is, to hijack as many dollars for themselves as they can wrest from a negotiated settlement."  *In re UnitedHealth Group PSLRA Litig.*, 643 F. Supp. 2d 1107, 1109 (D. Minn. 2009); *see also Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 248 (D.N.J. 2005) (finding Browne's objections "are without merit and do not weaken this Court's decision that the Settlement . . . provides substantial and real benefits"); *In re Currency Conversion Fee Antitrust Litig.*, 2010 U.S. Dist. LEXIS 27605 (S.D.N.Y. Mar. 5, 2010) (requiring Browne and other objectors to post an appeal bond).

[26] Jeffrey Scott Kessinger is a professional objector whose objections were overruled in *Meyenburg v. Exxon Mobil Corp.*, 2006 WL 5062697 (S.D. Ill. June 5, 2006), among many other cases.  *See Hale v. Wal-Mart Stores*, Case No. 01CV218710 (Mo. Cir. Ct. June 17, 2009) (Kessinger objected, attempted to intervene, and was sanctioned by the court); *Fielder v. Credit Acceptance Corp.*, Case No. 16CV96-24285 (Mo. Cir. Ct. Sept. 6, 2007) (court found that the objector represented by Kessinger "doesn't know what a class action is, what the proposed settlement 'is all about,' what an 'objector' is"); *Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231 (E.D.N.Y. 2010) (professional objector John J. Pentz, representing Kessinger, filed objection); *In re MCI Non-Subscriber Telephone Rates Litig.*, MDL No. 1275 (S.D. Ill. Apr. 19, 2001) (Kessinger objected); *In re Allstate Fair Credit Reporting Act Litig.*, MDL No. 1457, Case No. 3:02-md-1457 (M.D. Tenn. July 29, 2005) (Kessinger objected); *Synfuel Techs., LLC v. Airborne Express, Inc.*, Case No. 02-cv-324-DRH, DE # 66 (S.D. Ill. July 15, 2004) (court found "Kessinger's desire to conduct a fishing operation . . . is improper").

[27] John C. Kress is a professional objector whose objections were overruled in *In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp. 2d 997 (E.D. Wis. 2010); *see also Hale v. Wal-Mart Stores*, No. 01CV218710 (Mo. Cir. Ct. June 17, 2009) (Kress objected, attempted to intervene, and was sanctioned by the court).

[28] Jonathan Fortman is a professional objector whose objections were overruled in *In re Pre-Filled Propane Tank Mktg. & Sales Practices Litig.*, 2010 U.S. Dist. LEXIS 106888 (W.D. Mo. Oct. 4, 2010), among other cases.

[29] Patrick Sweeney is a professional objector who objected most recently to a proposed class action settlement in this District.  *See Kardonick v. JPMorgan Chase & Co.*, Case No. 10-cv-23235, DE # 357 (S.D. Fla. Aug. 19, 2011).

conflicting motives and a severely compromised view of what is in Settlement Class Members'
best interest.

## IV.    THE OBJECTIONS TO THE ATTORNEYS' FEE AND SERVICE AWARD APPLICATIONS SHOULD BE OVERRULED.

Class Counsel achieved an outstanding result in the face of extraordinary risks.  We
advanced significant costs, invested our own time and labor, and bypassed other profitable work
to pursue these claims.  As one of the country's leading experts on class action settlements
opined: "Class Counsel over-achieved.  They took a novel case with difficult legal merits of a
type that other lawyers had previously settled for moderate amounts and turned it into a
landmark recovery.   In my opinion, that is precisely when lawyers deserve to be well
compensated."  Expert Report of Professor Charles Silver [**DE # 1885** at Ex. K], at 3.

