Jeff Horwitz (Pro se)
1 State St 26th Floor
New York, NY 10004
jeff.horwitz@sourcemedia.com
(212) 803-8577

FILED by _____ D.C.

NOV 15 2011

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA – MIAMI

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| In re: | CASE NO. 1:09-MD-02036-JLK |
| CHECKING ACCOUNT OVERDRAFT LITIGATION | REPLY TO DEFENDANTS OPPOSITION TO MOTION OF JEFF HORWITZ TO UNSEAL RECORDS |
| MDL No. 2036 | |

## INTRODUCTION

I respectfully submit this filing in response to defendants' opposition to my motion to intervene and unseal records.

I apologize to the Court and to the opposing parties if I was insufficiently clear about the boundaries of my request. I do not seek confidential customer data, debit processing algorithms, or the hundreds of thousands of pages of unfiled discovery materials. My request is vastly less burdensome than the defendants appear to have assumed.

The question on which defendants' counsel and I fundamentally disagree is whether, now that the confidentiality of filings is being challenged, the parties in this case should continue to be allowed to unilaterally designate materials as confidential.

Contrary to the defendants' assertions, I believe they have not demonstrated good cause for the confidentiality of many sealed documents. Their rationales for maintaining secrecy fall

far short of the standard laid out in *Bridgestone* – and run contrary to this Court's own decision to allow the unsealing of an amended complaint in *Larsen v. Union Bank*, in which similar protestations of confidentiality were found to be deficient.

Next, I would like to address the specific claims of confidentiality cited in the declarations attached to the motion of opposition to unseal. Even accepting the defendants' descriptions of these documents at face value, many do not appear to pose the claimed threat to the defendants' business.

Finally, I would like to address the revelation that the defendants' attorneys are preparing to drop their confidential designation on some documents and exhibits filed in this case. Far from proving that my motion to unseal is unnecessary, the remarkable timing of their announcement suggests the parties may need to pay more attention to this Court's mandate that they exercise restraint in designating materials as confidential.

## DEFENDANTS MUST DEMONSTRATE GOOD CAUSE

The defendants' argument that convenience justifies confidentiality would appear to undercut the existence of an open courtroom. Some level of justification must be required for filing documents under seal.

Assuming that this Court accepts that the appropriate standard in this case is the limited "good cause" laid out in *Bridgestone*, the defendants' opposition to my motion should fail.[1] *Bridgestone* does not relieve the defendants of showing "good cause" for keeping litigation materials sealed. To the contrary, the ruling instructs the district court that "The first question

---

[1] Note that the application of the good cause standard may be merely dicta, as *Bridgestone* deals largely with documents filed during the discovery process in relation to discovery motions, not "more substantive motions" at issue here. I have no idea whether that standard should be the same for substantive filings, especially for underlying complaints.

that must be addressed on remand is whether Firestone's presumptively confidential documents do in fact contain trade secrets." Only after making such a determination, the appeals court found, should the district court weigh the defendant's interest in confidentiality against the competing interest in courtroom transparency.

While my lack of access to legal research services renders it difficult for me to determine whether Bridgestone is the most relevant reference, its requirement that a judge consider whether "good cause" exists after a challenge has not yet been met.

## OPPONENTS TO THIS MOTION ARE GLOSSING OVER THE CONDITIONAL NATURE OF THIS COURT'S PROTECTIVE ORDER

In opposing my motions to intervene and unseal, defendants are seeking to shut down a review process that was explicitly laid out in their original request for a protective order.

As the proposed protective order they submitted to this Court states, "The fact that any matter has been designated by a producing party as 'Confidential' shall not be construed as creating any presumption as to the confidentiality of such matter in the event of a motion challenging the confidentiality designation."

Defendants are now asking the court to ignore the order's provisional nature in the interest of "efficiencies." This argument should be discarded in favor of the review process suggested in *Bridgestone,* in which defendants must demonstrate to this Court that good cause actually exists and outweighs other interests.

