# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

### CASE NO. 09-MD-02036-JLK

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

THIS DOCUMENT RELATES TO:
FIRST TRANCHE ACTIONS

*Tornes, et al. v. Bank of America, N.A.*
S.D. Fla. Case No. 1:08-cv-23323-JLK

*Yourke, et al. v. Bank of America, N.A.*
S.D. Fla. Case No. 1:09-cv-21963-JLK
N.D. Cal. Case No. 3:09-2186

*Phillips, et al. v. Bank of America, N.A.,*
S.D. Fla. Case No. 1:10-cv-24316-JLK
W.D. Okla. Case No. 5:10-cv-01185-R

## ORDER OF FINAL APPROVAL OF SETTLEMENT, AUTHORIZING SERVICE AWARDS, GRANTING APPLICATION FOR ATTORNEYS' FEES, AND OVERRULING OBJECTIONS TO SETTLEMENT

On September 16, 2011, Plaintiffs filed their Motion for Final Approval of Settlement, Application for Service Awards, Class Counsel's Application for Attorneys' Fees, and Incorporated Memorandum of Law [DE # 1885] ("Motion"), seeking final approval of their Settlement[1] with Bank of America ("BofA") for $410 million. In support, Plaintiffs filed six affidavits from local and national experts in class action law, as well as several affidavits

---

[1] This Order incorporates the definitions of the terms used in the Settlement Agreement and Release of May 6, 2011 ("Agreement").

supplementing the factual record to enable the Court to evaluate the fairness and adequacy of this Settlement.  A number of Settlement Class Members filed timely objections to the Settlement (collectively "Objectors"), raising issues related generally to the sufficiency of the evidence supporting the Settlement, the amount of the Settlement, the manner in which the Settlement was negotiated, the methods used to notify Settlement Class Members and the information provided to them in the Notices, the scope of the proposed release to be given by Settlement Class Members to BofA, the *cy pres* provision of the Settlement, the absence of injunctive relief, and the amount of the fee award sought by Settlement Class Counsel.

This matter came before the Court on November 7, 2011, pursuant to the Court's Preliminary Approval Order dated May 24, 2011, for a hearing on Plaintiffs' Motion for Final Approval of the Settlement ("Final Approval Hearing").  The Court carefully reviewed all of the filings related to the Settlement, including those discussed above, as well as responses to the Objectors filed by Class Counsel and by BofA respectively.  *See* Plaintiffs' Response to Objections to Motion for Final Approval of Settlement and Class Counsel's Application for Service Awards and Attorneys' Fees [**DE # 2030**]; Defendant's Memorandum in Response to Objections Regarding Final Approval of Class Action Settlement [**DE # 2029**] ["Defendant's Memorandum"].  The Court also heard a full day of oral argument on the Motion.  After full consideration of the presentations of the Parties and the Objectors, the Court concludes that there can be no doubt that this Settlement provides a substantial recovery for the Settlement Class Members, and is an excellent result for the Settlement Class under all of the circumstances and challenges presented by this case.  The Court specifically finds that the Settlement is fair, reasonable and adequate, and a more than acceptable compromise of the Settlement Class' claims.  The Settlement complies with Fed. R. Civ. P. 23(e), and thus the Court grants final

approval to the Settlement, and will certify the Settlement Class.

The Court denies the objections and rejects the arguments of Objectors in all respects, and finds that they are both completely unsupported in the record (no Objector having submitted even a single affidavit to provide facts or expert opinions supporting their positions) and unpersuasive as to the substance of their complaints.[2] *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir. 1998) (affirming final approval of nationwide class action settlement where "[t]he objectors presented no evidence" to support their arguments). Significantly, of the approximately 13 million Settlement Class Members, only 49 timely filed objections – 0.0004 percent.[3] Botzet Supp. Aff. **[DE #2030-2]** at 3. This extraordinarily "low percentage of objections points to the reasonableness of a proposed settlement and supports its approval."[4] *Lipuma v. American Express Co.*, 406 F. Supp. 2d 1298, 1324 (S.D. Fla. 2005). Therefore, as discussed more fully below, the Court grants the Motion in its entirety, approves the Settlement, and awards the fee requested by Settlement Class Counsel and the service awards for the representative Plaintiffs.[5]

---

[2] Some of the Objectors purported to include "motions" in their filed papers in support of their respective objections. The Court hereby denies any and all such motions as substantively unmeritorious and as procedurally non-compliant with the Court's rules and orders. *See* footnote 41, *infra*.

[3] An additional eight objections were untimely filed after the deadline of October 3, 2011. They are denied both for this reason and for the substantive reasons set forth below.

[4] The average number of objections to settlements of consumer class actions is 233. In a settlement of this magnitude, the Court should expect to receive around 2,000 objections (extrapolating from the average of 4.7 objectors per $1 million in consumer recovery). *See* Theodore Eisenberg & Geoffrey Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues*, 57 VAND. L. REV. 1529 (2004); Supplemental Declaration of Professor Geoffrey Miller [DE # 2030-1], ¶ 9.

[5] Consistent with this Court's Order Modifying this Court's February 4, 2011 Order Regarding the Composition of the Plaintiffs' Executive Committee **[DE # 1912]**, the Court hereby

## BACKGROUND

The procedural and factual history of this Action is set forth in considerable detail in the Motion, and thus the Court will only briefly summarize the most important aspects of that history here. Further, this Court previously set forth the factual allegations and described the causes of action asserted against BofA (and a host of other defendant banks) in this multidistrict litigation. *See In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d 1302 (S.D. Fla. 2010). No party or Objector has offered contrary facts. The Court is quite familiar with this history, having presided over this case for the better part of the last two years. In that time, the Court has had the opportunity to observe both Settlement Class Counsel and BofA's counsel, and the work that both have done. These attorneys, several of whom have practiced before this Court for many years, are extremely skilled advocates, and all of them vigorously litigated this case up to and even after agreeing to the Settlement. The Settlement is quite obviously the result of arms-length negotiations, and the Court so finds.

In addition, the evidentiary record is more than adequate for the Court to consider the fairness, reasonableness and adequacy of the Settlement. The fundamental question is whether the district judge has sufficient facts before him to evaluate and intelligently and knowledgeably to approve or disapprove the settlement. *In re General Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1084 n. 6 (6th Cir. 1984) (citing *Detroit v. Grinnell*, 495 F.2d 448, 463-68 (2d Cir.1974)). In this case, the Court clearly had such facts before it in considering the Motion, including the evidence and opinions of Class Counsel and their experts, and the sheer magnitude of the settlement sum, $410 million, making this one of the largest settlements of a consumer case ever.

---

substitutes Bruce Rogow, Esq. and the law firm of Bruce S. Rogow, P.A., for the Alters Law Firm, P.A., as one of the Settlement Class Counsel, as that term is defined in the Agreement, and as Co-Lead Counsel, as previously ordered.

The record is both complete and sufficient, and the Court so finds.[6]

### 1. Procedural History

Plaintiffs alleged a variety of business practices in the operative pleadings, including principally that BofA systemically re-sequenced Settlement Class Members' debit card transactions for the sole purpose of maximizing its overdraft fee revenue. According to the allegations in the operative complaints, BofA's practices violated the bank's contractual and good faith duties owed to its customers; BofA's acts resulted in unlawful conversion of depositor property; BofA's contractual provisions and practices were substantively and procedurally unconscionable; and BofA's conduct violated certain state unfair trade practices statutes, and resulted in its being unjustly enriched.

BofA, in turn, hotly contested each of these points, and raised arguments and defenses that went right to the core of Plaintiffs' case. These arguments and defenses posed a potentially mortal threat to Plaintiffs' claims. BofA argued that Plaintiffs' claims were preempted by the

---

[6] Two groups of Objectors moved for discovery in connection with final approval of the Settlement. Those motions were and are denied. The motions were untimely and would have unduly and unnecessarily disrupted the schedule this Court set for the Settlement-related proceedings. Moreover, in neither instance did the Objectors make any attempt to identify specifically or narrowly the precise discovery they were seeking or the reasons they were seeking such discovery. Rather, it was clear to the Court that these Objectors were seeking to engage in a broad "fishing expedition." Finally, the sole purpose of any settlement-related discovery is to ensure the Court has sufficient information before it to enable the Court to determine whether to approve the Settlement. *See Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ("the trial court may limit its proceeding to whatever is necessary to aid it in reaching an informed, just and reasoned decision"); *In re Gen. Tire & Rubber Sec. Litig.*, 726 F.2d at 1084 n.6 (chief consideration is whether the district court has before it "sufficient facts intelligently to approve the settlement offer"); *In re Domestic Air Transp. Antitrust Litig.*, 144 F.R.D. 421, 424 (N.D. Ga. 1992) ( "Class members who object to a settlement of a class action do not have an absolute right to conduct discovery and presentation of evidence."). As the Court has determined, the record here was more than sufficient to enable this Court to decide all of the issues presented by the Motion, and thus discovery would have served no proper purpose. Discovery was denied for each of these reasons. *See also* footnote 41, *infra*.

National Bank Act ("NBA") and regulations promulgated thereunder by the Office of the Comptroller of the Currency; that its posting order and related practices were permissible under governing federal law and policy; that its account agreements expressly authorized the very re-sequencing and overdraft practices Plaintiffs challenged; that it fully disclosed its practices to its customers; that BofA had other reasons for instituting its posting order and overdraft practices; that no unconscionability cause of action exists for damages; that no plausible conversion claim existed because Plaintiffs did not own the funds in their deposit accounts; that Plaintiffs could not maintain unjust enrichment claims because of the existence of an express agreement between the bank and its customers; that the consumer protection claims were defective; and that, moreover, the vast majority of the claims brought against it were extinguished based on a prior nationwide settlement of a class-action suit in California state court (*Closson*).

Plaintiffs sought monetary damages, restitution and declaratory relief. *See generally Tornes* Third Amended Consolidated Class Action Complaint ("TAC") **[DE # 344]**; *Yourke* Amended Class Action Complaint **[DE # 345]**. The Action began on December 1, 2008, when Plaintiff Ralph Tornes filed a complaint against BofA in this Court. *See Tornes v. Bank of America, N.A.*, S.D. Fla. Case No. 08-23323. On April 9, 2009, Plaintiffs Steve Yourke and Kristin Richards filed a complaint against BofA in San Francisco County Superior Court, which was removed to the United States District Court for the Northern District of California. *See Yourke v. Bank of America, N.A.*, N.D. Cal. Case No. 09-cv-02186. These cases were transferred to this Court as part of MDL 2036, by order of the Judicial Panel for Multidistrict Litigation dated June 10, 2009.

Following transfer, Class Counsel interviewed over 100 BofA customers and potential plaintiffs to gather information about BofA's conduct and its impact upon consumers. *See* Joint

Declaration of Robert C. Gilbert and Michael W. Sobol [DE # 1885-3], ¶ 11 ("Joint Decl."). Class Counsel also expended significant resources researching and developing the legal claims at issue. *Id.* Soon after the filing of the *Yourke* and *Tornes* complaints, BofA, joined by the other First Tranche defendants at the time (Citibank, N.A.; JPMorgan Chase Bank, N.A.; Union Bank, N.A.; U.S. Bank, N.A.; Wachovia Bank, N.A.; and Wells Fargo Bank, N.A.) filed a 96-page Omnibus Motion to Dismiss and/or for Judgment on the Pleadings (the "Omnibus Motion"). [DE # 217]. Among the arguments raised by these banks was that the claims made by Plaintiffs were pre-empted by the NBA and related regulations, and that their deposit agreements disclosed that debits generally would be posted in an order other than the one in which they occurred. *See, e.g.,* *Tornes* TAC, Ex. A at 18. Plaintiffs filed a 98-page brief in opposition. [DE # 265].

At the banks' request, this Court stayed discovery in the First Tranche actions pending resolution of the Omnibus Motion. An all-day argument on the Omnibus Motion took place before this Court on February 25, 2010. [DE # 294]. On March 11, 2010, this Court issued its Order Ruling on Omnibus Motion to Dismiss, rejecting most of Defendants' arguments. [DE # 305]. However, this Court did dismiss without prejudice state statutory claims where no named plaintiff resided in the relevant states, state statutory claims with pre-suit notice requirements that were unsatisfied, and state statutory claims where Plaintiffs failed to plead required predicate acts. *Id.* at 1310-28.

On April 12, 2010, Plaintiffs filed amended complaints. [DE # 344, 345]. BofA answered these complaints on May 21, 2010, asserting 37 affirmative defenses in each answer, including defenses based on federal preemption under the NBA and certain federal regulations, arbitration, the voluntary payment doctrine and the terms of its customer agreement. [DE # 496, 497]. Additionally, BofA asserted that the claims brought in the operative complaints were

released, in whole or in part, by virtue of the class action settlement entered into and approved in *Closson*. [DE # 496 at ¶¶ 262, 263; DE # 497 at ¶¶ 181, 182].

Class Counsel and counsel for BofA engaged in extensive discussions and negotiations regarding a proposed pretrial discovery plan and schedule. On May 13, 2010, after the parties were unable to reach agreement, the Court lifted the stay of discovery and entered a comprehensive Order Establishing a Schedule for the Discovery, Motion Practice, Final Pretrial Conference, and Trial for Selected Cases. **[DE # 463]**. That same day, Plaintiffs served identical written discovery requests on the First Tranche banks, including BofA.  After the Parties negotiated and entered into a Stipulated Protective Order relating to the production of documents and information **[DE # 688]**, BofA produced over one million pages of documents.  Joint Decl. ¶ 19.  BofA also asserted extensive objections to Plaintiffs' discovery requests.  Class Counsel engaged in lengthy conferences and meetings with counsel for BofA in an effort to resolve discovery disputes, issues pertaining to Rule 30(b)(6) deposition topics, and other discovery-related issues. *Id.* On July 16, 2010, Plaintiffs moved to compel discovery from BofA. **[DE # 691]**.

