## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 1:09-MD-02036-JLK

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

THIS DOCUMENT RELATES TO:
FIRST TRANCHE ACTION

*Lopez v. JPMorgan Chase Bank, N.A.*
S.D. Fla. Case No. 1:09-cv-23127-JLK

*Luquetta v. JPMorgan Chase Bank, N.A.*
S.D. Fla. Case No. 1:09-cv-23432-JLK
C.D. Cal. Case No. 2:09-cv-06967-GHK

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
## AND INCORPORATED MEMORANDUM OF LAW

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ...................................................................................................2

II.     FACTUAL BACKGROUND ....................................................................................6

        A.      Chase Provided Checking and Debit Card Services Across the United
                States During the Class Period...................................................................6

        B.      Chase Perpetrated a Standardized Scheme to Collect Unlawful Overdraft
                Charges from Plaintiffs and the Class........................................................7

                1.      During the Class Period, Chase Uniformly Re-Sequenced Debit
                        Transactions and Posted Debits from Highest to Lowest for All
                        Class Members ...............................................................................8

                        a.      Step 1: Authorizing Debit Transactions...........................8

                        b.      Step 2: Posting Transactions and Assessing Overdraft Fees .........10

                2.      Chase Utilized a Secret Line of Credit Throughout the Class Period........12

                3.      Chase Adopted the Re-Sequencing at the Recommendation of
                        Consultants in Order to Increase Revenue....................................13

        C.      Chase's Deceptive Overdraft Fee Practices Ensnared the Class
                Representatives .........................................................................................15

        D.      Chase Failed to Disclose Its Practices and Provided Misleading
                Information to All Class Members ...........................................................17

                1.      Chase's Standardized Account Agreements Were Vague and
                        Misleading.....................................................................................17

                2.      Chase's Marketing Materials Contained Misrepresentations or
                        Omissions......................................................................................19

        E.      The Common Impact on the Class: Chase Reaped Hundreds of Millions of
                Dollars in Unlawful Overdraft Fees.........................................................22

                1.      Chase's Deceptive Overdraft Practices Produced Enormous Profits ........22

                2.      Customer Complaints Relating to Chase's Overdraft Practices Are
                        Legion and Highlight the Egregiousness of Its Uniform Conduct ............23

III.    ARGUMENT ........................................................................................................26

**Page**

A.   Plaintiffs and This Case Satisfy the Requirements of Rule 23(a).........................28

    1.   The Class Is So Numerous that Joinder of All Members Is Impracticable............................................................................................28

    2.   There Are Questions of Law and Fact Common to All Class Members ...............................................................................................29

    3.   Plaintiffs' Claims Are Typical of Those of the Class................................30

    4.   Plaintiffs Will Fairly and Adequately Protect the Interests of the Class..................................................................................................32

        a.   Plaintiffs' Interests Do Not Conflict With the Interests of the Class..............................................................................32

        b.   Plaintiffs' Counsel Are Qualified ..................................................33

B.   Plaintiffs and This Case Satisfy the Requirements of Rule 23(b) .........................34

    1.   Common Questions of Law or Fact Predominate......................................34

        a.   Common Issues Predominate Because Legal and Factual Questions Here Will Be Resolved with Proof Common to All Plaintiffs and Class Members ..................................................34

        b.   Common Issues Will Also Predominate Because Chase's Records Will Be Used to Systematically Ascertain the Class and Calculate Each Class Member's Individual Damages.......................................................................................39

        c.   Chase's Affirmative Defenses Do Not Vitiate Predominance.................................................................................43

        d.   Applying Multi-State Law Does Not Preclude Predominance.................................................................................45

    2.   A Class Action Is Superior to the Adjudication of Thousands of Separate Individual Cases ........................................................................52

IV.   CONCLUSION...............................................................................................................55

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Allapattah Servs., Inc. v. Exxon Corp.,*
   333 F.3d 1248 (11th Cir. 2003) ...............................................................35, 37, 45

*Amchem Prods., Inc. v. Windsor,*
   521 U.S. 591 (1997).................................................................................26, 37

*Ashcroft v. Iqbal,*
   129 S. Ct. 1937 (2009)...................................................................................43

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007)......................................................................................43

*Brown v. Pro Football,*
   146 F.R.D. 1 (D.D.C. 1992)...........................................................................42

*Brown v. SCI Funeral Servs. of Fla., Inc.,*
   212 F.R.D. 602 (S.D. Fla. 2003)...............................................27, 28, 29, 33

*Bussie v. Allmerica Fin. Corp.,*
   50 F. Supp. 2d 59 (D. Mass. 1999) ...............................................................46

*Byrne v. Nezhat,*
   261 F. 3d 1075 (11th Cir. 2001) ...................................................................44

*Castillo v. Roche Labs., Inc.,*
   2010 U.S. Dist. LEXIS 87681 (S.D. Fla. Aug. 2, 2010).................................43

*Cheney v. Cyberguard Corp.,*
   213 F.R.D. 484 (S.D. Fla. 2003)...................................................................29

*CV Reit, Inc. v. Levy,*
   144 F.R.D. 690 (S.D. Fla. 1992) (500) .........................................................28

*Daubert v. Merrell Dow Pharms., Inc.,*
   509 U.S. 579 (1993).....................................................................................41

*Deadwyler v. Volkswagen of Am. Inc.,*
   1986 U.S. Dist. LEXIS 28449 (W.D.N.C. 1986)............................................46

*Duhaime v. John Hancock Mut. Life Ins. Co.,*
   177 F.R.D. 54 (D. Mass. 1997).............................................................29, 46

**Page**

*Eisen v. Carlisle & Jacquelin,*
    417 U.S. 156 (1974).........................................................................................................27, 54

*Eisenberg v. Gagnon,*
    766 F.2d 770 (3d Cir. 1985)..........................................................................................27

*Grovenor House, L.L.C. v. E.I. DuPont De Nemours & Co.,*
    2010 U.S. Dist. LEXIS 91905 (S.D. Fla. Aug. 12, 2010)............................................44

*Gutierrez v. Wells Fargo Bank, N.A.,*
    2008 U.S. Dist. LEXIS 70124 (N.D. Cal. Sept. 11, 2008) ..........................................36

*Gutierrez v. Wells Fargo Bank, N.A.,*
    2010 U.S. Dist. LEXIS 29117 (N.D. Cal. Mar. 26, 2010).............................................37

*Gutierrez v. Wells Fargo Bank, N.A.,*
    730 F. Supp. 2d 1080 (N.D. Cal. 2010) .......................................................2, 5, 41, 54

*Hanlon v. Chrysler Corp,*
    150 F.3d 1011 (9th Cir. 1998) .....................................................................................46

*Hansen v. Monumental Life Ins. Co.,*
    2008 U.S. Dist. LEXIS 112254 (D. Conn. Mar. 6, 2008).............................................46

*Hastings-Murtagh v. Texas Air Corp.,*
    119 F.R.D. 450 (S.D. Fla. 1988) (King, J.)..................................................................28

*Holmes v. Continental Can Co.,*
    706 F.2d 1144 (11th Cir. 1983) ...................................................................................26

*Hoving v. Lawyers Title Ins. Co.,*
    256 F.R.D. 555 (E.D. Mich. 2009) ..............................................................................51

*In re Abbott Labs. Norvir Anti-Trust Litig.,*
    2007 U.S. Dist. LEXIS 44459 (N.D. Cal. June 11, 2007) ...........................................51

*In re Brand Name Prescription Drugs Antitrust Litig.,*
    1994 U.S. Dist. LEXIS 16658 (N.D. Ill. Nov. 15, 1994)..................................42-43, 53-54

*In re Cardizem CD Antitrust Litig.,*
    200 F.R.D. 326 (E.D. Mich. 2001) ..............................................................................28

*In re Cardizem CD Antitrust Litig.,*
    218 F.R.D. 508 (E.D. Mich. 2003) ..............................................................................51

**Page**

*In re Cephalon Sec. Litig.*, No. 96-0633, 1998 U.S. Dist. LEXIS 12321
(E.D. Pa. Aug. 12, 1998)...........................................................................................49

*In re Conseco Life Ins. Co. Lifetrend Ins. Sales & Mktg. Litig.*,
270 F.R.D. 521 (N.D. Cal. 2010)...............................................................................50

*In re Diet Drugs Prods. Liab. Litig.*,
1999 U.S. Dist. LEXIS 13228 (E.D. Pa. Aug. 26, 1999).........................................41

*In re Folding Carton Antitrust Litig.*,
75 F.R.D. 727 (N.D. Ill. 1977)....................................................................................27

*In re Pharmaceutical Indus. Average Wholesale Price Litig.*,
252 F.R.D. 83 (D. Mass 2008).....................................................................................46

*In re Playmobile Antitrust Litig.*,
35 F. Supp. 2d 231 (E.D.N.Y. 1998)..........................................................................31

*In re Prudential Ins. Co. of Am. Sales Practice Litig.*,
962 F. Supp. 450 (D.N.J. 1997)............................................................................46, 47

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
148 F.3d 283 (3d Cir. 1998)........................................................................................46

*In re School Asbestos Litig.*,
789 F.2d 996 (3d Cir. 1986).........................................................................................46

*In re Sugar Indus. Antitrust Litig.*,
73 F.R.D. 322 (E.D. Pa. 1976).....................................................................................54

*In re Synthroid Mktg. Litig.*,
188 F.R.D. 287 (N.D. Ill. 1999)...................................................................................31

*In re Telectronics Pacing Sys.*,
221 F.3d 870 (6th Cir. 2000) .......................................................................................48

*In re Telectronics Pacing Sys., Inc.*,
172 F.R.D. 271 (S.D. Ohio 1997)...........................................................................46, 48

*In re Terazosin Hydrochloride Antitrust Litig.*,
203 F.R.D. 551 (S.D. Fla. 2001).................................................................................42

*In re Terazosin Hydrochloride Antitrust Litig.*,
220 F.R.D. 672 (S.D. Fla. 2004)..............................................................29, 30, 31, 50

**Page**

*In re Visa Check/Master Money Antitrust Litig.,*
    280 F.3d 124 (2d Cir. 2001)..................................................................35, 54

*Ingram v. Coca-Cola Co.,*
    200 F.R.D. 685 (N.D. Ga. 2001)...........................................................34

*Klay v. Humana, Inc.,*
    382 F.3d 1241 (11th Cir. 2004) .......................................................... *passim*

*Kornberg v. Carnival Cruise Lines, Inc.,*
    741 F.2d 1332 (11th Cir. 1984) ...........................................................31

*Lessard v. Metropolitan Life Ins. Co.,*
    103 F.R.D. 608 (D. Me. 1984)..............................................................27, 31

*Little Caesar Enters., Inc. v. Smith,*
    172 F.R.D. 236 (E.D. Mich. 1997) .......................................................28

*Margaret Hall Found. v. Atlantic Fin. Mgmt.,*
    1987 U.S. Dist. Lexis 7528 (D. Mass. Jul. 30, 1987) ............................31

*Mid-Continent Cas. Co. v. Active Drywall S., Inc.,*
    2011 U.S. Dist. LEXIS 19978 (S.D. Fla. Feb. 25, 2011).......................43

*Miles v. America Online, Inc.,*
    202 F.R.D. 297 (M.D. Fla. 2001) (4,700)............................................28

*Mills v. Foremost Ins. Co.,*
    511 F.3d 1300 (11th Cir. 2008) ...........................................................42

*Moore v. Painewebber, Inc.,*
    306 F.3d 1247 (2d Cir. 2002)...............................................................34

*Pettway v. American Cast Iron Pipe Co.,*
    576 F.2d 1157 (5th Cir. 1978) .............................................................26

*Phillips Petroleum Co. v. Shutts,*
    472 U.S. 797 (1985)..............................................................................26

*Pickett v. IBP, Inc.*
    2001 U.S. Dist. LEXIS 22453 (MD. Ala. Dec. 21, 2001) .....................42

*Pottinger v. Miami,*
    720 F. Supp. 955 (S.D. Fla. 1989) .......................................................30, 32

**Page**

*Pujals ex rel. El Rey De Los Habanos, Inc. v. Garcia,*
  2011 WL 1134989 (S.D. Fla. Mar. 28, 2011) .................................................................. 43-44

*Roper v. Consurve, Inc.,*
  578 F.2d 1106 (5th Cir. 1978) .................................................................37, 38, 40

*Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.,*
  601 F.3d 1159 (11th Cir. 2010) .................................................................45, 50

*Sadler v. Midland Credit Mgmt.,*
  2009 U.S. Dist. LEXIS 26771 (N.D. Ill. Mar. 31, 2009) ........................................41

*Schumacher v. Tyson Fresh Meats, Inc.,*
  221 F.R.D. 605 (N.S.D. 2004) .................................................................51

*Shaw v. Toshiba Am. Info. Sys.,*
  91 F. Supp. 2d 942 (E.D. Tex. 2000) .................................................................46

*Simon v. Phillip Morris,*
  124 F. Supp. 2d 46 (E.D.N.Y. 2000) .................................................................46

*Smilow v. Southwestern Bell Mobile Sys.,*
  323 F.3d 32 (1st Cir. 2003) ................................................................. 27, 40, 44-45

*Sosna v. Iowa,*
  419 U.S. 393 (1975) .................................................................32

*Steinberg v. Nationwide Mut. Ins. Co.,*
  224 F.R.D. 67 (E.D.N.Y. 2004) .................................................................29, 46

*Stern v. AT&T Mobility Corp.,*
  No. CV 05-8842, 2008 U.S. Dist. LEXIS 110305 (C.D. Cal. Aug. 22, 2008) ........................41

*Tefel v. Reno,*
  972 F. Supp. 608 (S.D. Fla. 1997) (King, J.) .................................................................33

*Torres v. TPUSA, Inc.,*
  2009 U.S. Dist. LEXIS 22033 (M.D. Fla. March 19, 2009) ........................................43, 44

*Valley Drug. Co. v. Geneva Pharms., Inc.,*
  350 F.3d 1181 (11th Cir. 2003) .................................................................27, 32

*Walco Invs., Inc. v. Thenen,*
  168 F.R.D. 315 (S.D. Fla. 1996) .................................................................31

**Page**

*Walsh v. Pittsburgh Press Co.,*
    160 F.R.D. 527 (W.D. Pa. 1994) ................................................................42

*Waste Mgmt. Holdings v. Mowbray,*
    208 F.3d 288 (1st Cir. 2000)................................................................27, 44

*Windham v. American Brands,*
    565 F.2d 59 (4th Cir. 1977) ................................................................42

**STATUTES, RULES AND REGULATIONS**

Uniform Commercial Code
    §2-302 ................................................................................................51

Federal Rules of Civil Procedure
    Rule 12(f) ................................................................................44
    Rule 23 ................................................................................*passim*
    Rule 23(a) ................................................................................*passim*
    Rule 23(a)(1) ................................................................................3, 28
    Rule 23(a)(2) ................................................................................3, 29
    Rule 23(a)(3) ................................................................................3, 30, 32
    Rule 23(a)(4) ................................................................................3, 32, 33
    Rule 23(b) ................................................................................34, 52
    Rule 23(b)(3) ................................................................................*passim*
    Rule 23(c)(5) ................................................................................49
    Rule 23(g) ................................................................................1, 33

California Business and Professions Code
    §17200................................................................................................52

35

## MOTION AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Fed. R. Civ. P. 23, Plaintiffs, through their undersigned counsel, respectfully move for class certification based on the facts and authorities set forth in the following memorandum of law and accompanying Appendices I-IV.

