# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

## Case No. 1:09-MD-02036-JLK

| | |
|---|---|
| **IN RE:  CHECKING ACCOUNT OVERDRAFT LITIGATION** | ) ) ) ) |
| **MDL No. 2036** | ) ) |
| | ) |
| **THIS DOCUMENT RELATES TO: FIRST TRANCHE ACTIONS** | ) ) ) |
| *Tornes, et al. v. Bank of America, N.A.* S.D. Fla. Case No. 1:08-cv-23323-JLK | ) ) ) |
| *Yourke, et al. v. Bank of America, N.A.* S.D. Fla. Case No. 1:09-cv-21963-JLK N.D. Cal. Case No. 3:09-2186 | ) ) ) ) |
| *Phillips, et al. v. Bank of America, N.A.* S.D. Fla. Case No. 1:10-cv-24316-JLK W.D. Okla. Case No. 5:10-cv-01185-R | ) ) ) ) |

## OPPOSITION OF RICHARD HASTINGS AND JANEL BUYCKS TO PLAINTIFFS' MOTION TO REQUIRE POSTING OF APPEAL BONDS BY OBJECTOR-APPELLANTS

## I.      INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs move to require appellants, including Richard Hastings and Janel Buycks ("Appellants"), to post appeal bonds totaling $621,338.  Of this amount, only $5,000 is for "costs taxable under Rule 39(e) . . . ."  (Plaintiffs' Motion to Require Posting of Appeal Bonds By Objector-Appellants ("Motion"), at 8.)  The remaining $616,338 "represents two years' compounded interest at the current federal post-judgment rate (0.11%) on $280,000,000, which is the amount of the Settlement minus attorneys' fees . . . ."  (*Id*. at 7 n.3, 15.)  Plaintiffs urge the Court to include this amount in an appeal bond, "representing the estimated loss of use of the Net Settlement Fund to Settlement Class Members during the pendency of this appeal," equal to "the minimum that the Class could earn if its money were invested in these safe and secure investments" (*i.e.*, U.S. Treasury Bills).  (*Id*. at 8-9.)

Even assuming, *arguendo*, that damages for "loss of use" *were* properly includable in an appeal bond (they are not), they would not be includable in *this* case, for the simple reason that the Settlement Agreement, and the Court's orders, required Class Counsel to invest the Settlement Fund in Treasury Bills or other "interest-bearing short-term instruments," accruing interest for distribution to Settlement Class Members *pro rata*.[1]  Class Counsel, entrusted with the responsibility of investing $410 million in client funds in interest-bearing instruments – and having retained skilled professionals (at Settlement Class Members' expense) to assist them in that task – instead deposited the Settlement Fund in a non-interest bearing account.

Appellants are not a "profit center" for the Settlement Class.  There is no need for a bond to secure a "double recovery" of interest to which the class is not entitled.  The remedy for Class Counsel's defalcation lies not in the pockets of Appellants.  Class Counsel should be ordered –

---

[1] The interest sought by Plaintiffs amounts to less than five cents per Settlement Class Member ($616,338/13.8 million = $0.044), and is clearly intended to deter these legitimate appeals.

[2] (*See* Settlement Agreement ¶ 47 ("within fourteen calendar days of Preliminary Approval, BofA shall deposit the sum of Four Hundred Ten Million Dollars ($410,000,000.00) into the

*again* – to invest the Settlement Fund as required by the Settlement Agreement, and the interest already lost to Settlement Class Members should be recaptured from Class Counsel's fee award.

Plaintiffs' motion fails on the law, as well as the facts. Blurring the distinction between a bond for "costs on appeal" under FRAP 7 and a supersedeas bond, Plaintiffs suggest that the Court may include damages for delay resulting from an appeal under the former, while arguing for it under the latter. Damages for delay may not be included in a Rule 7 bond for costs, regardless of the alleged motives of Appellants, or the merit of their appeal, because no statute authorizes the recovery of delay damages as a "cost." Nor may a supersedeas bond be required of Appellants, who have not sought a stay pending appeal, as almost every court to consider the matter has expressly held.

Effective January 1, 2012, counsel may begin filing documents electronically in pending appeals using the Eleventh Circuit's ECF system, as Plaintiffs and Bank of America ("BofA") have done in *this* Court throughout the course of this litigation. Should they wish to forego the efficiencies of practice to which they are accustomed in order to foist unnecessary costs on Appellants, they may do so without requiring the security of a bond. Of the remaining costs recoverable under FRAP 39(e), Appellees, if successful, could recover the $186 cost of the reporter's transcript, but posting a bond in this amount is not worth the paperwork required.

Appellants' counsel is not a "professional objector"; he is one of the principal architects of this litigation, and his clients are highly dissatisfied with the result. The principal objections pressed by Appellants—to the insufficiency of a 9% settlement, and the absence of a class damages estimate by Plaintiffs' expert—are the same objections pressed by Class Counsel to both the *National City Bank* and *Fifth Third Bank* settlements, the approval of which Class Counsel appealed. Appellants' objections, and the ensuing appeal, are no more frivolous than those asserted by Class Counsel. The motion should be denied.

II.     **CLASS COUNSEL HAVE BREACHED THEIR FIDUCIARY DUTY TO THE SETTLEMENT CLASS BY FAILING TO INVEST THE SETTLEMENT FUND AS REQUIRED BY THE SETTLEMENT AGREEMENT**

Plaintiffs urge the Court to:

> include $616,338.00 in the appeal bond, representing the estimated
> loss of use of the Net Settlement Fund to Settlement Class
> Members during the pendency of this Appeal.  This amount is
> based on the current Treasury Bill interest rate, which is
> exceedingly conservative and represents the minimum that the
> Class could earn if its money were invested in these safe and
> secure investments.

