**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 09-MD-02036-JLK**

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

_____/

THIS DOCUMENT RELATES TO:
FIFTH TRANCHE ACTIONS

*Sachar, et al. v. IBERIABANK Corporation, et al.*
S.D. Fla. Case No. 1 :1 1-CV-22844-JLK

_____/

**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF**
**SETTLEMENT AND INCORPORATED MEMORANDUM OF LAW**

**I. INTRODUCTION**

Class Counsel successfully negotiated the Settlement with IBERIABANK Corporation and IBERIABANK (collectively hereinafter referred to as "IBERIABANK"), memorialized in the Amended Settlement Agreement and Release of October 19, 2011 (the "Agreement"), under which IBERIABANK will pay $2.5 million in cash to the Settlement Class.[1] The proceeds of the Settlement, less the costs of settlement administration, attorneys' fees, expenses, and service awards (the "Net Settlement Fund"), will be distributed pro rata to Settlement Class Members based on the harm that each individual sustained. In addition, the Agreement requires IBERIABANK to begin posting Debit Card Transactions to IBERIABANK Accounts in the order in which they are authorized or settled by IBERIABANK.  This proper method of posting

_____

[1] All capitalized terms have the same meaning as defined in the Agreement attached as Exhibit A. Any capitalized terms not defined there are defined herein.

began on November 1, 2011. Exhibit A ¶ 50.  In the face of serious litigation obstacles and legal risks, Settlement Class Members will receive immediate and substantial relief.

A key feature of the Settlement is that identifiable Settlement Class Members will automatically receive their pro rata share of the Net Settlement Fund without having to do anything at all. There are no claim forms to fill out. Settlement Class Members will not be asked to prove that they were damaged as a result of IBERIABANK's practice of re-sequencing debit card transactions from highest-to-lowest dollar amount ("Debit Re-sequencing"). Settlement Class Counsel and their experts used IBERIABANK's actual data to determine which IBERIABANK Accounts were harmed by IBERIABANK's Debit Re-sequencing, and will apply a formula (detailed in paragraph 75 of the Agreement) to calculate each identifiable Settlement Class Member's pro rata share of the Net Settlement Fund.[2]

Plaintiffs now move for Final Approval of the Settlement on behalf of the Settlement Class. The controlling legal standards and supporting facts warrant Final Approval of this Settlement.

For the reasons detailed below, Plaintiffs and Class Counsel ask that the Court: (1) approve the Settlement; (2) certify for settlement purposes the Settlement Class pursuant to Federal Rules of Civil Procedure 23(a), (b)(3) and (e); (3) appoint Plaintiffs David J. Sachar and Christine M. Sachar as class representatives for this Settlement ("Settlement Class Representatives"); (4) appoint as Class Counsel the attorneys and law firms listed in paragraph 8 of the Order Preliminarily Approving Class Settlement and Certifying Class Settlement; and (5) enter Final Judgment dismissing the Action with prejudice.

---

[2] The Parties have acknowledged that for certain banks acquired by IBERIABANK during the Class Period certain of IBERIABANK's records of customer accounts are not readily accessible. Fewer than 2% of Settlement Class Members fall within this category. To the extent that the Parties cannot readily identify Settlement Class Members or calculate the amount they may be due from the Settlement Fund, these Class Members are entitled to submit a claim form as described in paragraph 76 of the Agreement. If these Class Members fail to submit claim forms, the Parties have agreed to confer in good faith as to the appropriate use of any Settlement Fund amounts that can be attributed to not readily identified Settlement Class Members, to the extent that this is possible, subject to approval by the Court.

## II. MOTION FOR FINAL SETTLEMENT APPROVAL

**A.      Factual and Procedural Background.**

This Action involved sharply opposed positions on several fundamental legal and factual issues. The ultimate success of the litigation required Plaintiffs to prevail on all of these issues. Conversely, IBERIABANK's success on any one of these issues could have spelled defeat for Plaintiffs and the Settlement Class.

Plaintiffs alleged that IBERIABANK systemically re-sequenced Settlement Class Members' debit transactions in "high-to-low" order for the sole purpose of maximizing its overdraft fee revenue. According to the operative complaints, IBERIABANK's practices violated the bank's contractual and good faith duties owed to its customers, resulted in unlawful conversion of depositor property; unjustly enriched the bank, were substantively and procedurally unconscionable, and violated certain state unfair trade practices statutes.

IBERIABANK, on the other hand, consistently argued, among other things, that its check posting process was expressly authorized by State and federal law, particularly Regulation DD promulgated by the Federal Reserve Board; that Plaintiffs' claims were preempted by the Home Owners' Loan Act ("HOLA"); that its account agreements expressly authorized the very re-sequencing practice Plaintiffs challenged; that Plaintiffs failed to plead with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure; that no fiduciary relationship existed between IBERIABANK and Plaintiffs; that it fully disclosed its practices to its customers; that Plaintiffs' claims under the deceptive trade practices provisions failed because Arkansas law contains a safe harbor provision that specifically exempts conduct authorized by a federal agency and because it fully disclosed to Plaintiffs the bank's practice of automatically enrolling customers in Bounce Protection Privilege; that Plaintiffs cannot maintain a breach of implied duty of good faith separate and apart from a breach of contract; that no plausible conversion claim existed because Plaintiffs did not own the funds in their accounts; and that Plaintiffs could not maintain unjust enrichment claims because of the existence of an express agreement.

