# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**CASE NO. 09-MD-02036-JLK**

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036
_____/

THIS DOCUMENT RELATES TO:

*Sachar, et al. v. IBERIABANK Corp., et al.*
S.D. Fla. Case No. 1:11-CV-22844-JLK
_____/

**DECLARATION OF ARTHUR OLSEN**

      I, Arthur Olsen, declare as follows:

<u>Scope of Assignment</u>

      1.      I was asked to perform and oversee certain data extraction, data analysis and damage calculations in connection with the effectuation of the proposed class action settlement ("Settlement") with Iberia Bank ("Iberia"). My qualifications and background are set forth in more detail in my consultant profile attached hereto as Exhibit A.

      2.      This assignment required me to review and analyze the historical customer transaction data that Iberia has maintained for the Settlement class period(s) in order to determine whether the data could be utilized to: (a) identify those Iberia consumer accounts that were "harmed" (i.e., assessed additional overdraft fees) as a result of the practice of posting debit card transactions in the order of high-to-low in dollar amount instead of in low-to-high order; and (b) calculate the amount of harm (i.e., additional overdraft fees) each such consumer account incurred as a result of such practice.

3. From August 2011 through January 2012, my associate Ed Hamilton, (who works under my direct supervision), and I spent approximately 450 hours working with the Iberia data. I consulted at length with Iberia's in-house data managers in both telephone conferences and in person, and made several trips to Iberia's offices in New Iberia, Louisiana. As discussed in more detail below, I was able to determine that the data maintained by Iberia was sufficient to make the required damage calculations. Thereafter, I performed the full damage analysis in order to identify the accounts that were harmed, as well as the corresponding amount of that harm.

4. As a result of these efforts, I identified all accounts from the class period(s) covered by the proposed Settlement in this case that were harmed as a result of Iberia's high-to-low sequencing of debit card transactions, where such accounts were reasonably determinable from Iberia's available data. Specifically, I identified 42,119 accounts demonstrating such "harm." Additionally, I calculated the amount of additional overdraft fees each such consumer account incurred as a result of such practice. The aggregate amount of additional overdraft fees for these accounts totaled $12,500,467.35.

Project Timeline

5. In August, 2011, I was asked to embark on the assignment described above, (i.e., identify Iberia consumer accounts harmed by debit card re-sequencing and calculate each such account's corresponding harm).

6. During the time period from August 2011 through December 2011, Iberia employees pulled the data that was eventually utilized in order to perform the analysis. Throughout this time, I participated in several meetings and telephone conversations with data managers from Iberia, which included, (among others), Jack Deano, Mary Anne Smith, Linda Hatchett, Don Ledet and WR Holman.

7. From September 2011 through January 2012, the analysis was performed on-site at the Iberia facility in New Iberia, Louisiana. During this period, I spent three weeks at the Iberia facility. In addition, my associate Ed Hamilton spent four weeks on-site assisting with the analysis.

Analysis of the Iberia Data

8. The historical data maintained by Iberia consisted of account statements, which were provided in PDF format. As a result, the data in those statements had to be extracted and converted into a format that could then be loaded into a database.

9. Once in the database, the analysis consisted of the following steps:

   a. For each instance where a customer was assessed multiple overdraft charges on a given day, I programmatically re-sorted the transactions to match the alternative posting scenario that I was provided, and calculated the number of overdraft fees that would have been assessed under the alternative scenario. Specifically, I sorted all debit card transactions by transaction amount, from low-to-high, (as opposed to the original order of high-to-low), and then all other debits in their original order of high-to-low.

   b. Next, I calculated the differential between the overdraft fees that would have been assessed to each customer under the alternative low-to-high posting order that was provided to me by counsel, and the overdraft fees that Iberia actually assessed under its actual high-to-low posting order. I then added up the differentials for all of the customers to calculate the gross damages.

3

10. Through this analysis, I was able to identify the customers who were "harmed" (i.e., would have been charged fewer overdrafts under the alternative posting order) and the amount they were harmed during the class period.

11. To measure accurately the "harm" to each customer, I developed and applied methodologies to adjust the gross damages to account for: (a) "uncollectables" (where the customer closed the account with a negative balance and Iberia does not collect the assessed overdraft fee); and (b) "reversals" (where Iberia reversed the assessed overdraft fee).

12. For uncollectables, I was told to assume that if an account was closed after a write-off for a negative balance, it was to be considered uncollectable. In such instances, I simply reduced the customer's gross damages by the amount of such negative balance. If the remaining damage after that adjustment was zero or negative, then the customer was not considered "harmed."

13. For reversals, the data that I was provided contained the amount and reversal posting date (i.e., when the reversed amount was credited to the account) for all overdraft fee reversals, but the data did not indicate which overdraft fee reversals were tied to which assessed overdraft fees, making it impossible to determine precisely the impact of reversals on the "harm" caused by Iberia's posting order.

14. I used the "30 day" method to adjust for fee reversals in the absence of the precise data which tied overdraft fee reversals to overdraft fees charged. Under the 30-day method, all overdraft fee reversals that occurred in the 30 days after any "differential" (i.e., after any instance where the customer would have had fewer overdraft charges under the "scenario" in question) were used to offset such "differential." If the overdraft fee reversals equaled or exceeded the "differential," then the customer was not considered "harmed." If the overdraft fee reversals

4

were less than the "differential," then the "differential" (the harm) was reduced by the amount of the reversals.

15. After adjusting the gross damages to account for uncollectables and reversals, any customer with remaining damages was identified as a "harmed" customer (i.e., identified as someone who would have paid fewer overdraft fees if that alternative sequencing had been used instead of Iberia's actual posting practice), and the remaining damage was the amount of their "harm."

Conclusions

16. For the class period(s) provided to me in this case, I identified 42,119 accounts demonstrating the "harm" resulting from Iberia's debit card re-sequencing.

17. I calculated the amount of additional overdraft fees each such consumer account incurred as a result of Iberia's debit card re-sequencing practice. The specific amount of additional overdraft fees incurred on each of these accounts has been provided to Iberia. The aggregate amount of additional overdraft fees for these accounts totaled $12,500,467.35.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 1st day of March, 2012, at San Francisco, California.

_____
ARTHUR OLSEN