## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 1:09-MD-02036-JLK

**IN RE: CHECKING ACCOUNT OVERDRAFT LITIGATION**

**MDL No. 2036**

---

**THIS DOCUMENT RELATES TO: THIRD TRANCHE BANKS**

*Dwyer v. T.D. Bank, N.A.*
D. Ma. Case No. 1:09-12118
S.D. Fla. Case No. 10-cv-20855-JLK

*Mosser v. TD Bank, N.A.*
E.D. Pa. Case No. 2:10-cv-00731
S.D. Fla. Case No. 10-cv-21386-JLK

*Mascaro v. TD Bank, N.A.*
D.D. Case No. 1:10-cv-0040
S.D. Fla. Case No. 10-cv-21117-JLK

*Mazzadra, et al v. TD Bank, N.A.*
S.D. Fla. Case No. 1:10-cv-21870-JLK

---

### PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT TD BANK, N.A.'S MOTION TO EXCLUDE THE DECLARATION OF PLAINTIFFS' PROPOSED EXPERT ARTHUR OLSEN AND INCORPORATED MEMORANDUM OF LAW

Defendant TD Bank, N.A.'s ("TD") Motion to Exclude the Declaration of Plaintiffs' Expert Arthur Olsen ("Olsen") ("Motion") is a study in misdirection. Instead of addressing the expert analysis Olsen actually did, TD attacks an opinion Olsen never offered, and then claims that he lacks the qualifications to offer it. TD then proceeds to overstate and misstate the record in support of its claim that there are flaws in Olsen's methodology. TD concludes with argument about things that Olsen did not do (and was not required to do), and thus are irrelevant to a

meritorious *Daubert* challenge.  These arguments lack merit, but because TD raised them here, Plaintiffs address this in Part II below.

Olsen and his methodology easily satisfy the *Daubert* standard.  His expert testimony rests on sound principles of database mining and data analysis.  The analysis conducted by Olsen is relevant and will assist the Court in deciding Plaintiffs' Motion for Class Certification because it demonstrates that Plaintiffs are able, on a class-wide basis, to establish injury and calculate damages based on proposed alternate posting scenarios in comparison to the re-sequencing policies used by TD to extract excessive overdraft fees from its customers.  Indeed, TD's arguments are nearly identical to those raised by Wells Fargo in its *Daubert* challenge of Olsen, and rejected by United States District Judge William Alsup in *Gutierrez v. Wells Fargo & Co.*, 2010 WL 1233810 (N.D. Cal. Mar. 26, 2010).  Judge Alsup held that Olsen was a computer expert and that the data mining and methodologies he used to generate the various alternate posting scenarios to calculate the plaintiffs' damages were sound and reliable.  *Id.* at 13, 18-19. In fact, in reliance on Olsen's expert testimony, Judge Alsup in *Gutierrez* certified a class of California customers and entered final judgment for over $200 million in favor of the plaintiffs and against Wells Fargo.  *See Gutierrez v. Wells Fargo Bank, N.A.*, No. C. 07-05923 (N.D. Cal. Oct. 25, 2010); *see also Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080 (N.D. Cal. 2010).

## ARGUMENT

Olsen satisfies the *Daubert* standard because he is an expert in data analysis, which is the field in which Plaintiffs offered him as an expert and which encompass the methodologies that he employed to calculate the named Plaintiffs' damages under one of the possible alternative posting orders.  *See* Olsen Decl. ¶ 1 ("I was retained by Plaintiffs in the above-referenced action

to perform consulting and expert work regarding database analysis, data extraction and damage calculation issues.").  The methodological errors claimed by TD are not the result of mistakes made by Olsen but instead reflect shortcomings in TD's own data.  *See Gutierrez*, 2010 WL 1233810 at *11 (N.D. Cal. Mar. 26, 2010) ("defendant *cannot* object to a damage study that is as close to the best possible using its own data" when "defendant's *own data system* did not capture and store this information") (emphasis in original).  Finally, TD's argument that Olsen should calculate damages to the Class by comparison to a "but for" world is not a proper *Daubert* challenge, but is a merits argument that in no way relates to the strength of Olsen's qualifications or the robustness of his methodology.  It is instead a merits argument that has no place in a *Daubert* motion.  However, because TD raised it here, Plaintiffs will address it in this Response.

## I.     OLSEN'S EXPERT OPINIONS SATISFY THE *DAUBERT* LEGAL STANDARD

The Court must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597 (1993). In making that determination, the Court is only required to make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is . . . valid" and "whether that reasoning or methodology properly can be applied to the facts in issue."  *Id.* at 592-93. However, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence."  *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). "A district court's gatekeeper role under *Daubert* is not intended to supplant the adversary system or the role of the jury," *Allison v. McGhan*, 184 F.3d 1300, 1311 (11th Cir 1999), rather "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking" such evidence.  *Daubert* 509 U.S. at 596.

