# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 09-MD-02036-JLK**

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

_____/

THIS DOCUMENT RELATES TO:
FIFTH TRANCHE ACTIONS

*Sachar, et al. v. IBERIABANK Corporation, et*
*al.*
S.D. Fla. Case No. 1 :1 1-CV-22844-JLK

_____/

**JOINT DECLARATION OF CLASS COUNSEL IN SUPPORT OF APPLICATION FOR**
**SERVICE AWARDS, EXPENSES REIMBURSEMENT AND ATTORNEYS' FEES**

JACK WAGONER, BRENT WALKER, and STEVEN OWINGS declare as follows:

1.      We are counsel of record for Plaintiffs and the proposed Settlement Class in these

coordinated proceedings against IBERIABANK. We respectfully submit this joint declaration in

support of the application for service awards to class representatives, request for reimbursement

of case costs, and for an award of attorney fees. Except as otherwise noted, we have personal

knowledge of the facts set forth in this declaration, and could testify competently to them if

called upon to do so.

2.      On October 19, 2011, after litigation, discovery, and months of arms'-length

negotiation, Plaintiffs and IBERIABANK Corporation and IBERIABANK (collectively

"IBERIABANK") executed an Amended Settlement Agreement and Release ("Agreement")

1

under which IBERIABANK will pay $2.5 million in cash to the Settlement Class. The entirety of the "Net Settlement Fund" will be distributed directly to identifiable Settlement Class Members in proportion to the actual harm that each of them sustained, without those Settlement Class Members having to submit a claim form or take any other affirmative step.

3.       Plaintiffs assert that the claims asserted in the Action are meritorious, that any motion for class certification would prove successful, and that Plaintiffs would prevail if this matter proceeded to trial. This case involved sharply opposed positions on several fundamental legal and factual issues. The ultimate success of the litigation required Plaintiffs to prevail, in whole or in part, on *all* of these issues. Conversely, IBERIABANK's success on any one of these issues could have spelled defeat for Plaintiffs and the Settlement Class. Therefore, continued litigation presents significant risks to attaining a successful judgment, as well as the time and expenses associated with proceeding to trial, the time and expenses associated with appellate review, and the countless uncertainties of litigation, particularly in the context of a large and complex multi-district litigation.

4.       In light of the risks presented by continued litigation, and taking into account the immediate and tangible benefits to the Settlement Class Members under the terms of the Settlement Agreement, the Settlement provides fair and adequate compensation to the Settlement Class Members.

## A. Background of the Litigation

5.       Plaintiffs allege that IBERIABANK systemically re-sequenced Settlement Class Members' debit transactions for the sole purpose of maximizing its overdraft fee revenue. According to the complaint, IBERIABANK's practices violated its contractual and good faith duties owed to its customers; IBERIABANK's acts resulted in unlawful conversion of depositor

property; IBERIABANK's contractual provisions and practices were substantively and procedurally unconscionable; and IBERIABANK's conduct violated certain state unfair trade practices statutes, and resulted in it being unjustly enriched.

6.      IBERIABANK, consistently argued, *inter alia,* that its check posting process was expressly authorized by state and federal law, particularly Regulation DD promulgated by the Federal Reserve Board; that Plaintiffs' claims were preempted by the Home Owners' Loan Act ("HOLA"); that its account agreements expressly authorized the very re-sequencing practice Plaintiffs challenged; that Plaintiffs failed to plead with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure; that no fiduciary relationship existed between IBERIABANK and Plaintiffs; that it fully disclosed its practices to its customers; that Plaintiffs' claims under the deceptive trade practices provisions failed because Arkansas law contains a safe harbor provision that specifically exempts conduct authorized by a federal agency and because it fully disclosed to Plaintiffs the bank's practice of automatically enrolling customers in Bounce Protection Privilege; that Plaintiffs cannot maintain a breach of implied duty of good faith separate and apart from a breach of contract; that no plausible conversion claim existed because Plaintiffs did not own the funds in their accounts; and that Plaintiffs could not maintain unjust enrichment claims because of the existence of an express agreement between the parties.

### B. The Course of Proceedings.

7.      On February 18, 2011, Plaintiffs filed a complaint against IBERIABANK in the circuit court of Pulaski County, Arkansas, and the case was subsequently removed to the United States District Court for the Eastern District of Arkansas. [DE # 4].

8.      On April 29, 2011, Plaintiffs filed an amended complaint. [DE # 28]. IBERIABANK responded by moving for dismissal, or in the alternative for a more definitive

statement. [DE # 29]. Plaintiffs' complaint asserted claims against IBERIABANK based on its alleged unfair assessment and collection of overdraft fees.

