**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

**CASE NO: 1:09-MD-02036-JLK**

| | |
|---|---|
| IN RE: CHECKING ACCOUNT OVERDRAFT LITIGATION | ) ) ) |
| MDL No. 2036 | ) ) ) |
| THIS DOCUMENT RELATES TO: THIRD TRANCHE ACTIONS: | ) ) ) |
| *Jessica Duval v. Citizens Financial Group, Inc.* N.D. Ill. Case No. 10-cv-00533 S.D. Fla. Case No. 1:10-cv-21080-JLK | ) ) ) ) |
| *Eric Daniels v. Citizens Financial Group, Inc.* D. Mass. Case No. 10-cv-10386 S.D. Fla. Case No. 1:10-cv-22014-JLK | ) ) ) ) |
| *Michael L. Blankenship v. RBS Citizens, N.A.* D.R.I. Case No. 10-163S S.D. Fla. Case No. 1:10-cv-22942-JLK | ) ) ) ) |

**DEFENDANTS RBS CITIZENS, N.A.'S AND CITIZENS BANK OF PENNSYLVANIA'S REPLY IN SUPPORT OF MOTION TO STRIKE THE DECLARATION OF ARTHUR OLSEN IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

## INTRODUCTION

Plaintiffs do not have an expert capable of proving damages by common proof on a class-wide basis. They concede that their proffered expert, Arthur Olsen, is unqualified to opine on a correct damages model. Accordingly, Olsen's testimony is not helpful to the Court; it does nothing to advance the damages analysis in this case or support Plaintiffs' class certification motion. Put differently, Olsen's purported opinions do not bear on any material issue in the litigation. His opinions should thus be excluded under *Daubert*.

Plaintiffs fail to answer this fundamental shortcoming in their damages case. First, their suggestion that the Court deem Olsen a reliable, scientifically valid expert without first addressing the validity of the damages model that Olsen's testimony purportedly supports puts the cart before the horse. After all, how can the Court find that Olsen's testimony "fits" the case's liability and damages principles, and thus advances Plaintiffs' attempt to certify a class, when Plaintiffs have yet to identify a precise method for measuring damages? Second, regardless of whether Olsen's data manipulation was properly accepted in *Gutierrez v. Wells Fargo Bank*, a case that has yet to be reviewed on appeal, the fact remains that *Gutierrez* turned on a restitution theory of damages, one that focuses singularly on any gains by the defendant. Here, in contrast, Plaintiffs' contract and trade practices act claims invoke damages theories that require measuring each Plaintiff's asserted loss (rather than the defendant's asserted gain). Olsen's methodology fails to address material components of a damages analysis focused on an individual's loss, such as differences in costs Plaintiffs incur under one posting order versus another, and Plaintiffs' own posting order expectations. Third, Olsen's analysis, even if it were thought to bear on a material, relevant damages issue, is at all events unreliable due to the computational errors inherent in his analysis of Citizens' data.

The admissibility of Olsen's purported expert opinions is central to evaluating Plaintiffs' ability to satisfy Rule 23's predominance requirement. Referencing the Court's ruling in *In re Checking Acct. Overdraft Litig.* ("*Larsen v. Union Bank*"), 275 F.R.D. 666, 677 (S.D. Fla. 2011), Plaintiffs suggest that the Court has "implicitly" approved Olsen's methods under *Daubert*. But Union Bank did not challenge Olsen's methodology. *See id*. at 673. Here, the Court, after employing the careful analysis required by *Daubert*, can reach only one conclusion: Olsen fails to determine reliably the existence and quantum of damages in this case based on common proof.

**ARGUMENT**

I. **The *Gutierrez* Restitution-Based Damages Methodology Is Not Applicable Here.**

Embracing the damages methodology adopted in *Gutierrez v. Wells Fargo Bank, N.A.*, No. C 07-05923 (N.D. Cal 2010), Plaintiffs assert that Olsen can reliably "establish injury and calculate damages based on proposed alternate posting scenarios." But that case centered on a restitution-based damages theory. Here, on the other hand, the damages theory must be compensatory – one focused on Plaintiffs' actual injury, not Defendants' asserted gain.

