# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 1:09-MD-02036-JLK

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

THIS DOCUMENT RELATES TO:
FIRST TRANCHE ACTION

*Larsen v. Union Bank, N.A.*
S.D. Fla. Case No. 1:09-cv-23235-JLK
N.D. Cal. Case No. 4:09-cv-3250

**JOINT DECLARATION OF ROBERT C. GILBERT AND
MICHAEL W. SOBOL IN SUPPORT OF PLAINTIFFS'
UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF
CLASS SETTLEMENT AND CERTIFICATION OF SETTLEMENT CLASS**

MICHAEL W. SOBOL and ROBERT C. GILBERT, declare as follows:

1.  We are counsel of record for Plaintiffs and the proposed Settlement Class in these coordinated proceedings against Union Bank, N.A. ("Union" or the "Bank"). We respectfully submit this joint declaration in support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Settlement and Certification of Settlement Class.[1] Except as otherwise noted, we have personal knowledge of the facts set forth in this declaration, and could testify competently to them if called upon to do so.

---

[1] "Action" and all other capitalized terms used herein have the same meanings ascribed in Section II of the Agreement.

2.     The Parties have entered into a Settlement Agreement providing for a $35 million recovery for the Settlement Class.  Under the Settlement Agreement, Settlement Class Members are entitled to their *pro rata* share of the Net Settlement Fund without having to submit a claim form or take any other affirmative step.  This outstanding Settlement followed nearly three years of litigation, months of arms'-length settlement negotiations, and two mediation sessions before Professor Eric D. Green of Resolutions, LLC.

3.     Plaintiffs maintain that the claims asserted in the Action are meritorious and that Plaintiffs would prevail if this matter proceeded to trial.  Union maintains that Plaintiffs' claims are unfounded and cannot be maintained as a class action, denies any potential liability, and has demonstrated it will litigate its defenses vigorously.  Continued litigation, however, presented the risks attendant to litigation, which include, but are not limited to, the time and expenses associated with proceeding to trial, the time and expenses associated with appellate review, and the countless uncertainties of litigation, particularly in the context of a large and complex multi-district litigation.

**A.     Litigation History**

4.     Plaintiffs seek monetary damages, restitution and declaratory relief from Union due to its Debit Re-sequencing practices that were designed to increase the number of Overdraft Fees its customers incurred.

5.     Union denies all of Plaintiffs' allegations.  The Bank consistently defended its conduct by, *inter alia*, highlighting language in the relevant account agreements that it contends expressly advised its customers of and permitted the Debit Re-sequencing practices at issue.

6.     Union also asserts that Plaintiffs' claims are preempted by the National Bank Act.  Furthermore, the Bank advanced additional defenses, including that the UCC endorses the Debit

2

Re-sequencing practices at issue, that Plaintiffs cannot maintain common law unconscionability, conversion or unjust enrichment claims, and that Plaintiffs' state statutory claims fail.

7. On July 16, 2009, plaintiff Cynthia Larsen filed a Class Action Complaint in United States District Court for the Northern District of California seeking monetary damages, restitution and declaratory relief from Union, arising from its alleged unfair assessment and collection of Overdraft Fees, styled *Cynthia Larsen, et al. v. Union Bank, N.A.*, N.D. Cal. Case No. 4:09-cv-3250-PJH ("*Larsen*").

8. On October 14, 2009, the Judicial Panel on Multidistrict Litigation transferred *Larsen* for coordination with these proceedings, *In re Checking Account Overdraft Fee Litigation*, MDL No. 2036 ("MDL 2036"). The claims against Union thereafter proceeded in MDL 2036's First Tranche of cases.

9. On November 9, 2009, Plaintiffs filed a First Amended Complaint, which Union moved to dismiss. On March 11, 2010, the Court issued an order on Union's and other First Tranche banks' omnibus motion to dismiss, denying in part and granting in part the omnibus motion.

