## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 1:09-MD-2036-JKL

| | |
|---|---|
| IN RE: CHECKING ACCOUNT OVERDRAFT LITIGATION | ) ) ) |
| MDL No. 2036 | ) ) |
| | ) |
| THIS DOCUMENT RELATED TO: | ) ) ) |
| Stephen T. Anderson v. Compass Bank, N.D. Fla. Case No. 1:10-cv-00208 S.D. Fla. Case No. 1:11-cv-20436-JLK | ) ) ) |

### MOTION TO CANCEL EVIDENTIARY HEARING OR, IN THE ALTERNATIVE, MOTION IN LIMINE

Defendant Compass Bank respectfully moves the Court to enter an order cancelling the evidentiary hearing set for July 9, 2012 or, in the alternative, moves in limine to exclude any parol evidence.

The sole issue before the Court—whether Plaintiff Stephen T. Anderson's claims are subject to arbitration—is a purely legal question that requires the Court to make no findings of fact, and any parol evidence Anderson would offer cannot, as a legal matter, alter the terms of the agreements before this Court. The "factual conflict" cited by this Court in its order setting the evidentiary hearing principally regards whether certain amendments were valid—and is accordingly irrelevant. Even if the amendments were not valid, Anderson signed a signature card when he opened his account that bound him to the original Disclosure Booklet for Consumer Accounts bearing a revision date of 09/02 on the back cover (the "2003 Agreement"); that agreement would apply to Anderson's claims, and its unambiguous arbitration provision covers claims related to debit card transactions. Any questions regarding the scope of the

arbitration provision in the 2003 Agreement are purely legal, based on only *undisputed* facts, and do not—indeed, cannot—require any factual findings by this Court.

Compass recognizes that this Court ordered the evidentiary hearing, but it did so immediately after the initial post discovery arbitration briefing and therefore before Compass had the opportunity to file its reply brief. Compass believes that an evidentiary hearing would be a waste of judicial resources and would involve the admission of irrelevant (and otherwise objectionable) evidence and therefore moves to cancel such hearing and/or restrict the evidence.

## ARGUMENT[1]

### I.     Because Anderson Does Not Dispute Agreeing to the 2003 Agreement, There Is No Factual Issue that Requires an Evidentiary Hearing.

Although Anderson argues extensively that Compass Bank did not validly amend the 2003 Agreement that he received when he opened his account,[2] he does not explain why there is any factual issue relating to whether his claims are subject to arbitration under *that* 2003 Agreement (in fact, Anderson has never argued that there is a need for an evidentiary hearing). The 2003 Agreement itself included a broad arbitration provision:

---

[1]  Compass incorporates into each section of this motion any and all arguments made in each and every other section and subsection, as well as all arguments made to this Court in its prior motions and briefs directed to the arbitration issue, including (S.D. Fla. 1:11-CV-20436-JLK) **[DE ##6, 7, 16]** (motion to compel arbitration and responses); **[DE #1607]** (Compass briefing on motions to defer); **[DE ##1771, 1822]** (Compass renewed motion to compel arbitration and reply in support thereof); **[DE ## 1823, 1893]** (Compass motion to strike and reply in support thereof); **[DE #1857]** (Compass response in opposition to motion to defer ruling on Compass' arbitration motion); **[DE ##2663,2691]** (Compass' post discovery arbitration brief and reply).

[2]  Anderson does not dispute that he received the 2003 Agreement when he opened his account on April 15, 2003.  In fact, during the account opening process, Anderson signed a signature card for his checking account ending in 6689 in which he specifically acknowledged  receipt of the 2003 Agreement and "agree[d] to the terms and conditions of the account provided" in the 2003 Agreement and other disclosures. **[DE #1771-3]**. Anderson only denies *reading* the 2003 Agreement, but that does not relieve him of its provisions. *See, e.g., Murphy v. Courtesy Ford, L.L.C.*, 944 So. 2d 1131, 1134 (Fla. 3d DCA 2006) ("In Florida, a party to a contract is not 'permitted to avoid the consequences of a contract freely entered into simply because he or she elected not to read and understand its terms before executing it or because in retrospect, the bargain turns out to be disadvantageous.'" (quoting *Gainesville Health Care Ctr., Inc. v. Weston*, 857 So. 2d 278, 288 (Fla. 1st DCA 2003))).

