# EXHIBIT C



Interhack
1 S Dearborn St 21st Fl
Chicago, IL 60603

VOX +1 312 981 8910
FAX +1 614 545 0076
WEB http://web.interhack.com/

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:09-MD-02036-JLK

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

THIS DOCUMENT RELATES TO:
FIFTH TRANCHE ACTION

*Terry Case v. Bank of Oklahoma, N.A.*
*S.D. FL Case No. 1:11-cv-20815-JLK*
*W.D. OK Case No. 5:10-00901-L*

## Declaration of Lee T. Ayres in Support of Final Approval

I, Lee T. Ayres, declare as follows:

1. I am a Senior Analyst for Interhack Corporation ("Interhack"). I am supported by other members of Interhack staff.

2. Class Counsel retained Interhack to perform extraction and analysis of data provided by BOKF, N.A. ("BOK," or "Bank of Oklahoma") in order:

    (a) to assist in the estimation, prior to mediation, of the range of *damages* (*i.e.*, the total amount of "harm," defined by counsel as Overdraft Fees incurred as a result of BOK's High-to-low Debit Card Transaction Sequencing); and

    (b) to assist in the effectuation of the proposed class action settlement ("Settlement") with BOK.

2    LEE T. AYRES

3. These tasks required me to review and analyze the historical customer transactional data that BOK has maintained for the Class Period in order:

   (a) to estimate the percentage of Overdraft Fees actually assessed by BOK relative to the number of fees that would have been assessed under an alternative processing order based on certain sample transactional data;

   (b) to identify specific BOK consumer accounts that were "harmed" as a result of BOK's High-to-low Debit Card Transaction Sequencing;

   (c) calculate the number of additional Overdraft Fees each such consumer account incurred as a result of such practice; and

   (d) determine a *pro rata* allocation of the Settlement Fund.

4. From August 2011, through April 2012, I worked with the BOK data. I consulted at length with BOK's in-house data managers during two discrete phases of analysis.

*Phase 1 Analysis*

5. In September 2011, I was asked to embark on a Phase 1 assignment, (*i.e.*, estimating the proportional difference in Overdraft Fees incurred as a result of BOK's High-to-low Debit Card Transaction Sequencing based on a sample of BOK transactional data).

6. In the first phase, I analyzed sample transactional data provided by BOK for the months of May, 2010 to July, 2010.

7. In order to understand the data, I participated in several telephone conversations with data managers, executives from BOK, and counsel from both sides.

8. The data provided were sufficient to perform a consistent algorithmic comparison of Overdraft Fee assessments in support of damages estimation.

9. I used the sample transactional account data to analyze and estimate the range of damages at issue in the Actions, comparing Overdraft Fees actually charged to the Overdraft Fees that would have been charged had BOK not employed the High-to-low Debit Card Transaction Sequencing, to the extent permitted by the data available.

INTERHACK PROPRIETARY: CONFIDENTIAL/5/5

DECLARATION OF LEE T. AYRES  3

10. For the sample months of data, I identified accounts that were "harmed" as a result of BOK's High-to-low Debit Card Transaction Sequencing. In other words, I counted Overdraft Fees that would not have been assessed if the Bank had used a posting sequence or method for Debit Card Transactions other than ordering them from highest to lowest dollar amount, to the extent permitted by the available data.

11. I performed the identification as follows:

    (a) For each day during the sample period, I ordered all transactions posted in all consumer accounts on that day in the following posting order:
        i. All credits.
        ii. All Bank of Oklahoma initiated fees and transactions excepting Overdraft Fees and NSF Fees.
        iii. All Debit Card and ATM Transactions ordered in a manner that simulated, to the extent possible, the chronological order in which the transactions were initiated by Settlement Class Members. For those transactions in this category that lacked timestamp data, the impact of chronological ordering was simulated by:
            A. assigning each transaction a number using a computer based random number generator, and
            B. sorting the transactions based on the random number assigned.
        iv. All other debit transactions, including Check transactions, ACH transactions, and non-Debit Card-initiated cash withdrawals, ordered from the highest dollar amount to lowest dollar amount of transaction.
        v. All Overdraft Fees and NSF Fees.
    (b) After ordering the transactions in this manner, I identified the Overdraft Fees BOK actually assessed that exceeded the Overdraft Fees that would have been assessed if the Account had been ordered as set forth above.

