**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 1:09-02036-JLK**

**IN RE: CHECKING ACCOUNT**
**OVERDRAFT LITIGATION**

**MDL No. 2036**

---

**THIS DOCUMENT RELATES TO:**
**FIFTH TRANCHE ACTION**

*Jeremy Childs, Natalie Childs, and Richard Green, on behalf of themselves and all others similarly situated,*

     *Plaintiffs,*

*v.*

*Synovus Financial Corp. and Synovus Bank,*

     *Defendants.*

S.D. Fla. Case No. 1:10-cv-23938-JLK

---

<u>**SECOND AMENDED CLASS ACTION COMPLAINT**</u>

Plaintiffs Jeremy Childs, Natalie Childs, and Richard Green, pursuant to the stipulation of the parties and through undersigned counsel, file on behalf of themselves and all persons similarly situated this Second Amended Class Action Complaint, alleging the following based on personal knowledge as to allegations regarding the Plaintiffs and on information and belief as to other allegations.

## INTRODUCTION

1.      This is a civil action seeking monetary damages, restitution, and declaratory relief from Defendants Synovus Bank and Synovus Financial Corp., collectively "Synovus" or "the Bank," arising from their improper, unfair, and unconscionable assessment and collection of excessive overdraft fees.

2.      In the era of electronic banking and the ubiquitous use of debit card transactions, the assessment of overdraft fees has become a major profit center for many United States banks, including Defendants.  For years, banks covered customers who occasionally bounced checks and even did so for a time for customers using debit cards, without charging their customers. Since the early 1990's, however, banks have devised methods to provide overdraft "protection" for customers and charge them in each instance.  A recent FDIC report estimated that overdraft fees represent 74 percent of the total service charges that are imposed on deposit accounts in the United States.  A 2008 FDIC study reports that overdraft fees for debit cards can carry an effective annualized interest rate that *exceeds 3,500 percent*.  Nevertheless, the Consumer Federation of America reports that five of the ten largest banks raised their overdraft fees in a recent twelve month period.

3.      In 2007, banks collected more than $17 billion in overdraft fees.  That number nearly doubled in 2008, as more and more consumers struggled to maintain positive checking account balances.  *In 2009, banks brought in $37.1 billion in overdraft charges alone.*  As one of largest banks in the Southeast, with over $32 billion in assets, Synovus, through 30 locally branded banks (which until recently maintained separate banking charters but had unified "back office" systems), provides commercial and retail banking, as well as investment services, to customers through 327 offices and 461 ATMs in Georgia, Alabama, South Carolina, Florida, and Tennessee.  Thus, Synovus is a notable beneficiary of these staggering overdraft charges.

4.      Almost by definition, these fees disproportionately affect the poor, who are most likely to maintain low balances.  Moebs Services, a research company that has conducted studies for the government as well as banks, estimates that 90 percent of overdraft fees are paid by the poorest 10 percent of banks' customer base.  Moreover, these fees have the tendency to create a domino effect, because the imposition of a fee on an account with a negative balance will make it less likely that the account holder's balance will reach positive territory, resulting in more fees.

5.      Before debit cards existed, banks occasionally extended the courtesy of honoring paper checks written on overdrawn or otherwise deficient accounts for customers who were typically in good standing.  Banks extended this courtesy largely because the third party involved in a sales transaction allowed the customer to pay by check, expecting the funds to be available and the check to clear.  For example, if a customer wrote a check to purchase groceries, the grocery store would only know whether the check cleared *after* the groceries had been purchased.

6.      The same considerations are not present when customers use debit cards.  Banks could simply decline to honor debit or point of sale transactions where accounts lack sufficient funds to execute the transactions.  Retail and service transactions could still be executed if consumers presented an alternative form of payment.  ATM transactions could still proceed if banks provided a warning that an overdraft fee would be assessed, and customers chose to proceed nevertheless.  In fact, until a few years ago, most banks simply declined debit transactions that would overdraw an account.

7.      Instead of simply declining debit transactions when there are insufficient funds, or warning its customers that an overdraft fee will be assessed if they proceed with the transaction, Synovus routinely processes such transactions and then charges its customers an overdraft fee of

$36 – even when the transaction is for only a few dollars.  This automatic, fee-based overdraft scheme is intentionally designed to maximize overdraft fee revenue for Synovus.  Additionally, as part of its inequitable motive to generate obscene profits gained through the imposition of unconscionable overdraft fees, Synovus fails to adequately notify its customers of the Bank's true overdraft practices.

8.      In many instances, these overdraft fees cost account holders of Synovus hundreds of dollars in a matter of days, or even hours, when they may be overdrawn by only a few dollars. Even more egregious, customer accounts may not actually be overdrawn at the time the overdraft fees are charged, or at the time of the debit transaction.

9.      Thus, it is through manipulation and alteration of customers' transaction records that Synovus maximizes overdraft penalties imposed on customers.

## JURISDICTION AND VENUE

10.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, there are at least 100 members of the putative Class, and at least one of the members of the proposed Class is a resident of a different state than Defendants Synovus Bank and Synovus Financial Corp., which are Georgia entities.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1407(a).  Venue was proper in the Northern District of Georgia and Middle District of Georgia, the districts in which Plaintiffs' actions were originally filed, pursuant to 28 U.S.C. § 1391 because Synovus is subject to personal jurisdiction there and regularly conducts business in those districts, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred and continue to occur in those districts.

4

**THE PARTIES**

12.     Plaintiffs Jeremy and Natalie Childs are citizens of the State of Georgia.

13.     Plaintiff Richard Green is a citizen of the State of Georgia.

14.     Synovus Bank is one of the largest banks in the Southeast, with over $32 billion in assets.  Synovus provides banking services to consumers through 30 banks, 327 offices, and 461 ATMs in Georgia, Alabama, South Carolina, Florida, and Tennessee.  Each of these banks held its own charter until recently, when Synovus concluded the consolidation of all of the banks under one charter in or about June of 2010.  Even when the affiliated banks held their own charters, most "back office" systems and corporate policies and practices were handled in a unified and consistent fashion by Synovus.

