**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 1:09-MD-02036-JLK

| |
|---|
| **IN RE: CHECKING ACCOUNT OVERDRAFT LITIGATION** <br><br> **MDL No. 2036** |

| |
|---|
| **THIS DOCUMENT RELATES TO:** <br> **FIFTH TRANCHE ACTION** <br><br> *Terry Case v. Bank of Oklahoma, N.A.* <br> S.D. FL Case No. 1:11-cv-20815-JLK <br> W.D. OK Case No. 5:10-00901-L |

**ORDER OF FINAL APPROVAL OF SETTLEMENT, AUTHORIZING SERVICE AWARDS, AND GRANTING APPLICATION FOR ATTORNEYS' FEES**

On July 16, 2012, Plaintiffs filed their Motion for Final Approval of Settlement, Application for Service Awards, Class Counsel's Application for Attorneys' Fees, and Incorporated Memorandum of Law (DE # 2843) ("Motion"), seeking Final Approval of the Settlement with BOKF, N.A. ("BOK" or "Bank").[1]  Plaintiffs also filed declarations to enable the Court to evaluate the fairness and adequacy of this Settlement and the application for attorneys' fees.  One objection on behalf of three individuals was filed (DE # 2873), but the objection was subsequently withdrawn.  (DE # 2876).

This matter came before the Court on August 29, 2012, for a Final Approval Hearing pursuant to the Court's Preliminary Approval Order dated April 20, 2012 (DE # 2644).  The

---

[1] This Order incorporates the definitions of the terms used in the Settlement Agreement and Release of March 16, 2012 ("Agreement" or "Settlement").

Court carefully reviewed all of the filings related to the Settlement and heard argument on the

Motion. After full consideration of the Motion and the presentations of the Parties, the Court

concludes that this Settlement provides a substantial recovery for Settlement Class Members, and

is an excellent result for the Settlement Class under all of the circumstances and challenges

presented by the Actions. The Court specifically finds that the Settlement is fair, reasonable and

adequate, and an acceptable compromise of the Settlement Class Members' claims. The

Settlement complies with Fed. R. Civ. P. 23(e), and, thus, the Court grants Final Approval to the

Settlement, certifies the Settlement Class, and awards the fees and costs requested by Class

Counsel and the Service Awards for the representative Plaintiffs.

## BACKGROUND

The procedural and factual history of the Actions are set forth in considerable detail in

the Motion. Thus, the Court will only briefly summarize the most important aspects of that

history here. The Court is familiar with the history of the Actions, having presided over MDL

2036 for over three years. During that time, the Court has had the opportunity to observe both

Class Counsel and BOK's counsel, and the work that both have done. These attorneys, several

of whom have practiced before this Court for many years, are extremely skilled advocates, and

all of them vigorously litigated this case up to the time of the Settlement. The Settlement is quite

obviously the result of arm's-length negotiations, and the Court so finds.

In addition, the evidentiary record is more than adequate for the Court to consider the

fairness, reasonableness and adequacy of the Settlement. The fundamental question is whether

the district judge has sufficient facts before him to evaluate and intelligently and knowledgeably

to approve or disapprove the settlement. *In re General Tire & Rubber Co. Sec. Litig.*, 726 F.2d

1075, 1084 n. 6 (6th Cir. 1984) (citing *Detroit v. Grinnell*, 495 F.2d 448, 463-68 (2d Cir.1974)).

In this case, the Court clearly had such facts before it in considering the Motion, including the evidence and opinions of Class Counsel and their experts. The record is both complete and sufficient, and the Court so finds.

### 1.    Procedural History

Plaintiffs alleged a variety of business practices in the operative pleadings, including principally that BOK systemically re-sequenced Settlement Class Members' Debit Card Transactions for the sole purpose of maximizing its Overdraft Fee revenues. According to the allegations in the operative complaint, BOK's practices violated the Bank's contractual and good faith duties owed to its customers; its acts resulted in unlawful conversion of depositor property; its contractual provisions and practices were substantively and procedurally unconscionable; and its conduct violated certain state unfair trade practices statutes, and resulted in its being unjustly enriched.

BOK, in turn, vigorously contested each of these points, and raised arguments and defenses that went to the core of Plaintiffs' case. These arguments and defenses posed a potentially mortal threat to Plaintiffs' claims. BOK argued that Plaintiffs' claims were preempted by the National Bank Act ("NBA") and regulations promulgated thereunder by the Office of the Comptroller of the Currency; that its posting order and related practices were permissible under governing federal law and policy; that its Account agreements expressly authorized the posting order and overdraft practices Plaintiffs challenged; that it fully disclosed its practices to its customers; that BOK had other reasons for instituting its posting order and overdraft practices; that no unconscionability cause of action exists under Oklahoma law; that no plausible conversion claim existed because the funds in Plaintiff's Accounts were intangible, and not owned by them; that Plaintiffs could not maintain unjust enrichment claims because of the

existence of an express agreement between the Bank and its customers; and that the consumer protection claims were defective under Oklahoma law.

On August 17, 2010, Plaintiff Susan Eaton filed a Class Action Petition in District Court of Tulsa County, Oklahoma, seeking monetary damages, restitution and declaratory relief from BOK, arising from its alleged unfair assessment and collection of Overdraft Fees, captioned *Susan Eaton v. Bank of Oklahoma, N.A., et al.*, Case No. CJ-2010-5209 ("*Eaton*"). *See* Joint Declaration of Hassan Zavareei, Jeffrey M. Ostrow, Robert C. Gilbert and Burton Finkelstein ¶ 7 ("Joint Decl. ¶ __"),. (DE # 2843-2). On the same date, Plaintiff Terry Case filed a similar Class Action Complaint in United States District Court for the Western District of Oklahoma, seeking monetary damages, restitution and declaratory relief from BOK, arising from the alleged unfair assessment and collection of Overdraft Fees, captioned *Terry Case v. Bank of Oklahoma, N.A.*, W.D. OK Case No. 5:10-00901-L ("*Case*"). *Id.* at ¶ 8. On September 16, 2010, Plaintiff Bryan Ramer filed a Class Action Petition in District Court of Tulsa County, Oklahoma, also seeking monetary damages, restitution and declaratory relief from BOK, arising from its alleged unfair assessment and collection of Overdraft Fees, captioned *Bryan Ramer v. Bank of Oklahoma, N.A.*, Case No. CJ-2010-05841 ("*Ramer*"). *Id.* at ¶ 9.

On September 21, 2010, BOK moved to dismiss *Case* in the Western District of Oklahoma. *Id.* at ¶ 10. Subsequently, the district court granted Plaintiff's motion to stay proceedings pending the Judicial Panel on Multidistrict Litigation's ("JPML") ruling on BOK's motion to vacate the Conditional Transfer Order previously entered by the JPML. *Id.* On November 30, 2010, the JPML denied BOK's motion to vacate the CTO and transferred *Case* to this Court as part of MDL 2036. *Id.* BOK filed a petition for mandamus to the Eleventh Circuit Court of Appeals seeking to vacate the JPML's transfer order in *Case*. *Id.* On March 4, 2011,

the Eleventh Circuit denied the petition. *Id.* On October 19, 2011, Case filed his Amended Complaint, and the action was made part of MDL 2036's Fifth Tranche. *Id.*; (DE # 2009).

