UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:09-MD-02036-JLK

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

THIS DOCUMENT RELATES TO:
FIRST TRANCHE ACTION

*Larsen v. Union Bank, N.A.*
S.D. Fla. Case No. 1:09-cv-23235-JLK
N.D. Cal. Case No. 4:09-cv-3250

ORDER OF FINAL APPROVAL OF SETTLEMENT, AUTHORIZING SERVICE
AWARDS, AND GRANTING APPLICATION FOR ATTORNEYS' FEES

On July 30, 2012, Plaintiffs filed their Motion for Final Approval of Settlement,

Application for Service Awards, Class Counsel's Application for Attorneys' Fees and Expenses,

and Incorporated Memorandum of Law (DE # 2859) ("Motion"), seeking Final Approval of the

Settlement with Union Bank, N.A. ("Union" or "Bank").[1]  In support, Plaintiffs filed two

affidavits from experts in class action law, as well as three affidavits supplementing the factual

record to enable the Court to evaluate the fairness and adequacy of this Settlement.  Two

objections to the Settlement were filed, and each was subsequently withdrawn. (DE # 2918, 2935.)

This matter came before the Court on September 13, 2012, for a Final Approval Hearing pursuant

---

[1] This Order incorporates the definitions of the terms used in the Settlement Agreement and
Release of April 2012 ("Agreement" or "Settlement") (DE # 2859–1).

to the Court's Preliminary Approval Order dated April 26, 2012 (DE # 2659).  The Court reviewed all of the filings related to the Settlement and heard argument on the Motion.

After careful consideration, the Court has determined that this Settlement provides a strong recovery for Settlement Class Members ($35 million, or 63% of the likely value of their claims) and constitutes an excellent result for the Settlement Class under all of the circumstances and challenges presented by the Action.  The Court specifically finds that the Settlement is fair, reasonable and adequate, and a satisfactory compromise of the Settlement Class Members' claims. The Settlement fully complies with Fed. R. Civ. P. 23(e), and, thus, the Court grants Final Approval to the Settlement, certifies the Settlement Class, and awards the fees and costs requested by Class Counsel as well as the requested Service Awards for the representative Plaintiffs.

## BACKGROUND

The Court is familiar with the history of this consumer case against Union Bank, having presided over MDL 2036 for over three years.  During that time, the Court has had ample opportunity to observe Class Counsel and Union Bank's counsel in action.  These attorneys, several of whom have practiced before this Court for many years, are extremely skilled advocates, and all of them vigorously litigated this case up to the time of the Settlement.  The Settlement is quite obviously the result of arm's-length negotiations, and the Court so finds.

The present evidentiary record is more than adequate for the Court to consider the fairness, reasonableness and adequacy of the Settlement.  A fundamental question is whether the district judge has sufficient facts before him to evaluate and intelligently and knowledgeably  approve or disapprove the settlement. *In re General Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1084 n.6 (6th Cir. 1984) (citing *Detroit v. Grinnell*, 495 F.2d 448, 463-68 (2d Cir. 1974)).  In this case, the Court clearly has such facts before it in considering the Motion, including the evidence and

opinions of Class Counsel and their experts.

     1.     **Factual and Procedural Background of the Action.**

     Plaintiffs brought this Action seeking monetary damages, restitution and declaratory relief based on Union's Debit Re-sequencing practices that Plaintiffs claim were designed to increase the number of Overdraft Fees its customers incurred. *See generally Larsen* Second Amended Class Action Complaint (DE # 349). Plaintiffs alleged that as a result of Union's manipulation of the order in which customers' Debit Card Transactions were posted, customers' funds were depleted more rapidly than they should have been, and Plaintiffs and class members paid more Overdraft Fees than they should have paid. (*Id.*)

     Union denied all of Plaintiffs' allegations. The bank consistently defended its conduct by, *inter alia*, highlighting language in the relevant account agreements that it contends expressly advises customers of, and permits, the Debit Re-sequencing practices at issue. (Joint Declaration of Robert C. Gilbert and Michael W. Sobol ("Joint Decl."), ¶ 5 (DE # 2859–2).) Union also contended that Plaintiffs' claims are wholly preempted by the National Bank Act (NBA). In addition, Union advanced several other defenses, including that the Uniform Commercial Code (UCC) endorses the Debit Re-sequencing practices at issue, that Plaintiffs cannot maintain common law unconscionability, conversion or unjust enrichment claims, and that Plaintiffs' state statutory claims fail. (Joint Decl. ¶ 6.)

     On July 16, 2009, plaintiff Cynthia Larsen filed a Class Action Complaint against Union Bank in the United States District Court for the Northern District of California seeking monetary damages, restitution and declaratory relief, based on the alleged unfair assessment and collection of Overdraft Fees. *See Cynthia Larsen, et al. v. Union Bank, N.A.*, N.D. Cal. Case No. 4:09-cv-3250-PJH ("*Larsen*"). On October 14, 2009, the Judicial Panel on Multidistrict Litigation

transferred *Larsen* to this Court for inclusion in MDL 2036.  The claims against Union Bank proceeded as part of MDL 2036's First Tranche.  On November 9, 2009, Plaintiffs filed a First Amended Complaint.  (DE # 138.)

Soon thereafter, Union, joined by the other First Tranche defendants – Bank of America, N.A.; Citibank, N.A.; JPMorgan Chase Bank, N.A.; Wells Fargo Bank, N.A.; Wachovia Bank, N.A.; and U.S. Bank, N.A. – filed a lengthy Omnibus Motion to Dismiss and/or for Judgment on the Pleadings.  (DE # 217.)  Union's two primary arguments focused on federal preemption under the NBA and the language in its account agreement.  Plaintiffs submitted a lengthy brief in opposition.  (DE # 265.)  An all-day argument concerning the Omnibus Motion took place before this Court on February 25, 2010.  (DE # 294).  On March 11, 2010, this Court ruled on the Omnibus Motion, denying it in part and granting it in part. *See In re Checking Account Overdraft Litigation*, 694 F. Supp. 2d 1302 (S.D. Fla. 2010) (DE # 305).

On April 12, 2010, Plaintiffs filed their Second Amended Complaint against Union Bank. (DE # 349).  Three additional Class Representatives were named: Cheryl Brown, Kristian Logan, and Josh Naehu-Reyes.  On May 21, 2010, Union answered.  (DE # 500).

Discovery in the First Tranche actions had been stayed – at the banks' request – pending resolution of the Omnibus Motion.  On May 13, 2010, the Court lifted the stay of discovery and entered a comprehensive Scheduling Order.  (DE # 463).  That same day, Plaintiffs served written discovery requests on the First Tranche banks, including Union, seeking probative documents and information in their possession.  (Joint Decl. ¶ 11.)  Union, like certain other banks, refused to produce various categories of discovery material.  (Joint Decl. ¶ 22.)  As a result, on July 16, 2010, Plaintiffs moved to compel discovery from several banks, including Union (DE # 691), and the Court eventually overruled most of Union's objections.  (Joint Decl. ¶ 22.)  Also on July 16, 2010,

the Parties entered into a Stipulated Protective Order governing the production of documents and information. (Joint Decl. ¶ 11.)

