# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

*Lopez v. JPMorgan Chase Bank, N.A.*
*Luquetta v. JPMorgan Chase Bank, N.A.*

*Case No. 1:09-MD-02036-JLK*

## DECLARATION OF BRIAN T. FITZPATRICK

I.  Background and qualifications

1.      My name is Brian Fitzpatrick and I am a Professor of Law at Vanderbilt University in Nashville, Tennessee.  I joined the Vanderbilt law faculty in 2007, after serving as the John M. Olin Fellow at New York University School of Law in 2005 and 2006.  I graduated from Harvard Law School in 2000.  After law school, I served as a law clerk to The Honorable Diarmuid O'Scannlain on the United States Court of Appeals for the Ninth Circuit and to The Honorable Antonin Scalia on the United States Supreme Court.  I also practiced law for several years in Washington, D.C., at Sidley Austin LLP.  My C.V. is attached as Appendix 1.

2.      Like my research at New York University before it, my teaching and research at Vanderbilt have focused on class action litigation.  I teach the Civil Procedure, Federal Courts, and Complex Litigation courses at Vanderbilt.  In addition, I have published a number of articles on class action litigation in such journals as the University of Pennsylvania Law Review, the Journal of Empirical Legal Studies, and the Vanderbilt Law Review.  My work has been cited by numerous courts, scholars, and popular media outlets, such as the New York Times, USA Today, and Wall Street Journal.  I am also frequently invited to speak at symposia and other events about class action litigation, such as the ABA National Institute on Class Actions in 2011 and the

ABA Annual Meeting in 2012.  Since 2010, I have also served on the Executive Committee of the Litigation Practice Group of the Federalist Society for Law & Public Policy Studies.

3.        In December 2010, I published an article in the Journal of Empirical Legal Studies entitled *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010) (hereinafter "Empirical Study").  This article is what I believe to be the most comprehensive examination of federal class action settlements and attorneys' fees that has ever been published.  Unlike other studies of class actions, which have been confined to securities cases or have been based on samples of cases that were not intended to be representative of the whole (such as settlements approved in published opinions), my study attempted to examine *every* class action settlement approved by a federal court over a two-year period, 2006-2007.  *See id*. at 812-13.  As such, not only is my study an unbiased sample of settlements, but the number of settlements included in my study is several times the number of settlements per year that has been identified in any other empirical study of class action settlements: over this two-year period, I found 688 settlements, including 54 from the Eleventh Circuit alone.  *See id*. at 817.  I presented the findings of my study at the Conference on Empirical Legal Studies at the University of Southern California School of Law in 2009, the Meeting of the Midwestern Law and Economics Association at the University of Notre Dame in 2009, and before the faculties of many law schools in 2009 and 2010.  This study has been relied upon by a number of courts, scholars, and testifying experts.  *See, e.g.*, *In re Heartland Payment Systems, Inc. Customer Data Sec. Breach Litigation*, 2012 WL 948365, at *30 (S.D.Tex., Mar. 20, 2012) (relying on article to set fees in a class action case); *Pavlik v. FDIC*, 2011 WL 5184445, at *4 (N.D.Ill., Nov. 1, 2011) (same); *In re Black Farmers Discrimination Litigation*, 2011 WL 5117058, at *33 (D.D.C., Oct. 27, 2011) (same); *In re AT & T Mobility Wireless Data*

*Services Sales Tax Litigation*, 792 F.Supp.2d 1028, 1033 (N.D.Ill. 2011) (same); *In re MetLife Demutualization Litigation*, 689 F.Supp.2d 297, 359 (E.D.N.Y. 2010) (same).

 4. I have been asked by class counsel to opine on whether the settlement they have asked the court to approve is fair, adequate, and reasonable, and whether the attorneys' fees they have requested are reasonable.  In order to formulate my opinion, I reviewed a number of documents provided to me by class counsel; I have attached a list of these documents (and noted how I refer to these documents herein) in Appendix 2.  As I explain, based on my study of settlements across the country and in the Eleventh Circuit in particular, I believe both the settlement agreement and fee request here are within the range of reason.

 II.  Case background

 5. These lawsuits allege that JPMorgan Chase Bank, N.A., (hereinafter "Chase") breached the covenant of good faith and fair dealing and other state laws of general application through its practice of sequencing customers' debit-card transactions from the largest amount to the smallest amount in order to maximize the number of overdraft fees it could charge its customers.  The *Luquetta* lawsuit was filed on September 24, 2009.  The *Lopez* lawsuit was filed on October 19, 2009.  The parties have now settled these lawsuits in a single agreement, and they have moved the court to certify a settlement class and approve the settlement.  The court preliminarily did so on May 24, 2012.

 6. The settlement class includes, with minor exceptions, all holders of Chase accounts who "from January 1, 2003, through and including March 29, 2010, incurred one or more Overdraft Fees as a result of High-to-Low Posting."[1]  Chase Settlement Agreement ¶ 65.

---

[1] Chase stopped the high-to-low sequencing of customers' debit card transactions on March 29, 2010.  *See* Chase Settlement Agreement ¶ 21.

Pursuant to the settlement agreement, the settlement class will release Chase from any and all claims pertaining to matters during the class period that "were or could have been alleged" in these lawsuits, including any claims arising out of "the calculation, assessment, imposition, amount, or collection of one or multiple Overdraft Fees . . . ." *See id.* at ¶ 121. In exchange, Chase will pay the class $110 million, to be distributed *pro rata* (after deducting attorneys' fees, expenses, and service awards to the named plaintiffs), and with no amount reverting to Chase. *See id.* at ¶¶ 68, 112-115, 119-120. Most settlement class members will receive their cash distributions automatically, without the need to file a claim form.[2] *See id.* at ¶¶ 94-97, 116. In addition to the cash compensation, Chase has also agreed in the settlement to an important change in its overdraft fee policy and practices: for at least two (2) years, Chase will no longer charge any of its consumer account holders (as of the date of preliminary approval) any overdraft fees on debit-card transactions of $5.00 or less.[3] *See id.* at ¶ 69. Based on an analysis of actual overdraft fees incurred during the period April 2012 through June 2012 by the settlement class members who are current Chase account holders, this change in practice is estimated to save the class approximately $52 million over the next two years (not to mention the savings to Chase's other customers). *See* Olsen Declaration ¶ 41. Finally, Chase has agreed to pay—in addition to the $110 million cash compensation—all of the costs associated with administering the settlement and notifying the class of the settlement, which are estimated to exceed $3 million. *See* Chase Settlement Agreement ¶ 70; Chase Joint Declaration ¶ 35. Therefore, the total value of the settlement is approximately $165 million.

---

[2] Because Chase lacks data with which to identify settlement class members or the amount of their damages during certain limited portions of the class period, the settlement agreement allows class members to submit claims covering those periods in addition to their eligibility to receive automatic distributions for damages sustained during the balance of the class period. *See* Chase Settlement Agreement ¶¶ 95, 98-109.

[3] It is my understanding that Chase implemented this new program in July 2012.

7.      Plaintiffs and class counsel are now moving for final approval of the settlement and class counsel are moving for an award of fees equal to thirty percent (30%) of the value of the settlement, minus the $3 million Chase is paying for settlement notification and administration—i.e., 30% of the $162 million in cash and estimated savings the class will enjoy from the change in overdraft fee practices Chase has adopted as part of the settlement.

III. Assessment of the reasonableness of the settlement

8.      Under Federal Rule of Civil Procedure 23, class actions can be settled "only with the court's approval," Fed. R. Civ. P. 23(e), and only if the settlement is "fair, reasonable, and adequate," Fed. R. Civ. P. 23(e)(2). The court is given this responsibility because the interests of class counsel, the class representatives, and the defendant can diverge from the interests of absent class members, and the court must ensure that the absent class members are treated fairly before they are bound to the agreement. *See, e.g.,* Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 Vand. L. Rev. 1623, 1630 (2009) (hereinafter "Objector Blackmail").

9.      Courts usually examine a number of factors in discharging this duty. In the Eleventh Circuit, courts have been instructed to consider at least six factors: "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the range of possible recovery at which a settlement is fair, adequate, and reasonable; (4) the anticipated complexity, expense, and duration of litigation; (5) the opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved." *Faught v. Amer. Home Shield Corp.*, 668 F.3d 1233, 1240 (11th Cir. 2012); *see also Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984). It is not possible to assess the fifth factor at this time because the deadline for objections to the settlement

5

has not yet passed.[4]  But, as I explain below, all of the other factors clearly counsel in favor of approving the settlement.

