# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:09-MD-02036-JLK

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

THIS DOCUMENT RELATES TO:
FOURTH TRANCHE BANKS

*Orallo v. Bank of the West*
C.D. Cal. Case No. 2:10-cv-2469
S.D. Fla. Case No. 1:10-cv-22931-JLK

*Dee v. Bank of the West*
N.D. Cal. Case No. 4:10-cv-02736
S.D. Fla. Case No. 1:10-cv-22985-JLK

## DECLARATION OF PROFESSOR GEOFFREY MILLER

I, Geoffrey P. Miller, declare as follows:

1.      I am the Stuyvesant P. Comfort Professor of Law at New York University located in New York, New York.  I have been retained to provide an expert opinion as to (a) the fairness, adequacy and reasonableness of the settlement involving Bank of the West ("Bank of the West", "Defendant", or the "Bank"), and (b) the reasonableness of the fee award requested by class counsel in connection with that settlement.  I make the following representations on the basis of my own personal knowledge.  If called as a witness, I could and would competently testify to the matters stated herein.

## Background and Qualifications

2.      For more than twenty years I have been involved in the area of class action litigation as a teacher, scholar, attorney, consultant, and expert witness.

3.      I am presently teaching or have taught classes covering class action litigation, including Civil Procedure, Complex Litigation, and other courses.  I regularly lecture on class actions at academic conferences and continuing legal education seminars.  I was a member of the Board of Advisors for the American Law Institute's project on "Principles of the Law of Aggregate Litigation."  In June, 2008, I co-organized an international conference in Florence, Italy on "Class Actions in the United States and Europe," sponsored by the European University Institute, the American Law Institute, and New York University Law School.

4.      I have acted as counsel in class actions and shareholders derivative litigation.  I have consulted with attorneys to assist with issues pertaining to class certification, class settlement, and awards of attorney's fees.  I have offered testimony in class action cases in state and federal courts across the United States.

5.      I have written approximately two dozen research articles dealing with class action law and practice.  One of my areas of research has been the subject of class action attorneys' fees and expenses.  With Professor Theodore Eisenberg of Cornell University, I am the author of leading empirical analyses of attorneys' fees and expenses in class action cases, "Attorneys' Fees in Class Action Settlements: An Empirical Study," 1 Journal of Empirical Legal Studies 27 (2004); and Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008, 7 Journal of Empirical Legal Studies 248 (2010). My empirical work with Professor Eisenberg on class action litigation has been cited or relied on in numerous state and federal decisions across the country.[1]

---

[1] *See In re Trans Union Corp. Privacy Litigation,* 629 F.3d 741 (7th Cir. 2011); *In re Amaranth Natural Gas Commodities Litigation,* 2012 WL 2149094 (S.D.N.Y. 2012); *Board of Trustees of AFTRA Retirement Fund v.*

6.    I have written extensively on various legal and policy issues in the field of class actions and complex litigation.  My articles on these topics, some of them co-authored with Professor Jonathan Macey of Yale Law School, are also cited by state and federal courts around the country.[2]

---

*JPMorgan Chase Bank, N.A.*, 2012 WL 2064907 (S.D.N.Y. 2012); *Lane v. Page*, 2012 WL 1940574 (D.N.M. 2012); *Silverman v. Motorola, Inc.*, 2012 WL 1597388 (N.D.Ill. 2012); *In re Heartland Payment Systems, Inc. Customer Data Sec. Breach Litigation*, 2012 WL 948365 (S.D.Tex. 2012) ("The tables included in the [Eisenberg and Miller] study are good indicators of what the market would pay for class counsel's services because the tables show what attorneys have been paid in similar cases, and thus what class counsel could have expected when they decided to invest their resources in this case."); *Walsh v. Popular, Inc.*, 2012 WL 769600 (D.Puerto Rico 2012); *American International Group, Inc. v. ACE INA Holdings, Inc.*, 2012 WL 651727 (N.D.Ill. 2012); *Ebbert v. Nassau County*, 2011 WL 6826121 (E.D.N.Y. 2011); *In re Checking Account Overdraft Litigation*, 830 F.Supp.2d 1330 (S.D.Fla. 2011); *Latorraca v. Centennial Technologies Inc.*, 834 F.Supp.2d 25 (D.Mass. 2011); *In re Kentucky Grilled Chicken Coupon Marketing & Sales Practices Litigation*, 280 F.R.D. 364 (N.D.Ill. 2011); *Pavlik v. FDIC*, 2011 WL 5184445 (N.D.Ill. 2011); *In re Puerto Rican Cabotage Antitrust Litigation*, 815 F.Supp.2d 448 (D.Puerto Rico 2011); *In re Vioxx Products Liability Litigation*, 2011 WL 3563004 (E.D.La. 2011) and 760 F.Supp.2d 640 (E.D.La. 2010); *In re AT & T Mobility Wireless Data Services Sales Tax Litigation*, --- F.Supp.2d ----, 2011 WL 2173746, N.D.Ill., June 02, 2011 (No. MDL 2147, 10 C 2278); *Velez v. Novartis Pharmaceuticals Corp.*, 2010 WL 4877852, S.D.N.Y., November 30, 2010 (No. 04 CIV 09194 CM); *Braud v. Transport Service Co. of Illinois*, 2010 WL 3283398, E.D.La., August 17, 2010 (No. CIV.A. 05-1898, CIV.A. 06-0891, CIV.A. 05-1977, CIV.A. 05-5557); *In re Lawnmower Engine Horsepower Marketing & Sales Practices Litigation*, 733 F.Supp.2d 997 (E.D.Wis. 2010); *Klein v. O'Neal, Inc.*, Civ. No. 7:03-CV-102-D, 2010 WL 143516, at *35 (N.D. Tex. Apr. 9, 2010); *Fiala v. Metropolitan Life Ins. Co., Inc.*, --- N.Y.S.2d ----, 2010 WL 716176, at *8 (N.Y. Sup. 2010); *In re Metlife Demutualization Litig.*, Civ. No. 601180, 2010 WL 517389, at *55 (E.D.N.Y. Mar. 3, 2010); *In re Marsh ERISA Litig.*, 04 Civ. 8157, 2010 WL 451028, at *17 (S.D.N.Y. Jan. 29, 2010) (McMahon, J.); *Strawn v. Farmers Ins. Co. of Oregon*, 233 Or. App. 401, 423, 226 P.3d 86, 99 (Or. App. 2010); *Hall v. Children's Place Retail Stores, Inc.*, 669 F. Supp. 2d 399, 404 n.35 (S.D.N.Y. 2009); *In re Trans Union Corp. Privacy Litig.*, 2009 WL 4799954, at *12 (N.D. Ill. 2009); *Loudermilk Services, Inc. v. Marathon Petroleum Co. LLC*, 623 F.Supp.2d 713, 724 (S.D. W.Va. 2009) ("[b]ecause the Eisenberg and Miller study was a far more comprehensive analysis of similar cases than this Court could hope to achieve in a reasonable time, the Court accepts their results as a benchmark on which to judge a reasonable fee in this case"); *Rodriguez v. West Publishing Co.*, 563 F.3d 948, 958 (9th Cir. 2009); *In re OCA, Inc. Securities and Derivative Litig.*, 2009 WL 512081, at *20 (E.D. La. 2009); *In re Enron Corp. Securities, Derivative & ERISA Litig.*, 586 F.Supp.2d 732, 800 (S.D. Tex. 2008); *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 755 n.2 (S.D. Ohio 2007); *In re Tyco Int'l., Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 269 (D.N.H. 2007); *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 388 (C.D. Cal. 2007); *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 853, 862-64, 866, 870 (E.D. La. 2007) ("[T]he Court will look to Eisenberg and Miller's data sets to determine an average percentage for cases of similar magnitude"); *Silberblatt v. Morgan Stanley*, 524 F. Supp. 2d 425, 435 n.6 (S.D.N.Y. 2007); *Fireside Bank v. Superior Court*, 40 Cal.4th 1069, 1089, 155 P.3d 268, 281 (Cal. 2007); *In re Cabletron Sys., Inc. Sec. Litig.*, 239 F.R.D. 30, 38, 42 (D.N.H. 2006); *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1209, 1211 (S.D. Fla. 2006); *In re Educational Testing Service Praxis Principles of Learning and Teaching Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 629-32 (E.D. La. 2006); *Hicks v. Stanley*, 2005 WL 2757792, at *9 (S.D.N.Y. 2005); *In re Lupron Marketing and Sales Practices Litig.*, 2005 WL 2006833, at *5 (D. Mass. 2005); *In re HPL Technologies, Inc. Sec. Litig.*, 366 F.Supp.2d 912, 914 (N.D. Cal. 2005); *Allapattah Services, Inc. v. Exxon Corp.*, 362 F.3d 739, 760 (11th Cir. 2004) (Judges Tjoflat and Birch, dissenting from denial of en banc review); *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 80-81 (D. Mass. 2005), 221 F.R.D. 260, 286 (D. Mass. 2004).

[2] *In re Processed Egg Products Antitrust Litigation*, 2012 WL 2885924 (E.D.Pa. 2012); *Louisiana Municipal Police Employees' Retirement System v. Pyott*,--- A.3d ----, 2012 WL 2087205 (Del.Ch. 2012); *Forsythe v. ESC*

7.      I am also an expert in the field of banking law and regulation.  My casebook, *The Law of Banking and Financial Institutions* (co-authored with Richard Scott Carnell and Jonathan R. Macey), now in its fourth edition, is widely recognized as a leading authority in the field.  I am the author of several other books and many research articles on the topic of financial institution regulation.  I have been a visiting scholar at the Bank of Japan and the Federal Reserve Bank of Chicago, and am a member of the board of directors and the audit, ALCO, compensation and risk committees of State Farm Bank, a federally-chartered federal thrift institution with nearly $15 billion in assets.

8.      I am a 2011 inductee into the American Academy of Arts and Sciences and one of HeinOnline Law Journal Library's top-100 most cited authors all time.[3] A recent empirical study of scholarly influence lists me as one of America's top-50 most relevant law professors.[4]

---

*Fund Management Co.,* 2012 WL 1655538 ( Del.Ch. 2012); *Creative Montessori Learning Centers v. Ashford Gear LLC,* 662 F.3d 913, (7th Cir. 2011); *In re Sauer-Danfoss Inc. Shareholders Litigation,* 2011 WL 2519210 (Del.Ch. 2011); *Thorogood v. Sears, Roebuck and Co.,* 627 F.3d 289 (7th Cir. 2010); *Ehrheart v. Verizon Wireless,* 609 F.3d 590 (3rd Cir. 2010); *In re Revlon, Inc. Shareholders Litigation,* 990 A.2d 940 (Del.Ch. 2010); *Lubin v. Farmers Group, Inc.,* 2009 WL 3682602 (Tex.App. 2009); *Westgate Ford Truck Sales, Inc. v. Ford Motor Co.,* 2007 WL 2269471 (Ohio App. 2007); *Acosta v. Trans Union, LLC,* 243 F.R.D. 377 (C.D.Cal. 2007); *Amalgamated Bank v. Yost,* 2005 WL 226117 (E.D.Pa. 2005); *Official Committee of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery,* 330 F.3d 548 (3rd Cir. 2003); *Fruchter v. Florida Progress Corp.,* 2002 WL 1558220, (Fl. App. 2002); *In re Microstrategy, Inc.,* 172 F.Supp.2d 778 (E.D.Va. 2001); *In re Cendant Corp. Litigation,* 264 F.3d 201 (3rd Cir. 2001); *Scardelletti v. Debarr,* 265 F.3d 195 (4th Cir. 2001); *In re Auction Houses Antitrust Litigation,* 197 F.R.D. 71 (S.D.N.Y. 2000); *Lealao v. Beneficial California, Inc.,* 82 Cal.App.4th 19, 97 Cal.Rptr.2d 797 (2000); *AUSA Life Ins. Co. v. Ernst and Young,* 206 F.3d 202 (2nd Cir. 2000); *Davis v. Carl Cannon Chevrolet-Olds, Inc.,* 182 F.3d 792 (11th Cir. 1999); *In re Baan Co. Securities Litigation,* 186 F.R.D. 214 D.D.C. 1999); *In re Quantum Health Resources, Inc.,* 962 F.Supp. 1254 (C.D. Cal. 1999); *Strong v. BellSouth Telecommunications, Inc.,* 173 F.R.D. 167 (W.D.La. 1997); *Howard v. Globe Life Ins. Co.,* 973 F.Supp. 1412 (N.D.Fla. 1996); *Kamilewicz v. Bank of Boston Corp.,* 100 F.3d 1348 (7th Cir. 1996); *In re Asbestos Litigation,* 90 F.3d 963 (5th Cir. 1996); *General Motors Corp. v. Bloyed,* 916 S.W.2d 949 (Tex. 1996); *Brundidge v. Glendale Federal Bank, F.S.B.,* 168 Ill.2d 235, 659 N.E.2d 909, 213 Ill.Dec. 563 (1995); *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litigation,* 56 F.3d 295 (1st Cir. 1995); *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation,* 55 F.3d 768 (3rd Cir. 1995); *BTZ, Inc. v. Great Northern Nekoosa Corp.,* 47 F.3d 463 (1st. Cir. 1995); *Bell Atlantic Corp. v. Bolger,* 2 F.3d 1304 (3rd Cir. 1993); *In re Oracle Securities Litigation,* 829 F.Supp. 1176 (N.D. Ca. 1993); *Gottlieb v. Wiles,* 150 F.R.D. 174 (D.Colo. 1993); *Durr v. Intercounty Title Co. of Illinois,* 826 F.Supp. 259 (N.D.Ill. 1993); *qad. inc. v. ALN Associates, Inc.,* 807 F.Supp. 465 (N.D.Ill. 1992); *Wesley v. General Motors Acceptance Corp.,* 1992 WL 57948 (N.D.Ill. 1992); *In re Verifone Securities Litigation,* 784 F.Supp. 1471 (N.D.Cal. 1992); *Davis v. Coopers & Lybrand,* 1991 WL 154460 (N.D.Ill. 1991).

