## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### 1:09-md-2036-JLK

---

**IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION**

**MDL No. 2036**

---

**THIS DOCUMENT RELATES TO:
FIRST TRANCHE ACTIONS**

*Lopez v. JP Morgan Chase Bank, N.A.*
S.D. Fla. Case No. 1:09-cv-23127-JLK

*Luquetta v. JP Morgan Chase Bank, N.A.*
S.D. Fla. Case No. 1:09-cv-23432-JLK
C.D. Cal. Case No. 2:09-cv-06967-GHK

---

## OBJECTIONS TO SETTLEMENT AND AWARD OF ATTORNEYS' FEES BY CLASS MEMBERS DARCY LINDNER, DIANE CLAGG & JOY CABALLERO AND INCORPORATED MEMORANDUM & NOTICE OF INTENT TO BE HEARD AT FAIRNESS HEARING

COMES NOW, Darcy Lindner, XXX Drive, Aurora Ohio 44202, phone (216) XXX-

XXXX, Diane Clagg, XXX Avenue, Sheffield Lake, Ohio 44054, phone (440) XXX-

XXXX and Joy Caballero, XXX Avenue, Fresno, California 93720, (559) XXX-XXXX

by and through their attorneys[1], and Mr. Steve Miller will appear on behalf of Objectors

---

1   Home addresses redacted pursuant to ECF redaction rules.  None of the objectors have previously objected to any class action settlements.  The undersigned attorneys represent the objectors. The Objectors object to the information sought in paragraphs 78 and 79 of the Settlement Agreement as it is irrelevant and for purposes of harassment only, and that the number of objections filed by counsel of record is irrelevant and prejudicial to Objectors in that it places an improper burden on Objectors' counsel potentially limiting the ability of the objectors to retain the attorney of their choice in violation of the Fifth Amendment's guarantee of due process to those who may be deprived of a property right.  Without waiving such objection, the objectors' counsel state that they have filed objections previously.

at the fairness hearing, and hereby file their OBJECTIONS TO SETTLEMENT AND
AWARD OF ATTORNEYS' FEES, objecting to the Stipulated Class Action Settlement
and application for attorneys' fees by settlement counsel for the following reasons:

## I.    The Settlement is unfair as it fails to take into account the need for subclasses:

Those who are eligible for an "automatic payment" versus those that
may only receive a "Non-automatic payment", require the establishment of
subclasses (See Claims Form-"Claim Form General Instructions"). Subclasses should
be established, since non-automatic payment class members are forced to produce
their bank records to demonstrate their entitlement to a payment (see below; also
"Frequently Asked Questions: How can I receive a payment?"). Non-Automatic
payment subclass members are required to prove entitlement to payment by
attaching 6 or 10 year old bank records to receive payment.  Automatic payment
class members do absolutely nothing.

The Supreme Court has made clear that "[s]ettlement is relevant to a class
certification." *In re Pet Food Products Liab. Litig. Jim W. Johnson And Dustin Turner*,
629 F.3d 333,341 (3rd Cir., 2010); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619
(1997). Consequently, a district court "may take the proposed settlement into
consideration when examining the question of certification." *In re Prudential Ins. Co.*,
148 F.3d 283, 308 (3d Cir. 1998). In Amchem, the Supreme Court explained:

Confronted with a request for settlement-only class certification, a
district court need not inquire whether the case, if tried, would present intractable
management problems, for the proposal is that there be no trial.  But other specifications
of [Rule 23]—those designed to protect absentees by blocking unwarranted or overbroad
class definitions—demand undiluted, even heightened, attention in the settlement context.
Such attention is of vital importance, for a court asked to certify a settlement class will
lack the opportunity, present when a case is litigated, to adjust the class, informed by the

proceedings as they unfold.

