# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 1:09-MD-02036-JLK

---

**IN RE: CHECKING ACCOUNT**
**OVERDRAFT LITIGATION**

**MDL No. 2036**

---

**THIS DOCUMENT RELATES TO:**
**FOURTH TRANCHE ACTION**

*Swift v. BancorpSouth, Inc.*
N.D. Fla. Case No. 1:10-00090-SPM-AK
S.D. Fla. Case No. 1:10-cv-23872-JLK

---

## PLAINTIFFS' OPPOSITION TO DEFENDANT
## BANCORPSOUTH BANK'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Shane Swift, individually and on behalf of the certified class (collectively, "Plaintiffs"), files this opposition to Defendant BancorpSouth Bank's ("BancorpSouth" or "Bank") Motion for Summary Judgment ("Motion").  (DE # 2999).  In accordance with S.D. Fla. Local Rule 56.1(a), Plaintiffs attach hereto as <u>Exhibit A</u> Plaintiffs' Statement of Facts to Be Tried and Response to BancorpSouth Bank's Statement of Material Facts, which supports this opposition ("Plfs. Stmt."), inclusive of Exhibits 1 through 31 thereto.

## **INTRODUCTION**

BancorpSouth attempts to defeat Plaintiffs' claims by ignoring clear facts and law, and previous decisions of this Court.  Resolution of this case requires a fact-finder to resolve a number of disputed facts.  The affirmative defenses raised by BancorpSouth do not change that fact.  Therefore, having failed to meet its summary judgment burden as to Plaintiffs' claims or the select affirmative defenses raised in the Motion, BancorpSouth's Motion must be denied.[1]

## **FACTUAL BACKGROUND**

For at least ten years, BancorpSouth operated sophisticated computer software to manipulate and re-order its customers' debit card transactions in order to generate excess overdraft fees.  (Plfs. Stmt. ¶¶ 68-72).  Instead of instantaneously holding or sequestering a depositor's funds, as Bank personnel concede is the reasonable expectation of customers (Plfs. Stmt. ¶ 93), BancorpSouth waited hours, sometimes even days, to process and then reorder the transactions from highest dollar amount to lowest dollar amount before removing the funds. (Plfs. Stmt. ¶¶ 68, 71, 81).  These account manipulations caused Plaintiffs' accounts to be depleted more rapidly than they would have if the transactions had been posted in the order in which they were actually initiated and authorized, resulting in more overdrafts and, consequently, more overdraft fees.  (Plfs. Stmt. ¶¶ 68, 71).  Many overdraft fees were levied when, but for BancorpSouth's bookkeeping device, Plaintiffs would have had sufficient funds in their accounts.  (Plfs. Stmt. ¶¶ 68, 71).  BancorpSouth did not disclose to Plaintiffs the account manipulations, took active steps to keep them secret, and engaged in these manipulations despite recognizing that it harmed its own customers.  (Plfs. Stmt. ¶¶ 70, 76, 78, 83, 86-89).

BancorpSouth attempts to justify its actions by relying on the terms of multiple standardized deposit account agreements and related documents – terms hidden in a succession

---

[1] Plaintiffs are no longer pursuing the claim for conversion in this action and, therefore, do not oppose summary judgment on this count.

1

of dense, small type boilerplate agreements.   (Plfs. Stmt. ¶ 82).   The Bank misconstrues Plaintiffs' claims by asserting that Plaintiffs seek to alter the terms of the account agreements. Plaintiffs seek only to require that BancorpSouth discharge its discretionary contractual rights in good faith and otherwise comply with common and statutory laws that are the subject of Plaintiffs' other claims.   BancorpSouth fails to offer undisputed facts demonstrating that it exercised its discretion in good faith; that its adhesion account agreement and overdraft policies were not unconscionable; that it was not unjustly enriched by the implementation and enforcement of its overdraft policies; or that it did not violate the Arkansas Deceptive Trade Practices Act.

## ARGUMENT

### I.    Summary Judgment Standard

A party is entitled to summary judgment only when there is no "genuine issue as to any material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986).  The moving party bears the burden of showing that there are no genuine issues of material fact that should be decided at trial. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159 (1970); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  A factual dispute is genuine where the evidence is such that a reasonable fact-finder could return a verdict for the non-moving party.  *Patterson & Wilder Constr. Co., Inc. v. United States*, 226 F.3d 1269, 1273 (11th Cir. 2000).

In deciding a motion for summary judgment, a court must view all evidence and inferences in the light most favorable to the non-moving party.  *Clark*, 929 F.2d at 606.  As the Eleventh Circuit has repeatedly explained:

> All reasonable doubts about the facts should be resolved in favor of the non-movant.  If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial.  *Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts.  If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment.*

*Patterson & Wilder Constr.*, 226 F.3d at 1273 (emphasis in original) (citations omitted).  *See also United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties in the State of Ala.*, 941 F.2d 1428, 1437 (11th Cir. 1991).  As this Court recently noted, "in reviewing the record evidence, the Court may not undertake the jury's function of weighing the evidence

properly offered by the Parties." *Cortina v. F.A.D. Detective & Sec. Services, Inc.*, Case No. 11-20732-CIV, 2011 WL 6025638, at *1 (S.D. Fla. Dec. 1, 2011) (slip copy) (citations omitted).

Opinion evidence alone can be sufficient to preclude summary judgment, *Poe v. Sears, Roebuck & Co., Inc.*, 1 F. Supp. 2d 1472, 1477 (N.D. Ga. 1998), and conflicting opinions may preclude a finding that no genuine issues exist. *Wise v. Hartford Life and Accident Ins. Co.*, 360 F. Supp. 2d 1310, 1324 (N.D. Ga. 2005). Courts "would 'rather wrongly submit a close question to the jury than wrongly deny a litigant his or her day in court.'" *Kendall v. Cobb County, Ga.*, 14 F. Supp. 2d 1342, 1346-47 (N.D. Ga. 1998) (quoting *McKenzie v. Atlantic Richfield Co.*, 906 F. Supp. 572, 576-77 (D. Colo. 1995)); *see also Collins v. Beazer Homes USA, Inc.*, 334 F. Supp. 2d 1365, 1377 (N.D. Ga. 2004) (denying summary judgment in a "close case"). This case is not even close, as Plaintiffs demonstrate below.

## II. Plaintiffs' Claims for Breach of Contract and Breach of the Implied Duty of Good Faith and Fair Dealing Require Resolution of Many Disputed Facts

BancorpSouth's principal argument in support of the Motion has previously been rejected by this Court – that Plaintiffs fail to state a claim for breach of contract. (DE # 1305). BancorpSouth "respectfully" disagrees with the Court's earlier ruling, contending that the Court failed to consider Arkansas law. (DE # 2999-1 at 3, n. 5 (hereafter, "Def.'s Mem.")). Tellingly, BancorpSouth's supporting memorandum fails to cite a single fact in support of the Motion attacking Plaintiffs' contract claims. Rather, BancorpSouth merely attempts to re-litigate the same arguments previously raised in its Motion to Dismiss. (DE # 1068).

BancorpSouth argues that since its adhesive Deposit Agreement implicitly permits high-to-low posting of debit card transactions, it can post high-to-low irrespective of the methods it employs or its rationale for doing so. (Def.'s Mem. at 5). This argument flies in the face of this Court's prior ruling that Arkansas law allows claims for breach of contract and for breach of the implied duty of good faith and fair dealing when a party fails to exercise in good faith the discretion it reserved to itself in a contract: "Plaintiffs do not ask the Court to tell the [bank] how to order transactions, but simply that the ordering must be carried out as contemplated by the covenant of good faith and fair dealing." *In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d 1302, 1315 (S.D. Fla. 2010). Other courts have reached similar conclusions:

> The court cannot find as a matter of law that the Deposit Agreement's statement that Wachovia "may" post items "in any order" . . . expressly gives Wachovia the right to manipulate transactions, delay posting indefinitely, and maximize overdraft fees in the ways the Complaint alleges.

