# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 1:09-MD-02036-JLK

IN RE: CHECKING ACCOUNT )
OVERDRAFT LITIGATION )
)
MDL No. 2036 )
Fourth Tranche )
)
_____ )
)
THIS DOCUMENT RELATES TO: )
)
*Shane Swift v. BancorpSouth, Inc.*, )
S.D. Fla. Case No. 1:10-cv-23872-JLK )
_____ )

**PROFFER OF TESTIMONY FOR ATTORNEY ERIC JON TAYLOR**

Pursuant to the paragraph 4 of the Joint Stipulation and Proposed Order Regarding Disclosures in Advance of Hearing on Plaintiff's Motion for Sanctions, attorney Eric Jon Taylor makes the following proffer of testimony that he may present if called as a witness at the hearing:

1.

I graduated from the University of Detroit in 1987 with a Bachelor of Arts in Philosophy and graduated from the University of Michigan Law School in 1990. I have been admitted to the practice of law by the State of Georgia for more than 22 years. During that time, I have served as a litigator in private practice and as an in-house litigation attorney. I am currently a partner in the law firm Parker, Hudson, Rainer & Dobbs LLP. I have been admitted to every court in Georgia including the Georgia Court of Appeals and Georgia Supreme Court, numerous federal district and circuit courts throughout the United States, and the United States Supreme Court. I have never been denied admission to any court, and have never been sanctioned or the subject of

disciplinary action, complaint, or inquiry of any kind. I have lectured and taught on several topics including defending class action litigation (including settling class actions), complex commercial litigation (including representing clients in MDL litigation), and legal ethics and professionalism.

2.

I have handled numerous class actions for plaintiffs and defendants throughout my career. Examples of my participation in reported class actions include *Cooper, et al. v. Southern Company* (N.D. Ga. Case No. 1:00-CV-2231; 11th Cir. Case No. 03-12230) and *AMAE v. State of California* (N.D. Cal. Case No. C-92-3874; 9th Cir. Case Nos. 96-17131). Many of the class actions I have worked on have settled on a confidential basis. Additionally, I have been involved in numerous MDL litigation matters, including MDL 1371 (concerning insurance pricing; E.D. La.) and MDL 1130 (concerning non-filing insurance; M.D. Ala.). I have handled complex litigation from the beginning of my career through the present.

3.

I plan to testify consistent with the Declaration I filed on April 2, 2012 (DE # 2605-1), the Supplemental and Corrected Declaration I filed on April 16, 2012 (DE # 2635-1), and BancorpSouth's Opposition to Plaintiff's Motion for Sanctions (DE # 2909).

4.

I was retained by BancorpSouth Bank in May 2010 to represent its interests in the *Swift, et al. v. BancorpSouth Bank, et al.* litigation filed in the Northern District of Florida. As lead defense counsel, I am responsible for developing and implementing strategy to defend BancorpSouth's interests.

5.

Plaintiff in the *Swift* action filed a "tag-along" notice with the JPML in June 2010. On behalf of the Bank, I opposed the conditional transfer order. The case was transferred by the JPML to MDL 2036 on October 26, 2010. In order to appear on behalf of BancorpSouth, I filed a notice of appearance in the Northern District of Florida and filed a Motion for Limited Appearance of and Electronic Filing Privileges for Defendants' Out-of-State Attorneys in the MDL, which was granted. Before filing that motion, I familiarized myself with the local rules of the Southern District of Florida and the pleadings and orders filed in the MDL. Among other things, I specifically reviewed Local Rule 3.8 and Pretrial Order No. 1 (DE # 60). In good faith, I believed Pretrial Order No. 1 superseded Local Rule 3.8, under Local Rule 1.1, because Pretrial Order No. 1 specifically addresses how this Court intended to be notified of other lawsuits in MDL 2036.

6.

