# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:09-MD-02036-JLK

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

THIS DOCUMENT RELATES TO:
FOURTH TRANCHE ACTIONS

*Swift v. BancorpSouth, Inc.*
N.D. FL, C.A. No. 1:10-00090-SPM-AK
S.D. Fla. Case No. 1:10-cv-23872-JLK

## PROFFER OF TESTIMONY FOR ATTORNEY JEFFREY M. OSTROW

Pursuant to the parties' Joint Stipulation and Order Regarding Disclosures in Advance of Hearing on Plaintiff's Motion for Sanctions [D.E. #2961], the following is a proffer of what Jeffrey M. Ostrow would testify to if called as a witness at the November 14, 2012 hearing on the Motion for Sanctions:

### Professional Background

1.  I am the founder and Managing Partner of Kopelowitz Ostrow P.A., a 38-attorney law firm with offices in Miami, Fort Lauderdale, and Boca Raton. In addition to overseeing the day-to-day operations and strategic direction of the firm, I also maintain a full-time law practice in the areas of consumer class actions and complex commercial litigation. I am AV Preeminent rated by Martindale-Hubbell. Before practicing law, I received a Bachelors of Science in

Business Administration from the University of Florida and a Juris Doctorate from Nova Southeastern University.

2. I am a member of The Florida Bar and fully admitted to practice in the United States District Courts for the Southern, Middle, and Northern Districts of Florida, Northern District of Illinois, Eastern District of Michigan, Western District of Wisconsin, and the U.S. Court of Appeals for the Eleventh Circuit. Additionally, I have been admitted to practice for various cases in other federal district courts throughout the country, including those in the Northern District of California, Western District of Missouri, Western District of Oklahoma, Western District of Kentucky, Northern District of Illinois, and Northern District of Georgia, and in state court actions in California, Hawaii, Indiana, Illinois, Michigan, New York, Massachusetts, and Tennessee.

3. I have been recognized as one of *Florida's Legal Elite Attorneys*, a finalist for the *South Florida Business Journal's Key Partners Award*, and named one of the top lawyers in Florida for several years running by *Super Lawyers*. When not practicing law, I serve on the Board of Governors of Nova Southeastern University's Wayne Huizenga School of Business, am a Member of the Broward County Courthouse Advisory Task Force, and the Managing Member of One West Las Olas LLC, a commercial real estate development company.

4. In addition to *Swift v. Bancorpsouth*, I am also currently Class Counsel for many bank overdraft fee cases around the country, including the following pending in this MDL: a) Associated Bank; b) Bank of Oklahoma; c) Bank of the West; d) Citizens Bank; e) Commerce Bank; f) Great Western Bank; g) Harris Bank; h) M & I Bank; i) RBC Bank; and j) Susquehanna Bank; and.

5.     I have never been sanctioned by any court and have never been denied admission into any federal or state courts.

### *Swift v. BancorpSouth* Relevant Procedural Background

6.     I filed the *Swift v. BancorpSouth Bank* ("*Swift*") action on May 19, 2010 in the Northern District of Florida. The case has been litigated before this Court since it was transferred to MDL 2036 on October 20, 2010.

7.     This case has been continuously litigated for the past 24 months. BancorpSouth filed multiple motions, including a motion to vacate the Judicial Panel on Multidistrict Litigation's Conditional Transfer Order, multiple motions to dismiss, including a motion for lack of subject matter based upon *Cappuccitti v. Direct TV*, No. 09-14107 (11th Cir. October 15, 2010), and, among other court filings. BancorpSouth has also taken and defended depositions, answered written discovery, produced over 100,000 pages of documents, opposed Plaintiff's motion for class certification and moved to strike the declaration of Plaintiff's expert. The Court granted the motion for class certification on May 4, 2012 and denied Bancorpsouth's motion to strike Plaintiff's expert.

8.     My law firm and the other plaintiffs' firms working on this case have collectively devoted thousands of hours of time, and incurring over $100,000.00 in litigation costs, to the prosecution of this case.

9.     On March 27, 2012, at approximately 3:00 p.m. EDT, BancorpSouth's counsel, Eric J. Taylor and William J. Holley, called me to advise that they had negotiated a class action settlement in a case pending in the Western District of Arkansas that purportedly subsumed the claims asserted on behalf of the proposed class in *Swift*.

