**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

FILED by _I/AX_ D.C.

NOV 15 2012

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

| | |
|---|---|
| In re: Checking Account Overdraft Litigation ) | 1:09-MD-02036-JLK |
| ) | |
| <u>MDL No. 2036</u> ) | |
| ) | |
| **THIS DOCUMENT RELATES TO:** ) | |
| **FIRST TRANCHE ACTIONS** ) | |
| ) | |
| *Lopez v. JPMorgan Chase Bank, N.A.* ) | |
| S.D. Fla. Case No. 1:09-cv-23127-JLK ) | |
| ) | |
| *Luquetta v. JPMorgan Chase Bank, N.A.* ) | |
| S.D. Fla. Case No. 1:09-cv-23432-JLK ) | |
| C.D. Cal. Case No. 2:09-cv-06967-GHK ) | |

<u>**OBJECTIONS OF HUGH RAMSEY, ROBERT D. FONTENOT, JAMEY AND
KELLI DELONEY AND CAROLYN A. MCLEMORE AND NOTICE OF
INTENTION TO APPEAR**</u>

NOW COME Class Members Hugh Ramsey, 1809 Haver St., Houston, Texas
77006, Chase Account # 813909791265; and Robert D. Fontenot, 7625 Washington
Blvd., Beaumont, Texas 77707, Chase Account #1822337349; Jamey and Kelli Deloney,
25530 Saddlebrook Village, Tomball, Texas 77375, Chase Account #1595600527;
Carolyn A. McLemore, #47 W. Bellmeade Place, The Woodlands, Texas 77382, Chase
Account #1587379734; and object to the proposed settlement of this class action and the
request for attorney's fees.

Objector, Hugh Ramsey, had a Chase consumer checking account that he could
access with his Chase debit card from May 30, 2003 through January 27, 2010.    Mr.
Ramsey periodically incurred overdraft charges from approximately June 2003 through
January 2010. Mr. Ramsey received individual notice of the settlement in the mail.  Mr.

Ramsey has read this objection filed on his behalf and indicated his endorsement and adoption of this objection by his signature.

Objector, Robert D. Fontenot, had a Chase consumer checking account that he could access with his Chase debit card between June 1, 2003 and March 29, 2010.   Mr. Fontenot periodically incurred overdraft charges from approximately June 1, 2003 through March 29, 2010.  Mr. Fontenot believes that he received an individual notice of the settlement in the mail.  Mr. Fontenot has read this objection filed on his behalf and indicated his endorsement and adoption of this objection by his signature.

Objector, Jamey and Kelli Deloney, had a Chase consumer checking account that they could access with their Chase debit card from January 2005 to April 2010.   Mr. & Mrs. Deloney periodically incurred overdraft charges from approximately January 2005 through April 2010.  Mr. & Mrs. Deloney believe they received an individual notice of the settlement in the mail.  Mr. & Mrs. Deloney have read this objection filed on their behalf and indicated their endorsement and adoption of this objection by Mrs. Deloney's signature.

Objector, Carolyn A. McLemore, had a Chase consumer checking account that she could access with her Chase debit card from June 1, 2003 and March 29, 2010.  Ms. McLemore periodically incurred overdraft charges from approximately June 1, 2003 through March 29, 2010.  Ms. McLemore received individual notice of the settlement in the mail.  Ms. McLemore has read this objection filed on her behalf and indicated her endorsement and adoption of this objection by her signature.

I.      **The Subclass of Consumers Who Must File Claim Forms Requires Separate Representation and a Higher Recovery.**

There is an absence of the unity of interests necessary for certification of a unitary settlement class. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999).

In *In re: Literary Works in Electronic Databases Copyright Litig.*, 2011 U.S. App. LEXIS 17026 (2nd Cir. Aug. 17, 2011), the Second Circuit applied the *Ortiz* holding to a proposed settlement that disfavored a particular subclass, and clarified that the mere fact that the lead plaintiffs happened to be members of the disfavored subclass does not overcome the fact that no one was advocating for the interests of the subclass alone. *Id.* at *23.

