# EXHIBIT A

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

*Lopez v. JPMorgan Chase Bank, N.A.*
*Luquetta v. JPMorgan Chase Bank, N.A.*

*Case No. 1:09-MD-02036-JLK*

**SUPPLEMENTAL DECLARATION OF BRIAN T. FITZPATRICK**

I.  Background and qualifications

1. I signed a declaration on October 15, 2012, opining that the settlement in this case is fair, adequate, and reasonable, and that the attorneys' fees class counsel have requested are reasonable. I supplement my original declaration to respond to some of the objections that have been filed.

2. Some objectors contend that the settlement cannot be approved because the interests of class members are too divergent to satisfy the adequacy of representation requirement in Fed. R. Civ. P. 23(a)(4). *See, e.g.,* Objections of Hugh Ramsey et al. at 3-5 (citing *Ortiz v. Fibrebaord Corp.*, 527 U.S. 815 (1999)); Objections of Darcy Lindner et al. 2-6 (citing *AmChem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997)). The divergent interests asserted by these objections are largely between those class members who incurred the relevant overdraft fees before 2005 and those who incurred the relevant overdraft fees in 2005 and thereafter. The objectors contend that because the former group must submit documentation of their losses while the latter group need not (because Chase already has their data), the interests of the groups are too divergent for class counsel and the named plaintiffs to represent them simultaneously; rather, these objectors contend, subclasses (presumably with separate counsel and separate representatives) must be created in order to satisfy Rule 23(a)(4). I disagree with this analysis.

1

Although it is true that the Supreme Court in *Amchem* and *Ortiz* said that sometimes class members can have interests that are too divergent to be represented by the same counsel and the same named plaintiffs under Rule 23(a)(4), the Court said this was the case only when there was a conflict of interest among class members or at least a divergence of interest that was structural in nature.  In *Amchem*, there was a conflict between class members who had already manifested injury and between class members who had not; the former wanted no inflation adjustment for settlement payments whereas the latter did.  *See Amchem*, 521 U.S. at 626 ("[F]or the currently injured, the critical goal is generous immediate payments.  That goal tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future.").  In *Ortiz*, class members who were injured before the defendants' insurance expired had structurally stronger legal claims than those who were not.  *See Ortiz*, 527 U.S. at 857 ("Pre–1959 claimants accordingly had more valuable claims than post–1959 claimants, the consequence being a[n] instance of disparate interests within the certified class.  While at some point there must be an end to reclassification with separate counsel, [this] instance of conflict [is] well within the requirement of structural protection recognized in *Amchem*." (citation omitted)).  There are no conflicts of interests or structurally divergent interests at play here.  The interests of class members who incurred the relevant overdraft fees before 2005 are aligned with those who incurred the relevant fees in 2005 and thereafter, and their claims are all of the same legal strength.  Indeed, the settlement allocation here is *pro rata* based on the number of fees all claimants incurred; thus, every claimant—no matter when the fees were incurred—will receive the same exact compensation for every relevant overdraft fee.  The only way the settlement treats these class members differently is to require class members who incurred fees before 2005 to submit documentation showing that they incurred relevant overdraft fees.  The only reason the

settlement requires this is because Chase does not have adequate electronic data available with which to identify class members who incurred relevant overdraft fees before 2005 and/or to calculate their damages using the formula set forth in the settlement. The fact that some class members will have a greater burden than others with respect to the claims procedure is neither a conflict of interest nor a structural divergence of interest, and, in my experience, has never been thought to violate Rule 23(a)(4). The lower court cases cited by the objectors are not to the contrary. *See Dewey v. Volkswagen AG*, 861 F.3d 170, 187-90 (3d Cir. 2012) (finding conflict of interest because some class members received first dibs on settlement funds and other class members received only what was remaining); *In re Literary Works in Electronic Databases Copyright Litigation*, 654 F.3d 242, 251 & n.6 (2d Cir. 2011) (finding divergent interests because some class members had legally stronger claims than others).[1]

