**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 1:09-MD-02036-JLK**

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

THIS DOCUMENT RELATES TO:
THIRD TRANCHE ACTIONS

*Duval v. Citizens Financial Group, Inc.*
N.D. Ill. Case No. 1:10-cv-00533
S.D. Fla. Case No. 1:10-cv-21080-JLK

*Daniels v. Citizens Financial Group, Inc.*
D. Mass. Case No. 1:10-cv-10386
S.D. Fla. Case No. 1:10-cv-22014-JLK

*Blankenship v. RBS Citizens, N.A.*
D.R.I. Case No. 1:10-cv-00163
S.D. Fla. Case No. 1:10-cv-22942-JLK

**PLAINTIFFS' AND CLASS COUNSEL'S MOTION FOR FINAL APPROVAL OF
CLASS SETTLEMENT, AND APPLICATION FOR SERVICE AWARDS, ATTORNEYS'
FEES AND EXPENSES AND INCORPORATED MEMORANDUM OF LAW**

After more than two years of hard-fought litigation before this Court, Class Counsel

negotiated the Settlement Agreement and Release attached as Exhibit A ("Settlement" or

"Agreement"), with Defendants Citizens Financial Group, Inc. (now known as RBS Citizens

Financial Group, Inc.), RBS Citizens, N.A. and Citizens Bank of Pennsylvania (collectively,

"Citizens" or the "Bank").[1]   The Settlement – which consists of $137,500,000 in cash, plus

---

[1] All capitalized defined terms used herein have the same meanings ascribed in the Agreement.

Citizens' payment of all fees and costs associated with the Notice Program and administration of the Settlement, and its change of the order in which it posts Debit Card Transactions from highest-to-lowest dollar amount to chronological order, based on the date and time stamp information provided to Citizens – is an outstanding achievement that will provide immediate benefits to the Settlement Class, without further risks, delays and costs. *See* Joint Declaration of Aaron S. Podhurst, Robert C. Gilbert and Ted Trief ¶¶ 4, 31-39, 57-68, attached as Exhibit B ("Joint Decl."). The Settlement represents an "outstanding result," in the opinion of one nationally recognized expert. *See* Declaration of Professor Geoffrey Miller ¶ 34, attached as Exhibit C ("Miller Decl. ¶").

Plaintiffs and Class Counsel now seek Final Approval of the Settlement. Based on the controlling legal standards and the supporting facts, Final Approval is clearly warranted. In addition, Class Counsel respectfully request that the Court award Service Awards to the eleven (11) named Plaintiffs, whose willingness to represent the Settlement Class and active participation in the Action helped make possible the Settlement. Finally, Class Counsel respectfully request that the Court award attorneys' fees representing thirty percent (30%) of the Settlement Fund, and reimbursement of certain expenses, to compensate us for our work in achieving the Settlement.

## I.      INTRODUCTION

In 2010, Plaintiffs sued on behalf of themselves and all others similarly situated who incurred Overdraft Fees as a result of Citizens' practice of re-sequencing all Debit Card Transactions from highest-to-lowest dollar amount ("High-to-Low Posting"). Plaintiffs alleged that Citizens systemically engaged in High-to-Low Posting of Debit Card Transactions to maximize the Bank's Overdraft Fee revenues. According to Plaintiffs, Citizens' practices

violated the Bank's contractual and good faith duties, were substantively and procedurally unconscionable, violated state unfair trade practices laws, and resulted in conversion and unjust enrichment. Joint Decl. ¶ 5.

The Action involved sharply opposed positions on several fundamental legal questions, including: (i) whether the National Bank Act ("NBA") preempts Plaintiffs' claims; (ii) whether Citizens breached its duty of good faith and fair dealing when it engaged in High-to-Low Posting of its customers' Debit Card Transactions; (iii) whether Citizens' policies and practices involving High-to-Low Posting were unconscionable, constituted conversion and/or resulted in unjust enrichment; and (iv) the appropriate methodology for establishing damages on a class-wide basis and the amount of damages to be recovered. Joint Decl. ¶¶ 3, 5-6, 10, 12, 15. Citizens consistently argued that Plaintiffs' claims are preempted under the NBA, and that the applicable Account agreements expressly authorized its High-to-Low Posting practices. *Id.*

Class Counsel actively litigated the Action for over two years. The litigation was hard-fought; the Parties engaged in significant motion practice and extensive discovery, including approximately nineteen (19) depositions and the production of approximately 1,700,000 pages of documents. Joint Decl. ¶¶ 16-19.

Preliminary settlement discussions began in late 2011. Joint Decl. ¶ 25. After a full day mediation on April 17, 2012, Class Counsel and Citizens reached agreement on the material terms of the Settlement. Joint Decl. ¶¶ 25, 27. A Summary Agreement memorializing those terms was executed on April 19, 2012. Joint Decl. ¶ 27. Several months of detailed discussions followed between Settlement Class Counsel and Citizens to address, *inter alia*, complex issues relating to Citizens' data, the identification of Settlement Class Members, and distribution of the

Settlement Fund.   Joint Decl. ¶ 29.   Once those issues were resolved, the Agreement was finalized and executed by the Parties in late August and early September 2012.  *Id.*

Under the Settlement, all identifiable Settlement Class Members who had Positive Differential Overdraft Fees and do not opt-out will automatically receive their *pro rata* share of the Settlement Fund.  Agreement ¶¶ 101-104.  For those Settlement Class Members, there are no claims forms to fill out, and they will not be asked to prove that they were damaged as a result of the Bank's High-to-Low Posting.  Settlement Class Counsel and their experts used available Citizens' data to determine which Citizens Account holders were harmed by High-to-Low Posting, and applied the formula detailed in paragraph 103 of the Agreement to calculate the amount of each Settlement Class Member's Positive Differential Overdraft Fees.  Joint Decl. ¶¶ 32, 103; *See* Declaration of Arthur Olsen ¶¶ 21-37, attached as Exhibit D ("Olsen Decl."). Settlement Class Members who cannot be identified because Citizens' data does not exist or is not reasonably accessible in electronic form to permit Settlement Class Counsel and their experts to perform the analysis to identify them and/or to calculate the full amount such Settlement Class Members may be due from the Settlement Fund, also have the opportunity to file Claims with the Settlement Administrator seeking their *pro rata* share of the Settlement Fund.  Agreement ¶¶ 32, 105-119; Joint Decl. ¶ 35.  The claims process is the best solution to address the fact that Citizens does not have adequate data covering the entire Class Period.  Joint Decl. ¶ 35.

A testament to the reasonableness and fairness of the Settlement is the magnitude of the Settlement Fund.  Class Counsel negotiated a $137,500,000 cash payment, which represents approximately forty-two percent (42%) of the most probable recovery *if* the Settlement Class prevailed at every juncture through final judgment and on appeal.  Joint Decl. ¶ 61.  In addition to the $137,500,000 Settlement Fund, Citizens agreed to pay all fees and costs incurred in

connection with the administration of the Notice Program and the Settlement, that are estimated to be approximately $1,500,000.  Agreement ¶ 77; Joint Decl. ¶ 91.  As part of the Settlement, Citizens also agreed to adopt and implement a new posting order, for not less than three (3) years, whereby it will discontinue the challenged High-to-Low Posting Order for Debit Card Transactions.  Agreement ¶ 78; Joint Decl. ¶ 39.  Under the new posting order, Citizens will post Debit Card Transactions in chronological order based on date and time stamp information provided to Citizens, and before certain other types of debit transactions, including most checks. *Id.*  Implementation of the new Posting Order is estimated to occur by the end of the second quarter of 2013, when Citizens' reconfiguration of its relevant systems is completed.  *Id.*  During this three (3) year period, Citizens may change its posting order only to comply with any applicable statute, regulation, judicial authority, or regulator guidance, request or order, or otherwise with the agreement of its regulators.  *Id.*

Accordingly, Plaintiffs and Class Counsel respectfully request that the Court: (1) grant Final Approval to the Settlement; (2) certify for settlement purposes the Settlement Class, pursuant to Rule 23(b)(3) and (e) of the Federal Rules of Civil Procedure; (3) appoint as class representatives the Plaintiffs identified in paragraph 57 of the Agreement; (4) appoint as Class Counsel and Settlement Class Counsel the law firms and attorneys listed in paragraphs 33 and 69 of the Agreement, respectively; (5) approve Service Awards to the eleven (11) Plaintiffs identified in paragraph 57 of the Agreement; (6) award Class Counsel attorneys' fees and reimbursement of certain costs and expenses; and (7) enter Final Judgment dismissing the Action with prejudice.

## II.     MOTION FOR FINAL APPROVAL

### A.     Factual Background.

#### 1.     Procedural History.

On January 26, 2010, Plaintiff Jessica Duval filed *Duval v. Citizens Financial Group, Inc. and John Does 1-50*, No. 1:10-cv-00533 ("*Duval*") in the United States District Court for the Northern District of Illinois.   Joint Decl. ¶ 8.   On March 2, 2010, the Judicial Panel on Multidistrict Litigation ("JPML") transferred *Duval* to this Court for inclusion in MDL 2036.   *Id.*

Thereafter, a number of other complaints were filed against Citizens alleging similar claims and were transferred by the JPML to MDL 2036.   Joint Decl. ¶ 9.   On March 4, 2010, Plaintiff Eric Daniels filed *Daniels v. Citizens Financial Group, Inc.* ("*Daniels*") in the United States District Court for the District of Massachusetts; on April 6, 2010, Plaintiff Michael L. Blankenship filed *Blankenship v. RBS Citizens, N.A., Citizens Bank of Pennsylvania, and Citizens Financial Group, Inc.* ("*Blankenship*") in the United States District Court for the District of Rhode Island; on May 27, 2010, Plaintiff John C. Chierici filed *Chierici v. Citizens Financial Group, Inc., James G. Connolly, Ellen Alemany, Kristen Tartaglia and John Does 1-50*, ("*Chierici*"), in the United States District Court for the District of New Jersey; and on September 1, 2010, Plaintiffs Shirley Durgin and Brittany Durgin filed *Durgin v. RBS Citizens, N.A. and Citizens Bank of Pennsylvania* ("*Durgin*").   The JPML subsequently transferred *Duval, Blankenship, Chierici and Durgin* to MDL 2036.[2]   *Id.*

On June 7, 2010, Plaintiffs Jaclyn Curtis, Eric Daniels, Jessica Duval, Kathleen Dwyer, Jill Giordano, Gale Hercula, Annie Mullen, Greg Murphy, Marcea Taylor, and Sheryl Wood

---

[2] On December 6, 2010, the Durgins filed a notice of voluntary dismissal without prejudice and, by Order dated December 7, 2010, the Court dismissed *Durgin* without prejudice (DE # 1001, 1004).

filed a Consolidated Amended Class Action Complaint, asserting claims for breach of contract/implied covenant of good faith and fair dealing, unconscionability, conversion, unjust enrichment, and under various states' consumer protection statutes based on Citizens' alleged unfair assessment and collection of Overdraft Fees and seeking monetary damages, restitution, and equitable relief (DE # 560). On July 12, 2010, pursuant to a joint stipulation, the Court dismissed Citizens Financial Group, Inc. from *Duval* and *Daniels* (DE # 675).

On July 9, 2010, Citizens Bank of Pennsylvania filed a motion to dismiss the Consolidated Amended Class Action Complaint (DE # 666); RBS Citizens, N.A. filed a joinder to that motion (DE # 668). On August 9, 2010, Plaintiffs filed their opposition to the motion and the joinder (DE # 750). Citizens' reply was filed on August 30, 2010 (DE # 769). On November 17, 2010, following briefing and oral argument, this Court issued an Order denying Citizens' motions to dismiss (DE # 934).

