UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

Case No. 1:09-MD-02036-JLK

| | |
|---|---|
| **In re: Checking Account Overdraft Litigation** | ) ) |
| **MDL No. 2036** | ) ) ) |
| **THIS DOCUMENT RELATES TO:** **THIRD TRANCHE ACTIONS** | ) ) ) ) |
| *Duval v. Citizens Financial Group, Inc.,* N.D. Ill. Case No. 1:10-cv-00533 S.D. Fla. Case No. 1:10-cv-21080-JLK | ) ) ) ) ) |
| *Daniels v. Citizens Financial Group, Inc.* D. Mass. Case No. 1:10-cv-10386 S.D. Fla. Case No. 1:10-cv-22014-JLK | ) ) ) ) |
| *Blankenship v. RBS Citizens, N.A.* D.R.I. Case No. 1:10-cv-00163 S.D. Fla. Case No. 1:10-cv-22942-JLK | ) ) ) ) |

**OBJECTION OF SANDRA BUSSER
AND NOTICE OF INTENTION TO APPEAR**

NOW COMES Class Member Sandra L. Busser, 3405 Prestwyck Lane, Richfield OH 44286, telephone # 330-659-6809, and objects to the proposed settlement of this class action and the request for attorneys' fees.

Ms. Busser had a Charter One consumer checking account that she could access with her debit card beginning sometime prior to 2005 until sometime after 2005. Ms. Busser received individual notice of the settlement in the mail. Ms. Busser has read this objection filed on her behalf and indicated her endorsement and adoption of this objection by her signature.

## I. The Subclass of Consumers Who Must File Claim Forms Requires Separate Representation and a Higher Recovery.

There is an absence of the unity of interests necessary for certification of a unitary settlement class. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999).

In *In re: Literary Works in Electronic Databases Copyright Litig.*, 2011 U.S. App. LEXIS 17026 (2nd Cir. Aug. 17, 2011), the Second Circuit applied the *Ortiz* holding to a proposed settlement that disfavored a particular subclass, and clarified that the mere fact that the lead plaintiffs happened to be members of the disfavored subclass does not overcome the fact that no one was advocating for the interests of the subclass alone. *Id.* at *23.

The United States Court of Appeals for the Third Circuit rejected a similar settlement in *Dewey v. Volkswagen AG*, 681 F.3d 170 (3rd Cir. 2012). In that case, the settlement created an $8 million reimbursement fund that was available only to certain subgroups of the class, while the rest of the class members could only file claims against any residual funds. The Third Circuit rejected the settlement for inadequate representation of the disfavored subgroup.

> The structure of the settlement agreement itself, which divides a single class into two groups of plaintiffs that receive different benefits, supports the inference that the representative plaintiffs are inadequate. The reimbursement group has priority access to the $8 million fund.
> ...
> Every plaintiff in the class had an incentive to maximize the number of plaintiffs in the residual group, while ensuring that they themselves were in the reimbursement group. ... Doing so would create the least amount of competition for the first round of reimbursement claims, and would thus give class members in the reimbursement group the best chance at having their claims satisfied in full.

*Id.* at 187-188.

2

Here, the Plaintiffs in the Automatic Payment subclasses have an incentive to maximize the amount available to satisfy their claims. Therefore, rather than providing for an automatic payment of some amount to the January 1, 2002- July 25, 2005 subclass, perhaps the average amount of overdraft fees per account for those years, the Plaintiffs in the Automatic Payment group have agreed to a settlement structure that is guaranteed to provide almost no compensation to the 2002-2005 subclass. Almost no class member will have credit card records dating back 8 to 11 years that would permit them to file a claim against the settlement fund. The claim form requirement will have the practical effect of providing the 2002-2005 subclass no compensation from the settlement fund, and no consideration for the release of their claims.

