# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 1:09-MD-02036-JLK

---

**IN RE:  CHECKING ACCOUNT OVERDRAFT LITIGATION**

**MDL No. 2036**

---

**THIS DOCUMENT RELATES TO:**

*Martinez v. Wells Fargo Bank, N.A.*
S.D. Fla. Case No. 1:09-cv-23834
D.N.M. Case No. 6:09-cv-01072-GBW-ACT

---

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................................ 1

II.     FACTUAL BACKGROUND ............................................................................................. 3

        A.      How a Wells Fargo Debit Card Works .................................................................. 3

        B.      Wells Fargo's Posting and Overdraft Practices .................................................... 3

                1.      Transaction Settlement and Posting ........................................................... 3

                        a)      Posting Order in States Other Than Washington, New
                                Mexico, and Nevada ...................................................................... 4

                        b)      Washington and New Mexico ("TOD" Posting) ........................... 4

                        c)      Nevada ........................................................................................... 5

                2.      Overdrafts and Assessment of Overdraft Fees........................................... 6

        C.      Authorization Policies............................................................................................ 7

        D.      Wells Fargo's Consumer Account Agreements...................................................... 7

        E.      Other Information Provided to Customers.............................................................. 10

        F.      Complaints and Reversals of Overdraft Fees......................................................... 10

        G.      Procedural History ................................................................................................. 11

        H.      The Two Named Plaintiffs...................................................................................... 12

III.    ARGUMENT ..................................................................................................................... 14

        A.      Plaintiffs' Effort to Circumvent the Ninth Circuit's Holding in *Gutierrez*
                Creates New Issues on Class Certification. .......................................................... 15

        B.      Class Certification Decisions in Other Cases Involving Posting Order Do
                Not Support Certification Here............................................................................... 17

        C.      Plaintiffs' Proposed Nationwide Class Impermissibly Combines the
                Plaintiffs and Claims of Three Different Lawsuits. .............................................. 19

        D.      Plaintiffs Have Not Even Attempted to Satisfy Rule 23 for Any Class on
                Whose Behalf They Seek to Try Any Claim. ........................................................ 21

        E.      Plaintiffs Cannot Satisfy the Rule 23(a) Prerequisites for Class
                Certification. .......................................................................................................... 22

i

1. Plaintiffs Have Not Established Numerosity. .......................... 22

2. Plaintiffs Have Not Demonstrated Commonality As to All Wells Fargo Customers During the Class Period. ................................ 24

    a) There Is No Commonality in the Posting Practice Creating the Alleged Injury. ....................................................... 25

    b) There Is No Commonality In the Contracts or in Communications Concerning Them. ............................. 28

    c) There is No Commonality in Plaintiffs' Contentions About Class Members' Contractual Relationships With the Bank. ......... 31

    d) Material Differences in the Applicable Law Also Preclude Any Finding of Commonality. ...................................... 32

3. The Claims of Martinez and Graham Are Not Typical of the Claims of the Proposed Class or Subclasses. .............................. 33

4. Martinez and Graham Cannot Adequately Represent a National Class or Any Subclasses. ................................................... 37

    a) Most Proposed Subclasses Lack Any Class Representatives. ................................................................ 37

    b) Plaintiffs' Abandonment of the Claims of Numerous Class Members Demonstrates That They Are Not Adequate Representatives of Any National Class ........................ 37

    c) Conflicts of Interest Prevent Graham and Martinez From Serving as Adequate Class Representatives. ............................... 39

    d) There is a Conflict of Interest With Class Members Who Benefited From the Challenged Practice. ...................................... 41

F. Plaintiffs Have Not Satisfied the Additional Requirements for Certification Under Rule 23(b)(3). .......................................................... 43

1. Common Issues Do Not Predominate. ...................................... 44

    a) Substantial Variation in Applicable Law Precludes Certification of the Proposed Subclasses. .................................... 44

    b) Each of Plaintiffs' Claims Presents Predominantly Individualized Issues ........................................................... 49

c) Wells Fargo's Defenses Also Raise Individualized Issues that Preclude Class Certification..................................................... 54

d) Plaintiffs Have Not Presented a Reliable and Manageable Plan for Proving Actual Injury to All Class Members.................. 59

2. Class Litigation Would Not Be a Superior Method of Adjudication, Given the Unmanageability of the Proposed Class and Subclasses. ........ 61

G. Plaintiffs Have Failed to Identify an Ascertainable Class for Which It Is Possible to Comply with the Notice Requirement of Rule 23. ............................ 64

1. Plaintiffs' Class Definition Is Insufficient to Permit Adequate Notice to the Class. ...................................................................... 64

2. The Reference to "Applicable Statutes of Limitation" Does Not Satisfy the Requirement of a Concrete Class Period. ............................... 67

IV. CONCLUSION................................................................................................. 67

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abercrombie v. Lum's Inc.*,
 345 F. Supp. 387 (S.D. Fla. 1972) ....................................................................19

*Agan v. Katzman & Korr, P.A.*,
 222 F.R.D. 692 (S.D. Fla. 2004) ......................................................................33

*Allapattah Servs., Inc. v. Exxon Corp.*,
 333 F.3d 1248 (11th Cir. 2003) ...........................................................29, 59, 60

*Almanor v. Bankatlantic Bancorp., Inc.*,
 261 F.R.D. 672 (S.D. Fla. 2009) ...........................................................41, 42, 43

*Amchem Prods, Inc. v. Windsor*,
 521 U.S. 591, 620 (1997) ................................................................................45

*Andrews v. Am. Tel. & Tel. Co.*,
 95 F.3d 1014 (11th Cir. 1996) ...................................................................30, 49

*Arthur's Garage, Inc. v. Racal-Chubb Sec. Sys., Inc.*,
 997 S.W.2d 803 (Tex. Ct. App. 1999) ..............................................................52

*Auto Ventures, Inc. v. Moran*,
 1997 WL 306895 (S.D. Fla. Apr. 3, 1997) .......................................................43

*Avritt v. Reliastar Life Ins.*,
 615 F.3d 1023 (8th Cir. 2010) ..........................................................................50

*Babineau v. Fed. Express Corp.*,
 576 F.3d 1183 (11th Cir. 2009) ........................................................................22

*Barnes v. Am. Tobacco Co.*,
 161 F.3d 127 (3rd Cir. 1998) ...........................................................................59

*Barras v. Branch Banking & Trust Co.*,
 685 F.3d 1269 (11th Cir. 2012) ........................................................................24

*Bayou Land Co. v. Talley*,
 924 P.2d 136 (Colo. 1996) ...............................................................................50

*Benefield v. International Paper Co.*,
 270 F.R.D. 640 (M.D. Ala. 2010) ....................................................................66

iv

*Bennett v. Hayes Robertson Group, Inc.*,
880 F. Supp. 2d 1270 (S.D. Fla. 2012) ...................................................................24

*Berry v. Federal Kemper Life Assur. Co.*,
99 P.3d 1166 (N.M. Ct. App. 2004) ........................................................................50

*Bochese v. Town of Ponce Inlet*,
405 F.3d 964 (11th Cir. 2005) .................................................................................34

*Bolden v. Walsh Constr. Co.*,
688 F.3d 893 (7th Cir. 2012) ...................................................................................64

*Bowers v. Jefferson Pilot Financial Ins. Co.*,
219 F.R.D. 578 (E.D. Mich. 2004) ..........................................................................50

*Brannan v. Wells Fargo Home Mortgage, Inc.*,
2011 WL 5331601 (Bankr. M.D. Ala. Nov. 7, 2011) ...............................................35

*Brooks v. Norwest Corp.*,
103 P.3d 39 (N.M. Ct. App. 2004) ................................................................18, 31, 53

*Brown v. Kerkhoff*,
279 F.R.D. 479 (S.D. Iowa 2012) ...........................................................................39

*Bridge v. Phoenix Bond & Indemnity Co.*,
553 U.S. 639 (2008) ...........................................................................................22, 30

*Bynum v. District of Columbia*,
214 F.R.D. 27 (D.D.C. 2003) ..................................................................................65

*Camafel Bldg. Inspections, Inc. v. Bellsouth Advertising & Publ'g Corp.*,
2008 WL 649778 (N.D. Ga. Mar. 7, 2008) ..............................................................56

*Casa Orlando Apartments. Ltd. v. Fed. Nat'l Mortgage Ass'n*,
624 F.3d 185 (5th Cir. 2010) ....................................................................32, 44, 46, 48

*Castano v. American Tobacco Co.*,
84 F.3d 734 (5th Cir. 1996) ...............................................................................32, 44

*CC Investors Corp. v. Raytheon Co.*,
2005 WL 1026904 (D. Del. Apr. 22, 2005) .............................................................56

*CE Design Ltd. v. King Architectural Metals, Inc.*,
637 F.3d 721 (7th Cir. 2011) .............................................................................34, 39

*Central Wesleyan Coll. v. W.R. Grace & Co.*,
6 F.3d 177 (4th Cir. 1993) .......................................................................................22

v

*Champ v. Siegel Trading Co., Inc.*,
    1990 WL 19984 (N.D. Ill. Feb. 27, 1990) ............................................................23

*Cimino v. Raymark Indus., Inc.*,
    151 F.3d 297 (5th Cir. 1998) ............................................................................60

*City of St. Petersburg v. Total Containment, Inc.*,
    265 F.R.D. 630 (S.D. Fla. 2010) ......................................................................52

*Clausnitzer v. Fed. Exp. Corp.*,
    248 F.R.D. 647 (S.D. Fla. 2008) ...................................................44, 54, 58, 67

*Coady v. Cross County Bank*,
    729 N.W.2d 732 (Wis. Ct. App. 2007) ......................................................49, 52

*Coastal Neurology, Inc. v. State Farm Mut. Auto. Ins. Co.*,
    2012 WL 205800 (11th Cir. Jan. 25, 2012) ...............................................54, 64

*Coca-Cola Bottling Co. of Elizabethtown, Inc. v. Coca-Cola Co.*,
    95 F.R.D. 168 (D. Del. 1982) ...........................................................................56

*Compass Bank v. Snow*,
    823 So. 2d 667 (Ala. 2001) .....................................................18, 31, 54, 58

*Cooper v. Southern Co.*,
    390 F.3d 695 (11th Cir. 2004) ..........................................................................33

*Cox v. Sears Roebuck & Co.*,
    647 A.2d 454 (N.J. 1994) .................................................................................52

*Cuming v. South Carolina Lottery Comm'n*,
    2008 WL 906705 (D. S.C. Mar. 31, 2008) .......................................................64

*Davenport Ltd. P'Ship v. 75th & Dodge I, L.L.P.*,
    780 N.W.2d 416 (Neb. 2010) ...........................................................................56

*Deadwyler v. Volkswagen of America, Inc.*,
    1986 WL 12567 (W.D.N.C. Mar. 7, 1986) .......................................................45

*Doyle v. Finance Am., LLC*,
    918 A.2d 1266 (Md. Ct. Spec. App. 2007) .......................................................49

*DWFII Corp. v. State Farm Mut. Auto. Ins. Co.*,
    271 F.R.D. 676 (S.D. Fla. 2010) ......................................................................64

*Dykes v. Dudek*,
    2011 WL 4904407 (N.D. Fla. Oct. 14, 2011) ...................................................25

*Elk River Assoc. v. Huskin*,
  691 P.2d 1148 (Colo. Ct. App. 1984) ...................................................................57

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ...............................................................................34

*Endres v. Wells Fargo Bank*,
  2008 WL 344204 (N.D. Cal. Feb. 6, 2008) .............................................54, 55, 56, 59

*Eric v. Swenson & Sons v. Colvin*,
  130 F. 626 (C.C.D. Conn. 1904) ..........................................................................32

*Feinstein v. Firestone Tire & Rubber Co.*,
  535 F. Supp. 595 (S.D.N.Y. 1982) ..................................................................37, 39

*First Class Coach & Equip., Inc. v. Thomas Built Buses, Inc.*,
  2006 WL 269983 (M.D. Fla. Feb. 3, 2006) .........................................................32, 39, 63

*Fischler v. AmSouth Corp.*,
  176 F.R.D. 583 (M.D. Fla. 1997) ..........................................................................22

*Fisher v. Ciba Specialty Chems. Corp.*,
  238 F.R.D. 273 (S.D. Ala. 2006) .....................................................................59, 66

*Forman v. Data Transfer, Inc.*,
  164 F.R.D. 400 (E.D. Pa. 1995) ..........................................................................64

*Fosmire v. Progressive Max Ins. Co.*,
  277 F.R.D. 625 (W.D. Wash. 2011) ......................................................................39

*Franze v. Equitable Assurance*,
  296 F.3d 1250 (11th Cir. 2002) ...........................................................................35

*Gibbs Props. Corp. v. CIGNA Corp.*,
  196 F.R.D. 430 (M.D. Fla. 2000) ..........................................................................65

*Gooch v. Life Investors Ins. Co. of Am.*,
  672 F.3d 402 (6th Cir. 2012) ...............................................................................39

*Griffin v. Dugger*,
  823 F.2d 1476 (11th Cir. 1987) ...........................................................................35

*Grimes v. Fairfield Resorts, Inc.*,
  331 F. App'x 630 (11th Cir. Jan. 30, 2007) ..........................................................39

*Gutierrez v. Wells Fargo & Co.*,
  2009 WL 1247040 (N.D. Cal. May 5, 2009) ..........................................................60

vii

*Gutierrez v. Wells Fargo & Co.*,
   2010 WL 1233810 (N.D. Cal. Mar. 26, 2010).........................................................66

*Gutierrez v. Wells Fargo Bank, N.A.*,
   704 F.3d 712 (9th Cir. 2012) ...................................................................... passim

*Gutierrez v. Wells Fargo Bank, N.A.*,
   730 F. Supp. 2d 1080 (N.D. Cal 2010) ...........................................................15, 16

*Hagen v. City of Winnemucca*,
   108 F.R.D. 61 (D. Nev. 1985)..........................................................................64

*Han v. Sterling Mortg. Co., Inc.*,
   2011 WL 4344235 (E.D.N.Y. Sept. 14, 2011) ....................................................39

*Hansen v. Monumental Life Ins. Co.*,
   2008 U.S. Dist. LEXIS 112254 (D. Conn. Mar. 6 2008)........................................45

*Harris v. Purcell*,
   973 P.2d 1166 (Ariz. 1998)...............................................................................58

*Hartford Acc. & Indem. Co. v. Beaver*,
   466 F.3d 1289 (11th Cir. 2006) .........................................................................23

*Heaven v. Trust Bank Co.*,
   118 F.3d 735 (11th Cir. 1997) ....................................................................54, 61

*Heffner v. Blue Cross & Blue Shield of Ala., Inc.*,
   443 F.3d 1330 (11th Cir. 2006) .........................................................................30

*Hough v. Regions Fin. Corp.*,
   672 F.3d 1224 (11th Cir. 2012) ....................................................................23, 24

*Hudson v. Delta Air Lines, Inc.*,
   90 F.3d 451 (11th Cir. 1996) .............................................................................30

*In re American Med. Sys., Inc.*,
   75 F.3d 1069 (6th Cir. 1996) ....................................................................32, 44, 61

*In re Aqua Dots Prods. Liab. Litig.*,
   270 F.R.D. 377 (N.D. Ill. 2010).........................................................................48

*In re Bayshore Ford Trucks Sales, Inc.*,
   471 F.3d 1233 (11th Cir. 2006) .........................................................................23

*In re Bisphenol-A (BPA) Polycarbonate Plastic Products Liab. Litig.*,
   276 F.R.D. 336 (W.D. Mo. 2011).......................................................................33

*In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.,*
    288 F.3d 1012 (7th Cir. 2002) ................................................................14, 32, 44

*In re Checking Account Overdraft Litig.,*
    694 F. Supp. 2d 1302 (S.D. Fla. 2010) ................................................................32

*In re Copper Antitrust Litig.,*
    196 F.R.D. 348 (W.D. Wis. 2000) ................................................................65

*In re Countrywide Fin. Corp. Mortg. Mktg. & Sales Practices Litig.,*
    2011 WL 6325877 (S.D. Cal. Dec. 16, 2011).................................................25

*In re Currency Conversion Fee Antitrust Litig.,*
    224 F.R.D. 555 (S.D.N.Y. 2004) ................................................................22

*In re Fedex Ground Package Sys., Inc.,*
    662 F. Supp. 2d 1069 (N.D. Ind. 2009) ................................................................37

*In re Fla. Cement & Concrete Antitrust Litig.,*
    2012 WL 27668 (S.D. Fla. Jan. 3, 2012) ................................................................49

*In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.,*
    174 F.R.D. 332 (D.N.J. 1997).................................................................54

*In re Hitachi Television Optical Block Cases,*
    2011 WL 9403 (S.D.Cal. Jan. 3, 2011).................................................................22

*In re Korean Air Lines Co. Antitrust Litig.,*
    642 F.3d 685 (9th Cir. 2011) ................................................................20

*In re Light Cigarettes Mktg. Sales Practices Litig.,*
    271 F.R.D. 402 (D. Me. 2010)................................................................56, 64

*In re Literary Works in Elec. Databases Copyright Litig.,*
    654 F.3d 242 (2d Cir. 2011)................................................................39

*In re Marriage of Diest,*
    77 P.3d 525 (Mont. 2003)................................................................58

*In re Marsh & McLennan Cos., Inc. Sec. Litig.,*
    536 F. Supp. 2d 313 (S.D.N.Y. 2007)................................................................37

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,*
    209 F.R.D. 323 (S.D.N.Y. 2002) ................................................................39

*In re Motions to Certify Classes Against Court Reporting Firms,*
    715 F. Supp. 2d 1265 (S.D. Fla. 2010) ................................................................52

*In re Motor Fuel Temp. Sales Practices Litig.*,
   271 F.R.D. 263 (D. Kan. 2010)........................................................................40

*In re Panacryl Sutures Prods. Liab. Cases*,
   263 F.R.D. 312 (E.D.N.C. 2009) ....................................................................40

*In re Pharm. Indus. Average Wholesale Price Litig.*,
   252 F.R.D. 83 (D. Mass. 2008)..................................................................44, 45

*In re Schering Plough Corp. ERISA Litig.*,
   589 F.3d 585 (3d Cir. 2009).............................................................................34

*In re School Asbestos Litig.*,
   789 F.2d 996 (3d Cir. 1986).............................................................................45

*In re Teflon Prods. Liab. Litig.*,
   254 F.R.D. 354 (S.D. Iowa 2008) ....................................................................39

*In re Telectronics Pacing Sys., Inc.*,
   168 F.R.D. 203 (S.D. Ohio 1996) ....................................................................22

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   2011 WL 1753784 (N.D. Cal. May 9, 2011) ...................................................23

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods.
   Liab. Litig.*,
   785 F. Supp. 2d 925 (C.D. Cal. 2011) .............................................................20

*In re Wilborn*,
   609 F.3d 748 (5th Cir. 2010) ...........................................................................56

*Jamie S. v. Milwaukee Pub. Sch.*,
   2012 WL 336170 (7th Cir. Feb. 3, 2012) ........................................................25

*Jim Moore Ins. Agency, Inc. v. State Farm Mut. Auto. Ins. Co., Inc.*,
   2003 WL 21146714 (S.D. Fla. May 6, 2003) ..................................................59

*Johnson v. American Credit Co. of Ga.*,
   581 F.2d 526 (5th Cir. 1978) ...........................................................................22

*Kelecseny v. Chevron, U.S.A., Inc.*,
   262 F.R.D. 660 (S.D. Fla. 2009).......................................................................64

*Kerr v. City of W. Palm Beach*,
   875 F.2d 1546 (11th Cir. 1989) .......................................................................49

*Kirkpatrick v. J.C. Bradford & Co.*,
   827 F.2d 718 (11th Cir. 1987) ....................................................................22, 38

x

*Klay v. Humana, Inc.*,
   382 F.3d 1241 (11th Cir. 2004) ................................................................................. passim

*Kornberg v. Carnival Cruise Lines, Inc.*,
   741 F.2d 1332 (11th Cir. 1984) ...........................................................................33, 35, 36

*Koziara v. City of Casselberry*,
   392 F.3d 1302 (11th Cir. 2004) .........................................................................................34

*Kpadeh v. Emmanuel*,
   261 F.R.D. 687 (S.D. Fla. 2009) ......................................................................................59

*Kunzelmann v. Wells Fargo Bank, N.A.*,
   2013 WL 139913 (S.D. Fla. Jan. 10, 2013) ....................................................44, 52, 58

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
   523 U.S. 26 (1998) ............................................................................................................20

*Lohman v. Daimler-Chrysler Corp.*,
   166 P.3d 1091 (N.M. Ct. App. 2007) ..............................................................................53

*London v. Wal-Mart Stores, Inc.*,
   340 F.3d 1246 (11th Cir. 2003) .........................................................................................15

*Lopez v. Washington Mut. Bank, FA*,
   302 F.3d 900 (9th Cir. 2002) ............................................................................................56

*Lovey v. Regence BlueShield of Idaho*,
   72 P.3d 877 (Idaho 2003) ..................................................................................................23

*Mann v. TD Bank, N.A.*,
   2010 WL 4226526 (D.N.J. Oct. 20, 2010) .....................................................................64

*Matter of Rhone-Poulenc Rorer, Inc.*,
   51 F.3d 1293 (7th Cir. 1995) ............................................................................................46

*Mays v. Tennessee Valley Auth.*,
   274 F.R.D. 614 (E.D. Tenn. 2011) ...................................................................................37

*Mazza v. Am. Honda Motor Co., Inc.*,
   666 F.3d 581 (9th Cir. 2012) ............................................................................................47

*Merrill v. DeMott*,
   951 P.2d 1040 (Nev. 1997) ...............................................................................................57

*Motel Enters., Inc. v. Nobani*,
   784 S.W.2d 545 (Tex. App. Ct. 1990) .............................................................................57

*Mulford v. Altria Grp., Inc.*,
   242 F.R.D. 615 (D.N.M. 2007)................................................................53

*Murray v. Auslander*,
   244 F.3d 807 (11th Cir. 2001) ..............................................................21

*Neenan v. Carnival Corp.*,
   199 F.R.D. 372 (S.D. Fla. 2001)...........................................................59

*Neumont v. Monroe Cnty.*,
   198 F.R.D. 554 (S.D. Fla. 2000)...........................................................66

*Nevada Yellow Cab Corp. v. Eighth Judicial Dist. Ct.*,
   152 P.3d 737 (Nev. 2007).....................................................................56

*O'Donovan v. Cashcall, Inc.*,
   2012 WL 2568174 (N.D. Cal. July 2, 2012)........................................22

*O'Neill v. The Home Depot U.S.A., Inc.*,
   243 F.R.D. 469 (S.D. Fla. 2006)...........................................................66

*Oginski v. Paragon Props. of Costa Rica, LLC*,
   282 F.R.D. 672 (S.D. Fla. 2012) (King, J.)..........................................54

*Oman v. Davis School Dist.*,
   194 P.3d 956 (Utah 2008)......................................................................40

*Pablo v. Service Master Global Holdings, Inc.*,
   2011 WL 3476473 (N.D. Cal. Aug. 9, 2011) .......................................22

*Pearl v. Allied Corp.*,
   102 F.R.D. 921 (E.D. Pa. 1984).............................................................39

*Perez v. Metabolife Int'l, Inc.*,
   218 F.R.D. 262 (S.D. Fla. 2003)...........................................................61

