**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 1:09-MD-02036-JLK**

---

**IN RE:  CHECKING ACCOUNT**
**OVERDRAFT LITIGATION**

**MDL No. 2036**

---

**THIS DOCUMENT RELATES TO:**


*Garcia, et al. v. Wachovia Bank, N.A.*
S.D. Fla. Case No. 1:08-cv-22463-JLK

---

**MEMORANDUM IN OPPOSITION TO**
**PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     FACTUAL AND PROCEDURAL BACKGROUND......................................................... 3

        A.      The Former Wachovia Bank ............................................................................ 3

        B.      The Bank's Processing and Posting of Debit-Card Transactions ........................... 3

        C.      Overdrafts and Overdraft Fees ........................................................................ 5

        D.      Authorization Into Insufficient Funds ............................................................... 6

        E.      Deposit Agreements ....................................................................................... 7

        F.      Other Information Provided to Customers About Their Accounts ........................... 8

        G.      Complaints and Reversals of Overdraft Fees ..................................................... 9

        H.      The Named Plaintiffs .................................................................................... 10

        I.      Procedural Background .................................................................................. 13

III.    ARGUMENT ................................................................................................... 14

        A.      Plaintiffs' Effort to Circumvent the Ninth Circuit's Holding in *Gutierrez*
                Creates New Issues on Class Certification. ....................................................... 15

        B.      Decisions in Other Cases Involving Posting Order Do Not Support Class
                Certification Here......................................................................................... 17

        C.      The Proposed Class Impermissibly Commingles Plaintiffs and Claims
                from Different Lawsuits.................................................................................. 19

        D.      Plaintiffs' Proposed Nationwide Class Exceeds the Scope of Their
                Pleading..................................................................................................... 21

        E.      Plaintiffs' Motion Does Not Even Attempt to Satisfy Rule 23 With
                Respect to Any of the Subclasses that Are the True Subject of Their
                Motion....................................................................................................... 21

        F.      Plaintiffs Cannot Satisfy the Rule 23(a) Prerequisites for Class
                Certification. .............................................................................................. 22

                1.      Plaintiffs Have Not Established Numerosity. ........................................... 22

                2.      Plaintiffs Have Not Demonstrated Commonality As To All
                        Customers During the Class Period. ...................................................... 24

a)     There Is No Commonality In Either the Mechanisms Creating the Alleged Injury or in Plaintiffs' Contracts With the Bank. ........................................................ 25

b)     There is No Commonality in Plaintiffs' Contentions Concerning Class Members' Contracts With the Bank. .............. 29

c)     Material Differences in the Applicable Law Preclude Any Finding of Commonality ............................................... 30

3.     The Named Plaintiffs' Claims Are Not Typical  of the Claims of the Proposed Class and Subclasses. ....................................... 32

4.     The Named Plaintiffs Cannot Adequately Represent the National Class or Any of the Subclasses. ............................................... 34

a)     Most Subclasses Lack Class Representatives Who Can Adequately Represent Customers from All States in the Subclass, and Some Have No Class Representatives at All. ........ 35

b)     Differences in State Laws Applicable to the Proposed Subclasses Create Intractable Conflicts of Interest. ...................... 36

c)     There is a Conflict of Interest Between Customers  Who Have Benefited From the Challenged Practices and Those Who Have Not. .......................................................... 37

d)     Plaintiffs Have Shown Their Inadequacy As Class Representatives Through Their Abandonment of Potential Claims of Absent Class Members. ................................... 39

G.     Plaintiffs Have Not Satisfied the Requirements for Certification Under Rule 23(b)(3). ...................................................................... 40

1.     Common Issues Do Not Predominate. ....................................... 41

a)     Substantial Variation in Applicable State Laws Preclude Certification of the Proposed Multistate Subclasses ..................... 41

b)     Each of Plaintiffs' Claims Presents Predominantly Individualized Issues ................................................. 46

c)     Defenses Requiring Individualized Evidence Preclude Class Certification ...................................................... 50

d)     Plaintiffs Have Not Presented a Reliable and Manageable Plan for Proving Actual Injury to All Class Members .................. 56

      2.     Class Litigation Would Not Be a Superior Method of Adjudication, Given the Unmanageability of the Proposed Class and Subclasses. ........ 59

H.    Plaintiffs Have Not Defined an Ascertainable Class or Subclasses. .................... 62

      1.     Plaintiffs' Class Definition Is Insufficient to Permit Adequate Notice to the Class. ................................................................................. 62

      2.     The Reference to "Applicable Statutes of Limitation" Does Not Satisfy the Requirement of a Concrete Class Period. .............................. 65

      3.     Plaintiffs' Class Definition Does Not Adequately Explain  Who Would Be Considered "Wachovia Customers." ....................................... 66

IV.    CONCLUSION ........................................................................................................... 66

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abercrombie v. Lum's Inc.*,
　345 F. Supp. 387 (S.D. Fla. 1972) ...................................................................19, 35

*Adler v. Abramson*,
　728 A.2d 86 (D.C. 1999) ...............................................................................................31

*Allapattah Services, Inc. v. Exxon Corp.*,
　333 F.3d 1248 (11th Cir. 2003) ........................................................................27, 55, 58

*Almanor v. Bankatlantic Bancorp., Inc.*,
　261 F.R.D. 672 (S.D. Fla. 2009) .................................................................................37, 38

*Andrews v. American Tel. & Tel. Co.*,
　95 F.3d 1014 (11th Cir.1996) .......................................................................................28, 46

*Arthur's Garage, Inc. v. Racal-Chubb Sec. Sys., Inc.*,
　997 S.W.2d 803 (Tex. Ct. App. 1999) ......................................................................48

*Auto Ventures, Inc. v. Moran*,
　1997 WL 306895 (S.D. Fla. Apr. 03, 1997) .............................................................38

*Avritt v. Reliastar Life Ins.*,
　615 F.3d 1023 (8th Cir. 2010) ....................................................................................47

*Babineau v. Fed. Express Corp.*,
　576 F.3d 1183 (11th Cir. 2009) ...................................................................................22

*Barnes v. Am. Tobacco Co.*,
　161 F.3d 127 (3rd Cir. 1998) .........................................................................................55

*Barras v. Branch Banking & Trust Co.*,
　685 F.3d 1269 (11th Cir. 2012) ....................................................................................24

*Bayou Land Co. v. Talley*,
　924 P.2d 136 (Colo. 1996) ............................................................................................47

*Benefield v. International Paper Co.*,
　270 F.R.D. 640 (M.D. Ala. 2010) ................................................................................64

*Bennett v. Hayes Robertson Group, Inc.*,
　880 F. Supp. 2d 1270 (S.D. Fla. 2012) ......................................................................24

v

*Berry v. Federal Kemper Life Assur. Co.*,
   99 P.3d 1166 (N.M. Ct. App. 2004).......................................................................47

*Bolden v. Walsh Constr. Co.*,
   688 F.3d 893 (7th Cir. 2012) ..................................................................................62

*Bowers v. Jefferson Pilot Fin. Ins. Co.*,
   219 F.R.D. 578 (E.D. Mich. 2004) ..........................................................................47

*Brandon v. Wright*,
   838 S.W.2d 532 (Tenn. Ct. App. 1992)...................................................................53

*Brooks v. Norwest Corp.*,
   103 P.3d 39 (N.M. Ct. App. 2004)......................................................................18, 29

*Brown v. Kerkhoff*,
   279 F.R.D. 479 (S.D. Iowa 2012) ...........................................................................40

*Bridge v. Phoenix Bond & Indemnity Co.*,
   553 U.S. 639 (2008)............................................................................................21, 28

*Bynum v. District of Columbia*,
   214 F.R.D. 27 (D.D.C. 2003)..................................................................................63

*Camafel Bldg. Inspections, Inc. v. Bellsouth Advertising & Publ'g Corp.*,
   2008 WL 649778 (N.D. Ga. Mar. 7, 2008).............................................................53

*Casa Orlando Apartments. Ltd. v. Fed. Nat'l Mortgage Ass'n*,
   624 F.3d 185 (5th Cir. 2010) .........................................................30, 41, 43, 45

*Castano v. American Tobacco Co.*,
   84 F.3d 734 (5th Cir. 1996) ...........................................................................30, 41

*CC Investors Corp. v. Raytheon Co.*,
   2005 WL 1026904 (D. Del. Apr. 22, 2005).............................................................53

*CE Design Ltd. v. King Architectural Metals, Inc.*,
   637 F.3d 721 (7th Cir. 2011) ........................................................................33, 36

*Central Wesleyan Coll. v. W.R. Grace & Co.*,
   6 F.3d 177 (4th Cir. 1993) .......................................................................................22

*Champ v. Siegel Trading Co., Inc.*,
   1990 WL 19984 (N.D. Ill. Feb. 27, 1990) ..............................................................22

*Cimino v. Raymark Indus., Inc.*,
   151 F.3d 297 (5th Cir. 1998) ...................................................................................58

*City of St. Petersburg v. Total Containment, Inc.*,
265 F.R.D. 630 (S.D. Fla. 2010) ................................................................48

*Clausnitzer v. Federal Express Corp.*,
248 F.R.D. 647 (S.D. Fla. 2008) ........................................................... passim

*Coady v. Cross County Bank*,
729 N.W.2d 732 (Wis. Ct. App. 2007) ................................................46, 48

*Coastal Neurology, Inc. v. State Farm Mut. Auto. Ins. Co.*,
271 F.R.D. 538 (S.D. Fla. 2010), *aff'd*, 453 Fed. App'x 793 (11th Cir. 2012) ......................62

*Coastal Neurology, Inc. v. State Farm Mut. Auto. Ins. Co.*,
458 Fed. App'x 793 (11th Cir. 2012) .......................................................50

*Coca-Cola Bottling Co. of Elizabethtown, Inc. v. Coca-Cola Co.*,
95 F.R.D. 168 (D. Del. 1982) ...................................................................53

*Commercial Credit Corp. v. Nelson Motors, Inc.*,
147 S.E.2d 481 (S.C. 1966) .....................................................................31

*Compass Bank v. Snow*,
823 So. 2d 667 (Ala. 2001) .................................................18, 29, 51, 54

*Copello v. Boehringer Ingelheim Pharm., Inc.*,
812 F. Supp. 2d 886 (N.D. Ill. 2011) .....................................................24

*Cox v. Sears Roebuck & Co.*,
647 A.2d 454 (N.J. 1994) ........................................................................49

*Cuming v. South Carolina Lottery Comm'n*,
2008 WL 906705 (D. S.C. Mar. 31, 2008) .............................................62

*Davis v. Davis*,
713 S.E.2d (Ga. Ct. App. 2011) ..............................................................55

*Deadwyler v. Volkswagen of Am., Inc.*,
1986 WL 12567 (W.D.N.C. Mar. 7, 1986) ............................................42

*Degirmenci v. Sapphire-Fort Lauderdale, LLP*,
693 F. Supp. 2d 1325 (S.D. Fla. 2010) ..................................................30

*Doyle v. Finance Am., LLC*,
918 A.2d 1266 (Md. Ct. Spec. App. 2007) ...........................................46

*DWFII Corp. v. State Farm Mut. Auto. Ins. Co.*,
271 F.R.D. 676 (S.D. Fla. 2010) ............................................................62

vii

*Dykes v. Dudek*,
    2011 WL 4904407 (N.D. Fla. Oct. 14, 2011) ........................................................................25

*Eisenberg v. Gagnon*,
    766 F.2d 770 (3d Cir. 1985).................................................................................................14

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) ...............................................................................................33

*Emerson Radio Corp. v. Orion Sales, Inc.*,
    253 F.3d 159 (3d Cir. 2001)..................................................................................................47

*Endres v. Wells Fargo Bank*,
    2008 WL 344204 (N.D. Cal. Feb. 6, 2008) ...............................................................51, 53, 55

*Eric v. Swenson & Sons v. Colvin*,
    130 F. 626 (C.C.D. Conn. 1904)............................................................................................29

*Feinstein v. Firestone Tire & Rubber Co.*,
    535 F. Supp. 595 (S.D.N.Y. 1982).................................................................................39, 40

*First Class Coach & Equip., Inc. v. Thomas Built Buses, Inc.*,
    2006 WL 269983 (M.D. Fla. Feb. 3, 2006) ........................................................29, 33, 36, 61

*Fischler v. AmSouth Corp.*,
    176 F.R.D. 583 (M.D. Fla. 1997)..........................................................................................22

*Fisher v. Ciba Specialty Chems. Corp.*,
    238 F.R.D. 273 (S.D. Ala. 2006) ....................................................................................55, 64

*Forman v. Data Transfer, Inc.*,
    164 F.R.D. 400 (E.D. Pa. 1995)............................................................................................62

*Forrest v. Verizon Commc'ns, Inc.*,
    805 A.2d 1007 (D.C. 2002) ..................................................................................................24

*Fosmire v. Progressive Max Ins. Co.*,
    277 F.R.D. 625 (W.D. Wash. 2011) ......................................................................................40

*Freeman Indus., LLC v. Eastman Chem. Co.*,
    172 S.W.3d 512 (Tenn. 2005)...............................................................................................31

*Gibbs Props. Corp. v. GIGNA Corp.*,
    196 F.R.D. 430 (M.D. Fla. 2000)..........................................................................................63

*Gilman v. Wheat*,
    692 A.2d 454 (Md. 1997) .....................................................................................................24

*Grimes v. Fairfield Resorts, Inc.*,
    331 F. App'x 630 (11th Cir. 2007) ...................................................................36

*Gutierrez v. Wells Fargo & Co.*,
    2010 WF 1233810 (N.D. Cal. Mar. 26, 2010) ................................................64

*Gutierrez v. Wells Fargo Bank, N.A.*,
    704 F.3d 712 (9th Cir. 2012) ................................................................. passim

*Gutierrez v. Wells Fargo Bank, N.A.*,
    730 F. Supp. 2d 1080 (N.D. Cal 2010) ......................................................15, 16

*Hagen v. City of Winnemucca*,
    108 F.R.D. 61 (D. Nev. 1985) ........................................................................62

*Han v. Sterling Mortgage Co., Inc.*,
    2011 WL 4344235 (E.D.N.Y. Sept. 14, 2011) ...............................................36

*Hansen v. Monumental Life Ins. Co.*,
    2008 U.S. Dist. LEXIS 112254 (D. Conn. Mar. 6, 2008)................................42

*Hartford Accident & Indem. Co. v. Beaver*,
    466 F.3d 1289 (11th Cir. 2006) ......................................................................23

*Heaven v. Trust Bank Co.*,
    118 F.3d 735 (11th Cir. 1997) ..................................................................50, 59

*Heffner v. Blue Cross & Blue Shield of Alabama, Inc.*,
    443 F.3d 1330 (11th Cir. 2006) ......................................................................28

*Hough v. Regions Fin. Corp.*,
    672 F.3d (11th Cir. 2012) ...................................................................23, 24, 36

*Hudson v. Delta Air Lines, Inc.*,
    90 F.3d 451 (11th Cir. 1996) ..........................................................................28

*In re Am. Med. Sys., Inc.*,
    75 F.3d 1069 (6th Cir. 1996) ................................................................30, 41, 60

*In re Aqua Dots Prods. Liab. Litig.*,
    270 F.R.D. 377 (N.D. Ill. 2010).....................................................................45

*In re Bayshore Ford Trucks Sales, Inc.*,
    471 F.3d 1233 (11th Cir. 2006) ......................................................................23

*In re Bridgestone/Firestone, Inc.*,
    288 F.3d 1012 (7th Cir. 2002) ..................................................................14, 41

ix

*In re Checking Account Overdraft Litig.*,
  694 F. Supp. 2d 1302 (S.D. Fla. 2010) ...................................................................29

*In re Copper Antitrust Litigation*,
  196 F.R.D. 348 (W.D. Wis. 2000) ....................................................................63, 64

*In re Countrywide Fin. Corp. Mortgage Mktg. & Sales Practices Litig.*,
  2011 WL 6325877 (S.D. Cal. Dec. 16, 2011) .......................................................25

*In re Currency Conversion Fee Antitrust Litig.*,
  224 F.R.D. 555 (S.D.N.Y. 2004) ..........................................................................22

*In re Fedex Ground Package Sys., Inc.*,
  662 F. Supp. 2d 1069 (N.D. Ind. 2009) ................................................................39

*In re Fla. Cement & Concrete Antitrust Litig.*,
  2012 WL 27668 (S.D. Fla. Jan. 3, 2012) ..............................................................46

*In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*,
  174 F.R.D. 332 (D.N.J. 1997) ...............................................................................50

*In re Hitachi Television Optical Block Cases*,
  2011 WL 9403 (S.D. Cal. Jan. 3, 2011) ................................................................22

*In re Hydrogen Peroxide Antitrust Litigation*,
  552 F.3d 305 (3d Cir. 2008) ..................................................................................14

*In re Korean Air Lines Co. Antitrust Litig.*,
  642 F.3d 685 (9th Cir. 2011) .................................................................................20

*In re Light Cigarettes Mktg. Sales Practices Litig.*,
  271 F.R.D. 402 (D. Me. 2010) ..............................................................................53

*In re Literary Works in Elec. Databases Copyright Litig.*,
  654 F.3d 242 (2d Cir. 2011) ..................................................................................40

*In re Marsh & McLennan Co., Inc. Sec. Litig.*,
  536 F. Supp. 2d 313 (S.D.N.Y. 2007) ...................................................................39

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,
  209 F.R.D. 323 (S.D.N.Y. 2002) ..........................................................................40

*In re Motions to Certify Classes Against Court Reporting Firms*,
  715 F. Supp. 2d 1265 (S.D. Fla. 2010) .................................................................48

*In re Motor Fuel Temp. Sales Practices Litig.*,
  271 F.R.D. 263 (D. Kan. 2010) .............................................................................36

*In re Panacryl Sutures Prods. Liab. Cases*,
    263 F.R.D. 312 (E.D.N.C. 2009) ...................................................................36

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    252 F.R.D. 83 (D. Mass. 2008)......................................................................41

*In re Schering Plough Corp. ERISA Litig.*,
    589 F.3d 585 (3d Cir. 2009)...........................................................................33

*In re Teflon Prods. Liab. Litig.*,
    254 F.R.D. 354 (S.D. Iowa 2008) ..................................................................40

*In re Telectronics Pacing Sys., Inc.*,
    168 F.R.D. 203 (S.D. Ohio 1996) ..................................................................22

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    2011 WL 1753784 (N.D. Cal. May 9, 2011) .................................................23

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods.
    Liab. Litig.*,
    785 F. Supp. 2d 925 (C.D. Cal. 2011) ...........................................................20

*In re Wilborn*,
    609 F.3d 748 (5th Cir. 2010) .........................................................................53

*Jamie S. v. Milwaukee Public Schools*,
    668 F.3d 481 (7th Cir. 2012) .........................................................................25

*Jim Moore Ins. Agency, Inc. v. State Farm Mut. Auto. Ins. Co., Inc.*,
    2003 WL 21146714 (S.D. Fla. May 6, 2003) ................................................55

*Johnson v. Am. Credit Co. of Ga.*,
    581 F.2d 526 (5th Cir. 1978) .........................................................................21

*Johnson v. Johnson*,
    191 A.D. 2d 257 (N.Y. App. Div. 1993) .......................................................53

*Kelecseny v. Chevron, U.S.A., Inc.*,
    262 F.R.D. 660 (S.D. Fla. 2009).....................................................................62

*Kerr v. City of W. Palm Beach*,
    875 F.2d 1546 (11th Cir. 1989) .....................................................................46

*Kirkpatrick v. J.C. Bradford & Co.*,
    827 F.2d 718 (11th Cir. 1987) .................................................................22, 39

*Klay v. Humana, Inc.*,
    382 F.3d 1241 (11th Cir. 2004) ............................................................. passim

*Kornberg v. Carnival Cruise Lines, Inc.*,
   741 F.2d 1332 (11th Cir. 1984) .................................................................32

*Kottaras v. Whole Foods Mkt., Inc.*,
   281 F.R.D. 16 (D.D.C. 2012)......................................................................58

*Kpadeh v. Emmanuel*,
   261 F.R.D. 687 (S.D. Fla. 2009) .........................................................56, 58

*Kunzelmann v. Wells Fargo Bank, N.A.*,
   2013 WL 139913 (S.D. Fla. Jan. 10, 2013) ..........................................41, 55

*Lee v. Carter-Reed Co.*,
   4 A.3d 561 (N.J. 2010) ..............................................................................49

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
   523 U.S. 26 (1998).....................................................................................20

*London v. Wal-Mart Stores, Inc.*,
   340 F.3d 1246 (11th Cir. 2003) .................................................................15

*Lopez v. Washington Mut. Bank, FA*,
   302 F.3d 900 (9th Cir. 2002) .....................................................................52

*Mann v. TD Bank, N.A.*,
   2010 WL 4226526 (D.N.J. Oct. 20, 2010)..................................................62

*Marcus v. BMW of N. America, LLC*,
   687 F.3d 583 (3d Cir. 2012).................................................................49, 50

*Marino v. Home Depot U.S.A., Inc.*,
   245 F.R.D. 729 (S.D. Fla. 2007) ................................................................44

*Matter of Rhone-Poulenc Rorer, Inc.*,
   51 F.3d 1293 (7th Cir. 1995) .....................................................................43

*Mays v. Tennessee Valley Auth.*,
   274 F.R.D. 614 (E.D. Tenn. 2011)..............................................................39

*Mazza v. Am. Honda Motor Co., Inc.*,
   666 F.3d 581 (9th Cir. 2012) .....................................................................45

*McNair v. Synapse Group, Inc.*,
   2009 WL 1873582 (D.N.J. June 29, 2009) .............................................49, 50

*Moore v. American Fed. of Television & Radio Artists*,
   216 F.3d 1236 (11th Cir. 2000) .................................................................33

*Motel Enters., Inc. v. Nobani*,
    784 S.W.2d 545 (Tex. App. Ct. 1990) ........................................................................53

*Murray v. Auslander*,
    244 F.3d 807 (11th Cir. 2001) ...............................................................................20

*Neenan v. Carnival Corp.*,
    199 F.R.D. 372 (S.D. Fla. 2001) ............................................................................56

*Neumont v. Monroe County*,
    198 F.R.D. 554 (S.D. Fla. 2000) ............................................................................64

*O'Donovan v. Cashcall, Inc.*,
    2012 WL 2568174 (N.D. Cal. July 2, 2012) ...........................................................22

*O'Neill v. The Home Depot U.S.A., Inc.*,
    243 F.R.D. 469 (S.D. Fla. 2006) ............................................................................64

*Oginski v. Paragon Props. of Costa Rica, LLC*,
    282 F.R.D. 672 (S.D. Fla. 2012) ............................................................................50

*Pablo v. ServiceMaster Global Holdings Inc.*,
    2011 WL 3476473 (N.D. Cal. Aug. 9, 2011) .........................................................22

*Palmer v. Convergys Corp.*,
    2012 WL 425256 (N.D. Ga. Feb. 9, 2012) .............................................................24

*Pearl v. Allied Corp.*,
    102 F.R.D. 921 (E.D. Pa. 1984) .............................................................................39

*Perez v. Metabolife Int'l, Inc.*,
    218 F.R.D. 262 (S.D. Fla. 2003) ............................................................................59

