# EXHIBIT 8

**APPENDIX D**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 1:09-MD-02036-JLK

---

**IN RE:  CHECKING ACCOUNT OVERDRAFT LITIGATION**

**MDL No. 2036**

---

**THIS DOCUMENT RELATES TO:**

*Garcia, et al. v. Wachovia Bank, N.A.*
S.D. Fla. Case No. 1:08-cv-22463-JLK

*Spears-Haymond v. Wachovia Bank, N.A.*
S.D. Fla. Case No. 1:09-cv-21680-JLK
N.D. Cal. Case No. 3:08-cv-4610

---

## DECLARATION OF MICHAEL C. KEELEY, Ph.D. IN SUPPORT OF MEMORANDUM OF DEFENDANT WELLS FARGO BANK, N.A. IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

I.    Qualifications ................................................................................................... 1

II.   Plaintiffs' Claims ............................................................................................ 2

III.  Assignment ..................................................................................................... 3

IV.  Materials Considered ...................................................................................... 3

V.   Summary of Opinions ..................................................................................... 4

VI.  Background on Wachovia's Posting and Settlement Process............................ 6

     A.    Batch Posting Means that Debits Must Be Settled When They Are Presented for Payment, Not When They Occur ..................................... 6

     B.    Wachovia Employed Four Different Posting Sequences........................ 7

     C.    Posting Credits before Debits Benefits Customers and Thus a More Chronological Posting Order Can Lead to More Overdraft Fees ........... 9

VII.  It Is Not Possible to Ascertain which Customers Are in the Class without Knowing the Alternative Posting Order ......................................................... 11

VIII. Individual Evidence Is Required to Determine which Customers, If Any, Were Harmed........................................................................................................ 13

     A.    Injury Cannot Be Determined Based Solely on a Calculation of Differences in Overdraft Fees................................................................ 14

     B.    Individual Inquiry Is Required to Determine the Additional Costs Associated with a Rejected and Unpaid Transaction ............................ 19

IX.  Plaintiffs' Liability Claims Cannot Be Evaluated Based on Common Evidence............ 21

     A.    Proof that Wachovia's Posting Sequences Were Unfair, Unreasonable, or Not in Good Faith Will Vary for the Different Posting Sequences.................. 23

     B.    Proposed Class Members Who Understood Wachovia's Posting Sequence Could Not Have Been Injured.............................................................. 25

     C.    Plaintiffs Cannot Show that Wachovia's Posting Sequences Were Unfair, Unreasonable, or Not in Good Faith without Considering the Interests of All Wachovia Customers ......................................................................... 26

X.   There Are Conflicts among Proposed Class Members ................................... 27

XI.  Other Practices and Alleged Affirmative Misrepresentations Challenged in Plaintiffs' Complaints Are Distinct from Posting Order ................................. 29

XII.  Plaintiffs Cannot Show through Their Expert that the Proposed Class Is Ascertainable or that Injury and/or Damages Can Be Proven with Common Evidence ......................... 32

XIII. Signature ...................................................................................................... 41

## I.  Qualifications

1.     My name is Michael C. Keeley.  I am an economist and Senior Vice President of Cornerstone Research, an economic and financial consulting firm.  Prior to joining Cornerstone Research, I served as an Officer of the Federal Reserve Bank of San Francisco where my research and policy responsibilities involved the regulation of the banking industry and the financial system.  I specialize in economic, financial, and statistical analysis.  I earned an S.B. degree in mathematics from the Massachusetts Institute of Technology, and M.A. and Ph.D. degrees in economics from the University of Chicago.

2.     For more than 30 years, I have consulted and served as an expert witness on class certification, damage, and liability issues.  I have provided expert testimony or consulting related to class certification in a number of cases, including cases in the financial industry.

3.     In addition to consulting on issues relating to litigation, I have consulted on non-litigation business, economic, and public policy issues.  For example, I have addressed issues concerning banking and financial regulation, energy policy, welfare reform, the design of the PCS spectrum auctions, optimal bidding strategy, design of an auction for virtual capacity in the chemical industry, and strategic issues in contract bidding.  Moreover, while serving as a Research Officer at the Federal Reserve Bank of San Francisco, I addressed policy and regulatory issues regarding the banking and financial industries including the regulation of bank deposit accounts, safety and soundness, and antitrust issues.

4.     My research has been published in economics and finance journals and as chapters in books.  I am the author of over fifty published articles and one book, and I edited another book. Based on citations of my research, I was selected for inclusion in *Who's Who in Economics*.  I was also awarded the Garn Prize for my research on bank risk-taking, and I have served as a referee (i.e., reviewer) for many of the major economics and finance journals.  Details of my qualifications are provided in the attached copy of my curriculum vitae in Attachment A.  A list of cases in which I have provided expert testimony since 2007 is provided in Attachment B. Cornerstone Research is being compensated at my customary billing rate of $695 per hour for the work I have done on these cases and is being compensated for the work of my colleagues at their standard billing rates.  Cornerstone Research's compensation is not dependent on the outcome of this litigation.

## II.    Plaintiffs' Claims

5.      Plaintiffs allege that Wachovia violated the covenant of good faith and fair dealing and otherwise acted unlawfully by engaging "in a systematic, unfair and deceptive scheme to extract the greatest possible number of overdraft fees from Plaintiffs and similarly situated Wachovia consumers across the country."[1]  Plaintiffs focus on overdraft fees on debit card transactions that allegedly result from Wachovia's supposed sequencing of debit card transactions from highest to lowest.[2]

6.      Plaintiffs maintain that Wachovia's posting orders were unlawful.  Plaintiffs claim that Wachovia should have used an (unspecified) alternative order of posting transactions.

7.      Plaintiffs seek certification of the following class of Wachovia customers:

> All Wachovia customers in the United States who had or have one or more consumer accounts and who, from applicable statutes of limitation through August 13, 2010 (the "Class Period"), incurred an overdraft fee as a result of Wachovia's practice of sequencing debit card transactions from highest to lowest.[3]

Plaintiffs' class definition relates only to Wachovia's alleged sequencing of debit card transactions from highest to lowest.

8.      Plaintiffs' motion makes reference to various other alleged practices beyond the order of posting for debit card transactions, but does not appear to include those as issues presented for class certification.  Below, I focus my analysis on Plaintiffs' allegations regarding Wachovia's posting order.  I do, however, point out that if Plaintiffs were to seek certification of a class based on different or additional allegations regarding misrepresentations or other banking practices, an entirely different set of issues regarding class certification would arise, including the fact that the Plaintiffs' proposed class definition cited above would no longer be applicable.  I

---

[1] Plaintiffs' Motion for Class Certification and Incorporated Memorandum of Law, January 28, 2013, *In Re:  Checking Account Overdraft Litigation*, MDL No. 2036, United States District Court Southern District of Florida, Case No. 1:09-MD-02036-JLK ("Plaintiffs' Motion"), p. 2.  See also, *Garcia, et al.* v. *Wachovia Bank, N.A., Poulin, et al.* v. *Wachovia* Bank, N.A., Second Amended Consolidated Class Action Complaint, ("Garcia Complaint"), ¶7; *Spears-Haymond, et al.* v. *Wachovia Bank, N.A.*, Third Amended Class Action Complaint ("Spears-Haymond Complaint"), ¶7.

[2] Plaintiffs' Motion, p. 2; Garcia Complaint, ¶23; Spears-Haymond Complaint, ¶16. As explained below, Wachovia used at least four different posting sequences.  Although some of the sequences post debit transactions from high to low within certain categories of transactions, debit *card* transactions are included in more than one category and the categories also include other types of debits.

[3] Plaintiffs' Motion, p. 1.

reserve the right to address these issues should Plaintiffs seek to certify a class to pursue other claims.

## III.    Assignment

9.      I have been retained by counsel for Wachovia to assess:  (1) whether Plaintiffs have defined which Wachovia checking customers are members of the proposed class; (2) whether, assuming a class can be defined, common evidence can be used to prove that each proposed class member was injured by the challenged conduct; (3) whether Plaintiffs' liability claims can be evaluated based on common evidence; (4) whether potential conflicts exist among proposed class members assuming a proposed class can be defined; and (5) whether Plaintiffs have demonstrated through their expert, Mr. Olsen, that they can ascertain who is a member of the proposed class and determine injury and/or damages with common evidence.

## IV.    Materials Considered

10.     In preparing this report, I have reviewed legal pleadings in the two cases at issue,[4] the Wells Fargo MDL cases,[5] [*Veronica*] *Gutierrez v. Wells Fargo Bank, N.A.*, Case No. 07-05923 in the Northern District of California ("*Veronica Gutierrez*"),[6] Plaintiffs' Motion for Class Certification, deposition testimony of Wachovia and Wells Fargo personnel, deposition testimony of the named Plaintiffs, checking account statements and other reports of the named Plaintiffs' transaction activity, the Declaration of Arthur Olsen attached to Plaintiffs' Motion for Class Certification and his deposition in this matter, among other materials.  A complete list of the materials I have considered in forming my opinions is provided in Attachment C.

---

[4] That is, the two cases:  *Garcia, et. al. v. Wachovia bank, N.A. and Wells Fargo Bank, N.A.*, and *Spears-Haymond v. Wachovia Bank, N.A. and Wells Fargo Bank, N.A.*

[5] *Martinez v. Wells Fargo Bank, NA.*, S.D. Fla. Case No. 1:09-cv-23834-JLK, D.N.M. Case No. 6:09-cv-01072-GBW-ACT; *Dolores Gutierrez v. Wells Fargo Bank, NA.*, S.D. Fla. Case No. 1:09-cv-23685-JLK, D. Or. Case No. 3:09-cv-01329-ST; *Zankich, et al. v. Wells Fargo Bank, NA.*, S.D. Fla. Case No. 1:09-cv-23186-JLK, W.D. Wash. Case No. C-08-1476-RSM.

[6] *Gutierrez v. Wells Fargo Bank, N.A.*, Case No. 07-05923, in the Northern District of California.

## V.  Summary of Opinions

- Wachovia employed at least four distinct posting sequences (depending on the time period).  Thus, the same evidence cannot be used to show that each posting sequence was unfair, unreasonable, or not in good faith on a common basis.  Assuming a class is defined, with four posting sequences, the number of overdraft fees actually incurred under some of the sequences may be less than would be incurred under a given alternative (such as a more chronological posting order) for some proposed class members on a given day or on net over the class period.  Given that some proposed class members may experience fewer overdraft fees on net with an actual posting sequence than a given alternative (depending on the actual posting sequence at issue), Plaintiffs fail to explain how the unfairness, unreasonableness, or bad faith of all of the posting sequences presents a single common question.

- It is not possible to post transactions for settlement in the order in which they occurred because debits are not presented to Wachovia for payment in the order they occurred.  Thus, these cases are not about "re-sequencing" transactions.  Instead, Plaintiffs must show with common evidence that all of the actual sequences used were unfair, unreasonable, or not in good faith and that some unspecified alternative sequence would be fair, reasonable, and in good faith.

- Plaintiffs have not defined who is in the proposed class.  Although their class definition requires identification of an alternative posting sequence, they have not identified an alternative sequence.  Moreover, Plaintiffs have not shown that it is possible to specify an alternative posting order that is consistent with their class definition.  Plaintiffs' failure to specify an alternative posting order means that Plaintiffs cannot determine whether they even would be members of the proposed class themselves, cannot determine whether they were injured, cannot state whose interests they seek to represent, and cannot claim that their interests are typical of other potential proposed class members.

- Assuming that an alternative posting order is identified, injury cannot be determined solely by comparing the number of overdraft fees under the alternative sequence with the actual sequences.  To assess injury it also is necessary to determine:  (1) whether any proposed class member's debits that were paid under the sequence actually employed by Wachovia would not have been paid (and thus returned) under the alternative sequence; (2) the magnitude of Insufficient Funds ("NSF") fees that would have been imposed by Wachovia; (3) the magnitude of fees that would have been imposed by the payee; and (4) the cost of other adverse consequences to the customer of not having a debit paid, such as a downgrade in credit rating or having a service cut off.  These elements require individual inquiry.

- Plaintiffs cannot prove liability or harm with common evidence because:  (1) proof that a posting sequence was unfair, unreasonable, or not in good faith will vary among the four posting sequences; (2) a proposed class member who

4

understood the Wachovia posting sequence that applied to her account and preferred it to an alternative cannot have been harmed; and (3) whether an alternative posting sequence makes a customer or proposed class member better off or worse off depends on the circumstances of that customer or proposed class member.  Plaintiffs fail to explain how an actual posting sequence that makes many customers or proposed class members better off compared to an alternative posting sequence could be unfair, unreasonable, or not in good faith.

- Assuming an alternative posting sequence can be defined and thus a proposed class can be defined, there are conflicts within the proposed class.

- If Plaintiffs were to pursue claims regarding alleged misrepresentations, an entirely different set of issues regarding class certification would arise.  First, to show injury, Plaintiffs would have to show that potential class members incurred more overdraft fees than they would have had they not been exposed to the alleged misrepresentations.  Thus, Plaintiffs' current proposed class definition would no longer be applicable.  Moreover, Plaintiffs would need to show:  (1) that common evidence could be used to prove that all proposed class members were exposed to and relied on the alleged misrepresentations; (2) that none of the proposed class members knew (or learned) how Wachovia's actual posting processes worked; and (3) that harm and damages can be calculated with common proof based on how the proposed class members would have acted had they understood Wachovia's posting order.  Neither Plaintiffs nor Mr. Olsen have identified any method that is capable of addressing these issues.

- In addition to alleged misrepresentations, Plaintiffs raise other ambiguous complaints about certain of Wachovia's other business practices, such as the practice of approving some debit card transactions into insufficient funds, but make no serious attempt to show how they might address such practices on a class-wide basis.  For example, Plaintiffs do not address whether they can prove with common evidence that the practice of authorizing some transactions into insufficient funds was unfair, unreasonable, or not in good faith.  Nor do Plaintiffs address the fact that certain proposed class members were better off because their transactions were authorized into insufficient funds and, indeed, they desired that option.  Plaintiffs' expert does not address this practice.

- Plaintiffs' expert, Mr. Olsen, a computer programmer, only offers opinions related to the feasibility of certain computations.  Thus, Mr. Olsen's work cannot alone support a conclusion that injury and/or damages can be proven with common evidence or that a common method exists to determine who is in the proposed class.

## VI.     Background on Wachovia's Posting and Settlement Process

11.      Wachovia, like virtually all other banks, used a "batch" method of posting transactions to its customers' accounts for the purpose of settlement.  Batch processing worked (and works) as follows.  After the end of each business day, Wachovia posted to its customers' checking accounts all of the transactions for which it had received the information necessary for settlement (i.e., in the case of debits, those debits presented to it for payment) since the close of the previous business day.[7]  Wachovia does not have information about when all transactions occurred relative to other transactions, such as when a check submitted for payment was written relative to when a debit card transaction was initiated.[8]  As a result, Wachovia cannot sequence all of a customer's transactions chronologically based on when they occurred and Wachovia must identify an order to post the transactions to a customer's account.[9]

### A.     Batch Posting Means that Debits Must Be Settled When They Are Presented for Payment, Not When They Occur

12.      Plaintiffs allege in their complaint that Wachovia should have posted transactions to customers' accounts in "chronological order."  Plaintiffs claim that Wachovia somehow unlawfully re-sequenced transactions from the chronological order in which they occurred.  However, Plaintiffs' characterization of Wachovia's transaction processing fails to adequately distinguish between the *authorization* of a debit card transaction and the *settlement* of a debit card transaction.[10]  Authorization of a debit occurs (if it occurs) when the transaction is made,

---

[7] See Defendant Wachovia Bank, N.A.'s Responses to Plaintiffs' First Set of Interrogatories, June 17, 2010, p. 16.

[8] Wachovia also, in some instances, does not have date and/or time information for debit card transactions.  Mr. Olsen, Plaintiffs programming expert, acknowledges this fact.  (Declaration of Arthur Olsen in Support of Plaintiffs' Motion for Class Certification, April 25, 2011 related to the *Garcia* and *Spears-Haymond* litigation ("Olsen Declaration"), p. 12, footnote 2.)

[9] Plaintiffs apparently agree that chronological sequencing is not possible and that no one sequence benefits all customers.  Not only did the *Veronica Gutierrez* plaintiffs provide numerous different posting sequences to their programming expert to evaluate in the *Veronica Gutierrez* matter, but none of the alternatives sequenced *all* transactions chronologically nor did any sequence all *debit card* transactions chronologically.  (Supplemental Expert Report of Arthur Olsen in the *Veronica Gutierrez* matter, April 12, 2010, pp. 5-6.)  In other words, Plaintiffs' alternative posting orders in the *Veronica Gutierrez* case were no less "re-sequenced" than the actual posting orders used by Wachovia.

[10] Point-of-sale ("POS") debit card transactions are usually, but not always, submitted to Wachovia for authorization.  Depending on the type of merchant and the type of transaction, the authorization amount may or may not be equal to the amount ultimately submitted for payment.  For instance, "pay at the pump" transactions at gas stations typically involve an authorization only for $1 because at the time authorization is sought, the amount of the transaction is not known.  Similarly, restaurants typically seek authorization for the amount of the initial check, pre-gratuity.  Wachovia

6

and settlement occurs when (if) the transaction is presented for payment. Some debit card transactions that are authorized are never settled and some debit card transactions that are settled are never authorized. For non-debit card transactions (such as checks or ACH[11] transactions), Wachovia's first encounter with the transaction is when it is submitted to Wachovia for settlement.[12] Wachovia cannot post all transactions in the order in which they were made because the bank does not have full information about many transactions that are authorized—and has no information about when the customer initiated transactions that are not authorized, such as checks and ACH payments—until they are presented for settlement.[13]

### B.    Wachovia Employed Four Different Posting Sequences

13.    From before its merger with First Union Corporation ("First Union") in 2001 through August 13, 2010, Wachovia employed at least four separate posting sequences in its settlement processing, depending on the time period. Also during much of the class period, customers with overdraft protection on their accounts were subject to posting procedures that could effectively result in a different posting order for them if they overdrafted.[14]

14.    Under each of the four posting orders, Wachovia posted all deposits and other credits prior to posting any debits. The grouping and order of debit transactions, however, varied under each of the four posting orders. Prior to the merger with First Union, Wachovia posted non-check debit transactions (including debit card transactions) in high-to-low order, and checks

---

either authorizes or declines the transaction, and if a transaction is authorized, Wachovia does not receive any notice of the final transaction amount until the transaction is presented for settlement, potentially several days after the transaction occurred. Thus, transactions that were made on a given day or that were authorized on a given day will often be presented to Wachovia for payment on different days. (Declaration of Brad Arrowood, February 27, 2013, pp. 3–4.) When Wachovia authorizes a debit card transaction, it does not know whether that transaction will result in an overdraft fee because there may be subsequent credits or debits and because the amount authorized will not necessarily be equal to the amount presented for payment.

[11] ACH (or Automated Clearing House) transactions are electronic transfers of funds that are processed without the need for a physical check or one-time presentation of a debit card. Common examples of ACH payments are recurring monthly bill payments such as utilities, insurance premiums, mortgages, or other loans. ("Glossary," Wells Fargo Home Mortgage website available at <https://www.wellsfargo.com/mortgage/glossary/a>.)

[12] See Defendant Wachovia Bank, N.A.'s Responses to Plaintiffs' First Set of Interrogatories, June 17, 2010, pp. 13-16.

[13] The amount of time that passes between when a transaction occurs or is authorized and when it is presented to Wachovia for payment also can vary among transactions for reasons outside of Wachovia's control. For example, a debit card transaction that originated on an earlier day than another debit card transaction may not be settled on an earlier day.

[14] Declaration of Dean Harrington, February 27, 2013, pp. 2-3.

posted in serial order.[15]  After the merger with First Union, Wachovia sorted debit transactions into different categories and posted high to low within each category.[16]  The debit transaction categories (and the order in which they posted) were:  online bill payments, debit card purchases made without PIN numbers, ACH transactions, non-Wachovia ATM withdrawals, debit card purchases made with PIN numbers, and checks.[17]

15.     Beginning in 2004, Wachovia combined the debit categories mentioned above and posted transactions in high-to-low order.  Under this order, which I refer to as Wachovia's most common posting sequence, transactions were posted in the following manner:

- Deposits and credits.

- Most debit transactions (e.g., ATM transactions, debit card transactions, checks, ACH transactions, etc.), high to low.[18]

Starting June 25, 2010, shortly before the new Regulation E changes took effect, Wachovia began posting debit card transactions in a separate group before many of the other customer-generated debit transactions.  Transactions were posted in the following groups:  (1) ATM and debit card transactions; (2) account transfers, cashed checks and cash withdrawals; and (3) checks and other automatic payments (e.g., ACH transactions).  Within each group, transactions were posted from high to low.[19]

16.     For much of the class period, different posting procedures applied to customers with overdraft protection.  For customers with overdraft protection, if their checking account did not have sufficient available funds to cover a debit transaction when it was presented, the transaction was skipped and the next transaction was evaluated.  Each subsequent transaction was evaluated in this manner.  The transactions that could be paid from the available funds in the customer's

---

[15] Declaration of Dean Harrington, February 27, 2013, p. 1.

[16] Declaration of Dean Harrington, February 27, 2013, p. 1.

[17] Declaration of Dean Harrington, February 27, 2013, p. 1.  Note that by grouping debit transactions into different categories, debit transactions are not necessarily posted high to low even if the transactions within a particular category are posted high to low.

[18] Declaration of Dean Harrington, February 27, 2013, p. 1.  Some types of debit transactions were posted separately, for example, customer-initiated transfers to other Wachovia accounts posted before the new group of debit transactions.

[19] Declaration of Karen Moore related to *Garcia* and *Spears-Haymond* litigation, February 25, 2013, p. 4.

checking account were paid and the transactions that could not were skipped in the "first post." In a "second post," if sufficient funds existed in linked accounts that were the source of the overdraft protection, the unpaid transactions in the "first post" were paid and a single overdraft protection transfer fee was assessed. If there were not sufficient funds in the linked overdraft protection accounts, the remaining unpaid transactions would post into overdraft and an overdraft fee would be assessed for each transaction.[20]

### C.   Posting Credits before Debits Benefits Customers and Thus a More Chronological Posting Order Can Lead to More Overdraft Fees

17.    An overdraft occurs when a customer does not have enough funds available in her account to cover items that are presented for payment and paid by the bank. So long as credits are posted before debits, the order in which debits are posted has no impact on whether or not the customer's available funds are sufficient to cover them. Regardless of the order in which debits are posted to an account, they add up to the same amount, and if that amount is greater than the funds in the customer's account, the account will overdraft—that is, have a negative balance.[21]

18.    However, if credits are not posted before debits, the posting order can have an impact on whether or not an account will overdraft, and if it does overdraft, the number of overdraft fees. The practice of posting credits first reduces the number of overdraft fees. Thus, an alternative posting order in which credits would not necessarily be posted before debits, such as a more chronological posting order, could lead to more overdraft fees, at least for some customers on certain days. The transaction records of Anthony Poulin demonstrate that Wachovia's practice of posting credits first tended to reduce the number of overdraft fees in comparison to a more chronological posting order. As shown in Table 1, Mr. Poulin made a $950 deposit to his account on Wednesday, August 8, 2007 that enabled him to avoid overdraft fees on debit card transactions he made on Monday and Tuesday of that same week.

---

[20] Declaration of Dean Harrington, February 27, 2013, p. 2.

[21] As I discuss below, the number of overdraft fees that are assessed depends on the posting categories as well as the sequencing of transactions within the categories.

**Table 1:  Comparison of Wachovia's Most Common Posting Order
with a More Chronological Posting Order
Anthony Poulin 8/8/07**

| Payee | Transaction Amount | Transaction Date | Transaction Time | Transaction Type[1] | Balance | Overdraft Fees |
|---|---|---|---|---|---|---|
| **Wachovia Posting Order** | | | | | | |
| Starting Balance[2] | | | | | -$221.83 | |
| Counter Deposit | $950.00 | 8/8/2007 | | Credit | $728.17 | |
| Fee Refund | $70.00 | 8/8/2007 | | Credit | $798.17 | |
| Iron Sushi | -$28.93 | 8/6/2007 | 7:54 PM | Debit Card | $769.24 | |
| A&P | -$6.20 | 8/7/2007 | 10:52 AM | Debit Card | $763.04 | |
| Total | | | | | | $0.00 |
| **Posting Order by Transaction Date and Time** | | | | | | |
| Starting Balance[2] | | | | | -$221.83 | |
| Iron Sushi | -$28.93 | 8/6/2007 | 7:54 PM | Debit Card | -$250.76 | -$35.00 |
| A&P | -$6.20 | 8/7/2007 | 10:52 AM | Debit Card | -$256.96 | -$35.00 |
| Counter Deposit | $950.00 | 8/8/2007 | | Credit | $693.04 | |
| Fee Refund | $70.00 | 8/8/2007 | | Credit | $763.04 | |
| Total | | | | | | -$70.00 |

Source:  Wachovia Account Statement for Anthony S. Poulin, 7/12/07–8/8/07 [WFNC_0002328–33]; Wachovia Transaction Journal for Anthony S. Poulin, 8/8/07 [WFNC_0008269–358 at 291]; Wachovia EZ Journal for Anthony S. Poulin, 8/7/07 [WFNC_0008176–268 at 204]

Note:
[1] ACH Payments are identified as "Automated Debit" transactions and debit card transactions are denoted as "Purchases" within the "Other Withdrawals and Service Fees" section of the Wachovia account statement.
[2] Starting balance = Available balance (adjusted for holds). See Deposition of Laura Sturmer, 12/7/10, pp. 21–22; see also Deposition of Laura Sturmer, 3/3/11, pp.10–11.

