**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 1:09-MD-02036-JLK**

---

**IN RE:  CHECKING ACCOUNT**
**OVERDRAFT LITIGATION**

**MDL No. 2036**

---

**THIS DOCUMENT RELATES TO:**

*Michael Dasher and Stephanie Avery v.*
*RBC Bank (USA), predecessor in interest to*
*PNC Bank, N.A.*

S.D. Fla. Case No. 1:10-CV-22190-JLK

---

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Plaintiffs Michael Dasher and Stephanie Avery, through undersigned counsel, on behalf of themselves and all persons similarly situated, allege the following based on personal knowledge as to allegations regarding the Plaintiffs and on information and belief as to other allegations.

**INTRODUCTION**

1.      This is a civil action seeking monetary damages, restitution, and declaratory relief from Defendant PNC Bank, N.A., the successor-in-interest to RBC Bank (USA) ("RBC" or the "Bank"), arising from its unfair and unconscionable assessment and collection of excessive overdraft fees.

2.      During the pendency of this case, PNC Bank, N.A. merged with RBC.  Since the claims herein do not extend to the practices of PNC Bank, for the sake of clarity, Plaintiffs continue to refer to Defendant as RBC.

3.      In the era of electronic banking and the ubiquitous use of debit card transactions, the assessment of overdraft fees has become a major profit center for many United States banks, including RBC.  For years, banks covered customers who occasionally bounced checks and even did so for a time for customers using debit cards, without charging their customers.  Since the early 1990's, however, banks have devised methods to provide overdraft "protection" for customers and charge them in each instance.  An FDIC report estimated that overdraft fees represent 74 percent of the total service charges that are imposed on deposit accounts in the United States.  A 2008 FDIC study reported that overdraft fees for debit cards can carry an effective annualized interest rate that *exceeds 3,500 percent*.

4.      In 2007, banks collected more than $17 billion in overdraft fees.  That number nearly doubled in 2008, as more and more consumers struggled to maintain positive checking account balances.  *In 2009, banks brought in $37.1 billion in overdraft charges alone.*  As the 38th largest bank in the country, which was then operating more than 420 full-service banking centers throughout Alabama, Florida, Georgia, Northern Carolina, South Carolina, and Virginia, RBC was among the largest beneficiaries of these staggering charges.

5.      Almost by definition, these fees disproportionately affect the poor, who are most likely to maintain low balances.  Moebs Services, a research company that has conducted studies for the government as well as banks, estimates that 90 percent of overdraft fees are paid by the poorest 10 percent of banks' customer base.  Moreover, these fees have the tendency to create a domino effect, because the imposition of a service charge on an account with a negative balance will make it less likely that the account holder's balance will reach positive territory, resulting in more fees.

6.     Before debit cards existed, banks occasionally extended the courtesy of honoring paper checks written on overdrawn or otherwise deficient accounts for customers who were typically in good standing.  Banks extended this courtesy largely because the third party involved in a sales transaction allowed the customer to pay by check, expecting the funds to be available and the check to clear.  For example, if a customer wrote a check to purchase groceries, the grocery store would only know whether the check cleared *after* the groceries had been purchased.

7.     The same considerations are not present when customers use debit cards.  Banks could simply decline to honor debit or point of sale transactions where accounts lack sufficient funds to execute the transactions.  Retail and service transactions could still be executed if consumers presented an alternative form of payment.  ATM transactions could still proceed if banks provided a warning that an overdraft fee would be assessed, and customers chose to proceed nevertheless.  In fact, until a few years ago, most banks simply declined debit transactions that would overdraw an account.

8.     Instead of simply declining debit transactions when there are insufficient funds, or warning its customers that an overdraft fee will be assessed if they proceed with the transaction, RBC routinely processed such transactions and then charged its customers an overdraft fee of $35 – even when the transaction was for only a few dollars.  This automatic, fee-based overdraft scheme was intentionally designed to maximize overdraft fee revenue for RBC.  Additionally, as part of its inequitable motive to generate obscene profits gained through the imposition of unconscionable overdraft fees, RBC failed to adequately disclose to its customers that they could have opted out of the ability to overdraft their account through debit card transactions.

9.      In many instances, these overdraft fees cost RBC account holders hundreds of dollars in a matter of days, or even hours, when they may be overdrawn by only a few dollars. Even more egregious, customer accounts may not actually have been overdrawn at the time the overdraft fees are charged, or at the time of the debit transaction.

10.     Thus, it is through manipulation and alteration of customers' transaction records that RBC maximized overdraft penalties imposed on customers.

## JURISDICTION AND VENUE

11.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005.  Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed classes is a resident of a different state than RBC.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because RBC (now PNC Bank) is subject to personal jurisdiction here and regularly conducts business in the Southern District of Florida, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## THE PARTIES

13.     Plaintiff Michael Dasher is a citizen of the State of North Carolina.

14.     Plaintiff Stephanie Avery is a citizen of the State of North Carolina.

15.     RBC was a full-service financial institution incorporated in the State of North Carolina that maintained its principal place of business in Raleigh, North Carolina.  RBC regularly and systematically conducted business throughout the State of Florida, including in this District.  Among other things, RBC was engaged in the business of providing retail banking services to Plaintiffs and members of the putative Classes, which included the issuance of debit

- 4 -

cards for use by its customers in conjunction with their checking accounts.  RBC had more than $30 billion in assets and operated more than 420 full-service banking centers throughout Alabama, Florida, Georgia, Northern Carolina, South Carolina, and Virginia.

16.     On June 20, 2011, PNC Bank announced its intention to merge with RBC.  The merger was finalized on March 2, 2012.  As a result of the merger, PNC Bank converted RBC's approximately 900,000 customers and more than 400 branches.  On March 2, 2012, Plaintiffs and members of the putative Classes became customers of PNC Bank.  As a result of the merger, PNC Bank is liable for the acts of RBC.  This lawsuit relates to RBC's conduct prior to the customers' accounts being transferred to PNC Bank's systems.

17.     PNC Bank maintains its headquarters and principal place of business in Pittsburgh, Pennsylvania.   PNC Bank conducts business throughout the State of Florida, including in this District.

## CLASS ALLEGATIONS

18.     Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

19.     The proposed Classes are defined as:

> All RBC customers in the United States who, within the applicable statute of limitations preceding the filing of this action, incurred an overdraft fee as a result of RBC's practice of re-sequencing debit card transactions from highest to lowest and whose account was closed prior to February 1, 2013 (the "Avery National Class").

> All RBC customers in the United States who, within the applicable statute of limitations preceding the filing of this action, incurred an overdraft fee as a result of RBC's practice of re-sequencing debit card transactions from highest to lowest and whose account remained open on or after February 1, 2013 (the "Dasher National Class").

All RBC customers having accounts at branches in the state of North Carolina for the purpose of asserting claims under North Carolina's consumer protection statute and whose account was closed prior to February 1, 2013 (the "Avery State Subclass") (*see* Fifth Claim for Relief, *infra*).

