# EXHIBIT B

Attachment

---

**Office of the Comptroller of the Currency**
**Board of Governors of the Federal Reserve System**
**Federal Deposit Insurance Corporation**
**National Credit Union Administration**

---

## Joint Guidance on Overdraft Protection Programs

### February 18, 2005

The Office of the Comptroller of the Currency (OCC), Board of Governors of the Federal Reserve System (Board), Federal Deposit Insurance Corporation (FDIC), and National Credit Union Administration (NCUA), collectively "the Agencies," are issuing this joint guidance concerning a service offered by insured depository institutions that is commonly referred to as "bounced-check protection" or "overdraft protection." This credit service is sometimes offered on both consumer and small business transaction accounts as an alternative to traditional ways of covering overdrafts. This joint guidance is intended to assist insured depository institutions in the responsible disclosure and administration of overdraft protection services, particularly those that are marketed to consumers.[1]

### Introduction

To protect against account overdrafts, some consumers obtain an overdraft line of credit, which is subject to the disclosure requirements of the Truth in Lending Act (TILA). If a consumer does not have an overdraft line of credit, the institution may accommodate the consumer and pay overdrafts on a discretionary, ad-hoc basis. Regardless of whether the overdraft is paid, institutions typically have imposed a fee when an overdraft occurs, often referred to as a nonsufficient funds or "NSF" fee. Over the years, this accommodation has become automated by many institutions. Historically, institutions have not promoted this accommodation. This approach has not raised significant concerns.

More recently, some depository institutions have offered "overdraft protection" programs that, unlike the discretionary accommodation traditionally provided to those lacking a line of credit or other type of overdraft service (e.g., linked accounts), are marketed to

---

[1] Federal credit unions are already subject to certain regulatory requirements governing the establishment and maintenance of overdraft programs. 12 CFR § 701.21(c)(3). This regulation requires a federal credit union offering an overdraft program to adopt a written policy specifying the dollar amount of overdrafts that the credit union will honor (per member and overall); the time limits for a member to either deposit funds or obtain a loan to cover an overdraft; and the amount of the fee and interest rate, if any, that the credit union will charge for honoring overdrafts. This joint guidance supplements but does not change these regulatory requirements for federal credit unions.

consumers essentially as short-term credit facilities. These marketed programs typically provide consumers with an express overdraft "limit" that applies to their accounts.

While the specific details of overdraft protection programs vary from institution to institution, and also vary over time, those currently offered by institutions incorporate some or all of the following characteristics:

- Institutions inform consumers that overdraft protection is a feature of their accounts and promote the use of the service. Institutions also may inform consumers of their aggregate dollar limit under the overdraft protection program.

- Coverage is automatic for consumers who meet the institution's criteria (e.g., account has been open a certain number of days; deposits are made regularly). Typically, the institution performs no credit underwriting.

- Overdrafts generally are paid up to the aggregate limit set by the institution for the specific class of accounts, typically $100 to $500.

- Many program disclosures state that payment of an overdraft is discretionary on the part of the institution, and may disclaim any legal obligation of the institution to pay any overdraft.

- The service may extend to check transactions as well as other transactions, such as withdrawals at automated teller machines (ATMs), transactions using debit cards, pre-authorized automatic debits from a consumer's account, telephone-initiated funds transfers, and on-line banking transactions.[2]

- A flat fee is charged each time the service is triggered and an overdraft item is paid. Commonly, a fee in the same amount would be charged even if the overdraft item was not paid. A daily fee also may apply for each day the account remains overdrawn.

- Some institutions offer closed-end loans to consumers who do not bring their accounts to a positive balance within a specified time period. These repayment plans allow consumers to repay their overdrafts and fees in installments.

## Concerns

Aspects of the marketing, disclosure, and implementation of some overdraft protection programs, intended essentially as short-term credit facilities, are of concern to the Agencies. For example, some institutions have promoted this credit service in a manner that leads consumers to believe that it is a line of credit by informing consumers that their account includes an overdraft protection limit of a specified dollar amount without clearly

---

[2] Transaction accounts at credit unions are called share draft accounts. For purposes of this joint guidance, the use of the term "check" includes share drafts.

disclosing the terms and conditions of the service, including how fees reduce overdraft protection dollar limits, and how the service differs from a line of credit.

