**FILED BY** *HH*

Deputy Clerk

*Mar 14, 2018*

STEVEN M. LARIMORE
CLERK U.S. DISTRICT CT.
S.D. OF FLA. MIAMI

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

March 14, 2018

Steven M. Larimore
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

Appeal Number:  15-13871-AA
Case Style: Michael Dasher v. RBC Bank (USA)
District Court Docket No: 1:10-cv-22190-JLK
Secondary Case Number: 1:09-md-02036-JLK

A copy of this letter, and the judgment form if noted above, but not a copy of the court's decision, is also being forwarded to counsel and pro se parties. A copy of the court's decision was previously forwarded to counsel and pro se parties on the date it was issued.

The enclosed copy of the judgment is hereby issued as mandate of the court. The court's opinion was previously provided on the date of issuance.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to:  Lois Tunstall
Phone #:  (404) 335-6191

Enclosure(s)

MDT-1 Letter Issuing Mandate

## UNITED STATES COURT OF APPEALS
### For the Eleventh Circuit

_____

No. 15-13871

_____

District Court Docket Nos.
1:10-cv-22190-JLK; 1:09-md-02036-JLK

MICHAEL DASHER,

Plaintiff - Appellee,

versus

RBC BANK (USA),
d.b.a. RBC Bank,

Defendant - Appellant.

_____

Appeal from the United States District Court for the
Southern District of Florida

_____

JUDGMENT

It is hereby ordered, adjudged, and decreed that the opinion issued on this date in this appeal is entered as the judgment of this Court.

Entered: February 13, 2018
For the Court: DAVID J. SMITH, Clerk of Court
By: Jeff R. Patch

[PUBLISH]

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

————————————————

No. 15-13871

————————————————

D.C. Docket Nos. 1:10-cv-22190-JLK; 1:09-md-02036-JLK

MICHAEL DASHER,

Plaintiff - Appellee,

versus

RBC BANK (USA),
d.b.a. RBC Bank,

Defendant - Appellant.

————————————————

Appeal from the United States District Court
for the Southern District of Florida

————————————————

(February 13, 2018)

Before TJOFLAT, JULIE CARNES, and MELLOY,[*] Circuit Judges.

MELLOY, Circuit Judge:

————————————————

[*] Honorable Michael J. Melloy, United States Circuit Judge for the Eighth Circuit, sitting by designation.

Defendant RBC Bank (USA) ("RBC") appeals the district court's denial of a motion to compel arbitration. We affirm, albeit for reasons different than those cited by the district court.

## I.

Michael Dasher held a checking account with RBC and used a debit card for that account. Dasher asserts RBC failed to properly warn him of possible overdrafts at points of sale when he used his debit card. He also asserts RBC impermissibly rearranged the order of debit-card transactions so as to process larger transactions before smaller transactions. Through this practice, RBC more quickly drove account balances to zero, thus maximizing the number of separate overdrafts. RBC charged a fee for each overdraft regardless of the size of the overdraft. By rearranging transactions in a manner that maximized the number of separate overdrafts, RBC maximized total fees charged to Dasher.[1]

---

[1] As an example, assume a customer account contains a balance of $100. Also assume the customer used a debit card to buy coffee for $10 at 7:00 am, parking for $20 at 9:00 am, lunch for $15 at noon, gas for $25 at 4:00 pm, and groceries for $125 at 7:00 pm. If the transactions were posted in chronological order, the account would still have a $30 balance after the 4:00 pm gas purchase. The $125 grocery charge would create an overdraft resulting in a single overdraft fee. By rearranging the transactions so the largest transaction on any given day is first, the $125 grocery charge is posted first. This creates an overdraft for that charge and each of the other charges that actually occurred earlier in the day. The customer is then charged an overdraft fee for each of the five transactions.

