## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 1:09-MD-02036-JLK

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

THIS DOCUMENT RELATES TO:

*Michael Dasher and Stephanie Avery v. RBC Bank (USA), predecessor in interest to PNC Bank, N.A.*

*S.D. Fla. Case No. 1:10-CV-22190-JLK*

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
## AND INCORPORATED MEMORANDUM OF LAW

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iv

MOTION AND INCORPORATED MEMORANDUM OF LAW ................................................. 1

I.     INTRODUCTION ........................................................................................ 2

II.    FACTUAL BACKGROUND ........................................................................ 6

    A.    RBC Provided Checking and Debit Card Services in Six
         States During the Class Period ........................................................ 6

    B.    RBC Perpetrated a Standardized Scheme to Collect Unlawful
         Overdraft Charges from Plaintiffs and the Classes ...................................... 7

         1.    During the Class Period, RBC Bank uniformly re-sequenced
                 transactions and posted debits from highest to lowest for all class
                 members. ........................................................................... 7

                 a.    Authorizing debit transactions. .................................... 8

                 b.    Posting transactions and assessing overdraft fees. ......................... 12

         2.    RBC utilized a secret "Overdraft Matrix Limit" throughout the
                 Class Period. ........................................................................... 15

         3.    RBC adopted the posting and overdraft practices at the
                 recommendation of consultants in order to increase revenue ................... 18

         4.    RBC failed to update its account agreements to reflect its
                 new overdraft practices………………………………………………… 18

    C.    RBC's Deceptive Overdraft Fee Practices Ensnared the Class Representatives ... 20

    D.    RBC Failed to Disclose its Practices and Provided Misleading
         Information to All Class Members .................................................... 21

         1.    RBC's standardized agreements were vague and misleading ................... 21

         2.    RBC actively sought to conceal its scheme. ............................. 25

         3.    RBC ignored opportunities to educate those who were
                 charged overdraft fees………………………………………………… 26

    E.    The Common Impact on the Class: RBC Reaped Millions of
         Dollars in Unlawful Overdraft Fees .................................................. 27

1.  RBC's deceptive overdraft practices produced enormous profits. ...................................................................................27

2.  Customer complaints relating to RBC's overdraft practices highlight the egregiousness of RBC's uniform conduct. ...........................28

III. ARGUMENT .......................................................................................30

 A. Plaintiffs and This Case Satisfy the Requirements of Rule 23(a) ........................32

  1.  The Classes are so numerous that joinder of all members is impracticable… .......................................................................32

  2.  There are questions of law and fact common to all class members ...........33

  3.  Plaintiffs' claims are typical of those of the Classes ...............................35

  4.  Plaintiff will fairly and adequately protect the interests of the Classes .....36

   a.  Plaintiffs' interests do not conflict with the interests of the Classes ...............................................................37

   b.  Plaintiffs' counsel are qualified. ...................................................38

 B. Plaintiffs and This Case Satisfy the Requirements of Rule 23(b) ........................38

  1.  Common questions of law or fact predominate. ........................................39

   a.  Common issues predominate because legal and factual questions here will be resolved with proof common to Plaintiffs and class members........................................39

   b.  Common issues will also predominate because RBC's records will be used to systematically ascertain the Classes and calculate each class member's individual damages ...42

   c.  RBC's affirmative defenses do not vitiate predominance. ............44

   d.  Applying multi-state law does not preclude predominance...........46

  2.  A class action is superior to the adjudication of thousands of separate individual cases. ......................................................................53

IV. CONCLUSION...................................................................................55

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Allapattah Servs., Inc. v. Exxon Corp.,*
333 F.3d 1248 (11th Cir. 2003) ................................................................ *passim*

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997)................................................................................31, 41

*Ashcroft v. Iqbal,*
129 S. Ct. 1937 (2009)................................................................................44

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)....................................................................................44

*Brown v. SCI Funeral Servs. of Fla., Inc.,*
212 F.R.D. 602 (S.D. Fla. 2003)............................................................. *passim*

*Bussie v. Allmerica Fin. Corp.,*
50 F. Supp. 2d 59 (D. Mass. 1999) ..............................................................47

*Castillo v. Roche Labs., Inc.,*
2010 U.S. Dist. LEXIS 87681 (S.D. Fla. Aug. 2, 2010)........................................44

*Cheney v. Cyberguard Corp.,*
213 F.R.D. 484 (S.D. Fla. 2003) ..................................................................33

*CV Reit, Inc. v. Levy,*
144 F.R.D. 690 (S.D. Fla. 1992) ..................................................................33

*Daubert v. Merrell Dow Pharms., Inc.,*
509 U.S. 579 (1993)....................................................................................43

*Deadwyler v. Volkswagen of Am. Inc.,*
1986 U.S. Dist. LEXIS 28449 (W.D.N.C. 1986)....................................................47

*Duhaime v. John Hancock Mut. Life Ins. Co.,*
177 F.R.D. 54 (D. Mass. 1997)................................................................33, 47

*Eisen v. Carlisle & Jacquelin,*
417 U.S. 156 (1974)................................................................................32, 54

*Eisenberg v. Gagnon,*
766 F.2d 770 (3d Cir. 1985)..........................................................................31

*Grovenor House, LLC v. E.I. DuPont De Nemours & Co.,*
2010 U.S. Dist. LEXIS 919095, at *10 (S.D. Fla. Aug. 12, 2010) .........................................45

iv

*Gutierrez v. Wells Fargo Bank, N.A.*,
    2008 U.S. Dist. LEXIS 70124 (N.D. Cal. Sept. 11, 2008) .....................................40

*Gutierrez v. Wells Fargo Bank, N.A.*,
    2010 U.S. Dist. LEXIS 29117 (N.D. Cal. Mar. 26, 2010).....................................40

*Gutierrez v. Wells Fargo Bank, N.A.*,
    730 F. Supp. 2d 1080 (N.D. Cal. 2010) ............................................... 2, 5, 43

*Gutierrez v. Wells Fargo Bank, N.A.*,
    704 F.3d 712 (9th Cir. 2012) ......................................................... 3, 5, 41

*Gutierrez v. Wells Fargo Bank, N.A.*,
    944 F. Supp. 2d 819 (N.D. Cal. 2013), *rev'd in part*, 589 Fed. App'x 824 (9th Cir. 2014)..... 3

*Hanlon v. Chrysler Corp*,
    150 F.3d 1011 (9th Cir. 1998) .........................................................46

*Hansen v. Monumental Life Ins. Co.*,
    2008 U.S. Dist. LEXIS 112254 (D. Conn. Mar. 6, 2008)......................................46

*Hastings-Murtagh v. Texas Air Corp.*,
    119 F.R.D. 450 (S.D. Fla. 1988).................................................33, 37, 54

*Holmes v. Continental Can Co.*,
    706 F.2d 1144 (11th Cir. 1983) ........................................................31

*Hoving v. Lawyers Title Ins. Co.*,
    256 F.R.D. 555 (E.D. Mich. 2009) .....................................................52

*Ingram v. Coca-Cola Co.*,
    200 F.R.D. 685, 699 (N.D. Ga. 2001) ..................................................39

*In re Abbott Labs. Norvir Anti-Trust Litig.*,
    2007 U.S. Dist. LEXIS 44459 (N.D. Cal. June 11, 2007) .....................................52

*In re Brand Name Prescription Drugs Antitrust Litig.*,
    1994 U.S. Dist. LEXIS 16658 (N.D. Ill. Nov. 15, 1994).......................................54

*In re Cardizem CD Antitrust Litig.*,
    200 F.R.D. 326 (E.D. Mich. 2001) .....................................................32

*In re Cardizem CD Antitrust Litig.*,
    218 F.R.D. 508 (E.D. Mich. 2003) .....................................................52

*In re Cephalon Sec. Litig.*,
    1998 U.S. Dist. LEXIS 12321, at *19 (E.D. Pa. Aug. 12, 1998) ...............................50

*In re Checking Account Overdraft Litig.*, ........................................................................... *passim*
    275 F.R.D. 666, 679 (S.D. Fla. 2011)

*In re Checking Account Overdraft Litig.*,
    286 F.R.D. 645 (S.D. Fla. 2012) ................................................................................. *passim*

*In re Checking Account Overdraft Litig.*,
    281 F.R.D. 667 (S.D. Fla. 2012) ...............................................................................5, 33, 35

*In re Conseco Life Ins. Co. Lifetrend Ins. Sales & Mktg. Litig.*,
    270 F.R.D. 521 (N.D. Cal. 2010)..............................................................................50

*In re Folding Carton Antitrust Litig.*,
    75 F.R.D. 727 (N.D. Ill. 1977)...................................................................................31

*In re Mercedes Benz Tele Aid Contract Litig.*,
    267 F.R.D. 113 (D.N.J. 2010)....................................................................................51

*In re Pharmaceutical Indus. Average Wholesale Price Litig.*,
    252 F.R.D. 83 (D. Mass 2008)...................................................................................46

*In re Playmobile Antitrust Litig.*,
    35 F. Supp. 2d 231, 242 (E.D.N.Y. 1998) ...............................................................36

*In re Prudential Ins. Co. of Am. Sales Practice Litig.*,
    962 F. Supp. 450 (D.N.J. 1997) ...........................................................................47, 48

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
    148 F.3d 283 (3d Cir. 1998)......................................................................................46

*In re School Asbestos Litig.*,
    789 F.2d 996 (3d Cir. 1986).......................................................................................46

*In re Synthroid Mktg. Litig.*,
    188 F.R.D. 287 (N.D. Ill. 1999)................................................................................36

*In re Telectronics Pacing Sys.*,
    221 F.3d 870 (6th Cir. 2000) .....................................................................................49

*In re Telectronics Pacing Sys., Inc.*,
    172 F.R.D. 271 (S.D. Ohio 1997)........................................................................47, 48

*In re Terazosin Hydrochloride Antitrust Litig.*,
    203 F.R.D. 551 (S.D. Fla. 2001)...............................................................................44

*In re Terazosin Hydrochloride Antitrust Litig.*,
    220 F.R.D. 672 (S.D. Fla. 2004)...............................................................34, 35, 36, 51

*In re Visa Check/Master Money Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001)..................................................................................55

*Klay v. Humana, Inc.*,
    382 F.3d 1241 (11th Cir. 2004) ................................................................. *passim*

*Kornberg v. Carnival Cruise Lines, Inc.*,
    741 F.2d 1332 (11th Cir. 1984) ......................................................................35

*Lessard v. Metropolitan Life Ins. Co.*,
    103 F.R.D. 608 (D. Me. 1984)...................................................................32, 36

*Margaret Hall Found. v. Atlantic Fin. Mgmt.*,
    1987 U.S. Dist. LEXIS 7528 (D. Mass. Jul. 30, 1987)........................................36

*Mid-Continent Cas. Co. v. Active Drywall South, Inc.*,
    2011 U.S. Dist. LEXIS 19978 (S.D. Fla. Feb. 25, 2011)......................................44

*Miles v. America Online, Inc.*,
    202 F.R.D. 297 (M.D. Fla. 2001).....................................................................33

*Mills v. Foremost Ins. Co.*,
    511 F.3d 1300 (11th Cir. 2008) ......................................................................44

*Moore v. Painewebber, Inc.*,
    306 F.3d 1247 (2d Cir. 2002)..........................................................................39

*Pettway v. American Cast Iron Pipe Co.*,
    576 F.2d 1157, 1220-21 n.80 (5th Cir. 1978) ....................................................31

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985)......................................................................................31

*Pickett v. IBP, Inc.*
    2001 U.S. Dist. LEXIS 22453 (M.D. Ala. Dec. 21, 2001) ....................................44

*Pottinger v. Miami*,
    720 F. Supp. 955 (S.D. Fla. 1989) ...............................................................35, 37

*Roper v. Consurve, Inc.*,
    578 F.2d 1106 (5th Cir. 1978) ...............................................................41, 42, 43

*Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*,
    601 F.3d 1159 (11th Cir. 2010) ..................................................................46, 50

*Schumacher v. Tyson Fresh Meats, Inc.*,
    221 F.R.D. 605 (N.S.D. 2004) ........................................................................52

*Shaw v. Toshiba Am. Info. Sys.,*
   91 F. Supp. 2d 942 (E.D. Tex. 2000) ..................................................................46

*Simon v. Phillip Morris,*
   124 F. Supp. 2d 46 (E.D.N.Y. 2000) ..................................................................47

*Smilow v. Southwestern Bell Mobile Sys.,*
   323 F.3d 32 (1st Cir. 2003) ..............................................................31, 43, 45

*Sosna v. Iowa,*
   419 U.S. 393 (1975) ..........................................................................................36

*Steinberg v. Nationwide Mut. Ins. Co.,*
   224 F.R.D. 67 (E.D.N.Y. 2004) ..................................................................34, 46

*Tefel v. Reno,*
   972 F. Supp. 608 (S.D. Fla. 1997) ....................................................................37

*Torres v. TPUSA, Inc.,*
   2009 U.S. Dist. LEXIS 22033 (M.D. Fla. Mar. 19, 2009)..................................45

*Valley Drug. Co. v. Geneva Pharms., Inc.,*
   350 F.3d 1181 (11th Cir. 2003) ..............................................................32, 36, 37

*Walco Invs., Inc. v. Thenen,*f
   168 F.R.D. 315 (S.D. Fla. 1996) ......................................................................35

*Waste Mgmt. Holdings v. Mowbray,*
   208 F.3d 288 (1st Cir. 2000) ......................................................................32, 45

## STATUTES

N.C. Gen. Stat. §§ 75-1.1, *et seq.*..................................................................52

## OTHER AUTHORITIES

American Law Institute, *Principles of the Law: Aggregate Litigation* § 2.05(b) (2010) .............47

Fed. R. Civ. P. 23 ............................................................................................ *passim*

## MOTION AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Fed., R. Civ. P. 23, Plaintiffs respectfully move for class certification based on the facts and authorities set forth in the following memorandum of law and accompanying Appendices I-IV.

The proposed Classes are defined as follows:

All RBC customers in the United States who, within the applicable statute of limitations preceding the filing of this action, incurred an overdraft fee as a result of RBC's practice of re-sequencing debit card transactions from highest to lowest and whose account was closed prior to February 1, 2013 (the "Avery National Class").

All RBC customers in the United States who, within the applicable statute of limitations preceding the filing of this action, incurred an overdraft fee as a result of RBC's practice of re-sequencing debit card transactions from highest to lowest and whose account remained open on or after February 1, 2013 (the "Dasher National Class").

All RBC customers having accounts at branches in the state of North Carolina for the purpose of asserting claims under North Carolina's consumer protection statute and whose account was closed prior to February 1, 2013 (the "Avery State Subclass").

All RBC customers having accounts at branches in the state of North Carolina for the purpose of asserting claims under North Carolina's consumer protection statute whose account remained open on or after February 1, 2013 (the "Dasher State Subclass").

Excluded from the Classes are PNC, its parents, subsidiaries, affiliates, officers and directors, any entity in which PNC (previously RBC) has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.[1]

Plaintiffs also move to be appointed representatives of the Classes, and for the appointment of the following firms as Class Counsel pursuant to Rule 23(g): Bruce S. Rogow,

---

[1] Plaintiffs also request that the Court certify subclasses for specific claims as set forth in Plaintiffs' Proposed Trial Plan for Trial of All Class Claims (the "Trial Plan"), which is submitted herewith as Appendix I.

