UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.  1:09-MD-02036-JLK

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

THIS DOCUMENT RELATES TO:

*Michael Dasher v. RBC Bank (USA),
predecessor in interest to PNC Bank, N.A.*

*S.D. Fla. Case No. 1:10-CV-22190-JLK*

PLAINTIFFS' AND CLASS COUNSEL'S MOTION FOR FINAL APPROVAL OF
CLASS SETTLEMENT, AND APPLICATION FOR SERVICE AWARD, ATTORNEYS'
FEES AND EXPENSES, AND INCORPORATED MEMORANDUM OF LAW

After more than eight years of litigation, Settlement Class Counsel negotiated the
Settlement Agreement and Release attached as Exhibit A ("Agreement" or "Settlement") with
Defendant PNC Bank, N.A. ("PNC"), successor in interest to RBC Bank (USA) ("RBC") ("PNC"
or the "Bank").[1]  The Settlement – which consists of the Bank's payment of $7,500,000.00,
inclusive of attorneys' fees, costs and expenses to be awarded to Class Counsel and a Service
Award to the Class Representative, plus PNC's payment of all fees, costs, charges and expenses
of the Notice Administrator and Settlement Administrator in connection with the Settlement – is

---

[1] All capitalized defined terms used herein have the same meanings ascribed in the Agreement.
References to the party to this Agreement will be to PNC, as RBC no longer exists as a corporate
entity.  References to historical facts alleged in the litigation will be to the particular entity (PNC
or RBC) involved.  References to proceedings in the litigation will be to RBC, even after it was
merged into PNC, because RBC was the named party throughout the litigation and the litigation
involved RBC's overdraft fee policies.

an outstanding result for the Settlement Class. *See* Joint Declaration of Aaron Podhurst, Bruce S. Rogow and Robert C. Gilbert ¶¶ 5, 56 attached as Exhibit B ("Joint Decl."). The Settlement is fair, adequate and reasonable, and represents a "very impressive" result in the opinion of one nationally recognized expert. *See* Declaration of Professor Brian T. Fitzpatrick ¶ 17 attached as Exhibit C ("Fitzpatrick Decl.").

Plaintiffs and Class Counsel now seek Final Approval of the Settlement. Based on the controlling legal standards and supporting facts, Final Approval is clearly warranted. In addition, Class Counsel respectfully request that the Court award a Service Award to the Class Representative, whose willingness to represent the Settlement Class and participation in the Action helped make the Settlement possible. Finally, Class Counsel respectfully request that the Court award attorneys' fees equal to thirty-five percent (35%) of the Settlement Fund to compensate us for our work in achieving the Settlement and approve reimbursements of certain expenses incurred in prosecuting the Action and in connection with the Settlement.

## I.     INTRODUCTION

The Action involved sharply opposed positions on several fundamental legal and factual questions. Plaintiffs sued on behalf of themselves and all others similarly situated who incurred Overdraft Fees as a result of RBC's High-to-Low Posting of Debit Card Transactions. Plaintiffs alleged that RBC systemically engaged in High-to-Low Posting of Debit Card Transactions to maximize the Bank's Overdraft Fee revenues. According to Plaintiffs, RBC's practices violated the Bank's contractual and good faith duties, were substantively and procedurally unconscionable, resulted in conversion and unjust enrichment, and violated the North Carolina consumer protection statute. RBC, on the other hand, consistently argued that the relevant Account agreements expressly authorized it to engage in High-to-Low Posting, that the claims brought in the Action

were subject to mandatory individual arbitration, and that Plaintiffs' state law claims for relief were preempted.  Joint Decl. ¶ 3.

Preliminary Settlement discussions began in 2018.  Settlement Class Counsel and PNC participated in a settlement conference in late January 2019.  On that date, they reached an agreement in principle concerning the material terms of the Settlement.  On February 5, 2019, Settlement Class Counsel and PNC executed a Summary Agreement that memorialized the material terms of the Settlement.  Soon thereafter, they filed a Joint Notice of Settlement and requested suspension of all pretrial deadlines pending the drafting and execution of the Agreement. Further discussions followed to address, *inter alia*, various issues relating to the Settlement.  Once those issues were resolved, the Agreement was finalized and executed in October 2019.[2]  Joint Decl. ¶¶ 25-28.

Under the Settlement, all eligible Settlement Class Members who sustained a Positive Differential Overdraft Fee and do not opt-out will automatically receive their *pro rata* share of the Net Settlement Fund.  There are no claims forms to fill out, and Settlement Class Members will not be asked to prove that they were damaged as a result of the Bank's High-to-Low Posting. Instead, Settlement Class Counsel and their expert used RBC's available electronic customer data to determine which RBC Account Holders were adversely affected by High-to-Low Posting, and applied the formula detailed in paragraph 85 of the Agreement to calculate each Settlement Class Member's damages under the Settlement.  Joint Decl. ¶¶ 30-31.

A testament to the reasonableness and fairness of the Settlement is the magnitude of the

---

[2] Plaintiff Stephanie Avery, who filed her own action and was named as a Plaintiff in the Consolidated Amended Complaint, declined to participate in the Agreement and, therefore, is not one of the Parties to the Agreement, but is a member of the Settlement Class.  *See* Agreement at ¶ 41 n.2.

Settlement Fund.  Settlement Class Counsel negotiated a $7,500,000 Settlement, which is remarkable given that RBC asserted – and would continue to assert in the absence of this Settlement – that the relevant Account agreements expressly authorized it to engage in High-to-Low Posting, that the claims brought in the Action were subject to mandatory individual arbitration, and that state law claims for relief were preempted.  In the face of those risks, the $7,500,000 recovery secured through this Settlement clearly merits Final Approval.  In addition to the $7,500,000 Settlement Fund, PNC agreed to pay all fees and costs incurred in connection with the Notice Program and Settlement administration, further increasing the recovery for the Settlement Class.  Joint Decl. ¶¶ 2-5.

Plaintiffs and Class Counsel respectfully request that the Court: (1) grant Final Approval to the Settlement; (2) certify for settlement purposes the Settlement Class, pursuant to Rule 23(b)(3) and (e) of the Federal Rules of Civil Procedure; (3) appoint as Class Representative the Plaintiff listed in paragraph 24 of the Agreement; (4) appoint as Class Counsel and Settlement Class Counsel the law firms and attorneys listed in paragraphs 22 and 51 of the Agreement, respectively; (5) approve a Service Award to the Class Representative; (6) award Class Counsel attorneys' fees and reimbursement of certain expenses pursuant to Rule 23(h) of the Federal Rules of Civil Procedure; and (7) enter Final Judgment dismissing the Action with prejudice.

## II.  MOTION FOR FINAL APPROVAL

### A.  <u>Procedural History</u>

On July 2, 2010, Plaintiff Michael Dasher filed *Dasher v. RBC Bank USA*, Case No. 1:10-CV-22190-JLK (S.D. Fla.) ("*Dasher*"), a class action complaint, in the United States District Court for the South District of Florida, alleging RBC's improper assessment and collection of Overdraft Fees due to High-to-Low Posting and seeking, *inter alia*, monetary damages, restitution, and equitable relief.  (*See* Compl., Case No. 10-22190 (S.D. Fla.), ECF No. 1).  Joint Decl. ¶ 9.

On July 22, 2010, RBC moved to compel arbitration in *Dasher*. (*See* Mot. to Compel Arbitration, Case No. 10-22190, ECF No. 5). On July 28, 2010, *Dasher* was transferred to MDL 2036 and thereafter assigned to the "Second Tranche" of cases. (*See* MDL Transfer Receipt, ECF No. 730; Joint Report re List of Cases in Second Tranche, ECF No. 1494 (May 18, 2011)). On August 23, 2010, the Court denied RBC's motion to compel arbitration and stay litigation in *Dasher* on the ground that "the arbitration provision has the effect of deterring Plaintiff from bringing his claim and vindicating his rights." (Order Den. Mot. to Compel Arbitration, ECF No. 763, at 7; *In re Checking Account Overdraft Litig.*, 2010 WL 3361127, at *2 (S.D. Fla. Aug. 23, 2010). RBC timely appealed to the Eleventh Circuit. (*See* Def. RBC Bank (USA)'s Notice of Appeal, ECF No. 797). Joint Decl. ¶ 10.

While the *Dasher* appeal was pending, the U.S. Supreme Court issued *AT&T Mobility, LLC v. Concepcion*, 563 U.S. 333 (2011). The parties in *Dasher* jointly moved the Eleventh Circuit to vacate the Court's order denying arbitration and remand the case for reconsideration in light of *Concepcion*. The Eleventh Circuit granted the joint motion and *Dasher* returned to the Court on June 28, 2011. (*See* Order Granting Joint Mot. to Vacate and Remand, ECF No. 1670). Joint Decl. ¶ 11.

On July 9, 2010, Plaintiff Stephanie Avery filed *Avery v. RBC Bank USA*, Case No. 10-CVS-11527, ("*Avery*"), a class action complaint, in the General Court of Justice, Superior Court Division, Wake County, North Carolina, alleging RBC's improper assessment and collection of Overdraft Fees due to High-to-Low Posting and seeking, *inter alia*, monetary damages, restitution and equitable relief. On August 12, 2010, *Avery*, the second-filed action, was removed to the Eastern District of North Carolina under Case No. 5:10-cv-329. (*See* Notice of Removal, Case No. 10-24382 (S.D. Fla.), ECF No. 1). Avery amended her complaint on August 26, 2010. (*See* Am.

Compl., Case No. 10-24382, ECF No. 8).   Joint Decl. ¶ 12.

On September 16, 2010, RBC filed its motion to compel arbitration in *Avery*. (Mot. to Compel Arbitration & Mem. in Support, Case No. 10-24382, ECF Nos. 16-17).   Further proceedings in *Avery* were stayed pending a ruling by the Judicial Panel on Multidistrict Litigation on whether the action would be become part of MDL 2036. (Order Granting Mot. to Stay, Case No. 10-24382, ECF No. 21 (Oct. 4, 2010)).   On March 3, 2011, *Avery* was transferred to this Court and made part of MDL 2036. (MDL Transfer Receipt, ECF No. 1232).   Joint Decl. ¶ 13.