### A.    A Fee of 30 Percent of the Common Fund Is Reasonable.

The 30 percent fee sought by Class Counsel is within the range of fees typically awarded
in similar cases.  In his expert report, Judge Thomas Scott pointed to multiple cases *in this
District* that fully support the requested fee:

   a.  *Allapattah Servs., Inc. v. Exxon Corp*., 454 F. Supp. 2d 1185 (S.D. Fla. 2006)
       (awarding fees of 31 1/3 % of $1.06 billion);

   b.  *In re: Terazosin Hydrochloride Antitrust Litigation*, 99-1317-MDL-Seitz (S.D.
       Fla. April 19, 2005) (awarding fees of 33 1/3 % of settlement of over $30
       million);

   c.  *In re: Managed Care Litig. v. Aetna*, MDL No. 1334, 2003 WL 22850070 (S.D.
       Fla. Oct. 24, 2003) (awarding fees and costs of 35.5% of settlement of $100
       million);

   d.  *Gutter v. E.I. Dupont De Nemours & Co*., 95-2152-Civ-Gold (S.D. Fla. May 30,
       2003) (awarding fees of 33 1/3 % of settlement of $77.5 million);

   e.  *Waters v. Int'l Precious Metals Corp*., 190 F.3d 1291 (11th Cir. 1999) (affirming
       fee award of 33 1/3 % of settlement of $40 million).

Declaration of Honorable Thomas E. Scott [**DE # 1885** at Ex. I], ¶ 25.  Likewise, Professor
Fitzpatrick's recent empirical study of Eleventh Circuit class action settlements yielded the

finding that the average attorney fee award was 28.1 percent and the median award was 30 percent. *See* Supplemental Declaration of Brian T. Fitzpatrick, ¶ 3.

A 30 percent fee corresponds both to Eleventh Circuit precedent and to the market rate for class actions like this case. *See* Expert Report of Professor Charles Silver [**DE # 1885** at Ex. K], at 16–25. There can be no doubt that a contingency fee agreement is the only arrangement by which virtually all Settlement Class Members could have pursued relief. The individual claims are small. The litigation requires a substantial advancement of time and expense. The measure of recoverable damages is uncertain, and the risk of underpayment or non-payment is very significant. Under these circumstances, it would have been financially irrational for any of the named Plaintiffs to have pursued this matter on any basis other than contingency, with expenses advanced.

The *unrebutted* expert reports of several nationally-acclaimed scholars support Class Counsel's 30 percent fee request. *See Hanlon*, 150 F.3d at 1021 (upholding nationwide class settlement where objectors "presented no evidence"). Certain Objectors reference the work of one of Plaintiffs' experts, Geoffrey Miller, apparently not realizing Professor Miller has lent his strong support to Class Counsel's fee request in this case. [**DE # 1935**].[30] In describing the sound basis for the 30 percent request, Professor Miller emphasized the spectrum of risks and the 30 percent (or higher) fees that courts have awarded in similarly high-risk consumer class actions. *See* Supplemental Declaration of Professor Geoffrey Miller, attached as Exhibit A.

Certain other Objectors argue that the fact of a large settlement justifies a reduction in the percent fee awarded.[31] However, courts nationwide have repeatedly awarded fees of 30 percent or higher in so-called "megafund" settlements. *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467 (S.D.N.Y. 2009) (33.3 percent of $510 million); *Allapattah Servs. Inc. v.*

---

[30] Trying to contrast this Settlement with securities fraud settlement precedents [**DE # 1935**] is a fruitless exercise, because every fee petition must be judged on its own merit regardless of the type of claims being settled. *See* Fed. R. Civ. P. 23(h) (providing, without regard to area of law, that "[i]n a certified class action, the court may award reasonable attorney's fees . . .").

[31] *E.g.*, Locke [**DE # 1922**]; Repa [**DE # 1935**].

*Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) (31.33 percent of $1.075 billion); *In re Vitamins Antitrust Litig.*, 2001 WL 34312839 (D.D.C. July 16, 2001) (34.6 percent of $365 million).[32]  The myriad risks of this litigation – considered together – justify a 30 percent fee. *See* Section II.A.1, *supra*.

Objectors' argument, if accepted, would have the negative effect of reducing contingent fee attorneys' incentives to bring large and important civil actions.  "In order to deter wrongdoing, lawyers must be given incentives to invest their own time and money in class actions despite the risk of earning nothing if they are unsuccessful.  Yet, *these incentives are blunted for the very cases offering the greatest deterrence (i.e., larger cases) when courts award lower fee percentages as settlements become larger*."  Declaration of Brian T. Fitzpatrick [**DE # 1885** at Ex. J], ¶ 19 (emphasis added).