## DEFENDANTS' DEMANDS THAT KEY DOCUMENTS IN AMENDED COMPLAINTS AND OTHER SUBSTANTIVE MOTIONS REMAIN UNDER SEAL RUNS CONTRARY TO THIS COURT'S RULING TO UNSEAL IN *LARSEN V. UNION BANK.*

Many of the arguments made in opposing my motion to unseal are identical to those raised in

opposition to the Plaintiffs' successful effort to file an unsealed amended complaint in the Union Bank case. The defendant's attorneys argued that plaintiffs had falsely accused them of abusing the privilege of marking documents as confidential, that there was no good cause to unseal, and that making the documents public would cause serious harm to Union Bank's business.

These arguments did not win, and the parallels between *Larsen* and the other cases in this MDL are inescapable. Much of the information that defendants now declare would pose a threat to the safety of their banks -- such as analyses of customer behavior, the profitability of overdraft fees, and the process of dispute resolution information -- appears very much in keeping with that unsealed in the Union Bank case.

## DEFENDANTS HAVE NOT, AND LIKELY CANNOT, DEMONSTRATE GOOD CAUSE FOR SEALING MANY OF THE DOCUMENTS.

My request was simply that the defendants be obligated to defend the confidentiality of the designated documents under the appropriate legal standard. However, since the opposition to my motion describes the basis of Wells Fargo's designations, I seek leave to rebut them.

The defendants and I agree that this Court should not unseal any documents that would expose consumer account information or put banks at risk of fraud. We also agree that it would be inappropriate to air the algorithms excluded from the Gutierrez case or other legitimate trade secrets.

Unfortunately, the defendants appear to be conflating any secret document that speaks about their business with a business secret. This is especially clear in the declaration of Karen Moore. Why, for example, would a 2007 study of Wachovia's customer preferences (Exhibit I to the Oct 13 unopposed motion) be "commercially valuable and competitively sensitive?" Is the bank seriously arguing that its competitors would benefit from four-year old research about a defunct institution's customer behavior?

The above example is hardly an outlier. In its attempt to protect Plaintiffs interrogatory number 11, in which Wells describes the total overdraft fees it charged its customers, the

circumstances under which they were accrued, and what volume of refunds the bank issued, Moore states that "the answers to this interrogatory contain detailed and specific, state-by-state and month-by-month information about Wells Fargo's financial performance.... Its public release would provide Wells Fargo's competitors with detailed information about Wells Fargo's financial performance and consumer deposit portfolio, which would commercially harm Wells Fargo."

Would a few months of limited data on a subsection of a $1.3 trillion dollar bank's fee revenue -- prior to the fundamental overdraft changes brought about Gutierrez and the Federal Reserve's Regulation E -- truly give Wells' competitors an edge?

I could go on, citing the dubious rationale for sealing records of Wells' overdraft arbitration (presumably redactable), Wells' customer dispute resolution statistics (probably useless to competitors), or Wells' policies as to when its bankers should issue refunds (unlikely to be revolutionary given that practices have changed). It is also difficult to imagine that the bank's competitors are eager to see such documents, when they have ready access to information specific to their own companies.

Finally, one thing notably absent from the description of many documents is the date of their creation. Given that many of the industry's overdraft sorting practices go back as much as a decade, much of the information is likely to have little import to the various banks' business models. Moreover, the industry went through a fundamental change in mid 2010 due to the Federal Reserve's Regulation E, which banned overdraft protection programs without customer opt-ins. Additional changes have come along as many of Wells' competitors have dropped high to low processing, or in the course of Bank of America, overdraft fee programs entirely.

The defense's argument that there is good cause to deem such information sensitive is not credible. In the absence of clear and justifiable evidence that they would result in harm to the defendants, these filings should be unsealed. *See Seattle Times Co. v. Rhinehart,* 467 U.S. 20 (1984) ("documents ... that influence or underpin the judicial decision are open to public inspection unless

they meet the definition of trade secrets or other categories of bona fide long-term confidentiality.").