During the Summer and Fall of 2010, Class Counsel prepared objections and responses to BofA's extensive discovery requests to Plaintiffs, including requests for production of documents and interrogatories, Joint Decl. ¶ 23, and defended against BofA's motion to compel discovery. **[DE # 902, 939, 1016]**. Class Counsel also began deposing BofA personnel.

### 2.     The *Closson* Settlement

The proposed settlement in *Closson v. Bank of America*, San Francisco Sup. Ct., No. CGC-04-436877, posed a significant threat to the legal viability of class members' claims in these actions.  The bar order in *Closson* was extremely broad, and would have released many, if

not most (perhaps as much as 80% of the value) of the claims of the members of the proposed Settlement Class, all in return for a settlement of $35 million. *See* Joint Decl. ¶¶ 28, 71.  As BofA argued in its motion to stay in *Tornes*: "the nationwide class action settlement in *Closson*, which has already been preliminarily approved by the state court, will have the effect of resolving and releasing all or most of the purported claims asserted in this action. . . ."  [**DE # 17** in *Tornes*, Case No. 08-cv-23323].  Accordingly, Class Counsel undertook significant efforts to object to and, after that settlement was finally approved by the trial court over Class Counsel's objections, to appeal, the *Closson* settlement. *See Jan L. Petrus, et al. v. Rhonda J. Closson, et al. & Bank of America, N.A.*, Cal. Ct. of Appeal No. A125963 (and coordinated appeals).

### 3. Settlement Negotiations and Terms

Settlement Class Counsel and counsel for BofA first began preliminary settlement discussions in this Action in mid-October 2010.  Joint Decl. ¶ 31.  The full history of these negotiations, including three separate mediation sessions, and the specific terms of the Settlement, are set out in Class Counsel's Joint Declaration and in the Motion, as well as in the Settlement itself, and need not be repeated in detail here.  What is clear from that history is that success was never assured on Class Counsel's appeal in *Closson*; the parties negotiated in good faith and at arms-length; and but for the efforts of the parties and Professor Eric Green, this Settlement would never have been achieved and the Court and the parties would still be expending tremendous resources on these cases.

On May 13, 2011, Plaintiffs filed their Motion for Preliminary Approval of the Settlement. [**DE # 1471**]. On May 24, 2011, this Court entered the Order Granting Preliminary Approval [**DE # 1520**], finding that the Settlement Class met the requirements of Fed. R. Civ. P. 23, that the Settlement was "the result of informed, good-faith, arms'-length negotiation between

9

the parties and their capable and experienced counsel" and was "not the result of collusion," that the Settlement is "within the range of reasonableness" and that it should be preliminarily approved. [**DE # 1520 at 2**]. The Court's conclusions in this regard have not changed. If anything, these conclusions are strengthened by the extensive record evidence and expert opinions offered by Plaintiffs in support of the Motion.

Pursuant to the Preliminary Approval Order, notice of the Settlement was mailed to over 13 million Settlement Class Members.[7] *See* Decl. of Joel Botzet [**DE # 1885-4**] at 4. In addition, notice of the Settlement was published in a number of national consumer magazines. *See* Decl. of Katherine Kinsella [**DE # 1885-5**] at 5-7. A special Settlement website was also established. *See id.* at 7-8. As discussed below, the Court finds that the Notice Program proposed by Plaintiffs was effectively executed, and that it was more than adequate to put the Settlement Class Members on notice of the terms of the Settlement, the procedures for objecting to and opting out of the Settlement, and the rights that the Settlement Class Members will be giving up by remaining part of the Settlement. Indeed, based upon the evidence, it appears that about 96% of the identifiable Settlement Class Members received "direct mail" notice of the Settlement. *Id.* at 3.

Of particular note, Settlement Class Members do not have to submit claims or take any other affirmative step to receive relief under the Settlement. Joint Decl. ¶ 40. Instead, within 30 days of the Effective Date of the Settlement (Agreement ¶ 22), BofA and the Settlement Administrator will distribute the Net Settlement Fund to all identifiable Settlement Class Members who do not opt out of the Settlement and who are entitled to a distribution under the

---

[7] The record reflects that approximately 13.8 million accounts were affected by the practices alleged in these cases against BofA. Some customers have multiple deposit accounts. The 13.8 million accounts were held by about 13.2 million Settlement Class Members.

formula provided in the Settlement (Agreement ¶ 79).  At the same time, the distribution will be made to the Court-approved recipients of the *Cy Pres* Distribution Amount on behalf of those Settlement Class Members who could not be identified.   Agreement ¶¶ 83, 91.   More particularly, all identifiable Settlement Class Members who experienced a "Positive Differential Overdraft Fee" will receive a *pro rata* distribution of the Net Settlement Fund, minus the *Cy Pres* Distribution Amount. Agreement ¶¶ 79, 83–85. The Positive Differential Overdraft Fee analysis determines, among other things, which BofA Account holders were assessed additional overdraft fees that would not have been assessed if the Bank had used a posting sequence or method that ordered Debit Card Transactions (Agreement ¶ 20) from lowest-to-highest dollar amount, rather than from highest-to-lowest dollar amount, and how much in additional overdraft fees those Account holders paid.   The calculation involves a complex, multi-step process described in the Agreement. Agreement ¶ 79.   All $410 million of the Settlement will be distributed or spent in support of the Settlement.   None of the $410 million will revert back to BofA (unless the Settlement terminates in the circumstances defined in the Agreement).

## DISCUSSION

Federal courts have long recognized a strong policy and presumption in favor of class action settlements.   The Rule 23(e) analysis should be "informed by the strong judicial policy favoring settlements as well as the realization that compromise is the essence of settlement." *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. Unit B 1982); *see also Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996).  In evaluating a proposed class action settlement, the Court "will not substitute its business judgment for that of the parties; 'the only question . . . is whether the settlement, taken as a whole, is so unfair on its face as to preclude judicial approval.'" *Rankin v. Rots*, 2006 WL 1876538, at *3 (E.D. Mich. June 27, 2006) (quoting *Zerkle*

11

*v. Cleveland-Cliffs Iron Co.*, 52 F.R.D. 151, 159 (S.D.N.Y. 1971)).  "Settlement agreements are highly favored in the law and will be upheld whenever possible because they are a means of amicably resolving doubts and uncertainties and preventing lawsuits." *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1105 (5th Cir. 1977).

### 1.    The Court Has Personal Jurisdiction Over the Settlement Class Because the Class Received Adequate Notice and an Opportunity to Be Heard.

This Court has personal jurisdiction over all of the Settlement Class Members because they received the requisite notice and due process required by the United States Supreme Court. The Court finds that the Settlement Class Members have received "the best practicable" notice which was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections," and the Court so holds.  *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 811-12 (1985) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950)); *see also In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 306 (3d Cir. 1998).   The Court has subject matter jurisdiction over the Action pursuant to 28 U.S.C. §§ 1332(d)(2), 1407 and, in the case of a removed Action, § 1441(a).

### a.    The Best Notice Practicable Was Provided to the Class.

Notice of the Settlement was mailed to over 13 million Settlement Class Members. *See* Decl. of Joel Botzet [**DE # 1885-4**] at 4. In addition, notice of the Settlement was published in a number of popular national consumer magazines of wide circulation, including People, Sports Illustrated, and TV Guide, and notice was distributed through the Internet on sites including Facebook, Yahoo, and the Microsoft Media Network. *See* Decl. of Katherine Kinsella [**DE # 1885-5**] at 5-7. A special Settlement website and automated toll-free number were also established which enabled Settlement Class Members to obtain additional information about the

Settlement. *See id.* at 7-8.

    **b.**    **The Notice Was Reasonably Calculated to Inform Settlement Class Members of Their Rights.**

The Court finds that the Notice approved previously[8] was fully and properly effectuated and was sufficient to satisfy the requirements of due process because it described "the substantive claims . . . [and] contained information reasonably necessary to [allow Settlement Class Members to] make a decision to remain a class member and be bound by the final judgment." *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104-05 (5th Cir. 1977). The Notice, among other things, defined the Settlement Class, described the release as well as the amount and method and manner of proposed distribution of the Settlement proceeds, and informed Settlement Class Members of their rights to opt-out or object, the procedures for doing so, and the time and place of the Final Approval Hearing.  The Notice also informed Settlement Class Members that a class judgment would bind them unless they opted out, and told them where they could obtain more information, such as access to a full copy of the Agreement.  The Notice additionally informed Settlement Class Members that up to 14% of the Net Settlement Fund would be paid into a *cy pres* fund on behalf of those Settlement Class Members who could not be identified.  Further, the Notice described in summary form the fact that Class Counsel would be seeking attorneys' fees of up to 30 percent of the Settlement.  Settlement Class Members were provided with the best practicable notice "reasonably calculated, under [the] circumstances, to apprise them of the pendency of the action and afford them an opportunity to

_____

[8] Order Granting Preliminary Approval [**DE # 1520**] at 2 (finding "the proposed Notice Program and proposed forms of Notice satisfy Federal Rule of Civil Procedure 23 and Constitutional Due Process requirements, and are reasonably calculated under the circumstances to apprise the Settlement Class of the pendency of the Action . . .").

present their objections." *Mullane*, 339 U.S. at 314.[9]  The content of the Notice fully complied with the requirements of Rule 23.

Several Objectors nonetheless contend the Notice was insufficient.[10]  The Court rejects these contentions.  The statistics provided by Plaintiffs are telling:

- 13,280,225 Notices were mailed;

- 268,775 Settlement Class Members called the Settlement hotline on or before October 15, 2011, meaning they had a question about the Settlement and sought further information about it;

---

[9] In fact, the record reflects that the Notice was exceedingly effective:  up to 96% of the identifiable Settlement Class Members appear to have received direct mail notice of the Settlement, *see* Decl. of Katherine Kinsella [**DE # 1885-5**] at 3; and almost one million Settlement Class Members either visited the settlement website, called the toll-free number, or requested a copy of the Long-form Notice.  Still others posed questions to and communicated with the Settlement Administrator.

[10] Objectors finding fault with the Notice include Hastings and Buycks ("Hastings") [**DE # 1916**], Repa, Spann and Palting [**DE # 1935**] ("Repa"), Carapia and Dorego [**DE # 1936**] ("Carapia"), and Finn [**DE # 2133**].  For example, Hastings claims the notice "falsely" informed Settlement Class Members that Class Counsel could not determine how much money each Settlement Class Member would receive.  [**DE # 1916**] at 1.  But that is a true statement:  the amount each Settlement Class Member would receive from the Settlement could not be calculated accurately as of the time Class Notice was disseminated.  It would have been "false[]" to provide each Settlement Class Member with a particular damage figure when that figure necessarily depended on such unknowns as the number of opt-outs and the outcome of the application for attorneys' fees which was not known until after the Final Approval Hearing.  Furthermore, the Notice also could not have informed Settlement Class Members accurately of the amount of "damages" each class member incurred.  As expressly stated in the Agreement, the formula set forth therein for calculating the Positive Net Differential Overdraft Fees was for purposes of the Settlement only and not for any other purpose.  Agreement ¶ 80.  Had the Notice contained an estimated recovery of each individual Settlement Class Member, and that estimate turned out either to over-estimate or under-estimate the amount of that recovery, objectors would surely come forward complaining that they were misled to their detriment by the Notice.  It is likely for this reason that settlement notices rarely, if ever, provide such information.  In short, the Court agrees that any specific figures provided in the Notice would have been misleading, if not erroneous, and led to another generation of claims.  Besides, under Rule 23(e), such information is clearly not required to be set forth in a class notice.

- there were approximately 281,413 unique visitors to the Settlement website as of October 15, 2011;

- 102,304 Settlement Class Members went so far as to contact the Settlement Administrator to request a mailed copy of the Long-form Notice; and

- the Notice prominently included the names and telephone numbers of Settlement Class Counsel, who fielded hundreds of phone calls and e-mails from Settlement Class Members seeking additional information.

The Settlement was widely known and appreciated, and any Settlement Class Member who wished to express comments or objections had ample opportunity and means to do so. There were only 352 timely exclusion requests (0.0027%), and only 49 timely objections (0.0004%).  Supp. Botzet Decl. **[DE #2030-2]** at 3.  The near "unanimous approval of the proposed settlements by the class members is entitled to nearly dispositive weight in this court's evaluation of the proposed settlements." *In re Art Materials Antitrust Litig.*, MDL No. 436, 100 F.R.D. 367, 372 (N.D. Ohio 1983); *see also Lipuma*, 406 F. Supp. 2d at 1324. Here, the "small number of objectors from a plaintiff class of many thousands is strong evidence of a settlement's fairness and reasonableness." *Assn. for Disabled Americans. v. Amoco Oil Co.,* 211 F.R.D. 457, 467 (S.D. Fla. 2002); *accord Mangone v. First USA Bank*, 206 F.R.D. 222, 227 (S.D. Ill. 2001) ("In evaluating the fairness of a class action settlement, such overwhelming support by class members is strong circumstantial evidence supporting the fairness of the Settlement."); *Austin v. Penn. Dept. of Corrections*, 876 F. Supp. 1437, 1458 (E.D. Pa. 1995) ("Because class members are presumed to know what is in their best interest, the reaction of the class to the Settlement Agreement is an important factor for the court to consider.").