The proposed Class is defined as follows:

All JPMorgan Chase Bank, N.A. ("Chase") customers in the United States who had or have one or more consumer accounts and who, from applicable statutes of limitation through August 13, 2010 ("Class Period"), incurred one or more overdraft fees as a result of Chase's practice of sequencing debit card transactions from highest to lowest.

Excluded from the Class are Chase; its parents, subsidiaries, affiliates, officers and directors; any entity in which Chase has a controlling interest; all customers who make a timely election to be excluded; and all judges assigned to this litigation and their immediate family members.[1]

Plaintiffs Estella Lopez, Linda McDaniel, Charles Reed, Jr., John Stone and Andrea Luquetta ("Plaintiffs") also move to be appointed representatives of the Class,[2] and for the appointment of the following firms as Class Counsel pursuant to Fed. R. Civ. P. 23(g): Alters Law Firm, P.A.; Podhurst Orseck, P.A.; Grossman Roth, P.A.; Baron & Budd, P.C.; Golomb & Honik, P.C.; Lieff Cabraser Heimann & Bernstein LLP; Trief & Olk; and Webb, Klase & Lemond, L.L.C.

---

[1] Plaintiffs also request that the Court certify subclasses for specific claims and appoint class representatives to represent such subclasses as set forth in Plaintiffs' Proposed Trial Plan for Trial of Class Claims (the "Trial Plan"), which is submitted herewith as Appendix I.

[2] Plaintiffs intend to seek the appointment of Valerie Williams, Megan Biss, Billy Martin Ruiz and Deborah Ruiz, John D. Kirkland, Jacqueline Miller, Thomas Larsen, Brent Lowe, Jennifer Palacios and Martin Palacios and Angela Walsh-Duffy as additional class representatives, and to certify additional subclasses for which these Plaintiffs will serve as class representatives, if the Eleventh Circuit affirms this Court's Order denying Chase's motion to compel arbitration. Oral argument is scheduled for May 19, 2011.

## I.    INTRODUCTION

Through the use of specially designed software programs, Chase engaged in a systematic scheme to extract the greatest possible number of overdraft fees from Plaintiffs and similarly-situated Chase consumers across the country.  Chase collected hundreds of millions of dollars in excessive overdraft fees as a result of this systematic scheme, much of it from Chase's most vulnerable customers.  In doing so, Chase abused the discretion afforded it under its standard customer agreements and committed other well-recognized violations of law.

To carry out this scheme, Chase manipulated debit card transactions by, among other things, employing a bookkeeping trick to re-sequence the transactions from highest-to-lowest dollar amount at the time of posting, even though it represented to customers that the advantage of their debit accounts was that they could track them in real time.  These account manipulations, which were applied in the same manner to all Class members as a result of Chase's standardized computer software, caused funds in customer accounts to be depleted more rapidly, resulting in more overdrafts and, consequently, more overdraft fees.  In many instances, overdraft fees were levied despite the fact that the debit card transactions were authorized with sufficient funds, and when, but for Chase's manipulation, there would have been sufficient funds in the consumers' accounts to settle those transactions.  Chase did not fairly disclose its manipulations to Plaintiffs and Class members.  And, Chase engaged in these manipulations despite recognizing that it harmed its own customers, particularly the poor.  *See infra* at 8-27.  One Court, after a full bench trial, emphatically condemned similar practices as "***gouging and profiteering***."  *See Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080, 1104 (N.D. Cal. 2010) (emphasis added).

Plaintiffs now move for certification of their claims for breach of contract and breach of the implied covenant of good faith and fair dealing, unjust enrichment, unconscionability, the California

Unfair Competition Law ("UCL"), and conversion.  Because all required elements of Fed. R. Civ. P. 23(a) and (b)(3) are satisfied, the Court should certify the proposed Class.

As Plaintiffs demonstrate below, Rule 23(a)(1) numerosity is satisfied because the proposed Class is comprised of hundreds of thousands of Chase customers who have been subjected to Chase's re-sequencing practice, thereby making joinder of them all impracticable.  *See infra* at 29-30.  There are also many common questions of law and fact arising from Chase's form contracts and its uniform high-to-low re-sequencing practice, thus satisfying Rule 23(a)(2)'s commonality requirement.  Questions about whether Chase properly disclosed its debit transaction manipulations (it did not), and how those manipulations and the resultant overdraft fees adversely impacted Chase's customers (they did), are common to all Plaintiffs and all Class members.  *See infra* at 30-31.

Rule 23(a)(3)'s typicality requirement is also satisfied.  Plaintiffs' claims are typical of the claims of all Class members because each Plaintiff and member of the Class, whose accounts were governed by common and materially similar agreements, were subjected to Chase's practice of re-sequencing debit transactions from high-to-low, and were assessed overdraft fees as a result.  Plaintiffs and the Class thus seek redress via common legal claims arising out of the same course of conduct by Chase.  *See infra* at 31-33.  Plaintiffs' claims are also typical of other Class members that they seek to represent through proposed subclasses.

The final Rule 23(a) requirement – adequacy of representation under Rule 23(a)(4) – is fulfilled because Plaintiffs do not have interests that conflict with the Class, and they are represented by well-qualified counsel who are diligently prosecuting these claims on behalf of the Class.  Each Plaintiff, like each Class member, has a strong interest in proving the unlawfulness of Chase's scheme and obtaining redress.  The interests of Plaintiffs and the Class are thus co-extensive.  *See infra* at 33-35.

- 3 -

Having satisfied the requirements of Rule 23(a), Plaintiffs also demonstrate their entitlement to certification under Rule 23(b)(3), which requires that common issues of law or fact predominate over questions affecting individual class members, and that class treatment is superior to other methods of adjudicating the matter.  Common issues predominate because the salient legal and factual questions in this case will be resolved with proof common to all Plaintiffs and Class members.  Plaintiffs will prove their case with, among other things, evidence that Chase's form adhesion contracts applied to all Class members and contained similar terms; that Chase systematically re-sequenced debt transactions from high-to-low for all Class members in the same manner and through the same means; that Chase systematically failed to provide accurate balance information to Class members; and that Chase established a secret shadow line of credit known as "Matrix" for all Class members so Chase could charge its customers more overdraft fees.  All of this evidence, and more, will have a direct impact on every Class member's effort to establish liability and on every Class member's entitlement to relief.  Common issues thus predominate.  *See infra* at 36-40.

Predominance of common questions is also highlighted by the nature of the proof required to ascertain members of the Class and calculate their individual damages.  Both exercises will be accomplished by Plaintiffs' highly-qualified expert, Arthur Olsen, through an automated process using Chase's detailed transaction history records.  Using Chase 's data, and without the need for any input from individual Class members, Mr. Olsen will identify and segregate those customers who were charged overdraft fees as a result of Chase's manipulation of debits through high-to-low re-sequencing, as opposed to those who would have incurred the fees regardless of posting order.  The amount of damage incurred by each Class member will be calculated in a similar manner using the same data.  *See infra* at 41-44.  Indeed, Mr. Olsen persuasively identified Class members and

- 4 -

their damages using a very similar approach in the related *Gutierrez* case, where the Court found his methods and conclusions highly reliable. *See* 730 F. Supp. 2d at 1139.

Individual issues relating to affirmative defenses will not detract from the common, predominating issues in this litigation. Chase's defenses are ill-defined and cannot upset the determinative constellation of common issues that bind the Class together. Further, many defenses, such as waiver and the statute of limitations, apply, if at all, on a class-wide basis. *See infra* at 45-47.

Nor does applying multi-state law preclude predominance here. In Appendix I, Plaintiffs submit a companion Trial Plan and extensive survey of applicable law that present a comprehensive roadmap for trying the Class's claims. On the basis of these detailed legal surveys, Plaintiffs propose certification of discrete subclasses for claims containing materially-identical legal standards. This approach, which has been expressly approved by the Eleventh Circuit in *Klay v. Humana, Inc.*, 382 F.3d 1241, 1262 (11th Cir. 2004), demonstrates that common legal issues will remain the predominant focus of this litigation, notwithstanding the application of multi-state law. *See infra* at 47-54.

Turning to the superiority prong of Rule 23(b)(3), all Class members have claims that are too small to litigate on an individual basis. Unless the proposed Class is certified, the courthouse doors will be closed to all but, at most, a handful of these consumers, and Chase will retain hundreds of millions of dollars in ill-gotten gains from its unlawful conduct. Further, adjudicating claims in a single proceeding before this Court, which is already intimately familiar with the subject matter of this case, is much more efficient than a multiplicity of suits here and elsewhere that would unduly burden the judicial system. As the proposed Trial Plan demonstrates, Plaintiffs do not foresee any

serious manageability problems.  A class action is a superior method of adjudicating Plaintiffs' claims.  *See infra* at 54-57.

## II.     FACTUAL BACKGROUND

Though discovery is still in its early stages, the evidence adduced to date establishes that class-wide issues predominate over individual questions.  Below is a sampling of the types of evidence that Plaintiffs will present at trial to demonstrate how those common issues will be proven on a class-wide basis.  The recitation highlights the predominance of common issues, typicality of Plaintiffs' claims and the superiority of the class action as a vehicle for resolving these claims.

**A.     Chase Provided Checking and Debit Card Services Across the United States During the Class Period**

Chase is a national bank with its corporate headquarters in New York City, New York.  It is part of a financial services empire with over $2 trillion in assets, $1 trillion in deposits, $115.6 billion in annual revenue in 2010, and $11.7 billion in profits in 2010.[3]  Chase's retail and commercial bank is run out of Chicago, Illinois, and its technology hub is in Columbus, Ohio.[4]

In 2000, Chase acquired the prominent investment bank, J.P. Morgan & Co., becoming what is today JPMorgan Chase & Co.[5]  In 2004, Chase merged with retail banking juggernaut Bank One, N.A. ("Bank One").[6]  In 2006, Chase acquired Bank of New York's ("BNY") branches, including

---

[3] *See* www.jpmorganchase.com (last visited on April 20, 2011).

[4] *Id.*

[5] *Id.*

[6] *Id.*

BNY's retail consumer and commercial customer accounts. *See* Ex. 1 at 372:12-22.[7]  And, in September, 2008, Chase purchased most of the banking operations of Washington Mutual Bank ("WaMu"), including its assets, secured debt obligations and deposits, after WaMu went into receivership of the Federal Deposit Insurance Corporation ("FDIC") and the Office of the Comptroller of the Currency ("OCC").[8]

Chase controls the nation's second-largest branch network, with over 5,000 locations in 23 states reaching 42% of the U.S. population.[9]  Chase has retail banking operations in Arizona, California, Colorado, Connecticut, Florida, Georgia, Idaho, Illinois, Indiana, Kentucky, Louisiana, Michigan, Nevada, New Jersey, New Mexico, New York, Ohio, Oklahoma, Oregon, Texas, Utah, Washington, West Virginia, and Wisconsin.[10]  Chase provides checking and debit card services to customers through approximately 20 million accounts nationwide.  Ex. 3 at 270:9-18.

**B.     Chase Perpetrated a Standardized Scheme to Collect Unlawful Overdraft Charges from Plaintiffs and the Class**

The common evidence described below identifies the practices challenged by Plaintiffs and chronicles how each wrongful practice increased Chase's overdraft fee revenue at the expense of the Class.

---

[7]  References to "Ex." are to exhibits included in Appendix III.

[8]  Office of the Comptroller of the Currency, News Release, *OCC Approves Applications for JPMorgan Chase Bank* (Sep. 25, 2008), available at http://www.occ.treas.gov/news-issuances/news-releases/2008/nr-occ-2008-114.html (last visited on April 21, 2011).

[9]  *See* www.jpmorganchase.com (last visited on April 20, 2011).

[10]  *See* https://www.chase.com/index.jsp?pg_name=ccpmapp/shared/assets/page/Branch_Locator (last visited on April 21, 2011); *see also* Ex. 4 at 27-48 (Report of Retail Deposit Pricing Committee (March 11, 2010)).

1.      **During the Class Period, Chase Uniformly Re-Sequenced Debit Transactions and Posted Debits from Highest to Lowest for All Class Members**

Beginning in July 2004, and continuing throughout the Class Period, Chase uniformly manipulated the posting order of its customers' debit transactions pursuant to a standardized scheme that re-sequenced and posted debits in the order of highest-to-lowest dollar amount, instead of posting them in chronological order.[11] Chase's re-sequencing was formulaic, automated, and applied to all debit transactions on retail consumer accounts. The process begins with authorization, followed by posting.

a.      **Step 1: Authorizing Debit Transactions.**

When a customer initiates either a signature-based or PIN-based point-of-sale ("POS") transaction, the merchant must obtain authorization from Chase to process the sale.[12] The merchant sends Chase an electronic authorization request, which is received by Chase's system. Ex. 5 at 33:14-20. Using the customer's account information and the transaction information sent by the merchant, Chase's system automatically determines whether the transaction should be approved. Ex. 2 at 27:21-30:25. In doing so, the system checks the "available balance" in the customer's account and, if the available balance is less than the transaction amount, Chase's system determines the

---

[11] *See, e.g.*, Ex. 2 at 143:10-144:3. Posting occurred in the DDA system, and the re-sequencing protocols are set forth in a "DDA [M]anual," which serves as Chase's central guide for all functions related to accounts. Ex. 1 at 62:8-63:17; Ex. 2 at 113:5-114:7; *see also* Ex. 7 (Monetary Transaction Code Posting Priority Table); Ex. 5 at 154:3-155:24 (Ex. 7 thereto); Ex. 6 (Overdraft and Unposted Item Processing). A single internal transaction code grouped all relevant transactions (each of which is designated by an "external transaction code") and then sorted them by amount, highest to lowest. Ex. 2 at 99:15-102:5; 113:5-14:7. The DDA system also assesses overdraft fees. *Id.* at 136:6-24.

[12] There are two types of POS transactions: (i) "signature-based" POS transactions where the customer is required to provide a signature to the merchant at the point of sale; and (ii) "PIN-based" POS transactions, where the customer enters a pin number at the point of sale.