(Motion, at 8-9.)  (*See also* Motion, at 7 n.3 ("This amount represents two years' compounded

interest at the current federal post-judgment rate (0.11%) on $280,000,000, which is the amount

of the Settlement minus attorneys' fees . . . .").)

Class Counsel were *required* to invest the Settlement Fund in short-term, interest-bearing

instruments, but neglected to do so, in violation of the Settlement Agreement, the Court's Orders,

and their fiduciary duty to the Settlement Class.  Accordingly, it is Class Counsel, not

Appellants, who are responsible for any damages to the Settlement Class resulting from any

delay in distribution.

A.     **The Settlement Agreement Requires That Class Counsel Invest the
Settlement Fund In "Interest-Bearing Short-Term Instruments"**

As Bank of America took pains to clarify in its response to objections:

> Pursuant to the Settlement Agreement and in accordance with the
> Court's express orders, *BANA has already provisionally paid the
> entire $410 million settlement sum into an Escrow Account* with a
> neutral third party to hold and disburse as provided in the
> Settlement.  (Dkt. #1471, Ex. A, ¶¶ 23, 24, 40, 47, 50; Dkt. #1520,
> ¶¶ 12, 14, 27; Dkt. #1572.)  More particularly, the funds have been
> deposited at Northern Trust in accounts under the control of the
> Court-approved Settlement Administrator and Escrow Agent, Rust
> Consulting, Inc. (Dkt. #1572.)

(Defendant's Memorandum in Response to Objections (Dkt. No. 2029), at 5 (emphasis added).)

The Settlement Agreement specifically provides that the "'Escrow Account' means the

*interest bearing* account to be established by BofA" (Settlement Agreement ¶ 23 (emphasis

added)), and that:

> Upon the establishment of the Escrow Account, the Escrow Agent
> shall cause the Settlement Funds in the Escrow Account to be
> invested in *interest-bearing short-term instruments – to be agreed
> upon by Settlement Class Counsel and BofA* . . . .  The Escrow

3

Agent shall thereafter re-invest the proceeds and the principal as
they mature in similar Instruments . . . .

(Settlement Agreement ¶ 48 (emphasis added).)

The Settlement Agreement further provides that "[e]ach Settlement Class Member . . .

shall receive a distribution in the amount of a pro rata share of the Net Settlement Fund" (*id.* ¶

83), which "is equal to the Settlement Fund plus any *interest earned from the Instruments . . . .*"

(Settlement Agreement ¶¶ 82-83 (emphasis added).)

On June 2, 2011, Class Counsel and Bank of America filed a Joint Motion to Modify

Certain Provisions of Preliminary Approval Order Regarding Handling of Escrow Account for

Settlement (Dkt. No. 1559), acknowledging that "the Settlement Agreement provides that . . . the

Settlement Funds will be deposited into an Escrow Account at BofA and invested in short-term

government-backed Instruments . . . ." (*Id.*, at 2.)  Class Counsel explained that:

> the Parties to the Settlement have worked diligently with Rust
> Consulting, Inc., the Court-appointed Settlement Administrator, to
> establish the Escrow Account and to prepare for *the investment of
> the bulk of the Settlement Fund into government-backed
> Instruments as provided in the Settlement Agreement.*  However,
> the Parties have discovered that, in the present financial market, to
> handle the Settlement Fund in a prudent and fiscally conservative
> manner, the Settlement Administrator needs greater flexibility to
> make account and investment decisions than is presently provided
> for in the Settlement Agreement.
>
> Accordingly, Settlement Class Counsel, on behalf of Plaintiffs and
> the Settlement Class Members, and BofA seek to amend
> paragraphs 47-49 of the Settlement Agreement [DE # 1471, Ex. A]
> and paragraph 12 of the Preliminary Approval Order [DE # 1520]
> *in the following respects only*: (a) Northern Trust or its affiliates, or
> such other financial institution as the parties may subsequently
> mutually agree upon, may be the depository for the Escrow
> Account; (b) *that portion of the Settlement Fund that the
> Settlement Administrator reasonably estimates needs to be
> available on a liquid basis to pay on-going costs of settlement
> administration, as provided in the Settlement Agreement, may be
> placed in one or more insured accounts, even if such accounts may
> be non-interest-bearing*; and (c) any costs or fees incurred in
> connection with investment of the Settlement Fund in the
> Instruments, as explained in paragraph 48 of the Settlement
> Agreement, shall constitute a cost of settlement administration and
> be payable out of the Settlement Fund.  *Except as specifically
> clarified and/or modified above, all terms and provisions of the
> Settlement Agreement and Preliminary Approval Order will
> remain unchanged.*

4

> Settlement Class Counsel and BofA believe that the foregoing clarifications and/or modifications are necessary and appropriate to give the Settlement Administrator the flexibility to . . . *select the types of Instruments, . . . and maximize the available return on the Settlement Fund, subject to and consistent with investment in short-term instruments that are backed by the full faith and credit of the United States Government or that are fully insured by the United States Government or an agency thereof.*

(*Id*. at 2-3 (emphasis added).)

On June 3, 2011, the Court granted the motion, amending the Settlement Agreement and Preliminary Approval Order as requested by Class Counsel. *See* Order Granting Motion to Modify Certain Provisions of Preliminary Approval Order Regarding Handling of Escrow Account for Settlement (Dkt. No. 1572). On September 16, 2011, the Settlement Administrator quantified the remaining "portion of the Settlement Fund" subject to the amendments (*id*.), "estimat[ing] that the remaining settlement administration costs will be approximately $3,290,000.00." (Declaration of Joel Boetzet Regarding Notice and Settlement Administration Costs (Dkt. No. 1885-14), ¶ 7.)

Pursuant to the Settlement Agreement, as modified by the Court, Class Counsel were required to invest all but the remaining settlement administration costs of less than $3.3 million in "interest-bearing, short-term instruments," and to reinvest the proceeds, earning compound interest for *pro rata* distribution to the Settlement Class.