The Settlement represents a compromise of competing interests that resolves the claims with finality today–avoiding years of continued litigation in the trial and appellate courts.

**1.      The Course of Proceedings.**

Plaintiffs brought this case seeking monetary damages, restitution and declaratory and injunctive relief, arising from the IBERIABANK's alleged Debit Re-sequencing, which Plaintiffs contend was devised to increase the number of overdraft fees its customers incurred. Plaintiffs allege that because IBERIABANK manipulated the order in which customers' debit transactions were posted, customers' funds were allegedly depleted more rapidly than they should have been, and Plaintiffs and Settlement Class Members allegedly paid more overdraft fees than they should have paid.

On February 18, 2011, Plaintiffs filed a complaint against IBERIABANK in the circuit court of Pulaski County, Arkansas, and the case was subsequently removed to the United States District Court for the Eastern District of Arkansas. On April 29, 2011, Plaintiffs filed an amended complaint. IBERIABANK responded by moving for dismissal, or in the alternative for a more definitive statement. The Plaintiffs' complaint asserted claims against IBERIABANK based on its alleged unfair assessment and collection of overdraft fees.

Plaintiffs sought monetary and injunctive relief on behalf of a putative class of "all holders of an account at IBERIABANK, IBERIABANK*fsb*, Acadiana Bancshares, LBA Savings Bank, Alliance Bank of Baton Rouge, American Horizons Bank of Monroe, Pulaski Investment Corp., Pulaski Bank and Trust, Pocahontas Bancorp, Inc., First Community Bank, Omni Bank, and Cameron State Bank (as well as ANB Financial, Capital South Bank, Century Bank, Orion Bank, and Sterling Bank after the date of legal conversion) who, within the applicable limitations period in the state in which debit card overdraft charges were incurred through the date of Preliminary Approval, incurred one or more debit card overdraft charges as a result of debit card charge re-sequencing.." The Plaintiffs asserted claims under the Arkansas Deceptive Trade Practices Act, for breach of good faith and fair dealing, unjust enrichment, conversion, unconscionability, and for injunctive relief.  Plaintiffs described the challenged IBERIABANK practices as follows:

- Sometime after the close of the banking day, often in the early hours of the morning, banks engage in a process called "posting."

- Posting is the process wherein transactions for a set period of time "post" to a customer's bank account, causing increases or decreases in the available balance in the account.  IBERIABANK posts one day's worth of transactions during the week, while Saturday, Sunday, Monday and bank holiday transactions are "batch-processed" in one posting.

- Banks can use different methods for ordering the transactions that post to an account. Three possibilities, for example, are chronological posting, low-to-high posting, and high-to-low posting. Historically, most banks have used low-to-high posting.

- The posting order employed by a bank may have dramatic consequences in the context of account overdrafts.

- IBERIABANK manipulates the debit card transaction posting order to post transactions from largest to smallest. This is not disclosed to the customer.

- High-to-low posting has the effect of maximizing the number of overdraft fees.

- High-to-low posting turns what would ordinarily be *one* overdraft into *many* overdraft fees, dramatically multiplying the number of fees the bank charges for a single mistake by a customer.

- High-to-low posting caused customers to incur overdraft fees for debit card transactions that were covered by the customer's existing account balance at the time the transaction was made.

- For example, if a customer with a $100 balance in his checking account makes three five dollar purchases with his checking account's debit card in the morning, and one $100 debit card purchase in the afternoon, one would expect the three five dollar purchases to clear the account. There should be $85 in the account after those three purchases are made. When the $100 charge is made later in the day, there would not be sufficient funds to cover the $100 debit, and one bank charge for drawing an item against insufficient funds would be deducted from the customer's account. Defendants' practice of high-to-low re-sequencing of transactions causes the $100 transaction to be processed first. The $100 transaction clears first and a zero balance remains. The three five dollar items are then processed – with each of the three items incurring on NSF fee.

- IBERIABANK's practices transform a single NSF fee into multiple fees through its transaction re-sequencing process of posting debit card transactions from highest to lowest. The sole purpose of this practice is to generate the largest possible amount of fee income for the bank.

- IBERIABANK does not disclose to customers that it employs high-to-low posting when ordering debit card transactions in the posting process.

- Plaintiffs allege that it was IBERIABANK's conscious intent and sole purpose to reap excessive fees through the use of high-to-low posting.

- Prior to regulatory changes implemented in 2010, IBERIABANK automatically enrolled all of its customers in standard overdraft protection, which

IBERIABANK called "Bounce Protection Privilege."

- Under its standard overdraft-protection plan, IBERIABANK allowed customers to overdraw their accounts, then charged the customer a per transaction overdraft fee that ranged from approximately $22.50 to $35 during the relevant time period.

- IBERIABANK automatically enrolled its customers in this Bounce Protection Privilege "service" without their consent and without disclosing that all debit card transactions would be resequenced and posted in high-to-low order.

- Posting the largest transactions first results in the most rapid consumption of a customer's available balance, so numerous small debit card transactions trigger the maximum possible number of overdraft fees.

*Id.* ¶ 29-44. The parties engaged in substantial discovery to determine the merits of the litigation, scope of the class members, and damages.

On May 19, 2011, the *Sachar* Plaintiffs and IBERIABANK participated in mediation, with the aid of mediator Gary McGowan of McGowan Dispute Resolution, in Houston, Texas. Before and during the mediation, the *Sachar* Plaintiffs' counsel reviewed documentary evidence concerning IBERIABANK's relevant overdraft fee policies.