"As a general rule the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Hartley v. Dillard's, Inc.*, 310 F.3d 1055, 1061 (8th Cir. 2002). "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Id.* Under this standard, courts rarely find expert testimony inadmissible. As one court noted:

> A key but sometimes forgotten principle of Rule 702 and *Daubert* is that Rule 702, both before and after *Daubert*, was intended to relax traditional barriers to admission of expert opinion testimony. Accordingly, courts are in agreement that Rule 702 mandates a liberal standard for the admissibility of expert testimony. As the Advisory Committee to the 2000 amendments to Rule 702 noted with apparent approval, "[a] review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."

*Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1082-83 (D. Colo. 2006) (citations omitted). Plaintiffs need not prove that the proffered expert testimony is correct or even persuasive, only that it is sufficiently reliable to assist the jury: "The requirement of reliability is lower than the standard of correctness." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994) (quoted with approval in 2000 Advisory Cmt. Note to Fed. R. Evid. 702). Maintaining the distinction between the evidentiary requirement of reliability and the higher standard of whether the expert's conclusions are correct "is indeed significant as it preserves the fact finding role of the jury." *In re TMI Litig.*, 193 F.3d 613, 665 n.90 (3d Cir. 1999).

Scientific evidence is reliable if it is based on an assertion that is grounded in methods of science – the focus is on principles and methodology, not on conclusions. *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 841 (9th Cir. 2001). In determining whether an expert's reasoning or methodology is scientifically valid, courts consider (1) whether the scientific theory or technique can be (or has been) tested, (2) whether the theory or technique has been subjected to peer review

4

and publication, (3) whether a particular technique has a known potential rate of error, and (4) whether the theory or technique is generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 593-94.  These reliability factors are not intended to be exhaustive or to apply in every case.  *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000).  Rather, the *Daubert* inquiry is tailored to the facts of the case and the particular type of expert testimony, and the court enjoys "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

A.     **Olsen Is Qualified To Testify Competently Regarding The Matters He Intends to Address**

Olsen is eminently qualified to analyze the alternate posting scenarios to determine the damages incurred by TD's customers based on TD's re-sequencing practices.  Olsen has more than 15 years of professional experience in database development, data mining, data engineering, and analysis at such database industry leaders as Microsoft, Hewlett-Packard, and Cisco Systems.  Olsen Decl. ¶¶ 4, 6-7.  TD provided Olsen access to certain of the named Plaintiffs' transactional and customer data through which he was able to identify the amount of damages each named Plaintiff suffered as a result of TD's re-sequencing practices when compared to an alternate posting sequence.  *Id.* at ¶¶ 51-52.  In so doing, he proved the only thing that was asked of him at this point in the case:  that Plaintiffs can ultimately establish damages on a class-wide basis utilizing TD's own data.  *See, e.g., Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 326-7 (5th Cir. 1978) (individual issues relating to damages do not defeat class certification where those damages can be calculated using a mathematical or mechanical formula).

In order to determine each named Plaintiff's damages, Olsen relied on TD's transactional data and applied the methodology that he developed to automatically re-sequence the named

Plaintiffs' daily transactions to re-create an alternate posting scenario where the same transactions were posted in a different sequence than the high-to-low re-sequencing utilized by TD to maximize overdraft fees. Olsen Decl. ¶¶ 49-52. Olsen's analysis reliably compared, on an account-by-account basis for each named Plaintiff, the number of overdraft charges TD would have assessed under an alternate scenario with the charges TD actually assessed based on its re-sequencing. *Id.* The resulting difference determined the measure of harm experienced by each named Plaintiff. *Id.* Olsen, applying this same methodology, can perform the same calculation on a class wide basis during the class period relying on TD's own data. *Id.* ¶¶ 43, 46; *see also* Olsen Reply Decl. ¶ 4.[1] This is the same methodology he used and that Judge Alsup approved in *Gutierrez.*

> This order finds that plaintiffs' expert Arthur Olsen has convincingly shown that it is entirely practical to re-run the computerized data in storage for each class members' account and determine how many overdrafts were added by the high-to-low practice for debit-card transactions during the class period. Indeed, he has already done so, using various alternate posting sequences. This has been done by him on an account-by-account, day-by-day, and transaction-by-transaction basis, using the bank's own real-world data.

*Gutierrez*, 730 F. Supp. 2d at 1138. Indeed, TD's expert Visser admitted that he was able to recreate Olsen's results using the same data given to Olsen. Visser Depo. at 136:11-137:8.

## B.    Olsen Did Not Need To Choose the "Proper" Posting Method

To show how damages could be proven on a class-wide basis, Olsen ran a computer program that calculated the difference between the overdraft fees that were generated under TD's high-to-low posting method and the overdraft fees that would have been generated under the "Scenario 2A" posting method that Judge Alsup adopted as the proper posting method in

---

[1] Olsen's Reply Declaration in Support of Plaintiffs' Motion for Class Certification ("Reply Declaration") is attached as an exhibit to Plaintiffs' reply to TD's' response to Plaintiffs' motion for class certification.