9.      Plaintiffs sought monetary and injunctive relief on behalf of a putative class of "all holders of an account at IBERIABANK, IBERIABANK*fsb*, Acadiana Bancshares, LBA Savings Bank, Alliance Bank of Baton Rouge, American Horizons Bank of Monroe, Pulaski Investment Corp., Pulaski Bank and Trust, Pocahontas Bancorp, Inc., First Community Bank, Omni Bank, and Cameron State Bank (as well as ANB Financial, Capital South Bank, Century Bank, Orion Bank, and Sterling Bank after the date of legal conversion) who, within the applicable limitations period in the state in which debit card overdraft charges were incurred through the date of Preliminary Approval, incurred one or more debit card overdraft charges as a result of debit card charge re-sequencing.."  *Sachar* SAC. ¶ 96. Plaintiffs asserted claims for violation of state trade practices acts, breach of the duty of good faith and fair dealing, unjust enrichment, conversion, unconscionability, and injunctive relief.

10.      On October 19, 2011, the Parties executed an Amended Settlement Agreement and Release, which was subject to preliminary approval and final approval by the Court as required by Rule 23 of the Federal Rules of Civil Procedure.

11.      On November 1, 2011, the Court entered an Order Preliminarily Approving Class Settlement and Certifying Settlement Class. [DE # 2060.]

### C.      Settlement Negotiations

12.      Class Counsel and counsel for IBERIABANK first engaged in settlement discussions in mid-May, 2011.  Prior to mediation IBERIABANK disclosed all documents necessary to evaluate the relative merits of the claims and defenses and to analyze the damages sustained by the class. The parties met in Houston in May 2011 to participate in formal

mediation proceedings, and proposed that Gary McGowan of McGowan Dispute Resolution in Houston, Texas, a nationally prominent mediator, preside over the mediation proceedings. Class Counsel agreed to participate in mediation and to Mr. McGowan's selection as the mediator.

13.     During the first session, the Parties discussed their relative views of the law and facts and potential relief for the proposed Class.  During the course of mediation, IBERIABANK vigorously argued that Plaintiffs' state-law claims conflict with the HOLA and its implementing regulations. Further, it insisted that the ordering of debits falls within the bank's federally authorized deposit-taking powers and, as such, cannot be regulated under state law but rather through the Federal Reserve Board. Moreover, it added, the federal agency responsible for regulating national banks specifically indicated that various methods of posting and ordering debits are permissible under federal law. Therefore, IBERIABANK argued that any attempt to use state laws to reach account posting would not only interfere with core banking operations, but would also pose a clear conflict with federal law.

14.     Additionally, IBERIABANK pointed to its deposit account agreement, which informs customers, among other things, that the bank "do[es] not process and post transactions in the order in which they occurred."  IBERIABANK further raised the issue that the deposit agreement also states that the bank "may" post debits in any order it chooses. Based on these provisions, IBERIABANK advanced the position that there can be no contractual breach, including a breach of an implied contractual duty of good faith, when the contract at issue expressly permits the complained-of practice and includes as a material term the very possibility of high-to-low posting. Thus, IBERIABANK claimed that it adequately disclosed its debit re-sequencing practices and that it could not be held liable for Plaintiffs' decision to maintain IBERIABANK checking accounts under a contract authorizing such practices.

15.     The first mediation session ended with the Parties executing a Memorandum of Understanding that memorialized the Parties' agreement to settle the action, subject to a mutually agreeable written Settlement Agreement and subject to preliminary approval and final approval by the Court as required by Rule 23 of the Federal Rules of Civil Procedure.

16.     Subsequent to mediation and execution of the Memorandum of Understanding, IBERIABANK provided further documentary evidence to Plaintiffs' counsel regarding its relevant overdraft fee policies.  On June 3, 2011, after additional negotiations, Plaintiffs and IBERIABANK entered into a Settlement Agreement and filed a Joint Motion for Preliminary Approval of Class Action Settlement.

17.     On June 14, 2011, the MDL Plaintiffs' Co-Lead Counsel, MDL Plaintiffs' Coordinating Counsel, and MDL Plaintiffs' Executive Committee filed a Verified Motion to Enjoin Copycat Case under the All Writs Act [MDL DE 1608], requesting that the Southern District of Florida enjoin Plaintiffs' and IBERIABANK's Settlement Agreement filed in the Eastern District of Arkansas.