The *Gutierrez* plaintiffs advanced claims against Wells Fargo pursuant to California's Business & Profession Code. Cal. BPC §§ 17200, *et seq.* Section 17203 permits statutory restitution, a punitive theory of recovery measuring damages by a defendant's *gain*, not a plaintiff's *actual injury*. *People v. Beaumont Investment, Ltd.*, 111 Cal. App. 4th 102, 134-135 (2003) (Section 17203 "is designed to penalize a defendant for past unlawful conduct."). As the *Gutierrez* court said, "relief under [Section 17200, *et seq.*] is available without individualized proof of . . . injury," meaning that class members "need not show on an individualized basis that they have lost money or property as a result of the unfair competition[.]" *Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080, 1137-38 (N.D. Cal. 2010) (quoting *In re Tobacco II Cases*, 207 P.3d 20, 35 (Cal. 2009)). The *Gutierrez* damages methodology thus identified only the differential in overdraft fees between Wells Fargo's actual posting order versus a proposed "2A" restitution scenario. *See id.* at 1139 (focusing narrowly on "restitution," specifically "the amounts that were wrongfully taken by Wells Fargo"). Critically, it did not address any additional costs the 2A scenario would have caused customers to incur.

In contrast, Plaintiffs' contract and trade practices act claims here incorporate *loss-based* theories of recovery. For those theories, the relevant damages measure is "an amount reasonably calculated to make [the plaintiff] whole and neither more nor less." 24 Williston on Contracts § 64:1 (4th ed.).[1] In other words, damages here must be measured "according to the pecuniary loss

---

[1] *See Jones v. Hryn Dev., Inc.,* 778 N.E.2d 245, 249 (Ill. App. 2002); *Ambrogio v. Beaver Rd. Assocs.*, 836 A.2d 1183, 1187 (Conn. 2003); *Paul v. Deloitte & Touche LLP*, 974 A.2d 140, 146 (Del. 2009); *Sheppard v. Stanich*, 749 N.E.2d 609, 611-12 (Ind. App. 2001); *Perroncello v. Donahue*, 859 N.E.2d 827, 832 (Mass. 2007); *Corl v. Huron Castings, Inc.*, 544 N.W.2d 278, 280, 286 (Mich. 1996); *State ex rel. Stacy v. Batavia Local Sch. Dist. Bd. of Educ.*, 829 N.E.2d 298, 305 (Ohio 2005); *Riblet Tramway Co., Inc. v. Stickney*, 523 A.2d 107, 112 (N.H. 1987); *Totaro, Duffy, Cannova & Co., LLC v. Lane, Middleton & Co., LLC*, 921 A.2d 1100, 1107-08

suffered by the promisee, rather than according to the benefits gained by the promisor." *Id.*[2] Thus, unlike in *Gutierrez*, Plaintiffs here must show that Olsen can calculate *compensatory* damages based on common proof. This analysis includes not only a determination of the differential in the number of overdraft transactions between the real world and a hypothetical, alternative transaction ordering system (as Olsen attempted in *Gutierrez*), but also an assessment of the additional costs associated with the substitute order (which Olsen does not even purport to do). Plainly, his methodology is inadequate for calculating compensatory damages.

II.     **Olsen's Opinions Do Not "Fit" The Damages And Liability Theories Asserted Here.**

To reliably determine damages, Plaintiffs must offer a viable "but for" methodology that analyzes the benefits and costs of posting debit card transactions under an alternative posting scenario. (*See* DE # 2435 ("Open Br.") 3, 9-12; Decl. of Gregory Udell ("Udell Decl.") ¶¶ 15, 32-33, 35, 71, attached as Appendix II to the Citizens Defendants' Opposition To Plaintiffs' Motion For Class Certification (DE # 2433).) It follows that to "fit" a damages model to their claims, Plaintiffs' model must account for the inevitable changes in the "elements of . . . the retail package that [Citizens] offers" its checking customers, including changes to the amount of its per overdraft fee, its monthly maintenance fees, interest rates on accounts, and overdraft limits, had Plaintiffs' posting order been adopted. (Dep. of Gregory Udell ("Udell Dep.") 39:12-9, 65:9-67:18, attached as Exhibit A; Udell Decl. ¶¶ 15, 32, 39-40, 49.) Plaintiffs must also account for the "pecuniary" and "non-pecuniary costs" associated with transactions that were paid under Citizens' real-world posting process, but would be returned for lack of funds under Plaintiffs' substitute posting scenario – such as third-party returned check costs, late fees, and delinquent credit reporting. (Udell Dep. 40:10-41:16, 68:25-70:20; Udell Decl. ¶¶ 15, 37-38, 64-