10. On April 12, 2010, Plaintiffs filed their Second Amended Complaint against Union. In the Second Amended Compliant, three additional class representatives were named: Cheryl Brown, Kristian Logan, and Josh Naehu-Reyes. On May 21, 2010, Union filed its Answer to the Second Amended Complaint.

11. On May 13, 2010, Plaintiffs propounded their first request for production of documents, first set of interrogatories and first requests for admissions. On July 16, 2010, the Parties entered into a Stipulated Protective Order relating to the production of documents and information. On January 26, 2011, Plaintiffs propounded a Second Request for Production.

3

Over the course of the Action, Union produced to Plaintiffs approximately 1.2 million pages of documents.

12. During the Action, Class Counsel took 15 depositions of Union current and former employees and officers, some lasting for more than one day. Union deposed all four of the Plaintiffs. Additionally, Plaintiffs subpoenaed documents from a third party consultant of Union Bank, CAST Management Consultants, Inc.

13. On January 28, 2011, Plaintiffs moved to amend the complaint to add a claim under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1691, *et seq.* ("RICO"). By Order dated March 21, 2011, the Court granted the motion to amend the complaint, and on March 29, 2011, Plaintiffs filed the Third Amended Complaint. On April 20, 2011, Union Bank moved to dismiss the RICO claim in the Third Amended Complaint. On July 13, 2011, the Court granted the motion to dismiss the RICO claim.

14. Beginning in early 2011, the Parties engaged in preliminary settlement discussions. Thereafter, the Parties participated in formal mediation sessions under the auspices of Professor Eric Green of Resolutions, LLC. The first mediation session was held in Miami on April 6, 2011. After the first mediation, Union Bank provided Settlement Class Counsel with sample transactional and aggregate data regarding its Overdraft Fee revenues.

15. By August 1, 2010, as a result of this Action and other factors, Union reviewed, evaluated and modified some of its checking account policies and practices with respect to its consumer DDA accounts, ultimately modifying its practices so that debit and ATM transactions on such accounts are now generally posted from lowest to highest dollar amount.

16. On April 25, 2011, Plaintiffs filed a motion for class certification. On July 25, 2011, this Court entered an Order Granting Class Certification. On July 27, 2011, Union,

pursuant to Fed. R. Civ. P. 23(f), petitioned the United States Court of Appeals for the Eleventh Circuit for permission to appeal the Order Granting Class Certification. On October 7, 2011, the Eleventh Circuit denied Union's petition.

17. On August 18, 2011, Plaintiffs served upon Union their Third Request for Production, which sought all applicable transactional data for class members during the Class Period.

18. On November 1, 2011, the Parties participated in a second formal mediation session with Professor Eric Green in Boston, Massachusetts. As a result of the mediation, the Parties signed a memorandum of understanding that memorialized the Parties' good-faith intention to fully, finally, and forever resolve the claims of the Settlement Class Members.

19. On November 2, 2011, the Parties filed a notice of settlement with the Court.

20. Several months of intense negotiations regarding the specific terms of the Settlement Agreement followed. The Settlement Agreement was signed on April 6-9, 2012.

### B. Class Counsel's Investigation

21. Class Counsel spent hundreds of hours investigating the claims of many potential plaintiffs against the defendants in this MDL. Class Counsel interviewed customers and potential plaintiffs to gather information about the Bank's conduct and its impact upon consumers. This information was essential to counsel's ability to understand the nature of Union's conduct, the language of the account agreements at issue, and potential remedies.

22. Class Counsel also expended significant resources researching and developing the legal claims at issue, in drafting the operative Complaints, and in opposing the omnibus motion to dismiss. Mindful of the Court's emphasis on the development of the factual record in its denial of most points raised in the omnibus motion, Class Counsel crafted document requests,

5

interrogatories and requests for admission with an eye toward class certification, summary judgment and trial.

23. In response to those discovery requests, Union produced more than one million pages of documents, answered interrogatories and requests for admission. Class Counsel created a large document review team whose task was to review and analyze the produced documents. To make the review and subsequent litigation more efficient, Class Counsel established coding procedures for electronic review of the documents produced, and team members remained in constant contact with each other to ensure that all counsel became aware of significant emerging evidence in real time.