By opening or maintaining or maintaining the account, you agree that if *a dispute of any kind* arises under this Agreement *or relates to your account or any transactions involving your account*, either you or we can choose to have that dispute resolved by binding arbitration. **This arbitration provision limits your ability to litigate claims in court and your right to a jury trial. You should review this section carefully.** You will not have the right to participate as a class representative or member of any class of claimants for any claim subject to arbitration. Arbitration is usually an informal proceeding in which disputes are decided by one or more neutral arbitrators who receive the evidence at a hearing and then issue a binding ruling in the form of an award. You and we understand that discovery and other procedures in arbitration may be more limited than discovery in court proceedings and that the ability to modify, vacate, or appeal an award by an arbitrator(s) is strictly limited.

You and we agree, upon written demand made by you or us, to submit to binding arbitration *all disputes, controversies, and claims, whether based on contract, fraud, tort, intentional tort, statute, regulation, constitution, common law, equity, or any other legal basis or theory*, and whether pre-existing, present, or future, that arise from or relate to (a) this Agreement, the account, *any transaction involving the account*, or any advertisements, promotions, or oral or written statements related to this Agreement or the account, (b) *the relationships that result from this Agreement* (including, to the fullest extent permitted by applicable law, relationships with third parties who are not parties to this Agreement or this arbitration provision), or (c) the scope or enforceability of this Agreement (collectively, a "Claim"). All parties retain the right to seek relief in a small claims court for disputes or claims within the scope of the jurisdiction of the small claims court.

**[DE #2665-2] at 10-12** (underline and italic emphases added; bold emphasis in original).

This language alone is broad enough to compel arbitration of Anderson's claims without reliance on any of the challenged amendments or resort to any other agreement or disclosure. The provision requires arbitration of "a dispute of any kind" that, among other things, "relates to [Anderson's] account or any transactions involving [his] account." **[DE #2665-2] at 10**. Debit card transactions (including associated fees) plainly "relate to" the account and transactions involving the account and debit cards clearly are a "relationship" that resulted from the Agreement. Anderson even acknowledges this necessary relationship in his complaint:

- "Through debit cards, customers can engage in <u>transactions</u> using funds directly from their <u>checking accounts</u> by engaging in 'debit' or point of sale transactions." (Comp. ¶ 33) (emphasis added).

- "Compass issued Plaintiff a debit card which allowed him to use the card to access his checking <u>account funds</u> for POS <u>transactions</u>."   (Comp. ¶ 70) (emphasis added).

Compass Bank's evidence is in accord.   As Wanda Birge, Compass Bank's Vice President of Debit/Prepaid Card Operations, pointed out in her declaration, "[a]ll of Compass Bank's check cards are linked to a transactional deposit account, such as a checking account (but not a savings account), and do not exist independent of such an account." **[DE #2691-1] ¶ 4.** Birge further pointed out that "[a] consumer may have a transactional deposit account such as a checking account without also having a check card, but it is impossible for a consumer to have a check card without also having a transactional deposit account." **[DE #2691-1] ¶ 4.** "In other words," Birge noted, "a check card is inextricably linked to an underlying transactional deposit account." **[DE #2691-1] ¶ 4.**

In fact, the 2003 Agreement itself expressly mentions the practice central to Anderson's complaint and reflects that the practice relates to the account:

> **Order of Payment.**  If two or more <u>items</u> are presented for payment <u>from your account</u> on the same day, we may pay or charge the items to your account in any order without regard to any contrary instructions from you, even if paying a particular item or items results in an insufficient balance in your account to pay one or more other items that otherwise could have been paid.

**[DE #2665-2] at 5-6** (emphases added); *and see id.* at 4 (defining "item" to "include point-of-sale, ATM, and <u>debit card transactions</u>" (emphasis added)); *compare, e.g.,* Compl. ¶ 11 ("Compass utilizes the 'high to low reordering' methodology; meaning the highest debit card transactions in a given batch of debit processing are posted to a customer's account first, regardless of whether the transactions were actually the first in time.").)  As further evidence of the linkage between a debit card and the account, the 2003 Agreement booklet includes an entire disclosure concerning "Electronic Fund Transfers," which are defined as certain types of "transfer of funds . . . [to or from] *an account*," including "debit card transactions." **[DE #2665-**

2] at 16 (emphasis added).  That disclosure is required by federal law, under which a debit card is considered an "access device," or "a card, code, or other means of access to a <u>consumer's account</u> . . . that may be used by the consumer to initiate electronic fund transfers." 12 C.F.R. 205.2(a)(1) (2005) (emphasis added).[3]

In short, as simply a means of accessing funds from a consumer's deposit account in order to pay transactions, a debit card "relates to" that deposit account.  *See, e.g., Bullard v. Capital One, F.S.B.*, 288 F. Supp. 2d 1256, 1258 (N.D. Fla. 2003) (concluding that arbitration clause requiring arbitration of "any legal claim . . . regarding your account" applied to all claims "relating to, deriving from, and under the account," which applied to claims of "improper payment of money that was *in the account*"); *see id.* at 1259 ("The parties' relationship and contract governed Ms. Bullard's money market account, and Ms. Bullard's tort and civil theft claims arising from the forged checks are 'regarding' Ms. Bullard's money market account."). The Court need not consider any of Anderson's other arguments, therefore, because it can conclude as a matter of law that the 2003 Agreement requires arbitration even if never validly amended.