12. Class Counsel informed me that business accounts were not at issue in this matter. Based on information provided by BOK I was able to identify the proportion of business accounts as opposed to consumer accounts in the sample data set. I was able to perform the above analysis on consumer accounts only for the purposes of damages estimation.

4   LEE T. AYRES

13. Class-wide damages were estimated using the above analysis and BOK's overdraft revenue as given to me and refunds for the same time period as follows:

   (a) Both the gross actual Overdraft Fees and the excessive Overdraft Fees identified in 11b above were reduced by the total Overdraft Fee refunds as given to me. Actual Overdraft Fee counts were adjusted to account for the proportion of business accounts.

   (b) The percentage difference between the final adjusted Overdraft Fees and the adjusted excessive Overdraft Fees was applied to BOK's revenue from Overdraft Fees as given to me for the period from August, 2005 to August, 2011.

14. Based on the above method, estimated Class-wide damages amount to approximately $41 million.

*Phase 2 Analysis*

15. In December, 2011 I was asked to embark on a Phase 2 assignment described above, (*i.e.*, identify BOK consumer accounts "harmed" by BOK's High-to-low Debit Card Transaction Sequencing and calculate each such account's corresponding "harm").

16. In the second phase, I was provided with transactional data for the entirety of the Class Period.

17. In order to understand the data, I participated in several telephone conversations with data managers, executives from BOK, and counsel from both sides.

18. The data maintained was sufficient to compute damage on an Account by Account basis.

19. During my review of the data, I identified a gap in BOK account balance data from January, 2005 to October, 2005 (the "Data Period"), and worked to mitigate this issue by use of a proxy discussed below.

20. As a result of these efforts, I identified Accounts during the Class Period that were "harmed" as a result of BOK's High-to-low Debit Card Transaction Sequencing.

21. I also determined the Additional Overdraft Amount for each Account. The Additional Overdraft Amount analysis

determined which BOK Account holders were assessed additional Overdraft Fees that would not have been assessed if the Bank had used a posting sequence or method for Debit Card Transactions other than ordering them from highest to lowest dollar amount, and how much in additional Overdraft Fees those Account holders were assessed, to the extent permitted by the available data.

22. Except with respect to the ten-month Data Period discussed below, I performed the calculation as follows:

   (a) For each calendar day on which Bank of Oklahoma provided data, based on my understanding of the BOK data, I ordered all transactions posted in all accounts on that day in the following posting order:
      i. All credits;
      ii. All Bank of Oklahoma initiated fees and transactions excepting Overdraft Fees and NSF Fees;
      iii. All Debit Card and ATM Transactions ordered in a manner that simulated, to the extent possible, the chronological order in which the transactions were initiated by Settlement Class Members. For those transactions in this category that lacked timestamp data, the impact of chronological ordering was simulated by:
         A. assigning each transaction a number using a computer based random number generator, and
         B. sorting the transactions based on the random number assigned;
      iv. All other debit transactions, including Check transactions, ACH transactions, and non-Debit Card-initiated cash withdrawals, ordered from the highest dollar amount to lowest dollar amount of transaction; and
      v. All Overdraft Fees and NSF Fees.
   (b) After ordering the transactions in this manner, I identified each Account, on a daily basis, in which the number of Overdraft Fees BOK actually assessed exceeded the number of Overdraft Fees that would have been assessed if the Account had been ordered as set forth in 22a and recorded the resulting difference.

23. Since individualized damage assessment is sensitive to the specific ordering of transactions, and a subset of the transactions were sorted randomly, the above procedure was performed twenty times for each account for each day with the final recorded result begin the mean of the twenty iterations.

INTERHACK PROPRIETARY: CONFIDENTIAL/5/5

6  LEE T. AYRES

24. This calculation yielded the identification of all Account holders whose Accounts experienced Additional Overdraft Fees and the magnitude of excess per day.

25. For the period January, 2005 through and including October, 2005 (the "Data Period"), BOK did not maintain daily balance information. It did, however, maintain data pertaining to transaction information, including the assessment of Overdraft Fees. Accordingly, I worked with Class Counsel and BOK to develop a proxy for allocating the amount of the distribution from the Settlement Fund for Overdraft Fees incurred during the Data Period.