15.     Synovus Financial Corp. is a financial services company with more than $32 billion in assets based in Columbus, Georgia.  It is the holding company for Synovus Bank.

**CLASS ALLEGATIONS**

16.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rule 23.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

17.     The proposed class is defined as:

> All Synovus customers in the United States who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, incurred an overdraft fee as a result of Synovus' practices of re-sequencing debit card transactions from highest to lowest or assessing overdraft fees even at times when the customer had sufficient funds in their account to cover all merchant requests for payment.

18.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate and as the Court may otherwise allow.

5

19.     Excluded from the Class are Synovus, its parents, subsidiaries, affiliates, officers, and directors, any entity in which Synovus has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

20.     The members of the Class are so numerous that joinder is impractical.  The Class consists of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to Synovus' records.

21.     The claims of the representative Plaintiffs are typical of the claims of the Class in that the representative Plaintiffs, like all Class members, were charged overdraft fees by Synovus as a result of its improper practices, to include its re-sequencing of debit card transactions from highest to lowest and assessing overdraft fees at times when sufficient funds were on hand.  The representative Plaintiffs, like all Class members, have been damaged by Synovus' misconduct in that they have been assessed and/or will continue to be assessed unfair and unconscionable overdraft charges.  Furthermore, the factual basis of Synovus' misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Class.

22.     There are numerous questions of law and fact common to the Class and those common questions predominate over any questions affecting only individual Class members.

23.     Among the questions of law and fact common to the Class are whether Synovus:

a.     Did not clearly disclose and/or refused to allow its customers to opt out of its overdraft protection program;

b.     Did not obtain affirmative consent from its customers prior to processing transactions that would result in overdraft fees;

6

       c.      Did not alert its customers that a debit card transaction would trigger an overdraft fee, and did not provide its customers with an opportunity to cancel such transactions;

       d.      Manipulates and reorders transactions so that it can increase the number of overdraft fees it imposes;

       e.      Manipulates and reorders debits from highest to lowest in order to maximize the number of overdrafts and, consequently, the amount of overdraft fees;

       f.      Imposes overdrafts and overdraft fees even when there are sufficient funds in the account;

       g.      Fails to provide customers with accurate balance information;

       h.      Delays posting of transactions by customers using debit cards so that customers are charged overdraft fees on transactions, even though the customers had sufficient funds in their accounts to cover the transactions upon execution;

       i.      Charges exorbitant overdraft fees that bear no relationship to the actual costs and risks of covering insufficient funds transactions;

       j.      Breaches its covenant of good faith and fair dealing with Plaintiffs and other members of the Class through its overdraft policies and practices;

       k.      Requires its customers to enter into standardized account agreements which include unconscionable provisions;

       l.      Converts money belonging to Plaintiffs and other members of the Class through its overdraft policies and practices;

       m.      Is unjustly enriched through its overdraft policies and practices; and

       n.      Violates the consumer protection acts of certain states through its overdraft policies and practices.

24.     Other questions of law and fact common to the Class include:

      a.     The proper method or methods by which to measure damages, and

      b.     The declaratory relief to which the Class are entitled.

25.     Plaintiffs' claims are typical of the claims of other Class members, in that they arise out of the same wrongful overdraft policies and practices and the same or substantially similar unconscionable provisions of Synovus' account agreements and other related documents. Plaintiffs have suffered the harm alleged and have no interests antagonistic to the interests of any other Class member.

26.     Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers against financial institutions.  Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Class.

27.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Synovus, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses and Synovus' misconduct will proceed without remedy.

28.     Even if Class members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard

which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

## COMMON FACTUAL ALLEGATIONS

### A.    Synovus

29.     According to its website, Synovus has over $32 billion in assets, provides banking services to consumers through 327 offices and 461 ATMs in Georgia, Alabama, South Carolina, Florida, and Tennessee.   Synovus operates over 30 locally branded banks throughout the southeast.

30.     Synovus is in the business of providing its customers with a variety of banking products and services.  Customers who open a checking account are provided with a debit card, also known as a check card or ATM card.  Through such debit cards, customers can engage in transactions using funds which are withdrawn from their accounts by engaging in "debit" or "point of sale" ("POS") transactions, or may withdraw money from their accounts at automated teller machines ("ATMs").  Whether the card is used to execute POS transactions or to withdraw cash from ATMs, the transaction is processed electronically.  As a result, Synovus is notified instantaneously when the card is swiped, and has the option to accept or decline transactions at such time.

31.     Synovus employs sophisticated software to automate its overdraft system.  This program maximizes the number of overdrafts, and thus, the amount of overdraft fees charged per customer.  Synovus utilizes this sophisticated software system to generate overdraft fees. Customers at all Synovus banks suffer from the same policies and systems in regard to overdraft fees.

32.     As a result of Synovus' manipulation and alteration of customers' transactions records, funds in a customer's account are depleted more rapidly and more overdraft fees are likely to be charged for multiple smaller transactions.  Indeed, overdraft charges are likely to occur at times when, but for the manipulation and alteration, there would be funds in the account and no overdraft would occur.  For example, if a customer, whose account has a $50 balance at the time Synovus posted several transactions, made four transactions of $10 and then one subsequent transaction of $100, the Bank would reorder the debits from largest to smallest, imposing four overdraft fees on the customer.  Conversely, if the $100 transaction were debited last – consistent with the actual order of transactions – only one overdraft fee would be assessed. *See* FDIC Study of Bank Overdraft Programs, November 2008, *available at*: http://www.fdic.gov/bank/analytical/overdraft/, at 11, n. 12.