On September 21, 2010, BOK filed a motion to dismiss *Eaton* on a number of grounds, including that the state law claims were preempted by the National Bank Act ("NBA") and that the Oklahoma Consumer Protection Act ("OCPA"), breach of contract and unjust enrichment state law claims failed as a matter of law. Joint Decl. ¶ 11. On March 15, 2011, after briefing and oral argument, the state court presiding over *Eaton* dismissed Plaintiff's unjust enrichment claim, but denied BOK's motion as to Eaton's two remaining claims. *Id.* BOK filed a motion to reconsider the court's ruling on the OCPA claim, arguing that state law (specifically Okla. Stat. Ann. 15 § 754(2)) exempted Plaintiff Eaton's checking account transactions from regulation under the OCPA because they were regulated by the Office of the Comptroller of the Currency ("OCC"). *Id.* The state court denied the motion on April 14, 2011. *Id.* BOK subsequently filed a motion for summary judgment on Plaintiff's OCPA claims in *Eaton,* which were denied by the court on August 17, 2011. *Id.*

On October 18, 2010, BOK also filed a motion to dismiss in the *Ramer* action on a number of grounds, nearly identical to those raised in *Eaton. Id.* at ¶ 12. The motion to dismiss in *Ramer* was fully briefed by December 12, 2010. *Id.* On September 19, 2011, the *Ramer* and *Eaton* cases were consolidated before the *Eaton* court. *Id.* BOK's motion to dismiss was ultimately denied in its entirety by the state court without hearing on October 19, 2011, after consolidation of the *Ramer* and *Eaton* cases. *Id.*

Faced with the prospect of litigating three separate Actions against BOK in federal and state courts, counsel in *Eaton, Case* and *Ramer* agreed to coordinate the joint prosecution of the Actions to make efficient use of judicial and professional resources and to achieve the best

possible results for the Settlement Class. *Id.* at ¶ 16.

### 2. Settlement Negotiations and Terms

Class Counsel and counsel for BOK first began preliminary settlement discussions in this Action in 2011. The full history of these negotiations, including the specific terms of the Settlement, are set out in Class Counsel's Joint Declaration and in the Motion, as well as in the Settlement itself, and need not be repeated in detail here. The parties negotiated in good faith and at arm's length. But for the efforts of the Parties and the mediator, Honorable Layn Phillips, United States District Judge (Ret.), this Settlement would likely never have been achieved and the Court and the Parties would still be expending tremendous resources on these cases.

On April 13, 2012, Plaintiffs filed their Motion for Preliminary Approval of the Settlement. (DE # 2631). On April 20, 2012, this Court entered the Order Granting Preliminary Approval (DE # 2644), finding that the Settlement Class met the requirements of Fed. R. Civ. P. 23, that the Settlement was "the result of informed, good-faith, arms-length negotiations between the parties and their capable and experienced counsel" and was "not the result of collusion," that the Settlement is "within the range of reasonableness" and that it should be preliminarily approved. (DE # 2644 at 2). The Court's conclusions in this regard have not changed. If anything, these conclusions are strengthened by the extensive record evidence and expert opinions offered by Plaintiffs in support of the Motion.

Pursuant to the Preliminary Approval Order, notice of the Settlement was mailed to over 270,000 Settlement Class Members. *See* Decl. of Cameron R. Azari, Esq. (DE # 2843-4 at 6). In addition, notice of the Settlement was published in a number of regional newspapers where the Bank maintains branches. *Id.* at 8-9. A special Settlement website was also established. *Id.* at 9-10. As discussed below, the Court finds that the Notice Program was effectively executed, and

that it was more than adequate to put the Settlement Class Members on notice of the terms of the Settlement, the procedures for objecting to and opting out of the Settlement, and the rights that the Settlement Class Members will be giving up by remaining part of the Settlement. Indeed, based upon the evidence, it appears that about 89% of the Settlement Class Members received "direct mail" notice of the Settlement. *Id.* at 7.

Of particular note, Settlement Class Members do not have to submit claims or take any other affirmative step to receive relief under the Settlement. Joint Decl. ¶ 28. (DE # 2843-2). Instead, within 30 days of the Effective Date of the Settlement, BOK and the Settlement Administrator will distribute the Net Settlement Fund *pro rata* to Settlement Class Members who did not opt out of the Settlement and who are entitled to a distribution under the formula provided in the Settlement. *Id.* All that remains of the $19 million after payment of attorney fees and class service awards will be distributed - none of it will revert back to BOK.

## DISCUSSION

Federal courts have long recognized a strong policy and presumption in favor of class action settlements. The Rule 23(e) analysis should be "informed by the strong judicial policy favoring settlements as well as the realization that compromise is the essence of settlement." *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. Unit B 1982); *see also Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996). In evaluating a proposed class action settlement, the Court "will not substitute its business judgment for that of the parties; 'the only question . . . is whether the settlement, taken as a whole, is so unfair on its face as to preclude judicial approval.'" *Rankin v. Rots*, 2006 WL 1876538, at *3 (E.D. Mich. June 27, 2006) (quoting *Zerkle v. Cleveland-Cliffs Iron Co.*, 52 F.R.D. 151, 159 (S.D.N.Y. 1971)). "Settlement agreements are highly favored in the law and will be upheld whenever possible because they are a means of

amicably resolving doubts and uncertainties and preventing lawsuits." *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1105 (5th Cir. 1977).

1.    **The Court Has Personal Jurisdiction Over the Settlement Class Members Because the Settlement Class Received Adequate Notice and an Opportunity to Be Heard.**

This Court has personal jurisdiction over all of the Settlement Class Members because they received the requisite notice and due process required by the United States Supreme Court. The Court finds that the Settlement Class Members received "the best practicable" notice which was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections," and the Court so holds. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950)); *see also In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 306 (3d Cir. 1998). The Court has subject matter jurisdiction over the Action pursuant to 28 U.S.C. §§ 1332(d)(2), 1407 and, in the case of a removed Action, § 1441(a).

a.    **The Best Notice Practicable Was Provided to the Settlement Class.**

Notice of the Settlement was mailed to over 270,000 Settlement Class Members. *See* Decl. of Cameron R. Azari, Esq. (DE # 2843-4 at 6). In addition, notice of the Settlement was published in a number of popular newspapers of wide circulation covering regions with the highest concentration of BOK branches, including the *Albuquerque Journal, Dallas Morning News, Denver Post/Boulder Daily Camera Combo, Ft. Smith Times Record, Houston Chronicle, Kansas City Star, Oklahoman, Arizona Republic* and *Tulsa World. Id.* at 8-9. A special Settlement website and automated toll-free number were also established which enabled Settlement Class Members to obtain additional information about the Settlement. *Id.* at 9-10.