On July 19, 2010, the Eleventh Circuit issued *Cappuccitti v. DirecTV, Inc.*, 611 F.3d 1252 (11th Cir. 2010). *Cappuccitti* created delay and uncertainty in this Action for months, and placed the viability of these claims in doubt. The original panel decision held that, under the Class Action Fairness Act of 2005, a court lacks jurisdiction over a claim originally filed in federal court unless at least one of the plaintiffs alleges an amount in controversy exceeding $75,000. On September 8, 2010, this Court stayed all MDL 2036 litigation pending the outcome of motions for rehearing and rehearing *en banc* in *Cappuccitti*. (DE # 790). Only after the panel vacated its original decision, on October 15, 2010, could this litigation resume. *See Cappuccitti v. DirecTV, Inc.*, 623 F.3d 1118 (11th Cir. 2010).

Discovery intensified after the *Cappuccitti* detour. On January 26, 2011, Plaintiffs served Union Bank with a Second Request for Production of Documents. Over the course of this Action, Union produced approximately 1,200,000 pages of internal documents, and deposed all four (4) of the class representatives. Class Counsel deposed fifteen (15) Union current and former employees and officers. Class Counsel also subpoenaed documents from a third party consultant of Union, CAST Management Consultants, Inc. (Joint Decl. ¶¶ 11, 13.)

By August 1, 2010, partly as a result of this Action, Union Bank modified some of its checking account policies and practices with regard to its consumer DDA accounts so that debit and ATM transactions in such accounts are now generally posted from *lowest to highest* dollar amount. (Joint Decl. ¶ 12.)

On January 28, 2011, Plaintiffs moved to amend the operative complaint to add a claim under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1691, *et seq.*

5

("RICO"). (DE # 1113.) By Order dated March 21, 2011, the Court granted the motion to amend, and on March 29, 2011, Plaintiffs filed their Third Amended Complaint. (DE # 1316, 1317). On April 20, 2011, Union moved to dismiss the RICO claim in the Third Amended Complaint. (DE # 1355). On July 13, 2011, the Court granted the motion to dismiss the RICO claim. (DE # 1726.)

On April 25, 2011, Plaintiffs filed their Motion for Class Certification, which was extensively briefed by both sides. This Court heard argument on July 13, 2011. On July 25, 2011, the Court entered an Order Granting Class Certification. (DE # 1763). On July 27, 2011, Union Bank, pursuant to Fed. R. Civ. P. 23(f), petitioned the United States Court of Appeals for the Eleventh Circuit for permission to appeal the Order Granting Class Certification. Plaintiffs and the certified class filed an opposition and, on October 7, 2011, the Eleventh Circuit denied Union's petition. (Joint Decl. ¶ 15.)

On August 18, 2011, Plaintiffs served upon Union their Third Request for Production, seeking all applicable transactional data for class members covering the Class Period. (Joint Decl. ¶ 16.) Union thereafter produced applicable transaction data customer data for analysis by Class Counsel's expert, Arthur Olsen. Mr. Olsen conducted an exhaustive analysis of the Union transactional data and determined the total amount of Overdraft Fees that Plaintiffs contend were sustained by members of the certified class as a result of Union's Debit Re-sequencing practices. (Joint Decl. ¶ 16; *see also* Declaration of Arthur Olsen, ¶¶ 21–35 (DE # 2859–4).) In addition to Mr. Olsen's work, Class Counsel began preparing for pretrial expert disclosures in accord with the Court's Scheduling Order applicable to the First Tranche actions. (Joint Decl. ¶ 16.)

### 2. Settlement Negotiations and Proceedings.

The Parties first engaged in settlement discussions in early 2011, and ultimately participated in two (2) formal mediation sessions under the auspices of Professor Eric D. Green of

Resolutions, LLC.  The first mediation session was held on April 6, 2011 and ended without success.  (Joint Decl. ¶ 17 (DE # 2859–2).)  The litigation continued as described above.  On November 1, 2011, after the class had been certified, the Eleventh Circuit had denied Union's Rule 23(f) petition, virtually all fact discovery had been completed, and Mr. Olsen had completed his damage analysis – and on the eve of serving expert disclosures – the Parties participated in a second formal mediation session with Professor Green.  The negotiations continued to be adversarial and hotly contested, but this time the Parties were able to reach an agreement in principle to resolve the Action.  The Parties signed a memorandum of understanding that memorialized their good-faith intention to fully, finally, and forever resolve the claims of the Settlement Class Members.  (Joint Decl. ¶ 17.)

On November 2, 2011, the Parties filed a Notice of Settlement with the Court.  Several months of intense negotiations regarding the specific terms of the Agreement followed.  The Agreement was signed between April 6 and 9, 2012.  (Joint Decl. ¶¶ 18–19.)

On April 24, 2012, Plaintiffs filed their Motion for Preliminary Approval of the Settlement.  (DE # 2654).  On April 26, 2012, the Court entered an Order Granting Preliminary Approval, and on June 20, 2012, amended that Order to correct a scrivener's error.  (DE # 2659, 2778.)  Pursuant to the Preliminary Approval Order, on May 24, 2012, Notice of the Settlement was mailed to 307,324 members of the Settlement Class.  (Declaration of Joel Botzet ("Botzet Decl."), ¶ 8 (DE # 2859–3).)  Notice of the Settlement was also published in the *Los Angeles Times*, the *San Diego Union Tribune*, and the *Orange County Register*.  (Declaration of Alicia Gehring with Respect to Publication ("Gehring Decl.") (DE # 2733–1).)  In addition, a special Settlement website, www.unionbankoverdraftsettlement.com, became operational on May 23, 2012; it provides details regarding the Settlement as well as numerous court documents.  (Botzet Decl. ¶ 4.)  As discussed

below, the Court finds that the Notice Program was properly effectuated, and that it was more than adequate to put the Settlement Class Members on notice of the terms of the Settlement, the procedures for objecting to and opting out of the Settlement, and the rights that the Settlement Class Members will give up by remaining part of the Settlement.

### 3.    Summary of the Settlement Terms.

The Settlement's terms are set forth in the Agreement (DE # 2859–1).[2] The Court now provides a summary of the material terms.

### a.    The Settlement Class.

The Settlement Class is an opt-out class under Rule 23(b)(3) of the Federal Rule of Civil Procedure. The Settlement Class is defined as:

> All Union Bank customers in the United States who had one or more consumer accounts and who, during the Class Period, incurred an Overdraft Fee as a result of Union Bank's Debit Re-sequencing.

(Agreement ¶ 54.) The Class Period is defined as the period from July 16, 2005 through August 13, 2010. (Agreement ¶ 18.)

### b.    Monetary Relief for the Benefit of the Class.

On May 10, 2012, Union deposited $35 million into the Escrow Account, thereby creating the Settlement Fund (Joint Decl. ¶ 25 (DE # 2859–2); Agreement ¶ 47 (DE # 2859–1).) Settlement Class Members will not submit claims or take any other affirmative step to receive relief under the Settlement. Instead, within 30 days of the Effective Date of the Settlement (Agreement ¶ 22), Union and the Settlement Administrator will distribute the Net Settlement Fund to all identifiable Settlement Class Members who do not timely and properly opt out of the Settlement Class. (Agreement ¶ 79.) Payments to Settlement Class Members who are Current Account Holders will

---

[2] Capitalized terms used in this Order have the same meaning as set forth in the Settlement.

be made by Union crediting such Settlement Class Members' accounts, and notifying the Settlement Class Members of the credit. (Agreement ¶ 83.) Settlement Class Members who are Past Account Holders will receive payment by checks mailed by the Settlement Administrator. (Agreement ¶ 85.)