10.     Consider first the factors "(1) the likelihood of success at trial," "(2) the range of possible recovery," and "(3) the range of possible recovery at which a settlement is fair, adequate, and reasonable."  These factors together ask the court to assess whether the settlement is a fair value in light of the risks presented by the litigation.  That is, these factors ask the court to compare the relief called for in the settlement with the relief the plaintiffs might have recovered had the case gone forward, discounted by the risks of no or reduced recovery.  According to class counsel and their damages expert Arthur Olsen, class members were charged over $780 million in wrongful overdraft fees because Chase used high-to-low rather than chronological ordering of debit-card transactions.  *See* Olsen Declaration ¶ 20; Chase Joint Declaration ¶ 67.  Thus, the $110 million in cash consideration represents approximately 14% of the wrongful overdraft fees the settlement class members were charged.  On top of this $110 million, Chase has agreed to change practices that are estimated to save class members $52 million in future overdraft fees as well as to pay $3 million in estimated costs associated with class notice and settlement administration.  See Olsen Declaration ¶ 41; Chase Joint Declaration ¶¶ 2, 35.  All said, then, the settlement here is worth $165 million, or approximately 21% of the wrongful overdraft fees the settlement class members were charged.  In light of the risks and expense of class action litigation, it is not uncommon to see courts approve class action settlements with percentage recoveries much smaller than the one here.  *See, e.g., In re Cendant Corp. Litig.*, 264 F.3d 201, 241 & n.22 (3d Cir. 2001) (citing securities settlements with

---

[4] It is important to note that, even if there is opposition to the settlement from class members, not all opposition is created equal.  Although some class members file objections because they sincerely believe there is something amiss in the settlement, many others do so only to try to delay final resolution of the case and to use that delay to extract side payments from class counsel.  This phenomenon is known as objector blackmail, and courts are wise to stand guard against it.  *See generally* Fitzpatrick, *Objector Blackmail, supra*.

recoveries between 1.6% and 14% of damages). As I explain below, for three reasons, I believe the recovery here is a fair value in light of the risks presented by the litigation.

11.      First, it was not at all clear that the plaintiffs would have won their case on the merits had these suits gone forward. Chase argued throughout these suits that federal banking laws preempt the plaintiffs' claims. Although the court rejected these arguments, *see* Omnibus Motion to Dismiss Order at 9-16, this outcome was far from certain, and it is not certain the Eleventh Circuit would have come out the same way if these suits had gone forward and been appealed. Indeed, the very same preemption question presented here is currently under consideration by the United States Court of Appeals for the Ninth Circuit from an appeal of a judgment against Wells Fargo for similar debit-card practices. *See Gutierrez v. Wells Fargo Bank, N.A.*, (9th Cir., Nos. 10-16959, 10-17468, 10-17689) (argued May 15, 2012). If this case goes forward and the Ninth Circuit decides the preemption question differently than the court here did, these suits would lose much of their expected value. In addition, Chase argued throughout these suits that it adequately disclosed its high-to-low posting practices to its customers, and, as such, and in light of several other defenses, it did not breach the covenant of good faith and fair dealing or violate any other state laws. Although the court here rejected these arguments, others have not, *see* Omnibus Motion to Dismiss Order at 18-46, and, again, it is not at all clear how the Eleventh Circuit would have ruled.

12.      Second—and, in my view, even more important—the account agreements between Chase and the plaintiffs contained an arbitration clause that included a provision prohibiting the plaintiffs from suing Chase on a class-wide basis. *See* Chase Customer Agreement at 19. If Chase were permitted to enforce these provisions, each member of the proposed class here would be compelled to proceed individually against Chase in arbitration,

something few would do because the small individual recoveries at issue would make doing so cost prohibitive.  In other words, if Chase were permitted to enforce these provisions, it would effectively insulate Chase from this class action.  It is for this reason that many courts have held that these so-called "class action waivers" are unconscionable under state contract law.  *See, e.g.*, *Discover Bank v. Superior Court*, 113 P.3d 1100, 1110 (Cal. 2005).

13.     In April 2011, however, the United States Supreme Court held that the Federal Arbitration Act preempted such state laws, thereby rendering class action waivers enforceable. *See AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740 (2011).  This decision and the decisions that have applied *Concepcion* over the past eighteen months have created serious doubt that the plaintiffs here would be able to recover anything at all on a class-wide basis in these cases.  To begin with, although it is possible that the plaintiffs could find some way around the Supreme Court's *Concepcion* ruling and invalidate Chase's class waiver, I believe this possibility is a doubtful one.  It is true the Plaintiffs were permitted to take discovery of Chase in order to assess how often its customers had sought to invoke arbitration in the past to try to prove that enforcing the class waiver in Chase's arbitration agreement would not permit plaintiffs to vindicate meaningfully their rights under state law, *see* Arbitration Discovery Order at 1-3, but it is far from clear whether any vindication-of-rights exception to the Federal Arbitration Act exists for state (as opposed to federal) law claims.  *See Cruz v. Cingular Wireless*, LLC, 648 F.3d 1205, 1215 (11th Cir. 2011) (leaving question open); Myriam Gilles & Gary Friedman, *After Class: Aggregate Litigation in the Wake of* AT&T Mobility v. Concepcion, 79 U. Chi. L. Rev. 623, 641, 643-47 (2012) (acknowledging the difficulty of the argument).  Moreover, although it is also possible that the plaintiffs could find another provision in Chase's arbitration clause that would

render it unconscionable even if the class waiver no longer will, this, too, strikes me as doubtful.[5] Finally, even if the plaintiffs could find another problematic provision in Chase's arbitration clause, the Eleventh Circuit held very recently in related litigation against BB&T that such a provision could be severed from the rest of the arbitration clause, leaving enforceable the class waiver. *See In re Checking Account Overdraft Litig., MDL No. 2036*, 685 F.3d 1269, 1283 (11th Cir. 2011). Although Chase's arbitration clause does not have a severability provision like the one in BB&T's account agreements, *see id*. at 1282, a court could still decide from general principles of contract interpretation that any problematic provision of Chase's agreement was severable from the class waiver. *See, e.g.*, Restatement (Second) of Contracts § 208 ("If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result.").

14.     Indeed, had these lawsuits been filed today instead of in 2009, Chase no doubt would have invoked its arbitration clauses, and, for the reasons I noted above, these clauses very probably would have been enforced. These suits have survived in court as long as they have, in my view, in large measure because Chase did not immediately invoke arbitration when the suits were filed in 2009. Instead, Chase said it would invoke arbitration only against any new persons added to the lawsuits, including absent class members should a motion for class certification be filed. *See Lopez* Answer at 15 ("Affirmative Defense Concerning Arbitration"); *Luquetta* Answer at 16 ("Affirmative Defense Concerning Arbitration"). After *Concepcion* was decided,

---

[5] For example, the Eleventh Circuit has held in related litigation against BB&T that a one-sided fee-shifting provision—i.e., a provision that shifted BB&T's attorneys' fees to the customer regardless of whether BB&T prevailed in the arbitration—was unconscionable. *See In re Checking Account Overdraft Litig., MDL No. 2036*, 685 F.3d 1269, 1281-82, 1283 (11th Cir. 2011). But Chase's agreement does not contain a one-sided fee-shifting provision like the one in BB&T's agreement.