[3] See http://www.heinonline.org/HOL/MostCitedAuthors?collection=journals.

9.     Further information on my background and qualifications is set forth in my resume, attached hereto as Appendix B.

Summary of Opinion

10.     For the reasons stated below, and considering the risks and other factors involved, it is my opinion that the settlement proposed with Bank of the West is fair, adequate and reasonable and that the requested award of attorneys' fees is within the range of reason.

Materials Relied On

11.     In preparing this opinion, I have reviewed an extensive compilation of court filings and other documents, including but not limited to the items listed in Appendix A to this Declaration.   I have also discussed this matter with class counsel and investigated appropriate case law and secondary authorities.

The Litigation

12.     Plaintiff Betty Orallo filed her class action complaint on April 5, 2010; Saynyonoh Dee filed her complaint on June 22, 2010.  The complaints allege that Bank of the West engaged in a systematic scheme to extract the greatest possible number of overdraft fees from its customers and thereby misappropriated millions of dollars from class members.  The Bank allegedly manipulated debit card transactions by re-sequencing and posting debits at the end of each day in the order of largest-to-smallest dollar amount, a strategy which caused customer accounts to be depleted as quickly as possible and thereby maximized the number of overdrafts on which the Bank could charge overdraft fees.  According to Plaintiffs, the Bank's practices violated its contractual and good faith duties to the class, were substantively and

---

[4] John Yoo & James Cleith Phillips, The Cite Stuff: Inventing a Better Law Faculty Relevance Measure, UC Berkeley Public Law Research Paper No. 2140944 (September 3, 2012), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2140944.

procedurally unconscionable, violated state unfair trade practices laws, and resulted in conversion and unjust enrichment.  The complaint sought monetary damages, restitution and declaratory relief.

13.     Because these cases have substantial similarities with cases pending against other banks alleging improper overdraft fees, the Judicial Panel on Multidistrict Litigation conditionally transferred this case to the multidistrict litigation pending before Judge King of the Southern District of Florida.  On December 6, 2010, plaintiffs filed a consolidated first amended class action complaint against the Bank.

14.     The parties thereupon commenced discovery, including document production, interrogatories and requests for admissions.  Ultimately more than one million pages of documents were produced.  Plaintiffs deposed two of the Bank's corporate representatives on October 5, 2011 and November 30, 2011.

15.     In connection with this litigation, and in light of regulatory developments, the Bank modified its debit card practice to process transactions in the order received or in low-to-high order.

16.     The parties commenced settlement discussions in the fourth quarter of 2011; on January 6, 2012 they participated in a formal mediation session before the Honorable Edward A. Infante.  As a result of this mediation, the parties signed a memorandum of understanding containing the essential terms of the present settlement.

17.     On July 13, 2012, this Court entered its Order, which, inter alia, preliminarily approved the settlement, certified the settlement class, appointed Betty Orallo, Saynyonoh Dee and Michele Draper as class representatives, directed Rust Consulting to act as settlement

administrator, appointed settlement class counsel, provided for notice to the settlement class, and scheduled a final fairness hearing..

## The Proposed Settlement

18.    The settlement agreement requires Bank of the West to pay $18,000,000.00 in cash to create a common fund for the benefit of the Settlement Class.

19.    The proceeds of the settlement, after payment of attorneys' fees, expenses and reasonable service awards, will be automatically distributed to eligible Settlement Class Members based on the damages that each individual sustained as a result of the Bank's Debit Re-sequencing.

20.    An important feature of this settlement is the fact that receipt of settlement benefits will be automatic.  Eligibility to recover settlement benefits as well as the amount of the benefit to which a Settlement Class Member is entitled will be ascertained directly from the Bank's files.  No claim forms will be required.  The fact that this settlement will generate automatic benefits for the Settlement Class is a significant advantage as compared with many consumer class action settlements which require all class members to submit proofs of claim in order to obtain the settlement benefits.

21.    Another valuable feature of the settlement is that it ensures that none of the settlement fund will return to the Bank, even if checks are not cashed.  Instead, the parties will either make further distributions to Settlement Class Members or arrange for the distribution of the excess through a *cy pres* program to be approved the Court.

22.    In addition to these monetary and non-monetary benefits, the Bank has agreed to pay the costs of notice and settlement administration.

<u>The Proposed Settlement is Fair, Adequate and Reasonable for the Class</u>

23.     Relevant criteria for evaluating class settlements in this Circuit are: (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved. *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984); *In re CP Ships Ltd. Securities Litigation*, 578 F.3d 1306, 1317 (11th Cir. 2009). I will evaluate the settlement under each of these *Bennett* factors.

### *Bennett Factor 1: Likelihood of Success at Trial*

24.     This case presented significant risks both at the outset and throughout the litigation.

25.     One such risk concerned the doctrine of federal preemption. There is no doubt that Congress has substantial power to preempt state regulation of national banks. *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1 (2007); *Barnett Bank of Marian County, N.A. v. Nelson*, 517 U.S. 25 (1996). Nor is there any doubt that the Office of Comptroller of the Currency ("OCC"), as the regulator of national banks, has authority to promulgate regulations which also may pre-empt state regulation if authorized to do so by Congress. *Fidelity Federal Savings & Loan Ass'n v. de la Cuesta*, 458 U.S. 141 (1982). The OCC in fact enacted a regulation, 12 C.F.R. § 7.4002(a), which specifies the power of a national bank to "charge its customers non-interest charges and fees" insofar as this accords with safe and sound banking principles. Supplementing this provision is 12 C.F.R. § 7.4007, which recognizes that national banks have the power to

manage their deposit-taking activities free of obstruction or impairment from state authorities – though it also contains a "savings clause" allowing for the enforcement of certain state laws. To the extent these OCC regulations, and related OCC interpretive letters, are applicable, they may provide a basis for a national bank to argue that high-to-low posting practices are permissible activities under the National Bank Act.

26.     Case law in the Eleventh Circuit recognizes broad principles of preemption under the National Bank Act. In *Baptista v. J.P. Morgan Chase Bank, N.A.*, 640 F.3d 1194 (11th Cir. 2011), the court held that a Florida statute which banned check-cashing fees was preempted by 12 CFR § 7.4002. Although *Baptista* did not address the question of preemption of generally applicable state law as it pertains to the order of posting withdrawals, the reasoning and language of the opinion suggested that the Eleventh Circuit recognizes the limitations of enforcing state law upon national banks.

27.     Another risk in this litigation was the argument that the Bank's account agreements specifically advised its customers of the sequencing practice employed by the Bank for overdrafts associated with debit card transactions, and that these agreements authorized the Bank to engage in this practice. Had this argument succeeded, the class would have probably been unable to establish any liability or to obtain any damages.

28.     A further risk stemmed from the possibility of the Court denying in full or in part Plaintiffs' request for class certification. The Bank was likely to argue, among other things, that individual issues present in this case rendered it unmanageable as a multi-state class action.

### Bennett Factor 2: Range of Possible Recovery

29.     Settlement, by its very nature, represents a compromise. Neither party obtains all it wishes in a settlement; the nature of compromise is that both parties must accept an outcome

that gives less than the plaintiff initially demands and more than the defendant initially offers. Accordingly, this Court is not called on to conduct a trial on the merits.[5]  Nor is it the Court's responsibility to determine whether, had negotiations proceeded differently, the class conceivably might have obtained even greater recovery.[6]  Rather, the issue before this Court is whether the proposed settlement is within a range of reason given the risks inherent in the litigation. *See Figueroa v. Sharper Image Corp.*, 517 F.Supp.2d 1292, 1298 (S.D. Fla. 2007).

30.     Based on class counsels' expert's analysis, the $18 million cash portion of the Settlement represents 52% of the most probable damages that could be recovered had this action proceeded to trial.  This is an outstanding result.  Many class actions – especially consumer class actions – generate only a small fraction of the total damages.  Given the risks of this litigation, a settlement that generates a fund equal to more than half the estimated class damages clearly satisfies the second *Bennett* factor.

### *Bennett Factor 3: Overall Fairness of the Proposed Settlement*

31.     As noted immediately above, before the Court is a settlement for more than half of the Settlement Class' most probable damages, without the risks of further litigation (which could result in the class receiving nothing at all).  This outstanding achievement, in itself, is probative of the overall fairness of the proposed settlement.

---

[5] See *In re Corrugated Contained Antitrust Litig.*, 643 F.2d 195, 212 (5th Cir. 1981) (evaluation of a settlement "is not and cannot involve a trial on the merits"); *In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, 228 F.R.D. 541, 553 (S.D. Tex. 2005) (evaluation of a settlement cannot involve a trial on the merits "because the policy of encouraging settlements is effected by 'the very uncertainty of the outcome of the litigation and the avoidance of wasteful litigation and expense.'"); *UAW v. Gen. Motors Corp.*, 235 F.R.D. 383, 387 (E.D. Mich. 2006) ("[A] fairness hearing is not a trial, but instead has a very singular and narrow purpose—to determine whether the settlement at issue is fair, reasonable, and adequate."); *Ass'n For Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 467 (S.D. Fla. 2002) ("In evaluating these considerations, the Court must not try the case on the merits.").

[6] See *Sullivan v. DB Invs.*, 667 F.3d 273, 324 (3d Cir. 2011) (en banc) ("the court must guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution."); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) (the "trial court should not make a proponent of a proposed settlement justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes.") (internal quotations marks omitted).

32.     Moreover, the structure of this settlement has an additional excellent feature that is only rarely observed in consumer class action cases.  Many consumer class actions require that class members submit claim forms in order to qualify for relief.  While this requirement is often necessary in order to prevent fraud and to ensure that recoveries are properly distributed, the requirement of filing a claim form can be a significant deterrent to class members taking advantage of class action settlements.  Not so in the present case.  Here, Settlement Class Members will automatically receive payments by check, if their account is closed, or by account credit if their account is still open.  This feature of the settlement is highly beneficial because it ensures that Settlement Class Members will receive the settlement benefits without having to undertake any affirmative action – thus optimizing class recovery.

33.     Residual amounts remaining after known individuals are compensated will either be distributed pro rata to class members who previously received distributions or to a *cy pres* fund.  In no event will they be returned to the Bank.

### *Bennett Factor 4: Litigation History*

34.     This case was actively litigated for more than two years. During the course of that time, class counsel researched available claims, reviewed account agreements and financial records, analyzed potential class members' bank statements, conducted interviews of potential class members, prepared discovery requests, conducted depositions, and reviewed in excess of a million pages of documents.  These and other activities by class counsel indicate that the case has been vigorously litigated and that it is now in an appropriate posture for settlement.

*Bennett Factor 5: Objections*

35.     Objections are due on November 6, 2012.  As of October 19, 2012, no objections had been filed out of the approximately 386,000 class members – an indication that the Settlement Class is satisfied with this settlement.

36.     Also relevant, in connection with the reaction of the Settlement Class to the proposed settlement, is the degree to which Settlement Class Members exercise their right to opt out of the settlement.  The opt-out period also expires on November 6, 2012.  As of October 13, 2012, only 12 Settlement Class Members had opted out of this settlement.  This very low level of opt outs indicates a lack of substantial opposition among the vast majority of the Settlement Class.

*Bennett Factor 6: Stage of Proceedings*

37.     The stage of the proceedings factor tests whether counsel for the class – and the Court in reviewing a settlement – have sufficient information on which to determine that the terms agreed to are fair, adequate and reasonable.  Obviously this factor cannot be applied mechanically; otherwise litigation would be protracted unnecessarily merely to convince the reviewing court that matters have progressed far enough to warrant a settlement.  What matters is whether counsel and the Court, realistically, possess enough information to make an informed judgment.

38.     This case is at a stage in which counsel and the Court can make such an informed judgment.  The issues in the case are not principally over the facts pertaining to the Bank's posting practices; those are not essentially in dispute.  Thus, the relevant issue is whether the settlement represents reasonable compensation for the Settlement Class given the risks of continued litigation.  The answer to that question depends on two factors.  First is the relevant

strength of the legal claims, given the facts – something that counsel and this Court are fully able to do at this stage of the proceedings. The second factor is the amount of damages sustained by the Settlement Class. This information is also readily available; the Bank provided class counsel with information sufficient to allow their expert to estimate the actual amount of the Settlement Class' damages. This case is thus in a suitable posture for resolution at this point in time.

39.     This litigation, in fact, was well-developed at the time the settlement was achieved. Checking account overdraft posting litigation has now been underway for nearly three years; and class counsel developed extensive information about the characteristics of this particular case, including both information obtained during settlement negotiations, confirmatory discovery obtained after the execution of the term sheet, and extensive analysis by class counsel and their damages expert.

The Requested Fee

40.     Class counsel request a fee equal to 30% of the $18 million settlement fund, or $5.4 million.

41.     While class counsel are seeking 30% of the Settlement Fund already paid into escrow by the Bank, it is important to note that the proposed settlement contemplates that Defendant will pay the costs of notice and settlement administration. Because those costs would otherwise be payable by the Settlement Class, the Bank's commitment to paying them may properly be considered part of the total benefit conferred upon the class.