In *Re Pet Food Products Liab. Litig.*, 629 F.3d. at 341, *Amchem*, 521 U.S. at 620. Under such circumstances, the Supreme Court mandates that Class Counsel must show that "'the representative parties will fairly and adequately protect the interests of the class.'" *Id.* at 342. The adequacy of the representation is paramount to the Supreme Court on cases where certification has occurred for settlement purposes only. *Id.* The dominant concern then becomes whether a proposed class "has sufficient unity so that absent class members can fairly be bound by decisions of class representatives. That dominant concern persists when settlement, rather than trial, is proposed." *Id.*

When appropriate, a class action may be divided into subclasses that are each treated as a class under [Rule 23]. Fed. R. Civ. P. 23(c)(5). In Re Pet Food Products Liab. Litig., 629 F.3d. at 343. Subclasses are appropriate "'[w]here a class is found to include subclasses divergent in interest.'" *In re Pet Food Products Liab. Litig.*, 629 F.3d. at 343; *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 271 (3d Cir. 2009) (quoting Fed. R. Civ. P. 23(c) advisory committee's note); see also *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999) (explaining that Amchem requires "a class divided between holders of present and future claims" to be "divi[ded] into homogeneous subclasses... with separate representation to eliminate conflicting interests of counsel"). Accordingly, "[a] district court hearing a class action has the discretion to divide the class into subclasses and certify each subclass separately." *In Re Pet Food Products Liab. Litig.*, 629 F.3d. at 343; *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 202 (3d Cir. 2005).

Here, this case was certified on for the purposes of settlement, and the following class definition was articulated on the website chaseoverdraftsettlement.com:

You are a member of the Settlement Class if you: Had a Chase consumer deposit account that you could access with a Chase debit card anytime between January 1, 2003 and March 29, 2010; and Were charged one or more overdraft fees as a result of Chase's practice of posting debit card transactions from highest to lowest dollar amount. To be included in the Class, you must have had two or more overdraft fees caused by debits posted to your account on a single day during the time period listed above.

("Frequently Asked Questions: Who is Included in the Settlement?"). What class counsel fails to account for is the additional onerous requirements placed upon those class members who are not entitled to an "automatic payment". As a consequence, the subclass consisting of "Non-Automatic payment" class members, consisting of those who were subjected to overdrafts between January 1, 2003 and December 31, 2004 and October 2, 2006 and March 31, 2007 requires more protection and assistance than class counsel is providing, as discussed more fully below:

**a) Class Counsel and Defendant force consumers in the"Non-Automatic payment" subclass to locate documents that the Defendant already has in order to submit a claim:**

Incredibly, the parties to this Settlement see no problem burdening their class members with producing bank records that go back over a decade. Class members are told to produce "your bank statements or equivalent records to determine whether you are eligible to receive a payment. It cannot be determined whether you have a valid claim without examining these records." (Claim Form, "Instructions"). Defendant has this information and knows who their class members are; this requirement is designed simply to decrease the actual number of claims submitted. The Pocket Guide warns the judiciary that a "hot button indicator" of a bad settlement involves "...[l[imits on the the amount of recovery per claimant, strict eligibility criteria, or other procedural or substantive obstacles to honoring

4

claims from class members may dramatically reduce the apparent value of a settlement." (Pocket Guide, 2010 ed, p. 19). No bank records dating back to 2006-2007 or 2003 or 2004? No payment.("Frequently Asked Questions: How can I receive a payment?").

The Settlement as currently proposed is openly hostile to the interests of those members of the subclass in the "Non-Automatic payment" subclass requiring them to make copies of their bank records from years ago, in order to receive payment.  The Settlement requires that class members attach to their claim form"1) the bank statement showing the transaction that caused the Overdraft Fee to occur; 2) (if different) the bank statement on which the Overdraft Fee appeared; and 3) the bank statement after the one on which the Overdraft Fee appeared." (Claim Form-"Instructions"). Defendant are offering no assistance to Consumers with producing their bank records during the claims period, making such a task needlessly onerous to the class members.