3

*White v. Wachovia Bank, N.A.*, 563 F. Supp. 2d 1358, 1364 (N.D. Ga. 2008).

Here, Plaintiffs are not trying to vary the explicit contract language, in derogation of *Burger King Corp. v. C.R. Weaver; M-W-M, Inc.*, 169 F.3d 1310, 1316 (S.D. Fla. 1995) (applying Florida law).  (Def.'s Mem. at 5).   Rather, Plaintiffs seek only to require that BancorpSouth discharge its discretionary contractual rights in good faith.  BancorpSouth fails to offer any new or convincing rationale this Court did not previously consider and reject warranting entry of judgment on Plaintiffs' breach of contract claims.  Indeed, BancorpSouth does not even contend that it discharged its duty in good faith, let alone offer any factual support for that argument.

> **a.** **Arkansas Law Recognizes an Implied Covenant of Good Faith and Fair Dealing in the Performance of Contracts.**

Under Arkansas law, "every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement."  *Aon Risk Servs., Inc. v. Meadors*, 267 S.W.3d 603, 613 (Ark. Ct. App. 2007); *Cantrell-Waind & Assocs., Inc. v. Guillaume Motorsports, Inc.*, 968 S.W.2d 72 (Ark Ct. App. 1998) (quoting Restatement (Second) of Contracts § 205). Accordingly, "[a]s is the case with the contract's express terms, the implied covenant is part of the contract and creates contractual obligations that are actionable." *Yarborough v. DeVilbiss Air Power, Inc.*, 321 F.3d 728, 732 (8th Cir. 2003) (applying Arkansas law).  Having adopted the Restatement (Second) of Contracts § 205, Arkansas courts look to see whether the conduct at issue is "consisten[t] with the justified expectations of the other party."  Restatement (Second) of Contracts § 205, cmt. a.  *See Arkansas Research Medical Testing, LLC v. Osborne*, No. 10-750, 2011 WL 1423993 (Ark. Apr. 14, 2011) (citing Restatement (Second) of Contracts § 205).

As it previously argued, BancorpSouth again overstates the Arkansas Supreme Court's holding in *Preston v. Stoops*, 285 S.W.3d 606 (Ark. 2008), when it argues that implied covenant of good faith and fair dealing claims are not recognized by Arkansas courts.  (Def.'s Mem. at 5). In fact, *Preston* only provides that the "court has never recognized a cause of action for failure to act in good faith" in the context of "a cause of action *pled in tort*."  *Preston*, 373 S.W.3d at 610 (emphasis added).  BancorpSouth erroneously attempts to bolster its argument by citing the more recent Arkansas Supreme Court ruling in *Arkansas Research*.  That case is in line with *Preston* but does not require this Court to conclude that Plaintiffs may not pursue this claim. BancorpSouth incorrectly argues that Plaintiffs are prosecuting a claim independent of their

4

breach of contract claim.  After reconfirming that there is no independent *tort* claim in Arkansas, the *Arkansas Research* court observed that a breach of the implied duty of good faith and fair dealing may demonstrate evidence of a breach of contract between parties, which is what is in play here. *Arkansas Research*, 2011 WL 1423993 at *6.  Also, *Arkansas Research* is an appeal from a verdict where the jury found no breach of contract, but ruled for the plaintiffs on their implied duty of good faith and fair dealing claim.  Having concluded that breach of the implied duty may be evidence of a breach of contract, the Arkansas Supreme Court has not eliminated Plaintiffs' claim challenging the policy of re-sequencing debit card transactions in the face of the contract language the Bank used in its Deposit Agreement.  Ultimately, the cases on which BancorpSouth relies do not preclude Plaintiffs' claims.  The Deposit Agreement undisputedly contains discretionary terms in that it provides:

> If more than one item or order is presented for payment against the account on the same day and the available balance of the account is insufficient to pay them all, we ***may*** pay any of them in any order we choose, even if the order we choose results in greater insufficient funds fees than if we had chosen to pay them in some other order.

(Plfs. Stmt. ¶¶ 77, 78).  The Account Information Statement also contains similar discretionary language as that of the Deposit Agreement including language that falsely suggests that BancorpSouth will not *always* post transactions from high to low.  (Plfs. Stmt. ¶¶ 77, 83).  Discretion is apparent from the use of the term "may," and the issue of whether or not that language permitted BancorpSouth to manipulate transactions, delay posting indefinitely, or maximize overdraft fees in the ways the Second Amended Complaint alleges are questions of fact that preclude the grant of a Rule 56 motion.  *See Checking Account Overdraft Litig.*, 694 F. Supp. 2d at 1316-1317.

BancorpSouth does not argue that Plaintiffs failed to present sufficient facts that the Bank chose to exercise its discretion in bad faith.  Instead, BancorpSouth argues incorrectly that such a bad faith exercise of discretion does not give rise to a claim.  The rehashing of the Motion to Dismiss should again be rejected.

Additionally, BancorpSouth cites to language in its Account Information Statement from 2010 that discloses to Bank customers that the Bank's account manipulations may result in additional overdraft fees.  (Def.'s Mem. at 4).  This evidence is insufficient to serve as the basis for summary judgment.  The statements to which the Bank cites do nothing to put Plaintiffs on notice that their instantaneous debit card transactions will be held and then reordered at a later

time in order to maximize the number of fees to the Bank.  Nor are customers advised of the negative impacts that arise from the undisclosed Overdraft Matrix Limit that the Bank used throughout the class period to exacerbate the effects of re-sequencing.  The supposed disclosure itself is insufficient and buried within multiple pages of small typeface.  Finally, as noted later in this opposition regarding unconscionability, the pre-2010 versions of the Account Information Statement were misleading.  *See infra* at 11-13.  There are clear, disputed and material facts regarding the timing and sufficiency of the Bank's disclosure that a jury must decide.  Summary judgment is therefore inappropriate.

BancorpSouth does not argue that it complied with the covenant of good faith and fair dealing.  It cannot do so.  The testimony from Bank officers shows that BancorpSouth introduced high-to-low re-sequencing for the purpose of increasing the Bank's revenue, after first installing the secret Overdraft Matrix Limit, despite the fact that it knew the re-sequencing was harmful to its customers.  (Plfs. Stmt. ¶¶ 69, 70, 73, 74, 76, 85, 89).  Derek Caswell, First Vice President of Retail Banking, testified that the Bank's processing order was so confusing that Bank personnel – from front line tellers up to regional Bank presidents – lacked sufficient understanding to clearly convey it to BancorpSouth's customers.  (Plfs. Stmt. ¶ 90, 91, 93).  Indeed, Mr. Caswell's testimony shows that the Bank's processing order was deliberately confusing in order to maximize overdraft fee revenue.  (Plfs. Stmt. ¶¶ 92-94).  Further, Michael Lindsey, Senior Vice President of Retail Banking, confirmed that the bank's disclosures do not state that the Bank always posted high to low; the customers' account statements do not disclose the commingled posting of all customer-initiated debits high to low; and the overdraft notices make no mention of the posting order that caused additional overdraft fees to be assessed.  (Plfs. Stmt. ¶¶ 86-88).

**b.    The Court Should Follow Decisions Recognizing that BancorpSouth's Overdraft Fee Scheme Constitutes a Breach of the Implied Covenant.**

Citing *Gunn v. Farmers Ins. Exch.*, 372 S.W.3d 346 (Ark. 2010), BancorpSouth argues that language in the Deposit Agreement providing that it "may pay [debit items] in any order we choose" and "[w]hen we pay Transactions, we generally choose to pay the largest Transaction first and the smallest Transaction last," are "expressly bargained-for terms," which preclude a claim for breach of the implied covenant because "the contract at issue permits the actions of which Plaintiff complains."  (Def.'s Mem. at 6).  However, the contract in *Gunn* – a case involving a series of agreements appointing the plaintiff to serve as a reserve agent for the Farmers Insurance companies – bears no resemblance to BancorpSouth's contract of adhesion.