After the *Swift* action was transferred to MDL 2036, a lawsuit was filed against BancorpSouth Bank and BancorpSouth, Inc. in Crawford County Circuit Court in the State Court in Arkansas relating to overdraft fees (*Lawson, et al. v. BancorpSouth, Inc. and BancorpSouth Bank*, Case No. CV-2011-426I (Circuit Court of Crawford County, Arkansas, First Division)). I became aware of that lawsuit on or about August 15, 2011. A review of the complaint in that lawsuit made clear to me that Plaintiff intended for the case not to be removable. In fact, Plaintiff specifically signed an affidavit that, under Arkansas law, the lawsuit was filed and plead to prevent CAFA jurisdiction from applying to such a state court action. I performed research to determine if there were grounds to remove the *Lawson* lawsuit. After personally reviewing applicable case law, I determined *Lawson* was not removable to federal court.

3

7.

Because Pretrial Order No. 1 only required notice of cases that might properly be consolidated or coordinated as part of MDL 2036 and the *Lawson* case was not removable to federal court, in good faith I determined that no notice to the Court or to the PEC was required of the Arkansas state action.

8.

In order to avoid BancorpSouth facing litigation in two different lawsuits regarding overdraft fees, I had discussions with Plaintiff's counsel in the *Lawson* action in late Fall 2011 about settling the *Lawson* lawsuit. Plaintiff's counsel in the *Lawson* action decided to dismiss the Arkansas state action to discuss potential settlement with BancorpSouth. No substantial settlement progress was made at that time.

9.

In October 2011, the JPML issued two important orders. The first, JPML DE # 639 (October 11, 2011), informed that the JPML no longer required tag-along notifications to be sent to MDL 2036. The second order, JMPL DE # 640 (October 11, 2011), explained that additional cases would not be included in the MDL. Taken together, I interpreted in good faith these orders to mean that the JPML no longer intended to transfer cases to MDL 2036. There were no limitations on these orders and no mention of cases where defendants already were defending litigation in MDL 2036. My conclusion was reinforced when the JPML vacated conditional transfer orders on and after October 11, 2011.

10.

Because I believed that there no longer was a requirement to send tag-along notification to the JPML, I believed that there was no requirement to notify the MDL Court of cases that

4

were not properly transferrable to the MDL. My and good faith conclusion was that if a settlement could be reached with the lawyers representing Lawson, it could be filed in federal court and there would be no requirement to notify opposing counsel or the MDL Court.

11.

I understand fully that this Court has now determined that Local Rule 3.8 should have triggered earlier notice of the *Thomas/Lawson* action, and apologize that my analysis of Rule 3.8 yielded a different conclusion and delayed notice. My analysis of Rule 3.8, however, was undertaken in good faith and certainly with no attempt to undermine this Court's authority and the multi-district litigation process. If I believed that earlier notice was required, earlier notice would have been given.

12.

Settlement discussions continued with the Plaintiffs' lawyers in Arkansas throughout the Fall and Winter of 2011. My reasonable and good faith belief is that those negotiations were confidential and I was under an affirmative duty not to inform any opposing counsel -- particularly lawyers representing the Plaintiffs in *Swift* -- about those negotiations.

13.

Indeed, I believed that if I let one set of Plaintiffs lawyers know about the other Plaintiffs' lawyers, I could be accused of attempting to engineer a "reverse auction." Knowing that would be an improper tactic that could prevent any class action settlement's final approval, I was careful not to inform any third parties about settlement discussions in Arkansas.

14.

I was aware that banks who were defendants in MDL 2036 had reached settlements both inside of and outside of MDL 2036. I knew that Fifth Third Bank's settlement was finally

approved by Federal District Judge Robert Dow in the Northern District of Illinois despite the objections of the MDL Plaintiffs' Executive Committee ("PEC") and that National City Bank's settlement was finally approved by Federal District Judge John Bates over the objections of the PEC. I also knew that Webster Bank's settlement was approved in the United States District Court for the District of Connecticut. From reviewing filings related to these settlements, I knew that there were several methods for calculating damages from overdraft charges allegedly caused by "resequencing" of transactions during the posting process.

15.

At Plaintiff's request in the *Swift* case, BancorpSouth shared information so that Plaintiff could formulate a settlement demand. When the *Swift* Plaintiff's lawyers finally completed their calculations and suggested that BancorpSouth's damages exposure was approximately $42,000,000.00, I informed the *Swift* Plaintiff's lawyers that BancorpSouth would not settle with Plaintiff on those terms, or close to the terms, and we would continue to litigate and try the case.