3

10. Messrs. Taylor and Holley further advised that, on March 26, 2012, the settlement had been preliminarily approved by the Honorable Robert T. Dawson in the Western District of Arkansas, in *Thomas, et al. v. Bancorpsouth Bank, et al.*, Case No. 1:12-cv-1016-RTD ("*Thomas*").

11. Messrs. Taylor and Holley further advised that they would be filing a Motion to Stay with this Court pending final approval of the *Thomas* settlement.

12. In response, I requested that they provide copies of the settlement documents and preliminary approval papers filed in *Thomas*. Mr. Holley declined, responding that "they are in the public record."

13. Prior to this March 27 call, Plaintiff's counsel were unaware of any other overdraft-fee-related class action suits pending against BancorpSouth, and had no reason to suspect that any such suits existed.

14. Moreover, just two days earlier, on March 25, 2012, in e-mail communications concerning ongoing discovery matters, BancorpSouth's counsel failed to disclose any other pending litigation, let alone a settlement, and instead requested to schedule certain depositions in this case for late April 2012, because of purported scheduling conflicts. BancorpSouth's counsel indicated that he wanted to delay the depositions in order to focus attention on preparing and filing a reply in support of a *Daubert* motion challenging Plaintiff's expert.

15. Following the filing of BancorpSouth's Motion to Stay, my review of PACER and Arkansas public records revealed that on August 2, 2011 – nearly 18 months after *Swift* was filed – one of the named plaintiffs in *Thomas*, Billy Lawson, Jr., filed a state court action in Arkansas state court styled *Billy D. Lawson, Jr. v. Bancorpsouth, Inc., et al.*; Case No.: CV-11-426I (21st Judicial District, Crawford County, Ark.) ("*Lawson*"), alleging nearly identical claims

4

to those asserted in *Swift*. On September 9, 2011 – approximately six months before the *Thomas* settlement was preliminarily approved – *Lawson* was voluntarily dismissed.

16. In *Swift*, on May 23, 2011, Plaintiff propounded discovery on BancorpSouth, including a Request for Production of Documents, Interrogatories, and Request for Admissions. Request for Production No. 60 asked BancorpSouth to: "Produce all documents by any party or non-party in any other litigation (outside of this multi-district litigation) brought by any current or former customer(s) challenging your overdraft fee policies and/or practices" ("RFP 60"). On June 27, 2011, in its response, BancorpSouth denied the existence of any such litigation. Thereafter, pursuant to Federal Rules of Civil Procedure 26(e), BancorpSouth had a continuing obligation to supplement its responses to all discovery, including its response to RFP 60. Nevertheless, until the telephone call informing me of the *Thomas* preliminary approval, BancorpSouth never told me, or any other lawyer working on this case, of the existence of *Lawson*, or that it had been filed in state court, voluntarily dismissed, and then re-filed as *Thomas* in the Western District of Arkansas.

17. Beginning in January 2012, when BancorpSouth was supposed to be reviewing documents and sending rolling productions of documents to Plaintiff's counsel for review, BancorpSouth's counsel represented to Plaintiff's counsel that it was becoming too expensive for Bancorpsouth to have its counsel review the documents prior to production. Bancorpsouth's counsel asked Plaintiff's counsel to first review documents on a shared electronic database and tag the documents of interest, after which BancorpSouth's counsel would then review those documents in order to determine whether they should be produced. As an accommodation to BancorpSouth and its counsel, and because BancorpSouth's prior delays in delivering documents were compromising Plaintiff's ability to properly and timely prepare its Motion for Class

5

Certification, Plaintiff's counsel dedicated several coders for many weeks, spending hundreds of hours and tens of thousands of dollars to review BancorpSouth's documents.

18. Based on the foregoing, I believe that BancorpSouth intentionally concealed the existence of *Lawson* and *Thomas* from the Court and Plaintiff's Counsel in this Case, delayed discovery in *Swift*, and shifted the financial burden of this litigation onto the Plaintiff and Plaintiff' counsel so that it could settle the *Thomas* action without having to incur any further expenses in *Swift*. Further the *Thomas* class definition was purposely structured to exclude Plaintiff Shane Swift so that he would not have standing to oppose the settlement.