The United States Court of Appeals for the Third Circuit rejected a similar settlement in *Dewey v. Volkswagen AG*, 681 F.3d 170 (3rd Cir. 2012).  In that case, the settlement created an $8 million reimbursement fund that was available only to certain subgroups of the class, while the rest of the class members could only file claims against any residual funds.   The Third Circuit rejected the settlement for inadequate representation of the disfavored subgroup.

> The structure of the settlement agreement itself, which divides a single class into two groups of plaintiffs that receive different benefits, supports the inference that the representative plaintiffs are inadequate.   The reimbursement group has priority access to the $8 million fund.
> ...
> Every plaintiff in the class had an incentive to maximize the number of plaintiffs in the residual group, while ensuring that they themselves were in the reimbursement group. ... Doing so would create the least amount of competition for the first round of reimbursement claims, and would thus give class members in the reimbursement group the best chance at having their claims satisfied in full.

*Id.* at 187-188.

Here, the Plaintiffs in the Automatic Payment subclasses have an incentive to maximize the amount available to satisfy their claims. Therefore, rather than providing for an automatic payment of some amount to the 2003-2004 subclass, perhaps the average amount of overdraft fees per account for the years 2003-2004, the Plaintiffs in the Automatic Payment group have agreed to a settlement structure that is guaranteed to provide almost no compensation to the 2003-2004 subclass.[1] Almost no class member will have credit card records dating back nine or ten years that would permit them to file a claim against the settlement fund. The claim form requirement will have the practical effect of providing the 2003-2004 subclass no compensation from the settlement fund, and no consideration for the release of their claims.

The Plaintiffs had alternatives to the meaningless claim form provision for the 2003-2004 subclass. For instance, they could have agreed to set aside a portion of the settlement fund for the benefit of those class members who would not receive automatic payments. They could have estimated the amount of overdraft charges in 2003 and 2004 by extrapolating from the known data in later years, as was done in the Bank of America settlement. Moreover, they could have paid this portion of the fund to persons who had accounts in 2003 and 2004 by simply making a *pro rata* distribution of the average amount of overdraft charges per account during that time period. This would result in each class member from that time period receiving *some* consideration for the release of their claims, albeit not in direct proportion the exact amount of their damages. Such a distribution, while imperfect, is far preferable to a forfeiture of all compensation by this subclass. Amounts that should rightfully be paid to the 2003-2004 subclass will

---

[1] These same arguments apply with respect to the October 2, 2006 to March 31, 2007 BoNY subclass.

instead be transferred to class members who had accounts from 2005-2010, thus subsidizing the recoveries of the favored subclass.  This is improper.

Regardless of what impact a re-allocation of the settlement to comport with *Ortiz* would have on any individual class member, the proposed settlement must be rejected for failing to adequately represent and compensate class members whose overdrafts occurred in 2003 and 2004.

The Court should reject the proposed settlement and decertify the settlement class for failing to adequately represent the 2003-2004 subclass.

**II.     The Entire Settlement Fund Should Be Paid To Class Members; If There Is *Cy Pres*, Potential *Cy Pres* Recipients Must Be Identified Now, Not Later.**

The proposed settlement provides that any money remaining after claims are made will be distributed to nonprofit organizations, without identifying what those organizations will be.  This is a violation of the law of several federal circuits.

First of all, there should be no *cy pres* payments whatsoever in this case.  It is undisputed that the amount of the settlement -- $110 million – is less than the total amount of class members' damages.  In these circumstances, the entire settlement fund must be distributed to class members if that is at all possible.  *See Klier v. Elf Atochem N.A., Inc.*, 658 F.3d 468 (5th Cir. 2011).