3.   Some objectors contend that the possibility of a *cy pres* award here is inappropriate because 1) any leftover funds should be redistributed to class members who received a first distribution, *see, e.g.,* Objections of Ramsey et al. at 5-7, 2) the specific charities that will receive any *cy pres* awards have not yet been selected, *see, e.g.,* Objections of Ramsey et al. at 7-8, and 3) the charities that will receive *cy pres* awards are not sufficiently tied to the purposes of this litigation, *see, e.g.,* Objections of Lindner et al. at 7-9. I disagree with these contentions. First, in my opinion, when there are leftover monies from a class action settlement, it is reasonable for the court to do any number of things with it, including approving the

---

[1] One objection argues that there is a debilitating conflict of interest between those class members who still have accounts with Chase and will benefit from the new "item cushion," and those class members who do not. *See* Objections of Wilkins et al. at 4-5. The gravamen of this complaint is that both groups of class members are asked to contribute "equally" to the fee award here despite the fact that the former group will benefit from Chase's changed practice whereas the latter group will not. *Id*. at 4. But this is not the case. Both groups are asked to contribute to the fee award only in proportion to the benefits they will receive from the settlement: because the former group will receive greater benefits from the settlement (i.e., the changed practice as well as cash compensation), the 30% across-the-board fee requested will mean that the former group will contribute more to the fee award as well.

distribution of the leftover money to charities that will serve the purposes of the litigation; the most important consideration is that the money not revert back to the defendant (as it does not here). I believe this because in so-called "small stakes" class actions like this one, the most important purpose of the litigation is deterrence, and that deterrence is achieved so long as the defendant pays *someone* the appropriate amounts. Second, there is nothing untoward about taking time to identify the specific charities to receive the award. In this case, the parties have pledged to distribute any leftover monies to organizations furthering "financial literacy education," *see* Settlement Agreement at ¶ 120, and, although the organizations have not yet been identified, the court will have the final say in approving or rejecting the *cy pres* recipients proposed by the parties. Indeed, the court has already approved of this procedure in related cases in this litigation.[2] Finally, in my opinion, there is more than sufficient nexus between "financial literacy education" charities and the consumer-protection nature of this litigation, which, of course, is why the court approved similar provisions for *cy pres* distributions in other MDL 2036 settlements. Indeed, the very case relied upon the objectors supports this conclusion. *See Dennis v. Kellogg Co.*, --- F.3d ---, 2012 WL 3800230, at *7 (9th Cir. 2012). (suggesting that "appropriate *cy pres* recipients" in a consumer fraud case would be "organizations dedicating to protecting consumers from . . . false advertising").

    4.    Some objectors contend that it is inappropriate to award fees to class counsel based on a portion of the value of both the changed practices and cash they wrested from the defendant. *See, e.g.,* Objections of Ramsey et al. at 9-13; Objections of Bullard et al. at 9-10;

---

[2] The *Dennis* case from the Ninth Circuit cited by objectors is not to the contrary. *See Dennis v. Kellogg Co.*, --- F.3d ---, 2012 WL 3800230 (9th Cir. 2012). In that case, the Ninth Circuit held that the *cy pres* distribution was inappropriate because it was unrelated to the purpose of the litigation, not, as objectors contend, because it was not specifically identified at the time of final approval. *Compare id.* at *6 ("[A]ny charity to receive a portion of the *cy pres* distributions will be one that feeds the indigent. This noble goal, however, has 'little or nothing to do with the purposes of the underlying lawsuit . . . .'" (internal citations omitted)) *with id.* (stating that these concerns with the *cy pres* charities could not be *solved* by "the settlement provision that the charities will be identified at a later date").