On December 6, 2010, Plaintiffs Jaclyn Curtis, Eric Daniels, Jessica Duval, Kathleen Dwyer, Jill Giordano, Gale Hercula, Annie Mullen, Greg Murphy, Marcea Taylor, and Sheryl Wood, along with new Plaintiffs Michael L. Blankenship, John C. Chierici, Rhonda Winkelman and Richard Winkelman, filed a Second Consolidated Amended Class Action Complaint (DE # 1000), followed by a Corrected Second Consolidated Amended Class Action Complaint on December 22, 2010 (DE # 1022). On January 7, 2011, RBS Citizens, N.A. and Citizens Bank of Pennsylvania filed answers to the Corrected Second Consolidated Amended Class Action Complaint, denying any and all wrongdoing and liability and asserting various affirmative defenses (DE # 1034, 1035). In its answer, RBS Citizens, N.A. asserted that Charter One was one of its brand names and not a separate entity (DE # 1035). After the filing by John C. Chierici and Rhonda Winkelman of Stipulations of Voluntary Dismissal of Claims on February

24, 2010 and October 6, 2011 (DE # 1201, 1957), respectively, the Court entered Orders of dismissal without prejudice with respect to the claims asserted by them. (DE # 1207, 1966).[3]

The Parties entered into a stipulated protective order on January 18, 2011 (DE # 1049). On May 4, 2011, the Parties filed a stipulated discovery plan and order for electronically stored information that was approved and adopted by the Court on May 9, 2011 (DE # 1464). Citizens thereafter produced approximately 1,700,000 pages of documents and other materials (including voluminous data files and spreadsheets). Joint Decl. ¶¶ 16, 17. Class Counsel established a large document review team that analyzed the documents produced for information supporting Plaintiffs' claims and the Bank's defenses. Joint Decl. ¶ 18. Class Counsel also served written interrogatories and requests for admission to which Citizens responded and subsequently amended after discovery conferences with Class Counsel. Joint Decl. ¶¶ 16, 17.

Class Counsel took approximately eight (8) depositions of Citizens' Rule 30(b)(6) designees, current and former senior employees, including Joseph Blain (over four days), Michael Formica, Edward Goings, Mary Main, Susan Milligan, Peg Marty, Geoffrey Thomas, and its expert Professor Gregory Udell. Joint Decl. ¶ 19. Class Counsel also defended eleven (11) depositions of the named Plaintiffs. *Id.*

On April 29, 2011, Citizens filed a motion to compel production of documents by Plaintiffs (DE # 1376); Plaintiffs opposed the motion on May 6, 2011 (DE # 1452); and Citizens' reply was filed on May 11, 2011 (DE # 1468). On June 3, 2011, the Court denied Citizens' motion to compel production of documents (DE # 1577).

---

[3] On November 14, 2011, Class Counsel filed a motion to withdraw as counsel for Gregory Murphy in the Action (DE # 2114). On November 15, 2011, the Court granted that motion (DE # 2139).

On May 24, 2011, RBS Citizens, N.A. filed a joinder in JPMorgan Chase Bank, N.A.'s motion, based on recently decided Eleventh Circuit authority, to dismiss on grounds of preemption pursuant to Rule 12(c) and on further reconsideration of its earlier motion pursuant to rule 12(b)(6), or, in the alternative for certification pursuant to 28 U.S. § 1292(b) (DE # 1521). On June 3, 2011, Plaintiffs filed their opposition to RBS Citizens, N.A.'s joinder (DE # 1578). On July 13, 2011, the Court issued an Omnibus Order Denying Defendants' Motions for Reconsideration, which also denied the joinder of RBS Citizens, N.A (DE # 1725).

On October 27, 2011, Plaintiffs filed a motion to quash Citizens' subpoenas of Plaintiffs' non-party family members and for a protective order (DE # 2040). Citizens opposed the motion on November 3, 2011 (DE # 2073), and Plaintiffs replied on November 8, 2011 (DE # 2096). On November 14, 2011, the Court entered an Order granting Plaintiffs' motion (DE # 2116).

On December 16, 2011, Plaintiffs filed their motion for class certification under seal. Joint Decl. ¶ 23. On January 30, 2012, Citizens filed its opposition to class certification, and on March 6, 2012, Plaintiffs filed their reply.[4] Joint Decl. ¶ 23. On January 30, 2012, Citizens also filed a motion to strike the declaration of Arthur Olsen (DE # 2435). Plaintiffs opposed that motion on March 6, 2012, and Citizens replied on March 16, 2012 (DE # 2565).

## 2. Settlement Negotiations.

Preliminary settlement discussions began in late 2011. Joint Decl. ¶ 25. Those discussions led to the scheduling of mediation and Citizens' production of certain overdraft data to Class Counsel for analysis by its expert. *Id.* On March 13, 2012, the Parties filed a joint motion to temporarily suspend proceedings on Plaintiffs' motion for class certification and

---

[4] On August 29 and August 30, 2012, Plaintiffs, with the agreement of Citizens, re-filed all of the class certification papers on the CM/ECF system (DE # 2924, 2929), with limited redactions to protect information previously designated as "confidential" or "highly confidential" under the Stipulated Protective Order.

Citizens' motion to strike the expert declaration of Arthur Olsen (DE # 2558).  The Court granted that motion on March 15, 2012 (DE # 2559).

Class Counsel and Citizens participated in mediation on April 17, 2012 with Professor Eric Green of Resolutions LLC, one of the leading mediators in the United States.  Joint Decl. ¶ 27.  During the mediation, Class Counsel and Citizens reached an agreement on the material terms of the Settlement.  *Id.*  On April 19, 2012, Class Counsel and Citizens executed a Summary Agreement memorializing the material terms of the Settlement.  *Id.*  On April 25, 2012, Class Counsel and Citizens filed a joint notice of settlement and requested a suspension of deadlines pending the drafting and execution of the Agreement (DE # 2656); the Court granted the motion on April 26, 2012 (DE # 2660).  Four months of extensive and detailed discussions followed regarding additional terms of the Settlement including, among other things, issues pertaining to Citizens' data, the identification of Settlement Class Members, an appropriate plan for allocation of the Settlement Fund and handling of claims for limited periods during the Class Period for which data does not exist and/or is not reasonably accessible in electronic form.  Joint Decl. ¶ 29.  Following the resolution of these issues, the Agreement was completed and was executed in late August and early September 2012.  *Id.*

On September 18, 2012, Plaintiffs and Class Counsel filed their motion for preliminary approval.  (DE # 2955).  On September 19, 2012, the Court entered an Order Granting Preliminary Approval.  (DE # 2959).  In so ruling, the Court preliminarily determined that the Settlement is "fair, reasonable and adequate" and found "that the Settlement was reached in the absence of collusion, and is the product of informed, good-faith, arms'-length negotiations between the parties and their capable and experienced counsel."  *Id.* at ¶ 11; Joint Decl. ¶ 29.

Pursuant to the Preliminary Approval Order, Notice of the Settlement was timely mailed to 2,143,489 members of the Settlement Class.  *See* Declaration of Cameron Azari ¶¶ 12-18, attached as Exhibit E ("Azari Decl.").  Notice of the Settlement was also timely published in thirteen (13) of the highest daily circulation newspapers and/or newspapers that were more likely to be read by Settlement Class Members in the top geographic markets where Citizens maintained branches during the Class Period.  Azari Decl. ¶¶ 23-24.  In addition, a special Settlement website and toll free telephone numbers were established to provide details regarding the Settlement.  Azari Decl. ¶¶ 27-29.

### A.    Summary of the Settlement Terms.

The Settlement's terms are detailed in the Agreement attached as Exhibit A.  The following is a summary of the material terms.

### 1.    The Settlement Class.

The Settlement Class is an opt-out class under Rule 23(b)(3) of the Federal Rule of Civil Procedure.  The Settlement Class is defined as:

> All holders of a Citizens Account who, from January 1, 2002, through and including August 13, 2010, incurred one or more Overdraft Fees as a result of High-to-Low Posting.  Excluded from the Class are all current Citizens employees, officers and directors, and the judge presiding over this Action.

Agreement ¶ 74.

### 2.    Monetary Relief for the Class.

Citizens timely deposited $137,500,000 into the Escrow Account following Preliminary Approval.  Agreement ¶ 97; Joint Decl. ¶ 31.  That deposit created the Settlement Fund, that will be used to pay: (i) all distributions of money to the Settlement Class; (ii) all Service Awards to the Plaintiffs; (iii) all attorneys' fees, costs and expenses of Class Counsel; (iv) any residual *cy pres* distributions; (v) any taxes; (vi) any costs of Settlement Administration other than those to

be paid by Citizens; and (vii) additional fees, costs and expenses not specifically enumerated in the Agreement, subject to approval of Settlement Class Counsel and Citizens.  Agreement ¶ 100. In addition to the $137,500,000 Settlement Fund, Citizens is responsible for paying all costs and fees associated with the Notice Program and administration of the Settlement, that are estimated to be approximately $1,500,000.  Agreement ¶ 77; Joint Decl. ¶ 31.

All identifiable Settlement Class Members who experienced Positive Differential Overdraft Fees and all eligible Settlement Class Members who timely submit valid Claims demonstrating that they experienced a Positive Differential Overdraft Fee will receive *pro rata* distributions from the Settlement Fund, if they have not opted out.  Agreement ¶ 119; Joint Decl. ¶ 32.  The Positive Differential Overdraft Fee analysis determines, among other things, which Citizens Account holders were assessed additional Overdraft Fees that would not have been assessed if the Bank had used an alternative posting sequence or method for posting Debit Card Transactions other than High-to-Low Posting, and how much in additional Overdraft Fees those Account holders paid.  The calculation involves a multi-step process that is described in detail in the Agreement.  Agreement ¶¶ 101-104; Joint Decl. ¶ 32.

The Net Settlement Fund – which will be distributed *pro rata* among all identifiable Settlement Class Members who had Positive Differential Overdraft Fees and all eligible Settlement Class Members who submit valid Claims – is equal to the Settlement Fund, plus interest earned (if any), less Court-awarded attorneys' fees and costs to Class Counsel, Service Awards for the Plaintiffs, and certain additional costs or expenses and reservations for prospective costs.  Agreement ¶¶ 119-120; Joint Decl. ¶ 33.

Most Settlement Class Members do not have to submit claims or take any other affirmative steps to receive relief under the Settlement.  Joint Decl. ¶ 34.  The amounts of their

Positive Differential Overdraft Fees have been determined by Settlement Class Counsel and their expert through analysis of Citizens' data. Agreement ¶¶ 101-104; Joint Decl. ¶ 34. As discussed below, Settlement Class Members who incurred Overdraft Fees during the limited periods of time for which Citizens does not have sufficient reasonably accessible data (the "Claims Period")[5] and who sustained the requisite Overdraft Fees are able to submit Claims seeking their *pro rata* share of the Settlement Fund based on the same formula used to determine the amount of Positive Differential Overdraft Fees for Settlement Class Members for whom Citizens has available data. Agreement ¶¶ 105-118; Joint Decl. ¶ 35. As soon as practicable after the Effective Date of the Settlement (but not sooner than 120 days after the Effective Date), Citizens and the Settlement Administrator will distribute the Net Settlement Fund to all Settlement Class Members who had Positive Differential Overdraft Fees and do not timely opt out of the Settlement and are entitled to a distribution under the Automatic Distribution and/or under the Alternative Claims Process. Agreement ¶¶ 119-129; Joint Decl. ¶ 37.