The Plaintiffs had alternatives to the meaningless claim form provision for the 2002-2005 subclass. For instance, they could have agreed to set aside a portion of the settlement fund for the benefit of those class members who would not receive automatic payments. They could have estimated the amount of overdraft charges during 2002-2005 by extrapolating from the known data in later years, as was done in the Bank of America settlement. Moreover, they could have paid this portion of the fund to persons who had accounts in 2002 through 2005 by simply making a *pro rata* distribution of the average amount of overdraft charges per account during that time period. This would result in each class member from that time period receiving *some* consideration for the release of their claims, albeit not in direct proportion the exact amount of their damages. Such a distribution, while imperfect, is far preferable to a forfeiture of all compensation by this subclass. Amounts that should rightfully be paid to the 2002-2005 subclass will

instead be transferred to class members who had accounts from 2005-2010, thus subsidizing the recoveries of the favored subclass. This is improper.

Regardless of what impact a re-allocation of the settlement to comport with *Ortiz* would have on any individual class member, the proposed settlement must be rejected for failing to adequately represent and compensate Charter One class members whose overdrafts occurred in 2002, 2003, 2004 and 2005.

The Court should reject the proposed settlement and decertify the settlement class for failing to adequately represent the 2002-2005 subclass.

## II.     The Entire Settlement Fund Should Be Paid To Class Members; If There Is *Cy Pres*, Potential *Cy Pres* Recipients Must Be Identified Now, Not Later.

The proposed settlement provides that any money remaining after claims are made will be distributed to nonprofit organizations, without identifying what those organizations will be. This is a violation of the law of several federal circuits.

First of all, there should be no *cy pres* payments whatsoever in this case. It is undisputed that the amount of the settlement -- $137.5 million – is less than the total amount of class members' damages. In these circumstances, the entire settlement fund must be distributed to class members if that is at all possible. *See Klier v. Elf Atochem N.A., Inc.*, 658 F.3d 468 (5th Cir. 2011).

> We begin our analysis with a return to basic principles. As we will explain, these core principles control and decide this appeal.... These precepts define the first – and often the last – arena of analysis, imposing foundational limitations on a district court's discretion as it administers a class-action settlement. Because the settlement funds are the property of the class, a cy pres distribution to a third party of unclaimed settlement funds is permissible "only when it is not feasible to make further distributions to class members." Where it is still logistically feasible and economically viable to make additional pro rata distributions to class members, the district court should do so, except where an additional class distribution would provide a windfall to class members with liquidated-

> damages claims that were 100 percent satisfied by the initial distribution. A cy pres distribution puts settlement funds to their next-best use by providing an indirect benefit to the class. That option arises only if it is not possible to put those funds to their very best use: benefitting the class members directly.

*Id.* at 474-475.

As the Fifth Circuit held, there are "foundational limitations" on this Court's discretion to order payments to *cy pres* organizations. Indeed, the Court has no power to approve any *cy pres* payments until each and every class member has received 100 percent of his or her liquidated damages. The $137.5 million settlement amount represents 42% of class members' liquidated damages that would be recovered at trial, according to Plaintiffs' Motion for Final Approval of Settlement. Therefore, it would clearly be feasible to double the amounts that will be paid to each class member without creating a windfall. Certainly, if there are leftover funds, a *pro rata* distribution could be made to those class members who will not receive automatic payments and who do not file claims for benefits.[1]

Most significantly, there is little doubt that the Charter One's high-to-low overdraft policy generated revenues during 2002-2005. In fact, that time period represents approximately 41% of the Charter One Class Period, but class members who had overdrafts during that time period will receive nothing in compensation for their overdraft payments from 2002-2005, with the exception of the handful of class members who may have retained their credit card statements from eight to twelve years ago.

---

[1] In other words, automatic payments could be made to those class members for whom Defendants do not have records sufficient to calculate their overdraft charges during the Class Period. The amount left over would simply be divided by the number of accounts that have not received automatic payments, and each such class member account would receive the same amount.

In order to comply with *Klier*, and thus the ALI Principles, the settlement must be amended to provide some compensation to the 2002-2005 Charter One subclass. Since the settlement covers 8.5 years, the 2002-2005 subclass represents approximately 41% of the entire class period. Therefore, 41% of the net settlement fund designated for Charter One customers should be segregated for 2002-2005 class members, and that amount should be distributed *pro rata* to all identified 2002-2005 account holders. While this may slightly overcompensate some class members who had no overdraft charges, it will guarantee *some compensation* to every class member who experienced an overdraft charge during 2002 - 2005.