*Piazza v. Ebsco Industries Inc.*,
   273 F.3d 1341 (11th Cir. 2001) ................................................19, 34, 35

*Pickett v. Iowa Beef Processors*,
   209 F.3d 1276 (11th Cir. 2000) ................................................39, 41, 43

*Pilgrim v. Universal Health Card, LLC*,
   660 F.3d 943 (6th Cir. 2011) ................................................................44

*Porcell v. Lincoln Wood Prods., Inc.*,
   713 F. Supp. 2d 1305 (D.N.M. 2010) ...................................................53

*Potlach Educ. Ass'n v. Potlach School Dist. No. 285*,
    226 P.3d 1277 (Idaho 2010)........................................................................40

*Powers v. Gov't Employees Ins. Co.*,
    192 F.R.D. 313 (S.D. Fla. 1998)............................................................44, 46

*Prado-Steiman v. Bush*,
    221 F.3d 1266 (11th Cir. 2000) ....................................................19, 20, 35, 40

*Presser v. Key Food Stores Co-Op, Inc.*,
    218 F.R.D. 53 (E.D.N.Y. 2003).................................................................56

*PSE Consulting, Inc. v. Frank Mercede & Sons, Inc.*,
    838 A.2d 135 (Conn. 2004).....................................................................50

*Ricotta v. Finance Am., LLC*,
    2007 WL 987854 (D. Col. Apr. 2, 2007).......................................................38

*Robinson v. Gillespie*,
    219 F.R.D. 179 (D. Kan. 2003)................................................................45

*Ross v. BankSouth, N.A.*,
    837 F.2d 980 (11th Cir. 1988) .............................................................34, 39

*Rustein v. Avis Rent-a-Car Sys., Inc.*,
    211 F.3d 1228 (11th Cir. 2000) ..............................................................15

*S.E.C v. Badian*,
    822 F. Supp. 2d 352 (S.D.N.Y. 2011)..........................................................55

*Sacred Heart Health Sys. v. Humana Military Healthcare Servs.*,
    601 F.3d 1159 (11th Cir. 2010) .........................................................passim

*Sandlin v. Ameriquest Mortg. Co.*,
    2010 WL 4260030 (Bankr. N.D. Ala. Oct. 21, 2010)............................................57

*Schmidt v. Interstate Fed. Sav. & Loan Ass'n*,
    74 F.R.D. 423 (D.D.C. 1977)..................................................................58

*Schnall v. AT & T Wireless Servs., Inc.*,
    259 P.3d 129 (Wash. 2011)....................................................................56

*Seidenberg v. Summit Bank*,
    791 A.2d 1068 (N.J. App. Div. 2002)..........................................................50

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
    130 S. Ct. 1431 (2010).......................................................................14

*Shelley v. AmSouth Bank*,
   2000 WL 1121778 (S.D. Ala. July 24, 2000), .......................................18, 31, 54, 58

*Sikes v. Teleline, Inc.*,
   281 F.3d 1350 (11th Cir. 2002) ........................................................................30

*Smoot v. Physicians Life Ins. Co.*,
   87 P.3d 545 (N.M. Ct. App. 2003)....................................................................53

*Soutter v. Equifax Info. Servs., LLC*,
   2012 WL 5992207 (4th Cir. Dec. 3, 2012) .......................................................34

*Spagnola v. Chubb Corp.*,
   264 F.R.D. 76 (S.D.N.Y. 2010) ........................................................................56

*Spencer v. Hartford Fin. Servs. Grp., Inc.*,
   256 F.R.D. 284 (D. Conn. 2009).......................................................................48

*Stearns v. Ticketmaster Corp.*,
   655 F.3d 1013 (9th Cir. 2011) ..........................................................................36

*Steinberg v. Nationwide Mut. Ins. Co.*,
   224 F.R.D. 67 (S.D.N.Y. 2004) ........................................................................45

*Stirman v. Exxon Corp.*,
   280 F.3d 554 (5th Cir. 2002) ............................................................................32

*Stratton v. Am. Med. Sec., Inc.*,
   266 F.R.D. 340 (D. Ariz. 2009) ........................................................................50

*Telecomm Technical Servs., Inc. v. Siemens Rolm Commc'ns, Inc.*,
   172 F.R.D. 532 (N.D. Ga. 1997).......................................................................40

*Thompson v. American Tobacco Co.*,
   189 F.R.D. 544 (D. Minn. 1999).................................................................37, 39

*Thompson v. Jiffy Lube Int'l, Inc.*,
   250 F.R.D. 607 (D. Kan. 2008).........................................................................48

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
   445 F.3d 311 (4th Cir. 2006) ............................................................................59

*Three Way, Inc. v. Burton Enters., Inc.*,
   177 P.3d 219 (Wyo. 2008) ................................................................................32

*Valentino v. Carter-Wallace, Inc.*,
   97 F.3d 1227 (9th Cir. 1996) ............................................................................65

xiv

*Valley Drug Co. v. Geneva Pharm., Inc.*,
    350 F.3d 1181 (11th Cir. 2003) ............................................................15, 39, 41, 43

*Vega v. T-Mobile USA, Inc.*,
    564 F.3d 1256 (11th Cir. 2009) ................................................................... passim

*Vickers v. General Motors Corp.*,
    204 F.R.D. 476 (D. Kan. 2001)............................................................................64

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011)..................................................................................... passim

*Walco Invs., Inc. v. Thenen*,
    168 F.R.D. 315 (S.D. Fla. 1996)..........................................................................22

*Wanstrath v. Time Warner Entm't Co., L.P.*,
    1997 WL 122815, at *2 (S.D.N.Y. Mar. 17, 1997) ............................................64

*Washa v. Miller*,
    546 N.W.2d 813 (Neb. 1996)................................................................................32

*Welch v. Atlas Roofing Corp.*,
    2007 WL 3245444 (E.D. La. Nov. 02, 2007) ......................................................37

*Western States Wholesale, Inc. v. Synthetic Indus., Inc.*,
    206 F.R.D. 271 (C.D. Cal. 2002) .........................................................................37

*Whittington v. Taco Bell of America, Inc.*,
    2011 WL 1772401 (D. Colo. May 10, 2011).......................................................23

*Williams v. Board of Regents of Univ. Sys. of Georgia*,
    477 F.3d 1282 (11th Cir. 2007) ...........................................................................35

*Yarger v. ING Bank , FSB*,
    285 F.R.D. 308 (D. Del. 2012) ............................................................................48

*Zapka v. Coca-Cola Co.*,
    2000 WL 1644539 (N.D. Ill. Oct. 27, 2000).......................................................45

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180, 1190 (9th Cir. 2001) ...................................................................44

## STATUTES

28 U.S.C. § 1407(a) ........................................................................................................20

N.M. Stat. Ann. §§ 57-12-1 ...........................................................................................53

N.M. Stat. Ann. § 57-12-10 ...................................................................................53

UCC § 4-303(b) ....................................................................................................42

UCC § 2-302 ..........................................................................................................48

**OTHER AUTHORITIES**

70 C.J.S. Payment § 104 (2007) ...........................................................................56

74 Fed. Reg. 5498, 5547−48 (Jan. 29, 2009).......................................................42

74 Fed. Reg. 59033, 59040 (Nov. 17, 2009).........................................................42

1 McLaughlin on Class Actions § 4:2 (8th ed.)....................................................65

2 Wis. Jury Instructions, Civ. 3057.......................................................................62

17A C.J.S. Contracts § 170 ...................................................................................57

Fed. R. Civ. P. 12 ..................................................................................................55

Fed. R. Civ. P. Rule 15 ..........................................................................................55

Fed. R. Civ. P. 23 ............................................................................................ passim

Manual for Complex Litig. (Fourth) § 21.222 ......................................................64

Manual for Complex Litig. (Fourth) § 21.23 .........................................................22

Manual for Complex Litig. (Fourth) § 22.141 .......................................................43

Restatement (Second) of Contracts, Section 211...................................................50

## I.      INTRODUCTION

Plaintiff's amended Motion for Class Certification (DE # 3262) ("Mot.") raises important issues that this Court has not yet addressed in this MDL.  Ignoring both basic constitutional principles and the Federal Rules of Civil Procedure, plaintiffs ask the Court to certify a single class to cut across three different lawsuits to be tried in three different courts, with the named plaintiffs in each case appointed to "represent" classes and subclasses in *different* cases in which they are not even parties.  Plaintiffs also ignore, in assuring the Court that numerosity is easily satisfied, the fact that all Wells Fargo customers have a contractual obligation to arbitrate their claims – an issue that becomes ripe only after class certification and is hence not affected by any prior waiver of arbitration as to the named plaintiffs.  And although plaintiffs seek certification of a nationwide class, their motion proposes to abandon the claims of large segments of that class, leaving them bound by the judgment but with no hope of relief. *These are all issues of first impression in this MDL.*

More broadly, plaintiffs' motion fails to demonstrate that this case can be tried on a class basis in a manner that satisfies the due process rights of all parties, including absent class members.  The Supreme Court and Eleventh Circuit have emphasized that the class action mechanism, no matter how advantageous it might otherwise seem, may not to be employed unless the claims of each and every class member can be adjudicated with exactly the same standards and rules of decision as would apply in an individual action.  Plaintiffs bear the burden of proving that Rule 23 is satisfied in every respect.  Their motion fails to carry that burden in multiple respects, including (but not limited to) the following:

1.      Plaintiffs seek to manufacture a single nationwide "class" by improperly combining parties and claims from three separate lawsuits that were filed in three different jurisdictions on behalf of different classes – and that must ultimately be tried in three different courts before three different juries.  When the Court addresses each case independently, as it must, it will find that plaintiffs have failed to provide a basis for certification in *any* of them.

2.      Plaintiffs do not propose to try any claims on behalf of a nationwide class. Rather, they propose to seek relief on behalf of ten "subclasses" consisting of widely varying (and very incomplete) subsets of a hypothetical "nationwide" class.  But plaintiffs have failed to demonstrate – as they are required to do – that each subclass satisfies all Rule 23 requirements.

3.      The proposed class and subclasses fail to satisfy the requirement of numerosity, as virtually all class members are contractually obligated to arbitrate their claims.

4.      Plaintiffs' arguments about "commonality" and "predominance" ignore the fact that class members did *not* all have their transactions posted according to the same methodology and were *not* all subject to the same contract.  The two *Martinez* plaintiffs were part of a pilot program in which Wells Fargo used a posting order that was dramatically different from that used elsewhere and employed substantially different contractual language. These and other factual dissimilarities preclude even a threshold finding of commonality, and common issues plainly do not predominate.  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011).

5.      There is substantial variation in the applicable state laws *even within each proposed subclass*.  This means that the jury would need to apply inconsistent and incompatible legal standards in attempting to decide even the claim of a single subclass.

6.      The two plaintiffs in this case are not typical of the class they seek to represent.  For example, one of them claims that his account was covered, not by the bank's standard written contract, but by a unique oral contract.  (As it happens, he has no standing to assert a claim anyway, as he suffered no damages.)  The other name plaintiff in this case admits that she had actual knowledge of the bank's posting order.

7.      Plaintiffs are demonstrably inadequate representatives for the large number of class members whose claims their trial plan proposes to abandon entirely.  In this and other respects, their interests are in *conflict* with those of other class members.

8.      Plaintiffs' "trial plan" offers no workable way to manage the complex structure plaintiffs seek to create.  The Eleventh Circuit has rejected proposals involving much lesser degrees of complexity.  *See, e.g.*, *Sacred Heart Health Sys. v. Humana Military Healthcare Servs.*, 601 F.3d 1159 (11th Cir. 2010).  It is impossible to try this case on a class basis without depriving Wells Fargo of its due process right to litigate individualized issues that must be determined to adjudicate the claims of individual class members and the bank's defenses to those claims.

9.      Plaintiffs' proposed class definition is inadequate to permit the Court to provide absent class members with meaningful notice, as required by Rule 23.

Because the class certification determinations must be made separately for each of the three cases addressed in plaintiffs' motion, Wells Fargo is filing a separate opposition in each

of the cases.  With this approach, the deficiencies plaintiffs seek to hide by addressing the three cases together become readily apparent.  There are, however, many respects in which the barriers to certification are largely the same in all three cases.  To avoid undue duplication, Wells Fargo will cross-reference such common arguments rather than repeating them.

## II.  FACTUAL BACKGROUND

### A.  How a Wells Fargo Debit Card Works

Most checking account customers receive debit cards, which can be used to withdraw cash from an ATM or to make a purchase from a merchant.  Moore Dec. (Ex. 1) ¶ 9.[1] A debit card looks like a credit card, but the customer is not sent a bill; rather, debit-card purchases are simply deducted from the account.  As when a customer pays with a check, the amount of a debit-card purchase is posted when the merchant submits the transaction to Wells Fargo for payment.  If the account has insufficient funds to cover the transaction at that time, it will become an "overdraft item" and a fee may be charged.  *Id.* ¶ 10.

When a customer makes a purchase with a debit card, the merchant often (but not always) seeks an electronic "authorization" from the bank.  *Id.* ¶ 11.  If the bank authorizes the transaction, it is guaranteeing payment when the transaction is later presented for payment.  *Id.* However, at the time of authorization, Wells Fargo does not know whether the final transaction amount will be the same as the authorized amount.  *Id.* ¶ 15.[2]

### B.  Wells Fargo's Posting and Overdraft Practices[3]

#### 1.  Transaction Settlement and Posting

Throughout each business day, Wells Fargo receives tens of millions of transaction records from all over the world for settlement and posting to the accounts of its millions of customers.  Moore Dec. ¶ 17.  Wells Fargo processes these records in "batches"

---

[1] The declarations and exhibits cited herein are provided in Appendix D.

[2] For most debit-card transactions for which authorization is provided, Wells Fargo places a "hold" on the account for the amount authorized, which is then factored into the customer's "available" balance.  However, this available balance cannot take into account information about a customer's pending transactions (such as checks) of which the bank is unaware.  Moore Dec. ¶ 16.

[3] Different rules applied to customers whose accounts were maintained on the systems of the former Wachovia Bank, which Wells Fargo acquired in 2009.  Moore Dec. ¶ 24.  Plaintiffs' class definition explicitly excludes those customers.  Mot. at 1.

overnight.  *Id.*  Because there is no natural order to the settlement files received each day, Wells Fargo (like all banks) must adopt "posting order" rules for sorting transactions.  Wells Fargo's posting order rules have varied considerably by state and over time.  Moore Dec. ¶ 19.

### a)    Posting Order in States Other Than Washington, New Mexico, and Nevada

For the majority of its customers, and throughout most of the period at issue, Wells Fargo used the following order for transactions posting to an account on a given day: First, all deposits and other credits were posted, before the checks, debit-card transactions, and other subtractions ("debits").  This practice maximized the balance from which debits would be subtracted, which tended to reduce overdrafts.  Moore Dec. ¶ 21.  Thus, if a customer spent more than was in her account over the course of a day, but made a covering deposit late in the day, the deposit would post first, thereby eliminating any overdraft fees.  *Id.*  After posting credits, Wells Fargo posted debits in groups.  The first group included ATM and other cash withdrawals and online transfers, which were sorted from highest to lowest amount.  *Id.*  The second group included checks, debit-card purchases, and "ACH" transactions, which were also sorted from high to low.  *Id.*

This posting order was used in most of the country until July 2010.[4]  However, ***it was not used for the accounts of either of the named plaintiffs in this case***, as a different order was used in New Mexico for most of the relevant period.  *See id.* ¶ 25.

### b)    Washington and New Mexico ("TOD" Posting)

Beginning on October 1, 2005, Wells Fargo began a pilot program in New Mexico and Washington – referred to as "Transaction Order Date" (or "TOD") posting – that used a fundamentally different posting order with more emphasis on chronology.  Moore Dec. ¶ 25.  Although completely chronological posting was (and remains) technologically impossible using Wells Fargo's systems, the bank wished to test the potential impact of using more of a chronological element in posting.  *Id.* ¶ 26.  It was anticipated (correctly) that the change would lead to increased overdraft fees in some situations and decreased fees in others.  *Id.*  The TOD methodology was used for the accounts of both of the named plaintiffs in this case.  *Id.* ¶¶ 63, 73.

---

[4] In July 2010, shortly before the end of the proposed class period, the order was changed to move debit-card purchases from the second category of debits to the first.  *Id.* ¶ 22.

Under TOD posting, the bank divided all transactions into two groups based on whether they had occurred on the current business day or a prior day. The "prior-day" group included deposits and debit-card transactions initiated before the current day. "Current-day" transactions included deposits and debit-card transactions that were initiated and submitted for payment on the same day, as well as other debits that the bank received for payment that day. *Id.* ¶ 26.[5] Under the TOD methodology, all "prior-day" transactions were posted before any "current-day" transactions. *Within* each group ("prior-day" and "current-day"), the posting order rules were the same as in other states: credits were posted first, followed by the two categories of debits, with each category posted high-low. *Id.* ¶ 27.

The impact of TOD on overdraft fees varied depending on a customer's mix of transactions on any given day. (*See* pp. 13, 26, 35-36, and 41 below.) Because of the chronological component of TOD, some customers incurred *more* overdraft fees than they would have under the bank's usual posting order. Other customers incurred fewer fees. *See* Keeley Dec. (Ex. 4) ¶¶ 23, 34 n.40, 56 n.67.

The TOD pilot ended on June 28, 2010, after which the posting rules in New Mexico and Washington were the same as elsewhere in the country. Moore Dec. ¶ 29.

### c)   Nevada

In Nevada, as elsewhere, Wells Fargo posted credits first. Moore Dec. ¶ 30. Until January 2006, the bank posted debits in three groups. The first group consisted of ATM and other cash withdrawals and online transfers; the second consisted of the remaining debit transactions other than checks; and the third group consisted of checks. Transactions in the first two groups were sorted from low to high. The checks were posted in serial order. *Id.*

Beginning in January 2006, Well Fargo maintained the same groupings but began sorting transactions in the first two groups from highest to lowest. Checks continued to be posted in serial order. *Id.* ¶ 31. The order was changed again in March 2007, when the "checks"

---

[5] The bank had no way to automate the determination of when a check was written or an ACH debit authorized. Those transactions were therefore treated as "current day" in TOD posting, even though the bank recognized that they were often the earliest transactions of all. Moore Dec. ¶ 26.

group was moved up to second.  *Id.* ¶ 32.  Finally, in July 2010, the order was changed yet again, and debit-card purchase transactions were moved to the first group.  *Id.* ¶ 33.

### 2.    Overdrafts and Assessment of Overdraft Fees

If an account did not have enough funds to cover an item that was presented for payment, two things could happen.  If the item was a check, the bank could refuse payment and return it, charging the customer a fee.  The payee often also charged its own fees and penalties. *See* Moore Dec. ¶ 36; Keeley Dec. ¶¶ 47-49.  Alternatively, if the differential was modest, the bank could, in its discretion, go ahead and pay the check, creating an overdraft.  Moore Dec. ¶ 37.  The customer would be charged an overdraft fee, but no other fees or penalties would be incurred.  If the transaction was a debit-card transaction, the bank would be obligated to pay it and would charge the customer an overdraft fee.  *Id.* ¶ 38.  Pursuant to new federal regulations ("Reg. E") that took effect in mid-2010, the bank stopped charging overdraft fees on any debit-card transactions of customers who did not opt in to overdraft services for those transactions.  *Id.* ¶ 39.

In the states in which the bank posted all credits first, the posting order for debits had no impact on whether a customer overdrafted her account.  *See* Keeley Dec. ¶ 19.  Indeed, the practice of posting all credits first leads to *fewer* overdrafts than one in which all transactions are posted in chronological order.  *Id.*  ¶¶ 20-22.  However, posting order could have an impact on the *amount* a customer was charged when he overdrafted, because overdraft fees were charged on a "per item" basis.  When larger items are posted first, it increases the likelihood that there will be funds available to pay high-value items like mortgage and rent checks.  *Id.* ¶ 38.  But it can also, in some situations, result in a larger number of overdraft items.  It is this latter effect that plaintiffs challenge in this case.[6]  As federal regulators have explicitly recognized, however, there is no single posting order that consistently benefits all customers more than any other, and the advantages of high-to-low posting are widely recognized.  *See* pp. 41-42 & nn. 39-40 below.

---

[6] The number of fees can also be affected by whether different *categories* of transactions (such as checks or debit-card purchases) are posted separately or all together.  The impact of this will vary, depending on the mix of transactions on any given day.  Keeley Dec. ¶ 27.

Although Wells Fargo charged overdraft fees on a "per item" basis throughout the period, Moore Dec. ¶ 34, other aspects of the fee calculation varied in different states and over time.  In addition to variations in posting order, there were also variations in other aspects of the bank's methodology for calculating overdraft fees, including the per-item dollar amount of the fee and exception rules for situations in which no fees were assessed.  *Id.*

### C.      Authorization Policies

Beginning in 2002, Wells Fargo gradually rolled out a policy of authorizing debit-card transactions in certain circumstances when a customer's account lacked the funds to cover them at the time of authorization.  Moore Dec. ¶ 13.  This policy became effective in different states at different times.  *Id.*  This authorization policy of overdraft "tolerance" permitted customers to use debit cards in the same way as checks to pay for transactions even if the funds were not in the account at the time of the purchase.  As with a check written under such circumstances, no overdraft fees were incurred so long as the customer promptly deposited sufficient funds to cover the transaction.  *Id.*  After Reg. E went into effect in the summer of 2010, this service was discontinued for customers who did not affirmatively opt into it.  *Id.* ¶ 39. None of the named plaintiffs chose to opt in, but many other customers did.  *Id.*

Although plaintiffs' complaint purports to challenge this practice, *see* DE # 437 ¶¶ 63-64, their motion does not identify any concrete harm suffered by either of the named plaintiffs associated with it.  Their expert has performed no work to test whether it would even be feasible to calculate damages relating to the practice on a class basis and has no plans to do so.  Ex. 6 at 98-100, 157.  Posting order and the rules for authorizing transactions are separate and distinct practices, with independent impacts on overdraft fees.  *See* Keeley Dec. ¶ 70.

### D.      Wells Fargo's Consumer Account Agreements.

Wells Fargo provided each of its customers with a Consumer Account Agreement ("CAA") at the time of account opening.  Moore Dec. ¶ 4.  Customers also received an Addendum describing material changes to the existing CAA.  *Id.* ¶ 6.  Customers were required to sign documents at account opening confirming receipt of the agreement.  *Id.* ¶ 5; Ex. 43.

When the bank modified the CAA, the new version was handed out to new customers (and was also available on the bank's website), but was typically not re-sent to existing customers.  *Id.* ¶ 7.  However, notice of material changes was given to existing customers through a message printed on the customer's monthly account statement or an

addendum included with the statement.  *Id.*  Such separate disclosures were made, for example, when TOD posting was implemented in New Mexico and Washington.  *Id.* ¶ 43.

Each version of the CAA required the parties to arbitrate any disputes concerning the account on a non-class basis.  Moore Dec. ¶ 41; *see also, e.g.*, Ex. 17 at 6.

**Versions Used in Most States.**  The terms of the main CAA varied over time, but every version contained specific disclosures about posting order, expressly providing that Wells Fargo had the right to post transactions in any order, including highest amount to lowest.