*Piazza v. Ebsco Industries Inc.*,
    273 F.3d 1341 (11th Cir. 2001) .............................................................................19

*Pickett v. Iowa Beef Processors*,
    209 F.3d 1276 (11th Cir. 2000) ...................................................................36, 37, 38

*Pilgrim v. Universal Health Card, LLC*,
    660 F.3d 943 (6th Cir. 2011) .................................................................................41

*Pittman v. Pittman*,
    158 S.E.2d 746 (Ct. App. 1968) ............................................................................55

*Pitts v. Jackson Nat'l Life Ins. Co.*,
    574 S.E.2d 502 (S.C. App. 2002) ..........................................................................31

*Powers v. Gov't Employees Ins. Co.*,
  192 F.R.D. 313 (S.D. Fla. 1998) ...................................................................41, 43

*Prado-Steiman v. Bush*,
  221 F.3d 1266 (11th Cir. 2000) ..............................................................19, 20, 35

*Presser v. Key Food Stores Co-Op, Inc.*,
  218 F.R.D. 53 (E.D.N.Y. 2003) ............................................................................53

*Primrose Dev. Corp. v. Benchmark Acquisition Fund I Ltd. P'ship*,
  1998 WL 957312 (Va. Cir. Ct. Oct. 29, 1998) ....................................................32

*PSE Consulting, Inc. v. Frank Mercede & Sons, Inc.*,
  267 Conn. 279 (2004) ...........................................................................................47

*Reed v. Advocate Health Care*,
  268 F.R.D. 573 (N.D. Ill. 2009)...........................................................................58

*Rink v. Cheminova, Inc.*,
  203 F.R.D. 648 (M.D. Fla. 2001).........................................................................62

*Robinson v. Gillespie*,
  219 F.R.D. 179 (D. Kan. 2003).............................................................................42

*Ross v. Bank South, N.A.*,
  837 F.2d 980 (11th Cir. 1988) .......................................................................33, 36

*Rustein v. Avis Rent-a-Car Sys., Inc.*,
  211 F.3d 1228 (11th Cir. 2000) ............................................................................15

*S.E.C v. Badian*,
  822 F. Supp. 2d 352 (S.D.N.Y. 2011)...................................................................51

*Sacred Heart Health Sys. v. Humana Military Healthcare Servs.*,
  601 F.3d 1159 (11th Cir. 2010) ..................................................................... passim

*Sandlin v. Ameriquest Mortgage Co.*,
  2010 WL 4260030 (Bankr. N.D. Ala. Oct. 21, 2010)...........................................53

*Schmidt v. Interstate Fed. Sav. & Loan Ass'n*,
  74 F.R.D. 423 (D.D.C. 1977)...............................................................................55

*Schnall v. AT & T Wireless Servs., Inc.*,
  259 P.3d 129 (Wash. 2011)...................................................................................53

*Scibek v. Longette*,
  770 A.2d 1242 (N.J. Super. Ct. App. Div. 2001)..................................................53

*Seidenberg v. Summit Bank*,
    791 A.2d 1068 (N.J. App. Div. 2002)...................................................................47

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
    130 S. Ct. 1431 (2010)..................................................................................15

*Shelley v. AmSouth Bank*,
    2000 WL 1121778 (S.D. Ala. July 24, 2000) .............................................. passim

*Spagnola v. Chubb Corp.*,
    264 F.R.D. 76 (S.D.N.Y. 2010) ......................................................................53

*Spencer v. Hartford Fin. Servs. Group, Inc.*,
    256 F.R.D. 284 (D. Conn. 2009).....................................................................45

*Steinberg v. Nationwide Mut. Ins. Co.*,
    224 F.R.D. 67 (S.D.N.Y. 2004) ......................................................................42

*Stirman v. Exxon Corp.*,
    280 F.3d 554 (5th Cir. 2002) .........................................................................30

*Stratton v. American Med. Sec., Inc.*,
    266 F.R.D. 240 (D. Ariz. 2009)......................................................................47

*Szczubelek v. Cendant Mortgage Corp.*,
    215 F.R.D. 107 (D.N.J. 2003).........................................................................49

*Telecomm Technical Servs., Inc. v. Siemens Rolm Commc'ns*,
    172 F.R.D. 532 (N.D. Ga. 1997).....................................................................37

*Thompson v. American Tobacco Co.*,
    189 F.R.D. 544 (D. Minn. 1999)................................................................39, 40

*Thompson v. Jiffy Lube Int'l, Inc.*,
    250 F.R.D. 607 (D. Kan. 2008).......................................................................45

*Thompson v. RelationServe Media, Inc.*,
    610 F.3d 628 (11th Cir. 2010) .......................................................................32

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
    445 F.3d 311 (4th Cir. 2006) .........................................................................55

*University of S. Miss. v. Williams*,
    891 So.2d 160 (Miss. 2004)............................................................................31

*Valentino v. Carter-Wallace, Inc.*,
    97 F.3d 1227 (9th Cir. 1996) .........................................................................63

xv

*Valley Drug Co.v. Geneva Pharms., Inc.*,
  350 F.3d 1181 (11th Cir. 2003) ..................................................................15, 36, 37, 39

*Vega v. T-Mobile USA, Inc.*,
  564 F.3d 1256 (11th Cir. 2009) ................................................................................ passim

*Vickers v. General Motors Corp.*,
  204 F.R.D. 476 (D. Kan. 2001)............................................................................................62

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011) ............................................................................................... passim

*Walco Invs., Inc. v. Thenen*,
  168 F.R.D. 315 (S.D. Fla. 1996) .........................................................................................22

*Webber v. Esquire Deposition Serv., LLC*,
  2011 WL 3822001 (11th Cir. Aug. 31, 2011).....................................................................48

*Weisfeld v. Sun Chem. Corp.*,
  84 F. App'x. 247 (3d Cir. 2004) ..........................................................................................58

*Welch v. Atlas Roofing Corp.*,
  2007 WL 3245444 (E.D. La. Nov. 02, 2007) .....................................................................39

*Western States Wholesale, Inc. v. Synthetic Indus., Inc.*,
  206 F.R.D. 271 (C.D. Cal. 2002) ........................................................................................39

*Whittington v. Taco Bell of America, Inc.*,
  2011 WL 1772401 (D. Colo. May 10, 2011).......................................................................23

*Winfree v. Educators Credit Union*,
  900 S.W.2d 285 (Tenn. Ct. App. 1995)...............................................................................31

*Yarger v. ING Bank , FSB*,
  285 F.R.D. 308 (D. Del. 2012) ............................................................................................45

*Zapka v. Coca-Cola Co.*,
  2000 WL 1644539 (N.D. Ill. Oct. 27, 2000).......................................................................42

*Zinser v. Accufix Research Inst., Inc.*,
  253 F.3d 1180 (9th Cir. 2001) .......................................................................................30, 41

## STATUTES

28 U.S.C. § 1407(a) ......................................................................................................................20

**OTHER AUTHORITIES**

70 C.J.S. Payment § 104 (2007) ..................................................................................52

74 Fed. Reg. 5498 (Jan. 29, 2009) ..............................................................................37

74 Fed. Reg. 59033 (Nov. 17, 2009)............................................................................38

17A C.J.S. Contracts § 170 ..........................................................................................54

Fed. R. Civ. P. 12 ........................................................................................................51

Fed. R. Civ. P. 15 ........................................................................................................51

Fed. R. Civ. P. 23 ................................................................................................ passim

Restatement (Second) of Contracts..............................................................................47

UCC § 4-303(b) ...........................................................................................................37

## I.    INTRODUCTION

Plaintiffs' amended Motion for Class Certification (DE # 3198) ("Mot.") contains fundamental defects that the Court has not had occasion to address in other cases in this MDL. In a completely unprecedented request that ignores both basic constitutional principles and the Federal Rules of Civil Procedure, plaintiffs ask the Court to certify a single class cutting across two different cases that are to be tried in two different courts.  They even ask that multiple subclasses in each case be "represented" by persons who are not parties in that case.

Plaintiffs also ignore, in asserting that numerosity is easily satisfied, the fact that all customers have a contractual obligation to arbitrate their claims on a non-class basis. Importantly, the Eleventh Circuit's holding that Wells Fargo waived its arbitration rights as to the named plaintiffs has no significance to this issue, as it is well-established that the proper time to assert arbitration rights against absent class members does not arise before class certification.

More broadly, plaintiffs' motion fails to demonstrate that this case can be tried on a class basis in a manner that satisfies the due process rights of all parties, including absent class members.  The Supreme Court and Eleventh Circuit have emphasized that the class action mechanism, no matter how advantageous it might otherwise seem, may not be employed unless the claims of each and every class member can be adjudicated with exactly the same standards and rules of decision as would apply in an individual action.  Plaintiffs bear the burden of proving that Rule 23 is satisfied in every respect.  Their motion fails to carry that burden in multiple respects, including (but not limited to) the following:

1.    Plaintiffs seek to manufacture a single nationwide "class" by improperly combining parties and claims from two separate lawsuits that were filed in two different venues on behalf of mutually exclusive classes (and that will ultimately be tried in two different courts before two different juries).[1]  When the Court addresses each case separately, as it must, it will find that plaintiffs have failed to provide a basis for certification in either one.

2.    Under plaintiffs' proposal, no claims would actually be tried on behalf of any nationwide class.  Rather, plaintiffs propose to seek relief on behalf of thirteen "subclasses" consisting of widely varying (and incomplete) subsets of the hypothetical "nationwide" class.

---

[1] The motion addressed here seeks to certify a class in two lawsuits, *Garcia* and *Spears-Haymond*, that present claims on behalf of customers of the former Wachovia Bank.

Plaintiffs have not even tried to demonstrate (as they are required to do) that each subclass itself satisfies all Rule 23 requirements.

3.      The proposed class and subclasses fail to satisfy the requirement of numerosity, as virtually all class members are contractually obligated to arbitrate their claims on an individual, non-class basis.

4.      Plaintiffs impermissibly ask the Court to certify several subclasses to be "represented" by a person who is not even a plaintiff in this case.  Nor are the named plaintiffs in this case typical of the class and subclasses they seek to represent.  Indeed, in critical respects the named plaintiffs' interests are in *conflict* with those of other class members.

5.      Members of the proposed class were not all subject to the same contracts, did not all have their transactions posted according to the same methodology, and did not all have the same experiences with regard to overdrafts.  Such factual dissimilarities preclude even a threshold finding of common issues under Rule 23(a), much less the finding under Rule 23(b) that such common issues predominate.  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011).

6.      There is substantial variation in the applicable state laws *even within each individual proposed subclass*.  This means that, contrary to plaintiffs' suggestion, the jury would need to apply inconsistent and incompatible legal standards in attempting to decide even the claims of a single subclass. The Eleventh Circuit has rejected proposals involving much lesser degrees of complexity.  *See, e.g.*, *Sacred Heart Health Sys. v. Humana Military Healthcare Servs.*, 601 F.3d 1159 (11th Cir. 2010).

7.      Individualized issues will be predominant in any adjudication of the parties' claims and defenses.

8.      Plaintiffs' class definition lacks the precision required to enable the Court to provide absent class members with adequate notice as required by Rule 23.

Because the class certification determination must be made separately for each of the two cases addressed in plaintiffs' motion, Wells Fargo is filing a separate opposition in each case.  With this approach, the deficiencies plaintiffs seek to hide by addressing the two cases together become apparent.  There are, however, many respects in which the barriers to class certification are largely the same in both cases.  To avoid undue duplication, Wells Fargo will cross-reference such common arguments rather than repeat them.

## II.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      The Former Wachovia Bank

Wachovia Bank, N.A. ("Wachovia") was a national bank that offered checking accounts to consumers.  In the decade before its acquisition by Wells Fargo in 2009, Wachovia merged with or acquired several other banks; the largest such merger was with First Union Bank in 2001.  Dec. of Brad Arrowood ("Arrowood Dec.") (Ex. 1) ¶ 3.[2]  Each of the other banks had previously used its own distinct contracts and systems for managing accounts, including different posting order rules.  *Id.* ¶ 4.

Wachovia was acquired by Wells Fargo on January 1, 2009, after which Wachovia ceased to exist, and Wachovia customers became customers of Wells Fargo.  Dec. of Karen Moore ("Moore Dec.") (Ex. 3) ¶ 3.  However, those customers' accounts were kept on the old Wachovia systems for a period of time and were still managed according to the Wachovia rules, including those on posting order.  *Id.* ¶¶ 4-5.  Those rules were significantly different from those of the Wells Fargo systems.  *Id.* ¶ 5.  Between 2009 and 2012, former Wachovia accounts that remained active were gradually transitioned to the Wells Fargo systems.  When an account was converted, the customer was sent a new Wells Fargo account agreement, and the account was managed under the rules of the Wells Fargo systems.  *Id.* ¶ 4.[3]

### B.      The Bank's Processing and Posting of Debit-Card Transactions

A debit card is a card that a bank customer can use to pay for transactions with merchants.  Unlike with a credit card, the bank does not tally up each month's purchases and send the customer a bill; rather, the amount of each transaction is posted automatically to the customer's account when the bank pays the merchant.  *See* Arrowood Dec. ¶ 7.

When a customer offers his card to pay for a purchase, the merchant may send an electronic communication seeking "authorization" for the transaction.  If the bank provides this authorization, it is committed to paying the merchant if the transaction is later presented for payment, regardless of whether the customer at that later time has the funds in the account.

---

[2] Declarations and exhibits cited in this Opposition and the accompanying appendices appear in Appendix D, filed herewith.

[3] All of the named plaintiffs whose accounts remain active have been converted to the Wells Fargo systems.  *See* Moore Dec. ¶¶ 9-16.  The Wachovia systems have been shut down.  *Id.* ¶ 8.

However, the transaction is not posted to the account until the merchant submits it for payment. Most debit-card transactions settle and post within one to three days. *Id*. ¶ 8.

Only the customer has complete information about the funds he has committed from his account. A bank is often unaware of a transaction (such as a check) until it is submitted to the bank for settlement and payment. Even the bank's information about pending debit-card transactions is incomplete. When a merchant submits a transaction for authorization, the bank often does not know what the final amount will be. For example, gas stations typically seek authorization for only token amounts and do not inform the bank of the final amount until later. When it has sufficient information, a bank typically places a "hold" on the account for the authorized amount. However, Wachovia did not place holds on some types of transactions for which the authorization amounts commonly did not match the actual transaction amounts. Only the customer is able to maintain a complete tally of amounts actually spent through checks written, debit-card transactions, and other withdrawals. *Id*. ¶ 9.

Throughout each business day, Wachovia received millions of settlement records for checks, debit-card purchases, automated "ACH" payments, and other transactions. Late at night each business day, the bank performed an immense batch processing operation, matching those assorted records to customer accounts, sorting the transactions to be posted to each account, and then posting credits and debits to the account. *Id*. ¶ 10.

Throughout the period, Wachovia began by posting all deposits and other credits before subtracting debits (payments and withdrawals). Dec. of Dean Harrington ("Harrington Dec.") (Ex. 2) ¶¶ 3-4. However, the order in which the subtractions, including debit card transactions, were posted varied over time and for different groups of customers.

Before the merger with First Union, Wachovia posted all non-check debits from highest amount to lowest; checks were then posted in serial order. *Id.* ¶ 2.

After the First Union merger, Wachovia changed to a system that first sorted debits into groups based on transaction codes and then posted all transactions (including checks) from highest to lowest within each transaction group. *Id.* ¶ 3. Debit-card transactions were split into at least two different groups, however. As a result, the debit-card transactions posting each day were not necessarily all posted from highest to lowest. *Id.* Starting in 2004, Wachovia began grouping the majority of debits together in a single group and posting from highest to lowest within that group. *Id.* ¶ 4.

4

For one large group of customers – those who had signed up for Overdraft Protection – the bank used a *different* posting order for debits for most of the class period.  For those customers, the bank sorted debits high to low but then *skipped over* any items for which the account had insufficient funds and began posting any smaller items for which funds were available.  Harrington Dec. ¶¶ 5-6.  Only after available funds were exhausted with such smaller transactions did the bank return, in a "second post," to the larger transactions.  *Id.* ¶¶ 6-7.  If the customer's overdraft protection source (*e.g.*, savings account) had sufficient funds to cover the overdraft, the bank would transfer those funds to cover them.  If there were insufficient funds in overdraft protection, the bank would charge the customer fees on any remaining overdraft items. *Id.*  This system was in use from 2002 until the Wachovia systems were shut down.  *Id.* ¶ 5.

Thus, customers who signed up for overdraft protection were subject to a different posting order than those who did not sign up for that service.  The latter's debit-card transactions were posted high-low; the former's were not.  As a result of this difference, the same array of transactions would yield a different number of overdraft fees for customers with and without overdraft protection.  *See id.* ¶ 5, 8-9; Dec. of Michael C. Keeley ("Keeley Dec.") (Ex. 8) ¶ 45.

Starting in June 2010 (before the end of the proposed class period), the posting order for customers still on the Wachovia systems was changed yet again, with debit-card transactions posted in a separate group.  Moore Dec ¶ 19.  The "first post/second post" system remained in place for customers with overdraft protection.  *See* Harrington Dec. ¶ 5.

The impact of posting order on a customer's overdraft fees could vary tremendously depending on which of these posting orders was used and a customer's mix of transactions on a given day.  *See* Keeley Dec. ¶¶ 43-46.

C.    **Overdrafts and Overdraft Fees**

If a Wachovia customer did not have enough funds to cover an item posting on a given day, two things could happen.  If the item was a check, the bank could refuse payment and return it, charging the customer a returned item fee.  (The payee would often also charge its own fees and other penalties.)  Alternatively, if the differential was modest, the bank could, in its discretion and taking account of risk considerations, go ahead and pay the check, causing the account to go into overdraft.  The customer would be charged an overdraft fee, but no other fees or penalties would be incurred.  If the transaction was a debit-card transaction, the bank would be obligated to pay it and so would do so, charging the customer an overdraft fee.  Arrowood Dec.

5

¶ 11.  However, pursuant to new federal regulations (referred to as "Reg. E"), in mid- 2010 the bank stopped charging overdraft fees on debit-card transactions of customers who had not affirmatively opted in to overdraft services for those transactions.  Moore Dec. ¶ 17.

Because the bank posted all credits first, the posting order for debits had no impact on whether a customer overdrafted his account.  *See* Keeley Dec. ¶ 17.  However, posting order for debits could have an impact on the amount a customer was charged when he did overdraft, because overdraft fees were charged on a "per item" basis.  When larger items are posted first, it increases the likelihood that there will be enough funds in the account to ensure payment of high-value items like mortgage and rent checks.  *See id.* ¶ 25.  But it can also, in some situations, result in a larger number of individual overdraft items.  It is this latter effect that plaintiffs challenge in this case.  As federal regulators have recognized, there is no single posting order that consistently benefits all customers more than other alternatives that a bank might use, and the advantages of high-to low posting are widely recognized.  *See* pp. 36-38 below.[4]

Although Wachovia charged overdraft fees on a "per item" basis throughout the period at issue, important details of this calculation varied over time.  Arrowood Dec. ¶ 12.  As discussed above, the bank's posting order changed significantly after the merger with First Union and then changed again in 2004 and in 2010.  The methodology for calculating the available balance each day – the starting point for measuring overdrafts – changed over time as well.  *Id.* The specific per-item dollar amount of the fee varied by state (and sometimes even within a state) and over time.  *Id.*

D.   **Authorization Into Insufficient Funds**

Wachovia allowed authorization of debit-card transactions in some circumstances even if the account lacked sufficient funds at the time of authorization.  Arrowood Dec. ¶ 14.  This policy permitted customers to use debit cards in the same way as checks to pay for transactions even if the funds were not in the account at the precise moment of the transaction.  As with a check written under such circumstances, no overdraft fees were incurred so long as the customer promptly deposited sufficient funds to cover the transaction.  *Id.*  Plaintiffs' motion

---

[4] The number of fees can also be affected by whether different *categories* of transactions (e.g., checks or debit-card purchases) are posted separately or all together in one group.  The impact of such grouping decisions will vary from customer to customer and from day to day, depending on each customer's mix of transactions and their relative amounts.  *See* Keeley Dec. ¶¶ 43-44.

6

does not identify harm suffered by any of the named plaintiffs associated with this practice, and their expert has done no work (and contemplates no such work) to measure any such harm. Ex. 17 at 98-100, 157. After Reg. E went into effect in 2010, this service was discontinued for those customers who did not affirmatively opt into it. Moore Dec. ¶ 17. Many customers within the proposed class chose to opt in, although no named plaintiffs did so. *Id.* ¶ 18.

### E. Deposit Agreements

Every Wachovia customer was given a Deposit Agreement at the time of account opening. Arrowood Dec. ¶ 15. As plaintiffs acknowledge, these agreements set out the terms governing their accounts. *See* DE # 352 ¶ 39 & Ex. A.

The Deposit Agreement was revised from time to time. Each new customer received the then-current version. In some instances, changes to the Deposit Agreement (including the revised posting order language in the January 2004 version of the Deposit Agreement) were provided to all customers. Arrowood Dec. ¶ 15. All customers received complete new agreements after the First Union merger; similarly, customers of banks acquired by Wachovia were sent new agreements. *Id.*

The Deposit Agreements used during the pertinent period used varying language to address the issue of posting order. *Id.* ¶ 17. For example, the version of the contract in effect in September 2002 stated: "We may pay checks or other items drawn on your account, including those payable to us, in any order we determine, even if paying a particular item results in an insufficient balance in your account to pay other items that otherwise could have been paid." Ex. 19 at 2; Arrowood Dec. ¶ 18.

Beginning in November 2002, the agreement was revised to state:

> We may pay checks or other items drawn upon your account (including those payable to us or on which we may be liable) in any order determined by us, even if paying a particular check or item results in an insufficient balance in your account to pay one or more other items that otherwise could have been paid out of your account. Without prior notice to you, we may change the order in which we generally pay items.

Ex. 20 at 26; Arrowood Dec. ¶ 19. In January 1, 2004, the agreement was revised again to specify even more explicitly that the bank could pay items in any order even if "using a particular order results in … the imposition of additional fees." Ex. 21 at 8; Arrowod Dec. ¶ 20.

The pertinent portion of the agreement was revised substantially yet again on June 22, 2010.  *Id.* ¶ 21 & Ex. 29.

The account agreements also disclosed that the bank could authorize and pay checks or other items (including debt-card transactions) even if such a payment would result in an insufficient balance and result in fees for overdrafts.  Arrowood Dec. ¶ 17.

The Deposit Agreement required arbitration of any disputes concerning an account.  *See id.* ¶ 16.  This arbitration clause included capitalized language stressing that the customer was voluntarily agreeing to waive any jury right or to be represented in a class action lawsuit.  *See, e.g.*, Ex. 21 at 10.

## F.  Other Information Provided to Customers About Their Accounts

Wachovia customers could view their account activity online and see (a) a list of all posted transactions, arranged in the order in which they were posted, (b) all "pending" transactions of which the bank was aware, and (c) the bank's most recent calculation of the available and posted balances.  Arrowood Dec. ¶ 26.  Information about balances and transactions could also be obtained from a branch, at an ATM, or by calling a toll free number.  *Id.*  In addition, every Wachovia customer received monthly account statements.  *Id.*

Every time a customer overdrafted, he was sent an "overdraft notice" that showed how his overdraft transactions had been posted and the overdraft fees calculated.  The notice listed (among other things) the available balance before the overdraft items were posted and the order in which the overdraft transactions were posted.  *Id.* ¶ 27; *see, e.g.*, Ex. 46.  Some of the named plaintiffs received dozens of these notices; nearly all received at least one before incurring the overdraft fees challenged in the complaint.  *See, e.g.*, Dec. of Laura Sturmer ("Sturmer Dec.") (Ex. 4) ¶¶ 16, 23, 31, 35.