19.    Mr. Poulin's $950 deposit increased his balance from a negative $221.83 to a positive $728.17, which allowed the two transactions initiated prior to August 8th to post without generating any overdraft fees.[22]  If Wachovia had sorted his credits and debits presented for payment according to the date on which they were initiated, causing the deposit to post after his previous two days' transactions submitted for settlement on this same day, his two debit card transactions would have generated overdraft fees when, in fact, none were assessed. This demonstrates that whether a customer experiences fewer or more overdraft fees with the posting orders used by Wachovia in comparison to a more chronological order depends on the types and dollar amounts of that particular customer's transactions.[23]  And since an alternative posting

---

[22] Mr. Poulin also received a "fee refund" credit for $70 on this same day, related to overdraft fees he incurred on a prior day.  Because he was starting with a negative balance of more than $200 on this day, however, this credit would not have allowed him to avoid the two overdraft fees generated by a more chronological posting order.  It was the $950 deposit that Wachovia posted prior to his debits that allowed Mr. Poulin to avoid the two overdraft fees.

[23] Additional examples where named Plaintiffs incurred fewer or more overdraft fees under Wachovia's actual posting order than a more chronological posting order is demonstrated by the transactions of Angela Gonzalez on 12/1/08, as shown in Exhibit 1, and by the Jones' transactions from 1/20/09, as shown in Exhibit 2.

order can increase a customer's overdraft fees on any given day, it can increase the total number of overdraft fees a customer would experience over the class period (a customer's net overdraft fees), and can increase the aggregate net overdraft fees Wachovia charges all customers.

### VII.   It Is Not Possible to Ascertain which Customers Are in the Class without Knowing the Alternative Posting Order

20.     According to Plaintiffs' class definition, in order to be a member of the proposed class, it is necessary to determine whether Wachovia's actual posting sequences *resulted* in an overdraft fee on a debit card transaction.  That is, for each customer, according to Plaintiffs, it is necessary to compare the actual overdraft fees Wachovia assessed to the overdraft fees that would have been assessed based on an alternative posting sequence.  However, Plaintiffs have not identified the specific alternative posting sequence they claim Wachovia should have used, and different alternative posting sequences result in different customers being included in the proposed class. Thus, it is not possible to determine who is in the proposed class.  An alternative sequence, such as a more chronological sequence, that leads to fewer overdraft fees for one customer can lead to more overdraft fees for another and vice versa.

21.     As a basic matter of economics, to determine the harm of any challenged practice, it is necessary to specify the alternative.  The *Veronica Gutierrez* plaintiffs' submissions illustrate that class membership depends on the specific alternative posting order chosen.  The plaintiffs in that case evaluated ten alternative posting scenarios.  The number of proposed class members under the ten different scenarios varied from 693,423 to 1,503,733, depending on the specific alternative posting scenario.[24]  This wide variation in the number of proposed class members demonstrates that it is not possible to determine who is a member of the proposed class without knowing what alternative posting order will be used for comparison purposes.

22.     The hypothetical example in Table 2 below demonstrates that different alternative posting sequences can generate different results when comparing the number of overdraft fees actually incurred based on Wachovia's most common posting sequence to the number that would have been incurred under an alternative sequence.  Under Plaintiffs' Scenario 2A posting order,[25]

---

[24] Supplemental Expert Report of Arthur Olsen in the *Veronica Gutierrez* matter, April 12, 2010, p. 27.

[25] I refer to the posting order described by Mr. Olsen as "Scenario 2A."  (Olsen Declaration, p. 17.)  It orders transactions in the following manner: (1) Credits; (2) In-person cash withdrawals; (3) Debit card transactions and ATM

the customer would have experienced the same number of overdraft fees (two) as were actually assessed on this day.  Under a more chronological order, however, the customer would have incurred only one overdraft fee instead of two.  As a result, this customer would not qualify as a member of the proposed class based on the Scenario 2A posting order, but would qualify as a member of the proposed class if a more chronological posting order is presented by Plaintiffs as the alternative Wachovia should have used.[26]

23.     By not defining who is in the proposed class, Plaintiffs cannot determine whether they even would be members of the proposed class themselves, cannot determine whether they were injured, cannot state whose interests they seek to represent (including what alternative posting order they maintain should have been used), and cannot claim that their interests are typical of other potential proposed class members.

---

transactions with date/time information in chronological order based on authorization; (4) Debit card transactions without date/time information in low-to-high order; (5) Checks and ACH transactions, sorted in high-to-low order; and 96) Fees accrued based on the day's posting activities.  This order is a modified version of "Scenario 2A" in Olsen's declaration of the *Dolores Gutierrez v. Wells Fargo Bank, NA* case, April 25, 2011.

I have not set out my criticisms of the merits of Scenario 2A here because I understand Mr. Olsen is using Scenario 2A in his declaration only as an exemplar alternative posting order.  I understand that neither Mr. Olsen nor Plaintiffs have endorsed Scenario 2A as the "correct" and lawful posting order Wachovia "should have" used, and that the merits of Scenario 2A are not in dispute now.  However, I reserve the right to offer such criticisms if and when Mr. Olsen or Plaintiffs endorse Scenario 2A as the "correct" and lawful alternative.  For example, I observe that Scenario 2A arbitrarily moves checks to the end of the posting order, a change that is inconsistent both with Plaintiffs' claims (which challenge only the order in which debit card transactions post) and any sort of more chronological posting order given that checks are typically initiated before the debit card transactions that post before them under Scenario 2A.

[26] Mr. Olsen describes his Scenario 2A as a chronological posting of debit card transactions, but he only sequences *some* debit card transactions (which were presented for payment on a given day in a given category) chronologically. (Note that debit card transactions fall into two separate categories under Mr. Olsen's 2A Scenario.)  Moreover, he only sequences transactions presented for payment on a given day and thus does not sequence transactions in the order they were made.  (Olsen Declaration, pp. 9-11.)

**Table 2:  Comparison of Wachovia Posting Order with Scenario 2A and a More Chronological Sequence Hypothetical Scenario**

| Payee | Transaction Amount | Transaction Date | Transaction Time | Balance | Overdraft Fees |
|---|---|---|---|---|---|
| **Wachovia Most Common Posting Order** | | | | | |
| Starting Balance | | | | $100.00 | |
| Debit Card Purchase 2 | -$70.00 | 8/15/2009 | 11:00 AM | $30.00 | |
| Debit Card Purchase 1 | -$60.00 | 8/15/2009 | 7:30 AM | -$30.00 | -$35.00 |
| ACH Transfer | -$20.00 | 8/14/2009 | 12:30 PM | -$50.00 | -$35.00 |
| **Total** | | | | | **-$70.00** |
| **Scenario 2A Posting Order**[2] | | | | | |
| Starting Balance | | | | $100.00 | |
| Debit Card Purchase 1 | -$60.00 | 8/15/2009 | 7:30 AM | $40.00 | |
| Debit Card Purchase 2 | -$70.00 | 8/15/2009 | 11:00 AM | -$30.00 | -$35.00 |
| ACH Transfer | -$20.00 | 8/14/2009 | 12:30 PM | -$50.00 | -$35.00 |
| **Total** | | | | | **-$70.00** |
| **Posting Order by Transaction Date and Time** | | | | | |
| Starting Balance | | | | $100.00 | |
| ACH Transfer | -$20.00 | 8/14/2009 | 12:30 PM | $80.00 | |
| Debit Card Purchase 1 | -$60.00 | 8/15/2009 | 7:30 AM | $20.00 | |
| Debit Card Purchase 2 | -$70.00 | 8/15/2009 | 11:00 AM | -$50.00 | -$35.00 |
| **Total** | | | | | **-$35.00** |

Note:
[1] An overdraft tolerance of at least $50 is assumed.
[2] Transactions are posted in the order described by Mr. Olsen and presented in his calculations.  See Olsen Declaration, p. 17 and Olsen Analysis Excel Workbook [WACHOVIA_OLSEN 00001].

## VIII.   Individual Evidence Is Required to Determine which Customers, If Any, Were Harmed

24.     As mentioned above, Plaintiffs propose to identify which individual customers were harmed, and by how much, by estimating the difference between overdraft fees charged in the actual world and the fees that would have been charged under an alternative (unspecified) posting order.[27]  An alternative posting order, however, also would have directly affected how many and which debits were declined, potentially causing higher-value (and possibly more

---

[27] Plaintiffs' Motion, pp. 37–38.

important transactions) to be returned and NSF fees to be levied.  In these situations, to determine whether a customer was harmed (and by how much), Plaintiffs also must account for other costs related to having a check returned or an ACH transaction declined.

25.     One of the benefits to customers of a high-to-low posting order is that it increases the likelihood that more important transactions, such as mortgage payments, are paid.  The average value of checks and ACH transactions is much higher than the average value of debit card and ATM transactions.[28]  Therefore, on average, checks and ACH transactions were posted towards the beginning under Wachovia's most common posting order.  However, under Plaintiffs' Scenario 2A posting order, checks and ACH transactions would be posted towards the end (after all debit card transactions) and would be more likely to be rejected.  Accounting for the increase in returned or declined transactions and their associated costs would show that some members of the proposed class (assuming that one is defined) would have been made worse off with an alternative posting sequence.  Identifying which account holders were not harmed by—and in fact benefitted from—the challenged posting sequences requires individual inquiry.

### A.     Injury Cannot Be Determined Based Solely on a Calculation of Differences in Overdraft Fees

26.     Tables 3 and 4, which show the same set of hypothetical transactions, illustrate that injury cannot be determined by simply looking at the number of overdraft fees and must instead take into account other consequences of using an alternative posting sequence.

27.     Table 3 compares the overdraft fees resulting from posting three hypothetical transactions in the most common posting order used by Wachovia to the fees that would result if these three transactions were posted using Plaintiffs' Scenario 2A alternative sequence (a sequence that makes it more likely that large-value checks would be declined because checks are posted last).  Importantly, Plaintiffs assume that every debit that actually was paid would continue to be paid

---

[28] A Federal Reserve payment study found that in 2009 the average value of paid checks was $1,294 and the average value of ACH payments was $1,947, compared with an average value of debit card transactions of $38. ("The 2010 Federal Reserve Payments Study, Noncash Payment Trends in the United States: 2006 – 2009," Federal Reserve System, December 8, 2010.)

under the alternative posting sequence, but this assumption is false.[29]  Plaintiffs' assumption that all debits will be paid regardless of posting order is reflected in Table 3.[30]

**Table 3:  Plaintiffs' Injury Calculation**
**Alternative Posting Sequence Scenario 2A**
**Hypothetical Scenario**

| Payee | Transaction Amount | Transaction Date | Transaction Type | Balance | Overdraft Fees |
|---|---|---|---|---|---|
| *Overdraft Tolerance – $250.00* | | | | | |
| **Wachovia Posting Order** | | | | | |
| Starting Balance | | | | $1,700.00 | |
| Chase Mortgage | -$1,500.00 | 8/5/2008 | Check | $200.00 | |
| Hilton Hotels | -$375.00 | 8/6/2008 | Debit Card | -$175.00 | -$35.00 |
| Southwest Airlines | -$350.00 | 8/4/2008 | Debit Card | -$525.00 | -$35.00 |
| **Total** | | | | **[a]** | **-$70.00** |
| **Scenario 2A Posting Order[1]** | | | | | |
| Starting Balance | | | | $1,700.00 | |
| Southwest Airlines | -$350.00 | 8/4/2008 | Debit Card | $1,350.00 | |
| Hilton Hotels | -$375.00 | 8/6/2008 | Debit Card | $975.00 | |
| Chase Mortgage | -$1,500.00 | 8/5/2008 | Check | -$525.00 | -$35.00 |
| **Total** | | | | **[b]** | **-$35.00** |
| **Difference in Fees** | | | | **[c] = [b] – [a]** | **$35.00** |

Note:
[1] Transactions are posted in the order described by Mr. Olsen and presented in his calculations.  See Olsen Declaration, p. 17 and Olsen Analysis Excel Workbook [WACHOVIA_OLSEN 00001].

28.     Plaintiffs claim this account holder was "harmed" on this day because he or she would have been charged $35 more in overdraft fees under the posting sequence actually used as compared to Scenario 2A.  This simple comparison of only overdraft fees, however, cannot determine whether a proposed class member was injured because it fails to consider that this account on this day has a maximum overdraft tolerance of $250, and that under the alternative posting sequence, the Chase Mortgage payment would have been returned unpaid.[31]  A simple

---

[29] Deposition of Arthur Olsen, February 15, 2013, p. 157.

[30] The comparisons made between the Scenario 2A and other posting orders reflect the methodology used by Mr. Olsen, despite the fact that applying Scenario 2A is not an accurate measure of harm.  As discussed in later sections of the report, Scenario 2A is not a measure of harm for any Plaintiffs or proposed class members.

[31] For instance, as long as the overdraft tolerance for this account is less than $525, the Chase Mortgage check would be returned unpaid.  Under this hypothetical, in the top panel, the Hilton Hotels and Southwest Airlines debit card transactions result in a negative balance, but those transactions are honored because they are assumed to have

comparison of overdraft fees also fails to consider that account holders bear various costs of having checks (or other debits) returned unpaid.[32]

29.      For example, although no overdraft fee would have been charged as a result of the Chase Mortgage payment being declined, an NSF fee would have been charged that day, and potentially multiple NSF fees would have been charged in the future if the payee resubmitted the returned check for payment, as often occurs.[33]  In addition, the customer also could have suffered other adverse consequences and costs associated with a returned mortgage payment, as I describe later.[34]

30.      Table 4 includes the same hypothetical set of posted transactions examined above in Table 3, but this time also includes a comparison of NSF fees and other fees imposed by the payee.

---

been previously authorized by Wachovia, as is usually the case with debit card transactions, and therefore could not be returned unpaid.  Unlike debit card transactions, however, checks are not authorized in advance by Wachovia.

[32] The deposition testimony of named Plaintiff Murlee Damor provides a specific example of possible negative financial consequences of having a check or ACH transaction returned.  Ms. Damor testified that she made regularly scheduled ACH payments for her Macy's and Target credit cards, as well as ACH payments to a debt consolidation company.  She noted that if she failed to make these payments, she either would be charged a larger amount in the future or her debt payment agreements would be annulled and she would have to pay the full balance.  (Deposition of Murlee Damor, March 24, 2011, pp. 84-86.)

[33] See, for example, Declaration of Karen Moore related to *Gutierrez*, *Martinez* and *Zankich* litigation, February 25, 2013, ¶ 36.

[34] Named plaintiffs appear to make mortgage payments out of their Wachovia checking accounts using a check or ACH transaction.  See, for example, Account Statement for Angela Gonzalez, 12/25/07–1/24/08 [WFNC_0000651–6 at 5]; Account Statement for Angela and Gabriel Gonzalez, 11/6/08–12/4/08 [WACHOVIA_GONZALEZ000015–21 at 16]; and Account Statement for Frances Knight Pinckney, 1/28/05–2/25/05 [WFNC_0001788–95 at 90] and Check Image for Frances Knight Pinckney [WFNC-M_0000628].

**Table 4:  Injury Calculation Accounting for NSF Fees and Other Declined Payment Penalties**
**Alternative Posting Sequence Scenario 2A**
**Hypothetical Scenario**

| Payee | Transaction Amount | Transaction Date | Transaction Type | Balance | Wachovia Fees | | Non-Wachovia Fees[1] | Total Fees |
|---|---|---|---|---|---|---|---|---|
| | | | | | Overdraft | NSF | | |
| Overdraft Tolerance – $250.00 | | | | | | | | |
| **Wachovia Posting Order** | | | | | | | | |
| Starting Balance | | | | $1,700.00 | | | | |
| Chase Mortgage | -$1,500.00 | 8/5/2008 | Check | $200.00 | | | | |
| Hilton Hotels | -$375.00 | 8/6/2008 | Debit Card | -$175.00 | -$35.00 | | | -$35.00 |
| Southwest Airlines | -$350.00 | 8/4/2008 | Debit Card | -$525.00 | -$35.00 | | | -$35.00 |
| **Total** | | | | **[a]** | **-$70.00** | **$0.00** | **$0.00** | **-$70.00** |
| **Scenario 2A Posting Order[2]** | | | | | | | | |
| Starting Balance | | | | $1,700.00 | | | | |
| Southwest Airlines | -$350.00 | 8/4/2008 | Debit Card | $1,350.00 | | | | |
| Hilton Hotels | -$375.00 | 8/6/2008 | Debit Card | $975.00 | | | | |
| Chase Mortgage - Returned | -$1,500.00 | 8/5/2008 | Check | $975.00 | | -$35.00 | -$100.00 | -$135.00 |
| **Total** | | | | **[b]** | **$0.00** | **-$35.00** | **-$100.00** | **-$135.00** |
| **Difference in Total Fees** | | | | **[c] = [a] − [b]** | **$70.00** | **-$35.00** | **-$100.00** | **-$65.00** |

Note:
[1] The Federal Trade Commission reports that "[l]ate fees can add hundreds of dollars to your mortgage bill."  See "FTC Facts for Consumers:  Defaulting on Your Mortgage Has Costly Consequences," Federal Trade Commission Bureau of Consumer and Business Education, June 2010.
[2] Transactions are posted in the order described by Mr. Olsen and presented in his calculations.  See Olsen Declaration, p. 17 and Olsen Analysis Excel Workbook [WACHOVIA_OLSEN 00001].

31.     In addition to accounting for the NSF fee generated under the Scenario 2A posting sequence, I also assume that this hypothetical customer would be charged various fees totaling $100 by the payee, Chase Mortgage.  Accounting for the returned mortgage payment, the NSF fees, and the fees imposed by Chase Mortgage, the account holder in this hypothetical example is better off under Wachovia's actual posting order than under the alternative sequence.

32.     The transaction records of Angela Gonzalez similarly demonstrate that NSF fees need to be taken into account when assessing the total cost to a customer of having a debit transaction returned unpaid.  Table 5 shows Ms. Gonzalez's transactions on 5/23/06, 6/6/06 and 6/21/06.  An ACH payment initiated by her on 5/20/06 to Faith Christian Academy was returned on May 23, 2006, resubmitted and returned again on June 6, 2003, and resubmitted and returned yet again on June 21, 2003, causing three NSF fees totaling $105.[35]

---

[35] Ms. Gonzalez also initiated two other ACH payments on 6/21/06 to "Faith Christian Academy" and to "Faith Tuition" that were returned unpaid and that caused NSF fees.  In other words, it appears that Ms. Gonzalez made three separate payments to Faith Christian Academy on 6/21/06, all of which were returned unpaid and one of which was returned unpaid three times.

**Table 5:  Multiple NSF Fees for the Same Transaction**
**Angela Gonzalez 5/23/06 – 6/21/06**

| Payee | Transaction Amount | Transaction Date | Transaction Type[1] | Balance | Wachovia Fees Overdraft | NSF |
|---|---|---|---|---|---|---|
| **5/23/2006 Posting Date** | | | | | | |
| Starting Balance[2] | | | | -$2.75 | | |
| Counter Deposit | $175.00 | 5/23/2006 | Credit | $172.25 | | |
| State Farm | -$185.84 | 5/23/2006 | ACH Payment | -$13.59 | -$35.00 | |
| Colonial Medical | -$20.00 | 5/22/2006 | Debit Card | -$33.59 | -$35.00 | |
| Faith Christian Academy 5/20/06 – 1st Submission - Returned | -$700.63 | 5/20/2006 | ACH Payment | -$33.59 | | -$35.00 |
| **Total** | | | | | **-$70.00** | **-$35.00** |
| **6/6/2006 Posting Date** | | | | | | |
| Starting Balance[3] | | | | $186.89 | | |
| Facts/M-PYMT/Fee | -$25.00 | 6/6/2006 | ACH Payment | $161.89 | | |
| Scholastic | -$18.96 | 6/5/2006 | Debit Card | $142.93 | | |
| Exxon Mobile | -$15.00 | 6/4/2006 | Debit Card | $127.93 | | |
| Faith Christian Academy 5/20/06 – 2nd Submission - Returned | -$700.63 | 5/20/2006 | ACH Payment | $127.93 | | -$35.00 |
| **Total** | | | | | **$0.00** | **-$35.00** |
| **6/21/2006 Posting Date** | | | | | | |
| Starting Balance[2] | | | | -$51.06 | | |
| Counter Deposit | $550.00 | 6/21/2006 | Credit | $498.94 | | |
| Publix | -$94.15 | 6/19/2006 | Debit Card | $404.79 | | |
| Facts/M-PYMT/Fee | -$25.00 | 6/6/2006 | ACH Payment | $379.79 | | |
| Faith Christian Academy 5/20/06 – 3rd Submission - Returned | -$700.63 | 5/20/2006 | ACH Payment | $379.79 | | -$35.00 |
| Faith Christian Academy 6/20/06 – 1st Submission - Returned | -$700.63 | 6/20/2006 | ACH Payment | $379.79 | | -$35.00 |
| Faith Tuition - Returned | -$784.59 | 6/21/2006 | ACH Payment | $379.79 | | -$35.00 |
| **Total** | | | | | **$0.00** | **-$105.00** |

Source:  Wachovia Account Statement for Angela Gonzalez, 4/22/06–5/23/06 [WFNC_0000538–42]; Wachovia Transaction Journal for Angela Gonzalez, 5/23/06 and 6/21/06 [WFNC_0009177–392 at 222 and 238]; Wachovia Account Statement for Angela Gonzalez, 5/24/06–6/22/06 [WFNC_0000543–7]

Note:
[1] ACH Payments are identified as "Automated Debit" transactions and debit card transactions are denoted as "Purchases" within the "Other Withdrawals and Service Fees" section of the Wachovia account statement.
[2] Starting balance = Available balance (adjusted for holds).  See Deposition of Laura Sturmer, 12/7/10, pp. 21–22; see also Deposition of Laura Sturmer, 3/3/11, pp. 10–11.
[3] A transaction journal is not available for this posting date; therefore, the starting balance is the account balance and does not account for holds.

33.     On these instances, Wachovia's high-low posting order did not prevent Ms. Gonzalez's tuition payments from being returned.  In other scenarios, posting the largest item first will have just that effect, avoiding costly NSF fees as well as other adverse consequences such as late fees imposed by the payee.[36]

---

[36] For example, on November 28, 2008, Ms. Gonzalez overdrew her account and incurred overdraft fees.  On this day, a $1,524.99 automated check to Chase Home Finance was paid by Wachovia.  Under an alternative posting order that would have resulted in posting this payment after their debit card transactions, her automated check to Chase Home Finance may have been rejected.  Additional examples include Ms. Gonzalez's transactions on 7/25/06

**B.      Individual Inquiry Is Required to Determine the Additional Costs Associated with a Rejected and Unpaid Transaction**

34.      In order to properly account for returned checks or ACH transactions when analyzing injury, it is necessary to identify those items that would have been returned for insufficient funds and been subject to NSF fees and other penalties.  One must determine:  (1) the overdraft tolerance for an account;[37] (2) which transactions would have been returned; (3) total overdraft and NSF fees (which depend on how many times the items are resubmitted for payment and the account balance when they are resubmitted); and (4) other costs of returned checks and ACH transactions, such as fees imposed by the intended recipient of the payment.  This analysis requires individual inquiry.

35.      As discussed above, many checks or ACH transactions are presented by the recipient again for payment before the account holder deposits sufficient funds to allow the transaction to settle, resulting in multiple NSF fees.[38]  In addition to the NSF fee charged by Wachovia, the account holder also may be charged a returned item fee and/or late charges by the recipient.[39]

36.      Consider, for example, the fees associated with late credit card payments.  The average late fee charged by large credit card issuers was about $35 in 2007.[40]  Even after passage of the Credit Card Accountability Responsibility and Disclosure Act in 2009 (which regulated credit

---

and 1/22/07 (Exhibits 3 and 4); Mr. Thornton's transactions on 9/17/07, 10/28/08, and 3/3/09 (Exhibits 5 to 7); Ms. Damor's transaction on 4/7/09 (Exhibit 8); Ms. Pinckney on 1/31/05 (Exhibit 9); and Ms. Spears-Haymond on 8/20/07 (Exhibit 10).  Each of these exhibits shows that under alternative posting orders to Wachovia's actual posting orders, certain check payments and/or ACH payments may get rejected.

[37] Wachovia determined the "overdraft tolerance" associated with each account at a point in time by developing a score, known as a CEM (or customer evaluation matrix) score, that assessed the risk associated with the account. (Deposition of Bradley W. Arrowood, March 2, 2011, pp. 107–113, p. 131).