All RBC customers having accounts at branches in the state of North Carolina for the purpose of asserting claims under North Carolina's consumer protection statute whose account remained open on or after February 1, 2013 (the "Dasher State Subclass") (*see* Fifth Claim for Relief, *infra*).

The National Classes and the State Subclasses are collectively referred to as the "Classes."

20.      The Classes have been divided into the Avery and Dasher Classes because Defendant has indicated that, despite Plaintiffs' victory before this Court and the Eleventh Circuit Court of Appeals as to the unenforceability of RBC's arbitration provision following the merger of PNC and RBC, it may again move to compel arbitration as to Mr. Dasher on the basis that he remained a PNC customer after February 1, 2013, the date PNC Bank purported to impose a new arbitration requirement on its customers based on an addition to its account agreement.

21.      Plaintiffs reserve the right to modify or amend the definitions of the proposed Classes before the Court determines whether certification is appropriate.

22.      Excluded from the Classes are PNC, its parents, subsidiaries, affiliates, officers and directors, any entity in which PNC (previously RBC) has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

23.      The members of the Classes are so numerous that joinder of all members is impossible.  The Classes consist of hundreds of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to PNC's (RBC's) records.

24.     The claims of the representative Plaintiffs are typical of the claims of the Classes in that the representative Plaintiffs, like all Class members, were charged overdraft fees by RBC as a result of its practice of re-sequencing debit card transactions from highest to lowest.  The representative Plaintiffs, like all Class members, have been damaged by RBC's misconduct in that they have been assessed unfair and unconscionable overdraft charges.  Furthermore, the factual basis of RBC's misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.

25.     There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual Class members.

26.     Among the questions of law and fact common to the Classes are whether RBC:

a.      Did not clearly disclose and/or refused to allow its customers to opt out of its overdraft protection program;

b.      Did not obtain affirmative consent from its customers prior to processing transactions that would result in overdraft fees;

c.      Did not alert its customers that a debit card transaction would trigger an overdraft fee, and did not provide its customers with an opportunity to cancel such transactions;

d.      Manipulated and reordered transactions to increase the number of overdraft fees it imposed;

e.      Manipulated and reordered debits from highest to lowest in order to maximize the number of overdrafts and, consequently, the amount of overdraft fees;

f.      Imposed overdrafts and overdraft fees when, but for reordering transactions, there would otherwise have been sufficient funds in the account;

g.      Failed to provide customers with accurate balance information;

- 7 -

h.      Delayed posting of transactions by customers using debit cards so that customers were charged overdraft fees on transactions even though the customers had sufficient funds in their accounts to cover the transactions upon execution;

i.      Charged exorbitant overdraft fees that bore no relationship to the actual costs and risks of covering insufficient funds transactions;

j.      Breached its covenant of good faith and fair dealing with Plaintiffs and other members of the Classes through its overdraft policies and practices;

k.      Required its customers to enter into standardized account agreements which included unconscionable provisions;

l.      Converted monies belonging to Plaintiffs and other members of the Classes through its overdraft policies and practices;

m.      Was unjustly enriched through its overdraft policies and practices; and

n.      Violated the consumer protection acts of certain states through its overdraft policies and practices.

27.      Other questions of law and fact common to the Classes include:

a.      The proper method or methods by which to measure damages, and

b.      The declaratory relief to which the Classes are entitled.

28.      Plaintiffs' claims are typical of the claims of other Class members, in that they arise out of the same wrongful overdraft policies and practices and the same or substantially similar unconscionable provisions of RBC's account agreements and other related documents. Plaintiffs have suffered the harm alleged and have no interests antagonistic to the interests of any other Class member.

29.    Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions regarding overdraft fee practices.  Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Classes.

30.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of RBC, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will have no remedy.

31.    Even if the Class members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

## COMMON FACTUAL ALLEGATIONS

### A.    RBC

32.    Prior to RBC's merger with PNC Bank, RBC had more than $30 billion in assets and operated more than 400 branches throughout Alabama, Florida, Georgia, Northern Carolina, South Carolina, and Virginia.

33.     RBC was in the business of providing its customers with a variety of banking services.  One of the services provided by RBC for customers who opened a checking account was a debit card, also known as a check card or ATM card.  Through debit cards, customers could engage in transactions using funds directly from their accounts by engaging in "debit" or "point of sale" ("POS") transactions, and were able to withdraw money from their accounts at automated teller machines ("ATMs").  Whether the card was used to execute POS transactions or to withdraw cash from ATMs, the transactions were processed electronically.  As a result, RBC was notified instantaneously when the card was swiped, and had the option to accept or decline transactions at such time.

34.     RBC employed sophisticated software to automate its overdraft system.  This program maximized the number of overdrafts, and thus, the amount of overdraft fees charged per customer.

35.     As a result of RBC's manipulation and alteration of customers' transactions records, funds in a customer's account were depleted more rapidly and more overdraft fees were charged for multiple smaller transactions.  Indeed, overdraft charges occured at times when, but for the manipulation and alteration, there would have been funds in the account and no overdraft would have occurred.  For example, if a customer, whose account had a $50 balance at the time RBC processed several transactions, made four transactions of $10 and one subsequent transaction of $100 on the same day, RBC would reorder the debits from largest to smallest, imposing five overdraft fees on the customer.  Conversely, if the $100 transaction was debited last – consistent with the actual order of transactions – only one overdraft fee would be assessed.  *See* FDIC Study of Bank Overdraft Programs, November 2008, *available at*: http://www.fdic.gov/bank/analytical/overdraft/, at 11, n.12.  Notably, as one element of its

settlement in this multi-district litigation, PNC Bank ceased this practice.  Thus, Plaintiffs and

the Classes losses based on this practice ceased in of about December of 2012.

**B.**     **RBC Bank's Relevant Customer Documents Regarding Overdrafts**

36.     Plaintiffs and all members of the Classes maintained a checking account with

RBC.  The terms of RBC's checking accounts were contained in standardized account holder

agreements, presented to its customers on a "take it or leave it" basis, drafted and imposed by

RBC, which was the party of vastly superior bargaining strength, and thus constituted

agreements of adhesion.  A representative copy of RBC's "Account Disclosure" (the "Deposit

Agreement"), covering Plaintiffs and other RBC customers during the period of time complained

of in this lawsuit, and which is 22 pages long, dual-columned, single-spaced and in small font, is

attached as Exhibit A.

37.     The Deposit Agreement states:

Unless applicable law requires a different order, we will *normally* honor
withdrawals, fund transfers and other payments from the Account which are
presented on the same Business Day in the following order: wire transfers will be
paid first, then all other Items including ACH and other electronic fund transfers,
cashed checks and other cashed Items, etc., will be paid in descending order of
amount largest paid first; provided, however, *we reserve the right, in our sole
discretion, to pay Items in any order we deem appropriate from time to time*,
without any liability to you or any other person.

Deposit Agreement at p. 4 (emphasis added).

38.     The Deposit Agreement also states that if "the Available Balance is not sufficient

or we otherwise deem in good faith that it is not sufficient, we will not be required to honor or

pay, and we may return or reject, the withdrawal, fund transfer or other payment transaction."