In addition, some institutions have adopted marketing practices that appear to encourage consumers to overdraw their accounts, such as by informing consumers that the service may be used to take an advance on their next paycheck, thereby potentially increasing the institutions' credit exposure with little or no analysis of the consumer's creditworthiness. These overdraft protection programs may be promoted in a manner that leads consumers to believe that overdrafts will always be paid when, in reality, the institution reserves the right not to pay some overdrafts. Some institutions may advertise accounts with overdraft protection coverage as "free" accounts, and thereby lead consumers to believe that there are no fees associated with the account or the overdraft protection program.

Furthermore, institutions may not clearly disclose that the program may cover instances when consumers overdraw their accounts by means other than check, such as at ATMs and point-of-sale (POS) terminals. Some institutions may include overdraft protection amounts in the sum that they disclose as the consumer's account "balance" (for example, at an ATM) without clearly distinguishing the funds that are available for withdrawal without overdrawing the account. Where the institution knows that the transaction will trigger an overdraft fee, such as at a proprietary ATM, institutions also may not alert the consumer prior to the completion of the transaction to allow the consumer to cancel the transaction before the fee is triggered.

Institutions should weigh carefully the risks presented by the programs including the credit, legal, reputation, safety and soundness, and other risks. Further, institutions should carefully review their programs to ensure that marketing and other communications concerning the programs do not mislead consumers to believe that the program is a traditional line of credit or that payment of overdrafts is guaranteed, do not mislead consumers about their account balance or the costs and scope of the overdraft protection offered, and do not encourage irresponsible consumer financial behavior that potentially may increase risk to the institution.

### Safety & Soundness Considerations

When overdrafts are paid, credit is extended. Overdraft protection programs may expose an institution to more credit risk (e.g., higher delinquencies and losses) than overdraft lines of credit and other traditional overdraft protection options to the extent these programs lack individual account underwriting. All overdrafts, whether or not subject to an overdraft protection program, are subject to the safety and soundness considerations contained in this section.

Institutions providing overdraft protection programs should adopt written policies and procedures adequate to address the credit, operational, and other risks associated with these types of programs. Prudent risk management practices include the establishment of express account eligibility standards and well-defined and properly documented dollar limit decision criteria. Institutions also should monitor these accounts on an ongoing

3

basis and be able to identify consumers who may represent an undue credit risk to the institution. Overdraft protection programs should be administered and adjusted, as needed, to ensure that credit risk remains in line with expectations. This may include, where appropriate, disqualification of a consumer from future overdraft protection. Reports sufficient to enable management to identify, measure, and manage overdraft volume, profitability, and credit performance should be provided to management on a regular basis.

Institutions also are expected to incorporate prudent risk management practices related to account repayment and suspension of overdraft protection services. These include the establishment of specific timeframes for when consumers must pay off their overdraft balances. For example, there should be established procedures for the suspension of overdraft services when the account holder no longer meets the eligibility criteria (such as when the account holder has declared bankruptcy or defaulted on another loan at the bank) as well as for when there is a lack of repayment of an overdraft. In addition, overdraft balances should generally be charged off when considered uncollectible, but no later than 60 days from the date first overdrawn.[3] In some cases, an institution may allow a consumer to cover an overdraft through an extended repayment plan when the consumer is unable to bring the account to a positive balance within the required time frames. The existence of the repayment plan, however, would not extend the charge-off determination period beyond 60 days (or shorter period if applicable) as measured from the date of the overdraft. Any payments received after the account is charged off (up to the amount charged off against allowance) should be reported as a recovery. Some overdrafts are rewritten as loan obligations in accordance with an institution's loan policy and supported by a documented assessment of that consumer's ability to repay. In those instances, the charge-off timeframes described in the Federal Financial Institutions Examination Council (FFIEC) Uniform Retail Credit Classification and Account Management Policy would apply.[4]