Dasher and other account holders sued RBC, and the present case became part of the Checking Account Overdraft Litigation, MDL No. 2036. RBC moved to compel arbitration, seeking to invoke an arbitration provision in a 2008 customer account agreement. The district court denied the motion. *See In re Checking Account Overdraft Litig.*, No. 09-MD-02036-JLK, 2010 WL 3361127 (S.D. Fla. Aug 23, 2010). RBC appealed. While the appeal was pending, the Supreme Court decided *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011). Perceiving the possible applicability of *Concepcion*, the parties moved to vacate and remand for reconsideration. The Eleventh Circuit granted the motion. *See In re Checking Account Overdraft Litig.*, 425 F. App'x 826 (11th Cir. 2011) (per curiam).

Back at the district court, the parties conducted limited discovery related to the issue of arbitration. Discovery revealed PNC Bank, N.A. ("PNC") had acquired RBC and had issued a new version of its customer-account agreements in 2012.[2] In doing so, PNC relied upon provisions in the 2008 agreement authorizing RBC's successors to step into RBC's shoes and also authorizing RBC to make

---

[2] Dasher's amended complaint identifies the defendant as "RBC Bank (USA), predecessor in interest to PNC Bank, N.A." Dasher alleges that due to "the merger, PNC Bank is liable for the acts of RBC." The defendant represents that RBC was merged into PNC and ceased to exist as an entity. For purposes of this opinion, we refer to the defendant from this point forward as PNC, referring to RBC only where necessary to describe past events.

changes to the terms of the agreement.   PNC's 2012 agreement lacked an arbitration provision.   The 2012 agreement purported to become binding and effective upon account holders who continued to use their accounts without opting out.  Dasher did not opt out of the 2012 agreement.

PNC renewed the RBC motion to compel arbitration, arguing the 2008 agreement and its arbitration provision should apply.   Dasher resisted, arguing PNC's more recent 2012 agreement wholly superseded the 2008 agreement, thus leaving the parties without a contractual duty to arbitrate.  On January 11, 2013, the district court issued a written order agreeing with Dasher and denying the motion to compel.  *In re Checking Account Overdraft Litig.*, 915 F. Supp. 2d 1334 (S.D. Fla. 2013).  PNC filed a notice of appeal that same day.

Shortly after the district court entered its order, PNC sent account holders an amended agreement inserting an arbitration provision into the otherwise operative 2012 agreement.  The amendment purported to become effective February 1, 2013. The arbitration provision of the February 2013 amendment is not a model of clarity, but it contains language suggesting it might have retroactive effect upon existing claims.   The February 2013 amendment indicates PNC deems account holders to accept the amendment if the account holders fail to opt out and continue to use their accounts.  Dasher neither opted out nor ceased using his account.

The parties then briefed and argued their appeal from the district court's January 2013 order. We affirmed the judgment of the district court on February 10, 2014, concluding the 2012 agreement wholly superseded the 2008 agreement, thus leaving the parties without a current duty to arbitrate. *See Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1127 (11th Cir. 2014). PNC filed a motion for reconsideration on February 28, 2014. In that motion, PNC argued "the logic of the Panel Opinion" showed that "if PNC amended its account agreement to include an arbitration provision (which it did beginning in February 2013), Plaintiffs must arbitrate their claims, because the most-current version of the agreement 'supersedes' any prior agreement." We denied the motion for reconsideration on March 27, 2014.

On April 1, 2014, PNC filed a motion to stay the mandate pending pursuit of a writ of certiorari in the Supreme Court. We granted the stay, PNC unsuccessfully sought review in the Supreme Court, and our Court issued the mandate on October 20, 2014. On November 10, 2014, pursuant to an October 29, 2014 scheduling order, Dasher filed an amended consolidated complaint in the district court.

Then, on December 5, 2014, PNC moved to compel arbitration based upon the February 2013 amendment to the 2012 agreement. Prior to this motion, and

throughout the lengthy appeal from the January 2013 order, PNC had not sought to enforce the arbitration provision from the February 2013 amendment.  Further, PNC did not suggest it had directed the February 2013 amendment to Dasher's counsel in February 2013 during the window of time PNC designated for its account holders to accept or opt out of the proposed amendment.  Similarly, PNC did not suggest it directed the proposed amendment to the attention of the court at that time.  In fact, PNC does not suggest it attempted to supplement any record or notify the court or opposing counsel other than through the above-quoted and oblique parenthetical reference contained in the February 2014 motion for reconsideration.