P.A.; Podhurst Orseck, P.A.; Grossman Roth Yaffa Cohen, P.A.; Baron & Budd, P.C.; Golomb & Honik, P.C.; Lieff Cabraser Heimann & Bernstein LLP; Trief & Olk; Webb, Klase & Lemond, LLC; Kopelowitz Ostrow Ferguson Weiselberg Gilbert; and Darren Kaplan Law Firm, PC.

## I.      INTRODUCTION

Throughout the Class Period, senior leadership at RBC Bank (USA) ("RBC") made it a key corporate-wide priority to aggressively increase fee revenue and specifically overdraft fee revenue.   Using sophisticated automated systems and software programs designed for that task, RBC engaged in a systematic scheme to extract the greatest possible number of overdraft fees from Plaintiffs and similarly situated RBC checking account holders, collecting tens-of-millions of dollars in excessive overdraft fees, much of it from RBC's most vulnerable customer base: the poor and underprivileged.   In doing so, RBC abused the discretion afforded it under its standard customer agreements and committed other well-recognized violations of law.

To carry out this scheme, RBC manipulated debit card transactions by, among other things, employing a bookkeeping trick to re-sequence these transactions from highest-to-lowest dollar amount at the time of posting.   These account manipulations, which were applied in the same manner to all members of the Classes as a result of RBC's standardized computer software, caused funds in customer accounts to be depleted more rapidly, resulting in more overdrafts and, consequently, more overdraft fees.   In many instances, overdraft fees were levied at times when, but for RBC's manipulation, there would have been sufficient funds in the consumers' accounts. RBC did not fairly disclose its manipulations and even took active steps to keep them secret. One Court, after a full bench trial, emphatically condemned similar practices as "***gouging and profiteering***."   *See Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080, 1104 (N.D. Cal.

2010)[2] (emphasis added).

Plaintiffs now move for certification of their claims for breach of contract and the breach of the duty of good faith and fair dealing, unjust enrichment, unconscionability, and violation of the North Carolina Unfair and Deceptive Trade Practices Act.[3]  Because all required elements of Fed. R. Civ. P. 23(a) and (b)(3) are satisfied, the Court should certify the proposed Classes.

As Plaintiffs demonstrate below, Rule 23(a)(1) numerosity is satisfied because the proposed Classes are comprised of thousands of RBC customers who have been subjected to RBC's re-sequencing practice, thereby making joinder of them all impracticable.  *See infra* at 32 to 33.  Many common questions of law and fact arise from RBC's form contracts and its uniform high-to-low re-sequencing practice, thus satisfying Rule 23(a)(2) commonality.  Questions about whether RBC properly disclosed its debit transaction manipulations (it did not), and how those manipulations and the resultant overdraft fees adversely impacted RBC's customers (they did), are common to Plaintiffs and all members of the Classes.  *See infra* at 33 to 35.

Rule 23(a)(3)'s typicality requirement is also satisfied.  Plaintiffs' claims are typical of the claims of all members of the Classes because all accounts were governed by common and materially uniform agreements, were subjected to RBC's practice of re-sequencing debit transactions from high-to-low, and were assessed overdraft fees as a result.  Plaintiffs thus seek redress for the Classes via common legal claims arising out of the same course of RBC conduct.  *See infra* at 35-36.  Plaintiffs' claims are also typical of others that they seek to represent through proposed subclasses.

---

[2] The Ninth Circuit affirmed class certification and upheld Wells Fargo's liability to the class based on the bank's affirmative misrepresentations that deceived consumers.  *Gutierrez v. Wells Fargo Bank, N.A.*, 704 F.3d 712, 728-29 (9th Cir. 2012).  *See also Gutierrez v. Wells Fargo Bank, N.A.*, 944 F. Supp. 2d 819 (N.D. Cal. 2013) (reinstating verdict following appeal), *rev'd in part*, 589 Fed. App'x 824 (9th Cir. 2014).
[3] Plaintiffs do not seek to certify for class treatment the claim for conversion.

Rule 23(a)(4)'s adequacy of representation requirement is fulfilled because Plaintiffs do not have interests that conflict with the Classes, and they are represented by well-qualified counsel who are diligently prosecuting these claims.  Plaintiffs, like each of the other members of the Classes, have a strong interest in proving the unlawfulness of RBC's scheme and obtaining redress.  Thus, there interests are co-extensive.  *See infra* at 36 to 38.

Plaintiffs are entitled to certification under Rule 23(b)(3).  Common issues predominate because the salient legal and factual questions in this case will be resolved with proof common to Plaintiffs and the Classes.  Plaintiffs will prove their case with, among other things, evidence that RBC's form adhesion contracts, which the bank admits were non-negotiable for its retail customers, apply to all members of the Classes and contain similar terms that failed to meaningfully disclose RBC's scheme; that RBC systematically re-sequenced debt transactions from high-to-low for all members of the Classes in the same manner and through the same means; and that RBC established a secret "Matrix" overdraft limit for all members of the Classes through its overdraft coverage service so that RBC could charge its customers more overdraft fees.  All of this evidence, and more, will have a direct impact on every Class member's effort to establish liability and on every Class member's entitlement to relief.   Common issues thus predominate.  *See infra* at 39 to 53.

Predominance of common questions is also highlighted by the nature of the proof required to ascertain members of the Classes and calculate their individual damages.  Both exercises will be accomplished by Plaintiffs' highly-qualified expert, Arthur Olsen, through an automated process using RBC's detailed transaction history records.  Using RBC's data, and without the need for any input from individual class members, Mr. Olsen will identify and segregate those customers who were charged overdraft fees due to RBC's manipulation of debits

through high-to-low re-sequencing, at the same time calculating the harm suffered by each, as opposed to those who would have incurred the fees regardless of posting order.  *See infra* at 42 to 44.  Indeed, Mr. Olsen persuasively identified class members and their damages using a very similar approach in many cases before this Court and the *Gutierrez* case, where the court found his methods and conclusions highly reliable.  *See* 730 F. Supp. 2d at 1139.

Any individual issues relating to affirmative defenses will not detract from the common, predominating issues in this litigation.  RBC's defenses cannot upset the determinative constellation of common issues that bind the Classes together.  Further, many defenses, such as preemption and the statute of limitations, apply, if at all, on a class-wide basis.  *See infra* at 44 to 46.  The focus is on RBC's alleged, uniform deceptive practices.

Nor does applying multi-state law defeat predominance here.  In Appendix I, Plaintiffs submit a companion Trial Plan and extensive survey of applicable law that present a comprehensive roadmap for trying the Classes' claims.  On the basis of these detailed legal surveys, Plaintiffs propose certification of discrete subclasses for claims containing materially-identical legal standards.  This approach, which has been expressly approved by the Eleventh Circuit in *Klay v. Humana, Inc.*, 382 F.3d 1241, 1262 (11th Cir. 2004), and adopted by this Court in the Union Bank case, *In re Checking Account Overdraft Litig.*, 275 F.R.D. 666, 679 (S.D. Fla. 2011) ("*Union*"), among others,[4] demonstrates that common legal issues will remain the predominant focus, notwithstanding the application of multi-state law.  *See infra* at 46 to 53.

---

[4] The Court's class certification orders in the following cases certified multi-state classes.  *See In re Checking Account Overdraft Litig.*, 286 F.R.D. 645 (S.D. Fla. 2012) ("Comerica Bank"); *In re Checking Account Overdraft Litig.*, Order Granting Class Cert., DE # 2847 (S.D. Fla. July 19, 2012) ("*Capital One*"); *In re Checking Account Overdraft Litig.*, Order Granting Class Cert., DE # 2697 (S.D. Fla. May 16, 2012) ("*PNC Bank*"); *In re Checking Account Overdraft Litig.*, Order Granting Class Cert., D.E. 2673 (S.D. Fla. May 4, 2012) ("*BancorpSouth*"); *In re Checking Account Overdraft Litig.*, 281 F.R.D. 667 (S.D. Fla. 2012) ("*TD Bank*").

5

Turning to the superiority prong of Rule 23(b)(3), nearly all members of the Classes have claims too small to litigate on an individual basis. Unless the proposed Classes are certified, the courthouse doors will be closed to almost all of these consumers, and RBC will retain the ill-gotten gains of its unlawful conduct. Further, adjudicating claims in a single proceeding before this Court, which is already intimately familiar with the subject matter of this case, is much more efficient than a multiplicity of suits that would unduly burden the judicial system. As the proposed Trial Plan shows, Plaintiffs do not foresee any manageability problems. A class action is, therefore, a superior method of adjudicating Plaintiffs' claims. *See infra* at 53 to 55.

## II.      FACTUAL BACKGROUND

Though discovery has not concluded, the evidence adduced to date establishes that class-wide issues predominate over individual questions. Below is a sampling of the evidence Plaintiffs will present at trial to demonstrate how those common issues will be proven on a class-wide basis. The recitation of evidence highlights the predominance of common issues, typicality of Plaintiffs' claims, and the superiority of the class action format to resolve these claims.

**A.      RBC Provided Checking and Debit Cards in Six States During the Class Period**

Prior to merging with PNC in March 2012, RBC was a privately held corporation, headquartered in North Carolina. When the merger was announced in June 2011, RBC held approximately $25 billion in assets with a substantial retail banking presence, including checking and debit card services, at 424 branches in Alabama, Florida, Georgia, North Carolina, South Carolina, and Virginia. (http://pnc.mediaroom.com/index.php?s=3473&item=74425 (last checked August 19, 2018)). Based on Plaintiffs' review of data received from RBC to date, approximately 150,000 unique accounts make up the Classes. *See* Appendix IV at ¶52.[5]

---

[5] Upon entry of an order granting class certification, Plaintiffs' expert will perform additional analysis confirming the full size of the Classes using all transactional data that RBC can supply.

**B.   RBC Perpetrated a Uniform Scheme to Collect Unlawful Overdraft Charges from Plaintiffs and the Classes**

The common evidence described below identifies the challenged practices, chronicling

how each wrongful practice increased RBC's overdraft fee revenue at the Classes' expense.

**1.   During the Class Period, RBC uniformly re-sequenced transactions and posted debits from highest to lowest for all class members.**

Prior to 2006, RBC's architect of changes to its posting order, Robert Cooper, described

the bank's posting order as follows:

> Currently, *the daily debit activity initiated by clients is grouped according to transaction priority code and then posted from the larges to smallest dollar amount in each group.*  These are separated high to low for ATM, POS, and ACH items and On-us checks.  The separation of the transactions results in combining of posting and pay return decisions, *which results in lower # of NSF items.*
>
> *We presently give highest priority to electronic items such as ATM withdrawals and POS debits because they are authorized transactions*, checks second, and ACH and On-us items the lowest priority.
>
> *By changing our posting priorities (which is essentially a parameter change in impacs) to collapse our priority posting to not discriminate between POS (client initiated transactions) versus ACH or checks*, we estimate we could get another 300 NSF items per day, at $36 per throw, at 20 days a month, at 122 months in a year- comes to *maybe $2.5 MM.*  I would have to show you a model example for you to get the full picture, but this is within our grasp.
>
> How fast could we do it?  Pretty fast. More later.

*See* Ex. 3 (RBC-0029951-0029952) (emphasis added).[6]  Thus, during the portion of the Class

Period prior to June 2006, when the posting order changed, RBC was using high-to-low posting,

instead of the order in which transactions were authorized.

For additional context, Mr. Cooper started his October 2005 email conversation with

another high-ranking RBC employee, Ron Day, with the following: "What would you say if I

told you I've figured out a way for us to make another $2 MM in fee revenue next year ***by***

---

[6] References to "Ex." are to exhibits separately included in Appendix III to this Motion.  "Depo. Ex." refers to exhibits attached to Ex. 1 (the Rule 30(b)(6) deposition transcript) in Appendix III.

*messing with our item posting order*?"  *Id.* (emphasis added).  Mr. Day responded: "I don't think you need to ask!!!  Just tell me how and when.  I am extremely curious!!"  *Id.*  Following this exchange, RBC set into motion its plan, continuing throughout the entire Class Period, to implement changes that uniformly manipulated the order of its customers' debit transactions pursuant to a uniform scheme that re-sequenced and posted different categories of debits each day in the order of largest-to-smallest in dollar amount rather than the order in which they were authorized.  *See* Ex. 2 (Amended Answer to Interrog. No. 4) at 13-16.  During internal testing to measure expected "lift" in revenue, Mr. Cooper emailed another high-ranking employee, commenting, "Lift of $32,000 for the day- HOLY $*&%($#*#", after lamenting in earlier emails recent poor performance in RBC's retail sector.  *See* Ex. 4 (RBC 0038541-0038544).[7]

    The posting scheme did not vary from state to state within RBC's footprint.  *See* Ex. 2 (Amended Answer to Interrogatory No. 5) at 16-17.  It applied to all account holders, including Plaintiffs.  Ex. 1 at 256:3-260:6.  RBC's bank-wide re-sequencing was formulaic, automated, and applied to all debit transactions.  The process begins with authorization, followed by posting.

### a.    Authorizing debit transactions.

    According to RBC, the two most common types of debit card transactions are ATM withdrawals and point-of-sale ("POS") purchases made at a merchant.  In either type of POS transaction, the merchant must obtain authorization from RBC to process the sale.[8]  Both types of transactions involved the merchant sending RBC an electronic authorization request, which is

---

[7] Earlier in 2005, a Retail Deposit Product Strategy and Realignment Discussion document stated that "35% of RBC's total deposit fee income [was] derived from NSF activity sourced from our retail checking base."  Ex. 5 (RBC-0029089).  RBC noted that if its volume of NSF activity reached industry average, it could generate $27 million in additional fee revenue.

[8] There are two types of POS transactions: (i) "signature-based" POS transactions where the customer is required to provide a signature to the merchant at the point of sale; and (ii) "PIN-based" POS transactions, where the customer enters a pin number at the point of sale.  Ex. 2 (Amended Interrogatory Response No. 8) at 19; Ex. 1 at 24:15-23.

received by RBC's IMPACS system ("IMPACS").[9]   Ex. 1 at 50:1-19; 51:23-52:6;53:11-21.

Using the customer's account information and the transaction information sent by the merchant,

IMPACS determined whether to authorize the transaction.   "RBC typically authorized the debit

card transaction if the account, at the time of the request, had sufficient funds in the account."

*See* Ex. 2 (Amended Answer to Interrogatory No. 8) at 20.   RBC also authorized transactions

even though the account had insufficient funds at the time the merchant sought authorization.   *Id.*

Important for this case, customers who RBC assigned "Overdraft Coverage," would have a

RBC-assigned and calculated overdraft limit against which insufficient funds transactions were

authorized to increase the frequency of overdrafts.   IMPACS used this overdraft limit which was

not disclosed to customers.   "In any event, if RBC chose to authorize the transaction, the

authorization was communicated to the merchant."   *Id.*

For POS and ATM transactions, RBC maintains data containing the authorization date

and time.  Ex. 1 at 50:22-51:4; 53:2-7; 60:22-61:1. For PIN-POS transactions, the authorization

query typically included the specific and final dollar amount of the transaction.   *See* Ex. 2

(Amended Answer to Interrogatory No. 8) at 19.   Signature-POS transactions at times were

authorized with dollar amounts that differed from the final amount. *Id.* at 19-20. All accounts

were subjected to the same POS transactions authorization process.  Ex. 1 at 55:5-9.