On June 20, 2011, the Court issued an Omnibus Order that included *Avery* within its ambit. (*See* Omnibus Order Administratively Closing Member Cases, ECF No. 1640, at 4). That order denied as moot all motions filed under the original case numbers (*see id.* at 5), which terminated RBC's motion to compel arbitration in *Avery*.  On September 12, 2011, the Court issued its *Interim Scheduling Order re Fifth Tranche Actions*, which assigned *Avery* to the Fifth Tranche. (*See* Interim Scheduling Order re Fifth Tranche Actions, ECF No. 1861, at 2). The Scheduling Order set a deadline for banks defending actions in the Fifth Tranche to file motions to compel arbitration. (*See id.* at 3).  Joint Decl. ¶ 14.

RBC's counsel and Plaintiffs' Coordinating Counsel in MDL 2036 agreed that RBC would file a coordinated motion to compel arbitration in *Dasher* and *Avery*. Thus, when the Court issued its *Interim Scheduling Order re Fifth Tranche Actions* and set the deadline for motions to compel arbitration, counsel agreed that RBC would file a motion to compel arbitration encompassing both *Dasher* and *Avery*, thereby putting both actions on the same procedural track.  Joint Decl. ¶ 15.

On October 3, 2011, RBC renewed its motion to compel arbitration and stay litigation in *Dasher* and *Avery*. (Renewed Mot. to Compel Arbitration, ECF No. 1929). Following discovery on arbitrability requested by Plaintiffs' counsel and permitted by the Court (*see* Order Deferring

Ruling on Mot. to Compel Arbitration, ECF No. 2191 (Dec. 5, 2011)), Plaintiffs opposed RBC's renewed motion to compel arbitration.  Joint Decl. ¶ 16.

On January 11, 2013, the Court denied RBC's renewed motion to compel arbitration in *Dasher* and *Avery*. (Order Den. Mot. to Compel Arbitration, ECF No. 3162); *In re Checking Account Overdraft Litig.,* No. 09-2036, 2013 WL 151179 (S.D. Fla. Jan. 11, 2013). RBC appealed that order. (Def. RBC Bank (USA)'s Notice of Appeal, ECF No. 3164).  Joint Decl. ¶ 17.

On February 10, 2014, the Eleventh Circuit affirmed the Court's denial of RBC's renewed motion to compel arbitration pursuant to the RBC Agreement. *See Dasher v. RBC Bank (USA)*, 745 F.3d 1111 (11th Cir. 2014).  The Eleventh Circuit denied RBC's motion for rehearing.  The Eleventh Circuit granted RBC's motion to stay its mandate pending the filing of a petition for certiorari.  On June 20, 2014, RBC filed a petition for writ of certiorari with the U.S. Supreme Court, arguing that arbitration should have been compelled pursuant to the RBC arbitration clause. The Supreme Court denied certiorari on October 6, 2014.  On October 20, 2014, the Eleventh Circuit remanded the case to the Court.  Joint Decl. ¶ 18.

On November 10, 2014, the Consolidated Amended Complaint ("CAC") was filed. (Consolidated Am. Class Action Compl., ECF No. 4007).  On December 5, 2014, RBC moved to compel arbitration of Plaintiff Dasher's amended claims in the CAC pursuant to the arbitration clause in PNC's 2013 amended account agreement.  (Mot. to Compel Arbitration of Pl. Dasher's Individual Claims, ECF No. 4017). The Court denied that motion on August 21, 2015.  (Order Den. Def's Mot. to Compel Arbitration, ECF No. 4210).  RBC appealed that order.  (Def. RBC Bank (USA)'s Notice of Appeal, ECF No. 4213).  Joint Decl. ¶ 19.

On February 5, 2016, while the appeal was pending, the Court denied RBC's motion to dismiss Plaintiff Avery's individual claims.  (Def. Mot. to Dismiss Pl. Avery's Individ. Claims,

ECF No. 4018; Order Den. Def's Mot. to Dismiss, ECF No. 4284).  RBC was not required to file its answer to Plaintiff Avery's individual claims until the Court resolved RBC's motion to dismiss or strike Plaintiff Avery's national class claims for lack of subject matter jurisdiction.  (Order Grant. Jt. Mot. to Mod. Deadline to Ans. Pl. Avery's Claims, ECF No. 4286).  Joint Decl. ¶ 20.

On July 5, 2016, while the appeal was still pending, the Court denied RBC's motion to dismiss or strike Plaintiff Avery's putative national class claims for lack of subject matter jurisdiction.  (Def. Mot. to Dismiss or Strike Pl.'s Nat'l Class Claims for Lack of Subj. Matter Juris., ECF No. 4019; Order Den. Mot. to Dismiss or Strike Pl.'s Nat'l Class Claims for Lack of Subj. Matter Juris., ECF No. 4302). That order denied RBC's motion without prejudice to it raising the arguments again at the class certification stage. (ECF No. 4302 at 9).  On July 25, 2016, RBC answered Plaintiff Avery's claims and asserted affirmative defenses.  (Ans. and Aff. Def. of Def. to Pl. Avery's Claims in CAC, ECF No. 4307).  Joint Decl. ¶ 21.

On February 13, 2018, the Eleventh Circuit affirmed the Court's denial of arbitration on the ground that Plaintiff Dasher did not agree to arbitrate.  *See Dasher v. RBC Bank (USA)*, 882 F.3d, 1017 (11th Cir. 2018).  *Dasher* returned to the Court on March 14, 2018 and thereafter proceeded pursuant to the Court's existing scheduling orders.  (*See* Am. Scheduling Order, ECF No. 4223 (Sept. 22, 2015); Order Cancelling Pretrial Conf. and Modifying Deadlines, ECF No. 4334 (Mar. 22, 2017)).  On April 3, 2018, RBC answered Plaintiff Dasher's claims and asserted affirmative defenses. (Ans. and Aff. Def. of Def. to Pl. Michael Dasher's Claims in CAC, ECF No. 4348). Joint Decl. ¶ 22.

On August 31, 2018, after substantial discovery, Plaintiffs moved for class certification. (ECF No. 4364).  On October 10, 2018, RBC filed its opposition to class certification.  (ECF No. 4370).  On November 9, 2018, Plaintiffs filed their reply in support of class certification.   (ECF

No. 4371).  Joint Decl. ¶ 23.

On December 12, 2018, the Court heard oral argument on the motion for class certification and reserved ruling.  The Court directed both sides to submit proposed orders following receipt of the hearing transcript.  Joint Decl. ¶ 24.

> **B.**      **Settlement Negotiations.**

Beginning in 2018, PNC and Settlement Class Counsel initiated preliminary settlement discussions.  The settlement discussions resulted in the production of certain confidential overdraft data of RBC to Settlement Class Counsel.  The overdraft data was analyzed by Settlement Class Counsel's expert for the purpose of identifying the number of affected Accounts and the amount of damages sustained as a result of High-to-Law Posting.  Joint Decl. ¶ 25.

On January 22, 2019, Settlement Class Counsel and PNC participated in a settlement conference.  On that date, Settlement Class Counsel and PNC reached an agreement in principle concerning the material provisions of the Settlement.  Joint Decl. ¶ 26.

On February 5, 2019, Settlement Class Counsel and PNC executed a Summary Agreement that memorialized the material terms of the Settlement.  On February 8, 2019, Settlement Class Counsel and PNC filed a Joint Notice of Settlement with the Court and requested suspension of all pretrial deadlines pending the drafting and execution of a final settlement agreement; the Court granted the request on February 14, 2019.  (ECF Nos. 4381, 4382).  Following further negotiations and discussions, the Parties resolved all remaining issues, culminating in the Agreement.  Joint Decl. ¶ 27.

On November 6, 2019, Plaintiffs and Class Counsel filed their motion for preliminary approval.  (DE # 4423).  On November 13, 2019, the Court entered an Order Preliminarily Approving Class Settlement and Certifying Settlement Class.  (DE # 4425).  Pursuant to the

Preliminary Approval Order, notice was disseminated to members of the Settlement Class that provided, *inter alia*, a summary of the Settlement and advised them of their rights to object to or opt-out of the Settlement.  Joint Decl. ¶ 28.

        **C.**    **Summary of the Settlement Terms**

The Settlement terms are detailed in the Agreement attached as Exhibit A.  The following is a summary of the material terms of the Settlement.

        **1.**    **The Settlement Class**

The Settlement Class is an opt-out class under Rule 23(b)(3) of the Federal Rule of Civil Procedure.  The Settlement Class is defined as:

> All holders of a RBC Account who, from October 10, 2007 through and including March 1, 2012, incurred one or more Overdraft Fees as a result of RBC's High-to-Low Posting.

> Excluded from the Class are all former RBC and current PNC employees, officers and directors, and the judge presiding over this Action.

Agreement ¶ 56.

        **2.**    **Monetary Relief**

The Settlement required PNC to deposit $7,500,000.00 into the Escrow Account following entry of the Preliminary Approval Order.  Agreement ¶ 58.  The Bank deposited that sum, thereby creating the Settlement Fund.  Joint Decl. ¶ 29.

The Settlement Fund will be used to: (i) pay all payments to Settlement Class Members; (ii) pay all Court-ordered awards of attorneys' fees, costs and expenses of Class Counsel; (iii) pay the Court-ordered Service Award to the Class Representative; (iv) distribute any residual funds; (v) pay all Taxes; (vi) pay any costs of Notice Administrator and Settlement administration other than those required to be paid by PNC; and (vii) pay any additional fees, costs and expenses not specifically enumerated in paragraph 82 of the Agreement, subject to approval of Settlement Class

Counsel and PNC.  Agreement ¶ 82.  In addition to the $7,500,000.00 Settlement Fund, PNC is responsible for paying all costs and fees of the Settlement Administrator and Notice Administrator incurred in connection with the administration of the Notice Program and Settlement administration.  *Id.* at ¶ 59.

All identifiable members of the Settlement Class who experienced a Positive Differential Overdraft Fee will receive *pro rata* distributions from the Net Settlement Fund, provided they do not opt-out of the Settlement.[3]  Agreement ¶¶ 85, 87.  The Positive Differential Overdraft Fee analysis determines, among other things, which RBC Account holders were assessed additional Overdraft Fees that would not have been assessed if the Bank had used a chronological posting sequence or method for posting Debit Card Transactions instead of High-to-Low Posting, and how much in additional Overdraft Fees those Account holders paid as a result.  The calculation involves a multi-step process described in detail in the Agreement.  *Id*. at ¶ 85.