Similarly, in *Allapattah*, U.S. District Court Judge Alan Gold held that decreasing a fee percentage solely in light of a large settlement:

> is *antithetical* to the percentage of the recovery method adopted by the Eleventh Circuit in *Camden*, the whole purpose of which is to align the interests of Class Counsel and the Class by rewarding counsel in proportion to the result obtained.  By not rewarding Class Counsel for the additional work necessary to achieve a better outcome for the class, the sliding scale approach creates the perverse incentive for Class Counsel to settle too early for too little.

454 F. Supp. 2d at 1213 (emphasis added); *see also Williams v. General Elec. Capital Auto Lease*, 1995 WL 765266, at *10 (N.D. Ill. Dec. 16, 1995) ("Without significant counsel fees to encourage the pursuit of these claims, the public policy to induce compliance with the law would be disserved.").

---

[32] *See also In re Linerboard Antitrust Litig.*, 2004 WL 1221350 (E.D. Pa. June 2, 2004) (30 percent of $202 million); *In re Prison Realty Sec. Litig.*, 2001 U.S. Dist. LEXIS 21942 (M.D. Tenn. Feb. 9, 2001) (30 percent of $104 million); *In re Combustion Inc.*, 968 F. Supp. 1116 (W.D. La. 1997) (36 percent of $127 million); *In re Home-Stake Prod. Co. Sec. Litig.*, MDL No. 153 (N.D. Okla. Jan. 2, 1990) (30 percent of $185 million).

Some Objectors suggest this case was settled too early. In fact, most diversity class actions settle within two years of being filed.[33] To the extent the Settlement here could nonetheless be viewed as "early," this is one of the occasions when "an early resolution may demonstrate that the parties and their counsel are well prepared and well aware of the strength and weaknesses of their positions and of the interests to be served by an amicable end to the case." *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, MDL No. 2147, 2011 WL 2204584 (N.D. Ill. June 2, 2011) (citations omitted). Indeed, when this Settlement was reached, many attorneys had already spent months reviewing, sorting and coding almost a million pages of BofA documents. Class Counsel had already completed extensive state-by-state surveys of law; had briefed, argued and prevailed on the Rule 12 motion; had deposed BofA employees; and had prepared damages estimates based on BofA revenue numbers in consultation with Expert Olsen. *See* Joint Decl., ¶¶ 83–91.

Settlement Class Counsel, while efficient, also negotiated tenaciously to get a very high settlement figure, rejected a number of BofA offers as insufficient, and threatened to cut off mediation without resolution.[34] The end result was an outstanding benefit, particularly when weighed against the combined risks of prosecuting the Actions. *See* Section II.A.1, *supra*. For these reasons, the Court should award the requested fee.

---

[33] *See* Federal Judicial Center, *Impact of the Class Action Fairness Act on the Federal Courts: Preliminary Findings from Phase Two's Pre-CAFA Sample of Diversity Class Actions*, at 7 (2008) (finding that the average diversity class action settles in 21.2 months and three-quarters of diversity class actions settle within 30 months).

[34] A small number of Objectors raise the specter of collusion. [*E.g*., **DE # 1903, 1933**]. They may be unaware of this Court's prior finding that "the Settlement is the result of informed, good-faith, arms' length negotiations between the parties and their capable and experienced counsel, was reached with the assistance of an experienced, highly-qualified mediator, and is not the result of collusion." *In re Checking Account Overdraft Litig.*, --- F.R.D. ----, 2011 WL 2258458 (S.D. Fla. 2011).

**B.**      **Under the Controlling *Camden* Decision, the Court Should Not Undertake a Lodestar Analysis.**

A small number of Objectors urge the Court to scrutinize Class Counsel's voluminous time and task records in evaluating the fee request.[35]  These Objectors would have the Court act inconsistently with Eleventh Circuit precedent.   In establishing percentage of the fund as the *exclusive method* for awarding fees in common fund class actions, the Eleventh Circuit could not have been more clear:

> [T]he percentage of the fund approach [as compared with the lodestar approach] is the *better reasoned* in a common fund case. Henceforth in this circuit, attorneys' fees awarded from a common fund *shall be* based upon a reasonable percentage of the fund established for the benefit of the class.