## BASED ON DEFENDANTS' OVERLY BROAD DEFINITIONS OF CONFIDENTIALITY, EITHER THE BASIS OF THE PROTECTIVE ORDER OR THE PARTIES' COMPLIANCE WITH THAT ORDER SHOULD BE REVISITED.

I do not yet know what information the defense has, after additional review and consultation with the plaintiffs, decided that it is now appropriate to release. According to the declaration of JPMorgan Chase attorney Peter Homer, both parties' briefs regarding class certification and the 125 accompanying exhibits are now slated to be unsealed.

I am pleased to learn that the public and I will have access to this information at some point in the future, but I find it notable that the defendants have only agreed to unseal these filings following a challenge from a third party.

I would welcome more information as to why Chase initially determined that these filings needed to be filed under seal and why it subsequently changed that view. To quote from the protective order issued by this Court, "Designations of matter as 'Confidential' or "Highly Confidential" must be narrowly tailored to include only matter for which there is good cause. A pattern of over-designation may result in an appropriate remedial order."

I raise this point not to harp on the defendants' prior designations but because I am concerned about future confidentiality determinations. The multiple tranches of this MDL still have a long way to go, and additional discovery and amended complaints are likely. Given the substantial public importance of this case, it is virtually certain that reporters and other members of the public will continue to desire to follow its progress. As stated in my original motion, I and numerous other nonparties would be grateful for any action by this Court that would prevent a "stamp it confidential first, ask questions later" approach from again taking hold.

## THE PUBLIC INTEREST IN THIS CASE AND RATIONALE FOR UNSEALING RECORDS REMAINS UNCHANGED

Despite defendants' assertions to the contrary, the current public record of this case does not

provide the public with the ability to appropriately access records in this proceeding.  While the defendants are correct in noting that the vast majority of the 2000-plus docket entries in this case are already public, the most substantive filings are not.

To reinforce this point, I've attached a recent article I wrote on the unsealed Union Bank filings. Without this Court's decision to unseal those records in the *Larsen v. Union Bank* case, I would never have been able to write that story, which explored Union Bank's motivations, its partnership with third-party consultants, and the impact high to low processing had on its customers. Without those unsealed records, the millions of consumers who have a financial interest in the MDL will not know the details of their own case and their attorneys' negotiating position.

Given the limited nature of my request to unseal, customers' personal data, the banks' intellectual property, and the efficiency of these proceedings are under no threat. While there may be limited instances in which filed documents truly do contain confidential information, I ask this Court to weigh them against the public's interest in these proceedings. There are doubtlessly many elements of this litigation that the defendants would prefer to keep confidential – but that does not make them sensitive business information.

Dated:  New York, N.Y.
        November 14, 2011

Respectfully submitted,

Jeff Horwitz
Reporter, American Banker
1 State St 26th Floor
New York, N.Y. 10004
(212) 803 8577
jeff.horwitz@sourcemedia.com

# EXHIBIT A

Case 1:09-md-02036-JLK   Document 2149   Entered on FLSD Docket 11/16/2011   Page 9 of 12

# AMERICAN BANKER.

## Union Bank Email Show Overdraft's Seedy Underbelly

**By Jeff Horwitz**
SEP 26, 2011 5:02pm EDT

**Banks have long argued that processing debit card transactions by starting with the largest dollar balances and working their way to the smallest benefited customers. Here's an alternate explanation of what might have motivated them: "Multiple Millions $$$$$$$$$$$$$$$$$$$$$."**

That was the pitch a popular vendor of "high-to-low" debit transaction processing software delivered to Union Bank of California, a unit of Mitsubishi UFJ Financial Group, according to documents recently unsealed in a consolidated federal class action.

CAST Management Consultants promised that by processing customers' daily checking and debit transactions based on the highest to the lowest dollar values, instead of in chronological order, Union Bank could drastically increase how many "insufficient funds" fees clients paid. Union Bank signed up, according to an amended class action complaint pending in U.S. District Court for the Southern District of Florida.