Contrary to what certain Objectors suggest, the law does not require that notice be given

of the amount an individual class member will recover, either as a lump sum or as a range or percentage of potential recovery. A class action settlement notice "need not be so detailed that an individual class member can calculate the amount of his or her actual recovery under the settlement." *In re WorldCom, Inc.*, 347 B.R. 123, 140 (Bankr. S.D.N.Y. 2006) (citation, quotation marks, and alteration omitted); *see Mangone*, 206 F.R.D. at 231-34 (overruling objection that class settlement notice did not state "the value of damages, the merits of the claims, . . . the maximum potential recovery for the Class, and the methodology for determining and calculating damages"; holding that "none of the items complained of are required by the notice requirements set out in F.R.C.P. 23 or due process.").

Likewise, disclosure in the Notice of all the risks of continuing the litigation and corresponding percentages would have required describing a series of possible eventualities that depend on legal assumptions and guesswork, and this easily could have led to a garbled or misleading Notice, contrary to the purpose of Rule 23(e)(1). There was simply no meaningful way to disclose all these details briefly, to non-lawyers, without provoking confusion. Nor was there any requirement to make such an extensive disclosure in the Notice. "Class members are not expected to rely upon the notices as a complete source of settlement information." *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 122 (8th Cir.).

Here, the Notice was adequate because it informed the Settlement Class Members of the principal Settlement terms, including that BofA was paying to create the $410 million Settlement Fund, and because it explained that the amount of the distributions to Settlement Class Members will be "based on the number of people in the Settlement Class and the amount of additional overdraft fees each Settlement Class Member paid as a result of Bank of America's posting order." **[DE # 1471-2 at 36]**. The Agreement sets forth the exact formula by which the Net

Settlement Fund is to be allocated among Settlement Class Members, and that formula was referenced in the Notice and readily available in full on the Settlement Website. The Notice also explained the rights of Settlement Class Members under the Settlement, and where they could find more information, including a website containing links to the Settlement Agreement, operative complaints, Motion for Final Approval, and many other documents relevant to the Settlement and the litigation posture of the Action. [DE # 1471, Ex. A, ¶¶ 79, 102, 106; DE # 1471-2 at 46]. Class Counsel also included in the Motion their considered opinions that the Settlement represents a range of recovery of 45 percent to 9 percent of Settlement Class Members' claimed losses. Joint Decl. ¶ 68. The disclosure of this range was sufficient to put Settlement Class Members on notice of their potential recovery based on their personal history with BofA, and to allow them to make an informed decision about whether to accept the Settlement, object to it or opt out of it.

## 2.    The Settlement Is Fair, Adequate and Reasonable.

In determining whether to approve the Settlement, the Court considers whether it is "fair, adequate, reasonable, and not the product of collusion." *Leverso v. SouthTrust Bank of Al., N.A.,* 18 F.3d 1527, 1530 (11th Cir. 1994); *see also Bennett v. Behring Corp.,* 737 F.2d 982, 986 (11th Cir. 1984). A settlement is fair, reasonable and adequate when "the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued." *In re Lorazepam & Clorazepate Antitrust Litig.,* MDL No. 1290, 2003 WL 22037741, at *2 (D.D.C. June 16, 2003) (quoting *Manual for Complex Litigation* (Third) § 30.42 (1995)). The Court is "not called upon to determine whether the settlement reached by the parties is the best possible deal, nor whether class members will receive as much from a settlement as they might have recovered from victory at trial." *In re Mexico Money Transfer Litig.,* 164 F. Supp. 2d 1002, 1014

(N.D. Ill. 2000) (citations omitted).

The Eleventh Circuit has identified six factors to be considered in analyzing the fairness, reasonableness and adequacy of a class action settlement under Rule 23(e):

(1) the existence of fraud or collusion behind the settlement;

(2) the complexity, expense, and likely duration of the litigation;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the probability of the plaintiffs' success on the merits;

(5) the range of possible recovery; and

(6) the opinions of the class counsel, class representatives, and the substance

and amount of opposition to the settlement.

*Leverso*, 18 F.3d at 1530 n.6; *see also Bennett*, 737 F.2d at 986.

### a.     There Was No Fraud or Collusion.

As discussed above, the Court readily concludes that there was no fraud or collusion leading to this Settlement. *See, e.g., In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1329 n.3 (S.D. Fla. 2001); *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001) (court had "no doubt that this case has been adversarial, featuring a high level of contention between the parties"); *In re Motorsports Merchandise Antitrust Litig.*, 112 F. Supp. 2d 1329, 1338 (N.D. Ga. 2000) ("[t]his was not a quick settlement, and there is no suggestion of collusion"); *Warren v. City of Tampa*, 693 F. Supp. 1051, 1055 (M.D. Fla. 1988) (record showed no evidence of collusion, but to the contrary showed "that the parties conducted discovery and negotiated the terms of settlement for an extended period of time"), *aff'd*, 893 F.2d 347 (11th Cir. 1989).  None of the Objectors seriously contended otherwise.

### b.     The Settlement Will Avert Years of Highly Complex and Expensive Litigation.

This case involves millions of Settlement Class Members and alleged wrongful overdraft fees in the billions of dollars. The claims and defenses are complex; litigating them has been difficult and time consuming. Although this litigation has been pending for more than two years, recovery by any means other than settlement would require additional years of litigation in this Court and the appellate courts. *See United States v. Glens Falls Newspapers, Inc.*, 160 F. 3d 853, 856 (2d Cir. 1998) (noting that "a principal function of a trial judge is to foster an atmosphere of open discussion among the parties' attorneys and representatives so that litigation may be settled promptly and fairly so as to avoid the uncertainty, expense and delay inherent in a trial."); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. at 317, 325-26 & n.32 ("adjudication of the claims of two million claimants could last half a millennium").

In contrast, the Settlement provides immediate and substantial benefits to millions of BofA customers. *See In re Shell Oil Refinery*, 155 F.R.D. 552, 560 (E.D. La. 1993) ("The Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation.") (alterations in original) (quoting *Oppenlander v. Standard Oil Co.*, 64 F.R.D. 597, 624 (D. Colo. 1974)); *see also In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) (noting that complex litigation "can occupy a court's docket for years on end, depleting the resources of the parties and taxpayers while rendering meaningful relief increasingly elusive"). Especially because the "demand for time on the existing judicial system must be evaluated in determining the reasonableness of the settlement," *Ressler v. Jacobson*, 822 F. Supp. 1551, 1554 (M.D. Fla. 1992) (citation omitted), there can be no reasonable doubt as to the adequacy of this Settlement.

Several Objectors complain that $410 million is not enough to adequately compensate the

Settlement Class. The Court disagrees. By all accounts, the $410 million paid into escrow by BofA represents between 45 percent and 9 percent of the total potential damages. [**DE # 1885** at 27]. This range of recovery derives from the broad spectrum of risks present in the Action. The 9 percent figure at the bottom end of this range, which is based on BofA's maximum possible liability, assumes that a fact-finder would have calculated damages by comparing the total overdraft fees BofA assessed using its high-to-low posting order with the total overdraft fees it would have assessed using the inverse method, *i.e.*, posting debits from lowest-to-highest dollar amount.

Objectors' assumption that such relief was the inevitable result of this litigation, and their subsequent use of that figure as a basis to criticize the exemplary result here, is unfounded. Objectors neglect to consider that a fact-finder might not have used a low-to-high comparator to calculate damages but, instead, might have calculated damages by comparing the fees actually assessed with the fees that would have been assessed under a chronological posting order, as another court did following the trial of an action involving similar legal claims against another bank. *See Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080, 1138-39 (N.D. Cal. 2010) (rejecting a damage calculation based upon a low-to-high posting order, and instead calculating damages based on the finding that chronological posting of debits "would have tracked the ordinary and reasonable expectations of depositors."). The use of such a chronological comparison, as opposed to a low-to-high comparison, significantly reduces BofA's total potential liability and, in turn, significantly increases the percentage of recovery for the Settlement Class that the $410 million settlement sum represents. Moreover, standing alone, nine percent or higher constitutes a fair settlement even absent the risks associated with prosecuting these claims. *See Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988) (King, C. J.)

("A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery."); *Newbridge Networks Sec. Litig.*, 1998 WL 765724, *2 (D.D.C. Oct. 23, 1998) ("an agreement that secures roughly six to twelve percent of a potential recovery . . . seems to be within the targeted range of reasonableness"); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 715 (E.D. Pa. 2001) (noting that since 1995, class action settlements have typically "recovered between 5.5% and 6.2% of the class members' estimated losses"); *In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d 568, 581 (E.D. Pa. 2003).

Plaintiffs properly note that Objectors' argument regarding the sufficiency of the Settlement amount suffers from hindsight bias and an unduly sanguine view of Plaintiffs' litigation risks – risks that these Objectors never faced because they arrived on the scene after the Settlement was reached. A settlement fairness analysis must consider such risks at the time the settlement was reached, not after settlement. *See, e.g.*, *In re CIGNA Corp.*, 2007 WL 2071898, at *3 (E.D. Pa. July 13, 2007). The combined risks here were real and potentially catastrophic for the Class. As Professor Miller stated: "This is among the riskiest class action cases I have encountered in more than twenty years of involvement in the field of class action and complex litigation." Decl. of Prof. Geoffrey Miller [**DE # 1885** at Ex. H], ¶ 22. A brief review of the risks Plaintiffs confronted confirms Professor Miller's observation.

*First*, whether Plaintiffs' claims are preempted by the NBA and related regulations remains an open question. Despite this Court's rulings that such preemption does not apply here, *see Luquetta v. JPMorgan Chase Bank, N.A.* (*In re Checking Account Overdraft Litig.*), 2011 WL 2746171, 2011 U.S. Dist. LEXIS 75782 (S.D. Fla. July 13, 2011), no federal appeals court

has yet reached the NBA preemption issue in this specific context.[11]   The preemption defense "was a 'light switch' which, if successfully turned 'on' by BOA, would have led to dismissal of the entire case, which was predicated entirely on state law."   Expert Report of Prof. Charles Silver [**DE # 1885-12**], at 15; *cf. Enterprise Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 248 (S.D. Ohio 1991) (rejecting the argument "that the Class should get more" because of the "very real potential that the Class could come away from a long expensive trial with nothing.").

*Second*, high-to-low posting of debit card transactions is "by no means clearly unlawful." Decl. of Prof. Samuel Issacharoff in Support of Settlement [**DE # 1885-7**], ¶ 17.   The account agreements disclose that BofA may process debits out of order and/or in high-to-low order, and the Uniform Commercial Code expressly permits the reordering of checks.  *See* UCC § 4-303(b) & cmt. 7.

*Third*, while Objectors treat class certification as a foregone conclusion, it is anything but that.  This Court had not certified any class in MDL 2036 when this Settlement was reached, nor had it done so before the Settlement Agreement was signed.  BofA would undoubtedly have opposed class certification on multiple grounds, including manageability, as stated by BofA in its Response to Objections.  [DE #2029 at 20-26].  Had BofA defeated class certification, the value of this case would have decreased to near zero.

*Fourth*, the Class faced a large roadblock to recovery in the *Closson* settlement.   Its release purported to subsume all BofA customers who incurred overdrafts between 2001 and 2007, as well as large numbers of BofA customers who incurred overdrafts after 2007.   Yet

---

[11] And, in denying the Omnibus Motion, this Court specifically recognized that it was only ruling in the context of a motion to dismiss or for judgment on the pleadings.

Settlement Class Counsel "successfully navigated around the *Closson* Settlement and obtained an outstanding settlement for the class." Decl. of Roberto Martinez [**DE # 1885-8**], ¶ 32. Indeed, "not only did class counsel here manage to persuade Bank of America that this previous settlement might not withstand appeal, but they managed to persuade Bank of America to *resettle* the dispute for nearly ten times what it had been willing to pay only three years ago." Decl. of Prof. Brian T. Fitzpatrick [**DE # 1885-11**], ¶ 14. This speaks to both the merits of the Settlement and the skill of Settlement Class Counsel in obtaining it.

*Fifth*, Objectors downplay the risk that BofA would have joined other First Tranche Banks in seeking arbitration based on the Supreme Court's recent decision in *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011). [*E.g.*, **DE # 1384**]. Objector Hastings relies on BofA's public statement of August 13, 2009, after *Tornes* and *Yourke* were filed, that it "will no longer enforce mandatory arbitration in *new* banking disputes with *individual* customers." [**DE # 1916** at 16 (emphases added)]. In addition to being non-binding and a potentially reversible policy of the bank, this announcement, by its literal terms, did not extend to class action suits or disputes already on file at the time. Moreover, in its Answer, BofA raised arbitration as a defense, purporting to reserve the right to enforce the arbitration provision in the governing (not the current) BofA account agreement. *See* BofA Answer in *Tornes* [**DE # 496**], ¶ 268; *cf. Chavez v. Bank of Am., N.A.*, 2011 WL 4712204 (N.D. Cal. Oct. 7, 2011) (enforcing arbitration provision in BofA consumer contract against two plaintiffs). Had BofA attempted to enforce, and succeeded in enforcing, its arbitration provision, the value of this case would have been significantly reduced.