- 8 -

amount of credit or "overdraft limit," if any, that Chase is willing to extend. Ex. 2 at 34:9-39:25. This is done by way of an algorithm called "Matrix," which extends a secret line of credit to customers used to authorize transactions that exceed the balance and collect overdraft fees for insufficient balance. *Id.*

For all Class members' accounts, Chase keeps a "real time" running calculation of the account's "available balance" for purposes of determining whether sufficient funds exist at the time of an authorization request. *See id.*; Ex. 5 at 83:11-83:15. The available balance in the account is then updated during the course of the day, decreasing it as Chase places "memo posts" based on transactions that are authorized but that have not yet posted to the account. Ex. 2 at 73:7-8; Ex. 5 at 74:23-75:9. Thus, for example, if a customer makes a POS purchase on a Monday, even though that transaction may not post to her account for a couple of days, Chase places a "memo post" for the amount of the pending purchase, and deducts it from her available balance for purposes of determining whether there are sufficient funds to cover a later-initiated debit transaction. *See* Ex. 5 at 77:14-77:21; 105:3-6. If Chase's system determines that a transaction should be authorized, the system electronically communicates the approval to the merchant, who then completes the sale. Ex. 5 at 31:16-32:17. The merchant receives the approval along with an approval code; neither the merchant nor the customer is told via an authorization whether there were sufficient funds in the customer's primary account to cover the transaction, nor whether the transaction was approved into overdraft using the Matrix line of credit.[13] Ex. 2 at 39:17-42:16; Ex. 5 at 35:20-37:8.

---

[13] Chase's authorization process, including the information the bank receives and uses to authorize or deny the transaction, is essentially the same for ATM and teller withdrawals as it is for POS transactions. Ex. 5 at 84:2-86:5.

### b.   Step 2: Posting Transactions and Assessing Overdraft Fees.

During the Class Period, Chase employed the exact same posting order protocols for all customers regardless of which state they were in (save for Nevada). Ex. 2 at 143:10-44:3. Posting re-sequencing protocols are set forth in a "DDA Manual," which serves as Chase's central guide for all functions related to accounts. Ex. 1 at 62:8-63:17; Ex. 2 at 113:5-14:7. The DDA Manual is specifically written for a system programmer to be able to execute the policy decisions of the bank on the DDA system. Ex. 5 at 63:19-24. Pursuant to a standardized, automated process in its DDA system, Chase groups all debit transactions, including POS, ATM, and teller debit transactions, according to a single internal transaction code and then sorts them in the order of largest-to-smallest in dollar amount. Ex. 1 at 62:8-63:17; Ex. 2 at 99:15-102:5; 113:5-14:7; Ex. 5 at 149:3-8; 154:3-55:24 & Exhibit 7 thereto (Monetary Transaction Code Posting Priority Table as of Nov. 2004); Ex. 6 (Overdraft and Un-Posted Item Processing as of Mar. 2010). The DDA system also assesses overdraft fees. Ex. 2 at 136:6-24.

For each debit card transaction that Chase authorized to a customer's account, an automatic determination is made at the time of authorization regarding whether there are sufficient funds to cover the transaction in question. Ex. 2 at 39:8-25. This determination is distinct from the one Chase made at the posting stage in deciding whether or not to pay a non-debit card transaction. Ex. 5 at 82:18-23; 336:12-37:13. Whereas Chase would decide whether to pay a debit card transaction at the time when the authorization was requested by the merchant, Chase decided whether to pay a non-debit card or ATM transaction such as check or ACH into overdraft during posting, which occurred during batch cycle at a single point of the day, usually at night. Ex. 5 at 73:16-74:14; 82:18-23. Chase decided whether to pay a check or ACH transaction after its systems had already approved the debit card charges, and Chase would then post those items highest-to-lowest during batch cycle for

the purpose of charging overdraft fees. *Id.*; *see also* Ex. 5 at 73:16-74:14; 82:18-23; 88:7-89:11; Ex. 1 at 62:8-63:17; Ex. 2 at 99:15-102:5, 113:5-14:7.  If there were insufficient funds in the primary account at the time of posting, Chase's automated system looked to whether there were funds in a linked savings account or line of credit to cover the overages.  Ex. 2 at 33:20-22.  And if not, then Chase assessed an overdraft fee in the amount of approximately $30-$34.[14]

Chase's high-to-low posting order had a dramatic impact on the number of overdraft fees assessed.  When there were insufficient funds to cover all posted transactions, the high-to-low posting order allowed Chase to authorize the same dollar amount to be overdrawn but to charge more fees.  Ex. 5 at 175:9-13.  The high to low posting reduced customers' balances as quickly as possible, thereby maximizing the number of overdraft fees assessed. Ex. 5 at 98:24-99:10.  Chase's Senior Vice President of Risk Management and former Sr. Vice President of Deposit Products testified that, generally, posting transactions high-to-low caused more items-per-occurrence to occur; the more items-per-occurrence, the more overdraft items there were and, in turn, the more overdraft fees generated.  Ex. 5 at 224:19-26:19 & Exhibit 9A attached thereto; 238:24-39:11.

This is precisely why Chase adopted high-to-low posting in April 2004. *Id.*  When Chase and Bank One merged into a single entity in 2004, and Chase customers were all put onto the same high to low posting, David Cohen, then head of the deposit products group, noted that the bank would have to "spin that properly." *See* Ex. 5 at 210:5-23; 212:9-17 & Exhibit 12 attached thereto.  After the first part of the conversion in Texas, the results were so successful and profitable that the executives at Chase wanted to accelerate the conversion to put the rest of Chase onto the Matrix

---

[14] The amount has varied over time, from $30 in 2004, *see* Ex. 9 at 14 at MDL-CH_0024023, to as much as $34 for the highest tier throughout the class period from 2006 on. *See* Ex. 10 at MDL-CH_0025158.

decisioning system under the expectation that that would generate an additional $1 million in monthly overdraft revenues. *See* Ex. 5 at 284:6-85:6; 286:21-88:16 & Exhibits 19 and 20 thereto.

### 2.    Chase Utilized a Secret Line of Credit Throughout the Class Period

Instead of simply declining debit transactions when there were insufficient funds, or warning its customers that an overdraft fee would be assessed if they proceeded with the transaction, Chase uniformly extended a line of credit to Class members. Ex. 5 at 286:1-13. This was another integral part of Chase's scheme to create the conditions necessary to charge overdraft fees and take advantage of Class members without their full knowledge or understanding.

As discussed above, throughout the Class Period, if a customer's primary account and any linked account balances were not sufficient to cover the transaction amount, and if the customer did not have a line of credit, Chase secretly authorized customers' debit-card transactions into overdraft up to a maximum or ceiling amount the bank determined was appropriate for each customer. This was done via an automated process utilizing a Matrix line of credit that Chase built for the customer, which considered a series of uniform factors to decide whether to honor a check or debit-card transaction. Ex. 47; *see also* Ex. 5 at 286:1-13; Ex. 1 at 195:2-3; Ex. 7 (B1B DDA Transaction Codes – Monetary Posting Priority Table (Nov. 2004) (chapter of DDA Manual setting forth the uniform factors and technical processes for Matrix)).[15]

One common factor is the REDACTED score, REDACTED          (Ex. 6 at 39) and is a statistical model that looks at REDACTED

_____

[15]  Pursuant to Regulation E, beginning sometime in 2010, Chase discontinued use of the Matrix secret shadow line of credit unless customers affirmatively opted into the program. Ex. 3 at 185:24-88:3; 192:1-10 & Ex. 3 attached thereto.  In other words, unless the customer affirmatively authorized participation in the Matrix line of credit, debit card transactions exceeding available account balances would be denied.

REDACTED                                                    The score is then translated

into an overdraft limit. Ex. 1 at 196:21-97:6. The Matrix was how Chase determined, using a highly

complex algorithm, whether to allow a customer to overdraft and by how much, and calculated for

Chase an amount that Chase is likely to be able to collect from the customer. Ex. 5 at 298:25-300:2.

Augmenting its re-sequencing practice, Chase's use of the Matrix line of credit was integral to its

overall scheme of increasing the number of completed debit transactions and the number of

overdrafts. And the entire design and process of determining the amount of the Matrix line of credit

and authorizing a transaction into overdraft were never disclosed to the customer. Ex. 5 at 311:1-

12:10; Ex. 11.

In fact, Chase earned more than just one extra overdraft fee each day it allows someone to

overdraft. For every one additional overdraft "occurrence" that Matrix generated – that is, each time

a customer balance went negative – Chase generated fees equal to the average *number of items* per

occurrence. As of 2009, Chase on average generated 1.66 items per occurrence at an average of

$33.40 per item as a result of marrying the Matrix line of credit to the practice of high-to-low re-

sequencing. Ex. 8. And Chase was able to do this while minimizing write-offs. *See* Ex. 8

(comparing Chase's "Behavior Score Invisible Limit" strategy to WaMu's "Visible Tenure / Balance

Based Limits" to show that Matrix allowed lower losses). By 2008, Matrix allowed Chase to

approve 1% more transactions, resulting in at least $400 million more per year in overdraft revenue.

Ex. 12. As Chase's Senior Vice President testified, more items per occurrence means more overdraft

fees. Ex. 5 at 174:23-75:3; 179:18-80:8 (Exhibit 9A attached thereto).

**3.      Chase Adopted the Re-Sequencing at the Recommendation of
        Consultants in Order to Increase Revenue**

Chase's high-to-low re-sequencing process was proposed by a third-party consultant called

Methods Research, Inc. ("MRI"), which recommended that Bank One use an "Aggressive Method"

that posted all debits – checks, ACH, debit cards, cash withdrawals and ATMs together – and charged them against the balance from highest to lowest dollar amount. Ex. 13; Ex. 1 at 58:20-59:64. This methodology would "*maximize fee income potential from overdraft and NSF fees in the processing of daily transactions* for various deposit products." Ex. 14 at 2 (emphasis added). The contingent fee contract between Bank One and MRI specifically anticipated that the scheme would generate more than $75 million in additional fees, with Bank One and MRI each earning increased profits as the generated fees increased. *Id.* at 4.

MRI provided an illustration of how its "Aggressive Method" for posting order would impact the number of overdraft fees that could be charged:

**Consumer Account Example**

| | Current Posting Priorities | | | | Aggressive Posting Priorities | | |
|---|---|---|---|---|---|---|---|
| Internal TC | Description | Amount | Balance | Internal TC | Description | Amount | Balance |
| | | | 1000.00 | | | | 1000.00 |
| 362 | POS debit | 20.00 | 980.00 | 364 | ACH Debit | 250.00 | 750.00 |
| 362 | POS debit | 40.00 | 940.00 | 364 | ATM withdrawal | 200.00 | 550.00 |
| 362 | Check #1010 Cashed | 150.00 | 790.00 | 364 | Check #1007 | 200.00 | 350.00 |
| 362 | ATM withdrawal | 200.00 | 590.00 | 364 | Check #1010 Cashed | 150.00 | 200.00 |
| 362 | ACH Debit | 250.00 | 340.00 | 364 | Check #1004 | 125.00 | 75.00 |
| 364 | Check #1002 | 100.00 | 240.00 | 364 | Check #1002 | 100.00 | -25.00 |
| 364 | Check #1004 | 125.00 | 115.00 | 364 | Check #1005 | 50.00 | -75.00 |
| 364 | Check #1005 | 50.00 | 65.00 | 364 | POS debit | 40.00 | -115.00 |
| 364 | Check #1007 | 200.00 | -135.00 | 364 | POS debit | 20.00 | -135.00 |

| **Current Method** | | **Aggressive Method** | |
|---|---|---|---|
| NSF/OD Items | 1 | NSF/OD Items | 4 |

Ex. 13 at 2.

Notably, in both examples, the exact same transactions are paid, and the account in both cases is overdrawn $135; but, in the "Aggressive Posting Priorities," four overdraft fees can be charged as opposed to just one. *Id.* Chase's internal documents from that time period showed that, by posting high to low, they could expect more "exception items" – *e.g.*, more overdrafts, which

would then result in $44 million in additional overdraft fees with little additional risk that Chase would not be able to collect the amount they authorized. Ex. 5 at 174:23-75:3; 179:18-80:8 & Exhibit 9A attached thereto. Chase also found that, by using "external resources for this initiative," it could save a lot of money and get a head start which would pay for itself. *Id.*

Just prior to the June 2004 merger with Bank One, Chase also had adopted a posting order process whereby it comingled checks, ACH, debit cards, cash withdrawals and ATM transactions, and then posted them high to low. Ex. 1 at 219:5-22. The process had been proposed to Chase by Carreker, another consulting firm, under the moniker of "consistent posting." *Id.* at 220:23-21:13.

Prior to Chase and Bank One's merger in the summer of 2004, the operations of Bank One and Chase were separate, but their posting order logic was nearly identical. Chase's operations were migrated onto Bank One's platform, *see* Ex. 1 at 188:5-89:22; 230:4-22, and the Bank One Demand Deposit Account ("DDA") system became the system for the entire bank. Ex. 1 at 189:13-22.

Bank One's contract with MRI survived the merger with Chase, and the combined unit sought to leverage the methods and know how provided by MRI across the newly combined enterprise. Ex. 1 at 218:14-19:22; Ex. 15. The use of the Methods Research "operationalized" transaction code system to manage and effectuate the posting order scheme survives to this day and generated hundreds of millions in additional profits. Ex. 1 at 60:2-9.

## C.    Chase's Deceptive Overdraft Fee Practices Ensnared the Class Representatives

Each of the proposed class representatives has claims typical of other Class members. Just like each Class member, Plaintiffs were charged overdraft fees as a result of Chase's practice of re-sequencing debit card transactions from high-to-low. The narrative included in Appendix II filed herewith demonstrates that each Plaintiff would have been assessed fewer overdraft fees had Chase posted their debit card transactions in chronological order. In fact, Plaintiffs' expert, Art Olsen, has

- 15 -

already identified damage caused to the named Plaintiffs during the Class Period using the limited data that Chase has produced to date for each Plaintiff.[16]  *See* Declaration of Art Olsen ("Olsen Decl."), included in Appendix IV), ¶¶41-45. Illustrative is the following chart, which demonstrates that on August 24, 2009, Plaintiff Estella Lopez suffered five additional overdrafts because of Chase's "Aggressive Posting" method:

**Consumer Account Example: Estella Lopez**

| Posting Chronologically | | | | Aggressive Posting: High to Low | | | |
|---|---|---|---|---|---|---|---|
| Internal TC | Description | Amount | Balance | Internal TC | Description | Amount | Balance |
| | | | $275.91 | | | | $275.91 |
| 364 | DEBIT CARD | ($12.69) | $263.22 | 364 | DEBIT CARD | ($164.54) | $111.37 |
| 364 | DEBIT CARD | ($49.00) | $214.22 | 364 | DEBIT CARD | ($82.63) | $28.74 |
| 364 | DEBIT CARD | ($19.89) | $194.33 | 364 | DEBIT CARD | ($49.00) | -$20.26 |
| 364 | DEBIT CARD | ($7.37) | $186.96 | 364 | DEBIT CARD | ($30.77) | -$51.03 |
| 364 | DEBIT CARD | ($82.63) | $104.33 | 364 | DEBIT CARD | ($24.00) | -$75.03 |
| 364 | DEBIT CARD | ($24.00) | $80.33 | 364 | DEBIT CARD | ($19.89) | -$94.92 |
| 364 | DEBIT CARD | ($30.77) | $49.56 | 364 | DEBIT CARD | ($12.69) | -$107.61 |
| 364 | DEBIT CARD | ($164.54) | -$114.98 | 364 | DEBIT CARD | ($7.37) | -$114.98 |
| 363 | OD | ($35.00) | -$149.98 | 363 | OD | ($204.00) | -$318.98 |

| Posting Chronologically | | Aggressive Method | |
|---|---|---|---|
| NSF/OD Items: | 1 | NSF/OD Items: | 6 |

*See* Olsen Decl. ¶46(a).