### B. Class Counsel Placed the Settlement Fund in a Non-Interest Bearing Account, in Violation of the Settlement Agreement

The entire $410 million Settlement Fund was deposited by Bank of America at Northern Trust over seven months ago, on or before June 7, 2011.[2] Several days before this deposit was

---

[2] (*See* Settlement Agreement ¶ 47 ("within fourteen calendar days of Preliminary Approval, BofA shall deposit the sum of Four Hundred Ten Million Dollars ($410,000,000.00) into the Escrow Account to create the Settlement Fund"); Order Preliminarily Approving Class Settlement and Certifying Settlement Class (Dkt. No. 1520) (entered May 24, 2011); Defendant's Memorandum in Response to Objections (Dkt. No. 2029), at 5 ("Pursuant to the Settlement Agreement and in accordance with the Court's express orders, *BANA has already provisionally paid the entire $410 million settlement sum into an Escrow Account . . .* at Northern Trust in accounts under the control of the Court-approved Settlement Administrator and Escrow Agent").)

made, Class Counsel represented to the Court that they were "prepar[ing] for the *investment of the bulk of the Settlement Fund into government-backed Instruments* as provided in the Settlement Agreement," in order to "maximize the available return on the Settlement Fund, subject to and consistent with *investment in short-term instruments that are backed by the full faith and credit of the United States Government or that are fully insured by the United States Government or an agency thereof*."  (Joint Motion to Modify Certain Provisions of Preliminary Approval Order Regarding Handling of Escrow Account for Settlement (Dkt. No. 1559), at 2-3 (emphasis added).)  At the same time, Class Counsel sought and obtained from the Court permission to place only "that portion of the Settlement Fund that *the Settlement Administrator reasonably estimates needs to be available on a liquid basis to pay on-going costs of settlement administration* . . . in one or more insured accounts, even if such accounts may be non-interest-bearing . . . ."  (Order Granting Motion to Modify Certain Provisions of Preliminary Approval Order Regarding Handling of Escrow Account for Settlement (Dkt. No. 1572), at 1-2 (emphasis added).)

Accordingly, on January 4, 2012, counsel for Appellants telephoned Co-Lead Counsel for Plaintiffs, Mr. Rogow, to offer Plaintiffs an opportunity to withdraw the instant motion, in light of the fact that the Settlement Fund was (apparently) already earning interest, and the Settlement Class was not entitled to a "double recovery" of interest from Appellants.  (Declaration of Barry Himmelstein in Opposition to Plaintiffs' Motion to Require Posting of Appeal Bonds By Objector-Appellants ("Himmelstein Decl.," Exh. A hereto) ¶ 2.)  Mr. Rogow stated that he understood the issue, and would look into the matter.  (*Id*.)

On January 5, 2012, Mr. Rogow left a voicemail message for counsel for Appellants, stating that "[m]y understanding is it [the Settlement Fund] is not in an interest-bearing account, and in order to be fully-insured, it can't be."  (Himmelstein Decl. ¶ 3.)  Shortly thereafter, Mr. Rogow reached Appellants' counsel at a different telephone number, and conveyed the same information.  (*Id*.)  Appellants' counsel once again confronted Mr. Rogow with the provisions of the Settlement Agreement requiring that the Settlement Funds be invested in interest-bearing,

short-term instruments.  (*Id*.)  Class Counsel have not provided any further information or clarification.  (*Id*.)

C.     **Class Counsel, Not Appellants, Should Be Required to Reimburse the Settlement Fund for Lost Interest**

In violation of the Settlement Agreement and the Court's orders, Class Counsel apparently deposited the *entire* Settlement Fund into "one or more insured accounts" that are "non-interest bearing,"  (Dkt. No. 1572, at 2.)  (*See* Himmelstein Decl. ¶¶ 2-3.)  Class Counsel, not Appellants, are responsible for the interest lost to Settlement Class Members as a result of their defalcation.  Class Counsel should be ordered—*yet again*—to invest the remaining Settlement Fund in U.S. Treasury Bills or other interest-bearing short-term instruments, which, by Class Counsel's own measure, is sufficient to compensate the Settlement Class for any delay in payment resulting from the appeals.

Class Counsel should *also* be required to reimburse the Settlement Fund for the over seven months worth of interest that has been *irretrievably lost* as a result of the ongoing breach of their fiduciary duty to invest the Settlement Fund as required by the Settlement Agreement.[3] *See, e.g.*, Commentary, Rules Regulating Florida Bar, Rule 5-1.1 ("A lawyer must hold property of others with the care required of a professional fiduciary. . . . A lawyer who holds funds for a client or third person and who determines that the funds are not nominal or short term . . . should hold the funds in a separate interest-bearing account with the interest accruing to the benefit of the client or third person unless directed otherwise in writing by the client or third person.").

III.    **DAMAGES FOR DELAY MAY NOT BE INCLUDED IN A COST BOND, REGARDLESS OF THE ALLEGED MOTIVES OF OBJECTORS OR THE MERIT OF THEIR OBJECTIONS**

Plaintiffs argue that "[t]he costs that can be included in a Rule 7 bond are not limited to costs defined by Rule 39," citing *Pedraza v. United Guaranty Corp.*, 313 F.3d 1323, 1333 (11th Cir. 2002).  (Motion, at 6.)  *Pedraza* holds that attorneys' fees on appeal are *not* recoverable as a

---

[3] Appellants will move separately to disqualify Settlement Class Counsel as a result of this persistent breach of their fiduciary duty to the Settlement Class.

"cost" unless specifically provided by statute, and that "the district court [therefore] erred . . . to the extent that it relied on Fed. R. App. P. 7 in imposing a cost bond that encompassed anticipated appellate attorneys' fees." *Id.* at 1335.