As a result of the mediation sessions the Parties signed a Memorandum of Understanding that memorialized the Parties' agreement, subject to a mutually agreeable written Settlement Agreement and subject to preliminary approval and final approval by the Court as required by Rule 23 of the Federal Rules of Civil Procedure.

Subsequent to mediation and execution of the Memorandum of Understanding, IBERIABANK provided further documentary evidence to the *Sachar* Plaintiffs' counsel regarding its relevant overdraft fee policies.

On June 3, 2011, after difficult negotiations, the *Sachar* Plaintiffs and IBERIABANK entered into a Settlement Agreement and filed a Joint Motion for Preliminary Approval of Class Action Settlement. The same day, the *Sachar* Plaintiffs filed an Unopposed Motion for Leave to File Second Amended and Substituted Class Action Complaint.

On June 14, 2011, the MDL Plaintiffs' Co-Lead Counsel, MDL Plaintiffs' Coordinating Counsel, and MDL Plaintiffs' Executive Committee filed a Verified Motion to Enjoin Copycat Case under the All Writs Act [MDL DE 1608], requesting that the Southern District of Florida enjoin the *Sachar* Plaintiffs' and IBERIABANK's Settlement Agreement filed in the Eastern District of Arkansas.  On June 27, 2011, IBERIABANK filed its response to the MDL Plaintiffs'

motion under the All Writs Act [MDL DE 1659].  At the June 28, 2011 hearing on the MDL Plaintiffs' motion, the Parties were granted a continuance permitting the Parties to engage in further settlement negotiations.

As a result of the additional settlement negotiations, the Parties signed a Memorandum of Understanding that memorialized, subject to a mutually agreeable written revised Settlement Agreement and subject to preliminary approval and final approval by the Court as required by Rule 23 of the Federal Rules of Civil Procedure, the Parties' good faith intention to fully, finally, and forever resolve, discharge and release all rights and claims of the Settlement Class Members in exchange for IBERIABANK's agreement to pay the total sum of $2,500,000, inclusive of all attorneys' fees and costs and costs of notice and settlement administration, to create a common fund to benefit the Settlement Class, and to post Debit Card Transactions to IBERIABANK Accounts in the order in which the transactions are authorized or settled by IBERIABANK.

**B.    Summary of the Settlement Terms.**

The terms of the Settlement are detailed in the Agreement attached hereto as "Exhibit A," and are summarized as follows.

**1.    The Settlement Class.**

The Settlement Class is an opt-out class under Rule 23(b)(3) of the Federal Rule of Civil Procedure. The Settlement Class is defined as:

> All persons who maintained an IBERIABANK, IBERIABANK*fsb* Acadiana Bancshares, LBA Savings Bank, Alliance Bank of Baton Rouge, American Horizons Bank of Monroe, Pulaski Investment Corporation, Pulaski Bank and Trust, Pochahontas Bancorp, lnc., First Community Bank, Omni Bank, or Cameron State Bank Account, within the applicable limitations period in the state in which the account incurred fees, or an ANB Financial, Capital SouthBank, Century Bank, Orion Bank, or Sterling Bank Account after the date IBERIABANK assumed certain assets of those banks after each failed and the Federal Deposit Insurance Corporation was appointed as receiver, and within the applicable limitations period in the state in which the account incurred fees, who incurred one or more Overdraft Fees as a result of Debit Re-sequencing. Excluded from the Class are all current IBERIABANK employees, officers and directors, and the judge presiding over this Action.

**2.    Monetary Relief for the Benefit of the Settlement Class.**

As required by the Amended Settlement Agreement and Release, IBERIABANK has deposited the sum of $2.5 million into an Escrow Account. Joint Decl. ¶ 22 (Ex. B). That deposit created the Settlement Fund, which will be used to pay all distributions, fees, costs, and expenses

of the Settlement, including but not limited to distribution of funds to the Settlement Class; all costs of Settlement Notice; all costs of Settlement Administration; all Service Awards; and all attorneys' fees, costs and expenses of Class Counsel. Exhibit A ¶ 49.

Identifiable Settlement Class Members do not have to submit claims or take any other affirmative step to receive relief under the Settlement. Within 30 days of the Effective Date of the Settlement Exhibit A ¶ 80, IBERIABANK and the Settlement Administrator will distribute the Net Settlement Fund to all identifiable Settlement Class Members who do not opt out of the Settlement.

All identifiable Settlement Class Members who experienced a "Positive Differential Overdraft Fee" will receive a pro rata distribution of the Net Settlement Fund. Exhibit A ¶ 75. The Positive Differential Overdraft Fee analysis determines, among other things, which IBERIABANK Account holders were assessed additional overdraft fees that would not have been assessed if the Bank had used a posting sequence or method for Debit Card Transactions, Exhibit A ¶ 75, other than ordering them from highest to lowest dollar amount, and how much in additional overdraft fees those Account holders paid.  The calculation involves a complex, multi-step process described in the Agreement.  Exhibit A ¶ 75.