*Gutierrez*.  *See* Olsen Decl. ¶¶ 50-53; Reply Decl. ¶ 4-5 (explaining methodology).  TD faults Olsen for not endorsing Scenario 2A as the proper posting method for this case.  Motion at 5. But the question of which posting method is the proper or lawful one for this case is for the jury to answer at the merits stage, not for Olsen at the class-certification stage.  *See In re Linerboard Antitrust Litig.*, 305 F.3d 145, 155 (3d Cir. 2002) (because certification stage is early in litigation process, expert is not required to choose between potentially viable econometric models at class certification stage); *In re Corrugated Container Antitrust Litig.*, 80 F.R.D. 244, 251-52 (S.D. Tex. 1978) (plaintiffs satisfied 23(b)(3) requirements where expert's affidavit that either or a combination of two economic methodologies could be used to determine damages without raising individualized issues of proof).

At the class certification stage, Plaintiffs need only show that damages are susceptible to class-wide proof.  *See Behrend v. Comcast Corp.*, 655 F.3d 182, 204 (3d Cir. 2011) ("The inquiry for a district court at the class certification stage is whether the plaintiffs have demonstrated by a preponderance of the evidence that they will be able to measure damages on a class-wide basis using common proof.").  Olsen's calculations, and indeed TD's own expert's calculations, accomplish this task by showing that, whichever posting order the jury deems the proper or lawful one, damages can be calculated for the entire class using a mathematical or mechanical formula.  Both this Court and Judge Alsup in *Gutierrez* have already concluded that such calculations satisfy this requirement in bank overdraft cases like this one. *See Larsen*, 275 F.R.D. at 677; *Gutierrez*, 2008 WL 4279550 at *17.  Thus, Olsen's refusal to endorse Scenario 2A as the proper posting order does not preclude class certification.

**C.     The Methodology By Which Olsen Reached His Conclusions Is Sufficiently Reliable**

TD insists that Olsen's work is unreliable.  Motion at 7.  However, strip away the rhetoric, and TD makes essentially two claims regarding the reliability of Olsen's analysis.  TD argues that Olsen is unable to link a certain percentage of transactions to the date and time that they were initiated, and that Olsen is unable to link the refunds of certain overdraft fees by TD to the specific overdraft fees assessed by the bank.  Motion at 8.  Plaintiffs address each of these in turn.

**i.     Olsen is not required to link overdraft fee reversals to particular overdraft fees**

TD admits that its own data "does not indicate which reversals tie to which assessed overdraft fees."  Motion at 8; *see also* Visser Decl. at ¶¶ 12-13 (noting that the reason that Olsen could not match reversals to specific overdraft fees is because TD Bank does not match reversals to specific overdrafts).  TD then tries to make this Plaintiffs' problem.  That gambit must fail. First, the reduction of damages based on overdraft fee reversals is simply a set off.  As such, it is an affirmative defense for which TD bears the burden of proof.  *See, e.g., Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1292 (11th Cir. 2005).  TD admits that as a result of its choice not to collect data linking overdraft fees to refunds, it cannot meet that burden of proof, and thus is not entitled to an set off of any kind.  TD's own expert admitted that, if linking reversals to specific overdraft fees was important to the bank, it would have tried to "implement something to build that relationship into its systems" if it were feasible.  Visser Depo. at 242:18 – 243:5. Plaintiffs are entitled to summary judgment on this point based on this concession.

Second, in making this argument, TD is not only improperly attempting to shift its set off burden of proof to plaintiffs, but is asserting that Plaintiffs' claims fail solely because TD did not

keep records sufficient for plaintiffs to determine their harm. In *Gutierrez*, Judge Alsup addressed and rejected this very argument. *Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080, 1139 (N.D. Cal. 2010) (citing *Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 264 (1946) (Class members, of course, should not be penalized for data deficiencies in the very computer systems used to power the bank's unlawful practices).

Third, even though Plaintiffs do not bear the burden of setting off refunds against overdraft fee damages, Plaintiffs nevertheless asked Olsen to do so, and he arrived at two adequate methods of doing so. Because Plaintiffs do not bear the burden here, and because there is every likelihood that refunds tie to no overdraft fees in particular, or to those for which no damages were assessed because they did not result from re-posting, these two methods represent an extremely conservative (and favorable to the bank) approach to this issue. As Judge Alsup correctly determined, nothing more is required of Plaintiffs.

> Here, even Wells Fargo's own damages expert, Dr. Cox, freely admits that "[fee] reversals are not tied to particular transactions" (Cox Dep. at 13-15). Given this reality, Wells Fargo cannot cry "foul" when plaintiffs' damages study fails to account for the subjective intent behind each and every fee reversal granted by their banks. Stated differently, plaintiffs cannot be expected to determine, with 100% accuracy, the exact overdraft charge associated with a particular fee reversal when defendant's *own data system* did not capture and store this information. Indeed, even if the claims were brought individually rather than on a class-wide basis, the same ambiguities in transaction data would be present for each individual customer. In sum, defendant *cannot* object to a damage study that is as close to the best possible using its own data, especially if class-wide methods of proof would be no less imprecise than individual methods of proof. *See, e.g., Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 66 S. Ct. 574, 90 L. Ed. 652 (1946).