18.     On June 27, 2011, IBERIABANK filed its response to the MDL Plaintiffs' motion under the All Writs Act [MDL DE 1659].  At the June 28, 2011 hearing on the MDL Plaintiffs' motion, the Parties were granted a continuance permitting the Parties to engage in further settlement negotiations.

19.     As a result of these additional settlement negotiations, the Parties signed a second Memorandum of Understanding that memorialized, subject to a mutually agreeable written revised Settlement Agreement and subject to preliminary approval and final approval by the Court as required by Rule 23 of the Federal Rules of Civil Procedure, the Parties' good faith intention to fully, finally, and forever resolve, discharge and release all rights and claims of the

Settlement Class Members in exchange for IBERIABANK's agreement to pay the total sum of $2,500,000, inclusive of all attorneys' fees and costs and costs of notice and settlement administration, to create a common fund to benefit the Settlement Class, and to post Debit Card Transactions to IBERIABANK Accounts in the order in which the transactions are authorized or settled by IBERIABANK. The parties also agree to transfer the case to this MDL proceeding.

20.      At all times throughout the mediation proceedings, the negotiations were adversarial, non-collusive and at arms' length.

21.      On November 1, 2011, the Court entered the Order Granting Preliminary Approval, which, *inter alia*, preliminary approved the Settlement, finding that the Settlement Class met the requirements of Fed. R. Civ. P. 23, the Settlement was "the result of informed, good-faith, arms'-length negotiation between the parties and their capable and experienced counsel" and was "not the result of collusion," the Settlement is "within the range of reasonableness" and that is should be approved. [DE # 2060].

### D. Settlement Recovery

22.      Pursuant to the Settlement, IBERIABANK deposited $2.5 million into an Escrow Account. That deposit created the Settlement Fund, which will be used to pay all distributions, fees, costs and expenses of the Settlement including, but not limited to, distribution of money to the Settlement Class Members; all costs of Settlement Notice; all costs of Settlement Administration; all attorneys' fees, costs and expenses of Class Counsel; and all Service Awards for Plaintiffs.

23.      The Settlement Agreement acknowledged that for certain banks acquired by IBERIABANK during the Class Period certain of IBERIABANK's records of customer accounts are not readily accessible.  (Agreement ¶ 74).

24.     Identifiable Settlement Class Members do not have to submit claims or take any other affirmative step to receive relief under the Settlement. Instead, within 30 days of the Effective Date of the Settlement, IBERIABANK and the Settlement Administrator will distribute the Net Settlement Fund to all identifiable Settlement Class members who do not opt out of the Settlement. (Agreement ¶76).

25.     Settlement Class Members have been identified through a complex analysis of IBERIABANK data, conducted by Data Analyst Arthur Olsen. (Mr. Olsen's declaration has been filed as an exhibit to Plaintiffs' motion for final approval of the settlement). As Mr. Olsen explains, his analysis allows for the identification of Settlement Class members who experienced excess overdraft fees as a result of re-sequencing of debit card transactions. IBERIABANK's data was sufficiently complete to permit the Parties to identify nearly all Settlement Class Members who had Accounts during that period, and to calculate the amount of the distribution from the Settlement Fund to which each is entitled under the Settlement.

26.     IBERIABANK lacked a subset of relevant customer account data for banks acquired by IBERIABANK during the Class Period. It was therefore acknowledged that it may not be possible for the Parties to readily identify all Settlement Class Members, or to calculate all amounts that such not readily identified Settlement Class Members may be due from the Settlement Fund for such periods. For these Settlement Class Members, to the extent that the Parties, consistent with the foregoing data constraints and limitations, can readily identify Settlement Class Members and calculate the amount such Settlement Class Members are due from the Settlement Fund, the Parties agreed that a distribution will be provided to them based upon the same terms as the Identifiable Settlement Class if they submit a claim. (Agreement ¶74).

27.      To the extent that the Parties cannot readily identify Settlement Class Members or calculate the amount such not readily identifiable Settlement Class Members may be due from the Settlement Fund, and such not readily identifiable Settlement Class Members fail to submit a claim form as described in paragraph 76 of the Agreement, the Parties agreed to confer in good faith as to the appropriate use of any Settlement Fund amounts that can be attributed to such not readily identified Settlement Class Members, to the extent that this is possible, subject to approval by the Court.  (Agreement ¶74).

### E. Class Release.

28.      In exchange for the benefits conferred by the Settlement, all Settlement Class Members who do not opt out will be deemed to have released IBERIABANK from claims related to the subject matter of the Action. The detailed release language can be found in Section XV of the Agreement.