---

(continued…)

(N.J. 2007); *Freund v. Wash. Square Press, Inc.*, 314 N.E.2d 419, 420-21 (N.Y. 1974); *Helpin v. Trustees of Univ. of Pa.*, 10 A.3d 267, 270 (Pa. 2010); *Guzman v. Jan-Pro Cleaning Sys., Inc.*, 839 A.2d 504, 508 (R.I. 2003); *Tour Costa Rica v. Country Walkers, Inc.*, 758 A.2d 795, 802 (Vt. 2000).

[2]As for contract claims, a plaintiff asserting a trade practices act claim is entitled to seek actual damages. *See* Mass Gen Laws. Ch 93A, § 9; *Aspinall v. Phillip Morris Cos., Inc.*, 813 N.E.2d 476, 490 (Mass. 2004); N.Y. Gen. Bus. Law § 349(h); *Stutman v. Chemical Bank*, 731 N.E.2d 608, 610 (N.Y. 2000); 73 P.S. § 201-9.2; *Young v. Dart*, 630 A.2d 22, 26-27 (Pa. Super. Ct. 1993).

70.)  While the *Gutierrez* court found that these costs were "tangential" to restitution-based damages, they are a material aspect of any reliable assessment of compensatory damages.

Olsen's narrow focus on a limited range of data matching does not fit the more comprehensive damages analysis required here.  Most notably, Olsen entirely fails to consider the universe of transactional and non-transactional information necessary to determine putative class members' losses.  Accordingly, his analysis does not help the trier of fact determine the fact and quantum of *compensatory* damages by common proof, and thus should be stricken.  *See Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1167 (S.D. Fla. 1996) (excluding opinion where expert's methodology failed to consider relevant data).

Olsen's opinions also do not fit Plaintiffs' liability theory because much of the "harm" he purports to quantify was not caused by conduct Plaintiffs deem to be unlawful.  Plaintiffs claim that Citizens' customers incurred additional costs "as a result of . . . sequencing debit card transactions from highest to lowest" as opposed to "chronological" order.  Plaintiffs, however, admit that Olsen's data analysis also manipulates all *non-debit card* transactions (*e.g.*, checks), and then does so by utilizing a *non-chronological* posting order.  Making matters worse, Plaintiffs concede that the lion's share of Olsen-identified "harm" springs from this non-chronological posting of non-debit card transactions.  In other words, Olsen's data mining methods attribute a large chunk of the asserted damages to *lawful* conduct.  Such imprecise, inconsistent, and ill-fitting damages calculations plainly fail the strict *Daubert* standards.  *See Boca Raton Community Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1234 (11th Cir. 2009) (affirming exclusion of expert testimony for lack of "fit" where plaintiffs' expert measured injury and damages from activity that was not unlawful under plaintiffs' liability theory); *Johnson Elec. N. Am., Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 280-81 (S.D.N.Y. 2000) (finding expert's opinions "fatally flawed" and "simply irrelevant" to the extent they computed damages for conduct not at issue in the case).

Finally, Olsen's opinions do not fit Plaintiffs' case because, as demonstrated in Citizens' opening brief (at 13-14), yet disregarded entirely in Plaintiffs' response, Olsen ignores Plaintiffs' own expectations with respect to the posting order of credits – no doubt to inflate Plaintiffs' supposed damages.  *See Shelley v. AmSouth Bank*, No. Civ. A 97-1170, 2000 WL 1121778, at *9, *15 (S.D. Ala. July 24, 2000), *aff'd*, 247 F.3d 250 (11th Cir. 2001 (table) ("each depositor's damages must be measured with reference to the alternate posting order identified by the

depositor as the one she believed in place"). So not only do Olsen's methods generate damages related to lawful conduct, but they also fail to incorporate the very customer expectations upon which Plaintiffs base their claims.