24. Class Counsel took 15 depositions of Union current and former employees and officers, obtained a contested class certification order from the Court, and expended significant effort to prepare responses to the Union's requests for documents maintained by Plaintiffs.

25. After the Parties executed the memorandum of understanding in connection with the Settlement, Plaintiffs engaged in additional settlement-related investigation, to determine, among other things, the most appropriate method by which to implement the plan for direct allocation of the Settlement funds to Settlement Class Members. That investigation required Settlement Class Counsel and their experts to analyze the relevant transactional data related to Overdraft Fees imposed upon Settlement Class members, and to help determine the fairest and most appropriate distribution formula in light of the data that Union possesses.

**C.** **<u>Settlement Recovery</u>**

26. The Settlement requires Union to deposit $35 million into an Escrow Account following this Court's Preliminary Approval of the Settlement. (Agreement ¶ 47.) That deposit will create the Settlement Fund.

27. Settlement Class Members do not have to submit claims or take any other affirmative steps to receive relief under the Settlement. Instead, within 30 days of the Effective Date of the Settlement (Agreement ¶ 22), Union and the Settlement Administrator will distribute the Net Settlement Fund to all identifiable Settlement Class Members who do not opt out of the Settlement. (Agreement ¶ 79.)

28. Settlement Class Members are going to be identified through a complex analysis of Union data that allows for the identification of Settlement Class Members who experienced excess Overdraft Fees as a result of Debit Re-sequencing. Union data for the period July 16, 2005 through August 13, 2010 is sufficiently complete to permit the Parties to identify all Settlement Class Members who had Accounts during that period, and to calculate the amount of the distribution from the Net Settlement Fund to which each is entitled under the Settlement. (Agreement ¶¶ 78-82.)

### D. Settlement Notice

29. Settlement Class Counsel and Union have retained Rust Consulting, Inc. ("Rust"), to serve as the Notice Administrator for this Settlement.

30. The Notice Program is reasonably calculated under the circumstances to apprise the Settlement Class of the pendency of the Action, class certification, the terms of the Settlement, Class Counsel's Fee Application and request for Service Awards for Plaintiffs, and their rights to opt-out of the Settlement Class and object to the Settlement, Class Counsel's Fee Application, and/or the request for Service Awards for Plaintiffs. The Notice and Notice Program constitute sufficient notice to all persons entitled to notice. The Notice and Notice Program satisfy all applicable requirements of law including, but not limited to, Federal Rule of Civil Procedure 23 and the Constitutional requirements of due process. The Notice Program is designed to reach a high percentage of Settlement Class Members (including many by direct

7

mail, the best possible form of notice), and exceeds the requirements of constitutional due process.

### 1.     Mailed Notice

31.     Rust will administer the Mailed Notice Program.  Within 28 days from the date that Rust receives from Settlement Class Counsel and Union the data files that identify the names and last known addresses of the identifiable Settlement Class Members, Rust will run such addresses through the National Change of Address Database, and will mail to all such Settlement Class Members postcards that contain the Mailed Notice (the "Initial Mailed Notice").  The Initial Mailed Notice will be completed no later than 15 days after the date on which the Court preliminarily approves the Settlement.

32.     Rust will perform reasonable address traces for all Initial Mailed Notice postcards that are returned as undeliverable.  No later than 35 days from the Initial Mailed Notice date, Rust will complete the re-mailing of Mailed Notice postcards to those Settlement Class Members whose new addresses were identified as of that time through address traces (the "Notice Re-mailing Process").

33.     Within seven days after Rust completes the Notice Re-mailing Process, Rust will provide Settlement Class Counsel and Union's counsel an affidavit that confirms that the Mailed Notice Program was completed in a timely manner.  Settlement Class Counsel will file such affidavit with the Court in conjunction with Plaintiffs' motion for Final Approval.