II.     **Even if the Arbitration Provision was Limited to the 2003 Agreement, Anderson Would Still Be Required to Arbitrate His Claims Because the 2003 Agreement Expressly Incorporates the Debit Card Agreement.**

The debit card agreement that Anderson's briefing now claims was "previously unavailable" does not save his claims from arbitration.  Anderson argues that the debit card agreement is separate and contains no arbitration provisions.  As explained above, however, because Anderson's claims "relate to" his account, the Court need not even consider this

---

[3] "The laws which exist at the time and place of the making of a contract enter into and become a part of the contract made, as if they were expressly referred to and incorporated in its terms, including those laws which affect its construction, validity, enforcement or discharge." *Brandt v. Brandt*, 525 So. 2d 1017, 1020 (Fla. 4th DCA 1988) (citing *Humphreys v. State*, 145 So. 858 (Fla. 1933)).

argument; even if true, the claims are still subject to the 2003 Agreement's arbitration provision. Even if the arbitration agreement was limited to the deposit agreement, Anderson's claims are still subject to the arbitration provision of the 2003 Agreement because the debit card agreement is incorporated into the 2003 Agreement for three separate reasons:

- The 2003 Agreement expressly incorporates the debit card agreement by reference, and the debit card agreement's silence regarding arbitration does not create an "inconsistency" with the 2003 Agreement.

- The 2003 Agreement and the debit card agreement are construed together as a single agreement because they were executed at or near the same time and they concern the same subject matter.

- Federal law makes clear that Anderson's debit card is inextricably intertwined with his deposit account and that the arbitration provision in the 2003 Agreement is equally applicable to check card transactions.

### A.   The 2003 Agreement Expressly Incorporates the Debit Card Agreement By Reference.

Anderson's suggestion that the debit card agreement is entirely independent of the 2003 Agreement ignores the latter's express incorporation clause:

> This Agreement also incorporates, by reference, any *supplemental* or amended provisions *and disclosures* we may provide concerning your account. All of these documents together are the contract between you and us.

**[DE #2665-2] at 4** (emphasis added). The 2003 Agreement likewise contemplates (and provides examples of) such supplemental agreements and disclosures:

> If you have chosen to receive any of our other banking services offered in connection with your account, *such as debit cards*, ATM cards, overdraft lines of credit, and PC banking, we may provide the specific terms and conditions of the additional service to you in a separate agreement or disclosure.

**[DE #2665-2] at 12**. Thus, the "Visa Check Card Agreement and Disclosure Statement" is simply one of the "supplemental . . . provisions and disclosures" provided to Anderson for the "additional service" of a debit card. *See, e.g., Henns v. Mony Life Ins. Co. of Am.*, No. 5:11-cv-

55-J-37TBS, 2001 U.S. Dist. LEXIS 138165, at *37 (M.D. Fla. Dec. 1, 2011) ("See Black's Law Dictionary 1577 (9th ed. 2009) (defining 'supplemental' as "[s]upplying something additional . . . ") (emphasis added)); *see also* 2003 Check Card Agreement **[DE #2691-2] at 7-8** (expressly referring matters relating to overdrafts and overdraft fees back to the Deposit Agreement: "**All such overdrafts and fees are governed by the terms and charges applicable to the affected deposit account(s).**" (emphasis added)).

The 2003 Agreement and debit card agreement are, therefore, treated as a single contract and must be harmonized.  "[U]nder Florida law the Court does not read clauses in a contract in isolation, but looks to the contract as a whole." *Feldkamp v. Long Bay Parnters*, LLC, 773 F. Supp. 2d. 1273, 1281 (M.D. Fla. 2011); *and see* 2003 Agreement at 2 ("All of these documents together are a contract between you and us.").  And Anderson's argument that the absence of an arbitration provision within the four corners of the debit card agreement does not nullify the arbitration provision in the 2003 Agreement because "silence on an issue spoken to in another document does not render the documents inconsistent." *Maxum Found., Inc. v. Salus Corp.*, 779 F.2d 974, 980 n.5 (4th Cir. 1985).  Rather, "[t]he terms of the two contracts would be inconsistent if they could not simultaneously be true.  Here there is no term in the subcontract that belies the existence of the arbitration right sought to be enforced by Salus." *Id.*  Likewise, here, the debit card agreement includes no term indicating that the arbitration provision in the 2003 Agreement does not equally apply to debit card transactions.  Consequently, the 2003 Agreement's arbitration provision remains in full effect and covers debit card transactions that are not only referenced within its four corners but also within its ambit by incorporation of the debit card agreement.