26. Specifically, I determined the average increase in Overdraft Fees attributable to High-to Low Debit Card Transaction Sequencing during the entire Class Period, not including the Data Period. I then multiplied this average increase by the number of Overdraft Fees assessed to Accounts on banking days on which two or more Overdraft Fees were incurred during the Data Period. The result was retained as a proxy for the excess value for the day.

27. I then computed the *pro rata* amount of Additional Overdraft Fees each Account experienced in relation to other Accounts during the Class Period by:

    (a) For each account, calculating the total excess value across all observed days ("Individual excess");

    (b) Calculating the total excess value for all accounts for all days ("Total excess"); and

    (c) For each account, calculating the percentage of "Individual excess" relative to "Total excess."

28. I identified a total of 289,956 Accounts demonstrating "harm" resulting from BOK's High-to-low Debit Card Transaction Sequencing and produced the *pro rata* values for each.

29. These same persons, I understand, should the Settlement become effective, will receive direct payment from the Settlement Fund.

*Data Reviewed*

30. I received and reviewed sample transactional data for the months of May, 2010 to July, 2010. This data was contained in a single Microsoft Office Excel 2007 Workbook format

(.xlsx) file detailing transaction information and daily account balance information.

31. I received and reviewed transactional data for the entirety of the Class Period. This data was in the form of nine Comma Separated Value (csv) files detailing transaction information, daily account balance information, and account customer name and contact information.

32. I understand that the datasets provided by BOK contained all of the transactions for all consumer checking accounts for days on which those accounts incurred multiple Overdraft Fees. Accounts that had a daily beginning balance less than zero and did not have at least one credit on that day were excluded.

33. BOK's datasets included the following relevant information for all of the customer transactions, including the overdrafting transactions:

    (a) the posting date of the transaction;
    (b) the dollar amount of the transaction; and
    (c) a *transaction code*, (*i.e.*, a numeric value assigned by the bank to each transaction identifying the type of that transaction.)[1]

34. I also reviewed documents and charts provided by BOK that identified and described the various transaction codes (*i.e.*, the type of transactions that are described by each transaction code included in the data sources that BOK provided).

## Summary of My General Qualifications

35. I have over eleven years of professional information and computer science experience, specializing in the areas of software development, forensic analysis, and large-scale data-set analysis.

36. I have provided litigation data analysis in several matters. Notable cases include:

    - *In Re: NYSE Specialists Securities Litigation*, Southern District of New York Case No. 1:03-cv-08264-RWS;
    - *Gail Ford, Carrie A. Dunne, John E. Bell, and Patricia A. Klorer v. SBC Communications Inc. and SBC Internet Services, Inc. d/b/a AT&T Internet Services, Inc.*, Circuit Court of St. Louis County (Missouri) Cause No. 06CC-003325, Division No. 6;

---

[1] For example, transactions with the description "ATM Withdrawal" are assigned the transaction code 2101 in BOK's data.

8   LEE T. AYRES

- *Britton-Gallagher & Associates, Inc. v. Michael Cremeans*, Court of Common Pleas, Cuyahoga County, Ohio Case No. 723877; and
- *Vistula Management Company, et al. v. William Hirt, et al.*, Court of Common Pleas, Lucas County, Ohio Case No. CI0201006293.

37. I was retained by plaintiffs in multiple recent Overdraft Fee cases, for example:

    - *Allen et al. v. UMB Bank et al.*, Circuit Court of Jackson County, Missouri Case No. 1016-cv-34791 and
    - *Thomas Casto et al. v. City National Bank, N.A.*, Circuit Court of Kanawha County, West Virginia Case No. 10-c-1089.

38. In those cases, I was asked to review and analyze the historical transactional data maintained by various banks, and to assist in the assessment of the feasibility of using such data to recreate alternative posting orders for the customers' transactions (*i.e.*, where the same transactions are sequenced in a different order than the order in which the bank actually posted them) for the purpose of comparing the number of Overdraft Fees those banks assessed each customer pursuant to its actual posting order with the number of Overdraft Fees those banks would have assessed had the alternative posting order been used.

I declare under penalty of perjury of the laws of Illinois and the United States that the foregoing is true and correct, and that this declaration was executed in Chicago, Illinois on July 16, 2012.

*[signature]*
Lee T. Ayres

INTERHACK PROPRIETARY: CONFIDENTIAL/5/5