## B.     Synovus' Relevant Customer Documents Regarding Overdrafts

33.     Plaintiffs and all members of the Class maintain or maintained a checking account with Synovus.  The terms of the Bank's checking accounts are contained in standardized account holder agreements, presented to its customers on a "take it or leave it" basis, drafted and imposed by Synovus, which was the party of vastly superior bargaining strength, and thus constitute agreements of adhesion.

34.     Until required to do so by federal regulators in 2010, Synovus failed to give customers the option to "opt out" of the Bank's overdraft scheme.

35.     The Bank's account agreement does not adequately disclose Synovus' improper re-ordering and overdraft assessment practices described herein.

## C.     Synovus' Re-Ordering of Checking Account Transactions

36.     In an effort to maximize overdraft revenue, Synovus manipulates and reorders debits from highest to lowest during given periods of time.  Synovus reorders debit card

transactions for no reason other than to increase the number of exorbitant overdraft fees it can charge.  This practice violates the parties' contract and the covenant of good faith and fair dealing as applied to the Bank's deposit agreement.

37.     Transactions involving debit cards used by Synovus customers, including the withdrawal of cash from ATMs and POS transactions with vendors, are processed electronically. As a result, Synovus is notified instantaneously when the customer's debit card is swiped, and has the option to accept or decline these transactions.

38.     Notwithstanding the instantaneous nature of these electronic debit card transactions, under Synovus' posting system, it fails to post charges in the order in which they are assessed or received.  Synovus developed a policy and employs a practice whereby account charges and debits are posted to its customers' accounts out of chronological order for the sole purpose of maximizing the number of overdraft transactions and, therefore, the amount of overdraft fees charged to its customers.

39.     Instead of processing such transactions in chronological order, Synovus processes them starting with the largest debit and ending with the smallest debit, so as to generate the largest possible number of overdrafts and the greatest possible amount of overdraft fees.

40.     Synovus refrains from immediately posting charges to a customer's account as it receives them – sometimes for multiple business days.  By holding charges rather than posting them immediately to an account, Synovus is able to amass a number of charges on the account. Subsequently, Synovus posts all of the amassed charges on a single date.  When the group of charges is eventually posted to the customer's account, Synovus posts them in order of largest to smallest – not in the order in which they were received or in the order in which they were charged.  This delayed posting results in the imposition of multiple overdraft fees that would not

otherwise be imposed.   The delayed posting also prevents customers from ascertaining the accurate balances in their accounts.

41.     Synovus' policy and practice of posting charges from largest to smallest, rather than chronologically, or from smallest to largest, is specifically designed to maximize the generation of overdraft fees by triggering overdraft fees for account charges that would not otherwise result in such fees.   The Bank would have no higher expenses and would face no greater risk if it were to order transactions chronologically or from smallest to largest.

42.     Synovus enforces an unconscionable policy whereby charges assessed are posted to customers' accounts in a non-chronological order, from highest to lowest, and are held for multiple days and then batched together, to maximize the number of overdraft transactions and fees.   Synovus' processing practices substantially increase the likelihood that customers' smaller charges will result in multiple overdraft fees.   The practices provide Synovus with substantially higher service fee revenues than it would otherwise achieve absent these practices.

43.     As a result, Plaintiffs and members of the Class have been assessed overdraft fees for transactions which occurred when they actually had sufficient funds in their accounts to cover those transactions.

###     D.     Synovus' Cloaking of Accurate Balance Information

44.     Synovus actively promotes the convenience of its debit cards and other electronic debiting, but fails to provide customers with accurate balance information.   When customers execute account transactions, they generally do not have access to an accurate balance register or balance information.

45.     Synovus provides inaccurate balance information to its customers through its electronic network.   In certain cases, Synovus informs its customers that they have a positive balance when, in reality, they have a negative balance pursuant to the Bank's manipulations of

the customer's transactions, despite the Bank's actual knowledge of all outstanding debits and transactions.

46.     Even when Synovus has actual knowledge of outstanding transactions which have already created a negative available balance in a customers' account, it encourages the customer to incur more overdraft charges by approving – rather than prudently declining – subsequent debit card purchases and other electronic transactions.

47.     Synovus also assesses overdraft fees at times when actual funds in the customer account are sufficient to cover all debits that have been submitted to the Bank for payment.  It does this by placing a "hold" on actual funds in the customer's account.  In doing so, Synovus charges overdraft fees where it faces no risk, because the cash balance in the customer's account has not dropped below zero.

E.      **Synovus' Failure to Notify Customers of Overdrafts or Advise Customers of Their Right to Opt Out**

48.     At the time its debit cards are used in POS transactions or at ATMs, Synovus is able to determine, almost instantaneously, whether there are sufficient funds in a customer's account to cover that particular transaction.  The Bank has the technological capability to decline transactions (which it does when a pending transaction would exceed a pre-determined, overdraft tolerance limit for the account), or notify customers at that very moment that the particular debit card transaction would result in an overdraft.  Prior to the effective date of the opt in/opt out requirements of Regulation E (the "Effective Date"), Synovus could have given customers the option to decline the transaction to avoid incurring overdraft fees, but it failed to do so because it sought to maximize the amount of revenue generated through its assessment of overdraft fees.

49.     Notwithstanding its technological capabilities and actual knowledge, Synovus failed to provide notice to Plaintiffs and the Class that a particular debit card transaction would

result in an overdraft and, hence, an overdraft fee. Because Synovus' customers were not notified of the potential overdraft, and were not given the option of declining the debit card transaction or providing another form of payment, the customers were assessed monetary damages in the form of overdraft fees.

50.     Until recently, when it was under a federal mandate to do so as a result of recently adopted legislation, Synovus failed to make Plaintiffs and Class members aware that they can opt out of its overdraft scheme upon request, thereby avoiding any overdraft fees from being charged.