**b.      The Notice Was Reasonably Calculated to Inform Settlement Class Members of Their Rights.**

The Court finds that the Notice approved previously[2] was fully and properly effectuated and was sufficient to satisfy the requirements of due process because it described "the substantive claims . . . [and] contained information reasonably necessary to [allow Settlement Class Members to] make a decision to remain a class member and be bound by the final judgment." *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104-05 (5th Cir. 1977). The Notice, among other things, defined the Settlement Class, described the release as well as the amount, method and manner of proposed distribution of the Settlement proceeds, and informed Settlement Class Members of their rights to opt-out or object, the procedures for doing so, and the time and place of the Final Approval Hearing.  The Notice also informed Settlement Class Members that a class judgment would bind them unless they opted out, and told them where they could obtain more information, such as access to a full copy of the Agreement.  The Notice described in summary form the fact that Class Counsel would be seeking attorneys' fees of up to 30% of the Settlement.   Settlement Class Members were provided with the best practicable notice "reasonably calculated, under [the] circumstances, to apprise them of the pendency of the action and afford them an opportunity to present their objections." *Mullane,* 339 U.S. at 314.[3]  The content of the Notice fully complied with the requirements of Rule 23.

---

[2]  Order Granting Preliminary Approval (DE # 2644 at 2) (finding "the proposed Notice Program and proposed forms of Notice satisfy Federal Rule of Civil Procedure 23 and constitutional due process requirements, and are reasonably calculated under the circumstances to apprise the Settlement Class of the pendency of the Actions . . .").

[3]  In fact, the record reflects that the Notice was exceedingly effective. More than 89% of the Settlement Class Members received direct mail notice of the Settlement and almost 11,000 Settlement Class Members visited the settlement website and/or called the toll-free number for information. *See* Decl. of Cameron R. Azari, Esq. (DE # 2843-4 at 7).

The Settlement was widely known, and any Settlement Class Member who wished to express comments or objections had ample opportunity and means to do so. There were only ten (10) exclusion requests (two of which were duplicates) and only one (1) objection on behalf of three individuals, which was later withdrawn. *See* August 29, 2012 Final Approval Hearing Transcript (DE # 2934). The near "unanimous approval of the proposed settlements by the class members is nearly dispositive weight in this court's evaluation of the proposed settlements." *In re Art Materials Antitrust Litig.*, MDL No. 436, 100 F.R.D. 367, 372 (N.D. Ohio 1983); *see also Lipuma*, 406 F.Supp. 2d at 1324. In evaluating the fairness of a class action settlement, such overwhelming support by class members is strong circumstantial evidence supporting the fairness of the Settlement. *Mangone v. First USA Bank*, 206 F.R.D. 222, 227 (S.D. Ill. 2001); *Austin v. Penn. Dept. of Corrections*, 876 F.Supp. 1437, 1458 (E.D. Pa. 1995) ("Because class members are presumed to know what is in their best interest, the reaction of the class to the Settlement Agreement is an important factor for the court to consider.").

Here, the Notice was adequate because it informed Settlement Class Members of the principal Settlement terms, including that BOK was paying to create the $19 million Settlement Fund, and because it explained that "[p]ayments will be calculated using a formula outlined in Section XI of the Settlement Agreement," which is available on the website or upon request by calling the Settlement Administrator toll-free, and that the "formula allocates a proportional share of the Net Settlement Fund to Settlement Class Members, based on the number of Overdraft Fees each incurred due to High-to-Low Debit Card Transaction Sequencing. (DE # 2843-1 at 57). The Agreement sets forth the exact formula by which the Net Settlement Fund is to be allocated among Settlement Class Members, and as stated above, that formula was referenced in the Notice and readily available in full on the Settlement Website or upon request

from the Settlement Administrator. The Notice also explained the rights of Settlement Class Members under the Settlement, and where they could find more information, including a website containing links to the Settlement Agreement, operative complaint, Motion for Final Approval, and many other documents relevant to the Settlement and the litigation posture of the Actions. (DE # 2843-1 at 49 and 52). Class Counsel also included in the Motion their considered opinions that the Settlement represents approximately forty-six percent (46%) of the most probable damages Plaintiffs and the Settlement Class could recover at trial. Joint Decl. ¶ 68. The disclosure of this percentage was sufficient to put Settlement Class Members on notice of their potential recovery based on their personal history with BOK, and to allow them to make an informed decision about whether to accept the Settlement, object to it or opt out of it.

### 2. The Settlement Is Fair, Adequate and Reasonable.

In determining whether to approve the Settlement, the Court considers whether it is "fair, adequate, reasonable, and not the product of collusion." *Leverso v. SouthTrust Bank of Al., N.A.,* 18 F.3d 1527, 1530 (11th Cir. 1994); *see also Bennett v. Behring Corp.,* 737 F.2d 982, 986 (11th Cir. 1984). A settlement is fair, reasonable and adequate when "the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued." *In re Lorazepam & Clorazepate Antitrust Litig.,* MDL No. 1290, 2003 WL 22037741, at *2 (D.D.C. June 16, 2003) (quoting *Manual for Complex Litigation* (Third) § 30.42 (1995)). The Court is "not called upon to determine whether the settlement reached by the parties is the best possible deal, nor whether class members will receive as much from a settlement as they might have recovered from victory at trial." *In re Mexico Money Transfer Litig.,* 164 F. Supp. 2d 1002, 1014 (N.D. Ill. 2000) (citations omitted).

The Eleventh Circuit has identified six factors to be considered in analyzing the fairness,

reasonableness and adequacy of a class action settlement under Rule 23(e):

> (1) the existence of fraud or collusion behind the settlement;
>
> (2) the complexity, expense, and likely duration of the litigation;
>
> (3) the stage of the proceedings and the amount of discovery completed;
>
> (4) the probability of the plaintiffs' success on the merits;
>
> (5) the range of possible recovery; and
>
> (6) the opinions of the class counsel, class representatives, and the substance
> and amount of opposition to the settlement.

*Leverso*, 18 F.3d at 1530 n.6; *see also Bennett*, 737 F.2d at 986.

### a.      There Was No Fraud or Collusion.

As discussed above, the Court readily concludes that there was no fraud or collusion leading to this Settlement.  *See, e.g., In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1329 n.3 (S.D. Fla. 2001); *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001) (court had "no doubt that this case has been adversarial, featuring a high level of contention between the parties"); *In re Motorsports Merchandise Antitrust Litig.*, 112 F. Supp. 2d 1329, 1338 (N.D. Ga. 2000) ("[t]his was not a quick settlement, and there is no suggestion of collusion"); *Warren v. City of Tampa*, 693 F. Supp. 1051, 1055 (M.D. Fla. 1988) (record showed no evidence of collusion, but to the contrary showed "that the parties conducted discovery and negotiated the terms of settlement for an extended period of time"), *aff'd,* 893 F.2d 347 (11th Cir. 1989).  No Settlement Class Member contends otherwise.