Accordingly, all identifiable Settlement Class Members who experienced a "Positive Differential Overdraft Fee" will automatically receive a *pro rata* distribution of the Net Settlement Fund. (Agreement ¶¶ 78–83, 85.) The Positive Differential Overdraft Fee analysis determines, among other things, which Settlement Class Members were assessed additional Overdraft Fees that Plaintiffs contend would not have been assessed had Union employed a posting sequence for Debit Card Transactions (Agreement ¶ 20) other than ordering them from highest to lowest dollar amount, and how much in additional Overdraft Fees those Settlement Class Members would have incurred.  The calculation involves a complex multi-step process detailed in the Agreement. (Agreement ¶ 78.) The Net Settlement Fund – which will be distributed *pro rata* to identifiable Settlement Class Members who do not opt out – equals the Settlement Fund plus any accrued interest and less: (a) the amount of the Court-awarded attorneys' fees and cost reimbursements to Class Counsel; and (b) the amount of the Court-awarded Service Awards to the Plaintiffs. (Agreement ¶ 80.)

All fees and charges related to Settlement Administration have been and will be paid by Union Bank, and will *not* come out of the $35 million Settlement Fund. (Agreement ¶ 53.)

Any uncashed or returned checks will remain in the Settlement Fund for one year from the date the first distribution check is mailed by the Settlement Administrator, during which time the Settlement Administrator will make reasonable efforts to effectuate delivery of the Settlement Class Member Payments. (Agreement ¶ 87.) Any residue still remaining after the one-year period

will first be used to reimburse Union for settlement notice and administration costs and fees Union paid to third parties, and any remaining balance will either be distributed to Settlement Class Members who received Settlement Class Member Payments on a *pro rata* basis, if feasible and practical in light of the costs of administering such payments or, alternatively, through a residual *cy pres* program subject to Court approval.  (Agreement ¶ 88.)

      **c.**     **Class Release.**

In exchange for the benefits conferred by the Settlement, all Settlement Class Members who do not opt out will be deemed to have released Union Bank from claims relating to the subject matter of the Action.  (Agreement § XIV (DE # 2859–1).)  The Court expressly adopts and incorporates this Release in its separately entered Final Judgment.

**DISCUSSION**

Federal courts have long recognized a strong policy and presumption in favor of class action settlements.  The Rule 23(e) analysis should be "informed by the strong judicial policy favoring settlements as well as the realization that compromise is the essence of settlement." *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. Unit B 1982); *see also Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996).  In evaluating a proposed class action settlement, the Court "will not substitute its business judgment for that of the parties; 'the only question . . . is whether the settlement, taken as a whole, is so unfair on its face as to preclude judicial approval.'" *Rankin v. Rots*, 2006 WL 1876538, at *3 (E.D. Mich. June 27, 2006) (quoting *Zerkle v. Cleveland-Cliffs Iron Co.*, 52 F.R.D. 151, 159 (S.D.N.Y. 1971)).  "Settlement agreements are highly favored in the law and will be upheld whenever possible because they are a means of amicably resolving doubts and uncertainties and preventing lawsuits." *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1105 (5th Cir. 1977).

10

As explained below, the Settlement here is more than sufficient under Rule 23(e).   It creates a $35 million Settlement Fund for the benefit of the Settlement Class; and each Settlement Class Member will receive recovery as a matter of course, without needing to take any action, based on an analysis by Class Counsel's expert of information in Union Bank's possession.

### 1.   The Court's Exercise of Jurisdiction Is Proper.

In addition to having personal jurisdiction over the Plaintiffs, who are parties to this litigation, the Court also has personal jurisdiction over all members of the Settlement Class because they have received the requisite notice and due process.   *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985) (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950)); *see also In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 306 (3d Cir. 1998).   The Court has subject matter jurisdiction over the Action pursuant to 28 U.S.C. §§ 1332(d)(2) and (6) and 28 U.S.C. § 1407.

### a.   The Best Notice Practicable Was Provided to the Settlement Class.

As discussed above, Notice of the Settlement in the forms approved by the Court was mailed to over 300,000 members of the Settlement Class.   (Botzet Decl. ¶ 8 (DE # 2859–3).) Notice of the Settlement was also published in the *Los Angeles Times*, the *San Diego Union Tribune*, and the *Orange County Register*.   (Gehring Decl. (DE # 2733–1).)   In addition, a special Settlement website was established to enable Settlement Class Members to obtain detailed information about the Action and the Settlement.   (Botzet Decl. ¶ 4.)

b.      **The Notice Was Reasonably Calculated to Inform Settlement Class Members of Their Rights.**

The Court-approved Notice[3] satisfies the due process requirements because it described "the substantive claims . . . [and] contained information reasonably necessary to make a decision to remain a class member and be bound by the final judgment." *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104-05 (5th Cir. 1977).  The Notice, among other things, defined the Settlement Class; described the release provided to Union under the Settlement as well as the amount, manner of allocating, and proposed distribution of the Settlement proceeds; and informed Settlement Class Members of their right to opt-out and object, the procedures for doing so, and the time and place of the Final Approval Hearing.  Further, the Notice stated that Class Counsel intended to seek attorneys' fees of up to thirty percent (30%) of the Settlement Fund.  In addition to disclosing these material terms, the Notice informed Settlement Class Members that a class judgment would bind them unless they opted out, and told them where they could get more information – for example, at the website that posts a copy of the fully executed Agreement, as well as other important court documents such as the Motion for Final Approval.  That Motion contains Class Counsel's considered opinion that the Settlement represents approximately sixty-three percent (63%) of the most probable damages Plaintiffs and the Settlement Class could recover at trial. (Joint Decl. ¶ 49 (DE # 2859–2).) The disclosure of this percentage was sufficient to put Settlement Class Members on notice of their potential recovery based on their personal history with Union Bank and to allow them to make an informed decision about whether to accept the Settlement, object to it or opt out of it.

---

[3] *See* Preliminary Approval Order (DE # 2659 at 2) (finding "the proposed Notice Program and proposed forms of Notice satisfy Federal Rule of Civil Procedure 23 and constitutional due process requirements, and are reasonably calculated under the circumstances to apprise the Settlement Class of the pendency of the Action . . . .").

12

The Court finds that the Settlement Class Members were provided with the best practicable notice; the notice was "reasonably calculated, under [the] circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Shutts*, 472 U.S. at 812 (quoting *Mullane*, 339 U.S. at 314-15). This Settlement with Union Bank was widely publicized, and any Settlement Class Member who wished to express comments or objections had ample opportunity and means to do so.

## 2. The Settlement Is Fair, Adequate and Reasonable, and Therefore Is Finally Approved Under Rule 23.

In determining whether to approve the Settlement, the Court considers whether it is "fair, adequate, reasonable, and not the product of collusion." *Leverso v. SouthTrust Bank of Al., N.A.,* 18 F.3d 1527, 1530 (11th Cir. 1994); *see also Bennett v. Behring Corp.,* 737 F.2d 982, 986 (11th Cir. 1984). A settlement is fair, reasonable and adequate when "the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued." *In re Lorazepam & Clorazepate Antitrust Litig.*, MDL No. 1290, 2003 WL 22037741, at *2 (D.D.C. June 16, 2003) (quoting *Manual for Complex Litigation* (Third) § 30.42 (1995)). The Court is "not called upon to determine whether the settlement reached by the parties is the best possible deal, nor whether class members will receive as much from a settlement as they might have recovered from victory at trial." *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1014 (N.D. Ill. 2000) (citations omitted).