however, Chase invoked arbitration against the original plaintiffs as well (except plaintiff Luquetta, because she apparently did not have the same account agreement as everyone else). *See* Chase's Arbitration Motion re: Named Plaintiffs at 3.  As such, the plaintiffs argued that Chase waived its right to invoke arbitration in these suits.  But the plaintiffs' arguments in this regard are not without doubt.  Although the court here has found that some of the defendant banks waived arbitration in some of the related litigation, *see, e.g.*, Wells Fargo Arbitration Order at 6-9, waiver is a circumstance-specific inquiry and every set of circumstances is different.  Indeed, courts across the country have split over when and whether defendants who invoked arbitration only after *Concepcion* waived their rights,[6] and the Eleventh Circuit is currently considering that very question in related litigation against Wells Fargo, *see Garcia v. Wachovia Bank, N.A.*, (11th Cir., Nos. 11-16029EE, et al.) (oral argument Aug. 25, 2012). Moreover, even if the plaintiffs were to win their waiver arguments with regard to the named plaintiffs, it is an entirely different question whether Chase waived its rights against absent class members.  Prior to class certification, absent class members cannot be bound by what transpires in a piece of litigation.  *See Smith v. Bayer* Corp., 131 S.Ct. 2368, 2380 (2011).  As such, courts have split over whether defendants waive their arbitration rights against absent class members at the same time they waive them against named plaintiffs.  *Compare In re TFT-LCD (Flat Panel) Antitrust Litigation*, 2011 WL 1753784, *4 (N.D.Cal., May 09, 2011) (no waiver*) and Allied Sanitation, Inc. v. Waste Management Holdings, Inc.*, 97 F.Supp.2d 320, 328 (E.D.N.Y. 2000) (no waiver) *with In re Currency Conversion Fee Antitrust Litigation*, 361 F.Supp.2d 237, 257-58

---

[6] *Compare, e.g.*, *Kingsbury v. U.S. Greenfiber, LLC*, 2012 WL 2775022, at *2-*7 (C.D.Cal., June 29, 2012) (waiver) *and In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability*, 838 F.Supp.2d 967, 976-80 (C.D.Cal. 2012) (waiver); *Barkwell v. Sprint Communications Co., L.P.*, 2012 WL 112545, at *4-*6 (M.D.Ga., Jan. 12, 2012) (waiver) *with In re Apple iPhone 3G and 3GS MMS Marketing and Sales Practices Litigation*, 2012 WL 1069169, at *4-*6 (E.D.La., Mar. 29, 2012) (no waiver) *and In re Apple & AT & TM Antitrust Litig.*, 826 F.Supp.2d 1168, 1174 & n. 12 (N.D.Cal. 2011) (no waiver); *Brown v. TrueBlue, Inc.*, 2011 WL 5869773, at *5-*8 (M.D.Pa., Nov. 22, 2011) (no waiver).

(S.D.N.Y. 2005) (waiver).  In summary, whatever value these lawsuits have hinges, in large part, on whether Chase would ultimately be found to have waived its right to invoke arbitration against both the named plaintiffs *and* the absent class members.  This consideration alone—but certainly when combined with the other substantial uncertainties outlined above with regard to the merits—paints a very challenging picture for the plaintiffs had these lawsuits gone forward.

15.     Third, especially given the substantial risks associated with arbitration discussed above, the percentage recovery in this settlement is commensurate with the other settlements in this MDL that have already been approved by the court or for which final approval is pending. In the following table, I set forth each of these settlements, the sum of the cash and any valued changed practices called for in the settlement as a percentage of the class's damages (using chronological ordering as the baseline), whether the defendant had invoked arbitration, the approximate number of states comprising the plaintiff classes in each case,[7] and any other obvious considerations relevant to the risk and recovery in these suits:

---

[7] These numbers were provided to me by class counsel.  This factor is important because the lawsuits in this MDL are based on state law claims and the laws of the states vary to some extent; the greater the number of states represented by the class, the greater the risk raised by the predominance requirement under Fed. R. Civ. P. 23(b)(3).

**Table 1: Settlements in *In re: Checking Account Overdraft Litigation*, MDL No. 2036**

| Defendant | Final approval | Recovery as % of damages | Arbitration invoked? | No. of states | Other factors |
|---|---|---|---|---|---|
| Chase | Pending | 21% | Yes | 25 | |
| Bank of America[8] | 11/22/11 | 9-45% | No | 50 | Prior settlement |
| Bank of OK[9] | 9/13/12 | 46% | No | 9 | |
| Union[10] | 10/4/12 | 63% | No | 3 | Certified, 23(f) denied |
| Bank of the West[11] | Pending | 52% | No | 19 | |
| Associated[12] | Pending | 50% | No | 4 | |
| Commerce[13] | Pending | 45+% | No | 6 | |
| Great Western[14] | Pending | 50+% | No | 7 | |
| Citizens[15] | Pending | 42% | No | 13 | |
| TD[16] | Pending | 42% | No | 14 | Certified, 23(f) pending |
| Harris[17] | Pending | 65% | No | 10 | |
| M & I[18] | Pending | 25% | Yes | 10 | |

As this table shows, most of the settlements to date in this MDL recovered (or are poised to recover, if not yet finally approved) between 40% and 65% of the damages estimated by class counsel's expert, with the variation largely dependent on how likely the prospects for class certification appeared (including the prospects of surviving an appeal under Fed. R. Civ. P. 23(f) to review class certification).  The exceptions have been the Bank of America settlement and the settlement here and with M&I.  In my opinion, other factors justified the lower percentage recoveries in these settlements.  As I alluded to in the table, the low-end percentage recovered

---

[8] *See* Bank of America Joint Declaration ¶¶ 24-30, 68.

[9] *See* Bank of Oklahoma Joint Declaration ¶25.

[10] *See* Union Bank Joint Declaration ¶¶ 15, 49.

[11] *See* Bank of the West Joint Declaration ¶ 46.

[12] *See* Associated Bank Joint Declaration ¶ 50.

[13] *See* Commerce Bank Joint Declaration ¶ 45.  The total percentage recovery against Commerce Bank is unknown at this time because the changed practices it agreed to as part of its settlement have not yet been valued.

[14] *See* Great Western Joint Declaration ¶ 50.  The total percentage recovery against Great Western Bank is unknown at this time because the changed practices it agreed to as part of its settlement have not yet been valued.

[15] *See* Citizens Financial Joint Declaration ¶ 65.

[16] *See* TD Bank Joint Declaration ¶¶ 25-27, 54.

[17] *See* Harris Bank Joint Declaration ¶ 38.

[18] *See* M&I Joint Declaration ¶¶ 9, 39.

against Bank of America was impressive because class counsel estimated that approximately 80% of the value of the claims there had already been settled in state court in California; although class counsel were challenging that settlement, they had been rebuffed by the trial court and there was plenty of doubt that they would have any more success on appeal.  With regard to the settlement here and the one with M&I, the lower percentage recoveries are well justified, in my opinion, by the fact that these are the first settlements in this MDL where the defendant bank had invoked arbitration, and, as I explained above, arbitration clauses can create serious doubt whether account holders can recover anything at all on a class-wide basis.  In my opinion, the doubts created by these arbitration issues place the risk-recovery tradeoff here well in line with the other settlements in this MDL.

16. Consider next the factor "(4) the anticipated complexity, expense, and duration of litigation." This factor asks the court to assess whether the risk-recovery trade-off identified by the above factors might be further justified by the savings in time and expense that the settlement brings.  There is little doubt that going forward in these suits would entail not only great risk for the plaintiffs (as I explained above), but great expense and great delay as well.  At the time of settlement, the parties were in the midst of litigation over the arbitration issues I discussed above; whatever the resolution of these issues by the court here, there is no doubt that there would have been an interlocutory appeal (indeed, Chase previously filed one interlocutory appeal regarding arbitration, *see Larsen v. J.P. Morgan Chase Bank, N.A.*, 438 Fed.Appx. 894 (11th Cir. 2011) (vacating and remanding in light of *Concepcion*)).  The parties were also in the midst of litigation over class certification; again, whatever the resolution of this issue, there is little doubt that there would have been an interlocutory appeal (as there has been in the two other cases in this MDL where a class was certified before settlement, as I noted in Table 1).  In addition to

these matters, going forward here would have included litigating summary judgment, preparing for trial, completing trial and all that goes with it, litigating post-trial motions, and then litigating any appeals on the merits.  All of this would have probably consumed millions of dollars of class counsel's time and delay any payments to class members for several years.  As such, this factor further supports the settlement in this case.

17.    Consider next the factor "(6) the stage of proceedings at which the settlement was achieved."  This factor asks the court to satisfy itself that class counsel have dug far enough into the case to know what the case is worth and to enable the court to assess what the case is worth using the factors discussed above; it is largely a procedural consideration rather than a substantive one.   Here, the case has transpired over three years; it has been through a considerable amount of discovery both on the merits and with regard to the arbitration issues I discussed above; it has been the subject of extensive litigation over arbitration; and it has had the benefit of decisions by the court here and the Eleventh Circuit in related litigation involving other banks.   In other words, these lawsuits are at a mature stage; they were not rushed to settlement for a quick fee award.