42.     The reasonableness of the fee request in the present case can be evaluated in light of fees already awarded in other, similar, checking account overdraft cases. As can be seen from the following table, the attorneys' fees requested in this litigation are fully consistent with awards in the most relevant set of similar cases:

**Table 1: Fee Awards in Checking Account Overdraft Cases**

| Case | Citation | Award | Percentage |
|---|---|---|---|
| *Molina v. Intrust Bank, N.A.* | No. 10-CV-3686 (Dist. Ct. Ks.) | $2.7 million | 33.33% |
| *Casto v. City National Bank, N.A.* | No. 10-C-1089 (Cir. Ct. W.Va.) | $3 million | 33% |
| *Schulte v. Fifth Third Bank* | No. 09-cv-6655 (N.D. Ill.) | $9.5 million | 33% |
| *Larsen v. Union Bank* | No. 1:09-MD-02036-JLK (S.D. Fla.) | $35 million | 30% |
| *Tornes v. Bank of America, N.A.* | No. 1:09-MD-02036-JLK | $410 million | 30% |
| *Case v. Bank of Oklahoma, N.A.* | No. 1:09-MD-02036-JLK | $19 million | 30% |
| *Allen v. UMB Bank* | No. 1016-CV34791 (Cir. Ct. Mo.) | $7.8 million | 30% |
| *Trombley v. National City Bank* | ,No. 10-00232 (JDB) (D. D.C.) | $12 million | 25% |
| *Mathena v. Webster Bank, N.A.* | No. 3:10-cv-1448-SRU (D. Conn.) | $2.8 million | 25% |
| *Trevino v. Westamerica Bank* | No. CV 1003690 (Cal. Supr.) | $2 million | 25% |
| *Taulava v. Bank of Hawaii* | No. 11-1-0037-02 KTN (1st Cir. Haw.) | $9 million | 25% |
| *Peterson v. Central Pacific Bank* | No. 11-1-0457-03 VLC (1st Cir. Haw.) | $1.2 million | 25% |
| *Nelson v. Rabobank, N.A.* | No. RIC 1101391 (Cal. Supr.) | $2.4 million plus $700,000 non-monetary relief | 25% |

43.    The fee request in the present case is also consistent with awards granted in the Eleventh Circuit and in federal district courts in the state of Florida, as shown in the following table:

**Table 2: Fee Awards in Florida District Courts**

| Name | Citation | Settlement Value | Fee Percentage |
|---|---|---|---|
| *LaGrasta v. Wachovia Capital Mkts, LLC* | No. 2:01-CV-251-TM-29-DNF, 2006 WL 4824480, at *1 (M.D. Fla. Nov. 6, 2006) | $9 million | 30% |
| *Sewell v. D'Allesandro & Woodyard, Inc.,* | No. 2:07-cv-343-FtM-29SPC, 2011 WL 6047085, at *2 (M.D. Fla. Dec. 6, 2011) | $3.6 million | 30% |
| *Stahl v. MasTec, Inc.* | No. 8:05-CV-1265-T-27TGW, 2008 WL 2267469, at*2 (M.D. Fla. May 20, 2008) | $13.1 million | 27.9% |
| *In re Winn-Dixie Stores, Inc., ERISA Litig.* | No. 3:04-cv-194, 2008 WL 815724, at *8 (M.D. Fla. Mar. 20, 2008) | $3 million | 26% |
| *In re Managed Care Litig.* | MDL No. 1334, 2003 WL 22850070 (S.D. Fla. Oct. 24, 2003) | $100 million | 35.5% |
| *Gutter v. E.I. Dupont De Nemours & Co.* | 95-2152-CIV-Gold (S.D. Fla. May 30, 2003) | $77.5 million | 33.3% |
| *In re Terazosin Hydrochloride Antitrust Litig.* | 99-1317-MDL-Seitz (S.D. Fla. Apr. 19, 2005) | > $30 million | 33.33% |
| *In re Winn-Dixie Stores, Inc., ERISA Litig.* | No. 3:04-cv-194, 2008 WL 815724, at *8 (M.D. Fla. Mar. 20, 2008) | $3 million | 26% |
| *Sands Point Partners, LP v. Pediatrix Med. Group, Inc.* | 2002 U.S. Dist. Lexis 25721 (S.D. Fla. 2002) | $12 million | 30% |
| *In re CHS Elecs., Inc. Sec. Litig.* | 99-8186-CIV-Gold (S.D. Fla. 2002) | $11 million | 30% |
| *Ehrenreich v. Sensormatic Elecs. Corp.,* | 95-6637-CIV-Zloch (S.D. Fla. 1998) | > $44 million | 30% |
| *Tapken v. Brown* | 90-0691-CIV-Marcus (S.D. Fla. 1995) | $10 million | 33% |
| *Waters v. Int'l Precious Metals Corp.* | 190 F.3d 1291 (11th Cir. 1999), *cert. denied*, 530 U.S. 1289 (2000) | $40 million | 33.33% |

44.     A fee award of 30% is also reasonable when judged against the results of several studies that provide information about fee awards as percentages of the recovery in class action cases.   A 1996 study by the National Economic Research Associates (NERA), an economic consulting firm, examined fee awards in settled securities class actions.   Table 3 shows average and median fee awards for settled securities cases where the settlements ranged from less than $1 million to more than $50 million.

**Table 3: Fee Awards in Settled Securities Class Actions 1991-1996: NERA Data**

| Settlement Range (millions) | Number of Settlements | Total Value of Settlements | Total Attorney Fees | Average Attorney Fees as a Percentage of Settlement | Median Attorney Fees as a Percentage of Settlement |
|---|---|---|---|---|---|
| $0.00-$0.99 | 37 | $24,696,750 | $7,617,600 | 30.38% | 30.00% |
| $1.00-$1.99 | 66 | $96,506,502 | $30,642,005 | 31.88% | 33.33% |
| $2.00-$9.99 | 245 | $1,184,141,901 | $381,149,262 | 32.11% | 33.33% |
| $10.00-$49.99 | 76 | $1,488,892,280 | $471,161,635 | 31.72% | 33.15% |
| $50+ | 9 | $571,650,000 | $179,920,000 | 31.48% | 30.00% |
| Total | 433 | $3,365,887,433 | $1,070,490,502 | 31.84% | 33.33% |

**Source:  Denise N. Martin, Vinita M. Juneja, Todd S. Foster, and Frederick C. Dunbar, Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions? Table 9 (1996)**

45.    As can be seen, average fees in the NERA study are approximately 32% and median fees are approximately 33%.  For the category including class recoveries of between $10 million and $50 million the average fee was 31.7% and the median fee was 33.1%.  The fee request of 30% is clearly reasonable in light of this study.

46.    The 1996 NERA study also demonstrated that fee awards in the various federal circuits are consistent with one another.  As shown in Table 4, average awards fell within a narrow range, from a low of 30.73% in the Fifth Circuit to a high of 32.78% in the Fourth Circuit.  Again, the requested fee of 30% is quite reasonable when judged against this data set of class action fee awards.

**Table 4: Plaintiffs' Attorneys Fees by Federal Circuit: NERA Data**

| Circuit | Number of Settle-ments | Settlements as a Percentage of Total | Total Value of Settlements | Total Attorney Fees | Average Attorney Fee as a Percentage of Settlement |
|---------|---------|---------|---------|---------|---------|
| | | (Percent) | ---------------(Dollars)--------------- | | (Percent) |
| D.C. | 2 | 0.46 | 6,750,000 | 2,200,000 | 31.67 |
| First | 26 | 6.00 | 82,633,902 | 25,677,884 | 30.99 |
| Second | 69 | 15.94 | 440,285,121 | 139,037,770 | 31.48 |
| Third | 58 | 13.39 | 423,292,596 | 132,738,442 | 32.00 |
| Fourth | 12 | 2.77 | 75,325,000 | 23,716,667 | 32.78 |
| Fifth | 26 | 6.00 | 262,720,500 | 81,420,017 | 30.73 |
| Sixth | 13 | 3.00 | 120,875,000 | 36,921,000 | 31.00 |
| Seventh | 18 | 4.16 | 149,933,784 | 48,375,833 | 31.83 |
| Eighth | 12 | 2.77 | 52,175,000 | 17,640,500 | 32.47 |
| Ninth | 155 | 35.80 | 1,379,894,030 | 450,725,681 | 32.57 |
| Tenth | 13 | 3.00 | 203,650,000 | 62,038,333 | 32.13 |
| Eleventh | 29 | 6.70 | 168,352,500 | 49,998,375 | 29.92 |
| Total | 433 | 100.00% | $3,365,887,433 | $1,070,490,502 | 31.84% |

**Source:  Denise N. Martin, Vinita M. Juneja, Todd S. Foster, and Frederick C. Dunbar, Recent Trends IV: What Explains Filings and Settlements in Shareholder Class Actions? Table 12b (1996).**

47.    Researchers affiliated with NERA partially updated the 1996 study in 1999.  The 1999 NERA update shows that, exclusive of expenses, attorneys' fee awards in securities class actions cluster at between 31-33% of the common fund recovery.  The 30% fee requested in the present case is lower than the average fees reported in this 1999 study.  Table 5 shows this in the bottom row:

**Table 5: Fee Awards in Settled Securities Class Actions 1991-1999: NERA Data**

|  | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | Jun-99 |
|---|---|---|---|---|---|---|---|---|---|
| Number of Settlements | 48 | 79 | 90 | 101 | 104 | 104 | 98 | 80 | 29 |
| Average Settlement (millions) | $6.3 | $9.9 | $8.3 | $6.1 | $10.7 | $7.0 | $7.9 | $11.0 | $6.0 |
| Median Settlement (millions) | $3.7 | $5.0 | $4.4 | $3.6 | $4.8 | $4.1 | $3.2 | $5.8 | $4.3 |
| Average Fee as a Percentage of Average Settlement | 33% | 27% | 24% | 34% | 33% | 31% | 32% | 31% | 33% |

**Source: Todd S. Foster, Denise N. Martin, Vinita M. Juneja, Frederick C. Dunbar, Trends in Securities Litigation and the Impact of PSLRA, Figure 12 (June 1999).**

48.    The Federal Judicial Center has also examined the issue of attorneys' fees in class action litigation.  A 1996 Federal Judicial Center study examined all class actions (*i.e.*, not just securities cases) terminated between July 1, 1992, and June 30, 1994, in four federal district courts.  Thomas E. Willging, et al., *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules* 4 (1996).  Median fee awards ranged from 27% to 30%, and most awards were between 20% and 40% of the monetary settlement. Table 6 demonstrates that fee awards cluster at around 30 percent in all types of class action litigation in the four federal district courts:

**Table 6: Percentage Fees in Four Federal District Courts**

Figure 72: Mean and Median Fee-Recovery Rates in Certified Cases Using Percentage of Recovery Method and Providing Net Monetary Distribution to Class



*Note:* "Net monetary distribution" is net of attorneys' fees and administrative expenses.

**Source: Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules 151 (1996).**

49.     A large-scale study on fees is found in the March-April 2003 edition of *Class Action Reports* (CAR), which contains data on cases extending back to 1974.  Table 7 reports the CAR data broken down by type of case:

**Table 7:  Fee-Award Percent Summary by Case Category**

| Category | Mean | Median | Std. Dev. | Number |
|---|---|---|---|---|
| Class Action Reports Data (CAR), 1993–2002 | | | | |
| Antitrust | 26.8 | 28.4 | 7.1 | 31 |
| Consumer | 24.3 | 25.0 | 8.5 | 48 |
| Civil rights | 23.5 | 25.5 | 11.0 | 4 |
| Derivative | 33.3 | 33.3 | ⸺ | 1 |
| Employment | 25.5 | 25.7 | 7.6 | 17 |
| Environmental | 30.5 | 30.5 | 7.8 | 2 |
| Government regulation | 29.7 | 29.7 | ⸺ | 1 |
| Labor/wage/pension | 22.9 | 26.4 | 10.6 | 30 |
| Mass tort | 17.6 | 17.0 | 6.9 | 8 |
| Securities | 27.9 | 30.0 | 7.4 | 483 |
| Taxpayer | 3.5 | 3.5 | ⸺ | 1 |
| Utilities | 20.3 | 20.3 | 1.7 | 2 |
| Social welfare/entitlements | 16.9 | 16.9 | 4.4 | 2 |
| Total | 27.0 | 30.0 | 7.9 | 630 |

**Sources: Theodore Eisenberg & Geoffrey P. Miller, Attorney Fees in Class Action Settlements: An Empirical Study, 1 *Journal of Empirical Legal Studies* 51 analyzing data from Stuart J. Logan, Jack Moshman & Beverly C. Moore, Jr., Attorney Fee Awards in Common Fund Class Actions, 24 *Class Action Rep.* 169 (2003).**

50.     Table 7 discloses that the median fee across the range of cases in the study was 30.0%.  The requested fee of 30% is clearly reasonable when judged against this data.

51.     Recent empirical studies confirm that attorneys' fees have not decreased since the time the foregoing studies were conducted.  For example, in a study of fees in settled securities fraud litigation, Eisenberg, Miller and Perino found that the mean and median fees in securities cases decided across all circuits in the years prior to 2000 were 27.63% and 30%, while the mean and median award in the years 2000-2007 were 26.06% and 26.94% – results consistent with the

fee requested in the present case. *See* Theodore Eisenberg, Geoffrey Miller & Michael Perino, *Empirical Research on Decision-Making in the Federal Courts: A New Look at Judicial Impact: Attorneys' Fees in Securities Class Actions After Goldberger v. Integrated Resources, Inc.*, 29 Washington University Journal of Law & Policy 5-35 (2009).

52.    The requested fee also accords with the results of Eisenberg and Miller's study of fees in all published class action settlements between 1993 and 2008. Theodore Eisenberg and Geoffrey Miller, Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008, 7 Journal of Empirical Legal Studies 248 (2010). These authors find that the average fee in consumer class actions across the entire data set was 25%. The requested fee of 30% of the estimated class recovery is within the range of reason when judged by this data.