Furthermore, the printed Claim Form forces members of the "Non-Auotmatic payment" subclass to determine whether or not they were injured by the Bank's practices: "Step 3: Determine which transactions caused Overdraft Fees to be charged to your account."  Instead of providing a mechanism for Consumers to trigger to easily determine whether they qualify as a class member, they are forced to search through bank statements that go back over 10 years and then sift through their records trying to establish their injury in fact.  Subclasses are appropriate "'[w]here a class is found to include subclasses divergent in interest.'" *In Re Pet Food Products Liab. Litig.*, 629 F.3d. at 343; *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 271 (3d Cir. 2009) (quoting

Fed. R. Civ. P. 23(c) advisory committee's note); see also *Ortiz v. Fibreboard Corp.*, 527

U.S. 815, 856 (1999). Here, the "Non-Automatic payment" subclass has an interest that

is completely divergent from the "Automatic Payment" subclass: they need assistance

with obtaining their bank records and determining whether they have been injured (isn't

that why class counsel is representing them?). At minimum, this Court should not

approve the Settlement unless it provides for assistance to these class members in

reconstructing their bank records and their overdraft history.

## II.      The Release is over broad, permitting Defendant to continue to collect funds from class members that is based upon the improper posting of fees to class members accounts that were the stimulus for such litigation.

Although the class members waive any claims they have during the relevant

claim period for the Defendant's improper banking practices (Stlmt Agrmt, p. 44-45,

par. 123), they are still subject to collection actions for debts allegedly incurred that

directly relate to the improper posting of amounts to class members' accounts

which resulted in the increase of the debt, or the establishment of a debt with the

Defendant (Stlmt Agrmt, p. 46-47, par. 124). Class Counsel, in their eagerness to get

ahold of their fees, allowed the Defendants to recover past due amounts from class

members – without regard to how such amounts were incurred. "Nothing in this

Agreement shall operate or be construed to release any claims or rights Chase has to

recover any past, present or future amounts that may be owed by Plaintiffs or by

any Settlement Class Member on his/her accounts, loans or any other debts with

Chase, pursuant to the terms and conditions of such accounts, loans or any other

debts." (Par. 124). Nothing prevents the Defendant from bringing an action against a

class member to collect on a "debt" owed Defendant that is based in whole, or in part on the assessment of bogus bank fees associated with the creative posting methods employed by Defendant that led to this suit being filed in the first place.

In essence, Defendant is released from liability from its predatory posting practices, but class members still have to pay the fees that were assessed. This is a "hot button indicator" for this Court, according to the Pocket Guide, for which this Court should evaluate closely and with scrutiny.  The Pocket Guide warns:

At times parties have attempted to release a damages remedy without making any correlative payment to class members . . . (Pocket Guide, p. 22, "Hot Button Indicators: 7. Release of liability without remedy.").

All claims for all class members are released-without regard to whether or not they receive payment, or the amount of payment.  And yet the Defendant is permitted to initiate collection actions against these class members.  This Court should deny the Settlement or require the parties to fully release each other, particularly as it relates to the overdrawn accounts of the class members.

### III.    The Settlement is unfair as the likelihood of unclaimed funds will result in the establishment of a Cy Pres Fund that is unnecessary and does not benefit the Class.

For reasons that are not disclosed to the Court, class counsel and the Defendant want to see funds diverted to cy pres relief.  According to the website "If there are any funds remaining in the Settlement Fund after payments are made to Settlement Class Members, all remaining funds will be distributed to a nonprofit organization or organizations agreed upon by Class Counsel and Chase and approved by the Court." (Frequently Asked Questions: "What does the Settlement provide?").  The only reason

funds would be left over, is if the parties contemplate that many class members will not recover any payments- particularly those class members who could not locate their bank records and figure out whether or not they had a claim, as discussed in Point I, above.