6

*Gunn* affirmed summary judgment against the plaintiff's claim that the defendant terminated the plaintiff's agency in violation of the implied covenant, finding that the language addressing termination without cause was a provision:

> (1) where the parties have expressly disavowed any limitations on their discretion, and (2) the consequences of the exercise of that discretion are easily foreseeable. . . . The parties clearly bargained for such termination on three months' notice, and an implied covenant should not be used to limit an expressly bargained-for term.

*Gunn*, 372 S.W.3d at 352.

Here, in contrast, there is no evidence that Plaintiffs intended to disavow any limitations on BancorpSouth's discretion to post transactions in any order it saw fit, or if such disavowal was remotely fair even if it was intended. Here, the Bank's representatives admit that the Deposit Agreement, the account statements, and overdraft notices did not warn Plaintiffs that BancorpSouth always reordered debit card transactions from high-to-low, while employing the Overdraft Matrix Limit to authorize additional transactions without regard to actual funds in the accounts, resulting in excessive overdraft fees and, in fact, at times causing overdrafts even when the accounts would otherwise not have been overdrawn. (Plfs. Stmt. ¶¶ 70, 71, 76, 78, 86-88). At the very least, there is a genuine question of fact as to whether the consequences of BancorpSouth's exercise of discretion were foreseeable to Plaintiffs. *Keck v. American Employment Agency*, 652 S.W.2d 2, 4 (Ark. 1983) (foreseeability is a question of fact for the jury); *Stacks v. Ark. Power & Light, Co.*, 771 S.W.2d 754, 756 (Ark. 1989) ("It will be up to the trier of facts to decide whether the occurrence was foreseeable…."). The mere fact that BancorpSouth's Deposit Agreement reserves discretion to post high-to-low does not resolve whether BancorpSouth exercised its discretion in bad faith. Arkansas law is consistent with other states in providing a claim for breach of the implied duty of good faith and fair dealing premised on an express contractual provision. *Arkansas Research*, 2011 WL 1423993 at *6.

This Court's denial of BancorpSouth's Motion to Dismiss is also in accord with the *White* and *Gutierrez* decisions. In *White*, the court found that Wachovia's deposit agreement did not confer *absolute* discretion because of the implied duty of good faith and fair dealing existed in all contracts in relation to the following discretionary language: "Wachovia 'may' post transactions in any order." 563 F. Supp. 2d at 1365. Likewise, in *Gutierrez v. Wells Fargo & Co.*, 622 F. Supp. 2d 946 (N.D. Cal. 2009), Judge Alsup denied summary judgment to Wells Fargo notwithstanding its argument that the account agreement conferred absolute discretion

regarding the posting order:

> even if the bank-depositor contract confers discretion on the bank as to the
> sequence of honoring presentments, the bank must exercise its discretion in
> accordance with fair dealing and cannot exercise its discretion to enrich itself by
> gouging the consumer. Put differently, even if the bank-depositor contract
> purports to allow the bank to post in any order it wishes, such discretion remains
> subject to the bank's duty of good faith and fair dealing. There is a duty of good
> faith and fair dealing to honor checks in such a way as to be fair to the consumer
> and that discretionary power cannot be exercised so as to pile on ever greater
> penalties on the depositor, which is exactly what Wells Fargo seems to be doing,
> or so a reasonable jury could conclude.

*Id.* at 952-53.

BancorpSouth ignores *White* and *Gutierrez*, and instead relies on *Saunders v. Mich. Ave. Nat'l Bank*, 662 N.E.2d 602 (Ill. App. Ct. 1996), (Def.'s Mem. at 12), the Illinois case repeatedly rejected by this Court. *See Checking Account Overdraft Litig.*, 694 F. Supp. 2d at 1319. Like many of the cases cited by BancorpSouth (Def.'s Mem. at 7, n. 8), *Saunders* deals only with the high-to-low posting of paper checks. Debit card transactions are not implicated. In addition, BancorpSouth cites inapplicable U.C.C. § 4-303 cases. *See Checking Account Overdraft Litig.*, 694 F. Supp. 2d at 1316. In fact, BancorpSouth's disclosed trial expert, Paul A. Carrubba, Esq., agreed this UCC provision is not even applicable to debit card transactions. (Plfs. Stmt. ¶ 99).

In sum, BancorpSouth's attempt to re-argue the same issues raised in its Motion to Dismiss should be rejected. Because BancorpSouth cannot establish *undisputed* genuine facts showing that it exercised its discretion in good faith, the Motion must be denied.

## III.    Unconcsionability

BancorpSouth incorrectly argues that Plaintiffs' unconscionability claims fail because the claim does not exist under Arkansas law and, even if it does, Plaintiffs cannot prove that BancorpSouth's contracts and implementation of its overdraft policies are unconscionable.

### a.    Plaintiffs May Assert Unconscionability as an Affirmative Cause of Action

The Court previously rejected the argument that a claim for unconscionability does not exist under Arkansas law. (DE # 1305). BancorpSouth seeks to have this Court reverse course based on the Bank's same faulty analysis. The record evidence warrants a trial on the merits.

Rehashing its argument, BancorpSouth completely ignores this Court's reasoning in its Order Ruling on Omnibus Motion to Dismiss ("Omnibus Order"), in which the Eleventh Circuit case on which BancorpSouth relies was correctly distinguished. *See Checking Account*

*Overdraft Litig.*, 694 F. Supp. 2d at 1318 (citing *Cowen Equip. Co., Inc. v. Gen. Motors Corp.*, 734 F.2d 1581 (11th Cir. 1984)).  As argued in opposition to BancorpSouth's Motion to Dismiss, the issue here is exactly the same.  *See Checking Account Overdraft Litig.*, 694 F. Supp. 2d at 1318 ("Defendants appear to be correct in their assertion that, ordinarily, unconscionability is properly asserted as a defense to a contract rather than an affirmative cause of action.  *But this is not the ordinary case* . . . [in this situation] the customer never has the opportunity to raise unconscionability as a defense for nonpayment.  The only opportunity to do so is through a lawsuit filed by the customer, after payment has been made.  Hence, the facts of the instant case weigh in favor permitting Plaintiffs to pursue unconscionability claim.").  BancorpSouth's failure to distinguish this Court's prior ruling demonstrates the futility of its argument.

The Bank relies on *Hughes v. Wet Seal Retail, Inc.*, No. 10-CV-05090, 2010 WL 4750216 (W.D. Ark. Nov. 16, 2010), and *Parker v. Frazer's, Inc.*, No. CA98-116, 1998 WL 811425 (Ark. Ct. App. Nov. 18, 1998), for the proposition that unconscionability may not be asserted as an affirmative claim.[2]  Those cases merely state that, generally speaking, unconscionability is asserted as a defense to a contract – precisely what this Court concluded in its Omnibus Order when it recognized the unique circumstances of this case supporting the unconscionability claim.  Further, neither *Hughes* nor *Parker* dealt with a cause of action for unconscionability where the plaintiff sought declaratory relief, as Plaintiffs do here.  Damages are sought as supplemental relief in accordance with Arkansas law.  *See* Ark. Code Ann. § 16-111-103(a) (creating jurisdiction for Arkansas courts for claims seeking declaratory relief "either affirmative or negative in form and effect"); Ark. Code Ann. § 16-111-110 (authorizing Arkansas courts to grant supplemental relief based on the declaratory judgment).  Further, the federal counterpart, 28 U.S.C. §§ 2201-2202, creates the platform for a damages award as "[f]urther necessary or proper relief based on a declaratory judgment or decree."  *See BancInsure, Inc. v. BNC Nat. Bank, N.A.*, 263 F.3d 766 (8th Cir. 2001) ("[D]istrict courts have broad power under 28 U.S.C. § 2202 to craft damages awards in declaratory judgment actions to effectuate their judgment."); *Auto-Owners Ins. Co. v. Johnson, Rast & Hays Ins. of South Alabama, Inc.*, 820 F.2d 380, 384 (11th Cir. 1987) (same).