16.

Settlement discussions in Arkansas continued. In November 2011 and January 2012, two full-day mediation sessions took place. Those mediations were conducted by experienced, neutral mediators. I signed a mediation statement on behalf of BancorpSouth that further committed to confidentiality of the mediation proceedings. Substantial progress toward a settlement was made during the mediation session on November 29, 2011. That session was mediated by Frank Hamlin of Hamlin Dispute Resolution. Despite the efforts of the parties and Mr. Hamlin, the parties did not reach agreement to settle. In fact, no monetary terms were discussed on November 29, 2011. At the conclusion of the November 29, 2011 mediation, I was unsure that a settlement agreement could be reached, many hurdles remained to overcome.

17.

The first monetary demand I received from the *Thomas/Lawson* Plaintiffs' lawyers was on December 21, 2011. The next discussion of monetary settlement terms with the *Thomas/Lawson* plaintiffs' lawyers was at the January 16, 2012 mediation session.

18.

The January 16, 2012 mediation was conducted by mediator Chris Gromlicker in Little Rock, Arkansas. After several exchanges of demands, offers, counter-demands and counter-offers, the parties reached agreement on settlement compensation that included $1.75 million in cash (approximately 10% of the total damage figure calculated by opposing counsels' expert) and practice changes by BancorpSouth estimated at a value of $11.25 million. At the time I believed the compensation to be on par with or more class-favorable than the Fifth Third, National City, and Bank of America settlements that received final court approval.

19.

The settlement in principle was based on a model approved by the Northern District of Illinois in *Shulte, et al. v. Fifth Third Bank*. The *Thomas/Lawson* plaintiffs' experts analyzed BancorpSouth's historical transaction data to determine a "damages exposure." The settlement negotiations were based on that model. The Fifth Third formula takes into account consumer behavior, specifically acknowledging that consumers who use overdrafts frequently are well aware of the practice, accept and expect the charges, and the banks should not be penalized for such charges. The difference in methodologies between the *Swift* experts and *Thomas/Lawson* experts leads to different potential damages exposures. Both have been approved by federal courts.

20.

I understood that counsel for Mr. Thomas and Mr. Lawson had engaged the services of the expert relied upon by Judge Dow in approving the Fifth Third Settlement, that the expert had examined certain data provided by BancorpSouth, and that the expert had concluded that the proper "resequencing" damages figure was in the range of $17 million. I understood that the expert's analysis was relied upon by counsel for Thomas and Lawson as the parties' counsel exchanged settlement offers and demands on January 16.

21.

The January 16, 2012 mediation concluded with an agreement in principle on monetary terms but with numerous other aspects of the proposed settlement remaining to be negotiated. I believed that reaching a final settlement agreement was more likely than not but still subject to significant negotiations.

22.

In January, 2012, before the mediation session, I asked Mr. Holley to communicate with Epiq regarding potential class notification issues. I did not handle this communication myself because I planned to be out of the country at the time I anticipated that class notice would need to be provided if a final agreement could be reached.

23.

BancorpSouth reached an agreement with Thomas and Lawson on most, but not all, settlement terms by late February 2012. A complaint was filed in the Western District of Arkansas on February 28, 2012. The settlement agreement was finalized and signed on February 29, 2012. Documents requesting a hearing related to that settlement and supporting that settlement were publically filed in the *Thomas/Lawson* action in March 2012.

24.

Any suggestion that the settlement reached in the Arkansas case is unfair is incorrect for several reasons. First, it was the product of arms-length negotiation. Second, the settlement was the product of two full days of mediation with recognized expert mediators, both of whom submitted affidavits in this action confirming that there was no collusion involved in the settlement and the negotiations were at arms-length. Third, the settlement is based on an accepted formula that has been used in previous cases addressing the same legal theories.

25.

No effort was made to hide the *Thomas/Lawson* action. It was filed publically and available on PACER. Indeed, any lawyer who had an alert system keyed to the word "BancorpSouth" would have been informed of the lawsuit immediately.