19. On March 29, 2012, at 2:30pm EDT, I, along with Robert C. Gilbert, met and conferred by telephone with Messrs. Taylor and Holley, in connection with our response to Bancorpsouth's Motion to Stay and the intended filing of the Emergency Motion to Enjoin Copycat Case Under the All Writs Act ("Motion to Enjoin"), which we immediately began drafting on March 27 due to the exigent circumstances created by the preliminary settlement approval in *Thomas*. During the conference, Mr. Gilbert specifically asked Messrs. Taylor and Holley three things: (1) whether they would tell us anything about the background and provide details surrounding the negotiation of the *Thomas* settlement; (2) whether they would agree to transfer *Thomas* to this Court for further proceedings; and (3) whether they would agree to enjoin any further prosecution of *Thomas* in the Western District of Arkansas. In response, Mr. Gilbert and I were told that they would not share any details in connection with the settlement, other than what was filed in the Western District of Arkansas and in this Court; that they would not agree and in fact would oppose transfer of *Thomas* to this Court on the grounds that the court in Arkansas has jurisdiction; and that they would not agree to enjoin further proceedings of *Thomas*

6

in the Western District of Arkansas, and would oppose a motion on the grounds this Court has no jurisdiction to do so.

20. Having received no agreement from BancorpSouth to the aforementioned relief, the Motion to Enjoin was filed on March 29, 2011. [DE #2603]. I supplied two declarations in support of the Motion to Enjoin, the substance of which are discussed in this proffer. [DE # 2603-1, 2626-2].[1]

21. In his Declaration in support of BancorpSouth's opposition to the Motion to Enjoin [DE #2605-1], Mr. Taylor states that during the brief (less than five minutes) March 29, 2012 conference call with Mr. Gilbert and me, he "explained that the Western District of Arkansas was a better location for a significant percentage of BancorpSouth's customers while BancorpSouth had no branches in Miami and only two branches in northern Florida," and that that "because the JPML was not transferring cases to MDL 2036," this Court "would not have jurisdiction." (Taylor Decl. ¶ 9). Mr. Taylor never made the detailed statements above during our March 29, 2012 conference call. Rather, in a conclusory fashion, he stated that this Court would not have jurisdiction over *Thomas*.

22. Similarly in his declaration in support of BancorpSouth's opposition to the Motion to Enjoin [DE # 2605-2], Mr. Holley repeats the substance of the statement attributed to Mr. Taylor in paragraph 21 above. (Holley Decl. ¶ 5). As indicated above, Mr. Taylor never made those detailed statements attributed to him during our brief conference call on March 29, 2012.

---

[1] My Supplemental Declaration [DE #2626-2] was filed under seal to avoid placing the substance of settlement negotiations in the public record.

7

## Settlement Discussions in *Swift*

23. Mr. Taylor acknowledges that the *Lawson* Arkansas state court case was filed against BancorpSouth in August 2011 and voluntarily dismissed on September 9, 2011 "in order to pursue settlement discussions with BancorpSouth" and "[t]hereafter, counsel for Lawson and BancorpSouth began confidential negotiations regarding the possibility of resolving class overdraft claims against BancorpSouth." (Taylor Decl. ¶¶ 14-15). Mr. Taylor goes on to describe the six (6) month chronology of those settlement negotiations, including a November 29, 2011 initial mediation, a January 16, 2012 second mediation, and subsequent settlement negotiations that culminated in the signing of the *undated* settlement agreement and immediate filing of an "amended complaint" in the Western District of Arkansas on February 29, 2012. (Taylor Decl. ¶¶ 16-17).[2]

24. Mr. Taylor's declaration fails to disclose that he and his colleagues engaged in ongoing confidential settlement discussions with us in *Swift* in MDL 2036 – not to mention actively litigating *Swift* before this Court – for most of the six (6) month period during which he was secretly engaged in settlement negotiations in Arkansas involving claims raised in a state court lawsuit that had been voluntarily dismissed.

25. Mr. Taylor states "[w]hile I had "preliminary settlement discussions with Swift's counsel, Swift never made a settlement demand. The only settlement negotiations I have conducted on behalf of Bancorpsouth were with Plaintiff's counsel in the *Thomas* and *Lawson* matters. No other settlement negotiations took place with any other party." (Taylor Decl. ¶ 19).

---

[2] Mr. Taylor's inaccurately states that the Settlement Agreement was executed on February 29, 2012 and, thereafter, an *amended* complaint was filed in *Thomas*. (Taylor Decl. ¶ 17). In actuality, *Thomas* was filed on February 28, 2012. [DE # 2605-3]. Only one complaint was filed in *Thomas*. *Id.*

26. Mr. Taylor's above-quoted statements are misleading at best, if not altogether false. As detailed below, between July 2011 and December 2011, counsel in *Swift* engaged in a series of confidential settlement communications, including a lengthy and costly damage analysis process, with the stated goal of participating in mediation aimed at resolving the claims being prosecuted in *Swift* in MDL 2036.