> We begin our analysis with a return to basic principles.  As we will explain, these core principles control and decide this appeal.... These precepts define the first – and often the last – arena of analysis, imposing foundational limitations on a district court's discretion as it administers a class-action settlement.  Because the settlement funds are the property of the class, a cy pres distribution to a third party of unclaimed settlement funds is permissible "only when it is not feasible to make further distributions to class members."  Where it is still logistically feasible and economically viable to make additional pro rata distributions to class members, the district court should do so, except where an additional class distribution would provide a windfall to class members with liquidated-

damages claims that were 100 percent satisfied by the initial distribution. A cy pres distribution puts settlement funds to their next-best use by providing an indirect benefit to the class.  That option arises only if it is not possible to put those funds to their very best use: benefitting the class members directly.

*Id.* at 474-475.

As the Fifth Circuit held, there are "foundational limitations" on this Court's discretion to order payments to *cy pres* organizations.  Indeed, the Court has no power to approve any *cy pres* payments until each and every class member has received 100 percent of his or her liquidated damages.  Clearly, the $110 million settlement amount does not represent 100% of all class members' liquidated damages as alleged in the numerous complaints that were filed.  According to paragraph 23 of the Settlement Agreement, Chase's revenues from the high-to-low overdraft posting policy generated revenues of between $127 million and $250 million per year.  Thus, the $110 million settlement amount does not even represent one year of class members' liquidated damages, let alone 100% of single damages unenhanced by any statutory penalties. Therefore, it is clearly feasible to increase the amounts that will be paid to each class member five or six-fold without creating a windfall.

Most significantly, there is little doubt that Chase's high-to-low overdraft policy generated revenues of at least $250 million during 2003 and 2004, according to paragraph 23 of the Settlement Agreement.  This means that class members who were charged overdraft fees in 2003 and 2004 are entitled to at least $31 million, or approximately 28% of the settlement amount, while the current settlement would provide them nothing, with the exception of the handful of class members who may have retained their credit card statements from nine or ten years ago.

6

In order to comply with *Klier*, and thus the ALI Principles, the settlement must be amended to provide some compensation to the 2003-2004 subclass.  Since the settlement covers 7 years, the 2003-2004 subclass represents approximately 28% of the entire class damages.  Therefore, 28% of the net settlement fund should be segregated for 2003-2004 class members, and that amount should be distributed *pro rata* to all identified 2003-2004 account holders.  While this may slightly overcompensate some class members who had no overdraft charges, it will guarantee *some compensation* to every class member who experienced an overdraft charge during 2003 and 2004.

As demonstrated above, there should be no *cy pres* payments in this case, in which the settlement amount is less than one-seventh of the class' damages.  However, to the extent that a *cy pres* provision remains part of the settlement, it is reversible error for the parties to leave the identities of the potential *cy pres* recipients unidentified at the time of settlement approval.  This is not a mere trivial detail to be filled in later.  *See Dennis v. Kellogg Co.*, 687 F.3d 1149 (9th Cir. 2012).

The facts in *Dennis* were identical to this case, in that the settlement provided that the charities would be identified later and approved by the court.  Despite these contingencies, the Ninth Circuit still rejected the settlement as insufficiently definite.

> Our concerns are not placated by the settlement provision that the charities will be identified at a later date and approved by the court – a decision from which the Objectors might again appeal.  Our standards of review governing pre-certification settlement agreements require that we carefully review the entire settlement ... *Cy pres* distributions present a particular danger in this regard.  "When selection of *cy pres* beneficiaries is not tethered to the nature of the lawsuit and the interests of the silent class members, the selection process may answer to the whims and self-interests of the parties, their counsel, or the court." *Nachsin, 663 F.3d at 1039.* This record leaves open the distinct possibility that the asserted $5.5 million value of the *cy pres* award will only be of serendipitous value to the class purportedly protected by the settlement.  The difficulty here is

7

that, by failing to identify the *cy pres* recipients, the parties have restricted our ability to undertake the searching inquiry that our precedent requires. The *cy pres* problem in this case is of the parties' own making, and encouraging multiple costly appeals by punting down the line our review of the settlement agreement is no solution.