4

Objections of Treat et al. at 6. This is simply not the case. As I noted in my original declaration, this is one of several reasonable options district courts have at their disposal to reward class counsel for negotiating non-cash benefits from the defendant. Indeed, this approach has been endorsed by federal district courts,[3] by federal appellate courts,[4] and by the American Law Institute (whose treatise on the subject was written by some of the most prominent class action scholars from across the political spectrum).[5] Moreover, I do not believe, as some objectors contend, that class counsel's valuation of Chase's changed practices is too speculative to serve as the basis of a fee award. *See, e.g.,* Objections of Lindner et al. at 16; Objections of Treat at 6. As I noted in my original declaration, I believe the valuation of the changed practices here is reliable because, not only did the information for this valuation come directly from Chase, but it is based on an analysis of actual overdraft fees incurred by settlement class members. Indeed, the valuation was confirmed by an unrelated cost analysis Chase did in 2009 of the very same practice change; at that time, Chase placed an even larger figure on the practice change. *See* Settlement Agreement at ¶ 23. As such, I see little reason to worry that the valuation submitted by class counsel was manipulated to generate a higher fee award.[6] These objectors may have

---

[3] In my empirical study of two years of federal court class action settlements, there were five such settlements. *See Spartanburg Regional Health Service District, Inc. v. Hillenbrand Industries, Inc.* (D.S.C., No. 03-2141); *In re Sprint Corp. ERISA Litigation* (D.Kan., No. 03-2202); *Bynum v. Government of District of Columbia* (D.D.C., No. 02-956); *Desantis v. Snap-On Tools Co., LLC* (D.N.J., No. 06-2231); *Humphrey v. Hexion Specialty Chemicals, Inc.* (W.D.Ky, No. 06-276).

[4] *See, e.g., Staton v. Boeing Co.*, 327 F.3d 938, 974 (9th Cir. 2003) ("[W]here the value to individual class members of benefits deriving from injunctive relief can be accurately ascertained . . . courts [may] include such relief as part of the value of a common fund for purposes of applying the percentage method . . . .").

[5] *See* Principles of the Law of Aggregate Litigation, § 3.13(b) (American Law Institute, 2010) ("[A] percentage of the fund approach should be the method utilized in most common-fund cases, with the percentage being based on both the monetary and nonmonetary value of the judgment or settlement."). Some objectors cited the anti-coupon provisions of the Class Action Fairness Act of 2005 ("CAFA") as a barrier to rewarding class counsel for the changed practices they wrested from Chase. *See* Objections of Ramsey et al. at 12; Objections of Wilkins et al. at 7. But this settlement does not pay class members in coupons; it pays them in cash. Hence, CAFA is inapposite.

[6] One objection criticizes the value of the changed practice because Chase is required to maintain the changed practice for only two years. *See* Objections of Treat at 5-6. But class counsel only sought a fee award for the

come to the opposite conclusion because they may have confused the newly adopted and recently implemented changed practice for which class counsel is seeking fee compensation here (i.e., the "item cushion" whereby Chase is no longer charging customers overdraft fees on all debit card *transactions* of $5.00 or less) with another overdraft-related practice that Chase implemented in early 2010 shortly after this litigation began (i.e., the "balance cushion" where Chase no longer charges customers overdraft fees if the *overdrawn balance in their accounts at the end of the day* is $5.00 or less).  *See* Objections of Lindner et al. at 16-17; Objections of Treat at 5.

5.  Some objectors contend that the 30% fee award requested here is out of line with percentages awarded in other cases.  *See, e.g.,* Objections of Ramsey et al. at 8-9; Objections of Bullard et al. at 5-9; Objections of Wilkins at 9; Objections of Treat at 4.  I strongly disagree with these contentions.  Many of the objectors may have come to this conclusion because they do not rely on fair and representative samples of fee awards; they simply cite the awards most favorable to their arguments and ignore the awards that are less favorable.  When fee awards are examined scientifically rather than anecdotally—as I did in my empirical study—it becomes clear that a 30% award would be reasonable here for the reasons I noted in my original declaration.  Indeed, my empirical study showed that 30% is actually the median percentage awarded by district courts in the Eleventh Circuit.  *See* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811, 836 (2010). Although it is true, as some objections contend, that some courts outside the Eleventh Circuit reduce fee percentages as settlement sizes increase, as I noted in my original declaration, there is no evidence that courts in the Eleventh Circuit are doing so, many district courts in the Eleventh Circuit have explicitly rejected this notion, and there are sound policy reasons not to do so.