Payments to Settlement Class Members who are Current Account Holders will be made by the Bank crediting such Settlement Class Members' Accounts, and notifying them of the

---

[5] The Claims Period for which Citizens' data does not exist or is not reasonably accessible in electronic form is January 1, 2002 through and including August 15, 2002, for former customers of Mellon Bank's Mid-Atlantic Franchise Branches (PA, DE, NJ); January 1, 2002 through and including December 14, 2002, for former customers of Medford Savings Bank (MA) (subsidiary of Medford Bancorp Inc.); January 1, 2002 through and including March 14, 2003, for customers of Commonwealth Bank (PA) (subsidiary of Commonwealth Bancorp); January 1, 2002 through and including August 22, 2003, for former customers of Cambridge Port Bank (MA) (subsidiary of Port Financial Corp.); January 1, 2002 through and including December 13, 2003, for former customers of Community National Bank (MA) (subsidiary of Community Bancorp); January 1, 2002 through and including February 6, 2004, for former customers of Roxborough-Manayunk Bank (PA, DE) (subsidiary of Thistle Group Holdings, Co.); January 1, 2002 through and including July 25, 2005, for former customers of Charter One Bank, N.A. (subsidiary of Charter One Financial, Inc.); and January 1, 2002 through and including August 27, 2007, for former customers of GreatBank (IL), GreatBank Chicago, and First National Bank (IL) (subsidiaries of GreatBanc, Inc.). Agreement ¶ 32.

credit.  Agreement ¶ 125; Joint Decl. ¶ 37.  Citizens will then be entitled to a reimbursement for such credits from the Settlement Fund.  Agreement ¶ 126; Joint Decl. ¶ 37.  Former Account Holders and Current Account Holders whose accounts cannot feasibly be automatically credited will receive payments from the Settlement Fund by checks mailed by the Settlement Administrator.  Agreement ¶¶ 125, 127; Joint Decl. ¶ 37.

Any uncashed or returned checks will remain in the Settlement Fund for one year from the date the first distribution check is mailed by the Settlement Administrator, during which time the Settlement Administrator will make reasonable efforts to effectuate delivery of the Settlement Fund Payments.  Agreement ¶ 129; Joint Decl. ¶ 38.

### 3.   Alternative Claim Distributions.

As discussed above, most Settlement Class Members are going to be identified through an analysis of certain types of Citizens' data.  Citizens' data for the period January 1, 2002 through August 13, 2010 is sufficient to permit the Parties to identify most Settlement Class Members who had Accounts during that period, and to calculate the amount of the distribution to which each such person is entitled under the Settlement.  Agreement ¶¶ 101-102; Joint Decl. ¶¶ 34-36.  Citizens lacks certain reasonably accessible data for limited portions of the Class Period that would permit Settlement Class Counsel and their expert to identify all Account holders who were affected by Citizens' High-to-Low Posting practices during the Claims Period and/or to automatically calculate their damages through electronic means.  Agreement ¶¶ 32, 102; Joint Decl. ¶¶ 34-36.

To address that limitation, all Settlement Class Members who held an Account during the Claims Period and who sustained two or more Overdraft Fees on a calendar day at any time during the applicable Claims Period are eligible to submit Claims seeking a *pro rata* distribution

from the Settlement Fund.[6]  Agreement ¶¶ 32, 105-118; Joint Decl. ¶ 35.  The Settlement Administrator also has the discretion to consider a Claim relating to any period outside of the Claims Period.  Agreement ¶ 106.  The Claim Form requires Settlement Class Members to provide the same type of information for Claims that Settlement Class Counsel and their expert have used in determining the amount of Automatic Distributions from the Settlement Fund. Agreement ¶¶ 103, 111.  The Settlement Administrator will determine the validity and amount of all Claims.  Agreement ¶ 113.

All Settlement Class Members who submit valid Claims covering Overdraft Fees incurred during the Claims Period will be entitled to receive a *pro rata* distribution from the Settlement Fund in the same manner as all identifiable Settlement Class Members, in addition to and not exclusive of any Automatic Distribution to which the same Settlement Class Member may be entitled under the Agreement.  Agreement ¶¶ 105-107; Joint Decl. ¶ 36.

### 4.    Non-Monetary Relief.

In addition to the $137,500,000 cash recovery, as additional consideration, Citizens agreed to adopt and implement a new practice whereby it will change the order in which it posts Debit Card Transactions and certain other debit transactions.  Agreement ¶ 78; Joint Decl. ¶ 39. Instead of the current High-to-Low Posting order, Citizens will post Debit Card Transactions and certain other types of transactions in chronological order, determined by the date and time stamp information provided to Citizens.  *Id.*  The change will be implemented as soon as practicable after Citizens' relevant systems are reconfigured, a process that Citizens anticipates will be completed by the end of the second quarter of 2013.  *Id.*  Once the posting process is fully

---

[6] Former customers of Charter One Bank, N.A. (subsidiary of Charter One Financial, Inc.) during the period between January 1, 2003 and July 25, 2005 are eligible to receive an Automatic Distribution based on available data under Section XI of the Agreement, and can also submit a Claim for Overdraft Fees charged during the Claims Period.  Agreement ¶ 107.

implemented, Citizens has agreed not to materially modify or rescind the new posting order for a minimum of three (3) years following full implementation, absent the obligation to comply with statutory or other legal authority or through communications with its regulators.  *Id.*

### 5.   Class Release.

In exchange for the benefits conferred by the Settlement, all Settlement Class Members who do not opt out will be deemed to have released Citizens from claims related to the subject matter of the Action.   The detailed release language can be found in Section XV of the Agreement.

### 6.   The Notice Program.

The Notice Program (Agreement Section VIII) was designed to provide the best notice practicable, and is tailored to take advantage of the information Citizens has available about the Settlement Class Members.   Agreement ¶¶ 88-94.  Citizens will pay all fees and costs of the Notice Program, that are estimated to be approximately $1,500,000, in addition to the $137,500,000 Settlement Fund.  Agreement ¶ 93; Joint Decl. ¶ 31.  The Notice Program was reasonably calculated under the circumstances to apprise the Settlement Class of the pendency of the Action, the terms of the Settlement, Class Counsel's Fee Application and request for Service Awards for Plaintiffs, and their rights to opt-out of the Settlement Class and object to the Settlement.   Joint Decl. ¶ 42; Azari Decl. ¶¶ 7-8, 12-41.  The Notices and Notice Program constituted sufficient notice to all persons entitled to notice.  *Id.*; Azari Decl. ¶¶ 7-8, 38-41.  The Notices and Notice Program satisfied all applicable requirements of law, including, but not limited to, Federal Rule of Civil Procedure 23 and the constitutional requirement of due process. Azari Decl. ¶ 41.

### 7.      Settlement Termination.

Either Party may terminate the Settlement if it is rejected or materially modified by the Court or an appellate court.  Agreement ¶ 140; Joint Decl. ¶ 49.  Citizens also has the right to terminate the Settlement if the number of Settlement Class Members who timely opt out of the Settlement Class equals or exceeds the number or percentage specified in the separate letter executed concurrently with the Agreement by Citizens' counsel and Settlement Class Counsel. Agreement ¶ 141; Joint Decl. ¶ 49.  The number or percentage will be confidential except to the Court, who upon request will be provided a copy of the letter for *in camera* review.  *Id.*

### 8.      Class Representative Service Awards.

Pursuant to the Agreement, Class Counsel will request, and Citizens will not oppose, Service Awards of $10,000 per named Plaintiff, or $5,000 per Plaintiff for married couples when both spouses are Plaintiffs.  Agreement ¶ 138; Joint Decl. ¶ 69.  If the Court approves them, the Service Awards will be paid from the Settlement Fund, and will be in addition to the other relief the eleven (11) named Plaintiffs will be entitled to as Settlement Class Members.  *Id.*  These awards will compensate the eleven (11) named Plaintiffs for their time and effort in the Action, and for the risk they undertook in prosecuting the Action against Citizens.  Joint Decl. ¶¶ 69, 72-73.

### 9.      Attorneys' Fees and Costs.

Pursuant to the Agreement, Class Counsel will request, and Citizens will not oppose, attorneys' fees of up to thirty percent (30%) of the Settlement Fund, plus reimbursement of litigation costs and expenses.  Agreement ¶ 135; Joint Decl. ¶ 74.  The Parties negotiated and reached agreement regarding attorneys' fees and costs only after reaching agreement on all other material terms of this Settlement.  Agreement ¶ 139; Joint Decl. ¶ 74.

## III.    ARGUMENT

Court approval is required for settlement of a class action.  Fed. R. Civ. P. 23(e).  The federal courts have long recognized a strong policy and presumption in favor of class settlements.  The Rule 23(e) analysis should be "informed by the strong judicial policy favoring settlements as well as the realization that compromise is the essence of settlement."  *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. Unit B 1982).  In evaluating a proposed class settlement, the Court "will not substitute its business judgment for that of the parties; 'the only question . . . is whether the settlement, taken as a whole, is so unfair on its face as to preclude judicial approval.'"  *Rankin v. Rots*, 2006 WL 1876538, at *3 (E.D. Mich. June 28, 2006) (quoting *Zerkle v. Cleveland-Cliffs Iron Co*., 52 F.R.D. 151, 159 (S.D.N.Y. 1971)). Indeed, "[s]ettlement agreements are highly favored in the law and will be upheld whenever possible because they are a means of amicably resolving doubts and uncertainties and preventing lawsuits."  *In re Nissan Motor Corp. Antitrust Litig*., 552 F.2d 1088, 1105 (5th Cir. 1977).  Class settlements minimize the litigation expenses of the parties and reduce the strain that litigation imposes upon already scarce judicial resources.  Therefore, "federal courts naturally favor the settlement of class action litigation."  *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996).

The Settlement here is more than sufficient under Rule 23(e) and Final Approval is clearly warranted.

### A.    The Court Has Personal Jurisdiction Over the Settlement Class Because the Class Received Adequate Notice and an Opportunity to Be Heard.

In addition to having personal jurisdiction over the Plaintiffs, who are parties to this Action, the Court also has personal jurisdiction over all members of the Settlement Class because they received the requisite notice and due process.  *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985) (citing *Mullane v. Cent. Hanover Bank & Trust Co*., 339 U.S. 306, 314-

- 18 -

15 (1950)); *see also In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 306 (3d Cir. 1998), *cert. denied*, 525 U.S. 1114 (1999).

### 1.      The Best Notice Practicable Was Furnished.

The Notice Program was comprised of three parts: (1) direct mail postcard notice ("Mailed Notice") to all identifiable Settlement Class Members; (2) publication notice ("Published Notice") designed to reach those Settlement Class Members for whom direct mail notice is not possible; and (3) a "Long Form" notice with more detail than the direct mail or publication notices, that has been available on the Settlement Web Site and via mail upon request.  Agreement, Section VIII; Azari Decl. ¶¶ 12-28.

Each facet of the Notice Program was accomplished.  Azari Decl. ¶¶ 7-8, 12-29, 32-41. The Settlement Administrator received the data files that identified the names and last known addresses of all identifiable Settlement Class Members, ran the addresses through the National Change of Address Database, and mailed the postcards to 2,143,489 Settlement Class Members that contained the Mailed Notice.  Azari Decl. ¶ 12-21.  The Mailed Notice Program was timely completed.  Azari Decl. ¶¶ 16-19.  The Published Notice Program was completed through advertisements in thirteen (13) of the highest daily circulation newspapers and/or newspapers that were more likely to be read by Settlement Class Members in the geographic markets where Citizens maintained branches during the Class Period.  Azari Decl. ¶¶ 23-24.  In addition, the Settlement Web Site with a "Long Form" notice was established to enable Settlement Class Members to obtain detailed information about the Action and the Settlement.  Azari Decl., ¶ 27. As of January 7, 2013, the Settlement Website had over 58,016 visitors.  Azari Decl., ¶ 28.