As demonstrated above, there should be no *cy pres* payments in this case, because the settlement amount is less than one-half of the class' single damages. However, to the extent that a *cy pres* provision remains part of the settlement, it is reversible error for the parties to leave the identities of the potential *cy pres* recipients unidentified at the time of settlement approval. This is not a mere trivial detail to be filled in later. *See Dennis v. Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012).

Because the potential *cy pres* recipients are not identified in the Settlement Agreements, there is no assurance that those recipients satisfy the requirements that there be a reasonable certainty that class members will benefit from *cy pres*, and that it will be geographically distributed in a way that corresponds to the geographical distribution of the class. Therefore, this Court should reject the Settlements until the potential *cy pres* recipients are identified, and the Court verifies that they meet the criteria set forth in *Nachsin v. AOL, LLC*, 663 F.3d 1034 (9th Cir. 2011).

## III. Class Counsel's Requested Fees Are Unreasonable for This, The Third Megafund Recovery In This Consolidated Litigation.

At some point, Class Counsel's lodestar and the windfall to Class Counsel must become relevant. This Court has already approved two 30% fee awards, in Bank of America and Chase, in settlements that exceeded $100 million, without ever inquiring into the amount of Class Counsel's lodestar, or what multiplier of that lodestar the fee represented. Class Counsel has already been awarded $171.6 million in just those two megafund settlements, plus several smaller fee awards in the non-megafund settlements. This amount vastly exceeds Class Counsel's reasonable lodestar for this entire case. Because Class Counsel has already been compensated for all of its time in these consolidated cases, plus an extremely generous multiplier of its time, Class Counsel is essentially double-dipping for all future fee requests.

Class Counsel should not be permitted to "recycle" the lodestar for which they have already been compensated in prior cases. To the extent that there is additional, uncompensated lodestar specifically traceable to this case, Class Counsel should be permitted to claim that lodestar in support of its fee request in this case. However, Class Counsel should not be permitted to claim lodestar that was spent pursuing this MDL action generally, including the First Tranche and Second Tranche actions.

The average fee award in all cases settling for more than $100 million (so-called "megafund" cases) was 15% in 2003. *See Exhibit A*. Professor Brian Fitzpatrick's recent empirical study demonstrates that this average has persisted through 2010. *See An Empirical Study of Class Action Settlements and Their Fee Awards*, attached hereto as *Exhibit B*, at p. 839.

7

> In 2004, following an examination of two data sets covering class actions from 1993 to 2002, Theodore Eisenberg and Geoffrey Miller found that, for cases with recovery ranges that exceeded $190 million..., the mean fee awarded was 12% and the median fee was 10.1% ... For Class Action Reports Data ("CAR") cases involving recoveries in excess of $190 million, Eisenberg and Miller found the mean fee to be 16.4% ... More recently, Brian Fitzpatrick studied every federal class-action settlement in 2006 and 2007... For settlements in the amount of $100 million to $250 million, he found that the mean fee was 17.9% and that the median was 16.9%.

*In re AT&T Mobility Wireless Data Services Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1033 (N.D. Ill. 2011).

Despite this empirical data, this Court has twice awarded 30% percentage fees in settlements greater than $100 million. Those fee awards resulted in a windfall to Class Counsel, and, rather than weighing in favor of the requested 30% fee award in this case, weigh against another windfall of that magnitude.

There is no reason to depart from the benchmark established by megafund cases here. During this case, class counsel was pursuing cases against other defendants in addition to Citizens. The fee awards to date have substantially mitigated any risk Class Counsel bore in the remaining cases against other defendants, since it is now certain that these consolidated cases will not be a losing proposition for Class Counsel. Accordingly, a 20% fee award to class counsel would appear to be more than adequate in the circumstances of this case and the prior fee awards, and class counsel has not borne its burden of establishing that it is entitled to anything more to avoid unjust enrichment of the class.

## IV. A Lodestar Cross-Check Is Increasingly Important In This and Future Settlements.

Class counsel has to date requested fees without the benefit of a lodestar-cross-check. This is improper, especially in the third megafund settlement to date, when there is no question that Class Counsel has now been fully reimbursed for all of the time they have spent on these consolidated cases, and that any future fee awards will represent pure profit and continue to increase the lodestar-multiplier that they have already received. *See In re: Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 944-945 (9th Cir. 2011) (courts required to guard against unreasonable fees by cross-checking against second method, regardless of primary method used).