Since at least 2000, the CAA stated in relevant part:

> **Debiting Your Account; Order of Posting.**  … The Bank may pay Items presented against your account in any order it chooses, unless a particular order is either required or prohibited by law. In particular, the Bank may, if it chooses, pay Items in the order of highest dollar amount to lowest dollar amount (unless such a practice is specifically prohibited by an applicable state or federal law, rule, or regulation). The Bank may change the order of posting Items to your account at any time without notice to you.

Moore Dec. ¶ 42 & Ex. 17 at 25.

Beginning in October 2004, Wells Fargo added additional language that explicitly warned customers that ordering transactions from highest to lowest dollar amount could increase the number of items that post into overdraft, resulting in an increased number of fees:

> If more than one *Item* is presented to the Bank for payment on a day the Bank determines there are sufficient funds to pay one or more but not all of the *Items*, the number of *Items* paid and the overdraft and returned *Item* fees assessed may be affected by the order that the Bank chooses to pay those *Items* …. For example, if the Bank pays *Items* in the order of highest to lowest dollar amount, the total number of overdraft and returned *Item* fees you are charged may be larger than if the bank were to pay the *Items* in the order of lowest to highest dollar amount.

Moore Dec. ¶ 42 & Ex. 19 at 23.

**Versions Used in TOD States.**  Before the TOD pilot began on October 1, 2005, Wells Fargo began providing customers in New Mexico and Washington with an Addendum to the CAA that stated as follows:

> **Posting Deposits and Withdrawals to Your Account**
>
> **General**. This Section explains (i) posting; (ii) how the order of posting affects the balance in your Account that is available to pay your *Items*;

8

and (iii) how the order of posting may affect Overdraft and Returned Item fees you pay when *Items* presented for payment on your Account exceed the available balance in your Account.

**Posting**. As used in this Agreement, "posting" is the process the Bank uses to update its records of your Account for deposits and withdrawals. The Bank usually posts transactions at the end of each *Business Day*, but it may also post transactions during the *Business Day*. Deposits received on or before the applicable cutoff time on a *Business Day* will post that *Business Day*. Deposits received after the cutoff time on a *Business Day* or on a day that is not a *Business Day* will post the next *Business Day*. The Bank posts all withdrawals to your Account on the *Business Day* the Bank makes its decision to pay them.

**Order of Posting**. The Bank may post *Items* to your Account in any order.  For example, the Bank may, if it chooses, post *Items* in the order of the highest dollar amount to the lowest dollar amount.  The Bank may change the order of posting at any time without notice.

If the calendar day on which a transaction occurs is not a *Business Day*, the Bank will post the transaction on the next *Business Day*.  The Bank may also, at its option, post deposits and withdrawals occurring before the current *Business Day* separately from and before transactions occurring on the current *Business Day*, even though the Bank may post all of these transactions on the same *Business Day*.

For example, the Bank will post deposits and withdrawals you make on a weekend on the next *Business Day*, which would usually be Monday. The Bank will post your weekend deposits and withdrawals separately from and before the Bank posts your Monday deposits and withdrawals. The Bank will not consider your Monday deposits when posting your weekend transactions, even though the Bank posts all of these transactions on Monday.  If you do not have sufficient available funds in your account over the weekend to cover your weekend withdrawals, you may be subject to Overdraft or Returned Item fees.

**How Order Of Posting Can Affect Fees You Pay**.  On a *Business Day* when the Bank determines there are sufficient funds in your Account to pay one or more but not all of the *Items* presented for payment on your Account, the order in which the Bank posts such *Items* may affect the number of *Items* paid and the Overdraft and Returned Item fees assessed. When the Bank posts *Items* in the order of highest to lowest dollar amount, the total amount of Overdraft and Returned Item fees you may be charged may be greater than the total amount these fees would be if the Bank were to post the *Items* in the order of lowest to highest dollar amount.

> **You will be subject to Overdraft or Returned Item fees if you have insufficient available funds in your Account when you issue a check, or make an ATM withdrawal, POS purchase or other transaction**. You can avoid these fees by (i) ensuring you have sufficient available funds in your Account to cover each withdrawal on the calendar day the transaction is initiated or (ii) making a transfer or cash deposit to your Account sufficient to cover each withdrawal before the applicable cutoff time on the calendar day the transaction is initiated.  You may also want to enroll in one of the Bank's overdraft protection plans.

Moore Dec. ¶ 43 & Ex. 22 at 1-2.

This information was provided to all existing customers in New Mexico and Washington through notices printed on their monthly statements.  Moore Dec. ¶ 43; Ex. 58.

**E.      Other Information Provided to Customers**

Every Wells Fargo customer received monthly account statements.  Moore Dec. ¶ 45.  Customers could also view their account activity online and see (a) a list of all posted transactions, arranged in the order in which they were posted and (b) all "pending" transactions of which the bank was aware.  *Id.*  Similar information could be obtained from a branch, at an ATM, or by calling a toll free number.  *Id.*  Every time a customer overdrafted her account, she was sent a separate notice that showed how the overdraft transactions were posted and indicated whether an overdraft or insufficient funds fee was charged.  *Id.* ¶ 47; Ex. 42.  Customers who complained about overdraft fees were often given additional detailed information about how those fees had been calculated.  Moore Dec. ¶ 48; Ex. 53, 54.

Wells Fargo has used a variety of brochures to describe its services.  Plaintiffs claim that isolated statements in a few such documents misleadingly implied that the bank posted transactions in chronological order.  *See* Mot. at 20-22.  Wells Fargo disputes this claim, but what matters for current purposes is that plaintiffs do not – and cannot – contend that documents with the challenged language were distributed to all members of the proposed class, much less that all class members actually read and were misled by them.  Indeed, neither of the named plaintiffs claims to have even seen, much less been affected by, any of these documents.

**F.      Complaints and Reversals of Overdraft Fees**

One of the purposes of overdraft fees is to deter customers from overdrafting their accounts, and the fees are understandably unpopular with customers, who often complain about

them.  Moore Dec. ¶ 49.[7]  Wells Fargo had a generous policy of responding to complaints by reversing fee charges.  Approximately 10 percent of all overdraft fees charged were reversed.  *Id.* ¶ 51.  Reversals were particularly apt to be given if the customer had not overdrafted previously or if the circumstances indicated that the customer did not have reason to know she was overspending her account.  Even when these considerations were not present, fees were often reversed as a simple matter of good customer relations and to resolve disputes.  *Id.*  In those circumstances, the bank and the customer often agreed to "split the difference," with the bank reversing a portion of the fees assessed.  *Id.*  As discussed below, both named plaintiffs in this case were beneficiaries of the bank's generous policy on fee reversals.

### G.    Procedural History

The lead plaintiff in this case, Marc Martinez, was originally a named plaintiff in a different case against Wells Fargo concerning posting order, *McMillan v. Wells Fargo Bank*. *McMillan* was filed in the Northern District of California and was transferred to this MDL on October 20, 2009.  DE # 104.  Following that transfer, the *McMillan* complaint was voluntarily dismissed.  DE # 141.  Shortly thereafter, Martinez filed this case (*Martinez*) in the District of New Mexico, asserting venue in that district.  Jolley Dec. (Ex. 3) ¶ 4.  *Martinez* was then similarly transferred to this MDL (DE # 209), after which plaintiffs filed an amended complaint. DE # 355.  A second amended complaint was filed on May 5, 2010, adding Ivy Graham as a plaintiff.  DE # 437.  The amended complaints, like the original complaint, asserted venue in the District of New Mexico, where both named plaintiffs reside.  *Id.* ¶ 14.

Plaintiffs' motion seeks certification of a single class that would cut across this case and two other separate lawsuits: *Zankich*, filed (and asserting venue) in the Western District of Washington, and *D. Gutierrez*, filed (and asserting venue) in the District of Oregon.  *See* DE

---

[7] Wells Fargo took many steps to help customers avoid overdrafting.  The CAA warned customers that it was their responsibility to keep proper track of their transactions and monitor their accounts.  *See* Ex. 21 at 14.  Wells Fargo created and disseminated brochures and other materials designed to help customers perform this function.  *See, e.g.*, Exs. 24, 25.  The bank also encouraged customers to enroll in overdraft protection.  Moore Dec. ¶ 50.

# 354 ¶ 14; *Zankich* DE #1 ¶ 8.[8]  Plaintiffs have elected from the beginning of this MDL to maintain these three cases as separate lawsuits rather than filing a single consolidated complaint (as was often done in cases against other banks in this MDL).  Jolley Dec. ¶ 17.  Indeed, both Marc Martinez, a named plaintiff in this case (*Martinez*) and Dolores Gutierrez, a named plaintiff in *D. Gutierrez*, were originally plaintiffs in *McMillan*, and a deliberate choice was made to dismiss that single case and file new, separate ones instead.  The different venue allegations in *Martinez, D. Gutierrez,* and *Zankich* have also remained consistent, including through amendments of the pleadings.  Any trials in these cases must take place in three different courts in three different districts.

## H.    The Two Named Plaintiffs

Marc Martinez and Ivy Graham are residents of New Mexico.  The key facts relating to each of them are summarized below. Further details and specific record citations for the facts set out below are supplied in Appendix B, which responds to plaintiffs' Appendix II.

Plaintiffs propose that the class also be "represented" by other individuals who are not parties in this case but are instead plaintiffs in the *Zankich* and *D. Gutierrez* cases.  Because none of those individuals can possibly qualify as class representatives in *this* case, the facts relating to them are discussed in Wells Fargo's separate oppositions filed in the *Zankich* and *D. Gutierrez* cases.  Those discussions are incorporated here by reference.

**Marc Martinez.**  Marc Martinez is a former mortgage advisor at Wells Fargo, a job that he quit voluntarily in 2005 following conflicts with a co-worker.[9]  He had previously worked for many years for various Wall Street firms as a financial advisor.

Martinez opened his original checking account with Wells Fargo in June 2007 in New Mexico.  It was the routine policy and practice of the bank at that time to provide customers

---

[8] *Dolores Gutierrez v. Wells Fargo Bank* is referred to herein as the "*D. Gutierrez*" case to distinguish it from the *Gutierrez* case in California that is referred to extensively in the parties' papers.  The two cases are unrelated.

[9] The fact that Martinez was a former employee of Wells Fargo is nowhere disclosed in either the complaint or plaintiffs' motion.  Nor did Martinez disclose it in a prior deposition taken in *McMillan*.  To the contrary, when asked at that time how he knew of Wells Fargo when he chose to open an account there, Martinez testified that he "worked in the investment world for many years" and "knew of [Wells Fargo] from a distance."  Ex. 7 at 12.

who opened new accounts in New Mexico with copies of both the CAA and the New Mexico Addendum (which described the TOD posting order). Despite the fact that Martinez signed multiple documents confirming that he had received the CAA – and notwithstanding the fact that the complaint alleges that the CAA governed his account – he has denied that he did receive it. Indeed, he claims that he had only an oral contract with the bank, with terms unique to him.

Martinez has testified that his personal claim in this case is that it was wrongful for Wells Fargo to charge him *any* overdraft fees because he never in fact overdrafted his account. When asked whether this claim was the same or different from that of a customer who was simply challenging how his fees were calculated when he *did* overdraft, Martinez confirmed that his claim is "different." Ex. 8 at 227.

In fact, Martinez overdrafted repeatedly. He visited the bank numerous times to discuss and challenge the resulting fees. On one early occasion, he received a fee reversal. The complaint challenges ten overdraft fees that were assessed for transactions that posted several months later, on December 1, 2008, asserting that he would have only received six fees if the transactions had posted in chronological order. DE # 437 ¶ 82-84.

During the entire period Martinez had his Wells Fargo accounts, his transactions were processed under the TOD posting order used uniquely in New Mexico and Washington. On at least one occasion Martinez received more overdraft fees as a result of the chronological aspect of TOD posting than he would have received under the non-chronological posting order the bank used elsewhere. On another occasion he received fewer fees under TOD than he would have received under the bank's usual order. *See* Keeley Dec. ¶ 34 n.40.

Martinez's account was closed in 2009 with a large negative balance, which remains unpaid and exceeds the largest total that could ever possibly be calculated as damages for him in this case. *See id.* ¶¶ 91-93.

**Ivy Graham.** Unlike Martinez, Ivy Graham does not deny having received the CAA when she opened her account. She, like Martinez, is a serial overdrafter. Graham repeatedly contacted the bank to complain about her overdraft fees. She was granted reversals on at least three occasions. Her written communications with the bank confirmed her affirmative understanding of the bank's posting order. While expressing her displeasure at that policy, she nonetheless elected to keep her account open – and continued overdrafting.

Graham's account, like those of other New Mexico residents, was part of the TOD pilot. The complaint challenges one of the overdraft fees that she received for transactions that posted to her account on March 23, 2009. DE # 437 ¶ 91. In fact, those fees had nothing to do with high-low posting. Indeed, Graham would have received no overdraft fees at all on that date had her transactions been posted according to the bank's usual methodology; the fees were instead attributable to the *chronological* aspect of the TOD methodology. Keeley Dec. ¶ 23.

Plaintiff's expert, Arthur Olsen, opines that Graham suffered $420 in excess fees because of the bank's high-low posting order. Dec. of Arthur Olsen ("Olsen Dec.") (Mot. App. IV) ¶ 45. In fact, this conclusion showed that Olsen's methodology did not "work" for the TOD posting order, as this conclusion measures "harm" that, again, derives from the *chronological* component of TOD rather than high-low posting of debit-card transactions. Keeley Dec. ¶ 84.

## III. ARGUMENT

A class may be certified only following a "rigorous analysis" of the requirements of Rule 23. *Sacred Heart,* 601 F.3d at 1169; *see also Dukes*, 131 S. Ct. at 2551-52; *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1266 (11th Cir. 2009). The court must carefully scrutinize the evidentiary record to determine whether each and every requirement of Rule 23 is satisfied. *Dukes*, 131 S. Ct. at 2551 ("Rule 23 does not set forth a mere pleading standard" but instead requires a plaintiff to "prove" that all required elements are satisfied). Plaintiffs' argument in favor of a more relaxed standard (Mot. at 24) relies upon outdated precedents.

A class may not be certified if doing so would "sacrific[e] procedural fairness." Fed. R. Civ. P. 23 Advisory Committee Notes, 1966 Amendments; *see Dukes*, 131 S. Ct. at 2561. A court may not gloss over differences in applicable law or facts to impose a different standard of proof than would exist for an individual action. *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 288 F.3d 1012, 1020 (7th Cir. 2002). Nor may a court deprive a defendant of its right to litigate its defenses fully. *Dukes*, 131 S. Ct. at 2561; *see also Sacred Heart*, 601 F.3d at 1176 (class members could not amalgamate their claims in the name of convenience where to do so would abridge the defendant's rights). In a class action, "the parties' legal rights and duties [remain] intact and the rules of decision unchanged." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431, 1443 (2010).

The burden is on plaintiffs to establish all elements of Rule 23. *Dukes*, 131 S. Ct. at 2561; *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1253 (11th Cir. 2003); *Rustein v. Avis*

14

*Rent-a-Car Sys., Inc.*, 211 F.3d 1228, 1233 (11th Cir. 2000).  This burden cannot be carried by conclusory assertions; rather, plaintiffs must identify evidence on which the Court can base specific findings.  *See Vega*, 564 F.3d at 1275 (reversing certification in absence of required findings supported by the record); *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1196 (11th Cir. 2003) (same).  Plaintiffs' motion does not satisfy this rigorous standard.

Before turning to the specific defects in plaintiffs' motion, this Opposition begins by addressing two preliminary points:  the recent Ninth Circuit decision in *Gutierrez* (which plaintiffs highlight in the amended version of their motion) and the general significance of class certification decisions in other "posting order" cases, including in this MDL.

### A. Plaintiffs' Effort to Circumvent the Ninth Circuit's Holding in *Gutierrez* Creates New Issues on Class Certification.

Because of the passage of time since plaintiffs' motion was filed, they were permitted to file an "updated" version.  *See* DE # 3193 at 2.  Much of plaintiffs' "updating" consisted of a discussion of the Ninth Circuit's decision in *Gutierrez v. Wells Fargo Bank, N.A.*, 704 F.3d 712 (9th Cir. 2012), and several editorial changes that are clearly designed to make the claims in *this* case appear to resemble the portion of *Gutierrez* that the Ninth Circuit left standing, as opposed to the core claims in that case that the Ninth Circuit rejected as a matter of law.

As this Court is aware, plaintiffs here have long relied upon the trial court decision in *Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080 (N.D. Cal 2010).  In that decision, the trial court held that Wells Fargo's high-low posting order was "unfair" within the meaning of the California Unfair Competition Law ("UCL") because it violated the covenant of good faith and fair dealing in the bank's contracts with its customers.  *Id.* at 1122-24.  The court entered an injunction barring the practice and awarded monetary relief to the class in the amount of $203 million.  *Id.* at 1137-40.  The district court further held that the bank violated the separate "fraud" prong of the UCL by failing adequately to disclose its posting order to its customers.  *Id.* at 1126-28.  It also held that certain statements the bank made in brochures and other documents distributed to customers in California constituted affirmative misrepresentations that reinforced customers' natural expectation the debit-card transactions would be posted in chronological order.  *Id.* at 1128-29.  The court awarded injunctive relief for these violations.  *Id.* at 1137.

The Ninth Circuit reversed the district court on two of its three liability holdings. Citing extensive case law from the Supreme Court and other appellate courts (including the Eleventh Circuit), the Ninth Circuit held that the National Bank Act preempted any claim brought under state law that challenged either the bank's posting order or the adequacy of its disclosure of that posting order. 704 F.3d at 723-26. The court held that preemption did not extend to affirmative misrepresentations and confirmed that the district court could enter injunctive relief barring such misrepresentations. *Id.* at 726-28. However, federal law precluded either injunctive or monetary relief based on any of the state-law theories that challenged the bank's posting order itself or its adequacy of the disclosure of that practice. *Id.* at 728. All relief granted by the district court was vacated, and the case was remanded for a determination of what relief , "if any," was properly granted for the narrow claim that survived. *Id.* at 730.

Clearly anticipating that the Eleventh Circuit will follow *Gutierrez* (just as they have long encouraged this Court to rely upon the lower court's decision in that case), plaintiffs have edited their class certification motion extensively to add new assertions about supposed "misrepresentations" by Wells Fargo. Indeed, to read their "updated" motion papers, one would think that this was predominantly a fraud case. Nothing could be further from the truth. Plaintiffs' primary claim here has always been that Wells Fargo breached the covenant of good faith and fair dealing by posting high-low – exactly the same theory that the trial court accepted (and the Ninth Circuit rejected on preemption grounds) in *Gutierrez*. Plaintiffs have alleged no causes of action for fraud. Indeed, they have always vigorously argued that customers' individual understanding and expectations about posting order (which would be key questions for any misrepresentation claim) are *irrelevant*. Nor would the record support any such claim. Unlike in *Gutierrez*, none of the plaintiffs in any of the three cases addressed in plaintiff's motion claims to have seen or relied upon, much less been harmed by, any class-wide misrepresentations about posting order.[10]

To the extent plaintiffs are now seeking to distort their original claims to turn them into misrepresentation claims, they take on new burdens at the class certification stage that

---

[10] The factual findings about misrepresentations in *Gutierrez* are largely irrelevant in *this* case, as *Gutierrez* dealt exclusively with customers and events in California. California customers are expressly *excluded* from the class definition here. Mot. at 1.

16

neither Eleventh Circuit law nor the factual record permits them to satisfy.  These issues, which this Court has not had to address previously, are discussed further below.

**B.   Class Certification Decisions in Other Cases Involving Posting Order Do Not Support Certification Here.**

As this Court has repeatedly stressed, decisions on class certification present unique issues for every case, and the certification of a class in one case does not mean that certification is proper in another case, even if the claims are similar.  *See, e.g.,* DE # 2627 at 8-9. Nonetheless, plaintiffs' motion is largely premised on the assumption that the Court should grant certification here because certification was granted in *Gutierrez* and in other cases in this MDL.

All of these prior cases differ from this case in significant respects. For one thing, all of them pre-dated the Ninth Circuit's decision in *Gutierrez*, which reversed the district court's decision on all claims analogous to those presented here.  Even leaving this aside, the trial court's class certification in *Gutierrez* is highly distinguishable:  For example, the *Gutierrez* court had no need to consider many critical issues presented in this case:

- Numerosity was not in dispute in *Gutierrez*, as the class in that case was certified long before the Supreme Court's *Concepcion* decision.  At that time, the arbitration clause in the bank's account agreement was not enforceable under California law.

- The class certified in *Gutierrez* was for a single case to be tried in a single court, not for three different cases to be tried in three different courts.

- The class certified in *Gutierrez* involved residents and the law of only California.  In contrast, plaintiffs here seek to certify a "nationwide" class (excluding California).

- *Gutierrez* involved a bench trial for a single class focusing on claims that were subject to a single rule of decision.  In contrast, plaintiffs seek a class trial by jury of five different causes of action under the laws of 24 different jurisdictions – laws that even plaintiffs concede vary widely.

- Plaintiffs' trial plan here proposes to simply abandon the claims of many class members; this was not an issue in *Gutierrez*.

- In *Gutierrez*, class members' transactions were all subject to exactly the same posting order rules.  Here, there are dramatic differences in the posting order rules that applied to different groups of customers in the proposed class.  The plaintiffs here are not even typical of the majority of the proposed class in this respect.

- In *Gutierrez*, there were no issues arising from differences in contract language.  In contrast, the claims here involve multiple different contracts, some of which were very different from one another.

17

- In *Gutierrez,* the plaintiffs were unaware of the bank's posting order.  In contrast, at least some of the plaintiffs and other class members here were fully aware of Wells Fargo's high-low posting policy *before* incurring their challenged fees.

- In *Gutierrez*, the class period was fixed.  In contrast, plaintiffs here propose an indeterminate class period requiring individualized application of dozens of different statutes of limitations.

- To the extent plaintiffs now seek to re-cast their claims as resting upon alleged "misrepresentations," *Gutierrez* involved allegations of uniform misrepresentations made to the named plaintiffs and (it was claimed) uniformly distributed to the California class in written brochures and similar items.  Neither of the plaintiffs here claims to have been exposed to, much less injured by, any such misrepresentations.

This Court's prior class certification rulings in this MDL were also made under very different circumstances.  Again, numerosity was not in serious dispute in any of those cases, as none of those defendants had arbitration clauses in their account agreements.  Nor did plaintiffs in those cases seek to combine the parties and claims in multiple lawsuits that were to be tried separately in different courts.[11]  The Court found that the class members in each of those cases were subject to the substantially the same posting orders and contracts; no such finding is possible here. The prior cases involved a much less elaborate structure of subclasses.  And none of the Court's prior orders addressed the propriety of a trial plan that requires abandonment of the claims of many class members.

At least equally significant are decisions in which class certification was *denied* for claims challenging a bank's posting order.[12]  Those decisions recognized that certification is improper where variations in the facts and applicable law are too great to permit class members' claims to be assessed through a streamlined evidentiary submission that focuses only on facts common to the class as a whole.  The same result is appropriate here.

---

[11]  The motion by the TD Bank customer plaintiffs (DE # 2579-1) was captioned in two cases, but plaintiffs had filed a single amended complaint consolidating those cases.  (*See* DE # 559, 997.)  Similarly, the motion by the PNC customer plaintiffs (DE # 2276) was captioned in four cases, but the plaintiffs had filed a single amended complaint consolidating them.  (*See* DE # 991.)  The situation is very different here.