Customers who complained about overdraft fees were given additional information about how those fees had been calculated.  For example, a response letter often used language such as "items are processed once a day and are posted to the account from highest dollar item to the smallest."  Dec. of Mary Davis ("Davis Dec.") (Ex. 6) ¶ 3; Ex. 30.  Records documenting oral discussions with customers in branches or on the phone reflect many similar communications with customers.  Davis Dec. ¶ 3; Ex. 32.

### G.     Complaints and Reversals of Overdraft Fees

Customers dislike overdraft fees, and many complained about them.  This is not surprising, as one of the purposes of overdraft fees is to deter customers from overdrafting their accounts.  Davis Dec. ¶ 2.[5]  However, balancing this goal with customer service objectives, Wachovia had a generous policy of responding to complaints by reversing fee charges.  *Id*. Reversals were particularly apt to be granted if the customer did not have a history of overdrafts or if the circumstances otherwise indicated that the customer had not fully realized that he was incurring an overdraft.  *Id.*  In other instances, fees were reversed as a simple matter of good customer relations to resolve a dispute with the customer.  *Id.*  In those circumstances, the bank and the customer would often agree to a compromise, with the bank granting a reversal of a portion of the fees assessed.  *Id*.

All of the named plaintiffs in this case were beneficiaries of the bank's generous policy on fee reversals.  Plaintiff Anthony Poulin, for example, on multiple occasions visited Wachovia branches to challenge overdraft fees he had incurred.  On each such occasion, the bank granted him either a full or partial reversal.  Ex. 14 at 9, 99, 116-17, 125-26, 140; Sturmer Dec. ¶ 9-12.  He admits that he gained a thorough understanding through these conversations of the bank's posting order and other practices that he now challenges.  Ex. 14 at 82, 94, 99-100, 132-37, 141.  Yet rather than close his account – or change his behavior to avoid further overdrafts – he simply continued his reckless spending habits, incurring additional overdrafts. *Id*. at 63-64, 99, 153.  Notably, the overdraft fees challenged in the complaint, see DE # 352 ¶¶ 82-85, were incurred *after* Poulin had received multiple fee reversals and had gained a full understanding of the bank's overdraft fee policies and practices.  Other named plaintiffs also discussed overdraft fees with the bank and received reversals *before* incurring the specific fees challenged in their complaint.

---

[5] Wachovia also took other steps to deter customers from overdrafting.  The Deposit Agreement warned customers that it was their responsibility to track their transactions and ensure that their accounts had adequate funds.  *See* Arrowood Dec. ¶ 13; Ex. 21 at 8.  Wachovia also encouraged customers to enroll in overdraft protection.  Arrowood Dec. ¶ 13; Davis Dec. ¶ 4.

### H.    The Named Plaintiffs

Six of the named plaintiffs in this case are proposed as class representatives.  *See* App. II to Plaintiffs' Amended Mot. (DE # 3198-2) ("Mot. App. II").[6]  Plaintiffs provide limited information about these individuals in Appendix II to the Motion but do not discuss them in their brief.  Plaintiff's expert, Arthur Olsen, opines that each of these plaintiffs was "harmed" by the bank's posting order.  App. IV to Plaintiffs' Amended Mot. (DE # 3198-89) ("Mot. App. IV") at 17-19.  The Motion offers no evidence that any of them was harmed by any practice other than posting order.

The facts as to these plaintiffs are summarized below.  Further details, along with record citations, are supplied in Appendix B, which responds directly to Appendix II to plaintiffs' motion.  All of these individuals were, unlike the typical Wachovia customer, serial overdrafters who overspent their accounts on a regular basis.  Nearly all received generous fee reversals from the bank.  None of them claims to have seen or been adversely affected by any misrepresentation about the bank's posting order.  Indeed, at least some admit that they had full knowledge of the challenged posting order *before* incurring the fees challenged in the complaint.

**Anthony Poulin** (*see* Appendix B at 1-4) is a lawyer whose practice focuses on debt collection.  He opened his account in New Jersey in July 2004, at which time he signed a Customer Access Agreement agreeing to be bound by the Deposit Agreement.  *See* Ex. 24.  His account was converted to the Wells Fargo systems in February 2011.  Moore Dec. ¶ 10.

The complaint challenges four overdraft fees Poulin incurred for transactions posted to his account on May 11, 2009, claiming that he would have received fewer fees if the transactions had posted in a different order.  DE # 352 ¶¶ 82-85.  Poulin readily admits that he was fully aware of the bank's posting order and other overdraft fee policies *before* those fees were incurred.  He had received overdraft fees on several prior occasions and in several instances had contacted the bank to complain about them.  In every such instance, the bank gave him a full or partial reversal of his fees.  On several occasions Poulin visited a bank branch and discussed with bank representatives at some length how his overdraft fees had been calculated.

---

[6] Betty Jones (wife of plaintiff Charles Jones) is also a named plaintiff but is not proposed as a class representative.  Plaintiffs also propose Celia Spears-Haymond as a "representative" of the class and several subclasses, but she is not a plaintiff in this case.  Facts relating to her account are discussed in the separate opposition to class certification filed in the *Spears-Haymond* case.

**Murlee Damor** (*see* Appendix B at 19-22) opened her account in 2008 in New Jersey. She signed a Consumer Access Agreement in which she agreed to be bound by the Deposit Agreement. Her account was converted to the Wells Fargo systems in February 2011. Moore Dec. ¶ 15.

Damor challenges certain overdraft fees she incurred on December 28, 2009. She does not dispute that she overdrafted on that day but asserts that she would have had fewer separate overdraft items – and hence been charged a lesser amount – had her transactions been posted in chronological order. Yet Damor admits that she knew (from reviewing her account on-line as well as from numerous conversations with the bank) that Wachovia posted her transactions from highest to lowest and not chronologically. She received fee reversals from Wachovia on at least five occasions, including three times before she incurred the fees on December 28, 2009. She also received a partial reversal of the December 2009 fees.

Damor has at times benefited from the bank's high-to-low posting order and the ability to have transactions paid into overdraft instead of being rejected. For example, on one occasion in 2009 Damor's account had insufficient funds to cover all of her transactions, including a payment to a debt consolidation company. That transaction posted first under high-to-low posting, but would have posted last under plaintiff's scenario; in the latter case there would have been insufficient funds to cover the payment, and the bank could have declined to pay it. *See* Keeley Dec. ¶ 33 n.36. Had this happened, Damor admits she "would have had a problem with the debt collectors." Ex. 10 at 85-86, 125.

**Frances Pinckney** (*see* Appendix B at 4-8) opened her account in North Carolina, originally with First Union, in 1993. At the time of the First Union-Wachovia merger in 2001, she received a new Wachovia Deposit Agreement. *See* Arrowood Dec. ¶ 15. She signed Consumer Access Agreements agreeing to be bound by the Deposit Agreement. She filed a declaration in this case claiming not to "recall" having received it but then admitted in her deposition that she did receive it. The account was converted to the Wells Fargo systems in October 2010. *See* Moore Dec. ¶ 11.

Pinckney overdrafted her account regularly and incurred hundreds of overdraft fees. She received fee refunds or reversals on at least twelve occasions, including on at least seven occasions before she incurred the overdraft fees on January 14, 2008, that are challenged in the complaint. Through her numerous communications with the bank about her overdraft fees,

11

she gained full knowledge of the bank's use of high-low posting – yet she continued to overdraft her account.

Pinckney benefited from the bank's high-to-low posting order on some occasions. For example, in January 2005 a large check to Countrywide Mortgage was paid into insufficient funds instead of being returned.  This transaction posted first under high-to-low posting, but would have posted last if posted according to Olsen's scenario, Keeley Dec. ¶ 33 n.36, and the bank could have rejected it.  If this payment had been rejected, Pinckney would have incurred, not just fees from Wachovia, but additional fees and penalties from Countrywide.

**Angela Gonzalez** (*see* Appendix B at 13-16) opened her account in Florida.  She also signed a Consumer Access Agreement agreeing to be bound by the Deposit Agreement. Gonzalez overdrew her account the month after she opened it and frequently thereafter, often exceeding her account balance several times in a single month.  She communicated with the bank repeatedly about her fees and does not claim that it ever gave her any false information.  She knew how the bank posted – she simply did not like it.

The complaint challenges two of the overdraft fees Gonzalez incurred for transactions posted on January 29, 2007.  DE # 352 ¶ 102.  She had received overdraft fee reversals from Wachovia on at least six occasions before these fees were incurred.  She received hundreds of dollars more in fee reversals in February 2007, and hundreds of dollars more thereafter.  Gonzalez affirmatively benefitted from the fact that her transactions did not all post in chronological order when important credit card and insurance payments were paid under Wachovia's actual posting order but might have been rejected under plaintiffs' scenario.

Gonzalez's account was closed in February 2009 with a negative balance of $165.03.  Another Wachovia account she had opened in July 2008 was closed in February 2009 with a negative balance of $144.16.

**Robert Thornton** (*see* Appendix B at 16-19) opened his account in January 2007 in Virginia.  He signed a Consumer Access Agreement agreeing to be bound by the Deposit Agreement.  The account was closed in April 2011.

The complaint challenges three overdraft fees Thornton incurred for transactions posted to his account on October 22, 2008.  He received reversals of two of those fees on October 30, 2008.  Like many of the other named plaintiffs he has personal opinions about the posting order Wachovia should have used but does not claim the bank ever misled them about its

12

actual practice.  Thornton has benefited from the bank's high-to-low posting order and the ability to have transactions paid into overdraft instead of being refused and returned.  For example, on October 28, 2008, a large alimony check was posted first and paid into insufficient funds instead of being returned.

        **Charles Jones** (*see* Appendix B at 8-13) knows virtually nothing about his account or the claims in this lawsuit.  In his deposition, he was unable to confirm that statements made in a sworn declaration he had signed or interrogatory answers he had verified were true.  He did not even know for certain that his account had been with Wachovia; he deferred on this and other points to his wife (who is not proposed as a class representative).  He did not know what the claims were in this case or even that it was pending in Miami.  He testified that he would not be prepared to travel to Miami for trial.

        According to Wachovia's records, Jones opened a joint account with his wife, Betty Jones, in July 2007 at a Wachovia branch in Texas.  Both signed Consumer Access Agreements agreeing to be bound by the bank's Deposit Agreement.

        The complaint challenges overdraft fees charged to this joint account for transactions posted on November 5, 2007, asserting that these transactions would have resulted in fewer fees if posted in chronological order.  DE # 352 ¶¶ 97-100.  Plaintiffs have offered no evidence to show that Charles (as opposed to Betty) Jones was responsible for these overdrafts.

        The Jones's account was overdrawn on more than fifty occasions between August 2007 and June 2009.  Numerous fee reversals were granted during that period.  The account was closed in August 2009 with a negative balance of $198.26, which has not been repaid.

      **I.**      **Procedural Background**

        The original Complaint in this case (*Garcia*) was filed in this Court, alleging venue in this district.  *See* Dec. of Emily Johnson Henn ("Henn Dec.") (Ex. 7) ¶ 3.  An Amended Complaint, which consolidated this case with a separate suit originally brought by plaintiff Poulin, was filed on October 16, 2009.  DE # 80.  A Second Amended Complaint ("SAC") was filed on April 12, 2010.  DE # 352.  The SAC alleges two classes.  The first consists of "[a]ll Wachovia customers in the United States *(except for California)* who … incurred an overdraft fee as a result of Wachovia's practice of re-sequencing debit card transactions from highest to lowest…."  *Id.* ¶ 23 (emphasis added).  The second consists of "All Wachovia customers having

13

accounts at branches in the State(s) (sic) of New Jersey for the purpose of asserting claims under their (sic) respective state consumer protection statutes (sic)." *Id.*

Plaintiffs' motion seeks certification of a single class to be operative both in this case and in the separate *Spears-Haymond* suit. *Spears-Haymond* was filed in the Northern District of California and asserted venue in that district. *See* Henn Dec. ¶ 4. It was transferred to this MDL in June 2009 (DE # 1), after which Spears-Haymond successfully sought leave to file a Second Amended Complaint. *See* DE # 79, 144. She filed a Third Amended Complaint (DE # 353) after the Court's decision on the omnibus motion to dismiss. All of the *Spears-Haymond* complaints, both before and after transfer to this MDL, pled venue in the Northern District of California and asserted California law claims for a putative California-only class. DE # 353 ¶¶ 11, 16. None of the amendments expanded the scope of that case beyond California.

## III.  ARGUMENT

The Eleventh Circuit requires class certification decisions to rest on a "rigorous analysis of the Rule 23 prerequisites." *Sacred Heart*, 601 F.3d at 1169; *see also Dukes*, 131 S. Ct. at 2551-52; *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1266 (11th Cir. 2009). A court must scrutinize the evidentiary record to determine whether each and every requirement of Rule 23 is satisfied. *Dukes*, 131 S. Ct. at 2551. Plaintiffs' suggestion of a more relaxed standard (Mot. at 25-26) relies upon outdated precedents.[7]

A class may not be certified where to do so would "sacrific[e] procedural fairness." Fed. R. Civ. P. 23 Advisory Committee Notes, 1966 Amendments; *see Dukes*, 131 S. Ct. at 2561. A court may not gloss over differences in the laws or facts governing the separate claims of class members to impose a different standard of proof than would exist for an individual action. *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1020 (7th Cir. 2002). Nor may a court deprive a defendant of its right to litigate its defenses fully. *Dukes*, 131 S. Ct. at 2561; *Sacred Heart*, 601 F.3d at 1176 (class members could not amalgamate their claims in the name of convenience where to do so would abridge the defendant's rights). In a class action,

---

[7] For example, plaintiffs argue that "in a doubtful case . . . any error, if there is to be one, should be committed in favor of allowing a class action." Mot. at 26 (quoting *Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985)). This is *not* the law today. Rule 23 was amended in 2003 to preclude certification unless all requirements are established. *See* Fed. R. Civ. P. 23 Advisory Committee's Note, 2003 Amendments; *see also In re Hydrogen Peroxide Antitrust Litigation*, 552 F.3d 305, 321 (3d Cir. 2008) (confirming change in the law and repudiating *Eisenberg*).

"the parties' legal rights and duties [remain] intact and the rules of decision unchanged." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431, 1443 (2010).

The burden is on plaintiffs to establish *all* pertinent elements of Rule 23. *Dukes*, 131 S. Ct. at 2561; *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1253 (11th Cir. 2003); *Rustein v. Avis Rent-a-Car Sys., Inc.*, 211 F.3d 1228, 1233 (11th Cir. 2000). To meet this burden, plaintiffs must identify evidence on which the Court can base specific findings. *See Vega*, 564 F.3d at 1275 (reversing certification in absence of required findings supported by the record); *Valley Drug Co.v. Geneva Pharms., Inc.*, 350 F.3d 1181 (11th Cir. 2003) (same). Plaintiffs' motion falls well short of satisfying this rigorous standard.

Before turning to the specific defects in plaintiffs' class certification motion, this Opposition begins by addressing two preliminary points: the recent Ninth Circuit decision in *Gutierrez* (highlighted in the amended version of plaintiffs' motion) and the general significance of class certification decisions in "posting order" cases, including other cases in this MDL.

### A.   Plaintiffs' Effort to Circumvent the Ninth Circuit's Holding in *Gutierrez* Creates New Issues on Class Certification.

Because of the passage of time since plaintiffs' motion was filed, they were permitted to file an "updated" version of their memorandum. DE # 3193 at 2. Apart from citations to this Court's decisions in other cases in this MDL, much of plaintiffs' "updating" consisted of a discussion of the Ninth Circuit's decision in *Gutierrez v. Wells Fargo Bank, N.A.*, 704 F.3d 712 (9th Cir. 2012), and various editorial changes that are clearly designed to make the claims in *this* case appear to resemble the portion of the *Gutierrez* case that the Ninth Circuit left standing, as opposed to the core claims in that case that the Ninth Circuit rejected as a matter of law.

As this Court is aware, plaintiffs here have long relied upon the trial court decision in *Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080 (N.D. Cal 2010). In that decision, the trial court held that Wells Fargo's high-low posting order was "unfair" within the meaning of the California Unfair Competition Law ("UCL") because it violated the covenant of good faith and fair dealing in the bank's contracts with its customers. *Id.* at 1122-24. The court entered an injunction barring the practice and awarded monetary relief to the class in the amount of $203 million.  *Id.* at 1137-40. The district court further held that the bank violated the separate "fraud" prong of the UCL by failing adequately to disclose its posting order to its

15

customers.  *Id.* at 1126-28.  It also held that certain statements the bank made in brochures and other documents distributed to customers in California constituted affirmative misrepresentations that reinforced customers' natural expectation that debit-card transactions would be posted in chronological order.  *Id.* at 1128-29.  The court awarded injunctive relief for these violations.  *Id.* at 1137.

The Ninth Circuit reversed the district court on two of its three liability holdings.  Citing extensive case law from the Supreme Court and other appellate courts (including the Eleventh Circuit), the Ninth Circuit held that the National Bank Act preempted any claim brought under state law that challenged either the bank's posting order or the adequacy of its disclosure of that posting order.  *Gutierrez*, 704 F.3d at 723-26.  The court held that preemption did not extend to affirmative misrepresentations and confirmed that the district court could enter injunctive relief barring such misrepresentations.  *Id.* at 726-28.  However, federal law precluded either injunctive or monetary relief based on any of the state-law theories that challenged the bank's posting order itself or the adequacy of the disclosure of that practice.  *Id.* at 728.  All relief granted by the district court was vacated, and the case was remanded for a determination of what relief, "if any," was properly granted for the narrow claim that survived.  *Id.* at 730.

Clearly anticipating that the Eleventh Circuit will follow *Gutierrez* (just as they have long encouraged this Court to rely upon the lower court's decision in that case), plaintiffs have edited their class certification motion extensively to add new assertions about supposed "misrepresentations" by Wachovia about its posting order.  Their original motion was largely bare of such assertions.  Indeed, to read plaintiffs' "updated" motion papers, one would think that this is predominantly a fraud case.  Nothing could be further from the truth.  Plaintiffs' primary claim here has always been that Wachovia breached the covenant of good faith and fair dealing – exactly the same theory that the trial court accepted (and the Ninth Circuit rejected on preemption grounds) in *Gutierrez*.  Plaintiffs have alleged no causes of action for fraud – indeed, they have always vigorously argued in this MDL that customers' individual understanding and expectations (which would be key questions for any misrepresentation claim) are *irrelevant*.  Nor would the factual record support any such claim.  Unlike in *Gutierrez*, none of the named plaintiffs claims to have seen or relied upon, much less been harmed by, any misrepresentations about posting order.

16

To the extent plaintiffs are now seeking to distort their original claims to turn them into misrepresentation claims, they take on new burdens at the class certification stage that neither Eleventh Circuit law nor the factual record permits them to satisfy. These issues, which this Court has not had to address previously in this MDL, are discussed in more detail below as they pertain to each of the Rule 23 factors.

**B.      Decisions in Other Cases Involving Posting Order Do Not Support Class Certification Here.**

As this Court has stressed on numerous occasions, decisions on class certification present unique issues for every case, and the certification of a class in one case does not mean that certification is proper in another case, even if the claims are similar. *See, e.g.,* DE # 2627 at 8-9. Nonetheless, plaintiffs' motion is largely premised on the assertion that the Court should grant certification because class certification was granted in *Gutierrez* and in other cases in this MDL. All of these prior decisions differ from this case in significant respects. For one thing, all of them pre-dated the Ninth Circuit's decision in *Gutierrez*, which reversed the district court's decision on all claims analogous to those presented here. Even leaving this aside, the trial court's class certification in *Gutierrez* is highly distinguishable:

- The class certified in *Gutierrez* involved residents and the law of only California. In contrast, plaintiffs here seek to certify a "nationwide" class.

- Numerosity was not in dispute in *Gutierrez*, as the class in that case was certified long before the Supreme Court's *Concepcion* decision. At that time, the arbitration clause in the bank's account agreement was not enforceable under California law.

- The class certified in *Gutierrez* was for a single case to be tried in a single court, not for two different cases to be tried in two different courts.

- *Gutierrez* involved a bench trial for a single class that was subject to a single uniform rule of decision. In contrast, plaintiffs seek a trial by jury of five different claims under the laws of 22 different jurisdictions that even plaintiffs concede vary widely.

- In *Gutierrez*, class members' transactions were subject to identical posting order rules throughout the entire class period. In contrast, the claims here involve multiple different contracts and posting practices that were far from uniform.

- In *Gutierrez*, the plaintiffs were unaware of the bank's posting order. In contrast, at least some of the plaintiffs and other class members here were fully aware of the bank's high-low posting policy *before* incurring their challenged fees.

17

- In *Gutierrez*, the class period was fixed.  In contrast, plaintiffs here propose an indeterminate class period requiring individualized application of 65 different statutes of limitations.

- *Gutierrez* involved the distinct operations and practices of a different bank and the knowledge, experience, and conduct of a different group of plaintiffs.

- To the extent plaintiffs now seek to re-cast their claims as resting upon alleged "misrepresentations," *Gutierrez* involved allegations of uniform misrepresentations made to the named plaintiffs and (it was claimed) uniformly distributed to the class in written brochures and similar items.  None of the plaintiffs here claims to have been exposed to, much less injured by, any such misrepresentations.

For similar reasons, this Court's class certification rulings in this MDL offer little guidance here.  Numerosity was not in dispute in those cases, as none of the defendants had arbitration clauses in their account agreements.  Nor did plaintiffs in those cases seek to combine the parties and claims in multiple lawsuits that were to be tried separately in different courts.[8] The Court found that class members in those cases were subject to substantially the same posting orders and contracts; no such finding is possible here.  The prior cases involved a much less elaborate structure of subclasses.  And none of the Court's prior orders addressed the propriety of a trial plan that requires abandonment of the claims of many class members.

At least equally significant are decisions in which class certification was *denied* for claims challenging a bank's posting order.[9]  Those decisions recognized that certification is improper where variations in the facts and applicable law are too great to permit class members' claims to be assessed through a streamlined evidentiary submission that focuses only on facts common to the class as a whole.  A similar result should apply here.

---

[8]  The motion by the TD Bank plaintiffs (DE # 2579-1) was captioned in two cases, but plaintiffs had filed one amended complaint consolidating those cases.  (*See* DE # 559, 997.)  Similarly, the motion by the PNC plaintiffs (DE # 2276) was captioned in four cases, but the plaintiffs had filed a single amended complaint consolidating those cases.  (*See* DE # 991.)  Plaintiffs made a deliberate choice *not* to consolidate the *Garcia* and *Spears-Haymond* cases.

[9] *See Shelley v. AmSouth Bank*, 2000 WL 1121778 (S.D. Ala. July 24, 2000), *aff'd*, 247 F.3d 250 (11th Cir. 2001) (table); *Compass Bank v. Snow*, 823 So. 2d 667, 676 (Ala. 2001); *Brooks v. Norwest Corp.*, 103 P.3d 39, 50 (N.M. Ct. App. 2004).