[38] See, for example, "A New Approach to Covering Overdrafts," Alex Sheshunoff, Bank Director Magazine - 2nd Quarter 2002.  The transaction records of named Plaintiffs, Ms. Angela Gonzalez and Ms. Celia Spears-Haymond, also demonstrate how one transaction can lead to multiple NSF fees.  See Account Statement of Angela S. Gonzalez, 5/24/06–6/22/06 [WFNC_0000543–0000547] and Account Statement of Celia Spears-Haymond, 8/18/07–9/19/07, Exhibit 65 to the Appendices to the Plaintiffs' Motion for Class Certification (Wachovia).  In her deposition, Ms. Spears-Haymond acknowledged an occasion when a check she wrote was submitted and returned unpaid multiple times, resulting in multiple NSF fees. (Deposition of Celia Spears-Haymond, February 14, 2013, pp. 89-90).

[39] "National retail merchants have increased what they charge consumers whose checks are returned for  insufficient funds by 20 percent, according to the latest annual survey by Moebs Services.  Merchants are now charging $30 as a median fee in comparison to $25 in 2009."  "Retailers Charge for Bounced Checks Surpasses Banks/Credit Union NSF Fees," Moebs Services, August 10, 2010. Examples of named plaintiffs incurring such fees include:  Ms. Celia Spears-Haymond acknowledged that she was charged a $25 return fee by a grocery store that returned her check because she had insufficient funds in her account. (Deposition of Celia Spears-Haymond, February 14, 2013, p. 99); Ms. Frances Knight Pinckney testified that she was charged a fee by her mortgage provider for a late payment. (Deposition of Frances Knight Pinckney, February 16, 2013, p. 199).

[40] "Why Banks Are Boosting Credit Card Interest Rates and Fees," USA Today, November 14, 2008.

card fees), late payment fees can be up to $35, and card holders will generally be charged interest on their balances in addition.[41]  Further, as discussed in more detail below, late credit card payments can lead to higher interest rates, a lower credit score, and forfeited rewards (points or miles).

37.     Penalties caused by missed mortgage or rent payments can be even more substantial and run to hundreds of dollars.[42]  In Tennessee, for example, state law explicitly permits a fee of up to 10 percent of the monthly rental amount for late payments.[43]  Similarly, the consequences of late utilities payments can be hundreds of dollars.[44]  Even the IRS has a specific fee policy that applies when a tax payer writes a check that bounces.  The IRS may impose a penalty of 2 percent of the amount of the check that bounced, or if the check is under $1,250, the penalty is equal to the smaller of the amount of the check and $25.[45]  Since these costs depend on the individual's circumstances, only individual inquiry can determine the additional fees to a proposed class member of having a check or ACH transaction returned unpaid.

38.     There also are other potential negative consequences of having a transaction returned unpaid that would make the account holder worse off.  Account holders that fail to pay certain transactions on time may suffer increased interest rates, damage to their credit ratings, foreclosure, initiation of eviction processes, court proceedings, loss of insurance coverage, or other consequences whose full economic costs far exceed an overdraft fee or even multiple overdraft fees.  Higher 'penalty APRs' on credit cards can impose substantial additional costs on consumers.[46]  The financial impact of a lower credit score can be even more severe.  For example, the impact of being 30 days late on a mortgage payment can have severe consequences on a consumer's credit score and increase credit costs by thousands of dollars.[47]  The impact of being 90 days late on a credit card payment can be as damaging to a credit score as a bankruptcy

---

[41] "Action Line:  Credit Card Late Fees, Interest Hikes Still Legal," Tulsa World, April 3, 2011.

[42] FTC Facts for Consumers:  "Defaulting on Your Mortgage Has Costly Consequences," Federal Trade Commission Bureau of Consumer and Business Education, June 2010.

[43] *See* Tennessee Code. § 66-28-201(d).

[44] "Orlando Utilities Commission Hits Late Payers with Big Deposits," Orlando Sentinel, April 10, 2009.

[45] "Avoiding Penalties and the Tax Gap," August, 20, 2010 available at http://www.irs.gov/newsroom/article/0,,id=181068,00.html.

[46] "Action Line:  Credit Card Late Fees, Interest Hikes Still Legal," Tulsa World, April 3, 2011.

[47] "How to Wreck Your Credit Score," The Wall Street Journal, May 24, 2011.

or repossession.[48]  Missing a rent payment can result in eviction.[49]  And a late car insurance payment can result in cancelled coverage and higher rates if the consumer is able to reestablish coverage.[50]  Finally, a bounced check can result in having to deal with a collection company or mandatory participation in financial classes,[51] and can even be treated as a crime.[52]

39.     For many bank customers, the increased cost of returned transactions from an alternative posting order that makes it less likely those transactions would be paid would more than outweigh the decrease in the number of overdraft fees.  The Federal Reserve conducted extensive research on consumer preferences and overdraft behavior and concluded:

> First, participants in consumer testing indicated that they would prefer to have their checks paid into overdraft, because those transactions represented important bills. … Second, a consumer will generally be charged the same fee by the financial institution whether or not a check is paid; yet, if the institution covers an overdrawn check, the consumer may avoid other adverse consequences, such as the imposition of additional merchant returned item fees.[53]

40.     Taking into account potentially multiple NSF fees, additional fees imposed by the payee, and the potential for other costs of having a check or ACH transaction returned, many members of the proposed class would have been worse off under an alternative posting order that reduced the likelihood such debits would be paid, such as Plaintiffs' 2A Scenario or a more chronological posting order.  Moreover, individual inquiry is required to identify these individuals.

## IX.     Plaintiffs' Liability Claims Cannot Be Evaluated Based on Common Evidence

41.     I understand that Plaintiffs have asserted several causes of action in these cases under the laws of numerous states.  I offer no opinions concerning the content of the applicable state laws,

---

[48] "5 Ways to Ruin Your Credit," The Motley Fool, April 28, 2008.

[49] "How Not to Pay Your Bills," MSN Money, September 15, 2010.

[50] "Consequences of Late Auto Insurance Payments," available at http://www.carinsurancequote.net/late-car-insurance-payments.html.

[51] "What You Need to Know About Bounced Checks," Gerri Detweiler, Credit.com.

[52] See, for example, Or. Rev. Stat. § 165.065 (Oregon law).

[53] Board of Governors of the Federal Reserve System, Final rule; official staff commentary on Regulation E; Docket No. R–1343, Federal Register Vol. 74, No. 220, November 17, 2009, 59033-59056 at 34–5.

but my understanding is that Plaintiffs' position is that, under the pertinent standards, Wachovia's posting orders were not in good faith, were unfair, or were otherwise unreasonable. Plaintiffs do not say how they anticipate proving these liability arguments using common evidence.  However, Plaintiffs cannot prove unfairness or unreasonableness with common evidence because:  (1) Wachovia used four separate posting orders and effectively applied yet another posting order to customers with overdraft protection; (2) not all of Wachovia's posting orders could have maximized overdraft fees;[54] and (3) some potential class members (as well as some customers who are not potential class members) would experience fewer overdraft fees on net with the actual sequence than with a more chronological posting order that does not necessarily post all credits first.  It is hard to imagine any standard that would condemn a posting order as to a particular customer if that customer was actually better off under it.

42.      Moreover, Plaintiffs have not identified any objective legal or economic principle to determine the alternative posting order Wachovia should have used, other than referring to "chronological order," which, as discussed above, is not possible and is not embodied in any scenario Mr. Olsen has ever used (or could use).  I understand Plaintiffs have not asserted that Wachovia was under a legal obligation to *minimize* the overdraft fees incurred by every customer.  Even if it were, a more chronological posting order can actually *increase* overdraft fees at least for some customers because on any particular day credits are not necessarily posted prior to all debits.  Indeed, as the Federal Reserve recognized in 2009, there is no one order that is best for all account holders:

> The Agencies are not addressing transaction processing order at this time. The Agencies believe that it would be difficult to set forth a bright-line rule that would clearly result in the best outcome for all or most consumers.  For example, requiring institutions to pay smaller dollar items first may cause an institution to return unpaid a large dollar nondiscretionary item, such as a mortgage payment, if there is an insufficient amount of overdraft coverage remaining to cover the large dollar item after the smaller items have been paid.[55]

---

[54] In fact, none of the four posting orders employed by Wachovia maximizes overdraft fees.

[55] Board of Governors of the Federal Reserve System (Board); Office of Thrift Supervision, Treasury (OTS); and National Credit Union Administration (NCUA), Final Rule on Unfair or Deceptive Acts or Practices, Federal Register Vol. 74, No. 18, January 29, 2009, 5498-5584 at 5548.

### A.      Proof that Wachovia's Posting Sequences Were Unfair, Unreasonable, or Not in Good Faith Will Vary for the Different Posting Sequences

43.      The proof of whether the actual posting order was unfair, unreasonable, or not in good faith will vary, even for otherwise similarly situated class members, depending on the specific actual posting order Wachovia used.  Although in most cases, posting order has no impact on overdraft fees because most customers do not overdraft their accounts, if an account is overdrawn, there are instances in which differences in posting order can have an effect on the number of overdraft fees.  This is because the actual order in which transactions are posted to an account depends on the types of transactions that are included in different posting categories as well as the sequence of the transactions within those categories.  For the four Wachovia posting orders that were in effect during the class period, the primary difference among them was the grouping of transactions within categories.  Alternative sequences that allow the posting categories to change relative to the actual categories used by Wachovia can result in either higher or lower overdraft fees, depending on the particular transactions being posted on that day for the particular customer.  The effects of different posting sequences on overdraft fees can be seen by comparing the number of overdraft fees assessed under Wachovia's most common posting sequence to other Wachovia posting sequences used at other points in time.

44.      Table 6 below demonstrates, based on a set of hypothetical transactions, that the number of overdraft fees assessed to an account on a particular day depends on the actual posting order that is used.  In the example, the same set of transactions generates either one, two, or three overdraft fees depending on which of Wachovia's posting orders is being examined.[56]  Because Wachovia's actual posting sequences can generate different numbers of fees, whether a particular alternative posting order will *reduce* the number of fees assessed depends on the actual order to which it is being compared.

---

[56] Wachovia used four different posting sequences during the proposed class period, but I do not have sufficient detail for one of the four sequences to include it in this comparison.

**Table 6:  Comparison of Wachovia Posting Sequences - Hypothetical Scenario**

| Payee | Transaction Amount | Transaction Date | Transaction Type | Balance | Overdraft Fees |
|---|---|---|---|---|---|
| **Wachovia Posting Order After the First Union/Wachovia Merger, Prior to 2004** | | | | | |
| Starting Balance | | | | $80.00 | |
| Branch Deposit | $50.00 | 1/14/2008 | Credit | $130.00 | |
| Debit Card Purchase 1[1] | -$55.00 | 1/12/2008 | Debit Card | $75.00 | |
| Debit Card Purchase 2[1] | -$30.00 | 1/13/2008 | Debit Card | $45.00 | |
| ACH Payment | -$25.00 | 1/14/2008 | ACH Payment | $20.00 | |
| Check Payment | -$90.00 | 1/11/2008 | Check | -$70.00 | -$35.00 |
| **Total** | | | | | **-$35.00** |
| **Most Common Wachovia Posting Order (2004 – June 2010)** | | | | | |
| Starting Balance | | | | $80.00 | |
| Branch Deposit | $50.00 | 1/14/2008 | Credit | $130.00 | |
| Check Payment | -$90.00 | 1/11/2008 | Check | $40.00 | |
| Debit Card Purchase 1 | -$55.00 | 1/12/2008 | Debit Card | -$15.00 | -$35.00 |
| Debit Card Purchase 2 | -$30.00 | 1/13/2008 | Debit Card | -$45.00 | -$35.00 |
| ACH Payment | -$25.00 | 1/14/2008 | ACH Payment | -$70.00 | -$35.00 |
| **Total** | | | | | **-$105.00** |
| **Most Common Wachovia Posting Order, with OD Protection, No Funds in Linked Account** | | | | | |
| *First Post* | | | | | |
| Starting Balance | | | | $80.00 | |
| Branch Deposit | $50.00 | 1/14/2008 | Credit | $130.00 | |
| Check Payment | -$90.00 | 1/11/2008 | Check | $40.00 | |
| Debit Card Payment 1 - SKIPPED[2] | -$55.00 | 1/13/2008 | Debit Card | $40.00 | |
| Debit Card Payment 2 | -$30.00 | 1/11/2008 | Debit Card | $10.00 | |
| ACH Payment - SKIPPED[2] | -$25.00 | 1/14/2008 | ACH Payment | $10.00 | |
| *Second Post* | | | | | |
| Debit Card Payment 1 | -$55.00 | 1/13/2008 | Debit Card | -$45.00 | -$35.00 |
| ACH Payment | -$25.00 | 1/14/2008 | ACH Payment | -$70.00 | -$35.00 |
| **Total** | | | | | **-$70.00** |
| **Wachovia Posting Order Post June 2010** | | | | | |
| Starting Balance | | | | $80.00 | |
| Branch Deposit | $50.00 | 1/14/2008 | Credit | $130.00 | |
| Debit Card Purchase 1 | -$55.00 | 1/12/2008 | Debit Card | $75.00 | |
| Debit Card Purchase 2 | -$30.00 | 1/13/2008 | Debit Card | $45.00 | |
| Check Payment | -$90.00 | 1/11/2008 | Check | -$45.00 | -$35.00 |
| ACH Payment | -$25.00 | 1/14/2008 | ACH Payment | -$70.00 | -$35.00 |
| **Total** | | | | | **-$70.00** |

Note:
[1] The debit card purchases are assumed to be made without PIN numbers.
[2] The debit card purchase and ACH payments are skipped in the first post because the available balance is not sufficient to cover the transactions.  See Harrington Declaration. p. 2.

45.    Wachovia's customers who had overdraft protection service were effectively subject to a different posting order, as described earlier.[57]  Customers with overdraft protection would not be assessed overdraft fees if they had sufficient funds in their overdraft protection accounts to cover the amount of their overdrafts (but they would be charged an overdraft protection transfer fee). Customers with overdraft protection who did not have sufficient funds in their linked accounts, could be charged a different number of overdraft fees from customers who did not have overdraft protection.[58]  As shown in Table 6, under Wachovia's most common posting order, a customer without overdraft protection would incur three overdraft fees.  In contrast, a customer with overdraft protection, but no funds in their linked account, would incur only two overdraft fees. Alternative posting orders proposed by the Plaintiffs (including Scenario 2A) could lead to more or less overdraft fees for these customers.

46.    In sum, Plaintiffs fail to discuss how they could prove with common evidence that each of these posting orders, including the effective posting order for customers with overdraft protection, was wrongful, not in good faith, and harmful to each proposed class member given that the number of fees that is assessed under the different orders varies.

### B.    Proposed Class Members Who Understood Wachovia's Posting Sequence Could Not Have Been Injured

47.    Also relevant to the evaluation of a particular posting order and whether it was in good faith, reasonable, or fair, is the fact that proposed class members who understood Wachovia's posting sequence could have chosen to bank elsewhere.  Wachovia has long operated in a highly competitive environment, and Wachovia checking account customers have many alternatives when choosing a financial institution.  Some banks, for example, post from low to high.[59]  If an account holder understood Wachovia's posting practices and still chose to bank with Wachovia rather than with another bank that, for example, posted from low to high, that account holder has shown, by revealed preference, that he or she preferred Wachovia's overdraft practices, services,

---

[57] Named plaintiffs Angela Gonzalez, Charles Jones, Frances Knight Pinckney, and Anthony Poulin had overdraft protection for certain periods of time. (Declaration of Laura Sturmer, February 27, 2013, ¶ 21; Deposition of Charles Jones, Jr., February 11, 2013, p. 149; Deposition of Frances Knight Pinckney, February 16, 2013, pp. 207-210, Exhibit 17, Exhibit 18; Deposition of Anthony Poulin, March 21, 2011, pp. 46-48).

[58] Declaration of Dean Harrington, February 27, 2013, pp. 2-3.

[59] See FDIC Study of Bank Overdraft Programs, November 2008, pp. ii, 11, and 27.

and fees and, therefore, was not harmed.[60]  As discussed below, there are in fact good reasons why customers might make exactly that choice.

48.     Deposition testimony from named Plaintiffs indicates that certain Wachovia customers did understand how transactions were posted, yet chose to continue banking with Wachovia.  For example, Ms. Murlee Damor indicated that she became aware of Wachovia's posting order on one of her accounts, but did not change her banking habits once she was aware.[61]  Another named plaintiff, Mr. Anthony Poulin, testified that he was generally aware in 2007 or 2008 of Wachovia's posting practices.[62]  Despite that knowledge and the presence of "lots of banks everywhere," he chose to continue to bank with Wachovia because he liked it and the convenience that it provided him even though he disliked its posting practices.[63]

49.     In sum, the reasonableness and fairness of each posting order, and the circumstances and understanding of each customer related to those posting orders, pose distinct sets of questions that will require separate and distinct evaluation based on individual inquiry.

C.     **Plaintiffs Cannot Show that Wachovia's Posting Sequences Were Unfair, Unreasonable, or Not in Good Faith without Considering the Interests of All Wachovia Customers**

50.     Plaintiffs claim they will be able to show that all of Wachovia's actual posting sequences were unfair, unreasonable, or not in good faith by only considering the effects on proposed class members (assuming a class is defined).  However, any alternative posting order would affect all Wachovia customers, not just those who qualify as proposed class members.  As a result, any comparison of overdraft fees under Wachovia's posting orders to an alternative cannot be limited only to members of the proposed class.  It also is necessary to consider the effects of the

---

[60] Proposed class members also could have taken various measures to avoid incurring overdraft fees such as linking their checking accounts to other accounts as a source for overdraft protection.  Defendant Wachovia Bank, N.A.'s Responses to Plaintiffs' First Set of Interrogatories, June 17, 2010, p. 15.

[61] Deposition of Murlee Damor, March 24, 2011, pp. 92, 94.  "Q. Did you ever notice anything [on online banking] about the order that transactions posted to your account? A. Yes. Q. What did you notice about the order that they posted? A. They didn't post on the days that the purchases went through. Like, let's say I make a purchase Monday, Tuesday, Wednesday and Thursday. You know, each day was a different purchase. It wouldn't post that way. It would post from highest to lowest…. Q. After you found out about the posting order, did you, in any way, change your banking habits? A. No."

[62] Deposition of Anthony Poulin, March 21, 2011, p. 141.  "Q. Okay. So then at least by the time, you know, 2008, 2007, 2008, some of these overdrafts we have been talking about, at least by that point you understood that the bank processed the transactions from high to low. Correct?  A. Yes, generally speaking. Yes."

[63] Deposition of Anthony Poulin, March 21, 2011, pp. 141–144.

alternative posting order on all customers.  For instance, a more chronological posting order may decrease the number of overdraft fees assessed to one group of customers, but increase the number of overdraft fees for another group of customers.  Plaintiffs fail to explain how they could prove that any given actual posting order was unfair, unreasonable, or not in good faith if the alternative posting order increases the number of overdraft fees (or other fees) for many Wachovia customers.  Given that a more chronological order that applies both to credits and to debits can increase overdraft fees even on days when none were assessed, it is particularly important to consider the effect of the alternative on all customers who would have been subject to that posting order, including those customers who did not incur any overdraft fees under the actual posting order used by Wachovia.  This exercise must be done separately for each of posting orders used by Wachovia.

51.     Moreover, as mentioned above, alternative posting orders would have much broader effects than simply changing the number of overdraft fees.  Even if overdraft fees are lower with an alternative posting order, NSF fees, other fees, and all the costs of having debits returned unpaid can exceed the cost of additional overdraft fees.  If many, or even most, Wachovia customers are better off under one of the posting orders Wachovia actually used, as opposed to an alternative proposed by the Plaintiffs, it is hard to see how that actual posting order was unfair, unreasonable, or not in good faith—even if some other customers might have been better off under the alternative.  And with four actual posting orders and effectively another posting order for customers with overdraft protection in effect during the proposed class period, the same evidence cannot be used to show that otherwise similarly situated class members were harmed compared to a given alternative.

## X.     There Are Conflicts among Proposed Class Members

52.     Assuming that an alternative posting sequence and thus a proposed class is defined, a proposed class member who would have been better off under the alternative posting order has interests in conflict with other proposed class members who would be worse off under the alternative posting order.  As discussed above, overdraft fees are only one among many factors that customers might consider in evaluating different posting sequences.  Therefore, only individual inquiry could determine which proposed class members would be made worse off, be made better off, or not be affected by an alternative posting sequence.

53.     Proposed class members will be worse off under the alternative posting sequence if, under the alternative sequence, they would have experienced a higher number of returned transactions (i.e., transactions that are not paid) and, after factoring in the various fees and other consequences of returned items, these costs outweigh a possible reduction in overdraft fees over the class period.  (Even if overdraft fees are lower on a given day for a class member, total overdraft fees over the entire class period for that class member could be higher.)  These proposed class members would be better off under the posting order actually used by Wachovia as opposed to the alternative order that may result in fewer overdraft fees if that alternative order imposes other costs on them in the form of (potentially multiple) NSF fees, late payment fees, damage to credit ratings, and other costs.  Only individual inquiry could determine these costs of having items not paid because in the actual world they were paid.  These opposing interests create conflicts among proposed class members.

54.     Proposed class members also may be worse off under the alternative posting sequence if they would have been assessed overdraft fees on days when under Wachovia's actual posting order, none were assessed.  A Wachovia customer meets Plaintiffs' class definition if he or she was assessed one or more overdraft fees "as a result of Wachovia's practice of sequencing debit card transactions from highest to lowest."  A proposed class member may be worse off overall, however, when all days are considered.  As demonstrated above, one of the benefits of each of Wachovia's posting sequences is that they post all credits submitted for settlement on a particular day prior to all debits submitted on that same day regardless of when the debits or deposits occurred.  Movement to a more chronological ordering of transactions can generate overdraft fees when none would have been assessed under the sequences actually used by Wachovia.

55.     Interestingly, Plaintiffs' Scenario 2A alternative posting order continues to post all credits prior to any debits even if the debit transactions took place prior to the credit transactions.  If Plaintiffs are going to advocate a more chronological posting of transactions, at least in part because customers believed transactions were posted to their accounts in chronological order, there is no basis for them to maintain this feature of Wachovia's posting sequences.  Plaintiffs apparently have done so simply to prevent a situation in which a customer would be assessed more overdraft fees than were assessed under Wachovia's actual posting orders, even though it is inconsistent with what they claim Wachovia should have done (i.e., post transactions in chronological order).

28

56.     In sum, any proposed class member who, over the lifetime of his account, would have been assessed more overdraft fees under the alternative order in comparison to a different alternative posting order has interests in conflict with other proposed class members.

## XI.     Other Practices and Alleged Affirmative Misrepresentations Challenged in Plaintiffs' Complaints Are Distinct from Posting Order

57.     Plaintiffs' class definition focuses only on the impact of Wachovia's posting sequence, but Wachovia's posting sequence is only one of several business practices Plaintiffs purport to challenge in their complaints.  For example, Plaintiffs suggest that Wachovia was "able to determine, almost instantaneously, whether there are sufficient funds in a customer's account to cover that particular transaction . . .  and could give customers the option to decline the transaction to avoid incurring the overdraft fee…."[64]  The practice of approving debit card transactions into insufficient funds is separate and distinct from posting order and can have a separate and distinct effect on overdraft fees.  Because this practice is not the subject of Plaintiffs' class certification motion, I address it only briefly here.

58.     It is important to understand that it is not possible for Wachovia to determine at the time of authorization if a particular debit card transaction will ultimately lead to an overdraft fee. Wachovia may authorize a transaction without knowing it subsequently will trigger an overdraft fee if:  (1) the transaction's authorization amount is less than its settlement amount;[65] or (2) the transaction is authorized when there are sufficient funds in the account, but a transaction that Wachovia had no way of knowing was pending (e.g., a check) is submitted for settlement before the debit card transaction is submitted for settlement.

59.     Wachovia must determine whether or not to authorize a transaction without having full knowledge of the pending transactions for the account.  Not all transactions that Wachovia

---

[64]  Spears-Haymond Complaint, ¶53.

[65]  A transaction amount that is posted to an account may differ from the amount that previously was authorized for the transaction.  Common examples are fuel purchases and restaurant purchases.  When the amount that is authorized is less than the amount that is submitted for settlement, Wachovia may not know that a particular debit card transaction will overdraft the customer's account absent an intervening covering deposit.  The set of hypothetical transactions in Exhibit 11 illustrates an example of a situation where it was not possible for Wachovia to know that a transaction it authorized would later lead to an overdraft fee.  Exhibit 11 shows that the customer's purchase was authorized for only $1 on 10/16/2008, but later settled for $42.03 on 10/20/2008.  Had the settlement amount matched the authorization amount, no overdraft fee would have resulted.  The customer had access to more information than Wachovia regarding whether purchases he made from October 17 to 19 would cause his account to overdraft.

processes for an account are authorized at the time they are initiated.  An account holder with $700 in his account may mail a $700 rent check to his landlord, and the next day use his debit card to purchase a $400 television.  The $400 purchase is submitted to Wachovia for authorization, Wachovia sees $700 in the customer's account, determines the account has sufficient funds, and authorizes the transaction.  If both the check and the television purchase are presented to Wachovia two days later for settlement, Wachovia will process the $700 rent check first and also will process the previously-authorized television purchase, triggering an overdraft fee.  At the time of authorization, Wachovia had no way of knowing there was a $700 check pending or that the television purchase would overdraw the account.  Only the customer knew that he was initiating two transactions, not one, and that there were insufficient funds in the account to cover both transactions.