*Id.*

39.     In addition, the Deposit Agreement states:

We may also assess against you and the Account a nonsufficient funds ("NSF")
fee for each Item returned or rejected, including for multiple returns or rejects of

- 11 -

the same Item.  If we pay a withdrawal, fund transfer or other payment transaction when you do not have a sufficient Available Balance, thereby creating or increasing an overdraft in your Account, we may also charge you a separate "overdraft/re-entry fee" in addition to the NSF fee for each Item so paid, and you will pay us, on demand, the amount of the overdraft and all fees associated therewith.

*Id.*

40.     The Deposit Agreement further states that the "NSF Fees, overdraft/re-entry fees, and other fees and charges are set out in our Schedule of Fees." *Id.* at 5.

41.     The Deposit Agreement and related documents, failed to disclose to customers that they had the option to "opt out" from the overdraft scheme, although it was possible for them to opt out upon request.

42.     As described above, subsequent to RBC's merger with PNC Bank, all former RBC customers who continued to use their account became PNC Bank customers under the terms of the PNC account agreement.

        **C.**    **RBC Bank's Re-Ordering of Checking Account Transactions**

43.     In an effort to maximize overdraft revenue, RBC manipulated and reordered debits from highest to lowest dollar amount during given periods of time.  RBC reordered transactions for no reason other than to increase the number of exorbitant overdraft fees it could charge.  This practice violated the consumer protection laws of certain states, the Deposit Agreement and its implied covenant of good faith and fair dealing, and is unconscionable.

44.     In addition, RBC misled its customers regarding its reordering practices.  For example, the Deposit Agreement was deceptive and/or unfair because it was, in fact, RBC's practice to *always* reorder debits from highest to lowest, and because the Bank grouped together transactions that occurred on subsequent days with transactions that occurred on earlier days, and reordered them so that higher debits that occurred on subsequent days were posted to its

customers' accounts before lower debits that occurred on earlier days, contrary to the terms of the Deposit Agreement and its customers' reasonable expectations. This practice thus violated the covenant of good faith and fair dealing implied in the Deposit Agreement as well as the consumer protection laws of North Carolina and other states.

45.     RBC's website and other disclosures were littered with deceptive representations. RBC claimed that customers could use internet banking in order to receive detailed information about their account, including balances and the dates of transactions. Contrary to RBC's advertisements and representations, the online account features were not a means by which consumers could gain control of their finances or effectively manage their accounts. In fact, the inaccurate and unreliable information displayed online duped consumers into generating overdraft fees for RBC.

46.     Transactions involving debit cards used by RBC customers, including the withdrawal of cash from ATMs and POS transactions with vendors, were processed electronically. As a result, RBC was notified instantaneously when the customer's debit card is swiped, and had the option to accept or decline these transactions.

47.     Notwithstanding the instantaneous nature of these electronic debit card transactions, under RBC's posting system, it failed to post charges in the order in which they were assessed or received. RBC developed a policy and employed a practice whereby account charges and debits were posted to its customers' accounts out of chronological order for the sole purpose of maximizing the number of overdraft transactions and, therefore, the amount of overdraft fees charged to its customers.

48.     Instead of processing such transactions in chronological order, RBC processed them starting with the largest debit and ending with the smallest debit, so as to generate the largest possible number of overdrafts and the greatest possible amount of overdraft fees.

49.     RBC refrained from immediately debiting charges to a customer's account as it approved them – sometimes for multiple business days.  By holding charges rather than debiting them immediately, RBC was able to amass a number of charges on the account.  Subsequently, RBC posted all of the amassed charges on a single date.  When the group of charges was eventually posted to the customer's account, RBC posted them in order of largest to smallest – not in the order in which they were received or in the order in which they were charged.  This delayed posting resulted in the imposition of multiple overdraft fees that would not otherwise have been imposed.  The delayed posting also prevented customers from ascertaining the accurate balances in their accounts.

50.     RBC's policy and practice of posting charges from largest to smallest, rather than chronologically, or from smallest to largest, was specifically designed to maximize the generation of overdraft fees by triggering overdraft fees for account charges that would not have otherwise resulted in such fees.

51.     RBC enforced an unconscionable policy whereby charges assessed were posted to customers' accounts in a non-chronological order, from highest to lowest dollar amount, and were held for multiple days and then batched together, to maximize the number of overdraft transactions and fees.  RBC's processing practices substantially increased the likelihood that customers' smaller charges would result in multiple overdraft fees.  The practices provided RBC with substantially higher service fee revenues than it would otherwise have achieved.

52.     As a result of this practice and others, Plaintiffs and members of the Classes have been assessed overdraft fees for transactions which occurred when they actually had sufficient funds in their accounts to cover those transactions.

**D.     RBC Bank's Cloaking of Accurate Balance Information**

53.     RBC actively promoted the convenience of its debit cards and other electronic debiting, but failed to provide customers with accurate balance information.  When customers executed account transactions, they generally did not have access to an accurate balance register or balance information.

54.     RBC claimed that online banking provided current balance information about customers' accounts.  But in reality, RBC's computers were set up not to process transactions in the order received – in "real time" or even chronologically, but in order from highest to lowest dollar amount so as to ensure that the maximum number of overdraft charges were imposed on customers' accounts.

55.     RBC provided inaccurate balance information to its customers through its electronic network.  In certain cases, RBC informed its customers that they had a positive balance when, in reality, they had a negative balance, despite the Bank's actual knowledge of outstanding debits and transactions.

56.     Even when RBC had actual knowledge of outstanding transactions which had already created a negative balance in a customer's account, it encouraged the customer to incur more overdraft charges by approving – rather than prudently declining – subsequent debit card purchases and other electronic transactions.

57.     RBC also assessed overdraft fees at times when actual funds in the customer's account were sufficient to cover all debits that had been submitted to the Bank for payment.  It did this by placing a "hold" on actual funds in the customer's account.  In doing so, RBC Bank

- 15 -

charged overdraft fees where it faced no risk, because the cash balance in the customer's account had not dropped below zero.

58.     A debit card can be used to make a purchase in two ways:  (1) an Automated Clearing House ("ACH") transaction in which a customer enters his/her PIN number at the point of sale; or (2) an "offline signature" transaction, in which the debit card is treated like a credit card and the customer usually is required to sign a receipt.  In the former, the money is debited from the account instantaneously.  In the latter, the "offline signature" transaction occurs in two parts: first, authorization for the purchase amount is obtained by the merchant.  Second, the transaction is not actually "settled" (that is, money between the bank and the merchant does not change hands) until the merchant submits the transaction to the bank sometime after the customer's purchase.  Before settlement, "authorization holds" may be placed on the customer's account, preventing access to money so held.  For some transactions, the authorization hold is for an amount larger than the purchase actually made by the customer.  RBC charged an overdraft fee when the authorization hold amount – not the purchase price – pushed an account balance into negative territory.

59.     Such "authorization hold" policies, and the extent to which they were used by RBC to charge overdraft fees, were inconsistent with the Deposit Agreement.