With respect to the reporting of income and loss recognition on overdraft protection programs, institutions should follow generally accepted accounting principles (GAAP) and the instructions for the Reports of Condition and Income (Call Report), and NCUA 5300 Call Report. Overdraft balances should be reported on regulatory reports as loans. Accordingly, overdraft losses should be charged off against the allowance for loan and lease losses. The Agencies expect all institutions to adopt rigorous loss estimation processes to ensure that overdraft fee income is accurately measured. Such methods may include providing loss allowances for uncollectible fees or, alternatively, only recognizing that portion of earned fees estimated to be collectible.[5] The procedures for estimating an adequate allowance should be documented in accordance with the Policy

---

[3] Federal credit unions are required by regulation to establish a time limit, not to exceed 45 calendar days, for a member to either deposit funds or obtain an approved loan from the credit union to cover each overdraft. 12 CFR § 701.21(c)(3).

[4] For federally insured credit unions, charge-off policy for booked loans is described in NCUA Letter to Credit Unions No. 03-CU-01, "Loan Charge-off Guidance," dated January 2003.

[5] Institutions may charge off uncollected overdraft fees against the allowance for loan and lease losses if such fees are recorded with overdraft balances as loans and estimated credit losses on the fees are provided for in the allowance for loan and lease losses.

Statement on the Allowance for Loan and Lease Losses Methodologies and Documentation for Banks and Savings Institutions.[5]

If an institution advises account holders of the available amount of overdraft protection, for example, when accounts are opened or on depositors' account statements or ATM receipts, the institution should report the available amount of overdraft protection with legally binding commitments for Call Report, and NCUA 5300 Call Report purposes. These available amounts, therefore, should be reported as "unused commitments" in regulatory reports.

The Agencies also expect proper risk-based capital treatment of outstanding overdrawn balances and unused commitments.[7]  Overdraft balances should be risk-weighted according to the obligor.  Under the federal banking agencies' risk-based capital guidelines, the capital charge on the unused portion of commitments generally is based on an off-balance sheet credit conversion factor and the risk weight appropriate to the obligor.  In general, these guidelines provide that the unused portion of a commitment is subject to a zero percent credit conversion factor if the commitment has an original maturity of one year or less, or a 50 percent credit conversion factor if the commitment has an original maturity over one year.  Under these guidelines, a zero percent conversion factor also applies to the unused portion of a "retail credit card line" or "related plan" if it is unconditionally cancelable by the institution in accordance with applicable law.[8]  The phrase "related plans" in these guidelines includes overdraft checking plans.  The Agencies believe that the overdraft protection programs discussed in this joint guidance fall within the meaning of "related plans" as a type of "overdraft checking plan" for the purposes of the federal banking agencies' risk-based capital guidelines.  Consequently, overdraft protection programs that are unconditionally cancelable by the institution in accordance with applicable law would qualify for a zero percent credit conversion factor.

Institutions entering into overdraft protection contracts with third-party vendors must conduct thorough due diligence reviews prior to signing a contract.  The interagency guidance contained in the November 2000 Risk Management of Outsourced Technology Services outlines the Agencies' expectations for prudent practices in this area.

**Legal Risks**

Overdraft protection programs must comply with all applicable federal laws and regulations, some of which are outlined below.  State laws also may be applicable, including usury and criminal laws, and laws on unfair or deceptive acts or practices.  It is important that institutions have their overdraft protection programs reviewed by counsel

---

[5] Issued by the Board, FDIC, OCC, and Office of Thrift Supervision.  The NCUA provided similar guidance to credit unions in Interpretive Ruling and Policy Statement 02-3, "Allowance for Loan and Lease Losses Methodologies and Documentation for Federally Insured Credit Unions," 67 FR 37445, May 29, 2002.

[7] Federally insured credit unions should calculate risk-based net worth in accordance with the rules contained in 12 CFR Part 702.

[8] See 12 CFR Part 3, Appendix A, Section 3 (b)(5) (OCC); 12 CFR Part 208, Appendix A, Section III.D.5 (Board); and 12 CFR Part 325, Appendix A, Section II.D.5 (FDIC).

for compliance with all applicable laws prior to implementation. Further, although the guidance below outlines federal laws and regulations as of the date this joint guidance is published, applicable laws and regulations are subject to amendment. Accordingly, institutions should monitor applicable laws and regulations for revisions and to ensure that their overdraft protection programs are fully compliant.