Dasher resisted the new motion to compel arbitration, arguing PNC had waived the right to rely upon the arbitration provision in the February 2013 amendment by failing to raise it at an earlier time.  Dasher characterized the timing of the 2013 amendment and PNC's earlier failure to alert counsel and the court of the amendment as strategic ploys.  PNC, on the other hand, argued the amendment was unrelated to Dasher's litigation and was merely a change to a standard form agreement sent to account holders as a matter of routine business.  PNC argued further that waiver should not apply because the district court record had closed prior to the February 2013 amendment such that the amendment could not have

become part of the appellate record.[3]  According to PNC, there was no opportunity to raise the February 2013 amendment with the court prior to completion of the last appeal.  The parties also presented arguments as to whether applicable state law permitted the insertion of an arbitration provision into an agreement in the absence of express acceptance by both parties.

The district court denied the motion in August 2015, finding PNC waived the right to pursue arbitration under the 2013 amendment because PNC (1) did not create the amendment until almost three years after litigation commenced; (2) failed to assert the amendment for almost two years after it purportedly went into effect; and (3) vigorously pursued arbitration under a different provision throughout this time without seeking to rely on the 2013 amendment and without timely notifying counsel or the court of the amendment.  In the alternative, citing cases arising under the Uniform Commercial Code, the district court held the addition of an arbitration provision to an existing agreement was a material alteration that could not become effective unless both parties expressly agreed to the addition.  PNC Appeals.

---

[3] In fact, PNC sent the amendment prior to the deadline for a notice of appeal from the district court's January 2013 order and listed an effective date that also preceded that deadline.

II

We review *de novo* the district court's denial of PNC's motion to compel
arbitration.  *Dasher*, 745 F.3d at 1115.  In conducting our review, we find it
unnecessary to address the questions of waiver or the district court's alternative
holding.  Instead, we conclude PNC's motion fails for a more fundamental reason:
PNC failed to demonstrate the requisite meeting of the minds to support a finding
that the parties agreed through the February 2013 amendment to arbitrate their
then-pending litigation.

We reach this conclusion for two related reasons.  First, PNC distributed the
proposed, purportedly retroactive and litigation-ending amendment directly to
Dasher, even though PNC knew Dasher was an adverse litigant actively
represented by counsel as to the very issues raised in the amendment.  Second, at
the time Dasher failed to opt out of the proposed amendment, he was forcefully
and consistently resisting arbitration of the pending litigation.  At most, then, PNC
demonstrated inconsistent communications from Dasher (his implicit acceptance
by failing to opt out and his express resistance to arbitration) coupled with a failure
on PNC's part to communicate through counsel.  In this narrow context, we cannot
overlook PNC's failure to direct its purportedly court-evicting proposed
amendment through known litigation counsel.  *See, e.g.*, *Russell v. Citigroup, Inc.*,
748 F.3d 677, 680–81 (6th Cir. 2014) (holding an arbitration provision in a new

employment agreement entered into mid-litigation did not evict a pending lawsuit from court in part because the employer-defendant failed to direct the agreement to plaintiff's litigation counsel); *see also In re Cox Enters., Inc. Set-top Cable Telev. Box Antitrust Litig.*, 835 F.3d 1195, 1203 (10th Cir. 2016) (recognizing the "common sense" rule of *Russell* but distinguishing *Russell* on its facts).

In *Russell*, a call-center employee had signed an employment agreement with Citicorp requiring arbitration of individual claims but not class actions. 748 F.3d at 679. After leaving employment, the employee instituted a class action against Citicorp. *Id.* While that class action was pending, he applied to work at the same call center and signed a new employment agreement. *Id.* This time, the employment agreement contained an arbitration provision covering class actions. *Id.* He received the new agreement at the call center and signed and submitted the new agreement at the call center. *Id.*