Once authorized, "RBC placed a 'hold' on the account in [the] amount of the *authorized*

transaction."   *See* Ex. 2 (Amended Answer to Interrogatory No. 8) at 20.   For PIN-POS

transactions, a "hard hold" would be placed on the transaction until nightly batch-posting

occurred.  *Id.*  Up until a point in 2009, signature-POS transactions had a "soft hold," meaning

---

[9] IMPACS was RBC's demand deposit account system, or core banking system, housing all of
the bank's accounts where all transaction activity feeds into to maintain the proper balances and
account activity.  Ex. 1 at 52:14-53:1.

that RBC maintained a hold on the account until it received the final settlement file from the merchant, but per a VISA rule, a hold would expire after three business days.  *Id.* at 20-21. Despite the hold expiring, the transaction would still post to the account during the next batch processing when presented by the merchant for payment.  *Id.* at 21.  In 2009, as part of its scheme to increase overdraft fee revenue, RBC implemented a policy change to place "hard holds" on all signature-POS transactions. Ex. 1 at 23:1-24:9, 24:10-14.  The difference between a "soft hold" and hard hold" is that the former would not impact the funds available to pay against when the bank performed its nightly posting, but the latter would.  *Id.* at 55:18-24.  When RBC had its "soft hold" policy for signature-POS transactions that had been authorized, that hold would not cause other items to overdraft at posting.  *Id.* at 62:23-63:11.

RBC prepared a Q&A document issued to its market sales coordinators who trained staff addressing its June 2009 change to posting most signature-based transactions the same day they were authorized.  *Id.* at 267:6-25, 268:14-8; Depo. Ex. 27.  According to RBC: "As the financial services industry moves to real-time posting processes, clients should be advised to treat all debit card transaction [sic] *as immediate and posted to their account at the time of purchase*."  Depo. Ex. 27 at RBC-0088516 (emphasis added).  RBC repeated the statement, stating "**all** debit card transactions post to your account at the time of purchase."  *Id.* at RBC0088517 (emphasis in original).  Despite this, RBC will undoubtedly contend that class members should not have expected chronological posting.  Perhaps most shocking and telling, RBC instructed rank and file employees to tell customers it does not announce posting order changes:

> Q: Why was I not notified that this change was going to occur?
> A: Debit card transactions are processed in accordance with your current Depositor's Agreement. *Although we do not announce all of our processing changes*, we do continually strive to enhance processing and we looked forward to more improvements in the future.

*Id.* at RBC-0088516 (emphasis added); Ex. 1 at 270:16-21.

ATM withdrawals were authorized via a process similar to POS transactions, including authorization using the Overdraft Coverage limit. *See* Ex. 2 (Amended Answer to Interrogatory No. 8) at 21. Once authorized, "RBC placed a memo hold [a "hard hold"] on the account in the amount of the authorization request, which was subtracted from the account's available balance." *Id.* Nearly always the same business day, the ATM withdrawal posted. *Id.*

When authorizing transactions, RBC tapped into different sources that were included in the account's "available balance."[10] First, RBC used the balance of the customer's primary account tied to the debit card. Second, it could use the balance in any linked "overdraft protection" account, if the customer had such an account.[11] Third, it could use the customer's bank-assigned "Overdraft Matrix Limit" through RBC's Overdraft Coverage, what RBC describes as a courtesy overdraft service which encompasses setting a secret dollar limit to authorize transactions and collect overdraft fees if insufficient balances exist. Ex. 1 at 71:5-21. RBC viewed it as a discretionary service because the customer did not specifically establish a separate account with funds the bank could tap into, and the bank "essentially is extending a courtesy for funds that are not available." *Id.* at 70:1-18. RBC was loaning money to the customer. *Id.* at 70:19-24. A customer could have both an overdraft protection product and have an Overdraft Matrix Limit assigned to the account via Overdraft Coverage, tapping into the former first. *Id.* at 72:11-73:8.

---

[10] The available balance was the balance that dynamically changed or updated throughout the day based on any account activity, such as when memo holds were placed for transactions. Ex. 1 at 66:6-17.

[11] During the Class Period, RBC offered overdraft protection products, allowing customers to formally enroll in programs (as opposed to being enrolled by default) which link another bank account or a line of credit. Ex. 1 at 69:8-25. The funds available on such products were limited to the funds actually available. *Id.* at 71:21-72:10.

For all class members' accounts, RBC kept a "real time" running calculation of the account's "available balance" for purposes of determining whether sufficient funds existed at the time of an authorization request.  At the beginning of each business day, each account had an opening "ledger balance" before any transactions occur that day.  This opening "ledger balance" was effectively the account's available balance at the start of the day as a result of the previous night's posting activity.  *Id.* at 66:17-19.  Transaction authorizations like those described above would change the intraday available balance.  In 2009, RBC's DDA Posting Optimization Initiative focused on generating more overdraft fee revenue by utilizing "hard holds" on signature-POS transactions, as well as additional changes to posting priorities for certain transactions. *See* Depo. Ex. 24 at RBC-0002456.

If RBC's system authorized the POS transaction, the system electronically communicated the approval to the merchant, who then completed the sale.  The approval information provided to the merchant (and, in turn, the information the customer received) did ***not*** indicate whether there were sufficient funds in the customer's primary account to cover the transaction or whether the transaction was approved into overdraft using to the overdraft limit the bank assigns using Overdraft Coverage.  Ex. 2 (Amended Answer to Interrogatory No. 8) at 20.

### b.    Posting transactions and assessing overdraft fees.

Pursuant to a standardized, automated process, RBC received batch settlement files from various sources for the different debit transactions, which files were matched to customers' accounts, applicable soft holds were removed,[12] and the transactions posted against each applicable account on a given day.  *See* Ex. 2 (Amended Answer to Interrogatory No. 8) at 21. All of this happened at night and into the early hours of the morning.

---

[12] A hard hold would reduce the ledger balance during the nightly posting process, but a soft hold would not.  Ex. 1 at 110:6-14.

> Essentially, at the end of each day, all the activity that has occurred during that day, such as deposits, checks that have come in and been processed against that account, card transactions, ACH transactions, et cetera, everything comes in and during batch processing all activity is -- is posted against that account, debits and credits.

Ex. 1 at 59:23-60:6.

The order in which RBC posted debit transactions, in which customers had no say, dictated the order in which the funds are deducted from the account. *Id.* at 60:7-14. Throughout the Class Period, it was RBC's uniform practice to post all debits on checking accounts for a given day from highest-to-lowest dollar amount, with changes being made to commingle categories of transactions beginning in June 2006, knowing that collapsing its posting process into less posting groups would increase overdraft fee revenue. Ex. 1 at 65:12-21; Ex. 2 (Amended Answer to Interrogatory No. 8) at 21. The high-to-low posting priorities in place prior to June 2006 were less aggressive, but still caused customers to be charged additional overdraft fees. The 2006 change reduced the number of "buckets" to generate millions in increased overdraft fee revenue.

Following the re-sequencing of all debit transactions from highest-to-lowest on the given day, for each debit transaction that RBC posted to a customer's account during the bank's nighttime process, an automatic determination was made at the time of posting regarding whether there were sufficient funds to cover the transaction in question. *See, e.g.* Ex. 6 (RBC-0079698-0079699) (noting the 2008 modernizing of RBC's internal processing for automated overdraft decisioning). That posting determination was distinct from the one the bank made at the authorization stage in deciding to approve or decline a transaction. If there were sufficient funds in the primary account at the time of posting, no overdraft fee is assessed. If there were insufficient funds, RBC's system looked to whether there are funds in a linked overdraft

protection product (i.e., another savings/checking account, a credit card account, or a line of credit account) to cover the overages.  Ex. 1 at 100:12-103:10.  If so, then the bank would apply funds from the linked products to cover the transaction, would not assess an overdraft fee, but would assess the disclosed, albeit smaller, fee associated with that overdraft protection product. Ex. 1 at 103:13-16; 103:20-104:18.  Absent an overdraft protection product in place, which was the usual case, RBC always charged a per transaction "Non-sufficient funds check fee," which early in the Class Period was $33.00 and increased to $35.00, and a $6.00 per transaction "Overdraft/re-entry fee," making the total per item overdraft fee $41.00.  Ex. 1 at 150:3-1524:3. Notably, if RBC returned an item, the $6.00 re-entry fee was not charged, whereas most banks charged the same amount whether the item was paid or returned.  RBC's total fee amount of $41 places it atop the list of all banks' per item overdraft fee.  The charging of either fee breached the account agreement for reasons discussed below.

Early in the Class Period, the Overdraft Matrix Limit was set at a static level or $200 for all account holders that RBC deemed eligible, but that limit could be exceeded if a branch employee approved paying additional items.  Ex. 1 at 79:1-13; Ex. 7 (RBC-0026937-0026939). Later changes to the Overdraft Matrix in 2006, which are discussed further below, led RBC to set a different limit of up to a maximum of $500.  *Id.*  There was never a limit on the number of overdraft fees that could be assessed in a single day or a minimum dollar amount that could trigger an overdraft fee.  Ex. 1 at 157:3-158:1; 189:1-25 (a number of small dollar transactions could result in ten overdraft fees).  One penny could trigger an overdraft.  *Id.*  Each overdraft fee RBC assessed was tied to a particular debit transaction, and posted to the customer's account the same day that transaction was posted to the account.  Ex. 1 at 110:22-25.

RBC's high-to-low posting order had a dramatic impact on the number of overdraft

charges assessed.  If there were insufficient funds to cover all posted transactions, the bank's high-to-low posting order reduced customers' balances as quickly as possible, thereby maximizing the number of overdraft fees that were assessed.  This is the fundamental reason why RBC adopted high-to-low posting and continued to aggressively modify its high-to-low posting during the Class Period, including RBC's 2006 Priority Posting project.  *See, e.g.,* Ex. 1 at 214:23-219:22; Depo. Ex. 19.  In a document describing that project's goals, RBC wrote: "Fee income is behind 2006 plan.  By increasing the number of NSFs, RBC Centura stands to make an additional 3 million in annual NSF fees."  Depo. Ex. 19 at RBC-0035778.[13]  That document estimated increased activity of 300 transactions per day and increased monthly NSF Fee income of $200,000-$300,000 per month (a 10% increase).  *Id.*  In 2008, Mr. Cooper, while comparing RBC's overdraft policies to another bank's, noted RBC "utilizes a more sophisticated operational processing methodology that is 'tuned' to *maximize NSF revenue*, couple by our general higher pricing structure."  Ex. 8 (RBC-0132061) (emphasis added).  So not only were customers charged more overdraft fees, the fees were higher ($41).

**2.      RBC utilized a secret "Overdraft Matrix Limit" throughout the Class Period.**

Throughout the Class Period, if a customer's primary account and any linked overdraft protection account balances were insufficient to cover the transaction amount, RBC secretly authorized customers' debit-card transactions into overdraft up to a maximum amount that the bank determined was appropriate for each customer.  As introduced above, a static $200 limit had been used, but in 2006 RBC considered and implemented a new system to score each account using Overdraft Matrix criteria that would re-evaluate each account monthly.  Ex. 1 at

---

[13] RBC used NSF in this context to refer to both paid and returned transactions, the former being overdrafts. Ex. 1 at 218:22-25.

79:1-19.  That matrix applied bank-wide and to all debit card and ATM transactions.  *Id.* at 58:8-59:9; 101:25-103:3.  This was done via an automated process utilizing the Overdraft Matrix that RBC built in 2006 with the assistance of a third party contractor, The Highland Group, specifically to generate more income from overdraft fees.  *Id.* at 80:17-25, 81:22-82:9, 82:12-22; 219:23-222:25; Depo. Ex. 20.  This was a RBC revenue enhancement project.  *Id.* at 82:23-83:8.  The upper limit of the new Overdraft Matrix became $500.  *Id.* at 82:10-11.

In a document pertaining to RBC's 2006 OD Matrix Modification project, RBC described its purpose as: "Expand the customer criteria for *shadow OD protection* to allow greater customer access therefore increasing customer satisfaction and fee income . . . . Currently there are strict limitations on who can access this *non-disclosed OD shadow amount* . . . . By expanding our OD shadow amounts to more customers we anticipate a $126,000 lift in monthly fee income."  Depo. Ex. 20 at RBC-0127402 (emphasis added).  RBC anticipated approximately 123,000 additional accounts would be added by modifying the Overdraft Matrix, a "63% increase in accounts in the monthly evaluation process = 65% increase in the number of auto-decisioned overdrafts."  *See* Ex. 9 (RBC-0033692-0033694).  Shortly after this change was made, Mr. Cooper wrote to another employee: "The ultra good news is NSF fee income is *off the charts*, with total deposit fees (service charge and NSFs) up over $1 MM from the prior month, almost all from NSF.  Overdraft Matrix has kicked ass . . . which again leads to the conclusion our troubles this year are not fee income . . . ."  *See* Ex. 10 (RBC-0045982) (emphasis added).

Thereafter, in 2008, RBC undertook what it called its NSF/OD Fee Optimization Initiative with the primary objective to "increase top line non-interest income through implementation of new overdraft Scoring Models for consumer and small business accounts."  Depo. Ex. 21 at RBC-0115624; Ex. 1 at 225:4-13.  RBC's representative testified that the

objective of the initiative was to further increase the frequency of overdrafts to make sure RBC "increased revenue from overdraft transactions." Ex. 1 at 226:14-25. A document discussing the initiative stated that the 2006 posting order and Overdraft Matrix projects increased per capita fees per month from $7.88 to $11.64, and the expected opportunity from the NSF/OD Fee Optimization Initiative was a 15-19% (or $8-$11 million) lift in annual overdraft fee income. *Id.* at 227:23-234:1; Depo. Ex. 22 (RBC-0052696) (attachment). One aspect of this initiative was to solidify holds prior to nightly posting, doing away with "soft holds," to drive increased overdraft fee assessments. *Id.* RBC was successful in increasing revenue. Ex. 1 at 234:2-4. Shortly after the 2008 changes to the Overdraft Matrix were implemented, coupled with modernizing RBC's processing of automated overdraft decisioning, Mr. Cooper synopsized the tremendous benefits that RBC achieved immediately:

> This generated another $600 M to $700 M per month, within expectations. . . . This revenue lift is included in our 2009 plan forecast totaling *$116 MM for the year as of right now (up from the $84 MM for 2008)* which includes the POS Posting Initiative being delivered in August of next year as well- annualized benefit of $8.4 MM. Have more detail on this if you would like to see it (forecast per business day, by segment, charge offs, net of losses, etc.).

Ex. 6 (RBC-0079698-0079699) (emphasis added).