Members of the Settlement Class do not have to submit claims or take any other affirmative step to receive relief under the Settlement.  The amount of their damages has been determined by Settlement Class Counsel's expert through analysis of RBC's electronic data.  Agreement Section XI.  As soon as practicable after Final Approval, but no later than 150 days from the Effective Date (Agreement ¶¶ 87-95), the Settlement Administrator will calculate and distribute the Net Settlement Fund, on a pro rata basis, to all Settlement Class Members who had a Positive Differential Overdraft Fee and did not timely opt out of the Settlement.  Agreement Section XII.

---

[3] The Net Settlement Fund is equal to the Settlement Fund, plus interest earned (if any), less the amount of Court-awarded attorneys' fees and costs to Class Counsel, the amount of the Court-awarded Service Award to the Class Representative, a reservation of a reasonable amount of funds for prospective costs of Settlement administration that are not PNC's responsibility pursuant to paragraph 82 of the Agreement, and any other costs and/or expenses incurred in connection with the Settlement that are not specifically enumerated in paragraph 82 that are provided for in the Agreement and have been approved by Settlement Class Counsel and PNC.  Agreement ¶ 82.

Payments to Settlement Class Members who are Current Account Holders will be made by crediting such Settlement Class Members' Accounts and notifying them of the credit. Agreement ¶ 92. PNC will then be entitled to a reimbursement for such credits from the Net Settlement Fund. *Id.* at ¶ 93. Past Account Holders (and any Current Account Holders whose Accounts cannot feasibly be automatically credited) will receive their payments by checks mailed by the Settlement Administrator. *Id.* at ¶ 94.

Any uncashed or returned checks will remain in the Settlement Fund for one year from the date the first distribution check is mailed, during which time the Settlement Administrator will make reasonable efforts to effectuate delivery of the Settlement Fund Payments. Agreement ¶ 95. Any residual funds remaining in the Settlement Fund one year after the first Settlement Fund Payments are mailed will be distributed pursuant to Section XIII of the Agreement. *Id.* at ¶ 96.

### 3.   Class Release

In exchange for the benefits conferred by the Settlement, all Settlement Class Members who do not opt out will be deemed to have released PNC from claims related to the subject matter of the Action. The detailed release language is found in Section XIV of the Agreement. Agreement ¶¶ 97-100.

### 4.   Settlement Notice

The Notice Program (Agreement, Section VIII) was designed to provide the best notice practicable and was tailored to take advantage of the information PNC has available about Settlement Class Members. Agreement ¶¶ 65-76. PNC is obligated to pay all fees and costs of the Notice Program. *Id.* at ¶¶ 59, 75. The Notice Program was reasonably calculated under the circumstances to apprise members of the Settlement Class of the pendency of the Action, the terms of the Settlement, Class Counsel's fee application and request for Service Award for the Class Representative, and their rights to opt-out of the Settlement Class or object to the Settlement. *See*

Declaration of Cameron Azari ¶¶ 7-9, 13-30, 32-41 attached as Exhibit D ("Azari Decl."); Joint Decl. ¶¶ 36-44.  The Notices and Notice Program constituted sufficient notice to all persons entitled to notice, and satisfied all applicable requirements of law including, but not limited to, Federal Rule of Civil Procedure 23 and the constitutional requirement of due process.  Azari Decl. ¶ 41; Joint Decl. ¶ 37.

### 5. Settlement Termination

Either Party may terminate the Settlement if it is rejected or materially modified by the Court or an appellate court.  Agreement ¶ 106.  PNC also has the right to terminate the Settlement if the number of Settlement Class Members who timely opt out of the Settlement Class equals or exceeds the number or percentage specified in the separate letter executed concurrently with the Agreement by the Bank's counsel and Settlement Class Counsel.  *Id.* at ¶ 107.  The number or percentage will be confidential except to the Court, who upon request will be provided with a copy of the letter agreement for *in camera* review.  *Id.*

### 6. Service Award

Class Counsel are entitled to request, and PNC will not oppose, a Service Award of Ten Thousand and 00/100 Dollars ($10,000.00) for the Class Representative.  Agreement ¶ 104.  If the Court approves it, the Service Award will be paid from the Settlement Fund and will be in addition to any other relief to which the Class Representative is entitled as a Settlement Class Member.  *Id.* The Service Award will compensate the Class Representative for his time and effort in the Action, and for the risks he undertook in prosecuting the Action.  Joint Decl. ¶ 46.

### 7. Attorneys' Fees and Costs

Class Counsel are entitled to request, and PNC will not oppose, attorneys' fees of up to thirty-five percent (35%) of the Settlement Fund, plus reimbursement of litigation costs and expenses.  Agreement ¶ 101.  The Parties negotiated and reached agreement regarding attorneys'

fees and costs only after reaching agreement on all other material terms of the Settlement. Agreement ¶ 105; Joint Decl. ¶ 47.

> **D.    Argument.**

Court approval is required for settlement of a class action.  Fed. R. Civ. P. 23(e).  The federal courts have long recognized a strong policy and presumption in favor of class settlements. The Rule 23(e) analysis should be "informed by the strong judicial policy favoring settlements as well as the realization that compromise is the essence of settlement."  *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. Unit B 1982).  In evaluating a proposed class settlement, the Court "will not substitute its business judgment for that of the parties; 'the only question . . . is whether the settlement, taken as a whole, is so unfair on its face as to preclude judicial approval.'" *Rankin v. Rots*, 2006 WL 1876538, at *3 (E.D. Mich. June 28, 2006) (quoting *Zerkle v. Cleveland-Cliffs Iron Co*., 52 F.R.D. 151, 159 (S.D.N.Y. 1971)).  Indeed, "[s]ettlement agreements are highly favored in the law and will be upheld whenever possible because they are a means of amicably resolving doubts and uncertainties and preventing lawsuits."  *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1105 (5th Cir. 1977).  Class settlements minimize the litigation expenses of the parties and reduce the strain that litigation imposes upon already scarce judicial resources. Therefore, "federal courts naturally favor the settlement of class action litigation."  *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996).

The Settlement here is more than sufficient under Rule 23(e) and Final Approval is clearly warranted.

> **1.    The Court Has Personal Jurisdiction Over the Settlement Class Because Settlement Class Members Received Adequate Notice and an Opportunity to Be Heard.**

In addition to having personal jurisdiction over Plaintiffs, who is a party to this Action, the

Court also has personal jurisdiction over all members of the Settlement Class because they received the requisite notice and due process. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985) (citing *Mullane v. Cent. Hanover Bank & Trust Co*., 339 U.S. 306, 314-15 (1950)); *see also In re Prudential Ins. Co. of Am. Sales Practices Litig*., 148 F.3d 283, 306 (3d Cir. 1998).

### a.    The Best Notice Practicable Was Furnished.

The Notice Program was comprised of three parts: (1) Mailed Notice consisting of direct mail postcards sent to all identifiable members of the Settlement Class; (2) Published Notice designed to reach those members of the Settlement Class for whom direct mail notice was not possible; and (3) a Long-Form Notice with more detail than the direct mail or publication notices, that has been available on the Settlement Website and via mail upon request.  Agreement, 69-73; Azari Decl. ¶¶ 13-29.

Each facet of the Notice Program was timely and properly accomplished.  Azari Decl. ¶¶ 13-29, 32-37.   The Notice Administrator received data files from PNC that identified 152,138 Accounts included in the Settlement Class, which represented 148,437 unique Settlement Class member records, ran the associated names and addresses through the National Change of Address Database and mailed postcards to 130,424 unique addresses assigned to members of the Settlement Class.  *Id*. at ¶¶ 13-18.  The Notice Administrator performed follow up research and attempted to re-mail postcards to those members of the Settlement Class whose initial postcard notices were returned by the postal service.  *Id*. at ¶ 20.  The Notice Administrator also mailed the Long-Form Notice in response to requests from members of the Settlement Class.  *Id*. at ¶ 19.

The Notice Administrator also performed and timely completed the Published Notice Program through Local Online Banners, Local Sponsored Search Listings and a National Press Release.  Azari Decl. ¶¶ 21-27.

The Notice Administrator also established the Settlement Website, including the Long-Form Notice, to enable members of the Settlement Class to obtain detailed information about the Action and the Settlement. Azari Decl. ¶¶ 28-29. As of February 21, 2020, the Settlement Website had over 18,135 unique visitor sessions. *Id*. at ¶ 29. In addition, a toll-free number was established and has been operational since January 3, 2020. *Id*. at ¶ 30. By calling this number, members of the Settlement Class can listen to answers to frequently asked questions and request a copy of the Long-Form Notice. *Id*. As of February 21, 2020, the toll-free number had handled over 1,882 calls. *Id*.

### b.     The Notice and Notice Program Were Reasonably Calculated to Inform Settlement Class Members of Their Rights.

The Court-approved Notice and Notice Program satisfied due process requirements because they described "the substantive claims . . . [and] contain[ed] information reasonably necessary to make a decision to remain a class member and be bound by the final judgment." *In re Nissan Motor Corp. Antitrust Litig*., 552 F.2d at 1104-05. The Notice, among other things, defined the Settlement Class, described the release provided to PNC under the Settlement, as well as the amount and proposed distribution of the Settlement proceeds, and informed members of the Settlement Class of their right to opt-out or object, the procedures for doing so, and the time and place of the Final Approval Hearing. It also notified members of the Settlement Class that a class judgment would bind them unless they opted out and told them where they could get more information – for example, at the Settlement Website that posts a copy of the Agreement, as well as other important documents. Further, the Notice described Class Counsel's intention to seek attorneys' fees of up to thirty-five percent (35%) of the $7,500,000.00 Settlement Fund, plus expenses, and a Service Award for the Class Representative. Hence, the members of the Settlement Class were provided with the best practicable notice that was "reasonably calculated,

under [the] circumstances, to apprise interested parties of the pendency of the action and afford

them an opportunity to present their objections."  *Shutts*, 472 U.S. at 812 (quoting *Mullane*, 339

U.S. at 314-15); *see* Azari Decl. ¶¶ 32-41.