*Camden*, 946 F.2d at 774 (emphasis added).[36]   Even before *Camden*, courts in this Circuit recognized that "a percentage of the gross recovery is the only sensible method of awarding fees in common fund cases."  *Mashburn v. Nat'l Healthcare, Inc.*, 684 F. Supp. 660, 690 (M.D. Ala. 1988).

The lodestar approach should not be imposed through the back door via a "cross-check." In *Camden*, the Court forcefully criticized lodestar and the inefficiencies that it creates.  946 F.2d at 773-75.  In so doing, the Eleventh Circuit "mandate[d] the *exclusive* use of the percentage

---

[35] Objectors raising the lodestar issue include Jenkins [**DE # 1920**] and Locke [**DE # 1922**].

[36] Eleventh Circuit attorneys' fee law governs this request, not the law of Florida.  [**DE # 1933**]. Judge Gold, sitting in diversity, rejected the same legal argument made by Objectors Sarro and Marek (who are represented by a professional objector) in *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1200 (S.D. Fla. 2006).  There, Judge Gold applied Eleventh Circuit law – not state law – to award attorney fees following settlement of class action claims brought under state laws, including the law of Florida.  The key holding was that "[t]he district court presiding over a diversity-based class action pursuant to Fed.R.Civ.P. 23 has equitable power to apply federal common law in determining fee awards *irrespective of state law*."  *Id.* (emphasis added). Objector's reliance on the Settlement Agreement's choice-of-law provision fails for three reasons:  (1) the choice-of-law provision governs disputes between the parties to the agreement, but does not limit the Court's independent determinations; (2) private litigants cannot by agreement limit a federal court's inherent authority to regulate the lawyers appearing before it; and (3) the parties to this Agreement did not intend for Florida substantive fee law to govern, as demonstrated by the provisions where BofA agreed not to oppose a 30 percent fee request.  *See* Agreement, ¶ 102.  These Objectors also cite Ninth Circuit law as if it is controlling or even persuasive, which it is not, because Ninth Circuit fee law is different than Eleventh Circuit fee law.  [**DE # 1933** at 3–4].

approach in common fund cases, reasoning that it more closely aligns the interests of client and attorney, and more faithfully adheres to market practice." *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000) (emphasis added); *see also* Alba Conte, *Attorney Fee Awards* § 2.7, at 91 fn. 41 ("The Eleventh . . . Circuit[] repudiated the use of the lodestar method in common-fund cases"). Therefore, under *Camden*, courts in this Circuit regularly award fees based on a percentage of the recovery, without discussing lodestar at all. *See, e.g.*, *In re Managed Care Litig. v. Aetna*, MDL No. 1334, 2003 WL 22850070 (S.D. Fla. Oct. 24, 2003); *In re Friedman's, Inc. Sec. Litig.*, 2009 WL 1456698 (N.D. Ga. May 22, 2009).[37]

The percentage-of-the-fund method is superior because "the measure of the recovery is the best determinant of the reasonableness and quality of the time expended." *Mashburn*, 684 F. Supp. at 690. "[A] common fund is itself the measure of success and represents the benchmark on which a reasonable fee will be awarded. . . . In this context, monetary results achieved predominate over all other criteria." *Camden*, 946 F.2d at 774 (citations and alterations omitted). The percentage method "has the advantages of being easy to calculate (because courts need not review voluminous time records and the like) and of aligning the interests of class counsel with the interests of the class (because the more the class recovers, the more class counsel recovers)." Declaration of Brian T. Fitzpatrick [**DE # 1885** at Ex. J], ¶ 11. The percentage method thus "motivates lawyers to marshal the resources they need to increase claim values," preserving incentives for civil enforcement to deter and redress violations that harm large sections of the population. Expert Report of Professor Charles Silver [**DE # 1885** at Ex. K], at 8.