The Union Bank case is one of more than 30 related suits pending before U.S. District Judge Lawrence King and the first in which previously confidential documents have been unsealed. Consolidated by the court in 2009, the now unified multidistrict class action alleges that large banks manipulated the order in which they processed debit card transactions to checking accounts to stick customers with higher overdraft fees. Specifically, it alleges that banks shifted to high-to-low processing to maximize the number of overdraft fees charged after customers' checking account balances dipped below zero. Such practices were often hidden from bank customers even as they were used to extract illegal fees, the class action alleges.

The industry has contended that high-to-low processing was legitimate and in fact in demand among customers who wanted their largest bills to be paid first.

The difference of views has led to numerous cases charging leading banks with wrongful behavior. Among them: Bank of America Corp., JPMorgan Chase & Co., Citigroup Inc. and Fifth Third Bank. Some of the suits have been settled out-of-court. In other cases banks appear to have a solid shot at getting claims transferred to industry arbitration panels, where they are likely to result in a more favorable outcome for defendants, as previously reported in American Banker.

In Hassler v. Sovereign Bank, a judge in the U.S. District Court of New Jersey dismissed a

high-to-low case because the judge found that the bank's processing method had been adequately disclosed.

Whatever the final outcome of the Union Bank case, it could prove highly embarrassing to the commercial banks by showing how they aggressively adopted recommendations of lavishly paid consultants, even as they downplayed the ethical, legal and reputational risks.

"They're all similar," says Aaron Podhurst, an attorney on the plaintiffs' executive committee in the consolidated Florida class action, of the lawsuits. Banks "were warned in-house that this is dangerous, get rid of this, not a good idea. And they didn't heed that."

Documents filed in the Union Bank case appear to paint a picture of an institution focused on maximizing fee revenue by using CAST's technology while dismissing employee concerns that resequencing payments was unfair and possibly illegal. One bank employee argued high-to-low processing was harmful to "Poor but Honest" customers, according to an email sent from a colleague and cited in the amended complaint.

Bank documents turned over to plaintiff attorneys during discovery indicate Union Bank agreed that CAST would receive 20% of any extra overdraft charges generated under its high-to-low system. Union Bank employees also discussed how to hide the bank's policy from customers, even as it was costing them tens of millions of dollars, internal emails show.

"By design, the details of what happens inside the bank when an overdraft occurs were never intended to be communicated to the public," a Union Bank employee wrote to a colleague in an email cited in the suit.

Union Bank said its overdraft policies were in line with those of its peers in a written statement to *American Banker*. Those policies "reflect our customers' preferences, and are lawful," a bank spokeswoman wrote. CAST, which is based in Los Angeles, did not respond to repeated requests for comment.

There is a strong case to be made for processing checks — as opposed to debit card transactions — in descending order from those with the largest to the smallest balances, says industry researcher Mike Moebs. Large payments tend to be the most important to customers, and beginning with them makes it more likely that they will be paid in the event that a customer does not have enough money to immediately cover all charges.

In contrast to check processing, however, debit card charges are what are called "must pay" transactions, meaning the bank is committed to covering all bills in the system. Under these terms, there is no benefit to customers in having their largest transactions processed first.

Union Bank reversed its high-to-low overdraft policy last year. It now posts transactions from the lowest-to-highest values.

Some Union Bank records do show employees arguing that high-to-low processing would meet an unspecified "customer demand." However, executives raised objections on fairness grounds, while the employees implementing the system appear to have feared an adverse customer reaction.

"Posting large items first has been done before and is very painful to customers," wrote Charlie

Pedersen, who oversaw the bank's processing operations, shortly after the high-to-low processing policy was proposed. "So go forward into the night, but keep the headlights on."

Pedersen, who has since retired, did not return a call from *American Banker*.

"We should ... burn all our documentation that [says the only purpose of reordering payment] posting sequence = more fees," an employee wrote in an exchange cited by class action attorneys.