Finally, Class Counsel confronted not merely a single large bank, but "the combined forces of a substantial portion of the entire American banking industry, and with them a large

contingent of some of the largest and most sophisticated law firms in the country." Decl. of Prof. Geoffrey Miller [**DE # 1885-9**], ¶ 49. The record of proceedings here, like the record in *Bennett v. Behring Corp.*, 737 F.2d 982, 988 (11th Cir. 1984), demonstrates "great patience and diligence" on the part of "counsel and the court in resolving a massive and difficult case."[12]

It is easy enough for Objectors to claim in hindsight that Settlement Class Counsel could or should have obtained more. It is quite another thing to accomplish that result in the face of all these risks. "Successful outcomes often make risks seem less risky in hindsight than they were at the time," and, even though "inherent in compromise is a yielding of absolutes and an abandoning of highest hopes," final settlement approval orders "almost always override the wishes of some class members for a bigger slice of the pie." *In re Abrams & Abrams, P.A.*, 605 F.3d 238, 248 (4th Cir. 2010); *Cotton*, 559 F.2d at 1330 (citation omitted); *Curtis-Wright Corp. v. Helfand*, 687 F.2d 171, 175 (7th Cir. 1982). The point is that, but for the Settlement, Plaintiffs and the class faced a multitude of potentially serious, substantive defenses, any one of which could have precluded or drastically reduced the prospects of recovery.

    c.    **The Factual Record is Sufficiently Developed to Enable Plaintiffs and Class Counsel to Make a Reasoned Judgment Concerning the Settlement.**

Courts also consider "the degree of case development that class counsel have accomplished prior to settlement" to ensure that "counsel had an adequate appreciation of the merits of the case before negotiating." *In re General Motors Corp. Pick-up Truck Fuel Tank*

---

[12] Class Counsel also pointed out that, given the extraordinary economic events of the past few years and their effects on large national banks like BofA, these banks face an existential threat that poses a similar risk to the Class' recovery. Objector Fletcher argued at the Final Approval Hearing that there exists an implicit U.S. government guarantee of the solvency of any financial institution, but that is incorrect under the recently-passed Dodd-Frank Wall Street Reform and Consumer Protection Act ("DFA"), Pub. L. 111-203, 124 Stat. 1518, Sec. 214(a) (July 21, 2010) (codified at 12 U.S.C. § 5394(a)) ("[n]o taxpayer funds shall be used to prevent the liquidation of any financial company under [Title II of the DFA].").

*Prods. Liab. Litig.*, 55 F.3d 768, 813 (3d Cir. 1995). At the same time, "[t]he law is clear that early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations." *Ressler*, 822 F. Supp. at 1555.

According to Class Counsel's uncontested statement of facts, significant investigation and discovery occurred in this case prior to the Settlement. Joint Decl. ¶ 60. That was sufficient to give Settlement Class Counsel insight into the strengths and weaknesses of their claims against BofA. *Id.* That is, Class Counsel developed ample information and performed extensive analyses from which "to determine the probability of their success on the merits, the possible range of recovery, and the likely expense and duration of the litigation." *Mashburn v. Nat'l Healthcare, Inc.*, 684 F. Supp. 660, 669 (M.D. Ala. 1988); Joint Decl. ¶ 60.

Certain Objectors imply, without any support in the record whatsoever, that Settlement Class Counsel entered into the Settlement without knowing BofA's total liability exposure. [*E.g.*, **DE # 1916**]. The Court rejects this unsupported claim. Settlement Class Counsel participated in three days of mediation, overseen by nationally recognized mediator Professor Eric Green, with several damages and exposure estimates in hand based on information provided by BofA. Before entering mediation and reaching the Settlement, Settlement Class Counsel also reviewed and analyzed a substantial number of BofA internal documents that showed BofA's own calculations of how much extra revenue the debit re-sequencing generated. Moreover, as part of the ongoing settlement process, Plaintiffs' expert Art Olsen, using BofA's own customer account transactional data that was reasonably available in electronic form, performed the detailed work necessary to determine the exact amount of each identifiable Settlement Class Member's damages resulting from high-to-low debit re-sequencing and the proposed plan of allocation, based upon the low-to-high formula provided in the Agreement. *See* Joint Decl. ¶ 36;

Agreement ¶¶ 77-79.  The Court is satisfied that Settlement Class Counsel were more than sufficiently prepared to negotiate and enter into the Settlement.  *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 237 (5th Cir. Unit B 1982) ("It is enough if representation of the class during the negotiations was adequate and that the settlement itself is fair.") (citations, quotation marks, and alterations omitted)).

### d.   Plaintiffs Would Have Faced Significant Obstacles to Obtaining Relief.

The Court must also consider "the likelihood and extent of any recovery from the defendants absent . . . settlement."  *In re Domestic Air Transp.*, 148 F.R.D. at 314 (N.D. Ga. 1993); *see also Ressler*, 822 F. Supp. at 1555 ("A Court is to consider the likelihood of the plaintiff's success on the merits of his claims against the amount and form of relief offered in the settlement before judging the fairness of the compromise.").

Plaintiffs correctly note that they faced several major risks in this litigation, including those relating to (1) the *Closson* settlement release, (2) federal preemption, (3) the BofA account agreement, and (4) arbitration, as discussed above.  Absent this Settlement, this litigation would have continued for some additional years, at tremendous expense to the parties.  Given the myriad risks attending these claims, the Settlement is a fair compromise. *See, e.g., Bennett*, 96 F.R.D. at 349-50 (plaintiffs faced a "myriad of factual and legal problems" that led to "great uncertainty as to the fact and amount of damage," which made it "unwise [for plaintiffs] to risk the substantial benefits which the settlement confers . . . to the vagaries of a trial"), *aff'd*, 737 F.2d 982 (11th Cir. 1984); *Enter. Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 248 (S.D. Ohio 1991) (citing the "very real potential that the [c]lass could come away from a long expensive trial with nothing," the court rejected the argument "that the Class should get more").

**e.    The Benefits Provided by the Settlement Are Fair, Adequate and Reasonable When Compared to the Range of Possible Recovery.**

In determining whether a settlement is fair in light of the potential range of recovery, the Court is guided by the "important maxim[]" that "the fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate." *Behrens*, 118 F.R.D. at 542.  This is because a settlement must be evaluated "in light of the attendant risks with litigation." *Thompson v. Metropolitan Life Ins. Co.*, 216 F.R.D. 55, 64 (S.D.N.Y. 2003); *see Bennett*, 737 F.2d at 986 ("[C]ompromise is the essence of settlement."); *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("[T]he very essence of a settlement is . . . a yielding of absolutes and an abandoning of highest hopes.") (internal quotation omitted). Thus, courts regularly find settlements to be fair where "[p]laintiffs have not received the optimal relief." *Warren*, 693 F. Supp. at 1059; *see, e.g., Great Neck Capital Appreciation Investment P'ship, L.P. v. PriceWaterHouseCoopers, L.L.P.*, 212 F.R.D. 400, 409-410 (E.D. Wis. 2002) ("The mere possibility that the class might receive more if the case were fully litigated is not a good reason for disapproving the settlement.").

The Settlement provides substantial value to the Settlement Class, and is well within the range of reasonableness. Under the Settlement, Plaintiffs and the Settlement Class have recovered $410 million, which represents between 45 percent and 9 percent of their anticipated total recovery, depending on how the *Closson* appeal was resolved as well as the future course of this litigation. *See* Joint Decl. [DE # 1885-3] at ¶ 68; Decl. of Prof. Samuel Issacharoff **[DE # 1885-7]** at 9 ("The assessment of the value to the class here must include the harm avoided if the *Closson* settlement had been affirmed on appeal, thereby foreclosing most of the class claims."); Decl. of Roberto Martinez **[DE # 1885-8]** at 10 (noting that settlement representing a portion of alleged loss "is not only reasonable and adequate, but outstanding…").  Objectors assert that the

Settlement shortchanges the Settlement Class, but they offer no facts to support their argument; they offer merely the bravado that the claims are worth more.[13]  However, the Court finds this Settlement to be "fair, reasonable and adequate."  As the experts have attested, this is one of the largest settlements in a consumer class action; even if the risks of the *Closson* release and other defenses were put aside, a 9 percent settlement (the absolute lowest percentage anyone has attempted to ascribe to this Settlement) is still within the range of reasonableness.  *See e.g.* *Behrens*, 118 F.R.D. at 542 ("A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery."); *Newbridge*, 1998 WL 765724, *2  ("an agreement that secures roughly six to twelve percent of a *potential* recovery . . . seems to be within the targeted range of reasonableness");  *In re Rite Aid*, 146 F. Supp. 2d at 715 (noting that since 1995, class action settlements have typically "recovered between 5.5% and 6.2% of the class members' estimated losses").  Moreover, in light of the "damage" formula being used to effectuate this Settlement and the *Closson* and other defenses at play in these cases, the Court believes that this Settlement is actually providing a far greater percentage recovery.

The absence of a claims-made process further supports the conclusion that the Settlement is reasonable. *See* Decl. of Prof. Samuel Issacharoff [**DE # 1885-7**] at 14 (noting the significant benefit of the proposed direct distribution to Settlement Class Members "is designed to optimize the class recovery."); Decl. of Prof. Geoffrey Miller [**DE # 1885-9**] at 7 ("The automatic nature of the individual payments is an important benefit . . ."). Settlement Class Members will receive

---

[13] A few Objectors in their papers or at the Final Approval Hearing invited the Court to compare the facts in this case with those in cases against other banks.  Other than conclusory assertions, they offered no evidentiary basis for the Court to make such a comparison.  The Court is aware that, while the business practices of banks may be similar, the manner in which those practices were implemented, including, among other factors, customer notices and disclosures and the banks' objectives in adopting their practices, may vary, potentially leading to different findings and liability.

the benefit automatically, without needing to fill out any claim form or indeed to take any action whatsoever.[14]  In contrast, the *Closson* settlement required potential settlement class members to submit claims forms themselves in order to receive benefits.

### f.     The Opinions of Settlement Class Counsel, Class Representatives, and Absent Settlement Class Members Strongly Favor Approval of the Settlement.

The Court gives "great weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation." *Warren,* 693 F. Supp. at 1060; *see also Mashburn*, 684 F. Supp. at 669 ("If plaintiffs' counsel did not believe these factors all pointed substantially in favor of this settlement as presently structured, this Court is certain that they would not have signed their names to the settlement agreement."); *In re Domestic Air Transp.*, 148 F.R.D. at 312-13 ("In determining whether to approve a proposed settlement, the Court is entitled to rely upon the judgment of the parties' experienced counsel. '[T]he trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel.'" (citations omitted)).  Settlement Class Counsel have made clear that they believe that this Settlement is extraordinary and deserving of Final Approval. Joint Decl. at 23.[15]

---

[14] *Cf. Sylvester v. CIGNA Corp.*, 369 F. Supp. 2d 34, 52 (D. Me. 2005) (finding that "'claims made' settlements regularly yield response rates of 10 percent or less."); *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 391 (C.D. Cal. 2007) ("[M]uch of what is attainable will go unpaid as a result of the claims-made process.").

[15] Objector Hastings argued that the Class Counsel are taking inconsistent positions because they objected to a settlement of less than 10 percent of Fifth Third bank's potential exposure, and yet seek approval of a potentially equivalent recovery here. *Schulte v. Fifth Third Bank,* _ F. Supp. 2d _, No. 09-cv-6655, 2011 WL 3269340, at *6-7, *14 (N.D. Ill. July 29, 2011) (finally approving $9.5 million settlement on a monetary exposure assumed to be around $96.5 million). The facial appeal of this argument quickly fades when one inquires into the actual facts of each case.  When the bar created by the proposed *Closson* release, as well as BofA's other defenses, are factored into the equation, this Settlement is far more favorable than Fifth Third's in *Schulte*. Moreover, unlike in *Schulte* where class members had to submit claims to share in the settlement fund, Settlement Class Members here did not have to file any claim or take any action at all to

### g.   Other Issues Raised by Objectors Regarding the Fairness of the Settlement.

### i.   The Release is Proper.

The Court rejects the contention of certain Objectors that the release in the Settlement is improper.[16]   The release permissibly protects BofA from follow-on claims, but not from new claims arising after the cutoff date in the Agreement or from claims unrelated to the subject matter of these cases.  By its own terms, the release is tailored to claims that relate to or arise out of conduct that is the subject matter of the complaints.  [DE # 1471, Ex. A, ¶ 98].  The release withstands scrutiny because this litigation concerned all of the released issues, and BofA is providing extremely valuable consideration in exchange for the release.  *See, e.g., In Re Managed Care Litig.*, 2010 WL 6532985, at *11 (S.D. Fla. Aug. 15, 2010) (holding similar release language – precluding "any and all causes of action . . . that are, were or could have been asserted . . . by reason of, arising out of, or in any way related to any of the facts, acts, events, transactions, [or] occurrences" – "only applies to claims that relate to the course of conduct" at issue in the underlying settled multidistrict litigation).

### ii.   Injunctive Relief is Unnecessary.

The Court also rejects the complaints of those Objectors who lament the absence of injunctive relief.  Contrary to their misstatements, it is no longer possible for BofA to continue the same overdraft practices.[17]  As counsel for BofA notes, "[t]hese objectors overlook the fact

---

receive a distribution from the Settlement Fund.  Hence, this Settlement will confer monetary benefits on a substantially higher percentage of the Settlement Class than the Fifth Third settlement does.

[16] *E.g.*, Jenkins *et al.* [DE # 1920] ("Jenkins") and Sarro and Marek [DE # 1933] ("Sarro").

[17] These Objectors include Repa [DE # 1935], Carapia [DE # 1936], Fletcher [DE # 1903], and Jordan [DE # 1941].

that, during the pendency of this litigation, banks were required by federal law to eliminate practices of which Plaintiffs complain." *See* Defendant's Memorandum at 4.   Regulation E, which took effect on August 15, 2010, prohibits banks from assessing overdraft fees on non-recurring debit transactions unless consumers affirmatively consent to this practice. *See* 12 C.F.R. § 205.17.   That is, BofA "has been required to obtain a customer's affirmative consent prior to imposing any fee or charge for overdraft services associated with one-time (non-recurring) debit card transactions" since July 2010.   Defendant's Memorandum at 4.   Therefore, injunctive relief is unnecessary.