---

[16]  On January 26, 2011, Plaintiffs requested that Chase produce, in native format, all named plaintiffs' transactional data so that Mr. Olsen could calculate their damages for purposes of class certification.  Despite repeated assurances, the data was not produced to Plaintiffs until April 22, 2011, three days prior to the deadline for filing this Motion.  Later that night, Chase advised Plaintiffs that the data produced for one of the Plaintiffs, Andrea Luquetta, was actually for another customer with the same last name.  Chase did not locate the actual data for Plaintiff Luquetta until late Saturday April 23, and offered to deliver it on Easter Sunday.  Even if the data had been produced on April 23, however, it would have left insufficient time for Mr. Olsen to complete the analysis for class representative Luquetta prior to the filing of this Motion.  Thus, Plaintiffs will provide such analysis in their reply memorandum.

This initial analysis not only demonstrates that each named Plaintiff was harmed by Chase's practices, it also constitutes additional evidence that Mr. Olsen can perform a comprehensive damages analysis for the entire Class once Chase releases the class-wide data. *See id.*, ¶¶39-40.

**D.      Chase Failed to Disclose Its Practices and Provided Misleading Information to All Class Members**

Chase leveraged its overdraft fee scheme into a billion dollar revenue stream by providing inaccurate and misleading information to Class members.[17]  Chase's so-called "disclosures" never advised that the bank would manipulate all debit transactions from high to low during the posting process, and Chase kept its disclosures about its posting practices deliberately vague and pervasively misrepresented to customers how it would process debit transactions.

**1.      Chase's Standardized Account Agreements Were Vague and Misleading**

Chase's relationships with its account holders were governed by standardized form "Account Rules and Regulations" (the "Account Agreements") that were issued with each checking account and periodically updated. *See* Ex. 16; Ex. 17.  The Account Agreements were given to customers when they opened an account and which a customer would have received as an update. *Id.*  While they changed in immaterial ways over time, they were otherwise uniform while in effect. *Id.*  Thus, Plaintiffs and the all Class members were subject to materially similar account terms and legal disclosures.

Upon implementing high-to-low posting in July 2004, and continuing throughout the Class Period, Chase provided these form contracts to its retail banking customers on a non-negotiable "take-it-or-leave it" basis. *See* Ex. 16; Ex. 17.  Throughout the entire Class Period, all Account

---

[17] *See generally* Ex. 4 (Reports of the Retail Pricing Committee).

Agreements contained a section devoted to "Access Cards," which included debit cards. In each of these agreements identified spanning the Class Period, Chase advised its customers that, with respect to their debit cards:

> If you use your Card to access an Account that does not have sufficient funds to complete a transaction or that would exceed the daily authorization limit attached to your Card, [the Bank] may, **at [its] sole discretion**, authorize the transaction. If [the Bank] authorize[s] a transaction that over-draws your Account, [the Bank] **may assess a fee** and/or charge interest **for any overdraft** against your Account.[18]

Nothing in this provision or anywhere in the section discusses posting order. *See supra,* n.15. The Account Agreements elsewhere contained disclosures expressly reserving discretion to Chase regarding its posting order and overdraft fee practices, and obligated customers to pay a fee when Chase pays a transaction that overdraws the account. For example, Chase's agreements stated:

> We have no obligation to pay or honor any item or withdrawal request unless it is drawn or requested against available funds credited to your Account at the opening of business on the day the item is presented for payment or the request is received . . . If we pay an item or honor your request that overdraws your Account, a deposited item has been returned unpaid, or for any other reason your Account has become overdrawn, you agree to pay the amount of the overdraft together with any fee[.][19]

---

[18] Ex. 18 at 36 (Special Personal Deposit Account Updates, June 16, 2009); Ex.10 at 36 (Special Customer Update including Account Rules and Regulations beginning on May 22, 2009); Ex. 19 at 36 (Special Personal Deposit Account Updates, Feb. 25, 2009); Ex. 20 at 22 (Account Rules and Regulations, Dec. 31, 2008); Ex. 21 at 21-22 (Account Rules and Regulations, July 20, 2008); Ex. 22 at 29-30 (Updates for your deposit accounts, effective Aug. 24, 2007); Ex. 23 at 38 (Account Rules and Regulations, beginning Sept. 15, 2006); Ex. 24 at 38 (Account Rules and Regulations, beginning Sept. 15, 2006); Ex. 25 at 39-40 (Account Rules and Regulations July 16, 06); Ex. 26 at 27-28 (Account Rules and Regulations, effective Feb. 27, 2006); Ex. 27 at 27-28 (Account Rules and Regulations, effective Sept. 17, 2005); Ex. 28 at 25 (Account Rules and Regulations, Jan. 18, 2004); Ex. 29 at 24-25 (Account Rules and Regulations, effective Jan. 15, 2005) (emphasis added).

[19] Ex. 25 (Chase Account Agreement (La.) effective July 16, 2006) at 26; *cf.* Ex. 23 (Chase, beginning Sept. 15, 2006); Ex. 22 (Updates For Your Deposit Accounts – effective Aug. 24, 2007); Ex. 20 (Chase, effective Dec. 31, 2008); Ex. 19 (Chase (ID, OR, WA – WaMu) effective May 22, 2009); Ex. 18 (Chase (CA, NV - WaMu) effective Oct. 23, 2009).

Moreover, Chase reserved its discretion to change the posting order without notice in the agreements. *See, e.g.*, Ex. 29 at 15. These provisions were buried deep in the Account Agreements which, throughout the Class Period, were single-spaced, small-font form contracts of adhesion generally exceeding 40 pages, which the bank could not reasonably expect customers to absorb and understand, either before or after they opened their accounts. *See* nn.20 & 21.

Thus, Chase never fully or meaningfully disclosed to customers its intent of re-sequencing transactions from highest to lowest in order to artificially increase the number of overdrafts and overdraft fees. Notably, Chase's executives and its consultants' documents admit that posting order neither changes the dollar amount of each overdraft nor the fact the customer overdrafted, but does change the number of items per occurrence and, therefore, the total amount of fees Chase charged. *See* Ex. 5 at 175:4-13; 175:23-80:8; Ex. 13. And, despite giving vague lip service to its discretionary posting order, Chase did not disclose that it would batch pre-authorized debit card transactions and ATM withdrawals together with yet-to-be-paid checks and ACHs and other withdrawals. Ex. 5 at 73:16-74:14; 82:18-23; 88:7-89:11. Nor did Chase disclose that it would always re-sequence transactions from high-to-low at night to manufacture more overdraft fees. *See* Ex. 1 at 163:15-25. But, in reality, high-to-low re-sequencing always resulted in the maximum number of overdraft fees for Chase. *See* Ex. 5 at 238:24-39:11. Finally, Chase never disclosed to customers their secret line of credit created by the Matrix algorithm. *See* Ex. 5 at 312:11-13.

### 2. Chase's Marketing Materials Contained Misrepresentations or Omissions

Chase also communicated with Class members using its online website, uniform account statements, common mailings, and uniform inserts to account statements. However, Chase has not yet identified or produced relevant disclosures relating to posting order or processes that were made available to its retail customers at large. Further, although Chase's website included a glossary, the

- 19 -

terms "posting order," "overdraft," "available balance," and "insufficient funds" were tellingly not defined in *any* of Chase's Account Agreements. *See* citations in nn.20 & 21, *supra*.

Chase has also produced minimal marketing materials to date. But, those that were produced do not disclose the scheme, and, to the contrary, some affirmatively mislead consumers. For instance, in a tri-fold brochure entitled "Managing Your Checking Account" distributed in 2007, Chase explained the purpose of the document was to "make sure you don't pay fees that may be avoidable. Here are some tips to help you manage your checking account and avoid fees." Ex. 30 at 1-2. Included in the "tips" was recording every transaction in your check register. *Id.* Yet, Chase knew that keeping track of transactions in the order they were spent, like by using a check register, would *not* accurately reflect one's balance because of its policies and practices of high-to-low posting order, holds, delays and pay/no pay decisions. *See, e.g.*, Ex. 31 at MDL0068843; *see also* Ex. 32. In fact, this was one reason why Chase did not institute a running balance on its online register. *Id.*

Moreover, Chase's marketing materials discussed the ability of a customer to check their balance at any time using their card at Chase.com, calling Chase, accessing mobile banking or accessing any Chase ATM. *See* Ex. 30 at 1-2. But the balance that customers could access reflected the balance only at the beginning of the day and was static; it did not reflect the beginning day ledger balance less any authorized transactions entered into during the day. *See* Ex. 1 at 315:22-16:9. Thus, checking one's balance throughout the day or prior to a transaction was *not* a useful tool for customers to employ in trying to avoid overdraft fees. And, more importantly, if one failed to avoid overdrawing her account, nothing in Chase's arsenal of tools could prevent a customer who, thinking they had overdrawn their account with one large item, from incurring multiple overdraft fees because Chase posts the largest items first, and then the smaller ones post into overdraft.

Notably, Chase acknowledged the importance of a customer being able to check one's balance throughout the day, and have that accurately reflect the state of their account in its March 29, 2010 "Enhancements – Overview" document announcing its abandonment of high-to-low posting order:

> Posting Order Changes Help Customers Track Spending, Avoid Overdrafts: Debit card and ATM transactions will post <u>as they occur</u>, NOT largest to smallest. Checks and ACH debits still post high to low.  Deposits still post <u>first</u>.

Ex. 33.

Chase's 2009 10-K also admitted that Chase's posting order had been too complicated and shrouded in complexity for its customers to understand:

> In addition, we are revamping our overdraft policies to meet regulatory requirements, *to make them clearer and simpler, and to give customers more control*.  Customers now can choose if they want overdraft services for their debit cards, and *they will have a real-time ability to see their balances over the course of the day.* These changes are ongoing and complex . . . . While costly (we estimate these changes will reduce our after-tax income by $500 million annually), *we believe these moves will strengthen our long-term relationship with our customers.*

Ex. 34 at 9 (emphasis added).  Although Chase often touted overdraft protection[20] as a means of avoiding the high overdraft fees, Chase bankers also recognized that many high volume overdrafters – those who pay the bank the most money – often did not have the financial means to qualify for overdraft protection – for instance, by not having enough to even open a savings account. *See, e.g.,* Ex. 35.

---

[20] Overdraft protection is a means whereby the customer's checking account is linked to a credit card, savings account or other checking account, such that if the card-based account runs out of money, it can draw from these other sources of funds for a far lesser fee than the $35 fee Chase was charging for "courtesy" overdraft.

E.   **The Common Impact on the Class: Chase Reaped Hundreds of Millions of Dollars in Unlawful Overdraft Fees**

1.   **Chase's Deceptive Overdraft Practices Produced Enormous Profits**

During the Class Period, Chase made enormous profits from overdraft charges, generating over $7 billion, much of it taken from Chase's most vulnerable customers. *See generally* Ex. 4. Chase's egregious overdraft practices and their adverse impact on its customers reached the highest levels of Chase management. Jamie Dimon, the Chairman and CEO of Chase's parent, recently acknowledged that, until Congress curbed these abusive practices, Chase and other banks were raking in overdraft fees: "It got to be too much. ... People have a $2 cup of coffee, and they got a $34 fee, three times a day."[21]

Erol Aspromatis, a Chase Vice President, found that 16% of Chase's annual overdraft revenue, or $500 million per year, was realized solely from posting debit card transactions high-to-low, and that Chase would have made half-a-billion dollars in 2010 from the practice:

---

[21] *See The New York Times*, December 1, 2010, http://www.nytimes.com/2010/12/05/magazine/05Dimon-t.html?_r=1&pagewanted=3

From: Erol R Aspromatis
To: Michael Cleary; Christopher J Henry
Cc: Art Weston; Keith Budzynski
Sent: Sun Sep 20 12:36:25 2009
Subject: Initial Results on OD Sizing
Please find attached the initial results of the OD Sizing. For Item 1 (the base case "real-time" posting sequence):

- The estimated base impact is a -16% reduction in NSF/OD Items from changing to a "Real-Time" posting sequence.
- On a NSF/OD revenue base of $3B, this would represent to a possible -$0.5B revenue reduction (not accounting for changes in consumer behavior).
- Moving the OD threshold from $0 to -$5 could cause a further -9% reduction.

I'm still working on the other pieces with the goal of completing them by this evening.

-Erol

Ex. 36 at MDL-CH_0374937. Chase's modeling was able to definitively identify the number of transactions on a monthly basis that authorized with available funds but caused an overdraft because a check or ACH posted first. *See* Ex. 37. Consistent with Chase's projections when instituting the "income enhancement" posting policies, the volume of transactions considered overdrafts (and thus transactions on which Chase levied fees) rose dramatically each year. Ex. 38 at MDL-CH_0462500; Ex. 39.

### 2. Customer Complaints Relating to Chase's Overdraft Practices Are Legion and Highlight the Egregiousness of Its Uniform Conduct

Chase's conduct prompted thousands of Class members to complain about the confusion engendered by the bank's overdraft practices and the unfair overdraft charges Chase extracted from the Class. Not surprisingly, those complaints mirror the very grievances raised by Plaintiffs in this litigation.

- 23 -

Despite the fact that Chase adopted high-to-low posting to increase revenues, Chase communicated a different message to complaining customers. As an example, Chase's customer service script provided:

> The above-described posting order is not intended to create a fee-based revenue for Chase bank. The posting order was devised after a great many Chase customers requested that Chase honor their mandatory bills over other irregular debit. . . . There is really no conspiracy to increase profit margins.

Ex. 40 at MDL-CH_0031106. Of course, this was a blatant lie given the ample evidence demonstrating that Chase's high-to-low re-sequencing and the secret line of credit were expressly crafted to increase overdraft revenues. *See, e.g.*, Ex. 12; Ex. 13. Further, Chase recently admitted that posting order changes were "less about honoring most important debits first" and more because Chase sought "consistency across all the different posting types." Ex. 1 at 338:5-22.

Moreover, Chase bankers recognized that the entire process of collecting fees for reordered debit items was "unconscionable." For example, on Chase employee wrote:

> Its [*sic*] so difficult and upsetting to explain to them that although they had enough in their account to cover most of their debits that came through on a particular day, since we pay the highest debit first, all of their debits posted NSF. I realize this benefits the bank since we collect more fees, however it seems a bit ***unconscionable***. Has Chase considered paying checks and debits in the order in which they occur, which is not only fair, but also would make more sense to our customers and save us from a lot of disheartening conversations.