Plaintiffs point to no statute providing for the recovery of damages for delay resulting from an appeal as a "cost." As the Middle District of Florida recently held in ruling on a motion to require an unsuccessful objector to a class action settlement to post an appeal bond, "damages for delay cannot be included in Rule 7 bonds where no underlying statute provides for the inclusion of such costs." *Eastwood Enterprises, LLC v. Farha*, 8:07-CV-1940-T-33EAJ, 2011 WL 2681915, *1-2 (M.D. Fla. July 11, 2011) (citations omitted).[4] Courts have consistently held that "damages for delay cannot be included" in a bond for costs, regardless of the alleged motives of the objectors, or the merit of their objections. *See In re Initial Public Offering Sec. Litig.*, 728 F. Supp. 2d 289, 293-97 (S.D.N.Y. 2010) (predicting order approving class action settlement "will be affirmed," and finding "evidence of bad faith or vexatious conduct by the Objectors," including a "serial objector" who "holds personal, documented animus toward the IPO Executive Committee," but denying motion to require objectors to post appeal bond for delay damages, "concur[ring] with those courts that have concluded that damages for delay cannot be included in Rule 7 bonds where no underlying statute provides for the inclusion of such costs").[5]

---

[4] *See also In re Currency Conversion Fee Antitrust Litig.*, 01 MDL 1409, 2010 WL 1253741, *3 (S.D.N.Y. Mar. 5, 2010) (Rule 7 does not allow inclusion in bond of "costs to the settlement fund"); *In re Diet Drugs Prods. Liab. Litig.*, MDL No. 1203, 2000 WL 1665134, *4-*5 (E.D. Pa. Nov. 6, 2000) (Rule 7 bond cannot include "damages caused by delay incident to an appeal").

[5] *See also In re Air Cargo Shipping Services Antitrust Litig.*, 06MD1775 JG VVP, 2010 WL 1049269, *2-*3 (E.D.N.Y. Mar. 22, 2010) (finding that appeal by alleged professional objector "lacks merit," but holding that "appeal bond may not include . . . delay damages"); *Fleury v. Richemont N. Am., Inc.*, C-05-4525 EMC, 2008 WL 4680033, *8-*9 (N.D. Cal. Oct. 21, 2008) (finding objections "meritless" and "not likely to succeed" on appeal, but denying motion to require objector to post appeal bond for "damages due to delay" as outside scope of Rule 7); *In re AOL Time Warner, Inc., Sec. & "ERISA" Litig.*, 02 CV. 5575 (SWK), 2007 WL 2741033, *3-*4 (S.D.N.Y. Sept. 20, 2007) (finding that objectors' "arguments lack merit, and [objector] is unlikely to succeed on appeal," and finding "evidence of bad faith and vexatious conduct on the part of [objector] during this litigation," but holding that "[t]he appeal bond . . . cannot include the estimated . . . costs caused by the delay in administering the settlement").

The Middle District of Florida found the principal case relied upon by Plaintiffs in support of their argument, *Allapattah Services*, unavailing:

> As for the $5,000,000 appeal bond to cover damages, the two cases cited by Lead Plaintiffs in support of their argument that district courts have required objectors to post appeal bonds in an amount to cover the damages that the entire class will lose as a result of the appeal are unavailing.  In *Allapattah Servs* 91–0986–CIV, 2006 WL 1132371, at *18 (S.D.Fla. Apr.7, 2006) the district court prospectively ordered an objector, if it filed an appeal, to post a $13 million bond to cover the damages the class would suffer.  The district court cited to *Pedraza* in support of its ability to order an appeal bond in an amount sufficient to cover the damages that the class will lose as a result of the appeal.  *Id.*  The Eleventh Circuit in *Pedraza,* however, did not address or approve including potential damages to a class in an appeal bond.  *Pedraza,* 313 F.3d 1323.

*Eastwood Enterprises,* 2011 WL 2681915, at *1.  *Accord Fleury*, 2008 WL 4680033, at *9 (finding *Allapattah Services* and *In re Compact Disc* "not persuasive").[6]

## IV.   APPELLANTS, WHO HAVE NOT SOUGHT A STAY, CANNOT BE REQUIRED TO POST A SUPERSEDEAS BOND

As another MDL transferee court recently explained in denying a motion to require an objector to a class action settlement to post a supersedeas bond, while an appellant may post a supersedeas bond to stay execution of a judgment pending appeal, a supersedeas bond may not otherwise be *required* of an appellant:

> The plaintiffs seek a supersedeas bond pursuant to Federal Rule of Civil Procedure 62(d), . . . [which] states:  "If an appeal is taken, the appellant may obtain a stay by supersedeas bond . . . .  The stay

---

[6] The Middle District of Florida also rejected plaintiffs' reliance on "*In re Compact Disc Minimum Advertised Price Antitrust Litig.*, No. MDL 1361, 2003 WL 22417252, at *1 (D.Me. Oct.7, 2003), to support the argument that damages resulting from delay or disruption of settlement administration caused by a frivolous appeal may be included in a Rule 7 bond," because "[t]he district court in *Compact Disc* . . . cites to *In re NASDAQ Market–Makers Antitrust Litig.*, 187 F.R.D. 124, 128 (S.D.N.Y.1999), as its authority for including damages in an appeal bond," which is "contrary to the clear majority of cases in that circuit."  *Eastwood Enterprises*, 2011 WL 2681915, at *1 (citations omitted).

takes effect when the court approves the bond." Fed.R.Civ.P. 62(d).[7]