The Net Settlement Fund is equal to the Settlement Fund plus any interest earned from the Instruments, and less the following:

    a.    all costs incurred in connection with providing Notice to the Settlement Class and mailing checks from the Settlement Fund to Settlement Class Members;

    b.    all costs, expenses, and fees incurred by the Settlement Administrator, the Notice Administrator and the Tax Administrator, and any Taxes;

    c.    a reservation of a reasonable amount of funds for prospective costs of Settlement administration, tax administration and/or additional Notice as agreed upon by Class Counsel and counsel for IBERIABANK;

    d.    the amount of the Court-awarded attorneys' fees, costs and expenses to Class Counsel;

    e.    the amount of the Court-awarded Service Awards to the Plaintiffs;

    f.    the amount of expenses incurred in connection with maintaining the Escrow Account;

g.  the costs associated with investing in the Instruments; and

h.  all other costs and/or expenses incurred in connection with the Settlement not specifically enumerated in subsections (a) through (g) above, that are expressly provided for in this Agreement or have been approved by Class Counsel and counsel for IBERIABANK.

Exhibit A ¶ 80.

  Payments to Settlement Class Members who are current IBERIABANK account holders will be made either by the bank directly crediting such Settlement Class Members' accounts and notifying the Settlement Class members of the credit, or by mailed check, in those circumstances where it is not feasible or reasonable to make the payment by a credit to the Settlement Class Members' Account. Exhibit A ¶ 84.  If payment is made by crediting such Settlement Class Members' accounts, IBERIABANK will then be entitled to a reimbursement for such credits from the Settlement Fund. Exhibit A ¶ 85. Settlement Class Member Payments to Past Account Holders will be made by check with an appropriate legend, in a form approved by Class Counsel and IBERIABANK's counsel, to indicate that it is from the Settlement.  Exhibit A ¶ 86.

  Checks will be cut and mailed by the Settlement Administrator, and will be sent to the addresses that the Settlement Administrator identifies as valid Settlement Class Member addresses. Checks will be valid for 180 days. The Settlement Administrator will make all reasonable efforts to locate the proper address for any Settlement Class Member whose check is returned by the Postal Service as undeliverable, and will re-mail it once to the updated address. All costs associated with the process of printing and mailing the checks and any accompanying communication to Past Account Holders shall be paid out of the Settlement Fund. The Settlement Fund shall pay all such invoices within thirty days of Class Counsel's and IBERIABANK's counsel's approving the invoice for payment. Exhibit A ¶86.

  The amount of the Settlement Fund attributable to un-cashed checks and checks returned to the Settlement Administrator shall remain in the Settlement Fund for one year from the date that the first distribution check is mailed by the Settlement Administrator, during which time the Settlement Administrator will make a reasonable effort to locate Settlement Class Members whose checks were returned to effectuate delivery of such checks to the Settlement Class Members entitled to them. The Settlement Administrator will make one attempt to re-mail or re-issue a distribution check. Exhibit A ¶ 87.

  **3.**  **Distribution of Residual Funds and Cy Pres Distributions.**

Within one year plus thirty days after the date the Settlement Administrator mails the first Settlement Class Member Payment, any funds remaining in the Settlement Fund will be distributed as follows:

> a.    At the election and complete discretion of Class Counsel and counsel for IBERIABANK, the funds may be distributed to Settlement Class Members who received Settlement Class Member Payments on a pro rata basis, to the extent feasible and practical in light of the costs of administering such subsequent payments (all such costs to prepare and transmit such additional payments to be paid by the Settlement Fund); or

> b.    At the election of Class Counsel and counsel for IBERIABANK, the funds may be distributed through a residual *cy pres* program. The residual *cy pres* recipient(s) shall be agreed upon by IBERIABANK and Class Counsel, and approved by the Court. Any residual *cy pres* distribution shall be paid as soon as reasonably possible following the completion of distribution of funds to the Settlement Class Members.

> c.    If Class Counsel and counsel for IBERIABANK are unable to agree on a distribution plan ((a) or (b)) or on the recipient(s), they shall bring the matter, together with supporting materials and argument, to the Court for determination.

Exhibit A ¶ 88.

All costs associated with the disposition of residual funds –whether through an additional distribution to Settlement Class Members or through a residual *cy pres* program – will be borne solely by the Settlement Fund. In the event no money remains in the Settlement Fund, the Parties will have no obligation whatsoever to make any distribution as contemplated by subparagraphs (a) or (b) of paragraph 88.  *Id.*

**4.    Class Release.**

In exchange for the benefits conferred by the Settlement, all Settlement Class Members who do not opt out will be deemed to have released IBERIABANK from claims related to the subject matter of the Action. The detailed release language can be found in Section XV of the Agreement.  Exhibit A ¶¶ 93-95.

**5.    Service Awards, Class Counsel's Fees, and Expenses.**

The Settlement provides that Class Counsel will apply for service awards to each Class Representative, amounting to $5,000 per Class Representative. Exhibit A ¶ 100. The Settlement also provides that Class Counsel will seek up to 30 percent of the Settlement Fund for attorneys'

fees, as well as reasonable expenses, after deducting certain Settlement-related administration expenses. Exhibit A ¶ 96.