*Gutierrez*, 2010 WL 1233810 at *11.

### ii.     Olsen can more than adequately link debit card transactions to the date and time of authorization

Olsen is able to link most transactions to a date/time of authorization.  Olsen analyzed the data made available to him by TD and concluded preliminarily that he could link 85% of debit card transactions to their time and date of authorization using TD's own data.  Reply Decl. ¶ 5.[2] This is consistent with Olsen's findings in *Gutierrez*.  *Id.* ¶¶ 5-6.  TD challenges this through Visser, who disingenuously claims that Olsen is unable "to include time information for 46% of the total named Plaintiffs' transactions."  Motion at 11 (citing Visser Decl. ¶ 13).[3]  This is a blatant effort to mislead the Court.  TD reaches this number by including all transactions, including checks (on which consumers typically do not write the time at which they drafted the check).  Visser admitted, however, that, based on his review of the entirety of the data for the proposed Class (which data he reviewed but did not provide to Olsen), among debit card transactions, data exists to link transactions to date/time information for between 82% and 85% of transactions.  Visser Depo. at 107:25-108:9.[4]

---

[2] It is possible that Olsen will be able to improve on this figure when he receives more data from TD.  Plaintiffs learned during the Visser deposition that Visser and his staff were responsible for deciding what fields of data that Olsen would receive and what fields he would not receive.  Visser Depo. at 85:17-25, 87:5-10.  Thus, Olsen received only data related to the class representatives, and then only certain fields from within that data, while Visser had the benefit of access to and possession of all of TD's data covering all of its customers, without limitation, and apparently used that data to test some of his theories.  Visser Depo. at 73:4-13, 126:2-127:10, 129:25-130:25, 133:2-12, 134:1-16, 249:13-19.

[3] Counsel for TD also repeatedly instructed Visser not to answer questions about the results of any analysis he had done of the entirety of TD's data (as opposed to the small subset the Olsen received).  *See, e.g.*, Visser Depo. at 43:20-23, 107:11-12, 108:13-14, 112:3-5, 113:4-5, 115:18-20, 116:23-25, 118:3-4, 133:6-8.

[4] Visser also admitted that, in constructing the alternative "chronological" posting order set forth in his Declaration, he could not account for certain "low frequency occurrences" as well, but that this was acceptable because he "used the data to the best of his ability."  Visser Depo. at 228:6-230:24.

Judge Alsup appropriately rejected TD's argument in *Gutierrez*:

> As stated, 84 percent of debit-card transactions had date/time information (Tr. 879-80). Class members, of course, should not be penalized for data deficiencies in the very computer systems used to power the bank's unlawful practices. It would not be equitable to allow the bank to extract hundreds of millions of dollars through unfair and fraudulent business practices and then use the supposed inadequacies of its own record-keeping system to shield itself from restitution.

*Gutierrez*, 730 F. Supp. 2d at 1139 (citing *Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 264 (1946)).  Olsen notes that, based on his analysis in *Gutierrez* of the data of over 1 million customers, "it made very little difference in the aggregate (less than 1/10 of one percent difference) whether the transactions without date and time information were posted before or after transactions with date and time information."  Reply Decl. ¶ 8.  That is, what TD points to as a problem with Olsen's approach leads to little if any actual error at all.

TD offers no credible proof to the contrary.[5]  Instead, it complains that some of the historical data that it claims is necessary for linking certain debit card transactions to the date and time of authorization is "not available for the entire class period or every account."  Motion at 16.  What it omits to tell the Court is that this data once existed and was within TD's exclusive possession, but it can now not locate it.  When asked about this issue, TD's expert Visser testified that he had conversations with TD about the missing data, but he could not

---

[5] Instead, after having its expert hand-pick the data that Olsen would receive, Visser Depo. at 85:17-25, 87:5-10, while giving its own expert all of the data for all of the members of the proposed Class, TD proceeds to fault Olsen for doing "no analysis on customers outside of these eight" lead plaintiffs.  Motion at 15.  TD forfeited its right to make this argument when it selectively limited Olsen's access to data.  Further, if there were any actual difference between Olsen's results and those found using the larger group of Class members, TD's expert Visser surely would have reported them.  He did not, and as noted above he was repeatedly instructed by counsel for TD not to answer questions about his work with the larger data set.

recall why that data was no longer available.  Visser Depo. at 254:4:23, 257:25-258:3, 258:20-259:1.[6]