### F. Settlement Notice

29.      Settlement Class Counsel retained one of the leading class action notice experts in the country, Hilsoft Notifications ("Hilsoft"), to serve as the Notice Administrator, and Epiq Class Action and Claims Solutions ("ECA") as Settlement Administrator for this Settlement.

30.      The Notice and Notice Program was reasonably calculated under the circumstances to apprise the Settlement Class of the pendency of the Action, class certification, the terms of the Settlement, Class Counsel's Fee Application and request for Service Awards for Plaintiffs, and their rights to opt-out of the Settlement Class and object to the Settlement, Class Counsel's Fee Application and/or the request for Service Awards for Plaintiffs. The Notice and Notice Program constituted sufficient notice to all persons entitled to notice. The Notice and

Notice Program satisfied all applicable requirements of law, including, but not limited to, Federal Rule of Civil Procedure 23 and the Constitutional requirements of due process.

**1. Mailed Notice**

31.     Hilsoft and ECA are well qualified and leaders in their industry.   Together, Hilsoft and ECA administered the Notice Program in accord with the terms of the Settlement Agreement and the Court's Order Preliminarily Approving Class Settlement and Certifying Settlement Class ("Preliminary Approval Order").

32.     IBERIABANK was able to identify names and direct contact information for the vast majority of Settlement Class Members.   We understand that 50,282 account records were provided to ECA and that these records included names and physical mailing addresses.  Of this total, 17,821 records were for current IBERIABANK customers who receive monthly paper statements by mail.  The remaining records were comprised of current IBERIABANK customers who are not sent monthly statements by mail and Settlement Class Members for which the applicable IBERIABANK Account was closed prior to the onset of the Notice Program. IBERIABANK acknowledged that there was a small subset of potential Settlement Class Members for which records of customer accounts were not readily accessible. These accounts were held with banks that IBERIABANK acquired, or otherwise acquired the assets of, during the Class Period. In total, these accounts represent less than 2% of overall potential Settlement Class Members.

33.     As such, on or about January 13, 2012, IBERIABANK sent 17,821 notice packages by USPS First Class Mail to potential Settlement Class Members who received monthly paper statements by mail.  Each notice package included a 1-image, 8" x 11" Summary Mailed Notice.   The Summary Mailed Notice was folded and inserted at the back of the

statement envelope with the headline facing the flap. The outside of the envelope had the prominent call-out "Important Overdraft Settlement Notice Enclosed" printed to alert potential Settlement Class Members that important legal information was included.

34.     On February 3, 2012, after running the remaining names and last known addresses of the identifiable Settlement Class Members through the National Change of Address Database ECA sent 33,831 Summary Postcard Notices by USPS First Class Mail to potential Settlement Class members who: (1) received monthly statements electronically and did not receive monthly paper statements by mail; and (2) in which the applicable IBERIABANK Account was closed up to three years ago; and in which the applicable IBERIABANK Account was closed more than three years ago or the Account closed date was unknown.  Each notice was a four image 4.25" x 5.5" Summary Postcard Notice.

35.     The return address of the Summary Postcard Notice is a post office box maintained by ECA.  As of February 12, 2012, ECA has re-mailed 156 Summary Postcard Notices for addresses that were corrected or identified through the USPS.  Additionally, an extra search for different addresses using a third-party lookup service, ALLFIND, maintained by LexisNexis for undeliverable Summary Mailed Notices and Summary Postcard Notices, resulted in mailing and re-mailing of 2,274 Notices.  As of February 24, 2012, only 888 mailings remained undelivered.

36.     Considered together, the disseminated Summary Mailed Notice and Summary Postcard Notices are estimated to have reached 97% of the Settlement Class.  We believe this is a remarkable achievement by the Notice Administrator.

37.     Hilsoft timely completed the Mailed Notice Program by March 2, 2012 in accordance with the Court's Preliminary Approval Order.

## 2. Published Notice

38.     The Published Notice Program was comprised of the following components: an approximate one-fifth page Summary Publication Notice (approximately 5" x 9") appearing once on a weekday in the major daily newspaper in (a) eighteen selected media markets, which include the primary city locations of each of the banks acquired by IBERIABANK for which the parties acknowledge that certain IBERIABANK's records of customer accounts are not readily accessible, and (b) the media markets with the highest number of IBERIABANK branches.