Plaintiffs do not deny the imprecision of Olsen's methodology, but instead argue that it cannot be helped. (Opp. 10.) But although they argue Olsen had no choice but to re-order non-debit card transactions along with debit card transactions – and thus ill-fittingly chalk up "harm" from lawful conduct – Plaintiffs' "necessity" argument is wholly unsupported by Olsen or any other expert. After all, Olsen concedes that his alternative posting scenarios come exclusively from Plaintiffs' counsel's instructions. (Olsen Decl. ¶ 5.) The Court is thus left with nothing more than counsel's inadmissible *ipse dixit*. (*See* Open Br. 10-11.)

Equally unavailing is Plaintiffs' assertion that "but for" damages models are appropriate only in the antitrust context. (*See* Opp. 12 (criticizing Citizens' citation to *Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005) and *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.,* 247 F.R.D. 156 (C.D. Cal. 2007).) Plaintiffs offer no cases to support their dim view of the law, nor do they challenge Professor Udell's testimony supporting the necessity of a "but for" model for the compensatory damages analysis necessary here.

III. **Olsen's Opinions On Alternative Posting Scenarios Are Unreliable.**

In response to the reliability shortcomings of Olsen's alternative posting scenarios (*see* Open Br. 9-16), Plaintiffs assert that Olsen need not identify a reliable model for damages at the class certification stage and, at all events, that his "2A" analysis demonstrates his ability to perform a damages analysis on common proof. But Olsen's failure to identify a valid damages methodology renders his analysis worthless and his opinion that he can calculate class-wide damages purely speculative. Additionally, Olsen's inability to use Citizens' data to calculate a reliable *compensatory* damages model separately requires that his declaration be stricken.

    A. **Plaintiffs' Failure To Advance A Valid Damages Methodology Makes Olsen's Damages Analysis Meaningless.**

In a purported class action, plaintiffs must demonstrate that they can prove class-wide damages using a reliable damages model, and must do so at the class certification stage. *See In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 26 (1st Cir. 2008) ("district court must engage in a searching inquiry into the viability of [a novel or complex damages] theory" at class certification stage); *Kottaras v. Whole Foods Market, Inc.*, __ F. Supp. 2d __, 2012 WL 259862, at *10-11 (D.D.C. Jan. 30, 2012) (denying class certification where the

plaintiff's "proposed methodology is not sufficiently developed" and his expert failed to "tell the Court the precise [damage] analyses he intended to undertake"). With respect to damages models based upon purported expert testimony, "the issue is not whether [an expert] has shown just any method for proving impact and damages on a class-wide basis; it is whether the method he proposes is a reliable means of common proof." *Reed v. Advocate Health Care*, 268 F.R.D. 573, 593-94 (N.D. Ill. 2009) (denying class certification).

At the certification stage, Plaintiffs have the burden of presenting a damages methodology to demonstrate that class-wide damages can be reliably calculated with some level of precision. *See Wiesfeld v. Sun Chemical Corp.*, 84 Fed. Appx. 257, 261-64 (3d Cir. Jan. 9, 2004) (affirming denial of class certification where plaintiffs' expert failed to provide an "extensive empirical investigation and economic analysis" of his proposed damages models) (internal quotation marks omitted). Asking the Court to ignore its duty to rigorously analyze that methodology and instead delegate the assessment of a valid damages methodology to the jury, as Plaintiffs do here, violates the requirements of Rule 23, to say nothing of *Daubert*. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 317 n.17, 323 (3d Cir. 2009) (A concern for merits avoidance "should not be talismanically invoked to artificially limit a trial court's examination of the factors necessary to a reasoned determination of whether a plaintiff has met her burden of establishing each of the Rule 23 class action requirements" because "[w]eighing conflicting expert testimony at the certification stage is not only permissible; it may be integral to the rigorous analysis Rule 23 demands."); *Reed*, 268 F.R.D. at 594 ("when it comes to the reliability of an expert's methods," the suggestion that evaluation of the methodology is "strictly for the jury" is incorrect). Rather, it is now, not later, that Plaintiffs must show a viable measure for reliably proving damages by common proof. Plaintiffs' refusal to embrace a precise damages methodology is grounds for exclusion of Olsen's derivative opinions.