### 2.     Published Notice

34.     The Published Notice Program, for which Rust is also responsible, will be completed no later than 15 days after the date on which the Court preliminarily approves the Settlement.  The Publication Notice will be comprised of a one-time appropriate sized

8

advertisement in the newspaper of highest circulation in each of the three market areas with the highest number of the Bank's customers.

35.     Within seven days after the date Rust completes the Published Notice Program, Rust will provide Settlement Class Counsel and counsel for Union with one or more affidavits that confirm that Published Notice was given in accordance with the Published Notice Program. Settlement Class Counsel will promptly file such affidavit(s) with the Court.

### 3.     The Settlement Website and the Toll-Free Settlement Hotline

36.     The Settlement Administrator will establish a Settlement Website as a means for Settlement Class Members to obtain notice of, and information about, the Settlement. The Settlement Website will be established as soon as practicable following Preliminary Approval, but no later than commencement of the Notice Program. The Settlement Website will include hyperlinks to the Settlement, the Long-Form Notice, the Preliminary Approval Order, and such other documents as Settlement Class Counsel and counsel for Union agree to post or that the Court orders posted on the Settlement Website. These documents will remain on the Settlement Website at least until Final Approval.

37.     The Settlement Administrator will establish and maintain an automated toll-free telephone line for Settlement Class Members to call with Settlement-related inquiries, and answer the questions of Settlement Class Members who call with or otherwise communicate such inquiries.

### E.     Service Awards and Attorneys' Fees and Costs

38.     Class Counsel will seek, and Union will not oppose, Service Awards of $10,000 per named Plaintiff. (Agreement ¶ 101.) If the Court approves them, the Service Awards will be paid from the Settlement Fund, and will be in addition to the relief the Plaintiffs will be entitled to under the terms of the Settlement. (*Id.*) The requested awards will compensate the Plaintiffs

9

for their time and efforts in the Action, and for the risks they assumed in prosecuting the case against Union. Among other things, each of the named Plaintiffs in this Action was deposed for nearly a full day.

39. Union will not oppose Class Counsel's request for attorneys' fees of up to 30% of the Settlement Fund, net of Settlement-related costs and expenses, plus reimbursement of litigation costs and expenses. (Agreement ¶ 97.) The Parties negotiated and reached this agreement regarding attorneys' fees and costs only after reaching agreement on all other material terms of this Settlement. (Agreement ¶ 98.)

### F. Considerations Supporting Settlement

#### 1. The Settlement is the Product of Good Faith, Informed and Arm's Length Negotiations

40. Settlement negotiations were informed by the experience of counsel for both sides in the litigation, certification, trial and settlement of nationwide class action cases, including consumer cases. In particular, Settlement Class Counsel had the benefit of years of experience and a familiarity with the facts of this Action as well as with other cases involving similar claims.

41. As detailed above, Class Counsel conducted a thorough investigation and analysis of Plaintiffs' claims and engaged in extensive formal discovery with Union. Counsel's review of that extensive discovery enabled them to gain an understanding of the evidence related to central questions in the Action, and prepared Settlement Class Counsel for well-informed settlement negotiations.

42. Certain of Settlement Class Counsel successfully pursued similar claims against Wells Fargo Bank, N.A. through class certification, summary judgment and a two-week trial that resulted in a $203 million plaintiffs' verdict. That case, *Gutierrez v. Wells Fargo Bank, N.A.*,

10

No. 07-cv-5923 (N.D. Cal), was filed in the Northern District of California in 2007 on behalf of a class of California Wells Fargo customers. As this Court is aware, the *Gutierrez* plaintiffs challenged high-to-low posting practices almost identical to those challenged in this Action.

### 2. Risks Associated with Trial Favor Settlement

43. Plaintiffs and Settlement Class Counsel are confident in the strength of their case, but are also pragmatic in their awareness of the various defenses available to Union, and the risks inherent to litigation. Plaintiffs faced the risk of dismissal on various theories advanced at the motion to dismiss stage, including NBA preemption and a legal challenges to the common law and state statutory claims. The success of Plaintiffs' claims in future litigation turns on these and other questions that were certain to arise in the context of motions for summary judgment, at trial, and on appeal.