**B.**     **The 2003 Agreement and the Debit Card Agreement Constitute a Single Agreement As a Matter of Law Because they Were Agreed to by the Same Parties at the Same Time and Relate to the Same Subject Matter.**

Even if the 2003 Agreement did not expressly incorporate the terms of the debit card agreement, Anderson would still be required to arbitrate his claims under the original 2003 Agreement to which he agreed. By operation of law, the two documents are considered a single agreement. "Florida law is well-settled that where two or more documents are executed by the same parties at or near the same time, in the course of the same transaction, and concern the same subject matter, they will be read and construed together." *Hopfenspriger v. West*, 949 So. 2d 1050, 1053 (Fla. 5th DCA. 2006); *see also Quix Snaxx v. Sorensen*, 710 So. 2d 152, 153 (Fla. 3d DCA 1998) ("Documents executed by the same parties, on or near the same time, and concerning the same transaction or subject matter are generally construed as a single contract"). Moreover, where an agreement expressly refers to and sufficiently describes another document, the other document is to be interpreted as part of the agreement. *Quix Snaxx*, 710 So. 2d at 153 (holding that a License Agreement and Purchase Order Agreement, which referred to each other, were contemporaneously executed documents obligating the plaintiff to arbitrate his claims); *Sharpe v. Lytal & Reiter, Clark, Sharpe, Roca, Fountain, Williams*, 702 So. 2d 622, 623 (Fla. 4th DCA 1997) (holding that partners' 1989 letter agreement was legally sufficient to both incorporate and evidence the partners' agreement to be bound to the arbitration provision contained in the 1985 partnership agreement).

The signature card that Anderson signed when he opened his account reflects that Anderson applied for his debit card on the same application used to open his checking account. In fact, two uncontested declarations before the Court further support that Anderson entered the 2003 Agreement with Compass Bank at or near the same time he entered the debit card agreement with Compass Bank:

- Georgia Painter, EFTSource, Inc.'s Customer Service Account Manager for Compass Bank, confirmed that Anderson would have received his check card agreement in the same envelop in which he received his initial check card. **[DE #2691-2] at 3 ¶ 6.**

- Wanda Birge stated that Compass Bank issued Anderson his initial check card at or near the same time he opened his checking account. **[DE #2691-1] at 3 ¶ 7.**

Further, there can be no dispute that the agreements deal with the same transactions and subject matter. As explained above, use of the debit card is dependent upon the existence of the deposit account. The 2003 Agreement, even absent the express incorporation language, repeatedly refers to that relationship, which, as also noted above and described fully in the next section, is prescribed by federal law. Consequently, even if the arbitration provision was limited to the 2003 Agreement and even if the 2003 Agreement did not expressly incorporate the debit card agreement, they would be considered a single agreement, and Anderson is required to arbitrate his claims.

C.   **Under Federal Law Incorporated into the 2003 Agreement, Anderson's Debit Card Is Inextricably Intertwined With His Deposit Account, and the Arbitration Provision in the 2003 Agreement Is Equally Applicable to Debit Card Transactions.**

As noted above, federal law makes clear that a debit card cannot exist apart from and is inextricably intertwined with a consumer's deposit account. Specifically, Regulation E, which was originally promulgated by the Federal Reserve Board[4] under the Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq.*, "applies to any electronic fund transfer that authorizes a financial institution to debit or credit a consumer's account." 12 C.F.R. § 205.3(a) (2005). "The term electronic fund transfer . . . includes . . . [t]ransfers resulting from debit card transactions . . . ." 12 C.F.R. § 205.3(b)(5) (2005). "Account means a demand deposit [checking], savings, or other

---

[4] Pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act, responsibility for Regulation E has been transferred from the Federal Reserve Board to the Consumer Financial Protection Bureau and has been relocated to 12 C.F.R. Part 1005.

consumer asset account . . . held directly or indirectly by a financial institution and established primarily for personal, family, or household purposes." 12 C.F.R. § 205.2(b)(1) (2005). Finally, a debit card is considered an "access device" which is defined as "a card, code, or other means of access to a consumer's account . . . that may be used by the consumer to initiate electronic fund transfers." 12 C.F.R. 205.2(a)(1) (2005).