### F.     Synovus' Overdraft Policies and Practices Are Contrary to Best Practices

51.     By engaging in the conduct described herein, Synovus has failed to follow the list of "best practices" for overdraft programs set forth in the "Joint Guidance on Overdraft Protection Programs" ("Joint Guidance") issued by the United States Department of the Treasury, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the National Credit Union Administration (collectively the "Agencies"). A copy of the Joint Guidance is attached as Exhibit "A". These "best practice" recommendations include: "Provide election or opt-out of service. Obtain affirmative consent of consumers to receive overdraft protection. Alternatively, where overdraft protection is automatically provided, permit consumers to 'opt-out' of the overdraft program and provide a clear consumer disclosure of this option." 70 F.R. 9127-01, 9132.

52.     According to rules proposed by the Agencies: "Injury [caused by overdraft charges] is not outweighed by countervailing benefits . . . . This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction

would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee."  73 F.R. 28904-01, 28929 (May 19, 2008).

53.     The Joint Guidance also advises banks to "[a]lert customers before a transaction triggers any fees.  When consumers attempt to withdraw or transfer funds made available through an overdraft protection program, provide a specific consumer notice, where feasible, that completing the withdrawal may trigger the overdraft fees."  70 F.R. 9127, 9132.  The Joint Guidance further advises that "[t]his notice should be presented in a manner that permits consumers to cancel the attempted withdrawal or transfer after receiving the notice."  *Id*.

54.     Similarly, the list of "best practices" recommended in "Overdraft Protection: A Guide for Bankers," issued by the American Bankers Association, includes offering customers the option of "opting out" of any overdraft programs, and informing customers, before they access funds, that a particular point of sale or ATM transaction will cause them to incur an overdraft fee.  A copy of "Overdraft Protection: A Guide for Bankers" is attached as Exhibit "B".

55.     Synovus' overdraft policies make it difficult for customers to avoid injury even if they carefully track the balance in their account.  In fact, the Agencies have stated that injury resulting from such policies, "is not reasonably avoidable" by the consumer.  73 F.R. 28904-01, 28929.  "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available."

56.     On October 6, 2009, the Center for Responsible Lending issued a report entitled "Overdraft Explosion:  Bank Fees for Overdrafts Increase 35% in Two Years."  The report, attached hereto as Exhibit "C," found that it is now "standard procedure to automatically enroll checking account customers in their most expensive overdraft loan program."  The report finds that debit card transactions account for more overdraft fees than traditional checks or any other type of transaction, even though "debit card transactions and ATM withdrawals . . . could easily be denied for no fee."  The report also finds that overdraft fees increased 35 percent from 2006 to 2008, and that over 50 million Americans overdrew their accounts in a 12-month period, with 27 million accounts incurring five or more overdraft fees.

57.     A chart from the research company Moebs Services shows that, in every year since 1992, banks have gained increased revenues from overdraft fees:



### G.   Synovus' Unconscionable Provisions and Policies

58.   Synovus' overdraft policies and practices are unconscionable in the following respects, among others:

a.   Prior to the Effective Date, the Bank did not disclose or reasonably disclose to customers that they had the option to "opt out" of the Bank's overdraft scheme;

b.   Prior to the Effective Date, the Bank did not obtain affirmative consent from checking account customers prior to processing a transaction that would overdraw the account and result in an overdraft fee;

c.      The Bank did not alert its customers that a debit card transaction will trigger an overdraft, and does not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

d.      The Bank used unduly discretionary power to assess fees even at times when no economic argument could be made for such fees.

e.      The account agreement and related documents are contracts of adhesion in that they are standardized forms, imposed and drafted by the Bank, which is a party of vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement in its entirety; and

f.      The account agreement provided to customers is ineffective, ambiguous, deceptive, unfair, and misleading

**H.      Synovus' Overdraft Practices Harmed Plaintiffs**

59.     Synovus' wrongful overdraft policies and practices described above harmed Plaintiffs and members of the Class.  The following allegations regarding the named Plaintiffs are made for purposes of illustrating the harm and damage sustained by Plaintiffs and members of the Class as a result of Synovus' wrongful overdraft policies and practices.

60.     Plaintiffs are current or former checking account customers of Synovus.

61.     In connection with their account, the Bank issued a debit card to Plaintiffs.  A debit card allows customers to access their checking account funds by using the card to execute a transaction.  The charge is processed electronically, and the Bank has the option to accept or decline the transaction at the point of sale.

a.      Jeremy & Natalie Childs

62.     Synovus wrongfully charged Jeremy and Natalie Childs overdraft fees on multiple occasions.  By way of illustration, they were charged five overdraft fees on July 21, 2009 in the

amount of $36.00 each, for a total of $180.00.  Based on information and belief, the overdraft

fees were based on the following ordering of transactions:

## Balance Sheet per Synovus Reordering Scheme
### (Debits Processed from Highest to Lowest)

| | | Debits | Fees | Balance |
|---|---|---|---|---|
| | Beginning Balance on 7/17/2009: | | | 161.23 |
| Date Posted | Debit Description | | | |
| 7/20/2009 | POS PCH CASH BACK – CVS | 62.40 | | 98.83 |
| 7/20/2009 | CHECK CARD PURCHASE – Steak Out | 33.15 | | 65.68 |
| 7/20/2009 | CHECK CARD PURCHASE – Hidden Lake Btl | 26.56 | | 39.12 |
| 7/20/2009 | CHECK CARD PURCHASE – Mr. Bs | 24.34 | | 14.78 |
| 7/20/2009 | CHECK CARD PURCHASE – KFC | 17.31 | | -2.53 |
| 7/20/2009 | CHECK CARD PURCHASE – Firehouse Subs | 13.55 | | -16.08 |
| 7/20/2009 | POS PURCHASE – Money Back # 9 | 10.07 | | -26.15 |
| 7/20/2009 | CHECK CARD PURCHASE – RN Gamehouse | 8.99 | | -35.14 |
| 7/20/2009 | CHECK CARD PURCHASE – Chick-Fil-A | 4.23 | | -39.37 |
| 7/21/2009 | OVERDRAFT FEE | | 36.00 | -75.37 |
| 7/21/2009 | OVERDRAFT FEE | | 36.00 | -111.37 |
| 7/21/2009 | OVERDRAFT FEE | | 36.00 | -147.37 |
| 7/21/2009 | OVERDRAFT FEE | | 36.00 | -183.37 |
| 7/21/2009 | OVERDRAFT FEE | | 36.00 | -219.37 |
| | | Total Fees: | $180.00 | |

63.     If Synovus had not manipulated and reordered the Childs' transactions from

highest to lowest, they would not have been assessed five overdraft fees.