### b.      The Settlement Will Avert Years of Highly Complex and Expensive Litigation.

This case involves over 270,000 Settlement Class Members and alleged wrongful Overdraft Fees in the tens of millions of dollars.  The claims and defenses are complex and

litigating them has been difficult and time consuming. Although this litigation has been pending for over two years, recovery by any means other than settlement would require additional years of litigation in this Court, in the Oklahoma state courts, and the appellate courts of each. *See United States v. Glens Falls Newspapers, Inc.*, 160 F. 3d 853, 856 (2d Cir. 1998) (noting that "a principal function of a trial judge is to foster an atmosphere of open discussion among the parties' attorneys and representatives so that litigation may be settled promptly and fairly so as to avoid the uncertainty, expense and delay inherent in a trial."); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. at 317, 325-26 & n.32 ("adjudication of the claims of two million claimants could last half a millennium.")

In contrast, the Settlement provides immediate and substantial benefits to over 270,000 current and former BOK customers. *See In re Shell Oil Refinery*, 155 F.R.D. 552, 560 (E.D. La. 1993) ("The Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation.") (alterations in original) (quoting *Oppenlander v. Standard Oil Co.*, 64 F.R.D. 597, 624 (D. Colo. 1974)); *see also In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) (noting that complex litigation "can occupy a court's docket for years on end, depleting the resources of the parties and taxpayers while rendering meaningful relief increasingly elusive"). Especially because the "demand for time on the existing judicial system must be evaluated in determining the reasonableness of the settlement," *Ressler v. Jacobson*, 822 F. Supp. 1551, 1554 (M.D. Fla. 1992) (citation omitted), there can be no reasonable doubt as to the adequacy of this Settlement.

The amount of the recovery is extremely reasonable in light of the risks Plaintiffs faced. Forty-six percent (46%) constitutes a very fair settlement. Since 1995, class action settlements

have typically "recovered between 5.5% and 6.2% of the class members' estimated losses." *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 715 (E.D. Pa. 2001).

The combined risks here were real and potentially catastrophic for the Class.

*First*, whether Plaintiffs' claims are preempted by the NBA and related regulations remains an open question. Despite this Court's rulings that such preemption does not apply here, *see Luquetta v. JPMorgan Chase Bank, N.A. (In re Checking Account Overdraft Litig.)*, 2011 WL 2746171, 2011 U.S. Dist. LEXIS 75782 (S.D. Fla. July 13, 2011), no federal appeals court has yet reached the NBA preemption issue in this specific context.[4]

*Second*, high-to-low posting of Debit Card Transactions is by no means clearly unlawful. The Account agreements disclose that BOK may process debits out of order and/or in high-to-low order, and the Uniform Commercial Code expressly permits the reordering of checks. *See* UCC § 4-303(b) & cmt. 7.

*Third*, although some Plaintiffs in other bank cases have achieved class certification, it is not a foregone conclusion that it would have been obtained here. BOK would undoubtedly have opposed class certification on multiple grounds, including manageability, which many other banks in this MDL have raised. Had BOK defeated class certification, the value of this case would have decreased to near zero.

          **c.**       **The Factual Record is Sufficiently Developed to Enable Plaintiffs and Class Counsel to Make a Reasoned Judgment Concerning the Settlement.**

Courts also consider "the degree of case development that class counsel have accomplished prior to settlement" to ensure that "counsel had an adequate appreciation of the

---

[4] In denying the first tranche banks' omnibus motion, this Court specifically recognized that it was only ruling in the context of a motion to dismiss or for judgment on the pleadings.

merits of the case before negotiating." *In re General Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 813 (3d Cir. 1995). At the same time, "[t]he law is clear that early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations." *Ressler*, 822 F. Supp. at 1555.

According to Class Counsel's declaration, significant investigation and discovery occurred prior to reaching the Settlement. Joint Decl. ¶¶ 13-15,17-20,26. That investigation and discovery was sufficient to give Class Counsel insight into the strengths and weaknesses of their claims against BOK. *Id.* at 21. That is, Class Counsel developed ample information and performed extensive analyses from which "to determine the probability of their success on the merits, the possible range of recovery, and the likely expense and duration of the litigation." *Mashburn v. Nat'l Healthcare, Inc.*, 684 F. Supp. 660, 669 (M.D. Ala. 1988).

The Court is satisfied that Class Counsel were sufficiently prepared to negotiate and enter into the Settlement. *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 237 (5th Cir. Unit B 1982) ("It is enough if representation of the class during the negotiations was adequate and that the settlement itself is fair.") (citations, quotation marks, and alterations omitted)).

### d.  Plaintiffs Would Have Faced Significant Obstacles to Obtaining Relief.

The Court must also consider "the likelihood and extent of any recovery from the defendants absent . . . settlement." *In re Domestic Air Transp.*, 148 F.R.D. at 314 (N.D. Ga. 1993); *see also Ressler*, 822 F. Supp. at 1555 ("A Court is to consider the likelihood of the plaintiff's success on the merits of his claims against the amount and form of relief offered in the settlement before judging the fairness of the compromise.").

Plaintiffs correctly note that they faced several major risks in this litigation, including those relating to federal preemption under the NBA and the BOK Account agreement, as

discussed above.  Absent this Settlement, this litigation would have continued for additional years, at tremendous expense to the Parties.  Given the myriad risks attending these claims, the Settlement is a fair compromise.  *See, e.g., Bennett*, 96 F.R.D. at 349-50 (plaintiffs faced a "myriad of factual and legal problems" that led to "great uncertainty as to the fact and amount of damage," which made it "unwise [for plaintiffs] to risk the substantial benefits which the settlement confers . . . to the vagaries of a trial"), *aff'd*, 737 F.2d 982 (11th Cir. 1984).

> **e.    The Benefits Provided by the Settlement Are Fair, Adequate and Reasonable When Compared to the Range of Possible Recovery.**

In determining whether a settlement is fair in light of the potential range of recovery, the Court is guided by the "important maxim[]" that "the fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate." *Behrens*, 118 F.R.D. at 542.  This is because a settlement must be evaluated "in light of the attendant risks with litigation." *Thompson v. Metropolitan Life Ins. Co.*, 216 F.R.D. 55, 64 (S.D.N.Y. 2003); *see Bennett*, 737 F.2d at 986 ("[C]ompromise is the essence of settlement."); *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("[T]he very essence of a settlement is . . . a yielding of absolutes and an abandoning of highest hopes.") (internal quotation omitted).  Thus, courts regularly find settlements to be fair where "[p]laintiffs have not received the optimal relief." *Warren*, 693 F. Supp. at 1059; *see, e.g., Great Neck Capital Appreciation Investment P'ship, L.P. v. PriceWaterHouseCoopers, L.L.P.*, 212 F.R.D. 400, 409-410 (E.D. Wis. 2002) ("The mere possibility that the class might receive more if the case were fully litigated is not a good reason for disapproving the settlement.").