The Eleventh Circuit has identified six factors to be considered in analyzing the fairness, reasonableness and adequacy of a class action settlement under Rule 23(e):

(1) the existence of fraud or collusion behind the settlement;

(2) the complexity, expense, and likely duration of the litigation;

(3) the stage of the proceedings and the amount of discovery completed;

13

(4) the probability of the plaintiffs' success on the merits;

(5) the range of possible recovery; and

(6) the opinions of the class counsel, class representatives, and the substance and amount of opposition to the settlement.

*Leverso,* 18 F.3d at 1530 n.6; *see also Bennett,* 737 F.2d at 986.

### a.    There Was No Fraud or Collusion.

The Court has readily concluded there was no fraud or collusion behind this Settlement. *See, e.g., In re Sunbeam Sec. Litig.,* 176 F. Supp. 2d 1323, 1329 n.3 (S.D. Fla. 2001); *Ingram v. Coca-Cola Co.,* 200 F.R.D. 685, 693 (N.D. Ga. 2001) (court had "no doubt that this case has been adversarial, featuring a high level of contention between the parties"); *In re Motorsports Merchandise Antitrust Litig.,* 112 F. Supp. 2d 1329, 1338 (N.D. Ga. 2000) ("[t]his was not a quick settlement, and there is no suggestion of collusion"); *Warren v. City of Tampa,* 693 F. Supp. 1051, 1055 (M.D. Fla. 1988) (record showed no evidence of collusion, but to the contrary showed "that the parties conducted discovery and negotiated the terms of settlement for an extended period of time"), *aff'd,* 893 F.2d 347 (11th Cir. 1989).

### b.    The Settlement Will Avert Years of Highly Complex and Expensive Litigation.

This case involves over 300,000 Settlement Class Members and alleged wrongful Overdraft Fees in the tens of millions of dollars. The claims and defenses are complex. Litigating them has been difficult and time consuming. Although this litigation has been pending for over three years, recovery by any means other than settlement would require additional years of litigation in this Court and others, including appellate courts. *See United States v. Glens Falls Newspapers, Inc.,* 160 F.3d 853, 856 (2d Cir. 1998) (noting that "a principal function of a trial judge is to foster an atmosphere of open discussion among the parties' attorneys and

14

representatives so that litigation may be settled promptly and fairly so as to avoid the uncertainty, expense and delay inherent in a trial."); *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. at 317, 325-26 & n.32 ("adjudication of the claims of two million claimants could last half a millennium").

The Settlement provides immediate and substantial benefits to over 300,000 current and former Union Bank customers. *See In re Shell Oil Refinery*, 155 F.R.D. 552, 560 (E.D. La. 1993) ("The Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation.") (alterations in original) (quoting *Oppenlander v. Standard Oil Co.*, 64 F.R.D. 597, 624 (D. Colo. 1974)); *see also In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) (noting that complex litigation "can occupy a court's docket for years on end, depleting the resources of the parties and taxpayers while rendering meaningful relief increasingly elusive"). Particularly because the "demand for time on the existing judicial system must be evaluated in determining the reasonableness of the settlement," *Ressler v. Jacobson*, 822 F. Supp. 1551, 1554 (M.D. Fla. 1992) (citation omitted), there can be no reasonable doubt as to the adequacy of this Settlement.

The amount of the recovery is extremely reasonable in light of the risks Plaintiffs faced. Sixty-three percent (63%) of the most probable sum Plaintiffs anticipated recovering at trial constitutes a very fair settlement. The combined risks here were real – and potentially catastrophic for the Class.

*First*, whether Plaintiffs' claims are preempted by the NBA and its implementing regulations remains an open question. Despite this Court's rulings that such preemption does not apply here, *see Luquetta v. JPMorgan Chase Bank, N.A. (In re Checking Account Overdraft*

*Litig.*), 2011 WL 2746171, 2011 U.S. Dist. LEXIS 75782 (S.D. Fla. July 13, 2011), no federal appeals court has yet reached the NBA preemption issue in this specific context.[4]

*Second*, high-to-low posting of Debit Card Transactions is not clearly unlawful. The UCC permits the reordering of checks, and Union's deposit account agreement states: "You agree that we may pay or certify your checks and other items in any order we choose . . . . We will generally pay larger checks and transactions first." *See* UCC § 4-303(b) & cmt. 7; *Larsen* TAC, Ex. A at 43 (DE # 1317).

*Third*, Union Bank likely would have continued to oppose class certification on multiple grounds, including manageability. Had Union Bank succeeded in a motion for decertification, or in a post-judgment challenge to class certification on appeal, the value of this case would have decreased to near zero.

### c.    The Factual Record is Sufficiently Developed to Enable Plaintiffs and Class Counsel to Make a Reasoned Judgment Concerning the Settlement.

The Court considers "the degree of case development that class counsel have accomplished prior to settlement" to ensure that "counsel had an adequate appreciation of the merits of the case before negotiating." *In re General Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 813 (3d Cir. 1995). At the same time, "[t]he law is clear that early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations." *Ressler*, 822 F. Supp. at 1555.

Voluminous discovery occurred in this Action. The Parties settled only after nineteen (19) depositions had been taken and over a million pages of documents reviewed, after a litigated class

---

[4] In denying the First Tranche banks' Omnibus Motion, this Court specifically recognized that it was only ruling in the context of a motion to dismiss or for judgment on the pleadings.

certification decision, and on the eve of disclosures of expert reports on the merits. (Joint Decl. ¶¶ 40, 43 (DE # 2859–2).)  The course of the litigation, including information obtained through discovery, afforded Settlement Class Counsel insight into the strengths and weaknesses of the claims against Union.  (Joint Decl. ¶ 43.)  Prior to settling, Class Counsel had developed ample information and performed analyses from which "to determine the probability of . . . success on the merits, the possible range of recovery, and the likely expense and duration of the litigation." *Mashburn v. Nat'l Healthcare, Inc.*, 684 F. Supp. 660, 669 (M.D. Ala. 1988).  (Joint Decl. ¶ 43.) That this Action was at an advanced stage when the Parties reached an agreement to settle it supports granting Final Approval.

> d.      **Plaintiffs Would Have Faced Significant Obstacles to Obtaining Relief.**

The Court also considers "the likelihood and extent of any recovery from the defendants absent . . . settlement." *In re Domestic Air Transp.*, 148 F.R.D. at 314 (N.D. Ga. 1993); *see also Ressler*, 822 F. Supp. at 1555 ("A Court is to consider the likelihood of the plaintiff's success on the merits of his claims against the amount and form of relief offered in the settlement before judging the fairness of the compromise.").