18.    Consider finally one other factor that I believe should be examined in order to complete a thorough assessment of the fairness of this settlement: the majority of the settlement class members here will *automatically* receive their share of the settlement; they will not have to submit claim forms.  *See* Chase Settlement Agreement ¶¶ 94-97, 116.  This feature of the settlement is very unusual in my experience (although, it has been seen before in this MDL), and it is another reason to look favorably on the settlement.

19.     For all these reasons, but particularly those related to the risks presented by the arbitration issues here, I believe this settlement is not only fair, adequate and reasonable, but impressive as well.

IV. Assessment of the reasonableness of the request for attorneys' fees

20.     This is a so-called "common fund" settlement, where the efforts by attorneys for the plaintiffs have created a common fund for the benefit of class members, but, because this is a class action and there is no fee-shifting statute applicable, the attorneys can be compensated only from the fund they have created.  At one time, courts that awarded fees in common fund class action cases did so using the familiar lodestar approach.  *See* Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little*, 158 U. Pa. L. Rev. 2043, 2051 (2010) (hereinafter "Class Action Lawyers").  Under this approach, courts awarded class counsel a fee equal to the number of hours they worked on the case (to the extent the hours were reasonable), multiplied by a reasonable hourly rate as well as by a discretionary multiplier that courts often based on the risk of non-recovery and other factors.  *See id.*  Over time, however, the lodestar approach fell out of favor in common fund class action cases because it was difficult to calculate the lodestar (courts had to review voluminous time records and the like) and the method did not align the interests of class counsel with the interests of the class (because class counsels' recovery did not depend on how much the class recovered).  *See id.* at 2051-52; *Camden I Condominium Ass'n v. Dukle*, 946 F.2d 768, 771-74 (11th Cir. 1991).  According to my empirical study, the lodestar method is now used to award fees in only a small percentage of class action cases.  *See* Fitzpatrick, *Empirical Study*, *supra*, at 832 (finding the lodestar method used in only 12% of settlements).

21.      Reflecting this trend, the Eleventh Circuit held in 1991 that courts should no longer use the lodestar method in common fund cases, and, instead, should use what is known as the percentage-of-the-fund method.  *See Camden I*, 946 F.2d at 774 ("Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund . . . .").  Under this approach, courts select a percentage that they believe is fair to class counsel, multiply the settlement amount by that percentage, and then award class counsel the resulting product.  The percentage-of-the-fund approach has the advantages of being easy to calculate (because courts need not review voluminous time records and the like) and of aligning the interests of class counsel with the interests of the class (because the more the class recovers, the more class counsel recovers).  *See* Fitzpatrick, *Class Action Lawyers, supra,* at 2052.

22.      Courts usually examine a number of factors when deciding what percentage to award class counsel under the percentage-of-the-fund approach.  *See* Fitzpatrick, *Empirical Study, supra*, at 832.  In the Eleventh Circuit, courts use 25% as the "'bench mark' percentage fee award" and then adjust it upward or downward "in accordance with the individual circumstances of each case."  *Camden I*, 946 F.2d at 775.  Although "[t]he factors which will impact upon the appropriate percentage . . . in any particular case will undoubtedly vary," the Eleventh Circuit has identified sixteen factors that it has said may be "appropriate[]" or "pertinent" to consider.  *Camden I*, 946 F.2d at 775.  These factors include "[1] the time required to reach a settlement, [2] whether there are any substantial objections . . ., [3] any non-monetary benefits conferred upon the class . . ., and [4] the economics involved in prosecuting a class action," *id*., as well as the twelve factors from *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974): "[5] the time and labor required; [6] the novelty and difficulty of the questions involved; [7] the skill requisite to perform the legal service properly; [8] the

preclusion of other employment by the attorney due to acceptance of the case; [9] the customary fee; [10] whether the fee is fixed or contingent; [11] time limitations imposed by the client or the circumstances; [12] the amount involved and the results obtained; [13] the experience, reputation, and ability of the attorneys; [14] the 'undesirability' of the case; [15] the nature and length of the professional relationship with the client; [and] [16] awards in similar cases." *Camden I*, 946 F.2d at 772 n.3.

23.    In this case, class counsel are seeking an award of fees equal to thirty percent (30%) of the value of the settlement, minus the $3 million in estimated class notice and administration costs Chase has agreed to pay—or 30% of $162 million.[19]   In my opinion, the award requested here is within the range of reason because, not only is it appropriate to award class counsel a percentage of the value of Chase's changed practices as well as the cash portion of the settlement, but nearly all of the factors listed by the Eleventh Circuit suggest that this percentage should exceed the 25% benchmark.

24.    Consider first the factor "[3] any non-monetary benefits conferred upon the class."   When using the percentage-of-the-fund approach, courts compensate class counsel for their work in extracting non-cash relief from the defendant in a variety of ways.   When the non-cash relief cannot be reliably valued, courts often either increase the percentage awarded to class counsel from the cash portion of the settlement, *see, e.g., Staton v. Boeing Co.*, 327 F.3d 938, 946 (9th Cir. 2003) ("The fact that counsel obtained injunctive relief in addition to monetary relief for their clients is . . . a relevant circumstance to consider in determining what percentage of the fund is reasonable as fees."), or award class counsel a flat fee for the non-cash relief in addition to a percentage of the cash portion, *see, e.g., Faught v. American Home Shield Corp.*,

---

[19] Although the estimated $3 million in class notice and administration costs could also be considered part of the value of the settlement, class counsel are not asking for a percentage of this portion of the settlement.

668 F.3d 1233, 1243 (11th Cir. 2012) (affirming fee award of $1.5 million plus 25% of cash recovery).  When the non-cash relief can be reliably valued, courts have a third option: including the value of this relief in the common fund and awarding class counsel a percentage of the total fund.  *See, e.g., Staton*, 327 F.3d at 974 ("[W]here the value to individual class members of benefits deriving from injunctive relief can be accurately ascertained . . . courts [may] include such relief as part of the value of a common fund for purposes of applying the percentage method . . . ."); cases cited in footnote 22, *infra*; *see also* Principles of the Law of Aggregate Litigation, § 3.13(b) (American Law Institute, 2010) ("[A] percentage of the fund approach should be the method utilized in most common-fund cases, with the percentage being based on both the monetary and nonmonetary value of the judgment or settlement.").  In my opinion, it would be reasonable to follow the latter approach in this case—i.e., to award class counsel a percentage of both the cash and non-cash portions of the settlement—because I believe the valuation of the changed practices here is reliable.  Not only did the information for this valuation come directly from Chase, but it is based on an analysis of actual overdraft fees incurred by settlement class members on debit-card transactions of $5.00 or less during the three-month period immediately before the practice change was implemented.  *See* Olsen Declaration ¶ 41; Chase Joint Declaration ¶ 44.  Moreover, the valuation can be confirmed by a cost analysis Chase did in 2009 of the very same practice change.  In 2009, Chase considered foregoing overdraft fees on debit card transactions of $5.00 or less for internal business reasons, but decided not to do so after finding it could cost up to $211 million annually in lost revenue (or up to $422 million over two years).  *See* Chase Settlement Agreement ¶ 23.  The 2009 figure is somewhat greater than the figure estimated today; this may be because Chase has since eliminated a number of other practices that bear on overdraft fee revenue, including, perhaps

most importantly, its decision to end high-to-low posting after this litigation began.  *See* Chase Joint Declaration ¶ 45.  But the more important point is that, because Chase placed a larger figure on the very same practice change a few years ago, there is little reason to worry that the valuation submitted today is inflated.  As such, this factor supports the fee award requested here.