53.    The reasonableness of the requested fee is confirmed by a recent study by Professor Brian Fitzpatrick of Vanderbilt University of all federal class action settlements in 2006-2007. Fitzpatrick finds that the mean attorneys' fee for consumer class action cases across the data set was 23.5% of the class recovery and the median fee was 24.6% of the recovery. Brian Fitzpatrick, An Empirical Study of Class Action Settlements and Their Fee Awards, 7 J. Empirical L. Stud. 811 (2010). The requested fee of 30% of the estimated combined class recovery is within the range of reason when judged against Fitzpatrick's study.

54.    Empirical work establishes that risk is associated with fee awards in a predictable way: the riskier the case, the higher the award as a percentage of the recovery. Eisenberg and Miller find in a survey of all published class action settlements between 1993 and 2008 that high-risk cases generated higher fees than low-risk cases in 80% of the case categories they examined. Theodore Eisenberg and Geoffrey Miller, Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008, 7 Journal of Empirical Legal Studies 248, 265 Table 8 (2010).

Regression analysis revealed that high-risk cases were significantly associated with higher fee awards as a percentage of the recovery in every specification of the model. Awarding a higher fee for higher risk is simply common sense: doing so both rewards counsel for excellent success and also incentivizes them to undertake socially valuable litigation in the future.

55.     As noted, there were significant risk factors present in this litigation and there were many demands on class counsel. At the time counsel filed this case, on a purely contingency fee basis, the chance of recovery was far from certain. Class counsel obtained a superb result in the face of several formidable risks.

56.     Other factors also indicate the appropriateness of a suitably compensatory fee: the outstanding results achieved; the high levels of energy, diligence and skill displayed by counsel; the superb quality of the attorneys representing their adversary; the social utility of this litigation; and the fact that, at least so far, there have been zero objections filed out of approximately 380,000 class members.

<u>Conclusion</u>

57.     Based on the foregoing, it is my opinion that the proposed settlement is fair, adequate and reasonable for the class. Further, the requested attorneys' fee of $5.4 million is well within the range of reason given the characteristics of this case.[7]

---

[7] I also note that the proposed award of $5,000 to each of the representative plaintiffs is entirely appropriate and consistent with awards in similar cases. See Theodore Eisenberg and Geoffrey Miller, Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA Law Review 1303 (2006).

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  October 19, 2012.

Geoffrey P. Miller

## Appendix A: Materials Reviewed

Settlement Agreement and Release

Order Preliminarily Approving Class Action Settlement, Certifying the Settlement Class, and Providing for Notice to the Settlement Class

Plaintiffs' Unopposed Motion for Preliminary Approval of Class Settlement and For Certification of Settlement Class and Incorporated Memorandum of Law

Joint Declaration of Robert C. Gilbert, Michael W. Sobol, Jeffrey M. Ostrow and Elaine Ryan in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Settlement and Certification of Settlement Class

Order of Final Approval of Settlement, Authorizing Service Awards, and Granting application for Attorneys' Fees, *Larsen v. Union Bank, N.A.*

Transcript of Final Approval of Settlement Hearing Before the Honorable James Lawrence King, Senior United States District Judge, September 13, 2012

### Appendix B:   Resume

### GEOFFREY P. MILLER

New York University Law School
40 Washington Square South Suite 411G
New York, New York 10012
 (212) 998-6329 (office)
(212) 995-4659 (fax)
geoffrey.miller@nyu.edu

#### Work Experience

New York University Law School (1995-present)
  Stuyvesant P. Comfort Professor of Law
  Director, NYU Center for the Study of Central Banks and Financial Institutions (1994-present)
  Co-Director, NYU Center for Law, Economics and Organization (2006-present)
  Co-Founder and Co-President, Society for Empirical Legal Studies (2006-2007)
  Chair, Academic Personnel Committee (1999-2000; 2004-2006)
  Chair, Promotions and Tenure Committee (2007-2009)

University of Chicago Law School (1983-1995)
  Kirkland & Ellis Professor (1989-1995)
  Editor, Journal of Legal Studies (1989-1995)
  Director, Program in Law and Economics (1994-1995)
  Director, Legal Theory Workshop (1989-1993)
  Associate Dean (1987-1989)
  Professor of Law (1987-1989)
  Assistant Professor of Law (1983-1987)

Faculty Member, Study Center Gerzensee, Switzerland, Spring 2012 (invited)
Visiting Lecturer, University of Genoa Department of Law, 2011 (invited)
Visiting Scholar, European University Institute, Florence Italy, Fall/Winter 2010
Visiting Chair on Private Actors and Globalisation, Hague Institute for the Internationalisation
        of Law, Fall/Winter 2010
Robert B. and Candace J. Haas Visiting Professor of Law, Harvard Law School,
        Fall 2009
Max Schmidheiny Guest Professor, University of St. Gallen, Switzerland
        Summer 2009
Faculty Member, NYU-NUS in Singapore, 2009, 2011 (invited)
Fresco Endowed Professor of Law, University of Genoa, Italy, Summer 2008,
        Spring 2009, Summer 2010

Visiting Scholar, University of Minnesota Law School, Spring 2008
Visiting Lecturer, University of Bolzano, Italy, Summer 2007
Commerzbank Visiting Professor, Institute for Law & Finance, University of
        Frankfurt, Germany, Summer 2004, Summer 2005, Summer 2010
Visiting Professor, Columbia Law School, Fall 2001
Visiting Professor, University of Sydney, Australia, Summer 2002; Summer 2006;
        Spring 2009
Zaeslin Visiting Professor, University of Basel, Switzerland, Summer 2001, 2002, 2003,
        2004, 2005, 2007, 2008, 2009, 2010, 2011 (invited)
Visiting Scholar, CentER for Economic Research, Tilburg, Holland, Summer 1996
John M. Olin Visiting Scholar, Cornell University Law School, Summer 1992,
        Spring 1996; Winter 1997, Summer 2005, Spring 2008, Spring 2009, Spring 2010
Visiting Scholar, Bank of Japan, Spring 1995
Visiting Professor, New York University Law School, Fall 1994
Consultant, Federal Reserve Bank of Chicago, 1992-1994
Visiting Scholar, New York University Law School, Fall 1993
Simpson Grierson Butler White Visiting Professor, University of Aukland,
    New Zealand, Summer 1993

Associate, Ennis, Friedman, Bersoff & Ewing
Washington, D.C. (1982-83)

Attorney Adviser, Office of Legal Counsel
U.S. Department of Justice (1980-82)

Clerk, Hon. Byron R. White
Supreme Court of the United States (1979-80)

Clerk, Hon. Carl McGowan
U.S. Court of Appeals, District of Columbia (1978-79)

Corporate Service

Member of the Board of Directors, State Farm Bank (2010) – board and committee service for
nontraditional thrift institution with $15 billion in assets.

Education

Columbia Law School, J.D. (1978)
Editor-in-Chief, Columbia Law Review (1977-78)
Princeton University, A.B. *magna cum laude* (1973)

<u>Publications</u>

<u>Books</u>

The Governance of International Banking (co-authored with Fabrizio Cafaggi, with Tiago Andreotti, Maciej Borowicz, Agnieszka Janczuk, Eugenia Macchiavello and Paolo Saguato) (Edward Elgar, forthcoming)

Ways of a King: Legal and Political Ideas in the Bible (Vandenhoeck & Ruprecht 2011)

Trust, Risk, and Moral Hazard in Financial Markets (Il Mulino 2011)

The Origins of the Necessary and Proper Clause (with Gary Lawson, Robert Natelson, and Guy Seidman) (Cambridge University Press 2010)

The Economics of Ancient Law (editor) (Edward Elgar 2010)

Bank Mergers and Acquisitions (editor, with Yakov Amihud) (Kluwer Academic Publishers 1998)

La Banca Central en América Latina: Aspectos Económicos y Jurídicos [Central Banks in Latin America and Their New Legal Structure] (in Spanish) (editor, with Ernesto Aguirre and Roberto Junguito Bonnet) (Tercer Mundo: Bogotá 1997)

Costly Policies: State Regulation and Antitrust Exemption in Insurance Markets (AEI Press 1993) (with Jonathan R. Macey)

Banking Law and Regulation, Little, Brown & Co. 1992 (with Jonathan R. Macey); Second Edition, Aspen Law & Business 1997 (with Jonathan R. Macey), Third Edition, Aspen Law & Business 2001 (with Jonathan R. Macey and Richard Scott Carnell); Fourth Edition, Aspen Law & Business 2008 (with Richard Scott Carnell and Jonathan R. Macey), under title "The Law of Banking and Financial Institutions"

Banking Law and Regulation: Statutory and Case Supplement (Little, Brown & Co. 1992; Second Edition, Aspen Law & Business, 1997) (with Jonathan R. Macey), Third Edition, Aspen Law & Business, 2000) (with Jonathan R. Macey and Richard Scott Carnell); Fourth Edition, Aspen Law & Business 2008 (with Richard Scott Carnell and Jonathan Macey)

Banking Law and Regulation: Teacher's Manual (1992; Second Edition 1997; Third Edition 2001, Fourth Edition 2008) (with Jonathan R. Macey and Richard Scott Carnell)

Articles

Civil Procedure

Group Litigation in the Enforcement of Tort Law, in Jennifer Arlen, ed., The Economics of Torts (forthcoming 2011)

The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal, 63 Vanderbilt Law Review 107 (2010) (with Charles Silver)

Will Aggregate Litigation Come to Europe?, 62 Vanderbilt Law Review 177-210 (2009) (with Samuel Issacharoff)

Preliminary Judgments, 2010 University of Illinois Law Review 165 (2009)

A New Look at Judicial Impact: Attorneys' Fees in Securities Class Actions after Goldberger v. Integrated Resources, Inc., 29 Washington University Journal of Law & Policy 5-35 (2009) (with Theodore Eisenberg and Michael Perino)

Punti cardine in tema di class action negli Stati Uniti e in Italia (Cutting-Edge Issues in U.S. and Italian Class Action Litigation), 2008 Analisi Giuridica dell'Economia 211-230 (2008)

Compensation and Deterrence in Consumer Class Actions in the United States, in Fabrizio Cafaggi and Hans W. Micklitz, eds., New Frontiers in Consumer Protection: The Interplay Between Private and Public Enforcement 263-282 (2009)

Pleading after *Tellabs*, 2009 Wisconsin Law Review 507-534 (2009)

Mandatory Arbitration for Customers But Not For Peers, 92 Judicature 118-123 (2009) (with Theodore Eisenberg and Emily Sherwin)

Arbitration's Summer Soldiers: An Empirical Study of Arbitration Clauses in Consumer and Non-Consumer Contracts, 41 University of Michigan Journal of Law Reform 871-96 (2008) (with Theodore Eisenberg and Emily Sherwin); reprinted in 7 ICFAI University Journal of Alternative Dispute Resolution (Hyderabad, India)

Reversal, Dissent, and Variability in State Supreme Courts: The Centrality of Jurisdictional Source, 89 Boston University Law Review 2009 (2009) (with Theodore Eisenberg)

All-or-Nothing Versus Proportionate Damages, 38 Journal of Legal Studies 345-382 (2009) (with Shmuel Leshem)

Judicial Review of Class Action Settlements, 1 Journal of Legal Analysis 167-205 (2008) (with Jonathan R. Macey)

Do Juries Add Value? Evidence From an Empirical Study of Jury Trial Waiver Clauses in Large Corporate Contracts, 4 Journal of Empirical Legal Studies 539 (2007) (with Theodore Eisenberg)

The Flight from Arbitration: An Empirical Study of *Ex Ante* Arbitration Clauses in Publicly-Held Companies' Contracts, 56 DePaul Law Review 335 (2007) (with Theodore Eisenberg), reprinted in 49 Corporate Practice Commentator 323 (2007)

Rethinking Certification and Notice in Opt-Out Class Actions, 74 University of Missouri Kansas City Law Review 637 (2006)

Incentive Awards to Class Action Plaintiffs: An Empirical Study, 53 UCLA Law Review 1303 (2006) (with Theodore Eisenberg)

Review of the Merits in Class Action Certification, 33 Hofstra Law Review 51 (2004)

The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues, 57 Vanderbilt Law Review 1529 (2004) (with Theodore Eisenberg)

Competing Bids in Class Action Settlements, 31 Hofstra Law Review 633-650 (2003)

On the Costs of Civil Justice, 80 University of Texas Law Review 2115 (2002)

Class Actions in the Gulf States: Empirical Analysis of a Cultural Stereotype, 74 Tulane Law Review 681 (2000)

Full Faith and Credit to Settlements in Overlapping Class Actions: A Reply to Kahan and Silberman, 73 New York University Law Review 1167-1178 (1998)

Nonpecuniary Class Action Settlements, 60 Law and Contemporary Problems 97-155 (1997) (with Lori Singer)

Class Actions, in I New Palgrave Dictionary of Economics and the Law 257-262 (Peter Newman, ed., Macmillan Press 1998)

The Legal-Economic Analysis of Comparative Civil Procedure, 45 American Journal of Comparative Law 905-19 (1997)

Overlapping Class Actions, 71 New York University Law Review 514 (1996)

Settlement of Litigation: A Critical Retrospective, in Larry Kramer, ed., Reforming the Civil Justice System 13-37 (NYU Press 1996)

Expanding on the Fifty Percent Hypothesis: A Multimodal Approach to the Selection of Cases for Litigation, 25 Journal of Legal Studies 233 (1996) (with Daniel Kessler and Thomas Meites)

A Market Approach to Tort Reform Via Rule 23, 80 Cornell Law Review 909 (1995) (with Jonathan R. Macey)

Settlement Escrows, 24 Journal of Legal Studies 87 (1994) (with Robert Gertner)