Residual Cy Pres Distribution provides benefit to non class members for issues unrelated to this litigation, and therefore this Court should prohibit such distribution under any circumstances. According to the parties, "The purpose of any residual cy pres distribution shall be to benefit consumer financial literacy education, and to educate and assist consumers with financial services issues through advisory and related services (excluding litigation)." (Stlmt Agrmt, p. 43, par 120). What the parties are really saying here is that funds will be distributed to organizations that will encourage consumers to pay their credit cards instead of file bankruptcy ("educate and assist consumers with financial services issues through advisory and related services"). This Court should see requests for cy pres payments to so-called non-profits which operate to aid consumers in consolidating their consumer debt and restructuring their payments to Defendant. And what exactly is "consumer financial literacy education" anyway? It certainly does not educate consumers on how to avoid predatory banking institutions which violate their rights. Nor does it offer consumers insight into improper banking practices, or how to avoid being victimized by your financial institution. Under the Pocket Guide, this payment benefits Defendants only- and no one else. According to the Pocket Guide, "Cy pres relief must come as close as possible to the objective of the case and the interests of the class members. Question whether the class members might feasibly obtain a personal benefit." (Pocket Guide, p. 19, Hot Button Indicators- Cy Pres relief ("fluid recovery").

Obviously, a non-profit that is funded from the remaining proceeds of this

settlement that seeks to educate and warn consumers about predatory banking practices would hit on the mark. But instead the parties seek to "benefit consumer financial literacy education". This is not even close to the objectives sought by class counsel in their Complaints. Class Counsel seems to have forgotten that "cy pres" means "as near as possible" to the original purpose (Pocket Guide, p. 19). The purpose of the litigation was never "to educate and assist consumers with financial services issues through advisory and related services (excluding litigation)" (Stlmt Agrmt, p. 43, par. 120). Indeed, the fact that the cy pres cannot be established to educate consumers on litigating issues is very telling indeed as to the true motives of the establishment of the cy pres: to benefit the Defendant by funneling funds into programs that will aid it in squeezing more money out of consumers. Therefore, this Court should reject the proposed settlement because the cy pres component is not only unnecessary, but unrelated to the purposes underlying the litigation.

### IV.     The Settlement is unfair as it does not provide a floor or a ceiling on what a class member will receive as payment.

Aside from Class Counsels' firm conviction that it will take 30% of the Settlement Fund as attorneys' fees, the class members have no additional security or any representations as to the actual cash value per class member or claim that the Settlement will provide. The website states that "It is not possible to know at this point how much any Settlement Class Member's payment from the Settlement will be. Only a small percentage of all overdraft fees that were charged by Chase were affected by high to low posting. So, not every overdraft fee that was charged is eligible for payment under this Settlement." (Frequently Asked Questions: "How Much will my payment be?").

Basically, the parties to this settlement have absolutely no idea what will be paid, despite having made provisions to transfer the leftover settlement funds to class counsel's and the Defendant's agreed upon "pet charities." What is certain is Class Counsels' previous assertion that Defendant has "control over 24.5 Million checking accounts" in the United States (Luquetta 2nd Amended Complaint, p. 8, par. 34, Doc # 348).   Clearly, Class Counsel is hedging its bets in terms of what will ultimately be paid to the class members, and the amount anticipated is so abysmally low, that Class Counsel is apparently embarrassed to even discuss the subject, despite claiming a whopping 30 Million plus Dollars as fees.  Because the parties cannot even articulate a dollar amount that a class member would receive, the proposed settlement should be denied.

## V.      The Settlement is unfair because it does not protect all consumers, and still allows the Defendant to engage in the overdraft practices that were the basis of this litigation.

What about injunctive relief?  How about the Defendant no longer engaging in the overdraft practices that led to the litigation?  No.  Instead, "Chase has also agreed to implement the following change to its business practices: For at least two years, Chase will not charge an overdraft fee on any individual debit card transaction of $5.00 or less for Settlement Class Members who are Chase Account holders as of May 24, 2012." (Frequently Asked Questions: "What other benefits does the Settlement provide?").