Contrary to BancorpSouth's assertion, numerous courts have sustained claims, like the

---

[2] Pursuant to Arkansas Revised Supreme Court Rule 5-2, the *Parker* opinion is not entitled to any precedential value.

claims asserted here, seeking affirmative declaratory relief that the terms of a contract are unconscionable. *See e.g.*, *Williams v. First Gov't Mortg. & Inv. Corp.*, 225 F.3d 738, 748-49 (D.C. Cir. 2000); *Ross v. Wells Fargo Bank, N.A.*, No. 3:08-1452, 2009 WL 357921, at *2 (S.D. W. Va. Feb 12, 2009); *Premier Digital Access, Inc. v. Cen. Tel. Co.*, 360 F. Supp. 2d 1161, 1168 (D. Nev. 2005); *Eva v. Midwest Nat'l Mortg. Banc, Inc.*, 143 F. Supp. 2d 862, 895 (N.D. Ohio 2001). In fact, in the recent overdraft fee decision of *Hughes v. TD Bank*, *N.A.*, 856 F. Supp. 2d 673 (D.N.J. 2012), the United States District Court for the District of New Jersey aligned itself with this Court's Omnibus Order in finding that the plaintiffs' were entitled to assert an affirmative claim of unconscionability regarding TD Bank's overdraft fee policies because the bank would not need to sue for unpaid overdraft fees, meaning that customers would not otherwise have the opportunity to raise unconscionability as an affirmative defense.

  **b.**  **BancorpSouth's Contract and Overdraft Policy is Unconscionable Under Arkansas Law**

   Summary judgment is improper given that "the issue of unconscionability is a mixed question of law and fact and must be resolved at a trial on the merits." *In re Price*, 313 B.R. 805, 812 (E.D. Ark. Bankr. 2004) (citing *Associated Press v. So. Ark. Radio Co.*, 809 S.W.2d 695, 697 (Ark. Ct. App. 1991)). There are numerous disputed material facts to support a jury finding of unconscionability here. BancorpSouth ignores those facts in seeking summary judgment. To determine whether a contractual provision is unconscionable under Arkansas law, "courts should review the totality of the circumstances surrounding the negotiation and execution of the contract." *State ex rel. Bryant v. R&A Inv. Co.*, 985 S.W.2d 299, 302 (Ark. 1999) (citing *Geldermann & Co., Inc. v. Lane Processing, Inc.*, 527 F.2d 571, 575 (8th Cir. 1975)). Arkansas courts also consider "whether there is a gross inequality of bargaining power between the parties to the contract and whether the aggrieved party was made aware of and comprehended the provision in question." *Associated Press*, 809 S.W.2d at 697 (finding unconscionability where "[t]he agreement is a preprinted form; . . . the agreement was neither read nor understood by the appellee; . . . and there appears to be a substantial disparity in the relative bargaining power of the parties").

   As in most other states, this analysis is "divided into two categories; (1) procedural and (2) substantive." *Easter v. Compcredit Corp.*, No. 08-CV-1041, 2009 WL 499384, at *4 (W.D. Ark. Feb. 27, 2009). Procedural unconscionability "deals with the manner in which a contract was entered into . . . ." *Gobeyn v. Travelers Indem. Co.*, No. 1:09CV00034JLH, 2009 WL

3148755, at *3 (E.D. Ark. Sept. 24, 2009).  Substantive unconscionability, on the other hand, "looks to the terms of the contract and whether they are harsh, one-sided, or oppressive." *Gobeyn*, 2009 WL 3148755 at *3.  Using language identical to that used in this Court's Omnibus Order, the Arkansas Court of Appeals held that an unconscionable contract is one "such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other."  *T-1 Constr., Inc. v. Tannenbaum Dev. Co.*, 2009 WL 613552 (Ark. Ct. App. Mar. 11, 2009) (citing *Hume v. U.S.*, 132 U.S. 406, 415 (1889)).  The record evidence here supports reasonable inferences for both elements of unconscionability.

### 1.  *Procedural Unconscionability*

As recognized by BancorpSouth, "[c]ourts may look at various factors when determining whether an agreement is procedurally unconscionable, including whether the contract is 'oppressive,' which has been defined as arising from unequal bargaining power that results in an absence of meaningful choice, and the extent to which the person signing the agreement may be surprised by the terms hidden in a from drafted by the party seeking to enforce its terms." *Hughes*, 2010 WL 4750216 at *3.  The record here is replete with evidence of procedural unconscionability.

Despite BancorpSouth's claims to the contrary, Plaintiff Shane Swift testified on numerous occasions that he was not aware until shortly before this lawsuit was filed that BancorpSouth engaged in the practice of re-sequencing and posting his debit card transactions from high to low dollar amount, and that he incurred overdraft fees as a result of BancorpSouth's practice.  (Plfs. Stmt. ¶ 95).  Testimony referenced by BancorpSouth claiming otherwise suffers from a hindsight bias given that Plaintiff Swift had engaged counsel and filed suit.  While BancorpSouth purports to offer "multiple channels" from which customers, including Plaintiff Swift, could access account information, those channels are of little help given BancorpSouth's clear lack of transparency as to its actual posting practice.  The Bank's argument is belied by the fact that the various account documents at issue did *not* clearly and unambiguously disclose BancorpSouth's everyday posting practice.

BancorpSouth's account agreements derive from standardized form adhesion contracts, which were *non-negotiable* for consumer account holders, like Plaintiff Swift and the members of the certified class.  (Plfs. Stmt. ¶ 80).  BancorpSouth's Deposit Account Terms and Conditions provided the following relevant language for the first time in the October 22, 2008 version:

> ORDER OF PAYMENT – Unless otherwise provided in the Account Information Statement (see OTHER TERMS section below) if more than one item or order is presented for payment against the account on the same day and the available balance of the account is insufficient to pay them all, we **_may_** pay any of them in any order we choose, even if the order we choose results in greater insufficient funds fees than if we had chosen to pay them in some other order.  Our payment of any item or order in overdraft does not create any obligation for us to pay any other item or order in overdraft in the future, and you agree that no course of dealing regarding the payment of items or orders in overdraft will be created between us.

(Plfs. Stmt. ¶ 78) (emphasis added).[3]  This provision was buried deep in the account agreement which, throughout the class period, was a single-spaced, small-font form contract of adhesion. (Plfs. Stmt. ¶ 82).  Nor is the subject language even accurate, as the evidence demonstrated that BancorpSouth *always* posted high-to-low.  (Plfs. Stmt. ¶¶ 81, 82).

BancorpSouth's 2004 version of its Account Information Statement, referenced in the Deposit Account Terms and Conditions, was equally misleading because it failed to: (a) refer to the uniform high-to-low posting order that had been established for all retail accounts; and (b) inform customers that they could opt out of the Bank's so-called discretionary overdraft process, instead choosing to only inform customers that overdraft fees could be avoided if they enrolled in one of the Bank's overdraft protection products.  (Plfs. Stmt. ¶ 83).  Previous versions of the Account Information Statement included a vague reference to debiting multiple debit transactions presented for payment on a single banking day in descending order of the dollar amount of the transactions, but this process would have been part of BancorpSouth's pre-2003 posting order (outside the class period).  (Plfs. Stmt. ¶ 84).  Also, some of these prior versions mentioned: "A description of the categories, method, and order of payment/posting is available upon request."  (Plfs. Stmt. ¶ 84).  Notably, the bank removed this verbiage from the Account Information Statement as of the May 1, 2003 version.  (Plfs. Stmt. ¶ 84).

BancorpSouth concealed its practice of re-sequencing debit transactions to artificially increase the number of overdrafts and overdraft fees.  While the Bank's high-to-low posting practice remained consistent throughout the class period, and could have easily been described in clear, certain terms, the Bank chose not to provide clear disclosures.  Rather, it cryptically stated

---

[3] Previous versions excluded the phrase: "Unless otherwise provided in the Account Information Statement (see OTHER TERMS) section below."  (Plfs. Stmt. ¶ 79).  Thus, prior to October 2008, customers were not directed by the Deposit Account Terms and Conditions documents to directly refer to the Account Information Statement, discussed *infra.*

that BancorpSouth "*may* pay any of them in any order we choose." (Emphasis added). Plus, the Bank removed the offer to provide customers with a description of the actual posting order. Notably, the Bank considered doing so in 2007, but decided against it. (Plfs. Stmt. ¶¶ 84-85).