26.

Because we determined that there was no obligation to notify the JPML of a federal lawsuit for purposes of transfer to MDL 2036, and because no cases had been transferred by the JPML to MDL 2036 since months before the October 2011 JPML orders, I believed in good faith that there was no obligation to notify the JPML or opposing counsel in *Swift* of the publically filed *Thomas/Lawson* lawsuit.

27.

I also was aware that no Rule 3.8 notices had been filed in MDL 2036 when the Western District of Arkansas lawsuit was filed. At that time, there were more than 100 overdraft cases that were filed outside of MDL 2036 and were either (i) the subject of CTOs that were ultimately transferred to MDL 2036 or (ii) arose outside of MDL 2036 and resolved outside of MDL 2036 that involved parties represented by plaintiffs' counsel in the MDL. Significantly, neither the

9

PEC nor any defendant's counsel ever filed a Rule 3.8 notice identifying *any* of these cases. Nor was the failure to do so ever identified as improper in any of these cases. While I acknowledge that "two wrongs do not make a right," this indicated to me that every lawyer involved in the MDL shared my analysis. I believed this validated my conclusion that no Rule 3.8 notice was applicable in MDL 2036 and underscored my good faith and reasonable interpretation of Rule 3.8.

28.

I was present at the hearing conducted by Judge Dawson on March 26, 2012 to address the unopposed motion to preliminarily approve the *Thomas/Lawson* settlement and certify a settlement class. As the hearing was publicly requested and disclosed on the federal court docket system (PACER), I did not know who would appear at the hearing other than counsel for BancorpSouth and counsel for Messrs. Thomas and Lawson. Based on the PEC's opposition to the Fifth Third and National City settlements, I expected that the PEC would file similar objections and that those objections would be resolved by Judge Dawson in the ordinary course. Just prior to the hearing Judge Dawson welcomed all counsel present in his chambers and, among other things, explained that he had fully reviewed all of the voluminous materials presented to him regarding the proposed settlement. Before the hearing, I filed numerous documents identifying and describing MDL 2036 and included discussions of MDL 2036 in BancorpSouth's Bench Memorandum in Support of Settlement Agreement (DE # 2605-14). Specifically, I informed the Court that the *Swift* action challenged similar BancorpSouth practices, informed the Court of the length of time *Swift* had been pending, informed the Court that class certification in *Swift* was fully briefed and that no hearing on the class issue had been set, and I presented the specific scheduling orders entered in the MDL to Judge Dawson. During

the hearing I, along with co-counsel Mr. Holley, discussed the existence of the MDL, and shared with Judge Dawson our conclusion that the JPML had ceased transferring cases to MDL 2036 and our opinion that the case would remain in the Western District of Arkansas. Neither Mr. Holley nor I withheld any information regarding this case or MDL 2036 when making representations to Judge Dawson. I believe that every statement made by us to Judge Dawson was true and accurate to the best of my knowledge at the time.

29.

Mr. Holley and I returned from the March 26, 2012 Arkansas hearing very late. On March 27, 2012, we participated in a conversation with Mr. Ostrow, an attorney representing Plaintiff Swift. My recollection of that call is set forth in the declaration submitted to the Court on April 2, 2012 (DE # 2605-1).

30.

The settlement agreement between BancorpSouth and Messrs. Thomas and Lawson and the preliminary order entered by Judge Dawson charged plaintiffs' counsel with the responsibility for ensuring that timely notice was made. While I reviewed certain notice documents for accuracy, I abided by Judge Dawson's order and deferred to counsel for Mr. Lawson and Mr. Thomas on other matters related to notice, including but not limited to timing of notice.

31.

For those matters in which I participated regarding the *Thomas/Lawson* settlement, I did not take any action with the intention of disrespecting this Court, this Court's jurisdiction or Plaintiff's counsel. Furthermore, I am unaware of any action taken by any attorney representing

11

BancorpSouth that taken in bad faith or in an attempt to disrespect this Court or this Court's jurisdiction or Plaintiff's counsel.

Executed this 5th day of October, 2012 in Atlanta, Georgia.

_____
Eric Jon Taylor