27. I began exploring the prospect of settlement with BancorpSouth in October 2010, when I sent Mr. Taylor a letter outlining the general framework for pursuing settlement discussions. *See* Exhibit A. Approximately nine (9) months elapsed before Mr. Taylor advised that he was in a position to further discuss settlement by furnishing sample transactional level customer data.

28. In early July 2011, Mr. Talyor and I began to seriously discuss the subject of settlement. During the initial conversation, I advised Mr. Taylor and his colleague, Darren E. Gaynor, that the first step in the settlement process would be for BancorpSouth to provide us with sample transactional level customer data so that our expert, Arthur Olsen, could analyze the scope of BancorpSouth's actual damage exposure for the overdraft fee claims being litigated in MDL 2036.

29. On July 15, 2011, Mr. Gaynor sent me an email designated as "Confidential Settlement Communications," soliciting information and documentation relating to other bank settlements, both inside and outside of MDL 2036, as well as the list of information and data we needed so that Mr. Olsen could perform his damages analysis. *See* Exhibit B. I provided the requested information to Mr. Gaynor on July 18, 2011.

30. On July 19, 2011, Mr. Taylor sent me a lengthy email asking for additional information and documentation surrounding some of the settlements referenced in the materials I

9

previously provided. In that email, Mr. Taylor closed by saying: "Finally, thank you for your offer to talk settlement soon. I am on vacation next week, but am anxious for us to continue our discussions." *See* Exhibit C. The very same day, I provided more documentation in connection with a couple of settlements, as requested by Mr. Taylor. *Id*. Between July 19, 2011 and July 22, 2011, I exchanged further emails with Mr. Taylor concerning settlements in other bank overdraft fee cases, as well as BancorpSouth determining what data could be supplied for settlement analysis. *See* Exhibit D.

31. On August 18, 2011, in another "Privileged and Confidential Settlement Communication," Mr. Taylor sent me an email transmitting a chart showing Bancorpsouth's NSF/OD revenue from 2007 – 2010. *See* Exhibit E. The accompanying chart, also designated as "Privileged and Confidential – Communicated for Settlement Negotiations Only, pursuant to Fed. R. Evid. 408," reflected that BancorpSouth's aggregate net overdraft/NSF revenues generated by debit card transactions and overdrafts were $62.4 million for 2007, $61.9 million for 2008, $57.5 million for 2009 and $27.8 million for the first half of 2010. *Id*.

32. Also on August 18, 2011, I emailed Mr. Taylor a bank settlement chart outlining the settlements announced to date, which included the settlement amounts and the percentage of those settlement amounts compared to each of the settling bank's exposure. The chart was sent to Mr. Taylor so that BancorpSouth would have an idea of the anticipated range of settlement percentage expected if the *Swift* case were to settle. *See* Exhibit F.

33. At the time of our August 18, 2011 settlement communications, Mr. Taylor did not disclose that he was aware of the existence of the *Lawson* Arkansas state court case as of August 15, 2011. (Taylor Decl. ¶ 14). Nor did Mr. Taylor disclose, on August 18 or at any time thereafter, that the *Lawson* state court case was voluntarily dismissed in early September 2011

"in order to pursue settlement discussions" and that shortly thereafter, "counsel for BancorpSouth began confidential negotiations regarding the possibility of resolving class overdraft claims against BancorpSouth." (Taylor Decl. ¶ 15).

34. On September 26, 2011, Mr. Gaynor sent me an email advising of the status of BancorpSouth's delivery of the "data for settlement evaluation," indicating that the agreed upon sample transactional data for purposes of settlement evaluation should be in my hands "within a couple of days." *See* Exhibit G.

35. On September 30, 2011, in furtherance of our ongoing settlement discussions, Mr. Gaynor sent me an email attaching an excel spreadsheet breaking down, on a monthly basis, BancorpSouth's overdraft fee/NSF revenues for the period 2007 – 2010, and confirming that additional transactional data would be delivered within the next week. Mr. Gaynor concluded: "As we discussed this week, at that point we will have produced all the settlement-related information you requested . . ." *See* Exhibit H.

36. On October 11, 2011, Mr. Gaynor sent me an email responsive to my October 10, 2011 email providing feedback as to the data that BancorpSouth could and could not produce for settlement analysis. *See* Exhibit I.