*Dennis* at **16-18.

Because the potential *cy pres* recipients are not identified in the Settlement Agreements, there is no assurance that those recipients satisfy the Ninth Circuit requirements that there be a reasonable certainty that class members will benefit from *cy pres*, and that it will be geographically distributed in a way that corresponds to the geographical distribution of the class. Therefore, this Court should reject the Settlements until the potential *cy pres* recipients are identified, and the Court verifies that they meet the criteria set forth in *Nachsin v. AOL, LLC*, 663 F.3d 1034 (9th Cir. 2011).

**III.    Class Counsel's Requested Fees Are Unreasonable for a Megafund Recovery.**

While correctly noting the Eleventh Circuit's expressed preference for the common fund method of awarding attorneys' fees, class counsel grossly overstate the range of percentages awarded in cases of this magnitude. In a case that has lasted just 3 years from filing to settlement, a 30% fee would be unconscionable and inconsistent with the trend toward awarding smaller percentage fees in cases that result in recoveries in the hundreds of millions of dollars. *Cf. Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1189 (S.D. Fla. 2006) (approving 31% fee because case lasted fifteen years, resulted in two trials, and involved extensive appeals including one to the United States Supreme Court).

The average fee award in all cases settling for more than $100 million (so-called "megafund" cases) was 15% in 2003. *See Exhibit A*. As noted above, the trend in recent

years has been to award more modest fees in megafund cases and to avoid windfalls for class counsel. *See e.g.*, *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 57 (2d Cir. 2000). Therefore, the average fee award in cases settling for more than $100 million would likely be even lower in 2011 than it was in 2003.[2]

There is no reason to depart from the benchmark established by megafund cases here. During this case, class counsel was pursuing cases against other First Tranche defendants in addition to Chase. Class counsel has already been awarded $123 million in the Bank of America case, which substantially mitigated any risk they bore in the remaining cases against the other defendants. Accordingly, a 20% fee award to class counsel would appear to be more than adequate in the circumstances of this case, and class counsel has not borne its burden of establishing that it is entitled to anything more to avoid unjust enrichment of the class.

## IV. Class Counsel Is Not Entitled A Fee Equal To 43% of the Cash Settlement Fund.

Class counsel has requested the extraordinary fee of 30% of the $110 million cash settlement fund, *plus the projected value* of Chase's agreement not to charge overdraft fees for transactions of $5 or less for a period of two years, or a total of $162 million. This means that class counsel would take $48.6 million of the $110 million cash fund, or *44% of the cash*, as their fee. Class counsel's fee request was never adequately disclosed to the class members. The notice states only that they would seek 30% of the value of the Settlement, without specifying what that value is, leaving class members with the impression that class counsel would seek "only" 30% of the $110 million fund disclosed

---

[2] The statement in *Camden I Condominium Ass'n v. Dunkle* that the majority of common fund fee awards fall between 20% to 30% of the fund is 20 years out of date, and does not apply to megafund settlements in any event. The fund in *Camden I*, after all, was just $3 million, and the awarded fee was $1 million. The lone citation in *Camden I* for the 20%-30% range was to *Newberg*.

in the notice. Nowhere is the $52 million valuation attached to the injunction mentioned in the notice. Only if the class member downloaded and read Class Counsel's Motion for Attorneys' Fees and Expenses would he or she learn the true dimensions of class counsel's overreaching.

Class counsel make their extraordinary request without seeing fit to provide their lodestar or to calculate a lodestar-multiplier for the requested fee. This is improper, especially in a case where a substantial portion of the requested fee is based upon injunctive relief. *See In re: Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 944-945 (9th Cir. 2011) (courts required to guard against unreasonable fees by cross-checking against second method, regardless of primary method used).