---

expected benefit to the class over this two-year period (not for any benefit to the class if Chase voluntarily extends the changed practice).  As such, the fee request here is entirely appropriate in this regard.

6.     Some objectors contend that it would be unreasonable for the court to award class counsel a fee award without considering class counsel's lodestar.  *See, e.g.,* Objections of Ramsey et al. at 10-13; Objections of Wilkins et al. at 7-8; Objections of Treat at 7.  I disagree.  As I noted in my original declaration, the Eleventh Circuit has held that district courts should award fees in class actions using the percentage-of-the-fund method rather than the lodestar method.[7]  Although some district courts in the Eleventh Circuit "crosscheck" these fee percentages with class counsel's lodestar, many others do not[8] (including the court here in other MDL 2036 settlements), and the Eleventh Circuit has never held that district courts abuse their discretion by choosing not to employ a so-called "lodestar crosscheck."  Indeed, in my opinion, courts that do not use the crosscheck are on firmer footing than courts that do.  As scholars have explained, the lodestar crosscheck can effectively cap the amount of compensation class counsel can receive from a settlement and thereby blunt their incentives to achieve the largest possible award for the class.  *See* Myriam Gilles & Gary Friedman, *Exploding the Class Action Agency Costs Myth: The Social Utility of Entrepreneurial Lawyers*, 155 U. Pa. L. Rev. 103, 140-45 (2006).  As such, it can reintroduce the very same undesirable consequences of the lodestar method that the percentage-of-the-fund method was designed to correct in the first place.  *See,*

---

[7] Citing a case from a different jurisdiction, one objection contends that Florida law rather than federal law should govern the fee award in this case. *See* Objections of Wilkins et al. at 10-11 (citing *In re Volkswagen and Audi Warranty Extension Litigation*, 692 F.3d 4 (1st Cir. 2012)). But, as I noted in my original declaration, this is a so-called "common fund" settlement (where the fee award will be paid from the fund created by the efforts of class counsel for the benefit of the class rather than from the defendant), and that case explicitly noted that its holding did not extend to such settlements. *See id.* at 16 ("[T]his is not a common fund or a common benefit case . . . ."). By contrast, cases in this jurisdiction make it clear that federal law applies. *See Allapattah Services, Inc. v. Exxon Corp.,* 454 F.Supp.2d 1185, 1200 (S.D.Fla. 2006) ("The district court presiding over a diversity-based class action pursuant to Fed. R. Civ. P. 23 has equitable power to apply federal common law in determining fee awards irrespective of state law.").

[8] *See, e.g., David v. American Suzuki Motor Corp.,* 2010 WL 1628362 (S.D.Fla., April 15, 2010); *Noell v. Suncruz Casinos,* 2009 WL 541329 (M.D.Fla., March 04, 2009); *Stahl v. MasTec, Inc.,* 2008 WL 2267469 (M.D.Fla., May 20, 2008); *Allapattah Services, Inc. v. Exxon Corp.,* 454 F.Supp.2d 1185 (S.D.Fla. 2006); *In re: Managed Care Litigation, Class Plaintiffs v. Aetna Inc., and Aetna – US,* 2003 WL 22850070 (S.D.Fla., October 24, 2003); *Fabricant v. Sears Roebuck & Co.,* 2002 WL 34477904 (S.D.Fla., September 18, 2002).

*e.g.*, *Camden I Condominium Ass'n v. Dukle*, 946 F.2d 768, 771-74 (11th Cir. 1991) (citing the lodestar method's difficulty to administer and failure to align class counsel's interests with the class's interests).

7.     For all these reasons, I continue to believe that the settlement in this case is fair, adequate, and reasonable, and that the attorneys' fees class counsel have requested are reasonable.

Nashville, TN

November 26, 2012

/s/ Brian T. Fitzpatrick

Brian T. Fitzpatrick