**2.      The Notice Was Reasonably Calculated to Inform Settlement Class Members of Their Rights.**

The Court-approved Notice satisfies due process requirements because it described "the substantive claims . . . [and] contain[ed] information reasonably necessary to make a decision to remain a class member and be bound by the final judgment." *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104-05 (5th Cir. 1977). The Notice, among other things, defined the Settlement Class, described the release provided to Citizens under the Settlement as well as the amount and proposed distribution of the Settlement proceeds, and informed Settlement Class Members of their right to opt-out and object, the procedures for doing so, and the time and place of the Final Approval Hearing. It also notified Settlement Class Members that a class judgment would bind them unless they opted out, and told them where they could get more information – for example, at the website that posts a copy of the Agreement, as well as other important court documents. Further, the Notice described Class Counsel's intention to seek attorneys' fees of up to thirty percent (30%) of the $137,500,000 Settlement Fund. Hence, the Settlement Class Members were provided with the best practicable notice, which was "reasonably calculated, under [the] circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Shutts*, 472 U.S. at 812 (quoting *Mullane*, 339 U.S. at 314-15); Azari Decl. ¶¶ 7-8, 32-41.

As of January 7, 2013, the Notice Administrator had received only thirty-nine (39) requests for exclusion (opt-outs). Azari Decl. ¶ 30. As of that date, only two (2) objections to the Settlement had been received. Azari Decl. ¶ 30; Joint Decl. ¶ 67.

**B.      The Settlement Should Be Approved as Fair, Adequate and Reasonable.**

In deciding whether to approve the Settlement, the Court will analyze whether it is "fair, adequate, reasonable, and not the product of collusion." *Leverso v. Southtrust Bank*, 18 F.3d

1527, 1530 (11th Cir. 1994); *see also Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984) ("*Bennett*").  A settlement is fair, reasonable and adequate when "the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued."  *In re Lorazepam & Clorazepate Antitrust Litig.*, MDL No. 1290, 2003 WL 22037741, at *2 (D.D.C. June 16, 2003) (quoting *Manual for Complex Litigation (Third)* § 30.42 (1995)). Importantly, the Court is "not called upon to determine whether the settlement reached by the parties is the best possible deal, nor whether class members will receive as much from a settlement as they might have recovered from victory at trial."  *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1014 (N.D. Ill. 2000) (citations omitted).

The Eleventh Circuit has identified six factors to be considered in analyzing the fairness, reasonableness and adequacy of a class settlement under Rule 23(e):

> (1)     the existence of fraud or collusion behind the settlement;
>
> (2)     the complexity, expense, and likely duration of the litigation;
>
> (3)     the stage of the proceedings and the amount of discovery completed;
>
> (4)     the probability of the plaintiffs' success on the merits;
>
> (5)     the range of possible recovery; and
>
> (6)     the opinions of the class counsel, class representatives, and the substance and amount of opposition to the settlement.

*Leverso*, 18 F.3d at 1530 n.6; *see also Bennett*, 737 F.2d at 986.  The analysis of these factors set forth below shows this Settlement to be eminently fair, adequate and reasonable.

### 1.   There Was No Fraud or Collusion.

This Court well knows the vigor with which the Parties litigated until they reached the Settlement.  The sharply contested nature of the proceedings in this Action demonstrates the

absence of fraud or collusion behind the Settlement.  *See, e.g.*, *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1329 n.3 (S.D. Fla. 2001) ("*Sunbeam*"); *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001) (court had "no doubt that this case has been adversarial, featuring a high level of contention between the parties"); *In re Motorsports Merchandise Antitrust Litig.*, 112 F. Supp. 2d 1329, 1338 (N.D. Ga. 2000) ("This was not a quick settlement, and there is no suggestion of collusion"); *Warren v. City of Tampa*, 693 F. Supp. 1051, 1055 (M.D. Fla. 1988) ("*Warren*") (record disclosed no evidence of collusion, but to the contrary showed "that the parties conducted discovery and negotiated the terms of settlement for an extended period of time"), *aff'd*, 893 F.2d 347 (11th Cir. 1989).

Class Counsel negotiated the Settlement with similar vigor.  Plaintiffs and the Settlement Class were represented by experienced counsel at these negotiations.  The Parties engaged in extensive mediation before an experienced and respected mediator.  These negotiations were arm's-length and extensive.  Joint Decl. ¶¶ 27, 29.

### 2. The Settlement Will Avert Years of Highly Complex and Expensive Litigation.

This Action involves millions of Settlement Class Members and wrongful Overdraft Fees in the hundreds of millions of dollars.  Joint Decl. ¶ 57.  The claims and defenses are complex; litigating them is both difficult and time-consuming.  *Id.*  Although this Action was actively litigated for over two years before the Parties reached an agreement to resolve it, recovery by any means other than settlement would require additional years of litigation.  *See United States v. Glens Falls Newspapers, Inc.*, 160 F. 3d 853, 856 (2d Cir. 1998) (noting that "a principal function of a trial judge is to foster an atmosphere of open discussion among the parties' attorneys and representatives so that litigation may be settled promptly and fairly so as to avoid the uncertainty, expense and delay inherent in a trial."); *In re Domestic Air Transp. Antitrust*

*Litig.*, 148 F.R.D. 297, 317, 325-26 & n.32 (N.D. Ga. 1993) ("*Domestic Air*") ("[A]djudication

of the claims of two million claimants could last half a millennium").

By contrast, the Settlement provides immediate and substantial benefits to over 2,000,000

Settlement Class Members, all of whom are current or former Citizens' customers.  Joint Decl. ¶

57.  As stated in *In re Shell Oil Refinery*, 155 F.R.D. 552 (E.D. La. 1993):

> The Court should consider the vagaries of litigation and compare
> the significance of immediate recovery by way of the compromise
> to the mere possibility of relief in the future, after protracted and
> expensive litigation.  In this respect, "[i]t has been held proper to
> take the bird in the hand instead of a prospective flock in the
> bush."

*Id*. at 560 (alterations in original) (quoting *Oppenlander v. Standard Oil Co*., 64 F.R.D. 597, 624

(D. Colo. 1974)); *see also In re U.S. Oil & Gas Litig*., 967 F.2d 489, 493 (11th Cir. 1992) (noting

that complex litigation "can occupy a court's docket for years on end, depleting the resources of

the parties and taxpayers while rendering meaningful relief increasingly elusive").  Particularly

because the "demand for time on the existing judicial system must be evaluated in determining

the reasonableness of the settlement," *Ressler v. Jacobson*, 822 F. Supp. 1551, 1554 (M.D. Fla.

1992) (citation omitted) ("*Ressler*"), there can be no doubt about the adequacy of the present

Settlement, which provides generous benefits to the Class.  Miller Decl. ¶¶ 34-35.

### 3. The Factual Record Is Sufficiently Developed to Enable Class Counsel to Make a Reasoned Judgment.

Courts also consider "the degree of case development that class counsel have

accomplished prior to settlement" to ensure that "counsel had an adequate appreciation of the

merits of the case before negotiating."  *In re General Motors Corp. Pick-up Truck Fuel Tank*

*Prods. Liab. Litig*., 55 F.3d 768, 813 (3d Cir. 1995).  At the same time, "[t]he law is clear that

early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations." *Ressler*, 822 F. Supp. at 1555.

Voluminous discovery occurred in the Action. Nineteen lengthy depositions were taken and defended, and over 1,700,000 pages of documents were reviewed. Joint Decl. ¶¶ 17, 19, 81. Discovery afforded Class Counsel insight into the strengths and weaknesses of the claims against Citizens. *Id.* Prior to settling, Class Counsel developed ample information and performed analyses from which "to determine the probability of . . . success on the merits, the possible range of recovery, and the likely expense and duration of the litigation." *Mashburn v. Nat'l Healthcare, Inc.*, 684 F. Supp. 660, 669 (M.D. Ala. 1988) ("*Mashburn*"). Joint Decl. ¶¶ 53-56. The advanced stage of the proceedings when the Parties reached an agreement to settle supports granting Final Approval. Miller Decl. ¶¶ 38, 41-43.

### 4.   Plaintiffs Would Have Faced Significant Obstacles to Prevailing.

The "likelihood and extent of any recovery from the defendants absent . . . settlement" is another important factor in assessing the reasonableness of a settlement. *Domestic Air*, 148 F.R.D. at 314; *see also Ressler*, 822 F. Supp. at 1555 ("A Court is to consider the likelihood of the plaintiff's success on the merits of his claims against the amount and form of relief offered in the settlement before judging the fairness of the compromise."). In the words of Professor Miller: "This case presented significant risks both at the outset and throughout the litigation." Miller Decl. ¶ 27.

Class Counsel believe that Plaintiffs have a solid case against Citizens. Joint Decl. ¶ 60. Even so, we are mindful that Citizens advanced significant defenses that we would have been required to overcome in the absence of the Settlement. *Id.* This Action involved several major litigation risks. *Id.* As this Court recognized in granting final approval to the settlement with

Bank of America in MDL 2036: "The combined risks here were real and potentially catastrophic . . . . [B]ut for the Settlement, Plaintiffs and the class faced a multitude of potentially serious, substantive defenses, any one of which could have precluded or drastically reduced the prospects of recovery." *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1347-48 (S.D. Fla. 2011) ("*Checking Account Overdraft*").

Apart from the risks, continued litigation would have involved substantial delay and expense, which further counsels in favor of Final Approval here.  Had Plaintiffs succeeded in obtaining class certification of a multistate class, Plaintiffs and the certified class would still have faced summary judgment, a trial on the merits, and a post-judgment appeal.  Joint Decl. ¶¶ 59, 66.  The uncertainties and delays from this process would have been significant.   Joint Decl. ¶¶ 57-58, 60, 62-63, 66.

Given the myriad risks attending these claims, as well as the certainty of substantial delay and expense from ongoing litigation, the Settlement cannot be seen as anything except a fair compromise.  *See, e.g.*, *Bennett v. Behring Corp.*, 96 F.R.D. 343, 349-50 (S.D. Fla. 1982), *aff'd*, 737 F.2d 982 (11th Cir. 1984) (plaintiffs faced a "myriad of factual and legal problems" creating "great uncertainty as to the fact and amount of damage," making it "unwise [for plaintiffs] to risk the substantial benefits which the settlement confers . . . to the vagaries of a trial").

### 5.   The Benefits Provided by the Settlement Are Fair, Adequate and Reasonable Compared to the Range of Possible Recovery.

In determining whether a settlement is fair given the potential range of recovery, the Court should be guided by "the fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate."  *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988) (King, J.), *aff'd*, 899 F.2d 21 (11th Cir. 1990) ("*Behrens*").  Indeed, "[a] settlement can be satisfying even if it amounts to a hundredth or even

a thousandth of a single percent of the potential recovery." *Id.*  This is because a settlement must be evaluated "in light of the attendant risks with litigation." *Thompson v. Metropolitan Life Ins. Co.*, 216 F.R.D. 55, 64 (S.D.N.Y. 2003); *see also Bennett*, 737 F.2d at 986 ("[C]ompromise is the essence of settlement.").  Thus, courts regularly find settlements to be fair where "[p]laintiffs have not received the optimal relief." *Warren*, 693 F. Supp. at 1059; *see, e.g.*, *Great Neck Capital Appreciation Investment P'ship, L.P. v. PriceWaterHouseCoopers, L.L.P.*, 212 F.R.D. 400, 409-410 (E.D. Wis. 2002) ("The mere possibility that the class might receive more if the case were fully litigated is not a good reason for disapproving the settlement.").