Indeed, district courts in the Eleventh Circuit have routinely employed a lodestar cross-check for guidance in assessing the reasonableness of a percentage fee award. *See In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1336 (S.D. Fla. 2001) (finding that multiplier of 1.45 does not require higher percentage award, in case settled for $110 million); *Pinto v. Princess Cruise Lines Ltd.*, 513 F. Supp. 2d 1334, 1343 (S.D. Fla. 2007) (approving lodestar multiplier of 1.2 in $4.25 million settlement).

The first factor set forth in *Camden I Condominium Ass'n v. Dunkle*, 946 F.2d 768 (11th Cir. 1991), is "the time and labor required." *Id.* at 772. In this Circuit, that factor has been interpreted to mean the number of hours that class counsel spent on the case – in effect, a lodestar cross-check. Class counsel once again neglect to provide that figure in their Motion for Final Approval, instead providing a summary description of tasks performed and number of documents reviewed.

The case of *Faught v. American Home Shield Corp.*, 668 F.3d 1233 (11th Cir. 2011) makes clear that "where the requested fee exceeds 25%, the court is instructed to

9

apply the twelve *Johnson* factors," including, most importantly, the time and labor required. *Id.* at 1242.

There are additional reasons why class counsel should be required to provide detailed information to satisfy the first factor set forth in *Camden I*, and to enable this Court to perform a lodestar cross-check. First, this is the third megafund settlement in these consolidated cases, unlike *Camden I* and *Pinto, supra*, and therefore the lodestar will provide critical information to the Court about what percentage is reasonable in the circumstances of multiple megafund settlements. Class Counsel are receiving a higher percentage fee in these consolidated cases as a result of the piecemeal settlement process. If, instead, Class Counsel waited until all of the settlements were completed before requesting a fee, as was done in *Newby v. Enron*, 586 F. Supp. 2d 732 (S.D. Tex. 2008), it would be clear that this is a billion dollar total settlement, and that a 30% fee is grossly excessive.

Courts in this Circuit have held that a lodestar multiplier of 1.45 is adequate. *See Sunbeam, supra*, 176 F. Supp. 2d at 1336. The only appropriate way to set a percentage fee in a case of this magnitude, and such short duration, is to require the percentage to be informed by the first *Camden I* factor – the time and labor required – which class counsel has improperly failed to quantify.

The Eleventh Circuit in *Faught, supra*, suggested a range of reasonable fees of 20-25%. 668 F.3d at 1242. Because this is a megafund settlement, objectors suggest that a fee at the lower end of that range, or 20%, of the $137.5 million monetary fund would be reasonable here.

10

### IV.     Objectors' Attorneys' Experience.

Objectors object to the onerous and unreasonable requirement contained in the Settlement Agreement and Preliminary Approval Order that they and their attorneys identify each time they have objected or represented an objector for the past five years. Such a requirement is designed to deter competent and counseled objections, by imposing such a burden on potential counsel that no class member can retain competent representation.

Without waiving these objections, Ms. Busser states that she has never objected to a class action settlement before. The Objectors' counsel, Brian Silverio, represented several objectors to the Bank of America overdraft settlement and the JP Morgan Chase settlement.

## CONCLUSION

For the foregoing reasons, this Court should deny approval to the proposed Settlement unless the allocation is amended to provide some automatic compensation to 2002-2005 account holders, and should award class counsel no more than 20% of the monetary fund, or $27.5 million, in attorneys' fees.

Respectfully submitted,

*s/ Brian M. Silverio*
Brian M. Silverio
FL Bar #0183301
Silverio & Hall, P.A.
150 West Flagler Street
Penthouse - 2850
Miami, Florida 33130
(305) 371-2756
(305) 372-2744 (Fax)
bsilverio@silveriohall.com

Signed By:
Sandra L. Busser

## **CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the foregoing has been served via transmission of Notices of Electronic Filing generated by CM/ECF on January 28, 2013, and was filed with the Clerk of Court using CM/ECF, and that as a result a copy of this filing has been served upon every counsel of record.

/s/ *Brian Silverio*