[12]  *See Shelley v. AmSouth Bank*, 2000 WL 1121778 (S.D. Ala. July 24, 2000), *aff'd*, 247 F.3d 250 (11th Cir. 2001) (table); *Compass Bank v. Snow*, 823 So. 2d 667, 676 (Ala. 2001); *Brooks v. Norwest Corp.*, 103 P.3d 39, 54 (N.M. Ct. App. 2004).

### A.    Plaintiffs' Proposed Nationwide Class Impermissibly Combines the Plaintiffs and Claims of Three Different Lawsuits.

The first fundamental defect in plaintiff's motion is that it commingles three separate and distinct lawsuits.  This case (*Martinez*) was filed in the District of New Mexico and asserts venue in that district.  *See* DE # 437 ¶ 14.  *D. Gutierrez* was filed in the District of Oregon and asserts venue there.  *See* DE # 354 ¶ 14; *see also* DE 208.  *Zankich* was filed in the Western District of Washington and asserts venue in that district.  *See Zankich* DE # 1 ¶ 8.  These venue allegations were maintained after the cases were transferred to this MDL for pretrial proceedings.  *See, e.g.*, DE # 437 ¶ 14.

Plaintiffs' motion ignores the fact that these are separate cases that must each be remanded to a different district court for trial.  It also ignores critical differences between the complaints – for example, the fact that each asserts a different array of causes of action.  Instead, plaintiffs mix and mingle named plaintiffs and causes of action from the different complaints in an attempt to stitch together a single enormous class, with no regard for the allegations and claims pleaded in any complaint or the requirement that each case be returned to a different court for trial.  Thus, for example, the only class representatives identified for six of the ten proposed subclasses are not even plaintiffs in *Martinez*.

It is black-letter law that a person cannot serve as a class representative in a case in which he or she is not even a party.  *See Prado-Steiman v. Bush*, 221 F.3d 1266, 1280 (11th Cir. 2000) ("Only after the court determines the issues for which the *named plaintiffs* have standing should it address the question whether the *named plaintiffs* have representative capacity, as defined by Rule 23(a), to assert the rights of others.") (citation omitted; emphasis added).[13]  It is similarly clear that no subclass can be certified without a class representative; indeed, the Eleventh Circuit has made clear that – with or without the formal designation of subclasses – no cause of action may be pursued on a class basis unless at least one named plaintiff has personal standing to pursue that cause of action.  *See Prado-Steiman*, 221 F.3d at 1266, 1279-80.

---

[13] *See also Piazza v. Ebsco Industries Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001) (Rule 23(a) requirements "are designed to limit class claims to those 'fairly encompassed' by the named plaintiffs' individual claims"); *Abercrombie v. Lum's Inc.*, 345 F. Supp. 387, 393 (S.D. Fla. 1972) (King, J.) ("Plaintiffs can not properly represent a 'subclass' of which they are not members any more than they can represent an overall class to which they do not belong").

It would clearly be improper to certify a single class that jumbles together claims and claimants from three different cases.  Any class certified in *this* case (*Martinez*) must be supported by the pleadings, parties, and record of *this* case – regardless of what parties, claims, and facts exist in other cases.  The Court recognized this principle when it held, in partially granting defendants' motions to dismiss, that standing requirements "must be met for each Complaint" and that "it is insufficient for Plaintiffs to assert that a certain state statutory claim in one Complaint should remain because a named plaintiff in another Complaint resides in that state."  DE #305 at 40 n.13.

Thus, for example, when the Court determines whether Rule 23(a) is satisfied in this case (*Martinez*) for plaintiffs' Good Faith and Fair Dealing ("GFFD") Subclass 1, it must determine whether the two *Martinez* plaintiffs are proper representatives for that subclass.  Plaintiffs effectively admit that the answer to that question is "no" when they assign both *Martinez* plaintiffs to a GFFD Subclass 3 instead.  *See* DE # 3262-1 ("Mot. App. I") Ex. A at 9.  They cannot rectify that deficiency by suggesting, as they do, that plaintiffs in a *different* lawsuit, to be tried in a different court, represent GFFD Subclass 1.  *See id.* at 2.

Nothing in the MDL procedure permits this.  "Within the context of MDL proceedings, individual cases that are consolidated or coordinated for pretrial purposes remain fundamentally separate actions, intended to resume their independent status once the pretrial stage of litigation is over."  *In re Korean Air Lines Co. Antitrust Litig.*, 642 F.3d 685, 700 (9th Cir. 2011).  Indeed, these cases not only must be tried separately; they must be tried in different courts.  The MDL statute requires that each case transferred to an MDL proceeding "*shall be remanded* by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated…."  28 U.S.C. § 1407(a) (emphasis added).  This remand requirement is mandatory.  *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 40 (1998).  Accordingly, "an MDL [may not] be managed in a manner that fails to take into account that the cases are destined to be returned to their transferee jurisdictions."  *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 785 F. Supp. 2d 925, 930 (C.D. Cal. 2011).

This issue cannot be addressed by certifying the same nationwide class three times.  It is undisputed that Rule 23 cannot be satisfied in *any* of the three cases for the entirety of plaintiffs' proposed class/subclass structure – there is, for example, no plaintiff in *Martinez*

who can represent the six subclasses for which plaintiffs have only identified representatives from other cases.  Moreover, the Eleventh Circuit has cautioned that courts should not certify duplicative or overlapping classes in multiple cases.  *See Murray v. Auslander*, 244 F.3d 807, 813 (11th Cir. 2001).  One of the purposes of pretrial management in an MDL is to avoid exactly that kind of confusion and duplication.

Nor do plaintiffs offer any basis upon which their monolithic class could be divided up among the three cases.  Plaintiffs' subclass groupings do not correspond to the distinctions between the cases; nor are those groupings consistent for all causes of action.  For example, for the unconscionability claim, plaintiffs group customers from New Mexico (the state in which Martinez and Graham reside) with those from Washington, Arizona, Illinois, and Utah. *See* Mot. App. I at 16.  But their "unjust enrichment" subclasses group New Mexico instead with Nebraska and Michigan.  *Id.* at 14.

Because plaintiffs' entire motion is premised on an impermissible combination of three separate and distinct cases, it is fatally flawed and should be denied at the threshold.

### B.   Plaintiffs Have Not Even Attempted to Satisfy Rule 23 for Any Class on Whose Behalf They Seek to Try Any Claim.

The only "class" for which plaintiffs' motion offers specific argument about the Rule 23 factors is their proposed nationwide class.[14]  As Appendix I to their motion makes clear, however, plaintiffs do not assert that any cause of action can be tried on behalf of that class. Their proposed verdict form, for example, does not seek any verdict on its behalf.  Plaintiffs concede that material differences in the applicable laws preclude this.  Rather, they propose that claims be tried on behalf of ten subclasses – subclasses that do not add up to anything close to the full national class even in the aggregate.  *See generally* pp. 37-38 below.

Even though subclasses are central to plaintiffs' motion, they make no effort to demonstrate that Rule 23 is satisfied for any subclass.  Yet subclasses are subject to all of the same requirements for certification as "classes."  *See Klay v. Humana, Inc.*, 382 F.3d 1241, 1267 (11th Cir. 2004); *abrogated on other grounds by Bridge v. Phoenix Bond & Indemnity Co.*, 553

---

[14] This proposed class excludes customers in California.  *See* Mot. at 1.  However, for the sake of simplicity, it will be referred to herein as a "nationwide" class.

U.S. 639 (2008); Manual for Complex Litigation (Fourth) § 21.23.[15]  Plaintiffs must supply "the exact definition of each subclass, its representatives, and the reasons each subclass meets the prerequisites of Rule 23(a) and (b)."  *In re Telectronics Pacing Sys., Inc.*, 168 F.R.D. 203, 221 (S.D. Ohio 1996).  They have made no effort to do so.  This deficiency alone warrants denial of the motion.  *Id.*; *see In re Hitachi Television Optical Block Cases*, 2011 WL 9403, at *10 (S.D.Cal. Jan. 3, 2011).

### C.    Plaintiffs Cannot Satisfy the Rule 23(a) Prerequisites for Class Certification.

Rule 23(a) imposes four threshold requirements for class certification, generally referred to as "numerosity," "commonality," "typicality," and "adequacy of representation."  Fed. R. Civ. P. 23(a); *see Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1190 (11th Cir. 2009).  Plaintiffs have satisfied none of these requirements.

### 1.    Plaintiffs Have Not Established Numerosity.

Rule 23 permits a class action to proceed "only if ... the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Numerosity must be affirmatively proven in every case.  *Vega*, 564 F.3d at 1266-67.  Plaintiffs' assertion that numerosity has been established ignores the arbitration clause in the CAA.

Any persons "subject to arbitration … could not be considered members of the class."  *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 725 n.5 (11th Cir. 1987); *see Pablo v. Service Master Global Holdings, Inc.*, 2011 WL 3476473, at *2 (N.D. Cal. Aug. 9, 2011) (existence of arbitration agreements precluded findings of numerosity and superiority); *Fischler v. AmSouth Corp.*, 176 F.R.D. 583, 585 (M.D. Fla. 1997) (recognizing that arbitration right affects numerosity).[16]  Once one eliminates customers who must arbitrate their claims, few potential class members remain.

---

[15] *See also Johnson v. American Credit Co. of Ga.*, 581 F.2d 526, 532 (5th Cir. 1978); *Walco Invs., Inc. v. Thenen*, 168 F.R.D. 315, 323 (S.D. Fla. 1996); *Central Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 189 (4th Cir. 1993).

[16] *See also O'Donovan v. Cashcall, Inc.*, 2012 WL 2568174, at *2 (N.D. Cal. July 2, 2012) (excluding customers who had arbitration agreements from class); *In re Currency Conversion Fee Antitrust Litig.*, 224 F.R.D. 555, 570-71 (S.D.N.Y. 2004) (excluding from class customers of banks that had arbitration agreements in place before the litigation was filed); *Champ v. Siegel Trading Co., Inc.*, 1990 WL 19984, at *7 (N.D. Ill. Feb. 27, 1990) (any class "would have to be limited to persons who did not agree to arbitration").

Plaintiffs cannot get around this by arguing that arbitration has been waived.[17] Notwithstanding any waiver as to the named plaintiffs, Wells Fargo *could not* have waived its arbitration right as to absent class members, for the simple reason that no such right has existed − or will exist − until and unless this Court gains jurisdiction over those individuals by certifying a class. Before class certification, unnamed class members are "immune to the court's power." *In re Bayshore Ford Trucks Sales, Inc.*, 471 F.3d 1233, 1245 (11th Cir. 2006); *see also Hartford Acc. & Indem. Co. v. Beaver*, 466 F.3d 1289, 1294 (11th Cir. 2006) ("class members are not part of a lawsuit until certification"). Wells Fargo could not waive its rights against persons who were not subject to the Court's authority. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 1753784, at *3-*4 (N.D. Cal. May 9, 2011) (defendants did not waive right to arbitrate claims of absent class members because they were not parties before certification).[18]

If plaintiffs seek to avoid class members' arbitration obligation by asserting that some did not receive the contract or that the contract is unconscionable, such arguments would require evidence unique to each class member and consideration of the specific laws of each state. For example, any claim that the agreement is procedurally unconscionable could require consideration of the circumstances under which the customer received the contract, what she was and was not told when she received it, and what other options she had available to her in contracting for checking account services. *See, e.g.*, *Lovey v. Regence BlueShield of Idaho*, 72 P.3d 877, 882-83 (Idaho 2003) (procedural unconscionability could not be established under Idaho law just by characterizing contract as one of adhesion); *Hough v. Regions Fin. Corp.*, 672 F.3d 1224, 1229 (11th Cir. 2012). Notably, in challenging Wells Fargo's arbitration clause previously, plaintiffs relied on declarations and other evidence from the named plaintiffs addressing these issues. *See generally* DE #1487, 1971, 2036. The need to assess such individual issues would itself be sufficient to preclude certification.

---

[17] Wells Fargo pled its arbitration right as an affirmative defense in its answer and also separately notified plaintiffs and the Court of its intent to assert its arbitration rights against absent class members when and if the opportunity arose. *See* DE # 549 at 23, # 390.

[18] *See also Whittington v. Taco Bell of America, Inc.*, 2011 WL 1772401, at *5 (D. Colo. May 10, 2011) (same); *see generally* Motion to Dismiss All Claims of Absent Class Members in Favor of Arbitration at 11-12 (citing additional cases).

In any event, there can be no serious question about the enforceability of Wells Fargo's arbitration agreement, which plaintiffs have previously sought to challenge on grounds the Eleventh Circuit has now rejected. *See Barras v. Branch Banking & Trust Co.*, 685 F.3d 1269, 1282-83 (11th Cir. 2012); *Hough*, 672 F.3d at 1229. These issues are addressed further in Wells Fargo's accompanying Motion to Dismiss All Claims of Absent Class Members, which is incorporated herein by reference.

Accordingly, the record does not permit "a supported factual finding, that the class actually certified meets the numerosity requirement." *Vega*, 564 F.3d at 1267.

### 2.    Plaintiffs Have Not Demonstrated Commonality As to All Wells Fargo Customers During the Class Period.

Rule 23(a)(2) permits a class action to proceed only when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Plaintiffs rely for this element on a conclusory listing of purportedly common questions. *See* Mot. at 26-27. However, the Supreme Court has made clear that such a list cannot satisfy a plaintiffs' burden, because "any competently crafted class complaint literally raises common questions." *Dukes*, 131 S. Ct. at 2551. As this Court has explained, "it is insufficient for plaintiffs merely to assert a string of common questions without demonstrating how resolution of these questions evidences common injury." *Bennett v. Hayes Robertson Group, Inc.*, 880 F. Supp. 2d 1270, 1279 (S.D. Fla. 2012) (King, J.). Rather, it must be shown that the "claims ... depend upon a common contention," and that this common contention is "of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S. Ct. at 2551.

This standard is not met here, just as it was not met in *Dukes*. In *Dukes*, the plaintiffs framed the common question as whether Wal-Mart's pay and promotion policies, although they varied at the local level, resulted cumulatively in discrimination on a company-wide basis. *See id.* at 2548-50. The Supreme Court held that such allegations failed to meet the commonality requirement because the plaintiffs had not shown that the challenged employment decisions were the result of any common company policy. *Id.* at 2552.[19]

---

[19] *See also Jamie S. v. Milwaukee Pub. Sch.*, 2012 WL 336170, at *13 (7th Cir. Feb. 3, 2012) (certification of class of persons who "suffered" as a result of failure to provide services (continued...)

An examination of the "questions" listed in plaintiffs' motion (at 26-27) confirms their insufficiency.  The first and fourth questions relate to alleged practices *other than* the posting order practice as to which certification is sought.  The named plaintiffs do not claim to have been harmed by these alleged practices, and their expert has proposed no methodology for calculating "damages" relating to them.  (The fourth "question," moreover, is plainly *not* common, as plaintiffs have identified no common misrepresentation made to the entire class.)  The second, third, and fifth "questions" are merely restatements of the same generic issue: whether class members were charged "too many" overdraft fees because of the various posting orders used by the bank.  This is similar to the question in *Dukes* of whether "too few" women were promoted as a result of Wal-Mart's varying personnel policies.

Here, commonality is absent across at least four critical dimensions.

> ### a)  There Is No Commonality in the Posting Practice Creating the Alleged Injury.

There is a fundamental lack of commonality in the mechanism – the bank's posting order – through which plaintiffs claim their alleged injury was incurred.  This lack of commonality is much more pronounced than any the Court has confronted in this MDL.  In this respect, this case is on all fours with *Dukes*.

In *Dukes*, commonality was found to be absent because, although all members of the class claimed to have been subject to discrimination, the actual *mechanisms* through which their alleged injuries were caused – in that case the personnel practices in Wal-Mart's various regions and individual stores – were not common.  Here, there is similarly a lack of commonality in the challenged practice – posting order for debit-card transactions –  that plaintiffs claim caused them injury.

---

"completely misunderstands" commonality requirement after *Dukes*); *In re Countrywide Fin. Corp. Mortgage Mktg. & Sales Practices Litig.*, 2011 WL 6325877, at *4,, 7 (S.D. Cal. Dec. 16, 2011) (denying certification of class of borrowers, despite evidence of uniform loan documentation, because of need to consider one-on-one communications with the lender); *Dykes v. Dudek*, 2011 WL 4904407, at *3 (N.D. Fla. Oct. 14, 2011) (after *Dukes*, variations in applicable law defeat assertion of commonality).

Plaintiffs assert that Wells Fargo's posting practices and related policies were uniform across the country and throughout the class period, thus making their claims readily susceptible to consideration on a common basis. *See* Mot. at 4, 26-27. That is flatly wrong.

Throughout most of the class period, the posting order used in New Mexico, the state in which both plaintiffs reside, differed dramatically from the posting orders used anywhere else in the country except Washington. Under the TOD methodology used in New Mexico, debit-card transactions were *not* all posted high-low with no regard to the order in which the transactions occurred − the practice plaintiffs challenge in this case. Rather, debit-card transactions initiated on days prior to the posting date were posted first, and transactions initiated on the current date were posted afterward, *even if the amounts were higher*. (*See* p. 5 above.) Thus, this posting order represented a substantial step in the direction of *chronological* posting − which is the approach plaintiffs urge in this litigation.

It is predictable that plaintiffs, to preserve their class arguments, will claim that TOD is "not chronological enough" or is objectionable for other reasons. But such an argument cannot save their position. The fact remains that it is fundamentally *different* and has very different impact on the calculation of a customer's overdraft fees.

The fees incurred by plaintiff Graham that are specifically challenged in the complaint present a striking example of this. *See* DE # 437 ¶ 91. In the real world, under the TOD system, Graham was charged two fees on the day in question. *Id.* Plaintiffs allege that she should have been charged only one fee that day. *Id.* But if the bank's usual posting order in the non-TOD states had been used, Graham would actually have incurred **no overdraft fees at all** on that day. Keeley Dec. ¶ 23. In short, the only "cause" of Graham incurring *any* overdraft fees on the day in question was the bank's use, not of high-low posting, but of *chronological* posting − the very thing plaintiffs seek to *promote* in this litigation. *Id.* Thus, a determination by the jury on the lawfulness or unlawfulness of the high-low posting order used by the bank in other states will not resolve Graham's challenge to these fees.

Similar examples of alleged "harm" that have nothing to do with high-low posting of debit card transactions are found throughout the calculations of plaintiffs' expert, Art Olsen, for customers from TOD states. *See id.* ¶ 84. Olsen has demonstrated no ability to separate out the impacts of high-low posting for those customers. Indeed, he acknowledged in his deposition that it presented a challenge for which he had developed no solution. Ex. 6 at 87-88, 210.

26

The fact of the matter is that customers for whom the TOD methodology was used (including both plaintiffs) were sometimes better off than they would have been under the bank's regular posting order and sometimes they were worse off.  *See* Keeley Dec. ¶¶ 23, 34 n.40, 56 n.67.  For purposes of this motion, the Court need not evaluate which of these alternative posting methodologies was "better" or whether one (or both) was lawful or unlawful.  What is critical for current purposes is that they were *different* and yielded very different results.

The TOD system was not the only different posting system Wells Fargo used during the period in question.  The bank also used a series of significantly different posting orders in Nevada.  (*See* p. 5 above.)  These yielded results different from those yielded by either the TOD system or the system used in the other states.  *See* Keeley Dec. ¶ 56 n.67.  And the posting order used throughout the country (including in the TOD states) changed significantly in July 2010, shortly before the end of the proposed class period.  That posting order also yielded significantly different results in many instances.  *Id.* ¶ 27 n.33.[20]

It would be no answer for plaintiffs to argue that there was still *some* component of high-low posting in most of the systems used.  The fact remains each posting order had very different impacts.  *Id.* ¶¶ 55-58.  Even Olsen admits that considering posting orders with even minor differences yields different results for any analysis of "harm."  Ex. 6 at 108, 199-200, 213-216.  A commonality finding cannot be based merely on the contention that there were instances under each in which the outcome was "too many" overdraft fees.  This is exactly what the *Dukes* plaintiffs claimed – that even though Wal-Mart's personnel decisions were made through different avenues, the end-result was still "too few" promotions for women.  The Supreme Court flatly rejected this facile approach to proving commonality.

Other practices plaintiffs purport to challenge also varied during the pertinent period.  Some were introduced for the first time only mid-way through the period or were revised over time, with differing impacts on different class members.  *See* Moore Dec. ¶ 13; Keeley Dec. ¶¶ 70-74.  For example, plaintiffs make much in their motion of Wells Fargo's policy of

---

[20] If one goes back further in time (as plaintiffs' class definition seems to require in some instances), the posting orders used by the bank were substantially different from those used during the subsequent period and varied across the country.  *See* Moore Dec. ¶ 20.

approving some transactions against insufficient funds. *See* Mot. at 11-12. This practice is completely separate from the posting order practice upon which their class definition is based and on which their expert claims to be prepared to address issues of impact and damages. *See* Keeley Dec. ¶ 70; Ex. 6 at 98-100. Even if plaintiffs assert this issue is important to the claims of some class members – and they have proposed no methodology for assessing its impact on a class basis – it is clearly not relevant to the claims of class members who were unaffected by it. Neither of the two named plaintiffs claims to have suffered harm from this practice.

> **b)      There Is No Commonality In the Contracts or in Communications Concerning Them.**

Plaintiffs' main claim is for breach of the contractual covenant of good faith and fair dealing, with the pertinent contracts being the bank's account agreements. *See, e.g.*, DE # 437 ¶¶ 103-12 & Ex. A. But those agreements (including the sections addressing posting order) were revised over the years, with different customers receiving different versions. The agreements used in New Mexico and Washington during the period when TOD posting was used were substantially different from those used elsewhere. (*See* pp. 8-10 above.) Plaintiffs have made no effort to demonstrate – as it was their burden to do – that these contractual differences are immaterial to their claims. *See Sacred Heart*, 601 F.3d at 1176; *Vega*, 564 F.3d at 1272 (same).

Moreover, in opposing Wells Fargo's earlier arbitration motion, plaintiffs took the position that many class members – including plaintiff Martinez – had no written contracts with the bank at all. *See* DE # 2036 at 2. Martinez contends that he had an oral contract that was unique to him. *See* Ex. 7 at 23. If so, he and others like him must rely on claims about their "contracts" that are very different from those of other class members.

In *Vega*, the Eleventh Circuit reversed class certification for breach-of-contract claims where members of the proposed class were subject to different contracts, even though the conduct by the defendant that allegedly breached those contracts was the same for all. The *Vega* plaintiffs sought to represent a class of salespeople in challenging a uniform policy adopted by their employer for determining sales volume. Plaintiffs claimed this policy breached the company's contractual obligations to its sales employees by reducing their commissions. Although (unlike here) the challenged policy was the same for all class members, the Eleventh Circuit reversed certification because the plaintiffs had not shown that all class members were

28

subject to a common contract.  *See Vega*, 564 F.3d at 1272; *see also id*. at 1274 (vacating class on separate unjust enrichment claims due to lack of commonality).