C.     **The Proposed Class Impermissibly Commingles Plaintiffs and Claims from Different Lawsuits.**

Perhaps the most fundamental defect in plaintiff's motion is that it commingles two separate and distinct lawsuits:  (1) *Garcia v. Wachovia Bank, N.A.*, and (2) *Spears-Haymond v. Wachovia Corporation* ("*Spears-Haymond*").  *Garcia* was filed in this Court and seeks to assert claims on behalf of all "Wachovia customers" in the United States, *excluding California*.  DE # 352 ¶ 23.  No plaintiff in the *Garcia* case was a California customer.  *Spears-Haymond* was originally filed in the Northern District of California, asserts venue in that district, and presents claims on behalf of a class limited to California customers *only*.  *See* DE # 353 ¶ 16.

Plaintiffs' motion treats these distinct lawsuits as if they were a single action, seeking certification of just *one* class for *two* different cases.  Their proposed class and subclasses jumble the California residents and claims from *Spears-Haymond* with customers and claims from the states at issue in *Garcia*.  *See* Mot. App. I at 13, 15, 17.  Spears-Haymond – the named plaintiff in *Spears-Haymond*, who pled only claims under California law on behalf of a putative California-only class – is proposed as a representative (in some instances the *only* representative) of subclasses that include mostly customers of other states.  *Id.* at 14-15, 17.  Yet Spears-Haymond cannot serve as a "representative" of *any* class or subclass in *Garcia*, in which she is not a party.  *See Prado-Steiman v. Bush*, 221 F.3d 1266, 1280 (11th Cir. 2000) ("Only after the court determines the issues for which the *named plaintiffs* have standing should it address the question whether the *named plaintiffs* have representative capacity, as defined by Rule 23(a), to assert the rights of others.") (citation omitted; emphasis added).[10]

It would clearly be improper to certify a single class that jumbled together claims and claimants from *Garcia* and *Spears-Haymond*.  Any class certified in each case must be supported by the pleadings, parties, and record *of that case*.  The Court recognized this basic principle when it held, in partially granting defendants' motions to dismiss, that standing requirements "must be met for each Complaint" and that "it is insufficient for Plaintiffs to assert that a certain state statutory claim in one Complaint should remain because a named plaintiff in

---

[10] *See also Piazza v. Ebsco Industries Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001) (Rule 23(a) requirements "are designed to limit class claims to those 'fairly encompassed' by the named plaintiffs' individual claims"); *cf. Abercrombie v. Lum's Inc.*, 345 F. Supp. 387, 393 (S.D. Fla. 1972) (King, J.) ("Plaintiffs cannot properly represent a 'subclass' of which they are not members any more than they can represent an overall class to which they do not belong").

another Complaint resides in that state."  DE #305 at 40 n.13.  As the Eleventh Circuit made clear in *Prado-Steiman*, at least one named plaintiff must have standing for *each* class and subclass on *each* claim.  221 F.3d at 1279-80.

Thus, for example, when the Court determines whether Rule 23(a) is satisfied in *this* case (*Garcia*) for plaintiffs' Unjust Enrichment Subclass # 1, it must determine if any of the named plaintiffs in this case can serve as a representative for that subclass.  Plaintiffs effectively admit that the answer to that question is "no" when they assign all of the named plaintiffs in this case to their other Unjust Enrichment subclasses.  *See* Mot. App. I Ex. B. They cannot rectify the deficiency by suggesting, as they do, that Unjust Enrichment Subclass #1 be "represented" by Spears-Haymond, a plaintiff in a *different* lawsuit.  *See id.*

Nothing in the MDL procedure permits this.  "Within the context of MDL proceedings, individual cases that are consolidated or coordinated for pretrial purposes remain fundamentally separate actions, intended to resume their independent status once the pretrial stage of litigation is over."  *In re Korean Air Lines Co. Antitrust Litig.*, 642 F.3d 685, 700 (9th Cir. 2011).  Indeed, these cases not only must be tried separately; they must be tried in different courts.  The MDL statute requires that each action transferred to an MDL proceeding "*shall be remanded* by the panel at or before the conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have been previously terminated…."  28 U.S.C. § 1407(a) (emphasis added).  This remand requirement is "impervious to judicial discretion." *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998).  And "an MDL [may not] be managed in a manner that fails to take into account that the cases are destined to be returned to their transferee jurisdictions."  *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 785 F. Supp. 2d 925, 930 (C.D. Cal. 2011).

This defect cannot be remedied by certifying the same class twice, once in each case.  It is undisputed that Rule 23 cannot be satisfied in *either Garcia or Spears-Haymond* for the entirety of plaintiffs' proposed class/subclass structure – there is, for example, no plaintiff in *Garcia* who can represent Unjust Enrichment Subclass 1 (and no plaintiff in *Spears-Haymond* who could represent Unjust Enrichment Subclass 2).  Moreover, the Eleventh Circuit has cautioned that courts should not certify duplicative or overlapping classes in multiple cases. *Murray v. Auslander*, 244 F.3d 807, 813 (11th Cir. 2001).  One of the purposes of pretrial

management in an MDL is to avoid exactly that kind of confusion, duplication, and waste of judicial resources.

Because plaintiffs' entire motion is premised on an impermissible combination of two separate and distinct cases, it is fatally flawed and should be denied for that reason alone.

### D.    Plaintiffs' Proposed Nationwide Class Exceeds the Scope of Their Pleading.

The *Garcia* plaintiffs' operative complaint, filed after extensive opportunity for amendment, seeks relief on behalf of a class that explicitly *excludes* California customers.  *See* DE # 352 at 23.  Absent yet another amendment of their complaint (which plaintiffs do not seek − and which would be untimely in any event at this late date), the Court cannot certify a class that is broader than that set forth in the complaint.  *See Vega*, 564 F.3d at 1271.

Both plaintiffs' "nationwide" class and each of their proposed subclasses that includes customers from California are inconsistent with their pleadings and so may not be certified.  For similar reasons, the Court may not properly certify a subclass in this case to pursue a claim under the California Unfair Competition Law, *see* Mot. App. I at 18, as no such cause of action is pled in plaintiffs' complaint.  If any such claim had been pled, this Court would have dismissed it pursuant to its holding that a state statutory claim may not be pursued in the absence of a named plaintiff from that state *in the same case*.  DE # 305 at 40 n.13.

### E.    Plaintiffs' Motion Does Not Even Attempt to Satisfy Rule 23 With Respect to Any of the Subclasses that Are the True Subject of Their Motion.

A proper class definition identifies the group of persons on whose behalf specific claims are to be *tried*.  *See* 1 Newberg on Class Actions § 3:1.  Plaintiffs do not propose to try any claim on behalf of their proposed nationwide class.  They concede that material differences in the applicable laws preclude this, and the verdict form proffered with their trial plan seeks no verdict on any claim on behalf of a nationwide class.  Rather, plaintiffs propose that claims be tried on behalf of thirteen "subclasses."  *See* Mot. at 1 n.1, Mot. App. I at 13-18.  Significantly, those subclasses do not add up to a full national class even in the aggregate.  *See* pp.34-35 below.

Even though the subclasses are central to plaintiffs' motion, they have made no effort to demonstrate that Rule 23 is satisfied for each subclass.  This is a fatal flaw, as subclasses are subject to all of the same requirements for certification as "classes."  *See Klay v. Humana, Inc.*, 382 F.3d 1241, 1267 (11th Cir. 2004), *abrogated on other grounds by Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008); *Johnson v. Am. Credit Co. of Ga.*, 581

F.2d 526, 532 (5th Cir. 1978); *Walco Invs., Inc. v. Thenen*, 168 F.R.D. 315, 323 (S.D. Fla. 1996);
*Central Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 189 (4th Cir. 1993); Manual for
Complex Litigation (Fourth) § 21.23.  Plaintiffs must supply "the exact definition of each
subclass, its representatives, and the reasons each subclass meets the prerequisites of Rule 23(a)
and (b)."  *In re Telectronics Pacing Sys., Inc.*, 168 F.R.D. 203, 221 (S.D. Ohio 1996).  They have
not done so.  This alone warrants denial of the motion.  *Id.*; *see In re Hitachi Television Optical
Block Cases*, 2011 WL 9403, at *10 (S.D. Cal. Jan. 3, 2011).

> **F.      Plaintiffs Cannot Satisfy the Rule 23(a) Prerequisites for Class Certification.**

Rule 23(a) imposes four threshold requirements for class certification, generally
referred to as "numerosity," "commonality," "typicality," and "adequacy of representation."
Fed. R. Civ. P. 23(a); *see Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1190 (11th Cir. 2009).
Plaintiffs have satisfied none of these requirements.

> **1.      Plaintiffs Have Not Established Numerosity.**

A class action may proceed "only if ... the class is so numerous that joinder of all
members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Numerosity must be proven in every case.
*See Vega*, 564 F.3d at 1266-67.  Plaintiffs' assertion that this requirement is "easily" satisfied,
Mot. at 27, ignores the arbitration clause in the Wachovia Deposit Agreement.

Any persons "subject to arbitration … could not be considered members of the
class."  *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 725 n.5 (11th Cir. 1987); *see Pablo v.
ServiceMaster Global Holdings Inc.*, 2011 WL 3476473, at *2 (N.D. Cal. Aug. 9, 2011)
(existence of arbitration agreements precluded findings of numerosity and superiority); *Fischler
v. AmSouth Corp.*, 176 F.R.D. 583, 585 (M.D. Fla. 1997) (recognizing impact of arbitration
agreements on numerosity).[11]  In this case, once one eliminates customers who must arbitrate
their claims, few, if any, potential class members remain.

---

[11] *See also O'Donovan v. Cashcall, Inc.*, 2012 WL 2568174, at *2 (N.D. Cal. July 2, 2012)
(excluding customers with arbitration agreements from class); *In re Currency Conversion Fee
Antitrust Litig.*, 224 F.R.D. 555, 570-71 (S.D.N.Y. 2004) (excluding from class customers of
banks that had arbitration agreements in place before litigation was filed); *Champ v. Siegel
Trading Co., Inc.*, 1990 WL 19984, at *7 (N.D. Ill. Feb. 27, 1990) (any class "would have to be
limited to persons who did not agree to arbitration").

Plaintiffs cannot validly argue that Wells Fargo waived its right to arbitration.[12] Notwithstanding any waiver as to the named plaintiffs, Wells Fargo *could not* have waived its right to compel arbitration as to absent class members, for the simple reason that no such right has existed − or will exist − until and unless this Court gains jurisdiction over those individuals by certifying a class that includes them.  Before a class is certified, unnamed class members are "immune to the court's power."  *In re Bayshore Ford Trucks Sales, Inc.*, 471 F.3d 1233, 1245 (11th Cir. 2006); *see also Hartford Accident & Indem. Co. v. Beaver*, 466 F.3d 1289, 1294 (11th Cir. 2006) ("class members are not part of a lawsuit until certification").  Wells Fargo could not waive its arbitration rights against persons who were not subject to the Court's authority.  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 1753784, at *3-*4 (N.D. Cal. May 9, 2011) (defendants did not waive right to arbitrate claims of absent class members because they were not parties prior to certification).[13]

If and to the extent plaintiffs seek to avoid the arbitration obligation by asserting that some class members did not receive the contract or that the contract is unconscionable, such arguments cannot be decided without reference to evidence unique to each class member and consideration of the specific laws of each state.  For example, depending on the applicable state law, any claim that the agreement is procedurally unconscionable could require consideration of the circumstances under which the customer received the contract, what he was and was not told when he received it, and what other options he had available to him in contracting for checking account services.  *See, e.g.*, *Hough v. Regions Fin. Corp.*, 672 F.3d at 1224, 1229 (11th Cir. 2012) (procedural unconscionability could not be established under Georgia law just by characterizing contract as one of adhesion).  Notably, when plaintiffs challenged Wells Fargo's arbitration clause with respect to the named plaintiffs, they submitted declarations and deposition testimony from those plaintiffs addressing these issues.  *See generally* DE # 1487, 1971, 2036. The need to assess such individual issues would alone preclude certification here.

---

[12] The bank pled its arbitration right as an affirmative defense in its answer.  *See* DE # 503 at 25. It also separately notified plaintiffs and the Court of its intent to assert its arbitration rights against absent class members when and if the opportunity arose.  *See* DE # 387.

[13] *See also Whittington v. Taco Bell of America, Inc.*, 2011 WL 1772401, at *5 (D. Colo. May 10, 2011) (defendants could not compel arbitration against absent class members before certification); *see generally* Motion to Dismiss or Stay Pending Arbitration of Claims of Absent Class Members, filed herewith, at 7-11 (citing additional cases).

23

In any event, given recent decisions of the Eleventh Circuit, there can be no serious question about the enforceability of the Wachovia arbitration agreement, which plaintiffs have previously sought to challenge on grounds the appellate court has now rejected. *See, e.g.*, *Barras v. Branch Banking & Trust Co.*, 685 F.3d 1269, 1282-83 (11th Cir. 2012); *Hough*, 672 F.3d at 1229-30. These issues are addressed further in Wells Fargo's accompanying Motion to Dismiss Claims of Absent Class Members in Favor of Arbitration, which is incorporated herein by reference.

Regardless of whether absent class members are required to arbitrate, plaintiffs cannot establish numerosity for the additional reason that the Wachovia's Deposit Agreement contains a clause that waives the right to proceed in *any* class action against the bank, whether in litigation or arbitration. *See* Ex. 26 at 12. Courts have explicitly upheld similar class litigation waivers in many of the relevant states. *See, e.g.*, *Palmer v. Convergys Corp.*, 2012 WL 425256, at *5-6 (N.D. Ga. Feb. 9, 2012); *Copello v. Boehringer Ingelheim Pharm., Inc.*, 812 F. Supp. 2d 886, 894-97 (N.D. Ill. 2011); *see also  Forrest v. Verizon Commc'ns, Inc.*, 805 A.2d 1007, 1011-13 (D.C. 2002) (upholding Virginia forum selection clause, which effectively functioned as class action waiver because Virginia law does not provide for class actions); *Gilman v. Wheat*, 692 A.2d 454, 463-65 (Md. 1997) (same). Once one eliminates class members who are subject to this provision, plaintiffs cannot establish that the numerosity requirement is satisfied.

In short, the record does not permit "a supported factual finding, that the class actually certified meets the numerosity requirement." *Vega*, 564 F.3d at 1267.

### 2.    Plaintiffs Have Not Demonstrated Commonality As To All Customers During the Class Period.

Rule 23(a)(2) requires a finding that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Plaintiffs rely for this element on a conclusory list of purportedly common questions. *See* Mot. at 28-29. The Supreme Court has explicitly held that such a list is insufficient to establish commonality, because "any competently crafted class complaint literally raises common questions." *Dukes*, 131 S. Ct. at 2551. As this Court has explained, "it is insufficient for plaintiffs merely to assert a string of common questions without demonstrating how resolution of these questions evidences common injury." *Bennett v. Hayes Robertson Group, Inc*., 880 F. Supp. 2d 1270, 1279 (S.D. Fla. 2012) (King, J.). Rather, it must be shown that the claims "depend upon a common contention," and that this common contention

24

is "of such a nature that it is capable of class-wide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S. Ct. at 2551.  This standard is not met here, just as it was not met in *Dukes*.

In *Dukes*, the plaintiffs framed the common question as whether Wal-Mart's pay and promotion policies, although varying at the local level, resulted cumulatively in unlawful discrimination on a company-wide basis.  *See id.* at 2548-50. The Supreme Court held that this failed to identify a genuinely common question, because the plaintiffs had not shown that the challenged employment decisions were the result of any common company policy.  *Id.*at 2552.[14]

An examination of the "questions" listed in plaintiffs' motion (at 28-29) confirms that they identify no common issues within the meaning of Rule 23.  The first, second, fifth, and sixth questions do not even relate to the posting order practice as to which certification is sought; they relate instead to *different* banking practices.  The motion does not claim that any named plaintiff was harmed by those other practices, and their expert has proposed no methodology for calculating class "damages" relating to them.  The remaining questions are simply restatements of the same generic question:  whether class members were charged "too many overdraft fees" because of the posting orders used by the bank.  This is similar to the question in *Dukes* of whether "too few" women were promoted as a result of Wal-Mart's varying personnel policies.

Here, commonality is missing across at least three critical dimensions:

> **a)** **There Is No Commonality In Either the Mechanisms Creating the Alleged Injury or in Plaintiffs' Contracts With the Bank.**

This case resembles *Dukes*, in that the alleged injuries of the proposed class were not the result of a single uniform policy and contract.  In *Dukes*, commonality was absent because, although all members of the class claimed to have been subject to discrimination, the actual *mechanisms* causing their injuries – the personnel practices in Wal-Mart's various regions

---

[14] *See also Jamie S. v. Milwaukee Public Schools*, 668 F.3d 481, 497 (7th Cir. 2012) (holding that certification of class of persons who "suffered" as a result of failure to provide services "completely misunderstands" commonality requirement after *Dukes*); *In re Countrywide Fin. Corp. Mortgage Mktg. & Sales Practices Litig.*, 2011 WL 6325877, at *4, *7-*9 (S.D. Cal. Dec. 16, 2011) (denying certification of class of borrowers, despite evidence of uniform loan documentation, because of need to consider one-on-one communications with the lender); *Dykes v. Dudek*, 2011 WL 4904407, at *3 (N.D. Fla. Oct. 14, 2011) (after *Dukes*, variations in applicable law defeat assertion of commonality).

and stores – were not common.  Here also, there is no commonality among the practices that caused plaintiffs' alleged injury.  Differences include the following:

   ***Differences in Posting Order and Other Overdraft Fee Policies.***  Plaintiffs' motion assumes that Wachovia's posting and other challenged practices were uniform throughout the class period.  *See* Mot. at 7-11.  This is incorrect.  Members of the proposed class and subclasses were *not* all subject to the same posting order.  Wachovia's posting order changed substantially after the First Union merger in 2001.  It then changed again significantly in 2004 and again in 2010.  *See* Harrington Dec. ¶¶ 2-4; Moore Dec. ¶ 19.  And throughout most of the class period, customers who signed up for overdraft protection were subject to a materially different posting order than those who did not.  Harrington Dec. ¶¶ 5-9.  Each of these different posting orders had different results for the calculation of overdraft fees.  *See* Keeley Dec. ¶¶ 43-46.  Changes were also made during the class period to other policies – some of which plaintiffs also purport to challenge in this case – that affected the calculation of overdraft fees.  *See* Arrowood Dec. ¶¶ 5-6.[15]

   ***Differences in the Contracts.***  Plaintiffs' main claims are for breach of the implied contractual covenant of good faith and fair dealing, with the pertinent contracts being the Deposit Agreements.  *See, e.g.*, DE # 352 ¶¶ 123-28 & Ex. A.  Those agreements were revised several times over the years.  (*See* pp. 7-8 above.)  Moreover, in opposing Wells Fargo's arbitration motion against the named plaintiffs, plaintiffs asserted that some of them had no written contracts with the bank at all.  *See* DE # 2036 at 3-4.  The claims of persons who had contracts with the bank are plainly different from those of any customers who did not.

   In *Vega*, the Eleventh Circuit reversed class certification for breach-of-contract claims where members of the proposed class were subject to different contracts, even though the

---

[15] As discussed above, these other practices are distinct from the posting order practice upon which plaintiffs' class definition is based and on which their expert claims to be prepared to address issues of injury and damages.  But if plaintiffs assert that those practices *are* important to the claims of some class members, that creates yet another serious impediment to any finding of commonality.  The practice of approving transactions against insufficient funds, for example, had nothing to do with the challenged fees incurred by most class members, including the named plaintiffs.  Many debit-card purchases for which the customer has insufficient funds at the time of authorization never result in overdraft fees, because the customer typically has time to cover the deficit with a deposit before the purchases post to his account.  Conversely, debit-card transactions that did result in overdraft fees were typically authorized against account balances that were sufficient to cover them at the time of authorization.

conduct by the defendant that allegedly breached those contracts was the same for all.  The *Vega* plaintiffs sought to represent a class of cellular telephone salespeople in challenging a uniform policy adopted by their employer for determining sales volume.  Plaintiffs claimed this policy breached the company's contractual obligations to its sales employees by reducing their commissions.  Although the company policy at issue was identical for all class members, the Eleventh Circuit reversed the district court's grant of class certification because the plaintiffs had not shown that all class members were subject to a "common contract."  Absent such a showing, there was no commonality under Rule 23(a)(2).  *See Vega*, 564 F.3d at 1272, 1274 (vacating class on separate unjust enrichment claims due to lack of commonality).

Similarly, in *Sacred Heart*, the Eleventh Circuit reversed a grant of class certification for a breach of contract claim.  In that case, a group of hospitals sought to challenge on a class basis a health insurer's change in its methodology for calculating reimbursements to hospitals.  Although the challenged conduct – the defendant's methodology for calculating reimbursements – was the same for all class members, the Eleventh Circuit again vacated class certification, because the plaintiffs had failed to demonstrate that the contracts were themselves uniform.  *See Sacred Heart*, 601 F.3d at 1170-1176.[16]

***Differences in Other Sources of Information Received by Class Members***.  Even if plaintiffs had demonstrated that all class members were subject to agreements with uniform language, it would still be the case that different customers acquired information about the bank's posting and other practices from a variety of different sources.  The experiences of the named plaintiffs, several of whom have acknowledged receiving detailed truthful information about the challenged posting order from those communications, prove this beyond any reasonable dispute. *See* p. 8 above and Appendix B.

This Court's consideration of this issue in other cases in this MDL has focused on whether the subjective expectations of individual customers are pertinent to the good faith and fair dealing claim.  *See, e.g.*, DE # 1763 at 23.  There is clear authority in many states (including

---

[16] *Allapattah Services, Inc. v. Exxon Corp.*, 333 F.3d 1248 (11th Cir. 2003), cited by plaintiffs, is not to the contrary.  Unlike here, the contracts at issue in *Allapattah* were "materially similar," and the individual issues raised by Exxon "pertained primarily to the issue of damages rather than liability."  *Id.* at 1261.  Here, plaintiffs assert that some plaintiffs had no contract with the bank, and members of the proposed class were subject to different contracts, which raises individualized issues relating to liability, not just damages.

those involved here) that individualized evaluation of each customer's expectations is critical to that claim. (*See* pp. 46-47 below.)  Nonetheless, the Court has accepted plaintiffs' arguments in other cases in this MDL that no evidence need be considered concerning customers' actual understanding of the bank's posting order.  But plaintiffs' new-found assertion that their claims are (like the surviving claim in *Gutierrez*) based on allegations of misrepresentation (*see* Mot. at 12-18) must surely make any such argument untenable.

If plaintiffs' claims did depend upon the proposition that the bank said or wrote things that led customers to believe it posted debit-card transactions in an order different than the one actually used, then the jury would be required to determine whether Wachovia's statements in fact had any such effect.  This would necessarily require consideration of individualized evidence of (a) what statements by the bank each class member was actually exposed to, (b) what those statements caused the customer to believe, and (c) what impact, if any, the statements had on the customer's use of his debit-card.