60.      Even when the bank's current calculation of a customer's available balance is negative at the time of authorization, an approved transaction will not necessarily result in an overdraft fee. This is because under all of Wachovia's posting orders, credits are posted prior to debits regardless of when the debits were initiated.  As such, a customer can make a covering deposit at any time after initiating the debit card transaction, up to and including the day the transaction posts, and avoid a fee.

61.      Whether a customer or proposed class member is made worse off by having a transaction authorized into insufficient funds requires individual inquiry.  Some customers would be made better off by having a debit card transaction authorized into insufficient funds.  For example, customers needing to purchase gasoline late at night, or needing to purchase groceries on a Saturday before their payroll checks are deposited on Monday, could be better off having a debit card transaction authorized into insufficient funds (based on the balance at the time) even if that might result in an additional overdraft fee.  And, as discussed above, in many instances it will *not* result in any fee.  Whether a debit transaction authorized into insufficient funds does result in an additional overdraft fee depends on when that transaction is submitted for settlement relative to when any credits are posted to the account.  A customer eating out with a friend might know there are insufficient funds in her account, choose to pay for the meal with her debit card anyway, and make a covering deposit shortly afterwards.  This customer benefits from having the transaction authorized into overdraft and is able to avoid an overdraft fee by depositing funds prior to the settlement of the transaction.

62.     Plaintiffs' claim that Wachovia misled customers regarding the posting order is not the subject of Plaintiffs' class certification motion, and so I do not address it in this report. However, if Plaintiffs were to make this claim an element of their class certification argument, they would need a different class definition and would need to demonstrate:

- That all proposed class members were commonly exposed to (and paid attention to) the alleged misrepresentations.

- That all proposed class members relied on the allegedly misleading material.

- That no proposed class members understood Wachovia's posting order and assessment of overdraft fees or learned about these practices during the class period.

- That all proposed class members incurred more overdraft fees under each of Wachovia's actual posting orders than they would have incurred had they not been allegedly misled. That is, had proposed class members allegedly not been misinformed of Wachovia's practices and posting order, they would have modified their behavior so as to reduce the number of overdraft fees incurred, for example, by changing their debit card purchasing practices.

- That harm and damages can be calculated with common proof based on how the proposed class members would have acted had they understood Wachovia's posting order.  Moreover, neither harm nor damages could be based on a comparison of the number of overdraft fees that would result from an alternative posting order.  Such calculations would not measure how proposed class members were harmed (or the magnitude of damages caused) by the allegedly misleading information.

- Any proper measure of harm stemming from alleged misrepresentations would require proof that all of the fees identified as having been unlawfully obtained were caused, not by the bank's choice of posting order, but by misrepresentations that affirmatively caused customers to expect something different.

63.     Plaintiffs do not seek to certify a class of customers who relied upon, and were harmed by, alleged misrepresentations.  They have not attempted to demonstrate that any individual plaintiff, much less an entire class of consumers, relied upon alleged misrepresentations that caused them to incur additional overdraft fees.  Neither Plaintiffs nor Mr. Olsen have put forth any method that is capable of identifying customers that were harmed by alleged misrepresentations.  Should Plaintiffs later attempt to certify a class of customers that relied on and were harmed by the alleged misrepresentations, I reserve the right to offer additional opinions at that time.

XII.   **Plaintiffs Cannot Show through Their Expert that the Proposed Class Is Ascertainable or that Injury and/or Damages Can Be Proven with Common Evidence**

64.     Mr. Olsen, Plaintiffs' expert, is a computer programmer and only offers opinions related to the feasibility of certain computations.  He does not address fundamental questions relevant to a consideration of class certification.  As he admits, he does not address harm, damages, or who is in the proposed class.[66]  Thus, Plaintiffs cannot show through Mr. Olsen that injury or damages can be proved with common evidence.  (Plaintiffs do not even discuss how they would prove liability with common evidence.)  Nor have Plaintiffs shown that the proposed class is ascertainable.

65.     Plaintiffs state that Mr. Olsen will "identify customers who were charged overdraft fees due to Wachovia's manipulation of high-to-low re-sequencing, as opposed to those who would have incurred the fees <u>regardless of posting order</u>."[67]  Mr. Olsen never states that he can identify that set of customers who, <u>regardless of the posting order</u>, always would have incurred fewer overdraft fees in comparison to the sequence employed by Wachovia, and he does not offer any opinion about the posting sequence that Wachovia should have used.  Whether overdraft fees resulted from Wachovia's actual posting sequences depends on the particular alternative sequence to which the actual sequence is compared.  It is thus not possible to determine which customers were charged overdraft fees regardless of posting order.

66.     Mr. Olsen stated that he applied a modified version of the "Scenario 2A" method that he used in the *Veronica Gutierrez* California litigation to the named Plaintiffs in the two cases at issue.[68]  Mr. Olsen stated that he did this "to illustrate" that he could calculate "harm" for the named Plaintiffs.  He admits he is not opining on harm or damages and is just performing a calculation.  He does not have a plan for what alternative posting order he will use for purposes of measuring "harm" in these cases.[69]  Furthermore, he states that he "could compare Wachovia's

---

[66] Olsen Declaration, ¶ 43.

[67] Plaintiffs' Motion, p. 4 (emphasis added).

[68] Olsen Declaration, ¶ 43.

[69] Olsen Declaration, ¶ 43.  Deposition of Arthur Olsen, February 15, 2013, p. 109.

actual posting practices to one or more other alternative posting models,"[70] and he admits that different alternative posting orders will lead to different results.[71]

67.     Mr. Olsen has not specified any alternative posting order that would identify Wachovia customers who "incurred one or more overdraft fees as a result of Wachovia's practice of sequencing debit card transactions from highest to lowest."  The alternative posting order that he applied to the named Plaintiffs in these cases as well as all of the alternative posting orders he considered in the *Veronica Gutierrez* California litigation, reordered not only debit card transactions, but also check and ACH transactions.  Thus, his method does not distinguish between overdrafts caused by the order in which debit card transactions were posted and the order in which other transactions were posted.[72]  For example, as shown in Table 7, on March 25, 2008 Mr. Olsen calculated $105 of "harm" for Ms. Pinckney that he would *not* have found had he not moved the sequence in which ACH transactions posted.  In other words, the "harm" he found was exclusively the result of the placement of ACH transactions in the posting order and had nothing to do with high-to-low posting of debit card transactions.

---

[70] Olsen Declaration, ¶ 40.

[71] See Deposition of Arthur Olsen, February 15, 2013, p. 108.

[72] Moreover, Mr. Olsen admits that if, for example, a bank had used the equivalent of one of the posting orders that he had proposed in the *Veronica Gutierrez* California case (Scenario 3B) and he took Scenario 2A as the "alternative" posting order, he would find instances of harm.  (Deposition of Arthur Olsen, February 15, 2013, p. 214.)  Thus, even a posting order that Plaintiffs have claimed is reasonable and fair would harm customers according to Mr. Olsen's method.

**Table 7:  "Harm" Calculated by Mr. Olsen as a Result of ACH Transactions Posting After Debit Card Transactions**

**Frances Knight Triggs Pinckney 3/25/2008**

| Payee | Transaction Amount | Transaction Date | Transaction Time | Transaction Type[1] | Balance | Overdraft Fees |
|---|---|---|---|---|---|---|
| **Wachovia Posting Order** | | | | | | |
| Starting Balance[2] | | | | | $378.69 | |
| Scana Energy | -$249.19 | 3/25/2008 | | ACH Payment | $129.50 | |
| BellSouth | -$146.60 | 3/25/2008 | | ACH Payment | -$17.10 | -$35.00 |
| Trade Mart | -$51.00 | 3/23/2008 | 8:49 AM | Debit Card | -$68.10 | -$35.00 |
| ATM Withdrawal | -$40.00 | 3/24/2008 | 9:10 PM | ATM Withdrawal | -$108.10 | -$35.00 |
| Shell Oil | -$28.01 | 3/23/2008 | 6:44 PM | Debit Card | -$136.11 | -$35.00 |
| **Total** | | | | | | **-$140.00** |
| **Scenario 2A Posting Order[3]** | | | | | | |
| Starting Balance[2] | | | | | $378.69 | |
| Trade Mart | -$51.00 | 3/23/2008 | 8:49 AM | Debit Card | $327.69 | |
| Shell Oil | -$28.01 | 3/23/2008 | 6:44 PM | Debit Card | $299.68 | |
| ATM Withdrawal | -$40.00 | 3/24/2008 | 9:10 PM | ATM Withdrawal | $259.68 | |
| Scana Energy | -$249.19 | 3/25/2008 | | ACH Payment | $10.49 | |
| BellSouth | -$146.60 | 3/25/2008 | | ACH Payment | -$136.11 | -$35.00 |
| **Total** | | | | | | **-$35.00** |
| **Scenario 2A Posting Order With ACH Payments Before Debit Card Transactions[4]** | | | | | | |
| Starting Balance[2] | | | | | $378.69 | |
| Scana Energy | -$249.19 | 3/25/2008 | | ACH Payment | $129.50 | |
| BellSouth | -$146.60 | 3/25/2008 | | ACH Payment | -$17.10 | -$35.00 |
| Trade Mart | -$51.00 | 3/23/2008 | 8:49 AM | Debit Card | -$68.10 | -$35.00 |
| Shell Oil | -$28.01 | 3/23/2008 | 6:44 PM | Debit Card | -$96.11 | -$35.00 |
| ATM Withdrawal | -$40.00 | 3/24/2008 | 9:10 PM | ATM Withdrawal | -$136.11 | -$35.00 |
| **Total** | | | | | | **-$140.00** |
| **Mr. Olsen's "Harm" Calculation** | | | | | | **$105.00** |
| **Mr. Olsen's "Harm" Calculation With ACH Payments Before Debit Cards Transactions** | | | | | | **$0.00** |

Source:  Wachovia Account Statement of Frances Knight Triggs Pinckney, 2/28/08–3/27/08 [WFNC_0001546–50]; Wachovia Transaction Journal of Frances Knight Triggs Pinckney, 3/25/08 [WFNC_0007640–8019 at 7882]; Wachovia EZ Journal of Frances Knight Triggs Pinckney, 3/25/08 [WFNC_0007296–639 at 520–2]; Olsen Analysis Excel Workbook [WACHOVIA_OLSEN 00001]

Note:
[1] ACH Payments are identified as "Automated Debit" transactions and debit card transactions are denoted as "Purchases" within the "Other Withdrawals and Service Fees" section of the Wachovia account statement.
[2] Starting balance = Available balance (adjusted for holds).  See Deposition of Laura Sturmer, 12/7/10, pp. 21–22; see also Deposition of Laura Sturmer, 3/3/11, pp. 10–11.
[3] Transactions are posted in the order described by Mr. Olsen and presented in his calculations.  See Olsen Declaration, p. 17 and Olsen Analysis Excel Workbook  [WACHOVIA_OLSEN 00001].
[4] Transactions are posted in the order described by Mr. Olsen, with the exception that ACH payments are posted prior to debit card transactions.

68.     Additionally, Mr. Olsen calculates "harm" in situations where there logically *cannot* be any harm from high-to-low ordering of debit card transactions.  For example, Mr. Olsen found harm on days where named Plaintiffs' debit card transactions remain in a high-to-low order

(because high-to-low corresponds to his "chronological" order), and on days when only one debit card transaction posted to the account (in which case there is no high-to-low order of debit card transactions). For example, as shown in Table 8, Mr. Olsen calculates $70 of "harm" for Mr. Poulin on December 18, 2007, yet Mr. Poulin's debit card transactions remain in a high-to-low order even after Mr. Olsen's reordering. That is, on this day, "chronological' and "high-to-low" happened to be the same. Again, the "harm" calculated has nothing to do with high-to-low posting of debit card transactions.

**Table 8:  "Harm" Calculated by Mr. Olsen**

**Anthony Poulin 12/18/2007**

| Payee | Transaction Amount | Transaction Date[1] | Transaction Time | Transaction Type[2] | Balance | Overdraft Fees |
|---|---|---|---|---|---|---|
| **Wachovia Posting Order** | | | | | | |
| Starting Balance[3] | | | | | $146.56 | |
| Louis Antonelli | -$120.67 | 12/11/2007 | | Check | $25.89 | |
| Green Rock Tap & Grill | -$39.00 | 12/16/2007 | 11:26 PM | Debit Card | -$13.11 | -$35.00 |
| A&P | -$12.62 | 12/17/2007 | 4:20 PM | Debit Card | -$25.73 | -$35.00 |
| A&P | -$6.36 | 12/17/2007 | 8:43 PM | Debit Card | -$32.09 | -$35.00 |
| **Total** | | | | | | **-$105.00** |
| **Scenario 2A Posting Order[4]** | | | | | | |
| Starting Balance[3] | | | | | $146.56 | |
| Green Rock Tap & Grill | -$39.00 | 12/16/2007 | 11:26 PM | Debit Card | $107.56 | |
| A&P | -$12.62 | 12/17/2007 | 4:20 PM | Debit Card | $94.94 | |
| A&P | -$6.36 | 12/17/2007 | 8:43 PM | Debit Card | $88.58 | |
| Louis Antonelli | -$120.67 | 12/11/2007 | | Check | -$32.09 | -$35.00 |
| **Total** | | | | | | **-$35.00** |
| **Scenario 2A Posting Order With Checks Before Debit Card Transactions[5]** | | | | | | |
| Starting Balance[3] | | | | | $146.56 | |
| Louis Antonelli | -$120.67 | 12/11/2007 | | Check | $25.89 | |
| Green Rock Tap & Grill | -$39.00 | 12/16/2007 | 11:26 PM | Debit Card | -$13.11 | -$35.00 |
| A&P | -$12.62 | 12/17/2007 | 4:20 PM | Debit Card | -$25.73 | -$35.00 |
| A&P | -$6.36 | 12/17/2007 | 8:43 PM | Debit Card | -$32.09 | -$35.00 |
| **Total** | | | | | | **-$105.00** |
| **Mr. Olsen's "Harm" Calculation** | | | | | | **$70.00** |
| **Mr. Olsen's "Harm" Calculation With Check Payments Before Debit Cards Transactions** | | | | | | **$0.00** |

Source: Wachovia Account Statement for Anthony S. Poulin, 12/11/07–1/10/08 [WFNC_0002359–64]; Wachovia Transaction Journal for Anthony S. Poulin, 12/18/07 [WFNC_0008269–358 at 299]; Wachovia EZ Journal for Anthony S. Poulin, 12/18/07 [WFNC_0008176–268 at 213]; Wachovia Check Images for Anthony Poulin [WFNC-M_0002019–41 at 41]; Olsen Analysis Excel Workbook [WACHOVIA_OLSEN 00001]

Note:
[1] The date for checks refers to the date that appears on the check.
[2] ACH Payments are identified as "Automated Debit" transactions and debit card transactions are denoted as "Purchases" within the "Other Withdrawals and Service Fees" section of the Wachovia account statement.
[3] Starting balance = Available balance (adjusted for holds).  See Deposition of Laura Sturmer, 12/7/10, pp. 21–22; see also Deposition of Laura Sturmer, 3/3/11, pp. 10–11.
[4] Transactions are posted in the order described by Mr. Olsen and presented in his calculations.  See Olsen Declaration, p. 17 and Olsen Analysis Excel Workbook  [WACHOVIA_OLSEN 00001].
[5] Transactions are posted in the order described by Mr. Olsen, with the exception that checks are posted prior to debit card transactions.

69.     Similarly, as shown in Table 9, Mr. Olsen calculates $35 of "harm" for Charles Jones on April, 15, 2008, a day on which only a single debit card transaction posted to his account.

**Table 9: "Harm" Calculated by Mr. Olsen**

**Charles Jones 4/15/2008**

| Payee | Transaction Amount | Transaction Date | Transaction Type[1] | Balance | Overdraft Fees |
|---|---|---|---|---|---|
| **Wachovia Posting Order** | | | | | |
| Starting Balance[2] | | | | $513.53 | |
| Prog County | -$537.32 | 4/15/2008 | ACH Payment | -$23.79 | -$35.00 |
| Family Dollar | -$27.20 | 4/14/2008 | Debit Card | -$50.99 | -$35.00 |
| **Total** | | | | | **-$70.00** |
| **Scenario 2A Posting Order[3]** | | | | | |
| Starting Balance[2] | | | | $513.53 | |
| Family Dollar | -$27.20 | 4/14/2008 | Debit Card | $486.33 | |
| Prog County | -$537.32 | 4/15/2008 | ACH Payment | -$50.99 | -$35.00 |
| **Total** | | | | | **-$35.00** |
| **Mr. Olsen's "Harm" Calculation** | | | | | **$35.00** |

Source: Wachovia Account Statement for Charles and Betty Jones, 4/15/08–5/13/08 [WFNC_0000935–8]; Wachovia Transaction Journal for Charles and Betty Jones, 4/15/08 [WFNC_0006871–7179 at 7000]; Olsen Analysis Excel Workbook [WACHOVIA_OLSEN 00001]

Note:
[1] ACH Payments are identified as "Automated Debit" transactions and debit card transactions are denoted as "Purchases" within the "Other Withdrawals and Service Fees" section of the Wachovia account statement.
[2] Starting balance = Available balance (adjusted for holds).  See Deposition of Laura Sturmer, 12/7/10, pp. 21–22; see also Deposition of Laura Sturmer, 3/3/11, pp. 10–11.
[3] Transactions are posted in the order described by Mr. Olsen and presented in his calculations.  See Olsen Declaration, p. 17 and Olsen Analysis Excel Workbook  [WACHOVIA_OLSEN 00001].

70.     Mr. Olsen calculates "harm" for these class representatives on these days (in Tables 7, 8, and 9) because of his choice to post ACH payments and checks <u>after</u> all debit card transactions. The placement of ACH payments and checks relative to other transactions is not an issue raised by Plaintiffs in their complaint, yet Mr. Olsen calculates "harm" in situations that are not attributable to Wachovia's high-to-low posting of debit card transactions.

71.     Mr. Olsen's failure to calculate "harm" based solely on Wachovia's ordering of debit card transactions also affects his claim that he is able to identify (i.e., ascertain) customers who were "harmed."[73]  The proposed class is defined to include Wachovia's customers who "incurred one or more overdraft fees as a result of Wells Fargo's practice of sequencing debit card transactions from highest to lowest…"[74]  Because Mr. Olsen's calculation of "harm" is not based

---

[73] Olsen Declaration at ¶¶2, 41.

[74] Plaintiffs' Motion, p. 1.

solely on the ordering of debit card transactions, he has not demonstrated that he is able to ascertain the members of the proposed class.

72.     As discussed above, an alternative posting sequence, such as a more chronological sequence, can both increase and decrease the number of overdraft fees assessed to different accounts, and can increase or decrease the number of NSF fees and other costs incurred by the account holder.  Mr. Olsen declares that if he is provided an alternative posting sequence, he can write a computer program that will allow him to identify the set of customers who would have had fewer overdraft fees assessed to their accounts under that particular alternative sequence, and the set of customers he identifies will vary depending on the particular sequence used.  Mr. Olsen has not provided any method to identify proposed class members because he has not identified which alternative posting order Plaintiffs would use and because none of the alternatives he has presented in these cases, the Wells Fargo cases, or the *Veronica Gutierrez* California case can identify proposed class members (because they re-order non-debit card transactions).[75]  The ability to implement a mechanical computation does not address who is in the proposed class, who was injured, or what posting sequence Wachovia should have used.

73.     In addition to failing to consider the consequences of having certain transactions not paid under the alternative posting sequence, Mr. Olsen also limits his analysis to only certain days—days in which a customer is assessed two or more overdraft fees.[76]  As I mention above, however, a more chronological posting sequence that does not post all credits prior to all debits may result in more overdraft fees on other days, including days on which no overdraft fee was assessed.  As a result, Mr. Olsen's proposed methodology cannot assess the net harm to any proposed class member.

74.     Mr. Olsen also cannot determine harm to a customer because he cannot match overdraft fee reversals to the transaction that triggered the underlying overdraft fee.  Mr. Olsen proposes two potential methods for accounting for reversals of overdraft fees:  the "30-day" method[77] and

---

[75] For instance, if the alternative sequence is a chronological ordering of all transactions, Mr. Olsen will not be able to identify proposed class members based on the method he has described because, as I described above, Wachovia does not have date and time information for all transactions.

[76] Olsen Declaration, ¶ 16.

[77] Under the "30-day" method, Mr. Olsen credits a reversal to any overdraft fee that he finds would not have occurred under the alternative posting sequence as long as this overdraft fee was assessed within 30 days of the refund.

the "LIFO" method.[78]  Neither of these methods allows Mr. Olsen to definitively match reversals to the original overdraft fee, which he acknowledges.[79]  Moreover, both the "30-day" method and the "LIFO" method can assign fee reversals, not to the "harmful" overdraft fees that actually precipitated them, but rather to overdraft fees the customer would have incurred *regardless* of the posting order Wachovia used, and are thus not in dispute.  In this manner, both the 30-day and LIFO methods can overstate plaintiffs' measure of "harm."[80]

75.     Regardless of which of his two methods Mr. Olsen uses to account for reversals, even within his definition of harm, he cannot determine the harm suffered by potential class members, nor can he determine who was and was not harmed (i.e., who is and is not in the class), because he cannot determine which reversals belong to which overdraft fees.  Mr. Olsen acknowledges that, even within just one of his proposed posting orders in the *Veronica Gutierrez* California litigation, the number of proposed class members varied depending on how he accounted for reversals.  Using one set of assumptions about how to account for fee reversals, rather than a different set, resulted in 47,787 more people being included in the proposed class.[81]  Only individual inquiry of customers can determine the true net impact of the reversals, the degree to which potential class members were harmed, and which potential class members were harmed.  Moreover, individual inquiry would be necessary to know if customers accepted full or partial reversals of overdraft fees as complete resolution of any dispute they may have had.  Mr. Olsen's methodology cannot address this issue.

---

[78] Under the "LIFO" method, Mr. Olsen credits a reversal to the overdraft fee that preceded it.

[79] Olsen Declaration, ¶26.

[80] Mr. Olsen's "30-day" methodology could overstate his measure of harm in situations where a customer did not request or receive a reversal until more than 30 days after the overdraft fee initially was assessed; for example, if a customer routinely waited to challenge overdraft fees until after reviewing his monthly statement.  Mr. Olsen's "LIFO" method could overstate his measure of harm in situations where a reversal was mistakenly matched to a day in which Mr. Olsen does not find any harm, such as on a single overdraft day or on a day in which the same number of overdraft fees are assessed regardless of the posting order (for example, because the account began the day already overdrawn), rather than being properly matched to a day on which Mr. Olsen did find harm.

[81] *See* Olsen Declaration, ¶29.  The figure 47,787 is calculated by subtracting the number of customers allegedly harmed using the "After 30-day Reversal" method (1,144,577) from the number of customers allegedly harmed using the "After LIFO Reversal" method (1,192,364).  The number of customers allegedly harmed under the "LIFO" method is different than the number under the "30-day" method because under the "LIFO" method, Mr. Olsen uses a reversal to refund to the most recent overdraft, regardless if it is an overdraft that he finds would not have occurred under the alternative posting sequence.  Under the "30-day" method, Mr. Olsen uses a reversal to refund any overdraft that occurred that he finds would not have occurred under the alternative posting sequence as long as this overdraft fee was assessed within 30-days of the refund.  (Olsen Declaration, ¶ 26)

76.     Mr. Olsen also does not adequately address to what extent his calculation will account for account charge-offs, that is, negative balances in a customer's account after the account is closed.  The account history of named plaintiff Ms. Celia Spears-Haymond is instructive on the importance of accurately incorporating charge-offs.  On October 19, 2007, Ms. Spears-Haymond's account with Wachovia was closed with a balance of *negative* $1,170.69.[82]  The cumulative amount of *all* of the overdraft fees she incurred during the time her Wachovia account was open was $555.[83]  Because her cumulative overdraft fees were less than the amount of her balance upon closing, Ms. Spears-Haymond was not harmed, according to Plaintiffs' measure of "harm"—even if one was to assume *every single fee* Ms. Spears-Haymond incurred counted as "harm," which is not the case.

77.     Mr. Olsen stated that his methodology would reduce his measure of "harm" if an account holder walked away from his or her account when it had a negative balance.  He indicated that he would need to reduce damages for those account holders by the amount of the negative balance (i.e., the uncollected amount or charge-off experienced by the bank).[84]  Yet, Mr. Olsen has now confirmed he did not factor in account charge-offs in his calculations of "harm" to the named Plaintiffs.[85]

---

[82] Declaration of Patricia Kennedy, February 27, 2013, ¶ 5.