60.     The terms of the Deposit Agreement and other disclosures failed to alert customers that they had to keep a large cushion of funds in their account in order to guard against an overdraft fee even when customers did not spend more than the funds in their account.  This was materially deceptive.  Accordingly, RBC charged customers improper overdraft fees even when there were sufficient funds in customers' accounts to cover transactions.

61.     Charging an overdraft fee when in fact an account had never had a negative balance of actual funds was materially deceptive.  By charging overdraft fees when in fact the customer's account had not been overdrafted, RBC breached its contract.

**E.     RBC Bank's Failure to Notify Customers of Overdrafts or Advise Customers of Their Right to Opt Out**

62.     At the time its debit cards were used in POS transactions or at ATMs, RBC was able to determine, almost instantaneously, whether there were sufficient funds in a customer's account to cover that particular transaction.  The Bank had the technological capability to decline transactions (which it did when a pending transaction would exceed a pre-determined, overdraft tolerance limit for the account), or notify customers at that very moment that the particular debit card transaction would result in an overdraft.  Prior to the effective date of the opt in/opt out requirements of Regulation E , RBC Bank could have given customers the option to decline the transaction to avoid incurring the overdraft fee, but it did not do so because it sought to maximize the amount of revenue generated through its assessment of overdraft fees.

63.     Notwithstanding its technological capabilities and actual knowledge, RBC failed to provide notice to Plaintiffs and the Classes that a particular debit card transaction would result in an overdraft and, hence, an overdraft fee.  Because RBC's customers were not notified of the potential overdraft, and were not given the option of declining the debit card transaction or providing another form of payment, the customers were assessed monetary damages in the form of overdraft fees.

64.     Prior to the effective date of the opt in/opt out requirements of Regulation E, RBC failed to make Plaintiffs and Class members aware that they could opt out of its overdraft scheme upon request, thereby avoiding any overdraft fees from being charged.

- 17 -

F.    **RBC Bank's Overdraft Policies and Practices Were Contrary to Best Practices**

65.    By engaging in the conduct described herein, RBC failed to follow the list of "best practices" for overdraft programs set forth in the "Joint Guidance on Overdraft Protection Programs" ("Joint Guidance") issued by the United States Department of the Treasury, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, and the National Credit Union Administration (collectively, the "Agencies").   A copy of the Joint Guidance is attached as Exhibit B.   These "best practice" recommendations include: "Provide election or opt-out of service.   Obtain affirmative consent of consumers to receive overdraft protection.   Alternatively, where overdraft protection is automatically provided, permit consumers to 'opt-out' of the overdraft program and provide a clear consumer disclosure of this option."   70 F.R. 9127-01, 9132.

66.    According to rules proposed by the Agencies: "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . .   This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee."   73 F.R. 28904-01, 28929 (May 19, 2008).

67.    The Joint Guidance also advises banks to "[a]lert customers before a transaction triggers any fees.   When consumers attempt to withdraw or transfer funds made available through an overdraft protection program, provide a specific consumer notice, where feasible, that completing the withdrawal may trigger the overdraft fees."   70 F.R.D. 9127, 9132.   The Joint Guidance further advises that "[t]his notice should be presented in a manner that permits consumers to cancel the attempted withdrawal or transfer after receiving the notice."   *Id.*

68.     Similarly, the list of "best practices" recommended in "Overdraft Protection: A Guide for Bankers," issued by the American Bankers Association, includes offering customers the option of "opting out" of any overdraft programs, and informing customers, before they access funds, that a particular point of sale or ATM transaction will cause them to incur an overdraft fee.  A copy of "Overdraft Protection: A Guide for Bankers" is attached as Exhibit C.

69.     RBC Bank's overdraft policies made it difficult for customers to avoid injury even if they carefully tracked the balance in their account.  In fact, the Agencies have stated that "Injury" resulting from such policies, "is not reasonably avoidable" by the consumer.  73 F.R. 28904-01, 28929.  "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available."

70.     On October 6, 2009, the Center for Responsible Lending issued a report entitled "Overdraft Explosion:  Bank Fees for Overdrafts Increase 35% in Two Years."  The report, attached hereto as Exhibit D, finds that it is now "standard procedure to automatically enroll checking account customers in their most expensive overdraft loan program."  The report finds that debit card transactions account for more overdraft fees than traditional checks or any other type of transaction, even though "debit card transactions and ATM withdrawals . . . could easily be denied for no fee."  The report also finds that overdraft fees increased 35 percent from 2006 to 2008, and that over 50 million Americans overdrew their accounts in a 12-month period, with 27 million accounts incurring five or more overdraft fees.

71.     A chart from the research company Moebs Services shows that, in every year from 1992 to 2009, banks gained increased revenues from overdraft fees:



G.      **RBC's Unconscionable Provisions and Policies**

72.     RBC's overdraft policies and practices were unconscionable in the following respects, among others:

        a.      Prior to the effective date of the opt in/opt out requirements of Regulation E, the Bank did not disclose or reasonably disclose to customers that they had the option to "opt out" of the Bank's overdraft scheme;

      b.     Prior to the effective date of the opt in/opt out requirements of Regulation E, the Bank did not obtain affirmative consent from checking account customers prior to processing a transaction that would overdraw the account and result in an overdraft fee;

      c.     The Bank did not alert its customers that a debit card transaction, even a cash withdrawal at an ATM, would trigger an overdraft and did not provide the customer the opportunity to cancel the transaction before assessing an overdraft fee;

      d.     The Deposit Agreement and related documents were contracts of adhesion in that they were standardized forms, imposed and drafted by the Bank, which was a party of vastly superior bargaining strength, and only relegated to the customer the opportunity to adhere to them or reject the agreement in its entirety;

      e.     The amount of overdraft fees was disclosed in an ineffective, ambiguous, misleading, and unfair manner, since it was not contained in the Deposit Agreement, but rather in a different and separate document, which is not signed by the depositor; and

      f.     The Deposit Agreement provided to customers was ineffective, ambiguous, deceptive, unfair, and misleading in that it did not unambiguously state that the Bank always reorders debits from high to low, even though RBC Bank *always* reordered transactions in this way for customers in order to maximize overdrafts and overdraft fee revenues.

**H.**    **RBC's Overdraft Practices Harmed Plaintiffs**

73.     RBC's wrongful overdraft policies and practices described above harmed Plaintiffs and members of the Classes.  The following allegations regarding the named Plaintiffs are made for purposes of illustrating the harm and damage sustained by Plaintiffs and members of the Classes as a result of RBC's wrongful overdraft policies and practices.

74.     Plaintiff, Michael Dasher, is a current checking account customer of Defendant.

75.     In connection with his account, RBC issued a debit card to Mr. Dasher.  The debit card allowed Mr. Dasher to access his checking account funds by using the card to execute a transaction.  The charge was processed electronically, and the Bank had the option to accept or decline the transaction at the point of sale.