Federal Trade Commission Act / Advertising Rules
Section 5 of the Federal Trade Commission Act (FTC Act) prohibits unfair or deceptive acts or practices.[9]  The banking agencies enforce this section pursuant to their authority in section 8 of the Federal Deposit Insurance Act, 12 U.S.C. § 1818.[10]  An act or practice is unfair if it causes or is likely to cause substantial injury to consumers that is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition. An act or practice is deceptive if, in general, it is a representation, omission, or practice that is likely to mislead a consumer acting reasonably under the circumstances, and the representation, omission, or practice is material.

In addition, the NCUA has promulgated similar rules that prohibit federally insured credit unions from using advertisements or other representations that are inaccurate or misrepresent the services or contracts offered.[11]  These regulations are broad enough to prohibit federally insured credit unions from making any false representations to the public regarding their deposit accounts.

Overdraft protection programs may raise issues under either the FTC Act or, in connection with federally insured credit unions, the NCUA's advertising rules, depending upon how the programs are marketed and implemented. To avoid engaging in deceptive, inaccurate, misrepresentative, or unfair practices, institutions should closely review all aspects of their overdraft protection programs, especially any materials that inform consumers about the programs.

Truth in Lending Act
TILA and Regulation Z require creditors to give cost disclosures for extensions of consumer credit.[12]  TILA and the regulation apply to creditors that regularly extend consumer credit that is subject to a finance charge or is payable by written agreement in more than four installments.[13]

Under Regulation Z, fees for paying overdraft items currently are not considered finance charges if the institution has not agreed in writing to pay overdrafts.[14]  Even where the

---

[9] 15 U.S.C. § 45.
[10] See OCC Advisory Letter 2002-3 (March 2002); and joint Board and FDIC Guidance on Unfair or Deceptive Acts or Practices by State-Chartered Banks (March 11, 2004).
[11] 12 CFR § 740.2.
[12] 15 U.S.C. §§ 1601 et seq. TILA is implemented by Regulation Z, 12 CFR Part 226.
[13] See 15 U.S.C. § 1602(f) and 12 CFR 226.2(a)(17). Institutions should be aware that whether a written agreement exists is a matter of state law. See, e.g., 12 CFR § 226.5.
[14] See 12 CFR 226.4(c)(3). Traditional lines of credit, which generally are subject to a written agreement, do not fall under this exception.

6

institution agrees in writing to pay overdrafts as part of the deposit account agreement, fees assessed against a transaction account for overdraft protection services are finance charges only to the extent the fees exceed the charges imposed for paying or returning overdrafts on a similar transaction account that does not have overdraft protection.

Some financial institutions also offer overdraft repayment loans to consumers who are unable to repay their overdrafts and bring their accounts to a positive balance within a specified time period.[15] These closed-end loans will trigger Regulation Z disclosures, for example, if the loan is payable by written agreement in more than four installments. Regulation Z will also be triggered where such closed-end loans are subject to a finance charge.[16]

Equal Credit Opportunity Act
Under the Equal Credit Opportunity Act (ECOA) and Regulation B, creditors are prohibited from discriminating against an applicant on a prohibited basis in any aspect of a credit transaction.[17] This prohibition applies to overdraft protection programs. Thus, steering or targeting certain consumers on a prohibited basis for overdraft protection programs while offering other consumers overdraft lines of credit or other more favorable credit products or overdraft services, will raise concerns under the ECOA.

In addition to the general prohibition against discrimination, the ECOA and Regulation B contain specific rules concerning procedures and notices for credit denials and other adverse action. Regulation B defines the term "adverse action," and generally requires a creditor who takes adverse action to send a notice to the consumer providing, among other things, the reasons for the adverse action.[18] Some actions taken by creditors under overdraft protection programs might constitute adverse action but would not require notice to the consumer if the credit is deemed to be "incidental credit" as defined in Regulation B. "Incidental credit" includes consumer credit that is not subject to a finance charge, is not payable by agreement in more than four installments, and is not made pursuant to the terms of a credit card account.[19] Overdraft protection programs that are not covered by TILA would generally qualify as incidental credit under Regulation B.