Citicorp subsequently sought retroactive application of the broad arbitration provision in the new employment agreement to evict the pending class action from court. *Id.* The Sixth Circuit examined the new agreement and found little textual support for retroactive application. *Russell*, 748 F.3d at 679–80. The court also relied on the fact that Citicorp did not communicate the new contract to Russell through his attorney. *Id.* at 680 ("One party's lawyer may not communicate about

a pending case with an opposing litigant he knows has legal representation."
(citing Ky. Sup. Ct. R. 3.130 and Model Rules of Prof'l Conduct r. 4.2 (1983))).
The court emphasized that this rule extended to attorneys assisting their clients'
direct communications with represented parties.  *Id.* ("The canons preclude a
lawyer not only from communicating with a represented adversary but also (for the
most part) from helping his client [to] do so." (citing *Restatement (Third) of the
Law Governing Lawyers* § 99 cmt. k (2000))).  The court ultimately concluded the
parties could not have intended the agreement to be retroactive in a manner that
would evict the pending action from court.  *Id.* at 681 ("All in all, 'arbitration is a
matter of consent, not coercion.'" (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l
Corp.*, 559 U.S. 662, 681 (2010))).

We find *Russell* persuasive to the extent it considered the failure to
communicate through litigation counsel material to the existence of a retroactive
and court-evicting agreement to arbitrate.  Arbitration, after all, "is simply a matter
of contract" such that parties cannot be required to arbitrate a matter unless they
have agreed to arbitration.  *Dasher*, 745 F.3d at 1116 (quoting *First Options of
Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)).  Further, in addressing the
underlying question of whether parties have a valid arbitration agreement, no
presumption in favor of arbitration applies.  *See id.* ("[W]hile doubts concerning
the scope of an arbitration clause should be resolved in favor of arbitration, the

10

presumption does not apply to disputes concerning whether an agreement to arbitrate has been made." (quoting *Applied Energetics, Inc. v. NewOak Capital Mkts., LLC*, 645 F.3d 522, 526 (2d Cir. 2011))). Rather, the well-recognized national policy favoring arbitration comes into play later, when addressing whether a particular claim is covered by an otherwise valid and enforceable arbitration agreement. *See id.* at 1115–16 ("*Granite Rock* [*Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 301 (2010)] thus precludes application of the FAA's presumption of arbitrability before it is determined whether there is a 'validly formed and enforceable arbitration agreement.'").

State contract law determines the existence and contours of parties' agreements, and in this case, North Carolina law controls. *See Dasher*, 745 F.3d at 1116 ("[I]n determining whether a binding agreement arose between the parties, courts apply the contract law of the particular state that governs the formation of contracts." (alteration in original) (quoting *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1368 (11th Cir. 2005))). Looking to North Carolina, we find nothing unorthodox in that state's analysis of contract law. In the absence of a wholly integrated and signed document spelling out the parties' agreement, we determine the parties' intent by examining what the parties communicated to one another through words and actions. *See id.* ("Thus, to resolve this case we apply North Carolina contract law and look for objective evidence that the parties agreed

11

to arbitrate."); *Chappell v. Roth*, 548 S.E.2d 499, 500 (N.C. 2001) ("For an agreement to constitute a valid contract, the parties' minds must meet as to all the terms." (citation omitted)); *Creech v. Melnik*, 495 S.E.2d 907, 911–12 (N.C. 1998) (stating that it is necessary to look at "the actions of the parties" when assessing an implied offer or acceptance and noting that, "[e]xcept for the method of proving the fact of mutual assent," express and implied contracts are proven through similar means).

Here, PNC unilaterally proposed the February 2013 amendment to add an arbitration provision and invited its account holders to opt out if they did not wish to be bound by the amendment.  PNC communicated its proposed amendment and preferred communication mechanisms to account holders in writing.  Dasher's uncounseled response purportedly was silence.  His counseled actions, however, clearly and simultaneously evinced an ongoing resistance to arbitration.