Augmenting its high-to-low re-sequencing practice, RBC's use of the Overdraft Matrix was integral to its overall scheme of increasing the number of completed debit transactions and, in turn, the number of overdrafts. And the entire Overdraft Matrix process of determining the amount which would be available and authorizing a transaction into overdraft was kept secret from customers during the Class Period. Ex. 1 at 96:20-24. Though RBC will claim it purportedly did not want to promote overdrafts, by keeping the Overdraft Matrix Limit secret during the transaction authorization process, the Overdraft Matrix further deceived account holders regarding the status of available funds in their accounts. They were not informed

17

transactions were authorized despite a lack of available funds.

**3.      RBC adopted posting and overdraft practices at the recommendation of consultants in order to increase revenue.**

Beginning in 2005 and during the Class Period, RBC worked first with Methods Research and later The Highlands Group, consulting firms that focused on the financial services industry, and offered fee revenue optimization as one of their services.  Ex. 2 (Amended Answer to Interrogatory 13) at 26-27.  Methods Research assisted in modifying RBC's posting priority process, and The Highland Group assisted with Overdraft Matrix Modifications and other posting process modifications.  *Id.*  RBC was approached by these companies at different times with proposals aimed at increasing RBC's overdraft fee revenue by millions of dollars, which RBC implemented.  Payments to these consultants was contingent on RBC achieving net revenue increases.  *See* Ex. 11 (RBC-0031292-0031297), Ex. 12 (RBC0032810-0032812) (Methods Research compensation at 25% of net revenue increase); Depo. Ex. 22 (Highlands Group paid 7% of revenue lift).  The undisputed purpose driving RBC's switch to more aggressive high-to-low posting was to increase overdraft occurrences in order to generate more overdraft fees.

**4.      RBC failed to update its account agreements to reflect its new overdraft practices.**

Shockingly, although RBC repeatedly reprogrammed its software systems to generate more overdraft fees, it consistently failed to update its account agreements to reflect the changes.  As a result, RBC regularly breached its contracts with customers.

During the first part of the Class Period, RBC still used its prior contract, which did not allow debit cards to overdraft.  The verbiage was all from the time before RBC changed its practices to generate more overdrafts and fees.  For example, in both of the 2005 versions of the contract, RBC included the following:

On page 23: "Bank does not charge for electronic funds transfers";

On page 25: "you may purchase up to . . . the available account balance" for point-of-sale transactions;

On page 25: promising only "nominal fees" for transfers and committing that they must be "disclosed in the Schedule of Fees";

On page 29: customers were prohibited from using debit cards to go into a negative balance: "You agree not to use the Card (or permit it to be used) to make any withdrawal, transfer or payment from any Checking, Savings, [sic] Revolving Credit Accounts if there is not enough money in those Checking or Savings Accounts or available funds in your line of credit in those Revolving Credit Accounts to complete the transaction."

Depo. Exs. 3, 5. Most damningly, in the Schedule of Fees, the only "overdraft" fee is $6, the "Nonsufficient funds check fee" in the amount of $35 plainly does not apply to debit cards.

RBC even doubled down on its misrepresentations by claiming in October 2005 – long after it began to intentionally approve debit card overdrafts to make more profits – "we typically do not pay overdrafts if your account is not in good standing, or you are not making regular deposits, or you have to many overdrafts." Depo. Ex. 5 at 9. RBC breached these provisions to the tune of millions of dollars in improper overdraft fees. Indeed, RBC had deceptively charged *the highest debit card overdraft fee in history* ($41) without ever changing its contract. Notably, *all of these provisions* remained in place in the January 2006, December 2006, and June 2007 contract versions. Depo. Exs. 4, 6; Ex. 13 (RBC-0000140-0000155).

RBC finally updated its terms in some respects in April of 2008, but it continued to use text that it knew it was breaching. For example, on page 4 it added that "electronic fund transfers," defined to include debit card use, were not subject to high-to-low posting. Depo. Ex. 7 at 4 ("wire transfers will be paid first, then ACH and other electronic fund transfers, followed by cashed checks and other cashed items, and then remaining transactions posting on the same Business Day will be paid in descending order of amount, largest paid first"). Also, RBC added: "When you initiate a withdrawal, fund transfer or other payment transaction . . . you must have

19

an Available Balance in the Account that is sufficient to cover, at the time . . . ."  *Id.*  RBC, of course, had long before started using its Overdraft Matrix in breach of this provision.  Even more damning, the Schedule of Fees was never changed to identify a $41 overdraft fee for debit card or ATM transactions, but continued to use the misleading $35 "Nonsufficient funds check fee" and $6 "overdraft/re-entry fee."  Depo. Ex. 11; Ex. 14 (RBC-0080889-0080890).  At best, RBC equivocated about its policy to always charge both fees.  For example, the 2008 agreement stated: "If we pay a withdrawal, fund transfer, or other payment transaction when you do not have a sufficient Available Balance, thereby creating or increasing an overdraft in your Account, *we may also charge you a separate "overdraft/re-entry fee"* in addition to the NSF fee for each item so paid, and you will pay us, on demand, the amount of the overdraft and all fees associated therewith."  Depo. Ex. 7 at RBC-0000160 (emphasis added).

**C.      RBC's Deceptive Overdraft Fee Practices Ensnared the Class Representatives**

The proposed class representatives have claims that are typical of the claims of other class members.  Just like each class member, Plaintiffs were charged overdraft fees as a result of RBC's uniformly deceptive practice of re-sequencing debit card transactions from high-to-low.  All class members were subject to the same non-negotiable deposit agreements, meaning the same language regarding the posting order and failure to disclose that two fees would be charged, the computerized batch account processing, and the same overdraft fee policies, including the overdraft notice and overdraft fee reversal or refund policies. Ex. 1 at 258:8-259:6.  The narrative included in Appendix IV demonstrates that Plaintiffs would have been assessed fewer overdraft fees had RBC posted his debit card transactions in chronological order.  In fact, Plaintiffs' expert, Arthur Olsen, has already calculated damages Plaintiffs' sustained during the Class Period using data RBC has produced to date in this case.  Declaration of Arthur Olsen in Support of Plaintiffs' Motion for Class Certification ("Olsen Decl.," attached as Appendix IV),

¶51. This analysis not only demonstrates that Plaintiffs were harmed by RBC's practices, it also constitutes additional evidence that Mr. Olsen can perform a comprehensive damages analysis for the entirety of the Classes.  Olsen Decl., ¶¶40-52.

**D.  RBC Failed to Disclose its Practices and Provided Misleading Information to All Class Members**

RBC leveraged its overdraft fee scheme into tens of millions of dollars annually by providing inaccurate and misleading information to class members.   RBC's so-called "disclosures" never advised that the bank would *always* manipulate transactions from high-to-low amount during the posting process.  Ex. 1 at 209:13-25.  RBC kept its posting practice disclosures deliberately vague, did not notify customers of changes, and pervasively misrepresented to customers how it would process debit transactions.  *Id.* at 267:6-25, 269:19-270:21; Depo. Ex. 27.  And RBC only "disclosed its relevant posting procedures to consumer checking account customers in its consumer checking account agreements."  Ex. 2 (Amended Answer to Interrogatory 6) at 18; Ex. 1:165:20-166:11 (interrogatory answer accurate).  It also failed to disclose overdraft fee pricing applicable to debit card and ATM transactions.

**1.  RBC's standardized agreements were vague and misleading.**

RBC's account agreements called "Service Agreements" derive from standardized form adhesion contracts that are uniform across the states in which RBC does business, and which were *not negotiable* for any customers, including Plaintiffs.  Ex. 1 at 258:8-259:7.  Throughout the Class Period, RBC misled customers by providing form contracts that failed to clearly describe its high-to-low sequencing and overdraft fee practices or to create the right to charge overdraft fees on debit card transactions, and certainly not $41 overdraft fees, thereby misleading them.  Though the account agreement verbiage went from non-existent in 2005, to at least some description by 2010, it never provided clarity, and still indicated its posting order could change at

any time in RBC's sole discretion.  Ex. 1 at 114:16-115:19 (identifying account agreements); Depo. Ex. 3 (April 2005 version);[14] Depo. Ex. 4 (January 2006 version); Depo. Ex. 5 (October 2005 version); Depo. Ex. 6 (December 2006 version); Depo. Ex. 7 (April 2008 version); Depo. Ex. 8 (November 2009 version); Depo. Ex. 9 (December 2010 version).  *See also* Ex. 13 (June 2007 version). The relevant provisions were buried deep in the account agreements which, throughout the Class Period, were single-spaced, small-font contracts of adhesion.  RBC *always* posted items from highest to lowest. [15]

The October 26, 2005 version stated "[t]ransactions posting on the same business day will be paid in descending order of amount, largest first."  Depo. Ex. 5 at RBC-0000093. However, as noted *supra* at 7, RBC's high-to-low posting actually separated transaction types. *See also* Ex. 1 at 121:19-122:6 (RBC did not disclose that different groups of transactions were in different posting buckets, and confirming RBC made no other disclosures).

RBC's posting order language as of January 23, 2006 and December 1, 2006 differed. The former stated: "All electronic funds transfer and cashed checks will be paid first, then remaining transactions posting on the same business day will be paid in descending order of amount, largest paid first."  Depo. Ex. 4 at RBC-0000109.  RBC's Rule 30(b)(6) deponent struggled to explain whether an "electronic funds transfer" would include debit card and ATM transactions, ultimately stating he could not do so:

> Q. Okay. And so can you determine from reading this sentence where in the posting order ATM and debit card transactions would have been proceeded in the posting order?
> A. Not specifically.
> Q. Why is that?
> A. Because I am not 100 percent certain that the electronic funds transfer was

---

[14] This version made no mention of a posting order.
[15] The posting order between November 2009 and the March 2012 merger date with PNC Bank did not change.  Ex. 1 at 118:24-119:7.

intended to include – terminology was intended to include debit and ATM transactions.
Q. Okay. But if we were to look at the effective transaction code posting documents –
A. Yes.
Q. – that you were referring to –
A. Yes.
Q. – we can make that determination, correct?
A. Yes, correct.
Q. But it's not obvious to you, sitting here reading this, what the posting order was, correct?
A. Not related to debit card transactions.

Ex. 1 at 127:4-24.  Customers had no access to such transactions code posting documents.

The December 1, 2016 version stated: "Wire transfers will be paid first, followed, by cashed checks, and then remaining transactions posting on the same day will be paid in descending order of amount, largest paid first."  Depo Ex. 6 a RBC-0000125.  At this point, RBC had implemented its June 2006 Priority Posting change without notifying existing account holders of its change in the posting order.

RBC ushered in the use of equivocal posting order language as represented in the April 4, 2008 version, and reverting to using "electronic funds transfer" language, albeit in a disjointed way in a section titled Withdrawals and Processing Order:

> Unless applicable law requires a different order, *we will normally honor* withdrawals, fund transfers and other payments from the Account in the following order: wire transfers will be paid first, *then ACH and electronic fund transfers*, followed by cashed checks and other cashed Items, and then remaining transactions posting on the same Business Day will be paid in descending order of amount, largest paid first; *provided, however, we reserve the right, in our sole discretion, to pay Items in any order we deem appropriate from time to time, without any liability to you or any other person*.

Depo. Ex. 7 at RBC-0000160 (emphasis added).  In this version, the definition of an "electronic funds transfer" is buried deeper, 14 pages later.  *Id.* at RBC-0000174; Ex. 1 at 135:10-136:18.  Discussing this posting order language, and when asked where debit card and ATM transactions

fit in the posting order, RBC's Rule 30(b)(6) representative indicated he thought it would be part of "electronic funds transfer" and no longer in the "remaining transactions" group, but would want the aid of RBC's internal posting order documentation to be sure, none of which would be available to consumers.  Ex. 1 at 135:2-9.  As noted above, the correct reading of the 2008 version is that debit card and ATM transactions would not be posted high-to-low.

The November 10, 2009 and December 3, 2010 versions of the account agreement contained identical language, retaining the "normally honor" and "sole discretion" terms allowing RBC to change the posting order at will:

> Unless applicable law requires a different order, we will normally honor withdrawals, fund transfers and other payments from the Account which are presented on the same Business Day in the following order: **wire transfers will be paid first, then ACH and electronic fund transfers, cashed checks and other cashed Items, etc., will be paid in descending order of amount, <u>largest paid first</u>**; provided, however, we reserve the right, in our sole discretion, to pay Items in any order we deem appropriate from time to time, without any liability to you or any other person.

Depo. Ex. 9 (2010 version) (emphasis in original).  In 2009, the bold and underlined language was in ordinary text, and the definition of "electronic funds transfer" remained 14 pages later in both versions.  Depo. Ex. 8 (2009 version).  RBC's 30(b)(6) representative agreed having the definition sooner would allow consumers to find it, and confirmed he had never read the agreement cover to cover because he did not find it necessary.  Ex. 1 at 116:4-8, 138:2-10.

RBC never disclosed to customers its practice of re-sequencing debit transactions to artificially increase the number of overdrafts and overdraft fees, or that its posting order would have that effect.  While RBC's practices and posting order could have easily been described in clear, certain terms, the Service Agreements never disclosed them.

Comparing RBC's account agreements to what Union Bank, for example, represented to its customers, there was not even a reference to a concept that larger checks would ***generally*** be

paid first so as to even suggest that high-to-low posting could increase the frequency of overdrafts for the bank's benefit, or that a different posting order would result in less overdraft fees.   D.E. 1387 at 25.   RBC did not disclose to its customers that it ***always*** posted debit transactions highest-to-lowest in dollar amount throughout the Class Period.

>    **2.      RBC actively sought to conceal its scheme.**

RBC's vaguely worded account agreements were purposeful, as RBC took active measures ***not*** to communicate to class members the bank's high-to-low re-sequencing and method of setting the customer's Overdraft Matrix Limit.   When it adopted its more aggressive high-to-low posting in June 2006 to increase overdraft fee revenue, RBC consciously did not disclose the change or the new posting order to customers and maintained that policy throughout the Class Period.   For example, in a memorandum from Mr. Cooper to a handful of high-level RBC employees discussing the posting order change, he wrote:

> There *will be limited communication* with respect to this change, as the associates [meaning the employees who deal directly with customers] will only notice a slight increase in NSF items as a result of this activity.   To put it in perspective, 493 items per day, uniformly placed over 274 banking centers, would be less than 2 per day per branch.   That said, we did want to make you aware as leaders of the Sales team in the event that the question arises in one off situation.

*See* Ex. 15 (RBC-0039160-0039161) (emphasis added).   Later, when it rolled out the 2006 Overdraft Matrix changes, a bank employee emailed other high-ranking employees about what bankers would be told, indicating he "struggled with this, because I do not want to over communicate what I hope will not be a big deal.   I have what is potentially too many details, because we <u>do not</u> want our bankers disclosing this to customers."   *See* Ex. 16 (RBC-0044454-0044456) (underline emphasis in original).   In the portion of the document titled "What do I tell my customers," he wrote "<u>Remember no details of our overdraft protection logic should ever be communicated to a customer.   This is an internal process.</u>"   *Id.* (underline emphasis in original).