    As of February 21, 2020, the Notice Administrator had received no requests for exclusion

(opt-outs).  Azari Decl. ¶ 31.  As of that same date, no objections to the Settlement had been

received.  *Id.*; Joint Decl. ¶ 67.

    **2.    The Settlement Should Be Approved as Fair, Adequate and Reasonable.**

    In deciding whether to approve the Settlement, the Court will analyze whether it is "fair,

adequate, reasonable, and not the product of collusion."  *Leverso v. Southtrust Bank*, 18 F.3d 1527,

1530 (11th Cir. 1994); *see also Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984).  A

settlement is fair, reasonable and adequate when "the interests of the class as a whole are better

served if the litigation is resolved by the settlement rather than pursued."  *In re Lorazepam &*

*Clorazepate Antitrust Litig.*, MDL No. 1290, 2003 WL 22037741, at *2 (D.D.C. June 16, 2003)

(quoting *Manual for Complex Litigation (Third)* § 30.42 (1995)).  Importantly, the Court is "not

called upon to determine whether the settlement reached by the parties is the best possible deal,

nor whether class members will receive as much from a settlement as they might have recovered

from victory at trial."  *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1014 (N.D. Ill.

2000) (citations omitted).

    The Eleventh Circuit has identified six factors to be considered in analyzing the fairness,

reasonableness and adequacy of a class settlement under Rule 23(e):

    (1)     the existence of fraud or collusion behind the settlement;

    (2)     the complexity, expense, and likely duration of the litigation;

    (3)     the stage of the proceedings and the amount of discovery completed;

(4)     the probability of the plaintiffs' success on the merits;

(5)     the range of possible recovery; and

(6)     the opinions of the class counsel, class representatives, and the substance
and amount of opposition to the settlement.

*Leverso*, 18 F.3d at 1530 n.6; *see also Bennett*, 737 F.2d at 986.  Additionally, effective December

1, 2018, Rule 23(e) was amended to add a mandatory, but not exhaustive, list of similar final

approval factors:

(A) the class representatives and class counsel have adequately represented
the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief
to the class, including the method of processing class-member
claims;

(iii) the terms of any proposed award of attorney's fees, including
timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). The analysis set forth below shows this Settlement to be eminently fair,

adequate and reasonable.

> **a.      There Was No Fraud or Collusion and the Settlement Was
> Negotiated at Arm's Length.**

This Court well knows the vigor with which the Parties litigated until they reached the

Settlement.  The sharply contested nature of the proceedings in this Action demonstrates the absence of fraud or collusion behind the Settlement.  *See, e.g.*, *In re Sunbeam Sec. Litig*., 176 F. Supp. 2d 1323, 1329 n.3 (S.D. Fla. 2001); *Ingram v. Coca-Cola Co*., 200 F.R.D. 685, 693 (N.D. Ga. 2001) (court had "no doubt that this case has been adversarial, featuring a high level of contention between the parties"); *In re Motorsports Merchandise Antitrust Litig*., 112 F. Supp. 2d 1329, 1338 (N.D. Ga. 2000) ("This was not a quick settlement, and there is no suggestion of collusion"); *Warren v. City of Tampa*, 693 F. Supp. 1051, 1055 (M.D. Fla. 1988) (record disclosed no evidence of collusion, but to the contrary showed "that the parties conducted discovery and negotiated the terms of settlement for an extended period of time"), *aff'd*, 893 F.2d 347 (11th Cir. 1989).

Settlement Class Counsel negotiated the Settlement with similar vigor.  Plaintiffs and the Settlement Class were represented by experienced counsel throughout the negotiations.  Settlement Class Counsel and PNC engaged in arm's-length negotiations.  Joint Decl. ¶¶ 25-27.  *Cotton v. Hinton*, 559 F. 2d 1326, 1330 (5th Cir. 1977) (a class action settlement should be approved so long as the Court finds that it is "fair, adequate and reasonable and is not the product of collusion between the parties.").  *See also Lipuma v. American Express Co*., 406 F. Supp. 2d 1298, 1318-19 (S.D. Fla. 2005) (approving class settlement where the "benefits conferred on the Class are substantial, and are the result of informed, arms-length negotiations by experienced Class Counsel").  Thus, Rule 23(e)(2)(B) is satisfied.

### b. The Settlement Will Avert Years of Highly Complex and Expensive Litigation.

The claims and defenses are complex; litigating them is both difficult and time-consuming. Joint Decl. ¶¶ 58, 66; Fitzpatrick Decl. ¶¶ 12-15.  Although this Action was litigated for over eight years before the Parties resolved it, recovery by any means other than settlement would require

19

additional years of litigation.  *Id*.; *see United States v. Glens Falls Newspapers, Inc.*, 160 F. 3d 853, 856 (2d Cir. 1998) (noting that "a principal function of a trial judge is to foster an atmosphere of open discussion among the parties' attorneys and representatives so that litigation may be settled promptly and fairly so as to avoid the uncertainty, expense and delay inherent in a trial."); *In re Domestic Air Transp. Antitrust Litig*., 148 F.R.D. 297, 317, 325-26 & n.32 (N.D. Ga. 1993) ("[A]djudication of the claims of two million claimants could last half a millennium").

In contrast, the Settlement provides immediate and substantial benefits to approximately 150,000 members of the Settlement Class, all of whom were RBC customers.  Joint Decl. ¶ 58. As stated in *In re Shell Oil Refinery*, 155 F.R.D. 552 (E.D. La. 1993):

> The Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation.  In this respect, "[i]t has been held proper to take the bird in the hand instead of a prospective flock in the bush."

*Id*. at 560 (alterations in original) (quoting *Oppenlander v. Standard Oil Co*., 64 F.R.D. 597, 624 (D. Colo. 1974)); *see also In re U.S. Oil & Gas Litig*., 967 F.2d 489, 493 (11th Cir. 1992) (noting that complex litigation "can occupy a court's docket for years on end, depleting the resources of the parties and taxpayers while rendering meaningful relief increasingly elusive").  Particularly because the "demand for time on the existing judicial system must be evaluated in determining the reasonableness of the settlement," *Ressler v. Jacobson*, 822 F. Supp. 1551, 1554 (M.D. Fla. 1992) (citation omitted), there can be no doubt about the adequacy of the present Settlement under Rule 23(e)(2)(C), which provides reasonable benefits to the Settlement Class.

### c.   The Factual Record Is Sufficiently Developed to Enable Class Counsel to Make a Reasoned Judgment.

Courts also consider "the degree of case development that class counsel have accomplished prior to settlement" to ensure that "counsel had an adequate appreciation of the merits of the case

before negotiating." *In re General Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 813 (3d Cir. 1995). At the same time, "[t]he law is clear that early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations." *Ressler*, 822 F. Supp. at 1555.

Settlement Class Counsel negotiated the Settlement with the benefit of significant litigation before this Court and the Eleventh Circuit involving RBC (and other banks in MDL 2036), including a damage analysis by Settlement Class Counsel's expert based on RBC customer data. Joint Decl. ¶¶ 25, 31, 59; Declaration of Arthur Olsen ¶¶ 11-28 attached as Exhibit E ("Olsen Decl."). Settlement Class Counsel's analysis and understanding of the various legal obstacles, as well as the damage analysis, positioned them to evaluate with confidence the strengths and weaknesses of Plaintiffs' claims and defenses through the conclusion of the litigation, as well as the range and amount of damages that were potentially recoverable if the Action successfully proceeded to judgment on a class-wide basis. Joint Decl. ¶¶ 59-66; Fitzpatrick Decl. ¶¶ 12-15. "Information obtained from other cases may be used to assist in evaluating the merits of a proposed settlement of a different case." *Lipuma*, 406 F. Supp. 2d at 1325.

### d. Plaintiffs Faced Significant Obstacles to Prevailing.

The "likelihood and extent of any recovery from the defendants absent . . . settlement" is another important factor in assessing the reasonableness of a settlement. *Domestic Air*, 148 F.R.D. at 314; *see also Ressler*, 822 F. Supp. at 1555 ("A Court is to consider the likelihood of the plaintiff's success on the merits of his claims against the amount and form of relief offered in the settlement before judging the fairness of the compromise."). According to Professor Fitzpatrick: "[I]t was not at all clear that the plaintiffs would have won their cases on the merits." Fitzpatrick Decl. ¶¶ 12-15.

Settlement Class Counsel believe that Plaintiffs had a solid case against RBC. Joint Decl.

¶ 60.   Even so, we are mindful that RBC advanced significant defenses that would have been required to overcome in the absence of the Settlement.  *Id*. at ¶¶ 60-61; Fitzpatrick Decl. ¶¶ 12-15. This Action involved several major litigation risks.  Joint Decl. ¶ 60; Fitzpatrick Decl. ¶¶ 12-13. As this Court recognized in granting final approval to the settlement with Bank of America: "The combined risks here were real and potentially catastrophic . . .  [B]ut for the Settlement, Plaintiffs and the class faced a multitude of potentially serious, substantive defenses, any one of which could have precluded or drastically reduced the prospects of recovery."  *In re Checking Account Overdraft Litig*., 830 F. Supp. 2d 1330, 1347-48 (S.D. Fla. 2011).

Apart from the risks, continued litigation would have involved substantial delay and expense, which further counsels in favor of Final Approval.  Joint Decl. ¶ 61; Fitzpatrick Decl. ¶ 14.  The uncertainties and delays from this process would have been significant.  *Id*.

Given the myriad risks attending these claims, as well as the certainty of substantial delay and expense from ongoing litigation, the Settlement cannot be seen as anything except a fair compromise.  *See, e.g*., *Bennett v. Behring Corp*., 96 F.R.D. 343, 349-50 (S.D. Fla. 1982), *aff'd*, 737 F.2d 982 (11th Cir. 1984) (plaintiffs faced a "myriad of factual and legal problems" creating "great uncertainty as to the fact and amount of damage," making it "unwise [for plaintiffs] to risk the substantial benefits which the settlement confers . . . to the vagaries of a trial").  All of this evidences that Rule 23(e)(2)(C)(i) is satisfied.

### e.   The Benefits Provided by the Settlement Are Fair, Adequate and Reasonable Compared to the Range of Possible Recovery.