As compared with the percentage method, the lodestar method results in an "undue emphasis on the number of hours logged" and therefore "provides a disincentive to early settlement." *Mashburn*, 684 F. Supp. at 690. Lodestar "creates an incentive to keep litigation

---

[37] *See also Sands Point Partners, L.P. v. Pediatrix Med. Group, Inc.*, 2002 WL 34343944 (S.D. Fla. May 3, 2002); *Eslava v. Gulf Tel. Co., Inc.*, 2007 WL 4105977 (S.D. Ala. Nov. 16, 2007); *Stahl v. MasTec, Inc.*, 2008 WL 2267469 (M.D. Fla. May 20, 2008); *In re Winn-Dixie Stores, Inc. ERISA Litig.*, 2008 WL 815724 (M.D. Fla. Mar. 20, 2008); *Flournoy v. Honeywell Int'l, Inc.*, 2007 WL 1087279 (S.D. Ga. Apr. 6, 2007); *Fabricant v. Sears Roebuck & Co.*, 2002 WL 34477904 (S.D. Fla. Sept. 18, 2002).

going in order to maximize the number of hours included in the court's lodestar calculation." *In re Quantum Health Resources, Inc.*, 962 F. Supp. 1254, 1256 (C.D. Cal. 1997).  At the same time, the lodestar method "encourages cheap settlements.  Why bargain hard for a large recovery when hard bargaining entails risks and a small settlement will generate a fee that covers the time a lawyer has expended?"  Supplemental Expert Report of Professor Charles Silver, attached as Exhibit D, at 3.

For these reasons, "every Supreme Court case addressing the computation of a common fund fee award has determined such fees on a percentage of the fund basis." *Camden*, 946 F.2d at 773; *see also Phemister v. Harcourt Brace Jovanovich, Inc.*, 1984 WL 21981, at *15 (N.D. Ill. Sept. 14, 1984) (noting that the Supreme Court has "clearly recognized the propriety of using the percentage of recovery method in a common fund case") (citations omitted); *Howes v. Atkins*, 668 F. Supp. 1021, 1024 (E.D. Ky. 1987) ("[A] lodestar analysis is usually inappropriate in cases of this kind and indeed in most common fund cases.").  The lodestar method is inappropriate here, would set a bad precedent, and should not be used.

## C.      The Service Awards Are Reasonable.

Objector Jenkins is not a class representative and therefore is ineligible for a Service Award.  [Letter of P. Jenkins of Aug. 25, 2011].  The requested Service Awards of $5,000 are justified to "compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *Allapattah*, 454 F. Supp. 2d at 1218.

## V.      CONCLUSION

For the foregoing reasons and the reasons set forth in Plaintiffs' Motion for Final Settlement Approval, the Court should approve the Settlement, award Class Counsel the requested fee, and award Service Awards for the class representatives.

Dated: October 21, 2011.

Respectfully submitted,

/s/ Aaron S. Podhurst
Aaron S. Podhurst, Esquire
Florida Bar No. 063606
apodhurst@podhurst.com
Robert C. Josefsberg, Esquire
Florida Bar No. 40856
rjosefsberg@podhurst.com
Steven C. Marks, Esquire
Florida Bar No.  516414
smarks@podhurst.com
Peter Prieto, Esquire
Florida Bar No. 501492
pprieto@podhurst.com
Stephen F. Rosenthal, Esquire
Florida Bar No. 0131458
srosenthal@podhurst.com
John Gravante, III, Esquire
Florida Bar No. 617113
jgravante@podhurst.com
PODHURST ORSECK, P.A.
City National Bank Building
25 W. Flagler Street, Suite 800
Miami, FL 33130-1780
Tel: 305-358-2800
Fax: 305-358-2382

/s/ Bruce S. Rogow
Bruce S. Rogow, Esquire
Florida Bar No. 067999
brogow@rogowlaw.com
Bruce S. Rogow, P.A.
Broward Financial Center
500 East Broward Boulevard
Suite 1930
Fort Lauderdale, FL  33394
Tel: 954-767-8909
Fax: 954-764-1530

*Co-Lead Counsel for Plaintiffs*

/s/ Robert C. Gilbert
Robert C. Gilbert, Esquire
Florida Bar No. 561861
rcg@grossmanroth.com
Stuart Z. Grossman, Esquire
Florida Bar No. 156113
szg@grossmanroth.com
David M. Buckner, Esquire
Florida Bar No. 60550
dbu@grossmanroth.com
Seth E. Miles, Esquire
Florida Bar No. 385530
sem@grossmanroth.com
GROSSMAN ROTH, P.A.
2525 Ponce de Leon Boulevard
Eleventh Floor
Coral Gables, FL 33134
Tel: 305-442-8666
Fax: 305-779-9596