Union Bank's venture into high-to-low processing began in 2002, when it retained CAST, a consulting firm headed by Steve McCollum, a former Citigroup banker. CAST promotes itself on its website as an expert in "revenue optimization" based on a "database of proven revenue enhancement practices." Its clients include Citibank, Wells Fargo, U.S. Bank and more than a dozen large regional banks.

Union Bank brought in CAST with a mandate to leave "no stone unturned, particularly in the fee-income area," according to a document cited in an amended complaint but not yet available through Federal court records.

CAST turned to overdraft processing. The tweak required is conceptually simple: By deducting a customer's largest payments first, the bank increases the likelihood that his or her account will incur multiple overdrafts.

The order in which the transactions are processed can have a big influence on fees charged. Assume, for example, that a customer has $100 in his checking account and engages in four debit card transactions over the course of a day — three for $10 and a final one for $110. Processing the small transactions first will result in a single overdraft charge, while putting through the large transaction first will result in four overdraft fees.

A system of putting through the transactions in whatever order maximized fees would in the first year boost Union Bank's overdraft revenue by $18 million, or nearly 25%, CAST estimated. CAST also recommended raising the charge per overdraft and sought one-fifth of all additional revenue.

Some Union Bank executives balked. "Well, as a UBOC shareholder [and a consumer] I would STRONGLY disagree with the high-to-low approach," William Christensen, the bank's executive vice president for item processing, wrote to colleagues in a 2003 email released by the court. "I don't believe that UBOC [Union Bank] has ever done this before ... I don't think the bank ought to do anything that encourages a class action lawsuit right now."

Email messages indicate that other executives also opposed a switch to high-to-low debit card processing, and the idea appears to have languished for a while. But in May of 2003, with Union Bank apparently scrounging to make its numbers, its chief marketing officer, Gretta Ryan, raised high-to-low again.

"CAST seems to believe it had seven-figure opportunities and given we are drifting way behind budget I'd like to see if this was ever implemented," Ryan said in a May 21, 2003 email. In a followup email a month later, she acknowledged her colleagues' distaste for high to low but advocated moving forward anyway. "We are not taking any of these concerns lightly but obviously with $1.0mm a month at stake we want to try to work them through to ... let the risks be weighted

Union Bank Email Shows Overdraft's Seedy Underbelly - American Banker ... http://www.americanbanker.com/issues/176_87/union-bank-overdraf...

against the rewards," Ryan wrote in an email to colleagues that is disclosed in the Florida class action.

Ryan is still with the bank but did not respond to an email seeking comment. She also appears to have felt pressure to brush aside employees' qualms about highest-to-lowest processing from the fact CAST was portraying bank competitors as forging ahead.

"Everyday [CAST employees] email me with another Bank's practices," she wrote. "5th 3rd [Fifth Third Bank] switched to high to low posting order and according to CAST, they have never looked back."

Neither would Union Bank. In the summer of 2003, it established a "High to Low Implementation Team" in cooperation with CAST. In the first year, overdraft revenue jumped far more than expected — by $33 million to a total of $125 million.

Customer complaints finally led 2009 to suggestions by employees that Union Bank reverse its high-to-low processing.

"There is considerable pain around overdrafts in general," Chief Administrative Officer Linda Odenath wrote to colleagues in 2009, citing high-to-low processing as problematic. Once a customer is overdrafted "it is hard to catch up," she added.

Despite such concerns, Union Bank did not reverse its policy on debit card transactions for another year, by which time it was embroiled in the multidistrict litigation.

"While I have always had a philosophical problem with paying high to low, I suspect the loss of income would be significant if we were to change at this time," senior vice president Mark Woods wrote to colleagues.

Woods also did not respond to a request seeking comment.

 © 2011 American Banker and SourceMedia, Inc. All Rights Reserved. SourceMedia is an Investcorp company. Use, duplication, or sale of this service, or data contained herein, except as described in the Subscription Agreement, is strictly prohibited.