### iii.   Subclasses Are Unnecessary.

A few Objectors argue for the establishment of subclasses based on certain Settlement Class Members' participation in the settlement in *Closson*.[18]   The proposed plan of allocation approved by this Court treats all Settlement Class Members equally.   All Settlement Class Members were harmed by the same BofA practices and in the same manner, and all were subject to the same overriding (and existential) risks of federal preemption, arbitration, defenses grounded in BofA's account agreements, and other defenses.

No material intra-class conflict exists that requires the establishment of subclasses. *See In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d at 237.   "There are no conflicts in the representation of class members who all were subject to the exact same procedures by Bank of America.   The relief afforded to class members is precisely proportionate to the charges they suffered as a result of the contested overdraft policy."   Decl. of Prof. Samuel Issacharoff [DE # 1885-7], ¶ 40.   Moreover, at the time the Settlement was negotiated, the parties did not yet know

---

[18] Objectors who raise the *Closson* subclass argument include Hastings [DE # 1916], Locke [DE # 1922], and Clayton [DE # 1945].

whether *Closson* would be affirmed or overturned on appeal. *See In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981) (analysis of a potential intra-class conflict looks to "whether . . . interests conflicted at the point of settlement negotiation"). The uncertainty and risk presented by *Closson* falls well short of the material variations in class member rights and interests that required subclasses in the cases cited by Objectors at the time of settlement. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999); *In re Literary Works in Elec. Databases Copyright Litig.*, -- F.3d --, 2011 WL 3606725 (2d Cir. Aug. 17, 2011).[19]

A variant on this objection notes that some number of BofA account holders who may belong to both settlement classes will receive a double recovery. **[DE # 1945]**. This is not a basis for creating subclasses here. First, any overlapping recovery is minimal and negligible in the context of this Settlement. Class members in *Closson* filed only 110,000 total claims, and that limited group stands to receive approximately $8 million, less than two percent of the amount secured by this Settlement. *See* Decl. of Prof. Samuel Issacharoff **[DE # 1885-7]**, ¶ 27. Second, even if a minimal degree of overlapping recovery exists here, it would be structurally justified because the two settlements may separately compensate individuals for distinct alleged violations. Plaintiffs argued that in *Closson*, BofA settled claims based on allegations of false advertising, and agreed to pay account holders who had incurred even a single overdraft charge. Here, BofA is settling claims based on allegations of breach of the implied covenant of good faith and fair dealing and unfair business practices (*i.e.*, the practice of reordering debits), and has agreed to pay account holders who incurred two or more overdrafts on a single day as a result of the reordering.

Some Objectors contend that Settlement Class Members from the post-*Closson* period

---

[19] The establishment of subclasses presents several practical difficulties as well.

had stronger claims, unaffected by the *Closson* release, and should be in a separate subclass.[20] As counsel for both BofA and Plaintiffs pointed out at the Final Approval Hearing, Objectors overlook that Account holders in the later part of this Settlement class period might actually be seen as having weaker claims, to the extent they could be portrayed as being on notice of the relevant BofA practices from the filing of overdraft fee cases and the increasing media coverage of alleged bank overdraft fee abuses. Such Settlement Class Members might well be considered less, rather than more, entitled to recover, even though their claims may not fit within the *Closson* release. *See* BofA Answer in *Tornes* [**DE # 496**], ¶¶ 247–52 (asserting defenses of voluntary payment, voluntary conduct, estoppel, consent, ratification, and disclosure). At a minimum, the Settlement Fund could not be allocated between hypothetical settlement subgroups (assuming they could even be identified) except on the basis of unwarranted and speculative assumptions going to the merits of the parties' claims and defenses.

The subclass argument also has no logical stopping-point. Minor or speculative distinctions do not rise to the level of a material intra-class conflict. The Settlement correctly treats all Account holders the same, as BofA subjected all its consumer accounts to the same Debit Re-sequencing and all Settlement Class Members confronted several major litigation risks, each of which could have eliminated the claims of each and every Settlement Class Member in

---

[20] Indeed, at the Final Approval Hearing, some of these Objectors suggested still other potential distinctions within and among the group of Settlement Class Members potentially affected by the *Closson* release (*e.g.* those *Closson* settlement class members with relatively more overdraft fees paid in the period 2008-2010 and those with relatively more such fees paid in 2007 and before). It would be difficult or impossible to assign a meaningful percentage or weight to each of these distinctions and then to translate them into differences in the plan of allocation, and the Court finds that there is no reason to do so.

their entirety.[21]

### 3.   The Proposed Settlement Class Is Certified.

This Court previously found the requirements of Rule 23(a) and 23(b)(3) satisfied in this case. *See In re Checking Account Overdraft Litig.*, -- F.R.D. --, 2011 WL 2258458, at *2-3 (S.D. Fla. May 24, 2011) (analyzing Rule 23 class certification factors in granting preliminary approval) **[DE # 1520]**. The Court finds that: (a) the Settlement Class Members are so numerous that joinder of all Settlement Class Members is impracticable; (b) there are questions of law and fact common to the Settlement Class which predominate over individual questions; (c) the claims of the representative Plaintiffs are typical of the claims of the Settlement Class; (d) the representative Plaintiffs and Settlement Class Counsel fairly and adequately represent and protect the interests of the Settlement Class Members; and (e) a class action is superior to other available methods for the fair and efficient adjudication of the instant controversy. Accordingly, the proposed Settlement Class is certified.[22]

### 4.   The *Cy Pres* Program Is Reasonable.

The Settlement provides for a *cy pres* program for (i) funds due Settlement Class Members who cannot reasonably be identified because certain of BofA's older transaction data is not in a form that is reasonably manipulable or searchable, Agreement ¶¶ 82, 91; and (ii) any

---

[21] At the Final Approval Hearing, Objector Sarro complained that the Notice to the Settlement Class was defective in light of the alleged undisclosed fee arrangements among certain counsel for the Settlement Class and lawyers from South America. The Court is aware that lawyers from South America claim an interest in the fees earned by a former member of the PEC. [*See* DE # 2083, 2084]. However, these are contractual matters before the Florida state courts. Whatever arrangements exist, and how fees are divided among Class Counsel, in no way impacts the Court's consideration of the fairness of the Settlement and Class Counsel's fee request.

[22] The individuals listed in Exhibit A to the Final Judgment timely opted out of the Settlement, and therefore are not part of the Settlement Class, are not bound by the Settlement or Release contained herein and will not receive any distribution from the Settlement.

funds that remain after distribution of Settlement Class Member payouts as a result of, for example, checks that are not cashed or returned as undeliverable. *Id.* ¶ 93.

The *cy pres* doctrine permits courts to distribute unclaimed settlement amounts to worthy charities, especially to charities whose purposes harmonize with the underlying lawsuit. *See, e.g.,* *In re Motorsports Merchandise Antitrust Litig.*, 160 F. Supp. 2d 1392, 1394 (N.D. Ga. 2001) (approving *cy pres* distributions of settlement residue, stating that "[w]here settlement funds remain after distribution to class members, courts have approved charitable donations to organizations geared toward combating harms similar to those that injured the class members. Such a donation may serve the cy pres principle of indirectly benefiting all class members.") (internal quotation marks and citation omitted). The *cy pres* doctrine has routinely been recognized in the class action settlement context when, among other circumstances, "class members are difficult to identify." *Powell v. Ga.-Pac. Corp.*, 119 F.3d 703, 706 (8th Cir. 1997). When the *cy pres* doctrine is employed by settling parties, the funds "should be distributed for a purpose as near as possible to the legitimate objectives underlying the lawsuit, the interests of class members, and the interests of those similarly situated." *In re Infant Formula Multidistrict Litig.*, No. 4:91-CV-00878-MP, 2005 WL 2211312, at *1 (N.D. Fla. Sept. 8, 2005); *In re Airline Ticket Comm'n Antitrust Litig.*, 307 F.3d 679, 683 (8th Cir. 2002).

The Court finds that the proposal here comports with the law regarding *cy pres* and is approved. The American Law Institute recommends *cy pres* distributions "only when direct distributions to class members are not feasible—either because class members cannot be reasonably identified or because distribution would involve such small amounts that, because of the administrative costs involved, such distribution would not be economically viable." American Law Institute, *Principles of the Law: Aggregate Litigation* § 3.07, cmt. b (2010). In

this case, because of impediments posed by the format of BofA's older records, it is not feasible to identify certain BofA customers who incurred overdraft fees between January 1, 2001 and December 31, 2003. Plaintiffs contend that because the claims being settled involve allegations of unfair treatment of customers by a large financial institution, it is reasonable to direct these funds to respected organizations that promote financial literacy. The Court agrees.

Some Objectors challenge this *cy pres* arrangement.[23] The Court has the discretion to approve *cy pres* provisions of the Settlement (a) in the interests of "facilitating a settlement in a hard-fought, complex class action," and (b) to "serve[] the goals of civil damages by ensuring [the defendant] fairly pays for the class's alleged losses."[24]  *In re Pharm. Indus. Average Wholesale Price Litig.*, 588 F.3d 24, 35-36 (1st Cir. 2009); *see Cotton*, 559 F.2d at 1329 (reviewing court will evaluate whether District Judge "clearly abused his discretion" in approving settlement as a whole).[25]  Since there is a reasonable basis for *cy pres* distributions here, approving the relevant provisions, which are narrowly tailored to the purpose of the underlying action, is within the Court's discretion. *See In re Rasbury*, 24 F.3d 159, 168 (11th

---

[23] Objectors focusing on *cy pres* include Jenkins [**DE # 1920**], Carapia [**DE # 1936**], Fletcher [**DE # 1903**], and Finn [**DE # 2133**]. Objector Jenkins conceded at the Final Approval Hearing that he does not object to the residual *cy pres* provision (ii), above. Final Approval Hearing Tr. (Nov. 7, 2011) at 66.

[24] As one of Plaintiffs' experts opined, "in small-stakes cases, the most important function of the class action device is not compensation of class members but deterrence of wrongdoing . . . [and] if defendants did not pay someone—even third parties like *cy pres* charities—for such harms, then defendants would have every incentive to cause such harms in the future. . . . Thus, in such [small-stakes] cases, the most important thing is that the defendant pays for the wrongs it has perpetrated—it is less important *who* the defendant pays." Supp. Decl. of Prof. Brian T. Fitzpatrick, [**DE # 2030-3**], ¶¶ 6, 9.

[25] *Accord Bennett*, 737 F.2d at 986 ("Determining the fairness of the settlement is left to the sound discretion of the trial court and we will not overturn the court's decision absent a clear showing of abuse of that discretion.").

Cir. 1994) (reciting Eleventh Circuit "range of choice" approach to highly deferential abuse-of-discretion standard of review).

The Settlement Agreement's *cy pres* provisions are fully consistent with the law of *cy pres*, under which courts have approved settlements awarding class members nothing and allocating the entire fund to charities whose missions harmonize with the purposes of the suit. *Shepherd Park Citizens Ass'n v. Gen. Cinema Beverages of Wash., D.C., Inc.*, 584 A.2d 20, 25 (D.C. 1990).[26] It is not the law, as one of the Objectors argued, that *cy pres* may only be drawn from unclaimed funds, and Objectors have cited no controlling case so holding. What would be legally unjustified here is for unclaimed funds to revert to BofA. However, as the Settlement is structured, that will not happen. *See* ALI, *Principles of the Law: Aggregate Litigation* § 3.07, cmt. b (2010) (noting that "reversion to the defendant . . . would undermine the deterrence function of class actions and . . . reward[] the alleged wrongdoer simply because distribution to the class would not be viable.").

The Court asked several Objectors at the Final Approval Hearing whether they would instead direct that the money earmarked for Settlement Class Members who cannot be identified be returned to BofA. All of them affirmed that this is not their preferred outcome, establishing that their wishes and the outcome achieved by the Settlement align at least in part. Because of the *cy pres* provision, no funds will revert to BofA.[27] If, alternatively, Objectors' approach were

---

[26] *See also New York by Vacco v. Reebok Int'l*, 903 F. Supp. 532 (S.D.N.Y. 1995), *aff'd*, 96 F.3d 44 (2d Cir. 1996) (settlement distributed to state athletic activities and facilities); *In re Toys R Us Antitrust Litig.*, 191 F.R.D. 347 (E.D.N.Y. 2000) (settlement distributed $37 million in new toys through the Toys for Tots program and established a $20 million fund to buy books and computers for schools); *In re Vitamins Cases*, 107 Cal. App. 4th 820 (Cal. Ct. App. 2003) (affirming *cy pres* award of an entire settlement).

[27] Some Objectors incorrectly claim that there is a reverter provision in the Settlement, but there is not. Their confusion seems to arise from a misapprehension of the function of the $410

followed, and the funds earmarked for unidentified Settlement Class Members were distributed to the Settlement Class Members who could be identified, this would simply be *cy pres* directed to different recipients. However, the unidentified Settlement Class Members would receive no benefit at all (as opposed to the indirect benefit they will obtain from the distributions to consumer welfare organizations whose services they may ultimately benefit from), and this might itself cause some of their number to object to that settlement alternative.[28] This is why, faced with a set of reasonable but imperfect choices, the law allows the Court discretion in approving the ultimate outcome. *See* Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11:20 (4th ed. 2002).

Significantly, as counsel for BofA explained at the Final Approval Hearing, the *cy pres* funds are not being "taken away" from those Settlement Class Members who can be identified. Instead, the share of the Settlement that would have gone to the unidentifiable Settlement Class Members is going instead to charitable organizations for the indirect benefit of unidentifiable Settlement Class Members. Stated another way, the identifiable Settlement Class Members will receive under this Settlement precisely the same amount they would have received if there were no issues with the bank's data from early in the Class Period and all Settlement Class Members could be identified and paid.[29]

---

million Escrow Account and subsequent reimbursement of BofA for those sums that it deposits directly to customer accounts under the terms of the Settlement. *See* Defendant's Memorandum at 5-6 (explaining process).