Ex. 41 (emphasis added). Reflecting the arrogance of Chase's executives, Alan Newstead, a First Vice President in the product group, recently testified that, although he received the above complaint and many others like it, and though he never personally discussed overdraft fees with a customer, he was in the best position to determine whether Chase account holders had a "positive customer experience." Ex. 3 at 245:22-46:21.

Chase also plainly understood that its most vulnerable customers were those suffering the most from overdrafts, recognizing that those with more than the typical number of overdrafts tended

to use their debit cards actively, were: "Lower income; Lower assets; Lower FICO; Less educated; Employed; [African American] or Hispanic." Ex. 3 at 15 (attached as Exhibit 6a to Newstead Deposition). Chase also understood the "domino effect" that those low-income customers faced when having fees reduce the deficit plus multiple overdraft fees, making it markedly more difficult for them to get back to zero. *See* Ex. 42.

Chase acknowledged that customers questioned "whether or not high to low was the right way to post." Ex. 1 at 368:20-22. Indeed, going back as far as 2007, Chase's deposit product group recognized customers had a common complaint – they wanted the option of opting-out of overdraft and expect that their debit card would work like a stored-value card and not be usable when there's no money in their checking account. Ex. 5 at 258:5-11. Such a policy was expected to lower fee revenue, but "increase customer satisfaction and checking account retention." Ex. 5 at 254:18-63:5 & Ex. 16 thereto. However, Chase did not begin formally tracking customer feedback about posting order until 2008 or 2009. *Id.* at 369:10-17. By July 2008, Chase was receiving *over 9,000 customer complaints per month* about "the dollar amount of fees and that posting order of payments caused additional fees." Ex. 43 at MDL-CH_00338434. Chase never adopted an opt-out program during the Class Period despite their recognition of the adverse customer impact. *See* Ex. 5 at 254:18-63:5 & Ex. 16 thereto.

When Chase converted the WaMu customer base to its own system, which entailed switching them from a "real time" posting/payment to high-to-low posting at the end of the day, complaints *increased significantly* because the re-sequencing led to more overdraft fees. Ex. 44 at MDL-CH_0010020.

Chase finally conducted a study to assess customer understanding of its overdraft fee policies and to decide how to get customers to "opt in" to overdraft and continue paying the fees – what Chase coined the "opportunity" population. Chase concluded that:

> There is uncertainty as to exactly how Chase charges fees for overdraft services and overdrawn accounts. Providing specifics about the fee structure will make customers more trusting of the bank and more prepared to make a decision about the opt-out.

Ex. 45 at MDL-CH_0534584.

The foregoing complaints constitute additional evidence of Chase's uniform course of conduct in imposing overdraft fees on the class and highlight the egregiousness of that conduct.

## III.   ARGUMENT

Class actions have long been recognized by the courts as an essential tool for adjudicating cases involving multiple claims that have similar factual and/or legal inquiries and that might be too modest to warrant prosecuting on an individual basis. In crafting Rule 23, "the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997). Class actions thus give voice to plaintiffs who "would have no realistic day in court if a class action were not available." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985); *see also Holmes v. Continental Can Co.*, 706 F.2d 1144, 1154 (11th Cir. 1983) (describing "the policies of Rule 23" and observing "the individual might be unable to obtain counsel to prosecute his action when the amount of individual damages is relatively small") (quoting *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1220-21 n.80 (5th Cir. 1978)). Class actions also serve an important deterrent function. "The public at large . . . benefit[s] from a class action and expeditious adjudication of the issues involved, since class actions reinforce the regulatory scheme by providing an additional deterrent beyond that afforded either by public

enforcement or by single-party private enforcement." *In re Folding Carton Antitrust Litig.*, 75 F.R.D. 727, 733 (N.D. Ill. 1977) (citations and quotations omitted).

Thus, "[i]t is well-established that class actions are a particularly appropriate and desirable means of redressing common claims for uniform legal violations that affect large numbers of persons in the same way." *Brown v. SCI Funeral Servs. of Fla., Inc.*, 212 F.R.D. 602, 603 (S.D. Fla. 2003); *see also Smilow v. Southwestern Bell Mobile Sys.*, 323 F.3d 32, 41-42 (1st Cir. 2003) (classes of consumers are particularly ripe for certification). The policies underlying the need for class action litigation require that certification under Rule 23 be liberally construed. *See, e.g., Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985) (citations omitted) ("The interests of justice require that in a doubtful case . . . any error, if there is to be one, should be committed in favor of allowing a class action."); *Lessard v. Metropolitan Life Ins. Co.*, 103 F.R.D. 608, 610 (D. Me. 1984) ("Rule 23(a) should be liberally construed in order not to undermine the policies underlying the class action rule.").

Although the Court must undertake a rigorous analysis of the Rule 23 prerequisites, the Court has broad discretion to certify. *Klay v. Humana, Inc.*, 382 F.3d 1241, 1251 (11th Cir. 2004). In making the certification decision, the Court does ***not*** determine whether plaintiffs will ultimately prevail on the merits. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974)). But it may consider the factual record in deciding whether the requirements of Rule 23 are satisfied. *Valley Drug. Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1188 n.15 (11th Cir. 2003). Courts "formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Waste Mgmt. Holdings v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000). In other words, the Court undertakes "an analysis of the issues and the nature of required proof at trial to determine whether the matters in dispute and the nature of plaintiffs' proofs

are principally individual in nature or ***are susceptible of common proof*** equally applicable to all class members." *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 334 (E.D. Mich. 2001) (emphasis added) (quoting *Little Caesar Enters., Inc. v. Smith*, 172 F.R.D. 236, 241 (E.D. Mich. 1997)).

In this case, the record supports certification of the Class. By proving their own case, the named Plaintiffs will succeed in proving absent Class members' claims against Chase.

## A.    Plaintiffs and This Case Satisfy the Requirements of Rule 23(a)

Rule 23(a) requires a party seeking class certification to satisfy four prerequisites: (i) numerosity; (ii) commonality; (iii) typicality; and (iv) adequacy of representation. *Klay*, 382 F.3d at 1250.

### 1.    The Class Is So Numerous that Joinder of All Members Is Impracticable

Rule 23(a)(1) requires that the proposed Class be so numerous that joinder of all members is impracticable. Joinder need not be impossible; the rule only requires that the difficulty or inconvenience of joining all members make use of the class action appropriate. "[A] numerical yardstick is not the determinant for class certification; rather a court should examine the numbers involved to see if joinder of all is impossible or impracticable." *Hastings-Murtagh v. Texas Air Corp.*, 119 F.R.D. 450, 459 (S.D. Fla. 1988) (King, J.). Courts in the Southern District and the Middle District have found numerosity where the class numbered 500, 4,700 and 9,000. *See Brown*, 212 F.R.D. at 604 (9,000); *Miles v. America Online, Inc.*, 202 F.R.D. 297 (M.D. Fla. 2001) (4,700); *CV Reit, Inc. v. Levy*, 144 F.R.D. 690, 696 (S.D. Fla. 1992) (500).

This case easily satisfies the numerosity requirement. Although the exact number of Class members is unknown at this time, Chase's discovery responses indicate that the proposed Class is

comprised of millions of Chase customers, making joinder of them all impracticable if not impossible.

### 2.    There Are Questions of Law and Fact Common to All Class Members

Rule 23(a)(2) requires that there be questions of law or fact common to the class. The "commonality" requirement of Rule 23(a)(2) "is a 'low hurdle' easily surmounted." *Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. 54, 63 (D. Mass. 1997) (citations omitted); *see also Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 490 (S.D. Fla. 2003) (commonality threshold is "not high"). It only requires "at least one issue common to all class members." *Brown*, 212 F.R.D. at 604. Where the defendant is alleged to have "engaged in a standardized course of conduct that affects all class members," commonality is satisfied. *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 685-86 (S.D. Fla. 2004); *see also Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 74 (E.D.N.Y. 2004) ("claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action"). Moreover, "Plaintiffs' legal claims need not be completely identical and factual differences concerning treatment or damages will not defeat a finding of commonality." *Brown*, 212 F.R.D. at 604.

The Class satisfies the commonality test. The allegations and proof (summarized above) focus on the existence, scope, duration and efficacy of Chase's scheme. The liability proof will place the actions of Chase at center stage – proof common to all of the millions of Class members: Chase's disclosures to all Class members were standardized and materially uniform, as were its re-sequencing policies; Chase's debit card transaction re-sequencing was done using automated computer programs for all Class members; and Chase assessed all Class members overdraft fees based on re-sequencing.

Thus, while only one question of law *or* fact is required, there are many questions of law and fact common to the proposed Class, including whether Chase:

- Disclosed and/or refused to allow its Class members to opt out of the overdraft program and secret line of credit;

- Alerted Class members that a debit card transaction would trigger an overdraft fee if processed and provided them with an opportunity to cancel the transaction;

- Manipulated and re-ordered transactions in order to increase the number of overdraft fees imposed;

- Imposed overdraft fees when, but for re-sequencing, there would be sufficient funds in the account;

- Delayed posting transactions so that Class members were charged overdraft fees even when sufficient funds were in the account to cover the transactions; and

- Breached its contracts and covenant of good faith and fair dealing with Plaintiffs and the Class; engaged in practices that were substantively and procedurally unconscionable; was unjustly enriched at the expense of Plaintiffs and the Class; converted Plaintiffs' and the Class' property and violated various consumer protection statutes.

Other common questions of law and fact include the proper method by which to measure damages and the declaratory relief to which the Class is entitled.

### 3. Plaintiffs' Claims Are Typical of Those of the Class

Rule 23(a)(3) requires that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." This "typicality" requirement is met when the claims of the representative plaintiffs arise from the same course of conduct that gives rise to the claims of the other class members, and where the claims are based upon similar legal theories and are not antagonistic to those of the class. *Pottinger v. Miami*, 720 F. Supp. 955, 959 (S.D. Fla. 1989). Typicality and commonality are related, with commonality referring to the group characteristics of the class as a whole, and typicality focusing on the named plaintiffs' claims in relation to the class. *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. at 686 n.23.

- 30 -

Typicality does not require identical claims or defenses, and a "factual variation will not render a class representative's claim atypical unless the factual position of the representative markedly differs from that of other members of the class." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984). Indeed, any alleged typicality between the named plaintiffs' claims and those of the class "must be clear and must be such that the interests of the class are placed in significant jeopardy." *Walco Invs., Inc. v. Thenen*, 168 F.R.D. 315, 326 (S.D. Fla. 1996). Nor do variations in the amount of damages vitiate typicality. *Kornberg*, 741 F.2d at 1337; *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. at 687.[22]

Plaintiffs' claims here arise out of the same course of conduct and are based on the same legal theories as those of the absent Class members. Each Plaintiff and member of the Class, governed by common and materially similar agreements, was subjected to Chase's practice of re-sequencing debit card transactions from high-to-low, and was assessed overdraft fees a result. Plaintiffs and the Class seek redress via common legal claims for breach of the duty of good faith and fair dealing, unjust enrichment, unconscionability, conversion and violations of certain state consumer protection statutes. Thus, the claims of Plaintiffs and the Class arise from the same course

---

[22] Courts have consistently refused to deny class certification where the named plaintiffs may have been subject to unique defenses such as lack of reliance, statute of limitations, or compulsory counterclaims. *See, e.g., Margaret Hall Found. v. Atlantic Fin. Mgmt.*, 1987 U.S. Dist. Lexis 7528, at *7 (D. Mass. Jul. 30, 1987) ("possible statute of limitations defenses, like possible nonreliance defenses, do not vitiate typicality"); *Lessard v. Metropolitan Life Ins. Co.*, 103 F.R.D. 608, 611 (D. Me. 1984) (holding that named plaintiff is not atypical because she may be subject to compulsory counterclaims). This is because "typicality refers to the nature of the claims of the representative, not the individual characteristics of the plaintiff." *Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. at 687 (quoting *In re Playmobile Antitrust Litig.*, 35 F. Supp. 2d 231, 242 (E.D.N.Y. 1998)). It is only when a unique defense "will consume the merits of a case that a class should not be certified." *In re Synthroid Mktg. Litig.*, 188 F.R.D. 287, 291 (N.D. Ill. 1999). Chase can make no such showing here.

- 31 -

of Chase's conduct and are based on the same legal theories, thereby satisfying Rule 23(a)(3). Moreover, Plaintiffs propose discrete multi-state subclasses for some of the state law claims to ensure the proposed class representatives' claims are materially identical to all other Class members that they seek to represent.[23] *See infra* at 47-54.

### 4. Plaintiffs Will Fairly and Adequately Protect the Interests of the Class

Rule 23(a)(4) requires that the representative parties will "fairly and adequately protect the interests of the class." This requirement is satisfied when (i) the class representatives have no interests conflicting with the class; and (ii) the representatives and their attorneys will properly prosecute the case. *Sosna v. Iowa*, 419 U.S. 393, 403 (1975); *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d at 1189. Both prongs are satisfied here.

### a. Plaintiffs' Interests Do Not Conflict With the Interests of the Class

Adequacy exists where the named plaintiffs share common interests with the class members and seek the same type of relief for themselves as they seek for the class. *Pottinger*, 720 F. Supp. at 959. The existence of minor conflicts of interest between the plaintiffs and the class "alone will not defeat a party's claim to class certification: the conflict must be a 'fundamental' one going to the specific issues in controversy." *Valley Drug*, 350 F.3d at 1189. A fundamental conflict exists where the economic interests and objectives of the class representatives "differ significantly from the economic interests and objectives of unnamed class members," such as when other members of the

---

[23] As previously noted, Plaintiffs intend to seek the appointment of Valerie Williams, Megan Biss, Billy Martin Ruiz and Deborah Ruiz, John D. Kirkland, Jacqueline Miller, Thomas Larsen, Brent Lowe, Jennifer Palacios and Martin Palacios and Angela Walsh-Duffy as additional class representatives if the Eleventh Circuit affirms this Court's Order denying Chase's motion to compel arbitration.

Class actually benefitted from the conduct challenged by the plaintiffs. *Id.* at 1189-90. No such fundamental conflict exists here.

Neither the Plaintiffs nor their counsel have any interests that are antagonistic to those of the absent Class members. The central issues in this case – the existence, unlawfulness and effect of Chase's scheme to manipulate debit card transactions and increase the number of overdraft fees assessed – are common to the claims of Plaintiffs and the other members of the Class. Each representative Plaintiff, like each absent Class member, has a strong interest in proving Chase's scheme, establishing its unlawfulness, demonstrating the impact of the illegal conduct, and obtaining redress. Certainly, no Class member has an interest in paying ***more*** overdraft fees, and there is no colorable argument to be made that Chase's assessment of excessive overdraft fees benefitted the Class. As Plaintiffs prove their own claims, they also will be proving the claims of hundreds-of-thousands of absent Class members. Plaintiffs thus "share the true interests of the class." *Texas Air*, 119 F.R.D. at 459; *see also Tefel v. Reno*, 972 F. Supp. 608, 617 (S.D. Fla. 1997) (King, J.) (the "common goal of each member of the class" is to remedy the unlawful conduct, and "[i]f the Plaintiffs succeed, the benefits will inure to all class members."). There is no conflict between the Plaintiffs and the absent Class members, and Plaintiffs satisfy the requirements of Rule 23(a)(4).