A supersedeas bond provides an appellant with a manner to stay the judgment. . . . [¶] Nothing in the rule indicates that an appellee may move the court for imposition of a supersedeas bond. Courts have rejected such motions from appellees in similar situations. *E.g.*, *In re Diet Drugs Prods. Liab. Litig.*, No. MDL 1203, 2000 WL 1665134, at *1-3 (E.D.Pa. Nov. 6, 2000) (denying plaintiffs' motion for supersedeas bond for appellant-objectors to a settlement despite the alleged frivolity and leverage of appellants' appeal because appellants did not move for a stay); *O'Keefe v. Mercedes Benz USA, L.L.C.*, No. 01-cv-2902, 2003 WL 22097451, at *4-5, 2003 U.S. Dist. LEXIS 9838, at *12-17 (E.D. Pa. June 5, 2003) (denying plaintiffs' motion for supersedeas bond for appellant-objectors because appellants had not moved for a stay). *Because [objector] did not move for a stay by posting a supersedeas bond, a supersedeas bond pursuant to Rule 62(d) is inapplicable.*

*In re American Investors Life Ins. Co. Annuity Marketing and Sales Practices Litig.*, 695 F. Supp. 2d 157, 161-62 (E.D. Pa. 2010) (emphasis added). *See also Diet Drugs*, 2000 WL 1665134, *3 ("Although the consequences of an appeal from approval of a class action settlement may be similar to a stay, the court . . . has no authority to impose a supersedeas bond in the absence of an appellant's motion for a formal stay of execution.").

The Court went on to distinguish the principal case relied upon by Plaintiffs, *Allapattah Services*, as follows:

The plaintiffs cite to *Allapattah Services, Inc. v. Exxon Corporation*, No. 91-0986, 2006 WL 1132371, 2006 U.S. Dist. LEXIS 88829 (S.D.Fla. Apr. 7, 2006), for the proposition that a supersedeas bond is appropriate upon a frivolous appeal that delays a settlement's implementation. In *Allapattah Services*, the district court . . . held that if the objector chose to appeal the court's decision, it would be required to post a bond for $13.5 million because an appeal would be detrimental to the class. Although the *Allapattah Services* court termed this bond "supersedeas," it is not. The full amount of the settlement was over $1 billion dollars, not the $13.5 million that the objector would be required to post. Further, the court noted that the bond was calculated from the costs to cover the appeal, not the final judgment award.

*American Investors*, 695 F. Supp. 2d at 163 (citations omitted).

---

[7] FRAP 8 provides that "[a] party must ordinarily move first in the district court for . . . approval of a supersedeas bond." FRAP 8(a)(1)(B). Accordingly, Fed. R. Civ. P. 62 governs the instant motion.

*Allapattah Services* is also inapplicable on factual grounds:  in that case, while the settlement fund itself was earning interest,[8] the awards to individual claimants, issued on a rolling basis, did not, causing those class members damages from the delay in distribution.  *See* Report and Recommendation on Westheimer's Objection to the Class Settlement (Dkt. No. 2757), at 23 ("The interest on these projected payments belongs to individual Claimants as opposed to the Settlement Fund.").  In this case, by contrast, the Settlement Agreement expressly provides that each Settlement Class Member will receive a *pro rata* share of the interest accrued on the Settlement Fund, compensating them for any delay in distribution.  (Settlement Agreement ¶¶ 82-83.)

## V.   THE RELEVANT FACTORS WEIGH AGAINST IMPOSITION OF A COST BOND

### A.   The Principal Costs on Appeal Have Already Been Paid

Under FRAP 7, Class Counsel seek a bond of $5,000 for "costs taxable under [FRAP] Rule 39(e), including the estimated cost for printing and copying briefs and other submissions . . . ."  (Motion, at 8.)  The grandeur of appellate practice has at last given way to the efficiencies of the Electronic Case Files ("ECF") system.

Effective January 1, 2012, in the Eleventh Circuit, "[c]ounsel may begin filing documents electronically in pending appeals . . . ."  USCA Eleventh Circuit, General Order 37 (Oct. 19, 2011).  Throughout the course of this litigation, Appellees have used *this* Court's CM/ECF system to electronically file their pleadings.  Should Appellees wish to forgo the efficiencies of practice to which they are accustomed in order to foist unnecessary costs upon Appellants, they may do so without requiring the security of a bond.

The remaining costs recoverable under FRAP 39(e), for "the reporter's transcript" and "the fee for filing the notice of appeal" (*id.*), have already been paid.  While Appellees, if

---

[8] *See Allapattah DFC Class Action Settlement Fund v. United States*, 08-23514-CIV, 2010 WL 6430699, *6 (S.D. Fla. Dec. 23, 2010) ("The Fund's assets are held in an investment portfolio at JPMorganChase Bank and are invested in treasury notes and bills and in a money market account.  The Fund earned $30,604,589 in tax year 2006.").

successful, could recover the $186.00 cost of the transcript (*see* Himmelstein Decl. ¶ 4), posting a bond in this amount is not worth the attendant paperwork required of Appellants, Appellees, and the Court.

### B.      Appellants Lack the Financial Resources to Post the Requested Bond

Plaintiffs argue that "Courts presume that appellants are financially able to post appeal bonds unless they demonstrate otherwise." (Motion, at 9.)  Mr. Hastings, who was charged thousands of dollars in overdraft fees on debit card transactions by Bank of America, is elderly, retired, living on a fixed income, and lacks the personal financial resources to post a bond of even $5,000.  (Declaration of Richard Hastings in Opposition to Plaintiffs' Motion to Require Posting of Appeal Bonds By Objector-Appellants (Exh. B hereto), ¶¶ 2-3.)  Ms. Buycks, who was also charged thousands of dollars in overdraft fees on debit card transactions by BofA, also lacks the personal financial resources to post a bond of $5,000.  (Declaration of Janel Buycks in Opposition to Plaintiffs' Motion to Require Posting of Appeal Bonds By Objector-Appellants (Exh. C hereto), ¶¶ 2-3.)