**C.      The Proposed Settlement with IBERIABANK Should Be Approved.**

Court approval is required for settlement of a class action. Fed. R. Civ. P. 23(e). Federal courts have long recognized a strong policy and presumption in favor of class action settlements. The Rule 23(e) analysis should be "informed by the strong judicial policy favoring settlements as well as the realization that compromise is the essence of settlement." *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. Unit B 1982). In evaluating a proposed class action settlement, the court "will not substitute its business judgment for that of the parties; 'the only question . . . is whether the settlement, taken as a whole, is so unfair on its face as to preclude judicial approval.'" *Rankin v. Rots*, 2006 WL 1876538, at *3 (E.D. Mich. June 27, 2006) (quoting *Zerkle v. Cleveland-Cliffs Iron Co.*, 52 F.R.D. 151, 159 (S.D.N.Y. 1971)). Indeed, "[s]ettlement agreements are highly favored in the law and will be upheld whenever possible because they are a means of amicably resolving doubts and uncertainties and preventing lawsuits." *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1105 (5th Cir. 1977). Class settlements minimize the litigation expenses of the parties and reduce the strain that litigation imposes upon already scarce judicial resources. Therefore, "federal courts naturally favor the settlement of class action litigation." *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996).

The Settlement here is more than sufficient under the standard of Rule 23(e). Not only does it secure a $2.5 million fund for the benefit of the Settlement Class, but each identifiable Settlement Class Member will receive his or her recovery as a matter of course, without needing to do anything at all, based on an analysis of information in IBERIABANK's possession. As set forth below, Final Approval of this Settlement is clearly warranted.

**1.      The Court Has Personal Jurisdiction over the Settlement Class Because the Class Received Adequate Notice and an Opportunity to Be Heard.**

In addition to having personal jurisdiction over the named Plaintiffs, who are parties to this litigation and agreed to serve as Class Representatives, the Court also has personal jurisdiction over all members of the Settlement Class because they have received the requisite notice and due process required by the United States Supreme Court. As stated by the Supreme Court, for a court to exercise jurisdiction over the claims of absent class members:

> [I]t must provide minimal procedural due process protection. The plaintiff must receive notice plus an opportunity to be heard and participate in the litigation,

whether in person or through counsel. The notice must be the best practicable, 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985) (quoting *Mullane v. Cent. Hanover Bank & Trust Co*., 339 U.S. 306, 314-15 (1950)); see also *In re Prudential Ins. Co. of Am. Sales Practices Litig*., 148 F.3d 283, 306 (3d Cir. 1998) ("[T]he district court obtains personal jurisdiction over the absentee class members by providing proper notice of the impending class action and providing the absentees with the opportunity to be heard or the opportunity to exclude themselves from the class."). These due process protections were provided with respect to the Settlement.

a.     **The Best Notice Practicable Was Provided to the Class.**

The primary objective of this settlement notice effort was to effectively reach the greatest practicable number of Settlement Class Members with a "noticeable" Notice of the settlement, and provide them with every reasonable opportunity to understand that their legal rights were affected, to be heard, and to object or exclude themselves if they so choose.  *See* Decl. of Cameron R. Azari (Ex. B) at 6.  Calculations by Hilsoft Notification indicate that the Summary Mailed Notice reached approximately 97% of the Settlement Class. *Id*. at 18.  The initial mailing of notices was completed on February 13, 2012, which allowed an adequate amount of time for Settlement Class Members to see the Notice and respond accordingly before the March 16, 2012 exclusion and objection deadlines.  *Id*. at 15. With approximately 33 days from the completion of the initial Notice mailing until the exclusion and objection deadlines, Settlement Class Members were allotted adequate time to act on their rights.

Because mailing recipients are accustomed to receiving junk mail that they may be inclined to discard unread, the program called for steps to bring the Notice to the attention of Settlement Class Members.  *Id*. at 36.  Hence, the Notices were clearly worded with simple, plain language to encourage readership and comprehension, and the design of the Notices followed the principles embodied in the Federal Judicial Center's illustrative "model" notices posted at www.fjc.gov.  *Id*.

Additionally, the Summary Mailed Notice carried a prominent callout on the front of the envelope in which it was sent ("**Important Overdraft Settlement Notice Enclosed**"), and featured a prominent headline ("**If you paid overdraft fees related to an IBERIABANK debit**

**card, check card and/or bank card, you could receive a cash payment from a class action settlement.**") in bold text. *Id*. at 37. These design elements alerted recipients that the Notice is an important document authorized by a court and that the content may affect them, thereby supplying reasons to read the Notice.

In addition, notice of the Settlement was published in each Designated Market Area ("DMA") with 6 or more IBERIABANK branch offices with an appropriate daily newspaper. *Id*. The selected newspaper in each DMA was either the highest circulation daily newspaper published in the DMA or a newspaper that was more likely to be read by Settlement Class Members based on the geographic distribution of IBERIABANK branches in the DMA. *Id*. These 9 DMA's included 111 IBERIABANK branch offices or almost 82% of total branches, averaging over 8 branches per DMA. *Id*. at 23.

An approximate fifth-page Summary Publication Notice (approximately 5" x 9") appeared once in a weekday edition in the major daily newspaper in 18 selected media markets covering both the primary city locations of each of the banks acquired by IBERIABANK for which the settling Parties acknowledge that certain of IBERIABANK's records of customer accounts were not readily accessible, and the media markets with the highest number of IBERIABANK branch offices. The 18 total newspapers have a combined average daily circulation of 1,460,356. Positioning was sought in the main news section of each newspaper to enhance readership. *Id*. at 24.