The Supreme Court held long ago that where a defendant has done wrong, the defendant, as the wrongdoer, cannot object to a damage study that is the best possible with the data available.  *Bigelow*, 327 U.S. at 264-65.  It is settled that "a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible."  *Eastman Kodak Co. of New York v. Southern Photo Materials Co.*, 273 U.S. 359, 379 (1927).  "Any other rule . . . would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain.  Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be of a recovery."  *Bigelow*, 327 U.S. 251, 264-65 (1946).  Because "the wrongdoer must bear the risks of the uncertainty which [its] conduct has created . . . it is hornbook law that doubts as to the certainty of damages will be resolved against the wrongdoer[.]"  *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 92-93 (S.D.N.Y. 1998) (internal quotation marks and citation omitted).[7]

---

[6] Visser admitted that he did not provide to Plaintiffs the data that would allow them to test his assertion.  Visser Depo. at 260:4-8.

[7] TD attacks Olsen for allegedly making "assumptions" about TD's data.  Motion at 8-10. Ironically, it is TD's expert, Visser, who repeatedly made assumptions in order to construct the alternative "chronological" posting methodologies set forth in his declaration.  Visser Depo. at 221:24-222:17 (Visser agreeing that he "relied on data whose accuracy [he] cannot independently establish" because "it seemed reasonable to [him] at the time."); 224:19-225:11 (Visser admitting that he made "assumption" about data TD could have collected but did not). TD is in no position to argue that make reasonable assumptions about missing data renders an expert's approach invalid under Daubert when its own expert engages in that very process in attempting to convince the Court of a contrary proposition.

### D.      Olsen's Testimony Will Assist The Trier Of Fact

TD argues that Olsen's testimony does not "fit" Plaintiffs' theory of the case on the premise that, while Plaintiffs complain of TD's re-sequencing of debit card transactions, Olsen re-sequences *all* transactions in his analysis.  Motion at 3-7.  This is sophistry.  Because TD presently posts debit card transactions with all other customer-initiated transactions in a single bucket from highest to lowest, re-sequencing debit card transactions chronologically necessarily involves removing them from the bucket and posting them in that fashion.  Again, Olsen is not selecting or even recommending a posting order.  The import of his testimony at the class certification stage of this case is simply to demonstrate that he can re-sequence customers' transactions using TD's own data.  The "fit" issue, like so many of the others raised by TD, is ultimately a merits question for the finder of fact.

TD Bank points to the deposition testimony of one Plaintiff, in which she offers a lay opinion as to what would be the posting order required by the implied covenant of good faith and fair dealing, to absurdly argue that each Plaintiff's individual view of the legal requirements creates individualized issues.  Motion at 5.  As discussed in Plaintiffs' Reply in support of class certification, Plaintiffs' individual subjective views are not relevant.

Moreover, putting aside the obvious point that TD's question called for a legal conclusion, this argument also fails because a plaintiff's testimony does not determine the nature of her legal claims.  *See Buford v. H&R Block, Inc.*, 168 F.R.D. 340, 353 (S.D. Ga. 1996) ("It is, however, unrealistic to expect the class representative to possess either a considerable amount of legal knowledge or a seamless knowledge of the facts of the case."); *Shamberg v. Ahlstrom*, 111 F.R.D. 689, 695 (D.N.J. 1986) ("A plaintiff need not have complete knowledge of a case to be an

adequate class representative.  Indeed, he may even '[display] a complete ignorance of the facts concerning the transaction that he was challenging.'").

TD's reliance on *Shelley v. Amsouth Bank*, No. CIV.A.97-1170-RV-C, 2000 WL 1121778 (S.D. Ala. July 24, 2000), is misplaced as that case is wholly inapposite.  TD cites *Shelley* for the proposition that the testimony of each plaintiff as to the posting order she believed to be in place is necessary to prove the claims.  TD, however, neglects to mention that the court in *Shelley* only reached that conclusion because the claims at issue there were for fraud and violation of the Truth in Lending Act and involved analyses of individual reliance.  Individual reliance is not at issue in the present case.  Accordingly, TD Bank's argument that Olsen's analysis does not "fit" the case are without merit.[8]

## II.    TD'S NON-*DAUBERT* ARGUMENTS HAVE NO PLACE IN ITS MOTION, AND IN ANY EVENT THEY ARE WITHOUT MERIT

TD's final attack on Olsen is that he does not account for how TD and its customers would have acted had TD not posted items from high-to-low.  Motion at 12-14.  This argument, however, is really in the nature of a defense for which TD bears the burden of proof, and is factually unsupported.