39.     According to the Federal Deposit Insurance Corporation, IBERIABANK (FDIC Certificate Number 28100) and IBERIABANK*fsb* (FDIC Certificate Number 33538) had 136 offices with reported deposits in 6 states as of June 30, 2010. To guide the media selection, Hilsoft and ECA analyzed IBERIABANK's branch offices by county Designated Market Area, or "DMA."   DMA is a "term used by Nielsen Media Research to identify an exclusive geographic area of counties in which the home market television stations hold a dominance of total hours viewed. There are 210 DMA's in the US."

40.     For each DMA with 6 or more IBERIABANK branch offices, an appropriate daily newspaper was selected.  The selected newspaper in each DMA was either the highest circulation daily newspaper published in the DMA or a newspaper that was more likely to be read by Settlement Class Members based on the geographic distribution of IBERIABANK branches in the DMA.  These 9 DMA's included 111 IBERIABANK branch offices or almost 82% of total branches, averaging over 8 branches per DMA. The remaining 25 IBERIABANK offices outside of these 9 DMA's are located in 10 additional DMA's with an average of only 2 branches per DMA.

41. An approximate fifth-page Summary Publication Notice (approximately 5" x 9") appeared once in a weekday edition in the major daily newspaper in 18 selected media markets covering both the primary city locations of each of the banks acquired by IBERIABANK for which the settling Parties acknowledge that certain of IBERIABANK's records of customer accounts were not readily accessible, and the media markets with the highest number of IBERIABANK branch offices. The 18 total newspapers have a combined average daily circulation of 1,460,356. Positioning was sought in the main news section of each newspaper to enhance readership. The newspaper insertion dates and positioning are indicated below:

Primary City Location Coverage

| City/State | Newspaper | Issue Date | Page Position |
|---|---|---|---|
| Ruston, LA | Ruston Daily Leader | 2/3/2012 | 3 |
| Baton Rouge, LA | Baton Rouge Advocate | 2/3/2012 | 6A |
| Germantown, TN | Memphis Commercial Appeal | 2/3/2012 | A3 |
| Lake Charles, LA | Lake Charles American Press | 2/3/2012 | A5 |
| Rogers, AR | Morning News | 2/3/2012 | 11A |
| Huntsville, AL | Huntsville Times | 2/3/2012 | A10 |
| Birmingham, AL | Birmingham News | 2/3/2012 | 7A |
| Montgomery, AL | Montgomery Advertiser | 2/3/2012 | 5B |
| Jacksonville, FL | Florida Times-Union | 2/3/2012 | A7 |
| Lantana, FL | Palm Beach Post | 2/3/2012 | 16A |
| Miami, FL (Florida Keys) | Miami Herald | 2/3/2012 | 17A |

Branch Office Coverage

| DMA | IBERIABANK Offices | Newspaper | City/State | Issue Date | Page Position |
|---|---|---|---|---|---|
| Jonesboro | 14 | Jonesboro Sun | Jonesboro, AR | 2/3/2012 | A5 |
| Little Rock-Pine Bluff | 13 | Arkansas Democrat Gazette | Little Rock, AR | 2/3/2012 | A7 |
| Fort Smith | 8 | Morning News | Rogers, AR | 2/3/2012 | 11A |
| Ft. Myers-Naples | 11 | Ft. Myers News Press | Ft . Myers, FL | 2/3/2012 | B3 |
| Miami-Fort Lauderdale | 6 | Miami Herald | Miami, FL | 2/3/2012 | 17A |
| Tampa-St. Petersburg-Sarasota | 14 | Sarasota Herald Tribune | Sarasota, FL | 2/3/2012 | 3B |
| Lafayette | 21 | Lafayette Daily Advertiser | Lafayette, LA | 2/3/2012 | 7A |
| Monroe-El Dorado | 11 | Monroe News Star | Monroe, LA | 2/3/2012 | 2B |
| New Orleans | 13 | New Orleans Times Picayune | New Orleans, LA | 2/3/2012 | A7 |
| TOTAL | 111 | | | | |

**Case Website**

42.     The case website, www.IberiabankOverdraftSettlement.com, went live on

December 29,2011 and included complete versions in both English and Spanish.  The website

address was displayed prominently in all notice documents.  By visiting this website, Settlement

Class Members can view additional information about the settlement, including: the Detailed

Long-form Notice, Settlement Agreement, Preliminary Approval Order, Preliminary Approval

14

Order Correction and a list of Frequently Asked Questions.  Settlement Class Members can also print out a copy of the Claim Form.  The website was made secure using a Secure Socket Layer (SSL) Certificate through Network Solutions, LLC.