Citing *In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002), Plaintiffs assert that whether they select what they believe to be the proper posting order is "irrelevant to the question of class certification" because "an expert is not required to choose between potentially viable damage models at class certification." (Opp. 11.) Even setting aside the fact that *Linerboard* precedes the 2003 amendment to Fed. R. Civ. P. 23, after which federal courts have adopted a more strenuous *Daubert*-like inquiry of expert evidence offered in support of class certification, s*ee Sher v. Raytheon Co*., No. 09-15798, 2011 WL 814379, at *3 (11th Cir. Mar. 9, 2011);

*American Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010), *Linerboard* does not stand for the proposition that experts need not provide *any* insight on the viability of a damage model at the class certification stage. Rather, the *Linerboard* court found it "significant" that qualified economics experts "made an extensive empirical investigation" of their proposed methodologies; "studied the structure of the industry"; and input the relevant data into the two empirically verified models. *Linerboard*, 305 F.3d at 153-54. If anything, "*Linerboard* . . . teaches that at least some analysis of the relevant market and other facts" unique to the particular damages model is required before an expert can opine that all class members have suffered injury. *American Seed Co., Inc. v. Monsanto Co.*, 238 F.R.D. 394, 399 (D. Del. 2006).

No more convincing is Plaintiffs' attempt to limit their burden of demonstrating a proper compensatory damages model by labeling the costs associated with alternative posting scenarios as mere "set offs" that, according to Plaintiffs, are not only unimportant to the damages analysis, but also are Citizens' burden to establish. Plaintiffs' assertion is unsupported by law or fact. A setoff is a "defendant's counterdemand against the plaintiff, arising out of a transaction *independent* of the plaintiff's claim." Black's Law Dictionary 1376 (7th Ed. 1999); *Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 336 (2d Cir. 2005) ("a claim for setoff embodies a counterdemand based on some transaction entirely extrinsic to the plaintiff's cause of action"). But Plaintiffs' costs sustained in a "but for" world stem from the *same* transactions upon which Plaintiffs advance their current claims. Such costs cannot constitute "set offs" capable of shifting the burden of proof from Plaintiffs to Citizens. This is true not only for claimed costs but also avoided costs inherent in an alternative damages methodology.[3]

Plaintiffs remaining arguments are equally unavailing. For one, their suggestion that a detailed "but for" analysis is speculative and unnecessary is at odds with both empirical industry evidence and Professor Udell's own research, which together provide the factual and analytical

---

[3] *See Sys. Fuels, Inc. v. United States*, 666 F.3d 1306, 1312 (Fed. Cir. 2012) (quoting *S. Nuclear Operating Co. v. United States*, 637 F.3d 1297, 1304 (Fed. Cir. 2011)) ("[A] defendant must move forward by pointing out the costs it believes the plaintiff avoided because of its breach,' but 'with respect to both claimed costs and avoided costs, plaintiffs bear the burden of persuasion.'"); *Energy Nw. v. United States*, 641 F.3d 1300, 1308 n.5 (Fed. Cir. 2011) ("Once the defendant has properly articulated an offset, the burden shifts to the plaintiff to incorporate those saved costs into its formulation of a plausible but-for world.") (internal quotation marks omitted).

support for the need for a "but for" analysis for reliably calculating damages. (*See* Udell Dep. 66:3-17 (empirical examples of increased overdraft and account maintenance fees), 92:3-95:12 (Udell's involvement in the most comprehensive study of the macro environment that considered retail banking and banking service).)  For another, Plaintiffs' suggestion that a "but for" model renders consumer class actions impossible (Opp. 13-14) is simply their attempt to mischaracterize Professor Udell's testimony.  Fully considered, that testimony states that Olsen's restitution scenarios cannot calculate harm in this case, not that a but for damages model can never be successfully applied.  (*See* Udell Dep. 139:5- 140:21.)