44. Protracted litigation carries inherent risks and inevitable delay. Under the circumstances, Plaintiffs and Settlement Class Counsel determined that the Settlement reached with Union outweighs the risks of continued litigation.

### 3. The Settlement Amount Is Reasonable Given the Range of Possible Recovery

45. Analysis of the transaction data provided by Union showed that the most probable sum that Plaintiffs and the certified class could reasonably have anticipated recovering at a trial in this Action was $55,851,755. With this Settlement, Plaintiffs and the Settlement Class Members recover approximately 63% of those damages without any further litigation risks. This $35 million Settlement is an extremely fair and reasonable recovery for the Settlement Class Members in light of the Bank's defenses, and the challenging and unpredictable path of litigation Plaintiffs would have faced absent a settlement.

### 4. The Complexity, Expense, and Duration of Ongoing Litigation Favors Settlement

46. The proposed Settlement is the best vehicle for Settlement Class Members to receive the relief to which they are entitled in a prompt and efficient manner. One of the most expensive aspects of ongoing litigation of this Action – to which Settlement Class Counsel can attest after the *Gutierrez* trial – would involve the retention of experts to perform data analyses and to present those analyses in expert reports, at depositions and at trial.

### 5. Proceedings Are at an Appropriate Stage for Settlement

47. Plaintiffs settled this action following certification of a litigation class, and with the benefit of at least one million pages produced by Union, as well as deposition testimony from 15 of the bank's current or former employees and officers. Review of those documents and testimony positioned Settlement Class Counsel to evaluate with confidence the strengths and weaknesses of Plaintiffs' claims and the prospects for success at summary judgment, at trial, and on appeal.

48. Settlement Class Counsel are highly familiar with the Bank's practices and likely defenses through their experience litigating similar cases.

### G. Class Certification for Settlement Purposes

49. The Court has already certified a class for litigation purposes in this case. Certification of a Settlement Class is likewise appropriate, and fully warranted here.

50. Certification under Rule 23(a) of the Federal Rules of Civil Procedure requires that (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Under Rule 23(b)(3), certification is

appropriate if the questions of law or fact common to the members of the class predominate over individual issues of law or fact and if a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

51. The numerosity requirement of Rule 23(a) is satisfied because the Settlement Class consists of hundreds of thousands of the Bank's customers; joinder of all such persons is impracticable.

52. The commonality requirement is satisfied because there are many questions of law and fact common to the Settlement Class that center on Union's practice of systemically engaging in Debit Re-sequencing, as alleged in the operative complaints.

53. Plaintiffs are typical of absent Settlement Class Members because they suffered from the same Debit Re-sequencing injuries, and because they will equally benefit from the relief provided by the Settlement.

54. Adequacy is established because Plaintiffs' interests are coextensive with, not antagonistic to, the interests of the Settlement Class; because Plaintiffs and absent Settlement Class Members have an equally great interest in the relief offered by the Settlement; and because absent Settlement Class Members have no diverging interests.  Further, Class Counsel are qualified and competent and have extensive experience prosecuting complex class actions, including consumer actions similar to the instant case.  Class counsel have devoted substantial time and resources to vigorous litigation of this Action from its inception through the date of the Settlement.

55. Plaintiffs satisfy the predominance requirement because liability questions common to all Settlement Class Members substantially outweigh any possible issues that are individual to each Settlement Class Member.  For example, each Settlement Class Member's

relationship with Union arises from an account agreement that is the same in all relevant respects to other Settlement Class Members' account agreements.

\* \* \*

I declare under penalty of perjury of the laws of Florida and the United States that the foregoing is true and correct, and that this declaration was executed in Coral Gables, Florida on April 23, 2012.

*/s/ Robert C. Gilbert*
Robert C. Gilbert

I declare under penalty of perjury of the laws of California and the United States that the foregoing is true and correct, and that this declaration was executed in San Francisco, California on April 23, 2012.

*/s/ Michael W. Sobol*
Michael W. Sobol