These regulations are part of the 2003 Agreement and debit card agreement because "[t]he laws which exist at the time and place of the making of a contract enter into and become a part of the contract made, as if they were expressly referred to and incorporated in its terms, including those laws which affect its construction, validity, enforcement or discharge." *Brandt v. Brandt*, 525 So. 2d 1017, 1020 (Fla. 4th DCA 1988) (citing *Humphreys v. State*, 145 So. 858 (Fla. 1933)). Thus, by operation of law Anderson's debit card and deposit account were inextricably intertwined, and the documents must be construed together. When construed together, the 2003 Agreement requires arbitration of Anderson's claims relating to debit card transactions because the debit card agreement contains no conflicting provisions. *Maxum*, 779 F.2d at 980 n.5 (holding that "silence on an issue spoken to in another document does not render the documents inconsistent").

**III.    Anderson's Defenses to the Enforcement of the Arbitration Provision Are Issues To Be Resolved By the Arbitrator, Not by the Court.**

Under either alternative above—the breadth of the arbitration provision in the 2003 Agreement or, alternatively, its incorporation of the debit card agreement—Anderson's claims are facially subject to the arbitration provision in the 2003 Agreement that he received when he opened his checking account. Any evidence that Anderson seeks to introduce in support of his defenses to arbitration "go[] only to substantiating the very public policy arguments that were expressly rejected in *Concepcion*" and therefore, as a matter of law, does not invalidate the

arbitration provision. *See Cruz v. Cingular Wireless, LLC*, 648 F.3d 1205, 1214 (11th Cir. 2011) (holding that plaintiff's evidence that class action waiver would be exculpatory did not affect arbitrability under *Concepcion*).   Even if relevant, though, Anderson's defenses to the enforcement of that provision must be addressed in the first instance by the arbitrator, not by the Court because the 2003 Agreement contains at least two separate delegation clauses:

- "You and we agree, upon written demand made by you or us, to submit to binding arbitration <u>all disputes</u>, controversies, and claims, whether based on contract, fraud, tort, intentional tort, statute, regulation, constitution, common law, equity, or any other legal basis or theory, and whether pre-existing, present, or future, that arise from or relate to . . . (c) <u>the scope and enforceability of this Agreement</u>." **[DE #2665-2] at 11** (emphases added).

- "Any dispute as to whether any statute of limitations, estoppel, waiver, laches, or similar doctrine bars the arbitration of any Claim shall be decided by arbitration in accordance with the provisions of this Agreement." *Id.*

"Courts should enforce valid delegation provisions as long as there is 'clear and unmistakable' evidence that the parties manifested their intent to arbitrate a gateway question." *In re Checking Account Overdraft Litigation MDL No. 2036 (Given v. M&T Bank Corp.)*, 674 F.3d 1252, 1255 (11th Cir. 2012) (quoting *Rent–A–Center, W., Inc. v. Jackson*, 130 S. Ct. 2772, 2777-78 & n.1 (2010)).   Moreover, "[a] delegation provision is severable from the rest of the arbitration agreement and must be challenged 'specifically.'" *Id.* at 1256 (citing *Rent–A–Center*, 130 S. Ct. at 2777–79 ("[A] party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate [contained within the challenged contract].")).

Like the delegation clause at issue in *Given*, which provided that "[a]ny issue regarding whether a particular dispute or controversy is . . . subject to arbitration will be decided by the arbitrator," Compass Bank's broadest delegation clause provides that the "scope and enforceability" of the 2003 Agreement (which, of course, contains the arbitration provision) are

for the arbitrator to decide.   This delegation clause and the second one "clearly and unmistakably" commit threshold issues of arbitrability to the arbitrator.

Thus, whether Anderson is challenging the scope of the entire Agreement (that is, whether the Agreement includes the debit card agreement) or whether Anderson is challenging just the scope and enforceability of the arbitration clause, the delegation clause applies to both challenges.   The Court, therefore, needs to hear no evidence on those issues, and the evidentiary hearing should be cancelled.