64.     For instance, if Synovus had posted the transactions from lowest to highest, the

Childs would have been assessed only one overdraft fee instead of five:

## Balance Sheet if Debits Were Processed from Lowest to Highest

| | | Debits | Fees | Balance |
|---|---|---|---|---|
| | Beginning Balance on 7/17/2009: | | | 161.23 |
| Date Posted | Debit Description | | | |
| 7/20/2009 | CHECK CARD PURCHASE – Chick-Fil-A | 4.23 | | 157.00 |
| 7/20/2009 | CHECK CARD PURCHASE – RN Gamehouse | 8.99 | | 148.01 |
| 7/20/2009 | POS PURCHASE – Money Back # 9 | 10.07 | | 137.94 |
| 7/20/2009 | CHECK CARD PURCHASE – Firehouse Subs | 13.55 | | 124.39 |
| 7/20/2009 | CHECK CARD PURCHASE – KFC | 17.31 | | 107.08 |
| 7/20/2009 | CHECK CARD PURCHASE – Mr. Bs | 24.34 | | 82.74 |
| 7/20/2009 | CHECK CARD PURCHASE – Hidden Lake Btl | 26.56 | | 56.18 |
| 7/20/2009 | CHECK CARD PURCHASE – Steak Out | 33.15 | | 23.03 |
| 7/20/2009 | POS PCH CASH BACK – CVS | 62.40 | | -39.37 |
| 7/21/2009 | OVERDRAFT FEE | | 36.00 | -75.37 |
| | | Total Fees: | $36.00 | |

65.     Even if Synovus had posted the transactions in chronological order, they would have been assessed only three overdraft fees instead of five:

**Balance Sheet if Debits Were Processed in Chronological Order**

| | | Debits | Fees | Balance |
|---|---|---|---|---|
| | Beginning Balance on 7/17/2009: | | | 161.23 |
| **Date Posted** | **Debit Description & Date** | | | |
| 7/20/2009 | CHECK CARD PURCHASE – Chick-Fil-A  (7/16) | 4.23 | | 157.00 |
| 7/20/2009 | CHECK CARD PURCHASE – Steak Out  (7/16) | 33.15 | | 123.85 |
| 7/20/2009 | CHECK CARD PURCHASE – KFC (7/17) | 17.31 | | 106.54 |
| 7/20/2009 | CHECK CARD PURCHASE – Mr. Bs  (7/17) | 24.34 | | 82.20 |
| 7/20/2009 | POS PCH CASH BACK – CVS  (7/17) | 62.40 | | 19.80 |
| 7/20/2009 | CHECK CARD PURCHASE – RN Gamehouse (7/18) | 8.99 | | 10.81 |
| 7/20/2009 | CHECK CARD PURCHASE – Firehouse Subs  (7/18) | 13.55 | | -2.74 |
| 7/20/2009 | CHECK CARD PURCHASE – Hidden Lake Btl (7/18) | 26.56 | | -29.30 |
| 7/20/2009 | POS PURCHASE – Money Back # 9 | 10.07 | | -39.37 |
| 7/21/2009 | OVERDRAFT FEE | | 36.00 | -75.37 |
| 7/21/2009 | OVERDRAFT FEE | | 36.00 | -111.37 |
| 7/21/2009 | OVERDRAFT FEE | | 36.00 | -147.37 |
| | | Total Fees: | $108.00 | |

66.     Synovus failed to notify the Childses that they could be assessed overdraft fees on transactions even though there were sufficient funds in the checking account to cover the transaction at the time the transaction was executed or posted.  In addition, Synovus never notified them at the time they executed the purported insufficient funds transactions described above, that their checking account was overdrawn or that they would be charged an overdraft fee as a result of the transactions.  Furthermore, Synovus paid, rather than returned, all of the debit card charges described above, even though the Childs' accounts purportedly lacked sufficient funds to cover the transactions.

67.     Synovus also charged the Childses overdraft fees when their account was not actually overdrawn.  According to the Childs' account records, they had a balance of $528.20 at the end of the day on January 15, 2010.  As shown in the following chart, on January 19, 2010, 14 transactions were posted to Plaintiffs' account.  Even though the Childs' account balance was never overdrawn, they were assessed 10 overdraft fees totaling $360.00 on January 20, 2010.