The Settlement provides substantial value to the Settlement Class, and is well within the range of reasonableness.  Under the Settlement, Plaintiffs and the Settlement Class have recovered $19 million, which represents 46% of the most probable aggregate damages that could

have been recovered at a trial.  "This is an outstanding result" given that "[m]any class actions –
especially consumer class actions – generate only a small fraction of the total damages."  *See*
Decl. of Professor Geoffrey Miller in Support of Motion for Final Approval (DE # 2843-5 at 10).
The absence of a claims-made process further supports the conclusion that the Settlement is
reasonable. *Id.* at 11 (noting the significant benefit of the proposed direct distribution to
Settlement Class Members "is highly beneficial because it ensures that class members will
receive the settlement benefits without having to undertake any affirmative action – thus
optimizing recovery.")

> **f.      The Opinions of Class Counsel, Class Representatives, and Absent
> Settlement Class Members Strongly Favor Approval of the
> Settlement.**

The Court gives "great weight to the recommendations of counsel for the parties, given
their considerable experience in this type of litigation." *Warren,* 693 F. Supp. at 1060; *see also
Mashburn,* 684 F. Supp. at 669 ("If plaintiffs' counsel did not believe these factors all pointed
substantially in favor of this settlement as presently structured, this Court is certain that they
would not have signed their names to the settlement agreement."); *In re Domestic Air Transp.,*
148 F.R.D. at 312-13 ("In determining whether to approve a proposed settlement, the Court is
entitled to rely upon the judgment of the parties' experienced counsel. '[T]he trial judge, absent
fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of
counsel.'" (citations omitted)).  Class Counsel have made clear that they believe that this
Settlement is excellent and deserving of Final Approval.

> **3.      The Proposed Settlement Class Is Certified.**

This Court previously found the requirements of Rule 23(a) and 23(b)(3) satisfied in this
case. *See* Preliminary Approval Order (DE # 2644) (analyzing Rule 23 class certification factors

in granting preliminary approval).  The Court finds that: (a) the Settlement Class Members are so numerous that joinder of all Settlement Class Members is impracticable; (b) there are questions of law and fact common to the Settlement Class which predominate over individual questions; (c) the claims of the representative Plaintiffs are typical of the claims of the Settlement Class; (d) the representative Plaintiffs and Class Counsel fairly and adequately represent and protect the interests of the Settlement Class Members; and (e) a class action is superior to other available methods for the fair and efficient adjudication of the instant controversy.   Accordingly, the proposed Settlement Class is certified.[5]

### 4.     The Residual *Cy Pres* Program Is Reasonable.

The Settlement provides that funds remaining in the Settlement Fund resulting from Settlement Class Members' un-cashed checks may be paid to Settlement Class Members *pro rata* in a second distribution or distributed through a *cy pres* program as provided in the Agreement.

The *cy pres* doctrine permits courts to distribute unclaimed settlement amounts to worthy charities, especially to charities whose purposes harmonize with the underlying lawsuit.  *See, e.g., In re Motorsports Merchandise Antitrust Litig.*, 160 F. Supp. 2d 1392, 1394 (N.D. Ga. 2001) (approving *cy pres* distributions of settlement residue, stating that "[w]here settlement funds remain after distribution to class members, courts have approved charitable donations to organizations geared toward combating harms similar to those that injured the class members.  Such a donation may serve the cy pres principle of indirectly benefiting all class members.") (internal quotation marks and citation omitted).   The *cy pres* doctrine has routinely been

---

[5] The individuals listed in Exhibit A to the Final Judgment timely opted out of the Settlement, and, therefore, are not part of the Settlement Class, are not bound by the Settlement or Release contained herein, and will not receive any distribution from the Settlement Fund.

recognized in the class action settlement context when, among other circumstances, "class members are difficult to identify." *Powell v. Ga.-Pac. Corp.*, 119 F.3d 703, 706 (8th Cir. 1997). When the *cy pres* doctrine is employed by settling parties, the funds "should be distributed for a purpose as near as possible to the legitimate objectives underlying the lawsuit, the interests of class members, and the interests of those similarly situated." *In re Infant Formula Multidistrict Litig.*, No. 4:91-CV-00878-MP, 2005 WL 2211312, at *1 (N.D. Fla. Sept. 8, 2005); *In re Airline Ticket Comm'n Antitrust Litig.*, 307 F.3d 679, 683 (8th Cir. 2002).

The Court finds that the proposal here comports with the law regarding *cy pres* and is approved. The American Law Institute recommends *cy pres* distributions "only when direct distributions to class members are not feasible—either because class members cannot be reasonably identified or because distribution would involve such small amounts that, because of the administrative costs involved, such distribution would not be economically viable." American Law Institute, *Principles of the Law: Aggregate Litigation* § 3.07, cmt. b (2010). In the event the funds are distributed through a *cy pres* program, the Court agrees that it is reasonable to direct any remaining funds to respected organizations that promote financial literacy. The Agreement's *cy pres* provisions are fully consistent with the law of *cy pres*, under which courts have approved settlements awarding class members nothing and allocating the entire fund to charities whose missions harmonize with the purposes of the suit. *Shepherd Park Citizens Ass'n v. Gen. Cinema Beverages of Wash., D.C., Inc.*, 584 A.2d 20, 25 (D.C. 1990).[6]

---

[6] *See also New York by Vacco v. Reebok Int'l*, 903 F. Supp. 532 (S.D.N.Y. 1995), *aff'd*, 96 F.3d 44 (2d Cir. 1996) (settlement distributed to state athletic activities and facilities); *In re Toys R Us Antitrust Litig.*, 191 F.R.D. 347 (E.D.N.Y. 2000) (settlement distributed $37 million in new toys through the Toys for Tots program and established a $20 million fund to buy books and computers for schools); *In re Vitamins Cases*, 107 Cal. App. 4th 820 (Cal. Ct. App. 2003) (affirming *cy pres* award of an entire settlement).

**5.     The Application for Service Awards to the Class Representatives is Approved.**

Service awards "compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1218 (S.D. Fla. 2006). "[T]here is ample precedent for awarding incentive compensation to class representatives at the conclusion of a successful class action." *David v. American Suzuki Motor Corp.*, 2010 WL 1628362, at *6 (S.D. Fla. Apr. 15, 2010). Courts have consistently found service awards to be an efficient and productive way to encourage members of a class to become class representatives. *See, e.g., Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 694 (N.D. Ga. 2001) (awarding class representatives $300,000 each, explaining that "the magnitude of the relief the Class Representatives obtained on behalf of the class warrants a substantial incentive award."); *Spicer v. Chi. Bd. Options Exchange, Inc.*, 844 F. Supp. 1226, 1267-68 (N.D. Ill. 1993) (collecting cases approving service awards ranging from $5,000 to $100,000, and awarding $10,000 to each named plaintiff).

The factors for determining a service award include: (1) the actions the class representatives took to protect the interests of the class; (2) the degree to which the class benefited from those actions; and (3) the amount of time and effort the class representatives expended in pursuing the litigation. *See, e.g., Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998). The Court notes that the class representatives expended time and effort in meeting their fiduciary obligations to the Class, and deserve to be compensated for it. Accordingly, the Court authorizes service awards of $5,000 per representative Plaintiff, to be paid from the Settlement Fund.