Plaintiffs correctly note that they faced several major risks in this litigation, including those discussed above relating to federal preemption under the NBA and the Union Bank deposit account agreement.  Absent this Settlement, this litigation likely would have continued for additional years, at tremendous expense to the Parties.  Given the myriad risks attending these claims, the Settlement is a fair compromise. *See, e.g., Bennett*, 96 F.R.D. at 349-50 (plaintiffs faced a "myriad of factual and legal problems" that led to "great uncertainty as to the fact and amount of damage," which made it "unwise [for plaintiffs] to risk the substantial benefits which the settlement confers . . . to the vagaries of a trial"), *aff'd*, 737 F.2d 982 (11th Cir. 1984).

e.   **The Benefits Provided by the Settlement Are Fair, Adequate and Reasonable When Compared to the Range of Possible Recovery.**

In determining whether a settlement is fair in light of the potential range of recovery, the Court is guided by the "important maxim[]" that "the fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate." *Behrens*, 118 F.R.D. at 542.   This is because a settlement must be evaluated "in light of the attendant risks with litigation." *Thompson v. Metropolitan Life Ins. Co.*, 216 F.R.D. 55, 64 (S.D.N.Y. 2003); *see Bennett*, 737 F.2d at 986 ("[C]ompromise is the essence of settlement."); *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("[T]he very essence of a settlement is . . . a yielding of absolutes and an abandoning of highest hopes.") (internal quotation omitted).   Thus, courts regularly find settlements to be fair where "[p]laintiffs have not received the optimal relief." *Warren*, 693 F. Supp. at 1059; *see, e.g.*, *Great Neck Capital Appreciation Investment P'ship, L.P. v. PriceWaterHouseCoopers, L.L.P.*, 212 F.R.D. 400, 409-410 (E.D. Wis. 2002) ("The mere possibility that the class might receive more if the case were fully litigated is not a good reason for disapproving the settlement.").

The Settlement provides substantial value to the Settlement Class.   Under the Settlement, Plaintiffs and the Settlement Class have recovered $35 million, which represents 63% of the most probable aggregate damages that Plaintiffs believe they could have recovered at a trial.   This is an "outstanding result" given that "[m]any class actions – especially consumer class actions – generate only a small fraction of the total damages." (Declaration of Professor Geoffrey Miller in Support of Motion for Final Approval ("Miller Decl."), ¶¶ 35–36 (DE # 2859–5).)   The absence of a claims-made process further supports the conclusion that the Settlement is reasonable. *See id.* ¶ 37 (noting the significant benefit of the proposed direct distribution to Settlement Class Members "is highly beneficial because it ensures that class members will receive the settlement benefits

18

without having to undertake any affirmative action – thus optimizing class recovery.").

      **f.**    **The Opinions of Class Counsel, Class Representatives, and Absent Settlement Class Members Strongly Favor Approval of the Settlement.**

The Court gives "great weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation." *Warren,* 693 F. Supp. at 1060; *see also Mashburn,* 684 F. Supp. at 669 ("If plaintiffs' counsel did not believe these factors all pointed substantially in favor of this settlement as presently structured, this Court is certain that they would not have signed their names to the settlement agreement."); *In re Domestic Air Transp.*, 148 F.R.D. at 312-13 ("In determining whether to approve a proposed settlement, the Court is entitled to rely upon the judgment of the parties' experienced counsel. '[T]he trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel.'" (citations omitted)).

Class Counsel and the representative Plaintiffs believe that this Settlement is superb and deserving of Final Approval, and the Court agrees. Furthermore, the Court also finds it telling that, of the approximately 307,324 Settlement Class Members, only two (2) filed objections to the Settlement – and both withdrew their objections prior to the final approval hearing. The Court hereby approves the withdrawal of objections by Settlement Class Members Dallas Stephens (DE # 2935) and Larissa Love Lazarus (DE # 2918). The fact there is not a single Settlement objection before this Court is unusual and strongly supports the propriety of final approval. Indeed, such "unanimous approval . . . by the class members is entitled to nearly dispositive weight in this court's evaluation of the proposed settlements." *In re Art Materials Antitrust Litig.*, MDL No. 436, 100 F.R.D. 367, 372 (N.D. Ohio 1983); *see also Lipuma v. American Express Co.*, 406 F. Supp. 2d 1298, 1324 (S.D. Fla. 2005) (finding that a low percentage of objections "points to the reasonableness of a proposed settlement and supports its approval.").

### 3.  The Settlement Class.

This Court has previously found the requirements of Rule 23(a) and 23(b)(3) satisfied in this Action and has certified this Settlement Class, which is defined above as well as in the separately entered Final Judgment and in paragraphs 18 and 54 of the Settlement Agreement. The twelve (12) individuals listed in Exhibit A to the Final Judgment elected to opt out of the Settlement. The Court therefore finds and decrees that they are not part of the Settlement Class, are not bound by the Settlement or Release contained therein, and will not receive any distribution from the Settlement Fund. (DE # 1763, 2659.) The Court hereby reiterates its findings that: (a) the Settlement Class Members are so numerous that joinder of them is impracticable; (b) there are questions of law and fact common to the Settlement Class that predominate over any individual questions; (c) the claims of the representative Plaintiffs are typical of the claims of the Settlement Class; (d) the representative Plaintiffs and Class Counsel fairly and adequately represent and protect the interests of the Settlement Class Members; and (e) a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### 4.  The Application for Service Awards to the Class Representatives Is Approved.

Service awards "compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1218 (S.D. Fla. 2006). "[T]here is ample precedent for awarding incentive compensation to class representatives at the conclusion of a successful class action." *David v. American Suzuki Motor Corp.*, 2010 WL 1628362, at *6 (S.D. Fla. Apr. 15, 2010). Courts have consistently found service awards to be an efficient and productive way to encourage members of a class to become class representatives. *See, e.g., Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 694 (N.D. Ga. 2001) (awarding class representatives $300,000 each, explaining that

"the magnitude of the relief the Class Representatives obtained on behalf of the class warrants a substantial incentive award."); *Spicer v. Chi. Bd. Options Exchange, Inc.*, 844 F. Supp. 1226, 1267-68 (N.D. Ill. 1993) (collecting cases approving service awards ranging from $5,000 to $100,000, and awarding $10,000 to each named plaintiff). The factors for determining a service award include: (1) the actions the class representatives took to protect the interests of the class; (2) the degree to which the class benefited from those actions; and (3) the amount of time and effort the class representatives expended in pursuing the litigation. *See, e.g.*, *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998).

The Court finds that the four class representatives expended substantial time and effort in representing the Class, including sitting for depositions, and deserve to be compensated for such time and effort on behalf of the Class. Therefore, the Court approves the requested service awards of $10,000 per representative Plaintiff, to be paid from the Settlement Fund.

### 5. Class Counsel's Application for Attorneys' Fees Is Granted.

Class Counsel request a fee equal to thirty percent (30%) of the common fund created through their efforts in litigating this case and reaching the Settlement. The Court analyzes this fee request under *Camden I Condominium Assn. v. Dunkle*, 946 F.2d 768 (11th Cir. 1991). As set forth below, the Court concludes that each of the *Camden I* factors supports Class Counsel's fee request, and the Court accordingly awards the fee sought.

#### a.    The Law Awards Class Counsel Fees from the Common Fund Created Through Their Efforts.

It is well established that when a representative party has conferred a substantial benefit upon a class, counsel is entitled to attorneys' fees based upon the benefit obtained. *Camden I*, 946 F.2d at 771; *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). The common benefit doctrine is an exception to the general rule that each party must bear its own litigation costs. The doctrine

21

serves the "twin goals of removing a potential financial obstacle to a plaintiff's pursuit of a claim on behalf of a class and of equitably distributing the fees and costs of successful litigation among all who gained from the named plaintiff's efforts." *In re Gould Sec. Litig.*, 727 F. Supp. 1201, 1202 (N.D. Ill. 1989) (citation omitted). The common benefit doctrine stems from the premise that those who receive the benefit of a lawsuit without contributing to its costs are "unjustly enriched" at the expense of the successful litigant. *Van Gemert*, 444 U.S. at 478. As a result, the Supreme Court, the Eleventh Circuit, and courts in this District have all recognized that "[a] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as whole." *Sunbeam*, 176 F. Supp. 2d at 1333 (citing *Van Gemert*, 444 U.S. at 478); *see also Camden I*, 946 F.2d at 771 ("Attorneys in a class action in which a common fund is created are entitled to compensation for their services from the common fund, but the amount is subject to court approval.").