25.     Consider next the factors that go to the fee awards in other cases: "[9] the customary fee" and "[16] awards in similar cases."  According to my empirical study, there were 35 class action cases in 2006 and 2007 in which district courts in the Eleventh Circuit used the percentage-of-the-fund method to award attorneys' fees.  *See* Fitzpatrick, *Empirical Study, supra*, at 836.  The average fee awarded in these cases was 28.1% and the median fee awarded was 30%.[20]  *See id.*  These numbers are obviously very much in line with the award requested here.  Moreover, even when compared to fee awards outside the Eleventh Circuit, the fee requested in this case is within the range of other awards.  According to my empirical study, the most common percentages awarded by federal courts nationwide using the percentage-of-the-fund method were 25%, 30%, and 33%, with nearly two-thirds of awards between 25% and 35%, and with a mean award of 25.4% and a median award of 25%.  *See id.* at 833-34, 838.  Finally, even when compared to the subset of fee awards where the court based the fee on a percentage of the cash portion of a settlement as well as the value of changed practices, the fee request in this case is still within the range of other awards.  My database included five such cases, and the fee

---

[20]  In their empirical study, Ted Eisenberg and Geoff Miller found that the mean and median fee awards in the Eleventh Circuit were 21% and 22%, respectively.  *See* Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical L. Stud. 248, 260 (2010).  Their study was based on settlements from 1993 to 2008, and, as such, much of their data are old.  Moreover, their study examined only a fraction of the settlements over this period, and the fraction examined was not designed to be representative of the whole.  *See id.* at 253 ("[O]ur data include only opinions that were published in some readily available form.  Obviously, therefore, we have not included the full universe of cases . . . .  [P]ublished opinions are not necessarily representative of the universe of all cases.").  For example, over their *sixteen*-year period, their data included *fewer* Eleventh Circuit settlements (34) than I examined over my *two*-year period.  *See id.* at 260.  As such, I believe their study should not be read to detract from the findings I set forth in my study.  *See* Fitzpatrick, *Empirical Study, supra*, at 829 (discussing the unrepresentative sampling in the Eisenberg-Miller studies).

awards in those cases ranged from 9.3% to 33.3% of the value of the settlements.[21]  One of these five settlements was even larger than the one here: in *Hillenbrand*, the court awarded class counsel 25% of the $468.6 million total value of a settlement, which consisted of a cash portion of $316.3 million and changed practices valued at $152.3 million.[22]  The court rejected any notion that the fee percentage should exclude the value of the changed practices because, like here, the changed practices had "real, measurable value to the class."[23]  As such, these factors, too, support the fee request here.

26.      It is true that, because class counsel must be paid in cash (rather than saved overdraft fees), the fee award attributable to the cash portion of this settlement and the fee award attributable to the future savings of overdraft fees must both come from the cash portion of the settlement.  As such, if the request here is granted, class counsel's fee will consume a share of the cash portion alone in excess of 30%.  But, of course, this will always be the case when a court compensates class counsel for their efforts in securing non-monetary relief, and the Eleventh Circuit has held that there is no need to reduce a fee request for this reason.  In particular, in the *Faught* case, the district court awarded class counsel $1.5 million for work on winning changes to the defendant's practices in addition to 25% of the cash recoveries class members received.  *See Faught*, 668 F.3d at 1238.  Objectors who appealed the fee award

---

[21] *See Spartanburg Regional Health Service District, Inc. v. Hillenbrand Industries, Inc.* (D.S.C., No. 03-2141); *In re Sprint Corp. ERISA Litigation* (D.Kan., No. 03-2202); *Bynum v. Government of District of Columbia* (D.D.C., No. 02-956); *Desantis v. Snap-On Tools Co., LLC* (D.N.J., No. 06-2231); *Humphrey v. Hexion Specialty Chemicals, Inc.* (W.D.Ky, No. 06-276).  Although, as I mention below, I believe it is not necessary (especially in light of the Eleventh Circuit's disinterest in the question in *Faught*) to consider separately what percentage of the cash portion alone would be consumed by a fee award intended to reward work on the non-cash portion of the settlement, I will note that the fee request here would not be unusual in that regard, either: in these five cases, the fee awards consumed between 13% and 46% of the cash portions alone.  Thus, no matter how you frame the question, the award requested here would be consistent with fee awards in other cases.

[22] *See Spartanburg Regional Health Service District, Inc. v. Hillenbrand Industries, Inc.* (D.S.C., No. 03-2141, Aug. 15, 2006).

[23] *See id*. at 5.

20

contended that the award attributable to the changed practices would push the total award "outside the 25% fee that this circuit has said is the benchmark." *Id*. at 1243. The Eleventh Circuit, however, rejected this challenge: "These arguments ignore the district court's finding that the $1.5 million payment is designed to compensate the class counsel for the non-monetary benefits they achieved for the class . . . to which the 25% fee is not applied." *Id*. at 1243-44. Indeed, the Eleventh Circuit appeared to be wholly unconcerned with how far the fee award attributable to the non-cash portion of the settlement would drive class counsel's take of the cash portion: the court affirmed the award despite the fact that, "because there [was] no fixed common fund," there was "no way to determine by what percentage the additional $1.5 million increases the attorneys' fee award." *Id*. at 1243. In my view, the Eleventh Circuit has it right: if courts refuse to compensate class counsel for work extracting non-cash relief because it would end up consuming too much of the cash portions of settlements, it would be tantamount to rejecting the notion that class counsel ought to be additionally compensated for the additional work that they do in securing non-monetary benefits. Not only would this be contrary, as I noted above, to the approach of the Eleventh Circuit and other courts, but it would also create perverse incentives for class counsel: if class counsel are not compensated in some way for pursuing non-monetary relief, then they will have no incentive to pursue it even when it may be more valuable to the class than the monetary relief.

27.     It should also be noted that the nationwide data in my empirical study showed that settlement size had a statistically significant but inverse relationship with the fee percentages awarded by federal courts—*i.e.*, that federal courts awarded lower percentages in cases where settlements were larger. *See* Fitzpatrick, *Empirical Study, supra,* at 838, 842-44. The settlement here is on the larger side: in my empirical study, only 41 settlements nationwide (less than 7%)

exceeded $100 million.  *See id.* at 828.  It is therefore unsurprising that the award requested here would exceed the mean and median fee percentages (17.9% and 16.9%, respectively) awarded in the fourteen percentage-of-the-fund settlements in my dataset between $100 and $250 million. *See id.* at 839.  As I explain below, however, I do not believe these nationwide data detract from my opinion that the award requested here is within the range of reasonable awards.

28.      First, I have found no evidence that district courts in the Eleventh Circuit are lowering fee percentages as settlement amounts increase, even though district courts in other circuits may be doing so.  In particular, when I separated from the settlements in other circuits the 35 percentage-of-the-fund settlements in my dataset from district courts in the Eleventh Circuit, I found no statistically significant relationship between settlement size and fee percentage.  Indeed, district courts in the Eleventh Circuit—including the court here—have explicitly rejected this idea.  *See, e.g., In re Checking Account Overdraft Litigation*, 830 F.Supp.2d 1330, 1367 (S.D.Fla. 2011) (rejecting argument); *Allapattah Services, Inc. v. Exxon Corp.*, 454 F.Supp.2d 1185, 1213 (S.D.Fla. 2006) ("While some reported cases have advocated decreasing the percentage awarded as the gross class recovery increases, that approach is antithetical to the percentage of the recovery method adopted by the Eleventh Circuit . . . . .  By not rewarding class counsel for the additional work necessary to achieve a better outcome for the class, the sliding scale approach creates the perverse incentive for class counsel to settle too early for too little.").

29.      Second, the practice among some district courts to decrease fee percentages as settlement amounts increase has been criticized by many scholars and other courts, and, in my opinion, courts in the Eleventh Circuit should not begin emulating this practice in cases such as these here.  In particular, courts and commentators have worried that lowering percentages as

settlement sizes increase will blunt the incentives of class counsel to fight for the largest settlement, and, indeed, might incentivize class counsel to settle cases earlier for smaller sums. *See, e.g.*, *In re Cendant Corp. Litigation*, 264 F.3d 201, 284 n. 55 (3d Cir. 2001) ("Th[e] position [that the percentage of a recovery devoted to attorneys fees should decrease as the size of the overall settlement or recovery increases] . . . has been criticized by respected courts and commentators, who contend that such a fee scale often gives counsel an incentive to settle cases too early and too cheaply." (alteration in original)).   Consider the following example: if courts award class counsel 30% of settlements if they are under $100 million, but only 20% of settlements if they are over $100 million, then rational class counsel will prefer to settle cases for $90 million (*i.e.*, a $27 million fee award) than $125 million (*i.e.*, a $25 million fee award). Such incentives are obviously perverse.   Although it is true that class actions can decrease the per capita cost of representation, and that there are arguments that these economies of scale should be passed along to class members in the form of lower fee percentages, *see* Fitzpatrick, *Class Action Lawyers*, *supra*, at 2066, the amount of money for which a class action settles does not necessarily reflect the number of people in the action (and, therefore, the per capita cost of the representation).   Moreover, even when larger settlements do reflect larger class sizes (and lower per capita costs of representation), it is difficult to justify decreasing fee percentages as settlements increase in cases where class members have only small amounts of money at stake, which appears to be true here.   As scholars have long recognized, in these so-called "small stakes cases," the most important function of the class action device may not be compensation of class members, but deterrence of wrongdoing.   *See id*. at 2069 (citing David Shapiro, *Class Actions: The Class as Party and Client*, 73 Notre Dame L. Rev. 913 (1998); Myriam Gilles & Gary Friedman, *Exploding the Class Action Agency Costs Myth: The Social Utility of Entrepreneurial*