Introduction: Economic Analysis of Civil Procedure, 23 Journal of Legal Studies 303 (1994)

Auctioning Class Action and Derivative Suits: A Rejoinder, 87 Northwestern Law Review 701 (1992) (with Jonathan R. Macey)

The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform, 58 University of Chicago Law Review 1 (1991) (with Jonathan R. Macey), reprinted in Franklin A. Gevurtz, Corporate Law Anthology 186-194 (1997)

Some Thoughts on the Equilibrium Hypothesis, 69 Boston University Law Review 561 (1989)

Some Agency Problems in Settlement, 16 Journal of Legal Studies 189 (1987)

An Economic Analysis of Rule 68, 15 Journal of Legal Studies 93 (1986)

The Public Interest in Attorneys' Fees Awards for Public Interest Litigation, 47 Law and Contemporary Problems 233 (1984) (with Robert V. Percival), reprinted in University of Chicago Law School Record (1989)

Note, Aldinger v. Howard and Pendent Jurisdiction, 77 Columbia Law Review 127 (1977)

<u>Legal Ethics/Legal Profession</u>

The English vs. the American Rule on Attorneys Fees: An Empirical Study of Attorney Fee Clauses in Publicly-Held Companies' Contracts (manuscript 2010) (with Theodore Eisenberg)

Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008, 7 Journal of Empirical Legal Studies 248 (2010) (with Theodore Eisenberg)

Ethical Considerations in Class Action Practice, in Practising Law Institute, Class Action Litigation 2007: Prosecution & Defense Strategies (2007)

From Club to Market: The Evolving Role of Business Lawyers, 74 Fordham Law Review 1105 (2005)

Bad Judges, 83 Texas Law Review 431 (2004)

Attorneys' Fees in Class Action Settlements: An Empirical Study, 1 Journal of Empirical Legal Studies 27 (2004) (with Theodore Eisenberg)

Professional Independence and the Corporate Lawyer (with William T. Allen), in Jay W. Lorsch, Leslie Berlowitz, and Andy Zelleke, Restoring Trust in American Business 113-126 (American Academy of Arts and Sciences 2005)

Conflicts of Interest in Class Action Litigation: An Inquiry into the Appropriate Standard, 2003 University of Chicago Legal Forum 581-630 (2003)

Payment of Expenses in Securities Class Actions: Ethical Dilemmas, Class Counsel, and Congressional Intent, 22 Review of Litigation 557 (2003)

Ethical Considerations in Class Action Practice, in Practising Law Institute, Class Action Litigation: Prosecution & Defense Strategies (2003)

Conflicts of Interest in Negotiation: An After-word and a Reply, 84 Iowa Law Review 1133-1139 (1999) (with Jonathan R. Macey)

Second Opinions in Litigation, 84 Virginia Law Review 1411-1437 (1998)(with Michael Klausner and Richard Painter)

Kaye, Scholer as Original Sin: The Lawyer's Duty of Candor and the Bar's Temptations of Evasions and Apology, 23 Law & Social Inquiry 305-313 (1998)

An Economic Analysis of Conflict of Interest Regulation, 82 Iowa Law Review 965-1005 (1997) (with Jonathan R. Macey), republished in Foundations of the Law and Ethics of Lawyering, George Meredith Cohen and Susan P Koniak, editors. New York: Foundation Press (2004)

Reflections on Professional Responsibility in a Regulatory State, 63 George Washington Law Review 1105 (1995) (with Jonathan R. Macey)

Government Lawyers' Ethics in a System of Checks and Balances, 54 University of Chicago Law Review 1293 (1987)

### Corporate, Contract and Securities Law

A Modest Proposal for Fixing Delaware's Broken Duty of Care, 2010 Columbia Business Law Review 319 (2010)

Un-manifested Harm in Business-to-Business Cases, 167 Journal of Theoretical and Institutional Economics 80-93 (2011)

Process as Currency with the Courts: Judicial Scrutiny of Directors' Decisions, 1 International Journal of Corporate Governance 337-365 (2010) (with Jonathan R. Macey)

A Simple Theory of Takeover Regulation in the United States and Europe, 42 Cornell International Law Journal 301 (2009) (with Guido Ferrarini), reprinted in 55 Rivista Delle Società 680 (2010)

Bargains Bicoastal: New Light on Contract Theory, 31 Cardozo Law Review 1475 (2010)

Flight to New York: an Empirical Analysis of Choice of Law and Forum Selection Clauses in Large Commercial Contracts, 30 Cardozo Law Review 1475 (2009) (with Theodore Eisenberg)

The Market for Contracts, 30 Cardozo Law Review 2073 (2009) (with Theodore Eisenberg)

Ex Ante Choices of Law and Forum: An Empirical Analysis of Corporate Merger Agreements, 59 Vanderbilt Law Review 1975 (2006) (with Theodore Eisenberg)

Catastrophic Failures: Enron and Beyond, 89 Cornell Law Review 423-455 (2004)

Capital Markets on the Internet: An Introduction, 5 New York University Journal of Legislation and Public Policy 1 (2001-2002)

Das Kapital: Solvency Regulation of the American Business Enterprise, in Eric Posner, ed., Chicago Lectures in Law and Economics 65-81 (2000)

Takeovers: English and American, 6 European Financial Management 533-542 (2000)

Choice of Law as a Pre-Commitment Device, in F.H. Buckley, ed., The Fall and Rise of Freedom of Contract 357-69 (Duke University Press 1998)

On the Advantages of Defined Contribution Plans, in Samuel Estreicher, ed., Proceedings of the 50th Annual Conference on Labor (Kluwer Academic Press, forthcoming 1998)

Political Structure and Corporate Governance: Some Points of Contrast Between the U.S. and the U.K., 1998 Columbia Business Law Review 51-78 (1998), reprinted in Sloan Project on Corporate Governance at Columbia Law School, Corporate Governance Today 629-648 (1998)

Finance and the Firm, 152 Journal of Institutional and Theoretical Economics [Zeitschrift fur die Gesamte Staatswissenschaft] 89-107 (1996)

Corporate Governance and Commercial Banking: A Comparative Examination of Germany, Japan and the United States, 48 Stanford Law Review 73 (1995) (with Jonathan R. Macey)

Comment on "Brokerage, Market Fragmentation, and Securities Market Regulation," in Andrew W. Lo, ed., The Industrial Organization and Regulation of the Securities Industry, University of Chicago Press (1996)

Corporate Stakeholders: A Contractual Perspective, 43 University of Toronto Law Review 401 (1993) (with Jonathan R. Macey)

The Culture of Capital: Comments on Conley and O'Barr, 71 North Carolina Law Review 201 (1992)

The Economic Efficiency of Close Corporation Law: A Comment, 70 Washington University Law Quarterly 399 (1992)

Lessons from Financial Economics: Materiality, Reliance, and the Utility of Empirical Methodology in Extending the Reach of Basic v. Levinson, 77 Virginia Law Review 1015 (1991) (with Jonathan R. Macey, Jeffrey Netter, and Mark Mitchell)

The Fraud on the Market System Revisited, 77 Virginia Law Review 999 (1991) (with Jonathan R. Macey)

Politics, Bureaucracies, and Financial Markets: Bank Entry into Commercial Paper Underwriting in the United States and Japan, 139 University of Pennsylvania Law Review 369-453 (1990) (with David Litt, Jonathan R. Macey, and Edward L. Rubin)

Good Finance, Bad Economics: An Analysis of the Fraud on the Market Theory, 42 Stanford Law Review 1059 (1990) (with Jonathan R. Macey)

Trans-Union Reconsidered, 98 Yale Law Journal 127 (1988)(with Jonathan R. Macey)

Toward an Interest Group Theory of Delaware Corporate Law, 65 Texas Law Review 469 (1987) (with Jonathan R. Macey)

Constitutional Law

Confederacy, in The Encyclopedia of Political Thought (Wiley-Blackwell: forthcoming)

The President's Power of Interpretation: Implications of a Unified Theory of Constitutional Law, 56 Law and Contemporary Problems 35 (1993)

The Unitary Executive in a Unified Theory of Constitutional Law: The Problem of Interpretation, 15 Cardozo Law Review 201 (1993)

Liberty and Constitutional Architecture: The Rights-Structure Paradigm, 16 Harvard Journal of Law & Public Policy 87 (1993)

Rights and Structure in Constitutional Theory, 8 Social Philosophy & Policy 196 (1991), reprinted in E. Frankel Paul, ed., Reassessing Civil Rights (1991)

The Appropriations Power and the Necessary and Proper Clause, 68 Washington University Law Quarterly 640 (1990) (panel)

From Compromise to Confrontation: Separation of Powers in the Reagan Era, 57 George Washington Law Review 401 (1989)

Rediscovering Economic Liberties, 41 Rutgers Law Review 773 (1989) (panel)

War Powers and the Constitution: A Middle Ground, 43 University of Miami Law Review 35 (1988) (panel)

The Debate Over Independent Agencies in Light of the Empirical Evidence, 1988 Duke Law Journal 215 (1988)

Independent Agencies, 1986 Supreme Court Review 41 (1986)

Financial Institutions

Financial Private Regulation and Enforcement (manuscript, 2010)

Intellectual Hazard and the Design of Financial Stability Regulation, in University of St. Gallen Series in Law and Economics, Peter Nobel, ed. (Zurich: Schulthess, 2010) (with Gerald Rosenfeld)

Intellectual Hazard: How Conceptual Biases in Complex Organizations Contributed to the Crisis of 2008, 33 Harvard Journal of Law & Public Policy 807 (2010) (with Gerald Rosenfeld)

Helping Law Catch Up to Markets: Applying Broker-Dealer Law to Subprime Mortgages, 34 Journal of Corporation Law 789 (2009) (with Jonathan Macey, Maureen O'Hara and Gabriel D. Rosenberg)

The Basel Committee, Global Administrative Law, and the Developing World, in Benedict Kingsbury and Richard Stewart, eds, India, the South and the Shaping of Global Administrative Law (forthcoming, Oxford University Press India 2008) (with Michael Barr)

Comment: Credit Risk Transfer, Hedge Funds, and the Supply of Liquidity, in Peter Nobel and Marina Gets, eds., Law and Economics of Risk in Finance, University of St. Gallen Series in Law and Economics 73 (2008)

Global Administrative Law – The View from Basel, 17 European Journal of International Law 15 (2006) (with Michael Barr)

Three Myths about Central Banks, Federal Reserve Bank of Cleveland Economic Commentary (November 2002)

Central Bank Independence in Ordinary and Extraordinary Times, in Jan Kleiniman, ed., Central Bank Independence: the Economic Foundations, the Constitutional Implications, and Democratic Accountability (Kluwer Academic Press 2000) 31-51 (with Rosa Lastra)

External Review of Central Bank Decisions, in 1 International Monetary Fund, Current Developments in Monetary and Financial Law 535-51 (1999)

Bank Mergers and American Bank Competitiveness, in Yakov Amihud & Geoffrey Miller, eds., Bank Mergers and Acquisitions 175-190 (Kluwer Academic Publishers, 1998) (with Jonathan R. Macey)

Introduction: Bank Mergers and Acquisitions, in Yakov Amihud & Geoffrey Miller, eds., Bank Mergers and Acquisitions vii-xiii (Kluwer Academic Publishers, 1998)

Deposit Insurance for Economies in Transition, in Kluwers Yearbook of International and Financial Law 103-138 (1997) and R. Lastra and H. Schiffman, eds., Bank Failures and Bank Insolvency Law in Economies in Transition 37-70 (Kluwers Academic Press 1998)

Central Bank Independence, Liberalization and Inflation in Transition Economies: An International Perspective, 49 Journal of Monetary Economics 237 (2002) (with Alex Cukierman and Bilin Neyapti)

An Interest-Group Theory of Central Bank Independence, 27 Journal of Legal Studies 433-453 (June 1998)

On the Obsolescence of Commercial Banking, 154 Journal of Institutional and Theoretical Economics [Zeitschrift fur die gesamte Staatswissenschaft] 61-73 (1998)

Banking Crises in Perspective: Two Causes and One Cure, in Gerard Caprio, Jr, William C. Hunter, George G. Kaufman, and Danny M. Leipziger, eds., Preventing Banking Crises: Lessons from Recent Global Bank Failures 279-287 (Federal Reserve Bank of Chicago, 1998)

Universal Banks are Not the Answer to America's Corporate Governance "Problem": A Look at Germany, Japan, and the U.S., 9 Journal of Applied Corporate Finance 57-73 (1997)(with Jonathan R. Macey), republished in The Revolution in Corporate Finance, Joel M Stern and David H. Chew, editors, Marlden, MA: Blackwell (2003)

Cooperation, Conflict, and Convergence in Japanese Finance: Evidence from the "Jusen" Problem, 29 Law and Policy in International Business 1-78 (1998)(pre-published as Washington University School of Law, Working Paper No. 97-3-1) (with Curtis Milhaupt)

Nihon no kin'yu ni okeru jusenmondai hoteki bunsekito keizaiteki bunseki [The Jusen Problem in Japanese Finance: A Legal and Economic Analysis], 1132 Jurisuto 140-49; 1134 Jurisuto 86-92; 1136 Jurisuto 83-89 (1998) (with Curtis Milhaupt) (in Japanese)

A Regulatory Cartel Model of Decisionmaking in Japanese Finance, 4 Zeitschrift fur Japanisches Recht 18-29 (1997)(with Curtis Milhaupt)

Banco de Fondos Mutuos Para América Latina? [Mutual Fund Banking for Latin America?], in La Banca Central en América Latina: Aspectos Económicos y Juridicos [Central Banks in Latin America and Their New Legal Structure], Ernesto Aguirre, Roberto Junguito Bonnet, and Geoffrey Miller, eds. 272-280 (1997) (in Spanish)