First, the only class members who are provided with any protection must be account holders as of May 24, 2012.  Second, it does not protect consumers who sign on as new account holders with Defendant. Most problematic, however, is that the injunctive

relief is wholly unrelated to the wrongs complained of in the suit.  The protection

provided is irrelevant and de minimis.  At best- consumers are still subject to the same

predatory behavior exhibited by the bank that led to this litigation, except the bank now

promises it won't charge an overdraft fee on debit card transactions of $5.00 or less – in

fact, the injunctive relief has no bearing of the wrongs complained of and does nothing.

It's back to business as usual, allowing Defendant to utilize the same unfair practices that

led to this litigation to recover the funds paid by Defendant to settle this matter.  This is

nothing more than a veneer of injunctive relief tacked upon the attorneys' fee application

in this case to cover up the vast disparity between the true value of this settlement and the

grossly disproportionate attorneys' fees award.

     The Pocket Guide warns this Court that it should "Question whether injunctive

relief will truly benefit class members in the case at hand."(Pocket Guide, p. 21., 2010

ed.).  But Defendant has not agreed to stop the complained of practices.  Instead, Class

Members receive some unknown sum of money that class counsel cannot even divulge

due to the small size that will be awarded to the class members.  This is a "small award"

that the Pocket Guide would have this Court avoid considering, with instead the

affirmative reliance of meaningful injunctive relief:

In many cases, by putting an end to illegal practices, an injunction will benefit more class
members than a small award. It will also avoid clogging the judicial system with the
administration of small awards to thousands of class members. Pocket Guide, p. 21-22,
2010 ed.

Would it not be more reassuring and satisfying for the class members that are still bank

customers to know that the Defendant will no longer engage in the behavior that led to

the filing of these class actions?  Of course it would be.  Most class members would trade

the small award of what is likely to be a few dollars for the reassurance that this

outrageous banking practice is extinguished.  Yet class counsel has the audacity to

represent that the "value" to the class for such 2 year "overdraft protection" for

transactions of $5 or under is somehow 52 Million Dollars (Mtn for Fees, p. 1, Doc #

3010).

**VI.     The Settlement is unfair as it provides for an attorney's fee award that is
inconsistent with fee awards provided to attorneys in megafund cases.**

Uncertain of what the class members will receive in this case, Class Counsel has

the temerity ". . . to request up to 30 percent of the value of the Settlement for attorneys'

fees  . . ." (Frequently Asked Questions: "How will the lawyers be paid?").

Class counsel's fee request is grossly excessive.  According to the Pocket Guide,

"as the total recovery increases, the percentage allocated to fees should decrease."   Class

Action Pocket Guide (3d ed. 2010) at 36.  In cases involving settlements in the hundreds

of millions to billions of dollars, courts "should be looking at a percentage of recovery far

less than the typical range." In those cases, court should look for a "percentage of

recovery far less than the typical range and perhaps as low as 4%."  Id.

The trend in recent years has been to award more modest fees in megafund cases

and to avoid windfalls for class counsel. *See e.g., Goldberger v. Integrated Resources,
Inc.,* 209 F.3d 43, 57 (2d Cir. 2000).   In fact, a fee of 30% in a megafund cases is

justified only in those circumstances where class counsel has expended extraordinary

efforts to secure recovery for the class. *See, e.g.,  Cf. Allapattah Servs., Inc. v. Exxon*

*Corp.,* 454 F. Supp. 2d 1185, 1189 (S.D. Fla. 2006) (approving 31% fee because case lasted fifteen years, resulted in two trials, and involved extensive appeals including one to the United States Supreme Court).   None of those factors exist here.  This case is one of several cases involving the same subject matter of numerous banking entities.  It has not been litigated through appeal, has not resulted in any trials, and does not evidence any extraordinary efforts on behalf of class counsel.  As such, a 30% fee is unwarranted, and a fee in the range of 15% is more than adequate to compensate class counsel.