Moreover, throughout the class period, customers' monthly statements did not disclose BancorpSouth's practice of re-sequencing and posting debit card transactions from high-to-low dollar value. (Plfs. Stmt. ¶ 86). In fact, transactions debited from a customers' account are contained in two separate sections – checks and other debits – and the statements do not indicate the actual commingled posting of checks and other debits. (Plfs. Stmt. ¶ 87). Further, during the entire class period, the Notice of Charge for Overdrawn Accounts, which is the Bank's form overdraft notice, did not disclose the posting order for future reference and clarity. (Plfs. Stmt. ¶ 88).

BancorpSouth's reliance on *Best v. U.S. Nat. Bank of Oregon*, 739 P.2d 554 (Ore. 1987), and *Saunders v. Michigan Ave. Nat'l Bank*, 662 N.E.2d 602 (Ill. App. 1996), is unavailing. Both decisions only concerned the re-ordering of checks. In addition, allegations of unconscionability in *Best* were narrowly limited to the per item NSF fee amount charged by that bank in relation to its actual cost of processing NSF checks. As set forth in the Second Amended Complaint and demonstrated here, the allegations and evidence of unconscionability in this case are far broader. *Saunders* specifically dealt with the Illinois Consumer Fraud Act, which is not even at issue here.

The evidence summarized above establishes that the disparity in sophistication and bargaining power between Plaintiffs and the Bank was obvious. The terms at issue were contained in voluminous boilerplate language drafted by the Bank. Even if Plaintiffs disagreed with the terms in these adhesion contracts, there was no meaningful opportunity to negotiate with the Bank. *Checking Account Overdraft Litig.*, 694 F. Supp. 2d at 1319.

>           **2.    Substantive Unconscionability**.

As previously stated, "substantive unconscionability . . . looks to the terms of the contract and whether they are harsh, one-sided, or oppressive." *Gobeyn*, 2009 WL 3148755 at *3. BancorpSouth's overdraft policy and its implementation of that policy are archetypal examples of substantive unconscionability under Arkansas law.

BancorpSouth disputes that its high-to-low posting is unconscionable. However, with good reason, this Court has left no doubt that substantive unconscionability is shown by:

> deposit agreements contain[ing] contractual terms regarding overdraft protection
> that had the purpose and effect of allowing defendants to re-order the posting of

> debit transactions to maximize the number and amount of overdraft fees to Plaintiffs, and that the fees bear no reasonable commercial relationship to the costs or risks associated with providing the overdraft service.

*Checking Account Overdraft Litig.*, 694 F. Supp. 2d at 1320; *see also Hunter*, 798 F.2d at 303; *Gobeyn*, 2009 WL 3148755 at *3. In addition, this Court rejected BancorpSouth's argument that "the UCC and statements of federal bank regulatory agencies accept the authority of banks to post in high-to-low order." *See supra* at 8. Specifically, this Court held: "Defendants are not entirely correct when they state that high-to-low posting is expressly condoned by the UCC. As discussed in the above section, the provision they rely on, section 4-303(b), applies only to paper checks, not the electronic debits that are the subject of this lawsuit." *Checking Account Overdraft Litig.*, 694 F. Supp. 2d at 1320. Neither *White* nor *Daniels v. PNC Bank, N.A.*, 738 N.E.2d 447 (Ohio App. 2000), both cited by BancorpSouth, held otherwise when stating that the high-to-low posting of <u>checks</u> was not unconscionable.

BancorpSouth's high-to-low posting order can have a dramatic impact on the number of overdraft charges assessed. If there are insufficient funds to cover all posted transactions, the Bank's high-to-low posting order reduces customers' balances as quickly as possible, thereby maximizing the number of overdraft fees assessed. This is the fundamental reason why BancorpSouth adopted high-to-low posting in 2003. (Plfs. Stmt. ¶ 69).[4] Beginning in 2002, BancorpSouth engaged EPG, a financial consulting firm for banks that offered fee revenue optimization as one of its services, and adopted its recommendation of a high-to-low posting order which commingled debits. (Plfs. Stmt. ¶ 69). In its recommendation to the Bank, EPG stated: "It is anticipated that the bank will also realize an increase in NSF/OD fee revenue, as more items will be paid into overdraft or returned." (Plfs. Stmt. ¶ 69). With EPG's assistance, combined overdraft and NSF fee revenue, which had been around $35 million in 2002, grew to over $48 million in 2003, a 36% increase. (Plfs. Stmt ¶ 69). Even though high-to-low re-sequencing provided significant fee revenue, one of the Bank's regional presidents questioned posting high-to-low as early as in 2005 in an email to BancorpSouth's top management:

---

[4] BancorpSouth admits that if it wanted to go *low-to-high* when it implemented its posting priority in 2003, it could have done so, but the Bank followed the recommendation of its third party consultant for the purpose of increasing revenues. (Plfs. Stmt. ¶ 73). The Bank considered the impact of *low-to-high* posting in 2007 and concluded that it would significantly decrease revenues, estimating a 17.5% decrease of more than $12 million. (Plfs. Stmt. ¶ 74). It did so again in 2010 after the filing of this lawsuit, and noted concern that switching "could provide a different class of customer to claim unfair practice." (Plfs. Stmt. ¶ 75).

14

PLEASE EXPLAIN THE RATIONALE BEHIND OUR POLICY OF POSTING LARGEST ITEMS FIRST.   WHAT CAN BE DONE TO PROTECT OUR BANK FROM LOSS AND OUR TELLERS FROM CRITICISM IN SITUATIONS WHERE TRANSIT ITEMS COME THROUGH AND PAY AHEAD OF ITEMS WE HANDLE PROPERLY DURING OPREATION HOURS?

(Plfs. Stmt. ¶ 89).

To make matters worse for consumers, beginning in 2002, BancorpSouth utilized a secret "Overdraft Matrix Limit" to augment its high-to-low posting.   BancorpSouth's use of the Overdraft Matrix was integral to its scheme to increase debit card transaction authorizations and, in turn, the number of overdrafts as much as possible.   (Plfs. Stmt. ¶ 71).   The Overdraft Matrix process was intentionally concealed.   (Plfs. Stmt. ¶ 76).

BancorpSouth's assertion that "Plaintiff has presented no evidence that BancorpSouth's posting order was wrongful" is incorrect.   (Def.'s Mem. at 11).   BancorpSouth ignores Plaintiff Swift's descriptions of BancorpSouth's re-sequencing scheme as "unfair," and specifically unfair for the Bank to engage in the re-sequencing practice for its own financial gain.   (Plfs. Stmt. ¶ 97). In fact, when asked whether he believed re-sequencing is always harmful to BancorpSouth customers, Plaintiff Swift emphatically replied: "It's always harmful.    I believe unfair resequencing is always harmful to BancorpSouth customers."   (Plfs. Stmt. ¶ 97).   Plaintiff even referred to BancorpSouth's re-sequencing scheme as a "corrupt practice."   (Plfs. Stmt. ¶ 97).   In addition, BancorpSouth's claim that Plaintiff Swift "refused to identify a 'correct' posting order" is likewise contradicted by Plaintiff Swift's testimony.   Plaintiff Swift repeatedly stated that BancorpSouth should post debit card transactions in chronological order.   (Plfs. Stmt. ¶ 98). Ultimately, it is up to the jury to decide if the posting order was unfair.

At no time did the Swifts agree that re-sequencing debit card transactions from high-to-low dollar value was a benefit, as BancorpSouth claims.   Even if the Swifts acknowledged their obligation to pay overdraft fees that were *not* caused by re-sequencing, it does not follow that they "preferred" that BancorpSouth pay transactions into overdraft that <u>do not actually overdraft the account</u>.   Similarly, it is inconsequential that the Swifts did not tell BancorpSouth that they did not want overdraft protection, or that they did not complain to the Bank, given that they were unaware that they had fallen victim to BancorpSouth's re-sequencing scheme.