37. On October 13, 2011, BancorpSouth's counsel delivered detailed transactional data for approximately 400,000 accounts, for three months (one month in 2007, 2008 and 2009). The letter from Mr. Gaynor stated: "This information is communicated for settlement negotiations only, and thus is inadmissible pursuant to Federal Rule of Evidence 408." *See* Exhibit J.

38. Over the next few weeks, our expert Art Olsen spent a significant amount of time reviewing and analyzing the settlement data provided by BancorpSouth.

39. On November 1, 2011, I emailed BancorpSouth's counsel a list of several questions that Mr. Olsen had regarding the format of the data and the codes utilized for each transaction. *See* Exhibit K. BancorpSouth's counsel responded two days later. *See* Exhibit L.

40. On November 17, 2011, Bancorpsouth delivered additional transactional data for 2007, 2008 and 2009 sample months. Once again, Mr. Gaynor's letter reiterated that: "This information is communicated for settlement negotiations only, and thus is inadmissible pursuant to Federal Rule of Evidence 408." *See* Exhibit M.

41. On December 2 and 5, 2011 additional "privileged and confidential" settlement communications were exchanged with BancorpSouth's counsel. In my December 2nd email to Mr. Taylor, I indicated that once BancorpSouth gave us certain remaining data, "we will be in a position to share damage figures with you and begin discussing the possible resolution of this case." *See* Exhibit N. With his December 5th email, Mr. Gaynor attached a chart reflecting BancorpSouth's gross and net overdraft fee revenues for the years 2004 – 2010. The chart was also designated "Privileged and Confidential – Communicated for Settlement Negotiations Only, Pursuant to Fed. R. Evid. 408." *See* Exhibit O.

42. On December 6, 2011, I telephoned Mr. Taylor to advise him that our expert Mr. Olsen had completed the damage analysis based on the sample transactional data provided by BancorpSouth. I advised Mr. Taylor that we were prepared to discuss the damage figures, and to schedule a formal mediation. In response to his request, I advised Mr. Taylor that our expert concluded that the class' damages were in excess of $42 million. I explained that, based upon proposed settlements reached with a number of other banks as of that time, the $42 million damages would represent the foundation for our participation in a formal mediation to settle the class' claims in *Swift*. In response, Mr. Taylor stated that "the case would not settle and will go

to trial." I then asked Mr. Taylor to convey our damage analysis to BancorpSouth. Later that day, I emailed Mr. Gilbert to confirm the substance of my conversation with Mr. Taylor. *See* Exhibit P.

43. I do not believe I had any further settlement-related discussions or communications with Mr. Taylor after December 6. Instead, we focused our attention thereafter on moving for class certification in *Swift* in accord with the deadlines established by the Court.

44. Although I and my colleagues had numerous communications, via telephone and email, with Messrs. Taylor and Gaynor between early December 2011 and late March 2012 relating to the ongoing class certification briefing and discovery matters in general, at no time during this period did Mr. Taylor or Mr. Gaynor disclose that they were engaged in ongoing mediation proceedings in Arkansas in an effort to settle the overdraft fee claims being prosecuted in *Swift* with other parties to a then non-pending lawsuit.

45. In retrospect, it appears that Mr. Taylor and his colleagues purpose for engaging in the above-described confidential settlement communications with me, while simultaneously engaging in undisclosed settlement negotiations with counsel for the *Lawson/Thomas* parties, was to find the "lowest bidder" with whom to settle the claims being litigated in *Swift*, and when it became apparent that BancorpSouth would face much greater exposure in *Swift* than elsewhere, Mr. Taylor and his client covertly concluded a settlement in *Thomas* for a fraction of the class' true damages.

46. In his Supplemental and Corrected Declaration [DE #2635-1], Mr. Taylor denies participating in any settlement negotiations. However, he fails to acknowledge that the specific and only purpose for BancorpSouth supplying the extensive settlement data that was analyzed by Mr. Olsen was to facilitate settlement discussions in *Swift*, which the bank apparently had no

13

intent to pursue despite indicating a clear intent to embark on settlement negotiations as of July 2011. The $42 Million damages figure was conveyed to Mr. Taylor to move the settlement discussions to the next phase of negotiations, including mediation. However, he and his client knew that the plaintiff in *Lawson* and his counsel had committed to a ceiling of $5 Million combined for damages, attorneys' fees, and costs to avoid the Class Action Fairness Act threshold. [DE #2605-25].

Executed on this 5th day of October, 2012 in Fort Lauderdale, Florida.

_____
Jeffrey M. Ostrow