Indeed, district courts in the Eleventh Circuit have routinely employed a lodestar cross-check for guidance in assessing the reasonableness of a percentage fee award. *See In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1336 (S.D. Fla. 2001) (finding that multiplier of 1.45 does not require higher percentage award, in case settled for $110 million); *Pinto v. Princess Cruise Lines Ltd.*, 513 F. Supp. 2d 1334, 1343 (S.D. Fla. 2007) (approving lodestar multiplier of 1.2 in $4.25 million settlement).

The first factor set forth in *Camden I Condominium Ass'n v. Dunkle*, 946 F.2d 768 (11th Cir. 1991), is "the time and labor required." *Id.* at 772. In this Circuit, that factor has been interpreted to mean the number of hours that class counsel spent on the case – in effect, a lodestar cross-check. Class counsel neglect to provide that figure in their Motion for Final Approval, instead providing a summary description of tasks performed and number of documents reviewed.

The amount of class counsel's lodestar is particularly important in this settlement, for the reason that a large portion of the requested fee ($15.6 million) is claimed for work done to secure the injunctive relief known as the "item cushion." Surely, class counsel did not devote $15 million worth of lawyer time to persuading Chase to adopt the "item cushion." Indeed, given the fact that Chase has already abandoned high-to-low posting and adopted a balance cushion two years ago, it was probably more than willing to offer this additional measure of protection to customers with low-value transactions with relatively little arm-twisting.

Class counsel cites the case of *Faught v. American Home Shield Corp.*, 668 F.3d 1233 (11th Cir. 2011) in support of its fee request, but *Faught* in fact ***does not*** support class counsel's fee request here, and indeed makes clear why class counsel's lodestar is highly relevant to a reasonable fee award in this case.

First, *Faught* makes clear that "where the requested fee exceeds 25%, the court is instructed to apply the twelve *Johnson* factors," including, most importantly, the time and labor required. *Id.* at 1242. In *Faught*, in contrast to this settlement, class counsel requested 25% of the monetary compensation received by class members, plus $1.5 million, to be paid separately by the defendant, for the injunctive relief. The Eleventh Circuit found that the defendant's separate payment of the $1.5 million fee for the injunctive relief made the overall fee reasonable.

> First, the $1.5 million did not come from the money set aside for the class; rather, it is a separate lump sum from AHS to class counsel. Second, the district court noted that the $1.5 million was intended to compensate class counsel for additional work performed and value added to the settlement, specifically, the work done in changing AHS's business practices and in establishing a state of the art center to field class member inquiries regarding the settlement. The court calculated the hours and the rates of the attorneys and staff working on the claims and determined that the $1.5

11

million was a very small amount compared to the amount of money invested in the case.

*Id.* at 1243.

In other words, the district court in *Faught* calculated class counsel's lodestar, and determined that the $1.5 million, in addition to being paid separately by the defendant, was actually *less than class counsel's lodestar* spent working on the business changes and the call center. The contrast with this settlement could not be more stark.

Here, the entire fee *will be* deducted from the monetary settlement fund, with the result that class counsel's requested fee will actually consume *44%* of the settlement fund. This is 19 percentage points higher than what the Eleventh Circuit held in *Faught* is reasonable in a class action. The additional injunctive relief, which probably did not even require $1.5 million in legal services to secure, is used to drain another $15.6 million of the class' money from the settlement fund. This is not permissible in the Eleventh Circuit or anywhere else. *Cf.* Class Action Fairness Act of 2005 at §1712(c)(when fee is based on injunctive relief and coupons, the portion of fee for injunctive relief must be "based upon the amount of time class counsel reasonably expended working on the action.").

A basic principle of fee jurisprudence, reflected in CAFA and elsewhere, is that attorneys' fees must be calculated separately for each type of settlement relief, and the fee for each type of relief must be paid from that relief. One cannot raid the monetary portion of a settlement to subsidize the attorneys' fees for an injunctive portion of a settlement. But that is exactly what class counsel is attempting to do here.