Class Counsel have a thorough understanding of the practical and legal issues they would continue to face litigating these claims against Citizens based, in part, on similar claims challenging Wells Fargo's high-to-low posting practices prosecuted in *Gutierrez v. Wells Fargo Bank, N.A.*, , 730 F. Supp. 2d 1080 (N.D. Cal. 2010).  Joint Decl. ¶ 55.  The United States Court of Appeals for the Ninth Circuit recently reversed and remanded that judgment on the basis that certain provisions of California's Unfair Competition Law are preempted by federal laws and regulations.  *Gutierrez v Wells Fargo Bank, NA*, --- F.3d ----, 2012 WL 6684748 (9th Cir., December 26, 2012) ("*Gutierrez*").

Here, in addition to the challenges raised in *Gutierrez*, Plaintiffs faced challenges presented by a large, multistate class certification proceeding.  If Citizens were successful in defeating multistate class certification, there would be no further litigation of these claims in this Court on a classwide basis.  Joint Decl.  ¶ 63.

Analysis of the Citizens' transactional data showed that the most probable sum Plaintiffs and the Settlement Class could reasonably have anticipated recovering at a trial in this Action was $328,929,406.  Olsen Decl. ¶ 20; Joint Decl. ¶ 61.  Through this Settlement, Plaintiffs and

the Settlement Class Members have achieved a recovery of approximately forty-two percent (42%) of those damages without any further risk or delay.  Joint Decl. ¶ 61.  This Settlement provides an extremely fair and reasonable recovery to the Settlement Class in light of Citizens' defenses and the challenging, unpredictable path of litigation Plaintiffs would otherwise have continued to face in the trial and appellate courts.  Joint Decl. at ¶¶ 61-66.  "This is an outstanding result.  Many class actions – especially consumer class actions – generate only a small fraction of the total damages.  Given the risks of this litigation, a settlement that generates a fund equal to 42% of the estimated classwide damages clearly satisfies the second *Bennett* factor."  Miller Decl. ¶ 34.

The $137,500,000 cash recovery is excellent given the complexity of the Action, and the significant barriers that stood between now and final judgment: class certification; interlocutory Rule 23(f) appeal of class certification; motions for summary judgment; trial; and post-trial appeals.  Joint Decl. ¶ 66.  Taking these risks into account, the $137,500,000 Settlement Fund represents an outstanding result.  Joint Decl. ¶ 65.  Moreover, Citizens' agreement to pay all fees, costs and expenses of the Notice Administrator and Settlement Administrator, estimated to be approximately $1,500,000, and its agreement to discontinue High-to-Low Posting, further enhance the Settlement.  Joint Decl. ¶ 91.  Given the extraordinary obstacles that Plaintiffs faced in the litigation, this recovery is a significant achievement by any objective measure.

### 6. The Opinions of Class Counsel, the Class Representatives, and Absent Class Members Favor Approval of the Settlement.

Class Counsel wholeheartedly endorse the Settlement with Citizens.  Joint Decl. ¶¶ 65-68.  The Court should give "great weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation."  *Warren*, 693 F. Supp. at 1060; *see also Domestic Air*, 148 F.R.D. at 312-13 ("In determining whether to approve a proposed

settlement, the Court is entitled to rely upon the judgment of the parties' experienced counsel. '[T]he trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel.'") (citations omitted).

To date, opposition to the Settlement has been *de minimis*.  As of January 7, 2013, only thirty-nine (39) Settlement Class Members had requested to be excluded from the Settlement Class.  Azari Decl. ¶ 30.  As of January 7, 2013, two (2) Settlement Class Members had objected to the Settlement.  Azari Decl. ¶ 30; Joint Decl. ¶ 67.  This is yet another indication that the Settlement Class is satisfied with the Settlement.  Miller Decl. ¶ 39.  It is settled that "[a] small number of objectors from a plaintiff class of many thousands is strong evidence of a settlement's fairness and reasonableness."  *Association for Disabled Americans. v. Amoco Oil Co*., 211 F.R.D. 457, 467 (S.D. Fla. 2002); *see Mangone v. First USA Bank*, 206 F.R.D. 222, 227 (S.D. Ill. 2001) ("In evaluating the fairness of a class action settlement, such overwhelming support by class members is strong circumstantial evidence supporting the fairness of the Settlement."); *Austin v. Pennsylvania Dept. of Corrections*, 876 F. Supp. 1437, 1458 (E.D. Pa. 1995) ("Because class members are presumed to know what is in their best interest, the reaction of the class to the Settlement Agreement is an important factor for the court to consider.").

### C.    The Court Should Certify the Settlement Class.

This Court has previously found the requirements of Rule 23(a) and 23(b)(3) satisfied in this Action in a settlement posture (DE # 2959), and in similar actions in MDL 2036 on contested motions for class certification (*see*, *e.g.*, DE # 1763 (Union Bank, N.A.); DE # 2615 (TD Bank, N.A.); DE # 2697 (PNC Bank, N.A.)) and in the context of settlement (*see*, *e.g.*, DE # 1520, 2150 (Bank of America, N.A.); DE # 2712, 3134 (JPMorgan Chase Bank, N.A.)).  The Court should make the same class certification findings in granting Final Approval.

Based on the foregoing, the Settlement is fair, adequate and reasonable, and merits Final Approval.

## IV.   APPLICATION FOR SERVICE AWARDS

Pursuant to the Settlement, Class Counsel request, and Citizens does not oppose, Service Awards of $10,000 per named Plaintiff, or $5,000 per Plaintiff for married couples when both spouses are Plaintiffs.   Agreement ¶ 138; Joint Decl. ¶ 69.  Service awards "compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation."  *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1218 (S.D. Fla. 2006).   "[T]here is ample precedent for awarding incentive compensation to class representatives at the conclusion of a successful class action."  *David v. American Suzuki Motor Corp.*, 2010 WL 1628362, at *6 (S.D. Fla. Apr. 15, 2010).   Courts have consistently found service awards to be an efficient and productive way to encourage members of a class to become class representatives.  *See, e.g.*, *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 694 (N.D. Ga. 2001) (awarding class representatives $300,000 each, explaining that "the magnitude of the relief the Class Representatives obtained on behalf of the class warrants a substantial incentive award."); *Spicer v. Chi. Bd. Options Exchange, Inc.*, 844 F. Supp. 1226, 1267-68 (N.D. Ill. 1993) (collecting cases approving service awards ranging from $5,000 to $100,000, and awarding $10,000 to each named plaintiff).

The relevant factors include: (1) the actions the class representatives took to protect the interests of the class; (2) the degree to which the class benefited from those actions; and (3) the amount of time and effort the class representatives expended in pursuing the litigation.  *See, e.g.*, *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998).

The above factors, as applied to this Action, demonstrate the reasonableness of Service Awards to each of the eleven (11) named Plaintiffs.  Joint Decl. ¶¶ 69-73; *see, e.g., Checking Account Overdraft*, 830 F. Supp. 2d at 1357-58 ("The Court notes that the class representatives expended time and effort in meeting their fiduciary obligations to the Class, and deserve to be compensated for it.").  The Service Awards will be paid from the Settlement Fund.  Agreement ¶ 138.

The eleven (11) named Plaintiffs provided assistance that enabled Class Counsel to successfully prosecute the Action and reach the Settlement, including (1) submitting to interviews with Class Counsel, (2) locating and forwarding responsive documents and information (i.e., monthly account statements and account agreements), and (3) participating in conferences with Class Counsel.  In so doing, the Plaintiffs were integral to forming the theory of the case.  Moreover, each of the Plaintiffs committed to devoting significant time and potential travel to preparing for and testifying at lengthy depositions to be taken by Citizens' lawyers. Joint Decl. ¶72.

The named Plaintiffs not only devoted time and effort to the litigation, but the end result of their efforts, and those of Class Counsel, was a substantial benefit to the Settlement Class. Joint Decl. ¶ 72.  If the Court approves them, the total Service Awards will be $110,000.  This amount is 0.08% of the Settlement Fund, a ratio that falls well below the range of what has been deemed to be reasonable service awards.  Joint Decl. ¶ 73; s*ee, e.g*., *Enter. Energy Corp. v. Columbia Gas Transmission*, 137 F.R.D. 240, 251 (S.D. Ohio 1991) (approving service awards totaling $300,000, or 0.56% of a $56.6 million settlement).  The Service Awards requested here are reasonable and should be approved.

## V.    APPLICATION FOR ATTORNEYS' FEES AND EXPENSES

As indicated in the Agreement and the Notice, and consistent with standard class action practice and procedure, Class Counsel respectfully request attorneys' fees equal to thirty percent (30%) of the $137,500,000 Settlement Fund created through our efforts.[7]   Agreement ¶ 135; Joint Decl. ¶ 74.   Class Counsel also seek reimbursement of limited out-of-pocket costs and expenses totaling $185,434.66 incurred in connection with their prosecution of this Action.   *Id.*   The Parties negotiated and reached agreement regarding attorneys' fees and costs only after reaching agreement on all other material terms of this Settlement.   Agreement ¶ 139; Joint Decl. ¶ 74.   The thirty percent (30%) fee request is within the guidelines set forth by the Eleventh Circuit in *Camden I Condominium Assn. v. Dunkle*, 946 F.2d 768 (11th Cir. 1991) ("*Camden I*"), and adheres to this Court's prior decisions in MDL 2036 regarding attorneys' fees.   *See* Declaration of Thomas E. Scott, ¶¶ 9-25, attached as Exhibit F ("Scott Decl.").   For the reasons detailed herein, the requested fee is appropriate, fair and reasonable, and should be approved.

### A.    The Law Awards Class Counsel Fees From the Common Fund Created Through Their Efforts.

It is well established that when a representative party has conferred a substantial benefit upon a class, counsel is entitled to attorneys' fees based upon the benefit obtained.   *Camden I*, 946 F.2d at 771; *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("*Van Gemert*").   The common benefit doctrine is an exception to the general rule that each party must bear its own litigation costs.   The doctrine serves the "twin goals of removing a potential financial obstacle to a plaintiff's pursuit of a claim on behalf of a class and of equitably distributing the fees and costs of successful litigation among all who gained from the named plaintiff's efforts."   *In re Gould Sec. Litig.*, 727 F.

---

[7] In addition to the firms identified as Class Counsel in paragraph 33 of the Agreement, this fee request also includes Alters Law Firm, P.A.; Law Offices of Peter N. Wasylyk; Law Office of Andrew Kierstead: and Stanley-Iola, LLP.

Supp. 1201, 1202 (N.D. Ill. 1989) (citation omitted).  The common benefit doctrine stems from the premise that those who receive the benefit of a lawsuit without contributing to its costs are "unjustly enriched" at the expense of the successful litigant.  *Van Gemert*, 444 U.S. at 478.  As a result, the Supreme Court, the Eleventh Circuit, and courts in this District have all recognized that "[a] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as whole."  *Sunbeam*, 176 F. Supp. 2d at 1333 (citing *Van Gemert*, 444 U.S. at 478); *see also Camden I*, 946 F.2d at 771 ("Attorneys in a class action in which a common fund is created are entitled to compensation for their services from the common fund, but the amount is subject to court approval.").  Courts have also recognized that appropriate fee awards in cases such as this encourage redress for wrongs caused to entire classes of persons, and deter future misconduct of a similar nature.  *See, e.g.*, *Mashburn*, 684 F. Supp. at 687; *see also Deposit Guar. Nat'l Bank v. Rope*, 445 U.S. 326, 338-39 (1980).  Adequate compensation promotes the availability of counsel for aggrieved persons:

> If the plaintiffs' bar is not adequately compensated for its risk, responsibility, and effort when it is successful, then effective representation for plaintiffs in these cases will disappear . . . .  We as members of the judiciary must be ever watchful to avoid being isolated from the experience of those who are actively engaged in the practice of law.  It is difficult to evaluate the effort it takes to successfully and ethically prosecute a large plaintiffs' class action suit.  It is an experience in which few of us have participated.  The dimensions of the undertaking are awesome.

*Muehler v. Land O'Lakes, Inc.*, 617 F. Supp. 1370, 1375-76 (D. Minn. 1985).