Similarly, in *Sacred Heart*, the Eleventh Circuit reversed a grant of class certification for a breach of contract claim.  In that case, a group of hospitals sought to challenge on a class basis a health insurer's change in its methodology for calculating reimbursements to hospitals.  Although the challenged conduct – the defendant's methodology for calculating reimbursements – was the same for all class members, the Eleventh Circuit again vacated class certification, because the plaintiffs had failed to demonstrate that the contracts were themselves uniform.  *See Sacred Heart*, 601 F.3d at 1170-1176.[21]

Of particular significance for some of plaintiffs' claims, there were also fundamental differences in *other* sources of information received by class members, including communications that plaintiffs themselves contend to be very important.  Customers learned about the bank's practices from many different sources.  *See* Moore Dec. ¶¶ 42-48.  Plaintiffs' theory relies heavily on the contention that the bank misled customers about its posting order. *See* Mot. at 16-23.  Yet plaintiff Martinez, for example, testified that he never received any of the supposedly misleading communications about which plaintiffs complain.  Ex. 7 at 25, 28, 31. Nor has evidence been offered that any plaintiff ever saw (much less was misled by) any such communications.  And it is clear that many class members received extensive *accurate* information about the bank's posting order from bank personnel.  Moore Dec. ¶¶ 58, 66, 85.

Plaintiffs' own arguments about the significance of these points have been wildly inconsistent.  They contend that variations in the bank's communications with customers beyond the contract are irrelevant, because those communications need not be considered to decide their claims.  Yet such communications are discussed at length in their Motion and are even the subject of one of the supposedly important "questions" that plaintiffs claim are common in this case.  *See, e.g.*, Mot. at 27.

---

[21] *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248 (11th Cir. 2003), cited by plaintiffs, is not to the contrary.  Unlike here, the contracts at issue in *Allapattah* were "materially similar," and the individual issues raised by Exxon "pertained primarily to the issue of damages rather than liability."  *Id.* at 1261.  Here, plaintiffs assert that some plaintiffs had no contract with the bank, and members of the proposed class were subject to different contracts, which raises individualized issues relating to liability, not just damages.

This Court's consideration of this issue in other cases in this MDL has focused on whether the subjective expectations of individual customers are pertinent to the good faith and fair dealing claim. *See, e.g.*, DE # 1763 at 23. There is clear authority in many states (including those involved here) that individualized evaluation of each customer's expectations is critical to that claim. (*See* pp. 49-51 below.) Nonetheless, the Court has accepted plaintiffs' arguments in other cases in this MDL that no evidence need be considered concerning customers' actual understanding of the bank's posting order. But plaintiffs' new-found assertion that their claims are (like the surviving claim in *Gutierrez*) based on allegations of misrepresentation must surely make any such argument untenable.

If plaintiffs' claims depend upon the proposition that the bank made statements that led customers to believe it posted debit-card transactions in an order different than the one actually used, then the jury would be required to determine whether Wells Fargo's statements in fact had any such effect. This would necessarily require consideration of individualized evidence of (a) what statements by the bank each class member was actually exposed to, (b) what those statements caused the customer to believe, and (c) what impact, if any, the statements had on the customer's use of her debit-card. It is well-recognized that the need for such individualized analysis nearly always precludes class certification in cases based on fraud or misrepresentation. *See, e.g.*, *Heffner v. Blue Cross & Blue Shield of Ala., Inc.*, 443 F.3d 1330, 1334 (11th Cir. 2006) (holding that "the reliance element of a class claim presents problems of individualized proof that preclude class certification"); *Sikes v. Teleline, Inc.*, 281 F.3d 1350, 1361-63 (11th Cir. 2002) (reversing class certification for a civil RICO claim), *abrogated on other grounds by Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008); *Andrews v. Am. Tel. & Tel. Co.*, 95 F.3d 1014, 1023-25 (11th Cir. 1996) (reversing certification of a class action asserting mail and wire fraud claims), *abrogated on other grounds by Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008); *Hudson v. Delta Air Lines, Inc.*, 90 F.3d 451, 457 (11th Cir. 1996) (affirming denial of class certification because reliance element of ERISA claims was "not susceptible to class-wide proof").[22]  Similarly, in other suits challenging

---

[22] Plaintiffs cannot avoid this bar by relying on the Ninth Circuit's affirmance in *Gutierrez* of the certification of a class for the statutory misrepresentation claim even without proof of individual reliance. As that court's discussion makes clear, this holding was limited to the conclusion that (continued…)

30

overdraft fees, courts have considered customer-specific variations in the information received about posting practices to be fatal to class certification.  *See Shelley*, 2000 WL 1121778, at *11; *Compass Bank*, 823 So. 2d at 677; *Brooks*, 103 P.2d at 50.[23]

          **c)        There is No Commonality in Plaintiffs' Contentions About Class Members' Contractual Relationships With the Bank.**

Any finding of commonality is further precluded by plaintiffs' inconsistent *contentions* about their contractual relationships with the bank.  For purposes of the good faith and fair dealing claims, plaintiffs acknowledge (as they must) the existence of a valid contract but assert that the bank's posting order was not authorized by that contract and thus violated the implied covenant of good faith and fair dealing.  For the unconscionability claims, plaintiffs acknowledge that a contract authorizes high-low posting but contend that this authorization was unconscionable.  For the unjust enrichment claims, plaintiffs must assert that there is no valid contract at all.  And for purposes of evading their obligation to arbitrate their claims, plaintiffs have contended, variously, that the contract was handed out to all customers in a uniform way and was not handed out at all.  *See* DE # 1971 at 2-3, 2036 at 2-3.

Not only are these contentions very different, they are mutually inconsistent.  And while plaintiffs may plead claims in the alternative at the start of litigation, they cannot "simultaneously prevail" on incompatible theories of recovery.  *In re Checking Account*

---

absent class members had standing under the California UCL, which has uniquely broad standing rules. 704 F.3d at 729.  None of plaintiffs' causes of action invoke state laws with comparable rules.  Moreover, such standing could be found to exist even under the California statute only if (a) the named plaintiffs were shown to have affirmatively relied upon, and been harmed by, the challenged statements and (b) those same statements were shown to have been broadly disseminated to the class.  *Id.* at 728-29.  No such showing has been made here.

[23] In other cases in this MDL, plaintiffs have asserted that *Shelley* is off-point because it involved only claims for "fraud and violation of the Truth and Lending Act."  *See, e.g.*, DE 2529 at 14.  In fact, the *Shelley* court also denied class certification for a *breach of contract* claim, finding that "[c]ausation, as well as the defense of failure to mitigate, requires individual assessments of what each depositor understood to be the defendant's policies, which in turn requires assessments of such things as what information each depositor was given in addition to the written documents and what each depositor did do or would have done once armed with sufficient awareness of the defendant's actual policies."  2000 WL 1121778, at *11.  The same reasoning is equally applicable here.

*Overdraft Litig.*, 694 F. Supp. 2d 1302, 1321 (S.D. Fla. 2010).[24]  And the optimal choice among plaintiffs' varying contentions will not be the same for all class members.  For example, given their contention that some class members (including plaintiff Martinez) were not parties to the CAA, plaintiffs cannot establish that the bank's alleged "breach" of an implied covenant of that contract presents an issue common to the class.  Conversely, given that most customers *were* subject to the CAA, plaintiffs cannot establish that there is a "common" entitlement to recovery for unjust enrichment, as such entitlement can exist under most state laws only where no contract exists.  *See, e.g.*, *Three Way, Inc. v. Burton Enters., Inc.*, 177 P.3d 219, 226 (Wyo. 2008); *Washa v. Miller*, 546 N.W.2d 813, 818-19 (Neb. 1996).[25]  Because the class would not even have a common theory of the case, plaintiffs cannot satisfy Rule 23(a)(2).  *See Dukes*, 131 S. Ct. at 2551 (claims "must depend upon a common contention" that is "capable of classwide resolution").

### d)    Material Differences in the Applicable Law Also Preclude Any Finding of Commonality.

Even before *Dukes*, nationwide classes in cases asserting state-law claims were rarely approved, especially where, as here, there were clear variations among the state laws to be applied.[26]  In light of *Dukes*, it is plain that such differences in the applicable law preclude any finding of commonality, even apart from the factual variations discussed above.

Plaintiffs seek certification of a class to pursue five causes of action under the laws of 24 states. As plaintiffs concede, and as discussed further below and in Appendix A, there

---

[24] *See also First Class Coach & Equip., Inc. v. Thomas Built Buses, Inc.*, 2006 WL 269983, at *7 (M.D. Fla. Feb. 3, 2006) (plaintiff could not simultaneously assert unconscionability while also seeking damages for breach of the parties' contract); *Eric v. Swenson & Sons v. Colvin*, 130 F. 626, 626-27 (C.C.D. Conn. 1904) ("[I]t is worse than inconsistent, it is inherently impossible, [for plaintiffs] to charge that they were cheated into making an unconscionable bargain, and in the same breath try to recover damages for a breach of the bad bargain.").

[25] Nor can this variation be addressed through subclasses.  There is no way of telling which customers are in each category.  And plaintiffs have already proposed more subclasses than any Court, including the Eleventh Circuit, has accepted as manageable.  *See Sacred Heart*, 601 F.3d at 1176, 1183 (subclass strategy not available when multiple subdivisions would be needed to address both differences in contracts and differences in applicable laws).

[26] *See, e.g.*, *Sacred Heart*, 601 F.3d at 1180-83; *Casa Orlando Apartments. Ltd. v. Fed. Nat'l Mortgage Ass'n*, 624 F.3d 185, 195-96 (5th Cir. 2010); *Stirman v. Exxon Corp.*, 280 F.3d 554, 556 (5th Cir. 2002); *In re Bridgestone/Firestone, Inc.*, 253 F.3d at 1189-90; *In re American Med. Sys., Inc.*, 75 F.3d 1069, 1085 (6th Cir. 1996); *Castano v. American Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996).

are significant material differences in the laws of these states, belying any claim "that classwide proceeding[s] [will] generate common answers apt to drive the resolution of the litigation." *Dukes*, 131 S. Ct. at 2551 (citation and emphasis omitted); *see In re Bisphenol-A (BPA) Polycarbonate Plastic Products Liab. Litig.*, 276 F.R.D. 336, 346 (W.D. Mo. 2011) (holding commonality requirement not satisfied for claims of unjust enrichment and violations of consumer protection statutes, due to difficulty of applying myriad state laws).

Plaintiffs effectively *concede* that commonality does not exist for their purported nationwide "class," acknowledging that no claim can be presented directly on behalf of any such class. Instead, they suggest that actual litigation of the claims should proceed piecemeal on behalf of ten subclasses. But commonality must still be demonstrated for each subclass. *See, e.g., Klay*, 382 F.3d at 1267; *Agan v. Katzman & Korr, P.A.*, 222 F.R.D. 692, 696 (S.D. Fla. 2004). As the analysis in Appendix A makes clear, the same lack of commonality as to the applicable law that precludes a nationwide class infects every one of the proposed multi-state subclasses as well. (*See also* pp. 44-49 below.)

In short, plaintiffs have not, and cannot, demonstrate the requisite common legal or factual issues that "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S. Ct. at 2551.

### 3. The Claims of Martinez and Graham Are Not Typical of the Claims of the Proposed Class or Subclasses.

Rule 23(a)(3) requires that the Court determine that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). To be "typical," a plaintiff "must possess the same interest and suffer the same injury as the class members." *Cooper v. Southern Co.*, 390 F.3d 695, 713 (11th Cir. 2004), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006). This requires a showing that "the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984). A plaintiff is unsuited to represent the class when he or she is subject (even arguably) to unique defenses that could become a significant focus of the

trial. *Ross v. BankSouth, N.A.*, 837 F.2d 980, 990-91 (11th Cir. 1988), *vacated in part on other grounds*, 848 F.2d 1132 (11th Cir. 1988).[27]

Neither Martinez nor Graham has claims that are "typical." Both had their transactions posted, and fees calculated, under the TOD posting order, which was *not* used for the majority of the proposed class. *See Soutter v. Equifax Info. Servs., LLC*, 2012 WL 5992207, at *4 (4th Cir. Dec. 3, 2012) (plaintiff not typical where finding of liability as to one method of collecting information for credit reports would not "advance" the claim of class members whose information was gathered in a different way). Both were also subject to different contractual language than the rest of the class. Martinez claims that he had an oral contract unique to him.

Typicality is also absent for all of the same reasons cited above that commonality is absent. Martinez and Graham do not have claims that are "typical" of the claims of a customer from Idaho, for example, because the questions that must be answered to resolve those claims under New Mexico law are not "typical" of those that must be answered to resolve the claims of an Idaho customer – a fact that plaintiffs concede by assigning customers from Idaho to subclasses that neither Martinez nor Graham would "represent." *See* Motion App. I.

An examination of the specific circumstances of each plaintiff shows other elements of atypicality as well:

1. Martinez's account was closed with a large negative balance, which he has never paid. *See* Moore Dec. ¶ 80; Kennedy Dec. (Ex. 2) ¶¶ 7-8; Ex. 8 at 210. Even plaintiffs readily acknowledge that a customer's alleged damages must be reduced by any amounts the customer owes in these circumstances. *See* Olsen Dec. ¶¶ 24-25. In the case of Martinez, this negative balance is greater than the largest possible amount that he could possibly recover as damages in this case. *See* Keeley Dec. ¶¶ 91-93. Accordingly, he has no standing to pursue any claim here, either for himself or anyone else.[28] As this Court has recognized, "[t]o be entitled to

---

[27] *See also CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011); *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 598 (3d Cir. 2009).

[28] *See Koziara v. City of Casselberry*, 392 F.3d 1302, 1304 (11th Cir. 2004); *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 985 (11th Cir. 2005); *Piazza*, 273 F.3d at 1347. Martinez also lacks standing to sue for declaratory or injunctive relief, as his account was closed long ago. *See* (continued…)

class certification, the party seeking certification must have standing."  DE # 2673 at 3; *see also Franze v. Equitable Assurance*, 296 F.3d 1250, 1254 (11th Cir. 2002); *Piazza*, 273 F.3d at 1347; *Prado-Steiman v. Bush*, 221 F.3d 1266, 1279-80 (11th Cir. 2000); *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987).  "Without individual standing to raise a legal claim, a named representative does not have the requisite typicality to raise the same claim on behalf of a class." *Prado-Steiman*, 221 F.3d at 1279; *see also Brannan v. Wells Fargo Home Mortgage, Inc.*, 2011 WL 5331601, at *7 (Bankr. M.D. Ala. Nov. 7, 2011) (denying certification of proposed class of persons seeking to recover fees where proposed class representatives had not paid any fees).

2.    Martinez himself acknowledges that his claim is not typical of the class. Unlike the typical class member, who admittedly overspent her account but (plaintiffs claim) should have been assigned fewer overdraft fees, *see, e.g.* DE # 437 ¶ 91,[29] he insists that he never overdrafted his account at all and so should not have been charged *any* overdraft fees.  He readily acknowledges that this claim is "different" from that of a customer who simply challenges the amount he was charged when he *did* overdraft.  Ex. 8 at 227.

3.    Martinez is also atypical because he contends that he never received a copy of the Consumer Account Agreement and that his relationship with Wells Fargo was not governed by that contract.  If this is true, the terms of his relationship with the bank will be determined on an entirely different basis from virtually every other member of the class.  Martinez has even claimed that he had a special oral contract under which his account was subject to "no or low" overdraft fees.  Ex. 7 at 37, 50-51.  Wells Fargo does not believe Martinez can prove any such thing, but for current purposes what matters is that his claims, as he presents them, do not arise "from the same event or pattern or practice" and cannot be "based on the same legal theory" as the claims of other customers.  *Kornberg*, 741 F.2d at 1337.

4.    Martinez received at least one reversal of overdraft fees.  Ex. 7 at 26-33, 38-40.  This fact supports several affirmative defenses, such as ratification, waiver, and voluntary payment, that may not be applicable to other members of the class.  (*See* pp. 55-57 below.)

---

*Dukes*, 131 S. Ct. at 2560; *Williams v. Board of Regents of Univ. Sys. of Georgia*, 477 F.3d 1282, 1303 (11th Cir. 2007).

[29] Plaintiffs' expert acknowledges that anyone who was harmed by high-low posting necessarily did in fact overdraft his or her account.  Ex. 6 at 118-19; *see* Olsen Dec. ¶ 16.

5.   Martinez does not claim to have been harmed by other alleged practices the complaint purports to challenge.  He does not claim to have relied on inaccurate account balance information, for example.  *See* Ex. 8 at 82-83.  Nor does he claim that he read or relied on any of Wells Fargo's promotional materials that plaintiffs claim were misleading.  *Id.* at 23-24; *see* DE # 437 ¶ 76.  *See Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1019-20 (9th Cir. 2011) (plaintiff who was not deceived by alleged misrepresentation not typical).

6.   Like Martinez, Graham is not "typical" of most class members because the posting order used to calculate her overdraft fees was substantially different from that for the vast majority of class members.  This fact is illustrated by the very transactions cited in her complaint.  For those transactions, she claims she should have received one overdraft fee rather than two.  *See* DE # 437 ¶ 92.  But under the bank's regular posting order, as used in most states, she would have incurred *no overdraft fees at all* on that day.  *See* Keeley Dec. ¶ 23.  The fact that she did incur fees was due to the fact that there was a chronological component to TOD posting that was not present in the bank's regular system.  When that chronological component is eliminated, and one uses only the bank's standard high-low posting that is challenged here, her fees for that date are eliminated.  *Id.*  Her challenge to these fees thus does not "arise from the same event or pattern or practice" as those of other class members.  *Kornberg*, 741 F.2d at 1337.

7.   Graham was subject to contract language on posting order that was significantly different from that of most customers.  The contractual language on TOD was very specific and detailed, and the issues arising from its interpretation and application are not "typical" of those presented by the contracts used in other states.

8.   Graham had actual knowledge of the bank's use of high-low posting and nonetheless, with this knowledge, overdrafted her account repeatedly.  *See* App. B at 7.  This precludes her from being "representative" of a class of supposedly unwitting customers who incurred excessive overdraft fees while expecting the bank to post her transactions chronologically.  It also subjects her claim to numerous affirmative defenses not shared by all class members.  (*See* pp. 55-58 below.)

9.   Graham does not claim that she ever received inaccurate information from Wells Fargo or that she suffered concrete harm as a result of any of the practices other than posting order challenged in the complaint.

36

With neither plaintiff able to present claims that are typical of the proposed class, Rule 23(a) is not satisfied, and the class may not be certified.

### 4. Martinez and Graham Cannot Adequately Represent a National Class or Any Subclasses.

#### a) Most Proposed Subclasses Lack Any Class Representatives.

Rule 23(a)(4) requires that, in any certified class, "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement applies also to subclasses. (*See* p. 21 & n.15 above (citing cases)). As a threshold matter, it should go without saying that a person cannot be an adequate class representative if he is not even a party. Yet for a majority of the proposed subclasses, the only "representatives" identified are plaintiffs in *different* cases who are not parties in *Martinez*.[30] None of these subclasses has "adequate" representatives by definition: When this case is remanded for trial to the District of New Mexico, most subclasses would have no representative. (The affected subclasses are identified in Appendix A.)

#### b) Plaintiffs' Abandonment of the Claims of Numerous Class Members Demonstrates That They Are Not Adequate Representatives of Any National Class.

The inadequacy of the plaintiffs to serve as class representatives is apparent from the fact that they propose to abandon the claims of millions of customers by pursuing a subclass scheme that excludes the customers from several states for each claim − and for thousands of class members would pursue *no claims at all*. A class representative is not adequate when she or her counsel "abandons particular remedies to the detriment of the class." *Western States Wholesale, Inc. v. Synthetic Indus., Inc.*, 206 F.R.D. 271, 277 (C.D. Cal. 2002).[31]

---

[30] For one subclass, plaintiffs identify no representative at all. *See* Mot. App. I at 16. Plaintiffs suggest that this subclass may be indirectly "represented" by the representative of a different subclass. This is impermissible. (*See* pp. 19 & 34 above.)

[31] *See also Mays v. Tennessee Valley Auth.*, 274 F.R.D. 614, 622-24 (E.D. Tenn. 2011); *In re Fedex Ground Package Sys., Inc.*, 662 F. Supp. 2d 1069, 1082 (N.D. Ind. 2009); *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 536 F. Supp. 2d 313, 318 n.5 (S.D.N.Y. 2007); *Welch v. Atlas Roofing Corp.*, 2007 WL 3245444, *4 (E.D. La. Nov. 02, 2007); *Thompson v. American Tobacco Co.*, 189 F.R.D. 544, 550 (D. Minn. 1999); *Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595, 606–07 (S.D.N.Y. 1982).

During the class period, Wells Fargo had checking account operations in 25 states, 24 of which are included in their class definition.[32]  Plaintiffs' trial plan includes customers from only 13 of these states in the subclasses on whose behalf they would try the good faith and fair dealing claim.[33]  Under plaintiffs' plan, therefore, this claim would be abandoned for customers from nearly half of the states.  Plaintiffs abandon the unjust enrichment claims of class members from almost two-thirds of the states.[34]  And four states (Indiana, Kansas, Missouri, and Nevada) are excluded from the "unconscionability" subclasses.

Three states (Indiana, Kansas, and Missouri) are found in ***no subclasses at all***. Thus, although plaintiffs would include customers from those states in the nationwide class, they would pursue ***no claims of any kind*** at trial on their behalf.  For customers from six other states, plaintiffs propose to try only a claim for unconscionability, which is among the most legally suspect of their causes of action.[35]

Plaintiffs do not explain why they propose to abandon the claims of so many thousands of customers in the class they seek to represent.  One assumes that the laws of the omitted states do not fit neatly into plaintiffs' subclass scheme.  But because all customers outside California are included in the proposed national class, *all* of them would be bound by the judgment and precluded from pursuing their claims separately, regardless of whether plaintiffs actually pursue their claims in this case.  *See Kirkpatrick v. JC Bradford & Co.*, 827 F.2d 718,

---

[32] *See* Moore Dec. ¶ 3; Mot. App. I.  Customers in California are excluded from the class definition.  Mot. at 1.  Plaintiffs' motion states that Wells Fargo operates in 39 states.  That figure appears to include states in which the former Wachovia Bank operated and in which all accounts remained on the "Wachovia" systems throughout the class period.  Those customers are excluded from plaintiffs' class definition and are included in none of their proposed subclasses.

[33] The states excluded from the GFFD subclasses are Alaska, Colorado, Illinois, Indiana, Iowa, Kansas, Minnesota, Missouri, Nebraska, Ohio, and Texas.  The Court dismissed the good faith claim as to Texas customers.  *See* DE # 305 at 24-25.  However, plaintiffs offer no reason for the exclusion of customers from the other states.

[34] The excluded states for this claim are Arizona, Colorado, Illinois, Indiana, Iowa, Kansas, Minnesota, Missouri, Montana, Nevada, North Dakota, Ohio, South Dakota, Texas, and Utah.

[35] Most states recognize no cause of action for "unconscionability."  Unconscionability is instead recognized only as a defense to a breach of contract claim.  *See, e.g.*, *Ricotta v. Finance Am., LLC*, 2007 WL 987854, at *3 (D. Col. Apr. 2, 2007) ("claims" for unconscionability are affirmative defenses to a claim for breach of contract and could not be asserted as direct claims).