It is well-recognized that the need for such individualized analysis nearly always precludes class certification in cases based on fraud or misrepresentation.  *See, e.g.*, *Heffner v. Blue Cross & Blue Shield of Alabama, Inc.*, 443 F.3d 1330, 1344 (11th Cir. 2006) (holding that "the reliance element of a class claim presents problems of individualized proof that preclude class certification"); *Andrews v. American Tel. & Tel. Co.*, 95 F.3d 1014, 1023-25 (11th Cir.1996) (reversing certification of a class action asserting mail and wire fraud claims), *abrogated on other grounds by Bridge*, 553 U.S. 639 (2008); *Hudson v. Delta Air Lines, Inc.*, 90 F.3d 451, 457 (11th Cir. 1996) (affirming denial of class certification because reliance element of ERISA claims was "not susceptible to class-wide proof").[17]  Similarly, in other suits challenging overdraft fees, courts have considered customer-specific variations in the

---

[17] Plaintiffs cannot avoid this bar by relying on the Ninth Circuit's affirmance in *Gutierrez* of the certification of a class for the statutory misrepresentation claim even without proof of individual reliance.  That holding was limited to the conclusion that absent class members had standing under the California UCL, which has uniquely broad standing rules.  704 F.3d at 729.  None of plaintiffs' causes of action invoke state laws with comparable rules.  Moreover, class standing could be found to exist even under the California statute only if (a) the named plaintiffs were shown to have affirmatively relied upon, and been harmed by, the challenged statements and (b) those same statements were shown to have been broadly disseminated to the class.  *Id.* at 728-29.  No such showing has been made here.

information received about posting practices to be fatal to class certification.  *See Shelley*, 2000
WL 1121778, at *11; *Compass Bank*, 823 So.2d at 677; *Brooks*, 103 P.2d at 50.[18]

**b)** **There is No Commonality in Plaintiffs' Contentions
Concerning Class Members' Contracts With the Bank.**

The absence of commonality is not simply a question of differences in the
underlying facts.  It extends even to plaintiffs' *contentions* about class members' contractual
relationships with the bank.  Rather than relying on a common contention, plaintiffs present
*different* and *conflicting* contentions about their and other customers' relationships with the bank.
For purposes of the good faith and fair dealing claim, plaintiffs acknowledge (as they must) the
existence of a valid contract but assert that the bank's posting order was not authorized under
that contract and thus violated the implied covenant of good faith and fair dealing.  For purposes
of the unconscionability claim, plaintiffs concede that high-low posting is authorized by contract
but contend that this authorization was unconscionable.  For purposes of the unjust enrichment
claim, plaintiffs must assert that there is no valid contract at all.  And for purposes of evading
their arbitration obligation, plaintiffs have contended, variously, that the contract was handed out
to all customers in a uniform way and was not handed out at all.  *See* DE # 2036 at 3-4, 15.

Not only are these contentions very different, they are mutually inconsistent.  And
while plaintiffs may plead claims in the alternative, they cannot simultaneously prevail on
incompatible theories of recovery.  *In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d
1302, 1321 (S.D. Fla. 2010).[19]  Importantly, the optimal choice among plaintiffs' varying

---

[18] In other cases in this MDL, plaintiffs have asserted that *Shelley* is off-point because it involved
only claims for "fraud and violation of the Truth and Lending Act."  *See, e.g.*, DE 2529 at 14.  In
fact, the *Shelley* court also denied class certification for a *breach of contract* claim, finding that
"[c]ausation, as well as the defense of failure to mitigate, requires individual assessments of what
each depositor understood to be the defendant's policies, which in turn requires assessments of
such things as what information each depositor was given in addition to the written documents
and what each depositor did do or would have done once armed with sufficient awareness of the
defendant's actual policies."  2000 WL 1121778, at *11.  The same reasoning is equally
applicable here.

[19] *See also First Class Coach & Equip., Inc. v. Thomas Built Buses, Inc.*, 2006 WL 269983, at *7
(M.D. Fla. Feb. 3, 2006) (plaintiff could not simultaneously assert unconscionability while also
seeking damages for breach of the parties' contract); *Eric v. Swenson & Sons v. Colvin*, 130 F.
626, 626-27 (C.C.D. Conn. 1904) ("[I]t is worse than inconsistent, it is inherently impossible,
[for plaintiffs] to charge that they were cheated into making an unconscionable bargain, and in
the same breath try to recover damages for a breach of the bad bargain.").

contentions will not be the same for all class members. For example, given their contention that some class members were not parties to the Deposit Agreement, plaintiffs cannot establish that the bank's "breach" of an implied covenant in that contract presents an issue common to the entire class. Conversely, given that most customers *were* subject to Deposit Agreements, plaintiffs cannot establish that there is a "common" entitlement to recovery for unjust enrichment, as such entitlement can exist under most state laws only where no contract exists. *See, e.g.*, *Degirmenci v. Sapphire-Fort Lauderdale, LLP*, 693 F. Supp. 2d 1325, 1347 (S.D. Fla. 2010). Because plaintiffs do not even have a common theory of the case for the whole class, they cannot satisfy Rule 23(a)(2). *See generally Dukes*, 131 S. Ct. at 2551 (class claims "must depend upon a common contention" that is "capable of classwide resolution").

> **c)** **Material Differences in the Applicable Law Preclude Any Finding of Commonality.**

Even before *Dukes*, nationwide classes in cases asserting claims under state law were rarely approved, especially when, as here, there was significant variation among the state laws to be applied.[20] After *Dukes*, it is clear that such variations defeat any possible showing of commonality, even apart from the factual variations described above.

Plaintiffs seek to certify here a nationwide class for five separate claims asserted under the laws of 22 jurisdictions. Most of their subclasses cover multiple jurisdictions in which the laws vary significantly. Appendix A to this brief sets forth many of these differences in detail. Given the substantial variations in the applicable law *even within each subclass*, it cannot be said that a class trial would "generate common answers apt to drive the resolution of the litigation." *Dukes*, 131 S. Ct. at 2551.

Plaintiffs effectively concede that commonality does not exist for a nationwide class. That is why they suggest that the trial would focus instead on thirteen subclasses. But the "subclass" approach is permissible only when plaintiffs prove that each subclass satisfies all Rule 23 requirements. As is clear from the detailed analysis set forth in Appendix A, plaintiffs

---

[20] *See, e.g.*, *Sacred Heart*, 601 F.3d at 1180-83; *Casa Orlando Apartments. Ltd. v. Fed. Nat'l Mortgage Ass'n*, 624 F.3d 185, 195-96 (5th Cir. 2010); *Stirman v. Exxon Corp.*, 280 F.3d 554, 556 (5th Cir. 2002); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189-90 (9th Cir. 2001); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1085 (6th Cir. 1996); *Castano v. American Tobacco Co.*, 84 F.3d 734, 741 (5th Cir. 1996).

no more meet the commonality standard for their subclasses than they do for a "nationwide" class.  Two examples illustrate this point:

Example 1:  Plaintiffs have grouped within their Good Faith and Fair Dealing Subclass #2 states whose laws vary widely with regard to the level of culpability on the part of the defendant that plaintiffs must establish:

- The District of Columbia requires a plaintiff to show the defendant's actions were arbitrary or capricious.  *Adler v. Abramson*, 728 A.2d 86, 90 (D.C. 1999).

- Mississippi requires proof that the defendant acted "because of dishonest purpose or moral obliquity."  *University of S. Miss. v. Williams*, 891 So.2d 160, 170-71 (Miss. 2004).

- Tennessee requires a showing that a party intentionally or purposely tried to defeat the contract's purpose.  *See, e.g.*, *Winfree v. Educators Credit Union*, 900 S.W.2d 285, 289 (Tenn. Ct. App. 1995)

- South Carolina does not focus on culpability; rather, courts in those states simply look at whether a party violated a fairly implied contract term.  *See, e.g.,Commercial Credit Corp. v. Nelson Motors, Inc.*, 147 S.E.2d 481, 484 (S.C. 1966).

*See* App. A. at 12-13.

Plaintiffs' "trial plan" does not even mention this element of the cause of action. Nor do plaintiffs explain how the claims of all customers from these five jurisdictions can be resolved "in one stroke," *Dukes*, 131 S.Ct. at 2551, in light of these different standards. Plaintiffs' plan proposes that the jury be given one set of verdict form questions for this subclass. *See* Mot. App. I Ex. E.  That form would clearly need to include a question about the bank's level of culpability.  But there is no way to frame that question – or to instruct the jury on the law to apply to it – that correctly states the law of all of these states simultaneously.

Example 2:  Plaintiffs have combined within Unjust Enrichment Subclass #2 states that impose unique requirements not shared by other jurisdictions within that subclass:

- South Carolina requires proof of an independent duty to the plaintiff owed by the defendant.  *See Pitts v. Jackson Nat'l Life Ins. Co.*, 574 S.E.2d 502, 512 (S.C. App. 2002).

- Tennessee requires proof that the plaintiff exhausted all other remedies, including making an affirmative demand of the defendant.  *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525-26 (Tenn. 2005).

31

- Virginia requires proof that "the benefits were conferred at the express or implied request" of the defendant. *Primrose Dev. Corp. v. Benchmark Acquisition Fund I Ltd. P'ship*, 1998 WL 957312, at *2 (Va. Cir. Ct. Oct. 29, 1998).

*See* App. A at 24-25.

Again, plaintiffs' motion and "trial plan" do not mention these unique requirements. Their proposed verdict form would merely ask, "Under the circumstances, would it be unfair for the defendant to retain the benefit?" Mot. App. I Ex. E, Unjust Enrichment at 4. They do not explain how the determination of what is "unfair" can present a common question for this subclass in light of these states' different standards for what "circumstances" are pertinent.

**Example 3**:  Plaintiffs delineate three subclasses for their unconscionability cause of action based solely on whether the laws of those states require proof of *both* procedural *and* substantive unconscionability, proof of *either* substantive *or* procedural unconscionability, or just proof of substantive unconscionability alone.  Mot. App. I at 16-17.  Yet within each of those groups the standards for determining what is "unconscionable" vary substantially.  *See* App. A at 33-37, 39-40, 43-45.  Because of these varying standards, a determination that a contract is unconscionable under the laws of one state will not automatically resolve "in one stroke" the question whether that same contract is unconscionable under the laws of another state in the same subclass.[21]

### 3. The Named Plaintiffs' Claims Are Not Typical of the Claims of the Proposed Class and Subclasses.

Rule 23(a)(3) requires that the Court determine that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  To be "typical," a class representative "must possess the same interest and suffer the same injury as the class members."  *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 679 n.72 (11th Cir. 2010).  This requires a showing that "the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory."  *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984).  A

---

[21] The Court is already familiar with this variation in state law from its analysis of plaintiffs' assertions that various banks' arbitration clauses were unconscionable.  Indeed in the context of arbitration, plaintiffs have argued that unconscionability determinations are not only state-specific, but also customer-specific.  *See* DE # 1514 at 23-34.

plaintiff is not typical if he is subject (even arguably) to unique defenses that could become a significant focus of the trial. *Ross v. Bank South, N.A.*, 837 F.2d 980, 990-91 (11th Cir. 1988), *vacated on other grounds*, 848 F.2d 1132, 1133 (11th Cir. 1988).[22]

Measured by these standards, the claims of the proposed class representatives fail to satisfy the typicality requirement for multiple reasons.

*First*, for the same reasons plaintiffs cannot satisfy the commonality requirement, the individual named plaintiffs are not typical of the class as a whole. Each plaintiff is subject to one particular version of the contract and incurred his or her overdraft fees under one particular posting and overdraft regime. That plaintiff is not typical of class members who were subject to a different contract and/or whose fees were calculated under a different posting order. *See Moore v. American Fed. of Television & Radio Artists*, 216 F.3d 1236, 1241-42 (11th Cir. 2000). Similarly, a plaintiff whose account was governed by a particular version of the Deposit Agreement and claims Wachovia breached the implied covenant of good faith in that contract is not "typical" of class members who assert they received no contract at all from the bank and must instead pursue a theory of unjust enrichment. And the claims of a plaintiff who must prove a discrete set of elements under his own state's laws will not be typical of the claims of customers from states for which the same claim requires proof of different elements.

*Second*, these particular plaintiffs were all serial overdrafters who were well informed about the bank's posting and overdraft fee policies, both from their own ongoing experiences and as a result of frequent communications with the bank. Some *admit* they were well aware of the bank's posting order before they incurred the fees challenged in the complaint. The evidence supports a strong inference that the others – who had a similar history of numerous overdrafts and communications with the bank – were similarly well informed. None of these plaintiffs can be considered typical of a class of customers who were genuinely ignorant of the way the bank posted transactions and reasonably expected that a different posting order was used. And given that none of them claims to have been misled by any misrepresentation disseminated to the class, they certainly cannot be deemed "typical" of customers who do claim to have been so misled.

---

[22] *See also CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011); *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 598 (3d Cir. 2009).

33

*Third*, these plaintiffs continued to incur overdrafts and fees despite having actual knowledge of the challenged practice. All of them received numerous reversals of their fees – in some instances including full or partial reversals of the very same fees that are challenged in the complaint. The claims of these plaintiffs are subject to a battery of defenses, including voluntary payment, accord and satisfaction, waiver, unclean hands, ratification, and failure to mitigate. As discussed below (at pp. 51-55), many of the states whose laws are at issue here do not impose an "actual knowledge" requirement to apply these defenses. But no matter what standard applies, these defenses will likely bar the claims of at least some of the named plaintiffs, because it will be undisputed that they *had* actual knowledge.

*Fourth*, some of these plaintiffs abandoned their accounts with negative balances that they never paid off. This conduct, too, exposes these plaintiffs to unique defenses not shared by most members of the class.

*Fifth*, none of these plaintiffs claims to have been harmed by any of the alleged bank practices other than posting order that are discussed in their complaint. *See* DE # 352 ¶¶ 75-113. Although these other practices are referenced liberally in their class certification motion, especially following its recent "updating," *see* Mot. at 9-10, 18-19, 21-23, no evidence has been presented that a single named plaintiff was harmed by any of them. These plaintiffs' claims are therefore by definition not "typical" of those of class members who might have been harmed by such practices.

Any of these considerations is sufficient to disqualify a proposed class representative. As set forth in Appendix B, each of the named plaintiffs suffers from several of these defects.

### 4. The Named Plaintiffs Cannot Adequately Represent the National Class or Any of the Subclasses.

Rule 23(a)(4) requires a finding that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This element requires, *inter alia*, a demonstration that at least one named plaintiff is available to represent each subclass, that the named plaintiffs will vigorously pursue the claims of *all* members of the class, and that the interests of the named plaintiffs are aligned with those of all other class members, with no material conflicts of interest. Plaintiffs fail on all of these points.

34

Some of the named plaintiffs plainly cannot be adequate representatives under any standard.  For example, plaintiff Jones knows nothing about this case, cannot even verify the accuracy of facts about his account set forth in a sworn declaration he signed, is not available to testify at trial, and has no basis to offer such testimony anyway, as he is sure of virtually nothing about his account – including even whether it was with Wachovia.  *See* App. B at 9.  While other class representatives may not suffer from these particular defects, they fail the adequacy test on other grounds.

a)      **Most Subclasses Lack Class Representatives Who Can Adequately Represent Customers from All States in the Subclass, and Some Have No Class Representatives at All.**

As discussed above, the Court may not certify a class that commingles plaintiffs and claims from separate cases.  Thus, the plaintiff in *Spears-Haymond* cannot by definition be an adequate class representative for any subclass in *this* case.  Yet for two subclasses she is the *only* representative identified.  *See* Mot. App. I at 15, 18.  For another subclass, plaintiffs identify no representative from *any* case who is a member of that subclass.  *Id.* at 17. Plaintiffs suggest that this subclass (Unconscionability Subclass # 3) can be "represented" indirectly by the representatives of a *different* subclass.  *See id.*  But "plaintiffs cannot properly represent a 'subclass' of which they are not members any more than they can represent an overall class to which they do not belong."  *Abercrombie*, 345 F. Supp. at 393 (King, J.).  The Eleventh Circuit has confirmed this.  *See Prado-Steiman*, 221 F.3d at 1279-80.

Adequacy of representation is also a concern for all subclasses for which plaintiffs seek to have a plaintiff from one state represent residents from different states.  For example, plaintiffs propose that two New Jersey plaintiffs represent subclasses that include customers from (variously, depending on the cause of action) North Carolina, Arizona, and Kansas.  *See* Mot. App. I at 13-14, 16.  Plaintiffs contend that a plaintiff from one state can adequately represent customers from another state if the laws of those states are the same.  But, as is shown in detail in Appendix A hereto, the laws of the states that plaintiffs have grouped together into each subclass are *not* the same.  Because uniformity forms the entire premise of the assertion that plaintiffs can adequately represent customers from other states, it follows that they have not satisfied the adequacy of representation requirement.

35

**b)**     **Differences in State Laws Applicable to the Proposed Subclasses Create Intractable Conflicts of Interest.**

The "adequacy of representation" element requires particular care in evaluating "whether any substantial conflicts of interest exist between the representatives and the class." *Valley Drug*, 350 F.3d at 1189. The Eleventh Circuit has repeatedly cautioned that "the named representatives cannot vigorously prosecute the interests of the class through qualified counsel [when] their interests are actually or potentially antagonistic to, or in conflict with, the interests and objectives of other class members." *Id.* (internal marks omitted); *see also Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1277-80 (11th Cir. 2000); *Grimes v. Fairfield Resorts, Inc.*, 331 F. App'x 630 (11th Cir. 2007). Numerous conflicts exist here.

*First*, these plaintiffs are inadequate class representatives because they are subject to defenses not applicable to the class as a whole. This creates a conflict of interest, because the jury's attention will be diverted to those unique defenses instead of focusing exclusively on the claims of the class. *Ross*, 837 F.2d at 990-91. *See* p. 33 above.[23]

*Second*, conflicts of interest arise from variation in the laws of the states included within each subclass. Other sections of this brief and Appendix A explain in detail how plaintiffs' incomplete state-law discussion omits or disguises material differences in those laws. The fact that the laws of states grouped within the same subclass diverge in material respects renders the plaintiffs identified as prospective representatives unable to represent the entire subclass adequately. *In re Motor Fuel Temp. Sales Practices Litig.*, 271 F.R.D. 263, 284 (D. Kan. 2010); *In re Panacryl Sutures Prods. Liab. Cases*, 263 F.R.D. 312, 323 (E.D.N.C. 2009).

For example, as discussed above (pp. 30-31), plaintiffs group together in Good Faith and Fair Dealing Subclass 2 states that require showings, variously, that the defendant's action was (a) arbitrary and capricious, (b) the result of dishonest purpose or moral obliquy, (c) intentionally inconsistent with the contract, or (d) merely contrary to a fairly implied contract term. If this element of this subclass's claim is to be decided with a single question on the

---

[23] Relatedly, there are significant questions about the credibility of several of the named plaintiffs. Plaintiff Jones, for example, could not verify the accuracy of his own sworn declaration offered in support of this motion. *See* p. 34 above. Such credibility issues render a plaintiff inadequate as a class representative. *See CE Design Ltd.*, 637 F.3d at 724; *Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 431 (6th Cir. 2012); *Han v. Sterling Mortgage Co., Inc.*, 2011 WL 4344235, at *7 (E.D.N.Y. Sept. 14, 2011).

36

verdict form, Wells Fargo's due process rights will require that the jury be instructed to find in plaintiffs' favor *only* if it found Wachovia's conduct was morally dishonest *and* arbitrary *and* deliberately inconsistent with a contract term.  This would disadvantage subclass members whose own state law required no proof of dishonesty or arbitrariness.   Forcing those subclass members to subject their claims to a higher standard of proof creates a clear conflict of interest within the class.  *See Telecomm Technical Servs., Inc. v. Siemens Rolm Commc'ns*, 172 F.R.D. 532, 544 (N.D. Ga. 1997) ("Antagonistic interests are not only those which directly opposed one another, but also are those which may be … unharmonious such that one party's interest may be sacrificed for another's.").

c)      **There is a Conflict of Interest Between Customers Who Have Benefited From the Challenged Practices and Those Who Have Not.**

Plaintiffs admit that "a fundamental conflict exists where the economic interests and objectives of the class representatives 'differ significantly from the economic interests and objectives of unnamed class members,' such as when other members of the class actually benefited from the conduct challenged by the plaintiffs."  Mot. at 31-32 (quoting *Valley Drug*, 350 F.3d at 1189-90); *see also Pickett*, 209 F.3d at 1280 (reversing certification where "class includes those who claim harm from the very same acts from which other members of the class have benefitted"); *Almanor v. Bankatlantic Bancorp., Inc.*, 261 F.R.D. 672, 676 (S.D. Fla. 2009).  Such conflicts exist here.

There is overwhelming evidence that many customers benefited from the challenged posting practice.  Indeed, plaintiffs' refusal to identify the specific alternate posting order they contend should have been used represents a tacit recognition that no posting order always benefits everyone.  Rather, each possible posting order has both advantages and drawbacks.  *See* Keeley Dec. ¶¶ 43-46, 50-51.[24]  The high-low posting order that plaintiffs challenge ensured that larger, typically more important obligations (such as mortgage, rent, car,

---

[24] It is largely for this reason that federal regulators chose not to mandate that banks use a particular posting order.  *See* Federal Reserve Sys. Bd. of Governors, Final Rule, Unfair or Deceptive Acts or Practices, 74 Fed. Reg. 5498, 5547−48 (Jan. 29, 2009) (declining to prescribe posting order rule because "it would be difficult to set forth a bright-line rule that would clearly result in the best outcome for all or most consumers").  Similarly, the drafters of the Uniform Commercial Code went out of their way to specify that a bank can post transactions "in any order," recognizing that no posting order is always optimal.  UCC § 4-303(b) & official cmt. 7.

37

or tax payments) were paid out of available funds first. *Id.* ¶ 25. This minimized the likelihood that such important payments would be rejected, as every bank establishes a threshold past which it will no longer pay such items. *Id.*; *see* Arrowood Dec. ¶ 14. Using a different posting order would result in more frequent rejection of important payments, together with the imposition of additional fees by both the bank and the payee. Keeley Dec. ¶¶ 25-31. The total cost to the customer in that situation is typically higher – often much higher – than an overdraft fee. *Id.* ¶¶ 35-40. Regulators have expressly acknowledged this benefit of high-low posting.[25]

As set out in detail in Appendix B, the record shows that several of the named plaintiffs would themselves have likely had important payments returned unpaid – at the risk of substantial penalties – if the bank had used a different posting order. *See* Keeley Dec. ¶ 33. While it is likely that the *net* impact on serial overdrafters like the named plaintiffs was often negative, the opposite will be the case for many class members who overdrafted less often.

Given this evidence, it is plain that plaintiffs' proposed class includes customers who actually benefitted from the practice plaintiffs challenge. And the Eleventh Circuit has made clear that "a class cannot be certified when its members have opposing interests or when it consists of members who benefit from the same acts alleged to be harmful to other members of the class." *Pickett*, 209 F.3d at 1280).[26]

In short, any alternative posting methodology would only create new "groups of winners and losers." *Almanor*, 261 F.R.D. at 677; *Auto Ventures, Inc. v. Moran*, 1997 WL

---

[25] As the Federal Reserve has stated:

> [T]he payment of overdrafts for [checks and recurring debits] may enable consumers to avoid other adverse consequences that could result if such items are returned unpaid, such as returned item fees charged by the merchant. Consumers may also be more likely to use checks, ACH and recurring debit card transactions to pay for significant household expenses, such as utilities and rent. In the Board's consumer testing, participants generally indicated that they were more likely to pay important bills using checks, ACH, and recurring debits, and to use debit cards on a one-time basis for their discretionary purchases.