[83] See Exhibit 12 and Declaration of Laura Sturmer, February 27, 2013, ¶ 42.  Plaintiffs stated that Ms. Spears-Haymond had "at least $745 in overdraft fees." (Spears-Haymond Complaint, ¶73.)  It would appear that they are including both overdraft fees and other fees in their figure.

[84] Olsen Declaration, ¶ 24.

[85] Deposition of Arthur Olsen, February 15, 2013, p. 129.

## XIII.  Signature

I declare under the penalty of perjury that foregoing is true and correct.

Executed this 4th day of March , 2013 in Menlo Park, (A

Michael C. Keeley, Ph. D.

# Exhibit 1
# Comparison of Actual Wachovia Posting Order and Posting Order by Transaction Date
# Angela Gonzalez
## 12/1/2008 Posting Date

| Payee | Transaction Amount | Transaction Date | Transaction Type[1] | Balance | Overdraft Fees |
|---|---|---|---|---|---|
| **Actual Wachovia Posting Order** | | | | | |
| Starting Balance[2] | | | | -$77.02 | |
| Branch Deposit | $100.00 | 12/1/2008 | Credit | $22.98 | |
| Superstar Video | -$2.63 | 11/28/2008 | Debit Card | $20.35 | |
| **Total** | | | | | **$0.00** |
| **Posting Order by Transaction Date** | | | | | |
| Starting Balance[2] | | | | -$77.02 | |
| Superstar Video | -2.63 | 11/28/2008 | Debit Card | -$79.65 | -$35.00 |
| Branch Deposit | $100.00 | 12/1/2008 | Credit | $20.35 | |
| **Total** | | | | | **-$35.00** |

Source:  Wachovia Account Statement for Angela and Gabriel Gonzalez, 11/06/08–12/04/08
[WACHOVIA_GONZALEZ000015–22]

Note:
[1] ACH Payments are identified as "Automated Debit" transactions and debit card transactions are denoted as "Purchases" within the "Other Withdrawals and Service Fees" section of the Wachovia account statement.
[2] An transaction journal is not available for this posting date.  Therefore, the starting balance is the account balance and does not account for holds.

# Exhibit 2
# Comparison of Actual Wachovia Posting Order and Posting Order by Transaction Date and Time
# Charles and Betty Jones
## 1/20/2009 Posting Date

| Payee | Transaction Amount | Transaction Date[1] | Transaction Time | Transaction Type[2] | Balance | Overdraft Fees |
|---|---|---|---|---|---|---|
| **Actual Wachovia Posting Order** | | | | | | |
| Starting Balance[3] | | | | | $612.88 | |
| Southern Dental | -$178.00 | 1/16/2009 | 7:42 AM | Debit Card | $434.88 | |
| Southern Dental | -$177.90 | 1/16/2009 | 7:44 AM | Debit Card | $256.98 | |
| Reliant Energy[4] | -$139.47 | 1/10/2009 | | Check | $117.51 | |
| ATM Withdrawal | -$80.00 | 1/18/2009 | 9:59 AM | ATM | $37.51 | |
| Wyatt Cafeteria | -$34.52 | 1/17/2009 | 11:33 AM | Debit Card | $2.99 | |
| Fiesta Mart | -$31.28 | 1/20/2009 | 7:20 AM | Debit Card | -$28.29 | -$35.00 |
| Southern Dental | -$25.00 | 1/16/2009 | 7:42 AM | Debit Card | -$53.29 | -$35.00 |
| Buy Fix It | -$19.90 | 1/15/2009 | 7:47 AM | Debit Card | -$73.19 | -$35.00 |
| Pappas Bar-B-Q | -$15.37 | 1/16/2009 | 8:10 PM | Debit Card | -$88.56 | -$35.00 |
| Whataburger | -$11.19 | 1/19/2009 | 6:10 AM | Debit Card | -$99.75 | -$35.00 |
| Shell | -$4.48 | 1/19/2009 | 11:17 PM | Debit Card | -$104.23 | -$35.00 |
| **Total** | | | | | | **-$210.00** |
| **Posting Order by Transaction Date and Time** | | | | | | |
| Starting Balance[3] | | | | | $612.88 | |
| Reliant Energy[4] | -$139.47 | 1/10/2009 | | Check | $473.41 | |
| Buy Fix It | -$19.90 | 1/15/2009 | 7:47 AM | Debit Card | $453.51 | |
| Southern Dental | -$178.00 | 1/16/2009 | 7:42 AM | Debit Card | $275.51 | |
| Southern Dental | -$25.00 | 1/16/2009 | 7:42 AM | Debit Card | $250.51 | |
| Southern Dental | -$177.90 | 1/16/2009 | 7:44 AM | Debit Card | $72.61 | |
| Pappas Bar-B-Q | -$15.37 | 1/16/2009 | 8:10 PM | Debit Card | $57.24 | |
| Wyatt Cafeteria | -$34.52 | 1/17/2009 | 11:33 AM | Debit Card | $22.72 | |
| ATM Withdrawal | -$80.00 | 1/18/2009 | 9:59 AM | ATM | -$57.28 | -$35.00 |
| Whataburger | -$11.19 | 1/19/2009 | 6:10 AM | Debit Card | -$68.47 | -$35.00 |
| Shell | -$4.48 | 1/19/2009 | 11:17 PM | Debit Card | -$72.95 | -$35.00 |
| Fiesta Mart | -$31.28 | 1/20/2009 | 7:20 AM | Debit Card | -$104.23 | -$35.00 |
| **Total** | | | | | | **-$140.00** |

Source:  Wachovia Account Statement for Charles and Betty Jones, 1/14/09–2/11/09 [WFNC_0000968–72]; Wachovia Transaction Journal for Charles and Betty Jones, 1/20/09 [WFNC-M_0002225]; Wachovia EZ Journal for Charles and Betty Jones, 1/20/09 [WFNC_0006485–722 at 683–687]; Wachovia Check Images for Charles and Betty Jones [WFNC-M_0002478–91 at 78]

Note:
[1] The date for checks refers to the date that appears on the check.
[2] ACH Payments are identified as "Automated Debit" transactions and debit card transactions are denoted as "Purchases" within the "Other Withdrawals and Service Fees" section of the Wachovia account statement.
[3] Starting balance = Available balance (adjusted for holds). See Deposition of Laura Sturmer, 12/7/10, pp. 21–22; see also Deposition of Laura Sturmer, 3/3/11, pp.10–11.
[4] This check was originally submitted for payment on 1/13/09.  The check did not clear, and the plaintiffs were charged an NSF fee of $35 on 1/14/09.  See Transaction Journal for Charles and Betty Jones, 1/13/09 [WFNC-M_0002226].

# Exhibit 3
## Comparison of Actual Wachovia Posting Order and Posting Order by Transaction Date and Scenario 2A Posting Order
## Angela Gonzalez
### 7/25/2006 Posting Date

| Payee | Transaction Amount | Transaction Date | Transaction Time | Transaction Type[1] | Balance | Wachovia Fees | |
|---|---|---|---|---|---|---|---|
| | | | | | | Overdraft | NSF |
| **Actual Wachovia Posting Order** | | | | | | | |
| Starting Balance[2] | | | | | $196.82 | | |
| State Farm | -$185.84 | 7/25/2006 | | ACH Payment | $10.98 | | |
| Exxon Mobile | -$15.03 | 7/23/2006 | 4:31 PM | Debit Card | -$4.05 | -$35.00 | |
| Colonial Medical | -$10.00 | 7/24/2006 | 8:48 AM | Debit Card | -$14.05 | -$35.00 | |
| Sunpass Operations | -$10.00 | 7/23/2006 | 4:18 AM | Debit Card | -$24.05 | -$35.00 | |
| Winn-Dixie Store | -$5.99 | 7/25/2006 | 8:04 AM | Debit Card | -$30.04 | -$35.00 | |
| Service Fee | -$2.00 | 7/25/2006 | | Fee | -$32.04 | | |
| **Total** | | | | | | **-$140.00** | |
| **Posting Order by Transaction Date and Time[3]** | | | | | | | |
| Starting Balance[2] | | | | | $196.82 | | |
| Sunpass Operations | -$10.00 | 7/23/2006 | 4:18 AM | Debit Card | $186.82 | | |
| Exxon Mobile | -$15.03 | 7/23/2006 | 4:31 PM | Debit Card | $171.79 | | |
| Colonial Medical | -$10.00 | 7/24/2006 | 8:48 AM | Debit Card | $161.79 | | |
| Winn-Dixie Store | -$5.99 | 7/25/2006 | 8:04 AM | Debit Card | $155.80 | | |
| Service Fee | -$2.00 | 7/25/2006 | | Fee | $153.80 | | |
| State Farm | -$185.84 | 7/25/2006 | | ACH Payment | Unknown | Unknown | Unknown |
| **Total** | | | | | | **Unknown** | **Unknown** |
| **Scenario 2A Posting Order[4]** | | | | | | | |
| Starting Balance[2] | | | | | $196.82 | | |
| Sunpass Operations | -$10.00 | 7/23/2006 | 4:18 AM | Debit Card | $186.82 | | |
| Exxon Mobile | -$15.03 | 7/23/2006 | 4:31 PM | Debit Card | $171.79 | | |
| Colonial Medical | -$10.00 | 7/24/2006 | 8:48 AM | Debit Card | $161.79 | | |
| Winn-Dixie Store | -$5.99 | 7/25/2006 | 8:04 AM | Debit Card | $155.80 | | |
| State Farm | -$185.84 | 7/25/2006 | | ACH Payment | Unknown | Unknown | Unknown |
| Service Fee | -$2.00 | 7/25/2006 | | Fee | Unknown | | |
| **Total** | | | | | | **Unknown** | **Unknown** |

Source:  Wachovia Transaction Journal for Angela Gonzalez, 7/25/06 [WFNC_0009251–2]; Wachovia Account Statement for Angela Gonzalez, 6/23/06–7/25/06 [WFNC_0000548–53], Wachovia EZ Journal for Angela Gonzalez, 7/20/06–7/25/06 [WFNC_0006282–9 at 7–9]

Note:
[1] ACH Payments are identified as "Automated Debit" transactions and debit card transactions are denoted as "Purchases" within the "Other Withdrawals and Service Fees" section of the Wachovia account statement.
[2] Starting balance = Available balance (adjusted for holds).  See Deposition of Laura Sturmer, 12/7/10, pp. 21–22; see also Deposition of Laura Sturmer, 3/3/11, pp.10–11.
[3] Where time data is unavailable, debit transactions initiated on the same day are posted low to high.
[4] Transactions are posted in the order described by Mr. Olsen and presented in his calculations.  See Olsen Declaration, p. 17 and Olsen Analysis Excel Workbook [WACHOVIA_OLSEN 00001].

# Exhibit 4
## Comparison of Actual Wachovia Posting Order and Posting Order by Transaction Date and Scenario 2A Posting Order
## Angela Gonzalez
1/22/2007 Posting Date

| Payee | Transaction Amount | Transaction Date | Transaction Time | Transaction Type[1] | Balance | Wachovia Fees Overdraft | Wachovia Fees NSF |
|---|---|---|---|---|---|---|---|
| **Actual Wachovia Posting Order** | | | | | | | |
| Starting Balance[2] | | | | | $196.25 | | |
| Capital One | -$66.19 | 1/22/2007 | | ACH Payment | $130.06 | | |
| Capital One | -$63.42 | 1/22/2007 | | ACH Payment | $66.64 | | |
| Publix | -$50.98 | 1/22/2007 | 4:17 PM | Debit Card | $15.66 | | |
| Publix | -$24.14 | 1/19/2007 | 4:32 PM | Debit Card | -$8.48 | -$35.00 | |
| Publix | -$4.56 | 1/21/2007 | 12:22 PM | Debit Card | -$13.04 | -$35.00 | |
| **Total** | | | | | | **-$70.00** | |
| **Posting Order by Transaction Date and Time[3]** | | | | | | | |
| Starting Balance[2] | | | | | $196.25 | | |
| Publix | -$24.14 | 1/19/2007 | 4:32 PM | Debit Card | $172.11 | | |
| Publix | -$4.56 | 1/21/2007 | 12:22 PM | Debit Card | $167.55 | | |
| Publix | -$50.98 | 1/21/2007 | 4:17 PM | Debit Card | $116.57 | | |
| Capital One | -$63.42 | 1/22/2007 | | ACH Payment | $53.15 | | |
| Capital One | -$66.19 | 1/22/2007 | | ACH Payment | Unknown | Unknown | Unknown |
| **Total** | | | | | | **Unknown** | **Unknown** |
| **Scenario 2A Posting Order[4]** | | | | | | | |
| Starting Balance[2] | | | | | $196.25 | | |
| Publix | -$24.14 | 1/19/2007 | 4:32 PM | Debit Card | $172.11 | | |
| Publix | -$4.56 | 1/21/2007 | 12:22 PM | Debit Card | $167.55 | | |
| Publix | -$50.98 | 1/21/2007 | 4:17 PM | Debit Card | $116.57 | | |
| Capital One | -$66.19 | 1/22/2007 | | ACH Payment | $50.38 | | |
| Capital One | -$63.42 | 1/22/2007 | | ACH Payment | Unknown | Unknown | Unknown |
| **Total** | | | | | | **Unknown** | **Unknown** |

Source:  Wachovia Transaction Journal for Angela Gonzalez, 1/22/07 [WFNC_0009303–4]; Wachovia Account Statement for Angela Gonzalez, 12/22/06–1/25/07 [WFNC_0000582–7]; Wachovia EZ Journal for Angela Gonzalez, 1/17/07–1/30/07 [WFNC_0006334–50 at 37–9]

Note:
[1] ACH Payments are identified as "Automated Debit" transactions and debit card transactions are denoted as "Purchases" within the "Other Withdrawals and Service Fees" section of the Wachovia account statement.
[2] Starting balance = Available balance (adjusted for holds).  See Deposition of Laura Sturmer, 12/7/10, pp. 21–22; see also Deposition of Laura Sturmer, 3/3/11, pp.10–11.
[3] Where time data is unavailable, debit transactions initiated on the same day are posted low to high.
[4] Transactions are posted in the order described by Mr. Olsen and presented in his calculations.  See Olsen Declaration, p. 17 and Olsen Analysis Excel Workbook [WACHOVIA_OLSEN 00001].

# Exhibit 5
# Comparison of Actual Wachovia Posting Order and Scenario 2A Posting Order
# Robert Thornton
## 9/17/2007 Posting Date

| Payee | Transaction Amount | Transaction Date[1] | Transaction Type[2] | Balance | Wachovia Fees Overdraft | NSF |
|---|---|---|---|---|---|---|
| **Actual Wachovia Posting Order** | | | | | | |
| Starting Balance[3] | | | | $261.60 | | |
| Prince William Foot & Ankle Center | -$133.73 | 9/12/2007 | Check | $127.87 | | |
| Sunoco SVC Station | -$52.00 | 9/13/2007 | Debit Card | $75.87 | | |
| Shoppers Food | -$30.63 | 9/14/2007 | Debit Card | $45.24 | | |
| Giant Food, Inc. | -$30.14 | 9/15/2007 | Debit Card | $15.10 | | |
| iTunes | -$29.97 | 9/14/2007 | Debit Card | -$14.87 | -$22.00 | |
| Red Lobster | -$24.46 | 9/15/2007 | Debit Card | -$39.33 | -$22.00 | |
| Shoppers Food | -$24.31 | 9/16/2007 | Debit Card | -$63.64 | -$22.00 | |
| Shoppers Food | -$18.50 | 9/15/2007 | Debit Card | -$82.14 | -$22.00 | |
| **Total** | | | | | **-$88.00** | |
| **Scenario 2A Posting Order[4]** | | | | | | |
| Starting Balance[3] | | | | $261.60 | | |
| Sunoco SVC Station | -$52.00 | 9/13/2007 | Debit Card | $209.60 | | |
| iTunes | -$29.97 | 9/14/2007 | Debit Card | $179.63 | | |
| Shoppers Food | -$30.63 | 9/14/2007 | Debit Card | $149.00 | | |
| Shoppers Food | -$18.50 | 9/15/2007 | Debit Card | $130.50 | | |
| Red Lobster | -$24.46 | 9/15/2007 | Debit Card | $106.04 | | |
| Giant Food, Inc. | -$30.14 | 9/15/2007 | Debit Card | $75.90 | | |
| Shoppers Food | -$24.31 | 9/16/2007 | Debit Card | $51.59 | | |
| Prince William Foot & Ankle Center | -$133.73 | 9/12/2007 | Check | Unknown | Unknown | Unknown |
| **Total** | | | | | **Unknown** | **Unknown** |

Source:  Wachovia Transaction Journal for Robert Thornton, 9/17/07 [WFNC_0009911–2]; Wachovia Account Statement for Robert Thornton, 8/25/07–9/27/07 [WFNC_0002900–6]; Wachovia Check Images for Robert Thornton [WFNC-M_0002969–3014 at 3002]

Note:
[1] The date for checks refers to the date that appears on the check.
[2] ACH Payments are identified as "Automated Debit" transactions and debit card transactions are denoted as "Purchases" within the "Other Withdrawals and Service Fees" section of the Wachovia account statement.
[3] Starting balance = Available balance (adjusted for holds).  See Deposition of Laura Sturmer, 12/7/10, pp. 21–22; see also Deposition of Laura Sturmer, 3/3/11, pp.10–11.
[4] Transactions are posted in the order described by Mr. Olsen and presented in his calculations.  See Olsen Declaration, p. 17 and Olsen Analysis Excel Workbook [WACHOVIA_OLSEN 00001].

# Exhibit 6
## Comparison of Actual Wachovia Posting Order
## and Scenario 2A Posting Order
## Robert Thornton
10/28/2008 Posting Date

| Payee | Transaction Amount | Transaction Date[1] | Transaction Type[2] | Balance | Wachovia Fees Overdraft | NSF |
|---|---|---|---|---|---|---|
| **Actual Wachovia Posting Order** | | | | | | |
| Starting Balance[3] | | | | $612.18 | | |
| October Alimony | -$500.00 | 10/15/2008 | Check | $112.18 | | |
| Home Depot | -$96.60 | 10/27/2008 | Debit Card | $15.58 | | |
| Wal-Mart | -$23.18 | 10/27/2008 | Debit Card | -$7.60 | -$35.00 | |
| Cracker Barrel | -$10.75 | 10/26/2008 | Debit Card | -$18.35 | -$35.00 | |
| **Total** | | | | | **-$70.00** | |
| **Scenario 2A Posting Order[4]** | | | | | | |
| Starting Balance[3] | | | | $612.18 | | |
| Cracker Barrel | -$10.75 | 10/26/2008 | Debit Card | $601.43 | | |
| Wal-Mart | -$23.18 | 10/27/2008 | Debit Card | $578.25 | | |
| Home Depot | -$96.60 | 10/27/2008 | Debit Card | $481.65 | | |
| October Alimony | -$500.00 | 10/15/2008 | Check | Unknown | Unknown | Unknown |
| **Total** | | | | | **Unknown** | **Unknown** |

Source: Wachovia Transaction Journal for Robert Thornton, 10/28/08 [WFNC_0009930–1]; Wachovia Account Statement for Robert Thornton, 9/26/08–10/29/08 [WFNC_0002979–86]; Wachovia Check Images for Robert Thornton [WFNC-M_0003039–62 at 52]

Note:
[1] The date for checks refers to the date that appears on the check.
[2] ACH Payments are identified as "Automated Debit" transactions and debit card transactions are denoted as "Purchases" within the "Other Withdrawals and Service Fees" section of the Wachovia account statement.
[3] Starting balance = Available balance (adjusted for holds). See Deposition of Laura Sturmer, 12/7/10, pp. 21–22; see also Deposition of Laura Sturmer, 3/3/11, pp.10–11.
[4] Transactions are posted in the order described by Mr. Olsen and presented in his calculations. See Olsen Declaration, p. 17 and Olsen Analysis Excel Workbook [WACHOVIA_OLSEN 00001].

# Exhibit 7
## Comparison of Actual Wachovia Posting Order and Scenario 2A Posting Order
## Robert Thornton
### 3/3/2009 Posting Date

| Payee | Transaction Amount | Transaction Date | Transaction Time | Transaction Type[1] | Balance | Wachovia Fees Overdraft | NSF |
|---|---|---|---|---|---|---|---|
| **Actual Wachovia Posting Order** | | | | | | | |
| Starting Balance[2] | | | | | $51.28 | | |
| State Farm | -$59.25 | 3/3/2009 | | ACH Payment | -$7.97 | -$35.00 | |
| Perkins | -$13.69 | 3/1/2009 | 8:43 AM | Debit Card | -$21.66 | -$35.00 | |
| Target | -$9.96 | 3/2/2009 | 3:41 PM | Debit Card | -$31.62 | -$35.00 | |
| Klatt True Value | -$7.42 | 3/2/2009 | 9:21 AM | Debit Card | -$39.04 | -$35.00 | |
| **Total** | | | | | | **-$140.00** | |
| **Scenario 2A Posting Order[3]** | | | | | | | |
| Starting Balance[2] | | | | | $51.28 | | |
| Perkins | -$13.69 | 3/1/2009 | 8:43 AM | Debit Card | $37.59 | | |
| Klatt True Value | -$7.42 | 3/2/2009 | 9:21 AM | Debit Card | $30.17 | | |
| Target | -$9.96 | 3/2/2009 | 3:41 PM | Debit Card | $20.21 | | |
| State Farm | -$59.25 | 3/3/2009 | | ACH Payment | Unknown | Unknown | Unknown |
| **Total** | | | | | | **Unknown** | **Unknown** |

Source:  Wachovia Transaction Journal for Robert Thornton, 3/3/09 [WFNC_0009948–9]; Wachovia Account Statement for Robert Thornton, 2/25/09–3/25/09 [WFNC_0041416–21]; Wachovia EZ Journal for Robert Thornton, 3/3/09 [WFNC_0008867–71]

Note:
[1] ACH Payments are identified as "Automated Debit" transactions and debit card transactions are denoted as "Purchases" within the "Other Withdrawals and Service Fees" section of the Wachovia account statement.
[2] Starting balance = Available balance (adjusted for holds).  See Deposition of Laura Sturmer, 12/7/10, pp. 21–22; see also Deposition of Laura Sturmer, 3/3/11, pp.10–11.
[3] Transactions are posted in the order described by Mr. Olsen and presented in his calculations.  See Olsen Declaration, p. 17 and Olsen Analysis Excel Workbook [WACHOVIA_OLSEN 00001].

# Exhibit 8
# Comparison of Actual Wachovia Posting Order
# and Scenario 2A Posting Order
# Murlee Damor
## 4/7/2009 Posting Date

| Payee | Transaction Amount | Transaction Date | Transaction Type[1] | Balance | Wachovia Fees | |
|---|---|---|---|---|---|---|
| | | | | | Overdraft | NSF Fees |
| **Actual Wachovia Posting Order** | | | | | | |
| Starting Balance[2] | | | | $108.94 | | |
| Financial Freedom | -$100.00 | 4/7/2009 | ACH Payment | $8.94 | | |
| Frederick's Mail Order | -$53.95 | 4/7/2009 | Debit Card | -$45.01 | -$35.00 | |
| **Total** | | | | | **-$35.00** | |
| **Scenario 2A Posting Order[3]** | | | | | | |
| Starting Balance[2] | | | | $108.94 | | |
| Frederick's Mail Order | -$53.95 | 4/7/2009 | Debit Card | $54.99 | | |
| Financial Freedom | -$100.00 | 4/7/2009 | ACH Payment | Unknown | Unknown | Unknown |
| **Total** | | | | | **Unknown** | **Unknown** |

Source: Wachovia Account Statement for Murlee Damor, 3/12/09–4/13/09 [WFNC_0000104–7]; Wachovia Transaction Journal for Murlee Damor, 4/7/09 [WFNC_0008950–99 at 77]

Note:
[1] ACH Payments are identified as "Automated Debit" transactions and debit card transactions are denoted as "Purchases" within the "Other Withdrawals and Service Fees" section of the Wachovia account statement.
[2] Starting balance = Available balance (adjusted for holds). See Deposition of Laura Sturmer, 12/7/10, pp. 21–22; see also Deposition of Laura Sturmer, 3/3/11, pp.10–11.
[3] Transactions are posted in the order described by Mr. Olsen and presented in his calculations. See Olsen Declaration, p. 17 and Olsen Analysis Excel Workbook [WACHOVIA_OLSEN 00001].