76.     RBC wrongfully charged Mr. Dasher overdraft fees on multiple occasions.  By way of illustration, Mr. Dasher was charged three overdraft fees on August 7, 2010, in the amount of $35.00 each, for a total of $105.00.  In addition, accompanying each overdraft fee was an additional $6.00 "re-entry" fee, which was also wrongfully charged, and thus, the total amount of fees assessed on August 7, 2007 equaled $123.00.  Based on information and belief, the overdraft fees were based on the following ordering of transactions:

**Balance Sheet per RBC Bank Reordering Scheme**
**(Debits Processed from Highest to Lowest)**

|  |  | **Debits** | **Fees** | **Balance** |
|---|---|---|---|---|
|  | **Beginning Balance on 08/07/2007** |  |  | $385.00[1] |
| **Date  Posted** | **Debit Description** |  |  |  |
| 08/07/2007 | CHECK | 200.00 |  | 62.62 |
| 08/07/2007 | STRIDE RITE | 99.50 |  | -36.88 |
| 08/07/2007 | THE OLIVE GARDEN | 58.71 |  | -95.59 |
| 08/07/2007 | EXXONMOBIL | 25.01 |  | -120.60 |
| 08/07/2007 | EXXONMOBIL | 20.00 |  | -140.60 |
| 08/07/2007 | HORNIBLOW'S TAVERN | 8.00 |  | -148.60 |
| 08/07/2007 | MCDONALD'S | 4.19 |  | -152.79 |
| 08/07/2007 | Non-Sufficient Funds Fee |  | 35.00 | -187.79 |
| 08/07/2007 | Non-Sufficient Funds Fee |  | 35.00 | -222.79 |
| 08/07/2007 | Non-Sufficient Funds Fee |  | 35.00 | -257.79 |
| 08/07/2007 | Overdraft/Re-entry Fee |  | 18.00 | -275.79 |
|  |  | **Total Fees** | **$153.41** |  |

77.     If RBC had not manipulated and reordered Mr. Dasher's transactions from highest to lowest, he would not have been assessed three overdraft fees.

---

[1] This beginning balance includes a deposit in the amount of $50.00 and an automatic advance from Mr. Dasher's credit line in the amount of $122.38, both credited to his account on August 7, 2007.

78.     For instance, if RBC had posted the transactions from lowest to highest, Mr.

Dasher would have been assessed only one overdraft fee instead of three:

### Balance Sheet if Debits Were Processed from Lowest to Highest

| | | Debits | Fees | Balance |
|---|---|---|---|---|
| | **Beginning Balance on 08/07/2007** | | | $385.00[2] |
| **Date  Posted** | **Debit Description** | | | |
| 08/07/2007 | MCDONALD'S | 4.19 | | 258.43 |
| 08/07/2007 | HORNIBLOW'S TAVERN | 8.00 | | 250.43 |
| 08/07/2007 | EXXONMOBIL | 20.00 | | 230.43 |
| 08/07/2007 | EXXONMOBIL | 25.01 | | 205.42 |
| 08/07/2007 | THE OLIVE GARDEN | 58.71 | | 146.71 |
| 08/07/2007 | STRIDE RITE | 99.50 | | 47.21 |
| 08/07/2007 | CHECK | 200.00 | | -152.79 |
| 08/07/2007 | Non-Sufficient Funds Fee | | 35.00 | -187.79 |
| 08/07/2007 | Overdraft/Re-entry Fee | | 6.00 | -193.79 |
| | | **Total Fees** | **$41.00** | |

79.     Likewise, if RBC had posted the transactions in chronological order, Mr. Dasher

would have been assessed only one overdraft fee instead of three:

---

[2] This beginning balance includes a deposit in the amount of $50.00 and an automatic advance from Mr. Dasher's credit line in the amount of $122.38, both credited to his account on August 7, 2007.

**Balance Sheet if Debits Were Processed in Chronological Order**[3]

| | | Debits | Fees | Balance |
|---|---|---|---|---|
| | **Beginning Balance on 08/07/2007** | | | $385.00[4] |
| **Date Posted** | **Debit Description** | | | |
| 08/07/2007 | STRIDE RITE | 99.50 | | 163.12 |
| 08/07/2007 | THE OLIVE GARDEN | 58.71 | | 104.41 |
| 08/07/2007 | EXXONMOBIL | 25.01 | | 79.40 |
| 08/07/2007 | EXXONMOBIL | 20.00 | | 59.40 |
| 08/07/2007 | HORNIBLOW'S TAVERN | 8.00 | | 51.40 |
| 08/07/2007 | MCDONALD'S | 4.19 | | 47.21 |
| 08/07/2007 | CHECK | 200.00 | | -152.79 |
| 08/07/2007 | Non-Sufficient Funds Fee | | 35.00 | -187.79 |
| 08/07/2007 | Overdraft/Re-entry Fee | | 6.00 | -193.79 |
| | | **Total Fees** | **$41.00** | |

80.     Plaintiff, Stephanie Avery, is a former checking account customer.

81.     In connection with her account, the RBC also issued her a debit card.

82.     RBC wrongfully charged Ms. Avery overdraft fees on multiple occasions.  By way of illustration, Ms. Avery was charged nine overdraft fees on November 24, 2009, in the amount of $35.00 each, for a total of $315.00.  In addition, accompanying each overdraft fee was an additional $6.00 "re-entry" fee, which was also wrongfully charged, and thus, the total amount of fees assessed on November 24, 2009 equaled $369.00.  Based on information and belief, the overdraft fees were based on the following ordering of transactions:

---

[3] Because the statements do not indicate the hour and minute of each transaction, Mr. Dasher has listed the transactions for each particular day in the same order in which they are listed in the statements, sorting only from earlier dates to later dates. Thus, if the Bank's statements list transactions that occurred on one particular day in some order other than chronological – sorting from highest to lowest transaction, for example – Mr. Dasher has not changed that order.  As a result, this chart may reflect even more overdraft fees than Mr. Dasher would have been assessed had the Bank posted the transactions in strict chronological order.

[4] This beginning balance includes a deposit in the amount of $50.00 and an automatic advance from Mr. Dasher's credit line in the amount of $122.38, both credited to his account on August 7, 2007.