Truth in Savings Act
Under the Truth in Savings Act (TISA), deposit account disclosures must include the amount of any fee that may be imposed in connection with the account and the conditions

---

[15] For federal credit unions, this time period may not exceed 45 calendar days.  12 CFR § 701.21(c)(3).
[16] See 12 CFR 226.4.
[17] 15 U.S.C. §§ 1691 et seq.  The ECOA is implemented by Regulation B, 12 CFR Part 202.  The ECOA prohibits discrimination on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to contract), the fact that all or part of the applicant's income derives from a public assistance program, and the fact that the applicant has in good faith exercised any right under the Consumer Credit Protection Act.
[18] See 12 CFR §§ 202.2(c) and 9.
[19] See 12 CFR § 202.3(c).

under which the fee may be imposed.[20]   In addition, institutions must give advance notice to affected consumers of any change in a term that was required to be disclosed if the change may reduce the annual percentage yield or adversely affect the consumer.

When overdraft protection services are added to an existing deposit account, advance notice to the account holder may be required, for example, if the fee for the service exceeds the fee for accounts that do not have the service.[21]   In addition, TISA prohibits institutions from making any advertisement, announcement, or solicitation relating to a deposit account that is inaccurate or misleading or that misrepresents their deposit contracts.

Since these automated and marketed overdraft protection programs did not exist when most of the implementing regulations were issued, the regulations may be reevaluated.

Electronic Fund Transfer Act

The Electronic Fund Transfer Act (EFTA) and Regulation E require an institution to provide consumers with account-opening disclosures and to send a periodic statement for each monthly cycle in which an electronic fund transfer (EFT) has occurred and at least quarterly if no transfer has occurred.[22]   If, under an overdraft protection program, a consumer could overdraw an account by means of an ATM withdrawal or POS debit card transaction, both are EFTs subject to EFTA and Regulation E.  As such, periodic statements must be readily understandable and accurate regarding debits made, current balances, and fees charged.  Terminal receipts also must be readily understandable and accurate regarding the amount of the transfer.  Moreover, readily understandable and accurate statements and receipts will help reduce the number of alleged errors that the institution must investigate under Regulation E, which can be time-consuming and costly to institutions.

**Best Practices**

Clear disclosures and explanations to consumers of the operation, costs, and limitations of an overdraft protection program and appropriate management oversight of the program are fundamental to enabling responsible use of overdraft protection.  Such disclosures and oversight can also minimize potential consumer confusion and complaints, foster good customer relations, and reduce credit, legal, and other potential risks to the institution.  Institutions that establish overdraft protection programs should, as applicable, take into consideration the following best practices, many of which have been recommended or implemented by financial institutions and others, as well as practices that may otherwise be required by applicable law.  While the Agencies are concerned about promoted overdraft protection programs, the best practices may also be useful for

---

[20] 12 U.S.C. §§ 4301 et seq.  TISA is implemented by Regulation DD at 12 CFR Part 230 for banks and savings associations, and by NCUA's TISA regulation at 12 CFR Part 707 for federally insured credit unions.

[21] An advance change in terms notice would not be required if the consumer's account disclosures stated that their overdraft check may or may not be paid and the same fee would apply.

[22] 15 U.S.C. §§ 1693 et seq.  The EFTA is implemented by Regulation E, 12 CFR Part 205.

8

other methods of covering overdrafts. These best practices currently observed in or recommended by the industry include:

Marketing and Communications with Consumers

- **Avoid promoting poor account management.** Institutions should not market the program in a manner that encourages routine or intentional overdrafts. Institutions should instead present the program as a customer service that may cover inadvertent consumer overdrafts.

- **Fairly represent overdraft protection programs and alternatives.** When informing consumers about an overdraft protection program, inform consumers generally of other overdraft services and credit products, if any, that are available at the institution and how the terms, including fees, for these services and products differ. Identify for consumers the consequences of extensively using the overdraft protection program.

- **Train staff to explain program features and other choices.** Train customer service or consumer complaint processing staff to explain their overdraft protection program's features, costs, and terms, including how to opt out of the service. Staff also should be able to explain other available overdraft products offered by the institution and how consumers may qualify for them.