Even assuming for the sake of argument that Dasher received and considered the proposed amendment when PNC asserts he did, Dasher's subsequent "communications" to PNC were not merely equivocal, they were irreconcilably in conflict with one another.  PNC therefore cannot show that Dasher accepted the addition of the arbitration provision, in general, or that he agreed specifically that the arbitration provision could apply retroactively to evict his pending action from

court.  *See Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1330 (11th Cir. 2016) ("The party asserting the existence of a contract has the burden of proving its existence and its terms." (citation omitted)); *Gen. Tire & Rubber Co. v. Distribs., Inc.*, 117 S.E.2d 479, 486 (N.C. 1960) ("The burden of proof constitutes a substantial right.  The burden of proof on an issue ordinarily rests on the party who asserts the affirmative thereof[.]" (citation omitted)).

Importantly, PNC knew in no uncertain terms that Dasher was contesting arbitration and that he was represented by counsel specifically employed for the purpose of handling the matter of the overdraft litigation.  Any communication must be understood in context, not viewed in the abstract.  In this context, the risks of communicating directly with the opposing party as to a purportedly court-evicting amendment outside the presence of opposing counsel are manifest.  *See, e.g.*, Model Rules of Prof'l Conduct r. 4.2 (Am Bar Ass'n 2014) ("In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter . . . ."); Rules Regulating Fla. Bar r. 4-4.2; N.C. Rules of Prof'l Conduct r. 4.2.  As in the Sixth Circuit's *Russell* case, if a party's "in-house counsel prepared a contract, expecting it to be given to a represented litigant but also expecting it to govern existing cases, they might find themselves near the edge of this rule."  748 F.3d at 680.

We do not mean to suggest PNC's litigation counsel communicated directly with Dasher.  Nor do we find it necessary to adopt Dasher's characterization of PNC's actions as purposeful avoidance of disclosure or nefarious sandbagging.[4] Quite simply, we do not intend to write an ethics opinion.  We merely find the failure to communicate through counsel material to the important question of whether Dasher agreed to accept the February 2013 amendment.  Given the wholly equivocal "communications" from Dasher after PNC sent the February 2013 amendments, given the fact that the amendments (if accepted and interpreted as argued by PNC) would conclusively establish the need to arbitrate the existing litigation, and given the wholesale failure of PNC to communicate the proposed amendments to known litigation counsel for Dasher, we conclude PNC failed to show Dasher agreed to the addition of the arbitration provision in the February 2013 amendment.

---

[4] Dasher attributes PNC's failure to communicate through counsel to ongoing litigation strategy. Dasher infers from the timing that PNC created the proposed February 2013 amendments in response to the January 2013 district court order denying PNC's motion to compel arbitration. Dasher also characterizes PNC's December 2014 request to invoke the February 2013 amendments as litigation-protracting sandbagging.

PNC takes great umbrage at these characterizations and describes the timing of the February 2013 proposed amendment as unrelated to the January 2013 order.  PNC characterizes the February 2013 proposed amendment as the mere updating of a form agreement unrelated to Dasher's case.  According to PNC, this characterization explains the failure to direct the proposed amendment to litigation counsel.

PNC, nevertheless, argues it is unfair and asymmetric for our court to have held PNC is bound by the superseding 2012 agreement it created and communicated to Dasher by identical means but now to hold Dasher is not bound by the 2013 amendment.  We find little merit in this "what's good for the goose is good for the gander" argument.  PNC unilaterally drafted and sought to impose upon account holders the 2012 agreement and the February 2013 amendment.  PNC, presumably assisted by counsel, drafted both and communicated both to its account holders.  PNC did not communicate equivocally or unclearly its desires and intentions.  Therefore, when Dasher asked the courts to enforce the 2012 agreement, Dasher asked merely for enforcement of PNC's own agreement as drafted and proposed by PNC.

Dasher did not suggest that he rejected or intended to reject PNC's 2012 agreement.  Rather, acceptance of the terms of the 2012 agreement by Dasher was an act wholly consistent with his actions in the pending litigation.  And, because Dasher was not the drafter of the 2012 agreement, he did not at any time communicate a proposed litigation-altering agreement to PNC outside of channels that included PNC's litigation counsel.  Further, PNC's omission of an arbitration provision from the 2012 agreement was PNC's own act and solely PNC's responsibility.  Enforcement of the 2012 agreement, therefore, involved neither

factual uncertainty nor dancing along ethical boundaries.  The factual uncertainty and related ethical restrictions surrounding communication of the February 2013 amendment simply did not exist as to the 2012 agreement.