RBC was deliberately vague choosing not to specifically disclose that it would systematically re-sequence all debit transactions from high-to-low and that the change would generate substantially more overdraft charges. RBC deemed its account agreement language sufficient. *See* Ex. 17 (RBC-0058873 ("Just an fyi . . . we were able to use words like 'may hold funds', 'may pay items into the overdraft totally at the discretion of the bank', and that the posting priority is 'at the discretion of the bank' . . . that sort of thing that the lawyers agreed would cover us in all situations.").

RBC also took measures to keep the Overdraft Matrix and assigned overdraft limit secret. *See supra* at 15-18. Having admonished employees that the Overdraft Matrix Limit should not be disclosed to customers, it would be difficult for class members to otherwise discover the secret line of credit because when RBC authorized a POS debit-card transaction pursuant to Overdraft Matrix, the customer were not notified at the point of sale that the transaction would overdraw their account or that they may be assessed an overdraft charge if they proceeded. This was true as to all POS transactions.

**3. RBC ignored opportunities to educate those who were charged overdraft fees.**

RBC ignored the opportunity to educate account holders about how the posting order caused overdrafts in something as simple as the notice it always sent out after assessing the overdraft fee. RBC's overdraft notices did not explain how the posting order impacted the frequency of overdraft fees or suggest any way to avoid future overdrafts because of the posting order. Ex. 1 at 176:6-21, 178:7-179:17; Depo. Ex. 12. Similarly, the monthly account statements were not organized to show the posting order in action because the different transactions types (i.e. checks and debit card transactions) are separated in each statement. Ex. 1 at 181:14-184:22, 185:4-6 ("you can't see the posting order in action by looking at the bank

statement"), 186:22-187:7; Depo. Ex. 14 (sample statement for Plaintiff Dasher's account); Depo. Ex. 15 (sample statement for Plaintiff Avery's account). Also, the fee schedule did not state the overdraft fee charged on debit card and ATM transactions with any clarity. *See supra* at 18-20.

**E.     The Common Impact on the Class: RBC Reaped Millions of Dollars in Unlawful Overdraft Fees**

**1.      RBC's deceptive overdraft practices produced enormous profits.**

RBC made enormous profits during the Class Period from overdraft fees, much of its taken from the banks most vulnerable customers. RBC closely monitored overdraft fee income in quarterly reports. *See* Ex. 18 (RBC-0048335-0048336). In an email directed to an employee who communicated bank policies to branch employees, one RBC employee wrote:

> I think there is an opportunity on the fee front, I've noticed that fee collection % has slipped, and with the higher fees and increased incidence of fees, we need to support the field in responding to customer concerns in this regard (we are waiving/refunding about $500,000 per month in fees due). There is an opportunity here that we need to tackle. I plan to highlight the opportunity in the next RP meeting but we need to develop some targeted communications (and perhaps training) to redress.

*Id.* In an email attaching a 2007 Power Point presentation directed to RBC Market Presidents, after noting that the 2006 posting order and Overdraft Matrix changes drove a net revenue lift of $14 million year over year, it noted there was an initiative underway "to continue to accelerate revenue through enhancements of the overdraft model in concert with streamlining/decision and collection activities." *See* Ex. 19 (RBC-0052451-0052459). At the time, "NSF revenue makes up 27% of total non interest income, and 6% of total monthly revenue (franchise wide)." *Id.* at RBC-0052453. In a subsection of that presentation titled "Lack of clarity to NSF decisioning process and role it plays on customer satisfaction as well as revenue," it was noted that "[s]ince December, volume of "opt out" request for overdraft automated scoring process has increased

27

corporate wide by 34% . . . These activities, while being done for the right reasons, drive lower revenue over the long run." *Id.* at RBC-0052454.

RBC encouraged employees not to refund overdraft fees. For example, in an email exchange regarding training, acknowledging RBC loans its customers money when overdrafts are paid and an overdraft fee refund is equivalent to giving an interest free loan, one employee attached an example of a training tool he used, which stated:

> **You should think twice about granting a request for an overdraft fee refund!**
>
> . . . .
>
> Remember, for every dollar you give away, it's a dollar you have to then go out and **<u>EARN AGAIN</u>** just to get back to even! Think about that before you simply say "yes" to a request for a fee refund! Every fee we earn is important to us. Don't put yourself in a position to make the 'easy out' decision of granting a fee to a customer who has not earned that level of service. Keep those 'golden bullet' refunds for customers who clearly are profitable to the bank and use it as an opportunity to sell a service such as overdraft protection as an offset for the fee refund.

*See* Ex. 20 (RBC-0127906-0127907).

In 2008, Mr. Cooper briefed a high-ranking RBC employee about the benefits of the posting order and Overdraft Matrix changes had achieved, noting:

> [T]he more you approve and pay (instead of returning items), the more the client will conduct NSF activity, which while driving risk of principal not being paid back, also drives revenue (put in January 2007). Our actual principal charge off rate from NSF activity is extremely low. These initiatives increased our Deposit Fee Income by (give or take) $10 MM annually- or roughly 20%.

*See* Ex. 21 (RBC-0064838-0064843). At that time, RBC centralized overdraft collections by taking responsibility from banking centers to increase profitability. *Id.* at RBC-0064840.

### 2. Customer complaints relating to RBC's overdraft practices highlight the egregiousness of RBC's uniform conduct.

RBC customers complained to RBC, expressing frustration that RBC authorized transactions instead of declining them. Ex. 1 at 267:1-5. In a 2007 RBC employee email

28

exchange about customer complaints, which included its Customer Relations Center Manager, an uptick in complaints around fees was attributed to the Priority Posting change, while another employee blamed the complaints on the Overdraft Matrix change "that is automatically paying more debits into overdraft and charging the fee." *See* Ex. 18 (RBC-0048335). The employee observed that branch employees were deferring to the Customer Relations Center because they were "ill-equipped to handle the concerns themselves. There is a training/ communications opportunity here for our branches . . . on how to overcome objections." *Id.*

Mr. Cooper was on notice as early February 2007 that customers would rather have transactions declined. Ex. 22 (RBC-0046035-0046037). News of a January 2007 report from the Center for Responsible Lending made its way to Mr. Cooper, referring to the following:

> A survey of account holders show [sic] that customers would avoid those fees if they had the chance. Over 60 percent of the 2,400 we surveyed preferred that their debit card transactions be denied at the checkout if they had insufficient funds. Nearly all would cancel their ATM withdrawal to avoid a fee.

*Id.* at RBC-0046036. He responded to a bank employee who was either unaware or confused about whether RBC debit card transactions "decline or draft to overdraft," stating that RBC had "shadow overdraft processes . . . embedded behind the scenes, is not disclosed to the client, covers all transactions (including Debit Point of Sale)." *Id.* at RBC-0046035. He continued:

> This process was designed to save the client the embarrassment of transaction decline in public settings, and to enhance the customer experience. *Our first preference is for clients to have a [sic] overdraft line of credit*, with [sic] automatically advances funds to cover purchases through POS or debits by other means, *which have very favorable rates and repayment terms*, and is most convenient to clients.

*Id.* (emphasis added). Yet, RBC was undeterred to increase its efforts to generate millions in overdraft draft fee income using Overdraft Coverage, combined with a more aggressive Overdraft Matrix, on the backs of those who could ill-afford $41 overdraft fees and could not

qualify for lines of credit.  RBC was aware of FDIC data showing that 68% of NSF fee related income comes from less than 5% of banking clients with more than 20 NSF fees per year, and examining one month's statistics, confirmed that 94% of its retail checking customers did not have a single NSF.  Ex. 23 (RBC-0089517).  "The result is a concentration of a significant source of income in the hands of a few clients."  *Id.*  At the time, 31% of RBC's revenue came from NSF fee income.  *Id.* at RBC-0089515.

This sentiment that customers preferred RBC to decline transactions was addressed again in May 2007.  In an email about a Quarterly Complaint Monitoring Report, Mr. Cooper was told:

> I just spoke with one of our reps at the [Customer Relations Center] and almost all the complaints around these overdrafts are customers who are upset that we allow transactions to process when they don't have available funds, but is allowed because of this $200 or $500 OD limit, and then we charge them an NSF and OD fee.  They say they would rather have the transaction declined at the post of sale rather than allowing it and subsequently imposing these fees.

*See* Ex. 24 (RBC-0048536-0048537).  *See also* Ex. 25 (RBC-0048525-0048527) (Complaint Management Compliance Report dated May 30, 2017, noting "Courtesy Overdrafts" and stating: "Complaints associated with courtesy overdraft were based on customers' unawareness that we honored items instead of returning them.")

RBC also knew that its overdraft policies confused consumers.  *See* Ex. 26 (RBC-0132270-0132271) (bank employees discussing a confused customer who said he called the bank before using his debit card and was told he had sufficient funds for the transaction).  The complaints and confusion amongst customers and employees alike constitute additional evidence of RBC's uniform course of conduct in imposing overdraft fees on the Classes and highlight the egregiousness of that conduct.

### III.   ARGUMENT

Class actions have long been recognized by the courts as an essential tool for adjudicating

cases involving multiple claims that have similar factual and/or legal inquiries and that might be too modest to warrant prosecuting on an individual basis.  In crafting Rule 23, "the Advisory Committee had dominantly in mind vindication of 'the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997).  Class actions thus give voice to plaintiffs who "would have no realistic day in court if a class action were not available." *Phillips Petro. Co. v. Shutts*, 472 U.S. 797, 809 (1985); *see also Holmes v. Continental Can Co.*, 706 F.2d 1144, 1154 (11th Cir. 1983) (describing "the policies of Rule 23" and observing "the individual might be unable to obtain counsel to prosecute his action when the amount of individual damages is relatively small") (quoting *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1220-21 n.80 (5th Cir. 1978)).  Class actions also serve as an important deterrent. "The public at large . . . benefit[s] from a class action and expeditious adjudication of the issues involved, since class actions reinforce the regulatory scheme by providing an additional deterrent beyond that afforded either by public enforcement or by single-party private enforcement."  *In re Folding Carton Antitrust Litig.*, 75 F.R.D. 727, 733 (N.D. Ill. 1977) (cites and quotes omitted).

Thus, "[i]t is well-established that class actions are a particularly appropriate and desirable means of redressing common claims for uniform legal violations that affect large numbers of persons in the same way." *Brown v. SCI Funeral Servs.of Fla., Inc.*, 212 F.R.D. 602, 603 (S.D. Fla. 2003); *see also Smilow v. Southwestern Bell Mobile Sys.*, 323 F.3d 32, 41-42 (1st Cir. 2003) (classes of consumers are particularly ripe for certification).  The policies underlying the need for class action litigation require that certification under Rule 23 be liberally construed. *See, e.g.*, *Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985) (citations omitted) ("The interests of justice require that in a doubtful case … any error, if there is to be one, should be

31

committed in favor of allowing a class action."); *Lessard v. Metropolitan Life Ins. Co.*, 103 F.R.D. 608, 610 (D. Me. 1984) ("Rule 23(a) should be liberally construed in order not to undermine the policies underlying the class action rule.").

Although the Court must undertake a rigorous analysis of the Rule 23 prerequisites, the Court has broad discretion to certify. *Klay v. Humana, Inc.*, 382 F.3d 1241, 1251 (11th Cir. 2004); *Comerica*, 286 F.R.D. at 649; *Union*, 275 F.R.D. at 670. In making the decision, the Court does ***not*** determine whether plaintiffs will ultimately prevail on the merits. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974); *also Comerica*, 286 F.R.D. at 649; *Union*, 275 F.R.D. at 671. But it may consider the factual record in deciding whether the requirements of Rule 23 are satisfied. *Valley Drug Co. v. Geneva Pharms., Inc*., 350 F.3d 1181, 1188 n.15 (11th Cir. 2003). Courts "formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Waste Mgmt. Holdings v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000). In other words, courts undertake "an analysis of the issues and the nature of required proof at trial to determine whether the matters in dispute and the nature of plaintiffs' proofs are principally individual in nature or ***are susceptible of common proof*** equally applicable to all class members." *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 334 (E.D. Mich. 2001) (emphasis added) (citation omitted).

In this case, the record supports certification of the Classes pursuant to Rule 23(b)(3). By proving their own cases, the Plaintiffs will succeed in proving absent class members' claims.

**A.** **Plaintiffs and This Case Satisfy the Requirements of Rule 23(a).**

Rule 23(a) requires a party seeking class certification to satisfy four prerequisites: (i) numerosity; (ii) commonality; (iii) typicality; and (iv) adequacy. *Klay*, 382 F.3d at 1250.

**1.** **The Classes are so numerous that joinder of all members is impracticable.**

Rule 23(a)(1) requires that the proposed Classes be so numerous that joinder of all

members is impracticable.  Joinder need not be impossible; the rule only requires that the difficulty or inconvenience of joining all members make use of the class action vehicle appropriate.  "[A] numerical yardstick is not the determinant for class certification; rather a court should examine the numbers involved to see if joinder of all is impossible or impracticable." *Hastings-Murtagh v. Texas Air Corp.*, 119 F.R.D. 450, 459 (S.D. Fla. 1988) (King, J.).  Courts in the Southern District and the Middle District have found numerosity where the class numbered 500, 4,700, and 9,000.  *See Brown*, 212 F.R.D. at 604 (9,000); *Miles v. America Online, Inc.*, 202 F.R.D. 297 (M.D. Fla. 2001) (4,700); *CV Reit, Inc. v. Levy*, 144 F.R.D. 690, 696 (S.D. Fla. 1992) (500); *also Comerica*, 286 F.R.D. at 651-52; *TD Bank*, 281 F.R.D. at 673-74; *Union*, 275 F.R.D. at 671 (certifying proposed class in the tens or hundreds of thousands)..

This case easily satisfies numerosity.  Although the exact number of class members is unknown at this time, Plaintiffs' expert's analysis using data supplied by RBC to date indicates that in excess of 150,000 unique accounts were ensnared by RBC's re-sequencing and overdraft policies.  Appendix IV at ¶52.  RBC confirms that its relevant policies did not vary from state to state.  Ex. 2 (Amended Answer to Interrogatories 4 and 5) at 13-17.  With over 150,000 unique accounts showing harm, the proposed Classes are comprised of thousands of RBC customers, making joinder of them all impracticable if not impossible.  *See* Appendix IV.

### 2. There are questions of law and fact common to all class members.

Rule 23(a)(2) requires that there be questions of law or fact common to the class.  The "commonality" requirement of Rule 23(a)(2) "is a 'low hurdle' easily surmounted."  *Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. 54, 63 (D. Mass. 1997) (citations omitted); *see also Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 490 (S.D. Fla. 2003) (commonality threshold is "not high").  It only requires "at least one issue common to all class members."  *Brown*, 212 F.R.D. at 604.  Where the defendant is alleged to have "engaged in a standardized course of

conduct that affects all class members," commonality is satisfied.  *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 685-86 (S.D. Fla. 2004); *see also Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 74 (E.D.N.Y. 2004) ("claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action").  Moreover, "[p]laintiffs' legal claims need not be completely identical and factual differences concerning treatment or damages will not defeat a finding of commonality."  *Brown*, 212 F.R.D. at 604.

The Classes satisfy commonality.  The allegations and proof (summarized above) focus on the existence, scope, duration, and efficacy of RBC's scheme.  The liability proof will place RBC's actions center stage – proof common to all of the class members:  RBC's disclosures to all class members were materially uniform, as were its re-sequencing policies; RBC's debit card transaction re-sequencing was done using the same computer programs and systems for all class members; and RBC assessed all class members overdraft fees based on re-sequencing.