In determining whether a settlement is fair given the potential range of recovery, the Court should be guided by "the fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate."  *Behrens v. Wometco Enters., Inc*., 118 F.R.D. 534, 542 (S.D. Fla. 1988) (King, J.), *aff'd*, 899 F.2d 21 (11th Cir. 1990).  Indeed, "[a]

settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery." *Id.*  This is because a settlement must be evaluated "in light of the attendant risks with litigation." *Thompson v. Metropolitan Life Ins. Co*., 216 F.R.D. 55, 64 (S.D.N.Y. 2003); *see also Bennett*, 737 F.2d at 986 ("[C]ompromise is the essence of settlement."). Thus, courts regularly find settlements to be fair where "[p]laintiffs have not received the optimal relief." *Warren*, 693 F. Supp. at 1059; *see, e.g.*, *Great Neck Capital Appreciation Investment P'ship, L.P. v. PriceWaterHouseCoopers, L.L.P*., 212 F.R.D. 400, 409-10 (E.D. Wis. 2002) ("The mere possibility that the class might receive more if the case were fully litigated is not a good reason for disapproving the settlement.").

Settlement Class Counsel were well-positioned to evaluate the strengths and weaknesses of Plaintiffs' claims, as well as the appropriate basis upon which to settle them, as a result of their litigation and settlement of similar claims reached within MDL 2036.  Joint Decl. ¶ 50.  Settlement Class Counsel also gained further insight into the practical and legal issues they would have continued to face litigating these claims against RBC based, in part, on similar claims challenging Wells Fargo's high-to-low posting practices prosecuted in *Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080 (N.D. Cal. 2010)[4]  Joint Decl. ¶ 51.

Settlement Class Counsel's damage expert's analysis of RBC's available electronic transactional data showed that the most favorable outcome Plaintiffs and the Settlement Class could have anticipated recovering at trial was $33,153,673.91 during the Class Period, although alternative sort orders could have resulted in a recovery of a much lower amount.  Olsen Decl. ¶¶

---

[4] On remand, the District Court again entered judgment for $203 million in favor of the class based on provisions of the California consumer fraud statute – a claim not available here since the Bank did not operate branches in California.  In 2014, in an unpublished opinion, the Ninth Circuit affirmed the reinstated judgment.

27, 33.  Through this Settlement, Plaintiffs and the Settlement Class have achieved a recovery of approximately twenty-three percent (23%) of the most favorable damage recovery, without further risks or delays.  Joint Decl. ¶ 55; Fitzpatrick Decl. ¶ 11.   This Settlement provides an extremely fair and reasonable recovery to the Settlement Class in light of RBC's defenses, as well as the challenging, unpredictable path of litigation that Plaintiffs would otherwise have continued to face in the trial and appellate courts.  Joint Decl. ¶ 63; Fitzpatrick Decl. ¶¶ 12-13.  The automatic *pro rata* distribution process further supports Final Approval; eligible Settlement Class Members will receive their cash benefits automatically, without needing to fill out any claim forms – or indeed to take any affirmative steps whatsoever.  Joint Decl. ¶ 64; Fitzpatrick Decl. ¶ 16.  This satisfies Rule 23(e)(2)(C)(ii) and Rule 23(e)(2)(D).

The $7,500,000 cash recovery is fair and reasonable given the obstacles confronted and the complexity of the Action, and the significant barriers that stood between the pre-settlement status of the Action and final judgment, including rulings on class certification, summary judgment, trial, and post-trial appeals.  Joint Decl. ¶¶ 63; Fitzpatrick Decl. ¶¶ 12-15.  Taking these risks into account, the Settlement "is not only fair, adequate and reasonable, but, frankly, very impressive as well."  Fitzpatrick Decl. ¶ 17.  RBC's agreement to pay the fees, costs and expenses of the Notice Administrator and Settlement Administrator further enhances the recovery.  Joint Decl. ¶ 56; Fitzpatrick Decl. ¶ 21 n. 28.  Given the extraordinary obstacles that Plaintiffs faced in the litigation, this recovery is an excellent achievement by any objective measure.  Thus, Rule 23(e)(2)(C) is met.

>           **f.      The Opinions of Settlement Class Counsel and Absent Class Members Favor Approval of the Settlement.**

Settlement Class Counsel fully endorse the Settlement with RBC.  Joint Decl. ¶¶ 65-66. The Court should give "great weight to the recommendations of counsel for the parties, given their

considerable experience in this type of litigation." *Warren*, 693 F. Supp. at 1060; *see also Domestic Air*, 148 F.R.D. at 312-13 ("In determining whether to approve a proposed settlement, the Court is entitled to rely upon the judgment of the parties' experienced counsel. '[T]he trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel.'") (citations omitted).

To date, there has been virtually no opposition to the Settlement. As of February 21, 2020, no members of the Settlement Class had requested to be excluded from the Settlement Class. Azari Decl. ¶ 31; Joint Decl. ¶ 67. Moreover, as of that date, no objections to the Settlement had been received. Azari Decl. ¶ 31; Joint Decl. ¶ 67. This is another indication that the Settlement Class is satisfied with the Settlement. It is settled that "[a] small number of objectors from a plaintiff class of many thousands is strong evidence of a settlement's fairness and reasonableness." *Association for Disabled Americans v. Amoco Oil Co*., 211 F.R.D. 457, 467 (S.D. Fla. 2002); *also Mangone v. First USA Bank*, 206 F.R.D. 222, 227 (S.D. Ill. 2001) ("In evaluating the fairness of a class action settlement, such overwhelming support by class members is strong circumstantial evidence supporting the fairness of the Settlement."); *Austin v. Pennsylvania Dept. of Corrections*, 876 F. Supp. 1437, 1458 (E.D. Pa. 1995) ("Because class members are presumed to know what is in their best interest, the reaction of the class to the Settlement Agreement is an important factor for the court to consider.").

### 3. The Court Should Certify the Settlement Class.

This Court found the requirements of Rule 23(a) and 23(b)(3) satisfied in this Action in granting Preliminary Approval to the Settlement (DE # 4425), and in granting final approval to settlements reached in numerous other actions in MDL 2036. *See, e.g*., DE # 2150 (Bank of America); DE # 3134 (JPMorgan Chase Bank); DE # 3331 (Citizens Financial); DE # 3580 (PNC

Bank); DE # 3753 (U.S. Bank); and DE # 4168 (Capital One).  The Court should make the same class certification findings in granting Final Approval.

Based on the foregoing, the Settlement is fair, adequate and reasonable, and merits Final Approval.

## III.    APPLICATION FOR SERVICE AWARDS

Pursuant to the Settlement, Class Counsel request, and PNC does not oppose, a Service Award in the amount of $10,000.00 for the Class Representative identified in paragraph 24 of the Agreement.  Agreement ¶ 104; Joint Decl. ¶ 69.  Service awards "compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation."  *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1218 (S.D. Fla. 2006).  "[T]here is ample precedent for awarding incentive compensation to class representatives at the conclusion of a successful class action."  *David v. American Suzuki Motor Corp.*, 2010 WL 1628362, at *6 (S.D. Fla. Apr. 15, 2010).  Courts have consistently found service awards to be an efficient and productive way to encourage members of a class to become class representatives. *See, e.g.*, *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 694 (N.D. Ga. 2001) (awarding class representatives $300,000 each, explaining that "the magnitude of the relief the Class Representatives obtained on behalf of the class warrants a substantial incentive award."); *Spicer v. Chicago Bd. Options Exchange, Inc.*, 844 F. Supp. 1226, 1267-68 (N.D. Ill. 1993) (collecting cases approving service awards ranging from $5,000 to $100,000, and awarding $10,000 to each named plaintiff).

The relevant factors include: (1) the actions the class representatives took to protect the interests of the class; (2) the degree to which the class benefited from those actions; and (3) the amount of time and effort the class representatives expended in pursuing the litigation.  *See, e.g.*,

*Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998).

The above factors, as applied to this Action, demonstrate the reasonableness of the requested Service Award to the Class Representative.  Joint Decl. ¶ 72; *see, e.g., Checking Account Overdraft*, 830 F. Supp. 2d at 1357-58 ("The Court notes that the class representatives expended time and effort in meeting their fiduciary obligations to the Class, and deserve to be compensated for it.").  The Class Representative's substantial assistance enabled Class Counsel to successfully prosecute the Action and reach the Settlement, including (1) submitting to interviews with Class Counsel, (2) locating and forwarding responsive documents and information (i.e., monthly account statements and account agreements), and (3) preparing for and testifying at a deposition taken by RBC's counsel.  In so doing, the Class Representative was integral to forming the theory of the case.  Joint Decl. ¶ 72.  He remained committed to the prosecution of the Action notwithstanding multiple interlocutory appeals.

The Class Representative not only devoted time and effort to the litigation, but the end result of his efforts, coupled with those of Class Counsel, provided a substantial benefit to the Settlement Class.  Joint Decl. ¶ 72.  If the Court approves it, the total Service Award will be $10,000.  This amount is less than 0.0013% of the Settlement Fund, a ratio that falls well below the range of what has been deemed to be reasonable.  *Id.* at ¶ 73; s*ee, e.g*., *Enter. Energy Corp. v. Columbia Gas Transmission*, 137 F.R.D. 240, 251 (S.D. Ohio 1991) (approving service awards totaling $300,000, or 0.56% of a $56.6 million settlement).  The Service Awards requested here are reasonable and should be approved.

## IV.  APPLICATION FOR ATTORNEYS' FEES AND EXPENSES

As indicated in the Agreement and the Notice, and consistent with standard class action practice and procedure, Class Counsel respectfully request attorneys' fees equal to thirty-five

percent (35%) of the $7,500,000 Settlement Fund created through our efforts.  Agreement ¶ 101; Joint Decl. ¶ 74.  Class Counsel also request reimbursement of limited out-of-pocket costs and expenses totaling $92,899.19 incurred in connection with the prosecution of the Action and in connection with the Settlement.  *Id*.  Settlement Class Counsel and PNC negotiated and reached agreement regarding attorneys' fees and costs only after reaching agreement on all other material terms of this Settlement.  Agreement ¶ 104; Joint Decl. ¶ 74.  The thirty-five percent (35%) fee request is within the range of reason under the factors listed by the Eleventh Circuit in *Camden I Condo. Ass'n. v. Dunkle*, 946 F.2d 768 (11th Cir. 1991).  Fitzpatrick Decl. ¶ 21.  For the reasons detailed herein, the requested fee is appropriate, fair and reasonable and should be approved in accordance with Rule 23(e)(2)(C)(iii).