*Coordinating Counsel for Plaintiffs*


/s/ E. Adam Webb
E. Adam Webb, Esquire
Georgia Bar No. 743910
Adam@WebbLLC.com
Matthew C. Klase, Esquire
Georgia Bar No. 141903
Matt@WebbLLC.com
G. Franklin Lemond, Jr., Esquire
Georgia Bar No. 141315
FLemond@WebbLLC.com
WEBB, KLASE & LEMOND, L.L.C.
1900 The Exchange, S.E.
Suite 480
Atlanta, GA 30339
Tel: 770-444-9325
Fax: 770-444-0271

/s/ Michael W. Sobol
Michael W. Sobol, Esquire
California Bar No. 194857
msobol@lchb.com
Roger N. Heller, Esquire
California Bar No. 215348
rheller@lchb.com
Jordan Elias, Esquire
California Bar No. 228731
jelias@lchb.com
LIEFF CABRASER HEIMANN &
  BERNSTEIN L.L.P.
Embarcadero Center West
275 Battery Street, 29th Floor
San Francisco, CA 94111
Tel: 415-956-1000
Fax: 415-956-1008

/s/ Russell W. Budd
Russell W. Budd, Esquire
Texas Bar No. 03312400
rbudd@baronbudd.com
Bruce W. Steckler, Esquire
Texas Bar No. 00785039
bsteckler@baronbudd.com
Mazin A. Sbaiti, Esquire
Texas Bar No. 24058096
msbaiti@baronbudd.com
BARON & BUDD, P.C.
3102 Oak Lawn Avenue
Suite 1100
Dallas, TX 75219
Tel: 214-521-3605
Fax: 214-520-1181

/s/ David S. Stellings
David S. Stellings, Esquire
New York Bar No. 2635282
dstellings@lchb.com
LIEFF CABRASER HEIMANN &
  BERNSTEIN L.L.P.
250 Hudson Street
8th Floor
New York, NY  10013
Tel: 212-355-9500
Fax: 212-355-9592

/s/ Ruben Honik
Ruben Honik, Esquire
Pennsylvania Bar No. 33109
rhonik@golombhonik.com
Kenneth J. Grunfeld, Esquire
Pennsylvania Bar No. 84121
kgrunfeld@golombhonik.com
GOLOMB & HONIK, P.C.
1515 Market Street
Suite 1100
Philadelphia, PA 19102
Tel: 215-985-9177
Fax: 215-985-4169

/s/ Ted E. Trief
Ted E. Trief, Esquire
New York Bar No. 1476662
ttrief@triefandolk.com
Barbara E. Olk, Esquire
New  York Bar No. 1459643
bolk@triefandolk.com
TRIEF & OLK
150 E. 58th Street
34th Floor
New York, NY 10155
Tel: 212-486-6060
Fax: 212-317-2946

*Plaintiffs' Executive Committee*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 09-MD-02036-JLK**

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

**CERTIFICATE OF SERVICE**

I hereby certify that on October 21, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Robert C. Gilbert
Robert C. Gilbert, Esquire
Florida Bar No. 561861
GROSSMAN ROTH, P.A.
2525 Ponce de Leon Blvd.
Eleventh Floor
Coral Gables, FL 33134
Tel: 305-442-8666
Fax: 305-779-9596