[28] The agreement to pay a percentage of the net settlement fund to *cy pres* beneficiaries on behalf of those Settlement Class Members who could not be identified was expressly disclosed in the various Notices of the Settlement that were sent to the class and published in the media and on-line. The specific recipients of the *cy pres* fund will have to be approved by the Court.

[29] Nor is it the case that Settlement Class Counsel labors under a conflict of interest as alleged by Objector Jenkins. *See* Final Approval Hearing Tr. at 73. These Objectors have offered no

Nor is the Fifth Circuit's recent decision in *Klier v. Elf Atochem N. Am., Inc.*, -- F.3d --, 2011 WL 4436528 (5th Cir. 2011), an impediment to the proposed *cy pres* distribution here. The settlement agreement in that case "required the court to reallocate the funds among the subclasses of the class that generated the settlement fund," *id.* at *8, and the court of appeals specifically tied its holding to this contractual requirement, *id.* at *1 ("We hold that the district court abused its discretion by ordering a *cy pres* distribution in the teeth of the bargained-for terms of the settlement agreement, which required residual funds to be distributed within the class."). Also, the *Klier* decision by its terms only "treat[ed] a distinct category of such cases, in which funds have gone unused by a particular subclass." *Id.* at *7. In contrast, there are no subclasses here, let alone unused money allocated to a subclass, and the Settlement Agreement explicitly and appropriately provides for *cy pres* distributions in light of the infeasibility of determining recipients. Objectors ask this Court to do precisely what the Fifth Circuit found to be error in *Klier* – ignore the Settlement Agreement and re-allocate the *cy pres* funds. This the Court will not do.

For all of the reasons set forth above, the Court concludes that the Settlement is fair, reasonable and adequate and finally approves it.

### 5.    The Application for Service Awards to the Class Representatives is Approved

Service awards "compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1218 (S.D. Fla. 2006). "[T]here is ample precedent for awarding

---

evidence that the interests of the Settlement Class Members who can be identified and of the Settlement Class Members who cannot be identified diverge, or that the *cy pres* distribution represents a diversion of Settlement Class funds to charity, and their arguments in this regard are unpersuasive.

incentive compensation to class representatives at the conclusion of a successful class action." *David v. American Suzuki Motor Corp.*, 2010 WL 1628362, at *6 (S.D. Fla. Apr. 15, 2010). Courts have consistently found service awards to be an efficient and productive way to encourage members of a class to become class representatives. *See, e.g., Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 694 (N.D. Ga. 2001) (awarding class representatives $300,000 each, explaining that "the magnitude of the relief the Class Representatives obtained on behalf of the class warrants a substantial incentive award."); *Spicer v. Chi. Bd. Options Exchange, Inc.*, 844 F. Supp. 1226, 1267-68 (N.D. Ill. 1993) (collecting cases approving service awards ranging from $5,000 to $100,000, and awarding $10,000 to each named plaintiff).

The factors for determining a service award include: (1) the actions the class representatives took to protect the interests of the class; (2) the degree to which the class benefited from those actions; and (3) the amount of time and effort the class representatives expended in pursuing the litigation. *See, e.g., Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998). The Court notes that the class representatives expended time and effort in meeting their fiduciary obligations to the Class, and deserve to be compensated for it. Accordingly, the Court authorizes service awards of $5,000 per class representative or married couple.

### 6.     Class Counsel's Application for Attorneys' Fees is Granted.

Class Counsel request a fee of 30% (inclusive of expenses incurred in this litigation) of the common fund created through their efforts in litigating this case and reaching the Settlement, net of certain expenses identified in the Agreement. Agreement ¶102. The Court analyzes this fee request under the Eleventh Circuit's decision in *Camden I Condominium Assn. v. Dunkle*, 946 F.2d 768 (11th Cir. 1991). Having done so below, the Court readily concludes that each of the *Camden I* factors supports Class Counsel's fee request, and the Court will therefore award

the fee sought.  As the Court noted at the Final Approval Hearing, "but for the high level of dedication, ability, talent and massive and incredible hard work by the Class attorneys, the Class representatives, . . . I do not believe that the Class would have ever seen not nine percent, not five percent, but not a penny."  Final Approval Hearing Tr. at 153.

>    **a.    The Law Awards Class Counsel Fees From the Common Fund Created Through Their Efforts.**

It is well established that when a representative party has conferred a substantial benefit upon a class, counsel is entitled to an allowance of attorneys' fees based upon the benefit obtained. *Camden I,* 946 F.2d at 771; *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980).  The common benefit doctrine is an exception to the general rule that each party must bear its own litigation costs.  The doctrine serves the "twin goals of removing a potential financial obstacle to a plaintiff's pursuit of a claim on behalf of a class and of equitably distributing the fees and costs of successful litigation among all who gained from the named plaintiff's efforts." *In re Gould Sec. Litig.,* 727 F. Supp. 1201, 1202 (N.D. Ill. 1989) (citation omitted); *see also Ramey,* 508 F.2d at 1195.  The common benefit doctrine recognizes that those who receive the benefit of a lawsuit without contributing to its costs are "unjustly enriched" at the expense of the successful litigant. *Boeing,* 444 U.S. at 478; *Mills,* 396 U.S. at 392.  The Supreme Court, the Eleventh Circuit, and courts in this District have all noted that "[a] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as whole." *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1333 (S.D. Fla. 2001) (citing *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980)); *see also Camden I*, 946 F.2d at 771 ("Attorneys in a class action in which a common fund is created are entitled to compensation for their services from the common fund, but the amount is subject to court approval.").

In the Eleventh Circuit, class counsel is awarded a percentage of the fund generated

through a class action settlement. In *Camden I*, the Eleventh Circuit held that "the percentage of the fund approach [as opposed to the lodestar approach] is the better reasoned in a common fund case. Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." *Camden I*, 946 F.2d at 774.

This Court has substantial discretion in determining the appropriate fee percentage awarded to counsel. "There is no hard and fast rule mandating a certain percentage of a common fund which may be awarded as a fee because the amount of any fee must be determined upon the facts of each case." *In re Sunbeam*, 176 F. Supp. 2d at 1333 (quoting *Camden I*, 946 F.2d at 774). Nevertheless, "[t]he majority of common fund fee awards fall between 20 percent to 30 percent of the fund," although "an upper limit of 50 percent of the fund may be stated as a general rule." *Id.* (quoting *Camden I*, 946 F.2d at 774-75); *see also Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291 (11th Cir. 1999) (approving fee award where the district court determined that the benchmark should be 30 percent and then adjusted the fee award higher based on the circumstances of the case).

The Court finds, for the reasons set forth below, that Class Counsel are entitled to an award of 30% of the Settlement Fund net of the expenses in paragraph 82(a-c),(e-h) of the Agreement. Agreement ¶102. Class Counsel achieved an extraordinary result and overcome numerous procedural and substantive hurdles to obtain the Settlement for the Class. As Plaintiffs' several experts have noted, Class Counsel took on a great deal of risk in bringing this case, and turned a potentially empty well into a significant judgment. That kind of initiative and skill must be adequately compensated to insure that counsel of this caliber is available to undertake these kinds of risky but important cases in the future. *See Muehler v. Land O'Lakes*,

*Inc.*, 617 F. Supp. 1370, 1375-76 (D. Minn. 1985).

    **b.**       **The *Camden I* Factors.**

The Eleventh Circuit's factors for evaluating the reasonable percentage to award class-action counsel are:

    (1) the time and labor required;

    (2) the novelty and difficulty of the questions involved;

    (3) the skill requisite to perform the legal service properly;

    (4) the preclusion of other employment by the attorney due to acceptance of
the case;

    (5) the customary fee;

    (6) whether the fee is fixed or contingent;

    (7) time limitations imposed by the client or the circumstances;

    (8) the amount involved and the results obtained;

    (9) the experience, reputation, and ability of the attorneys;

    (10) the "undesirability" of the case;

    (11) the nature and the length of the professional relationship with the client;

    (12) awards in similar cases.

*Camden I*, 946 F.2d at 772 n.3 (citing factors originally set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)).

These twelve factors are not exclusive. "Other pertinent factors are the time required to reach a settlement, whether there are any substantial objections by class members or other parties to the settlement terms or the fees requested by counsel, any non-monetary benefits conferred upon the class by the settlement, and the economics involved in prosecuting a class action." *In re*

*Sunbeam,* 176 F. Supp. 2d at 1333 (quoting *Camden I,* 946 F.2d at 775). These factors are merely guidelines, and the Eleventh Circuit has "encouraged the lower courts to consider additional factors unique to the particular case." *Id.* (quoting *Walco Inv., Inc. v. Thenen,* 975 F. Supp. 1468, 1472 (S.D. Fla. 1997)).

i.     <strong>The Claims Against BofA Required Substantial Time and Labor.</strong>

As Class Counsel point out, prosecuting and settling the claims in the Action demanded considerable time and labor. Moreover, had Class Counsel not mounted a vigorous challenge to the *Closson* settlement, BofA's exposure in the Action would have been drastically reduced, if not eliminated altogether. As Professor Issacharoff noted, "[w]hat is critical here is that the efforts of class counsel realized through this settlement voided the potential loss of hundreds of millions of dollars in claims through the operation of the *Closson* settlement." Decl. of Prof. Samuel Issacharoff **[DE # 1885-7]** at 9.

Class Counsel offer unrebutted testimony that throughout the pendency of this case, the internal organization of Class Counsel, including assignments of work, weekly conference calls, and oversight of task-oriented subcommittees, ensured that Class Counsel were engaged in coordinated, productive efforts to maximize efficiency and minimize duplication of work. In-person meetings of Class Counsel were also held at various times during the course of the litigation. Class Counsel spent hundreds of hours investigating the claims of many dozens of potential plaintiffs against BofA in this MDL. Joint Decl. ¶ 85. Class Counsel interviewed more than 100 BofA customers and potential plaintiffs to gather information about BofA's conduct and its impact upon consumers. *Id.* Class Counsel note that this information was essential to their ability to understand the nature of BofA's conduct, the language of the account agreements at issue, and potential remedies. *Id.*

Class Counsel obtained, reviewed, sorted, and analyzed dozens of BofA deposit account agreements. Joint Decl. ¶ 85. Class Counsel also expended significant resources researching and developing the legal claims at issue. For example, state-by-state legal surveys were necessary to determine which state common law doctrines and consumer protection statutes provided Plaintiffs with viable claims. Joint Decl. ¶ 86. Following the research, drafting and filing of the master *Tornes* complaint, Class Counsel soon faced a significant hurdle with the filing of the Omnibus Motion, as to which BofA was one of the moving parties. [**DE # 217**]. Substantial additional legal research was necessary to oppose the Omnibus Motion, as well as a considerable briefing effort that ultimately resulted in Plaintiffs' 98-page Opposition Brief. Joint Decl. ¶ 87 (citing [**DE # 265**]). Class Counsel also convened in advance of oral argument on the Omnibus Motion to prepare for the day-long argument held on February 25, 2010. Joint Decl. ¶ 87 (citing [**DE # 294**]).

Discovery in the First Tranche actions was stayed – at the banks' request – pending resolution of the Omnibus Motion. [**DE # 148**]. On May 13, 2010, approximately two months after the Court allowed the claims to proceed, the Court lifted the stay of discovery and entered a comprehensive Scheduling Order. [**DE # 463**]. The very same day, Plaintiffs served identical written discovery requests on each of the Defendants, seeking relevant and probative documents and information in their possession. Joint Decl. ¶ 88. The process of developing, refining and finalizing such discovery requests – with an eye toward class certification, summary judgment, and trial – required considerable effort by Class Counsel. *Id.*

BofA produced over one million pages of documents in response to Plaintiffs' discovery requests. Joint Decl. ¶ 89. It also asserted layers of blanket, boilerplate objections to Plaintiffs' discovery requests. *Id.* On July 16, 2010, Plaintiffs moved to compel discovery from BofA.

[DE # 691]. Class Counsel established a large document review team consisting of dozens of attorneys whose task was to review, sort, and code the produced documents. Joint Decl. ¶ 90. To make the review and subsequent litigation more efficient, Class Counsel established uniform coding procedures for electronic review of the documents produced, and team members remained in constant contact with each other to ensure that all counsel became aware of significant emerging evidence in real time. *Id.* Such document review efforts and coordination were essential, and account for a large proportion of the attorney hours expended in this action.

During the Summer and Fall of 2010, Class Counsel began the process of negotiating with BofA's counsel (as well as counsel for other First Tranche Banks) regarding Rule 30(b)(6) deposition topics. Joint Decl. ¶ 91. In addition, Class Counsel expended significant time and effort to prepare responses to BofA's interrogatories and requests for production of documents directed to the Plaintiffs, and to successfully defend against BofA's motion to compel discovery. *Id.* (citing [DE # 902, 939, 1016]).

Beginning in mid-October 2010, Settlement Class Counsel began preliminary settlement discussions with BofA's counsel. Joint Decl. ¶ 92. In December 2010 and again in January 2011, Settlement Class Counsel prepared for and participated in three separate days of mediation in various locations in an attempt to settle this action. *Id.* After the parties executed the MOU in connection with the Settlement, Settlement Class Counsel engaged in extensive discussions over the terms of the Settlement Agreement as well as settlement-related analysis to determine, among other things, an appropriate plan for allocation of the Settlement funds. Joint Decl. ¶ 93. That process required Settlement Class Counsel and their experts to analyze transactional data concerning overdraft fees imposed upon Settlement Class Members, and to determine the most appropriate distribution formula in light of BofA's data. *Id.* In addition, Settlement Class

Counsel directed and oversaw Class Counsel's post-MOU confirmatory discovery, including ongoing document review and coding as well as regular conference calls, pending final approval of the Settlement. *Id.*

Quite clearly, as even the Objectors acknowledged at the Final Approval Hearing, Class Counsel expended a large number of attorney work-hours in reaching the result for which they seek final approval. No one has offered any evidence to the contrary. Indeed, all of the evidence, and particularly the results achieved, point to the exemplary and sustained efforts of Class Counsel in this case. This factor therefore supports Class Counsel's fee request.