### b.  Plaintiffs' Counsel Are Qualified

Class counsel must be qualified to represent the Class, and the Plaintiffs must participate in the prosecution of the litigation. *Brown*, 212 F.R.D. at 605. The law firms seeking to represent the Class here include very qualified lawyers experienced in the successful prosecution of consumer class actions, and they have collectively recovered billions-of-dollars for class members in other litigation. To support the determinations required under Fed. R. Civ. P. 23(a)(4) and 23(g), the firms seeking appointment as Class Counsel, including those appointed to leadership positions in the

Court's prior orders, each provide a firm resume setting forth their experience and expertise in class actions. *See* Ex. 60.[24] These firms and their co-counsel stand ready, willing and able to devote the resources necessary to litigate this case vigorously and to see it through to the best possible resolution. And Plaintiffs have expressed their commitment to overseeing the attorneys and participating in the prosecution of the case.[25]

**B.      Plaintiffs and This Case Satisfy the Requirements of Rule 23(b)**

In addition to establishing the elements of Rule 23(a), Plaintiffs also must show that they satisfy at least one of the conditions of Rule 23(b). *Klay*, 382 F.3d at 1250. Under Rule 23(b)(3), certification is appropriate if: (i) common questions of law or fact predominate over questions affecting the individual class members only; and (ii) class treatment is superior to other methods available for adjudicating the controversy.

**1.      Common Questions of Law or Fact Predominate**

**a.      Common Issues Predominate Because Legal and Factual Questions Here Will Be Resolved with Proof Common to All Plaintiffs and Class Members**

"Common issues of fact and law predominate if they 'have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief.'" *Klay*, 382 F.3d at 1255 (quoting *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 699 (N.D. Ga. 2001)); *see also Moore v. Painewebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002)

---

[24]  These firms are Alters Law Firm, P.A.; Podhurst Orseck, P.A.; Grossman Roth, P.A.; Baron & Budd, P.C.; Golomb & Honik, P.C.; Lieff Cabraser Heimann & Bernstein LLP; Trief & Olk; and Webb, Klase & Lemond, L.L.C.

[25]  *See* Declarations of Estella Lopez, Linda McDaniel, Charles Reed, Jr., John Stone and Andrea Luquetta, which are included in Appendix II.

(Common issues predominate "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."). It is not necessary that all questions of law or fact be common; only some questions must be common, and they must predominate over individual questions. *Klay*, 382 F.3d at 1254; *see also In re Visa Check/Master Money Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001) (the rule "calls only for predominance, not exclusivity, of common questions").

The predominance inquiry seeks to determine the evidentiary effect of adding plaintiffs to the Class. If adding more plaintiffs requires the introduction of "significant amounts of new evidence," this suggests that individual issues are important. Conversely, if adding more plaintiffs leaves the amount of evidence needed to prove the claims "relatively undisturbed," common issues likely predominate. *Klay*, 382 F.3d at 1255.

Numerous courts have held that "the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate." *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003) (citing *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 139 (2d Cir. 2001)).

Rule 23(b)(3) is satisfied here. As the evidentiary proffer summarized above and in the accompanying Trial Plan demonstrate, the salient evidence necessary to establish Plaintiffs' claims is common to both Plaintiffs and all members of the Class; they all seek to prove that Chase's high-to-low re-sequencing practice was wrongful. And the evidentiary presentation changes little if there are 100 class members or 100,000: in either instance, Plaintiffs would present the ***same*** evidence, *inter alia*, of (i) Chase's form adhesion contracts, with similar terms, applicable to ***all*** Plaintiffs and Class

- 35 -

members;[26] (ii) Chase's systematic re-sequencing of debt transactions from high-to-low for **all** Plaintiffs and Class members through its automated software programs;[27] and (iii) the "Matrix" shadow line of credit that Chase secretly established for **all** Plaintiffs and Class members in order to charge them overdraft fees.[28]  In the words of the Eleventh Circuit, the foregoing evidence has a direct impact on every Class member's effort to establish liability and on every Class member's entitlement to relief.  *Klay*, 382 F.3d at 1255; *see also id.* at 1257.  Therefore, common issues predominate.

In certifying the class in *Gutierrez v. Wells Fargo Bank, N.A.*, 2008 U.S. Dist. LEXIS 70124, at *48-*49 (N.D. Cal. Sept. 11, 2008), U. S. District Judge William Alsup found that common issues predominated in a similar case against Wells Fargo:

> The challenged practice is a standardized one applied on a routine basis to all customers. . . .  [I]ndividual variations will not predominate over the pervasive commonality of the highest-to-lowest method and its adverse impact on hundreds of thousands of depositors.

---

[26]  *See, e.g.*, Ex. 29 at 25 (Chase agreement provided throughout the class period that "the Bank may, at its sole discretion, authorize the transaction.  If the Bank authorizes a transaction that over draws your Account, the Bank may assess a fee and or charge interest for any overdraft against your Account.").

[27]  Posting occurs in the DDA system, and the re-sequencing protocols are set forth in a "DDA Manual," which serves as Chase's central guide for all functions related to accounts.  Ex. 1 at 62:8-63:17; Ex. 2 at 113:5-14:7; *see also* Ex. 7 (Monetary Transaction Code Posting Priority Table); Ex. 6 (Overdraft and Un-Posted Item Processing).  A single internal transaction code groups all relevant transactions (each of which is designated by an "external transaction code") and then sorts them by amount, highest to lowest.  Ex. 2 at 99:15-102:5, 113:5-14:7.  The DDA system also assesses overdraft fees.  *Id.* at 136:6-24.

[28]  Ex. 47; *see also* Ex. 1 at 195:2-3; Ex. 7 (DDA Manual set forth the uniform factors and technical processes for Matrix).

In rejecting Wells Fargo's motion to decertify the class on the eve of trial, Judge Alsup again concluded that "there is no question that common questions predominate in this action." *Gutierrez v. Wells Fargo Bank, N.A.*, 2010 U.S. Dist. LEXIS 29117, at *41 (N.D. Cal. Mar. 26, 2010). The Court also noted:

> The legal claims of the "re-sequencing" class target the alleged overcharging of overdraft fees for over a million different Wells Fargo customers. . . . All members of the "re-sequencing" class were charged overdraft fees due to defendant's accused high-to-low posting of transactions. The fees themselves, however, were only around $34 each. Given this backdrop, it cannot be disputed that a denial of class-certification would close the door of justice to a staggering amount of claimants. The deterrent value of class litigation and the desirability of providing recourse for the injured consumer who would otherwise be financially incapable of bringing suit clearly render the class action a viable and important mechanism in challenging an alleged fraud on the public. This is *especially* important here, where the allegedly unlawful practice disproportionately gouges those who maintain, due to choice or (more likely) financial hardship, a shallow amount of funds in their checking accounts. [*Id.*, at *40.]

Judge Alsup's certification decision in *Gutierrez* is even more persuasive given that consumer class actions are particularly appropriate where, as here, the defendant exhibits a common course of conduct. *See, e.g., Amchem Prods. Inc., v. Windsor*, 521 U.S. at 625 ("[p]redominance is a test readily met in certain cases alleging consumer . . . fraud"); *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248 (11th Cir. 2003); *Roper v. Consurve, Inc.*, 578 F.2d 1106 (5th Cir. 1978).

In *Allapattah Services*, Exxon dealers alleged that Exxon breached their agreements and violated the duty of good faith and fair dealing by overcharging them for fuel purchases. At issue was an "open price term" in Exxon's form contracts with each dealer, which permitted Exxon to adjust the price of the gasoline that it delivered in response to commercial dynamics in various distribution markets. Exxon used that clause to charge dealers a three percent processing fee on sales to consumers who paid by credit card. Exxon promised to offset this charge by reducing the

wholesale price that each dealer paid for the gasoline, actually provided the offset for approximately six months, but then stopped the offset without informing the dealers. 333 F.3d at 1251.

The Eleventh Circuit upheld certification of a class of 10,000 dealers in 35 states. In focusing on the materially similar nature of both the agreements and the breach, the Court rejected Exxon's plea that individual issues inherent in each dealer's breach of contract claim predominated:

> Because all of the dealer agreements were materially similar and Exxon purported to reduce the price of wholesale gas for all dealers, the duty of good faith was an obligation that it owed to the dealers as a whole. Whether it breached that obligation was a question common to the class and the issue of liability was appropriately determined on a class-wide basis.

*Id.* at 1261.[29] Just as Chase did, Exxon cheated all of the dealers in the exact same way. Thus, "[o]nce the plaintiffs proved that Exxon engaged in this behavior, each individual plaintiff's breach of contract claim was substantially advanced" by this class-wide evidence.[30] And so it is here.

Similarly, in *Roper*, the Fifth Circuit supported certification of a class of 90,000 credit card holders who accused a national bank of imposing usurious interest on the unpaid portion of prior bills. Common issues predominated even though an individual inquiry needed to be made into each class member's transaction history, a process that could be done systematically by the plaintiffs' expert using defendant's data. Defendants' billing program harmed each customer in the same way through the use of the same allegedly illegal formula; proof of this common course of conduct

---

[29] Notably, before appeal, the jury returned a special verdict in favor of the plaintiffs on a class-wide basis, *id.* at 1252, thereby demonstrating the manageability of the multi-state claims, which Exxon did not even bother to challenge on appeal.

[30] This quotation was how the *Klay* court described the import of *Allapattah Services* decision. *See* 382 F.3d at 1266.

substantially advanced all class members' claims.  The Court thus found that Rule 23(b)(3) was satisfied:

> This is a classic case for a Rule 23(b)(3) class action.  The claims of a large number of individuals can be adjudicated at one time, with less expense than would be incurred in any other form of litigation.  The claims are relatively small, said even by the plaintiffs to average less than $100 each, and the question of law is one that applies alike to all.   While it may be necessary to make individual fact determinations with respect to charges, if that question is reached, these will depend on objective criteria that can be organized by a computer, perhaps with some clerical assistance.  It will not be necessary to hear evidence on each claim.

578 F.2d at 1112.

As in the foregoing cases, Plaintiffs here challenge a uniform deception perpetrated on all Class members by Chase.  Once Plaintiffs prove Chase's common course of conduct, the claims of Plaintiffs and Class members are substantially advanced.  Common issues thus predominate.

### b.    Common Issues Will Also Predominate Because Chase's Records Will Be Used to Systematically Ascertain the Class and Calculate Each Class Member's Individual Damages

Chase maintains detailed records of the amounts of overdraft fees charged the Class members during the Class Period, in addition to the detailed transaction data that resulted in those charges. This information will be used to identify Class members and calculate the total, adverse impact to the Class.  Olsen Decl., at ¶¶35-39.

These records, as well as the documents generated from those records, are maintained by Chase.  *See id*. at ¶¶35-38.  Although the data may be time-consuming to analyze, this transaction information will be used to identify class members and calculate the adverse impact to the Class. *See id*. at ¶39.  Chase records will be used to re-create account histories, transaction by transaction, provide a complete list of debits and credits posted to an individual account on any given day, as well as the number and amount of overdraft fees incurred.  *See id.*; *see also* Ex. 46 at 20:23-21:3; 28:16-43:5 & Ex. 1 thereto (charts of transactions produced for each of the named plaintiff's

- 39 -

accounts). It thus becomes possible to identify those customers who received excessive overdraft fees due to high-to-low posting order. Olsen Decl., ¶39.

Damages will be calculated using these same records. In addition to overdraft fees, Plaintiffs' expert will analyze available data concerning fee reversals and account charge-offs as he did in the *Gutierrez* case. *See id.* at ¶¶24-28. Reversals to individual class members can be verified by cross-referencing reversal data with individual account statements, which also reflects this information. These reversals and charge-offs will be deducted during the damages calculation. *See id.* at ¶¶28, 38-39.

By taking the difference between the overdraft fees that Chase collected and the overdraft fees that it ***would have*** collected had it used a chronological order, Plaintiffs will be able to determine precisely the number of excessive overdrafts for each Plaintiff. *Id.* at ¶39. The resulting figure will represent Plaintiffs' damages, which also equates to the revenue Chase enjoyed from its egregious high-to-low reordering scheme and re-grouping of transaction types, done for the purpose of bilking customers out of fees even though there was money available in their accounts at the time of the transaction.

Courts regularly certify classes where the defendant's records can be mined to identify class members and the harm that they suffered. For instance, in *Roper v. Consurve, Inc.*, 578 F.2d 1106, the plaintiffs' expert testified that he could utilize the bank's detailed computer data to isolate the amount of interest that was usurious. He would do this by determining billing dates, charges, credits, finance charges, payment, and payment dates for each cardholder, thereby "reconstruct[ing] every account in full by again processing the transactions." *Id.* at 1109-10. The Fifth Circuit found this methodology sufficed to ensure that individual issues did not swamp the common ones. *Id.*; *see also Smilow v. Southwestern Bell Mobile Sys.*, 323 F.3d at 40 (common issues predominate "where

individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria – thus rendering unnecessary an evidentiary hearing on each claim"); *Sadler v. Midland Credit Mgmt.*, 2009 U.S. Dist. LEXIS 26771, at *4-*5 (N.D. Ill. Mar. 31, 2009) (automated query of defendants' database would yield "objective criteria" necessary to ascertain the class); *Stern v. AT&T Mobility Corp.*, No. CV 05-8842, 2008 U.S. Dist. LEXIS 110305, at *12-*13 (C.D. Cal. Aug. 22, 2008) (defendants' business records provided sufficient information to identify individuals who purchased cellular telephone service and were enrolled in either one of the challenged services without ever having requested the service); *In re Diet Drugs Prods. Liab. Litig.,* 1999 U.S. Dist. LEXIS 13228, at *34-*35 (E.D. Pa. Aug. 26, 1999) (finding class definition was adequate because there were reliable means to determine who had actually taken the drug where fact sheets, prescription records, and records of medical treatment were available to verify consumption).

As in the foregoing cases, Class members here are readily ascertainable through objective criteria: Chase's own records of individuals who were assessed overdraft fees. Plaintiffs' expert will formulate calculations that can identify members of the Class simply by running queries in Chase's computer records. Such calculations would be merely ministerial in nature, and will not be plagued by resolution of individual Class member issues.[31]

Likewise, damages will be calculated using the same Chase records used to identify the Class members. Chase's posting practices will be compared to alternative posting models, such as

---

[31] In *Gutierrez v. Wells Fargo Bank, N.A.*, Plaintiffs' expert, Art Olsen, withstood Wells Fargo's *Daubert* challenge to his methodology and conclusions. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993). At the conclusion of the trial, Judge Alsup found Mr. Olsen's methodology to be "professional" and "careful," and the Court concluded that Mr. Olsen had "convincingly" identified the class members and isolated the amounts that were wrongfully taken by Wells Fargo from the class. *Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080, 1139 (N.D. Cal. 2010).

chronological posting, to calculate the damage to each Class member using an approach similar to that employed in *Gutierrez*. Olsen Decl., ¶¶38-40. Indeed, Mr. Olsen has already done so for a selection of the named Plaintiffs' transactions.[32] *Id.* at ¶¶41-45.