### C.      There is Nothing "Frivolous" About the Hastings Objections[9]

### 1.      The Settlement Was Approved Without a Sufficient Record

The "official guide" for federal judges conducting fairness hearings on class action settlements is the Federal Judicial Center's *Manual For Complex Litigation, Fourth* (2004). The Manual cautions that:

> At the fairness hearing, the proponents of the settlement must show that the proposed settlement is "'fair, reasonable, and adequate.'" The parties may present witnesses, experts, and affidavits or declarations. . . .
>
> *[T]he judge must ensure that there is a sufficient record as to the basis and justification for the settlement.*  Rule 23 and good practice both require *specific findings as to how the settlement meets or fails to meet the statutory requirements.  The record and findings must demonstrate to a reviewing court that the judge has made the requisite inquiry* and has considered the diverse interests and the

---

[9] For illustrative purposes, Appellants present argument on only two of their objections here.

> requisite factors in determining the settlement's fairness,
> reasonableness, and adequacy.

*Id.*, §§ 21.634-35 (emphasis added).

Invoking this principle, the Plaintiffs' Executive Committee objected to two settlements of overlapping "overdraft" claims, brought against *Fifth Third Bank* and *National City Bank*, on the ground that class counsel had not presented sufficient evidence of the total damages sustained by the class.  (*See* Objections of Richard Hastings and Janel Buycks to Final Approval of Proposed Class Action Settlement (Dkt. No. 1916, "Hastings Objections") at 3-6, 12-13.) Accepting these criticisms, the *Fifth Third Bank* Court explained that "the district court should begin by 'quantify[ing] the net expected value of continued litigation to the class,'" and "caution[ed] the parties that it cannot grant final approval unless the parties present *evidence* that would enable the Court to determine the potential value of Class Members' claims."  Opinion and Order (Exh. E to Hastings Objections), at 4-5 (citations omitted, emphasis added).

In compliance with the Court's directive, *Fifth Third Bank* class counsel submitted the report of their damages expert, who "estimate[d] $97.7 million in Excess OD [Overdraft] Fees over the Class Period."  (Expert Report of Thomas Tarter (Exh. 1 to Emergency Motion to Compel Attendance of Arthur Olsen at November 7, 2011 Fairness Hearing ("Emergency Motion," Dkt. No. 2045)), at 15.)  Defendant Fifth Third Bank submitted "its own damage calculation that estimates that 'the impact of high-to-low posting on debit and ATM transactions during the Class Period was $16,752,210 annually.'  Extrapolated out over the entire class period, that figure amounts to approximately $95,281,038."  Memorandum Opinion and Order (Exh. K to Hastings Objections), at 12-13 (quoting Affidavit of Senior Vice President).  Based on this *evidence*, the Court found "that around $96.5 million (the average of parties' top-end damage calculations) is the most that the class could hope to recover," and approved the settlement.  *Id.* at 26.

In the *National City Bank* case, the Court likewise

> caution[ed] the parties that they must offer *evidence* that enables the
> Court to calculate the potential trial recovery in this case in order to
> obtain final approval of the settlement. . . . At the Final Fairness

> Hearing, the parties should provide the Court with an independent
> analysis for reaching the agreed settlement amount and explain and
> defend their methodology to demonstrate that it is a fair, adequate,
> and reasonable settlement.

*Trombley v. National City Bank*, 759 F. Supp. 2d 20, *25 (D.D.C. 2011) (emphasis added).

Complying with the Court's directive, class counsel submitted the report of their expert, who estimated the total damages sustained by the class.  (*See* Expert Report of Edgeworth Economics (Exh. 2 to Emergency Motion).)  Finding the expert's methodology sufficiently reliable, the Court found this *evidence* sufficient to support class counsel's calculation of the percentage recovery represented by the settlement:

> Edgeworth concluded that based on the first scenario of low to
> high reordering, total damages would have amounted to $116.5
> million and . . . if the transactions had been chronologically
> ordered (the second scenario), the damages would amount to $46
> million . . . . In summary, the range of damages spanned from
> $116.5 million to $46 million . . . .  *Hence, plaintiffs assert that the
> $12 million settlement fund would be in the range of 10% to 26%
> of the two damages calculations* . . . .

*Trombley v. National City Bank*, No. 10-00232 (JDB), 2011 WL 5986484, *5 (D. D.C. 2011) (emphasis added).

The leading authorities, Class Counsel, and the two other courts to consider class action settlements of "overdraft" claims are all in accord that final approval may not properly be granted without sufficient *evidence* in the record of the damages sustained by the Settlement Class.  Despite Appellants' repeated requests, and numerous opportunities for Class Counsel to correct this glaring deficiency, there remains *no such evidence in the record in this case*.

As pointed out in the Hastings Objections, the declaration of Plaintiffs' damages expert, Arthur Olsen, establishes that he carried out his assigned task of "identify[ing] the accounts that were harmed, as well as the corresponding amount of that harm," and that he "identified 13.8 million accounts demonstrating the 'harm' resulting from BOA's debit card re-sequencing." (Declaration of Arthur Olsen (Dkt. No. 1885-6), ¶¶ 3, 35.)  Although Mr. Olsen *calculated* the total damages sustained by the Settlement Class, *that critical information is not contained*

14

*anywhere in his declaration*.  Nor was a damages estimate contained anywhere else in Plaintiffs'
motion for final approval, or in any supporting declaration.

 As pointed out in the Hastings Objections, the only information provided by Plaintiffs
concerning the damages sustained by the Settlement Class is a statement in the declaration of
Class Counsel that the settlement amount of $410 million "represents between 45% and 9% of
their anticipated total recovery, depending on how the *Closson* appeal was resolved (and
presuming it would affect 80% of the aggregate value of the litigation)."  (Joint Declaration (Dkt.
No. 1885-3), ¶ 68.)  (*See* Hastings Objections, at 7-8, 13.)  Aside from the $410 million
numerator, Class Counsel cited *nothing* in support of any of these percentage-recovery
calculations, from which Appellants attempted to "reverse engineer" the following damages
calculation:  $410 million/.09 = $4.55 billion.  (*Id.* at 8.)