A special Settlement website was also established, which enables Settlement Class members to obtain additional information about the Settlement. The case website, www.IberiabankOverdraftSettlement.com, went live on December 29, 2011 and included complete versions in both English and Spanish. The website address was displayed prominently in all notice documents. By visiting this website, Settlement Class Members can view additional information about the settlement, including the Detailed Notice, Settlement Agreement, Preliminary Approval Order, Preliminary Approval Order Correction and a list of Frequently Asked Questions. Settlement Class Members could and can also print out a copy of the Claim Form. The website was made secure using a Secure Socket Layer (SSL) Certificate through Network Solutions, LLC. *Id*. at 27.

As of February 24, 2012, there have been 1,531 website visitor sessions in which 8,532 website pages were viewed, which equates to just over five (5) pages per visitor session.

Finally, on December 29, 2012, the toll free number, became operational.  By calling this number, Settlement Class Members could and can listen in both English and Spanish to answers to frequently asked questions and request a copy of the Detailed Notice and Claim Form.  This automated system has been available 24 hours per day, 7 days per week.  As of February 24, 2012, the toll free number has handled 945 calls representing 2,624 minutes of use.

**b.      The Notice Was Reasonably Calculated to Inform Class Members of Their Rights.**

The Court-approved notice provided to the Settlement Class members was sufficient to satisfy the requirements of due process because it described "the substantive claims . . . [and] contained information reasonably necessary to make a decision to remain a class member and be bound by the final judgment." *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104-05 (5th Cir. 1977).

This notice, among other things, defined the Settlement Class, described the release as well as the amount and proposed distribution of the Settlement proceeds, and informed Settlement Class Members of their right to opt-out and object, the procedures for doing so, and the time and place of the Final Approval Hearing. It also notified Settlement Class Members that a class judgment would bind them unless they opted out, and told them where they could obtain more information, such as access to a full copy of the Agreement. The notice also described in summary form the fact that Class Counsel would be seeking attorneys' fees of up to 30 percent of the Settlement.

Settlement Class Members were provided with the best practicable notice "reasonably calculated, under [the] circumstances, to apprise them of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

**2.      The Settlement Should Be Approved Because It Is Fair, Adequate and Reasonable.**

In determining whether to approve the Settlement, the Court considers whether it is "fair, adequate, reasonable, and not the product of collusion." *Leverso v. SouthTrust Bank of Al., N.A.*, 18 F.3d 1527, 1530 (11th Cir. 1994); *see also Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984). A settlement is fair, reasonable, and adequate when "the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued." *In re Lorazepam & Clorazepate Antitrust Litig.*, MDL No. 1290, 2003 WL 22037741, at *2 (D.D.C.

June 16, 2003) (quoting Manual for Complex Litigation (Third) § 30.42 (1995)). The Court is "not called upon to determine whether the settlement reached by the parties is the best possible deal, nor whether class members will receive as much from a settlement as they might have recovered from victory at trial." *In re Mexico Money Transfer Litig*., 164 F. Supp. 2d 1002, 1014 (N.D. Ill. 2000) (citations omitted).

The Eleventh Circuit has identified six factors to be considered in analyzing the fairness, reasonableness and adequacy of a class action settlement under Rule 23(e):

(1)      the existence of fraud or collusion behind the settlement;
(2)       the complexity, expense, and likely duration of the litigation;
(3)      the stage of the proceedings and the amount of discovery completed;
(4)      the probability of the plaintiffs' success on the merits;
(5)      the range of possible recovery; and
(6)      the opinions of the class counsel, class representatives, and the substance and amount of opposition to the settlement.

*Leverso*, 18 F.3d at 1530 n.6; *see also* Bennett, 737 F.2d at 986. As set forth below, an analysis of these factors shows the Settlement to be fair, adequate and reasonable.

### a.      There Was No Fraud or Collusion.

The Court is well aware of the nature and complexity of this case and others of its kind presently in this MDL.  This Settlement is the result of informed, good-faith, arms'-length negotiations between the Parties and their capable and experienced counsel and the assistance of an experienced, highly qualified mediator, and it is not the result of collusion.  The contested nature of the proceedings in this case demonstrates the lack of fraud or collusion behind the Settlement. *See, e.g., In re Sunbeam Sec. Litig*., 176 F. Supp. 2d 1323, 1329 n.3 (S.D. Fla. 2001); *Ingram v. Coca-Cola Co*., 200 F.R.D. 685, 693 (N.D. Ga. 2001) (court had "no doubt that this case has been adversarial, featuring a high level of contention between the parties"); *In re Motorsports Merchandise Antitrust Litig*., 112 F. Supp. 2d 1329, 1338 (N.D. Ga. 2000) ("[t]his was not a quick settlement, and there is no suggestion of collusion"); *Warren v. City of Tampa*, 693 F. Supp. 1051, 1055 (M.D. Fla. 1988) (record showed no evidence of collusion, but to the contrary showed "that the parties conducted discovery and negotiated the terms of settlement for an extended period of time"), *aff'd*, 893 F.2d 347 (11th Cir. 1989).

### b.      The Settlement Will Avert Years of Highly Complex and Expensive Litigation.

This case involves thousands of Settlement Class Members and alleged wrongful overdraft fees in the millions of dollars. The claims and defenses are complex, and litigating

them is difficult and time consuming. The Action has been pending for more than a year, and recovery by any means other than settlement would require additional years of litigation in this Court and appellate courts. *See United States v. Glens Falls Newspapers, Inc*., 160 F.3d 853, 856 (2d Cir. 1998) ("a principal function of a trial judge is to foster an atmosphere of open discussion among the parties' attorneys and representatives so that litigation may be settled promptly and fairly so as to avoid the uncertainty, expense and delay inherent in a trial"); *In re Domestic Air Transp. Antitrust Litig*., 148 F.R.D. 297, 317, 325-26 & n.32 (N.D. Ga. 1993) ("adjudication of the claims of two million claimants could last half a millennium").