First, TD's insistence on a "but for" damage model – with an econometric analysis of all potential variables that could affect a world involving a different posting order – is an

---

[8] TD also cites *Boca Raton Community Hospital, Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1230 (11th Cir. 2009), for the proposition that "Olsen's methodology cannot distinguish lawful from unlawful conduct, and thus is similarly baggy when compared to Plaintiffs' theory of liability, and must be excluded."  Mot. At 7.  TD's reliance on *Boca Raton* is misplaced. There, the expert used a benchmark to establish lawful and unlawful conduct that did not comport with the plaintiffs' liability theory.  As noted above, the ultimate determination of the appropriate posting order is a question for the finder of fact and not for Olsen.  Accordingly, Olsen's damages methodology appropriately fits Plaintiffs' theory of liability because it does not determine whether any posting scenario is lawful or unlawful but rather demonstrates that class wide damages can be calculated under any posting order determined to be appropriate by the finder of fact.

unsuccessful attempt to transplant an antitrust concept into a different context where it serves no purpose. TD relies on an antitrust case, *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp L.P.*, 247 F.R.D. 156, 176-77 (C.D. Cal. 2007)), whose analysis is tethered to the irrelevant concept of antitrust impact that requires an expert to construct a hypothetical market to determine "but-for pricing," *id.* at 176.[9] Transplanting that specialized damages model into this case is neither necessary nor legally appropriate, and TD cites no case law supporting its position. Under the common law claims and state consumer-protection statutes at issue in this case, it is not necessary to create a complete "but-for" damages analysis; rather, the law of damages only requires a practical approximation of the harm suffered by the victims of the unlawful conduct. *See, e.g., Butera v. Boucher*, 798 A.2d 340, 350 (R.I. 2002) (stating that "[d]amages do not have to be calculated with mathematical exactitude; all that is required is that they are based on reasonable and probable estimates"*); Maloof v. Bonser*, 769 A.2d 339, 343, 145 N.H. 650, 655 (N.H.2000) (holding that a damage award need only be an "approximation" and does not require "mathematical certainty").[10] And for present purposes of class certification, Plaintiffs need only

---

[9] The "'but-for' world" constructed to prove damages in antitrust cases typically employs "an economic regression model incorporating a variety of factors." *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 88 (D. Conn. 2009).

[10] Calculation of the damages at issue in this case could be accomplished by application of simple damages models. For example, for unjust enrichment claims, damages are measured by calculating the value of the property conferred to the defendant at the time the property was so conferred. *See, e.g., Stonington Partners, Inc. v. Lernout & Hauspie Speech Prods, N.V.*, No. Civ.A. 18524, 2003 WL 21555325, at *4 (Del. Ch. July 8, 2003); *Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.*, 649 A.2d 518, 522 (Conn. 1994); *R. Zoppo Co., Inc. v. City of Manchester*, 453 A.2d 1311, 1314 (N.H. 1982); *Fallon v. McKeon*, 230 A.D.2d 629, 629 (N.Y. App. Div. 1996); *D.A. Hill Co. v. Clevetrust Realty Investors*, 573 A.2d 1005, 1009 (Pa. 1990); *In re Estate of Elliot*, 542 A.2d 282, 285 n.2 (Vt. 1988); *Wanaque Borough Sewerage Authority v. Township of West Milford*, 677 A.2d 747, 753 (N.J. 1996). Similarly, for breach of contract claims, damages are measured by calculating the amount necessary to place the non-breaching party in the same position he or she would have been in had the contract been performed. *See, e.g., Hildreth Consulting Engineers, P.C. v. Larry E. Knight, Inc.*, 801 A.2d 967, 972 (D.C.

show that it is feasible to prove those damages on a class-wide basis. *See Behrend*, 655 F.3d at 204. The court in *Gutierrez* observed that: "plaintiffs' expert Arthur Olsen has convincingly shown that it is entirely practical" to determine how many overdrafts each class member incurred as a result of the high-to-low practice. 730 F. Supp.2d at 1138. This Court followed suit in certifying the class against Union Bank. *See Larsen*, 275 F.R.D. at 677. The same favorable considerations involving the banks' computerized records of transactions are applicable here. *See* Olsen Decl. ¶¶ 43-46.

TD's argument that Olsen was required to identify those other aspects of its banking practices that would change if it were required to change its posting order, and to incorporate changes in customer behavior resulting from a change in the posting order into his model, (Motion at 12-14), are just merits arguments dressed up as a *Daubert* challenge, and are irrelevant to the question of class certification currently before the Court. The question of what posting scenario satisfies TD's good faith and fair dealing obligations is for the finder of fact after trial, as it was in *Gutierrez*. As noted above, Plaintiffs' burden, and Olsen's purpose, at this point is simply to show that, whatever scenario is chosen, damages can be calculated using TD's data. TD's other arguments – that Olsen needed to conduct an independent analysis of Plaintiffs' posting preferences to determine what scenario to use, and that he needed to construct a "but for" posting process – is the same argument restated several ways. That is, TD contends that Plaintiffs are required to account for all of the possible consequences, if any, of a change in posting order, not simply the effects on overdraft fees of the change itself. There are several problems with this approach. Olsen is not being offered as an expert in these things, and thus his