43.    As of February 24, 2012, there have been 1,531 website visitor sessions in which 8,532 website pages were viewed, which equates to just over five (5) pages per visitor session.

### *Toll Free Number*

44.    On December 29, 2012, the toll free number, set up and hosted by ECA, became operational.  By calling this number, Settlement Class Members can listen in both English and Spanish to answers to frequently asked questions and request a copy of the Detailed Notice and Claim Form.  This automated system is available 24 hours per day, 7 days per week.  As of February 24, 2012, the toll free number has handled 945 calls representing 2,624 minutes of use. The Published Notice Program was timely completed by March 1, 2012. *See* Declaration of Cameron R. Azari attached to the Motion for Final Approval.

### G. Considerations Supporting Settlement

### 1. There Was No Fraud or Collusion

45.    The Court is well aware of the complex nature of the litigation at hand, and the contested nature of the proceedings in this case demonstrates the lack of fraud or collusion behind the Settlement.  Indeed, Class Counsel negotiated the Settlement with vigor. Plaintiffs were represented by experienced counsel at these arms' length negotiations. Settlement negotiations were informed by the experience of counsel for both sides in the litigation, certification, trial, and settlement of nationwide class action cases.

46.    As detailed above, Class Counsel conducted a thorough investigation and analysis of Plaintiffs' claims and engaged in extensive informal discovery with IBERIABANK. Class

Counsel's review of that informal discovery enabled us to gain an understanding of the evidence related to central questions in the case, and prepared us for well-informed settlement negotiations.

**2. The Settlement Will Avert Years of Highly Complex and Expensive Litigation.**

47.     This case involves tens of thousands of Settlement Class Members and wrongful overdraft fees in the millions of dollars. The claims and defenses are complex; litigating them is difficult and time consuming. Although the Action has been pending for more than a year, recovery by any means other than settlement would require additional years of litigation in this Court and appellate courts. In contrast, the Settlement provides immediate and tangible benefits to tens of thousands of IBERIABANK customers.

**3. The Factual Record is Sufficiently Developed to Enable Plaintiffs and Class Counsel to Make a Reasoned Judgment Concerning the Settlement.**

48.     Significant informal discovery occurred in this case prior to the Settlement. While discovery was not complete, it nonetheless afforded Class Counsel insight into the strengths and weaknesses of their claims against IBERIABANK. Before settling, we had already developed ample information and performed extensive analyses from which to assess the probability of success on the merits, the possible range of recovery, and the likely expense and duration of the litigation.

**4. Plaintiffs Would Have Faced Significant Obstacles to Obtaining Relief.**

49.     Plaintiffs and Class Counsel are confident in the strengths of their case, but we are also aware of the various defenses available to IBERIABANK and the risks inherent to litigation. While Plaintiffs and Settlement Class Counsel believe we have a compelling case against IBERIABANK, we are mindful that IBERIABANK advanced significant defenses we would be required to overcome at summary judgment, at trial, and eventually on appeal. This litigation

involved several major risks, including but not limited to: (1) HOLA preemption; (2) the IBERIABANK account agreement; and (3) Federal Reserve Board promulgated rules. Class Counsel and Plaintiffs thus appreciate that, absent a settlement, it would have taken years of additional litigation – and overcoming vigorous legal and factual defenses – to bring the Action to finality. Even then, the outcome would be uncertain. Given the myriad risks attending these claims, the Settlement cannot be seen as anything other than a fair compromise.

50.     Protracted litigation carries inherent risks and inevitable delay. Under the circumstances, Plaintiffs and Class Counsel determined that the Settlement reached with IBERIABANK clearly outweighs the risks of continued litigation.

**5. The Settlement Amount is Reasonable Given the Range of Possible Recovery**

51.     The Settlement provides immediate value to the Settlement Class. Such value is well within the range of reasonableness. Under the Settlement, Plaintiffs and the Settlement Class will recover $2.5 million.  In addition, IBERIABANK has already changed its posting practices.

52.     Moreover, the absence of a claims-made process for Identifiable Class Members here speaks volumes about the propriety of settlement approval. These Identifiable Settlement Class Members will receive the benefit *automatically*, without needing to fill out *any* claim form or indeed to take any action whatsoever.

**6. The Opinions of Class Counsel, Class Representatives, and Absent Class Members Strongly Favor Approval of the Settlement.**

53.     Class Counsel believe that this Settlement is reasonable and adequate and deserving of Final Approval. Moreover, opposition to the Settlement has been nonexistent. As of March 5, 2012, Class Counsel have received no objections to the Settlement, and the claims administrator has received no requests for exclusion from the Settlement Class. Decl. of

17

Cameron Azari, Exhibit B to Plaintiffs' Corrected Motion for Final Approval of Settlement and Incorporated Memorandum of Law, ¶ 31.