      B.      **Olsen Cannot Calculate Compensatory Damages Using Common Proof.**

Next, Plaintiffs assert that because Olsen can purportedly script Citizens' transactional data onto a "2A" restitution scenario, he can utilize the same methods and data to demonstrate damages on common proof no matter what damages methodology the jury eventually adopts. Olsen's opinions, however, are not that fungible.  In actuality, Olsen purports only to have the ability to determine the "differential" in the number of overdraft fees charged under Citizens' historic posting orders versus a proposed restitution scenario using Citizens' transactional data. (*See* Opp. 6.)  In other words, Olsen's opinions require adoption of a restitution-based model; he provides no proof that he can (or could) use his same methods or the same transactional data to evaluate damages under a compensatory damages model.  At best, Olsen can determine the *benefits* a plaintiff gained from an alternative ordering of transactions; he entirely fails to account for the *costs* associated with a different order.

Indeed, Olsen's methodology is of no value in assessing compensatory damages.  Unlike a restitution damages analysis, a compensatory damages analysis here requires the trier of fact to consider, among other things, the additional costs each Plaintiff would incur under one of Olsen's alternative posting scenarios.  To assess those additional costs, one must consider, among other factors, how Plaintiffs would have been impacted in the alternative scenario by increased maintenance and overdraft fees, lowered interest rates, and adjustments in overdraft limits.  Olsen, however, ignores these considerations.  And even had he thought to address them, his exclusive reliance on Citizens' transactional data would make such determinations impossible, as these additional costs are not reflected in that data.

To the same end, a proper compensatory damages analysis here would require calculating the increased third-party costs caused by a change in posting order, for instance, merchant-

returned check fees and late fees. Here too, Olsen ignores those costs in his analysis. Nor, here again, do Citizens' systems contain the necessary data to make such determinations. Rather, an assessment of third-party costs relies on evaluating idiosyncratic merchant-specific information in the individual merchant's possession. For these reasons, Olsen offers nothing more than his unsupported *ipse dixit* to suggest that his calculations not only account for all of the relevant compensatory damages factors, but also that such calculations can be reliably made based solely on the Citizens' transactional data. Such a "trust me" approach cannot withstand *Daubert* scrutiny. *See General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert"); *Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1194 (11th Cir. 2010) (court may not "admit speculation, conjecture, or inference that cannot be supported by sound scientific principles") (citation omitted).

  C. **The Opposition Ignores The Significant Data Errors Inherent In Olsen's Methods.**

Plaintiffs' opposition also fails to rebut the dispositive impact that Olsen's computational errors have on the reliability of his data manipulation. In assessing the reliability of Olsen's methods, the Court must consider the error rate associated with his technique. Plaintiffs bear the burden of demonstrating that the error rate does not render the methodology unreliable. *See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340-41 (11th Cir. 2003) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-94 (1993)) (the court must "consider, to the extent possible . . . the known or potential rate of error").

Once again, Plaintiffs want to litigate the *Gutierrez* case rather than this one: They direct all of their attention to an issue that apparently was a shortcoming in Wells Fargo's data – the inability to match certain electronic debit card transactions to an authorization date and time. But Citizens has never contended that this is an issue with its data; rather Citizens' expert, Professor Udell, opines that Olsen's methodology is of questionable reliability because Professor Udell could not recreate it.[4] (*See* Udell Decl. ¶¶ 76-81.) *Quiet Tech.*, 326 F.3d at 1340-41

---

[4] Plaintiffs discount Professor Udell's opinions on data issues by mischaracterizing Udell's testimony on his expertise. Plaintiffs assert that Udell "has no expertise in database management or data analysis" and cite to Udell's deposition at 12:1-9. (Opp. 5, fn. 1.) But the question counsel asked Udell was whether Udell "hold[s] any degrees or advanced training in data analysis, and Udell answered that he "do[es] not hold any degrees in that." (*Id.*) Udell