IV.   **The Evidentiary Hearing Is Futile Because Parol Evidence Is Impermissible, and Even If It Were Appropriate, Anderson Cannot Possibly Offer Any Admissible Parol Evidence Because He Contends He Did Not Read the 2003 Agreement When He Opened His Account and Did Not Know About the Debit Card Agreement.**

A.   **Evidence of Anderson's Subjective Intent Is Impermissible Parol Evidence.**

The issue before the Court—whether the 2003 Agreement requires arbitration of Anderson's claims—is a question of law for the Court to decide.   *See, e.g., MONY Sec. Corp. v. Bornstein*, 390 F.3d 1340, 1342 (11th Cir. Fla. 2004) ("This Court reviews de novo questions of law, such as a district court's interpretation of an agreement to arbitrate (and whether it binds the parties to arbitrate) . . ."); *Avatar Props. v. Greetham*, 27 So. 3d 764, 766 (Fla. 2d DCA 2010) (stating that "the existence of a valid agreement to arbitrate is a question of law").   Even when the courts look to the intent of the parties in determining arbitrability, it is still a matter of law for the Court.   *Paladino v. Avnet Computer Techs.*, 134 F.3d 1054, 1058 (11th Cir. 1998) (affirming the decision of a district court that had "first noted that 'in any contract case, the parties' intent is controlling with regard to whether they agree to arbitrate a particular dispute, and determining intent is a question of law for the court'"); *see also Southeast Nursing Home, Inc. v. St. Paul Fire & Marine Ins. Co.*, 750 F.2d 1531 (11th Cir. 1985) ("In the case at hand, the parties' intent is easily discernible from a reading of the insurance contract and therefore was a pure question of

law for the district court).  Even the threshold question of whether an ambiguity exists is a question of law for the Court.  *Skopelos Seafood & Steak Rest., Inc. v. Estate of Gus Silivos*, 17 So. 3d 834, 836 (Fla. 1st DCA 2009); *Larsen v. Airtran Airways, Inc.*, No. 8:07-CV-00442-T-17-TBM, 2009 U.S. Dist. LEXIS 33515, at *28 (M.D. Fla. 2009).  Thus, there is no justification for permitting evidence to be offered on these issues.

The Florida Supreme Court has long made clear that "[t]he making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs - not on the parties having meant the same thing but on their having said the same thing." *Gendzier v. Bielecki*, 97 So. 2d 604, 608 (Fla. 1957).  The court held that "evidence of the unilateral secret intent of a party to a written instrument is in and of itself immaterial to the actual creation of a contract." *Id.* at 609.

In more recent years, Florida courts have continued to abide by this principle.  Florida law prohibits the consideration of extrinsic, or parol, evidence that addresses the subjective intent of the parties, as long as the contract is unambiguous.  Rather, the parties' intent must be determined from the plain language of the document.  The Eleventh Circuit, for example, stated that "[u]nder Florida law, 'the parties' intent is to be measured solely by the language of the policies unless the language is ambiguous." *Fireman's Fund Ins. Co. v. Tropical Shipping & Constr. Co.*, 254 F.3d 987, 1003 (11th Cir. 2001) (quoting *Towne Realty v. Safeco Ins. Co. of Am.*, 854 F.2d 1264, 1267 (11th Cir. 1988)).  The court continued to summarize Florida decisions, explaining that "[t]he intention of the parties to a contract is to be deducted from language employed, and such intention, when expressed, is controlling, regardless of the intention existing *in the minds* of parties." *Id.* (quoting *Lee v. Montgomery*, 624 So. 2d 850, 851 (Fla. 1st DCA 1993) (per curiam) (emphasis in original)).

Many other courts have stated and reaffirmed this principle in a variety of situations. *See Essex Ins. Co. v. Zota*, 466 F.3d 981, 986 (11th Cir. 2006) ("The court may look to parol evidence in interpreting an insurance contract only if there is an ambiguity"); *Larsen*, 2009 U.S. Dist. LEXIS 33515, at *27-28 ("[U]nder Florida law . . . [t]he plain language of the contract is the best evidence of the parties' intent, which generally governs a contract's construction and interpretation. [W]here there is no ambiguity, the search for the parties' intent should not stray from within the four corners of the document."); *Robert C. Roy Agency, Inc. v. Sun First Nat'l Bank*, 468 So. 2d 399, 404 (Fla. 4th DCA 1985) ("Testimony as to [one party's] subjective intent in receiving the future advance clause was a classic violation of the parol evidence rule and clearly inadmissible") (quoting *Bank of Woodson v. Hibbitts*, 626 S.W.2d 133 (Tex. App. 1981)); *Lemon v. Aspen Emerald Lakes Assocs.*, 446 So. 2d 177, 180 (Fla. 5th DCA 1984) ("[W]ell settled is the proposition that parol evidence is inadmissible to contradict, vary, defeat or modify a complete and unambiguous instrument, or to change, add to or subtract from such instrument, or affect its construction"). Furthermore, ambiguity itself is determined within the four corners of the document and cannot be established by introducing outside evidence.[5] *Fireman's Fund*, 254 F.3d at 1004 ("[W]e confine ourselves to the language in those policies to ascertain whether the polices are ambiguous").