20

| | | Debits | Fees | Balance |
|---|---|---|---|---|
| | **Beginning Balance on 1/19/2010:** | | | **$528.20** |
| **Date Posted** | **Debit Description & Date** | | | |
| 1/19/2010 | PREAUTHORIZED WITHDRAWAL – Loan Payment | $158.76 | | $369.44 |
| 1/19/2010 | POS PURCHASE – Walmart  (1/16) | $70.51 | | $298.93 |
| 1/19/2010 | ATM CASH WITHDRAWAL  (1/16) | $50.00 | | $248.93 |
| 1/19/2010 | ATM CASH WITHDRAWAL  (1/19) | $50.00 | | $198.93 |
| 1/19/2010 | POS PURCHASE – Walmart  (1/15) | $37.42 | | $161.51 |
| 1/19/2010 | CHECK CARD PURCHASE – Mr. Bs  (1/17) | $22.60 | | $138.91 |
| 1/19/2010 | CHECK CARD PURCHASE – Shell Oil  (1/17) | $16.63 | | $122.28 |
| 1/19/2010 | CHECK CARD PURCHASE – Boos Party Shop  (1/15) | $15.46 | | $106.82 |
| 1/19/2010 | CHECK CARD PURCHASE – Burger King  (1/14) | $10.79 | | $96.03 |
| 1/19/2010 | POS PURCHASE – Shell  (1/16) | $10.40 | | $85.63 |
| 1/19/2010 | CHECK CARD PURCHASE – Circle K  (1/15) | $10.00 | | $75.63 |
| 1/19/2010 | CHECK CARD PURCHASE – Carmike  (1/17) | $10.00 | | $65.63 |
| 1/19/2010 | CHECK CARD PURCHASE – Mr. Bs  (1/17) | $4.82 | | $60.81 |
| 1/19/2010 | CHECK CARD PURCHASE – McDonalds (1/17) | $4.26 | | $56.55 |
| 1/20/2010 | OVERDRAFT FEE | | $36.00 | |
| 1/20/2010 | OVERDRAFT FEE | | $36.00 | |
| 1/20/2010 | OVERDRAFT FEE | | $36.00 | |
| 1/20/2010 | OVERDRAFT FEE | | $36.00 | |
| 1/20/2010 | OVERDRAFT FEE | | $36.00 | |
| 1/20/2010 | OVERDRAFT FEE | | $36.00 | |
| 1/20/2010 | OVERDRAFT FEE | | $36.00 | |
| 1/20/2010 | OVERDRAFT FEE | | $36.00 | |
| 1/20/2010 | OVERDRAFT FEE | | $36.00 | |
| 1/20/2010 | OVERDRAFT FEE | | $36.00 | |

### b.   Richard Green

68.    Mr. Green used his ATM/debit card issued by Defendant on several occasions in order to conduct electronic funds transfers.

69.    Synovus wrongfully charged Mr. Green overdraft fees on multiple occasions.  In many instances, this practice caused a cascade effect that led Mr. Green's account to fall further into a negative balance.

70.    By way of example, below is the ordering of transactions as reflected in Mr. Green's statement for the indicated dates:

**Balance Sheet per Synovus' Reordering Scheme**
**(Debits Processed from Highest to Lowest)**

|  |  | Debits | Fees | Balance |
|---|---|---|---|---|
|  | **Beginning Balance on 6/21/2010:** |  |  | **69.40** |
| **Date Posted** | **Debit Description** |  |  |  |
| 6/21/2010 | Check Card Purchase | 78.35 |  | -8.95 |
| 6/21/2010 | ATM Withdrawal | 60.00 |  | -68.95 |
| 6/21/2010 | Check Card Purchase | 25.01 |  | -93.96 |
| 6/21/2010 | POS Purchase | 4.07 |  | -98.03 |
|  |  |  |  |  |
|  | **Beginning Balance on 6/22/2010** |  |  | -98.03 |
| 6/22/2010 | Overdraft Charge (x4) |  | 144.00 | -242.03 |
|  |  |  |  |  |
|  | **Beginning Balance on 6/25/2010** |  |  | -242.03 |
| 6/25/2010 | Direct Deposit                    (+ 949.00) |  |  | 706.97 |
| 6/25/2010 | ATM Withdrawal | 95.00 |  | 611.97 |
|  |  | **Total Fees:** | **$144.00** |  |

71.     The excerpted portion of Mr. Green's account statement includes only electronic debits to his account – no checks were cashed during the included time period.  Thus, each transaction required instantaneous electronic approval from Synovus prior to payment, which Synovus granted despite the purported lack of funds.

72.     The above chart illustrates how Synovus processed all transactions from highest to lowest regardless of the order that they were made.  For example, Synovus treated the $78.35 debit on June 21, 2010 as first in time, even though it was not.  This practice of resequencing transactions caused Mr. Green to suffer more overdraft charges than he would have otherwise incurred.  Had Mr. Green's $78.35 debit on June 21, 2010 been processed last instead of first, for example, he would have been assessed only three $36 overdraft fees, as opposed to four.

73.     Synovus repeated this behavior causing Mr. Green to incur nearly $2,000 in unwarranted overdraft fees in 2010 alone.

74.     The overdraft charges assessed to the Childs and Mr. Green are representative of millions of dollars of overdraft fees that Synovus wrongfully assessed and deducted from its customers' accounts.  These wrongful takings are especially egregious considering the fact that

the Bank approved each transaction and knew at the time of approval whether there were sufficient funds in the account to cover the transaction.

### I.     **The Damages Sustained by Plaintiffs and the Class**

75.     As shown by these examples, Synovus' overdraft policies make it difficult for a customer to avoid injury even if the customer keeps close track of the balance in his or her account.  In fact, the Agencies have stated that "injury" resulting from such policies "is not reasonably avoidable" by consumers.  73 F.R. 28904-01, 28929.  "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available." *Id*.

76.     According to rules proposed by the Agencies: "Injury [caused by overdraft charges] is not outweighed by countervailing benefits . . . . This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee."  73 F.R. 28904-01, 28929 (May 19, 2008).

77.     Thus, as a consequence of Synovus' overdraft policies and practices, Plaintiffs and the Class have been wrongfully forced to pay overdraft fees.  Synovus has improperly deprived Plaintiffs and the Class of significant funds, causing ascertainable monetary losses and damages.

78.     As a consequence of Synovus' improper overdraft fees, Synovus has wrongfully deprived Plaintiffs and the Class of funds to which it had no legitimate claim.

79.     Plaintiffs had sufficient funds to cover at least some of the transactions for which they and the Class were charged overdraft fees.  Plaintiffs and members of the Class either had adequate funds to cover the transactions posted to their accounts, or the accounts were allowed to become overdrawn, even by *de minimis* margins, exclusively so that Synovus could impose these wrongful charges.  In many instances, Synovus' manipulation of the process for imposing overdraft fees triggered a cascade of charges that exponentially added to the charges it collected from Plaintiffs and Class members.