**6.     Class Counsel's Application for Attorneys' Fees and Expenses is Granted.**

Class Counsel request a fee equal to thirty percent (30%) of the common fund created

through their efforts in litigating this case and reaching the Settlement, net of certain expenses identified in the Agreement. The Court analyzes this fee request under the Eleventh Circuit's decision in *Camden I Condominium Assn. v. Dunkle*, 946 F.2d 768 (11th Cir. 1991). Having done so below, the Court readily concludes that each of the *Camden I* factors supports Class Counsel's fee request, and the Court will therefore award the fee sought.

### a.    The Law Awards Class Counsel Fees From the Common Fund Created Through Their Efforts.

It is well established that when a representative party has conferred a substantial benefit upon a class, counsel is entitled to an allowance of attorneys' fees based upon the benefit obtained. *Camden I,* 946 F.2d at 771; *Boeing Co. v. Van Gemert,* 444 U.S. 472, 478 (1980). The common benefit doctrine is an exception to the general rule that each party must bear its own litigation costs. The doctrine serves the "twin goals of removing a potential financial obstacle to a plaintiff's pursuit of a claim on behalf of a class and of equitably distributing the fees and costs of successful litigation among all who gained from the named plaintiff's efforts." *In re Gould Sec. Litig.,* 727 F. Supp. 1201, 1202 (N.D. Ill. 1989) (citation omitted); *see also Ramey,* 508 F.2d at 1195. The common benefit doctrine recognizes that those who receive the benefit of a lawsuit without contributing to its costs are "unjustly enriched" at the expense of the successful litigant. *Boeing,* 444 U.S. at 478; *Mills,* 396 U.S. at 392. The Supreme Court, the Eleventh Circuit, and courts in this District have all noted that "[a] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as whole." *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1333 (S.D. Fla. 2001) (citing *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980)); *see also Camden I,* 946 F.2d at 771 ("Attorneys in a class action in which a common fund is created are entitled to compensation for their services from the common fund, but the amount is subject to court approval.").

In the Eleventh Circuit, class counsel is awarded a percentage of the fund generated through a class action settlement. In *Camden I*, the Eleventh Circuit held that "the percentage of the fund approach [as opposed to the lodestar approach] is the better reasoned in a common fund case. Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." *Camden I*, 946 F.2d at 774.

This Court has substantial discretion in determining the appropriate fee percentage awarded to counsel. "There is no hard and fast rule mandating a certain percentage of a common fund which may be awarded as a fee because the amount of any fee must be determined upon the facts of each case." *In re Sunbeam*, 176 F. Supp. 2d at 1333 (quoting *Camden I*, 946 F.2d at 774). Nevertheless, "[t]he majority of common fund fee awards fall between 20 percent to 30 percent of the fund," although "an upper limit of 50 percent of the fund may be stated as a general rule." *Id.* (quoting *Camden I*, 946 F.2d at 774-75); *see also Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291 (11th Cir. 1999) (approving fee award where the district court determined that the benchmark should be 30 percent and then adjusted the fee award higher based on the circumstances of the case).

The Court finds, for the reasons set forth below, that Class Counsel are entitled to an award of 30% of the Settlement Fund. Class Counsel achieved an excellent result and overcame numerous procedural and substantive hurdles to obtain the Settlement for the Settlement Class. As Class Counsel's expert has noted, Class Counsel undertook a risky and undesirable case, and through their diligence, perseverance and skill, obtained an outstanding result for the Class. (DE # 2843-6 at 15). Class Counsel are to be commended for such an excellent result, and should be compensated in accord with their request because it is warranted and reasonable given similar fee

awards. *Id.* That kind of initiative and skill must be adequately compensated to insure that counsel of this caliber is available to undertake these kinds of risky but important cases in the future. *See Muehler v. Land O'Lakes, Inc.*, 617 F. Supp. 1370, 1375-76 (D. Minn. 1985).

      **b.**    **The *Camden I* Factors.**

The Eleventh Circuit's factors for evaluating the reasonable percentage to award class-action counsel are:

    (1) the time and labor required;

    (2) the novelty and difficulty of the questions involved;

    (3) the skill requisite to perform the legal service properly;

    (4) the preclusion of other employment by the attorney due to acceptance of the case;

    (5) the customary fee;

    (6) whether the fee is fixed or contingent;

    (7) time limitations imposed by the client or the circumstances;

    (8) the amount involved and the results obtained;

    (9) the experience, reputation, and ability of the attorneys;

    (10) the "undesirability" of the case;

    (11) the nature and the length of the professional relationship with the client;

    (12) awards in similar cases.

*Camden I*, 946 F.2d at 772 n.3 (citing factors originally set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)).

These twelve factors are not exclusive. "Other pertinent factors are the time required to reach a settlement, whether there are any substantial objections by class members or other parties

to the settlement terms or the fees requested by counsel, any non-monetary benefits conferred upon the class by the settlement, and the economics involved in prosecuting a class action." *In re Sunbeam*, 176 F. Supp. 2d at 1333 (quoting *Camden I*, 946 F.2d at 775).   These factors are merely guidelines, and the Eleventh Circuit has "encouraged the lower courts to consider additional factors unique to the particular case." *Id.* (quoting *Walco Inv., Inc. v. Thenen*, 975 F. Supp. 1468, 1472 (S.D. Fla. 1997)).

### i.   The Claims Against BOK Required Substantial Time and Labor.

As Class Counsel point out, prosecuting and settling the claims in the Actions demanded considerable time and labor.  Joint Dec. ¶¶ 13-15.  Class Counsel spent many hours researching and investigating the claims of potential plaintiffs against BOK.  *Id.* at ¶ 13.  Class Counsel note that this information was essential to their ability to understand the nature of BOK's conduct, the language of the account agreements at issue, and potential remedies.  *Id.*

Class Counsel obtained, reviewed, sorted and analyzed dozens of BOK Account agreements.  *Id.*  Class Counsel also expended significant resources researching and developing the legal claims at issue.  *Id.* at ¶ 14.  Following the research, drafting and filing of the initial complaints in both federal and state court in Oklahoma, Class Counsel had to contend with motions to dismiss, and a motion opposing transfer of the *Case* action to MDL 2036 and a petition for mandamus to the Eleventh Circuit Court of Appeals in connection with the transfer order, and a motion to dismiss and motion for summary judgment in the *Eaton* action.  *Id.* at ¶¶ 10-12. Substantial legal research and time were necessary to oppose those motions.  *Id.* at ¶ 15.

Once discovery began, BOK produced over 25,000 pages of documents in response to Plaintiffs' discovery requests.  *Id.* at ¶ 18.  Class Counsel and their document review team reviewed the entire production and identified material documents in preparation for depositions,

class certification briefing, and dispositive motions. *Id.* at ¶ 19. Thereafter, Class Counsel took the deposition of one of BOK's top bank executives. *Id.*

On November 11, 2011, Class Counsel participated in a full day of mediation in Tulsa, Oklahoma. *Id.* at ¶ 22. After the parties eventually executed an MOU in connection with the Settlement, Class Counsel engaged in extensive discussions over the terms of the Settlement Agreement. *Id.* at ¶ 26.