In the Eleventh Circuit, class counsel are awarded a percentage of the fund generated through a class action settlement. As the Eleventh Circuit held, "the percentage of the fund approach [as opposed to the lodestar approach] is the better reasoned in a common fund case. Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." *Camden I*, 946 F.2d at 774.

This Court has substantial discretion in determining the appropriate fee percentage awarded to counsel. "There is no hard and fast rule mandating a certain percentage of a common fund which may be awarded as a fee because the amount of any fee must be determined upon the facts of each case." *In re Sunbeam,* 176 F. Supp. 2d at 1333 (quoting *Camden I*, 946 F.2d at 774). However, "[t]he majority of common fund fee awards fall between 20 percent to 30 percent of the

fund," although "an upper limit of 50 percent of the fund may be stated as a general rule." *Id.* (quoting *Camden I,* 946 F.2d at 774-75); *see also Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291 (11th Cir. 1999) (approving fee award where the district court determined that the benchmark should be 30% and then adjusted the fee award higher based on the circumstances of the case).

Based on the findings below, Class Counsel are entitled to an award of 30% of the Settlement Fund. Class Counsel achieved an excellent result and overcame numerous procedural and substantive hurdles to obtain this Settlement benefiting the Settlement Class. Class Counsel undertook a risky and undesirable case and, through diligence, perseverance and skill, obtained an outstanding result. They are to be commended and should be compensated in accord with their request, which is both warranted and reasonable given similar fee awards. The Court firmly believes this kind of initiative and skill must be adequately compensated to insure that counsel of this caliber is available to undertake these kinds of risky but important cases in the future. *See Muehler v. Land O'Lakes, Inc.*, 617 F. Supp. 1370, 1375-76 (D. Minn. 1985).

b.    **As Applied Here, the *Camden I* Factors Demonstrate the Requested 30% Fee Is Reasonable and Justified.**

The Eleventh Circuit's factors for evaluating the reasonable percentage to award class-action counsel are:

> (1) the time and labor required;
>
> (2) the novelty and difficulty of the questions involved;
>
> (3) the skill requisite to perform the legal service properly;
>
> (4) the preclusion of other employment by the attorney due to acceptance of the case;
>
> (5) the customary fee;
>
> (6) whether the fee is fixed or contingent;

(7) time limitations imposed by the client or the circumstances;

(8) the amount involved and the results obtained;

(9) the experience, reputation, and ability of the attorneys;

(10) the "undesirability" of the case;

(11) the nature and the length of the professional relationship with the client;

(12) awards in similar cases.

*Camden I*, 946 F.2d at 772 n.3 (citing factors originally set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)).

These twelve factors are guidelines; they are not exclusive. "Other pertinent factors are the time required to reach a settlement, whether there are any substantial objections by class members or other parties to the settlement terms or the fees requested by counsel, any non-monetary benefits conferred upon the class by the settlement, and the economics involved in prosecuting a class action." *Sunbeam*, 176 F. Supp. 2d at 1333 (quoting *Camden I*, 946 F.2d at 775). In addition, the Eleventh Circuit has "encouraged the lower courts to consider additional factors unique to the particular case." *Camden I*, 946 F.2d at 775.

      i.      **The Claims Against Union Bank Required Substantial Time and Labor.**

Investigating, prosecuting and settling these claims demanded considerable time and labor. Throughout the pendency of the Action, the internal organization of Class Counsel, including assignments of work, weekly conference calls, and oversight of task-oriented subcommittees, ensured that Class Counsel were engaged in coordinated, productive work efforts to maximize efficiency and minimize duplication of effort. To the same ends, in-person meetings of Class Counsel were also held several times during the course of the litigation. (Joint Decl. ¶ 65 (DE # 2859–2).) Class Counsel spent hundreds of hours investigating the claims of many potential

plaintiffs against Union Bank.  Class Counsel interviewed numerous Union customers and potential plaintiffs to gather information about Union's conduct and its effect on consumers.  This information was essential to Class Counsel's ability to understand the nature of Union's conduct, the language of the account agreements at issue, and potential remedies.  (Joint Decl. ¶ 66.)

Class Counsel also expended significant resources researching, developing, pleading and prosecuting the legal claims at issue.  For example, state-by-state legal surveys were necessary to determine which state common law doctrines and consumer protection statutes provided Plaintiffs with viable claims.  (Joint Decl. ¶ 67.)  Class Counsel faced a significant hurdle with the filing of the Omnibus Motion, as to which Union was one of the moving parties.  (DE # 217.)  Substantial additional legal research and briefing was necessary to successfully oppose the Omnibus Motion. (DE # 265.)

Once the stay of discovery in the First Tranche cases was lifted and the Court entered its comprehensive Scheduling Order (DE # 463), Class Counsel served written discovery requests on Union Bank seeking relevant and probative documents and information.  The process of developing, refining and finalizing such discovery requests – with an eye toward class certification, summary judgment, and trial – required considerable effort.  (Joint Decl. ¶ 67.) Union ultimately produced approximately over a million pages of internal bank documents in discovery in this Action.  (Joint Decl. ¶ 11.)  Class Counsel established a large document review team consisting of dozens of attorneys whose task was to review, sort, and code the produced documents.  To make the review and subsequent litigation more efficient, Class Counsel instituted uniform coding procedures for electronic review of the documents produced, and team members remained in constant contact with each other to ensure that all counsel became aware of significant emerging evidence in real time.  Such document review efforts and coordination were plainly

necessary and accounted for a substantial amount of the attorney time expended in this Action. (Joint Decl. ¶ 71.)  Furthermore, in addition to preparing for and defending the depositions of the four representative Plaintiffs, Class Counsel took 15 depositions of Union Bank's current and former employees and officers.  Preparing for and taking these depositions involved extensive time and effort. (Joint Decl. ¶ 73.)  Class Counsel also expended significant time and effort to prepare responses to Union's interrogatories and requests for production of documents directed to the Plaintiffs. (Joint Decl. ¶ 74.)

Significantly, Class Counsel devoted extensive time and effort to researching and preparing their Motion for Class Certification as well as the reply brief in support thereof; to analyzing Union's lengthy opposition; and to preparing for the oral argument – the first in MDL 2036 – on class certification.  Class Counsel likewise devoted significant time and effort to successfully defend the Court's class certification order before the Eleventh Circuit. (Joint Decl. ¶ 75.)

Settlement negotiations consumed additional time and resources.  Two separate mediation sessions were held, the first in Miami on April 6, 2011, and the second in Boston on November 1, 2011.  Each required substantial preparation and follow-up work. (Joint Decl. ¶ 76.)  After the Parties executed the memorandum of understanding, several months of painstaking negotiations concerning the specific terms of the Settlement followed.  Class Counsel also engaged in subsequent settlement-related investigation, to determine, among other things, the most appropriate method by which to implement the plan for direct allocation of the Net Settlement Fund to Settlement Class Members. (Joint Decl. ¶ 77.)