*Lawyers*, 155 U. Pa. L. Rev. 103 (2006)).  In order to deter wrongdoing, lawyers must be given incentives to invest their own time and money in class actions despite the risk of earning nothing if they are unsuccessful.  Yet, these incentives are blunted for the very cases offering the greatest deterrence (*i.e.*, larger cases) when courts award lower fee percentages as settlements become larger.  Although trading away deterrence for other ends may be justifiable in some cases, it is difficult to justify it in small-stakes cases like this one, where deterrence is the paramount consideration.  *See id.* at 2069-74.

30.     Consider next the factors that go to the results obtained by class counsel in light of the risks class counsel faced: "[4] the economics involved in prosecuting a class action," "[6] the novelty and difficulty of the questions involved," "[8] the preclusion of other employment by the attorney due to acceptance of the case," "[10] whether the fee is fixed or contingent," "[12] the amount involved and the results obtained," and "[14] the 'undesirability' of the case."  All of these factors support exceeding the benchmark here.  As I explained above, the recovery in these suits was impressive in light of the risks class counsel faced.  Not only did class counsel face serious questions whether the plaintiffs' claims were preempted by federal law or whether they would fail in light of the disclosures in Chase's account agreements and other such defenses, but, unlike all but one other settlement to date in this MDL, there was an even more serious question whether the plaintiffs could maintain a class action at all in light of the waivers found in Chase's arbitration agreements.

31.     Consider finally the other *Camden* factors.  One of these factors is inapplicable because, as I noted above, the period for objection has not yet closed: "[2] whether there are any substantial objections."  But the other remaining factors look favorably on the fee award requested here.  Two of these factors go to the time it took to litigate and settle these cases: "[1]

the time required to reach a settlement" and "[5] the time and labor required."  These factors support the award requested here because, not only have these lawsuits transpired for over three years, but they have been very busy during that time.  In addition to the extensive motions practice before this court and the Eleventh Circuit that I noted above, Chase produced and class counsel reviewed nearly one million pages of discovery.  *See* Chase Joint Declaration ¶ 24. Class counsel also prepared for and took over a dozen lengthy depositions of Chase's current and former employees, among others.  *See id*. at 26.  The other factors go to the skills of class counsel and their relationship with the plaintiffs: "[7] the skill requisite to perform the legal service properly," "[11] time limitations imposed by the client or the circumstances," "[13] the experience, reputation, and ability of the attorneys," and "[15] the nature and length of the professional relationship with the client."  Although I was not privy to the attorney-client relationships here, I can say that class counsel count among their number some of the most experienced and highly regarded lawyers in the United States.  These are not mere "benchmark" lawyers.

32.     For all these reasons, I believe fee award requested here is within the range of reason.

33.     My compensation in this matter is $495 per hour plus expenses.

Nashville, TN

October 15, 2012


/s/ Brian T. Fitzpatrick

Brian T. Fitzpatrick

# Appendix 1

# BRIAN T. FITZPATRICK

Vanderbilt University Law School
131 21st Avenue South
Nashville, TN 37203
(615) 322-4032
brian.fitzpatrick@law.vanderbilt.edu

## ACADEMIC APPOINTMENTS

**VANDERBILT UNIVERSITY LAW SCHOOL**, *Professor*, August 2012 to present
- *Associate Professor*, 2010-2012; *Assistant Professor*, 2007-2010
- Classes: Civil Procedure, Federal Courts, Complex Litigation
- Hall-Hartman Outstanding Professor Award, 2008-2009
- Vanderbilt's Association of American Law Schools Teacher of the Year, 2009

## EDUCATION

**HARVARD LAW SCHOOL**, J.D., *magna cum laude*, 2000
- Fay Diploma (for graduating first in the class)
- Sears Prize, 1999 (for highest grades in the second year)
- *Harvard Law Review*, Articles Committee, 1999-2000; Editor, 1998-1999
- *Harvard Journal of Law & Public Policy*, Senior Editor, 1999-2000; Editor, 1998-1999
- Research Assistant, David Shapiro, 1999; Steven Shavell, 1999

**UNIVERSITY OF NOTRE DAME**, B.S., Chemical Engineering, *summa cum laude*, 1997
- First runner-up to Valedictorian (GPA: 3.97/4.0)
- Steiner Prize, 1997 (for overall achievement in the College of Engineering)

## CLERKSHIPS

**HON. ANTONIN SCALIA**, Supreme Court of the United States, 2001-2002

**HON. DIARMUID O'SCANNLAIN**, U.S. Court of Appeals for the Ninth Circuit, 2000-2001

## EXPERIENCE

**NEW YORK UNIVERSITY SCHOOL OF LAW**, Feb. 2006 to June 2007
*John M. Olin Fellow*

**HON. JOHN CORNYN**, United States Senate, July 2005 to Jan. 2006
*Special Counsel for Supreme Court Nominations*

**SIDLEY AUSTIN LLP**, Washington, DC, 2002 to 2005
*Litigation Associate*

## ACADEMIC ARTICLES

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, 98 VA. L. REV. 839 (2012)

Twombly *and* Iqbal *Reconsidered*, 87 NOTRE DAME L. REV. 1621 (2012)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 7 J. EMPIRICAL L. STUD. 811 (2010) (selected for the 2009 Conference on Empirical Legal Studies)

*Do Class Action Lawyers Make Too Little?*, 158 U. PA. L. REV. 2043 (2010)

*Originalism and Summary Judgment*, 71 OHIO ST. L.J. 919 (2010)

*The End of Objector Blackmail?*, 62 VAND. L. REV. 1623 (2009) (selected for the 2009 Stanford-Yale Junior Faculty Forum)

*The Politics of Merit Selection*, 74 MISSOURI L. REV. 675 (2009)

*Errors, Omissions, and the Tennessee Plan*, 39 U. MEMPHIS L. REV. 85 (2008)

*Election by Appointment: The Tennessee Plan Reconsidered*, 75 TENN. L. REV. 473 (2008)

*Can Michigan Universities Use Proxies for Race After the Ban on Racial Preferences?*, 13 MICH. J. RACE & LAW 277 (2007)


## BOOK CHAPTERS

*Civil Procedure in the Roberts Court* in BUSINESS AND THE ROBERTS COURT (Jonathan Adler, ed., Oxford University Press, forthcoming 2012)


## ACADEMIC PRESENTATIONS

*The Problem: AT & T as It Is Unfolding*, Conference on *AT & T Mobility v. Concepcion*, Cardozo Law School (Apr. 26, 2012) (panelist)

*Standing under the Statements and Accounts Clause,* Conference on Representation without Accountability*,* Corporate Law Center, Fordham Law School (Jan. 23, 2012)

*The End of Class Actions?*, Washington University Law School (Dec. 9, 2011)

*Book Preview Roundtable: Accelerating Democracy: Matching Social Governance to Technological Change*, Searle Center on Law, Regulation, and Economic Growth, Northwestern University School of Law (Sep. 15-16, 2011) (participant)

*Is Summary Judgment Unconstitutional?  Some Thoughts About Originalism*, Stanford Law School (Mar. 3, 2011)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Northwestern Law School (Feb. 25, 2011)

*The New Politics of Iowa Judicial Retention Elections: Examining the 2010 Campaign and Vote*, University of Iowa Law School (Feb. 3, 2011) (panelist)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Washington University Law School (Oct. 1, 2010)

Twombly *and* Iqbal *Reconsidered,* Symposium on Business Law and Regulation in the Roberts Court, Case Western Reserve Law School (Sep. 17, 2010)