The Role of a Central Bank in A Bubble Economy, 18 Cardozo Law Review 1053 (1996)

Decisionmaking at the Bank of Japan, 28 Law and Policy in International Business 1 (1996)

Is Deposit Insurance Inevitable? Lessons From Argentina, 16 International Review of Law and Economics 211 (1996), reprinted in Jagdeep Bandhari and Alan Sykes, eds., Economic Dimensions in International Law: Comparative and Empirical Perspectives 392-404 (Cambridge University Press, 1998)

El Papel del Banco Central en una Economia Especulativa [The Role of a Central Bank in a Speculative Economy], in Miguel Mancera Aguayo, ed., El Banco de México en la Reconstrucción Económica Nacional 137 (Centro Cultural Manuel Gómez Morin, A.C., 1996)

Comments on Rajan and James, in A. Saunders & I. Walter, eds., Universal Banking: Financial System Design Reconsidered 330-333 (Irwin & Co. 1996)

Deposit Insurance, the Regulatory Contract, and the Mismatch in the Term Structure of Banks' Assets and Liabilities, 12 Yale Journal on Regulation 1-50 (1995)(with Jonathan R. Macey), reprinted as L'Assurance Des Depots, Le Contrat Reglementaire Implicite, et la Destruction des Eschances des Actifs et Passifs Bancaires, 6 Journal des Economistes et des Etudes Humaines 531 (1995)

Double Liability of Bank Shareholders: A Look at the New Data, 28 Wake Forest Law Review 933 (1993) (with Jonathan R. Macey)

Politics of Deposit Insurance Reform: The Case of Argentina, Federal Reserve Bank of Chicago, Proceedings of a Conference on Bank Structure and Competition 473 (1993) and 1 University of Chicago Law School Roundtable 129 (1994), republished as "Políticas de Reforma de Seguro de Depósito. El Caso de la Argentina," in Revista de Derecho Bancario y de la Actividad Financiera, Año 4, Enero-diciembre 1994, No. 19/24, at 221-239 (1995) (Argentine journal)

Comment on Universal Banks and Financial Stability, 19 Brooklyn International Law Journal 197 (1993)

Kaye, Scholar, FIRREA and the Desirability of Early Closure: A View of the Kaye, Scholar Case from the Perspective of Bank Regulatory Policy, 66 University of Southern California Law Review 1115 (1993) (with Jonathan R. Macey)

Constitutional Moments, Pre-commitment, and Fundamental Reform: The Case of Argentina, 71 Washington University Law Quarterly 1061 (1993)

Legal Restrictions on Bank Consolidation: An Economic Analysis, 77 Iowa Law Review 1083 (1992)

The Community Reinvestment Act: An Economic Analysis, 79 Virginia Law Review 291 (1993) (with Jonathan R. Macey)

Drunken Sailors on a Sinking Ship? The Rehnquist Court and the Bank Failure Problem, 1993 Public Interest Law Review 83 (1993)

Comments on Calomiris, in M. Klausner & L. White, eds., Structural Change in Banking 212 (1993)

The McCarran-Ferguson Act: A Case Study of Regulatory Federalism, 68 New York University Law Review 13 (1993), republished in 7 National Insurance Law Review 521 (1995)(with Jonathan R. Macey)(study prepared originally under the auspices of the American Enterprise Institute's Project on Federalism)

Bank Failure: The Politicization of a Social Problem, 45 Stanford Law Review 289 (1992) (with Jonathan R. Macey)

Toward Enhanced Consumer Choice in Banking: Uninsured Depository Facilities as Financial Intermediaries for the 1990s, 1991 N.Y.U. Annual Survey of American Law 865 (1992) (with Jonathan R. Macey)

Nondeposit Deposits and the Future of Bank Regulation, 91 Michigan Law Review 237-273(1992) (with Jonathan R. Macey)

America's Banking System: The Origins and Future of the Current Crisis, 69 Washington University Law Quarterly 769 (1991) (with Jonathan R. Macey)

Bank Failures, Risk Monitoring, and the Market for Corporate Control (with Jonathan R. Macey), 88 Columbia Law Review 1153 (1988) (study conducted under the auspices of the Administrative Conference of the United States)

The Future of the Dual Banking System, 53 Brooklyn Law Review 1 (1987)

Public Policy Implications of Legislation Limiting the Growth of Interstate Banks, Federal Reserve Bank of Chicago, Proceedings of a Conference on Bank Structure and Competition 602 (1986)

Interstate Branching and the Constitution, 41 Business Lawyer 337 (1986)

Interstate Banking in the Court, 1985 Supreme Court Review 179 (1985)

Legal History

The Corporate Law Origins of the Necessary and Proper Clause, 79 George Washington University Law Review 1 (2010)

*Meinhard v. Salmon,* in Jonathan R. Macey, ed., Corporate Law Stories (2008)

The Industrial Organization of Political Production: A Case Study, 149 Journal of Institutional and Theoretical Economics [Zeitschrift fur die gesamte Staatswissenschaft] 769 (1993)

Comments on Priest, 36 Journal of Law and Economics 325 (1993)

Toward "Neutral Principles" in the Law: Selections from the Oral History of Herbert Wechsler, 93 Columbia Law Review 854 (1993) (with Norman Silber)

Double Liability of Bank Shareholders: History and Implications, 27 Wake Forest Law Review 31 (1992) (with Jonathan R. Macey)

Origin of the Blue Sky Laws, 70 Texas Law Review 347 (1991) (with Jonathan R. Macey), reprinted in 34 Corporate Practice Commentator 223 (1992)

Public Choice at the Dawn of the Special Interest State: The Story of Butter and Margarine, 77 California Law Review 83 (1989)

The True Story of Carolene Products, 1987 Supreme Court Review 397 (1987), reprinted in Michael J. Glennon, et al., eds., Constitutional Law Anthology (Anderson Publishing 1997), pp. 94-103; reprinted in J. Ely, Property Rights in American History: Reform and Regulation of Property Rights (Garland Publishing 1997), pp. 165-197.

Interviewer, Columbia University Oral History Collection, Life of Herbert Wechsler (1980-1982) (with Norman Silber)

<u>Jurisprudence</u>

The Case of the Speluncean Explorers: Contemporary Proceedings, 61 George Washington Law Review 1798 (1993)

The End of History and the New World Order: The Triumph of Capitalism and the Competition Between Liberalism and Democracy, 25 Cornell International Law Journal 277 (1992) (with Jonathan R. Macey)

The Canons of Statutory Construction and Judicial Preferences, 45 Vanderbilt Law Review 647 (1992) (with Jonathan R. Macey)

Pragmatics and the Maxims of Interpretation, 1990 Wisconsin Law Review 1179 (1990)

Economic Efficiency and the Lockean Proviso, 10 Harvard Journal of Law and Public Policy 401 (1987)

<u>Ancient Law</u>

Taxation, in Oxford Encyclopedia of the Bible and Law (Oxford University Press: forthcoming)

Logos and Narrative, NYU School of Law, Public Law Research Paper No. 10-78 (2010)

Monarchy in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-76 (2010)

Nationhood and Law in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-57 (2010)

Revelation and Legitimacy in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-52 (2010)

The Book of Judges: The Hebrew Bible's Federalist Papers, NYU School of Law, Public Law Research Paper No. 10-66 (2010)

Consent of the Governed in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-56 (2010)

Nomadism, Dependency, Slavery and Nationhood: Comparative Politics in the Book of Exodus, NYU School of Law, Public Law Research Paper No. 10-49 (2010)

Economics of Ancient Law, in Geoffrey P. Miller, ed., The Economics of Ancient Law (Edward Elgar, forthcoming 2010)

Patriarchy: The Political Theory of Family Authority in the Book of Genesis (manuscript 2010)

The Dark Age:  How the Biblical Narratives Demonstrate the Necessity for Law and Government (NYU School of Law, Public Law Research Paper No. 10-18)

Origin of Obligation: Genesis 2:4b-3:24 (NYU School of Law, Public Law Research Paper No. 09-60)

Sovereignty and Conquest in the Hebrew Bible, NYU School of Law, Public Law Research Paper No. 10-61 (2010)

Golden Calves, Stone Tablets, and Fundamental Law: A Political Interpretation of Exodus 32 (NYU School of Law, Public Law Research Paper No. 10-02)

A Riposte Form in the Song of Deborah, in Tikva Frymer-Kensky, Bernard Levinson and Victor Matthews, eds., Gender and Law in the Hebrew Bible and the Ancient Near East  113-27 (1998)

Foreword: The Development of Ancient Near Eastern Law, 70 Chicago-Kent Law Review 1623 (1996)

Why Ancient Law?, 70 Chicago-Kent Law Review 1465 (1995)(with James Lindgrin and Laurent Mayali)

Foreword: Land Law in Ancient Times, 71 Chicago-Kent Law Review 233 (1996)

The Song of Deborah: A Legal-Economic Analysis, 144 University of Pennsylvania Law Review 2293 (1996)

The Legal-Economic Approach to Biblical Interpretation, 150 Journal of Institutional and Theoretical Economics [Zeitschrift fur die gesamte Staatswissenschaft] 755 (1994)

J as Constitutionalist: A Legal-Economic Interpretation of Exodus 17:8-16 and Related Texts, 70 Chicago-Kent Law Review 1829 (1995)

Verbal Feud in the Hebrew Bible: Judges 3:12-30 and 19-21, 55 Journal of Near Eastern Studies 105 (1995)

Contracts of Genesis, 22 Journal of Legal Studies 15-45 (1993)

Ritual and Regulation: A Legal-Economic Analysis of Selected Biblical Texts, 22 Journal of Legal Studies 477 (1993)

<u>Law and Society</u>

Parental Bonding and the Design of Child Support Obligations, in William S. Comanor, ed., The Law and Economics of Child Support Payments 210-240 (Edward Elgar 2004)

The Legal Function of Ritual, 80 Chicago-Kent Law Review 1181 (2005)

Handicapped Parking, 29 Hofstra Law Review 81 (2000) (with Lori S. Singer)

Custody and Couvade: The Importance of Paternal Bonding in the Law of Family Relations, 33 Indiana Law Review 691 (2000)

Norm Enforcement in the Public Sphere: The Case of Handicapped Parking, 71 George Washington Law Review 895-933 (2004)

Norms and Interests, 32 Hofstra Law Review 637 (2003)

Female Genital Mutilation: A Cultural-Legal Analysis (manuscript)

Circumcision: A Legal-Cultural Analysis, 9 Virginia Journal of Social Policy and the Law 498-585 (2002), pre-published as New York University Public Law and Legal Theory Working Paper Series, Working Paper 5 (2000)

Law, Pollution, and the Management of Social Anxiety, 7 Michigan Women's Law Journal 221-289 (2001)

Other:

Richard Posner, 61 N.Y.U. Annual Survey of American Law 13 (2004)

Introduction: The Law and Economics of Risk, 19 Journal of Legal Studies 531 (1990) (with Richard A. Epstein)

Law School Curriculum: A Reply to Kennedy, 14 Seton Hall Law Review 1077 (1984) (under pen name of Chris Langdell)

Book Reviews

Defusing the Banks' Financial Time Bomb, BusinessWeek (Mar. 11, 2010) (review of Robert Pozen, Too Big to Save?  How to Fix the U.S. Financial System

Love & Joy: Law, Language and Religion in Ancient Israel, by Yochanan Muffs, 58 Journal of Near Eastern Studies 144-45 (1999)

Jesus and the Jews: The Pharisaic Tradition in John; The Trial Of Jesus; Jesus And The Law, by Alan Watson, 1 Edinburgh Law Review 273 (1997)

No Contest: Corporate Lawyers and the Perversion of Justice in America, by Ralph Nader and Wesley J. Smith, Washington Post (October 13, 1996)

The Rise and Fall of the Classical Corporation: Hovenkamp's Enterprise and American Law: 1836-1937, 59 University of Chicago Law Review 1677 (1993)

Property Rights and the Constitution: A Review of James W. Ely, Jr.'s The Guardian of Every Other Right, 37 American Journal of Legal History 378 (1993)

Anatomy of A Disaster: Why Bank Regulation Failed, 86 Northwestern University Law Review 742 (1992)

The Glittering Eye of Law, 84 Michigan Law Review 1901 (1986)

A Rhetoric of Law, 52 University of Chicago Law Review 247 (1985)

Major Lectures

Trust, Risk, and Moral Hazard in Financial Markets (University of Genoa, Fresco Chair Lectures in Law and Finance, June 2010)

A Simple Theory of Takeover Regulation in the United States and Europe; Intellectual Hazard (Commerzebank Lectures, University of Frankfurt, May 2010)

The European Union's Takeover Directive and Its Implementation in Italy (University of Rome III, 2008)

Catastrophic Financial Failures: Enron, HIH and More (Ross Parsons Lecture, Sydney, Australia, 2002)

Das Kapital: Solvency Regulation of the American Business Enterprise (Coase Lecture, University of Chicago Law School, 1993)

Banking in the Theory of Finance; The Simple Economics of Litigation and Settlement; The Economic Structure of Corporation Law (University of Auckland, New Zealand, 1993)

<u>Journal Referee Reports</u>

American Law and Economics Review
Journal of Legal Studies
Journal of Law, Economics and Organization
Review of Law and Economics

<u>Conferences Organized</u>

Judicial Dialogue on Mass Litigation, Florence Italy, October 15-16, 2010 (co-organizer of conference co-sponsored by NYU Law School, the American Law Institute, and the European University Institute)

Finlawmetrics 2010: Central Banking, Regulation & Supervision after the Financial Crisis  (co-sponsor and member of steering committee)

Finlawmetrics 2009: After The Big Bang:  Reshaping Central Banking, Regulation and Supervision (Milan, Italy, Spring 2009) (co-sponsor and member of steering committee)

NYU Global Economic Policy Forum 2009: The Future of Regulation and Capital Markets (November 5, 2009) (co-organized with Professor Alan Rechtschaffen and with the NYU Law School Alumni Association)

Third Annual Conference on Empirical Legal Studies (Cornell University, Ithaca, New York, Fall 2008) (co-organizer)

NYU Global Economic Policy Forum (April 14, 2007).  Major conference on economic policy. Keynote address by Jean Claude Trichet, President of the European Central Bank; presentations by Tevi Troy, Deputy Secretary of the Department of Health and Human Services; Kevin Warsh, Member of the Board of Governors of the Federal Reserve System; and Donald B. Marron, Jr., Senior Economic Advisor, President's Council of Economic Advisors.  Co-organized with Professor Alan Rechtschaffen.