Further, Class Counsel has failed to produce their time records and submit same before this Court, in violation of this Court's Local Rule 7.3, which establishes the standard for fee applications, requiring each application to not only list the hours claimed for each timekeeper, but " a description of the tasks done during those hours;" and to "describe and document with invoices all incurred and claimed fees and nontaxable expenses."  Those items are absent from Class Counsels' application- and with good reason.  Because the time invested in this case can never justify the 33 Million Dollars sought by Class Counsel.

**VII.    The Settlement is unfair because the attorneys' fees demanded in this case are excessive when compared to the benefit received by the class members.**

The Pocket Guide advises the court that a "hot button indicator" that a settlement is unfair exists when there is "an imbalance between the cash value of the settlement to the class as a whole and the agreed amount of attorneys fees is a prime indicator of collusion by settling attorneys." (Pocket Guide "Reverse Auctions" and the like" 2010 ed. p. 20. Collusion:). This case appears to be nothing more than one of collusion between Class Counsel and Defendant to pay an exorbitant fee in exchange for leaving class

members with nothing more than the promise of some remuneration, meager that it will

be while protecting the Defendants from suit and damages, permitting the Defendant to

collect on its "debt" incurred by the predatory banking practices.

The Pocket Guide warns judges to be vigilant regarding Class Counsel who seek

fees for what is nothing more than settlement of the case at hand, evidencing collusion or

a "Reverse Auction" among the parties:


A typical element of a reverse auction is a promise to pay attorneys more than a
reasonable value for the time they invested in negotiating the settlement. Generally, the
overpayment of the attorneys originates in an underpayment of what the class should
receive based on an objective assessment of the merits of the class claims. (Pocket Guide,
p. 21).

Here, Class Counsel claims to have participated in "2 years of hard fought litigation"

(Mtn for Fees, p. 1, Doc# 3010).  Conveniently, Class Counsel glosses over the reality

that the bulk of the time invested in this case was nothing more than settlement

discussions, since "late 2010" (Mtn for Fees, p. 3, Doc# 3010).  The Pocket Guide

cautions the judiciary to be wary of settlement where there is an "underpayment" of what

the class should receive.  Here, the only certain fact is that class counsel is seeking thirty

(30) percent of the "value of the settlement created through our efforts." (Mtn for Fees, p.

30, Doc #3010).  And class counsel cannot articulate just what dollar amount, if any, the

class members will receive – at minimum.  Why is that? Quite simply, its because what is

paid to the class members is irrelevant and insignificant in the bigger scheme of lining

class counsel's briefcases with the Defendant's money, which the Defendant is all too

eager to oblige, literally opening the bank vaults and walking away to allow class counsel

to take their fill.

**VIII.   The Settlement is unfair in that Defendants' have agreed to not oppose the attorneys' fees requested in this settlement.** Without question, Class Counsel has made the payment of attorney's fees the crown jewel of this treasure trove bestowed by the Defendant Bank.  First and foremost, "Chase agrees not to oppose Class Counsel's request for attorney's fees of up to 30% of the value of the settlement, and not to oppose Class Counsel's request for reimbursement of costs and expenses." (Stlmt Agrmt, p. 47, par. 125).  Furthermore, regardless of the expenses presented, the Defendant agrees to sit idle and permit such reimbursement.  This "Clear Sailing Provision" or "Red Carpet Treatment" is further evidence of the unfairness of the proposed settlement, that does nothing more than guarantee that class counsel receives 30% of the 110 Million Dollar "Settlement Fund" while the class gets leftover table scraps, and the opportunity to watch their settlement fund be paid over to the parties pet non-profit(s) pursuant to a nebulous cy pres provision.