Finally, BancorpSouth's claim that Plaintiff Swift "can avoid any possible disadvantage by simply not overdrawing his" account is misleading and untrue.   (Def.'s Mem. at 12).   While

15

Plaintiff Swift acknowledged that he had control over whether his account became overdrawn in the context of one overdraft occurrence, BancorpSouth's re-sequencing scheme, including the undisclosed Overdraft Matrix, deprived Plaintiff Swift and the other members of the Class of the ability to prevent the cascade effect of multiple overdrafts that occurred solely based on the Bank's high-to-low re-sequencing scheme.   The evidence clearly shows that Plaintiff Swift and members of the Class could not reasonably avoid incurring the additional overdraft fees as a result of BancorpSouth's manipulation, even when exercising due diligence to monitor his account balance and to maintain sufficient funds.

## IV.    Unjust Enrichment

The Bank once again simply rehashes its Motion to Dismiss without citation to relevant material facts.  As previously stated, Plaintiffs acknowledge that they cannot recover judgment under both claims, but are permitted to plead and pursue these alternative claims.  *Checking Account Overdraft Litig.*, 694 F. Supp. 2d at 1321 ("The Court agrees with Plaintiff's position. Fed. R. Civ. P. 8(d) allows pleading in the alternative, even if the theories are inconsistent. Defendants have not conceded that Plaintiff is entitled to recovery under the contract, and if the contractual claim fails, Plaintiff may still be entitled to recovery under an unjust enrichment theory.").  Arkansas law expressly permits alternative pleading.  *See Crawford v. Lee County Sch. Dist.*, 983 S.W.2d 141, 145 (Ark. Ct. App. 1998); *Wachter Elec. Co. v. Elec. Sys., Inc.*, Nos. 3:10CV00083 SWW and 3:10CV00140 DPM, 2010 WL 5137361 (E.D. Ark. Dec. 9, 2010). Therefore, in the event Plaintiffs ultimately recover a verdict under the contract-based claims, judgment would be entered under those claims only.  Likewise, should the fact-finder reject the contract claims but award recovery under the unjust enrichment claim, judgment would be entered under that claim only.

The Bank also erroneously argues that because Plaintiffs allege a contract in one claim, summary judgment on the unjust enrichment claim is warranted.  (Def.'s Mem. at 15).  Plaintiffs are challenging the material contract terms as unconscionable.  As this Court has previously and correctly held, "if the terms of the deposit agreement are subsequently declared to be unconscionable, Defendant may be barred from relying on them."  *Checking Account Overdraft Litig.*, 694 F. Supp. 2d at 1323.  Moreover, this Court previously concluded that even if the deposit agreement gives a bank the discretion to re-order debits ("we *may* pay them in any order we choose"), a bank exercises that discretion in bad faith by intentionally causing the account

16

holder to incur overdrafts that would not have otherwise be incurred.  *Id.*  Indeed, BancorpSouth is being unjustly enriched by the re-sequencing of debit card transactions and using the Overdraft Matrix Limit in the process to exacerbate the frequency of overdrafts.  Thus, Plaintiffs' unjust enrichment claim should proceed until a fact-finder determines whether or not the terms of the Deposit Agreement are unconscionable and unenforceable.

## V.   Arkansas Deceptive Trade Practice Act Claims ("ADTPA")

BancorpSouth advances three arguments in support of its Motion as to the ADTPA: (1) Plaintiffs' claim fails because BancorpSouth's conduct falls within the ADTPA's "safe harbor" provision; (2) the record lacks evidence that BancorpSouth engaged in any deceptive practice; and (3) the record lacks evidence that Plaintiffs have been damaged by BancorpSouth's deceptive practices.  BancorpSouth's arguments are without merit.

### a.   BancorpSouth's Conduct Does Not Fall Within the ADTPA's "Safe Harbor" Provision

BancorpSouth's argues that that because state and federal law authorize its posting order for debit card transactions its conduct falls within the ADTPA's safe harbor provision.  However, since these laws do not authorize high-to-low posting, this Court should reject the safe harbor argument.  *See supra* at 8 and 14.[5]  In addition, the OCC Opinion cited by BancorpSouth stating that "banks are authorized, pursuant to section 24 (Seventh) of the National Bank Act and Section 7.4002, to charge NSF fees that result from the high-to-low order of <u>check posting</u>" is inapposite.  (Emphasis added).

Even in the context of checks, the OCC advisory letters, drawing upon state law, suggest that such reordering is permissible *only* if the bank does so *in good faith*.  OCC Interp. Letter No. 997, 2002 WL 32639293, at *2 (Apr. 15, 2002).  According to the OCC, "a procedure designed to maximize the number of returned checks solely to increase returned check fees charged to customers *would not be appropriate*."  *Id.* (quoting Texas statutory commentary) (emphasis added).  Moreover, a bank "could not properly follow an established practice of maximizing the number of returned checks for the sole purpose of increasing the amount of returned check fees charged to the customer."  OCC Interp. Letter No. 916, 2001 WL 1285359 (May 22, 2001) (quoting California statutory commentary).  Nothing in 12 C.F.R. § 7.4002 or OCC

---

[5] BancorpSouth made this argument in its Motion to Dismiss.  (DE # 1068).  The Order denying that motion does not explicitly reference the issue, but the Court apparently agreed this argument was wrong.  (DE # 1305).

interpretations condones an overdraft scheme implemented to maximize fees charged to customers.  Under 12 C.F.R. § 7.4002(b), non-interest fees may be established only "according to sound banking judgment and safe and sound banking principles," and not for the purpose of maximizing fees.  The regulation, as written, clearly contemplates that the imposition of non-interest fees may be subject to at least some state laws.  12 C.F.R. § 7.4002(d).[6]  Given the fundamental difference between checks and debit card transactions – namely the instantaneous nature of electronic debit card transactions – if this procedure is inappropriate as applied to checks, then it certainly cannot be appropriate to debit card transactions when the risk to the merchant is much less significant since a bank can choose to decline the purchase at the point of service.  Because this case does not concern the high-to-low posting of checks, the ADTPA's safe harbor provision is not applicable.

> **b.    The Record Evidence Supports a Claim Under the ADTPA**

The ADTPA prohibits "[d]eceptive and unconscionable trade practices," which include, but are not limited to, "[k]nowingly taking advantage of a consumer who is reasonably unable to protect his or her interest because of ignorance," and "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade."  Ark. Code Ann. § 4-88-107(a)(10).  "An 'unconscionable' act is an act that 'affront[s] the sense of justice, decency, or reasonableness.'"  *Baptist Health v. Murphy*, 226 S.W.3d 800, 811 n. 6 (Ark. 2006).  Although Arkansas courts have not construed the term "deceptive," the ADTPA is to be liberally construed to protect consumers.  *State ex rel. Bryant v. R&A Inv. Co.*, 985 S.W.2d 299, 302 (Ark. 1999).

Assuming the Court concludes that Plaintiffs have met their burden in opposing summary judgment on the unconscionability claim, the facts supporting unconscionability claim support a claim under the express terms of the ADTPA.  *See supra* at 8-16; *Baptist Health*, 226 S.W.3d at 811 (defining unconscionability as "an act that 'affront[s] the sense of justice, decency, or reasonableness'"); *State ex rel. Bryant*, 985 S.W.2d at 302 ("[t]he deceptive and unconscionable trade practices listed in this section are in addition to and do not limit the types of unfair trade practices actionable at common law") (citing Ark. Code Ann. § 4-88-107(b)).  Thus, even if the

---

[6] Further, even if OCC interpretive letters lent support to the Bank's argument that its practices are lawful, the letters are not binding and do not preempt Arkansas's general civil laws.  An OCC letter is advisory only.  It "does not have the full force of law.  It is merely interpretive rather than legislative."  *Gutierrez v. Wells Fargo Bank, N.A.*, Case No. 07-05923 WHA, 2008 WL 4279550 at *7 (N.D. Cal. Sept. 11, 2008).