The $110 million settlement fund cannot support a fee of more than 20-25% of that fund, or $22 million to $27.5 million. The fee for the injunctive portion of the settlement, if any, must come from some other source. It may not come from the

12

monetary settlement fund, because to do so would result in more than 40% of the fund going to pay fees.

There are additional reasons why class counsel should be required to provide detailed information to satisfy the first factor set forth in *Camden I*, and to enable this Court to perform a lodestar cross-check.  First, this is a megafund settlement, unlike *Camden I* and *Pinto, supra*, and therefore the lodestar will provide critical information to the Court about what percentage is reasonable in the circumstances of this case.  Second, this case settled in 3 years, and therefore one would not expect that class counsel's lodestar would be very high.  Third, class counsel has already been compensated in the amount of $123 million in the Bank of America settlement, which likely exceeded the amount of time that class counsel devoted to the case against that defendant.  It would be improper to permit class counsel to recycle hours claimed in the BofA settlement against non-BofA defendants to justify its fees in this and future settlements.  *See Sunbeam, supra*, 176 F. Supp. 2d at 1334 ("the total hours spent on this case cannot be supposed to be identical to those spent on the settlement with this particular defendant").

Courts in this Circuit have held that a lodestar multiplier of 1.45 is adequate.  *See Sunbeam, supra*, 176 F. Supp. 2d at 1336.  The only appropriate way to set a percentage fee in a case of this magnitude, and such short duration, is to require the percentage to be informed by the first *Camden I* factor – the time and labor required – which class counsel has improperly failed to quantify.

The Eleventh Circuit in *Faught, supra*, suggested a range of reasonable fees of 20-25%.  668 F.3d at 1242.  Because this is a megafund settlement, objectors suggest that a fee at the lower end of that range, or 20%, of the $110 million monetary fund would be

reasonable here.  Class counsel should receive no additional fee for the injunctive relief, unless they can persuade Chase to pay it.

**IV.     Objectors' Attorneys' Experience.**

Objectors object to the onerous and unreasonable requirement contained in the Settlement Agreement and Preliminary Approval Order that they and their attorneys identify each time they have objected or represented an objector for the past five years. Such a requirement is designed to deter competent and counseled objections, by imposing such a burden on potential counsel that no class member can retain competent representation.

Without waiving these objections, the Objectors state that none of them has ever objected to a class action settlement before, with the exception of Mr. Ramsey, who filed an objection in the case *Hall v. AT&T Mobility*, No. 07-5325 (D.N.J.), in 2010.  The Objectors' counsel, Ernest Browne, and local counsel Brian Silverio, represented several objectors to the Bank of America overdraft settlement last year.

### CONCLUSION

For the foregoing reasons, this Court should deny approval to the proposed Settlement unless the allocation is amended to provide some automatic compensation to 2003-2004 account holders, and should award class counsel no more than 20% of the monetary fund, or $22 million, in attorneys' fees.

Respectfully submitted,

s/ Brian M. Silverio
Brian M. Silverio
FL Bar #0183301
Silverio & Hall, P.A.
150 West Flagler Street
Penthouse - 2850
Miami, Florida 33130
(305) 371-2756
(305) 372-2744 (Fax)
bsilverio@silveriohall.com


s/Ernest J. Browne, Jr.
ERNEST J. BROWNE, JR.
BROWNE & BROWNE
2380 Eastex Freeway
Beaumont, TX 77703
(409) 898-2123 Telephone
(409) 898-2126 Facsimile


Signed By:

Hugh Ramsey, Objector

Robert D. Fontenot, Objector

Jamey & Kelli Deloney, Objectors

Carolyn A. McLemore, Objector

## **CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the foregoing has been served via transmission of Notices of Electronic Filing generated by CM/ECF on November 5 2012, and was filed with the Clerk of Court using CM/ECF, and that as a result a copy of this filing has been served upon every counsel of record.

*s/ Brian M. Silverio*
Brian M. Silverio