In the Eleventh Circuit, class counsel receives a percentage of the funds obtained through a settlement.  In *Camden I* – the controlling authority regarding attorneys' fees in common-fund class actions – the Eleventh Circuit held that "the percentage of the fund approach [as opposed to the lodestar approach] is the better reasoned in a common fund case.  Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the

fund established for the benefit of the class." *Camden I*, 946 F.2d at 774.  This Court has applied

the percentage of the fund approach in MDL 2036, holding:

> The Eleventh Circuit made clear in *Camden I* that percentage of the fund is the exclusive method for awarding fees in common fund class actions. *Camden I*, 946 F.2d at 774.  Even before *Camden I*, courts in this Circuit recognized that "a percentage of the gross recovery is the only sensible method of awarding fees in common fund cases."  *Mashburn v. Nat'l Healthcare, Inc.*, 684 F. Supp. 660, 670 (M.D. Ala. 1988).  More importantly, the Court observed first hand the monumental effort exerted by Class Counsel in this case, and does not need to see timesheets to know how much work Class Counsel have put in to reach this point.

*Checking Account Overdraft*, 830 F. Supp. 2d at 1362.

The Court has substantial discretion in determining the appropriate fee percentage.

"There is no hard and fast rule mandating a certain percentage of a common fund which may be

awarded as a fee because the amount of any fee must be determined upon the facts of each case."

*Sunbeam*, 176 F. Supp. 2d at 1333 (quoting *Camden I*, 946 F.2d at 774).  Nonetheless, "[t]he

majority of common fund fee awards fall between 20 percent to 30 percent of the fund" – though

"an upper limit of 50 percent of the fund may be stated as a general rule."  *Id.* (quoting *Camden

I*, 946 F.2d at 774-75); *see also Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291 (11th Cir.

1999), *cert. denied*, 530 U.S. 1289 (2000) ("*Waters*") (approving fee award where the district

court determined that the benchmark should be 30 percent and then adjusted the fee award higher

in view of the circumstances of the case).

Class Counsel's fee request falls within this accepted range and accords with the Court's

prior fee rulings in MDL 2036.  Scott Decl. ¶¶ 23-24.  There is no reason for the Court to deviate

from its prior fee rulings here.

### B.     Application of the *Camden I* Factors Supports the Requested Fee.

The Eleventh Circuit has provided a set of factors the Court should use once again to

determine a reasonable percentage to award class action counsel:

(1)     the time and labor required;

(2)     the novelty and difficulty of the relevant questions;

(3)     the skill required to properly carry out the legal services;

(4)     the preclusion of other employment by the attorney as a result of his acceptance of the case;

(5)     the customary fee;

(6)     whether the fee is fixed or contingent;

(7)     time limitations imposed by the clients or the circumstances;

(8)     the results obtained, including the amount recovered for the clients;

(9)     the experience, reputation, and ability of the attorneys;

(10)    the "undesirability" of the case;

(11)    the nature and the length of the professional relationship with the clients;

(12)    fee awards in similar cases.

*Camden I*, 946 F.2d at 772 n.3 (citing factors originally set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)).

These twelve factors are guidelines and are not exclusive.  "Other pertinent factors are the time required to reach a settlement, whether there are any substantial objections by class members or other parties to the settlement terms or the fees requested by counsel, any non-monetary benefits conferred upon the class by the settlement, and the economics involved in prosecuting a class action."  *Sunbeam*, 176 F. Supp. 2d at 1333 (quoting *Camden I*, 946 F.2d at 775).  In addition, the Eleventh Circuit has "encouraged the lower courts to consider additional

factors unique to the particular case." *Camden I*, 946 F.2d at 775.  As applied here, the *Camden I* factors demonstrate that the Court should approve the requested fee.  Scott Decl. ¶ 12.

### 1.     The Claims Against Citizens Required Substantial Time and Labor.

Prosecuting and settling these claims demanded considerable time and labor, making this fee request reasonable.  Throughout the pendency of the Action, the internal organization of Class Counsel, including assignments of work, weekly conference calls, and oversight of task-oriented subcommittees, ensured that we were engaged in coordinated, productive work efforts to maximize efficiency and minimize duplication of effort.  Frequent in-person meetings and conference calls among Class Counsel were held during the course of the litigation.  Joint Decl. ¶ 76.  Class Counsel spent a substantial amount of time investigating the claims of many potential plaintiffs against Citizens.  Joint Decl. ¶ 77.  Class Counsel interviewed numerous Citizens' customers and potential plaintiffs to gather information about Citizens' conduct, both at the time the lawsuit was filed and in the past, to determine the effect that Citizens' conduct had on consumers.  *Id.*  This information was essential to Class Counsel's ability to understand the nature of Citizens' conduct, the language of the Account Agreements at issue, and potential remedies.  *Id.*  Class Counsel also expended significant resources researching and developing the legal claims at issue.  For example, state-by-state legal surveys were necessary to determine which state common law doctrines and consumer protection statutes provided Plaintiffs with viable claims.  Joint Decl. ¶ 78.

Once Citizens' motion to dismiss was denied and discovery opened, Class Counsel served written discovery requests on Citizens seeking relevant and probative documents and information.  Joint Decl. ¶ 79.  The process of developing, refining and finalizing such discovery requests – with an eye toward class certification, summary judgment, and trial – required

considerable effort on the part of Class Counsel. *Id.* Citizens asserted objections to discovery requests, as to many categories of relevant documents. Joint Decl. ¶ 17. The parties exchanged voluminous correspondence regarding discovery-related issues and held numerous conferences to resolve the discovery issues between them. Joint Decl. ¶ 17. Plaintiffs were ultimately required to move to quash Citizens' subpoenas of Plaintiffs' non-party family members and for a protective order and to defend against a motion to compel production of documents brought by Citizens, both times successfully (DE ##1577, 2116). Joint Decl. ¶¶ 20, 22.

Citizens ultimately produced approximately 1,700,000 pages of internal bank documents in discovery. Joint Decl. ¶ 17. Class Counsel established a large document review team consisting of dozens of attorneys whose task was to review, sort, and code the produced documents. Joint Decl. ¶ 18. To make the review and subsequent litigation more efficient, we instituted uniform coding procedures for electronic review of the documents produced, and team members across the country remained in constant contact with each other to ensure that all counsel became aware of significant emerging evidence in real time. *Id.* Such document review efforts and coordination were plainly necessary and accounted for a substantial amount of the attorney time expended in this Action. *Id.*

Furthermore, Class Counsel conducted lengthy depositions of eight (8) current and former Citizens' employees, officers, and representatives, including its expert witness. Joint Decl. ¶ 19. The deposition of one of the witnesses, Joseph Blain, who appeared as both a 30(b)(6) witness and a witness with personal knowledge, took place over four (4) days. *Id.* In addition, Class Counsel defended the depositions of all eleven (11) named Plaintiffs. *Id.* Preparing for and taking these depositions involved extensive time and effort. *Id.* Class Counsel also expended significant time and effort preparing responses to Citizens' requests for production

of documents directed to the Plaintiffs.  Joint Decl. ¶ 82.  Class Counsel devoted extensive time and effort to researching and preparing their motion for class certification and analyzing Citizens' lengthy opposition.  Joint Decl. ¶ 83.

Settlement negotiations consumed additional time and resources.  Preliminary settlement discussions began in late 2011 and mediation was held in April 2012.  Joint Decl. ¶¶ 25, 27.  The mediation required substantial preparation and follow-up work.  Joint Decl. ¶ 84.  On April 25, 2012, the Parties filed a Joint Notice of Settlement (DE # 2656).  Joint Decl. ¶ 28.  Several months of detailed discussions followed concerning the specific terms of the Settlement.  Joint Decl.t ¶ 29.  The drafting of the Agreement was completed in August 2012 and was executed in late August and early September 2012.  *Id.*

All told, Class Counsel's coordinated work paid great dividends for the Settlement Class.  Each of the above-described efforts was essential to achieving the Settlement before the Court.  Joint Decl. ¶ 86.  The time and resources Class Counsel devoted to prosecuting and settling this Action readily justify the fee that we now request.  "It is quite evident and beyond legitimate dispute that substantial time and labor were required of Class Counsel in this case. . . .  Undoubtedly, the time and labor required and expended by Class Counsel warrant the requested fee of thirty percent (30%) of the common fund.").  Scott Decl. ¶ 13.

### 2.   The Issues Involved Were Novel and Difficult, and Required the Skill of Highly Talented Attorneys.

The Court regularly witnessed and commented upon the high quality of our legal work, which conferred a substantial benefit on the Settlement Class in the face of significant litigation obstacles.  To begin with, it is very difficult to identify – let alone establish liability based upon – the High-to-Low Posting practice that lies at the heart of the Action.  The management of this

very large MDL, including the cases against Citizens, presented challenges most law firms are simply not able to meet.  Joint Decl. ¶ 87.

In any given case, the skill of legal counsel should be commensurate with the novelty and complexity of the issues, as well as the skill of the opposing counsel.  Litigation of this Action required counsel highly trained in class action law and procedure as well as the specialized issues presented here.  Class Counsel possess these attributes, and their participation added immense value to the representation of this large Settlement Class.  Joint Decl. ¶ 88. The record demonstrates that the Action involved a broad range of complex and novel challenges, which Class Counsel met at every juncture.  Joint Decl. ¶ 89.  "[T]here were significant risk factors present in this litigation and there were many demands on class counsel.  . . .  Class counsel achieved a superb result in the face of several formidable risks.  Miller Decl. ¶ 59.

In evaluating the quality of representation by Class Counsel, the Court should also consider the quality of opposing counsel.  *See Camden I*, 946 F.2d at 772 n.3; *Ressler*, 149 F.R.D. at 654.   Throughout the litigation, Citizens was represented by extremely capable counsel.  These were worthy, highly competent adversaries.  Joint Decl. ¶ 90; Miller Decl. ¶ 60; *see also Checking Account Overdraft*, 830 F. Supp. 2d at 1348 (King, J.) (finding "Class Counsel confronted not merely a single large bank, but the combined forces of a substantial portion of the entire American banking industry, and with them a large contingent of some of the largest and most sophisticated law firms in the country.") (internal quotation marks and citation omitted); *Walco Invs. v. Thenen*, 975 F. Supp. 1468, 1472 (S.D. Fla. 1997) ("*Walco*") (stating that "[g]iven the quality of defense counsel from prominent national law firms, the Court is not confident that attorneys of lesser aptitude could have achieved similar results").

### 3.     Class Counsel Achieved a Superb Result.

Given the significant litigation risks faced by the Settlement Class here, the Settlement represents an excellent achievement.  Miller Decl. ¶ 59 ("Class counsel obtained a superb result in the face of several formidable risks.").  Rather than facing more years of costly and uncertain litigation, the overwhelming majority of Settlement Class Members will receive an immediate cash benefit.  Joint Decl. ¶ 91.  The Settlement Fund will not be reduced by costs of Notice or settlement administration; such expenses have been and will continue to be borne separately by Citizens.  Agreement ¶¶ 77, 93, 98; Joint Decl. ¶ 91.  Moreover, most of the payments to the Settlement Class will be forthcoming automatically, through direct deposit (for Current Account Holders) or checks (for Past Account Holders).  Agreement ¶¶ 101-104, 125; Joint Decl. ¶ 91.  Finally, as part of the Settlement, Citizens agreed to discontinue High-to-Low Posting for Debit Card Transactions.  Joint Decl. ¶¶ 39, 62.