38

726 (11th Cir. 1987) (all class members bound by res judicata effect of a judgment in a class action).  The potential prejudice to these individuals is manifest, and their interests are not adequately represented in plaintiffs' proposed scheme.  *See In re Teflon Prods. Liab. Litig.*, 254 F.R.D. 354, 368 (S.D. Iowa 2008) (certification improper where omitted claims could be barred by res judicata).[36]

**c)      Conflicts of Interest Prevent Graham and Martinez From Serving as Adequate Class Representatives.**

The Eleventh Circuit has repeatedly cautioned that proposed class representatives cannot satisfy the adequacy requirement if "their interests are actually or potentially antagonistic to, or in conflict with, the interests and objectives of other class members."  *Valley Drug*, 350 F.3d at 1189; *see also Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1277-80 (11th Cir. 2000); *Grimes v. Fairfield Resorts, Inc.*, 331 F. App'x 630 (11th Cir. Jan. 30, 2007).  Numerous such conflicts exist here.

*First*, these plaintiffs are inadequate class representatives because they are subject to individual defenses not applicable to the class as a whole.  (*See* pp. 35-36 above.)  This creates a conflict of interest because the jury's attention will be diverted to those unique defenses instead of focusing exclusively on the claims of the class.  *Ross*, 837 F.2d at 990-91.[37]

*Second*, conflicts of interest arise from variation in the laws of the states included within each subclass.  Other sections of this brief and Appendix A explain in detail how

---

[36] *See In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 253-54 (2d Cir. 2011) (finding conflict where named plaintiffs held best claims and thus lacked incentive to maximize recovery for class members with different types of claims); *Brown v. Kerkhoff*, 279 F.R.D. 479, 495 (S.D. Iowa 2012) (plaintiffs unable to demonstrate ability to protect class members from impact of claim splitting); *Fosmire v. Progressive Max Ins. Co.*, 277 F.R.D. 625, 634 (W.D. Wash. 2011) (class representative's splitting of claim to create appearance of commonality rendered her inadequate); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 209 F.R.D. 323, 339 (S.D.N.Y. 2002); *Thompson*, 189 F.R.D. at 551; *Pearl v. Allied Corp.*, 102 F.R.D. 921, 924 (E.D. Pa. 1984); *Feinstein*, 535 F. Supp. at 606.

[37] Relatedly, there will be significant issues of credibility in the claims of the named plaintiffs. For example, Martinez disputes that he received the CAA; yet he signed a document confirming that he had received it.  The credibility issue this presents precludes Martinez from adequately representing the class.  *See CE Design Ltd.*, 637 F.3d at 724; *Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 431 (6th Cir. 2012); *Han v. Sterling Mortg. Co., Inc.*, 2011 WL 4344235, at *7 (E.D.N.Y. Sept. 14, 2011).

plaintiffs' incomplete state-law discussion omits or disguises material differences in those laws. The existence of such differences – the fact that the laws of states grouped within the same subclass diverge in material respects – renders Martinez and Graham unable to represent any such subclass adequately. *In re Motor Fuel Temp. Sales Practices Litig.*, 271 F.R.D. 263, 284 (D. Kan. 2010); *In re Panacryl Sutures Prods. Liab. Cases*, 263 F.R.D. 312, 323 (E.D.N.C. 2009).

As shown in Appendix A, this presents a concrete issue for all of plaintiffs' proposed multi-state subclasses. For example, plaintiffs include both Utah and Idaho in their Good Faith and Fair Dealing Subclass 2. Under Utah law, plaintiffs must show that the bank intentionally injured their rights to receive the benefits of the contract. *See Oman v. Davis School Dist.*, 194 P.3d 956, 968 (Utah 2008). Idaho law, in contrast, uses a wholly objective standard "independent of the [defendant's] subjective intent." *Potlach Educ. Ass'n v. Potlach School Dist. No. 285*, 226 P.3d 1277, 1281 (Idaho 2010). If this element of the subclass's claim is to be decided with a single question on the verdict form, and if Wells Fargo's due process rights are to be respected (as they must), the jury would have to be instructed that it could find for this subclass *only* if it found Wells Fargo had "intentionally" done something to injure class members' contractual rights, even though Idaho law has no such requirement. This creates a clear conflict of interest within the class. *See Telecomm Technical Servs., Inc. v. Siemens Rolm Commc'ns, Inc.*, 172 F.R.D. 532, 544 (N.D. Ga. 1997) ("Antagonistic interests are not only those which directly opposed one another, but also are those which may be … unharmonious such that one party's interest may be sacrificed for another's.").

An equally, if not more, egregious situation is created by plaintiffs' proposal that their Unconscionability Subclass 1 be represented, not by plaintiffs who are members of that subclass, but by persons who are instead members of Unconscionability Subclass 3. Mot. App. I at 16. According to plaintiffs, the states in Subclass 1 require proof of *both* substantive and procedural unconscionability, while the states in Subclass 3 require proof of *either* substantive *or* procedural unconscionability. Even apart from the fact that a subclass must be represented by a person who is a member *of that subclass* – the Eleventh Circuit has been quite clear on this point (*see Prado-Steiman*, 221 F.3d at 1279-80, 1283) – it is evident that the representatives of Subclass 3 cannot adequately represent Subclass 1. Plaintiffs argue that the representatives of Subclass 1 are "incentivized" to prove both substantive and procedural unconscionability, even

40

though they need prove only one or the other.  Mot. App. I at 16.  Adequacy cannot be found based on a vague assurance that a plaintiff is "incentivized" to prove more than her own claim requires.[38]

### d)   There is a Conflict of Interest With Class Members Who Benefited From the Challenged Practice.

As plaintiffs admit, a "fundamental conflict exists where the economic interests and objectives of the class representatives 'differ significantly from the economic interests and objectives of unnamed class members,' such as when other members of the class actually benefited from the conduct challenged by the plaintiffs."  Mot. at 29 (citing *Valley Drug*, 350 F.3d at 1189-90); *see also Pickett v. Iowa Beef Processors,* 209 F.3d 1276, 1280 (11th Cir. 2000) (reversing certification where "class includes those who claim harm from the very same acts from which other members of the class have benefitted"); *Almanor v. Bankatlantic Bancorp., Inc.*, 261 F.R.D. 672, 676 (S.D. Fla. 2009).  Such conflicts exist here, because there is no single posting order that will always benefit each member of the class, and each potential posting order – including the high-low order that plaintiffs challenge in this MDL, the TOD posting order applicable to the named plaintiffs, and each of the alternatives suggested in the complaint and in Olsen's declaration – offers both advantages and drawbacks.  *See* Keeley Dec. ¶¶ 55-58.

Plaintiff Graham's account history offers a concrete example of the fact that different posting orders can have dramatically different effects – sometimes positive, sometimes negative – on different customers in different situations.  As discussed above, the chronological component of the TOD posting order resulted in two overdraft fees for her on March 23, 2009, whereas that bank's standard non-chronological, high-low posting order – that is, the posting order plaintiffs challenge in this MDL – would have yielded *no* overdraft fees that day.  Keeley Dec. ¶ 23.  On the other hand, for her transactions that posted on July 17, 2008, Graham would have incurred more overdraft fees under the bank's regular high-low system than she received

---

[38] Ironically, plaintiffs offer the exact opposite argument in the "Wachovia" cases (*Garcia* and *Spears-Haymond*), where they have a different gap in their class representatives and so assert that a subclass with a lesser burden may be "represented" by someone in a different subclass whose own state requires a *greater* showing.  *See* DE # 3198-1 App. I at 16-17.  These arguments make a mockery of plaintiffs' own subclass structure, which otherwise tries to give at least lip service to the need to identify subclasses whose claims involve uniform legal standards.

under TOD.  *Id.* ¶ 56 n.67.  Which system was "better" for her on any given day depended on the specific mix of her transactions on that day.  Extrapolating this out to the class, it is clear that, on a net basis, some class members would have had more fees under the bank's regular system, while others would have had fewer.  *Id.* ¶ 34 n.40.

> Moreover, there is overwhelming evidence that many customers affirmatively benefited from high-low posting.  *See* Keeley Dec. ¶¶ 37-45.[39]  A high-low posting order ensures that larger, typically more important obligations (such as mortgage, rent, car, or tax payments) are paid out of a customer's available funds first.  *Id.* ¶ 38.  This minimizes the likelihood that such important payments will be rejected for insufficient funds, as every bank establishes a threshold past which it will no longer pay items.  Moore Dec. ¶ 34; Keeley Dec. ¶ 38.  Using a different posting order therefore results in more frequent rejection of important payments, together with the imposition of "insufficient funds" fees by both the bank and the payee to whom the payment was owed.  Keeley Dec. ¶¶ 38-44.  The total cost to the customer in that situation is typically higher – often much higher – than an overdraft fee.  *Id.* ¶¶ 46-52.  Regulators have expressly acknowledged this benefit of high-low posting.[40]

> Recent experience has confirmed that elimination of the bank's high-low posting order genuinely affects the rate at which items are rejected for payment.  Wells Fargo revised its

---

[39] It is largely for this reason that federal regulators chose not to mandate that banks use a particular posting order.  *See* Federal Reserve Sys. Bd. of Governors, Final Rule, Unfair or Deceptive Acts or Practices, 74 Fed. Reg. 5498, 5547−48 (Jan. 29, 2009) (declining to prescribe posting order rule because "it would be difficult to set forth a bright-line rule that would clearly result in the best outcome for all or most consumers").  Similarly, the drafters of the Uniform Commercial Code went out of their way to specify that a bank can post transactions "in any order," recognizing that no posting order is always optimal.  UCC § 4-303(b) & official cmt. 7.

[40] As the Federal Reserve has stated:

> [T]he payment of overdrafts for [checks and recurring debits] may enable consumers to avoid other adverse consequences that could result if such items are returned unpaid, such as returned item fees charged by the merchant.  Consumers may also be more likely to use checks, ACH and recurring debit card transactions to pay for significant household expenses, such as utilities and rent. In the Board's consumer testing, participants generally indicated that they were more likely to pay important bills using checks, ACH, and recurring debits, and to use debit cards on a one-time basis for their discretionary purchases.

Federal Reserve Sys. Bd. of Governors, Final Rule, Regulation E, 74 Fed. Reg. 59033, 59040 (Nov. 17, 2009).

posting order in 2010, eliminating its practice of grouping debit-card transactions with checks. Moore Dec. ¶ 22.  This had the effect of moving high-dollar-value checks "later" in the posting order.  After that change was made, there was an immediate increase in the bank's rejection rate – more items were indeed being rejected for payment.  *Id.*

In short, no posting order will be consistently "better" or "worse" for all customers in all circumstances.  A posting order that saved Ivy Graham $35 could easily have led to *higher* costs for other customers.  A situation that simply creates new "groups of winners and losers" presents the quintessential conflict situation in which class certification is inappropriate.  *Auto Ventures, Inc. v. Moran*, 1997 WL 306895, at *5 (S.D. Fla. Apr. 3, 1997) (denying class certification); *see Pickett*, 209 F.3d at 1280 (class may not be certified when some members benefit from same acts alleged to harm others); *Valley Drug*, 350 F.3d at 1193-94 (even "potential" conflict violates Rule 23(a)(4) requirement of adequate representation).

**D.    Plaintiffs Have Not Satisfied the Additional Requirements for Certification Under Rule 23(b)(3).**

Rule 23(b)(3) requires a showing that (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Plaintiffs' motion meets neither requirement.

Rule 23(b)(3) requires the Court to consider, from a practical perspective, how the claims would actually be tried.  *See Sacred Heart*, 601 F.3d at 1183 (explaining that variations in underlying contracts and applicable laws made trial of the proposed class claim unworkable).  Plaintiffs' "trial plans" must demonstrate with specificity how the issues can be tried on a class basis.  *See* Manual for Complex Litigation (Fourth) § 22.141 (2004); *Vega*, 564 F.3d at 1279 n.20 (emphasizing "the importance of a realistic, clear, detailed, and specific trial plan"); *Sacred Heart*, 601 F.3d at 1180 (plaintiffs must identify applicable state law variations and show they can be effectively managed).

The trial plan that plaintiffs present in Appendix I to their Motion is plainly inadequate.  Plaintiffs have not supplied a reliable analysis of the pertinent law, facts, and evidence that would need to be presented in this complex case.  Instead, they offer only simplified and incomplete characterizations of a few elements of each cause of action, together with equally oversimplified descriptions of evidence they hope to present. Appendix A to this

Opposition provides a detailed response to plaintiff's trial plan, as set forth in their Appendix I. As explained below, it is plain that common issues do *not* predominate here and that plaintiffs' claims cannot be tried on a class basis in a manageable fashion.

      **1.**      **Common Issues Do Not Predominate.**

           **a)**      **Substantial Variation in Applicable Law Precludes Certification of the Proposed Subclasses.**

Although nationwide classes are common in cases brought under federal statutes, nationwide classes are rarely certified for claims that require application of numerous separate state laws. It is well recognized in the Eleventh Circuit, as elsewhere, that variations in state law usually swamp any common issues. *See, e.g., Klay*, 382 F.3d at 1261; *Sacred Heart*, 601 F.3d at 1180-83.[41] To overcome this, a plaintiff seeking to certify a multi-state class must provide an extensive and detailed analysis demonstrating the absence of material variations in the applicable state laws. *See Sacred Heart*, 601 F.3d at 1180-83 (reversing certification where plaintiffs failed to demonstrate similarity in state laws); *Clausnitzer*, 248 F.R.D. at 660-61 (denying certification where plaintiffs failed to demonstrate similarity in state laws); *Kunzelmann v. Wells Fargo Bank, N.A.*, 2013 WL 139913, at *10-*11 (S.D. Fla. Jan. 10, 2013) (Middlebrooks, J.); *Powers v. Gov't Employees Ins. Co.*, 192 F.R.D. 313, 318-19 (S.D. Fla. 1998).

The difficulty in satisfying this burden is demonstrated by the fact that few courts have actually certified such classes outside the settlement context. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 94 (D. Mass. 2008) (observing that "[w]hile numerous courts have talked-the-talk that grouping of multiple state laws is lawful and possible, very few courts have walked the grouping walk"). Indeed, although plaintiffs rely for this purpose on *Klay*, the Eleventh Circuit *rejected* class certification for the common-law claims in that case. *See* 382 F.3d at 1252, 1263, 1267-68.

Plaintiffs' trial plan contemplates that a single jury would resolve the class claims by reference to the laws of 24 different states. It is *undisputed* that there are major differences among the laws of those states, although plaintiffs acknowledge only a fraction of them.

---

[41] *See also Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 947-49 (6th Cir. 2011) (collecting cases); *Casa Orlando Apartments, Ltd.*, 624 F.3d at 194-96; *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001); *In re Bridgestone/Firestone, Inc.,* 288 F.3d at 1020; *Castano*, 84 F.3d at 741; *In re American Med. Sys., Inc.*, 75 F.3d at 1085.

Predominance plainly does not exist for the proposed "nationwide" class.  Plaintiffs' proposal of a complex subclass structure does not cure this problem.  Subclasses may be appropriate "if the applicable state laws can be sorted into a *small* number of groups."  *Klay*, 382 F.3d at 1262 (emphasis added).  But subclasses may not be used to circumvent the requirements of Rule 23, and "common sense tells us that the necessity of a large number of subclasses may indicate that common questions do not predominate."  *Sacred Heart*, 601 F.3d at 1176 (citation and internal marks omitted).  Plaintiffs cite no case in which a court has ever certified as many subclasses as are proposed here; smaller numbers are regularly rejected.[42]

Most of the cases plaintiffs cite in which courts permitted certification of multi-state classes involved *settlement* classes, for which the issues presented on certification are substantially different − as plaintiffs' own counsel has repeatedly stressed in urging the Court to approve settlement classes in this MDL.  *See, e.g.*, DE # 2710 at 33.  For example, when "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, … for the proposal is that there be no trial."  *Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 620 (1997).  Nor do the few non-settlement cases that plaintiffs cite provide support for their proposal here.  For example, in *In re School Asbestos Litigation*, 789 F.2d 996 (3d Cir. 1986), the Third Circuit affirmed certification only with great reluctance, observing that manageability of as many as four subclasses was a "serious concern" and might need to be revisited later.  *Id.* at 1010 n.11 & 1011.  Nor does *Gutierrez* offer any help to plaintiffs on this point, as that case involved only the law of a single state.[43]

---

[42] *See, e.g.*, *Sacred Heart*, 601 F.3d at 1176 (reversing certification of six subclasses); *Robinson v. Gillespie*, 219 F.R.D. 179, 184-85 (D. Kan. 2003) (rejecting certification and noting that "plaintiffs show the court no case in which seven subclasses have been certified"); *Zapka v. Coca-Cola Co.*, 2000 WL 1644539, at *4 (N.D. Ill. Oct. 27, 2000) (denying motion for class certification accompanied by proposal for seven subclasses).

[43] Plaintiffs' other cases are similarly inapposite.  *In re Pharmaceutical Industry Average Wholesale Price Litigation* concerned only one theory of liability, as opposed to the several presented here, and the court acknowledged that "manageability of this case will be difficult." 252 F.R.D. at 107.  *Steinberg v. Nationwide Mutual Insurance Company*, 224 F.R.D. 67, 77 (S.D.N.Y. 2004), and *Hansen v. Monumental Life Ins. Co.*, 2008 U.S. Dist. LEXIS 112254, at *26 (D. Conn. Mar. 6 2008), also each involved only a single theory of liability − and the *Hansen* court still refused to include states where the relevant statute differed from the model statute (continued…)

None of the cases upon which plaintiffs rely involved similar dramatic variations in the law within each subclass. Plaintiffs' conclusory assurances that the relevant laws are "substantially" the same (*e.g.*, Mot. App. I at 15) fall far short of satisfying their burden of presenting an "extensive analysis" to show that differences in the applicable laws are both minimal and manageable. *Sacred Heart*, 601 F.3d at 1180; *see also Klay*, 382 F.3d at 1262; *Powers*, 192 F.R.D. at 319 (rejecting certification where plaintiff provided only a "cursory analysis" of state laws). Even where the differences involve only nuances, those nuances cannot be ignored, as they can affect the outcome. *Casa Orlando Apartments, Ltd.*, 624 F.3d at 194; *Matter of Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1300 (7th Cir. 1995). As shown in Appendix A and summarized below, the differences here go far beyond nuance.

**Good Faith and Fair Dealing Subclasses.** Plaintiffs propose three subclasses for their claims for breach of the implied covenant of good faith and fair dealing. Mot. App. I at 12-14. Their sole grounds for differentiating among these subclasses is whether the applicable state laws require proof of a breach of the underlying contract and whether the defendant's breach must frustrate an essential purpose of the contract. *Id.* & Ex. A. But as demonstrated in Appendix A, the laws applicable to this claim vary in several other critical respects, creating material differences within each subclass.

Elsewhere, plaintiffs have argued that *Klay* "accept[ed] the proposition that the applicable state laws governing contract interpretation and breach are sufficiently identical to constitute common legal issues." DE # 3198, at 45-46 (quoting *Klay*). In fact, the Eleventh Circuit said only that the "definition of 'breach'" did not appear to vary − and it "accepted" that conclusion because the defendants had failed to argue otherwise on appeal. 382 F.3d at 1263. The court then went on to *reject* certification for breach of contract claims. *Id.* at 1263.

More pertinent is the Eleventh Circuit's decision in *Sacred Heart*, which reversed an order certifying a class of hospitals that had sued a medical insurer for breach of contract under the laws of six states. The Eleventh Circuit held that the hospitals' claims did not present predominately common issues because, *inter alia*, the defense of ratification and waiver

---

most states had adopted. *Deadwyler v. Volkswagen of America, Inc.*, 1986 WL 12567 (W.D.N.C. Mar. 7, 1986), is a short order tentatively certifying three classes and does not reflect the rigorous analysis that the Supreme Court and Eleventh Circuit now mandate.

necessitated an individualized assessment of each hospital's conduct.  *See* 601 F.3d at 1170-79. Noting judicial "skepticism" that class treatment is ever appropriate "where the law of multiple states will apply," the court provided a careful, state-by-state analysis of just one defense (waiver) to illustrate that differences among the laws of the six states could not be managed through the six subclasses the district court had certified.  *Id*. at 1180-83.

Significantly, the contract claims presented in *Klay* and *Sacred Heart* were far more straightforward than the good faith and fair dealing claims asserted here.  The elements of a simple breach of contract claim are generally well developed (although important differences do exist, as *Sacred Heart* makes clear).  But a claim for the breach of the implied covenant of good faith and fair dealing may require consideration of multiple issues that fall outside the four corners of the contract, and there is tremendous variety in the applicable state laws. Plaintiffs' motion ignores these differences.  For example, they have grouped within the same subclasses:

- In GFFD Subclass 1, a state that does not allow the implied covenant of good faith and fair dealing to defeat the stated terms of the contract – and states whose laws permit a claim for breach of the implied covenant of good faith even if the express terms of the contract were complied with.  *See* App. A at 7.

- In GFFD Subclass 2, a state that requires showing the defendant's subjective intention to injure plaintiffs' contractual rights – and a state that uses an objective standard to determine whether the parties acted in good faith.  *See id*. at 11-12.

- In both GFFD Subclass 1 and 2, states that require the plaintiff to identify the specific provision of the contract that she claims was not performed in good faith – and states that have no such requirement.  *See id*. at 7, 12.

Other differences similarly exist in the laws applicable to this claim.  (*See* App. A at 6-8, 11-13.)  There is no way to craft instructions to guide a jury in simultaneously applying such divergent and contradictory legal standards *to the same subclass*.

**Unjust Enrichment**.  Courts have consistently recognized that the law of unjust enrichment varies immensely and is therefore inherently unsuited for litigation by a multi-state class.  *See, e.g.*, *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 596 (9th Cir. 2012)

(vacating class certification in light of "variances in state law" of unjust enrichment).[44]  Indeed, even under the law of a *single* state, the Eleventh Circuit has observed that "common questions will rarely, if ever, predominate [in] an unjust enrichment claim, the resolution of which turns on individualized facts." *Vega*, 564 F.3d at 1274; *see Yarger v. ING Bank , FSB*, 285 F.R.D. 308, 324-25 (D. Del. 2012); *In re Aqua Dots Prods. Liab. Litig.*, 270 F.R.D. 377, 386-87 (N.D. Ill. 2010).

In an effort to avoid this weight of authority, plaintiffs' proposed Unjust Enrichment subclasses ignore many variations in the laws of the states within each subclass.  For example, proposed Unjust Enrichment Subclass 1 includes three states that each define the elements of this cause of action differently:

- New Mexico law requires two elements, showing that (1) the defendant knowingly benefited at plaintiff's expense, and that (2) it would be unjust for defendant to retain the money.  (*See* App. A at 17.)

- Michigan law requires two different elements, showing that (1) a defendant received a benefit from the plaintiff (with no mention of a state of mind requirement), and (2) a resulting inequity if the defendant retains the benefit.  (*See id.* at 17-18.)

- Nebraska law requires three elements, that (1) the defendant received money, (2) retained the money, and (3) justice and fairness require the defendant to return the money.  In addition, the plaintiff must show that the defendant engaged in wrongdoing. (*See id.* at 18.)

Similar problems exist in Unjust Enrichment Subclass 2.  For example, that subclass includes Wyoming, which requires proof that the defendant received a benefit conferred with the expectation of payment in return.  *See id.* at 20.  Alaska, also in that subclass, instead allows recovery if the defendant would otherwise receive "a windfall."  *Id.*  Additional differences can be found in both proposed subclasses for this cause of action.  *See id.* at 17-18, 20-21.