Federal Reserve Sys. Bd. of Governors, Final Rule, Regulation E, 74 Fed. Reg. 59033, 59040 (Nov. 17, 2009).

[26] Conflicts of interest also arise from the claim that customers expected transactions to be posted chronologically. Plaintiffs have offered no evidence that customers who expected *debits* to be posted chronologically would not have expected the same for *credits*. Under this scenario, some customers would have incurred more overdraft fees. Keeley Dec. ¶¶ 18-19.

306895, at *5 (S.D. Fla. Apr. 03, 1997).  This creates a conflict of interest within the class.  *See also Valley Drug*, 350 F.3d at 1194 (even "potential" conflict violates Rule 23(a)(4) requirement of adequate representation).

**d)    Plaintiffs Have Shown Their Inadequacy As Class Representatives Through Their Abandonment of Potential Claims of Absent Class Members.**

The proposed class representatives are also inadequate because they propose to abandon claims that absent class members could have presented.  A class representative is not adequate when he "abandons particular remedies to the detriment of the class."  *Western States Wholesale, Inc. v. Synthetic Indus., Inc.*, 206 F.R.D. 271, 277 (C.D. Cal. 2002).[27]  Efforts by plaintiffs "to certify a class by abandoning some of the claims of their fellow class members" defeats any claim of adequacy.   *Pearl v. Allied Corp.*, 102 F.R.D. 921, 924 (E.D. Pa. 1984).

Although plaintiffs seek to represent all Wachovia customers nationwide, their proposed subclasses would not, even in the aggregate, pursue all claims of that class.  Thus, for example, customers from Illinois and Maryland are excluded from the proposed subclasses for the unjust enrichment claim.  Plaintiffs' trial plan just drops that claim for those customers, presumably because the laws of those states did not fit neatly into their subclass categorization.

The gaps become even greater once it is recognized that these plaintiffs cannot pursue the claims of subclasses for which they have identified no class representative at all or have identified as a "representative" only non-party Spears-Haymond, who cannot represent anyone in this case.  This will require abandonment of the unjust enrichment claims of customers from three additional states and the unconscionability claims of customers from four states.

This wholesale abandonment of claims has significant negative repercussions for those class members.  Because all customers are included in the proposed national class, *all* of them would be bound by the judgment and precluded from pursuing their claims separately, regardless of whether plaintiffs actually pursue their claims in this case.  *See Kirkpatrick v. JC Bradford & Co.*, 827 F.2d 718, 726 (11th Cir. 1987) (all class members bound by res judicata

---

[27] *See also Mays v. Tennessee Valley Auth.*, 274 F.R.D. 614, 622-24 (E.D. Tenn. 2011); *In re Fedex Ground Package Sys., Inc.*, 662 F. Supp. 2d 1069, 1082 (N.D. Ind. 2009); *In re Marsh & McLennan Co., Inc. Sec. Litig.*, 536 F. Supp. 2d 313, 318 n.5 (S.D.N.Y. 2007); *Welch v. Atlas Roofing Corp.*, 2007 WL 3245444, *4 (E.D. La. Nov. 02, 2007);*Thompson v. American Tobacco Co.*, 189 F.R.D. 544, 550 (D. Minn. 1999); *Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595, 606–07 (S.D.N.Y. 1982).

effect of a judgment in a class action).  The potential prejudice to these individuals is manifest, and there can be no question that their interests are not adequately represented in plaintiffs' proposed scheme.  *See In re Teflon Prods. Liab. Litig.*, 254 F.R.D. 354, 368 (S.D. Iowa 2008) (certification improper where omitted claims could be barred by res judicata).[28]

### G.  Plaintiffs Have Not Satisfied the Requirements for Certification Under Rule 23(b)(3).

Rule 23(b)(3) requires a showing that (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Plaintiffs' motion meets neither requirement.

Rule 23(b)(3) requires the Court to consider, from a practical perspective, how the claims would actually be tried.  *See Sacred Heart*, 601 F.3d at 1183 (explaining that variations in underlying contracts and applicable laws made trial of the proposed class claim unworkable).  Plaintiffs' "trial plans" must demonstrate with specificity how the issues can be tried on a class basis.  *See* Manual for Complex Litigation (Fourth) § 22.141 (2004); *Vega*, 564 F.3d at 1279 n.20 (emphasizing "the importance of a realistic, clear, detailed, and specific trial plan"); *Sacred Heart*, 601 F.3d at 1180 (plaintiffs must identify applicable state law variations and show they can be effectively managed).

The trial plan presented in plaintiffs' Appendix I does not supply a reliable analysis of the pertinent law, facts, and evidence that the jury would need to consider in this complex case.  Instead, plaintiffs offer only highly simplified and incomplete characterizations of a few elements of each cause of action, together with equally oversimplified descriptions of some of the evidence they hope to present.  Appendix A to this Opposition provides a detailed response to plaintiff's trial plan, as set forth in their Appendix I.  As that response makes clear,

---

[28] *See In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 253-54 (2d Cir. 2011); (finding conflict where named plaintiffs held best claims and thus lacked incentive to maximize recovery for class members with different types of claims); *Brown v. Kerkhoff*, 279 F.R.D. 479, 495 (S.D. Iowa 2012) (plaintiffs unable to demonstrate ability to protect class members from impact of claim splitting); *Fosmire v. Progressive Max Ins. Co.*, 277 F.R.D. 625, 634 (W.D. Wash. 2011) (class representative's splitting of claim to create appearance of commonality rendered her inadequate); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 209 F.R.D. 323, 339 (S.D.N.Y. 2002); *Thompson*, 189 F.R.D. at 551; *Feinstein*, 535 F. Supp. at 606.

40

and as explained further below, it is plain that common issues do *not* predominate and that plaintiffs' claims cannot be tried on a class basis in any manageable fashion.

>1.      **Common Issues Do Not Predominate.**

>>a)      **Substantial Variation in Applicable State Laws Preclude Certification of the Proposed Multistate Subclasses.**

Although nationwide classes are common in cases brought under federal statutes, nationwide classes are rarely certified for claims that require application of numerous separate state laws.  It is well recognized in the Eleventh Circuit, as elsewhere, that variations in state law usually swamp any common issues.  *See, e.g., Klay*, 382 F.3d at 1261; *Sacred Heart*, 601 F.3d at 1180-83.[29]  To overcome this, a plaintiff seeking to certify a multi-state class must provide an extensive and detailed analysis demonstrating the absence of material variations in the applicable state laws.  *See Sacred Heart*, 601 F.3d at 1180-83 (reversing certification where plaintiffs failed to demonstrate similarity in state laws); *Kunzelmann v. Wells Fargo Bank, N.A.*, 2013 WL 139913, at *10 (S.D. Fla. Jan. 10, 2013) (Middlebrooks, J.); *Clausnitzer v. Federal Express Corp.*, 248 F.R.D. 647, 660-61 (S.D. Fla. 2008) (denying certification where plaintiffs failed to demonstrate similarity in state contract laws); *Powers v. Gov't Employees Ins. Co.*, 192 F.R.D. 313, 318-19 (S.D. Fla. 1998).

The difficulty in satisfying this burden is demonstrated by the fact that few courts have actually certified such classes outside the settlement context.  *See In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 94 (D. Mass. 2008) (observing that "[w]hile numerous courts have talked-the-talk that grouping of multiple state laws is lawful and possible, very few courts have walked the grouping walk").  Indeed, although plaintiffs seek to rely for this purpose on *Klay*, the Eleventh Circuit *rejected* class certification in that case for all the common-law claims.  *See* 382 F.3d at 1252, 1263, 1267-68.

Plaintiffs' trial plan contemplates that a single jury would resolve the class claims by reference to the laws of 22 jurisdictions.  It is *undisputed* that there are major differences among the laws of those jurisdictions, although plaintiffs acknowledge only a fraction of them.

---

[29] *See also Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 947-49 (6th Cir. 2011) (collecting cases); *Casa Orlando Apartments, Ltd.*, 624 F.3d at 194-96;  *Zinser*, 253 F.3d at 1190 (9th Cir. 2001); *In re Bridgestone/Firestone, Inc.,* 288 F.3d at 1020; *Castano*, 84 F.3d at 741; *In re Am. Med. Sys.*, 75 F.3d at 1085.

Plaintiffs' proposal of subclasses does not cure this problem.  Subclasses may be appropriate "if the applicable state laws can be sorted into a *small* number of groups."  *Klay*, 382 F.3d at 1262 (emphasis added).  But subclasses may not be used to circumvent the requirements of Rule 23, and "common sense tells us that the necessity of a large number of subclasses may indicate that common questions do not predominate."  *Sacred Heart*, 601 F.3d at 1176 (citation and internal marks omitted).  Plaintiffs cite no case in which a court has ever certified as many as thirteen subclasses; smaller numbers are regularly rejected.[30]

Most of the cases plaintiffs cite in which courts permitted certification of multi-state classes involved *settlement* classes, for which the issues presented on certification are substantially different − as plaintiffs' own counsel has repeatedly stressed in urging the Court to approve settlement classes in this MDL.  *See, e.g.*, DE # 2710 at 33.  For example, when "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, . . . for the proposal is that there be no trial."  *Amchem*, 521 U.S. at 620.  Nor do the few non-settlement cases that plaintiffs cite provide support for their proposal here.  For example, in *In re School Asbestos Litig.*, the Third Circuit affirmed certification only with great reluctance, observing that, even though only four subclasses were involved, manageability of the case was a "serious concern" and might need to be revisited later.  789 F.2d 996, 1010 n.11, 1011 (3d Cir. 1986).  Nor does *Gutierrez* offer any help to plaintiffs on this point, as that case involved only the law of a single state.[31]

---

[30] *See, e.g.*, *Sacred Heart*, 601 F.3d at 1176 (reversing certification of six subclasses); *Robinson v. Gillespie*, 219 F.R.D. 179, 184-85 (D. Kan. 2003) (rejecting certification and noting that "plaintiffs show the court no case in which seven subclasses have been certified"); *Zapka v. Coca-Cola Co.*, 2000 WL 1644539 (N.D. Ill. Oct. 27, 2000) (denying motion for class certification accompanied by proposal for seven subclasses).

[31] Plaintiffs' other cases are similarly inapposite.  *In re Pharmaceutical Industry Average Wholesale Price Litigation* concerned only *one* theory of liability, not several, and the court acknowledged that "manageability of this case will be difficult."  252 F.R.D. 85, 107 (D. Mass. 2008).  *Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 77 (S.D.N.Y. 2004), and *Hansen v. Monumental Life Ins. Co.*, 2008 U.S. Dist. LEXIS 112254, at *26-*28 (D. Conn. Mar. 6, 2008), also each involved only a single theory of liability − and the *Hansen* court still refused to include states where the relevant statute differed from the model statute most states had adopted.  *Deadwyler v. Volkswagen of Am., Inc.*, 1986 WL 12567 (W.D.N.C. Mar. 7, 1986), is a short order tentatively certifying three classes and does not reflect the rigorous analysis that the Supreme Court and Eleventh Circuit now mandate.

None of the cases upon which plaintiffs rely involved similar dramatic variations in the law within each subclass. And plaintiffs' conclusory assurances that the relevant laws are "substantially" or "largely" the same (*e.g.*, Mot. App. I at 13, 16) fall far short of satisfying their burden of presenting an "extensive analysis" to show that differences in the applicable laws are both minimal and manageable. *Sacred Heart*, 601 F.3d at 1180; *see also Klay*, 382 F.3d at 1262; *Powers*, 192 F.R.D. at 318 (rejecting certification where plaintiff provided only a "cursory analysis" of state laws). Even where the differences involve only nuances, those nuances cannot be ignored, as they can affect the outcome. *Casa Orlando Apartments, Ltd.*, 624 F.3d at 194; *Matter of Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1300 (7th Cir. 1995). As shown in Appendix A and summarized below, the differences here go far beyond nuance.

**Good Faith and Fair Dealing Subclasses.** Plaintiffs propose four subclasses for their claims for breach of the implied covenant of good faith and fair dealing ("GFFD"). Mot. App. I at 13-15. Their sole grounds for differentiation among these subclasses is whether the plaintiff must separately prove his own performance of the contract and whether the defendant's breach must frustrate an essential purpose of the contract. *Id.* However, the laws of the relevant jurisdictions vary in numerous other respects as well.

Plaintiffs try to brush past these differences by asserting that *Klay* "accept[ed] the proposition that the applicable state laws governing contract interpretation and breach are sufficiently identical to constitute common legal issues." Mot. at 44 (quoting *Klay*). In fact, the Eleventh Circuit said only that the "definition of 'breach'" did not appear to vary, and it "accepted" that conclusion because the defendants had failed to argue otherwise on appeal. *Klay*, 382 F.3d at 1262. Moreover, the appellate court went on to *reject* certification of the breach of contract claims on the grounds that the common issues were "far outweighed by the individualized issues of fact pertinent to these claims." *Id.* at 1263.

More pertinent is the Eleventh Circuit's decision in *Sacred Heart*, which reversed certification of a class of hospitals that had sued an insurer for breach of contract under the laws of six states. The Eleventh Circuit held that the hospitals' claims did not present predominately common issues because, among other things, the defenses of ratification and waiver necessitated an individualized assessment of each hospital's conduct. *See* 601 F.3d at 1170-79. Noting judicial "skepticism" that class treatment is ever appropriate "where the law of multiple states will apply," the court provided a careful, state-by-state analysis of just one defense (waiver) to

illustrate that differences among the laws of the six states could not be managed through the six subclasses the district court had certified.  *Id.* at 1180-83.

Significantly, the contract claims presented in *Klay* and *Sacred Heart* were far more straightforward than the good faith and fair dealing claims asserted here.  The elements of a simple breach of contract claim are generally well developed (although important differences do exist, as *Sacred Heart* makes clear).  But a claim for breach of the implied covenant of good faith and fair dealing is more complex, requiring consideration of multiple issues and evidence that fall outside the four corners of the contract, and there is considerable variety in the laws of different states applied to that cause of action.

For example, as discussed at pp. 30-31 above, the laws of the states plaintiffs assign to GFFD Subclass 2 vary widely on the showing that must be made on a defendant's culpability.  There is no way to craft jury instructions that would simultaneously apply such divergent and even contradictory legal standards.  And this is just one element of the claim. There are material differences among the laws of these states on other issues as well.  *See* App. A at 11-14.

There are similar dissimilarities in the standards of the states grouped together in plaintiffs' other three proposed GFFD subclasses.  Thus, plaintiffs have grouped together:

- In GFFD Subclass 1, a state that recognizes an implied covenant of good faith only for matters that could not reasonably have been anticipated at the time the parties contracted – and states whose laws permit the covenant to be applied to subject matters of which the parties were aware at the time of contracting (*see* App. A at 7);

- In GFFD Subclass 3, a state in which no breach of the implied covenant can ever be found where the defendant has exercised discretion granted to it under the contract – and states that impose, under varying conditions, some good-faith limits on the exercise of such discretion (*see* App. A at 15);

- In GFFD Subclass 4, a state in which the plaintiff is required to prove his own full performance of the contract − and states in which that element need not be established (*see* App. A at 17).

When all of these and other differences are taken into consideration, "[t]he need to apply the nuances of the contract law of [nearly two dozen] states to Plaintiffs' proposed class leads to the conclusion that common issues of law or fact do not predominate."  *Marino v. Home Depot U.S.A., Inc.*, 245 F.R.D. 729, 736 (S.D. Fla. 2007); *see also Clausnitzer*, 248 F.R.D. at 658-60 (denying certification due to contract law variations).

44

**Unjust Enrichment**.  Courts have consistently recognized that the law of unjust enrichment varies immensely and is therefore unsuited for litigation by a multi-state class.  *See, e.g.*, *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 596 (9th Cir. 2012) (vacating class certification where variances in state law of unjust enrichment overwhelmed common issues).[32]  Indeed, even under the law of a *single* state, the Eleventh Circuit has noted that "common questions will rarely, if ever, predominate" in an unjust enrichment claim.  *Vega*, 564 F.3d at 1274; *see Yarger v. ING Bank , FSB*, 285 F.R.D. 308, 324-25 (D. Del. 2012); *In re Aqua Dots Prods. Liab. Litig.*, 270 F.R.D. 377, 386-87 (N.D. Ill. 2010).

Plaintiffs' proposed Unjust Enrichment subclasses ignore many variations in the laws of the states within each subclass.  For example, as discussed above (at p. 31), proposed Unjust Enrichment Subclass #2 encompasses several states with unique elements of this cause of action not required in the other states in that subclass.

Plaintiffs' proposed Unjust Enrichment Subclass #1 similarly ignores key differences among the states, including differences addressing the consequences of a valid contract and the defendant's state of mind.  For example:

- California courts do not recognize unjust enrichment claims in the presence of an express contract, unless that contract is procured by fraud.  In the District of Columbia and Mississippi, the existence of a contract between the parties bars a claim for unjust enrichment under any circumstances.  However, Connecticut will permit unjust enrichment claims if the contract "does not fully address a subject."  (*See* App. A at 21-22 (citing cases).)

- Connecticut requires a plaintiff to show both that the defendant's retention of funds would be unjust and that any failure of payment was to the plaintiff's financial detriment.  In contrast, Mississippi requires a plaintiff to show the defendant engaged in some form of wrongdoing.  (*See* App. A at 22.)

**Unconscionability**.  Plaintiffs assert that the law of unconscionability is "substantially uniform" across the states, because all have adopted statutes based on Section 2-302 of the Uniform Commercial Code ("UCC").  Mot. App. I at 16-17.  But the UCC merely authorizes a court to refuse enforcement of a contract with an unconscionable term; it does not establish an affirmative cause of action.  Moreover, "the U.C.C. does not define

---

[32] *See also Casa Orlando Apartments, Ltd. v. Federal Nat. Mortg. Ass'n*, 624 F.3d at 195-96; *Spencer v. Hartford Fin. Servs. Group, Inc.*, 256 F.R.D. 284, 304 (D. Conn. 2009); *Thompson v. Jiffy Lube Int'l, Inc.,* 250 F.R.D. 607, 626 (D. Kan. 2008).

unconscionability, nor does it provide any guidance as to the factors, circumstances, and standards that should be employed in making such a finding." *Doyle v. Finance Am., LLC*, 918 A.2d 1266, 1273 (Md. Ct. Spec. App. 2007). For this reason, "[i]t is not possible to define unconscionability [which] is not a concept but a determination to be made in light of a variety of factors not unifiable into formula." *Coady v. Cross County Bank*, 729 N.W.2d 732, 741, (Wis. Ct. App. 2007).

Notably, plaintiffs have not cited a single case in which a multi-state class has been certified for an unconscionability claim. Nonetheless, plaintiffs propose three subclasses for this claim, consisting of (a) states that require proof of both substantive and procedural unconscionability, (b) states that require proof of only substantive unconscionability, and (c) states that only require proof of *either* substantive *or* procedural unconscionability. Mot. App. I at 16-17. Even leaving aside plaintiffs' numerous errors in assigning states to these groups (*see* App. A at 33-34, 39), this simplistic allocation ignores multiple variations in the laws within each of these sets of states. How is procedural unconscionability defined? How is substantive unconscionability defined? When both are present, how are they to be analyzed in combination? What additional elements are required to establish the cause of action? Indeed, is an affirmative cause of action for "unconscionability" recognized at all? (For most states, the answer to this last question is "no.") Appendix A demonstrates these questions are not answered uniformly by the states within any of the three proposed subclasses.

> **b)      Each of Plaintiffs' Claims Presents Predominantly Individualized Issues.**

"Where, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification under Rule 23(b)(3)." *Klay*, 382 F.3d at 1255; *see also Andrews,* 95 F.3d at 1023-24; *Kerr v. City of W. Palm Beach*, 875 F.2d 1546, 1557-58 (11th Cir. 1989); *In re Fla. Cement & Concrete Antitrust Litig.*, 2012 WL 27668, at *17 (S.D. Fla. Jan. 3, 2012). Here, the individualized determinations that would be needed are substantial. When overlaid by the material variations in applicable state laws, "the proliferation of disparate factual and legal issues is compounded exponentially." *Sacred Heart*, 601 F.3d at 1183 (internal marks and citation omitted).

**Good Faith and Fair Dealing.**  Under the laws of most states, plaintiffs' claim would require consideration of the expectations of each class member, at the time of contracting, concerning how his transactions would be posted and overdraft fees assessed.[33]  This is an individualized inquiry.  *See Seidenberg v. Summit Bank*, 791 A.2d 1068, 1077 (N.J. App. Div. 2002) ("the court must consider the expectations of the parties and the purposes for which the contract was made [and i]t would be difficult, if not impossible, to make that determination without considering evidence outside the written memorialization of the parties' agreement").  *See* App. A at 10, 14, 15-16, 18 (citing similar rulings from other states).[34]

This issue is not susceptible to common proof, particularly where, as here, the claim is *not* that the contract said one thing and the bank did the opposite.  *Nothing* in the contracts here even hinted that the bank would post transactions chronologically.  Accordingly, insofar as plaintiffs are asserting that customers' "reasonable expectations" were that some specific order would be used, the *source* of those expectations could only have come from outside the contracts and would not have been the same for all class members.

**Unjust Enrichment**.  It is plain that individualized determinations will be required to determine which class members are able to assert unjust enrichment claims at all.  Under the laws of most states, this cause of action cannot be asserted if the subject matter is addressed in a contract between the parties.  (*See* App. A at 19.)  It is undisputed that most class members are subject to such a contract (the Deposit Agreement), which is the focus of plaintiffs' Good Faith & Fair Dealing claims.  Plaintiffs contend that this is not the case for some customers

---

[33] *See, e.g.*, *Avritt v. Reliastar Life Ins.*, 615 F.3d 1023, 1032 (8th Cir. 2010) (under Washington law, "[t]he district court properly concluded that evidence of the parties' justified expectations would be required to establish a breach of the duty of good faith and fair dealing"); *Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 170 (3d Cir. 2001) (under New Jersey law, allegations of breach of implied covenant require an inquiry into "the reasonable expectations of the contracting parties"); *PSE Consulting, Inc. v. Frank Mercede & Sons, Inc.*, 267 Conn. 279, 302  (2004), *Bayou Land Co. v. Talley*, 924 P.2d 136, 154 (Colo. 1996).

[34] In other cases in this MDL, plaintiffs have relied on Section 211 of the Restatement (Second) of Contracts, which addresses the interpretation of "standard" contracts, as a basis for excluding the need for consideration of individualized evidence about customer expectations.  However, Section 211 is rarely interpreted in the manner plaintiffs suggest; indeed, several states have explicitly declined to do so.  *See, e.g.*, *Bowers v. Jefferson Pilot Fin. Ins. Co.*, 219 F.R.D. 578, 581-82 (E.D. Mich. 2004); *Berry v. Federal Kemper Life Assur. Co.*, 99 P.3d 1166, 1182-84 (N.M. Ct. App. 2004); *Stratton v. American Med. Sec., Inc.*, 266 F.R.D. 240, 353 (D. Ariz. 2009).