# Exhibit 9
# Comparison of Actual Wachovia Posting Order and Scenario 2A Posting Order Frances Knight Triggs Pinckney
## 1/31/2005 Posting Date

| Payee | Transaction Amount | Transaction Date[1] | Transaction Type[2] | Balance | Wachovia Fees | |
|---|---|---|---|---|---|---|
| | | | | | Overdraft | NSF |
| **Actual Wachovia Posting Order** | | | | | | |
| Starting Balance[3] | | | | $567.51 | | |
| Check | -$1,141.82 | 1/27/2005 | Check | -$574.31 | -$30.00 | |
| Branch Withdrawal | -$100.00 | 1/28/2005 | Cash Withdrawal | -$674.31 | -$30.00 | |
| AOL Service | -$23.90 | 1/30/2005 | Debit Card | -$698.21 | -$30.00 | |
| **Total** | | | | | **-$90.00** | |
| **Scenario 2A Posting Order[4]** | | | | | | |
| Starting Balance[3] | | | | $567.51 | | |
| Branch Withdrawal | -$100.00 | 1/28/2005 | Cash Withdrawal | $467.51 | | |
| AOL Service | -$23.90 | 1/30/2005 | Debit Card | $443.61 | | |
| Check | -$1,141.82 | 1/27/2005 | Check | -$698.21 | Unknown | Unknown |
| **Total** | | | | | **Unknown** | **Unknown** |

Source:  Wachovia Transaction Journal for Frances Knight Pinckney, 1/31/05 [WFNC_0007640–8019 at 7645]; Wachovia Account Statement for Frances Knight Pinckney, 1/28/05–2/25/05 [WFNC_0001788–95], Wachovia Check Images for Frances Knight Pinckney [WFNC-M_0000628–9]

Note:
[1] The date for checks refers to the date that appears on the check.
[2] ACH Payments are identified as "Automated Debit" transactions and debit card transactions are denoted as "Purchases" within the "Other Withdrawals and Service Fees" section of the Wachovia account statement.
[3] Starting balance = Available balance (adjusted for holds).  See Deposition of Laura Sturmer, 12/7/10, pp. 21–22; see also Deposition of Laura Sturmer, 3/3/11, pp.10–11.
[4] Transactions are posted in the order described by Mr. Olsen and presented in his calculations.  See Olsen Declaration, p. 17 and Olsen Analysis Excel Workbook [WACHOVIA_OLSEN 00001].

# Exhibit 10
# Comparison of Actual Wachovia Posting Order and Posting Order by Transaction Date and Time
# Celia Spears-Haymond
## 8/20/2007 Posting Date

| Payee | Transaction Amount | Transaction Date | Transaction Time | Transaction Type[1] | Balance | Wachovia Fees Overdraft | NSF Fees |
|---|---|---|---|---|---|---|---|
| **Actual Wachovia Posting Order** | | | | | | | |
| Starting Balance[2] | | | | | $883.26 | | |
| NSF/OD Fee Refund | $90.00 | 8/20/2007 | 3:00 PM | Credit | $973.26 | | |
| ATM Withdrawal | -$402.00 | 8/17/2007 | 8:48 AM | ATM | $571.26 | | |
| Desarr del Descans | -$143.36 | 8/18/2007 | 10:52 AM | Debit Card | $427.90 | | |
| Desarr del Descans | -$143.36 | 8/17/2007 | 3:18 PM | Debit Card | $284.54 | | |
| Shell | -$100.00 | 8/20/2007 | | ACH Payment | $184.54 | | |
| Withdrawal[3] | -$98.87 | 8/18/2007 | 2:38 PM | ATM | $85.67 | | |
| Mexican Insurance | -$60.46 | 8/18/2007 | 2:03 AM | Debit Card | $25.21 | | |
| Calafia | -$55.65 | 8/17/2007 | 10:36 PM | Debit Card | -$30.44 | -$30.00 | |
| Withdrawal[3] | -$44.94 | 8/18/2007 | 12:18 PM | ATM | -$75.38 | -$30.00 | |
| Tijuana Junior Taco | -$36.94 | 8/18/2007 | 4:46 PM | Debit Card | -$112.32 | -$30.00 | |
| Withdrawal[3] | -$8.99 | 8/19/2007 | 1:19 PM | ATM | -$121.31 | -$30.00 | |
| Int'l Service Fee | -$2.87 | 8/17/2007 | | Fee | -$124.18 | | |
| Int'l Service Fee | -$2.87 | 8/18/2007 | | Fee | -$127.05 | | |
| Int'l Service Fee | -$1.98 | 8/18/2007 | 2:38 PM | Fee | -$129.03 | | |
| Int'l Service Fee | -$1.11 | 8/17/2007 | | Fee | -$130.14 | | |
| Int'l Service Fee | -$0.90 | 8/18/2007 | 12:18 PM | Fee | -$131.04 | | |
| Int'l Service Fee | -$0.74 | 8/18/2007 | | Fee | -$131.78 | | |
| Int'l Service Fee | -$0.18 | 8/19/2007 | 1:19 PM | Fee | -$131.96 | | |
| **Total** | | | | | | **-$120.00** | |
| **Posting Order by Transaction Date and Time[4]** | | | | | | | |
| Starting Balance[2] | | | | | $883.26 | | |
| ATM Withdrawal | -$402.00 | 8/17/2007 | 8:48 AM | ATM | $481.26 | | |
| Desarr del Descans | -$143.36 | 8/17/2007 | 3:18 PM | Debit Card | $337.90 | | |
| Calafia | -$55.65 | 8/17/2007 | 10:36 PM | Debit Card | $282.25 | | |
| Int'l Service Fee | -$1.11 | 8/17/2007 | | Fee | $281.14 | | |
| Int'l Service Fee | -$2.87 | 8/18/2007 | | Fee | $278.27 | | |
| Mexican Insurance | -$60.46 | 8/18/2007 | 2:03 AM | Debit Card | $217.81 | | |
| Desarr del Descans | -$143.36 | 8/18/2007 | 10:52 AM | Debit Card | $74.45 | | |
| Int'l Service Fee | -$0.90 | 8/18/2007 | 12:18 PM | Fee | $73.55 | | |
| Withdrawal[3] | -$44.94 | 8/18/2007 | 12:18 PM | ATM | $28.61 | | |
| Int'l Service Fee | -$1.98 | 8/18/2007 | 2:38 PM | Fee | $26.63 | | |
| Withdrawal[3] | -$98.87 | 8/18/2007 | 2:38 PM | ATM | -$72.24 | -$30.00 | |
| Tijuana Junior Taco | -$36.94 | 8/18/2007 | 4:46 PM | Debit Card | -$109.18 | -$30.00 | |
| Int'l Service Fee | -$0.74 | 8/18/2007 | | Fee | -$109.92 | | |
| Int'l Service Fee | -$2.87 | 8/18/2007 | | Fee | -$112.79 | | |
| Int'l Service Fee | -$0.18 | 8/19/2007 | 1:19 PM | Fee | -$112.97 | | |
| Withdrawal[3] | -$8.99 | 8/19/2007 | 1:19 PM | ATM | -$121.96 | -$30.00 | |
| NSF/OD Fee Refund | $90.00 | 8/20/2007 | 3:00 PM | Credit | -$31.96 | | |
| Automated Shell Debit | -$100.00 | 8/20/2007 | | ACH Payment | Unknown | Unknown | Unknown |
| **Total** | | | | | | **Unknown** | **Unknown** |

Source:  Wachovia Account Statement for Celia M. Haymond, 8/18/07–9/19/07 [WFNC_0002793–6]; Wachovia EZ Journal for Celia M. Haymond, 8/17/07–8/21/07 [WFNC_0008724–53 at 48–51];  Wachovia Transaction Journal for Celia M. Haymond, 8/20/07 [WFNC-M_0015329–31]

Note:
[1] ACH Payments are identified as "Automated Debit" transactions and debit card transactions are denoted as "Purchases" within the "Other Withdrawals and Service Fees" section of the Wachovia account statement.
[2] Starting balance = Available balance (adjusted for holds).  See Deposition of Laura Sturmer, 12/7/10, pp. 21–22; see also Deposition of Laura Sturmer, 3/3/11, pp.10–11.
[3] These transactions are assumed to be ATM withdrawals.
[4] Where time data is unavailable, debit transactions initiated on the same day are posted low to high.

# Exhibit 11
# Wachovia Cannot Predict Whether a Transaction Will Generate an Overdraft Fee
# Hypothetical Transactions for a Single Posting Day
## 10/20/2008 Posting Date

| Payee | Transaction Amount | Transaction Date | Transaction Type | Balance | Overdraft Fees |
|---|---|---|---|---|---|
| **Information Available to Wachovia** | | | | | |
| Starting Balance | | | | $15.29 | |
| Shell Oil | -$1.00 | 10/16/2008 | Debit Card | $14.29 | |
| Carl's Jr | -$6.39 | 10/17/2008 | Debit Card | $7.90 | |
| Smiths Food | -$1.49 | 10/19/2008 | Debit Card | $6.41 | |
| Redbox DVD | -$1.07 | 10/17/2008 | Debit Card | $5.34 | |
| **Total** | | | | | **$0.00** |
| **Information Available to Customer** | | | | | |
| Starting Balance | | | | $15.29 | |
| Shell Oil | -$42.03 | 10/16/2008 | Debit Card | -$26.74 | -$35.00 |
| Carl's Jr | -$6.39 | 10/17/2008 | Debit Card | -$33.13 | -$35.00 |
| Smiths Food | -$1.49 | 10/19/2008 | Debit Card | -$34.62 | -$35.00 |
| Redbox DVD | -$1.07 | 10/17/2008 | Debit Card | -$35.69 | -$35.00 |
| **Total** | | | | | **$140.00** |

# Exhibit 12
# Accumulation of Fees vs. Debts at Account Closing
# Celia Spears-Haymond

| Date | Overdraft Fees | Running Total |
|------|---------------|---------------|
| 7/30/2007 | -$25.00 | -$25.00 |
| 7/31/2007 | -$25.00 | -$50.00 |
| 8/6/2007 | -$25.00 | -$75.00 |
| 8/16/2007 | -$30.00 | -$105.00 |
| 8/20/2007 | -$120.00 | -$225.00 |
| 8/21/2007 | -$210.00 | -$435.00 |
| 8/22/2007 | -$120.00 | -$555.00 |
| **Total** | | **-$555.00** |

**Closing Account Balance (10/19/2007)**      **-$1,170.69**

Source: Wachovia Account Statements of Celia M. Spears-Haymond: 6/11/07–6/19/07 [WFNC_0002778–80], 6/20/07–7/20/07 [WFNC_0002781–7], 7/21/07–8/17/07 [WFNC_0002788–92], 8/18/07–9/19/07 [WFNC_0002793–6], 9/20/07–10/19/07 [WFNC_0002797–8].

Attachment A

**MICHAEL C. KEELEY, Ph.D.**
**Senior Vice President**

**Cornerstone Research**
mkeeley@cornerstone.com

| | |
|---|---|
| **Business** | **Home** |
| 1000 El Camino Real • Menlo Park, CA 94025 | 2290 Stockbridge Avenue • Woodside, CA 94062 |
| 650.470.7120 • fax 650.324.9204 | 650.368.7944 • fax 650.364.4185 |

## ACADEMIC BACKGROUND

| 1974 | **University of Chicago** | Chicago, Illinois |
|---|---|---|
| | *Ph.D., Economics* | |
| 1971 | **University of Chicago** | Chicago, Illinois |
| | *M.A., Economics* | |
| 1969 | **Massachusetts Institute of Technology** | Cambridge, Massachusetts |
| | *S.B., Mathematics* | |

## RANGE OF EXPERIENCE

Expert in economics, econometrics, and finance. Provided consulting and expert testimony in antitrust, intellectual property, breach of contract, product misrepresentation, and securities matters. Testified in over 20 trials. Provided business consulting on pricing, auction design, and strategy. Provided public policy analysis on energy, labor, economic development, welfare reform, and banking issues. Has industry experience in telecommunications, insurance, banking, oil & gas, medical device, health care, pharmaceutical, computer software and hardware, automotive, internet, chemical, financial, agriculture, bio-technology, and real estate industries among others.

## PROFESSIONAL EXPERIENCE

1989 – Present **Cornerstone Research** Menlo Park, California
*Senior Vice President*

Developed the firm's antitrust practice. Cases involved issues of alleged price fixing, monopolization, predatory pricing, price discrimination, tying, and mergers and acquisitions.

Developed the firm's intellectual property practice. Addressed issues of damages in patent, copyright, trade secret, and trade dress infringement matters, commercial success in a patent liability matter and the economics of technology sharing agreements.

Testified in several prominent cases, such as *Monsanto v. DuPont*, the Long Beach crude oil price fixing case, the Mercedes-Benz tying cases, *Verizon v. Cox, Verdin v. R & B Falcon et al., Aguilar v. Atlantic Richfield et al.*, and the *AMD v. Intel* litigation. Served as the expert in a number of other antitrust and intellectual property matters.

Served as an expert or consultant regarding class certification in a number of cases in the financial, pharmaceutical, medical device, chemical, oil and gas, and high tech industries, as well as in cases involving labor markets.

MICHAEL C. KEELEY, Ph.D.
Senior Vice President

**PROFESSIONAL EXPERIENCE (CONT.)**

Managed a number of prominent cases, including the *High Fructose Corn Syrup Antitrust Litigation,* the *Lotus v. Borland* copyright litigation, and the Wyoming Tight Sands Antitrust Cases, in which affiliated experts served as the testifying experts. Responsible for defining the scope of research and analysis, managing project teams, coordinating work with attorneys and experts and presenting research findings.

Consulted on issues of auction design and bidding strategy. Work has included consulting on the PCS spectrum auctions and helping to design and administer an auction in the petrochemical industry. Also, assisted a firm in the petrochemical industry on contract negotiation strategy.

Provided public policy analysis on energy issues.

Consulted or testified in a variety of other types of cases, including securities fraud, breach of contract, fraudulent conveyance, usury, piercing the corporate veil, transfer pricing and wrongful termination.

Cases have involved a variety of industries, including telecommunications, oil and gas, automotive, chemical, health care, pharmaceutical, software, semi-conductor, banking, insurance and retailing.

1983 – 1989    **Federal Reserve Bank of San Francisco**    San Francisco, California
*Research Officer*
Contributed to the development of the Bank's policy on regulatory, banking and financial issues.

Conducted research and published articles on banking and financial regulation and deregulation. (See **Journal Articles** and **Weekly Letters**.)

Analyzed the competitive effects of bank mergers and acquisitions in conjunction with the Bank's regulatory activities.

1983 – 1989    **Michael C. Keeley, Consulting**
*Sole Proprietor*
Provided expert testimony and litigation consulting. Work involved primarily economic and statistical analysis of damage claims.

1975 – 1983    **SRI International**    Menlo Park, California
*Manager, Antitrust Economics Consulting Group*
Started up and managed SRI's Antitrust Economics Consulting Group, which provided economic research, statistical analysis and expert testimony.
*Project Director and Principal Investigator, The Labor-Market Evaluation of the Employment Opportunity Pilot Projects (EOPP)*
Developed study design and was awarded a multi-million dollar contract to conduct an evaluation of EOPP. Managed in-house staff and two sub-contracting firms.
*Principal Investigator of a Study of the Labor-Market Performance of Small Business*
Developed study plan and was awarded funding to analyze turnover, new hiring, and flows between large and small business.

**MICHAEL C. KEELEY, Ph.D.**
**Senior Vice President**

---

**PROFESSIONAL EXPERIENCE (CONT.)**

**SRI International (cont.)**

*Senior Economist, Regulatory Economics Program*
Conducted series of published studies of market-oriented approaches to regulation funded by the Presidential Task Force on Regulatory Relief.  (See **Government Publications**.)

*Task Leader of Studies of the Seattle and Denver Income Maintenance Experiment*
Developed new approach for evaluating the behavioral effects and costs of alternative welfare programs.  (See **Books and Monographs**, **Journal Articles** and **SRI Publications**.)

1982 – 1983   **University of Santa Clara**                     Santa Clara, California
*Visiting Associate Professor*
Taught courses in managerial economics and microeconomics in the Graduate School of Business and Department of Economics.

1976 – 1977   **University of Santa Clara**                     Santa Clara, California
*Lecturer*
Taught courses in managerial economics in the Graduate School of Business.

1973 – 1975   **General Electric, TEMPO, Center for Advanced Studies**
*Economist*
Developed economic-demographic simulation models and conducted research on the relationships between economic and demographic variables.  Research culminated in book on economic development.  (See **Books and Monographs** and **Journal Articles**.)

**AWARDS AND SERVICES**

Four-year full fellowship, University of Chicago; selected for inclusion in Who's Who in Economics, Who's Who in the West, Who's Who in Finance and Industry, and the International Biographical Dictionary; reviewer for the National Science Foundation, the Hoover Institution and the Pacific Institute; invited speaker for the Garn Institute, the Cato Institute, the Lowe Institute, Urban Land Institute, the National League of Cities, the Chicago Bank Structure Conference, the Municipal Finance Officers Association, The Law and Society Association, and the Bank Administration Institute; awarded the Garn prize for paper on bank risk-taking.

**REFEREEING ACTIVITY**

Referee for:  *American Economic Review*; *The Journal of Political Economy*; *The Journal of Economic Literature*; *The Journal of Law and Economics*; *The Journal of Banking and Finance*; *The Journal of Financial Services Research*; *The Journal of Money, Credit and Banking*; *Demography*; *Economic Inquiry*; *International Economic Review*; *The Quarterly Journal of Economics*; *The Review of Economics and Statistics*; *The Journal of Human Resources*; *Public Finance Quarterly*; *Behavioral and Brain Sciences*; *Economic Development and Cultural Change*; *Land Economics*; *Eastern Economic Review*; and *Federal Reserve Bank of San Francisco's Economic Review*.

**MICHAEL C. KEELEY, Ph.D.**
**Senior Vice President**

**PUBLICATIONS**

**Books and Monographs**

*Labor Supply and Public Policy:  A Critical Review*, New York, New York:  Academic Press, June 1981, 196 pp.

*Population, Public Policy, and Economic Development*, ed., New York, New York:  Praeger, 1976, 259 pp.

**Journal Articles**

"Uniform Gasoline Price Regulation:  Consequences for Consumer Welfare," with K. Elzinga, *International Journal of the Economics of Business*, Volume 10, No. 2, July 2003, pp. 157-168.

"Infringement:  Valuing IP for Damages," *les Nouvelles*, Volume XXXIV No. 4, December 1999, pp. 172-175.

"Deposit Insurance, Risk and Market Power in Banking," *American Economic Review*, Volume 80, 1990, pp. 1183–1200.

"A Reexamination of Mean-Variance Analysis of Bank Capital Regulation," with F. Furlong, *Journal of Banking and Finance*, Volume 14, 1990, pp. 69–84.

"Capital Regulation and Bank Risk-Taking:  A Note," with F. Furlong, *Journal of Banking and Finance*, Volume 13, 1989, pp. 883–891.

"Estimating the Fisher Effect and the Stochastic Money Growth Process," with M. Hutchinson, *Economic Inquiry*, Volume XXVII, April 1989, pp. 219–239.

"The Stock Price Effects of Bank Holding Company Security Issuance," *Economic Review*, Federal Reserve Bank of San Francisco, Winter 1989, pp. 3–19.

"Bank Capital Regulation in the 1980s:  Effective or Ineffective," *Economic Review*, Federal Reserve Bank of San Francisco, Winter 1988, pp. 3–20.

"Bank Capital Regulation and Asset Risk," with F. Furlong, *Economic Review*, Federal Reserve Bank of San Francisco, Spring 1987, pp. 20–40.

"Policy Coordination and Financial Intermediaries:  The 1986 Fall Academic Conference of the Federal Reserve Bank of San Francisco," with C. Walsh, *Economic Review*, Federal Reserve Bank of San Francisco, Winter 1987, pp. 31–46.

"The Effects of Experimental Negative Income Tax Programs on Marital Dissolution:  Evidence from the Seattle and Denver Income Maintenance Experiments," *International Economic Review*, Volume 28, No. 1, February 1987, pp. 241–257.

"Deposit Rate Deregulation and the Demand for Transactions Media," with G. Zimmerman, *Economic Review*, Federal Reserve Bank of San Francisco, Summer 1986, pp. 47–62.

"Bank Regulation and the Public Interest," with F. Furlong, *Economic Review*, Federal Reserve Bank of San Francisco, Spring 1986, pp. 55–71.

"The Regulation of Bank Entry," *Economic Review*, Federal Reserve Bank of San Francisco, Summer 1985, pp. 5–13.

**MICHAEL C. KEELEY, Ph.D.**
**Senior Vice President**

**Journal Articles (cont.)**

"Determining Geographic Markets for Deposit Competition in Banking," with G. Zimmerman, *Economic Review*, Federal Reserve Bank of San Francisco, Summer 1985, pp. 25–45.

"Job Search for the Duration of Unemployment," with P.K. Robins, *Journal of Labor Economics*, July 1985, pp. 337–362.

"Competition for Money Market Deposit Accounts," with G. Zimmerman, *Economic Review*, Federal Reserve Bank of San Francisco, Spring 1985, pp. 5–27.

"Cyclical Unemployment and Employment:  Effects of Labor-Force Entry and Exit," *Economic Review*, Federal Reserve Bank of San Francisco, Summer 1984, pp. 5–25.

"The Economics of Firm Size:  Implications from Labor-Market Studies," *Economic Review*, Federal Reserve Bank of San Francisco, Winter 1984, pp. 5–21.

"A Review of the Evidence on Labor-Supply Response from the Income Maintenance Experiments," *Social Science Forum*, Volume 4, No. 1, 1981–1982, pp. 23–37.

"The Effects of a Negative Income Tax on Migration," *The Journal of Human Resources*, Volume VI, No. 4, Fall 1980, pp. 480–498.

"The Effects of a Negative Income Tax on Fertility," *The Journal of Human Resources*, Volume VI, No. 4, Fall 1980, pp. 675–694.

"Experimental Design, The Conlisk-Watts Assignment Model, and the Proper Estimation of Behavioral Response," with P.K. Robins, *The Journal of Human Resources*, Volume VI, No. 4, Fall 1980, pp. 695–706.

"An Analysis of the Age Pattern of First Marriage," *International Economic Review*, Volume 20, No. 2, June 1979, pp. 421–438.

"Work Incentives and the Negative Income Tax," with P.K. Robins, *Challenge*, Volume 22, No. 1, March/April 1979, pp. 52–56.

"The Estimation of Labor-Supply Models Using Experimental Data," with P.K. Robins, R.G. Spiegelman and R.W. West, *The American Economic Review*, Volume 68, No. 5, December 1978, pp. 873–887.

"The Economics of Family Formation:  An Investigation of the Age of First Marriage," *Economic Inquiry*, April 1977, pp. 238–250.

"A Comment on an Interpretation of the Economic Theory of Fertility," *Journal of Economic Literature*, Volume XIII, No. 2, June 1975, pp. 461–468.

**Chapters in Books**

"Potential Damages Facing Auditors in Securities Fraud Cases," with William H. Beaver and James K. Malernee, in *Accountants' Liability:  The Need for Fairness*, Washington, D.C.:  National Legal Center for the Public Interest, 1994.

"Interest on Business Checking Accounts," in *Readings in Money, the Financial System and Monetary Policy*, N.Y.:  Prentice Hall, 1990.

"Troubled Banks and Thrifts," in *Financial Institutions and Markets in a Changing World*, Business Publications, Fall 1989.

**MICHAEL C. KEELEY, Ph.D.**
**Senior Vice President**

---

**Chapters in Books (cont.)**

"Reforming Deposit Insurance," in *Financial Institutions and Markets in a Changing World*, Business Publications, Fall 1989.

"A Cashless Society?" in *Macroeconomics*, Guildford, Conn.:  Dushkin Publishing Group, Inc., Fall 1989; Also in *Readings in Money, the Financial System and Monetary Policy*, N.Y.:  Prentice Hall, 1990.

"The Thrift Insurance Crisis," with J. Neuberger, in *Financial Institutions and Markets in a Changing World*, Business Publications, Fall 1989.

"International Coordination of Regulation:  Comment," in *Proceedings of a Conference of Governing Banking's Future*, The Cato Institute, 1989.

"Regulating Bank Capital," with F. Furlong, in *Macroeconomics*, Guildford, Conn.:  Dushkin Publishing Group, Inc., Fall 1988.

"Money and the Fisher Effect," with M. Hutchinson, in *Macroeconomics,* Guildford, Conn.:  Dushkin Publishing Group, Inc., Fall 1988.

"Bank Capital Regulation:  Effective or Ineffective?" in *Proceedings of a Conference on Bank Structure and Competition,* Federal Reserve Bank of Chicago, 1988.

"Uniting Investment and Commercial Banking," with R. Pozdena, in *Current Readings on Money, Banking and Financial Markets,* edited by James Wilcox, Boston, Mass.:  Little, Brown & Co., 1988.

"Interest Checking," with G. Zimmerman, in *Current Readings on Money, Banking and Financial Markets,* edited by James Wilcox, Boston, Mass.:  Little, Brown & Co., 1987.

"Regulation of Bank Entry," in *Financial Institutions and Markets in a Changing World, Business Publications,* Spring 1986.

"The Search for Financial Stability," with F. Furlong, in *The Search for Financial Stability:  The Past 50 Years*, Federal Reserve Bank of San Francisco, 1986.

"Competition for Money Market Deposit Accounts," with G. Zimmerman, in *Proceedings of a Conference on Bank Structure and Competition*, Federal Reserve Bank of Chicago, 1985.

"Unemployment vs. Employment," in *Macroeconomics 85/86*, edited by John Pisciotta, Guildford, Conn.:  Dushkin Publishing Group, Inc., 1985.