**Balance Sheet per RBC Bank Reordering Scheme**
**(Debits Processed from Highest to Lowest)**

| | | Debits | Fees | Balance |
|---|---|---|---|---|
| | **Beginning Balance on 11/24/2009** | | | $281.72 |
| **Date   Posted** | **Debit Description** | | | |
| 11/24/2009 | COSTCO WHSE | 147.04 | | 134.68 |
| 11/24/2009 | DR BRITT D VINSON | 96.00 | | 38.68 |
| 11/24/2009 | COSTCO WHSE | 51.73 | | -13.05 |
| 11/24/2009 | MAIL SERV PHARMACY | 50.00 | | -63.05 |
| 11/24/2009 | SHELL OIL | 30.11 | | -93.16 |
| 11/24/2009 | MCDONALD'S | 24.75 | | -117.91 |
| 11/24/2009 | PETCO ANIMAL | 10.49 | | 128.40 |
| 11/24/2009 | EXXONMOBIL | 9.72 | | -138.12 |
| 11/24/2009 | MCDONALD'S | 8.29 | | -146.41 |
| 11/24/2009 | MCDONALD'S | 6.30 | | -152.71 |
| 11/24/2009 | PARTY CITY | 3.76 | | -156.47 |
| 11/24/2009 | Non-Sufficient Funds Fee | | 35.00 | -191.47 |
| 11/24/2009 | Non-Sufficient Funds Fee | | 35.00 | -226.47 |
| 11/24/2009 | Non-Sufficient Funds Fee | | 35.00 | -261.47 |
| 11/24/2009 | Non-Sufficient Funds Fee | | 35.00 | -296.47 |
| 11/24/2009 | Non-Sufficient Funds Fee | | 35.00 | -331.47 |
| 11/24/2009 | Non-Sufficient Funds Fee | | 35.00 | -366.47 |
| 11/24/2009 | Non-Sufficient Funds Fee | | 35.00 | -401.47 |
| 11/24/2009 | Non-Sufficient Funds Fee | | 35.00 | -436.47 |
| 11/24/2009 | Non-Sufficient Funds Fee | | 35.00 | -471.47 |
| 11/24/2009 | Overdraft/Re-entry Fee | | 54.00 | -525.47 |
| | | **Total Fees** | **$369.00** | |

83.     If RBC had not manipulated and reordered Ms. Avery's transactions from highest to lowest, she would not have been assessed nine overdraft fees.

84.      For instance, if RBC had posted the transactions from lowest to highest, Ms. Avery would have been assessed only two overdraft fees instead of nine:

- 25 -

**Balance Sheet if Debits Were Processed from Lowest to Highest**

| | | Debits | Fees | Balance |
|---|---|---|---|---|
| | **Beginning Balance on 11/24/2009** | | | $281.72 |
| **Date Posted** | **Debit Description** | | | |
| 11/24/2009 | PARTY CITY | 3.76 | | 277.96 |
| 11/24/2009 | MCDONALD'S | 6.30 | | 271.66 |
| 11/24/2009 | MCDONALD'S | 8.29 | | 263.37 |
| 11/24/2009 | EXXONMOBIL | 9.72 | | 253.65 |
| 11/24/2009 | PETCO ANIMAL | 10.49 | | 243.16 |
| 11/24/2009 | MCDONALD'S | 24.75 | | 218.41 |
| 11/24/2009 | SHELL OIL | 30.11 | | 188.30 |
| 11/24/2009 | MAIL SERV PHARMACY | 50.00 | | 138.30 |
| 11/24/2009 | COSTCO WHSE | 51.73 | | 86.57 |
| 11/24/2009 | DR BRITT D VINSON | 96.00 | | -9.43 |
| 11/24/2009 | COSTCO WHSE | 147.04 | | -156.47 |
| 11/24/2009 | Non-Sufficient Funds Fee | | 35.00 | -191.47 |
| 11/24/2009 | Non-Sufficient Funds Fee | | 35.00 | -226.47 |
| 11/24/2009 | Overdraft/Re-entry Fee | | 12.00 | -238.47 |
| | | **Total Fees** | **$82.00** | |

85.     Likewise, if RBC had posted the transactions in chronological order, Ms. Avery would have been assessed only two overdraft fees instead of nine:

**Balance Sheet if Debits Were Processed in Chronological Order**[5]

| | | Debits | Fees | Balance |
|---|---|---|---|---|
| | Beginning Balance on 11/24/2009 | | | $281.72 |
| Date  Posted | Debit Description | | | |
| 11/24/2009 | MAIL SERV PHARMACY | 50.00 | | 231.72 |
| 11/24/2009 | EXXONMOBIL | 9.72 | | 222.00 |
| 11/24/2009 | MCDONALD'S | 6.30 | | 215.70 |
| 11/24/2009 | SHELL OIL | 30.11 | | 185.59 |
| 11/24/2009 | MCDONALD'S | 8.29 | | 177.30 |
| 11/24/2009 | MCDONALD'S | 24.75 | | 152.55 |
| 11/24/2009 | PARTY CITY | 3.76 | | 148.79 |
| 11/24/2009 | PETCO ANIMAL | 10.49 | | 138.30 |
| 11/24/2009 | DR BRITT D VINSON | 96.00 | | 42.30 |
| 11/24/2009 | COSTCO WHSE | 51.73 | | -9.43 |
| 11/24/2009 | COSTCO WHSE | 147.04 | | -156.47 |
| 11/24/2009 | Non-Sufficient Funds Fee | | 35.00 | -191.47 |
| 11/24/2009 | Non-Sufficient Funds Fee | | 35.00 | -226.47 |
| 11/24/2009 | Overdraft/Re-entry Fee | | 12.00 | -238.47 |
| | | Total Fees | $82.00 | |

86.     RBC failed to notify Plaintiffs that they could be assessed overdraft fees on transactions even though there were sufficient funds in their checking accounts to cover the transactions at the time the transactions were executed.   In addition, RBC never notified Plaintiffs at the time they executed the purported insufficient funds transactions described above, that their checking accounts were overdrawn or that they would be charged an overdraft fee as a result of the transactions.   Furthermore, RBC paid, rather than returned, all of the debit card charges described above, even though Plaintiffs' accounts purportedly lacked sufficient funds to cover the transactions.

---

[5] Other than for the 10.49, 51.73 and 147.04 transactions, the statement does not indicate the hour and minute of each transaction.  Thus, other than those transactions, Ms. Avery has listed the transactions for each particular day in the same order in which they are listed in the statements, sorting only from earlier dates to later dates. Thus, if the Bank's statements list transactions that occurred on one particular day in some order other than chronological – sorting from highest to lowest transaction, for example – Ms. Avery has not changed that order.  As a result, this chart may reflect even more overdraft fees than Ms. Avery would have been assessed had the Bank posted the transactions in strict chronological order.

87.     The overdraft charges assessed Plaintiffs are representative of millions of dollars of overdraft fees that RBC wrongfully assessed and deducted from its customers' accounts. These wrongful takings are especially egregious considering the fact that the Bank approved each transaction and knew at the time of approval whether there were sufficient funds in the account to cover the transaction.

### B.     The Damages Sustained by Plaintiffs and the Classes

88.     As shown by these examples, RBC's overdraft policies made it difficult for a customer to avoid injury even if the customer kept close track of the balance in his or her account.  In fact, the Agencies have stated that "injury" resulting from such policies "is not reasonably avoidable" by consumers.  73 F.R. 28904-01, 28929.  "It appears that consumers cannot reasonably avoid this injury if they are automatically enrolled in an institution's overdraft service without having an opportunity to opt out.  Although consumers can reduce the risk of overdrawing their accounts by carefully tracking their credits and debits, consumers often lack sufficient information about key aspects of their account.  For example, a consumer cannot know with any degree of certainty when funds from a deposit or a credit for a returned purchase will be made available."  *Id*.

89.     According to rules proposed by the Agencies: "Injury [caused by overdraft charges] is not outweighed by countervailing benefits. . . . This is particularly the case for ATM withdrawals and POS debit card transactions where, but for the overdraft service, the transaction would typically be denied and the consumer would be given the opportunity to provide other forms of payment without incurring any fee."  73 F.R. 28904-01, 28929 (May 19, 2008).