- **Clearly explain discretionary nature of program.** If payment of an overdraft is discretionary, make this clear. Institutions should not represent that the payment of overdrafts is guaranteed or assured if the institution retains discretion not to pay an overdraft.

- **Distinguish overdraft protection services from "free" account features.** Institutions should not promote "free" accounts and overdraft protection programs in the same advertisement in a manner that suggests the overdraft protection program is free of charges.

- **Clearly disclose program fees.** In communications about overdraft protection programs, clearly disclose the dollar amount of the fee for each overdraft and any interest rate or other fees that may apply. For example, rather than merely stating that the institution's standard NSF fee will apply, institutions should restate the dollar amount of any applicable fee or interest charge.

- **Clarify that fees count against the disclosed overdraft protection dollar limit.** Consumers should be alerted that the fees charged for covering overdrafts, as well as the amount of the overdraft item, will be subtracted from any overdraft protection limit disclosed.

- **Demonstrate when multiple fees will be charged.** If promoting an overdraft protection program, clearly disclose, where applicable, that more than one overdraft

9

fee may be charged against the account per day, depending on the number of checks presented on, and other withdrawals made from, the consumer's account.

- **Explain impact of transaction clearing policies.** Clearly explain to consumers that transactions may not be processed in the order in which they occurred, and that the order in which transactions are received by the institution and processed can affect the total amount of overdraft fees incurred by the consumer.

- **Illustrate the type of transactions covered.** Clearly disclose that overdraft fees may be imposed on transactions such as ATM withdrawals, debit card transactions, preauthorized automatic debits, telephone-initiated transfers or other electronic transfers, if applicable, to avoid implying that check transactions are the only transactions covered.

Program Features and Operation

- **Provide election or opt-out of service.** Obtain affirmative consent of consumers to receive overdraft protection. Alternatively, where overdraft protection is automatically provided, permit consumers to "opt out" of the overdraft program and provide a clear consumer disclosure of this option.

- **Alert consumers before a transaction triggers any fees.** When consumers attempt to withdraw or transfer funds made available through an overdraft protection program, provide a specific consumer notice, where feasible, that completing the withdrawal may trigger the overdraft fees (for example, it presently may be feasible at a branch teller window). This notice should be presented in a manner that permits consumers to cancel the attempted withdrawal or transfer after receiving the notice. If this is not feasible, then post notices (e.g., on proprietary ATMs) explaining that transactions may be approved that overdraw the account and fees may be incurred. Institutions should consider making access to the overdraft protection program unavailable through means other than check transactions, if feasible.

- **Prominently distinguish balances from overdraft protection funds availability.** When disclosing a single balance for an account by any means, institutions should not include overdraft protection funds in that account balance. The disclosure should instead represent the consumer's own funds available without the overdraft protection funds included. If more than one balance is provided, separately (and prominently) identify the balance without the inclusion of overdraft protection.

- **Promptly notify consumers of overdraft protection program usage each time used.** Promptly notify consumers when overdraft protection has been accessed, for example, by sending a notice to consumers the day the overdraft protection program has been accessed. The notification should identify the date of the transaction, the type of transaction, the overdraft amount, the fee associated with the overdraft, the amount necessary to return the account to a positive balance, the amount of time consumers have to return their accounts to a positive balance, and the consequences

of not returning the account to a positive balance within the given timeframe. Notify consumers if the institution terminates or suspends the consumer's access to the service, for example, if the consumer is no longer in good standing.

- **Consider daily limits on the consumer's costs.** Consider imposing a cap on consumers' potential daily costs from the overdraft program. For example, consider limiting daily costs from the program by providing a numerical limit on the total overdraft transactions that will be subject to a fee per day or by providing a dollar limit on the total fees that will be imposed per day.

- **Monitor overdraft protection program usage.** Monitor excessive consumer usage, which may indicate a need for alternative credit arrangements or other services, and inform consumers of these available options.

- **Fairly report program usage.** Institutions should not report negative information to consumer reporting agencies when the overdrafts are paid under the terms of overdraft protection programs that have been promoted by the institutions.

This concludes the text of the final Joint Guidance on Overdraft Protection Programs.

11

# EXHIBIT "D"