Finally, as a separate issue, PNC argues that Dasher's filing of his consolidated amended complaint in November 2014 "revived" PNC's arbitration rights.  PNC seemingly makes this argument to counter Dasher's waiver argument—the argument adopted by the district court which we do not reach on appeal.

As a general matter, PNC correctly notes that, in some situations involving waivers of arbitration rights, we have held a party's subsequent filing of an amended complaint may serve to revive the defendant's arbitration rights if the amended complaint materially alters the theory or scope of the case.  *See, e.g.*, *Collado v. J. & G. Transp., Inc.*, 820 F.3d 1256, 1259 (11th Cir. 2016) (per curiam) ("In limited circumstances, however, where a party has waived the right to compel arbitration, an amended complaint can revive that right if it is shown that the amended complaint unexpectedly changes the scope or theory of the plaintiff's claims." (citation omitted)); *Krinsk v. SunTrust Banks, Inc.*, 654 F.3d 1194, 1202 (11th Cir. 2011) ("[T]he defendant will be allowed to plead anew in response to an amended complaint, as if it were the initial complaint, when the amended

complaint . . . changes the theory or scope of the case." (alteration in original) (citation omitted)).  Given our resolution of this appeal on grounds other than waiver, however, PNC's argument is a poor fit.  Because we conclude Dasher did not agree to the purportedly court-evicting February 2013 amendment, there was no arbitration right for PNC to waive and no arbitration right for the November 2014 consolidated amended complaint to revive.

Even if PNC's revival theory could apply in this substantially different context, the changes in the November 2014 consolidated amended complaint simply would not be sufficient to revive a waived right.  Rather, Dasher's November 2014 consolidated amended complaint shrank rather than expanded the scope of the action.  Dasher's original complaint and his consolidated amended complaint asserted his theories for relief through the same five causes of action. The class definitions, however, changed.  The class definitions in the original complaint were broad:

> All RBC customers in the United States who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, incurred an overdraft fee as a result of RBC's practice of re-sequencing debit card transactions from highest to lowest (the "National Class").

and

> All RBC customers having accounts at branches in the state of North Carolina for the purpose of asserting claims under North Carolina's

consumer protection statute (the "North Carolina State Subclass") (*see* Fifth Claim for Relief, *infra*).

The class definitions in the consolidated amended complaint were more limited:

> All RBC customers in the United States who, within the applicable statute of limitations preceding the filing of this action, incurred an overdraft fee as a result of RBC's practice of re-sequencing debit card transactions from highest to lowest and whose account was closed prior to February 1, 2013 (the "Avery National Class").

> All RBC customers in the United States who, within the applicable statute of limitations preceding the filing of this action, incurred an overdraft fee as a result of RBC's practice of re-sequencing debit card transactions from highest to lowest and whose account remained open on or after February 1, 2013 (the "Dasher National Class").

and

> All RBC customers having accounts at branches in the state of North Carolina for the purpose of asserting claims under North Carolina's consumer protection statute and whose account was closed prior to February 1, 2013 (the "Avery State Subclass") (*see* Fifth Claim for Relief, *infra*).

> All RBC customers having accounts at branches in the state of North Carolina for the purpose of asserting claims under North Carolina's consumer protection statute whose account remained open on or after February 1, 2013 (the "Dasher State Subclass") (*see* Fifth Claim for Relief, *infra*).

PNC also argues the scope of the action changed because Dasher attached a 2009 account agreement to his consolidated amended complaint but a 2010

account agreement to his original complaint.  Dasher, however, referred in his original complaint to the 2010 account agreement merely as a representative copy. More importantly, given the applicable statute of limitations, multiple years' agreements were material to the claims in both complaints.  The fact that different years' agreements were attached did not expand or shrink the scope of the action. PNC's revival argument, therefore, would fail even if it could otherwise find application in this case, where we do not adopt the theory of waiver.

We affirm the district court's denial of the motion to compel arbitration.