Thus, while only one question of law *or* fact is required, there are many questions of law and fact common to the proposed Classes, including whether RBC:

- Disclosed in any meaningful way that RBC would or could assess overdraft fees on debit charges and ATM withdrawals that were authorized with sufficient funds at the time due to the high-to-low posting order of all transactions;

- Alerted class members that a debit card transaction would trigger an overdraft fee if processed and provided them with an opportunity to cancel the transaction;

- Manipulated and re-ordered transactions in order to increase the number of overdraft fees imposed;

- Imposed overdraft fees when, but for re-sequencing, there would be sufficient funds in the account;

- Failed to provide class members with accurate balance information;

- Precluded debit card overdrafts and related fees as a matter of contract and certainly never provided for two fees *totaling $41*; and

- Breached its contract and the covenant of good faith and fair dealing with

34

> Plaintiffs and the Classes; engaged in unconscionable practices; was unjustly enriched at the expense of Plaintiffs and the Class; and violated the North Carolina Unfair and Deceptive Trade Practices Act.

This Court found the same or similar issues to satisfy the commonality requirements of Rule 23(a)(3) in cases against several other banks in this MDL. *See, e.g., Comerica*, 286 F.R.D. at 652-53; *TD Bank*, 281 F.R.D. at 674-75; *Union*, 275 F.R.D. at 674-75.

### 3. Plaintiffs' claims are typical of those of the Classes.

Rule 23(a)(3) requires that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." This "typicality" requirement is met when the claims of the representative plaintiffs arise from the same course of conduct that gives rise to the claims of the other class members, and where the claims are based upon similar legal theories and are not antagonistic to those of the class. *Pottinger v. Miami*, 720 F. Supp. 955, 959 (S.D. Fla. 1989). Typicality and commonality are related, with commonality referring to the group characteristics of the class as a whole, and typicality focusing on the named plaintiffs' claims in relation to the class. *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. at 686 n.23.

Typicality does not require identical claims or defenses, and a "factual variation will not render a class representative's claim atypical unless the factual position of the representative markedly differs from that of other members of the class." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984). Indeed, any alleged atypicality between the named plaintiffs' claims and those of the class "must be clear and must be such that the interests of the class are placed in significant jeopardy." *Walco Invs., Inc. v. Thenen*, 168 F.R.D. 315, 326 (S.D. Fla. 1996). Nor do variations in the amount of damages vitiate typicality. *Kornberg*, 741 F.2d at 1337; *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. at 687.[16]

---

[16] Courts have consistently refused to deny class certification where the named plaintiffs may have been subject to unique defenses such as lack of reliance, statute of limitations, or

Plaintiffs' claims here arise out of the same course of conduct and are based on the same legal theories as those of the absent class members. Plaintiffs and members of the Classes, governed by common and materially uniform agreements, were subjected to RBC's practice of re-sequencing debit card transactions from high-to-low, and were assessed overdraft fees as a result. Plaintiff and the Classes seek redress via common legal claims for breach of the duty of good faith and fair dealing, unjust enrichment, unconscionability, and the North Carolina Unfair and Deceptive Trade Practices Act. Thus, Plaintiffs' and the Classes' claims arise from the same course of RBC's conduct and the same legal theories, thereby satisfying Rule 23(a)(3). Moreover, Plaintiffs propose discrete multi-state subclasses for some of the state law claims to ensure the proposed class representatives' claims are materially identical to all other class members that they seek to represent. *See infra* at 44 to 53.

### 4. Plaintiffs will fairly and adequately protect the interests of the Classes.

Rule 23(a)(4) requires that the representative parties will "fairly and adequately protect the interests of the class." This requirement is satisfied when (i) the class representatives have no interests conflicting with the class; and (ii) the representatives and their attorneys will properly prosecute the case. *Sosna v. Iowa*, 419 U.S. 393, 403 (1975); *Valley Drug*, 350 F.3d at 1189. Both prongs are satisfied here.

---

compulsory counterclaims. *See*, *e.g.*, *Margaret Hall Found. v. Atlantic Fin. Mgmt.*, 1987 U.S. Dist. LEXIS 7528, at *7 (D. Mass. Jul. 30, 1987) ("possible statute of limitations defenses, like possible nonreliance defenses, do not vitiate typicality"); *Lessard*, 103 F.R.D. at 611 (holding that named plaintiff is not atypical because she may be subject to compulsory counterclaims). This is because "typicality refers to the nature of the claims of the representative, not the individual characteristics of the plaintiff." *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. at 687 (quoting *In re Playmobile Antitrust Litig.*, 35 F. Supp. 2d 231, 242 (E.D.N.Y. 1998)). It is only when a unique defense "will consume the merits of a case that a class should not be certified." *In re Synthroid Mktg. Litig.*, 188 F.R.D. 287, 291 (N.D. Ill. 1999). RBC can make no such showing here.

      **a.**      **Plaintiffs' interests do not conflict with the interests of the Classes.**

The named plaintiff is adequate if she shares common interests with the class members and seeks the same type of relief for herself as she seeks for the class. *Pottinger*, 720 F. Supp. at 959. Minor conflicts of interest between the plaintiff and the class "alone will not defeat a party's claim to class certification: the conflict must be a 'fundamental' one going to the specific issues in controversy." *Valley Drug*, 350 F.3d at 1189. A fundamental conflict exists where the economic interests and objectives of the class representatives "differ significantly from the economic interests and objectives of unnamed class members," such as when other members of the class actually benefited from the challenged conduct by the plaintiff. *Id.* at 1189-90. No such fundamental conflict exists here.

Neither the Plaintiffs nor their counsel have any interests antagonistic to those of the absent class members. The central issues in this case – the existence, unlawfulness and effect of RBC's scheme to manipulate debit card transactions and increase the number of overdraft fees assessed – are common to the claims of Plaintiffs and the other members of the Classes. Plaintiffs, like each absent class member, have a strong interest in proving RBC's scheme, establishing its unlawfulness, demonstrating the impact of the illegal conduct, and obtaining redress. Certainly, no customer has an interest in paying *more* overdraft fees, and there is no colorable argument to be made that RBC's assessment of excessive overdraft fees benefited the Classes. As Plaintiffs proves their own claims, they also will be proving the claims of approximately 150,000 absent class members. Plaintiff thus "share[s] the true interests of the class." *Texas Air*, 119 F.R.D. at 459; *see also Tefel v. Reno*, 972 F. Supp. 608, 617 (S.D. Fla. 1997) (King, J.) (the "common goal of each member of the class" is to remedy the unlawful conduct, and "[i]f the Plaintiffs succeed, the benefits will inure to all class members.") There is no conflict between Plaintiffs and the absent class members.

**b.    Plaintiffs' counsel are qualified.**

Class counsel must be qualified to represent the Classes, and the Plaintiffs must participate in the prosecution of the litigation.  *Brown*, 212 F.R.D. at 605.  The law firms seeking to represent the Classes here include very qualified lawyers experienced in the successful prosecution of consumer class actions, and they have collectively recovered billions-of-dollars for class members in other litigation.  As this Court has previously determined in other cases prosecuted as part of MDL 2036, these firms are well-qualified to serve as Class Counsel under Fed. R. Civ. P. 23(a)(4) and 23(g).[17]  *See, e.g. Comerica Bank*, 286 F.R.D. at 655; *BancorpSouth*, D.E. 2673 at 12.  These firms and their co-counsel stand ready, willing, and able to devote the resources necessary to litigate this case vigorously and to see it through to the best possible resolution.  And Plaintiffs have expressed their commitment to overseeing the attorneys and participating in the prosecution of the case.[18]

**B.    Plaintiffs and This Case Satisfy the Requirements of Rule 23(b)**

In addition to establishing the elements of Rule 23(a), Plaintiff also must show that this case satisfies at least one of the conditions of Rule 23(b).  *Klay*, 382 F.3d at 1250.  Under Rule 23(b)(3), certification is appropriate if: (i) common questions of law or fact predominate over questions affecting the individual class members only; and (ii) class treatment is superior to other methods available for adjudicating the controversy.

---

[17] With the exception of the last listed firm, all have been appointed class counsel in this MDL: Bruce S. Rogow, P.A.; Podhurst Orseck, P.A.; Grossman Roth Yaffa Cohen, P.A.; Baron & Budd, P.C.; Golomb & Honik, P.C.; Lieff Cabraser Heimann & Bernstein LLP; Trief & Olk; Webb, Klase & Lemond, LLC; Kopelowitz Ostrow Ferguson Weiselberg Gilbert; and Darren Kaplan Law Firm, PC.  Mr. Kaplan was previously affiliated with a firm (Chitwood Harley Harnes) appointed as class counsel in this MDL.  *BancorpSouth*, D.E. 2673 at 12.

[18] *See* Declarations of Plaintiffs Dasher and Avery included in Appendix II.

1.      **Common questions of law or fact predominate.**

    a.      **Common issues predominate because legal and factual questions here will be resolved with proof common to Plaintiffs and class members.**

"Common issues of fact and law predominate if they 'have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief.'"  *Klay*, 382 F.3d at 1255 (quoting *Ingram*, 200 F.R.D. at 699); *see also Moore v. Painewebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002) (common issues predominate "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.").  It is not necessary that all questions of law or fact be common; only some questions must be common, and they must predominate over individual questions.  *Klay*, 382 F.3d at 1254.

    The predominance inquiry seeks to determine the evidentiary effect of adding plaintiffs to the Classes.  If adding more plaintiffs requires the introduction of "significant amounts of new evidence," this suggests that individual issues are important.  Conversely, if adding more plaintiffs leaves the amount of evidence needed to prove the claims "relatively undisturbed," common issues likely predominate.  *Klay*, 382 F.3d at 1255.

    Rule 23(b)(3) is satisfied here.  As the evidentiary proffer summarized above and in the accompanying Trial Plan demonstrate, the salient evidence necessary to establish Plaintiffs' claims is common to both Plaintiffs and all members of the Classes; they all seek to prove that RBC's high-to-low re-sequencing practice was wrongful.  And the evidentiary presentation changes little if there are 100 class members or 100,000: in either instance, Plaintiffs would present the *same* evidence of (i) RBC's form adhesion contracts, with similar terms, applicable to Plaintiffs and class members; (ii) RBC's systematic re-sequencing of debt transactions from

high-to-low for Plaintiffs and class members through its automated software programs; and (iii) the secret "Overdraft Matrix" that RBC secretly established for Plaintiffs and class members in order to charge them overdraft fees. *See, e.g.*, Ex. 1 at 258:8-260:6. In the words of the Eleventh Circuit, the foregoing evidence has a direct impact on every Class member's effort to establish liability and on every Class member's entitlement to relief. *Klay*, 382 F.3d at 1255

In decisions certifying classes in several other MDL cases, this Court found predominance to be satisfied by form contracts with similar terms applicable to plaintiffs and the class members, the bank's "systematic re-sequencing of debt transactions from high-to-low for all Plaintiffs and class members through its automated software programs," and a line of credit that the bank secretly established for all plaintiffs and class members in order to impose overdraft fees on them. *Union*, 275 F.R.D. at 676. In certifying those classes, this Court found predominance satisfied by substantially similar evidence. *Comerica*, 286 F.R.D. at 656; *Union*, 275 F.R.D. at 677. Those elements are likewise present here.

Similarly, in certifying the class in *Gutierrez v. Wells Fargo Bank, N.A.*, 2008 U.S. Dist. LEXIS 70124, at *48-49 (N.D. Cal. Sept. 11, 2008), under similar circumstances, U.S. District Judge William Alsup found that common issues predominated:

> The challenged practice is a standardized one applied on a routine basis to all customers. . . . [I]ndividual variations will not predominate over the pervasive commonality of the highest-to-lowest method and its adverse impact on hundreds of thousands of depositors.

In rejecting Wells Fargo's motion to decertify the class on the eve of trial, Judge Alsup again concluded that "there is no question that common questions predominate in this action." *Gutierrez v. Wells Fargo Bank, N.A.*, 2010 U.S. Dist. LEXIS 29117, at *41 (N.D. Cal. Mar. 26, 2010). The Ninth Circuit affirmed Judge Alsup's predominance finding and class certification

order.  *See Gutierrez*, 704 F.3d at 728-30.[19]

In *Allapattah Servs.,* Exxon dealers alleged that Exxon breached their agreements and violated the duty of good faith and fair dealing by overcharging them for fuel purchases.  At issue was an "open price term" in Exxon's form contracts with each dealer, which permitted Exxon to adjust the price of gasoline delivered in response to commercial dynamics in various distribution markets.  Exxon used that clause to charge dealers a 3% processing fee on sales to consumers paying by credit card.  Exxon promised to offset this charge by reducing the wholesale price that each dealer paid for gasoline, actually provided the offset for approximately six months, but then stopped the offset without informing the dealers.  *Allapattah Servs.*333 F.3d at 1251.

The Eleventh Circuit upheld certification of a class of 10,000 dealers in 35 states.  In focusing on the materially similar nature of both the contracts and the breach, the court rejected Exxon's plea that individual issues inherent in each breach of contract claim predominated:

> Because all of the dealer agreements were materially similar and Exxon purported to reduce the price of wholesale gas for all dealers, the duty of good faith was an obligation that it owed to the dealers as a whole.  Whether it breached that obligation was a question common to the class and the issue of liability was appropriately determined on a class-wide basis.

*Id*. at 1261.[20]  Just as RBC did, Exxon cheated all dealers in the exact same way.  Thus, "[o]nce the plaintiffs proved that Exxon engaged in this behavior, each individual plaintiff's breach of

---

[19] Judge Alsup's certification decision in *Gutierrez* highlights that consumer class actions are particularly appropriate where, as here, the defendant exhibits a common course of conduct.  *See, e.g.*, *Amchem Prods. Inc.*, 521 U.S. at 625 ("[p]redominance is a test readily met in certain cases alleging consumer . . . fraud"); *Allapattah Servs., Inc. v. Exxon Corp*., 333 F.3d 1248 (11th Cir. 2003); *Roper v. Consurve, Inc*., 578 F.2d 1106 (5th Cir. 1978).

[20] Notably, before appeal, the jury returned a special verdict in favor of the plaintiffs on a class-wide basis, *id.* at 1252, thereby demonstrating the manageability of the multi-state claims, which Exxon did not even bother to challenge on appeal.

contract claim was substantially advanced" by this class-wide evidence.[21]   And so it is here.

Similarly, in *Roper*, the Fifth Circuit supported certification of a class of 90,000 credit card holders who accused a national bank of imposing usurious interest on the unpaid portion of prior bills.  Common issues predominated even though an individual inquiry needed to be made into each class member's transaction history, a process that could be done systematically by the plaintiffs' expert using defendant's data.  Defendants' billing program harmed each customer in the same way through the use of the same allegedly illegal formula, and proof of this common course of conduct substantially advanced all class members' claims.