## A.  The Law Awards Class Counsel Fees From the Common Fund Created Through Their Efforts.

It is well established that when a representative party has conferred a substantial benefit upon a class, counsel is entitled to attorneys' fees based upon the benefit obtained.  *Camden I*, 946 F.2d at 771; *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).  The common benefit doctrine is an exception to the general rule that each party must bear its own litigation costs.  The doctrine serves the "twin goals of removing a potential financial obstacle to a plaintiff's pursuit of a claim on behalf of a class and of equitably distributing the fees and costs of successful litigation among all who gained from the named plaintiff's efforts."  *In re Gould Sec. Litig*., 727 F. Supp. 1201, 1202 (N.D. Ill. 1989) (citation omitted).  The common benefit doctrine stems from the premise that those who receive the benefit of a lawsuit without contributing to its costs are "unjustly enriched" at the expense of the successful litigant.  *Van Gemert*, 444 U.S. at 478.  As a result, the Supreme Court, the Eleventh Circuit, and courts in this District have all recognized that "[a] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable

attorney's fee from the fund as whole." *Sunbeam*, 176 F. Supp. 2d at 1333 (citing *Van Gemert*, 444 U.S. at 478); *see also Camden I*, 946 F.2d at 771 ("Attorneys in a class action in which a common fund is created are entitled to compensation for their services from the common fund, but the amount is subject to court approval."). Courts have also recognized that appropriate fee awards in cases such as this encourage redress for wrongs caused to entire classes of persons and deter future misconduct of a similar nature. *See, e.g.*, *Mashburn*, 684 F. Supp. at 687; *see also Deposit Guar. Nat'l Bank v. Rope*, 445 U.S. 326, 338-39 (1980). Adequate compensation promotes the availability of counsel for aggrieved persons:

> If the plaintiffs' bar is not adequately compensated for its risk, responsibility, and effort when it is successful, then effective representation for plaintiffs in these cases will disappear . . . . We as members of the judiciary must be ever watchful to avoid being isolated from the experience of those who are actively engaged in the practice of law. It is difficult to evaluate the effort it takes to successfully and ethically prosecute a large plaintiffs' class action suit. It is an experience in which few of us have participated. The dimensions of the undertaking are awesome.

*Muehler v. Land O'Lakes, Inc.*, 617 F. Supp. 1370, 1375-76 (D. Minn. 1985).

In the Eleventh Circuit, class counsel receives a percentage of the funds obtained through a settlement. In *Camden I* – the controlling authority regarding attorneys' fees in common-fund class actions – the Eleventh Circuit held that "the percentage of the fund approach [as opposed to the lodestar approach] is the better reasoned in a common fund case. Henceforth in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." *Camden I*, 946 F.2d at 774. This Court has applied the percentage of the fund approach in MDL 2036, holding:

> The Eleventh Circuit made clear in *Camden I* that percentage of the fund is the exclusive method for awarding fees in common fund class actions. *Camden I*, 946 F.2d at 774. Even before *Camden I*, courts in this Circuit recognized that "a percentage of the gross recovery is the only sensible method of awarding fees in common fund cases." *Mashburn v. Nat'l Healthcare, Inc*., 684 F. Supp. 660, 670 (M.D. Ala. 1988). More importantly, the Court observed first-hand the

monumental effort exerted by Class Counsel in this case, and does not need to see timesheets to know how much work Class Counsel have put in to reach this point.

*Checking Account Overdraft*, 830 F. Supp. 2d at 1362.

The Court has substantial discretion in determining the appropriate fee percentage. "There is no hard and fast rule mandating a certain percentage of a common fund which may be awarded as a fee because the amount of any fee must be determined upon the facts of each case." *Sunbeam*, 176 F. Supp. 2d at 1333 (quoting *Camden I*, 946 F.2d at 774). Nonetheless, "[t]he majority of common fund fee awards fall between 20 percent to 30 percent of the fund" – though "an upper limit of 50 percent of the fund may be stated as a general rule." *Id.* (quoting *Camden I*, 946 F.2d at 774-75); *see also Waters v. Int'l Precious Metals Corp*., 190 F.3d 1291 (11th Cir. 1999), *cert. denied*, 530 U.S. 1289 (2000) (approving fee award where the district court determined that the benchmark should be 30 percent and then adjusted the fee award higher in view of the circumstances of the case).

Class Counsel's fee request falls within this accepted range and, as Professor Fitzpatrick points out, over 40% of the Eleventh Circuit percentage method fee awards analyzed in his study included fee awards between 30% and 35%. Fitzpatrick Decl. ¶ 25. As Professor Fitzpatrick opines, analysis of the relevant factors and circumstances justify fee request in this case. *Id.* at ¶¶ 22-32.

## B.   Application of the *Camden I* Factors Supports the Requested Fee.

The Eleventh Circuit has provided a set of factors the Court should use to determine a reasonable percentage to award as an attorney's fee to class counsel in class actions:

(1)   the time and labor required;

(2)   the novelty and difficulty of the relevant questions;

(3)   the skill required to properly carry out the legal services;

(4)     the preclusion of other employment by the attorney as a result of his acceptance of the case;

(5)     the customary fee;

(6)     whether the fee is fixed or contingent;

(7)     time limitations imposed by the clients or the circumstances;

(8)     the results obtained, including the amount recovered for the clients;

(9)     the experience, reputation, and ability of the attorneys;

(10)    the "undesirability" of the case;

(11)    the nature and the length of the professional relationship with the clients; and

(12)    fee awards in similar cases.

*Camden I*, 946 F.2d at 772 n.3 (citing factors originally set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)).

These twelve factors are guidelines and are not exclusive. "Other pertinent factors are the time required to reach a settlement, whether there are any substantial objections by class members or other parties to the settlement terms or the fees requested by counsel, any non-monetary benefits conferred upon the class by the settlement, and the economics involved in prosecuting a class action." *Sunbeam*, 176 F. Supp. 2d at 1333 (quoting *Camden I*, 946 F.2d at 775). In addition, the Eleventh Circuit has "encouraged the lower courts to consider additional factors unique to the particular case." *Camden I*, 946 F.2d at 775. As applied here, the *Camden I* factors demonstrate that the Court should approve the requested fee. Fitzpatrick Decl. ¶¶ 20-25.

### 1.     The Claims Against RBC Required Substantial Time and Labor.

Prosecuting and settling these claims demanded considerable time and labor, making this fee request reasonable. Joint Decl. ¶¶ 76-81; Fitzpatrick Decl. ¶ 26.

Throughout the pendency of the Action, the organization of Class Counsel ensured that we were engaged in coordinated, productive work to maximize efficiency and minimize duplication of effort. Joint Decl. ¶ 76. Class Counsel devoted substantial time to investigating the claims against RBC. *Id.* at ¶ 77. Class Counsel interviewed numerous RBC customers and potential plaintiffs to gather information about the Bank's conduct, at the time the lawsuit was filed and in the past, to determine the effect that its conduct had on consumers. *Id.* This information was essential to Class Counsel's ability to understand the nature of RBC's conduct, the language of the Account agreements at issue, and potential remedies. *Id.* Class Counsel also expended significant resources researching and developing the legal claims at issue. *Id.*

Class Counsel expended significant resources researching and developing the legal theories and arguments presented in our pleadings and motions, and in opposition to RBC's motions and briefs, before this Court and the Eleventh Circuit. Joint Decl. ¶ 78. Substantial time and resources were also dedicated to conducting formal discovery, that included review of over 145,000 pages of documents and electronic data as well as taking and defending eight depositions and preparing and arguing the motion for class certification, as well as three appeals before the Eleventh Circuit. *Id.* at ¶ 79.

Settlement negotiations consumed additional time and resources. Joint Decl. ¶ 80. As noted previously, initial settlement discussions began in 2018 and Settlement Class Counsel and PNC participated in a settlement conference in late January 2019. *Id.* On that date, they reached an agreement in principle concerning the material provisions of the Settlement. *Id.* Ultimately, on February 5, 2019, Settlement Class Counsel and PNC reached an agreement in principle and executed a Summary Agreement that memorialized the material terms of the Settlement. Soon thereafter, they filed a joint notice of settlement requesting a suspension of all deadlines pending

the drafting and execution of the Agreement.  *Id.*  Months of detailed discussions and negotiations

ensued, ultimately resulting in the drafting and execution of the Agreement.  *Id.*

All told, Class Counsel's coordinated work paid dividends for the Settlement Class.  Each

of the above-described efforts was essential to achieving the Settlement before the Court.  Joint

Decl. ¶ 81.  The time and resources Class Counsel devoted to prosecuting and settling this Action

readily justify the fee that we now request.  "For all these reasons, I believe the fee award requested

here is well within the range of reason.  Class counsel undertook an incredibly risky and

undesirable case, and through their diligence, perseverance, and skill, obtained an outstanding

result for the settlement class.  Class counsel should be commended for such an excellent result

and should be compensated in accord with their request because it is warranted and reasonable

given similar fee awards."  *See* Fitzpatrick Decl. ¶ 32.

As Professor Fitzpatrick notes, this particular case was litigated longer than almost any

other case in MDL 2036 (over 8 years), well beyond the average time to resolve a consumer class

action.  *See* Fitzpatrick Decl. ¶ 26.  These factors support the increased fee request.  *Id*.

        **2.**       **The Issues Involved Were Novel and Difficult, and Required the Skill of Highly Talented Attorneys.**

The Court regularly witnessed and commented upon the high quality of our legal work,

which conferred a substantial benefit on the Settlement Class in the face of significant litigation

obstacles.  Joint Decl. ¶¶ 82-85.  Our work required the acquisition and analysis of a substantial

amount of factual and legal information.  *Id*.  The management of this very large MDL, including

the Action against RBC, also presented challenges most law firms are simply not able to meet.  *Id*.