- 33 -

| | |
|---|---|
| Fiorella R. Caceda<br>577 Short Pine Circle<br>Orlando, FL 32807-6270 | Marco A. Caceda<br>ITF Roxana Barreda<br>577 Short Pine Circle<br>Orlando, FL 32807-6270 |
| Wanda Stuart<br>5636 Ormes St.<br>Philadelphia, PA 19120 | Roxana Barreda<br>577 Short Pine Circle<br>Orlando, FL 32807-6270 |
| Mary Carroll<br>16200 Vermont Ave. #305<br>Paramount, CA 90723 | Shaun Pereira<br>2238 Monroe Street #201<br>Hollywood, FL 33020 |
| Obioma Madubuike<br>2201 Rockbrook Dr. #1023<br>Lewisville, TX 75067 | Jon Mullins<br>1004 Bellmark Ct.<br>Leland, N.C. 28451 |
| Marilyn Bloch<br>1350 Tyler St. #6<br>Hollywood, Fl. 33204 | Brian Nash<br>4000 Essex Lan #4202<br>Houston, TX 77027 |
| Theresa Vaughan<br>6 Webster Drive<br>Greenville, PA 16125 | Jaclyn Wilhite<br>815 S. Haley St.<br>Bakersfield, CA 93307-1249 |
| Melody Scroggs<br>17077 PR 2173<br>Cassville, Mo 65625 | Prentiss Jenkins<br>423 E. 7th St. #425<br>Los Angeles, CA 90014 |
| Anthony James McMahon<br>3080 Corona Ave.<br>Norco, CA 92860 | Martha D. Brown<br>3313 Peppertree Circle, #D<br>Decatur, GA 30034 |
| Fay L. Robinson<br>6924 Parkdale Drive<br>St. Louis Mo 63121 | Fred R. Fletcher<br>34188 Pacific Coast Highway<br>Dana Point, CA 92629 |
| Jacquelynn Balp-Reyes<br>4903 NW Lindy Ave.<br>Lawton, OK 73505 | John Finn<br>1455 S. Allec St.<br>Anaheim, CA 92805 |
| Celeste Cushman<br>P.O. Box 6453<br>Crestline, CA 92325 | Jason Michael Lanier<br>2784 Summertrees Boulevard<br>Johns Island, SC 29455 |
| Daniel J. Hall<br>Lanette L. Hall<br>1001 Harbor Lights Drive<br>Corpus Christi, Texas 78412-5342 | Catherine Ann Clayton<br>2700 Sowerby<br>Plano, Texas 75093 |
| Brad Neilley<br>48 Overlook Drive<br>Hackettstown, NJ 07840 | Stacy L. Jordon<br>4401 Champions Drive<br>Lufkin, Texas 75901 |

| | |
|---|---|
| John W. Davis<br>Law Office of John W. Davis<br>501 W. Broadway, St 800<br>San Diego, CA 92101 | Matt Weinstein<br>Paul M. Kade<br>9200 South Dadeland Blvd., Suite 400<br>Miami Fl 33156 |
| Brain Harrison<br>664 Sailfish Trl<br>Key Largo, FL 33037 | John Jacob Jingleheimer Schmidt<br>327 Blossom Valley Dr.<br>Los Gatos, CA 95032 |
| Jacquelynn Balp-Reyes<br>4903 NW Lindy Ave<br>Lawton, OK 73505 | Judith Brown<br>7522 Holly Hills Dr.<br>Dallas, Texas 75231 |
| Katrina Brown<br>4518 Lake Halberd Ln<br>Richmond TX 77002 | Jeantine Nazar<br>1109 Campbell Street<br>Glendale, CA 91207 |
| Charles Brown, Jr.<br>4518 Lake Halberd Ln<br>Richmond TX 77002 | Barry Himmelstein<br>Himmelstein Law Network<br>2000 Powell St., Suite 1605<br>Emeryville, Ca 94608-1861 |
| Philip Freidin<br>Freidin Dobrinsky<br>One Biscayne Tower<br>2 South Biscayne Blvd., Suite 3100<br>Miami, Fl 33131 | Brian M. Silverio<br>Silverio & Hall, P.A.<br>150 West Flagler Street<br>Penthouse-2850<br>Miami, Florida 33130 |
| Ernest J. Browne, Jr.<br>Browne & Browne<br>2380 Eastex Freeway<br>Beaumont, Tx 77703 | Neil Kodsi<br>Alderman & Kodsi<br>Shoreview Center<br>9999 N.E. 2nd Ave., Suite 211<br>Miami Shores, Fl 33138 |
| Stephen R. Cochell<br>The Cochell Lawfirm<br>7026 Katy Road, Suite 259<br>Houston, Texas 77024 | Patrick Sweeney<br>Sweeney & Sweeney, S.C.<br>440 Science Drive, Ste. 101<br>Madison, WI 53711 |
| Brian L. Morgan<br>8006 SE Taggart St.<br>Portland Oregon, 97206-1071 | Darlene Johnson<br>933 Franklin Dr.<br>Pamplico, SC 29583 |
| Benjamin Garguena<br>901 S Rimpau Blvd.<br>Los Angeles, CA 90019 | |