Several Objectors complain about Class Counsel's fee request.[30] A few Objectors urge

---

[30] As Plaintiffs noted both in their pleadings, *see* Plaintiffs' Response to Objections to Motion for Final Approval of Settlement and Class Counsel's Application for Service Awards and Attorneys' Fees [**DE # 2030**] at 20-22, and at the Final Approval Hearing, most if not all of the Objections are motivated by things other than a concern for the welfare of the Settlement Class. Instead, they have been brought by professional objectors and others whose sole purpose is to obtain a fee by objecting to whatever aspects of the Settlement they can latch onto. The Court agrees with the court in *Barnes v. Fleet Boston Fin. Corp.*, 2006 U.S. Dist. LEXIS 71072, at *3-4 (D. Mass. Aug. 22, 2006), that, "[P]rofessional objectors can levy what is effectively a tax on class action settlements, a tax that has no benefit to anyone other than to the objectors. Literally nothing is gained from the cost: Settlements are not restructured and the class, on whose benefit the appeal is purportedly raised, gains nothing." *See also In re UnitedHealth Group PSLRA Litig.*, 643 F. Supp. 2d 1107, 1108-09 (D. Minn. 2009); *O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 295 n.26 (E.D. Pa. 2003); *Snell v. Allianz Life Ins. Co. of N. Am.*, 2000 WL 1336640, at *9 (D. Minn. Sept. 8, 2000); *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942, 975 (E.D. Tex. 2000). As Professor Issacharoff explained, "[t]he unfortunate game is to lodge *pro forma* objections at the trial stage, then negotiate a private resolution in order to drop the invariable notice of appeal. Once the case has progressed beyond the trial court, there is no longer any accountability for side payments to objectors' counsel, and the game is on." Decl. of Prof. Samuel Issacharoff [**DE # 1885-7**], ¶ 33. The Court has nonetheless considered their objections on the merits, and rejects them for the reasons set forth herein. Should these or any other Objectors choose to persist in their objections in order to tie up the execution of this Settlement and further delay payment to the members of the Settlement Class, the Court will consider additional measures to make sure that the members of the Settlement Class are not further harmed as a result. *See* Supplemental Decl. of Prof. Brian T. Fitzpatrick [**DE # 1885-7**], ¶¶ 11-13 (discussing "objector blackmail" and observing that courts have fought back by sanctioning professional objectors and requiring hefty appeal bonds). And, as Judge Gold noted

the Court to scrutinize Class Counsel's voluminous time and task records in evaluating the fee request.[31]  This the Court will not do.  The Eleventh Circuit made clear in *Camden I* that percentage of the fund is the exclusive method for awarding fees in common fund class actions. *Camden I*, 946 F.2d at 774.[32]  Even before *Camden I*, courts in this Circuit recognized that "a percentage of the gross recovery is the only sensible method of awarding fees in common fund cases." *Mashburn v. Nat'l Healthcare, Inc.*, 684 F. Supp. 660, 690 (M.D. Ala. 1988).  More importantly, the Court observed first hand the monumental effort exerted by Class Counsel in this case, and does not need to see timesheets to know how much work Class Counsel have put in to reach this point.

As the Court noted at the Final Approval Hearing, Tr. at 87-89, one of the many problems with Objectors' argument that the Court should consider the lodestar of Class Counsel is that it encourages inefficiency.  That is, if counsel knows that they can substantially enhance

in the *Allapattah* case, an Objector seeking a fee "for simply filing a claim when Class Counsel has done all the work" will "[a]t the end of the day . . . have to appear before this Court to justify his fees."  *See Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1191 (S.D. Fla. 2006).

[31] Objectors raising the lodestar issue include Jenkins [**DE # 1920**] and Locke *et al.* [**DE # 1922**] ("Locke").

[32] Contrary to the argument pressed by Objector Sarro at the Final Approval Hearing, Plaintiffs are correct that Eleventh Circuit attorneys' fee law governs this request, not the law of Florida. *See Allapattah Servs., Inc.*, 454 F. Supp. 2d at 1200 ("[t]he district court presiding over a diversity-based class action pursuant to Fed. R. Civ. P. 23 has equitable power to apply federal common law in determining fee awards irrespective of state law."); *see also Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 522 n. 5 (1st Cir. 1991) (recognizing that district court presiding over diversity-based class action has equitable power to apply federal common law in determining fee award irrespective of state law); *Clark Equip. Co. v. Armstrong Equip. Co.*, 431 F.2d 54, 57 (5th Cir. 1970) (*Erie* doctrine does not deprive federal court in diversity case from power to employ equitable remedies not available under state law).  The Court also rejects Objectors' reliance on the Settlement Agreement's choice-of-law provision, which does not in any event bind the Court.

their fees by dragging out the litigation for years and pouring in billable hours, there is little incentive to obtain an early settlement even where, as here, that settlement is substantial and results in immediate relief for the class, and is thus in the class' best interest.

The lodestar approach should not be imposed through the back door via a "cross-check." Lodestar "creates an incentive to keep litigation going in order to maximize the number of hours included in the court's lodestar calculation." *In re Quantum Health Resources, Inc.*, 962 F. Supp. 1254, 1256 (C.D. Cal. 1997). In *Camden I*, the Eleventh Circuit criticized lodestar and the inefficiencies that it creates. 946 F.2d at 773-75. In so doing, the court "mandate[d] the *exclusive* use of the percentage approach in common fund cases, reasoning that it more closely aligns the interests of client and attorney, and more faithfully adheres to market practice." *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000) (emphasis added); *see also* Alba Conte, *Attorney Fee Awards* § 2.7, at 91 fn. 41 ("The Eleventh . . . Circuit[] repudiated the use of the lodestar method in common-fund cases"). Under *Camden I*, courts in this Circuit regularly award fees based on a percentage of the recovery, without discussing lodestar at all. *See, e.g., David v. American Suzuki Motor Corp.*, 2010 WL 1628362 (S.D. Fla. Apr. 15, 2010).[33] "[A] common fund is itself the measure of success and represents the benchmark on which a reasonable fee will be awarded. . . . In this context, monetary results achieved predominate over all other criteria." *Camden I*, 946 F.2d at 774 (citations and alterations omitted). This Court will not deviate from that approach, for all of the reasons set forth above and in the excellent analyses presented in Plaintiffs' expert declarations.

ii.     **The Issues Involved Were Novel and Difficult and Required the**

---

[33] *See also Stahl v. MasTec, Inc.*, 2008 WL 2267469 (M.D. Fla. May 20, 2008); *Sands Point Partners, L.P. v. Pediatrix Med. Group, Inc.*, 2002 WL 34343944 (S.D. Fla. May 3, 2002); *Fabricant v. Sears Roebuck & Co.*, 2002 WL 34477904 (S.D. Fla. Sept. 18, 2002).

### Exceptional Skill of a Highly Talented Group of Attorneys

As the Court has noted, the attorneys on both sides of this case displayed an exceptional amount of skill in litigating on behalf of their clients. *See Walco*, 975 F. Supp. at 1472 (explaining that "[g]iven the quality of defense counsel from prominent national law firms, the Court is not confident that attorneys of lesser aptitude could have achieved similar results"); *see also Camden I*, 946 F.2d at 772 n.3 (in assessing the quality of representation by Class Counsel, Court also should consider the quality of their opposing counsel.); *Johnson*, 488 F.2d at 718; *Ressler v. Jacobson*, 149 F.R.D. 651, 654 (M.D. Fla. 1992). Class Counsel's work is emblematic of the effort and outcomes witnessed by this Court on a regular basis in this MDL. Nor can there be any legitimate dispute that, based on the novel and very complex issues confronted by Class Counsel in this case, detailed here and elsewhere, that an extraordinary group of lawyers was required to prosecute this case. The Court knows many of these lawyers from years of presiding over cases in this district, and has come to expect this level of performance from them. That is not to say, however, that such performance should be taken for granted. Instead, the fact that this level of legal talent was available to the Settlement Class is another compelling reason in support of the fee requested. As with most things, you get what you pay for, and the Settlement Class received a truly impressive amount and quality of legal services. In the private marketplace, as pointed out by several of Plaintiffs' experts, counsel of exceptional skill commands a significant premium. So it must be here.

### iii.    The Claims Against BofA Entailed Considerable Risk.

Prosecuting these claims was daunting. The risks involved in this case from the Plaintiffs' perspective have been discussed at length above, in the Motion for Final Approval, and elsewhere. The Objectors downplay these risks because it is in their interests to do so, but

their arguments are not persuasive.  Having arrived at the eleventh hour after the game is won, they seek to criticize the team on the field so that they can share in the fruits of victory.  Our system may allow them to be heard, but it does not compel the Court to agree.  The simple fact is that there were a larger than usual number of ways that Plaintiffs could have lost this case, and they still managed to achieve a successful settlement.  A significant amount of the credit for this must be given to Class Counsel's strategy choices, effort and legal acumen.

"A court's consideration of this factor recognizes that counsel should be rewarded for taking on a case from which other law firms shrunk. Such aversion could be due to any number of things, including social opprobrium surrounding the parties, thorny factual circumstances, or the possible financial outcome of a case. All of this and more is enveloped by the term 'undesirable.'" *In re Sunbeam*, 176 F. Supp. 2d at 1336. In addition, "[t]he point at which plaintiffs settle with defendants . . . is simply not relevant to determining the risks incurred by their counsel in agreeing to represent them." *Skelton v. General Motor Corp.*, 860 F.2d 250, 258 (7th Cir. 1988), *cert. denied*, 493 U.S. 810 (1989). "Undesirability" and relevant risks must be evaluated from the standpoint of plaintiffs' counsel as of the time they commenced the suit, not retroactively, with the benefit of hindsight. *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 112 (3d Cir. 1976); *Walco*, 975 F. Supp. at 1473.

The most undesirable part of this case was the long odds on success.  Plaintiffs had to fight the *Closson* settlement and its potentially fatal release,[34] federal preemption of Plaintiffs' state law claims, the language in BofA's deposit agreement, and the possibility of compelled

---

[34] *See* Decl. of Thomas E. Scott (Ex. I) at 6 ("Being  able to secure a settlement in this case for almost twelve times as much as the prior *Closson* Settlement was no easy feat because class action settlements are difficult to overturn.").

individual arbitration.  The Court expresses no opinion on the merits of these arguments by this or any other Defendant.  The critical point for present purposes is that, heading into this case, Class Counsel were staring down the barrel of these issues without any assurances whatsoever as to how the Court would rule.  Class Counsel accepted these cases nonetheless, and the truly noteworthy risks that went with them.  As discussed above, given the positive societal benefits to be gained from lawyers' willingness to undertake difficult and risky, yet important, work like this, such decisions must be properly incentivized.  The Court believes, and holds, that the proper incentive here is a 30% fee.

**iv.    Class Counsel Assumed Substantial Risk to Pursue This Action on a Pure Contingency Basis, and Were Precluded From Other Employment as a Result.**

Class Counsel prosecuted the Action entirely on a contingent fee basis. Joint Decl. ¶ 105. In undertaking to prosecute this complex action on that basis, Class Counsel assumed a significant risk of nonpayment or underpayment.  *Id.*   Numerous cases recognize that the contingent fee risk is an important factor in determining the fee award. "A contingency fee arrangement often justifies an increase in the award of attorney's fees." *In re Sunbeam*, 176 F. Supp. 2d at 1335 (quoting *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 548 (S.D. Fla. 1988), aff'd, 899 F.2d 21 (11th Cir. 1990)); *see also In re Continental Ill. Sec. Litig.*, 962 F.2d 566 (7th Cir. 1992) (holding that when a common fund case has been prosecuted on a contingent basis, plaintiffs' counsel must be compensated adequately for the risk of non-payment); *Ressler*, 149 F.R.D. at 656 ("Numerous cases recognize that the attorney's contingent fee risk is an important factor in determining the fee award."); *Walters v. Atlanta,* 652 F. Supp. 755, 759 (N.D. Ga. 1985), *modified*, 803 F.2d 1135 (11th Cir.); *York v. Alabama State Bd. of Education,* 631 F. Supp. 78, 86 (M.D. Ala. 1986).  As this Court has observed:

52

> Generally, the contingency retainment must be promoted to assure representation when a person could not otherwise afford the services of a lawyer. . . . A contingency fee arrangement often justifies an increase in the award of attorney's fees. This rule helps assure that the contingency fee arrangement endures. If this "bonus" methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing.

*Behrens*, 118 F.R.D. at 548.   The risks taken by Class Counsel have been discussed.   It is uncontroverted that the time spent on the Action was time that could not be spent on other matters.   Joint Decl. ¶ 108.   This factor too supports the requested fee.

**v.**      **Class Counsel Achieved an Excellent Result.**

The Court has expressed its opinion that the Settlement is an outstanding result for the Settlement Class.   Professor Silver sums it up well:

> [I]nstead of performing as expected, class counsel over-achieved. They took a novel case with difficult legal merits of a type that other lawyers had previously settled for moderate amounts and turned it into a landmark recovery.

Expert Report of Prof. Charles Silver [**DE # 1885-12**] at 3.