"[W]here damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification." *Klay*, 382 F.3d at 1259-60 (footnotes omitted). By applying an "algebraic formula" for the computation of damages, Plaintiffs meet the predominance requirement of Rule 23(b)(3) even if "the jury will also have to consider some individualized evidence in rendering individual damage calculations." *In re Terazosin Hydrochloride Antitrust Litig.*, 203 F.R.D. 551, 559 (S.D. Fla. 2001); *see also Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1310 (11th Cir. 2008) (class treatment appropriate where plaintiffs contended that damages could be determined "with relative ease through basic forensic accounting" using defendant's own data); *Pickett v. IBP, Inc.* 2001 U.S. Dist. LEXIS 22453, at *35 (MD. Ala. Dec. 21, 2001) ("If damages can be computed using 'statistical techniques, the existence of individualized damage claims does not pose a barrier to certification."); *Walsh v. Pittsburgh Press Co.*, 160 F.R.D. 527, 531 (W.D. Pa. 1994) (noting that where damages "are largely a matter of mathematical calculation" courts may find that common questions predominate); *Brown v. Pro Football*, 146 F.R.D. 1, 5 (D.D.C. 1992) (Where proof of injury and damages "breaks down on what may be characterized as 'virtually a mechanical task,' 'capable of mathematical or formula calculations,' the existence of individualized claims for damages seems to offer no barrier to class certification on grounds of manageability.") (quoting *Windham v. American Brands*, 565 F.2d 59, 68 (4th Cir. 1977)); *In re Brand Name Prescription*

---

[32] *See supra*, at n.17.

*Drugs Antitrust Litig.*, 1994 U.S. Dist. LEXIS 16658, at *13-*14 (N.D. Ill. Nov. 15, 1994) ("the possible complexity of a damage calculation" should not preclude class certification).

Plaintiffs will be able to use Chase's records to apply formulaic damage calculations, again demonstrating that common issues predominate.

### c.   Chase's Affirmative Defenses Do Not Vitiate Predominance

In scattershot fashion, Chase asserts a number of affirmative defenses. These defenses generally lack any detail or foundation, making it difficult for Plaintiffs to discern what they mean or what facts, if any, support them. Consequently, the defenses cannot serve to defeat class certification.

In this Court, affirmative defenses must meet the pleading standards of *Iqbal* and *Twombly*. *See Castillo v. Roche Labs., Inc.,* 2010 U.S. Dist. LEXIS 87681, at *5 (S.D. Fla. Aug. 2, 2010) (noting that "a majority of district courts in Florida have applied this heightened pleading standard to affirmative defenses."); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). Affirmative defenses that merely offer "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.; Mid-Continent Cas. Co. v. Active Drywall S., Inc.*, 2011 U.S. Dist. LEXIS 19978, at *6 (S.D. Fla. Feb. 25, 2011) (striking affirmative defense under *Twombly* because, as pled, it involved "nothing more than bare conclusions" without "any factual basis"). Because Chase's defenses do not meet the pleading standard, they are insufficient and cannot impede class certification. *See generally Torres v. TPUSA, Inc.*, 2009 U.S. Dist. LEXIS 22033, at *3-*5 (M.D. Fla. March 19, 2009) (holding that defenses that simply claim "statute of limitations," "waiver," and "estoppel" are insufficiently plead); *Pujals ex rel. El Rey De*

*Los Habanos, Inc. v. Garcia*, 2011 WL 1134989, at *6 (S.D. Fla. Mar. 28, 2011) (striking waiver

defense where defendants failed to allege "any facts detailing how Plaintiff waived his claims").[33]

In any event, it is clear that – even in their presently nascent, unsupported form – many of

Chase's affirmative defenses cannot defeat certification.  For example, the affirmative defenses of

failure to state a claim and preemption have already been denied by the Court under a Rule 12(b)(6)

standard.  *See, e.g.*, Dkt. No. 305; *see also Grovenor House, L.L.C. v. E.I. DuPont De Nemours &*

*Co.*, 2010 U.S. Dist. LEXIS 91905, at *10 (S.D. Fla. Aug. 12, 2010) (noting that a "Motion to

Dismiss addressing these exact arguments" was denied and thus the affirmatives defenses were

"clearly invalid as a matter of law" and dismissing them "with prejudice").  Other defenses simply

appear not to apply here, as they are unrelated to any of Plaintiffs' claims.  *See, e.g.*, Dkt. No. 501 at

14-15 (consent and assumption of risk).  This highlights the problems caused by thoughtless,

shotgun pleadings of the type propounded by Chase, permitting the Court to ignore or strike them.

*See, e.g., Torres*, 2009 U.S. Dist. LEXIS 22033, at *3.

Other purported affirmative defenses, even if debatably improper, apply equally to all

members of the proposed Class.  This leads courts to commonly find that affirmative defenses do not

upset the predominance of common issues as long as a sufficient constellation of common issues

binds the class together.  *See, e.g., Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st

Cir. 2000) (statute of limitations defenses do not vitiate Rule 23(b)(3) predominance); *Smilow v.*

---

[33] Further, "shotgun" pleadings such as Chase's affirmative defenses are frowned upon because they are asserted *en masse*, with little thought, and are indicative of automatic list-making rather than any serious consideration of applicable defenses.  Accordingly, courts are encouraged to dismiss them *sua sponte.  See, e.g., Byrne v. Nezhat*, 261 F. 3d 1075, 1132-33 & n.114 (11th Cir. 2001) (explaining the district court's duty to dismiss shotgun pleadings *sua sponte*, whether they be in a complaint or an answer); *see also* Fed. R. Civ. P. 12(f) (noting that a court "may strike from a pleading an insufficient defense . . . on its own").

*Southwestern Bell Mobile Sys.*, 323 F.3d at 39 ("Courts traditionally have been reluctant to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be available against individual members.") (waiver defense common to the class); *see also Allapattah Servs.*, 333 F.3d at 1262-63 (jury was instructed on statute of limitations and law of fraudulent concealment in 35 states). Thus, if Chase can present sufficient facts to survive a motion for summary judgment, the jury can readily decide their application on a class-wide basis. *See, e.g.*, Dkt. No. 501 at 14 (voluntary action); *id.* at 13 (statutes of limitations); *id.* at 15 (unclean hands). Other defenses will apply universally to all Class members, and thus militate in favor of, rather than against, class certification. *See, e.g., id.* (contractual interpretation). And some defenses can be dealt with, if need be, during the claims process. *See, e.g., id.* at 14 (setoff); *see also Allapattah Servs.*, 333 F.3d at 1259 (if liability is established, set-off claims can be handled on a class member-by-class member basis during claims administration).

### d.  Applying Multi-State Law Does Not Preclude Predominance

When seeking certification of a class for which the laws of several states potentially apply, the plaintiff bears the burden of demonstrating a suitable and realistic plan for trial of the class claims and must submit an extensive analysis showing that there are no material variations among the law of the states for which certification is sought. *Klay*, 382 F.3d at 1262.[34] "[I]f the applicable state laws can be sorted into a small number of groups, each containing materially identical legal

---

[34]  In a later decision, the Eleventh Circuit declined to explain precisely what "extensive" specifically means other than to say it must be "more than [] perfunctory." *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1180 (11th Cir. 2010).

standards, then certification of subclasses embracing each of the dominant legal standards can be appropriate." *Id.*[35]

Numerous courts have recognized that differences in state law can be appropriately managed in a class action when the core facts are common to the class. *See, e.g., In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 315 (3d Cir. 1998); *In re School Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir. 1986); *Hanlon v. Chrysler Corp*, 150 F.3d 1011, 1022 (9th Cir. 1998); *Hansen v. Monumental Life Ins. Co.*, 2008 U.S. Dist. LEXIS 112254, at *22-*29 (D. Conn. Mar. 6, 2008); *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 93-101 (D. Mass 2008); *Steinberg v. Nationwide Mut. Ins. Co.*, 224 at 76-80; *Shaw v. Toshiba Am. Info. Sys.*, 91 F. Supp. 2d 942, 956-57 (E.D. Tex. 2000); *Bussie v. Allmerica Fin. Corp.*, 50 F. Supp. 2d 59, 71 (D. Mass. 1999); *In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 962 F. Supp. 450, 525 (D.N.J. 1997); *Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. at 64; *In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271 (S.D. Ohio 1997); *Deadwyler v. Volkswagen of Am. Inc.*, 1986 U.S. Dist. LEXIS 28449, at *4-*5 (W.D.N.C. 1986).

The Court need not find complete uniformity of state law, only that there are no material conflicts among the laws so that they can be divided into a small number of sub-groups. *See Simon v. Phillip Morris*, 124 F. Supp. 2d 46, 77 (E.D.N.Y. 2000); *see also* American Law Institute, *Principles of the Law: Aggregate Litigation* §2.05(b) (2010) ("The court may authorize aggregate treatment of multiple claims, or of a common issue therein, by way of a class action if the court determines that (1) a single body of law applies to all such claims or issues; (2) different claims or

---

[35] In *Klay*, although the Court reversed certification of claims for breach of contract and unjust enrichment, the Court recognized that state law claims "based on a principle of law that is uniform among the states" can form a "realistic possibility" of certification. *Id.* at 1261.

issues are subject to different bodies of law that are the same in functional content; or (3) different claims or issues are subject to different bodies of law that are not the same in functional content but nonetheless present a limited number of patterns that the court . . . can manage by means of identified adjudicatory procedures.").

In *Prudential,* the Court endorsed the use of comprehensive surveys to demonstrate that certain state laws, including claims for breach of contract and the implied duty of good faith and fair dealing, are substantially similar, with any differences falling into a limited number of predictable patterns:

> Plaintiffs have demonstrated, consistent with the approach endorsed in *School Asbestos* and cited with approval in *Georgine,* that any state-by-state variations in the governing legal standards are manageable. . . . Plaintiffs have submitted a series of charts setting forth comprehensive analyses of the various states' laws potentially applicable to their common law claims for fraud, breach of contract, implied obligations of good faith and fair dealing, negligence, and negligent misrepresentation. . . . These charts compare state-by-state the elements of the claims alleged in the Second Amended Complaint with citations to the pertinent authorities in each of the fifty states – the same approach used in the School Asbestos litigation. The elements of these common law claims are substantially similar and any differences fall into a limited number of predictable patterns. Issacharoff Decl. at P 22 ("Any variations among legal standards [of the state laws] are neither particularly great nor insuperable to the certification of a litigation class. To the extent that such variations exist, they could be readily handled by instructions and structured questions to the jury and, if necessary, appropriate subclasses."). Thus, plaintiffs' claims can be grouped into a manageable number of categories accommodating any variations in the elements of the potentially applicable states' laws. . . . And, the Court finds that a manageable number of jury instructions could be fashioned to comport with the elements of the common law claims in the many jurisdictions.

962 F. Supp. at 525 (citations and footnotes omitted).

The plaintiffs in Prudential also submitted special verdict forms to illustrate that variations among potentially applicable state laws can be managed to permit a fair and efficient adjudication by the fact finder at trial. *Id*. at n.49. The Court ultimately certified a class of eight million consumers nationwide who purchased life insurance policies from Prudential, including claims for breach of

contract and implied obligations of good faith and fair dealing. The Third Circuit expressly affirmed the district court's predominance findings, which were based on the state law surveys submitted by the plaintiffs. *Id.* at 315.

In *Telectronics*, the Court rejected suggestions that nationwide classes could not be certified under Rule 23 and held that "minute and insignificant" differences in state law do not preclude certification. 172 F.R.D. at 292. Recognizing that state law is not universal, the Court carefully highlighted the appropriate inquiry for courts to make: "[C]an the relevant variations be dealt with in a simple and efficient manner?" *Id.* In conducting that inquiry, it is important for courts to distinguish between variations that "are pertinent to the issues being certified and those which are unimportant to these questions." *Id.* The Court further explained that a careful inquiry will ordinarily lead to three options: "(1) find that state law is sufficiently similar that a single class is appropriate, (2) find that the state law varies so much that class certification is inappropriate, or (3) find that state law variations can be categorized and then divided into subclasses." *Id.* Judge Spiegel chose the latter option and certified a nationwide class of implant recipients using subclasses.[36]

Accordingly, common issues of law and fact will remain the predominant focus of this litigation, notwithstanding the potential application of multiple states' laws. In denying the Defendants' omnibus motion to dismiss last year, this Court found that state laws governing the common law claims were materially similar: "Without conducting an extensive choice of law analysis, it appears that, for purposes of this motion, there are no relevant differences in how each state interprets these various causes of action." Dkt. No. 305 at 17. The Court also observed that

---

[36] The Sixth Circuit ultimately reversed certification of a no-opt-out settlement class on the basis of constitutional considerations. *See In re Telectronics Pacing Sys.*, 221 F.3d 870 (6th Cir. 2000). The Court, however, left intact Judge Spiegel's rationale supporting nationwide certification.

"Defendants generally acknowledge that the elements of the common law claims asserted are the same in every state." *Id.*[37]

Plaintiffs' Trial Plan, included in Appendix I, contains an extensive analysis of state law breach of contract/breach of the duty of good faith and fair dealing, unjust enrichment, unconscionability, the California Unfair Competition Law, and conversion. As the surveys demonstrate, variations are minimal. In those few instances where variations are material, Plaintiffs propose that the Court group state laws into subclasses, as contemplated by *Klay* and other authorities.[38] More specifically, Plaintiffs propose subclasses for each claim summarized as follows.[39]

**Breach of Contract and the Duty of Good Faith and Fair Dealing Subclasses.** In *Klay*, the Court "accept[ed] the proposition that the applicable state laws governing contract interpretation and breach are sufficiently identical to constitute common legal issues . . . ." 382 F.3d at 1263. As the Court vividly explained, determining breach is a simple question of contract interpretation that does not vary from state to state: "A breach is a breach, whether you are on the sunny shores of

---

[37] Plaintiffs submit that a lengthy choice of law analysis is not needed here given that Plaintiffs' concede that the laws of their home states, as well as the home states of all Class members, will apply.

[38] Rule 23 expressly authorizes subclasses: "When appropriate, a class may be divided into subclasses that are each treated as a class under this rule." Fed. R. Civ. P. 23(c)(5).

[39] Plaintiffs reserve their rights to later move to appoint additional Class representatives to represent additional subclasses and/or claims. *See* Fed. R. Civ. P. 23(c)(1)(C) (expressly permitting court to alter or amend an order granting or denying class certification before final judgment); *see, e.g., In re Cephalon Sec. Litig.*, No. 96-0633, 1998 U.S. Dist. LEXIS 12321, at *19 (E.D. Pa. Aug. 12, 1998) (granting plaintiffs' amended motion for class certification and appointing additional class representative).