 Rather than supplying the missing *evidence* demanded by Appellants (*e.g.*, a
supplemental declaration from Mr. Olsen containing the missing denominator, his class damages
calculation), Plaintiffs responded by confirming that their "expert Art Olsen performed the
detailed work necessary to determine the exact amount of each Settlement Class Member's
damages based on high to low Debit Re-sequencing," but *continued to withhold this vital
information from the Settlement Class, Appellants, and the Court*.  (Plaintiffs' Response to
Objections to Motion for Final Approval of Settlement (Dkt. No. 2030), at 11.)  Bank of
America's responses to objections contained no information on the class' damages.  (*See* Dkt.
No. 2029.)

 With the filings in support of the settlement ostensibly complete, but no *evidence* in the
record of class members' damages, Appellants filed their Emergency Motion to Compel
Attendance of Arthur Olsen at November 7, 2011 Fairness Hearing (Dkt. No. 2045), in the hope
that Mr. Olsen would supply the damages figure(s) conspicuously absent from his declaration, so
that the Court could decide the matter on a legally sufficient record.  Once again, Plaintiffs
declined the opportunity to correct this deficiency, and refused to produce Mr. Olsen to testify at
the Fairness Hearing.  (*See* Plaintiffs' Response to Emergency Motion to Compel Attendance of

Arthur Olsen (Dkt. No. 2052), at 1 ("Objectors can point to no material information missing from the record that would require additional testimony from Mr. Olsen and no law that requires his attendance.").)

Instead of supplying the missing *evidence*, Plaintiffs made only the following, circular argument:  "The $4.5 billion damages number to which Objectors refer in their objection is the class damages information that they claim is missing from the record."  (*Id*. at 3.)  Objectors' attempt to "reverse engineer" a damages estimate *missing* from the record is not the missing damages estimate.

Rule 602 of the Federal Rules of Evidence provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  Appellants and their counsel have no personal knowledge of the damages sustained by the Settlement Class.  Plaintiffs' damages expert, Mr. Olsen, and his assistant are the only persons who had access to the account data necessary to calculate the damages sustained by the Settlement Class.  (*See* Declaration of Arthur Olsen in Support of Final Approval (Dkt. No. 1885-6), ¶¶ 20-35.)  Plaintiffs confirm that it was Mr. Olsen, *not* Class Counsel, who "calculated the maximum possible damages that the Settlement Class could have recovered . . . ."[10]  (Dkt. No. 2052, at 4.)  Class Counsel have no more personal knowledge than Appellants of the amount of damages sustained by the Settlement Class.

Accordingly, at the Fairness Hearing, Appellants moved to strike the paragraph of Class Counsel's declaration purporting to set forth the percentage of recovery, as without sufficient foundation:

> The problem, again, there is nothing . . . in the record to support Class counsel's nine percent calculation.  We have the numerator, $410 million, the amount BofA is paying.  We have no denominator.  It is the division of those numbers that might get you a nine percent figure, but we have no denominator to get it.  This is not rocket science.  It is not a particularly sophisticated application of the Rules of Evidence.  It is simple math.
>
> * * *

---

[10] Plaintiffs followed this statement with the patently false representation that Mr. Olsen "put that information into the record through his declaration."  (*Id*.)

> Whether Mr. Olsen communicated that number to Class counsel orally or in writing, those statements are hearsay.  Class counsel did not acquire personal knowledge of the damages sustained by the Class by mere proximity to Mr. Olsen.
>
> In short, there is no evidence in the record to support a finding that Class counsel have personal knowledge of the denominator necessary to make their nine percent calculation.  [¶]  Accordingly, pursuant to Rule 602, we formally move to strike paragraph 68 of Mr. Gilbert's and Mr. Sobol's joint declaration.

(Transcript of Nov. 7, 2011 Fairness Hearing, at 100:14-101:15.)[11]

Appellants pressed similar foundational objections to Class Counsel's unsupported "estimate that if it were enforceable, the *Closson* settlement release would release approximately *80 percent* of the aggregate value of Settlement Class Members' claims" (Joint Declaration (Dkt. No. 1885-3) ¶ 28), and moved to strike paragraph 28 of Class Counsel's Joint Declaration as without sufficient foundation.  (*See* Hastings Objections, at 8, 13; Transcript of Nov. 7, 2011 Fairness Hearing, at 101:23-102:14.)

The Court reserved its ruling on these objections, placed front and center by Appellants, for the final footnote on the final page of its Order of Final Approval of Settlement ("Final Approval Order," Dkt. No. 2150):

> Objector Hastings' motions to strike portions of the Joint Declaration are . . . denied as they are without foundation.  The fact that Objector Hastings disagrees with the assertions contained in these paragraphs is not a basis for striking them.

*Id*. at 59 n.58.  This ruling misapprehends the very nature of the objection:  Appellants do not "disagree" with Class Counsel's percentage-of-recovery calculations; they contend that Class Counsel lacked the personal knowledge of class members' damages necessary to *make* them, which *is* "a basis for striking them."  (*Id*.)  It is Class Counsel's *assertions*, not Appellants' *objections*, that are "without foundation."  Fed. R. Evid. 602.

As a consequence of Class Counsel's refusal to place their expert's class damages calculation in the record, the Court's key factual finding, that the $410 million settlement

---

[11] Appellants have taken the liberty of correcting several minor transcription errors, for the sake of clarity.

"represents between 45 percent and 9 percent of [the Settlement Class'] anticipated total recovery, depending on how the *Closson* appeal was resolved" (Final Approval Order, at 27), cites only Paragraph 68 of Class Counsel's Joint Declaration (*id*.), and is likewise *without any admissible evidentiary support in the record*.