The Settlement provides immediate and substantial benefits to thousands of IBERIABANK customers. As stated in *In re Shell Oil Refinery*, 155 F.R.D. 552 (E.D. La. 1993):

> The Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation. In this respect, '[i]t has been held proper to take the bird in the hand instead of a prospective flock in the bush.'

*Id*. at 560 (alterations in original) (quoting *Oppenlander v. Standard Oil Co*., 64 F.R.D. 597, 624 (D. Colo. 1974)); *see also In re U.S. Oil & Gas Litig*., 967 F.2d 489, 493 (11th Cir. 1992) (noting that complex litigation "can occupy a court's docket for years on end, depleting the resources of the parties and taxpayers while rendering meaningful relief increasingly elusive"). Especially because the "demand for time on the existing judicial system must be evaluated in determining the reasonableness of the settlement," *Ressler v. Jacobson*, 822 F. Supp. 1551, 1554 (M.D. Fla. 1992) (citation omitted), there can be no reasonable doubt as to the adequacy of this Settlement, which provides an immediate, tangible, and significant benefit to the Class.

### c. The Factual Record is Sufficiently Developed to Enable Plaintiffs and Class Counsel to Make a Reasoned Judgment Concerning the Settlement.

Courts also consider "the degree of case development that class counsel have accomplished prior to settlement" to ensure that "counsel had an adequate appreciation of the merits of the case before negotiating." *In re General Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig*., 55 F.3d 768, 813 (3d Cir. 1995). At the same time, "[t]he law is clear that early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations." *Ressler*, 822 F. Supp. at 1555.

16

Significant informal discovery occurred in this case prior to the Settlement. That discovery afforded Settlement Class Counsel insight into the strengths and weaknesses of their claims against IBERIABANK. *Id*. Before settling, counsel had already developed ample information and performed extensive analyses from which "to determine the probability of their success on the merits, the possible range of recovery, and the likely expense and duration of the litigation*." Mashburn v. Nat'l Healthcare, Inc*., 684 F. Supp. 660, 669 (M.D. Ala. 1988).

      **d.**      **Plaintiffs Would Have Faced Significant Obstacles to Obtaining Relief.**

"[T]he likelihood and extent of any recovery from the defendants absent . . . settlement" constitutes an important factor in assessing the reasonableness of a settlement. *In re Domestic Air Transp*., 148 F.R.D. at 314 (N.D. Ga. 1993); *see also Ressler*, 822 F. Supp. at 1555 ("A Court is to consider the likelihood of the plaintiff's success on the merits of his claims against the amount and form of relief offered in the settlement before judging the fairness of the compromise.").

Plaintiffs and Class Counsel believe they have a compelling case against IBERIABANK. Even so, the defenses available to IBERIABANK would require Plaintiffs to overcome substantial obstacles in any contested proceeding. In fact, this litigation involved several major risks.  Class Counsel and Plaintiffs thus appreciate that, absent a settlement, it would potentially take years of additional litigation – and overcoming vigorous legal and factual defenses – to bring the Action to finality. Even then, the outcome would be uncertain.

Given the various risks attending these claims, the Settlement is a fair compromise. See, e.g., *Bennett v. Behring Corp*., 96 F.R.D. 343, 349-50 (S.D. Fla. 1982) (plaintiffs faced a "myriad of factual and legal problems" that led to "great uncertainty as to the fact and amount of damage," which made it "unwise [for plaintiffs] to risk the substantial benefits which the settlement confers . . . to the vagaries of a trial"), *aff'd*, 737 F.2d 982 (11th Cir. 1984); *Enter. Energy Corp. v. Columbia Gas Transmission Corp*., 137 F.R.D. 240, 248 (S.D. Ohio 1991) (citing the "very real potential that the [c]lass could come away from a long expensive trial with nothing," the court rejected the argument "that the Class should get more").

      **e.**      **The Benefits Provided by the Settlement Are Fair, Adequate and Reasonable When Compared to the Range of Possible Recovery.**

In determining whether a settlement is fair in light of the potential range of recovery, this Court should be guided by the "important maxim[]" it once articulated – namely, "the fact that a

proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate." *Behrens v. Wometco Enters., Inc*., 118 F.R.D. 534, 542 (S.D. Fla. 1988), aff'd, 899 F.2d 21 (11th Cir. 1990). "A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery." *Id*. This is because a settlement must be evaluated "in light of the attendant risks with litigation." *Thompson v. Metropolitan Life Ins. Co*., 216 F.R.D. 55, 64 (S.D.N.Y. 2003); see *Bennett*, 737 F.2d at 986 ("[C]ompromise is the essence of settlement."); *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("[T]he very essence of a settlement is . . . a yielding of absolutes and an abandoning of highest hopes.") (internal quotation omitted). Courts regularly find settlements to be fair where "[p]laintiffs have not received the optimal relief." *Warren*, 693 F. Supp. at 1059; *see, e.g., Great Neck Capital Appreciation Investment P'ship, L.P. v. PriceWaterHouseCoopers, L.L.P*., 212 F.R.D. 400, 409-410 (E.D. Wis. 2002) ("The mere possibility that the class might receive more if the case were fully litigated is not a good reason for disapproving the settlement.").