---

2002); *Hall v. Lovell Regency Homes Ltd. P'ship*, 708 A.2d 344 (Md. Ct. Spec. App. 1998); *S. Carolina Fed. Sav. Bank v. Thornton-Crosby Dev. Co., Inc.*, 399 S.E.2d 8 (S.C. Ct. App. 1990).

actual expertise cannot be challenged under *Daubert* on these bases, in the same way that a neurosurgeon's expertise in neurosurgery cannot be assessed based on his skill at lion-taming. Also, TD offers no support in the law for the proposition that any of this is required in a consumer case like this one.  As Judge Alsup observed, in rejecting a similar challenge by Wells Fargo:

> This order rejects defendant's argument that plaintiffs' failure to consider all possible third-party costs associated with "returned check" fees renders their damages methodology unreliable under *Daubert.* These incidental costs are simply too tangential to the measurable harms stemming directly from defendant's allegedly unlawful re-sequencing practice to be fatal to the admissibility of Olsen's report. If defendant's wish to attack plaintiffs' study on this alleged deficiency, "[v]igorous cross-examination" and "presentation of contrary evidence" shall be their tools at trial. *Daubert,* 509 U.S. at 596.

*Gutierrez*, 2010 WL 1233810 at *11-12.

Moreover, TD's criticism that Plaintiffs failed to account for additional costs that the bank might impose on customers under an alternative posting method is, in actuality, another quibble about *setoffs* from the damage amount calculated under the alternative scenario.  But setoff is an affirmative defense for which TD Bank – not Plaintiffs – bears the burden of proof. *See Stephenson v. Bell Atlantic Corp.* 177 F.R.D. 279, 288 (D.N.J. 1997) (defendant had the burden to prove legal basis of its setoff defense for purposes of 23(b)(3) predominance analysis).[11]  Moreover, TD Bank's own expert was unable to quantify this setoff amount, due to shortcomings in the bank's own data.  *See* Visser Depo. at 159-60, 155-65, 192-94.  The law, however, forbids the bank from using that deficiency as a sword to attack Plaintiff's expert's

---

[11]  *See also Ruscito v. F-Dyne Electronics Co., Inc.*, 411 A.2d 1371, 1379 (Conn. 1979); *Johnson v. Eric's Chop Shop, Inc.*, No. Civ.A. 00C-10-153SCD, 2003 WL 21673959, at *4 (Del. Super. Ct. 2003); *H & B Const. Co. v. James R. Irwin & Sons, Inc.*, 198 A.2d 17, 19 (N.H. 1964); *American Oil Co. v. Coughlin*, 261 A.D. 852, 852 (N.Y. App. Div. 1941); *Collins v. McKee*, 6 A. 396, 397 (Pa. 1886); *Vermont Structural Steel Corp. v. Brickman*, 236 A.2d 658, 661 (Vt. 1967).

damages calculation methodology. *See Guitierrez*, 730 F. Supp.2d at 1139 n.28 ("Class members, of course, should not be penalized for data deficiencies in the very computer systems used to power the bank's unlawful practices.") (citing *Bigelow*, 327 U.S. at 264).

Finally, even if Plaintiffs were legally required to proffer a complete "but-for" world, there would be no factual basis in the record supporting TD's criticism that Plaintiffs fail to account for the hypothetical *costs* of an alternative posting scenario. Such business changes are sheer speculation; no bank employee has testified that they would, as a matter of fact, have been implemented. They are also irrelevant. If TD's challenged overdraft practices are ultimately found to be unlawful, the proper point of comparison for assessing damages will be the bank's fee and cost structure in the *status quo ante*, prior to its implementation of the unlawful scheme, not in some imagined world in which the bank seeks to retain the profitability it achieved through unlawful overdrafts by shifting costs back to customers through new fees and restrictive policies.

TD's expert admitted as much. When asked which of the seven versions of TD's posting order utilized by the bank at various times represents the "but-for" world, Visser insisted that he did not "have an opinion in that regard." Visser Depo. at 160:10-16.[12] He admitted that TD does not collect data regarding the effect of changes in its posting order on its customers' behavior, Visser Depo. at 194:5-13, and thus TD could not have taken those effects into account when it made its numerous changes to its posting order over the years in order to maximize its profits at the expense of its customers. He acknowledged that he was "able to take TD's data, apply different sequencing methods and show that there would be different outcomes depending on

---

[12] Visser acknowledged he had no idea whether "TD considered but-for analyses . . . before implementing each of the wave policy changes." Visser Depo. at 161:16-162:3. He also admitted that had had no empirical data that would show, were the 2A posting order applied in real time, that consumer behavior would in fact change. Visser Depo. at 164:12-15.

what method [one] used." Visser Depo. at 196:4-8. And he agreed that he was able to do that "without knowing whether there were going to be additional transactions or fewer transactions as to the change," because "[t]hat was not needed for comparing the outcomes of the different sequencing scenarios here." Visser Depo. at 196:9-16. Quite so.

## CONCLUSION

For the reasons set forth above, TD's Motion should be denied.