### H. Service Awards

54.     Pursuant to the Settlement, Class Counsel seek, and IBERIABANK does not oppose, Service Awards of $5,000 per named Plaintiff.  If the Court approves them, the Service Awards will be paid from the Settlement Fund, and will be in addition to the relief the Class Representatives will be entitled to under the terms of the Settlement.   These awards will compensate the representatives for their time and effort in the Action, and for the risk they undertook in prosecuting the case against IBERIABANK.

55.     Service awards compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation.  Courts have consistently found service awards to be an efficient and productive way to encourage members of a class to become class representatives.

56.     The factors for determining a service award include: (1) the actions the class representatives took to protect the interests of the class; (2) the degree to which the class benefited from those actions; and (3) the amount of time and effort the class representatives expended in pursuing the litigation.

57.     The above factors, as applied to the Action, demonstrate the reasonableness of a service award of $5,000 to each Class Representative. Among other things, each Class Representative took numerous actions and provided substantial assistance to Class Counsel by locating and forwarding responsive documents and information – including monthly account statements and account agreements – and by engaging in conferences with Class Counsel. In so doing, the Class Representatives were integral to forming the theory of this case. The Class

Representatives not only devoted time and effort to this long-running litigation, but the end result of their efforts, and those of counsel, was a substantial benefit to the Class. The Class Representatives should be compensated for their service.

58.     If each of the Class Representatives are awarded $5,000, the total service awards will be $10,000. This is a mere .4% of the Settlement Fund of $2.5 million, and well within the range of reasonable service awards.

### I. Class Counsels' Attorneys' Fees

59.     Pursuant to the Settlement, Class Counsel have agreed to request that the Court award an attorney fee equal to 27.5% of the common fund, or $687,500, which is reduced pursuant to Class Counsel's agreement to pay $100,000 in fees to data analysis experts without reimbursement, resulting in a net attorney fee of $587,500.  Data expert Art Olsen will receive an additional $42,084.25, which will be paid from the settlement fund. The attorney fee will be shared by the three law firms serving as proposed class counsel (the undersigned), and the Kopelowitz Ostrow law firm.  Class counsel also seeks to be reimbursed expended case costs in the amount of $83,785.61. The Parties negotiated and reached this agreement regarding attorneys' fees and expenses only after reaching agreement on all other material terms of this Settlement. *See* Combined Expense Reports attached as Exhibit A.

60.     As indicated in the Court-approved Notice disseminated to the Settlement Class, and consistent with standard class action practice and procedure, Class Counsel request a fee amounting to 27.5 percent of the $2.5 million common fund created through our efforts in creating the Settlement Fund, net of Settlement-related costs and expenses.

**1. The Claims Against IBERIABANK Required Substantial Time and Labor.**

61.     Prosecuting and settling the claims in the Action demanded considerable time and labor, making this fee request reasonable. Throughout the pendency of the Action, the internal organization of Class Counsel, including assignments of work, weekly and sometimes daily conference calls ensured that we were engaged in coordinated, productive work efforts to maximize efficiency and minimize duplication of effort. To the same ends, in-person meetings of Class Counsel were also held at various times during the course of the litigation.

62.     Class Counsel spent many hours investigating the claims of many potential plaintiffs against IBERIABANK in this matter. Class Counsel obtained, reviewed, sorted, and analyzed various BERIABANK deposit account agreements and a substantial quantity of data. This information was essential for understanding the nature of IBERIABANK's conduct, the account agreements at issue, and potential remedies for class members.

63.     Class Counsel expended significant resources researching and developing the legal claims at issue.

64.     IBERIABANK produced a substantial volume of documents in response to Plaintiffs' informal requests.

65.     All told, Class Counsel's efforts have resulted in a fair and adequate result for the Settlement Class. Taken together, the time and resources Class Counsel devoted to prosecuting and settling the Action justify the requested fee.

**2. The Issues Involved Were Novel and Difficult and Required the Exceptional Skill of a Highly Talented Group of Attorneys.**

66.     As the Court is aware from presiding over these cases in the MDL, it is challenging to identify, and establish liability based upon, the debit re-sequencing that lies at the heart of the Action. The proof is not self-evident from the face of Plaintiff's bank statements.