(citing *Daubert*, 509 U.S. at 593-94) (factors bearing on reliability of an expert's opinion include "whether the expert's theory can and has been tested"). Faced with this criticism, Olsen, in a "Reply Declaration," now says he fixed an error in his original calculations, and blames his original error on Citizens' failure to provide him certain data. (Olsen Reply Decl. ¶ 11.) But between the time of Olsen's original and reply declaration, Citizens did not provide Olsen with any additional information – he fixed his admitted error using the information that was always in his possession. Any error is thus exclusively assignable to Olsen's methodologies. Accordingly, Plaintiffs' citation to *Bigelow w. RKO Radio Pictures*, 327 U.S. 251 (1946), and *Eastman Kodak Co. of New York v. Southern Photo Materials Co.*, 273 U.S. 359, 379 (1927), is inapposite. What is more, we are left still not knowing how many other errors Olsen's methodologies will engender. Certainly, it should not be Citizens' burden somehow to find them all.

Lastly, Plaintiffs' opposition flatly ignores the fundamental criticism of Olsen's computational errors with *Citizens'* data – the *mismatching* of authorization date and time information. (*See* Open. Br. 15; Udell Decl. ¶¶ 74-75; Udell Dep. 81:24-82:8, 84:18-85:15.) Lacking an explanation for this completely distinct class of error, Olsen omits any discussion of mismatch errors in his original or reply declaration. This unique class of error calls into question the integrity of Olsen's entire supposed "chronological" re-sequencing of Citizens' electronic debit card data. (*See* Udell Decl. ¶¶ 75, 81.) Because this error corrupts Olsen's time-stamped debit card transaction order (and not the placement of non-time stamped debit card transactions), Olsen's supplemental 0.1% analysis relating to non-stamped debit card transactions is wholly unresponsive. (*See* Udell Dep. 74:5-23.) Still today, the Court is left without any idea of the error rate in Olsen's work. Plainly, his methodology is neither reliable nor verifiable.

## CONCLUSION

For these reasons, as well as those articulated in its opening motion, Citizens respectfully requests that this Court grant Citizens' motion and enter an order striking the December 8, 2011 Declaration of Arthur Olsen In Support Of Plaintiff's Motion for Class Certification.

---

(continued…)

does have extensive experience in working with data. Indeed, about 75% of his published economic research involves working with large amounts of data and databases. (*See* Mar. 15, 2012 Udell Decl. ¶¶ 4-8, attached as Exhibit B.)

Dated:  March 16, 2012

Respectfully submitted,

/s/ David F. Adler

David F. Adler
Lisa B. Gates
JONES DAY
901 Lakeside Avenue
Cleveland, OH  44114
Telephone:  (216) 586-1344
Facsimile:   (216) 579-0212
dfadler@jonesday.com
lgates@jonesday.com

Chad Readler
JONES DAY
325 John H. McConnell Blvd.
Columbus, Ohio 43215
Telephone: (614) 281-3891
Facsimile: (614) 461-4198
careadler@jonesday.com

Erin L. Shencopp
Gabriel H. Scannapieco
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, IL  60601-1692
Telephone:  (312) 782-3939
Facsimile:   (312) 782-8585
eshencopp@jonesday.com
gscannapieco@jonesday.com

Albert J. Rota
JONES DAY
2727 N. Harwood Street
Dallas, TX  75201
Telephone:  (214) 969-3698
Facsimile:   (214) 969-5100
ajrota@jonesday.com

*Attorneys for Defendants RBS Citizens, N.A. and Citizens Bank of Pennsylvania*

## **CERTIFICATE OF SERVICE**

   I hereby certify that on March 16, 2012, a copy of the foregoing was filed electronically with the Court's Case Management/Electronic Case Files (CM/ECF) docketing system.  Notice of this filing will be sent by operation of the CM/ECF system.  Parties may access this filing through the CM/ECF system.

              /s/ David F. Adler
              *Attorney for Defendants RBS Citizens, N.A.*
              *and Citizens Bank of Pennsylvania*