Furthermore, the Court's analysis should be unaffected by Anderson's argument that the 2003 Agreement is a contract of adhesion. In *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011), the United States Supreme Court rejected the argument that an arbitration agreement is *per se* unconscionable simply because it is found in a contract of adhesion. The

---

[5] No ambiguity exists within the 2003 Agreement because it expressly anticipates disputes over transactions on the account and provides that they should be resolved by arbitration. **[DE #2665-2] at 10** ("By opening or maintaining the account, you agree that if a dispute of any kind arises under this Agreement or relates to your account or <u>any transactions involving your account</u>, either you or we can choose to have that dispute resolved by binding arbitration." (emphasis added)).

Court observed that "the times in which consumer contracts were anything other than adhesive are long past," *id.* at 1750, and noted that "States remain free to take steps addressing the concerns that attend contracts of adhesion . . . . Such steps cannot, however, conflict with the FAA or frustrate its purpose to ensure that private arbitration agreements are enforced according to their terms." *Id.* at 1750 n.6; *accord Daugherty v. Encana Oil & Gas (USA), Inc.*, No. 10-cv-02272-WJM-KLM, 2011 WL 2791338, at *9 (D. Colo. July 15, 2011) ("The fact that the contract at issue in *Concepcion* was an adhesion contract did not affect the Supreme Court's analysis and, indeed, the majority in *Concepcion* appeared to be little troubled by that fact.").

Any testimony from Anderson concerning his own subjective intent would improperly allow him to rewrite the 2003 Agreement at his own whim. *F.W.F. Inc. v. Detroit Diesel Corp.*, 494 F. Supp. 2d 1342, 1360 (S.D. Fla. 2007) (explaining the danger of parol evidence and asserting that "the effect of admitting extrinsic evidence would be to allow one party to substitute his view of his obligations for those clearly stated"). Accordingly, he should not be allowed to offer parol evidence in an attempt to vary the terms of a nine-year-old written agreement between the parties. The evidentiary hearing should be cancelled.

### B.   Even if Parol Evidence Is Admissible, It Is Strictly Limited to a Party's Intent at the Time the Contract Was Formed.

If, despite the unambiguous language of the 2003 Agreement, the Court finds that there is ambiguity on the face of the arbitration clause, there is no relevant evidence that Anderson conceivably can offer. In the limited circumstances in which Florida courts have admitted parol evidence in the face of ambiguity, they have clearly restricted acceptable evidence to a party's intent *at the time the contract was formed*: "[E]xtrinsic evidence of the subject matter of the contract, of the relations of the parties to each other, and of the facts and circumstances surrounding them *when they entered into the contract* may be received to enable the court to

make a proper interpretation of the instrument." *Larsen*, 2009 U.S. Dist. LEXIS 33515, at *29-30 (emphasis added); *see also Lemon*, 446 So. 2d at 180.

In *Ace Electric Supply Co. v. Terra Nova Electric, Inc.*, 288 So. 2d 544, 546 (Fla. 1st DCA 1973), for instance, the court specifically dealt with a situation in which one of the parties to a written guaranty testified to his understanding of the purpose and intent of a clause in the guaranty. The court clarified the law and the scope of admissible parol evidence given the acknowledged ambiguity, allowing "declarations of intent, or bearing on their intent, made by the parties prior to or at the time of the execution of the instrument . . ." *Id.* at 547-48 (emphasis added). The court then firmly rebuked the plaintiff's self-serving, after-the-fact testimony:

> [Plaintiff's] after the fact self-serving statement of his understanding of the intent in this connection, as distinguished from evidence in the form of a declaration of intent by the parties made prior to or at the time of the execution of the guaranty instrument, was lacking in probative force and was not binding on the opposing party.

*Id.* at 549.

Anderson cannot possibly offer any relevant and admissible evidence of intent from the time of formation because he admits he did not read the 2003 Agreement at the time he opened his account **[DE #1798-1] ¶¶ 6, 8** and contends he discovered the debit card agreement only during this litigation. **[DE #1798-1] ¶ 8.** Any attempt to impose his current, subjective understanding of the arbitration clause at this point in time is the equivalent of the "after the fact self-serving statement" in *Ace Electric*. Even if clarification is necessary because an ambiguity exists, Anderson's cannot shed light on the mutual intent of the parties at the time they entered into 2003 Agreement; they merely show how he currently wishes to advantageously view the agreement in the midst of litigation. As such, this Court could not accept his testimony and should cancel the evidentiary hearing scheduled for July 9, 2012.