80.     All conditions precedent to the relief sought herein have either occurred or have been performed or waived.

### FIRST CLAIM FOR RELIEF
### Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing[1]

81.     Plaintiffs repeat paragraphs 1 through 80 above.

82.     Plaintiffs and Synovus have contracted for bank account deposit, checking, ATM, and debit card services.  As described above, the actions taken by Synovus have violated the specific terms of the Bank's deposit agreement with customers.

83.     Under the laws of the states where Synovus does business, good faith is an element of every contract pertaining to the assessment of overdraft fees.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the

---

[1]  Certain states recognize a claim for breach of the covenant of good faith and fair dealing as a separate and independent claim from breach of contract.  Other states treat breach of the covenant of good faith and fair dealing as a species of breach of contract.  For the sake of convenience, these claims are brought in a single count.

substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

84.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

85.    Synovus has breached the covenant of good faith and fair dealing in its account agreement with customers through its overdraft policies and practices as alleged herein.

86.    Plaintiffs and the Class have performed all, or substantially all, of the obligations imposed on them under the account agreement.

87.    Plaintiffs and members of the Class have sustained damages as a result of Synovus' breaches of the account agreement and further breaches of the account agreement as modified by the covenant of good faith and fair dealing.

## SECOND CLAIM FOR RELIEF
### Unconscionability

88.    Plaintiffs repeat paragraphs 1 through 80 above.

89.    Synovus' overdraft policies and practices are substantively and procedurally unconscionable in the following respects, among others:

a.    Prior to the Effective Date, the Bank did not disclose or reasonably disclose to customers that they had the option to "opt out" of the Bank's overdraft scheme;

b.    Prior to the Effective Date, the Bank did not obtain affirmative consent from checking account customers prior to processing a transaction that would overdraw the account and result in an overdraft fee;

c.     The Bank does not alert its customers that a debit card transaction will trigger an overdraft, and does not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

d.     The account agreement is a contract of adhesion in that it is a standardized form, imposed and drafted by the Bank, which is a party of vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement in its entirety; and

e.     The account agreement provided to customers is ineffective, ambiguous, deceptive, unfair, and misleading in that it does not unambiguously state that the Bank always reorders debits from high to low, even though Synovus *always* reorders transactions in this way for customers in order to maximize overdrafts and overdraft fee revenues for the Bank.

90.     Considering the great business acumen and experience of Synovus in relation to Plaintiffs and the members of the Class, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law.

91.     The imposition of overdraft charges which exceed the amount overdrawn (*e.g.*, the imposition of a $36 charge on an overdraft of less than $10) is itself unconscionable.  Such charges are not reasonably related to the Bank's cost of covering the overdraft and/or its risk of nonpayment (where the Bank pays the overdraft), or to the Bank's cost of returning the item unpaid (where the Bank does not pay the overdraft).

92.    Plaintiffs and members of the Class have sustained damages as a result of Synovus' unconscionable policies and practices as alleged herein.

### THIRD CLAIM FOR RELIEF
#### Conversion

93.    Plaintiffs repeat paragraphs 1 through 80 above.

94.    Synovus had and continues to have a duty to maintain and preserve its customers' checking accounts and to prevent their diminishment through its own wrongful acts.

95.    Synovus has wrongfully collected overdraft fees from Plaintiffs and the members of the Class, and has taken specific and readily identifiable funds from their accounts in payment of these fees in order to satisfy them.

96.    Synovus has, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiffs and the members of the Class, without legal justification.

97.    Synovus continues to retain these funds unlawfully without the consent of Plaintiffs or members of the Class.

98.    Synovus intends to permanently deprive Plaintiffs and the members of the Class of these funds.

99.    These funds are properly owned by Plaintiffs and the members of the Class, not Synovus, which now claims that it is entitled to their ownership, contrary to the rights of Plaintiffs and the members of the Class.

100.    Plaintiffs and the members of the Class are entitled to the immediate possession of these funds.

101.    Synovus has wrongfully converted these specific and readily identifiable funds.

102.    Synovus' wrongful conduct is continuing.

103.     As a direct and proximate result of this wrongful conversion, Plaintiffs and the members of the Class have suffered and continue to suffer damages.

104.     By reason of the foregoing, Plaintiffs and the members of the Class are entitled to recover from Synovus all damages and costs permitted by law, including all amounts that Synovus has wrongfully converted.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**

105.     Plaintiffs repeat paragraphs 1 through 80 above.

106.     Plaintiffs, on behalf of themselves and the Class, assert a common law claim for unjust enrichment.  This claim is brought solely in the alternative and Plaintiffs concede that this claim cannot survive if their contractual claims succeed.  If, however, the parties' contracts are deemed unconscionable or otherwise unenforceable for any reason, unjust enrichment will dictate that Synovus disgorge all improperly assessed overdraft fees.

107.     By means of Synovus' wrongful conduct alleged herein, Synovus knowingly provides banking services to Plaintiffs and members of the Class that are unfair, unconscionable, and oppressive.

108.     Synovus knowingly received and retained wrongful benefits and funds from Plaintiffs and members of the Class.  In so doing, Synovus acted with conscious disregard for the rights of Plaintiffs and members of the Class.

109.     As a result of Synovus' wrongful conduct as alleged herein, Synovus has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Class.

110.     Synovus' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

111.    Under the common law doctrine of unjust enrichment, it is inequitable for Synovus to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of overdraft fees on Plaintiffs and members of the Class in an unfair, unconscionable, and oppressive manner.   Synovus' retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

112.    The financial benefits derived by Synovus rightfully belong to Plaintiffs and members of the Class.   Synovus should be compelled to disgorge in a common fund for the benefit of Plaintiffs and members of the Class all wrongful or inequitable proceeds received by them.   A constructive trust should be imposed upon all wrongful or inequitable sums received by Synovus traceable to Plaintiffs and the members of the Class.