Based upon the excellent results obtained here, the Court does not find it necessary to evaluate Class Counsel's timesheets. The Eleventh Circuit made clear in *Camden I* that percentage of the fund is the exclusive method for awarding fees in common fund class actions. *Camden I*, 946 F.2d at 774.[7] Even before *Camden I*, courts in this Circuit recognized that "a percentage of the gross recovery is the only sensible method of awarding fees in common fund cases." *Mashburn v. Nat'l Healthcare, Inc.*, 684 F. Supp. 660, 690 (M.D. Ala. 1988). More importantly, the Court observed first-hand the effort exerted by Class Counsel in this case and the other bank cases, and because of the excellent results achieved here, does not find it necessary or useful to review Class Counsel's lodestar.

Lodestar "creates an incentive to keep litigation going in order to maximize the number of hours included in the court's lodestar calculation." *In re Quantum Health Resources, Inc.*, 962 F. Supp. 1254, 1256 (C.D. Cal. 1997). In *Camden I*, the Eleventh Circuit criticized lodestar and

---

[7] Eleventh Circuit attorneys' fee law governs this request. *See Allapattah Servs., Inc.*, 454 F. Supp. 2d at 1200 ("[t]he district court presiding over a diversity-based class action pursuant to Fed. R. Civ. P. 23 has equitable power to apply federal common law in determining fee awards irrespective of state law."); *see also Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 522 n. 5 (1st Cir. 1991) (recognizing that district court presiding over diversity-based class action has equitable power to apply federal common law in determining fee award irrespective of state law); *Clark Equip. Co. v. Armstrong Equip. Co.*, 431 F.2d 54, 57 (5th Cir. 1970) (*Erie* doctrine does not deprive federal court in diversity case from power to employ equitable remedies not available under state law).

the inefficiencies that it creates.  946 F.2d at 773-75.  In so doing, the court "mandate[d] the *exclusive* use of the percentage approach in common fund cases, reasoning that it more closely aligns the interests of client and attorney, and more faithfully adheres to market practice." *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000) (emphasis added); *see also* Alba Conte, *Attorney Fee Awards* § 2.7, at 91 fn. 41 ("The Eleventh . . . Circuit[] repudiated the use of the lodestar method in common-fund cases").  Under *Camden I*, courts in this Circuit regularly award fees based on a percentage of the recovery, without discussing lodestar at all. *See, e.g., David v. American Suzuki Motor Corp.*, 2010 WL 1628362 (S.D. Fla. Apr. 15, 2010).[8] "[A] common fund is itself the measure of success and represents the benchmark on which a reasonable fee will be awarded. . . . In this context, monetary results achieved predominate over all other criteria." *Camden I*, 946 F.2d at 774 (citations and alterations omitted).  This Court will not deviate from that approach, for all of the reasons set forth above and in the analyses presented in Plaintiffs' expert declarations.

### ii.    The Issues Involved Were Novel and Difficult and Required the Exceptional Skill of a Highly Talented Group of Attorneys

As the Court has noted, the attorneys on both sides of this case displayed an exceptional amount of skill in litigating on behalf of their clients.  *See Walco*, 975 F. Supp. at 1472 (explaining that "[g]iven the quality of defense counsel from prominent national law firms, the Court is not confident that attorneys of lesser aptitude could have achieved similar results"); *see also Camden I*, 946 F.2d at 772 n.3 (in assessing the quality of representation by class counsel, the Court also should consider the quality of their opposing counsel.); *Johnson*, 488 F.2d at 718;

---

[8] *See also Stahl v. MasTec, Inc.*, 2008 WL 2267469 (M.D. Fla. May 20, 2008); *Sands Point Partners, L.P. v. Pediatrix Med. Group, Inc.*, 2002 WL 34343944 (S.D. Fla. May 3, 2002); *Fabricant v. Sears Roebuck & Co.*, 2002 WL 34477904 (S.D. Fla. Sept. 18, 2002).

*Ressler v. Jacobson,* 149 F.R.D. 651, 654 (M.D. Fla. 1992). Class Counsel's work is emblematic of the effort and outcomes witnessed by this Court on a regular basis in this MDL. Nor can there be any legitimate dispute that, based on the novel and very complex issues confronted by Class Counsel in this case, detailed here and elsewhere, that an extraordinary group of lawyers was required to prosecute this case. The Court knows many of these lawyers from years of presiding over cases in this district, and has come to expect this level of performance from them. That is not to say, however, that such performance should be taken for granted. Instead, the fact that this level of legal talent was available to the Settlement Class is another compelling reason in support of the fee requested. As with most things, you get what you pay for, and the Settlement Class received a truly impressive amount and quality of legal services. In the private marketplace, as pointed out by several of Class Counsel's experts, counsel of exceptional skill commands a significant premium. So it must be here.

### iii.      The Claims Against BOK Entailed Considerable Risk.

The risks involved in this case from the Plaintiffs' perspective have been discussed at length above, in the Motion, and elsewhere. There were any number of ways that Plaintiffs could have lost this case, and they still managed to achieve a successful Settlement. A significant amount of the credit for this must be given to Class Counsel's strategy choices, effort and legal acumen.

"A court's consideration of this factor recognizes that counsel should be rewarded for taking on a case from which other law firms shrunk. Such aversion could be due to any number of things, including social opprobrium surrounding the parties, thorny factual circumstances, or the possible financial outcome of a case. All of this and more is enveloped by the term 'undesirable.'" *In re Sunbeam*, 176 F. Supp. 2d at 1336. In addition, "[t]he point at which

plaintiffs settle with defendants . . . is simply not relevant to determining the risks incurred by their counsel in agreeing to represent them." *Skelton v. General Motor Corp.*, 860 F.2d 250, 258 (7th Cir. 1988), *cert. denied*, 493 U.S. 810 (1989).  "Undesirability" and relevant risks must be evaluated from the standpoint of plaintiffs' counsel as of the time they commenced the suit, not retroactively, with the benefit of hindsight. *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 112 (3d Cir. 1976); *Walco*, 975 F. Supp. at 1473.

The most undesirable part of this case was the long odds on success.  Class Counsel had to fight federal preemption of Plaintiffs' state law claims and the language in BOK's deposit agreement.  The Court expresses no opinion on the merits of these arguments by this or any other defendant.  The critical point for present purposes is that, heading into this case, Class Counsel were staring down the barrel of these issues without any assurances whatsoever as to how the Court would rule.  Class Counsel accepted these cases nonetheless, and the risks that went with them.  As discussed above, given the positive societal benefits to be gained from lawyers' willingness to undertake difficult and risky, yet important, work like this, such decisions must be properly incentivized.  The Court believes, and holds, that the proper incentive here is a thirty percent (30%) fee.

### iv.     Class Counsel Assumed Substantial Risk to Pursue the Actions on a Pure Contingency Basis, and Were Precluded From Other Employment as a Result.