In view of the excellent results obtained here, the Court deems it unnecessary to scrutinize Class Counsel's timesheets. The Eleventh Circuit made clear in *Camden I* that percentage of the

fund is the exclusive method for awarding fees in common fund class actions.[5] *Camden I*, 946

F.2d at 774. Even before *Camden I*, courts in this Circuit recognized that "a percentage of the

gross recovery is the only sensible method of awarding fees in common fund cases." *Mashburn v.*

*Nat'l Healthcare, Inc.*, 684 F. Supp. 660, 690 (M.D. Ala. 1988). More importantly, the Court

observed firsthand the effort exerted by Class Counsel in this case and the other bank cases, and,

given the outstanding results achieved here, does not find it necessary or useful to review Class

Counsel's lodestar records.

Lodestar "creates an incentive to keep litigation going in order to maximize the number of

hours included in the court's lodestar calculation." *In re Quantum Health Resources, Inc.*, 962 F.

Supp. 1254, 1256 (C.D. Cal. 1997). In *Camden I*, the Eleventh Circuit criticized lodestar and the

inefficiencies that it creates. 946 F.2d at 773-75. In so doing, the court "mandate[d] the *exclusive*

use of the percentage approach in common fund cases, reasoning that it more closely aligns the

interests of client and attorney, and more faithfully adheres to market practice." *Goldberger v.*

*Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000) (emphasis added); *see also* Alba Conte,

*Attorney Fee Awards* § 2.7, at 91 fn. 41 ("The Eleventh . . . Circuit[] repudiated the use of the

lodestar method in common-fund cases"). Under *Camden I*, courts in this Circuit regularly award

fees based on a percentage of the recovery, without discussing lodestar at all. *See, e.g., David v.*

---

[5] Eleventh Circuit attorneys' fee law governs this request. *See Allapattah*, 454 F. Supp. 2d at 1200 ("[t]he district court presiding over a diversity-based class action pursuant to Fed. R. Civ. P. 23 has equitable power to apply federal common law in determining fee awards irrespective of state law."); *see also Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 522 n.5 (1st Cir. 1991) (recognizing that district court presiding over diversity-based class action has equitable power to apply federal common law in determining fee award, irrespective of state law); *Clark Equip. Co. v. Armstrong Equip. Co.*, 431 F.2d 54, 57 (5th Cir. 1970) (*Erie* doctrine does not deprive federal court in diversity case of power to employ equitable remedies not available under state law).

*American Suzuki Motor Corp.*, 2010 WL 1628362 (S.D. Fla. Apr. 15, 2010).[6] "[A] common fund is itself the measure of success and represents the benchmark on which a reasonable fee will be awarded. . . . In this context, monetary results achieved predominate over all other criteria." *Camden I*, 946 F.2d at 774 (citations and alterations omitted). This Court will not deviate from that sound approach.

### ii.    The Issues Involved Were Novel and Difficult and Required the Exceptional Skill of a Highly Talented Group of Attorneys

The attorneys on both sides of this case displayed a very high level of skill. *See Walco*, 975 F. Supp. at 1472 (explaining that "[g]iven the quality of defense counsel from prominent national law firms, the Court is not confident that attorneys of lesser aptitude could have achieved similar results"); *see also Camden I*, 946 F.2d at 772 n.3 (in assessing the quality of representation by class counsel, Court also should consider the quality of their opposing counsel.); *Johnson*, 488 F.2d at 718; *Ressler v. Jacobson*, 149 F.R.D. 651, 654 (M.D. Fla. 1992). Class Counsel's work is emblematic of the effort and outcomes witnessed by this Court on a regular basis in this MDL. Nor can there be any legitimate dispute that, based on the novel and very complex issues confronted by Class Counsel in this case, detailed here and elsewhere, that an extraordinary group of lawyers was required to prosecute this case. The Court knows many of these lawyers from years of presiding over cases in this district, and has come to expect this level of performance from them. That is not to say, however, that such performance should be taken for granted. Instead, the fact that this level of legal talent was available to the Settlement Class is another compelling reason in support of the fee requested. As with most things, you get what you pay for, and the Settlement

---

[6] *See also Stahl v. MasTec, Inc.*, 2008 WL 2267469 (M.D. Fla. May 20, 2008); *Sands Point Partners, L.P. v. Pediatrix Med. Group, Inc.*, 2002 WL 34343944 (S.D. Fla. May 3, 2002); *Fabricant v. Sears Roebuck & Co.*, 2002 WL 34477904 (S.D. Fla. Sept. 18, 2002).

Class received a truly impressive amount and quality of legal services.  (Miller Decl. ¶ 58 (DE # 2859–5) (noting "the high levels of energy, diligence and skill displayed by counsel" for Plaintiffs).)  In the private marketplace, counsel of exceptional skill commands a significant premium.  So it must be here.

### iii.    The Claims Against Union Bank Entailed Considerable Risk.

The risks facing the Plaintiffs in this case have been discussed above, in the Motion for Final Approval, and elsewhere.  There were myriad ways in which Plaintiffs could have lost this case – yet they managed to achieve a successful Settlement.  A large amount of the credit for this must be given to Class Counsel's strategic choices, effort and legal acumen.

"A court's consideration of this factor recognizes that counsel should be rewarded for taking on a case from which other law firms shrunk.  Such aversion could be due to any number of things, including social opprobrium surrounding the parties, thorny factual circumstances, or the possible financial outcome of a case. All of this and more is enveloped by the term 'undesirable.'" *In re Sunbeam*, 176 F. Supp. 2d at 1336.  Moreover, as Professor Miller points outs, "[a]warding a higher fee for higher risk is simply common sense:  doing so both rewards counsel for excellent success and also incentivizes them to undertake socially valuable litigation in the future." (Miller Decl. ¶ 56 (DE # 2859–5).)  In addition, "[t]he point at which plaintiffs settle with defendants . . . is simply not relevant to determining the risks incurred by their counsel in agreeing to represent them." *Skelton v. General Motor Corp.*, 860 F.2d 250, 258 (7th Cir. 1988), *cert. denied*, 493 U.S. 810 (1989). "Undesirability" and relevant risks must be evaluated from the standpoint of plaintiffs' counsel as of the time they commenced the suit, not retroactively, with the benefit of hindsight. *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 112 (3d Cir. 1976); *Walco*, 975 F. Supp. at 1473.

The most undesirable aspect of this case was the long odds on success. Class Counsel had to contest federal preemption of Plaintiffs' state law claims as well as the language in Union Bank's deposit account agreement. The Court expresses no opinion on the merits of these arguments by this or any other defendant. The critical point for present purposes is that, heading into this case, Class Counsel confronted these issues without any assurances as to how the Court would rule. Class Counsel nonetheless accepted the case and the risks that accompanied it. Given the positive societal benefits to be gained from attorneys' willingness to undertake this kind of difficult and risky, yet important, work, such decisions must be properly incentivized. The Court believes, and holds, that the proper incentive here is a thirty percent (30%) fee.

iv.     **Class Counsel Assumed Substantial Risk to Pursue the Action on a Pure Contingency Basis, and Were Precluded From Other Employment as a Result.**

Class Counsel prosecuted the Action entirely on a contingent fee basis. (Joint Decl. ¶ 88 (DE # 2859–2).) In undertaking to prosecute this complex action on that basis, Class Counsel assumed a significant risk of nonpayment or underpayment. *See id.*

Numerous cases recognize such a risk as an important factor in determining a fee award. "A contingency fee arrangement often justifies an increase in the award of attorney's fees." *In re Sunbeam*, 176 F. Supp. 2d at 1335 (quoting *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 548 (S.D. Fla. 1988), *aff'd*, 899 F.2d 21 (11th Cir. 1990)); *see also In re Continental Ill. Sec. Litig.*, 962 F.2d 566 (7th Cir. 1992) (holding that when a common fund case has been prosecuted on a contingent basis, plaintiffs' counsel must be compensated adequately for the risk of non-payment); *Ressler*, 149 F.R.D. at 656; *Walters v. Atlanta*, 652 F. Supp. 755, 759 (N.D. Ga. 1985), *modified*, 803 F.2d 1135 (11th Cir.); *York v. Alabama State Bd. of Education*, 631 F. Supp. 78, 86 (M.D. Ala. 1986).