*Do Class Action Lawyers Make Too Little?*, Institute for Law & Economic Policy, Providenciales, Turks & Caicos (Apr. 23, 2010)

*Originalism and Summary Judgment*, Georgetown Law School (Apr. 5, 2010)

*Theorizing Fee Awards in Class Action Litigation*, Washington University Law School (Dec. 11, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Conference on Empirical Legal Studies, University of Southern California Law School (Nov. 20, 2009)

*Originalism and Summary Judgment*, Symposium on Originalism and the Jury, Ohio State Law School (Nov. 17, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Meeting of the Midwestern Law and Economics Association, University of Notre Dame Law School (Oct. 10, 2009)

*The End of Objector Blackmail?*, Stanford-Yale Junior Faculty Forum, Stanford Law School (May 29, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, University of Minnesota School of Law (Mar. 12, 2009)

*The Politics of Merit Selection*, Symposium on State Judicial Selection and Retention Systems, University of Missouri Law School (Feb. 27, 2009)

*The End of Objector Blackmail?*, Searle Center Research Symposium on the Empirical Studies of Civil Liability, Northwestern University School of Law (Oct. 9, 2008)

*Alternatives To Affirmative Action After The Michigan Civil Rights Initiative*, University of Michigan School of Law (Apr. 3, 2007) (panelist)

**OTHER PUBLICATIONS**

*Did the Supreme Court Just Kill the Class Action?*, THE QUARTERLY JOURNAL (April 2012)

*Let General Assembly Confirm Judicial Selections*, CHATTANOOGA TIMES FREE PRESS (Feb. 19, 2012)

*"Tennessee Plan" Needs Revisions*, THE TENNESSEAN (Feb. 3, 2012)

*How Does Your State Select Its Judges?*, INSIDE ALEC 9 (March 2011) (with Stephen Ware)

*On the Merits of Merit Selection*, THE ADVOCATE 67 (Winter 2010)

*Supreme Court Case Could End Class Action Suits,* SAN FRANCISCO CHRONICLE (Nov. 7, 2010)

*Kagan is an Intellect Capable of Serving Court*, THE TENNESSEAN (Jun. 13, 2010)

*Confirmation "Kabuki" Does No Justice*, POLITICO (July 20, 2009)

*Selection by Governor may be Best Judicial Option*, THE TENNESSEAN (Apr. 27, 2009)

*Verdict on Tennessee Plan May Require a Jury*, THE MEMPHIS COMMERCIAL APPEAL (Apr. 16, 2008)

*Tennessee's Plan to Appoint Judges Takes Power Away from the Public*, THE TENNESSEAN (Mar. 14, 2008)

*Process of Picking Judges Broken*, CHATTANOOGA TIMES FREE PRESS (Feb. 27, 2008)

*Disorder in the Court*, LOS ANGELES TIMES (Jul. 11, 2007)

*Scalia's Mistake*, NATIONAL LAW JOURNAL (Apr. 24, 2006)

*GM Backs Its Bottom Line*, DETROIT FREE PRESS (Mar. 19, 2003)

*Good for GM, Bad for Racial Fairness*, LOS ANGELES TIMES (Mar. 18, 2003)

*10 Percent Fraud*, WASHINGTON TIMES (Nov. 15, 2002)

## OTHER PRESENTATIONS

*Life as a Supreme Court Law Clerk and Views on the Health Care Debate*, Exchange Club of Nashville (Apr. 3, 2012)

*The Tennessee Judicial Selection Process—Shaping Our Future*, Tennessee Bar Association Leadership Law Retreat, Dickson, TN (Feb. 3, 2012) (panelist)

*Reexamining the Class Action Practice*, ABA National Institute on Class Actions, New York, NY (Oct. 14, 2011) (panelist)

*Judicial Selection in Kansas*, Committee on the Judiciary, Kansas House of Representatives (Feb. 16, 2011)

*Judicial Selection and the Tennessee Constitution*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Mar. 24, 2009)

*What Would Happen if the Judicial Selection and Evaluation Commissions Sunset?*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Feb. 24, 2009)

*Judicial Selection in Tennessee*, Chattanooga Bar Association, Chattanooga, TN (Feb. 27, 2008) (panelist)

*Ethical Implications of Tennessee's Judicial Selection Process*, Tennessee Bar Association, Nashville, TN (Dec. 12, 2007)

# Appendix 2

Documents Reviewed:

- Omnibus Motion to Dismiss and/or For Judgment On the Pleadings and Incorporated Memorandum of Law in *In Re: Checking Account Overdraft Litigation*, No. 1:09-MD-02036-JLK (S.D.Fla.) (document 217, entered 12/22/09)

- JPMorgan Chase's [hereinafter "Chase"] Supplemental Motion to Dismiss the *Luquetta* Complaint and Incorporated Memorandum of Law in *Luquetta v. JPMorgan Chase Bank, N.A.*, No. 1:09-cv-23432-JLK (S.D.Fla.) (document 222, entered 12/22/09)

- Chase's Supplemental Motion to Dismiss the *Lopez* Complaint and Incorporated Memorandum of Law in *Lopez v. JPMorgan Chase Bank, N.A.*, No. 1:09-cv-23127-JLK (S.D.Fla.) (document 225, entered 12/22/09)

- Plaintiffs' Memorandum in Opposition to Defendants' Omnibus Motion to Dismiss and/or For Judgments on the Pleadings in *In Re: Checking Account Overdraft Litigation* (document 265, entered 2/5/10)

- Order Ruling on Omnibus Motion to Dismiss in *In Re: Checking Account Overdraft Litigation* (document 305, entered 3/11/10) ("Omnibus Motion to Dismiss Order")

- Motion to Clarify Court's March 11, 2010 Order Ruling on Omnibus Motion to dismiss and/or For Judgment on the Pleadings and Incorporated Memorandum of Law in *In Re: Checking Account Overdraft Litigation* (document 325, entered 4/5/10)

- Defendants' Motion for Certification under 28 U.S.C. § 1292(b) and Incorporated Memorandum of Law in *In Re: Checking Account Overdraft Litigation* (document 326, entered 4/5/10)

- Chase's Motion for Reconsideration or, in the Alternative, Certification Pursuant to 28 U.S.C. § 1292(b), of the Court's Order Regarding the *Lopez* and *Luquetta* Complaints in *Lopez* and *Luquetta* (document 329, entered 4/5/10)

- Amended Class Action Complaint in *Lopez* ("*Lopez* Complaint"), including the Chase Account Rules and Regulations attached as Exhibit A thereto ("Chase Customer Agreement") (document 347, entered 4/12/10)

- Second Amended Class Action Complaint in *Luquetta* ("*Luquetta* Complaint"), including the Chase Account Rules and Regulations attached as Exhibit A thereto ("Chase Customer Agreement") (document 348, entered 4/12/10)

- Chase's Response to Order of Court Dated April 14, 2010 regarding Arbitration in *Lopez* and *Luquetta* (document 367, entered 4/16/10)

- Chase's Unopposed Motion for Extension of Time to Answer Amended Complaints in *Lopez* and *Luquetta* (document 451, entered 5/11/10)

- Answer to Amended Class Action Complaint as to Plaintiffs Lopez, Stone, Reed, and McDaniel in *Lopez* (document 501, entered 5/21/10) ("*Lopez* Answer")

- Answer to Second Amended Class Action Complaint as to Plaintiff Luquetta in *Luquetta* (document 502, entered 5/21/10) ("*Luquetta* Answer")

- Chase's Motion to Stay Proceedings Relating to Claims of Plaintiffs Williams, Biss, Ruiz, Ruiz, Kirkland, and Miller, and Incorporated Memorandum of Law in *Luquetta* (document 505, entered 5/21/10)

- Chase's Motion to Stay Proceedings Relating to Claims of Plaintiffs Larsen, Lowe, Palacios, Palacios, and Walsh-Duffy, and Incorporated Memorandum of Law in *Lopez* (document 508, entered 5/21/10)

- Order Denying Chase's Motions to Stay Proceedings in the *Lopez* and *Luquetta* cases (document 594, entered 6/16/10)

- Order Denying Defendant Banks' Motion for Certification under 28 U.S.C. § 1292(b) in *In Re: Checking Account Overdraft Litigation* (document 624, entered 7/1/10)