Second Annual Conference on Empirical Legal Studies (New York, New York, November 10-11, 2007). Major conference (425 participants) exploring all aspects of the empirical study of law. Co-organized with Jennifer Arlen, Bernard Black, Theodore Eisenberg and Michael Heise.

NYU Global Economic Policy Forum (April 11, 2007). Major conference on economic policy. Keynote address by Ben S. Bernanke, Chairman of the Board of Governors of the Federal Reserve System; presentations by Stanley Druckenmiller, Founder of Dusquesne Capital, Tevi Troy, Domestic Policy Advisor for President George W. Bush, and Jeffrey Rosen, Vice Chair of Lazard. Co-organized with Professor Alan Rechtschaffen.

First Annual Conference on Empirical Legal Studies (Austin, Texas, October 2006). Major conference exploring all aspects of the empirical study of law. Co-organized with Jennifer Arlen, Bernard Black, Theodore Eisenberg and Michael Heise.

Conference on Legal Aspects of the International Activities of Central Banks, Lima Peru, October 1997. This conference, co-sponsored by the central bank of Peru, brought together leaders in the legal and economic issues facing central banks in the management of their external reserves.

Conference on the Governance of Institutional Investors (New York, New York, February 14, 1997). This conference, sponsored by the NYU Stern School of Business Salomon Center in association with the New York University Law School Center for the Study of Central Banks, brought together top executives, attorneys, scholars and others interested in the management and organization, both economic and legal, of the nation's large institutional investors, including its mutual fund industry.

Conference on Bank Mergers and Acquisitions (New York, New York, October 11, 1996). This conference, sponsored by the NYU Stern School of Business Salomon Center in association with the New York University Law School's Center for the Study of Central Banks, brought together leading academics, lawyers, and investment bankers to discuss some of the broader implications of bank mergers and acquisitions. Co-organizer of this conference was Professor Yakov Amihud of the Stern School's Finance Department.

Conference in Central Banks in Latin America (Bogota, Colombia, February, 1996). This conference, co-sponsored by the central bank of Colombia with technical assistance from the Legal Affairs Department of the International Monetary Fund, brought together leaders of Latin American central banks, the international financial community, and scholars from a variety of disciplines, to discuss issues related to the independence of central banks and economic development.

Conference on Central Banks in Asia (Shanghai, China, October, 1995). This conference, co-sponsored with KPMG-Peat Marwick, brought together leaders from commercial banks, investment banks, and industrial firms, as well as central bankers, to discuss Asian central banks to address issues such as the proposed law granting a degree of independence to the central bank of China.

Conference on Ancient Law (Berkeley, California, March 1995).  This conference, organized with Professors James Lindgren of Chicago-Kent Law School and Laurent Mayali of the University of California at Berkeley Law School, brought together important figures from a variety of disciplines interested in Ancient Law.

Conference on Central Banks in Eastern Europe and the Newly Independent States (Chicago, Illinois, April 1994).  This conference brought together the Prime Minister of Estonia, three present or former Ministers of Finance of Eastern European states (including Boris Fyoderov, former Finance Minister of the Russian Republic), the heads of the central banks of eleven nations in Eastern Europe and the Newly Independent States, together with a wide variety of highly-placed officials from these countries and from the west, to discuss issues related to the independence of central banks and economic development.

## Professional Memberships and Positions

New York State Bar
District of Columbia Bar
American Bar Association
American Law Institute (1988-1996)
Member, Paolo Baffi Centre Scientific Advisory Board, Milan, Italy (2008- present)
Member, International Academic Council, University of St. Gallen,
    Switzerland (2004-present)
Chairman, Section on Business Associations, American Association of Law
    Schools (1995)
Member of the Board of Directors, American Law and Economics Association
    (1995-1998)
Member of the Foreign Advisory Committee, Latin American Law and
    Economics Association (1995-2000)
Member of the Foreign Advisory Board, Universitad Tocurato Di Tella School of Law,
    Buenos Aires, Argentina (1992-1999)
Member of the Editorial Board, Supreme Court Economic Review
Member of the Editorial Board, The Independent Review
Member of the Advisory Board, Yearbook of International Financial and
    Economic Law
Member of the Advisory Board, University of Hong Kong Faculty of Law Asian Institute
    of International Financial Law (2001-present)
Member of the Advisory Board, LSN Comparative Law Abstracts

## Courses

Legal Profession (1985-93; 1996-98; 2003-2007; 2013 (scheduled))
The Crisis of 2008 (2009, 2010)
Reading Class: Restructuring Finance (2009)
Property (1986-87)
Corporations (1985-88; 1991-93; 1997-2000; 2005; 2008; 2012)
Seminar on Separation of Powers (1985, 1987)

Civil Procedure (1983-84; 2004-2005; 2011)
Federal Regulation of Banking (1983, 1989-93; 1995-97; 2003, 2006-2010; 2012)
Law and Business of Banking (2012; with Gerald Rosenfeld)
Land Development (1984-85)
Securities Law (1990-91)
Workshop in Legal Theory (1989-91)
Seminar on Financial Institutions (1992-93 (with Merton Miller); 1996-97)
Ethics in Class Action Practice (Continuing Legal Education Seminar 2002-2005)
Law and Economics (University of Basel, Switzerland 2005, 2007, 2008; 2009; 2010; 2011; 2012)
Advanced Seminar on Law and Economics (University of Genoa, Italy 2008)
Banking and the Financial Crisis (University of Genoa, Italy 2009)
Trust, Risk, and Moral Hazard in Financial Markets (University of Genoa, Italy, 2010)
International Banking (University of Sydney, Australia, 2002, 2006)
Introduction to Banking Law (University of Basel, Switzerland 2001, 2002, 2003, 2004, 2009, 2010; 2011; 2012
Banking in the Theory of Finance (University of Frankfurt, Germany 2004, 2005)
Banking Regulation in Crisis (University of Frankfurt, Germany, 2010)
Banking: Law and Economics Issues after the Financial Crisis (Study Center Gerzensee, 2012)

## Litigation and Alternative Dispute Resolution

Brief and Reply Brief for Plaintiff-Appellant, Glancy v. Taubman Centers, Inc. No. 03-1609 (6th Cir. 2003).

Amicus Brief for American Bankers Association, et al., In Re: Visa Check/Mastermoney Antitrust Litigation, 280 F.3d 124 (2d Cir. 2001) (of counsel)

Briefed and argued Moran v. Household Finance Corp. (the "Poison Pill" case) in the Supreme Court of Delaware (1985)

Briefed cases in the U.S. Supreme Court, U.S. Court of Appeals, U.S. District Courts, and state trial and appellate courts.  Conducted depositions and other pretrial discovery.  (1982-1983)

Briefed and argued Hodges v. Metts, 676 F.2d 1133 (6th Cir. 1982), on behalf of the United States.

Conducted trial of American Psychological Association v. Birch Tree Press, et al. (U.S. District Court, Washington, D.C. 1983).

Deposit Insurance for Thailand.  Prepared a draft deposit insurance law for Thailand, at the request of the International Monetary Fund (1999)

Schatz v. Blanchard.  Neutral arbitrator in a commercial arbitration (2000)

<u>Expert Witness Testimony (past five years)</u>

<u>In re Trans Union Corp. Privacy Litigation</u>, MDL Docket No. 1350, United States District Court for the Eastern District of Illinois (2008) (declaration on certification)

<u>Hoffman v. American Express</u>, Case No. 2001-022881, Superior Court for the State of California, Alameda County (2008) (deposition on claim preclusion issue)

<u>In re Pet Foods Products Liability Litigation</u>, MDL Docket No. 1850, Civil Action No. 07-2867 (NLH), United States District Court for the District of New Jersey (2008) (declaration on attorneys' fees)

<u>Hensley v. Computer Sciences Corp.</u>, No. CV-2005-59-3, Circuit Court of Miller County, Arkansas (2008) (affidavit and deposition on certification)

<u>Chivers v. State Farm Fire & Casualty Co.</u>, NO.: CV-2004-294-3, Circuit Court of Miller County, Arkansas (2008) (affidavit on certification)

<u>EM Ltd. and NML Capital, Ltd. v. The Republic of Argentina and Banco de La Nación Argentina</u>, No. 08 Civ 7974 (TPG), United States District Court for the Southern District of New York (declaration and responsive declaration on whether a state-owned financial institution is an alter-ego of the government) (2009); second supplemental declaration (2010)

<u>Tucker v. Scrushy, et al.</u>, Nos. CIV-02-5212, CV 03-3522, CV 03-2023, CV 03-2420, CV 98-6592, Circuit Court of Jefferson County, Alabama, 2008 (affidavit on fees) (2009)

<u>In Re: 2007 Wildfire Class Litigation</u>, Master Case No. 2008-00093086, Superior Court of California, County of San Diego (2009) (affidavit and deposition on certification)

<u>In re: Columbia Hospital for Women Medical Center, Inc.</u>, Case No. 09-00010 (Teel, J.), United States Bankruptcy Court for the District of Columbia (declaration on fees) (2009)

<u>In re Vioxx Products Liability Litigation</u>, Civil Action No. 2:05-MD-01657-EEF-DEK, United States District Court, Eastern District of Louisiana (affidavit on fee-capping order) (2009)

<u>State of Missouri v. SBC Communications, Inc.</u>, No. No. 044-02645, Circuit Court of the City of St. Louis, Missouri (2009) (affidavit on fees)

<u>Alexander v. Nationwide Mutual Insurance Co.</u>, No. CV-2009-120-3, Circuit Court of Miller County, Arkansas (2009) (affidavit on fees)

<u>Peterman v. North American Company for Life and Health Insurance</u>, Case No. BC357194, Superior Court of the State of California, County of Los Angeles (2009) (declaration on fees)

Holman v. Student Loan Xpress, Inc., Case No. 8:08-cv-00305-SDM-MAP (Middle District of Florida, Tampa Division) (2009) (declaration on fees)

Board of Trustees of the AFTRA Retirement Fund v. JPMorgan Chase, No. 09-00686 (Southern District of New York) (2010) (declaration on class certification)

Polion v. Wal-Mart Stores, Inc., No. 01-03645 (Superior Court of Massachusetts, Commonwealth of Massachusetts) (2010) (declaration on fees; supplemental declaration on fees and motion to strike counsel)

In re MoneyGram International, Inc. Securities Litigation, No. 08-883 (DSD/JJG), United States District Court, District of Minnesota (2010) (declaration on fees)

Board of Trustees of the AFTRA Retirement Fund v. JPMorgan Chase Bank, N.A., No. 09-cv-00686 (SAS) (DF), United States District Court for the Southern District of New York (2010) (declaration and deposition on certification)

Coffey v. Freeport-McMoran Copper & Gold, Inc., No. CJ-2008-68, District Court of Kay County, State of Oklahoma (2010) (affidavit on certification)

In Re Puerto Rican Cabotage Antitrust Litigation MDL Docket No. 3:08-md-1960 (DRD), United States District Court for the District of Puerto Rico (2010) (declaration on fees)

In re XTO Energy Shareholder Class Action Litigation, No. 352-242403-09, District Court of Tarrant County, Texas, 352nd Judicial District (2010) (affidavit on fees)

The Board of Trustees of the Southern California IBEW-NECA Defined Contribution Plan v. Bank of New York Mellon, Civil Action No. 09-Cv-06273, Southern District of New York (2011) (declaration on certification)

Iorio v. Asset Marketing Systems, Inc., Case No.: 05-CV-0633-JLS (CAB), Southern District of California (2011) (declaration in fees)

Villaflor v. Equifax Information Services, LLC, Case No.: 3:09-cv-00329-MMC, Northern District of California (2011) (declaration on fees)

Feely v. Allstate Insurance Company, Case No. CV-2004-294-3A, Circuit Court of Miller County, Arkansas (2011) (affidavit on settlement and fees)

Keegan v. American Honda Motor Co., Inc., Case Number: 2:10-cv-09508-MMM-AJW, United States District Court for the Central District of California (2011) (declaration on certification)

Compusource Oklahoma v. BNY Mellon, N.A., Case No: CIV 08-469-KEW, United States District Court for the Eastern District of Oklahoma (2011) (declaration on certification)

ABN Amro Bank v. Dinallo, Index No.: 601846/09 (New York State Supreme Court) (declaration and deposition on corporate restructuring/administrative law issue)

In re Checking Account Overdraft Litigation, Case No.: 1:09-MD-02036-JLK, United States District Court for the Southern District of Florida (2012) (Bank of America case; declaration and supplemental declaration on fees)

In re Checking Account Overdraft Litigation, Case No.: 1:09-MD-02036-JLK, United States District Court for the Southern District of Florida (2012) (Bank of Oklahoma case; declaration on fairness of settlement and fees)

In re Cell Therapeutics Inc. Securities Litigation, Master Docket No. C10-414 MJP, United States District Court for the Western District of Washington (2012) (declaration on fees)

In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010, MDL NO. 2179, Eastern District of Louisiana (2012) (declarations on economic and medical benefits class settlements)

Freudenberg v. eTrade Financial Corporation, Case No.: 07-CV-8538, United States District Court for the Southern District of New York (2012)

In re Checking Account Overdraft Litigation, Case No.: 1:09-MD-02036-JLK, United States District Court for the Southern District of Florida (2012) (Union Bank case; declaration on fees)

LaCour v. Whitney Bank, Case No. 8:11-cv-1896-VMC-MAP (Middle District of Florida 2012) (declaration on fairness of settlement and fees)

Smith v. American Bankers Insurance Company of Florida, Case No.: 2:11-cv-02113-PKH, Western District of Arkansas 2012 (declaration on class certification)

## Other Activities

Member, Board of Directors, American Law and Economics Association (1996-1999)

Member, Board of Advisors, The Independent Review (1996-present)

Member, Board of Advisors, Asian Institute of International Financial Law (2001-present)

Member, Editorial Advisory Board, Supreme Court Economic Review (1995-present)

Member, Editorial Advisory Board, The Brookings-Wharton Papers on Financial Policy (1997-present)

President, Section on Financial Institutions and Consumer Financial Services, American Association of Law Schools (1999)

President, Section on Business Associations, American Association of Law Schools (1995)

Member, Board of Contributors, American Bar Association Preview of Supreme Court Cases (1985-1993)

Consultant, Administrative Conference of the United States (1988-89; 1991-1992)

Board of Directors and Volunteer Listener, D.C. Hotline (1980-83)

Awards

1992 Paul M. Bator Award for Excellence in Teaching, Scholarship and Public Service, from the Federalist Society for Law and Public Policy Studies

Languages

Reading knowledge of Spanish, French, and Italian.