**IX.     The Settlement is unfair as the requested attorneys' fees are not based upon any realistic calculation of the value of the settlement provided to the class members.**

Class Counsel has no idea what amount of money class members will receive as payment (Website- "Frequently Asked Questions- How much will my payment be?" Therefore, this Court should refrain from entertaining, or considering any application for attorneys' fees until this Court has reviewed the claims data, showing the Court what exactly each claimant is receiving.  The Pocket Guide also warns the judiciary to be leery of settlements that are presented without corresponding claims data, and advises that the

recovery of class counsel should be based upon a percentage of the claims actually made:

> Your appraisal of the settlement should focus on the value actually distributed to the class-based on the number and percentage of class members who have filed a claim. . . Because there is no clear standard for predicting class response rates, consider calculating any attorney fee award as a percentage of the amount of the settlement fund that has already been distributed to claimants-even if that means deferring final determination of all or part of the fee award until the claims process is complete. (Pocket Guide, p. 16, 2010 ed).

In essence, this Court should not rubber stamp a fee application submitted by class counsel, but instead force class counsel to disclose how many class members will actually benefit, and the amount of money those class members will receive- and then determine the appropriateness of the fee application.  Further evidence that the value of the settlement is disproportionate to the attorneys' fees sought, is the sweeping, self-serving statement that "The value of the Settlement is approximately $162 million, consisting of $110 million in cash, and a change in Chase's overdraft fee policy that will result in savings to Settlement Class Members of approximately $52 Million over a two (2) year period." (Mtn for Fees, p. 1, Doc #3010).

However, no support is provided for such bold statement, and the only change in the Defendant's policy pertains to existing account holders who also happen to be class members as of May 24, 2012 ("Frequently Asked Questions: What other benefits does the Settlement provide?").  No benefits to class members who no longer have active accounts with Defendant.  Nor does this injunctive relief benefit class members who reactivate their accounts after May 24, 2012.  This is not a change in policy.  This is business as usual, with a small bone thrown to the class for a "policy" that can be found at any other bank-absent litigation.

Moreover, overdrafts are typically for an amount higher than $5.00.  Waiving

overdrafts of $5.00 or less is not an unusual "benefit" routinely bestowed by banks which are not litigants in class actions, provided to their bank customers. (www.regions.com/faq/coverage/rf "However, you will not be charged an overdraft fee if your account is overdrawn by $5 or less when we process your transactions at the end of the next day."); (www.thebeneficial.com/overdraft.asp "Each paid overdraft will result in a $35 fee unless the total amount overdrawn for the day is $5.00 or less. We will waive the overdraft fees for ATM and one-time check card purchases on accounts overdrawn by a daily total of $5 or less.");( www.kitsapbank.com "We do not charge for overdrafts totaling less than $5.00 on a single day."). A 52 Million Dollar benefit is claimed for a policy that is standard at most banks, by class counsel.

This Court should not even consider this so called "benefit" when evaluating the fees sought by class counsel. Instead, this Court should view the fee application of class counsel with skepticism, since the "value" ascertained to a business practice that is fairly standard in the banking industry has no value under these circumstances. Certainly not 52 Million Dollars.

It is proper for courts to review the actual claims made and the amount paid before calculating an attorney's fee award. *Schwartz v. Dallas Cowboys Football Club, Ltd.*, 157 F. Supp. 2d 561 (E.D. Pa. 2001); accord, *Sylvester v. CIGNA Corp.*, 369 F.Supp. 2d 34, 50-53 (D. Me. 2005). Not surprisingly, the claims administrator is not under any obligation to provide this Court with any claims data. This is suspect according to the Pocket Guide, as the best manner of determining the appropriateness of the attorneys' fee sought is to review the actual relief provided to the class members. And since at this stage of the proceedings that actual relief provided is unknown, this

Court should withhold its review of the attorneys' fee application until the claims data is provided to this Court.