Court were to exclude an affirmative unconscionability claim, the same deceptive practices that are in play in the claims for breach of contract and the implied duty of good faith and fair dealing and for unjust enrichment would support an ADTPA claim.

The Bank's argument that "nothing about BancorpSouth's posting practice was a 'deceptive' act as contemplated by the ADTPA" is based on the faulty premise that its practice of re-sequencing debit card transactions was disclosed in the contract between the parties, or that it exercised its reserved discretion fairly.  (Def.'s Mem. at 16).  BancorpSouth's claim is flatly contradicted by record evidence.  *See supra* at 11-13.  BancorpSouth's concealment of its re-sequencing practice is deceptive.  BancorpSouth's vaguely worded account agreements were purposeful, as BancorpSouth took active measures <u>not</u> to communicate to Plaintiffs the Bank's high-to-low re-sequencing or the existence of the Overdraft Matrix Limit.  When it adopted commingled high-to-low posting in 2003, BancorpSouth made the conscious decision not to disclose the change in posting order to customers and maintained that policy throughout the class period.  A prime example of such active concealment came in the form of a Frequently Asked Questions training document given to the Bank's call center employees discussing the Overdraft Matrix, which specifically stated at the assigned Overdraft Matrix Limit should not be disclosed to customers.  (Plfs. Stmt. ¶ 76).

 BancorpSouth even recognizes in its Motion that, rather than disclosing that it always posted high-to-low, it merely "disclosed its authority to post debit transactions from highest amount to lowest amount."  (Def.'s Mem. at 17).  Accordingly, *Carmichael v. Nationwide Life Ins. Co.*, 810 S.W.2d 39 (Ark. 1991), and *Belew v. Griffis*, 460 S.W.2d 80 (Ark. 1970), which both deal with claims of misrepresentations where alleged oral representations contradicted the written language of the contracts at issue, are inapposite.  (*See* Def.'s Mem. at 16-17).  In addition, while it is true that both cases recognize that a person is ordinarily bound to know the contents of a signed contract, it cannot be said that Plaintiffs were bound to know BancorpSouth's posting order because its posting order *was not disclosed* in the contract with Plaintiffs.[7]

BancorpSouth's citation to *Baskin v. Collins*, 806 S.W.2d 3 (Ark. 1991), is equally

---

[7] BancorpSouth also cites to the non-precedential opinion of *Yoes v. Marine Midland Bank*, No. CA90-235, 1991 WL 104049 (Ark. Ct. App. June 12, 1991) in violation of AR R S CT Rule 5-2. Notwithstanding the impropriety of the citation, *Yoes* is inapposite because it dealt with alleged oral misrepresentations that contradicted the express terms of the written agreement at issue.

unavailing.  In that case, the court held that the sellers of commercial property did not have a duty to disclose a certain federal environmental regulation concerning underground storage tanks, despite the fact that the sellers were aware that the buyers were purchasing the property for use as a gas station.  *Id.*  Perhaps acknowledging that it did not actually disclose the posting practice at issue, BancorpSouth believes this case supports the position that it was not required to disclose its posting practice to Plaintiffs.  However, in *Baskin*, the court explicitly held that "the duty to disclose does not arise where the 'fact' that is not disclosed is the existence of a federal regulation, because both parties have equal access to the knowledge." *Id.* at 5.  Here, however, the only way Plaintiffs could ever know BancorpSouth's posting practice is through BancorpSouth's disclosure of that fact.  There is simply no other source for Plaintiffs to ascertain the posting practice, and there is no law that specifically permits high-to-low posting of debit card transactions.  Accordingly, a fact-finder could reasonably infer that BancorpSouth and Plaintiffs did not have "equal access to the knowledge."  Thus, *Baskin actually* supports Plaintiffs' position that BancorpSouth's failure to disclose its posting practice was deceptive.

### c.   Plaintiffs Have Established Injury Arising From BancorpSouth's Deceptive Practices

BancorpSouth's final argument is that Plaintiffs have provided no proof that Plaintiff Swift would have acted differently had BancorpSouth actually disclosed its posting practice and, as a result, have failed to prove injury.  BancorpSouth's false assertion is again marred by a hindsight bias.  No matter how many times BancorpSouth claims otherwise, the fact is that Plaintiff Swift did not understand BancorpSouth's re-sequencing scheme until shortly before this lawsuit was filed.  A fact-finder can reasonably infer that BancorpSouth wanted it that way especially in light of the secret Overdraft Matrix and its obvious ability to be more transparent.  Thus, it is impossible to conclude at this juncture how Plaintiffs would have acted had BancorpSouth been transparent.  BancorpSouth's citation to *Bildstein v. MasterCard Intern, Inc.*, 329 F. Supp. 2d 410 (S.D.N.Y. 2004) is misplaced given that *Bildstein* deals solely with an alleged violation of New York General Business Law § 349, and the burden under that law for plaintiff to "show a materially deceptive conduct on which they relied to their detriment."  *Id.* at 414.  On the other hand, *Whatley v. Reconstruct Co. NA*, No. 3:10CV00242JLH, 2010 WL 4916372 (E.D. Ark. Nov. 23, 2010), cited by BancorpSouth, correctly states the rule that in order to recover under the ADTPA, one must suffer actual damages; however, that case is of little help given that the plaintiff there was unable to make allegations as to how the defendant's conduct

caused her to suffer damages, or even explain the nature of the damages. *Id.* at *6. Here, Plaintiffs have done both, and have provided this Court with ample facts in support of such allegations. Accordingly, sufficient facts exist for this Court to determine that Plaintiffs have satisfied the "actual damage" requirement of the ADTPA.

## VI. The Ratification Defense Does Not Bar Plaintiffs' Claims

As more fully briefed in Plaintiffs' Motion for Summary Judgment (DE # 2997), the Bank's purported ratification defense fails as a matter of law. "Ratification is a doctrine of agency, which is well-established in the common law, and it refers to the express or implied adoption and confirmation by one person of an act or contract performed or entered into in his behalf by another without authority." *Arnold v. All Am. Assur. Co.*, 499 S.W.2d 861, 865 (Ark. 1973). "Although ratification is typically a question of fact for the jury, Arkansas courts have made it clear that "[t]he doctrine of ratification, however, has no application if there was no agency relationship." *Sterne, Agee & Leach, Inc. v. Way*, 207 S.W.3d 369, 376 (Ark. Ct. App. 2007) (citing *E.P. Dobson, Inc. v. Richard*, 705 S.W.2d 893, 894 (Ark. Ct. App. 1986) ("The doctrine of ratification is inapplicable when no agency relationship is proved."). The "essential elements for a showing of the agency relationship (are) authorization and control." *Taylor v. Gill*, 934 S.W.2d 919, 921 (Ark. 1996). Here, it is undisputed that there is no agency relationship between Plaintiffs and BancorpSouth, and it would be impossible for BancorpSouth to show that Plaintiffs controlled BancorpSouth when it paid Plaintiffs' overdrafts, particularly given the previously cited language in the Deposit Agreement: "If more than one item or order is presented for payment against the account on the same day and the available balance of the account is insufficient to pay them all, *we may pay any of them in any order we choose*." (Emphasis added). Thus, the affirmative defense of ratification fails as a matter of law.

## VII. The Waiver Defense Does Not Bar Plaintiffs' Claims

BancorpSouth asserted waiver or license as a defense based on an assertion that "Plaintiff knowingly continued to overdraw his account and incur overdraft fees on his BancorpSouth account after he received multiple notices of overdraft fees and disclosures regarding BancorpSouth's overdraft policies." (Def.'s Mem. at 19.) "Waiver is the voluntary abandonment or surrender by a capable person of a right known by him to exist, with the intent that he shall forever be deprived of its benefits. *Pearson v. Henrickson*, 336 Ark. 12, 983 S.W.2d 419 (1999). It may occur when one, with full knowledge of material facts, does

21

something which is inconsistent with the right or his intention to rely upon that right. The relinquishment of the right must be intentional. *Id.*" *Bharodia v. Pledger*, 11 S.W.3d 540, 545 (Ark. 2000) (reversing judgment based on waiver).   BancorpSouth cannot show, based on undisputed facts, that Plaintiffs knew of a right and intended to relinquish that right forever.   This is especially true given that the account statements and overdraft notices admittedly do not reflect or discuss the re-sequencing that caused multiple overdrafts, nor are customers told of the assigned Overdraft Matrix Limit that further intentionally increases the frequency of overdrafts.