### 4.     The Claims Presented Serious Risk.

The Settlement here is particularly noteworthy given the combined litigation risks.  Citizens mounted vigorous defenses, fought hard in discovery, and advanced persuasive arguments in opposing class certification and in denying liability.  Joint Decl. ¶¶ 60, 66.  Success under these circumstances represents a genuine milestone.  "This was no ordinary class action.  The novelty and difficulty of the issues involved created significant risks for Class Counsel."  Scott Decl. ¶ 14; Miller Decl. ¶¶ 59-60.

Consideration of the "litigation risks" factor under *Camden I* "recognizes that counsel should be rewarded for taking on a case from which other law firms shrunk.  Such aversion could be due to any number of things, including social opprobrium surrounding the parties, thorny

factual circumstances, or the possible financial outcome of a case. All of this and more is enveloped by the term 'undesirable.'" *Sunbeam*, 176 F. Supp. 2d at 1336.

Further, "[t]he point at which plaintiffs settle with defendants . . . is simply not relevant to determining the risks incurred by their counsel in agreeing to represent them." *Skelton v. General Motor Corp.*, 860 F.2d 250, 258 (7th Cir. 1988), *cert. denied*, 493 U.S. 810 (1989). "Undesirability" and relevant risks must be evaluated from the standpoint of plaintiffs' counsel as of the time they commenced the suit – not retroactively, with the benefit of hindsight. *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 112 (3d Cir. 1976); *Walco*, 975 F. Supp. at 1473.

Prosecuting the Action was risky from the outset. Joint Decl. ¶¶ 92-96; Scott Decl. ¶ 14; Miller Decl. ¶ 59. An overview of three of the most serious litigation risks highlights these risks.

First, Citizens asserted that certification of the large multistate class, consisting of current and former customers representing thirteen (13) states, should be denied for a variety of reasons. Joint Decl. ¶ 93. If Citizens were successful in defeating class certification in this Court or before the Eleventh Circuit, this litigation would have effectively ground to a halt and this Settlement would not have been achieved. *Id.*; Scott Decl. ¶ 14

Second, Citizens would have continued to press its NBA preemption defense at all stages of the litigation. Joint Decl. ¶ 94; Scott Decl. ¶ 14. This Court stressed that its original preemption ruling, on motions to dismiss, applied only "[a]t this stage . . ." 694 F. Supp. 2d at 1313. When it subsequently approved the Bank of America settlement in MDL 2036, the Court observed that "whether Plaintiffs' claims are preempted by the NBA and related regulations remains an open question. . . . [N]o federal appeals court has yet reached the NBA preemption issue in this specific context. The preemption defense "was a 'light switch' which, if

successfully turned 'on' . . . would have led to dismissal of the entire case . . . ." *Checking Account Overdraft*, 830 F. Supp. 2d at 1347 (citations omitted).

Had the Action proceeded, Citizens would likely have raised the Ninth Circuit's recent decision in *Gutierrez*, that reversed and remanded a $203 million judgment against Wells Fargo on the grounds that certain provisions of California's Unfair Competition Law are preempted by federal laws and regulations. Joint Decl. ¶ 94. While *Gutierrez* is not applicable to this case because its preemption analysis was limited to particular provisions of California's Unfair Competition Law, Citizens would likely have argued that the NBA preempts these claims on the grounds that they "significantly interfere" with its federally-authorized banking powers. *Id.*

While Class Counsel believe that these claims – based on allegations of bad-faith conduct brought under state laws of general applicability – are not preempted, there can be no doubt that the federal preemption issue involves complex issues of law and fact, and presented a serious and ongoing risk to Plaintiffs' and the Settlement Class's claims against Citizens. Joint Decl. ¶ 94; *see also* Tr. of Nov. 7, 2011, Final Approval Hearing Regarding Bank of America Settlement, at 114:14–18 (this Court stated that preemption "seemed to me to be a very close issue. It caused me a lot of problems").

A third major risk derives from the fact that the language in Citizens' Account agreements suggests that, to some extent, Citizens adequately disclosed its practice of High-to-Low Posting. Joint Decl. ¶ 95; Scott Decl. ¶ 14. Thus, Citizens' asserted that its disclosure was adequate and that it could not be held liable for Plaintiffs' decisions to maintain Citizens' checking accounts under a contract authorizing such practices. *Id.*

The Court rejected this argument in denying the First Tranche banks' Omnibus Motion to Dismiss, finding that Plaintiffs seek only to have the bank exercise its contractual discretion in

good faith (DE # 305 at 19) and in denying Citizens' motion to dismiss (DE # 934).   Yet, Citizens' contractual language would have enabled it to argue to the fact-finder that it had the discretion to reorder as it did, and that it cannot be held responsible for Plaintiffs' decision to maintain Citizens' Accounts under these terms and then incur Overdraft Fees arguably of their own making.  Joint Decl. ¶ 95; Scott Decl. ¶ 14; *see Checking Account Overdraft*, 830 F. Supp. 2d at 1347 (noting that "high-to-low posting of debit card transactions is by no means clearly unlawful.  The account agreements disclose that [the bank] may process debits out of order and/or in high-to-low order, and the Uniform Commercial Code expressly permits the reordering of checks.") (internal quotation marks and citation omitted).

Each of these risks, alone, could easily have impeded Plaintiffs' and the Settlement Class' successful prosecution of these claims at trial and in an eventual appeal.  Considered together, the risks demonstrate that Plaintiffs' claims were far from a "slam dunk," and that the Settlement represents a superb result.  Joint Decl. ¶ 96.

> **5.   Class Counsel Assumed Considerable Risk to Pursue This Action on a Pure Contingency Basis, and Were Precluded From Other Employment as a Result.**

In undertaking to prosecute this complex case entirely on a contingent fee basis, Class Counsel assumed a significant risk of nonpayment or underpayment.  Joint Decl. ¶ 97.  That risk warrants an appropriate fee.  Indeed, "[a] contingency fee arrangement often justifies an increase in the award of attorney's fees."  *Sunbeam*, 176 F. Supp. 2d at 1335 (quoting *Behrens*, 118 F.R.D. at 548); *see also In re Continental Ill. Sec. Litig.*, 962 F.2d 566 (7th Cir. 1992) ("*Continental*") (holding that when a common fund case has been prosecuted on a contingent-fee basis, plaintiffs' counsel must be adequately compensated for the risk of non-payment); *Ressler*,

149 F.R.D. at 656 ("Numerous cases recognize that the attorney's contingent fee risk is an important factor in determining the fee award.").

Public policy concerns – in particular, ensuring the continued availability of experienced and capable counsel to represent classes of injured plaintiffs holding small individual claims – support the requested fee.  Joint Decl. ¶ 98; Miller Decl. ¶¶ 59-60 .  In the Court's words:

> Generally, the contingency retainment must be promoted to assure representation when a person could not otherwise afford the services of a lawyer. . . . A contingency fee arrangement often justifies an increase in the award of attorney's fees.  This rule helps assure that the contingency fee arrangement endures.  If this "bonus" methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing.

*Behrens*, 118 F.R.D. at 548.

The progress of the Action shows the inherent risk faced by Class Counsel in accepting these cases on a contingency fee basis.  Despite Class Counsel's enormous effort in litigating this Action for nearly three years, we remain completely uncompensated for the tremendous amount of time invested in the Action, in addition to the expenses we advanced.   Joint Decl. ¶ 99. Uncompensated expenditures of this magnitude can severely damage or destroy firms of the relatively small size of our firms.  There can be no dispute that this case entailed substantial risk of nonpayment and financial catastrophe for Class Counsel's practices.

The time Class Counsel spent on this case was time that could not be spent on other matters.   Joint Decl. ¶ 100.   Thus, this factor militates strongly in favor of the requested attorneys' fees.  Scott Decl. ¶ 16.

### 6.      The Requested Fee Comports With Fees Awarded in Similar Cases.

The fee sought here matches the fee typically awarded in similar cases.  Joint Decl. ¶ 101;

Scott Decl. ¶ 23; Miller Decl. ¶ 46.  Legions of decisions have found that a thirty percent fee is

well within the range of a customary fee.  *See, e.g.*, *Sunbeam*, 176 F. Supp. 2d at 1333-34.

Several recent decisions within this Circuit have awarded attorneys' fees up to (or in excess of)

thirty percent, confirming the fairness and reasonableness of the thirty percent fee requested

here.  Joint Decl. ¶ 101.

As another member of this Court observed: "[F]ederal district courts across the country

have, in the class action settlement context, *routinely* awarded class counsel fees in excess of the

25 percent 'benchmark,' even in so-called 'mega-fund' cases."[8]  *Allapattah Servs., Inc. v. Exxon

Corp.*, 454 F. Supp. 2d 1185, 1210 (S.D. Fla. 2006) (emphasis added) (awarding fees equaling

31⅓ percent of settlement fund; *citing*, *inter alia*, *In re Relafen Antitrust Litig.*, No. 01-12239-

WGY (D. Mass. Apr. 9, 2004) (33⅓ percent); *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403

(S.D. Tex. 1999) (35.1 percent)); *see also Gaskill v. Gordon*, 942 F. Supp. 382, 387-88 (N.D. Ill.

1996), *aff'd*, 160 F.3d 361 (7th Cir. 1998) (finding that 33 percent is the norm, and awarding 38

percent of settlement fund); *In re Combustion, Inc.*, 968 F. Supp. 1116 (W.D. La. 1997) (36

percent); *In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320, 326 (E.D.N.Y. 1993) (33.8 percent); *In

re Ampicillin Antitrust Litig.*, 526 F. Supp. 494, 498 (D.D.C. 1981) (45 percent); *Beech Cinema,

Inc. v. Twentieth-Century Fox Film Corp.*, 480 F. Supp. 1195, 1199 (S.D.N.Y. 1979), *aff'd*, 622

---

[8] *See also* 1 *Court Awarded Attorney Fees*, ¶ 2.06[3], at 2-88 (Matthew Bender 2010) (noting that, "when appropriate circumstances have been identified, a court may award a percentage significantly higher" than 25 percent); 4 *Newberg on Class Actions*, § 14:6, at 551 (4th ed. 2002) ("Empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in class actions average around one-third of the recovery.").

F.2d 1106 (2d Cir. 1980) (approximately 53 percent); *Zinman v. Avemco Corp.*, 1978 WL 5686 (E.D. Pa. Jan. 18, 1978) (Higginbotham, J.) (50 percent).

Class Counsel's fee request falls within the range of the private marketplace, where contingency fee arrangements often approach or equal forty percent of any recovery.  Scott Decl. ¶ 17; *see Continental*, 962 F.2d at 572 ("The object in awarding a reasonable attorneys' fee . . . is to simulate the market."); *RJR Nabisco, Inc. Sec. Litig.*, Fed. Sec. L. Rep. (CCH) ¶ 94,268 (S.D.N.Y. 1992) ("[W]hat should govern [fee] awards is . . . what the market pays in similar cases").   And, "[i]n tort suits, an attorney might receive one-third of whatever amount the Plaintiff recovers.  In those cases, therefore, the fee is directly proportional to the recovery." *Blum v. Stenson*, 465 U.S. 886, 904 (1984) (Brennan, J., concurring); *see also Kirchoff v. Flynn*, 786 F.2d 320, 323, 325 n.5 (7th Cir. 1986) (noting "40 percent is the customary fee in tort litigation"); *In re Public Service Co. of New Mexico*, 1992 WL 278452, at *7 (S.D. Cal. July 28, 1992) ("If this were a non-representative litigation, the customary fee arrangement would be contingent, on a percentage basis, and in the range of 30% to 40% of the recovery.").