**Unconscionability**.  Plaintiffs assert that the law of unconscionability is "substantially uniform" across states, because all have adopted statutes based on Section 2-302

---

[44] *See also Casa Orlando Apartments, Ltd.*, 624 F.3d at 195-96; *Spencer v. Hartford Fin. Servs. Grp., Inc.*, 256 F.R.D. 284, 304 (D. Conn. 2009); *Thompson v. Jiffy Lube Int'l, Inc.*, 250 F.R.D. 607, 626 (D. Kan. 2008).

of the Uniform Commercial Code.  Mot. App. I at 15-16.  But the UCC merely authorizes a court to refuse enforcement of a contract with an unconscionable term.  It does not establish an affirmative cause of action.  Moreover, "the U.C.C. does not define unconscionability, nor does it provide any guidance as to the factors, circumstances, and standards that should be employed in making such a finding."  *Doyle v. Finance Am., LLC*, 918 A.2d 1266, 1273 (Md. Ct. Spec. App. 2007).  As a result, "[i]t is not possible to define unconscionability [which] is not a concept but a determination to be made in light of a variety of factors not unifiable into a formula."  *Coady v. Cross County Bank*, 729 N.W.2d 732, 741 (Wis. Ct. App. 2007).

> Plaintiffs have not cited a single case in which a multi-state class has been certified for an unconscionability claim.  Nonetheless, plaintiffs propose three subclasses for this claim consisting of (a) states that require proof of both substantive and procedural unconscionability, (b) states that require proof of only substantive unconscionability, and (c) states that only require proof of *either* substantive *or* procedural unconscionability.  Mot. App. I at 15-16.  Even leaving aside plaintiffs' erroneous allocations of states to these three categories (*see* App. A at 24, 28, 31), this simplistic allocation ignores multiple variations in the laws within each category.  How is procedural unconscionability defined?  How is substantive unconscionability defined?  When both are present, how are they to be analyzed in combination?  What additional elements are required to establish the cause of action?  Indeed, is an affirmative cause of action for "unconscionability" recognized in a particular state at all?  (For at least some states in each subclass, the answer to this last question is "no.")  Appendix A demonstrates that none of these questions is answered uniformly by the states within any of the three proposed subclasses.

> Because separate state-law issues predominate even within the individual subclasses, neither those subclasses nor the proposed nationwide class may properly be certified.

> ### b)      Each of Plaintiffs' Claims Presents Predominantly Individualized Issues.

> "Where, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification under Rule 23(b)(3)."  *Klay*, 382 F.3d at 1255; *see also Andrews*, 95 F.3d at 1023-24; *Kerr v. City of W. Palm Beach*, 875 F.2d 1546, 1557-58 (11th Cir. 1989); *In re Fla. Cement*

*& Concrete Antitrust Litig.*, 2012 WL 27668, at *17 (S.D. Fla. Jan. 3, 2012).  Here, the individualized determinations that would be needed for plaintiffs to recover under each of their five causes of action are substantial.  When overlaid by variations in the applicable laws, "the proliferation of disparate factual and legal issues is compounded exponentially."  *Sacred Heart*, 601 F.3d at 1183 (internal marks and citation omitted).

For example, to the extent members of a particular subclass were subject to different contracts and had their transactions managed under different posting regimes, individual determinations would be needed to assess each claim in light of the specific posting practices applied to that class member and the specific contractual language governing her account.  The individualized determinations that would be needed include the following:

**Good Faith and Fair Dealing.**  The laws of at least some states will require consideration of the expectations of each class member, at the time of contracting, concerning how her transactions would be posted and overdraft fees calculated.[45]  This is an individualized inquiry.  *See Seidenberg v. Summit Bank*, 791 A.2d 1068, 1077 (N.J. App. Div. 2002) ("the court must consider the expectations of the parties and the purposes for which the contract was made [and i]t would be difficult, if not impossible, to make that determination without considering evidence outside the written memorialization of the parties' agreement."  *See* App. A at 8-9, 13, 15 & nn. 19-20, 35, 37 (citing similar rulings from other states).[46]

---

[45] *See, e.g.*, *Avritt v. Reliastar Life Ins.*, 615 F.3d 1023, 1032 (8th Cir. 2010) (under Washington law, "[t]he district court properly concluded that evidence of the parties' justified expectations would be required to establish a breach of the duty of good faith and fair dealing"); *Bayou Land Co. v. Talley*, 924 P.2d 136, 154 (Colo. 1996); *see also Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 170 (3d Cir. 2001) (allegations of breach of implied covenant require an inquiry into "the reasonable expectations of the contracting parties"); *PSE Consulting, Inc. v. Frank Mercede & Sons, Inc.*, 838 A.2d 135, 151 (Conn. 2004).

[46] In other cases in this MDL, plaintiffs have relied on Section 211 of the Restatement (Second) of Contracts, which addresses the interpretation of "standard" contracts, as a basis for excluding the need for consideration of individualized evidence about customer expectations.  However, Section 211 is rarely interpreted in the manner plaintiffs suggest; indeed, several states – including plaintiffs' home state of New Mexico – have explicitly declined to do so.  *See Berry v. Federal Kemper Life Assur. Co.*, 99 P.3d 1166, 1182-84 (N.M. Ct. App. 2004); *see also Bowers v. Jefferson Pilot Financial Ins. Co.*, 219 F.R.D. 578, 581-82 (E.D. Mich. 2004); *Stratton v. Am. Med. Sec., Inc.*, 266 F.R.D. 340, 353 (D. Ariz. 2009).

It is critically important to recognize that the claim here is *not* that the contract said one thing and the bank did the opposite. *Nothing* in the contracts here even hinted that the bank would post transactions chronologically. To the contrary, in most states the *only* posting order even *mentioned* in the contract was high-low. (*See* p. 8 above.) For customers, like the two plaintiffs here, from states where TOD posting was used, the posting order discussed in their contracts was the very TOD posting order that was used for their transactions. Accordingly, insofar as plaintiffs are asserting that customers' "reasonable expectations" were that a *different* order would be used, the *source* of those expectations could only have come from outside the contracts and would not be the same for all class members.

This Court has found in decisions in this MDL that the subjective expectations of class members are not pertinent to the good faith claim. But the fact remains that the *objective* circumstances that determine whether a particular customer could reasonably have harbored expectations of a posting order *different from what the contract explicitly disclosed* will vary from one customer to another. Plaintiffs apparently hope to avoid the contract language by claiming that some customers were misled by other Wells Fargo documents that, they assert, can be interpreted as conveying contrary information. *See* Mot. at 19-23. But it is undisputed that not all customers received any such allegedly misleading communications – even the named plaintiffs did not do so – whereas virtually all did receive the contract. The *objectively reasonable* expectations of a customer who read the contract and nothing else will, under plaintiffs' own theory, necessarily differ from those of a customer who read and relied on one of those other documents instead.

**Unjust Enrichment**. At the threshold, it is plain that individualized determinations will be required to determine which class members are able to assert unjust enrichment claims at all. Under the laws of most states, this cause of action cannot be asserted if the subject matter is subject to a contract between the parties. *See* App. A at 15 n.37. It is undisputed that most class members are subject to such a contract. But plaintiffs contend that this is not the case for some customers (*see* DE # 2036 at 2-3), and determining which customers did and did not receive the contract will require evaluation of facts specific to each customer.

Moreover, under most state laws, an unjust enrichment claim requires proof that the specific circumstances under which each class member's overdraft fees were incurred were such that the fee charged by the bank *in that particular situation* was "unjust." This requires

51

consideration of facts that are inherently unique to each claimant.  Fees that may seem "unjust" when charged to a first-time overdrafter will not necessarily be viewed in the same light for a person who has overdrafted dozens, if not hundreds, of times and has a detailed understanding of how her transactions are posted.

The Eleventh Circuit has consistently rejected attempts to certify unjust enrichment classes.  *See Vega*, 564 F.3d at 1274; *Klay*, F.3d at 1267; *see also City of St. Petersburg v. Total Containment, Inc.*, 265 F.R.D. 630, 640 (S.D. Fla. 2010) (individualized issues preclude finding of predominance for unjust enrichment claim); *Kunzelmann*, 2013 WL 139913, at *6-*9 (same); *In re Motions to Certify Classes Against Court Reporting Firms*, 715 F. Supp. 2d 1265, 1274-76 (S.D. Fla. 2010) (same), *aff'd*, 439 F. App'x 849 (11th Cir. 2011).

*Vega* illustrates why this is so.  The *Vega* plaintiffs claimed their employer had unjustly enriched itself by failing to pay commissions.  *Vega*, 564 F.3d at 1262.  The Eleventh Circuit stated that "many class members were told about, and fully understood, how the [challenged] procedure worked," creating questions of fact that defied class-wide resolution.  *Id.* at 1277.  The unjust enrichment claims depended on each employee's awareness of the defendant's policy, and "[t]hose employees who concede awareness … cannot claim injustice when the company follows its compensation policies as expected and understood."  *Id.* at 1275.

**Unconscionability**.  Unconscionability "is not a concept but a determination to be made in light of a variety of factors not unifiable into formula."  *Coady*, 729 N.W.2d at 741; *see Arthur's Garage, Inc. v. Racal-Chubb Sec. Sys., Inc.*, 997 S.W.2d 803, 815 (Tex. Ct. App. 1999) ("'Unconscionability' has no precise legal definition because it is not a concept but a determination to be made in light of a variety of factors."); *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994) (unconscionability is an "amorphous concept").  Given the fact that this claim must take into consideration the specific circumstances of each customer, it is not surprising that plaintiffs have failed to cite a single case in which a court has certified an unconscionability class, much less a multi-state class.

Plaintiffs themselves have stressed in prior filings in this MDL (in attacking various banks' arbitration clauses) that unconscionability is a fact-specific determination that must be made on a case-by-case basis.  *See, e.g.*, DE # 1514 at 3, 22.  This is no less true of the contract provisions on posting order and fees than it is for the arbitration clause.

**Statutory Claims.**  Plaintiffs' proposed claim under the New Mexico Unfair Practices Act is also unsuitable for class resolution.  N.M. Stat. Ann. §§ 57-12-1, *et seq.*  The statute requires proof that (1) the defendant made an oral or written representation that was false or misleading; (2) the representation was knowingly made in the regular course of the defendant's business; and (3) the representation "was of the type that may, tends to, or does deceive or mislead any person."  *Lohman v. Daimler-Chrysler Corp.*, 166 P.3d 1091, 1093 (N.M. Ct. App. 2007).  In addition, only a person who suffers injury "as a result" of an illegal practice may bring an action for damages, and a plaintiff accordingly must prove a "causal link" between the defendant's conduct and the plaintiff's loss.  N.M. Stat. Ann. § 57-12-10(B); *Smoot v. Physicians Life Ins. Co.*, 87 P.3d 545, 550 (N.M. Ct. App. 2003).

Courts regularly deny certification of NMUPA claims where, as here, the alleged misrepresentations or omissions were not uniform across the class.  *See, e.g.*, *Brooks v. Norwest Corp.*, 103 P.3d 39, 52 (N.M. Ct. App. 2004) (denying certification because class representatives would have to prove on an individual basis "whether and when members received notice of the high-low policy"); *Porcell v. Lincoln Wood Prods., Inc.*, 713 F. Supp. 2d 1305, 1321–23 (D.N.M. 2010) (denying certification because class representatives would have to prove on an individual basis "what representations a particular class member read or saw").  Plaintiffs have identified no uniform misrepresentations here; to the contrary, the array of information provided about the bank's posting practices varied substantially, with many customers given precise and indisputably accurate information, while the communications plaintiffs purport to complain about were not even seen and read by the named plaintiffs themselves.  *See* pp. 7-10, 29, 36 above.

Establishing causation and loss likewise require individualized evidence.  To prove class NMUPA claims, class representatives must offer proof "to establish the requisite 'causal nexus' between the particular misrepresentations communicated to a class member and the class member's loss."  *Porcell*, 713 F. Supp. 2d at 1321; *see also Mulford v. Altria Grp., Inc.*, 242 F.R.D. 615, 627 (D.N.M. 2007) ("The need for individual evidence to determine if members of the proposed class suffered a loss strongly suggests that the proposed class is not sufficiently cohesive to warrant adjudication by representation.").  Plaintiffs' motion demonstrates no ability to address these issues on a class-wide basis either.  With no uniformity in the distribution of

challenged communications, there plainly can be no uniform method of proving reliance, causation, and resulting loss.

   The other statutory claim addressed in plaintiffs' Motion was brought under Washington law and pled in the *Zankich* lawsuit only.  No cause of action under that statute was pled in the *Martinez* complaint.  Wells Fargo addresses that claim in its Opposition to class certification in *Zankich*.  In the unlikely event that plaintiffs seriously seek certification of a class in *this* case to pursue this unpled claim, Wells Fargo incorporates that discussion by reference.

   **c) Wells Fargo's Defenses Also Raise Individualized Issues that Preclude Class Certification.**

   The need for individualized determinations in evaluating defenses provides an independent bar to class certification.  *Dukes*, 131 S. Ct. at 2561; *Sacred Heart*, 601 F.3d at 1176; *Heaven v. Trust Bank Co.*, 118 F.3d 735, 738 (11th Cir. 1997); *Oginski v. Paragon Props. of Costa Rica, LLC*, 282 F.R.D. 672, 678 (S.D. Fla. 2012) (King, J.); *Clausnitzer v. Fed. Exp. Corp.*, 248 F.R.D. 647, 655 n.11 (S.D. Fla. 2008); *see also Coastal Neurology, Inc. v. State Farm Mut. Auto. Ins. Co.*, 2012 WL 205800, at *1-2 (11th Cir. Jan. 25, 2012), *aff'd* 458 F. App'x 793 (11th Cir. 2012); *Klay*, 382 F.3d at 1254. Demonstrating that a decision based on common proof is *possible* is part of *plaintiffs'* burden at the class certification stage, regardless of who has the substantive burden of proof at trial.  *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 350 (D.N.J. 1997).[47]

   Here, multiple defenses present individualized issues that cannot be resolved on a class-wide basis.  The existence of individualized issues on defenses has precluded class certification in other cases involving challenges to high-to-low posting practices.  *Shelley*, 2000 WL 1121778, at *7; *Compass Bank*,  823 So.2d at 672-78.  This issue was also a barrier to certification in *Endres v. Wells Fargo Bank*, 2008 WL 344204 (N.D. Cal. Feb. 6, 2008), in which the plaintiffs sought to recover fees associated with overdraft protection services.  The court held that "applicability of the voluntary-payment doctrine, which may bar any claims made by class members who continued to incur and voluntarily pay the overdraft protection fees," presented

---

[47] Contrary to plaintiffs' assertion, this issue does not turn on which party bears the burden of proof on the defense itself.  Fundamental principles of due process preclude class treatment unless such defenses can be decided conclusively for all class members through common proof. *See Dukes*, 131 S. Ct. at 2561; *see also Sacred Heart*, 601 F.3d at 1176-78.

predominant questions of fact requiring individualized determinations, as did adjudication of the statute of limitations defense. *Id.* at *12. The same conclusion applies here.

Appendix C to this Opposition provides a detailed overview of Wells Fargo's affirmative defenses, with specific citation to the laws of the 24 jurisdictions that are at issue here. The discussion below summarizes some of the individualized issues that make class treatment of plaintiffs' claims inconsistent with Wells Fargo's due-process right to present these defenses. Three general points warrant brief discussion at the outset.

First, plaintiffs suggest (Mot. at 36) that the bank's affirmative defenses are not adequately pled in its answers. Any such challenge to the adequacy of Wells Fargo's pleading was waived long ago. *See* Fed. R. Civ. P. 12(f)(2) (requiring motions to strike "an insufficient defense" be filed within 21 days); *S.E.C v. Badian*, 822 F. Supp. 2d 352, 365 (S.D.N.Y. 2011) (denying untimely challenge to affirmative defenses). Plaintiffs chose not to challenge the bank's responsive pleading through a motion to strike or for more definite statement, as they did with other banks in this MDL. *See, e.g.*, DE # 1390, 1475, 1481.[48] In any event, regardless of whether more specific pleading could have been required for defenses pertaining to a named plaintiff, it is difficult to see how more could legitimately be required as to absent class members whose very identities remain unknown even to this day.

Second, plaintiffs have asserted that Wells Fargo's defenses can be ignored because they relate to individual damages issues rather than liability. The Eleventh Circuit explicitly rejected this argument in *Sacred Heart*, finding it to be "clear error" for the district court "to brush [the issues of ratification and waiver] aside as mere 'damages' issues." 601 F.3d at 1178-79.

Third, plaintiffs suggest that Wells Fargo's defenses can be ignored because they require a showing of actual knowledge of the posting practice (which, plaintiffs imply, cannot be established). But such knowledge is not even relevant to some of the defenses presented in this case. Other defenses can be established based on *constructive* knowledge alone. *See* App. C. at

---

[48] Had a timely challenge been made, Wells Fargo would have had the right to seek leave to amend its answer at that early stage – and that request would have been subject to the liberal amendment standard of Rule 15. Due process does not permit Wells Fargo to be deprived of valid defenses simply because *plaintiffs* failed to challenge the pleadings in a timely manner.

4, 9, 14, 19.  Moreover, the record here demonstrates unequivocally that at least some customers *did* have actual knowledge of the bank's use of high-low posting.  *See* p. 36 above.  For example, both plaintiff Graham and Karen Wickman, a plaintiff in the *D. Gutierrez* case, had such actual knowledge.  *See* App. B. at 7; Ex. 13 at 57.

   **Voluntary Payment.**  Under the voluntary payment doctrine, a plaintiff may not "recover money which he or she has voluntarily paid with a full knowledge of all the facts, and without any fraud, duress, or extortion, even if no obligation to make the payment existed."  70 C.J.S. Payment § 104 (2007).  (Specific citations from the relevant states are provided in Appendix C.)  The defense applies to class members who had knowledge of the challenged fee policies and yet continued to incur and pay them.  *See Lopez v. Washington Mut. Bank, FA*, 302 F.3d 900, 904 (9th Cir. 2002) ("Washington Mutual argues [that] each deposit to the account after an overdraft should be treated as a voluntary payment of a debt incurred.  We agree.").

   Numerous courts have rejected certification "where class claims are subject to a unique defense under the voluntary payment doctrine."  *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 98-99 (S.D.N.Y. 2010).[49]

   **Waiver.**  Generally speaking, waiver is defined as an intentional relinquishment of a known right.  *See, e.g.*, *Nevada Yellow Cab Corp. v. Eighth Judicial Dist. Ct.*, 152 P.3d 737, 740 (Nev. 2007).  Depending on the state law that applies, waiver may be inferred by conduct, or based on a "clear, unequivocal, and decisive action of a party."  *Davenport Ltd. P'Ship v. 75th & Dodge I, L.L.P.*, 780 N.W.2d 416, 425 (Neb. 2010).  *See generally* App. C. at 2-5.

   In *Sacred Heart*, the Eleventh Circuit explained that the defenses of waiver and ratification each raised predominant factual questions that could not be resolved on a class-wide basis.  *See* 601 F.3d at 1178-79.[50]  Similarly here, the bank has a due process right to present

---

[49] *See also Endres*, 2008 WL 344204, at *12; *Schnall v. AT & T Wireless Servs., Inc.*, 259 P.3d 129, 135 (Wash. 2011); *In re Light Cigarettes Mktg. Sales Practices Litig.*, 271 F.R.D. 402, 421 (D. Me. 2010); *Camafel Bldg. Inspections, Inc. v. Bellsouth Advertising & Publ'g Corp.*, 2008 WL 649778, at *11 (N.D. Ga. Mar. 7, 2008).

[50] Courts regularly deny certification in cases in which class members are potentially subject to a waiver defense.  *See also In re Wilborn*, 609 F.3d 748, 756-57 (5th Cir. 2010); *Presser v. Key Food Stores Co-Op, Inc.*, 218 F.R.D. 53, 59 (E.D.N.Y. 2003); *CC Investors Corp. v. Raytheon Co.*, 2005 WL 1026904, at *2 (D. Del. Apr. 22, 2005); *Coca-Cola Bottling Co. of Elizabethtown*, (continued…)

evidence that individual customers – many of whom knew of Wells Fargo's policies – waived any objection to collection of the overdraft fees assessed on their accounts.

**Ratification.**  *Sacred Heart* also confirms that certification is improper in light of Wells Fargo's right to pursue the defense of ratification.  601 F.3d at 1176-79.  Ratification is an act or statement through which an otherwise invalid contract is made valid and enforceable. *Merrill v. DeMott*, 951 P.2d 1040, 1044 (Nev. 1997).  Ratification may be implied under circumstances in which a party retains the benefits of an otherwise invalid contract with knowledge of the facts that make the contract voidable.  *See, e.g.*, *Motel Enters., Inc. v. Nobani*, 784 S.W.2d 545, 574 (Tex. App. Ct. 1990); *Elk River Assoc. v. Huskin*, 691 P.2d 1148, 1153 (Colo. Ct. App. 1984).  Similarly, "[t]he failure of a party to disaffirm a contract over a period of time may, by itself, ripen into a ratification, especially if rescission will result in prejudice to the other party."  17A C.J.S. Contracts § 170.  *See generally* App. C at 5-8.

There are a variety of situations in which this defense would apply here.  The evidence indicates that plaintiff Graham, for example, was aware of the bank's posting practice yet continued to overdraw her account.  Wells Fargo has a right to present individualized evidence that some customers ratified the practices plaintiffs now attack as illegal.  *See Sacred Heart*, 601 F.3d at 1176-78.

**Accord and Satisfaction**.  The defense of accord and satisfaction, also recognized under the laws of all jurisdictions at issue here (*see* Appendix C at 10), applies to class members who complained about the challenged fees and received full or partial reversals.[51] Even when a reversal was only partial, the bank is entitled to present its defense that, under the circumstances (including conversations between the customer and the bank), it was understood that the reversal was offered *and accepted* as a full resolution of the customer's dispute.  *See* Ex. 7 at 30-31 (agreement by Martinez that partial reversal "solve[d] the problem").  This issue

---

*Inc. v. Coca-Cola Co.*, 95 F.R.D. 168, 178 (D. Del. 1982); *Sandlin v. Ameriquest Mortg. Co.*, 2010 WL 4260030, at *7 n.11 (Bankr. N.D. Ala. Oct. 21, 2010).

[51] Plaintiffs' expert proposes to adjust for full reversals in his programmatic analysis.  Even apart from the flaws in his planned method for doing so, it is undisputed that his approach provides no basis for addressing situations in which a class member compromised his challenge to fees by accepting only a partial reversal of those fees.

obviously cannot be resolved on a class-wide basis through common proof, but instead requires examination of the circumstances under which each reversal was made.

**Failure to Mitigate.**  By continuing to incur overdraft fees after gaining actual knowledge of the bank's posting-order policies, plaintiffs and other customers failed to mitigate their alleged injuries.  Although the defense varies among jurisdictions, generally speaking damages are not recoverable for loss that the injured party could reasonably have avoided.  *See* App. C at 13-15.  Courts considering previous challenges involving overdraft fees have recognized that this defense necessarily "requires individual assessments of what each depositor understood to be the defendant's policies, which in turn requires assessments of such things as what information each depositor was given in addition to the written documents and what each depositor did do or would have done once armed with sufficient awareness of the defendant's actual policies."  *Shelley*, 2000 WL 1121778, at *11; *see also Compass Bank*, 823 So. 2d at 677.