(*see* DE # 2036 at 3-4), but determining which customers did and did not receive and accept the Deposit Agreement will require evaluation of facts specific to each customer.

Moreover, under most state laws, an unjust enrichment claim requires proof that the specific circumstances under which each class member's overdraft fees were incurred were such that the fee charged by the bank *in that particular situation* was "unjust." This kind of equitable evaluation requires consideration of facts that are unique to each claimant.

For this reason, the Eleventh Circuit has consistently rejected attempts to certify unjust enrichment classes. *See Webber v. Esquire Deposition Serv., LLC*, 2011 WL 3822001, at *1 (11th Cir. Aug. 31, 2011); *Vega*, 564 F.3d at 1274; *Klay*, F.3d at 1267; *see also City of St. Petersburg v. Total Containment, Inc.*, 265 F.R.D. 630, 640 (S.D. Fla. 2010) (unjust enrichment claims rarely satisfy predominance requirement "because a claim for unjust enrichment requires the court to assess whether the individual circumstances of each particular claim would result in inequity"); *In re Motions to Certify Classes Against Court Reporting Firms*, 715 F. Supp. 2d 1265, 1274-76 (S.D. Fla. 2010), *aff'd*, 439 F. App'x. 849 (11th Cir. 2011). *Vega* illustrates why this is so. In that case, the plaintiffs claimed that their employer had unjustly enriched itself by failing to pay commissions on certain transactions. *Vega*, 564 F.3d at 1262. The Eleventh Circuit stated that "many class members were told about, and fully understood, how the [challenged] procedure worked." *Id.* at 1277. The unjust enrichment claims thus depended on each employee's awareness of the defendant's policy, and "[t]hose employees who concede awareness …cannot claim injustice when the company follows its compensation policies as expected and understood." *Id.* at 1275.

Similarly here, there would need to be individualized inquiries about what each customer understood about the order in which Wachovia posted transactions. The evaluation of whether a challenged fee was "unjust" could be quite different, for example, for someone like plaintiff Poulin, who overdrafted repeatedly and knew perfectly well how his overdraft fees were calculated, as opposed to a hypothetical customer who was taken entirely by surprise. *See* App. B at 2-4. The only way to identify those customers is by looking at their individual facts and circumstances.

**Unconscionability**. It is well recognized that "[i]t is not possible to define unconscionability [which] is not a concept but a determination to be made in light of a variety of factors not unifiable into formula." *Coady*, 729 N.W.2d at 741; *accord Arthur's Garage, Inc. v.*

*Racal-Chubb Sec. Sys., Inc.*, 997 S.W.2d 803, 815 (Tex. Ct. App. 1999) ("'Unconscionability' has no precise legal definition because it is not a concept but a determination to be made in light of a variety of factors."); *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994) (unconscionability is an "amorphous concept").  Given the fact that this claim must take into consideration the specific circumstances of each customer, it is not surprising that plaintiffs have failed to cite a single case in which a court has certified an unconscionability class, much less a multi-state class.

Plaintiffs themselves have stressed in prior filings in this MDL (when attacking various banks' arbitration clauses) that unconscionability is a fact-specific determination that must be made on a case-by-case basis.  *See, e.g.*, DE # 1514 at 3, 22.  This is no less true of the contract provisions on posting order and fees than it is for the arbitration clause.

**New Jersey Consumer Fraud Act Claim**.  Plaintiffs' proposed claim under the New Jersey Consumer Fraud Act ("NJCPA") is also unsuitable for class resolution.  The statute requires proof of (1) an unlawful practice, (2) an "ascertainable loss," and (3) a causal relationship between the two.  *Lee v. Carter-Reed Co.*, 4 A.3d 561, 576 (N.J. 2010).

Neither loss nor causation can be presumed, and the need to prove these issues with individualized evidence will defeat a motion for class certification.  *See Marcus v. BMW of N. America, LLC*, 687 F.3d 583, 605-06 (3d Cir. 2012); *McNair v. Synapse Group, Inc.*, 2009 WL 1873582, at *9 (D.N.J. June 29, 2009); *Szczubelek v. Cendant Mortgage Corp.*, 215 F.R.D. 107, 122 (D.N.J. 2003).

For example, in *McNair*, the plaintiffs claimed a magazine subscription marketer violated the NJCFA with a confusing automated-renewal process.  2009 WL 1873582, at *1, 8. The court found that, even if the defendant engaged in a common course of conduct, individualized questions would predominate, including questions about whether particular customers understood the challenged renewal notices and whether some had simply changed their minds about canceling their subscriptions after being offered new discounts.  *Id.* at *11-12. Similarly, in *Szczubelek*, the court rejected an NJCFA class action challenging the adequacy of fee disclosures for appraisals.  *See* 215 F.R.D. at 121-23.  The court noted that some consumers might have chosen to use the defendant's appraisal service after reading and understanding the disclosures, and even consumers who were confused might not have sustained an ascertainable loss because they could not have found a cheaper service.  *Id.* at 122.

49

Most recently, in *Marcus*, the Third Circuit held that questions concerning the actual knowledge and preferences of customers precluded any finding of predominance. 687 F.3d at 607-08.  It was error, that court held, for the district court to consider only the conduct of the defendant; it was equally important to consider the actual knowledge and conduct of the plaintiffs and other class members. *Id.* at 610-11.

Plaintiffs' proposed NJCFA subclass would require similarly individualized determinations, making the claim unsuitable for class treatment.  Even if all class members had received the same written communications from Wachovia (which they did not), bank employees frequently explained the challenged posting-order policies to consumers.  Potential class members' understanding of and reaction to the policies was thus not "sufficiently uniform or common for class certification to be appropriate."  *McNair*, 2009 WL 1873582, at *10.

**California Statutory Claim**.  The statutory claim under California law is pled in the *Spears-Haymond* lawsuit only.  No cause of action under that statute was pled in this case (*Garcia*).  Wells Fargo therefore addresses that claim in its Opposition to class certification in *Spears-Haymond*.  In the unlikely event that plaintiffs seriously seek certification of a class in *this* case to pursue this unpled claim, Wells Fargo incorporates that discussion by reference here.

c)   **Defenses Requiring Individualized Evidence Preclude Class Certification.**

The need for individualized determinations in evaluating defenses also bars class certification.  *Dukes*, 131 S. Ct. at 2561; *Sacred Heart*, 601 F.3d at 1176; *Heaven v. Trust Bank Co.*, 118 F.3d 735, 738 (11th Cir. 1997); *Oginski v. Paragon Props. of Costa Rica, LLC*, 282 F.R.D. 672, 678 (S.D. Fla. 2012) (King, J.); *Clausnitzer*, 248 F.R.D. at 655 n.11; *see also Coastal Neurology, Inc. v. State Farm Mut. Auto. Ins. Co.*, 458 Fed. App'x 793, 794-95 (11th Cir. 2012); *Klay*, 382 F.3d at 1254.  Demonstrating that a decision based on common proof is *possible* is part of *plaintiffs'* burden at the class certification stage, regardless of who has the substantive burden of proof at trial.  *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 350 (D.N.J. 1997). [35]

---

[35] Contrary to plaintiffs' assertion, this issue does not turn on which party bears the burden of proof on the defense itself.  Fundamental principles of due process preclude class treatment unless such defenses can be decided conclusively for all class members through common proof. *See Dukes*, 131 S. Ct. at 2561; *see also Sacred Heart*, 601 F.3d at 1176-1178.

Here, there are multiple defenses that present individualized issues. The existence of individualized issues on defenses such as waiver, estoppel, and statute of limitations were held to preclude class certification in *Shelley* and *Compass Bank*, both of which involved challenges to high-to-low posting practices. *Shelley*, 2000 WL 1121778, at *7; *Compass Bank*, 823 So.2d at 672-78. This was also a barrier to certification in *Endres v. Wells Fargo Bank*, 2008 WL 344204 (N.D. Cal. Feb. 6, 2008), in which the plaintiffs sought to recover fees associated with overdraft protection services. The court held that "applicability of the voluntary-payment doctrine, which may bar any claims made by class members who continued to incur and voluntarily pay the overdraft protection fees," presented predominant questions of fact requiring individualized determinations, as did adjudication of the statute of limitations defense. *Id.* at *12. The same conclusion applies here.

Appendix C to this Opposition provides a detailed overview of several of the bank's affirmative defenses, with specific citation to the laws of the 22 separate jurisdictions that are at issue here. The discussion below explains how individualized issues relating to those defenses make class treatment of plaintiffs' claims inconsistent with Wells Fargo's due-process right to present these defenses. Three general points warrant brief discussion at the outset.

First, plaintiffs suggest (Mot. at 38-39) that the bank's affirmative defenses are not adequately pled in the bank's answers to the complaints. The time for any challenge to the adequacy of Wells Fargo's pleading has long passed. *See* Fed. R. Civ. P. 12(f)(2) (requiring motions to strike "an insufficient defense" be filed within 21 days); *S.E.C v. Badian*, 822 F. Supp. 2d 352, 364-65 (S.D.N.Y. 2011) (denying untimely challenge to affirmative defenses). Plaintiffs chose not to challenge the bank's responsive pleading through a motion to strike or for more definite statement, as they did with other banks in this MDL. *See, e.g.*, DE # 1390, 1475, 1481. Even if they had a valid basis for such a challenge, it has clearly been waived.[36] In any event, regardless of whether more specific pleading could have been required for the named

---

[36] Had a timely challenge been made, and had there been any merit to it, Wells Fargo would have had the right to seek leave to amend its answer at that early stage – and that request would have been subject to the liberal amendment standard of Fed. R. Civ. P. 15(a). Due process does not permit Wells Fargo to be deprived of valid defenses simply because *plaintiffs* failed to challenge the pleadings in a timely manner.

plaintiffs, it is difficult to see how more could legitimately be required as to absent class members, whose very identities remain unknown even to this day.

Second, plaintiffs have asserted that Wells Fargo's affirmative defenses can be ignored because they relate predominantly to individual damages issues rather than liability.  The Eleventh Circuit explicitly rejected this argument in *Sacred Heart*, finding it "clear error" for the district court "to brush [the issues of ratification and waiver] aside as mere 'damages' issues." 601 F.3d at 1178-79.

Third, plaintiffs suggest that defenses can be ignored because they require a showing of actual knowledge by the customer of the bank's posting practice (which, plaintiffs imply, cannot be established).  But such knowledge is not even relevant to some of the defenses presented in this case.  Even where knowledge *is* relevant, the record here demonstrates unequivocally that at least some customers, including several of the named plaintiffs, *did* have actual knowledge.  Moreover, the laws of many states permit the defense to rest on *constructive* knowledge.  *See* Appendix C at 5, 14.  Wells Fargo is entitled to offer evidence of such constructive knowledge − for example, in the case of a customer like Pinckney, who received at least a dozen reversals and communicated with the bank about her overdraft fees many times. *See* App. B at 5-7.

**Voluntary Payment.**  Under the voluntary payment doctrine, a plaintiff may not "recover money which he or she has voluntarily paid with a full knowledge of all the facts, and without any fraud, duress, or extortion, even if no obligation to make the payment existed."  70 C.J.S. Payment § 104 (2007).  (Specific citations from the relevant states are provided in Appendix C at 8-11.)  The defense applies to class members who had knowledge of the challenged fee policies and yet continued to incur and pay them.  *See Lopez v. Washington Mut. Bank, FA*, 302 F.3d 900, 904 (9th Cir. 2002) ("Washington Mutual argues [that] each deposit to the account after an overdraft should be treated as a voluntary payment of a debt incurred.  We agree.").

Numerous courts have rejected certification "where class claims are subject to a unique defense under the voluntary payment doctrine." *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 98-99 (S.D.N.Y. 2010).[37]

**Waiver.**   The defense of waiver is also available in virtually all states for which plaintiffs seek to assert claims.  (*See* Appendix C at 2-6.)  Depending on the applicable state law, waiver may be inferred by conduct or "spelled out from a state of facts exhibiting full knowledge of the circumstances producing a right and continuing indifference to exercise of that right." *Scibek v. Longette*, 770 A.2d 1242, 1250 (N.J. Super. Ct. App. Div. 2001) (internal quotations omitted).  In *Sacred Heart*, the Eleventh Circuit explained that the defenses of waiver and ratification (see below) each raised predominant factual questions that could not be resolved on a class-wide basis.  601 F.3d at 1178-79.[38]  Similarly here, the bank has a due process right to present evidence that individual customers – many of whom knew of Wachovia's policies – waived any rights to object to collection of challenged overdraft fees under the laws of their respective states.

**Ratification.**  *Sacred Heart* also confirms that certification is improper in light of Wells Fargo's right to pursue the defense of ratification.  601 F.3d at 1176-79.  Ratification is an act or statement through which an otherwise invalid contract is made valid and enforceable. *Brandon v. Wright*, 838 S.W.2d 532, 534 (Tenn. Ct. App. 1992); *see* App. C at 6-8.  Ratification may be implied under circumstances in which a party retains the benefits of an otherwise invalid contract with knowledge of the facts that make the contract voidable.  *See, e.g.*, *Johnson v. Johnson*, 191 A.D. 2d 257 (N.Y. App. Div. 1993); *Motel Enters., Inc. v. Nobani*, 784 S.W.2d 545, 547 (Tex. App. Ct. 1990).  Similarly, "[t]he failure of a party to disaffirm a contract over a

---

[37] *See also Endres*, 2008 WL 344204, at *12; *Schnall v. AT & T Wireless Servs., Inc.*, 259 P.3d 129, 135 (Wash. 2011); *In re Light Cigarettes Mktg. Sales Practices Litig.*, 271 F.R.D. 402, 421 (D. Me. 2010); *Camafel Bldg. Inspections, Inc. v. Bellsouth Advertising & Publ'g Corp.*, 2008 WL 649778, at *11 (N.D. Ga. Mar. 7, 2008).

[38] Courts regularly deny class certification in cases in which class members may be subject to a waiver defense.  *See Sacred Heart*, 601 F.3d at 1183; *In re Wilborn*, 609 F.3d 748, 756-57 (5th Cir. 2010); *Presser v. Key Food Stores Co-Op, Inc.*, 218 F.R.D. 53, 59 (E.D.N.Y. 2003); *CC Investors Corp. v. Raytheon Co.*, 2005 WL 1026904, at *2 (D. Del. Apr. 22, 2005); *Coca-Cola Bottling Co. of Elizabethtown, Inc. v. Coca-Cola Co.*, 95 F.R.D. 168, 178 (D. Del. 1982); *Sandlin v. Ameriquest Mortgage Co.*, 2010 WL 4260030, at *7 n.11 (Bankr. N.D. Ala. Oct. 21, 2010).

period of time may, by itself, ripen into a ratification, especially if rescission will result in prejudice to the other party."  17A C.J.S. Contracts § 170.

There are a variety of situations in which this defense would apply here. Plaintiffs Damor and Poulin, for example, have both testified to being fully aware of the posting practice based on communications with bank personnel.  *See* App. B at 3-4, 20-21.  Yet they continued to overdraw their accounts regularly thereafter.  Wells Fargo has a right to present individualized evidence that thousands of customers ratified the contractual authority for the practices plaintiffs now attack as illegal.  *See Sacred Heart*, 601 F.3d at 1176-78.

**Accord and Satisfaction**. The defense of accord and satisfaction, also recognized under the laws of all jurisdictions at issue here (*see* Appendix C at 11-13), applies to class members who complained about the challenged fees and received full or partial reversals.[39] Even when a reversal was only partial, the bank is entitled to present its defense that, under the circumstances (including conversations between the customer and the bank), it was understood that the reversal was offered *and accepted* as a full resolution of the customer's dispute. This issue obviously cannot be resolved on a class-wide basis through common proof, but instead requires examination of the circumstances under which each reversal was made.

**Failure to Mitigate.**  By continuing to incur overdraft fees after gaining actual knowledge of the bank's posting-order policies, plaintiffs and other customers failed to mitigate their alleged injuries.  Although the defense varies among jurisdictions, generally speaking damages are not recoverable for loss that the injured party could reasonably have avoided.  *See* App. C at 13-15.  Courts considering previous challenges involving overdraft fees have recognized that this defense necessarily "requires individual assessments of what each depositor understood to be the defendant's policies, which in turn requires assessments of such things as what information each depositor was given in addition to the written documents and what each depositor did do or would have done once armed with sufficient awareness of the defendant's actual policies."  *Shelley*, 2000 WL 1121778, at *11; *see also Compass Bank*, 823 So. 2d at 677.

---

[39] Plaintiffs' expert proposes to adjust for full reversals in his programmatic analysis.  Even apart from the flaws in his planned method for doing so, it is undisputed that his approach provides no method for addressing situations in which a class member compromised his challenge to fees by accepting only a partial reversal of those fees.

**Unclean Hands and Laches**.  Some of plaintiffs' claims, such as their claims of unjust enrichment and unconscionability, are subject to equitable defenses such as unclean hands and laches.  (*See* Appendix C at 16-20.)  A customer who overdrew her account hundreds of times is potentially subject to the defense of unclean hands.  The defense is also likely to apply to someone like Poulin, who knew how the bank posted his transactions and yet made no effort to modify his behavior so as to avoid overdrafting again and again.  This defense requires an individualized inquiry into the facts and circumstances of each customer.  *Kunzelmann*, 2013 WL 139913, at *11.

Laches is similarly an equitable defense that focuses on the specific facts and circumstances of each customer's fees.  *See, e.g.*, *Pittman v. Pittman*, 158 S.E.2d 746, 749 (Ct. App. 1968) ("[E]ach case is to be determined according to its own particular circumstances.") (citation omitted); *Davis v. Davis*, 713 S.E.2d 694, 697 (Ga. Ct. App. 2011) ("In determining what constitutes laches, each case must be determined according to its particular circumstances.").

**Statute of Limitations.**  "It is axiomatic that no class action may proceed on behalf of class members whose claims are barred by the applicable statute of limitations." *Schmidt v. Interstate Fed. Sav. & Loan Ass'n*, 74 F.R.D. 423, 428 (D.D.C. 1977).  The presence of individualized issues in applying the statute of limitations therefore precludes class certification.  *Clausnitzer*, 248 F.R.D. at 655 n.11; *Shelley*, 2000 WL 1121778 at *7.

The determination of which claims are time-barred theoretically can be handled programmatically where the statute of limitation applies a fixed limitations period.  But many of the statutes of limitations here calculate the limitations period according to the discovery rule, commencing when the claimant discovered or had a reasonable opportunity to discover the factual basis for his claim.  *See* App. C at 20-22.  This can rarely be addressed through class proof.  *Jim Moore Ins. Agency, Inc. v. State Farm Mut. Auto. Ins. Co., Inc.*, 2003 WL 21146714, at * 9 (S.D. Fla. May 6, 2003); *Endres*, 2008 WL 344204, at *12.[40]

---

[40] *See also Thorn v. Jefferson-Pilot Life Ins. Co*., 445 F.3d 311, 321-27 (4th Cir. 2006) (claims requiring application of discovery rule "not readily susceptible to class-wide determination"); *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 149 (3rd Cir. 1998); *Fisher v. Ciba Specialty Chems. Corp*., 238 F.R.D. 273, 309-10 (S.D. Ala. 2006).  *Allapattah Servs.*, 333 F.3d 1248, cited by plaintiffs, is not to the contrary.  There, the Eleventh Circuit held that a finding of fraudulent

55

> **d)   Plaintiffs Have Not Presented a Reliable and Manageable Plan for Proving Actual Injury to All Class Members.**

Although the need to determine damages on an individual basis does not automatically foreclose a finding of predominance, Rule 23(b)(3) cannot be satisfied where those same questions affect the determination of the bank's *liability* to a particular customer. *Klay*, 382 F.3d at 1260; *see Neenan v. Carnival Corp.*, 199 F.R.D. 372, 376-77 (S.D. Fla. 2001).  A finding of actual injury is a fundamental requirement for liability.  *See Kpadeh v. Emmanuel*, 261 F.R.D. 687, 692 (S.D. Fla. 2009) (observing that even in a class action, individual causation and damages must still be proved individually).

Plaintiffs do not suggest that injury can be proven on a class-wide basis without any reference to facts specific to each individual class member.  Rather, they propose to prove injury through a computer program designed by their expert, Arthur Olsen, that will analyze the individual data for each customer.  The Court is familiar with plaintiffs' overall approach in relying on Olsen's work.  Wells Fargo will not belabor in this brief points that the Court has already addressed on prior occasions and on which no new or unique issues are presented here.  Wells Fargo has presented its position on those issues in the *Daubert* motion that it is filing along with this Opposition, and it incorporates that motion here by reference.

There are, however, some critical issues here that the Court has not addressed in its prior rulings in other cases.

First, with respect to Wachovia – unlike other bank defendants in this MDL – it has now come to light that Olsen did not actually do the work needed to demonstrate an ability to perform a computerized analysis using Wachovia's business records.  *See generally* Dec. of Charles A. Cipione ("Cipione Dec.") (Ex. 9) ¶¶ IV.1-11.  The systems and records of every bank differ, so the fact that Olsen has shown himself able to decipher computer records from other banks to create databases he can manipulate and analyze does *not* automatically mean he is able to do the same thing with the Wachovia records.[41]  This is a far more fundamental point than

---

concealment was sufficient to toll the statute of limitations.  There is (and can be) no comparable allegation here.

[41] Cipione Dec. ¶ IV.2-4.  The computer systems of Wachovia differed substantially from those of Wells Fargo, for example, and the databases and records generated and maintained by those systems are completely different.  There is not even a correspondence in the *types* of records that the two banks maintained.  *Id.*

those previously presented concerning Olsen's methodology – whether, for example, he uses the "correct" alternative posting order and "but for" world to generate his numbers. It is, rather, a question of whether he has demonstrated that he can generate meaningful results of *any* kind from Wachovia's records. No such showing has been made.

The declaration supplied with plaintiffs' motion implies that Olsen conducted an analysis of Wachovia's computerized records of the named plaintiffs' overdraft fees to demonstrate his ability to perform the same analysis for the class as a whole. But when asked to provide the computer records that supported this implied claim, the only item plaintiffs produced was an Excel spreadsheet. In deposition, Olsen confirmed that this is the only item he can offer and that the analysis he performed was in fact done using simple Excel software. Ex. 17 at 12-13, 38, 48-49, 97-98. He also confirmed that it would not be feasible – and he does not propose – to calculate damages for the class in the same way. *Id.* at 38, 98. And the more sophisticated "program" he proposes to use for the class analysis has yet to be written. *Id.* at 162-64.

Critically, moreover, Olsen's Excel spreadsheet demonstrates no ability to actually *use* the millions of pages of electronic reports containing the data for the entire class to create the necessary database. His Excel spreadsheet contains several obvious errors that are consistent with the data having been inputted manually (i.e., typed in by hand) rather than transferred electronically from the original records. *See* Cipione Dec. ¶¶ IV.9-11. Olsen acknowledged in his deposition that some portions of the spreadsheet might have been created manually. Ex. 17 at 55-56, 63, 65, 149-50. He claimed that he had used "SSIS" computer code to download at least some of the data from the original records to a separate database. However, he could not produce that database – he admits it is nowhere to be found and must have been destroyed. *Id.* at 54. If any such database was created, therefore, there is no way to check it for accuracy. The "SSIS code" he claims to have used to create that database is also nowhere to be found.[42]

---

[42] *Id.* at 60. Although these facts on their face suggest the knowing destruction of evidence, it is possible that Olsen's memory has simply failed him when he claims such a database ever existed at all. His declarations were written two years ago, and Olsen acknowledged that his memory was hazy on much of the work he had done for this case. *See, e.g., id.* at 34-35, 55-56. Either way, it is clear that plaintiffs have not carried their burden of proving that Olsen is able to perform the necessary tasks with the Wachovia records.