"The Design of Social Experiments:  A Critique of the Conlisk-Watts Assignment Model," with P. Robins, in *Research in Labor Economics*, Volume 3, edited by Ronald G. Ehrenberg, Greenwich, Conn.:  JAI Press, 1980.

"A Design for Evaluating the Labor-Market Effects of the Employment Opportunity Pilot Projects," with J. Bishop, G. Farkas, E. Stromsdorfer and P. Robins, in *Evaluation Studies Review Annual*, Volume 5, edited by Ernst W. Stromsdorfer and George Farkas, Beverly Hills, Calif.:  Sage Publications, 1980, pp. 759–800.

"The Design of an Income Maintenance Experiment," Chapter I, with R.G. Spiegelman and R.W. West, in *A Guaranteed Annual Income:  Results from an Income Maintenance Experiment*, edited by P. Robins, R.G. Spiegelman, S. Weiner, and J.G. Bell, New York, New York:  Academic Press, 1980, pp. 3–32.

**MICHAEL C. KEELEY, Ph.D.**
**Senior Vice President**

**Chapters in Books (cont.)**

"Migration," Chapter XI, in *A Guaranteed Annual Income:  Results from an Income Maintenance Experiment*, edited by P. Robins, R.G. Spiegelman, S. Weiner, and J.G. Bell, New York, New York: Academic Press, 1980, pp. 241–262.

"The Demand for Children," Chapter XVI, in *A Guaranteed Annual Income:  Results from an Income Maintenance Experiment*, edited by P. Robins, R.G. Spiegelman, S. Weiner, and J.G. Bell, New York, New York:  Academic Press, 1980, pp. 207–220.

"Migration as Consumption:  The Impact of Alternative Negative Income Tax Programs," in *Research in Population Economics*, Volume 2, edited by Julian Simon and Julie DaVanzo, Greenwich, Conn.:  JAI Press, 1979, pp. 401–432.

"A Neoclassical Analysis of Economic-Demographic Simulation Models," Chapter I, in *Population, Public Policy, and Economic Development*, Praeger, edited by M.C. Keeley, 1976, pp. 25–45.

**Other Publications**

"An Economic Evaluation of the California Energy Commission's 2005 Integrated Energy Policy Report and an Alternative Blueprint for California Transportation Fuel Policy," Sacramento, California:  California Chamber of Commerce, May 10, 2006.

**Cornerstone Research Publications**

"Estimating Damages in Patent Infringement Cases:  An Economic Perspective," 1999.

"Stock Trading Behavior and Damage Estimation in Securities Cases," with William H. Beaver and James K. Malernee, 1993.

"Bank Charter Values and Risk Taking," 1990.

**Weekly Letters, Federal Reserve Bank of San Francisco**

"Reforming Deposit Insurance," April 21, 1989.

"The Thrift Insurance Crisis," with J. Neuberger, March 31, 1989.

"Banks' Cost of Capital," March 17, 1989.

"Bank Charter Values and Risk," February 24, 1989.

"States Take the Lead," with G. Zimmerman, September 9, 1988.

"Corporate Separateness," with B. Bennett, June 3, 1988.

"A Cashless Society?" April 15, 1988.

"Legislation to Expand Bank Powers," (with B. Bennett), March 19, 1988.

"Troubled Banks and Thrifts," January 29, 1988.

"Bank Capital Regulation in the Early 1980s," January 22, 1988.

"Subordinated Debt as Bank Capital," with F. Furlong, October 23, 1987.

**MICHAEL C. KEELEY, Ph.D.**
**Senior Vice President**

**Weekly Letters, Federal Reserve Bank of San Francisco (cont.)**

"Money and the Fisher Effect," with M. Hutchinson, August 7, 1987.

"A Deposit Insurance Puzzle," with F. Furlong, July 3, 1987.

"Uniting Investment and Commercial Banking," with R. Pozdena, June 19, 1987.

"Regulating Bank Capital," with F. Furlong, May 22, 1987.

"Interest Checking and M1," with G. Zimmerman, November 21, 1986.

"Interest Checking," with G. Zimmerman, November 14, 1986.

"Monetary Policy in a Deregulated World," August 22, 1986.

"Bank Runs," with F. Furlong, July 25, 1986.

"Are Banks Special?" with F. Furlong, July 18, 1986.

"Interest on Business Checking Accounts?" May 2, 1986.

"The Health of Banks and Thrifts," February 21, 1986.

"Geographic Deposit Competition," with G. Zimmerman, September 1985.

"Bank Entry and Deregulation," August 1985.

"Interest Sensitivity of MMDAs," with G. Zimmerman, June 1985.

"The Big Switch," with G. Zimmerman, June 1985.

"Western Banking Turnaround," with G. Zimmerman, April 1985.

"Unemployment vs. Employment," September 1984.

"Deregulation and Bank Profitability," with G. Zimmerman, July 1984.

"Interest–Rate Deregulation," January 1984.

**Government Publications**

"Monetary Incentives:  A Practical Guide to the Use of Fees, Subsidies and Cost Internalization as Regulatory Techniques," with J. Daly, U.S. Government publication, 1981.

"Marketable Rights in Regulatory Programs:  A Practical Guide," with D. Downing, U.S. Government publication, 1981.

**SRI Publications**

"Earnings Mobility, Program Participation, and the Labor-Supply Response to a Negative Income Tax Program," with H.S. Wai, Research Memorandum, 1981.

"A Simultaneous Model of the Marital Stability and Labor-Supply Response to a Negative Income Tax Program," Research Memorandum, 1980.

**SRI Publications (cont.)**

**MICHAEL C. KEELEY, Ph.D.**
**Senior Vice President**

---

"Labor-Supply Response to a Permanent Negative Income Tax Program," with H.S. Wai, Research Memorandum, 1980.

"The Effects of a Negative Income Tax Program on Work in the Home:  A Study of Nonmarket Time," with K. Yaeger, Research Memorandum, 1980.

"The Effects of Alternative Negative Income Tax Programs on Marital Dissolution," Research Memorandum, 1980.

 "Taxes, Transfers, and Subsidies and the Demand for Children:  The Impact of Alternative Negative Income Tax Programs," Research Memorandum No. 65, June 1979.

"The Destination Choices and Earnings of Migrants:  The Impact of Negative Income Tax Programs," Research Memorandum No. 64, May 1979.

"Final Report:  Design of the Labor-Market Impacts of the Employment Opportunity Pilot Projects," with John Bishop and George Farkas, co-principal investigators, prepared for the U.S. Department of Labor, December 1979.

"The Design of Social Experiments:  A Critique of the Conlisk-Watts Assignment Model," with P.K. Robins, Research Memorandum No. 57, December 1978.

"The Impact of Income Maintenance on Fertility:  Preliminary Findings from the Seattle and Denver Income Maintenance Experiments," Research Memorandum No. 49, February 1978.

"Impact of Income Maintenance on Geographical Mobility:  Preliminary Analysis and Empirical Results from the Seattle and Denver Income Maintenance Experiments," Research Memorandum No. 47, October 1977.

"An Interim Report on the Work-Effort Effects and Costs of a Negative Income Tax Using Results of the Seattle and Denver Income Maintenance Experiments:  A Summary," with P.K. Robins, R.G. Spiegelman and R.W. West, Research Memorandum No. 41, June 1977.

"The Labor-Supply Effects and Costs of Alternative Negative Income Tax Programs:  Evidence from the Seattle and Denver Income Maintenance Experiments, Part II:  National Predictions Using the Labor Supply Response Function," with P.K. Robins, R.G. Spiegelman and R.W. West, Research Memorandum No. 39, May 1977.

"The Labor-Supply Effects and Costs of Alternative Negative Income Tax Programs:  Evidence from the Seattle and Denver Income Maintenance Experiments, Part I:  The Labor Supply Response Function," with P.K. Robins, R.G. Spiegelman and R.W. West, Research Memorandum No. 38, May 1977.

"The Estimation of Labor-Supply Models Using Experimental Data:  Evidence from the Seattle and Denver Income Maintenance Experiments, Part II:  National Predictions Using the Labor Supply Response Function," with P.K. Robins, R.G. Spiegelman and R.W. West, Research Memorandum No. 29, August 1976.

# Attachment B

# Michael C. Keeley, Ph.D. Prior Testimony Since 2005

I have given expert testimony in written testimony, expert reports or declarations, depositions and/or at trial since 2005 as indicated below.  I have indicated in bold the party by whom I was retained.

*2013:  In re Methyl Tertiary Butyl Ether Products Liability Litigation (MDL No. 1358); New Jersey Department of Environmental Protection, et al. v. **Atlantic Richfield Company, et al.*** (expert report)

— United States District Court, Southern District of New York, MDL No. 1358, Case No. 08 Civ. 00312 (SAS)

— King & Spalding LLP, 101 Second Street, Suite 2300, San Francisco, CA 94105

— Matter alleging groundwater contamination resulting from MTBE.  Assessment of whether Chevron and Texaco owned or supplied gasoline containing MTBE to four trial sites of focus.  Also, assessment of Chevron and Texaco's wholesales sales of gasoline potentially containing MTBE in New Jersey during the 1986-2006 period.

*2012:  Brandeis University and GFA Brands, Inc. v. **Keebler Co., et al.*** (expert report, deposition)

— United States District Court for the Northern District of Illinois, Eastern Division, Civil Action No. 12-CV-1509

— Mayer Brown, 71 South Wacker Drive, Chicago, IL 60606

— Patent infringement matter.  Assessment of plaintiff's damage claims.

*2012:  Cedric Brady, et al. v. **Conseco Life Insurance Company*** (expert reports, deposition)

— United States District Court for the Northern District of California San Francisco Division, Case No. 3:08-CV-05746-SI

— Skadden, Arps, Slate, Meagher & Flom, One Beacon Street, Boston, MA 02108

— Breach of contract matter.  Assessment of factors affecting the cost of life insurance and whether resumption of cost-of-insurance charges constitutes recoupment.  Assessment of opposing expert's analysis.

*2012:  Masimo Corporation v. **Philips Electronics North America Corporation, et al.*** (expert reports, deposition)

— United States District Court for the District of Delaware, C.A. No. 09-80-LPS-MPT

— Mayer Brown LLP, 1999 K Street, N.W., Washington DC 20006

— Patent infringement matter.  Assessment of the Masimo's damage claims and assessment of the analysis of Masimo's damage expert.

*2012:*   *William Murr v.* **Midland National Life Insurance Company** (declaration, deposition)
— United States District Court Southern District of Iowa, Central Division, Case No. 4:10-cv-369
— Reed Smith, 101 Second Street, Suite 1800, San Francisco, CA 94105
— Proposed class action alleging breach of contract in the administration of Midland's fixed deferred annuities.  Assessment of whether impact and damages can be established with common evidence and whether there are conflicts among proposed class members.

*2012:*   **Philips Electronics North America Corporation** *v. Masimo Corporation* (expert report, deposition)
— United States District Court for the District of Delaware, C.A. No. 09-80-LPS-MPT
— Mayer Brown LLP, 1999 K Street, N.W., Washington DC 20006
— Patent infringement matter.  Assessment of Philip's damages.

*2012:*   **Monsanto Company and Monsanto Technology LLC** *v. E.I. du Pont de Nemours Company and Pioneer Hi-Bred International, Inc.* (deposition, trial)
— United States District Court, the Eastern District of Missouri, Eastern Division, Case No. 4:09CV00686 ERW
— Winston & Strawn LLP, 333 S. Grand Avenue, Los Angeles, CA 90071-1543;  Husch Blackwell Sanders, 190 Carondelet Plaza, St. Lewis, MO 63105
— Patent infringement and breach of contract matter.  Assessment of Monsanto's damages.

*2012:*   *Crescenta Valley Water District v.* **Exxon Mobil Corporation, et al.** (declaration)
— Superior Court of the State of California for the County of Merced, Case No. 148451
— King & Spalding LLP, 101 Second Street, Suite 2300, San Francisco, CA 94105
— Matter alleging groundwater contamination resulting from MTBE.  Declaration in conjunction with a motion to exclude plaintiff's expert.

*2011:*   **Monsanto Company and Monsanto Technology LLC** *v. E.I. du Pont de Nemours Company and Pioneer Hi-Bred International, Inc.* (expert report)
— United States District Court, the Eastern District of Missouri, Eastern Division, Case No. 4:09CV00686 ERW
— Winston & Strawn LLP, 333 S. Grand Avenue, Los Angeles, CA 90071-1543;  Husch Blackwell Sanders, 190 Carondelet Plaza, St. Lewis, MO 63105
— Patent Infringement and breach of contract matter.  Assessment of Monsanto's damages.

*2011: City of Fresno v.* **Chevron U.S.A., et al.** (expert report)
— United States District Court Southern District of New York, No. 04 CV-04973 (SAS)
— Arnold & Porter LLP, 44th Floor, 777 South Figueroa St., Los Angeles, CA 90017-5844
— Matter alleging groundwater contamination resulting from MTBE. Assessment of plaintiff's claim that MTBE was a defective product based on a cost-benefit analysis conducted by plaintiff's expert.

*2011: Avmed, Inc. v.* **Sheridan Healthcorp., Inc.** (declarations, expert report, deposition)
— In the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida, Case No.: 06-002992(07)
— Dewey & LeBoeuf, 1301 Avenue of the Americas, New York, NY 10019-6092
— Antitrust matter alleging that Sheridan's charges were set anti-competitively. Assessment of plaintiff's and plaintiff's experts' claims regarding liability issues and damages.

*2011: In the Matter of the Binding Arbitration between Dr. Sining Mao,* **Western Digital Corporation**, *et al. and Seagate Technology, LLC* (arbitration testimony)
— American Arbitration Association, Case No. 65 460 00129 07
— Irell & Manella, LLP, 1800 Avenue of the Stars, Suite 900, Los Angeles, CA 90067
— Matter alleging misappropriation of Seagate trade secrets in the hard disk drive industry. Assessment of the validity of the damage analysis conducted by Seagate's damage expert.

*2011: Orange County Water District v.* **Unocal Corp., et al.** (expert report, deposition)
— United States District Court Southern District of New York, Case No. 04 CIV. 4698 (SAS)
— King & Spalding LLP, 101 Second Street, Suite 2300, San Francisco, CA 94105
— Matter alleging groundwater contamination resulting from MTBE. Assessment of plaintiff's claim that MTBE was a defective product based on a cost-benefit analysis conducted by plaintiff's expert.

*2011: City of Merced Redevelopment Agency v.* **Exxon Mobil Corp., et al.** (expert report, deposition)
— United States District Court Southern District of New York, Case No. 08 CIV. 06306 (SAS)
— King & Spalding LLP, 101 Second Street, Suite 2300, San Francisco, CA 94105
— Matter alleging groundwater contamination resulting from MTBE. Assessment of plaintiff's claim that MTBE was a defective product based on a cost-benefit analysis conducted by plaintiff's expert.

*2011:*   *City of Merced v. **Chevron U.S.A., Inc., et al.*** (expert report, deposition)

— Superior Court of the State of California in and for the County of Merced, Case No. 148451

— King & Spalding LLP, 101 Second Street, Suite 2300, San Francisco, CA 94105

— Matter alleging groundwater contamination resulting from MTBE.  Assessment of plaintiff's claim that MTBE was a defective product based on a cost-benefit analysis conducted by plaintiff's expert.

*2011:*   *Crescenta Valley Water District v. **Exxon Mobil Corporation, et al.*** (deposition)

— Superior Court of the State of California County of Los Angeles, Case No. 07 Civ. 9453 (SAS)

— King & Spalding LLP, 101 Second Street, Suite 2300, San Francisco, CA 94105

— Matter alleging groundwater contamination resulting from MTBE.  Assessment of plaintiff's claim that MTBE was a defective product based on a cost-benefit analysis conducted by plaintiff's expert.

*2010:*   *In the Matter of the Binding Arbitration between Dr. Sining Mao, **Western Digital Corporation**, et al. and Seagate Technology, LLC* (expert report)

— American Arbitration Association, Case No. 65 460 00129 07

— Irell & Manella, LLP, 1800 Avenue of the Stars, Suite 900, Los Angeles, CA 90067

— Matter alleging misappropriation of Seagate trade secrets in the hard disk drive industry. Assessment of the validity of the damage analysis conducted by Seagate's damage expert.

*2010:*   *Crescenta Valley Water District v. **Exxon Mobil Corporation, et al.*** (expert report, deposition)

— Superior Court of the State of California County of Los Angeles, Case No. EC 044232

— King & Spalding LLP, 101 Second Street, Suite 2300, San Francisco, CA 94105

— Matter alleging groundwater contamination resulting from MTBE.  Assessment of plaintiff's claim that MTBE was a defective product based on a cost-benefit analysis conducted by plaintiff's expert.

*2010:*   *Jack Branning, et al. v. **Apple Computer, Inc.*** (declaration)

— Superior Court of the State of California County of Santa Clara, Case No. 1-05-CV-045719

— Latham & Watkins LLP, 140 Scott Drive, Menlo Park, CA 94025-3656

— Proposed class action in which plaintiffs allege that in conjunction with the development of the Apple retail stores, Apple planned secretly to drive Apple specialists and other resellers out of business by undermining them in various ways.  Assessment of issues related to class certification.

2010:   *Clarke and Rebecca Wixon, et al. v.* **Wyndham Resort Development Corp**., *et al.* (expert reports, deposition)

— In the United States District Court for the Northern District of California, Case No. C 07 2361 JSW

— Troutman Sanders, LLP, Bank of America Plaza, Suite 5200, 600 Peachtree Street, N.E., Atlanta, GA  30308

— Class action in which plaintiffs allege that defendants engaged in conduct that harmed members of a timeshare organization, WorldMark.  Assessment of issues related to liability.

2010:   *Kaiser Foundation Health Plan, et al. v.* **Pfizer, Inc.** *et al.*  (trial)

— In the United States District Court for the District of Massachusetts, No. 04-10981-PBS, MDL No. 1629

— Skadden Arps Slate Meagher & Flom LLP, 4 Times Square, New York, NY  10036

— Kaiser alleged that defendants engaged in promotion of Neurontin for certain indications and/or for certain dosage levels that were not approved by the FDA.  Assessment of plaintiffs' experts' reports on impact and damages.

2010:   *Cedric Brady, et al. v.* **Conseco Life Insurance Company** (declarations)

— United State District Court for the Northern District of California San Francisco Division, Case No. 3:08-CV-05746-SI

— Skadden Arps Slate Meagher & Flom LLP, One Beacon Street, Boston, MA 02108

— Proposed class action alleging Conseco failed to administer properly certain life insurance policies and proposed to change the administration of the policies in a manner inconsistent with the policies.  Assessment of whether plaintiffs' claims could be resolved with common evidence or whether individual inquiry would be required.

2009:   *Jeanette M. Peterman, et al. v.* **North American Company for Life and Health Insurance**, *et al.* (deposition)

— Superior Court of the State of California for the County of Los Angeles, No.: BC 357194

— Reed Smith LLP, 101 Second Street, Suite 1800, San Francisco, CA 94105

— Proposed class action alleging incomplete disclosures in the sale of fixed index annuities.  Assessment of the validity of plaintiffs' claims.

*2009:  Richard B. Clark, et al., v. **AdvanceMe, Inc.** (declaration)*

— United States District Court, Central District of California, Western Division, Case No. CV-08-3540 VBF (FFMx)

— Strook & Strook & Lavan LLP, 2029 Century Park East, Los Angeles, CA 90067-3086

— Proposed class action alleging that AdvanceMe's purchases of future credit card receivables are in fact loans that violate California's usury laws.  Assessment of whether there is class conflict, whether it is possible to compute an ex ante interest rate associated with AdvanceMe's contracts, and assessment of the validity of the plaintiffs' expert's analysis.

*2009:  In Re **Midland National Life Insurance Co.** Annuity Sales Practices Litigation* (declaration)

— United States District Court, Central District of California, Western Division, MDL No. 07-1825 CAS(MANx)

— Reed Smith, LLP, 101 Second Street, Suite 1800, San Francisco, CA 94105

— Proposed class action alleging incomplete disclosures in the sale of fixed index annuities.  Assessment of the validity of the damage and impact methods and calculations of plaintiffs' expert.  Declaration pertaining to defendant's motion to exclude the testimony of plaintiffs' expert.

*2009:  In Re Flash Memory Antitrust Litigation; Indirect Purchaser Actions (retained by the* **Defendants**) (declaration, deposition)

— In the United States District Court for the Northern District of California, Oakland Division, Case No. C07-0086 SBA (N.D. Cal)

— Proposed antitrust class action, alleging collusion regarding Flash memory.  Assessment of whether impact and damages can be proved using common evidence.

*2009:  In Re Flash Memory Antitrust Litigation; Direct Purchaser Actions (retained by the* **Defendants**) (declaration, deposition)

— In the United States District Court for the Northern District of California, Oakland Division, Case No. C07-0086 SBA (N.D. Cal)

— Proposed antitrust class action, alleging collusion regarding Flash memory.  Assessment of whether impact and damages can be proved using common evidence.

*2009: Ormco Corporation v.* **Align Technology, Inc.** (declaration)

— In the United States District Court for the Central District of California, Case No. SACV 03-16 CAS (ANx)

— Paul, Hastings, Janofsky & Walker, 55 Second Street, San Francisco CA 94105 and Townsend and Townsend and Crew, 379 Lytton Avenue, Palo Alto, CA 94301

— Patent matter.  Assessment of economic factors related to Ormco's request for an injunction.


*2009: Clarke and Rebecca Wixon, et al. v.* **Wyndham Resort Development Corp., et al.** (expert report, deposition)

— In the United States District Court for the Northern District of California, Case No. C 07 2361 JSW

— Troutman Sanders, LLP, Bank of America Plaza, Suite 5200, 600 Peachtree Street, N.E., Atlanta, GA  30308

— Proposed class action in which plaintiffs allege that defendants engaged in conduct that harmed members of a timeshare organization, WorldMark.  Assessment of whether common evidence can be used to address plaintiffs' claims of causation, impact, and damages, and assessment of the validity of the report of plaintiffs' expert.


*2009: Elizabeth Judy and Stephen Brown, et al. v.* **Pfizer, Inc., and Warner-Lambert, Inc.** (expert reports, deposition)

— In the Circuit Court of the City of St. Louis State of Missouri, Cause No. 042-01946

— Davis Polk & Wardwell, LLP, 450 Lexington Ave., New York, NY  10017

— Proposed class action in which plaintiffs allege that defendants engaged in false or misleading promotion of Neurontin for certain indications and/or for certain dosage levels that were not approved by the FDA.  Assessment of whether common evidence can be used to address plaintiffs' claims of causation, impact, and damages, and assessment of the validity of plaintiffs' expert's declaration.


*2009: City of New York v. Amerada Hess Corporation., et al.* (retained by **Chevron**) (expert reports)

— United States District Court, Southern District of New York, MDL No. 1358

— King & Spalding LLP, 1100 Louisiana, Suite 4000, Houston, TX 77002-5213

— Matter alleging groundwater contamination resulting from MTBE.  Assessment of whether Chevron was in the geographic market of focus for gasoline containing MTBE and if so, Chevron's market share.

*2009:  In Re Neurontin Marketing and Sales Practices Litigation* (retained by **Pfizer and Warner-Lambert Company**) (expert report, deposition)

— In the United States District Court District of Massachusetts, MDL Docket No. 1629, Master File No. 04-10981

— Davis Polk & Wardwell, LLP, 450 Lexington Ave., New York, NY  10017

— Proposed class action in which plaintiffs allege that defendants engaged in promotion of Neurontin for certain indications and/or for certain dosage levels that were not approved by the FDA.  Assessment of plaintiffs' experts' reports on aggregate impact and damages.

2008:  *Verizon Services Corp., et al. v. **Cox Fibernet Virginia, Inc., et al**.* (expert reports, deposition, trial)

— United States District Court for the Eastern District of Virginia 1:08-cv-157 CMH-TRJ

— Kilpatrick Stockton, 607 14th Street, N. W., Suite 900, Washington D.C., 20005

— Patent infringement matter.  Assessment of the validity of plaintiffs' expert's damage claims and assessment of plaintiff's damages assuming liability.

2008:  *Gregory Clark and Linda Meashey v. **Pfizer Inc., and Warner-Lambert Company, LLC*** (declaration, testimony in Frye hearing)

— In the Court of Common Pleas of Philadelphia County, Civil Trial Division No:  01819

— Davis Polk & Wardwell, LLP, 450 Lexington Ave., New York, NY  10017

— Class action in which plaintiffs allege that defendants engaged in promotion of Neurontin for certain indications and/or for certain dosage levels that were not approved by the FDA.  Assessment of plaintiffs' experts' reports on aggregate impact and damages.

2008:   *Goodridge, et al. v. **Pfizer Canada, Inc., et al.*** (expert report)
— Ontario Superior Court of Justice, Court File No. 06-CV_307728CP
— Cassels Brock & Blackwell LLP, 2100 Scotia Plaza, 40 King Street, West Toronto, ON M5H 3C2, Canada
— Proposed class action in which plaintiffs allege that defendants engaged in false or misleading promotion of Neurontin for certain indications and/or for certain dosage levels that were not approved by Canadian regulatory authorities.  Assessment of whether common evidence can be used to address plaintiffs' claims causation, impact, and damages.