90.     Thus, as a consequence of RBC's overdraft policies and practices, Plaintiffs and the Classes have been wrongfully forced to pay overdraft fees.  RBC has improperly deprived

Plaintiffs and the Classes of significant funds, causing ascertainable monetary losses and damages.

91.     As a consequence of RBC's improper overdraft fees, RBC has wrongfully deprived Plaintiffs and the Classes of funds to which it had no legitimate claim.

92.     Plaintiffs and the Classes had sufficient funds to cover at least some of the transactions for which she and the Classes were charged overdraft fees.  Plaintiffs and members of the Classes either had adequate funds to cover the transactions posted to their accounts, or the accounts were allowed to become overdrawn, even by *de minimis* margins, exclusively so that RBC could impose these wrongful charges.  In many instances, RBC's manipulation of the process for imposing overdraft fees triggered a cascade of charges that exponentially added to the charges it collected from Plaintiffs and members of the Classes.

93.     All conditions precedent to the relief sought herein have either occurred or have been performed or waived.

### FIRST CLAIM FOR RELIEF
### Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing[6]
**(On behalf of the Avery and Dasher National Classes)**

94.     Plaintiffs repeat paragraphs 1 through 93 above.

95.     Plaintiffs and RBC contracted for bank account deposit, checking, ATM, and debit card services, as embodied in RBC's Deposit Agreement and related documentation.  RBC breached the Deposit Agreement through its conduct as described above.

---

[6] Florida, North Carolina, and certain other states recognize a claim for breach of the covenant of good faith and fair dealing as a separate and independent claim from breach of contract.  Other states treat breach of the covenant of good faith and fair dealing as a species of breach of contract.  For the sake of convenience in this multi-district litigation, this Amended Complaint pleads these two types of claims, which are substantively identical, in a single count.

96.     Under the laws of all the states where RBC did business, good faith is an element of every contract pertaining to the assessment of overdraft fees.  Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain.  Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

97.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

98.     Since at least 2003, RBC has breached the Deposit Agreement by failing to act in accordance with the covenant of good faith and fair dealing through its overdraft policies and practices as alleged herein.

99.     Plaintiffs and the National Classes have performed all, or substantially all, of the obligations imposed on them under the Deposit Agreement.

100.     Plaintiffs and members of the National Classes have sustained damages as a result of RBC's breach of the Deposit Agreement and its breaches as a result of violations of the covenant of good faith and fair dealing.

## SECOND CLAIM FOR RELIEF
### Unconscionability
### (On behalf of the Avery and Dasher National Classes)

101.    Plaintiffs repeat paragraphs 1 through 93 above.

102.    RBC's overdraft policies and practices are substantively and procedurally unconscionable in the following respects, among others:

a.    The Bank did not disclose or reasonably disclose to customers that they had the option to "opt out" of the Bank's overdraft scheme;

b.    The Bank did not obtain affirmative consent from checking account customers prior to processing a transaction that would overdraw the account and result in an overdraft fee;

c.    The Bank did not alert its customers that a debit card transaction would trigger an overdraft, and did not provide the customer the opportunity to cancel that transaction, before assessing an overdraft fee;

d.    The Deposit Agreement and related documents, were and/or are contracts of adhesion in that they were and/or are standardized forms, imposed and drafted by the Bank, which is a party of vastly superior bargaining strength, and only relegates to the customer the opportunity to adhere to them or reject the agreement in its entirety;

e.    The amount of overdraft fees was disclosed in an ineffective, ambiguous, misleading, and unfair manner, since they were not contained in the Deposit Agreement, but rather in a different and separate documents, which is not signed by the depositor; and

f.    The Deposit Agreement provided to customers was ineffective, ambiguous, deceptive, unfair, and misleading in that it did not unambiguously state that the Bank

always reorders debits from high to low, even though RBC *always* reordered transactions in this way for customers in order to maximize overdrafts and overdraft fee revenues for the Bank.

103.   Considering the great business acumen and experience of RBC in relation to Plaintiffs and the Classes, the great disparity in the parties' relative bargaining power, the inconspicuousness and incomprehensibility of the contract language at issue, the oppressiveness of the terms, the commercial unreasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns, these provisions are unconscionable and, therefore, unenforceable as a matter of law.

104.   The imposition of overdraft charges which exceed the amount overdrawn (*e.g.*, the imposition of a $35 charge on an overdraft of less than $35) is itself unconscionable.  Such charges are not reasonably related to the Bank's cost of covering the overdraft and/or its risk of nonpayment (where the Bank pays the overdraft), or to the Bank's cost of returning the item unpaid (where the Bank does not pay the overdraft).

105.   In addition to being entitled to declaratory relief in the form of a declaration that RBC's policies and practices are unconscionable, Plaintiffs and members of the National Classes have sustained damages as a result of RBC's unconscionable policies and practices as alleged herein.  Plaintiffs and members of the National Classes should be awarded damages or restitution as supplemental relief to the declaratory relief.  *See* 28 U.S.C. §2202.

<u>**THIRD CLAIM FOR RELIEF**</u>
<u>**Conversion**</u>
**(On behalf of the Avery and Dasher National Classes)**

106.   Plaintiffs repeat paragraphs 1 through 93 above.

107.   RBC had and continues to have a duty to maintain and preserve its customers' checking accounts and to prevent their diminishment through its own wrongful acts.

- 32 -

108.     RBC has wrongfully collected overdraft fees from Plaintiffs and the members of the National Classes, and has taken specific and readily identifiable funds from their accounts in payment of these fees in order to satisfy them.

109.     RBC has, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiffs and the members of the National Classes, without legal justification.

110.     RBC continues to retain these funds unlawfully without the consent of Plaintiffs or members of the National Classes.

111.     RBC intends to permanently deprive Plaintiffs and the members of the National Classes of these funds.

112.     These funds are properly owned by Plaintiffs and the members of the National Classes, not RBC, which now claims that it is entitled to their ownership, contrary to the rights of Plaintiffs and the members of the National Classes.

113.     Plaintiffs and the members of the National Classes are entitled to the immediate possession of these funds.

114.     RBC has wrongfully converted these specific and readily identifiable funds.

115.     RBC's wrongful conduct is continuing.

116.     As a direct and proximate result of this wrongful conversion, Plaintiffs and the members of the National Classes have suffered and continue to suffer damages.

117.     By reason of the foregoing, Plaintiffs and the members of the National Classes are entitled to recover from RBC all damages and costs permitted by law, including all amounts that RBC has wrongfully converted.

## FOURTH CLAIM FOR RELIEF
### Unjust Enrichment
### (On behalf of the Avery and Dasher National Classes)

118.    Plaintiffs repeat paragraphs 1 through 93 above.

119.    Plaintiffs, on behalf of themselves and the National Classes, assert a common law claim for unjust enrichment.  This claim is asserted in the alternative to Plaintiffs' claims based on breach of contract.