> This is a classic case for a Rule 23(b)(3) class action.  The claims of a large number of individuals can be adjudicated at one time, with less expense than would be incurred in any other form of litigation.  The claims are relatively small, said even by the plaintiffs to average less than $100 each, and the question of law is one that applies alike to all.  While it may be necessary to make individual fact determinations with respect to charges, if that question is reached, these will depend on objective criteria that can be organized by a computer, perhaps with some clerical assistance.  It will not be necessary to hear evidence on each claim.

*Roper*, 578 F.2d at 1112.

As in the foregoing cases, Plaintiffs here challenge a uniform deception perpetrated on all class members by RBC.  Once Plaintiffs prove RBC's common course of conduct, the claims of Plaintiffs and all class members are substantially advanced.  Common issues thus predominate.

### b.   Common issues will also predominate because RBC's records will be used to systematically ascertain the Classes and calculate each class member's individual damages.

RBC maintained meticulous records of the amounts of overdraft fees charged the class members during the Class Period in its Systemware data warehouse, in addition to the detailed transaction data that resulted in those charges.  *See* Olsen Decl.  RBC imposition of the $6.00 Overdraft/re-entry fee, along with its use of distinct transaction codes for the pertinent debit card

---

[21] This quotation was how the *Klay* court described the import of *Allapattah Services* decision. *See* 382 F.3d at 1266.

and ATM transactions, will allow Plaintiffs' expert to use RBC's data to identify class members and systematically calculate each's individual damages. *See* Olsen Decl., ¶¶ 39.h., 40-50.

Courts regularly certify classes where the defendant's records can be mined to identify class members and the harm that they suffered. For instance, in *Roper*, the plaintiffs' expert testified that he could utilize the bank's detailed computer data to isolate the amount of interest that was usurious. He would do this by determining billing dates, charges, credits, finance charges, payment, and payment dates for each cardholder, thereby "reconstruct[ing] every account in full by again processing the transactions." *Roper*, 578 F.2d at 1109-10. The Fifth Circuit found this methodology sufficed to ensure that individual issues did not swamp the common ones. *Id*.; *also Smilow*, 323 F.3d at 40 (common issues predominate "where individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria – thus rendering unnecessary an evidentiary hearing on each claim").

As in the foregoing cases, class membership here is readily ascertainable through objective criteria: RBC's own records of individuals who were assessed overdraft fees. Plaintiffs' expert will formulate calculations that can identify members of the Classes simply by running queries in RBC's computer records. Such calculations would be merely ministerial in nature, and will not require resolution of individual class member issues.[22] Likewise, damages will be calculated using the same RBC records.

"[W]here damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an

---

[22] In *Gutierrez*, Plaintiffs' expert, Arthur Olsen, withstood Wells Fargo's *Daubert* challenge to his methodology and conclusions. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). At the conclusion of the trial, Judge Alsup found Mr. Olsen's methodology to be "professional" and "careful," and the Court concluded that Mr. Olsen had "convincingly" identified the class members and isolated the amounts that were wrongfully taken by Wells Fargo from the class. *Gutierrez*, 730 F. Supp. 2d at 1139.

individual basis is no impediment to class certification." *Klay*, 382 F.3d at 1259-60 (footnotes omitted). By applying an "algebraic formula" for the computation of damages, Plaintiff meets the predominance requirement of Rule 23(b)(3) even if "the jury will also have to consider some individualized evidence in rendering individual damage calculations." *In re Terazosin Hydrochloride Antitrust Litig*., 203 F.R.D. 551, 559 (S.D. Fla. 2001); *see also Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1310 (11th Cir. 2008) (class treatment appropriate where plaintiffs contended that damages could be determined "with relative ease through basic forensic accounting" using defendant's own data); *Pickett v. IBP, Inc*. 2001 U.S. Dist. LEXIS 22453, at *35 (M.D. Ala. Dec. 21, 2001) ("If damages can be computed using 'statistical techniques, the existence of individualized damage claims does not pose a barrier to certification.").

Plaintiffs will be able to use RBC's records to apply formulaic damage calculations, again demonstrating that common issues predominate.

### c.   RBC's affirmative defenses do not vitiate predominance.

RBC asserts a number of affirmative defenses. [D.E. 4307 (as to Avery), 4348 (as to Dasher)]. The defenses do not defeat class certification.

In this Court, affirmative defenses must meet the *Iqbal* and *Twombly* pleading standards. *See Castillo v. Roche Labs., Inc.,* 2010 U.S. Dist. LEXIS 87681, at *5 (S.D. Fla. Aug. 2, 2010) (noting that "a majority of district courts in Florida have applied this heightened pleading standard to affirmative defenses."); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). Affirmative defenses that merely offer "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.*; *Mid-Continent Cas. Co. v. Active Drywall South, Inc.*, 2011 U.S. Dist. LEXIS 19978, at *6 (S.D. Fla. Feb. 25, 2011) (striking affirmative defense under *Twombly* because, as pled, it involved "nothing more than bare conclusions" without "any factual basis"). To the extent that any of the RBC's

defenses do not meet the pleading standard, they are insufficient and cannot impede class certification. *See generally Torres v. TPUSA, Inc.*, 2009 U.S. Dist. LEXIS 22033, at *3-5 (M.D. Fla. Mar. 19, 2009) (holding that defenses that simply claim "statute of limitations," "waiver," and "estoppel" are insufficiently plead).

In any event, it is clear that many of RBC's affirmative defenses cannot defeat certification, just as they did not in *Union*. *See Union*, 275 F.R.D. at 677-678. For example, RBC offers the conclusory statement that one or more of Plaintiffs' claims are preempted by federal law, D.E. 4307 at 23, 4348 at 24, yet RBC was not a National Bank during the relevant time frame. Additionally, the failure to state a claim affirmative defense has already been rejected under a Rule 12(b)(6) standard. *See, e.g.,* D.E. 4284; *see also Grovenor House, LLC v. E.I. DuPont De Nemours & Co.*, 2010 U.S. Dist. LEXIS 919095, at *10 (S.D. Fla. Aug. 12, 2010) (noting a "Motion to Dismiss addressing the exact same arguments" was denied and thus the defenses were "clearly invalid as a matter of law" and dismissing them "with prejudice").

Other purported affirmative defenses, even if arguably proper, apply equally to all members of the proposed Classes. This leads courts to commonly find that affirmative defenses do not upset the predominance of common issues as long as a sufficient constellation of common issues binds the class together. *See, e.g., Waste Mgmt.*, 208 F.3d at 296 (statute of limitations defenses do not vitiate Rule 23(b)(3) predominance); *Smilow,* 323 F.3d at 39 ("Courts traditionally have been reluctant to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be available against individual members.") (waiver defense common to the class); *see also Allapattah Servs.*, 333 F.3d at 1262-63 (jury was instructed on statute of limitations and law of fraudulent concealment in 35 states). Thus, if RBC can present sufficient facts to survive a motion for summary judgment challenging its defenses, the jury can readily

decide their application on a class-wide basis. *See, e.g.*, D.E. 4307 at 23-24, 4348 at 24-25 (voluntary payment, ratification, and statute of limitations/laches). And RBC's setoff defense can be dealt with, if need be, during the claims process. *See, e.g.*, D.E. 4307 at 25, 4348 at 26; *also Allapattah Servs.*, 333 F.3d at 1259 (if liability is established, set-off claims can be handled during claims administration).

### d. Applying multi-state law does not preclude predominance.

When seeking certification of a class for which the laws of several states potentially apply, the plaintiff bears the burden of demonstrating a suitable and realistic plan for trial of the class claims and must submit an extensive analysis showing that there are no material variations among the law of the states for which certification is sought. *Klay*, 382 F.3d at 1262.[23] "[I]f the applicable state laws can be sorted into a small number of groups, each containing materially identical legal standards, then certification of subclasses embracing each of the dominant legal standards can be appropriate." *Id.*[24]

Numerous courts recognize that differences in state law can be appropriately managed in a class action when the core facts are common to the class. *See, e.g., In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 315 (3d Cir. 1998); *In re School Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir. 1986); *Hanlon v. Chrysler Corp*, 150 F.3d 1011, 1022 (9th Cir. 1998); *Hansen v. Monumental Life Ins. Co.*, 2008 U.S. Dist. LEXIS 112254, at *22-29 (D. Conn. Mar. 6, 2008); *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 93-101 (D. Mass 2008); *Steinberg*, 224 F.R.D. at 76-80; *Shaw v. Toshiba Am. Info. Sys.*, 91

---

[23] In a later decision, the Eleventh Circuit declined to explain precisely what "extensive" specifically means other than to say it must be "more than [] perfunctory." *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1180 (11th Cir. 2010).

[24] In *Klay*, although the court reversed certification of claims for breach of contract and unjust enrichment, it recognized that state law claims "based on a principle of law that is uniform among the states" can form a "realistic possibility" of certification. *Id.* at 1261.

F. Supp. 2d 942, 956-57 (E.D. Tex. 2000); *Bussie v. Allmerica Fin. Corp.,* 50 F. Supp. 2d 59, 71

(D. Mass. 1999); *In re Prudential Ins. Co. of Am. Sales Practice Litig.,* 962 F. Supp. 450, 525

(D.N.J. 1997); *Duhaime v. John Hancock Mut. Life Ins. Co.,* 177 F.R.D. at 64; *In re Telectronics*

*Pacing Sys., Inc.*, 172 F.R.D. 271 (S.D. Ohio 1997); *Deadwyler v. Volkswagen of Am. Inc.,* 1986

U.S. Dist. LEXIS 28449, at *4-5 (W.D.N.C. 1986).

The Court need not find complete uniformity of state law, only that there are no material

conflicts among the laws so that they can be divided into a small number of sub-groups.  *See*

*Simon v. Phillip Morris,* 124 F. Supp. 2d 46, 77 (E.D.N.Y. 2000); *see also* American Law

Institute, *Principles of the Law:  Aggregate Litigation*§ 2.05(b) (2010) ("The court may authorize

aggregate treatment of multiple claims, or of a common issue therein, by way of a class action if

the court determines that (1) a single body of law applies to all such claims or issues; (2)

different claims or issues are subject to different bodies of law that are the same in functional

content; or (3) different claims or issues are subject to different bodies of law that are not the

same in functional content but nonetheless present a limited number of patterns that the court . . .

can manage by means of identified adjudicatory procedures.").

In *Prudential,* the court endorsed the use of comprehensive surveys to demonstrate that

state laws, including claims for breach of contract and good faith and fair dealing, are

substantially similar, with any differences falling into a limited number of predictable patterns:

> Plaintiffs have demonstrated, consistent with the approach endorsed in *School
> Asbestos* and cited with approval in *Georgine,* that any state-by-state variations in
> the governing legal standards are manageable. . . .  Plaintiffs have submitted a
> series of charts setting forth comprehensive analyses of the various states' laws
> potentially applicable to their common law claims for fraud, breach of contract,
> implied obligations of good faith and fair dealing, negligence, and negligent
> misrepresentation. . . .  These charts compare state-by-state the elements of the
> claims alleged in the Second Amended Complaint with citations to the pertinent
> authorities in each of the fifty states – the same approach used in the School
> Asbestos litigation.  The elements of these common law claims are substantially

similar and any differences fall into a limited number of predictable patterns.  . . . .  Thus, plaintiffs' claims can be grouped into a manageable number of categories accommodating any variations in the elements of the potentially applicable states' laws. . . .  And, the Court finds that a manageable number of jury instructions could be fashioned to comport with the elements of the common law claims in the many jurisdictions.

962 F. Supp. at 525 (citations and footnotes omitted).

The plaintiffs in *Prudential* also submitted special verdict forms to illustrate that variations among potentially applicable state laws can be managed to permit a fair and efficient adjudication by the fact finder at trial.  *Id.* at n.49.  The court ultimately certified a class of eight million consumers nationwide who purchased Prudential life insurance policies, including claims for breach of contract and implied obligations of good faith and fair dealing.  The Third Circuit affirmed the district court's predominance findings, which were based on the state law surveys submitted by the plaintiffs.  *Id.* at 315.

In *Telectronics*, the court rejected suggestions that nationwide classes could not be certified under Rule 23 and held that "minute and insignificant" differences in state law do not preclude certification.  172 F.R.D. at 292.  Recognizing that state law is not universal, the court carefully highlighted the appropriate inquiry for courts to make: "[C]an the relevant variations be dealt with in a simple and efficient manner?"  *Id.*  In conducting that inquiry, it is important to distinguish between variations that "are pertinent to the issues being certified and those which are unimportant to these questions."  *Id.*  The Court further explained that a careful inquiry will ordinarily lead to three options: "(1) find that state law is sufficiently similar that a single class is appropriate, (2) find that the state law varies so much that class certification is inappropriate, or (3) find that state law variations can be categorized and then divided into subclasses."  *Id.*  Judge

48

Spiegel chose the third option, certifying a nationwide class using subclasses.[25]

Accordingly, common issues of law and fact will remain the predominant focus of this litigation, notwithstanding the potential application of multiple states' laws.  In denying the first tranche defendants' omnibus motion to dismiss, the Court found that state laws governing the common law claims were materially similar: "Without conducting an extensive choice of law analysis, it appears that, for purposes of this motion, there are no relevant differences in how each state interprets these various causes of action."  D.E. 305 at 17.  The Court also observed that "Defendants generally acknowledge that the elements of the common law claims asserted are the same in every state."  *Id.*[26]

Plaintiffs' Trial Plan, included in Appendix I, contains an extensive analysis of state law breach of contract, breach of the duty of good faith and fair dealing, unjust enrichment, unconscionability, and violation of North Carolina Unfair and Deceptive Trade Practice Act.  As the surveys demonstrate, variations are minimal.  In those few instances where variations are material, Plaintiffs propose that the Court group state laws into subclasses, as contemplated by *Klay* and other authorities.[27]   More specifically, Plaintiffs propose subclasses for each claim

---

[25] The Sixth Circuit ultimately reversed certification of a no-opt-out settlement class based on constitutional considerations.  *See In re Telectronics Pacing Sys.*, 221 F.3d 870 (6th Cir. 2000).  The Court, however, left intact Judge Spiegel's rationale supporting nationwide certification.

[26] Plaintiffs submit that a lengthy choice of law analysis is not needed here given the choice of law clause utilized by RBC in one version of its account agreement: "**Governing Law.**  The Agreement and any services we provide to you with respect to the Account will be governed, construed and enforced in accordance with the laws of the U.S. and the internal state laws of the State in which the Branch is located that are applicable to contracts made and to be performed in such State (to the extent state laws apply and are not modified by the Agreement, when permitted, or by the rules and regulations of clearing houses or other payment systems)."  *See, e.g.,* Depo. Ex. 9 at RBC-0000239.  Plaintiffs concede that the laws of their home state, as well as the home states of all class members, will apply.

[27] Rule 23 expressly authorizes subclasses: "When appropriate, a class may be divided into subclasses that are each treated as a class under this rule."  Fed. R. Civ. P. 23(c)(5).

summarized below.[28]   The Court has endorsed this approach in its previous order certifying subclasses against Union Bank, finding that "[t]he proposed special verdict forms and supporting surveys of law submitted by Plaintiffs with their Trial Plan illustrate that the variations among the potentially applicable state laws are not material and can be managed to permit a fair and efficient adjudication by the fact finder at trial."  *Union*, 275 F.R.D. at 679-80.