In any given case, the skill of legal counsel should be commensurate with the novelty and

complexity of the issues, as well as the skill of the opposing counsel.  Litigation of this Action

required counsel highly trained in class action law and procedure as well as the specialized issues

presented here, including the impact of evolving arbitration jurisprudence on consumer class actions. Class Counsel possess these attributes, and their participation added value to the representation of this large Settlement Class. Joint Decl. ¶ 83. The record demonstrates that the Action involved a broad range of complex and novel challenges, which Class Counsel met at every juncture. *Id.* at ¶ 84.

Consideration of the novelty and difficulty of the questions involved and the 'undesirability" of the case factors further support the increased fee request in this case. *See* Fitzpatrick Decl. ¶ 27. "To put it succinctly, this was no ordinary class action. Indeed, I believe this case was more risky and less desirable than most class actions, including many in this MDL." *Id.*

In evaluating the quality of representation by Class Counsel, the Court should also consider the quality of opposing counsel. *See Camden I*, 946 F.2d at 772 n.3; *Ressler*, 149 F.R.D. at 654. Throughout the litigation, PNC was represented by extremely capable counsel. They were worthy, highly competent adversaries. Joint Decl. ¶ 85; *see also Checking Account Overdraft*, 830 F. Supp. 2d at 1348 (finding "Class Counsel confronted not merely a single large bank, but the combined forces of a substantial portion of the entire American banking industry, and with them a large contingent of some of the largest and most sophisticated law firms in the country.") (internal quotation marks and citation omitted); *Walco Invs. v. Thenen*, 975 F. Supp. 1468, 1472 (S.D. Fla. 1997) (stating that "[g]iven the quality of defense counsel from prominent national law firms, the Court is not confident that attorneys of lesser aptitude could have achieved similar results").

### 3.    Class Counsel Achieved a Successful Result.

Given the significant litigation risks we faced, the Settlement represents a successful result. Fitzpatrick Decl. ¶¶ 17, 27. Rather than facing more years of costly and uncertain litigation, the

overwhelming majority of Settlement Class Members will receive an immediate cash benefit. Joint Decl. ¶ 86. The Settlement Fund will not be reduced by the substantial fees and costs of Notice or Settlement administration; such fees and expenses have been and will continue to be borne separately by PNC. *Id*. Moreover, payments to eligible Settlement Class Members will be forthcoming automatically, through direct deposit for Current Account Holders and checks for Past Account Holders. *Id*.

### 4.        The Claims Presented Serious Risk.

The Settlement is particularly noteworthy given the combined litigation risks. Joint Decl. ¶¶ 87-88; Fitzpatrick Decl. ¶ 24. RBC raised substantial defenses. Success under these circumstances represents a genuine milestone.

Consideration of the "litigation risks" factor under *Camden I* "recognizes that counsel should be rewarded for taking on a case from which other law firms shrunk. Such aversion could be due to any number of things, including social opprobrium surrounding the parties, thorny factual circumstances, or the possible financial outcome of a case. All of this and more is enveloped by the term 'undesirable.'" *Sunbeam*, 176 F. Supp. 2d at 1336.

Further, "[t]he point at which plaintiffs settle with defendants . . . is simply not relevant to determining the risks incurred by their counsel in agreeing to represent them." *Skelton v. General Motors Corp*., 860 F.2d 250, 258 (7th Cir. 1988). "Undesirability" and relevant risks must be evaluated from the standpoint of plaintiffs' counsel as of the time they commenced the suit – not retroactively, with the benefit of hindsight. *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp*., 540 F.2d 102, 112 (3d Cir. 1976); *Walco*, 975 F. Supp. at 1473.

Prosecuting the Action was risky from the outset. Joint Decl. ¶ 87; Fitzpatrick Decl. ¶ 27 ("[T]his case was more risky and less desirable than most class actions."). Given these risks, the

$7,500,000 cash recovery obtained through the Settlement is outstanding, given the complexity of the litigation and the significant risks and barriers that loomed in the absence of Settlement. These risks could easily have impeded, if not altogether derailed, Plaintiffs' and the Settlement Class's successful prosecution of these claims at trial and in an eventual appeal.

The recovery achieved by this Settlement must be measured against the fact that any recovery by Plaintiffs and the Settlement Class through continued litigation could only have been achieved if: (i) the Court granted Plaintiffs' pending motion for class certification and the Eleventh Circuit did not reverse it; (ii) Plaintiffs and the certified class defeated summary judgment; (iii) Plaintiffs and the certified class established liability and recovered damages at trial; and (iv) the final judgment was affirmed on appeal. The Settlement is an extremely fair and reasonable recovery for the Settlement Class in light of RBC's merits defenses, and the challenging and unpredictable path of litigation Plaintiffs would have faced absent the Settlement. Joint Decl. ¶¶ 57, 66; Fitzpatrick Decl. ¶¶ 12-14.

### 5.   Class Counsel Assumed Considerable Risk to Pursue This Action on a Pure Contingency Basis.

In undertaking to prosecute this complex case entirely on a contingent fee basis, Class Counsel assumed a significant risk of nonpayment or underpayment. Joint Decl. ¶ 89; Fitzpatrick Decl. ¶ 27. That risk warrants an appropriate fee. Indeed, "[a] contingency fee arrangement often justifies an increase in the award of attorney's fees." *Sunbeam*, 176 F. Supp. 2d at 1335 (quoting *Behrens*, 118 F.R.D. at 548); *see also In re Continental Ill. Sec. Litig.*, 962 F.2d 566 (7th Cir. 1992) (holding that when a common fund case has been prosecuted on a contingent-fee basis, plaintiffs' counsel must be adequately compensated for the risk of non-payment); *Ressler*, 149 F.R.D. at 656 ("Numerous cases recognize that the attorney's contingent fee risk is an important factor in determining the fee award.").

Public policy concerns – in particular, ensuring the continued availability of experienced and capable counsel to represent classes of injured plaintiffs holding small individual claims – support the requested fee.  Joint Decl. ¶ 90.  In the Court's words:

> Generally, the contingency retainment must be promoted to assure representation when a person could not otherwise afford the services of a lawyer. . . . A contingency fee arrangement often justifies an increase in the award of attorney's fees.  This rule helps assure that the contingency fee arrangement endures.  If this "bonus" methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing.

*Behrens*, 118 F.R.D. at 548.

The progress of the Action shows the inherent risk faced by Class Counsel in accepting and prosecuting the Action on a contingency fee basis.  Despite Class Counsel's effort in litigating this Action for more than eight years, we remain completely uncompensated for the time invested in the Action, in addition to the substantial expenses we advanced.  Joint Decl. ¶ 91.  There can be no dispute that this case entailed substantial risk of nonpayment for Class Counsel.  Fitzpatrick Decl. ¶ 27.

### 6.      The Requested Fee Comports With Fee Awards in Similar Cases.

The fee sought here is within the range of fees typically awarded in similar cases.  Joint Decl. ¶ 92; Fitzpatrick Decl. ¶¶ 21, 32.  Numerous decisions within and outside of the Eleventh Circuit have found that a 35% fee is within the range of reason under the factors listed by the *Camden I.  See* Fitzpatrick Decl. ¶ 21.

As another member of this Court observed: "[F]ederal district courts across the country have, in the class action settlement context, *routinely* awarded class counsel fees in excess of the

25 percent 'benchmark,' even in so-called 'mega-fund' cases."[5]  *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1210 (S.D. Fla. 2006) (emphasis added) (awarding fees equaling 31⅓ percent of settlement fund); *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403 (S.D. Tex. 1999) (35.1 percent)); *see also Gaskill v. Gordon*, 942 F. Supp. 382, 387-88 (N.D. Ill. 1996), *aff'd*, 160 F.3d 361 (7th Cir. 1998) (finding that 33 percent is the norm, and awarding 38 percent of settlement fund); *In re Combustion, Inc.*, 968 F. Supp. 1116 (W.D. La. 1997) (36 percent); *In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320, 326 (E.D.N.Y. 1993) (33.8 percent); *In re Ampicillin Antitrust Litig.*, 526 F. Supp. 494, 498 (D.D.C. 1981) (45 percent); *Beech Cinema, Inc. v. Twentieth-Century Fox Film Corp.*, 480 F. Supp. 1195, 1199 (S.D.N.Y. 1979), *aff'd*, 622 F.2d 1106 (2d Cir. 1980) (approximately 53 percent); *Zinman v. Avemco Corp.*, 1978 WL 5686 (E.D. Pa. Jan. 18, 1978) (Higginbotham, J.) (50 percent).

Class Counsel's fee request falls within the range of the private marketplace, where contingency fee arrangements often approach or equal forty percent of any recovery.  *See Continental*, 962 F.2d at 572 ("The object in awarding a reasonable attorneys' fee . . . is to simulate the market."); *RJR Nabisco, Inc. Sec. Litig.*, Fed. Sec. L. Rep. (CCH) ¶ 94, 268 (S.D.N.Y. 1992) ("[W]hat should govern [fee] awards is . . . what the market pays in similar cases").  And, "[i]n tort suits, an attorney might receive one-third of whatever amount the Plaintiff recovers.  In those cases, therefore, the fee is directly proportional to the recovery."  *Blum v. Stenson*, 465 U.S. 886, 904 (1984) (Brennan, J., concurring); *see also Kirchoff v. Flynn*, 786 F.2d 320, 323, 325 n.5 (7th Cir. 1986) (noting "40 percent is the customary fee in tort litigation"); *In re Public Serv. Co. of*

---

[5] *See also* 1 *Court Awarded Attorney Fees*, ¶ 2.06[3], at 2-88 (Matthew Bender 2010) (noting that, "when appropriate circumstances have been identified, a court may award a percentage significantly higher" than 25 percent); 4 *Newberg on Class Actions*, § 14:6, at 551 (4th ed. 2002) ("Empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in class actions average around one-third of the recovery.").

*N.M.*, 1992 WL 278452, at *7 (S.D. Cal. July 28, 1992) ("If this were a non-representative litigation, the customary fee arrangement would be contingent, on a percentage basis, and in the range of 30% to 40% of the recovery.").