The Court rejects the Objectors' argument that this case was settled too early.   The Settlement obtains immediate relief for millions of class members who have already waited years for this result.   The Court agrees with Plaintiffs that this is one of the occasions when "an early resolution may demonstrate that the parties and their counsel are well prepared and well aware of the strength and weaknesses of their positions and of the interests to be served by an amicable end to the case." *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, MDL No. 2147, 2011 WL 2204584 (N.D. Ill. June 2, 2011) (citations omitted).

**vi.**      **The Requested Fee Comports with Customary Fees Awarded in Similar Cases.**

Numerous recent decisions within this Circuit have awarded attorneys' fees up to (and at times in excess of) 30 percent. *See Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185

(S.D. Fla. 2006) (awarding fees of 31 1/3 % of $1.06 billion); *In re: Terazosin Hydrochloride Antitrust Litigation*, 99-1317-MDL-Seitz (S.D. Fla. April 19, 2005) (awarding fees of 33 1/3 % of settlement of over $30 million); *In re: Managed Care Litig. v. Aetna*, MDL No. 1334, 2003 WL 22850070 (S.D. Fla. Oct. 24, 2003) (awarding fees and costs of 35.5% of settlement of $100 million); *Gutter v. E.I. Dupont De Nemours & Co.*, 95-2152-Civ-Gold (S.D. Fla. May 30, 2003) (awarding fees of 33 1/3 % of settlement of $77.5 million); *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291 (11th Cir. 1999) (affirming fee award of 33 1/3 % of settlement of $40 million); *see also* Decl. of Hon. Thomas E. Scott [**DE # 1885-10**], ¶ 25. Moreover, the expert reports of several nationally-acclaimed scholars support Class Counsel's 30% fee request. Objectors offer nothing in response but rhetoric. *See Hanlon*, 150 F.3d at 1021 (upholding nationwide class settlement where objectors "presented no evidence").

The Court is convinced that a fee of 30% (inclusive of Plaintiffs' costs of litigation) is appropriate here, and comports with customary fee awards in similar cases.[35]  It is, of course, difficult to find a great many similar cases, given the size of the Settlement here, which in itself

---

[35]  Class Counsel rightly observes that their fee request falls at the low end of the average in the private marketplace. *See* Decl. of Prof. Charles Silver [**DE # 1885-12**] at 20 ("contingent percentage fees of 33-40 percent are common in mass action and . . . higher fees often prevail"); Decl. of Thomas E. Scott [**DE # 1885-10**] at 7 ("In contingency cases such as this one, the fees agreed between client and counsel normally range between twenty-five (25%) and forty (40%) percent."); *see also In re Continental Illinois Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992) ("The object in awarding a reasonable attorneys' fee . . . is to simulate the market."); *RJR Nabisco, Inc. Sec. Litig.*, Fed. Sec. L. Rep. (CCH) ¶ 94,268 (S.D.N.Y. 1992) ("what should govern [fee] awards is . . . what the market pays in similar cases . . . ."); *Kirchoff v. Flynn*, 786 F.2d 320, 325 (7th Cir. 1986) ("When the 'prevailing' method of compensating lawyers for 'similar services' is the contingent fee, then the contingent fee is the 'market rate.'") (emphasis in original) And, "[i]n tort suits, an attorney might receive one-third of whatever amount the Plaintiff recovers. In those cases, therefore, the fee is directly proportional to the recovery." *Blum v. Stenson*, 465 U.S. 886, 904 (1984) (Brennan, J., concurring); *see also Kirchoff*, 786 F.2d at 323, 325 n.5 (observing that "40 percent is the customary fee in tort litigation"); *In re Public Service Co. of New Mexico*, 1992 WL 278452, at *7 (S.D. Cal. July 28, 1992).

militates in favor of a significant fee.[36]

The record here establishes that Class Counsel's fee request is justified and comports with those in similar cases. As Professor Samuel Issacharoff notes:

> [T]his is an extraordinary recovery for the class. Settlements in excess of $100 million are generally categorized as megafund cases, and there have been relatively few of these. The proposed settlement of $410 million makes this among the 25 largest class action settlements and certainly one of the top handful for consumer cases.

Decl. of Prof. Samuel Issacharoff [DE # 1885-7] at 4. Professor Miller observes, "A fee award of 30% is consistent with the results of several studies that provide information about fee awards as percentages of the recovery in class action cases." Decl. of Prof. Geoffrey Miller [DE # 1885-9] at 16; *see also id.* at 16-23 (citing studies).[37] Similarly, Professor Fitzpatrick observes that of the 35 class actions in district courts in the Eleventh Circuit in which fees were awarded in 2006 and 2007, "[t]he average fee awarded in these cases was 28.1% and the median fee awarded was 30%. . . These numbers are obviously very much in line with the award requested here." Decl. of Prof. Brian T. Fitzpatrick [DE # 1885-11] at 14.[38]

---

[36] *See* 1 *Court Awarded Attorney Fees*, ¶ 2.06[3], at 2-88 (Matthew Bender 2010) (noting that, "when appropriate circumstances have been identified, a court may award a percentage significantly higher" than 25 percent); 4 *Newberg on Class Actions*, § 14:6, at 551 (4th ed. 2002) ("Empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in class actions average around one-third of the recovery.").

[37] Some Objectors seek to reduce the percentage fee awarded to Class Counsel to a purported "benchmark." The Court finds no merit in this argument. *See* Decl. of Brian Fitzpatrick [DE # 1885-11] at 13-14 ("In short, they have taken on remarkable risk, they have achieved remarkable results, and it would be well within reason to compensate them better than "benchmark" attorneys.").

[38] National Economic Research Associates, an economic consulting firm that has conducted a survey of fee awards in class actions, found that "[r]egardless of the case size, fees average approximately 32 percent of the settlement." Denise N. Martin, *et al.*, *Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions?* at 12-13 (NERA Nov. 1996).

Certain Objectors argue that the fact of a large settlement justifies a reduction in the percent fee awarded.[39] However, courts nationwide have repeatedly awarded fees of 30 percent or higher in so-called "megafund" settlements. *See, e.g., In re Initial Pub. Offering Sec. Litig.,* 671 F. Supp. 2d 467 (S.D.N.Y. 2009) (33.3 percent of $510 million); *Allapattah Servs. Inc. v. Exxon Corp.,* 454 F. Supp. 2d 1185 (S.D. Fla. 2006) (31.33 percent of $1.075 billion); *In re Vitamins Antitrust Litig.,* 2001 WL 34312839 (D.D.C. July 16, 2001) (34.6 percent of $365 million).[40] The myriad risks of this litigation, considered together, more than justify a 30 percent fee.

Judge Gold's rejection of the decreasing fee argument in *Allapattah* captures the flaw in the Objectors' argument, noting that:

> Such an approach also fails to appreciate the immense risks undertaken by attorneys in prosecuting complex cases in which there is a great risk of no recovery. Nor does it give significant weight to the fact that "large attorneys' fee" serve to motivate capable counsel to undertake these actions.
>
> While some reported cases have advocated decreasing the percentage awarded as the gross class recovery increases, that approach is **antithetical** to the percentage of the recovery method adopted by the Eleventh Circuit in *Camden I*, the whole purpose of which is to align the interests of Class Counsel and the Class by rewarding counsel in proportion to the result obtained. By not rewarding Class Counsel for the additional work necessary to achieve a better outcome for the

---

[39] *E.g.,* Locke [**DE # 1922**]; Repa [**DE # 1935**]. Repa argued at the Final Approval Hearing that because this is a consumer class action and not a commercial or securities class action, awards of attorneys' fees in cases involving the latter subjects, including *Allapattah*, are inapposite because of the need to maximize benefits to consumers. Repa offered no basis in fact or law to conclude that commercial or securities class members have any less of a need to recover their losses, or that consumers are any less obligated to compensate counsel who have obtained significant relief for them.

[40] *See also In re Linerboard Antitrust Litig.,* 2004 WL 1221350 (E.D. Pa. June 2, 2004) (30 percent of $202 million); *In re Prison Realty Sec. Litig.,* 2001 U.S. Dist. LEXIS 21942 (M.D. Tenn. Feb. 9, 2001) (30 percent of $104 million); *In re Combustion Inc.,* 968 F. Supp. 1116 (W.D. La. 1997) (36 percent of $127 million); *In re Home-Stake Prod. Co. Sec. Litig.,* MDL No. 153 (N.D. Okla. Jan. 2, 1990) (30 percent of $185 million).

class, the sliding scale approach creates the perverse incentive for Class Counsel
to settle too early for too little.

*Allapattah Servs.*, 454 F. Supp. 2d at 1213 (emphasis in original); *see also* Decl. of Prof. Brian T.
Fitzpatrick [**DE # 1885-11**], ¶ 19 ("In order to deter wrongdoing, lawyers must be given
incentives to invest their own time and money in class actions despite the risk of earning nothing
if they are unsuccessful. Yet, these incentives are blunted for the very cases offering the greatest
deterrence (i.e., larger cases) when courts award lower fee percentages as settlements become
larger."); *see also Williams v. General Elec. Capital Auto Lease*, 1995 WL 765266, at *10 (N.D.
Ill. Dec. 16, 1995) ("Without significant counsel fees to encourage the pursuit of these claims,
the public policy to induce compliance with the law would be disserved.").

### vii.    The Remaining *Camden I* Factors Also Favor Approving Class Counsel's Fee Request.

The Court finds that the remaining *Camden I* factors support Class Counsel's fee request,
and so holds. The burdens of this litigation and the relatively small size of most of the firms
representing Plaintiffs weigh in favor of the fee requested. Joint Decl. ¶¶ 108, 111. The fee
request is firmly rooted in "the economics involved in prosecuting a class action." *See In re
Sunbeam*, 176 F. Supp. 2d at 1333. The Court is convinced by its many years of presiding over
significant cases like this one that proper incentives must be maintained to insure that attorneys
of this caliber are available to take on cases of significant public importance like this one. The
factual record in this case, and the Court's own observations, all of which are incorporated into
this Order, compel this result.

### CONCLUSION

For the reasons detailed above, the Court: (1) finally approves the Settlement; (2) certifies
for settlement purposes the Settlement Class pursuant to Federal Rules of Civil Procedure 23(a),

(b)(3) and (e); (3) appoints Plaintiffs Richard Blair; David Brull; Jonathan Bylin; Marco Chelo; Robert Conroy; Joshua DiFrances; Carolyn Gipson; David Hanny; Haneef Haqq; Joi Holloway; Stephen and Esther James; John and Anya Kopp; Deborah and Therese Marshall; Jason Molitor; Laura Morland; Bruce and Maria Mosley; Nelson Norman; Ronald and Dawyn Palmer; William Powell; Kristin Richards; Alvin Richardson; Caroline Sherman; Ralph Tornes; Elona Wagner; Kelly Weatherspoon; William Werking; and Steve Yourke as class representatives for this Settlement ("Settlement Class Representatives"); (4) appoints as Class Counsel and Settlement Class Counsel the attorneys and law firms listed in paragraphs 15 and 42 of the Agreement, respectively, except that Bruce Rogow, Esq. and the law firm of Bruce S. Rogow, P.A., are substituted for the Alters Law Firm, P.A., as one of the Settlement Class Counsel, as set forth above; (5) awards service awards to the Settlement Class Representatives in the amount of $5,000 per Settlement Class Representative or married couple; (6) awards Class Counsel attorneys' fees and costs in the amount of 30% of the Settlement Fund net of the expenses in paragraph 82(a-c),(e-h) of the Agreement; (7) directs Settlement Class Counsel, Plaintiffs, and BofA to implement and consummate the Settlement Agreement according to its terms and conditions; (8) retains continuing jurisdiction over Plaintiffs, the Settlement Class, and BofA to implement, administer, consummate and enforce the Settlement Agreement and this Order of Final Approval of Settlement; and (9) will separately enter Final Judgment dismissing the Action with prejudice.  All objections to the Settlement or any component thereof or to the award of attorneys' fees are denied, and all pending motions related to the Settlement are denied.[41]

---

[41] Objector Sarro's motion to intervene [**DE # 1949**] is denied.   Objectors Jenkins' and Kennedy's motions to strike the expert affidavits submitted by Settlement Class Counsel because these experts were not subject to cross-examination is denied.  The Objectors made no timely effort to secure the presence of the experts at the Final Approval Hearing, and cannot now be

**DONE and ORDERED** in Chambers at the James Lawrence King Federal Justice Building and United States Courthouse in Miami, Florida, this 22d day of November, 2011.

JAMES LAWRENCE KING
UNITED STATES DISTRICT JUDGE

cc:    All Counsel of Record

Plaintiffs' Coordinating Counsel is directed to promptly mail a copy of this Order to all *pro se* Objectors.

---

heard to complain about their absence. Nor was Class Counsel under an obligation to produce their experts at the Final Approval Hearing. The unavailability of these experts for cross-examination is entirely the fault of Objectors, and they may not use their lethargy as a basis for striking parts of Plaintiffs' case. Objector Hastings' motions to strike portions of the Joint Declaration are also denied as they are without foundation. The fact that Objector Hastings disagrees with the assertions contained in these paragraphs is not a basis for striking them. As to all of these objections, "[t]he temptation to convert a settlement hearing into a full trial on the merits must be resisted." *Mars Steel Corp. v. Cont'l Illinois Nat'l Bank & Trust Co. of Chicago*, 834 F.2d 677, 684 (7th Cir. 1987); *see also In re Lupron Marketing and Sales Practices Litig.*, MDL No. 1430, 2005 WL 613492, at *4 (D. Mass. Mar. 16, 2005). It is for these reasons, among others, that the Court denied the Objectors' various (untimely) motions to conduct discovery. *See, e.g.*, [**DE # 2000**] (denying emergency motion for discovery); *see also* footnotes 2 and 6, *supra*.