- 49 -

California or enjoying a sweet autumn breeze in New Jersey." *Id.* at 1262-63.[40]  And, the Court in *In re Conseco Life Ins. Co. Lifetrend Ins. Sales & Mktg. Litig.*, 270 F.R.D. 521 (N.D. Cal. 2010), certified 48-state breach of contract class in a case involving form policy contracts and also found that "the law relating to the element of breach does not vary greatly from state to state." *Id.* at 529. As Plaintiffs' survey shows, this law is relatively uniform. *See* Trial Plan at 15-17 & Exhibit A. The few material variations that do exist can be managed through the creation of the four discrete subclasses identified in the Trial Plan. Notably, the four subclasses share common elements, with each requiring a valid contract; some level of bad faith, unreasonable conduct or interference with plaintiffs' expectations as to the contract by the defendant; and resulting damages. *Id.*

     ***Unjust Enrichment Subclasses.*** In *Terazosin Hydrochloride Antitrust Litigation*, Judge Seitz certified a 17-state unjust enrichment subclass, finding that unjust enrichment law is "virtually identical" from state to state. 220 F.R.D. at 697 n.40; *see also In re Mercedes Benz Tele Aid Contract Litig.*, 267 F.R.D. 113, 119 (D.N.J. 2010) (the minor variations in the elements of unjust

---

[40] Even though questions of contract law were common to the whole class, the *Klay* Court ultimately found certification of the breach of contract claims inappropriate given the individualized issues of fact they entailed. *Id.* at 1261. There were many different defendants with many different contracts with many different provider groups. Moreover, because the defendants breached the contracts through a variety of means and differing computer algorithms that were not subject to generalized proof, each physician would have to prove a variety of individual circumstances leading to the breach. *Id.* at 1263-64. The same problem bedeviled the proposed class in *Sacred Heart*, where there were substantial variations in the terms of over 300 hospital contracts that were individually negotiated, leading the Court to find that "the diversity of the material terms is overwhelming." 601 F.3d at 1171-72. The facts in *Klay* and *Sacred Heart* stand in sharp contrast to those here, where the agreements at issue are uniform form contracts offered on a take-it-or-leave it basis and were not the product of any individual negotiation. *See Sacred Heart*, 601 F.3d at 1171 ("It is the form contract, executed under like conditions by all class members, that best facilitates class treatment."). Nor do Plaintiffs here have to prove a variety of individual circumstances supporting the breach, as Chase's standard re-sequencing policy resulted in uniform conduct directed at all members of the Class.

enrichment in the laws of the various states are not material and do not create conflicts). This is confirmed by Plaintiffs' survey of unjust enrichment law, which supports the creation of four unjust enrichment subclasses. *See* Trial Plan at 17-18 & Exhibit B. Each subclass shares common elements given that almost all states base unjust enrichment on the Restatement (First) of Restitution §1 and require the presence of the following basic elements: (i) the plaintiff conferred a benefit; (ii) the defendant accepted or retained that benefit; (iii) under circumstances that would be unjust for the defendant to retain the benefit. Additional subclasses are then formed for those states that require an additional element of, respectively, defendant's appreciation of the benefit conferred, lack of an adequate remedy for the plaintiff, or defendant's wrongful conduct.[41]

*Unconscionability Subclass.* The law of unconscionability is substantially uniform across all states. All of the states, with the exception of Louisiana, have adopted statutes that are the same or substantially identical to Uniform Commercial Code ("U.C.C.") §2-302. The only difference between states is whether they require both procedural and substantive unconscionability, or just one of the two. Therefore, this minimal variation is easily managed through the creation of a single subclass. *See* Trial Plan at 19-20 & Exhibit C.

*California Unfair Competition Subclass.* The Court has ruled that Plaintiffs may only assert a state statutory claim if a named Plaintiff resides in that state. Dkt. No. 305 at 40. Plaintiffs seek to

---

[41] Other courts have likewise certified multi-state unjust enrichment classes. *See, e.g., In re Abbott Labs. Norvir Anti-Trust Litig.*, 2007 U.S. Dist. LEXIS 44459, at *9 (N.D. Cal. June 11, 2007) (certifying multi-state class of unjust enrichment claims); *Schumacher v. Tyson Fresh Meats, Inc.*, 221 F.R.D. 605, 612 (N.S.D. 2004) (certifying multi-state unjust enrichment claims for South Dakota and states with identical claims); *cf. Hoving v. Lawyers Title Ins. Co.*, 256 F.R.D. 555, 569-70 (E.D. Mich. 2009) (agreeing with courts that decided unjust enrichment doctrines are materially same); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 518 (E.D. Mich. 2003) (characterizing unjust enrichment standards in various states as "virtually identical").

certify a subclass on behalf of California Class members pursuant to Cal. Bus. & Prof. Code §17200, *et seq.* The elements required to prove UCL violations are set forth in Exhibit D to the Trial Plan.

  ***Conversion Subclasses.*** Plaintiffs do not propose grouping state laws for purposes of creating multi-state subclasses for conversion. Instead, Plaintiffs seek to certify single-state subclasses for states in which certain named Plaintiffs reside (Florida and Louisiana). *See* Trial Plan at 20 & Exhibit E.

  As further evidence demonstrating the manageability of applying multi-state law in this case, Plaintiffs also provide the Court with Proposed Special Verdict Forms that encapsulate the salient elements of each cause of action and account for the minor state law variations. The Proposed Special Verdict Forms are attached as Exhibit F to the Trial Plan. As these proposed forms demonstrate, the differences that do exist among state laws can easily be taken into account, thus ensuring careful adherence to legal requirements and eliminating any manageability issues.

**2. A Class Action Is Superior to the Adjudication of Thousands of Separate Individual Cases**

  The superiority analysis of Rule 23(b) requires that the Court examine whether the class action is superior to other methods of adjudication. Fed. R. Civ. P. 23(b)(3). The focus is "not on the convenience or burden of a class action suit *per se*, but on the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *Klay*, 382 F.3d at 1269. As the *Klay* Court recognized, there are four non-exhaustive factors a court should consider in assessing whether a class action is superior to individual litigation:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; [and]

> (D) the difficulties likely to be encountered in the management of a class action.

*Id.* (citing Fed. R. Civ. P. 23(b)(3)). All of these factors favor class treatment here.

With respect to the first factor, nearly all of the Class members in this case have claims that are so small that it would cost them much more to litigate an individual case than they could ever hope to recover in damages. Thus, "[t]here is no reason to believe that the putative class members in this case have any particular interest in controlling their own litigation[.]" *Id.*

The second superiority factor also favors class certification. Numerous class action lawsuits based on the same facts at issue here have been filed against Chase and other bank defendants. Through the MDL process, those cases were transferred to this Court and are part of this consolidated litigation, along with a few individual cases. That the Judicial Panel on Multidistrict Litigation chose this Court to be the transferee court is one indication that having a single case – as opposed to multiple cases – makes sense.

Concentrating the litigation in this forum is also logical and desirable for other reasons, which tilt the third superiority factor in favor of certification. First, through handling defendants' serial motions to dismiss, and numerous discovery disputes, this Court has become familiar with the factual and legal issues. *Id.* at 1271 ("it is desirable to concentrate claims in a particular forum when that forum has already handled several preliminary matters"). As this Court recognized in *Texas Air*, controversies are often "best managed as a class action, for this method allows all the [parties] to conduct all relevant discovery without repetition." 119 F.R.D. at 460. Second, holding separate trials for claims that could be tried together would be costly, inefficient and burden the court system; they should instead be tried together. *Klay*, 382 F.3d at 1270. Neither the parties nor the judicial system would benefit from redundant litigation in these matters. *See In re Brand Name Prescription*

- 53 -

*Drugs Antitrust Litig.*, 1994 U.S. Dist. Lexis 16658, at *15 (N.D. Ill. Nov. 18, 1994) ("[w]e fail to see the logic in defendants' contention that 50,000 individual actions are less complex than a single class action"). Indeed, "[w]here predominance is established, this consideration will almost always mitigate in favor of certifying a class." *Klay*, 382 F.3d at 1270. Third, the small value of the individual claims supports certification, especially, as here, the amounts in controversy make it unlikely that individual plaintiffs could find legal representation on a contingency fee basis "when the defendants are corporate behemoths with a demonstrated willingness and proclivity for drawing out legal proceedings for as long as humanly possible and burying their opponents in paperwork and filings." *Id.* at 1271.

The final superiority factor – manageability – focuses on the "practical problems that may render the class action format inappropriate for a particular suit." *Eisen*, 417 U.S. at 164. The question is whether multiple individual lawsuits would be more manageable than a class action, and not whether a class here will create significant management problems. *Klay*, 382 F.3d at 1273. Indeed, this fourth factor "will rarely, if ever, be in itself sufficient to prevent certification." *Id.* at 1272; *see also Visa Check/MasterMoney*, 280 F.3d at 140 (refusal to certify a class solely on grounds of manageability is disfavored and "should be the exception rather than the rule"); *In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322, 356 (E.D. Pa. 1976) ("denial of class certification because of suspected manageability problems is disfavored"). Here, Plaintiffs cannot foresee any serious manageability problems and certainly none that make thousands of individual actions a better alternative. This is particularly true given the recent experience in the *Gutierrez* case, which involved very similar facts and claims and a class of hundreds-of-thousands of members. As discussed in more detail above, Plaintiffs' Trial Plan, the extensive analysis of applicable law

- 54 -

provided in its accompanying surveys, and the proposed Special Verdict Forms, these issues will be resolved based upon common proof.  Simply put, this case can be tried in an efficient manner.

## IV.    CONCLUSION

Plaintiffs satisfy all of the elements of Rule 23(a) and (b)(3).  The class action mechanism is not only the best and most efficient way to adjudicate the Class members' claims in this case, it is also the only viable method of doing so.  For all of the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion to certify the Class pursuant to Fed. R. Civ. P. 23(b)(3).

DATED:  April 25, 2011.

Respectfully submitted,

Aaron S. Podhurst, Esquire
Florida Bar No. 063606
apodhurst@podhurst.com
Robert C. Josefsberg, Esquire
Florida Bar No. 40856
rjosefsberg@podhurst.com
Peter Prieto, Esquire
Florida Bar No. 501492
pprieto@podhurst.com
John Gravante, III, Esquire
Florida Bar No. 617113
jgravante@podhurst.com
PODHURST ORSECK, P.A.
City National Bank Building
25 W. Flagler Street, Suite 800
Miami, FL 33130
Tel: 305-358-2800
Fax: 305-358-2382

Bruce S. Rogow, Esquire
Florida Bar No. 067999
brogow@rogowlaw.com
Jeremy W. Alters, Esquire
Florida Bar No. 0111790
jeremy@alterslaw.com
ALTERS LAW FIRM, P.A.
4141 N.E. 2nd Avenue
Suite 201
Miami, FL 33137
Tel: 305-571-8550
Fax: 305-571-8558

*Co-Lead Counsel for Plaintiffs*

Robert C. Gilbert, Esquire
Florida Bar No. 561861
rcg@grossmanroth.com
Stuart Z. Grossman, Esquire
Florida Bar No. 156113
szg@grossmanroth.com
David Buckner, Esquire
Florida Bar No. 60550
dbu@grossmanroth.com
Seth E. Miles, Esquire
Florida Bar No. 3855830
sem@grossmanroth.com
GROSSMAN ROTH, P.A.
2525 Ponce de Leon Boulevard
Eleventh Floor
Coral Gables, FL 33134
Tel: 305-442-8666
Fax: 305-779-9596

*Coordinating Counsel for Plaintiffs*

/s/ E. Adam Webb
E. Adam Webb, Esquire
Georgia Bar No. 743910
Adam@WebbLLC.com
Matthew C. Klase, Esquire
Georgia Bar No. 141903
Matt@WebbLLC.com
G. Franklin Lemond, Jr., Esquire
Georgia Bar No. 141315
FLemond@WebbLLC.com
WEBB, KLASE & LEMOND, L.L.C.
1900 The Exchange, S.E.
Suite 480
Atlanta, GA 30339
Tel: 770-444-9325
Fax: 770-444-0271

/s/ Michael W. Sobol
Michael W. Sobol, Esquire
California Bar No. 194857
msobol@lchb.com
David S. Stellings, Esquire
New York Bar No. 2635282
dstellings@lchb.com
Roger N. Heller, Esquire
California Bar No. 215348
rheller@lchb.com
Jordan Elias, Esquire
California Bar No. 228731
jelias@lchb.com
LIEFF CABRASER HEIMANN &
  BERNSTEIN L.L.P.
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
Tel: 415-956-1000
Fax: 415-956-1008

/s/ Russell W. Budd
Russell W. Budd, Esquire
Texas Bar No. 03312400
rbudd@baronbudd.com
Bruce W. Steckler, Esquire
Texas Bar No. 00785039
bsteckler@baronbudd.com
Mazin A. Sbaiti, Esquire
Texas Bar No. 24058096
msbaiti@baronbudd.com
BARON & BUDD, P.C.
3102 Oak Lawn Avenue
Suite 1100
Dallas, TX 75219
Tel: 214-521-3605
Fax: 214-520-1181

/s/ Ruben Honik
Ruben Honik, Esquire
Pennsylvania Bar No. 33109
rhonik@golombhonik.com
Kenneth J. Grunfeld, Esquire
Pennsylvania Bar No. 84121
kgrunfeld@golombhonik.com
GOLOMB & HONIK, P.C.
1515 Market Street
Suite 1100
Philadelphia, PA 19102
Tel: 215-985-9177
Fax: 215-985-4169

/s/ Ted E. Trief
Ted E. Trief, Esquire
New York Bar No. 1476662
ttrief@triefandolk.com
Barbara E. Olk, Esquire
New York Bar No. 1459643
bolk@triefandolk.com
TRIEF & OLK
150 E. 58th Street
34th Floor
New York, NY 10155
Tel: 212-486-6060
Fax: 212-317-2946

*Plaintiffs' Executive Committee*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 09-MD-02036-JLK

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

### CERTIFICATE OF SERVICE

I hereby certify that on April 25, 2011, I filed the foregoing document with the Clerk of the

Court.  I also certify that the foregoing document is being served this day, via Federal Express, on

Christopher R. Lipsett, Esquire, David S. Lesser, Esquire, Wilmer Cutler Pickering Hale & Dorr,

LLP, 399 Park Avenue, New York, New York 10022; and Peter W. Homer, Esquire, Homer Bonner,

P.A., 1441 Brickell Avenue, Suite 1200, Miami, Florida 33131.

Robert C. Gilbert, Esquire
Florida Bar No. 561861
GROSSMAN ROTH, P.A.
2525 Ponce de Leon Boulevard
Eleventh Floor
Coral Gables, FL 33134
Tel: 305-442-8666
Fax: 305-779-9596