The Final Approval Order sidesteps this fatal defect, stating that "Class Counsel also included in the Motion their *considered opinions* that the Settlement represents a range of recovery of 45 percent to 9 percent of Settlement Class Members' claimed losses.  Joint Decl. ¶ 68."  Final Approval Order, at 17 (emphasis added).  The question of whether a proposed settlement providing Settlement Class Members with "a range of recovery of 45 percent to 9 percent" is "fair, reasonable, and adequate" is a matter of *opinion*; the question of whether the proposed settlement actually *provides* Settlement Class Members with "45 percent to 9 percent" of their damages is one of *mathematics*.  Where "X" equals the damages sustained by the Settlement Class, the value of "X" in the equation $410 million/X = .09 is *not* a matter of opinion.

### 2.  The Settlement is Patently Unfair to Class Members Unaffected by *Closson*

If upheld on appeal, the *Closson* settlement would release only claims belonging to members of the *Closson* settlement class, which is limited to persons who had Bank of America checking accounts and paid overdraft charges on those accounts (within five days of a debit card transaction) prior to December 31, 2007.[12]  Ms. Buycks, and the Settlement Class Members like her who did not open their BofA checking accounts until *after* that date, are not members of the *Closson* settlement class, and are unaffected by the *Closson* release.  Based on Class Counsel's "estimate," this would appear to constitute approximately *2.75 million Settlement Class Members* (*i.e.*, 20% of the 13.8 million accounts).

In its responses to objections, Bank of America dismissed the "argument posited by some objectors that the potential adverse impact of the *Closson* release . . . has been significantly

---

[12] *See* Order Finally Approving Class Action Settlement ¶ 6 (available at http://www.clossonsettlement.com/PDFs/FinalApprovalClassActionSettlement.pdf).

overstated in the settlement calculus," and confirmed that "the potential impact of the *Closson* release . . . properly occupied a very material place for both sides in the negotiations." (Defendant's Memorandum in Response to Objections (Dkt. No. 2029), at 7-8.)  BofA called it "difficult to fathom how any objector could seriously claim the *Closson* release . . . should not have played an important factor in the settlement negotiations," and concluded that "BANA and Class Counsel would have broken with reality if they did not attach *overwhelming importance* to the *Closson* settlement and release."  (*Id.* at 10-11 (emphasis added).)

The record reflects that Class Counsel *did* attach overwhelming importance to *Closson* in accepting a settlement for only 9% of Settlement Class Members' damages.[13]  At the time of the November 7, 2011 Fairness Hearing, Class Counsel had still pending an objection to the *National City Bank* settlement for 10% of class members' damages, using the same "low to high" reordering scenario used by Mr. Olsen to calculate the damages to the BofA Settlement Class. *See Trombley*, 2011 WL 5986484, at *19 ("the PEC Objectors contend that the settlement amount is inadequate, pointing to *Gutierrez* and the settlement in the consolidated multi-district litigation cases involving Bank of America").

Class Counsel's only explanation for objecting to a 10% settlement in another court as inadequate, while championing a lesser, 9% settlement here, is the impact of *Closson*, which they estimated "would release approximately *80 percent* of the aggregate value of Settlement Class Members' claims."  (Joint Declaration (Dkt. No. 1885-3) ¶ 28 (emphasis in original).)  The larger this "*Closson* discount," the more *unfair* the settlement is to the 2.75 million Settlement Class Members unaffected by *Closson*, whose claims have been sacrificed for a corresponding fraction of their true settlement value.[14]

---

[13] As set forth above, the record is devoid of evidence to support Class Counsel's calculation.

[14] This discount was also unfairly applied to the claims of Settlement Class Members who, though in the *Closson* class, have damages claims outside the temporal scope of the *Closson* release.  (*See* Hastings Objections, at 14; Transcript of Nov. 7, 2011 Fairness Hearing, at 119:24-121:8.)

On November 7, 2011—the same day as the Bank of America Fairness Hearing—an article appeared in *American Banker*, entitled "Overdraft Settlement Proves Costly to Union Bank" (Exh. D hereto), reporting that the settlement reached with Union Bank the previous week "appears to be around *40% of alleged damages*." (*Id.* (emphasis added).) The article quotes Co-Lead Counsel for Plaintiffs, Mr. Podhurst, as saying that "[w]e believe with the court rulings that are coming down, we're going to try to convince the banks to pay *60% or 70%*, give or take." (*Id.* (emphasis added).)

There is nothing frivolous about the Hastings Objections.

Dated:  January 13, 2012                               Respectfully submitted,


                                                       **s/Barry Himmelstein**
                                                       Barry Himmelstein (Cal. Bar No. 157736)
                                                       (*pro hac vice*)
                                                       barry@himmellaw.com
                                                       HIMMELSTEIN LAW NETWORK
                                                       2000 Powell St., Suite 1605
                                                       Emeryville, CA 94608-1861
                                                       Telephone:  (510) 450-0782
                                                       Facsimile:  (510) 380-6147


                                                       **s/Philip Freidin**
                                                       Philip Freidin (Florida Bar Number 118519)
                                                       pfreidin@fdlaw.net
                                                       FREIDIN DOBRINSKY
                                                       One Biscayne Tower
                                                       2 South Biscayne Blvd., Suite 3100
                                                       Miami, FL 33131
                                                       Telephone:  (305) 371-3666
                                                       Facsimile:  (305) 371-6725

                                                       *Attorneys for Settlement Class Members and*
                                                       *Objectors Richard Hastings and Janel*
                                                       *Buycks*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by CM/ECF on

January 13, 2012 on all counsel or parties of record in this proceeding.

**s/Philip Freidin**
Philip Freidin (Florida Bar No. 118519)
pfreidin@fdlaw.net
FREIDIN DOBRINSKY
One Biscayne Tower
2 South Biscayne Blvd., Suite 3100
Miami, FL 33131
Telephone:  (305) 371-3666
Facsimile:  (305) 371-6725