The Settlement provides substantial value to the Settlement Class. This value is well within the range of reasonableness. Under the Settlement, Plaintiffs and the Settlement Class have recovered $2.5 million, which represents approximately 20 percent of their anticipated total recovery. *See* Decl. of Arthur Olsen, Ex. C ¶ 17.

The absence of a claims-made process here also demonstrates the propriety of settlement approval. All identifiable Settlement Class Members will receive the benefit automatically, without taking any action whatsoever. *Cf. Sylvester v. CIGNA Corp*., 369 F. Supp. 2d 34, 52 (D. Me. 2005) (finding that "'claims made' settlements regularly yield response rates of 10 percent or less."); *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 391 (C.D. Cal. 2007) ("[M]uch of what is attainable will go unpaid as a result of the claims-made process.").

      **f.**      **The Opinions of Settlement Class Counsel, Class Representatives, and Absent Class Members Strongly Favor Approval of the Settlement.**

The Court should also give "great weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation." *Warren*, 693 F. Supp. at 1060; *see also Mashburn*, 684 F. Supp. at 669 ("If plaintiffs' counsel did not believe these factors all pointed substantially in favor of this settlement as presently structured, this Court is certain that they would not have signed their names to the settlement agreement."); *In re Domestic Air Transp*., 148 F.R.D. at 312-13 ("In determining whether to approve a proposed

settlement, the Court is entitled to rely upon the judgment of the parties' experienced counsel. '[T]he trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel.'" (citations omitted)).

Class Counsel believe that this Settlement deserves Final Approval. Moreover, there has been no opposition to the Settlement. To date, Settlement Class Counsel have not received any objections or opt-outs. *Id*.

As many courts have noted: "[A] small number of objectors from a plaintiff class of many thousands is strong evidence of a settlement's fairness and reasonableness." *Ass'n for Disabled Americans v. Amoco Oil Co*., 211 F.R.D. 457, 467 (S.D. Fla. 2002); accord *Mangone*, 206 F.R.D. at 227 ("In evaluating the fairness of a class action settlement, such overwhelming support by class members is strong circumstantial evidence supporting the fairness of the Settlement."); *Austin v. Pennsylvania Dept. of Correction*s, 876 F. Supp. 1437, 1458 (E.D. Pa. 1995) ("Because class members are presumed to know what is in their best interest, the reaction of the class to the Settlement Agreement is an important factor for the court to consider.").

3.      **The Court Should Certify the IBERIABANK Settlement Class.**

This Court has previously found the requirements of Rule 23(a) and 23(b)(3) to be satisfied in the Action.   The Court should make the same class certification findings in granting Final Approval.

Accordingly, for all the above reasons, the Settlement is fair, adequate and reasonable, and deserving of Final Approval.

## III. CONCLUSION

The Settlement securing $2.5 million in immediate compensation for the Settlement Class satisfies the fairness and reasonableness standard embodied in Rule 23(e), as well as the class certification requirements of Rules 23(a) and (b)(3).

Accordingly, Plaintiffs and Class Counsel respectfully request that this Court (1) approve the Settlement; (2) certify for settlement purposes the Settlement Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(3), and 23(e); (3) appoint Plaintiffs David J. Sachar and Christine M. Sachar as Class Representatives; (4) appoint as Class Counsel the attorneys and law firms listed in paragraph 8 of the Preliminary Approval Order, respectively; and (5) enter Final Judgment dismissing the Action with prejudice.

Dated this 1st day of March, 2012

RESPECTFULLY SUBMITTED,

Attorneys for Plaintiffs:

Steven A. Owings, AR Bar No. 89035
OWINGS LAW FIRM
1400 Brookwood
Little Rock, AR 72202
Telephone: (501) 661-9999
Fax: (501) 661-8393
sowings@owingslawfirm.com

By:   /s/ Steven A. Owings

and

Brent Walker, AR Bar No. 2002152
CARTER WALKER, PLLC
P.O. Box 628
Cabot, AR  72023
Telephone: (501) 605-1346
Fax: (501) 605-1348
bwalker@carterwalkerlaw.com

and

Jack Wagoner, AR Bar No. 89096
WAGONER LAW FIRM, P.A.
1320 Brookwood, Suite E
Little Rock, AR 72202
Telephone:  (501) 663-5225
Fax:  (501) 660-4030
Jack@wagonerlawfirm.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 1, 2012, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

<u>*s/ Steven A. Owings*</u>

Steven A. Owings

**<u>Service List</u>**
*Sachar v. IBERIABANK*
Case No. 09-cv-02036-JLK

Thomas Meeks
Aaron S. Weiss
Carlton Fields, P.A.
100 S.E. Second Street, Suite 4200
Miami, FL 33131
Telephone:  (305)  530-0050
Facsimile:  (305)  530-0055
E-mail: tmeeks@carltonfields.com
*(via electronic filing)*

Robert C. Gilbert
Grossman Roth, P.A.
2525 Ponce de Leon Boulevard
Suite 1150
Miami, FL 33134
Telephone: (305) 442-8666
Facsimile: (305) 779-9596
E-mail: rcg@grossmanroth.com
*(via electronic filing)*