Dated:   March 6, 2012.

Respectfully submitted,

/s/Aaron Podhurst_____        /s/Bruce S. Rogow_____ _____
Aaron S. Podhurst, Esquire         Bruce S. Rogow, Esquire
Florida Bar No. 063606             Florida Bar No. 067999
apodhurst@podhurst.com             brogow@rogowlaw.com
Robert C. Josefsberg, Esquire      Bruce S. Rogow, P.A.
Florida Bar No. 40856              Broward Financial Center
rjosefsberg@podhurst.com           500 East Broward Boulevard
Steven C. Marks, Esquire           Suite 1930
Florida Bar No.  516414            Fort Lauderdale, FL  33394
smarks@podhurst.com                Tel: 954-767-8909
Peter Prieto, Esquire              Fax: 954-764-1530
Florida Bar No. 501492
pprieto@podhurst.com
Stephen F. Rosenthal, Esquire
Florida Bar No. 0131458
srosenthal@podhurst.com
John Gravante, III, Esquire
Florida Bar No. 617113
jgravante@podhurst.com
PODHURST ORSECK, P.A.
City National Bank Building
25 W. Flagler Street, Suite 800
Miami, FL 33130-1780
Tel: 305-358-2800
Fax: 305-358-2382

*Co-Lead Counsel for Plaintiffs*

/s/ Robert C. Gilbert
Robert C. Gilbert, Esquire
Florida Bar No. 561861
rcg@grossmanroth.com
Stuart Z. Grossman, Esquire
Florida Bar No. 156113
szg@grossmanroth.com
David Buckner, Esquire
Florida Bar No. 60550
dbu@grossmanroth.com
Seth E. Miles, Esquire
Florida Bar No. 385530
sem@grossmanroth.com
GROSSMAN ROTH, P.A.
2525 Ponce de Leon Boulevard
Eleventh Floor
Coral Gables, FL 33134
Tel: 305-442-8666
Fax: 305-779-9596

*Coordinating Counsel for Plaintiffs*

<div style="display: flex;">
<div>

E. Adam Webb, Esquire
Georgia Bar No. 743910
Adam@WebbLLC.com
Matthew C. Klase, Esquire
Georgia Bar No. 141903
Matt@WebbLLC.com
G. Franklin Lemond, Jr., Esquire
Georgia Bar No. 141315
FLemond@WebbLLC.com
WEBB, KLASE & LEMOND, L.L.C.
1900 The Exchange, S.E.
Suite 480
Atlanta, GA 30339
Tel: 770-444-9325
Fax: 770-444-0271

</div>
<div>

Michael W. Sobol, Esquire
California Bar No. 194857
msobol@lchb.com
Roger N. Heller, Esquire
California Bar No. 215348
rheller@lchb.com
Jordan Elias, Esquire
California Bar No. 228731
jelias@lchb.com
LIEFF CABRASER HEIMANN &
   BERNSTEIN L.L.P.
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
Tel: 415-956-1000
Fax: 415-956-1008

</div>
</div>

Russell W. Budd, Esquire
Texas Bar No. 03312400
rbudd@baronbudd.com
Bruce W. Steckler, Esquire
Texas Bar No. 00785039
bsteckler@baronbudd.com
Mazin A. Sbaiti, Esquire
Texas Bar No. 24058096
msbaiti@baronbudd.com
BARON & BUDD, P.C.
3102 Oak Lawn Avenue
Suite 1100
Dallas, TX 75219
Tel: 214-521-3605
Fax: 214-520-1181

David S. Stellings, Esquire
New York Bar No. 2635282
dstellings@lchb.com
LIEFF CABRASER HEIMANN &
  BERNSTEIN L.L.P.
250 Hudson Street
8th Floor
New York, NY  10013
Tel: 212-355-9500
Fax: 212-355-9592

Ruben Honik, Esquire
Pennsylvania Bar No. 33109
rhonik@golombhonik.com
Kenneth J. Grunfeld, Esquire
Pennsylvania Bar No. 84121
kgrunfeld@golombhonik.com
GOLOMB & HONIK, P.C.
1515 Market Street
Suite 1100
Philadelphia, PA 19102
Tel: 215-985-9177
Fax: 215-985-4169

Ted E. Trief, Esquire
New York Bar No. 1476662
ttrief@triefandolk.com
Barbara E. Olk, Esquire
New  York Bar No. 1459643
bolk@triefandolk.com
TRIEF & OLK
150 E. 58th Street
34th Floor
New York, NY 10155
Tel: 212-486-6060
Fax: 212-317-2946

*Plaintiffs' Executive Committee*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 09-MD-02036-JLK**

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

**CERTIFICATE OF SERVICE**

I hereby certify that on March 6, 2012, I filed the foregoing document with the Clerk of

the Court.  I also certify that the foregoing document is being served this day via CM/ECF on all

counsel of record.

/s/David M. Buckner
David M. Buckner

22