Instead, it requires the acquisition and analysis of a substantial quantity of bank data, which requires the efforts of skilled lawyers and experts.

67.     Litigation of a case like this requires counsel experience in class action litigation, law and procedure, as well as experience in this particular kind of case. The attorneys representing Plaintiffs possess the requisite skill and experience.

68.     In assessing the quality of representation by Class Counsel, the Court also should consider the quality of their opposing counsel. IBERIABANK is represented by extremely able and diligent attorneys, who were worthy and highly competent adversaries.

**3. The Claims Against IBERIABANK Entailed Considerable Risk.**

69.     IBERIABANK denied any and all liability in this case.

70.     There were significant risks inherent in this litigation.   IBERIABANK would have raised its federal preemption argument at all stages of the litigation. The risk of this defense to class members is illustrated by the Union Bank case, in which Union Bank asserted the defense of federal preemption (under the National Bank Act) in two of its three primary arguments in a recent appeal to the Eleventh Circuit challenging this Court's class certification order under Federal Rule of Civil Procedure 23(f), *see* Eleventh Circuit Case No. 11-90012.  In the Wells Fargo litigation that serves as a bellwether case in this field of litigation, Wells Fargo asserted National Bank Act preemption in appealing the *Gutierrez* verdict (*Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080 (N.D. Cal. 2010)) to the Ninth Circuit.  *See* Ninth Circuit Case Nos. 10-16959, 10-17468 & 10-17689.

While the undersigned believe that the claims of the class members – brought under state laws of general applicability, and based on allegations of bad-faith conduct –are not preempted,

there can be doubt that the preemption defense involves complex issues of law and fact, and presented an ongoing, major risk to Plaintiffs' claims.

71.     An additional risk of litigation for class members lies in the argument that the express language in the IBERIABANK deposit account agreement shields it from liability for the claims asserted in the Action. The agreement states, in part, that: "The law permits us to pay checks or other items drawn upon your Account in any order determined by us, even if paying a particular check or item results in an insufficient balance in your account to pay one or more items that could have otherwise have been paid from your Account.  Generally, we process checks and other debit items from highest dollar amount to lowest dollar amount.  However, certain withdrawals such as wire transfers and checks cashed by a teller against your Account may be posted before other items.  We reserve the right to change this posting order without notice."  IBERIABANK would have continued to assert that this language expressly authorized it to engage in the challenged debit re-sequencing and therefore claims for breach of the covenant of good faith and fair dealing should not lie.

72.     Each of these risks, standing alone, could have impeded Plaintiffs' successful prosecution of these claims at trial (and in any appeal).

**4. Class Counsel Assumed Substantial Risk to Pursue The Action on a Pure Contingency Basis.**

73.     Class Counsel prosecuted the Action on a contingent fee basis, thereby assuming the expense and risk of prosecuting this case. That risk, and the result achieved, warrants the requested fee. Public policy concerns – especially ensuring the continued availability of experienced and capable counsel to represent classes of injured plaintiffs whose individual claims would defy vindication – further justifies the requested fee award.

74.     The time and expense expended on the prosecution of this case placed a significant strain upon the time and financial resources of Class Counsel.

75.     Furthermore, the time we spent on the Action resulted in lost opportunity costs, i.e. time and expense applied to other litigation, and this supports the requested fee.

**5. Class Counsel Achieved a Positive Result for the Class.**

76.     The Settlement is fair and adequate. Instead of facing additional years of costly and uncertain litigation, millions of Settlement Class Members will receive an immediate benefit from a settlement fund of $2.5 million.

**6. The Requested Fee Comports with Customary Fees Awarded in Similar Cases.**

77.     The fee requested here is in accordance with fees typically awarded in similar cases. A fee award of 30 percent of a common fund is well within the range of a customary fee; Class Counsel asks the Court to award 27.5%. The requested fee falls squarely within the range of awards made in numerous cases brought in this Circuit and District.

**7. Other Factors Also Favor Approving Class Counsels' Fee Request.**

78.     The fee request is reasonable in light of the economics involved in prosecuting a class action. Without adequate compensation and financial reward, this class of plaintiffs could not afford to individually litigate the issues present in this case.

We declare under penalty of perjury that the facts stated in the foregoing declaration are true and correct, and that this declaration was executed on March 6, 2012:


*/s/ Brent Walker*                     */s/ Steve Owings*                     */s/ Jack Wagoner*
Brent Walker                          Steve Owings                           Jack Wagoner
Carter Walker Law Firm                Owings Law Firm                        Wagoner Law Firm