## CONCLUSION

The Court may resolve the sole issue before it—the arbitrability of Anderson's claims—without making any factual findings or resolving any issues of fact. Based only on undisputed evidence, the Court may conclude, as a matter of law, that the 2003 Agreement requires arbitration of claims related to debit card transactions.[6] Thus, neither the validity of amendments to that agreement or to the debit card agreement nor Anderson's challenges to the scope or enforceability of the 2003 Agreement need to be resolved by the Court. Those issues are delegated to the arbitrator in the first instance. Because these are questions of law that the Court can make on the record before it, the evidentiary hearing scheduled for July 9, 2012, is unnecessary and should be canceled. In the alternative, if the Court proceeds with the hearing, the Court should enter an order prohibiting Anderson from offering any parol evidence as to the formation or meaning of the contractual provisions governing his relationship with Compass.

---

[6] Under any version of the deposit agreement, arbitration is due and therefore this Court need not hold an evidentiary hearing. Further, no hearing is necessary because of the additional reason that Anderson's complaint resolves any question about (1) whether the debit card agreement, not the deposit agreement, governs and (2) which version of the deposit agreement applies. In his complaint, he affirmatively alleges (1) that the *amended* 2008 deposit agreement embodied his contract with Compass Bank for "bank account deposit, checking, ATM and debit card services" (Comp. ¶¶ 81, 88); and (2) that the order in which Compass Bank posted transactions to Anderson's account "constitutes a breach of the express terms of the Deposit Agreement." (Comp. ¶ 92.) Anderson cannot simultaneously disclaim a portion of the deposit agreement while claiming that Compass Bank's posting decisions violates other portions of that very same agreement. *See Blinco v. Green Tree Servicing LLC*, 400 F.3d 1308 (11th Cir. 2005), *abrogated on other grounds by Arthur Anderson LLP v. Carlisle*, 556 U.S. 624 (2009); *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GmbH*, 206 F.3d 411, 418 (4th Cir. 2000) ("[Plaintiff's] entire case hinges on its asserted rights under the . . . contract; it cannot seek to enforce those contractual rights and avoid the contract's requirement that 'any dispute arising out of' the contract be arbitrated."); *Hughes Masonry Co., Inc. v. Greater Clark Cnty. Sch. Bldg. Corp.*, 659 F.2d 836, 838 (7th Cir. 1981) (compelling arbitration "because [plaintiff's] complaint is . . . fundamentally grounded in [defendant's] alleged breach of the obligations assigned to it in the [arbitration] agreement"); *Remapersad v. Primeco Pers. Commc'ns., L.P.*, No. 01-6640, 2001 U.S. Dist. LEXIS 26037 at * 3-4 (S.D. Fla. Oct. 16, 2001) (rejecting plaintiff's argument that an "agreement to arbitrate was never formed" because he alleged in the complaint that "he entered into a contract with Defendant and is suing for breach of that contract," stating that plaintiff "cannot claim that the contract was not formed to avoid arbitration and concurrently sue for breach of that contract."). *See also Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1177 (11th Cir. 2009) ("A party is bound by the admissions in his pleadings.").

## CERTIFICATION UNDER LOCAL RULE 7.1(a)(3)

Prior to filing this motion, the undersigned counsel informed counsel for Plaintiff Stephen T. Anderson that Compass Bank intended to seek relief in the form of cancelling the evidentiary hearing and/or limiting the permissible evidence. Anderson's counsel did not agree to such relief, and the issues raised by this motion cannot be resolved without a ruling from the Court.

Respectfully submitted,

/s/Gregory C. Cook
Counsel for Defendant
Compass Bank

**OF COUNSEL:**

Gregory C. Cook
A. Kelly Brennan-Bolvig
BALCH & BINGHAM LLP
1901 Sixth Avenue North
Birmingham, Alabama 35203-4644
Telephone:  205-251-8100
Facsimile: 205-226-8799
E-mail:  gcook@balch.com
         kbrennanbolvig@balch.com

**OF COUNSEL**:

Gerry S. Gibson and C. Bryce Albu
Fla. Bar Nos. 261998 and 657204
REEDER & REEDER, P.A.
250 South Central Blvd.
Suite 200
Jupiter, Florida 33458
Telephone: 561-575-9871
Facsimile: 561-575-9765
Email: gerry@reederandreeder.com
       bryce@reederandreeder.com

## CERTIFICATE OF SERVICE

I hereby certify that I have this day caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record entitled to receive service.

This 18th day of June, 2012.

/s/ Gregory C. Cook
Of Counsel