113.    Plaintiffs and members of the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class demand a jury trial on all claims so triable and judgment to include as follows:

1.    A declaration that Synovus' overdraft fee policies and practices are wrongful, unfair, and unconscionable;

2.    Restitution of all overdraft fees paid to Synovus by Plaintiffs and the Class, as a result of the wrongs alleged herein in an amount to be determined at trial;

3.    Disgorgement of the ill-gotten gains derived by Synovus from its misconduct;

4.    Actual damages in an amount according to proof;

5.    Punitive and exemplary damages;

6.    Pre-judgment interest at the maximum rate permitted by applicable law;

7.    Reimbursement for the costs and disbursements of Plaintiffs in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

Such other relief as this Court deems just and proper.

Dated: September 5, 2012.

Respectfully submitted,

/s/ Aaron S. Podhurst                     /s/ Bruce S. Rogow
Aaron S. Podhurst, Esquire                Bruce S. Rogow, Esquire
Florida Bar No. 063606                    Florida Bar No. 067999
apodhurst@podhurst.com                    brogow@rogowlaw.com
Robert C. Josefsberg, Esquire             BRUCE S. ROGOW, P.A.
Florida Bar No. 40856                     Broward Financial Center
rjosefsberg@podhurst.com                  500 E. Broward Boulevard
Peter Prieto, Esquire                     Suite 1930
Florida Bar No. 501492                    Fort Lauderdale, FL  33394
pprieto@podhurst.com                      Tel: 954-767-8909
Stephen F. Rosenthal, Esquire             Fax: 954-764-1530
Florida Bar No. 0131458
srosenthal@podhurst.com
John Gravante, III, Esquire
Florida Bar No. 617113
jgravante@podhurst.com
PODHURST ORSECK, P.A.
City National Bank Building
25 W. Flagler Street, Suite 800
Miami, FL 33130-1780
Tel: 305-358-2800
Fax: 305-358-2382

*Co-Lead Counsel for Plaintiffs*

/s/ Robert C. Gilbert
Robert C. Gilbert, Esquire
Florida Bar No. 561861
rcg@grossmanroth.com
Stuart Z. Grossman, Esquire
Florida Bar No. 156113
szg@grossmanroth.com
David Buckner, Esquire
Florida Bar No. 60550
dbu@grossmanroth.com
Seth E. Miles, Esquire
Florida Bar No. 385530
sem@grossmanroth.com
GROSSMAN ROTH, P.A.
2525 Ponce de Leon Boulevard
Eleventh Floor
Coral Gables, FL 33134
Tel: 305-442-8666
Fax: 305-779-9596

*Coordinating Counsel for Plaintiffs*

/s/ E. Adam Webb
E. Adam Webb, Esquire
Georgia Bar No. 743910
Adam@WebbLLC.com
Matthew C. Klase, Esquire
Georgia Bar No. 141903
Matt@WebbLLC.com
G. Franklin Lemond, Jr., Esquire
Georgia Bar No. 141315
FLemond@WebbLLC.com
WEBB, KLASE & LEMOND, L.L.C.
1900 The Exchange, S.E.
Suite 480
Atlanta, GA 30339
Tel: 770-444-9325
Fax: 770-444-0271


/s/ Russell W. Budd
Russell W. Budd, Esquire
Texas Bar No. 03312400
rbudd@baronbudd.com
Bruce W. Steckler, Esquire
Texas Bar No. 00785039
bsteckler@baronbudd.com
Mazin A. Sbaiti, Esquire
Texas Bar No. 24058096
msbaiti@baronbudd.com
BARON & BUDD, P.C.
3102 Oak Lawn Avenue
Suite 1100
Dallas, TX 75219
Tel: 214-521-3605
Fax: 214-520-1181

/s/ Michael W. Sobol
Michael W. Sobol, Esquire
California Bar No. 194857
msobol@lchb.com
Roger N. Heller, Esquire
California Bar No. 215348
rheller@lchb.com
Jordan Elias, Esquire
California Bar No. 228731
jelias@lchb.com
LIEFF CABRASER HEIMANN &
  BERNSTEIN L.L.P.
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
Tel: 415-956-1000
Fax: 415-956-1008


/s/ David S. Stellings
David S. Stellings, Esquire
New York Bar No. 2635282
dstellings@lchb.com
LIEFF CABRASER HEIMANN &
  BERNSTEIN L.L.P.
250 Hudson Street
8th Floor
New York, NY  10013
Tel: 212-355-9500
Fax: 212-355-9592

/s/ Ruben Honik
Ruben Honik, Esquire
Pennsylvania Bar No. 33109
rhonik@golombhonik.com
Kenneth J. Grunfeld, Esquire
Pennsylvania Bar No. 84121
kgrunfeld@golombhonik.com
GOLOMB & HONIK, P.C.
1515 Market Street
Suite 1100
Philadelphia, PA 19102
Tel: 215-985-9177
Fax: 215-985-4169

/s/ Ted E. Trief
Ted E. Trief, Esquire
New York Bar No. 1476662
ttrief@triefandolk.com
Barbara E. Olk, Esquire
New York Bar No. 1459643
bolk@triefandolk.com
TRIEF & OLK
150 E. 58th Street
34th Floor
New York, NY 10155
Tel: 212-486-6060
Fax: 212-317-2946

*Plaintiffs' Executive Committee*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 09-MD-02036-JLK

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

---

## CERTIFICATE OF SERVICE

I hereby certify that on September 5, 2012, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Robert C. Gilbert
Robert C. Gilbert, Esquire
Florida Bar No. 561861
GROSSMAN ROTH, P.A.
2525 Ponce de Leon Boulevard
Eleventh Floor
Coral Gables, FL 33134
Tel: 305-442-8666
Fax: 305-779-9596