Class Counsel prosecuted the Actions entirely on a contingent fee basis. Joint Decl. ¶ 64. In undertaking to prosecute this complex action on that basis, Class Counsel assumed a significant risk of nonpayment or underpayment.  *Id.*  Numerous cases recognize that the contingent fee risk is an important factor in determining the fee award.  "A contingency fee arrangement often justifies an increase in the award of attorney's fees."  *In re Sunbeam*, 176 F.

Supp. 2d at 1335 (quoting *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 548 (S.D. Fla. 1988), aff'd, 899 F.2d 21 (11th Cir. 1990)); *see also In re Continental Ill. Sec. Litig.*, 962 F.2d 566 (7th Cir. 1992) (holding that when a common fund case has been prosecuted on a contingent basis, plaintiffs' counsel must be compensated adequately for the risk of non-payment); *Ressler*, 149 F.R.D. at 656 ("Numerous cases recognize that the attorney's contingent fee risk is an important factor in determining the fee award."); *Walters v. Atlanta,* 652 F. Supp. 755, 759 (N.D. Ga. 1985), *modified,* 803 F.2d 1135 (11th Cir.); *York v. Alabama State Bd. of Education,* 631 F. Supp. 78, 86 (M.D. Ala. 1986).  As this Court has observed:

> Generally, the contingency retainment must be promoted to assure representation when a person could not otherwise afford the services of a lawyer. . . . A contingency fee arrangement often justifies an increase in the award of attorney's fees. This rule helps assure that the contingency fee arrangement endures. If this "bonus" methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing.

*Behrens,* 118 F.R.D. at 548.  The risks taken by Class Counsel have been discussed.  It is uncontroverted that the time spent on the Actions was time that could not be spent on other matters.  Joint Decl. ¶ 67.  This factor also supports the requested fee.

### v.    Class Counsel Achieved an Excellent Result.

The Settlement is an excellent result.  The Settlement obtains immediate relief for over 270,000 Settlement Class Members who have already waited years for this result.  This is one of the occasions when "an early resolution may demonstrate that the parties and their counsel are well prepared and well aware of the strength and weaknesses of their positions and of the interests to be served by an amicable end to the case." *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, MDL No. 2147, 2011 WL 2204584 (N.D. Ill. June 2, 2011) (citations omitted).

vi.     **The Requested Fee Comports with Customary Fees Awarded in Similar Cases.**

This Court has previously awarded thirty percent (30%) in attorneys' fees in the Bank of America case (*In re Checking Account Overdraft Litigation*, 830 F. Supp. 2d. 1330, 1359 (S.D. Fla. 2011) and twenty-seven and one half percent (27.5%) in the Iberiabank case. (DE # 2657). Additionally, numerous recent decisions within this Circuit have awarded attorneys' fees up to (and at times in excess of) thirty percent. *See Allapattah Servs., Inc.*, 454 F. Supp. 2d at 1191-92, 1204 (awarding fees of 31 1/3 % of $1.06 billion); *In re: Terazosin Hydrochloride Antitrust Litigation*, 99-1317-MDL-Seitz (S.D. Fla. April 19, 2005) (awarding fees of 33 1/3 % of settlement of over $30 million); *In re: Managed Care Litig. v. Aetna*, MDL No. 1334, 2003 WL 22850070 (S.D. Fla. Oct. 24, 2003) (awarding fees and costs of 35.5% of settlement of $100 million); *Gutter v. E.I. Dupont De Nemours & Co.*, 95-2152-Civ-Gold (S.D. Fla. May 30, 2003) (awarding fees of 33 1/3 % of settlement of $77.5 million); *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291 (11th Cir. 1999) (affirming fee award of 33 1/3 % of settlement of $40 million); *see also* Decl. of Thomas E. Scott in Support of Plaintiff's Motion for Final Approval (DE # 2843-6 at ¶ 23).

The Court is convinced that a fee of thirty percent (30%) plus expenses is appropriate here, and comports with customary fee awards in similar cases.  Professor Miller observes, "…considering the risks and other factors involved, it is my opinion that the settlement proposed with Bank of Oklahoma is fair, adequate and reasonable for the class, and that an award of attorneys' fees equal to 30% of the class recovery is within the range of reason." Decl. of Prof. Geoffrey Miller (DE # 2843-5 at ¶ 10).  Further, the award "is consistent with the results of several studies that provide information about fee awards as percentages of the recovery in class action cases. *Id.* at ¶ 42.  The myriad risks of this litigation, considered together, more than

30

justify a thirty percent fee.

### vii.    The Remaining *Camden I* Factors Also Favor Approving Class Counsel's Fee Request.

The Court finds that the remaining *Camden I* factors support Class Counsel's fee request, and so holds.  The burdens of this litigation and the relatively small size of most of the firms representing Plaintiffs weigh in favor of the fee requested. Joint Decl. ¶ 70.  The fee request is firmly rooted in "the economics involved in prosecuting a class action." *See In re Sunbeam*, 176 F. Supp. 2d at 1333.  The Court is convinced by its many years of presiding over significant cases like this one that proper incentives must be maintained to insure that attorneys of this caliber are available to take on cases of significant public importance like this one.  The factual record in this case, and the Court's own observations, all of which are incorporated into this Order, compel this result.

### viii.    Expenses Incurred by Class Counsel are Reasonable

The Court finds that Class Counsel's request for reimbursement of $78,136.78 in expenses to be reasonable as they were necessarily incurred in furtherance of the litigation of the Actions and the Settlement.  Joint Decl. ¶ 71.  Therefore, reimbursement of this amount shall be made from the Settlement Fund after payment of attorneys' fees.

### CONCLUSION

For the reasons detailed above, the Court: (1) grants Final Approval to the Settlement; (2) certifies for settlement purposes the Settlement Class pursuant to Federal Rules of Civil Procedure 23(a), (b)(3) and (e); (3) appoints Plaintiffs Terry Case, Susan Eaton and Bryan Ramer as class representatives for this Settlement; (4) appoints as Class Counsel the attorneys and law firms listed in paragraph 19 of the Agreement; (5) awards Service Awards to the class representatives in the amount of $5,000 each; (6) awards Class Counsel attorneys' fees equal to

thirty percent (30%) of the Settlement Fund and reimbursement of costs of $78,136.78; (7) approves Settlement Class Members' Ryan A. Hickman, Rachel E. McGuire, and James R. Turner withdrawal of their objection (DE # 2873 and DE # 2876); (8) directs Class Counsel, Plaintiffs, and BOK to implement and consummate the Settlement according to its terms and conditions; (9) retains continuing jurisdiction over Plaintiffs, the Settlement Class, and BOK to implement, administer, consummate and enforce the Settlement and this Final Approval Order; and (10) will separately enter Final Judgment dismissing the Action with prejudice.

**DONE and ORDERED** in Chambers at the James Lawrence King Federal Justice Building and United States Courthouse in Miami, Florida, this 13th day of September, 2012.

**JAMES LAWRENCE KING**
**UNITED STATES DISTRICT JUDGE**
**SOUTHERN DISTRICT OF FLORIDA**

cc:  All Counsel of Record