Public policy concerns – in particular, ensuring the continued availability of experienced and capable counsel to represent classes of injured plaintiffs holding small individual claims – support the requested fee here. As this Court has observed:

> Generally, the contingency retainment must be promoted to assure representation when a person could not otherwise afford the services of a lawyer. . . . A contingency fee arrangement often justifies an increase in the award of attorney's fees. This rule helps assure that the contingency fee arrangement endures. If this "bonus" methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing.

*Behrens*, 118 F.R.D. at 548. The risks taken by Class Counsel have already been discussed. It is uncontroverted that the attorney time spent on the Action was time that could not be spent on other matters. (Joint Decl. ¶ 67.) Consequently, this factor supports the requested fee.

### v.   Class Counsel Achieved a Superb Result.

The Court finds that this Settlement is exceptionally good. Rather than facing more years of costly and uncertain litigation, over 300,000 Settlement Class Members will receive an immediate cash benefit from the Settlement Fund amounting to nearly *two-thirds* the likely damages, assuming a Plaintiffs' verdict against Union Bank. (Joint Decl. ¶ 83 (DE # 2859–2).) The Settlement Fund will not be reduced by the costs of Notice or settlement administration expenses; such expenses have been and will continue to be borne separately by Union. (Joint Decl. ¶ 83.) Moreover, payments to the Settlement Class will be forthcoming *automatically*, through direct deposit (for Current Account Holders) or checks (for Past Account Holders). (Joint Decl. ¶ 83.) Finally, it was due in part to Class Counsel's prosecution of this Action that Union Bank switched from a high-to-low posting order for debit and ATM transactions . (Joint Decl. ¶ 83.)

Class Counsel's efforts in pursuing and settling these consumer claims were, quite simply, fabulous.

**vi.     The Requested Fee Comports with Fees Awarded in Similar Cases.**

In MDL 2036 this Court awarded thirty percent (30%) in attorneys' fees in the Bank of America case (*In re Checking Account Overdraft Litigation*, 830 F. Supp. 2d 1330, 1359 (S.D. Fla. 2011)), and twenty-seven-and-one-half percent (27.5%) in the Iberiabank case. (DE # 2657). Similarly, numerous recent decisions within this Circuit have awarded attorneys' fees up to and in excess of thirty percent. *See Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) (awarding fees of 31 1/3 % of $1.06 billion); *In re: Terazosin Hydrochloride Antitrust Litigation*, 99-1317-MDL-Seitz (S.D. Fla. April 19, 2005) (awarding fees of 33 1/3 % of settlement of over $30 million); *In re: Managed Care Litig. v. Aetna*, MDL No. 1334, 2003 WL 22850070 (S.D. Fla. Oct. 24, 2003) (awarding fees and costs of 35.5% of settlement of $100 million); *Gutter v. E.I. Dupont De Nemours & Co.*, 95-2152-Civ-Gold (S.D. Fla. May 30, 2003) (awarding fees of 33 1/3 % of settlement of $77.5 million); *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291 (11th Cir. 1999) (affirming fee award of 33 1/3 % of settlement of $40 million).

The Court finds that a fee of thirty percent (30%) plus expenses is appropriate here and comports with customary fee awards in similar cases. In his expert declaration, Professor Miller distilled several major empirical studies of attorneys' fees awarded in connection with class action settlements. (Miller Decl. ¶¶ 46–55 (DE # 2859–5).) Professor Miller's own published studies, for instance, found that the median fee award since 1974 in such cases is exactly 30 percent, with the median award in consumer cases slightly lower at 25 percent. (Miller Decl. ¶¶ 51–54.) Based on these empirical findings, Professor Miller concluded that the fee requested by Class Counsel in this case "is easily within the range of reason when judged by this data." (Miller Decl. ¶ 54.) The

32

Court agrees, and finds that the risks of this litigation, considered against the favorable result, easily justify a thirty percent fee.

### vii.    The Remaining *Camden I* Factors Also Favor Approving Class Counsel's Fee Request.

The Court finds that the remaining *Camden I* factors further support Class Counsel's fee request, and so holds.  The burdens of this litigation and the relatively small size of most of the firms representing Plaintiffs lend support to the fee awarded.  (Joint Decl. ¶ 93 (DE # 2859–2).) This fee is firmly rooted in "the economics involved in prosecuting a class action." *In re Sunbeam*, 176 F. Supp. 2d at 1333.  The Court is convinced by its many years of presiding over significant cases like this one that proper incentives must be maintained to insure that attorneys of this caliber are available to take on cases of significant public importance like this one.  The factual record in this case, and the Court's own observations, all of which are incorporated herein, compel the result required by this Order.

### 6.  Class Counsel's Application for Reimbursement of Litigation Costs Is Granted.

Finally, the Court finds that Class Counsel's request for reimbursement of $226,658 in out-of-pocket costs is reasonable and justified, and hereby grants the request. *See Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 391-92 (1970).  These costs, advanced by Class Counsel for the benefit of the Class, were necessarily incurred in furtherance of the litigation of the Action and the Settlement.  (Joint Decl. ¶¶ 94–95 (DE # 2859–2).)  Accordingly, reimbursement in this amount shall be made from the Settlement Fund following disbursement of attorneys' fees.

## CONCLUSION

For the foregoing reasons, the Court: (1) grants Final Approval to the Settlement; (2) appoints Plaintiffs Cynthia Larsen, Cheryl Brown, Kristian Logan, and Josh Naehu-Reyes as class representatives for this Settlement; (3) appoints as Class Counsel and Settlement Class Counsel the attorneys and law firms listed in paragraphs 17 and 44 of the Agreement, respectively; (4) awards Service Awards to the class representatives in the amount of $10,000 each; (5) awards Class Counsel attorneys' fees equal to thirty percent (30%) of the Settlement Fund, in addition to a cost reimbursement in the amount of $226,658; (6) approves the withdrawal of objections by Settlement Class Members Dallas Stephens (DE # 2935) and Larissa Love Lazarus (DE # 2918); (7) directs Settlement Class Counsel, Plaintiffs, and Union Bank to implement and consummate the Settlement pursuant to its terms and conditions; (8) retains continuing jurisdiction over Plaintiffs, the Settlement Class, and Union Bank to implement, administer, consummate and enforce the Settlement and this Final Approval Order; and (9) will separately enter Final Judgment dismissing the Action with prejudice.

**DONE and ORDERED** in Chambers at the James Lawrence King Federal Justice Building and United States Courthouse in Miami, Florida, this 4th day of October, 2012.

**JAMES LAWRENCE KING**
**UNITED STATES DISTRICT JUDGE**
**SOUTHERN DISTRICT OF FLORIDA**

cc: All Counsel of Record