- Order Denying Chase's Motion for Reconsideration, or, in the Alternative, Certification Pursuant to 28 U.S.C. § 1292(b) in *Lopez* and *Luquetta* (document 625, entered 7/1/10)

- Plaintiffs' Motion for Class Certification and Incorporated Memorandum of Law in *Lopez* and *Luquetta* (filed under seal Apr. 4, 2011; refiled with limited redactions as document 2195, entered 11/5/11)

- Chase's Motion to Stay or Dismiss, in Favor of Arbitration, the Proceedings Relating to Claims of Plaintiffs Lopez, McDaniel, Reed, and Stone, and Incorporated Memorandum of Law in *Lopez* (document 1444, entered 5/6/11) ("Chase's Arbitration Motion re: Named Plaintiffs")

- Plaintiffs' Response in Opposition to Chase's Motion to Stay or Dismiss in Favor of Arbitration in *Lopez* (document 1506, entered 5/19/11)

- Chase's Motion to Stay the Proceedings, in Favor of Arbitration, as to Putative Absent Class Members, and Incorporated Memorandum of Law in *Luquetta* (document 1616, entered 6/16/11) ("Chase's Arbitration Motion re: Absent Class Members")

- Chase's Successor Motion for a Stay of Judicial Proceedings, in Favor of Arbitration, as to the Named Plaintiffs and Absent Putative Class Members in *Lopez* and *Luquetta* (document 1905, entered 9/29/11)

- Chase's Brief in Support of its Successor Motion for a Stay of Judicial Proceedings, in Favor of Arbitration, as to the Named Plaintiffs and Absent Putative Class Members in *Lopez* and *Luquetta* (document 1906, entered 9/29/11)

- Order Deferring Ruling on Chase's Motion to Compel Arbitration, Granting 45 Days to Conduct Limited Arbitration-Related Discovery in *Lopez* and *Luquetta* (document 1985, entered 10/14/11) ("Arbitration Discovery Order")

- Plaintiffs' Unopposed Motion for Preliminary Approval of Class Settlement and for Certification of Settlement Class and Incorporated Memorandum of Law in *Lopez* and *Luquetta*, including the Settlement Agreement and Release attached as Exhibit A thereto ("Chase Settlement Agreement") (document 2710, entered 5/22/12)

- Order Preliminarily Approving Class Settlement and Certifying Settlement Class in *Lopez* and *Luquetta* (document 2712, entered 5/24/12)

- *Larsen, et al. v. JPMorgan Chase Bank, N.A.* (11th Cir., Nos. 10-12936 & 10-12937, Aug. 26, 2011)

- Brief for Appellant in *Larsen* (dated Aug. 6, 2010)

- Brief of Appellees in *Larsen* (dated Sep. 17, 2010)

- Reply Brief for Appellant in *Larsen* (dated Oct. 8, 2010)

- Order Denying Motion to Dismiss, or in the Alternative, Stay in Favor of Arbitration in *Garcia, et al. v. Wachovia Bank, N.A.*, and related cases (document 2224, entered 12/15/11) ("Wells Fargo Arbitration Order")

- Brief for Defendant-Appellant Wells Fargo Bank, N.A., in *Garcia, et al. v. Wachovia Bank, N.A.* and related cases (11th Cir., Nos. 11-16029EE, et al.) (dated Feb. 21, 2012)

- Brief of Appellees in *Garcia* and related cases (dated Apr. 2, 2012)

- Reply Brief of Defendant-Appellant Wells Fargo Bank, N.A., in *Garcia* and related cases (dated Apr. 19, 2012)

- *Barras v. Branch Banking & Trust Co.* (11th Cir., No. 11-14318, July 6, 2012)

- *Powell-Perry v. Branch Banking & Trust Co.* (11th Cir., No. 11-14319, July 31, 2012)

- Petition for Certiorari in *Hough, et ux., v. Regions Financial Corp., et al.* (S.Ct., No. 12-139) (dated July 26, 2012)

- Brief in Opposition in *Hough* (dated Aug. 30, 2012)

- Petition for Certiorari in *Buffington v. SunTrust Banks, Inc.* (S.Ct., No. 12-146) (dated July 30, 2012)

- Brief in Opposition in *Buffington* (filed Aug. 29, 2012)

- Joint Declaration of Robert C. Gilbert and Michael W. Sobol in Support of Plaintiffs' Motion for Final Approval of Settlement, Application for Service Awards, and Class Counsel's Application for Attorney's Fees in *Tornes, et al., v. Bank of America* and related cases ("Bank of America Joint Declaration") (document 1885-3, entered 9/16/11)

- Joint Declaration of Robert C. Gilbert, Michael W. Sobol, Jeffrey M. Ostrow, and Elaine Ryan in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Settlement and Certification of Settlement Class in *Dee v. Bank of the West* and related cases ("Bank of the West Joint Declaration") (document 2823-2, entered 7/11/12)

- Joint Declaration of Robert C. Gilbert, Hassan Zavareel, Jeffrey M. Ostrow, and Burton Finkelstein in *Terry Case v. Bank of Oklahoma* ("Bank of Oklahoma Joint Declaration") (document 2843-2, entered 7/16/12)

- Joint Declaration of Robert C. Gilbert and Jeffrey M. Ostrow in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Settlement and for Certification of Settlement Class in *Harris v. Associated Bank, N.A.* ("Associated Bank Joint Declaration") (document 2852-2, entered 7/24/12)

- Joint Declaration of Robert C. Gilbert and Michael W. Sobol in Support of Plaintiffs' Motion for Final Approval of Settlement, Application for Service Awards, and Class Counsel's Application for Attorney's Fees and Expenses in *Larsen v. Union Bank, N.A.* ("Union Bank Joint Declaration") (document 2859-2, entered 7/30/12)

- Joint Declaration of Robert C. Gilbert and Jeffrey M. Ostrow in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Settlement and For Certification of Settlement Class in *Wolfgeher v. Commerce Bank, N.A.* ("Commerce Bank Joint Declaration") (document 2879-2, entered 8/14/12)

- Joint Declaration of Robert C. Gilbert and Jeffrey M. Ostrow in Support of Plaintiff's Unopposed Motion for Preliminary Approval of Class Settlement and for Certification of Settlement Class in *McKinley v. Great Western Bank* ("Great Western Joint Declaration") (document 2912-2, entered 8/27/12)

- Joint Declaration of Aaron S. Podhurst, Robert C. Gilbert, and Ted Trief in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Settlement and For Certification of Settlement Class in *Duval v. Citizens Financial Group, Inc.* and related cases ("Citizens Financial Joint Declaration") (document 2955-2, entered 9/18/12)

- Joint Declaration of Robert C. Gilbert and Peter Prieto in Support of Plaintiffs' and Class Counsel's Unopposed Motion for Preliminary Approval of Class Settlement and

Certification of Settlement Class in *Mosser v. TD Bank, N.A.* and related cases ("TD Bank Joint Declaration") (document 2956-2, entered 9/18/12)

- Joint Declaration of Robert C. Gilbert and Jeffrey M. Ostrow in Support of Plaintiffs' and Class Counsel's Unopposed Motion for Preliminary Approval of Class Settlement and for Certification of Settlement Class in *Blahut v. Harris Bank, N.A.* ("Harris Bank Joint Declaration") (document 2979-2, entered 10/1/12)

- Joint Declaration of Robert C. Gilbert and Jeffrey M. Ostrow in Support of Plaintiffs' and Class Counsel's Unopposed Motion for Preliminary Approval of Class Settlement and for Certification of Settlement Class in *Eno v. M & I Marshall & Ilsley Bank* ("M&I Joint Declaration") (document 2981-2, entered 10/1/12)

- Joint Declaration of Aaron S. Podhurst, Bruce S. Rogow, Robert C. Gilbert, Russell Budd, and Richard Golomb in Support of Plaintiffs' and Class Counsel's Motion for Final Approval of Settlement, and Application for Service Awards, Attorneys' Fees and Expenses in *Lopez* and *Luquetta* (filed herewith) ("Chase Joint Declaration")

- Declaration of Arthur Olsen in Support of Final Approval of Class Action Settlement with JPMorgan Chase Bank, N.A., in *Lopez* and *Luquetta* (filed herewith) ("Olsen Declaration")