Personal

Born October 17, 1950

Children Jason (b. 1986) and Forrest (b. 1987).

Shorter Works

Defusing The Banks' Financial Time Bomb: Without Tough Reforms, Writes Robert Pozen, We'll Probably Face An Ugly Repeat of Recent History (Business Week, March 11, 2010)

Why Interstate Banking is in the National Interest, Testimony Before the Subcommittee on Financial Institutions Supervision, Regulation and Deposit Insurance of the House Committee on Banking, Housing and Urban Affairs (September 29, 1993)

Challenging the Concept of the Common Law as a Closed System, Columbia Law School Report, Autumn, 1993 (with Norman Silber)

The Insurance Industry's Antitrust Exemption: A Longstanding Tradition Faces its Greatest Challenge, 1992-93 ABA Preview of Supreme Court Cases 198 (1993)

Shootout at the Escheat Corral, 1992-93 ABA Preview of Supreme Court Cases (1993)

Choices and Chances for Consumers, Legal Times, Oct. 12, 1992, at 29-30.

Impeachment Procedures: An Unexplored Territory in the Separation of Powers, 1992-93 ABA Preview of Supreme Court Cases 39 (1992)

An (Ex)changing of the Guard, 21 Journal of Legal Studies iii (1992)

Revisiting the Contingency Factor in Fee-Shifting Awards, 1991-92 ABA Preview of Supreme Court Cases 327 (1992)

The Foreign Sovereign Immunities Act and the Market for Public International Debt, 1991-92 ABA Preview of Supreme Court Cases 307 (1992)

Return of the Tenth Amendment?: Federal Control and State Autonomy over Low Level Radioactive Wastes, 1991-92 ABA Preview of Supreme Court Cases 284 (1992)

What are the Limits on Congressional Power to Influence Pending Cases?, 1991-92 ABA Preview of Supreme Court Cases 158 (1991)

RICO Standing for Securities Fraud: Does the Purchaser-Seller Rule of Rule 10b-5 Apply?, 1991-92 ABA Preview of Supreme Court Cases 155 (1991)

Banking and Investment: Introduction to UPA Index and Microfiche Collection (University Publications of America 1991)

Source of Strength in the Court: Can Bank Holding Companies be Required to Support Failing Subsidiary Banks?, 1991-92 ABA Preview of Supreme Court Cases 42 (1991)

Source of Strength: A Source of Trouble, Legal Times, September 30, 1991 (Special Supplement, pp. 22-25)

The Once and Future American Banking Industry, The American Enterprise (with Jonathan R. Macey)(1991)

The Former Stockholder as Plaintiff in Short-Swing Trading Cases, 1990-91 ABA Preview of Supreme Court Cases (1991)

Disposing of Demand Excuse in Derivative Litigation, 1990-91 ABA Preview of Supreme Court Cases (1991)

Up in the Air: Can Congress Require States to Appoint Members of Congress to State Agencies?, 1990-91 ABA Preview of Supreme Court Cases 294 (1991)

The Statute of Limitations under Rule 10b-5, 1990-91 ABA Preview of Supreme Court Cases (1991)

Tort Claims Against Federal Banking Agencies: New Hope For Shareholders and Officers of Failed Depository Institutions?, 1990-91 ABA Preview of Supreme Court Cases 94 (1991)

Punitive Damages Redux: If the Eighth Amendment Doesn't Apply, What About the Due Process Clause?, 1990-91 ABA Preview of Supreme Court Cases 47 (1990)

Quandaries of Causation: Proxy Solicitation in Freeze-Out Mergers, 1990-91 ABA Preview of Supreme Court Cases 57 (1990)

Racial Statesmanship, Legal Times S31 (July 23, 1990)

Eurodollars, Sovereign Risk, and the Liability of U.S. Banks for Deposits in Foreign Branches, 1989-90 ABA Preview of Supreme Court Cases 281 (1990)

When is a Note a Note?, 1989-90 ABA Preview of Supreme Court Cases 18 (1990)

Interstate Banking and the Commerce Clause, 1989-90 ABA Preview of Supreme Court Cases 168 (1990)

Federal Courts, Municipalities, and the Contempt Power, 1989-90 ABA Preview of Supreme Court Cases 37 (1989)

Shoe Could Still Drop on Issue of Punitive Damages, National Law Journal (August 21, 1989)

Punitive Damages and the Constitution, 1988-89 ABA Preview of Supreme Court Cases 391 (1989)

States, Bankruptcy and the Eleventh Amendment, 1988-89 ABA Preview of Supreme Court Cases 412 (1989)

Stockholders, Arbitration, and the Securities Act of 1933, 1988-89 ABA Preview of Supreme Court Cases 383 (1989)

Appropriations Riders, Nondisclosure Agreements, and the Separation of Powers, 1988-89 ABA Preview of Supreme Court Cases 375 (1989)

Judicial Appointments and the ABA: Business as Usual or Brand New World?, 1988-89 ABA Preview of Supreme Court Cases 379 (1989)

S & L Receiverships, State Law, and the Federal Courts, 1988-89 ABA Preview of Supreme Court Cases 255 (1989)

The Non-delegation Doctrine in Taxation: A Different Constitutional Calculus?, 1988-89 ABA Preview of Supreme Court Cases 261 (1989)

Bankruptcy, Tax Liens, and Post-Petition Interest, 1988-89 ABA Preview of Supreme Court Cases (1989)

Federal Courts, State Taxes: A Vexing Dilemma For the Enforcement of Civil Rights in a Federal System, 1989-90 ABA Preview of Supreme Court Cases 95 (1988)

Separation of Powers and the Sentencing Commission, 1988-89 ABA Preview of Supreme Court Cases 23 (1988)

Administering the Savings and Loan Crisis: New Problems for the FSLIC, 1988-89 ABA Preview of Supreme Court Cases (1988)

Federal Procurement and the Separation of Powers, 1988-89 ABA Preview of Supreme Court Cases 26 (1988)

Thinking About a Career in Law, 1988-89 Talbot's Student Planning Book 32 (1988)

Carl McGowan: A Great Judge Remembered, 56 George Washington Law Review 697 (1988)

Separation of Powers: The Independent Counsel Case Tests the Limits, 1987-88 ABA Preview of Supreme Court Cases 390 (1988)

Decisionmaking in Collegial Bodies, Judicature, April/May 1988

The FDIC, Bank Officers and the Due Process Clause, 1987-88 ABA Preview of Supreme Court Cases 326 (1988)

Farm Foreclosures in Bankruptcy, 1987-88 ABA Preview of Supreme Court Cases 199 (1988)

Equal Access to Justice and Government Litigation, 1987-88 ABA Preview of Supreme Court Cases 160 (1988)

The Time Value of Money in Bankruptcy Cases, 1987-88 ABA Preview of Supreme Court Cases 116 (1987)

Getting the Fee First?: Attorneys and the SSI Program 1987-88 ABA Preview of Supreme Court Cases 118 (1987)

The Farmer and the FDIC, 1987-88 ABA Preview of Supreme Court Cases 48 (1987)

Testing the Limits of Securities Fraud: Financial Gossip in the Court, 1987-88 ABA Preview of Supreme Court Cases 26 (1987)

Checks and Balances in the Twenty-First Century, 33 University of Chicago Law School Record 7 (1987)

Separation of Powers May Become Focus Over NSC, Legal Times, Dec. 15, 1986, at 15

If a Bank is a Broker, is a Brokerage a Branch? 1986-87 ABA Preview of Supreme Court Cases 65 (1986)

Attorney's Fees in the Supreme Court, American Bar Association Journal 40 (November, 1986)

The Contingency Factor in Attorney's Fees Reconsidered, 1986-87 ABA Preview of Supreme Court Cases 20 (1986)

Restitution and Bankruptcy in a Federal System, 1986-87 ABA Preview of Supreme Court Cases (1986)

Don't Limit Contingent Fees, Chicago Tribune, June 11, 1986

The Budget and the Separation of Powers: Gramm-Rudman in the Court, 1985-86 ABA Previews of Supreme Court Cases 359 (1986)

Keeping Attorneys Fees in Proportion, 1985-86 ABA Preview of Supreme Court Cases 325 (1986)

Must the Federal Government Pay Interest on Attorneys Fees Awards?, 1985-86 ABA Preview of Supreme Court Cases 241 (1986)

The Contingency Factor in Attorneys Fees Awards, 1985-86 ABA Preview of Supreme Court Cases 243 (1986)

The FCC as Cop: Forcing State Public Service Commissions to Obey Federal Agency Orders, 1985-86 ABA Preview of Supreme Court Cases 191 (1986)

Preemption, Public Utilities, and Power Over Telephone Rate-Setting, 1985-86 ABA Preview of Supreme Court Cases 187 (1986)

A Bank is a Bank is a Bank -- or is it?, 1985-86 ABA Preview of Supreme Court Cases 67 (1985)

Settlement Offers Conditioned on Waiver of Attorneys' Fees: A Legal and Ethical Dilemma Confronts the Court, 1985-86 ABA Preview of Supreme Court Cases 55 (1985)

Bankruptcy and the Environment: The Case of Hazardous Wastes, 1985-86 ABA Preview of Supreme Court Cases 25 (1985)

A Different Approach to Interstate Banking, American Banker (August 8, 1985)

The SEC as Censor: Is Banning an Investment Advice Newsletter a Prior Restraint of the Press?, 1984-85 ABA Preview of Supreme Court Cases 243 (1985)

Enforcing Federal Rights in State Courts, 1984-85 ABA Preview of Supreme Court Cases 277 (1985)

Interstate Banking and the Constitution, 1984-85 ABA Preview of Supreme Court Cases 364 (1985)

The "Sale of Business" Doctrine in the Supreme Court, 1984-85 ABA Preview of Supreme Court Cases 344 (1985)

Sale of Business Revisited: Does the Doctrine Apply to Partial Sales of Corporate Control, 1984-85 ABA Preview of Supreme Court Cases 347 (1985)

Six Cases Shape Business Law, American Bar Association Journal 124 (Jan. 1985)

Offers of Settlement in Civil Rights Cases Pose Attorneys' Fees Question, 1984-85 ABA Preview of Supreme Court Cases 105 (1984)

Using Bankruptcy to Avoid Liability for Cleaning up Toxic Wastes, 1984-85 ABA Preview of Supreme Court Cases 36 (1984)

A Judicial Footnote Cemented the New Deal, Wall Street Journal, September 13, 1984

May Bank Holding Companies Provide Discount Brokerage Savings?, 1984-85 ABA Preview of Supreme Court Cases 575 (1984)

Blum v. Stenson:  Fundamental Questions About Attorneys' Fees Awards to Public Interest Lawyers, 1984-85 ABA Preview of Supreme Court Cases 301 (1984)

Myths on the Midway, 30 Chicago Law School Record 13 (1984)

Smith v. Robinson:  Another Step Towards Solving the Attorneys' Fees Puzzle? 1983-84 ABA Preview of Supreme Court Cases 437 (1984)

Securities Industry Association v. Board of Governors:  Can Banks Distribute Commercial Paper? 1983-84 ABA Preview of Supreme Court Cases 425 (1984)

The "7-Eleven" Case:  Arbitration v. Litigation in a Federal System, 1983-84 ABA Preview of Supreme Court Cases 161 (1983)

The Bildisco Case:  Reconciling Federal Bankruptcy and Labor Policies, 1983-84 ABA Preview of Supreme Court Cases 169 (1983)

The "Daily Income Fund" Case:  What Role Should a Mutual Fund's Board of Directors Play in Disputes over Investment Advisor Fees, 1983-84 ABA Preview of Supreme Court Cases 107 (1983)

Pulliam v. Allen:  Should State Judges who Act Unconstitutionally Pay the Plaintiff's Attorneys' Fees?, 1983-84 ABA Preview of Supreme Court Cases 115 (1983)

"Shortsighted" Bill Proposes D.C. Court Divestiture, Legal Time of Washington, August 16, 1982

The Tax Bill May Be Unconstitutional, Baltimore Sun, August 16, 1982 (with Donald N. Bersoff)