WHEREFORE, Objectors hereby pray that this Court deny the proposed Settlement stipulated into between the parties and enter the following additional relief:

(1) An Order overruling Class Counsels' application for attorney's fees of 30% of 110 Million Dollars, and imposing an order that Class Counsel will receive a fee that reflects the value of the settlement provided to the class members;

(2) In the alternative, an Order compelling Class Counsel to submit their time records to this Court to determine what hours of work performed are compensable, as time devoted to settlement is not factored into the lodestar or the percentage of the fund method;

(3) An Order withholding the calculation of the attorney's fees until this Court makes a determination of the number of claims actually submitted and paid, and the value of each claim;

4)  Establishment of subclasses for "non-automatic payment" class members and "automatic payment" class members;

(5) An Order compelling Class Counsel to provide this Court and the parties with information concerning the number of persons who are participants in each subclass: a) "non-automatic payment" class members and b) "automatic payment" class members;

(6) An Order denying the Cy pres relief, or in the alternative, and Order that such funds be directed to a non-profit that has the purpose of educating and advising consumers on improper banking practices;

(7) An Order requiring that the releases in this case be mutual- in that the Defendant is not permitted to undertake any collection efforts or file suit based upon any delinquent

accounts that were the result of its overdraft practices;

(8) Any further relief necessary within the premises based upon the objections set forth above and herein.

**OBJECTOR SIGNATURES ARE ATTACHED**

Dated: November 5, 2012                    Respectfully submitted,

s/Steve A. Miller
Steve A. Miller (FL Bar No. 992224)
Steve A. Miller, PC
1625 Larimer Street, No. 2905
Denver, CO 80202
Ph# 303-892-9933
Fax: 303-892-8925
Email: sampc01@gmail.com
Attorney for Objectors

Jonathan E. Fortman (40319MO)
Law Office of Jonathan E. Fortman, LLC
10 Strecker Rd., Suite 1150
Ellisville, MO 63011
Ph# (314) 522-2312
Fax: (314) 524-1519
Email: jef@fortmanlaw.com
Attorney for Objectors

John C. Kress (53396MO)
The Kress Law Firm, LLC
4247 S. Grand Blvd
St. Louis, MO 63111
Ph.#: (314) 631-3883
Fax: (314) 332-1534
Email: jckress@thekresslawfirm.com
Attorney for Objectors

J. Scott Kessinger (48221MO)
3-2600 Kaumualii Highway
Suite 1300, #325
Lihue, HI 96746
Phone: 808.635.2924
Fax: 314.754.8370
jscottkessinger@gmail.com
Attorney for Objectors

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of November, 2012, I have filed and served via
ECF Filing using the USDC SD FL ECF Electronic Filing System a true and correct
copy of the foregoing OBJECTIONS TO SETTLEMENT AND AWARD OF
ATTORNEYS' FEES BY CLASS MEMBERS DARCY LINDNER, DIANE CLAGG &
JOY CABALLERO AND INCORPORATED MEMORANDUM & NOTICE OF
INTENT TO BE HEARD AT FAIRNESS HEARING and in addition have mailed a
copy via U.S.P.S. First Class Postage Prepaid to the following:

Via U.S.P.S.
Robert C. Gilbert, Esq.
GROSSMAN ROTH, P.A.
2525 Ponce de Leon Blvd.
11th Fl.
Coral Gables, FL 33134

David Lesser, Esq.
WILMER CUTLER PICKERING
HALE AND DORR LLP
399 Park Ave.
New York, NY 10022

 s/Steve A. Miller
Steve A. Miller

I, Darcy Lindner, am a class member as defined by the parties and this Court and I agree with filing the objection and authorize the filing of same with this Court.

Darcy Lindner

I, Diane Clagg, am a class member as defined by the parties and this Court and I agree with filing the objection and authorize the filing of same with this Court.

Diane Clagg

I, Joy Christine Caballero, am a class member of this proposed settlement and I authorize the filing of this objection for the reasons set forth within the objection.

Signature