BancorpSouth points to Plaintiff Swift's testimony that he and his wife would debit their account when they were uncertain of the balance, because BancorpSouth would pay the debit in exchange for a fee.  (Def. Stmt. Facts ¶¶ 60-63).   Even if true, such facts do not defeat the re-sequencing claim.  Plaintiffs are not arguing that an overdraft fee policy is *per se* wrong.  Rather, Plaintiffs' claim is that the intentional re-sequencing of instantaneous transactions in order to charge additional overdraft fees, or to overdraft the account when the account contained sufficient funds at the time of the transaction, is a wrongful intentional and compensable action. The Bank cites no facts showing that Plaintiffs knew that BancorpSouth was: 1) holding instantaneous transactions until a later time; 2) re-sequencing instantaneous debit card transactions after they were held; 3) approving transactions using the Overdraft Matrix Limit; and 4) doing all of that to maximize overdraft fee revenue.  Plaintiffs' payment of overdrafts is immaterial to the defense and is not evidence of a voluntary abandonment of a right known to exist.  *See e.g. Ray Dodge, Inc. v. Moore*, 479 S.W.2d 518, 521 (Ark. 1972) (holding that waiver in affirming a contract is equivalent to ratification, and when based on inferences drawn from conduct, is properly a question for the jury).

BancorpSouth has presented no evidence that Plaintiffs knowingly and voluntarily relinquished their right to recover for BancorpSouth's wrongful actions with the intent to forever abandon that right.  Therefore, summary judgment should be denied as to this defense.

## CONCLUSION

The parties agree that the claims of the certified Class are adjudicated through Plaintiff Swift's case.  Thus, the parties agree that the Court's ruling as to Plaintiff Swift will bind all members of the class, except those who timely opt-out following class notice.[8]  As demonstrated

---

[8] Notice to the class has not yet been given.  See Revised Scheduling Order (DE # 2834, 2965, 2985, 3021).

above, Plaintiff Swift has provided sufficient evidence supporting each element of the claims asserted against BancorpSouth (except conversion) so as to prelude summary judgment in BancorpSouth's favor.  Accordingly, because BancorpSouth's Motion as to Plaintiff Swift must be denied, the claims of the certified Class proceed as well.  Plaintiffs respectfully request entry of an Order denying the Motion in its entirety.

Dated: November 8, 2012.

Respectfully submitted,

/s/ Aaron S. Podhurst                          /s/ Bruce S. Rogow
Aaron S. Podhurst, Esquire                 Bruce S. Rogow, Esquire
Florida Bar No. 063606                        Florida Bar No. 067999
apodhurst@podhurst.com                    brogow@rogowlaw.com
Robert C. Josefsberg, Esquire            Bruce S. Rogow, P.A.
Florida Bar No. 40856                         Broward Financial Center
rjosefsberg@podhurst.com                 500 East Broward Boulevard
Steven C. Marks, Esquire                   Suite 1930
Florida Bar No.  516414                      Fort Lauderdale, FL  33394
smarks@podhurst.com                       Tel: 954-767-8909
Peter Prieto, Esquire                          Fax: 954-764-1530
Florida Bar No. 501492
pprieto@podhurst.com
Stephen F. Rosenthal, Esquire
Florida Bar No. 0131458
srosenthal@podhurst.com
Jon Gravante, III, Esquire
Florida Bar No. 617113
jgravante@podhurst.com
PODHURST ORSECK, P.A.
City National Bank Building
25 W. Flagler Street, Suite 800
Miami, FL 33130-1780
Tel: 305-358-2800
Fax: 305-358-2382

*Co-Lead Counsel for Plaintiffs*

/s/ Robert C. Gilbert
Robert C. Gilbert, Esquire
Florida Bar No. 561861
rcg@grossmanroth.com
Stuart Z. Grossman, Esquire
Florida Bar No. 156113
szg@grossmanroth.com
David Buckner, Esquire
Florida Bar No. 60550
dbu@grossmanroth.com
Seth E. Miles, Esquire
Florida Bar No. 385530
sem@grossmanroth.com
GROSSMAN ROTH, P.A.
2525 Ponce de Leon Boulevard
Eleventh Floor
Coral Gables, FL 33134
Tel: 305-442-8666
Fax: 305-779-9596

*Coordinating Counsel for Plaintiffs*

/s/ E. Adam Webb
E. Adam Webb, Esquire
Georgia Bar No. 743910
Adam@WebbLLC.com
Matthew C. Klase, Esquire
Georgia Bar No. 141903
Matt@WebbLLC.com
G. Franklin Lemond, Jr., Esquire
Georgia Bar No. 141315
FLemond@WebbLLC.com
WEBB, KLASE & LEMOND, L.L.C.
1900 The Exchange, S.E.
Suite 480
Atlanta, GA 30339
Tel: 770-444-9325
Fax: 770-444-0271

/s/ Michael W. Sobol
Michael W. Sobol, Esquire
California Bar No. 194857
msobol@lchb.com
Roger N. Heller, Esquire
California Bar No. 215348
rheller@lchb.com
Jordan Elias, Esquire
California Bar No. 228731
jelias@lchb.com
LIEFF CABRASER HEIMANN &
   BERNSTEIN L.L.P.
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
Tel: 415-956-1000
Fax: 415-956-1008

/s/ Russell W. Budd
Russell W. Budd, Esquire
Texas Bar No. 03312400
rbudd@baronbudd.com
Bruce W. Steckler, Esquire
Texas Bar No. 00785039
bsteckler@baronbudd.com
Mazin A. Sbaiti, Esquire
Texas Bar No. 24058096
msbaiti@baronbudd.com
BARON & BUDD, P.C.
3102 Oak Lawn Avenue
Suite 1100
Dallas, TX 75219
Tel: 214-521-3605
Fax: 214-520-1181

/s/ David S. Stellings
David S. Stellings, Esquire
New York Bar No. 2635282
dstellings@lchb.com
LIEFF CABRASER HEIMANN &
  BERNSTEIN L.L.P.
250 Hudson Street
8th Floor
New York, NY  10013
Tel: 212-355-9500
Fax: 212-355-9592

/s/ Ruben Honik
Ruben Honik, Esquire
Pennsylvania Bar No. 33109
rhonik@golombhonik.com
Kenneth J. Grunfeld, Esquire
Pennsylvania Bar No. 84121
kgrunfeld@golombhonik.com
GOLOMB & HONIK, P.C.
1515 Market Street
Suite 1100
Philadelphia, PA 19102
Tel: 215-985-9177
Fax: 215-985-4169

/s/ Ted E. Trief
Ted E. Trief, Esquire
New York Bar No. 1476662
ttrief@triefandolk.com
Barbara E. Olk, Esquire
New  York Bar No. 1459643
bolk@triefandolk.com
TRIEF & OLK
150 E. 58th Street
34th Floor
New York, NY 10155
Tel: 212-486-6060
Fax: 212-317-2946

*Plaintiffs' Executive Committee*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 09-MD-02036-JLK

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

CERTIFICATE OF SERVICE

I hereby certify that on November 8, 2012, I electronically filed the foregoing document

with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being

served this day on all counsel of record or *pro se* parties in the manner specified, either via

transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized

manner for those counsel or parties who are not authorized to receive electronically Notices of

Electronic Filing.

*/s/ Robert C. Gilbert*
Robert C. Gilbert
Florida Bar No. 561861
GROSSMAN ROTH, P.A.
2525 Ponce de Leon Boulevard
Eleventh Floor
Coral Gables, FL 33134
Tel: 305-442-8666
Fax: 305-779-9596

26