The record here leaves no doubt that Class Counsel's fee request is appropriate and comports with attorneys' fees awarded in similar cases.  Professor Miller distilled several major empirical studies of attorneys' fees, including his own, awarded in connection with class action settlements.     Miller Decl. ¶¶ 48-58.   He concluded that the empirical data from those studies supports the reasonableness of a thirty percent (30%) fee award in this case.  *Id.*

Class Counsel's fee request also falls within the range of awards in numerous recent cases in this Circuit and District.  Scott Decl. ¶ 23; Miller Decl. ¶ 47; *see, e.g.*, *Waters*, 190 F.3d 1291 (11th Cir. 1999) (affirming fee award of 33⅓ percent on settlement of $40 million even though most of the fund ultimately reverted to the defendant); *In re Managed Care Litig. v.*

*Aetna*, MDL No. 1334, 2003 WL 22850070 (S.D. Fla. Oct. 24, 2003) (35.5 percent on settlement of $100 million); *Gutter v. E.I. Dupont De Nemours & Co*., 95-2152-CIV-Gold (S.D. Fla. May 30, 2003) (33⅓ percent of $77.5 million settlement); *In re Terazosin Hydrochloride Antitrust Litig*., 99-1317-MDL-Seitz (S.D. Fla. Apr. 19, 2005) (33⅓ percent on settlement of over $30 million); *Sands Point Partners, LP v. Pediatrix Med. Group, Inc*., 2002 U.S. Dist. LEXIS 25721 (S.D. Fla. 2002) (30 percent of $12 million settlement); *In re CHS Elecs., Inc. Sec. Litig*., 99-8186-CIV-Gold (S.D. Fla. 2002) (30 percent on settlement of over $11 million); *Ehrenreich v. Sensormatic Elecs. Corp*., 95-6637-CIV-Zloch (S.D. Fla. 1998) (30 percent on settlement of over $44 million); *Tapken v. Brown*, 90-0691-CIV-Marcus (S.D. Fla. 1995) (33 percent of $10 million settlement).[9]

### 7. The Remaining *Camden I* Factors Also Favor Approving the Requested Fee.

The remaining *Camden I* factors likewise support granting Class Counsel's fee request. "Undoubtedly, Class Counsel had the skill required to perform the services required in this litigation." Scott Decl. ¶ 15. "[T]his talented team of lawyers accomplished outstanding results for the Settlement Class in the face of substantial risks. Had they not had the skill to perform the necessary services, it is highly doubtful Class Counsel could have achieved the results obtained for the Settlement Class in this case." *Id*. As noted above, the burdens of this litigation have

---

[9] *See also In re Friedman's, Inc. Sec. Litig*., No. 1:03-cv-3475-WSD, 2009 WL 1456698 (N.D. Ga. May 22, 2009) (30 percent); *Francisco v. Numismatic Guar. Corp. of Am*., No. 06-61677-CIV-Martinez, 2008 WL 649124 (S.D. Fla. 2008) (30 percent); *Pinto v. Princess Cruise Lines, Ltd*., 513 F. Supp. 2d 1334 (S.D. Fla. 2007) (30 percent); *In re BellSouth Corp. Sec. Litig*., Civil Action No. 1:02-cv-2142-WSD (N.D. Ga. Apr. 9, 2007) (30 percent); *In re Cryolife, Inc. Sec. Litig*., Civil Action No. 1:02-cv-1868-BBM (N.D. Ga. Nov. 9, 2005) (30 percent); *In re Profit Recovery Group Int'l, Inc. Sec. Litig*., Civil Action No. 1:00-cv-1416-CC (N.D. Ga. May 26, 2005) (33⅓ percent plus interest and expenses); *In re Clarus Corp. Sec. Litig*., Civil Action No. 1:00-CV-2841-CAP (N.D. Ga. Jan. 6, 2005) (33⅓ percent); *In re Pediatric Servs. of Am., Inc. Sec. Litig*., Civil Action No. 1:99-CV-0670-RLV (N.D. Ga. Mar. 15, 2002) (33⅓ percent); *Ressler v. Jacobson*, 149 F.R.D. 651 (M.D. Fla. 1992) (30 percent).

foreclosed our pursuit of other work; the relatively small size of the firms representing Plaintiffs, and the major commitment involved, precluded Class Counsel from working on other cases and accepting other representations.   Joint Decl. ¶¶ 100, 102.   Moreover, without adequate compensation and financial reward, cases such as this simply could not be pursued.  *Id.*  The Court previously held that, "given the positive societal benefits to be gained from lawyers' willingness to undertake difficult and risky, yet important, work like this, such decisions must be properly incentivized.  The Court believes, and holds, that the proper incentive here is a 30% fee."  *Checking Account Overdraft*, 830 F. Supp. 2d at 1364.   The record before the Court compels the same outcome in this parallel MDL 2036 Action.  Scott Decl. ¶¶ 7, 9, 23-25.

## 8.  The Expense Request Is Appropriate.

Class Counsel also request reimbursement for a total of $185,434.66 in litigation costs and expenses.  Joint Decl. ¶ 103; *see Mills v. Electric Auto-Lite Co*., 396 U.S. 375, 391-92 (1970).  This sum corresponds to certain actual out-of-pocket costs and expenses that Class Counsel necessarily incurred in connection with the prosecution and settlement of the Action. Joint Decl. ¶ 103.  Specifically, these costs and expenses consist of: (1) $165,198.90 in fees and expenses for experts, including Arthur Olsen, whose analysis was necessary to determine the damages for the Settlement Class in the Action and to properly identify Settlement Class Members and allocate the Settlement Fund; (2) $13,519.65 in court reporter fees and transcripts; and (3) $6,716.11 in mediator's fees and expenses.[10]  *Id.*  All of these out-of-pocket expenses were reasonably and necessarily incurred in furtherance of the prosecution of this Action.  *Id.*

---

[10] Class Counsel have limited the categories of expenses for which reimbursement is being sought to those enumerated above, and are not seeking reimbursement for many thousands of dollars in other expenses that are routinely sought and recovered in common fund class actions. Joint Decl. ¶ 104.

## VI.    CONCLUSION

The Settlement with Citizens securing $137,500,000 in cash compensation for the benefit of the Settlement Class, as well as a change in Citizens' posting order, represents an outstanding result given the obstacles confronted in this litigation.   The Settlement more than satisfies the fairness and reasonableness standard of Rule 23(e), as well as the class certification requirements of Rules 23(a) and (b)(3).   Further, Class Counsel's application for fees and expenses is reasonable under all the circumstances.   The request satisfies the guidelines of *Camden I* given the outstanding result, the notable litigation risks, the extremely complicated nature of the factual and legal issues, and the time, effort, and skill required to litigate claims of this nature to a satisfactory conclusion.

Accordingly, Plaintiffs and Class Counsel respectfully request that this Court (1) grant Final Approval to the Settlement; (2) certify for settlement purposes the Settlement Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(3), and 23(e); (3) appoint as class representatives the eleven (11) Plaintiffs identified in paragraph 57 of the Agreement; (4) appoint as Class Counsel and Settlement Class Counsel the law firms and attorneys listed in paragraphs 33 and 69 of the Agreement, respectively; (5) approve the requested Service Awards for the named Plaintiffs; (6) award Class Counsel attorneys' fees and expenses; and (7) enter Final Judgment dismissing the Action with prejudice.

Dated: January 10, 2013.

Respectfully submitted,

/s/ Aaron S. Podhurst
Aaron S. Podhurst, Esquire
Florida Bar No. 063606
apodhurst@podhurst.com
Robert C. Josefsberg, Esquire
Florida Bar No. 40856
rjosefsberg@podhurst.com
Peter Prieto, Esquire
Florida Bar No. 501492
pprieto@podhurst.com
John Gravante, III, Esquire
Florida Bar No. 617113
jgravante@podhurst.com
PODHURST ORSECK, P.A.
City National Bank Building
25 W. Flagler Street, Suite 800
Miami, FL 33130
Tel: 305-358-2800
Fax: 305-358-2382

/s/ Bruce S. Rogow
Bruce S. Rogow, Esquire
Florida Bar No. 067999
brogow@rogowlaw.com
BRUCE S. ROGOW, P.A.
Broward Financial Center
500 E. Broward Boulevard
Suite 1930
Fort Lauderdale, FL  33394
Tel: 954-767-8909
Fax: 954-764-1530

*Co-Lead Counsel for Plaintiffs*

/s/ Robert C. Gilbert
Robert C. Gilbert, Esquire
Florida Bar No. 561861
rcg@grossmanroth.com
Stuart Z. Grossman, Esquire
Florida Bar No. 156113
szg@grossmanroth.com
David M. Buckner, Esquire
Florida Bar No. 60550
dmb@grossmanroth.com
Seth E. Miles, Esquire
Florida Bar No. 3855830
sem@grossmanroth.com
GROSSMAN ROTH, P.A.
2525 Ponce de Leon Boulevard
Eleventh Floor
Coral Gables, FL 33134
Tel: 305-442-8666
Fax: 305-779-9596


*Coordinating Counsel for Plaintiffs*


/s/ E. Adam Webb
E. Adam Webb, Esquire
Georgia Bar No. 743910
Adam@WebbLLC.com
Matthew C. Klase, Esquire
Georgia Bar No. 141903
Matt@WebbLLC.com
G. Franklin Lemond, Jr., Esquire
Georgia Bar No. 141315
FLemond@WebbLLC.com
WEBB, KLASE & LEMOND, L.L.C.
1900 The Exchange, S.E.
Suite 480
Atlanta, GA 30339
Tel: 770-444-9325
Fax: 770-444-0271

/s/ Michael W. Sobol
Michael W. Sobol, Esquire
California Bar No. 194857
msobol@lchb.com
Roger N. Heller, Esquire
California Bar No. 215348
rheller@lchb.com
Jordan Elias, Esquire
California Bar No. 228731
jelias@lchb.com
LIEFF CABRASER HEIMANN &
  BERNSTEIN L.L.P.
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
Tel: 415-956-1000
Fax: 415-956-1008

/s/ Russell W. Budd
Russell W. Budd, Esquire
Texas Bar No. 03312400
rbudd@baronbudd.com
Bruce W. Steckler, Esquire
Texas Bar No. 00785039
bsteckler@baronbudd.com
Mazin A. Sbaiti, Esquire
Texas Bar No. 24058096
msbaiti@baronbudd.com
BARON & BUDD, P.C.
3102 Oak Lawn Avenue
Suite 1100
Dallas, TX 75219
Tel: 214-521-3605
Fax: 214-520-1181

/s/ David S. Stellings
David S. Stellings, Esquire
New York Bar No. 2635282
dstellings@lchb.com
LIEFF CABRASER HEIMANN &
  BERNSTEIN L.L.P.
250 Hudson Street
8th Floor
New York, NY 10013
Tel: 212-355-9500
Fax: 212-355-9592

/s/ Ruben Honik
Ruben Honik, Esquire
Pennsylvania Bar No. 33109
rhonik@golombhonik.com
Kenneth J. Grunfeld, Esquire
Pennsylvania Bar No. 84121
kgrunfeld@golombhonik.com
GOLOMB & HONIK, P.C.
1515 Market Street
Suite 1100
Philadelphia, PA 19102
Tel: 215-985-9177
Fax: 215-985-4169

/s/ Ted E. Trief
Ted E. Trief, Esquire
New York Bar No. 1476662
ttrief@triefandolk.com
Barbara E. Olk, Esquire
New York Bar No. 1459643
bolk@triefandolk.com
TRIEF & OLK
150 E. 58th Street
34th Floor
New York, NY 10155
Tel: 212-486-6060
Fax: 212-317-2946

*Plaintiffs' Executive Committee*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 09-MD-02036-JLK

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

CERTIFICATE OF SERVICE

I hereby certify that on January 10, 2013, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Robert C. Gilbert
Robert C. Gilbert, Esquire
Florida Bar No. 561861
GROSSMAN ROTH, P.A.
2525 Ponce de Leon Boulevard
Eleventh Floor
Coral Gables, FL 33134
Tel: 305-442-8666
Fax: 305-779-9596