**Unclean Hands and Laches**.  Some of plaintiffs' claims, such as their claims of unjust enrichment and unconscionability, are subject to equitable defenses such as unclean hands and laches.  (*See* Appendix C at 15-20.)  A customer who overdrew her account hundreds of times is potentially subject to the defense of unclean hands.  The defense is also likely to apply to someone like Graham, who knew how the bank posted her transactions and yet made no effort to modify her behavior so as to avoid overdrafting her account again and again.  This defense requires an individualized inquiry into the facts and circumstances of each customer. *Kunzelmann*, 2013 WL 139913, at *11.

The defense of laches also focuses on the specific facts and circumstances of each customer.  *See, e.g.*, *In re Marriage of Diest*, 77 P.3d 525, 528 (Mont. 2003); *Harris v. Purcell*, 973 P.2d 1166, 1167 n.2 (Ariz. 1998).

**Statute of Limitations.**  "It is axiomatic that no class action may proceed on behalf of class members whose claims are barred by the applicable statute of limitations." *Schmidt v. Interstate Fed. Sav. & Loan Ass'n*, 74 F.R.D. 423, 428 (D.D.C. 1977).  The presence of individualized issues in applying the statute of limitations therefore precludes class certification.  *Clausnitzer*, 248 F.R.D. at 655 n.11; *Shelley*, 2000 WL 1121778 at *7.

The determination of which claims are time-barred can theoretically be handled programmatically where the statute of limitation applies a fixed limitations period.  But many of the statutes of limitations here calculate the limitations period according to the discovery rule,

58

commencing when the claimant discovered or had a reasonable opportunity to discover the factual basis for her claim. *See* App. C at 21. This can rarely be addressed through class proof. *Jim Moore Ins. Agency, Inc. v. State Farm Mut. Auto. Ins. Co., Inc.*, 2003 WL 21146714, at * 9 (S.D. Fla. May 6, 2003); *Endres*, 2008 WL 344204, at *12.[52]

> ### d)    Plaintiffs Have Not Presented a Reliable and Manageable Plan for Proving Actual Injury to All Class Members.

Although a need to determine damages on an individual basis does not automatically foreclose a finding of predominance, Rule 23(b)(3) cannot be satisfied where such individualized issues govern the bank's *liability* to a particular customer. *Klay*, 382 F.3d at 1260; *see Neenan v. Carnival Corp.*, 199 F.R.D. 372, 376-77 (S.D. Fla. 2001). A finding of actual injury is a fundamental requirement for liability. *See Kpadeh v. Emmanuel*, 261 F.R.D. 687, 692 (S.D. Fla. 2009).

Plaintiffs do not suggest that injury can be proven on a class-wide basis without reference to facts specific to each individual class member. Rather, they propose to prove injury through a computer program designed by their expert, Arthur Olsen, that will analyze the individual data for each customer. The Court is familiar with plaintiffs' overall approach in relying on Olsen's work in this MDL. Wells Fargo will not belabor arguments the Court has addressed on prior occasions and on which no new or unique aspects exist here. Wells Fargo has presented its position on those issues in the *Daubert* motion to be filed along with this Opposition, and it incorporates that motion here by reference. But there are some critical issues here that the Court has not addressed in its prior rulings in other cases.

To begin with, unlike in other cases, Olsen has presented a methodology for *this* case that demonstrably calculates "harm" in situations in which Olsen himself acknowledges that high-low posting of debit-card transactions could not have had any conceivable impact on a customer's overdraft fees. Ex. 6 at 119. He even calculates "harm" on days when the bank

---

[52] *See also Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 321-27 (4th Cir. 2006) (claims requiring application of discovery rule are "not readily susceptible to class-wide determination"); *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 149 (3rd Cir. 1998); *Fisher v. Ciba Specialty Chems. Corp.*, 238 F.R.D. 273, 309-10 (S.D. Ala. 2006). *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248 (11th Cir. 2003), cited by plaintiffs (Mot. at 37), is not to the contrary. There, the Eleventh Circuit held that a finding of fraudulent concealment was sufficient to toll the statute of limitations. There is (and can be) no comparable allegation here.

posted no debit-card transactions at all to the customer's account.  *See* Keeley Dec. ¶ 83.  Given this fact, it simply cannot be concluded that Olsen has demonstrated a reliable method for calculating harm from high-low posting, especially within the context of the TOD posting method.  Even leaving apart the question of whether the scenario used in his declaration is the "right" one, Olsen has not shown that he can employ *any* scenario that does not yield large amounts of similar "false positives."  *Id.* ¶¶ 80-86.

> Olsen's methodology is not designed to handle a posting scenario like TOD, in which the bank did not post all credits first.  (TOD was not used in California so Olsen did not confront it in *Gutierrez*.)  As applied to a customer whose transactions were posted using TOD, his methodology yields large numbers of false positives that are attributable solely to the way TOD treats credits.  *Id.* ¶ 84.  Nothing in plaintiffs' complaint in this (or any other case) challenges Wells Fargo's treatment of credits under TOD; nor does plaintiffs' motion claim that any such challenge has been presented.  Olsen himself admitted in his deposition that he has yet to figure out how he would deal with TOD.  Ex. 6 at 87-88, 210.

> Another critical issue is the ambiguity concerning *when* plaintiffs propose that Olsen present his proof of injury for each class member.  Plaintiffs' motion appears to contemplate that this would not occur until some kind of post-trial "administrative proceeding." *See* Mot. App.  I at 2.  This is clearly impermissible.[53]  Plaintiffs now appear to acknowledge that Olsen must perform his analysis *before* trial and present his findings for acceptance (or rejection) by the jury.  Yet critical ambiguities remain.

> For example, Olsen's declaration studiously avoids identifying what alternative posting order he will employ to analyze "harm" to each class member.  In responding to *Daubert* motions and other filings in this MDL, plaintiffs' counsel have simply asserted that the proper alternative posting order will be decided by the jury.  But their proposed verdict form (Mot.

---

[53] Such an approach would deprive Wells Fargo of its due-process right to litigate these issues and to have them decided by the jury.  Similar proposals were rejected by the Eleventh Circuit in *Allapattah*, 333 F.3d at 1258-1259, and in the *Gutierrez* case upon which plaintiffs otherwise depend so heavily.  *Gutierrez v. Wells Fargo & Co.*, 2009 WL 1247040, at *2, 4 (N.D. Cal. May 5, 2009).  *See also Dukes*, 131 S. Ct. at 2561 (rejecting "Trial by Formula"); *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 321 (5th Cir. 1998) ("the applicability of the Seventh Amendment is not altered simply because a case is [a] class action.").

App. I Ex. E) includes no question for the jury on that subject.  Nor do plaintiffs otherwise explain how they propose that this issue be managed.  Do they contemplate that the trial would be suspended while Olsen performed an analysis to match whatever posting order the jury chose? Or do they contemplate that the jury would be asked to choose from a long menu of results covering dozens of alternative posting orders?  Plaintiffs' motion and trial plan do not answer these questions, which have critical implications for the manageability of this case at trial.[54]

> ### 2.   Class Litigation Would Not Be a Superior Method of Adjudication, Given the Unmanageability of the Proposed Class and Subclasses.

Rule 23(b) also requires the Court to determine whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  A major aspect of this analysis is the degree to which the proposed class proceeding would be manageable.  *See* Fed. R. Civ. P. 23(b)(3)(D); *Perez v. Metabolife Int'l, Inc.*, 218 F.R.D. 262, 273 (S.D. Fla. 2003).

The analysis above demonstrates that class proceedings in this case would be wholly unmanageable.  For one thing, the substantial differences in the applicable laws even within a proposed subclass have critical implications for plaintiffs' trial plan.  Under that plan, the jury would be asked to fill out a verdict form addressing the elements of the claim of each subclass.  *See* Mot. App. I Ex. E.  This means that the jury would need to be given instructions that defined those elements and explained the applicable law.  But where the laws applicable to a given subclass differ (and are even in conflict), there is no way to craft instructions that would be valid as to all subclass members.  *See In re American Med. Sys., Inc.*, 75 F.3d at 1085 ("If more than a few of the laws … differ, the district judge would face an impossible task of instructing a jury on the relevant law….").

---

[54] Plaintiffs' motion also fails to offer a method, consistent with Wells Fargo's due process rights, to address the bank's claims against absent class members who closed their accounts with negative balances – in some cases amounts well in excess of their potential damages in this case. *See* Kennedy Dec. ¶¶ 7-10.  Because these class members' "exposure as counterclaim defendants could well exceed the amount they might recover for … penalties as class members[, t]he . . . claims asserted by the class would be against the interests of these individual class members." *Heaven v. Trust Co. Bank*, 118 F.3d 735, 738 (11th Cir. 1997).  Wells Fargo is in no position to identify, much less assert, these counterclaims in the absence of knowledge of who is actually in the class.  Plaintiffs have, again, offered no mechanism for addressing this issue.

The preceding sections of this brief present several examples of situations in which the law varies materially across a single subclass in a way that makes it impossible to craft instructions that accurately account for the laws of all states included in that subclass. Other examples are discussed in Appendix A.

Unsurprisingly, the differences seen in the case law are also reflected in model jury instructions for the various states. For example, in some states the defense of waiver requires proof of actual knowledge, while constructive knowledge is sufficient in other states. Jury instructions for states plaintiffs include within Good Faith and Fair Dealing Subclass 1 diverge on this critical point. The Wisconsin standard instruction permits the defendant to show "[t]hat the person who is alleged to have waived such a right had knowledge, actual or constructive, of the existence of his or her rights or of the important or material facts which were the basis of his or her right." 2 Wis. Jury Instructions, Civ. 3057 (App. E at 70). But the Nevada standard instruction states that "[i]n order to be effective, a waiver must occur with full knowledge of all material facts." Nev. Jury Instructions - Civ. 13CN.38 (2011) (App. E at 58).

Problems such as these cannot be addressed by subdividing the case further and adding even more subclasses. The Eleventh Circuit's decision in *Sacred Heart* is instructive on this point. There, the district court had certified a broad class and proposed to deal with differences in the contracts of different class members by subdividing the class into six subclasses corresponding to different types of contracts. The Eleventh Circuit expressed skepticism that the categorization of these contracts into only six groups was sufficient to address their differences. 601 F.3d at 1176. But the situation was made worse by the fact that the state laws that governed those contracts also differed significantly. Adding a new, cross-cutting set of subclasses to deal with this additional factor would go far beyond the degree of complexity that is tolerable under Rule 23. *Id.* at 1176, 1183.

Similarly here, it would take hundreds – and perhaps thousands – of subclasses to account for every combination of (a) the applicable legal standards, (b) the posting orders under which challenged fees were assessed, (c) the versions of the contract to which class members were subject, (d) the customer's knowledge before the challenged fees were incurred, and other variations across the class.

In light of these considerations, it would be an understatement to call class proceedings "unmanageable." A certified class here would present a logistical morass that could

62

not be administered without disregarding the rights of the bank and absent class members.  In this situation, plaintiffs "may not lawfully amalgamate their disparate claims in the name of convenience."  *Sacred Heart*, 601 F.3d at 1176.

Further adding to the unmanageability of plaintiffs' proposal is the fact that their groupings of states into subclasses are dramatically different from one claim to another.  Thus, for example, plaintiffs group Arizona, Nevada, Oregon, and Wisconsin in their Good Faith and Fair Dealing Subclass 1.  But those same states are grouped into *different* subclasses for the unconscionability claim:  Arizona is in Unconscionability Subclass 3, Oregon is in Unconscionability Subclass 2, Wisconsin is in Unconscionability Subclass 1, and Nevada is in no subclass at all.  Any jury would be hopelessly confused in trying to keep straight which facts as to customers from each state would be properly considered in assessing each subclass claim.

Perhaps the clearest evidence that plaintiffs' "trial plan" is divorced from reality lies in their suggestion that trial could be completed in this case in the same length of time as the trial in *Gutierrez*.  Mot. App. I at 2.  *Gutierrez* was a bench (not jury) trial focusing on essentially one cause of action under one state law (not five causes of action across 24 jurisdictions), brought on behalf of a California-only class, with no subclasses.  Moreover, the facts in that case were more streamlined, with all class members subject to the same posting order and no issues raised with variations in the pertinent contracts.  Thus, while it may be true that the claims of the named plaintiffs alone could be tried in the same length of time as *Gutierrez*, it is plain that any *class* trial would take much longer.

The sheer unmanageability of plaintiffs' proposal would preclude certification here even if class members had no other avenue of redress.  But in fact customers who wish to challenge their overdraft fees *do* have other means of doing so.  Many customers who complain about overdraft fees receive reversals of those fees.  Those who are not satisfied by this process have the ability to bring claims in small claims court, as many customers have historically done.  *See* DE # 1971 Ex. 2, 3.  Thus, if any customer had a legitimate claim against the bank, he or she has more than adequate opportunity to pursue that claim through other means.

### E.   Plaintiffs Have Failed to Identify an Ascertainable Class for Which It Is Possible to Comply with the Notice Requirement of Rule 23.

A separate requirement under Rule 23 is "that the proposed class be adequately defined and clearly ascertainable." *Coastal Neurology, Inc.*, 271 F.R.D. at 543.[55]  This is "critical," as the class definition identifies the persons who will be bound by the judgment and are therefore entitled to notice and an opportunity to opt out. *Vickers v. General Motors Corp.*, 204 F.R.D. 476, 477 (D. Kan. 2001).  Plaintiffs' motion fails to satisfy the ascertainability requirement.  Perhaps the most significant of these – the failure to present a plan for ascertaining the class that permits adequate *notice* under Rule 23 – is one the Court has not addressed in its prior rulings in this MDL.

### 1.   Plaintiffs' Class Definition Is Insufficient to Permit Adequate Notice to the Class.

By defining the proposed class as customers who have been assessed an overdraft fee "as a result of" high-low posting, plaintiffs' class definition impermissibly causes membership in the class to turn on a resolution of the merits that will not occur until long after class notice is provided.  *See generally* Manual for Complex Litig., § 21.222 (4th ed.) (urging avoidance of "terms that depend on resolution of the merits (*e.g.*, persons who were discriminated against)" to ascertain the class).  Courts routinely reject class definitions that require adjudication of individual claims to determine who is in the class at all.  *See, e.g., Bolden v. Walsh Constr. Co.*, 688 F.3d 893, 895 (7th Cir. 2012).[56]

Not every customer who incurred overdraft fees will be a class member.  *See* Keeley Dec. ¶ 24.  Further analysis is required to ascertain if those fees were incurred "as a result of" the posting order.  Plaintiffs propose to do this through a computer program that their expert

---

[55] This requirement has been rigorously enforced by this Court.  *See Kelecseny v. Chevron, U.S.A., Inc.*, 262 F.R.D. 660, 668 (S.D. Fla. 2009); *see also DWFII Corp. v. State Farm Mut. Auto. Ins. Co.*, 271 F.R.D. 676, 681 (S.D. Fla. 2010).

[56] *See also Mann v. TD Bank, N.A.*, 2010 WL 4226526, at *18 (D.N.J. Oct. 20, 2010); *Cuming v. South Carolina Lottery Comm'n*, 2008 WL 906705, at *2 (D. S.C. Mar. 31, 2008); *Wanstrath v. Time Warner Entm't Co., L.P.*, 1997 WL 122815, at *2 (S.D.N.Y. Mar. 17, 1997); *Forman v. Data Transfer, Inc.*, 164 F.R.D. 400, 403 (E.D. Pa. 1995); *Hagen v. City of Winnemucca*, 108 F.R.D. 61, 63-64 (D. Nev. 1985).

will create to analyze the bank's records.  Mot. at 34-35.  But this proposal offers no solution to the ascertainability challenge.

It is not enough to assert that the class *can be* ascertained in a future analysis.  The class must be ascertainable *now,* so that notice may be given pursuant to Rule 23(c)(2)(B) and recipients of the notice can perceive their membership in the class.[57]  A proper class notice is required to satisfy due process, as it is the only mechanism through which class members can make an informed judgment as to whether to opt out if they wish not to be bound by the final judgment.  *See Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) (reversing class certification in light of "serious due process concerns about whether adequate notice under Rule 23 can be given to all class members to enable them to make an intelligent choice as to whether to opt out").[58]

There are two ways to frame a class notice to fulfill this due process requirement.  One is to derive at the outset a reliable concrete listing of the class so that the notice can be directed to class members only and to no one else.  Plaintiffs do not propose this approach.

The alternative is to send the notice to a broader population but to word it in such a way that the notice itself – including the class definition – provides sufficient information to permit a recipient to determine for himself if he is in the class.  *Compare Bynum v. District of Columbia*, 214 F.R.D. 27, 32 (D.D.C. 2003) (approving class definition because "an individual would be able to determine, simply by reading the definition, whether he or she was a member of the proposed class"), *with In re Copper Antitrust Litig.*, 196 F.R.D. at 358 (rejecting certification

---

[57] *See In re Copper Antitrust Litig.,* 196 F.R.D. 348, 358 (W.D. Wis. 2000) (rejecting class certification where class definition failed to communicate to purchasers "what they need to know to decide whether they are in or outside the proposed class"); 1 McLaughlin on Class Actions § 4:2 (8th ed.) ("[T]he class definition must be precise, objective, and presently ascertainable.").

[58] *See also Gibbs Props. Corp. v. CIGNA Corp.*, 196 F.R.D. 430, 442 (M.D. Fla. 2000) (denying certification due to deficient class definition, observing that issue implicated substantial due process rights for both class members and defendants); 1 McLaughlin on Class Actions § 4:2 ("[C]lass members have to be able to determine with certainty from a class notice whether they are in the class, so that they can determine whether to object to or opt out of the class.").

where class definition failed to provide sufficient information to permit purchasers to determine if they were in the class).[59]  Plaintiffs' definition does not do this.

One cannot say whether an overdraft fee was "a result of" high-to-low posting without first determining whether the same fee would have been assessed under whatever alternative posting methodology plaintiffs contend is the "lawful" one.  *See Keeley Dec.* ¶¶ 24-26.  As Olsen himself acknowledges, every "alternative scenario" that is analyzed yields a different list of putative class members.  Ex. 6 at 199-200.  Thus, if a customer who receives the class notice is to figure out whether he incurred excess overdraft fees "as a result of" the challenged posting order, he *must* be told what the alternative posting order is.  But plaintiffs' definition does not do this.  In short, "[n]o objective criteria have been proposed" by plaintiffs "to separate the individuals who did benefit from those who did not benefit from the challenged practices."  *O'Neill*, 243 F.R.D. at 478.  As in *O'Neill*, such "problems with ascertaining class membership" are fatal to class certification.  *Id.*

The solution proposed by plaintiffs in prior class certification proceedings in this MDL – that class notice be provided to a population identified through a comparison using a "low-high" posting order – does nothing to address this issue.  Most "real" class members (that is, customers who incurred more overdraft fees under the bank's actual posting order than if chronological order had been used) would likely be *included* in a mailing sent to every customer who received fewer overdraft fees under a low-high scenario.[60]  But the same would be true if the notice were simply sent to every Wells Fargo customer.  A valid class notice must tell the

---

[59] *See also Benefield v. International Paper Co.*, 270 F.R.D. 640, 643 (M.D. Ala. 2010) (class description must be "sufficiently definite" to permit one "to determine whether a particular individual is a member"); *Neumont v. Monroe Cnty.*, 198 F.R.D. 554, 557 (S.D. Fla. 2000) ("[F]or a class definition to be viable, class membership must be 'capable of ascertainment under some objective standard.'"); *Fisher v. Ciba Specialty Chem. Corp.*, 238 F.R.D. 273, 301 (S.D. Ala. 2006) (rejecting certification where class definition would not permit class members to "self select" but "would instead require individualized fact-finding"); *O'Neill v. The Home Depot U.S.A., Inc.*, 243 F.R.D. 469, 478 (S.D. Fla. 2006) (requiring "objective criteria").

[60] In *Gutierrez*, the California case that plaintiffs rely on as a touchstone for much of their argument in this case, the district court explicitly *rejected* the suggestion that a comparison to a low-high order was a reasonable basis for determining who was genuinely affected by the challenged failure to post chronologically.  *See Gutierrez v. Wells Fargo & Co.*, 2010 WL 1233810, at *8 (N.D. Cal. Mar. 26, 2010).

recipient whether he is, *in fact*, a member of the class.  It would be clear error to certify a class of persons who are neither identified nor identifiable through clearly specified criteria that would permit a recipient of the notice to determine whether he or she is a class member.

**2.      The Reference to "Applicable Statutes of Limitation" Does Not Satisfy the Requirement of a Concrete Class Period.**

In a typical case, the class definition includes specific dates that establish a fixed beginning and end of the class period.[61]  This precision is critical, because only persons who suffered injury within the period are in the class and bound by the judgment.  Plaintiffs' proposed definition offers no such precision as to the beginning of the class period, instead referring vaguely to the "applicable statutes of limitation."  Mot. at 1.  This is improper.  In *Clausnitzer v. Federal Express Corp.*, 248 F.R.D. 647 (S.D. Fla. 2008), the Court rejected a similar definition because the limitations periods varied widely among the states at issue.  *Id.* at 656.  The variation presented here is, if anything, even wider.  These statutes vary in both the duration of their limitations periods and – of particular significance – in their triggers for determining when those periods begin to run.  *See* App. C at 20-21.  Particularly where the discovery rule applies, there is simply no reliable way to ascertain the class definitely.  And while it may theoretically be possible for plaintiffs' expert to include rules in his programming to insert the limitations period for each state, he admits that his methodology offers no way to address the individualized notice and knowledge issues that arise under the discovery rule.  Ex. 6 at 196-98.

**IV.      CONCLUSION**

For the reasons stated above, plaintiffs' motion for class certification should be denied.

---

[61] In *Gutierrez*, the certified class was limited to "Wells Fargo California customers from November 15, 2004, to June 30, 2008."  2008 WL 4729550, at *17.

DATED:  March 4, 2013                    COVINGTON & BURLING LLP

By:   */s/ David M. Jolley*

     Sonya D. Winner (*pro hac vice*)
     (swinner@cov.com)
     David M. Jolley (*pro hac vice*)
     (djolley@cov.com)
     COVINGTON & BURLING LLP
     One Front Street, 35th Floor
     San Francisco, CA 94111
     Telephone: (415) 591-6000
     Facsimile: (415) 591-6091

     Emily Johnson Henn (*pro hac vice*)
     (ehenn@cov.com)
     COVINGTON & BURLING LLP
     333 Twin Dolphin Drive, Suite 700
     Redwood Shores, CA 94065
     Telephone: (650) 632-4700
     Facsimile: (650) 632-4800

     Barry R. Davidson, FBN 107678
     (bdavidson@hunton.com)
     Jamie Zysk Isani, FBN 728861
     (jisani@hunton.com)
     HUNTON & WILLIAMS LLP
     1111 Brickell Avenue, Suite 2500
     Miami, FL 33131
     Telephone: (305) 810-2500
     Facsimile: (305) 810-2460

     Attorneys for Defendant
     WELLS FARGO BANK, N.A.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 4, 2013, I served the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the forgoing document is being served this day either by Notice of Electronic filing generated by CM/ECF or by U.S. mail on all counsel of record entitled to receive service.

   /s/ David M. Jolley
_____

David M. Jolley (*pro hac vice*)
(djolley@cov.com)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA, 94111
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