The results Olsen reports for his analysis are in some cases demonstrably wrong as a matter of simple arithmetic.  *See* Cipione Dec. ¶ IV.9-11.  It appears that in his rough Excel analysis Olsen counted as "harm" numerous situations in which high-low posting of debit-card transactions had ***no impact at all*** on a customer's overdraft fees.  Keeley Dec. ¶¶ 67-70.   His reported calculation of "harm" for the plaintiff in *Spears-Haymond* is the most mystifying of all: He asserts that she incurred $25 of "harm" based on one excess overdraft fee charged on a day on which ***she was charged no overdraft fees.***  Cipione Dec. ¶ IV.11; Sturmer Dec. ¶ 43.

In short, whatever method was used to generate Olsen's numbers, it was not a computer program that provides reliable results using the Wachovia records.  Instead, plaintiffs are merely asking the Court to accept their representation that Olsen can develop such a program in the future.  A class may not be certified based on this kind of "trust me" representation.[43]

Second, there is a critical ambiguity concerning *when* plaintiffs propose that Olsen would conduct his analysis to develop plaintiffs' proof of injury for each class member. Plaintiffs' motion appears to contemplate that Olsen would do this only in a post-trial "administrative proceeding."  *See* Mot. at 4-5 & App. I at 2.  This is clearly impermissible.[44] Plaintiffs now appear to acknowledge that Olsen must perform his analysis to determine the existence of actual injury for all class members *before* trial and present his findings for acceptance (or rejection) by the jury.  Yet critical ambiguities remain.

---

[43] *See Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.,* 100 F. App'x. 296, 299-300 (5th Cir. 2004) (upholding denial of class certification where proposed expert "did not offer a formula [to calculate damages] but merely opined that one could be found"); *Weisfeld v. Sun Chem. Corp.*, 84 F. App'x. 247, 261, 264 (3d Cir. 2004) (affirming denial of class certification where expert's declaration on ability to prove common injury rested on "bare conclusions and a statement that the expert 'proposes' to use" a particular type of model); *Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16, 25-26 (D.D.C. 2012) (denying certification where expert's proposed method for calculating impact was "tentative at best" and thus expert could not "tell the Court the precise analyses he intended to undertake"); *Reed v. Advocate Health Care*, 268 F.R.D. 573, 589 (N.D. Ill. 2009) (under Rule 23, court must conduct a "rigorous analysis" of proposed methodology and "cannot simply take [the plaintiff's expert's] declaration[] on faith").

[44] Such an approach would deprive Wells Fargo of its constitutional right to litigate these issues and to have them decided by the jury.  A similar notion was rejected by the Eleventh Circuit in *Allapattah Servs.*, 333 F.3d at 1258-1259.  *See also Dukes*, 131 S. Ct. at 2561 (rejecting "Trial by Formula"); *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 312 (5th Cir. 1998) ("the applicability of the Seventh Amendment is not altered simply because a case is [a] class action."); *Kpadeh*, 261 F.R.D. at 692.

58

For example, Olsen's declaration studiously avoids identifying what alternative posting order his proposed methodology will employ.  In responding to *Daubert* motions and other filings in this MDL, plaintiffs' counsel have simply asserted that the proper alternative posting order will be decided by the jury.  But their proposed verdict form (Mot. App. I Ex. E.) includes no question for the jury on that subject.  Nor do plaintiffs otherwise explain how this issue would be managed.  Do they contemplate that the trial would be bifurcated and proceedings suspended for several months while Olsen performed an analysis to match whatever posting order the jury chose?  Or do they contemplate that the jury would be asked to choose from a long menu of results covering all of the dozens (if not hundreds) of alternative possible posting orders it might select?  Plaintiffs' motion and trial plan do not answer these questions, both of which have critical implications for the manageability of this case at trial.[45]

In short, even apart from the numerous flaws that other defendants in this MDL have previously identified in plaintiffs' proposed approach to proving injury and damages for the class, it is clear that in *this* case plaintiffs have not carried their burden of demonstrating that they have a workable method for dealing with these issues on a class-wide basis.

**2.  Class Litigation Would Not Be a Superior Method of Adjudication, Given the Unmanageability of the Proposed Class and Subclasses.**

The superiority inquiry requires a court to determine whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  A major aspect of this analysis is the degree to which the proposed class proceeding would be manageable.  *See* Fed. R. Civ. P. 23(b)(3)(D) (requiring consideration of "the likely difficulties in managing a class action"); *Perez v. Metabolife Int'l, Inc.*, 218 F.R.D. 262, 273 (S.D. Fla. 2003) ("Severe manageability problems are a prime consideration that can defeat a claim of superiority.").

---

[45] Plaintiffs' motion also fails to offer a method, consistent with Wells Fargo's due process rights, to address the bank's claims against absent class members who closed their accounts with negative balances – in some cases amounts well in excess of their potential damages in this case. Wells Fargo cannot even identify, much less assert, those counterclaims in the absence of knowledge of who is actually in the class.  Plaintiffs have, again, offered no mechanism for addressing this issue.  Moreover, the existence of these net claims *against* class members means that "claims asserted by the class would be against the interests of these individual class members."  *Heaven v. Trust Co. Bank*, 118 F.3d at 738.

The analysis above demonstrates that class proceedings in this case would be wholly unmanageable.  For one thing, the substantial differences in the applicable laws even within a proposed subclass have critical implications for plaintiffs' trial plan.  Under that plan, the jury would be asked to fill out a verdict form addressing the elements of the claim of each subclass.  *See* Mot. App. I Ex. E.  To permit them to do this, the jury would need to be given instructions that defined the elements of each claim and explained the applicable law.  But where the laws applicable to a given subclass differ (and are even in conflict), there is no way to craft instructions that would be valid as to all subclass members.  *See In re Am. Medical Systems, Inc.,* 75 F.3d at 1085 ("If more than a few of the laws … differ, the district judge would face an impossible task of instructing a jury on the relevant law….").

Several examples of this are provided in the preceding sections of this brief, and others are addressed in Appendix A.  Two additional examples are provided below, based on actual model jury instructions from the pertinent jurisdictions:

**Example 1**:  State laws vary on whether the covenant of good faith imposes obligations independent of the express contract terms.  Connecticut and Nevada, although both included in plaintiffs' Good Faith and Fair Dealing Subclass 1, have standard instructions that are in direct conflict on this point.  The Connecticut instruction states that the covenant "is essentially a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended," and it is "not a separate contractual claim."  Conn. Civ. Jury Instructions 4.2-11 (App. E at 13).  The Nevada instruction, in contrast, states that the "obligation is independent of the express provisions of the contract," and that a breach can occur even where "the terms of the contract are literally complied with."  Nev. Jury Instructions - Civ. 13CN.44 (2011) (App. E at 16).

**Example 2**:  In some states the defense of waiver requires proof of actual knowledge of the waived right, while in other states constructive knowledge is sufficient.  Jury instructions for states plaintiffs include within Good Faith and Fair Dealing Subclass 2 diverge on this critical point.  The South Carolina instruction states that the defendant must show that the plaintiff "possessed, at the time, actual *or constructive* knowledge of his rights or of all the material facts upon which they depended."  Anderson, S.C. Requests to Charge - Civ. § 19-22 (2d ed. 2009) (App. E at 65) (emphasis added).  But the Tennessee instruction requires proof that

60

the plaintiff gave up her right "with full and complete knowledge of the relevant facts." Tenn. Pattern Jury Instructions Civ. 13.09 (11th ed.) (App. E at 68).

Problems such as these cannot be addressed by subdividing the case further and adding more subclasses. The Eleventh Circuit's decision in *Sacred Heart* is instructive on this point. There, the district court had certified a broad class and proposed to deal with the fact that different class members had different contracts with the defendant by subdividing the class into six subclasses corresponding with different types of contracts. The Eleventh Circuit expressed skepticism that the categorization of these contracts into only six subclasses was sufficient to address their differences. 601 F.3d at 1176. But the situation was made worse by the fact that the applicable state laws also differed significantly – and that those differences did not divide up along the same lines as the different contracts. Adding a new, cross-cutting set of subclasses to deal with this additional factor would go far beyond the degree of complexity that is tolerable under Rule 23. *Id.* at 1176, 1183.

In light of these considerations, it would be an understatement to call class proceedings "unmanageable." Class proceedings would result in a logistical morass that could not be administered without disregarding the rights of the bank and absent class members. In this situation, plaintiffs "may not lawfully amalgamate their disparate claims in the name of convenience." *Sacred Heart*, 601 F.3d at 1176 (citation and internal quotations omitted).

Further adding to the complexity and unmanageability of plaintiffs' proposal is the fact that their groupings of class representatives and states into subclasses are dramatically different from one claim to another. Thus, for example, for the unjust enrichment claim, plaintiffs Thornton (Virginia), Pinckney (Georgia), and Gonzalez (Florida) are all assigned to the same subclass, whereas for the unconscionability claim Thornton is assigned to a different subclass than is Pinckney and Gonzalez. All three are assigned to three different subclasses for the good faith and fair dealing claim. Any finder of fact would be hopelessly confused in trying to keep straight which facts as to which plaintiffs would be properly considered in assessing each subclass claim.

Perhaps the clearest evidence that plaintiffs' "trial plan" is completely divorced from reality lies in their suggestion that the trial in this case could be completed in the same length of time as the trial in *Gutierrez*. Mot. App. I at 2. *Gutierrez* was a *bench* (not jury) trial focusing on claims brought under one state law (not 22), brought by two (not seven) named

61

plaintiffs on behalf of a California-only (not national) class, with zero (not 13) subclasses. Moreover, the facts in that case were more streamlined, with all class members subject to the same posting order and no issues raised with variations in the pertinent contracts.  Thus, while it may be true that the claims of the named plaintiffs alone could be tried in the same length of time as *Gutierrez*, it is plain that any *class* trial would take much longer.

   The sheer unmanageability of plaintiffs' proposal would preclude class certification here even if class members had no other avenue of redress.  But in fact customers *do* have other available means of challenging overdraft fees.  Many customers who complain to the bank about overdraft fees receive reversals of those fees.  Those who are not satisfied by this process have the ability to bring claims in small claims court, as many customers have historically done.  *See* DE # 1971 Exs. 2, 3.  Thus, if any customer has a legitimate claim against the bank, he or she has more than adequate opportunity to pursue that claim through other means.

  **H.**  **Plaintiffs Have Not Defined an Ascertainable Class or Subclasses.**

   A separate requirement under Rule 23 is "that the proposed class be adequately defined and clearly ascertainable."  *Coastal Neurology, Inc. v. State Farm Mut. Auto. Ins. Co.*, 271 F.R.D. 538, 543 (S.D. Fla. 2010), *aff'd*, 453 Fed. App'x 793 (11th Cir. 2012).[46]  This is "critical," as the class definition identifies the persons who will be bound by the judgment and are therefore entitled to notice and an opportunity to opt out.  *Vickers v. General Motors Corp.*, 204 F.R.D. 476, 477 (D. Kan. 2001).  Moreover, "a vague class definition portends significant manageability problems for the court."  *Rink v. Cheminova, Inc.*, 203 F.R.D. 648, 660 (M.D. Fla. 2001).  Plaintiffs' motion fails to satisfy the ascertainability requirement.

  **1.**  **Plaintiffs' Class Definition Is Insufficient to Permit Adequate Notice to the Class.**

   By defining the proposed class as customers who have been assessed an overdraft fee "*as a result of*" the high-to-low policy, plaintiffs' class definition impermissibly causes membership in the class to turn on a resolution of the merits.  *See generally* Manual for Complex Litig., § 21.222 (4th ed.) (urging avoidance of "terms that depend on resolution of the merits (*e.g.*, persons who were discriminated against)" to ascertain the class).  Courts routinely reject

---

[46] This requirement has been rigorously enforced by this Court.  *See Kelecseny v. Chevron, U.S.A., Inc.*, 262 F.R.D. 660, 668 (S.D. Fla. 2009); *see also DWFII Corp. v. State Farm Mut. Auto. Ins. Co.*, 271 F.R.D. 676, 681 (S.D. Fla. 2010).

class definitions that require adjudication of individual claims to determine who is in the class at all.  *See, e.g.*, *Bolden v. Walsh Constr. Co.*, 688 F.3d 893, 895 (7th Cir. 2012).[47]

      Not every customer who incurred overdraft fees will be a class member.  *See* Keeley Dec. ¶¶ 22.  Considerable analysis is required to ascertain if those fees were incurred "as a result of" the posting order.  Plaintiffs claim they can do this through the use of a computer program that their expert, Olsen, would create.  Mot. at 36-38.  Even accepting *arguendo* that Olsen can do everything he says he can do, it offers no solution to the ascertainability challenge.

      It is not enough to assert that the class can be ascertained in some future analysis. The class must be ascertainable *now,* so that notice may be given pursuant to Rule 23(c)(2)(B) and recipients of the notice can perceive their membership in the class.[48]  A properly informative class notice is a fundamental requirement of due process, as it provides the only mechanism through which class members can make an informed judgment as to whether to opt out if they wish not to be bound by the final judgment.  *See Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) (reversing class certification where "many potential members of the classes cannot yet know if they are part of the class," raising "serious due process concerns about whether adequate notice under Rule 23(c)(2) can be given to all class members to enable them to make an intelligent choice as to whether to opt out").[49]

      There are two ways to frame a class notice to fulfill this due process requirement. One is to derive at the outset a reliable and definitive listing of who is in the class so that the

---

[47] *See also Mann v. TD Bank, N.A.*, 2010 WL 4226526, at *18 (D.N.J. Oct. 20, 2010); *Cuming v. South Carolina Lottery Comm'n*, 2008 WL 906705, at *2 (D. S.C. Mar. 31, 2008); *Wanstrath v. Time Warner Entm't Co.*, L.P., 1997 WL 122815, at *2 (S.D.N.Y. Mar. 17, 1997); *Forman v. Data Transfer, Inc.*, 164 F.R.D. 400, 403 (E.D. Pa. 1995); *Hagen v. City of Winnemucca*, 108 F.R.D. 61, 63-64 (D. Nev. 1985).

[48] *See In re Copper Antitrust Litigation,* 196 F.R.D. 348, 358 (W.D. Wis. 2000)  (rejecting class certification where "[p]laintiffs' suggested definition falls far short of communicating to copper purchasers what they need to know to decide whether they are in or outside the proposed class"); 1 McLaughlin on Class Actions § 4:2 (8th ed.) ("[T]he class definition must be precise, objective, and *presently* ascertainable." (emphasis added)).

[49] *See also Gibbs Props. Corp. v. GIGNA Corp.*, 196 F.R.D. 430, 442 (M.D. Fla. 2000) (denying certification due to deficient class definition, observing that issue implicated substantial due process rights for both class members and defendants); 1 McLaughlin on Class Actions § 4:2 ("[C]lass members have to be able to determine with certainty from a class notice whether they are in the class, so that they can determine whether to object to or opt out of the class.").

notice can be directed to class members only and to no one else.  Plaintiffs do not propose to use that approach here.

The alternative is to send notice to a broader population but to word it in such a way that the notice itself – and specifically the class definition – provides sufficient information to permit a recipient to determine for himself if he is in the class.  *Compare Bynum v. District of Columbia*, 214 F.R.D. 27, 32 (D.D.C. 2003) (approving class definition because "an individual would be able to determine, simply by reading the definition, whether he or she was a member of the proposed class") *with In re Copper Antitrust Litig.*, 196 F.R.D. at 358 (rejecting certification where class definition failed to provide sufficient information to permit purchasers to determine if they were in the class).[50]  Plaintiffs' definition is inadequate for this purpose.

One cannot say whether an overdraft fee was "a result of" high-to-low posting without first determining whether the same fee would have been assessed under whatever alternative posting methodology plaintiffs contend is the "lawful" one.  *See* Keeley Dec. ¶¶ 20-23.   As Olsen himself acknowledges, every "alternative scenario" that is analyzed yields a different list of putative class members.  Ex. 17 at 108, 199-200.  Thus, if a customer who receives the class notice is to figure out whether he incurred excess overdraft fees "as a result of" the challenged posting order, he *must* be told what the alternative posting order is.  But plaintiffs' definition does not do this.  In short, "[n]o objective criteria have been proposed" by plaintiffs "to separate the individuals who did benefit from those who did not benefit from the challenged . . . practices."  *O'Neill v. The Home Depot U.S.A., Inc.*, 243 F.R.D. 469, 478 (S.D. Fla. 2006). As in *O'Neill*, such "problems with ascertaining class membership" are fatal to class certification.  *Id.*

The solution proposed by plaintiffs in other class certification proceedings in this MDL – that class notice be provided to a population identified through a comparison using a "low-high" posting order (*see, e.g.* DE # 2847 at 7-8) – does nothing to address this issue.  As

---

[50] *See also Benefield v. International Paper Co.*, 270 F.R.D. 640, 643 (M.D. Ala. 2010) (class description must be "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member"); *Neumont v. Monroe County*, 198 F.R.D. 554, 557 (S.D. Fla. 2000) ("[F]or a class definition to be viable, class membership must be capable of ascertainment under some objective standard."); *Fisher v. Ciba Specialty Chem. Corp.*, 238 F.R.D. 273, 301 (S.D. Ala. 2006) (class definition must include "objective indicia to determine who is and is not part of the class").

plaintiffs motion makes clear repeatedly, the claim in this case is based on the assertion that Wachovia should have posted transactions in *chronological* order, not that the bank should have posted low-high.  *See, e.g.*, Mot. at 12, 37; Mot. App. II at 1-5.[51]  To be sure, most "real" class members (that is, customers who incurred more overdraft fees under the bank's actual posting order than if chronological order had been used) would likely be *included* in a mailing sent to every customer who received fewer overdraft fees under a low-high scenario.  But the same would be true if the notice were simply sent to every Wells Fargo customer.  A valid class notice must tell the recipient whether he is, *in fact*, a member of the class.  It would be clear error for the court to certify a class of persons who, as of now, are neither identified nor identifiable through clearly specified criteria that would permit a recipient of the class notice to determine whether he or she is, in fact, a class member.

### 2.  The Reference to "Applicable Statutes of Limitation" Does Not Satisfy the Requirement of a Concrete Class Period.

In a typical case, the class definition includes specific dates that establish a fixed beginning and end of the class period.[52]  This precision is critical, because any person who suffered injury within the period is in the class and bound by the judgment.  Plaintiffs' proposed definition offers no such precision as to time, instead referring vaguely to the "applicable statutes of limitation."  This is improper.  In *Clausnitzer v. Federal Express Corp.*, the Court rejected a similar definition because the limitations periods varied widely among the states at issue.  248 F.R.D. at 656.  The variation presented here is, if anything, even wider.  These statutes vary in both the duration of their limitations periods and – of particular significance – in their triggers for determining when those periods begin to run.  *See* App. C at 21-22.  Particularly where the discovery rule applies, there is simply no reliable way to ascertain the class definitely.  And while it may theoretically be possible for plaintiffs' expert to include rules in his programming to insert the limitations period for each state, he admits that his methodology offers no way to

---

[51] Notably, in *Gutierrez*, the California case that plaintiffs rely on as a touchstone for much of their argument in this case, the district court explicitly *rejected* the plaintiffs' use of a comparison to a low-high posting order.  *See Gutierrez v. Wells Fargo & Co.*, 2010 WF 1233810, at *8 (N.D. Cal. Mar. 26, 2010).

[52] For example, in *Gutierrez*, the certified class was limited to "Wells Fargo California customers from November 15, 2004, to June 30, 2008."  2008 WL 4279550, at *17.

address the individualized notice and knowledge issues that arise under the discovery rule.  Ex. 17 at 197-98.

### 3. Plaintiffs' Class Definition Does Not Adequately Explain Who Would Be Considered "Wachovia Customers."

Plaintiffs' class definition also fails to explain who will be considered a "Wachovia" customer.  Ordinarily this would be self-evident.  But in the unusual circumstances presented here, it poses a challenge for which plaintiffs offer no answer.

After Wells Fargo acquired Wachovia, former Wachovia customers became Wells Fargo customers.  But the transition of their accounts to the Wells Fargo systems took years to complete.  Moore Dec. ¶¶ 3-4.  Until an account was transferred, it continued to be managed on the Wachovia systems, with their distinct posting order rules.  Moreover, some customers who opened accounts in former Wachovia branches during the transition period were initially placed on the old Wachovia systems – but they were *never* customers of Wachovia Bank.  *See id.* ¶ 5-6.

A mere reference to "Wachovia customers" therefore provides no guidance on who is and is not in the class.  On a literal reading, there were no Wachovia customers after January 1, 2009.  But that appears not to be plaintiffs' intent.[53]  Rather, it appears plaintiffs intend "Wachovia customers" to include customers whose accounts were maintained on the systems of the legacy Wachovia operations even after Wachovia itself ceased to exist.  But plaintiffs' motion does not discuss the point, and their class definition does not address it.

## IV. CONCLUSION

For the foregoing reasons, plaintiffs' motion for class certification should be denied.

---

[53] Notably, the class definition in plaintiffs' motion for class certification in the separate cases against Wells Fargo specifically *excludes* from the definition of "Wells Fargo customer" those customers whose accounts were managed on the old Wachovia systems.

DATED:  March 4, 2013                                COVINGTON & BURLING LLP

                                                     By:   */s/ David M. Jolley*

                                                             Sonya D. Winner (*pro hac vice*)
                                                             (swinner@cov.com)
                                                             David M. Jolley (*pro hac vice*)
                                                             (djolley@cov.com)
                                                             COVINGTON & BURLING LLP
                                                             One Front Street, 35th Floor
                                                             San Francisco, CA 94111
                                                             Telephone: (415) 591-6000
                                                             Facsimile: (415) 591-6091

                                                             Emily Johnson Henn (*pro hac vice*)
                                                             (ehenn@cov.com)
                                                             COVINGTON & BURLING LLP
                                                             333 Twin Dolphin Drive, Suite 700
                                                             Redwood Shores, CA 94065
                                                             Telephone: (650) 632-4700
                                                             Facsimile: (650) 632-4800

                                                             Barry R. Davidson, FBN 107678
                                                             (bdavidson@hunton.com)
                                                             Jamie Zysk Isani, FBN 728861
                                                             (jisani@hunton.com)
                                                             HUNTON & WILLIAMS LLP
                                                             1111 Brickell Avenue, Suite 2500
                                                             Miami, FL 33131
                                                             Telephone: (305) 810-2500
                                                             Facsimile: (305) 810-2460

                                                             Attorneys for Defendant
                                                             WELLS FARGO BANK, N.A.

67

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 4, 2013, I served the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the forgoing document is being served this day either by Notice of Electronic filing generated by CM/ECF or by U.S. mail on all counsel of record entitled to receive service.

    /s/ David M. Jolley

David M. Jolley (*pro hac vice*)
(djolley@cov.com)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA, 94111
Telephone: (415) 591-6000
Facsimile: (415) 591-6091