2008:   *Reese v. **Ticketmaster**, et al.* (declaration)
— United States District Court Central District of California, Los Angeles Division, Case No. CV 07-01459 DSF (JTLx)
— Manatt, Phelps & Phillips LLP, 11355 West Olympic Blvd., Los Angeles, CA 90064
— Proposed class action involving allegations of misleading advertising.  Assessment of whether common evidence can be used to prove plaintiffs' allegations.

2008:   *BP Chemicals Ltd. v. **Jiangsu SOPO Corporation (Group) Ltd.,** Zhenjiang Chemical Plant, and Shanghai SOPO Chemical Design Engineering Co., Ltd* (expert report)
— United States District Court for the Eastern District of Missouri, No. 4:99-CV-00323 CDP
— Paul, Hastings, Janofsky & Walker LLP, 55 Second St., 24th Floor, San Francisco, CA 94105
— Case involving allegations of misappropriation of trade secrets.  Assessment of the validity of BP Chemicals' damage claim.

2007:   *Gary Yokoyama, et al. v. **Midland National Life Insurance Company*** (expert report)
— United States District Court District of Hawai'i, Civil No. CV 05-00303 JMS KSC
— Reed Smith LLP, 1999 Harrison Street, Suite 2400, Oakland, CA  94612-3572
— Proposed class action alleging incomplete disclosures in the sale of fixed-index annuities.  Assessment of plaintiffs' expert's approach to damages.

2007:  *In Re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation* (retained by **Chevron**) (expert report)

— United States District Court, Southern District of New York, MDL No. 1358 (SAS)

— King & Spalding LLP, 1100 Louisiana, Suite 4000, Houston, TX 77002-5213

— Matter alleging groundwater contamination resulting from MTBE.  Assessment of whether Chevron was in the geographic market of focus for gasoline containing MTBE and if so, the volume of Chevron's deliveries into the market.


2007:  *In Re **Midland National Life Insurance Co.** Annuity Sales Practices Litigation* (declarations, deposition)

— United States District Court, Central District of California, Western Division, MDL No. 07-1825 CAS(MANx)

— Reed Smith, LLP, 1999 Harrison Street, Suite 2400, Oakland, CA  94612-3572

— Proposed class action alleging incomplete disclosures in the sale of fixed index annuities.  Assessment of the validity of the damage methods and damage calculations of plaintiffs' expert.  Assessment of whether common evidence can be used to address plaintiffs' claims and assessment of the validity of plaintiffs' expert's analysis.


2007:  *United States ex rel. J. Richard West et al. v. **Timex Corporation*** (expert report, deposition)

— United States District Court, District of Connecticut, CV-212 (JBA)

— Carmody & Torrance, 195 Church Street, New Haven Connecticut

— Breach of contract matter.  Assessment of plaintiffs' claims regarding an alleged MFN clause.


2007:  *Cynthia Jean Goff as Administrator of the Estate of Lawrence J. Torango v. **Harrah's Operating Company, Inc., Harveys Tahoe Management Company Inc., Harrah's Laughlin, Inc., Aristocrat Technologies Australia Pty Ltd., Aristocrat Technologies, Inc.**, and International Game Technology* (expert report, deposition)

— United States District Court for the District of Nevada, CV-N-03-0690-ECR (RAM)

— McDermott, Will & Emery, 3150 Porter Dr., Palo Alto, CA 94304

— Patent infringement, theft of trade secrets, and breach of contract matter.  Assessment of the validity of plaintiffs' expert's damage claims and assessment of plaintiff's damages assuming liability.

2007:   *Morris & Dickson Co., LLC v. **Abbott Laboratories*** (expert report, deposition)

— United States District Court for the Western District of Louisiana, Shreveport Division, CV05-2147 S

— Munger, Tolles & Olson, 560 Mission Street, San Francisco, CA 94105

— Robison-Patman matter alleging price discrimination against plaintiff.  Assessment of the economics and competitive effects of the disputed practice and the validity of plaintiff's damage claims.

2007:   *Carmen Migliaccio, et al.  v. **Midland National Life Insurance Company*** (declaration, deposition)

— United States District Court Central District of California, Western Division, Case No. 2:06-CV-01007-CAS (MANx)

— Reed Smith LLP, 1999 Harrison Street, Suite 2400, Oakland, CA  94612-3572

— Proposed class action alleging incomplete disclosures in the sale of fixed-index annuities.  Assessment of whether common evidence can be used to address plaintiffs' claims and assessment of the validity of plaintiffs' experts' analysis.

2007:   *Ross v. **Hewlett Packard Corp.*** (expert report, depositions, trials)

— Superior Court of California County of Santa Clara, Case No. 104 CV 015323

— Wilson, Sonsini, Goodrich & Rosati, 650 Page Mill Road, Palo Alto, CA 94304

— Assess the earn-out provisions of technology purchase agreement.

2006:   *In Re:  Neurontin Marketing, Sales Practices, and Products Liability Litigation* (retained by **Pfizer, Inc and Warner-Lambert Company***) (declarations, deposition)

— United States District Court District of Massachusetts, Master File No. 04-10981

— Davis, Polk & Wardwell, 450 Lexington Avenue, New York, NY  10017

— Proposed class action in which plaintiffs allege that defendants engaged in false or misleading promotion of Neurontin for certain indications and/or for certain dosage levels that were not approved by the FDA.  Assessment of whether common evidence can be used to address plaintiffs' claims of causation, impact, and damages, and assessment of the validity of plaintiffs' experts' declarations.

2006:  *Gary Yokoyama, et al. v.* **Midland National Life Insurance Company** (declaration)

— United States District Court District of Hawai'i, Civil No. CV 05-00303 JMS KSC

— Reed Smith LLP, 1999 Harrison Street, Suite 2400, Oakland, CA 94612-3572

— Proposed class action alleging incomplete disclosures in the sale of fixed-index annuities.  Assessment of whether common evidence can be used to address plaintiffs' claims and assessment of the validity of plaintiffs' expert's analysis.

2006:  *In the Matter of:  Certain Incremental Dental Positioning Adjustment Appliances and Methods of Producing Same (*retained by **Align Technology***)* (expert report, deposition)

— United States International Trade Commission, Washington, DC, Inv. No. 337-TA-562

— Paul, Hastings, Janofsky & Walker LLP, 875 15th Street, N.W., Washington, DC 20005

— Section 337 matter.  Analysis of the domestic industry.

2006:  **LG. Philips LCD Co., Ltd.** *v. Tatung Co. of America, et al.* (expert report, deposition, trial testimony)

— United States District Court – Central District of California, Case No. CV-02-6775 CBM (JTLx)

— Morgan, Lewis & Bockius LLP, 1111 Pennsylvania Avenue, NW, Washington, DC 20004

— Patent infringement matter.  Assessment of plaintiff's damages.

2006:  *Saskia V.W. Hilton v. Children's Hospital San Diego;* **San Diego Diagnostic Radiology Medical Group, Inc.; Lee Pinckney, M.D., Lee Harvey, M.D., Patrick Carey, M.D.; and Melvin Senac, M.D.** (expert report)

— United States District Court – Southern District of California, Civil Action No. 02-CV-01080 L

— Sheppard, Mullin, Richter & Hampton LLP, 501 West Broadway, 19th Floor, San Diego, CA 92101

— Antitrust matter alleging Section I and Section II violations.  Assessment of the validity of plaintiff's antitrust claims.

2006: *Power Integrations, Inc. v.* **Fairchild Semiconductor International, Inc. and Fairchild Semiconductor Corporation** (expert reports, deposition, trial testimony)

— United States District Court – District of Delaware, Civil Action No. 04-1371-JJF

— Orrick, Herrington & Sutcliffe LLP, 1000 Marsh Road, Menlo Park, CA 94025-1015

— Patent infringement matter.  Assessment of the validity of plaintiff's damage claim and plaintiff's expert's analysis.


2005: *Spartanburg Regional Healthcare System v.* **Hillenbrand Industries, Inc., et al**. (declaration, affidavits, depositions)

— United States District Court – District of South Carolina, Civil Action No. 7 03 2141 20

— Boies, Schiller & Flexner LLP, 5301 Wisconsin Avenue, NW, Suite 800, Washington, D.C.  20015

— Class action alleging tying and attempted monopolization.  Assessment of factors pertaining to class certification and assessment of the validity of plaintiff's experts' declarations.


2005: *Brunswick Bowling & Billiards Corporation v.* **Shanghai Zhonglu Industrial Co. Ltd.** (expert reports, testimony at arbitration)

— Hong Kong International Arbitration Centre

— Williams, Kastner & Gibbs PLLC, Two Union Square, 601 Union Street, Suite 4100, Seattle, WA  98101-2380

— Assessment of damages resulting from Zhonglu's antitrust counterclaim alleging patent misuse.  Assessment of the validity of Brunswick's breach of contract damage claim.


2005: *Central Valley Dairymen, Inc. v.* **Sorrento Lactalis, Inc., fka Sorrento Cheese Company**, *Inc.* (depositions, declaration, trial testimony)

— Superior Court of California County of Stanislaus, Case No. 331029

— Hoge, Fenton, Jones & Appel, Inc., 60 South Market Street, Suite 1400, San Jose, CA 95113-2396

— Alleged breach of contract.  Assessment of the validity of plaintiff's damage claim.

# Attachment C
## Documents Considered by
## Michael C. Keeley Ph.D.

| Document Title, Bates Numbers | Document Date |
|---|---|
| **Legal Pleadings** | |
| [Adjusted] First Amended Class Action Complaint, *Veronica Gutierrez v. Wells Fargo* | April 24, 2008 |
| Wells Fargo Bank, N.A.s Response to Plaintiff Erin Walker's Special Interrogatories (Set One) [Nos. 1-23] [*Veronica Gutierrez* case] | May 8, 2008 |
| Declaration of Kenneth A. Zimmerman in Support of Wells Fargo Bank, N.A.'s Motion for Summary Judgment, *Veronica Gutierrez v. Wells Fargo* | July 9, 2008 |
| Class Action Complaint, *Alex Zankich, et al. v. Wells Fargo Bank, N.A.* | October 3, 2008 |
| Amended Consolidated Class Action Complaint, *Garcia, et al v. Wachovia Bank, N.A.* and *Poulin, et al. v. Wachovia Bank, N.A.* | October 16, 2009 |
| Class Action Complaint, *Martinez v. Wells Fargo Bank, N.A.*, with Exhibits A-D | November 10, 2009 |
| Second Amended Class Action Complaint, *Dolores Gutierrez v. Wells Fargo Bank, N.A.* | April 12, 2010 |
| Third Amended Class Action Complaint, *Spears-Haymond, et al. v. Wachovia Bank, N.A.* | April 12, 2010 |
| Second Amended Consolidated Class Action Complaint, *Garcia, et al. v. Wachovia Bank, N.A. and Poulin, et al. v. Wachovia Bank, N.A.* | April 12, 2010 |
| Second Amended Class Action Complaint, *Martinez v. Wells Fargo Bank, N.A.* | May 5, 2010 |
| Defendant Wachovia Bank, N.A.'s Responses to Plaintiffs' First Set of Interrogatories | June 17, 2010 |
| Responses of Defendant Wells Fargo Bank, N.A. to Plaintiffs' First Set of Interrogatories | June 17, 2010 |
| Findings of Fact and Conclusions of Law After Bench Trial in *Veronica Gutierrez v. Wells Fargo* | August 10, 2010 |
| Declaration of Arthur Olsen in Support of Plaintiffs' Motion for Class Certification (Wachovia) | April 25, 2011 |
| Plaintiffs' Motion for Class Certification and Incorporated Memorandum of Law (Wells Fargo Bank), with Appendices I-IV | April 25, 2011 |
| Plaintiffs' Motion for Class Certification and Incorporated Memorandum of Law (Wachovia Bank), with Appendices I-IV | April 25, 2011 |
| Declaration of Robert D. Willig In Support Of JPMorgan Chase Bank, N.A.'s Opposition to Class Certification in the *Luquetta* Action, with Appendices 1-3 - *Luquetta v. JPMorgan Chase Bank, N.A.* | June 16, 2011 |
| Opinion of the United States Court of Appeals of the Ninth Circuit, *Veronica Gutierrez, el. al, v. Wells Fargo Bank, NA* | December 26, 2012 |
| Revised Scheduling Order | January 28, 2013 |
| Plaintiffs' Motion for Class Certification and Incorporated Memorandum of Law (Amended) (Wells Fargo) | January 28, 2013 |
| Plaintiffs' Amended Motion for Class Certification and Incorporated Memorandum of Law (Wachovia) | January 28, 2013 |

| Document Title, Bates Numbers | Document Date |
|---|---|
| Declaration of Karen Moore in Support of Defendant Wells Fargo Bank, N.A.'s Memorandum in Opposition to Plaintiffs' Motion for Class Certification (Related to *Garcia* and *Spears-Haymond* Litigation) | February 25, 2013 |
| Declaration of Karen Moore in Support of Defendant Wells Fargo Bank, N.A.'s Memorandum in Opposition to Plaintiffs' Motion for Class Certification (Related to *D. Gutierrez, Martinez, and Zankich* Litigation) | February 25, 2013 |
| Declaration of Dean Harrington in Support of Wells Fargo Bank, N.A.'s Opposition to Plaintiffs' Motion for Class Certification | February 27, 2013 |
| Declaration of Brad Arrowood in Support of Wells Fargo Bank, N.A.'s Opposition to Plaintiffs' Motion for Class Certification | February 27, 2013 |
| Declaration of Laura Sturmer in Support of Wells Fargo Bank, N.A.'s Opposition to Plaintiffs' Motion for Class Certification | February 27, 2013 |
| Declaration of Patricia Kennedy | February 27, 2013 |
| **Depositions and Trial Testimony** | |
| Trail Testimony of Arthur Olsen from *Veronica Gutierrez v. Wells Fargo Bank, N.A.* | April 30, 2010 |
| Deposition of Laura Sturmer | December 7, 2010 |
| Deposition of Richard Welsh | December 7, 2010 |
| Deposition of Bradley W. Arrowood, with Exhibits 1-32 | March 2, 2011 |
| Deposition of Laura Sturmer, with Exhibits 33-61 | March 3, 2011 |
| Deposition of Anthony Poulin, with Exhibits 1-31 | March 21, 2011 |
| Deposition of Murlee Damor, with Exhibits 1-19 | March 24, 2011 |
| Deposition of Robert L. Thornton, Jr., with Exhibits 10-18 | February 9, 2013 |
| Deposition of Angela Gonzalez, with Exhibits 1-27 | February 12, 2013 |
| Deposition of Celia Spears-Haymond, with Exhibits 1-18 | February 14, 2013 |
| Deposition of Charles Jones, Jr., with Exhibits 1-27 | February 13, 2013 |
| Deposition of Arthur Olsen, with Exhibits 1-11 | February 15, 2013 |
| Deposition of Frances Knight Pinckney, with Exhibits 1-29 | February 16, 2013 |
| **Expert Reports** | |
| Expert Report of Christopher M. James, *Veronica Gutierrez v. Wells Fargo Bank, N.A.* | February 20, 2009 |
| Expert Report of Art Olsen, with Supplement to Report (2/27/09), *Veronica Gutierrez v. Wells Fargo Bank, N.A.* | February 20, 2009 |
| Responsive Expert Report of Christopher M. James, *Veronica Gutierrez v. Wells Fargo Bank, N.A.* | March 6, 2009 |
| Rebuttal Report of Christopher M. James to the March 6, 2009 Report of Charles D. Cowan, *Veronica Gutierrez v. Wells Fargo Bank, N.A.* | March 13, 2009 |
| Expert Report of Arthur Olsen, *Veronica Gutierrez v. Wells Fargo Bank, N.A.* | November 20, 2009 |
| Expert Report of Alan J. Cox, Ph.D., *Veronica Gutierrez v. Wells Fargo Bank, N.A.* | January 27, 2010 |

| Document Title, Bates Numbers | Document Date |
|---|---|

Supplemental Expert Report of Arthur Olsen, *Veronica Gutierrez, et al. v. Wells Fargo and Company, et al.*                          April 12, 2010

**Produced Documents**

**Account Statements for Damor**

WFNC_0000085-165

**Hold Journals for Damor**

WFNC-M_0000652; WFNC-M_0002207-8

**Transaction Journals for Damor**

WFNC_0006111-47; WFNC_0008950-99; WFNC_0037082; WFNC-M_0000653; WFNC-M_0002209-10

**Trial Balance Statements for Damor**

WFNC_0006166-83; WFNC_0037083-4

**Check Images for Damor**

WFNC-M_0001829-89

**Account Statements for Gonzalez**

WFNC_0000524-722; WFNC_0006209-415; WFNC_0000524-31; WFNC_0000533-8; WFNC_0000543-82; WFNC_0000588-722; WACHOVIA_GONZALEZ000015–22

**Transaction Journals for Gonzalez**

WFNC_0006209-484; WFNC_0009177-392; WFNC-M_0000657; WFNC_0009043-392; WFNC_0037087; WFNC-M_0000656-7; WFNC-M_0002215-8

**Hold Journals for Gonzalez**

WFNC_0009043-176; WFNC_0037087; WFNC-M_0000656; WFNC-M_0002215-6

**Overdraft Notices for Gonzalez**

WFNC_0040820-1; WFNC_0040828-9; WFNC_0040838-9; WFNC_0040844-5; WFNC_0040846-7; WFNC_0040852-3; WFNC_0040860-5; WFNC_0139077-9; WFNC_0139252-3

**Trial Balances Statements for Gonzalez**

WFNC_0006416-84

**Unavailable Funds Notices for Gonzalez**

WFNC_0040822-5; WFNC_0040842-3

**Account Statements for Jones**

WFNC_0000902-97; WFNC_0041014-7

**Trial Balance Statements for Jones**

WFNC_0007180-295

**Check Images for Jones**

WFNC-M_0002420-91

| Document Title, Bates Numbers | Document Date |
|---|---|

**Transaction Journals for Jones**

WFNC_0006485-7179; WFNC_0037088-125; WFNC-M_0000660-1; WFNC-M_0002223-6

**Account Statements for Pinckney**

WFNC_0001001-247; WFNC_0001536-98; WFNC_0001701-2094

**Check Images for Pinckney**

WFNC-M_0002492-968; WFNC-M_0000628-9; WFNC-M_0000630-1; WFNC-M_0000624-5; WFNC-M_0000626-7; WFNC-M_0000628-9; WFNC-M_0000630-1; WFNC-M_0000632-3; WFNC-M_0000634-5; WFNC-M_0000636-7

**Transaction Journals for Pinckney**

WFNC_0007640-8019; WFNC_0037231-316; WFNC-M_0000663; WFNC-M_0002229; WFNC-M_0002230; WFNC_0007829-30; WFNC_0007881-2; WFNC-M_0000662; WFNC-M_0002227; WFNC-M_0002228; WFNC_0037185; WFNC_0009393; WFNC_0037126-84; WFNC_0007296-639

**Account Statements for Poulin**

WFNC_0002169-71; WFNC_0002172-327; WFNC_0002328-551

**Check Images for Poulin**

WFNC-M_0000638-51; WFNC-M_0001890-2166

**Transaction Journals for Poulin**

WFNC_0008176-358; WFNC_0009755-830; WFNC_0037382-3; WFNC-M_0000664-5; WFNC-M_0002231-4

**Trial Balance Statements for Poulin**

WFNC_0008359-82; WFNC_0037384

**Account Statements for Spears-Haymond**

WFNC_0002778-98

**Transaction Journals for Spears-Haymond**

WFNC_0008776-811; WFNC_0008724-53; WFNC-M_0000658; WFNC-M_0002219; WFNC-M_0002220; WFNC_0008754-75; WFNC-M_0000659; WFNC-M_0002221; WFNC-M_0002222; WFNC-M_0015329-31; WFNC_0008776-811

**Check Images for Spears-Haymond**

WFNC-M_0002138- 66

**Trial Balance Statements for Spears-Haymond**

WFNC_0008812-25

**Account Statements for Thornton**

MDL-WAC-000174-9; WFNC_0002858-2940; WFNC_0002945-3046; WFNC_0041403-470

**Check Images for Thornton**

WFNC-M_0002969-3140

| Document Title, Bates Numbers | Document Date |
|---|---|

**Transaction Journals for Thornton**

WACHOVIA_THORNTON000051-8; WACHOVIA_THORNTON000087-92; WACHOVIA_THORNTON000105-8; WFNC_0008826-907; WFNC_0009831-10001; WFNC_0037454-63; WFNC-M_0000666-7; WFNC-M_0002235; WFNC-M_0002236-8

**Overdraft Notices for Thornton**

WFNC_0041359-62; WFNC_0041367-8; WFNC_0041379-80; WFNC_0041395-6

**Trial Balance Statements for Thornton**

WFNC_0008908-8949

**Unavailable Funds Notices for Thornton**

WFNC_0041365-6; WFNC_0041369-70; WFNC_0041377-8

**Other Produced Documents**

Wachovia Debit Card Agreement and Disclosures for Personal Accounts (Rev 05-09)
MDL-WAC-00001-12

Wachovia Deposit Agreements and Disclosures for Personal Accounts (Rev 06-14), February 1, 2005 – April 1, 2009
MDL-WAC-000013-137

Email from B. Grignon, to J. Dahlberg, Subject:  2pm Meeting, with Attachment:  Priority Posting Order Discussion Outline, 18 August, 2008
WFNC_0054761-2

Non-Sufficient Funds, Overdrafts, and Returned Items:  Information on Overdraft Processing, 27 July, 2007
WACH000108-28

Olsen Analysis Excel Workbook
WACHOVIA_OLSEN 00001

**Articles and Public Press**

"Consequences of Late Auto Insurance Payments," http://www.carinsurancequote.net/late-car-insurance-payments.html

"Wells Fargo Home Mortgage - Glossary," wellsfargo.com/mortgage/glossary/a

| | |
|---|---|
| Yochim, Dayana, "5 Ways to Ruin Your Credit," *The Motley Fool* | April 28, 2008 |
| Letter from G. Hillebrand (Consumers Union of U.S., Inc.), to J. Johnson (Board of Governors of the Federal Reserve System), Re:  Regulation AA - Unfair or Deceptive Acts or Practices, Board Docket R-1314, and Regulation Z, Board Docket R-1286, Office of Thrift Supervision:  Docket ID:  OTS-2008-0004, National Credit Union Administration:  RIN 3133-AD47 | July 2, 2008 |
| FDIC Study of Bank Overdraft Programs, November, 2008 | |
| Chu, Kathy, and Byron Acohido, "Why Banks are Boosting Credit Card Interest Rates and Fees," *USA Today* | November 14, 2008 |
| Board of Governors of the Federal Reserve System (Board); Office of Thrift Supervision, Treasury (OTS); and National Credit Union Administration (NCUA), Final Rule on Unfair or Deceptive Acts or Practices, Federal Register Vol. 74, No. 18, 5498-584 | January 29, 2009 |
| National Research Center Final Report:  Financial Regulation Poll | |

| Document Title, Bates Numbers | Document Date |
|---|---|
| Palm, Anika Myers, "Orlando Utilities Commission Hits Late Payers with Big Deposits," *Orlando Sentinel* | April 10, 2009 |
| Board of Governors of the Federal Reserve System, Final Rule; Official Staff Commentary on Regulation E; Docket No. R.1343, Federal Register Vol. 74, No. 220, 59033-56 | November 17, 2009 |
| "Most Americans Unaware of Impending Regulatory Changes Regarding Overdrafts," Harris Interactive, Harris Polls | May 20, 2010 |
| "FTC Facts for Consumers:  Defaulting on Your Mortgage Has Costly Consequences," Federal Trade Commission Bureau of Consumer and Business Education, June 2010 | |
| "Retailers Charge for Bounced Checks Surpasses Banks/Credit Union NSF Fees," Moebs Services | August 10, 2010 |
| Detweiler, Gerri, "What You Need to Know About Bounced Checks," http://www.credit.com/credit_information/money_management/What-You-Need-to-Know-About-Bounced-Checks.jsp | August 10, 2010 |
| "Avoiding Penalties and the Tax Gap*," IRS.gov*, Released March 19, 2008, Updated August 20, 2010, http://www.irs.gov/newsroom/article/0,,id=181068,00.html | |
| "How Not to Pay Your Bills," *MSN Money* | September 15, 2010 |
| The 2010 Federal Reserve Payments Study - Noncash Payment Trends in the United States: 2006-2009 | December 8, 2010 |
| Griffin, Lucy, "FDIC Steps Up Overdraft Attention," *ABA Banking Journal*, February 2011 | |
| Mulkins, Phil, "Action Line:  Credit Card Late Fees, Interest Hikes Still Legal," *Tulsa World* | April 3, 2011 |
| Blumenthal, Karen, "How to Wreck Your Credit Score," *Wall Street Journal* | May 24, 2011 |
| Sheshunoff, Alex, "A New Approach to Covering Overdrafts," *Bank Director Magazine*, 2nd Quarter 2002 | |

**Misc.**

Or. Rev. Stat. § 165.065

Tennessee Code. § 66-28-201(d).

**All other materials cited in the report and exhibits.**