120.    By means of RBC's wrongful conduct alleged herein, RBC knowingly provides banking services to Plaintiffs and members of the National Classes that are unfair, unconscionable, and oppressive.

121.    RBC knowingly received and retained wrongful benefits and funds from Plaintiffs and members of the National Classes.  In so doing, RBC acted with conscious disregard for the rights of Plaintiffs and members of the National Classes.

122.    As a result of RBC's wrongful conduct as alleged herein, RBC has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the National Classes.

123.    RBC's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

124.    Under the common law doctrine of unjust enrichment, it is inequitable for RBC to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of overdraft fees on Plaintiffs and members of the National Classes in an unfair, unconscionable, and oppressive manner.  RBC's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

125.    The financial benefits derived by RBC rightfully belong to Plaintiffs and members of the National Classes.  RBC should be compelled to disgorge in a common fund for the benefit of Plaintiffs and members of the National Classes all wrongful or inequitable proceeds received by them.  A constructive trust should be imposed upon all wrongful or inequitable sums received by RBC traceable to Plaintiffs and the members of the National Classes.

126.    Plaintiffs and members of the National Classes have no adequate remedy at law.

### FIFTH CLAIM FOR RELIEF
### Violations of North Carolina Law
**(On Behalf of the Avery and Dasher State Subclasses)**

127.    Plaintiffs repeat paragraphs 1 through 93 above.

128.    This claim is asserted on behalf of the members of the State Subclasses under North Carolina's consumer protection statute.

129.    RBC engaged in unfair business practices relating to the imposition of overdraft fees on consumers, in violation of N.C. Gen. Stat. §§ 75-1.1, *et seq*.

130.    As redress for RBC's repeated violations of these consumer protection statutes, Plaintiffs and the State Subclasses are entitled to, *inter alia*, damages and declaratory relief.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Classes demand a jury trial on all claims so triable and judgment as follows:

1.    Declaring RBC's overdraft fee policies and practices to have been wrongful, unfair, and unconscionable, and supplemental relief in the form of damages or restitution;

2.    Restitution of all improper overdraft fees paid to RBC by Plaintiffs and the Classes, as a result of the wrongs alleged herein in an amount to be determined at trial;

3.    Disgorgement of the ill-gotten gains derived by RBC from its misconduct;

4.      Actual damages in an amount according to proof;

5.      Punitive, exemplary, and statutory damages;

6.      Pre-judgment interest at the maximum rate permitted by applicable law;

7.      Fees and costs incurred by Plaintiffs in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

8.      Such other relief as this Court deems just and proper.

Dated: November 10, 2014.

Respectfully submitted,

*/s/ Aaron S. Podhurst*
Aaron S. Podhurst, Esquire
Florida Bar No. 063606
apodhurst@podhurst.com
Robert C. Josefsberg, Esquire
Florida Bar No. 40856
rjosefsberg@podhurst.com
Peter Prieto, Esquire
Florida Bar No. 501492
pprieto@podhurst.com
PODHURST ORSECK, P.A.
City National Bank Building
25 W. Flagler Street, Suite 800
Miami, FL 33130
Tel: 305-358-2800
Fax: 305-358-2382

*/s/ Bruce S. Rogow*
Bruce S. Rogow, Esquire
Florida Bar No. 067999
brogow@rogowlaw.com
BRUCE S. ROGOW, P.A.
Broward Financial Center
500 E. Broward Boulevard
Suite 1930
Fort Lauderdale, FL 33394
Tel: 954-767-8909
Fax: 954-764-1530

*Co-Lead Counsel for Plaintiff*

_/s/ Robert C. Gilbert_
Robert C. Gilbert, Esquire
Florida Bar No. 561861
rcg@grossmanroth.com
Stuart Z. Grossman, Esquire
Florida Bar No. 156113
szg@grossmanroth.com
David M. Buckner, Esquire
Florida Bar No. 60550
dmb@grossmanroth.com
Seth E. Miles, Esquire
Florida Bar No. 3855830
sem@grossmanroth.com
GROSSMAN ROTH, P.A.
2525 Ponce de Leon Boulevard
Eleventh Floor
Coral Gables, FL 33134
Tel: 305-442-8666
Fax: 305-779-9596

_Coordinating Counsel for Plaintiff_

/s/ E. Adam Webb
E. Adam Webb, Esquire
Georgia Bar No. 743910
Adam@WebbLLC.com
Matthew C. Klase, Esquire
Georgia Bar No. 141903
Matt@WebbLLC.com
G. Franklin Lemond, Jr., Esquire
Georgia Bar No. 141315
FLemond@WebbLLC.com
WEBB, KLASE & LEMOND, L.L.C.
1900 The Exchange, S.E.
Suite 480
Atlanta, GA 30339
Tel: 770-444-9325
Fax: 770-217-9950


/s/ Russell W. Budd
Russell W. Budd, Esquire
Texas Bar No. 03312400
rbudd@baronbudd.com
BARON & BUDD, P.C.
3102 Oak Lawn Avenue
Suite 1100
Dallas, TX 75219
Tel: 214-521-3605
Fax: 214-520-1181


/s/ Ruben Honik
Ruben Honik, Esquire
Pennsylvania Bar No. 33109
rhonik@golombhonik.com
Kenneth J. Grunfeld, Esquire
Pennsylvania Bar No. 84121
kgrunfeld@golombhonik.com
GOLOMB & HONIK, P.C.
1515 Market Street
Suite 1100
Philadelphia, PA 19102
Tel: 215-985-9177
Fax: 215-985-4169

/s/ Michael W. Sobol
Michael W. Sobol, Esquire
California Bar No. 194857
msobol@lchb.com
Roger N. Heller, Esquire
California Bar No. 215348
rheller@lchb.com
Jordan Elias, Esquire
California Bar No. 228731
jelias@lchb.com
LIEFF CABRASER HEIMANN &
  BERNSTEIN L.L.P.
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
Tel: 415-956-1000
Fax: 415-956-1008


/s/ David S. Stellings
David S. Stellings, Esquire
New York Bar No. 2635282
dstellings@lchb.com
LIEFF CABRASER HEIMANN &
  BERNSTEIN L.L.P.
250 Hudson Street
8th Floor
New York, NY  10013
Tel: 212-355-9500
Fax: 212-355-9592


/s/ Ted E. Trief
Ted E. Trief, Esquire
New York Bar No. 1476662
ttrief@triefandolk.com
Barbara E. Olk, Esquire
New  York Bar No. 1459643
bolk@triefandolk.com
TRIEF & OLK
150 E. 58th Street
34th Floor
New York, NY 10155
Tel: 212-486-6060
Fax: 212-317-2946

*Plaintiff's Executive Committee*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 09-MD-02036-JLK**

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

**CERTIFICATE OF SERVICE**

I hereby certify that on November 10, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

        */s/ Robert C. Gilbert*
        Robert C. Gilbert, Esquire
        Florida Bar No. 561861
        GROSSMAN ROTH, P.A.
        2525 Ponce de Leon Boulevard
        Eleventh Floor
        Coral Gables, FL 33134
        Tel: 305-442-8666
        Fax: 305-779-9596