    ***Breach of Contract and the Duty of Good Faith and Fair Dealing Subclasses***.  In *Klay*, the court "accept[ed] the proposition that the applicable state laws governing contract interpretation and breach are sufficiently identical to constitute common legal issues . . . ."  382 F.3d at 1263.  As the court explained, determining breach is a simple question of contract interpretation that does not vary from state to state: "A breach is a breach is a breach, whether you are on the sunny shores of California or enjoying a sweet autumn breeze in New Jersey."  *Id.* at 1262-63.[29]  And the Court in *In re Conseco Life Ins. Co. Lifetrend Ins. Sales & Mktg. Litig.*,

---

[28]  Plaintiffs reserve their right to later move to appoint additional Class representatives to represent additional subclasses and/or claims.  *See* Fed. R. Civ. P. 23(c)(1)(C) (expressly permitting court to alter or amend an order granting or denying class certification before final judgment); *see, e.g., In re Cephalon Sec. Litig.*, 1998 U.S. Dist. LEXIS 12321, at *19 (E.D. Pa. Aug. 12, 1998) (granting plaintiffs' amended motion for class certification and appointing additional class representative).

[29]  Even though questions of contract law were common to the whole class, the *Klay* Court ultimately found certification of the breach of contract claims inappropriate given the individualized issues of fact they entailed.  *Id.* at 1261.  There were many different defendants with many different contracts with many different provider groups.  Moreover, because the defendants breached the contracts through a variety of means and differing computer algorithms that were not subject to generalized proof, each physician would have to prove a variety of individual circumstances leading to the breach.  *Id.* at 1263-64.  The same problem bedeviled the proposed class in *Sacred Heart*, where there were substantial variations in the terms of over 300 hospital contracts that were individually negotiated, leading the Court to find that "the diversity of the material terms is overwhelming."  601 F.3d at 1171-72.  The facts in *Klay* and *Sacred Heart* stand in sharp contrast to those here, where the agreements at issue are uniform form contracts offered on a take-it-or-leave it basis and were not the product of any individual negotiation.  *See Sacred Heart*, 601 F.3d at 1171 ("It is the form contract, executed under like conditions by all class members, that best facilitates class treatment.").  Nor do Plaintiffs here have to prove a variety of individual circumstances supporting the breach, as RBC's standard re-

270 F.R.D. 521 (N.D. Cal. 2010), certified 48-state breach of contract class in a case involving form policy contracts and also found that "the law relating to the element of breach does not vary greatly from state to state." *Id.* at 529. As Plaintiffs' surveys shows, they may represent customers in all six states for direct breach of contract. *See Klay*, 382 F.3d at 1263 ("a breach is a breach is a breach"). Differences in the laws of the relevant states pertaining to good faith and fair dealing are not material in this matter because Plaintiffs have plainly tied their good faith claim to actual contractual provisions. Plaintiffs propose to represent citizens of Alabama, Florida, Georgia, North Carolina, South Carolina, and Virginia in seeking relief for RBC's breach of the covenant of good faith and fair dealing for reasons further explained in the Trial Plan. *See* Trial Plan at 3-5, 11-13 & Exhibits A and B.

   ***Unjust Enrichment Subclass***. In *Terazosin Hydrochloride Antitrust Litig*., 220 F.R.D. at 697 n.40, Judge Seitz certified a 17-state unjust enrichment subclass, finding that unjust enrichment law is "virtually identical" from state to state. *See also In re Mercedes Benz Tele Aid Contract Litig.*, 267 F.R.D. 113, 119 (D.N.J. 2010) (the minor variations in the elements of unjust enrichment in the laws of the various states are not material and do not create conflicts). Here, Plaintiffs propose the creation of a single unjust enrichment subclass on behalf of class members who reside in Florida, Georgia, North Carolina, and South Carolina, reserving the right to amend to add a potential class representative from Alabama and Virginia. *See* Trial Plan at 7-8, 13-14 & Exhibit C. Those four states base unjust enrichment on the RESTATEMENT (FIRST) OF RESTITUTION §1 and require the presence of the following basic elements: (i) the plaintiff conferred a benefit on defendant; (ii) the defendant accepted or retained that benefit; (iii) defendant appreciated the benefit conferred; (iv) under circumstances that would be unjust for

---

sequencing policy resulted in uniform conduct directed at all members of the Classes, and the contracts never authorized the conduct alleged.

the defendant to retain the benefit.[30]

*Unconscionability Subclass*.   The law of unconscionability is substantially uniform across all states.   All of the states have adopted statutes that are the same or substantially identical to Uniform Commercial Code ("U.C.C.") §2-302.   The only difference between states is whether they require both procedural and substantive unconscionability, or just one of the two. In Virginia, only substantive unconscionability is required.   Therefore, this minimal variation is easily managed through a single subclass for all six states.   *See* Trial Plan at 6-7, 14-15 & Exhibit D.

*North Carolina Unfair And Deceptive Trade Practices Acts Subclass*.   The Court has ruled that plaintiffs may only assert a state statutory claim if a named plaintiff resides in that state.  Dkt. No. 305 at 40.  Accordingly, Plaintiffs do not propose state unfair and deceptive trade practices act subclasses, and instead seek to certify a North Carolina Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. §§ 75-1.1, et seq.) subclass.   The elements to prove a violation of the statute are addressed in the Trial Plan (at 8-9, 15 and Exhibit E).

As further evidence demonstrating the manageability of applying multi-state law in this case, Plaintiffs also provide the Court with Proposed Special Verdict Forms that encapsulate the salient elements of each cause of action and account for the minor state law variations.   *See* Exhibits F through J to Trial Plan.  As these proposed forms demonstrate, the differences that do exist among state laws can easily be considered by the fact finder, thus ensuring careful

---

[30] Other courts have likewise certified multi-state unjust enrichment classes.  *See, e.g.*, *In re Abbott Labs. Norvir Anti-Trust Litig.*, 2007 U.S. Dist. LEXIS 44459, at *9 (N.D. Cal. June 11, 2007) (certifying multi-state class of unjust enrichment claims); *Schumacher v. Tyson Fresh Meats, Inc.*, 221 F.R.D. 605, 612 (N.S.D. 2004) (certifying multi-state unjust enrichment claims for South Dakota and states with identical claims); *cf. Hoving v. Lawyers Title Ins. Co.*, 256 F.R.D. 555, 569-70 (E.D. Mich. 2009) (agreeing with courts that decided unjust enrichment doctrines are materially same); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 518 (E.D. Mich. 2003) (characterizing unjust enrichment standards as "virtually identical").

adherence to legal requirements and eliminating any manageability issues.

2.    **A class action is superior to the adjudication of thousands of separate individual cases.**

The superiority analysis of Rule 23(b) requires that the Court examine whether the class action is superior to other methods of adjudication.  Fed. R. Civ. P. 23(b)(3).  The focus is "not on the convenience or burden of a class action suit *per se*, but on the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs."  *Klay*, 382 F.3d at 1269.  As *Klay* recognized, there are four non-exhaustive factors a court should consider in assessing whether a class action is superior to individual litigation:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; [and]
>
> (D) the difficulties likely to be encountered in the management of a class action.

*Id*. (citing Fed. R. Civ. P. 23(b)(3)).  All of these factors favor class treatment here.

With respect to the first factor, all members of the Classes have claims that are so small that it would cost them much more to litigate an individual case than they could ever hope to recover in damages.  Thus, "[t]here is no reason to believe that the putative class members in this case have any particular interest in controlling their own litigation[.]"  *Id*.

With respect to the second superiority factor, numerous class action lawsuits based on the same facts at issue here have been filed against RBC and other defendants.  Through the MDL process, those cases were transferred to this Court and are part of this consolidated litigation.  That the Judicial Panel on Multidistrict Litigation chose this Court to be the transferee court is one indication that having a single case –as opposed to multiple cases – makes sense.

Concentrating the litigation in this forum is also logical and desirable for other reasons, which tilt the third superiority factor in Plaintiffs' favor.  First, through handling defendants' serial motions to dismiss, and numerous discovery disputes, this Court has become familiar with the factual and legal issues.  *Id.* at 1271 ("it is desirable to concentrate claims in a particular forum when that forum has already handled several preliminary matters").  As this Court recognized in *Texas Air*, controversies are often "best managed as a class action, for this method allows all the [parties] to conduct all relevant discovery without repetition."  119 F.R.D. at 460. Second, holding separate trials for claims that could be tried together would be costly, inefficient and burden the court system; they should instead be tried together.  *Klay*, 382 F.3d at 1270. Neither the parties nor the judicial system would benefit from redundant litigation.  *See In re Brand Name Prescription Drugs Antitrust Litig.*, 1994 U.S. Dist. LEXIS 16658, at *15 (N.D. Ill. Nov. 18, 1994) ("[w]e fail to see the logic in defendants' contention that 50,000 individual actions are less complex than a single class action").  Indeed, "[w]here predominance is established, this consideration will almost always mitigate in favor of certifying a class."  *Klay*, 382 F.3d at 1270.  Third, the individual claims' small value supports certification, especially, as here, the amounts in controversy make it unlikely that individual plaintiffs could find legal representation on a contingency fee basis "when the defendants are corporate behemoths with a demonstrated willingness and proclivity for drawing out legal proceedings for as long as humanly possible and burying their opponents in paperwork and filings." *Id*. at 1271.

The final superiority factor – manageability – focuses on the "practical problems that may render the class action format inappropriate for a particular suit."  *Eisen*, 417 U.S. at 164. The question is whether multiple individual lawsuits would be more manageable than a class action, and not whether a class here will create significant management problems.  *Klay*, 382

F.3d at 1273.   Indeed, this fourth factor "will rarely, if ever, be in itself sufficient to prevent certification."  *Id.* at 1272; *see also In re Visa Check/Master Money Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001) (refusal to certify a class solely on grounds of manageability is disfavored and "should be the exception rather than the rule").   Here, Plaintiffs cannot foresee any serious manageability problems and certainly none that make thousands of individual actions a better alternative.   This is particularly true given the experience in the *Gutierrez* case, which involved very similar facts and claims and a class of hundreds-of-thousands of members.   As discussed in more detail above, Plaintiffs' Trial Plan, the extensive analysis of applicable law provided in its appendix surveys, and the proposed Special Verdict Forms, demonstrate that these issues can be resolved based upon common proof.   Simply put, this case can be tried in an efficient manner.

In finding superiority in similar overdraft MDL cases, the Court concluded that "[a] class action is the only realistic way Plaintiffs' claims can be adjudicated," and that "[s]eparate actions by each of the class members would be repetitive, wasteful, and an extraordinary burden on the courts."  *Comerica Bank*, 286 F.R.D. at 659 (quoting *Kennedy v. Tallant*, 710 F.2d 711, 718 (11th Cir. 1983)).   There is no reason to alter course here.

## IV.   CONCLUSION

Plaintiffs have demonstrated that they satisfy all of the elements of Rule 23(a) and (b)(3). The class action mechanism is not only the best and most efficient way to adjudicate the class members' claims in this case, it is also the only viable method of doing so.   For all of the foregoing reasons, Plaintiffs respectfully request that the Court certify the Classes.

Respectfully submitted,

Dated: August 31, 2018.

*/s/ Aaron S. Podhurst*
Aaron S. Podhurst, Esquire
Florida Bar No. 063606
Email: apodhurst@podhurst.com
Robert C. Josefsberg, Esquire
Florida Bar No. 40856
rjosefsberg@podhurst.com
Peter Prieto, Esquire
Florida Bar No. 501492
pprieto@podhurst.com
PODHURST ORSECK, P.A.
SunTrust International Center
One S.E. 3rd Avenue, Suite 2300
Miami, FL 33131
Tel: 305-358-2800

*/s/ Bruce S. Rogow*
Bruce S. Rogow, Esquire
Florida Bar No. 067999
Email: brogow@rogowlaw.com
BRUCE S. ROGOW, P.A.
100 NE 3rd Avenue
Suite 1000
Fort Lauderdale, FL 33301
Tel: 954-767-8909

*Co-Lead Counsel for Plaintiffs*

*/s/ Robert C. Gilbert*
Robert C. Gilbert, Esquire
Florida Bar No. 561861
Email: rcg@grossmanroth.com
Email: robert@gilbertpa.com
Stuart Z. Grossman, Esquire
Florida Bar No. 156113
Email: szg@grossmanroth.com
GROSSMAN ROTH YAFFA COHEN, P.A.
2525 Ponce de Leon Boulevard
Eleventh Floor
Coral Gables, FL 33134
Tel: 305-442-8666

*Coordinating Counsel for Plaintiffs*

*/s/ E. Adam Webb*
E. Adam Webb, Esquire
Georgia Bar No. 743910
Email: Adam@WebbLLC.com
G. Franklin Lemond, Jr., Esquire
Georgia Bar No. 141315
Email: FLemond@WebbLLC.com
WEBB, KLASE & LEMOND, L.L.C.
1900 The Exchange, S.E.
Suite 480
Atlanta, GA 30339
Tel: 770-444-9325

*/s/ Russell W. Budd*
Russell W. Budd, Esquire
Texas Bar No. 03312400
Email:  rbudd@baronbudd.com
BARON & BUDD, P.C.
3102 Oak Lawn Avenue
Suite 1100
Dallas, TX 75219
Tel: 214-521-3605

*/s/ Ruben Honik*
Ruben Honik, Esquire
Pennsylvania Bar No. 33109
Email:  rhonik@golombhonik.com
Kenneth J. Grunfeld, Esquire
Pennsylvania Bar No. 84121
Email:  kgrunfeld@golombhonik.com
GOLOMB & HONIK, P.C.
1835 Market Street
Suite 2900
Philadelphia, PA 19103
Tel: 215-985-9177

*/s/ Michael W. Sobol*
Michael W. Sobol, Esquire
California Bar No. 194857
Email: msobol@lchb.com
Roger N. Heller, Esquire
California Bar No. 215348
Email: rheller@lchb.com
LIEFF CABRASER HEIMANN &
  BERNSTEIN L.L.P.
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
Tel: 415-956-1000

*/s/ David S. Stellings*
David S. Stellings, Esquire
New York Bar No. 2635282
Email: dstellings@lchb.com
LIEFF CABRASER HEIMANN &
  BERNSTEIN L.L.P.
250 Hudson Street
8th Floor
New York, NY  10013
Tel: 212-355-9500

*/s/ Ted E. Trief*
Ted E. Trief, Esquire
New York Bar No. 1476662
Email:  ttrief@triefandolk.com
Barbara E. Olk, Esquire
New York Bar No. 1459643
Email:  bolk@triefandolk.com
TRIEF & OLK
150 E. 58th Street
34th Floor
New York, NY 10155
Tel: 212-486-6060

*Plaintiff's Executive Committee*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 09-MD-02036-JLK**

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

**CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Robert C. Gilbert
Robert C. Gilbert, Esquire
Florida Bar No. 561861
GROSSMAN ROTH YAFFA COHEN, P.A.
2525 Ponce de Leon Boulevard
Eleventh Floor
Coral Gables, FL 33134
Tel: 305-442-8666
Email: rcg@grossmanroth.com
Email: robert@gilbertpa.com