The record here leaves no doubt that Class Counsel's fee request is appropriate and comports with attorneys' fee awards in similar cases. *See* Fitzpatrick Decl. ¶¶ 24-25. Professor Fitzpatrick distilled several major empirical studies of attorneys' fees, including his own, awarded in connection with class action settlements. *Id*. at ¶ 25. He concluded that the empirical data from those studies supports the reasonableness of a 35% fee award in this case. *Id*.

Class Counsel's fee request also falls within the range of awards in numerous other cases within this Circuit and elsewhere. *See* Fitzpatrick Decl. ¶ 21; *see also, e.g*., *Waters*, 190 F.3d 1291 (11th Cir. 1999) (affirming fee award of 33⅓ percent on settlement of $40 million even though most of the fund ultimately reverted to the defendant); *Swift v. BancorpSouth Bank*, No. 1:10-cv-00090-GRJ, 2016 U.S. Dist. LEXIS 196328, at *41 (N.D. Fla. July 15, 2016) (35% of $24 million settlement of high-to-low overdraft fee claims following remand from MDL 2036); *Gutter v. E.I. Dupont De Nemours & Co*., 95-2152-CIV-Gold (S.D. Fla. May 30, 2003) (33⅓ percent of $77.5 million settlement); *Sands Point Partners, LP v. Pediatrix Med. Group, Inc*., 2002 U.S. Dist. LEXIS 25721 (S.D. Fla. 2002) (30 percent of $12 million settlement); *In re CHS Elecs., Inc. Sec. Litig*., 99-8186-CIV-Gold (S.D. Fla. 2002) (30 percent on settlement of over $11 million); *Ehrenreich v. Sensormatic Elecs. Corp*., 95-6637-CIV-Zloch (S.D. Fla. 1998) (30 percent on settlement of over $44 million); *Tapken v. Brown*, 90-0691-CIV-Marcus (S.D. Fla. 1995) (33 percent of $10 million settlement).[6]

---

[6] *See also In re Friedman's, Inc. Sec. Litig*., 2009 WL 1456698 (N.D. Ga. May 22, 2009) (30 percent); *Francisco v. Numismatic Guar. Corp. of Am*., 2008 WL 649124 (S.D. Fla. 2008) (30 percent); *Pinto v. Princess Cruise Lines, Ltd*., 513 F. Supp. 2d 1334 (S.D. Fla. 2007) (30 percent);

7.    **The Remaining *Camden I* Factors Counsel in Favor of the Requested Fee.**

The remaining *Camden I* factors likewise support granting Class Counsel's fee request. "[C]lass counsel count among their number some of the most experienced and highly regarded lawyers in the United States.  These are not mere 'benchmark' lawyers.  Indeed, had class counsel not been so talented, I doubt the class would have received the compensation that is provided in this settlement."  *See* Fitzpatrick Decl. ¶ 28.  Moreover, without adequate compensation and financial reward, cases such as this simply could not be pursued.  The Court previously held that, "given the positive societal benefits to be gained from lawyers' willingness to undertake difficult and risky, yet important, work like this, such decisions must be properly incentivized."  *Checking Account Overdraft*, 830 F. Supp. 2d at 1364.

In sum, the record before the Court amply justifies the increased fee request in his case. *See* Fitzpatrick Decl. ¶¶ 21-32.

8.    **The Expense Request Is Appropriate.**

Class Counsel also request reimbursement for a total of $92,899.19 in limited litigation costs and expenses.  Joint Decl. ¶ 94; *see Mills v. Electric Auto-Lite Co*., 396 U.S. 375, 391-92 (1970).  This sum corresponds to certain limited actual out-of-pocket costs and expenses that Class Counsel necessarily incurred and paid in connection with the prosecution of the Action and the Settlement.  Joint Decl. ¶ 94.  Specifically, these costs and expenses consist of: (1) $83,800.00 in fees and expenses incurred for experts, principally Arthur Olsen, whose services were critical in

---

*In re BellSouth Corp. Sec. Litig*., Civil Action No. 1:02-cv-2142-WSD (N.D. Ga. Apr. 9, 2007) (30 percent); *In re Cryolife, Inc. Sec. Litig*., Civil Action No. 1:02-cv-1868-BBM (N.D. Ga. Nov. 9, 2005) (30 percent); *In re Profit Recovery Group Int'l, Inc. Sec. Litig*., Civil Action No. 1:00-cv-1416-CC (N.D. Ga. May 26, 2005) (33⅓ percent plus interest and expenses); *In re Clarus Corp. Sec. Litig*., Civil Action No. 1:00-CV-2841-CAP (N.D. Ga. Jan. 6, 2005) (33⅓ percent); *In re Pediatric Servs. of Am., Inc. Sec. Litig*., Civil Action No. 1:99-CV-0670-RLV (N.D. Ga. Mar. 15, 2002) (33⅓ percent); *Ressler v. Jacobson*, 149 F.R.D. 651 (M.D. Fla. 1992) (30 percent).

determining the damages for the Settlement Class, in identifying members of the Settlement Class, and in allocating the Settlement Fund; (2) $8,229.69 in court reporter fees and transcripts associated with depositions and hearings in the Action; and (3) $869.50 associated with the printing of briefs for the United States Supreme Court.[7]  *Id.*  These out-of-pocket expenses were reasonably and necessarily incurred and paid in furtherance of the prosecution of this Action.  *Id.*

## V.    CONCLUSION

The Settlement with PNC securing $7,500,000 in cash compensation for the benefit of the Settlement Class represents an excellent result given the obstacles confronted in this Action.  The Settlement more than satisfies the fairness, reasonableness and adequacy standard of Rule 23(e)(2), as well as the class certification requirements of Rules 23(a) and (b)(3).  Further, Class Counsel's application for fees and expenses is reasonable under all the circumstances.  The request satisfies the guidelines of *Camden I* given the results achieved, the notable litigation risks, the extremely complicated nature of the factual and legal issues, and the time, effort and skill required to litigate claims of this nature to a satisfactory conclusion.

Accordingly, Plaintiffs and Class Counsel respectfully request that this Court (1) grant Final Approval to the Settlement; (2) certify for settlement purposes the Settlement Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(3), and 23(e); (3) appoint as Class Representative the Plaintiff listed in paragraph 24 of the Agreement; (4) appoint as Class Counsel and Settlement Class Counsel the law firms and attorneys listed in paragraphs 22 and 51 of the Agreement, respectively; (5) approve the requested Service Award for the Class Representative; (6) award Class Counsel attorneys' fees and expenses; and (7) enter Final Judgment dismissing the Action

---

[7] Class Counsel have limited the categories of expenses for which reimbursement is being sought to those enumerated above and are not seeking reimbursement for thousands of dollars in other expenses that are routinely sought and recovered in common fund class actions.  Joint Decl. ¶ 95.

with prejudice.

Dated: February 25, 2020.

Respectfully submitted,

/s/ Aaron S. Podhurst
Aaron S. Podhurst, Esquire
Florida Bar No. 063606
apodhurst@podhurst.com
PODHURST ORSECK, P.A.
One Southeast Third Avenue
Suite 2700
Miami, FL 33131
Tel: 305-358-2800

/s/ Bruce S. Rogow
Bruce S. Rogow, Esquire
Florida Bar No. 067999
brogow@rogowlaw.com
Bruce S. Rogow, P.A.
100 Northeast Third Avenue
Suite 1000
Fort Lauderdale, FL  33301
Tel: 954-767-8909

/s/ Robert C. Gilbert
Robert C. Gilbert, Esquire
Florida Bar No. 561861
rcg@grossmanroth.com
GROSSMAN ROTH YAFFA
    COHEN, P.A.
2525 Ponce de Leon Boulevard
Suite 1150
Coral Gables, FL 33134
Tel: 305-384-7269

*Settlement Class Counsel*

E. Adam Webb, Esquire
Georgia Bar No. 743910
Adam@WebbLLC.com
G. Franklin Lemond, Jr., Esquire
Georgia Bar No. 141315
FLemond@WebbLLC.com
WEBB, KLASE & LEMOND, L.L.C.
1900 The Exchange, S.E., Suite 480
Atlanta, GA 30339
Tel: 770-444-9325

Michael W. Sobol, Esquire
California Bar No. 194857
msobol@lchb.com
LIEFF CABRASER HEIMANN &
    BERNSTEIN L.L.P.
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111
Tel: 415-956-1000

Russell W. Budd, Esquire
Texas Bar No. 03312400
rbudd@baronbudd.com
BARON & BUDD, P.C.
3102 Oak Lawn Avenue
Suite 1100
Dallas, TX 75219
Tel: 214-521-3605

Richard Golomb, Esquire
Pennsylvania Bar No. 42845
rgolomb@golombhonik.com
GOLOMB & HONIK, P.C.
1515 Market Street, Suite 1100
Philadelphia, PA 19102
Tel: 215-985-9177

Jeffrey M. Ostrow, Esq.
Florida Bar No. 121452
ostrow@kolawyers.com
Jonathan M. Streisfeld, Esq.
Florida Bar No. 117447
streisfeld@kolawyers.com
KOPELOWITZ OSTROW FERGUSON
    WEISELBERG GILBERT
One West Las Olas Boulevard, Suite 500
Fort Lauderdale, FL 33301
Tel:  954-525-4100

David S. Stellings, Esquire
New York Bar No. 2635282
dstellings@lchb.com
LIEFF CABRASER HEIMANN &
    BERNSTEIN L.L.P.
250 Hudson Street, 8th Floor
New York, NY  10013
Tel: 212-355-9500

Ted E. Trief, Esquire
New York Bar No. 1476662
ttrief@triefandolk.com
TRIEF & OLK
150 E. 58th Street, 34th Floor
New York, NY 10155
Tel: 212-486-6060

Darren Kaplan, Esq.
New York Bar No. 2447381
dkaplan@darrenkaplanlaw.com
DARREN KAPLAN LAW FIRM, P.C.
1359 Broadway
Suite 2001
New York, NY 10018
Tel:  212-999-7982

*Class Counsel*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 09-MD-02036-JLK

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ *Robert C. Gilbert*
Robert C. Gilbert, Esquire
Florida Bar No. 561861
GROSSMAN ROTH YAFFA
   COHEN, P.A.
2525 Ponce de Leon Boulevard
Suite 1150
Coral Gables, FL 33134
Tel: 305-384-7269